# EXHIBIT "C"
# PART ONE

Case 3:08-cv-00443-BEN-POR Document 12-2 Filed 06/20/2008 Page 1 of 43

BANNING MICKLOW & BULL LLP
William L. Banning, State Bar No. 75757
Edward M. Bull III, State Bar No. 141996
501 West Broadway, Suite 2090
San Diego, California 92101
Telephone: (619) 230-0030
Facsimile: (619) 230-1350

Attorneys for Counter-Claimants
Mi Barur, Inc., Arsenio Farell
and Norma Farell

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEW HAMPSHIRE INSURANCE COMPANY,<br>Plaintiff,<br>vs.<br>MI BARUR, INC.,<br>Defendant.<br>———<br>MI BARUR, INC., ARSENIO FARELL and NORMA FARELL,<br>Counter-Claimants,<br>vs.<br>NEW HAMPSHIRE INSURANCE COMPANY, and DOES 1-10<br>Counter-Defendants. | Case No. 08 CV 0443 BEN POR<br><br>**COUNTER-CLAIM FOR BREACH OF INSURANCE CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, FRAUD, NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, LIBEL AND SLANDER**<br><br>**DEMAND FOR JURY TRIAL** |

**I.**

**INTRODUCTORY ALLEGATIONS**

1. This is an action for breach of insurance contract, breach of the implied covenant of good faith and fair dealing, fraud, negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, libel and slander brought by the owners of a yacht against their insurance company resulting from the insurer's

wrongful denial of coverage for a yacht fire that totally destroyed the vessel.

2. Counter-Claimant MI BARUR, INC. ("Mi Barur") is a corporation organized and existing under the laws of the State of Delaware.

3. Counter-Claimants ARSENIO FARELL ("Mr. Farell") and NORMA FARELL ("Mrs. Farell") are individuals and are husband and wife. They are citizens and residents of the Republic of Mexico.

4. Counter-Claimants are insureds under one or more of the policies of insurance issued by Counter-Defendant NEW HAMPSHIRE INSURANCE COMPANY ("NHIC") as more fully set forth below.

5. Counter-Claimants are informed and believe and thereon allege that Counter-Defendant NHIC is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in New York, New York.

6. Counter-Claimants are ignorant of the true names and capacities of the Counter-Defendants sued herein as DOES 1-10, inclusive, and therefore, Counter-Claimants sue these Counter-Defendants by such fictitious names. Counter-Claimants are informed and believe and thereon allege that each of these fictitiously named Counter-Defendants is responsible and liable in some manner for the occurrences and Counter-Claimants' damages herein alleged. Counter-Claimants will amend this Counter-Claim to allege their true names and capacities when ascertained.

7. Counter-Claimants are informed and believe and thereon allege that at all times herein mentioned each of the Counter-Defendants was and is the agent, alter ego, partner, joint venturer, co-conspirator, principal, shareholder, servant, employer, employee and the like of each of the other Counter-Defendants, and in doing the things hereinafter mentioned, was acting within the course and scope of that Counter-Defendant's authority as such agent, alter ego, partner, joint venturer, co-conspirator, principal, shareholder, servant, employer, and employee and the like of the other Counter-Defendants with the permission, ratification or consent of the other Counter-Defendants, and each of them, and thus, each Counter-Defendant is legally liable for

all damages, including punitive damages, if any, resulting from the acts and/or omissions of each of the other Counter-Defendants.

8. Jurisdiction exists pursuant to 28 U.S.C. §1332.

9. Venue is proper in this district because one or more of the insurance contracts at issue in this action were issued in the Southern District of California, Defendant and Counter-Claimant Mi Barur has its principal place of business in this district, a substantial part of the events and omissions giving rise to this claim occurred within the Southern District of California and NHIC has already filed a complaint against Defendant and Counter-Claimant Mi Barur in this district.

10. Mr. Farell comes from a family of four children. He and each of his siblings are highly educated and graduated *summa cum laude* from prestigious schools. Mr. Farell is an attorney; his brother is a cardiologist; one of his sisters is a mathematician and another is a dentist. For many generations, Mr. Farell's family has been widely recognized as one of the wealthiest in Mexico, and Mr. Farell's father (who passed away in 2006) was one of the top trial attorneys in the country for over twenty years. Mr. Farell followed in his father's footsteps and chose to be a trial attorney. A year after Mr. Farell finished law school in 1971, his father went into government service. Mr. Farell joined his father's law firm and ultimately came to lead the firm (which was founded in the late nineteen forties). During his thirty years of government service, Mr. Farell's father led various important government departments (for a long period, one level below the President) for five Mexican Presidents (with different ideologies, but requiring an administrator and politician of his skills and knowledge).

11. Mr. Farell has been, and still is, a legal counsel and trial attorney for many of the most important and influential businesspeople in Mexico and of many huge Mexican and foreign corporations, including several major insurance companies. He has also been counsel to Presidents and heads of government departments. At the time of this loss, Mr. Farell was comfortably leading his law firm through some of its

most prosperous and successful years.

12. Mr. Farell has been joyfully married to Mrs. Farell since 1977. In addition to a large and beautiful house that they have owned for over twenty-five years in Mexico City, a remarkable collection of automobiles and a stable full of pure blood horses, Mr. Farell is also the owner of a stunning beach front weekend house in Acapulco and an exceptional collection of paintings and sculptures from renowned Mexican artists. Mr. Farell has enjoyed leisure boats and yachts for many years. Mr. Farell also owns a third home as well as his office building in Mexico City (along with a law partner). All his properties and vessels are virtually debt free.

13. Mr. and Mrs. Farell's daughters have recently married (the last one last year). Their elder daughter is both a biologist and psychologist and holds dual Master's Degrees (one in mathematics) from Boston University and the University of Massachusetts. She is married to a Professor and both of them are to begin working at Yale University in August of this year. Mr. Farell's younger daughter is also married and living with her husband at Stanford University. At this time, Mr. Farell has greater personal wealth than at any prior time in his life. Mr. Farell has virtually no debts, outstanding obligations or financial problems of any kind.

14. Mr. Farell has owned numerous high-end boats and yachts over the last twenty-five years. In the larger yacht category, Mr. Farell owned a 42-foot Grand Banks, a 55-foot Grand Banks and a 75-foot DeFever before he purchased the 92' Hatteras MI BARUR. Mr. Farell purchased each of these vessels for cash, never carried any loans on any of his yachts, and always fully insured such vessels. In addition to owning the MI BARUR on the date of loss, Mr. Farell also owned a 29-foot yacht which he docks at his beachfront home in Acapulco. Mr. Farell maintains a berth at the Acapulco Yacht Club (for which he paid $120,000). Mr. Farell has never made an insurance claim.

15. MI BARUR, a 1990, 92-foot Hatteras motor yacht, was in pristine condition at the time of her loss; impeccably maintained and the product of one of the

Case 3:08-cv-00443-BEN-POR Document 12-2 Filed 06/20/2008 Page 5 of 43

most sought after, distinguished and respected yacht builders. At the time of her last survey, completed by marine surveyor Cecil Lange in September of 2007, the vessel was found to have a market value of $2,300,000 ("in its present condition") and a replacement cost of $5,500,000. At that time, the hull of the yacht, "including the decks, superstructure flying bridge and boat deck were found to be in excellent condition . . . ." The interior of the vessel was described as "excellent and like new condition throughout" and overall Lange commented that she was "a vessel that has been well maintained and a credit to her owner." *See* a true and correct copy of the Survey and Evaluation report for the motor vessel "MI BARUR" attached as **Exhibit A-1** hereto. A Demand letter of May 23, 2008 and a Supplemental Proof of Loss are also attached hereto collectively as **Exhibit A.**

16. When initially offered for sale by her prior owner, the asking price was $2,400,000. *See* the Hallmark Central Listing Agreement dated 6/16/03 and the cover sheet of the resultant listing, **Exhibits A-2 and A-3** to the Supplement Proof of Loss. In a prior listing, under the name ARRIVEDERCI III, the asking price for the vessel was $3,250,000. *See* the Merle Wood and Associates listing, **Exhibit A-4** attached hereto. In 1997, one Marion Knight purchased the MI BARUR for $2,850,000. He insured the vessel for $2,825,000. *See* **Exhibit A-5** attached hereto. Finally, when the boat was surveyed immediately prior to her purchase by Mr. Farell, she was surveyed by marine surveyor Marvin Henderson and found to have an estimated market value of $2,200,000. *See* the cover sheet to the Marvin Henderson survey dated September 7, 2003, **Exhibit A-6** attached hereto.

17. In the fall of 2003, seeking to purchase a larger boat to replace his 75-foot DeFever, Mr. Farell decided to purchase the 92-foot Hatteras, later to be named MI BARUR. Mr. Farell's yacht broker of many years, Michael Hallmark, had advised him that the current owner of the Hatteras was experiencing financial troubles and that an opportunity existed to get an exceptional deal on this high-end motor yacht. After a period of negotiations, Mr. Farell indeed purchased the Hatteras for a payment of

$900,000 cash and the trade-in of his existing yacht, the DeFever.

18. Prior to the transfer in question, the prospective owner arranged for a survey of the DeFever by Marvin Henderson, who placed the fair market value of the vessel at that time at $1,400,000. *See* the cover sheet of the Marvin Henderson survey of September 17, 2003, **Exhibit A-7** attached hereto. Counter-Claimants are informed and believe that at the time, Calcote was under financial duress, and as a result thereof, he later reduced the price to $1.1 million and then to $950,000 (*see* the Hallmark listings for said vessel, **Exhibit A-8** attached hereto). He ultimately sold the boat for $620,000. However, there is nothing to suggest that the fair market value of this vessel was less than $1,000,000 (had Calcote had the financial wherewithal to sell the vessel in the normal course). After the trade in, Zurich Insurance Company insured the DeFever's hull and machinery for $1.4 million. When the subsequent owner, Mr. Augustin Rodriguez, later listed the DeFever for sale (in February of 2006), he also valued the boat at in excess of one million dollars ($1.1 million). *See* Cover Note 5170 and the Hallmark Central Listing Agreement dated February 8, 2006, collectively **Exhibit A-9** attached hereto.

19. In addition to the above-referenced cash payment and yacht trade, following the purchase of the MI BARUR, Mr. Farell invested well in excess of $300,000 in additional upgrades and equipment for his new yacht. Prior to the denial of this claim, NHIC's agent and attorney obtained a full copy of Hallmark's file on this vessel. In said file were detailed documents evidencing the nature and extent of such work. Also in the file was a complete ledger report prepared by Hallmark showing that Mr. Farell spent in excess of $300,000 on vessel up-grades in the fall of 2003 alone. *See* Mr. Hallmark's Register Reports, **Exhibit A-10** attached hereto. Using these figures, the amount spent by Mr. Farell for the cost of the 92-foot Hatteras MI BARUR, including equipment, can be conservatively estimated at over $2.3 million (even valuing the DeFever at only $1.1 million and the upgrades at only $300,000).

20. When purchased by Mr. Farell, the Hatteras was a Coast Guard documented U.S. flagged vessel. It is common and perfectly legal for Mexican owners to fly a U.S. flag on such a vessel. As Mr. Farell explained in his Examination Under Oath, there were numerous legal benefits for him to continue to fly the U.S. flag on his yacht. Not only would maintaining the U.S. flag make it easier to resell the vessel (in the U.S. market or to another non U.S. citizen), but Mr. Farell had experienced firsthand that flying the American flag improved the treatment he received when calling in various ports in Mexico and elsewhere.

21. Mr. Farell also chose to hold title to the vessel in a single vessel holding corporation, a practice, as NHIC is well aware, that is very common for both recreational and commercial vessels. This is a common and perfectly legal practice. *See* the Declaration of Michael Hallmark, paragraph 9, and Paul Trusso, paragraph 4, **Exhibits A-11 and A-12** attached hereto. Furthermore, the holding by Mexican nationals of 100% of the stock in such a U.S. single vessel corporation is completely legal and is specifically approved by 46 C.F.R. §67.39. *See* the Declaration of Paul Trusso, paragraph 5. NHIC commonly insures such single vessel corporations, including companies where the stock is entirely held by Mexican citizens. *See* the Declaration of Henry Medina, paragraph 8, **Exhibit A-13** attached hereto. Indeed, when NHIC and similar marine insurance hull underwriters insure such recreational vessels, none of their standard application forms or questionnaires even inquire as to the nationality of the ownership of such single vessel corporations. *See* the Medina declaration, paragraph 8 and **Exhibit A-14** attached hereto.

22. Upon purchasing MI BARUR, Mr. Farell arranged for hull and P & I insurance for the vessel through Henry Medina of Mariners General Marine of San Diego ("Mariners General"). Although Mariners General received various quotes on the vessel (*see, e.g.*, the Chubb quote of 9/18/03 with hull limits of $2,200,000, a $44,000 deductible, and an annual premium of $12,645, **Exhibit A-15** attached hereto), at the advice of Medina, the yacht was ultimately insured by Zurich. A copy

of the Mariners General Cover Note #5171 indicates coverage effective September 23, 2003, with hull and machinery coverage in the amount of $2,200,000 (per the Henderson survey), a $44,000 deductible, and an annual premium of $20,990. *See* **Exhibit A-16** attached hereto. Zurich also offered to renew their policy the following year for the same policy limits and at a similar premium rate. *See* the Zurich quote dated August 16, 2004, **Exhibit A-17** attached hereto.

23. As the 2004 renewal deadline for the policy approached, Medina contacted other insurers, including the NHIC's general agent, Maritime General Agency ("MGA"). Medina advised MGA that he was currently insuring the vessel with Zurich, but was "looking for better coverage and premium." *See* the fax cover sheet from Medina to Chris Clark of August 17, 2004, **Exhibit A-18** attached hereto. This inquiry led to the issuance of the first NHIC policy on MI BARUR, that was to be renewed the following three years. The third year's policy was the one in effect when MI BARUR was destroyed by fire on October 20, 2007.

24. The application process was conducted entirely by Medina based upon NHIC's underwriting guidelines (as he understood them and based upon his conversations and experience with MGA). The application information was placed on a standard form utilized by Mariners General on prior placements with NHIC. A true and correct copy of the Yacht Insurance Application is attached as **Exhibit A-19** attached hereto. As alleged below, the initial submission to MGA included not only the cover sheet and the Mariners General standard application form, but also an updated yacht quote questionnaire prepared by Medina (**Exhibit A-20** attached hereto), a copy of the September 7, 2003 survey prepared by Henderson, and the resume for the vessel's Captain, Luis Manuel Rello (as well as other certificates and other documents attached thereto).

25. The following day, MGA's Clark e-mailed Medina attaching a quotation and requesting certain additional information including a signed compliance letter regarding the outstanding recommendation items on the Henderson survey and a

severe weather plan ("Weather Plan"). *See* a copy of Clark's August 18, 2004 email, **Exhibit A-21** attached hereto. Furthermore, when Medina responded and asked whether the original 2003 application would work to bind coverage, Clark responded that indeed it would. *See* the further e-mail exchange of August 18, 2004, **Exhibit A-22** attached hereto. Medina also promised to forward the compliance letter under separate cover.

26. Thereafter on September 14, 2004, Medina faxed the signed compliance letter to MGA as requested. *See* Medina's e-mail of September 14, 2004, the requested Weather Plan and the sign off compliance, **Exhibits A-23, A-24 and A-25** attached hereto. Thereafter, on September 23, 2004, NHIC did in fact issue policy EY 341-92-25 with an agreed hull value of $2,200,000, a hull deductible of $44,000, and a hull premium of $16,060. *See* the 2004-2005 Declarations Page, **Exhibit A-26** attached hereto. That policy was renewed twice by NHIC (with the same limits, deductible and hull premium), once on September 23, 2005, and again on September 23, 2006, each time with only a single page questionnaire and no further inquiry. *See* the NHIC Insurance Company declaration pages for policy periods 9/23/2005 to 9/23/2006, and 9/23/2006 to 9/23/2007, **Exhibits A-27 and A-28** attached hereto.

27. During the application process, and in related correspondence and conversations, Medina worked as an intermediary between NHIC and the Insureds and was thus particularly familiar with their underwriting guidelines. Medina gave all information which he considered to be material to NHIC, based on his many years of experience in the marine insurance business in general, and with NHIC in particular, in addition to any and all materials requested by the representatives of NHIC. Medina had absolutely no incentive to misrepresent or conceal any facts, had experienced no trouble whatsoever insuring this yacht in the past, and had received quotes with lower premiums from other insurers. Medina had insured many vessels held by single vessel owning corporations and/or Mexican citizens, and had never had any problem or any indication from any underwriter, including Clark or any others at NHIC, that either of

these considerations were considered negative risk factors by the underwriters. Clark and other representatives of NHIC were never shy about requesting information they felt was important to them. Mr. Farell was always completely forthcoming in his dealings with Medina and fully advised him of all facts regarding his yacht. *See* the declaration of Henry Medina, paragraphs 5, 6, and 7, **Exhibit A-13** attached hereto.

28. In addition to the fact that Mr. Farell disclosed all material information to Medina, Medina also disclosed all material information regarding the identity of the insured to NHIC as part of the initial application process. First, on both the standard yacht insurance application form and the yacht quote questionnaire (**Exhibits A-19 and A-20** attached hereto), the owner of the vessel was properly identified as Mi Barur, Inc. Given that the name of the vessel was also disclosed, it was abundantly clear to anyone with any experience in the maritime industry, that Mi Barur, Inc. was a single vessel holding corporation (a very common and legal arrangement). Second, the fact that Mr. Farell was the beneficial owner of the vessel and a Mexican citizen were also clearly disclosed. On both the yacht quote questionnaire and the yacht insurance application, the occupation of the owner is identified as "Attorney." Not only did the insurance application indicate that Mr. Farell employs a "Licensed Mexican Captain," but the cover page of the Marvin Henderson marine insurance survey dated September 7, 2003 (**Exhibit A-6** attached hereto) indicated that the survey was done at the request of Mr. Farell, with an address of "**Gutenberg 147 Col. Anzures, Mexico City, MX D.F. 11590**". Furthermore, when Medina was asked why the Captain's resume was in Spanish, he told Clark that the owners, crew etc., of the MI BARUR were "Mexicans." *See* the declaration of Henry Medina, paragraph 11, **Exhibit A-13** attached hereto.

29. In support of the application for coverage submitted to NHIC, Medina also disclosed to NHIC the market value of the MI BARUR as $2,200,000 based on the September 7, 2003 survey by Marvin Henderson. *See* the yacht quote questionnaire, **Exhibit A-20** attached hereto. Additionally, on the standard

application form under the heading "costs, including equipment" the figure of $2,200,000 was again entered. This, again, is a conservative figure given that Mr. Farell paid $900,000 in cash for the vessel, traded in a vessel with a survey value of $1.4 million (the DeFever) and invested in excess of $300,000 in upgrades immediately after purchasing the vessel. Notwithstanding the fact that Medina later suggested that Mr. Farell obtain an updated survey (in the fall of 2007), no representative of NHIC ever requested any further information regarding the value of the vessel, a further survey, or further details regarding the cost of the vessel. *See* the Medina Declaration, paragraph 12, **Exhibit A-13** attached hereto.

30. Medina also accurately disclosed the anticipated trading patterns of the vessel. Indeed, he not only disclosed these patterns, but additional premiums were charged and the deductible was increased to allow the vessel to travel as far south as Acapulco, Mexico. First, both the application and the yacht questionnaire described the location of where the vessel was moored as "San Diego/Acapulco." Second, the Weather Plan showed the vessel would travel in the La Paz area as well. During the years NHIC insured the vessel, she actually traveled within the areas identified in the application and the Weather Plan. *See* **Exhibit A-24** attached hereto. At the time that the vessel was purchased, and her extensive outfitting was completed (*i.e.* when the application was prepared), the vessel was in San Diego. It would, in fact, have been an omission, if not a misrepresentation, not to list San Diego on the document. Third, because Mr. Farell had always used a San Diego based yacht broker to buy and sell his yachts and had always had major repairs performed on his vessels by top boat yards in San Diego, this was a necessary disclosure given the probable future use and mooring of the vessel in these waters.

31. Medina was well aware, at the time of making these submissions, that it was very common for yachts to remain in Mexico for the entire year and that this was not an issue that was of any concern to any insurer he worked with, including NHIC. *See* the Medina Declaration, Paragraph 9, **Exhibit A-13** to Supplemental Proof of

Loss. Indeed, for the initial policy year, and each year there after, the vessel trading warranty was adopted pursuant to the navigation endorsement (Endorsement No. 1) specifically to allow the MI BARUR to travel to as far south as Acapulco, in exchange for an additional premium and an increase deductible. *See* **Exhibit A-29** attached hereto. If NHIC believed that its risk would be materially increased if the yacht operated out of the United States for an extended period of time, the Policy obviously could have included a limit on the time the MI BARUR could remain in Mexico. **Nowhere in the Policy is the vessel required to return to U.S. waters for any period of time.** Indeed, it is not uncommon for insurers that do want a vessel to return to a specific location to so mandate in the trading warranty or elsewhere in the Policy. *See* the Medina Declaration, Paragraph 10, **Exhibit A-13** to Supplemental Proof of Loss.

32. Approximately a year before the loss in question, Mr. Farell decided that he was going to sell the MI BARUR and purchase a smaller yacht. The MI BARUR had always been used as a center of family life and relaxation, and given that both of Mr. and Mrs. Farell's daughters were leaving Mexico to study in the United States, the Farells felt that the 92-foot Hatteras was simply too large for the couple at this stage in their lives.

33. Mr. Farell was willing to take the time needed to get a reasonable price and was never an anxious seller. However, he was flexible in price when the market suggested a reduced asking price and he had the financial ability to reduce his price with ease. For example, while the boat was originally offered for $2.7 million, the price was later lowered to $2.2 million at the suggestion of Mr. Farell. *See* the Hallmark Declaration, paragraph 1, **Exhibit A**-11 attached hereto. Mr. Farell was not in anyway desperate for money. Mr. Farell rejected multiple offers on the MI BARUR; two that Mr. Hallmark was aware of, one for $1.6 million cash and one for $1.85 million (including a home trade), and a third made directly to Mr. Farell for $1,000,000 and a 75' Italian yacht. *See* the Hallmark Declaration, Paragraph 11,

**Exhibit A-11** attached hereto.

34. In July 2007, Mr. Farell strongly considered moving MI BARUR to Florida to experience a different cruising ground and a better yacht market. According to one of Hallmark's competitors (Merrill-Stevens Yachts), Florida was a better market for a yacht the size of MI BARUR. All of this information was conveyed to NHIC and the 2007-2008 renewal was set to have revised trading restrictions accordingly. Merrill-Sevens also produced a $200,000 deposit and an offer for the yacht at $1,750,000. Ultimately before the renewal date, it was decided not to take the boat to Florida and to keep the boat in waters from San Diego to Acapulco. Consequently, the Policy renewed with the original trading warranty. Also, during the time prior to the 2007 renewal, Mr. Farell was considering bringing the boat back to San Diego and Hallmark had even made inquiries on arranging for a slip for the boat on Shelter Island in San Diego. *See* the Hallmark Declaration, Paragraph 12.

35. The Agreed Value for the 2007-2008 policy of $1.9 million was not based on any request or representation by the Insureds, but was based on independent research by MGA's underwriter, Michael Terrier. *See* the Declaration of Henry Medina, Paragraph 13 and the e-mail from Terrier to Medina of August 28, 2007, **Exhibit A-30** attached hereto.

36. Ultimately, with the boat remaining in LaPaz (and possibly being brought back to San Diego for sale), Medina requested the Policy be renewed with the same trading warranty; "a San Diego, La Paz, Acapulco vessel." *See* Medina's e-mail to Michael Terrier of September 20, 2007, **Exhibit A-31** attached hereto. All of the previously disclosed facts remained true and accurate and no additional information was requested by NHIC. The only material change in the coverage was as a result of Mr. Terrier's unilateral new valuation and the need to write the boat under the Yacht, rather than the Executive Yacht form. *See* the September 23, 2007 Declaration Page referencing new policy form BJP 2191-A (8/06), **Exhibit A-32** attached hereto. At

the time of the issuance of the Policy, Mr. Farell had been an insured with NHIC for three loss free years and had paid premiums of over $70,000.

37. As of the date of the loss (October 20, 2007), Captain Rello had worked for the Farells for over ten years as the full-time Captain of MI BARUR and prior yachts owned by the Farells. Captain Rello is a graduate of the Mexican Naval Academy, has excellent credentials and has no criminal record. Captain Rello was, at all times, well compensated and well liked by the Farells, and happily employed with no complaints about his employer. Captain Rello was an admitted smoker, but did not smoke in the lower enclosed cabins on the MI BARUR. No evidence exists that would demonstrate any reason why Captain Rello would intentionally set fire to MI BARUR. Moreover, he has passed a polygraph test demonstrating he was telling the truth when he told Murphy he did not commit arson.

38. On October 20, 2007, the vessel lay at her normal berth at the Marina Palmira in LaPaz, Baja Sur, Mexico. The marina is located in a major metropolitan area and is well served by police and fire services. The fire was first reported at approximately 9:30 a.m. The MI BARUR was moored on the starboard side, facing north at slips 201 and 203 located at the east end of dock No. 2. No one was on board the motor yacht at the time the fire was reported. Captain Rello had left the vessel approximately one hour before the fire was reported.

39. Multiple calls were received by witnesses within the marina, who observed white or light grey smoke emanating from the forward, starboard side, of the vessel. Two of the witnesses, Francisco Robles and Alfredo Amador, were working on adjacent vessels towards the middle of dock No. 2 and observed the early stages of the fire. Both men ran to the yacht, disconnected the shore-power, and boarded the vessel. They entered through the galley passageway door located amid-ships, main deck level, at the starboard (right) side of the vessel, and observed a smoke layer banking down from the overhead to about three-to-four feet off the galley deck. All smoke was observed light grey in color and emanating from the companion way stairs

leading down to the forward crew's quarters and VIP stateroom. Robles was able to get some three steps down the stairs before he was driven back by the smoke. There was very little heat and he felt that he could have gone down further if it was not for the smoke.

40. When he returned to the marina, Captain Rello got some help and moved the vessel from its original moored position at the west end dock No. 2 to north side of dock No. 7, on the interior east side of the marina breakwater. The vessel was moved so that other vessels would not be harmed by the fire and to provide better access for fire suppression equipment. Local firefighters arrived on the scene and observed heavy flames emanating from the galley door and salon. Firefighters began suppression operations, but were driven off the vessel by the intensity of the fire that had developed by that time. Firefighters then re-directed their efforts to the exterior of the vessel. Suppression effort and pumping of large quantities of water aboard the yacht continued until approximately 2:00 p.m., when the fire was thought to be completely extinguished. The MI BARUR and all contents sustained a total fire loss. The following morning a "re-kindle" occurred on the vessel and the vessel was taken outside the breakwater, where she burned to the water line and sank in shallow water. The vessel was submerged for days prior to being raised and taken to a local marine facility at Abaroa's shipyard, where she was placed in the ways for inspection.

41. The Insureds fully cooperated with the NHIC investigation following the Loss. At the express direction of NHIC and their marine surveyor Todd Schwede, Mr. Farell paid for significant sue and labor efforts to raise the yacht and have her hauled to facilitate the investigations of Schwede and Murphy. Mr. Farell spent in excess of $60,000 of his own money on preserving the yacht and helping NHIC in its on-scene investigation. *See* the Letter of November 5, 2007 from Schwede to Mr. Farell, **Exhibit A-33** attached hereto. Furthermore, Mr. Farell not only submitted a detailed Statement of Loss and provided releases for all of the files maintained by his insurance broker and both of his yacht brokers, he, his Captain, and Hallmark all

submitted to lengthy examinations under oath by counsel for NHIC. The Policy required that the Insureds provide NHIC with only a sworn statement not a videotaped examination under oath by counsel for NHIC.

42. NHIC's fire investigators failed to follow proper fire investigation procedure. As a result, much evidence was lost or destroyed. Mr. Farell indeed wrote to Mr. Schwede about this very issue following the loss. *See* Mr. Farell's letter of October 24, 2007, **Exhibit A-34** attached hereto. Fire investigators are supposed to comply with the requirements of NFPA 921. NHIC repeatedly failed to follow proper fire investigation procedure throughout their investigation. A true and correct copy of Mr. Lyson's peer review report is attached as **Exhibit A-42** attached hereto. NHIC's agents' haphazard use of grappling hooks and other devices to pull wreckage from the hull of the MI BARUR, destroyed critical cause and origin evidence. Further, after NHIC's raised the hull, it was left un-supervised and exposed to theft and tampering for over a week before Murphy returned to complete his cause and origin inspection and investigation. *See* the letter to Todd Schwede from Mr. Farell dated November 5, 2007, **Exhibit A-35** attached hereto. Finally, when Murphy did begin his inspection, his de-layering of the fire debris and removal of equipment was sloppy and haphazard, items being removed, for example, from the Captain's Cabin area and piled on other important areas, such as the Crew Lounge. Other debris was piled ashore, again unprotected.

43. In addition to this flawed technical approach, both Schwede and Murphy had a preconceived agenda to prove that the fire had been intentionally set, rather than conducting an objective investigation (Schwede actually asked various people, before any investigation had been carried out, if Captain Rello had set fire to the MI BARUR). An oral statement made by Schwede to sums up best the approach taken by the NHIC team, **"NEW POLICY, LESS THAN 30 DAYS OLD, TOTAL LOSS, MEXICAN, HE DID IT."** *See* the March 7, 2008, pre-denial e-mail from Mr. Medina to Mr. Robb, **Exhibit A-36** attached hereto and the Medina Declaration,

Paragraph 14.

44. Murphy's conclusion that the fire started in the Captain's Cabin was patently wrong. His conclusion that the fire was started by an arsonist was also patently wrong. Counter-Claimants do not currently know the full relationship between Murphy and NHIC/AIG. Counter-Claimants understand he has been hired on several occasions by NHIC to investigate fires and has received significant fees from NHIC. Counter-Claimants understand that Murphy's wife is an insurance claims adjuster. Counter-Claimants also understand he was attending a marine surveyor's conference in San Diego at the time of the fire and was asked by Todd Schwede and NHIC to participate in the investigation of this fire. While on scene Murphy let slip to Captain Rello that the evidence demonstrated that the fire was started by an electrical short in a refrigeration motor. However, in his report he concluded that the fire began in the "Captain's Cabin" (a cabin that Captain Rello did not use), and that "the Form of Ignition was (caused) by incendiary (intentional arson) human action."

45. Murphy's report has overtones of racial prejudice throughout. For example, Murphy states that Captain Rello was the last person aboard the vessel. He also states that the boat was unlocked (i.e. accessible to anyone within the marina complex, which houses hundreds of boats and is accessible not only by their owners, but their crews, guests, repair personnel, marine workers etc). He then implies that the Counter-Claimants and the marina management were involved in a conspiracy to hide the identity of the arsonist stating that the "identification of the arsonist could be proven by the introduction and/or release of the marina surveillance video recordings." The truth is that the video camera on that dock does not come close to visualizing the area where MI BARUR was docked at the time of the fire. All it visualizes is a small area around the gate. Ironically, Murphy made an appointment to see the video room at the marina and meet with the security personnel, including the technician in charge of the video surveillance system, but he never showed up. Further, if Murphy had requested the video earlier, he would have been given a copy

of whatever film there was prior to the fire. Unfortunately, Murphy waited until the video had automatically recycled.

46. Despite coming to the conclusion that the fire was caused by arson, Murphy found: (1) no specific evidence of incendiary origin; (2) no evidence of any timing device that would explain how Captain Rello could set the fire over an hour before any smoke was noted by persons on the crowded dock; and (3) no evidence of motive or any of the arson indicators that would implicate Captain Rello or Mr. Farell. *See* also the email from attorney Robb to Mr. Medina dated March 7, 2008, wherein even he notes in relation to the Murphy report that "I . . . did not see where he has concluded that Captain Rello started the fire." **Exhibit A-37** attached hereto.

