# EXHIBIT "C"
# PART TWO

BANNING MICKLOW & BULL LLP
William L. Banning, State Bar No. 75757
Edward M. Bull III, State Bar No. 141996
501 West Broadway, Suite 2090
San Diego, California 92101
Telephone: (619) 230-0030
Facsimile: (619) 230-1350

Attorneys for MI BARUR, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| New Hampshire Insurance Company,<br><br>Plaintiff,<br><br>v.<br><br>Mi Barur, Inc.,<br><br>Defendant | Case No. 08 CV 0443 BEN POR<br><br>**DECLARATION OF PAUL TRUSSO** |

1. I, Paul Trusso, declare:

2. I have personal knowledge of the facts stated in this Declaration. I am an adult over the age of 18 years of age and if called as a witness, can and will competently testify under oath as to the facts contained herein.

3. I am an attorney licensed to practice law in the State of California and in the United States District Court for the Southern District of California, and I have a practice emphasis in, among other things, vessel purchase and sale transactions, and registration issues associated with vessel ownership. In this capacity I believe I have developed an extensive knowledge and expertise in the manner different yacht owners hold title to their boats, select the vessel's flag of registry, and other vessel management issues.

4. In my capacity as a lawyer I have worked with Mr. Arsenio Farell helping him to buy, document, hold and sell various yachts and I have come to know him on a professional basis. In this capacity, I assisted and advised Mr. Farell in regard to the purchase, flagging and holding of the 92' Hatteras yacht MI BARUR, and I can say with complete confidence that Mr. Farell holding title to his yacht in a single vessel holding corporation is a practice that is very common for both recreational and commercial vessels, and is completely legal.

5. Also, based on my legal expertise, specific research, and substantial experience and involvement in many such sales and transactions, I can say without a doubt, that a non-U.S. citizen holding of 100% of the stock in such a U.S. single vessel corporation is completely legal and is in fact specifically approved by U.S. federal statue.

6. There are particular advantages to structuring the holding of the vessel in this manner, including tax benefits and easier resale (through stock sales), all commonly used in legitimate vessel sale and holding transactions.

I declare until penalty and perjury under the laws of the United States of America and the State of California that the forgoing is true and correct.

Executed this 21st day of May 2008, at San Diego, California.

Paul S. Trusso, Esq.

BANNING MICKLOW & BULL LLP
William L. Banning, State Bar No. 75757
Edward M. Bull III, State Bar No. 141996
501 West Broadway, Suite 2090
San Diego, California 92101
Telephone: (619) 230-0030
Facsimile: (619) 230-1350

Attorneys for MI BARUR, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| New Hampshire Insurance Company,<br><br>Plaintiff,<br><br>v.<br><br>Mi Barur, Inc.,<br><br>Defendant | Case No. 08 CV 0443 BEN POR<br><br>**DECLARATION OF HENRY MEDINA** |

1. I, Henry Medina, declare:

2. I have personal knowledge of the facts stated in this declaration. I am an adult over the age of 18 years of age and if called as a witness, can and will competently testify under oath as to the facts contained herein.

3. I am a professional marine insurance broker and have been in the marine insurance business in San Diego and Southern California for over twenty years. In this capacity I have developed extensive knowledge and expertise insuring yachts, including, I believe, a very good understanding as to what information is material to writing a particular risk and as to what is expected by marine underwriters during the application process.

4. In my capacity as a professional marine insurance broker I have worked with Mr. Arsenio Farell helping him to insure various yachts for over ten years. Mr.

Case 3:08-cv-00443-BEN-POR Document 13-3 Filed 06/20/2008 Page 8 of 43

Farell had, prior to the time of the loss of his 92' Hatteras MI BARUR, owned numerous high-end boats and yachts. In the larger yacht category, I understand that Mr. Farell owned a 42-foot Grand Banks, a 55-foot Grand Banks and a 75-foot DeFever before he purchased the 92' Hatteras. To the best of my understanding, Mr. Farell purchased each of these vessels for cash (and/or trade), never carried any loans on any of his yachts, and always fully insured such vessels. As far as I know, Mr. Farell he has never made an insurance claim on any boat he has owned.

5. To the best of my knowledge Mr. Farell and his corporation, through his staff, was always completely forthcoming in his dealings with me and has fully advised me of all relevant facts regarding his yacht. Based on my many years of experience in the marine insurance business in general, and with New Hampshire Insurance Company ("NHIC") in particular, at the time of placing the first NHIC policy on the MI BARUR, and in the renewal or replacement of that policy with NHIC, I, in turn, gave all information which I considered to be material to NHIC, in addition to any and all material requested by the representatives of NHIC.

6. In placing this insurance I had absolutely no incentive to misrepresent or conceal any facts. I had experienced no trouble whatsoever insuring this yacht in the past, I had received quotes of lesser premium from other insurers, and I could have placed insurance with numerous companies other than NHIC.

7. I also had insured many vessels held by single vessel owning corporations and/or Mexican citizens, never with any problem or any indication from any underwriter, including Mr. Clark and others at NHIC, that either of these considerations were considered negative risk factors by the underwriters. Mr. Clark and other representatives of NHIC were never shy about requesting information they felt was important to them.

8. NHIC's own underwriting files will reveal that it commonly insures such single vessel corporations, including companies where the stock is entirely held by Mexican citizens. When NHIC and similar marine insurance hull underwriters insure

Case 3:08-cv-00443-BEN-POR Document 13-3 Filed 06/20/2008 Page 9 of 43

vessels owned by single vessel holding corporations, none of their standard application forms or questionnaires that I have seen inquire as to the nationality of the stock holders of such single vessel corporations.

9. I was well aware at the time of making the application submissions to NHIC that it was very common for yachts to remain in Mexico for the entire year and that this had never been an issue that was of any concern to any insurer I worked with, including NHIC.

10. Although none of NHIC policies on the MI BARUR required her to return to U.S. waters for any period of time, it is not uncommon for insurers that do want a vessel to return to a specific location to so mandate in the trading warranty or elsewhere in the policy. However, an insured has paid for an absolute right to go anywhere in those areas, for any period of time, unless the insurer (the policy) imposes some limit. Other than what was set forth in the weather plan and a declaration increasing the deductible for weather damage sustained in the southern portion of the warranted area during the storm season, the policy in force on the date of the loss of the MI BARUR had no such restriction. I am aware of not a single instance where the MI BARUR violated her trading warranty for even a day.

11. After I faxed Captain Rello's resume to Chris Clark at NHIC, having received no response to this fax or an e-mail, I called Mr. Clark. He said he had been on vacation and out of the office. I asked if the material I forwarded were acceptable. He then asked why the Captain's resume was written in Spanish. He asked if everyone could read this, and I replied to the effect, "well, they are all Mexicans." I asked him "are we still OK," referring to the documents I submitted, including the Captain's resume. He replied, "yes, we should be OK." The policy subsequently issued.

12. At the time of the 2007 renewal, I suggested that Mr. Farell obtain an updated survey, because the carrier had inquired whether there was an updated

///

survey, and some quotes I received from other companies requested an updated survey

13. The Agreed Value for the 2007-2008 policy of $1.9 million was not based on any request or representation made by me or the Insureds, but was based on independent research by MGA's underwriter, Michael Terrier. Mr. Terrier informed me that if the vessel was being advertised for sale for $1.9 million, that is all he wanted to insure it for.

14. As I explained to Mr. Robb before the denial letter was even sent out, Mr. Schwede made the following comment; **"New policy, less than 30 days old, total loss, *Mexican*, he did it."** At the time, I assumed Mr. Schwede was joking but I corrected him by noting that the policy was in fact a renewal and had a new policy number, and that the policy was not less than 30 days old.

I declare until penalty and perjury under the laws of the United States of America and the State of California that the forgoing is true and correct.

Executed this 21st day of May 2008, at San Diego, California.

Henry Medina

Maritime General Agency

70 Essex Road • Westbrook, CT 06498
Phone: 800-566-8086 • Fax: 860-399-3670
E-mail: info@maritimegeneral.com

EFFECTIVE DATE: 10-11-06

**APPLICANT INFO**

Name: [redacted] LLC
Address: [redacted]
City: [redacted] State: [redacted] Zip: [redacted]
Beneficial Owner(s): [redacted]
Corporate Name (if any):
Is Corp for sole purpose of ownership of vessel? ☒ Yes ☐ No ☐ N/A

**LOSS PAYEE INFO**

Payee:
Address: insured
City: State: Zip:
% Financed:
Nature of operations of the business:
Is this vessel fractionally owned? ☐ Yes ☐ No

**Name**

| NAMED OPERATORS | D.O.B. | AFFILIATION TO OWNER |
|---|---|---|
| 1. [redacted] | 1934 | owner |
| 2. paid capt. | | |

**Vessel**

Builder/Manufacturer: Cheoy Lee Model: M/Y Hull ID/Serial #: CHLD43706091
Year: 1991 Length: 96
Vessel Name: Sapphire
Date Purchased: 10-11-06
Purchase Price: $1,500,000

CONSTRUCTION: ☒ Fiberglass ☐ Wood ☐ Aluminum ☐ Steel ☐ Other

TYPE: ☐ Runabout ☐ Cruiser ☐ Sailboat ☐ Houseboat ☒ Other Motor Yacht

**Engine & Equip.**

Engine Year: 1991 Engine Mfg.: cat Caterpillar Model: Serial #: P 38S14178
Total H.P.: 2100 Max Speed: 20 Serial #: S 38S14184
FUEL: ☐ Gas ☒ Diesel TYPE: (check one from each category) ☐ Outboard ☒ Inboard ☐ I/O ☒ Twin ☐ Single
ADDITIONAL EQUIPMENT: ☒ GPS, Radar or Loran ☐ CO Detector ☒ Fire Suppression
Tender Mfg.: Zodiac Length: 13 Value: Outboard Value:
Trailer Mfg.: Length: Value: Serial #:

**Personal**

Years boating: 10+ How many years in total have you owned boats? 10+
PRIOR VESSELS 1st PRIOR Length: 60 Type: Hatteras Years Owned:
2nd PRIOR Length: 35 Type: Bertram Years Owned:
5 Year Loss History: ☒ No Losses or (Date(s), Cause, Amount):
EDUCATION ☐ USCGA ☐ Licensed Capt. ☐ USPS ☒ Other
Present Marine Insurer: new purchase
Will applicant be living aboard? ☒ No ☐ Yes
Has your insurance ever been canceled or non-renewed? ☒ No ☐ Yes

**General**

Berthing Location: Summer (incl. zip): Winter (incl. zip):
Navigation Area: Florida until ship to Pacific Mexico ☐ Mooring ☒ At Dock ☐ Trailered
Lay-up From: — (12:01 AM) To: — ☐ On Land ☐ In Water, Bubbler System? ☐ No ☐ Yes
Do you employ a paid Captain or crew? ☐ No ☒ Yes, How many? 1 *Most recent survey? 9-26-06
Is vessel ever chartered / used commercially? ☒ No ☐ Yes Charter Type: # per year:
Is yacht used for racing? ☒ No ☐ Yes, details:
Is this vessel being held for sale? ☒ No ☐ Yes, held for sale since:
Additional Insured(s) & Relationship to Insured:
In the last 3 years, have you been convicted of a DUI, OUI or DWI? ☒ No ☐ Yes

**Coverages**

| | AMOUNT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| HULL & EQUIPMENT | $ 1,500,000 | $ 2% | $ 9860 |
| OUTBOARD MOTORS | $ incl | $ | $ |
| LIABILITY | $ 300,000 | $ — | $ 549 |
| MEDICAL PAYMENTS | $ incl | $ | $ |
| PERSONAL EFFECTS | $ incl | $ | $ |
| TRAILER / TENDER | $ incl | $ | $ |
| FUEL SPILL | $ incl | $ | $ |
| TOWING | $ incl | $ | $ |
| UNINSURED BOATER | $ incl | $ | $ 6000 Navigation |
| | | TOTAL PREMIUM: | $ 16,409 |

1% Min. or $250 which is greater; Trailer Deductible $100.

I hereby declare that I personally have read this application and declare that the statements made are true. I understand that this is not a binder of insurance. Any person who knowingly and with intent to defraud any insurance company or other person, files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

Applicant's Signature: [redacted]

Producer #
Agency: Mariners General Insurance
Address: 2390 Shelter Island Dr. #214 San Diego, CA 92106
Date:

*A survey, not older than 36 months, must accompany application for vessels over ten years old. Recommendations must be completed within thirty days from inception date of policy unless otherwise stated in your quote.

EXHIBIT A - 14
96

EXHIBIT C 0201

09/18/03 15:18 NO.114 002
09/18/2003 17:35 FAX 9085724057 CHUBB YACHT 002

# CHUBB GROUP OF INSURANCE COMPANIES

202 Hall's Mill Road Whitehouse Station, NJ 08889-1800
Phone 1-800-922-4875 Fax 1-908-572-4057

## Masterpiece YACHT INSURANCE QUOTE

The quotation for this yacht is based upon information provided by the producer and prospective insured and is subject to receiving the captain's resume, the one year itinerary and a current marine survey (if applicable), within thirty (30) days from this quotation date.

