# EXHIBIT "C"
# PART FOUR

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

¿When you get to the Vessel where did you see the flames?
Captain Rello answered that he did not see flames he only saw white smoke.

**VI.- INTERVIEW WITH MR. ALFREDO AMADOR FAUSTO "FREDDY" CREW MEMBER OF THE VESSEL "TACARI" AND WITNESS OF THE FACTS OCURRED IN OCTOBER 20, 2007.**

Mr. Freddy says that in October 20, approximately at the 7:00 hours he visited Captain Rello on the Vessel "MI BARUR", says that in a period of approximately one hour they drank coffee, smoked and watched the television, leaving approximately at the 8:00 hours of that day because he had a travel programmed for that day, that approximately at the 9:30 hours when he was shopping in the store he hears yelling and sees smoke coming out of the vessel "MI BARUR", runs and grab an extinguisher, he does not remember to what vessel it belonged, and goes onboard the Vessel "MI BARUR".

Freddy says that he could go down until the third step of the stairways that are located following the kitchen that leads to the cabin named VIP and the Dinning table because the smoke was itching and irritating.

"Freddy" says that in the place he saw "Kike" and that Captain Rello arrived minutes later.

**<u>Questions made to Alfredo Amador Fausto "Freddy".</u>**

¿What color was the smoke that came out of the Vessel "MI BARUR"?
Mr. Alfredo Amador answered that the color of the smoke was white.

¿Where were the flames?
Mr. Alfredo Amador answered that he did not see flames.

¿How many cigarettes did you smoke in the Vessel "MI BARUR" in October 20, 2007, when you drank coffee with Captain Rello?
Mr. Alfredo Amador answered three.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

**VII.- INTERVIEW WITH MR. FRANCISCO JAVIER ROBLES CREW MEMBER OF THE VESSEL "SI NOS DEJAN" AND WITNESS OF THE FACTS OCURRED IN OCTOBER 20, 2007.**

Mr. Francisco Javier Robles says that that day he arrived to the wharf number two between 7:50 and the 8:00 hours because he first took his daughter to school, and minutes later he saw Captain Rello, with who after saluting each other chatted with him about 5:00 minutes.

Mr. Francisco Javier Robles says that he took an extinguisher and went onboard the Vessel "MI BARUR" and when passing through the kitchen saw that the smoke was not coming from there, because of that he continued to the stairways, that go to the VIP cabin, and the Dinning table, achieving to go down two or three steps, not being able to go further because the smoke was too itching and without seeing from where the smoke was coming.

**<u>Questions made to Mr. Francisco Javier Robles.</u>**

¿When you arrived did you see flames?
Mr. Francisco Javier Robles answered no, that he did not see flames only smoke.

¿What color was the smoke?
Mr. Francisco Javier Robles answered that the color was white.

**VIII.- INTERVIEW WITH RAUL SANCHEZ CASTRO COMMANDER OF THE FIREFIGHTERS DEPARTMENT OF THE DISTRCT OF LA PAZ, BAJA CALIFORNIA SUR.**

With the objective to know about the intervention of the commander in the fire of the vessel "MI BARUR" I went to the premises of the firefighters department and when asking about the facts under investigation, the commander Raul Castro said:

That he is not authorized to perform investigations, that no one has invited him to perform an investigation of the cause or causes of the fire in the vessel "MI BARUR", that he has not emitted any technical opinion in such regard because, he repeats, he is not authorized to perform investigations.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

I was also informed that a total of 80,000 liters (6 pipes of 10,000 liters and 1 pipe of 20,000 liters) was used to put out the fire, as well as 600 liters of chemical foam (3 pipes of 200 liters).

**IX.- DISTANCE FROM THE PILE OF THE SPACE NUMBER 201 OF THE WHARF NUMBER TWO OF THE MARINA PALMIRA AND THE DOOR NUMBER 32 OF THE WAREHOUSE.**

With the objective to know the distance covered by the Captain Luis Manuel Rello Romero in October 20, 2007, after he left the vessel "MI BARUR" to the warehouse number 32, I proceed to measure the different distances, obtaining the following results:

First distance.- From the pile of the space number 201 to the access door of the wharf number two.

**Distance obtained 129.20 meters.**

Second distance.- From the access door of the wharf to the door of the warehouse number 32.

**Distance obtained 182.20 meters.**

Total distance.- From the pile of the space 201 to the wharf number two to the door of the warehouse number 32

**Distance obtained de 311.40 meters.**

(see photographs 46, 47, 48, 49, 50, 51 and 52).

Ing. Mario Ricardo Saldaña Nolasco.
Perito en Incendios y Explosivos.



Photograph number 46 Pile from the space 201, place where Captain Rello starts his way to the warehouses.



Photograph 47.- Captain Rello reaches the central aisle and turn to the right; also it can be seen the spaces 203 and 205 where Captains Rello says they were docked two vessels at the time of the fire.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 48.- Central aisle through where Captain Rello walks towards the warehouse, in his way salutes and chats with some friends.



Photograph number 49.- Captain Rello goes through the door and exits the wharf number two.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 50.- Façade of Atalanta's warehouse.



Photograph number 51.- From the access door to the warehouse area.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 52.- Access door to the warehouse number 32.

**X.- TIME DONE BY A PERSON WITH A NORMAL PACE WITHOUT SALUTING AND CHATTING WITH ANYONE.**

With the objective to know the time done by a person with a normal pace, without saluting and chatting with anyone was:

<u>First time of the tour.-</u> From the pile of the space number 201 to the access door of the wharf of the marina Palmira.

**Three minutes, thirty five seconds.**

<u>Second time of the tour.-</u> From the access door of the wharf number two to the door of the wharf number 32.

**Three minutes forty five seconds.**

<u>Total time of the tour.-</u> From the pile of the space number two to the door of the warehouse number 32.

**Seven minutes, twenty seconds.**

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

## XI.- TIME DONE BY CAPTAIN RELLO FROM THE PILE OF THE SPACE NUMBER 201 TO THE DOOR OF THE WAREHOUSE NUMBER 32.

With the objective to know the time done by Captain Rello, since he left the Vessel "MI BARUR" departing from the pile of the space number 201 to the door of the warehouse number 32, it was re-constructed the tour made by Captain Rello saluting and chatting with the people whom Captain Rello saluted and chatted in October 20, 2007.

First time of the tour.- From the pile of the space number 201 to the access door of the wharf number two.

**Eleven minutes, thirty six seconds.**

Second time of the tour.- From the access door to the wharf number two to the door of the warehouse number 32.

**Three minutes, forty five seconds.**

Total time of Captain Rellos´ tour.- From the pile of the space number 201 to the door of the warehouse number 32.

**Fifteen minutes twenty one seconds.**

## XII.- YACHT CLUB PALMIRA.
## La Paz Baja California sur, México.

Palmira´s marine according with its information and propaganda is an establishment that has the following services;

- Housing.
- Services.
- Reservations.
- Location.
- Premises.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

Palmira's marine has a depth of 12 feet and has a capacity of 189 spaces in service, for vessels from 22 to 130 feet of length.

