# TABS 1 - 3

# TAB 1

LEXSEE 24 CAL. 4TH 643

**ALAN O. AAS et al., Petitioners, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; WILLIAM LYON COMPANY et al., Real Parties in Interest. PROVENCAL COMMUNITY ASSOCIATION, Petitioner, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; WILLIAM LYON COMPANY et al., Real Parties in Interest.**

**No. S071258.**

**SUPREME COURT OF CALIFORNIA**

***24 Cal. 4th 627; 12 P.3d 1125; 101 Cal. Rptr. 2d 718; 2000 Cal. LEXIS 9048; 2000 Cal. Daily Op. Service 9607; 2000 Daily Journal DAR 12831***

**December 4, 2000, Decided**

**NOTICE:**

[EDITOR'S NOTE: PART 1 OF 2. THIS DOCUMENT HAS BEEN SPLIT INTO MULTIPLE PARTS ON LEXIS TO ACCOMMODATE ITS LARGE SIZE. EACH PART CONTAINS THE SAME LEXIS CITE.]

**SUBSEQUENT HISTORY:** Extending finality of Opinion is terminated January 8, 2001 and the Opinion is ordered Final.

**PRIOR HISTORY:** Superior Court of San Diego County. Super. Ct. Nos. 695611 and 694688. Robert E. May, Judge.

Appeal from the Fourth Appellate District, Division One. Nos. D030218 and D030399.

**DISPOSITION:** The judgment of the Court of Appeal is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In two construction defect actions against a developer, a contractor, and subcontractors, brought by a condominium homeowners association and owners of single-family homes in a subdivision, the trial court granted defendants' motions for orders in limine excluding evidence of alleged construction defects that had not caused property damage and related economic losses sustained by plaintiffs. (Superior Court of San Diego County, Nos. 695611 and 694688, Robert E. May, Judge.) Plaintiffs sought review of the rulings in limine by petition for a writ of mandate, and the Court of Appeal, Fourth Dist., Div. One, Nos. D030218 and D030399, denied the petitions.

The Supreme Court affirmed the judgment of the Court of Appeal. The court held that the trial court properly granted defendants' motions to exclude the evidence. The difference between the price paid and the value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than the law of negligence. Although a defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity may support recovery if the defendant was under a duty to protect those interests, the applicable multifactored balancing test did not identify such a duty in the present case. As to the degree of certainty that plaintiffs suffered injury, construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of appreciable harm--an essential element of a negligence claim. Nor could plaintiffs establish foreseeability of the harm because they did not show actual harm. Similarly, plaintiffs failed to show that any of the alleged defects

actually posed a serious risk of harm to person or property. (Opinion by Werdegar, J., with Kennard, Baxter, Chin, and Brown, JJ., concurring. Concurring and dissenting opinions by George, C. J. (see p. 653), and by Mosk, J. (see p. 673).)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Trial § 51--Presentation of Evidence--Objections--Motion to Exclude All Evidence--Standard of Review.** --While a ruling excluding evidence is not ordinarily subject to review by writ and typically is reviewed for abuse of discretion on appeal, a motion to exclude all evidence on a particular claim is subject to independent review as the functional equivalent of a common law motion for judgment on the pleadings or, if decided in light of evidence produced during discovery, a motion for nonsuit.

**(2a) (2b) Damages § 14--Measure of Damages--Construction Defect Case--Recovery for Economic Loss Without Personal Injury or Property Damage: Building and Construction Contracts § 6--Actions.** --In two construction defect actions against a developer, a contractor, and subcontractors, brought by a condominium homeowners association and owners of single-family homes in a subdivision, the trial court properly granted defendants' motions to exclude evidence of alleged construction defects that had not caused property damage and related economic losses sustained by plaintiffs. The difference between the price paid and the value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than the law of negligence. Although a defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity may support recovery if the defendant was under a duty to protect those interests, the applicable multifactored balancing test did not identify such a duty in the present case. As to the degree of certainty that plaintiffs suffered injury, construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of appreciable harm--an essential element of a negligence claim. Nor could plaintiffs establish foreseeability of the harm, since they did not show actual harm. Similarly, plaintiffs failed to show that any of the alleged defects actually posed a serious risk of harm to person or property. (Disapproving *Huang v. Garner (1984) 157 Cal.App.3d 404 [203 Cal.Rptr. 800]* to the extent it is inconsistent.)

[See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 1297, 1298.]

**(3) Torts § 6--Damages--Breach of Duty That Restates Contractual Obligation: Damages § 15--Breach of Contract.** --A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations. Instead, courts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.

**COUNSEL:** Procopio, Cory, Hargreaves & Savitch, Steven M. Strauss, Edward I. Silverman and Victor M. Felix for Petitioners Alan O. Aas et al.

Epstein & Grinnell, Douglas W. Grinnell, Luis E. Ventura; The Law Offices of Duane E. Shinnick, Silldorf, Shinnick & Duignan and Duane E. Shinnick for Petitioner Provencal Community Association and for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Ian Herzog; Douglas Devries; Roland Wrinkle; Harvey R. Levine; Robert Steinberg; Thomas G. Stolpman; William D. Turley; Mary E. Alexander; Joseph Harbison III; Bruce Broilett; Wayne McClean; Leonard Sacks; Tony Tanke; Lea-Ann Tratten; Steven J. Kleifield; David Rosen; Moses Lebovits; Christine Spagnoli; James Sturdevant; Daniel Smith; Deborah David; Lawrence Drivon; Thor Emblem; Rick Simons; David Casey, Jr., Kasdan, Simonds, McIntyre, Epstein & Martin and Kenneth S. Kasdan for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Verboon, Whitaker & Peter, Mark A. Milstein and Michael T. Whitaker for Southern California Apartment Owners Association as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Wolf, Rifkin & Shapiro, Leslie S. Marks and Douglas A. Lusson for League of California Homeowners as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Berding & Weil and James O. Devereaux for the Executive Council of Homeowners as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Berger & Hopkins, Jane Francis Hopkins and A. Alan Berger for the Structural Engineers Association of California as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Orbach & Huff, David M. Huff and Eric P. Weiss for Coalition of American Structural Engineers, Park Purdue Homeowners Association, Angelina Heights Homeowners Association and Silverado Oaks Homeowners Association as Amici Curiae on behalf of Petitioners Alan O. Aas et al.

Williams, Wester, Hall & Nadler and Scott A. Williams as Amici Curiae on behalf of Petitioners Alan O. Aas et al.

Burdman & Benson and Linda Angle-Keny as Amici Curiae on behalf of Petitioners Alan O. Aas et al.

No appearance for Respondent.

Newmeyer & Dillion, Gregory L. Dillion, Timothy S. Menter, Gene M. Witkin; Lincoln, Gustafson & Cercos, Thomas J. Lincoln and Charles K. Egan for Real Parties in Interest the William Lyon Company and Lyon Communities, Inc.

Dale, Braden & Hinchcliffe and Suzanne M. Martin for Real Parties in Interest Ben F. Smith, Inc., and B & L Plastering.

Wilson, Elser, Moskowitz, Edelman & Dicker, Andrew J. Blackburn and William S. Roberts for Real Parties in Interest West Coast Sheet Metal, Inc., and Ben F. Smith, Inc.

Kring & Brown, Jeffrey A. Lake and Jon H. Van de Grift for Real Parties in Interest Ben F. Smith, Inc., and New Continental Tile & Marble Co., Inc.

Maxie Rheinheimer Stephens & Vrevich, Barry M. Vrevich, Darin L. Wessel, Kelegian & Thomas and Michael Paul Thomas for Real Party in Interest Branco Corporation.

Bullard & Olin, Robert M. Granafei and Lee H. Graham for Real Party in Interest Cal West Nurseries, Inc.

Brownwood, Rice & Zurawski and Michael F. Saydah for Real Parties in Interest C.R.E. Electric and Ghianni Corporation.

Acker, Kowalick & Whipple, Anthony H. Whipple, W. Frederck Kowalick, Linwood Warren, Jr., Catherine L. Rhodes and Tawnya L. Southern for Real Party in Interest Premier Window Products, Inc.

Farmer, Weber & Case, David Weber; The Law Office of Mark Siegel and Mark Siegel for Real Party in Interest Sun Plumbing Company, Inc.

Kolod, Wager & Gordon, Scott M. Kolod, Jerome A. Wager, Vekeno Kennedy; Law Offices of Elisa J. Nemeth and Elisa J. Nemeth for Real Party in Interest Allstate Plumbing

Cozad & Krutcik and Ronald J. Cozad for Real Party in Interest Schmid Insulation Contractors, Inc.

Berger, Kahn, Safton, Moss, Figler, Simon & Gladstone, Timothy A. Nicholson and Stephen L. Weber for Real Party in Interest Surecraft Supply, Inc.

Perkins & Miltner and Timothy E. Salter for Real Party in Interest Bowers Construction Co.

Callahan, McCune & Willis and Norma Marshal for Real Party in Interest Frank Bowers Construction

Balestreri, Pendleton & Potocki, Thomas A. Balestreri, Jr., Mary B. Pendleton, Michael M. Freeland, Maurine P. Brand; Kring and Brown and Jeffrey A. Lake for South Coast Framers, Inc., Alta Drywall, Inc., West Coast Sheet Metal and D.J. Drywall, Inc., as Amici Curiae on behalf of Real Parties in Interest.

Lewis, D'Amato, Brisbois & Bisgaard, Robert V. Closson, Terrell A. Quealy and Judith A. Lewis for United National Insurance Company as Amicus Curiae on behalf of Real Parties in Interest.

John H. Findley, Sharon L. Browne and Stephen R. McCutcheon, Jr., for Pacific Legal Foundation as Amicus Curiae on behalf of Real Parties in Interest.

Dale, Braden & Hinchcliffe, George D. Dale, Suzanne M. Martin; Perkins & Miltner, Timothy E. Salter; and Kathryn Turner-Arsenault for the Construction Defect Defense Action Coalition as Amicus Curiae on behalf of Real Parties in Interest.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Real Parties in Interest.

Cox, Castle & Nicholson, Sandra C. Stewart, Jeffrey D. Masters, Debbie L. Freedman; Gray, Cary, Ware & Freidenrich and Jonathan B. Sokol for the Building Industry Legal Defense Foundation and the California Building Industry Association as Amici Curiae on behalf of Real Parties in Interest.

White, Gentes & Garcia, Timothy S. Noon and Charles R. Bongard for the Associated General Contractors of America, San Diego Chapter, Inc., as Amicus Curiae on behalf of Real Parties in Interest.

Thelen Reid & Priest, Gary L. Fontana, Hilary N. Rowen, James A. Riddle; Craig A. Berrington and Laura L. Kersey for American Insurance Association as Amicus Curiae on behalf of Real Parties in Interest.

Parker & Stanbury, Jenna L. Price and Mary-Tyler Crenshaw for West Coast Sheet Metal and H & D Construction as Amici Curiae on behalf of Real Parties in Interest.

Morris, Polich & Purdy, Randy Koenig and Gary L. Jacobsen as Amici Curiae on behalf of Real Parties in Interest.

Gibbs, Giden, Locher & Turner, Barry C. Vaughan and Michael I. Giden for CalMat Co. as Amicus Curiae.

**JUDGES:** Opinion by Werdegar, J., with Kennard, Baxter, Chin, and Brown, JJ., concurring. Concurring and dissenting opinions by George, C.J. (see p. 653), and by Mosk, J. (see p. 673).

**OPINION**

[*632] [**1128] [***721] **WERDEGAR, J.**

In this case we are asked to decide whether homeowners and a homeowners association may recover damages in negligence from the developer, contractor and subcontractors who built their dwellings for construction defects that have not caused property damage. Plaintiffs would find an affirmative answer in the tort of "negligent interference with prospective economic advantage" described in *J'Aire Corp. v. Gregory (1979) 24 Cal. 3d 799, 804-805 [157 Cal. Rptr. 407, 598 P.2d 60]*. Applying settled law limiting the recovery of economic losses in tort actions ( *Seely v. White Motor Co. (1965) 63 Cal. 2d 9, 18 [45 Cal. Rptr. 17, 403 P.2d 145]*), we answer the question in the negative and, thus, affirm the decision of the Court of Appeal.

I. BACKGROUND

This matter comes to us on review of consolidated writ proceedings affecting two cases in the superior court. Plaintiffs in *Aas v. William Lyon Co.* (Super. Ct. San Diego County, 1996, No. 695611) (*Aas*) own the [*633] single-family homes in the Belle Fleur subdivision. Plaintiff in *Provencal Community Assn. v. William Lyon Co.* (Super. Ct. San Diego County, 1996, No. 694688) (*Provencal*) is the homeowners [***722] association responsible for managing and maintaining the Provencal condominium project. Defendants (as relevant here) include the William Lyon Company and Lyon Communities, Inc. (collectively Lyon), which served as developer and general contractor of Belle Fleur and Provencal, and the many subcontractors who participated in those projects.

Plaintiffs in each case allege their dwellings suffer from a variety of construction defects affecting virtually all components and aspects of construction. Based on these defects, plaintiffs assert causes of action for negligence, strict liability, breach of implied warranty and, in the *Aas* case alone, breach of contract and express warranty. Plaintiffs in both cases seek, among other things, the cost of repairing the alleged defects. Additionally, plaintiffs in *Aas* expressly seek damages representing the diminution in value of their residences.

Trial has not yet commenced. In pretrial proceedings, defendants in both cases moved for orders in limine excluding evidence of those alleged construction defects that have not caused property damage. (There is no [**1129] claim of personal injury.) Plaintiff in *Provencal* responded with an offer of proof asserting that some of the alleged defects violate provisions of the applicable building codes intended to prevent harm to life, health and property. [1] Plaintiff acknowledged, however, that many of the defects enumerated in defendants' motions have not actually caused property damage. The same is true in *Aas*. After extensive oral argument in each case, the trial [*634] court granted defendants' motions as to plaintiffs' tort claims only. [2] With the court's encouragement, plaintiffs sought review of the rulings in limine by petition for writ of mandate. The Court of Appeal, after issuing an alternative writ,

denied the petitions. We granted review of that decision.

1 The following is a representative excerpt from plaintiff's offer of proof:

"5. During the investigation at Provencal in this case, engineers . . . observed violations of the Uniform Building Code, including failures to properly construct shear walls and failures to properly connect shear walls to other building components. Such shear walls and connections are required under the Uniform Building Code to prevent or minimize property damage and personal injury in the event of seismic and wind forces. . . .

"6. During the investigation at Provencal in this case, architects . . . observed violations of the Uniform Building Code, including failures to properly construct one-hour and two-hour fire protection in party walls. Such fire protection measures are required under the Uniform Building Code to prevent or minimize property damage and personal injury in the event of a fire. . . . [P] . . . [P]

"8. During the investigation of Provencal in this case, [an] electrical engineer . . . observed numerous violations of the National Electrical Code, including failures to support electrical cables, improperly supported light fixtures, and improperly labeled electrical circuits. . . . [P] . . . [P]

"10. For many of the Uniform Building Code and National Electrical Code violations described in paragraphs 5, 6, and 8, there has not yet been any physical property damage or personal injury. . . ."

2 Plaintiff in *Provencal* subsequently moved to amend its complaint to allege a cause of action for breach of implied warranty. Plaintiff's request for judicial notice of defendant Lyon's memorandum in opposition to the motion, filed after the Court of Appeal affirmed the trial court's ruling, is denied.

In granting defendants' motions, the trial court did not create or adopt a definitive list of construction defects to be excluded at trial. Instead, the court simply excluded "evidence of [defects] . . . that have not resulted in bodily injury or physical property damage, i.e., [defects causing only] 'economic loss' . . . ." The trial court illustrated the possible effect of its ruling with the example of "a home with no resultant damages at all, but everybody agrees that the flashing's not lapped properly under the industry standards, the [Uniform Building Code], whatever, but it hasn't resulted in any leaks; everybody agrees that the tile is overextended, that is, it doesn't have the overlap of three inches that's called for by the manufacturer; that [***723] you have a nailing pattern on the shear walls which does not comply with the applicable provision in the [Uniform Building Code], but the house is still standing and hasn't started swaying . . . ." The court and the parties seemed to recognize that further hearings (see generally *Evid. Code, § 402* [procedure for determining preliminary facts]) would be necessary to determine which alleged defects would, and would not, be submitted to the trier of fact in connection with plaintiffs' tort claims. [3]

3 The trial court explained: "I would address [at trial] any issues that are over and above my ruling that you felt were close calls and listen to what your proffer might be at the appropriate time." There is, thus, no basis for assuming that every item on the exhaustive lists of construction defects attached to defendants' motions in limine is deemed excluded, even if plaintiffs are able to prove that a particular defect has actually caused property damage.

The absence of a definitive list of excluded defects is of no consequence because the issue before us is one of law. **(1)** While a ruling excluding evidence is not ordinarily subject to review by writ ( *People v. Municipal Court (Ahnemann) (1974) 12 Cal. 3d 658, 660 [117 Cal. Rptr. 20, 527 P.2d 372]*) and typically is reviewed for abuse of discretion on appeal ( *People v. Williams (1997) 16 Cal. 4th 153, 197 [66 Cal. Rptr. 2d 123, 940 P.2d 710]*), a motion to exclude all evidence on a particular claim is subject to independent review as the functional equivalent of a common law motion for judgment on the pleadings ( *Edwards v. Centex Real Estate Corp. (1997) 53 Cal. App. 4th 15, 26-27 [61 Cal. Rptr. 2d 518]*; *Clemens v. American Warranty* [**1130] *Corp. (1987) 193 Cal. App. 3d 444, 451-452 [238 Cal. Rptr. 339]*; see generally 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, [*635] § 176, pp. 589-591) or, if decided in light of evidence produced during discovery, a motion for nonsuit (*Edwards v. Centex Real*

*Estate Corp., at p. 27*). Understood as a motion for judgment on the pleadings, the dispositive question is whether plaintiffs may state a cause of action for construction defects that have not caused property damage. (Cf. *id. at p. 26.*) Understood as a motion for nonsuit, the question is whether, disregarding conflicting evidence, indulging in every legitimate inference that may be drawn from the evidence, and viewing the record in the light most favorable to plaintiffs, evidence of construction defects that have not caused property damage will support a judgment in plaintiffs' favor. (Cf. *id. at pp. 27-28*; see also *Casey v. Overhead Door Corp. (1999) 74 Cal. App. 4th 112, 123-124 [87 Cal. Rptr. 2d 603]* [offer of proof may defeat nonsuit based on exclusion of evidence].) Accordingly, however we view the orders on review, the sole question before us is one of law.

II. DISCUSSION

**(2a)** We turn, then, to the question at hand: May plaintiffs recover in negligence from the entities that built their homes a money judgment representing the cost to repair, or the diminished value attributable to, construction defects that have not caused property damage? Plaintiffs define construction defects as deviations from the applicable building codes or industry standards. Strict liability is not here at issue. While plaintiffs have asserted strict liability claims, they no longer argue that strict liability provides a remedy for defects that have not caused property damage. We need not address liability for construction defects that *have* caused property damage, if any have, because the trial court's ruling does not prevent plaintiffs from introducing evidence of such defects. Nor, finally, does the ruling prevent plaintiffs from introducing any evidence relevant to their claims for breach of contract or warranty, assuming those claims survive to trial, even if that evidence has been excluded for the purposes of plaintiffs' tort claims.

This procedural posture makes the question we address fairly narrow. The question, [***724] however, is not simple, because it arises from the nebulous and troublesome margin between tort and contract law. (See generally *Erlich v. Menezes (1999) 21 Cal. 4th 543, 550-551 [87 Cal. Rptr. 2d 886, 981 P.2d 978]*; *Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal. 4th 85, 105-107 [44 Cal. Rptr. 2d 420, 900 P.2d 669]* (conc. & dis. opn. of Mosk, J.).) Speaking very generally, tort law provides a remedy for construction defects that cause property damage or personal injury. Focusing on the conduct of persons involved in the construction process, courts in this state have found [*636] such a remedy in the law of negligence. [4] Viewing the home as a product, courts have also found a tort remedy in strict products liability, [5] even when the property damage consists of harm to a sound part of the home caused by another, defective part. [6] For defective products and negligent services that have caused neither property damage nor personal injury, however, tort remedies have been uncertain. Any construction defect can diminish the value of a house. But the difference between price paid and value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence. In actions for negligence, a manufacturer's liability [**1131] is limited to damages for physical injuries; no recovery is allowed for economic loss alone. ( *Seely v. White Motor Co., supra*, 63 Cal. 2d 9, 18.) This general principle, the so-called economic loss rule, is the primary obstacle to plaintiffs' claim. [7]

4 *Sabella v. Wisler (1963) 59 Cal. 2d 21, 27-30 [27 Cal. Rptr. 689, 377 P.2d 889]*; *Stewart v. Cox (1961) 55 Cal. 2d 857, 861-863 [13 Cal. Rptr. 521, 362 P.2d 345]*; *Hale v. Depaoli (1948) 33 Cal. 2d 228, 230-232 [201 P.2d 1, 13 A.L.R.2d 183]*; *Sumitomo Bank v. Taurus Developers, Inc. (1986) 185 Cal. App. 3d 211, 223-224 [229 Cal. Rptr. 719]*; *Huang v. Garner (1984) 157 Cal. App. 3d 404, 419-425 [203 Cal. Rptr. 800]*; *Cooper v. Jevne (1976) 56 Cal. App. 3d 860, 867-869 [128 Cal. Rptr. 724]*.

5 *Stearman v. Centex Homes (2000) 78 Cal. App. 4th 611, 613 [92 Cal. Rptr. 2d 761]* (citing the many decisions applying strict liability to construction defects); *Avner v. Longridge Estates (1969) 272 Cal. App. 2d 607, 609-615 [77 Cal. Rptr. 633]*; *Kriegler v. Eichler Homes, Inc. (1969) 269 Cal. App. 2d 224, 227-229 [74 Cal. Rptr. 749]*.

6 *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611, 613-614, 617-623.*

7 Courts in other jurisdictions have reached various conclusions on this subject. South Carolina broadly holds builders liable in tort for all deviations from applicable building code and industry standards that diminish the value of a

house. ( *Kennedy v. Columbia Lumber & Mfg. Co. (1989) 299 S.C. 335 [384 S.E.2d 730, 736-738].*) Maryland more narrowly permits homeowners to recover in a negligence action the reasonable cost of correcting construction defects that present "a clear danger of death or personal injury," but not conditions that present merely "a risk to general health, welfare, or comfort . . . ." ( *Council of Co-Owners v. Whiting-Turner (1986) 308 Md. 18, 35 [517 A.2d 336, 344-345* & fn. 5].) A North Carolina decision does not clearly identify the circumstances that will support recovery, but holds that the plaintiffs stated a cause of action for negligence by alleging they "were forced to undergo extensive demolition and repair work to correct the defective, dangerous and unsafe conditions caused by the defendant's negligence." ( *Oates v. Jag, Inc. (1985) 314 N.C. 276 [333 S.E.2d 222, 224-226].*)

In contrast, the Supreme Court of Nevada, after tentatively rejecting the economic loss rule in construction defect cases ( *Calloway v. City of Reno (1997) 113 Nev. 564 [939 P.2d 1020, 1024-1026])*, reversed course on rehearing and held that no liability exists for defects that cause damage only to the house and its components. ( *Calloway v. City of Reno (Nev. 2000) 993 P.2d 1259, 1263-1270* [trial court properly dismissed negligence claims alleging that defective framing caused water intrusion, damage to flooring and ceilings, and structural and wood decay].)

Plaintiffs contend the decision in *J'Aire Corp. v. Gregory*, *supra*, 24 Cal. 3d 799 (J'Aire) overcomes this obstacle. According to plaintiffs, when the parties occupy the "special relationship" defined in *J'Aire* ( *id. at p. 804*), [*637] there is both a duty to avoid negligently [***725] injuring a person's economic interests and a right to recover for such injury, even though unaccompanied by any injury to person or property. Before addressing *J'Aire's* significance and application to this case, we review the law to which *J'Aire* is said to constitute an exception.

Formerly, after a builder had completed a structure and the purchaser had accepted it, the builder was not liable to a third party for damages suffered because of the work's condition, even though the builder was negligent. (E.g., *Fanjoy v. Seales (1865) 29 Cal. 243, 249-250*; see also *Hale v. Depaoli, supra, 33 Cal. 2d 228, 230* [reviewing the former law].) The purchaser, of course, had remedies against the builder in contract and warranty. But injured third parties had no clear remedy until we, following the trend that began with *MacPherson v. Buick Motor Co. (1916) 217 N.Y 382 [111 N.E. 1050]*, qualified the general rule exonerating manufacturers from third party claims with an exception applicable whenever " 'the nature of a [manufactured] thing is such that it is reasonably certain to place life and limb in peril when negligently made . . . .' " ( *Kalash v. Los Angeles Ladder Co. (1934) 1 Cal. 2d 229, 231-232 [34 P.2d 481]*, quoting *MacPherson v. Buick Motor Co., supra, 111 N.E. 1050, 1053.*) Having already held that the manufacturers of defective ladders (*Kalash v. Los Angeles Ladder Co., at pp. 231-233*), elevators ( *Dahms v. General Elevator Co. (1932) 214 Cal. 733, 737-742 [7 P.2d 1013]*), and tires ( *Nebelung v. Norman (1939) 14 Cal. 2d 647, 654 [96 P.2d 327]*) could be liable to persons not in contractual privity with them yet foreseeably injured by their products, we easily applied the same rule to someone responsible for part of a house, i.e., a defective railing (*Hale v. Depaoli, at pp. 230-232*).

We first recognized a remedy in the law of negligence for construction defects causing property damage, as opposed to personal injury, in *Stewart v. Cox, supra, 55 Cal. 2d 857*. There, we upheld a homeowner's judgment against a subcontractor who had negligently applied concrete to the inside of a swimming pool, thereby causing the release of water that damaged the pool, lot and house. In our opinion we noted, and seemingly were influenced by, the " 'decisions . . . plac[ing] building contractors on the same footing as sellers of goods, and . . . [holding] them to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by the negligence, even after acceptance of the work.' " ( *Id. at p. 862*, quoting Prosser, [**1132] Torts (2d ed. 1955) pp. 517-519.) The deciding factor in finding liability, however, appears to have been our own then recent decision in *Biakanja v. Irving (1958) 49 Cal. 2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]* (*Biakanja*). In *Biakanja*, we had held that the intended beneficiary of a failed testamentary gift could recover damages from a [*638] notary public who, practicing law without a license, negligently prepared the will and failed to have it properly solemnized. Because *Biakanja* is the acknowledged basis for the later decision in *J'Aire, supra*, 24 Cal. 3d 799, 804, the case on which plaintiffs here

primarily rely, it will be discussed in more detail later (at p. 643, *post*). At this point, it suffices to note that *Biakanja* held that the negligent performance of a contractual obligation, resulting in damage to the property or economic interests of a person not in privity, could support recovery if the defendant was under a duty to protect those interests. (*Biakanja, at pp. 648-650.*) "The determination whether in a specific case the defendant will be held liable to a third person not in privity," we wrote, "is a matter of policy and involves the balancing of various factors . . . ." ( *Id. at p. 650.*) 8 [***726] Applying those factors to the negligent concrete subcontractor in *Stewart v. Cox, supra, 55 Cal. 2d 857*), we determined that he should not be exempted from liability proximately caused by his negligence. His work, we explained, was specifically intended to affect the plaintiffs; damage to their property was foreseeable if the work were negligently done; and serious damage actually occurred. ( *Id. at p. 863, 13 Cal. Rptr. 521, 362 P.2d 345.*)

8 The six factors were: "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Biakanja, supra, 49 Cal. 2d 647, 650.*)

Two years later, we again applied *Biakanja, supra, 49 Cal. 2d 647*, to uphold a judgment for property damage caused by negligent residential construction. ( *Sabella v. Wisler, supra, 59 Cal. 2d 21, 29* (*Sabella*).) The defendant had built a house and offered it for sale to the general public. As it turned out, the defendant's negligent preparation of the lot, in combination with a subcontractor's careless plumbing work, later caused leaks, subsidence and damage to the house. The purchasers sued for negligence. The builder, arguing against the imposition of tort liability, sought to distinguish the recent decision in *Stewart v. Cox, supra, 55 Cal. 2d 857* (*Stewart*), on the ground "that damage to property other than the swimming pool [in *Stewart*] was foreseeable, [whereas] . . . the only harm foreseeable [in *Sabella*] . . . was damage to the house itself." (*Sabella, at p. 29.*) We rejected the asserted distinction because we had already determined "in the *Stewart* case that the liability of a contractor should be determined by the consideration and weighing of the various factors bearing upon liability [i.e., the factors set out in *Biakanja at page 650*], rather than by resort to special rules or distinctions." (*Sabella, at p. 29.*)

In the years following *Sabella, supra, 59 Cal. 2d 21*, the law governing tort remedies for construction defects diverged into two distinct theories: (1) [*639] strict products liability; and (2) the theory of negligence outlined in *Biakanja, supra, 49 Cal. 2d 647*, and further developed in *J'Aire, supra*, 24 Cal. 3d 799.

