# TABS 4 - 9

# TAB 4

LEXSEE 136 CAL.APP.4TH 1251

**MAGDA BENAVIDES, Plaintiff and Appellant, v. STATE FARM GENERAL INSURANCE COMPANY, Defendant and Appellant; LISA HALEY, Defendant and Respondent.**

**B179028**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION FIVE**

***136 Cal. App. 4th 1241*; *39 Cal. Rptr. 3d 650*; *2006 Cal. App. LEXIS 226*; *2006 Cal. Daily Op. Service 1593*; *2006 Daily Journal DAR 2190***

**February 23, 2006, Filed**

**NOTICE:** CERTIFIED [***1] FOR PARTIAL PUBLICATION*

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.C. and III.D., and a portion of the concurring opinion.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. SC073073, Terry B. Friedman, Judge.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

In an action brought by a condominium unit owner against an insurer which was based on the presence of mold in condominium units, the jury found that there was no insurance coverage and no breach of the insurance contract by the insurer. However, the jury also found the insurer negligently investigated the owner's claim, causing her $ 260,000 in damages. On appeal, the owner, who had submitted an additional living expense claim, argued that she was entitled to a new trial on her claims for contract breach and violation of the implied covenant of good faith and fair dealing against the insurer. (Superior Court of Los Angeles County, No. SC073073, Terry Friedman, Judge.)

The Court of Appeal reversed the owner's judgment against the insurer for negligent investigation, but affirmed the judgment in all other respects. The court held that absent coverage, there is no tort liability for improperly investigating a first party insurance claim, whether the insurer's conduct is characterized as an implied covenant breach or negligence. The insurance policy that was issued to the owner excluded coverage for mold unless a covered peril was the predominant cause of the mold. There was no tort liability on the insurer's part for negligent investigation of the owner's first party insurance claim. None of the circumstances allowing for a contract claim to be pursued as a tort cause of action were present. The cause of action at issue was not breach of the covenant of good faith and fair dealing, but negligence. Because no benefits were due, the insurer's allegedly negligent investigation did not frustrate the owner's right to the benefits of the contract. The owner suffered no injury as a result of the manner in which the insurer conducted its investigation. Whatever the merits of the owner's [*1242] assertion of inadequate investigation, the fact that the investigation yielded a correct conclusion of no coverage precluded any claim by the owner that the inadequacy caused her any damage. (Opinion by Turner, P. J., with Kriegler, J., concurring. Concurring opinion by Mosk, J. (see p. 1253).)

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Negligence § 27--Exercise of Care by Particular Persons--Insurer--Presence of Mold in Condominium Units--Negligent Handling of Claim.**--In an action based on the presence of mold in a condominium unit, the

condominium unit owner could not recover against an insurer for the negligent handling of her additional living expense claim where there was no coverage under the terms of her policy.

[2 Witkin, Summary of Cal. Law (10th ed. 2005) Insurance, § 251.]

**(2) Insurance Contracts and Coverage § 91--Property Insurance--Efficient Probable Cause--All-risk Policy.**--An all-risk policy covers risks of physical loss except those excluded under the terms of the insuring contract. Under an all-risk policy, the limits of coverage are defined by the exclusions. If an excluded risk is the efficient proximate or predominant cause of the loss, there is no coverage. Stated conversely, if the predominate cause of loss is a covered risk, the insured's claim will be covered, even if a non-insured peril contributed to the injury.

**(3) Insurance Contracts and Coverage § 91--Property Insurance--Efficient Probable Cause--Included and Excluded Risks.**--When sufficient evidence is introduced to support the possibility that an insured's damages were caused by both included and excluded risks, coverage should be determined by a jury under an efficient proximate cause analysis.

**(4) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant--Breach--Tort Liability.**--The relationship between insured and insurer is contractual. Nevertheless, it is well established that tort liability will lie against an insurer for breach of the implied covenant of good faith and fair dealing. The implied covenant arises from the contract. [*1243]

**(5) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant.**--In addition to the duties imposed on the contracting parties by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing. The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement.

**(6) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant--Breach--Tort Liability--Benefits Withheld Without Proper Cause.**--The precise nature and extent of the duty imposed by an implied promise of good faith and fair dealing will depend on the contractual purposes. In the first party insurance context, the insured's primary contractual right is to receive benefits due under the policy. Tort liability for an insurer's breach of the implied covenant of good faith and fair dealing arises when the insurer unreasonably and in bad faith withholds payment of the insured's claim. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort. For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it must give at least as much consideration to the latter's interests as it does to its own. An insurer cannot reasonably and in good faith deny payments to its insured without fully investigating the grounds for its denial. When an insurer withholds benefits for proper cause, however, there is no breach of the implied covenant. Declining to perform a contractual duty under the policy with proper cause is not a breach of the implied covenant. Thus, to establish an implied covenant tortious breach, an insured must show first, that benefits were due under the policy, and second, that the benefits were withheld without proper cause.

**(7) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant--Breach--Tort Liability--Covered Loss.**--An insured cannot maintain a claim for tortious breach of the implied covenant of good faith and fair dealing absent a covered loss. If the insurer's investigation--adequate or not--results in a correct conclusion of no coverage, no tort liability arises for breach of the implied covenant.

**(8) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant--Inadequate Investigation.**--Absent coverage, there is no tort liability for improperly investigating a first party insurance claim, whether the insurer's conduct is characterized as an implied covenant breach or negligence. The relationship between the parties is contractual. The insured's primary right is to receive compensation for covered losses. The insurer's duty is not to unreasonably [*1244] withhold the payment of benefits due. When no benefits are due, a negligent investigation does not frustrate the insured's right to the benefits of the contract. The insured who is not entitled to insurance proceeds has suffered no injury as a result of the manner in which the insurer's investigation was conducted. Whatever the merits of an assertion of inadequate investigation, the fact that the investigation yielded a correct conclusion of no coverage

precludes any claim that the inadequacy caused any damage.

**(9) Contracts § 45--Actions--Tortious Breach--Independent Duty.**--Generally, outside the insurance context, a tortious breach of contract may be found when: (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion; or (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages. A breach of contract is tortious only when some independent duty arising from tort law is violated.

**COUNSEL:** Cohen & Lord, Scott Richard Lord and James F. Boyle for Plaintiff and Appellant.

Horvitz & Levy, Mitchell C. Tilner, S. Thomas Todd; Sedgwick, Detert, Moran & Arnold and Maria Louise Cousineau for Defendant and Appellant.

Law Office of Lloyd C. Ownbey, Jr., and Lloyd C. Ownbey, Jr., for Defendant and Respondent.

**JUDGES:** Turner, P. J., with Kriegler, J., concurring. Concurring opinion by Mosk, J.

**OPINION BY:** Turner

**OPINION**

[**651] **TURNER, P. J.**--

I. INTRODUCTION

Before us are appeals from the judgment entered after a jury trial in an action based on the presence of mold in condominium units in Santa Monica instituted by plaintiff, Magda Benavides. Although she prevailed on her negligent investigation claim, plaintiff appeals from the judgment against her [*1245] insurer, defendant State Farm General Insurance Company (State Farm). Plaintiff argues that [***2] she is entitled to a new trial on her claims for contract breach and violation of the implied covenant of good faith and fair dealing against State Farm. Plaintiff does not argue she is entitled to a new trial on her negligent investigation claim on which she prevailed during the jury trial. But State Farm appeals from the judgment in favor of plaintiff on her negligent investigation claim. Plaintiff also appeals from a judgment in favor of defendant, Lisa Haley. Ms. Haley's condominium was upstairs from plaintiff's unit.

**(1)** In the published portion of this opinion, we discuss whether plaintiff may recover for negligent handling of her claim despite the fact there is no coverage under the terms of her policy. As will be noted, we conclude plaintiff may not recover for the negligent handling of her claim because there is no coverage under the terms of the policy. Further, none of the circumstances which allow for a contract claim to be pursued as a tort cause of action are present. Hence, we reverse plaintiff's judgment against State Farm for negligent investigation. We affirm the judgment in all other respects.

II. BACKGROUND

Plaintiff purchased a ground floor condominium unit [***3] in Santa Monica in 1994. In 2001, mold was found in the exterior walls of the property, including walls adjacent to plaintiff's unit. Subsequent testing revealed mold inside plaintiff's condominium. Plaintiff was advised by a physician to move out of her condominium. Plaintiff submitted a claim for additional living expense to State Farm, which hired a civil engineer to investigate. State Farm later denied plaintiff's claim on grounds the mold was an excluded loss which was not caused by a covered peril. Plaintiff sued State Farm and Ms. Haley. Plaintiff alleged State Farm had failed to properly investigate her claim, resulting in an erroneous coverage decision. The jury found there was no coverage and no breach of the insurance contract. However, the jury also found State Farm negligently investigated [**652] plaintiff's claim, causing her $ 260,000 in damages.

Ms. Haley lived upstairs from plaintiff. The complaint alleged that in May 2000, during remodeling, Ms. Haley's contractor caused water to leak into plaintiff's kitchen and living room. At trial, plaintiff presented evidence of other leaks from Ms. Haley's unit. The jury found Ms. Haley was not negligent with regard to water intrusion [***4] into plaintiff's unit.

[*1246] III. DISCUSSION

A. *The Policy and the Jury Findings*

The State Farm insurance policy issued to plaintiff excluded mold unless a covered peril was the predominant cause of the mold. Plaintiff's additional living expense claim fell within "Coverage C--Loss of Use." That provision stated in part: "Additional Living Expense. When a Loss Insured causes the residence premises to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 24 months." "Losses Insured" included "Coverage A--Building Property." Coverage A provided: "We cover: [¶] 1. alterations, appliances, fixtures and improvements which are part of the building contained within your unit; [¶] 2. items of real property which pertain exclusively to your unit; or [¶] 3. property which is your insurance responsibility under the governing rules of the condominium. ..." (Italics omitted.) In "Section I--Losses Insured," the policy stated: "We insure for accidental direct physical loss to the property described in Coverage A [building property] ... , except as provided in SECTION I--LOSSES NOT INSURED." "Section I--Losses [***5] Not Insured" stated in relevant part: "1. We do not insure under any coverage for any loss consisting of the items in paragraphs 2., 3., 4. or 5. below. This exclusion does not apply if the loss is caused by a peril which is not otherwise excluded. [¶] 2. We do not insure for any loss to the property described in Coverage A [building property] ... which is caused by one or more of the items below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these: [¶] ... [¶] f. continuous or repeated seepage or leakage of water ... from a: [¶] ... [¶] (2) household appliance; or [¶] (3) plumbing system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings or floors; [¶] which occurs over a period of time ... ; [¶] g. wear, tear, marring, scratching, deterioration, inherent vice, latent defect or mechanical breakdown; [¶] h. corrosion, electrolysis or rust; [¶] i. Mold, fungus or wet or dry rot; [¶] j. contamination; [¶] ... [¶] 4. We [***6] do not insure under any coverage for any loss which is caused by one or more of the items below, regardless of whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these: [¶] ... [¶] c. Water Damage, meaning: [¶] (1) ... surface water ... . [¶] ... [¶] 5. We do not insure for loss described in paragraphs 2., 3. and 4. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss: [¶] ... [¶] b. defect, weakness, inadequacy, fault or unsoundness in: [¶] ... [*1247] [¶] (2) design, specifications, workmanship, construction, grading, compaction; [¶] (3) materials used in construction or repair; or [¶] (4) maintenance; [**653] [¶] of any property (including land, structures, or improvements or any kind) whether on or off the residence premises; or [¶] c. weather conditions. [¶] However, we do insure for any resulting loss from items a., b. and c. unless the resulting loss is itself [***7] a Loss Not Insured by this Section."

**(2)** With respect to building property coverage, the insurance policy at issue was a first party "all-risk" policy. (*Garvey v. State Farm Fire & Casualty Co. (1989) 48 Cal.3d 395, 399 [257 Cal. Rptr. 292, 770 P.2d 704]*; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2005) ¶ 6:250.1, p. 6B-24 (rev. # 1, 2005).) (The parties do not discuss and we do not consider the policy provisions relating to personal property loss.) An all-risk policy covers risks of physical loss except those excluded under the terms of the insuring contract. Under an all-risk policy, the limits of coverage are defined by the exclusions. (*Garvey v. State Farm Fire & Casualty Co., supra, 48 Cal.3d at p. 406*; *Nissel v. Certain Underwriters at Lloyds of London (1998) 62 Cal.App.4th 1103, 1114 [73 Cal. Rptr. 2d 174]*.) If an excluded risk is the "efficient proximate" or predominant cause of the loss, there is no coverage. (*Julian v. Hartford Underwriters Ins. Co. (2005) 35 Cal.4th 747, 761 [27 Cal. Rptr. 3d 648, 110 P.3d 903]*; *Garvey v. State Farm Fire & Cas. Co., supra, 48 Cal.3d at pp. 402-403*.) Stated conversely, if the predominate cause of [***8] loss is a covered risk, the insured's claim will be covered, even if a noninsured peril contributed to the injury. (*Julian v. Hartford Underwriters Ins. Co., supra, 35 Cal.4th at p. 754*; *State Farm Fire & Casualty Co. v. Von Der Lieth (1991) 54 Cal.3d 1123, 1131 [2 Cal. Rptr. 2d 183, 820 P.2d 285]*.)

**(3)** The Supreme Court has held that when sufficient evidence is introduced to support the possibility that a plaintiff's damages were caused by both included and excluded risks, "Coverage should be determined by a jury under an efficient proximate cause analysis." (*Garvey v. State Farm Fire & Casualty Co., supra, 48 Cal.3d at p. 412*; accord, *State Farm Fire & Cas. Co. v. Von Der Lieth, supra, 54 Cal.3d at p. 1131*.) In *Garvey*, for

example, there was conflicting evidence as to the causes of damage to the plaintiff's residence. Earth movement was an excluded peril. Contractor negligence was a covered risk. The Supreme Court held: "If the earth movement was the efficient proximate cause of the loss, then coverage would be denied ... . On the other hand, if negligence was the efficient proximate cause of the loss, then coverage exists ... . These issues were [***9] jury questions because sufficient evidence was introduced to support both possibilities." (*Garvey v. State Farm Fire & Casualty Co., supra, 48 Cal.3d at pp. 412-413.*)

It is undisputed plaintiff's condominium unit owners policy excluded coverage for mold. But an exception to the mold exclusion arose under the [*1248] following policy language found in "Section I--Losses Not Insured": "We do not insure under any coverage for any [losses not insured]. *This exclusion does not apply if the loss is caused by a peril which is not otherwise excluded.*" (Italics added.) A State Farm claims representative, Julie Lynn Nisbet, testified at trial the foregoing clause meant, "[I]f the cause of the mold is not otherwise excluded, then [State Farm] could provide coverage for the mold." Stated differently, she testified: "Mold is an excluded peril. However, if the predominant cause is covered, this paragraph gives that coverage back."

[**654] The jury found by an 11-to-1 margin that Sate Farm performed all of its contractual duties under the policy it issued to plaintiff. Further, the jury found by a 10-to-2 margin that the "Haley water event in May 2000" was not the predominant cause [***10] of the mold in plaintiff's unit. As noted, mold is a noncovered injury. But the evidence was subject to the interpretation that the May 2000 water leakage from Ms. Haley's unit was of the type that it *could* be a covered event; i.e. the leakage was a predominate cause of plaintiff's loss. Hence, that potentiality was presented to the jury. And the jury found a preponderance of the evidence demonstrated that the May 2000 water leakage from Ms. Haley's unit, which was immediately remediated, was not a predominate cause of plaintiff's injuries. Plaintiff does not contend that substantial evidence does not support the jurors' findings in this regard. Nor does plaintiff argue that the trial court committed evidentiary error in any respect. Hence, these issues have been forfeited. (*Tiernan v. Trustees of Cal. State University & Colleges (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal. Rptr. 115, 655 P.2d 317]*; *Johnston v. Board of Supervisors (1947) 31 Cal.2d 66, 70 [187 P.2d 686]*, disapproved on another point in *Bailey v. County of Los Angeles (1956) 46 Cal.2d 132, 139 [293 P.2d 449]*.) Therefore, in the absence of a loss covered by the policy, we are confronted with the question of [***11] whether plaintiff may recover for negligent failure to investigate her claim.

B. *There Was No Tort Liability in This Case for Negligent Investigation of a First Party Insurance Claim Absent Coverage*

We turn to the question whether, absent coverage, State Farm can be held liable in tort for negligently investigating plaintiff's insurance claim. The jury found State Farm negligently investigated plaintiff's claim causing her $ 260,000 in damages. We conclude there was no tort liability on State Farm's part for negligent investigation of plaintiff's first party insurance claim.

**(4)** The relationship between insured and insurer is contractual. Nevertheless, it is well established that tort liability will lie against an insurer for breach of the implied covenant of good faith and fair dealing. (*Frommoethelydo v. Fire Ins. Exchange (1986) 42 Cal.3d 208, 214 [228* [*1249] *Cal.Rptr. 160, 721 P.2d 41]*; *Silberg v. California Life Ins. Co. (1974) 11 Cal.3d 452, 461 [113 Cal. Rptr. 711, 521 P.2d 1103]*; *Gruenberg v. Aetna Ins. Co. (1973) 9 Cal.3d 566, 575 [108 Cal. Rptr. 480, 510 P.2d 1032]*; see *Kransco v. American Empire Surplus Lines Ins. Co. (2000) 23 Cal.4th 390, 402 [97 Cal. Rptr. 2d 151, 2 P.3d 1]*.) [***12] The implied covenant arises from the contract. (*Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 35-36 [44 Cal. Rptr. 2d 370, 900 P.2d 619]*; *Tran v. Farmers Group, Inc. (2002) 104 Cal.App.4th 1202, 1216-1217 [128 Cal. Rptr. 2d 728]*.) **(5)** The Supreme Court has held: "In addition to the duties imposed on the contracting parties by the express terms of their [insuring] agreement, the law implies in every contract a covenant of good faith and fair dealing. (*Comunale v. Traders & General Ins. Co. (1958) 50 Cal.2d 654, 658 [328 P.2d 198]*; see also Comment, *Extending the Insurer's Duty of Good Faith and Fair Dealing to Third Parties Under Liability Insurance Policies* (1978) 25 UCLA L.Rev. 1413, 1418-1424.) The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. (*Murphy v. Allstate Ins. Co. (1976) 17 Cal.3d 937, 940 [132 Cal. Rptr. 424, 553 P.2d 584]*; *Crisci v. Security Ins. Co. (1967) 66 Cal.2d 425, 429 [58 Cal. Rptr. 13, 426 P.2d 173]*;

*Comunale v. Traders &* [**655] *General Ins. Co., supra, 50 Cal.2d at p. 658.*)" (*Egan v. Mutual of Omaha Ins. Co. (1979) 24 Cal.3d 809, 818 [169 Cal. Rptr. 691, 620 P.2d 141]*; [***13] see *Love v. Fire Ins. Exchange (1990) 221 Cal. App. 3d 1136, 1153 [271 Cal. Rptr. 246]*.)

**(6)** The Supreme Court has held, "The precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes." (*Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal.3d at p. 818*; see *Jonathan Neil & Assoc., Inc. v. Jones (2004) 33 Cal.4th 917, 937 [16 Cal. Rptr. 3d 849, 94 P.3d 1055]*.) In the first party insurance context, the insured's primary contractual right is to receive benefits due under the policy. (*CalFarm Ins. Co. v. Krusiewicz (2005) 131 Cal.App.4th 273, 285-286 [31 Cal. Rptr. 3d 619]*; *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1153*.) Tort liability for an insurer's breach of the implied covenant of good faith and fair dealing arises when the insurer unreasonably and in bad faith withholds payment of the insured's claim. (*Frommoethelydo v. Fire Ins. Exchange, supra, 42 Cal.3d at pp. 214-215*; *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1151*.) The Supreme Court has held: " '[When] the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it [***14] is subject to liability in tort.' (*Gruenberg [v. Aetna Ins. Co., supra, 9 Cal.3d at p. 575*]; accord, *Silberg [v. California Life Ins. Co., supra, 11 Cal.3d at p. 461*]; *Fletcher[ v. Western National Life Ins. Co. (1970) 10 Cal. App. 3d 376, 401-402 [89 Cal. Rptr. 78]*].) For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it ... must give at least as much consideration to the latter's interests as it does to its own. (*Silberg[ v. California Life Ins. Co., supra, 11* [*1250] *Cal.3d at p. 460*]." (*Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal.3d at pp. 818-819*.) The Supreme Court has further explained, "[A]n insurer cannot reasonably and in good faith deny payments to its insured without fully investigating the grounds for its denial. (*Egan v. Mutual of Omaha Ins. Co.[, supra,] 24 Cal.3d [at pp.] 818-819* ... .)" (*Frommoethelydo v. Fire Ins. Exchange, supra, 42 Cal.3d at p. 215*.) When an insurer withholds benefits *for proper cause*, however, there is no breach of the implied covenant. [***15] (*Love v. Fire Ins. Exchange, supra, 121 Cal. App. 3d at p. 1151*; *California Shoppers, Inc. v. Royal Globe Ins. Co. (1985) 175 Cal. App. 3d 1, 54-55 [221 Cal. Rptr. 171]*.) This is because, as the Court of Appeal held in *California Shoppers, Inc.*: "[D]eclining to perform a contractual duty under the policy *with proper cause* is not a breach of the implied covenant. (See *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752, 770 [206 Cal. Rptr. 354, 686 P.2d 1158]*[, overruled in *Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal.4th 85, 87-88 [44 Cal. Rptr. 2d 420, 900 P.2d 669]*].)" (*California Shoppers, Inc. v. Royal Globe Ins. Co., supra, 175 Cal. App. 3d at p. 54*, original italics.) Thus, to establish an implied covenant tortious breach, an insured must show first, that benefits were due under the policy, and second, that the benefits were withheld without proper cause. (*Progressive West Ins. Co. v. Superior Court (2005) 135 Cal.App.4th 263, 278 [37 Cal. Rptr. 3d 434]*; *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1151*.)

[**656] **(7)** It follows an insured cannot maintain a claim for tortious breach of [***16] the implied covenant of good faith and fair dealing absent a covered loss. (*Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at pp. 35-36* [no potential coverage hence no duty to defend]; *McMillin Scripps North Partnership v. Royal Ins. Co. (1993) 19 Cal.App.4th 1215, 1222 [23 Cal. Rptr. 2d 243]*; *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1153*; *Murray v. State Farm Fire & Casualty Co. (1990) 219 Cal. App. 3d 58, 66 [268 Cal. Rptr. 33]*; *Brodkin v. State Farm Fire & Casualty Co. (1989) 217 Cal. App. 3d 210, 218 [265 Cal. Rptr. 710]*; see *Kopczynski v. Prudential Ins. Co. (1985) 164 Cal. App. 3d 846, 849 [211 Cal. Rptr. 12]*.) If the insurer's investigation--adequate or not--results in a *correct* conclusion of no coverage, no tort liability arises for breach of the implied convenant. (*Murray v. State Farm Fire & Casualty Co., supra, 219 Cal. App. 3d at p. 66*; *Brodkin v. State Farm Fire & Casualty Co., supra, 217 Cal. App. 3d at p. 218*; *Kopczynski v. Prudential Ins. Co., supra, 164 Cal. App. 3d at p. 849*.)

