# TABS 10 - 14

# TAB 10

LEXSEE 74 CAL APP 4TH 1394

**THOMAS M. FERLAUTO, Plaintiff and Appellant, v. JANE HAMSHER et al., Defendants and Respondents.**

**No. B125980.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION TWO**

***74 Cal. App. 4th 1394; 88 Cal. Rptr. 2d 843; 1999 Cal. App. LEXIS 850; 27 Media L. Rep. 2364; 99 Cal. Daily Op. Service 7829; 99 Daily Journal DAR 9903***

**September 20, 1999, Decided**

**PRIOR HISTORY:** **[***1]** APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC178368. Marvin M. Lager, Judge.

**DISPOSITION:** The judgment is affirmed. Costs on appeal to respondents.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court sustained without leave to amend a demurrer to a complaint by an attorney alleging that he was defamed in a book defendant wrote concerning her production of a movie and a lawsuit against her in connection with it, in which plaintiff represented the other party. The statements impugned plaintiff's ability as an attorney in a colorful and crude manner. (Superior Court of Los Angeles County, No. BC178368, Marvin Lager, Judge.)

The Court of Appeal affirmed. The court held that the complaint failed to state a cause of action, since the complained-of statements were of opinions, not facts. It was apparent from the totality of the circumstances that defendant applied spicy prose in describing the making of a controversial film and describing her thoughts on everyone associated with it. In this context, and especially with her views born out of litigation to which she was adverse to plaintiff, the average reader would deem her comments about plaintiff as subjective expressions of opinion devoid of factual matter. The court also held that plaintiff failed to show that defendant waived her *U.S. Const., 1st Amend.*, rights by a confidentiality agreement entered into when the lawsuit was settled. (Opinion by Boren, P. J., with Zebrowski, J., and Mallano, J., * concurring.)

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) Libel and Slander § 11--Actionable Words--As to Occupation or Business--Attorney--By Adverse Party in Lawsuit--Fact or Opinion.** --A complaint by an attorney alleging that he was defamed in a book defendant wrote concerning her production of a movie and a lawsuit against her in connection with it, in which plaintiff represented the other party, failed to state a cause of action, since the complained-of statements were of opinions, not facts. The statements included, inter alia, (1) "I [defendant] screamed, 'If some whore's son is filing a motion just to make me pay to defend it, even though it's preposterous, he should be forced to pay if he's found full of shit!'" (2) "Kmart Johnnie Cochran"; (3) "loser wannabe lawyer"; (4) "creepazoid attorney"; and (5) "meanest, greediest, low-blowing motherfuckers." It was apparent from the totality of the circumstances that defendant applied spicy prose in describing the making of a controversial film and describing her thoughts on everyone associated with it. In this context, and especially with her views born out of litigation to which she was adverse to plaintiff, the average reader would deem her comments about plaintiff as subjective expressions of opinion devoid of factual matter.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 486.]

**(2a) (2b) Libel and Slander § 7--Actionable Words--Waiver of First Amendment Rights--Confidential Settlement Agreement.** --In an action by an attorney alleging that he was defamed in a book defendant wrote concerning her production of a movie and a lawsuit against her in connection with it, in which plaintiff represented the other party, plaintiff failed to show that defendant waived her *U.S. Const., 1st Amend.*, rights by a confidentiality agreement entered into when the lawsuit was settled. The agreement bound the parties to confidentiality as to the nature of the claims asserted in the lawsuit or any other matter, and an understanding not to use or disclose any document, tape recording, or other matter of any description whatsoever occasioned by, or arising out of the lawsuit. The confidentiality clause did not by its terms specifically prohibit characterizations of the legal abilities or the personality of plaintiff. Indicative of the absence of any intent to shield plaintiff from anyone's First Amendment speech, the complaint did not assert plaintiff was a party to the confidentiality agreement or even mentioned in the terms of the agreement. It would be unusual for the typical confidential settlement agreement to protect counsel, rather than the litigants and the terms of their agreement. Moreover, the phrase was so imprecise and overbroad as to fall short of being a clear and compelling waiver of specific First Amendment rights regarding any comments about plaintiff.

**(3) Constitutional Law § 55--First Amendment Rights--Freedom of Speech--Waiver.** --*U.S. Const., 1st Amend.*, safeguards freedom of speech, which is the matrix, the indispensable condition, of nearly every other form of freedom. Thus, where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom, courts are unwilling to find waiver in circumstances that fall short of being clear and compelling. Courts closely scrutinize waivers of constitutional rights, and indulge every reasonable presumption against a waiver.

**(4) Libel and Slander § 7--Actionable Words--Fact or Opinion.** --To state a libel claim a plaintiff must allege a statement that is provably false. Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot reasonably be interpreted as stating actual facts about an individual. Thus, rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt, and language used in a loose, figurative sense have all been accorded constitutional protection. The critical determination of whether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court and therefore suitable for resolution by demurrer. If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury. In drawing the distinction between opinion and fact, California courts apply the totality of the circumstances test to determine whether an allegedly defamatory statement is actionable.

**(5) Libel and Slander § 7--Actionable Words--Fact or Opinion--Test.** --In applying the totality of the circumstances test to determine whether an allegedly libelous statement is one of fact or opinion, editorial context is regarded by the courts as a powerful element in construing as opinion what might otherwise be deemed fact. In evaluating whether language used is defamatory, courts look not so much to the allegedly libelous statement's effect when subjected to the critical analysis of a mind trained in the law, but to the natural and probable effect upon the mind of the average reader. Part of the totality of the circumstances used in evaluating the language in question is whether the statements were made by participants in an adversarial setting. Where potentially defamatory statements are published in a setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.

**COUNSEL:** Thomas M. Ferlauto, in pro. per., for Plaintiff and Appellant.

Sidley & Austin, Stephen G. Contopulos and Bradley H. Ellis for Defendants and Respondents.

**JUDGES:** Opinion by Boren, P. J., with Zebrowski, J., and Mallano, J., * concurring.

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**OPINION BY:** BOREN

**OPINION**

**[*1397] [**846] BOREN, P. J.**

Appellant, Attorney Thomas M. Ferlauto, sued respondents, Jane Hamsher, Don Murphy, Jane and Don Productions, Inc., and Broadway Books, for defamation and intentional and negligent infliction of emotional distress. The trial court sustained without leave to amend the demurrer to Ferlauto's second amended complaint. We affirm.

FACTUAL AND PROCEDURAL HISTORY

Ferlauto sued because of unflattering comments impliedly referring to him in Hamsher's book entitled Killer

Instinct: How Two Young Producers Took on Hollywood and Made the Most Controversial [***2] Film of the Decade (1997) (hereinafter, the book). [1] The book concerned the making of the movie Natural Born Killers (1994), which was produced by Hamsher and Murphy, "written by" Quentin Tarantino, and directed by Oliver Stone. The book [**847] discussed, in part, litigation that resulted when Rand Vossler, briefly slotted to be the director of the movie, sued Hamsher and Murphy for fraud after they asked him to step aside. Vossler was represented by Attorney Ferlauto, and a confidential settlement agreement was ultimately reached. In her book, Hamsher made critical remarks about the litigation and about the attorney for Vossler, though the name of the attorney was never mentioned.

1 Pursuant to respondents' request, we have taken judicial notice of the book, copies of which have been lodged with this court.

**[*1398]** Hamsher's book is laden with flip, earthy and colorful language, and written in an exaggerated, irreverent and attention-grabbing style. The jacket of the book advises the reader **[***3]** that it is "[a] shockingly candid, hilarious account" of the producer's "two-year roller-coaster ride through the ruthless world of studio pitbulls, idiotic film crew leeches, and unprecedented butt-kissing and back-stabbing." Book reviews quoted on the book jacket characterize the book as "lean, mean, scabrously honest," and as "[f]ast, funny and horrifically honest . . . . Hamsher delivers the most mercilessly incisive portrait of our prepsychotic film industry in years."

Nothing in the book specifically states that Ferlauto in his legal representation of Vossler was incompetent or unethical, but Ferlauto alleged in his complaint that those were reasonable implications from various statements culled from the book. The statements complained of concerned negative remarks about the Vossler lawsuit and several imaginative and vigorous insults.

**(1a)** The comments, taken out of context and listed seriatim much as Ferlauto did in his complaint, were as follows: (1) "I [Hamsher] screamed, 'If some whore's son is filing a motion just to make me pay to defend it, even though it's preposterous, he should be forced to pay if he's found full of shit!' "; [2] (2) filing the motion was "stupid"; **[***4]** (3) the judge "laughed at their motion"; (4) "the judge thought their motion was a joke"; (5) "the judge had laughed his case out of court during the summary judgment"; (6) " 'a judge threw out their summary motion as spurious' "; (7) " 'It's clearly a frivolous lawsuit' "; (8) " 'Rand's lawsuit is spurious' "; (9) "not an ethical one"; (10) "Kmart Johnnie Cochran"; (11) "loser wannabe lawyer"; (12) " 'creepazoid attorney' "; (13) "little fucker"; and (14) "meanest, greediest, low-blowing motherfuckers." Ferlauto alleged in the complaint that such statements implied that he is an unethical attorney who abuses legal procedures to vex, harass and annoy his opponents, and that such statements were defamatory on their face and actionable per se in that they tended to injure him in his profession without the necessity of considering the surrounding circumstances.

2 Appellant's motion for a preliminary injunction had been denied because he had not pled a cause of action requesting injunctive relief.

Ferlauto's **[***5]** second amended complaint also alleged that litigation in which he had represented Vossler was resolved with a confidential settlement agreement. According to the terms of the agreement, Hamsher, Murphy and their production company each agreed "to maintain the confidentiality of . . . the nature of the claims asserted in the [Vossler] Lawsuit or any other matter," and further agreed "not to use or disclose any document, tape **[*1399]** recording, or other matter of any description whatsoever occasioned by, or arising out of [the Vossler] Lawsuit. . . ." [3] Ferlauto urges that by entering into this agreement, respondents "waived their Constitutional right of free speech guaranteed by the First Amendment with respect to all communications concerning the [Vossler] Lawsuit." [4]

3 Pursuant to respondents' request, we have also taken judicial notice of the mutual limited release among the parties, dated May 28, 1998, which establishes that Ferlauto may not amend his complaint to state a cause of action against respondents for breach of contract as to the Vossler confidential settlement agreement.

**[***6]**

4 We note that respondent Broadway Books was not a party to this settlement agreement.

**[**848]** The trial court sustained the demurrer to Ferlauto's second amended complaint without leave to amend. The court held that the First Amendment barred the libel cause of action because "the alleged defamatory statements would not imply to a reasonable fact-finder provable false factual assertions," and that likewise the claims for emotional distress could not be sustained.

DISCUSSION

I. *No waiver of the First Amendment as a defense*

Ferlauto contends that respondents cannot assert the First Amendment as a defense to his claims because they knowingly and voluntarily waived those rights by entering into a confidentiality agreement in the Vossler litigation. According to Ferlauto, without the protection of the First Amendment, this court should apply the common law of defamation as it existed prior to *New York Times Co. v. Sullivan (1964) 376 U.S. 254 [84 S. Ct. 710, 11 L.*

*Ed. 2d 686, 95 A.L.R.2d 1412]*, and that by applying the law of defamation without the protections of the First **[***7]** Amendment all of the statements alleged in the second amended complaint are actionable. (See *Milkovich v. Lorain Journal Co. (1990) 497 U.S. 1, 12-21 [110 S. Ct. 2695, 2702-2707, 111 L. Ed. 2d 1]*[describing the history of First Amendment protections restricting the state law of defamation].)

**(2a)** Apart from Ferlauto's analysis of defamation law unencumbered by the First Amendment, his underlying premise is flawed. There was no waiver of the First Amendment by the terms of the confidentiality agreement at issue here.

**(3)** The First Amendment "safeguards a freedom which is the 'matrix, the indispensable condition, of nearly every other form of freedom.' [Citation.] Where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom, we are unwilling to find waiver in **[*1400]** circumstances which fall short of being clear and compelling." ( *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 145 [87 S. Ct. 1975, 1986, 18 L. Ed. 2d 1094].) **[***8]** " '[I]t is well established that courts closely scrutinize waivers of constitutional rights, and "indulge every reasonable presumption against a waiver." ' " ( *City of Glendale v. George* (1989) 208 Cal. App. 3d 1394, 1398 [256 Cal. Rptr. 742] [record fails to establish understanding waiver of First Amendment rights by a consent judgment].)

**(2b)** The agreement here alleged to result in a waiver of fundamental First Amendment rights binds the parties to confidentiality as to "the nature of the claims asserted in the [Vossler] Lawsuit or any other matter," and an understanding "not to use or disclose any document, tape recording, or other matter of any description whatsoever occasioned by, or arising out of [the Vossler] Lawsuit." [5] The confidentiality clause does not by its terms specifically prohibit characterizations of the legal abilities or the personality of Attorney Ferlauto. Indicative of the absence of any intent to shield Ferlauto from anyone's First Amendment speech, the second amended complaint does not assert Ferlauto was a party to the confidentiality agreement **[***9]** or even mentioned in the terms of the agreement. Indeed, it would be unusual for the typical confidential settlement agreement to protect counsel, rather than the litigants and the terms of their agreement.

5 Ferlauto has not alleged that respondents used or disclosed any document, tape recording, or specific physical item.

Moreover, the phrase "the nature of the claims asserted . . . or any other matter," is so imprecise and overbroad as to "fall short of being [a] clear and compelling" ( *Curtis Publishing Co. v. Butts, supra*, 388 U.S. at p. 145 [87 S. Ct. at p. 1986]) waiver of specific First Amendment rights regarding **[**849]** any comments about Ferlauto. It is uncertain whether the phrase "nature of the claims asserted" applies only to preclude revelation of the causes of action in the complaint, or is intended to prohibit any general discussion of the claims. And, the vague phrase "any other matter," without any point of reference, is hopelessly imprecise and overbroad. Such **[***10]** language is an inadequate basis for a knowing and intelligent waiver of the constitutional right to freedom of speech. (See *National Polymer Products v. Borg-Warner Corp. (6th Cir. 1981) 641 F.2d 418, 423-424* [terms of a protective order to preserve confidentiality of discovery material were deemed ambiguous and not a waiver of First Amendment rights].)

Accordingly, respondents have not waived the right to rely on the First Amendment in defense of appellant's claims.

**[*1401]** II. *Appellant cannot state a libel claim because none of the statements cited from the book convey a provably false factual assertion*

**(4)** To state a libel claim which is not defeated by the freedom of speech protections of the First Amendment, Ferlauto must allege a statement that is provably false. ( *Milkovich v. Lorain Journal Co., supra*, 497 U.S. at p. 20 [110 S. Ct. at p. 2706].) Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation **[***11]** action if they cannot " 'reasonably [be] interpreted as stating actual facts' about an individual." (*Ibid.*, citing *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 50 [108 S. Ct. 876, 879, 99 L. Ed. 2d 41].) Thus, "rhetorical hyperbole," "vigorous epithet[s]," "lusty and imaginative expression[s] of . . . contempt," and language used "in a loose, figurative sense" have all been accorded constitutional protection. ( *Greenbelt Pub. Assn. v. Bresler* (1970) 398 U.S. 6, 14 [90 S. Ct. 1537, 1542, 26 L. Ed. 2d 6]; *Letter Carriers v. Austin* (1974) 418 U.S. 264, 284, 286 [94 S. Ct. 2770, 2781, 2782, 41 L. Ed. 2d 745].)

"The critical determination of whether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court [citations] and therefore suitable for resolution by demurrer. [Citation.] If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be **[***12]** resolved by a jury. ( *Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) 22 Cal. 3d 672, 680 . . . .)" ( *Campanelli v. Regents of University of California* (1996) 44 Cal. App. 4th 572, 578 [51 Cal. Rptr. 2d 891].) In drawing the distinction between opinion and fact, California courts apply the totality of the circumstances test to determine whether an allegedly

defamatory statement is actionable. ( *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal. 3d 254, 260 [228 Cal. Rptr. 206, 721 P.2d 87].)

**(5)** In applying the totality of the circumstances test, " 'editorial context is regarded by the courts as a powerful element in construing as opinion what might otherwise be deemed fact.' " ( *Morningstar, Inc. v. Superior Court* (1994) 23 Cal. App. 4th 676, 693 [29 Cal. Rptr. 2d 547].) In evaluating whether language used is defamatory, **[***13]** courts look " 'not so much [to the allegedly libelous statement's] effect when subjected to the critical analysis of a mind trained in the law, but [to] the natural and probable effect upon the mind of the average reader.' " ( *Id.* at p. 688.)

Part of the totality of the circumstances used in evaluating the language in question is whether the statements were made by participants in an adversarial setting. "[W]here potentially defamatory statements are published in a . . . setting in which the audience may anticipate efforts by the parties to **[*1402]** persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of **[**850]** statements of opinion." ( *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal. 3d 596, 601 [131 Cal. Rptr. 641, 552 P.2d 425] [statements in a bulletin attacking the motives of union officers in a labor dispute].) **[***14]** " '[S]ince such [labor] disputes, realistically considered, normally involve considerable differences of opinion and vehement adherence to one side or the other, a necessarily broad area of discussion without civil responsibility in damages is an indispensable concomitant of the controversy.' " ( *Id.* at p. 602; see also *Information Control v. Genesis One Computer Corp.* (9th Cir. 1980) 611 F.2d 781, 784 [disparaging comments by business litigants generally understood not as statements of fact but as predictable opinion of the other side's motives].)

In *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, the court discussed critical comments made in Attorney Vincent Bugliosi's book about another attorney's unsuccessful representation of a defendant in a murder case, in which Bugliosi had obtained an acquittal for the codefendant in a separate trial. With personal accounts by a commentator who was a participant involved in the litigation, "a reader would be likely to recognize that the critiques of the judges, witnesses, and other participants in the [litigation]-- and particularly of the other counsel-- generally represent the **[***15]** highly subjective opinions of the author rather than assertions of verifiable, objective facts." ( *Id.* at p. 1154.) Although Bugliosi had clearly implied that Attorney Partington had inadequately represented his client ( *id.* at p. 1157), "[c]ritiques of a lawyer's performance in a particular case generally cannot be proved true or false and, consequently, cannot ordinarily serve as the basis of a defamation claim. . . . [P] . . . [P] . . . [C]ourts should be reluctant to hold comments concerning the professional abilities of an individual actionable." ( *Id.* at pp. 1158-1159; see also *James v. San Jose Mercury News, Inc.* (1993) 17 Cal. App. 4th 1, 7-8, 14-15 [20 Cal. Rptr. 2d 890] [statements that an attorney used " 'sleazy tactic[s]' " and engaged in a " ' "fishing expedition," ' " and supposition that the judge had a " 'dim view of the defense tactics' " qualify as opinion].)

**(1b)** In the present case, the comments about Ferlauto all related to Hamsher's discussion of the lawsuit against her, an event she took very **[***16]** personally. As Hamsher explained in the book: "If you've never been sued before, let me tell you, nothing can quite match the wild disbelief that courses through your whole body when you realize someone's going to take you to court." With that introduction, already having experienced over 60 pages of Hamsher's hyperbolic rhetoric, knowing that the movie was a major item in Hamsher's fledgling career, and knowing the headaches Vossler had **[*1403]** already caused her, no reader would expect Hamsher to suddenly change her tone in the book. Hamsher would not be expected to describe Vossler's legal attack with an arid, dispassionate, desiccated recital of bare facts. A reasonable reader would expect exactly what Hamsher provided--her highly partisan opinions of the lawsuit and her opponents, including Attorney Ferlauto.

Turning to the particular language alleged to be defamatory, the numerous descriptions of the lawsuit and the motion as "stupid," "laughed at," "a joke," "spurious," and "frivolous," are common characterizations which are nothing more than "the predictable opinion" of one side to the lawsuit. ( *Information Control v. Genesis One Computer Corp., supra*, 611 F.2d at p. 784.) **[***17]** Use of such descriptive terms does not improperly attack appellant's competence or ethics and cannot be the basis for a defamation claim.

Nor is it of any significance that one of the above deprecating descriptions is from Hamsher's attorney. ( *Information Control v. Genesis One Computer Corp., supra*, 611 F.2d at p. 784 [holding that statement of defendant's counsel that plaintiff corporation acted to avoid paying its obligations was nonactionable opinion].) Also contrary to Ferlauto's assertion, the mere **[**851]** passage of time between the events described and the publication of the book is not determinative. Regardless whether Hamsher is retelling what occurred five years ago or five days ago, the overall context of the book, the subject matter, and the author's literary style alert readers that they are reading the subjective views of a partisan participant to the events described. The publication date

of the book would not affect the reader's view of the statements.

Caricature, imaginative expression, and rhetorical hyperbole, as used here, are often subject **[***18]** to the threat of a defamation action, but generally constitute a legitimate exercise of literary style. ( *Milkovich v. Lorain Journal Co., supra, 497 U.S. at p. 20 [110 S. Ct. at p. 2706*]; *Baker v. Los Angeles Herald Examiner, supra*, 42 Cal. 3d at pp. 263-264.) For example, the statements in the book that the judge in the Vossler litigation "laughed at their motion" and "thought their motion was a joke" are merely colorful descriptions of the incontestable fact that the court indeed denied Vossler's motion. Although the judge may not have literally laughed, authors are not limited to a sterile narrative of facts.

Hamsher's imaginative phrase "Kmart Johnnie Cochran" is also not actionable. Ferlauto asserts the phrase means that his legal services were of low quality and that he is unethical. The phrase is a lusty and creative expression of contempt, too loose and figurative to be susceptible of being proved true or false. (See *Hustler Magazine v. Falwell, supra*, 485 U.S. at pp. **[*1404]** 53-55 [108 S. Ct. at pp. 880-882]; *James v. San Jose Mercury News, Inc., supra*, 17 Cal. App. 4th at p. 15.)

Similarly, the **[***19]** phrases "creepazoid attorney" and "loser wannabe lawyer" are classic rhetorical hyperbole which "cannot 'reasonably [be] interpreted as stating actual facts.' " ( *Milkovich v. Lorain Journal Co., supra, 497 U.S. at p. 20 [110 S. Ct. at p. 2706*].) Hamsher's use of curse words, although not in good taste, are of course not to be taken literally. Her expressive phrases are merely name-calling of the "sticks and stones will break my bones" variety. They are epithets and subjective expressions of disapproval, devoid of any factual content, reflecting Hamsher's "vague expressions of low esteem" for Ferlauto. ( *Copp v. Paxton (1996) 45 Cal. App. 4th 829, 838 [52 Cal. Rptr. 2d 831]* [use of the metaphoric expressions "keep him honest," "booby," and "baying in the ocean breezes" are subjective expressions of negative opinion with no disprovable factual content].) Hamsher's book recounts in detail the circumstances leading up to the Vossler lawsuit, and the bases for her colorful expressions of opinion are thoroughly disclosed with no fact of any significance falsely stated.