47. Donald Perkins of Fire Cause Analysis, Berkeley, California, has conducted an investigation of the Loss at the request of the Counter-Claimants. Perkins is a retired Captain from the San Jose, California Fire Department. He has extensive fire and arson investigation experience and was the Arson Unit Supervisor/Investigator for that Department for four years. *See* a copy of Perkins resume, **Exhibit A-38** attached hereto. Accompanying Perkins to La Paz was Ron Kilgore of Kilgore Engineering, Inc., and Bill Engstrom, a marine surveyor. Following his investigation, Perkins prepared a Fire Investigation Report in conformance with NFPA 921, **Exhibit A-39** attached hereto. To insure that the Perkins Report met the highest standards of NFPA 921, the Insureds had the Perkins Report peer reviewed by Dr. John Dehaan. Dr. Dehaan is one of the foremost authorities on fire science in the nation.

48. Although Perkins is continuing his investigation at the time this Counter-Claim is filed, he has reached the following conclusions:

A. Based on an objective analysis of the fire patterns, the fire originated in the Crews Lounge located on the lower level on the port side amidship. The fire then spread down the companion way and up the stairs and out the starboard side galley door. Murphy

never even inspected this area, but rather buried it under the debris he had removed from the Captain's Cabin.

B. The fire was probably caused by an undetermined electrical ignition source high within the forward bulkhead/overhead in the Crews Lounge compartment. Given the manner in which NHIC's agents destroyed the evidence at the fire seen; the severe burning of the electrical conductors and components and their degradation from salt water submergence, it is now impossible to identify the specific ignition source.

C. The fire did not reach the Captain's Cabin on the starboard side of the vessel until the vessel was well engulfed in fire, many minutes after ignition. Proof of this point can be found in the fact that the carpet and lower areas of the doors, bunk etc, suffered no fire damage at all due to the fact that they were submerged in water from on-going fire suppression efforts *before* the fire reached this compartment. Had the fire originated in this area, or even reached this area before the fire suppression water, the carpet would necessarily been burned (just as it was in the crew's lounge and cabin on the starboard side of the boat).

D. The cause of the fire was not arson. Pursuant to NFPA investigative criteria, and specifically NFPA 921, the cause of this fire must be ruled "undetermined." As discussed below in relation to his critique of Murphy's report, Perkins found no information or data that would support a conclusion of arson. See a complete copy of Perkins May 9, 2008 report, **Exhibit A-39** attached hereto.

E. Mr. Perkins has determined that there is a "vehicle history" of electrical fires on similar Hatteras yachts, including an electrical

fire in the crew's quarters on a Hatteras 105 built just several years after the MI BARUR.

49. In addition to the Perkins team, Counter-Claimants contacted and retained a highly renowned Mexican fire investigator, Mario Saldana Nolasco. Mr. Nolasco examined the remains of MI BARUR in the presence of Perkins. Mr. Nolasco reached the following conclusions:

A. The point of origin was not the Captain's Cabin.

B. The point of origin was not the Crew's Cabin.

C. The point of origin was the crew's "dinning area" (i.e. Crew's Lounge).

D. The fire was not intentionally set.

E. While the probable cause was electrical in nature, the fire must be deemed of an "unknown" cause. *See* the report of Mr. Nolasco, **Exhibit A-40** attached hereto.

50. In addition to retaining Mr. Perkins to complete his independent fire cause and origin investigation, Counter-Claimants asked Mr. Hal Lyson, another nationally renowned fire investigator, to complete, in his words, an "evaluation of the Maze fire investigation report." In response to this request, Counter-Claimants received, and submit herewith as **Exhibit A-42** attached hereto, Mr. Lyson's report of May 20, 2008. As indicated by way of introduction, Mr. Lyson is highly critical of the methodology of the Maze investigation and its conclusions. The report concludes that:

A. Mr. Murphy violated NFPA 921, section 28.3.5.11, when he "failed to examine the vessel while it was partially submerged" and failed to use "qualified people" to complete the "recovery and documentation," and as a consequence, "allowed for the likely destruction of evidence."

B. Mr. Murphy ignored industry standards and NFPA 921 and did not

thoroughly identify and interview witnesses. As such, he missed valuable information, such as the fact that the smoke and heat of the early stages of this fire simply do not match his conclusions.

C. Mr. Murphy relied on "empirical data" that the electrical system was in proper working order, and ignored NFPA 921 sections 24.2.1-2 when he concluded that there had been no previous problems with the electrical system. Mr. Lyson notes that "NFPA 921 states that a vehicle and appliance history needs to be obtained" and notes that Mr. Murphy failed to do so. Ironically, Mr. Lyson was not even aware of the history of Hatteras electrical fires when he reached these conclusions.

D. Mr. Murphy has identified the cause as "incendiary" with open flame, but ignores the fact that while it took over an hour for this fire to be noticed, a fire of the type identified in his report would "flash over" to "full room involvement" very rapidly, "within minutes."

E. Mr. Murphy concluded that the fire started in a mattress that would "flow like an ignitable liquid and burn on the floor," and yet failed to notice that the carpet in the captain's cabin was not burned.

F. Mr. Murphy violated NFPA 921, section 22.3, when he improperly considered evidence "not directly related to the fire or explosion cause," such as the removal of personal items from the boat.

G. Mr. Murphy ignored the recommendations of NFPA chapters 11 and 16 when he failed to label and identify the evidence and the vessel contents as he removed material from the vessel.

H. Mr. Murphy violated NFPA 921 chapter 17 when he failed to complete "arc mapping" and wiring and circuit tracing (and probably could not even do so with the destruction of this critical

evidence).

I. Mr. Murphy incorrectly and indiscriminately relied on NFPA 921 section 18.2, "Process of Elimination," in a fire where NFPA specifically states that it could not be used.

J. Mr. Murphy violated NFPA 921 section 4.3.7 when he formed the arson hypothesis at least eight days before he even conducted his examination of the vessel.

K. Mr. Murphy ignored the clear requirements of NFPA 921, Chapter 4, when he failed to identify the cause of this fire as "undetermined."

NHIC has been advised of these findings. Given the major faults in the Maze investigation and conclusions, it is a violation of the implied of covenant of good faith and fair dealing for it to have relied on Mr. Murphy's report as a basis of the denial of this claim.

51. NHIC's entire claim of arson is implicitly based upon the assumption that Captain Rello intentionally set MI BARUR on fire (an assumption that does not even appear to be shared by NHIC's counsel, Mr. Geoffrey Robb; "I . . . did not see where he [Mr. Murphy] has concluded that Captain Rello started the fire." **Exhibit A-37** attached hereto). None of the Insureds were present in La Paz on the day of the fire and the only crewmember in La Paz was Captain Rello. Murphy implicitly claims in his report that Captain Rello was lying when he said he did not set fire to the yacht. According to Perkins, while he served as Chief of Arson Investigation for the City of San Jose, it was customary to give polygraph tests to arson suspects if the suspect was willing to take the test. Further, Perkins routinely would rely upon the results of the polygraph tests in forming his opinions concerning the cause of a fire. Consequently, the Insureds arranged to have Captain Rello undergo a polygraph exam on the issues of arson and smoking in the lower level of the yacht (Captain's Cabin and Lounge). During the exam Captain Rello was found to be telling the truth when he said he did

not commit arson and did not smoke in the lower level of the yacht on the day of the fire. A true and correct copy of an English translation of the report of the May 7, 2008 polygraph exam is attached as **Exhibit A-41** attached hereto.

52. NHIC Policy No. YM 868-56-66, effective date from 09/23/2007 to 09/23/2008, lists as the named insured Mi Barur, Inc. The Policy provides hull (Agreed Value) coverage of $ 1,900,000 subject to a 2% deductible of $38,000 and a premium of $14,060. The insured vessel, "Mi Barur," is described as a 92 foot Hatteras, built in 1990. The NHIC Yacht Policy standard form provides hull, protection and indemnity, medical and other incidental coverage per standard conditions [Form BJB 2191-A (8/06)].

53. The insuring language for the hull coverage provides standard "all risk" coverage and states in relevant part:

**<u>GENERAL CONDITIONS AND EXCLUSIONS</u>**

**1. GENERAL CONDITIONS**

. . .

**<u>SECTION "A" - HULL INSURANCE</u>**

**1. WHAT WE INSURE:**

Physical Loss to **Your Yacht: We** shall pay for direct physical loss to **your yacht** arising out of all perils unless otherwise excluded herein.

Those items "otherwise excluded," as set forth on page six of the policy, include the following:

**10. CAUSES OF LOSS THAT ARE NOT COVERED:**

We shall not cover any loss or damage arising out of:

(1) Any intentional misuse or misconduct, or lack of reasonable care or due diligence, in the operation or maintenance of **your yacht** or trailer;

. . .

> (5) Any willful misconduct, criminal, or dishonest act by an insured, **your** employees, or any person to whom **you** entrust **your yacht**;

54. **Part 11 of the General Conditions**, entitled **CONCEALMENT OR MISREPRESENTATION**, also provides that even in the event that a loss in not "otherwise excluded:"

> Any relevant coverage(s) shall be voided if **you** intentionally conceal or misrepresent any material fact or circumstance relating to this insurance or **your** insurance application, whether before or after a loss.

55. The **General Conditions, Part 5**, Entitled **WHAT YOU MUST DO IN THE EVENT OF A LOSS**, also imposes certain affirmative duties on the insured to give notice of any loss and provides, in relevant part, that:

> If **you** have a loss or **claim** that **you** think might be covered under this **policy**, **you** must do the following:
>
> . . .
>
> If **your yacht** or other property covered by this policy is damaged, **you** must take all lawful and reasonable steps to protect **your yacht** or other property from further damage. **We** will reimburse **you** for the reasonable expenses of protecting the property, not including **your** personal labor. These payments for protecting the damaged property shall be made in addition to any other payments we make for losses covered by this **policy**.

56. Part 1 of the GENERAL CONDITIONS similarly provides that:

> D. (4) If **your yacht** or other property covered by this **policy** is damaged **you** must take all lawful and reasonable steps to protect **your yacht** or other property from further damage. **We** will reimburse **you** for the reasonable expenses of protecting the property, not including **your** personal labor. These payments for protecting the damages property shall be made in addition to any other payments **we** make for losses

covered by this **policy**.

57. Thereafter, in **General Condition Part 6**, entitled **WHEN WE SHALL PAY FOR LOSSES**, the policy provides that:

> **We** shall pay for losses covered under this **policy** within thirty (30) days after **we** receive proof of loss or other requested documentation that is satisfactory to us.

58. As set forth above, the policy is an "Agreed Value" policy and pursuant to the policy definitions:

> "**Agreed Hull Value** means the value agreed to by **you** and by **us** on your insured **yacht** as shown on the declarations."

59. Finally:

> **You** and **your** means: (a) The person or organization named as the insured on the enclosed **declarations**; . . . c) Anyone else operating the insured vessel with the prior express permission of the named insured, as long as the actual use is within the scope of such permission and for private pleasure use only; or (d) A **captain** or **crew member** who works on **your yacht**.

60. In addition to these standard policy terms, The Policy was also subject to certain endorsements that are relevant to this loss. **Endorsement No. 1,** entitled Navigation Endorsement, for example, provides as follows:

> In consideration for premiums charged $1050. The navigation warranty of this policy is amended to include Navigation of Coastal Waters and waters tributary thereto, of the Pacific Ocean and Acapulco as far south as 16 Degrees 30 Minutes North Latitude.
>
> It is agreed and understood a 2% deductible shall apply while the named vessel is outside US waters.

**Endorsement No. 2**, entitled General Endorsement, provides in relevant part that:

> The following changes shall apply to this policy.

It is agreed and understood that the vessel named in this policy shall be subject to a 3% Named Windstorm deductible. This deductible shall apply any time the vessel is south of Rio Santo Tomas, MX, during the period of 6/30-11/1.

61. Putting aside the NHIC's allegations of non-disclosure, misrepresentation and out-right fraud (or arson), this fire loss would otherwise be covered by the Policy. The Policy under Section A, 1 provides that NHIC will pay for the "direct physical loss" of MI BARUR "arising out of all perils unless otherwise excluded . . . ." The Policy also covers Mr. Farell's personal effects lost as a result of these same "perils." The Policy also covers his Sue & Labor expenses in section 1. **General Conditions**, D.(4).

62. Unless Mr. Farell failed to disclose or misrepresented material facts, or the loss is "otherwise excluded," NHIC should have paid Mr. Farell the Agreed Value of the MI BARUR, $1.9 million, within thirty (30) days of his submission of his proof of loss, and should have paid his timely claims for lost personal effects and other covered losses.

63. Paragraphs 13 though 17 of NHIC's Complaint set forth the alleged failures to disclose and/or misrepresentations underlying its basis for the denial of this otherwise covered claim. The first such allegation, set forth in **paragraph 13**, states in relevant part, that: (1) the Mi Barur was **represented to be "a U.S. Company seeking to insure … a U.S. documented vessel."** Paragraph 13 continues with the allegation that: "the undisclosed risk … was that Mi Barur, Inc, was a 'shell' company set up by a Mexican resident to circumvent U.S. law regarding vessel documentation."

64. Both of these allegations fail in the face of the above outlined evidence. First, the truth was and is that MI BARUR *was* "a U.S. Company" (actually a Delaware Corporation) "seeking to insure … a U.S. documented vessel." Second, the fact that MI BARUR was a "shell" company, presumably a reference to a single vessel holding company, was openly disclosed and fully known to NHIC when it chose to insure this risk. As set forth in the Declarations of Henry Medina and Paul Trusso

(and will be easily shown at trial), the use of single vessel corporations (typically, as here, sharing the name of the vessel) is extremely common in the maritime industry and something that NHIC deals with all the time. What else could NHIC's experienced underwriters Chris Clark and Michael Terrier think a company **named after the yacht** that was warranted for private pleasure use only could have been formed for? Third, federal statutes expressly allow U.S. flag pleasure yachts (as compared to commercial vessels) to be owned entirely by non-U.S. citizens, including, yes, Mexicans. The allegation that the Insureds meant to "circumvent U.S. law regarding vessel documentation" is specious, defamatory and in Bad Faith. As Paul Trusso, the lawyer who formed this company states, such companies and stock ownership are totally legal, are very commonly used, and provide many totally legitimate benefits. Indeed, NHIC commonly insures such vessels, both single vessel holding companies and foreign owned boats, and we suspect that discovery would reveal that is does so at a healthy profit. Fourth, the reference, echoing Schwede, that the owners were "Mexican," not only smacks of racism, but again ignores the facts disclosed directly to NHIC in the application process. Set out in black and white in the application form, the questionnaire, and the attached survey sent by Medina in support of the original 2004-2005 placement, are the facts that the beneficial owner was a 58 year old "Attorney" in "Mexico City, MX." Also given to NHIC at this time were copies of Captain Rello's resume in Spanish and his Mexican mariner's documents. Indeed, when Mr. Clark asked the question "Why are they all in Spanish?" he answered that the Insureds, the Captain, etc., were "Mexicans." *See* the Declaration of Henry Medina, Paragraph 11, **Exhibit A-12** attached hereto.

65. **Paragraph 14** of the NHIC Complaint contains the next allegation of purported misrepresentation, that the MI BARUR was: **"calling in U.S. ports, particularly San Diego,"** and the next alleged non-disclosure, that after being purchased and modified in San Diego, she: "never returned to U.S. waters, and there was no intent to call in the U.S." Again, the **"undisclosed risk"** is alleged to be that:

"the MI Barur was a yacht purchased by Mexican residents for private pleasure use only in Mexican waters."

66. As with **paragraph 13**, the allegations of **paragraph 14** of the NHIC Complaint fail in the first instance because they misstate the true facts. Nowhere in the application does it state that MI BARUR was "calling in U.S. ports, particularly San Diego." It is also untrue that there was no intent to call in the U.S.. Mr. Farell had purchased all of his boats through Hallmark in San Diego, frequently used the high-end boat yards in San Diego, and fully anticipated that he might return the MI BARUR to San Diego at any time and during any policy period (and wanted to have the freedom to do so). Indeed, during the summer of 2007, shortly before the renewal and the decision to take the boat to Florida, Mr. Farell was seriously considering returning the yacht to San Diego for sale. Second, the claim that the **"undisclosed risk"** was **"that the MI BARUR was a yacht purchased by Mexican residents for private pleasure use only in Mexican waters"** is a violation of the covenant of good faith and fair dealing. Not only was Mr. Farell clearly identified as the beneficial owner and as a 58 year old Attorney residing in Mexico City, but the yacht was again required by NHIC to be "used only for private pleasure purpose" within the set trading warranty area, the vast majority of which lay in Mexico. This area covered only approximately 250 miles of coastline in southern California, but about 2500 miles of coastline in Mexico. Indeed, the Weather Plan submitted with the original application stated expressly that the boat would spend the **entire year in Mexico**; six months a year in Acapulco and May 15, through November 30 (the six month hurricane season) in La Paz or the Sea of Cortez, never referencing any time in California. NHIC wrote the Policy on the MI BARUR on this operational plan, never seeking a single word of clarification or voicing a single world of complaint, but simply charging, year after year, an increased premium and deductible for this trading *right*.

67. NHIC's Complaint not only alleges no misrepresentation or failure to disclose facts, it actually misstates the true facts. Specifically, the NHIC Complaint

alleges that **"the original application ... represented the purchase cost to be $2.2 million."** In truth, nowhere in the application does it state that the "purchase cost" was $2.2 million. In fact the original application materials lists $2.2 million under the heading **"cost, including equipment**," and the "cost, including equipment" was probably far in excess of $2.2. Mr. Farell's statement as to cost and equipment is equally true and accurate. Given the $1.4 million survey value of the DeFever, the $900,000 cash down payment and the $300,000 plus in improvements, it would not have been a misstatement to state the cost at $2.6 million.

68. As to **paragraph 16** of the NHIC Complaint, where it is alleged that the underwriter advised Medina, "the broker," not the other way around, that: "underwriters found the yacht listed for sale on the internet for $1.9 million" and thus "would drop the insured value ... to $1.9 million...," this simply shows that the entire issue of the original reported value and limits is irrelevant. At the time of this fire loss, the Agreed Value on this hull risk was not based on any representation made by the Insureds, but on the underwriter's own research and knowledge of the vessel.

69. **Paragraph 17** of the NHIC Complaint alleges that underwriters were told: (1) that the boat was going to be moved to Florida, (2) that theses plans were later changed and (3) that the boat would remain a "San Diego, La Paz, Acapulco vessel." However, again, each of these alleged representations are completely true. Indeed, as set forth above, while at the time of the loss Mr. Farell was planning to send the boat to Florida in January of 2008, just before the time of this renewal he had been making plans to return the vessel to San Diego for sale (Hallmark had even been looking for a slip). To omit the very real possibility of the boat returning to San Diego in this renewal, would actually have been an omission (perhaps not material, but an omission nonetheless).

70. Given these undisputed facts, there is no reasonable argument that the Insureds misrepresented or failed to disclosed any facts or did anything other than to act in the highest degree of good faith, disclosing all facts known to them that

materially affect the risk assumed by NHIC. Rather, the allegations of misrepresentation and non-disclosure, given this record, are themselves egregious violations of the covenant of good faith and fair dealing implied in every insurance contract.

71. The gravamen of NHIC's denial of the insurance claim and of the NHIC Complaint is that NHIC has no duty to indemnify the Insureds because the Loss was caused by arson. The **First Cause of Action** asserts that because of the arson there is no duty to indemnify the Insureds for the Loss based on "Exclusion 10(B)(1) (intentional acts) and Exclusion 10(B)(5) (wilful misconduct, criminal or dishonest acts) of the policy." These are actually terms, again, of the prior Executive Yacht Policy, rather than the Yacht Policy in question. The **Second Cause of Action** asserts that because of the arson there is no duty to indemnify the Insureds for the Loss based upon California Insurance Code § 533. The NHIC Complaint is silent on who committed the arson, but the Denial Letter states that "Underwriters find no evidence to suggest that anyone other than the Captain set the fire." The provisions of Insurance Code §533 have been held to be the equivalent of an exclusionary clause in an insurance policy. Thus, the insurer has the burden of proof with respect to Insurance Code §533 as well as any exclusion or exculpatory clause in the policy. Moreover, like the exclusions in the Policy, the Insurance Code §533 defense is narrowly construed.

72. Nowhere in Murphy's report does he identify any affirmative evidence that the fire was intentionally set by Captain Rello. In fact, he does not even say that Captain Rello started the fire. There was no evidence of any accelerant. There was no evidence of a timing device. There was no evidence that Captain Rello had any experience in arson techniques or any history of being involved with a vessel that caught fire. Perhaps most importantly, Murphy did not even correctly determine where the fire actually started. The overwhelming evidence is that the fire did not start in the Captain's Cabin as claimed by Murphy, but rather in the Crew Lounge as a

result of an electrical short.

73. Despite extensive interviews by Murphy and a videotaped examination under oath of Mr. Farell and Captain Rello, there is no evidence identified by Murphy that suggests that the Insureds or Captain Rello had any motive to intentionally set fire to MI BARUR. Not only did the Farells have absolutely no financial problems that would motivate such an extreme act, they had no mortgage on the yacht and the boat was in pristine condition. Thus, if Mr. Farell needed money, he could simply have taken one of the many offers that would have put funds in hand within a relatively few dollars of the insured value of the boat.

74. There is also no evidence that any of the Insureds had the opportunity to burn the MI BARUR. The Farells were in Mexico City and Hallmark was in San Diego at the time of the Loss. Captain Rello had left the boat more than an hour before the fire and was never seen to return by any witness on the docks that morning. Indeed, Murphy does not even provide an explanation of how Captain Rello was supposed to have ignited the foam mattress in the Captain's cabin (a highly flammable fuel source), over an hour before the first signs of smoke were seen by the numerous people on the crowded dock. As, set forth above, none of the tell-tale signs of arson are presented by the facts of this Loss.

75. NHIC has accused the Farells and Captain Rello of the criminal act of arson without the proof required by law and the proof required under NFPA 921. The accusations of criminal arson are insulting and defamatory on their face. Moreover, NHIC has committed the following acts which are breaches of the insurance contract and of the implied covenant of good faith and fair dealing: (1) failure to investigate the claim thoroughly and objectively before denial; (2) demanding examination under oath in bad faith; (3) making groundless accusations against the insured; (4) denying the claim before the claimants were given a chance to provide information to support coverage; (5) failing to evaluate the claim objectively; (6) relying on biased, prejudiced and unreasonable experts; (7) denying claim based on arbitrary and

unreasonable standards; (8) filing of a declaratory relief action after the claim has been denied but before considering the Insureds' Supplemental Proof of Loss; (9) refusing to reconsider its denial and continuing to allege arson and misrepresentation against Counter-Claimants even after receiving and reviewing the Supplemental Proof of Loss and all of its exhibits; and (10) filing and persisting in the maintenance of a declaratory relief action where the Counter-Defendants' position is inherently unreasonable.

## II.

## FIRST CAUSE OF ACTION

## (Breach Of Insurance Contract Against All Counter-Defendants)

76. Counter-Claimants refer to and by that reference incorporate as though fully set forth herein each and every allegation contained in paragraphs 1 through 75, above.

77. The policy of insurance identified herein constituted a valid contract of insurance as between Counter-Claimants and Counter-Defendants and each of them.

78. Counter-Claimants complied with all terms and conditions of such insurance contract and timely paid all insurance premiums due. Any policy terms or conditions which were not fully performed by Counter-Claimants, if any, were excused and/or waived.

79. The fire loss was covered under the terms and conditions of the insurance contract identified herein and any renewals thereof. As a result and under the circumstances of this case, NHIC and the other Counter-Defendants had a contractual duty to pay the claim.

80. NHIC and the other Counter-Defendants breached this duty by refusing and failing to pay the claim and thus avoid exposing Counter-Claimants herein to economic and non-economic damages.

81. As a proximate result of the breach of insurance contract by NHIC and the other Counter-Defendants, Counter-Claimants have suffered economic and non-

economic damages in amounts to be established at the time of trial.

**III.**

**SECOND CAUSE OF ACTION**

**(Breach Of The Implied Covenant of Good Faith And Fair Dealing Against All Counter-Defendants)**

82. Counter-Claimants refer to and by that reference incorporate as though fully set forth herein each and every allegation contained in paragraphs 1 through 81, above.

83. Implied by law in the above described policy of insurance issued to Counter-Claimants were covenants by which Counter-Defendants owed a duty to Counter-Claimants to act in good faith and to deal fairly with each of them in all insurance matters related to the policy of insurance and any renewals thereof.

84. NHIC and the other Counter-Defendants breached these implied covenants of good faith and fair dealing in various respects, including, but not limited to, the following:

(A) Unreasonably and without proper cause denying Counter-Claimant's insurance claim;

(B) Unreasonably and without proper cause forcing the litigation of this claim thus needlessly forcing Counter-Claimants to incur additional fees and costs to obtain benefits under their policy of insurance;

(C) Unreasonably and without proper cause placing their own financial interests ahead of the financial interests of Counter-Claimants herein;

(D) Unreasonably and without proper cause failing to undertake and perform a proper investigation of the claim by Counter-Claimants;

(E) Unreasonably and without proper cause refusing to timely and properly communicate with the insureds;

(F) Unreasonably and without proper cause withholding policy benefits;

(G) Relying on biased, prejudiced and unreasonable experts;

(H) Denying the claim based on arbitrary and unreasonable standards;

(I) Filing of a declaratory relief action after the claim has been denied but before considering the Insureds' Supplemental Proof of Loss;

(J) Refusing to reconsider its denial and continuing to allege arson and misrepresentation against Counter-Claimants even after receiving and reviewing the Supplemental Proof of Loss and all of its exhibits; and

(K) Filing and persisting in the maintenance of a declaratory relief action where the Counter-Defendants' position is inherently unreasonable.

85. As a proximate result of the multiple, successive and continuing breaches of the implied covenant of good faith and fair dealing by NHIC and the other Counter-Defendants , Counter-Claimants have suffered economic and non-economic damages in amounts to be established at the time of trial.

86. The acts and omissions of NHIC and the other Counter-Defendants in connection with the investigation and denial of Counter-Claimants' claims were done by NHIC and the other Counter-Defendants with fraud, malice and oppression entitling Counter-Claimant to an award of punitive damages in an amount sufficient to punish and make an example of NHIC and the other Counter-Defendants. NHIC and the other Counter-Defendants committed the acts complained of herein wilfully and with the design and intent to financially benefit themselves at the expense of injuring Counter-Claimants.

## IV.

## THIRD CAUSE OF ACTION

## (Fraud - No Intention to Perform - Against All Counter-Defendants)

87. Counter-Claimant refers to and by that reference incorporates as though fully set forth herein each and every allegation contained in paragraphs 1 through 86, above.

88. Counter-Defendants promised and warranted in the policies of insurance identified herein that and any renewals thereof that they would act in good faith and pay claims for losses to or of the vessel MI BARUR and that they would properly investigate all claims, act reasonably in evaluating claims and not subjugate the insureds' interests to their own.

89. Counter-Defendants made these promises and warranties with the design and intent that Counter-Claimants reasonably rely on them in purchasing the policies of insurance from Counter-Defendants.

90. Counter-Claimants did in fact reasonably rely on these promises and warranties made by NHIC and each of them and in reliance thereon purchased the insurance coverages set forth in the Policy and any renewals thereof.

91. Counter-Defendants at the time they made these promises and warranties had no intention of performing such promises or honoring such warranties.

92. As a legal result of such fraud, Counter-Claimants have suffered economic and non-economic damages in amounts to be established at the time of trial.

93. The above fraud by Counter-Defendants was committed with fraud, malice and oppression entitling Counter-Claimants to an award of punitive damages in an amount sufficient to punish and make an example of Counter-Defendants. Counter-Defendants committed the acts complained of herein wilfully and with the design and intent to financially benefit themselves at the expense of injuring Counter-Claimants.

## V.

## FOURTH CAUSE OF ACTION

**(Negligence Against All Counter-Defendants)**

94. Counter-Claimant refers to and by that reference incorporates as though

fully set forth herein each and every allegation contained in paragraphs 1 through 93, above.

95. Counter-Defendants owed a duty to Counter-Claimants to exercise the degree of care one would expect from reasonably prudent insurers and insurance professionals under the circumstances. Counter-Defendants were obligated to act in conformity with this standard of care with respect to all activities undertaken by them relating to solicitation of insurance business from Counter-Claimants, honoring claims under the Policy, reasonably communicating, reasonably resolving the claims being asserted and otherwise reasonably protecting the interests of the insureds under the Policy and any renewals thereof.

96. Counter-Defendants breached these duties by, among other things, the following conduct:

(A) Unreasonably and without proper cause denying Counter-Claimant's insurance claim;

(B) Unreasonably and without proper cause forcing the litigation of this claim thus needlessly forcing Counter-Claimants to incur additional fees and costs to obtain benefits under their policy of insurance;

(C) Unreasonably and without proper cause placing their own financial interests ahead of the financial interests of Counter-Claimants herein;

(D) Unreasonably and without proper cause failing to undertake and perform a proper investigation of the claim by Counter-Claimants;

(E) Unreasonably and without proper cause refusing to timely and properly communicate with the insureds;

(F) Unreasonably and without proper cause withholding policy benefits;

(G) Relying on biased, prejudiced and unreasonable experts;

(H) Denying the claim based on arbitrary and unreasonable standards;

(I) Filing of a declaratory relief action after the claim has been denied but before considering the Insureds' Supplemental Proof of Loss;

(J) Refusing to reconsider its denial and continuing to allege arson and misrepresentation against Counter-Claimants even after receiving and reviewing the Supplemental Proof of Loss and all of its exhibits;

(K) Filing and persisting in the maintenance of a declaratory relief action where the Counter-Defendants' position is inherently unreasonable;

(L) Unreasonably and without proper cause refusing to timely and properly communicate with the insureds regarding the claim for coverage under the Policy and refusing to take a written position on coverage; and

(M) Unreasonably and without proper cause denying Counter-Claimants' claim based on frivolous coverage positions.

97. The above conduct on the part of Counter-Defendants and each of them caused Counter-Claimant to suffer economic and non-economic damages in amounts to be established at the time of trial.

**VI.**

**FIFTH CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress By Counter-Claimants Arsenio Farell and Norma Farell Against All Counter-Defendants)**

98. Counter-Claimants refer to and by that reference incorporate as though fully set forth herein each and every allegation contained in paragraphs 1 through 97, above.

99. Counter-Defendants' conduct alleged herein was outrageous, intentional and malicious and done for the purpose of causing Counter-Claimants to suffer mental

anguish and emotional and physical distress, and/or was undertaken with reckless disregard of the probability of causing Counter-Claimants to suffer emotional distress.

100. Counter-Claimants have suffered severe emotional distress as the result of Counter-Defendants' outrageous conduct herein alleged, and have been injured in mind and body as follows: Counter-Claimants have suffered extreme stress and humiliation in front of friends, family and business associates, were repeatedly lied to and deceived, all to their further humiliation and distress, and have suffered and continue to suffer extreme mental distress, nervousness, grief, worry, depression and anxiety as a result thereof, all to Counter-Claimants' damage in a sum in excess of the jurisdictional minimum of this Court, said amount to be determined at trial, with interest on that sum at the legal rate.

101. The aforementioned conduct of Counter-Defendants was done intentionally and was malicious, oppressive and fraudulent in nature, and was done with the intention on the part of Counter-Defendants of thereby depriving Counter-Claimants of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Counter-Claimants to cruel and unjust hardship in conscious disregard of Counter-Claimants' rights. Counter-Defendants' wrongful conduct as herein alleged was done intentionally and was malicious, oppressive and fraudulent in nature, and was ratified or authorized by an officer, director of managing agent of NHIC and each of the other Counter-Defendants.

**VII.**

**SIXTH CAUSE OF ACTION**

**(Negligent Infliction of Emotional Distress By Counter-Claimants Arsenio Farell and Norma Farell Against All Counter-Defendants)**

102. Counter-Claimants incorporates by reference the allegations of paragraphs 1 through 101 of this Complaint.

103. Counter-Defendants owed a duty of care to Counter-Claimants. Specifically, Counter-Defendants owed Counter-Claimants a duty to exercise proper

care and skill in the performance of their duties under the Policy for Counter-Claimants, and/or to be honest and truthful towards them.

104. Counter-Defendants knew, or should have known, that their failure to exercise due care would cause Counter-Claimants severe emotional distress.

105. Counter-Claimants have suffered severe emotional distress as the result of Counter-Defendants' breach of their duty to Counter-Claimants, and have been injured in mind and body as follows: Counter-Claimants have suffered extreme stress and humiliation in front of friends, family and business associates, were repeatedly lied to and deceived, all to their further humiliation and distress, and has suffered and continue to suffer extreme mental distress, nervousness, grief, worry, depression and anxiety as a result thereof, all to Counter-Claimants' damage in a sum in excess of the jurisdictional minimum of this Court, said amount to be determined at trial, with interest on that sum at the legal rate.