Producer: *Boswell Insurance Agency*

Date: *9/18/03*

Insured: *Arsenio Farell Campa*

Yacht Description: *1990 92ft Hatteras*

Name: *N/A*

Hull Value: $ 2,200,000

Hull Deductible: $44,000

Liability Limit: $ 300,000

Total # of Crew: *3 Full-Time*

Personal Effects: $ 25,000

Charter Coverage: *None*

Medical Payments: $ 25,000

Towing Coverage: $10,000

Uninsured Boaters Coverage: $1,000,000

Personal Watercraft Coverage: *None*

Electronic navigational equipment is subject to a $250 deductible.

**Other coverages/Special Conditions:**

- $25,000 Coral Reef Coverage
- $25,000 Blanket Fine Arts Coverage (no deductible)
- $10,000 Substitute Watercraft Coverage
- There must be a minimum of 3 Full-Time crew member in order to write
- All recommendation must be completed within 30 days
- $5,000 Computer Hardware Coverage
- $2,500 Fire Arms Coverage (no deductible)
- $1,500 Additional Living Expense Coverage

Commission: 15%

Total Annual Premium $ 12,545

[signature]
Authorized Representative

Is your insurance program seaworthy?

This is a quotation only, subject to the usual terms, conditions, navigational areas, limitations customary to our policy form and the yacht to be insured. Insurance cover is not bound nor effective.
This quote is valid for thirty (30) days from the date above.

EXHIBIT A - 15
97

EXHIBIT C 0202

MARINER'S GENERAL

MARINE COVERNOTE #5171

INSURANCE GROUP

pending issuance of the Standard Marine Insurance Policy of the

Zurich Insurance Company
(NAME OF INSURANCE COMPANY)

Named Insured: Mi Barur, Inc.

Whose Address Is: 2525 Shelter Island Drive, #B, San Diego, CA 92106

Loss Payee, if any: Named Insured or Their Order

Description of Vessel: 1992 (Year) 92' (Length) Hatteras Motor Yacht (Type) HATDT3011990 DOC#975461 (HIN) Mi Barbur (Name)

Coverage to be Effective on: September 23, 2003 (Month) (Day) (Year) 12: 01 AM (Hour) for 30 days

Vessel Insured for: Two Million Two Hundred Thousand and no/100-----------------------------------

**Conditions of Insurance**

Amount of Insurance-Hull & Machinery: $2,200,000.00

Deductible: $ 44,000.00

Limits of Protection & Indemnity: $ 300,000.00

Limits of Medical Payments Coverage: $ 25,000.00

Navigational Limits: Pacific coastal waters not north of Pt. Conception, CA nor south of Acapulco, Mexico not more than 200 miles offshore.

Special Conditions: WARRANTED PRIVATE PLEASURE USE ONLY.

| | |
|---|---|
| Uninsured Boater (Bodily Injury Only) | $ 300,000.00 Electronic's deductible $500 (Theft Only) |
| Oil Spill Liability | $ 300,000.00 Coverage included for 2 paid captain |
| Personal Effects | $ 15,000.00/$100.00 deductible |
| Towing | $ 1,500.00 |

A 3% HULL DEDUCTIBLE WILL APPLY FOR ANY WINDSTORM DAMAGE

BINDER ISSUED PENDING ORIGINAL POLICY TERMS AND CONDITIONS.

Annual Premium: $20,990.

The obligations of the parties are according to the terms of the policy in ordinary use by the Company. This binder to continue in force until replaced by a regular policy, but in no event for a period longer than 30 days from the effective hour of commencement in this binder and the policy subsequently issued, that the time set forth herein shall govern and shall supersede and commencement provisions contained in such policy

BY [signature]

*Formerly Hall & Malone Marine Insurance*

2390 SHELTER ISLAND DRIVE, SUITE 216 • SAN DIEGO, CALIFORNIA 92106 • (619) 226-8661 • Fax (619) 226-6116 ... 02460157

Case 3:08-cv-00443-BEN-POR Document 13-3 Filed 06/20/2008 Page 14 of 43

Henry Here is what I came up with on this BW 8/16/04

# ZURICH MARINE SPECIALTY INSURANCE
## MASTER MARINER YACHT PROGRAM

QUOTE NUMBER: 2306
QUOTED BY: bill

PRINT DATE/TIME: 08-16-2004 / 11:53 am
TO: MARINERS GENERAL INSURANCE,AGENT CODE: 02366508

We appreciate the opportunity to provide a quotation on the following vessel, based on the information provided. Quote is valid for 30 days- if binding is required, we will need a completed and signed application.
This is a quotation only, not a binder.

OWNER: Mi Barur Inc

LAYUP:

VESSEL: 1999 92 Hatteras
NAVIGATION: Coastwise and navigable waters of the Pacific Ocean not north of Bodega Head, California nor south of Acapulco Mexico.

| | | |
|---|---|---|
| HULL | 2,200,000 | |
| LIABILITY | 300,000 | |
| MEDICAL PAYMENTS | 50,000 | |
| PERSONAL EFFECTS ($100 DED.) | 50,000 | |
| UNINSURED WATERCRAFT | 300,000 | |
| TOWING AND ASSISTANCE | 10,000 | PER OCCURRENCE |
| DINGHY ($250 DED.) | | |
| TRAILER ($100 DED.) | | |

ADDITIONALS

ELITE MARINER ENDORSESMENT ADDED( INCREASES SPECIFIC LIMITS SEE ENDT)

| | | |
|---|---|---|
| DED%- 1% | DEDUCTIBLE-22,000 | TOTAL PREMIUM-23,050.00 |
| DED%- 2% | DEDUCTIBLE-44,000 | TOTAL PREMIUM-20,814.00 |

COMMENTS: 3% windstorm deductible to apply

If you have any questions concerning this or any other insurance coverages, please give us a call. We are very interested in writing and retaining your good business.

P.O. BOX 17048 BALTIMORE, MD 21297 FAX: (410) 554-5007 PHONE:(800)553-7348

EXHIBIT A - 17

AUG-16-2004 11:53 AM 99 2

**MARINER'S GENERAL INSURANCE**
**2390 SHELTER ISLAND DRIVE, #216**
**SAN DIEGO, CA 92106**
**PHONE (619) 226-8661 FAX (619) 226-6410**

(Company Memo)

8/17/04

Maritime General Agency
c/o Chris Clark
fax: 860-399-3604

Named Insured:
Mi Barur, Inc.
#TBD

Chris,

I currently insure this vessel with Zurich, looking for better coverage and premium.

Attached is my signed application, survey and the captain information. There is also 1 crew member.

I have insured all of this insured's vessels, loss free. Vessel travelers from San Diego, Sea of Cortez to Acapulco.

Reviewing my file, I do not see the surveyor's compliance letter which I will get. I know they were done.

Should you have any questions regarding this matter, please do not hesitate to call me.

Sincerely,

Henry Medina

28
------ Total Pages

EXHIBIT A - 18
100

# YACHT INSURANCE APPLICATION

Mariner's General Insurance Group

Name and Address of Owner
Mi Barbur, Inc.
2525 Shelter Island Drive, #B
San Diego, CA 92106

| | | | |
|---|---|---|---|
| Driver's License Number | Occupation: Attorney | | |
| HULL | Name of Yacht: Mi Barbur | Reg. Number: 975461 | Hull Identification No: HATDT3011990 |

Type of Yacht: XX Cruiser ☐ Sailboat ☐ Trawler ☐ Auxiliary Sailboat ☐ Runabout ☐ Houseboat

| Manufacturer | Material | Year Built | Length | Date Purchased |
|---|---|---|---|---|
| Hatteras | f/g | 1990 | 92 | 9/23/03 |

| Cost including Equipment | New Replacement Cost | Principally Moored At |
|---|---|---|
| $2,200,000 | $ | San Diego/Acapulco |

Describe Any Modification to the Hull

| MACHINERY | Engine Type | Year | Make | No. of Engines |
|---|---|---|---|---|
| | ☐ Gasoline XX Diesel | 1992 | Detroit | 2 |

Total Horse Power: 4200
Designed Maximum Speed: 25

Describe any Modification to the Machinery

EQUIPMENT — Is Vessel Equipped With Approved Type Built in Automatic Extinguishing System: XX Yes ☐ No Describe: Halon
Date Certified

Is Vessel Equipped With
XX Ship-to-Shore Radio XXX Fume Detector XX Depth Finder XX Radar
☐ Other Specialized Safety Equipment: See Survey List

Is Vessel Equipped With
☐ ☐ Aux. Generator Type of Fuel:

Is Galley Stove Approved for Marine Use: XX Yes ☐ No Type of Fuel:
Number and Type of Fire Extinguishers

| GENERAL | Yachting Exp. as Owner | Yachting Exp. as Crew | Size, Type of Vessels Owned |
|---|---|---|---|
| | 25+ | 25+ | 74' Defever 55' Trawler<br>90' Hatteras |

Name, Age of Operators Under 19 and/or Having Less Than Two Years of Experience: none

Particulars and Amount of All Yacht and Outboard Losses in Past Three Years
If "NONE" STATE "NONE": none

Have Operators Successfully Completed
☐ Coast Guard Auxiliary Course ☐ Power Squadron Training Course XXX Other: Licensed Mexican Captain and crew

If Vessel Owned Corporately, Provide Specific Details of Usage: yes, private pleasure use only

Is Vessel Used Commercially or Chartered: ☐ Yes XX No Explain:
Water Skiing: ☐ Yes XX No
Racing: ☐ Yes XX No

Navigation Limits Requested: Pt. Conception, CA to Acapulco, MX

TRAILER
Previous Insurance Company: new purchase
Policy Number

| COVERAGE | Effective Date | Amt. of Hull Ins. | Deductible | P.I. Limits | Medical Payments | Personal Effects |
|---|---|---|---|---|---|---|
| | 9/23/03 | $2,200,000 | 2% | $300,000 | $ 25,000 | $15,000 |

| | Year | Manufacturer | Serial Number | |
|---|---|---|---|---|
| Tender | | | | $ |
| Outboard | | | | |

LOSS PAYEE AND ADDRESS:
Outstanding Mortgage
Amount $

| | |
|---|---|
| Dated | Signature of Insured |
| Dated | Signature of Agent |

As a normal part of our underwriting procedure, a routine inquiry may be made which will include information concerning character, general reputation, personal characteristics and mode of living. Public Law 91-508 (Federal Fair Credit Reporting Act) requires that if such a report is made, upon your written request within a reasonable time after you receive this notice, additional information as to the nature and scope of the inquiry will be provided. I understand that the above information, which is correct and complete to the best of my knowledge, is to be the basis of insurance, if granted, but does not obligate me to accept the insurance nor the company to accept the risk.

_CHT QUOTE QUESTIONNAIRE DATE 8-17-04

Mi Barur, Inc. PHONE #

2525 Shelter Island Dr. #B

San Diego, CA 92106

BOAT DESCRIPTION:

| YEAR | LENGTH | MAKE | TYPE | NAME | MATERIAL |
|---|---|---|---|---|---|
| 1992 | 92 | Hatteras | M/Y | Mi Barur | F/G |

ENGINE(S)

| YEAR | H.P. | MAKE | TYPE(GAS/DIESEL) | HULL# | CF# |
|---|---|---|---|---|---|
| 1992 | T-2100 | Detroit | (DIESEL circled) | | |

EQUIPMENT:

SHIP TO SHORE ✓ VHF ✓ RDF __ FUME DETECTOR __ RADAR __ ✓ LORAN __ SAT NAV ✓

DEPTH SOUNDER ✓ AUTO PILOT ✓ HALON ✓ OTHER __

OWNERS OCCUPATION: Attorney AGE 58 YEARS EXPERIENCE 25+

COAST GUARD __ POWER SQUADRON __

PRIOR BOATS OWNED: 55' Trawler

90' Hatteras

74' Defever

OTHER OPERATORS Paid crew

PREVIOUS INSURANCE Zurich / Mariners General

PREVIOUS LOSSES None

MOORING LOCATION San Diego / Acapulco

LENDER None

SURVEY INFORMATION: ✓

DATE OF SURVEY 9-7-2003 AFLOAT/DRYDOCK (DRYDOCK circled)

SURVEYOR Marvin Henderson

MARKET VALUE $2,200,000

REPLACEMENT VALUE $5,500,000

1 capt. 1 crew

AMOUNT OF COVERAGE:

HULL $ 2,200,000

P&I $ 300,000

MEDICAL PAYMENTS __

QUOTES:

| COMPANY | 1% DED | 2% DED | COMPANY | 1% DED | 2% DED | COMPANY | 1% DED | 2% DED |
|---|---|---|---|---|---|---|---|---|
| HULL | | | HULL | | | HULL | | |
| P&I | | | P&I | | | P&I | | |
| MED | | | MED | | | MED | | |
| OTHER | | | OTHER | | | OTHER | | |
| TOTAL | | | TOTAL | | | TOTAL | | |

**EXHIBIT A - 20**
**102**

EXHIBIT C 0207

**Henry Medina**

**From:** Chris Clark [chris.clark@maritimegeneral.com]
**Sent:** Wednesday, August 18, 2004 11:01 AM
**To:** hmedina@marinersinsurance.com
**Subject:** Mi Barur, Inc. Quote

Dear Henry Medina,

Attached is the New Hampshire Mega-Yacht quotation for the above captioned. Please be advised this quotation will expire in 30 days from the quote date.