Has fuel and diesel in the wharf of fuel and refill of tanks of propane gas, bombing of tanks, electricity of 130/110 amperes and 250/50 amperes, a triphase of 100 amperes available in some spaces, fax service and cable television.

When realizing the tour in the premises of Palmira marine, it was observed a parking lot, stores and restaurants, where the general public have access, this area has security personnel whom tours the area by foot and bike (see photograph number 53)



Photograph number 53, View of the area of restaurants, stores, watched by private security personnel.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

Also it was observed a second area comprise by the wharfs, observing that each wharf has an access door, to enter a metallic key or a card have to be used, in each door exists a security camera, and finding security personnel doing their tour in the wharfs (see photographs 54, 55 and 56).



Photograph number 54.- Private security personnel doing foot tours in the wharfs.

Standing at the access door of the wharf number two, I had in sight the security camera, which according to its position and orientation watch the entrance and exit of the wharf (see photograph 55).



Photograph number 55.- Access door to the wharf number two and to have access a metallic key or card is needed.



Photograph number 56.- Access door number two has a security camera for the entrance and exit of people.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

## CONSIDERATIONS.

1.- That the fire of the Vessel "MI BARUR" started approximately at the 9:30 hours in the morning, what discards that the fire was provoked, because in the wharf number two already existed personnel of neighbor vessels working as well as continued vigilance.

2.- That due the action of the fire the upper part of the Vessel disappeared, what indicates that the fire started beneath the upper part of the vessel.

3.- That the front part of the prow´s deck shows a greater action of fire in the port side (left side), what indicates that the development of the fire was greater in the port side (left side), opposite to the captain´s cabin.

4.-That in the area of the crew´s cabin all the deck disappeared, what indicates a greater presence of fire in the port side (left side) than in the starboard side (right side).

5.- That in the area of the captain´s cabin part of the prow´s deck from the starboard side, remained, what indicates lesser presence of fire in the starboard side (right side) in relation with the port side (left side) where the hole deck disappeared.

6.-That the door of the area of showers of the crew´s cabin shows greater damages caused by fire than the door of the area of shower of the captain´s cabin. That indicates a greater presence of fire in the crew´s cabin than in the captain´s cabin.

7.- That the carpet of the captain´s cabin does not show damages caused by fire, and it remains clean without damages, what indicates that the fire does not have its origin in the polyurethane mattress of the captain´s bed because if this material had ignited at the beginning it would have caused damages by fire to the carpet, or at least, substantial stains.

8.- That the carpet of the crew´s cabin shows damages caused by fire and that this damages caused by fire have a burnt pattern in a direction from

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

stern to prow (rear to front) and port to starboard (left to right) what indicates that the burnt pattern of this carpet is the direction of the fire spreading what indicates that the fire that affected this room came from the adjacent room named dinning room or dinning table, consequently is discarded that the fire started in this room.

9.- That the carpet of the aisle that lead to the cabins of the crew and the captain shows damages caused by fire with a burnt pattern from port to starboard (left to right) and from stern to prow (rear to front) what determines that the fire that affected this section came from the room named crew's cabin and from the dinning room (dinning table).

10.- That the wall that divides the cabin named VIP and the stairways that come down from the kitchen show a burnt pattern from top to bottom, what indicates the presence of fire in the upper part what moves downwards.

11.- That the furniture that is located next to the bed of the cabin named VIP shows a burnt pattern from top to bottom, what indicates the presence of fire in the upper part which moves from port to starboard (left to right).

12.- That the furniture of the dinning room area also known as Dinning table, show a burnt pattern from top to bottom and a direction from stern to prow (rear to front), what indicates that the presence of fire moves initially from the upper part of that room.

13.- That the wall which is behind the bed-head of the bed of the cabin named VIP, same wall that is adjacent to the dinning room (dinning table) shows a mark of fire in a swing form, with a burnt pattern in a radial form, from top to bottom, having its epicenter in the top central part

14.- That the cabin named VIP and the Dinning room also known as the Dinning table are located approximately one meter lower than the level of

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

the floor of the crew and captains cabins, what indicates that its space of oxygenation is very reduced, producing the presence of fire without flame.

15.- That the soffit or roof of the VIP cabin and the dinning room Dinning table, which at the same time is the kitchen's floor, collapsed, due the weakening of the affected material because of the heat concentration in its inferior part.

16.- That the kitchen's floor in its upper part does not show damages caused by fire, and in its interior part shows carbonization, being the carbonization an indicative that the heat was principally concentrated in this area.

17.- That the distribution panel or loading centre is completely destroyed, its damage by the action of the fire from top to bottom, what indicates that the fire came from the upper part.

18.- That in the areas of the distribution panel and machinery there were found a great variety of electric conductive cables cut by a sharp instrument and of pressure, what indicates that samples or traces related to the case under investigation were taken.

19.- That the elements or traces removed by sharp instruments of pressure, were not seen physically nor in photographs.

20.- That amongst the remnants located in the dockyard of Atalanta there were found electric conductive cables with short-circuit characteristics, what indicates that the fire may have been caused by a short-circuit.

21.- That the burnt pattern changes its direction in the middle part of the vessel, precisely in the room named crew's lounge, being this point where it goes in two directions, one trajectory to the stern (rear) and the other one to the prow (front)

22.- That the cabins located in the area of stern shows a burnt pattern from top to bottom and from the middle part of the vessel to the stern, what confirms the second trajectory of the fire.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

23.- That it was not possible to have in sight the "setinas" (lowest part of the boat), because their access was difficult.

24.- That the door of the compartment of the prow´s deck could be confused with a porthole.

25.- That Captain Rello before leaving the Vessel "MI BARUR" closed, and only the kitchen´s door open and considering that the wharf has lots of security, it is discarded the introduction of any person that would have provoked the fire.

26.- That Captain Rello smokes in the principal saloon, being so why it is discarded that the fire could have been provoked by a cigarette end in the captain´s cabin, crew's cabin, VIP cabin or crew´s lounge.

27.- That Captain Rello before leaving the vessel does cleaning tasks, which indicates he is a disciplined, tidy, cautious and careful person.

28.- That Captain Rello before leaving the vessel turns off the television, the coffee machine, the lights and the air extractor, what indicates that he is a disciplined, tidy, cautious and careful person.

29.- That Captain Rello leaves the vessel, walks through the wharf towards the exit, and in his way salutes and chats with acquaintances doing an a approximate time of 11 minutes 36 seconds, since he leaves the vessel until he reaches the door of the wharf, enough time note any smoke coming out from the vessel, not being so until the 9:30, what indicates that the fire was not provoked and it was no due a negligence or lack of caution.

30.-That the time he takes to reach the access door of the wharf and exit, since he leaves the Vessel "MI BARUR" is approximately eleven minutes thirty six seconds. What indicates that the Captain Rello was not in a rush of leaving and be distant of the vessel, due that the normal time that takes

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

to a person in a normal pace without chatting and saluting for leaving the wharf from the place where the vessel at issue was located, is 3 minutes 37 seconds.

31.- That the time that Captain Rello takes to reach the door of the warehouse number 32 since he left the vessel "MI BARUR" is approximately 15 minutes 21 seconds, considering the normal time of the tour.