We first embraced the doctrine of strict products liability in *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal. 2d 57 [27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]*, just a week after deciding *Sabella, supra, 59 Cal. 2d 21.* A few years later, the court in *Kriegler v. Eichler Homes, Inc., supra, 269 Cal. App. 2d 224* (*Kriegler*), applied the new tort to mass-produced homes, reasoning that in "today's society, there are no meaningful distinctions between [the] mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same." ( *Id. at p. 227*; see also [**1133] *Avner v. Longridge Estates, supra, 272 Cal. App. 2d 607, 609-615* [examining and following *Kriegler*].) The relevant policy considerations, the *Kriegler* court explained, were the average home buyer's reliance on the builder's skill and implied representations of fitness, and the public interest in assigning the cost of foreseeable injuries to the developer who created the danger. (*Kriegler, at p. 228*; cf. *Greenman v. Yuba Power Products, Inc., at pp. 63-64.*)

While these decisions applied the doctrine of strict liability to mass-produced homes, 9 they did not create a remedy for [***727] defects that have not caused property damage or personal injury. Whatever the product, whether homes or automobiles, strict liability affords a remedy only when the defective product causes property damage or personal injury. The tort does not support recovery of damages representing the lost benefit of a bargain, such as the cost of repairing a defective product or compensation for its diminished value. We explained this principle in *Seely v. White Motor Co., supra*, 63 Cal. 2d 9 (*Seely*). "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss," we wrote, "is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The

distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." ( *Id. at p. 18.*) A manufacturer "can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety," but not "for the level of performance" of its products unless the manufacturer "agrees that the product was designed to meet the consumer's demands." (*Ibid.*) Similarly, "[a] [*640] consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." (*Ibid.*)

9 See generally *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611, 613.* Compare *Peterson v. Superior Court (1995) 10 Cal. 4th 1185, 1200 [43 Cal. Rptr. 2d 836, 899 P.2d 905], Cronin v. J.B.E. Olson Corp. (1972) 8 Cal. 3d 121, 130 [104 Cal. Rptr. 433, 501 P.2d 1153],* and *Price v. Shell Oil Co. (1970) 2 Cal. 3d 245, 251* and footnote 6 [*85 Cal. Rptr. 178, 466 P.2d 722]* (all acknowledging the doctrine's potential applicability to persons in the business of residential construction).

Applying these principles, we concluded in *Seely, supra*, 63 Cal. 2d 9, that the plaintiff could not recover in strict liability or negligence for the cost of repairing a defective truck or for business income lost because the truck could not make deliveries. "Even in actions for negligence," we wrote, "a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." (*Id. at p. 18.*) Plaintiffs argue that this statement, and *Seely's* other observations about damages for negligence, were dictum because the court actually upheld, on a breach of express warranty theory, an award of damages representing the purchase price of the truck and lost profits. (*Id. at p. 13.*) Indeed, the statement can be seen either as dictum or as part of the court's rationale for permitting the *Seely* plaintiff to recover his economic losses in warranty rather than in tort. Which label we attach to the statement is of no consequence. This is because the principle articulated in *Seely* has by critical examination and application in subsequent cases been confirmed as law. Courts routinely apply *Seely* in strict liability and negligence cases alike to distinguish recoverable damages for physical injury from unrecoverable damages representing the benefit of a contractual bargain.

In *Zamora v. Shell Oil Co. (1997) 55 Cal. App. 4th 204, 208-211 [63 Cal. Rptr. 2d 762]*, for example, homeowners were not allowed to recover in negligence or strict liability for the cost of replacing water pipes known to be defective, but which had not yet leaked. In *Fieldstone v. Briggs Plumbing Products, Inc. (1997) 54 Cal. App. 4th 357, 363-367 [62 Cal. Rptr. 2d 701]*, a strict liability case, a general contractor was not awarded the cost of [**1134] replacing installed sinks that rusted and chipped prematurely, because no other property had been damaged. In *San Francisco Unified School Dist. v. W.R. Grace & Co. (1995) 37 Cal. App. 4th 1318, 1327-1330 [44 Cal. Rptr. 2d 305]*, a public school district could not state a cause of action in negligence or strict liability based on the presence of asbestos products in its buildings, when the products had not contaminated [***728] the buildings by releasing friable asbestos. In *Sacramento Regional Transit Dist. v. Grumman Flxible (1984) 158 Cal. App. 3d 289, 293-298 [204 Cal. Rptr. 736]*, the court held a transportation district could not recover in negligence or strict liability for the cost of repairing defective bus parts that had not caused further damage. "We believe," the court explained, that "the line between physical injury to property and economic loss reflects the line of demarcation between tort theory and contract theory." ( *Id. at p. 294.*) As one final example, significant [*641] because of its similarity to the case before us, the court in *Casey v. Overhead Door Corp., supra, 74 Cal. App. 4th 112, 123-124*, a negligence case based on defective windows in mass-produced housing, relied on *Seely, supra*, 63 Cal. 2d 9, to uphold an order excluding testimony about damages representing the cost to replace defective windows that had not caused property damage and a nonsuit based on that order. "A consumer," the court explained, "may not recover economic loss damages against the manufacturer of a defective product in a cause of action for strict liability or negligence. (*Seely*[, at p.] 18 . . . .) [P] Since plaintiffs could not recover economic losses [i.e., the cost of repairing and replacing the defective windows], testimony on that item of damages would have been irrelevant." (*Casey v. Overhead Door Corp., at p. 123.*)

Over time, the concept of recoverable physical injury or property damage expanded to include damage to one part of a product caused by another, defective part. Examples include cases in which poorly prepared lots subsided, damaging the houses built thereon ( *Stearman*

*v.* [**1135] *Centex Homes, supra, 78 Cal. App. 4th 611, 615, 616-623),* in which defective bottle caps ruined wine ( *International Knights of Wine, Inc. v. Ball Corp. (1980) 110 Cal. App. 3d 1001, 1003-1005 [168 Cal. Rptr. 301]* (lead opn. of Roth, P. J.); see also *id. at p. 1008* (conc. opn. of Fleming, J.)), and in which an unknown defect in an engine compartment started a fire that destroyed the entire automobile ( *Gherna v. Ford Motor Co. (1966) 246 Cal. App. 2d 639, 644, 649-651 [55 Cal. Rptr. 94]*). Indeed, the decision in *Seely*, *supra*, 63 Cal. 2d 9, suggested these results by intimating that further damage to a truck caused by a manufacturing defect might be recoverable in strict liability or negligence, even though the cost of repairing the original defect was not. (*Id. at p. 19*; see generally *Stearman v. Centex Homes, at pp. 616-623* [extensively discussing the point].)

Plaintiffs argue no requirement of property damage exists, at least in the context of residential construction. The cases discussed above do not support the argument. They go only so far as to hold that property damage compensable in tort can exist when a defective component damages other parts of the same product. Plaintiffs attempt to find a more favorable rule in the two older cases noted above, *Stewart, supra, 55 Cal. 2d 857*, and *Sabella, supra, 59 Cal. 2d 21.* (See *ante*, at p. 637 et seq.) Those cases, however, do not establish the rule plaintiffs seek. We held in *Stewart* that the plaintiff homeowners could recover from a subcontractor for damages to their house and lot caused by water escaping from a negligently built swimming pool. (*Stewart, at p. 860.*) No question was presented of a defect without resulting property damage. Likewise, *Sabella* concerned a house damaged by the subsidence of an improperly compacted lot. (*Sabella, at pp. 23-27.*) Today, [*642] after *Seely*, *supra*, 63 Cal. 2d 9, the plaintiffs in those cases would argue that defective components of the property (in *Stewart* the concrete in the swimming pool, and in *Sabella* the lot) had damaged [***729] other components, including the houses. (See, e.g., *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611, 622-623.*) Because *Stewart* and *Sabella* clearly involved property damage, we find nothing in those decisions to cast doubt on the requirement of property damage later articulated in *Seely* and the many cases following *Seely*. (See *ante*, at p. 639 et seq.) [10]

10 The concurring and dissenting justices would hold that property damage occurs when a defective component is incorporated into a house. (Conc. & dis. opn. of Mosk, J., at pp. 674-675; see also conc. & dis. opn. of George, C. J., at p. 673, fn. 11.) The decision offered as support for that view, *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co. (7th Cir. 1992) 972 F.2d 805*, however, offers its conclusion not as a rule of tort liability but as an interpretation of contractual language in an insurance policy. While we intimate no view as to *Eljer's* correctness as a matter of California law, we find the decision insufficiently relevant to the question before us to be of any assistance.

Plaintiffs also contend the court in *Seely*, *supra*, 63 Cal. 2d 9, was concerned exclusively with commercial losses or lost business profits, rather than economic losses in a broader sense. To the contrary, the court in *Seely* was unmistakably concerned not just with lost profits but also with the fundamental difference between, on the one hand, the consumer's contractual interest in having a product of the expected, bargained-for value and quality, and, on the other hand, the consumer's tort interest in not suffering property damage or personal injury due to negligence in the manufacturing process. Chief Justice Traynor could not have articulated the point more clearly: "A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." (*Id. at p. 18.*) Certainly the opinion also speaks of the manufacturer not being "held for the level of performance of his products *in the consumer's business* unless he agrees that the product was designed to meet the consumer's demands." (*Ibid.*, italics added.) After all, the immediate factual context of the case before the court included a claim for lost profits. (*Id. at p. 13.*) But to read this court's seminal decision in *Seely* as speaking only to claims for lost profits, and not more generally to the distinction between tort and contract, is to mistake the particular application for the governing principle.

An uncertain number of plaintiffs purchased their houses directly from defendant Lyon. As to these plaintiffs, it is argued, privity of contract offers [*643] an additional reason for rejecting any requirement of property damage in an action for negligence based on

construction defects. It has been said that "[a] contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner" and that "[a] negligent failure to do so may be both a breach of contract and a tort." ( *North American Chemical Co. v. Superior Court (1997) 59 Cal. App. 4th 764, 774 [69 Cal. Rptr. 2d 466].*) Therefore, plaintiffs argue, defendant Lyon's negligent breach of contractual duties owed directly to plaintiffs to deliver homes in compliance with the applicable building codes is a tort, for which plaintiffs may recover "the amount which will compensate for all the detriment proximately caused thereby . . . ." ( *Civ. Code, § 3333.*)

The argument is not persuasive. **(3) (2b)** A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations. Instead, " '[c]ourts will generally enforce the breach of a contractual promise through contract [***730] law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.' " ( *Erlich v. Menezes 21 Cal. 4th 543, 552*, quoting *Freeman & Mills, Inc. v. Belcher Oil Co., supra, 11 Cal. 4th 85, 107* (conc. & dis. opn. of Mosk, J.).) This court recently rejected the argument that the negligent performance of a construction contract, without more, justifies an award of tort damages. (*Erlich v. Menezes at pp. 550-554* [**1136] [reversing an award of damages for emotional distress for negligent construction].) In so doing, however, we reiterated that conduct amounting to a breach of contract becomes tortious when it also violates a duty independent of the contract arising from principles of tort law. (*Id. at p. 551.*) The strict liability and negligence cases discussed above, which hold the builders of homes liable for construction defects causing property damage, may be understood as recognizing such an independent duty. But that duty is limited by the rule in *Seely, supra, 63 Cal. 2d 9, 18*, which bars recovery of economic damages representing the lost benefit of a bargain.

We noted earlier that the law of construction defects after *Sabella, supra, 59 Cal. 2d 21*, diverged into two theories: strict products liability, which we have discussed, and the tort recognized in *J'Aire, supra*, 24 Cal. 3d 799. Apart from the arguments that *Seely, supra, 63 Cal. 2d 9*, does not apply to negligent construction (see *ante*, at pp. 641-642) and that plaintiffs in privity may recover tort damages for breach of contract (see *ante*, at p. 642), plaintiffs base their claim exclusively on *J'Aire* and cases following that decision.

*J'Aire, supra*, 24 Cal. 3d 799, as mentioned, relied on this court's 1958 decision in *Biakanja, supra, 49 Cal. 2d 647*. In *Biakanja*, we held that a [*644] defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity could support recovery if the defendant was under a duty to protect those interests. The court articulated a case-by-case test for identifying such a duty. "The determination whether in a specific case the defendant will be held liable to a third person not in privity," we wrote, "is a matter of policy and involves the balancing of various factors . . . ." (*Biakanja, at p. 650.*) The six factors were: "[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." (*Ibid.*) In concluding the defendant notary owed a duty to an intended beneficiary not to mishandle the will's drafting and solemnization, we attached particular importance to the fact that the " 'end and aim' " of the notary's service to the testator was "to provide for the passing of [the] estate to [the] plaintiff" (*ibid.*), and to the high impropriety of, and need to prevent, the unlicensed practice of law (*id. at p. 651*).

Twenty-one years later, the court in *J'Aire, supra*, 24 Cal. 3d 799, applied the *Biakanja* (*supra, 49 Cal. 2d 647, 650)* factors to conclude that the tenant of a building used as a restaurant could state a cause of action for negligence against a renovation contractor hired by the building's owner for business income lost when the contractor "fail[ed] to complete the project with due diligence." ( *J'Aire*, at pp. 802, 804-805, 157 Cal. Rptr. [***731] 407, 598 P.2d 60.) Applying the *Biakanja* factors, the court held that a "special relationship" (J'Aire, at p. 804) permitting recovery of economic losses (i.e., the relationship defined by the *Biakanja* test) existed between the contractor and the tenant. The court dismissed concerns that such a theory of recovery would threaten liability, out of proportion to fault, for remote consequences and speculative damages. (J'Aire, at pp. 807-808.) In the court's view, the *Biakanja* factors, in combination with "ordinary principles of tort law such as proximate cause," were "fully adequate to limit recovery" of purely economic damages "without the drastic

consequence of an absolute rule which bars recovery in all such cases." (J'Aire, at p. 808.)

The lower courts have applied the theory of liability articulated in *J'Aire*, *supra*, 24 Cal. 3d 799, in a wide variety of cases. To mention just a [**1137] few, courts have relied on *J'Aire* to assess a chemical manufacturer's claim against a transportation company for business losses caused by the contamination of its product in shipment ( *North American Chemical Co. v. Superior Court, supra, 59 Cal. App. 4th 764, 781-785)*; a dairy's claim against the manufacturer of an allegedly defective milking machine for lost profits and [*645] property damage ( *Ott v. Alfa-Laval Agri, Inc. (1995) 31 Cal. App. 4th 1439, 1448-1457 [37 Cal. Rptr. 2d 790]*); a construction lender/mortgagee's claim against a builder for construction defects ( *Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal. App. 3d 211, 223-226)*; an abalone packer's claim for lost profits against the manufacturer of unusable cans ( *Ales-Peratis Foods Internat., Inc. v. American Can Co. (1985) 164 Cal. App. 3d 277, 284-290 [209 Cal. Rptr. 917]*); and real estate investors' claims for the cost of repairing construction defects in an apartment building ( *Huang v. Garner, supra, 157 Cal. App. 3d 404, 422-425*; see *post*, at p. 648 et seq.).

The lower courts have also expanded upon *J'Aire*, *supra*, 24 Cal. 3d 799. While the court in *J'Aire* purported only to address duties owed to persons not in contractual privity with the defendant (*id. at p. 804*), courts subsequently have applied *J'Aire* to cases in which privity did exist. These courts have concluded that "the reasoning of *J'Aire* is wholly incompatible with a limitation of the cause of action to those instances in which the plaintiff and defendant are not in privity . . . ." ( *Ott v. Alfa-Laval Agri, Inc., supra, 31 Cal. App. 4th 1439, 1448*; see also *North American Chemical Co. v. Superior Court, supra, 59 Cal. App. 4th 764, 783*; *Pisano v. American Leasing (1983) 146 Cal. App. 3d 194, 197 [194 Cal. Rptr. 77]* [both applying *J'Aire* in cases apparently involving privity].)

Plaintiffs contend that *J'Aire*, *supra*, 24 Cal. 3d 799, when it applies, displaces the general rule (*Seely, supra, 63 Cal. 2d 9, 18)* that damages are not recoverable for product defects that have not caused property damage. [11] Plaintiffs base the contention on the following statement in *J'Aire*: "Where the risk of harm is foreseeable, . . . an injury to the plaintiff's [***732] economic interests should not go uncompensated merely because it was unaccompanied by any injury to his person or property." (J'Aire, at p. 805.) The validity of the orders on review depends largely on the significance of that statement. Paraphrasing it, one might ask the dispositive question this way: Does the law of negligence protect plaintiffs' economic interests in having houses that fully comply with the building codes, measured by the cost of repairs or diminished value associated with noncompliance, even though the asserted harm to those interests is unaccompanied by any injury to person or property?

11 Plaintiffs also argue that *Seely, supra, 63 Cal. 2d 9*, does not apply to the negligent performance of *services*, as distinguished from the negligent manufacture of *products*, but the basis for that argument appears, once again, to be that *J'Aire*, *supra*, 24 Cal. 3d 799, takes precedence over *Seely*. (See *North American Chemical Co. v. Superior Court, supra, 59 Cal. App. 4th 764, 778-785*, and *Huang v. Garner, supra, 157 Cal. App. 3d 404, 421-424* [both concluding that liability under *J'Aire* is unaffected by *Seely*]; cf. *Cooper v. Jevne, supra, 56 Cal. App. 3d 860, 867-869* [relying on *Biakanja, supra, 49 Cal. 2d 647*, rather than *J'Aire*, to reach the same conclusion].)

[*646] To apply the multifactored balancing test set out in *J'Aire*, *supra*, 24 Cal. 3d 799, 804, tends to involve a court in making fairly subjective judgments. In this case, however, a relatively objective obstacle to plaintiffs' claim appears in factor (3), which looks to "the degree of certainty that the plaintiff suffered injury . . . ." (*Ibid.*) Construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of " 'appreciable harm' " --an essential element of a negligence claim. ( *Davies v. Krasna (1975) 14 Cal. 3d 502, 513 [121 Cal. Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]*; see *San Francisco Unified School Dist. v. W.R. Grace & Co., supra, 37* [**1138] *Cal. App. 4th 1318, 1327-1331* [the presence of asbestos products in buildings did not, prior to the release of friable asbestos, constitute actual and appreciable harm under *Davies v. Krasna*]; *Zamora v. Shell Oil Co., supra, 55 Cal. App. 4th 204, 208-211* [finding no cognizable damage in the cost of replacing defective pipes that had not yet leaked].) The breach of a duty causing only speculative harm or the threat of future harm does not normally suffice to create a

cause of action. (*Davies v. Krasna, at p. 513.*) For the same reason--because the physical harm traditionally compensable in tort is lacking--to ask in the words of factor (2) whether the harm to plaintiffs was "foreseeab[le]" (*J'Aire*, at p. 804) simply begs the question: What harm?

Plaintiffs argue that the cost of repairs is an accepted measure of damage for construction defects and that plaintiffs could make the cost of repairs certain within the meaning of *J'Aire*, *supra*, 24 Cal. 3d 799, 804, by voluntarily repairing defects and obtaining a receipt for money spent. This confuses the *measurement* of alleged damages with the ability of particular facts to support a tort action. To say that one's house needs repairs costing a certain amount is not necessarily to say that one has suffered the type of harm cognizable in tort, as opposed to contract. Plaintiffs also argue that "the degree of certainty that the plaintiff suffered injury" (*ibid.*) is merely a factor to be balanced with the other factors set out in *J'Aire* for determining a person's liability for negligently injuring another's economic interests. We do not believe, however, that the *J'Aire* court intended to dispense with the rule that appreciable, nonspeculative, present injury is an essential element of a tort cause of action. ( *Davies v. Krasna, supra, 14 Cal. 3d 502, 513*; cf. *Romano v. Rockwell Internat., Inc. (1996) 14 Cal. 4th 479, 500-503 [59 Cal. Rptr. 2d 20, 926 P.2d 1114]* [plaintiff suffered appreciable harm sufficient to support a tort claim for wrongful discharge upon actual termination rather than upon prospective notification].) Lacking that fundamental prerequisite to a tort claim, it is difficult to imagine what other factors, singly or in combination, might justify the court in finding liability.

Turning to the other factors, we find no adequate justification. We may assume for argument's sake that the conduct of a person engaged in construction is "intended to affect" all foreseeable purchasers of the property. [*647] (*J'Aire, supra*, 24 Cal. 3d 799, 804 [***733] [factor (1)]; see also *Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal. App. 3d 211, 224*; *Huang v. Garner, supra, 157 Cal. App. 3d 404, 423-424*; *Cooper v. Jevne, supra, 56 Cal. App. 3d 860, 869.*) We may also assume that a sufficiently "close[] connection [exists] between . . . defendant's conduct" and the alleged defects. (*J'Aire*, at p. 804 [factor (4)].) Also, while some "moral blame" arguably "attach[es]" to many deviations from the building codes (*ibid.* [factor (5)]), the degree of blame would appear to depend upon the nature of the deviation. Thus, even if significant moral blame inheres in negligent construction creating a risk of likely structural failure leading to a notice of abatement (*Huang v. Garner, at p. 424* & fn. 13), we may still reasonably assign reduced moral blame to less serious defects not presenting that degree of risk, and to such flaws as doors that are out of plumb, discolored drain stoppers, and inoperable garbage disposals, to take a few examples from this case. Factor (6), the last factor, looks to "the policy of preventing future harm." (*J'Aire*, at p. 804.) Certainly, as plaintiff in *Provencal* noted in its offer of proof, the express purpose of the building codes is to "provide minimum standards to safeguard life or limb, health, property and public welfare . . . ." (U. Bldg. Code, § 102, Cal. Code Regs., tit. 24, former § 2-102.) Plaintiffs have not shown, however, that any of the alleged defects actually poses a serious risk of harm to person or property. To say, as plaintiffs do, that the purpose of construction standards for shear walls is to "minimize property damage and personal injury in the event of seismic and wind forces," is not to say that any given defect is sufficiently grave to pose a realistic risk of structural failure. [**1139] In conclusion, applying the *J'Aire* factors, we do not find they justify a broad rule permitting recovery of repair costs unaccompanied by property damage or personal injury.

Plaintiffs contend precedent requires a different result. "[E]very reported decision applying the *J'Aire*[, *supra, 24 Cal. 3d 799, 804]* factors to residential construction," they argue, "has allowed the recovery of economic loss," meaning, in this context, the cost of repairing defects that have not caused property damage. The decisions plaintiffs cite, however, do not strongly support their position. The courts in *Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal. App. 3d 211*, and *Cooper v. Jevne, supra, 56 Cal. App. 3d 860* (which predated *J'Aire* and relied on *Biakanja, supra, 49 Cal. 2d 647*), simply held that the plaintiffs in those cases had stated causes of action and, thus, reversed judgments of dismissal entered after demurrers were erroneously sustained. The court in *Sumitomo Bank v. Taurus Developers, Inc.*, did not address the distinction between economic damages and physical harm; no such issue was raised. The court in *Cooper v. Jevne* held that the plaintiff homeowners had stated a cause of action in negligence against the architects of their houses, with whom the plaintiffs were not in privity. As damages for [*648] their negligence cause of action, the plaintiffs sought the cost of repairs, compensation for lost use and income,

and "[p]ast and future damage to personal property," among other things. ( *Cooper v. Jevne, supra, 56 Cal. App. 3d at p. 867, fn. 2.*) That the plaintiffs had stated a cause of action was established by the architects' concession that their professional liability to the plaintiffs not in privity of contract with them extended to property damage. ( *Id. at p. 868, fn. 3.*) For this reason, and because the question was not before the court on demurrer, the court's conclusion that *Seely's* economic loss rule does not apply to professional negligence claims (*Cooper v. Jevne, at p. 869*) is dictum. The court, in any event, acknowledged *Seely's* continuing relevance to the liability of a manufacturer for product defects. (*Cooper v. Jevne, at p. 868.*) Furthermore, unlike the judgments of dismissal on appeal in *Sumitomo Bank v. Taurus Developers, Inc.*, and *Cooper v. Jevne*, the instant rulings in limine do not preclude plaintiffs from presenting to the trier of fact whatever claims for property damage may exist. [12]

12 In addition to these cases cited by plaintiffs, the Chief Justice relies on *Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal. 2d 850 [73 Cal. Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224]*, *Krusi v. S.J. Amoroso Construction Co. (2000) 81 Cal. App. 4th 995 [97 Cal. Rptr. 2d 294]*, *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611*, and *Keru Investments, Inc. v. Cube Co. (1998) 63 Cal. App. 4th 1412 [74 Cal. Rptr. 2d 744]*. None of these cases purports to hold that a plaintiff may recover for construction defects that have not caused damage to other property.

In *Connor v. Great Western Sav. & Loan Assn., supra, 69 Cal. 2d 850*, this court held that persons whose homes "suffered serious damage from cracking caused by ill-designed foundations" ( *id. at p. 856*) could sue the construction lender as the joint venturer of the developer on the theory that it owed the plaintiffs a duty to "exercise reasonable care to protect them from damages caused by major structural defects" ( *id. at p. 866*). Thus, to the extent *Connor* might be thought relevant to the case before us, it is entirely consistent with the rule we apply today. (The Legislature has rejected *Connor's* holding that construction lenders are liable in negligence for construction defects. See *Civ. Code, § 3434.*)

The courts in *Krusi v. S.J. Amoroso Construction Co., supra, 81 Cal. App. 4th 995, 1005*, and *Keru Investments, Inc. v. Cube Co., supra, 63 Cal. App. 4th 1412, 1423-1425*, held simply that causes of action for construction defects accrued when the defects caused damage and belonged to the persons who owned the buildings at that time, rather than to the subsequent purchasers. Because the courts in both cases held the plaintiffs lacked standing to sue, neither court faced any question of liability for purely economic damages. In any event, the buildings at issue in both cases had actually suffered major structural damage as a result of construction defects. (*Krusi, at p. 998*; *Keru, at p. 1415.*) The court in *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611, 616-623*, held merely that strict liability applies when a defective component of a house damages a nondefective component. (See p. 641, *ante*.)

Plaintiffs place particular emphasis on *Huang v. Garner, supra, 157 Cal. App. 3d 404* (*Huang*). The court in that case relied on *J'Aire*, *supra*, 24 Cal. 3d 799, to reverse [**1140] a nonsuit for the defendants (a developer and a contractor) on the plaintiff real estate investors' claims for the cost of repairing defects in an apartment building. Some of the alleged defects had caused property damage, and some had not. (*Huang, at pp. 419-425.*) The *Huang* [*649] court found the "certainty" of injury required by *J'Aire* (at p. 804) in plaintiffs' duty to comply with a notice of abatement citing likely structural failure and requiring specific repairs. (*Huang, at p. 424* & fn. 13.) Yet *Huang's* analysis is not entirely satisfactory because other alleged construction defects in that case had neither caused property damage nor been cited in the notice of abatement. (Compare *id. at pp. 419-420* [summary of alleged defects] with *id. at p. 424, fn. 13* [order of abatement].) Even accepting for the sake of argument the *Huang* court's suggestion that a notice of abatement might suffice to convert repair costs into tort damages, the decision offers no adequate explanation for permitting the plaintiffs, consistently with *Seely, supra, 63 Cal. 2d 9*, to recover repair costs for the other defects that had neither appeared in the notice nor resulted in property damage. Accordingly, we disapprove *Huang* to the extent it is inconsistent with the views set out in this opinion.

Whether viewed as part of the test set out in *J'Aire*, *supra*, 24 Cal. 3d 799, 804, or as an independent

argument for extending tort liability, the "policy of preventing future harm" (*ibid.* [factor (6)]) is probably plaintiffs' strongest argument. In some sense, [***735] that policy might be served by a rule of tort liability making builders, in effect, the insurers of building code compliance, even as to defects that have not caused property damage or personal injury. Moreover, as plaintiffs argue, to require builders to pay to correct defects as soon as they are detected rather than after property damage or personal injury has occurred might be less expensive. On the other hand, such a rule would likely increase the cost of housing by an unforeseeable amount as builders raised prices to cover the increased risk of liability. Such a rule should also be unnecessary to the extent buyers timely enforce their contract, warranty and inspection rights, and to the extent building authorities vigorously enforce the applicable codes for new construction.

The Chief Justice, in his concurring and dissenting opinion, proposes to resolve these conflicting policy considerations with a complex new rule of tort liability (1) barring recovery for *minor* defects and building code violations that have not caused personal injury or property damage; (2) permitting recovery for *serious* defects and code violations posing a significant risk of death, personal injury, or considerable property damage; and (3) requiring court-supervised disbursement of all damages awarded to ensure that repairs are actually made. (Conc. & dis. opn. of George, C. J., *post*, at pp. 653-654, 671, 672-673.)

The proposal entails serious difficulties. First among these is that the Chief Justice, while asserting that our holding "offends . . . established common law" (conc. & dis. opn. of George, C. J., *post*, at p. 653), nevertheless "agree[s] with the majority to the extent it declines to allow recovery in [*650] negligence for the cost of repairing construction defects that pose no significant risk of serious personal injury or property damage" (*id. at p. 671*). As we have explained, whether the economic loss rule applies depends on whether property damage has occurred rather than on the possible gravity of damages that have not yet occurred. While the Chief Justice rejects our understanding of the economic loss rule, his concurring and dissenting opinion offers no other rationale for denying recovery for minor defects. Although the Chief Justice advances policy considerations to justify providing recovery for serious defects, his narrow conception of the economic loss rule as applicable only to commercial losses (conc. & dis. opn. of George, C. J., *post*, at p. 657; but see this opn., *ante*, at p. 642) would seem to compel the court to permit recovery for minor defects, as well. In short, the proposed rule lacks coherence.