**(8)** The cause of action at issue is [***17] not breach of the implied covenant of good faith and fair dealing, but *negligence*. The question arises, therefore, whether, in the absence of benefits due under the insuring contract, plaintiff can recover for State Farm's *negligent* investigation of her claim. We conclude in this case that absent coverage, there is no tort liability for improperly investigating a first-party insurance claim whether the insurer's conduct is characterized as an implied covenant breach or negligence. The [*1251] same logic that precludes imposition of damages for breach of the implied covenant in the absence of coverage in this case

also rules out recovery for negligence. The relationship between the parties is contractual. The insured's primary right is to receive compensation for covered losses. The insurer's duty is not to unreasonably withhold the payment of benefits due. When, as here, no benefits are due, a negligent investigation does not frustrate the insured's right to the benefits of the contract. The insured who is not entitled to insurance proceeds has suffered no injury as a result of the manner in which the insurer's investigation was conducted. The Court of Appeal's conclusion in *Murray v. State Farm Fire & Casualty Co., supra, 219 Cal. App. 3d at pages 65-66,* [***18] with regard to a breach of the implied covenant claim is equally applicable to a negligence cause of action: "Whatever the merits [of the] assertion [of inadequate investigation], the fact that the investigation yielded a correct [no coverage] conclusion precludes any claim that the inadequacy caused any damage." (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc. (2000) 78 Cal.App.4th 847, 880 [93 Cal. Rptr. 2d 364]*; *Brodkin v. State Farm Fire & Casualty Co., supra, 217 Cal. App. 3d at p. 218.*)

**(9)** Also, the California Supreme Court has identified the limited circumstances where the litigants' relationship, which has its basis in a contract, can give rise to a tort claim. In *Robinson Helicopter Co., Inc. v. Dana Corp. (2004) 34 Cal.4th 979, 990 [22 Cal. Rptr. 3d 352, 102 P.3d 268]*, the Supreme Court synthesized the relevant test for allowing a contract based claim to be pursued as a tort cause of action: " 'Generally, outside the insurance context, "a tortious breach of contract ... may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or [***19] undue coercion; or (3) one party intentionally breaches the contract intending [**657] or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." [Citation.] Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated. [Citation.] If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies.' (*Erlich v. Menezes [(1999)] 21 Cal.4th [543,] 553-554 [87 Cal. Rptr. 2d 886, 981 P.2d 978].*)"

In *Robinson Helicopter*, the Supreme Court recited its prior holding in *Erlich* thusly: "In *Erlich* ... , we held that a party's contractual obligation may create a legal duty and that a breach of that duty may support a tort action. We stated, '[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. [Citation.]' (*Ibid.*) [¶] We went on to describe several instances where tort damages [***20] were permitted in contract cases. 'Tort [*1252] damages have been permitted in contract cases where a breach of duty directly causes physical injury [citation]; for breach of the covenant of good faith and fair dealing in insurance contracts [citation]; for wrongful discharge in violation of fundamental public policy [citation]; or where the contract was fraudulently induced. [Citation.]' [Citation.] '[I]n each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm. [Citation.]' [Citations.]" (*Robinson Helicopter Co., Inc. v. Dana Corp., supra, 34 Cal.4th at pp. 989-990.*)

This synthesis was based on principled distinctions between the purposes of contract and tort law. Citing largely to *Harris v. Atlantic Richfield Co. (1993) 14 Cal.App.4th 70, 77-80 [17 Cal. Rptr. 2d 649]*, former Chief Justice Malcolm Lucas explained the differing purposes of tort and contract remedies thusly: " 'The traditional goal of contract remedies is compensation of the promisee for the loss resulting from the breach, not compulsion of the promisor to perform his promises. Therefore, [***21] "willful" breaches have not been distinguished from other breaches. [Citation.] The restrictions on contract remedies serve purposes not found in tort law. They protect the parties' freedom to bargain over special risks and they promote contract formation by limiting liability to the value of the promise. This encourages efficient breaches, resulting in increased production of goods and services at lower cost to society. [Citation.] Because of these overriding policy considerations, the California Supreme Court has proceeded with caution in carving out exceptions to the traditional contract remedy restrictions. [Citations.]' ([*Harris v. Atlantic Richfield Co., supra] 14 Cal.App.4th at p. 77.*) [¶] The *Harris* court set forth as reasons for denying tort recovery in contract breach cases (1) the different objectives underlying the remedies for tort and contract breach, (2) the importance of predictability in assuring commercial stability in contractual dealings, (3)

the potential for converting every contract breach into a tort, with accompanying punitive damage recovery, and (4) the preference for legislative action in affording appropriate remedies. [***22] (*Harris [v. Atlantic Richfield Co.], supra, 14 Cal.App.4th at pp. 81-82*; see also *Foley[ v. Interactive Data Corp. (1988)] 47 Cal.3d [654], 683, 694, fn. 31, 696 [254 Cal. Rptr. 211, 765 P.2d 373].*)" (*Freeman & Mills, Inc.* [**658] *v. Belcher Oil Co. (1995) 11 Cal.4th 85, 98 [44 Cal. Rptr. 2d 420, 900 P.2d 669].*)

Plaintiff's negligence claim does not fall within the circumstances identified by the California Supreme Court which allow a contract based cause of action to be pursued as a tort claim. State Farm owed no contractual duty to plaintiff. Her negligence claim contains none of the elements identified in *Robinson Helicopter* and *Erlich*. Hence, plaintiff's negligence verdict and the ensuing judgment must be reversed.

[*1253] We recognize that in *Murray v. State Farm Fire & Casualty Co., supra, 219 Cal. App. 3d at page 66, footnote 5*, the Court of Appeal stated in obiter dictum that there may be a situation where even if there was no coverage, potential liability could still exist because of the unreasonable delay in performing an investigation. In *Murray,* the Court of Appeal noted, "[T]he insurance company might be liable if it unreasonably delayed in performing [***23] an investigation of a claim before concluding there was no coverage and the insured suffered consequential loss as a result of the delay." (*Ibid.*) Further, in *Brizuela v. CalFarm Ins. Co. (2004) 116 Cal.App.4th 578, 594 [10 Cal. Rptr. 3d 661]*, the Court of Appeal noted, again in dictum, an insurer might be liable for an implied covenant breach if, instead of investigating a noncovered claim, the insurance company embarked on a campaign to intimidate its insured into settling. (See *Progressive West Ins. Co. v. Superior Court, supra, 135 Cal.App.4th at p. 280.*) We need not discuss these holdings. None of the extreme circumstances identified is present here nor was the case litigated on these theories. There are no elements of detrimental reliance as in *Murray* nor the extreme conduct discussed in *Brizuela*. Further, we note none of these cases discusses the effect of *Robinson Helicopter* or *Erlich*. The effect of *Robinson Helicopter* or *Erlich* was not before the Courts of Appeal in *Murray* and *Brizuela* and the aforementioned analysis arose solely in the context of obiter dictum.

C., D.* [***24] [NOT CERTIFIED FOR PUBLICATION]

* See footnote, *ante*, page 1241.

IV. DISPOSITION

The judgment in favor of defendant, Lisa Haley, and against plaintiff, Magda Benavides, is affirmed. The judgment in favor of plaintiff and against defendant, State Farm General Insurance Company, is reversed. Defendants are to recover their costs on appeal from plaintiff.

Kriegler, J., concurred.

**CONCUR BY:** Mosk

**CONCUR**

**MOSK, J.,** Concurring.--I concur.

I agree that the judgment in favor of plaintiff and against defendant State Farm Insurance Company should be reversed. Plaintiff could not recover for negligence in investigating the insurance claim because "[n]egligence is not among the theories of recovery generally available against insurers. Delay or failure to pay policy benefits may be actionable as a breach of contract or bad [*1254] faith, not negligence." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2005) ¶ [***25] 11:205, p. 11-48.)

* [NOT CERTIFIED FOR PUBLICATION]

* See footnote, *ante*, page 1241.

# TAB 5

LEXSEE 70 CAL.APP.4TH 9

**SHARON BIERBOWER, Plaintiff and Appellant, v. FHP, INC., Defendant and Respondent.**

**No. G018307.**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

*70 Cal. App. 4th 1*; *82 Cal. Rptr. 2d 393*; *1999 Cal. App. LEXIS 137*; *14 I.E.R. Cas. (BNA) 1494*; *79 Fair Empl. Prac. Cas. (BNA) 69*; *99 Cal. Daily Op. Service 1326*; *99 Daily Journal DAR 1631*

**February 19, 1999, Decided**

**SUBSEQUENT HISTORY:** [***1] Rehearing Denied March 22, 1999. Review Denied May 12, 1999, Reported at: *1999 Cal. LEXIS 3128*.

**PRIOR HISTORY:** Appeal from a judgment of the Superior Court of Orange County. Super. Ct. No. 717174. Robert J. Polis, Judge.

**DISPOSITION:** The point is, of course, that maliciousness cannot be derived from negligence. Malice entails more than sloppiness or, as in this case, an easily explained typo. To make more of it borders on pettifoggery (literally, to wrangle or quibble about petty points). (See 11 Oxford English Dict. (1989) p. 643.) The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court granted a nonsuit for an employer in a defamation action by a former employee arising out of a memo written by plaintiff's supervisor relating the substance of a complaint by another employee accusing plaintiff of sexual harassment, finding that the memo was protected by the conditional privilege for communications to interested persons (*Civ. Code, § 47, subd. (c)*). (Superior Court of Orange County, No. 717174, Robert J. Polis, Judge.)

The Court of Appeal affirmed. The court held that the conditional privilege against defamation for communications made without malice on subjects of mutual interest covers investigations of sexual harassment complaints by private employers when made without malice. The malice necessary to overcome the privilege was not shown by the fact that the memo was written on the same day the complaint was received, that it was dated Aug. 27, 1992, but the first paragraph stated that the supervisor talked with the complainant on Aug. 26, 1992, a date when plaintiff was on vacation. When faced with sexual harassment allegations, the supervisor's duty was to document and report, not to evaluate or investigate. The supervisor testified, without contradiction, that the computer supplied the correct date, but he typed the wrong date. The court held that maliciousness cannot be derived from negligence and entails more than sloppiness or an easily explained typo. (Opinion by Sills, P. J., with Wallin and Sonenshine, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) Libel and Slander § 24--Qualified Privilege--Communication to Interested Persons--Report of Sexual Harassment Accusation--Malice.** --The trial court properly granted a nonsuit for an employer in a defamation action by a former employee arising out of a memo written by plaintiff's supervisor relating the substance of complaint by another employee accusing plaintiff of sexual harassment, since the memo was protected by the

conditional privilege for communications to interested persons (*Civ. Code, § 47, subd. (c)*). The malice necessary to overcome the privilege was not shown by the fact that the memo was written on the same day the complaint was received, that being the same day that the incident allegedly occurred, Aug. 27, 1992, but the first paragraph stated that the supervisor talked with the complainant on Aug. 26, 1992, a date when plaintiff was on vacation. When faced with sexual harassment allegations, the supervisor's duty was to document and report, not to evaluate or investigate. The supervisor testified, without contradiction, that the computer supplied the correct date, but he typed the wrong date. Also, the allegedly defamatory memo set forth three complaints, not just the one that happened on the date the complainant spoke with the supervisor. Moreover, when the allegedly defamatory memo is read as a whole and in the context of the undisputed fact that the complainant was at least upset (if not in tears) when she came to see the supervisor, it would be totally unreasonable to conclude that he harbored any malice in writing it. Maliciousness cannot be derived from negligence and entails more than sloppiness or an easily explained typo.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 526.]

**(2) Libel and Slander § 24--Qualified Privilege--Communication to Interested Persons--Sexual Harassment Accusation.** --The conditional privilege against defamation for communications made without malice on subjects of mutual interest (*Civ. Code, § 47, subd. (c)*) covers investigations of sexual harassment complaints by private employers when made without malice. Employers and employees both have a common interest in preventing and correcting sexual harassment. Any other conclusion would fly in the face of workplace reality as it has been shaped by sexual harassment law.

**COUNSEL:** Chandler & Vatave, Linda Hart Chandler and Sunil Lewis Vatave for Plaintiff and Appellant.

Heller, Ehrman, White & McAuliffe, Deborah C. Saxe, David B. Fischer; Jones, Day, Reavis & Pogue and Miwon Yi for Defendant and Respondent.

**JUDGES:** Opinion by Sills, P. J., with Wallin and Sonenshine, JJ., concurring.

**OPINION BY:** SILLS

**OPINION**

[*3] [**393] **SILLS, P. J.**

You cannot make a mountain out of a typo. Nor can you, at least in this case, make a defamation suit. **(1a)** Today we hold that a discrepancy [**394] in an office memo concerning the date on which an alleged incident of sexual harassment took place is insufficient [***2] evidence of malice for purposes of whether a company investigation of the alleged harassment is protected by the "common interest" privilege against defamatory communications. (See *Civ. Code, § 47, subd. (c)*.)

I

**(2)** *Civil Code, section 47, subdivision (c)* extends a conditional privilege against defamation to communications made *without malice* on subjects of mutual interest. (*Civ. Code, § 47, subd. (c)* ["A privileged publication . . . is one made: [P] . . . [P] (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested . . . ."].)

A number of cases have now established that this "mutual interest" privilege covers investigations of sexual harassment complaints by private employers when made without malice. (See *Cruey v. Gannett Co. (1998) 64 Cal. App. 4th 356, 369 [76 Cal. Rptr. 2d 670]* ["The conditional privilege set out in *subdivision (c) of section 47* potentially applies in the present case because Lacy's letter of complaint to Gannett pertains to a subject of mutual interest to Gannett and its employees, an accusation of workplace harassment and discrimination."]; *Garziano v. E. I. Du Pont De Nemours & Co. (5th Cir. 1987) 818 F.2d 380, 387* [***3] [intracompany memo protected by qualified common interest privilege under Mississippi law]; *Stockley v. AT & T Information Systems, Inc. (E.D.N.Y. 1988) 687 F. Supp. 764, 768* [applying common interest privilege under New York law to investigation into sexual harassment allegations]; *Lawson* v. *Boeing Co. (1990) 58 Wn.App. 261 [792 P.2d 545, 549]* [citing *Stockley*]; see also *Vackar v. Package Mach. Co. (N.D.Cal. 1993) 841 F. Supp. 310, 313-314* [assuming privilege applied where argument was over whether malice provision applied].)

There is no reason to doubt the validity of these courts' conclusions. As indicated by the groundbreaking case on the point, *Garziano v. E. I. Du Pont De Nemours & Co., supra, 818 F.2d 380*, employers and employees

both have a common interest in preventing and correcting sexual harassment. To that we would add--to put the matter in practical terms--that because any given interaction between any two people at the same workplace carries at least the *danger* of a sexual harassment lawsuit, the matter is necessarily of "mutual interest" under Civil Code CA_CIV_47 *section 47*, subdivision [***4] (c). Any other [*4] conclusion would fly in the face of workplace reality as it has been shaped by sexual harassment law.

The usual battleground in cases where an employee sues an employer claiming that he or she was falsely accused of sexual harassment is--as it is in the present appeal--whether the employer's communications were made with malice so as to deprive the employer of the conditional privilege. (E.g., *Stockley v. AT & T Information Systems, Inc., supra, 687 F. Supp. at p. 770* ["Plaintiff essentially concedes the existence of a qualified privilege, but argues that allegedly defamatory statements were made outside the scope of the privilege and with actual malice."].)

The present case involves a defamation action by Sharon Bierbower, a sales representative, against her former employer, FHP, a health care provider, arising out of a complaint made against her by a receptionist, Pauline Ayala. It is undisputed that on a day in late August 1992 (the exact date *is* disputed, as will soon be shown), Ayala complained about several incidents of alleged sexual harassment, including one incident that happened that very day. [1] She went to Bruce Huyghue, [***5] a senior plan manager at FHP. It is also undisputed that on that day she was upset (she testified she was crying, Huyghue testified she was upset but couldn't remember if she was crying), and related one [**395] of the incidents, which allegedly happened in the reception area. She also stated that she just wanted to make Bierbower "go away" and would file a formal complaint if Bierbower ever "approached her again in a suggestive manner."

1 The alleged incidents included one time when Bierbower stopped her car in front of Ayala in the company parking lot, asked her where she was going and said she wanted to be "friends"; one incident where Bierbower stuck out her butt at Ayala, rubbed it and licked her own lips; and one incident where Bierbower first asked to eat a baby plum that Ayala already had in her mouth, then exposed part of her breast, including a little bit of nipple, to Ayala, fondled it in front of her, and then left after making a crude remark. The plum and breast exposure incident was the one which happened the very day of the complaint.

[***6] Huyghue was familiar with FHP's anti-sexual harassment policy. As he understood company policy, he was *required* to "document" incidents of sexual harassment and report them to the company's personnel department even if the complainant did not want any action taken.

Huyghue typed up a memo concerning what Ayala had said to him within five minutes. The memo recited that he spoke with Ayala on August 26, but was dated August 27, and related the three incidents we have mentioned [*5] above. It also related the fact that Ayala wanted to file a "formal complaint" if Bierbower ever approached her in a "suggestive manner" again. [2]

2 Here is the complete text of the memo, in as close as we can approximate to its original typographical format:

"DATE: August 27, 1992

"TO: File

"FROM: W. Bruce Huyghue

"SUBJECT: Pauline Ayala Sexual Harassment Complaint

"I spoke with Pauline on August 26, 1992 regarding her complaint about the recent actions of Sharon Bierbower.

"Pauline stated that she is offended by the sexually explicit actions and remarks Sharon has made towards her.

"According to Pauline, Sharon has expressed a desire to 'become friends' with her on several occasions. According to Pauline:

"Sharon has approached Pauline in the parking lot after work and 'tried to come on to her.' She felt that the looks and comments Sharon gave her were intended to arouse a romantic interest

"Sharon asked Pauline for a plum. Pauline

answered that she was already eating the only plum she had. Sharon asked her to give her a piece of what was then in her mouth.

"Sharon entered the lobby when Pauline was at the switchboard and began talking to Pauline in a suggestive manner. Pauline asked her to get away from her. Sharon partially exposed and fondled her own breast while looking directly at Pauline. Sharon made a lewd comment and left.

"Pauline feels that the other female employees find it funny and embarrassing that Sharon displays such obvious sexual interest in Pauline who is also female.

"Pauline is aware of her right to file a complaint. She asked me to make Sharon just go away, since the Consultant group is being disbanded. She stated that she would definitely want to file a formal complaint if Sharon ever approached her again in a suggestive manner.

"I told her that I would discuss the situation with other appropriate management people and take what ever disciplinary action company policy might require."

[***7] Later that same day Huyghue spoke with Connie Walters, Bierbower's supervisor, about it. Walters told Huyghue that Bierbower was on vacation.

Now here is where the discrepancy in the dates becomes important in this appeal. Huyghue's memo was *dated* August *27*, 1992, but the first paragraph recites that "I spoke with Pauline on August 26." But it is also undisputed that on August *26* Bierbower was in Las Vegas on her vacation. According to Bierbower, because the conversation between Huyghue and Ayala took place on a date on which Huyghue knew Bierbower was on vacation, yet concerned an incident which took place on that very date, Huyghue necessarily must have known that Ayala's accusations were false (cf. *Lawson* v. *Boeing Co., supra, 792 P.2d at p. 549* ["If their allegations were false, they were unquestionably knowingly false."]). For Bierbower, the fact Huyghue later circulated the memo to the personnel department necessarily demonstrates that he acted with malice because the memo contained what he knew was a false accusation.

[*6] For his part, Huyghue testified that he wrote the memo on *August 27*, because the date was automatically supplied [***8] by his computer, and the recitation that he spoke with Ayala on August 26 was simply a mistake. Ayala, on the other hand, testified that she could not remember "the exact date," and said it was *either* the 26th or the 27th, but in any event it was the day she went to Huyghue. She did, however, admit that at her deposition she testified that the date was the 26th.

Despite the discrepancy over the date of Ayala's talk with Huyghue, the trial court judge granted a motion for nonsuit after Bierbower had rested her case when her [**396] defamation suit against FHP came to trial in May 1995. The judge concluded that Bierbower had failed to present any substantial evidence of malice on the part of FHP. From the ensuing judgment Bierbower has brought this appeal.

II

**(1b)** Naturally, given the procedural posture of the appeal, Bierbower reminds us that the standard of review of a judgment based on a motion for nonsuit runs in her favor. She is entitled to the benefit of any conflict in the evidence and any reasonable inference that might be drawn from it. Even so, we cannot say the trial court erred. A number of reasons based on the undisputed facts require this conclusion.

First, [***9] Huyghue's marching orders when faced with sexual harassment allegations were to document and report, not to evaluate. His testimony was unequivocal that his job was to document and report, not investigate. The question of *whether* Bierbower might have been falsely accused was not for him to decide. In that regard, we can hardly say that an employer acts maliciously in requiring supervisorial employees who may have no formal training in factual investigation to document and report sexual harassment claims without first having to ascertain the validity of those complaints. FHP's policy is easily justified as a matter of reasonable employer prudence. (See *Cotran v. Rollins Hudig Hall Internat., Inc. (1998) 17 Cal. 4th 93, 106-107 [69 Cal. Rptr. 2d 900, 948 P.2d 412].*) As our Supreme Court has recently observed, sexual harassment investigations may implicate "intractable factual uncertainties." ( *Id. at p. 106.*) [3] Given the difficulty faced by the employer in the face of a sexual harassment allegation, an employer certainly acts reasonably by having a mechanism for forwarding complaints on [*7] for an investigation even where there is something [***10] suspicious about the

complaint. To hold an employer liable for defamation because one employee must pass on a defamatory allegation of sexual harassment to another for investigation flies in the face of all sexual harassment law. The idea that the formal investigation should be conducted by a firm's human relations or personnel departments rather than the supervisor who first receives the complaint is an eminently reasonable one, if only because it promotes neutrality in any investigation. (See Lederman, *Investigating Sexual Harassment* (Nov. 1998) 18 Cal.Law. 73, 75 [recommending that investigation be conducted by employer's human relations department, or other neutral entity]; cf. *Casenas v. Fujisawa USA, Inc. (1997) 58 Cal. App. 4th 101 [67 Cal. Rptr. 2d 827]* [memo to regional sales manager containing sexual harassment complaint prompted timely investigation by both regional sales manager and company personnel manager; firm's response described by court as "exemplary"].) 4

3 A point with which Justice Kennard *agreed* in her concurring and dissenting opinion. (See 17th Cal. 4th at p. 117 (conc. & dis. opn. of Kennard, J.) ["resolution of close factual questions involving difficult evaluations of witness credibility and hard choices among conflicting inferences"].)

[***11]

4 As our Supreme Court observed in *Cotran* in the context of whether a dismissal contravened an implied agreement not to discharge except for good cause, the proper inquiry is whether the employer's decision that a "dischargeable act had been committed" had been "reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual." (*Cotran v. Rollins Hudig Hall Internat., Inc., supra, 17 Cal. 4th at p. 107.*) It is thus almost impossible to see how any one could take issue with a company policy that required all sexual harassment complaints to be forwarded for "appropriate investigation," and did not risk allowing the complaint to fall through the cracks by giving the supervisorial employee discretion to pocket veto any complaint if he or she concluded it was unfounded. Such a policy further promotes neutrality in the investigation. On the other hand, as *Casenas* teaches us, an employer who does allow a supervisor who receives a complaint to participate in its investigation can hardly be faulted either. In *Casenas* we gave the employer an "A" grade for an "exemplary" investigation. (See *Casenas v. Fujisawa USA, Inc., supra, 58 Cal. App. 4th at p. 118.*) Whether FHP here should get an "A" for its rigid requirement that all complaints be passed on to personnel (which assures neutrality), or merely a "B-" because the same policy allows possibly meritless complaints to make their way higher up the corporate hierarchy than might otherwise be the case, is a matter on which reasonable minds can disagree. Both approaches, however, obviously pass the course.

[***12] [**397] Two, the allegedly defamatory memo set forth *three* complaints from Ayala, not just the one that happened on the date Ayala spoke with Huyghue. This fact demonstrates that Huyghue's state of mind in writing the memo was to document and report Ayala's complaint, not investigate the bona fides of the one incident that allegedly happened on the day the memo was written. (Cf. generally, *Cotran v. Rollins Hudig Hall Internat., Inc., supra, 17 Cal. 4th at p. 107* [emphasizing employer's state of mind in distinction to whether employee did "in fact" commit dischargeable act as criterion for whether there was good cause to discharge].) As such, actual falsity was irrelevant from the point of view of Huyghue's duties in the overall scheme of FHP's anti-sexual harassment policy, and therefore the fact that the date might have belied Ayala's story is also irrelevant. Huyghue's role was [*8] simply to pass on information as part of an *overall* anti-sexual harassment policy, not adjudicate the bona fides of any given claim.

Three, when the allegedly defamatory memo is read as a whole and in the context of the undisputed fact that Ayala was at least "upset" [***13] (if not in tears) when she came to see Huyghue, it would be totally unreasonable to conclude that Huyghue harbored any malice in writing it. There is a complete absence in the text of the memo--with the arguable exception of the discrepancy in the dates--of anything that would even begin to give rise to an inference that Ayala's complaint was false. The memo recites that Ayala just wanted Bierbower to "go away" and only planned to file a "formal complaint" after the *next* incident of alleged harassment. That is hardly what one would expect from someone who was contriving an obviously false story against a coworker who supposedly was several hundred

miles away at the time. The facts that Ayala only wanted to have Bierbower kept away from her and would only file a formal complaint if another incident took place would naturally lead someone in Huyghue's position to believe that Ayala was not fabricating her complaint.

Finally, with regard to the discrepancy in the dates, Huyghue's testimony that his computer supplied the right date and he simply got the date wrong is without any basis for contradiction. As anyone who has ever written a check in January dated the previous year knows, [***14] human beings often make mistakes with exact dates. [5] It is unreasonable to ascribe to a malevolent conspiracy that which is easily, naturally and *ordinarily* explained by a common human error. "Things happen," as one of the wisest portions of the Civil Code reminds us, "according to the ordinary course of nature and the ordinary habits of life." (Civ. Code, CA_CIV_3546 § 3546.) Given the totality of evidence in this case, no reasonable jury could have found malice on FHP's part in this case.