Hamsher's only factual error was in mistakenly labeling a motion for summary **[***20]** judgment one which was actually a motion for preliminary injunction. The error in identifying the type of motion filed was here of no consequence. Libel law "overlooks minor inaccuracies and concentrates on substantial truth." ( *Masson v. New Yorker Magazine, Inc. (1991) 501 U.S. 496, 516 [111 S. Ct. 2419, 2432, 115 L. Ed. 2d 447]*.) What is critical in assessing whether a statement is capable of defamatory meaning is " 'the substance, the gist, the sting, of the libelous charge.' " ( *Id. at p. 517 [111 S. Ct. at p. 2433*].) Moreover, when analyzing the statements in question, courts do so from the perspective of the average reader, not a person trained in the technicalities of the law. ( *Morningstar, Inc. v. Superior Court, supra*, 23 Cal. App. 4th at p. 688.) Whether it was a summary judgment motion or a preliminary injunction motion, is a minor inaccuracy **[***21]** which would have no effect on how the average reader would interpret the statements made. (See, e.g., *Braun v. Chronicle Publishing Co. (1997) 52 Cal. App. 4th 1036, 1050, fn. 6 [61 Cal. Rptr. 2d 58]* [misstating that a criminal investigation **[**852]** was started by the district attorney rather than by the state auditor did not change the gist or sting of the alleged libel].)

Moreover, several of the statements complained of actually do not concern Ferlauto. He cannot constitutionally establish liability unless he proves that the contested statements are " 'of and concerning,' " him either by name or by "clear implication." ( *Blatty v. New York Times Co. (1986) 42 Cal. 3d 1033, 1042-1044 [232 Cal. Rptr. 542, 728 P.2d 1177]*.) Ferlauto, for example, **[*1405]** grossly distorts the text of the book by emphasizing the phrase "not an ethical one" FROM THE FOLLOWING PASSAGE: "Well, we were already well aware that Rand [Vossler] had us over a barrel, but it was a time barrel, not an ethical one; had we had all the time in the world to take the thing **[***22]** to court, we knew we would've won. But we didn't." In other words, Hamsher felt no ethical barriers in proceeding with the film without Vossler, but realized that his lawsuit presented a logistical obstacle. The sentence simply does not imply that Ferlauto (who was never referred to by name in the book) was unethical; the phrase "not an ethical one" was not of and concerning him at all.

Similarly, the most natural reading of the remarks made by Hamsher and her attorney wherein they surmise the motive behind Vossler's filing the motion and the denial of her request for attorney fees (i.e., "some whore's son is filing a motion just to make me pay to defend it, even though it's preposterous," etc.) is that they were remarks about Vossler, not his unnamed attorney. And, the most natural reading of the phrase "the meanest, greediest, low-blowing motherfuckers in Hollywood" is that it pertained not to Ferlauto, but rather to Vossler and to Tarantino, who at that stage did not want the film produced and thus was siding with Vossler. Moreover, the passage in which Hamsher's partner Murphy speculates before the fact that Vossler will "find some loser wannabe lawyer" to represent him only **[***23]** reflects Murphy's hypothetical expectations, rather than a specific allegation concerning the individual eventually hired. It is thus apparent that in addition to nonaction-

able, feisty expressions of permissible opinion, some of the statements complained of were not even directed at Ferlauto.

The totality of the circumstances test must be used ( *Baker v. Los Angeles Herald Examiner, supra*, 42 Cal. 3d at p. 260) in assessing the context of phrases from an evaluation of the entire book. ( *Scott v. McDonnell Douglas Corp. (1974) 37 Cal. App. 3d 277, 291, fn. 11 [112 Cal. Rptr. 609]*.) The statements complained of may not be ripped out of context or, as Ferlauto seeks to do, defined from language in a review on the book's jacket asserting the "horrifically honest" nature of the book. It is apparent from the totality of the circumstances that Hamsher applies spicy prose in describing the making of a controversial film and describing her thoughts on everyone associated with it. In this context, and especially with her views born out of litigation to which she **[***24]** was adverse to Ferlauto, the average reader would deem her comments about Ferlauto as subjective expressions of opinion devoid of factual matter. ( *Copp v. Paxton, supra, 45 Cal. App. 4th at p. 838*.)

Since Ferlauto was not entitled to legal relief under any possible theory and there was no reasonable possibility the pleading could be cured (see **[*1406]** *Platt v. Coldwater Banker Residential Real Estate Services (1990) 217 Cal. App. 3d 1439, 1444 [266 Cal. Rptr. 601]*), the trial court did not abuse its discretion in dismissing his second amended complaint without leave to amend. ( *Hendy v. Losse (1991) 54 Cal. 3d 723, 742 [1 Cal. Rptr. 2d 543, 819 P.2d 1]*.)

DISPOSITION

The judgment is affirmed. Costs on appeal to respondents.

**[**853]** Zebrowski, J., and Mallano, J., * concurred.

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution*.

# TAB 11

LEXSEE 81 CAL.APP. 4TH 1293

**ERNEST FRALEY et al., Plaintiffs and Appellants, v. ALLSTATE INSURANCE COMPANY, Defendant and Respondent.**

**No. D032817.**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION ONE**

***81 Cal. App. 4th 1282*; *97 Cal. Rptr. 2d 386*; *2000 Cal. App. LEXIS 532*; *2000 Daily Journal DAR 7355***

**June 14, 2000, Decided**

**SUBSEQUENT HISTORY:** [***1] The Publication Status of this Document has been Changed by the Court from Unpublished to Published July 6, 2000.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of San Diego County. Super. Ct. No. 717906. Thomas Ray Murphy, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court granted an insurer summary judgment in a bad faith action by insured homeowners. A fire had extensively damaged the insureds' house in 1994. The policy provided for replacement cost or actual cash value, and also provided that if the insurer paid the actual cash value, the insureds could apply for additional replacement costs if the repair or replacement occurred within 180 days of the cash value payment. The insurer paid a cash value estimate of $ 200,000 and advised the insureds that they were entitled to additional benefits if they actually repaired or replaced their home. The insureds submitted the claim dispute to appraisers, who in 1997 confirmed the actual cash value at $ 200,000 and the replacement cost at $ 364,500. The insurer then advised the insureds that they had 180 days from the date of the appraisal to repair or replace the house. Over five months later, the insureds had just secured a contractor, and the insurer advised them that replacement benefits were not available, since the replacement would not be completed within 180 days. The insureds purchased a different home to protect their replacement rights and the insurer paid the difference between the $ 200,000 cash value already paid and the replacement cost award. The insureds then brought this action, alleging that the insurer's delay in payment resulted in the insureds' purchasing a less desirable home. The trial court found that the 180-day provision applied to the insureds' claim and that insurer acted reasonably under the circumstances. (Superior Court of San Diego County, No. 717906, Thomas Ray Murphy, Judge.)

The Court of Appeal affirmed. It held that the homeowners policy required the insureds to repair or replace their damaged property within 180 days of a certain date as a prerequisite to obtaining replacement cost. Although the 180-day provision in the policy was in the subdivision concerning actual cash value, and not the subdivision concerning replacement cost, when the policy was read as a whole, the 180-day period unambiguously applied to the insureds' claim. The court further held that the record demonstrated that no triable issue of fact remained as to whether the insurer acted reasonably under the circumstances. (Opinion by Nares, J., with Huffman, Acting P. J., and McDonald, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Summary Judgment § 25--Appellate Review--Interpretation of Insurance Policy.** --The appellate court reviews the trial court's ruling on a

summary judgment motion, and its interpretation of an insurance policy, de novo.

**(2a) (2b) (2c) (2d) Insurance Contracts and Coverage § 89--Liability of Insurer--Homeowners Policy--Fire Damage--Requirement That Insured Repair or Replace Home Within 180 Days.** --In insured homeowners' bad faith action against their insurer, the trial court properly found that a 180-day provision to repair or replace the insureds' home applied to their claim. The policy provided for replacement cost or actual cash value, and also provided that if the insurer paid the actual cash value, the insureds could apply for additional replacement costs if the repair or replacement occurred within 180 days of the cash value payment. The insurer paid a cash value estimate of $ 200,000 and advised the insureds that they were entitled to additional benefits. After approximately three years, appraisers confirmed the actual cash value at $ 200,000 and the replacement cost at $ 364,500. The insurer then advised the insureds that they had 180 days from the date of the appraisal to repair or replace the house. Over five months later, the insureds had just secured a contractor, and the insurer advised them that replacement benefits would not be available, since the replacement would not be completed within 180 days. Consequently, the insureds purchased a less desirable home. Although the 180-day provision in the policy was in the subdivision concerning actual cash value, and not the subdivision concerning replacement cost, when the policy was read as a whole, the 180-day period unambiguously applied. The language of the policy demonstrated the necessary interrelation of the subdivisions. Further, the insureds initially accepted the actual cash value payment, and thus their claim fell within the subdivision containing the 180-day limit.

**(3) Insurance Contracts and Coverage § 10--Interpretation of Insurance Policy.** --The rules governing policy interpretation require courts to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. The interpretation of a contract must give effect to the mutual intention of the parties. This intent is to be inferred, if possible, solely from the written provisions of the contract. If the policy is ambiguous, i.e., susceptible to more than one reasonable interpretation, the ambiguity is construed in favor of coverage. However, the predicate to interpreting ambiguities in favor of coverage is that the policy be reasonably susceptible to more than one interpretation. Where a policy clearly excludes coverage, a court will not indulge in construction to find some theoretical ambiguity in order to find coverage.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 698, 699.]

**(4) Insurance Contracts and Coverage § 10--Interpretation of Insurance Policy--Reading Policy as Whole.** --Courts interpret insurance contracts as a whole, with each clause lending meaning to the others. Courts should interpret contractual language in a manner that gives force and effect to every clause rather than to one that renders clauses nugatory.

**(5) Insurance Contracts and Coverage § 10--Interpretation of Insurance Policy--Extrinsic Evidence.** --Extrinsic evidence may be admitted to aid in the interpretation of an insurance policy only where the terms of the policy are ambiguous.

**(6a) (6b) (6c) (6d) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Handling of Claim Arising from Fire Damage to Home.** --In a bad faith insurance action arising from extensive fire damage to the insured homeowners' house, no triable issue of fact existed as to whether the insurer acted in good faith, and thus the trial court properly granted the insurer summary judgment. Although the insurer's original repair estimate was $ 115,000 and the eventual replacement cost arbitration award was $ 364,500, the insurer acted reasonably. The insurer promptly hired two contractors who rendered estimates of approximately $ 110,000 and $ 115,000, respectively, and the insureds' contractor estimated repairs at approximately $ 227,000. The insureds then provided the insurer with a $ 291,106.57 repair estimate by another contractor, and in response, the insurer's expert rendered his opinion on the damage at $ 182,549. After comparing the various bids, the insurer conceded that the minimum repair cost was $ 199,671.94. There was a genuine dispute regarding the insurer's contractual obligations, and the record revealed that the insurer handled the claim reasonably by retaining experts and investigating, paying the undisputed actual cash value of the loss, and proceeding to appraisal on the disputed portion of the claim, i.e., the replacement cost. Moreover, the insurer promptly paid the replacement cost appraisal award after the insureds purchased another home.

**(7) Appellate Review § 109--Briefs--Argument and**

**Authority.** --Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion by the court.

**(8) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Covenant of Good Faith and Fair Dealing.** --The covenant of good faith and fair dealing is implied in law to assure that a contracting party refrains from doing anything to injure the other party's right to receive the benefits of the agreement. In essence, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that, while not technically transgressing the express covenants, frustrates the other party's rights to the benefits of the contract. Thus, where benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable, and numerous other tactics may breach the implied covenant, because the conduct frustrates the insured's primary right to receive the benefits of his or her contract, i.e., prompt compensation for losses.

**(9) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Bad Faith Action.** --In a bad faith case against an insurer, the primary test is whether the insurer withheld payment of an insured's claim unreasonably and in bad faith. Where benefits are withheld for proper cause, there is no breach of the implied covenant of good faith and fair dealing. Bad faith liability cannot be imposed where there exists a genuine issue as to the insurer's liability under California law. A court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability. This "genuine dispute" doctrine may be applied where the insurer denies a claim based on the opinions of experts.

**(10) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Disparity Between Experts for Insured and for Insurer.** --Where an insurer and its insured rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith. Despite the special relationship between an insurer and its insureds, an insurer may give its own interests consideration equal to that it gives the interests of its insured.

**COUNSEL:** Levine, Steinberg & Miller and Harris I. Steinberg for Plaintiffs and Appellants.

Luce, Forward, Hamilton & Scripps, Charles A. Bird, Peter H. Klee, Charles A. Danaher and William G. Peterson for Defendant and Respondent.

**JUDGES:** Opinion by Nares, J., with Huffman, Acting P. J., and McDonald, J., concurring.

**OPINION BY:** NARES

**OPINION**

[*1286] [**387] **NARES, J.**

In this insurance bad faith case, Ernest Fraley and Linda Fraley appeal a summary judgment in favor of Allstate Insurance Company (Allstate). The principal issue is whether a homeowners policy required the Fraleys to repair or replace their damaged property within 180 days of a certain date as a prerequisite to obtaining replacement cost. We conclude it did, and accordingly affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On May 17, 1994, a fire extensively damaged the Fraleys' home. The loss was covered by their deluxe homeowners policy with [***2] Allstate. It provides in pertinent part:

"5. How We Pay For a Loss

"Building Structures

"Payment for covered loss to building structures insured under the Dwelling Protection coverage will be by one of the following methods:

"a) Replacement Cost. This means there will not be a deduction for depreciation. [P] Payment will not exceed the smallest of the following amounts: [P] 1) the replacement cost of that part of the building structure damaged for equivalent construction and use on the same premises; [P] 2) the amount actually and necessarily spent to repair or replace the damaged building structure; or [P] 3) the limit of liability applicable to the building structure.

"We will not pay more than the actual cash value of the damaged building structure until the repair or

replacement is completed.

[*1287] "b) Actual Cash Value. This means there may be a deduction for depreciation.

"If you do not repair or replace the damaged building structure, payment will be on an actual cash value basis, not to exceed the limit of liability shown on the declarations page for Coverage A--Dwelling Protection. You may make a claim for any additional payment on a replacement [***3] cost basis if you repair or replace the damaged building structure within 180 days of the actual cash value payment." 1

1 In *Hess v. North Pacific Ins. Co. (1993) 122 Wn.2d 180 [859 P.2d 586]*, the court explained the genesis of replacement cost provisions of fire policies: "Traditional coverage was for the actual or fair cash value of the property. The owner was indemnified fully by payment of the fair cash value, in effect the market value, which is what the owner lost if the insured building was destroyed. [Citation.] [P] However, it was recognized that an owner might not be made whole because of the increased cost to repair or to rebuild. Thus, replacement cost coverage became available. 'Replacement cost coverages . . . go beyond the concept of indemnity and simply recognize that even expected deterioration of property is a risk which may be insured against.' " (*Id. at p. 587.*)

Allstate promptly investigated the claim, but the parties' contractors could not agree on the scope [***4] or cost of repair. In the meantime, Allstate's appraiser set actual cash value of the home at $ 200,000. [**388] In September 1994, Allstate paid the Fraleys $ 164,822, the amount of its latest repair estimate. In December 1994, however, Allstate conceded the minimum repair cost was $ 199,671.94. It sent the Fraleys a check for $ 35,178, explaining that it, "together with the $ 164,822 previously paid . . ., represented payment of the actual cash value [of $ 200,000] . . . ." Allstate advised the Fraleys they were entitled to additional benefits under the policy if they actually repaired or replaced their home.

The Fraleys, whose final repair estimate was approximately $ 490,107, exercised their right to have the claim submitted to a panel of three appraisers. The hearing was delayed until late 1996 because of the Fraleys' "two successive attempts to disqualify Allstate's appraiser (one successful, one unsuccessful), [the Fraleys'] . . . fallout with their own appraiser, and the withdrawal of the original appraisal umpire." On February 25, 1997, the appraisers set the actual cash value at $ 200,000 and the replacement cost at $ 364,500.

On March 4, 1997, Allstate advised [***5] the Fraleys as follows: "The Appraisal Award indicates the actual cash value loss at $ 200,000 . . . . That amount was paid to you . . . as of December 8, 1994. Pursuant to the terms of the policy, no additional payments will be made until repair or replacement of the damaged building structure is completed." On April 8, 1997, Allstate [*1288] informed the Fraleys that under the terms of the policy, they had 180 days following payment of the actual cash value of the property to repair or replace their home. However, because the 180-day period had already expired, Allstate offered to stipulate that the time would run from the service of the appraisal award.

On April 17, 1997, the Fraleys' counsel, Bruce Cornblum, sent Allstate a letter stating: "Given the fact that the actual cash value was paid in December 1994 to the Fraleys, and the [appraisers'] award was not rendered until [February 10, 1997], and the confirmation will be rendered April 28, 1997, I would agree that the 180 day time period commences as of the date of confirmation. It was my opinion to Mr. Fraley that such would be the commencement date . . . ." Allstate agreed to treat April 28, 1997, as the date the [***6] limitation period began to run, without consideration of whether the award was confirmed. Although not required by the policy, in May 1997 Allstate also agreed to fund reconstruction of the Fraleys' home by making periodic payments to the contractor or setting up an escrow fund.

The parties apparently had no further contact until September 26, 1997, when the Fraleys notified Allstate they had "finally been able to secure a general contractor to rebuild our home" and completion was expected by March 30, 1998. The Fraleys said they were "hopeful that [the project] will proceed in accordance with the time specified in the contract." On October 14, 1997, Allstate advised the Fraleys that because reconstruction could not be completed by October 25, 1997, the end of the stipulated 180-day period, replacement cost benefits were no longer available. On October 22, 1997, Cornblum wrote to Allstate that in order to preserve their right to replacement cost, the Fraleys purchased another home. 2 Allstate paid them the difference between the $ 200,000

previously paid and the replacement cost award.

2 In *Conway v. Farmers Home Mut. Ins. Co. (1994) 26 Cal. App. 4th 1185, 1192 [31 Cal. Rptr. 2d 883]*, this court held that under a replacement cost provision the insured has the option of purchasing a replacement dwelling at another location.

[***7] The Fraleys obtained new counsel and sued Allstate for breach of contract, breach of the implied duty of good faith and fair dealing and fraud. The Fraleys accused Allstate of unfairly delaying payment and forcing them to purchase a less desirable home by misrepresenting that the 180-day provision applied to a claim made under the replacement cost provision of the policy.

[**389] Allstate moved for summary judgment. The court granted the motion, determining the 180-day provision applied to the Fraleys' claim and Allstate [*1289] acted reasonably under the undisputed facts. Judgment was entered in Allstate's favor on November 19, 1998.

DISCUSSION

I

A summary judgment motion is appropriate if "[the cause of] action has no merit . . ." (*Code Civ. Proc., § 437c, subd. (a)*); that is, if "[o]ne or more of the elements of the cause of action cannot be separately established. . . ." (*Code Civ. Proc., § 437c, subd. (n)(1).*) "The motion [***8] . . . shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (*Code Civ. Proc., § 437c, subd. (c).*) **(1)** We review the trial court's ruling on the summary judgment motion, and its interpretation of the insurance policy, de novo. (*Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal. 4th 666, 673-674 [25 Cal. Rptr. 2d 137, 863 P.2d 207]; Truck Ins. Exchange v. Pozzuoli (1993) 17 Cal. App. 4th 856, 859 [21 Cal. Rptr. 2d 650].)*

II

**(2a)** The Fraleys concede they were not entitled to replacement cost until they actually repaired or replaced their home. (See *Myers v. Allstate Ins. Co. (C.D.Cal. 1997) 989 F. Supp. 1250, 1253-1254.*) In their view, however, the 180-day limitation period is inapplicable because they sought replacement cost under subdivision (a) of paragraph 5 of section I of the policy, which contains no express reference to it. Rather, the 180-day period appears only in subdivision (b) [***9] of paragraph 5 of that section, the actual cash value provision. The Fraleys also point out that the preface to subdivisions (a) and (b) of section I, paragraph 5 provides, "Payment for covered loss to building structures insured under the Dwelling Protection coverage will be by *one* of the following methods . . . ." (Italics added.)

**(3)** "The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.] . . . [P] The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. '. . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.]' " (*Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal. 4th 1, 18 [44 Cal. Rptr. 2d 370, 900 P.2d 619].*)

" [***10] If the policy is ambiguous (i.e., susceptible to more than one reasonable interpretation), the ambiguity is construed in favor of coverage. [Citation.] [*1290] [P] However, the predicate to interpreting ambiguities in favor of coverage is that the policy be *reasonably* susceptible to more than one interpretation. Where a policy clearly excludes coverage, we will not indulge in tortured construction to divine some theoretical ambiguity in order to find coverage." (*Titan Corp. v. Aetna Casualty & Surety Co. (1994) 22 Cal. App. 4th 457, 469 [27 Cal. Rptr. 2d 476], original italics.)*

**(2b)** Contrary to the Fraleys' position, subdivision (a) of paragraph 5 of section I of the policy cannot be considered in isolation. **(4)** Rather, we interpret insurance contracts "as a whole, with each clause lending meaning to the others. [Citation.] Importantly, [***11] we should interpret contractual language in a manner which gives force and effect to every clause rather than to one which renders clauses nugatory." (*Titan Corp. v. Aetna Casualty & Surety Co., supra, 22 Cal. App. 4th at pp. 473-474.)* **(2c)** *Indeed, the interrelation of subdivisions (a) and (b) of section I, paragraph 5 is illustrated by the description in subdivision (a)(1)*

*through (3) of Allstate's replacement cost payment obligation,* [**390] *necessarily applicable to both subdivisions (a) and (b).*

We conclude that section I, paragraph 5 of the policy, read as a whole, unambiguously required the Fraleys to comply with the 180-day requirement. As explained in *Myers v. Allstate Ins. Co., supra, 989 F. Supp. 1250*, payment provisions such as the one here preclude recovery of replacement cost without proof of the insureds' actual repair or replacement of the damaged or lost property. To ameliorate the hardship to the insureds, however, the insureds may initially obtain the actual cash value of the property and use it "to begin the process of repair or replacement, at which point [they] could submit claims for expenditures that went above the actual [***12] cash value of the loss." (*Id. at p. 1254*; see also *Maryland Cas. Co. v. Knight (9th Cir. 1996) 96 F.3d 1284, 1293.)*

Although the Fraleys ultimately sought the cost of reconstructing their property, they initially accepted the $ 200,000 actual cash value from Allstate. The claim was thus adjusted under subdivision (b) of section I, paragraph 5 of the policy, which contains the 180-day limitation. The Fraleys' claim that the $ 200,000 was a partial payment of replacement cost is without merit. Again, the policy states that Allstate "will not pay more than the actual cash value of the damaged building structure until the repair or replacement is completed." Moreover, as noted, the Fraleys' previous counsel expressly acknowledged that the $ 200,000 represented the actual cash value of their home. Indeed, the Fraleys, through their prior counsel, agreed that the 180-day provision was applicable and stipulated to the date it would begin running.