**VIII.**

**SEVENTH CAUSE OF ACTION**

**(Libel By Counter-Claimants Arsenio Farell and Norma Farell Against All Counter-Defendants)**

106. Counter-Claimants refer to and by that reference incorporate as though fully set forth herein each and every allegation contained in paragraphs 1 through 105, above.

107. On or about March 10, 2008, Counter-Defendants, by and through their agents, AI Marine Adjusters, Inc. ("AIMA"), wrote a letter to the President of Mi Barur, Inc., containing false and defamatory statements of fact of and concerning Counter-Claimants Mr. and Mrs. Farell. A true and correct copy of the March 10, 2008 denial letter is attached hereto as **Exhibit B** and incorporated by reference herein.

108. The statements contained in **Exhibit B** are not privileged.

109. The statements contained in **Exhibit B** are defamatory because they

falsely accuse Mr. and Mrs. Farell of intentionally setting fire or conspiring with others to set fire to their yacht MI BARUR in an illegal scheme to collect insurance proceeds.

110. Counter-Defendants intended to defame Counter-Claimants Mr. and Mrs. Farell when they made the libelous statements or they made such statements after negligently failing to ascertain the falsity of such statements.

111. These false and libelous statements have exposed Counter-Claimants Mr. and Mrs. Farell to hatred, contempt, ridicule, disgrace and have caused them to be shunned or avoided in their occupations. As a result of said libelous statements, Counter-Claimants have suffered consequential damages and special damages including but not limited to attorney's fees, fire investigator's fees, and investigation expenses, in amounts to be proven at trial.

112. These statements were made maliciously, fraudulently and oppressively, thus entitling Counter-Claimants to an award of punitive damages.

**IX.**

**EIGHTH CAUSE OF ACTION**

**(Slander By Counter-Claimants Arsenio Farell and Norma Farell Against All Counter-Defendants)**

113. Counter-Claimants refer to and by that reference incorporate as though fully set forth herein each and every allegation contained in paragraphs 1 through 112, above.

114. In or about April or March 2008, Todd Schwede, an agent of Counter-Defendants, published an oral defamatory statement of and concerning Counter-Claimants Mr. and Mrs. Farell to Counter-Claimants' insurance broker, Harold Medina when he stated that **"NEW POLICY, LESS THAN 30 DAYS OLD, TOTAL LOSS, MEXICAN, HE DID IT."** *See* the March 7, 2008, pre-denial e-mail from Mr. Medina to Mr. Robb, **Exhibit A-36** attached hereto and the Medina Declaration, Paragraph 14.

115. This slanderous statement was not privileged.

116. This statement is slanderous because it falsely accuses Mr. and Mrs. Farell of a crime, specifically an illegal scheme to set fire or conspire with others to set fire to their yacht MI BARUR to fraudulently collect insurance proceeds.

117. Counter-Defendants intended to defame Counter-Claimants Mr. and Mrs. Farell when they made the slanderous statement or they made such statement after negligently failing to ascertain the falsity of such statements.

118. This false and slanderous statement has exposed Counter-Claimants Mr. and Mrs. Farell to hatred, contempt, ridicule, disgrace and have caused them to be shunned or avoided in their occupations. As a result of such statement, Counter-Claimants have suffered consequential damages and special damages including but not limited to attorney's fees, fire investigator's fees, and investigation expenses, in amounts to be proven at trial.

119. This statement was made maliciously, fraudulently and oppressively, thus entitling Counter-Claimants to an award of punitive damages.

## X.

## PRAYER

WHEREFORE, Counter-Claimants prays judgment against Counter-Defendants, and each of them, as follows:

a. Economic damages as allowed by law according to proof at trial;

b. Non-economic damages as allowed by law according to proof at trial;

c. Punitive damages in an amount to be determined at trial;

d. The attorneys' fees and costs incurred by Counter-Claimants to vindicate their rights under the Policy and any renewals thereof;

e. Costs of suit;

f. Prejudgment interest on all of the above amounts; and

g. Such other and further relief as the Court deems just and proper.

Case 3:08-cv-00443-BEN-POR Document 12-2 Filed 06/20/2008 Page 42 of 43

DATED: June 20, 2008

Respectfully submitted,

BANNING MICKLOW & BULL LLP

By s/ William L. Banning

WILLIAM L BANNING
EDWARD M. BULL III

Attorneys for Counter-Claimants
Mi Barur, Inc., Arsenio Farell
and Norma Farell

Case 3:08-cv-00443-BEN-POR Document 12-2 Filed 06/20/2008 Page 43 of 43

**X.**

**DEMAND FOR JURY TRIAL**

Counter-Claimants hereby demands a trial by jury on their Counter-Claim and on all causes of action asserted in the entire action.

DATED: June 20, 2008

Respectfully submitted,

BANNING MICKLOW & BULL LLP

By /S/ William L. Banning

WILLIAM L BANNING
EDWARD M. BULL III

Attorneys for Counter-Claimants
Mi Barur, Inc., Arsenio Farell
and Norma Farell

# CERTIFICATE OF SERVICE

NEW HAMPSHIRE INSURANCE COMPANY v. MI BARUR, INC.

CASE NO.: 08 CV 0443 BEN POR

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; and that I served the following document(s):

**ANSWER TO COMPLAINT FOR DECLARATORY JUDGMENT; DEMAND FOR JURY TRIAL**

on the parties in this action in the manner indicated below:

Electronic Mail

I served the following by electronic mail at the e-mail address listed below:

Rebecca R. Weinreich, Esq.
E-Mail: weinreich@lbbslaw.com
Stephen V. Kovarik, Esq.
E-Mail: kovarik@lbbslaw.com
Lewis Brisbois Bisgaard & Smith LLP
221 North Figueroa Street, Suite 1200
Los Angeles, California 90012
Counsel for Plaintiff, New Hampshire Insurance Co.
(213) 250-1800/ (213) 481-0621 Fax

Philip E. Weiss
Weiss & Jones
1551 Shelter Island Drive
San Diego, California 92106
Co-Counsel for Defendant Mi Barur, Inc.
(619) 225-8884/ (619) 225-8801 Fax
E-Mail: shiplaw@earthlink.com

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.

Executed June 20, 2008 at San Diego, California.

Maria J. Rodrigues
E-Mail: zrodrigues@banningmicklow.com

Case 3:08-cv-00443-BEN-POR Document 12-4 Filed 06/20/2008 Page 1 of 1

# CERTIFICATE OF SERVICE

NEW HAMPSHIRE INSURANCE COMPANY v. MI BARUR, INC.

CASE NO.: 08 CV 0443 BEN POR

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; and that I served the following document(s):

**COUNTER-CLAIM FOR BREACH OF INSURANCE CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, FRAUD, NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, LIBEL AND SLANDER; DEMAND FOR JURY TRIAL**

on the parties in this action in the manner indicated below:

Electronic Mail

I served the following by electronic mail at the e-mail address listed below:

Rebecca R. Weinreich, Esq.
E-Mail: weinreich@lbbslaw.com
Stephen V. Kovarik, Esq.
E-Mail: kovarik@lbbslaw.com
Lewis Brisbois Bisgaard & Smith LLP
221 North Figueroa Street, Suite 1200
Los Angeles, California 90012
Counsel for Plaintiff, New Hampshire Insurance Co.
(213) 250-1800/ (213) 481-0621 Fax

Philip E. Weiss
Weiss & Jones
1551 Shelter Island Drive
San Diego, California 92106
Co-Counsel for Defendant Mi Barur, Inc.
(619) 225-8884/ (619) 225-8801 Fax
E-Mail: shiplaw@earthlink.com

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.

Executed June 20, 2008 at San Diego, California.

Maria J. Rodrigues
E-Mail: zrodrigues@banningmicklow.com

# TABLE OF CONTENTS OF EXHIBITS


**EXHIBIT A.** .......... **1 - 43**
**EXHIBIT A -1** .......... **44 - 54**
**EXHIBIT A -2** .......... **55 - 56**
**EXHIBIT A -3** .......... **57**
**EXHIBIT A -4** .......... **58 - 63**
**EXHIBIT A -5** .......... **64**
**EXHIBIT A -6** .......... **65**
**EXHIBIT A -7** .......... **66**
**EXHIBIT A -8** .......... **67 - 76**
**EXHIBIT A -9** .......... **77 - 78**
**EXHIBIT A -10** .......... **79 - 85**
**EXHIBIT A -11** .......... **86 - 89**
**EXHIBIT A -12** .......... **90 - 91**
**EXHIBIT A -13** .......... **92 - 95**
**EXHIBIT A -14** .......... **96**
**EXHIBIT A -15** .......... **97**
**EXHIBIT A -16** .......... **98**
**EXHIBIT A -17** .......... **99**
**EXHIBIT A -18** .......... **100**
**EXHIBIT A -19** .......... **101**
**EXHIBIT A -20** .......... **102**
**EXHIBIT A -21** .......... **103**
**EXHIBIT A -22** .......... **104**
**EXHIBIT A -23** .......... **105**
**EXHIBIT A -24** .......... **106**
**EXHIBIT A -25** .......... **107**

**EXHIBIT A -26** .................................................. **108**
**EXHIBIT A -27** .................................................. **109**
**EXHIBIT A -28** .................................................. **110**
**EXHIBIT A -29** .................................................. **111**
**EXHIBIT A -30** .................................................. **112**
**EXHIBIT A -31** .................................................. **113**
**EXHIBIT A -32** .................................................. **114**
**EXHIBIT A -33** .................................................. **115 - 116**
**EXHIBIT A -34** .................................................. **117**
**EXHIBIT A -35** .................................................. **118**
**EXHIBIT A -36** .................................................. **119**
**EXHIBIT A -37** .................................................. **120**
**EXHIBIT A -38** .................................................. **121 - 128**
**EXHIBIT A -39** .................................................. **129 - 162**
**EXHIBIT A -40** .................................................. **163 - 216**
**EXHIBIT A -41** .................................................. **217 - 228**
**EXHIBIT A -42** .................................................. **229 - 235**
**EXHIBIT B** .................................................. **236 - 239**

# EXHIBIT "A"

**BANNING MICKLOW & BULL LLP**
ATTORNEYS AT LAW
501 West Broadway • Suite 2090
San Diego, California 92101
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

William L. Banning
Partner
E-mail: wbanning@
nningmicklow.com

SAN DIEGO
•
SAN FRANCISCO
•
AMERICAN SAMOA
•
LONDON

May 23, 2008

**New Hampshire Insurance Company**
c/o AI Marine Adjusters, Inc.
Member Companies of American International Group, Inc.
175 Water Street, 14th Floor
New York, New York, 10038

**Attention:**
Ms. Susan Smith, Regional Hull Manager
Marine Claims Department

| | | |
|---|---|---|
| Re: | <u>M/Y MI BARUR</u> | |
| | Insureds: | Mi Barur, Inc., Arsenio Farell, Norma Farrell |
| | Policy No.: | YM 868-56-66 |
| | Date of Loss: | October 20, 2007 |
| | Your Reference No. | LE08939 |
| | Our File No.: | 8274-001 |

Dear Ms. Smith:

We write on behalf of your insureds Mi Barur, Inc., Arsenio Farell and Norma Farrell ("Insureds") with the hope of convincing New Hampshire Insurance Company ("NHIC") to change its decision to deny the Insureds' claims ("Claims") for the losses incurred during the fire and total loss of M/Y MI BARUR ("MI BARUR") at La Paz, Mexico on October 20, 2007 (the "Loss"). More particularly, this letter is in response to your letter dated March 10, 2008, wherein the Insureds' claims on the NHIC Policy No. YM868-56-66 (the "Policy") arising out of the Loss were denied ("Denial Letter"). NHIC sued the Insureds on March 10, 2008, in the action entitled *New Hampshire Insurance Company v. MiBarur, Inc.,* United States District Court for the Southern District of California, Case No. 08 CV 0443 BEN POR ("Action"). The Action seeks damages against the

**EXHIBIT A**
**1**

Insureds and a declaration that NHIC owes nothing to the Insureds under the Policy for the Loss. The letter will also respond to the substantive allegations of the Complaint in the Action ("Complaint").

As set forth herein, the Insureds believe the denial of their Claims was wrong, defamatory and in Bad Faith. The Insureds demand that NHIC promptly pay all Claims due under the Policy, as well as the attorneys' fees and costs and the experts' fees and costs they have expended to date, interest at 10% on the unpaid amount beginning 30 days after the Insureds' Claim was submitted, and, the withdrawal of any adverse or other reporting regarding the Farells, Mi Barur, Inc., and Captain Rello from any data base where it may have been submitted.

## I. <u>Introduction</u>:

Within a few days of the October 20, 2007, fire involving MI BARUR, NHIC sent a team of investigators to La Paz, Mexico to gather information. The Insureds from the date of the Loss, cooperated in every reasonable way possible to provide documents and information to NHIC. However, on March 3, 2008, NHIC coverage counsel, attorney Geoffrey Robb of the law firm of Gibson Robb & Lindh wrote to Mi Barur Inc., President, Michael Hallmark, ("Robb Letter") enclosing a copy of the insurer's investigation fire report prepared by Arthur Murphy, dated February 26, 2008 ("Murphy Report"). Shocking to the Insureds, the Murphy Report contends that the loss of MI BARUR was caused by arson. The Robb Letter followed more than four months of investigation of the Loss by NHIC. The Robb letter requested "further relevant information" from the Insureds if the Insureds disagreed with the finding of arson. Before the Insureds had any meaningful opportunity to respond legally and factually to the Murphy Report, the Robb Letter and the allegation of arson, on March 10, 2008, NHIC filed the Action and mailed out the Denial Letter.

In the Action and in the Denial Letter, NHIC claims, *inter alia*, that the loss of the MI BARUR was "caused by the willful or intentional wrongful acts of Mi Barur, Inc., its employees, agents, or others acting on its behalf." NHIC further claims that Mi Barur, Inc. was guilty of "intentional concealment or

**EXHIBIT A**
**2**

misrepresentation of material fact or circumstance relating to the insurance or the application for insurance." The prayer of NHIC in the Action seeks a declaration from the court that New Hampshire "is not obligated to indemnify Mi Barur, Inc. in connection with the loss of the MI BARUR," but instead, should reimburse New Hampshire for $61,883.43 for amounts "incurred to raise and preserve the MI BARUR following the fire."

## II. Summary of Reasons Why the Denial of the Insureds Claims Was Wrong and in Bad Faith:

### A. Allegations of Arson:

In the Action NHIC asserts several technical defenses to coverage, including nondisclosure and misrepresentation. The heart of the Denial however, clearly lies in the allegation that the Insureds intentionally burned MI BARUR in an attempt to obtain insurance proceeds. Having now completed a thorough inspection of the wreck of the MI BARUR, interviewed material witnesses, reviewed all relevant documents, and received the opinions of multiple true fire experts, there is no basis whatsoever in fact or law for NHIC to deny the Insureds' Claims based upon the defense of arson or variations thereof.

First, Murphy, a former park ranger with no fire department experience, is wrong about where the fire started. The fire started in the area of the Crew Lounge, port side, amidships, not the captain's cabin (stateroom).

Second, the fire was not intentionally started by Captain Rello or anyone else. The fire started from a short in the electrical wiring of the vessel.

Third, Murphy failed to follow basic fire science rules of investigation and protocol for determining the cause of the fire. Even accepting all of his factual statements as true, the only proper conclusion in his report should have been that the fire was of "undetermined" origin, not one of arson.

Fourth, NHIC's agents, including Murphy, committed spoliation of the

evidence at the fire scene.

Fifth, the insurer has the burden of proving arson and its other affirmative defenses to coverage, including Insurance Code §533. Such affirmative defenses are construed by the courts as exclusions and are therefore strictly construed. In this circumstantial evidence case, NHIC has the burden of proving: (1) proof of incendiary origin, (2) proof of opportunity or other inculpatory evidence, and (3) proof of motive or other inculpatory evidence. NHIC will not be able to carry its burden on any of the elements of proof. There is no proof of incendiary origin, only Murphy's rank speculation. The is no proof of opportunity to set the fire, as smoke was not seen for over an hour after Captain Rello left the vessel. There is no evidence anywhere of any timing device that would have allowed Captain Rello to set a fire that was not discovered for over an hour on a dock crowded with people. Finally, neither the Insureds nor Captain Rello had any motive to commit arson.

**B. <u>Allegation of Non-disclosure and Misrepresentation</u>:**

No evidence supports NHIC's claim of non-disclosure or misrepresentation. Mr. Farell, who has owned and insured expensive yachts for over twenty-five years, fully disclosed all material facts to NHIC and made only affirmative representations that were in all respects true and correct. He, for example, never hid the fact that Mi Barur, Inc., was fully owned by him and his wife, Mexican citizens. At the time of the issuance (and renewal) of the NHIC policies, NHIC was expressly notified in writing that the vessel was owned by a single vessel corporation (a title holding mechanism known and approved by NHIC) and that its beneficial owner was an "Attorney" named "Arsenio Farell" residing in "Mexico City, MX."

Similarly, NHIC was fully aware that the MI BARUR would be trading primarily, if not exclusively, in Mexico, and, again, was provided this information <u>in writing</u> during the underwriting process and at the time of renewal. In fact, NHIC charged an additional premium for these extended trading rights. Finally, in representing the "cost, including equipment," of the MI BARUR, or her fair

market value, the figure of $2,200,000 was completely honest and accurate. Specifically, not only did the Farells provide NHIC with a copy of the referenced survey placing the value at $2,200,000, but it is undisputed that Mr. Farell paid $900,000 in cash, traded in a 75 foot yacht with a survey market value of $1.4 million and spent in excess of $300,000 on upgrades on the MI BARUR.

C. **Bad Faith Failure to Pay the Claims of the Insureds**

The evidence indicates that NHIC and its agent were determined to deny the Insureds' Claims even before doing any investigation. Among other things, the fire investigation was superficial and contrary to standard NFPA practice; NHIC destroyed evidence; NHIC jumped to unsupported conclusions; the Insureds were excluded from the fire investigation; and NHIC lied to the Insureds about their interest in giving the Insureds a chance to respond to the arson allegations. The statement by NHIC's surveyor Todd Schwede sums up the manner in which NHIC handled this claim:

> "New Policy, less than 30 days old, total loss, Mexican, [arson] he did it." (Insert added).

Unfortunately, NHIC Bad Faith claims handling practices did not stop with the Denial Letter. The Complaint in the Action makes patently false statements of fact and law in support of its denial of coverage. Among other things, NHIC alleges in paragraph 57, lines 22-23, of the Complaint in the Action "that Mi Barur, Inc., was set up to circumvent U.S. law regarding U.S. documentation." This allegation is not only false, but defamatory. Either the allegation was made knowing it was false, or as a result of a reckless failure to properly investigate the Claims. It is clearly not illegal under U.S. law for a U.S. flagged recreational vessel to be owned by a U. S. corporation that is 100% owned by Mexican nationals. To allege otherwise is Bad Faith.

Amazingly, NIHC also attached a policy to the Complaint that is not the policy form which was purchased by the Insureds and relies on an exclusion not even included in the operative Yacht Policy. Again, blatant acts of Bad Faith.

Each of these points, and others, are fully explained below and are fully documented by the Supplemental Proof of Loss submitted herewith. NHIC is guilty of a Bad Faith denial of the Claims of the Insureds and has defamed Mr. and Mrs. Farell and Captain Rello. NHIC now has a chance to act in Good Faith by paying the Insureds' full policy benefits and their attorneys' fees and costs and experts' fees and costs.

## III. Summary of Supplemental Proof of Loss and Other Relevant Facts:

### A. Mr. and Mrs. Farell:

Arsenio Farell comes from a family of four children. He and each of his siblings are highly educated and graduated *summa cum laude* from prestigious schools. Mr. Farell is, of course, an attorney, his brother is a cardiologist, one of his sisters is a mathematician and another a dentist. For many generations Mr. Farell's family has been widely recognized as one of the wealthiest in Mexico, and Mr. Farell's father (who passed away in 2006) was one of the top trial attorneys in the country for over twenty years.

Mr. Farell followed in his father's footsteps and chose to be a trial attorney. A year after Mr. Farell finished law school in 1971, his father went into government service. Mr. Farell joined his father's law firm and ultimately came to lead the firm (which was founded in the late nineteen forties). During his thirty years of government service, Mr. Farell's father led various important government departments (for a long period, one level below the President) for five Mexican Presidents (with different ideologies, but requiring an administrator and politician of his skills and knowledge).

Mr. Farell has been, and he is still, a legal counsel and trial attorney for many of the most important and influential entrepreneurs in Mexico and of many huge Mexican and foreign corporations, including major insurance companies. He has also been counsel to Presidents and heads of government departments. At the time of this loss, Mr. Farell was comfortably leading his law firm through some of its most prosperous and successful years.

Mr. Farell has been joyfully married to Mrs. Farell since 1977. In addition to a large and beautiful house that they have owned for over twenty-five years in Mexico City, a remarkable collection of automobiles and a stable full of pure blood horses, Mr. Farell is also the owner of a stunning beach front weekend house in Acapulco and an exceptional collection of paintings and sculptures from renowned Mexican artists. Mr. Farell has enjoyed leisure boats and yachts for many years, the size and amenities aboard which he regularly improved. Mr. Farell also owns a third home as well as his office building in Mexico City (along with his sole law partner). All his properties and vessels are virtually debt free.

Mr. and Mrs Farell's daughters have recently married (the last one last year). Their elder daughter is both a biologist and psychologist and holds dual Master's Degrees (one in mathematics) from Boston University and the University of Massachusetts. She is married to a Professor and both of them are to begin working at Yale University in August of this year. Mr. Farell's youngest daughter is also married and living with her husband at Stanford University. As a consequence of their children living abroad, Mr. and Mrs. Farell have been simplifying, rather than expanding, their boats over the past few years. At this time, Mr. Farell has greater personal wealth than at any prior time in his life. Mr. Farell has virtually no debts, outstanding obligations or financial problems of any kind.

**B. <u>Yacht Ownership and Insurance History</u>:**

Mr. Farell has owned numerous high-end boats and yachts over the last twenty-five years. In the larger yacht category, Mr. Farell owned a 42-foot Grand Banks, a 55-foot Grand Banks and a 75-foot DeFever before he purchased the 92' Hatteras MI BARUR. Mr. Farell purchased each of these vessels for cash, never carried any loans on any of his yachts, and always fully insured such vessels. In addition to owning the MI BARUR on the date of loss, Mr. Farell also owned a 29-foot yacht which he docks at his beachfront home in Acapulco. Mr. Farell maintains a berth at the Acapulco Yacht Club (for which he paid $120,000). Mr. Farell has never made an insurance claim. See the Examination Under Oath of Mr. Farell, dated January 3, 2008, pages 14-20.

**EXHIBIT A**
**7**

Case 3:08-cv-00443-BEN-POR Document 13 Filed 06/20/2008 Page 11 of 46



C. **M/Y MI BARUR**:

MI BARUR, a 1990, 92-foot Hatteras motor yacht, was in pristine condition at the time of her loss; impeccably maintained and the product of one of the most sought after, distinguished and respected yacht builders. At the time of her last survey, completed by marine surveyor Cecil Lange in September of 2007, the vessel was found to have a market value of $2,300,000 ("in its present condition") and a replacement cost of $5,500,000. At that time, the hull of the yacht, "including the decks, superstructure flying bridge and boat deck were found to be in excellent condition . . . ." The interior of the vessel was described as "excellent and like new condition throughout" and overall Lange commented that she was "a vessel that has been well maintained and a credit to her owner." See a true and correct copy of the Survey and Evaluation report for the motor vessel "MI BARUR" attached as **Exhibit 1** to the Supplemental Proof of Loss delivered herewith.

When initially offered for sale by her prior owner, George Calcote, the asking price was $2,400,000. See the Hallmark Central Listing Agreement dated 6/16/03 and the cover sheet of the resultant listing, **Exhibits 2 and 3** to the Supplement Proof of Loss. In a prior listing, under the name ARRIVEDERCI III, the asking price for the vessel was $3,250,000. See the Merle Wood and Associates listing, **Exhibit 4** to the Supplemental Proof of Loss. In 1997 Marion Knight purchased the MI BARUR for $2,850,000. He insured the vessel for $2,825,000. See **Exhibit 5** to the Supplemental Proof of Loss. Finally, when the boat was surveyed immediately prior to her purchase by Mr. Farell, she was surveyed by marine surveyor Marvin Henderson and found to have an estimated market value of $2,200,000. See the cover sheet to the Marvin Henderson survey dated September 7, 2003, **Exhibit 6** to the Supplemental Proof of Loss.

D. **Mr. Farell's Financial Investment In MI BARUR:**

In the fall of 2003, seeking to purchase a larger boat to replace his 75-foot DeFever, Mr. Farell decided to purchase the 92-foot Hatteras, later to be named

**EXHIBIT A**
**8**

MI BARUR. As Mr. Farell testified in his Examination Under Oath, his yacht broker of many years, Michael Hallmark, had advised him that the current owner of the Hatteras was experiencing financial troubles and that an opportunity existed to get an exceptional deal on this high-end motor yacht. After a period of negotiations, Mr. Farell indeed purchased the Hatteras for a payment of $900,000 cash and the trade-in of his existing yacht, the DeFever. It is undisputed, and NHIC has in its possession, evidence of this cash payment.

Although many factors go into what a vessel will ultimately sell for (at any given time or place), prior to the transfer in question, the prospective owner, George Calcote, arranged for a survey of the DeFever by Marvin Henderson, who placed the fair market value of the vessel at that time at $1,400,000. See the cover sheet of the Marvin Henderson survey of September 17th 2003, **Exhibit 7** to the Supplemental Proof of Loss. Calcote, who was apparently under financial duress, later reduced the price to $1.1 million, and then to $950,000 (see the Hallmark listings for said vessel, **Exhibit 8** to the Supplemental Proof of Loss), and ultimately sold the boat for $620,000. However, there is nothing to suggest that the fair market value of this vessel was less than $1,000,000 (had Calcote had the financial wherewithal to sell the vessel in the normal course). After the trade in, Zurich Insurance Company insured the DeFever's hull and machinery for $1.4 million. When the subsequent owner, Mr. Augustin Rodriguez, later listed the DeFever for sale (in February of 2006), he also valued the boat at in excess of one million dollars ($1.1 million). See Cover Note 5170 and the Hallmark Central Listing Agreement dated February 8, 2006, collectively **Exhibit 9** to the Supplemental Proof of Loss submitted herewith.

In addition to the above-referenced cash payment and yacht trade, following the purchase of the MI BARUR Mr. Farell invested well in excess of $300,000 in additional upgrades and equipment for his new yacht.[1] See Mr. Hallmark's

[1] NHIC's attorney, Mr. Robb, obtained a full copy of Hallmark's file on this vessel. Contained in the file are detailed documents evidencing the nature and extent of such work. Also in the file is a complete ledger report prepared by Hallmark showing that Mr. Farell spent in excess of $300,000 on vessel up-grades

Register Reports, **Exhibit 10** to the Supplemental Proof of Loss. Using these figures, the amount spent by Mr. Farell for the cost of the 92-foot Hatteras MI BARUR, including equipment, can be conservatively estimate at over $2.3 million (even assuming the value of the DeFever at only $1.1 million and the upgrades at only $300,000).

**E. <u>Mi Barur, Inc</u>:**

When purchased by Mr. Farell, the Hatteras was a Coast Guard documented U.S. flagged vessel. It is common and perfectly legal for Mexican owners to fly a U.S. flag on such a vessel. As Mr. Farell explained in his Examination Under Oath, there were numerous legal benefits to continue flying the U.S. flag on his yacht. Not only would maintaining the U.S. flag make it easier to resell the vessel (in the U.S. market or to another non U.S. citizen), but Mr. Farell had experienced firsthand that flying the American flag improved the treatment he received when calling in various ports in Mexico and elsewhere.

Mr. Farell also chose to hold title to the vessel in a single vessel holding corporation, a practice, as NHIC is well aware, that is very common for both recreational and commercial vessels. Both Mr. Farell's yacht broker, Michael Hallmark, and his San Diego based attorney, Paul Trusso, will testify that this is a common and perfectly legal practice. See the Declaration of Michael Hallmark, paragraph 9, and Paul Trusso, paragraph 4, **Exhibits 11 and 12** to the Supplemental Proof of Loss. Furthermore, notwithstanding the false statements in the Denial Letter, in the Action, and in questions posed by Robb, the holding by Mexican nationals of 100% of the stock in such a U.S. single vessel corporation is completely legal and is specifically approved by 46 C.F.R. 67.39. See the Declaration of Paul Trusso, paragraph 5. NHIC's own underwriting files will reveal that it commonly insures such single vessel corporations, including companies where the stock is entirely held by Mexican citizens. See the Declaration of Henry Medina, paragraph 8, **Exhibit 13** to the Supplemental Proof

---

in the fall of 2003 alone.

of Loss. Indeed, when NHIC and similar marine insurance hull underwriters insure such recreational vessels, none of their standard application forms or questionnaires even inquire as to the nationality of the ownership of such single vessel corporations. See the Medina declaration, paragraph 8 and **Exhibit 14** to the Supplemental Proof of Loss.

**F. Initial Coverage with Zurich Insurance Company ("Zurich"):**

Upon purchasing MI BARUR, Mr. Farell arranged for hull and P & I insurance for the vessel through Henry Medina of Mariners General Marine of San Diego ("Mariners General"). Although Mariners General received various quotes on the vessel (see, e.g., the Chubb quote of 9/18/03 with hull limits of $2,200,000, a $44,000 deductible, and an annual premium of $12,645, **Exhibit 15** to the Supplemental Proof of Loss), at the advice of Medina, the yacht was ultimately insured by Zurich. A copy of the Mariners General Cover Note #5171 indicates coverage effective September 23, 2003, with hull and machinery coverage in the amount of $2,200,000 (per the Henderson survey), a $44,000 deductible, and an annual premium of $20,990. See **Exhibit 16** to the Supplemental Proof of Loss. Zurich also offered to renew their policy the following year for the same policy limits and at a similar premium rate. See the Zurich quote dated August 16, 2004, **Exhibit 17** to the Supplemental Proof of Loss.

**G. The NHIC Application and Initial Policies:**

As the 2004 renewal deadline for the policy approached, Medina contacted other insurers, including the NHIC's general agent, Maritime General Agency ("MGA"). Medina advised MGA that he was currently insuring the vessel with Zurich, but was "looking for better coverage and premium." See the fax cover sheet from Medina to Chris Clark of August 17, 2004, **Exhibit 17** to the Examination Under Oath of Mr. Farell, and **Exhibit 18** to the Supplemental Proof of Loss. This inquiry lead to the issuance of the first NHIC policy on MI BARUR, that was to be renewed the following three years, and upon which coverage would ultimately be denied by NHIC.

**1. The Application Process:**

The application process was conducted entirely by Medina based upon NHIC's underwriting guidelines (as he understood them based upon his conversations and experience with MGA). The application information was placed on a standard form utilized by Mariners General on prior placements with NHIC. A true and correct copy of the Yacht Insurance Application is attached as **Exhibit 19** to the Supplemental Proof of Loss and is also part of **Exhibit 17** to Mr. Farell's Examination Under Oath. As discussed more fully below, the initial submission to MGA included not only the cover sheet and the Mariners General standard application form, but also an updated yacht quote questionnaire prepared by Medina (**Exhibit 20** to the Supplemental Proof of Loss), a copy of the September 7, 2003 survey prepared by Henderson, and the resume for the vessel's Captain, Luis Manuel Rello (as well as other certificates and other documents attached thereto). For complete copies of these latter documents, see **Exhibit 17** to the Examination Under Oath of Arsenio Mr. Farell.

The following day, MGA's Clark emailed Medina attaching a quotation and requesting certain additional information including a signed compliance letter regarding the outstanding recommendation items on the Henderson survey and a severe weather plan ("Weather Plan"). See a copy of Clark's August 18th 2004 email, **Exhibit 21** to the Supplemental Proof of Loss. Furthermore, when Medina responded and asked whether the original 2003 application would work to bind coverage, Clark responded that indeed it would. See the further email exchange of August 18, 2004, **Exhibit 22** to the Supplemental Proof of Loss. Medina also promised to forward the compliance letter under separate cover.