This risk was quoted with the following coverages included:

* Coverage for 2 Crewmembers
* $25,000 Coral Reef Damage
* $10,000 Computer Hardware
* $2,500 Fire Arms Coverage
* $25,000 Fine Arts Blanket Coverage
* $2,500 China & Silver Coverage
* Pacific coastal Navigation

This quote is subject to the following conditions prior to coverage being bound:

* Receipt of completed signed applications
* A Copy of the Captain's resume
* Signed Compliance letter for all recommendations noted in survey.
* Warranted a Full Time Captain be employed and in charge of vessel
* severe weather plan

The following additional premiums shall apply, if desired:

0.5% Deductible = $770 A/P

If you have any questions please do not hesitate to email me, or call me directly at the number below.

Sincerely,

Chris Clark
Yacht Underwriter
Maritime General Agency
Phone: (860) 399-3694
Fax: (860) 399-3604

For more information visit www.maritimegeneral.com. Your insurance source for Marinas, Boat Dealers, Yacht Clubs, Boats & Yachts, Mega-Yachts and Charter Boats.

**Henry Medina**

**From:** Chris Clark [chris.clark@maritimegeneral.com]
**Sent:** Wednesday, August 18, 2004 1:03 PM
**To:** hmedina@marinersinsurance.com
**Subject:** RE: Mi Barur, Inc. Quote

Hi Henry,

Yes, I can use the app I have here for binding. I did get the captain's license, but the resume is in Spanish? In any case I can bind with what I have subject to the other things.

If you can sell it with increased premium and deductible, great, just let me know. Thanks.

Chris Clark
Yacht Underwriter
Maritime General Agency
Phone: (860) 399-3694
Fax: (860) 399-3604

For more information visit www.maritimegeneral.com. Your insurance source for Marinas, Boat Dealers, Yacht Clubs, Boats & Yachts, Mega-Yachts and Charter Boats.

---

**From:** Henry Medina [mailto:hmedina@marinersinsurance.com]
**Sent:** Wednesday, August 18, 2004 2:48 PM
**To:** Chris Clark
**Subject:** RE: Mi Barur, Inc. Quote

Chris,

Will the 2003 signed application I faxed work to bind coverage?

Also I faxed the captain license and resume, with certificates of the Merchant marine academy, he is the full time captain?

I will get the signed compliance letter and weather plan.

I will also increase your quote and advise you of the premium.

2% deductible while in Mexican waters and 3% windstorm deductible, will also apply?

Please advise,

Henry

-----Original Message-----
**From:** Chris Clark [mailto:chris.clark@maritimegeneral.com]
**Sent:** Wednesday, August 18, 2004 11:01 AM
**To:** hmedina@marinersinsurance.com

**..enry Medina**

**From:** Henry Medina [hmedina@marinersinsurance.com]
**Sent:** Tuesday, September 14, 2004 10:28 AM
**To:** CHRIS CLARK
**Subject:** Mi Barur, Inc. 92' Hatteras Motor Yacht

Chris,

I just faxed you the signed survey compliance letter and the weather plan.

Thanks

Henry

Chris Clark

3 Pages



EXHIBIT A - 23
105

EXHIBIT C 0210

# Weather Plan

M/Y Mi Baur
1992 92' Hatteras

The Motor Yacht Mi Baur is moved between Pt. Conception, CA and Acapulco, MX.

Remaining in Acapulco about 6 months out of the year. During hurricane season the vessel is moved north into the Sea of Cortez. (La Paz)

Vessel has a full time crew onboard and if needed the vessel is moved further north into the Sea of Cortez.

# COMPLETION OF SURVEY RECOMMENDATIONS SIGN-OFF FORM

Date: 9/14/2004

Insured: Mi Barur, Inc. Policy #: TBD

I HEREBY CERTIFY THAT I HAVE DUTIFULLY COMPLIED WITH ALL RECOMMENDATIONS MADE ON THE Marvin Henderson SURVEY, DATED 9/7/2003

A CONDITION AND VALUATION SURVEY HAS BEEN COMPLETED ON YOUR VESSEL. AN INSPECTION OF THIS KIND SHOULD BE PART OF NORMAL MAINTENANCE AND IS DESIGNED TO IMPROVE THE QUALITY OF THE VESSEL

COMPLETION OF THE SURVEY RECOMMENDATIONS WILL PROVIDE SAFETY, SEAWORTHINESS, AND EFFICIENT MARINE PERFORMANCE. IN ADDITION, A LOSS THAT MAY BE OTHERWISE COVERED MAY NOT BE IF SUCH A LOSS IS IDENTIFIED WITH NON-COMPLETION OF THE SURVEYORS RECOMMENDATIONS.

[signature] Pres.

OWNERS SIGNATURE ____________ DATED

IF THERE ARE ANY EXCEPTIONS, LIST BY RECOMMENDATION NUMBER AND INTENDED DATE OF COMPLETION BELOW:

RECOMMENDATION #____________ DATE____________

RECOMMENDATION #____________ DATE____________

RECOMMENDATION #____________ DATE____________

PLEASE RETURN TO OUR OFFICE BEFORE ASAP SO THAT WE CAN MEET OUR UNDERWRITERS REQUESTS.

*THANK YOU FOR YOUR PROMPT ATTENTION TO THIS MATTER.*

MARINERS GENERAL INSURANCE GROUP
2390 SHELTER ISLAND DRIVE #216
SAN DIEGO, CA 92106
Phone: (619) 226-8661 Fax: (619) 226-6410

# NEW HAMPSHIRE INSURANCE COMPANY®

Boston, Massachusetts

This is a declaration page with Policy Provisions - Section A and Endorsements, if any, to issue and form part thereof, completes the below numbered policy of the NEW HAMPSHIRE INSURANCE COMPANY, A CAPITAL STOCK COMPANY.

New

Policy No.EY 341-92-25

Effective Date From: 09/23/2004 to09/23/2005 at 12:01 a.m. Standard Time at place of issuance.

**Producer:** 400060
Mariner's General Insurance
2390 Shelter Island Dr
Suite #216
San Diego, CA 92106

**Named Insured:**
Mi Barur, Inc.
2525 Shelter Island Drive #B
San Diego, CA 92106

Coverage applies to items below only when amount and limits are specified.

| Section | Coverage Description | Limits | Deductible | Premium |
|---|---|---|---|---|
| A | HULL (Agreed Value) | $2,200,000 | $44,000 | $16,060 |
| | Tender | $22,000 | $500 | Inc. |
| B | PROTECTION & INDEMNITY<br>Longshoremen's & Harbor Workers compensation insurance as provided in public act 803 of the 69th congress, as amended.<br>Includes coverage for 2 crew. | $300,000 | N/A | $1,280 |
| C | Medical Payments | $25,000 | N/A | Inc. |
| E | Towing | $10,000 | N/A | Inc. |
| F | Personal Effects | $22,000 | $250 | Inc. |
| G | Uninsured Boater | $300,000 | N/A | Inc. |
| H | Fuel Spill Liability | $300,000 | N/A | Inc. |
| | | | | $650 |

Endorsements: Nav-1
W-2, B-11, B-12, B-5, MAN-2, B-7, GC-1, MAN-1, MAN-3, B-6, B-8

**TOTAL PREMIUM** $17,990

**Description of Vessel:** Year Built 1992 Manufacturer: Hatteras
Length: 92 ft Model: M/Y
Name: "Mi Barur" Hull Serial # HATDT3011990

**Description of Motors** Year Built 1992 Manufacturer: Detroit Serial# P:
S:

Navigation Limits Warranty: Warranted confined to the use and navigation of coastal waters and tributaries of the Pacific Ocean, not North of Pt. Conception, CA and not south of Rio Santo Tomas, Baja, MX. Nav.# 955

Countersigned: 09/15/2004
M O Taxloc NY

[signature]
MARITIME GENERAL AGENCY

The declarations page and endorsements attached hereto, are made part of, and attach to, policy form:74163 (7/99)

**EXHIBIT A - 26**
**108**

EXHIBIT C 0213

# NEW HAMPSHIRE INSURANCE COMPANY®

Boston, Massachusetts

This is a declaration page with Policy Provisions - Section A and Endorsements, if any, to issue and form part thereof, completes the below numbered policy of the NEW HAMPSHIRE INSURANCE COMPANY, A CAPITAL STOCK COMPANY.

Renewal

Policy No.EY 341-92-25

Effective Date From: 09/23/2005 to09/23/2006 at 12:01 a.m. Standard Time at place of issuance.

**Producer:** 400060
Mariner's General Insurance
2390 Shelter Island Dr
Suite #216
San Diego, CA 92106

**Named Insured:**
Mi Barur, Inc.
2525 Shelter Island Drive #B
San Diego, CA 92106

Coverage applies to items below only when amount and limits are specified.

| Section | Coverage Description | Limits | Deductible | Premium |
|---|---|---|---|---|
| A | HULL (Agreed Value) | $2,200,000 | $44,000 | $16,060 |
| | Tender | $22,000 | $500 | Inc. |
| B | PROTECTION & INDEMNITY<br>Longshoremen's & Harbor Workers compensation insurance as provided in public act 803 of the 69th congress, as amended.<br>Includes coverage for 2 crew. | $300,000 | N/A | $1,280 |
| C | Medical Payments | $25,000 | N/A | Inc. |
| E | Towing | $10,000 | N/A | Inc. |
| F | Personal Effects | $22,000 | $250 | Inc. |
| G | Uninsured Boater | $300,000 | N/A | Inc. |
| H | Fuel Spill Liability | $300,000 | N/A | Inc. |

Endorsements: Nav-1, MAN-5 — $650
B-7, GC-1, MAN-1, MAN-2, B-11, B-12, B-5, W-2, B-6, B-8, MAN-3

TOTAL PREMIUM $17,990

Description of Vessel: Year Built 1992 Manufacturer: Hatteras
Length: 92 ft Model: M/Y
Name: "Mi Barur" Hull Serial # HATDT3011990

Description of Motors Year Built 1992 Manufacturer: Detroit Serial# P:
S:

Navigation Limits Warranty: Warranted confined to the use and navigation of coastal waters and tributaries of the Pacific Ocean, not North of Pt. Conception, CA and not south of Rio Santo Tomas, Baja, MX. Nav.# 955

Countersigned: 07/27/2005
M O Taxloc NY

MARITIME GENERAL AGENCY

The declarations page and endorsements attached hereto, are made part of, and attach to, policy form:74163 (7/99)

EXHIBIT A - 27
109

EXHIBIT C 0214

# NEW HAMPSHIRE INSURANCE COMPANY®

Boston, Massachusetts

This is a declaration page with Policy Provisions - Section A and Endorsements, if any, to issue and form part thereof, completes the below numbered policy of the NEW HAMPSHIRE INSURANCE COMPANY. A CAPITAL STOCK COMPANY.

**Policy No.EY 341-92-25** **Renewal**

Effective Date From: 09/23/2006 to09/23/2007 at 12:01 a.m. Standard Time at place of issuance.

**Producer:** 400060
Mariner's General Insurance
2390 Shelter Island Dr
Suite #216
San Diego, CA 92106

**Named Insured:**
Mi Barur, Inc.
2525 Shelter Island Drive #B
San Diego, CA 92106

Coverage applies to items below only when amount and limits are specified.

| Section | Coverage Description | Limits | Deductible | Premium |
|---|---|---|---|---|
| A | HULL (Agreed Value) | $2,200,000 | $44,000 | $16,250 |
| | Tender | $22,000 | $500 | Inc. |
| B | PROTECTION & INDEMNITY<br>Longshoremen's & Harbor Workers compensation insurance as provided in public act 803 of the 69th congress, as amended.<br>Includes coverage for 2 crew. | $300,000 | N/A | $1,280 |
| C | Medical Payments | $25,000 | N/A | Inc. |
| E | Towing | $10,000 | N/A | Inc. |
| F | Personal Effects | $22,000 | $250 | Inc. |
| G | Uninsured Boater | $300,000 | N/A | Inc. |
| H | Fuel Spill Liability | $300,000 | N/A | Inc. |

Endorsements: Nav-1, MAN-5 $1,100
B-7, GC-1, MAN-1, MAN-2, B-11, B-12, B-5, W-2, B-6, B-8, MAN-3

TOTAL PREMIUM $18,630

Description of Vessel: Year Built 1992 Manufacturer: Hatteras
Length: 92 ft Model: M/Y
Name: "Mi Barur" Hull Serial # HATDT3011990

Description of Motors Year Built 1992 Manufacturer: Detroit Serial# P:
S:

Navigation Limits Warranty: Warranted confined to the use and navigation of coastal waters and tributaries of the Pacific Ocean, not North of Pt. Conception, CA and not south of Rio Santo Tomas, Baja, MX. Nav.# 955

Countersigned: 08/28/2006
M O Taxloc NY

MARITIME GENERAL AGENCY

The declarations page and endorsements attached hereto, are made part of, and attach to, policy form:74163 (7/99)

**EXHIBIT A - 28**
**110**

This Endorsement #: 1 Effective: 9/23/2006

Attached To And Forming Part Of Policy #: EY 3419225

Of The: New Hampshire Insurance Co.