32.- Since Captain Rello left the vessel "MI BARUR" and the first yells of alert about the fire of a vessel were heard, it has already passed approximately 1 hour 20 minutes.

33.- That Alfredo Amador Fausto "Freddy" and Francisco Javier Robles "Kike", say that they only were able to get until the second and third step of the stairway following the kitchen, because the smoke was very itching, what indicate that the smoke came from beneath the kitchen, consequently the fire was in its first stages.

34.- That Alfredo Amador Fausto "Freddy", Francisco Javier Robles y el Captain Rello say that they did not see flames, but white smoke, what indicates that it was in incipient fire.

35.- That there is no video of the fire from Palmira marine.

36.- That the access to the wharf number two of the Palmira marine is controlled by a metallic key or a card, what guarantees the safety of the people who access the wharf, avoiding the presence of estrangers.

37.- That there is vigilance through security personnel by foot, in the wharf number two, by private security personnel, what guarantees the safety of the people who access the wharf, avoiding the presence of strangers.

38.- That the Vessel "MI BARUR" had to be moved towards the wharf number 7 also known as the breakwater wharf, located in front of the spaces 201 y 202, to avoid other vessels to be affected principally those located in spaces 203 and 205, what indicates the presence of people near the space where the vessel "MI BARUR" was docked.

Case 3:08-cv-00443-BEN-POR Document 13-8 Filed 06/20/2008 Page 17 of 18

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

39.- That is discarded that the fire has had its origin in the mattresses of the beds of the cabins of the captain and the crew, because due that the material is polyurethane it would have produced black-colored smoke, and what the witnesses says is that the smoke was white.

40.- That is discarded that the fire was provoked or intentional, because there were not found multiple points of origin in questionable places, and no evidence to support such a conclusion was found.

Due the aforementioned, I reached the following:

## CONCLUSIONS

**First.-** In accordance to all the damages caused by the fire and the burnt pattern, the origin of the fire did not take place in the captain's cabin

**Second.-** In accordance to all the damages caused by the fire and the burnt pattern, the origin of the fire did not take place in the crew's cabin

**Third.-** In accordance to all the damages caused by the fire and the burnt pattern, the origin of the fire took place in the dinning room area, also known as the crew's lounge in the roof or soffit.

**Fourth.-** In accordance to the characteristics of the damages caused by the fire, in the vessel "MI BARUR" in October 20, 2007, at the 9:30 hours, it was not intentional, considering the arguments contained in this study.

**Fourth.-** In accordance to the circumstances and characteristics in which the vessel "MI BARUR" was found, the cause of the fire is undetermined, without the possibility of discarding that it was caused by a short circuit.

What I make of your knowledge for corresponding legal and administrative endings and effects.

**Yours respectfully,**

**Ing. Mario Ricardo Saldaña Nolasco**
**Expert in FIRE and explosions.**

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

**CAMERA.**

In the investigation of the vessel "MI BARUR" it was use the digital camera Brand: Sony, Model: DSC-W100 de 8.1 Mega pixels.
Lens: Carl Zeiss, Vario-Tessar, 2.8-5.2/7.9-23.7
High sensitivity iso 1250 2.5'' LCD Monitor Strong Flash up to 10.5 m

**BIBLIOGRAPHY.**

The specialized bibliography used for the proper analysis of this Report was the following:


**1.- "Guía para las investigaciones sobre incendios y explosiones"**
Edición: 1995. NFPA Nacional Fire Protection Association.
Editorial: MAPFRE.

**2.- "Seguridad de incendios en almacenes y depósitos de mercancías"**
Fundación: MAPFRE. Editorial: MAPFRE.

**3.- "Investigación del origen y causas de los incendios"**
Autores: Calvin C. Phillipps y David A. Mcfadden.
Edicion: 1984, Editorial MAPFRE.

**4.- "Incendios intencionales y laboratorio del fuego"**
Autor: Ing. Sergio Pineda Sicardo. Editado por La Procuraduría General de la Republica Edicion: 1996.

**5.- "Una guia practica en la investigación de los incendios intencionales"**
Autor: Juan A. Benavides Flores. Edicion: 2000
Editorial: El Cosario.

**6.- "Incendios"**
Fasciculo: 7 Autor: Ricardo Cicero Betancourt.
Edicion: 1998 Editorial: Centro nacional de Prevención de Desastres.

**7.- "Guia para la Investigación de Incendios y Explosiones",**
Autor: Daniel L. Churchward . Edicion: 2008. Editorial: NFPA 921

México D. F., May 7, 2008

In answer to your request, in which you asked the intervention of the undersigned, in order to render an expert report in polygraph related to the fire case of the boat "Mi Barur", I present to you the following:

# REPORT

## PROBLEM POSED.

**A.** Determine whether Mr. **Rello Romero Luis Manuel** intentionally provoked the fire of the boat "Mi Barur" on October 20, 2007, located at dock number 2 of Marina Palmira in La Paz, Baja California Sur.

# SICENTIFIC METHODOLOGY

## I. APPLICATION OF A POLYGRAPH TEST

These were the steps of the scientific methodology that were taken during the test:

- Introduction of the persons in charge of the test.
- Authorization (in writing) to perform the test (to respect the fundamental rights of the United Mexican States Constitution).
- Personal background
- Review of the medical – psychological status of the person being interviewed.
- Explanation of the polygraph.
- In-depth interview.
- Introduction to control questions.
- Making and reviewing of questions that were to be used during the test.
- Elaboration of graphics.
- Interpretation of the graphics.
- Post-test interview.

## II. QUESTIONS USED DURING THE TEST

The questions that were used are the following:

**Irrelevant (questions 1, 7 y 10).** This questions are designed with the purpose of decreasing the emotional stress, as well as to verify the reaction capacity of the subject, as they are not linked with the target fact being investigated.

**Symptomatic (question 2).** This is designed with the objective of testing a single fact subject matter of the investigation and to cause the subject not to disperse his psychological attention in other acts.

**Relevant (questions 4, 6 y 8).** They are designed with the purpose of exploring the facts subject matter of the investigation, because they are linked to the target of the test.

**Comparative (questions 3, 5 and 9).** They are designed with the purpose of balancing the emotional charge, caused by the relevant questions that are linked with the target of the investigation.

1I Are you now in Sinaloa*? (No)

2T Did you answer with the truth all the questions that I made to you today? (Yes)

3C Do you remember taking women to the boat without the authorization of the owner in any occasion? (No)

**4R Did you intentionally cause the fire by any means of the boat "Mi Barur"? (No)**

5C Do you remember having consumed alcoholic beverages in the boat in any occasion? (No)

**6R Did you intentionally cause the fire of the boat "Mi Barur" on October 20, 2007? (No)**

7I Are you now in Mexico City? (Yes)

**8R Did you smoke in the area of the cabins located at bow on October 20, 2007? (No)**

9C Do you remember, in any other occasion, having defrauded the trust of the owner of the boat? (No)

10I Are you now in Aguascalientes*? (No)

The used technique was the MGQT, which is a modified version of the technique developed by John Reid in 1953, who was the first in developing the method comparing comparative questions

* Translators note: Sinaloa is a one of the 31 States of Mexico.
* Translators note: Aguascalientes is a one of the 31 States of Mexico.

and the guilt complex reaction questions, incorporating that to this technique. In 1968, the Arm Forces Academy modified Reid's technique and call it MGQT, incorporating the principles used in the test of comparative zones of Cleve Backster ZCT (comparative questions separated in space and time), which was adopted by the Arm Forces Academy of the U.S.A. in 1961.