The Legislature, whose lawmaking power is not encumbered by precedent, is free to [**1141] adopt a rule like that proposed in the Chief Justice's concurring and dissenting opinion. Yet even if the proposed rule could plausibly be defended as a logical development of the common law, and thus appropriate for judicial rather than legislative promulgation, the rule's shortcomings would counsel its rejection. The distinction between serious and minor defects has a superficial theoretical appeal that evaporates in practice. Amicus curiae Structural Engineers Association of California, which supports plaintiffs' position in this court, aptly demonstrates that almost any building code violation can, under the right set of assumptions and circumstances, be considered serious. [13] [***736] "[T]here is no mechanism at this level to separate life safety defects from cosmetic defects," amicus curiae argues; such questions, in its view, are "better left to the trier of fact after a complete presentation of expert testimony on both sides." If experts claim to be unable before trial to rule out any building code violations as trivial, then a rule looking to the *potential* seriousness of *possible* property damage, rather than the existence of *actual* damage, is very likely to frustrate the pretrial disposition of claims based on trivial defects. Such a rule, by forcing judges [*651] to attempt to predict the likelihood that any given defect will cause property damage and, if so, its likely seriousness, will make it difficult for them to screen out trivial claims as a matter of law. Because, moreover, the rule invites a speculative inquiry, any pretrial dispositions based thereon are likely to be inconsistent [14] and challenged on appeal. In short, the practical effect of a rule permitting recovery for "serious" defects only, however well intentioned, would likely be to insulate from demurrer and summary judgment virtually all complaints containing allegations of building code violations.

13 Amicus curiae explains in detail how alleged defects that might on "[i]nitial impression[]" seem "trivial, nitpickey and even ridiculous," might cause or indicate serious problems. "Closet shelving, interior doors not fitting properly, sagging roof rafters, spalling plaster, [and] GFI

[ground fault interrupt] receptacles missing" are cited as examples. Expert testimony at trial, amicus curiae speculates, might show that "the location of the closet shelving in conjunction with the lighting poses a fire hazard and violates the National Electrical Code. The interior doors may not fit properly because the buildings/homes have moved due to structural problems or soil issues. The roof rafters may be sagging because they were not attached properly, and their installation violates the Uniform Building Code. The plaster could be spalling due to missing structural components, and by the way, maybe the plaster is supposed to serve as some shear. The missing GFI receptacles pose a fire hazard and a life safety threat to adults and children and the fact that they are missing violates the National Electrical Code."

14 This case illustrates the problem. The Chief Justice apparently concludes that the defects alleged in this case put plaintiffs' homes at risk of collapse or fire. (Conc. & dis. opn. of George, C. J., *post*, at p. 654.) To be sure, plaintiffs have alleged that shear and fire walls do not comply with the applicable building codes, and that the purpose of codes for these components is to protect against those sorts of harm. (See *ante*, at p. 633 & fn. 1.) Yet, as the trial court recognized (see *ante*, at pp. 633-634), this does not necessarily mean that any given defect is sufficiently grave to pose a realistic risk of serious damage. (See also *ante*, at pp. 646-647.)

The Chief Justice's suggestion that courts should supervise the disbursement of tort damages (conc. & dis. opn. of George, C. J., *post*, at pp. 663-664, 672-673) highlights a final difficulty with the rule he proposes. Ordinarily, nothing compels a successful plaintiff to spend money recovered in construction defect litigation on repairs. Indeed, plaintiffs in *Aas* expressly seek in their complaint, in addition to the cost of repairs, damages representing the "diminution in value" of their residences. [15] The possibility that tort damages [***737] [**1142] will not actually be spent on repairs, defendants contend, weakens the argument that imposing liability for construction defects without resulting damage will serve the policy goal of improving the state's housing stock. [*652] The rule the Chief Justice proposes would address this concern by requiring court-supervised disbursement of all damages awarded to ensure that repairs are actually made. (Conc. & dis. opn. of George, C. J., at pp. 672-673.) Again, while such a rule might be appropriate as *legislation*, to reconcile it with the traditional role of the judiciary is very difficult, indeed. While there have been exceptions, courts do not ordinarily tell successful plaintiffs how to spend their tort recoveries. [16] That judicial control over the proceeds might be necessary to render the proposed liability rule fair suggests the rule tries the limits of our power to expound the common law.

15 Plaintiffs may be surprised to read in the Chief Justice's concurring and dissenting opinion that he believes they have abandoned this claim. Plaintiffs did abandon a claim for so-called stigma damages, representing the residual loss of market value after repairs have been made, after losing on this issue in the Court of Appeal. As that court explained, no reported decision in this state appears to authorize such recovery; we intimate no view on the matter.

In contrast, diminished value is simply one of the standard alternative measures of damage for injury to property. The successful plaintiff in such cases ordinarily recovers either the diminution in market value attributable to the injury or the cost of repairs, whichever is less ( *Mozzetti v. City of Brisbane (1977) 67 Cal. App. 3d 565, 576 [136 Cal. Rptr. 751]*), although the rule is not rigid and the court may award the greater amount in appropriate circumstances ( *Heninger v. Dunn (1980) 101 Cal. App. 3d 858, 863-864 [162 Cal. Rptr. 104]*; see generally 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 1461- 1462, pp. 934-935). Plaintiffs understandably emphasize the cost of repairs in their briefs and argument because damages measured by the cost of repairs typically exceed damages measured by diminution in value.

This case is being remanded for further proceedings, possibly including a trial on any alleged defects that have caused property damage. (See *ante*, at pp. 634, 635.) Because plaintiffs have not expressly abandoned the right to recover the diminished value of their homes, should that turn out to be the appropriate measure of damages, we see no basis on which to preclude the court from applying the ordinary law of remedies.

16 Arguing that courts *should* do so, the Chief Justice cites *Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal. 4th 965 [25 Cal. Rptr. 2d 550, 863 P.2d 795]*. (Conc. & dis. opn. of George, C. J., at pp. 663-664, 672-673.) The plaintiffs in *Potter* sought, among other things, medical monitoring costs following their exposure to carcinogenic toxic waste. In a footnote, we noted the suggestion of "[v]arious commentators and courts . . . that creation of court-supervised funds to pay medical monitoring claims as they accrue, rather than the award of a lump-sum verdict, may be a more appropriate mechanism for compensating plaintiffs in a toxic exposure case." ( *Id. at p. 1010, fn. 28.*) Nothing in the *Potter* decision, which we painstakingly limited to its specific factual and legal context, suggests that courts have a broad, general role in supervising the disbursement of tort recoveries.

In our view, the many considerations of social policy this case implicates, rather than justifying the imposition of liability for construction defects that have not caused harm of the sort traditionally compensable in tort (*Seely, supra, 63 Cal. 2d 9, 18)*, serve instead to emphasize that certain choices are better left to the Legislature. That body has at its disposal a wider range of options and superior access to information about the social costs and benefits of each. "Legislatures, in making such policy decisions, have the ability to gather empirical evidence, solicit the advice of experts, and hold hearings at which all interested parties may present evidence and express their views . . . ." ( *Foley v. Interactive Data Corp. (1988) 47 Cal. 3d 654, 694, fn. 31 [254 Cal. Rptr. 211, 765 P.2d 373]*; see also *Moore v. Regents of University of California (1990) 51 Cal. 3d 120, 147 [271 Cal. Rptr. 146, 793 P.2d 479, 16 A.L.R. 4th 903].*) [17]

17 In fact, the Legislature in this term has considered and rejected proposals to make persons engaged in residential construction liable for the cost of bringing homes into compliance with the building codes, without regard to the existence of property damage (Assem. Bill. No. 1669 (1999-2000 Reg. Sess.), as introduced Mar. 15, 1999) and to create a state-sanctioned home warranty program (Assem. Bill No. 1221 (1999-2000 Reg. Sess.)). We note the Legislature is also considering a bill that would recognize a lack of "empirical data on the incidence of construction defects, the amount of construction defects litigation, and whether there is any causal relationship between shoddy construction, construction defect litigation, and the construction of new condominium and affordable housing," and commission a comprehensive study to collect such data. (Sen. Bill No. 1882 (1999-2000 Reg. Sess.).) Defendants' motion for judicial notice of these bills is granted.

Home buyers in California already enjoy protection under contract and warranty law for enforcement of builders' and sellers' obligations; under the [*653] law of negligence and strict liability for acts and omissions that cause property damage or personal injury; under the law of fraud for misrepresentations about the property's condition; and an exceptionally long 10-year statute of limitations for latent construction defects ( *Code Civ. Proc., § 337.15*). While the Legislature may add [***738] whatever additional protections it [**1143] deems appropriate, the facts of this case do not present a sufficiently compelling reason to preempt the legislative process with a judicially created rule of tort liability.

III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CONCUR BY:** GEORGE (In Part); MOSK (In Part)

**DISSENT BY:** GEORGE (In Part); MOSK (In Part)

**DISSENT**

**GEORGE, C. J.**, Concurring and Dissenting.

Other courts faced with the question we address today have asked: Why should a homeowner have to wait for a personal tragedy to occur in order to recover damages to repair known serious building code safety defects caused by negligent construction? (E.g., *Council of Co-Owners v. Whiting-Turner (1986) 308 Md. 18 [517 A.2d 336, 345].*) Perhaps because those courts have addressed the matter from such a commonsense perspective, they have reached conclusions very different from that adopted by the majority in the present case. In determining that a negligently constructed home must first collapse or be gutted by fire before a homeowner may sue in tort to collect costs necessary to repair negligently constructed shear walls or fire walls, the majority today embraces a ruling that offends both

established common law and basic common sense.

In this case, we must decide whether, under California law, when a building contractor has breached its duty of care by constructing a home that violates significant building safety code provisions that are designed to protect health and safety, and the homeowner has discovered these safety code violations before a personal injury has occurred or before the home has suffered any physical property damage, the homeowner, in a negligence action, may recover those costs of repair that a reasonably prudent homeowner would incur under the circumstances, or whether the "economic loss" rule of *Seely v. White Motor Co. (1965) 63 Cal. 2d 9 [45 Cal. Rptr. 17, 403 P.2d 145]* (*Seely*)--a rule designed to limit recovery of such business-related losses as lost profits or lost commercial opportunities--bars a homeowner from recovering such repair costs in a negligence action.

I agree with the majority that many if not most of the defects listed in the underlying complaints--items such as "discolored drain stoppers, and inoperable garbage disposals" (maj. opn., *ante*, at p. 647)--do not pose a risk of [*654] personal injury or property damage sufficient to warrant recognition of a right to recover repair costs in negligence, and hence to this extent I concur in the judgment. At the same time, however, I conclude, consistent with California authority and with the courts of other jurisdictions, that a homeowner may maintain a cause of action in negligence to recover the costs of correcting the most significant building safety code violations conceded in this litigation (e.g., shear walls that were improperly constructed or fastened and that put the structure at risk of collapse during high winds or an earthquake; improperly constructed fire walls that would allow a fire to spread rapidly from one part of the structure to another), but that have not yet manifested themselves in physical damage to the property or resulted in personal injury. To the extent the majority bars such recovery, I dissent. Recognizing a right to recover costs to repair the serious safety defects here at issue--defects that pose a risk of serious personal injury or considerable property damage--would not require us to break new ground; all of the established factors traditionally used to assess building defect cases militate strongly in favor of such relief. And allowing such limited recovery also best comports with rational economic policy, as well as common sense: It obviously is preferable to pay a relatively few dollars at an early date to correct a serious safety risk that may cost millions [***739] or billions of dollars to redress if the inhabitants of dwellings are forced to wait for disaster to strike and for death, personal injury, or physical property damage to ensue.

I.

A.

In *Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal. 2d 850 [73 Cal. Rptr. 369,* [**1144] *447 P.2d 609, 39 A.L.R.3d 224]* (*Connor*), Chief Justice Roger Traynor, upholding a negligence action by homeowners against a lending institution that had financially backed and extensively controlled a new housing development, observed that "the usual buyer of a home is ill-equipped with experience or financial means to discern . . . structural defects." ( *Id., at p. 867*.) The *Connor* opinion rejected as "conjectural claims" assertions that recognizing a duty on the part of the defendant to the homeowners would "increase housing costs, drive marginal builders out of business, and decrease total housing at a time of great need" (*ibid.*), observing that "[i]n any event, there is no enduring social utility in fostering the construction of seriously defective homes. If reliable construction is the norm, the recognition of a duty on the part of tract financiers to home buyers should not materially increase the cost of housing or drive small builders out of business." ( *Id., at pp. 867-868*, fn. omitted.) Finally, the court observed in *Connor* that "a home is not only a major investment for the usual buyer but [*655] also the only shelter he has. *Hence it becomes doubly important to protect him against structural defects that could prove beyond his capacity to remedy*." ( *Id., at p. 867*, italics added.)

As implied in the above italicized observation, tort law offers the most effective, and often the only realistic, nonstatutory remedy for consumers in this area. Although technically available to at least some of the plaintiffs in this and similar litigation, contract or warranty claims in this setting are difficult to prove and to enforce, and our decisions have recognized that problems with privity, disclaimers inserted into contracts by developers or contractors, and notice requirements, often frustrate the ability to recover on contract or warranty theories. (See, e.g., *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal. 2d 57, 61 [27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]* [notice requirement under implied warranty is a " 'booby-trap for the unwary' " and " 'consumer[s are] seldom "steeped in the business practice which justifies the rule" ' "]; *Anthony v. Kelsey-Hayes Co.*

*(1972) 25 Cal. App. 3d 442, 448 [102 Cal. Rptr. 113]* [lack of privity defeats implied warranty claim]. ) As observed in *Kriegler v. Eichler Homes, Inc. (1969) 269 Cal. App. 2d 224, 228 [74 Cal. Rptr. 749]* (*Kriegler*), because the purchaser of a " 'development house' " " 'has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible. . . .' [P] 'Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale.' " Accordingly, as Chief Justice Traynor recognized in *Connor, supra, 69 Cal. 2d 850*, the inadequacy of contract and warranty law properly should inform our consideration of the role and use of tort law in this context. (Cf. *Kaiser Steel Corp. v. Westinghouse Elec. Corp. (1976) 55 Cal. App. 3d 737, 747-748 [127 Cal. Rptr. 838].*)

B.

As the majority observes, the author of *Connor's* rousing confirmation of the right of homeowners to sue in negligence in [***740] order to remedy negligent construction also authored the majority opinion in *Seely, supra, 63 Cal. 2d 9*--a decision that concerned not an action in negligence for repair of serious construction defects in residential housing, but, instead, an action under warranty and strict products liability for lost business profits arising from an assertedly defective commercial truck. The majority asserts that dictum in *Seely,* to the effect that "[*e*]*ven in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for* [*656] *economic loss alone*" ( *id., at p. 18*, italics added), supports a conclusion that there can be no recovery in negligence for any of the repair or correction costs here at issue. I disagree with the majority's broad reading of the *Seely* dictum, and I agree with plaintiffs that *Seely's* dictum should not be extended to bar recovery in negligence for *costs to correct serious safety violations in the construction* [**1145] *of dwellings* that pose a significant risk of personal injury or property damage. Because the majority relies heavily upon a broad reading of *Seely's* dictum, and because I believe that reliance is misplaced, I review the decision in *Seely* in some detail.

In *Seely, supra, 63 Cal. 2d 9*, the plaintiff sued the manufacturer in both warranty and strict liability after his truck, which he used in his commercial hauling business, was involved in an accident and needed to be repaired. Previously, the plaintiff had become dissatisfied with the truck; he informed the manufacturer that it was "galloping" (bouncing violently) and was difficult to handle. ( *Id., at p. 12.*) He used the truck in his business for approximately 11 months, during which time the manufacturer tried unsuccessfully on many occasions to correct the galloping problem to the plaintiff's satisfaction. During this period, the plaintiff paid off approximately half of the purchase price. Then one day, rounding a corner, the brakes failed and the truck overturned. The plaintiff was convinced that the accident was caused by the defective condition of the truck, and he also was dissatisfied with the overall performance of the truck, even before the accident. He had the truck repaired, ceased making payments, and sued for "(1) damages, related to the accident, for the repair of the truck, and (2) damages, unrelated to the accident, for the money he had paid on the purchase price and for the profits lost in his business because he was unable to make normal use of the truck." ( *Id., at p. 13.*) The trial court found that the plaintiff had not proved that the galloping had caused the accident, and hence declined to award damages for repair costs. (*Ibid.*) The trial court did, however, award the other damages on the plaintiff's warranty cause of action. (*Ibid.*)

In *Seely, supra, 63 Cal. 2d 9*, this court approved the award of those damages, based upon the plaintiff's warranty theory. Then, in dictum, we also addressed the plaintiffs' strict liability claim. At this point in the analysis, we considered the damages described in item (2) above, finding them not allowable under strict liability theory. First, we noted concern about the prospect of permitting "unknown and unlimited" liability for such "commercial losses." ( *Id., at p. 17.*) In this regard, we stated that a consumer (i.e., the plaintiff) is "fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." ( *Id., at p. 18.*) The court then stated, in dictum within dictum that has been repeated in subsequent cases and is heavily relied upon by the majority: [*657] "*Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.*" (*Ibid.*, italics added.)

[***741] Clearly, this dictum in *Seely, supra, 63 Cal. 2d 9*, was directed toward the issue presented in *Seely*--the recovery of *lost profits* and related liability for *commercial expectation damages*. The majority, however, reads *Seely's* dictum much more broadly, as precluding recovery in either negligence or strict liability for the cost of repairing serious and potentially life-threatening defects reflecting building safety code violations in residential housing. I find no such suggestion in *Seely*. Although the court felt it important to explain that a manufacturer should not be liable in tort for commercial losses caused by the failure of a product to meet the specific needs of a purchaser's business ( *id., at p. 17*), it did not assert, expressly or by implication, that there could be no damages in negligence for correction of serious safety violations in residential housing that pose a danger of personal injury or serious property damage. Such a conclusion, of course, would be quite at odds with the tenor of Chief Justice Traynor's above quoted observations in *Connor, supra, 69 Cal. 2d at pages 867-868*, rendered just a few years thereafter.

Recognition of a homeowner's ability to recover repair costs necessary to remedy serious safety defects in residential housing would not substantially implicate *Seely's* concerns about "unknown and unlimited" liability for "commercial losses." ( *Seely, supra, 63 Cal. 2d at p. 17.*) As plaintiffs note in their joint opening [**1146] brief, "[r]ecovery of costs of repair in negligence is adequately limited. Code violations or other negligent construction must be proven. Causation must be proven. Costs of repair are limited in amount, even if expert opinions may vary as to exact amounts. The number of claimants is limited to the number of homes sold. These factors distinguish recovery of such costs from the 'economic loss' cases in which concern was expressed about potentially limitless claims by potentially limitless claimants."

In short, *Seely's* cautions against allowing recovery of commercial expectation damages for lost profits do not justify barring recovery of the cost of repairing serious construction defects involving dwelling code violations that pose a threat to life and property. Accordingly, I find the majority unpersuasive to the extent that it relies on a broad interpretation of the *Seely* dictum.

C.

The understanding of the limited reach of *Seely, supra, 63 Cal. 2d 9*, set forth above is confirmed by numerous decisions described below, in which [*658] California courts repeatedly have allowed recovery of construction repair costs.

Eleven years after *Seely*, the Court of Appeal in *Cooper v. Jevne (1976) 56 Cal. App. 3d 860 [128 Cal. Rptr. 724]* (*Cooper*), allowed a negligence suit by condominium owners against architects, for "economic loss" damages ( *id., at p. 868*) that included "cost of repairs" ( *id., at p. 867, fn. 2*). Eight years later, the Court of Appeal decision in *Huang v. Garner (1984) 157 Cal. App. 3d 404 [203 Cal. Rptr. 800]* (*Huang*), presented a situation essentially identical to the one that we address in this case. Apartment building owners sued the developer and contractor for costs to remedy serious safety code violations that, like the present case, fell into two categories: (i) building safety code violations that *had* manifested themselves in physical damage ( *id., at p. 419* [these consisted of "deflected and cracked beams and dry rot damages to the balcony area"]), and (ii) building safety code violations that *had not yet* manifested themselves in physical damage ( *id., at pp. 419-420* [in *Huang*, as here, these consisted of inadequate or missing "firewalls, shear walls, fire stops, and other alleged defects in the structure which had not yet caused actual physical damages at the time of [***742] trial"]). The Court of Appeal in *Huang*, distinguishing *Seely*, ruled that the apartment owners could recover repair costs to remedy the serious building safety code violations that had not yet manifested themselves in physical damage. ( *Id., at pp. 421-425.*) Addressing the crucial question whether there was sufficient certainty that the plaintiffs in that case had suffered harm, the court noted in *Huang* that the defects were "dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant." ( *Id., at p. 424.*) That court further observed: "Failure to comply with the Uniform Building Code by a developer-contractor involves potential risk of harm to later purchasers. In this case ample evidence was offered with respect to the cost of repairing the subject defects. Thus it is relatively certain that plaintiffs have suffered injury as a result of the defects. . . . [P]laintiffs have . . . suffered damages in being forced to repair the building." (*Ibid.*)

In *Sumitomo Bank v. Taurus Developers, Inc. (1986) 185 Cal. App. 3d 211 [229 Cal. Rptr. 719]*, a California appellate court followed *Huang, supra, 157 Cal. App. 3d 404*, and *Cooper, supra, 56 Cal. App. 3d 860*, allowing a purchaser of a condominium complex to pursue a

negligence action against the builder for the cost to repair both then existing physical damage, e.g. , cracking concrete and leaking roofs, and, apparently, detriment that had not yet manifested itself in physical damage, e.g., improperly designed drainage and structural retaining walls. (*185 Cal. App. 3d at pp. 216, 223-226.*) Subsequently, construction litigation decisions of our Courts of Appeal that have had occasion to address the aspect of *Huang* that is relevant here have [*659] uniformly treated *Huang's* analysis as accepted and established law. (See, e.g., *Keru Investments, Inc. v. Cube Co. (1998) 63 Cal. App. 4th 1412, 1421-1422 [74 Cal. Rptr. 2d 744]* [noting that in *Huang* the plaintiffs were not seeking lost opportunity costs, but instead, " 'the cost to repair the defects in the structure in order to bring it into compliance [**1147] with the Uniform Building Code' "]; *Krusi v. S.J. Amoroso Construction Co. (2000) 81 Cal. App. 4th 995, 1000-1001 [97 Cal. Rptr. 2d 294]* [describing with apparent approval *Huang's* conclusion that "the plaintiffs were entitled to economic damages" in order to correct building code violations "in addition to recovery for physical damage" and noting testimony in *Huang* that the defects were " 'dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant' "]; cf. *Stearman v. Centex Homes (2000) 78 Cal. App. 4th 611, 618 [92 Cal. Rptr. 2d 761]* [discussing with approval "Huang's definition and application of [*Seely's*] economic loss rule"].)

D.

Finally, the above reading of *Seely, supra, 63 Cal. 2d 9*, also is confirmed by numerous cases from other jurisdictions that permit recovery of construction repair costs essentially identical to those here at issue. Although the majority adopts a broad view of the *Seely* dictum as barring recovery of costs for repair of construction defects that pose a substantial risk to persons and property, the trend of well-reasoned sister-court decisions is in the opposite direction.

Almost all of the out-of-state decisions in this area cite and discuss *Seely* and adopt in general a version of the rule set out in that case, restricting recovery for commercial expectation damages. These sister-state decisions recognize that *Seely* was concerned primarily with precluding potentially limitless damages for lost profits and/or lost commercial expectations in the context of suits for product liability, and these out-of-state cases also recognize, explicitly or implicitly, that suits for costs to repair and correct dwelling safety defects that pose a serious risk to life and limb are [***743] clearly distinguishable from *Seely* and do not similarly implicate concerns of limitless damages.

The majority, *ante*, at page 636, footnote 7, mentions three such out-of-state decisions. ( *Kennedy v. Columbia Lumber & Mfg. Co. (1989) 299 S.C. 335 [384 S.E.2d 730, 737]* [a builder does not escape liability for building code violations merely because "luck has smiled upon him and no physical harm has yet occurred. . . . [W]e once again join those states which strive to protect the modern new home buyer"]; *Oates v. Jag, Inc. (1985) 314 N.C. 276 [333 S.E.2d 222, 225-226]* [allowing recovery of repair costs to correct [*660] building code violations that had apparently not caused physical damages, and noting, "[w]e must be realistic. . . . The purchaser can ill afford to suddenly find a latent defect in his or her home . . . and have no remedy for recourse"]; *Council of Co-Owners v. Whiting-Turner, supra, 517 A.2d 336* (*Whiting-Turner*).)

The *Whiting-Turner* case is especially well reasoned and particularly apt here. In that case the Maryland high court permitted the plaintiff in a negligence action to recover the costs necessary to correct the construction of 10 vertical utility shafts in a 22-story condominium complex. The shafts presented a fire hazard because of the absence of required insulation--a serious violation of applicable building codes. ( *Whiting-Turner, supra, 517 A.2d at pp. 338-339.*) Although the defective shafts all posed a clear danger of death or personal injury, none of them yet had produced any personal injury or physical property damage.

The *Whiting-Turner* decision held: " 'We reject the contention by appellant that there can be no recovery in negligence absent proof of personal injury or property damage. We hold that there can be recovery for economic loss. Why should a buyer have to wait for a personal tragedy to occur in order to recover damages to remedy or repair defects? In the final analysis, the cost to the developer for a resulting tragedy could be far greater than the cost of remedying the condition.' [P] We conclude that the determination of whether a duty will be imposed in this type of case should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage. Where the risk is of death or personal injury the action will lie for recovery of the reasonable cost of correcting

the dangerous condition." ( *Whiting-Turner, supra, 517 A.2d at p. 345*, fn. omitted.) [1]

1 In the omitted footnote, the court wrote in *Whiting-Turner*: "It is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual injury. Accordingly, conditions that present a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice. A claim that defective design or construction has produced a drafty condition that may lead to a cold or pneumonia would not be sufficient." ( *Whiting-Turner, supra, 517 A.2d at p. 345, fn. 5.*)

[**1148] In addition to these authorities, it is instructive to consider another out-of-state decision relied upon by defendants to support their assertion that all repair and correction costs in the present case should be barred under *Seely's* rule restricting recovery of commercial expectation damages. As defendants observe, the Florida Supreme Court's closely divided decision in *Casa Clara v. Charley Toppino and Sons (Fla. 1993) 620 So.2d 1244* (*Casa Clara*) does support defendants' and the majority's position. There, a condominium association sued the supplier of concrete for having provided defective [*661] concrete with a high salt content that caused it to crack, putting at risk the dwellings constructed with the concrete. The Florida high court, employing a broad interpretation of *Seely's* dictum barring recovery of commercial expectation damages (*Casa Clara, at p. 1245* et seq.), and ignoring Chief Justice Traynor's caution against relying on contract law to protect homeowners [***744] in such circumstances (see *ante,* 101 Cal. Rptr. 2d at pp. 722-723, 12 P.3d at pp. 1128-1130), concluded that home buyers should " 'bear the cost of economic losses sustained by those who failed to bargain for adequate contract remedies' " (*Casa Clara, at p. 1247*), and denied the condominium association any recovery in negligence premised upon "the mere possibility" that the defective concrete "will cause physical injury." ( *Id., at p. 1247.*) The court reasoned in *Casa Clara* that the plaintiffs' "argument goes completely against the principle that *injury must occur before a negligence action exists. Because an injury has not occurred, its extent and the identity of injured persons is completely speculative.*" (*Ibid.*, italics added.) The court in *Casa Clara* was divided four to three, and reached its conclusion over the dissenting justices' protestations that "it stretches reason to apply the [economic loss] doctrine in this context." ( *Id., at p. 1248* (conc. & dis. opn. of Barkett, C. J.).)

Defendants, however, overlook the subsequent history of *Casa Clara.* More than a year ago, the Florida Supreme Court, by a six-to-one vote, "effectively overruled" that case. ( *Moransais v. Heathman (Fla. 1999) 744 So.2d 973, 985* (dis. opn. of Overton, J.) [characterizing the majority opinion] (*Moransais* ).) [2] The Florida high court's analysis and observations in *Moransais* concerning the proper scope of *Seely's* rule barring recovery of commercial expectation damages are especially instructive and strongly repudiate the broad application of the rule proposed by defendants and the majority.

2 The opinion in *Moransais* was filed after briefing in the present case was completed. On August 28, 2000, however, codefendant William Lyon Company filed a "Supplemental Brief of Additional Authorities," citing and discussing the recent subsequent history of a Nevada case cited in earlier briefs, and citing three other recent (and distinguishable) cases from other jurisdictions. Nonetheless, the supplemental brief failed to note that, more than one year earlier, the Florida Supreme Court effectively had overruled *Casa Clara, supra, 620 So.2d 1244*, the primary out-of-state case upon which Lyon had relied in its "Answer Brief on the Merits."

*Moransais, supra, 744 So.2d 973*, was a suit by a homeowner against a professional engineer who had inspected the plaintiff's home prior to purchase. The inspection had failed to disclose various (unspecified) defects that "rendered the home uninhabitable" ( *id., at p. 975*), but which had not yet caused any property damage or personal injury. The plaintiff was not in privity with the engineer, but was with the engineer's employer. The plaintiff sued the engineer personally for his negligent inspection of the home.