5 There is no reasonable inference that can be drawn in Bierbower's favor from the fact that one date was typed in and the other generated automatically by the computer. If an inference had to be drawn, it is that the date Huyghue typed in was the incorrect one, because--however maddening computers and their software programs can sometimes be--they usually have the right date and approximately the right time.

Unlike *Cruey v. Gannett Co., supra, 64 Cal. App. 4th 356*, this case does not involve [***15] the issue of whether there was any evidence that a complaining *coworker* may have acted with malice in making a false sexual harassment complaint. (Cf. *Cruey, supra, 64 Cal. App. 4th at pp. 369-370* [statement by coworker that she "knew how to protect her job" held sufficient to allow malice issue to go to jury].) This case, rather, is more like *Garziano v. E. I. Du Pont De Nemours & Co., supra, 818 F.2d at pages 390-391* and *Vackar v.* [*9] *Package Mach. Co., supra, 841 F. Supp. at pages 314-315*, where the allegedly defamed coworker unsuccessfully argued that malice could be inferred from the fact that the employer could have done a better job of investigating the sexual harassment complaint.

The point is, of course, that maliciousness cannot be derived from negligence. Malice entails more than sloppiness or, as in this case, an easily explained typo. To make more of it borders on pettifoggery (literally, to wrangle or quibble about petty points). [**398] (See 11 Oxford English Dict. (1989) p. 643.) The judgment is affirmed.

Wallin, J., and Sonenshine, J., concurred.

A petition for a rehearing was denied March 22, 1999, and [***16] appellant's petition for review by the Supreme Court was denied May 12, 1999.

# TAB 6

LEXSEE 42 CAL.3D 1042

**WILLIAM PETER BLATTY, Plaintiff and Appellant, v. NEW YORK TIMES COMPANY, Defendant and Respondent**

**L.A. No. 32173**

**Supreme Court of California**

***42 Cal. 3d 1033*; *728 P.2d 1177*; *232 Cal. Rptr. 542*; *1986 Cal. LEXIS 300*; *13 Media L. Rep. 1928***

**December 29, 1986**

**SUBSEQUENT HISTORY:** Appellant's Petition for a Rehearing was Denied February 26, 1987.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. WEC82071, Laurence J. Rittenband, Judge.

**DISPOSITION:** The judgment of the Court of Appeal is reversed insofar as it reverses the judgment of dismissal on the amended complaint's causes of action for intentional interference with prospective economic advantage, with directions to affirm the judgment in that respect, and in all other respects the judgment of the Court of Appeal is affirmed; and the order of the Court of Appeal dismissing as moot the appeal from the order denying the motion to tax costs is reversed with directions to resolve that issue on the merits.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action by the author of a novel against a newspaper based upon the newspaper's failure to include the novel on its best seller list, the trial court sustained without leave to amend defendant's demurrer to causes of action for negligent interference with prospective economic advantage, negligence, and trade libel, and sustained with leave to amend defendant's demurrer to the cause of action alleging intentional interference with prospective economic advantage. Plaintiff amended the complaint to allege intentional interference with prospective economic advantage based on publication of the list in the newspaper, intentional interference with prospective economic advantage based on marketing of the list, unfair competition in violation of *Bus. & Prof. Code, §§ 17200-17208*, false and misleading advertising in violation of *Bus. & Prof. Code, §§ 17500-17520*, and "breach of the public duty and trust to report the news fairly and honestly without bias or prejudice." The trial court sustained defendant's demurrer to the amended complaint without leave to amend. (Superior Court of Los Angeles County, No. WEC82071, Laurence J. Rittenband, Judge.) The Court of Appeal, Second Dist., Div. Seven, Nos. B008737 and B010053, affirmed in part and reversed in part.

The Supreme Court affirmed in part and reversed in part with directions the judgment of the Court of Appeal, holding that the causes of action plaintiff attempted to assert in his original and amended complaints had as their gravamen the alleged injurious falsehood of the best seller list, and hence were required to satisfy *U.S. Const., 1st Amend.*, requirements. The court further held that the trial court properly sustained without leave to amend defendant's demurrer to all the causes of action, since none of them alleged nor reasonably could allege that the list was "of and concerning" plaintiff author or his novel. (Opinion by Mosk, J., with Bird, C. J., Reynoso and Panelli, JJ., concurring. Separate concurring and dissenting opinion by Grodin, J., with Broussard and Lucas, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 128--Scope and Extent--**

**Rulings on General Demurrers.** --When the ultimate object of review is the sufficiency of a complaint against a general demurrer, the reviewing court accepts as true all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. The reviewing court also considers facts that may be judicially noticed. Moreover, when the allegations of the complaint contradict or are inconsistent with such facts, the reviewing court accepts the latter and rejects the former. When a demurrer is sustained, the reviewing court determines whether the complaint states facts sufficient to constitute a cause of action. When it is sustained without leave to amend, the reviewing court decides whether there is a reasonable possibility that the defect can be cured by amendment. If it can be, the trial court has abused its discretion and will be reversed. If not, there has been no abuse of discretion and the trial court's ruling will be affirmed. The burden of proving such reasonable possibility is on the plaintiff.

**(2) Libel and Slander § 38--Actions--Pleading--Complaint--Plaintiff's Burden of Pleading and Proving Falsehood.** --In defamation actions, in which the alleged injurious falsehood of a statement is the gravamen of the plaintiff's claim, for constitutional purposes it is not enough that the traditional affirmative defense of truth, with the burden of proof on the defendant, be available to the press; rather it is the plaintiff who is required to plead and prove falsehood.

**(3a) (3b) Libel and Slander § 4--Application to Plaintiff.** --In defamation actions *U.S. Const., 1st Amend.*, requires that the statement on which the claim is based must specifically refer to, or be "of and concerning," the plaintiff in some way. A defamation plaintiff cannot constitutionally establish liability without satisfying the requirement, even though the governing state law imposes no such prerequisite. The "of and concerning" or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe caused them some hurt. The requirement serves to immunize a kind of statement which, though it can cause hurt to an individual, is deemed too important to the vigor and openness of public discourse in a free society to be discouraged.

**(4a) (4b) Constitutional Law § 57--Freedom of the Press--Application of Constitutional Limitations to Claims Based Upon Alleged Injurious Falsehood of a Statement.** --The limitations that define the zone of protection of *U.S. Const., 1st Amend.*, for the press apply to all claims whose gravamen is the alleged injurious falsehood of a statement. Although such limitations happen to have arisen in defamation actions, they do not concern matters peculiar to such actions but broadly protect free-expression and free-press values. Moreover, if these limitations applied only to actions denominated "defamation," they would furnish little if any protection to free-speech and free-press values: plaintiffs suing press defendants might simply affix a label other than "defamation" to their injurious-falsehood claims--a task that appears easy to accomplish as a general matter. To prevent creative pleading from rendering the limitations nugatory, they must be broadly applicable wherever the gravamen of the claim is injurious falsehood.

**(5) Interference § 8--Interference With Prospective Economic Advantage--Justification, Privilege, Defenses--Newspaper's Failure to Include Novel on Best Seller List.** --In an action by the author of a novel against a newspaper for failure of the newspaper to include the novel on its best seller list, the trial court properly sustained defendant newspaper's demurrer to causes of action alleging intentional interference with prospective economic advantage. Since the gravamen of those causes of action was the alleged injurious falsehood of a statement, they were required to satisfy the requirements of *U.S. Const., 1st Amend.* The claims failed to allege that the list was of and concerning, or specifically referred to, plaintiff author or his novel. Moreover, the best seller list did not expressly refer to the author or his novel, and could not be reasonably understood to so refer by implication. The statement alleged to be injuriously false concerned a group in excess of 25 members, and accordingly plaintiff could not show that the statements were of and concerning him. Moreover, plaintiff failed to attempt to carry his burden of showing that it was reasonably possible he could cure the defect by amendment.

**(6) Constitutional Law § 57--Freedom of the Press--Application of Constitutional Limitations to Claims Based Upon Alleged Injurious Falsehood of a Statement.** --In an action by the author of a book against a newspaper for failure of the newspaper to include the book on its best seller list, the trial court properly sustained defendant newspaper's general demurrer to

causes of action alleging negligent interference with prospective economic advantage, negligence, trade libel, unfair competition in violation of *Bus. & Prof. Code, §§ 17200- 17208*, false and misleading advertising in violation of *Bus. & Prof. Code, §§ 17500- 17520*, and "breach of the public duty and trust to report the news fairly and honestly without bias or prejudice." Each of these causes of action had as its gravamen the alleged injurious falsehood of the list and hence was required to satisfy the requirements *U.S. Const., 1st Amend.*, and none of the causes of action alleged or reasonably could allege that the list was "of and concerning" the author or his novel.

**COUNSEL:** Richard M. Coleman, John P. Farrell and Coleman & Farrell for Plaintiff and Appellant.

McCutchen, Doyle, Brown & Enersen, Palmer Brown Madden and Lynne M. Yerkes as Amici Curiae on behalf of Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Richard P. Levy, Gail E. Lees, William C. Foutz and David A. Thurm for Defendant and Respondent.

Edward J. McIntyre, John Allcock, Laura Whitcomb Halgren, Gray, Cary, Ames & Frye and Harold W. Fuson, Jr., as Amici Curiae on behalf of Defendant and Respondent.

**JUDGES:** Opinion by Mosk, J., with Bird, C. J., Reynoso and Panelli, JJ., concurring. Separate concurring and dissenting opinion by Grodin, J., with Broussard and Lucas, JJ., concurring.

**OPINION BY:** MOSK

**OPINION**

[*1036] [**1178] [***543] The fundamental question in this case is whether a newspaper can be held liable for failing to include a book in its list of "best sellers." As we shall explain, we conclude that the answer is no.

I

Plaintiff William Peter Blatty brought this action for damages against defendant New York Times Company, publisher of the New York Times. Four causes of action are asserted in the original complaint: negligent interference with prospective economic advantage, intentional interference with prospective economic advantage, negligence, and trade libel.

The allegations underlying each of these causes of action may be summarized as follows: Blatty is the author of a number of works of fiction [*1037] including *The Exorcist* and a recently published hardback novel entitled *Legion*; the Times publishes a weekly list "purporting to rank best selling books . . . based on actual sales"; because many new books are published each year, authors whose hardback books appear on this list benefit by greater sales of the books themselves and an increased value of paperback and film rights; although the list purports to rank books on the basis of sales and expresses no opinion on their merits, because of the reputation of the Times and its perceived expertise in literary matters the list has a substantial positive influence on the ordering and promotion [**1179] of books by booksellers and on the purchase of books by consumers; the Times knew or should have known of this influence; *Legion*, authored by Blatty and published by Simon & Schuster, sold more than enough copies, and met all other criteria, to merit inclusion on the list; the Times, however, failed to include *Legion*; [***544] as a result, Blatty suffered injury by loss of the benefits that inclusion would have brought. With respect to the intentional-interference claim it is also alleged that Simon & Schuster provided the Times with information to the effect that *Legion* had sold more than enough copies to merit inclusion, but that the Times nevertheless refused to include the book.

Although they bear different labels, the four causes of action each have as their gravamen the alleged injurious falsehood of a statement -- viz., the Times falsely represented that the list was based on actual sales; by failing to include *Legion*, the Times falsely represented that the novel did not meet its stated criteria for inclusion; by these misrepresentations, the Times adversely affected the volume of sales of the hardback edition and consequently the value of the paperback and film rights, thereby subjecting Blatty to injury.

Before the Times responded to the complaint, Blatty filed a notice to take certain depositions and produce certain documents. Thereupon the Times generally demurred on the following ground, among others: "The Complaint as a whole fails to state facts sufficient to constitute a cause of action against the Times in that . . .

the complained of 'Best Seller' list is not of and concerning plaintiff and therefore cannot constitutionally provide a basis for liability upon a media defendant . . . ." In its memorandum of points and authorities the Times properly requested that the court take compulsory judicial notice, pursuant to *Evidence Code sections 452* and *453*, of a copy of one week's list which bore the following legend: "The listings above are based on computer-processed sales figures from about 2,000 bookstores in every region of the United States."

Blatty moved to compel discovery, asserting his right to do so despite the pendency of the demurrer. In support he submitted a declaration incorporating by reference an attached newspaper article which he alleged [*1038] showed the relevance of the proposed discovery. Led by the article to question the truth of Blatty's allegation that the Times refused to include *Legion* on the list despite its receipt of sales information from Simon & Schuster, the court declined to rule on the demurrer until it could determine whether the allegation was supported by admissible evidence. Over Blatty's objection, the court then issued an order directing the parties to depose certain employees of Simon & Schuster and the Times with regard to the alleged communication and to that matter alone, and the parties did so. Also over Blatty's objection, the court prohibited further discovery until the legal sufficiency of his complaint appeared.

Taking judicial notice of what it considered to be the "uncontradicted facts adduced at the depositions" to the effect that "at no time did [Simon & Schuster] disclose to [the Times] the actual figures of sales of the book," the court made the following ruling, as subsequently clarified, on the demurrer. As to the intentional-interference claim, the court sustained the demurrer but granted leave to amend "to allege in good faith facts to establish (1) that the New York Times violated its public duty or trust to sell or distribute its newspaper to the public containing a fair and honest report of all news without bias or prejudice; and (2) . . . that the New York Times had in its possession reports of the actual sales of the book, *Legion*, which would qualify it for inclusion on the Best Seller List, and deliberately refrained from listing plaintiff's book." As to this cause of action the court ruled that "if the new facts to be alleged also are sufficient to support other causes of action, the complaint may so allege," and that Blatty was "[limited] . . . to a cause of action for an intentional omission of *Legion* from the 'Best Seller List' by the New York Times despite its *knowledge* [**1180] that the sales of the book to the public qualified it for inclusion on the List." As to Blatty's other claims, the court sustained the demurrer "on all grounds stated therein without leave to amend."

In his amended complaint Blatty added Doe defendants and asserted five causes of [***545] action: intentional interference with prospective economic advantage based on the Times publication of the list in the newspaper; intentional interference with prospective economic advantage based on the Times marketing of the list separate and apart from its newspaper publication; unfair competition in violation of *Business and Professions Code sections 17200 to 17208*; false and misleading advertising in violation of *Business and Professions Code sections 17500 to 17508*; and "breach of [the] public duty and trust to report the news fairly and honestly without bias or prejudice."

The allegations underlying each of these causes of action are essentially those stated in the original complaint with the following relevant modifications and additions: the Times falsely "represented . . . that the List was [*1039] an objective, unbiased and accurate compilation of actual sales of books each week by 2000 bookstores in every region of the United States"; and Simon & Schuster told the Times that it had sales figures to substantiate its claim that *Legion* merited inclusion, but the Times failed and refused to review the figures.

Once again, although they bear different labels the five causes of action each have as their gravamen the alleged injurious falsehood of a statement -- viz., the Times falsely represented that the list was an accurate compilation of actual book sales; by failing to include *Legion*, the Times falsely represented that the novel did not meet its stated criteria for inclusion; and by so doing the Times caused Blatty to be harmed.

The Times again generally demurred on the ground, among others, that the complaint was "barred by the *First Amendment to the United States Constitution* and by *Article I, Section 2 of the California Constitution*, in that those provisions . . . forbid the imposition of liability where, as here, no statement has been made 'of and concerning' the plaintiff . . . ." In its memorandum of points and authorities the Times again effectively made a proper request that the court take compulsory judicial notice of a copy of one week's list and the legend it bore.

The court sustained the demurrer without leave to

amend "on grounds stated in the moving papers," ordered the action dismissed, awarded costs to the Times, and entered judgment accordingly. After judgment Blatty moved to tax costs, and the court denied the motion.

Thereupon Blatty filed timely notices of appeal from the judgment of dismissal and the order denying his motion to tax costs. On his motion the Court of Appeal ordered the appeals consolidated.

On appeal, Blatty contended that both the original and the amended complaints stated causes of action, and that in the proceedings on the demurrer to the original complaint the court erred in ordering and taking judicial notice of the depositions and in restricting discovery to those limited depositions. He also contended that the court erred in denying his motion to tax costs.

Relying on our decision in *Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660]*, in which we held that "Although ordinarily an appellate court will not consider the allegations of a superseded complaint [citation], that rule does not apply when the trial court denied plaintiffs leave to include those allegations in an amended complaint," the Court of Appeal concluded [*1040] that its review extended not only to the claims of the amended complaint but also to those of the original complaint as to which the trial court sustained the demurrer without leave to amend.

The Court of Appeal held that the facts alleged were legally sufficient to support the intentional interference causes of action [**1181] of the amended complaint and accordingly reversed the judgment of dismissal in that respect with directions to overrule the demurrer as to those causes of action. It also held that the trial court otherwise properly ruled on the demurrers, and hence that it was not obligated to, and did not, reach Blatty's contentions concerning the [***546] discovery rulings; it therefore affirmed the judgment in all other respects. It also dismissed the appeal from the order denying Blatty's motion to tax costs on the ground that because the award of costs to the Times was incident to the judgment, the partial reversal operated to vacate the award and hence this appeal was moot.

Both parties petitioned for review. In his petition Blatty contended that the trial court erred in ordering and taking judicial notice of the depositions for the purpose of ruling on the original complaint and that the Court of Appeal erred in holding that no cause of action was or could be stated for negligence, negligent interference with prospective economic advantage, or unfair competition. In its petition the Times contended that the Court of Appeal erred in holding that on the facts alleged it can be held liable under either or both of the amended complaint's two causes of action for intentional interference with prospective economic advantage.

II

**(1)** When, as in this case, the ultimate object of our review is the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. We accept as true "all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." ( *Serrano v. Priest (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]*.) We also consider facts that may be judicially noticed. (*Ibid.*) Indeed, when the allegations of the complaint contradict or are inconsistent with such facts, we accept the latter and reject the former. (See, e.g., *Curran v. Mount Diablo Council of the Boy Scouts (1983) 147 Cal.App.3d 712, 722 [195 Cal.Rptr. 325, 38 A.L.R.4th 607]*; *Saltares v. Kristovich (1970) 6 Cal.App.3d 504, 510-511 [85 Cal.Rptr. 866]*, and cases cited.) "When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has [*1041] been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." ( *Blank v. Kirwan (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]*.)

The Times contends that Blatty's intentional interference claims -- and his other claims as well -- do not, and cannot, state a claim on which relief may be granted. In support it argues, inter alia, that the *First Amendment to the United States Constitution* and *article I, section 2, of the California Constitution* establish an absolute bar to liability. For the reasons that follow, we agree.

A

**(2)** In order to advance society's interest in free and open discussion on matters of public concern and to

avoid undue self-censorship by the press, the First Amendment establishes a broad zone of protection within which the press may publish without fear of incurring liability on the basis of injurious falsehood. ( *Reader's Digest Assn. v. Superior Court (1984) 37 Cal.3d 244, 265 [208 Cal.Rptr. 137, 690 P.2d 610]*; see *Bose Corp. v. Consumers Union of U.S., Inc. (1984) 466 U.S. 485, 513 [80 L.Ed.2d 502, 525, 104 S.Ct. 1949]*; see generally *New York Times Co. v. Sullivan (1964) 376 U.S. 254, 267-283 [11 L.Ed.2d 686, 698-708, 84 S.Ct. 710]*; *Curtis Publishing Co. v. Butts (1967) 388 U.S. 130, 155 [18 L.Ed.2d 1094, 1111, 87 S.Ct. 1975]* [plur. opn.], 162-165 [18 L.Ed.2d 1115-1117] [conc. opn. of Burger, C. J.], 170 [*18 L.Ed.2d 1120]* [conc. opn. of Black, J.], 172 [*18 L.Ed.2d 1121]* [conc. opn. of Brennan, J.]; *Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 339-348* [**1182] *[41 L.Ed.2d 789, 804-810, 94 S.Ct. 2997].*) *Article I, section 2, of the California Constitution*, our state constitutional guarantee of freedom of expression and of the press, independently establishes a zone of protection that is broader still. (See *People v. Glaze (1980) 27 Cal.3d 841, 844, fn. 2 [166 Cal.Rptr. 859, 614 P.2d 291]*; [***547] *Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908-910 [153 Cal.Rptr. 854, 592 P.2d 341]*, affd. *(1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]*; *Wilson v. Superior Court (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116].*)

The necessity for this protection is clear. "The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty -- and thus a good unto itself -- but also is essential to the common quest for truth and the vitality of society as a whole." ( *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at pp. 503-504 [80 L.Ed.2d at p. 518*].)

The First Amendment establishes its broad zone of protection by means of various rules. Two are especially implicated by the allegations of the original and amended complaints herein.

[*1042] At the threshold, in defamation actions -- in which, of course, the alleged injurious falsehood of a statement is the gravamen of the plaintiff's claim -- the amendment has abrogated the common law of strict liability. ( *Gertz v. Robert Welch, Inc., supra, 418 U.S. at p. 347 [41 L.Ed.2d at pp. 809-810*].) For constitutional purposes it is not enough that the traditional affirmative defense of truth, with the burden of proof on the defendant, be available to the press; rather it is the plaintiff who is required to plead and prove falsehood. ( *Id. at pp. 339-348 [41 L.Ed.2d at pp. 804-810*]; *New York Times Co. v. Sullivan, supra, 376 U.S. at pp. 278-280 [11 L.Ed.2d at pp. 705-707*]; see, e.g., *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at p. 511, fn. 30 [80 L.Ed.2d at p. 524, fn. 30*] [holding that when the plaintiff is a public official or public figure, in order to carry his burden he must prove "actual malice" -- i.e., he must "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement"]; *Gertz v. Robert Welch, Inc., supra, at p. 347 [41 L.Ed.2d at pp. 809-810*] [effectively holding that when the plaintiff is a private individual, he must prove that the defendant made the falsehood with at least negligence].)

**(3a)** In defamation actions the First Amendment also requires that the statement on which the claim is based must specifically refer to, or be "of and concerning," the plaintiff in some way. The *New York Times* case suggested as much, although it could possibly have been read to imply that the requirement derives from the due process clause of the Fourteenth Amendment and ultimately from the state's definition of the tort of defamation, and hence that it is merely an element which the state is presumably free to require or not as it sees fit. (*376 U.S. at pp. 288-292 [11 L.Ed.2d at pp. 711-714*].) *Rosenblatt v. Baer (1966) 383 U.S. 75 [15 L.Ed.2d 597, 86 S.Ct. 669]*, however, made it plain that the requirement derives directly and ultimately from the First Amendment. In that case, the United States Supreme Court held that a defamation plaintiff could not constitutionally establish liability without satisfying the requirement even though the governing state law imposed no such prerequisite: "under *New York Times* . . . [the plaintiff is] required to show *specific reference*." ( *Id. at p. 83 [15 L.Ed.2d at p. 604*], italics added.)

**(4a)** Although the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement: "[that] constitutional protection does not depend on the label given the stated cause of action" ( *Reader's Digest Assn. v. Superior Court, supra, 37 Cal.3d at p. 265*), and no cause of action "can claim . . . talismanic immunity from constitutional limitations" [*1043] [**1183] ( *New*

*York Times Co. v. Sullivan, supra, 376 U.S. at p. 269 [11 L.Ed.2d at p. 700]*). (See, e.g., *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at pp. 493-514 [80 L.Ed.2d at pp. 511-526*] [in a product-disparagement action a public figure plaintiff must prove actual malice]; *Time, Inc. v. Hill (1967) 385 U.S. 374, 387-388* [***548] *[17 L.Ed.2d 456, 466-467, 87 S.Ct. 534]* [under a statute granting a person a right of action when his name, picture, or portrait is the subject of a false publication, a public-figure plaintiff must prove actual malice]; *Reader's Digest Assn.* v. *Superior Court, supra*, at p. 265 [in an action for intentional infliction of emotional distress, "false light" invasion of privacy, and "intrusion" invasion of privacy, a public-figure plaintiff must prove actual malice]; *Kapellas v. Kofman (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]* [same as to "false light" invasion of privacy].)

Further, it is immaterial for First Amendment purposes whether the statement in question relates to the plaintiff himself or merely to his property broadly defined. (See *Bose Corp. v. Consumers U. of U.S., Inc. (D. Mass. 1981) 508 F.Supp. 1249, 1270-1271*, revd. on other grounds (1st Cir. 1982) *692 F.2d 189*, affd. *(1984) 466 U.S. 485 [80 L.Ed.2d 502, 104 S.Ct. 1949]* [holding that when a public-figure plaintiff sues to recover damages predicated on injury to his product, just as when he sues to recover damages predicated on injury to his reputation, he must prove actual malice]; *Simmons Ford, Inc.* v. *Consumers Union of U.S.* (S.D.N.Y. 1981) *516 F.Supp. 742, 744, fn. 4* [same].)