[*1291] The Fraleys' reliance on Allstate's claims adjusting manual is misplaced. **(5)** Extrinsic evidence may be [***13] admitted to aid in the interpretation of an insurance policy only where the terms are ambiguous. (ACL *Technologies, Inc. v. Northbrook Property & Casualty Ins. Co. (1993) 17 Cal. App. 4th 1773, 1790-1791 [22 Cal. Rptr. 2d 206].*) **(2d)** As discussed, the policy here unambiguously required the Fraleys to comply with the 180-day requirement. [3] In any event, the claims manual supports that conclusion: "Losses to building structures will be settled on an [actual cash value] basis, not to exceed the limit of liability shown on the Declarations Page for Coverage A, if the insured doesn't want to replace the damaged property. Occasionally, insureds suffer losses to property which they do not wish to replace. If the insured does decide to replace, he or she can apply for the difference between [actual cash value] and full replacement cost if the building structure is repaired or replaced within 180 days of the [actual cash value] payment."

3 For the same reason, we need not address the Fraleys' argument regarding amendments Allstate made to the standard policy language after the date of the policy here.

[***14] In sum, Allstate did not misrepresent the terms of the policy to the Fraleys. Therefore, breach of contract, breach of the implied covenant of good faith and fair dealing and fraud claims based on the ostensible misapplication of the 180-day provision are barred as a matter of law.

III

**(6a)** Alternatively, the Fraleys contend there were triable issues of fact regarding whether Allstate acted in bad faith by hiring "captive" contractors and "low balling" the repair estimates. They rely solely on the differential between Allstate's original repair estimate of $ 115,000 and the replacement cost arbitration award of $ 364,500.

The Fraleys cite no authority for their position. **(7)** "Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham (1970) 7 Cal. App. 3d 768, 783 [86 Cal. Rptr. 906]*, disapproved on another ground in [**391] *People v. Compton (1971) 6 Cal. 3d 55, 60, fn. 3 [98 Cal. Rptr. 217, 490 P.2d 537]*; *People v. Sierra (1995) 37 Cal. App. 4th 1690, 1693, fn. 3 [44 Cal. Rptr. 2d 575]*; [***15] *9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627.)* **(6b)** *Even absent waiver, however, the Fraleys' claim is unavailing.*

**(8)** "The covenant of good faith and fair dealing is implied in law to assure that a contracting party 'refrain[s] from doing anything to injure the [*1292] right of the other to receive the benefits of the agreement.' [Citation.] In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates

the other party's rights to the benefits of the contract. Thus, when benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because it frustrates the insured's *primary* right to receive the benefits of his contract--i.e., prompt [***16] compensation for losses." (*Love v. Fire Ins. Exchange (1990) 221 Cal. App. 3d 1136, 1153 [271 Cal. Rptr. 246]*, original italics.)

**(9)** In a bad faith case, the "primary test is whether the insurer withheld payment of an insured's claim unreasonably and in bad faith. [Citation.] Where benefits are withheld for proper cause, there is no breach of the implied covenant." (*Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1151.) It is well established that "bad faith liability cannot be imposed where there 'exist[s] a genuine issue as to [the insurer's] liability under California law.' [Citation.]" (Opsal v. United Services Auto. Assn. (1991) 2 Cal. App. 4th 1197, 1205-1206 [10 Cal. Rptr. 2d 352], citing Safeco Ins. Co. of America v. Guyton (9th Cir. 1982) 692 F.2d 551, 557, disapproved on other grounds in Garvey v. State Farm Fire & Casualty Co. (1989) 48 Cal. 3d 395, 410-411 [257 Cal. Rptr. 292, 770 P.2d 704].)* [***17] *"[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." (Lunsford v. American Guarantee & Liability Ins. Co. (9th Cir. 1994) 18 F.3d 653, 656.) The "genuine dispute" doctrine may be applied where the insurer denies a claim based on the opinions of experts. (See Allstate Ins. Co. v. Madan (C.D.Cal. 1995) 889 F. Supp. 374, 380; Austero v. National Cas. Co. (1978) 84 Cal. App. 3d 1, 35 [148 Cal. Rptr. 653], disapproved on other grounds in Egan v. Mutual of Omaha Ins. Co. (1979) 24 Cal. 3d 809, 824, fn. 7 [169 Cal. Rptr. 691, 620 P.2d 141].)*

**(6c)** Here, Allstate promptly hired contractors, Reconstruction Masters Incorporated (RMI) and Landmark Construction, Inc. (Landmark), and they rendered estimates of approximately $ 110,000 and $ 115,000, respectively. The Fraleys' contractor, Knight Construction of San Diego Incorporated [***18] (Knight), estimated repairs at approximately $ 227,000. After discussions regarding the extent of damage, RMI, Landmark and Knight increased their repair estimates to approximately $ 151,000, $ 164,822 and $ 235,763, respectively.

The Fraleys then provided Allstate with a $ 291,106.57 repair estimate by Shoreline General Contractors, Inc. (Shoreline). In response, Allstate had [*1293] Tim Behnke, of BR Building Repairs, Inc., "provide his expert opinion on the damage and scope." On November 14, 1994, Behnke rendered a $ 182,549 repair estimate. After comparing the various bids, in December 1994, Allstate conceded that the minimum repair cost was $ 199,671.94. At the 1997 appraisal, the Fraleys no longer relied on Shoreline. Rather, they submitted a reconstruction estimate of $ 490,107.37 by American Building Company.

The record plainly shows a genuine dispute regarding Allstate's contractual obligations. In fact, the Fraleys concede that the "dispute over the 'scope' of what [**392] needed to be repaired was in large part the reason why [they] were forced to demand appraisal on the Replacement Cost of their home." [***19] **(10)** Where the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith. Despite the " 'special relationship' " (*Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1147*) between an insurer and its insureds, an insurer "may give its own interests consideration equal to that it gives the interests of its insured[s]." (*Id. at pp. 1148-1149.*)

**(6d)** The record reveals that Allstate handled the Fraleys' claim reasonably, by retaining experts and investigating, paying the undisputed actual cash value of the loss and proceeding to appraisal on the disputed portion of the claim, replacement cost. Moreover, Allstate promptly paid the replacement cost appraisal award after the Fraleys purchased another home. We agree with the trial court that their bad faith claim fails as a matter of law.

DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and McDonald, J., concurred.

# TAB 12

LEXSEE 153 CAL.APP.4TH 1442

**FRONTIER OIL CORPORATION et al., Plaintiffs and Appellants, v. RLI INSURANCE COMPANY, Defendant and Respondent.**

**B189158**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION THREE**

***153 Cal. App. 4th 1436*; *63 Cal. Rptr. 3d 816*; *2007 Cal. App. LEXIS 1289*; *37 ELR 20201***

**August 6, 2007, Filed**

**SUBSEQUENT HISTORY:** Modified by *Frontier Oil Corp. v. RLI Ins. Co., 2007 Cal. App. LEXIS 1476 (Cal. App. 2d Dist., Sept. 5, 2007)*
Review denied by *Frontier Oil Corp. v. RLI Insurance Co., 2007 Cal. LEXIS 12848 (Cal., Nov. 14, 2007)*

**PRIOR HISTORY:** [***1]
Superior Court of Los Angeles County, No. BC311259, Richard L. Fruin, Jr., Judge.

**DISPOSITION:**

**SUMMARY:**


CALIFORNIA OFFICIAL REPORTS SUMMARY

Plaintiffs, a Texas-based oil company and its subsidiary, sued a Texas insurer, alleging the insurer had a duty to defend plaintiffs in several personal injury actions arising from the operation of an oil and gas production facility adjacent to a high school in Beverly Hills. The trial court granted summary judgment in favor of the insurer, concluding that, under Texas law, the policy did not include a duty to defend pollution claims because a pollution liability endorsement did not expressly promise a defense. (Superior Court of Los Angeles County, No. BC311259, Richard L. Fruin, Jr., Judge.)

The Court of Appeal reversed the judgment and remanded the case for further proceedings. The court concluded that California law, not Texas law, governed the interpretation of the insurance policy. Notwithstanding the application of the governmental interest analysis to other choice-of-law issues, *Civ. Code, § 1646*, was the choice-of-law rule that determined the law governing the interpretation of the policy. The policy included a duty to defend pollution claims arising from "sudden and accidental" releases. Under California law, the policy included a contractual duty on the insurer's part to defend. California was the intended place of performance of the contract with respect to the pollution claims. The parties anticipated that a suit arising from oil and gas operations in Beverly Hills could be prosecuted in California and that the insurer would be obligated to provide a defense in California if the claims were potentially covered under the policy. The facts alleged in the underlying third party complaints against plaintiffs were sufficient to create a potential for coverage giving rise to a duty to defend. The pollution liability endorsement did not clearly and unmistakably exclude pollution claims from the duty to defend stated in the body of the policy and thus did not exclude pollution claims from the duty to defend. Because the insurer failed to establish the absence of a duty to defend, it was not entitled to summary judgment against plaintiffs on that basis. (Opinion by Croskey, J., with Klein, P. J., and Kitching, J., concurring.) [*1437]


**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES

**(1) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--California Law--Operation of Oil and Gas Production Facility.**--In a case in which a Texas-based insured

alleged a Texas insurer had a duty to defend the insured in several personal injury actions arising from the operation of an oil and gas production facility adjacent to a high school in Beverly Hills, *Civ. Code, § 1646*, was the choice-of-law rule that determined the law governing the interpretation of the insurance policy. California, as the location of the risk insured under the policy, was the state where the insurer was obligated to perform its defense obligations under the policy, and the contracting parties knew this at the time the policy was issued. The policy included several endorsements reflecting the existence of a covered risk located in California. Therefore, California law governed the interpretation of the policy. Under California law, the insurer had a duty to defend the insured. The facts alleged in the underlying complaints against the insured were sufficient to create a potential for coverage giving rise to a duty to defend.

[1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 90; *Cal. Forms of Pleading and Practice (2007) ch. 140, Contracts, § 140.30.*]

**(2) Conflict of Laws § 1--Application of Out-of-state Law--Particular Issue.**--Choice of law refers to the determination of which state's or other jurisdiction's law applies to a particular issue. Choice of law is one branch of the larger doctrine of conflicts of laws, which also includes the questions in which jurisdiction a suit can be brought and the effect of a foreign judgment. Choice-of-law rules can be statutory or based on common law.

**(3) Statutes § 21--Construction--Legislative Intent.**--A court's fundamental task in construing a statute is to ascertain the legislative intent so as to effectuate the purpose of the law. Because the statutory language ordinarily is the most reliable indicator of legislative intent, the court begins by examining the words of the statute. The court gives the words of the statute their ordinary and usual meaning and construes them in the context of the statute as a whole and the entire scheme of law of which it is a part. If the language is clear and a literal construction would not result in absurd consequences that the Legislature did not intend, the court presumes that the Legislature meant what it said and the plain meaning governs. If the language is ambiguous, the court may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy [*1438]

**(4) Conflict of Laws § 5--Contracts--Interpretation--Place of Performance.**--*Civ. Code, § 1646*, prescribes a choice-of-law rule concerning the interpretation of contracts. It states that a contract is to be interpreted according to the law and usage of the place where it is to be performed, but only if the contract indicates a place of performance, and is to be interpreted according to the law and usage of the place where it was made if the contract does not indicate a place of performance.

**(5) Conflict of Laws § 5--Contracts--Interpretation--Place of Performance--Parties' Intention.**--*Civ. Code, § 1646*, was intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation. The parties' intention as to the place of performance sometimes can be gleaned from the nature of the contract and the surrounding circumstances, even if the contract does not expressly specify a place of performance. Moreover, the use of the word "indicate" in *§ 1646* in lieu of a more restrictive word such as "specify" or "state" suggests that the Legislature intended a less restrictive meaning. Accordingly, a contract indicates a place of performance within the meaning of *§ 1646* if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. The intended place of performance is a question of contract interpretation for the court to decide, except to the extent the answer may depend on the credibility of extrinsic evidence.

**(6) Conflict of Laws § 5--Contracts--Interpretation--Place of Performance--Insurance--Execution and Validity.**--*Civ. Code, § 1646*, means that the place where the contract is made is of importance when the contract does not indicate a specific place of performance. The law of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity, unless the terms of the contract provide otherwise or the circumstances indicate a different intention.

**(7) Conflict of Laws § 4--Governmental Interest Analysis--Applicable Rules of Law--Examination of Interests--True Conflict--Comparative Impairment.**--Under the governmental interest analysis, the court first determines whether the applicable rules of law of the potentially concerned jurisdictions are the

same or different. If the applicable rules of law are identical, the court may apply California law. If the applicable rules of law differ materially, the court proceeds to the second step, which involves an examination of the interests of each jurisdiction in having its own law applied to the particular dispute. If each jurisdiction has an interest in applying its own law to the issue, there is a true conflict [*1439] and the court must proceed to the third step. In the third step, known as the comparative impairment analysis, the court determines which jurisdiction has a greater interest in the application of its own law to the issue or, conversely, which jurisdiction's interest would be more significantly impaired if its law were not applied. The court must apply the law of the jurisdiction whose interest would be more significantly impaired if its law were not applied.

**(8) Conflict of Laws § 4--Governmental Interest Analysis--Ascertainment of Appropriate Law.**--California follows a three-step governmental interest analysis to address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement. These rules apply whether the dispute arises out of contract or tort, and a separate conflict of laws inquiry must be made with respect to each issue in the case.

**(9) Conflict of Laws § 4--Governmental Interest Analysis--Interpretation of Contract.**--It cannot be concluded that California has judicially abrogated the express legislative mandate of *Civ. Code, § 1646*, relating to the interpretation of contracts. Instead, the choice-of-law rule in *§ 1646* determines the law governing the interpretation of a contract, notwithstanding the application of the governmental interest analysis to other choice-of-law issues. The California Supreme Court has never applied the governmental interest analysis to determine the law governing the interpretation of a contract and has never stated or suggested that *§ 1646* does not determine the law governing the interpretation of a contract. Broad statements declaring the governmental interest analysis under California's choice-of-law rule and rejecting traditional choice-of-law rules should be viewed in light of the particular choice-of-law issues that were before the court in those cases.

**(10) Insurance Contracts and Coverage § 77--Defense and Indemnity Obligations--Insured Risk--Operations--One or More Fixed Locations.**--An indemnity obligation entails the payment of money in order to resolve liability. A defense obligation, in contrast, entails the rendering of a service, viz., the mounting and funding of a defense. An insurer performs its defense obligation by providing defense services through an attorney. If the insured risk involves operations at one or more fixed locations, a third party complaint against the insured arising from those operations typically is prosecuted in the jurisdiction where the operations are located. The insurer provides defense services in the jurisdiction where the suit is prosecuted. [*1440]

**(11) Insurance Contracts and Coverage § 10--Interpretation--Parties' Intent.**--A court interprets an insurance policy under California law using the same rules of interpretation applicable to other contracts. The mutual intention of the contracting parties at the time the contract was formed governs (*Civ. Code, § 1636*). The court ascertains that intention solely from the written contract if possible, but also considers the circumstances under which the contract was made and the matter to which it relates (*Civ. Code, §§ 1639, 1647*). The court considers the contract as a whole and interprets the language in context, rather than interprets a provision in isolation (*Civ. Code, § 1641*). The court interprets words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage (*Civ. Code, § 1644*). If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs.

**(12) Insurance Contracts and Coverage § 10--Interpretation--Insuring Clause--Exclusions--Reasonable Expectations.**--A court interprets an insuring clause broadly consistent with the reasonable expectations of the insured. An exclusion from coverage otherwise within the scope of an insuring clause must be clear and unmistakable to be given effect. The exclusionary clause must be conspicuous, plain, and clear. An exception to an exclusion is treated in the same manner as a coverage provision and therefore is interpreted broadly consistent with the insured's reasonable expectations.

**(13) Insurance Contracts and Coverage § 10--Interpretation--Endorsements.**--An endorsement modifies the basic insuring forms of the policy and is an integral part of the policy. Standing alone, an endorsement means nothing. Endorsements on an

insurance policy form a part of the insurance contract, and the policy of insurance with the endorsements and riders thereon must be construed together as a whole. An endorsement can expand or restrict the coverage otherwise provided by the policy. If there is any conflict between an endorsement and the body of a policy, the endorsement controls, provided that any reduction in coverage reasonably expected under the body of a policy must be conspicuous, plain, and clear.

**(14) Insurance Contracts and Coverage § 79.6--Liability--Environmental Risks--Pollution Incident--Sudden and Accidental.**--California courts interpret the phrase "sudden and accidental" when used in the context of an insuring clause providing coverage for damages arising from a pollution incident, to mean abrupt in time, unexpected, and unintended. [*1441]

**(15) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--Policy Interpretation--Uncertainties--Reasonable Expectations.**--The duty to defend is independent of and broader than the duty to indemnify. Uncertainties concerning policy interpretation must be resolved in favor of the reasonable expectations of the insured. An insurer must defend a suit that potentially seeks damages covered by the policy.

**(16) Insurance Contracts and Coverage § 77--Liability--Duty to Defend.**--The duty to defend arises whenever the insurer ascertains facts that create a potential for liability under the policy, whether the insurer learns those facts from the complaint, the insured, or other sources.

**(17) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--California Law.**--A liability insurer has a duty to defend its insured under California law if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy. The facts need only raise the possibility that the insured will be held liable for covered damages. An insurer has a duty to defend even if the claims against the insured are groundless, false, or fraudulent. Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor.

**(18) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--California Law--Prospective Extinguishment.**--A duty to defend arises under California law upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage. If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered. If a duty to defend has arisen by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively only, and not retroactively.

**(19) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--Texas Law.**--A liability insurer has a duty to defend its insured under Texas law if facts alleged in the complaint potentially could give rise to coverage under the policy. A plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend. Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. In case of doubt as to whether or not the allegations of a complaint [*1442] against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor. Under Texas law, the duty to defend is determined based on the policy terms and the allegations of the complaint, without regard to the truth or falsity of those allegations and without regard to extrinsic evidence. Any doubt as to whether the complaint alleges facts that give rise to a duty to defend must be resolved in favor of the insured. If the duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered.

**(20) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--Texas and California Law--Extrinsic Facts.**--Texas law differs from California law in that under Texas law, facts extrinsic to the complaint cannot give rise to a duty to defend. Under California law, extrinsic facts known to the insurer give rise to a duty to defend if the facts create a potential for coverage under the policy.

**COUNSEL:** Dickstein Shapiro Morin & Oshinsky, Kirk A. Pasich, Clyde M. Hettrick and Daniel H. Rylaarsdam for Plaintiffs and Appellants.

Morison-Knox Holden & Prough, William C. Morison, Michael D. Prough and Richard A. Eggerth for Defendant and Respondent.

**JUDGES:** Croskey, J., with Klein, P. J., and Kitching, J., concurring.

**OPINION BY:** Croskey

**OPINION**

[**821] **CROSKEY, J.**--Frontier Oil Corporation (Frontier) and its wholly owned subsidiary, Wainoco Oil & Gas Company (Wainoco), appeal a summary judgment in favor of RLI Insurance Company (RLI). Frontier and Wainoco contend RLI has a duty to defend them in several personal injury actions arising from the operation of an oil and gas production facility adjacent to Beverly Hills High School in Beverly Hills, California. Frontier's predecessor and RLI's predecessor had entered into a liability insurance policy in Texas. The parties dispute whether RLI agreed under the terms of the policy to defend pollution claims and whether a duty to defend the underlying actions has arisen. Each of these questions presents a choice-of-law issue concerning the law governing our determination. Each choice-of-law issue in turn [***2] presents the threshold question of the applicable choice-of-law rule.

**(1)** We conclude that notwithstanding the application of the governmental interest analysis to *other* choice-of-law issues, *Civil Code section 1646* is the [*1443] choice-of-law rule that determines the law governing the *interpretation* of a contract. *Section 1646* states that a contract is to be interpreted according to the law and usage of the place it is to be performed if the contract "indicate[s] a place of performance" and according to the law and usage of the place it was made if the contract "does not indicate a place of performance." 1 A contract "indicate[s] a place of performance" within the meaning of *section 1646* if the contract expressly specifies a place of performance or if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. California, as the location of the risk insured under the policy, was the state where RLI would be obligated to perform its defense obligations under the policy, and the contracting parties knew this at the time the policy was issued. Indeed, the policy included several endorsements reflecting the existence of a covered risk located [***3] in California. The law of California therefore governs the interpretation of the policy. Interpreting the policy under California law, we will hold that it includes a contractual duty to defend and that the facts alleged in the underlying complaints were sufficient to create a potential for coverage giving rise to a duty to defend. We will therefore reverse the judgment.

> 1 *Civil Code section 1646* provides: "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."

***FACTUAL AND PROCEDURAL BACKGROUND***

1. *The Insurance Policy*

Underwriters Indemnity Company, RLI's predecessor in interest, issued a commercial general liability insurance policy to Wainoco Oil Corporation, Frontier's predecessor in interest, in January 1988. Wainoco Oil Corporation, acting through an insurance brokerage, and Underwriters Indemnity Company entered into the insurance contract in Texas. The policy was effective from October 1, 1987, to October 1, 1988.

The policy's liability insuring clause states: "We will pay those sums that the insured becomes legally [***4] obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. ... The 'bodily injury' or 'property [**822] damage' must be caused by an 'occurrence' ... . *We will have the right and duty to defend any 'suit' seeking those damages*." (Italics added.) Exclusion of, in the same coverage form, provided for an "absolute" pollution exclusion: "This insurance does not apply to: [¶] ... [¶] ... 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants ... ."

The policy includes several contemporaneously issued endorsements, including one entitled "Oil and Gas Lease Operators' Pollution Liability [*1444] Coverage" (the pollution liability endorsement), which states at the top of its first page, "This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein." The pollution liability endorsement *deletes* exclusion of from the policy and states: "We will pay those sums that the

'insured' becomes legally obligated to pay as compensatory damages because of 'bodily injury' or 'property damage' to which this [***5] insurance applies, caused by a 'pollution incident'." The endorsement defines "pollution incident" as "the sudden and accidental emission, discharge, release or escape of pollutants into or upon land or the atmosphere, provided that such emission, discharge, release or escape emanates from operations conducted on land and results in ?environmental damage'." 2 "Environmental damage" is defined as "the injurious presence in or upon land or the atmosphere of solid, liquid, gaseous or thermal contaminants, irritants or pollutants." The endorsement, however, does not mention a duty to defend.

2 The effect of this endorsement was to remove the *absolute* pollution exclusion from the original policy and provide in its place a limited promise of coverage for claims arising from any "sudden and accidental emission, discharge, release or escape of pollutants."

The policy also includes three additional endorsements relating specifically to the oil and gas operations in Beverly Hills, California. One adds the City of Beverly Hills as an additional insured ("with respect to claims arising out of the following project: Oil and Gas Operations at 9865 Olympic Blvd., City of Beverly Hill[s], CA"), apparently [***6] as a public entity that had issued a permit to conduct oil and gas operations at the site; the second adds the department of transportation of the City of Los Angeles as an additional insured, also apparently as a public entity that had issued a permit; and the third is a "Waiver of Transfer Rights of Recovery Against Others" made out in favor of the City of Beverly Hills with respect to claims arising from the same project.