Thereafter on September 14, 2004, Medina faxed the signed compliance letter to MGA and as requested. See Medina's email of September 14th, the requested and the sign off compliance, **Exhibits 23, 24 and 25** to the Supplemental Proof of Loss. Thereafter on September 23, 2004, NHIC did in fact issue policy EY 341-92-25 with an agreed hull value of $2,200,000, a hull deductible of $44,000, and a hull premium of $16,060. See the 2004-2005

Declarations Page, **Exhibit 26** to the Supplemental Proof of Loss. That policy was renewed twice by NHIC on September 23, 2005, and again on September 23, 2006, each time with only a single page questionnaire and no further inquiry (with the same limits, deductible and hull premium). See the NHIC Insurance Company declaration pages for policy periods 9/23/2005 to 9/23/2006, and 9/23/2006 to 9/23/2007, **Exhibits 27 and 28** to the Supplemental Proof of Loss.

**2. <u>All Aspects of the Application and Placement Were Handled by Marine Insurance Specialist Henry Medina</u>:**

During the above referenced application process, and in related correspondence and conversations, Medina worked as an intermediary between NHIC and the Insureds and was thus particularly familiar with their underwriting guidelines. Medina will testify that he gave all information which he considered to be material to NHIC, based on his many years of experience in the marine insurance business in general, and with NHIC in particular, in addition to any and all material requested by the representatives of NHIC. Medina had absolutely no incentive to misrepresent or conceal any facts, had experienced no trouble whatsoever insuring this yacht in the past, and had received quotes with lower premiums from other insurers. As mentioned above, Medina had insured many vessels held by single vessel owning corporations and/or Mexican citizens, never with any problem or any indication from any underwriter, including Clark and others at NHIC, that either of these considerations were considered negative risk factors by the underwriters. Medina will testify Clark and other representatives of NHIC were never shy about requesting information they felt was important to them. Medina will also testify that Mr. Farell was always completely forthcoming in his dealings with Medina and fully advised him of all facts regarding his yacht. See the declaration of Henry Medina, paragraphs 5, 6, and 7, **Exhibit 13** to the Supplemental Proof of Loss.

**3. <u>Mr. Farell, an Attorney With a Mexico City Address, Was Clearly Identified To NHIC As The Beneficial Owner</u>:**

Case 3:08-cv-00443-BEN-POR Document 13 Filed 06/20/2008 Page 17 of 46



In addition to the fact that Mr. Farell disclosed all material information to Medina, Medina also disclosed all material information regarding the identity of the insured to NHIC as part of the initial application process. First, on both the standard yacht insurance application form and the yacht quote questionnaire (**Exhibits 19 and 20**), the owner of the vessel was properly identified as Mi Barur, Inc. Given that the name of the vessel was also disclosed, it would be abundantly clear to anyone with any experience with the maritime industry, that Mi Barur, Inc. was a single vessel holding corporation (as set forth above, a very common and legal arrangement).

Second, the fact that Mr. Farell was the beneficial owner of the vessel and a Mexican citizen were also clearly disclosed. Specifically, on both the yacht quote questionnaire and the yacht insurance application, the occupation of the owner is identified as "Attorney." Not only does the insurance application indicate that Mr. Farell employs a "Licensed Mexican Captain," but the cover page of the Marvin Henderson marine insurance survey dated September 7, 2003 (**Exhibit 6**) indicates that the survey was done at the request of Mr. Farell, with an address of **"Gutenberg 147 Col. Anzures, Mexico City, MX D.F. 11590"**. Furthermore, Medina will testify that when he was asked why the Captain's resume was in Spanish, he told Clark that the owners, crew etc., of the MI BARUR were "Mexicans." See the declaration of Henry Medina, paragraph 11, **Exhibit 13** to the Supplemental Proof of Loss.

**4. <u>The Total Cost of the MI BARUR, Including Equipment, And Her Fair Market Value, Was $2.2 Million</u>:**

In support of the application for coverage submitted to NHIC, Medina also disclosed to NHIC the market value of the MI BARUR as $2,200,000, based on the September 7, 2003 survey by Marvin Henderson. See the yacht quote questionnaire, page 2 to exhibit 17 to Mr. Farell's Declaration under Oath. Additionally, on the standard application form under the heading "costs, including equipment" the figure of $2,200,000 was again entered. This, again, is a conservative figure given that Mr. Farell paid $900,000 in cash for the vessel,

traded in a vessel with a survey value of $1.4 million (the DeFever) and invested in excess of $300,000 in upgrades immediately after purchasing the vessel. Medina will testify that, notwithstanding the fact that he later suggested that Mr. Farell obtain an updated survey (in the fall of 2007), no representative of NHIC ever requested any further information regarding the value of the vessel, a further survey, or further details regarding the cost of the vessel. See the Medina Declaration, paragraph 12.

5. **The Trading Area of the MI BARUR Was Fully and Accurately Disclosed:**

Medina also accurately disclosed the anticipated trading patterns of the vessel. Indeed, he not only disclosed these patterns, but additional premiums were charged and the deductible was increased to allow the vessel to trade as far south as Acapulco, Mexico. First, both the application and the yacht questionnaire describe the location of where the vessel was moored as "San Diego/Acapulco." Second, the Weather Plan showed the vessel would trade in the La Paz area as well. During the years NHIC insured the vessel she actually traded as set forth in the application and the Weather Plan. See **Exhibit 24** to the Supplemental Proof of Loss. At the time that the vessel was purchased, and her extensive outfitting was completed (i.e. when the application was prepared), the vessel was indeed in San Diego. It would, in fact, have been an omission, if not a misrepresentation, not to list San Diego on the document. Second, because Mr. Farell had always used a San Diego based yacht broker to buy and sell his yachts and had always had major repairs done in top boat yards in San Diego, this was a necessary disclosure given the probable future use and mooring of the vessel in these waters.

Medina was well aware, at the time of making these submissions, that it was very common for yachts to remain in Mexico for the entire year and that this was not an issue that was of any concern to any insurer he worked with, including NHIC. See the Medina Declaration, Paragraph 9. Indeed, as mentioned, for the initial policy year, and each year there after, the vessel trading warranty was adopted pursuant to the navigation endorsement (Endorsement No. 1) specifically

to allow the MI BARUR to travel to as far south as Acapulco, in exchange for an additional premium and an increase deductible. See **Exhibit 29** to the Supplemental Proof of Loss. If NHIC believed that its risk would be materially increased if the yacht operated out of the United States for an extended period of time, the Policy obviously could have included a limit on the time the MI BARUR could remain in Mexico. **Nowhere in the policy is the vessel required to return to U.S. waters for any period of time.** Indeed, as Medina will testify, it is not uncommon for insurers that do want a vessel to return to a specific location to so mandate in the trading warranty or elsewhere in the policy. See the Medina Declaration, Paragraph 10.

### H. <u>The Decision and Efforts To Sell MI BARUR</u>:

As Mr. Farell explained in his Examination Under Oath, approximately a year before the loss in question he decided that he was going to sell the MI BARUR and purchase a smaller yacht. As he further explained to attorney Robb, the yacht had always been used as a center of family life and relaxation, and given that both of Mr. Farell's daughters were leaving Mexico to study in the United States, the Farells felt that the 92-foot Hatteras was simply too large for the couple at this stage in their lives.

As Hallmark will testify, Mr. Farell was willing to take the time needed to get a reasonable price and was never an anxious seller. However, he was flexible in price when the market suggested a reduced asking price and he had the financial ability to reduce his price with ease. For example, while the boat was originally offered for \$2.7 million, the price was later lowered to \$2.2 million at the suggestion of Mr. Farell. See the Hallmark Declaration, paragraph 11. See also the Hallmark Central Listing Agreements, Exhibits 22 and 23 to Mr. Farell's Examination Under Oath.[2]

[2] Mr. Farell was not in anyway desperate for money. Mr. Farell rejected multiple offers on the MI BARUR; two that Mr. Hallmark was aware of, one for \$1.6 million cash and one for \$1.85 million (including a home trade), and a third made directly to Mr. Farell for \$1,000,000 and a 75' Italian yacht. See the

In July 2007, Mr. Farell strongly considered moving MI BARUR to Florida to experience a different cruising ground and a better yacht market. According to one of Hallmark's competitors (Merrill-Stevens Yachts), Florida was a better market for a yacht the size of MI BARUR. All of this information was conveyed to NHIC and the 2007-2008 renewal was set to have revised trading restrictions accordingly. [3] Ultimately before the renewal date, it was decided not to take the boat to Florida and to keep the boat in waters from San Diego to Acapulco. Consequently, the Policy renewed with the original trading warranty. Also, during the time prior to the 2007 renewal, Mr. Farell was considering bringing the boat back to San Diego and Hallmark had even made inquiries on arranging for a slip for the boat on Shelter Island in San Diego. See the Hallmark Declaration, Paragraph 12.

## I. <u>The 2007 Renewal</u>:

The Agreed Value for the 2007-2008 policy of $1.9 million was not based on any request or representation by the Insureds, but was based on independent research by MGA's underwriter, Michael Terrier. See the Declaration of Henry Medina, Paragraph 13 and the email from Terrier to Medina of August 28, 2007, **Exhibit 30** to the Supplemental Proof of Loss.

Ultimately, with the boat remaining in LaPaz (and possibly being brought back to San Diego for sale), Medina requested the policy be renewed with the same trading warranty; "a San Diego, La Paz, Acapulco vessel." See Medina's email to Michael Terrier of September 20, 2007, **Exhibit 31** to the Supplemental Proof of Loss. All of the previously disclosed facts remained true and accurate and no additional information was requested by NHIC. The only material change in the coverage was as a result of Mr. Terrier's unilateral new valuation and the

---

Hallmark Declaration, Paragraph 11.

[3] Merrill-Sevens also produced a $200,000 deposit and an offer for the yacht at $1,750,000.

need to write the boat under the Yacht, rather than the Executive Yacht form. See the September 23, 2007 Declaration Page referencing new policy form BJP 2191-A (8/06), **Exhibit 32** to the Supplemental Proof of Loss. At the time of the issuance of the Policy, Mr. Farell had been an insured with NHIC for three loss free years and had paid premiums of over $70,000.

**J. Captain Rello:**

On the date of the loss, Captain Rello had worked for the Farells for over ten years as the full-time Captain of MI BARUR and prior yachts owned by the Farells. Captain Rello is a graduate of the Mexican Naval Academy, has excellent credentials and has no criminal record. Captain Rello was, at all times, well compensated and well liked by the Farells, and happily employed with no complaints about his employer. Captain Rello was an admitted smoker, but did not smoke in the lower enclosed cabins on the MI BARUR. No evidence exists that would demonstrate any reason why Captain Rello would intentionally set fire to MI BARUR. Moreover, he has passed a polygraph test demonstrating he was telling the truth when he told Murphy he did not commit arson.

**K. The Loss:**

The general facts relating to the loss of the MI BARUR are covered in the Murphy report. On the date of the fire the vessel lay at her normal berth at the Marina Palmira in LaPaz, Baja Sur, Mexico. The marina is located in a major metropolitan area and is well served by police and fire services. The fire was first reported at approximately 9:30 a.m. The MI BARUR was moored on the starboard side, facing north at slips 201 and 203 located at the east end of dock No. 2. No one was on board the motor yacht at the time the fire was reported. Captain Rello had left the vessel approximately one hour before the fire was reported.

Multiple calls were received by witnesses within the marina, who observed white or light grey smoke emanating from the forward, starboard side, of the

vessel. Two of the witnesses, Francisco Robles and Alfredo Amador, were working on adjacent vessels towards the middle of dock No. 2 and observed the early stages of the fire. Both men ran to the yacht, disconnected the shore-power, and boarded the vessel. They entered through the galley passageway door located amid-ships, main deck level, at the starboard (right) side of the vessel, and observed a smoke layer banking down from the overhead to about three-to-four feet off the galley deck. All smoke was observed light grey in color and emanating from the companion way stairs leading down to the forward crew's quarters and VIP stateroom. Robles was able to get some three steps down the stairs before he was driven back by the smoke. There was very little heat and he felt that he could have gone down further if it was not for the smoke.

With assistance from individuals around the marina, captain Rello moved the vessel from its original moored position at the west end dock No. 2 to north side of dock No. 7, on the interior east side of the marina breakwater. The vessel was moved so that other vessels would not be harmed by the fire and to provide better access for fire suppression equipment. Local firefighters arrived on the scene and observed heavy flames emanating from the galley door and salon. Firefighters began suppression operations, but were driven off the vessel by the intensity of the fire that had developed by that time. Firefighters then re-directed their efforts to the exterior of the vessel. Suppression effort and pumping of large quantities of water aboard the yacht continued until approximately 2:00 p.m., when the fire was thought to be completely extinguished. The MI BARUR and all contents sustained a total fire loss. The following morning a "re-kindle" occurred on the vessel and the vessel was taken outside the breakwater, where she burned to the water line and sank in shallow water. The vessel was submerged for days prior to being raised and taken to a local marine facility at Abaroa's shipyard, where she was placed in the ways for inspection.

### L. The Insureds' Full Cooperation:

The Insureds fully cooperated with the NIHC investigation following the Loss. At the express direction of NHIC and their marine surveyor Todd Schwede, Mr. Farell paid for significant sue and labor efforts to raise the yacht and have her

hauled to facilitate the investigations of Schwede and Murphy. Mr. Farell spent in excess of $60,000 of his own money on preserving the yacht and helping NHIC in its on-scene investigation. See the Letter of November 5, 2007 from Schwede to Mr. Farell, **Exhibit 33** to the Supplemental Proof of Loss. Furthermore, Mr. Farell not only submitted a detailed Statement of Loss and provided releases for all of the files maintained by his insurance broker and both of his yacht brokers, he, his Captain, and Hallmark all submitted to lengthy examinations under oath by counsel for NHIC. The Policy required that the Insureds provide NHIC with only a sworn statement not a videotaped examination under oath by counsel for NHIC.

**M. <u>The NHIC On-Sight Investigation</u>:**

NHIC's fire investigators failed to follow proper fire investigation procedure. As a result, much evidence was lost or destroyed. Mr. Farell indeed wrote to Mr. Schwede about this very issue following the loss. See Mr. Farell's letter of October 24, 2007, **Exhibit 34** to the Supplemental Proof of Loss. Fire investigators are supposed to comply with the requirements of NFPA 921. As is noted by Mr. Perkins in his fire investigation report (see below) (as well as the peer review of Murphy's report prepared by Hal Lyson, CFI), NHIC repeatedly failed to follow proper fire investigation procedure throughout their investigation. A true and correct copy of Mr. Lyson's peer review report is attached as **Exhibit 42** to the Supplemental Proof of Loss. Common sense dictates that NIHC's agents' haphazard use of grappling hooks and other devices to pull wreckage from the hull of the MI BARUR, destroyed critical cause and origin evidence. Further, after NHIC's raised the hull, it was left un-supervised and exposed to theft and tampering for over a week before Murphy returned to complete his cause and origin inspection and investigation. See the letter to Todd Schwede from Mr. Farell dated November 5, 2007, **Exhibit 35** to the Supplemental Proof of Loss. Finally, when Murphy did begin his inspection, his de-layering or the fire debris and removal of equipment was sloppy and haphazard, items being removed, for example, from the Captain's Cabin area and piled on other important areas, such as the Crew Lounge. Other debris was piled ashore, again unprotected.

In addition to this sloppy technical approach, it was clear to those on the scene that both Schwede and Murphy had a preconceived agenda to prove that the fire had been intentionally set, rather than conducting an objective investigation (Schwede actually asked various people, before any investigation had been carried out, if Captain Rello had set fire to the MI BARUR). In addition, a comment that Medina will testify was made by Schwede sums up best the approach taken by the NHIC team, **"New policy, less than 30 days old, total loss, Mexican, he did it."** See the March 7, 2008, pre-denial email from Mr. Medina to Mr. Robb, **Exhibit 36** to the Supplemental Proof of Loss and the Medina Declaration, Paragraph 14.

**N. <u>Murphy's Conclusions</u>:**

Murphy's conclusion that the fire started in the Captain's Cabin is patently wrong. His conclusion that the fire was started by an arsonist is also patently wrong. We do not currently know the full relationship between Murphy and NHIC/AIG. We understand he has been hired on several occasions by NHIC to investigate fires and has received significant fees from NHIC. We understand that Murphy's wife is an insurance claims adjuster. We also understand he was attending a marine surveyor's conference in San Diego at the time of the fire and was asked by Todd Schwede and NHIC to participate in the investigation of this fire. While on scene Murphy let slip to Captain Rello that the evidence demonstrated that the fire was started by an electrical short in a refrigeration motor. However, in his report he concluded that the fire began in the "Captain's Cabin" (a cabin that Captain Rello did not use), and that "the Form of Ignition was (caused) by incendiary (intentional arson) human action."

Murphy's report has overtones of racial prejudice throughout. For example, Murphy states that Captain Rello was the last person aboard the vessel. He also states that the boat was unlocked (<u>i.e.</u> accessible to anyone within the marina complex, which houses hundreds of boats and is accessible not only by their owners, but their crews, guests, repair personnel, marine workers etc). He then implies that the Insureds and the marina management were involved in a conspiracy to hide the identity of the arsonist stating that the "identification of the

arsonist could be proven by the introduction and/or release of the marina surveillance video recordings." The truth is that the video camera on that dock does not come close to visualizing the area where MI BARUR was docked at the time of the fire. All it visualizes is a small area around the gate. Ironically, Murphy made an appointment to see the video room at the marina and meet with the security personnel, including the technician in charge of the video surveillance system, but he never showed up. Further, if Murphy had requested the video earlier, he would have been given a copy of whatever film there was prior to the fire. Unfortunately, Murphy waited until the video had automatically recycled.

Despite coming to the conclusion that the fire was caused by arson, Murphy found: (1) no specific evidence of incendiary origin; (2) no evidence of any timing device that would explain how Captain Rello could set the fire over an hour before any smoke was noted by persons on the crowded dock; and (3) no evidence of motive or any of the arson indicators that would implicate Captain Rello or Mr. Farell. See also the email from attorney Robb to Mr. Medina dated March 7, 2008, wherein even he notes in relation to the Murphy report that "I . . . did not see where he has concluded that Captain Rello started the fire." **Exhibit 37** to the Supplemental Proof of Loss.

### O. <u>The Perkins Investigation and Results</u>:

Donald Perkins of Fire Cause Analysis, Berkeley, California, has conducted an investigation of the Loss at the request of the Insureds. Perkins is a retired Captain from the San Jose, California Fire Department. He has extensive fire and arson investigation experience and was the Arson Unit Supervisor/Investigator for that Department for four years. See a copy of Perkins resume, **Exhibit 38** to the Supplemental Proof of Loss. Accompanying Perkins to La Paz was Ron Kilgore of Kilgore Engineering, Inc., and Bill Engstrom, a marine surveyor.

Following his investigation, Perkins prepared a Fire Investigation Report in conformance with NFPA 921. **Exhibit 39** to the Supplemental Proof of Loss. To insure that the Perkins Report met the highest standards of NFPA 921, the

Case 3:08-cv-00443-BEN-POR Document 13 Filed 06/20/2008 Page 26 of 46



Insureds had the Perkins Report peer reviewed by Dr. John Dehaan. Dr. Dehaan is one of the foremost authorities on fire science in the nation.

Perkins continues his investigation at this time, but has reached the following conclusions (some of which were not noted at the time he finalized his report at our request):

1). Based on an objective analysis of the fire patterns, the fire originated in the Crews Lounge located on the lower level on the port side amidship. The fire then spread down the companion way and up the stairs and out the starboard side galley door.[4]

2). The fire was probably caused by an undetermined electrical ignition source high within the forward bulkhead/overhead in the Crews Lounge compartment. Given the manner in which NHIC's agents destroyed the evidence at the fire seen; the severe burning of the electrical conductors and components and their degradation from salt water submergence, it is now impossible to identify the specific ignition source.

3). The fire did not reach the Captain's Cabin on the starboard side of the vessel until the vessel was well engulfed in fire, many minutes after ignition. Proof of this point can be found in the fact that the carpet and lower areas of the doors, bunk etc, suffered no fire damage at all due to the fact that they were submerged in water from on-going fire suppression efforts *before* the fire reached this compartment. Had the fire originated in this area, or even reached this area before the fire suppression water, the carpet would necessarily been burned (just as it was in the crew's lounge and cabin on the starboard side of the boat).

[4] Murphy never even inspected this area, but rather buried it under the debris he had removed from the Captain's Cabin.

4). The cause of the fire was not arson. Pursuant to NFPA investigative criteria, and specifically NFPA 921, the cause of this fire must be ruled "undetermined." As discussed below in relation to his critique of Murphy's report, Perkins found no information or data that would support a conclusion of arson. See a complete copy of Perkins May 9, 2008 report, **Exhibit 39** to the Supplemental Proof of Loss.

5). Mr. Perkins has determined that there is a "vehicle history" of electrical fires on similar Hatteras yachts, including an electrical fire in the crew's quarters on a Hatteras 105 built just several years after the MI BARUR.

**P. <u>The Mexican Fire Investigation and Results</u>:**

In addition to the Perkins team, the Insureds contacted and retained a highly renowned Mexican fire investigator, Mario Saldana Nolasco. Mr. Nolasco examined the remains of MI BARUR in the presence of Perkins. Mr. Nolasco reached the following conclusions:

1). The point of origin was not the Captain's Cabin.

2). The point of origin was not the Crew's Cabin.

3). The point of origin was the crew's "dinning area" (ie. Crew's Lounge).

4). The fire was not intentionally set.

5). While the probable cause was electrical in nature, the fire must be deemed of an "unknown" cause. See the report of Mr. Nolasco, **Exhibit 40** to the Supplemental Proof of Loss.

Q. **The MAZE Report is Fatally Flawed:**

In addition to retaining Mr. Perkins to complete his independent fire cause and origin investigation, we asked Mr. Hal Lyson, another Nationally renowned fire investigator, to complete, in his words, an "evaluation of the Maze fire investigation report." In response to this request, we received, and submit herewith as **Exhibit 42** to the Supplemental Proof of Loss, Mr. Lyson's report of May 20, 2008. As indicated by way of introduction, Mr. Lyson is highly critical of the methodology of the Maze investigation and its conclusions.

Simplifying it to its key points, the report concludes that:

1). Mr. Murphy violated NFPA 921, section 28.3.5.11, when he "failed to examine the vessel while it was partially submerged" and failed to use "qualified people" to complete the "recovery and documentation," and as a consequence, "allowed for the likely destruction of evidence."

2). Mr. Murphy ignored industry standards and NFPA 921 and did not thoroughly identify and interview witnesses. As such, he missed valuable information, such as the fact that the smoke and heat of the early stages of this fire simply do not match his conclusions.

3). Mr. Murphy relied on "empirical data" that the electrical system was in proper working order, and ignored NFPA 921 sections 24.2.1-2 when he concluded that there had been no previous problems with the electrical system. Mr. Lyson notes that "NFPA 921 states that a vehicle and appliance history needs to be obtained" and notes that Mr. Murphy failed to do so. Ironically, Mr. Lyson was not even aware of the history of Hatteras electrical fires when he reached these conclusions.

4). Mr. Murphy has identified the cause as "incendiary" with open flame, but ignores the fact that while it took over an hour for this fire to be noticed, a fire of the type identified in his report would "flash over" to "full room involvement" very rapidly, "within minutes."

5). Mr. Murphy concluded that the fire started in a mattress that would "flow like an ignitable liquid and burn on the floor," and yet failed to notice that the carpet in the captain's cabin was not burned.

6). Mr. Murphy violated NFPA 921, section 22.3, when he improperly considered evidence "not directly related to the fire or explosion cause," such as the removal of personal items from the boat.

7). Mr. Murphy ignored the recommendations of NFPA chapters 11 and 16 when he failed to label and identify the evidence and the vessel contents as he removed material from the vessel.

8). Mr. Murphy violated NFPA 921 chapter 17 when he failed to complete "arc mapping" and wiring and circuit tracing (and probably could not even do so with the destruction of this critical evidence).

9). Mr. Murphy incorrectly and indiscriminately relied on NFPA 921 section 18.2, "Process of Elimination," in a fire where NFPA specifically states that it could not be used.

10). Mr. Murphy violated NFPA 921 section 4.3.7 when he formed the arson hypothesis at least eight days before he even conducted his examination of the vessel.

11). Mr. Murphy ignored the clear requirements of NFPA 921, Chapter 4, when he failed to identify the cause of this fire as "undetermined."

Given these major faults in the Maze investigation and conclusions, it would be clear Bad Faith to continue to rely on Mr. Murphy's report as a basis of the denial of this claim.

**R. <u>Captain Rello has Passed a Polygraph Exam Wherein He Denies Smoking and Arson:</u>**

NHIC's entire claim of arson is implicitly based upon the assumption that Captain Rello intentionally set MI BARUR on fire (an assumption that does not even appear to be shared by NHIC's counsel, Mr. Geoffrey Robb; "I . . . did not see where he [Mr. Murphy] has concluded that Captain Rello started the fire." **Exhibit 37** to the Supplemental Proof of Loss). None of the Insureds were present in La Paz on the day of the fire and the only crewmember in La Paz was Captain Rello. Murphy implicitly claims in his report that Captain Rello was lying when he said he did not set fire to the yacht. According to Perkins, while he served as Chief of Arson Investigation for the City of San Jose, it was customary to give polygraph tests to arson suspects if the suspect was willing to take the test. Further, Perkins routinely would rely upon the results of the polygraph tests in forming his opinions concerning the cause of a fire. Consequently, the Insureds arranged to have Captain Rello undergo a polygraph exam on the issues of arson and smoking in the lower level of the yacht (Captain's Cabin and Lounge). During the exam Captain Rello was found to be telling the truth when he said he did not commit arson and did not smoke in the lower level of the yacht on the day of the fire. A true and correct copy of an English translation of the report of the May 7, 2008 polygraph exam is attached as **Exhibit 41** to the Supplemental Proof of Loss.

**IV. <u>The Relevant Policy Terms</u>:**

NHIC Policy No. YM 868-56-66, effective date from 09/23/2007 to 09/23/2008, lists as the named insured Mi Barur, Inc. The Policy provides hull (Agreed Value) coverage of $ 1,900,000 subject to a 2% deductible of $38,000

and a premium of $14,060. The insured vessel, "Mi Barur," is described as a 92 foot Hatteras, built in 1990.

The NHIC Yacht Policy standard form provides hull, protection and indemnity, medical and other incidental coverage per standard conditions [Form BJB 2191-A (8/06)]. The insuring language for the hull coverage provides standard "all risk" coverage and states in relevant part:

**GENERAL CONDITIONS AND EXCLUSIONS**

**1. GENERAL CONDITIONS**

. . .

**SECTION "A" - HULL INSURANCE**

**1. WHAT WE INSURE:**

Physical Loss to **Your Yacht: We** shall pay for direct physical loss to **your yacht** arising out of all perils unless otherwise excluded herein.
Those items "otherwise excluded," as set forth on page six of the policy, include the following:

**10. CAUSES OF LOSS THAT ARE NOT COVERED:**

We shall not cover any loss or damage arising out of:

(1) Any intentional misuse or misconduct, or lack of reasonable care or due diligence, in the operation or maintenance of **your yacht** or trailer;

. . .

(5) Any willful misconduct, criminal, or dishonest act by an insured, **your** employees, or any person to whom **you** entrust **your yacht**;

**Part 11 of the General Conditions**, entitled **CONCEALMENT OR MISREPRESENTATION,** also provides that even in the event that a loss in not "otherwise excluded:"

> Any relevant coverage(s) shall be voided if **you** intentionally conceal or misrepresent any material fact or circumstance relating to this insurance or **your** insurance application, whether before or after a loss.

The **General Conditions, Part 5**, Entitled **WHAT YOU MUST DO IN THE EVENT OF A LOSS,** also imposes certain affirmative duties on the insured to give notice of any loss and provides, in relevant part, that:

> If **you** have a loss or **claim** that **you** think might be covered under this **policy, you** must do the following:
>
> . . .
>
> If **your yacht** or other property covered by this policy is damaged, **you** must take all lawful and reasonable steps to protect **your yacht** or other property from further damage. **We** will reimburse **you** for the reasonable expenses of protecting the property, not including **your** personal labor. These payments for protecting the damaged property shall be made in addition to any other payments we make for losses covered by this **policy.**

Part 1 of the GENERAL CONDITIONS similarly provides that:

> D. (4) If **your yacht** or other property covered by this **policy** is damaged **you** must take all lawful and reasonable steps to protect **your yacht** or other property from further damage. **We** will reimburse **you** for the reasonable expenses of protecting the property, not including **your** personal labor. These payments for protecting the damages property shall be made in addition to any other payments **we** make for losses covered by this **policy.**

Thereafter, in **General Condition Part 6**, entitled **WHEN WE SHALL PAY FOR LOSSES**, the policy provides that:

> **We** shall pay for losses covered under this **policy** within thirty (30) days after **we** receive proof of loss or other requested documentation that is satisfactory to us.

As set forth above, the policy is an "Agreed Value" policy and pursuant to the policy definitions:

> "**Agreed Hull Value** means the value agreed to by **you** and by **us** on your insured **yacht** as shown on the declarations."

Finally:

> **You** and **your** means: (a) The person or organization named as the insured on the enclosed **declarations**; . . . c) Anyone else operating the insured vessel with the prior express permission of the named insured, as long as the actual use is within the scope of such permission and for private pleasure use only; or (d) A **captain** or **crew member** who works on **your yacht**.

In addition to these standard policy terms, The Policy was also subject to certain endorsements that are relevant to this loss.

**Endorsement No. 1**, entitled **Navigation Endorsement**, for example, provides as follows:

> In consideration for premiums charged $1050. The navigation warranty of this policy is amended to include Navigation of Coastal Waters and waters tributary thereto, of the Pacific Ocean and Acapulco as far south as 16 Degrees 30 Minutes North Latitude.

> It is agreed and understood a 2% deductible shall apply while the named vessel is outside US waters.

**Endorsement No. 2**, entitled **General Endorsement**, provides in relevant part that:

> The following changes shall apply to this policy.
>
> It is agreed and understood that the vessel named in this policy shall be subject to a 3% Named Windstorm deductible. This deductible shall apply any time the vessel is south of Rio Santo Tomas, MX, during the period of 6/30-11/1.

## V. The Applicable Law:

Both federal maritime law and California law recognize that the parties to a marine insurance policy are held to the highest degree of good faith, i.e., *uberrimae fidei*. The insured and insurer both owe each other a duty of utmost good faith. Under this obligation, the party seeking to obtain insurance is required to disclose the facts known to him that materially affect the risk. Certain Underwriters at Lloyds v. Inlet Fisheries Inc., 518 F.3d 645 (9th Cir. 2008); N.H. Ins. Co. v. C'Est Moi, Inc., 519 F.3d 937 (9th Cir. 2008); Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp., 159 F.3d 412, 420 (9th Cir. 1998); C.N.R. Atkin v. Smith, 137 F.3d 1169 (9th Cir. 1998); Certain Underwriters at Lloyd's v. Montford, 52 F.3d 219 (9th Cir. 1995); California Insurance Code Section 1900.

There is, however, "a reciprocal duty on the part of the insurer to deal fairly, to give the assured fair notice of his obligations, and to furnish openhandedly the benefits of a policy . . . Insurance obligations must not be construed so as to render the coverage mere gossamer." Contractors Realty Co., Inc. v. Insurance Co. of North America, 469 F. Supp. 1287, 1294 (S.D.N.Y. 1979).

Based on this duty, a marine insurer may rescind the contract if it can show intentional misrepresentation of a fact (regardless of materiality) or concealment of a fact material to the risk (regardless of intent). Cigna Prop. & Cas. Ins., 159 F.3d at 420; Markel Am. Ins. Co. v. Fitt, 528 F. Supp. 2d 1010 (S.D. Cal. 2007). The key, however, is that the insured has to have made a misrepresentation or concealed a material fact. The obligation is also undeniably bilateral, mandating the utmost good faith from both the insured and the insurer. Furthermore, "Materiality depends 'solely on the probable and *reasonable* influence of the facts upon the party to whom the communication is due.' . . . and the likely practices of the insurance company had the concealed facts been truthfully disclosed." Markel American Ins. Co. v. Fitt, 528 F. Supp. 2d at 1017. [emphasis added].