Issued To: Mi Barur, Inc.

## NAVIGATION ENDORSEMENT

In consideration for premiums charged $1100. The navigation warranty of this policy is amended to include Navigation of Coastal Waters and waters tributary thereto, of the Pacific Ocean and Acapulco as far south as 16 Degrees 30 Minutes North Latitude.

It is agreed and understood a 2% deductible shall apply while the named vessel is outside US Waters.

All other terms and conditions remain unchanged.

Dated: 8/28/2006

[signature]
Maritime General Agency

Endorsement Form: Nav - 1

EXHIBIT A - 29
111

The terms outlined below seem ok and not out of line. Can yc. cell me what the cost would be for the renewal?

It seems to me that the vessel will be onboard Dockwise when it renews on 9/23/07. We should however include the Mexican navigation on the renewal just in case Dockwise is behind schedule.

Henry

---

From: Michael Terrier [mailto:Michael.Terrier@MaritimeGeneral.com]
Sent: Tuesday, August 28, 2007 8:44 AM
To: Henry Medina
Cc: Michael Terrier
Subject: RE: Mi Barur, Inc. #EY341-92-25

Henry, I see this for sale asking $1,900,000. I will have to drop the value from $2.2mm to $1.9mm and rewrite the policy upon renewal as this changes the class(policy number). We will also warrant the insured is listed as an AI on the yacht dealers policy, add a wind deductible, etc.This is also listed as a 1990 in the yacht world listing but is insured as a 1992, the survey lists it as a 1990.

An older Cheoy Lee up for sale, moored in Florida during hurricane season is less than desirable as new business.We would probably pass.

I will get back to you later this week with new terms.

Thank you,

Michael Terrier
Senior Yacht Underwriter
Maritime General Agency
70 Essex Road
Westbrook, Ct, 06498

800.366.8086 ext 1619
860.399.3619 direct
860.399.3652 Fax
michael.terrier@maritimegeneral.com

* Marinas * Boat Dealers * Yacht Clubs * Boats & Yachts * Mega Yachts
* Charter Vessels

Instant On-line Boat quotes at www.maritimegeneral.com

---

From: Henry Medina [mailto:hmedina@marinersinsurance.com]
Sent: Tuesday, August 28, 2007 10:36 AM

**Henry Medina**

**From:** Henry Medina [hmedina@marinersinsurance.com]
**Sent:** Thursday, September 20, 2007 1:42 PM
**To:** 'Michael Terrier'
**Subject:** Mi Barur, Inc #QD0062514

Hi Michael,

Please issue the renewal policy effective 9/23/2007 at the value of $1,900,000. However the navigation limits must be amended to match the expiring policy #EY341-92-25. The vessel will not longer be shipped to Florida, vessel will remain a San Diego, La Paz, Acapulco vessel.

Please issue the policy and advise what the new annual premium is?

Henry Medina
Mariner's General Insurance Group
San Diego Office
phone 619-226-8661
fax 619-226-6410
hmedina@marinersinsurance.com



**EXHIBIT A - 31**
**113**

# NEW HAMPSHIRE INSURANCE COMPANY®

Boston, Massachusetts

This is a declaration page with Policy Provisions - Section A and Endorsements, if any, to issue and form part thereof, completes the below numbered policy of the NEW HAMPSHIRE INSURANCE COMPANY, A CAPITAL STOCK COMPANY.

**Policy No.YM 868-56-66** New

Effective Date From: 09/23/2007 to09/23/2008 at 12:01 a.m. Standard Time at place of issuance.

**Producer:** 400060
Mariner's General Insurance
2390 Shelter Island Dr
Suite #216
San Diego, CA 92106

**Named Insured:**
Mi Barur, Inc.
2525 Shelter Island Drive #B
San Diego, CA 92106

Coverage applies to items below only when amount and limits are specified.

| Section | Coverage Description | Limits | Deductible | Premium |
|---|---|---|---|---|
| A | HULL (Agreed Value) | $1,900,000 | $38,000 | $14,060 |
| | Tender | $25,000 | $500 | Inc. |
| B | PROTECTION & INDEMNITY<br>Longshoremen's & Harbor Workers compensation insurance as provided in public act 803 of the 69th congress, as amended.<br>Includes coverage for 2 crew. | $300,000 | N/A | $749 |
| C | Medical Payments | $10,000 | N/A | Inc. |
| E | Towing | $2,500 | N/A | Inc. |
| F | Personal Effects | $10,000 | $250 | Inc. |
| G | Uninsured Boater | $300,000 | N/A | Inc. |
| H | Fuel Spill Liability | $300,000 | N/A | Inc. |
| Endorsements: | MAN-5, MAN-6, W-1, Nav-1<br>MAN-2, GC-1, MAN-3, MAN-1, B-8 | | | $1,050 |
| | | TOTAL PREMIUM | | $15,859 |

**Description of Vessel:** **Year Built** 1990 **Manufacturer:** Hatteras
**Length:** 92 ft **Model:** M/Y
**Name:** "Mi Barur" **Hull Serial #** HATDT3011990

**Description of Motors** **Year Built** 1992 **Manufacturer:** Detroit **Serial#** P:
S:

Navigation Limits Warranty: Warranted confined to the use and navigation of coastal waters and tributaries of the Pacific Ocean, not North of Pt. Conception, CA and not south of Rio Santo Tomas, Baja, MX. Nav.# 955

Countersigned: 09/21/2007
M O Taxloc NY

MARITIME GENERAL AGENCY

The declarations page and endorsements attached hereto, are made part of, and attach to, policy form:BJP 2191-A (8/06)

**EXHIBIT A - 32**
**114**

EXHIBIT C 0219

**TODD & ASSOCIATES, INC.**
MARINE SURVEYORS & CLAIMS SETTLING AGENTS

2390 SHELTER ISLAND DRIVE; SUITE 220
SAN DIEGO, CALIFORNIA 92106
PHONE: (619) 226-1895
24 HR. PHONE: (619) 224-2394
TELEFAX: (619) 223-8942

November 5, 2007
File No.: 07-1278

Attorney Arsenio Farell Campa

Re: "Mi Barur"

Dear Señor Farell:

Thank you for your continued cooperation regarding the salvage and investigation required by your insurance company as a result of the unfortunate fire to your vessel "Mi Barur".

As you are aware, the vessel remains were re-floated Wednesday, October 31, 2007, and towed by Abbaroa, November 1, 2007, to the haulout facility, where the vessel was hauled from the water and remains.

At my last attendance, with your representative, Sr. Ricardo Fernandez, Captain Luis Rello, and Sr. Poncho Abbaroa present, my instructions for the vessel were clearly communicated through Ricardo to Poncho Abbaroa, as follows:

1. The vessel should be towed to the shipyard, and immediately hauled from the water.

2. Following haulout, fiberglass repairs to the bottom of the vessel should be undertaken to secure the vessel from taking on additional amounts of water following relaunching.

3. The shipyard should steam clean the engineroom only, to assist in facilitate Terry Carpenter, who has been engaged by my office to preserve the vessel's main engines and generators.

4. It was agreed that Sr. Abbaroa was to provide all assistance to Mr. Carpenter.

5. Fire Investigator Arthur Murphy is returning to La Paz to complete the Cause & Origin investigation November 7, 8 & 9, 2007. Please instruct Signor Abbaroa to assist Mr. Murphy in all regards, and provide cooperation to facilitate the completion of inspections. Mr. Murphy may require two of the shipyard employees to assist in debris removal.

6. Please communicate to Sr. Abbaroa that nothing is to be disturbed in the hull of the vessel forward of the engineroom bulkhead.

7. It is my understanding that your insurance company will reimburse you for the vessel salvage expenses, haulout and cleaning expenses, following receipt and review of all invoices provided by you and presented to my office for review.

8. Please instruct Sr. Abbaroa to prepare a separate invoice for the haulout of the vessel, and additional expenses beyond the salvage expense, to include one month in the water storage at his facility.

9. Following completion of the fire Cause & Origin inspections, anticipated to be completed Friday, November 9, 2007, in the late afternoon, the vessel may be relaunched, and should be stored in the water at the Abbaroa Shipyard.

I appreciate your assistance in communicating to Sr. Abbaroa the need for cooperation and assistance, so that we may complete our requirement for investigations this Friday, November 9, 2007.

Upon presentation of appropriate invoices or expenses associated with the salvage and local investigation expenses, I shall immediately review appropriate documents and present them to your insurance company for reimbursement.

I appreciate your continued assistance.

Yours truly,

ACCREDITED MARINE SURVEYOR S.A.M.S. 163 MEMBER

Todd Schwede, AMS, CPI I, CMI
Todd & Associates, Inc.

CC: Susan Smith, AIG insurance
Geoff Robb

TAS/sjh

Todd and Associates, and the surveyor signing this report agree to use their best efforts in behalf of those for whom this survey is made, but it is expressly understood and agreed that this survey is undertaken and this report issued with the understanding that neither shall be liable for any errors or omissions, whether due to active negligence or otherwise, in excess of the actual charge made for this survey, and that any and all persons interested in or to be affected hereby accept this report on that basis.

**October 24, 2007.**

**TODD & ASSOCIATES, INC.**
**Marine Surveyors & Claims Settling Agents**
**2390 Shelter Island Drive # 220**
**San Diego, California 92106.**

**Dear Mr. Todd Schwede:**

Through the present one I go to you soliciting from you or somebody of the insurance agency AIG to appear in La Paz Baja California of immediate form, because to remove the boat afloat, they have been seen in the necessity to remove some things that hinder to the divers such as carpets or tapestries, the previous thing by virtue of which you indicated to me the inconvenience to remove any thing, reason for which I require your authorization, or somebody else, which is present in La Paz for the maneuvers before commented.

Combined to the previous thing, also I mention that I have a great number of problems with the harbor authorities by the problem of the pollution of diesel, reason why I require the attendance from my insurer in the aid of these problems.

Sincerely,

**LIC: ARSENIO FARELL CAMPA.**

November 5, 2007.

**MR. TODD SCHWEDE**
**Present**

**Dear Mr. Schwede:**

Today I have received a telephone call from my Captain **Luis Rello** to inform me that the shipyard of Mr. **Abaroa** had concluded the works and that the boat could be put again afloat or be left on dry dock. Mr. **Abaroa** asked Mr. **Carpenter** what they wanted to do with the boat, and Mr. **Carpenter** cannot answer whether if the boat stays afloat or on dry dock, therefore, I beg you to tell us what to do with the vessel, understanding that you commented that once I took the boat out, she would be under your custody and as of the present day, Mr. **Carpenter** does not know what to do with the boat. It should be pointed out that if the boat remains afloat without surveillance, there would be people starting to steal parts of her, on the other side you also commented that once the boat was on dry dock, the expenses should be at your account, and if the boat remains more days in Mr. Abaroa's yard, such expenses shall be invoiced to the subscribed, therefore, I beg you to define what would you like to do with the vessel. Waiting for your instructions, I remain,

Sincerely,

**Attorney Arsenio Farell Campa**

CARTA TODD SCHWEDE-AFC

Case 3:08-cv-00443-BEN-POR Document 13-3 Filed 06/20/2008 Page 34 of 43



Geoff

---

**From:** Henry Medina [mailto:hmedina@marinersinsurance.com]
**Sent:** Friday, March 07, 2008 12:51 PM
**To:** grobb@gibsonrobb.com
**Cc:** HallmarkYachts@aol.com; 'Beatriz Pineda'
**Subject:** M/Y Mi Barur, Claim # 3513.31

Mr. Robb,

Thank you for responding so quickly to my email of March 5, 2008 It's very unfortunate that this claim may turn into a Bad Faith suit.

I trust you understand our position which as an Insurance Agency we must stand by our client as they have purchased an All Perils Yacht Policy on Good Faith from New Hampshire Insurance Company. "Unless there is actual proof of any wrong doing"

Again, I'm not an attorney but as I read Mr. Murphy's report on page 13 he states "did you start the fire" and again page 35 in his conclusion states (arson) and Captain Rello being the last to leave the vessel.

As for Mr. Murphy's alleged comments, perhaps it was a misunderstanding due to the English/Spanish communications. However, I did not misunderstand Todd Schwede when he stated to me "Henry New Policy, less the 30 days old, total loss, Mexican, he did it" I took that as a joke, perhaps I misunderstood and it was the intention of New Hampshire Insurance Company not to pay this claim from the start.

Did I misunderstand you, when you told me "The Mexican's started the savage hours before Terry Carpenter arrived" Mr. Carpenter is only a mechanic per Mr. Murphy's report, why was he in charge of the savage? The vessel sat in the water for days before she was raised any evidence from the Fire Origin was contaminated by the water and air elements Murphy's report is not valid. Also reading this report it appears to me someone else influenced the writing of this report.

Mi Barur, Inc. is entitled to full payment of $1,900,000 Hull and Machinery (Agreed Hull Value) per the All Perils Yacht Policy and payment for Personal Property subject to a $250 deductible for what ever personal items where still onboard the Yacht. Again this policy is an All Perils Policy which includes coverage for any type of fire. Unless you can prove this was intentional set by the owner (who has not financial gain by doing this) or his captain, we expect full payment to be expedited.