The main difference between Reid's Technique (1953), and that of the Army MGQT (1968), was that Reid's did not use a numeric analysis, the controls were not isolated in time and/or place regarding the relevant matter, and he permitted multiple matters in the test in a sole series (crossing objectives). Crossing objectives consists on two or more different matters or crimes.

In the last years, both the Army and the Marine of the United States of America have modified the MGQT in several way and have used this technique in criminal and counterintelligence areas.

The results to determine the accuracy of the Poligraph made by some Universities are presented below:

- Stanford's states a 96%.
- Utah's, a 94%.
- British Columbia's, a 96%.

On the other hand:

- Jagiellonian, in Poland, a 95%.
- Another from the government of India, a 90%

## MGQT'S PRINCIPLES

- Comparative questions technique
- Uniformity of the technique
- Permits up to five relevant questions concerning a single crime or subject matter and/or several subject matters.

## PSYCHOLOGY OF THE MGQT'S STURCTURE

The MGQT is a test designed to cause a threat in the security of the person being examined, without minding if he is guilty or innocent, and focing him to center his attention in the specific questions of the structure of the test.

The MGQT uses a structured format where the questions are reviewed with the person being examined. In any event, the exact sequence of how the questions will be made is not known. It is designed to avoid external matters to interfere with the examination, the use of symptomatic questions used in the ZCT technique.

It is used to identify the spot responder, this means to avoid that the person being examined is responding to a question because he is in the same position always, because this technique permits the rotation of both relevant and control questions in each of the sequences, always respecting the recognized principles of the American Association of Poligraphs.

## III PROTOCOL TO QUALIFY THE PHYSIOLOGICAL REACTIONS OBTAINED BY THE TEST

- The numeric evaluation of the MGQT is vertical, there is not an horizontal total, this is because each QR's refers to different matters.
- To obtain a result of NDI a vertical total score greater to + 3 has to be obtained in each of the relevant questions.
- To diagnosticate a DI resulta vertical total score of -3 has to be obtained in each of the questions.
- If none of this scores are obtained, then it is inconclusive or we do not issue an opinion.

SCORES OBTAINED IN THE TEST

| VAT 1 | 4 [illegible] | 6 | 8 |
|---|---|---|---|
| | 0 | +1 | 0 |
| | 0 | +1 | 0 |
| | 0 | +1 | +1 |
| | 0 | +3 | +1 |

| VAT 2 | [illegible] | 6 | 8 |
|---|---|---|---|
| | +1 | +1 | +1 |
| | +1 | +1 | -1 |
| | +1 | -1 | +1 |
| | +3 | +1 | +1 |

| VAT3 | 4 [illegible] | 6 | 8 |
|---|---|---|---|
| | +1 | -1 | 0 |
| | 0 | -1 | +1 |
| | 0 | +1 | +1 |

| | +1 | | -1 | | +2 | |
|---|---|---|---|---|---|---|
| | 4 | | 6 | | 8 | |
| TOTALS | + 4 | | + 3 | | + 4 | |

## CONCLUSIONS

1. With respect to the polygraph test performed to Mr. Luis Manuel Rello Romero we obtained a "VERACITY" result (NDI), sustained in the quantitative analysis of the psycho-physiological of the person being examined according to the protocols established by the American Association of Polygraphs.

2. No psycho-physiological reactions of lack of veracity were registered when he answered negatively to the question if Mr. Luis Manuel Rello Romero intentionally caused the fire by any means of the boat "Mi Barur".

3. No psycho-physiological reactions of lack of veracity were registered when he answered negatively to the question if Mr. Luis Manuel Rello Romero intentionally caused the fire by any means of the boat "Mi Barur" on October 20, 2007 and if on October 20, 2007 he smoked in the area of the quarters of bow.

4. For the reasons stated above, the undersigned poligraph experts, Psychologists **Julián Flores Anda and Psic. Carlos Enrique Ramos Raths,** conclude that according to the protocols of the polygraph techniques and based on the methodology of the psycho-physiological test of Deceit Detection (PDD) and the numeric qualification obtained thereto, that no reactions of deceit were registered in the main subject of the evaluation by Mr. Luis Manuel Rello Romero.

**SINCERELY,**

**PSIC. JULIAN FLORES ANDA**
Certified Poligraph Expert
Supervisor

**PSIC. CARLOS ENRIQUE RAMOS RATHS**
Certified Poligraph Expert
Person applying the test

BIBLIOGRAPHY

**Tuvia Rosen** (2002), The polygraph, myths and reality, Mexico: INACIPE.



**EXHIBIT A - 41**
**221**

EXHIBIT C 0326

**James Allan Matte, Ph D.** (1968), "Forensic psychophysiology using the polygraph".

**Norman Ansley** (1990), Validity and accuracy of poligraph decisions in real cases

**Elmer Criswell** (2003), Study of the test formats of P.D.D., article presented to the Annual Seminar of the American Association of Polygraphs, Sparks, Nevada.

México D. F., a 07 de Mayo del 2008

En atención a su solicitud donde requirió de nuestra intervención de los que suscriben, para dictaminar en materia de poligrafía referente al caso del incendio del barco "Mi Barur" remito a usted lo siguiente:

# DICTAMEN

## PROBLEMA PLANTEADO

A. Determinar si el **C. Rello Romero Luis Manuel**, provocó intencionalmente el incendio del barco "Mi Barur" el día 20 de octubre del 2007, en la Marina de Palmira en la Paz, Baja California Sur en el muelle marcado con el número 2

# METODOLOGIA CIENTÍFICA

## I APLICACIÓN DE LA EVALUACIÓN POLIGRAFICA

Estos son los pasos de la metodologia científica que se emplearon durante la evaluación:

- Presentación de los Evaluadores
- Autorización (por escrito) para llevar a cabo la prueba (Respeto a las garantías Individuales plasmadas en la Constitución Política de los Estados Unidos Mexicanos)
- Antecedentes personales
- Revisión de la situación médico – psicológica del entrevistado
- Explicación del polígrafo
- Entrevista Profunda
- Introducción de preguntas control
- Formulación y revisión de preguntas que se van a utilizar durante el examen
- Elaboración de gráficos
- Interpretación de gráficas
- Entrevista post-test.

## II PREGUNTAS EMPLEADAS EN LA PRUEBA

Las preguntas que se utilizaron fueron:

**Irrelevantes (preguntas 1, 7 y 10).** Estas preguntas están diseñadas con la finalidad de disminuir la tensión emocional, así como verificar la capacidad de reacción del sujeto, ya que no están ligadas con el objetivo del hecho que se investiga.