[*662] Consistent with *Cooper, supra, 56 Cal. App. 3d 860*, in which our Court of Appeal permitted a similar action against architects, the Florida high court in *Moransais, supra, 744 So.2d 973*, allowed the negligence suit against the engineer. In the process, the Florida court explained that its prior decisions--including, most notably, *Casa Clara*--"[*u*]*nfortunately*" had extended the economic loss doctrine "*beyond its principled origins and*

*have contributed to applications of the rule . . . well beyond our* [**1149] *original intent.*" ( *Moransais, supra, 744 So.2d at p. 980*, italics added).) The court held that henceforth, the doctrine would be limited in order to avoid precluding traditional and well-established actions in tort. ( *Id., at p. 983.*)

Underscoring its retreat from its prior applications of *Seely's* economic loss rule, the court explained in *Moransais*: "Today, we again emphasize that by recognizing that *the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of action*, such as those for neglect in providing professional services. *Rather, the rule was primarily intended to limit actions in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical* [***745] *to those underlying the product liability-type analysis. . . . The rule, in any case, should not be invoked to bar well-established causes of actions in tort . . . .*" ( *Moransais, supra, 744 So.2d at p. 983*, fn. omitted, italics added.) The court in *Moransais* concluded by stressing that " '[*i*]*f the doctrine were genuinely applied to bar "all tort claims for economic losses without accompanying personal injury or property damage," the rule would wreak havoc on the common law of torts*.' " (*Ibid.*, italics added.)

Instead of expanding the reach of *Seely's* rule barring recovery of commercial expectation damages beyond its proper original and intended scope, and instead of reaching to distinguish and disapprove established California Court of Appeal decisions that appropriately have limited the scope of *Seely's* dictum in the context of serious building code violations, we should, like the Florida Supreme Court, recognize the appropriate limited reach of the *Seely* doctrine so that it does not preclude application of traditional rules of negligence permitting limited and rational recovery of correction costs in the circumstances here presented.

II.

Even outside the construction defect context, past California decisions do not support the majority's conclusion that the dictum in *Seely, supra, 63 Cal. 2d 9*, properly should be interpreted to bar a plaintiff in a negligence action from recovering damages in the absence of personal injury or physical property damage. [*663]

For example, in *Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal. 4th 965 [25 Cal. Rptr. 2d 550, 863 P.2d 795]* (*Potter*), a case in which the plaintiffs were negligently exposed to carcinogens in their drinking water, we approved the plaintiffs' recovery of costs for medical monitoring, prior to any actual manifestation of personal injury. ( *Id., at p. 974.*) Our reasoning in *Potter* in permitting the plaintiffs to recover the costs of medical monitoring is instructive here.

First, *Potter, supra, 6 Cal. 4th 965*, employing established tort analysis, allowed recovery of costs to monitor an increased risk of future illness even though there was no "present physical injury or illness" ( *id., at p. 974*), upon a showing that the need for such monitoring was *a reasonably necessary response to the defendant's negligent acts*. ( *Id., at p. 1009.*) The same reasoning applies here: Costs to remedy the most serious building code safety violations should be allowed to the extent they are a reasonably prudent and necessary response to the defendants' negligent acts, incurred to avoid or minimize the damage that will result from such negligence.

Second, *Potter, supra, 6 Cal. 4th 965*, approved the recovery of these limited damages, without regard to the majority's broad reading of the *Seely* dictum. *Potter* is obviously distinguishable from *Seely*, in that *Potter* addressed medical monitoring costs designed to guard against severe personal injury, whereas the *Seely* dictum was addressed to the question of allowing recovery of potentially limitless lost profits and lost commercial expectations. In the same fashion, the present case also is distinguishable from *Seely*--here we are concerned with repair costs designed to guard against severe personal injury and property damage caused by negligent construction of residential housing. *Seely's* dictum did not stand in the way of allowing monitoring costs in *Potter*, and it does not [**1150] stand in the way of allowing repair costs here.

Third, as plaintiffs observe in their briefs, and as *Potter, supra, 6 Cal. 4th 965*, stressed ( *id., at pp. 1005-1006*), *Civil Code section 3333* provides [***746] that a plaintiff may recover in negligence damages "for all the *detriment* proximately caused thereby" (italics added)--the statute imposes no requirement of a showing of present physical injury or property damage. [3] This statute and comparable provisions of the Restatement Second of Torts (§§ 7, 910, & 917) are at odds with the

majority's broad application of the *Seely* dictum and with its holding that, in the absence of present physical injury or [*664] property damage, costs to remedy the most serious building code safety violations conceded here are not recoverable in negligence.

3 That statute provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." ( *Civ. Code, § 3333.*)

Fourth, just as we acknowledged in *Potter, supra, 6 Cal. 4th 965*, with regard to the various policy reasons supporting recovery of medical monitoring costs in that case ( *id., at p. 1008*), here as well, policy factors relating to public safety, deterrence, mitigation of damages, economic efficiency, and "societal notions of fairness and elemental justice" (*ibid.*) all militate in favor of allowing the limited recovery proposed.

Finally, as was true with regard to the medical monitoring costs at issue in *Potter, supra, 6 Cal. 4th 965*, the policy factors supporting the conclusion that we should allow recovery of costs to repair the most serious safety code defects here at issue--considerations aimed at ensuring that known safety risks in our housing stock are avoided, or at least corrected--in this case militate in favor of adopting a "fund remedy" procedure that we described with approval in *Potter, supra, 6 Cal. 4th at page 1010*, footnote 28. [4]

4 Our opinion in *Potter* stated in this regard: "Various commentators and courts have suggested that creation of court-supervised funds to pay medical monitoring claims as they accrue, rather than the award of a lump-sum verdict, may be a more appropriate mechanism for compensating plaintiffs in a toxic exposure case. [Citation.] [P] In *Ayers* [*v. Jackson Tp. (1987) 106 N.J. 557 [525 A.2d 287, 314, 76 A.L.R.4th 571]]*, the court observed: 'Although conventional damage awards do not restrict plaintiffs in the use of money paid as compensatory damages, mass-exposure toxic tort cases involve public interests not present in conventional tort litigation. The public health interest is served by a fund mechanism that encourages regular medical monitoring for victims of toxic exposure.' [Citation.] Thus, in contrast to a lump-sum payment, a fund remedy will encourage plaintiffs to spend money to safeguard their health by not allowing them the option of spending the money for other purposes. The fund remedy will also assure that medical monitoring damages will be paid only to compensate for medical examinations and tests actually administered, thus serving to limit the liability of defendants to the amount of expenses actually incurred. (*Ibid.*) In turn, this should tend to reduce insurance costs, both to potential defendants and the general public alike." ( *Potter, supra, 6 Cal. 4th at p. 1010, fn. 28.*)

III.

As the majority implicitly concedes, the scope of *Seely's* dictum, *supra, 63 Cal. 2d at page 18*, has been limited in a variety of contexts by decisions allowing such recovery upon a proper showing based upon the familiar six-factor test set out in *Biakanja v. Irving (1958) 49 Cal. 2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]* (*Biakanja*) and *J'Aire Corp. v. Gregory (1979) 24 Cal. 3d 799 [157 Cal. Rptr. 407, 598 P.2d 60]* (*J'Aire*). In light of that authority, the majority finds it necessary to paraphrase the question before us as follows: "Does the law of negligence protect plaintiffs' economic interests in *having houses that fully comply with the building codes*, measured by the cost of repairs *or diminished value associated with noncompliance*, even [*665] though the asserted harm to those interests is unaccompanied by any injury to person or property?" (Maj. opn., [***747] *ante*, at p. 645, 101 Cal. Rptr. 2d at p. 732, 12 P.3d at 1137, italics added.)

By reformulating the question in this manner, the majority skews the inquiry and fails adequately to consider that even if a negligence [**1151] action cannot be maintained for the costs of remedying every minor building code violation, general common law negligence principles support a cause of action for the costs of correcting serious building code safety violations that pose a significant risk of death, serious personal injury, or considerable property damage if left unremedied. [5]

5 Although plaintiffs' complaint sought, among other things, damages for the diminution in value of their homes, plaintiffs' briefing and argument before this court make it quite clear that they have abandoned any such claim and that they *now* limit

their negligence claim regarding code violations that have not manifested themselves in physical injury or property damage to recovery of repair costs. Plaintiffs' joint opening brief states the issue as follows: "Can homeowners and a homeowners association . . . recover in negligence for the *cost to repair* violations of governing building codes . . . even though the violations have not yet caused physical property damage?" (Italics added.) This phrasing of the issue and this singular focus of recovery sought at this stage in the litigation is repeated throughout the briefing. Indeed, plaintiffs specifically assert, "*the measure of damages for negligent construction is limited to the cost of repair. Imaginative consequential damages are not applicable.*" (Italics added.) And plaintiffs also argue that defendants in this case should be responsible "only . . . for compliance with governing building codes" and "*will not be exposed to monetary damages beyond the cost of repair.*" Similarly, at oral argument, counsel for plaintiffs asserted that at this stage plaintiffs do not seek lost profits or any other such difficult-to-define form of damages, but instead, and only, funds necessary to address "very specific code violations for which specific repairs are designed and for which there is a known measure of damages"--namely, the specific "costs to repair code violations."

Thus, the matter in contention, at this point, is simply whether, with respect to code violations that have not manifested themselves in physical injury or property damage, we should recognize a limited negligence action for recovery of specific and definable repair costs. In my view it does not advance this inquiry for the majority to invoke repeatedly plaintiffs' now abandoned claim for damages relating to the diminished value of their homes.

In applying the traditional six-factor test, the majority determines with very little discussion that four of the six relevant factors set out in *Biakanja, supra, 49 Cal. 2d at page 650*, and *J'Aire, supra, 24 Cal. 3d at page 804*, support plaintiffs' right to sue in negligence for repair costs, but that two of the factors do not support a negligence action for costs of repair. The majority applies these factors out of their traditional order, and I shall do so here as well, addressing last the two assertedly problematic factors.

A.

*Factor (1): The extent to which the transaction was intended to affect plaintiffs*. The majority, in a single sentence, "assume[s] for argument's sake that the conduct of a person engaged in construction is 'intended to affect' [*666] all foreseeable purchasers of the property." (Maj. opn., *ante*, at p. 646.) It is unclear why the majority includes that qualification; this factor is quite clearly met, and is in fact established law, as the Court of Appeal--which ultimately agreed with the majority's conclusion that the repair costs sought by plaintiffs are *not* recoverable--readily acknowledged. The appellate court stated: "It is undisputed that the 162-unit residential condominium project at issue in the pending Provencal case was developed and built by [codefendant] Lyon. The subcontractors were also involved in the construction of Provencal. It is also undisputed that the Aas [plaintiffs'] [***748] single-family homes were developed and built by Lyon, and that Lyon subcontracted with several design and construction professionals to design and build the homes. [P] *These facts are sufficient to satisfy the first Biakanja factor under well-settled case law.*" (Italics added.) I believe the majority should acknowledge, and not minimize, plaintiffs' strong showing with regard to this factor.

B.

*Factor (4): The closeness of the connection between defendants' conduct and the injury suffered.* The majority also "assume[s] that a sufficiently 'close[] connection [exists] between . . . defendant's conduct' and the alleged defects." (Maj. opn., *ante*, at p. 647.) Again, the Court of Appeal expressed no hesitation [**1152] on this point, stating: "Lyon and subcontractors do not vigorously contend their conduct is remote to [plaintiffs'] alleged harm. Their alleged conduct is sufficiently connected to the alleged construction defects alleged in the [plaintiffs'] pleadings."

# TAB 2

LEXSEE 2 CAL.4TH 1254

# BANK OF THE WEST, Petitioner, v. THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent; INDUSTRIAL INDEMNITY COMPANY et al., Real Parties in Interest.

**No. S019556**

**SUPREME COURT OF CALIFORNIA**

***2 Cal. 4th 1254; 833 P.2d 545; 10 Cal. Rptr. 2d 538; 1992 Cal. LEXIS 3489; 61 U.S.L.W. 2102; 92 Cal. Daily Op. Service 6640; 92 Daily Journal DAR 10597***

**July 30, 1992, Decided**

**PRIOR HISTORY:** Superior Court of Contra Costa County, Nos. C88-04328, C88-04346 and C89-00665, Richard S. Flier, Judge.

**DISPOSITION:** The judgment of the Court of Appeal is reversed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court granted summary adjudication of issues in favor of a comprehensive liability insurer, declaring that provisions in a policy issued to a bank covering "damages" the insured must pay for injury arising out of "unfair competition" in the course of "advertising activities," did not cover restitutionary relief paid by the bank under *§ 17203* of the Unfair Business Practices Act (*Bus. & Prof. Code, § 17200 et seq.*). The claims paid by the bank were based on the inadequacy of disclosures to consumers and illegality of the terms of loans to finance automobile insurance premiums. (Superior Court of Contra Costa County, Nos. C88-04328, C88-04346 and C89-00665, Richard S. Flier, Judge.) The Court of Appeal, First Dist., Div. Four, No. A050298, granted the bank's petition for a writ of mandate and vacated the trial court's order.

The Supreme Court reversed the judgment of the Court of Appeal. The court held that insurance coverage for "advertising injury" due to "unfair competition" is limited to claims under the common law and excludes statutory claims; that the policy provision covered "damages," which are available for common law unfair competition, but not relief under *Bus. & Prof. Code, § 17203*, which provides for disgorgement or restitution. So read, the provision was not ambiguous and no construction in favor of the insured was called for. The court further held that the settlement payment represented disgorgement, since if it did not it would not have been for a violation of the act, and if not for such a violation, it could not have been for "unfair competition." The court also held that the claims were not based on "unfair competition" arising under "advertising activities" so as to be insurable under the policy. Although the bank advertised the loan program in question to insurance agents for customers desiring to pay insurance premiums in installments, consumers were not aware of the advertising activities. The policy provision required a causal connection between "advertising activities" and "advertising injury." A mere remote connection between the bank's advertisements and the lending practices resulting in the consumer claims did not give rise to coverage. (Opinion by Panelli, J., with Lucas, C. J., Arabian, Baxter and George, JJ., concurring. Separate concurring opinion by Mosk, J., with Kennard, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) (1c) (1d) Insurance Contracts and Coverage § 79--Risks Covered by Liability Insurance--Damages for Unfair Competition--Restitution Under Unfair Business Practices Act.** --The trial court properly

granted summary adjudication of issues in favor of a comprehensive liability insurer, declaring that provisions in a policy issued to a bank covering "damages" the insured must pay for injury arising out of "unfair competition" in the course of "advertising activities," did not cover restitutionary relief paid by the bank in settlement of a consumer class action alleging violations of the Unfair Business Practices Act (*Bus. & Prof. Code, § 17200 et seq.*). Insurance coverage for "advertising injury" due to "unfair competition" is limited to claims under the common law and excludes statutory claims; the provision covers "damages," which are available for common law unfair competition, but not by way of relief under *§ 17203* of the act, which provides for disgorgement or restitution. So read, the provision was not ambiguous and no construction in favor of the insured was called for. The settlement payment represented disgorgement, since if it did not it would not have been for a violation of the act, and if not for such a violation, it could not have been for "unfair competition." (Disapproving *United Farm Workers of America v. Superior Court (1975) 47 Cal.App.3d 334, 344 [120 Cal.Rptr. 904]*, to the extent it is inconsistent with the court's opinion.) [See 11 **Witkin,** Summary of Cal. Law (9th ed. 1990) Equity, § 95.]

**(2) Unfair Competition § 3--Unfair Practices--Purpose.** --The primary purpose of the Unfair Business Practices Act (*Bus. & Prof. Code, § 17200 et seq.*) is to extend to the entire consuming public the protection once afforded only to business competitors, since the common law tort of unfair competition, which required a showing of competitive injury, did not provide an effective remedy for consumers. Statutory "unfair competition" extends to all unfair and deceptive business practices, and thus cannot be equated with the common law definition of unfair competition.

**(3) Insurance Contracts and Coverage § 15--Interpretation Against Insurer--Ambiguity.** --Although insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply, including *Civ. Code, § 1649*, providing that ambiguous or uncertain terms are to be interpreted in the sense in which the promisor believed the promisee understood it. As applied to a promise of coverage in an insurance policy, the rule protects not the subjective beliefs of the insurer but, rather, the objectively reasonable expectations of the insured. Only if this rule does not resolve the ambiguity is it resolved against the insurer. Thus, a court faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy, since language in a contract must be construed in the context of the instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.

[See 1 **Witkin,** Summary of Cal. Law (9th ed. 1987) Contracts, § 699.]

**(4) Insurance Contracts and Coverage § 79--Risks Covered by Liability Insurance--Return of Wrongfully Acquired Property.** --One may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Such orders do not award "damages" as that term is used in insurance policies.

**(5) Unfair Competition § 10--Actions--Damages and Injunctive Relief.** --The purpose of *Bus. & Prof. Code, § 17203*, authorizing courts to make orders to restore to any person in interest any money or property which may have been acquired by unfair competition, is to deter future violations of the Unfair Business Practices Act (*Bus. & Prof. Code, § 17200 et seq.*) and to foreclose retention by the violator of its ill-gotten gains. If insurance coverage were available for monetary awards under the act, a person found to have violated the act would simply shift the loss to his or her insurer and, in effect, retain the proceeds of the unlawful conduct, a result inconsistent with the act's deterrent purpose. Insurable "damages" do not include claims for costs incurred in disgorging money that has been wrongfully acquired; hence there is no insurance coverage for such claims under *Bus. & Prof. Code, § 17203*.

**(6) Unfair Competition § 4--Acts Constituting Unfair Competition--Advertising--What Constitutes.** --Claims settled by a bank that were based on the inadequacy of disclosures to borrowers and illegality of the terms of the loans, did not amount to "unfair competition" arising under "advertising activities" so as to be insurable under a comprehensive liability policy. Although the bank advertised the loan program in question to insurance agents for customers desiring to pay insurance premiums in installments, consumers were not

aware of the advertising activities. The policy provision required a causal connection between "advertising activities" and "advertising injury." A mere remote connection between the bank's advertisements and the lending practices resulting in the consumer claims did not give rise to coverage.

**COUNSEL:** Severson & Werson, Jan T. Chilton and William L. Stern for Petitioner.

Martha Chuchill, Thomas & Porrozzo, Michael H. Porrozzo, Anderson, Kill, Olick & Oshinsky, Eugene R. Anderson, William G. Passannante, Cotchett, Illston & Pitre, Joseph W. Cotchett, Susan Illston, Marie Seth Weiner, Morgan, Ruby, Schofield, Franich & Fredkin, Allen J. Ruby, Lexie D. Schroeder, Thomas T. Anderson, Sherry N. Bass, David A. Beck, Morrison & Hecker, P. John Owen, Ann S. DuRoss, Richard J. Osterman, Jr., Joan E. Smiley, Nossaman, Guthner, Knox & Elliott, Kurt W. Melchior, Jared E. Peterson, Alison S. Hightower, Patricia Lee Connors, Wilson, Sonsini, Goodrich & Rosati, Denise M. Amantea, Richard F. Cauley, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Denis T. Rice, Helane L. Morrison, Kathryn M. Nelson, H. Joseph Escher III and Alan T. Foster as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Lawrence O. Monin, Michael A. Mathews, Andre Hassid, Crosby, Heafey, Roach & May, Raoul D. Kennedy, Peter W. Davis, Richard de Saint Phalle, Dolores A. Dalton, Paul H. Breslin, Frank Gilbert, Jesse I. Santana, James C. Martin and James H. Kallianis, Jr., for Real Parties in Interest.

Baker, Hostetler, McCutchen & Black, Philip K. Verleger, Donna R. Black, Martin J. McTigue, Jr., Proskauer, Rose, Goetz & Mendelsohn, Phyllis E. Andelin, McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner, James H. Wilkins, Robert K. Landen, Morton, Lulofs & Allen, Michael Charles Comyns, Horvitz & Levy, Ellis J. Horvitz, Peter Abrahams, Lisa Perrochet, Alan I. Widiss, Cummins & White, James D. Otto, Kent M. Bridwell, Haight, Brown & Bonesteel, Roy G. Weatherup, Lawrence A. Tabb, Greines, Martin, Stein & Richland, Irving H. Greines and Feris M. Greenberger as Amici Curiae on behalf of Real Parties in Interest.

**JUDGES:** Opinion by Panelli, J., with Lucas, C. J., Arabian, Baxter and George, JJ., concurring. Separate concurring opinion by Mosk, J., with Kennard, J., concurring.

**OPINION BY:** PANELLI, J.

**OPINION**

[*1258] [**547]

[***540] Comprehensive general liability (CGL) insurance policies generally include coverage for "advertising injury." This coverage, as ordinarily written, applies to "damages" the insured must pay for injury arising out of "unfair competition" occurring in the course of the insured's "advertising activities." We granted review to consider questions regarding the scope of coverage afforded by this standard policy language. As we shall explain, we hold that the CGL policy does not cover claims for advertising injury that arose under the Unfair Business Practices Act. ( *Bus. & Prof. Code, § 17200 et seq.* [1] )

1 All further references to statutes are to the Business and Professions Code except as noted or as the context may require.

FACTS AND PROCEDURAL HISTORY

Plaintiffs Industrial Indemnity Company and Industrial Insurance Company of Hawaii, Ltd. (collectively Industrial) have sued for a declaratory judgment determining their obligations under a CGL policy issued to Central Bank. Defendant Bank of the West is Central Bank's successor in interest. (This opinion refers to both entities collectively as the Bank.) Judgment has not been entered. However, by granting Industrial's motion for summary adjudication of issues the trial court has decided that language in the Bank's CGL policy relating to "advertising injury" does not give rise to coverage for the particular claims involved in this case. It is this order that we are reviewing. We are not called upon to decide any other coverage issues or any issues involving the duty to defend.

The coverage dispute arises out of the Bank's settlement of a consumer class action entitled Fallat v. Central Bank (Super. Ct., S.F., No. 865597). To summarize the relevant facts, the Bank developed a program to finance automobile insurance premiums [**548] [***541] for consumers who preferred to pay

in installments. The Bank did not advertise the so-called "Coast Program" directly to consumers. Instead, the Bank informed insurance agents that it was willing to lend money to finance premiums and that it would pay fees to agents who referred such business to the Bank. Nor did consumers apply directly to the Bank for loans. Instead, when a consumer expressed a desire to extend payment the insurance agent would ask for a down payment of 20 to 30 percent, obtain the consumer's power of attorney, and apply for a loan [*1259] in the consumer's name. Sometime later, the consumer would receive notice of the loan's acceptance by the Bank and disclosure of its terms. Until receiving such notice, many consumers were unaware both of the Coast Program's existence and that loans had in fact been made. Many were also unaware of the terms of the loans, which included interest at rates of over 126 percent, as well as substantial fees and penalties. Some consumers, upon receiving notification, sought to cancel their loans by paying the balance due. However, the Bank did not permit cancellation.

In their complaint against the Bank, the Fallat plaintiffs alleged violations of the federal Truth-in-Lending Act (*15 U.S.C. § 1601 et seq.*), the Unruh Act ( *Civ. Code, § 1801 et seq.*), the Unfair Business Practices Act (*§ 17200 et seq.*), and a state statute that prohibits excessive liquidated damages ( *Civ. Code, § 1671*). The Fallat plaintiffs also alleged that the loans were unconscionable and that the Bank had breached the covenant of good faith and fair dealing.

The case was removed to federal court, which remanded all but the federal claims. (*Fallat v. Central Bank* (N.D. Cal., No. C-86-6521 RFP).) On the Fallat plaintiffs' motion for partial summary judgment, the federal court held that the Bank had violated the Truth-in-Lending Act by miscalculating and misdisclosing the interest rate and by failing to give disclosures required by federal law before the loans were consummated. (See *15 U.S.C. § 1638*.) In its order, the court explained that the Bank's miscalculation of interest "resulted in an understatement of an already astronomical APR by over 20 percentage points." The court also found that the additional "error" of untimely disclosure "was built into the incentives given to insurance agents responsible for recommending the Coast Program to their clients." As the court explained, "[t]o the extent insurance agents' compensation is tied to their level of policy sales, such agents have a strong incentive to 'sell' a loan program like the Coast Program *without* making the required [Truth-in-Lending Act] disclosures that could jeopardize a potential sale."

Several months after the federal court ruled, the state court in Fallat addressed the parties' motions for summary adjudication of issues related to the state law claims. The court's order disposing of these motions eliminated the plaintiffs' claims under the Unruh Act ( *Civ. Code, § 1801 et seq.*) and the covenant of good faith and fair dealing but allowed the remaining claims to proceed.

The federal and state court rulings considerably narrowed the scope of the dispute between the Fallat plaintiffs and the Bank. Although the plaintiffs continued to seek injunctive and declaratory relief, the only remaining [*1260] claims under which plaintiffs sought to recover money were their claims under the Unfair Business Practices Act (*§ 17203*), the statute prohibiting excessive liquidated damages ( *Civ. Code, § 1671*), and the Truth-in-Lending Act (*15 U.S.C. § 1640*). In their complaint, the Fallat plaintiffs incorporated each of their claims into their request for relief under the Unfair Business Practices Act. Indeed, the Fallat plaintiffs' only demand for money, other than for punitive damages and attorneys' fees, was for "restitution ... of any and all amounts collected by defendants through their unlawful and unfair business practices ...." (Cf. *§ 17203* [authorizing such relief].)

It was in this posture that the Fallat case settled. Pursuant to a class- wide settlement agreement, the Bank paid the plaintiffs $ 500,000 and attorneys fees, and agreed to make several changes in the operation [**549] [***542] of its Coast Program. The settlement agreement did not characterize the $ 500,000 payment as attributable to any particular claim. However, in the parties' joint motion for approval of the settlement the Fallat plaintiffs' counsel expressed the opinion that $ 500,000 represented the amount that could be recovered either as the return of unlawful liquidated damages ( *Civ. Code, § 1671*) or as the maximum statutory recovery under the Truth-in-Lending Act (*15 U.S.C. § 1640(a)(2)(b)*).

At some point before the Fallat parties agreed to settle, the Bank began to assert that its CGL policy covered the claims in that action. Industrial responded by filing a complaint for declaratory judgment, asking the court to declare that the policy did not provide coverage. The Bank cross-complained for breach of the insurance

contract.

The ensuing litigation focused on a single theory of coverage: The Bank sought to prove that the amounts it had paid to the Fallat plaintiffs were "damages" for "unfair competition" that occurred in the course of the Bank's "advertising activities." To support its argument, the Bank looked to the statutory definition of "unfair competition" contained in the Unfair Business Practices Act. (*§ 17200.*) 2 Industrial, in contrast, sought to prove that the policy referred to the common law tort of unfair competition rather than to conduct prohibited by the act. Industrial also sought to prove that insurance was not available for restitutionary relief under the act,3 and that the Fallat plaintiffs' claims had not occurred "in the course of [the Bank's] advertising activities" within the meaning of the policy.

2 *Section 17200* provides:

"As used in this chapter, *unfair competition* shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." (Italics added.)

3 The only nonpunitive monetary relief available under the Unfair Business Practices Act is the form of restitution described in *section 17203*:

"Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. *The court may make such orders or judgments*, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or *as may be necessary to restore to any person in interest any money* or property, real or personal, *which may have been acquired by means of such unfair competition.*" (Italics added.)

[*1261] Industrial moved for summary adjudication of issues to obtain a ruling on the Bank's theory of coverage. The superior court granted the motion. In its order, the court decided the following issues in Industrial's favor, thus holding, in effect, that coverage for "advertising injury" did not include the Fallat plaintiffs' claims:

"1. The phrase 'unfair competition' in the policies insuring [the] Bank and issued by Industrial ... means the common law tort of unfair competition;

"2. The *Fallat* claim does not allege, and could not be amended to allege, the common law tort of unfair competition;

"3. The policies insuring [the] Bank issued by Industrial ... do not cover claims for equitable or restitutionary relief such as provided for in *Business and Professions Code Section 17203*; and

"4. The acts on which the *Fallat* claim was based did not occur in the course of [the] Bank's or the Coast Program's 'advertising activities' within the meaning of the policies referred to in paragraph 1."

When the Bank challenged this ruling in a petition for writ of mandate, the Court of Appeal found coverage and vacated the trial court's order. The court did not conclude that the Fallat plaintiffs had alleged common law claims for unfair competition. Instead, contrary to the weight of authority, the court held that the policy term "unfair competition" was ambiguous and could refer either to the common law or to conduct prohibited by the Unfair Business Practices Act. The court resolved the perceived ambiguity against Industrial.

[**550] [***543] In response to Industrial's further argument that insurable "damages" do not include the restoration of amounts obtained through violations of the Unfair Business Practices Act, the Court of Appeal concluded that the Fallat action could be viewed as seeking compensatory damages in addition to statutory restitution. Although the act does not authorize compensatory damages, the court believed that the law on this point was uncertain. The court also resolved this perceived uncertainty in the law against Industrial. Finally, the court held that the instances of "unfair competition" alleged in [*1262] the Fallat complaint had "occurred in the course of [the Bank's] advertising activities" within the meaning of the policy.

We granted Industrial's petition for review.

DISCUSSION

**(1a)** The ultimate question before us is whether language in the CGL policy concerning "advertising

injury" provides coverage for the claims asserted in the Fallat action and, thus, for the Bank's payment to settle such claims.

The relevant policy language provides: "The company [Industrial] will pay on behalf of the insured [the Bank] all sums which the insured shall become legally obligated to pay as *damages* because of ... *advertising injury* to which this insurance applies .... 'Advertising injury' means injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, *unfair competition*, or infringement of copyright, title or slogan." (Italics added.)