The fundamental reason that the various limitations rooted in the First Amendment are applicable to all injurious falsehood claims and not solely to those labeled "defamation" is plain: although such limitations happen to have arisen in defamation actions, they do not concern matters peculiar to such actions but broadly protect free-expression and free-press values. (See *Reader's Digest Assn. v. Superior Court, supra, 37 Cal.3d at p. 265*.)

For example, the fault requirement gives "freedom[] of expression . . . the 'breathing space' that [it] '[needs] . . . to survive.'" ( *New York Times Co. v. Sullivan, supra, 376 U.S. at pp. 271-272 [11 L.Ed.2d at p. 701*].) As the United States Supreme Court has stated: "Realistically, . . . some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times, Butts, Gertz*, and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material." ( *Herbert v. Lando (1979) 441 U.S. 153, 171-172 [60 L.Ed.2d 115, 131, 99 S.Ct. 1635]*; accord, *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at p. 513 [80 L.Ed.2d at p. 525*].)

[*1044] The "of and concerning" or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt. To allow a plaintiff who is not identified, either expressly or by clear implication, to institute such an action poses an unjustifiable threat to society. For example, as a federal court has cautioned, the absence of the "of and concerning" requirement "could invite any number of vexatious lawsuits and seriously interfere with public discussion of issues, or groups, which are in the public eye. Statements about a religious, ethnic, or political group could invite thousands of lawsuits from disgruntled members of these groups claiming that the portrayal was inaccurate and thus libelous. Such suits would be especially damaging to the media, and could result in the public receiving less information about topics of general concern." (*Michigan United Conservation Clubs* v. *CBS News* (W.D.Mich. 1980) *485 F.Supp. 893, 900*, affd. (6th Cir. 1981) *665 F.2d 110*.) In the special case in which the plaintiff is a public official suing in response to criticism of governmental operations, an absence of this requirement would allow recovery based on a theory that is "tantamount to . . . libel of government, [**1184] and therefore . . . constitutionally insufficient." ( *Rosenblatt v. Baer, supra, 383 U.S. at p. 83 [15 L.Ed.2d at p. 604*].)

**(3b)** The "of and concerning" requirement serves to immunize a kind of statement which, though it can cause hurt to an individual, [***549] is deemed too important to the vigor and openness of public discourse in a free society to be discouraged. Statements of opinion, "[however] pernicious," are immunized by the First Amendment in order to insure that their "correction [depends] not on the conscience of judges and juries but on the competition of other ideas." ( *Gertz v. Robert Welch, Inc., supra, 418 U.S. at p. 339-340 [41 L.Ed.2d at p. 805*].) Statements without specific reference are immunized for a similar reason: "'It is far better for the public welfare that some occasional consequential injury

to an individual arising from general censure of his profession, his party, or his sect should go without remedy than that free discussion on the great questions of politics, or morals, or faith should be checked by the dread of embittered and boundless litigation.'" ( *Michigan United Conservation Clubs* v. *CBS News, supra*, 485 F.Supp. at p. 900.) [1]

1 To be referred to specifically, we emphasize, the plaintiff need not be mentioned by name, but may be identified by clear implication. For example, if a company consists of Smith, Jones, and Doe, and a publication asserts "Smith and Jones are the only honest members of the company," certainly the publication specifically refers to Doe and accuses him of dishonesty by clear implication.

**(4b)** Not only does logic compel the conclusion that First Amendment limitations are applicable to all claims, of whatever label, whose gravamen [*1045] is the alleged injurious falsehood of a statement, but so too does a very pragmatic concern. If these limitations applied only to actions denominated "defamation," they would furnish little if any protection to free-speech and free-press values: plaintiffs suing press defendants might simply affix a label other than "defamation" to their injurious-falsehood claims -- a task that appears easy to accomplish as a general matter (see, e.g., *Reader's Digest Assn. v. Superior Court, supra, 37 Cal.3d at p. 265* [injurious-falsehood claim asserted as causes of action for defamation, intentional infliction of emotional distress, "false light" invasion of privacy, and "intrusion" invasion of privacy]) -- and thereby avoid the operation of the limitations and frustrate their underlying purpose.

Regrettably, the foregoing is not mere unsupported speculation. In recent years plaintiffs suing press defendants have more frequently affixed labels other than defamation to injurious falsehood claims and have increasingly achieved some measure of success in their actions. (Mead, *Suing Media for Emotional Distress: A Multi-Method Analysis of Tort Law Evolution* (1983) 23 Washburn L.J. 24, 24-25, 30-44 [discussing defamation, privacy, and intentional infliction of emotional distress theories].)

It follows that to prevent creative pleading from rendering the limitations nugatory, they must be broadly applicable whenever the gravamen of the claim is injurious falsehood.

B

**(5)** The causes of action for intentional interference with prospective economic advantage, as stated, are barred by the First Amendment.

It is plain that Blatty's intentional interference claims have as their gravamen the alleged injurious falsehood of a statement. Under the allegations of the amended complaint the assertion they make is as follows: the Times falsely represented that the list was an accurate compilation of actual book sales; by failing to include *Legion*, the Times falsely represented that the novel did not meet its stated criteria for inclusion; by so doing the Times caused Blatty to be harmed. Under the allegations of the original complaint the assertion can be read in substantially the same way, and in his petition for review Blatty himself urged us to do so. Because these causes of action thus have as their gravamen the alleged injurious falsehood of a statement, [**1185] they must satisfy the requirements of the First Amendment.

[***550] It is also plain that Blatty's intentional interference claims fail to satisfy First Amendment requirements.

[*1046] The claims fail to allege that the list is of and concerning, or specifically refers to, Blatty or his novel. In order to satisfy this requirement, the plaintiff must effectively plead that the statement at issue either expressly mentions him or refers to him by reasonable implication. (Cf. *Kelly v. Johnson Publishing Co. (1958) 160 Cal.App.2d 718, 721-726 [325 P.2d 659]* [action for defamation and invasion of privacy]; *Saucer v. Giroux (1921) 54 Cal.App. 732, 733-734 [202 P. 887]* [action for defamation].) Blatty, however, can do neither.

To begin with, the list does not expressly refer to Blatty or his novel. Nor does he contend otherwise. Quite the contrary: the failure of *Legion* to appear on the list is the very basis of his action.

Further, the list cannot be reasonably understood to refer to Blatty or his novel by implication. When, as in this case, the statement that is alleged to be injuriously false concerns a group -- here, books currently in print and their authors -- the plaintiff faces a "difficult and sometimes insurmountable task. If the group is small and its members easily ascertainable, [the] plaintiff[] may succeed. But where the group is large -- in general, any group numbering over twenty-five members -- the courts

in California and other states have consistently held that plaintiffs cannot show that the statements were 'of and concerning them,' *See, e.g., Noral v. Hearst Publications, Inc., 40 Cal.App.2d 348, 350, 104 P.2d 860 (1940); Mullins v. Brando, 13 Cal.App.3d 409, 422-23* & n. 13, *91 Cal.Rptr. 796 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2231, 29 L.Ed.2d 701 (1971)*, and cases cited therein; *Neiman-Marcus v. Lait, 13 F.R.D. 311 (S.D.N.Y. 1952).*" (*Barger* v. *Playboy Enterprises, Inc.* (N.D.Cal. 1983) *564 F.Supp. 1151, 1153*, affd. (9th Cir. 1984) *732 F.2d 163*, cert. den. *469 U.S. 853 [83 L.Ed.2d 110, 105 S.Ct. 175]* [discussing Cal. defamation law].)

The group in question here obviously numbers substantially more than 25 members: a visit to even the smallest bookstore establishes this fact. Moreover, Blatty himself has impliedly admitted the point. In the amended complaint he alleges that "To obtain sales figures from bookstores, [the Times] sent to the bookstores forms . . . which [it] prepared; the forms for works of fiction contain and contained a printed list of 36 'bestselling' books which has and had the effect of encouraging reports as to sales of books listed on the forms and discouraging reports as to sales of books not listed on the forms . . . ." By so stating Blatty impliedly alleges that the "forms" should have contained the titles of more than 36 books and hence that more than 36 books were potentially among the top 15 "best sellers." [2]

2 Blatty's claims also fail to effectively allege falsehood. Contrary to Blatty's allegation, the Times did *not* make the crucial false representation of which he complains -- viz., that the list was an accurate compilation of actual book sales. This is so because the Times never made such a representation, whether true or false. The legend of the list -- of which the trial court properly took compulsory judicial notice ( *Evid. Code, §§ 452, subd. (h)*, and *453*), and of which we must therefore take judicial notice as well (*id.*, § 459, subd. (a)) -- declared merely that "The listings above are *based on* computer-processed sales figures from about 2,000 bookstores in every region of the United States." To the extent that Blatty may mean to argue that the compound adjective "computer-processed" implies, in the words of the amended complaint, an "objective, unbiased and accurate compilation of actual sales," he is unpersuasive: the legend plainly implies that the list represents a general ranking of books based on sales figures from a *sample* of bookstores.

[*1047] Not only are the intentional interference claims barred by the First Amendment as stated, Blatty has failed to attempt to carry his burden of showing that it is reasonably possible he can cure the defect by amendment. Limiting our consideration to the "of and concerning" requirement, we reiterate that in sustaining the demurrer to the amended complaint without leave to amend the trial court relied generally "on grounds stated in the moving papers" -- one of which was that the complaint was barred [**1186] by the constitutional provisions forbidding [***551] the imposition of liability "where, as here, no statement has been made 'of and concerning' the plaintiff . . . ." Even though he was thus put on notice, Blatty has made no attempt to carry his burden. Hence, we are compelled to conclude that there is no reasonable possibility he can cure the defect.

To prevent this conclusion Blatty insists that the "of and concerning" requirement does not derive from the First Amendment. The point, as we have shown, is plainly without merit.

Blatty then argues in effect that to require a plaintiff to establish that the alleged injurious falsehood published by a press defendant is "of and concerning" him would add a new element to the tort of intentional interference with prospective economic advantage and thereby alter its nature, and that such a result is impermissible. In support he relies on *Falwell v. Flynt (4th Cir. 1986) 797 F.2d 1270*, in which the court held that a public-figure plaintiff suing a press defendant for intentional infliction of emotional distress was not required to establish actual malice as that term has commonly been understood: "When applied to a defamation action, the actual malice standard alters none of the elements of the tort; it merely increases the level of fault the plaintiff must prove in order to recover in an action based upon a publication. Requiring a plaintiff to prove knowledge of falsity or reckless disregard of the truth in an action for intentional infliction of emotional distress would add a new element to this tort, and alter its nature." ( *Id. at p. 1275.*) The point must be rejected.

The fundamental premise of Blatty's argument is unsound. Under the supremacy clause a state's definition of a tort cannot undermine the requirements [*1048] of the First Amendment. That is precisely the teaching of *New York Times*. In that case, the United States Supreme

Court held that the First Amendment required the plaintiff to establish falsity (*376 U.S. at pp. 279-280 [11 L.Ed.2d at pp. 706-707*]) -- even though state law did not require him to do so ( *id. at p. 262 [11 L.Ed.2d at p. 696*]). Indeed, in that case the court effectively held that the First Amendment abrogated the common law of strict liability, added the element of falsity, and thereby altered the nature of the tort. The *Falwell* court misses this crucial point and as a result cannot be followed. [3]

3 Blatty argues in effect that the First Amendment is inapplicable to the intentional-interference claim based on the Times's marketing of the list, on the ground that in that context the list constitutes "commercial speech." The argument is unpersuasive.

To begin with, even in that context the list does not constitute commercial speech. "Commercial speech" is defined as speech that does "no more than propose a commercial transaction . . . ." ( *Pittsburg Press Co. v. Human Rel. Comm'n (1973) 413 U.S. 376, 385 [37 L.Ed.2d 669, 677, 93 S.Ct. 2553]*; see *Friedman v. Rogers (1979) 440 U.S. 1, 10, fn. 9 [59 L.Ed.2d 100, 110-111, fn. 9, 99 S.Ct. 887]*; see generally *Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 510-511 [217 Cal.Rptr. 225, 703 P.2d 1119]*.) The list plainly does not come within that definition. That the Times is alleged to have marketed the list for its newspaper profit does not affect the result: commercial motivation does not transform noncommercial speech into commercial speech (see *Friedman v. Rogers, supra, at p. 11, fn. 10 [59 L.Ed.2d at p. 111, fn. 10*]; see also *Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 761 [48 L.Ed.2d 346, 358, 96 S.Ct. 1817]* [stating that "Speech . . . is protected [under the First Amendment] even though it is carried in a form that is 'sold' for profit"]; *New York Times Co. v. Sullivan, supra, 376 U.S. at p. 266 [11 L.Ed.2d at p. 698*] [holding that the fact that the Times was paid for publishing the noncommercial advertisement in question in that case was "immaterial"]).

In any event, Blatty's major premise is false: commercial speech is *not* excluded from First Amendment protections. (E.g., *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at p. 504, fn. 22 [80 L.Ed.2d at p. 519, fn. 22*]; *Schaumburg* v. *Citizens For Better Environ. (1980) 444 U.S. 620, 632, fn. 7 [63 L.Ed.2d 73, 85 fn. 7, 100 S.Ct. 826]*; *Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 758, 770 [48 L.Ed.2d at pp. 356, 363]*.)

III

**(6)** Because each of the other causes of action that Blatty attempted to assert in his original and amended complaints has as its gravamen the alleged injurious falsehood [**1187] [***552] of the list and hence must satisfy First Amendment requirements, and because none of them does or can reasonably allege that the list is "of and concerning" Blatty or his novel, the Court of Appeal did not err in holding that the judgment of dismissal was proper as to them. Thus, we need not discuss Blatty's arguments to the contrary. Nor need we consider his contentions going to the trial court's discovery rulings and its taking of judicial notice of the depositions in passing on the Times demurrer to the original complaint. Since each of the causes of action, as we have concluded, was barred on First Amendment grounds specified in the demurrer, the sustaining of the demurrer was correct and as such must be [*1049] upheld. (*Penziner* v. *West American Finance Co. (1933) 133 Cal.App. 578, 582 [24 P.2d 501]*; *des Granges v. Crall (1915) 27 Cal.App. 313, 316 [149 P. 777]*; see, e.g., *Weinstock v. Eissler (1964) 224 Cal.App.2d 212, 224-226 [36 Cal.Rptr. 537]*.) It follows that Blatty's point is unnecessary to our decision and need not be considered. (E.g., *Ferguson v. Keays (1971) 4 Cal.3d 649, 656, fn. 6 [94 Cal.Rptr. 398, 484 P.2d 70]*; *Young v. Three for One Oil Royalties (1934) 1 Cal.2d 639, 647 [36 P.2d 1065]*.) [4]

4 Throughout this opinion we have used "First Amendment" to refer not only to that provision of the United States Constitution, but also to *article I, section 2, of the California Constitution.* It is the latter on which we primarily rely.

The judgment of the Court of Appeal is reversed insofar as it reverses the judgment of dismissal on the amended complaint's causes of action for intentional interference with prospective economic advantage, with directions to affirm the judgment in that respect, and in all other respects the judgment of the Court of Appeal is affirmed; and the order of the Court of Appeal dismissing as moot the appeal from the order denying the motion to

tax costs is reversed with directions to resolve that issue on the merits.

**CONCUR BY:** GRODIN (In Part)

**DISSENT BY:** GRODIN (In Part)

**DISSENT**

**GRODIN, J.,** Concurring and Dissenting. I cannot join in the majority's conclusion that the "of and concerning" requirement applicable to defamation actions is a constitutionally required element of a cause of action for intentional interference with prospective economic advantage, whenever the alleged intentional tort is effectuated through a media publication. A hypothetical example may be helpful in exposing the fallacy of the majority's broad holding.

Suppose that the New York Times, after conducting its normal survey of representative bookstores throughout the country, found that Blatty's novel was, indeed, the top selling book for a particular week based on its own statistics. Suppose further that, despite this information, the Times purposefully substituted one of its own publications for Blatty's book at the top of its best seller list in order to enhance its own book's sales, and entirely omitted Blatty's book from the list.

Under the majority's analysis, Blatty would have no cause of action against the New York Times for intentional interference with prospective economic advantage under these hypothetical facts, because nothing in the false best seller list would have indicated to the reading public that the falsity in the published information was "of and concerning" Blatty's book. It seems clear from this hypothetical, however, that the "of and concerning" requirement [*1050] is ill-suited to this type of intentional tort, since the plaintiff is required in any event to prove, as an element of the tort, that the defendant acted for the specific purpose of injuring the particular plaintiff. If a plaintiff can prove that a media defendant knowingly published a false statement for the purpose of inflicting financial injury on him personally, I do not believe that the free speech provisions of either the state or federal Constitution would be offended if the defendant were held liable in damages for such conduct, [***553] even if it were [**1188] not obvious on the face of the publication who the defendant was intending to injure. Thus, I do not join in the majority's broad holding.

Nonetheless, on the specific facts of this case, I concur in the judgment. Although plaintiff has attempted to state a cause of action for intentional interference with prospective economic advantage, the facts that he has alleged -- even after being granted leave to amend -- are not, in my view, sufficient to support such an action. Plaintiff's allegations do not suggest that the Times intentionally misrepresented the actual results of its bookstore survey for the purpose of injuring plaintiff financially; at most, the allegations suggest that the Times did not do as thorough a job in gathering sales statistics as it should have and that, after Blatty's publisher complained to the Times, the Times should have realized that its survey figures would harm plaintiff financially. Even assuming those allegations are true, they would not support recovery on an intentional-interference theory.

Accordingly, I agree with the majority that the trial court properly sustained defendant's demurrer to all causes of action, and I concur in the reversal of the judgment of the Court of Appeal to the extent that its judgment is inconsistent with this conclusion.

# TAB 7

LEXSEE 163 CAL.APP.3D 1068

**C & H FOODS CO. et al., Plaintiffs and Appellants, v. HARTFORD INSURANCE COMPANY, Defendant and Respondent**

**No. B004275**

**Court of Appeal of California, Second Appellate District, Division Four**

***163 Cal. App. 3d 1055*; *211 Cal. Rptr. 765*; *1984 Cal. App. LEXIS 2914***

**October 17, 1984**

**SUBSEQUENT HISTORY:** [***1] Appellants' petition for a hearing by the Supreme Court was denied January 17, 1985.

**PRIOR HISTORY:** Superior Court of Los Angeles County, Nos. 416674, B004275, Lawrence C. Waddington, Judge.

**DISPOSITION:** The order (judgment) of dismissal is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, the trial court sustained the insurer's demurrers, without leave to amend, to the causes of action for declaratory relief, bad faith, refusal to pay benefits, and emotional distress to the two individual owners of the insured. A policy provision limited the time for bringing an action on the policy to 12 months after the occurrence of loss, and the insured filed the action after expiration of that period of time. (Superior Court of Los Angeles County, No. 416674, Lawrence C. Waddington, Judge.)

The Court of Appeal affirmed the order of dismissal. It held that the 12-month time limitation in the policy was valid. The provision was clear, plain, and easily understood, and the insured could not avoid application thereof by contending that, both because the insurer did not advise the insured of the limitation, and because it was "buried in small type in an obscure corner of the back side of the insurance policy," it was unaware of the provision. The court held that the insurer did not waive the provision; the insured gave no notice of loss to the insurer until more than one year after the loss occurred. Moreover, in the insured's own complaint, it pled the fact that the insurer based its timely denial of liability for the claims in part on the failure of the insured to commence suit within the 12-month period. The insured could not avoid the effect of the time limitation by contending that, since the beef which was delivered in a spoiled and unusable condition was immediately destroyed by government order, notice to the insurer within 12 months would have made no difference for the purposes of the insurer's investigation. The court held that there was no coverage for the loss and no bad faith in denying coverage on that ground. Further, it held that the right to punitive damages could not arise from the mere pleading of the covenant of good faith or its breach. Since neither of the two individual owners of the insured was a named or additional insured or beneficiary under the policy, they did not state a cause of action for bad faith or negligent infliction of emotional distress. (Opinion by McClosky, J., with Woods, P. J., and Byrne, J., * concurring.)

* Assigned by the Chairperson of the Judicial Council.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 23--Decisions Appealable--Orders on Demurrer.** --An order sustaining a demurrer is nonappealable.

**(2) Pleading § 22--Demurrer to Complaint--Demurrer as Admission.** --A general demurrer admits all material facts that are properly pleaded. Generally, material facts alleged in the complaint are treated as true for the purpose of ruling on the demurrer. Also taken as true are facts that may be implied or inferred from those expressly alleged. However, contentions, deductions, or conclusions of fact or law alleged in the complaint are not considered in judging its sufficiency. In short, the ruling on a demurrer determines a legal issue on the basis of assumed facts, i.e., those properly alleged in the complaint, regardless of whether they ultimately prove to be true.

**(3) Pleading § 29--Demurrer to Complaint--Hearing and Determination.** --In ruling on a demurrer, the trial court is required to construe the complaint liberally with a view to substantial justice between the parties.

**(4) Pleading § 29--Demurrer to Complaint--Hearing and Determination.** --A general demurrer will not be sustained unless the complaint liberally construed fails to state a cause of action on any theory. Doubt in the complaint may be resolved against the plaintiff and facts not alleged are presumed not to exist.

**(5) Pleading § 30--Demurrer to Complaint--Hearing and Determination--Amendment After General Demurrer Sustained.** --Sustaining a general demurrer without leave to amend is not an abuse of discretion if it appears from the complaint that under applicable substantive law there is no reasonable probability that the defect can be cured by amendment.

**(6a) (6b) Insurance Contracts and Coverage § 126--Actions--Limitations and Defenses.** --The provision in an insured's insurance policy limiting the time for bringing an action thereon to 12 months after the occurrence of the loss was valid where it was clear, plain, and easily understood. The insured could not avoid application thereof by contending that, both because the insurer did not advise it of the provision, and because the provision was "buried in small type in an obscure corner of the backside of the insurance policy," it was unaware of the provision, since the policy consisted of a single page, printed on both sides, and the provision in question was printed in the same size type as the others.

**(7) Insurance Contracts and Coverage § 124--Actions--Pleading.** --Where a conclusion is alleged along with the special facts from which the conclusion is drawn, the special facts control if they are inconsistent with and do not support the conclusion, and the sufficiency of the complaint is to be determined from the special facts pleaded. Thus, in determining a demurrer to the complaints in an action by an insured against its insurer, the language in the actual policy provision appearing in the exhibit to the complaints prevailed over the inconsistent general conclusional allegations concerning that provision.

**(8) Insurance Contracts and Coverage § 126--Actions--Limitations and Defenses.** --In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, the insurer did not waive the policy provision limiting the time for bringing an action on the policy to 12 months after the occurrence of the loss. The insured gave no notice of loss to the insurer until more than one year after the losses occurred. In the insured's own complaint it pled the fact that in a letter to the insured the insurer based its denial of liability for the claims in part on the failure of the insured to commence suit within the 12-month period.

**(9) Insurance Contracts and Coverage § 126--Actions--Limitations and Defenses.** --In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, which action the insured filed after expiration of the 12-month period specified by the insurance policy for bringing an action on the policy, the insured could not avoid the effect of the 12-month limitation by contending that, since the beef, which was delivered in a spoiled and unusable condition, was immediately destroyed by government order, notice to the insurer within 12 months would have made no difference for the purposes of the insurer's investigation. The complaint did not allege when the goods were destroyed or the pails buried or why no notice was given and no suit filed until more than one year after the last of the losses occurred. Nothing in the complaint negated the insurer's ability to have conducted a meaningful investigation had the insured complied with the policy by giving timely notice before the goods were destroyed.

**(10) Insurance Contracts and Coverage § 126--Actions--Limitations and Defenses.** --In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, which action the insured filed after expiration of the 12-month period specified by the insurance policy for bringing an action on the policy, the insured's allegation that a pail of the beef, which was

delivered in a spoiled and unusable condition and therefore destroyed by government order, was recovered and was a representative sample of the destroyed pails was not an allegation of fact to be accepted as true for the purpose of ruling on a general demurrer, but was a mere conclusion of no avail to the insured.

**(11) Insurance Contracts and Coverage § 124--Actions--Pleading--Bad Faith Refusal to Pay Benefits.** --In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, the insured and its owners failed to state a cause of action for bad faith refusal to pay benefits. The failure of the insured to give the insurer timely notice of the loss, the admitted destruction of the goods before the notice was given, the failure of the insured to file suit within the 12-month period provided by the policy for bringing an action on the policy, and the allegation in the complaint that the damage to the goods was not the result of transit damages but was the result of a manufacturer's defect in the pails in which the beef was packed, adequately formed the basis upon which the trial court properly sustained the general demurrers to the causes of action. There was no coverage for the loss and no bad faith in denying coverage on that ground.