Finally, an endorsement for certain "Texas Changes" apparently conforms this policy issued in Texas with Texas law with respect to three specific areas, none of which is relevant to the issues raised in this appeal: (1) the "notice prejudice" rule, (2) policy cancellation, and (3) policy renewal. That endorsement also states that the insured may complain to the Texas State Board of Insurance if any dispute concerning the premium or a claim is not resolved.

2. *Underlying Actions and Tender of Defense*

Lori Lynn Moss and numerous other plaintiffs filed a complaint against Frontier, Wainoco, and other oil and gas industry defendants in June 2003 (*Moss v. Venoco, Inc.* (Super. Ct. L.A. County, No. BC297083)). The plaintiffs alleged that the defendants' oil and gas operations [***7] at "Drill-Site #1" [*1445] and other locations at the Beverly Hills site caused releases of toxic chemicals into the environment resulting in personal injuries and deaths. Other [**823] plaintiffs filed similar complaints against Frontier, Wainoco, and others alleging the same operative facts in six additional actions filed from July 2003 to May 2005. Frontier and Wainoco tendered defense of all of these actions to several primary liability insurers, including RLI. RLI responded that it would investigate the matter.

In January 2004, Frontier and Wainoco made a written demand on numerous insurers, including RLI, to provide a defense in the underlying actions. On February 12, 2004, RLI filed a complaint in the United States District Court for the Southern District of Texas seeking a declaratory judgment that it had no duty to defend or indemnify Frontier or Wainoco in the underlying actions (*RLI Insurance Co. v. Wainoco Oil & Gas Co.* (S.D.Tex., No. H-04-0553)). RLI sent a letter to Frontier and Wainoco the next day denying coverage and a defense.

3. *Trial Court Proceedings*

Frontier and Wainoco filed their complaint in this action against RLI and other insurers in February 2004, alleging counts for (1) [***8] declaratory relief, (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing, all relating to the insurers' refusal to defend the underlying actions. The Texas federal district court stayed RLI's declaratory relief action in April 2004 under its broad discretionary authority to abstain from ruling on a declaratory relief action where there is a pending state court action in which the matters in controversy might be fully resolved. Frontier and Wainoco later resolved this action with respect to all of the insurer defendants except RLI.

RLI moved for summary judgment against Frontier in November 2005, arguing that it had no duty to defend Frontier in the underlying actions. RLI argued that Texas law governed the dispute pursuant to *Civil Code section 1646* and *Code of Civil Procedure section 1857* and that under Texas law, RLI had no duty to indemnify or defend Frontier. Specifically, RLI argued that under Texas law (1) the pollution liability endorsement does not promise a defense of pollution claims, so the policy provides for indemnity of pollution claims but not a defense; and, in

any event (2) the allegations in the underlying complaints do not [***9] create a potential for coverage. RLI moved for summary judgment against Wainoco on the same grounds, and also argued that Wainoco was entitled to no relief because it was not a named insured under the policy. [*1446]

[**824] The trial court concluded that *Civil Code section 1646* determined whether the law of California or Texas governed the dispute. [3] Noting the ?Texas Changes" endorsement, the court stated, "The insurance policy as a whole shows the intent of the parties at the time the insurance contract was made was that Texas law would apply to any disputes arising out of the contract." The court concluded, "the insurance contract was made and accepted between a Texas insurer and a Texas-based insured in Texas and was to be performed under Texas law." The court therefore held that Texas law governed this dispute. The court acknowledged that "[t]he major risk identified by the parties in their contract was the insured's petroleum drilling operation in California," but stated that such circumstance alone did not compel the conclusion that California law governed.

3 The trial court also apparently relied on *Code of Civil Procedure section 1857* (see fn. 4, *post*).

The trial court concluded that, under [***10] Texas law, the policy did not include a duty to defend pollution claims because the pollution liability endorsement did not expressly promise a defense. The court therefore held that RLI had no duty to defend Frontier or Wainoco regardless of the allegations in the underlying actions. The court granted the summary judgment motions against both Frontier and Wainoco and entered a judgment in favor of RLI. Frontier and Wainoco filed a timely appeal.

***CONTENTIONS***

Frontier and Wainoco contend (1) the governmental interest analysis is the choice-of-law rule that determines whether California law or Texas law governs the parties' rights under the policy, and under that analysis California law applies; (2) even under *Civil Code section 1646* and *Code of Civil Procedure section 1857*, the contemplated place of performance was California, so California law applies; (3) interpreted in accordance with California law, the policy includes a contractual duty to defend that extends to claims arising from pollution incidents; (4) the allegations of the third party complaints establish a potential for coverage under the policy and therefore create a duty to defend; and (5) RLI has a duty to defend under [***11] Texas law, even if it applies.

RLI disputes these contentions and argues that (1) *Civil Code section 1646* and *Code of Civil Procedure section 1857* establish the choice-of-law rule that determines whether California law or Texas law governs the interpretation of the policy and, under that analysis, Texas law applies because the policy does not expressly specify a place of performance and the contract was made in Texas; (2) even under the governmental interest analysis, Texas law [*1447] applies; (3) interpreted in accordance with Texas law, the policy does not include a duty to defend pollution claims; (4) the allegations of the third party complaints do not establish a potential for coverage under the policy and therefore cannot support a duty to defend under Texas law; (5) if California law applies, the matter should be remanded to the superior court to consider extrinsic evidence that was not considered in ruling on the prior summary judgment motion; and (6) Wainoco is not an insured under the policy, so the judgment should be affirmed as to Wainoco.

***DISCUSSION***

1. *Standard of Review*

A party is entitled to summary judgment only if there is no triable issue of material fact and the party is entitled [***12] to judgment as a matter of law. (*Code Civ. Proc., § 437c, subd. (c).*) A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. (*Id., subd. (p)(2).*) A defendant can satisfy its burden by presenting evidence that negates an element of the cause of action or evidence that the plaintiff cannot reasonably obtain needed evidence. (*Kahn v. East Side Union High School Dist. (2003) 31 Cal.4th 990, 1003 [4 Cal. Rptr. 3d 103, 75 P.3d 30].*) If the defendant meets this burden, the burden shifts to the plaintiff to set forth "specific facts" showing that a triable issue of material fact exists. (*Code Civ. Proc., § 437c, subd. (p)(2).*) We review the trial court's ruling de novo, liberally construe the evidence in favor of the opposing party, and resolve all doubts concerning the evidence in favor of the opposing party. (*Miller v. Department of Corrections (2005) 36 Cal.4th 446, 460 [30 Cal. Rptr. 3d 797, 115 P.3d 77].*) [**825]

2. *Choice-of-law Doctrine*

**(2)** Choice of law refers to the determination of which state's or other jurisdiction's law applies to a particular issue. Choice of law is one branch of the larger doctrine of conflicts of laws, which also includes the [***13] questions in which jurisdiction a suit can be brought and the effect of a foreign judgment. (See Weintraub, Commentary on the Conflict of Laws (5th ed. 2006) § 1.1, p. 1; *Rest.2d Conflict of Laws, § 2, com. a*, pp. 2-3.) Choice-of-law rules can be statutory or based on common law. (See *Rest.2d Conflict of Laws, § 5, coms. b, c*, p. 9; Leflar, *Choice-of-Law Statutes* (1977) *44 Tenn. L.Rev. 951.*) Courts and commentators have long struggled with differing approaches to challenging choice-of-law problems.

The determination whether RLI has a duty to defend under the policy presents two principal issues. The first is whether the policy includes a duty [*1448] to defend pollution claims. This is a question of contract interpretation. The second is whether the underlying personal injury actions trigger the duty to defend. Each of these questions presents a choice-of-law issue as to whether the law of California or another state governs. Each choice-of-law issue in turn presents the threshold question of which choice-of-law rule properly applies.

We first will decide that *Civil Code section 1646* is the choice-of-law rule that determines the law governing the interpretation of the policy. We then will apply [***14] *section 1646*, conclude that California law governs, and interpret the policy under California law. Such interpretation will require us to conclude that the policy includes a duty to defend pollution claims. Next, we will consider the choice of law with respect to whether the underlying actions trigger the duty to defend. We will hold that California law governs under either *section 1646* or the governmental interest analysis. Applying California law, we will conclude that RLI has a duty to defend Frontier and Wainoco in the underlying actions.

3. *Civil Code Section 1646 Is California's Choice-of-law Rule That Determines the Law Governing the Interpretation of a Contract*

*Civil Code section 1646* (see fn. 1, *ante*) [4] was first enacted in 1872 based on an identical provision in the Field Code (Field's Draft N.Y. Civ. Code (1865) § 811) and remains unchanged today. Published opinions by California courts have applied the statute as a choice-of-law rule determining the law governing the interpretation of a contract very infrequently, and those opinions (discussed *post*) provide little guidance as to the meaning of the critical phrase "indicate a place of performance" (*Civ. Code, § 1646*).

4 *Code of Civil Procedure section 1857* [***15] states, in terms somewhat similar to *Civil Code section 1646*: "The language of a writing is to be interpreted according to the meaning it bears in the place of its execution, unless the parties have reference to a different place." In light of our conclusion that *Civil Code section 1646* determines the law governing the interpretation of a contract and the apparent similarities between the two statutes, we need not decide whether *Code of Civil Procedure section 1857* also states a choice-of-law rule or only an interpretive rule concerning usage.

**(3)** Our fundamental task in construing a statute is to ascertain the legislative intent so as to effectuate the purpose of the law. (*Hassan v. Mercy American River Hospital (2003) 31 Cal.4th 709, 715 [3 Cal. Rptr. 3d 623, 74 P.3d 726].*) Because the statutory language ordinarily is the most reliable indicator of legislative intent, we begin by examining the words of the statute. (*Ibid.*) We give the words of the statute their ordinary and usual meaning [**826] and construe them in the context of the statute as a whole and the entire scheme of law of which it is a part. (*State Farm Mutual Automobile Ins.* [*1449] *Co. v. Garamendi (2004) 32 Cal.4th 1029, 1043 [12 Cal. Rptr. 3d 343, 88 P.3d 71].*) If the language is clear and a literal construction [***16] would not result in absurd consequences that the Legislature did not intend, we presume that the Legislature meant what it said and the plain meaning governs. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles (2004) 34 Cal.4th 733, 737 [21 Cal. Rptr. 3d 676, 101 P.3d 563].*) If the language is ambiguous, we may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy. (*Ibid.*)

**(4)** *Civil Code section 1646*, by its express terms, prescribes a choice-of-law rule concerning the interpretation of contracts. It states that a contract is to be interpreted according to the law and usage of the place where it is to be performed, but only if the contract "indicate[s] a place of performance," and is to be interpreted according to the law and usage of the place where it was made if the contract "does not indicate a

place of performance." 5 Frontier and Wainoco construe the quoted language to mean that a contract must be interpreted according to the law of the place where it is to be performed if the contract *contemplates* performance in a particular place, while RLI construes the same language to mean that the law of the place where the contract is to be performed governs [***17] only if the contract *expressly specifies* a place of performance.

5 *Civil Code section 1646* prescribes both a choice-of-law rule concerning the interpretation of contracts and a rule of interpretation regarding word usage. The California Supreme Court has cited *section 1646* in several opinions to support the admissibility of evidence of usage for the purpose of interpreting a contract. (*Callahan v. Stanley (1881) 57 Cal. 476, 479*; *Burns v. Sennett & Miller (1893) 99 Cal. 363, 371-372 [33 P. 916]*; *Law v. Northern Assurance Co. (1913) 165 Cal. 394, 407 [132 P. 590]*; *Alta Planing Mill Co. v. Garland (1914) 167 Cal. 179, 183 [138 P. 738]*; *Buckner v. Leon & Co. (1928) 204 Cal. 225, 227 [267 P. 693]*; *Alamitos Land Co. v. Shell Oil Co. (1935) 3 Cal.2d 396, 404 [44 P.2d 573]*; *Ermolieff v. R.K.O. Radio Pictures (1942) 19 Cal.2d 543, 550 [122 P.2d 3]*; *Beneficial etc. Ins. Co. v. Kurt Hitke & Co. (1956) 46 Cal.2d 517, 525-526 [297 P.2d 428]*.) Those opinions typically cited *section 1646* together with other statutes stating that the words of a contract or writing are to be interpreted in accordance with any special meaning intended by the parties (e.g., *Civ. Code, §§ 1644, 1645*; *Code Civ. Proc., § 1861*), and did not discuss the meaning of "indicate a place of performance" in *section 1646*. [***18] The California Supreme Court has never cited *section 1646* as a choice-of-law rule.

The apparent purpose of *Civil Code section 1646* is to determine the choice of law with respect to the interpretation of a contract in accordance with the parties' presumed intention at the time they entered into the contract. This was the explanation given by courts and commentators for the former common law rule on which *section 1646* apparently was based. Judge Joseph Story, in his highly regarded treatise on conflict of laws, described an exception to the general rule that the law of the place of making governed the validity and interpretation of a contract: "[W]here the contract is, either expressly or tacitly, to be performed in any other place, there the general rule [*1450] is in conformity to the presumed intention of the parties that the contract as to its validity, nature, obligation, and interpretation is to be governed by the law of the place of performance." (Story, Conflict of Laws (7th ed. 1872) § 280, p. 325.) Similarly, Kent's Commentaries explained that the law of the place a contract is to be performed should govern because, "The rights of the parties are to be judged of by that law by which [***19] they intended, or rather by which [**827] they may justly be presumed to have bound themselves. [Citations.]." 6 (2 Kent, Commentaries on American Law (12th ed. 1873) p. 622 (459) fn. 1.) Numerous contemporary judicial opinions followed this rule based on the parties' presumed intention. (See, e.g., *Vanzant Jones & Co. v. Arnold, Hamilton & Johnson et al. (1860) 31 Ga. 210*; *McDaniel v. The Chicago & Northwestern Railway Co. (1868) 24 Iowa 412*; *Dyke v. Erie Railway (1871) 45 N.Y. 113, 116-117*; *Waverly Bk., Appellant, v. Hall (1892) 150 Pa. 466, 472-473 [24 A. 665]*.)

6 The former common law rule described by these commentators was not limited to the choice-of-law issue of *contract interpretation*, as is *Civil Code section 1646*.

**(5)** In our view, *Civil Code section 1646* was intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation. 7 The parties' intention as to the place of performance sometimes can be gleaned from the nature of the contract and the surrounding circumstances, even if the contract does not expressly specify a place of performance. This was Story's view. (Story, Conflict of Laws, *supra*, § 280, p. 325 ["where the contract [***20] is, *either expressly or tacitly*, to be performed in any other place, ..." (italics added)]; see also *Pomeroy v. Ainsworth* (N.Y. Sup. 1856) 22 Barb. 118, 128 ["If no place of performance is expressly stated, *or implied from the terms of the contract*, the law of the place where it was made will govern" (italics added)].) 8 Moreover, the use of the word "indicate" in *section 1646* in lieu of a more restrictive word such as "specify" or "state" suggests that the Legislature intended a less restrictive meaning. Accordingly, we conclude that a contract "indicate[s]" a place of performance within the meaning of *section 1646* if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. The intended place of performance is a question of contract

interpretation for the court to decide, except [*1451] to the extent the answer may depend on the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865 [44 Cal. Rptr. 767, 402 P.2d 839]*; *American Alternative Ins. Corp. v. Superior Court (2006) 135 Cal.App.4th 1239, 1245 [37 Cal. Rptr. 3d 918]*.)

7 If the parties state their intention in an express choice-of-law clause, California courts ordinarily will enforce the parties' [***21] stated intention unless (1) the chosen state has no substantial relationship to the parties or their transaction, and there is no other reasonable basis for the parties' choice, or (2) the chosen state's law is contrary to a fundamental policy of the state whose law otherwise would apply, and the latter state has a materially greater interest in the matter than does the chosen state. (*Nedlloyd Lines B.V. v. Superior Court (1992) 3 Cal.4th 459, 464-466 & fns. 5 & 6 [11 Cal. Rptr. 2d 330, 834 P.2d 1148]*.)

8 Both of these authorities were among the references cited in the notes to section 811 of the Field's Draft New York Civil Code, which was the source for the identical language in *Civil Code section 1646*.

4. *Prior California Opinions Offer Little Guidance on the Application of Civil Code Section 1646 As a Choice-of-law Rule*

The California Courts of Appeal have cited *Civil Code section 1646* in several opinions involving choice-of-law issues, but those opinions offer little or no meaningful guidance as to the meaning of "indicate a place of performance."

*Blochman etc. Bank v. Ketcham (1918) 36 Cal.App. 284 [171 P. 1084]* (*Blochman*) was the first opinion by a California court to expressly invoke *Civil Code section 1646* as a choice-of-law [***22] rule. *Blochman* involved [**828] a promissory note executed and delivered in Mexico, with the place of payment left blank. The plaintiff later inserted in the blank a location in California. (*Blochman, supra, at p. 285.*) *Blochman* concluded that the parties intended to allow the holder to designate a place for payment. The court stated that this was the law of California when a blank was left in a note for the holder to fill in, stated that there was nothing in the record to indicate that Mexican law was to the contrary, and therefore presumed that Mexican law was the same. (*Id. at pp. 286-287.*) Although this discussion concerned the choice of law with respect to the interpretation of the contract, *Blochman* did not cite *section 1646* in this context. Instead, *Blochman* cited *section 1646* in support of its conclusion that California law, rather than the law of Mexico, governed the validity and enforceability of the note because the note was payable in California. [9] (*36 Cal.App. at p. 287.*) *Blochman* did not discuss whether there was any indication that the contracting parties anticipated that the note would be made payable in California.

9 *Civil Code section 1646* states that a contract is to be interpreted [***23] according to the law and usage of the place it is to be performed if the contract indicates a place of performance, but does not state that the validity and enforceability of a contract are to be determined according to the law of the intended place of performance.

**(6)** *Blair v. New York Life Ins. Co. (1940) 40 Cal. App. 2d 494 [104 P.2d 1075]* (*Blair*) was an action by an insured for payment of disability insurance benefits. The defendant executed and issued the policy in New York, and delivered it to the insured in the State of Washington. The insured moved to California several years later. The insured received disability benefits in Washington and California before the defendant discontinued the payment of benefits based on the insured's failure to disclose material facts concerning her physical condition. (*Id. at p. 496.*) The choice-of-law issue concerned the [*1452] interpretation of an incontestability clause. (*Id. at p. 500.*) *Blair* quoted *Civil Code section 1646* and stated that the statute "means that the place where the contract is made is of importance when the contract does not indicate a specific place of performance." (*Blair, supra, at p. 498.*) After an intervening discussion, *Blair* stated, "The law [***24] of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity (*Flittner v. Equitable Life Assur. Soc. [(1916)] 30 Cal.App. 209 [157 Pac. 630]*), unless the terms of the contract provide otherwise or the circumstances indicate a different intention." [10] (*Id. at* [**829] *p. 499.*) *Blair* did not cite *section 1646* with regard to this last quoted statement.

10 *Flittner v. Equitable Life Assur. Soc., supra, 30 Cal.App. 209* held that a minor could rescind a life insurance policy and recover the premiums

paid, applying California law. (*Id. at pp. 215-216.*) The choice-of-law issue was whether the law of California or New York governed the minor's right to rescind the contract. The contract was made in California, and *Flittner* concluded that the contract contemplated performance in New York. (*Id. at p. 213.*) *Flittner* stated: "All matters connected with the performance of a contract are regulated by the law of the place where the contract by its terms is to be performed. All matters bearing upon the execution, the *interpretation*, and the validity of contracts including the capacity [***25] of the parties to contract, are *determined by the law where the contract is made* (*Union Nat. Bank v. Chapman, 169 N. Y. 538, [88 Am. St. Rep. 614, 57 L. R. A. 513, 62 N. E. 672]*; *Phoenix Mut. Life Ins. Co. v. Simons, 52 Mo. App. 357*; 2 Wharton on Conflict of Laws, sec. 401; note in *Mayer v. Roche, 77 N.J.L. 681 [75 A. 235, 26 L. R. A. (N. S.) 767]*; *Hauck Clo. Co. v. Sharpe, 83 Mo. App. 385*)." (*Id. at p. 215*, italics added.) *Flittner* did not cite *Civil Code section 1646* with respect to the law governing the interpretation of a contract and cited no California authority in support of the quoted statement.

The terms of the insurance policy in *Blair* provided for payment of premiums at the defendant's home office in New York or to an authorized agent elsewhere. (*Blair, supra, 40 Cal. App. 2d at p. 498.*) *Blair* concluded, "[u]nder this provision, the contract was to be performed partly in New York and partly in any other place where the premiums were paid or other necessary business could be transacted." (*Id. at p. 499*; but see *Flittner v. Equitable Life Assur. Soc., supra, 30 Cal.App. at p. 213*, reaching a different conclusion on similar facts.) *Blair* stated that the contract was performed partly in New York and [***26] partly in Washington, that the defendant waived the right to apply Washington law by paying benefits to the plaintiff in California, and that the law of California governed because the breach occurred in California. [11] (*Blair, at p. 499*; see also *Braun v. New York Life Ins. Co. (1941) 46 Cal. App. 2d 335, 344-346 [115 P.2d 880]* [followed *Blair* and declined to [*1453] discuss the argument that *Blair* failed to give effect to *Civ. Code, § 1646*].) The holding in *Blair* apparently was based on the stated choice-of-law rule that in the circumstances of that case, liability for breach of contract was governed by the laws of the state where the breach occurred; the holding apparently was not based on *section 1646*.

11 *Blair, supra, 40 Cal. App. 2d at page 499* stated: "In recognizing California as the place for the payment of benefits by delivery thereof in this state, defendant waived any right to insist that the Washington law governed. The waiver is not one of jurisdiction, but of the right to apply the Washington law to an action tried in California. The intention of the parties, as gathered from attending circumstances, is controlling in determining the place of trial and the governing laws. Liability for the breach [***27] of a contract partly performed in one state, and made and partly performed in another, is fixed by the laws of the state wherein the breach occurred. (17 C. J. S., p. 343.) The breach in this case was defendant's refusal to pay further disability income benefits to plaintiff in California."

*Shippers Dev. Co. v. General Ins. Co. (1969) 274 Cal. App. 2d 661 [79 Cal. Rptr. 388]* (*Shippers*) involved the interpretation of an insurance policy exclusion. (*Id. at pp. 673-674.*) *Shippers* stated that the insurer relied on *Civil Code section 1646*, quoted the statute, and then stated: "The insurer's argument fails to consider the following rule: 'The law of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity [citation], unless the terms of the contract provide otherwise or the circumstances indicate a different intention. In this case, the circumstances do not indicate that in the matter of the interpretation of the contract, the parties intended to be restricted to the laws of the State of Washington, where the contract was consummated by the delivery of the policy.' (*Blair v. New York Life Ins. Co.[, supra,] 40 Cal. App. 2d [at p.] 499 [104 P.2d 1075]*.) [***28] It was contemplated that the policy would be effective and might have to be performed outside the State of Washington. The law of this state in interpreting the policy will govern the extent of the coverage with respect to losses occurring within this state. [Citation.]" (*Shippers, supra, at p. 674*, fn. omitted.) Thus, it appears that rather than construe and apply *section 1646*, *Shippers* followed dicta [**830] from *Blair*. Although it appears that the dicta may be somewhat consistent with *section 1646* with respect to the law governing contract interpretation, we must construe and apply the statute

rather than a purported rule of law of some other origin.