In order to prove arson, the burden on the insurer is high.[5] Because direct proof of arson is often unavailable, courts have determined that arson can be established, in proper cases, by circumstantial evidence. However, to sustain a jury's finding of arson based upon circumstantial evidence, the insurer must establish by a preponderance of the evidence: 1) fire of an incendiary origin, 2) motive on the part of the insured and, 3) opportunity of the insured to cause the fire. American Home Assurance Co. v. Essy, 179 Cal. App. 2d 19 (1960). Don Burton, Inc. v. Aetna Life & Casualty Co., 575 F.2d 702, 707 (9th Cir. 1978); Boone v. Royal Indemnity Co., 460 F.2d 26, 29 (10th Cir. 1972); St. Paul Fire & Marine Ins. Co. v. Salvador Beauty College, Inc., 930 F.2d 1329, 1331 (8th Cir. 1991); S & W Properties Inc. v. American Motorist Ins. Co., 668 So. 2d 529 (Ala. 1995); Allstate Ins. Co. v. McGory, 697 So. 2d 1171 (Miss. 1971). None of these factors can be demonstrated here.

[5] The trend of the law is to require the insurer to prove arson by "clear and convincing evidence." B. Bennett Mfg. Co. Inc v. South Carolina Inc. Co., 692 So. 2d 1258 (La. Ct. App. 5th Cir. 1997); American Family Mut. Ins. Co. v. Schley, 978 F. Supp 870 (E.D. Wis 1997); Chenago Mutual Ins. Co. v. Charles, 235 A.D. 2d 667, 652 NY S.2d 134 (3d Dept. 1997).

VI. <u>Coverage Analysis</u>:

**A. <u>The Loss of the MI BARUR Is Clearly Covered By the Policy</u>:**

Putting aside the NHIC's allegations of non-disclosure, misrepresentation and out-right fraud (or arson), there can be no doubt that this fire loss would otherwise be covered by the Policy. The Policy under Section A, 1. provides that NHIC will pay for the "direct physical loss" of MI BARUR "arising out of all perils unless otherwise excluded . . . ." The policy also covers Mr. Farell's personal effects lost as a result of these same "perils." The Policy also covers his Sue & Labor expenses in section 1. **General Conditions**, D.(4).

Thus, unless Mr. Farell failed to disclose or misrepresented material facts, or the loss is "otherwise excluded," NHIC should have paid Mr. Farell the Agreed Value of the MI BARUR, $1.9 million, within thirty (30) days of his submission of his proof of loss, and should have paid his timely claims for lost personal effects and other covered losses.

**B. <u>The Insureds' Disclosures to NHIC Were Truthful and Contained All the Material Facts</u>:**

Paragraphs 13 though 17 of NHIC's Complaint on file in the Action set forth the alleged failures to disclose and/or misrepresentations underlying its basis for the denial of this otherwise covered claim.

The first such allegation, set forth in **paragraph 13**, states in relevant part, that:

> (1) the Mi Barur was **represented to be "a U.S. Company seeking to insure ... a U.S. documented vessel."**

Paragraph 13 continues with the allegation that:

> **"the undisclosed risk ... was that Mi Barur, Inc, was a 'shell' company set up by a Mexican resident to circumvent U.S. law regarding vessel documentation."**

Both of these allegations utterly fail in the face of the above outlined evidence.

First, the truth was and is that MI BARUR *was* "a U.S. Company" (actually a Delaware Corporation) "seeking to insure ... a U.S. documented vessel."

Second, the fact that MI BARUR was a "shell" company, presumably a reference to a single vessel holding company, was openly disclosed and fully known to NHIC when it chose to insure this risk. As set forth in the Declarations of Henry Medina and Paul Trusso (and will be easily shown at trial), the use of single vessel corporations (typically, as here, sharing the name of the vessel) is extremely common in the maritime industry and something that NHIC deals with all the time. What else could NHIC's experienced underwriters Chris Clark and Michael Terrier think a company **named after the yacht** that was warranted for private pleasure use only could have been formed for?

Third, federal statutes expressly allow U.S. flag pleasure yachts (as compared to commercial vessels) to be owned entirely by non-U.S. citizens, including, yes, Mexicans. The allegation that the Insureds meant to "circumvent U.S. law regarding vessel documentation" is specious, defamatory and in Bad Faith. As Paul Trusso, the lawyer who formed this company states, such companies and stock ownership are totally legal, are very commonly used, and provide many totally legitimate benefits. Indeed, Medina will testify that NHIC commonly insures such vessels, both single vessel holding companies and foreign owned boats, and we suspect that discovery would reveal that is does so at a healthy profit.

Fourth, the reference, echoing Schwede, that the owners were "Mexican," not only smacks of racism, but again ignores the facts disclosed directly to NHIC in the application process. As mentioned above, set out in black and white in the application form, the questionnaire, and the attached survey sent by Medina in support of the original 2004-2005 placement, are the facts that the beneficial owner was a 58 year old "Attorney" in "Mexico City, MX." Also given to NHIC at this time were copies of Captain Rello's resume in Spanish and his Mexican mariner's documents. Indeed, Mr. Medina will testify that when Mr. Clark asked the question "Why are they all in Spanish?" he answered that the Insureds, the Captain, etc., were "Mexicans." See the Declaration of Henry Medina, Paragraph 11, **Exhibit 12** to the Supplemental Proof of Loss.

**Paragraph 14** of the complaint contains the next allegation of purported misrepresentation, that the MI BARUR was:

> **"calling in U.S. ports, particularly San Diego,"**

and the next alleged non-disclosure, that after being purchased and modified in San Diego, she:

> **"never returned to U.S. waters, and there was no intent to call in the U.S."**

Again, the **"undisclosed risk"** is alleged to be that:

> **"the MI Barur was a yacht purchased by Mexican residents for private pleasure use only in Mexican waters."**

As with **paragraph 13**, the allegations of **paragraph 14** fail in the first instance because they misstate the true facts. Nowhere in the application does it state that MI BARUR was "calling in U.S. ports, particularly San Diego." It is also untrue that there was no intent to call in the U.S. Mr. Farell had purchased all of his boats through Hallmark in San Diego, frequently used the high-end boat

yards in San Diego, and fully anticipated that he might return the MI BARUR to San Diego at any time and during any policy period (and wanted to have the freedom to do so). Indeed, during the summer of 2007, shortly before the renewal and the decision to take the boat to Florida, Mr. Farell was seriously considering returning the yacht to San Diego for sale.

Second, the claim that the **"undisclosed risk"** was **"that the MI BARUR was a yacht purchased by Mexican residents for private pleasure use only in Mexican waters"** is in Bad Faith. Not only was Mr. Farell clearly identified as the beneficial owner and as a 58 year old Attorney residing in Mexico City, but the yacht was again required by NHIC to be "used only for private pleasure purpose" within the set trading warranty area, the vast majority of which lay in Mexico. This area covered only approximately 250 miles of coastline in southern California, but about 2500 miles of coastline in Mexico. Indeed, the Weather Plan submitted with the original application stated expressly that the boat would spend the **entire year in Mexico**; six months a year in Acapulco and May 15, through November 30 (the six month hurricane season) in La Paz or the Sea of Cortez, never referencing any time in California. NHIC wrote the policy on the MI BARUR on this operational plan, never seeking a single word of clarification or voicing a single world of complaint, but simply charging, year after year, an increased premium and deductible for this trading *right*.

**Paragraph 15** not only alleges no misrepresentation or failure to disclose facts, it actually misstates the true facts. Specifically, the Complaint alleges that **"the original application ... represented the purchase cost to be $2.2 million."** In truth, nowhere in the application does it state that the "purchase cost" was $2.2 million. In fact the original application materials lists $2.2 million under the heading **"cost, including equipment,"** and the "cost, including equipment" was probably far in excess of $2.2. Mr. Farell's statement as to cost and equipment is equally true and accurate. Frankly, given the $1.4 survey value of the DeFever, the $900 cash down payment and the $300,000 plus in improvements, it would not have been a misstatement to state the cost at $2.6 million.

As to **paragraph 16**, where it is alleged that the underwriter advised Medina, "the broker," not the other way around, that:

> **"underwriters found the yacht listed for sale on the internet for $1.9 million"** and thus **"would drop the insured value ... to $1.9 million...,"**

This simply shows that the entire issue of the original reported value and limits is irrelevant. Simply put, at the time of this fire loss, the Agreed Value on this hull risk was not based on any representation made by the Insureds, but on the underwriter's own research and knowledge of the vessel.

Finally, **paragraph 17,** alleges that underwriters were told: (1) that the boat was going to be moved to Florida, (2) that theses plans were later changed and (3) that the boat would remain a "San Diego, La Paz, Acapulco vessel." However, again, each of these alleged representations are completely true. Indeed, as set forth above, while at the time of the loss Mr. Farell was planning to send the boat to Florida in January of 2008, just before the time of this renewal he had been making plans to return the vessel to San Diego for sale (Hallmark had even been looking for a slip). To omit the very real possibility of the boat returning San Diego in this renewal, would actually have been an omission (perhaps not material, but an omission nonetheless).

Given these undisputed facts, there is simply no reasonable argument that the Insureds misrepresented or failed to disclosed any facts or did anything other than to act in the highest degree of good faith, disclosing all facts known to them that materially affect the risk assumed by NHIC. Rather, the allegations of misrepresentation and non-disclosure, given this record, are themselves clear acts of Bad Faith.

Case 3:08-cv-00443-BEN-POR Document 13 Filed 06/20/2008 Page 41 of 46



C. **The Claims Should be Paid As There Is No Evidence of Intentional Destruction or Arson:**

The gravamen of the Denial Letter and the Action is that NHIC has no duty to indemnify the Insureds because the Loss was caused by arson. The **First Cause of Action** asserts that because of the arson there is no duty to indemnify the Insureds for the Loss based on "Exclusion 10(B)(1) (intentional acts) and Exclusion 10(B)(5) (wilful misconduct, criminal or dishonest acts) of the policy."[6] The **Second Cause of Action** asserts that because of the arson there is no duty to indemnify the Insureds for the Loss based upon California Insurance Code § 533. The Complaint is silent on who committed the arson, but the Denial Letter states that "Underwriters find no evidence to suggest that anyone other than the Captain set the fire."[7]

NHIC seeks to deny coverage even though there is no proof of any of the required elements of arson.

1). **Murphy Found No Evidence That the Fire Was of an Incendiary Origin:**

Nowhere in Murphy's report does he identify any affirmative evidence that the fire was intentionally set by Captain Rello. In fact, he does not even say that Captain Rello started the fire. There was no evidence of any accelerant. There

---

[6] Which are actually terms, again, of the prior Executive Yacht Policy, rather than the Yacht Policy in question.

[7] The provisions of Insurance Code §533 have been held to be the equivalent of an exclusionary clause in an insurance policy. Thus, the insurer has the burden of proof with respect to Insurance Code §533 as well as any exclusion or exculpatory clause in the policy. Clemmer v. Hartford Ins. Co., 22 Cal. 3d 865, 880 (1978). Moreover, like exclusions in the policy, the Insurance Code §533 defense is narrowly construed.

was no evidence of a timing device. There was no evidence that Captain Rello had any experience in arson techniques or any history of being involved with a vessel that caught fire. Perhaps most importantly, Murphy did not even correctly determine where the fire actually started. The overwhelming evidence is that the fire did not start in the Captain's Cabin as claimed by Murphy, but rather in the Crew Lounge as a result of an electrical short.

2). **Murphy and Attorney Robb Found No Evidence of Motive by the Insureds or Captain Rello to Commit Arson:**

Despite extensive interviews by Murphy and a videotaped examination under oath of Mr. Farell and Captain Rello, there is not one shred of evidence identified by Murphy that proves that the Insureds or Captain Rello had any motive to intentionally set fire to MI BARUR. Not only did the Farells have absolutely no financial problems that would motivate such an extreme act, they had no mortgage on the yacht and the boat was in pristine condition. Thus, if Mr. Farell needed money, he could simply have taken one of the many offers that would have put funds in hand within a relatively few dollars of the insured value of the boat. Hallmark will testify, for example, that if Mr. Farell were desperate (which he never appeared to be), he could have sold the yacht "overnight" if he had dropped the price even to $1.6 million. In other words, one would have to believe that Mr. Farell or Captain Rello would commit this most serious crime, risking not only their careers, but criminal prosecution, for $200,00 to $300,000 (an amount less than the value of Mr. Farell's automobiles alone).

3). **Murphy Found No Evidence That the Insureds or Their Agents Had the Opportunity to Set the Fire:**

There is also no evidence that any of the Insureds had the opportunity to burn the MI BARUR. The Farells were in Mexico City and Hallmark was in San Diego at the time of the Loss. Captain Rello had left the boat more than an hour before the fire and was never seen to return by any witness on the docks that morning. Indeed, Murphy does not even provide an explanation of how Captain

Rello was supposed to have ignited the foam mattress in the Captain's cabin (a highly flammable fuel source), over an hour before the first signs of smoke were seen by the numerous people on the crowded dock. Indeed, as set forth above, none of the tell-tale signs of arson are presented by the facts of this Loss.

## VII. Failure to Pay the Claims Immediately Will Be Bad Faith:

NHIC has accused the Farells and Captain Rello of the criminal act of arson without the proof required by law and the proof required NFPA 921. The accusations of criminal arson are defamatory on their face. Moreover, NHIC has committed the following acts which constitute Bad Faith:

- **Failure to Investigate the Claim Thoroughly Before Denial:**
  Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d 809, 819 (1979).

- **Demanding Examination Under Oath in Bad Faith:**
  Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1281 (1994).

- **Groundless accusations against the Insured:**
  Gruenberg v. Aetna Ins. Co., 9 Cal. 3d 566, 575 (1973) [arson].

- **Denial of the Claim Before the Claimants were given a chance to provide information to support coverage:**
  Blake v. Aetna Life Ins. Co., 99 Cal. App. 3d 901, 924 (1979).

- **Failure to Evaluate Claim Objectively:**
  Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1281 (1994).

- **Relying on Unreasonable Experts:**
  Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (applying California law); See also Fraley v. Allstate Ins. Co., 81 Cal App. 4th 1282, 1292 (2000).

- **Denying Claim Based on Arbitrary or Unreasonable Standards:** Moore v. American United Life Ins. Co., 150 Cal. App. 3d 610, 621 (1984); Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1162-1163 (9th Cir. 2001); Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th at 1281-1282.

- **Filing of a Declaratory Relief Action After the Claim has Been Denied:** Atlas Assur. C. Ltd. V. McCombs Corp., 146 Cal. App. 3d 135, 150 (1983).

- **Filing of a Declaratory Relief Action Where the Insurer's Position is Inherently Unreasonable:** Dalrymple v. United Services Auto Ass'n, 40 Cal. App. 4th 497, 515 (1995).

We, on behalf of the Insureds, reserve all rights, to assert other grounds for Bad Faith and other torts. We will dispense, for now, with a full discussion of potential Bad Faith and other tort claims that can be brought against NHIC. Instead, we hope that the evidence itself, rather than the risk of punitive damages, will lead you to pay the Claims at this time.

## VIII. Conclusion:

We hereby request that NHIC consider all of the evidence and points made herein and submitted herewith, and reverse its earlier decision to deny the Claims. We believe that if indeed the evidence is considered in good faith, and the flaws and gaps in Murphy's investigation and conclusions are considered objectively, NHIC will have no choice but to alter its initial conclusion and promptly pay all Claims due under the Policy, as well as the attorneys' fees and costs and the experts' fees and costs the Insureds have expended to date, interest at 10% on the unpaid amount beginning 30 days after the Insureds' Claim was submitted, and, the withdrawal of any adverse or other reporting regarding the Farells, Mi Barur, Inc., and Captain Rello from any data base where it may have been submitted.

We trust that we have provided all the information that you require to complete your re-evaluation of this claim and to reverse your earlier denial. However, if you require any further information, documentation or other assistance from us, please do not hesitate to have your counsel contact us.

Respectfully,

BANNING MICKLOW & BULL

William L. Banning
Edward M. Bull III

**BANNING MICKLOW & BULL LLP**
ATTORNEYS AT LAW
501 West Broadway • Suite 2090
San Diego, California 92101
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

William L. Banning
Partner
E-mail: wbanning@banningmicklow.com

SAN DIEGO • SAN FRANCISCO • AMERICAN SAMOA • LONDON

May 23, 2008

**New Hampshire Insurance Company**
c/o AI Marine Adjusters, Inc.
Member Companies of American International Group, Inc.
175 Water Street, 14th Floor
New York, New York, 10038

**Attention:**
Ms. Susan Smith, Regional Hull Manager
Marine Claims Department

Re: M/Y MI BARUR: SUPPLEMENTAL PROOF OF LOSS:

| | |
|---|---|
| Insureds: | Mi Barur, Inc., Arsenio Farell, Norma Farrell |
| Policy No.: | YM 868-56-66 |
| Date of Loss: | October 20, 2007 |
| Your Reference No. | LE08939 |
| Our File No.: | 8274-001 |

Dear Ms. Smith:

We hereby submit, on behalf of your insureds Mi Barur, Inc., Arsenio Farell and Norma Farrell, the following Supplemental Proof of Loss in conjunction with our letter of this date. Please do not hesitate to request any further information you may require to evaluate this claim.

Respectfully,

BANNING MICKLOW & BULL

William L. Banning
Edward M. Bull III

**EXHIBIT A**
**43**

EXHIBIT C 0150

# SURVEY AND VALUATION REPORT FOR MOTOR VESSEL " MI BARUR "



*CECIL M. LANGE, SA*
*MARINE SURVEYOR AND CONSULTANT*
*MEMBER - SOCIETY OF ACCREDITED MARINE SURVEYORS*

VHF Channel 22
Tel: 011 52 (612) 122-7066
Cell: 044 (612) 131-7459
Morelos #915 esq. Josefa O. de Dominguez
La Paz, B.C.S. Mexico 23000
cecillange1925@yahoo.com

**EXHIBIT A - 1**
**44**

| | |
|---|---|
| AC CIRCUIT PROTECTION: | Breakers |
| A C GALVANIC ICOLATOR | No |

## PROPULSION AND AUXILARY SYSTEMS

| | |
|---|---|
| PROPULSION MANUFACTURER: | Detroit Twin 16V-149TIB |
| MODEL: | 191627422 |
| RATED HORSEPOWER: | 2100 hp each |
| YEAR MANUFACTURERED: | 1990 |
| YEAR INSTALLED: | 1990 |
| SERIAL NUMBER: | Pt 16E009112 St 16E009300 |
| ENGINE HOURS: | Pt 5658 approx. St 5666 |
| FUEL TYPE: | Diesel |
| ALARMS: | Oil pressure, water temperature, high bilge alarms |
| FRESH WATER COOLED: | Yes |
| TRANSMISSION REDUCTION GEAR: | Twin Disc Serial Number: 4336-059 2.52-1 4330-060 |
| ENGINE MOUNTS CONDITION: | Good condition |
| DRIP PAN: | Built in |
| FUEL RETURN: | Yes |
| EXHAUST CLEAR OF WOODWORK: | Clear of wood work |
| EXHAUST/MUFFLER MATERIAL: | St Steel ,Exhaust hose FRP, water cooled |
| GENERATOR | Engine hrs PT 9367 STBD 9718<br>Northern Lights 50 Kw Serial No 2392-6428<br>Northern Lights 50 Kw Serial No 2392 -4430 |
| OIL DISCHARGE PLAQUE POSTED: | Yes |

## CORROSION CONTROL SYSTEM

| | |
|---|---|
| BONDING: | Yes |
| ZINC SYSTEM: | Yes |
| ZINC CONDITION: | New August 2007 |

EXHIBIT A - 1
47

| | |
|---|---|
| IMPRESSED CURRENT SYSTEM: | No |
| ANODE CONDITION: | NA |
| GROUND PLATE: | No |

## THRU-HULL FITTINGS AND SEACOCKS

| | |
|---|---|
| THRU-HULL MATERIAL: | Bronze |
| THRU-HULL CONDITION: | Appear sound |
| SEACOCK MATERIAL: | Bronze |
| SEACOCK CONDITION: | Good condition |
| HOSES DOUBLE-CLAMPED: | Double clamped |
| HOSE CONDITION: | Appear sound |

## STEERING SYSTEM

| | |
|---|---|
| HELM TYPE: | Wheel |
| STEERING METHOD: | Hydraulic |
| EMERGENCY STEERING: | Motors, Autopilot |
| NO. OF STATIONS: | Two |

## TANKAGE

| | |
|---|---|
| NUMBER OF FUEL TANKS: | Six |
| FUEL TANK MATERIAL: | FRP |
| FUEL TANK LOCATION: | Two Center aft of engine room, 4 wing tanks |
| FUEL TOTAL CAPACITY: | 4,364 gallons |
| PROPERLY SECURED: | Well secured |
| FILL PIPE MATERIAL: | Fuel hose |
| FILL PIPE SIZE: | 2" |
| GROUNDED: | Yes |
| TIGHT AT DECK FITTING: | Yes |
| VENT LINE: | Vented |

| | |
|---|---|
| OVERFLOW GOES OVERBOARD: | Yes |
| FUEL LINE SHUT-OFF: | Yes |
| WATER TANK MATERIAL: | FRP |
| NUMBER OF WATER TANKS: | Two |
| WATER TOTAL CAPACITY: | 540 gallons |
| HOLDING TANK MATERIAL: | FRP |
| NUMBER OF HOLDING TANKS: | One 258 gallons, 1 grey water tank 135 gallons |

## ELECTRONICS AND NAVIGATION

**See separate section.*

| | |
|---|---|
| COMPASS: | 1 electronic, 1 Ritchie |
| SHIP'S CLOCK: | Yes |
| BAROMETER | Yes |
| NAVIGATION LIGHTS: | International |
| HORN | Electric |
| BELL: | Yes |

## SAFETY EQUIPMENT

| | |
|---|---|
| BILGE PUMPS: | 8 electric automatic Rule 3000 |
| PERSONAL FLOTATION DEVICES: | 20 Type I, 6 children Type |
| THROWABLE DEVICES (TYPE IV): | Two ring |
| VISUAL DISTRESS SIGNALS: | Expired January 2004 |
| EPIRB: | No |
| LIFE RAFT: | Two 8 men Givens. Inspected last in August 2005 |
| FIRE EXTINGUISHERS: | (4) 10 lb ABC powder, six 4 lb ABC Good 'til April 2008 |
| AUTOMATIC FIRE SUPRESSION SYSTEM: | Three 11 kg, two 20 kg |
| LIFE LINES: | St Steel stanchions with 1 ¼ stainless steel rails on for deck, and high bulwarks with teak caps |

**EXHIBIT A - 1**
**49**

## GROUND TACKLE

| | |
|---|---|
| ANCHORS: | 135 Kg large Danforth with 300Ft ½ chain<br>Spare Danforth with 300Ft rode |
| ANCHOR WINDLASS | Electric Lewmar 6000 |

## INTERIOR

| | |
|---|---|
| STOVE TYPE: | Thermador 4 burner with warmer separate oven and convection Galaxy microwave |
| WOODWORK PROTECTED: | Yes |
| FUEL LOCATION: | Electric |
| PROPANE SOLENOID SWITCH: | No |
| FUEL CONNECTION METHOD: | NA |
| REFRIGERATION: | See separate list |
| HOT WATER TANK: | Two 40 gallons each |
| OTHER EQUIPMENT: | 3 Air conditioning units Aqua air 5 tons each |
| WASTE MANAGEMENT PLAQUE: | Not seen |
| WASTE MANAGEMENT PLAN: | No |

## ADDITIONAL EQUIPMENT

| | |
|---|---|
| MARINE SANITATION DEVICE: | 6 showers, 7 toilets, 2 Vacum and 5 air |
| MSD SYSTEM VALVING: | Holding tank, deck pump out, overboard |
| WATER MAKER: | Two, 1 Village marine 60 gph and 1 HRO 40 gph |
| DINGHY: | 13 Ft Achilies inflatable |
| OUTBOARD ENGINE: | Yamaha 25HP |
| OTHER: | 1 swimming step ladder, 2 aluminum |
| Dinghy hoist hydraulic/electric 1 ton | 1 stern boarding platform |
| 1 Yamaha wave runner | Central vacuum system |
| 4 kayaks, 2 double 2 single | 1 BBQ charcoal |
| 3 large and 2 medium fenders | Fuel filtering system |
| 9 dock lines | Raw water and fresh water washdown system |
| Air compressor | Many spare parts and tools |

**EXHIBIT A - 1**
**50**

**REFRIGERATION:**

Stand up refrigerator freezer with ice maker,

Scotsman refrigerator at crews quarters

Scotsman refrigerator and a Uline Ice maker at wet bar

Stand up freezer and chest freezer by crews quarters

Chest freezer near engine room access

Refrigerator/ice maker on flying bridge

**ELECTRONICS AND NAVIGATION EQUIPMENT:**

FLYING BRIDGE:

VHF Standard Horizon

Simrad radar 60 miles

B&G depth sounder, wind, log, speed

Bow thruster control

Trim tab controls

Engine synchronizer

Stabilizer control

Autopilot control

PILOT HOUSE:

VHF ICOM ICM402

SSB ICOM ICM700 Pro with automatic tuner

Radar Simrad 48 miles integrated ARPA

GPS plotter Trimble Navigator Graphic II

GPS Northstar 952X, Simrad HS50

Naiad stabilizer

Bow thruster

Furuno depth sounders FCV 552

Autopilot Simrad AP20

Raytheon Hayler

B&G 20/20 CD wind speed

Engine room camera screen and controls (WJ 45)

Trim tab controls

2 remote controls spot lights

Furuno weather fax

Engine synchronizer

Electronic compass

Satellite phone

**ENTERTAINI. Γ SYSTEM:**

MAIN SALON

Toshiba TV 32"

Sony 5 disc DVD and CD changer

Sony amplifier with Ipod attachment

12 speakers including galley and dinette

MASTER STATE ROOM

Toshiba TV 20"

Sony DVD/CD

Sony amplifier with 6 speakers

GUEST STATE ROOM No 1

Toshiba TV 19"

Sony DVD/CD

Sony amplifier

GUEST STATE ROOM No 2

Toshiba TV 15"

Sony DVD

AM/FM stereo, CD and 2 speakers

CREWS QUARTERS

AM/FM CD 2 speakers

GUEST STATE ROOM No 3

Toshiba TV Sony DVD

AM/FM Stereo CD 2 speakers

GALLEY/DINETTE

Panasonic microwave

Toshiba 14" TV/DVD

JVC AM/FM CD

EXHIBIT A - 1

51

## HULL BELOW WATER LINE *was not inspected by this surveyor.

## HULL ABOVE WATER LINE

The hull above the water line including the decks, superstructure, flying bridge and boat deck were found to be in excellent condition including paint work with the exception of the radar arch where it is mounted on both port and starboard sides shows fiberglass cracks.

## FORE DECK

The fore deck consists of heavy duty bow roller and anchor and electric windlass, heavy duty cleats, a flush fore peak hatch, washdown outlets, large bell, storage, and sun lounge cushions. The fore deck has stainless steel stanchions and hand rails above bulwarks. Four integral deck lockers and deck light; Side decks port and starboard, washdown system, deck lights, heavy teak hand rails on high bulwarks with gates port and starboard.

## FLYING BRIDGE

The flying bridge steering station is on a console forward centre with steering, engine controls and instruments, navigation electronics *(see electronics)* with two swivel chairs behind, chart plotter table and AC electric panel. Behind are cabinets, a sink and refrigeration under, the top makes into a bar with 3 bar stools behind. Access to the pilot house is forward on the port side. Aft are two L shape settees with cushions, there is a large radar arch overhead, forming a sun shade with a bimini. Aft to the seats is a entrance to the boat deck consisting of a dinghy hoist, Yamaha waverunner, 2 kayaks, and 2 life rafts. There are 3 tables, 4 deck chairs, charcoal BBQ and sun lounge cushions. The flying bridge has a wrap around spray shield with hand rails all around.

## PILOT HOUSE

The pilot house consists of a large console, extending from port to starboard with steering centre with engine controls, instruments, and full navigation equipment *(see electronics)*. On port and starboard there are chart tables with electrical panel under. Behind the steering station is a leather cover bench seat. Access to the pilot house is on both port and starboard sides with access on the port side to the flying bridge.

# MECHANICALLY

## STEERING SYSTEM

The steering system was found in sound condition. Both rudder packing glands need adjusting or repacking.

## ENGINE ROOM

The engine room contains the twin V-16 Detroit engines and both generator units, one port one starboard. There are battery banks, electrical panels, battery charges, transformers, fuel filtering system, oil changing system, heavy duty water pumps, salt water and fresh, Naiad stabilizer equipment, and hydraulic bow thruster equipment. All engines were run, all raw water pumps seals appear to be in good condition. Engine exhaust system, polish stainless steel in good condition. Both propeller shaft packing glands appear to be adjusted correctly. All seacocks were activated and in good condition including hoses. Hoses are all double clamp below the water line. The intake hoses on both port and starboard aft of engines are rusty and need replacing. All bilge pumps were activated and are in working condition. Forward to the engine room is an air compressor, central vacuum cleaning system. All water pumps on the vessel are heavy duty and in good working condition. There are two cameras in the engine room viewed from the pilot house. The fuel filtering system is a dual Racor system. The air conditioning units and both water makers with their water pumps are in a separate compartment.

**EXHIBIT A - 1**
**52**

# INTERIOR

## ACCOMODATIONS

### MASTER STATE ROOM

The master state room is forward of the engine room and full width of the vessel with queen sized bed and a mirror behind. Walk around on three sides, on the starboard side is a night stand, a corner settee, a make up table with a seat under. On the port side is a night stand and cabinets, a bureau, six drawers and lockers. There is an entertainment centre, a walk-in closet cedar line, and owners safe, there is a private bathroom starboard aft, with two vanities, wash basin, toilette, and a Whirlpool tub shower. All bathrooms have Corean tops.

### GUEST STATE ROOM No 1

Aft of the engine room on the starboard side is the guest state room No 1 consisting of a king sized bed, 2 night tables, bureaus, two closets and a settee, TV and music centre, and its own private bathroom with vanity, mirrors, two wash basins, toilette and shower.

### GUEST STATE ROOM No 2

The guest state room No two is on the port side aft of the engine room, consisting of two twin berths, night table, closet and TV music centre. There is a private bathroom with vanity, mirrors, wash basin, toilette and shower.

### CREWS QUARTERS

The crews quarters are forward, access is from steps forward of the galley. On the starboard side is a double berth with shelf, built ins, and hanging locker, TV and music. On the port side are two upper and lower berths with built ins, bureau and hanging locker, TV and music. Both crews quarters have separate bathrooms, with vanity, mirror, hand basin, toilette and shower. On the port side aft of the crews quarters is a small lounge dinette area, with counter, sink, cabinets, refrigerator, microwave, TV and music. The captain's state room is aft of the crews quarters on the starboard side, consisting of a double berth, night tables, lockers with drawers, hanging locker, with TV and music. There is a bathroom with a vanity, hand basin, mirror, toilette and shower.

### GALLEY/DINNING ROOM

The galley is long and U-shape, with a stand up refrigerator freezer with an ice making machine, a 4 burner electric stove top with a warming oven under, there is a separate electric oven and a microwave. There is a long Corean counter top with a double sink, dishwasher, trash compactor and garbage disposal. There are ample cabinets above and below. The galley floor is tile. Aft of the galley is a formal dinning room with a long table with 9 chairs.

### MAIN SALON

The passage way between the galley, dinning room, and main salon has marmol floor tiles. The main salon is long and full width of the vessel. Forward on the starboard side is access to the dinning room/galley and up to the pilot house. On the port side is also access to the pilot house with glass cabinets and music centre and between. On the port side going aft is a round table with 4 lounge chairs, aft of this is a wet bar with 3 bar stools. Behind the forward end of the bar is access to the aft state rooms below. On the starboard side going aft are two lounge chairs and a settee centre with two round tables with lamps, and two larger round tables in front of the settee. Aft of the main salon are sliding doors to the aft deck.

EXHIBIT A - 1
53

## AFT DECK

The aft deck has access door to the swim platform via a stainless steel ladder. The floor of the aft deck is teak in good condition. There are two tables and a number of chairs. ,and 2 Lewmar 500 warping capstans

## INTERIOR COSMETICALLY

The interior cosmetically is excellent and like new condition through out. The interior of the vessel haven't been totally replaced less the five years ago. All bright work, vinyl hood lining and vinyl wall coverings are like new. The upholstery is in excellent condition through out, all carpeting is in good to excellent condition through out. Bathrooms have floor tiles, all counters and bathroom vanities are of Corean. All furniture in the vessel is of good quality and in like new condition.