Sincerely,

MARINERS
GENERAL INSURANCE GROUP

**Henry Medina**
**Mariners General Insurance**
**2390 Shelter Island Drive, #216**
**San Diego, CA 92106**
**Phone: 619-226-8661**

**EXHIBIT A - 36**
**119**



EXHIBIT C 0224

**Henry Medina**

**From:** Geoffrey Robb [grobb@gibsonrobb.com]
**Sent:** Friday, March 07, 2008 10:17 AM
**To:** 'Henry Medina'
**Subject:** RE: M/Y Mi Barur, Claim # 3513.31

Dear Mr. Medina,

Thank you for your input. I will forward your email to underwriters for review. I have been advised that the insured has hired counsel, and I think it best that further communications about the claim be directed through counsel.

However, I will take this opportunity to respond to a couple of your points regarding Mr. Murphy and his report. I checked Mr. Murphy's report and did not see where he has concluded that Captain Rello started the fire. He has found that the fire was intentionally set, and noted, among other findings, that Captain Rello was the last to leave the boat.

As far as Mr Murphy's alleged comments that the freezer motor in the Captain's stateroom was the cause, I would be very surprised if an expert of his caliber would make such a statement on the scene. Perhaps Captain Rello and Mr. Fernandez misunderstood some comment. My understanding is that Mr. Murphy photo documented his inspection, so I must presume that he has photos of what he looked at. I can discuss with underwriters making his photos available for inspection if requested.

Fortunately, to my knowledge, no inspected contents of the boat have been destroyed. So, if Captain Rello or the insured believe that the freezer motor caused the fire and if the insured intends to investigate the cause, the motor should still be available for inspection. It is very important that the insured give notice to underwriters of any disposition or inspection of the boat or its contents.

I am confident that underwriters will consider any evidence demonstrating that the cause of the fire was accidental and not arson.

Please let me know if I can be a further assistance.

Best Regards.

Geoff

---

**From:** Henry Medina [mailto:hmedina@marinersinsurance.com]
**Sent:** Wednesday, March 05, 2008 8:49 AM
**To:** grobb@gibsonrobb.com
**Subject:** M/Y Mi Barur, Claim # 3513.31

Dear Mr. Robb,

Fire Cause Analysis
A DIVISION OF IFT INC.

# CURRICULUM VITAE
# DONALD J. PERKINS

**Fire Cause Analysis**
**935 Pardee St.**
**Berkeley, CA 94710**

| | |
|---|---|
| **Business:** | **(510) 649-1300** |
| **Fax:** | **(510) 649-3099** |

## ***Area of Specialization:***

Fire Investigation/Litigation – Case File Review - Consulting

## ***Background and Professional Experience:***

Mr. Perkins' background consists of education/technical training and over 40 years of professional experience. He had worked in a major municipal fire department for 28 years and retired in 1994 at the rank of Captain. As a Fire Suppression Captain, Mr. Perkins worked on shift for over ten years. He was assigned to both Engine and Truck Companies at Battalion Headquarters in one of the busiest fire stations in San Jose, California. He was Incident Commander on numerous fires over the course of his career. Mr. Perkins also held the position of Fire Investigator (2 years) and Arson Unit Supervisor / Investigator for 4 years. During this time frame he conducted or supervised over 3,000 fire investigations. Mr. Perkins was also assigned to the San Jose Fire Prevention Bureau for over six years working in code enforcement, plan checking, and fire protection systems inspections. Mr. Perkins met the standards and successfully passed his tests to be qualified as a Certified Fire Protection Specialist. He recently completed the Wildland Fire Origin & Cause Determination certification class presented by the US Forest Service.

Mr. Perkins founded the firm Fire Cause Analysis in 1980 and merged his company with IFT Inc. in 1993. In addition to conducting his own investigations, he presently manages a team of highly qualified fire investigators. Mr. Perkins has conducted or supervised over 4,000 fire investigations and has over 30 years experience in fire/arson investigations with commercial and residential property, vehicle and marine vessels, arson and fraud, and has given expert witness testimony in both State and Federal Courts.

Mr. Perkins is a certified Level II Fire Investigator through the California State Fire Marshal's Office. He is also Certified by the International Association of Arson Investigators (IAAI). In July, 2005 he met the certification standards established for a Type 3 Wildland Fire Investigator developed by the National Wildland Coordinating Group. He is a licensed Private Investigator in California, Nevada, and Arizona. He has a "Lifetime Teaching Credential" in the State of California and teaches the basic and advanced curriculum in Fire/Arson Investigation as directed by the California State Fire Marshal's Office. Mr. Perkins has taught students enrolled in the Fire Science Program at local colleges as well law enforcement personnel at the Criminal Justice Training Center in San Jose.

Mr. Perkins has been a guest speaker and lecturer for the California Association of Arson Investigators and the International Association of Arson Investigators. Mr. Perkins was a member on the IAAI Certified Fire Investigators (CFI) Committee for three years and chaired the "IAAI Testing Committee" which writes the national certification test (CFI) for fire investigators. Mr. Perkins is a "co-author" on the IAAI Development Committee for the NFPA document "User's Manual for NFPA 921". Mr. Perkins was a project team member and contributed to the document "Performance of California Homes and Buildings in Urban Wildland Interface", a grant provided to Fire Cause Analysis by the California State Fire Marshal's office.

***Education/Training/Special Seminars:***

San Jose City College, San Jose, California - 1972
Associate of Arts Degree: Fire Science

West Valley College, Saratoga, California - 1975
Associate of Arts Degree: Business Management

Alcohol, Tobacco & Firearms - Glenco, Georgia -Advanced Arson for Profit – 1985
California Fire Academy - Asilomar, California - Fire Investigations - IA, IB, 2A, 2B
California Fire Academy - Asilomar, California - Fire Instructor - IA, IB
California Fire Academy - Asilomar, California - Incident Command Tactics - I, II, III
F.B.I. Academy - Quantico, Virginia - Police/Arson School - 1986
F.B.I. Bomb Investigations - Gilroy, CA - Seminar
National Fire Academy -Emmitsberg, Maryland - Fire/Arson Investigation School - 1979
National Fire Academy - Emmitsberg, Maryland - Fire/Arson Detection Instructor – 1982
National Fire Academy -Emmitsberg, Maryland – Courtroom Testimony Facilitator - 2001
Advanced Fire Investigation - Denver Fire Department - 1981
Arson/Bomb Scene Investigation - Calif. State Fire Marshal's Office 1978
Determining the Cause and Origin of Fires & Explosions - NAFI - 1990
International Association of Arson Investigators-Annual Seminar's
07, 06, 05, 04, 03, 02, 00, 99, 97, 95, 93, 91, 89, 88, 87
Dynamics of Fire Behavior - Factory Mutual Fire Test Facility - IAAI 10/93
Investigation of Large Loss Fires in Commercial & Industrial Buildings - IAAI - 4/94
Fire Dynamics / Live Burn Training Seminar – IAAI / ATF / NIST - 3/2000
California Conference of Arson Investigators Workshops (1979 – 2005)
Electrical Fire Investigations - San Francisco, California – Seminar - 1982
San Jose Police Department - Crime Scene Investigator School - 1984
California Department of Justice - Sacramento, California - Criminal Analysis - 1983
California Department of Justice - Sacramento, California - Surveillance Techniques - 1986
Santa Clara County Peace Officers School, Post Certified 1976
Third International Conference on Fire Research and Engineering 10/99
Fire Scene Photography - San Francisco, California - Kodak - 1980
Fire Scene Photography - Santa Clara, California – Nikon - 1985
Fire Protection Institute - Houston, Texas - Fire Marshals of North America 1992
Fire and Materials Conference – Fire Investigations – San Francisco, California – 2007
Electrical Fire Investigations in Residential Dwellings - Seminar - 4/94
Advanced Concepts in Fire Investigation - Seminar - 1/93
Electrical & Gas Appliance Fire Investigations - Seminar - 1995
Marine Casualty Investigations School - United States Coast Guard 1985
California Fair Claims Settlement Practices Regulations - 1993 / 1995 / 1997 / 1999
Introduction to Industrial and Commercial Fire Protection Engineering - UC Davis - 12/94
Kinesic Interview Techniques - San Jose, California - 1989
Hazardous Materials Familiarization Seminar - 11/80
Certificate of Achievement in Firemanship - 6/71

## ***Education/Training/Special Seminars Cont.:***

Explosive Ordnance Reconnaissance / Sabotage Device - 4/69
Public Agency Training Council – Electrical Fire Investigation – 12/01
Fire and Materials 2003 Conference – SF- Fire Cause Investigations – 1/03
NWCG – Wildland Fire Origin & Cause Determination – FI-210 – 7/05

## ***Professional Experience:***

**Fire Cause Analysis** (A Division of IFT Inc.), **Berkeley, California - 1993 to Present**

VICE PRESIDENT / PARTNER / SENIOR FIRE INVESTIGATOR - Fire Investigator with the responsibility of directing and managing eight highly qualified fire investigators. Work closely with the insurance industry providing additional services in all fire related disciplines including Computer Modeling, Fire Testing, Fire Safety Consulting, Mechanical & Electrical Engineering and Forensic Studies.

**Fire Cause Analysis, San Jose, California - 1980 to 1993**

OWNER / FIRE INVESTIGATOR - Licensed Private Investigator working closely with the insurance industry in handling fire cause investigations and consultation work.

**San Jose Fire Department, San Jose, California - 1967-1994**

FIREFIGHTER - SUPPRESSION / DRIVER - ENGINEER / FIRE PREVENTION OFFICER / FIRE INVESTIGATOR - 1978-1980/ CAPTAIN 1980-1994 / Retired - 2/4/94

**San Jose Fire Department, San Jose, California - 1984 to 1988**

UNIT SUPERVISOR - ARSON UNIT - Supervised and managed a staff of five fire investigators. Conducted and supervised over 3,000 investigations. Testified as an expert witness in Municipal and Superior Courts in both Criminal and Civil Cases.

**Campbell Fire Department, Campbell, California - 1965-1967**
FIREFIGHTER - SUPPRESSION

**United States Navy, 1961-1965**
Torpedoman 2nd Class, Qualified in Submarines

**United States Coast Guard Reserve, 11th Coast Guard District - 1980 to 1989**
**Marine Safety Office, Investigations Unit**
MARINE CASUALTY INVESTIGATOR – Conducted numerous marine vessel fire investigations. Investigations included the explosion and fatality aboard the USMV Hess, the "Honda Bluehawk" fire loss, and was a member of the marine Board investigating the fire and explosion aboard the tanker "Puerto Rican".

**Mission College, Santa Clara, California – 1986 to 1994**
FIRE SCIENCE INSTRUCTOR - Teach basic and advanced Fire/Arson Investigation Courses to students enrolled in the Fire Science Program. Instruction in Fire Investigation established by the State Fire Marshal's Office.

**American River College, Sacramento, California – 1990 to 1997**
FIRE SCIENCE INSTRUCTOR - Teach basic and advanced Fire/Arson Investigation Courses to students enrolled in the Fire Science Program. Instruction in Fire Investigation established by the State Fire Marshal's Office.

**Evergreen Community College, San Jose, California - 1990 to 1997**
Law Enforcement Training Center - Instructor
Teach "Evidence Collection in Arson Investigations" class to Police Officers throughout the State of California.

**California Conference of Arson Investigators, San Luis Obispo, California 1997**
Guest lecture - July 97' CCAI conference
Live Burn Facilitator – July 2000

**California Conference of Arson Investigators, Sacramento, California 1998**
Guest lecture - Feb 98' CCAI roundtable

**International Association of Arson Investigators, Olympia Washington 1997**
Guest Lecture - September 97 - IAAI conference of Washington Fire Investigators

**Certified by the California Bar Association for Continued Education - 1996**
Instructor for MCLE credits on the "Dynamics of Fire Investigation"

**38th RIMS (Risk & Insurance Management Society) Annual Conference -2000**
Guest Lecture

**34th Annual National Marine Conference West - 2002,** National Association of Marine Surveyors Inc., Guest Lecture

**Co-Author "Users Manual for NFPA 921" – Guide for Fire and Explosion Investigations 2003**
IAAI Development Committee - Published by National Fire Protection Association

***Marine/Vessel Fire Experience:***

**US Navy** (1961 to 1965) - Served on USS Patrick Henry SSBN 599 (submarine, ballistic, nuclear) and USS Tigrone SS419 - WWII fleet submarine - Missile Launch Technician and Torpedoman. Developed an understanding of ships, and working knowledge of propulsion systems, and equipment used.

**US Coast Guard** (1980 to 1990) – Reserves - Marine Casualty Investigator - Assigned to Coast Guard Investigations at Coast Guard Island, Alameda, CA. - Conducted numerous investigations in the maritime field with responsibilities including the investigations in the grounding, collisions, sinking of vessels and vessel fires.

**Major Vessel Investigations:**

Investigation of the "Puerto Rican", a tanker which caught fire off the San Francisco coast and sank. The vessel bow and a tank were towed into San Francisco bay for examination. Mr. Perkins was assigned to the Marine Board of Inquiry for the loss and provided information as to possible causes as well as research on the vessel. The research was conducted by diving down to the remains of the vessel, collecting evidence and photographing damage from underwater.