**Sintomática (pregunta 2).** Esta diseñada con el objetivo de evaluar sólo el hecho que se investiga y que el sujeto examinado no disperse su atención psicológica en otros actos.

**Relevantes (preguntas 4, 6 y 8).** Son diseñadas con la finalidad de explorar los hechos que se investigan, ya que están ligadas a los objetivos de la evaluación.

**Comparativas (preguntas 3, 5 y 9).** Son diseñadas con la finalidad equilibrar la carga emocional, que generan las preguntas relevantes que están ligadas con el objetivo que se investiga

1I ¿Estas ahora en Sinaloa? (No)

2T ¿Contesto con total veracidad a las preguntas que le realice el dia de hoy? (Si)

3C Recuerdas en alguna otra ocasión. ¿Haber llevado mujeres al barco sin autorización del propietario? (No)

4R **¿Deliberadamente ocasionaste el incendio a través de cualquier medio del barco "Mi Barur"? (No)**

5C ¿Recuerdas en alguna otra ocasión. ¿haber consumido bebidas alcohólicas en el barco? (No)

6R **¿Intencionalmente tu provocaste el incendio en el barco "mi barur" el 20 de octubre de 2007? (No)**

7I ¿Estas ahora en la ciudad de México? (Si)

8R **¿El día 20 de octubre de 2007 tú fumaste en el área de camarotes de proa? (No)**

9C ¿Recuerdas en alguna otra ocasión. ¿Haber defraudado la confianza del propietario del barco? (No)

10I ¿Estas ahora en Aguascalientes? (No)



Office Depot De Mexico SA 55140008 p.2

EXHIBIT A - 41
224

EXHIBIT C 0329

La técnica empleada fue MGQT que es una versión modificada de la técnica desarrollada por John Reid, en 1953, que fue el primero en desarrollar la comparación de las preguntas comparativas y las preguntas de reacción de complejo de culpa que incorporó en esta técnica. En 1968, la Academia de la Armada modificó la técnica de Reid y la llamó MGQT. Además le incorporaron los principios (preguntas comparativas separadas en tiempo y espacio) utilizados por el examen de comparación de zonas de Cleve Backster ZCT, que fue adoptado por la Academia de la Arma de los E. E. U. U. en 1961.

La diferencia principal entre la Técnica de Reid (1953), y la del Ejército MGQT 1968, fue que Reid no usaba el análisis numérico, sus controles no estaban aisladas por tiempo y/o lugar del asunto relevante, y él permitía múltiples asuntos en la prueba en una sola seria (cruzando objetivos). Cruzando objetivos consiste en dos o más diferentes asuntos o crímenes.

En los últimos años, tanto el Ejército como la Marina de los Estados Unidos de Norteamérica han modificado el MGQT en varias formas y han utilizado esta técnica en el área de crímenes y en contrainteligencia.
A continuación se presentan resultados para determinar la exactitud del Polígrafo realizadas por algunas Universidades:

- La de Stanford señala un 96%.
- La de Utah, el 94%.
- La de British Columbia, el 96%.

Por otro lado:

- Jagiellonian, en Polonia, el 95%.
- Otro por el gobierno de la India, arrojó el 90%

PRINCIPIOS DE MGQT

- Técnica de preguntas comparativas
- Uniformidad en la técnica
- Permite hasta cinto preguntas relevantes concernientes a un solo crimen o asunto y/o varios asuntos.

PSICOLOGÍA DE LA ESTRUCTURA MGQT

El MGQT es un examen diseñado para poner una amenaza a la seguridad del examinado, sin importar si es culpable o inocente, y forzarlo a centrar su atención en las preguntas específicas de la estructura del examen.

El MGQT usa un formato estructurado en donde las preguntas son revisadas con el examinado. De cualquier forma la secuencia exacta de cómo se formularán las preguntas no se conoce.

Esta diseñado para evitar que asuntos externos interfieran con la examinación, la utilización de preguntas sintomáticas usadas en la técnica ZCT.

Es utilizada para identificar al respondiente de punto (Spot Responder), esto se refiere cuando un examinado esta respondiendo a una misma pregunta por encontrarse en la misma posición siempre, esto lo evita ya que la técnica permite rotar tanto relevantes como controles en cada una de sus secuencias, siempre respetando los principios reconocido por la Asociación Americana de Poligrafistas.

## III LÍNEAMIENTOS DE CALIFICACIÓN DE LAS REACCIONES FISIOLÓGICAS OBTENIDAS

- La evaluación numérica en el MGQT es vertical, no hay un total horizontal., esto debido a que cada QR ´s se refieren a asuntos diferentes.

- Para obtener un resultado de NDI se debe obtener un puntaje total de manera vertical mayor a + 3 en cada una de las pregunta relevantes.

- Para diagnosticar un resultado DI se debe obtener un puntaje total de manera vertical menor a – 3 en alguna de las preguntas.

- Si no obtenemos ningún de estos puntajes, entonces tenemos un inconcluso o no emitimos una opinión.

## CALIFICACIONES OBTENIDOS EN EL EXAMEN

| VAT 1 | 4 | 6 | 8 |
|---|---|---|---|
| | 0 | +1 | 0 |
| | 0 | +1 | 0 |
| | 0 | +1 | +1 |
| | 0 | +3 | +1 |

| VAT 2 | 4 | 6 | 8 |
|---|---|---|---|
| | +1 | +1 | +1 |
| | +1 | +1 | -1 |
| | +1 | -1 | +1 |
| | +3 | +1 | +1 |

| VAT3 | 4 | | 6 | | 8 | |
|---|---|---|---|---|---|---|
| | +1 | | -1 | | 0 | |
| | 0 | | -1 | | +1 | |
| | 0 | | +1 | | +1 | |
| | +1 | | -1 | | +2 | |

| | 4 | | 6 | | 8 | |
|---|---|---|---|---|---|---|
| TOTALES | + 4 | | + 3 | | + 4 | |

## CONCLUSIONES

1. En lo concerniente a la evaluación poligráfica realizada al C. Rello Romero Luís Manuel se obtuvo un resultado de **"VERAZ" (NDI)**, sustentado en el análisis cuantitativo de las reacciones psicofisiológicas de examinado durante el corrido de las tres gráficas realizadas de acuerdo a los lineamientos establecidos por la Asociación Americana de Poligrafista.

2. En lo referente a si el **C. Rello Romero Luís Manuel**, deliberadamente ocasionó el incendio a través de cualquier medio del barco "Mi Barur", no se registraron reacciones psicofisiológicas de falta de veracidad, al contestar negativamente este cuestionamiento.

3. En lo referente a que si el **C. Rello Romero Luís Manuel**, intencionalmente provocó el incendio en el barco "mi barur" el 20 de octubre de 2007 y si el día 20 de octubre de 2007 fumó en el área de camarotes de proa, no se registraron reacciones de falta de veracidad, al contestar negativamente a estos a estos cuestionamientos

4. Por lo ya descrito, los que suscriben poligrafistas **Psic. Julián Flores Anda** y el **Psic. Carlos Enrique Ramos Raths**, concluyen que de acuerdo a los lineamientos de la técnica poligráfica y con base en la metodología de aplicación de la prueba psicofisiológica de Detección del Engaño (PDD), así como, de la calificación numérica obtenida, en el examen practicado al **C. Rello Romero Luís Manuel**, no se registraron reacciones de engaño

5.