This language appears in a "Liability Extended Coverage Endorsement" attached to the Bank's CGL policy. Through various renewals, the policy was in effect from April 1, 1984, to April 1, 1986. The language of the endorsement generally follows that of a form drafted in 1973 by the Insurance Services Office, Inc. (ISO), an organization that develops standard policy forms for the insurance industry and collects statistical data and estimates risks relevant to the forms. (See generally *In re Insurance Antitrust Litigation (9th Cir. 1991) 938 F.2d 919*.) In 1986 ISO developed a revised CGL policy that replaced the term "unfair competition" with "style of doing business." However, several insurance companies continue to offer coverage under the older form and many coverage disputes under the older form, including this case, remain pending.

A. *The Policy Term "Unfair Competition" Does Not Refer to Conduct Prohibited by the Unfair Business Practices Act.*

The Court of Appeal, as already mentioned, held that the CGL policy's reference to "unfair competition" was ambiguous and could refer either to statutory or to common law claims. Industrial challenges this conclusion.

The Court of Appeal's decision in this case stands virtually alone among published opinions in holding that the CGL policy's standard language [*1263] covers claims under a state statute prohibiting unfair business practices. The authority against coverage for such claims is overwhelming. ( *Seaboard Sur. Co. v. Ralph Williams' N.W. Chrys. P., Inc. (1973) 81 Wn.2d 740, [504 P.2d 1139, 1140-1143]*; *Ruder & Finn Inc. v. Seaboard Sur. Co. (1981) 52 N.Y.2d 663 [439 N.Y.S.2d. 858, 422 N.E.2d. 518, 522]*; *Pine Top Ins. v. Public Util. D. 1 of Chelan Cty. (E.D.Wash. 1987) 676 F.Supp. 212, 215-217*; *Globe Indem. Co. v. First American State Bank (W.D.Wash. 1989) 720 F.Supp. 853, 855- 857*; *Westfield Ins. Co. v. TWT, Inc. (N.D.Cal. 1989) 723 F.Supp. 492, 496*; *Boggs v. Whitaker, Lipp & Helea, Inc. (1990) 56 Wn.App. 583 [784 P.2d 1273, 1275-1276]*; *Aetna Cas. & Sur. Co. v. Trans World Assur. Co. (N.D.Cal. 1990) 745 F.Supp. 1524, 1528- 1529*; *Tigera Group, Inc. v. Commerce & Industry Ins. (N.D.Cal. 1991) 753 F.Supp. 858, 859-861*; *Nationwide Mut. Ins. Co. v. Dynasty Solar, Inc. (N.D.Cal. 1990) 753 F.Supp. 853, 855-858*.)

[**551] [***544] In two published opinions, lower federal courts in the Ninth Circuit have found *a duty to defend* claims under the Unfair Business Practices Act. ( *American States Insurance Co. v. Canyon Creek (N.D.Cal. 1991) 786 F.Supp. 821, 827-828*; *Keating v. National Union Fire Ins. Co. (C.D.Cal. 1990) 754 F.Supp. 1431, 1435-1437, 1441*.) However, these holdings are against the clear weight of authority both generally and in the Ninth Circuit. (See the cases cited above.)

The majority of courts have concluded that the term "unfair competition" as used in policy language defining "advertising injury" refers to the common law tort of unfair competition rather than to conduct prohibited by unfair business practice statutes. As we shall explain, this conclusion substantially limits the scope of coverage.

The common law tort of unfair competition is generally thought to be synonymous with the act of "passing off" one's goods as those of another. The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection. (See generally 1 Callmann, Unfair Competition, Trademarks & Monopolies (4th ed. 1981) § 2.01-2.03.) According to some authorities, the tort also includes acts analogous to "passing off," such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market. (See Rest., Torts, § 711-743; see also 1 Callmann, *supra*, § 2.04.)

Expansion of legal remedies against deceptive business practices occurred not so much through the common law as through the enactment of statutes, particularly the Federal Trade Commission Act. (*15*

*U.S.C. § 45.*) Of particular importance was a 1938 amendment to the act, which expanded the [*1264] Federal Trade Commission's (FTC) preexisting jurisdiction over "unfair methods of competition" to include "unfair or deceptive acts or practices." (52 Stat. 111 (1938), amending *15 U.S.C. § 45.*) This amendment, which became a model for state regulatory statutes, gave the FTC jurisdiction over unfair business practices that harmed the public, whether or not such practices also implicated the interests of competitors. (See *FTC v. Sperry & Hutchinson Co. (1972) 405 U.S. 233, 239-244 [31 L.Ed.2d 170, 176-179, 92 S.Ct. 898.*) A host of so-called "little FTC Acts" followed, including California's Unfair Business Practices Act. (*§ 17200 et seq.*; see also Civ. Code, former § 3369.)

**(2)** The primary purpose of these statutes was to "extend[] to the entire consuming public the protection once afforded only to business competitors." ( *Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 109 [101 Cal.Rptr. 745, 496 P.2d 817]*, interpreting Civ. Code, former § 3369.) The common law tort of unfair competition, which required a showing of competitive injury, did not provide an effective remedy for consumers. (See *Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660]*; *Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at pp. 109-110.*) In contrast, statutory "unfair competition" extends to all unfair and deceptive business practices. For this reason, the statutory definition of "unfair competition" "cannot be equated with the common law definition ...." ( *Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at p. 109*, interpreting Civ. Code, former § 3369.)

**(1b)** The majority of published opinions, as already mentioned, hold that insurance coverage for "advertising injury" due to "unfair competition" is limited to claims under the common law and excludes statutory claims. The Bank takes issue with these holdings. **(3)** Because the CGL policy does not define "unfair competition," that term, according to the Bank, is ambiguous and must be construed against the insurer. (See *Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168].*)

The Bank has invoked this rule of construction too early in the interpretive process. While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation [**552] [***545] apply. (See *AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253]* (AIU).) The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. ( *Civ. Code, § 1636.*) If contractual language is clear and explicit, it governs. ( *Civ. Code, § 1638.*) On the other hand, "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor [*1265] believed, at the time of making it, that the promisee understood it." (*Id., § 1649*; see *AIU, supra, 51 Cal.3d at p. 822.*) This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the insured." ( *AIU, supra, at p. 822.*) Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. (See *AIU, supra, at p. 822.*)

In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. ( *Producers Dairy Delivery Co. v. Sentry Ins. Co. (1986) 41 Cal.3d 903, 916- 917* & fn. 7 [*226 Cal.Rptr. 558, 718 P.2d 920].*) This is because "*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*" ( *Id., at p. 916, fn. 7*, italics added; cf. *Civ. Code, § 1641.*)

**(1c)** It is obviously possible to argue that the term "unfair competition," in the abstract, might refer to statutory claims. As the Bank correctly observes, policy terms must be read in their "ordinary and popular sense" ( *Civ. Code, § 1644*; see also *AIU, supra, 51 Cal.3d at p. 822*; cf. *Reserve Ins. Co. v. Pisciotta (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764]*), and definitions of "unfair competition" in standard dictionaries generally include acts that harm the public as well as acts that harm competitors only. One dictionary, for example, defines "unfair competition" as "business competition effected by an act that is deceptive and in effect a fraud on the public or that otherwise violates the legal and equitable rights of a competitor or the public." (See Webster's Third New Internat. Dict. (unabridged ed. 1961) p. 2494; cf. Random House Dict. of the English Language (unabridged ed. 1979) p. 1549 [giving "unfair

competition" as a synonym for "unfair practices"].)

While the foregoing argument is probably correct as a matter of abstract philology, it is defective as a matter of policy interpretation because it disregards the context. The policy does not purport to cover "unfair competition" in the abstract; instead, it covers "*damages*" for "advertising injury" caused by "unfair competition." Read in this context, the term "unfair competition" can only refer to a civil wrong that can support an award of damages.

Damages are available for common law unfair competition (see generally 4 Callmann, *supra*, § 22.48-22.51) and for each of the other wrongs [*1266] enumerated in the CGL policy's advertising injury coverage (i.e., libel, slander, defamation, violation of right of privacy, and infringement of copyright, title or slogan).

In contrast, damages are not available under *section 17203*. ( *Dean Witter Reynolds, Inc. v. Superior Court (1989) 211 Cal.App.3d 758, 774 [259 Cal.Rptr. 789]*; *Industrial Indemnity Co. v. Superior Court (1989) 209 Cal.App.3d 1093, 1095- 1097 [257 Cal.Rptr. 655]*; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 95, p. 776; see also *Chern v. Bank of America (1976) 15 Cal.3d 866, 875 [127 Cal.Rptr. 110, 544 P.2d 1310]* [interpreting the nearly identical language of section 17535].) The only nonpunitive monetary relief available under the Unfair Business Practices Act is the disgorgement of money that has been [**553] [***546] wrongfully obtained or, in the language of the statute, an order "restor[ing] ... money ... which may have been acquired by means of ... unfair competition." (*§ 17203*; cf. § 17206, 17207 [penalties].)

The Bank argues that the term "damages" for insurance purposes includes virtually all forms of monetary relief, including disgorgement orders under *section 17203*. However, the argument is too broad. **(4)** It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Such orders do not award "damages" as that term is used in insurance policies. (See *Jaffe v. Cranford Ins. Co. (1985) 168 Cal.App.3d 930, 934-935 [214 Cal.Rptr. 567]*; *AIU, supra, 51 Cal.3d at p. 836*; see also *O'Neill Investigations v. Ill. Emp. Ins., etc. (Alaska 1981) 636 P.2d 1170, 1173-1177*; *Central Dauphin School v. American Cas. Co. (1981) 493 Pa. 254 [426 A.2d 94, 95-97, 21 A.L.R.4th 884]*; *Haines v. St. Paul Fire & Marine Ins. Co. (D.Md. 1977) 428 F.Supp. 435, 439-442*; *Seaboard Sur. Co. v. Ralph Williams' N.W. Chrys. P., Inc., supra, 504 P.2d at pp. 1140- 1143*.)

**(5)** To explain the conclusion that insurable damages do not include the costs of disgorgement under *section 17203*, it is necessary to review the scope and purpose of the Unfair Business Practices Act and its remedial provisions.

The Unfair Business Practices Act defines "unfair competition" as any "unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising ...." (*§ 17200*.) The Legislature intended this "sweeping language" to include " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ( *Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at pp. 111, 113*, citation omitted.) In drafting the act, the Legislature deliberately traded the attributes of tort [*1267] law for speed and administrative simplicity. As a result, to state a claim under the act one need not plead and prove the elements of a tort. Instead, one need only show that "members of the public are likely to be deceived." ( *Chern v. Bank of America, supra, 15 Cal.3d at p. 876*; see also *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d at p. 211*.)

*Section 17203*, which incorporates the broad, statutory definition of "unfair competition," permits "any court of competent jurisdiction" to enjoin "[a]ny person performing or proposing to perform an act of unfair competition ...." (*§ 17203*.) The section also authorizes courts to make such orders as "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." () The purpose of such orders is "to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains." ( *Fletcher v. Security Pacific National Bank (1979) 23 Cal.3d 442, 449 [153 Cal.Rptr. 28, 591 P.2d 51]* [interpreting the nearly identical language of section 17535]; see also *People v. Superior Court (Jayhill) (1973) 9 Cal.3d 283, 288-289* & fn. 3 *[107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191]*.) The Legislature considered this purpose so important that it authorized courts to order restitution without individualized proof of deception, reliance, and injury if necessary to prevent the use or employment of an unfair practice. ( *Committee on Children's Television, Inc. v.*

*General Foods Corp., supra, 35 Cal.3d at p. 211*; see also *Fletcher v. Security Pacific National Bank, supra, 23 Cal.3d at pp. 449-453*.)

If insurance coverage were available for monetary awards under the Unfair Business Practices Act, a person found to have violated the act would simply shift the loss to his insurer and, in effect, retain the proceeds of his unlawful conduct. Such a result would be inconsistent with the act's deterrent purpose. As we have previously explained, " '[t]o permit the [retention of even] a portion of the illicit profits, would impair the full impact of the deterrent [**554] [***547] force that is essential if adequate enforcement [of the law] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom.' " ( *Fletcher v. Security Pacific National Bank, supra, 23 Cal.3d at p. 451*, quoting *Securities & Exchange Com'n v. Golconda Mining Co. (S.D.N.Y. 1971) 327 F.Supp. 257, 259-260* [brackets in *Fletcher*].)

The Court of Appeal below, which found coverage for statutory unfair competition claims under *section 17203*, sacrificed the deterrent goal of the Unfair Business Practices Act to a rule of construction, i.e., the principle that insurance policies should be interpreted to maximize coverage. The sacrifice, [*1268] however, is unnecessary if one applies the rule that insurable damages do not include costs incurred in disgorging money that has been wrongfully acquired. This rule bars coverage for claims under *section 17203*.

This was the reasoning of the court that first addressed the issue that is now before us. ( *Seaboard Sur. Co. v. Ralph Williams' N.W. Chrys. P., Inc., supra, 504 P.2d 1139* (*Seaboard*).) The insured in *Seaboard*, an automobile dealer, had been sued by the Attorney General of Washington for violations of Washington's Consumer Protection Act. The Washington statute, like California's Unfair Business Practices Act, prohibited "unfair methods of competition and unfair or deceptive acts or practices" and authorized the court to award injunctive relief and disgorgement but not damages. The dealer's liability insurer sued for declaratory relief to establish that it had no duty to defend under policy language providing coverage for "unfair competition" that caused "advertising injury." The Supreme Court of Washington held that the insurer had no duty to defend because the action did not threaten the insured with a judgment for "damages" within the meaning of the policy. (*Id., at pp. 1140-1143*.)

The principle that underlies the *Seaboard* decision is recognized in California law. The leading case is *Jaffe v. Cranford Ins. Co., supra, 168 Cal.App.3d 930* (*Jaffe*). The insured in *Jaffe*, a psychiatrist, was prosecuted by the Attorney General for the fraudulent receipt of Medi-Cal payments. The insured's malpractice insurer refused to provide a defense in the criminal action. After the insured was acquitted, he sued the insurer for reimbursement of his defense costs. Observing that his policy covered "damages," the insured argued that one consequence of a conviction might have been an order requiring him to reimburse the state for Medi-Cal overpayments. (See *Welf. & Inst. Code, § 14172*.)

The *Jaffe* court rejected the insured's argument as dependent on an overly broad interpretation of the term "damages." As the court explained, " '[d]amages' describes a payment made to compensate a party for injuries suffered. [In contrast, the return of Medi-Cal overpayments] is more properly characterized as restitutionary rather than compensatory in nature. The defendant is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct. At least absent demonstrably unusual circumstances, we have doubts whether an insurance policy which purported to insure a party against payments of a restitutionary nature would comport with public policy. Although the concept of 'restitution' may have a broader meaning in other contexts, we limit our reference to it here to situations in which the defendant is required to restore to the plaintiff that which was wrongfully acquired." ( *Jaffe, supra, 168 Cal.App.3d at p. 935*.)

[*1269] This reasoning has also found acceptance in other jurisdictions. For example, in *O'Neill Investigations v. Ill. Emp. Ins., etc., supra, 636 P.2d 1170*, the Supreme Court of Alaska held that a debt collector's professional liability insurance did not cover a claim under that state's Unfair Trade Practices and Consumer Protection Act for the restoration of money acquired from consumers through unfair collection practices. (See *id., at pp. 1173-1177*.) In *Central Dauphin School v. American Cas.* [**555] [***548] *Co., supra, 426 A.2d 94, 95-97*, the Supreme Court of Pennsylvania held that a school district's liability insurance policy did not cover a claim by taxpayers for

the return of unlawfully collected taxes. Similarly, in *Haines v. St. Paul Fire & Marine Ins. Co., supra, 428 F.Supp. 435, 439-442*, the federal court for the District of Maryland held that a law firm's professional liability insurance did not cover an action by the Securities Exchange Commission that threatened the insured with a judgment requiring it to disgorge attorneys' fees; the action did not seek "damages" within the meaning of the insurance policy.

The public policy rationale that underlies these holdings, explicitly or implicitly, is this: When the law requires a wrongdoer to disgorge money or property acquired through a violation of the law, to permit the wrongdoer to transfer the cost of disgorgement to an insurer would eliminate the incentive for obeying the law. Otherwise, the wrongdoer would retain the proceeds of his illegal acts, merely shifting his loss to an insurer. (Cf. *Jaffe, supra, 168 Cal.App.3d at p. 935*; *Central Dauphin School v. American Cas. Co., supra, 426 A.2d at p. 96.*) [4]

4 The Bank argues that Industrial waived the "public policy" issue by failing to raise it below. To the contrary, Industrial has advanced this position throughout the litigation. Citing *Jaffe, supra, 168 Cal.App.3d 930*, as authority, Industrial argued in its motion for summary adjudication that "[c]laims for ... restitutionary relief ... such as authorized by *Sections 17200 et seq.* do *not* entail 'damages' under liability insurance policies." Industrial prevailed on this issue in the trial court and renewed it in the Court of Appeal, which discussed the issue in its opinion.

Upon close examination, the Bank's claim of "waiver" boils down to the observation that Industrial did not attach the "public policy" label to its argument.

The Bank does not argue that monetary relief under the Unfair Business Practices Act is not intended to serve the goal of deterrence. Instead, the Bank argues that insurance for statutory restitution is permissible because the holding in *Jaffe, supra, 168 Cal.App.3d 930*, did not survive this court's decision in *AIU, supra, 51 Cal.3d 807*. To the contrary, *AIU* confirms the holding in *Jaffe*.

The insured in *AIU*, who had allowed hazardous wastes to contaminate groundwater, was ordered to reimburse the government for its cleanup and response costs under the Comprehensive Environmental Response, Compensation, and Liability Act. (*42 U.S.C. § 9601 et seq.*) One of the questions [*1270] before us was whether the government's suit for reimbursement of cleanup costs was an action for "damages" within the meaning of a CGL policy. We held that the suit did seek "damages" because the judgment awarding reimbursement was analogous to a judgment awarding damages for injury to property, measured by the cost of restoring the property to its original condition. Under the applicable statutes, the government could have proceeded against the insured either by requiring the insured to take remedial action or by taking remedial action itself and suing for reimbursement. The government chose the latter alternative. ( *AIU, supra, 51 Cal.3d at pp. 829-837.*)

The insurer in *AIU* argued that the *Jaffe* rule barred coverage for reimbursement of cleanup costs because such costs were a form of "restitution" rather than "damages." However, we rejected the analogy to *Jaffe* because "[r]eimbursement of response costs ... is not restitutive in the narrow sense identified by *Jaffe* as inappropriate for insurance coverage." ( *AIU, supra, 51 Cal.3d at p. 836.*)

Contrary to the Bank's argument, *AIU* did not overrule *Jaffe* or hold that any award capable of bearing the "restitution" label is insurable as "damages." We did hold in *AIU* that insurable "damages" include monetary awards that represent compensation for harm to third parties, even if such awards bear the label "restitution." However, we were also careful to note prior holdings to the effect that, "as a matter of public policy, an insured's payment of certain types of restitution cannot be covered by insurance." ( *AIU, supra, 51 Cal.3d at p. 836.*) [**556] [***549] We mentioned two illustrations of the rule: *Jaffe, supra, 168 Cal.App.3d 930*, which held that liability insurance would not cover the insured's restitution of Medi-Cal overpayments, and *State Farm Fire & Cas. Co. v. Superior Court (1987) 191 Cal.App.3d 74 [236 Cal.Rptr. 216]*, which held that insurance would not cover the insured's payment of statutory restitution to the victims of crime. To emphasize the distinction between what is insurable and what is not, we noted that *Jaffe* bars coverage only in " 'situations in which *the defendant is required to restore to the plaintiff that which was wrongfully acquired.*' " ( *AIU, supra, 51 Cal.3d at p. 836*, quoting *Jaffe, supra, 168 Cal.App.3d at p. 935*, italics added.)

The Bank also contends that a rule of public policy barring coverage for actions under the Unfair Business Practices Act would contradict *Insurance Code section 533.5*. In this statute, the Legislature declared that "[n]o policy of insurance" shall provide "coverage" or "any duty to defend" in "any action or proceeding" brought under the Unfair Business Practices Act "by the Attorney General, any district attorney, any city prosecutor, or any [*1271] county counsel ...." While *section 533.5* thus bars insurance in statutory unfair competition actions brought by the government, the Bank argues that the section also authorizes, by implication, insurance in actions brought by private plaintiffs.

The argument is easily met. The history of *section 533.5* does not suggest that the Legislature gave any thought to the availability of insurance coverage in private actions under the Unfair Business Practices Act. As originally enacted, *section 533.5* did not even refer to the act. Instead, it barred coverage in all civil and criminal actions, whatever the theory of liability, brought by the Attorney General, a district attorney, or a city prosecutor. (Stats. 1988, ch. 489, § 1, p. 1896.) In 1990, the Legislature limited the statute's reach to criminal actions and actions under the Unfair Business Practices Act. (Stats. 1990, ch. 1512, § 1.)

This legislative history might support the inference that the Legislature has equated actions under the Unfair Business Practices Act with criminal actions, at least for insurance purposes. (Obviously, the comparison does not advance the Bank's argument for coverage.) However, the legislative history does not support the additional inference that the Legislature actually considered the availability of insurance coverage in actions brought by private plaintiffs. On that point the history is silent. Lacking relevant legislation, the question can only be resolved by applying the more general principles of law on which we rely.

**(1d)** It remains to be considered whether the amount that the Bank paid to settle the Fallat action represented disgorgement under the Unfair Business Practices Act. The Bank strenuously argues that its payment did not represent disgorgement because the superior court had already dismissed, prior to settlement, the plaintiffs' claims under the Unruh Act ( *Civ. Code, § 1801 et seq.*) for recovery of excessive finance charges. The claims still being asserted at the time of settlement were pursuant to a state statute prohibiting excessive liquidated damages ( *Civ. Code, § 1671*) and the Truth-in-Lending Act (*15 U.S.C. § 1638, 1640*). The Bank asserts that these claims amounted to claims of "unfair competition" under the CGL policy because the Fallat plaintiffs incorporated them into their claim for statutory unfair competition under *section 17203*, which also survived summary adjudication. 5

5 The superior court held that the Fallat complaint "[did] not allege, and could not be amended to allege, the *common law* tort of unfair competition." (Italics added.) This ruling followed the Bank's acquiescence in Industrial's argument that competitive injury is an element of common law unfair competition ( *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d at p. 209*; *Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at pp. 109-110*) and that the Fallat plaintiffs' claims did not implicate the interests of the Bank's competitors.

Now, the Bank argues that "competitive injury has been cast aside as a requirement for common-law unfair competition claims ...." However, common law cases cited by the Bank establish only that courts may enjoin the unfair use of trade names or the sale of confusingly similar goods. (E.g., *Academy of Motion Picture, etc. v. Benson (1940) 15 Cal.2d 685 [104 P.2d 650]*; *American Philatelic Soc. v. Claibourne (1935) 3 Cal.2d 689 [46 P.2d 135]*.)

[**557] [***550] The problem with this argument is that it contradicts the Bank's theory of coverage. To argue for coverage, the Bank takes the position that the policy [*1272] term "unfair competition" includes claims under the Unfair Business Practices Act. Next, to avoid the rule that disgorgement is not a form of "damages" for insurance purposes, the Bank argues that its settlement payment did not represent disgorgement. However, disgorgement is the only nonpunitive monetary remedy available under the Unfair Business Practices Act. (See *§ 17203* [authorizing relief "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition"].) Thus, if the settlement payment did not represent disgorgement, it could not have been for a violation of the act. However, if the payment was not for a violation of the act, it could not have been for "unfair competition" and, hence, was

not covered even under the Bank's broad definition of that term.

In summary, the Unfair Business Practices Act does not authorize an award of damages, and a definition of "unfair competition" that cannot support a claim for damages cannot reflect the objectively reasonable expectations of the insured. Accordingly, we hold that the policy term "unfair competition" does not refer to conduct that violates the Unfair Business Practices Act. [6] (*§ 17200 et seq.*) Because the context elucidates the meaning, there is no need to resort to the rule that ambiguities are resolved against the insurer. (See *AIU, supra, 51 Cal.3d at p. 822.*)

6 The Bank argues that coverage restricted to claims of common law unfair competition would be illusory because a plaintiff must show fraud to recover damages under that theory (e.g., *Wood v. Peffer (1942) 55 Cal.App.2d 116, 125-126 [130 P.2d 220]*) and because *Insurance Code section 533* bars insurance for losses "caused by the willful act of the insured." We see no occasion to address this argument. No common law claim is involved in this case and, regardless of the scope of coverage for such claims, it is clear that claims under the Unfair Business Practices Act are not covered.

The Court of Appeal reached a different conclusion on this point because it believed that the case law was "in conflict as to whether damages are recoverable under *section 17203*." However, we perceive no conflict. In *Chern v. Bank of America, supra, 15 Cal.3d 866*, we expressly held that damages were not available under section 17535, another section of the Unfair Business Practices Act that authorizes courts to order the restoration of money acquired through misleading advertising. (*15 Cal.3d at p. 875.*) The language of section 17535 is nearly identical to that of *section 17203*, [*1273] which was based on the former. In addition, the history of *section 17203* demonstrates that the Legislature expressly intended both sections to be "interpreted in the same way." (Assem. Com. of Research, Report on Assem. Bill. No. 3279 (1975-1976 Reg. Sess.), p. 1.) *Chern* effectively overruled the earlier, contrary holding in *United Farm Workers of America v. Superior Court (1975) 47 Cal.App.3d 334, 344 [120 Cal.Rptr. 904]*, which the Court of Appeal in the case before us read to create a "conflict."

It is true that this court once expressly declined to decide a litigant's claim for compensatory damages under the Unfair Business Practices Act. ( *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d at p. 215*; cf. *id.*, dis opn. of Bird, C. J., at pp. 223-228 [opining that damages should be available under the Unfair Business Practices Act].) However, in view of *Chern's* express holding that damages are not available under the act, the Court of Appeal read far too much into *Committee on Children's Television, Inc., supra.* Today, the point is too well settled to warrant extensive discussion. [7]

7 See *Dean Witter Reynolds, Inc. v. Superior Court, supra, 211 Cal.App.3d at page 774*; *Industrial Indemnity Co. v. Superior Court, supra, 209 Cal.App.3d at pages 1095-1097*; see also *E.W. French & Sons, Inc. v. General Portland Inc. (9th Cir. 1989) 885 F.2d 1392, 1401-1402*; *Little Oil Co., Inc. v. Atlantic Richfield Co. (9th Cir. 1988) 852 F.2d 441, 445*; *Kates v. Crocker National Bank (9th Cir. 1985) 776 F.2d 1396, 1398*; *Burt on Behalf of McDonnell Douglas v. Danforth (E.D.Mo. 1990) 742 F.Supp. 1043, 1052-1054*; *Xerox Corp. v. Apple Computer, Inc. (N.D.Cal. 1990) 734 F.Supp. 1542, 1550*, footnote 14; *Newport Components v. NEC Home Electronics (C.D.Cal. 1987) 671 F.Supp. 1525, 1550-1552*; *Meta- Film Associates, Inc. v. MCA, Inc. (C.D.Cal. 1984) 586 F.Supp. 1346, 1363*; see also 11 Witkin, Summary of Cal. Law, *supra*, at page 776.

*United Farm Workers of America v. Superior Court, supra, 47 Cal.App.3d 334*, is disapproved to the extent it is inconsistent with our opinion.

[**558] [***551] In conclusion, we hold that the superior court properly granted Industrial's motion for summary adjudication of issues on the theory that the *Fallat* complaint did not seek "damages" for "unfair competition" within the meaning of the CGL policy. The Court of Appeal's decision to the contrary was erroneous and must be reversed.

B. *The Fallat Plaintiffs' Injuries Did Not Occur "In the Course of" the Bank's Advertising Activities.*

**(6)** The Bank's CGL policy covers "damages" for "unfair competition" only if such conduct "occur[s] in the

course of the ... insured's advertising activities." Because the Bank did not advertise its Coast Program to consumers, Industrial argues that the unlawful lending practices alleged in the *Fallat* complaint did not occur in the course of the Bank's advertising activities.

While we have concluded that the Fallat complaint did not seek "damages" for "unfair competition" within the meaning of the CGL policy, other [*1274] questions about the scope of coverage for "advertising injury" continue to have substantial importance. For that reason we shall address, as an alternative, independent basis for our decision, the parties' arguments about the requisite connection between "advertising activities" and "advertising injury."

As already discussed, the state and federal court orders granting summary adjudication narrowed the Fallat plaintiffs' claims for monetary relief to a few claims based on unlawful lending practices. These included the claims under the Truth-in-Lending Act for failing to make timely and correct disclosures (*15 U.S.C. § 1638*, *1640*) and under a state statute that prohibits excessive liquidated damages ( *Civ. Code, § 1671*). In their complaint, the Fallat plaintiffs incorporated both of these claims into their request for disgorgement under the Unfair Business Practices Act. (*§ 17203*.) Arguing that the remaining claims thus amounted to "unfair competition," the Bank asserted a claim for coverage under the policy.

The trial court, in its order granting Industrial's motion for summary adjudication, found that "[t]he acts on which the *Fallat* claim was based did not occur in the course of [the Bank's] 'advertising activities' within the meaning of the policies ...." While the Bank advertised its Coast Program to insurance agents through representatives and trade journals, it does not appear that consumers were aware of these advertising activities. Thus, it is only with considerable difficulty that the Bank is able to argue that the alleged acts of "unfair competition" "occur[ed] in the course of ... [the Bank's] advertising activities."