**(12) Insurance Contracts and Coverage § 138--Actions--Damages--Punitive Damages.** --The right to punitive damages against an insurer does not rise from the mere pleading of the covenant of good faith or its breach. While it is true that the requisite malice to establish a right to punitive damages is properly pleaded by alleging the wrongful motives, intent, or purpose, and that a general allegation of such intent is sufficient to support a claim for exemplary damages, sufficient facts must be pleaded to establish the breach of the insurer's duty to its insured.

**(13) Insurance Contracts and Coverage § 124--Actions--Pleading.** --In an action by an insured against its insurer on the insurance policy, neither of the two individual owners of the insured stated a cause of action for bad faith or negligent infliction of emotional distress. Neither was a named or additional insured or beneficiary under the policy.

**COUNSEL:** David S. Sperber for Plaintiffs and Appellants.

Overton, Lyman & Prince and Jon P. Kardassakis for Defendant and Respondent.

**JUDGES:** Opinion by McClosky, J., with Woods, P. J., and Byrne, J., * concurring.

* Assigned by the Chairperson of the Judicial Council.

**OPINION BY:** McCLOSKY

**OPINION**

[*1059] [**766] Plaintiffs C & H Foods Co. (C & H), a division of Kwik-Serv Foods, Inc. (Kwik-Serv), Frank Cottle (Cottle) and Fred W. Harris (Harris) purport to "appeal from the January 5, 1983 Superior Court's Order to the effect that a portion of the First Amended Complaint be sustained without leave to amend, and from the March 24, 1983 Superior Court's Order to the effect that the First and Second Causes of Action of the Second Amended Complaint be dismissed without leave to amend." **(1)** An order sustaining a demurrer is a nonappealable order. We treat the notice of appeal as taken from the order (judgment) of dismissal entered in favor of respondent [***2] The Hartford Fire Insurance Company (Hartford) on March 24, 1983. In connection therewith, we review the propriety of both orders of the trial court sustaining the demurrers to the portions of the first and second amended complaints.

All plaintiffs also sued defendants Hayward Mason and Rolapp Insurance Associates and certain Does for "insurance malpractice" but none of those defendants are properly parties to this appeal as the judgment was solely in favor of Hartford.

Plaintiffs contend: (1) A private statute of limitations in an insurance policy does not bar an insured when the insured is unaware of the private statute of limitations; (2) even if the private statute of limitations was a bar, it was waived by defendant Hartford; (3) the individual [**767] plaintiffs state a cause of action for bad faith refusal to pay an insurance benefit since there was a close nexus between the individuals and the corporate insured, and the corporate plaintiff states a cause of action for bad faith refusal to pay benefits; (4) the complaint affords a basis to award punitive damages.

[*1060] Facts

In their first and second amended complaints plaintiffs alleged that C & H bought eight marine insurance [***3] policies covering the shipment of 6,437

pails of cured beef. Of these, 4,154 pails of beef were delivered to Pago Pago, American Samoa between September 1980 and February 1, 1981, in a spoiled and unusable condition. The plaintiffs attached to the respective complaints a copy of a two-page marine insurance policy insuring the pails of beef "against all risks of physical loss or damage from any external cause . . . but . . . warranted free from any claims arising out of the inherent vice of goods insured . . . ." In the two complaints, all of the plaintiffs sued for declaratory relief, bad faith and refusal to pay benefits. The individual plaintiffs additionally sued for emotional distress. In the complaints it was further alleged that "[buried] within the reverse side of each of the aforesaid policies, in unreasonably small type, was the following provision: '12. No suit or action on this policy shall be sustainable in any court of law or Equity unless the Insured shall have complied in full with all the terms and conditions of this insurance, nor unless same shall be commenced within twelve (12) months next after the happening of the loss, . . .'"

Nevertheless, in the complaints [***4] it was alleged that defendants did not advise plaintiffs either orally or in writing of "the shortened statute of limitations," of which plaintiffs were unaware, but instead represented to plaintiffs "that defendants were not of the practice of relying upon technicalities of any kind in connection with the handling of claims by insureds, and in connection with the handling of a claim, defendants would look to the merits of the claim." They alleged further that "defendants owed to plaintiff a fiduciary responsibility, and pursuant to that fiduciary relationship, defendants are precluded from relying upon a shortened statute of limitations absent a complete and full disclosure of it to plaintiff."

On or about February 16, 1982, some 12 months after the last loss, plaintiffs first notified Hartford of the aforesaid loss and made demand upon it for $ 169,489.88, the amount of the loss. Defendants thereafter denied the claim saying among other things: "As I have told you, in most instances in my experience, technical provisions of a policy are not enforced by an insurance company if their basic position has not been jeopardized. In the case of the last claim [the claim on the eighth [***5] policy] where there was a potential of recovery from the steamship line, because of the passage of time, The Hartford is blocked out and therefore their position was seriously prejudiced. In the case of the other claims [policies one through seven] where there was an inadequate pail used, even though you have all-risk insurance, this type of situation does not fall under that area of coverage. It is presumed in any type of a cargo policy the container used for the [*1061] shipment must be adequate to the job and when it isn't, this is not subject to insurance."

On or about March 23, 1982, defendants wrote C & H as follows: "Our problems with the claims at this late date are:

"1. Late notice -- no opportunity to survey or inspect damages, or develop the facts as to cause.

"2. In the event of transit damages -- any claim against the responsible carrier is time barred -- T/B [time barred] date is one year from date delivered.

"3. As the major cause of damages appears to be the packing -- pails -- the shipments were apparently not sufficiently packaged to withstand the anticipated conditions of the voyage to Pago Pago. [**768] The insurance policy also contains a one year time [***6] for suit clause which had expired before receipt of notice. In view of the foregoing, we have no alternative but to decline liability for these claims under [the policies in question]."

Plaintiffs alleged on information and belief that their late notice caused no prejudice to defendants as "even timely notice would not have given [Hartford] an opportunity to survey or inspect damages, since the goods were ordered immediately destroyed by the Health Department of American Samoa. The goods were destoryed [*sic*], and the pails within which the goods were shipped were buried. A representative sample of the aforesaid pails has been recovered."

They also alleged on information and belief "that the damage was not the result of transit damages and defendants have not been prejudiced by any claim not being made to the shipper, since there is no claim as against the shipper." "That the cause of damages was the result of a manufacturer's defect in the pails, and that defendants have not been prejudiced in any way as to their rights as against the manufacturer of the pails."

Plaintiffs Cottle and Harris alleged that they were each 50 percent owners of C & H and that it was at their [***7] behest that the insurance policies were bought to

guarantee the continued operation of C & H. They further alleged that the unconditional denial of liability by Hartford to C & H was intentional, wrongful, reckless, malicious, oppressive, fraudulent in nature, and done in bad faith with conscious disregard of plaintiffs' rights and caused Cottle and Harris emotional distress for which they sought compensatory and punitive damages.

[*1062] All plaintiffs also alleged that Hartford, acting in bad faith, pursuant to a plan and scheme to act in bad faith refused to pay the benefits to them where there was no prejudice to Hartford. They alleged that it was Hartford's normal practice not to invoke the statute of limitations when there had been no prejudice to it by an insured's failure to file an "early" claim. They also alleged that Hartford failed to adopt and implement reasonable standards for the prompt investigation and processing and settlements of claims under plaintiffs' policies of insurance.

Discussion

I

**(2)** A general demurrer admits all material facts that are properly pleaded. Generally, material facts alleged in the complaint are treated as true for the purpose of ruling [***8] on the demurrer. (*Gruenberg* v. *Aetna Ins. Co. (1973) 9 Cal.3d 566, 572 [108 Cal.Rptr. 480, 510 P.2d 1032].*) Also taken as true are facts that may be implied or inferred from those expressly alleged. ( *Harvey v. City of Holtvile (1969) 271 Cal.App.2d 816 [76 Cal.Rptr. 795]*; *Miranda* v. *Great Southwest Fire Ins. Co. (1975) 50 Cal.App.3d 492 [123 Cal.Rptr. 357]*, disapproved in part on other grounds in *Wood v. Elling Corp. (1977) 20 Cal.3d 353, 362, fn. 7 [142 Cal.Rptr. 696, 572 P.2d 755].*) However, contentions, deductions or conclusions of fact or law alleged in the complaint are not considered in judging its sufficiency. ( *Gruenberg* v. *Aetna Ins. Co., supra*, 9 Cal.3d 566.) In short, the ruling on a demurrer determines a legal issue on the basis of assumed facts, i.e., those properly alleged in the complaint, regardless of whether they ultimately prove to be true. (See 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 800, p. 2413-2414.)

**(3)** In ruling on a demurrer, the trial court is required to construe the complaint liberally with a view to substantial justice between the parties. ( *Code Civ. Proc., § 452*; *Cameron v. Wernick* [***9] *(1967) 251 Cal.App.2d 890 [60 Cal.Rptr. 102].*) **(4)** A general demurrer will not be sustained unless the complaint liberally construed fails to state a cause of action on any theory. (See *Brousseau v. Jarrett (1977) 73 Cal.App.3d 864 [141 Cal.Rptr. 200].*) Doubt in the complaint may be resolved against plaintiff and facts not alleged are presumed not to exist. [**769] (*Melikian* v. *Truck Ins. Exchange (1955) 133 Cal.App.2d 113 [283 Cal.Rptr. 269].*) **(5)** Sustaining a general demurrer without leave to amend is not an abuse of discretion if it appears from the complaint that under applicable substantive law there is no reasonable probability that the defect can be cured by amendment. ( *Vater v. County of Glenn (1958) 49 Cal.2d 815, 821 [323 P.2d 85]*; *Sackett v. Wyatt (1973) 32 Cal.App.3d 592, 603 [108 Cal.Rptr. 219].*)

[*1063] Under these salutary principles, we consider plaintiffs' contentions.

II

**(6a)** Plaintiffs first contend that the private "statute of limitations does not bar plaintiffs' causes of action."

Each of the policies of insurance contained a provision to the effect that "[no] suit or action on this policy shall be sustainable in any court of [***10] law or Equity unless the Insured shall have complied in full with all the terms and conditions of this insurance, nor unless same shall be commenced within twelve (12) months next after the happening of the loss, . . ."

The trial court sustained a demurrer without leave to amend and noted that there was a "one year private statute of limitations" which "seems reasonable."

Plaintiffs urge that "this private statute of limitations was not one which was ever made known to the plaintiff." They also urge that defendant did not ever "advise plaintiff in writing or orally of the shortened statute of limitations, and indeed at all times defendant represented to plaintiffs that defendant was not of the practice of relying upon technicalities. Additionally, at all times, plaintiff was unaware of the shortened private statute of limitations, and plaintiff believed the statute of limitations as against plaintiff was the same statute of limitations as against any other entity on a written agreement."

A "representative policy" containing the language which constitutes the shortened time-for-commencement-of-suit provision is attached as

an exhibit and incorporated into the first and second amended [***11] complaints. Plaintiffs allege that that provision "is buried in small type in an obscure corner on the backside of the insurance policy." The record furnished us, however, discloses only a short policy with a single front and a single reverse side with the provision in question printed in the same size type as all of the other printed provisions of the policy except for the titles of some of its paragraphs and the witness clause. In short, the furnished provisions of the policy incorporated into the complaint as an exhibit are inconsistent with plaintiffs' conclusional allegations concerning them.

**(7)** "'[Where] a conclusion is alleged and also the special facts from which the conclusion is drawn, if the special facts are inconsistent with and do not support the conclusion, the former control, and the sufficiency of the complaint is to be determined from the special facts pleaded.'" ( *Denman v. City of Pasadena (1929) 101 Cal.App. 769, 776-777 [282 P. 820]*, quoting [*1064] *Little v. Union Oil Co. (1925) 73 Cal.App. 612, 619 [238 P. 1066]*; *Stowe v. Fritzie Hotels, Inc. (1955) 44 Cal.2d 416, 422 [282 P.2d 890]*; 3 Witkin, Cal. Procedure (2d ed. 1971) [***12] Pleading, § 338, p. 2006-2007.) Thus the language in the actual policy provision appearing in the exhibit to the complaints prevails over the inconsistent general conclusional allegations concerning that provision.

**(6b)** We next consider the validity of the clause itself. Such a provision has long been recognized as valid in California. As is stated in *Fageol T. & C. Co. v. Pacific Indemnity Co. (1941) 18 Cal.2d 748, 753 [117 P.2d 669]*, of a policy provision requesting action to be commenced within 12 months after the happening of the loss: "Such a covenant shortening the period of limitations is a valid provision of an insurance contract and cannot be ignored with impunity as long as the limitation is not so unreasonable as to show imposition or undue advantage. One year was not an unfair period of limitation. ( *Tebbets v. Fidelity and Casualty Co. [1909] 155 Cal. 137 [99 P.* [**770] *501]*; *Beeson v. Schloss [1920] 183 Cal. 618 [192 P. 292].*)" (Accord. *Olds* v. *General Acc. Fire etc. Corp. (1945) 67 Cal.App.2d 812, 817 [155 P.2d 676]*, disapproved in part on other grounds in *Barrera* v. *State Farm Mut. Automobile Ins. Co. (1969) 71 Cal.2d 659,* [***13] *679, fn. 16 [79 Cal.Rptr. 106, 456 P.2d 674].*) We accordingly hold that the shortened time-for-commencement-of-suit provision in the policies in question is valid and governs the time within which suit has to be commenced in this case. As the policies clearly so provided, and in view of the fact that plaintiffs do not deny that C & H was furnished the policies, we reject plaintiffs' claim that they were unaware of that provision.

Plaintiffs' reliance on *Ponder v. Blue Cross of Southern California (1983) 145 Cal.App.3d 709 [193 Cal.Rptr. 632]*, is misplaced. That case is completely distinguishable. In *Ponder*, the appellate court reversed a summary judgment against Mrs. Ponder in favor of Blue Cross. After first having paid benefits to her for treatment of her temporomandibular joint syndrome, Blue Cross later denied payments to her for further treatment of that joint problem on the basis that the policy did not cover treatment for temporomandibular joint syndrome. The *Ponder* court based its decision on its conclusion that the exclusion therein did not meet the reasonable expectations of the insured at the time the policy was taken out because it was neither [***14] conspicuous nor plain and clear. The exclusion of coverage for temporomandibular joint syndrome was hidden under a provision entitled "Dental Care" and a subheading of "Dental Care Services" in small print on a page containing other exclusions and provisions in bold faced type and in capitals. The temporomandibular joint syndrome was not so printed. The cases are not comparable. As distinguished from the *Ponder* provision, the provision in the case at bench is clear, plain and easily understood.

[*1065] III

**(8)** Plaintiffs next contend that "[the] statute of limitations has been waived by defendant." This contention is without merit.

Plaintiffs admit that they gave no notice of the loss to defendant until more than one year after the losses, and the record shows that the action was not filed until over one year after the latest of the losses. In paragraph 11 of their complaint, they contend that defendant did not raise the statute of limitations in its oral denial of liability and thus waived that provision. This contention, however, ignores the fact that plaintiffs incorporated into the complaint as exhibit 2, defendant Hartford's denial letter of March 23, 1982, which [***15] lists, among other things, the fact that "[the] insurance policy also contains a one year time for suit clause which had expired before receipt of notice." [1]

1 That letter read in pertinent part as follows:

"Gentlemen:

"We confirm our March 3, 1982 phone conversation during which you advised a number of claims on shipments of cured beef to Samoa had been received from C & H Foods. On March 12, 1982 we received your March 9, 1982 letter with the following claims:

| | | | | | |
|---|---|---|---|---|---|
| "Polynesia | 7/13/80 | 15 | 192 out of | 650 pails | $ 5,760.00 |
| Austral Moon | 8/21/80 | 16 & 17 | 1,324 out of | 2,208 pails | 39,720.00 |
| African Stars | 8/27/80 | 18 | 493 out of | 700 pails | 15,939.00 |
| Polynesia | 9/7/80 | 21 | 700 out of | 700 pails | 23,100.00 |
| African Stars | 9/18/80 | 19 | 700 out of | 700 pails | 22,400.00 |
| Austral Rainbow | 9/23/80 | 20 | 347 out of | 700 pails | 11,451.00 |
| Polynesia | 1/12/81 | 23 | 199 out of | 752 pails | 5,472.50 |
| | | | | | |
| | | | | Total | $ 123,842.50 |

"After review of the files and the general correspondence between Burns Philip South Sea Co., American Samoa Government, C & H Foods, Chamber of Commerce of American Samoa and U.S.D.A. Meat Inspector, Chief Lefao Su'e's confirmation that 3,746 pails of "Alofa Aja" brand cured salt beef was spoiled and dumped, we note Inspector Su'e states 'one of the major reasons resulting spoilage would be contributed by product packaging.'

"As Kwik Serv or C & H have filed claim on the Pail supplier and are negotiating with the Products Liability Carrier -- Chubb & Company, its [*sic*] quite clear that there is a substantial question on the propriety of the pails supplied, as indicated by the damages at Pago Pago -- pails crushed, split sides, buckled on sides, etc.

"Our problems with the claims at this late date are:

"1. Late notice -- no opportunity to survey or inspect damages, or develop facts as to cause.

"2. In the event of transit damages -- any claim against the responsible carrier is Time Barred -- T/B date is one year from date delivered.

"3. As the major cause of damages appears to be the packing -- pails -- the shipments were apparently not sufficiently packaged to withstand the anticipated conditions of the voyage to Pago Pago.

"The insurance policy also contains a one year time for suit clause which had expired before receipt of notice.

"In view of the foregoing, we have no alternative but to decline liability for these claims under *Open Policy 72 CO 037274* and original Marine Insurance policies *72 CO 037274*/ 15, 16, 17, 18, 19, 20, 21 and 23.

"If there is documentary evidence to bring the claim within the terms and conditions of policy coverage, we shall be pleased to review the matter."

[***16] [*1066] [**771] The facts specially pled by inclusion of that letter as an exhibit in the complaint demonstrate that the defendant Hartford based its timely denial of liability for the claims on, among other things, the failure of plaintiff C & H to commence suit within the one year time-for-suit provision of the policy. In the face

of their pleading of those special facts, plaintiffs' allegation that Hartford did not raise plaintiffs' violation of the policy "statute of limitations" in its "oral denial" is without consequence or merit.

**(9)** In their complaint plaintiffs also alleged in conclusional language, and on information and belief, that the late notice caused defendant no prejudice. They alleged that even had timely notice been given such timely notice "would not have given an opportunity to survey or inspect the damages [*sic*], since the goods were ordered immediately destroyed by the Health Department of American Samoa. The goods were destoryed [*sic*], and the pails within which the goods were shipped were buried. A representative sample of the aforesaid pails has been recovered."

Plaintiffs now urge on appeal that "[since] the goods were immediately destroyed, [***17] notice to defendants within 12 months would have made no difference for the purposes of defendant's investigation. In fact, if defendant wanted to conduct an investigation, they still could have, because plaintiff alleged that a pail was recovered."

The fact is that the complaint does not allege when the goods were destroyed or the pails buried or why no notice was given or no suit filed until more than one year after the last of the losses occurred. Nothing in the complaint negates Hartford's ability to have conducted a meaningful investigation had plaintiffs complied with the notice and time-for-commencement-of-suit provisions of the policies by giving timely notice before the goods were destroyed.

**(10)** Further, the allegation by plaintiffs that a pail that was recovered was a "representative sample" of the condition of the buried or destroyed pails of beef is not an allegation of fact, the truth of which we must accept for the purpose of ruling on the general demurrer, but is a mere conclusion which is of no avail to plaintiffs. Nor were any facts pled showing that the recovered pail was, at the time of the first notice to Hartford, in the same condition that the pails containing [***18] the spoiled beef were in when the loss was discovered, or that the cause of the loss was discoverable from the recovered pail at the time that notice was first given to Hartford.

IV

**(11)** Plaintiffs' next contention is that they have stated a cause of action for the bad faith refusal to pay benefits.

[*1067] In support of this contention, plaintiffs cite *Murphy v. Allstate Ins. Co. (1978) 83 Cal.App.3d 38 [147 Cal.Rptr. 565]*, for the proposition that "[even] if one has lost the principal cause of action, he may still have a claim for the bad faith subsequent con [**772] duct of the insurer." Not always. While that principle is true under certain circumstances, it is of no aid to plaintiffs here.

In the cited *Murphy* case, plaintiffs did not seek to hold Allstate on its policy, but for the damages caused by Allstate's conduct after the loss occurred in using contractors who did the repair and restoration of their fire damaged home in an unsatisfactory and unworkmanlike manner. (*83 Cal.App.3d 38, at pp. 49-50*).

The case at bench is distinguishable as there is no question concerning the date of accrual of the causes of action with which we are here concerned, or that the underlying [***19] causes of action were not "on the policy." Moreover, the purported causes of action for bad faith and for negligent infliction of emotional harm fail to state facts sufficient to constitute a cause of action based upon the incorporated facts of certain paragraphs of the respective first causes of action and the incorporated exhibits and the denial of Hartford. These factors, coupled with the failure of plaintiffs to give timely notice, the admitted destruction of the goods before the notice was given, the failure to file suit within the one year time-for-commencement-of-suit provision, and the allegation in the complaint that the damage to the goods was not the result of transit damages but was the result of a manufacturer's defect in the pails in which the beef was packed, adequately formed the basis upon which the trial court properly sustained the general demurrers to the causes of action in question. Since the "goods" consisted of pails of beef, the defective pails constituted an inherent vice of the goods themselves, not damage from an external cause. (See Goodacre, Marine Insurance Claims (1974) pp. 89-90.) Under the "Perils Insured and Special Conditions" clauses of each [***20] policy, in capital typed letters, the insured plaintiff warranted that the insurer Hartford would be free of any claims under the policy "arising out of the inherent vice of goods insured . . . ."

Inasmuch as each of the policies specified on its face that it covered "all risks of physical loss or damage from

any external cause . . ." there was no coverage for the loss and no bad faith in denying coverage on that ground.

V

**(12)** The plaintiffs' next contention is that the complaint affords a basis to award punitive damages. They urge that "[if] one has pled the covenant [*1068] of good faith and fair dealings, punitive damages will lie, since a breach of the covenant is an intentional non-negligent act. Punitive damages can be pled generally when an intentional non-negligent act is alleged. *Unruh v. Truck Insurance Exchange [1972] 7 Cal.3d 616, 632 [102 Cal.Rptr. 815, 498 P.2d 1063]* (a general allegation of such intent is sufficient to support a claim for exemplary damages)." (AOB 15-16)

The right to punitive damages does not rise from the mere pleading of the covenant of good faith or its breach. See *Neal* v. *Farmers Ins. Exchange (1978) 21 Cal.3d 910,* [***21] *922 [148 Cal.Rptr. 389, 582 P.2d 980]*; *Silberg v. California Life Ins. Co. (1974) 11 Cal.3d 452, 462-463 [113 Cal.Rptr. 711, 521 P.2d 1103].*) While it is true that the requisite malice to establish a right to punitive damages "'. . . is properly pleaded by alleging the wrongful motive, intent or purpose'" ( *Unruh v. Truck Insurance Exchange (1972) 7 Cal.3d at p. 632*, quoting 3 Witkin [Cal. Procedure (2d ed. 1971)] Pleading, § 766, p. 2383) and that "[a] general allegation of such intent is sufficient to support a claim for exemplary damages" ( *Unruh v. Truck Insurance Exchange, supra, 7 Cal.3d at p. 632*), nothing in that statement excuses the requirement that sufficient facts be pleaded to establish the breach of the insurer's duty to its insured. Plaintiffs have failed to sufficiently allege such facts in their complaints.

VI

As to plaintiffs Frank Cottle and Fred W. Harris, the relevant complaint alleged that each was an individual who owned "50 [**773] percent of the stock in plaintiff corporation and [is] employed by plaintiff corporation, and [maintains] a close working relationship with plaintiff corporation which relationship is well known to defendants."

[***22] **(13)** The incorporated policy of insurance shows that neither Cottle nor Harris was a named or additional insured or a beneficiary under the policy. They did not state a cause of action for bad faith or negligent infliction of emotional harm (emotional distress) against Hartford. (See *Austero v. National Cas. Co. (1976) 62 Cal.App.3d 511, 516-517 [133 Cal.Rptr. 107].*)

The trial court did not abuse its discretion in dismissing the causes of action in the two complaints as to which the demurrers were sustained without leave to amend.

[*1069] The order (judgment) of dismissal is affirmed.