Some California opinions citing *Civil Code section 1646* have concluded that there was no conflict between the laws of the states involved, and therefore have not determined whether the contract indicated a place of performance. (See, e.g., *Gitano Group, Inc. v. Kemper Group (1994) 26 Cal.App.4th 49, 56-57 & fn. 4 [31 Cal. Rptr. 2d 271]*; *International Service Ins. Co. v. Gonzales (1987) 194 Cal. App. 3d 110, 116 [239 Cal. Rptr. 341].*) Other opinions have cited *section 1646* to support conclusions on choice-of-law issues other than the law governing the interpretation of a contract (e.g., [***29] *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc. (1995) 38 Cal.App.4th 1532, 1540-1541 [46 Cal. Rptr. 2d 33]* [statute of limitations]; *Klein v. Superior Court (1988) 198 Cal. App. 3d 894, 902 [244 Cal. Rptr. 226]* [formation of an oral contract]; *Henderson v. Superior Court* [*1454] *(1978) 77 Cal. App. 3d 583, 592-593 [142 Cal. Rptr. 478]* [validity and enforceability of a contract, statute of limitations, statute of frauds, and parol evidence rule]; *Wheeling v. Financial Indem. Co. (1962) 201 Cal. App. 2d 36, 40 [19 Cal. Rptr. 879]* [validity of an insurance policy exclusion]; *Bracker v. American Nat. Food, Inc. (1955) 133 Cal. App. 2d 338, 344 [284 P.2d 163]* [measure of contract damages]; *Hardy v. Musicraft Records, Inc. (1949) 93 Cal. App. 2d 698, 702 [209 P.2d 839]* [validity of a stock sale under securities laws]; *Blochman, supra, 36 Cal.App. at p. 287* [validity of a promissory note]), without explaining why a statute that by its express terms establishes a choice-of-law rule only as to the interpretation of a contract should determine other choice-of-law issues. These and other California opinions offer little or no analysis of the meaning of "indicate a place of performance" in *section 1646.* [12]

12 *Wheeling v. Financial Indem. Co., supra, 201 Cal. App. 2d 36* and *Estate of Grace (1948) 88 Cal. App. 2d 956 [200 P.2d 189]* [***30] reflect differing views on the meaning of "indicate a place of performance" (*Civ. Code, § 1646*). *Wheeling* stated that an automobile liability insurance policy "was made and delivered in California, and did not specify a place of performance," and therefore applied California law to a claim arising from an accident in Virginia. (*Wheeling, supra, at p. 40.*) In contrast, *Estate of Grace* stated that an adoption contract made in both Texas and California "necessarily would be performed wherever the Graces might take the child," and held that the contract was enforceable in California although void in Texas. (*Estate of Grace, supra, at pp. 962-963, 966.*)

5. *The Governmental Interest Analysis Does Not Supplant Civil Code Section 1646 As to the Law Governing the Interpretation of Contracts*

The most prevalent modern choice-of-law rule in California is the governmental interest analysis. It replaced former common law choice-of-law rules, and is sometimes labeled California's modern choice-of-law rule. Some courts and commentators (discussed *post*) have inferred or suggested that the judicially developed governmental interest analysis supplants the choice-of-law rule [***31] stated in *Civil Code section 1646.* Our careful review of the governmental interest analysis as developed by the California Supreme Court, however, causes us to conclude that it does not supplant the legislative command of *section 1646.*

**(7)** Under the governmental interest analysis, the court first determines whether the [**831] applicable rules of law of the potentially concerned jurisdictions are the same or different. If the applicable rules of law are identical, the court may apply California law. If the applicable rules of law differ materially, the court proceeds to the second step, which involves an examination of the interests of each jurisdiction in having its own law applied to the particular dispute. If each jurisdiction has an interest in applying its own law to the issue, there is a "true conflict" and the court must proceed to the third step. In [*1455] the third step, known as the comparative impairment analysis, the court determines which jurisdiction has a greater interest in the application of its own law to the issue or, conversely, which jurisdiction's interest would be more significantly impaired if its law were not applied. The court must apply the law of the jurisdiction whose interest [***32] would be more significantly impaired if its law were not applied. (*Kearney v. Salomon Smith Barney, Inc. (2006) 39 Cal.4th 95, 107-108 [45 Cal. Rptr. 3d 730, 137 P.3d 914]* (*Kearney*); *Washington Mutual Bank v. Superior Court (2001) 24 Cal.4th 906, 919-920 [103 Cal. Rptr. 2d 320, 15 P.3d 1071]* (*Washington Mutual*).)

The California Supreme Court first definitively adopted the governmental interest analysis for use in tort actions in *Reich v. Purcell (1967) 67 Cal.2d 551 [63 Cal. Rptr. 31, 432 P.2d 727]* (*Reich*), a wrongful death action

arising from the collision of two automobiles in Missouri driven by residents of California and Ohio. [13] (*Id. at p. 552.*) The choice-of-law issue involved the amount of tort damages. A Missouri statute limited the amount of damages in a wrongful death action, while there were no such limitations under the laws of California and Ohio. (*Id. at pp. 552-553.*) *Reich* rejected the former common law rule that the law of the place of the wrong governed in tort actions. (*Id. at pp. 553, 555.*) *Reich* stated, "The forum must search to find the proper law to apply based upon the interests of the litigants and the involved states" (*id. at p. 553*), and stated that the former rigid rule "must be subordinated to the objective of proper choice of law in conflict cases, i.e., to determine [***33] the law that most appropriately applies to the issue involved [citation]" (*id. at p. 555*). *Reich* concluded that California had no interest in applying its law to the benefit of the defendant because California did not limit the amount of damages awardable, and that Missouri had no interest in applying its law limiting damages to the benefit of a defendant who was not a resident of that state as of the date of injury. The court therefore concluded that the law of Ohio governed the amount of damages and that the Missouri limitation on damages did not apply. (*Id. at pp. 555-556.*)

13 *Bernkrant v. Fowler (1961) 55 Cal.2d 588 [12 Cal. Rptr. 266, 360 P.2d 906]*, a precursor to *Reich, supra, 67 Cal.2d 551*, was an action to cancel a promissory note pursuant to an oral contract. (*Bernkrant, supra, at pp. 590-591.*) *Bernkrant* concluded that California had no interest in applying its own statute of frauds to a transaction made and performed in Nevada involving the refinancing of a loan secured by land in Nevada, and therefore held that the Nevada statute of frauds governed. (*Id. at pp. 595-596.*)

The California Supreme Court subsequently applied the governmental interest analysis in several other cases involving questions of tort and [***34] contract law. *Travelers Ins. Co. v. Workmen's Comp. App. Bd. (1967) 68 Cal.2d 7 [64 Cal. Rptr. 440, 434 P.2d 992]* was an action for workmen's compensation benefits. The plaintiff originally [**832] entered into an oral employment contract in California, and later was injured in Utah. (*Id. at pp. 9-11.*) The plaintiff was entitled to benefits under California's workmen's compensation statute only if [*1456] he were injured while working under an employment contract that was entered into in California. (*Id. at p. 11.*) The choice-of-law issues concerned the place of formation of the employment contract, whether an employment agency in Colorado acted as the employer's agent for purposes of transmitting an employment offer to the plaintiff, and whether the parties had rescinded the oral contract and formed a new employment contract in Wyoming. (*Ibid.*) *Travelers* decided each of these questions by considering the governmental interests of the states involved, stating, "California has rejected the traditional mechanical solutions to choice-of-law problems and adopted foreign law only when it is appropriate in light of the significant interests in the particular case." (*Id. at p. 11*, fn. omitted.) *Travelers* concluded that California had a strong [***35] interest in applying its own laws to determine whether an injured Californian was entitled to benefits under the workmen's compensation act and that the other states involved had no significant interest in applying their laws to the dispute. (*Id. at pp. 11-14.*) The court therefore concluded that California law governed the place-of-contracting, agency, and rescission issues. (*Id. at p. 14.*)

*Hurtado v. Superior Court (1974) 11 Cal.3d 574 [114 Cal. Rptr. 106, 522 P.2d 666]* was a wrongful death action arising from a collision in California involving three automobiles driven by residents of California and Mexico. (*Id. at p. 578.*) The choice-of-law issue involved the amount of tort damages. *Hurtado* concluded that Mexico had no interest in the application of its law limiting the amount of damages in a wrongful death action to the benefit of defendants who were not residents of Mexico, so there was no true conflict and the measure of damages of California, as the forum state, should apply. (*Id. at pp. 580-582.*)

*Bernhard v. Harrah's Club (1976) 16 Cal.3d 313 [128 Cal. Rptr. 215, 546 P.2d 719]* (*Bernhard*) involved a collision in California between an automobile driven by a California resident and a motorcycle driven by the plaintiff, who was also a California resident. [***36] The automobile driver allegedly was intoxicated after drinking liquor served by the defendant at a gambling casino in Nevada. (*Id. at pp. 315-316.*) The choice-of-law issue concerned the existence of tort liability. The allegations of the complaint supported negligence liability under California law, but did not support liability under Nevada law. (*Id. at p. 317.*) *Bernhard* concluded that each state was interested in the application of its own

law, so there was a true conflict, and that the true conflict should be resolved by a comparative impairment analysis. (*Id. at pp. 318-321.*) *Bernhard* concluded that California's interest in preventing the sale of alcoholic beverages to intoxicated persons whose intoxicated state is likely to contribute to injuries in California would be more significantly impaired than would Nevada's interest in protecting its tavern keepers from unlimited liability. (*Id. at pp. 322-323.*) The court therefore concluded that [*1457] California law applied and that the complaint alleged facts sufficient to state a cause of action under California law. (*Id. at pp. 323, 325.*) [**833]

*Offshore Rental Co. v. Continental Oil Co. (1978) 22 Cal.3d 157 [148 Cal. Rptr. 867, 583 P.2d 721]* (*Offshore Rental*) was a negligence action [***37] arising from a personal injury suffered by an officer of the plaintiff corporation while on the defendant's premises in Louisiana. The plaintiff sought to recover damages for injuries to its business interests resulting from the loss of the officer's services. (*Id. at pp. 160-161.*) The choice-of-law issue concerned the existence of tort liability. *Offshore Rental* assumed that California law (*Civ. Code, § 49*) allowed a cause of action for negligent injury to a business employee, and concluded that Louisiana law did not allow such a cause of action. (*Offshore Rental, supra, at pp. 162-163.*) *Offshore Rental* noted that no California court had squarely held that the California statute supported such a cause of action, while a Louisiana appellate court nine years earlier had held that Louisiana law did not allow a cause of action by a corporate plaintiff for the loss of services of its officer. (*Id. at pp. 162, 168.*) *Offshore Rental* characterized the California statute as "unusual and outmoded" and concluded that California's interest in establishing liability under the statute was less strong than Louisiana's interest in the application of its " 'prevalent and progressive' " law. (*Id. at p. 168.*) [***38] The court therefore concluded that Louisiana law applied and that the trial court's dismissal of the cause of action was proper. (*Id. at pp. 169-170.*)

*Washington Mutual, supra, 24 Cal.4th 906* was an action against a home mortgage lender for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair business practices under the unfair competition law (UCL) (*Bus. & Prof. Code, § 17200 et seq.*), unjust enrichment, and conversion. The deed of trust included a choice-of-law provision stating that the security instrument was governed by federal law and the law of the jurisdiction where the secured property was located. (*Washington Mutual, supra, at p. 912.*) The trial court certified the action as a nationwide class action without determining which law would apply to the class members. (*Id. at p. 913.*) The *Washington Mutual* court stated that a consideration of the law applicable to the class members' claims was essential to an informed decision on class certification. (*Id. at p. 915.*) It also stated that the trial court must apply the analysis set forth in *Nedlloyd Lines B.V. v. Superior Court, supra, 3 Cal.4th 459* to determine whether the class causes of action [***39] were subject to enforceable choice-of-law agreements. (*Washington Mutual, supra, at pp. 915-916.*) The court also stated that if the choice-of-law agreements were unenforceable or did not apply to the class causes of action and the party opposing class certification continued to assert that the law of another state applied to nonresident class members, the trial court must apply the governmental interest analysis to determine which state's law to apply. (*Id. at pp. 918-919.*) Thus, the choice-of-law issues concerned the law [*1458] governing the plaintiffs' causes of action for breach of contract, breach of the implied covenant, unfair business practices, unjust enrichment, and conversion.

**(8)** *Washington Mutual, supra, 24 Cal.4th at page 919* stated, "California follows a three-step 'governmental interest analysis' to [**834] address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement. [Citations.]" After describing the governmental interest analysis, the court concluded, "[t]hese rules apply whether the dispute arises out of contract or tort [citations], and a separate conflict of laws inquiry must be made with respect [***40] to each issue in the case [citations]." (*Id. at p. 920.*) *Washington Mutual* reversed the judgment by the Court of Appeal with directions to issue a peremptory writ of mandate directing the trial court to vacate its certification order and conduct the choice-of-law analyses described in the opinion. (*Id. at p. 929.*)

In *Kearney, supra, 39 Cal.4th 95*, clients of the defendant brokerage firm alleged that the defendant had surreptitiously recorded their telephone conversations without their consent in violation of a California statute (*Pen. Code, § 632*). The plaintiffs, in a class action complaint, alleged violations of the statute and unfair business practices under the UCL. (*Kearney, supra, at pp. 102-103* & fn. 1.) The choice-of-law issue concerned the

law governing those statutory causes of action. The court stated that the allegations of the complaint supported the alleged causes of action under California law, but did not support liability under Georgia law. (*Id. at pp. 120-122.*) *Kearney* concluded that California's interest in protecting individuals in California from the secret recording of their confidential telephone conversations would be more significantly impaired than would Georgia's [***41] interest in protecting the right of a business to record telephone conversations for legitimate business reasons. (*Id. at pp. 124-128.*) The court therefore held that California law applied and that the complaint alleged facts sufficient to state a cause of action under California law. (*Id. at pp. 323, 325.*)

Some federal courts have concluded or suggested that the governmental interest analysis has judicially supplanted the choice-of-law rule stated in *Civil Code section 1646* or that the state of California law on this point is uncertain. The Ninth Circuit in *Strassberg v. New England Mut. Life Ins. Co. (9th Cir. 1978) 575 F.2d 1262* applied the governmental interest analysis to determine the law governing whether an insurance policy had lapsed due to nonpayment of insurance premiums. *Strassberg* stated, "California conflicts law has developed significantly since the original enactment of *California Civil Code § 1646*," and "California law moved away from a mechanical choice of law process to employ the 'governmental interest analysis.' " (*Id. at p. 1263.*) Later, in *Arno v. Club Med Inc. (9th Cir. 1994) 22 F.3d 1464*, the Ninth Circuit applied the governmental interest analysis to determine [***42] the law [*1459] governing the existence of an implied-in-fact contract. *Arno* stated that *section 1646* would yield the same result and, "[t]here appears to be some difference of opinion as to whether California's choice of law rule for contracts is the governmental interest test ... or the test of *Cal.Civ. Code § 1646*." [14] (*Arno, at pp. 1468-1469* & [**835] fn. 6.) Although *section 1646* states a choice-of-law rule only as to contract interpretation, *Strassberg* and *Arno*, in making these statements, did not distinguish contract interpretation from other choice-of-law issues.

14 See also *Shannon-Vail Five Inc. v. Bunch (9th Cir. 2001) 270 F.3d 1207, 1210-1213* (Nev. law governed the viability of a usury cause of action under either *Civ. Code, § 1646* or the governmental interest analysis), and *Costco Wholesale Corp. v. Liberty Mut. Ins .Co. (S.D.Cal. 2007) 472 F. Supp. 2d 1183, 1197-1198, 1207* (Conn. law governed the scope of an insurance policy exclusion under either *§ 1646* or the governmental interest analysis). In contrast, *Royal Indemnity Group v. Travelers Indemnity Co.* (N.D.Cal., Sept. 6, 2005, No. C-04-00886) 2005 WL 2176896, pages *4-*5 concluded that the California courts had not abrogated the choice-of-law [***43] rule in *section 1646*.

The Sixth Circuit in *Northland Ins. Co. v. Guardsman Products, Inc. (6th Cir. 1998) 141 F.3d 612* applied the governmental interest analysis to determine the law governing the interpretation of an insurance policy, stating, "the California Supreme Court 'has moved away from the mechanical application of *§ 1646*' " and " 'now employs what is commonly termed the "governmental interest analysis" approach to choice-of-law questions.' [Citation.]" (*Id. at p. 617.*) Similarly, *Vestrock Partners v. California Energy Co.* (S.D.N.Y., Aug. 26, 1993, No. 92 Civ. 5690) 1993 WL 328912 stated with regard to the governmental interest analysis, "California courts normally employ the choice of law test in contracts cases notwithstanding *§ 1646*." (*Id.* at p. *5; see also Reppy, *Choice of Law Problems Arising when Unmarried Cohabitants Change Domicile* (2002) *55 SMU L.Rev. 273, 292*, fn. 90 [stating, "the California Supreme Court's adoption of interest analysis had worked a judicial repeal of the ... choice of law rule in *section 1646*"].) Again, in making these statements, these authorities did not distinguish contract interpretation from other choice-of-law issues.

**(9)** After reviewing [***44] all of these authorities, and in light of the fact that our Supreme Court has not addressed this issue, we are unable to conclude that California has "judicially abrogated" the express legislative mandate of *Civil Code section 1646* relating to the *interpretation* of contracts. Instead, we hold that the choice-of-law rule in *Civil Code section 1646* [**836] determines the law governing the interpretation of a contract, notwithstanding the application of the governmental interest analysis to other choice-of-law issues. [15] The California Supreme Court has never applied the governmental interest analysis to determine the law governing the interpretation of a contract and has [*1460] never stated or suggested that *section 1646* does not determine the law governing the interpretation of a contract. Broad statements declaring the governmental interest analysis California's choice-of-law rule [16] and

rejecting traditional choice-of-law rules [17] should be viewed in light of the particular choice-of-law issues that were before the court in those [***45] cases.

15 Whether this differentiated approach is either wise or desirable is a question best addressed to the Legislature, which has the sole authority to repeal a statute.

16 *Washington Mutual, supra, 24 Cal.4th at page 919* ("California follows a three-step 'governmental interest analysis' to address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement"); *Offshore Rental, supra, 22 Cal.3d at page 161* ("Questions of choice of law are determined in California, as plaintiff correctly contends, by the 'governmental interest analysis' rather than by the trial court's 'most significant contacts theory' ").

17 *Travelers Ins. Co. v. Workmen's Comp. App. Bd., supra, 68 Cal.2d at p. 11* ("California has rejected the traditional mechanical solutions to choice-of-law problems and adopted foreign law only when it is appropriate in light of the significant interests in the particular case").

The opinions by the California Courts of Appeal cited by Frontier and Wainoco are not inconsistent with our conclusion that *Civil Code section 1646* determines the law governing contract interpretation notwithstanding the application of the governmental interest analysis to other choice-of-law issues. *Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co. (1980) 103 Cal. App. 3d 198 [162 Cal. Rptr. 720]* was a declaratory relief action against [***46] a liability insurer. The trial court determined that the insurer had a duty to defend an action against the insured, and the question on appeal was whether the insured was entitled to recover its attorney fees incurred in the declaratory relief action. Applying the governmental interest analysis, the *McMullan* court concluded that the laws of California and the other states involved did not differ on that question and that even if the laws differed, only California had an interest in applying its own laws to the dispute. (*Id. at pp. 203-206.*) The choice-of-law issue concerned the right to recover attorney fees in an action to enforce the insured's rights under the policy and did not involve an issue of contract interpretation.

*Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc. (1993) 14 Cal.App.4th 637 [17 Cal. Rptr. 2d 713]* (*Stonewall*) was a declaratory relief action by excess liability insurers against their insured. The trial court concluded that the insurers were not required to indemnify the insured for a punitive damages award because California law, for reasons of public policy, prohibits indemnity for punitive damages. (*Id. at pp. 640-641.*) The question on appeal was whether the insurers could [***47] be required to indemnify the insured for punitive damages. Applying the governmental interest analysis, the Court of Appeal concluded that the laws of California and Wisconsin differed on that question and that California had a greater interest in applying its own laws to the dispute. (*Id. at pp. 645, 649.*) In deciding that California law governed, *Stonewall* placed particular importance on the location of the [*1461] insured risk. [18] (*Id. at pp. 646-647*, citing *Rest.2d Conflict of Laws, § 193 & com. f*, pp. 613-614.) The choice-of-law issue concerned the existence of a right of indemnity for punitive damages and did not involve an issue of contract interpretation.

18 We cited *Stonewall, supra, 14 Cal.App.4th 637* on this point in *Downey Venture v. LMI Ins. Co. (1998) 66 Cal.App.4th 478, 514 [78 Cal. Rptr. 2d 142]* (*Downey Venture*), and stated, "[a] liability insurance policy issued on a nationwide basis may be construed in accordance with the law of the jurisdiction in which a particular claim arises. [Citation.] Thus, the same policy language may receive different construction and application in different jurisdictions." We held in *Downey Venture* that *Insurance Code section 533* precluded indemnification for malicious prosecution [***48] under California law but did not relieve an insurer of the duty to defend a malicious prosecution claim. (*Downey Venture, supra, at pp. 506, 509.*) We concluded that despite the bar of indemnification under California law, an express promise to provide coverage for malicious prosecution was not illusory, not only because the insurer was required to defend such claims, but also because a California court could enforce the laws of other states that might not preclude indemnification. (*Id. at pp. 514-516.*) Our statement with regard to such a choice-of-law decision by a California court concerned the enforceability of an express contractual promise, rather than contract interpretation.

6. *The Intended Place of Performance of a Liability Insurance Policy Is the Place of the Insured Risk*

**(10)** The liability insurance policy at issue in this case includes both indemnity and defense obligations. An indemnity obligation "entails the payment of money in order to resolve liability. [Citations.]" [**837] (*Buss v. Superior Court (1997) 16 Cal.4th 35, 46 [65 Cal. Rptr. 2d 366, 939 P.2d 766]* (*Buss*).) A defense obligation, in contrast, "entails the rendering of a service, viz., the mounting and funding of a defense [citations]." (*Ibid.*) An insurer performs [***49] its defense obligation by providing defense services through an attorney. If the insured risk involves operations at one or more fixed locations, as here, a third party complaint against the insured arising from those operations typically is prosecuted in the jurisdiction where the operations are located. The insurer provides defense services in the jurisdiction where the suit is prosecuted. There is little doubt that this was the understanding of the parties at the time they entered into the insurance contract in this case.