## COMMENTS

" **Mi Barur** " is a vessel that has been well maintained and is a credit to her owner. And when requirements are completed she will be ready for her intended use of coastal and off shore cruising.

## REQUIREMENTS

1.- Update flares ,EXPIRED January 007, difficult to obtain in Mexico

## RECOMMENDATIONS

1.- Treat and paint flanges on large aluminum ports on hull where necessary

## SUMMARY

In accordance with the request for a marine survey of this vessel for the purpose of evaluating its present condition and estimating its market value and replacement cost, I hereby submit my conclusions based on the preceding report. The subject vessel was personally inspected and found to be a well-constructed, appointed and comfortable vessel.

Subject to corrections of the recommendations listed in this report, and predicated on the assumption engines and machinery are in working order, the vessel is considered to be "fit for its intended use" of recreational near coastal cruising and offshore sailing.

## SURVEYOR'S CERTIFICATION

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

The report analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is my personal, unbiased professional analyses, opinions and conclusions.

Observations and findings are limited to that which is visibly accessible.

I have no present or prospective interest in the vessel that is the subject of this report, and I have no personal interest or bias with respect to the parties involved .My compensation is not contingent of the reporting of a predetermined value or direction in value or direction in value that favors the cause of the client, the amount of the value estimated, the attainment of a stipulate result, or the occurrence of a subsequent event .I have made a personal inspection of the vessel that is the subject of this report.

Attending Surveyor: ______________________________

Cecil M. Lange SA, Member-Society of Accredited Marin e Surveyors

**EXHIBIT A - 1**
**54**

# HALLMARK

YACHT & SHIP BROKERS
2525 Shelter Island Drive, Suite B, San Diego, CA 92106
(619) 226-2644 Phone (619) 222-4352 Fax

## CENTRAL/EXCLUSIVE LISTING AGREEMENT

This Exclusive/Central Listing Agreement defines the terms and conditions whereby the undersigned sales management firm hereafter called Broker agrees to manage the sale of the Vessel described below on behalf of the undersigned seller / agent, hereafter called Seller.

1. Seller hereby grants to Broker, the exclusive right to manage the sale of the Vessel described below together with all gear, machinery, furnishings and other articles belonging to the Vessel, whether or not now on board, at the asking price of $ 2,400,000.00 or any other Gross Selling Price or terms acceptable to the Seller which are at the sole discretion of the Seller.

2. Seller agrees to provide photographs, drawings and other detailed information to the Broker; to provide convenient and reasonable access to the Vessel so that salespersons and other brokers may show the Vessel when Seller and his guests are not aboard; to keep Broker informed of changes in location, price, condition, inventory or specifications of the Vessel; to arrange for all appointments and offers made by anyone to be made only through the listing Broker; to provide Vessel registration and proof of ownership at time of sale; and to execute the customary purchase agreement in the event Broker finds a Buyer for the Vessel.

3. The term of this agreement is for One year ( 365 ) days, commencing 6/18/03 and terminating 6/17/04, unless terminated with written notice by either party to the other at least six months ( 180 ) days prior to the determined expiration date.

4. If requested by Broker, Seller will provide the information required by the SELLER'S SPECIFICATION SHEET. Based on information provided by Seller, Broker will prepare a listing report and / or brochure for distribution to prospective buyers and other brokers who may represent potential buyers, and shall answer any and all inquiries. Seller hereby authorizes Broker to share this listing with other brokers. Broker shall present all offers Broker receives without exception to Seller for his serious consideration. Seller agrees that Broker is providing a valuable service in the distribution of information and the marketing of Seller's Vessel. Therefore Broker is authorized and directed to distribute information describing the Vessel by any and all reasonable means, including but not limited to advertising and distribution on a regular and continuous basis.

5. Seller acknowledges and warrants that the Vessel will be transferred to Buyer free and clear of any and all debts, claims, liens and encumbrances of any kind including maritime liens; except for those exclusions specifically listed on the SELLER'S SPECIFICATION SHEET attached hereto or provided separately in writing.

6. The Seller agrees to pay the Broker a minimum commission of $________ or the commission of 10% percent which ever is greater of the Gross Selling Price if, during the term of this Agreement, a buyer is procured whether by Broker, Seller, other brokers or anyone else who is ready and willing to buy, trade, or exchange any interest in the Vessel. This Agreement supersedes all other prior listing agreements which may have been entered into for the sale of this Vessel.

7. Seller shall pay the commission specified in paragraph six (6) should he, or anyone else, within one (1) year after the date of termination of this Agreement, sell or transfer by trade or otherwise the Vessel to a Buyer to whom Vessel information has been provided by or through Broker during the term of this Agreement.

8. It is specifically understood and agreed that Broker does not assume and is not delegated care, custody or control of the Vessel by reason of this Agreement. In the event the Vessel is stored at Broker's premises, Broker is not responsible for damages, loss or theft of any kind to the Vessel or her gear or equipment. Seller shall carry his own marine insurance (Hull and P. & I.) and, upon request, provide Broker with a copy of said policies. Seller shall be solely responsible for all storage and marine handling charges, if applicable, unless otherwise agreed to in writing.



Copyright 1999 California Yacht Brokers Association and Cogswell Woolley Nakazawa & Russell
This form produced by Formulator Forms Software 800-336-1027

9. Any controversy of claim arising out of or relating to this Agreement, or the breach thereof, shall be decided by binding arbitration in accordance with the Arbitration Rules of the California Yacht Brokers Association, as set forth in the edition of the California Yacht Brokers Association Arbitration Procedures Manual, in effect at the time the claim is brought and judgment upon the awards rendered by the Arbitrator(s) may be entered in any Court having jurisdiction thereof. It is further agreed that the losing party agrees to pay all incurred costs of arbitration including reasonable attorney's fees. This agreement shall be construed in accordance with the laws of the State of California.

10. Seller acknowledges having understood the terms of this Agreement; that Seller has received a signed copy of this Agreement; that this document represents the entire Agreement of these parties; that no other representations, warranties, guarantee of sale or promises of any kind have been made to the Seller other than those set forth herein; and that this Agreement is binding on and shall inure to the benefit of all heirs, executors, successors, and assigns of both Seller and Broker.

11. In the event a sale is not consummated because of Seller's failure to perform, then the full commission shall be due and payable upon such failure. If a sale is not consummated because of Buyer's failure to perform, and all or any portion of Buyer's deposit is deemed liquidated damages, Seller agrees that such amount shall be deemed liquidated damages and shall first be applied to pay all expenses incurred by Broker in attempting to sell the Vessel (including, but not limited to surveys and haul out fees) and the remainder shall be divided equally between Broker and Seller, provided that Broker's share shall not exceed the commission set forth in this Agreement.

12. Should Seller determine that it is advantageous to donate the Vessel to a tax-exempt organization during the term of this Agreement or within six (6) months thereafter, Seller shall not be obligated to pay Broker a brokerage commission. Seller agrees however, that a donation made during the term of this Agreement will be handled by Broker, who agrees to handle the donation without charge to the Seller, although a finder's fee may be paid by the tax-exempt organization.

VESSEL NAME: Simon LENGTH ON DECK: 92

MANUFACTURER: Hatteras MODEL YEAR: 1989

MODEL: BOAT TYPE: Hatteras Motoryacht

TOP/RIG: HULL#: STATE/CG#: 975461

Seller Name (please print): George Calcote Home Phone: 562-712-4193

Seller Name (please print): Work Phone: 562-637-3121

Authorized Signature: [signature] Date: 6/16/03

Address: 13337 East South St suite 237 FAX Phone: 562-637-3122

City: Cerritos State: CA Zip: 90703

Broker/Agent: Michael Hallmark

Company Name: Hallmark Yacht and Ship Brokers

Authorized Signature: [signature] Date: 6/16/03

CLA-(5/99) Page 2 of 2

Copyright 1999 California Yacht Brokers Association and Cogswell Woolley Nakazawa & Russell
This form produced by Formulator Forms Software 800-336-1027

George Calcote acknowledges there is a $ 94,758.16 lien (Mike Hallmark) still on the vessel "SIMON" and agrees that this lien will be satisfied upon sale of the vessel.

Signature Date

EXHIBIT A - 2
56

# HALLMARK

## YACHT AND SHIP BROKERS

2525 Shelter Island Drive, Suite B, San Diego, CA 92106
Tel (619) 226-2644 • Fax (619) 222-4392

http://yachtworld.com/hallmark

Hallmark Yacht and Ship Brokers
2525 Shelter Island Drive, Suite
B
San Diego, CA 92106, USA

Tel (619) 226-2644
Fax (619) 222-4392
Email HallmarkYachts@aol.com

### 92' HATTERAS RAISED PILOTHOUSE



* Year: 1989
* Price: US$ 2,400,000
* Located in San Diego, CA
* Hull Material: Fiberglass
* Engine/Fuel Type: Twin Diesel
* YW# 20704-775102
* Sale Pending

Please contact owner's agent, Mike Hallmark at 619-246-6676, for further details.

**Builder/Designer**
Builder: Hatteras
Designer: J. Hargrave

**Dimensions**
LOA: 92'
Displacement:
Ballast:
LWL:
Draft: 7' 6
Beam: 23' 10
Bridge Clearance:

**Engines**
Engine(s): Detroit Diesel
Hours: 0
Engines(s) HP: 2100
Cruising Speed: 18
Engine Model: 16V-149TI's
Max Speed: 21

**Tankage**
Fuel: 4360
Water: 540
Holding:

**Accommodations**

The 92' Hatteras is a raised pilothouse motoryacht, two deck design with spacious bridge deck and tender stowage deck. The main deck has a formal dining salon with banquet galley forward, full beam salon and nearby powder room. The lower deck includes six staterooms and heads served by three separate stairways from the main deck. Natural and dyed woods are used throughout the vessel to compliment a variety of



EXHIBIT A - 3
57

EXHIBIT C 0162

MERLE WOOD & ASSOCIATES

Specialists in the Sale, Purchase, Charter & Construction of the World's Finest Yachts

# ARRIVEDERCI III
## 92' Hatteras Motoryacht, 1990

| | | |
|---|---|---|
| **Length Overall:** | 92.08' | (28.06 meters) |
| **Beam:** | 23.83' | ( 7.26 meters) |
| **Draft:** | 7.50' | ( 2.28 meters) |
| **Year Completed:** | 1989/90 | |

| | |
|---|---|
| **Type:** | Raised Pilothouse Motoryacht |
| **Flag:** | American |
| **Builder:** | Hatteras Yachts (U.S.A.) |
| **Naval Architect:** | Jack Hargrave |
| **Interior Designer:** | Susan Puleo |
| **Construction:** | Fiberglass hull, superstructure and teak decks |
| **Main Engines:** | (2) GM 16V-149TI diesels with 2,100hp each |
| **Electrical:** | 24V(DC), 120/240V, 50/60 Hz<br>(2) 50 Kw Northern Lights diesel generators |

**Speed:**

| | |
|---|---|
| Maximum: | 23.5 knots |
| Cruising: | 20.5 knots |
| Economical: | 14 knots |

**Tankage:**

| | | |
|---|---|---|
| Fuel: | 4,360 U.S. Gallons | (16,503 liters) |
| Water: | 540 U.S. Gallons | ( 2,045 liters) |

| | |
|---|---|
| **Range:** | 1500 nautical miles @ 14 knots |
| **Accommodations:** | Sleeps 8 in the owner's party in 4 double staterooms, plus crew accommodations. |
| **Location:** | Miami, Florida |
| **Price:** | $3,250,000. USD |

*"All speeds, capacities, consumption, etc. are approximate or estimated; measurements can also be approximate. Specifications are provided for information only and particulars herein obtained from sources believed to be correct, but are not guaranteed. Buyer should instruct his agent and/or surveyor to check all details for accuracy. Offered subject to prior sale, price and/or inventory change, or withdrawal from the market without notification."*

**EXHIBIT A - 4**

**58**

1535 Southeast 17th Street • Suite 206 • Fort Lauderdale, Florida 33316 • Phone: 305-525-5111 • Facsimile: 305-525-5165

## ACCOMMODATIONS & LAYOUT:

ARRIVEDERCI III is a raised pilothouse motoryacht, two deck design with spacious bridge deck and tender stowage deck.

The main deck has a formal dining salon with banquet galley forward, full beam salon and nearby powder room. The lower deck plan includes 6 staterooms and heads served by 3 separate stairways from the main deck. Natural and dyed woods are used throughout the vessel to compliment a variety of suede, fabric and silk panelled walls and floors of upgraded carpets and marble.

Owner's Stateroom:
The full width owner's suite is located forward of the engine room and is accessed from a staircase just aft of the pilothouse. A king size bed faces aft, offering walk-around capability and a settee is just to port. The large ensuite head includes a whirlpool garden tub with his and hers lavatories and bidet. This stateroom also features a complete entertainment center and generous walk-in closet. Beautifully accented, the owner's suite offers privacy in very sophisticated surroundings.

Guest Staterooms:
The guest stateroom to starboard aft offers a king size bed, his and hers closets and an ensuite bath with whirlpool tub and two sinks. The guest stateroom to port aft includes two twin beds with an ensuite head with shower. The guest stateroom forward to starboard features a walk-around queen bed with an ensuite head with shower.

Main Salon:
Aft on the main deck, the 20' X 24' full width salon includes a large wet bar and custom entertainment center. A full bulkhead with double siding glass doors opens to a 9' X 20' teak soled afterdeck. Furnishings include a large, sumptuous U-shaped sofa to starboard and coordinating game table with four upholstered chairs to port. The main deck powder room is located adjacent to the starboard companionway. There is a custom Lite Touch lighting system throughout the main deck.

Dining Salon:
The formal dining salon offers elegant seating for eight around a custom sculptured table. Interior design elements feature raw silk wallcoverings, alternating smoked mirror panels, coordinating Roman shades and brass inlay accents on the custom dining table. There is a custom buffet service area with china and stemware storage below.

Galley:
The fully equipped custom galley is located forward of the dining salon. The striking black on white appearance is complimented by Fountainhead countertops throughout and hand-laid tile flooring. A private entrance from the exterior allows crew access to galley and crew quarters.

Crew Quarters:
Located down forward steps, forward end of galley and include the Captain's cabin with double bed to starboard and private head. The port crew cabin across companionway features an upper and lower berth with a private head. The crew lounge offers a dinette, refrigerator, stainless steel sink, microwave/convection oven, cassette tape deck with AM/FM stereo receiver,

EXHIBIT A - 4
59

## ACCOMMODATIONS & LAYOUT:
**(continued)**

speakers and color T.V.. The washer and dryer and additional freezer are conveniently located in the companionway.

Raised Pilothouse:
Located forward of the main salon through starboard companionway has full instrumentation and custom installed electronics (see electronics and navigation equipment). Chart table to starboard and custom Captain's desk area to port. There is comfortable lounge seating for two with excellent visibility forward.

Flybridge:
Located up stairs via aft, port end of pilothouse with full controls and instrumentation in addition to custom installed electronics, custom two-tiered radar arch and a centerline entertainment center with wet bar, icemaker, refrigerator, storage and seating. Port and starboard is L-shaped seating with storage and the boat deck is further aft holding a Larson boat and hydraulic davit.

Engine Room:
Access to the engine room is via a watertight door in the passageway leading to the aft staterooms. With twin Detroit Diesel 16V-149TI's, the engine room is well laid out with excellent access to engines and machinery.

## GALLEY EQUIPMENT:

(1) GE Monogram Series refrigerator/freezer
(1) Thermador convection/microwave/thermal oven
(1) Thermador trashcompactor
(1) ISE in-sink garbage disposal
(1) Silhouette by Broan ventilator
(1) Thermador warming drawer
(1) Thermador dishwasher
(1) Thermador electric cooktop
Full compliment of china and silverware
Full compliment of cookware
Nutone food center

## ELECTRONICS & NAVIGATION EQUIPMENT:

Communication Equipment:
(1) Sailor SSB shortwave program 100/B automatic radio telephone
(1) Sailor Duplex VHF radio, program RT146 dual station - main
(1) Sailor Duplex VHF radio, program RT146 single station - auxiliary
(1) Sailor Duplex VHF radio, program RT146 single station - flybridge
(1) Motorola Tritan 880 Marine cellular telephone
(1) Furuno 208A weatherfax with Navtex
(1) Sharp UX350 telephone/copier/facsimile receiver

**ELECTRONICS & NAVIGATION EQUIPMENT:**
**(continued)**

Panasonic 12-station business telephone system with intercom/facsimile/cellular interface

Navigation Equipment:
(1) Robertson RMP Commander AP9 MKII dual station auto/manual pilot with remote
(1) Hokushin (Raytheon) CM2300X gyrocompass and repeater
(1) Raytheon M92 color CRT, 25Kw/120Nm radar/plotter with 9' antenna
(1) Anritsu RA711CA 60Nm color/radar (auxiliary)
(1) Trimble navigation Navgraphic II, dual station, Co. GPS/Loran C
(1) Magnavox MX5102 transit satellite navigator - pilothouse
(1) B&G Hydra-330 log/wind/speed/depth/temp instrument system with remotes for flybridge
(1) Furuno color video echo depth sounder FCV-552
(1) Ray 410 hailer with remote, 2 speakers

**ELECTRICAL SYSTEM:**

24V (DC) and 120/240V, 50/60 Hz service
(2) 50 Kw Northern Lights diesel generators

**DECK & HULL:**

Tenders & Toys:
(1) Larson 165 Senza Bowrider with 90hp Johnson outboard and depth sounder

Deck Equipment:
(2) Lewmar model 55 stern windlasses - port and starboard
(1) Lewmar model 5000 bow windlass with 1/2" chain cat
(1) Marquipt 2000lb capacity hydraulic davit
(1) Swim platform with ladder and gate
(1) Pool-N 297lb stainless anchor
(1) 1/2" grade 80 galvanized anchor chain
(1) Varnished teak caprail
Kahlenberg triple trumpet air horns
Central vacuum system
Teak decking on aft deck

Safety Equipment:
(2) RCL 600 (6 million C.P.) remote controlled searchlights
(2) Givens 8-person life rafts

Security Equipment:
Panasonic WJ-450 digital quad system with scanning cameras - engine room

Fire Fighting Equipment:
Fixed Halon 1301 system with automatic and remote manual releases

**EXHIBIT A - 4**
**61**

## MECHANICAL EQUIPMENT & ENGINE DETAILS:

Main Engines:
(2) GM 16V-149TI diesels with 2,100hp each

Other Machinery:
Naiad 301 stabilizers
Fuel filter/water separator system for main engines and generators
Electric fuel primer fuel transfer system - engines and generators
Emergency bilge pump system with deck mount diesel pump
Lube oil change system
Water cooled underwater exhaust system
Air conditioned engine room
Hydra-power systems: 42hp hydraulic bow thrusters
HRO system 10 watermaker - 1200 GPD capacity
HRO system 10 watermaker - 600 GPD capacity

Air Conditioning:
Chilled water air conditioning system

## OTHER FEATURES:

Remaining 5-year Detroit Diesel warranty effective October 1, 1989

## REMARKS:

As the former flagship of Hatteras' Custom Megayachts, ARRIVEDERCI III is equipped with every amenity imaginable. She features elegant styling and a unique interior designed by Susan Puleo. From Paradiso marble entryways to hand-dyed wall coverings, upholstered silk walls, pearlized leather headboard and gourmet galley, fully equipped with the finest English china and imported crystals, ARRIVEDERCI III is unsurpassed in her outfitting and decor. The equipment list is extensive and all systems were designed for long term reliability and convenient yacht management.

ARRIVEDERCI III is a serious bluewater cruising yacht with a world-class interior.

## EXCLUSIONS:

Personal items of owner and crew




**EXHIBIT A - 4**

*ARRIVEDERCI III 92' Hatteras M/Y*

ABM 9530

HALE & MALONE
Marine Insurance Brokers, Inc.
2812 Cañon Street • San Diego, CA 92106 • (619) 226-8661

# Policy of Insurance

In consideration of the premium as hereinafter stated, the insurors named herein do hereby insure the insured named herein for the respective proportions set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein:

## DECLARATIONS

Named Insured: Marion Knight

Whose Address is: P.O. Box 3037, Beverly Hills, CA 90212-0037

Loss Payee, If any: Named Insured or Their Order

Description of vessel: 1990 (YEAR) 92' (LENGTH) Hatteras/Motor Yacht (TYPE) "Simon" (NAME)

Coverage to be Effective on 13th day of June, 19 97 Until the 13th day of June, 19 98
12:01 A.M. Standard Time at the address of named insured

Hull Insurance: Amount of insurance and agreed valuation $ 2,825,000.00

Each loss, if any, under Section A shall be subject to a deductible of $ 28,250.00 unless the accident covered by this insurance results in the Total or Constructive Total Loss of the Yacht insured.

Protection & Indemnity Insurance: Total limit any one accident (Section B and C combined) $ 1,000,000.00
Including Longshoremen's and Harbor Workers' compensation insurance; per Section C

Medical Payments Coverage: Total limit any one accident $ 25,000.00

Navigational Limits: PORT RISK

Special Conditions: PRIVATE PLEASURE USE ONLY!

Form H&M-1 (90) Applies
Personal Property Endorsement #1
Tender & Motor Endorsement #2
Towing Endorsement #3
Uninsured Boater Endorsement #4
Electronics Endorsement #5
Included Crew Endorsement #6

Annual Premium: $14,904.00

In witness whereof, the insurors hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at San Diego, CA

this 1st day of July, 19 97

By: [signature]

HALE & MALONE MARINE INSURANCE BROKERS

Marvin D. Henderson
Commander, USCG (Ret.)

2726 PBM-1 Shelter Island Drive
San Diego, California 92106

Membership includes:
NAMS, ABYC

Telephone: (619) 224-3164
Facsimile: (619) 588-7607

# REPORT OF SURVEY

## MARVIN HENDERSON MARINE SURVEYORS INC

7 September 2003

## CONDITION/VALUATION SURVEY FOR PRE PURCHASE, INSURANCE, FINANCE PURPOSES FOR THE EXCLUSIVE USE OF ARSENIO FARELL

**ATTENTION: THIS SURVEY IS NOT TO BE USED FOR THE BENEFIT OF A BUYER OR OWNER OTHER THAN NAMED ABOVE.** This survey report constitutes only a statement of our opinion based on the conditions we found at time of our survey inspection. It is not a warranty of the condition of the vessel. This survey is subject to the condition that we and the individual surveyor are not to be held responsible for any error, omission, default, negligence, misrepresentation or misstatement in this report. It is also issued pursuant to the terms of the work order signed by the customer. Details of survey report are thought to be reliable but are not guaranteed.

**Vessel Name:** SIMON

**Type:** Hatteras 92 twin diesel 1990 model raised pilothouse, flybridge motor yacht

**Official Number:** 975461 Call Sign: WAX8699

**Owner:** ----

**Address:** ----

**Registration:** U. S. Coast Guard Certificate of Documentation

**Vessel Service:** Recreational

**Hailing Port:** Compton CA

**Built By:** Hatteras Yachts

**At:** New Bern NC, USA

**Year Built:** 1989 model 1990

**Designer:** J. Hargrave

**Hull I.D. Number:** HAT DT3011990

**Former Name:** ARRIVEDERCI III

**Accommodations:** berthing arrangements for 7 persons in 3 staterooms + 3 in crew quarters

**Cruise Speed (approx. kts):** reported 18 21 maximum

**Cruising Range (approx. nm):** not determined

**TENDERS:** Larson Senza Bowrider w/90hp Johnson outboard

**SURVEYED:** 4 September 2003 out of water Driscoll Boat Works, San Diego CA
dockside Cabrillo Isle Marina, San Diego CA

**By Request of:** Arsenio Farell Gutenburg 147 Col. Anzuis
Mexico City, MX D.F.11590

**ESTIMATED VALUES**

**Replacement:** $5,500,000.00

**Market:** $2,200,000.00

**EXHIBIT A - 6**
65

EXHIBIT C 0170

Case 3:08-cv-00443-BEN-POR Document 13-2 Filed 06/20/2008 Page 21 of 40



MARVIN HENDERSON MARINE SURVEYORS MH

Marvin D. Henderson
Commander, USCG (Ret.)

2726 PBM-1 Shelter Island Drive
San Diego, California 92106

Membership includes:
NAMS, ABYC

Telephone: (619) 224-3164
Facsimile: (619) 588-7607

# REPORT OF SURVEY

## MARVIN HENDERSON MARINE SURVEYORS INC
17 September 2003

CONDITION/VALUATION SURVEY FOR PRE-PURCHASE INSURANCE, FINANCE PURPOSES
**• FOR THE EXCLUSIVE USE OF GEORGE CALCOTE •**

ATTENTION: THIS SURVEY IS NOT TO BE USED FOR THE BENEFIT OF A BUYER OR OWNER OTHER THAN NAMED ABOVE. This survey report constitutes only a statement of our opinion based on the conditions we found at time of our survey inspection. It is not a warranty of the condition of the vessel. This survey is subject to the condition that we and the individual surveyor are not to be held responsible for any error, omission, default, negligence, misrepresentation or misstatement in this report. It is also issued pursuant to the terms of the work order signed by the customer. Details of survey report are thought to be reliable but are not guaranteed.

**Vessel Name:** MI BARUR
**Type:** DeFever 70 twin diesel 1993 pilot house offshore motor yacht
**Official Number:** CF 4675 SS former 993773 (not currently USCG Documented)
**Owner:** Arsenio Campa Farell & Norma Markmano Farell
**Address:** Box 60361, San Diego, CA 92166-8361
**Registration:** State of California Certificate of Number
**Vessel Service:** Recreational
**Hailing Port:** San Diego CA
**Built By:** Tania Yacht Co Ltd.
**At:** Kaohsiung, Taiwan
**Year Built:** 1993
**Designer:** Arthur DeFever
**Hull I.D. Number:** DGB70008A393
**Former Name:** NEW ADVENTURE
**Accommodations:** berthing for 8 owners/guests in 4 staterooms
**Cruise Speed (approx. kts):** reported 10 15 maximum
**Cruising Range (approx. nm):** not determined
**TENDERS:** Achilles SCX 12.2 inflatable HIN: ACH00080C787
Evinrude 25hp outboard engine Serial No: 604681447

**SURVEYED:** 12 September 2003 dockside and underway Marina Palmira, La Paz, BCS, Mexico

**By Request of:** George Calcote 4012 Long Beach Blvd
Long Beach CA 90807

**ESTIMATED VALUES**
**Replacement:** $2,800,000.00
**Market:** $1,400,000.00

**EXHIBIT A - 7**
66

HALLMARK
YACHT AND SHIP BROKERS
2525 Shelter Island Drive, Suite B, San Diego, CA 92106
Tel (619) 226-2644 • Fax (619) 222-4392
http://yachtworld.com/hallmark

2525 Shelter Island Drive, Suite B
San Diego, CA 92106, USA

Tel (619) 226-2644
Fax (619) 222-4392
Email HallmarkYachts@aol.com



**77' Defever Motoryacht**

- Year: 1993
- **Current Price: US$ 1,100,000** (02/06)
- Located in Acapulco, CA
- Hull Material: Fiberglass
- Engine/Fuel Type: Twin Diesel
- YW# 20704-1496775

Many upgrades in 2005/2006 including:

Aall new 6 fiberglass fuel tanks
2 New fiberglass water tanks
All wood in engine room replaced with fiberglass
All sound insulation replaced in engine room
All 4 new vacuflush oversize toilets
Furuno 2 station navnet
All new tv flatscreen & dvd in all staterooms, main stateroom, 42" w/home theater
All new batteries january 2006
New teak and holly floors in 2 staterooms
All new faucets and marble sink tops
New stereo system in salon and flybridge
Major service to water maker in 2005 new in 20006
Major service to both naiad stabilizers
Anchor winch overhaul
New wema fuel gauges for all fuel and water tanks

**EXHIBIT A - 8**
**67**

# HALLMARK

## YACHT AND SHIP BROKERS

2525 Shelter Island Drive, Suite B, San Diego, CA 92106
Tel (619) 226-2644 • Fax (619) 222-4392
http://yachtworld.com/hallmark

Hallmark Yacht and Ship Brokers
2525 Shelter Island Drive, Suite
B
San Diego, CA 92106, USA

Tel (619) 226-2644
Fax (619) 222-4392
Email HallmarkYachts@aol.com

### 74' Defever Motoryacht

* Year: 1993
* Price: US$ 950,000
* Located In San Diego, CA
* Hull Material: Fiberglass
* Engine/Fuel Type: Twin Diesel
* YW# 20704-1208684



Contact owner's agent, Mike Hallmark, at 619-246-6676 for further details.

**Builder/Designer**
Builder: Defever
Designer:

**Dimensions**
LOA: 74'
Displacement:
Ballast:
LWL: 64'
Draft: 5'6"
Beam: 17'8"
Bridge Clearance:

**Engines**
Engine(s): Detroit Diesel
Hours: 0
Engines(s) HP: 565
Cruising Speed: 11
Engine Model: 6V92DDEC
Max Speed: 15

**Tankage**
Fuel: 1500 - Aluminum
Water: 434 - Stainless
Holding: Yes

EXHIBIT A - 8



EXHIBIT C 0173

Case 3:08-cv-00443-BEN-POR Document 13-2 Filed 06/20/2008 Page 24 of 40

**Galley**

- Galley Up
- Refrigerator w/Freezer
- Deep Freeze
- 4 Burner Electric Stove w/Oven
- Self Cleaning Oven w/Broiler
- Dishwasher
- Garbage Disposal
- Microwave/Convection Oven
- Trashcompactor
- Corian Countertops
- Icemaker
- Water Heater
- Pressure Water System

**Electronics/Navigation**

- Trimble Loran w/Autopilot Interface
- (2) Robertson Autopilots
- (3) Compasses
- Rudder Angle Indicator
- Trimble NavGraphics GPS/Loran
- Trimble Navigation Chartdrive
- Furuno DFAX Weather Fax
- Depth Sounder
- Loud Hailer
- DDEC Monitoring Controls
- Anritsu RA-720 96 Mile Radar
- Anritsu 48 Mile Radar
- Kenwood SSB Radio
- Kenwood VHF Radio
- Intercom
- B&G Windspeed Indicator
- AM/FM Cassette Stereo

**Electrical**

- 12V/24V DC & 110V/220V AC Electrical System
- Northern Lights 20kW Generator
- (9) Batteries w/Parallel Switch
- 40 Amp Battery Charger
- Dockside Electrical Cables

**Deck/Hull**

- Bruce #125 Anchor
- (2) Anchors
- Anchor Davit
- Bow Pulpit w/Rails
- Mooring Covers
- Flybridge Curtains
- Coast Guard Safety Package
- FRP Deck
- Fresh & Saltwater Washdown System
- Electric Dinghy Davits
- 5 Person 13' Novurania Dinghy w/28 HP
- Maxwell 3500 Electric Windlass
- Fenders & Lines
- Life Jackets/Rings
- Navigation Lights
- Electric Controlled Search Light
- Swim Platform
- Swim Ladder
- Windshield Wipers

**Mechanical/ Engine Equipment**

EXHIBIT A - 8

* Cruisair SMX Reverse Cycle Air Conditioning
* Naiad 5' Stabilizers
* Automatic & Manual Halon Fire Extinguishing System
* 1200 Gallon/Day Watermaker
* Hydraulic Wheel Steering
* (6) Automatic & Manual Bilge Pumps
* Electric Holding Tank Head
* Freshwater Cooling System
* Fuel Filters
* Lube Oil Transfer System
* Engine Synchronizers
* Engine Alarm & Emergency Stop
* Engine Fuel Shut Off Valve
* Raw Water Sea Strainers

**Remarks**

This vessel offers a tremendous amount of efficiency in its layout as many twin deck motoryachts can do. "MI BARUR" has complete, single level walk arounds, which makes docking and mooring a much easier task to accomplish. The two large sliding glass doors from the salon open to a full 12' beam, totally covered aft deck which effectively expands to another large area.