The "Honda Blue Hawk" was carrying hundreds of new 1986 Honda's, when it caught fire off the coast of California. After its extinguishment it was towed into San Francisco bay where Mr. Perkins examined the vessel and participated in the investigation for the Coast Guard. Since the fire occurred in International waters and the ship was registered in Japan, no formal report was provided.

An explosion and fire on the USS Hess, located at the AAA Naval Shipyard in San Francisco, resulted in a fatality. Mr. Perkins was involved directly with the investigation to determine origin and cause of the explosion.

Mr. Perkins has provided expert witness information for the federal government and the US Attorney General's office in San Diego on a suspected fire and sinking of a vessel suspected of carrying narcotics.

As a private investigator with Fire Cause Analysis, Mr. Perkins has investigated dozens of fires of all types of vessels, including large sailboats, yachts, pleasure craft, fishing vessels and commercial vessels, including the "Argo Commodore" from the San Francisco "Red & White" fleet and the "Alaska Spirit", a large commercial fish processing vessel out of Seward, Alaska.

Mr. Perkins is also a certified NAUI Scuba Diver and a qualified Navy diver, which has been useful in conducting investigations and photographing underwater.

## Major Fire Investigation Experience:

Mr. Perkins has investigated numerous large loss fires and explosions in a variety of commercial and industrial buildings. The following list provides a sample of the variety of fire investigations he has personally been involved in:

Basic Resources – Asphalt Plant / Propane explosion – Clements, CA
MBA Polymers – Industrial – Dust explosion Richmond, CA
Andros Fire – Manufacturing – Berkeley, CA
Sears – Department Store – Mexico City, Mexico
Interstate Bank Building – Hi-Rise - Commercial Office - Honolulu, Hawaii
Liz Claiborne Factory – Garment Manufacturing – Colombo, Sri Lanka
Subaru Observatory – Keck Observatory - Mauna Kai – Hilo, Hawaii
El-Dorado Hotel – Hotel – Reno, Nevada
North Star – Ski Resort - Restaurant -Truckee, CA
Kirkwood Ski Resort – Power plant – Kirkwood, CA
Crescent City Pier – Pier Fire – Crescent City, CA
Santa Barbara Pier – Pier Fire – Santa Barbara, CA
Moro Bay Pier Fire – Moro Bay, CA
San Francisco Pier Fire, San Francisco, CA
Gold Strike Casino – Hotel & Casino – Boulder City, Nevada
KFX - Industrial Coal Processing – Gillett, Wyoming
NUMI Motors – Tank Farm – Fremont, CA
San Francisco Opera House – Opera House – San Francisco, CA
1330 Broadway – Hotel – Oakland, CA
Yaser Store Fire – Retail -Sunnyside, WA
Alaska Spirit – 280' Fishing Vessel – Seward, Alaska
MV Blue Hawk – Vehicle Transport ship, San Francisco, CA
MV Puerto Rican – explosion/fire on Tanker – San Francisco, CA
USS Hess – explosion – AAA Shipyard, San Francisco, CA
Fregosi Paint – Industrial – San Francisco, CA
Rough & Ready - Wildland – Rough & Ready, CA
Poe Fire – Wildland – Butte County, CA
Galvin Fire – Wildland – Fallbrook, CA
Coast Sausage Fire – Industrial - Arson – Oakland, CA
Tran Market Fire – Retail Strip Mall – Arson - Stockton, CA
Mountain Cold Storage – Refrigeration cold storage – Washington
Kamps Propane – Propane Incident – Lodi, CA
University of California – Explosion / Fire, Irvine, CA
University of California – Fire, Santa Cruz, CA
University of Honolulu – Fire – Arson - Honolulu, HI
Placer County Water Treatment Facility – Fire – Newcastle CA
Hampton Hotel / Cannery Fire – San Francisco, CA
Orthodox Church - Church - Los Altos, CA
Friar Tucks - Restaurant - Commercial - Nevada City, CA

Union Pacific Railroad – Rail Car - Wyoming
Amtrak - Dining car - Washington, DC
Amtrak – Rail car – New Orleans, LA
Amtrak – Dorm Car – Chicago. Ill
Santana Row – Retail / Dwelling – San Jose, CA
Forsgren Shopping Center – -American Samoa
Redwood Valley Business Park – Industrial - Redwood Valley, CA
Blyth Inc. – manufacturing – Monterey, Mexico
9ines – 9-story high rise – Omaha, Nebraska
Makiki St. Condo's – 11- story high rise – Honolulu, HI
Wines Central – Warehouse – Vallejo, CA
Prometheus Real Estate – 4-story condo –total loss – Santa Clara, CA

## ***Professional Affiliations:***

Santa Clara County Arson Task Force - Past President and Training Officer
Central Coast Claims Association – Past President-member
California Arson Prevention Committee - Past Chairman
San Mateo County Arson Task Force – Past Associate Member
Society of Fire Protection Engineers - Associate Member – member
International Association of Marine Investigators – 2007 to present
International Association of Arson Investigators – 1978 to present
International Association of Arson Investigators – Past Chairman - CFI Certification Committee
California Conference of Arson Investigators – 1978 to present
California Conference of Arson Investigators – Past Training Committee Member
International Association of Firefighters - Past member
Fire Marshals Association of North America
National Fire Protection Association
National Association of Fire Investigators – Certified CFI (Past Member)
East Bay Adjusters Association
Sacramento Claims Association
Northern California Fraud Investigators Association
California Association of Licensed Investigators (CALI)

Perkins CV (12/07)

# Fire Cause Analysis

A DIVISION OF IFT INC.

Fire Cause Analysis
A DIVISION OF IFT INC.

May 15, 2008

To: Edward M. Bull
William Banning
Banning, Micklow, & Bull, LLP
One Market Street, Steuart Tower #1440
San Francisco, Ca 4105-1429

**Re:** **Mr. Arsenio Farell**

| | |
|---|---|
| **Motor Yacht** | **"MI BARUR"** |
| **Vessel:** | **1990 Hatteras** |
| **HIN No.:** | **HATDT3011990** |
| **US Official Number:** | **975461** |
| **Date of Loss:** | **October 20, 2007 (Saturday)** |
| **Location of Loss:** | **Marina Palmira, dock #2, slip#201-#202 La Paz, Mexico** |
| **Responding FD:** | **La Paz Fire Department** |
| **Alarm Time:** | **9:40A.M.** |
| **Date of investigation:** | **April 7th – 9th, 2008** |
| **FCA Ref. No.:** | **08-10613V** |



Offices:
San Francisco Bay Area
Sacramento Valley
Southern California
Phoenix, Arizona

935 PARDEE STREET
BERKELEY, CA 94710-2623 USA
510.649.1300
800.726.5939
Fax:

EXHIBIT A - 39
130

EXHIBIT C 0235

Enclosed for your private and confidential information is my report of my investigation into this fire loss, conducted at your request, regarding the above referenced fire loss. My report consists of this summary, diagrams, and attached photographs.

The opinions expressed in this report are based upon data collected during the investigation process and utilizing the guidelines established in NFPA 921. These conclusions are based on the scientific method.

***Synopsis:***

In summary, this fire loss occurred in the mid-morning hours at the Marina Palmira Yacht Harbor in La Paz, Mexico. The fire occurred within the "MI BARUR", a 1990, 92-foot motor yacht, manufactured by Hatteras. MI BARUR was moored on the starboard side, facing north at slip #201 & #203 located at the east end of dock #2. Shore power was connected to the vessel providing 110-voltage. No one was on board the motor yacht at the time the fire was reported.



Multiple calls were received by witnesses within the marina, who observed smoke emanating from the forward, starboard side, of the vessel, mainly from the starboard galley passageway door. Two of the witnesses, Mr. Francisco Robles and Alfredo Amador were working on adjacent vessels towards the middle of dock #2 and observed the early stages of the fire.

Both men ran to the motor yacht "MI BARUR", disconnected the shore-power connection, and boarded the vessel. They entered through the galley passageway door located mid-ships,

main deck level, at the starboard (right) side of the vessel, and observed a smoke layer banking down from the overhead to about three-to-four feet off the galley deck. They dropped below the smoke layer and observed no fire in the galley.

All smoke was observed light grey in color and emanating from the companion way stairs leading down to the forward crew's quarters and VIP stateroom. Mr. Robles stated he was able to get some three steps down the stairs before he was driven back by the smoke. There was very little heat and he felt that he could have gone down further if it wasn't for the smoke. I showed Mr. Robles the above photo. He stated to me the fire photo was taken some ten minutes after he first entered the galley and companion way to the lower crew's area.

With assistance from individuals around the marina, the vessel was moved from its original



moored position at the west end dock #2 to north side of dock #7, on the interior east side of the marina breakwater. The vessel was moved so that other vessels would not be harmed by the fire and to provided better access for fire suppression equipment. Local firefighters arrived on scene and observed heavy flames emanating from the galley door and salon. Firefighters began suppression operations but were driven off

the vessel by the intensity of the fire. Firefighters then re-directed their efforts from the exterior of the vessel. Suppression efforts continued until approximately 2:00 P.M.

on the same day when the fire was thought to be completely extinguished. The motor yacht



"MI BARUR" and all contents sutained a total fire loss.

The following morning a "re-kindle" occurred on the vessel. The vessel was taken outside the breakwater, where it burned to the water line, and sank in shallow water. The vessel was submerged for some three days prior to being raised and taken to a local marine facility, Abaroa's shipyard, where she was placed in the ways for inspection.

Examination of the remaining fire patterns are consistent with photographs and witness statements in forming my opinion that the fire originated from the lower crews lounge and galley located port side, on the lower deck as observed in the photo below.



Remaining fire patterns indicate the fire progressed from the crews lounge / galley area along the overhead and into the companion way to the upper galley area as well as into the crews berthing area forward of the companion way as observed below.



Potential ignition sources identified in the crews lounge/galley area include a portion of the vessel's electrical system and conductors, which passed within the confined area in the overhead, recessed lighting, microwave oven, small refrigerator, TV, and discarded smoking materials.

The ignition sources and physical evidence identified within the area of fire origin sustained extensive degradation, not only from the duration and intensity of the fire, and suppression activities, but from being submerged for three days, as well as from the activities of raising the vessel, and movement of materials by the prior investigation conducted by Mr. Murphy

In noting the comments provided in Mr. Murphy's " Maze" report, Mr. Murphy offers the reader information related to the NFPA 921 document, but fails to follow this doctrine in that the vessel should have been inspected prior to its raising. The shallow water and conditions would not preclude anyone to dive onto the vessel and look for potential evidence or ensure evidence is not lost during its recovery.

Due to the damage sustained to this vessel in this fire loss, and the absence of inspection and documentation prior to raising the vessel, the immediate point of fire origin could not be determined. Remaining fire patterns and examination of materials could not be relied upon to form a conclusive or a more likely than not scenario as to the cause of this fire loss for reasons discussed above.

***Due to these circumstances there is insufficient evidence/data to determine the exact cause for this fire loss with scientific certainty therefore the cause of this fire loss is undetermined.***

A fire of incendiary origin (arson) was examined as a cause for this fire loss and could not be verified due to the destructive process of this fire and recovery. No other ignition sources were reported or identified in this area.

***Introduction:***

This investigation of this fire loss began with a site inspection and investigation of the motor vessel fire located in the ways at Abaroa's ship yard in La Paz, Mexico on Monday, April 7, 2008. Accompanying me during my investigation process was *Fire Investigator Mario Saldana Nolasco, from the Federal District Attorney's General Office, and his supervisor Mr. Carlos Lopez,* Electrical Engineer Ron Kilgore, PE, with Kilgore Engineering, and Mr. Bill Engstrom a Certified Marine Surveyor.

The investigation process continued through Wednesday, April 9, 2008. Approximately 360 photographs were taken to document my fire investigation. Interviews were conducted with marina security as well as a site visit to view their security equipment. I also interviewed witnesses to the fire, and examined evidence stored at a storage yard, adjacent to the marina.

Prior to issuing this report, I read the examination under oath of Mr. Arsenio Farrel and the vessel's captain, Mr. Luis Rello with attached exhibits, and Mr. Murphy's fire investigation report. I read the September 2007 Marine Survey on the vessel by Marine Surveyor Cecil Lange with photographs. I was also provided photographs of the fire's progress as taken by various witnesses within the Marina.

***Vessel Description:***

The "MI BARUR" is a 1990, 92-foot motor yacht manufactured by Hatteras Boat Works off the east coast. The vessel has a fiberglass (Fiberglass Reinforced Plastic-FRP), hull with an overall hull length of eighty-six feet with a 24-foot beam, powered by twin, V-16, Detroit Diesel engines. Specific information as to this vessel was obtained from a Marine Survey conducted by Cecil Lange on September 9, 2007. Mr. Lange summed up his survey report by stating: "The MI BARUR is a vessel that has been well maintained and is a credit to her owner." The vessel was purchased by Mr. Arsenio Farrel in August of 2003.

Accommodations include a main saloon and galley on the main deck with a raised fly bridge and steering station above the salon. The master cabin berthing with head and shower existed mid-ships, below decks. Two additional guest berths and head were located aft of the master cabin.