**ATENTAMENTE**

**PSIC. JULIAN FLORES ANDA**
Poligrafista Certificado
Supervisor

**PSIC. CARLOS ENRIQUE RAMOS RATHS**
Poligrafista Certificado
Aplicador

**BIBLIOGRAFÍA**

**Tuvia Rosen** (2002). El polígrafo mitos y realidades, México: INACIPE.

**James Allan Mattc, Ph D.** (1968). "Forensic psychophysiology using the polygraph.

**Norman Ansley** (1990). Validez y confiabilidad en decisiones poligráficas en casos reales

**Elmer Criswell** (2003). Estudio de los formatos de prueba de P. D. D., artículo presentado en el Seminario Anual de la Asociación Americana de Poligrafía, en Sparks Nevada.

**Fire Cause Analysis**
A DIVISION OF IFT INC.

May 20, 2008

To: Edward M. Bull
Banning, Micklow and Bull LLP
One Market – Steuart Tower #1440
San Francisco, CA 94105-1429

**Re: Mr. Arsenio Farell Campa**

| | |
|---|---|
| **Motor Yacht** | **"MI BARUR"** |
| **Vessel:** | **1990 Hatteras** |
| **HIN No.:** | **HATDT3011990** |
| **US Official Number:** | **975461** |
| **Date of Loss:** | **October 20, 2007 (Saturday)** |
| **Location of Loss:** | **Marina Palmira, dock #2, slip#201-#202<br>La Paz, Mexico** |
| **Responding FD:** | **La Paz Fire Department** |
| **Alarm Time:** | **9:40A.M.** |
| **FCA Ref. No.:** | **08-10613V** |

Enclosed for your private and confidential information is my report of the evaluation of the Maze fire investigation report of the above referenced fire. The opinions expressed in this report are based upon the guidelines established in the NFPA 921.

***Synopsis:***

In summary, this fire loss occurred in the mid-morning hours at the Marina Palmira Yacht Harbor in La Paz, Mexico. The fire occurred within the "MI BARUR", a 1990, 92-foot motor yacht, manufactured by Hatteras. MI BARUR was moored on the starboard side, facing north at slip #201 & #203 located at the east end of dock #2. No one was on board the motor yacht at the time the fire was reported.

Multiple calls were received by witnesses within the marina, who observed smoke emanating from the forward, starboard side, of the vessel, mainly from the starboard galley passageway door. Two of the witnesses, Mr. Francisco Robles and Alfredo Amador were working on adjacent vessels towards the middle of dock #2 and observed the early stages of the fire.

With assistance from individuals around the marina, the vessel was moved from its original moored position at the west end dock #2 to north side of dock #7, on the interior east side of the marina breakwater. The vessel was moved so that other vessels would not be harmed by the fire and to provided better access for fire suppression equipment.

Local firefighters arrived on scene and observed heavy flames emanating from the galley door and salon. Firefighters began suppression operations but were driven off the vessel by the intensity of the fire. Firefighters then re-directed their efforts from the exterior of the vessel. Suppression efforts continued until approximately 2:00 P.M. on the same day when the fire was thought to be completely extinguished. The motor yacht "MI BARUR" and all contents sutained a total fire loss.

The following morning, a "re-kindle" occurred on the vessel. The vessel was taken outside the breakwater, burned to the water line, and sunk in shallow water. The vessel was submerged for some three days prior to being raised and taken to a local marine facility, Abaroa's shipyard, where she was placed in the ways for inspection.

Maze delayed the investigation "while the vessel was raised from the water" and towed to Abaroa's Ship Yard. The initial inspection on October 28, 2007 the vessel was partially under water and was "unable to be inspected for fire Origin and Cause." On October 31, 2007 the vessel was raised and towed to the ship yard. Maze's second site inspection the MI BARUR was on supoprt stands at Abaroa's Ship Yard in La Paz, on November 8 & 9 2007. (Maze Investigation Report pages 4 & 5)

Senior Investigator Don Perkins conducted an investigation on April 7, 2008, (Don Perkins report page 6) subsequent to Mr. Murphy of Maze Investigations. The data acquired by Investigator Perkins was considered in my evaluation.

***MAZE Report Evaluation:***

**Investigation Process:**

**Failure to Document and Examine Potential Evidence:**

***Mr. Murphy failed to examine the vessel while it was partially submerged. It has been known in the industry that submerged vessels should be inspected and photographed prior to recovery as data (evidence) can become dislodged, moved or lost during the recovery.***

- It is also recognized by NFPA 921 section 28.3.5.11 where it states "Boats under the water or submerged should be inspected and photographically documented prior to recovery, if possible." Only "qualified people" should conduct the recovery and documentation.
- Mr. Murphy was not on site to assure the vessel was properly recovered so evidence was not destroyed. The vessel was "partially" submerged and "the fire scene investigation was delayed while the vessel was raised from the water..." Maze Investigation Report page 4).
- The vessel should have been examined and documented prior to recovery and at no less the recovery should have been overseen and directed to assure evidence was not lost. The extent of the damage to the vessel allowed for the likely destruction of evidence during recovery.

- Investigator Perkins and EE Kilgore noted that evidence was not available for examination (Don Perkin's report pages 4, 15, 16, 18, 20 (removal of evidence by Mr. Murphy with no documentation).

**Failure to Conduct Interviews:**

***Mr. Murphy did not thoroughly identify and interview witnesses. It is recognized in the industry that witnesses who first discover the fire may have valuable information.***

- The "Origin Determination" chapter in NFPA 921 states the "observation of persons who witnessed the fire" should be coordination to determine origin of the fire.
- Mr. Perkins was able to identify these witnesses and document their observations as they entered the entered the vessel and their observations of the fire in the vessel (Don Perkins report page 11 – 15).
- Mr. Murphy failed to identify this evidence or failed to document it in his report (Maze Investigation report 11 – 17). This information is important as the ensuing fire destroyed much of the remaining combustibles and patterns.
- These witnesses provide information that is important to establishing the stage, height and possible location of the fire.
- These witnesses provide information that the smoke and heat is high and they can see below the high layer in the area Mr. Murphy defines as the origin. Mr. Murphy relied on Captain Rello's interview as being "empirical data" without assuring that is was "capable of being verified" (NFPA 921 4.3.3).
- In particular, Captain Rello admitted to being a heavy smoker, he was in the vessel for some time including having coffee, using the restroom and other activities (Maze report pagers 11 – 15).
- A heavy smoker often smokes when he conducts these activities, and evaluation of the smoking habits should have been explored. Smoking materials could have been lost in the ensuing fire or the raising of the vessel.
- It is also know that heavy smoker's olfactories may not be as sensitive and he may not have noted unusual odors in the vessel.
- Mr. Murphy used this as "empirical data" that nothing was unusual when the captain left the vessel and did not explore or note if smoking activities occurred on the vessels.