In order to base a claim for coverage on advertising directed to insurance agents, the Bank must take the difficult position that the CGL policy does not require a causal connection between "advertising activities" and "advertising injury." Instead, according to the Bank, there is coverage if any connection, however remote, exists between the Bank's advertisements and the lending practices that harmed the Fallat plaintiffs, even if the advertisements, themselves, did not cause the harm.

This argument has not found acceptance in other jurisdictions. Those courts that have addressed the issue in published opinions have rejected coverage claims based on injuries that did not have a causal connection with the insured's advertising activities. ( *National Union Fire Ins. Co. v. Siliconix Inc. (N.D.Cal. 1989) 729 F.Supp. 77, 79-80*; *Meyers & Sons Corp. v. Zurich American Ins. (1989) 74 N.Y.2d 298 [546* [**559] [***552] *N.Y.S.2d. 818, 545 N.E.2d. 1206-1209]*; *Lazzara Oil Co. v. Columbia Casualty Co. (M.D.Fla. 1988) 683 F.Supp. 777, 780*; cf. *First Bank & Trust Co. v. N.H. Ins. Group (1983) 124 N.H. 417 [469 A.2d 1367, 1368]*.)

[*1275] The reasoning that supports the requirement of a causal connection is clear and persuasive: "Taken to its extreme, [the argument that no causal relationship is necessary] would lead to the conclusion that any harmful act, if it were advertised in some way, would fall under the grant of coverage merely because it was advertised. Under this rationale, for instance, injury due to a defective product which is sold as a result of advertising activity and which later harms a consumer may fall within the coverage grant. The definition of 'advertising' is quite broad and may encompass a great deal of activity. Thus, a great many acts may fall within the ambit of advertising, extending advertising injury coverage far beyond the reasonable expectations of the insured." ( *National Union Fire Ins. Co. v. Siliconix Inc., supra, 729 F.Supp. at p. 80*, fn. omitted.)

Under this rule, it has been held that a claim of patent infringement does not "occur[] in the course of ... advertising activities" within the meaning of the policy even though the insured advertises the infringing product, if the claim of infringement is based on the sale or importation of the product rather than its advertisement. ( *National Union Fire Ins. Co. v. Siliconix Inc., supra, 729 F.Supp. at p. 80* [sale]; *Meyers & Sons Corp. v. Zurich American Ins., supra*, 545 N.E.2d at pp. 1208-1209 [importation].) Similarly, there is no coverage for a bank's failure to provide an advertised service in a proper manner. ( *First Bank & Trust Co. v. N.H. Ins. Group, supra, 469 A.2d at p. 1368*.)

The single published opinion that the Bank cites as direct authority [8] to the contrary does not actually support

the Bank's position. ( *John Deere Ins. Co. v. Shamrock Industries, Inc. (D.Minn. 1988) 696 F.Supp. 434*, affd. on other grounds (8th Cir. 1991) *929 F.2d 413* (*John Deere*).) The insured in *John Deere* started a business in competition with his former employer. The employer filed suit, alleging that the employee's product infringed the employer's patents and constituted a misuse of its trade secrets. The employee tendered the claim to his CGL insurer, who refused to defend and sued for declaratory relief.

8 The Bank cites several cases that use or discuss the terms "advertising" and "in the course of" in other contexts. (E.g., *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d 197, 210* [concerning statutory prohibitions against false "advertising"]; *West American Ins. Co. v. California Mutual Ins. Co. (1987) 195 Cal.App.3d 314, 319-323 [240 Cal.Rptr. 540]* [concerning the requirement that injury must occur "in the course of" employment for workers' compensation insurance purposes].) These cases offer little help to a court interpreting a CGL policy.

One of the issues before the court was whether the alleged instances of patent infringement and misuse of trade secrets had "occurred in the course [*1276] of [the employee's] advertising activities" within the meaning of a CGL policy. ( *John Deere, supra, 696 F.Supp. at pp. 435-440.*) The insurer argued that it was the sale of the infringing product, rather than the employee's representations to potential purchasers, that constituted infringement and misuse of trade secrets. In opposition, the employee argued that the policy did not require a causal relationship between "advertising activities" and the alleged harm. The court did not resolve the issue. Instead, the court disposed of the case on the principle that claims "need only arguably fall within the coverage of the policies" to give rise to a duty to defend. ( *Id., at p. 440.*) This limited disposition is of no assistance to a court deciding a coverage dispute.

We believe that the apparent majority rule, under which "advertising injury" must have a causal connection with "advertising activities," best articulates the insured's objectively reasonable expectations about the scope of coverage. This conclusion is partly a matter of interpretation and partly a matter of common sense.

[**560] [***553] As a matter of interpretation, the context of the CGL policy strongly indicates the requirement of a causal connection. The other types of "advertising injury" enumerated in the policy often do have a causal connection with advertising. "Defamation," whether libel or slander, occurs upon publication. (See *Civ. Code, § 45, 46.*) "Violation of right of privacy," in the advertising context, is virtually synonymous with unwanted publicity. (See, e.g., *Civ. Code, § 3344.*) "Infringement of copyright, title or slogan" typically occurs upon unauthorized reproduction or distribution of the protected material. (See *17 U.S.C. § 106.*) Reading the term "unfair competition" in this context, an objectively reasonable insured would not conclude that the term "unfair competition" could refer to claims that bore no casual relationship to its advertising activities.

Moreover, as a matter of common sense, an objectively reasonable insured would not expect "advertising injury" coverage to extend as far as the Bank argues it should extend. Virtually every business that sells a product or service advertises, if only in the sense of making representations to potential customers. [9] If no causal relationship were required between "advertising activities" and "advertising injuries," then "advertising injury" coverage, [*1277] alone, would encompass most claims related to the insured's business. However, insureds generally expect to obtain such broad coverage, if at all, only by purchasing several forms of insurance, including coverage for "errors and omissions liability," "directors and officers liability," "completed operations and products liability," and/or other coverages available as part of a CGL policy. (See, e.g., *3 Cal. Insurance* Law (Matthew Bender 1990) pp. 43-55 et seq., 47-36 et seq., 49-80 et seq. [examples of policy forms for various coverages].)

9 Although we need not address the issue, we note that courts have disagreed on the question of what constitutes "advertising" for these purposes. Most of the published opinions hold that "advertising" means widespread promotional activities directed to the public at large. ( *International Ins. v. Florists' Mut. Ins. (1990) 201 Ill.App.3d 428 [147 Ill.Dec. 7, 559 N.E.2d 7, 9-10]*; *Playboy Enterprises v. St. Paul Fire & Marine Ins. (7th Cir. 1985) 769 F.2d 425, 428-429*; *Fox Chemical Co., Inc. v. Great Am. Ins. Co. (Minn. 1978) 264 N.W.2d 385, 386*; cf. *First Bank & Trust Co. v. N.H. Ins. Group, supra, 469 A.2d at p. 1368.*)

Of the published opinions, only the courts in *American States Insurance Co. v. Canyon Creek, supra, 786 F.Supp. 821, 828*, and *John Deere, supra, 696 F.Supp. 434, 440*, appear to have held that the term "advertising" can also encompass personal solicitations.

For these reasons, we hold that "advertising injury" must have a causal connection with the insured's "advertising activities" before there can be coverage. Applying this rule to the case before us, it is evident that the *Fallat* plaintiffs' claims were not so connected with the Bank's advertising activities. The only claims in the Fallat complaint that might be described as claims for "unfair competition," and which survived summary adjudication, were claims for the restoration of amounts allegedly acquired through violations of the Unfair Business Practices Act. (*§ 17203.*) These claims, which were based on the inadequacy of disclosures to consumers and the illegality of the terms of the loans, do not have a sufficient causal connection with advertisements directed solely to insurance agents.

Arguing against this conclusion, the Bank observes that its "advertising activities" included the payment of referral fees to insurance agents and that such fees, as the federal court found, gave the insurance agents an incentive to "sell" the Bank's loans without first making the disclosures required by federal law. [10] This contention, however, merely restates the argument that harm caused by a defective product or service is "advertising injury" simply because the product or service was incorrectly [**561] [***554] described. As already discussed, this argument has been rejected as an unreasonable extension of coverage. (See *National Union Fire Ins. Co. v. Siliconix Inc., supra, 729 F.Supp. at p. 80.*)

10 The Bank also argues that the loan application itself, which incorrectly disclosed the interest rate and other charges, can be viewed as a form of direct advertising to consumers. However, it was this document that, in many cases, was signed by the insurance agent rather than the customer pursuant to a power of attorney. As the federal court found, it was the Bank's practice to send the application to the consumer only after it had been accepted by the Bank and, thus, become the actual loan agreement. (See *ante*, pp. 1258-1259.)

We thus conclude, as did the superior court, that the acts underlying the Fallat plaintiffs' claims did not occur in the course of the Bank's advertising activities within the meaning of the CGL policy.

[*1278] DISPOSITION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**CONCUR BY:** MOSK, J.

**CONCUR**

I concur in the majority opinion insofar as it holds that disgorgement of sums obtained in violation of *section 17203 of the Business and Professions Code* is not "damages" for "advertising injury" caused by "unfair competition" under the policy. In my view, the opinion should conclude with the statement of this principle and its application to the facts of the case.

Discussion of the second point made by the majority, that there must be a causal connection between "advertising injury" and "advertising activities," and that such a connection was not established, is entirely unnecessary to the opinion. I express no view as to its validity.

Kennard, J., concurred.

# TAB 3

LEXSEE 38 CAL.3D 471

**GEORGE BECKER, Plaintiff and Appellant, v. IRM CORPORATION, Defendant and Respondent**

**S.F. No. 24618**

**Supreme Court of California**

*38 Cal. 3d 454*; *698 P.2d 116*; *213 Cal. Rptr. 213*; *1985 Cal. LEXIS 270*; *48 A.L.R.4th 601*; *CCH Prod. Liab. Rep. P10,522*

**April 29, 1985**

**PRIOR HISTORY:** Superior Court of Contra Costa County, No. 196265, Martin E. Rothenberg, Judge.

**DISPOSITION:** The judgment is reversed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A tenant was seriously injured when he slipped and fell against an untempered glass shower door in his rented apartment in a 36-unit apartment complex owned, operated, and maintained by defendant. The apartment complex had been built in 1962-1963 and was acquired by defendant in 1974. It was undisputed that the risk of serious injury would have been substantially reduced if the shower door had been made of tempered, rather than untempered, glass. The trial court granted summary judgment in favor of the landlord, dismissing the tenant's causes of action for negligence and strict liability. (Superior Court of Contra Costa County, No. 196265, Martin E. Rothenberg, Judge.)

The Supreme Court reversed, holding the trial court erred in granting summary judgment in favor of defendant as to each cause of action. The court held that a landlord engaged in the business of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant, in order to insure that the landlord who markets the product bears the cost of injuries resulting from the defects rather than the injured persons who are powerless to protect themselves. It further held the absence of a continuing business relationship between the builder and the landlord is not a factor warranting denial of strict liability of the landlord. The landlord's duty to inspect for dangerous conditions in the exercise of due care could properly be found in the instant case and lack of awareness of the dangerous condition did not necessarily preclude liability for negligence. (Opinion by Broussard, J., with Kaus, Reynoso and Grodin, JJ., concurring. Separate concurring opinion by Bird, C. J. Separate concurring and dissenting opinion by Lucas, J., with Mosk, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Summary Judgment § 3--Propriety.** --The summary judgment procedure is drastic and should be used with caution so that it will not become a substitute for a full trial. A summary judgment is proper only if the affidavits of the moving party would be sufficient to support a judgment in his favor and doubts as to the merits of the motion should be resolved in favor of the party opposing the motion.

**(2) Products Liability § 38--Strict Liability in Tort--Persons Liable--Manufacturers and Sellers.** --A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.

**(3) Products Liability § 32--Strict Liability in Tort--Stream of Commerce.** --The stream of commerce

approach to strict liability in tort extends liability to all those who are a part of the overall producing and marketing enterprise that should bear the cost of injuries from defective products.

**(4a) (4b) Landlord and Tenant § 74--Possession and Use of Premises--Injuries to Tenants, Employees and Occupants--Duties and Liabilities of Landlord--Strict Liability--Latent Defects.** --A landlord engaged in the business of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant. Accordingly, in an action by a tenant against the owner of a 36-unit apartment building for injuries sustained when the tenant slipped and fell against an untempered glass shower door in his apartment, the trial court erred in granting the landlord's motion for summary judgment on a strict liability cause of action on the asserted ground a landlord is not liable to a tenant for a latent defect of the rented premises absent concealment of a known danger or an express contractual or statutory duty to repair.

**(5) Landlord and Tenant § 52--Possession and Use of Premises--Covenants by Lessor.** --Absent disclosure of defects, a landlord in renting premises makes an implied representation that the premises are fit for use as a dwelling and the representation is ordinarily indispensable to the lease.

**(6) Products Liability § 37--Strict Liability in Tort--Persons Liable--Landlord--Purchase of Existing Building--Latent Defects.** --A landlord who purchases an existing building which is not new is not exempt from strict liability in tort for latent defects. Since a continuing business relationship is not essential to imposition of strict liability, and since the paramount policy of the strict products liability rule is the spreading throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects, the absence of a continuing business relationship between builder and landlord is not a factor warranting denial of strict liability of the landlord for latent defects. Landlords are an integral part of the enterprise of producing and marketing of rental housing, and the cost of protecting tenants is an appropriate cost of the enterprise.

**(7) Landlord and Tenant § 64--Possession and Use of Premises--Injuries to Tenants, Employees and Occupants--Duties and Liabilities of Landlord--Negligence.** --The fundamental principle of negligence liability (*Civ. Code, § 1714, subd. (a)*), is applicable to a landlord's liability to a tenant, and the landlord owes a tenant a duty of reasonable care in providing and maintaining the rented premises in a safe condition. Accordingly, a landlord in caring for his property must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect.

**(8) Landlord and Tenant § 74--Possession and Use of Premises--Injuries to Tenants, Employees and Occupants--Duties and Liabilities of Landlord--Negligence--Latent Defect.** --Where a tenant sustained injuries when he slipped and fell against an untempered glass shower door in his apartment in a 36-unit building which had been purchased by the landlord long after it was built, the landlord's lack of knowledge of the defective condition or of prior accidents did not relieve him of his duty to inspect for dangerous conditions in the exercise of due care, and his lack of awareness of the dangerous condition did not necessarily preclude liability although he was chargeable only with those matters a reasonable inspection would have disclosed. Maintenance of rental property in a safe and habitable condition is the primary responsibility of the landlord, and the mere fact that a particular kind of an accident has not happened before does not show that such accident is one which might not reasonably have been anticipated. *Civ. Code, § 1954*, limiting the landlord's right to enter a rented dwelling unit, did not bar the landlord's duty to inspect.

**COUNSEL:** Meyer & Mitchell and Jack P. Dougherty for Plaintiff and Appellant.

Leonard Sacks, Edwin Train Caldwell, McNamara, Houston, Dodge, McClure & Ney and Edward Kelly Shinnick as Amici Curiae on behalf of Plaintiff and Appellant.

John P. Caudle, Robert W. Brower and Kincaid, Gianunzio, Caudle & Hubert for Defendant and Respondent.

Rogers, Joseph, O'Donnell & Quinn, Joseph W. Rogers, Jr., Nance F. Becker and Jon D. Smock as Amici Curiae on behalf of Defendant and Respondent.

**JUDGES:** Opinion by Broussard, J., with Kaus, Reynoso

and Grodin, JJ., concurring. Separate concurring opinion by Bird, C. J. Separate concurring and dissenting opinion by Lucas, J., with Mosk, J., concurring.

**OPINION BY:** BROUSSARD

**OPINION**

[*457] [**117] [***214] In this personal injury action plaintiff's complaint asserted causes of action of strict liability and negligence against defendant landlord. Defendant moved for summary judgment urging that a landlord is not liable to a tenant for a latent defect of the rented premises absent concealment of a known danger or an expressed contractual or statutory duty to repair. The trial court granted the motion and denied a motion for reconsideration. Plaintiff appeals. [1]

1 We have been advised that while the case was pending in this court plaintiff settled with the builder and a door assembler and installer for $ 150,000 plus $ 50,000 in the event plaintiff is unsuccessful against the remaining defendants. Apparently, the case remains pending in the trial court against a component part supplier. Defendant landlord will be referred to as defendant herein.

We have concluded that the trial court erred as to both causes of action.

The complaint alleged that plaintiff was injured when he slipped and fell against the frosted glass shower door in the apartment he leased from defendant. The door was made of untempered glass. It broke and severely lacerated his arm. It is undisputed that the risk of serious injury would have been substantially reduced if the shower door had been made of tempered glass rather than untempered glass.

Defendant's affidavits in support of the motion for summary judgment may be summarized as follows: Plaintiff's apartment is part of a 36-unit apartment complex built in 1962 and 1963 and acquired by defendant in [*458] 1974. Prior to the acquisition, two officers of defendant walked through most of the apartments and observed that all of the shower doors were of frosted glass and appeared to be the same. The officials, one of whom managed the property from the time of its acquisition, stated that prior to plaintiff's accident in 1978 there were no accidents involving the shower doors and that they were not advised [**118] [***215] that any of the shower doors were made of untempered glass. They first learned that some of the shower doors were of untempered glass after the accident. Their inspection of shower doors after the accident provided "no visible difference between the tempered and untempered glass in terms of visible appearance."

Defendant's maintenance man stated that after the accident he examined the glass doors, and that 31 of the doors with untempered glass were replaced by him. He also stated that in looking for the untempered glass shower doors "there was no way that a layperson could tell any difference by simply looking at the shower doors. The only way that I was able to differentiate . . . was by looking for a very small mark in the corner of each piece of glass."

Plaintiff did not file affidavits in opposition to defendant's.

**(1)** The summary judgment procedure is drastic and should be used with caution so that it will not become a substitute for a full trial. A summary judgment is proper only if the affidavits of the moving party would be sufficient to support a judgment in his favor and doubts as to the merits of the motion should be resolved in favor of the party opposing the motion. ( *Rowland v. Christian (1968) 69 Cal.2d 108, 111 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].*)

Strict Liability

**(2)** In *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]*, we established the rule: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. Recognized first in the case of unwholesome food products, such liability has now been extended to a variety of other products that create as great or greater hazards if defective. [Citations.]" The court recognized that the cases imposing strict liability had "usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff." (*59 Cal.2d at p. 63.*) The justification for departing from warranty theory and for establishing a doctrine of strict liability in tort was the recognition that the [*459] liability was imposed by law

and the refusal to permit the manufacturer to define the scope of its own liability for defective products. (*Ibid.*)

Our concern was not that warranty law failed to adequately define the manufacturer's duty but that the "'intricacies of the law of sales'" applicable to commercial transactions might defeat the obvious representation of safety for intended use made by the manufacturer. ( *Id., at pp. 63-64.*) In declining to discuss the basis of the strict liability, *Greenman* pointed out that the basis of it had been fully articulated, citing to the classical concurring opinion in *Escola v. Coca Cola Bottling Co. (1944) 24 Cal.2d 453, 461 [150 P.2d 436]*. (*Id., at p. 63.*) In the concurring opinion in *Escola*, Justice Traynor pointed out: "The retailer, even though not equipped to test a product, is under an absolute liability to his customer, for the implied warranties of fitness for proposed use and merchantable quality include a warranty of safety of the product. [Citations.]" (*24 Cal.2d at p. 464.*) It was also pointed out that the retailer should not bear the burden of his warranty alone but that he could recoup any losses by means of the warranty of safety attending the wholesaler's or manufacturer's sale to him. (*Ibid.*)

*Greenman* also noted that the purpose of strict liability in tort is "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*59 Cal.2d at p. 63*; see *Daly v. General Motors Corp. (1978) 20 Cal.3d 725, 732-733, 736 [144 Cal.Rptr. 380, 575 P.2d 1162].*)

[**119] [***216] **(3)** We follow a stream of commerce approach to strict liability in tort and extend liability to all those who are part of the "overall producing and marketing enterprise that should bear the cost of injuries from defective products." ( *Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 262* et seq. [*37 Cal.Rptr. 896, 391 P.2d 168].*) The doctrine of strict liability in tort has been applied not only to manufacturers but to the various links in the commercial marketing chain including a retailer (*id.*), a wholesale-retail distributor ( *Barth v. B.F. Goodrich Tire Co. (1968) 265 Cal.App.2d 228, 251* et seq. [*71 Cal.Rptr. 306]*), personal property lessors and bailors ( *Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 251-253 [85 Cal.Rptr. 178, 466 P.2d 722]*), and a licensor of personalty ( *Garcia v. Halsett (1970) 3 Cal.App.3d 319, 324-326 [82 Cal.Rptr. 420]*). In holding that strict liability in tort was applicable to lessors and bailors in *Price v. Shell Oil Co., supra, 2 Cal.3d at page 254*, it was pointed out that strict liability does not apply to isolated transactions such as the sale of a single lot.

Application of warranty doctrine has not been limited to those engaged in commerce in personalty but has been applied where appropriate to those [*460] engaged in the real estate business. Traditionally, the courts applied the doctrine of caveat emptor with the buyer assuming the risk on quality unless there was express warranty, fraud or misrepresentation. (E.g., *Gustafson v. Dunman, Inc. (1962) 204 Cal.App.2d 10, 13 [22 Cal.Rptr. 161].*)

However, the courts have recognized that a contract to build is in effect one of material and labor, that implied warranties are not limited to sales transactions, and that building contracts give rise to a warranty of merchantability and suitability for ordinary use. ( *Aced v. Hobbs-Sesack Plumbing Co. (1961) 55 Cal.2d 573, 580-583 [12 Cal.Rptr. 257, 360 P.2d 897]*; *Pollard v. Saxe & Yolles Dev. Co. (1974) 12 Cal.3d 374, 378 [115 Cal.Rptr. 648, 525 P.2d 88]*; *Green v. Superior Court (1974) 10 Cal.3d 616, 626 [111 Cal.Rptr. 704, 517 P.2d 1168].*) And in *Pollard v. Saxe & Yolles Dev. Co., supra, 12 Cal.3d 374, 377-380*, it was held that an implied warranty of quality attaches to the sale of new construction. The court pointed out that the doctrine of implied warranty in a sales contract is based on the actual and presumed knowledge of the seller, reliance on the seller's skill and judgment, and the ordinary expectations of the parties. The court reasoned that "the builder or seller of new construction -- not unlike the manufacturer or merchandiser of personalty -- makes implied representations, ordinarily indispensable to the sale, that the builder has used reasonable skill and judgment in constructing the building. On the other hand, the purchaser does not usually possess the knowledge of the builder and is unable to fully examine a completed house and its components without disturbing the finished product." (*12 Cal.3d at p. 379.*) The court concluded that "builders and sellers of new construction should be held to what is impliedly represented -- that the completed structure was designed and constructed in a reasonably workmanlike manner." ( *Id. at p. 380.*)

Similarly, application of strict liability in tort has not been limited to those engaged in commerce in personalty but has been applied where appropriate to those engaged

in real estate businesses who impliedly represent the quality of their product. In *Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749]*, a builder who mass-produced homes was held strictly liable when the heating system placed in a home failed. The court relied upon *Schipper v. Levitt & Sons, Inc. (1965) 44 N.J. 70 [207 A.2d 314, 325-326]*, where the court pointed out that when in our modern society a person purchases a tract house from an advertised model, he relies upon the skill of the developer and the implied representation that the house will be erected in a reasonably workmanlike manner and reasonably fit for habitation, that the purchaser ordinarily does not have the means to protect himself either by hiring [**120] [***217] experts to supervise and inspect or by provision in the deed, and that the public interest dictates that the cost of injury from defects should be borne by the developer who created the danger [*461] and who is in a better economic position to bear the loss rather than the injured party who relied on the developer's skill and implied representation. In *Avner v. Longridge Estates (1969) 272 Cal.App.2d 607, 615 [77 Cal.Rptr. 633]*, it was held that a manufacturer of a residential lot may be held strictly liable in tort for damages suffered by the owner as the result of defect in the manufacturing process causing subsidence.

A similar development appears with respect to the landlord-tenant relationship. The earlier legal concepts regarded the lease as an equivalent to a sale of the premises for the term and under traditional common law rules the landlord owed no duty to place leased premises in a habitable condition and no obligation to repair absent an agreement. ( *Green v. Superior Court (1974) 10 Cal.3d 616, 622 [111 Cal.Rptr. 704, 517 P.2d 1168]*; *McNally v. Ward (1961) 192 Cal.App.2d 871, 878 [14 Cal.Rptr. 260]*.) "The common law placed the risk on the tenant as to whether the condition of the leased property made it unsuitable for the use contemplated by the parties. In recent years, the definite judicial trend has been in the direction of increasing the responsibility of the landlord, in the absence of a valid contrary agreement, to provide the tenant with property in a condition suitable for the use contemplated by the parties. This judicial trend has been supported by the statutes that deal with this problem. This judicial and statutory trend reflects a view that no one should be allowed or forced to live in unsafe and unhealthy housing." (Rest. 2d Property, Landlord and Tenant, ch. 5, introductory note, p. 150.)

The Restatement draws a distinction as to defective conditions in leased dwellings existing at the time of the lease and those arising thereafter. In the former situation the tenant may recover damages in the absence of lessor fault while in the latter damages are recoverable only if the landlord is at fault. (Compare *id.*, § 5.1, subd. (2)(a), pp. 168-169 with §§ 5.2, subd. (2) (a), p. 184, and 5.4, subd. (2)(a), pp. 194-195.)

Departures from the traditional common law rule applicable to landlords evolved in California both by statute and judicial decision. *Civil Code section 1941* requires that the lessor of a building intended for use as a dwelling put it in fit condition for such use and repair all subsequent dilapidations. However, the tenant's remedies for violation of the statute are limited to the making of necessary repairs and deducting costs from one month's rent, or to abandon the premises with discharge from rental obligations. (*Civ. Code, § 1942, subd. (a)*.) And the landlord's duty does not arise if the tenant has breached certain of his obligations relating to maintenance of the premises. (*Id.*, § 1941.2.) An agreement by the lessee waiving his rights under *section 1941* is void as contrary to public policy except that the lessee [*462] may agree as part of the rental to improve, repair, or maintain stipulated portions of the dwelling. (*Id.*, see § 1942.1.)

Pointing out that the traditional common law rule that the landlord had no duty to make the dwelling habitable arose in the agrarianism of the Middle Ages and is incompatible with contemporary social conditions and modern legal values, California courts have recognized that a lease for a dwelling contains an implied warranty of habitability. ( *Hinson v. Delis (1972) 26 Cal.App.3d 62, 68-71 [102 Cal.Rptr. 661]*; *Green v. Superior Court, supra, 10 Cal.3d 616, 622* et seq.; *Knight v. Hallsthammar (1981) 29 Cal.3d 46, 51-53 [171 Cal.Rptr. 707, 623 P.2d 268]*.) In *Green*, the court reasoned that the typical city dweller leasing an apartment cannot realistically be viewed as merely acquiring an interest in land but rather contracts for a place to live, that modern apartment buildings are complex, difficult and expensive to repair and adequate inspection by tenants is a virtual impossibility, that repairs will often be outside the reach of abilities or finances of tenants, that the scarcity of adequate low-cost housing has left tenants with little [**121] [***218] bargaining power and rendered the common law remedies inadequate, and that the widespread enactment of comprehensive housing codes

show that public policy compels landlords to bear "the primary responsibility for maintaining safe, clean and habitable housing in our state." (*10 Cal.3d at pp. 623-628.*)

*Green* analogized to the parallel dramatic changes in the law of commercial transactions where modern decisions have recognized that the consumer in an industrial society should be entitled to rely on the skill of the supplier to assure that goods and services are of adequate quality and, discarding the caveat emptor approach, have implied a warranty of merchantability and fitness. Pointing out that the modern urban tenant is in the same position as any normal consumer of goods, it was concluded that a tenant may reasonably expect that the product purchased is fit as a living unit and that since the lease specifies a term the tenant may reasonably expect that the premises will be fit for habitation for the term. (*10 Cal.3d at p. 627.*)

*Green* held that breach of the implied warranty of habitability may be urged as a defense in an unlawful detainer proceeding and that in such cases the court could determine that the breach warranted a partial or total reduction in rent. (*10 Cal.3d at p. 631* et seq.) Neither *Green* nor our subsequent decision in *Knight v. Hallsthammar, supra, 29 Cal.3d 46*, discussed whether or to what extent breach of the implied warranty of habitability might provide a basis for recovery of tort damages for injuries caused by the breach. 2

2 As will appear, subsequent Court of Appeal cases have considered this issue.

[*463] Developments in the law of landlord liability for injuries due to defective condition of the demised premises have not lagged far behind. The traditional common law rule was that a landlord is not liable to the tenant for injuries due to a defective condition or faulty construction of the demised premises in the absence of fraud, concealment or covenant in the lease. (E.g., *Del Pino v. Gualtieri (1968) 265 Cal.App.2d 912, 919-920 [71 Cal.Rptr. 716]*; *Forrester v. Hoover Hotel & Inv. Co. (1948) 87 Cal.App.2d 226, 232 [196 P.2d 825].*) The rule was not only based on traditional property concepts and caveat emptor but also on the landlord's lack of possession and control. (E.g., *Brennan v. Cockrell Investments, Inc. (1973) 35 Cal.App.3d 796, 799-801 [111 Cal.Rptr. 122].*) A number of exceptions have developed to the rule of landlord nonliability -- where the landlord voluntarily undertakes to repair, where the landlord had knowledge of defects, where a safety law was violated, where the landlord retained a part of the premises for common use, and where the lease was for a semipublic purpose. (3 Witkin, Summary of Cal. Law (8th ed. 1973) pp. 2135-2136.)