# TAB 8

LEXSEE 90 CAL.APP.4TH 346

**CHATEAU CHAMBERAY HOMEOWNERS ASSOCIATION, Plaintiff and Appellant, v. ASSOCIATED INTERNATIONAL INSURANCE COMPANY, Defendant and Respondent.**

**No. B137320.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION THREE**

***90 Cal. App. 4th 335; 108 Cal. Rptr. 2d 776; 2001 Cal. App. LEXIS 507; 2001 Cal. Daily Op. Service 5573; 2001 Daily Journal DAR 6809***

**June 29, 2001, Decided**

**SUBSEQUENT HISTORY:** [***1] As Modified on Denial of Rehearing July 30, 2001, Reported at: *2001 Cal. App. LEXIS 587*. There is no change in the judgment.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. SC043443. Hugh C. Gardner, III, Judge.

**DISPOSITION:** Affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Following the Northridge earthquake, a condominium homeowners association submitted a $ 5,771,522 claim to its insurer for loss arising from damage to the common areas of the condominium complex. The insurer paid several interim payments to the insured totaling $ 1,949,161, which represented the total amount of loss the insurer believed was actually covered under the policy. The insured brought an action for breach of the implied contract of good faith and fair dealing and for breach of contract against the insurer. The trial court granted defendant summary judgment on plaintiff's bad faith claim, finding that defendant's position with respect to plaintiff's claim was reasonable as a matter of law. The parties submitted the breach of contract claim to binding arbitration. The arbitrator found that plaintiff was owed an additional payment of $ 610,753, and so determined that the total amount of covered loss was $ 2,559,914. The trial court entered judgment confirming the arbitrator's award. (Superior Court of Los Angeles County, No. SC043443, Hugh C. Gardner III, Judge.)

The Court of Appeal affirmed, holding that the trial court did not err in granting defendant summary adjudication on plaintiff's bad faith claim. An insurer denying or delaying payment of policy benefits due to the existence of a genuine dispute as to the existence of coverage liability is not liable in bad faith even though it might be liable for breach of contract. This issue may be resolved as a matter of law in a proper case. In this case, the undisputed record demonstrated that, after the earthquake, plaintiff attempted to induce defendant to treat as covered losses and pay for a substantial amount of repairs that were not covered under the policy or that involved unnecessary costs. In opposition to defendant's motion, plaintiff offered only a two-page declaration of its expert expressing a conclusionary opinion that defendant had acted in bad faith. That declaration was not sufficient to raise a triable issue of fact. Only one inference could have been drawn from this record: that defendant had a reasonable and legitimate basis for questioning plaintiff's claim. (Opinion by Croskey, J., with Klein, P. J., and Kitching, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Summary Judgment § 26--Appellate Review--**

**Scope of Review.** --After examining documents supporting a summary judgment motion in the trial court, the appellate court independently determines their effect as a matter of law. The party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he or she is entitled to a judgment as a matter of law. There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. An issue of fact becomes one of law and loses its triable character if the undisputed facts leave no room for a reasonable difference of opinion. A defendant moving for summary judgment bears a burden of production to make a prima facie showing, by declarations or other evidence, that there is a complete defense to the plaintiff's action or an absence of an essential element of the plaintiff's case. Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.

**(2a) (2b) Contracts § 23.1--Construction and Interpretation--Good Faith and Fair Dealing.** --Every contract imposes on each party an implied duty of good faith and fair dealing. The burden imposed is that neither party will do anything that will injure the right of the other to receive the benefits of the agreement. A breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself. Bad faith implies unfair dealing rather than mistaken judgment. Thus, allegations that assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment, or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement. Just what conduct will meet these criteria must be determined on a case-by-case basis and will depend on the contractual purposes and reasonably justified expectations of the parties.

**(3a) (3b) Insurance Contracts and Coverage § 109--Adjustment of Loss and Liability--Duty of Insurer to Act in Good Faith.** --In the context of the insurance contract, an insurer's responsibility to act fairly and in good faith with respect to the handling of the insured's claim is not the requirement mandated by the terms of the policy itself. It is the obligation under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. The ultimate test of bad faith liability is whether the refusal to pay policy benefits or the alleged delay in paying was unreasonable. While the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence. The mistaken or erroneous withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability, does not expose the insurer to bad faith liability. Without more, such a denial of benefits is merely a breach of contract. Moreover, the reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors. While an insurer must give as much consideration to the interests of its insured as it does to its own, it is not required to disregard the interests of its shareholders and other policyholders when evaluating claims.

**(4a) (4b) (4c) (4d) Insurance Contracts and Coverage § 109--Adjustment of Loss and Liability--Duty of Insurer to Act in Good Faith--Payment of Proceeds--When Properly Resolved as Question of Law.** --In a bad faith action brought against its insurer by a condominium homeowners association, arising from defendant's resolution of plaintiff's claim of loss from damage to the common areas of the condominium complex following a large earthquake, the trial court did not err in granting defendant's motion for summary adjudication of plaintiff's claim. An insurer denying or delaying payment of policy benefits due to the existence of a genuine dispute as to the existence of coverage liability is not liable in bad faith even though it might be liable for breach of contract. This issue may be resolved as a matter of law in a proper case. In this case, the undisputed record demonstrated that, after the earthquake, plaintiff attempted to induce defendant to treat as covered losses, and pay for, a substantial amount of repairs that were not covered under the policy or that involved costs that exceeded those that were reasonably necessary. In opposition to defendant's motion for summary adjudication, plaintiff offered only a two-page

declaration of its expert expressing a conclusionary opinion that defendant had acted in bad faith. This declaration was not sufficient to raise a triable issue of fact. Only one inference could have been drawn from this record: that defendant had a reasonable and legitimate basis for questioning plaintiff's claim. Because there was no factual issue as to defendant's bad faith, this claim was properly resolved as a matter of law.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 749.]

**(5) Insurance Contracts and Coverage § 109--Adjustment of Loss and Liability--Duty of Insurer to Act in Good Faith--Reliance on Expert Opinion--Genuine Dispute Doctrine.** --A court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, and so not in bad faith, so long as there existed a genuine issue as to the insurer's liability. This genuine dispute doctrine may be applied where the insurer denies a claim based on the opinions of experts. Where the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith. An expert's testimony will not automatically insulate an insurer from a bad faith claim based on a biased investigation. Whether the genuine dispute doctrine applies is an issue that should be decided on a case-by-case basis. When the following circumstances are present, a biased investigation claim should go to jury: (1) the insurer was guilty of misrepresenting the nature of the investigatory proceedings; (2) the insurer's employees lied during the depositions or to the insured; (3) the insurer dishonestly selected its experts; (4) the insurer's experts were unreasonable; and (5) the insurer failed to conduct a thorough investigation.

**(6) Insurance Contracts and Coverage § 109--Adjustment of Loss and Liability--Duty of Insurer to Act in Good Faith--When Issue Becomes Question of Law--Appellate Review.** --Although an insurer's bad faith is ordinarily a question of fact to be determined by a jury by considering the evidence of motive, intent, and state of mind, the question becomes one of law when, because there are no conflicting inferences, reasonable minds could not differ. Thus, the issue of bad faith may, in specific instances, be treated as an issue of law. An appellate court reviews a judgment on an issue of law de novo.

**COUNSEL:** Girardi and Keese, Anne M. Huarte and John A. Girardi for Plaintiff and Appellant.

Cummings & White, Annabelle M. Harris and Daniel G. Bath for Defendant and Respondent.

**JUDGES:** Opinion by Croskey, J., with Klein, P. J., and Kitching, J., concurring.

**OPINION BY:** CROSKEY

**OPINION**

[*339] [**778] **CROSKEY, J.**

This appeal tests the validity of an order of the trial court summarily adjudicating, in favor of the insurer, the claim that the insurer was liable for its bad faith adjustment of the insured's claim of loss. Following the Northridge earthquake on January 17, 1994, the appellant, Chateau Chamberay Homeowners Association (HOA), submitted a claim of loss to its insurer, the respondent, Associated International Insurance Company (AIIC). When it was finally calculated, HOA's claim totaled $ 5,771,522.

During the investigation process, AIIC paid to HOA several interim payments, which [***2] together represented the total amount AIIC believed was due; that amount totaled $ 1,949,161. A subsequent stipulated arbitration determined that AIIC had underpaid the total amount of HOA's *covered* loss and ordered that AIIC pay an additional $ 610,753, plus interest; thus, HOA's total *covered* loss was determined to be $ 2,559,914, or approximately 45 percent of its claimed total loss.

While the amount of HOA's covered loss was resolved by arbitration, its claim for bad faith conduct on the part of AIIC went forward in the trial court. Concluding from the evidence presented that AIIC and HOA had a "genuine dispute" as to what was covered under AIIC's policy and the proper amount of HOA's loss, the trial court determined that AIIC could not be found liable in bad faith for its adjustment activities and the resulting delayed payment of HOA's claim. Based on that determination, it granted AIIC's motion for the summary adjudication of HOA's cause of action for bad faith. As all other issues have now been resolved and a final judgment entered, that ruling may now be reviewed.

The record before us reflects that AIIC and HOA did

have a genuine dispute as to (1) just what portion [***3] of HOA's claimed loss was *actually covered* under the policy and (2) the proper *amount* of HOA's covered loss. [*340] In addition, we can find no factual support for the conclusion that AIIC acted unreasonably or without proper cause in its adjustment of HOA's claim. We thus are able to determine, as a matter of law, that AIIC cannot be found liable in bad faith. As a result, we conclude that the trial court did not err in summarily adjudicating [**779] HOA's bad faith claim. We therefore will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

1

1 There is essentially no dispute as to the underlying facts on which HOA's bad faith claim is based. The facts we recite are based upon AIIC's separate statement of undisputed facts which HOA did not effectively counter. To the extent that HOA purported to quarrel with AIIC's separate statement, it did so by attempting to recharacterize, or by arguing with the significance of, certain undisputed facts. HOA did not offer any additional or competing facts; the opinions expressed by its expert were conclusionary in nature and essentially were based on AIIC's factual presentation.

[***4] Prior to January 17, 1994, AIIC had issued a $ 5 million policy of property insurance (including earthquake coverage) to HOA covering the common areas of its 66-unit condominium building at 2385 Roscomare Road in Los Angeles. [2] On that date, the Northridge earthquake caused significant damage to HOA's building. HOA promptly notified AIIC and made a claim of loss.

2 In providing this general description we note the fact that HOA's insurable interest applied only to the common areas of the condominium property and not to the interior portions of the 66 individual units. The claimed damage to the individual units is the subject of another proceeding which is also pending before us and which we have resolved concurrently with this matter. ( *Adelman v. Associated Internat. Ins. Co. (2001) 90 Cal. App. 4th 352 [108 Cal. Rptr. 2d 788].*)

On or about January 20, 1994, AIIC employed an adjuster to assist in the adjustment of HOA's loss. It also retained the services of a general contractor and [***5] a structural engineer to evaluate the nature and extent of the damage sustained to HOA's building. Within the following week, site inspections of the property were completed and AIIC paid an advance of $ 50,000 to HOA on February 1, 1994.

At about the same time, HOA retained a public adjuster and two structural engineers to assist it with the evaluation of its loss. On February 4, 1994, one of its engineers submitted a structural damage report which reflected, in part: "Internally the building seemed to have survived the earthquake with relatively little damage, with the exception of the four units located in the north and south wings of the building fronting the street . . . damages to units on levels A & B were negligible." However, the report went on to make repair recommendations that were designed to "minimize any further damage which may occur from future seismic activity" (e.g., the installation of [*341] plywood on all exterior walls of the first and second floors). Within 10 days to two weeks thereafter, it was reported to AIIC that the general contractor retained by HOA was installing shear paneling unnecessary for "emergency shoring," but apparently for the purpose [***6] of meeting *current* building codes. [3]

3 This information is relevant to the issues before us. As we discuss below, AIIC had no obligation to provide repairs to meet current building codes or to otherwise "upgrade" the property; its obligation was limited to repairing the loss suffered by HOA.

After several more site inspections during the spring of 1994, representatives of the adjusters hired by AIIC and HOA agreed that HOA's adjuster would submit to AIIC a repair scope and estimate which would be used as a basis for attempting to resolve HOA's claim. On or about March 28, 1994, AIIC discovered that public records reflected that the property had a settlement problem which had existed *before* the earthquake. In addition, AIIC [**780] later learned (through a review of HOA board meeting minutes) that there were other *pre-earthquake* problems, including land erosion, and water intrusion and tile buckling problems. It is AIIC's position that the impact these circumstances would necessarily have [***7] upon the damage sustained by HOA's building and the extent of HOA's *covered* loss had

to be investigated.

Although HOA's scope and repair estimate had not yet been provided, AIIC advanced another $ 100,000 to HOA on May 24, 1994. On June 22, AIIC formally advised HOA's adjuster of its position on the scope of coverage under the policy: (1) repairs required by new building codes were not covered under the subject policy, (2) asbestos removal was covered only from those areas of the property which were damaged by the earthquake, (3) only consequential damage to the interiors of the units resulting from repairs to the common area were covered, and (4) no coverage existed for the plywood shear panels which were installed after the earthquake absent evidence that they were installed on an "emergency" basis to stabilize the building. [4]

4 There does not appear to be any claim by HOA that AIIC's characterization of the limits of its coverage is incorrect. The relevant policy language is not cited to us by either party, but HOA does not contend that the AIIC policy provides coverage for any of these listed items.

[***8] HOA finally submitted its scope and estimate of repairs on September 29, 1994, which was nine months after the loss. It totaled $ 6,493,793 and included items such as (1) fortification of a *defectively constructed* foundation, (2) removal of stucco in order to install plywood sheathing, (3) repair of *preexisting* floor vibration problems, (4) repair of water intrusion problems, and (5) repair of the individual units. AIIC had significant problems with this estimate and, over the next several months, it had a number of [*342] discussions with HOA's adjuster. During the same time period, AIIC continued site inspections, including inspection of individual units.

On December 19, 1994, despite its reservations about HOA's repair estimate, AIIC made another advance payment, this time in the amount of $ 300,000. At the time of this payment, there was still no agreement on the scope or cost of covered repairs under the policy, and AIIC contended that HOA's estimate was grossly overstated. Finally, in March 1995, HOA's adjuster withdrew the estimate, citing "problems with it."

During the spring of 1995, AIIC attempted to ascertain the extent of the preexisting problems with [***9] HOA's building. In AIIC's view, this was critical because problems with the property that preexisted the earthquake could not properly be included in the earthquake claim. On or about May 9, 1995, AIIC's adjuster requested all expert reports and construction repair estimates which predated the earthquake so that AIIC could evaluate these problems. Subsequently, on June 2, 1995, the HOA submitted a new repair estimate. This estimate was in the amount of $ 5,771,522, and it far exceeded AIIC's evaluation of the *covered* loss. Still included was the cost of items not covered under the policy such as (1) compliance with current building code regulations, (2) repair of preexisting damage and construction and design defects, including the improperly constructed foundation, (3) installation of caissons and grading and (4) repair of floor vibrations and (5) repair of the interior of certain individual homeowner units. [5]

5 The estimate included approximately $ 900,000 worth of repairs to fix floor vibration. AIIC had determined, however, that the vibration issue was the subject of a lawsuit by the HOA against the developer of the condominiums *brought in 1978,* 14 years prior to the earthquake. Furthermore, AIIC learned, after inspecting the floor joists, that such vibration was the result of a *construction defect* consisting of overspanned and undersized joists.

[***10] [**781] Based on its investigation and what it believed to be covered under the policy, AIIC paid another $ 1 million on the claim on September 14, 1995, bringing the total payments to HOA, as of that date, to $ 1,450,000. Thereafter, in order to reach an agreement on the balance of HOA's claim, which was *not* disputed, AIIC's adjuster entered into negotiations with HOA's representative. AIIC proposed a compromise agreement on the scope and cost of repair of the earthquake damage to the HOA property covered under the policy in the amount of $ 2,287,783. An effort was then made to negotiate a narrative of what claims would be settled by payment of such amount, and what disputed items would remain open. HOA, however, ultimately refused to agree to a narrative. AIIC thereafter nonetheless paid an additional sum of $ 449,161.48, bringing the total payments made to HOA to $ 1,949,161.48. Following that payment, AIIC took the formal position that there was no more owing under the policy.

[*343] HOA responded by filing this action on January 25, 1996, for breach of contract and breach of the

implied covenant of good faith and fair dealing. With respect to its bad faith claim, [***11] HOA sought punitive damages, arguing that AIIC's conduct, in delaying the payments that it had made and refusing to pay HOA's claim in full, constituted acts committed with malice and oppression.

The basic dispute between AIIC and HOA with respect to the latter's claim for earthquake damage to its property raised several issues on which the parties could not agree: (1) whether HOA's claim included losses for which it was not at risk (i.e., damage sustained to noncommon areas) and thus not covered under the policy, (2) whether HOA's claim included sums to perform upgrades required by current building codes but which were not covered under the policy, (3) whether HOA's claim included amounts to correct conditions, including construction or design defects, which existed *prior* to the earthquake and thus were not covered under the policy, (4) whether the amounts claimed by HOA exceeded those reasonably necessary to replace damaged property with *comparable* material and quality as to that which existed prior to the earthquake and (5) whether the professional fees and costs for emergency repairs exceeded that which were reasonably required.

Contending that its position was reasonable [***12] and that a "genuine dispute" existed between it and HOA as to each of these issues, AIIC moved for summary adjudication of HOA's cause of action for bad faith. HOA opposed this motion primarily with the declaration of its expert witness, Keith Charleston. HOA offered evidence of no facts other than those summarized above, but relied upon the *opinion* of Charleston to the effect that AIIC's adjustment and handling of HOA's claim was unreasonable and constituted a breach of the implied covenant of good faith. On April 28, 1998, the trial court, concluding that AIIC's position with respect to HOA's claim was reasonable as a matter of law, granted the motion. The case then went forward on HOA's first cause of action for breach of contract.

Before that cause of action could come to trial, however, the parties entered into a stipulation on April 26, 1999, that provided [**782] HOA's claim could be resolved in binding arbitration. Such arbitration was conducted and, on July 22, 1999, an award was made in favor of HOA in the sum of $ 610,753, plus interest of $ 111,509 for a total award of $ 722,262, less a [*344] credit of $ 14,875. Thus, HOA's original claim of $ 5,771,522, [***13] was substantially rejected by the arbitrator. The sum $ 1,949,161, [6] already paid by AIIC, together with the sum of $ 610,753, found by the arbitrator to be due, represents only 45 percent of the original claim.

6 This sum, which was paid by AIIC prior to the filing of this action, represents approximately 80 percent of the value of HOA's total covered loss as ultimately determined by the arbitrator.

After the trial court entered a judgment of confirmation of the arbitrator's award, HOA filed this timely appeal asserting that the trial court had erred in granting AIIC's motion for summary adjudication of the bad faith cause of action. HOA argues that AIIC's handling of the claim (including, from HOA's point of view, its inadequate investigation and the delayed and inadequate payment of policy benefits) was unreasonable in the circumstances and presented an issue for the jury, not the court. Thus, HOA contends, it was improperly denied a jury trial on its second cause of action. HOA further argues that [***14] the opinions expressed by its expert, Charleston, were sufficient evidence to raise triable issues of fact which could not be resolved on a motion for summary judgment or adjudication.

AIIC counters that the essential or underlying facts are not in dispute and its position on coverage under the policy, as well as its estimate of the value of HOA's covered losses, was reasonable. It contends that, at the very least, there was a "genuine dispute" between the parties as to these issues and therefore AIIC could not be held liable for the tort of bad faith.

DISCUSSION

1. *Standard of Review*

**(1)** Summary judgment is granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. ( *Code Civ. Proc., § 437c, subd. (c)*; *Villa v. McFerren (1995) 35 Cal. App. 4th 733, 741 [41 Cal. Rptr. 2d 719].*) After examining documents supporting a summary judgment motion in the trial court, this court independently [***15] determines their effect as a matter of law. ( *Hulett v. Farmers Ins. Exchange (1992) 10 Cal. App. 4th 1051, 1057-1058 [12 Cal. Rptr. 2d 902].*)

"From commencement to conclusion, the party

moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to a judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would [*345] allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion *in accordance with the applicable standard of proof*." ( *Aguilar v. Atlantic Richfield Co. (2001) 25 Cal. 4th 826, 850 [107 Cal. Rptr. 2d 841, 24 P.3d 493]* (*Aguilar*), italics added.) An issue of fact becomes one of law and loses its "triable" character if the undisputed facts leave no room for a reasonable difference of opinion. ( *Preach v. Monter Rainbow (1993) 12 Cal. App. 4th 1441, 1450 [16 Cal. Rptr. 2d 320].*)

[***16] A defendant moving for summary judgment bears a burden of production to make a prima facie showing, by declarations and/or other evidence, that there is a complete defense to the plaintiff's action or an absence of an essential element of [**783] plaintiff's case. ( *Aguilar, supra, 25 Cal. 4th at p. 849, 107 Cal. Rptr. 2d 841, 24 P.3d 493.*) "Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials [of his] pleadings to show that a triable issue of material fact exists but, instead [must] set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." ( *Code Civ. Proc., § 437c, subd. (o)(2).*)

This, as we explain, HOA has failed to do.

2. *To Establish Bad Faith It Must be Shown That Insurer Acted Unreasonably or Without Proper Cause*

**(2a)** Every contract imposes [***17] on each party an implied duty of good faith and fair dealing. ( *Egan v. Mutual of Omaha Ins. Co. (1979) 24 Cal. 3d 809, 818 [169 Cal. Rptr. 691, 620 P.2d 141].*) Simply stated, the burden imposed is " 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " ( *Gruenberg v. Aetna Ins. Co. (1973) 9 Cal. 3d 566, 573 [108 Cal. Rptr. 480, 510 P.2d 1032]*, quoting *Comunale v. Traders & General Ins. Co. (1958) 50 Cal. 2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].*) Or, to put it another way, the "implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." ( *Schoolcraft v. Ross (1978) 81 Cal. App. 3d 75, 80 [146 Cal. Rptr. 57]*; accord, *Fletcher v. Western National Life Ins. Co. (1970) 10 Cal. App. 3d 376, 401 [89 Cal. Rptr. 78, 47 A.L.R.3d 286].*) A " 'breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty [***18] itself,' and it has been held that ' "bad faith implies unfair dealing rather than mistaken judgment. . . ." [Citation.]' [Citation.]" ( *Congleton v. National Union Fire Ins. Co. (1987) 189 Cal. App. 3d 51, 59 [234 Cal. Rptr. 218].*) [*346] **(3a)** For example, in the context of the insurance contract, it has been held that the insurer's responsibility to act fairly and in good faith with respect to the handling of the insured's claim " 'is not the requirement mandated by the terms of the policy itself--to defend, settle, or pay. It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities.' [Citation.]" ( *California Shoppers, Inc. v. Royal Globe Ins. Co. (1985) 175 Cal. App. 3d 1, 54 [221 Cal. Rptr. 171]*, italics omitted, quoting from *Gruenberg v. Aetna Ins. Co., supra, 9 Cal. 3d at pp. 573-574.*)

**(2b)** "Thus, allegations which assert such a claim must show that the conduct of [***19] the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement. Just what conduct will meet these criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties." ( *Careau & Co. v. Security Pacific Business Credit, Inc. (1990) 222 Cal. App. 3d 1371, 1395 [272 Cal. Rptr. 387]*; accord, *State Farm Fire & Casualty Co. v. Superior Court (1996) 45 Cal. App. 4th 1093, 1105 [53 Cal. Rptr. 2d 229].*)

**(4a)** HOA's claim of bad faith in this case rests upon the proposition that AIIC unreasonably delayed making payments [**784] due on HOA's claim and failed to conduct an adequate investigation. **(3b)** " 'The [***20] ultimate test of [bad faith] liability in the first party cases is whether the refusal to pay policy benefits [or the alleged delay in paying] was *unreasonable*.' " ( *Opsal v. United Services Auto. Assn. (1991) 2 Cal. App. 4th 1197,*

*1205 [10 Cal. Rptr. 2d 352]*; *Gourley v. State Farm Mut. Auto. Ins. Co. (1991) 53 Cal. 3d 121, 127 [3 Cal. Rptr. 2d 666, 822 P.2d 374]*.) While the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence. ( *Paulfrey v. Blue Chip Stamps (1983) 150 Cal. App. 3d 187, 196 [197 Cal. Rptr. 501]*.)

"The mistaken [or erroneous] withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability." ( *Tomaselli v. Transamerica Ins. Co. (1994) 25 Cal. App. 4th 1269, 1280-1281 [31 Cal. Rptr. 2d 433]*; *Nager v. Allstate Ins. Co. (2000) 83 Cal. App. 4th 284,* [*347] *288 [99 Cal. Rptr. 2d 348]*; [***21] *Opsal v. United Services Auto. Assn., supra, 2 Cal. App. 4th at p. 1205*.) Without more, such a denial of benefits is merely a breach of contract. Moreover, the reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors. (Cf. *Filippo Industries, Inc. v. Sun Ins. Co. (1999) 74 Cal. App. 4th 1429, 1441 [88 Cal. Rptr. 2d 881]*.)