The policy provides general liability coverage and specifically refers to claims arising from oil and gas operations at Drill-Site #1 in Beverly Hills, California. Two policy endorsements name the City of Beverly Hills and the Department of Transportation of the City of Los Angeles as additional insureds "with respect to claims arising out of ... [¶] Oil or Gas Operations" in the City of Beverly Hills, California. In another endorsement, RLI waives its right of recovery against the City of Beverly Hills for certain payments made under the policy with respect to the same specified claims. These three endorsements clearly demonstrate that the parties intended [***50] the policy to provide coverage for the insureds' oil and gas operations in Beverly Hills. [*1462] Accordingly, we conclude that the parties anticipated that a suit arising from those operations in Beverly Hills could be prosecuted in California and that RLI would be obligated to provide a defense in California if the claims were potentially covered under the policy.

We therefore conclude that California was the intended place of performance of the contract with respect to those claims, that the policy thus "indicate[s] a place of performance" within the meaning of *Civil Code section 1646* with respect to such claims, and that California law governs the interpretation of the policy. Accordingly, we have no need to apply a governmental interest analysis or give consideration to Texas law with respect to the interpretation of the policy.

7. *Interpreted Under California Law, the RLI Policy Includes a Duty to Defend Pollution Claims Arising from "Sudden and Accidental" Releases*

**(11)** We interpret an insurance policy under California law using the same rules of interpretation applicable to other contracts. (*Palmer v. Truck Ins. Exchange (1999) 21 Cal.4th 1109, 1115 [90 Cal. Rptr. 2d 647, 988 P.2d 568]*.) "The mutual intention of the contracting [***51] parties at the time the contract was formed governs. (*Civ. Code, § 1636*; *Palmer, supra, at p. 1115*.) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. (*Civ. Code, §§ 1639, 1647*.) We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. (*Id., § 1641*.) We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Id., § 1644*.) If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. (*Id., § 1638*.)" (*American Alternative Ins. Corp. v. Superior Court, supra, 135 Cal.App.4th at p. 1245*.) [**838]

**(12)** We interpret an insuring clause broadly consistent with the reasonable expectations of the insured. (*MacKinnon v. Truck Ins. Exchange (2003) 31 Cal.4th 635, 648 [3 Cal. Rptr. 3d 228, 73 P.3d 1205]*; *AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 822 [274 Cal. Rptr. 820, 799 P.2d 1253]*.) An exclusion from coverage otherwise within the scope of an insuring clause must be clear and unmistakable to be given effect. (*MacKinnon, supra, at p. 648*.) [***52] " 'The exclusionary clause "must be *conspicuous, plain and* [*1463] *clear*." ' [Citation.]" (*Ibid.*) An exception to an exclusion is treated in the same manner as a coverage provision and therefore is interpreted broadly consistent with the insured's reasonable expectations. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co. (2006) 40 Cal.4th 19, 27-28 [50 Cal. Rptr. 3d 597, 145 P.3d 472]*.)

**(13)** An endorsement modifies the basic insuring forms of the policy and is an integral part of the policy. [19] (*Adams v. Explorer Ins. Co. (2003) 107 Cal.App.4th 438, 450-451 [132 Cal. Rptr. 2d 24]*.) "Standing alone, an endorsement means nothing. 'Endorsements on an insurance policy form a part of the insurance contract

[citation], and the policy of insurance with the endorsements and riders thereon must be construed together as a whole [citation].' " (*Id. at p. 451.*) An endorsement can expand or restrict the coverage otherwise provided by the policy. If there is any conflict between an endorsement and the body of a policy, the endorsement controls, provided that any reduction in coverage reasonably expected under the body of a policy must be " 'conspicuous, plain and clear.' " (*Haynes v. Farmers Ins. Exchange (2004) 32 Cal.4th 1198, 1208 [13 Cal. Rptr. 3d 68, 89 P.3d 381].*)

> 19 Moreover, the pollution liability [***53] endorsement here expressly states that it "forms a part of the policy to which attached."

The policy here expressly promises both indemnity and a defense. The insuring clause in the commercial general liability coverage form provides coverage for sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by "an 'occurrence,' " and states that RLI has the right and duty to defend any suit seeking those damages. Exclusion of in the same coverage form states that the insurance does not apply to bodily injury or property damage caused by the actual or threatened release of pollutants at premises owned, occupied, or used by the insured. The pollution liability endorsement deletes exclusion of and provides coverage for sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by "a 'pollution incident.' " The endorsement does not mention the duty to defend, does not clearly and unmistakably exclude pollution claims from the duty to defend stated in the body of the policy, and therefore does not exclude pollution claims from the contractual duty to defend.

**(14)** The insuring clause [***54] in the pollution endorsement provides coverage for damages arising from "a 'pollution incident,' " which is defined in relevant part as a "sudden and accidental" release resulting in environmental damage. California courts interpret the phrase "sudden and accidental" when used in this context to mean abrupt in time, unexpected, and unintended. (*Shell Oil Co. v. Winterthur Swiss Ins. Co. (1993) 12 Cal.App.4th 715, 755 [15 Cal. Rptr. 2d 815].*) [*1464]

[**839] Interpreting the policy under California law, we conclude that RLI promised to defend claims for damages arising from pollution incidents with respect to the oil and gas operations in Beverly Hills notwithstanding that the pollution liability endorsement does not mention a duty to defend.

8. *The Allegations of the Third Party Complaints Create a Duty to Defend*

a. *The Applicable Choice-of-law Rule*

**(15)** The fundamental principles under California law regarding whether a duty to defend arises were established in *Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263 [54 Cal. Rptr. 104, 419 P.2d 168]* (*Gray*). *Gray* rejected the argument that an insurer had a duty to defend under the policy only if the insured was entitled to indemnity, and held that the duty to defend was independent of and broader than the duty to indemnify. [***55] (*Id. at pp. 274-275.*) *Gray* stated that uncertainties concerning policy interpretation must be resolved in favor of the reasonable expectations of the insured, and that in light of the policy language, the insured reasonably would expect the insurer to defend a suit involving a loss of the nature and kind covered by the policy. (*Ibid.*) *Gray* therefore concluded that an insurer must defend a suit that *potentially* seeks damages covered by the policy. (*Id. at p. 275.*)

**(16)** *Gray* seemed to state that these conclusions reflected the court's interpretation of policy provisions, as distinguished from a rule of law imposed on the parties for public policy reasons regardless of their intentions upon entering into the insurance contract. (*Gray, supra, 65 Cal.2d at p. 274.*) [20] This suggests that the fundamental principles discussed above regarding whether a duty to defend arises are rules of law regarding policy interpretation and that *Civil Code section 1646* determines the appropriate choice of law governing these issues. On the other hand, it was not necessary for the court in *Gray* to decide whether these rules of law were rules of policy interpretation for purposes of *section 1646*; these rules could [***56] be characterized as public policy choices that do not necessarily reflect the actual or presumed intention of the parties. Moreover, *Gray* stated further that the duty to defend arises whenever the insurer ascertains facts that create a potential for liability under the policy, whether the insurer learns those facts from the complaint, the insured, or other sources, and did not explain that [*1465] conclusion as a question of policy interpretation or refer to the reasonable expectations of the insured. (*Gray, supra, at pp. 276-277.*) [21] We need not decide whether these [**840] or other rules regarding the duty to defend

are rules of policy interpretation for purposes of *section 1646* because our conclusion under either *section 1646* or the governmental interest analysis is that California law governs, as we will explain. [22]

20 *Gray, supra, 65 Cal.2d at page 274* stated: "Since we must resolve uncertainties in favor of the insured and *interpret the policy provisions according to the layman's reasonable expectations*, [fn. omitted] and since the effect of the exclusionary clause is neither conspicuous, plain, nor clear, we hold that in the present case the policy provides for an obligation to defend and that [***57] such obligation is independent of the indemnification coverage." (Italics added.)

21 In *Montrose Chemical Corp. v. Superior Court (1993) 6 Cal.4th 287 [24 Cal. Rptr. 2d 467, 861 P.2d 1153]* (*Montrose*), the Supreme Court made clear that its analysis in *Gray, supra, 65 Cal.2d 263* was not limited to policy interpretation: "Because the policy at issue in *Gray* was ambiguous, and could be read either to exclude or to provide for coverage, we held that ordinary principles of insurance contract interpretation required it be construed in the insured's favor, according to his reasonable expectations. (*Gray, supra, 65 Cal.2d at pp. 271-272*; [citation].) As a distinct, separate, and alternative basis for our decision, we recognized that the insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy. (*Gray, supra, 65 Cal.2d at pp. 275-276.*) [¶] The alternative holding in *Gray, supra, 65 Cal.2d 263*, establishes the rule that the insurer must defend in some lawsuits where liability under the policy ultimately fails to materialize; this is one reason why [***58] it is often said that the duty to defend is broader than the duty to indemnify. [Citation.]" (*Montrose, supra, at p. 299.*)

22 We explain our conclusion under *Civil Code section 1646* that California law governs the interpretation of the policy in parts 3 through 6, *ante*.

b. *The Applicable Rules of Law of California and Texas Do Not Materially Differ*

The first step in the governmental interest analysis is to determine whether the applicable rules of law of the potentially concerned jurisdictions materially differ. (*Washington Mutual, supra, 24 Cal.4th at p. 919.*) If there is no material difference, there is no choice-of-law problem and the court may proceed to apply California law. (See *id. at p. 920.*) The party arguing that foreign law governs has the burden to identify the applicable foreign law, show that it materially differs from California law, and show that the foreign law furthers an interest of the foreign state. (*Id. at p. 919*; *Bernhard, supra, 16 Cal.3d at pp. 317-318.*)

**(17)** A liability insurer has a duty to defend its insured under California law if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy. (*Scottsdale Ins. Co. v. MV Transportation (2005) 36 Cal.4th 643, 654-655 [31 Cal. Rptr. 3d 147, 115 P.3d 460]* [***59] (*Scottsdale*); *Gray, supra, 65 Cal.2d at pp. 275-277.*) The facts need only "raise the possibility" that the insured will be held liable for covered damages. (*Montrose, supra, 6 Cal.4th at p. 304.*) An insurer has a duty to defend even if the claims against the insured are " 'groundless, false, or fraudulent.' " (*Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 19 [44 Cal. Rptr. 2d 370, 900 P.2d 619].*) "Any doubt as to whether the facts [*1466] establish the existence of the defense duty must be resolved in the insured's favor." (*Montrose, supra, at pp. 299-300.*)

**(18)** A duty to defend arises under California law upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage. (*Scottsdale, supra, 36 Cal.4th at p. 655*; *Montrose, supra, 6 Cal.4th at pp. 298-300.*) If a duty to defend arises, the insurer must defend the action in its [*1467] entirety, including claims that are not potentially covered. (*Buss, supra, 16 Cal.4th at pp. 48-49.*) If a duty to defend has [**841] arisen by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively [***60] only, and not retroactively. (*Id. at p. 46.*)

**(19)** A liability insurer has a duty to defend its insured under Texas law if facts alleged in the complaint potentially could give rise to coverage under the policy. (*GuideOne Elite v. Fielder Rd Baptist Church (Tex. 2006) 197 S.W.3d 305, 310* (*GuideOne*); *Heyden Newport*

*Chem. Corp. v. Southern Gen. Ins. Co. (Tex. 1965) 387 S.W.2d 22, 26* (*Heyden*).) "A plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend ... [citation]." (*GuideOne, supra, at p. 310.*) " 'Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.' " (*Heyden, supra, at p. 26*; accord, *Nat. Union Fire v. Merch. Fast Motor Lines (Tex. 1997) 939 S.W.2d 139, 141* [***61] (*Nat. Union*).) Under Texas law, the duty to defend is determined based on the policy terms and the allegations of the complaint, "without regard to the truth or falsity of those allegations" and without regard to extrinsic evidence. (*GuideOne, supra, at p. 308*; see also *Heyden, supra, at p. 24.*) Any doubt as to whether the complaint alleges facts that give rise to a duty to defend must be resolved in favor of the insured. [23] (*Allstate Ins. Co. v. Hallman (Tex. 2005) 159 S.W.3d 640, 643*; *Heyden, supra, at p. 26.*) If the duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered. (*Warrantech Corp. v. Steadfast Ins. Co. (Tex.App. 2006) 210 S.W.3d 760, 766*; *Nokia, Inc. v. Zurich American Ins. Co. (Tex.App. 2006) 202 S.W.3d 384, 388.*)

23 RLI quotes language from *Nat. Union, supra, 939 S.W.2d at page 142*, stating: "We will not read facts into the pleadings. [Citation.] Nor will we look outside the pleadings, or imagine factual scenarios which might trigger coverage." The complaint against the insured in that case alleged that the insured's driver negligently discharged a firearm while driving a truck, killing a passenger [***62] in another vehicle. (*Ibid.*) The Texas Supreme Court concluded that the facts alleged in the complaint did not indicate that the death resulted from use of the insured vehicle, as required for coverage under the policy. (*Id. at p. 142.*) The court stated, "the facts alleged in the pleadings do not suggest even a remote causal relationship between the truck's operation and Gonzalez's injury." (*Ibid.*) It was in this context that the court, in the language quoted *ante*, refused to augment the allegations of the complaint in the guise of a liberal construction.

**(20)** Texas law differs from California law in that under Texas law, facts extrinsic to the complaint cannot give rise to a duty to defend. (*GuideOne, supra, 197 S.W.3d at p. 308*; *Heyden, supra, 387 S.W.2d at p. 24.*) Under California law, in contrast, extrinsic facts known to the insurer give rise to a duty to defend if the facts create a potential for coverage under the policy. (*Scottsdale, supra, 36 Cal.4th at p. 654*; *Gray, supra, 65 Cal.2d 263, 276-277.*) Because the complaints in the underlying actions allege facts that create a potential for coverage without regard to extrinsic evidence, as explained *post*, this difference between California [***63] law and the law of Texas is not relevant here. Apart from this distinction, the foregoing Texas rules of law do not [**842] materially differ from California law, and no party has shown that any other Texas rule of law applicable to these facts materially differs from California law. We therefore conclude that the applicable rules of law of California and Texas are substantially identical with respect to a liability insurer's duty to defend; thus, even if the governmental interest analysis was the choice-of-law rule that we were to use to determine if a duty to defend ever arose, California law would be applied. (*Washington Mutual, supra, 24 Cal.4th at p. 920.*)

c. *The Third Party Complaints Allege Claims That Are Potentially Covered Under the Policy*

The complaints allege that defendants, including Frontier and Wainoco, conducted oil and gas exploration, production, processing, and storage activities at Drill-Site #1. They allege that as a result of those operations, hazardous substances were "spilled, emitted, released, [and] discharged" into the environment. They allege further that the operations resulted in "releases, discharges, fugitive emissions, leaks and spills." The complaints [***64] allege damage of a nature and kind covered by the policy and do not foreclose the possibility that the damage was caused by a sudden and accidental release, and therefore create a *potential* for coverage under the policy. (*Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 19*; *Gray, supra, 65 Cal.2d at pp. 274-275.*) This is sufficient to establish RLI's duty to defend. (*Montrose, supra, 6 Cal.4th at pp. 299-300*; *Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal.4th 1076, 1082-1083 [17 Cal. Rptr. 2d 210, 846 P.2d 792].*)

RLI [*1468] potentially could extinguish its defense duty prospectively, but cannot extinguish it retroactively. (*Scottsdale, supra, 36 Cal.4th at p. 655*; *Buss, supra, 16 Cal.4th at p. 46*.) RLI failed to show that facts extrinsic to the third party complaints conclusively negated the potential for coverage before the termination of the underlying actions and therefore failed to extinguish the duty to defend before the termination of those actions. Because RLI failed to establish the absence of a duty to defend, RLI was not entitled to summary judgment against Frontier and Wainoco on that basis.

9. *RLI Failed to Establish That Wainoco Is Not an Insured*

The policy declarations identify the named insured as "Wainoco [***65] Oil Corporation, et al." [24] (Capitalization omitted.) An endorsement referenced on the declarations page and incorporated in the policy lists several additional named insureds, including "Wainoco Oil & Gas Company, and the Northwestern Mutual Life Insurance Co., A Joint Venture" and several "Wainoco Appalachian" partnerships. The commercial general liability coverage form states that if the named insured is a partnership or joint venture, the insured's members and partners "are also insureds, but only with respect to the conduct of [the partnership's or joint venture's] business."

24 Wainoco Oil Corporation was predecessor in interest to Frontier, as stated *ante*, and is to be distinguished from Frontier's wholly owned subsidiary, Wainoco.

RLI argued in its summary judgment motion against Wainoco and argues again on appeal that Wainoco is not an insured with respect to the underlying actions because the alleged conduct does not pertain to Wainoco's joint venture activities. As the party moving for summary judgment, RLI had the burden to present either evidence [**843] that negates an element of the cause of action or evidence that Frontier and Wainoco cannot reasonably obtain needed evidence. [***66] (*Kahn v. East Side Union High School Dist., supra, 31 Cal.4th at p. 1003*.) RLI cited no evidence in support of its argument that Wainoco is not an insured apart from the policy and the third party complaints. A policy endorsement specifically identifies the Beverly Hills site and supports a reasonable inference that the parties intended the policy to provide coverage for Wainoco's operations at the site. The third party complaints allege that Wainoco conducted oil and gas operations at the Beverly Hills site. Nothing in either the policy or the third party complaints forecloses the possibility that Wainoco's operations at the Beverly Hills site pertained to its joint venture with Northwestern Mutual Life Insurance Company. Absent evidence to compel the conclusion that Wainoco's operations at the site did not pertain to its joint venture business, RLI failed to establish that Wainoco is not an insured. [*1469]

***DISPOSITION***

The judgment is reversed. The matter is remanded for further proceedings not inconsistent with the views expressed herein. Frontier and Wainoco are entitled to recover their costs on appeal.

Klein, P. J., and Kitching, J., concurred.

# TAB 13

LEXSEE 198 CAL.APP.3D 1034

**MICHAEL M. HATCHWELL et al., Plaintiffs and Appellants, v. BLUE SHIELD OF CALIFORNIA et al., Defendants and Respondents**

**No. B020734**

**Court of Appeal of California, Second Appellate District, Division Three**

***198 Cal. App. 3d 1027; 244 Cal. Rptr. 249; 1988 Cal. App. LEXIS 130***

**January 28, 1988**

**SUBSEQUENT HISTORY:** [***1] The Petition of Real Party in Interest Denise Hatchwell for Review by the Supreme Court was Denied April 27, 1988. Mosk, J., and Broussard, J., were of the Opinion that the Petition should be Granted.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. C346597, Edward M. Ross, Judge.

**DISPOSITION:** Judgment affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In a bad faith action against a medical insurer by a husband and wife, arising out of the insurer's alleged wrongful denial of medical benefits under the policy to the husband, the trial court granted the insurer's motion for summary adjudication as to the wife, holding that she had no standing to maintain the action. (Superior Court of Los Angeles County, No. C346597, Edward M. Ross, Judge.)

The Court of Appeal affirmed. It held that the wife's status as a dependent beneficiary under the plan did not give her standing as a co-insured to maintain an action on behalf of her husband, since she was not a claimant under the policy except with regard to her own health care benefits. It also held that she had no standing as a third party beneficiary, nor based on her community property interest in the insurance contract and community property liability for her husband's medical expenses. (Opinion by Arabian, J., with Danielson, Acting P. J., and Croskey, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Summary Judgment § 3--Propriety--Cautionary Use of Procedure.** --The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution. Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried.

**(2) Insurance Contracts and Coverage § 109--Adjustment of Loss and Liability--Duty of Insurer to Act in Good Faith--Damages Recoverable for Bad Faith.** --The unreasonable and bad faith refusal of an insurer to pay the valid claim of its insured gives rise to the insurer's liability in tort not only for the insured's pecuniary loss but also for his consequential emotional distress.

**(3) Insurance Contracts and Coverage § 109--Adjustment of Loss and Liability--Duty of Insurer to Act in Good Faith--Duty and Liability Predicated on Contract.** --The theory upon which an insurer's bad faith liability is predicated is that such conduct constitutes a tortious breach of the implied-in-law duty of good faith and fair dealing arising out of the insurance policy. Although an action for bad faith sounds in tort, the duty of good faith and fair dealing derives from and exists solely because of the contractual relationship between the parties. Thus, one who is not a party to the underlying contract may not be held liable for breach of an implied covenant of good faith and fair

dealing, for as to him no such implied covenant exists.

**(4a) (4b) Insurance Contracts and Coverage § 123--Actions--Parties--Action for Bad Faith Denial of Medical Benefits--Standing of Insured's Spouse.** --A wife who was not a party to her husband's medical insurance contract had no standing as a co-insured or third party beneficiary to maintain a bad faith action against the insurer for its alleged wrongful denial of medical benefits to her husband. As a dependent beneficiary enrolled by her husband under the contract, she had standing only to enforce her own right to health care benefits, but not her husband's. She was not an express beneficiary, but merely an incidental beneficiary, with regard to her husband's separate benefits under the contract. Foreseeability alone of harm to her was not sufficient to confer standing on her.

**(5) Insurance Contracts and Coverage § 111--Adjustment of Loss and Liability--Duty of Insurer to Act in Good Faith--Payment of Proceeds--Who Is "Claimant" Under Policy.** --A wife, who was separately insured as a dependent beneficiary under her husband's medical insurance policy, was not a "claimant" insofar as her husband's health care benefits were concerned, for purposes of standing to maintain an action for bad faith denial of benefits to her husband.

**(6) Insurance Contracts and Coverage § 123--Action for Bad Faith Denial of Medical Benefits--Standing of Insured's Spouse Predicated on Community Property Interests.** --A wife, who was not party to her husband's medical insurance policy, had no standing, based on her community property interest in the insurance contract or community property liability for the medical expenses incurred by her husband, to maintain a bad faith action against the insurer for alleged wrongful denial of benefits to her husband.

**COUNSEL:** Peter R. di Donato and Allan I. Shatkin for Plaintiffs and Appellants.

Hassard, Bonnington, Rogers & Huber and James H. Thompson, Jr., for Defendants and Respondents.

**JUDGES:** Opinion by Arabian, J., with Danielson, Acting P. J., and Croskey, J., concurring.

**OPINION BY:** ARABIAN

**OPINION**

[*1029] [**249] Introduction

This case raises the issue of whether a spouse who is not a party to the insurance [**250] contract has standing to maintain a bad faith action and related causes of action against the insurance company for wrongful denial of benefits to her insured husband. Plaintiff Denise Hatchwell appeals from the judgment entered against her following the grant of the motion of defendants Blue Shield of California (Blue Shield) and L.K. Lloyd & Associates (Lloyd) for summary adjudication on the ground that Denise was an improper party to the action arising out of a claim for medical benefits for her husband's open-heart surgery. Denise [***2] contends that as an intended beneficiary or as a "co-insured" of the insurance contract, she is a proper party to the action. Defendants contend that Denise is neither a party nor an express third party beneficiary to her husband's insurance contract and therefore lacks standing. We conclude Denise does lack standing and, accordingly, affirm the judgment.