**Disclaimer**

The Company offers the details of this vessel in good faith but cannot guarantee or warrant the accuracy of this information nor warrant the condition of the vessel. A buyer should instruct his agents, or his surveyors, to investigate such details as the buyer desires validated. This vessel is offered subject to prior sale, price change, or withdrawal without notice.

**EXHIBIT A - 8**

70

- Service Beyond the Sale
- Boats for Sale
- Meet Our Crew
- Email Us!

# HALLMARK

## YACHT AND SHIP BROKERS

2525 Shelter Island Drive, Suite B, San Diego, CA 92106
Tel (619) 226-2644 • Fax (619) 222-4392



*Click on image to enlarge*

### 74' Defever Motoryacht

- Year: 1993
- **Current Price: US$ 950,000**
- Located in San Diego, CA
- Hull Material: Fiberglass
- Engine/Fuel Type: Twin Diesel
- YW# 20704-1208684

Send Email | Finance It | Insure It | Ship It

**Additional Specs, Equipment and Information:**

**Builder/Designer**
Builder: Defever

**Dimensions**

| | | |
|---|---|---|
| LOA: 74' | LWL: 64' | Beam: 17'8" |
| Draft: 5'6" | | |

**Engines**

| | | |
|---|---|---|
| Engine(s): Detroit Diesel | Engine(s) HP: 565 | Engine Model: 6V92DDEC |
| Cruising Speed: 11 | Max Speed: 15 | |

**Tankage**

| | | |
|---|---|---|
| Fuel: 1500 - Aluminum | Water: 434 - Stainless | Holding: Yes |

EXHIBIT A - 8
71



Salon Forward



Pilothouse



Master Stateroom



Flybridge Aft



## Galley

- Galley Up
- Refrigerator w/Freezer
- Deep Freeze
- 4 Burner Electric Stove w/Oven
- Self Cleaning Oven w/Broiler
- Dishwasher
- Garbage Dispo
- Microwave/Con Oven
- Trashcompacto
- Corian Counter
- Icemaker
- Water Heater
- Pressure Water System

## Electronics/Navigation

- Trimble Loran w/Autopilot Interface
- (2) Robertson Autopilots
- (3) Compasses
- Rudder Angle Indicator
- Trimble NavGraphics GPS/Loran
- Trimble Navigation Chartdrive
- Furuno DFAX Weather Fax
- Depth Sounder
- Loud Hailer
- DDEC Monitoring Controls
- Anritsu RA-720 96 Mile Radar
- Anritsu 48 Mile Radar
- Kenwood SSB Radio
- Kenwood VHF Radio
- Intercom
- B&G Windspeed Indicator
- AM/FM Cassette Stereo

## Electrical

- 12V/24V DC & 110V/220V AC Electrical System
- Northern Lights
- (9) Batteries w/Parallel Switch
- 40 Amp Battery Charger
- Dockside

EXHIBIT A - 8

72

[redacted]

| | |
|---|---|
| 20kW Generator | Electrical Cables |

Photo 6

**Deck/Hull**

- Bruce #125 Anchor
- (2) Anchors
- Anchor Davit
- Bow Pulpit w/Rails
- Mooring Covers
- Flybridge Curtains
- Coast Guard Safety Package
- FRP Deck
- Fresh & Saltwater Washdown System
- Electric Dinghy Davits
- 5 Person 13' Novurania Dinghy w/28 HP
- Maxwell 3500 Electric Windlass
- Fenders & Lines
- Life Jackets/Rings
- Navigation Lights
- Electric Controlled Search Light
- Swim Platform
- Swim Ladder
- Windshield Wipers

**Mechanical/ Engine Equipment**

- Cruisair SMX Reverse Cycle Air Conditioning
- Naiad 5' Stabilizers
- Automatic & Manual Halon Fire Extinguishing System
- 1200 Gallon/Day Watermaker
- Hydraulic Wheel Steering
- (6) Automatic & Manual Bilge Pumps
- Electric Holding Tank Head
- Freshwater Cooling System
- Fuel Filters
- Lube Oil Transfer System
- Engine Synchronizers
- Engine Alarm & Emergency Stop
- Engine Fuel Shut Off Valve
- Raw Water Sea Strainers

**Remarks**

This vessel offers a tremendous amount of efficiency in its layout as many twin deck motoryachts can do. "MI BARUR" has complete, single level walk arounds, which makes docking and mooring a much easier task to accomplish. The two large sliding glass doors from the salon open to a full 12' beam, totally covered aft deck which effectively expands to another large area.

**EXHIBIT A - 8**
**73**





EXHIBIT C 0178

**Disclaimer**

The Company offers the details of this vessel in good faith but cannot guarantee or warrant the accuracy of this information nor warrant the condition of the vessel. A buyer should instruct his agents, or his surveyors, to investigate such details as the buyer desires validated. This vessel is offered subject to prior sale, price change, or withdrawal without notice.

*Last Revised: Sep 10, 2004*

Contact Hallmark Yacht and Ship Brokers.

2525 Shelter Island Drive, Suite B
San Diego, CA 92106, USA

Tel (619) 226-2644
Fax (619) 222-4392
Email HallmarkYachts@aol.com

**Hallmark Yacht and Ship Brokers**

2525 Shelter Island Drive, Suite B
San Diego, CA 92106, USA

Tel (619) 226-2644
Fax (619) 222-4392
Email HallmarkYachts@aol.com

http://yachtworld.com/hallmark

YACHTWORLD.com



**EXHIBIT A - 8**
**74**



EXHIBIT C 0179

**HALLMARK**
Yacht & Ship Brokers
2525 Shelter Island Drive, Suite B
San Diego, CA 92106
(619) 226-2644 Phone
(619) 222-4392 Fax
hallmarkyachts@aol.com

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | GEORGE CALCOTE | Fax: | 562-637-3122 |
| From: | Michael S. Hallmark | Date: | March 25, 2004 |
| Re: | DEFEVER | Pages: | 2 |
| CC: | | | |

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

**MIKE 619-246-6676**

Reduced to
$1,199,000

EXHIBIT A - 8
75

# HALLMARK

## YACHT AND SHIP BROKERS

2525 Shelter Island Drive, Suite B, San Diego, CA 92106
Tel (619) 226-2644 • Fax (619) 222-4392
http://yachtworld.com/hallmark

2525 Shelter Island Drive, Suite B
San Diego, CA 92106, USA

Tel (619) 226-2644
Fax (619) 222-4392
Email HallmarkYachts@aol.com

| Length | Boats | Year | Current US$ | Codes | Location |
|---|---|---|---|---|---|
| 87' | Defever/Sharp | 1989 | 990,000 | P U T D FG | Marina del Rey, CA |
| 78' | Defever | 1988 | 950,000 | P U T D FG | Miami Beach, FL |
| 74' | Defever Motoryacht | 1993 | 1,400,000 | P U T D FG | San Diego, CA |
| 72' | Defever Flushdeck Pilothouse | 1986 | 1,295,000 | P U T D FG | Ft Lauderdale, FL |
| 71' | Defever Flush Deck Cockpit Motor Yacht | 1998 | 1,395,000 | P U T D FG | Cruising Bahamas, Bahamas |
| 68' | Defever Custom Cockpit MY/POC Walkaround | 1990 | 649,000 | P U T D FG | Daytona Beach, FL |
| 65' | Defever LRC Trawler | 1967 | 695,000 | P U T D ST | Seattle, WA |
| 60' | Defever Cockpit Motoryacht | 1991 | 625,000 | P U T D FG | Long Beach, CA |
| 60' | Defever DF 53+7 | 1987 | 585,000 | P U T D FG | Annapolis, MD |
| 60' | Defever Intercontinental | 1989 | 525,000 | P U T D FG | Fort Lauderdale, FL |
| 60' | Defever Intercontinental Motor Yacht | 1990 | 595,000 | P U T D FG | Sale Pending |
| 60' | Defever Motoryacht | 1980 | 379,000 | P U T D FG | Bermuda, Bermuda |
| 60' | Defever Designed Enterprise | 1982 | 495,000 | P U T D FG | Channel Islands, CA |
| 60' | Defever/Sharp | 1991 | 695,000 | P U T D FG | Marina del Rey, CA |
| 59' | Defever LRC with Cockpit | 1983 | 379,000 | P U T D FG | Sale Pending |
| 57' | De Fever Motor Yacht | 1982 | 670,697 | P U T D FG | Sale Pending |
| 57' | Defever POC Cockpit Motor Yacht | 1989 | 615,000 | P U T D CP | Sale Pending |
| 55' | Defever Trawler | 1994 | 430,000 | P U S D ST | LA, USA |
| 55' | Defever Wide body twin deck | 1992 | 445,000 | P U T D FG | Richmond, BC |
| 53' | De Fever 53 | 1989 | 550,755 | P U T D FG | Contact Coastal Leisure, Spain |
| 53' | Defever 53 POC | 1986 | 495,000 | P U T D FG | Savannah, FL |
| 53' | Defever 53 POC | 1986 | 445,000 | P U T D FG | Boca Grande, USA |
| 53' | Defever Flybridge | 1988 | 449,000 | P U T D FG | Fort Lauderdale, FL |
| 53' | Defever High Performance | 1989 | 550,755 | P U S D FG | Palma de Mallorca, Spain |
| 53' | Defever Model-1988 | 1987 | 479,000 | P U T D FG | Sale Pending |
| 53' | Defever P.O.C. | 1988 | 449,000 | P U T D FG | Jupiter, FL |
| 53' | Defever Pilothouse | 1999 | 750,000 | P U T D FG | Seattle, WA |

**EXHIBIT A - 8**
76

Case 3:08-cv-00443-BEN-POR Document 13-2 Filed 06/20/2008 Page 32 of 40

MARINER'S GENERAL INSURANCE GROUP

COPY

MARINE COVERNOTE #5170

pending issuance of the Standard Marine Insurance Policy of the

Zurich Insurance Company
(NAME OF INSURANCE COMPANY)

Named Insured: George Calote

Whose Address Is: 13337 E. South Street, #237, Cerritos, CA 90703

Loss Payee, if any: Named Insured or Their Order

Description of Vessel: 1993 (Year) 74' (Length) DeFever M/Y (Type) DGB70008A393 (HIN) CF 4675 SS Mi Barur (Name)

Coverage to be Effective on: September 23, 2003 (Month) (Day) (Year) 12:01 AM (Hour) for 30 days

Vessel Insured for: One Million Four Hundred Thousand and no/100------------------------------------------

Conditions of Insurance

Amount of Insurance-Hull & Machinery: $1,400,000.00

Deductible: $ 28,000.00

Limits of Protection & Indemnity: $1,000,000.00

Limits of Medical Payments Coverage: $ 25,000.00

Navigational Limits: Pacific coastal waters not north of Pt. Conception, CA nor south of Rio Santo Tomas, Mexico not more than 200 miles offshore.

Special Conditions: WARRANTED PRIVATE PLEASURE USE ONLY.

| | |
|---|---|
| Uninsured Boater (Bodily Injury Only) | $1,000,000.00 Electronic's deductible $500 (Theft Only) |
| Oil Spill Liability | $1,000,000.00 Coverage included for 1 paid captain |
| Personal Effects | $ 15,000.00/$100.00 deductible |
| Towing | $ 1,500.00 |

Coverage also included for a one way voyage from La Paz, Mexico leaving on or about September 25, 2003 headed for San Diego.

BINDER ISSUED PENDING ORIGINAL POLICY TERMS AND CONDITIONS.

Annual Premium: $8,311

The obligations of the parties are according to the terms of the policy in ordinary use by the Company. This binder to continue in force until replaced by a regular policy, but in no event for a period longer than 30 days from the effective hour of commencement in this binder and the policy subsequently issued, that the time set forth herein shall govern and shall supersede and commencement provisions contained in such policy

BY [signature]

**EXHIBIT A - 9**

*Formerly Hall & Malone Marine Insurance*

2390 SHELTER ISLAND DRIVE, SUITE 216 • SAN DIEGO, CALIFORNIA 92106 • (619) 226-8661 • Fax (619) 226-6410 • Lic.#0717157

**HALLMARK YACHTS INC.**
dba HALLMARK YACHT & SHIP BROKERS
2525 Shelter Island Drive, Suite B Phone: (619) 226-2644
San Diego, California 92106 Fax: (619) 222-4392
hallmarkyachts@aol.com www.hallmarkyachts.com

# CENTRAL/EXCLUSIVE LISTING AGREEMENT

*CALIFORNIA YACHT BROKERS ASSOCIATION FORM*

**THIS AGREEMENT** is made by and between the broker identified above ("Broker") and:

SELLER(S) AGUAZUL INC. - AGUSTIN RODRIGUEZ
ADDRESS 3511 SILVERSIDE ROAD #105 CITY WILLIMINGTON ST DE ZIP 19810
Phone (W): ______ Phone (H): 555 5707678
Phone (C): ______ Facsimile: ______
E-mail: agustin@intercap.com.mx Citizenship: United States of America
(hereinafter "Seller")

1. **Exclusive Right to Sell.** Seller hereby employs and grants Broker the exclusive and irrevocable right to sell, trade, exchange, or lease-option all right, title and interest in and to the following vessel, together with all of its gear, machinery, equipment, furnishings, boats, dinghys, trailers, appurtenances and other articles (except personal effects), aboard and ashore, including, without limitation, all items set forth in any specifications, list or inventory attached hereto (collectively, the "Vessel"), subject to the terms and conditions of this Central/Exclusive Listing Agreement (hereinafter, this "Agreement"):

Name of Vessel: AGUAZUL Hull ID Number: DGB70008A393
Year: 1993 Make, Type, and Length: 70'
Registration No. or Official No. 993773 Flag or Reg. State: USA
Home Port (Documented Vessel): NVDC Hailing Port: WILMINGTON, DE
Dinghy: ______ Trailer: N/A

Seller covenants, represents, and warrants that there are no brokerage agreements in effect relating to the Vessel other than this Agreement, that Seller will make no other brokerage agreements during the Listing Period, and that this Agreement is intended to supercede, replace and revoke any other brokerage agreements relating to the Vessel. Seller shall take whatever action is necessary to ensure that any other brokerage agreements are terminated and of no effect.

2. **Listing Period.** Broker's exclusive right to sell, exchange, trade or lease-option the Vessel shall commence on Feb 8, 2006 and end at 11:59 p.m. on Aug 8, 2006 (the "Listing Period"), unless extended by written authorization.

3. **Price.** The gross asking price for the Vessel shall be: US$ 1,100,000.00 (______ United States Dollars), and no other price shall be quoted without authorization from Seller.

4. **Compensation to Broker.** Seller shall pay Broker as compensation for services (irrespective of agency relationships) a commission of ten percent ( 10 %) of the initial gross asking price, or, if a purchase agreement is entered into, of the Vessel purchase price, or a commission in the amount stated in Paragraph 24 below. The commission shall be due and payable if, during the Listing Period, a buyer appears who is ready, willing and able to purchase, trade, exchange, or lease-option the Vessel on terms agreeable to Seller, irrespective of whether Broker, any cooperating broker, Seller or anyone else produced the buyer. The commission also shall be due and payable if, within one (1) year after expiration of the Listing Period, the Vessel is sold, traded, exchanged, or

Seller's Initials: ______ ______

Copyright © 2005 California Yacht Brokers Association and Thomas A. Russell

CYBA



**EXHIBIT A - 9**
**78**

EXHIBIT C 0183

# Register Report

12/13/99 Through 12/4/03

12/4/03



| Date | Account | Num | Description | Memo | Category | Cl | Amount |
|---|---|---|---|---|---|---|---|
| | | | BALANCE 12/12/99 | | | | 0.00 |
| 9/3/03 | ARSENI... | | Opening Balance | FUNDS FOR BOAT | [ARSENIO FARELL] | | 100,000.00 |
| 9/8/03 | ARSENI... | 5376 | Driscoll Inc. | HAUL OUT FOR SU... | Yard Work | | -1,288.00 |
| 9/9/03 | ARSENI... | 5380 | Marvin Henderson | | Survey | | -1,104.00 |
| 9/11/... | ARSENI... | 5381 | Jay's Marine Diesel Service | | Engine Survey | | -240.00 |
| 9/15/... | ARSENI... | DEP | Arsenio Farell | | Funds For Boat | | 1,000,000.00 |
| 9/16/... | ARSENI... | 5382 | Christopher Yachts | PARTS FOR JORGE... | Boat Repair | | -767.00 |
| 9/16/... | ARSENI... | | Hallmark Yacht Trust Acc... | 92' Hatteras SIMON | Purchase Price | | -900,000.00 |
| 9/17/... | ARSENI... | Cash | Costco | (2) Televisions | Supplies, Bus | | -435.28 |
| 9/17/... | ARSENI... | | Smith & Barney | Return to Sr. Farell | | | -100,000.00 |
| 9/18/... | ARSENI... | CC | Postal Annex | Comforters to Mexico | Postage and Delivery | | -236.59 |
| 9/19/... | ARSENI... | 5075 | Andres Dominguez | | Maintenance | | -2,158.00 |
| 9/19/... | ARSENI... | CC | Postal Annex | Varnished Wood to M... | Postage and Delivery | | -43.26 |
| 9/19/... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -1,361.73 |
| 9/22/... | ARSENI... | 5384 | Baja Canvas | | Deposit On Work | | -12,715.00 |
| 9/23/... | ARSENI... | | Postal Annex | Sent Loan Pay Off C... | Postage and Delivery | | -20.52 |
| 9/25/... | ARSENI... | 5388 | Steven | Wallpaper (Deposit) | Boat Repair | | -3,500.00 |
| 9/25/... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -84.13 |
| 9/25/... | ARSENI... | 5079 | Andres Dominguez | | Maintenance | | -2,840.00 |
| 9/26/... | ARSENI... | | Karl Richardson | | Boat Repair | | -95.61 |
| 9/29/... | ARSENI... | | San Diego Marine Exchange | Supplies for Andres | Supplies, Bus | | -1,315.67 |
| 9/29/... | ARSENI... | 5081 | Andres Dominguez | | Maintenance | | -147.00 |
| 9/30/... | ARSENI... | CC | Central Wholesale Applian... | (2) Refrigerators | Supplies, Bus | | -2,256.29 |
| 9/30/... | ARSENI... | 5084 | Karl Richardson | | Boat Repair | | -1,624.40 |
| 8/30/... | ARSENI... | 5085 | Omega Diving Service | Dive Service | Dive Service | | -120.00 |
| 10/1/... | ARSENI... | | Macy's | Furniture | Supplies, Bus | | -7,470.26 |
| 10/2/... | ARSENI... | | CIM | Cabrillo Island Marina | Slip Rent | | -1,987.89 |
| 10/3/... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -220.89 |
| 10/4/... | ARSENI... | 5087/5... | Andre Dominguez | | Maintenance | | -3,243.00 |
| 10/5/... | ARSENI... | CC | Expo Design Center | Blinds | Supplies, Bus | | -4,596.89 |
| 10/5/... | ARSENI... | CC | Ridout Plastics | Acrylic | Supplies, Bus | | -896.12 |
| 10/6/... | ARSENI... | | Expo Design Center | Faucets | Supplies, Bus | | -950.32 |
| 10/6/... | ARSENI... | 5397 | Karl Richardson | | Boat Repair | | -1,841.69 |
| 10/6/... | ARSENI... | | Rello Ramero | Airline Ticket, Etc. | Expenses | | -400.00 |
| 10/6/... | ARSENI... | | John Vincent | Ensenada to San Die... | Captain Services | | -335.00 |
| 10/7/... | ARSENI... | 5398 | Andre Dominguez | | Maintenance | | -1,000.00 |
| 10/9/... | ARSENI... | CC | Sears | | | | -323.23 |
| 10/1... | ARSENI... | 5093 (M) | Andre Dominguez | | Maintenance | | -2,703.00 |
| 10/1... | ARSENI... | 5400 | Andre Dominguez | | Maintenance | | -200.00 |
| 10/1... | ARSENI... | 5401 | Rello Ramero | | Expenses | | -200.00 |
| 10/1... | ARSENI... | 5404 | Karl Richardson | | Boat Repair | | -3,094.48 |
| 10/1... | ARSENI... | | San Diego Marine Exchange | Parts for Karl | Supplies, Bus | | -38.42 |
| 10/1... | ARSENI... | | San Diego Marine Exchange | Parts for Karl | Supplies, Bus | | -141.96 |
| 10/1... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -23.07 |
| 10/1... | ARSENI... | 5405 | Andres Dominguez | | Maintenance | | -2,182.88 |
| 10/1... | ARSENI... | 5406 | Andres Dominguez | | Maintenance | | -600.00 |
| 10/2... | ARSENI... | CC | Barbeques Galore | Barbeque | | | -860.32 |
| 10/2... | ARSENI... | CC | Circuit City | CD Player | Electronics | | -150.84 |
| 10/2... | ARSENI... | CC | Best Buy | | Supplies, Bus | | -3,084.68 |
| 10/2... | ARSENI... | 5407 | Sanchez Carpet | Deposit on Carpet | Mi Barur | | -3,540.00 |
| 10/2... | ARSENI... | 5409 | Hugo Garcia | | Mi Barur | | -1,100.00 |
| 10/2... | ARSENI... | 5410 | Karl Richardson | | Mi Barur | | -1,070.51 |
| 10/2... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -6.11 |
| 10/2... | ARSENI... | 5408 | J.A.G. Yacht Painting | | Mi Barur | | -2,000.00 |
| 10/2... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -49.23 |
| 10/2... | ARSENI... | CC | San Diego Marine Exchange | Supplies for Andres | Supplies, Bus | | -1,289.29 |
| 10/2... | ARSENI... | CC | Circuit City | | Electronics | | -391.06 |
| 10/2... | ARSENI... | 5101 | Andre Dominguez | | Maintenance | | -2,855.00 |
| 10/2... | ARSENI... | 5102 | Luis Manuel Rello Romero | | Maintenance | | -400.00 |
| 10/2... | ARSENI... | | Andre Pasquali | Waxing/Detail | Maintenance | | -375.00 |
| 10/2... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -90.42 |
| 10/2... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -11.64 |

**EXHIBIT A - 10**

**79**

# Register Report

12/13/99 Through 12/4/03

12/4/03

Page 2

| Date | Account | Num | Description | Memo | Category | Cl | Amount |
|---|---|---|---|---|---|---|---|
| 10/2... | ARSENI... | 5108 | Paul S. Trusso | Lawyer | Documentation | | -2,500.00 |
| 10/2... | ARSENI... | 5109 | Omega Diving Service | Dive Service | Dive Service | | -460.00 |
| 10/2... | ARSENI... | 5107 | Baja Canvas | | Mi Barur | | -11,525.00 |
| 10/2... | ARSENI... | 5105 | J.A.G. Yacht Painting | | Mi Barur | | -250.00 |
| 10/2... | ARSENI... | 5104 | San Diego Light Bulb & Fi... | Deposit on Lights | | | -1,000.00 |
| 10/2... | ARSENI... | 5103 | Steven Graen | | | | -1,513.99 |
| 10/2... | ARSENI... | 5110 | Point Loma Sign | Signs for Boats | Boat Repair | | -1,245.00 |
| 10/3... | ARSENI... | | Postal Annex | | Postage and Delivery | | -6.45 |
| 10/3... | ARSENI... | DEP | Best Buy | Returned TV/DVD | Electronics | | 495.61 |
| 10/3... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -52.45 |
| 10/3... | ARSENI... | 5115 | Karl Richardson | | Mi Barur | | -1,434.57 |
| 10/3... | ARSENI... | 5411 | Andre Dominguez | | Maintenance | | -3,658.00 |
| 10/3... | ARSENI... | | Best Buy | Flat Screen TVs | Electronics | | -829.64 |
| 10/3... | ARSENI... | | Distribuidora Gemini S.A. ... | Television | Electronics | | -189.00 |
| 10/3... | ARSENI... | | Tiendas Comercial Mexica... | | Electronics | | -286.00 |
| 10/3... | ARSENI... | CC | Village Marine | Watermaker | | | -7,257.75 |
| 10/3... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -137.04 |
| 10/3... | ARSENI... | CC | Postal Annex | | Postage and Delivery | | -134.34 |
| 11/3/... | ARSENI... | 5413 | Luis Manuel Rello Romero | | Maintenance | | -600.00 |
| 11/3/... | ARSENI... | | Dona Jenkins | Paperwork | Documentation | | -282.00 |
| 11/3/... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -5.64 |
| 11/3/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -57.95 |
| 11/4/... | ARSENI... | DEP | Expo Design Center | Blind Order Cancelled | Reimbursement | | 4,596.89 |
| 11/4/... | ARSENI... | 5415 | Andre Dominguez | | Maintenance | | -400.00 |
| 11/4/... | ARSENI... | 5414 | Elidio Mario Cisneros | | | | -200.00 |
| 11/4/... | ARSENI... | 5416 | Jay's Marine Diesel Service | Engine Maintenance | | | -2,212.28 |
| 11/4/... | ARSENI... | CC | All Star Glass | Glass for Door | Home Repair | | -213.92 |
| 11/4/... | ARSENI... | Cash | San Diego Light Bulb & Fi... | | | | -920.11 |
| 11/4/... | ARSENI... | 5419 | Jason Triska | Measure for Blinds | | | -40.00 |
| 11/4/... | ARSENI... | 5418 | Plex Products | Flybridge Door | Mi Barur | | -1,395.37 |
| 11/4/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -83.34 |
| 11/5/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -14.53 |
| 11/6/... | ARSENI... | CC | 3 Day Blinds | Blinds | Supplies, Bus | | -1,453.79 |
| 11/6/... | ARSENI... | CC | 3 Day Blinds | Blinds | Supplies, Bus | | -64.65 |
| 11/6/... | ARSENI... | CC | Fry's Electronics | | Electronics | | -689.55 |
| 11/6/... | ARSENI... | | Expo Design Center | Light Bulbs | Supplies, Bus | | -6.37 |
| 11/6/... | ARSENI... | CC | Best Buy | | Electronics | | -140.06 |
| 11/6/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -16.43 |
| 11/6/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -211.47 |
| 11/7/... | ARSENI... | 5421 | Andre Dominguez | | Mi Barur | | -4,572.00 |
| 11/7/... | ARSENI... | | San Diego Marine Exchange | Supplies for Andres | Supplies, Bus | | -1,363.76 |
| 11/7/... | ARSENI... | | San Diego Marine Exchange | Barbque parts | Supplies, Bus | | -131.34 |
| 11/7/... | ARSENI... | CC | The Home Depot | | Supplies, Bus | | -140.02 |
| 11/7/... | ARSENI... | CC | Best Buy | | Electronics | | -203.64 |
| 11/7/... | ARSENI... | 5420 | Karl Richardson | | Mi Barur | | -1,470.06 |
| 11/7/... | ARSENI... | CC | San Diego Hardware Com... | | Supplies, Bus | | -555.86 |
| 11/7/... | ARSENI... | 5422 | Steve Graen | | | | -1,814.32 |
| 11/7/... | ARSENI... | 5423 | Daily Marine | Watermaker | Mi Barur | | -617.22 |
| 11/7/... | ARSENI... | CC | San Diego Hardware Com... | | Supplies, Bus | | -70.01 |
| 11/1... | ARSENI... | 5424 | Keith Wolcott | Watermaker | Mi Barur | | -3,209.46 |
| 11/1... | ARSENI... | 5427 | Yacht Docktor | Countertops | Mi Barur | | -3,800.00 |
| 11/1... | ARSENI... | 5426 | Mario Cisneros | Food | Mi Barur | | -200.00 |
| 11/1... | ARSENI... | 5425 | Benchmark | Deposit on Metal Work | Mi Barur | | -1,000.00 |
| 11/1... | ARSENI... | CC | Circuit City | | Electronics | | -32.31 |
| 11/1... | ARSENI... | CC | Port Supply | Speaker | Supplies, Bus | | -32.33 |
| 11/1... | ARSENI... | DEP | San Diego Marine Exchange | Returned Parts | Reimbursement | | 35.08 |
| 11/1... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -48.14 |
| 11/1... | ARSENI... | 5428 | Al Melone Custom Covers | Covers/Canvas | Supplies, Bus | | -8,055.00 |
| 11/1... | ARSENI... | Cash/5... | Jayson Triska | Blind Installation | Boat Repair | | -260.00 |
| 11/1... | ARSENI... | CC | Pacific Marine Supply | Liferafts Serviced | Supplies, Bus | | -1,158.56 |
| 11/1... | ARSENI... | 5429 | Yacht Docktor | Andres for Jorge | JORGE CASTRO | | -618.00 |
| 11/1... | ARSENI... | 5430 | Point Loma Sign | Signs for Boats | Mi Barur | | -225.00 |
| 11/1... | ARSENI... | CC | Central Wholesale | Trash Compactor | Mi Barur | | -453.36 |
| 11/1... | ARSENI... | CC | Valley Detroit Diesel | Pulley | Mi Barur | | -196.47 |

**EXHIBIT A - 10**

**80**

# Register Report

12/13/99 Through 12/4/03



12/4/03

| Date | Account | Num | Description | Memo | Category | Cl | Amount |
|---|---|---|---|---|---|---|---|
| 11/1... | ARSENI... | 5124 | Andres Dominguez | | Mi Barur | | -6,105.58 |
| 11/1... | ARSENI... | 5123 | Humberto Collins | | Mi Barur | | -876.00 |
| 11/1... | ARSENI... | 5126 | Karl Richardson | | Mi Barur | | -619.51 |
| 11/1... | ARSENI... | CC | Boat Depot | Achilles Skiff | | | -3,717.38 |
| 11/1... | ARSENI... | 5125 | Luis Manuel Rello Romero | | | | -350.00 |
| 11/1... | ARSENI... | 5140 | JDJ Business Group | Refinish Sinks | | | -450.00 |
| 11/1... | ARSENI... | 5127 | Sanchez Carpet | Carpet | | | -4,100.00 |
| 11/1... | ARSENI... | | Galaxy Electronics | | | | -144.00 |
| 11/1... | ARSENI... | 5138 | Yacht Docktor | Work order by Andres | Mi Barur | | -109.00 |
| 11/1... | ARSENI... | CC | Liberty Motorsports | Sea Doo | | | -7,465.48 |
| 11/1... | ARSENI... | CC | San Diego Hardware | | Supplies, Bus | | -32.33 |
| 11/1... | ARSENI... | 5128 | Andres Dominguez | Jorge Castro | | | -2,000.00 |
| 11/2... | ARSENI... | | Fuel (Yuma, Arizona To S... | Sea Doo Delivery | | | -50.00 |
| 11/2... | ARSENI... | CC | Shelter Island Boat Yard | | Slip Rent | | -6,713.13 |
| 11/2... | ARSENI... | 5133 | Benchmark | | Mi Barur | | -1,853.25 |
| 11/2... | ARSENI... | CC | Fun Bike Center | Kit-Lift | | | -266.65 |
| 11/2... | ARSENI... | 5132 | Plex Products | | Mi Barur | | -1,716.62 |
| 11/2... | ARSENI... | 5131 | Andres Dominguez | | Mi Barur | | -4,473.00 |
| 11/2... | ARSENI... | 5129 | Mario Cisneros | | Mi Barur | | -200.00 |
| 11/2... | ARSENI... | CC | The Home Depot | Light Bulbs | Supplies, Bus | | -355.22 |
| 11/2... | ARSENI... | 5137 | J.A.G. Yacht Painting | | | | -15,000.00 |
| 11/2... | ARSENI... | 5139 | Fed Ex | | Postage and Delivery | | -55.41 |
| 11/2... | ARSENI... | 5141 | Andres Dominguez | | | | -1,000.00 |
| 11/2... | ARSENI... | 5143 | Baja Canvas | | | | -15,680.00 |
| 11/2... | ARSENI... | 5143 | Baja Canvas | | | | -3,440.00 |
| 11/2... | ARSENI... | | Admiralty Marine Corporate | Parts for Keith | | | -653.18 |
| 11/2... | ARSENI... | | Keith Wolcott | | Mi Barur | | -3,622.32 |
| 11/2... | ARSENI... | 5149 | Steven Green | | Mi Barur | | -3,312.63 |
| 11/2... | ARSENI... | 5142 | Al Melone Custom Covers | | Mi Barur | | -2,989.37 |
| 11/2... | ARSENI... | CC | CME | Electronics & Installat... | | | -33,037.00 |
| 11/2... | ARSENI... | | San Diego Marine Exchange | Andres | Supplies, Bus | | -587.67 |
| 11/2... | ARSENI... | | San Diego Marine Exchange | Andres | Supplies, Bus | | -888.64 |
| 11/2... | ARSENI... | | San Diego Marine Exchange | Andres | Supplies, Bus | | -2,614.93 |
| 11/2... | ARSENI... | 5144 | Baja Canvas | | | | -680.00 |
| 11/2... | ARSENI... | CC | Driscoll - Mission Bay | | Yard Work | | -5,469.34 |
| 11/2... | ARSENI... | 5145 | Andres Dominguez | | | | -1,817.00 |
| 11/2... | ARSENI... | Cash | John Gumb | Bow Thruster | Boat Repair | | -225.00 |
| 11/2... | ARSENI... | DEP | Arsenio Farell | | Funds For Boat | | 200,000.00 |
| 11/2... | ARSENI... | CC | Home Depot | | Supplies, Bus | | -250.48 |
| 11/2... | ARSENI... | CC | Sears | | | | -43.09 |
| 11/2... | ARSENI... | CC | Sears | | | | -430.85 |
| 11/2... | ARSENI... | CC | Target | | Supplies, Bus | | -362.24 |
| 11/2... | ARSENI... | Cash | Costco | | | | -253.88 |
| 11/3... | ARSENI... | 5147 | Steven Green | | Mi Barur | | -744.22 |
| 11/3... | ARSENI... | CC | Big 5 | Foul Weather Gear | Clothing | | -91.54 |
| 11/3... | ARSENI... | Cash | Costco | | | | -297.36 |
| 11/3... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -30.22 |
| 11/3... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -1,239.94 |
| 11/3... | ARSENI... | Credit | San Diego Marine Exchange | Return Foul Weather ... | Supplies, Bus | | 452.55 |
| 11/3... | ARSENI... | | Admiralty Marine Corporate | Already Paid Admiralty | | | 653.18 |
| 11/3... | ARSENI... | | San Diego Marine Exchange | Steve Wilcott's | Supplies, Bus | | -196.59 |
| 12/1/... | ARSENI... | CC | Fuel Dock | | | | -8,516.80 |
| 12/1/... | ARSENI... | 5150 | Fleming Marine | Air Conditioning Servi... | Boat Repair | | -550.17 |
| 12/1/... | ARSENI... | | Keith Wolcott | | Mi Barur | | -505.00 |
| 12/1/... | ARSENI... | CC | Vons | | | | -191.79 |
| 12/1/... | ARSENI... | Credit | San Diego Marine Exchange | Steve Wilcott's | Supplies, Bus | | -14.02 |
| 12/1/... | ARSENI... | Credit | San Diego Marine Exchange | | Supplies, Bus | | -18.57 |
| 12/1/... | ARSENI... | Credit | San Diego Marine Exchange | Andres | Supplies, Bus | | -66.74 |
| 12/1/... | ARSENI... | Cash | Henry's | Food for Trip | | | -18.17 |
| 12/2/... | ARSENI... | Cash | John Gumb | Stabilizers | Boat Repair | | -200.00 |
| 12/2/... | ARSENI... | CC | Kona Kai Marina | | Slip Rent | | -496.09 |
| 12/2/... | ARSENI... | Cash | Funds For Delivery To Me... | | | | -5,254.70 |
| | | | TOTAL 12/13/99 - 12/4/03 | | | | 0.00 |