A VIP stateroom and crews berthing was located forward directly below the galley. Entrance to the VIP



stateroom was via a companion way and stairs located off the starboard side of the galley. The cabin contained a double berth with closet, chest of drawers, and private head with shower. The entrance to the VIP berth was located at the base of the companion way stairs to the forward crews berthing and lounge / galley.

The crew's quarters were located forward of the VIP stateroom. Crew berths were located outboard on the port side of the vessel. The crews lounge and galley area is located port side aft of the crews berthing area

The Captains berth was located on the starboard side of the crews berthing area with a separate head and shower forward.



The crew's berthing area has a bunk-bed type berth and existed outboard, on the port side of the vessel. A separation wall divided the crew berthing area from the Captains berth.

These pre-fire photos of the MI BARUR were taken from Mr. Cecil Lange's survey report. The interior of the vessel's passenger and crew areas were well furnished with wood decks, cabinetry, padded vinyl walls and ceiling areas, and carpet. The base support structure was wood framing.



This photo shows a close-up of the crew's berthing area.



This photo depicts the crew lounge / galley area.



EXHIBIT A - 39
138

EXHIBIT C 0243

The crew's galley was located just aft of the crew's quarters, and to the port side of the VIP stateroom. This room was used by only the crew. The cabin contained a small refrigerator, TV, microwave oven, and a small table with bench type seating with foam cushions. This area is referred to as the crew's lounge and galley area.



***Fire Suppression Activities:***

The La Paz Fire Department was dispatched to the marina and drove out onto the break water to fight the fire. The vessel MI BARUR had been moved to the breakwater but was still inside the marina. When firefighters arrived on scene, the vessel was heavily involved with fire within the galley and salon area. Initial suppression efforts on the vessel were not successful and firefighters were forced to leave the vessel and fight the fire from the breakwater. Firefighters were eventually successful in containing and extinguishing the fire some six hours after they arrived on scene.

The fire consumed a majority of the vessel above deck level including the salon', galley, and fly bridge area. The lowest area of fire damage was observed forward, below the main galley, in the area of the crews / berthing / lounge / galley area. The remaining areas of the vessel sustained severe to heavy, fire, heat, and smoke damage.

**Interviews:**

**Mr. Alfredo (Freddy) Amador 044 612 1179121**
**Witness**

I conferred with Mr. Amador during my investigation of this fire loss. He provided me with the following information:

- He was on the water front at the entrance to Dock #2 when he first observed the fire.
- He was returning to his boat with groceries.
- He observed smoke at the end of the dock. He wasn't sure were the smoke was coming from because there was another vessel in the way.
- He ran up to the end of the dock and met with Francisco Roblas.
- He looked into one of the port holes to the engine room on the starboard side of MI BARUR secured to dock #2 at slips #201-#202.
- The shore power connection was passing through the port hole in the engine room. He disconnected the shore power connection to the vessel.
- Approximately 5-10 minutes later, while they were on the boat, Captain Rello came on board.
- He stated the prior to the captain arriving on the vessel he and Mr. Roblas entered the starboard passageway door to the galley and observed smoke coming from below decks – forward.
- Mr. Roblas started to go down the stairs but because of smoke was driven back. Mr. Roblas was only able to go down three steps into the companion way to the lower crews berthing area and VIP Stateroom.
- All the smoke was coming from below but the smoke layer in the Galley was down to 3-4 feet off the galley deck. The smoke layer was not that dense or that hot.
  - Note: This observation is not consistent with a fire originating at a fuel source, such as a foam mattress
- He dropped down under the smoke layer and looked into the main galley area. No fire or visible flames was observed in the galley as he was looking to port from the starboard entrance.
- After he left the galley entrance he went back to the main salon and opened the door.
- He observed Captain Rello on the bridge and there was a lot of smoke.

**Mr. Francisco (Kiki) Robles 044 612 1579226**
**Witness**

I conferred with Mr. Roblas during my investigation of this fire loss. He provided me with the following information:

- Mr. Roblas was working on the motor vessel "Si Nos Deja" ("If they let us"), which was tied to a slip about half-way up the dock, when he heard some people yelling.

- He looked up and observed smoke at the end of dock #2.
- He ran to the end of the dock where he observed smoke coming from the motor vessel MI BARUR.
- "Freddy" met him half way up the dock and they both climbed on board the vessel together.
- They entered the vessel through the galley passageway door on the starboard side of the vessel.
- There was no glow of fire at that time visible to them.



- I showed "Kiki" the photo of the vessel with unknown persons looking into the vessel. He stated to me that this photo was taken some ten minutes after he first tried to enter down into the crew quarters. He did not know this person.
    - Note the color of the smoke which is indicative of a fire just about to go to flaming. No one would be able to enter the galley entrance at this time without injury to himself or others.
- He went into the galley and tried to go down the companion way stairs to the lower crew's quarters.
- "The smoke was light in color but bad for his eyes." There was little heat associated with the smoke.
- Note: His reported conditions are consistent with a synthetic fuel such as a foam mattress.

- It was some minutes after he tried to enter the galley when the smoke became dense and dark and was forcefully emanating from the starboard side of the galley passageway door.
- He stated that he looked under the smoke layer while in the galley and saw no flames from the floor of the galley or under the smoke layer.
- He heard explosions coming from the vessel, but that was when it was against the breakwater.
- He did not see the firefighters fighting the fire from on board the vessel
- He spoke briefly with Captain Rello around 8:15-8:20 A.M.
- He said that Captain Rello told him he was going to the warehouse.

**Captain Luis Rello**
**MI BARUR Captain**

I conferred with Mr. Rello during my investigation of this fire loss. He provided me with the following information:

- He is employed by Mr. Farell as Captain on the MI BARUR,
- On the morning of the fire he woke up early, had coffee, and watched a little television.
- He also took a shower, and used the facilities in the lower crews berthing area.
- He did not use the bunk beds or the Captains berth for sleep.
- He lives on board the vessel and sleeps on the floor of the salon on the main deck.
- He did not smell or detect anything out of the ordinary while in the crews berth or lounge.
- The lights were out in the lower berthing area but the freezers were always on.
- The port holes were closed. The doors to both berths were open.
- He had a friend come by and they had coffee together in the main salon.
- His friend left after an hour or so and he left the vessel around 8:00 -8:30 am.
- He walked off the dock and conferred with various individuals along the way to a small storage facility in a nearby warehouse.
- He smokes but not on the vessel
- He was not aware of any mechanical or electrical problems with the vessel.
- He first became aware of the fire when he heard people yelling about the fire.
- Once outside of the warehouse he first saw the smoke emanating from the MI BARUR.
- He does not know how the fire occurred.

**Mr. Cecil M. Lange, AMS 011 52 (612)122-7066**
**Marine Surveyor**

I spoke with Mr. Lange while conducting my investigation of this fire loss. He provided me with the following information:

- He surveyed the motor vessel MI BARUR in September of 2007'.
- He stated that there are "low power" problems to the docks within the Palmira Yacht Harbor Marina.
- He stated that a crane was used to raise the vessel and that sections were torn from the vessel during this process and prior to entering the ways at Abaroa's ship yard in La Paz, Mexico.
- There were divers in the water during this process.
- This process of raising the vessel was under the direction of a Mr. Terry Carpenter who was retained by Todd and Associates, a Mr. Todd Schwede, out of San Diego, California.
- He overheard Mr. Schwede asking individuals if Captain Rello had set the fire. This was before any investigation, as to the origin and cause of the fire, had been done on the vessel.
    - Note that Mr. Murphy's report on page #5 reflects that on October 31, 2007 the vessel MI BARUR was raised and towed to Abaror's boat yard for inspection.
    - On page #12 of Mr. Murphy's report he asked Captain Rello on October 30th if he set the fire.
    - It would be "presumption of cause" on Mr. Murphy, to have formed this opinon prior to any fire investigation.
        - NFPA 921: 4.3.7 "until all data has been collected, no specific hypothesis can be reasonable formed or treated. All fires, however, should be approached by the investigator without presumption.
- He knows Mr. Schwede and in fact had attended a SAMS conference in San Diego where Mr. Schwede and Fire Investigator Murphy (Maze Investigations) were presenting together as guest speakers at the conference.
- He stated to me that since Mr. Murphy was on the west coast at the conference, it would be convienent for him to look at the fire for Mr. Schwede.

**Mr. Victor Franchini (612)12-5-87-08**
**Electrical Maintenance**

I met and conferred with Mr. Franchini during my investigation of this fire loss. He provided me with the following information:

- He is an electrical maintenance person and was on the motor vessel MI BARUR two weeks prior to this fire loss.

- He performed maintenance in lower maintenance space below the crews galley
- There was a history with the shore power connection at the marina.
- The shore power was protected by a 55-ampere rated circuit breaker.
- Electrical Engineer Ron Kilgore and he conferred over the vessels electrical system.

**Mr. Ron Kilgore, EE**
**Kilgore Engineering**

I met and conferred with Mr. Kilgore who conducted his investigation of the vessels electrical system and components during my investigation process on the motor yacht MI BARUR. He provided me with a summation of his scene inspection on the vessel.

- He is a licensed Professional Engineer specializing in Electrical Engineering.
- Mr. Kilgore inspected both the remains of the hull of the vessel, along with the items retained in a fenced enclosure nearby.
- He also reviewed the electrical plans for the subject vessel, MI BARUR.
- The items inspected revealed no cause of the fire; however, the items removed from the area of fire origin were not available for inspection.
    - These items have many potential electrical failure modes that could have resulted in the subject fire.
  - The inability to inspect these items prevented the determination of the fire cause or elimination of their possible contribution.
- I referred Mr. Kilgore to the void head space above the crews dining area and below the main-floor galley as the area of origin.
  - The potential fire-causing equipment within that area are many wiring harnesses and light fixtures.
  - Both 120 Volt ac and low-voltage dc circuits were routed in that area.
  - None of the wiring harnesses were retained or preserved in a fashion that made them available for forensic analysis.
  - Additionally the light fixtures in that area were intermixed either by collapse during the fire events, salvage efforts or during post-fire investigation.
    - Because of this, any light fixtures within the area of origin were not identified and were also not available for forensic analysis.

    - For these reasons the remnants of the electrical system cannot be examined to determine any potential role in the ignition of the fire.
- The wiring harnesses within vessels have been known to cause fires due to the constant movement and frequent vibration leading to mechanical damage of the wire insulation.
- Electric failures, followed by short-circuit heating and electric arcing, can ignite combustibles. Also lighting fixtures can overheat or produce inadvertent contact of the light fixture with insulating and combustible materials.
- The inability to identify and analyze these components made determining the cause of this fire impossible.



EXHIBIT A - 39
144

**Fire Investigator Mario Saldana Nolasco**
**Federal District Attorney's General Office**

I conferred with Fire Investigator Mario Saldana Nolasco during my investigation of this fire loss. He assisted me in the debris removal and conducted his own fire scene investigation. He provided me with the following information via a translator.

- He is a fire and bomb investigator out of Mexico City, Mexico. He was accompanied by his supervisor Mr. Carlos Lopez.
- Mr. Mario Saldana Nolasco stated that he is of the opinion the fire originated in the overhead of the crew's lounge and galley area.
- He believes the fire is electrical in origin.

***Origin Determination:***

The forward section of the motor vessel MI BARUR was accessed by a companion way and stairs located just inside of the doorway off the main deck on the starboard side of the galley. I observed and documented the remains of companion way and stairs that led down to the forward VIP stateroom and crew accommodations.

***Crew's Berthing Area:***

The crew's accommodations were accessed from a small stairway off the base of the stairs from the starboard side of the galley. The stairs were located approximately mid-ships and raised to a small landing, which accessed two passageway doors; one to the Captains berth and head and the other to crews berthing and head. The Captain and crew accommodations were separated by a division wall and freezer with the captain's berth and head located on the starboard side and the crew bunk bed arrangement and head to port.



The above photo depicts the crew's berth to port on the left side of this photo and the Captains berth to the starboard or on the right side of the photo.

Two freezers were located in the crews berthing area.

- One freezer was enclosed mid-ships, and forward between the crews berth as mentioned above. The front of the freezer faced aft and was accessible from the top of the stairs landing area. Both were "on" at the time of the fire.

- The second freezer is located immediately starboard, from the top of the access stairs to the crews berthing. The front of the freezer faced mid-ships. The rear paneling for the freezer would enclose a portion of the Captains berth.

An enclosed diagram further depicts these areas.



Remaining fire debris from the previous investigation was removed and the deck area cleaned and washed. Excess fire debris was systematically removed from this area, placed in large garbage bags, and set on the remains of the main deck on the starboard side of the vessel. Remaining fire debris from the previous investigation by Mr. Murphy has been placed in the crew lounge/galley area and VIP stateroom. It was removed and the deck area cleaned and washed.

The crew's accommodations were severely fire damaged and consumed in this fire loss leaving only a portion of the crews berthing areas and storage accommodations "outboard" in place.

***The fire patterns observed are consistent with witness observations in that the fire did not start in the either crew or Captains berthing compartment.*** Among the observations supporting my opinions include:

- Initial witnesses on scene do not see any glow of fire from the starboard portholes located in the Captains berth and shower.
- The carpet area on the Captains side of the berth was clean and clear of any drop down materials or indications of charring from radiant heat flux as the fire consumed materials including a portion of the Captains berth.