***Mr. Murphy also relied as "empirical data" that the electrical system was in proper working order and there had been no previous problems with the electrical system, or he failed to provide that information in the report (Maze report page 16).***

- A history of the vessel should be explored including any maintenance issues or problems, replacement of electrical system, electronics and components should be addressed.

- Investigators Perkins and Kilgore note that some of the electrical components and systems were not available for inspection and therefore could note be ruled out (Don Perkin's report pages 15 – 16).
- NFPA 921 states that the vehicle and appliance history needs to be obtained (Section 24.2.1, 24.4.2, chapter 25 and chapter 28). Maze report page 15 states major changes had occurred but this information was not explored as to additional problems or activities that occurred in the fire area.
- A change in original systems such as activities by third parties should be explored as a potential failure does exist. This information would provide assistance in the evaluation of any hypotheses and provide information on problems with equipment or appliances. Such information on the electrical system and appliances was readily available from the marine surveyor, the captain and the owner.

***Mr. Murphy has listed the cause as "incendiary" with open flame (Maze report 34 & 35). This type of fire with the available fuels would rapidly go to "flashover" and "full room involvement" within minutes in the compartment (NFPA 921 chapter 5).***

- The fire discovery, witness information, and description of the fire indicates a fire that took a period of time to develop (Don Perkin's report pages 11 – 15), which often occurs with a fire from an accidental ignition source, as this type heat source generally does not generate enough energy to progress directly to flaming combustion but takes time to develop.
- Ventilation effects during fire spread masks or destroys the original fire movement and patterns (sequential), and will often have deeper fire charring and fire damage other that the fire origin., and mask or destroy the first patterns of the fire.
- These effects were not addressed by Mr. Murphy or are not addressed in the report. (Don Perkin's report pages 25 & 26).

***Mr. Murphy states the fire originated in the area of the captains bunk and goes on to state the mattress (polyurethane) will flow like an ignitable liquid and burn on the floor (Maze report pages 33 & 34).***

- The report also states this is the area of the captain's quarters are lowest and longest burning (Maze report pages 31, 32, 34).
- Mr. Perkins investigation revealed carpet remained in the area on the floor and below yet the carpet on the deck of the Captain's compartment (Don Perkin's report pages 19 & 20) remained intact receiving no flaming or heat related damage..
- NFPA 921 discusses burning of plastic and burning of floors in chapters 5 & 6, which is not consistent with the Maze report and the fire starting in this location.

***Mr. Murphy placed emphasis on the vessel being "FOR SALE" and that items had been removed from the vessel (Maze report page 14 and 32 [noted during Mr. Murphy's discussion of the scene examination]).***

- Mr. Murphy uses this information on reaching his conclusions.

- NFPA 921 section 22.3 cautions the investigator that such indicators are not to be used in determining cause as this information "not directly related to the fire or explosion cause". They may be used to determine witnesses for interviewing or to determine if they had prior knowledge.

***Mr. Murphy conducted an investigation of the vessel at Abaroa's Ship Yard. He did not label and identify the evidence and contents as he removed the material from the vessel which is recommended by NFPA 921 (chapter 16 and chapter 11).***

- To conduct a proper investigation the area should be "reconstruction" to observe patterns and to locate evidence to make an accurate origin determination (NFPA 921 17.3.2).
- These tasks requires the removal of debris and replace the contents to their pre fire location. NFPA 921 states the investigator "should accept the necessity of removing debris from the entire area of interest".
- The fire burned uncontrolled consuming much of the available fuels to the water line (fuel controlled fire), making sequential patterns more difficult to identity and the need for "reconstruction" of the fire scene.
- Investigator Perkins conducted this reconstruction, revealing data that was not evaluated by Mr. Murphy, or not addressed in his report (Don Perkin's report pages 20 – 25).

***NFPA 921 (chapter 17) requires that "arc mapping" be conducted to provide data to determine the origin. Mr. Murphy failed to do arc mapping or did not identify this information in his report.***

- The information provided by Investigator Perkins and Kilgore indicate much of the electrical system was destroyed or was missing.
- Mr. Murphy does state he looked at the "shore power" and electrical systems (Maze report pges 29, 30, 33) but provides little information, and how far he followed or traced the system with much of the materials to do such an analysis missing. (See Kigore discussion Perkins report pages 16, 17).
- Arc mapping requires tracing and following all the circuits in the origin including the cords to the appliances and the appliances themselves. This information is not addressed in Mr. Murphy's report, and likely could not be conducted do to the loss of much of the electrical system and components.
- The battery system in these vessels provides a lot of "fault current" energy for ignition of a fire if any failure occurs (NFPA 921 chapter 8, chapter 25 and chapter 28) (addressed in Maze report pages 22 & 23, and Kilgore discussion Perkin's report page 16).

***Mr. Murphy is apparently trying to use NFPA section 18.2 "Process of Elimination" where he identifies a cause based on eliminating all other causes (Maze report 34, 35)t.***

- This section is not suited for the case and NFPA 921 specifically states that it cannot be used in such cases.
- NFPA 921 states that the investigator must have a "clearly defined origin" and when the origin must be "known to the exclusions of all other potential origins", "some of the conditions and circumstances that prevent the origin from being clearly defined include the degree or extent of damage (such as those from a fully developed fire), or adverse effects of fire suppression activities" (this vessel was submerged in water for extinguishment and severely damaged by the fire, and raised prior to examination).
- Mr. Murphy's failure to conduct a complete scene analysis and gather all the data, also the destruction of much of the evidence, does not provide a "clearly defined origin".

***Mr. Murphy also appears to be using NFPA 921 section 18.2 to define the ignition source but again NFPA 921 cautions the investigator that this method can only be used "when it is know conclusively to the exclusion of all other potential ignition sources" and that this "not to be used indiscriminately".***

- This section also requires the "testing and rejections of alternate hypotheses", which did not occur as all the data was not developed, or Mr. Murphy did not address this in his report.

***NFPA 921 section 4.3.7 warns the investigator to "avoid presumption. Until data have been collected, no specific hypothesis can be reasonably formed or tested. All investigations of fire and explosion incidents should be approached by the investigator without presumption as to origin, ignition sequence, cause, fire spread, responsibility for incident.."***

- Both the marine surveyor and Mr. Murphy had discussion with witnesses about if Captain Rello had set the fire prior to conducting the scene examination.
- Mr. Schwede was overheard asking witnesses if Captain Rello started the fire (Don Perkins report page 14).

On October 30, 2007 Mr. Murphy asked Captain Rello if he had set the fire (Maze report page 12), which is approximately 8 days prior to conducting his examination of the vessel.

- Mr. Muphy was at the same conference as Mr. Schwede prior to conducting this investigation.

***NFPA 921 Chapter 4 is clear; the investigator must gather all the data, and evaluate all the "empirical data" to develop and "test" their hypotheses. If data does not support the final hypotheses, the investigator must gather additional data, reevaluate the data; and if the hypotheses does not with stand a "careful and serious challenge", it should be listed as undetermined.***

- With the information available there are other hypotheses that must be evaluated as being the possible origin, possible cause and fire spread.

Please feel free to contact me on any points needing further clarification.