Strict liability for the conditions of the demised premises has been applied to landlords. Prior to *Greenman*, it was held that where a landlord represented that a wall-bed was safe, secure and in fit condition at the time of the letting, the plaintiff could maintain an action based on the express warranty. ( *Shattuck v. St. Francis Hotel & Apts. (1936) 7 Cal.2d 358, 360-361 [60 P.2d 855].*) Also, prior to *Greenman*, it was held that a lessee could recover for breach of an implied warranty of fitness for use when a door to which a folding bed was attached fell and injured him. ( *Fisher v. Pennington (1931) 116 Cal.App. 248, 249-251 [2 P.2d 518].*) *Fisher* was followed in *Charleville v. Metropolitan Trust Co. (1934) 136 Cal.App. 349, 355 [29 P.2d 241]* which also involved a folding bed and *Hunter v. Freeman (1951) 105 Cal.App.2d 129, 131* et seq. [*233 P.2d 65]*, involving an explosion of a detachable heater. In all four cases, the accident occurred shortly after the tenant went into possession, and it was also held that the warranty liability was limited to "the condition of the premises at the beginning of the term and not to conditions which, unknown to the lessor, subsequently arise." ( *Forrester v. Hoover* [**122] [***219] *Hotel & Inv. Co., supra, 87 Cal.App.2d 226, 232 [196 P.2d 825].*) 3 Each of the above cases involved a furnished apartment and the accident was arguably attributable to the furnishings as well as the condition of the demised premises.

3 *Stowe v. Fritzie Hotels, Inc. (1955) 44 Cal.2d 416, 424 [282 P.2d 890]*, stated that *Forrester* and *Hunter* disapproved a statement in *Fisher* that the landlord of a furnished apartment warrants the safety of the premises and the furnishings to the same extent as an innkeeper. The citation to *Forrester* and *Hunter* reflects approval of the limited implied warranty recognized in the former case and applied in the latter of a warranty of the condition of the premises at the beginning of the term. Thus, *Stowe* should not be read as rejecting implied warranties by landlords generally but only the equation of such warranties to an innkeeper's warranties.

[*464] Subsequent to *Greenman*, strict liability in

tort was applied to landlords for injuries to tenants in *Fakhoury v. Magner (1972) 25 Cal.App.3d 58, 62-63 [101 Cal.Rptr. 473]* and *Golden v. Conway (1976) 55 Cal.App.3d 948, 960-963 [128 Cal.Rptr. 69]*. In *Fakhoury*, a couch in a furnished apartment collapsed, and the court held that the landlord is strictly liable in tort for defective furniture, pointing out that the liability was not for defective premises. (*25 Cal.App.3d at p. 63.*) In *Golden*, the landlord employed a contractor to install a heater, and because of defective manufacture or installation there was a fire. Although acknowledging the distinction made in *Fakhoury* between defective fixtures and defective furniture, the court rejected it and held that the landlord engaged in the business of leasing property is strictly liable in tort when he equips the premises with an appliance which proves to have defects causing injury. (*55 Cal.App.3d at pp. 960-963.*) Defendant points out that *Fakhoury* differs from the instant case because injury resulted from defective personalty rather than the condition of the premises and that *Golden* differs because the landlord installed the heater whereas the shower door was apparently installed by the builder.

**(4a)** We are satisfied that the rationale of the foregoing cases, establishing the duties of a landlord and the doctrine of strict liability in tort, requires us to conclude that a landlord engaged in the business of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant. [4] It is clear that landlords are part of the "overall producing and marketing enterprise" that makes housing accommodations available to renters. (Cf. *Vandermark v. Ford Motor Co., supra, 61 Cal.2d at p. 262*; *Green v. Superior Court, supra, 10 Cal.3d at pp. 623, 627.*) A landlord, like defendant owning numerous units, is not engaged in isolated acts within the enterprise but plays a substantial role. The fact that the enterprise is one involving real estate may not immunize the landlord. Our courts have long recognized that contracts relating to realty may give rise to implied warranties. ( *Aced v. Hobbs-Sesack Plumbing Co., supra, 55 Cal.2d 573, 580-583.*)

4 We do not determine whether strict liability would apply to a disclosed defect. (See *Luque v. McLean (1972) 8 Cal.3d 136, 141-146 [104 Cal.Rptr. 443, 501 P.2d 1163].*)

**(5)** Absent disclosure of defects, the landlord in renting the premises makes an implied representation that the premises are fit for use as a dwelling and the representation is ordinarily indispensable to the lease. ( *Pollard v. Saxe & Yolles Dev. Co., supra, 12 Cal.3d 374, 377-380.*) The tenant purchasing housing for a limited period is in no position to inspect for latent defects in the increasingly complex modern apartment buildings or to bear the expense of repair whereas the landlord is in a much better position to inspect for and repair latent defects. ( *Green v. Superior Court, supra, 10 Cal.3d at p. 626.*) [*465] The tenant's ability to inspect is ordinarily substantially less than that of a purchaser of the property. (Cf. *Pollard* [**123] [***220] *v. Saxe & Yolles Dev. Co., supra, 12 Cal.3d at p. 379.*)

The tenant renting the dwelling is compelled to rely upon the implied assurance of safety made by the landlord. It is also apparent that the landlord by adjustment of price at the time he acquires the property, by rentals or by insurance is in a better position to bear the costs of injuries due to defects in the premises than the tenants.

**(4b)** In these circumstances, strict liability in tort for latent defects existing at the time of renting must be applied to insure that the landlord who markets the product bears the costs of injuries resulting from the defects "rather than the injured persons who are powerless to protect themselves." ( *Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d at p. 63.*)

**(6)** Defendant argues that a landlord who purchases an existing building which is not new should be exempt from strict liability in tort for latent defects because, like dealers in used personalty, he assertedly is not part of the manufacturing and marketing enterprise. Defendant relies on a statement in *Vandemark v. Ford Motor Co., supra, 61 Cal.2d 256, 262-263*: "Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." Defendant states that it has never been in a business relationship with the builder and that purchasers of used rental properties do not have a continuing business relationship with builders permitting adjustments of the costs of protecting tenants.

In several cases, it has been held that a seller of used machinery who does not rebuild or rehabilitate the machinery is not strictly liable in tort. ( *Wilkinson v.*

*Hicks (1981) 126 Cal.App.3d 515, 520* et seq. [*179 Cal.Rptr. 5*]; *LaRosa v. Superior Court (1981) 122 Cal.App.3d 741, 748* et seq. [*176 Cal.Rptr. 224*]; *Tauber-Arons Auctioneers Co., Inc. v. Superior Court (1980) 101 Cal.App.3d 268, 273* et seq. [*161 Cal.Rptr. 789*].) Each of these cases relied at least in part on the theory that the used machinery dealer simply by offering machinery for sale does not make any representation as to quality or durability and thus does not generate the expectation of safety involved in the sale of new goods. ( *Wilkinson, supra, 126 Cal.App.3d at pp. 520-521*; *LaRosa, supra, 122 Cal.App.3d at pp. 760-761*; *Tauber-Arons, supra, 101 Cal.App.3d at p. 278* et seq.) When the seller of the used goods makes extensive modifications or reconditions, he is treated as a manufacturer -- there is an expectation that the safety of the product has been [*466] addressed. ( *Green v. City of Los Angeles (1974) 40 Cal.App.3d 819, 838 [115 Cal.Rptr. 685]*.)

*LaRosa v. Superior Court, supra, 122 Cal.App.3d 741, 756-757* and *Tauber-Arons Auctioneers Co., Inc. v. Superior Court, supra, 101 Cal.App.3d 268, 282*, also suggested that the used machinery dealer ordinarily is not part of the manufacturing and marketing enterprise.

However, a continuing business relationship is not essential to imposition of strict liability. The unavailability of the manufacturer is not a factor militating against liability of others engaged in the enterprise. The paramount policy of the strict products liability rule remains the spreading throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects. ( *Ray v. Alad Corp. (1977) 19 Cal.3d 22, 33-34 [136 Cal.Rptr. 574, 560 P.2d 3]*; *Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722]*; *Rawlings v. D.M. Oliver, Inc. (1979) 97 Cal.App.3d 890, 899* et seq. [*159 Cal.Rptr. 119*].) If anything, the unavailability of the manufacturer is a factor militating in favor of liability of persons engaged in the enterprise who can spread the cost of compensation. (See *Ray v. Alad Corp., supra, 19 Cal.3d 22, 33-34*.) Just as the unavailability of the manufacturer does not [**124] [***221] militate against liability, the absence of a continuing business relationship between builder and landlord is not a factor warranting denial of strict liability of the landlord.

Landlords are an integral part of the enterprise of producing and marketing rental housing. While used machinery is often scrapped or discarded so that resale for use may be the exception rather than the rule, landlords are essential to the rental business. They have more than a random or accidental role in the marketing enterprise. In addition, landlords have a continuing relationship to the property following the renting in contrast to the used machinery dealer who sells. As we have seen, in renting property the landlord, unlike the used machinery dealer, makes representations of habitability and safety.

The cost of protecting tenants is an appropriate cost of the enterprise. Within our marketplace economy, the cost of purchasing rental housing is obviously based on the anticipated risks and rewards of the purchase, and thus it may be expected that along with numerous other factors the price of used rental housing will depend in part on the quality of the building and reflect the anticipated costs of protecting tenants, including repairs, replacement of defects and insurance. Further, the landlord after purchase may be able to adjust rents to reflect such costs. The landlord will also often be able to seek equitable indemnity for losses.

[*467] We conclude that the absence of a continuing business relationship between builder and landlord does not preclude application of strict liability in tort for latent defects existing at the time of the lease, because landlords are an integral part of the enterprise and they should bear the cost of injuries resulting from such defects rather than the injured persons who are powerless to protect themselves. ( *Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d 57, 63*.) [5]

5 In view of our conclusion it is unnecessary to determine whether the landlord is strictly liable for defects in the property which develop after the property is leased.

Negligence

*Civil Code section 1714, subdivision (a)* establishes the fundamental principle of negligence liability, providing: "Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary skill in the management of his property or person, . . ."

Rejecting the prior distinctions made by the common law as to invitees, licensees, and trespassers, the landmark case of *Rowland v. Christian, supra, 69 Cal.2d*

*108, 111* et seq. held that the fundamental rule was applicable to the liability of owners and occupiers of land. **(7)** The fundamental principle is applicable to the landlord's liability to the tenant, and the landlord owes a tenant a duty of reasonable care in providing and maintaining the rented premises in a safe condition. ( *Stoiber v. Honeychuck (1980) 101 Cal.App.3d 903, 924 [162 Cal.Rptr. 194]*; *Evans v. Thomason (1977) 72 Cal.App.3d 978, 985 [140 Cal.Rptr. 525]*; *Golden v. Conway, supra, 55 Cal.App.3d 948, 955*; *Brennan v. Cockrell Investments, Inc., supra, 35 Cal.App.3d 796, 800-801.*)

Any departure from the fundamental principle involves the "balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" ( *Rowland v. Christian, supra, 69 Cal.2d at pp. 112-113.*)

[**125] [***222] "In the typical rental situation involving a dwelling house, the foreseeability of harm to a tenant from the landlord's failure to maintain the premises [*468] in a habitable condition is obvious; the degree of certainty that the tenant suffered injury and the closeness of the connection between the landlord's conduct and the injury is readily ascertainable by proof in each case; the moral blame attached to the landlord's conduct in not complying with the habitability requirements articulated in the Civil Code and the policy of preventing future harm are present. Nor can we say that the imposition of a duty to exercise care with resulting liability for breach would unduly extend a landlord's burden insofar as the availability, cost and prevalence of insurance for the risk involved. In short, we believe that under the policy standards articulated in *Rowland*, a due regard for human safety and health compels the imposition on a landlord of a duty of due care in the maintenance of the premises." ( *Stoiber v. Honeychuck, supra, 101 Cal.App.3d 903, 924.*)

Accordingly, a landlord in caring for his property must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect. ( *Golden v. Conway, supra, 55 Cal.App.3d 948, 955*; *Brennan v. Cockrell Investments, Inc., supra, 35 Cal.App.3d 796, 800-801.*)

**(8)** Defendant urges that in the absence of knowledge of the defective condition or of prior accidents it was not under a duty to inspect for defective shower doors and that imposition of a duty to inspect would conflict with *Civil Code section 1954* limiting the landlord's right to enter a rented dwelling unit. So far as appears in the instant case, the dangerous shower doors were installed by the builder at the time of the construction and were in position at the time defendant purchased the building.

A person contemplating purchase of rental property, in the exercise of due care, will examine its condition. Maintenance of rental property in a safe and habitable condition is the primary responsibility of the landlord. ( *Green v. Superior Court, supra, 10 Cal.3d 616, 627.*) In the exercise of ordinary care, the purchaser of rental property may be expected to inspect the premises not only to determine whether they are aesthetically pleasing but also to determine whether they meet bare living standards, including whether they are safe. The prospective purchaser may be expected to make such inspection in the absence of knowledge of any existing defects or of any prior accidents. Similarly, a landlord at time of letting may be expected to inspect an apartment to determine whether it is safe.

The mere fact that a particular kind of an accident has not happened before does not show that such accident is one which might not reasonably have been anticipated. ( *Weirum v. RKO General, Inc. (1975) 15 Cal.3d 40, 47* [*469] *[123 Cal.Rptr. 468, 539 P.2d 36].*) Defective glass doors provide a substantial risk of injury which reasonably may be anticipated.

*Civil Code section 1954* limiting the right of the landlord to enter the tenant's premises provides that he may enter to exhibit the dwelling unit "to prospective or actual purchasers" and to make necessary repairs, and the section does not provide a bar to recognition of a duty to inspect in the instant case. Defendant's officials inspected the apartments.

We conclude that a duty to inspect for dangerous

conditions in the exercise of due care may properly be found in the instant case and that lack of awareness of the dangerous condition does not necessarily preclude liability.

In urging that there was no duty to inspect, defendant relies upon cases where the defect developed after purchase of the building by the defendant and while the apartment was in possession of the tenant. [**126] [***223] (E.g., *Uccello v. Laudenslayer (1975) 44 Cal.App.3d 504, 510* et seq. [*118 Cal.Rptr. 741, 81 A.L.R.3d 628]*.) Those cases are distinguishable because, in the instant case, the dangerous condition existed at the time of purchase and at the time the property was leased.

The duty to inspect should charge the defendant only with those matters which would have been disclosed by a reasonable inspection. In the instant case, the undisputed affidavits are to the effect that there was "no visible difference between the tempered and untempered glass in terms of visible appearance," but that there was a "very small mark" in the corner of each piece of glass which apparently showed that the glass was untempered. The glass was not before the trial court when it granted the motion for summary judgment, and the record does not disclose the nature of the "mark." If the "mark" was "untempered" a trier of fact could properly conclude that a reasonable inspection would have, at least, included a visual inspection which disclosed the danger. In resolving doubts in favor of the party opposing the motion for summary judgment ( *Rowland v. Christian, supra, 69 Cal.2d 108, 111)*, defendant's failure to fully identify the "mark" requires us to assume that it would have disclosed the danger to a reasonable inspection.

As to each cause of action the trial court erred in granting summary judgment in favor of defendant.

The judgment is reversed.

**CONCUR BY:** BIRD; LUCAS (In Part)

**CONCUR**

[*470] **BIRD, C. J.,** Concurring. Justice Newsom wrote a fine opinion in the Court of Appeal with which I agree. It is adopted herewith as my own. *

* Brackets together, in this manner [], without enclosing material, are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote my insertions or additions.

"This is an appeal from a summary judgment dismissing appellant's causes of action for negligence and strict products liability. Declarations submitted by respondent in support of its motion for summary judgment reveal the following pertinent facts, which we summarize as necessary to a resolution of the issues raised on appeal.

Appellant was seriously injured on November 21, 1978, when he slipped and fell against the *untempered* glass shower door of his rented apartment, which is in a 36-unit apartment complex owned, operated and maintained by respondent. The apartment complex was built in 1963 and acquired by IRM Corporation in 1974 [IRM]. According to undisputed evidence, had the shower door been made of *tempered* glass, the risk of serious injury to appellant would have been reduced.

The declarations submitted in support of the summary judgment motion state that between the time respondent acquired the building and appellant's injury none of the tenants either complained that the shower doors were made of unsafe untempered glass or reported injuries similar to those suffered by appellant. Appellant's shower door was in place when IRM purchased the apartment complex. Of the 36 showers in the apartment building prior to appellant's accident, 31 had untempered and 5 had tempered glass.

It is difficult to visually distinguish tempered from untempered glass. The apartment manager for IRM declared that he walked through most of the bathrooms prior to appellant's accident, and found the two types of shower doors to be highly similar: he said both had a "frosted glass" appearance. After the accident, at respondent's request, a maintenance man for IRM and an expert from Diablo Glass & Paint Company inspected the shower doors. According to the maintenance man, "from my own examination following the . . . accident, there was no visible difference between the tempered or the nontempered glass in terms of visible appearance." But [**127] [***224] he also explained: "The only way that I was able to differentiate . . . was by looking for a very small mark in the corner of each piece of glass." After the inspection, the 31 shower doors without tempered glass were replaced with doors made of tempered glass.

The summary judgment procedure authorized by *section 437c of the Code of Civil Procedure* is a ""drastic procedure to be used sparingly and with [*471] circumspection." . . ."' ( *Harris v. De La Chapelle (1976) 55 Cal.App.3d 644, 647 [127 Cal.Rptr. 695]*[, disapproved on another point in *Sprecher v. Adamson Companies (1981) 30 Cal.3d 358, 372, fn. 9 (178 Cal.Rptr. 783, 636 P.2d 1121)*].) A defendant moving for summary judgment has the burden of establishing that the action is without merit; a factual showing negating all causes of action on all theories is required. ( *Tresemer v. Barke (1978) 86 Cal.App.3d 656, 666 [150 Cal.Rptr. 384, 12 A.L.R.4th 27]*; *Harris, supra, at p. 647*.) "If he fails in that burden, summary judgment must be denied despite the lack of opposing declarations." ( *Tresemer, supra, at p. 666*.) But if all material issues of fact are eliminated and the declarations filed in support of the motion establish that the defendant is entitled to judgment as a matter of law, summary judgment should be granted. ( *Tauber-Arons Auctioneers Co. v. Superior Court (1980) 101 Cal.App.3d 268, 273-274 [161 Cal.Rptr. 789]*.) "'Applicable substantive law determines the facts necessary to support a particular theory of relief and hence the sufficiency of properly framed factual statements in declarations to support a summary judgment."' ( *Tresemer, supra, at pp. 666-667*.)

Appellant claims that his negligence cause of action presents issues of fact which must be litigated at trial. He insists that respondent's declarations do not sufficiently negate the elements of his action for negligence.

Respondent submits that it had no *duty* of care to appellant, absent actual notice of the dangerous condition of the shower doors, and that its declarations disprove such notice.

The essential elements of a cause of action for negligence are: (1) defendant's legal duty of care to plaintiff, (2) defendant's breach of duty -- by negligent act or omission, (3) injury to plaintiff as the result of the breach, and (4) compensable damages. ( *Rosales v. Stewart (1980) 113 Cal.App.3d 130, 133 [169 Cal.Rptr. 660]*; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 450, p. 2103.) Liability for negligent conduct may only be imposed where it is found that defendant owed a duty of care to the plaintiff or to a class of persons of which the plaintiff is a member. ( *J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60]*; *Rogers v. Jones (1976) 56 Cal.App.3d 346, 350 [128 Cal.Rptr. 404]*.) The duty may arise by statute, contract, the general character of the activity in which the defendant engaged, the relationship of the parties, or even the interdependent nature of human society. ( *J'Aire, supra, at p. 803*.) "Whether a duty is owed is simply a shorthand way of phrasing what is '"the essential question -- whether the plaintiff's interests are entitled to legal protection against the defendant's conduct."'" (*Ibid.*)

The crucial issue before us is, therefore, whether plaintiff has established that his corporate landlord owed a duty of care to protect him against the [*472] particular risk of harm which caused his injury. ([See] *Evans v. Thomason (1977) 72 Cal.App.3d 978, 984 [140 Cal.Rptr. 525]*.) "'While the question whether one owes a duty to another must be decided on a case-by-case basis, every case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as a result of their conduct . . . .'" ( *J'Aire, supra, 24 Cal.3d at p. 806*; *Weirum v. RKO General, Inc. (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]*.) In *Rowland v. Christian (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.* [**128] *R.3d* [***225] *496]*, our high court enumerated the following factors as relevant to a determination of whether a possessor or owner of land owes a duty of care to injured victims: the foreseeability of the harm to the plaintiff; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between defendant's conduct and the injury suffered; the moral blame attached to the defendant's conduct; the policy of preventing future harm; the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and the availability, cost and prevalence of insurance for the risk involved. (See also *Thompson v. County of Alameda (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]*; *Sun N' Sand, Inc. v. United California Bank (1978) 21 Cal.3d 671, 695 [148 Cal.Rptr. 329, 382 P.2d 920]*; *Rosales v. Stewart, supra, 113 Cal.App.3d 130, 134*; *DeSuza v. Andersack (1976) 63 Cal.App.3d 694, 702 [133 Cal.Rptr. 920]*.)

But in all cases, the primary consideration in establishing the element of duty is the foreseeability of the risk. ( *Sun N' Sand, supra, 21 Cal.3d at p. 695*; *Weirum, supra, 15 Cal.3d at p. 46*; *DeSuza, supra, at p. 702*.) "'As a general principle, a "defendant owes a duty of care to all persons who are *foreseeably* endangered by

his conduct, with respect to all risks which make the conduct unreasonably dangerous."'" ( *Tresemer v. Barke, supra, 86 Cal.App.3d 656, 670.*) The question of whether a legal duty exists is one of law (*Thompson* v. *County of Alameda*[, *supra*,] *27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]*), but if the issue depends upon the foreseeability of the risk it becomes a question of fact for resolution by the jury (*Weirum* [], *supra*, *15 Cal.3d 40, 46*; *Harris v. De La Chapelle, supra, 55 Cal.App.3d 644, 647*). [1]

1 The reasonableness of the defendant's conduct is also a question for the trier of fact. ( *Slater v. Alpha Beta Acme Markets, Inc. (1975) 44 Cal.App.3d 274, 278 [118 Cal.Rptr. 561, 72 A.L.R.3d 1264].*)

It is now settled that a landlord generally owes a tenant a duty of reasonable care in maintaining the rented premises in a safe condition. ( *Evans v. Thomason, supra, 72 Cal.App.3d 978, 985*; *Golden v. Conway (1976) 55 Cal.App.3d 948, 955* [*473] *[128 Cal.Rptr. 69]*; *Brennan* v. *Cockrell Investments, Inc. (1973) 35 Cal.App.3d 796, 800-801 [111 Cal.Rptr. 122].*) In *Stoiber v. Honeychuck (1980) 101 Cal.App.3d 903, 924 [162 Cal.Rptr. 194]*, the court explained: "In the typical rental situation involving a dwelling house, the foreseeability of harm to a tenant from the landlord's failure to maintain the premises in a habitable condition is obvious; the degree of certainty that the tenant suffered injury and the closeness of the connection between the landlord's conduct and the injury is readily ascertainable by proof in each case; the moral blame attached to the landlord's conduct in not complying with the habitability requirements articulated in the Civil Code and the policy of preventing future harm are present. Nor can we say that the imposition of a duty to exercise care with resulting liability for breach would unduly extend a landlord's burden insofar as the availability, cost and prevalence of insurance for the risk involved. In short, we believe that under the policy standards articulated in *Rowland*, a due regard for human safety and health compels the imposition on a landlord of a duty of due care in the maintenance of the premises."

And in *Golden v. Conway, supra, 55 Cal.App.3d at page 955*, this court adopted the standard expressed in *Brennan v. Cockrell Investments, Inc., supra, 35 Cal.App.3d 796*, that ". . . a landlord must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of such injury, the burden of reducing or [**129] [***226] avoiding the risk, and his degree of control over the risk-creating defect . . . ."

But like any other business proprietor or owner of property, the landlord is not an insurer of a tenant's safety. ( *Riley v. Marcus (1981) 125 Cal.App.3d 103, 109 [177 Cal.Rptr. 827]*; *Rogers v. Jones, supra, 56 Cal.App.3d 346, 351.*) And, we repeat, as in all cases, foreseeability is the key factor to be considered. ( *Coulter v. Superior Court (1978) 21 Cal.3d 144, 152 [145 Cal.Rptr. 534, 577 P.2d 669]*[, superseded by statute as stated in *Strang v. Cabrol (1984) 37 Cal.3d 720, 724 (209 Cal.Rptr. 347, 691 P.2d 1013)*]; *Riley, supra, at p. 109.*) Consequently, we must decide whether the unsafe nature of the shower doors was reasonably foreseeable by respondent.

The uncontradicted evidence offered by respondent establishes that IRM had no actual notice of the dangerous condition of the premises either from complaints or previous accidents. According to undisputed declarations, it was also difficult to distinguish the untempered glass shower doors from those made of tempered glass; only a "very small mark in the corner of each piece of glass," observed upon a careful inspection following appellant's accident, set the two types of doors apart.

[*474] But foreseeability does not require that prior identical or even similar events must have occurred. ( *Kwaitkowski v. Superior Trading Co. (1981) 123 Cal.App.3d 324, 329 [176 Cal.Rptr. 494].*) As noted in *Weirum v. RKO General, Inc., supra, 15 Cal.3d 40, 47*: "'The mere fact that a particular kind of [an] accident has not happened before does not . . . show that such accident is one which might not reasonably have been anticipated.'" Appellant's accident cannot be characterized as unforeseeable simply because it was the first of its kind at the apartment complex.

And although the dangerous condition of the shower door may not have been readily apparent, the evidence indicates that it was discoverable upon reasonably careful inspection. In light of the landlord's control over the premises and ability to insure against the risk of injury, we think it reasonable to conclude that foreseeability of risk presented a triable issue of fact best left for resolution by the jury. That IRM had no actual notice of the risk should not, we repeat, absolve it from a duty of

care as a matter of *law*. Maintenance of rental property, particularly fixtures and appliances, in a safe and habitable condition, has been recognized as an important obligation of the landlord. ( *Green v. Superior Court (1974) 10 Cal.3d 616, 626-627 [111 Cal.Rptr. 704, 517 P.2d 1168]*; *Stoiber v. Honeychuck, supra, 101 Cal.App.3d 903, 914, 924.*) [2] Since it was possible if not likely that IRM would have learned of the dangerous condition of the property had it devoted closer attention to the safety of its tenants, particularly given the direct and serious threat of harm which the hazard posed to IRM's tenants, we think that the trial court erred in granting summary judgment and dismissing appellant's negligence action.

2 In *Stoiber, supra, 101 Cal.App.3d 903*, the court noted that "public policy requires landlords to bear the primary responsibility for maintaining safe, clean and habitable housing" ( *id., at p. 914*), and added: ". . . we believe that under the policy standards articulated in *Rowland* [v. *Christian (1968) 69 Cal.2d 108 (70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496)*], a due regard for human safety and health compels the imposition on a landlord of a duty of due care in the maintenance of the premises." (*Id., at p. 924.*)

Appellant also argues that respondent's declarations do not negate his strict liability cause of action since the doctrine of strict products liability applies to respondent as a supplier of housing. Respondent submits that, on the contrary, as a matter of law a landlord does not incur liability under a theory of strict liability for the defective condition of rented premises.

In the landmark case of *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]*, our high court announced the rule that, "A manufacturer is [**130] [***227] strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to [*475] a human being." (See also *McGee v. Cessna Aircraft Co. (1978) 82 Cal.App.3d 1005, 1012 [147 Cal.Rptr. 694].*) "That rule is equally applicable to the manufacturer and the retailer." (*Barrett* v. *Atlas Powder Co. (1978) 86 Cal.App.3d 560, 564 [150 Cal.Rptr. 339].*) [3]

3 In fact, as noted in *Kasel v. Remington Arms Co. [1972] 24 Cal.App.3d 711, 724 [101 Cal.Rptr. 314]*: "The following entities besides the manufacturer, obviously the principal one, have been found to be integral components of the particular enterprise responsible for placing alleged defective products on the market: a lessor ( *McClaflin v. Bayshore Equipment Rental Co., 274 Cal.App.2d 446* . . . [stepladder] and *Price v. Shell Oil Co., 2 Cal.3d 245* . . . [gasoline truck]); a developer ( *Kriegler v. Eichler Homes, Inc., 269 Cal.App.2d 224* . . . [a builder engaged in mass tract development of homes]); a licensee ( *Garcia v. Halsett, 3 Cal.App.3d 319* . . . [a launderette owner who was said to have licensed the use of a washing machine to plaintiff]); a retailer ( *Vandermark v. Ford Motor Co., supra, 61 Cal.2d 256* [retailer of a defective automobile]); and a wholesale-retail distributor ( *Barth v. B.F. Goodrich Tire Co., 265 Cal.App.2d 228* . . . [who merely distributed tires from his stock on order of the manufacturer])."