Thus, before an insurer can be found to have acted tortiously (i.e., in bad faith), for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause*. ( *Dalrymple v. United Services Auto. Assn. (1995) 40 Cal. App. 4th 497, 520 [46 Cal. Rptr. 2d 845]*; *Opsal v. United Services Auto. Assn., supra, 2 Cal. App. 4th at p. 1205*.) However, where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there [***22] can be no bad faith liability imposed on the insurer for advancing its side of that dispute. ( *Dalrymple, supra, at p. 520*; *Opsal, supra, at pp. 1205-1206*.) While an insurer must give as much consideration to the interests of its insured as it does to its own ( *Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal. 3d at pp. 818-819*), "it is not required to disregard the interests of its shareholders and other policyholders when evaluating claims. . . ." ( *Love v. Fire Ins. Exchange (1990) 221 Cal. App. 3d 1136, 1148-1149 [271 Cal. Rptr. 246]*; accord, *Austero v. National Cas. Co. (1978) 84 Cal. App. 3d 1, 30 [148 Cal. Rptr. 653]*, disapproved on other point in *Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal. 3d at p. 824, fn. 7*.) In other words, an insurer *is* entitled to give its own interests consideration when evaluating the merits of an insured's claim. ( *Tomaselli v. Transamerica Ins. Co., supra, 25 Cal. App. 4th at p. 1281*.)

**(4b)** It is now settled law in California that [***23] an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract. ( *Fraley v. Allstate Ins. Co. (2000) 81 Cal. App. 4th 1282, 1292 [97 Cal. Rptr. 2d 386]*.)

It is equally clear that this issue may be resolved as a matter of law in a proper case. **(5)** " '[A] court can conclude as a matter [**785] of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability.' [Citation.] The 'genuine dispute' doctrine may be applied where the insurer denies a claim based on the opinions of experts. [Citations.]" ( *Fraley v. Allstate Ins. Co., supra, 81* [*348] *Cal. App. 4th at p. 1292*.) In *Fraley*, a case that involved a dispute over the cost of repairs to the insureds' fire damaged home, with each side relying on the differing opinions of their respective experts, [***24] the court held "where the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith." ( *Id. at p. 1293*.)

While many, if not most, of the cases finding a genuine dispute over an insurer's coverage liability have involved *legal* rather than *factual* disputes, we see no reason why the genuine dispute doctrine should be limited to legal issues. (See, e.g., *Guebara v. Allstate Ins. Co. (9th Cir. 2001) 237 F.3d 987, 993-994*; *Phelps v. Provident Life and Acc. Ins. Co. (C.D.Cal. 1999) 60 F. Supp.2d 1014, 1021-1022*; *Allstate Ins. Co. v. Madan (C.D.Cal. 1995) 889 F. Supp. 374, 381*.) [7] That does not mean, however, that the genuine dispute doctrine may properly be applied in every case involving purely a factual dispute between an insurer and its insured. This is an issue which should be decided on a case-by-case basis. ( [***25] *Guebara v. Allstate Ins. Co., supra, 237 F.3d at p. 994*.)

7 For example, a coverage dispute involving the proper construction and application of policy language would be a *legal* dispute, while one involving a disagreement as to the reasonable

value of an insured's claim would be a *factual* one. Provided there is no dispute as to the *underlying facts* (e.g., what the parties did and said), then the trial court can determine, *as a matter of law*, whether such dispute is "genuine." In making that decision, the court does not decide which party is "right" as to the disputed matter, but only that a reasonable and legitimate dispute actually existed.

As the *Fraley* court emphasized, where an insurer, for example, is relying on the advice and opinions of independent experts, then a basis *may* exist for invoking the doctrine and summarily adjudicating a bad faith claim in the insurer's [***26] favor. ( *Fraley v. Allstate Ins. Co., supra, 81 Cal. App. 4th at p. 1293*; *Guebara v. Allstate Ins. Co., supra, 237 F.3d at p. 994*.) We concur, however, with the caveat advanced by the *Guebara* court. It cautioned that an expert's testimony will not *automatically* insulate an insurer from a bad faith claim based on a biased investigation. It suggested several circumstances where a biased investigation claim *should* go to jury: (1) the insurer was guilty of misrepresenting the nature of the investigatory proceedings (*see Tomaselli v. Transamerica Ins. Co., supra, 25 Cal. App. 4th 1269, 1281* [allowing a bad faith claim to go to the jury where an insurance company without any evidence of fraud forced an insured to submit to an examination under oath, dissuaded the insured from having an attorney present, and misled the insured about the purpose of the examination]); (2) the insurer's employees lied during the depositions or to the insured; [***27] (3) the insurer dishonestly selected its experts; (4) the insurer's experts were unreasonable; and (5) the [*349] insurer failed to conduct a thorough investigation. ( *Guebara v. Allstate Ins. Co., supra, 237 F.3d at p. 996*.) [8] **(4c)** As we now explain, we find that none of these circumstances [**786] are present in this case and the genuine dispute doctrine may properly be applied.

8 This list is certainly not intended to be exhaustive of the circumstances that may justify submission to a jury of an insurer's "genuine dispute" defense to a claim of bad faith. Nor, we must also add, may an insurer insulate itself from liability for bad faith conduct by the simple expedient of hiring an expert for the purpose of manufacturing a "genuine dispute."

3. *HOA Failed to Demonstrate a Triable Issue of Fact as to AIIC's Alleged Bad Faith*

When it moved for a summary adjudication of HOA's bad faith cause of action, AIIC presented evidence of the existence of a legitimate dispute with HOA as [***28] to just what was due under the policy. That evidence consisted primarily of the declaration of the officer of the claim adjustment company retained by AIIC to investigate HOA's claimed loss. That declaration spelled out in considerable detail the entire adjustment process as it unfolded. We have summarized that process in our earlier factual background discussion. The facts outlined in that declaration are not in dispute; they are not countered by HOA with any additional or different factual information.

What the evidentiary record made by the parties demonstrates is that, after the earthquake, HOA attempted to induce AIIC to treat as covered losses, and pay for, a substantial amount of repairs that, from AIIC's point of view, were not covered under the policy (e.g., damage to individual units not a part of the common areas, repairs that involved upgrades to meet current code requirements, and repairs to remedy design or construction defects or preexisting conditions and damages sustained to the property *prior* to the earthquake) or involved costs and expenses that exceeded those *reasonably* necessary to restore the property to the condition it was in prior to the earthquake. [***29] There is no *factually supported* suggestion in this record that (1) AIIC ever misrepresented the nature of its investigatory activity, (2) provided any false documents or testimony, (3) did not honestly select independent experts to make the appropriate loss evaluations, (4) relied upon expert reports that were not reasonable or, (5) failed to conduct a thorough investigation.

Indeed, AIIC presented substantial evidence justifying its position. In opposing AIIC's motion, HOA essentially offered only a two-page declaration of its expert who claimed to have read the claim files and, based thereon, expressed the *conclusionary* opinions that AIIC (1) had not conducted an adequate and thorough investigation of HOA's loss, (2) had [*350] engaged in dilatory claims handling and unreasonable adjusting practices, (3) had arrived at an inadequate initial scope of loss for the structural damage and (4) had failed to obtain all necessary engineering inspections and reports. HOA's expert then concluded that, by such actions, AIIC had breached the implied covenant of good faith and fair

dealing. HOA argues that such "evidence" is sufficient to raise a triable issue of fact. We disagree.

[***30] **(6)** Although an insurer's bad faith is ordinarily a question of fact to be determined by a jury by considering the evidence of motive, intent and state of mind, "the question becomes one of law . . . when, because there are no conflicting inferences, reasonable minds could not differ. [Citations.]" ( *Walbrook Ins. Co. v. Liberty Mutual Ins. Co. (1992) 5 Cal. App. 4th 1445, 1454-1455 [7 Cal. Rptr. 2d 513].*) "Thus, the issue of bad faith may, in specific instances, be treated as an issue of law. [Citation.] An appellate court reviews a judgment on an issue of law de novo. [Citations.]" ( *Dalrymple v. United Services Auto. Assn., supra, 40 Cal. App. 4th at p. 511.*) **(4d)** Given the record we have before us, we find that this case falls within the ambit of the foregoing principles. We are not called upon to determine whether AIIC's view as to the proper outcome of the adjustment [**787] process was correct. It is only necessary for us to determine that, *in light* [***31] *of the record as a whole*, its position with respect to the disputed points was *reasonable* or that AIIC had *proper cause* to assert the positions that it did.

We agree with the *Dalrymple* court's analysis of this issue when it concluded that, as long as *there is no dispute as to the underlying facts*, it is for the court, not a jury, to decide whether the insurer had "proper cause." ( *Dalrymple v. United Services Auto. Assn., supra, 40 Cal. App. 4th at p. 517.*) [9] Only one inference can be drawn from this record. AIIC had a reasonable and legitimate basis for questioning HOA's claim, as the ultimate resolution of that claim by the arbitrator confirmed. Viewed at the time AIIC acted, the record contains substantial and unrebutted evidence that HOA included in its claim matters that were not covered under the policy and/or related to preexisting conditions, including design and construction defects, and sought to claim unreasonable repair and professional fees and expenses. AIIC had every right to question these matters and to require HOA to provide full and [***32] proper support for its demands. HOA failed to do so. We can find nothing in this record that supports a contrary conclusion. Certainly the conclusionary declaration of HOA's expert does not. That simply represented his opinion on the ultimate question of whether AIIC had *proper* cause to contest HOA's claims, a question, as already noted, that is to be decided by the court, not a jury. As the subsequent arbitration results demonstrated, HOA was able to [*351] justify only 45 percent of its original claim and 80 percent of that sum had been paid by AIIC before HOA ever filed suit.

9 See footnote 7, *ante*.

The parties had a clear contract dispute as to the balance of the amount due on HOA's claim; it was resolved in the stipulated arbitration proceedings and HOA received an additional award (although it was less than 20 percent of the remaining balance it was claiming). The parties did not have a tort dispute; there is no factual issue as to "bad faith" on AIIC's part. It is not enough to say, [***33] as HOA's expert essentially does, that AIIC could have done a better job in adjusting HOA's claim. Sloppy or negligent claims handling does not rise to the level of bad faith. HOA is fully compensated by its breach of contract award together with interest on the delayed or unpaid sums found to be due. For all of the reasons discussed above this matter should now be concluded. [10]

10 In view of this result, we need not reach or discuss AIIC's attack on HOA's punitive damage claim. It was an integral part of, and falls with our rejection of, HOA's bad faith cause of action.

DISPOSITION

The judgment is affirmed. AIIC shall recover its costs on appeal.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied July 30, 2001, and the opinion was modified to read as printed above.

# TAB 9

LEXSEE 21 CAL.4TH 552

**BARRY ERLICH et al., Plaintiffs and Respondents, v. JOHN MENEZES, Defendant, Cross-complainant and Appellant; RON REBALDO et al., Cross-defendants and Respondents.**

**No. S068325.**

**SUPREME COURT OF CALIFORNIA**

***21 Cal. 4th 543; 981 P.2d 978; 87 Cal. Rptr. 2d 886; 1999 Cal. LEXIS 5530; 99 Cal. Daily Op. Service 6808; 99 Daily Journal DAR 8687***

**August 23, 1999, Decided**

**PRIOR HISTORY:** Superior Court of San Luis Obispo County. Super. Ct. No. CV70302. Paul H. Coffee, Judge, and Jay R. Ballantyne, Judge. *

* Retired Associate Justice of the Court of Appeal, Fifth District, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

**DISPOSITION:** The judgment of the Court of Appeal is reversed and the matter is remanded for further proceedings consistent with this opinion.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Homeowners filed an action against the contractor who built their new house for breach of contract, fraud, negligent misrepresentation, and negligent construction. Plaintiffs testified that they suffered emotional distress as a result of the defective condition of the house and defendant's invasive and unsuccessful repair attempts. The jury found that defendant breached his construction contract by negligently constructing the house but was not guilty of fraud or negligent misrepresentation. The jury awarded plaintiffs the cost of repairs and damages for emotional distress. (Superior Court of San Luis Obispo County, No. CV70302, Paul H. Coffee, Judge, and Jay R. Ballantyne, Judge. *) The Court of Appeal, Second Dist., Div. Six, No. B105675, affirmed.

* Retired Associate Justice of the Court of Appeal, Fifth District, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

The Supreme Court reversed the judgment of the Court of Appeal and remanded for further proceedings. The court held that since defendant's negligence directly caused only economic injury and property damage and breached no duty independent of the contract, plaintiffs could not recover damages for emotional distress based upon breach of the contract to build the house. Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. Conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. The court held that even assuming defendant's negligence constituted a breach of a sufficient independent duty to plaintiffs, such a finding would not entitle them to emotional distress damages on the facts alleged. The breach--the negligent construction of the house--did not cause physical injury. The only physical injury alleged was one plaintiff's heart disease, which flowed from the emotional distress and not directly from the negligent construction. The court held that the balance of policy considerations--the potential for significant increases in liability in amounts disproportionate to culpability, the court's inability to formulate appropriate limits on the availability of claims, and the magnitude of the impact on stability and predictability in commercial affairs--counseled against

expanding contract damages to include mental distress claims in negligent construction cases. (Opinion by Brown, J., with George, C. J., Kennard, Baxter, and Chin, JJ., concurring. Concurring and dissenting opinion by Werdegar, J., with Mosk, J., concurring (see p. 562).)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) Damages § 15--Measure of Damages--Breach of Contract--Distinction From Torts.** --Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise. In contrast, tort damages are awarded to fully compensate the victim for all injury suffered. The distinction between tort and contract is well grounded in common law, and divergent objectives underlie the remedies created in the two areas. Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate social policy.

**(2) Damages § 15--Measure of Damages--Breach of Contract--Breach of Legal Duty.** --The same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts. A contractual obligation may create a legal duty and the breach of that duty may support an action in tort. However, conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty. Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury, for breach of the covenant of good faith and fair dealing in insurance contracts, for wrongful discharge in violation of fundamental public policy, or where the contract was fraudulently induced. In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct that is both intentional and intended to harm.

[See 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 141.]

**(3) Negligence § 9--Elements--Duty of Care--Rules--Foreseeability.** --Foreseeability alone is not sufficient to create an independent tort duty. Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability. Because the consequences of a negligent act must be limited to avoid an intolerable burden on society, the determination of duty recognizes that policy considerations may dictate that a cause of action should not be sanctioned no matter how foreseeable the risk.

**(4a) (4b) Damages § 15--Measure of Damages--Breach of Contract--Defective Construction of House--Mental Distress.** --In an action by homeowners against the contractor who built their new house for breach of contract, fraud, negligent misrepresentation, and negligent construction, in which the jury found that defendant breached his construction contract by negligently constructing the house but was not guilty of fraud or negligent misrepresentation, plaintiffs were not entitled to recover damages for mental distress. A claim for negligent breach of a contract is not sufficient to support tort damages for violation of an independent tort duty. Even assuming defendant's negligence constituted a breach of a sufficient independent duty to plaintiffs, such a finding would not entitle them to emotional distress damages on the facts alleged. The breach--the negligent construction of the house--did not cause physical injury. The only physical injury alleged was one plaintiff's heart disease, which flowed from the emotional distress and not directly from the negligent construction. A preexisting contractual relationship, without more, will not support a recovery for mental suffering where the defendant's tortious conduct has resulted only in economic injury to the plaintiff. Also, the general measure of damages where injury to property is capable of being repaired is the reasonable cost of repair together with the value of lost use during the period of injury.

[See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1462.]

**(5) Damages § 15--Measure of Damages--Tortious Breach of Contract.** --Generally, outside the insurance context, a tortious breach of contract may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used

to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages. Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated.

**(6a) (6b) Damages § 15--Measure of Damages--Breach of Contract--Defective Construction of House--Mental Distress as Consequential Damages.** --In an action by homeowners against the contractor who built their new house for breach of contract, fraud, negligent misrepresentation, and negligent construction, in which the jury found that defendant breached his construction contract by negligently constructing the house but was not guilty of fraud or negligent misrepresentation, plaintiffs were not entitled to recover damages for mental distress as consequential or special damages. In California, damages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract. Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result. To permit emotional distress damages in cases of negligent construction of a personal residence when the negligent construction causes gross interference with the normal use and habitability of the residence would make the financial risks of construction agreements difficult to predict. Contract damages must be clearly ascertainable in both nature and origin. A rule focusing not on the risks contracting parties voluntarily assume, but on one party's reaction to inadequate performance, cannot provide any principled limit on liability.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 815.]

**COUNSEL:** Edward J. Horowitz, Claudia Ribet; Knapp, Petersen & Clarke, Daniels, Baratta & Fine, Alan J. Carnegie, James L. Hsu and Stephen M. Harris for Defendant, Cross-complainant and Appellant.

Sonnenschein Nath & Rosenthal, Paul E. B. Glad, Paula M. Yost and Cheryl Dyer Berg for American Insurance Association and Crum & Forster Insurance Company as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Alister McAlister for National Association of Independent Insurers as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Crosby, Heafey, Roach & May, Kathy M. Banke and Kay Long-Marin for Continental Metroplex as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Cox, Castle & Nicholson, Sandra C. Stewart and Debbie L. Freedman for the Building Industry Legal Defense Foundation and the California Building Industry Association as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Morgenstein & Jubelirer, James L. McGinnis and Laura E. Gasser for Centex Homes as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Songstad, Randall & Ulich, Andrew K. Ulich and Thomas D. Deardorff II for Taylor Woodrow Homes, Inc., as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Chapin Fleming McNitt Shea & Carter, Craig H. Bell and Keith A. Turner for Truck Insurance Exchange as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

John R. DeLoreto; Law Offices of Victor G. Zilinskas, Zilinskas & Jacobs, Victor G. Zilinskas and Michael L. Smith for Plaintiffs and Respondents.

Williams, Wester & Hall and Scott A. Williams as Amici Curiae on behalf of Plaintiffs and Respondents.

Kasdan, Simonds, McIntyre, Epstein & Martin and David G. Epstein for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

Keppleman & Associates and Richard D. Keppleman for Cross-defendant and Respondent Ron Rebaldo.

Borton, Petrini & Conron, Craig R. McCollum and Gary A. Bixler for Cross-defendant and Respondent John

Cravens Plastering, Inc.

**JUDGES:** Opinion by Brown, J., with George, C. J., Kennard, Baxter, and Chin, JJ., concurring. Concurring and dissenting opinion by Werdegar, J., with Mosk, J., concurring (see p. 562).

**OPINION BY:** BROWN

**OPINION**

[*548] [**980] [***888] **BROWN, J.**

We granted review in this case to determine whether emotional distress damages are recoverable for the negligent breach of a contract to construct a house. A jury awarded the homeowners the full cost necessary to repair their home as well as damages for emotional distress caused by [***889] the contractor's negligent performance. Since the contractor's negligence directly caused only economic injury and property damage, and breached no duty independent of the contract, we conclude the homeowners may not recover damages for emotional distress based upon breach of a contract to build a house.

I. FACTUAL AND PROCEDURAL BACKGROUND

Both parties agree with the facts as ascertained by the Court of Appeal. Barry and Sandra Erlich contracted with John Menezes, [**981] a licensed general contractor, to build a "dream house" on their ocean-view lot. The Erlichs moved into their house in December 1990. In February 1991, the rains came. "[T]he house leaked from every conceivable location. Walls were saturated in [an upstairs bedroom], two bedrooms downstairs, and the pool room. Nearly every window in the house leaked. The living room filled with three inches of standing water. In several locations water 'poured in in streams' from the ceilings and walls. The ceiling in the garage became so saturated . . . the plaster liquefied and fell in chunks to the floor."

Menezes's attempts to stop the leaks proved ineffectual. Caulking placed around the windows melted, " 'ran down [the] windows and stained them and ran across the driveway and ran down the house [until it] . . . looked like someone threw balloons with paint in them at the house.' " Despite several repair efforts, which included using sledgehammers and jackhammers to cut holes in the exterior walls and ceilings, application of new waterproofing materials on portions of the roof and exterior walls, and more caulk, the house continued to leak--from the windows, from the roofs, and water seeped between the floors. Fluorescent light fixtures in the garage filled with water and had to be removed.

"The Erlichs eventually had their home inspected by another general contractor and a structural engineer. In addition to confirming defects in the roof, exterior stucco, windows and waterproofing, the inspection revealed [*549] serious errors in the construction of the home's structural components. None of the 20 shear, or load-bearing walls specified in the plans were properly installed. The three turrets on the roof were inadequately connected to the roof beams and, as a result, had begun to collapse. Other connections in the roof framing were also improperly constructed. Three decks were in danger of 'catastrophic collapse' because they had been finished with mortar and ceramic tile, rather than with the light-weight roofing material originally specified. Finally, the foundation of the main beam for the two-story living room was poured by digging a shallow hole, dumping in 'two sacks of dry concrete mix, putting some water in the hole and mixing it up with a shovel.' " This foundation, required to carry a load of 12,000 pounds, could only support about 2,000. The beam is settling and the surrounding concrete is cracking.

According to the Erlichs' expert, problems were major and pervasive, concerning everything "related to a window or waterproofing, everywhere that there was something related to framing," stucco, or the walking deck.

Both of the Erlichs testified that they suffered emotional distress as a result of the defective condition of the house and Menezes's invasive and unsuccessful repair attempts. Barry Erlich testified he felt "absolutely sick" and had to be "carted away in an ambulance" when he learned the full extent of the structural problems. He has a permanent heart condition, known as superventricular tachyarrhythmia, attributable, in part, to excessive stress. Although the condition can be controlled with medication, it has forced him to resign his positions as athletic director, department head and track coach.

Sandra Erlich feared the house would collapse in an earthquake and feared for her daughter's safety. Stickers were placed on her bedroom windows, and [***890] alarms and emergency lights installed so rescue crews would find her room first in an emergency.

Plaintiffs sought recovery on several theories, including breach of contract, fraud, negligent misrepresentation, and negligent construction. Both the breach of contract claim and the negligence claim alleged numerous construction defects.

Menezes prevailed on the fraud and negligent misrepresentation claims. The jury found he breached his contract with the Erlichs by negligently constructing their home and awarded $ 406,700 as the cost of repairs. Each spouse was awarded $ 50,000 for emotional distress, and Barry Erlich received an additional $ 50,000 for physical pain and suffering and $ 15,000 for lost earnings.

[*550] By a two-to-one majority, the Court of Appeal affirmed the judgment, including the emotional distress award. The majority noted the breach of a contractual duty may support an action in tort. The jury found Menezes was negligent. Since his negligence [**982] exposed the Erlichs to "intolerable living conditions and a constant, justifiable fear about the safety of their home," the majority decided the Erlichs were properly compensated for their emotional distress.

The dissent pointed out that no reported California case has upheld an award of emotional distress damages based upon simple breach of a contract to build a house. Since Menezes's negligence directly caused only economic injury and property damage, the Erlichs were not entitled to recover damages for their emotional distress.

We granted review to resolve the question.

II. DISCUSSION

A.

In an action for breach of contract, the measure of damages is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom" (*Civ. Code, § 3300*), provided the damages are "clearly ascertainable in both their nature and origin" (*Civ. Code, § 3301*). In an action not arising from contract, the measure of damages is "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not" (*Civ. Code, § 3333*).

**(1a)** "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." ( *Applied Equipment Corp. v. Litton Saudi Arabia Ltd. (1994) 7 Cal. 4th 503, 515 [28 Cal. Rptr. 2d 475, 869 P.2d 454]* (*Applied Equipment*).) "In contrast, tort damages are awarded to [fully] compensate the victim for [all] injury suffered. [Citation.]" ( *Id. at p. 516.*)

" '[T]he distinction between tort and contract is well grounded in common law, and divergent objectives underlie the remedies created in the two areas. Whereas contract actions are created to enforce the intentions of the parties [*551] to the agreement, tort law is primarily designed to vindicate "social policy." [Citation.]' " ( *Hunter v. Up-right, Inc. (1993) 6 Cal. 4th 1174, 1180 [26 Cal. Rptr. 2d 8, 864 P.2d 88]*, quoting *Foley v. Interactive Data Corp. (1988) 47 Cal. 3d 654, 683 [254 Cal. Rptr. 211, 765 P.2d 373]* (*Foley*).) While the purposes behind contract and tort law are distinct, the boundary line between them is not ( *Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal. 4th 85, 106 [44 Cal. Rptr. 2d 420, 900 P.2d 669]* (conc. and [***891] dis. opn. of Mosk, J.) (*Freeman & Mills*)) and the distinction between the remedies for each is not " 'found ready made.' " (*Ibid.*, quoting Holmes, The Common Law (1881) p. 13.) These uncertain boundaries and the apparent breadth of the recovery available for tort actions create pressure to obliterate the distinction between contracts and torts--an expansion of tort law at the expense of contract principles which Grant Gilmore aptly dubbed "con*torts*." In this case we consider whether a negligent breach of a contract will support an award of damages for emotional distress--either as tort damages for negligence or as consequential or special contract damages.