Facts

In November 1981, Michael M. Hatchwell and Denise Hatchwell filed their second amended complaint against Blue Shield, Lloyd and the State Bar of California for breach of contract, fraud, bad faith conduct by an [*1030] insurance company (*Ins. Code, § 790.03, subd. (h)*), breach of fiduciary duties, breach of implied warranty and negligence.

The Hatchwells alleged the following: About September 1, 1979, Michael was enrolled in Plan "A" of Blue Shield's health care program, in reliance upon representations made by agents of defendants and their literature to the effect that Blue Shield utilized a system of health care payment based upon the "usual, customary, or reasonable fee" (UCR fee) as determined by Blue Shield. Blue Shield also represented that regional directories with listings of Physician Members were available. [***3] About April 30, 1980, in anticipation of Michael's impending heart surgery, Denise contacted Ms. Nadaka, a representative of Blue Shield's customer service department, to request a list of cardiologists who were subscribers of the Blue Shield plan. Ms. Nadaka "failed and refused to provide such a list," resulting in breach of the contract and preventing the Hatchwells from being able to take full advantage of Plan "A" which would pay 100 percent of his costs instead of the usual, customary, or reasonable fee for a nonsubscriber

cardiologist. Michael had his operation on May 8, 1980, and submitted claims to Blue Shield for bills in the amount of $ 6,565. Blue Shield paid $ 4,137.72. About June 1, 1980, Denise again contacted Ms. Nadaka, who informed her that payment would be based on the UCR fee schedule and that she could now send a list of subscriber cardiologists. Hatchwells continued to incur bills for postoperative care.

The complaint also alleged that Blue Shield and Lloyd made the representations and promises with no intention that the promises be performed, justifying punitive damages; Blue Shield violated *Insurance Code section 790.03, subdivsions (h)(1), (3), (5), (6),* [***4] *(7), (11)* and *(13),* [1] and breached its [*1031] [**251] fiduciary duties to plaintiffs; as administrator of the Blue Shield plan for members of the State Bar, Lloyd breached the implied warranty, and the State Bar and Lloyd negligently approved, supervised and administered the plan for Bar members.

1 *Insurance Code section 790.03, subdivision (h)* provides: "(1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.

". . . .

"(3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.

". . . .

"(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

"(6) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered.

"(7) Attempting to settle a claim by an insured for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application.

". . . .

"(11) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.

". . . .

"(13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement."

[***5] In October 1985, the defendants moved for summary adjudication seeking to dismiss plaintiff Denise on the ground that as a matter of law she had no contractual right to require Blue Shield to pay for her husband's health care benefits. Defendants supported the motion with evidence of the terms of the Blue Shield plan which defined an "Eligible Member" as "an individual member of the State Bar of California . . ."; a "Subscribing Member" as "an Eligible Person who has been enrolled and accepted by Blue Shield as a Member and has maintained his Blue Shield membership in accordance with this contract"; a "Dependent Member" as "a Subscribing Member's dependent who has been enrolled and accepted by Blue Shield as a Subscriber . . ."; and "Covered Person" as "either a Subscribing Member or a Dependent Member."

The Hatchwells opposed the motion, submitting excerpts from Denise's depositions and her declaration. Denise testified that she had previous work experience in the insurance business, telephoned Lloyd for information regarding changing insurance carriers, and spoke with Ms. Nadaka regarding subscriber cardiologists. [2] She also declared that all premiums paid to Blue Shield were [***6] paid with community funds.

2 Denise claims that this establishes that she "did the negotiating with Blue Shield . . . and received the fraudulent representations by Blue Shield. . .

."

The trial court granted defendants' motion for summary adjudication as to Denise, pursuant to the holding of *Fryer v. Kaiser Foundation Health Plan (1963) 221 Cal.App.2d 674 [34 Cal.Rptr. 688]*. Denise appeals. [3]

3 The State Bar is not a party to the appeal; the appeal of the judgment in its favor was dismissed.

Issue and Contentions

The sole issue upon review of the summary judgment is whether there is a triable issue of fact concerning Denise's standing to bring this action based upon the denial of medical benefits to her husband. [4]

4 Denise states the issue as follows: "Whether Plaintiff, Denise Hatchwell, may maintain the instant action against an insurer, its plan administrator, and the group, for breach of contract, bad faith, and related torts, involving the insurer's bad faith refusal to pay health benefits due her husband, where:

"(1) Denise negotiated and communicated with Defendants in contemplation of retaining Defendant, Blue Shield, as the family's health insurance carrier;

"(2) Denise reviewed and investigated the details and merits of Defendant's insurance (based upon her insurance background) and compared it to the family's former insurance policy;

"(3) Denise made the decision to purchase the policy as the family's health insurance plan;

"(4) All premiums paid to Defendant, Blue Shield, were paid with community property funds of Denise and Michael Hatchwell;

"(5) The community property of Denise and Michael Hatchwell was liable for the debts incurred by either spouse for medical expenses;

"(6) Denise contacted Defendants in regard to her husband's claim and significant representations were made directly to her, causing extreme emotional distress; and

"(7) Denise was a 'Covered Person' under the same insurance policy as her husband, as either a coinsured or a dependent beneficiary."

[*1032] [***7] Denise contends she that she was an intended beneficiary of the insurance contract. She also contends that she may maintain this action pursuant to her status as either a coinsured with her husband, Michael, or as a dependent beneficiary.

Blue Shield and Lloyd contend as follows:

"Under California law a person may pursue an independent cause of action for alleged bad faith only if she is a party to, or an express beneficiary of, the allegedly breached contract. Mrs. Hatchwell is neither.

". . . .

" [**252] A. To have standing, Mrs. Hatchwell must prove a contractual relationship.

"B. Mrs. Hatchwell is not a party to Mr. Hatchwell's contract.

"C. Mrs. Hatchwell is not an express third party beneficiary of Mr. Hatchwell's contract.

"D. Mrs. Hatchwell's community property interest does not give her standing.

"E. Mrs. Hatchwell's potential secondary liability for Mr. Hatchwell's debts does not give her standing.

"F. Mrs. Hatchwell is not an 'insured.'

"G. Foreseeability of possible harm to Mrs. Hatchwell does not give her standing."

[*1033] Discussion

A motion for summary judgment must be granted if the papers properly submitted by the parties show that there is no triable [***8] issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (*Code Civ. Proc., § 437c, subd. (c)*.)

**(1)** "The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution. ( *Eagle Oil & Ref. Co. v. Prentice (1942) 19 Cal.2d 553, 556 [122 P.2d 264]*.) Summary judgment is properly granted only when the evidence in support of the moving party establishes that

there is no issue of fact to be tried. (*Code Civ. Proc., § 437c*; *Lipson v. Superior Court (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822]*.)" ( *Mann v. Cracchiolo (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134]*.)

General principles of standing to sue for bad faith were summarized in *Austero v. National Cas. Co. (1976) 62 Cal.App.3d 511, 515 [133 Cal.Rptr. 107]*.)

**(2)** "It is now established that the unreasonable and bad faith refusal of an insurer to pay the valid claim of its insured gives rise to the insurer's liability in tort not only [***9] for the insured's pecuniary loss but also for his consequential emotional distress. ( *Silberg v. California Life Ins. Co. [1974] 11 Cal.3d 452, 460-461 [113 Cal.Rptr. 711, 521 P.2d 1103]*; *Gruenberg v. Aetna Ins. Co. [1973] 9 Cal.3d 566, 573-575 [108 Cal.Rptr. 480, 510 P.2d 1032]*; *Fletcher v. Western National Life Ins. Co. [1970] 10 Cal.App.3d 376, 401-402 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]*; see also *Merlo v. Standard Life & Acc. Ins. Co. [1976] 59 Cal.App.3d 5, 16 [130 Cal.Rptr. 416]*.) **(3)** The theory upon which liability is predicated is that such conduct constitutes a tortious breach of the implied-in-law duty of good faith and fair dealing arising out of the insurance policy. ( *Silberg v. California Life Ins. Co., supra*; *Gruenberg v. Aetna Ins. Co., supra, 9 Cal.3d at pp. 573-574*; *Fletcher v. Western National Life Ins. Co., supra*.) Although an action for bad faith [***10] breach of the covenant of good faith and fair dealing sounds in tort, the duty of good faith and fair dealing derives from and exists solely because of the contractual relationship between the parties. ( *Gruenberg v. Aetna Ins. Co., supra, 9 Cal.3d at pp. 576, 577-78*; *Truestone, Inc. v. Travelers Ins. Co. [1976] 55 Cal.App.3d 165, 170 [127 Cal.Rptr. 386]*.) Thus, one who is not a party to the underlying contract may not be held liable for breach of an implied covenant of good faith and fair dealing for as to him no such implied covenant exists. ( *Gruenberg v. Aetna Ins. Co., supra, 9 Cal.3d at p. 576*.)" ( *Austero v. National Cas. Co., supra, 62 Cal.App.3d 511, 515*.)

[*1034] 1. *Even if Denise is a "co-insured" or an intended beneficiary, she lacks standing.*

**(4a)** Denise claims that she is a "co-insured" or a "dependent beneficiary" of the insurance contract. The evidence establishes that Michael, as a member of the State Bar, was eligible to subscribe to the State Bar Group Plan provided by Blue Shield and administered [***11] by Lloyd. He enrolled and became a Subscribing Member. As a Subscribing Member, he was eligible for dependent benefits and enrolled Denise as a Dependent Subscriber.

[**253] Denise, however, was not a contracting party. [5] Someone who is not a party to the contract has no standing to enforce the contract or to recover extra-contract damages for wrongful withholding of benefits to the contracting party. As the court stated in *Austero v. National Cas. Co., supra, 62 Cal.App.3d 511*: "Whether for better or worse, the historical development of a tort is an important factor in determining its scope (see Prosser, Law of Torts (4th ed. 1971) pp. 19-21), and, thus far, liability for 'bad faith' has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recovery for 'bad faith' may be had. ( *Gruenberg v. Aetna Ins. Co., supra, 9 Cal.3d at p. 576*.)" (*Id., at pp. 516-517*.)

5 Denise's references to her testimony regarding her investigation of the plan and recommending it to her husband do not establish that she was a party to the contract.

[***12] Although she was eligible for health care benefits as a Dependent Subscriber, and as such may be termed a "co-insured" or "dependent beneficiary," as she urges, this is not sufficient to establish standing to sue for breach of contract and bad faith based upon the denial of benefits to Michael. A nonparty who is nevertheless entitled to policy benefits, such as an "insured" person under the terms of the policy or an express beneficiary, has standing only if she is the *claimant* whose benefits are wrongfully withheld. (See *Cancino v. Farmers Ins. Group (1978) 80 Cal.App.3d 335, 344-345 [145 Cal.Rptr. 503]*; *Blake v. Aetna Life Ins. Co. (1979) 99 Cal.App.3d 901 [160 Cal.Rptr. 528]*.)

Denise attempts to distinguish *Fryer v. Kaiser Foundation Health Plan, supra, 221 Cal.App.2d 674*, cited by the trial court, from her situation by emphasizing that *Fryer* concerned a husband and wife separately enrolled under two separate contracts. Mr. Fryer suffered a heart attack, was hospitalized and eventually died. Mrs. Fryer sued the health plan, alleging breach of contract for failure [***13] to pay certain medical bills and provide emergency ambulance service. The court held that Mrs. Fryer in her capacity as the surviving wife had no standing to enforce the breach. "The fact that [Mrs.

Fryer], as wife of the insured member, was also covered by a companion [*1035] contract is of no significance. Her rights under the second contract were only to have medical and hospital services performed for her own illnesses; that contract added nothing to the rights of William which are the ones herein sought to be enforced." ( *Id. at p. 680.*)

Denise's argument ignores the fact that the basis of her action is the denial of benefits for Michael. Her coverage as a dependent, like Mrs. Fryer's separate contract, does not give her standing to enforce Michael's contract rights. **(5)** (See fn. 6.) **(4b)** Although Denise is an insured person and an express beneficiary in regard to her own health care benefits, she is merely an incidental beneficiary in regard to Michael's benefits. [6]

6 Denise also claims to have the combined status as an insured and a claimant. For purposes of determining standing, Denise cannot be considered a "claimant," as she is not seeking health care benefits for herself.

[***14] Denise contends that as a "co-insured" she has standing even if she is not a claimant. The cases she cites, however, do not support that conclusion. In *Delos v. Farmers Insurance Group (1979) 93 Cal.App.3d 642 [155 Cal.Rptr. 843]*, Mr. and Mrs. Delos were joint insureds under an automobile insurance policy. The court held that the husband had standing to sue for emotional distress caused by the insurer's refusal to pay Mrs. Delos's uninsured motorist claim. "He was a party to the insurance contract and the effect upon him of the improper denial of his wife's claim was reasonably foreseeable." ( *Id. at p. 659*, citation omitted.) Unlike Mr. Delos, Denise is not a party to the contract. [7] Foreseeability alone is not sufficient. ( *Williams v. Transport Indemnity Co. (1984) 157 Cal.App.3d 953, 964 [203 Cal.* [**254] *Rptr. 868]*; action by spouse of a third party claimant.)

7 Furthermore, the insurance policy at issue in *Delos* was automobile insurance, not health care insurance.

[***15] In *Cancino v. Farmers Ins. Group, supra, 80 Cal.App.3d 335*, also relied on by Denise, the court held that the insurer's covenant of good faith and fair dealing was enforceable by plaintiff who was injured when struck while loading the insured motor vehicle. Plaintiff's claim under the policy was for uninsured motorist benefits, and his standing arose from the fact that he was an intended beneficiary of the contract and a claimant.

In *Truestone, Inc. v. Travelers Ins. Co. (1976) 55 Cal.App.3d 165, 170 [127 Cal.Rptr. 386]*, shareholders had standing to sue for extra-contract damages arising out of the insurer's failure to settle a claim against the corporation because they "equally with their closely held corporation, were parties to the insurance policy . . . ."

[*1036] 2. *Denise does not acquire standing based upon community property laws.*

**(6)** Relying primarily upon sister state cases, Denise contends that she may maintain the action pursuant to her community property interest in the contract and community property liability for the medical expenses debt incurred by her spouse.

In *Austero v. National Cas. Co., supra, 62 Cal.App.3d 511*, [***16] the court rejected this contention, stating: "Whatever plaintiff's property rights with respect to the policies and their proceeds may be, the fact remains that she is not a party to the contracts." ( *Id. at p. 517.*) (See also, *Williams v. Transport Indemnity Co., supra, 157 Cal.App.3d 953, 964*, at fn. 1.)

We decline to follow the principle endorsed by the South Carolina Supreme Court in *Ateyeh v. Volkswagen of Florence, Inc. (1986) 288 S.C. 101 [341 S.E.2d 378]*, holding that a spouse who is individually liable for her husband's medical expenses has sufficient interest in enforcement of the health insurance policy to enable her to maintain a cause of action for breach of contract and punitive damages. (*Id. at pp. 379-380.*) Such expansion of tort liability for breach of contract would be inappropriate in light of *Austero* and the fact that the community interest would seem sufficiently protected by the rights of the covered spouse.

In *Kenelia* v. *Glens Falls Ins. Co.. (1979) 171 N.J. Super. 144, [408 A.2d 144]*, the other out-of-state [***17] case cited by Denise, the result rests upon the language of the New Jersey "No-Fault" automobile liability insurance law, requiring coverage for "'[payment] of all reasonable medical expenses incurred as a result of personal injury sustained in an automobile accident.'" "[Since] the husband is liable for the cost of necessary medical services provided his wife as a result of this accident, he can reasonably be viewed as having

'incurred' these expenses under our No-Fault Act." ( *Id. at p. 146.*)

We conclude the superior court properly found that there is no triable issue of fact regarding Denise's standing and the defendants were entitled to judgment as a matter of law.

[*1037] Judgment affirmed.

# TAB 14

LEXSEE 150 CAL. APP. 4TH 181

**INFINET MARKETING SERVICES, INC., Cross-complainant and Appellant, v. AMERICAN MOTORIST INSURANCE COMPANY, Cross-defendant and Respondent. AMERICAN MOTORISTS INSURANCE COMPANY, Petitioner, v. THE SUPERIOR COURT OF ORANGE COUNTY, Respondent; INFINET MARKETING SERVICES, INC., Real Party in Interest.**

**G036312, G036248**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

***150 Cal. App. 4th 168; 58 Cal. Rptr. 3d 92; 2007 Cal. App. LEXIS 653; 2007 Cal. Daily Op. Service 4489; 2007 Daily Journal DAR 5699***

**April 6, 2007, Filed**

**SUBSEQUENT HISTORY:** Modified and rehearing denied by *Infinet Mktg. Servs. v. Am. Motorist Ins. Co., 2007 Cal. App. LEXIS 652 (Cal. App. 4th Dist., Apr. 6, 2007)*

**PRIOR HISTORY:** [***1] Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, W. Michael Hayes, Judge. Superior Court of Orange County, No. 04CC07426, No. 04CC09215, James M. Brooks, Judge.

**DISPOSITION:** Petition granted.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

Three client companies leased workers from an employee leasing company pursuant to an agreement by which the employee leasing company was to obtain workers' compensation insurance covering the leased workers. The client companies' injured workers were later denied worker's compensation coverage under the workers' compensation policy allegedly obtained by the employee leasing company. The client companies sued the marketing company, which had introduced the client companies to the employee leasing company. The marketing company tendered its own defense to the employee leasing company's carrier, contending it was a coemployer and therefore a third party beneficiary of the workers' compensation policy. When the defense was refused, the marketing company cross-complained against the insurer, claiming insurance bad faith. In one action, the trial court denied the insurer's motion for summary judgment on the cross-complaint. In a second action, the trial court granted the insurer's motion for summary judgment. (Superior Court of Orange County, Nos. 04CC07426 and 04CC09215, James M. Brooks, Judge.)

The Court of Appeal affirmed the summary judgment for the insurer and granted the insurer's petition for writ of mandate. The court held that the marketing company was not a third party beneficiary of the workers' compensation insurance contract under *Lab. Code, § 3602, subd. (d)*. There was no evidence of any other agreement between the marketing company and the employee leasing company whereby the employee leasing company agreed to obtain insurance on the marketing company's behalf. There was also no evidence the marketing company paid fees to the employee leasing company representing premiums for insurance. Thus, there was no evidence from which it could be concluded that [*169] the marketing company was of a class of persons for whose benefit the policy was purchased. Accordingly, the insurer had no duty to defend or indemnify the marketing company. Because the marketing company was neither a named insured nor a third party beneficiary of the policy, its cause of action for breach of the implied covenant of good faith and fair

dealing failed as well. Although an intended beneficiary of an insurance policy who is denied coverage may seek declaratory relief, the marketing company was not an intended beneficiary of the policy and thus had no standing to assert any rights under the policy. (Opinion by O'Leary, J., with Sills, P. J., and Moore, J., concurring.)

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Insurance Contracts and Coverage § 107.1--Liability and Indemnity Insurance--Obligation to Defend--Contractual Nature.**--A liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. But where there is no potential for coverage, there is no duty to defend. The duty to defend is contractual in nature. Furthermore, expectations of coverage must be reasonable in light of the plain language of the policy.

**(2) Workers' Compensation § 6--Exclusivity of Remedy--Exception--Employer's Failure to Secure Payment of Workers' Compensation.**--*Lab. Code, § 3602*, embodies the workers' compensation exclusive remedy rule. Every employer must secure workers' compensation insurance (*Lab. Code, § 3700*), and workers' compensation is the exclusive remedy for an injured worker against his or her employer. One exception to the exclusive remedy rule is when the employer fails to secure payment of workers' compensation (*Lab. Code, § 3706*). *Section 3602, subd. (d)*, provides only that when an employee is provided by his or her employer to a second employer, the second employer need not separately secure workers' compensation insurance if (1) he or she enters a valid agreement under which the original employer agrees to and does obtain workers' compensation coverage, and (2) the original employer in fact secures coverage under *Lab. Code, § 3700, subd. (a)* or *(b)*. [*170]

**(3) Workers' Compensation § 24--Actions Against Third Party Tortfeasors--Right to Indemnity--Beneficiary Status.**--Where there was no evidence from which it could be concluded that a marketing company was of a class of persons for whose benefit a workers' compensation policy was purchased, the insurer had no duty to defend or indemnify the marketing company. The marketing company was not a third party beneficiary of the insurance contract.

[2 Witkin, Summary of Cal. Law (10th ed. 2005) Insurance, §§ 70, 306.]

**(4) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Requirement of Privity of Contract.**--Privity of contract with the insurer is essential to an implied covenant action against the insurer. Liability for bad faith has been strictly tied to the implied in law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recovery for bad faith may be had. Thus, an insurer's duty of good faith and fair dealing is owed solely to its insured and, perhaps, any express beneficiary of the insurance policy.

**(5) Insurance Contracts and Coverage § 122--Declaratory Relief--Intended Beneficiary.**--An intended beneficiary of an insurance policy who is denied coverage may seek declaratory relief.

**(6) Contracts § 46--Actions--Contract for Benefit of Third Party--Intent.**--A third party's right to enforce covenants of a contract is predicated on the contracting parties' intent to benefit the third party. It is not enough that a literal interpretation of the contract would result in a benefit to the third party.

**COUNSEL:** Steven W. Murray; Cates Peterson LLP and Mark D. Peterson for Cross-complainant and Appellant for and Real Party in Interest InfiNet Marketing Services, Inc.

No appearance for Respondent.

Sedgwick, Detert, Moran & Arnold LLP, Frederick Douglas Baker, Brian D. Harrison, and Vanessa L. O'Brien for Cross-defendant and Respondent and for Petitioner.

**JUDGES:** O'Leary, J., with Sills, P. J., and Moore, J., concurring.

**OPINION BY:** [**93] O'Leary [*171]

**OPINION**

**O'LEARY, J.**--*Labor Code section 3602, subdivision (d)*, [1] allows an employer that leases or borrows an employee from another employer to fulfill its

statutory obligations to obtain workers' compensation insurance by contracting with the other employer for the other employer to obtain such coverage. In this case, three client companies allegedly leased workers from an employee leasing company pursuant to an agreement by [***2] which the employee leasing company was to obtain workers' compensation insurance covering the leased workers. The client companies' injured workers were later denied workers' compensation coverage under the workers' compensation policy allegedly obtained by the employee leasing company. The client companies sued the marketing company that introduced the client companies to the employee leasing [**94] company. The marketing company tendered its own defense to the employee leasing company's carrier contending it was a third party beneficiary of the workers' compensation policy. When a defense was refused, the marketing company cross-complained against the insurance company claiming insurance bad faith. In these consolidated actions we agree with the insurer that the marketing company is not a third party beneficiary of the insurance contract.

1 All further statutory references are to the Labor Code, unless otherwise indicated.

FACTS AND PROCEDURE

These consolidated cases involve employee leasing services provided [***3] by either Omne Staffing Services, Inc. (Omne Staffing), or Omne Staff Leasing Services, Inc. (Omne Leasing), to three client companies. 2 Omne Staffing is a Delaware corporation. Omne Leasing is a Florida corporation. InfiNet [*172] Marketing Services, Inc., doing business as InfiNet Insurance and Financial Network (InfiNet), is a Texas corporation in the business of providing marketing services to employee leasing companies.