**EXHIBIT A - 10**

**81**

# Register Report

12/13/99 Through 11/24/03

11/24/03

Page 1

| Date | Account | Num | Description | Memo | Category | Cl | Amount |
|---|---|---|---|---|---|---|---|
| | | | BALANCE 12/12/99 | | | | 0.00 |
| 9/3/03 | ARSENI... | | Opening Balance | FUNDS FOR BOAT | [ARSENIO FARELL] | | 100,000.00 |
| 9/8/03 | ARSENI... | 5376 | Driscoll Inc. | HAUL OUT FOR SU... | Yard Work | | -1,288.00 |
| 9/9/03 | ARSENI... | 5380 | Marvin Henderson | | Survey | | -1,104.00 |
| 9/11/... | ARSENI... | 5381 | Jay's Marine Diesel Service | | Engine Survey | | -240.00 |
| 9/15/... | ARSENI... | DEP | Arsenio Farell | | Funds For Boat | | 1,000,000.00 |
| 9/16/... | ARSENI... | 5382 | Christopher Yachts | PARTS FOR JORGE... | Boat Repair | | -767.00 |
| 9/16/... | ARSENI... | | Hallmark Yacht Trust Acc... | 92' Hatteras SIMON | Purchase Price | | -900,000.00 |
| 9/17/... | ARSENI... | Cash | Costco | (2) Televisions | Supplies, Bus | | -435.28 |
| 9/17/... | ARSENI... | | Smith & Barney | Return to Sr. Farell | | | -100,000.00 |
| 9/18/... | ARSENI... | CC | Postal Annex | Comforters to Mexico | Postage and Delivery | | -236.59 |
| 9/19/... | ARSENI... | 5075 | Andres Dominguez | | Maintenance | | -2,158.00 |
| 9/19/... | ARSENI... | CC | Postal Annex | Varnished Wood to M... | Postage and Delivery | | -43.26 |
| 9/19/... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -1,361.73 |
| 9/22/... | ARSENI... | 5384 | Baja Canvas | | Deposit On Work | | -12,715.00 |
| 9/23/... | ARSENI... | | Postal Annex | Sent Loan Pay Off C... | Postage and Delivery | | -20.52 |
| 9/25/... | ARSENI... | 5388 | Steven | Wallpaper (Deposit) | Boat Repair | | -3,500.00 |
| 9/25/... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -84.13 |
| 9/25/... | ARSENI... | 5079 | Andres Dominguez | | Maintenance | | -2,840.00 |
| 9/26/... | ARSENI... | | Karl Richardson | | Boat Repair | | -95.61 |
| 9/29/... | ARSENI... | | San Diego Marine Exchange | Supplies for Andres | Supplies, Bus | | -1,315.67 |
| 9/29/... | ARSENI... | 5081 | Andres Dominguez | | Maintenance | | -147.00 |
| 9/30/... | ARSENI... | CC | Central Wholesale Applian... | (2) Refrigerators | Supplies, Bus | | -2,256.29 |
| 9/30/... | ARSENI... | 5084 | Karl Richardson | | Boat Repair | | -1,624.40 |
| 9/30/... | ARSENI... | 5085 | Omega Diving Service | Dive Service | Dive Service | | -120.00 |
| 10/1/... | ARSENI... | | Macy's | Furniture | Supplies, Bus | | -7,470.26 |
| 10/2/... | ARSENI... | | CIM | Cabrillo Island Marina | Slip Rent | | -1,987.89 |
| 10/3/... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -220.88 |
| 10/4/... | ARSENI... | 5087/5... | Andre Dominguez | | Maintenance | | -3,243.00 |
| 10/5/... | ARSENI... | CC | Expo Design Center | Blinds | Supplies, Bus | | -4,596.89 |
| 10/5/... | ARSENI... | CC | Ridout Plastics | Acrylic | Supplies, Bus | | -896.12 |
| 10/6/... | ARSENI... | | Expo Design Center | Faucets | Supplies, Bus | | -950.32 |
| 10/6/... | ARSENI... | 5397 | Karl Richardson | | Boat Repair | | -1,841.69 |
| 10/6/... | ARSENI... | | Rello Ramero | Airline Ticket, Etc. | Expenses | | -400.00 |
| 10/6/... | ARSENI... | | John Vincent | Ensenada to San Die... | Captain Services | | -335.00 |
| 10/7/... | ARSENI... | 5398 | Andre Dominguez | | Maintenance | | -1,000.00 |
| 10/9/... | ARSENI... | CC | Sears | | | | -323.23 |
| 10/1... | ARSENI... | 5093 (M) | Andre Dominguez | | Maintenance | | -2,703.00 |
| 10/1... | ARSENI... | 5400 | Andre Dominguez | | Maintenance | | -200.00 |
| 10/1... | ARSENI... | 5401 | Rello Ramero | | Expenses | | -200.00 |
| 10/1... | ARSENI... | 5404 | Karl Richardson | | Boat Repair | | -3,094.48 |
| 10/1... | ARSENI... | | San Diego Marine Exchange | Parts for Karl | Supplies, Bus | | -38.42 |
| 10/1... | ARSENI... | | San Diego Marine Exchange | Parts for Karl | Supplies, Bus | | -141.96 |
| 10/1... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -23.07 |
| 10/1... | ARSENI... | 5405 | Andres Dominguez | | Maintenance | | -2,182.88 |
| 10/1... | ARSENI... | 5406 | Andres Dominguez | | Maintenance | | -600.00 |
| 10/2... | ARSENI... | CC | Barbeques Galore | Barbeque | | | -860.32 |
| 10/2... | ARSENI... | CC | Circuit City | CD Player | Electronics | | -150.84 |
| 10/2... | ARSENI... | CC | Best Buy | | Supplies, Bus | | -3,084.68 |
| 10/2... | ARSENI... | 5407 | Sanchez Carpet | Deposit on Carpet | Mi Barur | | -3,540.00 |
| 10/2... | ARSENI... | 5409 | Hugo Garcia | | Mi Barur | | -1,100.00 |
| 10/2... | ARSENI... | 5410 | Karl Richardson | | Mi Barur | | -1,070.51 |
| 10/2... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -6.11 |
| 10/2... | ARSENI... | 5408 | J.A.G. Yacht Painting | | Mi Barur | | -2,000.00 |
| 10/2... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -49.23 |
| 10/2... | ARSENI... | CC | San Diego Marine Exchange | Supplies for Andres | Supplies, Bus | | -1,289.29 |
| 10/2... | ARSENI... | CC | Circuit City | | Electronics | | -391.06 |
| 10/2... | ARSENI... | 5101 | Andre Dominguez | | Maintenance | | -2,855.00 |
| 10/2... | ARSENI... | 5102 | Luis Manuel Rello Romero | | Maintenance | | -400.00 |
| 10/2... | ARSENI... | | Andre Pasquali | Waxing/Detail | Maintenance | | -375.00 |
| 10/2... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -90.42 |
| 10/2... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -11.64 |

**EXHIBIT A - 10**

**82**

EXHIBIT C 0187

# Register Report

12/13/99 Through 11/24/03



11/24/03

| Date | Account | Num | Description | Memo | Category | Cl | Amount |
|---|---|---|---|---|---|---|---|
| 10/2... | ARSENI... | 5108 | Paul S. Trusso | Lawyer | Documentation | | -2,500.00 |
| 10/2... | ARSENI... | 5109 | Omega Diving Service | Dive Service | Dive Service | | -460.00 |
| 10/2... | ARSENI... | 5107 | Baja Canvas | | Mi Barur | | -11,525.00 |
| 10/2... | ARSENI... | 5105 | J.A.G. Yacht Painting | | Mi Barur | | -250.00 |
| 10/2... | ARSENI... | 5104 | San Diego Light Bulb & Fi... | Deposit on Lights | | | -1,000.00 |
| 10/2... | ARSENI... | 5103 | Steven Graen | | | | -1,513.99 |
| 10/2... | ARSENI... | 5110 | Point Loma Sign | Signs for Boats | Boat Repair | | -1,245.00 |
| 10/3... | ARSENI... | | Postal Annex | | Postage and Delivery | | -6.45 |
| 10/3... | ARSENI... | DEP | Best Buy | Returned TV/DVD | Electronics | | 495.61 |
| 10/3... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -52.45 |
| 10/3... | ARSENI... | 5115 | Kari Richardson | | Mi Barur | | -1,434.57 |
| 10/3... | ARSENI... | 5411 | Andre Dominguez | | Maintenance | | -3,658.00 |
| 10/3... | ARSENI... | DEP | Best Buy | Flat Screen TVs | Electronics | | -829.64 |
| 10/3... | ARSENI... | | Distribuidora Gemini S.A. ... | Television | Electronics | | -189.00 |
| 10/3... | ARSENI... | | Tiendas Comercial Mexica... | | Electronics | | -286.00 |
| 10/3... | ARSENI... | CC | Village Marine | Watermaker | | | -7,257.75 |
| 10/3... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -137.04 |
| 11/3/... | ARSENI... | 5413 | Luis Manuel Rello Romero | | Maintenance | | -600.00 |
| 11/3/... | ARSENI... | | Dona Jenkins | Paperwork | Documentation | | -262.00 |
| 11/3/... | ARSENI... | | San Diego Marine Exchange | | Supplies, Bus | | -5.64 |
| 11/3/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -57.95 |
| 11/4/... | ARSENI... | DEP | Expo Design Center | Blind Order Cancelled | Reimbursement | | 4,596.89 |
| 11/4/... | ARSENI... | 5415 | Andre Dominguez | | Maintenance | | -400.00 |
| 11/4/... | ARSENI... | 5414 | Elidio Mario Cisneros | | | | -200.00 |
| 11/4/... | ARSENI... | 5416 | Jay's Marine Diesel Service | Engine Maintenance | | | -2,212.28 |
| 11/4/... | ARSENI... | CC | All Star Glass | Glass for Door | Home Repair | | -213.92 |
| 11/4/... | ARSENI... | Cash | San Diego Light Bulb & Fi... | | | | -920.11 |
| 11/4/... | ARSENI... | 5419 | Jason Triska | Measure for Blinds | | | -40.00 |
| 11/4/... | ARSENI... | 5418 | Plex Products | Flybridge Door | Mi Barur | | -1,395.37 |
| 11/4/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -83.34 |
| 11/5/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -14.53 |
| 11/6/... | ARSENI... | CC | 3 Day Blinds | Blinds | Supplies, Bus | | -1,453.79 |
| 11/6/... | ARSENI... | CC | 3 Day Blinds | Blinds | Supplies, Bus | | -64.65 |
| 11/6/... | ARSENI... | CC | Fry's Electronics | | Electronics | | -689.55 |
| 11/6/... | ARSENI... | | Expo Design Center | Light Bulbs | Supplies, Bus | | -6.37 |
| 11/6/... | ARSENI... | CC | Best Buy | | Electronics | | -140.06 |
| 11/6/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker. | Supplies, Bus | | -16.43 |
| 11/6/... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -211.47 |
| 11/7/... | ARSENI... | 5421 | Andre Dominguez | | Mi Barur | | -4,572.00 |
| 11/7/... | ARSENI... | | San Diego Marine Exchange | Supplies for Andres | Supplies, Bus | | -1,363.76 |
| 11/7/... | ARSENI... | | San Diego Marine Exchange | Barbque parts | Supplies, Bus | | -131.34 |
| 11/7/... | ARSENI... | CC | The Home Depot | | Supplies, Bus | | -140.02 |
| 11/7/... | ARSENI... | CC | Best Buy | | Electronics | | -203.64 |
| 11/7/... | ARSENI... | 5420 | Kari Richardson | | Mi Barur | | -1,470.06 |
| 11/7/... | ARSENI... | CC | San Diego Hardware Com... | | Supplies, Bus | | -555.88 |
| 11/7/... | ARSENI... | 5422 | Steve Graen | | | | -1,814.32 |
| 11/7/... | ARSENI... | 5423 | Daily Marine | Watermaker | Mi Barur | | -617.22 |
| 11/7/... | ARSENI... | CC | San Diego Hardware Com... | | Supplies, Bus | | -70.01 |
| 11/1... | ARSENI... | 5424 | Keith Wolcott | Watermaker | Mi Barur | | -3,209.46 |
| 11/1... | ARSENI... | 5427 | Yacht Docktor | Countertops | Mi Barur | | -3,800.00 |
| 11/1... | ARSENI... | 5426 | Mario Cisneros | Food | Mi Barur | | -200.00 |
| 11/1... | ARSENI... | 5425 | Benchmark | Deposit on Metal Work | Mi Barur | | -1,000.00 |
| 11/1... | ARSENI... | CC | Circuit City | | Electronics | | -32.31 |
| 11/1... | ARSENI... | CC | Port Supply | Speaker | Supplies, Bus | | -32.33 |
| 11/1... | ARSENI... | DEP | San Diego Marine Exchange | Returned Parts | Reimbursement | | 35.08 |
| 11/1... | ARSENI... | | San Diego Marine Exchange | Parts for Watermaker | Supplies, Bus | | -48.14 |
| 11/1... | ARSENI... | 5428 | Al Melone Custom Covers | Covers/Canvas | Supplies, Bus | | -8,055.00 |
| 11/1... | ARSENI... | Cash/5... | Jayson | Blind Installation | Boat Repair | | -260.00 |
| 11/1... | ARSENI... | CC | Pacific Marine Supply | Liferafts Serviced | Supplies, Bus | | -1,158.56 |
| 11/1... | ARSENI... | 5429 | Yacht Docktor | Andres for Jorge | JORGE CASTRO | | -618.00 |
| 11/1... | ARSENI... | 5430 | Point Loma Sign | Signs for Boats | Mi Barur | | -225.00 |
| 11/1... | ARSENI... | CC | Central Wholesale | Trash Compactor | Mi Barur | | -453.36 |
| 11/1... | ARSENI... | CC | Valley Detroit Diesel | Pulley | Mi Barur | | -196.47 |
| 11/1... | ARSENI... | 5124 | Andres Dominguez | | Mi Barur | | -6,105.58 |

**EXHIBIT A - 10**

83

# Register Report

12/13/99 Through 11/26/03

11/25/03 Page 3

| Date | Account | Num | Description | Memo | Category | Clr | Amount |
|---|---|---|---|---|---|---|---|
| 11/1... | ARSENI... | 5124 | Andres Dominguez | | Mi Barur | | -6,105.58 |
| 11/1... | ARSENI... | 5123 | Humberto Collins | | Mi Barur | | -876.00 |
| 11/1... | ARSENI... | 5126 | Kari Richardson | | Mi Barur | | -619.51 |
| 11/1... | ARSENI... | CC | Boat Depot | Achilles Skiff | | | -3,717.38 |
| 11/1... | ARSENI... | 5125 | Luis Manuel Rello Romero | | | | -350.00 |
| 11/1... | ARSENI... | 5140 | JDJ Business Group | Refinish Sinks | | | -450.00 |
| 11/1... | ARSENI... | 5127 | Sanchez Carpet | Carpet | | | -4,100.00 |
| 11/1... | ARSENI... | | Galaxy Electronics | | | | -144.00 |
| 11/1... | ARSENI... | 5138 | Yacht Docktor | Work order by Andres | Mi Barur | | -109.00 |
| 11/1... | ARSENI... | CC | Liberty Motorsports | Sea Doo | | | -7,465.48 |
| 11/1... | ARSENI... | CC | San Diego Hardware | | Supplies, Bus | | -32.33 |
| 11/1... | ARSENI... | 5128 | Andres Dominguez | Jorge Castro | | | -2,000.00 |
| 11/2... | ARSENI... | | Fuel (Yuma, Arizona To S... | Sea Doo Delivery | | | -50.00 |
| 11/2... | ARSENI... | | Shelter Island Boat Yard | | Slip Rent | | -6,713.13 |
| 11/2... | ARSENI... | 5133 | Benchmark | | Mi Barur | | -1,853.25 |
| 11/2... | ARSENI... | CC | Fun Bike Center | Kit-Lift | | | -266.65 |
| 11/2... | ARSENI... | 5132 | Plex Products | | Mi Barur | | -1,718.62 |
| 11/2... | ARSENI... | 5131 | Andres Dominguez | | Mi Barur | | -4,473.00 |
| 11/2... | ARSENI... | 5129 | Mario Cisneros | | Mi Barur | | -200.00 |
| 11/2... | ARSENI... | CC | The Home Depot | Light Bulbs | Supplies, Bus | | -355.22 |
| 11/2... | ARSENI... | 5137 | J.A.G. Yacht Painting | | | | -15,000.00 |
| 11/2... | ARSENI... | 5139 | Fed Ex | | Postage and Delivery | | -55.41 |
| 11/2... | ARSENI... | 5141 | Andres Dominguez | | | | -1,000.00 |
| 11/2... | ARSENI... | 5143 | Baja Canvas | | | | -15,680.00 |
| 11/2... | ARSENI... | 5143 | Baja Canvas | | | | -3,440.00 |
| 11/2... | ARSENI... | | Admiralty Marine Corporate | Parts for Keith | | | -653.18 |
| 11/2... | ARSENI... | | Keith Wilcott | | Mi Barur | | -3,622.32 |
| 11/2... | ARSENI... | | Steven Green | | Mi Barur | | -3,312.63 |
| 11/2... | ARSENI... | 5142 | Al Melone Custom Covers | | Mi Barur | | -2,989.37 |
| 11/2... | ARSENI... | CC | CME | Electronics & Installat... | | | -33,037.00 |
| 11/2... | ARSENI... | | San Diego Marine Exchange | Andres | Supplies, Bus | | -587.67 |
| 11/2... | ARSENI... | | San Diego Marine Exchange | Andres | Supplies, Bus | | -888.64 |
| 11/2... | ARSENI... | | San Diego Marine Exchange | Andres | Supplies, Bus | | -2,614.93 |
| 11/2... | ARSENI... | 5144 | Baja Canvas | | | | -680.00 |
| 11/2... | ARSENI... | | Driscoll - Mission Bay | | Yard Work | | 0.00 |
| 11/2... | ARSENI... | | Fuel Dock | | | | 0.00 |
| 11/2... | ARSENI... | | Spare Parts | | | | 0.00 |
| 11/2... | ARSENI... | | Supplies | | | | 0.00 |
| 11/2... | ARSENI... | | Fleming Marine | Air Conditioning Servi... | Boat Repair | | 0.00 |
| 11/2... | ARSENI... | | Slip Fees | | | | 0.00 |
| | | | TOTAL 12/13/99 - 11/26/03 | | | | -173,821.95 |
| | | | BALANCE 11/26/03 | | | | -173,821.95 |
| | | | TOTAL INFLOWS | | | | 1,105,127.58 |
| | | | TOTAL OUTFLOWS | | | | -1,278,949.53 |
| | | | NET TOTAL | | | | -173,821.95 |

Rost Silver to Arsenne 11/25

EXHIBIT A - 10

84

# Register Report

12/13/99 Through 11/26/03

11/25/03 

| Date | Account | Num | Description | Memo | Category | Cl | Amount |
|---|---|---|---|---|---|---|---|
| 11/1... | ARSENI... | 5124 | Andres Dominguez | | Mi Barur | | -6,105.58 |
| 11/1... | ARSENI... | 5123 | Humberto Collins | | Mi Barur | | -876.00 |
| 11/1... | ARSENI... | 5126 | Karl Richardson | | Mi Barur | | -619.51 |
| 11/1... | ARSENI... | CC | Boat Depot | Achilles Skiff | | | -3,717.38 |
| 11/1... | ARSENI... | 5125 | Luis Manuel Rello Romero | | | | -350.00 |
| 11/1... | ARSENI... | 5140 | JDJ Business Group | Refinish Sinks | | | -450.00 |
| 11/1... | ARSENI... | 5127 | Sanchez Carpet | Carpet | | | -4,100.00 |
| 11/1... | ARSENI... | | Galaxy Electronics | | | | -144.00 |
| 11/1... | ARSENI... | 5138 | Yacht Docktor | Work order by Andres | Mi Barur | | -109.00 |
| 11/1... | ARSENI... | CC | Liberty Motorsports | Sea Doo | | | -7,465.48 |
| 11/1... | ARSENI... | CC | San Diego Hardware | | Supplies, Bus | | -32.33 |
| 11/1... | ARSENI... | 5128 | Andres Dominguez | Jorge Castro | | | -2,000.00 |
| 11/2... | ARSENI... | | Fuel (Yuma, Arizona To S... | Sea Doo Delivery | | | -50.00 |
| 11/2... | ARSENI... | | Shelter Island Boat Yard | | Slip Rent | | -6,713.13 |
| 11/2... | ARSENI... | 5133 | Benchmark | | Mi Barur | | -1,853.25 |
| 11/2... | ARSENI... | CC | Fun Bike Center | Kit-Lift | | | -266.65 |
| 11/2... | ARSENI... | 5132 | Plex Products | | Mi Barur | | -1,718.62 |
| 11/2... | ARSENI... | 5131 | Andres Dominguez | | Mi Barur | | -4,473.00 |
| 11/2... | ARSENI... | 5129 | Mario Cisneros | | Mi Barur | | -200.00 |
| 11/2... | ARSENI... | CC | The Home Depot | Light Bulbs | Supplies, Bus | | -355.22 |
| 11/2... | ARSENI... | 5137 | J.A.G. Yacht Painting | | | | -15,000.00 |
| 11/2... | ARSENI... | 5139 | Fed Ex | | Postage and Delivery | | -55.41 |
| 11/2... | ARSENI... | 5141 | Andres Dominguez | | | | -1,000.00 |
| 11/2... | ARSENI... | 5143 | Baja Canvas | | | | -15,680.00 |
| 11/2... | ARSENI... | 5143 | Baja Canvas | | | | -3,440.00 |
| 11/2... | ARSENI... | | Admiralty Marine Corporate | Parts for Keith | | | -653.18 |
| 11/2... | ARSENI... | | Keith Wilcott | | Mi Barur | | -3,622.32 |
| 11/2... | ARSENI... | | Steven Green | | Mi Barur | | -3,312.63 |
| 11/2... | ARSENI... | 5142 | Al Melone Custom Covers | | Mi Barur | | -2,989.37 |
| 11/2... | ARSENI... | CC | CME | Electronics & Installat... | | | -33,037.00 |
| 11/2... | ARSENI... | | San Diego Marine Exchange | Andres | Supplies, Bus | | -587.67 |
| 11/2... | ARSENI... | | San Diego Marine Exchange | Andres | Supplies, Bus | | -888.64 |
| 11/2... | ARSENI... | | San Diego Marine Exchange | Andres | Supplies, Bus | | -2,614.93 |
| 11/2... | ARSENI... | 5144 | Baja Canvas | | | | -680.00 |
| 11/2... | ARSENI... | CC | Driscoll - ~~Mission Bay~~ | | Yard Work | | -5,469.34 |
| 11/2... | ARSENI... | | Fuel Dock | | | | 0.00 |
| 11/2... | ARSENI... | | Spare Parts | | | | 0.00 |
| 11/2... | ARSENI... | | Supplies | | | | 0.00 |
| 11/2... | ARSENI... | | Fleming Marine | Air Conditioning Servi... | Boat Repair | | 0.00 |
| 11/2... | ARSENI... | | Slip Fees | | | | 0.00 |

| | |
|---|---|
| TOTAL 12/13/99 - 11/26/03 | -179,291.29 |
| BALANCE 11/26/03 | -179,291.29 |
| TOTAL INFLOWS | 1,105,127.58 |
| TOTAL OUTFLOWS | -1,284,418.87 |
| NET TOTAL | -179,291.29 |

225.00
195.99

3385 Jorge

**EXHIBIT A - 10**
**85**

BANNING MICKLOW & BULL LLP
William L. Banning, State Bar No. 75757
Edward M. Bull III, State Bar No. 141996
501 West Broadway, Suite 2090
San Diego, California 92101
Telephone: (619) 230-0030
Facsimile: (619) 230-1350

Attorneys for MI BARUR, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| New Hampshire Insurance Company,<br><br>Plaintiff,<br><br>v.<br><br>Mi Barur, Inc.,<br><br>Defendant | Case No. 08 CV 0443 BEN POR<br><br>**DECLARATION OF MICHAEL HALLMARK** |

1. I, Michael Hallmark, declare:

2. I have personal knowledge of the facts stated in this Declaration. I am an adult over the age of 18 years of age and if called as a witness, can and will competently testify under oath as to the facts contained herein.

3. I am a professional yacht broker and have been in the yacht brokerage business in San Diego and Southern California for approximately 14 years, and have been in the boating industry since 1977. In these capacities I have developed an extensive knowledge and expertise in valuing yachts, especially as to their market value at any given time or place. I have also developed significant personal

///

knowledge regarding the manners in which different yacht owners hold title to their boats, select the vessel's flag of registry, and other vessel management issues.

4. In my capacities as a yacht broker and a yacht manager I have worked with Mr. Arsenio Farell helping him to buy, sell, upgrade and manage various yachts for over twenty years, and I have come to know him well on a professional and personal basis.

5. Mr. Farell had, at the time of the loss of his 92' Hatteras MI BARUR, owned numerous high-end boats and yachts. In the larger yacht category, Mr. Farell owned a 42-foot Grand Banks, a 55-foot yacht (the make of which I do not recall) and a 74-foot DeFever before he purchased the 92' Hatteras. Mr. Farell purchased the DeFever and the 92-foot Hatteras for cash (including a trade). As far as I know, Mr. Farell has never financed the purchase of a yacht and has never made an insurance claim on any boat he has owned.

6. Prior to the time that Mr. Farell purchased the 92' Hatteras MI BARUR, I advised Mr. Farell that an opportunity existed to get an exceptional deal on this high-end motor yacht.

7. As part of the purchase of the MI BARUR, Mr. Farell traded his 74' DeFever yacht. Although many factors go into what a vessel will ultimately sell for, prior to the transfer in question, the seller of the 92-foot Hatteras and prospective owner of the DeFever, Mr. George Calcote, arranged for a survey by Mr. Marvin Henderson, who placed the fair market value of the Defever at that time at $1,400,000. Although when Mr. Calcote resold the Defever, I recall he reduced the asking price from $1.4 million to $1.1 million, and then to $950,000, and ultimately sold the boat for $620,000, there is nothing to suggest to me that the fair market value of this vessel was ever less than $1,000,000.

8. Following the purchase of the MI BARUR, Mr. Farell invested a substantial sum of money in additional upgrades and equipment for his new yacht. As the person in charge of supervising and advancing the funds to do the initial work, my office

maintained receipts and documents evidencing the nature and extent of such work. My brief review of these documents indicates that on this initial upgrade alone, Mr. Farrell spent well in excess of $300,000 in the fall of 2003 alone. Moreover, it is my understanding based on discussions with Mr. Farrell that, in addition to the above work (for which I have receipts) Mr. Farrell also spent many thousands of dollars more in further vessel improvements.

9. After conferring with counsel experienced in yacht purchase transactions, Mr. Farell chose to hold title to the vessel in a single vessel holding corporation, a practice that is very common for both recreational and commercial vessels. Also, based on my experience and my own personal involvement in many sales and discussions with experienced lawyers involved in such transactions, it is my understanding that a non-U.S. citizen holding of 100% of the stock in such a U.S. single vessel corporation is completely legal and is in fact specifically approved by U.S. federal statue. While I am not a lawyer, it is also my understanding and belief that there are particular advantages to structuring the holding of the vessel in this manner, including tax benefits and easier resale (through stock sales), all commonly used in legitimate vessel sale and holding transactions.

10. At the time that Mr. Farell decided to sell the MI BARUR, he explained to me the yacht had always been used as a center of his family life and relaxation, and given that both of his daughters were leaving Mexico to study in the United States, he and Mrs. Farell felt that the 92' Hatteras was simply too large for the couple at this stage in their lives. He never mentioned any financial need or motivation to sell the yacht.

11. Mr. Farell was in no great rush to sell the MI BARUR and was willing to take the time needed to get a reasonable price. Indeed, Mr. Farell was always a relaxed seller (having bought and sold numerous high-end yachts in the past), and while he always wanted to get a fair price, he was also flexible when the market mandated a reduced asking price. For example, while the MI BARUR was originally

offered for $2.7 million, the price was later lowered to $2.2 million at the suggestion of Mr. Farell. However, this was not to say that Mr. Farell was in anyway desperate or would take any offer. Indeed, Mr. Farell rejected multiple verbal offers on MI BARUR, including an offer for $1.6 million cash and another for $1.85 million (including a home in trade said to be valued at $850,000). Based on my experience and knowledge of the vessel, I firmly believe that she was worth at least the $1.9 million insured value on the date she burned.

12. After my initial attempts to sell MI BARUR proved unsuccessful Mr. Farrell retained the services of a Florida based broker; I understand he had planned to move the vessel to Florida and had already paid a deposit to have her transported there. Prior to the time Mr. Farrell engaged the Florida broker, while I was still the broker assisting him, Mr. Farrell discussed with me bringing the vessel to San Diego for purposes of marketing her here, and I therefore attempted (only a couple of months before the vessel burned) to secure berthing accommodations for MI BARUR at Harbor Island West Marina, located on Harbor Island, in San Diego.

I declare until penalty and perjury under the laws of the United States of America and the State of California that the forgoing is true and correct.

Executed this 9th day of May 2008, at San Diego, California.

Michael Hallmark