- The freezer protected the flooring and the head of the Captains berth.
- Carpet on the crew side of the berth was also clean with exception of the floor area mid-ships at the aft bulkhead. (as observed in photograph on page #18) A small nightstand and drawers were located in the area.



- The upper berth of the crew's bunk bed had greater fire damage than the bottom berth.
- Heat damage patterns on the carpeted floor indicate the fire entered the crews berthing area and involved a small chest as depicted in the survey photos.



- Comparison of both the Captains and crews head and shower facility clearly show greater fire damage from the port side of the vessel. Specific damage comparison was noted to the toilet, shower bulkhead and the overhead.

- The Captains berth was mostly consumed with exception to the head of the bed located aft and to the rear of the freezer and carpet on the Captains deck in front of his berth.

- In Mr. Murphy's report he comments on the combustibility of a foam mattress, which is well known to fire investigators. He fails to tell the readers of his report that a burning foam mattress produces materials running and pooling on the floor below yet the carpet on the deck of the Captain's compartment is not burned at all.



- By the time it took firefighters to reach the vessel and begin suppression efforts the carpet would have been burned. The carpet was not burned because the fire did not originate in the Captains berth or the crews berth.

***Fire Debris / Evidence Storage***



08-10

Fire debris from the motor vessel MI BARUR was in the northwest side of the storage yard located northeast of the marina. None of the materials / items I observed are marked or identified as evidence by the previous fire investigator.

We were told by security that this was the area where the pervious investigator had placed his "evidence". The items in this area were exposed to the elements and only protected by perimeter fencing and a yard dog. Due to the exposure, lack of protection, and absence of any proper documentation, these materials could not be subjected to any meaningful examination by the undersigned.

***VIP Stateroom:***



Just aft and starboard of the crews area was a VIP Stateroom with a double bed, closet, with a shower and head.

Note the bottom left hand side of the photo. This is at the base of the stairs from the galley and the entrance to the VIP Stateroom. The view is forward and to starboard. The stairs and companion way is located forward of the bulkhead with the picture on the wall.

When I examined the vessel, the fire debris was two feet above the bed platform. Given the amount of debris piled in this area I would have to assume the area was not processed or examined closely by the previous examiner. This omission would preclude meaningful data collection and analytical reasoning.

Mr. Murphy again failed to abide by his inferred systematic approach in his fire scene investigation by not conducting an inspection of remaining fire patterns in the crew's galley and VIP stateroom as recommended by NFPA 921 and Forensic Fire Scene Reconstruction as authored by Dr. John DeHaan and Dr. David Icove. Such an examination could reveal critical evidence of an alternate area of fire origin.

The VIP stateroom area was also cleared of remaining fire debris and photographed. Among the fire patterns I observed supporting my opinion that the fire did not originate from this area include:



- Fire patterns are even throughout the room and consistent with the fire progressing from the top-down.
- The door to the VIP Stateroom was burned off approximately two feet off the carpeted deck.
- All fire patterns were high, no floor patterns or low burn/char indicator supporting a

fire on the bed or from the lower areas of the room. (See above comment on results from foam mattress fires)

- Fire patterns are consistent with the fire progress into the VIP stateroom.

***Based on these considerations it was my opinion that the VIP stateroom was not the area of fire origin***

***Crew's Lounge / Galley area:***



Just aft of the crew's quarters on the port side of the vessel was a small lounge / dining area. As with the VIP Stateroom fire debris had been tossed into this area to some five-feet in depth.

It was clear that this area was not processed prior to my arrival. I have received no information to date suggesting or supporting that this area was properly processed as required by NFPA 921 and Forensic Fire Scene Reconstruction.
The Pre-Fire photos as observed within this report depict the crew lounge / dining areas. Both views were taken from the entrance passageway door located at the base of the companion way stairs from the starboard side of the galley above. These photos are part of



EXHIBIT A - 39
153

EXHIBIT C 0258

the survey photos taken in September of 2007'. According to information I received from Captain Rello the coffee maker was in the salon at the time of the fire and not in this location.

The area was cleared of all fire debris and the floor washed, the area photographed and fire patterns documented. All fire debris removed from this area was bagged and placed topside, starboard deck.



After debris was removed I observed and documented the area to include: A small, three- by-two-foot table surface with foam filled cloth covered bench seats on each side of the table. I also observed and documented contents in this area consistent with the photographs taken prior to this fire. The area contained a small refrigerator, TV, microwave, and built-in lighting.

Among the fire patterns that I relied upon to form my opinion that the fire originated from the area of the crew's lounge dining area include:



Figure shows Galley Deck from above.



Figure shows view from below with greater damage over crew's lounge/galley.

- Within the fire debris / evidence in the storage yard was the remains of the galley floor. Examination of the flooring clearly indicates greater fire damage from underneath over the area of the crew's lounge / galley area than the VIP stateroom.

- Extensive fire damage to the forward bulkhead, port side, which contained the refrigeration unit, microwave oven and lighting. Less damage was noted to opposite forward side of the bulkhead.







EXHIBIT A - 39
156

EXHIBIT C 0261

- Low fire damage extended down to the height of the crew's seating area with severe



fire damage to the port side of the aft table bench seat

- Fire damage was limited to heat and smoke at floor level, but greater damage than the crews berthing area.

- Fire patterns are consistent with normal fire progress from the crew's lounge / dining area out into the companion way and up to the galley and out the starboard side of the vessel.

- Fire patterns within the crew's lounge / dining area were generally high, above the table level with exception of the low damage at the rear table bench seat on the port side.

***Fire Behavior:***

Fire patterns are generally consistent with a fire originating high within the forward crew's lounge. The fire most likely originated in the "forward crew's galley / lounge" area from an accidental ignition source, likely from an electrical failure or improper use of smoking materials. The fire grew from the ignition phase to an incipient fire with the products of

combustion and heat filling the upper levels of the compartment venting out of any openings at that level. (This coincides with the witness description of the fire discovery and entry into the vessel.) The light grey smoke observed by witnesses indicated that the incipient fire involved predominately cellulosic materials.

As the fire grew to involve plastics, vinyl, and other synthetics and became "ventilation controlled" it created heavier darker and smoke (as described by witnesses). The fire breached the walls of the vessel and became "fuel controlled" consuming whatever combustible fuels were available to the ensuing fire. This ensuing fire destroyed evidence of the early fire such as burn patterns "sequential patterns" but left patterns that of the fire development. These patterns require "reconstruction" of the scene to develop.

The fire rekindled after the fire department's first attempt at extinguishment, further destroying the evidence of the fire's first existence, and burned to the vessel's waterline. This was a "fuel controlled fire" in that all that could burn did burn and in such the only evidence that remains is that of "non-combustible materials", and evidence that remains is "sequential patterns" of the final stages of the fire destroying original evidence of its original existence.

First witnesses to the fire were able to walk into the main galley and progress down the forward companion way before being driven out by smoke. They only reported "light" heat present, which would negate a fire originating from the captains berthing area. A fire in the Captain's berth, as implied in Mr. Murphy's report, would generate sufficient dark smoke and heat energy that Captain Rello would not only report intense smoke but unbearable heat.

Once the fire reached the upper galley and salon the fire was not only fuel driven but had unlimited ventilation, thus the fire's progression was more intense above deck level involving the main salon, galley, and fly bridge.

***Security:***

I spoke with Attorney Bismark Moyron and the computer technician who represents the Marina Palmira Yacht Harbor in La Paz, Mexico. I was able to view the control room and view the 14-monitors of the harbor. They record 24/7. The cameras are "smart view" in that they only record with there is movement. They do not have the ability to move their cameras during operation. The average digital recording lasts 10-15 days before the hard drive recycles itself.

The photo to the right depicts the camera on Dock #2, which does not pan or show that portion of the finger where MI BARUR was secured.





Presently the newer cameras have the ability to go 30 days without recycle. There are no cameras facing the end of dock #2 only the security gate at the east end of the dock.

***Fire Cause Analysis:***

As a result of my investigation and analysis of the fire scene and witness observations, I have concluded that this fire originated below decks within the forward crew's lounge / dining area. In an effort to determine the heat source and event that initiated the fire in this area, my analysis has led me to the following possible ignition scenarios that are consistent with the evidence in this case.

***Hypothesis #1:*** The cause of the fire can be directly related to an undetermined electrical failure from one of the above noted electrical sources in the immediate area/point of fire origin. The heat source is electrical energy. The fuel source is combustible material located within this area including interior finish materials. The event is from a yet undetermined electrical anomaly. There were reported problems with the shore power to vessels in the marina, which could cause failure of some electrical equipment or appliances.

In addition we should note that throughout this intense and long duration fire, potential items and materials that may have provided data to identify a cause were destroyed. During the prior scene investigation, where fire debris was not documented, or clearly identified and thrown about recklessly further compromised any evidence of causation.

A fire originating from an electrical anomaly cannot be eliminated.

**Hypothesis #2**: This fire originated from discarded smoking materials within the crew's lounge by Captain Rello or his companion. Among the information supporting this opinion would include:

- Captain Rello reported he smoked a pack of cigarettes a day.
- Captain Rello denies smoking in this area of the vessel although he was the only person in that area on the day of the fire.
- Mr. Rello states that he did not smell or hear anything unusual on the morning of the incident fire.
- The time frame of when Mr. Rello was in the area of fire origin and with the reporting of this fire, is consistent with a fire originating from discarded smoking materials.
- The bench seat is covered with a cloth / material over foam. Cotton upholstery or clothing can be ignited by a discarded cigarette and produce extensive smoke as the fire develops. As part of my training, education, and experience, these materials have been shown to smolder followed by flaming.

A fire resulting from discarded smoking materials cannot be eliminated.

My investigation follows the scientific method as presented in NFPA 921, the Guide for Fire and Explosion Investigations. In determining a cause for a fire the investigator must go through the following steps to provide a conclusive or more likely event cased a fire.

**NFPA 921 (2004 edition):**

4.3.3 Collect Data. Facts about the fire incident are now collected by observation, experiment, or other direct data-gathering means. The data collected is called **empirical data** because it is based on observation or experience and is **capable of being verified.**

4.3.4* Analyze the Data (Inductive Reasoning). All of the collected and observed information is analyzed by inductive reasoning: the process in which the total body of **empirical data** collected is carefully examined in the light of the investigator's knowledge, training, experience, and expertise. **Subjective or speculative information cannot be included in the analysis, only facts that can be proven clearly by observation or experiment.**

4.3.5 Develop a Hypothesis. Based on the data analysis, the investigator should now produce a hypothesis or group of hypotheses to explain the origin and cause of the fire or explosion incident. **This hypothesis should be based solely on the empirical data that the investigator has collected.**

4.3.6* Test the Hypothesis (Deductive Reasoning). The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. (See 3.3.35, Deductive Reasoning.)

This testing of the hypothesis may be either cognitive or experimental. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis should be tested. This test may include the collection of new data or the reanalysis of existing data.

This process needs to be continued until all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."

***Conclusion Re: Area of Origin:***

Based on the witness's descriptions and on accepted principals of fire and smoke spread, and burn pattern analysis, **it was concluded that the most likely area of fire origin was in the crew's lounge / galley area, lower deck, and forward on the port side of the vessel.** The VIP Stateroom, Captains quarters, and crew berthing area were eliminated as an area of fire origin.

Mr. Murphy states the fire originated in the captains berth with an open flame. A foam mattress in a small, ventilated room, would rapidly develop into flashover "full involvement" fire in that compartment. Such a fire would destroy the exposed carpet. This was not observed in the captain's berthing area.

To offer a "determined" cause you must have a "clearly defined origin"(NFPA 921-18.2.5), "when it is known conclusively to the exclusion of all other potential ignition sources". A conclusion that a fire was started with an open flam is "not to be used indiscriminately". When the origin is not clearly defined, this process is inappropriate". Some of the conditions and circumstances that prevent the origin from being clearly defined include the degree or extent of damage (such as those from a fully developed compartment fire), or adverse effects of fire suppression activities" (this vessel was under water and severely damaged by fire). This also requires the "testing and rejection or alternate hypotheses" which could not occur because all the data was not uncovered or developed.

Due to the damage sustained to this vessel in this fire loss, and no inspection and documentation prior to raising the vessel, the immediate point of fire origin could not be determined. Remaining fire patterns and examination of materials could not be relied upon to form a conclusive or a more likely than not scenario as to the cause of this fire loss for reasons discussed above.

***Due to these circumstances there is insufficient evidence to determine the exact cause for this fire loss with scientific certainty, therefore our opinion, based on the information and data available in this fire loss, is that the cause of this fire is undetermined.***

My assessment of this case is based on the analysis of physical evidence, the assessment of reported information and evaluation of all possible causes. My file will remain open pending your direction to close this file. Please feel free to contact me on any points needing further clarification.

Submitted by,

Donald J. Perkins, CFI
Fire Investigator
Fire Cause Analysis

Dr. John D. DeHaan, PhD, CFI
Technical Peer Review
Fire Ex-Forensics

DP/JdH/sa
08-10613-01-RDP