Submitted by,

Hal Lyson, CFI
Fire Investigator
Fire Cause Analysis

HL/sa
08-10613-01-RHL



EXHIBIT A - 42
235

EXHIBIT C 0340

# EXHIBIT "B"

MARINE
AI Marine Adjusters, Inc.

175 Water Street, 14th Floor
New York, New York 10038
Tel. #: 212-458-6513
Fax #: 212-458-6520
E-Mail: Susan.Smith3@AIG.com

March 10, 2008

**VIA CERTIFIED AND REGULAR MAIL**
Certified Mail No.: 70072560000172840513
Michael Hallmark
President Mi Barur, Inc.
2525 Shelter Island Drive, Suite B
San Diego, CA 92106

**Re: M/Y MI BARUR**
**Insured: Mi Barur, Inc.**
**Policy No.: YM 868-56-66**
**Date of Loss: October 20, 2007**
**Our Reference No.: LE08939**

Dear Mr. Hallmark:

Underwriters have reached a decision on the claim of Mi Barur, Inc. for total loss by fire occurring on October 20, 2007. The evidence discovered in the investigation supports the conclusion that the fire was started with the significant involvement of Captain Rello. For this reason, and other reasons stated more fully below, underwriters must decline your claim.

Underwriters authorized release of the fire investigation report, which was provided to you. The report concludes that the fire was intentionally set on the Captain's bunk. The fire investigator reviewed other possible causes, such as an accidental cause (including smoking) or electrical cause, but ruled them out. Captain Rello denied that he ever used or slept in the Captain's quarters; he observed that no lights on in those quarters the morning of the fire. He could point to no unusual events before the fire, such as flickering lights or smell of smoke. We understand that the fire investigator has ruled out any electrical source in that area as a cause.

Underwriters could find no evidence to suggest that anyone other than the Captain set the fire. Captain Rello was the only person staying on the boat; the other permanent crew had left La Paz for different reasons. The MI BARUR was located at the end of a dock behind a locked security gate with video surveillance. We understand that those who claim to have seen the video say that there was nothing unusual. While we must question why the Marina would not turn over the tapes, the report that there was nothing out of the ordinary suggests that no other person was involved in setting the fire.

Captain Rello was the last person leaving the boat before the fire started.

Underwriters have not determined if others were involved in planning the fire. It is not necessary to the current coverage decision, but underwriters reserve the right to further investigate others possibly involved and assert any related defenses.

New Hampshire Insurance Company issued the Executive Yacht Policy of insurance YM- 868-56-66 effective 9/23/07 - 08 to Mi Barur Inc, located in San Diego, California. California law and maritime law will therefore govern the contract.

While the policy would generally cover damage to the hull caused by accidental fires, it does not cover fires started by or with the involvement of a captain or others acting on behalf of the insured. Your policy states:

> 10. CAUSES OF LOSS THAT ARE NOT COVERED
>
> B. We shall not cover any loss or damage arising out of:
>
> (1) Intentional Acts: Any intentional misuse or misconduct, criminal, willful or malicious act or lack of reasonable care or due diligence, in the operation or maintenance of your yacht, tender or trailer;
>
> * * *
>
> (5) Any willful misconduct, criminal, or dishonest act by an insured, your employees, or any person to whom you entrust your yacht;

The policy also includes the Captain with in the definition of "YOU," and may thereby make his conduct the conduct of the named insured. Any involvement of an insured in the fire would subject the claim to an arson defense to a fire loss. It may also implicate certain provisions under California law such as Insurance Code Section 533 relating to willful action of the insured and/or Civil Code section 1668, relating to willful injury or violation of law.

There are other facts that have come to underwriters' attention that constitute additional bases for underwriters declining coverage as follows:

First, Mi Barur Inc. was formed as a US company, naming you, the yacht broker, as the sole president and director of the company. The purpose of the formation was to obtain US vessel documentation. As a Mexican citizen, Mr. Farell could not legally obtain US documentation for his boat. So, he created and wholly owns Mi Barur, Inc. (with his wife). Even though he is the decision maker for Mi Barur Inc and manager of the MI BARUR, the statement of any official involvement of Mr. Farell with Mi Barur Inc. is avoided; he is not mentioned in the submission for US documentation. Mi Barur Inc. appears to be a shell company, set up to use your US citizenship as the designated president and director, so that the company could try to meet US vessel document requirements.

Mi Barur Inc. was presented as a US company seeking to insure the MI BARUR, which was also represented to be calling in US ports, particularly San Diego. However, after the vessel was purchased and modified in San Diego, it never returned to US waters, and there was no intent for it to call in the US. The reality of the risk presented for insurance was that it was a boat purchased by Mexican resident for private pleasure use only in Mexican waters. That was not the risk disclosed to underwriters.

Both maritime law and California law require the utmost good faith in disclosing of matters material to the risk. The foregoing was not disclosed. Nor was the basis for the purchase cost disclosed. The application represented the purchase cost to be $2.2 million. We acknowledge a survey supporting the valuation, but the boat was actually purchased for about $1 million plus a trade in, which brought only $620,000 in resale. Before the fire, the boat was listed at $1.9 million, and the only offer received was for $1.7 million.

Pending any further development of facts, Underwriters must reserve rights to assert the condition of the policy which states:

J. CONCEALMENT OR MISREPRESENTATION

Any relevant coverage(s) shall be voided if you intentionally conceal or misrepresent any material fact or circumstance relating to this insurance, or your insurance application, whether before or after the loss.

New Hampshire is declining this claim based upon the information developed in its investigation. If you feel that underwriters' assessment is wrong or that underwriters have not considered relevant information, please provide the bases for your own assessment and the facts and information that support your position. The conclusions of the investigation are serious, and underwriters would like to make sure they have considered all relevant facts and information that reasonably support alternative conclusions.

If you believe that a further inspection of the hull is necessary, please provide ample advance notice so that we may arrange attendance for any further inspection. Otherwise, we see no reason to continue to incur the significant expenses being charged by Mr. Abarroa to retain the hull. There is significant salvage value to the engines, which underwriters do not claim in view of their coverage decision. Underwriters will agree to pay for continued storage of the hull until the end of March, which should allow sufficient time for you to decide on how you will approach any further salvage and destruction of the hull. Underwriters are also paying for storage of contents of the boat at Atalanta Marina, which underwriters hereby tender to your possession. Underwriters will likewise pay for storage until the end of March and then authorize removal or destruction if you have not claimed them.

Underwriters continue to reserve all rights, defenses and remedies available under the policy and at law, including but not limited the right to reimbursement of expenses

incurred and the right to rescind or decline on other facts that may be discovered, and underwriters do not waive any such rights, defenses and remedies by this declination or further actions taken in response to this claim.

If you feel this claim has been wrongfully denied, you may have the matter reviewed by the California Department of Insurance at: Claims Services Bureau, 11th Floor, 300 South Spring Street, Los Angeles, CA 90013 Tel: (800) 927-4357.

Please advise the undersigned if you have any questions or comments.

Very truly yours,

Susan Smith

Susan Smith
Regional Hull Manager
Marine Claims Department



A Member Company of
American International Group, Inc.