The courts have freely applied strict liability in tort law link by link in the marketing chain -- "from manufacturer to distributor, to retailer, and so forth." (*Kasel* v. *Remington Arms Co.*[, *supra*,] *24 Cal.App.3d 711, 724*[].) California follows a "stream-of-commerce" approach to strict liability, under which "'. . . no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability. It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability.'" ( *Tauber-Arons Auctioneers Co. v. Superior Court, supra, 101 Cal.App.3d 268, 275-276*, quoting from *Kasel v. Remington Arms Co., supra, 24 Cal.App.3d 711, 725.*) The strict products liability doctrine extends to all those who are "engaged in the business of distributing goods to the public" as an "integral part of the overall producing and marketing enterprise" for the product in question. ( *Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168]*; *Tauber-Arons, supra, at pp. 274-275.*) Thus, participation in the marketing enterprise by which distribution of the product to the consuming public is effected in more than

a "'random and accidental role'" justifies imposition of strict liability. ( *Tauber-Arons, supra, at p. 277*; *Garcia v. Halsett (1970) 3 Cal.App.3d 319, 326 [82 Cal.Rptr. 420]*.) 4

4 In *Garcia* a launderette owner who maintained four rows of coin-operated washing machines manufactured by Philco-Bendix in continuous operation for public use, was held liable as a marketer. The court observed: "Although respondent is not engaged in the distribution of the product, in the same manner as a manufacturer, retailer or lessor, he does provide the product to the public for use by the public, and consequently does play more than a random and accidental role in the overall marketing enterprise of the product in question." (*3 Cal.App.3d at p. 326*.)

[*476] Landlords have been included within the scope of the strict products liability doctrine. For example, in *Fakhoury v. Magner (1972) 25 Cal.App.3d 58 [101 Cal.Rptr. 473]*, the lessee of a furnished apartment -- injured when the couch supplied by her landlord collapsed under her -- sued on a theory of strict liability. The court concluded that the landlord was strictly liable as lessor of the defective furniture rather than as lessor of furnished real property. ( *Id., at p. 63*.)

[**131] [***228] Subsequently, in *Golden v. Conway, supra, 55 Cal.App.3d 948*, this court extended the doctrine of strict products liability to a landlord who supplied and installed, through an independent contractor, a defective wall heater in an unfurnished apartment. Relying upon *Fakhoury*, we found no reason to distinguish between furniture and appliances attached to realty, and concluded that a "lessor of real property who, as the landlord in this case, is engaged in the business of leasing apartments and appurtenant commercial premises, equips the premises with an appliance without knowing whether or not it is defective because of the manner in which it is manufactured or installed, and it proves to have defects which cause injury to persons or property when used in a normal manner, is strictly liable in tort." ( *Id., at pp. 961-962*.)

Here, respondent is in the business of leasing apartments, including appliances and fixtures, and is therefore an integral part of the marketing enterprise by which the shower door in question reached the user public. In *Green v. Superior Court, supra, 10 Cal.3d 616, 627*, our high court observed: "In most significant respects, the modern urban tenant is in the same position as any other normal consumer of goods. [Citation.] Through a residential lease, a tenant seeks to purchase 'housing' from his landlord for a specified period of time. The landlord 'sells' housing, enjoying a much greater opportunity, incentive and capacity than a tenant to inspect and maintain the condition of his apartment building. A tenant may reasonably expect that the product he is purchasing is fit for the purpose for which it is obtained, that is, a living unit. Moreover, since a lease contract specifies a designated period of time during which the tenant has a right to inhabit the premises, the tenant may legitimately expect that the premises will be fit for such habitation for the duration of the term of the lease. It is just such reasonable expectations of consumers which the modern 'implied warranty' decisions endow with formal, legal protection." The landlord is a vital link in the commercial chain, and directly profits from the consumer's use of products provided as part of the rental unit. We think it a reasonable rule that a landlord should be treated as a "retailer" of rental housing, subject to liability for defects in the premises rented.

[*477] In reaching this conclusion, we have considered that the salutary policies underlying the strict products liability doctrine will be furthered by inclusion of landlords within its scope. According to our high court, "the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." ( *Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722]*; see also *Tauber-Arons Auctioneers Co. v. Superior Court, supra, 101 Cal.App.3d 268, 283*.) "Placing the economic burden of injuries on those best able to pay for those costs while permitting the transfer of that burden to those most culpable is consistent with the equitable considerations inherent in the resolution of the difficult problems which have been judicially posed." ( *Rawlings v. D. M. Oliver, Inc. (1979) 97 Cal.App.3d 890, 901 [159 Cal.Rptr. 119]*.) The landlord receives the financial benefit from the tenants' use of appliances included in rental housing, and has the ability to spread the cost of compensation throughout the marketing system by obtaining insurance or otherwise accounting for the risk of loss. In addition, the landlord has control over the rental premises, which provides the means by which the possible harm from defective appliances or fixtures can be eliminated.

We find the cases relied upon by respondent unpersuasive. In both *Tauber-Arons Auctioneers Co. v. Superior Court, supra, 101 Cal.App.3d 268*, and *LaRosa v. Superior Court (1981) 122 Cal.App.3d 741, [176 Cal.Rptr. 224]* it was held that a dealer in used products acting merely as an agent for the seller or manufacturer, and who has no other connection with the product, cannot be held strictly [**132] [***229] liable in tort for its defective condition. In contrast, here respondent played no such random and accidental role in the marketing of the untempered glass shower doors; rather, it directly provided the product to tenants for their use, thus actively entering the marketing enterprise for that product.

It is vigorously argued as a reason for exclusion of respondent from liability as a matter of law, that it was not the owner of the building when the allegedly defective product was installed. Once IRM became the landlord, however, it acted in effect as distributor or supplier of housing, with authority and ability to monitor all products so furnished, including appliances and fixtures in the apartments. And by failing to remove shower doors made of untempered glass, respondent maintained the distribution of these appliances to its tenants.

Respondent argues with equal force that it reasonably ought not to incur liability for the defective shower doors because it had no notice of the defect. We disagree, since we regard notice as irrelevant to the strict liability analysis.

[*478] The doctrine of strict products liability is based upon a defect in the product, and can arise from an unsafe design as well as from faults attributable to the manufacturing process. ( *Pike v. Frank G. Hough Co. (1970) 2 Cal.3d 465, 475 [85 Cal.Rptr. 629, 467 P.2d 229]*.)

While the operative term "defect" is not capable of precise definition, and is concededly an amorphous and elusive concept, it does *not* require proof that the defective design renders the product "unreasonably dangerous" to the unsuspecting customer. ( *Cronin v. J.B.E. Olson Corp. (1972) 8 Cal.3d 121, 133 [104 Cal.Rptr. 433, 501 P.2d 1153]*; *McGee v. Cessna Aircraft Co., supra, 82 Cal.App.3d 1005, 1015*; *Buccery v. General Motors Corp. (1976) 60 Cal.App.3d 533, 544 [132 Cal.Rptr. 605]*.) On the other hand, of course, neither does the concept of strict liability make the manufacturer an absolute insurer of its product. (*Daly* v. *General Motors* [**133] [***230] *Corp. (1978) 20 Cal.3d 725, 733 [144 Cal.Rptr. 380, 575 P.2d 1162]*.)

Our high court has suggested that issue of defectiveness can best be resolved by resort to the "cluster of precedents" forming the crucible in which the products liability doctrine has been forged and shaped. ( *Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413, 428 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]*; *Cronin v. J.B.E. Olson Corp., supra, at p. 134*.) In *Barker, supra*, the court enumerated the following as standards to be employed in determining whether a product is defectively designed: "First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id., at p. 432*.)

In evaluating the adequacy of a product's design pursuant to these standards, a jury may consider, among other relevant factors: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer alternative design; the financial cost of an improved design; and the adverse consequences to the product and the consumer that would result from an alternative design. ( *Barker v. Lull Engineering Co., supra, 20 Cal.3d 413, 431*; *Horn v. General Motors Corp. (1976) 17 Cal.3d 359, 367 [131 Cal.Rptr. 78, 551 P.2d 398]*; *Southern Cal. Edison Co. v. Harnischfeger Corp. (1981) 120 Cal.App.3d 842, 854 [175 Cal.Rptr. 67]*.) The cases have recognized the "need to 'weigh' competing considerations in an *overall* product design, in [*479] order to determine whether the design was 'defective.'" ( *Daly v. General Motors Corp., supra, 20 Cal.3d 725, 746*, italics added.)

The strict liability doctrine also "'requires a manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse . . . .'" ( *Buccery v. General Motors Corp., supra, 60 Cal.App.3d 533, 546*; *Self* v. *General Motors Corp. (1974) 42 Cal.App.3d 1, 7*

*[116 Cal.Rptr. 575].)* Strict liability should not be imposed upon a manufacturer when injury results from a use of its product that is not reasonably foreseeable. ( *Cronin v. J.B.E. Olson Corp., supra, 8 Cal.3d 121, 126*; *Self, supra*, at p. 7.) But as the court acknowledged in *Cronin, supra*: "The design and manufacture of products should not be carried out in an industrial vacuum but with recognition of the realities of their everyday use." ( *Id., at p. 126*; *Buccery, supra, at p. 546*; *Self, supra*, at p. 7.) The prospect of liability for injuries resulting from foreseeable abuse and misuse "keeps the manufacturer on his toes and thereby serves a socially useful purpose." ( *Self* v. *General Motors, supra*, 42 Cal.App.3d at p. 8.) []"

**DISSENT BY:** LUCAS (In Part)

**DISSENT**

**LUCAS, J.**, Concurring and Dissenting. I concur in that portion of the majority opinion which holds that a landlord may be held liable for dangerous conditions of which he knew or should have known. However, I cannot join in imposing upon landlords strict liability for latent defects in any component of their property no matter who built or installed the defective item.

Taking an unprecedented leap, the majority imposes "an unusual and unjust burden on property owners . . . [The] landlord [will] be faced with liability for every injury claim resulting from any untoward condition in every cranny of the building, whether it is reasonably foreseeable or not." ( *Dwyer v. Skyline Apartments, Inc. (1973) 123 N.J.Super. 48 [301 A.2d 463, 467]*, affd. obiter dictum, *63 N.J. 577 [311 A.2d 1]*.) Any landlord, even one renting the family home for a year, will now be insurer for defects in any wire, screw, latch, cabinet door, pipe or other article on and in his premises at the time they are let despite the fact that he neither installed the item nor had any knowledge or reason to know of the defect. I believe, in conformance with the almost unanimous judgment of other jurisdictions considering this issue, that such imposition of liability is inappropriate. As one authority has remarked, "One problem in analyzing product liability law is our tendency to study rule changes in isolation and not to analyze their aggregate effect on liability costs or primary behavior." (Epstein, *Commentary* (1983) *58 N.Y.U. L.Rev. 930, 931*.) My colleagues here have taken just such an "isolated" viewpoint.

[*480] Justice Traynor, over 40 years ago in his classic concurrence, reasoned that "it should now be recognized that a manufacturer incurs an absolute liability when an article that he has placed on the market, knowing that it is to be used without inspection, proves to have a defect that causes injury to human beings." ( *Escola v. Coca Cola Bottling Co. (1944) 24 Cal.2d 453, 461 [150 P.2d 436]*.) Thereafter, in *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]*, speaking for a unanimous court, Justice Traynor explained that "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." In other words, one who *makes* the product should be held responsible for its defects.

The next year, strict liability was extended to retailers. ( *Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168]*.) The rationale articulated in support of this extension was that [**134] [***231] "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products . . . . Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and *works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship*." ( *Id. at pp. 262-263*, italics added.) We later held that lessors and bailors of personal property similarly might be held strictly liable, after stressing "the necessity for a continuous course of business as a condition to application of the rule . . . ." ( *Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 253-254 [85 Cal.Rptr. 178, 466 P.2d 722]*.) As I shall discuss, this requirement of a continuing relationship which avoids "injustice" to defendants is given no meaningful consideration in the majority approach.

The potential liability of *producers* of residences was addressed in *Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749]*, a case cited with approval in *Price, supra, (2 Cal.3d at p. 251, fn. 6)*, for the proposition that manufacturers placing products on the market, including mass producers of homes, should be held strictly liable for defects in their products. The *Kriegler* court concluded that "there are no meaningful

distinctions between Eichler's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same." (*269 Cal.App.2d at p. 227*; see *Del Mar Beach Club Owners Assn. v. Imperial Contracting Co. (1981) 123 Cal.App.3d 898, 911-912 [176 Cal.Rptr. 886, 25 A.L.R.4th 336].*) *Kriegler's* holding rested on the identification of Eichler as essentially a "manufacturer [*481] of homes," a situation undeniably very different from the one present here. IRM Corporation *purchased* an already "produced" and used property.

This distinction between a party actually selecting, installing, constructing and buying the defective product and a party who plays no such role and *therefore has no connection with anyone up the ladder of distribution*, was fundamentally adhered to by the Court of Appeal in two cases dealing with defects allegedly present in items found on or in leased premises. In *Fakhoury v. Magner (1972) 25 Cal.App.3d 58 [101 Cal.Rptr. 473]*, the plaintiff was injured when a couch in a rented apartment collapsed. She sued her landlord in strict liability asserting latent defects in the furniture. The court concluded that the landlord could be held strictly liable "not as lessor of real property, but as lessor of the furniture." (P. 63.) The requirement that property be placed in the stream of commerce was met because "a casual or isolated transaction will not bring the doctrine into play. [However, in] the case at hand, the landlord furnished two apartments in San Francisco and three in Sacramento at the same time with the same kind of couch purchased from the same seller." (P. 64.) In the instant case, the shower door was a fixture and the defendant is being sued as lessor of property not as lessor of furniture. Moreover, the shower doors had not been purchased by defendant.

The role of strict liability in landlord-tenant relationships was further explored in *Golden v. Conway (1976) 55 Cal.App.3d 948 [128 Cal.Rptr. 69]*. The plaintiff sued the landlord in strict liability after suffering damages in a fire caused by a wall heater installed by a contractor at the landlord's behest approximately one year before. The court permitted maintenance of the cause of action on the ground "that a lessor of real property who . . . is engaged in the business of leasing apartments and appurtenant commercial premises, equips the premises with an appliance without knowing whether or not it is defective because of the manner in which it was manufactured or installed, and it proves to have defects which cause injury to persons or property when used in a normal manner, is strictly liable in tort." (Pp. 961-962.) [**135] [***232] The installation of the heater assertedly created the dangerous condition, and the court was careful to distinguish the facts from those in *Ruiz v. Minnesota Mining & Mfg. Co. (1971) 15 Cal.App.3d 462 [93 Cal.Rptr. 270]*. In the latter case, the *Golden* court stressed, a product used on the premises was defective "and the property owner merely failed to take corrective action because he did not discover the defect" and therefore was not strictly liable. (*55 Cal.App.3d at p. 963*.) In our case, there is no allegation that the landlord was aware of the defect in the already present product. [1]

1 The *Golden* court did *not* discuss whether the transaction at issue there was an isolated one and therefore not normally the subject of an action in strict liability. The relevant continuing relationship usually is the one between the party sought to be held strictly liable and those up the chain of distribution to the manufacturer. Neither the relationship of the landlord to the marketing chain, nor between landlord and tenant was considered for this purpose, and I therefore consider *Golden* to be of limited assistance in evaluating the underlying policy problems.

[*482] The treatment of cases involving used goods and their sale better highlights relevant concerns ignored by the majority. In *Tauber-Arons Auctioneers Co. v. Superior Court (1980) 101 Cal.App.3d 268 [161 Cal.Rptr. 789]*, the Court of Appeal held that an auctioneer of used machinery who did not perform any maintenance or repair on the equipment, did not inspect it, and sold it "as is," could not be held strictly liable for any defects in the items. The court stated that when considering the requirement that a potential defendant be a participant "in the manufacturing-marketing system" before he be held subject to strict liability, one significant factor is "the requirement that defendant have a participatory connection with the enterprise which 'created consumer demand for and reliance upon' the particular 'injury-producing product' [citation] not just products of the same classification." (*101 Cal.App.3d at p. 276*; see also *Brejcha v. Wilson Machinery, Inc. (1984) 160 Cal.App.3d 630, 639 [206 Cal.Rptr. 688]*.) The court further emphasized participation in the "initial distribution of the particular manufacturer's products . . . ." (P. 277.) Because a used machinery dealer normally

"has no continuing business relationship with the manufacturer in the course of which he can adjust the cost of protection from strict liability . . . the rationale which underlies *Vandermark* simply is inapplicable to such a dealer. Moreover, the risk reduction which was sought in *Vandermark* on the assumption that 'the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end' ( Cal.2d at p. 262) . . . is simply unattainable because the 'used-goods dealer is normally entirely outside the original chain of distribution of the product . . . .' ( *Tillman v. Vance Equipment Co. [(Ore. 1979) 596 P.2d 1299, 1304].*)" (*101 Cal.App.3d at p. 283*, fn. omitted; see also *Wilkinson v. Hicks (1981) 126 Cal.App.3d 515, 521 [179 Cal.Rptr. 5]*; *LaRosa v. Superior Court (1981) 122 Cal.App.3d 741, 753-754 [176 Cal.Rptr. 224].*) Analogous considerations apply in the case of the "used property" lessor.

Discounting other crucial and long-recognized justifications for imposition of strict liability, my colleagues focus primarily on the "risk-spreading" function of this form of liability. Essentially they ignore the fact that landlords of used property have no special position with regard to original manufacturers and sellers and thus have no influence to wield in order to improve product safety. Moreover, contrary to the majority's implication, the landlord, while impliedly representing that the premises are habitable, [*483] is not representing to tenants that he has expertise and guarantees the perfection of every item forming the premises. Instead of considering what role landlords of used property realistically play with regard to that property, the majority concentrates narrowly on the advancement of "The paramount policy of the strict products liability rule [namely] the spreading [**136] [***233] throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects." (*Ante*, p. 466.) Next my colleagues observe that "landlords are essential to the rental business. They have more than a random or accidental role in the marketing enterprise [and] a continuing relationship to the property following the renting . . . ." In addition, "it may be expected that along with numerous other factors the price of used rental housing will depend in part on the quality of the building and reflect the anticipated costs of protecting tenants, including repairs, replacement of defects and insurance," and that rentals may be adjusted to cover such costs. (*Ante*, at p. 466.) [2]

2 One Court of Appeal recently undertook an extensive review of strict liability in the context of sellers of used machinery which "they neither inspected, repaired nor modified." ( *LaRosa v. Superior Court, supra, 122 Cal.App.3d 741, 743.*) It reviewed five "policy predicates" for strict liability described in Note, *Sales of Defective Used Products: Should Strict Liability Apply?* (1979) 52 So.Cal.L.Rev. 805, namely, (1) enterprise liability (forcing the enterprise to bear costs of injuries caused by its defective products); (2) deterrence; (3) risk distribution; (4) practicality (problems of proof made easier by application of strict liability) and (5) implied representations of safety because product is present on the market. (*122 Cal.App.3d at pp. 756-760.*) The Court of Appeal found that as to the risk-distribution rationale, so heavily relied upon here by the majority, "the very pervasiveness of the . . . rationale suggests that it is probably insufficient, by itself, to justify *strict* liability." (*122 Cal.App.3d at p. 759.*) As to diminishing problems of proof, the court observed "ease of recovery is not really a *rationale* for strict liability; more precisely it describes the *effect* strict liability was expected to have. Obviously if ease of recovery *were* a pervasive rationale for strict liability then strict liability would be the universal rule." ( *Id. at p. 760.*) These conclusions have validity in our context as well.

One major difficulty with this approach is the concentration on the wrong "stream of commerce." Unquestionably a landlord has more than an "accidental role" in the marketing of rental property. Except for those who on a one-time basis rent out a piece of property for a reasonably short term, every landlord of both multiple and single properties has a continuing role in the rental market. But those same landlords in all likelihood will have absolutely no direct or continuing relationships with the *manufacturers and marketers* of the particular defective products found on the premises. We are not discussing here those who *build* the property; we are discussing those who purchase already existing multiple residence properties. In fact, applying the majority's analysis, those who decide to rent out the family home on a regular basis are also now strictly liable for defects in any item located therein. Under the majority's formulation, where the relevant relationship is that of landlord to his property and tenants, any landlord is now

strictly liable for defects of which he or she has no knowledge or reason to [*484] know and which appear in any part of the property no matter how esoteric the understanding necessary to comprehend the working of that part. [3] Nothing in the majority's approach is necessarily confined to landlords of multiple residences.

3 This sharply contrasts with the general view that "Only a seller who can be regarded as a merchant or as one engaged in the business of supplying goods of the kind involved in the case is subject to strict liability . . . ." (Prosser & Keeton on the Law of Torts (5th ed. 1984) Products Liability, § 100 at p. 705.) We conformed to this viewpoint in *Price* where the court concluded "that for the doctrine of strict liability in tort to apply to a lessor of personalty, the lessor should be found to be in the business of leasing, in the same general sense as the seller of personalty is found to be in the business of manufacturing or retailing." (*2 Cal.3d at p. 254.*) The majority makes landlords "merchants" of anything contained in or on their property, no matter what the expertise or familiarity entailed, or the actual role of the landlord with regard to the particular product at issue.

The weakness of the majority's analysis of the relevant stream of commerce is revealed by consideration of its basis for concluding that "a continuing business relationship is not essential to imposition of strict liability." It relies upon *Ray v. Alad Corp. (1977) 19 Cal.3d 22 [136 Cal.Rptr.* [**137] [***234] *574, 560 P.2d 3]*, for the proposition that unavailability of a manufacturer militates in favor of the imposition of liability on "persons engaged in the enterprise who can spread the cost of compensation." (See *ante*, p. 466.) In *Alad*, we held that a corporation which had acquired all assets of the manufacturer of the defective product and which continued to run the business in a manner almost identical to its original form, could be held strictly liable for defects in a product manufactured by the predecessor corporation. "By taking over and continuing the established business of producing and distributing Alad ladders, Alad II became 'an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products' ( *Vandermark v. Ford Motor Co., supra, 61 Cal.2d 256, 262).*" ( *Ray v. Alad Corp., supra, 19 Cal.3d at p. 34.*) Under those narrow circumstances, we held the successor could be held liable.

Similar complete unavailability of the manufacturer or others in the original chain of distribution simply is not at issue here. As the majority states in its recitation of facts, the plaintiff here settled with the builder and a door assembler and installer for a minimum of $ 150,000 and has actions pending against defendants in addition to the landlord. No legal unavailability of the kind occurring in *Alad* presented a problem for plaintiff's recovery. Moreover, there is no reasonable suggestion that the relationship between the landlord here and any party participating in the original manufacture and distribution of the shower door can be analogized to the almost complete overlap of the corporate entities in *Alad*. It is illogical to conclude that the landlord here became part of the overall *marketing* scheme for the shower doors merely by purchasing property in which they had long since been installed.

[*485] Unlike retailers, lessors, bailors, wholesalers or others in the original chain of distribution of the product, the landlord owning used property cannot adjust the costs of protection up the chain. He may only do it, at best, *down* the chain of "distribution," namely by charging more to his tenants. Unlike the others mentioned above, such a "merchant" has no opportunity to enter into indemnification agreements with those more closely linked with the making of the product -- he will have little idea if any when he buys the property as to the origin of items such as the wiring found in the walls, and without doubt even if he has such knowledge will have no bargaining power to enter into any agreements with such suppliers. Moreover, his responsibility extends to a myriad of products, unlike the situation faced by a retailer of a particular line of goods. Landlords henceforth are in a risky business. No matter how carefully they inspect, and no matter how impossible to discern the defect, they are now the last outpost of liability for countless unrelated products in which they have no particular expertise. [4]

4 One court summed up the difference between extending strict liability to lessors of commercial products and to motel owners in a manner which has general application in our context as well: "A major consideration in holding lessors of commercial products strictly liable was that such lessors possessed expert knowledge of the characteristics of the equipment or machines they

leased. [Citations.] Another consideration is that such lessors, like retailers, deal continually with their suppliers, giving them an enduring relationship which permits them to seek contribution and indemnification. These considerations do not apply when a motel operator makes a one-time purchase of furnishings and fixtures about which he has no special expertise. Therefore, we hold that a motel operator is not strictly liable for defects in the fixtures and furnishings of the rooms he held out to the public." ( *Livingston v. Begay (1982) 98 N.M. 712 [652 P.2d 734, 738-739].*)

Consideration of the inherent problems -- and unfairness -- in extending strict liability to landlords has led almost every other jurisdiction deciding this issue to decide that imposition of such liability is unwarranted. In 1973, a New Jersey appellate court so held in a decision affirmed by that state's highest court. The opinion contained a cogent discussion of some of the [**138] [***235] reasons why use of this theory of recovery is inappropriate in this context:

"The underlying reasons for the enforcement of strict liability against the manufacturer, seller or lessor of products or the mass builder-vendor of homes do not apply to the ordinary landlord of a multiple family dwelling.

"Such a landlord is not engaged in mass production whereby he places his product -- the apartment -- in a stream of commerce exposing it to a large number of consumers. He has not created the product with a defect which is preventable by greater care at the time of manufacture or assembly. He does not have the expertise to know and correct the condition so as to be saddled with responsibility for a defect regardless of negligence.

[*486] "An apartment involves several rooms with many facilities constructed by many artisans with differing types of expertise, and subject to constant use and deterioration from many causes. It is a commodity wholly unlike a product which is expected to leave the manufacturer's hands in a safe condition with an implied representation upon which the consumer justifiably relies.

"The tenant may expect that at the time of the letting there are no hidden dangerous defects known to the landlord and of which the tenant has not been warned. But he does not expect that all will be perfect in his apartment for all the years of his occupancy with the result that his landlord will be strictly liable for all consequences of any deficiency regardless of fault. He expects only that in the event anything goes wrong with the accommodations or the equipment therein, the landlord will repair it when he knows or should know of its existence; and that if injury results liability will attach." ( *Dwyer v. Skyline Apartments, Inc., supra, 301 A.2d at p. 467.*)

Several other courts have reached similar conclusions in reviewing analogous cases. As the Missouri Court of Appeals observed, "No case has been cited, nor has one been found, imposing strict liability upon the nonbuilder landlord for latent defects, rendering the premises unsafe or dangerous, absent some actual or constructive notice of the defects." ( *Henderson v. W. C. Haas Rlty. Management, Inc. (Mo.App. 1977) 561 S.W.2d 382, 387.*) [5] Cases rejecting application of liability without knowledge have utilized various approaches. (See, e.g., *Meyer v. Parkin (Minn.App. 1984) 350 N.W.2d 435, 438-439* [recent legislation did not eliminate requirement of scienter on part of landlord before he has duty to warn lessee of concealed defects]; *George Washington University v. Weintraub (D.C.App. 1983) 458 A.2d 43, 49* and fn. 9 [landlord exercising reasonable care may not be held liable for losses caused from defects of which he neither knew nor should have known]; *Livingston v. Begay, supra, 652 P.2d 734* [lessor of motel room not strictly liable; theory not meant to apply to "unsafe design of a hotel room"]; *Boudreau v. General Elec. Co. (1981) 2 Hawaii App. 10 [625 P.2d 384, 389-390, 34 A.L.R.4th 86]* [strict liability requires lessor be engaged in business of supplying goods in which defect is claimed]; *Segal v. Justice Court Mut. Housing Co-op (1980) 105 Misc.2d 453 [432 N.Y.S.2d 463, 467]*, affd. *(1981) 108 Misc.2d 1074 [442 N.Y.S.2d 686]* [no strict liability of landlords under public policy or legislation; they are not insurers of property]; *Kidd v. Price (Ky.App. 1971) 461 S.W.2d 565, 567* [liability for latent defect depends on notice or knowledge thereof].)

5 The one apparent exception is in Louisiana where *pursuant to statute* a landlord may be held liable for defects in the absence of actual knowledge of the defective condition of his property. (See *Parr v. Head (La.App. 1983) 442 So.2d 1234, 1235*; *Buxton v. Allstate Ins. Co. (La.App. 1983) 434 So.2d 605, 607-608.*)

[*487] I would hold that a subsequent purchaser of property who has not installed, altered or created the item or condition which is claimed to be defective, and who has no actual or constructive knowledge of any defect therein, should not be held strictly liable. If the landlord knows or should know of the defect, then he has a duty to take appropriate action to correct or warn [**139] of the problem. However, where the landlord has no continuing relationship with the chain of marketing leading back to the [***236] manufacturer of the defective product, and thus has no way of influencing the production or design of the product or of adjusting potential costs of the *manufacturer's* enterprise or others in the business of marketing the item at issue, imposition of strict liability is inappropriate. The only rationales supporting such responsibility are ease of proof for the injured party and "distributing" the risk of damages to the landlord. The costs of such an extension of liability to those *without* expertise or continuing relationships for the multiple products and parts for which they may now bear responsibility will entail a significant shift in how our tort system has heretofore operated. It amounts, in effect, to insurance for tenants, [6] because it does nothing to aid in the goals of deterrence or product safety.

6 The majority never considers the economic effect of its holding. The only logical result is that the price of rental housing will increase because of the increased cost of insurance, assuming insurance can be obtained for this purpose. Even if landlords can sue participants in the original line of manufacture and marketing, the litigation costs involved will likely also have an effect on the price of rental housing. Arguably, instead of risk distribution, the majority's conclusion will result in a general increased cost attributable to the risks involved without a concurrent benefit. Someone will have to pay for the additional litigation today's decision is likely to create.

I would affirm the trial court's decision to the extent that it granted summary judgment to defendant on the cause of action sounding in strict liability, while joining in the majority's reversal as to the negligence cause of action.