B.

In concluding emotional distress damages were properly awarded, the Court of Appeal correctly observed that "the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts." ( *North American Chemical Co. v. Superior Court (1997) 59 Cal. App. 4th 764, 774 [69 Cal. Rptr. 2d*

*466],* citing 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 139, pp. 203-204.) Here, the court permitted plaintiffs to recover both full repair costs as normal contract damages and emotional distress damages as a tort remedy. [1]

1 At oral argument, plaintiff cited *Sloane v. Southern Cal. Ry. Co. (1896) 111 Cal. 668 [44 P. 320],* a case involving a passenger wrongly ejected from a train, for the proposition that emotional distress damages arising out of breach of contract have been permitted in California for many years. In fact, *Sloane* specifically recognized the distinction between contract and tort remedies and held plaintiff could either "bring an action simply for the breach of . . . contract, or she could sue . . . in tort" for the carrier's violation of the duty, as a common carrier, which it assumed upon entering into the contract. ( *Id. at p. 677.*)

[**983] **(2)** The Court of Appeal also noted that "[a] contractual obligation may create a legal duty and the breach of that duty may support an action in tort." This is true; however, conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. (*Applied Equipment, supra, 7 Cal. 4th at p. 515.*) " ' "An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." ' " (*Ibid.*, quoting *Jones v. Kelly (1929) 208 Cal. 251, 255 [280 P. 942].*)

Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury ( *Fuentes v. Perez (1977) 66 Cal. App. 3d* [*552] *163, 168, fn. 2 [136 Cal. Rptr. 275]*); for breach of the covenant of good faith and fair dealing in insurance contracts ( *Crisci v. Security Ins. Co. (1967) 66 Cal. 2d 425, 433-434 [58 Cal. Rptr. 13, 426 P.2d 173]*); for wrongful discharge in violation of fundamental public policy ( *Tameny v. Atlantic Richfield Co. (1980) 27 Cal. 3d 167, 175-176 [164 Cal. Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]*); or where the contract was fraudulently induced. ( *Las Palmas Associates v. Las Palmas Center Associates (1991) 235 Cal. App. 3d 1220, 1238-1239 [1 Cal. Rptr. 2d 301].*) In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm. (See, e.g., *Christensen v. Superior Court (1991) 54 Cal. 3d 868, 885-886 [2 Cal. Rptr. 2d 79, 820 P.2d 181].*)

Plaintiff's theory of tort recovery is that mental distress is a foreseeable consequence of negligent breaches of standard commercial contracts. **(3)** However, foreseeability alone is not sufficient to create an independent tort duty. " 'Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability.' [Citation.]" ( *Burgess v. Superior Court (1992) 2 Cal. 4th 1064, 1072* [***892] *[9 Cal. Rptr. 2d 615, 831 P.2d 1197].*) Because the consequences of a negligent act must be limited to avoid an intolerable burden on society ( *Elden v. Sheldon (1988) 46 Cal. 3d 267, 274 [250 Cal. Rptr. 254, 758 P.2d 582]*), the determination of duty "recognizes that policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk." (*Ibid.*, fn. omitted.) "[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for [an] injury." ( *Thing v. La Chusa (1989) 48 Cal. 3d 644, 668 [257 Cal. Rptr. 865, 771 P.2d 814].*) In short, foreseeability is not synonymous with duty; nor is it a substitute.

**(4a)** The question thus remains: is the mere negligent breach of a contract sufficient? The answer is no. It may admittedly be difficult to categorize the cases, but to state the rule succinctly: "[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." (*Freeman & Mills, supra, 11 Cal. 4th at p. 107* (conc. and dis. opn. of Mosk, J.).) The familiar paradigm of tortious breach of contract in this state is the insurance contract. There we rely on the covenant of good faith and fair dealing, implied in every contract, to justify tort liability. (*Foley, supra, 47 Cal. 3d at pp. 689-690.*) In holding that a tort action is available for breach of the covenant in an insurance contract, [*553] we have "emphasized the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility." (*Freeman & Mills, supra, 11 Cal. 4th at p. 91*; see Louderback & Jurika, *Standards* [**984] *for Limiting the Tort of Bad Faith Breach of Contract* (1982) 16

U.S.F. L.Rev. 187, 227.)

The special relationship test, which has been criticized as illusory and not sufficiently precise (Putz & Klippen, *Commercial Bad Faith: Attorneys Fees--Not Tort Liability--Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 478-479), has little relevance to the question before us. Menezes is in the business of building single-family homes. He is one among thousands of contractors who provide the same service, and the Erlichs could take their choice among any contractors willing to accept work in the area where their home would be constructed. Although they undoubtedly relied on his claimed expertise, they were in a position to view, inspect, and criticize his work, or to hire someone who could. Most significantly, there is no indication Menezes sought to frustrate the Erlichs' enjoyment of contracted-for benefits. He did build a house. His ineptitude led to numerous problems which he attempted to correct. And he remains ultimately responsible for reimbursing the cost of doing the job properly.

Moreover, since, as *Foley* noted, the insurance cases represented "a major departure from traditional principles of contract law," any claim for automatic extension of that exceptional approach whenever "certain hallmarks and similarities can be adduced in another contract setting" should be carefully considered. (*Foley, supra, 47 Cal. 3d at p. 690.*)

Our previous decisions detail the reasons for denying tort recovery in contract breach cases: the different objectives underlying tort and contract breach; the importance of predictability in assuring commercial stability in contractual dealings; the potential for converting every contract breach into a tort, with accompanying punitive damage recovery, and the preference for legislative action in affording appropriate remedies. (*Freeman & Mills, supra , 11 Cal. 4th at p. 98*, citing approvingly [***893] *Harris v. Atlantic Richfield Co. (1993) 14 Cal. App. 4th 70, 81-82 [17 Cal. Rptr. 2d 649].*) The same concerns support a cautious approach here. Restrictions on contract remedies serve to protect the " 'freedom to bargain over special risks and [to] promote contract formation by limiting liability to the value of the promise.' " (*11 Cal. 4th at p. 98*, quoting *Harris, supra, 14 Cal. App. 4th at p. 77.*)

**(5)** Generally, outside the insurance context, "a tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach [*554] the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." (*Freeman & Mills, supra, 11 Cal. 4th at p. 105* (conc. and dis. opn. of Mosk, J.).) Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated. (*Applied Equipment, supra, 7 Cal. 4th at p. 515.*) If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies.

**(4b)** In this case, the jury concluded Menezes did not act intentionally; nor was he guilty of fraud or misrepresentation. This is a claim for negligent breach of a contract, which is not sufficient to support tortious damages for violation of an independent tort duty.

It may ultimately be more useful, in attempting to develop a common law of tortious breach, to affirmatively identify specific practices utilized by contracting parties that merit the imposition of tort remedies (*Freeman & Mills, supra, 11 Cal. 4th at p. 107* (conc. and dis. opn. of Mosk, J.)), instead of comparing each new claim to a template for exceptions. In the interim, however, it is sufficient to note that more than mere negligence has been involved in each case where tort damages have been permitted. The benefits of broad compensation must be balanced against the [**985] burdens on commercial stability. "[C]ourts should be careful to apply tort remedies only when the conduct in question is so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be . . . to aid rather than discourage commerce." ( *Freeman & Mills, supra, 11 Cal. 4th at p. 109* (conc. and dis. opn. of Mosk, J.).)

C.

Even assuming Menezes's negligence constituted a sufficient independent duty to the Erlichs, such a finding would not entitle them to emotional distress damages on these facts. "The fact that emotional distress damages may be awarded in some circumstances (see *Rest.2d Torts, § 905*, pp. 456-457) does not mean they are available in every case in which there is an independent cause of action founded upon negligence." ( *Merenda v.*

*Superior Court (1992) 3 Cal. App. 4th 1, 7 [4 Cal. Rptr. 2d 87]* (*Merenda*).) "No California case has allowed recovery for emotional distress arising solely out of property damage" ( *Cooper v. Superior Court (1984) 153 Cal. App. 3d 1008, 1012 [200 Cal. Rptr. 746]*); moreover, a preexisting contractual relationship, without more, will not support a recovery for mental suffering [*555] where the defendant's tortious conduct has resulted only in economic injury to the plaintiff. ( *Smith v. Superior Court (1992) 10 Cal. App. 4th 1033, 1040, fn. 1 [13 Cal. Rptr. 2d 133]*; *Mercado v. Leong (1996) 43 Cal. App. 4th 317, 324 [50 Cal. Rptr. 2d 569]* [emotional distress damages are unlikely when [***894] the interests affected are merely economic]; *Camenisch v. Superior Court (1996) 44 Cal. App. 4th 1689, 1691 [52 Cal. Rptr. 2d 450]* (*Camenisch*) [emotional distress damages are not recoverable when attorney malpractice leads only to economic loss].)

Although the Court of Appeal, plaintiffs, and their amici curiae rely substantially on *Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal. 4th 965 [25 Cal. Rptr. 2d 550, 863 P.2d 795]* (*Potter*), that case does not assist our inquiry. *Potter*, a toxic tort case, is readily distinguishable. First, the analysis there was narrowly circumscribed by the issue presented: "whether . . . emotional distress engendered by the fear of developing cancer in the future as a result of a toxic exposure is a recoverable item of damages in a negligence action." ( *Id. at p. 981.*) Thus, the language of *Potter* cannot be read in support of some larger proposition affording emotional distress damages for any other type of fear of future harm in actions involving negligent breach of contract.

Second, the water supply of the plaintiffs in *Potter* had already been contaminated. The prolonged exposure could not be undone. In contrast, the Erlichs could have avoided the threatened injury by moving out of the house until necessary repairs had been completed. If they had, relocation expenses would have been part of their damages. In any event, the general measure of damages where injury to property is capable of being repaired is the reasonable cost of repair together with the value of lost use during the period of injury. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1462, pp. 934-935.)

In short, *Potter* permitted recovery, within stringent limits, for emotional distress resulting from a personal injury directly caused by the defendant's tortious conduct. The Erlichs seek recovery for emotional distress engendered by an injury to their property.

To the extent *Potter* is relevant here, it reiterates that "unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by [breach of the independent duty]. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests. [Citations.]" (*Potter, supra, 6 Cal. 4th at p. 985.*) Although the Erlichs feared [*556] physical injury, Menezes's negligent breach of contract resulted in only damage to their property, and they could have avoided any threat of harm.

The question was thoroughly explored in *Merenda, supra, 3 Cal. App. 4th 1,* [**986] a legal malpractice action in which the plaintiff sought damages for the severe emotional distress she suffered when her attorney's negligence caused the loss of expected damages from her claim for sexual assault and battery. "It is true that the 'transaction,' a contract for legal services, was intended to affect the plaintiff. However, the foreseeability of serious emotional harm to the client and the degree of certainty that the client suffered such injury by loss of an economic claim are tenuous. Litigation is an inherently uncertain vehicle for advancing one's economic interests. The expectation of a recovery is rarely so certain that a litigant would be justified in resting her peace of mind upon the assurance of victory." (*Id. at p. 10.*)

In *Camenisch, supra, 44 Cal. App. 4th 1689*, the plaintiff sought emotional distress damages because the lawyer's negligent estate planning advice thwarted his tax avoidance goals. The complaint alleged the attorney had been hired " 'for the express purpose of providing for [the plaintiffs' family] and obtaining repose regarding their financial [***895] security.' " ( *Id. at p. 1692.*) The trial court overruled the attorney's demurrer. The Court of Appeal rejected the claim for emotional distress damages. Acknowledging that *Merenda* dealt with malpractice related to litigation, the court nevertheless found its reasoning dispositive. "Public policy reasons do not support a different result when the alleged malpractice is committed in a tax advice context, even if the tax advice is part of an estate plan. [P] As in a litigation context, the client's primary protected interest is economic in a tax planning situation. The prospect of paying taxes is

generally considered distressing, and the prospect of paying a greater levy than necessary is even more disquieting. However, the emotional upset derives from an inherently economic concern." ( *Id. at p. 1697.*)

In *Lubner v. City of Los Angeles (1996) 45 Cal. App. 4th 525 [53 Cal. Rptr. 2d 24]*, two artists lost a substantial portion of their life's work when a city trash truck, which had been parked on a hilltop, rolled down and crashed into their home, damaging the house, two cars, and much of their artwork. The Lubners filed a negligence action and sought damages for their emotional distress. Recognizing that the artwork may have been extremely important to the Lubners, the court nevertheless found they were not entitled to recover for emotional distress caused by injury to property. ( *Id. at p. 532.*) The court based its ruling primarily on the absence of a preexisting relationship between the parties, but separately considered whether the defendant breached a duty of care to the plaintiffs. Noting that the moral blame on the [*557] defendant was only that which attends ordinary negligence and nothing in the record indicated bad faith or reckless indifference to the Lubners' emotional tranquillity, the court concluded liability for negligent infliction of emotional distress was unwarranted. ( *Id. at p. 534.*)

Public policy supports a similar limit where the negligence concerns the construction of a home. In *Blagrove v. JB Mechanical, Inc. (Wyo. 1997) 934 P.2d 1273* (*Blagrove*), the homeowners sued a plumbing contractor to recover damages for mental anguish caused when flooding from a faulty plumbing connection damaged their home and destroyed personal possessions. The Wyoming Supreme Court held that, absent physical injury, emotional distress damages can be recovered only in limited circumstances involving intentional torts, constitutional violations, and the breach of the covenant of good faith and fair dealing in insurance contracts, and concluded a contrary rule would be poor public policy.

"In deciding whether the plaintiff's interests are entitled to legal protection against the defendant's conduct, we must balance the interest of the injured parties against the view that a negligent act should have some end to its legal consequences. . . . We are persuaded that the concerns which have acted to prevent recovery for emotional distress when property is damaged remain relevant and weigh against permitting recovery. While we do not doubt that the Blagroves were justifiably and seriously distressed over the damage to [their home], adopting a rule allowing trial on the issue and recovery if [**987] proved would result in unacceptable burdens for both the judicial system and defendants. We therefore hold that emotional distress damages in connection with property damages are not compensable." (*Blagrove, supra, 934 P.2d at pp. 1276-1277*; see also *Caradonna v. Thorious (1969) 17 Mich.App. 41 [169 N.W.2d 179, 182]*; *Jankowski v. Mazzotta (1967) 7 Mich.App. 483 [152 N.W.2d 49]* [no mental anguish remedy available for ineptly constructed home].)

Here, the breach--the negligent construction of the Erlichs' house--did not cause physical injury. No one was hit by a falling beam. Although the Erlichs state they feared the house was structurally unsafe [***896] and might collapse in an earthquake, they lived in it for five years. The only physical injury alleged is Barry Erlich's heart disease, which flowed from the emotional distress and not directly from the negligent construction.

The Erlichs may have hoped to build their dream home and live happily ever after, but there is a reason that tag line belongs only in fairy tales. Building a house may turn out to be a stress-free project; it is much more likely to be the stuff of urban legends--the cause of bankruptcy, marital [*558] dissolution, hypertension and fleeting fantasies ranging from homicide to suicide. As Justice Yegan noted below, "No reasonable homeowner can embark on a building project with certainty that the project will be completed to perfection. Indeed, errors are so likely to occur that few if any homeowners would be justified in resting their peace of mind on [its] timely or correct completion . . . ." The connection between the service sought and the aggravation and distress resulting from incompetence may be somewhat less tenuous than in a malpractice case, but the emotional suffering still derives from an inherently economic concern.

D.

**(6a)** Having concluded tort damages are not available, we finally consider whether damages for emotional distress should be included as consequential or special damages in a contract claim. **(1b)** "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at the time; consequential damages beyond the expectations of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage

contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." (*Applied Equipment, supra, 7 Cal. 4th at p. 515.*)

" '[W]hen two parties make a contract, they agree upon the rules and regulations which will govern their relationship; the risks inherent in the agreement and the likelihood of its breach. The parties to the contract in essence create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks. Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law.' " (*Applied Equipment, supra, 7 Cal. 4th at p. 517.*)

**(6b)** Accordingly, damages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract in California. ( *Kwan v. Mercedes-Benz of North America, Inc. (1994) 23 Cal. App. 4th 174, 188 [28 Cal. Rptr. 2d 371]* (*Kwan*); *Sawyer v. Bank of America (1978) 83 Cal. App. 3d 135, 139 [145 Cal. Rptr. 623].*) "Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." (*Rest.2d* [*559] *Contracts, § 353.*) The Restatement specifically notes the breach of a contract to build a home is not "particularly likely" to result in "serious emotional disturbance." (*Ibid.*)

Cases permitting recovery for emotional distress typically involve mental anguish stemming from more personal undertakings the traumatic results of which were [**988] unavoidable. (See, e.g., *Burgess v. Superior Court, supra, 2 Cal. 4th 1064* [infant injured during childbirth]; *Molien v. Kaiser Foundation Hospitals (1980) 27 Cal. 3d 916 [167 Cal. Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]* [misdiagnosed venereal disease and subsequent [***897] failure of marriage]; *Kately v. Wilkinson (1983) 148 Cal. App. 3d 576 [195 Cal. Rptr. 902]* [fatal waterskiing accident]; *Chelini v. Nieri (1948) 32 Cal. 2d 480 [196 P.2d 915]* [failure to adequately preserve a corpse].) Thus, when the express object of the contract is the mental and emotional well-being of one of the contracting parties, the breach of the contract may give rise to damages for mental suffering or emotional distress. (See *Wynn v. Monterey Club (1980) 111 Cal. App. 3d 789, 799-801 [168 Cal. Rptr. 878]* [agreement of two gambling clubs to exclude husband's gambling-addicted wife from clubs and not to cash her checks]; *Ross v. Forest Lawn Memorial Park (1984) 153 Cal. App. 3d 988, 992-996 [203 Cal. Rptr. 468, 42 A.L.R.4th 1049]* [cemetery's agreement to keep burial service private and to protect grave from vandalism]; *Windeler v. Scheers Jewelers (1970) 8 Cal. App. 3d 844, 851-852 [88 Cal. Rptr. 39]* [bailment for heirloom jewelry where jewelry's great sentimental value was made known to bailee].)

Cases from other jurisdictions have formulated a similar rule, barring recovery of emotional distress damages for breach of contract except in cases involving contracts in which emotional concerns are the essence of the contract. (See, e.g., *Hancock v. Northcutt (Alaska 1991) 808 P.2d 251, 258* ["contracts pertaining to one's dwelling are not among those contracts which, if breached, are particularly likely to result in serious emotional disturbance"; typical damages for breach of house construction contracts can appropriately be calculated in terms of monetary loss]; *McMeakin v. Roofing & Sheet Metal Supply* (1990) 1990 Okla.Civ.App. 101 [*807 P.2d 288]* [affirming order granting summary judgment in favor of defendant roofing company after it negligently stacked too many brick tiles on roof, causing roof to collapse and completely destroy home, leading to plaintiff's heart attack one month later]; *Day v. Montana Power Co. (1990) 242 Mont. 195 [789 P.2d 1224]* [owner of restaurant that was destroyed in gas explosion allegedly caused by negligence of utility company employee not entitled to recover damages for emotional distress]; *Creger v. Robertson (La.Ct.App. 1989) 542 So.2d 1090* [reversing award for emotional distress damages caused by foul odor emanating from a faulty foundation, preventing plaintiff from entertaining guests in her residence]; *Groh v. Broadland Builders, Inc.* [*560] *(1982) 120 Mich.App. 214 [327 N.W.2d 443]* [reversing order denying motion to strike allegations of mental anguish in case involving malfunctioning septic tank system, and noting adequacy of monetary damages to compensate for pecuniary loss of "having to do the job over," as distinguished from cases allowing recovery because situation could never be adequately corrected].)

Plaintiffs argue strenuously that a broader notion of damages is appropriate when the contract is for the

construction of a home. Amici curiae urge us to permit emotional distress damages in cases of negligent construction of a personal residence when the negligent construction causes gross interference with the normal use and habitability of the residence.

Such a rule would make the financial risks of construction agreements difficult to predict. Contract damages must be clearly ascertainable in both nature and origin. (*Civ. Code, § 3301.*) A contracting party cannot be required to assume limitless responsibility for all consequences of a breach and must be advised of any special harm that might result in order to determine whether or not to accept the risk of contracting. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 815, p. 733.)

Moreover, adding an emotional distress component to recovery for construction defects could increase the already prohibitively high cost of housing in California, affect the availability of insurance for builders, and greatly diminish the supply of affordable housing. The potential for such broad-ranging economic consequences--costs likely to be paid by the public generally--means the task of fashioning [***898] appropriate limits on the availability of emotional distress claims [**989] should be left to the Legislature. (See *Tex. Prop. Code Ann. § 27.001 et seq.* (1999); *Haw. Rev. Stat. § 663-8.9* (1998).)

Permitting damages for emotional distress on the theory that certain contracts carry a lot of emotional freight provides no useful guidance. Courts have carved out a narrow range of exceptions to the general rule of exclusion where emotional tranquillity is the contract's essence. Refusal to broaden the bases for recovery reflects a fundamental policy choice. A rule which focuses not on the risks contracting parties voluntarily assume but on one party's reaction to inadequate performance, cannot provide any principled limit on liability.

The discussion in *Kwan*, a case dealing with the breach of a sales contract for the purchase of a car, is instructive. "[A] contract for [the] sale of an automobile is not essentially tied to the buyer's mental or emotional well-being. Personal as the choice of a car may be, the central reason for buying one is usually transportation. . . . [P] In spite of America's much-discussed [*561] 'love affair with the automobile,' disruption of an owner's relationship with his or her car is not, in the normal case, comparable to the loss or mistreatment of a family member's remains [citation], an invasion of one's privacy [citation], or the loss of one's spouse to a gambling addiction [citation]. In the latter situations, the contract exists primarily to further or protect emotional interests; the direct and foreseeable injuries resulting from a breach are also primarily emotional. In contrast, the undeniable aggravation, irritation and anxiety that may result from [the] breach of an automobile warranty are secondary effects deriving from the decreased usefulness of the car and the frequently frustrating process of having an automobile repaired. While [the] purchase of an automobile may sometimes lead to severe emotional distress, such a result is not ordinarily foreseeable from the nature of the contract." (*Kwan, supra, 23 Cal. App. 4th at p. 190.*)

Most other jurisdictions have reached the same conclusion. (See *Sanders v. Zeagler (La. 1997) 686 So.2d 819, 822-823* [principal object of a contract for the construction of a house was to obtain a place to live and emotional distress damages were not recoverable]; *Hancock v. Northcutt, supra, 808 P.2d at pp. 258-259* [no recovery for emotional distress as a result of defective construction; typical damages for breach of house construction contracts can appropriately be calculated in terms of monetary loss]; *City of Tyler v. Likes (Tex. 1997) 962 S.W.2d 489, 497* [mental anguish based solely on property damage is not compensable as a matter of law].)

We agree. The available damages for defective construction are limited to the cost of repairing the home, including lost use or relocation expenses, or the diminution in value. ( *Orndorff v. Christiana Community Builders (1990) 217 Cal. App. 3d 683 [266 Cal. Rptr. 193].*) The Erlichs received more than $ 400,000 in traditional contract damages to correct the defects in their home. While their distress was undoubtedly real and serious, we conclude the balance of policy considerations--the potential for significant increases in liability in amounts disproportionate to culpability, the court's inability to formulate appropriate limits on the availability of claims, and the magnitude of the impact on stability and predictability in commercial affairs--counsel against expanding contract damages to include mental distress claims in negligent construction cases.

DISPOSITION

The judgment of the Court of Appeal is reversed and the matter is remanded for further proceedings consistent

with this opinion.

George, C. J., Kennard, J., Baxter, J., and Chin, J., concurred. [*562]

**CONCUR BY:** WERDEGAR

**DISSENT BY:** WERDEGAR

**DISSENT**

[***899] **WERDEGAR, J.,**

Concurring and Dissenting.--I concur in the majority opinion insofar as it holds that a plaintiff may not recover damages for emotional distress based on a defendant's negligent breach of a contract to build a house when the defendant has breached no duty independent of the contract. Although I read the record differently as to whether these plaintiffs did, in fact, [**990] present an independent claim for negligence, in view of the majority's conclusion that plaintiffs did not present such a claim (see maj. opn., *ante*, at pp. 548, 554), the discussion in part C of the majority opinion (*id., at pp. 554-558*) is unnecessary. I therefore express no opinion on the circumstances under which a tort plaintiff may recover damages for emotional distress.

Mosk, J., concurred.