2 Employee leasing companies (also sometimes called professional employer services) typically "contract[] with client companies to provide leased labor and labor-related services, i.e., payroll, safety and tax services and employment benefits, including workers' compensation insurance[]" for employees the client company already has. (*Diamond Woodworks, Inc. v. Argonaut Ins. Co. (2003) 109 Cal.App.4th 1020, 1030-1031 [135 Cal. Rptr. 2d 736]* (*Diamond Woodworks*), disapproved on other grounds in *Simon v. San Paolo U.S. Holding Co., Inc. (2005) 35 Cal.4th 1159, 1182-1183 [29 Cal. Rptr. 3d 379, 113 P.3d 63]*.) The fees the client company pays the employee leasing company cover the costs of premiums, and the arrangement brings down the effective cost of workers' compensation insurance to the client companies because the employee leasing company can usually purchase workers' compensation insurance at a better rate. "As long as the employee leasing company obtains such coverage for the leased workers, the client company has also 'secured the payment of compensation' and cannot be sued for tort damages by a leased worker who is injured while working for the client company. (... *§ 3602, subd. (d)* ... .)" (*Diamond Woodworks, supra, 109 Cal.App.4th at pp. 1030-1031*.)

[***4] In 2002, the predecessor of American Motorist Insurance Company (AMICO) issued workers' compensation and employer's liability policy No. 5BR08510700 (hereafter, the policy) to Omne Staffing. The policy requires AMICO to pay all workers' compensation benefits required by law to be paid by the named insured, and to defend the named insured in any proceeding against it for those benefits. Omne Staffing is the only named insured on the policy, and the policy contains no provision or endorsement for coverage of alternate or additional employers.

The client companies involved here include Suburban Plastering, Inc., doing business as Proline Plastering and Martin Bros./Marcowall (sometimes collectively referred to as Suburban), which are the plaintiffs in *Suburban Plastering v. InfiNet Insurance and Financial Network* (Super. Ct. Orange County, No. 04CC07426) (hereafter, the Suburban action). The other client company is R.C. Wendt Painting, Inc., which is the plaintiff in *R.C. Wendt Painting, Inc. v. InfiNet Insurance and Financial Network* (Super. Ct. Orange County, No. 04CC09215) (hereafter, the Wendt action). At the heart of both actions are the client companies' [***5] claims that promised workers' compensation insurance was not obtained, exposing them to civil liability when workers were injured.

*The Suburban Complaint*

In July 2004, Suburban filed its complaint against InfiNet (and other defendants) [**95] alleging various tort and statutory causes of action arising out of its relationship with Omne Staffing and InfiNet. The

Suburban complaint alleged that in January 2003, the two client companies (i.e., Suburban and Martin Bros.) had negotiated with Omne Staffing and InfiNet for Omne Staffing *and* InfiNet to act as coemployers of the client companies' employees and, among other things, procure workers' compensation insurance, process payroll, and submit payroll tax payments to federal and state authorities covering those employees. Although no written contract was fully executed, throughout 2003, the client companies paid Omne Staffing large sums of money (in the range of $10 million combined), which fees included the client companies' workers' compensation insurance premiums. By early 2004, the [*173] client companies learned Omne Staffing had not procured workers' compensation insurance covering their leased employees. Omne Staffing's assets [***6] had been seized by the federal government and criminal proceedings commenced against it. Apparently, by the time this action was commenced Omne Staffing and Omne Leasing were in bankruptcy, and they were not named as defendants.

InfiNet's answer to the Suburban complaint included a general denial of all allegations of the complaint. InfiNet also raised numerous affirmative defenses, including that the client companies had failed to mitigate their damages by "adequately [pursuing] worker's compensation insurance coverage which, on information and belief, was purchased for the benefit of [the client companies'] workers ... ."

*The Wendt Complaint*

Wendt also filed an action for misrepresentation, conversion, and breach of contract against InfiNet (and other defendants). The second amended complaint contained similar allegations to those in the Suburban complaint. Wendt alleged there was a business relationship between InfiNet and Omne Staffing regarding obtaining workers' compensation insurance for "workers assigned to [Wendt] by [Omne Staffing]." InfiNet represented to Wendt workers' compensation insurance for its leased workers "would be obtained by and through [its] [***7] business relationship with [Omne Staffing] ... ." Wendt and InfiNet entered into a contract concerning Omne Staffing's provision of leased workers to Wendt, and InfiNet had breached the agreement by failing to procure workers' compensation insurance. An insurance producer, First Union, issued certificates of insurance to Wendt indicating there was coverage for its leased workers, and Wendt paid premiums to Omne Staffing. But the policy that had been obtained did not cover Wendt's leased workers.

*InfiNet's Cross-complaints in the Suburban and the Wendt Actions*

In both the Suburban action and the Wendt action, InfiNet filed virtually identical cross-complaints against the client companies and AMICO, for declaratory relief and, as to AMICO, for breach of duty to defend and breach of the covenant of good faith and fair dealing. InfiNet alleged the workers' compensation policy issued by AMICO to Omne Staffing covered the employees leased to the client companies and the client companies had failed to compel AMICO to honor its obligations under the policy. [3]

3 Although both complaints allege the client companies' employee leasing agreements were with Omne Staffing, AMICO disputes this and suggests Omne Leasing, a separate legal entity, which is not a named insured, was the entity with which the client companies had contracted for employee leasing services. That dispute cannot be resolved on the record before us.

[***8] [*174] In both cross-complaints, InfiNet specifically described itself as an independent [**96] provider of marketing services for professional employer organizations, putting small to midsize companies together with companies like Omne Staffing. Omne Staffing would then act as the general employer for the client companies' workers, providing necessary administrative services and obtaining workers' compensation insurance. InfiNet alleged it "was only the 'matchmaker' between [Omne Staffing], as general employer, and [the client companies], which became special employers." InfiNet alleged the AMICO policy covered all persons who worked for Omne Staffing, and by law it covered the client companies' leased workers. InfiNet "denied that it is a general employer of any kind ... ."

InfiNet alleged the client companies' injured workers filed workers' compensation claims, which the client companies tendered to AMICO. But AMICO denied defense or indemnity coverage to the client companies. When the client companies then filed this action against InfiNet, InfiNet tendered its own defense to AMICO under the policy. AMICO denied InfiNet a defense or

indemnity because InfiNet was not an insured under [***9] the policy.

InfiNet's cross-complaint sought a declaration as to the client companies' and its own rights under the AMICO policy. It also alleged causes of action against AMICO for breach of the insurance contract (i.e., breach of the duty to defend), and breach of the implied covenant of good faith and fair dealing contained in the insurance policy.

*AMICO's Motions for Summary Judgment*

AMICO filed virtually identical motions for summary judgment in both cases arguing there was no triable issue of fact as to whether InfiNet was an insured under the policy. The face of the policy was unambiguous; the only named insured was Omne Staffing, and there was nothing on the face of the policy, or any other evidence, that InfiNet was an express or intended beneficiary of the policy. AMICO's undisputed facts included that AMICO issued the policy to Omne Staffing, and listed only Omne Staffing as a named insured. Omne Staffing and Omne Leasing were separate corporations, and AMICO denied coverage to InfiNet because it was not an insured under the policy.

In its opposition, InfiNet did not dispute the contents of the policy, or that Omne Staffing was the only named insured on the policy. [***10] InfiNet contended *section 3602, subdivision (d)*, as a matter of law, made it a third party beneficiary of the AMICO policy because it was alleged to be a co-general [*175] employer of Omne Staffing's leased employees. In its separate statement, InfiNet presented petitions filed by AMICO in three unrelated workers' compensation proceedings (i.e., not involving workers of Suburban, Martin, or Wendt), to join InfiNet as a party defendant because InfiNet was possibly also an employer of the injured workers involved in those proceedings.

*Ruling in the Suburban Action*

The trial court granted the motion for summary judgment in the Suburban action. It found AMICO had demonstrated InfiNet was not a named insured on the policy. Furthermore, InfiNet did not demonstrate it was an employer within the meaning of *section 3602, subdivision (d)*, [**97] and the petitions filed by AMICO in the three workers' compensation proceedings did not constitute evidence InfiNet was such an employer. The court noted InfiNet "does not argue that it is actually a co-employer," and to the contrary, had specifically alleged in its cross-complaint Omne Staffing was the general employer and it had merely acted as the [***11] "matchmaker between [Omne Staffing] and [the client company] leasing employees from [Omne Staffing]."

*Ruling in the Wendt Action*

A different trial court denied AMICO's motion for summary judgment in the Wendt action. As in the Suburban action, the trial court found AMICO had met its initial burden to show InfiNet was not entitled to coverage under its policy by showing InfiNet was not a named insured, shifting the burden to InfiNet to demonstrate coverage. But, the court agreed that under *section 3602, subdivision (d)*, *all* coemployers of Omne Staffing's leased employees were third party beneficiaries of the AMICO policy. The court concluded that although "InfiNet denie[d] it is an employer," the fact that AMICO "filed a Petition in the Workers Compensation case seeking a finding that InfiNet is an employer," created a triable issue of fact as to whether InfiNet in fact was a coemployer. 4

4 On October 16, 2006, InfiNet filed a request for judicial notice of two rulings from the San Diego Superior Court in other actions involving AMICO, InfiNet, and different client companies than those involved in these consolidated cases. The request for judicial notice is denied.

On March 29, 2007, after this case was taken under submission, AMICO filed a request for judicial notice of an unpublished appellate court opinion concerning a Santa Barbara County Superior Court action involving AMICO, InfiNet, and a different client company than those involved in these consolidated cases. (*InfiNet Marketing Services v. American Motorist Ins. Co.* (Mar. 26, 2007, B187714).) The request for judicial notice is denied.

[***12] *The Appeal and the Writ*

InfiNet appealed from the judgment in the Suburban case. AMICO filed a petition for writ of mandate in the Wendt case. In the writ proceeding, we [*176] issued an order to show cause and stayed the trial court proceedings on InfiNet's cross-complaint in the Wendt case, but left

the trial court with discretion to sever InfiNet's cross-complaint from Wendt's complaint. We subsequently ordered the two appellate proceedings consolidated.

DISCUSSION

The issues presented in the appeal and the writ are the same. InfiNet alleged AMICO breached the policy's duty to defend and implied covenant of good faith and fair dealing by refusing to defend and indemnify InfiNet on the underlying Suburban and Wendt complaints and in various workers' compensation proceedings. AMICO contends there was no potential for coverage for InfiNet, and it is entitled to summary judgment in both actions, because InfiNet was not a named insured on the policy and InfiNet failed to establish it is an intended third party beneficiary of the policy.

On appeal, we independently review summary judgment rulings. (*Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 860 [107 Cal. Rptr. 2d 841, 24 P.3d 493]*.) [***13] A defendant moving for summary judgment bears the burden of demonstrating that one of the elements of the cause of action "cannot be established, or that there is a complete defense . ... " (*Code Civ. Proc., § 437c, subd. (p)(2)*; see also *Aguilar v. Atlantic Richfield Co., supra, 25* [**98] *Cal.4th at p. 850*.) Once sufficient evidence is produced to meet this burden, the onus shifts to the plaintiff to provide sufficient evidence to demonstrate that a triable issue of material fact exists. (*Code Civ. Proc., § 437c, subd. (p)(2)*.)

*A. No Duty to Defend or Indemnify*

**(1)** It is well established "a liability insurer owes a broad duty to defend its *insured* against claims that create a potential for indemnity." (*Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal.4th 1076, 1081 [17 Cal. Rptr. 2d 210, 846 P.2d 792]*, italics added.) But where there is no potential for coverage, there is no duty to defend. (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co. (1994) 9 Cal.4th 27, 39 [36 Cal. Rptr. 2d 100, 884 P.2d 1048]*.)

The duty to defend is contractual in nature. (*Alex Robertson Co. v. Imperial Casualty & Indemnity Co. (1992) 8 Cal.App.4th 338, 343 [10 Cal. Rptr. 2d 165]*.) "Furthermore, expectations of coverage [***14] must be reasonable in light of the plain language of the policy. [Citation.]" (*Ibid.*) The policy in this case covers workers' compensation claims against the "insured," defined as "an employer named in Item 1 of the Information Page" of the policy, which in [*177] turn identifies only Omne Staffing as an insured. There is no other language in the policy identifying any additional insureds. Thus, both trial courts properly concluded AMICO had met its initial burden to establish there was no coverage for InfiNet under the policy because it was not a named insured. The burden then shifted to InfiNet to demonstrate the policy was expressly intended for its benefit. (*Civ. Code, § 1559* ["[a] contract, made expressly for the benefit of a third person, may be enforced by him"].)

For InfiNet to qualify as a third party beneficiary of the policy, it must show the policy was procured expressly for its benefit, or that it is a member of the class of persons for whose benefit it was procured. (*Diamond Woodworks, supra, 109 Cal.App.4th at pp. 1039-1040*.) It cannot enforce the contract just because it would receive some benefit from its performance. [***15] (*Ibid.*)

InfiNet seeks to establish coverage by invoking *section 3602, subdivision (d)*. It argues pursuant to that section, as a matter of law, it is in the class of person for whose benefit the insurance contract between Omne Staffing and AMICO was made. We disagree.

**(2)** *Section 3602* embodies the workers' compensation exclusive remedy rule. Every employer must secure workers' compensation insurance (*§ 3700*), and workers' compensation is the exclusive remedy for an injured worker against his or her employer. One exception to the exclusive remedy rule is when the employer fails to secure payment of workers' compensation. (*§ 3706*.)

*Section 3602, subdivision (d)*, provides "... an employer may secure the payment of compensation on employees provided to it by agreement by another employer by entering into a valid and enforceable agreement with that other employer under which the other employer agrees to obtain, and has, in fact, obtained workers' compensation coverage for those employees. In those cases, both employers shall be considered to have secured the payment of compensation within the meaning of this section and [s]ections 3700 and 3706 if there is a valid and enforceable [***16] agreement between the employers to obtain that coverage, and that coverage ... has been in fact obtained ... . [¶] Employers who have complied with this subdivision shall not be subject to

civil, criminal, or other penalties for failure to provide workers' compensation [**99] coverage or tort liability in the event of employee injury, but may, in the absence of compliance, be subject to all three."

[*178] InfiNet's argument is premised on its claim it is, or might be, a co-general employer of the injured workers. It argues that under *section 3602, subdivision (d)*, if an employee has more than one employer, if any one of those employers has workers' compensation insurance, then *all* employers, special or general, are deemed third party beneficiaries of the policy. That is not what the statute says.

*Subdivision (d)* was added to *section 3602* in 1995 (Assem. Bill No. 914 (1995-1996 Reg. Sess.)), in direct response to the *Douglas Oil* case. (*Douglas Oil Company of California v. Western Asphalt Service* (Feb. 10, 1994, B038895), review granted June 20, 1994, review dismissed Aug. 18, 1994 (S038017).) In that case, an injured worker was employed by a general employer (the employee leasing company), and a special employer (the client [***17] company). Pursuant to its agreement with the special employer, the general employer obtained workers' compensation insurance which provided benefits for the injured employee. Nonetheless, the injured worker brought a civil tort action against the special employer. *Douglas Oil* held to comply with *section 3700*, both the general employer (the employee leasing company) and the special employer (the client company) had to purchase a workers' compensation policy. Because the client company had not obtained its own policy, it was not protected by the exclusive remedy rule.

*Section 3602, subdivision (d)*, was enacted "to allow general and special employers to come to an agreement to ensure that the workers are fully covered by workers' compensation insurance but not to burden both employers with redundant premium payments." (Assem. Com. on Insurance, Rep. on Assem. Bill No. 914 (1995-1996 Reg. Sess.) May 2, 1995, p. 3; see also Sen. Com. on Industrial Relations, Analysis of Assem. Bill No. 914 (1995-1996 Reg. Sess.) July 12, 1995, p. 1 [purpose of *§ 3602, subd. (d)*, was "[t]o permit an employer to satisfy the requirement to secure the payment of workers' compensation for employees [***18] provided by another employer by entering into a 'valid and enforceable agreement' with the other employer to provide coverage for the workers"].)

Even were it to turn out that with regard to any particular injured worker, InfiNet was acting as a co-general employer, that does not make InfiNet an intended third party beneficiary of the AMICO policy by virtue of *section 3602, subdivision (d)*. [5] "*Section 3602, subdivision (d)*[,] provides only that [*179] when an employee is provided by his employer to a second employer, the second employer need not separately secure workers' compensation insurance if (1) he enters a valid agreement under which the original employer agrees to and does obtain workers' compensation coverage[,] and (2) the original employer in fact secures coverage under *subdivisions (a)* or *(b) of section 3700*." (*Huffman v. City of Poway (2000) 84 Cal.App.4th 975, 985, fn. 12 [101 Cal. Rptr. 2d 325]*; see also *Tilley v. CZ Master Assn. (2005) 131 Cal.App.4th 464, 480, fn. 10* [**100] *[32 Cal. Rptr. 3d 151]*.)

5 We specifically do not decide whether InfiNet was a co-general employer of the injured workers. Accordingly, we need not decide whether AMICO's allegations in unrelated workers' compensation proceedings constitute evidence InfiNet was a co-general employer. Nor need we consider the effect of InfiNet's specific allegations in its own pleadings in these consolidated cases it was merely a "matchmaker" and was not "a general employer of any kind."

[***19] InfiNet has not established it satisfies any of the statute's requirements. InfiNet did not contract with Omne Staffing to lease employees, nor did it contract with Omne Staffing to obtain workers' compensation insurance to cover workers InfiNet had borrowed. There is no evidence of any other agreement between InfiNet and Omne Staffing whereby Omne Staffing agreed to obtain insurance on InfiNet's behalf. There is no evidence InfiNet paid fees to Omne Staffing representing premiums for insurance.

InfiNet cites *Diamond Woodworks, supra, 109 Cal.App.4th 1020*, for the proposition that if one coemployer has procured workers' compensation insurance, then by law all coemployers are third party beneficiaries of the policy. Its reliance is misplaced. *Diamond Woodworks* addressed *section 3602, subdivision (d)*, in the very context the statute envisioned. A general employer (the employee leasing company) obtained workers' compensation insurance from the defendant insurance company pursuant to an agreement with the special employer (the client company). The

insurer later denied workers' compensation coverage for the client company's injured worker contending the client [***20] company was not an insured. The court concluded *the client company* was an intended third party beneficiary of the insurance policy. "[The employee leasing company] purchased the ... policy for the very purpose of fulfilling its promise to [the client company] to obtain workers' compensation insurance for the leased employees; the cost of the premiums was included in the fees [the client company] paid to [the employee leasing company]. The ... insurance policy provided the promised coverage, thereby securing not only for [the employee leasing company] but for [the client company] the protection of ... *section 3602, subdivision (d)*. This was not an incidental benefit to [the client company]; it was at the very heart of the employee leasing contract and the insurance policy." (*Diamond Woodworks, supra, 109 Cal.App.4th at pp. 1040-1041.*) It was in this context that the court observed that *section 3602, subdivision (d)*, "confers a third party beneficiary status as a matter of law on *client companies* ... whose leased employees are injured at work." (*Diamond Woodworks, supra, 109* [*180] *Cal.App.4th at p. 1042, fn. 16*, italics [***21] added.) Nothing in *Diamond Woodworks* suggests all possible general employers are third party beneficiaries of the policy as a matter of law.

**(3)** In conclusion, there is no evidence from which it could be concluded that InfiNet was of a class of persons for whose benefit the policy was purchased. Accordingly, AMICO had no duty to defend or indemnify InfiNet.

B. *No Breach of Covenant of Good Faith and Fair Dealing*

**(4)** Because InfiNet is neither a named insured nor a third party beneficiary of the AMICO policy, its cause of action for breach of the implied covenant of good faith and fair dealing fails as well. It is well established that " '[p]rivity of contract with the insurer is essential to an implied covenant action against the insurer.' [Citation.] 'Whether for better or worse ... liability for "bad faith" has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recovery for "bad faith" may be had. [Citation.] [¶] ... [¶] [Thus], an insurer's duty of good faith and fair dealing is owed solely to its insured and, perhaps, any [**101] express beneficiary [***22] of the insurance policy.' [Citation.]" (*Seretti v. Superior Nat. Ins. Co. (1999) 71 Cal.App.4th 920, 929 [84 Cal. Rptr. 2d 315].*)

C. *Declaratory Relief*

InfiNet contends it is entitled to maintain its declaratory relief cause of action against AMICO to obtain a declaration of the client companies' rights under the AMICO policy. We disagree.

*Code of Civil Procedure section 1060* provides "Any person interested under a ... contract, ... may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of *his or her rights and duties* in the premises, including a determination of any question of construction or validity arising under the instrument or contract." (Italics added.)

**(5)** An intended beneficiary of an insurance policy who is denied coverage may seek declaratory relief. (See *Omaha Indemnity Co. v. Superior Court (1989) 209 Cal. App. 3d 1266, 1270 [258 Cal. Rptr. 66].*) But as we have already explained, InfiNet is not an intended beneficiary of the policy. Accordingly, it has no standing to assert any rights [***23] under the policy.

[*181] **(6)** We specifically do not decide here whether the client companies are intended third party beneficiaries of the AMICO policy or whether there is coverage for their injured workers under the policy. Therefore, it would be improper to cite this opinion as supporting in any way the preclusion of coverage for the injured workers of the client companies. These summary judgment motions concern only InfiNet's cross-complaints against AMICO. That InfiNet would derive a tangential benefit from a finding there is coverage for third parties does not confer upon it standing to enforce the policy to which it is a complete stranger. "'A third party's right to enforce covenants of a contract is predicated on the contracting parties' intent to benefit the third party. [Citation.] It is not enough that a literal interpretation of the contract would result in a benefit to the third party. [Citation.]' [Citation.]" (*City of Hope v. Bryan Cave, L.L.P. (2002) 102 Cal.App.4th 1356, 1370 [126 Cal. Rptr. 2d 283].*) [6]

6 Since InfiNet is not an insured or a third party beneficiary we need not consider its argument concerning the enforceability of the policy's deductible endorsement.

[***24] DISPOSITION

*The Appeal: G036312*

The judgment in Orange County Superior Court case No. 04CC07426 is affirmed.

*The Writ: G036248*

The petition for writ of mandate in Orange County Superior Court case No. 04CC09215 is granted. Respondent court is ordered to vacate its decision denying the motion of American Motorists Insurance Company for summary judgment on the cross-complaint, enter a new and different order granting the motion, and enter judgment on the cross-complaint in favor of American Motorists Insurance Company. Our order to show cause is discharged and the stay is dissolved.

[*182] *Costs*

American Motorists Insurance Company is awarded its costs on the appeal and in the writ proceedings.

Sills, P. J., and Moore, J., concurred.

A petition for a rehearing was denied April 24, 2007, and the opinion was modified to read as printed above.