# TABS 15 - 20

# TAB 15

1 of 1 DOCUMENT

**INSTITUTE OF ATHLETIC MOTIVATION, Plaintiff and Appellant, v. UNIVERSITY OF ILLINOIS et al., Defendants and Respondents**

**Civ. No. 45057**

**Court of Appeal of California, First Appellate District, Division One**

***114 Cal. App. 3d 1*; *170 Cal. Rptr. 411*; *1980 Cal. App. LEXIS 2612***

**December 29, 1980**

**SUBSEQUENT HISTORY:** [***1] A petition for a rehearing was denied January 26, 1981, and appellant's petition for a hearing by the Supreme Court was denied February 25, 1982.

**PRIOR HISTORY:** Superior Court of Santa Clara County, No. 330236, George H. Barnett, Judge.

**DISPOSITION:** Insofar as the trial court by its instructions left to the jury the legal question as to whether a privileged occasion existed, that was arguable error, [5] but that error could hardly operate to plaintiff's detriment. Viewing the instructions as constituting in effect, a determination by the trial court that a privileged occasion did exist, we find no error. [6] And plaintiff is in no position to complain of the instructions which the court gave to the jury concerning malice, since the only instructions given on that topic were those which plaintiff proposed. [7] The judgment is affirmed.

5 Ordinarily, the existence of the privilege is a legal question for the court. ( *Kramer v. Ferguson (1964) 230 Cal.App.2d 237, 245 [41 Cal.Rptr. 61]*; *Gantry Constr. Co. v. American Pipe & Constr. Co. (1975) 49 Cal.App.3d 186, 197 [122 Cal.Rptr. 834]*; *Field Research Corp. v. Patrick (1973) 30 Cal.App.3d 603, 609 [106 Cal.Rptr. 473]*.) While the jury may be required to determine disputed facts relating to the existence of the privilege, it is for the court to decide whether the facts found by the jury made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged. (*Rest.2d Torts, § 619, com. a.*) Here, since the court did not do that, we regard the issue on appeal as whether there existed a privilege as a matter of law.

[***2]

6 We do not mean to suggest approval of the court's privilege instructions as exemplars. Indeed, as our opinion indicates, qualifications would have been appropriate. But where the instruction states the law correctly and is "'deficient merely by reason of generality,'" a party may not complain of its lack of completeness unless he requested an additional or qualifying instruction. ( *Agarwal* v. *Johnson, supra*, 25 Cal.3d 932, 948-949.)

7 Plaintiff complains that the court misled the jury by responding to a request for clarification by rereading all relevant instructions. We find no reversible error.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A corporation founded by two clinical psychologists to develop and market a questionnaire administered to coaches and athletes purporting to identify certain personality traits predictive of athletic success brought an action for defamation against a university and one of its professors. Plaintiffs alleged they had been defamed by a four-page letter critical of them which had been sent to numerous professional athletic organizations and to several sports magazines. One of the organization recipients of the letter republished in its periodical and sent it to basketball coaches throughout the United States. Defendant claimed his sole motivation in writing the letter was to inform "interested parties" about the

unreliability of plaintiffs' institute and its potential for abuse. At the conclusion of the trial the trial court ruled that the letter was defamatory as a matter of law, and the case went to the jury on the defenses of truth and privilege. The trial court instructed the jury on the privilege for communication to interested persons under *Civ. Code, § 47, subd. 3*. The jury returned a general verdict for defendants. (Superior Court of Santa Clara County, No. 330236, George H. Barnett, Judge.)

The Court of Appeal affirmed. The court held the scope of the privilege under *Civ. Code, § 47, subd. 3*, is not capable of precise or categorical definition, and that its application in a particular case depends on an evaluation of the competing interests which defamation law and the privilege are designed to serve. Insofar as the trial court by its instructions left to the jury the legal question as to whether a privileged occasion existed, the court held that it was arguable error, but the error was not detrimental to plaintiff, and viewing the instructions as constituting a determination by the trial court that a privileged occasion did exist, there was no error. (Opinion by Grodin, J., with Elkington, Acting P. J., and Newsom, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Libel and Slander § 50--Actions--Trial, Judgment, New Trial and Appeal--Province of Court and Jury--Fact and Opinion.** --Whether an allegedly defamatory statement constitutes fact or opinion is a question of law to be determined in light of the nature and content of the communication taken as a whole.

**(2) Libel and Slander § 2--Definitions and Distinctions--Communication to Interested Persons--Fair Comment.** --While at common law the privilege for communication to interested persons and the privilege of fair comment were distinct, fair comment being limited to assertions of opinion rather than fact, the two privileges are fused under the statutory privilege accorded by *Civ. Code, § 47, subd. 3*. Insofar as the privilege of fair comment protects only statements of opinion, as distinguished from assertions of fact, it is redundant in light of constitutional principles precluding defamation liability for the expression of opinion. However, the fair comment privilege has been extended so that, where malice is disproved, the privilege applies not only to comment (opinions) but to false statements of fact as well.

**(3) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons.** --The scope of the privilege for communication to interested persons under *Civ. Code, § 47, subd. 3*, is not capable of precise or categorical definition, and its application in a particular case depends on an evaluation of the competing interests which defamation law and the privilege are designed to serve. Determination that a privilege exists does not provide carte blanche for reckless or improperly motivated attacks on people's reputations. The occasion for the privilege may be abused and the protection of the privilege lost by the publisher's lack of belief, or of reasonable grounds for belief, in the truth of the defamatory matter, by excessive publication, by a publication of defamatory matter for an improper purpose, or if the defamation goes beyond the group interest

**(4a) (4b) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons.** --In a defamation action by an institute founded by two psychologists to develop and market a questionnaire purporting to identify personality traits predictive of athletic success, against a university and a professor who wrote a four-page letter critical of the questionnaire which was sent to numerous professional athletic organizations and to several sports magazines asserting that plaintiff were unwilling or unable to provide any evidence their questionnaire was reliable or valid, the trial court properly instructed the jury on the privilege for communication to interested persons under *Civ. Code, § 47, subd. 3*, where the persons to whom the publication was directed had a potential interest in the subject matter which went beyond general or idle curiosity, where plaintiffs could reasonably be expected to have adequate opportunity for response, where the subject matter of the communication did not involve some private aspect of individual or corporate life, and where the professor, in that capacity and as a student of sport psychology, was one who stood in such a relation to the persons interested as to afford reasonable ground for supposing the motive for his communication to be innocent. However, insofar as the instructions left to the jury the legal question as to whether a privileged occasion existed, there was arguable

error, but the error was not detrimental to plaintiff.

**(5) Libel and Slander § 50--Actions--Province of Court and Jury--Privilege.** --In defamation actions, the trial court, in determining whether there exists an occasion for privilege, has to deal with the law of general averages based on human experience and must shape a general policy to deal with a general problem. On the other hand, in the question of abuse of privilege, the problem is one of particulars.

**COUNSEL:** Beauzay, Hammer, Ezgar, Bledsoe & Rucka, W. Robert Morgan and Morgan, Zazueta, Morgan, Towery, Morgan & Spector for Plaintiff and Appellant.

Ropers, Majeski, Kohn, Bentley & Wagner, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Michael J. Brady and Mark G. Bonino for Defendants and Respondents.

**JUDGES:** Opinion by Grodin, J., with Elkington, Acting P. J., and Newsom, J., concurring.

**OPINION BY:** GRODIN

**OPINION**

[*4] [**412] In this action for defamation the jury returned a general verdict for defendants and plaintiff appeals, asserting instructional error. The [***3] principal issue presented concerns the scope of privilege for communication to interested persons under *Civil Code section 47*, *subdivision 3*. Finding no error warranting reversal, we affirm.

Plaintiff Institute of Athletic Motivation is a corporation founded in the late 1960's by two clinical psychologists, Bruce Ogilvie and Thomas Tutko, to develop and market what they termed an "Athletic Motivation Inventory" (AMI). The AMI, in the form of a questionnaire, is administered to coaches and athletes and purports to identify certain personality traits predictive of athletic success. It was the first "sports-specific" psychological test to be developed, and has been widely used by high schools, colleges, and private and professional athletic organizations.

Defendant Rainer Martens is a professor of physical education at the University of Illinois with a Ph.D. in sports psychology. He has himself published extensively on the subject of sports psychology and scientific [**413] research methodology. On January 10, 1975, Professor Martens wrote a four-page letter critical of the AMI which he sent to numerous professional athletic organizations and to several sports magazines. The [***4] letter asserted, among other things, that while Ogilvie and Tutko "frequently claimed to have supportive evidence" for the AMI, "surprisingly they have been unwilling or unable to provide any evidence that AMI . . . is reliable or valid." To offer on a commercial basis a psychological test that does not have "extensive public documentation of its reliability and validity" is, the letter claimed, an "unethical practice" according to standards of the American Psychological Association; and "[to] infer a cause and effect relationship on the basis of correlational evidence" was "an error only the novice graduate student would make." Use of the AMI by coaches was asserted to be a matter of concern "because incorrect diagnoses and prognoses may be detrimental to the athlete and coach," and "because Ogilvie and Tutko have failed to adhere to scientific protocol and ethical behavior for psychologists," leading coaches and athletes to be "deceived under the auspices [*sic*] that scientific evidence provides the basis for their diagnoses and prognoses." The letter called upon "the various sport organizations who directly work with coaches and athletes [to] initiate action to expose the [***5] AMI" by "[informing] their constituents of the potential harm that can result from [*5] unproven psychological testing. If nothing else, it is un unjustified expense."

One of the organizational recipients of the letter, the National Basketball Coaches Association, republished the letter in its periodical, "Basketball Bulletin," which is sent to basketball coaches throughout the United States. So far as appears from the record, none of the other recipients republished or made public use of its contents.

Plaintiff sued both Martens and the University of Illinois (the latter on a theory of respondeat superior), claiming that the letter contained false and defamatory statements. At trial, plaintiff sought to establish that studies confirming the reliability and validity of the AMI did in fact exist, that Martens knew or should have known of their existence at the time he sent the letter, and that Martens ignored evidence of their existence which plaintiff sent him in an effort to obtain retraction. Plaintiff also sought to convince the jury that Martens acted with ulterior or selfish motives in sending the letter, and in that regard introduced evidence to show that in the

[***6] same month he sent the letter he published a book on the subject of sports psychology, and two years later published his own, competing, sports inventory test. Martens, on the other hand, claimed that he reached his conclusion as to the unreliability of the AMI only after extensive research, consultation with other experts, and unproductive requests for information from persons connected with plaintiff; and that his sole motivation in writing the letter was to inform "interested" parties about the unreliability of the AMI and its potential for abuse.

**(1)** (See fn. 1.) At the conclusion of trial, the court ruled that the letter was defamatory as a matter of law "in that it has a tendency to affect the integrity and business reputation of the plaintiff," [1] and that [*6] the University of Illinois was responsible for its publication through ratification. Accordingly, the case [**414] went to the jury on the defenses, asserted by both defendants, of truth and privilege.

1 If Martens' letter were viewed as containing only an expression of his opinion concerning the statistical accuracy or sufficiency of particular studies proffered in support of the AMI, then of course the communication would be immune from liability on the principle that "[under] the First Amendment there is no such thing as a false idea." ( *Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 339 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997]*; *Gregory v. McDonnell Douglas Corp. (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425].*) Respondents do not contend for that proposition, however, and the letter's assertion that Ogilvie and Tutko were unwilling or unable to provide "any evidence" of reliability or validity could reasonably be understood, and was arguably intended, as meaning not simply that particular studies were inadequate but that there were no studies at all. Whether an allegedly defamatory statement constitutes fact or opinion is a question of law, to be determined in light of the nature and content of the communication taken as a whole. ( *Gregory v. McDonnell Douglas Corp., supra, at p. 601.*)

[***7] On the issue of privilege, defendants submitted various instructions based upon *Civil Code section 47*, *subdivision 3* and the case law under that section. [2] Initially, plaintiff proposed a supplementary instruction to the effect that "[a] common interest in the subject matter must be demonstrated between the person communicating and the person reading the communication before this privilege is established." Later, however, plaintiff withdrew all requests for instructions relating to privilege, contending that the defense of privilege "does not exist in a situation like this." The trial court nevertheless gave the instructions on privilege proposed by defendants, with certain modifications, and it is these instructions which constitute the principal focus of plaintiff's appellate attack. [3] Jury instructions regarding the existence of a qualified privilege, plaintiff argues, should have been refused as a matter of law.

2 Defendants do not contend that plaintiff is a "public figure" within the meaning of federal constitutional doctrine ( *New York Times Co. v. Sullivan (1964) 376 U.S. 254 [11 L.Ed. 686, 84 S.Ct. 710, 95 A.L.R.2D 1412]*; *Curtis Publishing Co. v. Butts (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]*; *Gertz v. Robert Welch, Inc., supra, 418 U.S. 323*), and the jury was not instructed under that doctrine. In *Vegod Corp. v. American Broadcasting Companies, Inc. (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14]*, the California Supreme Court held that a corporation does not become a public figure subject to the *New York Times* rule simply because it sells goods to the public and advertises the sale: "While availability of goods for sale and their quality are matters of public interest, this is not the test." ( *Id., at p. 769.*) The court expressed no view, however, as to whether the statements in that case were privileged under California law. ( *Id., at p. 770, fn. 1.*)

Recent case law suggests that even private individuals suing for defamation may be precluded from recovery as a matter of constitutional doctrine, and apart from any privilege, unless it can be shown that the defendant was negligent in failing to ascertain the falsity or defamatory character of the publication. *Gertz* declared that states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehoods injurious to a private individual "so long as they do not impose liability without fault" (*418 U.S. at p. 347 [41 L.Ed.2d at p. 809]*), and while *Gertz* involved media defendants some

courts have found the principle applicable to nonmedia defendants as well. (E.g., *Jacron Sales Corp., Inc. v. Sindorf (1976) 276 Md. 580 [350 A.2d 688, 697]*; *Sewell v. Brookbank (1978) 119 Ariz. 422 [581 P.2d 267].*) This is also the Restatement view. (*Rest.2d Torts, § 580B, com. e.* But cf. *Wheeler v. Green (1979) 286 Ore. 99 [593 P.2d 777]*; *Calero v. Del Chemical Corp. (1975) 68 Wis.2d 487 [228 N.W.2d 737]*; Shiffrin, *Defamatory Non-Media Speech and First Amendment Methodology* (1978) 25 UCLA L.Rev. 915.) Defendants sought no instructions based on *Gertz*, however, and no such instructions were given. Accordingly, we are not called upon to consider whether or to what extent these constitutional principles may require modification of California defamation law.

[***8]

3 The jury was instructed in the language of *section 47, subdivision 3*, and in addition was instructed as follows: "If it is determined that Dr. Rainer Martens was acting in the common interests of the field of sports psychology and that the communication in question was reasonably calculated to protect or further the interests of sport psychology in general at the time that the statements were made then a privilege attaches and a verdict for the defendants must be returned. However, the privilege available may be lost if the defendant abuses the privilege by excessive publication or the inclusion of immaterial matters which have no bearing upon the interest sought to be protected or if the statements are actuated by malice." The jury was also instructed that if it found the plaintiff's activities were of "legitimate interest to the defendants and to the recipients of the January 10, 1975 paper, then you are instructed that the defendants could legitimately comment upon and criticize the Institute's activities even though the criticism adversely affected the Institute's reputation and business." Finally, the jury was given instructions on malice which had been proposed by plaintiff.

[***9] [*7] Discussion

*Civil Code section 47, subdivision 3* provides that a publication or broadcast is privileged if made: "In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

[**415] The code affords no definition of the term "interested" and the case law reflects an eclectic approach to its interpretation. One of the earliest cases is *Snively v. Record Publishing Co. (1921) 185 Cal. 565 [198 P. 1]*, involving the publication in a newspaper of a cartoon which imputed dishonesty to the Los Angeles Police Chief. The court held that the citizens of Los Angeles were "interested" within the meaning of *section 47, subdivision 3*, and that the newspaper's relation to the citizens was such as to afford "a reasonable ground for supposing the motive for the communication innocent," not because the publication was made in a newspaper but because "the official conduct of public officers, especially [***10] in a government by the people, is a matter of public concern of which every citizen may speak in good faith and without malice." (*185 Cal. at p. 571.* See also *Maher v. Devlin (1928) 203 Cal. 207, 281-284 [263 P. 812]*; cf. *Stevens v. Storke (1923) 191 Cal. 329 [216 P. 371].*)

In *Emde v. San Joaquin County etc. Council (1943) 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916]*, the Supreme Court had occasion to consider *section 47, subdivision 3* in the context of an allegedly false and defamatory publication concerning an employer involved in a labor dispute with a union, and appearing in the Stockton Labor Journal, a weekly newspaper devoted to the interests of organized labor. The court [*8] concluded, without extensive discussion, that "since the comment was published in a newspaper devoted exclusively to the interests of organized labor, its publication was conditionally privileged." ( *Id., at p. 161.*)

Five years later, the court in *Brewer v. Second Baptist Church (1948) 32 Cal.2d 791 [197 P.2d 713]*, confronted a suit brought by two members of a church against the pastor and two of its lay leaders who, plaintiffs contended, were responsible [***11] for defamatory and false statements contained in charges brought against them before the church membership. The plaintiffs were expelled on the basis of the charges, and a press release reporting the action of the church was given the local press. On the question of privilege, the court stated: "Ordinarily, the common interest of the members

of a church in church matters is sufficient to give rise to a qualified privilege to communications between members on subjects relating to the church's interest. [Citations.] A privilege would exist in this case if the publication had been made without malice and the occasion had not been abused." ( *Id., at pp. 796-797.*)

In *Maidman v. Jewish Publications, Inc. (1960) 54 Cal.2d 643 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439]*, the court held that an editorial published in a newspaper principally directed to the Jewish community in Los Angeles, and containing defamatory statements about a prominent member of that community in relation to the Jewish observances, was conditionally privileged within *section 47, subdivision 3.* **(2)** (See fn. 4.) The court observed: "Although the editorial is libelous *per se*, the defendants [***12] properly contend that the complaint itself reveals the existence of the defense of 'fair comment.' 'It is not only the privilege but the duty of every citizen and every newspaper in the community to fairly and impartially criticize the faults and misconduct of public officers, . . .' [Citation.] Statements of opinion, although of a defamatory nature, are privileged in California under *section 47, subdivision 3*, of the Civil Code. [Citations.] Maidman held a position of importance in the Southern California Jewish community. It was therefore of legitimate interest to members of that community, who would be the most likely readers of the defendant newspaper, to know whether Maidman was qualified for his position. [Citation.]" ( *Id., at pp. 651-652.*) 4

4 At common law, the privilege for communication to interested persons and the privilege of fair comment were distinct, the latter being limited to assertions of opinion rather than fact. (See 1 Harper & James, The Law of Torts (1956) § 5.28, p. 456 et seq.) In California, the two privileges have been fused under the statutory privilege accorded by *section 47, subdivision 3.* Insofar as the privilege of fair comment protects only statements of opinion, as distinguished from assertions of fact, it has proved to be redundant in light of constitutional principles which preclude defamation liability for the expression of opinion. (See fn. 3, *ante*.) In California, however, the cases have extended the fair comment privilege so that, where malice is disproved, the privilege applies not only to comment (opinions) but to false statements of fact as well. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 310, p. 2580.) *Maidman* itself involved what could appropriately be characterized as false assertions of fact, i.e., the implication that plaintiff, in his professional capacity as a lawyer, deliberately misled a court as to the nature of a religious holiday. (*54 Cal.2d at p. 651.*)

[***13] [*9] [**416] Court of Appeal decisions have held *section 47, subdivision 3* to apply to a variety of special relationships, e.g., to communications by an employer to its employees regarding alleged misconduct by a fellow employee, in order to explain the reasons for that employee's termination and thus preserve employee morale ( *Deaile v. General Telephone Co. of California (1974) 40 Cal.App.3d 841 [115 Cal.Rptr. 582]*); a complaint by a physician to a local bar association of allegedly unethical conduct by an attorney member ( *Katz v. Rosen (1975) 48 Cal. App.3d 1032 [121 Cal.Rptr. 853]*); and a complaint by parents of school pupils, addressed to the principal and asserting misconduct of a teacher. ( *Martin v. Kearney (1975) 51 Cal.App.3d 309 [124 Cal.Rptr. 281]*. See generally, 4 Witkin, *op. cit. supra* (1980 supp.) § 307 p. 128.)

More broadly, articles appearing in a newspaper of general circulation and describing a raid on a house of prostitution were held to be within the scope of *section 47, subdivision 3*, despite the claim that they were partly false, on the ground that "the articles were published during times of war in a community where [***14] extensive war activities were being conducted, both civilian and military, and where the welfare of those engaged therein was a matter of vital concern to every right-thinking person" ( *Glenn v. Gibson (1946) 75 Cal.App.2d 649, 659 [171 P.2d 118]*). The decision relied in part upon the comment to former Restatement of Torts section 598, to the effect that "An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that (a) facts exist which affect a sufficiently important public interest . . . ."

In *Williams v. Daily Review, Inc. (1965) 236 Cal.App.2d 405 [46 Cal.Rptr. 135]*, plaintiffs, engineering contractors on a job with the City of Hayward, complained of a newspaper article which insinuated they were responsible for delay in completion of a street repair project [*10] and were incompetent, both in the preparation of their bids and in the performance of the job. In upholding the trial court's

instruction to the jury that the communication was privileged under *section 47, subdivision 3*, this court reasoned as follows: "In California the 'fair comment' privilege is encompassed within the provisions of subdivision 3 [***15] of *section 47* . . . . It has been held that this qualified privilege exists *whether the publication be in the form of opinion or of false statements of fact* . . . . [para. ] *The crucial issue involved in determining the applicability of the 'fair comment' privilege is whether or not the publication was made in the public interest* . . . . [*Contrary*] *to plaintiffs' contention, the scope of the term 'public interest' in California is not limited to matters relating solely to public officials*. Both the cases of *Glenn* and *Maidman* applied the privilege to statements defaming *private individuals, where the subject matter of the article was determined to be of public interest or the defamed individual of renown among a certain interest group*." ( *Id., at pp. 416-417*, italics added. For similar broad applications of the *§ 47, subd. 3* privilege, see *Toney v. State of California (1976) 54 Cal. App.3d 779, 793 [126 Cal.Rptr. 869]*; *Lagies v. Copley (1980) 110 Cal.App.3d 958, 968 [168 Cal.Rptr. 368]*.)

The *section 47, subdivision 3* privilege is not without limits, however, as recently exemplified in *Rancho La Costa, Inc. v. Superior* [***16] *Court (1980) 106 Cal.App.3d 646 [165 Cal.Rptr. 347]*. In that case, owners and operators of a resort sued the publishers of a national magazine over an article which accused them of involvement with organized crime and sought to implicate them in the "Watergate" scandal, nationwide bank [**417] failures, securities frauds, criminal use of union monies and pension funds, as well as the swindle of many others, including churches. The court stated: "The state conditional privilege of *section 47(3)* does not apply to a publication by a magazine or newspaper merely because it relates to a matter which may have general public interest . . . . [para. ] The word 'interested' as used in the statute refers to a more direct and immediate concern. That concern is something other than mere general or idle curiosity of the general readership of newspapers and magazines." ( *Id. at pp. 664-665*.) Distinguishing cases which applied the *section 47, subdivision 3* privilege to defamatory comments related to public officials, and to publications "limited to a local or a special interest group and related to matters of special concern" ( *id., at pp. 666-667*), the court reasoned that "[whatever] [***17] privilege is accorded defendants under *Civil Code section 47(3)*, it must yield to the plaintiffs' constitutional rights of privacy." ( *Id., at p. 667*.) The court found extended discussion of the inapplicability of *section 47, subdivision 3* [*11] unnecessary "because the only basis upon which defendants seek the benefit of the statute is by saying that the public at large, and hence that part thereof which constitutes its readership, is interested generally in the fight against organized crime. There being no specific evidence of any particular or specific subject matter of communication, no recital of the inadequacy of the evidence on the application of the section is necessary." (*Ibid.*)

**(3)** The lesson we deduce from these cases is that the scope of the privilege under *section 47, subdivision 3* is not capable of precise or categorical definition, and that its application in a particular case depends upon an evaluation of the competing interests which defamation law and the privilege are designed to serve. The Restatement Second of Torts (§ 595), seeking to formulate a general rule, suggests that an occasion is conditionally privileged "if the circumstances induce a correct [***18] or reasonable belief that (a) there is information that affects a sufficiently important interest of the recipient or a third person, and (b) the recipient . . . is a person to whom its publication is otherwise within the generally accepted standards of decent conduct." In addition, the Restatement suggests a privilege exists "if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." (§ 596.)

Harper and James in The Law of Torts, *supra*: "The occasion is privileged in all these cases when the interest which the defendant's act tends to protect or advance is sufficiently important and the harm threatened thereto is sufficiently great to require or at least justify withdrawal of the legal protection ordinarily given to the plaintiff's interest according to a social policy based upon communal standards of interest value and decent conduct." (§ 5.25, pp. 435-436.) And Professor Eldredge: "The common interest [to be shared by the recipient] must be a legitimate interest, *i.e.*, an interest which the law [***19] recognizes as worthy of protection and not an interest which springs from and seeks to gratify idle curiosity alone. 'The word "interest" as used in the cases, is not used in any technical sense. It is used in the broadest popular sense, as when we say that a man is

"interested" in knowing a fact -- not interested in it as a matter of gossip or curiosity, but as a matter of substance apart from its mere quality as news.' 'So long as the interest is of so tangible a nature that for the common convenience and welfare of society, it is expedient to protect it, it will come within the rule.'" (Eldredge, The Law of Defamation (1978) § 87, at p. 481.)

[*12] Determination that a privilege exists under *section 47, subdivision 3* does not, of course, provide carte blanche for reckless or improperly motivated attacks on people's reputations. The occasion for the privilege "may be abused and the protection of the privilege lost, by the publisher's lack of belief, or of reasonable grounds for belief, in the truth of the defamatory matter, by [**418] excessive publication, by a publication of defamatory matter for an improper purpose, or if the defamation goes beyond the group interest." [***20] ( *Emde v. San Joaquin County etc. Council, supra, 23 Cal.2d 146, 154-155*; *Brewer v. Second Baptist Church, supra, 32 Cal.2d 791, 797.*) "Thus the privilege is lost if the publication is motivated by hatred or ill will toward plaintiff [citations], or by any cause other than the desire to protect the interest for the protection of which the privilege is given. [Citations.] Although there are situations where the protection of the interest involved may make it reasonable to report rumors or statements that the publisher may even know are false [citations], ordinarily the privilege is lost if defendant has no reasonable grounds for believing his statements to be true." ( *Brewer v. Second Baptist Church, supra, at p. 797.* See also *Stationers Corp. v. Dun & Bradstreet, Inc. (1965) 62 Cal.2d 412, 418 [42 Cal.Rptr. 449, 398 P.2d 785]*; *MacLeod v. Tribune Publishing Co. (1959) 52 Cal.2d 536, 552 [343 P.2d 36]*; cf. *Agarwal v. Johnson (1979) 25 Cal.3d 932, 944-945 [160 Cal.Rptr. 141, 603 P.2d 58]*; *Sanborn v. Chronicle Pub. Co. (1976) 18 Cal.3d 406, 413-414 [134 Cal.Rptr. 402, 556 P.2d 764].*)

**(4a)** In this case, unlike *Rancho La* [***21] *Costa*, the communication was not directed toward the world at large, but mainly toward those involved as professionals in the field of athletics. And those to whom it was directed had a potential interest in the subject matter which went well beyond general or idle curiosity. The coaches who comprised the various organizational recipients of Martens' letter constituted a group with a special concern for the subject matter of the communication: depending upon how they evaluated it, the communication could affect the manner in which they conducted their professional activities. If the contents of the communication were true, it was of professional importance for them to know it.

Moreover, the context of the communication was such that, unlike the situation in *Rancho La Costa*, the subjects of the alleged defamation could reasonably be expected to have adequate opportunity for response. The record is replete with references to professional conferences and publications in which the subject of sports testing was discussed. Indeed, the representative of the National Basketball [*13] Coaches Association who wrote Martens to advise him that his letter would be used in a forthcoming [***22] bulletin, made reference to the fact that Tutko "has twice talked at our National Convention, and had standing-room audiences with a great reception for his presentation." The primary focus of the communication was an academic-professional marketplace of ideas.

*Rancho La Costa* is also distinguishable for the substantiality of the privacy interests there implicated and stressed by the court. Here the subject matter of the communications did not involve some private aspect of individual or corporate life. Plaintiff entered the arena of public controversy by offering the AMI to the athletic community and by representing it as a valid indicator of behavioral response. The subject matter of the communication was directly related to that representation. (Cf. *Mashburn v. Collin (La. 1977) 355 So.2d 879*; Annot., 96 A.L.R.3d 609.)

Finally, Martens in his capacity as professor and student of sports psychology was one who stood in such a relation to the persons interested as to afford reasonable ground for supposing the motive for the communication to be innocent. That is not to say that his motive was in fact innocent, or that there was not evidence from which the jury might [***23] have concluded that his motives were selfish, just as there was evidence from which the jury might have concluded that Martens did not have reasonable basis for believing the statements to be true, or that he abused the privilege by disseminating the communication to an unreasonably broad group of recipients or by including in his communication statements not reasonably necessary to further the interests which he allegedly sought to protect. Those, however, were questions for the jury. **(5)** In determining whether there exists an occasion for privilege, "the courts . . . [**419] have to deal with the law of general

averages based on human experience and must shape a general policy to deal with a general problem. On the other hand, in the question of abuse of privilege, the problem is one of particulars." (1 Harper & James, The Law of Torts, *supra*, § 5.25, p. 438.)

**(4b)** Insofar as the trial court by its instructions left to the jury the legal question as to whether a privileged occasion existed, that was arguable error, [5] but that error could hardly operate to plaintiff's [*14] detriment. Viewing the instructions as constituting in effect, a determination by the trial court [***24] that a privileged occasion did exist, we find no error. [6] And plaintiff is in no position to complain of the instructions which the court gave to the jury concerning malice, since the only instructions given on that topic were those which plaintiff proposed. [7] The judgment is affirmed.

5 Ordinarily, the existence of the privilege is a legal question for the court. ( *Kramer v. Ferguson (1964) 230 Cal.App.2d 237, 245 [41 Cal.Rptr. 61]*; *Gantry Constr. Co.* v. American Pipe & Constr. Co. *(1975) 49 Cal.App.3d 186, 197 [122 Cal.Rptr. 834]*; *Field Research Corp. v. Patrick (1973) 30 Cal.App.3d 603, 609 [106 Cal.Rptr. 473]*.) While the jury may be required to determine disputed facts relating to the existence of the privilege, it is for the court to decide whether the facts found by the jury made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged. (*Rest.2d Torts, § 619, com. a.*) Here, since the court did not do that, we regard the issue on appeal as whether there existed a privilege as a matter of law.

[***25]

6 We do not mean to suggest approval of the court's privilege instructions as exemplars. Indeed, as our opinion indicates, qualifications would have been appropriate. But where the instruction states the law correctly and is "'deficient merely by reason of generality,'" a party may not complain of its lack of completeness unless he requested an additional or qualifying instruction. ( *Agarwal v. Johnson, supra, 25 Cal.3d 932, 948-949.*)

7 Plaintiff complains that the court misled the jury by responding to a request for clarification by rereading all relevant instructions. We find no reversible error.

# TAB 16

**FRANK N. JONES et al., Plaintiffs and Appellants, v. AETNA CASUALTY AND SURETY COMPANY, Defendant and Respondent.**

**No. A060386.**

**COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVISION THREE**

*26 Cal. App. 4th 1717*; *33 Cal. Rptr. 2d 291*; *1994 Cal. App. LEXIS 773*; *94 Cal. Daily Op. Service 5820*; *94 Daily Journal DAR 10549*

**July 26, 1994, Decided**

**PRIOR HISTORY:** [***1] Superior Court of Contra Costa County, No. C92-01442, David A. Dolgin, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Plaintiffs leased property to operate a restaurant, and pursuant to the lease, the lessor was obligated to maintain rental income insurance, at plaintiffs' expense, providing coverage for damage to the premises. The premises subsequently suffered water damage, causing plaintiffs to vacate. Plaintiffs notified the insurer of the loss, but the insurer failed to provide coverage benefits for loss of rental income or for damage to the structure, and the lessor ultimately sued plaintiffs for nonpayment of rent and for structural damage. Plaintiffs then sued the insurer in the present action for tortious breach of insurance contract, alleging breach of the insurer's obligations to plaintiffs as implied-in-law coinsureds and as third party beneficiaries under the policy. The insurer maintained that plaintiffs had no standing to sue, and the insurer's general demurrer to plaintiffs' amended complaint was sustained without leave to amend. (Superior Court of Contra Costa County, No. C92-01442, David A. Dolgin, Judge.)

The Court of Appeal affirmed. It held that the trial court properly sustained the insurer's demurrer without leave to amend, since plaintiffs had no standing to sue the insurer. Plaintiffs did not allege they were contracting parties for the policy, nor did they allege they were claimants. Rather, they asserted standing as implied-in-law coinsureds. While plaintiffs relied on subrogation principles, the principles governing subrogation by an insurer are equitable and have no application to a tort claim for breach of the covenant of good faith and fair dealing. Liability for bad faith has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recovery for bad faith may be had. The court further held that plaintiffs had no standing to sue the insurer as third party beneficiaries under the policy. While *Civ. Code, § 1559*, provides for enforcement of a contract by a third party beneficiary, a third party may qualify as a beneficiary only where the contracting parties intended to benefit the third party and such intent appears on the terms of the contract. The statute excludes enforcement of a contract by persons incidentally or remotely benefited by it. The fact that plaintiffs would have received some benefit if the insurer indemnified the lessor for loss of rental income only made plaintiffs incidental beneficiaries. The implied covenant of good faith and fair dealing was intended to benefit the lessor; the policy and surrounding circumstances did not show the insurer and lessor intended plaintiffs to benefit. (Opinion by Merrill, J., with White, P. J., and Chin, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Appellate Review § 128--Scope of Review--Function of Appellate Court--Rulings on Demurrers.** --The appellate court's review of the sufficiency of a complaint against a general demurrer admits all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law.

**(2) Appellate Review § 128--Scope of Review--Function of Appellate Court--Rulings on Demurrers Sustained Without Leave to Amend.** --On appeal from the judgment following the sustaining of a general demurrer without leave to amend, a reviewing court must determine whether the facts as pleaded state a cause of action on any legal theory, and decides whether there is a reasonable possibility that the defect can be cured by amendment. If there is no such possibility, an abuse of discretion is not shown and the reviewing court affirms the trial court.

**(3) Insurance Contracts and Coverage § 123--Actions--Parties--Standing of Nonparties to Enforce Contract.** --While an action for breach of the covenant of good faith and fair dealing sounds in tort, the duty of good faith and fair dealing arises from and exists solely because of the contractual relationship between the parties. Thus, someone who is not a party to the contract has no standing to enforce it or to recover extracontractual damages for the wrongful withholding of benefits to the contracting party. However, in the context of insurance policies, a nonparty who is nevertheless entitled to policy benefits, such as an "insured" person under the terms of the policy or an express beneficiary, has standing only if he or she is the claimant whose benefits are wrongfully withheld.

**(4a) (4b) Insurance Contracts and Coverage § 123--Actions--Parties--Tortious Breach of Contract--Standing as Implied-in-law Coinsureds.** --In an action by plaintiff lessees against an insurer for tortious breach of an insurance contract, the trial court properly sustained the insurer's demurrer without leave to amend, since plaintiffs had no standing to sue the insurer. Under the lease provisions, the lessor had to maintain rental income insurance, at plaintiffs' expense, for damage to the leased premises. When plaintiffs notified the insurer of water damage that resulted in plaintiffs' vacation of the premises, the insurer failed to provide coverage. However, plaintiffs did not allege they were contracting parties for the policy, nor did they allege they were claimants. Rather, they asserted standing as implied-in-law coinsureds. While plaintiffs relied on subrogation principles, the principles governing subrogation by an insurer are equitable and have no application to a tort claim for breach of the covenant of good faith and fair dealing. In contrast to a subrogation action, a bad faith tort claim is based on contractual principles. Liability for bad faith has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recovery for bad faith may be had.

**(5) Insurance Contracts and Coverage § 121--Subrogation--Doctrine of Superior Equities.** --A subrogation as applied to an insurer is its right to be put in the position of its insured against third parties legally responsible to its insured for the loss which the insurer has both insured and paid. An insurer's right to subrogation is governed by equitable principles. Under the doctrine of superior equities, followed in California, the burden is upon the surety to establish its superior equity in seeking recovery against a third party.

**(6a) (6b) Insurance Contracts and Coverage § 123--Actions--Parties--Tortious Breach of Contract--Standing as Third Party Beneficiaries.** --Plaintiff lessees had no standing to sue an insurer for tortious breach of an insurance contract as third party beneficiaries under an insurance policy. Under the lease, the lessor had to maintain rental income insurance, at plaintiffs' expense, for damage to the leased premises. When plaintiffs notified the insurer of water damage that caused plaintiffs to vacate the premises, the insurer failed to provide coverage. While *Civ. Code, § 1559*, provides for enforcement of a contract by a third party beneficiary, a third party may qualify as a beneficiary only where the contracting parties intended to benefit the third party and such intent appears on the terms of the contract. The statute excludes enforcement of a contract by persons incidentally or remotely benefited by it. The fact that plaintiffs would have received some benefit if the insurer indemnified the lessor for loss of rental income only made plaintiffs incidental beneficiaries. The implied covenant of good faith and fair dealing was intended to benefit the lessor; the policy and surrounding circumstances did not show the insurer and lessor intended plaintiffs to benefit.

[See 1 **Witkin,** Summary of Cal. Law (9th ed. 1987) Contracts, § 653 et seq.]

**(7a) (7b) Contracts § 46--Actions--Contract for Benefit of Third Party.** --A third party should not be permitted to enforce covenants made not for his or her benefit, but rather for others. The third party is not a contracting party; the third party's right to performance is predicated on the contracting parties' intent to benefit him or her. The fact that the third party is only incidentally named in the contract or that the contract, if carried out to its terms, would inure to the third party's benefit is insufficient to entitle him or her to demand enforcement. Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered.

**(8) Insurance Contracts and Coverage § 109--Extent of Loss of Insured and of Liability of Insurer--Insurer's Duty of Good Faith and Fair Dealing--To Whom Duty Is Owed.** --An insurer's duty of good faith and fair dealing is owed solely to its insured and, perhaps, any express beneficiary of the insurance policy. Incidental or remote beneficiaries of the policy cannot state a cause of action against the insurer for a breach of the duty.

**COUNSEL:** Mukesh Advani for Plaintiffs and Appellants.

Popelka, Allard, McCowan & Bondonno and John M. Ingle for Defendant and Respondent.

**JUDGES:** Opinion by Merrill, J., with White, P. J., and Chin, J., concurring.

**OPINION BY:** MERRILL, J.

**OPINION**

[*1720] [**293] Frank N. Jones, Donna M. Jones and Snowcreek, Inc. (Jones), appeal from the judgment entered in favor of respondent Aetna Casualty and Surety Company (Aetna), following the order sustaining the [*1721] demurrer without leave to amend to Jones's first amended complaint for tortious breach of insurance contract.

FACTUAL AND PROCEDURAL BACKGROUND

**(1)** Our review of the sufficiency of a complaint against a general demurrer admits all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. (See *Blank v. Kirwan (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].*) Accordingly, the following factual statement, gleaned from Jones's first amended complaint, [***2] is accepted as true for purposes of this appeal.

Jones had leased commercial property in Danville from Danville L&M Limited (lessor) for the operation of their restaurant. Pursuant to the lease agreement, lessor was obligated to maintain rental income insurance providing coverage for damage or destruction from fire or other perils. The lease stated this coverage would be at Jones's expense and the policy would provide that the loss would be payable to lessor. The lease also stated that during any repairs to the premises after damage or destruction from a peril, Jones's rent would be equitably reduced to the extent lessor received proceeds from the rental income insurance. The insurance policy lessor obtained, through Aetna, included a "rental value endorsement" which stated Aetna would be liable for the "Actual Loss Sustained by the insured resulting directly from necessary untenantability, caused by damage to or destruction of the building(s) or structure(s) as furnished and equipped by the insured, by a peril not excluded in this policy. . . ."

In 1989 and 1990, the restaurant premises suffered damage from the intrusion of water from a variety of sources. Patronage was reduced [***3] to the extent that Jones was unable to meet its rent obligations. On August 10, 1990, Jones vacated the premises.

Aetna was notified of the loss by Jones in 1989. It failed to provide coverage benefits on the claim for loss of rental income or damage to the structure. Jones alleged that Aetna's actions constituted a breach of the covenant of good faith and fair dealing and that such breach caused lessor to sue Jones for nonpayment of rent and for structural damage to the premises. In the first cause of action, Jones claimed Aetna breached its "obligations to the plaintiffs as implied-in-law co-insureds under the policy of insurance." In the second cause of action, Jones charged Aetna breached its obligations to Jones as third party beneficiaries under the insurance policy. A third cause of action stated that Aetna's actions were intentional and entitled Jones to punitive damages.

[*1722] Aetna's general demurrer to the original complaint was sustained with leave to amend. Its general demurrer to the amended complaint was sustained

without leave to [**294] amend. Aetna maintained Jones had no standing to sue as an implied-in-law coinsured under the contract of insurance or as a third party [***4] beneficiary.

DISCUSSION

**(2)** On appeal from the judgment following the sustaining of a general demurrer without leave to amend, a reviewing court must determine whether the facts as pleaded state a cause of action on any legal theory. When the demurrer has been sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment. If there is no such possibility, an abuse of discretion is not shown and we affirm the trial court. ( *Blank v. Kirwan, supra, 39 Cal.3d at p. 318.*) We find no error in the trial court's ruling as Jones has no standing to sue Aetna, either as an implied-in-law coinsured or as a third party beneficiary of the policy.

**(3)** While an action for breach of the covenant of good faith and fair dealing sounds in tort, the duty of good faith and fair dealing arises from and exists solely because of the contractual relationship between the parties. ( *Gruenberg v. Aetna Ins. Co. (1973) 9 Cal.3d 566, 577-578 [108 Cal.Rptr. 480, 510 P.2d 1032].*) Thus, someone who is not a party to the contract has [***5] no standing to enforce it or to recover extracontractual damages for the wrongful withholding of benefits to the contracting party. ( *Hatchwell v. Blue Shield of California (1988) 198 Cal. App. 3d 1027, 1034 [244 Cal.Rptr. 249].*) However, in the context of insurance policies, "[a] nonparty who is nevertheless entitled to policy benefits, such as an 'insured' person under the terms of the policy or an express beneficiary, has standing only if [he or] she is the *claimant* whose benefits are wrongfully withheld." (*Ibid.*)

**(4a)** Jones does not allege he was a contracting party for the insurance policy. Neither does he allege that he was a claimant. Instead, he submits that the facts as pled demonstrate standing as an implied-in-law coinsured under the terms of the policy. Jones states that as the lease agreement required lessor to purchase rental income insurance at Jones's expense, that insurance is deemed to mutually benefit both parties and as such he is a coinsured under the policy with standing to sue. However, the authority he cites for this proposition is unpersuasive.

Jones argues that principles set forth in subrogation cases are [***6] applicable here. He submits that in the context of subrogation cases an insurance policy [*1723] may be considered to be for the benefit of both the insured lessor and the lessee, even though the lessee is not a named insured under the policy, where the lease required the lessee to purchase the insurance. He contends, in such cases, the lessee is considered an implied-in-law coinsured. (See *Rokeby-Johnson v. Aquatronics International, Inc. (1984) 159 Cal. App. 3d 1076, 1085 [206 Cal.Rptr. 232]* [defendant held to be an implied-in-law coinsured and subrogation unavailable to insurer where separate agreement required defendant to insure equipment]; *Parsons Manufacturing Corp. v. Superior Court (1984) 156 Cal. App. 3d 1151, 1159-1160 [203 Cal.Rptr. 419]* [lease provision requiring lessor to maintain fire insurance was for mutual benefit of lessor and lessee, partial summary judgment for insurer in subrogation action denied]; *Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co. (1976) 59 Cal. App. 3d 860, 864 [131 Cal.Rptr. 211]* [held no right of subrogation [***7] where commercial expectations of parties to lease and sublease were that policy proceeds would cover loss, court considered inequities of allowing right of subrogation against sublessee who paid policy premiums and was regarded as implied-in-law coinsured]; *Tate v. Trialco Scrap, Inc. (M.D.Tenn. 1989) 745 F. Supp. 458, 473-474* [held no right of subrogation where lease provision required lessor to purchase insurance, such provision for mutual benefit of lessor and lessee absent contrary intent].)

These decisions are distinguishable as the principles governing subrogation by an insurer are equitable in nature and have no application to a tort claim for breach of the covenant of good faith and fair dealing.

**(5)** " 'A subrogation as applied to an insurer is its right to be put in the position of [**295] its insured against third parties legally responsible to its insured for the loss which the insurer has both insured and paid. [Citation.]' " ( *Parsons Manufacturing Corp. v. Superior Court, supra, 156 Cal. App. 3d at p. 1158*, citing *Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co., supra, 59 Cal. App. 3d at p. 864.*) [***8] An insurer's right to subrogation is governed by equitable principles. ( *Parsons Manufacturing Corp. v. Superior Court, supra, 156 Cal. App. 3d at p. 1158*, citing *Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co., supra, 59 Cal. App. 3d at p. 865.*) Under the doctrine of superior equities, followed

in California, the burden is upon the surety to establish its superior equity in seeking recovery against a third party. ( *Rokeby-Johnson v. Aquatronics International, Inc., supra, 159 Cal. App. 3d at p. 1084.*) For example, in the *Liberty Mutual* opinion, the Court of Appeal, in holding the insurer had no right of subrogation, considered the commercial expectation of the sublessees in paying the insurance premium and the windfall to the insurer in the event subrogation was permitted. ( *Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co., supra, 59 Cal. App. 3d at p. 865.*) The *Liberty Mutual* court denied subrogation against the sublessee as the sublessee was an implied-in-law coinsured [***9] under the insurance policy. (*Ibid.*)

[*1724] **(4b)** In contrast to a subrogation action, a bad faith tort claim is based on contractual principles. The doctrine of superior equities, critical to whether a right of subrogation exists, does not come into play in an action for tortious breach of the covenant of good faith and fair dealing. " 'Whether for better or worse, the historical development of a tort is an important factor in determining its scope (see Prosser, Law of Torts (4th ed. 1971) pp. 19-21), and, thus far, liability for "bad faith" has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recovery for "bad faith" may be had. [Citation.]' [Citation.]" ( *Hatchwell v. Blue Shield of California, supra, 198 Cal. App. 3d at p. 1034*, citing *Austero v. National Cas. Co. (1976) 62 Cal. App. 3d 511, 516-517 [133 Cal.Rptr. 107].*) Jones has not pled facts to establish standing under the implied-in-law coinsured theory. There is no reasonable possibility that this defect [***10] may be cured by amendment.

**(6a)** Neither are we persuaded by Jones's alternative argument that he has standing to prosecute the action as a third party beneficiary of the insurance policy. *Civil Code section 1559* provides: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." A third party may qualify as a beneficiary under a contract where the contracting parties must have intended to benefit that third party and such intent appears on the terms of the contract. ( *Ascherman v. General Reinsurance Corp. (1986) 183 Cal. App. 3d 307, 311 [228 Cal.Rptr. 1].*) However, it is well settled that *Civil Code section 1559* excludes enforcement of a contract by persons who are only incidentally or remotely benefited by it. ( *Lucas v. Hamm (1961) 56 Cal.2d 583, 590 [15 Cal.Rptr. 821, 364 P.2d 685]*, cert. den. *(1962) 368 U.S. 987 [7 L. Ed. 2d 525, 82 S.Ct. 603]*; *Walters v. Marler (1978) 83 Cal. App. 3d 1, 31 [147 Cal.Rptr. 655].*) [***11] **(7a)** "'A third party should not be permitted to enforce covenants made not for his benefit, but rather for others. He is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him. . ..' " ( *Cancino v. Farmers Ins. Group (1978) 80 Cal. App. 3d 335, 344 [145 Cal.Rptr. 503]*, quoting *Lucas v. Hamm, supra, 56 Cal.2d at pp. 590-591*; see also *Murphy v. Allstate Ins. Co. (1976) 17 Cal.3d 937, 944 [132 Cal.Rptr. 424, 553 P.2d 584].*) **(8)** An insurer's duty of good faith and fair dealing is owed solely to its insured and, perhaps, any express beneficiary of the insurance policy. Incidental or remote beneficiaries of the policy cannot state a cause of action against the insurer for a breach of the duty. ( *Cancino v. Farmers Ins. Group, supra, 80 Cal. App. 3d at p. 342*, citing *Austero v. National Cas. Co., supra, 62 Cal. App. 3d at pp. 516-517.*)

[**296] **(7b)** The fact that the third party is only [***12] incidentally named in the contract or that the contract, if carried out to its terms, would inure to the [*1725] third party's benefit is insufficient to entitle him or her to demand enforcement. ( *Walters v. Marler, supra, 83 Cal. App. 3d at p. 33.*) Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered. (*Ibid.*)

**(6b)** It is apparent from the terms of the insurance policy in the instant case that Jones was not an intended beneficiary. The fact that, by virtue of the lease provision for rent abatement, Jones would have received some benefit in the event Aetna indemnified the lessor for loss of rental income only makes him an incidental beneficiary under the policy. The policy itself and surrounding circumstances do not demonstrate that Aetna and lessor intended Jones to benefit from their agreement.

The implied covenant of good faith and fair dealing in the insurance policy at issue was intended to benefit the insured lessor. Jones has no [***13] standing as a third party beneficiary to enforce the covenant made for the benefit of the lessor.

We conclude the trial court properly determined the

facts as pleaded did not state a cause of action. There is no reasonable possibility that the lack of standing can be cured by amendment.

The judgment is affirmed.

White, P. J., and Chin, J., concurred.

# TAB 17

LEXSEE 12 CAL 4TH 631

**ANDREW LAZAR, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; RYKOFF-SEXTON, INC., Real Party in Interest.**

**No. S044234.**

**SUPREME COURT OF CALIFORNIA**

***12 Cal. 4th 631*; *909 P.2d 981*; *49 Cal. Rptr. 2d 377*; *1996 Cal. LEXIS 199*; *61 Cal. Comp. Cas 34*; *11 I.E.R. Cas. (BNA) 545*; *131 Lab. Cas. (CCH) P58,085*; *96 Cal. Daily Op. Service 645*; *96 Daily Journal DAR 937***

**January 29, 1996, Decided**

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. BC088634, Daniel A. Curry, Judge.

**DISPOSITION:** For the foregoing reasons, the judgment of the Court of Appeal is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

An employee who had been terminated from his management position brought an action against his former employer for various causes of action, including fraudulent inducement of employment contract. Plaintiff alleged in his complaint that the employer induced him to relocate from New York to Los Angeles with his family, and to relinquish a secure job as the president of the family company where he had worked all of his life, based on verbal representations of continued employment, the company's strong financial base, and pay raises, all of which were false and which the employer's agents knew to be false when making them. Plaintiff further alleged that, after two years of exemplary performance at his new position with defendant, he was terminated and was unable to find comparable employment. The trial court sustained the employer's demurrer without leave to amend as to all causes of action, except the breach of contract claim and the claim under *Lab. Code, § 970* (false representations to induce relocation). (Superior Court of Los Angeles County, No. BC088634, Daniel A. Curry, Judge.) The Court of Appeal, Second Dist., Div. Three, No. B083795, issued a writ of mandate directing the superior court to vacate its order, insofar as it sustained defendant's demurrers to plaintiff's causes of action for wrongful termination in violation of public policy, fraud and deceit, negligent misrepresentation, and intentional infliction of emotional distress, and to enter a new order overruling the demurrers to those causes of action.

The Supreme Court affirmed. The court held that the terminated employee adequately pled a cause of action for promissory fraud, since the employee's reliance on the employer's misrepresentations was truly detrimental, and the employer, which had no coercive power over the employee before the employment relationship was formed, used misrepresentations to induce the employee to change employment, a result the employer could not have achieved truthfully. Furthermore, the alleged misrepresentations were not made in the course of the employee's termination, but were separate from it. The court also held that an employer's misrepresentation to an employee that is not aimed at effecting termination of employment, but is instead designed to induce the employee to alter detrimentally his or her position in some other respect, might form a basis for a valid fraud claim even in the context of a wrongful termination--the action for promissory fraud, one of the existing protections against improper termination, remains viable in the employment context. Fraud recovery is precluded only where the result of the employer's misrepresentation is indistinguishable from an ordinary constructive wrongful termination. (Opinion by Werdegar, J., with Lucas, C. J., Arabian, Baxter and George, JJ., concurring. Concurring opinions by Mosk, J., and by Kennard, J.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1) Appellate Review § 128--Scope of Review--Rulings on Demurrers.** --When reviewing a trial court's order sustaining a defendant's demurrer to a complaint, the

reviewing court must assume the truth of all properly pleaded material allegations of the complaint in evaluating the validity of the decision below.

**(2a) (2b) Fraud and Deceit § 25--Actions--Pleading--Specificity--Action Against Corporate Employer.** --The elements of fraud, which give rise to the tort action for deceit, are (1) misrepresentation (false representation, concealment, or nondisclosure), (2) knowledge of falsity (or "scienter"), (3) intent to defraud (i.e., to induce reliance), (4) justifiable reliance, and (5) resulting damage. In this state, fraud must be pled specifically; general and conclusory allegations do not suffice. The policy of liberal construction of the pleadings will not ordinarily be invoked to sustain a pleading defective in any material respect. This particularity requirement necessitates pleading facts that show how, when, where, to whom, and by what means the representations were tendered. A plaintiff's burden in asserting a fraud claim against a corporate employer is even greater. In such a case, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.

**(3) Fraud and Deceit § 7--Actual Fraud--False Representations--Promises--Fraudulent Inducement of Contract.** --Promissory fraud is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. If it is enforceable, the plaintiff has a cause of action in tort as an alternative at least, and perhaps in some instances, in addition to his or her cause of action on the contract. Recovery, however, may be limited by the rule against double recovery of tort and contract compensatory damages.

**(4a) (4b) (4c) Employer and Employee § 9.2--Contracts of Employment--Actions for Wrongful Discharge--Pleading--Cause of Action for Promissory Fraud.** --An employee who had been terminated by his employer adequately pled a cause of action for promissory fraud in alleging that the employer induced him to relocate from New York to Los Angeles with his family, and to relinquish a secure job as the president of the family company where he had worked all of his life, based on verbal representations of continued employment, the company's strong financial base, and pay raises, all of which were false and which the employer's agents knew to be false when making them. The employee's reliance on the employer's misrepresentations was truly detrimental, and the employer, which had no coercive power over the employee before the employment relationship was formed, used misrepresentations to induce the employee to change employment, a result the employer could not have achieved truthfully. Furthermore, the alleged misrepresentations were not made in the course of the employee's termination, but were separate from it.

[See 2 **Witkin**, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 184G-3.]

**(5a) (5b) (5c) (5d) (5e) Employer and Employee § 9--Contracts of Employment--Actions for Wrongful Discharge--Tort Liability--Cause of Action for Promissory Fraud.** --Employers who terminate employees do not enjoy broad special immunities from tort liability. Employers are not exempted from ordinary fraud rules that apply to others. An employer's misrepresentation to an employee that is not aimed at effecting termination of employment, but is instead designed to induce the employee to alter detrimentally his or her position in some other respect, might form a basis for a valid fraud claim even in the context of a wrongful termination--the action for promissory fraud, one of the existing protections against improper termination, remains viable in the employment context. Fraud recovery is precluded only where the result of the employer's misrepresentation is indistinguishable from an ordinary constructive wrongful termination.

**(6a) (6b) Fraud and Deceit § 32--Actions--Damages--Fraudulent Inducement of Contract--In Employment Context.** --The cause of action for fraudulent inducement of contract involves both contract and tort principles and procedures. For example, it has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for the fraud. Contract remedies alone do not address the full range of policy objectives underlying the action for fraudulent inducement of contract. In pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future. Because of the extra measure of blameworthiness inhering in fraud, and because there is no need for predictability about the cost of contractual relationships in fraud cases, fraud plaintiffs may recover "out-of-pocket" damages in addition to benefit-of-the-bargain damages. For example, a fraudulently hired employee may incur a variety of damages separate from a wrongful termination, such as the expense and disruption of moving or loss of security and income associated with former employment.

**COUNSEL:** Ross & Morrison, Gary B. Ross, Andrew D. Morrison, Schulman & Miller, Barry A. Schulman and Jerry Miller for Petitioner.

William G. Hoerger, Luis Jaramillo, Joseph Posner, Quackenbush & Quackenbush and William C. Quackenbush as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Gibson, Dunn & Crutcher, Martin C. Washton and Jeffrey F. Webb for Real Party in Interest.

Musick, Peeler & Garrett, Richard J. Simmons, Michael G. Morgan, Morrison & Foerster, Kirby Wilcox and James E. Boddy, Jr., as Amici Curiae on behalf of Real Party in Interest.

**JUDGES:** Opinion by Werdegar, J., with Lucas, C. J., Arabian, Baxter and George, JJ., concurring. Concurring opinions by Mosk, J., and by Kennard, J.

**OPINION BY:** WERDEGAR, J.

**OPINION**

**[*634] [**982] [***378] WERDEGAR, J.**

We granted review in this matter to clarify, following our decisions in *Foley v. Interactive Data Corp. (1988) 47 Cal. 3d 654 [254* **[*635]** *Cal. Rptr. 211, 765 P.2d 373]* (*Foley*) and *Hunter v. Up-Right, Inc. (1993) 6 Cal. 4th 1174 [26 Cal. Rptr. 2d 8, 864 P.2d 88]* (*Hunter*), whether or under what circumstances a **[***379]** plaintiff may state a cause of action for **[**983]** fraudulent inducement of employment contract. The Court of Appeal concluded the allegations of the plaintiff in this case are adequate to state such a cause of action. For the reasons that follow, we agree. Accordingly, we affirm the judgment of the Court of Appeal.

I. *BACKGROUND*

**(1)** Because this matter comes to us after the trial court sustained the defendant's demurrer, "we must, under established principles, assume the truth of all properly pleaded material allegations of the complaint in evaluating the validity" of the decision below. ( *Tameny v. Atlantic Richfield Co. (1980) 27 Cal. 3d 167, 170 [164 Cal. Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]*; see also *Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal. 3d 493, 496 [86 Cal. Rptr. 88, 468 P.2d 216]*.)

Andrew Lazar alleged as follows:

Lazar was born in New York in 1950. He lived and worked in Long Island, New York until 1990. From 1972 to 1990, he was employed with a family-owned restaurant equipment company. As of 1990, he was president of the company, earning $ 120,000 annually and living in New York with his wife of 21 years and his 2 children, ages 17 and 15.

In September 1989, a vice-president of real party in interest Rykoff-Sexton, Inc. (Rykoff or defendant) contacted Lazar and tried to persuade him to come to work in Los Angeles as Rykoff's West Coast general manager for contract design. Rykoff, through its vice-president and, later, through its president and its chief executive officer, intensively recruited Lazar through February 1990. For recruitment purposes, Rykoff brought Lazar and his wife to Los Angeles to visit Rykoff's offices, to visit realtors and to see the city.

During this recruitment process, Lazar told Rykoff he was concerned about relocating to Los Angeles, as the move would entail relinquishing a secure job as president of the family company where he had worked all his adult life, separating his children from their friends at an important time of their lives and leaving his home of 40 years. As a condition of agreeing to relocate, Lazar required Rykoff's assurance that his job would be secure and would involve significant pay increases.

In response to Lazar's concerns, Rykoff made representations to Lazar that led him to believe he would continue to be employed by Rykoff so long **[*636]** as he performed his job and achieved goals. Rykoff represented that Lazar would enjoy continued advancement within the organization, would be welcomed as part of the Rykoff "family" and, as a Rykoff employee, would enjoy security and a strong future. Rykoff represented that Lazar would have a long-term relationship with the company. Additionally, Rykoff implied the current head of the department in which Lazar would work had plans to retire and Lazar would be groomed to assume that position.

Rykoff further represented that the company was very strong financially and anticipated solid growth and a stable, profitable future. In particular, Rykoff represented that the department in which Lazar would work was a growth division within the company and that Rykoff had plans to expand it. Rykoff also stated Rykoff would pay Lazar $ 130,000 annually to start and, if Lazar performed his job, his yearly income would quickly rise to $ 150,000. Rykoff told Lazar he would receive annual reviews and raises accordingly.

Lazar asked for a written employment contract, but was refused. Rykoff stated a written contract was unnecessary because "our word is our bond." In or about February 1990, Lazar accepted Rykoff's offer of employment on terms including the foregoing.

Rykoff's representations to Lazar regarding the terms on which he would be retained, Rykoff's financial health and Lazar's potential compensation were false and, when making them, Rykoff's agents knew they were false. Rykoff had in the immediately preceding period experienced its worst economic performance in recent history, and the company's financial outlook was pessimistic. In fact, Rykoff was planning an operational merger that would eliminate Lazar's position. Rykoff had no intention of retaining Lazar so long as he performed adequately. Instead, Rykoff secretly intended to treat Lazar as if **[**984] [***380]** he were an "at will" employee, subject to termination without cause. Rykoff knew the promised compensation increases would not be given, as company policy limited annual increases to 2 to 3 percent.

Based on Rykoff's representations, Lazar resigned his New York position and, in May 1990, commenced employment at Rykoff. The following month, Lazar bought a home in California and moved his family there.

Lazar performed his job at Rykoff in an exemplary manner. He obtained sales increases in his assigned region, and soon after he commenced employment his West Coast region achieved its sales budget for the first time. Lazar accomplished continued improvement in sales and lowered overall operating costs within his department.

In April 1992, Rykoff failed to pay Lazar certain bonus compensation to which he had become entitled under a company incentive program. Subsequently, in July, Lazar was terminated. Rykoff told Lazar his job was being **[*637]** eliminated owing to management reorganization. A Rykoff vice-president told Lazar his termination was not performance related and was for cause.

The Rykoff vice-president further stated Lazar could leave the company with dignity by tendering a letter of resignation and by keeping his regular status (and all the appearances of job stability) for three months so that he could better search for a new job. In fact, Lazar was given a desk in Rykoff's warehouse, where noise from forklifts made use of the telephone an absurdity. The fact Lazar was leaving Rykoff was not maintained as a secret and became common knowledge. Lazar has been unable to find comparable employment.

As a consequence of Rykoff's conduct and Lazar's reliance on Rykoff's representations, Lazar lost past and future income and employment benefits. He lost contact with the New York employment market so that reemployment there is difficult or impossible. Lazar is burdened with payments on Southern California real estate he can no longer afford. Lazar and his family have experienced emotional distress, with both psychological and physical manifestations.

Lazar further alleged Rykoff acted with oppression, fraud, or malice within the meaning of *Civil Code section 3294.*

Based on these allegations, Lazar set forth causes of action for: (1) violation of *Labor Code section 970* (false representations to induce relocation), (2) wrongful termination in violation of public policy, (3) fraud and deceit, (4) negligent misrepresentation, (5) breach of contract, (6) promissory estoppel, (7) intentional infliction of emotional distress, and (8) negligent infliction of emotional distress.

Rykoff demurred to all causes of action except the Labor Code and breach of contract claims. The trial court sustained Rykoff's demurrer in its entirety without leave to amend, leaving Lazar with only the *Labor Code section 970* and breach of contract causes of action. Lazar unsuccessfully sought reconsideration, then a writ of mandate. (Lazar did not seek review of the trial court's sustaining of Rykoff's demurrer to his cause of action for promissory estoppel.)

The Court of Appeal issued a writ of mandate directing the superior court to vacate its order, insofar as it sustained Rykoff's demurrers to Lazar's causes of action for wrongful termination in violation of public policy, fraud and deceit, negligent misrepresentation, and intentional infliction of emotional distress, and to enter a new order overruling the demurrers to those causes of action.

**[*638]** We granted Rykoff's petition for review. Subsequently, we specified that the issues to be argued would be limited to whether, or under what circumstances, a plaintiff may state a cause of action for fraudulent inducement of employment contract. (*Cal. Rules of Court, rule 29.2(b).*)

II. *DISCUSSION*

A. *Promissory fraud*

**(2a)** "The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, **[**985] [***381]** § 676, p. 778; see also *Civ. Code, § 1709*; *Hunter, supra, 6 Cal. 4th 1174, 1184*; *Molko v. Holy Spirit Assn. (1988) 46 Cal. 3d 1092, 1108 [252 Cal. Rptr. 122, 762 P.2d 46].*)

**(3)** "Promissory fraud" is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an im-

plied misrepresentation of fact that may be actionable fraud. ( *Union Flower Market, Ltd. v. Southern California Flower Market, Inc. (1938) 10 Cal. 2d 671, 676 [76 P.2d 503]*; see *Civ. Code, § 1710, subd. (4)*; 5 Witkin, Summary of Cal. Law, *supra*, § 685, pp. 786-787.)

An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. ( *Chelini v. Nieri (1948) 32 Cal. 2d 480, 487 [196 P.2d 915]* ["tort of deceit" adequately pled where plaintiff alleges "defendant intended to and did induce plaintiff to employ him by making promises . . . he did not intend to (since he knew he could not) perform" (fn. omitted)]; *Kuchta v. Allied Builders Corp. (1971) 21 Cal. App. 3d 541, 549 [98 Cal. Rptr. 588]*, citing *Horn v. Guaranty Chevrolet Motors (1969) 270 Cal. App. 2d 477, 484 [75 Cal. Rptr. 871]*; *Squires Dept. Store, Inc. v. Dudum (1953) 115 Cal. App. 2d 320, 323 [252 P.2d 418]*.) In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. "If it is enforceable, the [plaintiff] . . . has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract." ( *Rest.2d Torts, § 530, subd. (1)*, com. c., p. 65, cited with approval in *Tenzer v. Superscope, Inc. (1985) 39 Cal. 3d 18, 29 [216 Cal. Rptr. 130, 702 P.2d 212]*.) Recovery, however, may be limited by the rule against double recovery of tort and contract compensatory damages. ( *Tavaglione v. Billings (1993) 4 Cal. 4th 1150, 1159 [17 Cal. Rptr. 2d 608, 847 P.2d 574]*.)

**[*639]** **(4a)** Lazar's allegations, if true, would establish all the elements of promissory fraud. As detailed above, Lazar alleges that, in order to induce him to come to work in California, Rykoff intentionally represented to him he would be employed by the company so long as he performed his job, he would receive significant increases in salary, and the company was strong financially. Lazar further alleges that Rykoff's representations were false, and he justifiably relied on them in leaving secure New York employment, severing his connections with the New York employment market, uprooting his family, purchasing a California home and moving here.

Lazar alleges that Rykoff knew its representations regarding the terms upon which he would be retained in Rykoff's employ, potential salary increases and the financial strength of the company were false at the time they were made. He also alleges that, at the time Rykoff represented to him his job would be permanent and secure, Rykoff was planning an operational merger likely to eliminate Lazar's job, and Rykoff had no intention of retaining him so long as he performed adequately. Instead, Lazar alleges, Rykoff secretly intended to treat him as if he were subject to termination without cause. Lazar further alleges Rykoff knew the purported potential salary increases would not materialize, because company policy was to limit annual increases to 2 or 3 percent. These allegations adequately state a cause of action for promissory fraud as traditionally understood.

Rykoff and employers' groups appearing as amici curiae in support of Rykoff contend Lazar's fraud action is barred by our decisions in *Foley, supra, 47 Cal. 3d 654*, and *Hunter, supra, 6 Cal. 4th 1174*. Rykoff argues that, following *Foley* and *Hunter*, a California employee cannot state a tort claim arising from employment termination, other than wrongful termination in violation of public policy.

After cursory discussion, the Court of Appeal concluded, "*Hunter* did not preclude all fraud claims in the employment context. It merely bars the limited category of fraud claims arising from employer misrepresentations which are made to effect termination." We agree with the Court of Appeal's disposition **[**986]** **[***382]** permitting Lazar's fraud claim, but believe an adequate explanation of that result requires a somewhat fuller explication and clarification of our rationale in *Hunter*. In addition, we believe Rykoff is mistaken about the degree to which the policy considerations underlying our decision in *Foley* apply in fraudulent inducement of contract cases.

B. *Hunter*

In *Hunter, supra, 6 Cal. 4th 1174*, we considered whether a terminated employee may recover tort damages for fraud and deceit predicated on a **[*640]** misrepresentation used to effect the termination. Hunter, a welder, was falsely told by his supervisor a corporate decision to eliminate his position had been made. (*Hunter, supra, 6 Cal. 4th at pp. 1179, 1186*.) After being refused an opportunity to work in a lesser position within the company, Hunter signed a document setting forth his resignation. ( *Id. at p. 1179*.) The jury found that Up-Right, Hunter's employer, had breached an implied contract not to dismiss him without good cause. We noted that Up-Right could have accomplished Hunter's termination directly (incurring the risk of contract liability only) and had merely introduced the element of misrepresentation in the course of effecting that result. ( *Id. at pp. 1178, 1184*.) Hunter, therefore, could not be said to have "relied to his detriment on the misrepresentations in suffering constructive dismissal." ( *Id. at p. 1184*.)

Analyzing these circumstances in light of *Foley, supra*, and of the traditional elements of fraud, we concluded wrongful termination of employment ordinarily does not give rise to a cause of action for fraud or deceit, even if a misrepresentation is utilized to effect the termination. (*Hunter, supra, 6 Cal. 4th at p. 1178*.) We reasoned that "such representations are merely the means to the end desired by the employer, i.e., termination of em-

ployment." ( *Id. at p. 1185.*) The effect of Up-Right's misrepresentation was simply to transform Hunter's resignation into a constructive termination. ( *Id. at p. 1184.*)

Seizing upon language in *Hunter* indicating tort recovery is available only "when the plaintiff's fraud damages cannot be said to result from [the] termination itself" (*Hunter, supra, 6 Cal. 4th at p. 1178*), Rykoff argues Lazar's damages resulted from his termination and that *Hunter*, therefore, bars any tort recovery. According to Rykoff, *Hunter* stands for the general proposition that terminated employees should be limited to contract damages and, after *Hunter*, a terminated employee can obtain tort damages only by alleging the termination violated a fundamental public policy of the state. We disagree.

**(5a)** First, on its face *Hunter* does not preclude Lazar's fraud claim. As Lazar correctly points out, we expressly left open in *Hunter* the possibility "that a misrepresentation *not* aimed at effecting termination of employment, but instead designed to induce the employee to alter detrimentally his or her position in some other respect, might form a basis for a valid fraud claim even in the context of a wrongful termination." (*Hunter, supra, 6 Cal. 4th at p. 1185*, italics in original.) The misrepresentations Lazar alleges were *not* aimed at effecting his termination, but, rather, at inducing him to accept Rykoff's offer of employment.

In *Hunter*, moreover, we specifically preserved promissory fraud claims. Indeed, despite this court's division over the issue of tort recovery for **[*641]** misrepresentation used to effect termination, all seven members of the court either expressly or impliedly agreed that the action for promissory fraud remains viable in the employment context. (*Hunter, supra, 6 Cal. 4th at p. 1186, fn. 1* (maj. opn. by Panelli, J., Lucas, C. J., Baxter, J., and George, J., conc.) ["This is not a case of promissory fraud, and nothing in this opinion affects the availability of tort damages in any case in which the elements of promissory fraud are pleaded and proved."]; *id. at p. 1188* (dis. opn. of Mosk, J., Arabian, J., conc.) ["[I]n cases of promissory fraud . . . both the breach [of contract] **[**987]** **[***383]** and the fraud leading to the breach are **[***387]** separately actionable."]; *id. at p. 1197* (dis. opn. of Kennard, J.) ["[W]hen . . . the employer's conduct is not within the scope of the contractual employment relationship" the "defrauded employee is entitled to recover tort damages."].) As previously discussed, Lazar has adequately pled a cause of action for promissory fraud.

Looking deeper, it is clear the rationale for our decision in *Hunter* does not apply to this case. In *Hunter*, while we identified a situation in which a terminated employee was unable to plead all of the elements of fraud, we did not thereby intend to call into question generally the viability of traditional fraud remedies whenever they are sought by a terminated employee. Our decision in *Hunter* was not meant to alter fundamentally the law of fraud or to suggest it necessarily applies differently in the employment context than in other contexts. Rather, we applied traditional fraud analysis in the context of a termination "desired by the employer," where misrepresentation was introduced only "in the course of" effecting the desired termination, and where the employer "could have accomplished [the termination] directly." (*Hunter, supra, 6 Cal. 4th at pp. 1179, 1184, 1185.*) Under such circumstances, we concluded, the Court of Appeal had "erred in inferring" the employer had committed a fraud. ( *Id. at pp. 1184-1185.*)

*Hunter* dealt with a situation atypical of the usual fraud situation, in that there the alleged perpetrator of the fraud (the defendant employer, Up-Right) was attempting to accomplish by deception something it actually had power to accomplish forthrightly--termination of the plaintiff's employment. (See *Hunter, supra, 6 Cal. 4th at pp. 1184-1185.*) *Hunter*'s rationale does not readily extend beyond the termination context because, in the ordinary fraud case, the alleged perpetrator of the fraud lacks the power to accomplish his objective without resort to duplicity.

We reasoned in *Hunter* that "no independent fraud claim" arose from Up-Right's "misrepresentation aimed at termination of employment" (*Hunter, supra, 6 Cal. 4th at p. 1185*), because Hunter could not allege all of the elements of fraud. (See *Hunter, supra, 6 Cal. 4th at p. 1184*, citing 5 Witkin, **[*642]** Summary of Cal. Law, *supra*, Torts, § 676, p. 778; *Civ. Code, § 1709*; and *Hobart v. Hobart Estate Co. (1945) 26 Cal. 2d 412, 422 [159 P.2d 958].*) Specifically, as we explained, Hunter could not allege detrimental reliance. (*Hunter, supra, 6 Cal. 4th at p. 1184.*)

We noted, initially, that Hunter could not be said to have relied *to his detriment* on his employer's misrepresentation, because his employer "simply employed a falsehood to do what it otherwise could have accomplished directly." (*Hunter, supra, 6 Cal. 4th at p. 1184.*) That is, Hunter's employer had the power to terminate him, rightly or wrongly. We further noted that some misrepresentations used in the course of a dismissal are "merely the means to the end desired by the employer, i.e., termination of employment." (*Hunter, supra, 6 Cal. 4th at p. 1185.*) Had Hunter not resigned, he would, presumably, have been discharged in any event, a fact we implicitly recognized in noting that "the result of Up-Right's misrepresentation is indistinguishable from an ordinary constructive wrongful termination" (*id. at p. 1184*); in describing termination as Up-Right's "aim" and "desire" (*id. at p. 1185*); and in recognizing that the element of misrepresentation was introduced by Up-Right

only "in the course of" Hunter's dismissal. (*Id. at p. 1178.*) Hunter himself testified he was told he would be terminated if he did not resign. (*Id. at p. 1179.*)

In short, because Up-Right had both the power and intention of discharging him in any event, Hunter was no worse off for being induced by Up-Right's misrepresentation to resign. While Hunter may have relied on Up-Right's misrepresentation, and while in reliance thereon he allegedly changed his position (from employed to unemployed), his reliance did not cause him any detriment, as **[**988]** **[***384]** the tort requires. (See *Hull v. Sheehan (1952) 108 Cal. App. 2d 804, 805 [239 P.2d 704]*; *Bramaric v. Churich (1951) 101 Cal. App. 2d 846, 850 [226 P.2d 657].*) Accordingly, Hunter could not plead detrimental reliance. Lacking this element, we said, his fraud claim was "without substance." (*Hunter, supra, 6 Cal. 4th at p. 1184*).

**(4b)** By contrast, as alleged, Lazar's reliance on Rykoff's misrepresentations was truly detrimental, such that he may plead all the elements of fraud. Lazar's employer, Rykoff, did *not* have the power to compel Lazar to leave his former employment. Rykoff's misrepresentations were made before the employment relationship was formed, when Rykoff had no coercive power over Lazar and Lazar was free to decline the offered position. Rykoff used misrepresentations to induce Lazar to change employment, a result Rykoff presumably could *not* have achieved truthfully (because Lazar had required assurances the Rykoff position would be secure and would involve significant increases in pay). Moreover, Lazar's decision to join Rykoff left **[*643]** Lazar in worse circumstances than those in which he would have found himself had Rykoff not lied to him. (Allegedly, Lazar's secure living and working circumstances were disrupted, and Lazar became the employee of a financially troubled company, which intended to treat him as an at-will employee.)

**(5b)** In sum, *Hunter*'s core rationale (that a substantial fraud claim could not be pled because the element of detrimental reliance was absent) does not apply to this case. As alleged, Lazar's reliance was truly detrimental.

Contrary to Rykoff's arguments, our rationale for deciding *Hunter* does not preclude tort recovery in every case involving a termination. While in previewing our rationale in *Hunter*, we indicated it would support tort recovery "only" with respect to a misrepresentation that is "separate from the termination of **[***388]** the employment contract" (see *Hunter, supra, 6 Cal. 4th at p. 1178*), we did not mean thereby to suggest that simply effecting a termination in conjunction with fraudulent conduct will insulate an employer from an otherwise properly pled fraud claim. We meant, rather, to preclude fraud recovery only where "the result of [the employer]'s misrepresentation is indistinguishable from an ordinary constructive wrongful termination." (*Hunter, supra, 6 Cal. 4th at p. 1184.*)

**(4c)** Here, Rykoff's alleged misrepresentation was not made in the course of Lazar's termination, but, rather, is separate from his termination. The damage Lazar alleges does not, moreover, "result from [the] termination *itself*" (*Hunter, supra, 6 Cal. 4th at p. 1178*, italics added), but from Rykoff's misrepresentations (which allegedly came to light only at the time of termination). Absent its misrepresentations, Rykoff would not have been in the position to terminate Lazar, because Lazar allegedly would not have consented to the employment contract in the first place.

Thus, *Hunter* does not bar Lazar's fraud claim.

C. *Foley*

Rykoff suggests our recognition, in *Foley, supra, 47 Cal. 3d 654*, that the employment relationship is "fundamentally contractual" (*Foley, supra, at p. 696*), coupled with references in *Hunter* to economic policy considerations we invoked in *Foley* (see *Hunter, supra, 6 Cal. 4th at pp. 1180-1182*), implies employees should generally be limited to contract damages for employment terminations. Rykoff argues that permitting tort remedies in the employment context is unnecessary and extraordinarily costly, and the policy reasons for which we declined to extend tort relief in *Foley* apply with equal force **[*644]** against Lazar's claim for fraudulent inducement of employment contract. (See *47 Cal. 3d at p. 693.*)

*Foley* addressed whether tort remedies should be available for employment terminations that allegedly breach the implied covenant of good faith and fair dealing. At issue **[***385]** was whether the employment relationship **[**989]** was "sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies" for breach of the implied covenant of good faith and fair dealing in an employment contract. (*Foley, supra, 47 Cal. 3d at p. 693.*) We declined to make that extension, "in view of the countervailing concerns about economic policy and stability, the traditional separation of tort and contract law, and finally, the numerous protections against improper terminations already afforded employees." (*Ibid.*)

Thus, the issue in *Foley* was whether to acknowledge the existence of a *previously unrecognized* cause of action (i.e., tortious breach of the implied covenant of good faith and fair dealing in the employment context). **(5c)** The issue in this case is whether we should restrict the availability of traditional tort remedies when they are sought in the employment context. In *Foley*, we recognized "the extension of . . . [available] tort remedies" proposed by plaintiffs had "the potential to alter pro-

foundly the nature of employment, the cost of products and services, and the availability of jobs." (*Foley, supra, 47 Cal. 3d at p. 694.*) We concluded any such extension is "better suited for legislative decisionmaking." (*Ibid.*) Here, by contrast, defendant's suggestion this court, in order to optimize California's business climate for employers generally, should *restrict* the application of tort remedies traditionally available in the employment context, would seem to urge upon us a quasi-legislative enterprise such as we refused in *Foley*.

In declining judicially to *expand* tort remedies for breaches of the implied covenant in *Foley*, we alluded to the need for courts to practice restraint when asked to fashion new remedies in areas of the law already governed by "numerous legislative provisions" and subject to a "diversity of possible solutions." (*Foley, supra, 47 Cal. 3d at p. 700.*) Similarly, in this case, we should be mindful that our Legislature more than a century ago codified the common law cause of action for promissory fraud in inducing a contract, along with actions for promissory fraud and fraud, generally. (See *Civ. Code, § 1572, subd. 4, 1709, 1710.*) These statutes provide no express exception for employers or employees. Accordingly, judicial restraint such as we exercised in *Foley* counsels *against* disallowing the traditional fraud claim pled in this case.

Our concern in *Foley* not to create "potential tort recovery in every [discharge] case" (*47 Cal. 3d at p. 696*) does not weigh as heavily here, **[*645]** where plaintiff alleges a traditional fraud cause of action. **(2b)** In California, fraud must be pled specifically; general and conclusory allegations do not suffice. ( *Stansfield v. Starkey (1990) 220 Cal. App. 3d 59, 74 [269 Cal. Rptr. 337]*; *Nagy v. Nagy (1989) 210 Cal. App. 3d 1262, 1268 [258 Cal. Rptr. 787]*; 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 662, pp. 111-112.) "Thus ' "the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect." ' [Citation.] [P] This particularity requirement necessitates pleading *facts* which 'show how, when, where, to whom, and by what means the representations were tendered.' " (*Stansfield, supra, 220 Cal. App. 3d at p. 73*, italics in original.) A plaintiff's burden in asserting a fraud claim against a corporate employer is even greater. In such a case, the plaintiff must "allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." ( *Tarmann v. State Farm Mut. Auto. Ins. Co. (1991) 2 Cal. App. 4th 153, 157 [2 Cal. Rptr. 2d 861].*)

Our decision in *Foley* does not provide authority for exempting employers from ordinary fraud rules that apply to Californians generally. In fact, *Foley*'s entire thrust is to the contrary insofar as we held employers to ordinary, rather than special, standards. (*Foley, supra, 47 Cal. 3d at p. 693* [holding employers are not governed by the "special relationship" standard applicable to insurers].) Moreover, while *any* lawsuit that names an employer as defendant theoretically implicates the same general range of economic **[**990]** **[***386]** policy considerations we discussed in *Foley*, those policy considerations do not necessarily apply with the same force in a fraud case.

**(6a)** Contrary to defendant's arguments, fraudulent inducement of contract--as the very phrase suggests--is not a context where the "traditional separation of tort and contract law" (*Foley, supra, 47 Cal. 3d at p. 693*; *Hunter, supra, 6 Cal. 4th at p. 1181*) obtains. To the contrary, this area of the law traditionally has involved both contract and tort principles and procedures. For example, it has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for the fraud. ( *Campbell v. Birch (1942) 19 Cal. 2d 778, 791 [122 P.2d 902]*; see generally, 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 726, pp. 825-826.)

**(5d)** Defendant opines that barring claims for fraudulent inducement of employment contract, in light of "existing protections against improper terminations" (see *Hunter, supra, 6 Cal. 4th at p. 1182*, citing *Foley, supra, 47 Cal. 3d at pp. 692-693*), would leave employees well protected. But the resolution proposed here involves affirming, not inventing, the cause of **[*646]** action for promissory fraud. Thus the "existing protections" we invoked in *Hunter* necessarily included the availability of promissory fraud actions like this one.

**(6b)** More fundamentally, it is a truism that contract remedies alone do not address the full range of policy objectives underlying the action for fraudulent inducement of contract. In pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future. (Cf. *Foley, supra, 47 Cal. 3d at p. 683* [recognizing tort law is designed to vindicate social policy].) Because of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for "predictability about the cost of contractual relationships" (*ibid.*), fraud plaintiffs may recover "out-of-pocket" damages in addition to benefit-of-the-bargain damages. ( *Tavaglione v. Billings, supra, 4 Cal. 4th at p. 1159*, citing with approval *Pat Rose Associates v. Coombe (1990) 225 Cal. App. 3d 9, 20 [275 Cal. Rptr. 1]*; see also *Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal. 4th 85, 97 [44 Cal. Rptr. 2d 420, 900 P.2d 669]* [discussing "[t]he distinction between tort and contract actions, and their purposefully different measure of damages"].) For example, a fraudulently hired employee, as Lazar has alleged

himself to be, may incur a variety of damages "separate from the termination" itself, such as the expense and disruption of moving or loss of security and income associated with former employment.

It is true that in *Hunter* we buttressed our fraud analysis with references to some of the economic policy considerations reviewed in *Foley*. (See *Hunter, supra, 6 Cal. 4th at pp. 1180-1182* [reviewing the grounds for *Foley*'s conclusion the employment relationship is fundamentally contractual]; *id. at p. 1183* [reviewing restrictions on tort recovery for injuries covered by workers compensation].) Our *Hunter* opinion does contain some broad language suggestive of Rykoff's position. (See, e.g., *Hunter, supra, 6 Cal. 4th at p. 1185* ["Recognition of a fraud cause of action in the context of wrongful termination of employment not only would contravene the logic of *Foley*, but also potentially would cause adverse consequences for industry in general."])

Nevertheless, we reject Rykoff's contention that, by citing *Foley* in *Hunter*, we restricted or abandoned traditional tort remedies in the employment context. Instead, our reference in *Hunter* to "the logic of *Foley*" (*Hunter, supra, 6 Cal. 4th at p. 1185*) merely invoked *Foley*'s holding that tort damages should not be judicially extended in order to "fashion remedies for breach of a contract provision." (*Foley, supra, 47 Cal. 3d at p. 700.*) In *Hunter*, we had concluded that a misrepresentation to effect termination of **[*647]** employment did not "rise to the level of a separately **[**991]** actionable fraud." (*Hunter, supra, 6 Cal. 4th at p. 1185.*) Since "the result of Up-Right's misrepresentation [was] indistinguishable from an ordinary wrongful termination" ( *id. at p. 1184*), *Foley*'s "logic" (that, in light of "potentially enormous [economic] consequences," tort remedies ought not be judicially extended beyond their traditional limits) became pertinent. (*47 Cal. 3d at p. 699.*)

**(5e)** This case is different. Here we are not dealing with allegations of breach of a contract provision, but with allegations of fraud. *Foley* was a *contract* case in which we declined to *expand* the availability of tort remedies for breach of contract; this is a *tort* case in which we are being asked by defendant to *constrict* traditional tort remedies.

Defendants fix upon our reference in *Hunter* to "*Foley*'s conception of the employment relation as fundamentally contractual, giving rise only to contractual damages in the event of [a] breach in the absence of some violation of a fundamental public policy." (*Hunter, supra, 6 Cal. 4th at p. 1182.*) While in *Hunter* we noted we have "continuously adhered to that view" (*id. at p. 1178*), we were referring there to our consistent refusal to validate tort remedies for breach of contract, *not* to any erosion of traditional fraud remedies.

Nevertheless, defendant argues that in *Hunter* we impliedly extended *Foley* to preclude recovery of tort damages in any case where the plaintiff fails to allege the discharge violated a fundamental public policy. Defendant points to *Hine v. Dittrich (1991) 228 Cal. App. 3d 59 [278 Cal. Rptr. 330]*, *Soules v. Cadam, Inc. (1991) 2 Cal. App. 4th 390 [3 Cal. Rptr. 2d 6]* and *American Guar. & Liability v. Vista Medical Supply (N.D.Cal. 1988) 699 F. Supp. 787* as instances where courts have recognized and applied such a principle to defeat the plaintiff's tort claims. In *Hunter*, we cited *Hine* and *Soules* as examples of Court of Appeal cases following *Foley*, and suggested the conclusion in *American Guar. & Liability*, (that an employee's negligent misrepresentation claim, which arose out the employer's intentional act of discharging her, was "part and parcel" of her wrongful discharge claim), was "correct and pertinent" to the issue before us. (*Hunter, supra, 6 Cal. 4th at p. 1182.*)

Defendant argues that, in referring to *Hine* and *Soules* in *Hunter*, we impliedly endorsed the proposition that an employee can never state a tort claim arising from employment termination, other than wrongful termination in violation of public policy. Defendant makes too much of our mention of these cases. Our references in *Hunter* simply buttressed, in general terms, **[*648]** our recognition that California courts "have adhered to *Foley*'s conception of the employment relation." (*Hunter, supra, 6 Cal. 4th at p. 1182*, citing *Hine, Soules* and *American Guar. & Liability*.) Nothing in *Hunter*'s language or reasoning committed us to wholesale adoption of the sometimes sweeping analyses or conclusions contained in *Hine, Soules* and *American Guar. & Liability*.

*Hine v. Dittrich, supra, 228 Cal. App. 3d 59*, was a negligent supervision case in which the plaintiff specifically alleged he suffered no injury until he was discharged. ( *Hine v. Dittrich, supra, 228 Cal. App. 3d at p. 64.*) In a portion of the opinion we did not quote in *Hunter*, the Court of Appeal expansively opined: "As long as the alleged injury would not have occurred but for the employment termination, *Foley* indicates that the employee is generally limited to a contractual remedy." (*228 Cal. App. 3d at p. 65.*) By contrast, Lazar alleges injuries from intentionally tortious behavior which occurred before, during and after the actual termination. In *Soules*, the Court of Appeal disapproved the use of pleading artifice to relabel a deficient breach of contract claim. ( *Soules v. Cadam, Inc., supra, 2 Cal. App. 4th at pp. 403-404.*) By contrast, even defendant does not contend this case is one of artful pleading; as discussed, Lazar has alleged the traditional elements of promissory fraud. More importantly, the plaintiff in *Soules* founded his tort claims entirely upon conduct alleged to have breached **[**992]** the employment contract. ( *Id. at p. 404.*) Lazar alleges fraudulent inducement.

While in *Hunter* we also approved in dictum the court's conclusion in *American Guar. & Liability v. Vista Medical Supply, supra, 699 F. Supp. 787*, that the employee's negligent supervision claim was subsumed in her wrongful termination claim (*Hunter, supra, 6 Cal. 4th at p. 1182*), we did not intend thereby to usurp the legislative function and create any new across-the-board tort immunity for employers who wrongfully terminate employees. We agree with plaintiff there is no "*Foley* doctrine" stating or implying that employers who terminate employees do or should enjoy broad special immunities from tort liability.

In short, nothing in the logic of *Foley*, or our subsequent discussion in *Hunter* of the policy considerations underlying *Foley*, suggests California fraud doctrine should be revised judicially in the manner defendant advocates. Thus, *Foley* does not bar Lazar's fraud claim.

III. *CONCLUSION*

Consistent with the foregoing, as to his *fraud* claim Lazar may properly seek damages for the costs of uprooting his family, expenses incurred in **[*649]** relocation, and the loss of security and income associated with his former employment in New York. On the facts as pled, however, Lazar must rely on his *contract* claim for recovery of any loss of income allegedly caused by wrongful termination of his employment with Rykoff. Moreover, any overlap between damages recoverable in tort and damages recoverable in contract would be limited by the rule against double recovery. ( *Tavaglione v. Billings, supra, 4 Cal. 4th at p. 1159.*)

Lazar, therefore, may proceed with his claim for fraud in the inducement of employment contract, properly seeking damages for "all the detriment proximately caused thereby" ( *Civ. Code, § 3333*), as well as appropriate exemplary damages ( *Civ. Code, § 3294*).

For the foregoing reasons, the judgment of the Court of Appeal is affirmed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**CONCUR BY:** MOSK, J.

**CONCUR**

**MOSK, J.**

I concur in the judgment. I also agree with much of the reasoning of the majority opinion. I continue to believe, however, that *Hunter v. Up-Right, Inc. (1993) 6 Cal. 4th 1174 [26 Cal. Rptr. 2d 8, 864 P.2d 88]* (*Hunter*) was wrongly decided. The majority today do not overrule *Hunter*--indeed, because the present case is factually distinguishable, they have no occasion to do so. Instead, they reject the more extreme view of that case urged by real party in interest Rykoff-Sexton, Inc. (Rykoff), and attempt to put *Hunter* on a firmer logical basis. Although I remain unpersuaded that *Hunter* is soundly reasoned, I welcome the majority's limitation of *Hunter*'s potentially broad holding.

The majority wisely repudiate Rykoff's view that *Hunter* and *Foley v. Interactive Data Corp. (1988) 47 Cal. 3d 654 [254 Cal. Rptr. 211, 765 P.2d 373]* stand for the radical proposition that courts should not, for public policy reasons, enforce any tort liability arising in connection with the wrongful termination of an employment contract. They correctly identify the question in *Hunter* and the present case as whether all the traditional elements of fraud, and specifically the element of detrimental reliance, are present. They maintain that no detrimental reliance could be found in *Hunter*, stating: "Hunter's employer had the power to terminate him, rightly or wrongly. . . . Had Hunter not resigned, he would, presumably, have been discharged in any event . . . . [P] In short, because Up-Right had both the power and intention of discharging him in any event, Hunter was no worse off for being induced by Up-Right's misrepresentation to resign." (Maj. opn., *ante*, at p. 642.) Thus, they reason that Hunter did not *detrimentally* **[*650]** rely on Up-Right's misrepresentation inducing him to resign because he would have been discharged in any case.

**[**993]** **[***389]** Although I disagree with the majority's interpretation of the facts of the *Hunter* case (see *Hunter, supra, 6 Cal. 4th at p. 1191* (dis. opn. of Mosk, J.)), there is no need to reargue the merits of a case already decided. But the majority appear to recognize that the question central to *Hunter*--whether an employee who is deceived into resigning may sue the employer for fraud--turns on the answer to a question of fact: whether it is probable that the employee would have been terminated anyway, and therefore did not rely detrimentally on the employer's misrepresentation in any actual sense. The majority appear to presume that if an employer had both the intention and the power to discharge an employee, then the employee will be inevitably discharged by either truthful or deceptive means, and is therefore no worse off for having been deceived into resigning. But that presumption must be rebuttable on a contrary factual showing.

Under what circumstances would an employer who has the ability and intention to discharge an employee nonetheless refrain from discharging him *except* by means of misrepresentation? The answer, surely, is that under some circumstances, the employer will refrain from discharging the employee outright because it is too *costly* to do so. Employers may, for example, resort to such fraudulent deception when they know that to terminate the employee straightforwardly will lead to a law-

suit in which the employee would likely prevail. This species of fraud may be especially common in those situations in which a manager superior to the employee seeks to be rid of the employee, but finds such a decision to be at variance with official company policy. In such a case, the manager may seek not only to avoid potential lawsuits, but also the employer's internal disciplinary processes (see, e.g., *Scott v. Pacific Gas & Electric Co. (1995) 11 Cal. 4th 454, 460-461 [46 Cal. Rptr. 2d 427, 904 P.2d 834]*) by obtaining the employee's resignation through trickery. Under these circumstances, the employee would likely not have been fired unless the manager could resort to deception. Therefore the employee who resigns in reliance on such deception can be said to have "detrimentally relied," by any reasonable understanding of that term. The employee would therefore have a cognizable action for fraud against the manager and against his employer.

In the present case, the majority rightly recognize that all the elements of fraud, including detrimental reliance in the traditional sense, have been properly alleged in this ordinary fraudulent inducement case. By framing the *Hunter* opinion in narrow terms, the majority move in the direction of acknowledging that the question whether an employee has detrimentally **[*651]** relied on an employer's misrepresentations in connection with a discharge is one of fact, to be determined from the totality of the circumstances.

**KENNARD, J.,**

Concurring.--I agree with the analysis and conclusions of the majority, with the following exception. The majority describes at some length the "rationale" underlying this court's opinion in *Hunter v. Up-Right, Inc. (1993) 6 Cal. 4th 1174 [26 Cal. Rptr. 2d 8, 864 P.2d 88]*. (Maj. opn., *ante*, at pp. 641-642.) *Hunter* is now the law, but the rationale on which it is based is not well founded, as I explained in my dissenting opinion in that case. (*Hunter, supra, 6 Cal. 4th at pp. 1196-1198* (dis. opn. of Kennard, J.).) To the extent that the majority opinion may be read as endorsing *Hunter*'s reasoning, I do not join it. I agree with the majority, however, that *Hunter* is distinguishable from this case, and that the judgment of the Court of Appeal should be affirmed.

**DISSENT BY:** KENNARD, J.

# TAB 18

LEXSEE 221 CAL.APP.3D 1151

**DENIS LOVE et al., Plaintiffs and Appellants, v. FIRE INSURANCE EXCHANGE, Defendant and Respondent**

**No. D009984**

**Court of Appeal of California, Fourth Appellate District, Division One**

***221 Cal. App. 3d 1136; 271 Cal. Rptr. 246; 1990 Cal. App. LEXIS 683***

**June 28, 1990**

**SUBSEQUENT HISTORY:** [***1] Appellants' petition for review by the Supreme Court was denied September 13, 1990. Mosk, J., was of the opinion that the petition should be granted.

**PRIOR HISTORY:** Superior Court of San Diego County, No. 594987, William C. Pate, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Insureds hired a geotechnical engineering firm to inspect their home after they discovered cracks in the foundation and filling of their home and related problems. The firm advised them that the damage was related to earth movement and the negligence of the home builders. The insureds made a claim for damages which the insurer denied. Nearly five years later the insureds resubmitted their claim, which the insurer, after conducting an investigation, again denied. The insureds filed an action against the insurer for breach of the covenant of good faith and fair dealing, breach of statutory duties, breach of contract, fraud, and intentional infliction of emotional distress. The insurer moved for summary judgment on the grounds that the claims were time-barred by both the policy provisions and the governing statutes of limitation. The trial court granted summary judgment for the insurer. (Superior Court of San Diego County, No. 594987, William C. Pate, Judge.)

The Court of Appeal affirmed, holding that the insureds' action was time-barred. The court held that when an insured observes abnormal damage, hires an engineering firm to investigate, and obtains a report stating that earth movement and third party negligence are causes of the damage, his causes of action against the insurer accrue on receipt of such report, because the statute of limitations commences when a party knows or should know the facts essential to his claim. The court held that an insured who was aware of the essential facts cannot toll the statute of limitations by contending that he only belatedly discovered that his policy might provide coverage. The court also held that the insurer was not estopped to assert the defense of the statute of limitations, notwithstanding the insureds' contention that it had an obligation to disclose that where third party negligence was a proximate cause of the injury, an otherwise excluded loss was a covered loss. An insurer is under no obligation, the court held, to explain to the insured all possible legal theories of recovery. Finally, the court held, summary judgment was properly granted insofar as the insureds' causes of action were based on misfeasance allegedly committed by the insurer after they submitted their claim a second time; a cause of action for bad faith cannot be maintained unless policy benefits are due, and the insureds' claim for benefits was time-barred. (Opinion by Froehlich, J., with Kremer, P. J., concurring. Separate opinion by Wiener, J., concurring in the result.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Summary Judgment § 8--Affidavits--Construction.** --The purpose of the summary procedure is to penetrate

through evasive language and adept pleading and ascertain the existence or absence of triable issues. The trial judge determines whether triable issues exist by examining the affidavits and evidence before him, including any reasonable inferences that may be drawn from the facts before him. While the affidavits of the moving party are to be strictly construed and those of the opponent liberally construed, a party opposing a motion for summary judgment that is supported by affidavits or declarations sufficient to sustain the motion, has the burden of showing that triable issues of fact exist.

**(2) Limitation of Actions § 83--Trial, Judgment, and Appeal--Summary Judgment.** --Where the operative facts are undisputed, the question of the application of the statute of limitations is a matter of law, and summary judgment is proper where the facts show the action is time-barred as a matter of law.

**(3) Estoppel and Waiver § 16--Estoppel--Questions of Law and Fact--Summary Judgment.** --Estoppel is not always a question of fact that precludes summary judgment.

**(4a) (4b) Insurance Contracts and Coverage § 126--Actions--Statute of Limitations--Effect of Knowledge of Facts Essential to Claim.** --An action by insureds against their insurer for payments due under their policy and for wrongful denial of payment was time-barred, where the insureds were notified by their geotechnical firm that their home was suffering damages from subsidence problems caused by third party negligence in constructing the home, where the insurer denied coverage, and where they did not bring suit against the insurer until nearly seven years later. When an insured observes abnormal damage, hires an engineering firm to investigate, and obtains a report stating earth movement and third party negligence are causes of the damage, his causes of action against the insurer accrue on receipt of such report, because the statute of limitations commences when a party knows or should know the facts essential to his claim. An insured who is aware of the essential facts cannot toll the statute of limitations by contending that he only belatedly discovered that his policy might provide coverage.

**(5) Insurance Contracts and Coverage § 126--Actions--Statute of Limitations--Applicable Statutes.** --In an action by insureds against their insurer, the insureds' breach of the written contract count was subject to a four-year limitation (*Code Civ. Proc., § 337, subd. 1*), as was their claim for breach of the covenant of good faith and fair dealing insofar as it rested on the implied contractual premise.

**(6) Insurance Contracts and Coverage § 122--Breach of Statutory Duties--Private Right of Action.** --There is no private cause of action per se for an insurer's breach of its statutory duties under *Ins. Code, § 790.03*.

**(7a) (7b) Insurance Contracts and Coverage § 126--Actions--Statute of Limitations--Estoppel.** --In an action by insureds against their insurer that was brought nearly seven years after the insurer denied their claim, the insurer was not estopped to assert the statute of limitations, notwithstanding the insureds' contention that because the insurer stood in a fiduciary relationship with them, it had an obligation to disclose that where third party negligence was a proximate cause of the injury, an otherwise excluded loss was a covered loss. The insurer denied the claim without disclosing this alternative legal theory of coverage. However, an insurer is not estopped to assert the statute of limitations where denial of the claim was at most an incorrect interpretation of the terms of the policy. An insurer is under no obligation to explain to the insured all possible legal theories of recovery. Further, the entire cargo of fiduciary obligations cannot be imported uncritically into the port of insurance law: the insureds were not excused from exercising an ordinary degree of diligence in investigating or pursuing their rights because of the alleged existence of a fiduciary relationship.

**(8) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith.** --An insurer (like any other party to a contract) owes a general duty of good faith and fair dealing. Further, because of the special relationship inherent in the nature of an insurance contract, the insurer's obligations attendant to its duty of good faith are heightened. Because of this unique special relationship, a breach of the obligation of good faith may give rise to tort (rather than mere contractual) remedies.

**(9) Contracts § 41--Performance--Implied Covenant of Good Faith and Fair Dealing.** --The covenant of good faith and fair dealing is implied in every contract as a method to protect the interests of the parties in having the contractual promises and purposes performed. Because contracts differ, the nature and extent of the duties owed under the implied covenant are also variable and will depend on the contractual purposes.

**(10) Insurance Contracts and Coverage § 111--Duty of Insurer to Act in Good Faith--Payment of Proceeds.** --An insurer must investigate claims thoroughly. It may not deny coverage based on either unduly restrictive policy interpretations or standards known to be improper, and it may not unreasonably delay in processing or paying claims.

**(11) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Nature of Relationship Between Insurer and Insured.** --Unique obligations are imposed upon true fiduciaries that are not found in the insurance relationship. A true fiduciary must first consider and always act in the best interests of its trust and not allow self-interest to overpower its duty to act in the trust's best interests. An insurer, however, may give its own interests consideration equal to that it gives the interests of its insured. It is not required to disregard the interests of its shareholders and other policyholders when evaluating claims, and it is not required to pay noncovered claims, even though payment would be in the best interests of its insured.

**(12) Insurance Companies § 1--Use of Premiums.** --Unlike the rule that prohibits true fiduciaries from commingling trust funds with the funds of others or from profiting from using the funds received from the beneficiary, no similar prohibition circumscribes an insurer's use of premiums. Indeed, pooling of funds from insureds to create loss reserves, and investing such pooled funds for profit in order to enhance the insurer's financial strength, appear integral parts of the business of insurance.

**(13a) (13b) Insurance Contracts and Coverage § 126--Actions--Statute of Limitations--Insurer's Conduct Following Expiration of Period.** --In an action by insureds against their insurer that was brought nearly seven years after the insurer initially denied their claim, the trial court properly granted summary judgment for the insurer insofar as the insureds' causes of action were premised on the insurer's alleged acts of misfeasance occurring after the insureds resubmitted their claim five years after the original denial. At the time of the second submission, the statute of limitations on their right to sue for benefits under the policy had already expired, and when an insured's right to collect policy benefits is already time-barred, he may not resurrect his rights simply by resubmitting a claim after the lapse of the limitations period. Tort liability for breach of the implied covenant of good faith and fair dealing is primarily measured by whether the insurer withheld payment of an insured's claim unreasonably and in bad faith. Where benefits are withheld for proper cause, there is no breach of the implied covenant. A bad faith claim cannot be maintained unless policy benefits are due.

**(14) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Elements of Breach.** --There are at least two separate requirements to establish breach of the implied covenant of good faith and fair dealing in an insurance context: benefits due under the policy must have been withheld; and the reason for withholding benefits must have been unreasonable or without probable cause.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 656.]

**(15) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--As Supplemental to Insured's Primary Rights.** --The implied covenant of good faith and fair dealing is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract. Thus when benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because they frustrate the insured's primary right to receive the benefits of his contract--i.e., prompt compensation for losses.

**COUNSEL:** William J. Brown III for Plaintiffs and Appellants.

Kenneth N. Greenfield, Horvitz & Levy, Barry R. Levy and Mitchell C. Tilner for Defendant and Respondent.

**JUDGES:** Opinion by Froehlich, J., with Kremer, P. J., concurring. Separate opinion by Wiener, J., concurring in the result.

**OPINION BY:** FROEHLICH

**OPINION**

[*1141] [**247] Appellants Denis Love and Sharon Love appeal from a judgment in favor of Fire

Insurance Exchange (FIE) following the granting of FIE's motion for summary judgment based on the statute of limitations. The Loves contend (1) FIE's conduct estops it from relying on the statute of limitations; (2) they have independent causes of action for bad faith which are not [**248] time-barred; and (3) the numerous triable issues of fact preclude entry of summary judgment.

1. *Factual Background*

The Loves have resided in their home since 1969. They had insured the home through FIE at all relevant times. In late 1980 Mr. Love discovered cracks in the foundation and [***2] filling of the home, "strange" cracks in the ground adjacent to the home, separations, sticking doors and a broken framing member in and around the home. On February 3, 1981, the Loves hired a geotechnical engineering firm to inspect the home. The geotechnical engineering firm conducted the inspection and thereafter advised the Loves the damage was related to earth movement and the negligence of the home builders. The firm further advised the Loves the cracked slab was caused by expansion and contraction of the soils beneath the home.

Also in February of 1981 Mr. Love telephoned his insurance agent, Oliver Crocker, and made a claim for the damages described above. Crocker, FIE's agent and representative, denied the claim indicating there was no coverage under the Loves' policy because the claimed damages were an "act of god." The Loves took no further steps to pursue the denied claim.

In December of 1985 Mr. Love was told by an acquaintance the damage to his home (which had worsened over time) was common to homes in the [*1142] area and that other insurance companies had compensated other owners for similar damages. On December 30, 1985, Mr. Love again contacted Crocker to [***3] resubmit his claim for the above described damages. By a letter dated January 21, 1986, FIE acknowledged receipt of the renewed claim and informed the Loves it would undertake an investigation of their claim, without waiver of any defenses then available to FIE. The Loves acknowledged receipt of the letter, understanding that FIE was not waiving any of its rights. After conducting an investigation, FIE denied the Loves' claim on May 29, 1987.

On January 21, 1988, the Loves filed an action against FIE alleging, among others, causes of action for breach of the covenant of good faith and fair dealing, breach of statutory duties, breach of contract, fraud and intentional infliction of emotional distress. [1] FIE subsequently moved for summary judgment on the grounds the claims were time-barred by both the policy provisions [2] and governing statutes of limitations. The court concluded the action was barred by the statutory limitation periods and granted FIE's motion. Following entry of judgment, this appeal was undertaken.

1 The complaint also alleged causes of action for intentional and negligent interference with prospective economic advantage. However, these claims were against defendants other than FIE.

[***4]

2 The policies of insurance contained contractual provisions mandating that any suit on the policy be filed within one year after the loss.

2. *Standard of Review*

The purposes and standards for summary judgment are well established.

**(1)** "The purpose of the summary procedure is to penetrate through evasive language and adept pleading and ascertain the existence or absence of triable issues. [Citations.]" ( *Chern v. Bank of America (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].*) The trial judge determines whether triable issues exist by examining the affidavits and evidence before him, including any reasonable inferences which may be drawn from the facts before him. ( *People v. Rath Packing Co. (1974) 44 Cal.App.3d 56, 61-64 [118 Cal.Rptr. 438].*) While ". . . the affidavits of the moving party are to be strictly construed and those of the opponent liberally construed . . . [citation], . . . a party opposing a motion for summary judgment which is supported by affidavits or declarations sufficient to sustain [***5] the motion, has the burden of showing that triable issues of fact exist." ( *Chern v. Bank of America, supra, 15 Cal.3d at p. 873.*)

**(2)** Where the operative facts are undisputed, the question of the application of the statute of limitations is a matter of law [**249] ( *Wells Fargo Bank v.* [*1143] *Superior Court (1977) 74 Cal.App.3d 890, 895 [141 Cal.Rptr. 836]*), and summary judgment is proper where the facts show the action is time-barred as a matter of law ( *Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 1112*

*[245 Cal.Rptr. 658, 751 P.2d 923]*).

**(3) (See fn. 3.)** We conclude the trial court correctly determined there were no triable issues of material fact and the claims were barred by the statute of limitations. [3]

3 Love asserts estoppel is always a question of fact which precludes summary judgment. We disagree. (See, e.g., *Neff v. New York Life Ins. Co. (1947) 30 Cal.2d 165 [180 P.2d 900, 171 A.L.R. 563]* [where facts undisputed, trial court may summarily grant judgment in favor of defendant on statute of limitations grounds despite estoppel claim].)

[***6] 3. *Loves' Causes of Action Are Barred by the Statute of Limitations*

**(4a)** All of the Loves' claims for payments due under the policy (and their causes of action based on wrongful denial of said claims) accrued in 1981, when they were notified by their geotechnical firm the home was suffering damages from subsidence problems caused by third party negligence in constructing the home. Where an insured observes abnormal damage, hires an engineering firm to investigate, and obtains a report stating earth movement and third party negligence are causes of the damage, his causes of action against the insurer accrue on receipt of such report ( *Lawrence v. Western Mutual Ins. Co. (1988) 204 Cal.App.3d 565, 571-573 [251 Cal.Rptr. 319]*), because the statute of limitations commences when a party knows or should know the *facts* essential to his claim ( *Gutierrez v. Mofid (1985) 39 Cal.3d 892, 897-898 [218 Cal.Rptr. 313, 705 P.2d 886]*).

An insured who is aware of the essential facts cannot toll the statute of limitations by contending he only belatedly discovered his policy might provide coverage ( *Abari v. State Farm Fire & Casualty Co. (1988) 205 Cal.App.3d 530, 535-536 [252 Cal.Rptr. 565]*), [***7] because knowledge of the *facts*, rather than knowledge of the available legal theories or remedies, starts the statute of limitations ( *Gutierrez v. Mofid, supra, 39 Cal.3d at p. 898*). Accordingly, the Loves' causes of action accrued not later than February of 1981, because Loves were aware of the factual predicate to their suit and were aware their claim had been unconditionally denied. (Cf. *State Farm Fire & Casualty Co. v. Superior Court (1989) 210 Cal.App.3d 604 [258 Cal.Rptr. 413]* [knowledge of facts and unconditional denial of claim start statute of limitations].)

The Loves' complaint was filed in January of 1988, almost seven years after their claims were alleged to be wrongfully denied.

**(5)** ,

**(6) (See fn. 4.)**

[*1144] **(4b)** Although the different causes of action carry different periods of limitation, [4] all periods expired well before the complaint was filed.

4 The Loves' breach of the written contract count is subject to a four-year limitation ( *Code Civ. Proc., § 337, subd. 1*), as is their claim for breach of the covenant of good faith and fair dealing insofar as it rests on the implied contractual promise. ( *Comunale v. Traders & General Ins. Co. (1958) 50 Cal.2d 654, 662-663 [328 P.2d 198, 68 A.L.R.2d 883]*.) These obligations were breached on wrongful denial of the claim in 1981, and are time-barred. To the extent the Loves seek tort remedies on their claim for breach of the covenant of good faith and fair dealing, the claim is governed under and is barred by the two-year statute of limitations under *Code of Civil Procedure section 339, subdivision 1*. ( *Richardson v. Allstate Ins. Co. (1981) 117 Cal.App.3d 8, 12-13* [tort cause of action for breach of implied covenant of good faith governed by *Code Civ. Proc., § 339, subd. 1*].) The Loves' "fraud" claim (assuming it is somehow distinct or independent from their bad faith counts) is governed under and is barred by the three-year limitation period under *Code of Civil Procedure section 338, subdivision (d)*, since the Loves knew the *facts* (albeit not the legal theory) upon which the fraud was premised. Finally, the Loves' "intentional infliction of emotional distress" claim, again assuming it is somehow distinct or independent from their bad faith count (but see *Richardson v. Allstate Ins. Co., supra, 117 Cal.App.3d at pp. 12-14*), is barred by the one-year limitations period under *Code of Civil Procedure section 340, subdivision (3)* applicable to such claims. ( *Purcell v. Colonial Ins. Co. (1971) 20 Cal.App.3d 807, 809,*

*814-815 [97 Cal.Rptr. 874].)*

Although the Loves also purported to plead a cause of action for "breach of statutory duties," alleging violations of *Insurance Code section 790.03*, it is now settled there is not per se such a private cause of action. ( *Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal.3d 287, 304-305 [250 Cal.Rptr. 116, 758 P.2d 58].*)

[***8]

[**250] 4. *FIE's Conduct Does Not Estop It From Relying on the Statute of Limitations Defenses*

**(7a)** The Loves seek to avoid the time bar by arguing FIE is estopped to assert the statute of limitations. The Loves contend because FIE stood in a fiduciary relationship with them, it had an obligation to disclose that where third party negligence was a proximate cause of the injury, an otherwise excluded loss was a covered loss. FIE denied the 1981 claim without disclosing this alternative legal theory of coverage. Instead, the Loves argue, FIE fraudulently concealed such legal theory. They urge such fraudulent concealment and failure to disclose should operate to estop FIE from relying on the statute of limitations. We reject their argument for several reasons.

First, we are unaware of any authority holding that an insurer is estopped to plead the statute of limitations merely because when it denied a claim it failed to inform its insured of pertinent laws or legal theories upon which the insured could rely in a later lawsuit challenging denial of the claim. To the contrary, on facts similar to the instant case, our Supreme Court in *Neff v. New York Life Ins. Co., supra, 30 Cal.2d 165*, [***9] concluded an insurer's denial of a claim started the statute of limitations running. In *Neff* an [*1145] insured, possessing both the operative *facts* upon which his claim was based and the policy defining his rights, submitted a claim. The insurer unequivocally rejected the claim on the grounds the claim was not covered by the policy; and the insured failed to pursue the matter. In a later lawsuit the insured argued the insurer was estopped from relying on the statute of limitations, contending the insurer's denial of the claim was a "misrepresentation" which caused insured's failure to pursue the claim. Citing the rule that an insurer must deal with his insured in good faith and take no unfair advantage, insured claimed the denial of the claim amounted to concealing a "fact" (i.e., of coverage) sufficient to estop reliance on the statute of limitations.

The *Neff* court rejected this contention. It reasoned that if an insurer was held to have concealed facts sufficient to estop reliance on the statute of limitations merely because it denied a claim without disclosing potential legal theories or grounds for coverage, an insurer would rarely be entitled to litigate [***10] claims disputes within the limitation periods, as such periods would be indefinitely suspended until the insured sought and obtained legal advice indicating the grounds to challenge the insurer's decision. ( *Id. at p. 172.*) The *Neff* court instead concluded that, because the insured possessed both the facts and his policy, the insurer could deny the claim without concomitantly waiving the statute of limitations: ". . . Defendant [insurer], concealing no *fact* from the insured, was free to take this position. The insured, knowing all the facts which were known to defendant, was then free to litigate the issue of the liability which defendant had denied. It is a matter of common knowledge that there are often differences of opinion concerning liability under insurance policies and *no mere denial of liability, even though it be alleged to have been made through fraud or mistake, should be held sufficient, without more, to deprive the insurer of its privilege of having the disputed liability litigated within the period prescribed by the statute of limitations.*" (*30 Cal.2d at pp. 172-173*, italics [***11] added.)

It is undisputed that the Loves knew the operative facts (i.e., their home was damaged and the causes of damage included third party negligence), and there is no allegation they did not possess the policy provisions outlining their rights. Finally, they admit being told unequivocally in 1981 their claim was denied for lack of coverage. FIE neither "misrepresented" nor "concealed" any facts (as opposed to pertinent law or legal theories) upon which the Loves' claim was based, nor did it conceal the terms of the policy or the fact it denied the claim for lack of coverage. [5] Under [**251] *Neff*, as well as [*1146] numerous subsequent cases, ignorance of legal theories does not toll the statute of limitations. (Cf. *State Farm Fire & Casualty Co. v. Superior Court, supra, 210 Cal.App.3d at p. 608* ["ignorance of legal remedy does not toll the statute of limitations"]; *Cardosa v. Fireman's Fund Ins. Co. (1956) 144 Cal.App.2d 279 [300 P.2d 875]* [claim denied by agent for lack of coverage; insurer not estopped to rely on statute of limitations merely because insured "relied" on denial in failing to file suit].) [***12] As recognized in

*Matsumoto v. Republic Ins. Co. (9th Cir. 1986) 792 F.2d 869*, an insurer (who conceals no facts) is not estopped to assert statute of limitations because denial of claim was "at most, an incorrect interpretation of the terms of [the policy] . . . . Here, as in *Neff*, the insurer's denial of liability may have caused the insured not to pursue a cause of action, but this does not toll the statute of limitations." ( *Id. at p. 872.*)

5 Although the Loves cite numerous cases for the contention that nondisclosure, concealment or affirmative misrepresentations can estop an insurer from relying on the statute of limitations, those cases are inapposite. Several cases involved estoppel because the defendants' nondisclosures and/or misrepresentations effectively concealed the *facts* upon which the cause of action rested, *not* the *legal theories* supporting the complainants' claims. The cases of *Pashley v. Pacific Elec. Ry. Co. (1944) 25 Cal.2d 226 [153 P.2d 325]*; *Kimball v. Pacific Gas & Elec. Co. (1934) 220 Cal. 203 [30 P.2d 39]*; *Scott v. Federal Life Ins. Co. (1962) 200 Cal.App.2d 384 [19 Cal.Rptr. 258]* and *Baker v. Beech Aircraft Corp. (1974) 39 Cal.App.3d 315 [114 Cal.Rptr. 171, 91 A.L.R.3d 981]*, relied upon by the Loves, are all of this genre. The Loves also cite several other cases ( *Wyatt v. Union Mortgage Co. (1979) 24 Cal.3d 773 [157 Cal.Rptr. 392, 598 P.2d 45]*; *Davis v. Blue Cross of Northern California (1979) 25 Cal.3d 418 [158 Cal.Rptr. 828, 600 P.2d 1060]*; and *Westrick v. State Farm Insurance (1982) 137 Cal.App.3d 685 [187 Cal.Rptr. 214]*) for the proposition that misrepresentations or nondisclosures about the terms of the insurance policy, even though the documents are possessed by the insured, breach the insurer's fiduciary obligations. However, none of those cases stands for the proposition that failure to disclose a *legal theory* of coverage is tantamount to nondisclosure of a *fact* sufficient to toll the statute of limitations. *Wyatt* merely held that a borrower, even though he signed a stack of legal documents, could sue his loan broker who (in response to the borrower's direct questions) had orally misrepresented and failed to fully disclose the true *facts* of the loan transaction. ( *Wyatt v. Union Mortgage Co., supra, 24 Cal.3d at pp. 780, 782-784.*) *Davis* held that where the contract of insurance contains an arbitration clause buried in an obscure location, and it is apparent the insured is unaware of the *fact* this procedural device is available, an insurer may not fail to disclose this fact to his insured, because such nondisclosure effectively transforms a remedy originally intended to be mutually available into a remedy unilaterally open to the insurer. ( *Davis v. Blue Cross, supra, 25 Cal.3d at pp. 426-431.*) Finally, *Westrick* held that where the circumstances permit the insured justifiably to rely on his agent to obtain insurance for a vehicle, the agent may not escape liability for failing to obtain insurance merely because he made no express promise or remained silent in response to the insured's request for insurance, but must instead affirmatively disclose the *fact* that there would be no insurance. ( *Westrick v. State Farm, supra, 137 Cal.App.3d at pp. 690-693.*)

[***13] The Loves seek to avoid the dispositive impact of *Neff* by arguing that *Neff* was decided at a time when there was no fiduciary relationship between an insurer and an insured, whereas current law recognizes that such a relationship (and its attendant duties) now exists. Positing such a relationship, the Loves argue FIE's fiduciary obligation of full disclosure of all facts pertinent to the relationship was breached when it failed to disclose potential [*1147] coverage. They further argue their reliance on FIE's fiduciary obligation induced them to withhold investigation of the bona fides of coverage denial.

We cannot accept Loves' blanket characterization of FIE as a "fiduciary." 6

**(8)** Of course, an insurer (like any other party to a contract) owes a general duty of good faith and fair dealing. ( *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752, 768-769 [206 Cal.Rptr. 354, 686 P.2d 1158].*) Moreover, because of the "special relationship" inherent in the unique nature of an insurance contract, the [**252] insurer's obligations attendant to its duty of good faith are heightened. Such obligations have been characterized [***14] as *akin* to fiduciary-type responsibilities. ( *Frommoethelydo v. Fire Ins. Exchange (1986) 42 Cal.3d 208, 214-215 [228 Cal.Rptr. 160, 721 P.2d 41].*) Because of this unique "special relationship," a breach of the obligation of good faith may give rise to tort (rather than mere contractual) remedies. (See generally, *Foley v. Interactive Data Corp*

. *(1988) 47 Cal.3d 654, 683-693 [254 Cal.Rptr. 211, 765 P.2d 373]* [discussing reasons for disparity of tort versus contract remedies for breach of implied covenant of good faith].)

6 This court has previously intimated its reservations about loose characterizations of an insurer as a fiduciary. (See *State Farm Fire & Casualty Co. v. Superior Court (1989) 216 Cal.App.3d 1222, 1226-1227, 1233* & fn. 6 to conc. opn. at p. 1233 *[265 Cal.Rptr. 372]*; *Henry v. Associated Indemnity Corp. (1990) 217 Cal.App.3d 1405, 1418-1419 [266 Cal.Rptr. 578]*.)

[***15] However, the California Supreme Court has never squarely held that an insurer is a *true* fiduciary to its insured. ( *Gibson v. Government Employees Ins. Co. (1984) 162 Cal.App.3d 441, 445 [208 Cal.Rptr. 511]* [assuming a fiduciary relationship exists].) Instead, the Supreme Court has consistently described it as a "special relationship." ( *Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 687*; *Seaman's Direct Buying Service v. Standard Oil Co., supra, 36 Cal.3d at p. 768*.) Admittedly, the insurer's "special relationship" to its insured encompasses fiduciary-like duties of decency and humanity. ( *Frommoethelydo v. Fire Ins. Exchange, supra, 42 Cal.3d at p. 215*.) We perceive, however, that the "special" nature of the duties owed by an insurer are not owed because the insurer is a *true* fiduciary, but simply because such "special" duties are consonant with the special nature and purpose inherent in an insurance contract.

**(9)** The covenant of good faith and fair dealing is implied in every contract as [***16] a method to protect the interests of the parties in having the contractual promises and purposes performed. ( *Foley v. Interactive Data Corp., supra, 47 Cal.3d 654, 689-690*.) Because contracts differ, the nature and extent of the duties owed under the implied covenant are also variable and "will depend on the contractual purposes." ( *Egan v. Mutual of Omaha Ins. Co. (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141]*.)

[*1148] Insurance contracts are unique in nature and purpose. (See generally, *Foley, supra, 47 Cal.3d at pp. 682-693* [describing differences between insurance contracts and ordinary commercial contracts].) An insured does not enter an insurance contract seeking profit, but instead seeks security and peace of mind through protection against calamity. ( *Egan, supra, 24 Cal.3d at p. 819*.) The bargained-for peace of mind comes from the assurance that the insured will receive prompt payment of money in times of need. ( *Austero v. National Cas. Co. (1978) 84 Cal.App.3d 1, 29-30 [148 Cal.Rptr. 653]*.) [***17] Because peace of mind and security are the principal benefits for the insured, the courts have imposed special obligations, consonant with these special purposes, seeking to encourage insurers promptly to process and pay claims.

**(10)** Thus, an insurer must investigate claims thoroughly ( *Egan, supra, 24 Cal.3d at p. 819*); it may not deny coverage based on either unduly restrictive policy interpretations ( *Delgado v. Heritage Life Ins. Co. (1984) 157 Cal.App.3d 262, 277-278 [203 Cal.Rptr. 672]*) or standards known to be improper ( *Moore v. American United Life Ins. Co. (1984) 150 Cal.App.3d 610, 637-638 [197 Cal.Rptr. 878]*); it may not unreasonably delay in processing or paying claims ( *McCormick v. Sentinel Life Ins. Co. (1984) 153 Cal.App.3d 1030, 1048 [200 Cal.Rptr. 732]*).

These special duties, at least to the extent breaches thereof give rise to tort liability, find no counterpart in the obligations owed by parties to ordinary commercial contracts. The rationale for the difference in obligations is apparent. If an insurer were free of such [***18] special duties and could deny or delay payment of clearly owed debts with impunity, the insured would be deprived of the precise benefit the contract was designed to secure (i.e., peace of mind) and would suffer the precise harm (i.e., lack of funds in times of crisis) the contract was designed to prevent. ( *Wallis v. Superior* [**253] *Court (1984) 160 Cal.App.3d 1109, 1117-1118 [207 Cal.Rptr. 123]*.) To avoid or discourage conduct which would thus frustrate realization of the contract's principal benefit (i.e., peace of mind), special and heightened implied duties of good faith are imposed on insurers and made enforceable in tort. While these "special" duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, *not* because an insurer *is* a fiduciary.

**(11)** Unique obligations are imposed upon true fiduciaries which are not found in the insurance

relationship. For example, a true fiduciary must first consider and always act in the best interests of its trust and not allow self-interest to overpower its duty to act in the trust's best interests. [***19] (See, e.g., *Toedter v. Bradshaw (1958) 164 Cal.App.2d 200, 208 [330 P.2d 688].*) An insurer, however, may give its own interests consideration equal to that it [*1149] gives the interests of its insured ( *Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal.3d at pp. 818-819*); it is not required to disregard the interests of its shareholders and other policyholders when evaluating claims ( *Austero v. National Cas. Co., supra, 84 Cal.App.3d at p. 30*); and it is not required to pay noncovered claims, even though payment would be in the best interests of its insured ( *Native Sun Investment Group v. Ticor Title Ins. Co. (1987) 189 Cal.App.3d 1265, 1278 [235 Cal.Rptr. 34]*).

**(12)** Moreover, unlike the rule which prohibits true fiduciaries from commingling trust funds with the funds of others or from profiting by using the funds received from the beneficiary (see, e.g., *Estate of Evans (1944) 62 Cal.App.2d 249, 258 [144 P.2d 625]*), no similar prohibition circumscribes an insurer's use of premiums. Indeed, pooling [***20] of funds from insureds to create loss reserves, and investing such pooled funds for profit in order to enhance the insurer's financial strength, appear integral parts of the business of insurance.

The above examples are illustrative, not exhaustive, of the different nature of the duties owed by insurers versus true fiduciaries. [7]

**(7b)** Because of these differences, and in the absence of Supreme Court precedent declaring an insurer to be a *true* fiduciary, we decline to import uncritically the entire cargo of fiduciary obligations into the port of insurance law. We therefore reject Loves' attempt to denigrate the continued vitality of *Neff.* We also reject Loves' related argument that they were excused from exercising an ordinary degree of diligence in investigating or pursuing their rights because of the alleged existence of a fiduciary relationship. [8]

7 Some courts (see *Gibson v. Government Employees Ins. Co., supra, 162 Cal.App.3d 441, 444-446)* and some secondary sources (see 1 Cal. Insurance Law & Practice (1989 rev.) Claims Handling, § 13.02[2][a], pp. 13-8 to 13-9) have accepted without much question that the relationship between an insurer and its insured is a fiduciary one. However, in a manual co-authored by recently retired Supreme Court Justice Kaufman, some leading commentators on the subject of insurance bad faith have reached the opposite conclusion: "While making repeated references to the insurer's 'fiduciary responsibility' to the insured, the Supreme Court has never stated the insurer-insured relationship *is* a 'fiduciary relationship' . . . . [para.] It seems doubtful that insurer-insured is a 'fiduciary relationship' in the same sense as trustee-beneficiary, attorney-client, etc. It is merely a relationship characterized by unequal bargaining power, with a potential for special dependency by the insured on the insurer. Because of this special dependency, duties are imposed on the insurer which are *akin to those imposed on fiduciaries.* But that does *not* make it a fiduciary relationship!" (Kornblum et al., Cal. Practice Guide: Bad Faith (TRG 1989) §§ 3:74-3:74.1, pp. 3-34 to 3-35.) As previously discussed, our analysis accords with this latter view.

[***21]

8 The cases cited by Love involving fiduciaries do not suggest a different rule, as they all involved defendants who concealed or misrepresented the *facts* upon which the claims were predicated, not defendants who failed to disclose legal theories for the action. In *Stafford v. Schultz (1954) 42 Cal.2d 767, 775-779 [270 P.2d 1]*, the doctor's misrepresentation and nondisclosure of the facts (i.e., the extent of plaintiff's injury and the doctor's failure to perform certain diagnostic procedures before representing that the mode of treatment would be effective) tolled the statute of limitations on plaintiff's malpractice complaint. Again, in *Day v. Rosenthal (1985) 170 Cal.App.3d 1125, 1163-1167 [217 Cal.Rptr. 89]*, the court concluded the clients' malpractice action was tolled because they were unaware of a critical fact (i.e., damages from a defective tax shelter) until their appeal from an adverse tax determination was rejected on appeal, and they had no reason to suspect malpractice earlier because the attorney continually reassured them the appeal would succeed. ( *Id. at pp. 1163-1167.*)

[***22] [*1150] [**254] We are unaware of any

cases requiring an insurer to advise an insured of different legal theories or statutory provisions which an insured could use to avoid policy exclusions. The authorities suggest a contrary rule. "An insurer is under no obligation to explain to the insured all possible legal theories of recovery." ( *Lawrence v. Western Mutual Ins. Co., supra, 204 Cal.App.3d 565, 574.*) Neither the insured's ignorance of nor the insurer's failure to explain the different legal theories upon which suit might be filed extends the time within which the insured is required to file his action. The reason that "ignorance of legal remedy does not toll the statute of limitations" ( *State Farm Fire & Casualty Co. v. Superior Court, supra, 210 Cal.App.3d at p. 608*) is apparent. If such argument were accepted, ". . . the practical effect would be to nullify the [statute of limitations]. 'Any plaintiff could simply allege ignorance of his or her legal rights against a particular defendant. This is not difficult. Most people do not know the legal answers to questions arising from certain circumstances.' [***23] [ *McGee* v. *Weinberg, supra*, 97 Cal.App.3d [798] at p. 804 [159 Cal.Rptr. 86]]." ( *Lawrence v. Western Mutual Ins. Co., supra, 204 Cal.App.3d at p. 573.*) The *Neff* court, in refusing to apply estoppel to facts identical to this case, used a similar rationale: If denial of an otherwise covered claim were always treated as concealment of facts upon which to premise estoppel, ". . . that would mean that no insurer could deny liability without indefinitely suspending the running of the statute of limitations until perchance the insured . . . might obtain at some future time legal advice indicating the view that liability existed." ( *Neff v. New York Life Ins. Co., supra, 30 Cal.2d at p. 172.*)

Thus, the courts have not tolled the statute of limitations merely because the plaintiff was ignorant or not informed of his legal remedies. For these reasons we conclude FIE, which we determine not to be a true fiduciary, is not estopped from raising the statute of limitations to bar plaintiff's claims.

5. *Summary Judgment Was Properly Entered on the Loves' Causes of Action, Insofar* [***24] *as Such Claims Were Premised on the Purported Acts of Misfeasance Occurring After Loves' Claim Was Resubmitted*

**(13a)** The Loves finally contend that, even if their claims relating to the 1981 denial of coverage are time-barred, FIE committed independent acts of bad faith in delaying 17 months before rejecting the claim the Loves had [*1151] resubmitted in January of 1986. The Loves contend their bad faith claims based on these subsequent events were timely filed. We conclude the trial court correctly entered summary judgment as to this alternative theory.

At the time the Loves resubmitted their claim for damages, the statute of limitations on their right to sue for benefits under the policy had already expired. [9] Where an insured's right to collect policy benefits is already time-barred, he may not resurrect his rights merely by resubmitting a claim after the lapse of the limitations period. ( *Cardosa v. Fireman's Fund Ins. Co., supra, 144 Cal.App.2d 279, 282-283* [where insured submits claim to agent, who denies claim for lack of coverage, resubmission of claim after lapse of limitations period does not revive right to sue insurer for denial of [***25] the resubmitted claim].)

9 As previously discussed (see § 3, *ante*), the Loves' causes of action on the policy accrued in February 1981, and were subject to a four-year statute of limitations. That four-year period expired in February 1985, almost eleven months before the Loves resubmitted their claim in late December 1985 or early January 1986.

Because all of the Loves' rights under the policy had already lapsed, the [**255] Loves' resubmission of the claim does not entitle them to recover damages for breach of the covenant of good faith and fair dealing merely because FIE's investigation or its denial of the claim was tardy or inadequate. Tort liability for breach of the implied covenant of good faith and fair dealing has been variously measured. The primary test is whether the insurer withheld payment of an insured's claim unreasonably and in bad faith. ( *Frommoethelydo v. Fire Ins. Exchange, supra, 42 Cal.3d 208, 214-215.*) Where benefits are withheld for proper cause, [***26] there is no breach of the implied covenant. ( *California Shoppers Inc. v. Royal Globe Ins. Co. (1985) 175 Cal.App.3d 1, 54-55 [221 Cal.Rptr. 171].*) The duty imposed by law is not unreasonably to withhold payments due under the policy. ( *Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 920 [148 Cal.Rptr. 389, 582 P.2d 980].*)

**(14)** Thus, there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the

reason for withholding benefits must have been unreasonable or without proper cause. (See also *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court (1986) 184 Cal.App.3d 1428, 1433 [229 Cal.Rptr. 409]* [no award for bad faith can be made "without first establishing that coverage exists"]; *Kopczynski v. Prudential Ins. Co. (1985) 164 Cal.App.3d 846, 849 [211 Cal.Rptr. 12]].*) 10

**(13b)** Here, the undisputed [*1152] facts show the threshold requirement is absent. No benefits due were withheld or delayed, because the Loves' claim to benefits [***27] was already time-barred.

10 Our interpretation that a plaintiff must show, at a minimum, benefits were delayed or withheld, accords with the analysis of the commentators: "Where benefits are *fully and promptly paid,* no action lies for breach of the implied covenant -- no matter how hostile or egregious the insurer's conduct toward the insured may have been prior to such payment. *I.e., absent an actual withholding of benefits due, there is no breach of contract and likewise no breach of the insurer's implied covenant.* [Citation.]" (Kornblum et al., Cal. Practice Guide: Bad Faith, *supra,* § 4:28, p. 4-9, italics added.)

The Loves contend delay in denying a claim constitutes bad faith even if no coverage exists. The cases they rely upon, however, are inapposite. *McCormick v. Sentinel Life Ins. Co., supra, 153 Cal.App.3d 1030,* is cited as holding that lengthy delay in denying a claim can itself give rise to bad faith damages. However, the *McCormick* court operated [***28] on the assumption that benefits were in fact due, and merely addressed the issue of whether the insurer was excused from paying because of the insured's failure to provide sufficient information. ( *Id. at pp. 1041-1046.*) The *McCormick* court's statement that lengthy delay in processing a claim can constitute bad faith was based on its conclusion that such a delay can be tantamount to a denial of benefits *otherwise due.* ( *Id. at pp. 1048-1051.*) *McCormick* did not conclude that delayed denial of an uncovered claim is an independent ground for recovery of damages.

The Loves' reliance on *Travelers Ins. Co. v. Lesher (1986) 187 Cal.App.3d 169 [231 Cal.Rptr. 791]* is similarly misplaced. The *Lesher* court merely held that when an insurer provides a defense to its insured, the insurer can be held liable if the defense it provides is inadequate, causing its insured losses which an otherwise adequate defense would have prevented, even though there is an ultimate determination the insurer had no duty to indemnify or defend. ( *Id. at pp. 186-187.*) 11 [***29]

11 Loves rely on the *Lesher* court's statement that "Travelers does not advance a persuasive basis for holding that an insurer need process in a prompt and competent manner only those claims for which there is coverage. Logic compels the conclusion that under *section 790.03* the insurer must process all claims submitted to it promptly and competently, even in those instances where no coverage will ultimately be provided." ( *Id. at p. 190.*) We are unpersuaded that this language undermines the general rule that liability for bad faith depends on denial of policy benefits otherwise due, because this statement cannot be divorced from its factual context. In *Lesher,* the insured claimed injury from an inadequate defense, based in part on the appointed attorney's failure to negotiate or evaluate the advantages of settlement with the third parties ( *id. at pp. 182; 188-190)* and in part on Travelers' failure to provide replacement counsel for the insured until a few weeks before trial (which forced the insured into a disadvantageous settlement). ( *Id. at pp. 183-184.*) The duty promptly and competently to process claims was discussed within the context of determining *whether the defense as provided discharged insurer's duty to provide a prompt and competent defense.*

*Lesher* did not hold that bad faith liability could be founded on delay in denying an uncovered claim, at least where the delay caused no prejudice to the insured's other rights under the policy. To the extent the quoted language was so intended, it appears inconsistent with controlling Supreme Court language discussed above. Moreover, because the quoted language cites no authority, and (to our knowledge) has not been subsequently relied upon by other courts, the cited language appears to be an isolated and unsupported comment, which we decline to follow.

[***30] [*1153] [**256] Our conclusion that a

bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is rooted. The covenant of good faith and fair dealing is implied in law to assure that a contracting party "refrain[s] from doing anything to injure the right of the other to receive the benefits of the agreement." ( *Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal.3d at p. 818.*)

**(15)** In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract. Thus, when benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because it frustrates the insured's *primary* right to receive the benefits of his contract -- i.e., prompt compensation for losses. Absent that primary right, however, [***31] the *auxiliary* implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings.

The judgment is affirmed.

**CONCUR BY:** WIENER

**CONCUR**

**WIENER, J.**

I concur in the result reached by the majority in this case. The opinion's discussion regarding the extent to which the insurer is a "true" fiduciary is well-written and certainly interesting in the abstract. Unfortunately, I find the discussion completely unnecessary to the result we reach. I do not read the majority to dispute that insurers owe fiduciary duties to insureds under certain circumstances. The plaintiffs themselves characterize the relationship between insurer and insured as "quasi-fiduciary" in nature. The only question before us is whether the fiduciary aspects of the relationship compel the insurer, when it denies a claim on grounds of no coverage, to explain to the insured the reasons it might be wrong. I am convinced that the reasoning of *Neff v. New York Life Ins. Co. (1947) 30 Cal.2d 165 [180 P.2d 900, 171 A.L.R. 563]* remains good law and has not been undercut by more recent cases explicating [***32] the fiduciary components of the insurer-insured relationship.

[*1154] The majority's academic excursion appears to be motivated by a concern that courts in future cases will be seduced by the term "fiduciary" and impose unwarranted liability on insurers. I see little danger of such confusion. Rather, I fear that the rigid compartmentalization and convenient labeling suggested by the opinion may serve as a substitute for thoughtful analysis of whether the circumstances of a particular case justify the imposition of enhanced duties on the insurer. Accordingly, I cannot join the majority's extended and unnecessary exegesis.

# TAB 19

LEXSEE 7 CAL.4TH 1196

**VIVIENNE LUNDQUIST, Plaintiff and Respondent, v. HEINZ REUSSER et al., Defendants and Appellants.**

**No. S030738.**

**SUPREME COURT OF CALIFORNIA**

*7 Cal. 4th 1193*; *875 P.2d 1279*; *31 Cal. Rptr. 2d 776*; *1994 Cal. LEXIS 3786*; *94 Cal. Daily Op. Service 5588*; *94 Daily Journal DAR 10215*

**July 21, 1994, Decided**

**PRIOR HISTORY:** Superior Court of Santa Barbara County, No. SM59548, Rodney S. Melville, Judge.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A horse breeder brought an action arising from defendants' communication at a seminar of breeders and owners that plaintiff had had a show horse surgically altered to conceal conformational defects. At trial, the court instructed the jury that, pursuant to the privilege for statements of common interest made without malice (*Civ. Code, § 47, subd. (c)*), defendants bore the burden of proving the communication was made without malice. The jury returned verdicts for compensatory and punitive damages in favor of plaintiff. (Superior Court of Santa Barbara County, No. SM59548, Rodney S. Melville, Judge.) The Court of Appeal, Second Dist., Div. Six, No. B059617, reversed, concluding that the instruction constituted reversible error.

The Supreme Court reversed the judgment of the Court of Appeal insofar as it overturned the trial court's judgment in favor of plaintiff. The court held that the instruction was erroneous. The Legislature enacted *Civ. Code, § 47, subd. (c)*, with the intent to codify without change the common law common-interest privilege. At common law, the privilege embodied a two-step analysis under which the defendant bore the initial burden of demonstrating the communication was made on a privileged occasion, and the plaintiff then bore the burden of proving the communication was made with malice. However, the court held that the error was not prejudicial. The trial court correctly stated that the privilege was lost if the person making the statement was motivated by hatred or ill will toward the plaintiff. The jury also was instructed as to punitive damages. By awarding plaintiff punitive damages, the jury found that plaintiff proved not merely that defendants acted with the requisite reprehensible motivation, thereby defeating the privilege, but that defendants' conduct was intentionally injurious to plaintiff, thereby meeting the heightened requirements of malice to support the award. Thus, the verdicts would have been the same had the trial court properly instructed the jury on the burden of proof. (Opinion by George, J., expressing the unanimous view of the court.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) Libel and Slander § 45--Actions--Burden of Proof--Privilege and Malice--Privilege for Communication on Matter of Common Interest Made Without Malice--Burden of Proof on Issue of Malice.** --In a horse breeder's action arising from defendants' communication at a seminar of breeders and owners that plaintiff had had a show horse surgically altered to conceal conformational defects, the trial court erred in instructing the jury that, pursuant to the privilege for statements on matters of common interest made without malice (*Civ. Code, § 47, subd. (c)*), defendants bore the burden of proving the communication was made without malice. The Legislature enacted *§ 47, subd. (c)*, with the intent to codify without change the common law common-interest privilege. At common law, the privilege embodied a two-step analysis under which the defendant

bore the initial burden of demonstrating the communication was made on a privileged occasion, and the plaintiff then bore the burden of proving the communication was made with malice. The communication to persons sharing a common interest in horse breeding was within the scope of the privilege, and thus plaintiff had the burden of showing malice.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 520.]

**(2) Libel and Slander § 3--Elements of Defamation--Publication.** --For purposes of the law of defamation, publication of the defamatory communication does not require dissemination to a substantial number of individuals; it suffices that the defamatory matter is communicated to a single individual other than the one defamed.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 476.]

**(3) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons--Malice: Words, Phrases, and Maxims--Malice.** --For purposes of the statutory privilege for a communication made without malice to an interested person (*Civ. Code, § 47, subd. (c)*), "malice" is defined as a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy, or injure another person.

**(4) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons--Absence of Malice as Precluding Defamation Action.** --If *Civ. Code, § 47, subd. (c)* (communication to interested party), applies to the occasion on which a communication is made, and if that communication was made without malice, it is privileged and cannot constitute defamation under California law.

**(5) Evidence § 21--Burden of Proof--Party Upon Whom Burden Lies--Defamation Privilege--Placing Burden of Proof on Plaintiff to Show Malice.** --Placing upon the plaintiff in a defamation action the burden of proving malice concerning the privilege for a communication of common interest made without malice (*Civ. Code, § 47, subd. (c)*) is not inconsistent with *Evid. Code, § 500*, which states that, except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he or she is asserting. Under common law, this burden was on the plaintiff, and nothing in *Evid. Code, § 500*, suggests that the statute was intended to alter the operation of common law rules, relevant to the burden of proof, which were codified by the adoption of *Civ. Code, §§ 47, subd. (c)*, and *48*. Further, *Evid. Code, § 500*, does not purport to determine which facts are "essential" to the plaintiff's "claim for relief" and which facts are "essential" to a claimed defense. These are determinations to be resolved in light of the particular action or defense at issue. Therefore, placing the burden of proof on the plaintiff to establish malice does not conflict with *Evid. Code, § 500*.

**(6a) (6b) Libel and Slander § 57--Actions--Appeal--Harmless and Reversible Error--Instruction on Burden of Proof on Issue of Malice.** --In a horse breeder's action arising from defendants' communication at a seminar of breeders and owners that plaintiff had had a show horse surgically altered to conceal conformational defects, no prejudice resulted from the trial court's error in instructing the jury that, pursuant to the privilege for statements on matters of common interest made without malice (*Civ. Code, § 47, subd. (c)*), defendants bore the burden of proving the communication was made without malice. The jury rendered special verdicts awarding plaintiff compensable and punitive damages. The court correctly stated that the privilege was lost if the person making the statement was motivated by hatred or ill will toward the plaintiff. The jury also was instructed as to punitive damages. By awarding plaintiff punitive damages, the jury found that plaintiff proved not only that defendants acted with the requisite reprehensible motivation, thereby defeating the privilege, but that defendants' conduct was intentionally injurious to plaintiff. Thus, the verdicts would have been the same had the court properly instructed the jury on the burden of proof.

**(7) Appellate Review § 183--Determination and Disposition of Cause--Harmless and Reversible Error--Instructions.** --In order to persuade an appellate court to overturn a jury verdict because of instructional error, an appellant must demonstrate that the error was prejudicial and resulted in a miscarriage of justice. Instructional error ordinarily is considered prejudicial only when it appears probable that the improper instruction misled the jury and affected the verdict.

**COUNSEL:** Archbald & Spray, Barry Clifford Snyder, Katherine H. Bower and Douglas B. Large for Defendants and Appellants.

Glen M. Reiser, Cynthia H. Reiser, Nordman, Cormany, Hair & Compton and Michael C. O'Brien for Plaintiff and Respondent.

**JUDGES:** Opinion by George, J., expressing the unanimous view of the court.

**OPINION BY:** GEORGE, J.

**OPINION**

[*1196] [**1279] [***776] Under the "common-interest privilege," codified in California in *Civil Code section 47, subdivision (c)* (hereafter *section 47(c)*), [1] a defendant who makes a statement to others [***777] on a matter of common interest is immunized from liability for defamation so long as the statement is made "without malice." In this case we must determine whether, when it is established that the statement in question was made on an occasion that falls within the [**1280] parameters of the common-interest privilege, it is *the plaintiff* who bears the burden of proving that the statement was made *with malice*, or *the defendant* who bears the burden of proving that the statement was made *without malice*.

1 All further statutory references are to the Civil Code unless otherwise indicated.

Prior to reconfiguration of the statute in 1990 into lettered subdivisions, *section 47(c)* was designated *section 47, subdivision (3)*. Where in prior decisions the statute is cited under its former designation as *section 47, subdivision (3)* (or "*section 47(3)*"), we have retained that designation.

In the present case, the Court of Appeal held that the trial court erred in instructing the jury that, under *section 47(c)*, defendants bore the burden of proof upon the issue of malice; in addition, the Court of Appeal found that this instructional error was prejudicial and required reversal of the judgment rendered by the trial court in favor of plaintiff. For the reasons discussed hereafter, we agree with the Court of Appeal that the trial court erred in instructing the jury that defendants, rather than plaintiff, bore the burden of [*1197] proof upon the issue of malice under *section 47(c)*, but we disagree with the Court of Appeal's determination that this instructional error was prejudicial in the present case. As we shall explain, in view of the trial court's instructions on the issue of punitive damages, and the jury's award of punitive damages in favor of plaintiff, we believe there is no reasonable probability that the instructional error regarding the application of *section 47(c)* affected the outcome of the case. Accordingly, we conclude that the judgment of the Court of Appeal, overturning the judgment rendered by the trial court in favor of plaintiff, should be reversed.

I.

Plaintiff Vivienne Lundquist is an established breeder of Peruvian Paso horses, animals prized for their rarity, beauty, and smooth, elegant gait. She claimed defendants Heinz and Sylvia Reusser defamed her at a meeting of 30 to 40 owners and breeders of Peruvian Paso horses, held in Buellton, Santa Barbara County, on August 14, 1988. At this seminar, Heinz Reusser participated in a panel discussion with other recognized experts regarding the use of drugs and surgery to enhance the appearance and performance of show horses. Reusser told the audience that, prior to his acquisition of a "multiple-champion" mare, the animal had been altered surgically in order to conceal a neck bulge a defect that he described as a "cosmetic conformational problem." [2]

2 Heinz Reusser's tape-recorded remarks were as follows:

"I'm Heinz Reusser. The reason I like to be on the panel here is my concern about how we influence our horses with drugs and surgery and how that affects, really affects, the future quality and future potential of our breed and to me they are very much the same thing as a breeder. We know that people breed to winning horses and if these winning horses have only been winning because they had the pharmacist at their side, then we are leading people that are breeding these horses down the wrong path. Especially if they don't know. And the same is true if they are breeding or buying for breeding horses that are surgically altered, taking genetic problems out of the horse and later we breed to them. And, of course, they come back and I think that these two things have the same effect on what we achieve in breeding with many of our breeders being led

down the wrong path that may cost them tens or hundreds of thousands of dollars until they find out what happened.

"In my specific case, and I just want to mention this to you, I have a mare, a multiple champion mare, had a surgically altered neck-ewe and it's very visible and I think that it established that was done to the mare. And now I am looking at the first foal and the first foal has exactly the same cosmetic conformational problem as the mother had except you didn't know that. That is going to come up three years and fifty thousand dollars later. So, I think drugs and the methods of surgically altering a horse, if for the purpose of winning in the show ring, are some of the worst tools to serve our breed with. This is what I would like you to think about and see that we can come back from these ills. I think they are terrible things. Sylvia, do you have the pictures here? She took some pictures of that mare so you can look at it. We are not telling you some wild story, ok?"

A question was raised at trial regarding the term "neck-ewe" that appears in the above passage. Although "ewe-neck" is a recognized conformational defect found in some Peruvian Paso horses, "neck-ewe" apparently is not a recognized term of art. At trial, the parties contested whether Heinz Reusser had transposed the words, "ewe," and "neck," or had completed his sentence with the word, "neck." The dispute is insignificant in the resolution of the present case.

Heinz Reusser did not identify the mare or the breeder, but asked his wife, Sylvia Reusser, [***778] to distribute to the audience six photographs depicting the [*1198] mare and her foal. John Burges, a horse breeder who attended the seminar and had purchased several Peruvian Paso horses from Vivienne Lundquist, believed he recognized the mare. He asked Sylvia Reusser whether the photographs depicted [**1281] a Peruvian Paso mare, raised by Lundquist, named Perla de Oro. Sylvia Reusser responded that the rules of the seminar prohibited her from identifying the mare by name, prompting Burges to ask, "Do I know that mare?" Sylvia Reusser's reply suggested that Burges knew the mare. [3] Burges and others in attendance deduced the mare was Perla de Oro, and Lundquist was the breeder. Following the seminar, rumors spread among Peruvian Paso horse owners and breeders that Vivienne Lundquist surgically altered her show horses to conceal conformational defects.

3 At trial, Sylvia Reusser testified that, in reply to John Burges's inquiry, she stated, "You might know the horse." Burges testified that her reply was, "Yeah, you know the mare."

Upon ascertaining that the rumors originated from the seminar, Lundquist filed the present lawsuit, alleging that she had been defamed by the Reussers and that they had damaged her reputation and caused her to suffer emotional distress. In their answer, the Reussers raised the affirmative defense that the challenged communication was protected by the common-interest privilege set forth in *section 47(c)*, because the statement was made without malice to other interested persons.

At trial, Vivienne Lundquist testified that, since the mid-1970's, she had been involved in breeding and showing Peruvian Paso horses. In 1978, one of her horses, Perla de Oro, then eight months of age, developed a throat abscess, necessitating surgical removal of the abscess by a veterinarian. After the infected area healed, a 14-inch surgical scar remained, which nonetheless did not prevent Perla de Oro from winning multiple championships. The scar easily was visible during the summer months, becoming less visible during the winter, when the mare's coat was thicker. Lundquist denied that Perla de Oro ever had had a conformational defect or undergone cosmetic surgery, testimony that was corroborated by the veterinarian who performed the operation to remove the abscess.

Perla de Oro's success in the show ring attracted the attention of Heinz and Sylvia Reusser, who had established their own horse-breeding business in the mid-1980's and had purchased three other Peruvian Paso horses from Vivienne Lundquist. Prior to the sale of Perla de Oro to the Reussers, the [*1199] mare had given birth to four foals, none of which exhibited conformational defects. In 1985, when the mare was pregnant with a fifth foal, Lundquist sold her to the Reussers for $25,000, without mentioning the surgery performed on Perla de Oro's neck seven years earlier.

Heinz Reusser testified that he and his wife had been particularly interested in Perla de Oro because of Vivienne Lundquist's representation to them, made shortly before the sale, that Perla de Oro was in foal to La

Briego, a stallion Heinz Reusser described as "very charismatic." Lundquist testified Perla de Oro indeed had been bred to La Briego, but that the effort did not produce a foal, leading Lundquist to "re-breed" the mare to another stallion, Romanesco--a circumstance Lundquist had neglected to mention when making her initial representations to the Reussers. Upon discovering her error as to the sire's identity, and disclosing it to the Reussers prior to consummating the sale of Perla de Oro, Lundquist offered to rescind the sale, but the Reussers declined, preferring instead that Lundquist arrange a subsequent breeding of Perla de Oro to La Briego. Lundquist agreed to do so.

Following the sale of Perla de Oro to the Reussers, and the subsequent birth of her foal (Rio Allason), which displayed no conformational defects, the Reussers elected to [***779] forego the opportunity to have the mare bred to La Briego, instead breeding Perla de Oro to the mare's own half-brother, HMS Domingo (a stallion renowned for his fluid stride). This union led to the birth, in January 1988, of Tanya, the foal depicted in the photographs (distributed by the Reussers at the seminar) as having been born with an abnormal bulge beneath her chin. The Reussers believed the bulge in Tanya's neck constituted a genetic defect, although no veterinarian or other specialist in equine physiology had so advised them.

Following Tanya's birth, and the shedding of Perla de Oro's winter coat in the spring of [**1282] 1988, the Reussers discovered the scar on the mare's neck, located in the same area as the bulge beneath Tanya's chin. The Reussers consulted a veterinarian, who told them that muscle tissue had been surgically removed from Perla de Oro's neck, that he was unable to ascertain whether the surgery had been for medical or cosmetic purposes, and that he knew of no medical reason for such an operation. The Reussers compared "baby pictures" of Perla de Oro and Tanya and--*without even attempting to contact Vivienne Lundquist*--concluded that cosmetic surgery had been performed on Perla de Oro in order to conceal a genetic defect. [4]

4 Heinz Reusser testified he did not seek an explanation from Lundquist as to how Perla de Oro had obtained the scar, because he believed Lundquist initially had been dishonest with him regarding the breeding of Perla de Oro to La Briego, and because Lundquist had not disclosed the existence of the scar to him prior to the sale.

[*1200] John Burges, one of the horse breeders who attended the seminar, testified that, upon hearing Heinz Reusser's remarks attributing the scar on Perla de Oro's neck to "secret" surgery performed to conceal a genetic defect, and upon viewing the photographs distributed at the seminar by Sylvia Reusser, he believed he had made a "huge mistake" in purchasing Peruvian Paso horses from Vivienne Lundquist. Shortly after returning to his residence in Texas, he telephoned Heinz Reusser to inquire whether the mare depicted in the photographs was Perla de Oro. Reusser confirmed that it was.

Vivienne Lundquist testified other breeders and owners of Peruvian Paso horses, including individuals who had not attended the seminar, subsequently informed her that they had heard she had been accused of surgically altering her horses. Lundquist testified the accusations damaged her reputation and caused her to suffer emotional distress. At trial, she waived her claim for economic losses directly attributable to the communications made by the Reussers at the seminar, and sought only general and punitive damages arising from the injury to her reputation and from the infliction of emotional distress.

The trial court instructed the jury that, whereas plaintiff bore the burden of proving that the statements in question were made by defendants and were defamatory, defendants bore the burden of proving that the statements were made on a privileged occasion and were made without malice. [5]

5 Plaintiff's instruction No. 20, a modified version of *BAJI No. 2.60*, in pertinent part instructed the jury regarding the burden of proof, as follows:

"In plaintiff's first cause of action for defamation and slander, the plaintiff has the burden of establishing by a preponderance of the evidence the following:

"1. That the statements made by defendants on August 14, 1988, were untrue and intentionally published by the defendants;

"2. That the natural and probable effect on the average listener was to defame plaintiff;

"3. That the publication was the proximate cause of damage to plaintiff.

"In response to plaintiff's first cause of action for defamation and slander, defendant has asserted as a defense that the statements were true or that he was privileged. As to these defenses, the defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish:

"1. That the statements made by defendant on August 14, 1988 were true; or

"2. That when defendant made the statements on August 14, 1988:

"a. He made the statements without malice towards the plaintiff; and

"b. He made them to person[s] who were interested in the subject matter of the statement; and

"[c.] He was interested in the subject matter of the statements or stood in such relation to the person[s] interested as to afford a reasonable ground for supposing the motive for the communication innocent, or was requested by the person[s] interested to give the information. . .."

[*1201] By contrast, in advising the jury upon the issue [***780] of punitive damages, the trial court instructed the jury that, in order to obtain such damages, plaintiff bore the burden of proving, by clear and convincing evidence, that defendants had acted with malice and oppression toward plaintiff. [6]

6 With respect to plaintiff's prayer for punitive damages, the trial court instructed the jury, pursuant to modified versions of *BAJI Nos. 2.62* and *14.71*, that, in seeking an award of punitive damages, plaintiff bore the burden of proving, by clear and convincing evidence, all the facts necessary to establish that defendants acted with malice or oppression toward plaintiff.

[**1283] The jury returned special verdicts awarding Vivienne Lundquist $20,000 on her cause of action for slander, $20,000 for intentional infliction of emotional distress, $25,000 in punitive damages against Heinz Reusser, and $15,000 in punitive damages against Sylvia Reusser. In reaching its verdict, the jury found that the Reussers' communication to those persons in attendance at the seminar had defamed Lundquist and was not privileged, and, additionally, with regard to the jury's award of punitive damages, that Vivienne Lundquist had established that the Reussers acted with malice. The trial court denied posttrial motions filed by the Reussers alleging instructional error and insufficiency of the evidence.

The Court of Appeal reversed the judgment of the trial court, holding that the trial court erred in instructing the jury that the Reussers bore the burden of proving that the statements they made to persons in attendance at the seminar had been made without malice. Relying upon language contained in our decision in *Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711 [257 Cal.Rptr. 708, 771 P.2d 406]*, as well as upon other decisions rendered by California appellate courts ( *Manguso v. Oceanside Unified School Dist. (1984) 153 Cal. App. 3d 574, 580-581 [200 Cal.Rptr. 535]*; *Williams v. Taylor (1982) 129 Cal. App. 3d 745, 752 [181 Cal.Rptr. 423]*; *Gantry Constr. Co. v. American Pipe & Constr. Co. (1975) 49 Cal. App. 3d 186, 197-198 [122 Cal.Rptr. 834]*), the Court of Appeal held that, where the uncontested facts establish that the allegedly defamatory statement was made on an occasion within the reach of the common-interest privilege, the plaintiff bears the burden of proving that the defendant acted with actual malice, in order to prevail upon the defamation claim. [7]

7 The Court of Appeal also held that the trial court's instruction, assigning to the Reussers the burden of establishing an absence of malice, prejudicially affected the jury's verdict as to Vivienne Lundquist's cause of action for intentional infliction of emotional distress. Additionally, the Court of Appeal held that the jury's award of punitive damages did not "cure[] the instructional error," because, had the jury been instructed properly as to which party bore the burden of proof relating to malice, it might never have reached the question of punitive damages. For these reasons, the Court of Appeal reversed the entire judgment.

[*1202] We granted Vivienne Lundquist's ensuing petition for review in order to resolve a conflict in the California decisions as to proper allocation of the burden of proof under *section 47(c)*. [8]

8 Two weeks before oral argument, plaintiff's counsel informed this court that the parties had settled their dispute. Although this development suggested that the case had become moot, and, as a general rule, this court will not render an advisory opinion ( *Coleman v. Department of Personnel Administration (1991) 52 Cal.3d 1102, 1126 [278 Cal.Rptr. 346, 805 P.2d 300]*), we instead follow the well-established line of judicial authority recognizing an exception to the mootness doctrine, and permitting the court to decline to dismiss a case rendered moot by stipulation of the parties where the appeal raises issues of continuing public importance. (See, e.g., *Burch v. George (1994) 7 Cal.4th 246, 253, fn. 4 [27 Cal.Rptr.2d 165, 866 P.2d 92]*; *In re Kieshia E. (1993) 6 Cal.4th 68, 74, fn. 5 [23 Cal.Rptr.2d 775, 859 P.2d 1290]*; *Abbott Ford, Inc. v. Superior Court (1987) 43 Cal.3d 858, 868-869, fn. 8 [239 Cal.Rptr. 626, 741 P.2d 124]*; *Daly v. Superior Court (1977) 19 Cal.3d 132, 141 [137 Cal.Rptr. 14, 560 P.2d 1193]*; *Liberty Mut. Ins. Co. v. Fales (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213]*; *D.I. Chadbourne, Inc. v. Superior Court (1964) 60 Cal.2d 723, 731-732, fn. 5 [36 Cal.Rptr. 468, 388 P.2d 700]*; *County of Madera v. Gendron (1963) 59 Cal.2d 798, 804 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555]*; see also *Cal. Rules of Court, rule 19(b)* [once the record is filed in the reviewing court, dismissal following abandonment of the appeal is discretionary, not mandatory]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 505-506, pp. 491493.) Because the present case provides this court with an opportunity to reconcile disparate lines of judicial authority and thereby clarify the law with respect to the common-interest privilege (see *post*, pp. 1202-1203, 1208-1210), we refrain from dismissing the action, instead retaining jurisdiction for the purpose of resolving the legal issues presented.

II.

**(1a)** The principal issue presented in this case is whether the trial court properly instructed [***781] the jury that, in the jury's determination whether the common-interest privilege set forth in *section 47(c)* has been established, defendants bore the burden of proving not only that the allegedly defamatory statement was made upon an occasion that [**1284] falls within the common-interest privilege, but also that the statement was made without malice. Defendants contend that, in California and throughout the United States, the general rule is that, although a defendant bears the initial burden of establishing that the allegedly defamatory statement was made upon an occasion falling within the purview of the common-interest privilege, once it is established that the statement was made upon such a privileged occasion, the plaintiff may recover damages for defamation only if *the plaintiff* successfully meets the burden of proving that the statement was made with malice. (See generally, Prosser & Keeton on Torts (5th ed. 1984) Defamation, § 115, p. 835; 2 Harper et al., The Law of Torts (1986) Defamation, § 5.27, pp. 232-242; [*1203] *Rest.2d Torts, § 613, subd. (1)(h)*, p. 307.) 9 As stated above, the Court of Appeal agreed with defendants on this point. Although, as we shall explain, there are a few (primarily early) California decisions that state a contrary rule, both the legislative history of *section 47(c)* and the overwhelming majority of recent California decisions support the Court of Appeal's conclusion. Accordingly, we agree with the Court of Appeal insofar as it concluded that the trial court erred in instructing the jury that defendants bore the burden of proof upon the issue of malice, for purposes of *section 47(c)*.

9 The cited passage of the treatise authored by Prosser and Keeton states: "The burden is upon the defendant in the first instance to establish the existence of a privileged occasion for the publication, by proof of a recognized public or private interest which would justify the utterance of the words. . .. *Once the existence of the privilege is established, the burden is upon the plaintiff to prove that it has been abused by excessive publication, by use of the occasion for an improper purpose, or by lack of belief or grounds for belief in the truth of what is said.*" (Prosser & Keeton, *supra*, Defamation, § 115, p. 835, italics added, fns. omitted.) Similarly, the treatise authored by Harper et al. states: "As to 'malice,' i.e., actual ill will or improper purpose that constitutes an abuse of the occasion and therefore defeats a qualified privilege, the jury makes the findings, subject to the general and usual control of the court, *the burden of proof being on the plaintiff.*" (2 Harper et al., *supra*, Defamation, § 5.29, p. 248, italics added, fns.

omitted.) *Section 613 of the Restatement Second of Torts* provides in relevant part that "(1) In an action for defamation *the plaintiff has the burden of proving*, when the issue is properly raised, . . . [P] . . . (h) *the abuse of a conditional privilege*" (italics added), and comment *g* accompanying *section 613* (at p. 309) explains that, "[i]f [the defendant] relies upon the defense that the publication of the communication was conditionally privileged, [the defendant] has the burden of proving it. If he sustains this burden by evidence of the requisite quantity and quality, he will prevail *unless the plaintiff takes up and sustains the burden of proving that the privilege was abused*." (Italics added.)

A.

As we recently explained in *Brown v. Kelly Broadcasting Co., supra, 48 Cal.3d 711* (hereafter *Brown*), defamation, which constitutes an abuse of the right of free speech, "has two forms--libel and slander." (§ 44; *Brown, supra, 48 Cal.3d at p. 723.*) Slander is defined as including "a false and unprivileged publication, orally uttered, . . . [P] . . . [tending] directly to injure [any person] in respect to his office, profession, trade or business . . .." (§ 46; see also *Brown, supra, 48 Cal.3d at p. 723.*) **(2)** For purposes of the law of defamation, "publication" does not require dissemination to a substantial number of individuals; it suffices that the defamatory matter " 'is communicated to a single individual other than the one defamed.' " (*Brown, supra, 48 Cal.3d at 723, fn. 6*, quoting [***782] *Rest.2d Torts, § 577, com. b*, p. 202; *Cunningham v. Simpson (1969) 1 Cal.3d 301, 306-307 [81 Cal.Rptr. 855, 461 P.2d 39]*; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 476, p. 561.)

*Section 47(c)* establishes that certain communications made between persons on a matter of common interest are privileged if the statements are [*1204] made "without malice." [10] [**1285] *Section 48*, in turn, provides that with respect to statements falling within *section 47(c)*, "malice is not inferred from the communication."11 [11] **(3)** For purposes of this statutory privilege, malice has been defined as " 'a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.' " (*Brown, supra, 48 Cal.3d at p. 723*, quoting *Agarwal v. Johnson (1979) 25 Cal.3d 932, 944 [160 Cal.Rptr. 141, 603 P.2d 58].*) **(4)** We have held that "[i]f *section 47(3)* applies to the occasion on which a communication is made and if it was made without malice, it is privileged and cannot constitute a defamation under California law." (*Brown, supra, 48 Cal.3d at p. 723*, original italics, fn. omitted.)

10 *Section 47(c)* provides that a privileged publication is one made: "In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."

We observe that the common-interest privilege has proved to be a source of vexation and bafflement to courts and commentators alike. (See, e.g., *Institute of Athletic Motivation v. University of Illinois (1980) 114 Cal. App. 3d 1, 11 [170 Cal.Rptr. 411]* ["[T]he scope of the privilege . . . is not capable of precise or categorical definition . . .."]; see also *Brown, supra, 48 Cal.3d at pp. 723-733* & fn. 18 [resolving various points of confusion related to the privilege]; 4 Levy, et al., Cal. Torts (1993) Defamation Defenses and Privileges, § 45.12[4], pp. 45-66-45-67 [contrasting various judicial interpretations of the privilege within California]; Prosser & Keeton, *supra*, Defamation, § 115 pp. 825, 835 [noting the "complexity" of the qualified privilege structure and "the very vagueness of the rules" pertaining to the burden-of-proof issue].)

11 Initially enacted concurrently with *section 47* in 1872, *section 48* prescribes: "In the case provided for in *[section 47(c)]*, malice is not inferred from the communication."

**(1b)** The parties do not dispute that the allegedly defamatory statements at issue in the present case, made by defendants at a seminar to persons sharing a common interest in horse breeding, were made upon a "privileged occasion" for purposes of the common-interest privilege. Accordingly, the determination whether defendants could be held liable for such statements turned upon whether defendants made the statements with or without malice. As indicated above, in the present case the trial court instructed the jury that, for purposes of the application of

*section 47(c)*, defendants bore the burden of proving an absence of malice. On appeal, the parties dispute whether defendants' assertion of the common-interest privilege as an affirmative defense requires that *defendants* prove an *absence of malice* in order to establish the privilege, or requires instead that *plaintiff*, in order to establish that she was defamed, prove that the defamatory communication was made *with malice*. In analyzing this issue, we turn first to the applicable statutes.

[*1205] B.

Our primary task in construing a statute is to determine the Legislature's intent. (*Brown, supra, 48 Cal.3d at p. 724*; *Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]*.) " 'The court turns first to the words themselves for the answer.' " (*Brown, supra, 48 Cal.3d at p. 724*, quoting *People v. Knowles (1950) 35 Cal.2d 175, 182 [217 P.2d 1]*; see also *Committee of Seven Thousand v. Superior Court (1988) 45 Cal.3d 491, 501 [247 Cal. Rptr. 362, 754 P.2d 708]*.) In this instance, however, the language of the relevant statutes does not provide a ready answer. As we have seen, section 46, by its terms, defines slander as, inter alia, "a false and *unprivileged* publication"; *section 47(c)* [***783] defines a privileged publication as including one made "[i]n a communication, *without malice*, to a person interested therein" under specified circumstances, and *section 48* provides that, in cases governed by *section 47(c)*, "malice is not inferred from the communication." (Italics added.) The statutes contain no specific language directed to the burden-of-proof issue, and, in particular, to the question whether, for purposes of *section 47(c)*, the plaintiff bears the burden of proving that a statement, made upon a privileged occasion, was made with malice, or the defendant instead bears the burden of proving the absence of malice.

In the absence of an express statutory directive as to the burden-of-proof issue, we turn to the legislative history of *section 47(c)*. As we shall explain, unlike the language of the statute, the provision's legislative history sheds considerable light upon the legislative intent regarding the burden-of-proof issue.

[**1286] We recently had occasion to examine the legislative history of *section 47(c)* in *Brown, supra, 48 Cal.3d 711, 726-729*, in addressing the question whether *section 47(c)* establishes a broad "public-interest" privilege extending considerably beyond the traditional "common-interest" privilege. Because much of the discussion in *Brown* is pertinent to the question presented in the case now before us, we quote from that opinion at some length.

"*[Section 47(3)]* was enacted as part of the Civil Code in 1872. At that time, in the common law of England and the United States, defamation was subject to strict liability, that is, liability without fault as to truth or falsity. (Eldredge, [The Law of Defamation (1978)], § 5, pp. 14-25; Prosser & Keeton, The Law of Torts (5th ed. 1984) § 113, p. 804.) The standard of liability was succinctly phrased in Lord Mansfield's often quoted statement that, 'Whenever a man publishes he publishes at his peril.' ( *The King v. Woodfall* (1774) Lofft 776, 781 [98 Eng.Rep. 914, 916].) Justice Holmes [*1206] subsequently stated the rule in equally clear fashion: 'If the publication was [libelous] the defendant took the risk.' ( *Peck v. Tribune Co. (1909) 214 U.S. 185, 189 [53 L.Ed 960, 962, 29 S.Ct. 554]* . . ..)

"To ameliorate the harshness of the strict-liability standard, certain privileges and defenses developed in the common law. The one that is most relevant . . . is the common-interest privilege, which protected communications made in good faith on a subject in which the speaker and hearer shared an interest or duty. 12 This privilege applied to a narrow range of private interests. The interest protected was private or pecuniary; the relationship between the parties was close, e.g., a family, business, or organizational interest; and the request for information must have been in the course of the relationship. . ..

12 The "good faith" requirement distinguishes a conditional (or "qualified") privilege from an absolute one. (See, e.g., Lee & Lindahl, 3 Modern Tort Law (rev. ed. 1988) Defamation, § 36.20, p. 250 ["The distinction between absolute and qualified privileges is essentially that an absolute privilege confers immunity regardless of motive while a qualified privilege can be lost if the defendant acted out of malice." (Fn. omitted.)]; Eldredge, The Law of Defamation (1978) § 93, p. 510 ["Conditionally privileged occasions are created in order to permit the publisher of the defamation to protect the interest which is entitled to protection. If the publication is made primarily for the purpose of protecting or advancing that interest, the publisher has a proper purpose and,

with respect to the purpose element, does not abuse the occasion. On the other hand, where the primary purpose is another purpose, e.g., a desire to injure the defamed person, this is an abuse of the occasion and no privilege comes into being." (Fns. omitted.)]; 2 Harper et al., *supra*, Defamation, § 5.21, pp. 179-180 ["The difference between absolute and qualified privilege lies in the effect of the motive and purpose of the defamer. The malice or malevolent purpose of the defamer is of no consequence if the occasion is absolutely privileged, but if the privilege is conditional only, proof of actual malice or ill will makes the defendant liable. In other words, malice is irrelevant if the words are spoken on an occasion absolutely privileged, as the immunity is absolute and indefeasible. But the insulation of an occasion only qualifiedly privileged is overcome by proof of malice." (Fn. omitted.)].)

"The legislative history of *section 47(3)* indicates the Legislature intended to codify the narrow common law privilege of common [***784] interest, not to create any broad news-media privilege. . .. [P] . . . We also find significance in the drafters comments to *section 47(3)*. The wording of *section 47(3)* was identical to that of section 31 of the original New York Civil Code published in 1865 as a codification of the common law (N.Y. Civ. Code, § 31 (Field 1865)). In the comments following *section 47(3)*, its drafters cited two New York cases dealing with the common-interest privilege [*Lewis and Herrick v. Chapman (1857) 16 N.Y. 369* and *Thorn v. Moser (N.Y. Sup.Ct. 1845) 1 Denio 488]* . . .. [P] . . . [and] also cited a treatise on the common law, Hilliard, The Law of Torts or Private Wrongs (1859) chapter XIV, page 317." (*Brown, supra, 48 Cal.3d at pp. 726-728*, fns. omitted, citing code comrs. note foll. 1 Ann. *Civ. Code, § 47* (1st ed. 1872, Haymond & Burch, comrs.--annotators) p. 25.)

[*1207] The authorities cited by the drafters of *section 47(c)*, and noted by us in *Brown, supra, 48 Cal.3d at pages 728-729*, speak directly to the burden-of-proof issue presented in the case now before us. The treatise authored by [**1287] Hilliard, The Law of Torts or Private Wrongs (1859) (hereafter Hilliard), contains the traditional statement of the common law common-interest privilege set forth in an English case, *Harrison v. Bush* (1855) 119 Eng.Rep. 509, as follows: "A communication made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contain criminatory matter which, without this privilege, would be slanderous and actionable." (See Hilliard, *supra*, ch. XIV at pp. 317-318.) The Hilliard treatise explains that, when the facts establish the statement was made upon a privileged occasion, the burden rests upon the plaintiff to establish malice: "The rule is well settled, that, if the words were spoken or the publication made *upon a just occasion*, the communication is privileged, and *express malice must be shown in order to maintain an action*." (Hilliard, *supra*, ch. XIV, at p. 317, initial italics in original, latter italics added, fn. omitted.) In an accompanying footnote, the treatise cites two English cases addressing this issue. In *Taylor v. Hawkins* (1851) 117 Eng.Rep. 897, 902, Lord Campbell stated: "The rule is, that, if the occasion be such as repels the presumption of malice, the communication is privileged, and the plaintiff must then, if he can, give evidence of malice: if he gives no such evidence, it is the office of the Judge to say that there is no question for the jury, and to direct a nonsuit or a verdict for the defendant." Similarly, in *Wright v. Woodgate* (1835) 150 Eng.Rep. 244, 246, Baron Parke stated: "[T]he occasion on which the communication was made rebuts the inference prima facie arising from a statement prejudicial to the character of the plaintiff, and puts it upon him to prove that there was malice in fact--that the defendant was actuated by motives of personal spite or ill-will, independent of the occasion on which the communication was made." (See Hilliard, *supra*, ch. XIV at p. 317, fn. 1 (b).)

The *Lewis and Herrick* and *Thorn* cases, also cited by the drafters of *section 47(c)*, are equally explicit on this point. (See *Lewis and Herrick v. Chapman (1857) 16 N.Y. 369, 373* ["The term 'privileged,' as applied to a communication alleged to be libelous, means simply that the circumstances under which it was made were such as to repel the legal inference of malice, and to throw upon the plaintiff the burden of offering some evidence of its existence beyond the mere falsity of the charge." (Italics added.)]; *Thorn v. Moser (N.Y. Sup.Ct. 1845) 1 Denio 488, 492-493* ["In general the mere utterance of slanderous words constitutes a ground of action, and the plaintiff need only prove their speaking to authorize a recovery. But to this there are well known exceptions growing out of the occasion of speaking the [*1208] words and the attendant circumstances. These may be such as to repel the legal presumption of malice, which

usually attaches to the speaker of defamatory words, *and may require the plaintiff, before he can recover, to prove the existence of malice in fact on the part of the* [***785] *defendant*. . .. Indeed, whenever a person speaks in the performance of any duty, legal or moral, public or private, or in the assertion of his own rights, or to vindicate and protect his interest, no action will lie against him without proving express malice, however untrue what is said may be." (Italics added.)].)

In sum, as we set forth in *Brown, supra, 48 Cal.3d at pages 726-729*, it is clear that, in enacting *section 47(c)*, the Legislature intended to codify without change the common law common-interest privilege. At common law, that privilege embodied a two-step analysis, under which the defendant bore the initial burden of demonstrating that the allegedly defamatory communication was made upon a privileged occasion, and the plaintiff then bore the burden of proving that defendant had made the statement with malice. Accordingly, the legislative history of *section 47(c)* supports the Court of Appeal's determination in the present case that the trial court erred in instructing the jury that, under the common-interest privilege, defendants bore the burden of proof upon the question of malice.

C.

In challenging the Court of Appeal's conclusion as to the burden-of-proof issue, plaintiff relies heavily upon a line of decisions, [**1288] commencing with this court's opinion in *Snively v. Record Publishing Co. (1921) 185 Cal. 565 [198 P. 1]* (hereafter *Snively*), which state that a defendant who relies upon the common-interest privilege of *section 47(c)* as a defense to a defamation action has the burden of proving that the statement was made upon a privileged occasion *and* that the statement was made without malice. (See *Snively, supra, 185 Cal. at p. 578* [13]; see also *Siemon v. Finkle (1923) 190 Cal. 611, 617 [213 P. 954]* [following *Snively*]; *Stevens v. Snow (1923) 191 Cal. 58, 64-65 [214 P. 968]* [same]; *Maher v. Devlin (1928) 203 Cal. 270, 281-284 [263 P. 812]* [same]; *Longsworth v. Curson (1922) 56 Cal.App. 489, 497 [206 P. 779]*, hg. den. Apr. 17, 1922; *Miles v. Rosenthal (1928) 90 Cal.App. 390, 408 [266 P. 320]*; *Morcom v. San Francisco Shopping News* [*1209] *(1935) 4 Cal.App.2d 284, 288-289 [40 P.2d 940]*; *Fairfield v. Hagan (1967) 248 Cal.App.2d 194, 204-205 [56 Cal.Rptr. 402]* [following *Morcom*]; *Swope v. Moskovitz (1967) 253 Cal.App.2d 514, 517 [61 Cal.Rptr. 277]* [citing *Snively*].) Although plaintiff acknowledges that the *Snively* decision was disapproved in our recent decision in *Brown*, insofar as *Snively* suggested that the common-interest privilege codified in *section 47(c)* applies broadly to all news reports of matters of public interest (see *Brown, supra, 48 Cal.3d at pp. 732-733, fn. 18*), plaintiff maintains that *Snively's* analysis of the burden-of-proof issue was not disapproved in *Brown* and remains viable today. Plaintiff is correct that our decision in *Brown* did not address the burden-of-proof issue discussed in *Snively*, but, for a number of reasons, we cannot agree with plaintiff that the Court of Appeal erred in failing to adhere to the *Snively* line of decisions.

13 The court in *Snively* held: "[B]y averring in their answer that the publication was on a privileged occasion and was made without malice, the defendants directly put in issue the question of actual malice. As absence of actual malice was an essential part of that defense, it was necessary for the defendants to prove such absence in order to sustain this defense. The withdrawal by the plaintiff of his claim for punitive damages and the striking out of the averments of actual malice from the complaint did not establish the fact that defendants published the cartoon without actual malice, nor excuse them from the necessity of proving absence of such malice, if they desired to establish that defense." (*185 Cal. at p. 578*.)

To begin with, in stating that a defendant, under the common-interest privilege, has the burden of proving that the statement in question was made in the absence of malice, the *Snively* court cited no authority related to the common-interest privilege, and, in particular, failed to consider or analyze the common law background or legislative history of *section 47(c)* that we have discussed above. As we have explained, at the time *section 47(c)* was enacted, the common law rule was well established that, once the defendant proved that [***786] an allegedly defamatory statement was made upon a privileged occasion, the plaintiff bore the burden of proving that the statement was made with malice. *Section 47(c)* codified that rule, but the court in *Snively* apparently was unaware of that circumstance.

Second, although *Snively's* statement regarding the burden-of-proof issue was followed in several cases (cited above) in the years immediately after the decision

in *Snively*, the rationale of the conclusion reached in that case largely was undermined by this court's subsequent decision in *Locke v. Mitchell (1936) 7 Cal.2d 599, 602-604 [61 P.2d 922]*. As noted above (see fn. 13, *ante*), the court in *Snively* had reasoned that, because the "absence of actual malice was an essential part of [the] defense [provided by the common-interest privilege], it was necessary for the defendants to prove such absence in order to sustain this defense." (*Snively, supra, 185 Cal. at p. 578*.) In *Locke v. Mitchell*, however, this court, in clarifying the operation of the common-interest privilege, explained that, "*while in the case of a false and unprivileged publication, libelous* [per se], *malice is implied, and lack of it is a matter of defense*, which need not be pleaded [citing, inter alia, *Snively*], *this is not true of a qualified privilege*, for *section 48 of the Civil Code* expressly declares that malice is not inferred from the communication or publication in the cases provided for in subdivisions 3, 4 and 5 of *section 47*. *Hence, where the complaint discloses a case of qualified privilege, no malice* [*1210] *is presumed* [**1289] *and in order to state a cause of action the pleading must contain affirmative allegations of malice in fact*. [Citations.]" (*Locke, supra, 7 Cal.2d at p. 602*, italics added.)

We recognize that the *Locke* decision, by its terms, dealt only with the question of which party bore the burden of *pleading* malice, and did not address specifically the question of which party bore the *burden of proof* with regard to malice. Nonetheless, the common law decisions establishing the common-interest privilege, as we already have seen, had established that, when the evidence demonstrated a statement had been made upon a privileged occasion, the plaintiff in an action for defamation could prevail only if he or she proved that the statement was made with malice. Following the *Locke* decision, subsequent decisions of this court applying the common-interest privilege--while not addressing explicitly the burden-of-proof issue--implicitly recognized that, once it is established that an allegedly defamatory statement was made upon an occasion that gave rise to a qualified privilege under *section 47(c)*, a plaintiff may recover damages for defamation only if he or she presents evidence sufficient to establish that the statement was made with malice. (See, e.g., *Sanborn v. Chronicle Pub. Co. (1976) 18 Cal.3d 406, 413-414 [134 Cal.Rptr. 402, 556 P.2d 764]*; *Brewer v. Second Baptist Church (1948) 32 Cal.2d 791, 796-800 [197 P.2d 713]*; *Emde v. San Joaquin County etc. Council (1943) 23 Cal.2d 146, 154-155, 161 [143 P.2d 20, 150 A.L.R. 916]* .)

Although this court has not had occasion, in the 58 years that have elapsed since the *Locke* decision, to address explicitly the question of which party bears the burden of proof under *section 47(c)* as to the issue of malice, the overwhelming majority of Court of Appeal decisions that have addressed this point have held explicitly that, where the defendant establishes that the defamatory communication was made upon a privileged occasion, the plaintiff bears the burden of proving that the defendant acted with malice. (See, e.g., *Manguso v. Oceanside Unified School Dist., supra, 153 Cal. App. 3d 574, 580-581*; *Williams v. Taylor, supra, 129 Cal. App. 3d 745, 752*; *Gantry Constr. Co. v. American Pipe & Constr. Co., supra, 49 Cal. App. 3d 186, 198*; *Deaile v. General Telephone Co. of California (1974) 40 Cal. App. 3d 841, 846-849 [115 Cal.Rptr. 582]*; *Warfield v. McGraw-Hill, Inc. (1973) 32 Cal. App. 3d 1041, 1047 [108 Cal.Rptr. 652]*; *McCunn v. California Teachers Assn. (1970) 3 Cal. App. 3d 956, 962 [83 Cal.Rptr. 846]*; *Freeman v. Mills (1950) 97 Cal.App.2d 161, 166-169 [217 P.2d* [***787] *687]*; *Shoemaker v. Friedberg (1947) 80 Cal.App.2d 911, 919 [183 P.2d 318]*; contra, *Swope v. Moskovitz, supra, 253 Cal.App.2d 514, 517* [relying upon *Snively*]; *Fairfield v. Hagan, supra, 248 Cal.App.2d 194, 204-205* [relying upon *Morcom v. San Francisco Shopping News, supra, 4 Cal.App.2d 284*, one of the decisions that chose to follow *Snively*].) [*1211]

Thus, although plaintiff faults the Court of Appeal in the present case for failing to follow *Snively*, the passage in *Snively* upon which plaintiff relies has not been followed by the overwhelming majority of California decisions that have addressed this issue in the course of the last several decades. (See also 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 520, p. 610 ["Ordinarily, privilege must be specially pleaded by the defendant, and the burden of proving it is on him. [Citations.] But where the complaint shows that the communication or publication is one within the classes qualifiedly privileged, it is necessary for the plaintiff to go further and plead *and prove* that the privilege is not available as a defense in the particular case, e.g., because of malice. [Citations.]" (Italics added.)].)

Furthermore, the Court of Appeal's conclusion as to the burden-of-proof issue not only is supported by the common law background and legislative history of *section 47(c)*, and by most of the recent California

decisions discussing this issue, but also conforms to the application of the common-interest privilege in the great majority of jurisdictions throughout the United States. (See generally, Prosser & Keeton, *supra*, Defamation, § 115, pp. 835-836 [citing cases]; Harper et al., *supra* , Defamation, § 5.29, pp. 248-249, fn. 25 [citing cases].)

[**1290] **(5)** In addition to relying upon *Snively* and its progeny, plaintiff contends that the Court of Appeal's decision in the present case--and, by implication, all of the other Court of Appeal decisions, cited above, which held the burden of proof as to malice is upon the plaintiff--are inconsistent with the provisions of *Evidence Code section 500*, which sets forth a general rule with regard to allocation of the burden of proof. That statute, enacted in 1965 as part of California's initial codification of the rules of evidence, provides in full: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (*Ibid.*)

Plaintiff's contention is unavailing for several reasons. First, the introductory clause of *Evidence Code section 500*--"[e]xcept as otherwise provided by law"--makes it clear that the section was not intended to supersede rules (allocating the burden of proof) embodied in other statutory provisions or court decisions. (*Evid. Code, § 160.*) Plaintiff has not pointed to anything in the legislative history of *Evidence Code section 500* suggesting that the statute was intended to alter the operation of the common law rules, relevant to the burden of proof as to the common-interest privilege, which were codified by the adoption of *sections 47(c)* and *48*. Second, even without regard to its introductory clause, *Evidence Code section 500* does not purport to determine which facts are "essential" to the plaintiff's "claim for [*1212] relief" and which facts are "essential" to a claimed defense, but rather leaves those substantive determinations to be resolved in light of the particular cause of action or defense at issue. As we have seen, from its origins at early common law the common-interest privilege has been understood to require that the plaintiff prove the existence of "malice" as an essential requirement of a cause of action for defamation when the evidence establishes that the statement was made upon a privileged occasion. Accordingly, the rule placing upon the plaintiff the burden of proving malice, for purposes of *section 47(c)*, does not conflict with *Evidence Code section 500*.

Finally, plaintiff contends that our recent decision in *Brown, supra, 48 Cal.3d 711*, contains several statements "from which it could be inferred" that a defendant bears the burden of proving an absence of malice. As we shall explain, plaintiff is mistaken.

[***788] In *Brown, supra, 48 Cal.3d 711*, the sole issue presented was whether former *section 47, subdivision 3*, afforded a broad "*public*-interest privilege" to the news media to make false statements regarding a private individual. (*48 Cal.3d 711, 719*, italics added.) Defendants, members of the news media, argued that when news organizations publish and broadcast matters of public interest, they share a "common interest with their audiences," warranting protection under the statute. (*Ibid.*) In rejecting the defendants argument, we addressed two issues pertinent to our present discussion.

First, we held: *Section 47(3)* provides a privilege to specified communications made 'without malice.' . . .. If *section 47(3)* applies to the occasion on which a communication is made *and* if it was made without malice, it is privileged and cannot constitute a defamation under California law." (*Brown, supra, 48 Cal.3d at p. 723*, original italics.) Plaintiff contends that, properly interpreted, the quoted statement requires that, in order to prevail upon the defense of the common-interest privilege, a defendant must prove the occasion was privileged *and* the statement was made without malice. Yet *Brown* does not so hold. Indeed, *Brown* does not even address the burden-of-proof issue in the context of the common-interest privilege, and therefore the expansive interpretation of that decision urged by plaintiff is erroneous.

Second, in the context of examining the public-interest privilege in *Brown*, we held: "Interpreting *section 47(3)* to require a private person to prove malice might have another curious result. The distinction between public and private persons reflects a special solicitude for private reputation. Under a *section 47(3)* privilege, however, a private person might have to show a greater [**1291] degree of culpability by the defendant than would a public person under the common law fair-comment defense and its constitutional-malice [*1213] standard. . . . If so, a private person subject to *section 47(3)* would have a greater burden in obtaining redress for a damaged reputation than the high court has seen fit to impose on public persons." (*Brown, supra, 48 Cal.3d at p. 745*, fn. omitted.) Significantly, this

discussion in *Brown* was directed toward explaining why *section 47(3)* did not embrace the *public*-interest privilege urged by the defendants in that case. The discussion was unrelated to the distinct question presented here, which involves a nonmedia defendant who properly has asserted the statutorily endorsed *common*-interest privilege as an affirmative defense. Accordingly, we reject plaintiff's contention that *Brown* is supportive of her position.

III.

**(6a)** Although, as we have explained, the trial court's instructions to the jury in the present case erroneously allocated to defendants the burden of proving an absence of malice for purposes of the common-interest privilege, for the reasons set forth below we conclude that this error does not warrant reversal of the trial court's judgment in favor of plaintiff.

**(7)** In order to persuade an appellate court to overturn a jury verdict because of instructional error, an appellant must demonstrate that "the error was prejudicial (*Code Civ. Proc., § 475*) and resulted in a 'miscarriage of justice.' " ( *Pool v. City of Oakland (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163]*, quoting *Cal. Const., art. VI, § 13*; *People v. Watson (1956) 46 Cal.2d 818, 834 [299 P.2d 243]*.) Instructional error ordinarily is considered prejudicial only when it appears probable that the improper instruction misled the jury and affected the verdict. ( *Krouse v. Graham (1977) 19 Cal.3d 59, 72 [137 Cal.Rptr. 863, 562 P.2d 1022]*.) **(6b)** In the present case, as to the issue of malice, the trial court instructed the jury (pursuant to a modified version of *BAJI No. 7.05*) that the qualified privilege "is lost . . . if the person making the statement was: [P] 1. Motivated by hatred or ill-will toward the plaintiff which induced the publication; or [P] [***789] 2. Was without a good-faith belief in the truth of the statement." This instruction correctly stated the law. (See *Frommoethelydo v. Fire Ins. Exchange (1986) 42 Cal.3d 208, 217 [228 Cal.Rptr. 160, 721 P.2d 41]*; *Sanborn v. Chronicle Pub. Co., supra, 18 Cal.3d at p. 413*, quoting *Roemer v. Retail Credit Co. (1975) 44 Cal. App. 3d 926, 936 [119 Cal. Rptr. 82]* [" 'The malice necessary to defeat a qualified privilege is "actual malice" which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights (citations).' " (Italics by the court in *Roemer*.)].) As to the burden-of-proof issue, the trial [*1214] court erroneously instructed the jury that defendants bore the burden of proving that their statements to seminar attendees were made without malice. The trial court's error in instructing the jury as to the burden of proof clearly was harmless, however, because the jury also was instructed as to punitive damages (pursuant to a modified version of *BAJI No. 14.71*). In this regard, the jury was informed that, if it found "*by clear and convincing evidence*" that defendants' conduct was intended "*to cause injury to the plaintiff or* [*constituted*] *despicable conduct* . . . carried on by the defendant[s] with a willful and conscious disregard for the rights of others," malice (or "oppression," a term defined in the instruction as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights") thereby was established. (Italics added.) The jury's affirmative finding as to malice (or oppression) demonstrates that the jury found plaintiff had proved not only that defendants acted with the requisite reprehensible motivation constituting an abuse of the privileged occasion, thereby defeating the qualified privilege, but that defendants' conduct also was intentionally injurious to, or in conscious disregard of, plaintiff's rights, thereby meeting the *heightened* requirements of malice (or oppression) necessary to support an award of punitive damages. (See § 3294, subd. (c)(1), (2).) Thus, it is clear the jury's verdict would have [**1292] been the same had it been instructed correctly that, in order to establish that defendants abused the privileged occasion, plaintiff bore the burden of proving that defendants defamatory remarks were made with malice. Under these circumstances, reversal of the judgment rendered by the trial court is not warranted. (See *People v. Watson, supra, 46 Cal.2d at p. 836*.)

IV.

We reverse the judgment of the Court of Appeal insofar as it overturns the trial court's judgment in favor of plaintiff.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., Baxter, J., and Werdegar, J., concurred.

# TAB 20

LEXSEE 48 CAL.APP.4TH 481

**DESIDERIO MAGPALI, Plaintiff and Appellant, v. FARMERS GROUP, INC., et al., Defendants and Respondents.**

**No. B084128.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION FOUR**

***48 Cal. App. 4th 471; 55 Cal. Rptr. 2d 225; 1996 Cal. App. LEXIS 714; 96 Cal. Daily Op. Service 5530; 96 Daily Journal DAR 9002***

**July 25, 1996, Decided**

**SUBSEQUENT HISTORY:** [***1] As Modified on Denial of Rehearing August 20, 1996.

**PRIOR HISTORY:** Appeal from orders of the Superior Court of Los Angeles County. Super. Ct. No. KC010428. Hon. Clifton L. Allen, Judge. (Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.)

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A terminated insurance agent brought an action against the insurer for breach of contract, fraud, and intentional infliction of emotional distress arising out of his tenure as an insurance agent. Plaintiff alleged defendant made false representations concerning how plaintiff could operate the agency, which caused him to change employment. He further alleged defendant had an unspoken policy of discouraging writing insurance policies for minorities, including the minority to which plaintiff belonged. The breach of contract action was dismissed, and the trial court granted defendant a nonsuit on the other claims; plaintiff was also denied leave to amend to allege an Unruh Civil Rights Act (*Civ. Code, § 51 et seq.*) claim. (Superior Court of Los Angeles County, No. KC010428, Clifton L. Allen, Judge. *)

* Retired judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

The Court of Appeal affirmed. The court held that the allegation that defendant induced plaintiff to become one of its insurance agents by fraudulent representations stated a cause of action, but that the evidence did not support any of the claims. The evidence was uncontroverted that for years after plaintiff became a full-time insurance agent, defendant did not interfere with his operations in any way and that plaintiff ran his office as he thought best. It was only after multiple years of disappointing sales and a higher than average loss ratio that he was instructed to try different marketing techniques. The court also held that the claims were time-barred. It further held that the allegation that defendant had an unspoken policy prohibiting agents from marketing to any one specific ethnic group, and that plaintiff was instructed to write more insurance policies for non-minorities and to avoid writing policies for members of plaintiff's own ethnic group because they were poor risks, could constitute the extreme and outrageous conduct needed to support the tort of intentional infliction of emotional distress, but that the action was also time-barred. The court further held that the trial court properly denied plaintiff leave to amend on the day of trial. (Opinion by Baron, J., with Epstein, Acting P. J., and Hastings, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1) Fraud and Deceit § 7--False Representations--Promissory Fraud--To Change Employment--Insurance Agent.** --A complaint that an insurer induced plaintiff to become one of its insurance agents by fraudulent representations stated a cause of action. Where an employer uses misrepresentations to induce a party to change employment when the objective could not have been achieved truthfully, and the party is left in worse circumstances than those in which he or she would have found him- or herself had he or she not been lied to, the party has a claim for promissory fraud or fraud in the inducement. Although plaintiff was an independent contractor, not an employee, the same principle applied.

**(2) Fraud and Deceit § 7--False Representations--Promissory Fraud--To Change Employment.** --The trial court properly determined that an insurance agent could not recover on a claim that an insurer induced plaintiff to become one of its insurance agents by falsely promising to allow him to run his office as he saw fit and not be terminated or threatened with termination, where there was no evidence to support the claim the alleged promise was false when made. A promise of future conduct is actionable as fraud only if made without a present intent to perform. Something more than nonperformance is required to prove the defendant's intent not to perform the promise. The evidence was uncontroverted that for years after plaintiff became a full-time insurance agent defendant did not interfere with his operations in any way and that plaintiff ran his office as he thought best. It was only after multiple years of disappointing sales and a higher than average loss ratio that he was instructed to try different marketing techniques. Defendant could not have foreseen that plaintiff would be unable to profitably operate the agency at the time the contract was made and therefore could not have known that the alleged promise of noninterference was false when made.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 685.]

**(3) Limitation of Actions § 38--Commencement of Period--Fraud--Discovery--False Promise.** --The trial court properly determined that a claim that an insurer induced plaintiff to become one of its insurance agents by falsely promising to allow him to run his office as he saw fit and not be terminated or threatened with termination, was time-barred (*Code Civ. Proc., § 338, subd. (d)*). Plaintiff knew more than three years before filing the action that he had been designated a limited underwriting authority agent, restricted as to the types of insurance he could bind, forced to defend his operating and marketing practices, and ordered to develop a plan to return his agency to profitability by year's end, and thus he had notice that he would be operating under less than the absolute freedom he asserted was his due.

**(4a) (4b) Fraud and Deceit § 8--False Representations--Concealment--To Change Employment.** --A claim that an insurer induced plaintiff to become one of its insurance agents by falsely promising to allow him to run his office as he saw fit, but failed to disclose its limited underwriting authority (LUA) program, under which an underperforming agent could be restricted as to the types of insurance he or she could bind, was not supported by the evidence. Ordinarily, failure to disclose material facts is not actionable fraud unless there is some fiduciary relationship giving rise to a duty to disclose and an insurer does not owe a fiduciary duty to its agents. Also, the agent's guide which explained the LUA program was completely accessible to plaintiff before he left his prior occupation to become a full-time agent; indeed he was expected to study it as part of his training. Moreover, to be actionable, a misrepresentation or concealment must induce justifiable reliance and resulting damage. Under any view of the facts, plaintiff knew his future as an agent was uncertain and depended on his ability to engender profit for defendant. Plaintiff could not have reasonably expected that he would be permitted to run an unprofitable agency forever in light of the fact the parties' agreement included a requirement of conformance to normal good business practices and a right of termination for cause.

**(5) Fraud and Deceit § 8--False Representations--Concealment--Fiduciary Relationship.** --Ordinarily, failure to disclose material facts is not actionable fraud unless there is some fiduciary relationship giving rise to a duty to disclose The duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts that are not accessible to the plaintiff.

**(6) Limitation of Actions § 38--Commencement of Period--Fraud--Discovery--Concealment.** --A complaint alleging that an insurer induced plaintiff to become one of its insurance agents by falsely promising

to allow him to run his office as he saw fit, but failed to disclose its limited underwriting authority (LUA) program, under which an underperforming agent could be restricted as to the types of insurance he or she could bind, was time-barred. The evidence was uncontroverted that plaintiff knew about the program by no later than April of 1989 when he received notice that he was going to be designated a LUA agent due to his excessive loss ratio. That plaintiff may have believed the status was only temporary made no difference to the running of the statute of limitations, which accrues when the plaintiff has all the information essential to the claim. Since he did not file the complaint until July of 1992, more than three years later, the claim was barred.

**(7) Limitation of Actions § 38--Commencement of Period--Fraud--Discovery--False Representations.** --A complaint alleging that an insurer induced plaintiff to become one of its insurance agents by falsely representing that plaintiff would be free to deal with applicants regardless of racial background or nationality and never told plaintiff about its unspoken policy prohibiting agents from marketing to any one specific ethnic group, was time-barred. The damages did not arise from the loss of the position with defendant, but from the loss of the previously held position which plaintiff was induced to leave. The crucial event for accrual purposes was when plaintiff first learned of the alleged discriminatory policy, not the date on which he was terminated, and the statute did not begin running anew every time the alleged discriminatory policy was mentioned or emphasized. It was indisputable that plaintiff had sufficient reason to suspect the existence of a policy of discrimination over three years before he filed the action.

**(8) Torts § 5--Intentional Infliction of Emotional Distress--Insurance Selling Restrictions.** --A complaint by an insurance agent alleging that defendant insurer had an unspoken policy prohibiting agents from marketing in any one specific ethnic group, and that plaintiff was instructed to write more insurance policies for non-minorities and to avoid writing policies for members of plaintiff's own ethnic group because they were poor risks, could constitute the extreme and outrageous conduct needed to support the tort of intentional infliction of emotional distress.

**(9) Pleading § 77--Amendment--New Cause of Action--At Trial--Denial.** --In a fraud action by a terminated insurance agent against the insurance company, the trial court did not abuse its discretion in denying plaintiff's motion on the day of trial to amend and add a cause of action alleging a violation of the Unruh Civil Rights Act (*Civ. Code, § 51 et seq.*). Adding the new cause of action would have changed the tenor and complexity of the complaint from its original focus on representations and demands made to plaintiff by his superiors to an exploration of defendant's activities and practices in an entire geographical area. The new claim would have necessitated, at the very least, a continuance to allow defendant to depose new witnesses. Where the trial date is set, the jury is about to be impaneled, counsel, the parties, the trial court, and the witnesses have blocked the time, and the only way to avoid prejudice to the opposing party is to continue the trial date to allow further discovery, refusal of leave to amend cannot be an abuse of discretion. With every relevant factor aligned on the opposing side, denial of the motion for leave to amend was the only appropriate outcome.

**COUNSEL:** Perona, Langer & Beck, Major Alan Langer, Ellen R. Serbin and E. Todd Trumper for Plaintiff and Appellant.

Tharpe & Howell, Christopher S. Maile and David B. Wasson for Defendants and Respondents.

**JUDGES:** Opinion by Baron, J., with Epstein, Acting P. J., and Hastings, J., concurring.

**OPINION BY:** BARON

**OPINION**

[*475] [**227] **BARON, J.**

Appellant Desiderio Magpali brought suit against Farmers Group, Inc., Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, Farmers New World Life Insurance Company, Shel Chaffer, Norman Gerwien, and Joe Lowther (collectively referred to herein as Farmers) for breach of contract, fraud, and intentional infliction of emotional distress arising out of his tenure as an insurance agent for Farmers. The breach of contract claim was dismissed prior to trial and the court granted [***2] Farmers' motion for nonsuit as to the other two claims. On the eve of trial, Magpali sought and was denied leave to amend to add a claim for violation of the Unruh Civil Rights Act ( *Civ. Code, § 51* [**228] *et seq.*

, hereinafter referred to as the Act). We affirm.

PROCEDURAL AND FACTUAL BACKGROUND

*The Pleadings*

In his complaint, filed July 15, 1992, Magpali alleged causes of action based on breach of contract, fraud and intentional infliction of emotional [*476] distress. The complaint alleged that he had been an agent for Farmers since 1984 and that Farmers breached the parties' agreement on or about April 17, 1989, by "placing Magpali on Limited Underwriting Authority ('LUA') status, effective May 1, 1989," which "result[ed] in severe restrictions being placed upon the agent's ability to bind Farmers policies." The complaint further stated that Farmers breached the agreement "by telling Magpali how to run his business and requiring him to submit a plan of operation for Farmer[s's] approval" and "by terminating the [agreement] without good cause . . . ."

Concerning the fraud claim, the complaint alleged that in July of 1984 and April of 1985 Farmers made [***3] the following misrepresentations: "(a) As a Farmers' agent Magpali would be an independent contractor and as such, he would be able to determine the time in which he would carry out his business; [P] (b) That Magpali would be free to determine [the] manner in which he conducted his business; [P] (c) That Magpali would be free to make all decisions regarding the operation of his business as long as he performed his duties under the Appointment Agreement; [P] (d) That Magpali would be allowed to market policies to any and all interested applicants; and [P] (e) That Magpali would be free to deal with applicants regardless of racial background or nationality." According to the complaint, the truth was that Farmers "intended to, and did: [P] (a) Require that Magpali spend certain parts of each day and night soliciting new business; [P] (b) Impose requirements on Magpali regarding the manner in which he operated his business; [P] (c) Require that Magpali submit a plan of operation to Farmers which was subject to Farmers approval; [P] (d) Place Magpali on LUA status and preclude him from binding most types of Farmers policies, and, in some cases, from even submitting an [***4] inquiry to Farmers regarding an application; and [P] (e) Order Magpali to sell policies to applicants who were not Filipino or Hispanic."

In support of the claim for intentional infliction of emotional distress, Magpali alleged that between July 1991 and February 1992, Farmers' representatives: (a) "yelled that Magpali's record was the worst . . . ever[] seen and that Magpali should resign"; (b) "told Magpali that he was writing to[o] many policies for minorities and that he should write more policies for 'white people' or resign"; (c) "insulted, belittled, and shouted at Magpali and threatened to terminate him in an effort to get him to resign"; (d) "shouted at Magpali that he had no future with Farmers, that he should avoid writing Filipinos and Hispanics and that he should resign"; and (e) "force[d] Magpali, without any preparation, to do a mock sales presentation" and "told Magpali he was doing a lousy presentation and . . . was otherwise degrading and insulting to Magpali."

[*477] A demurrer to the complaint was overruled in all relevant parts. In its answer, Farmers contended that Magpali's claims for fraud and intentional infliction of emotional distress were [***5] barred by the relevant statutes of limitations. A motion brought by Farmers for summary judgment was denied.

Trial was set for March 2, 1994, and trailed until March 11, 1994. Magpali informed Farmers by letter dated March 8, 1994, that he intended to amend his complaint to bring a claim under the Act. He filed a motion for leave to amend on March 10. The court denied the motion on the first day of trial. Magpali dismissed the action for breach of contract during the argument on motions *in limine*.

*Evidence at Trial*

Accepting as true the evidence introduced by Magpali, he was recruited to become a Farmers insurance agent by John Cammeraat. [**229] Cammeraat told him at their first meeting that being a Farmers agent was an opportunity to be independent and to have his own business and earn unlimited income. Magpali believes he indicated to Cammeraat that his natural market was the Filipino community.

Magpali became a reserve agent in July of 1984, which means he began selling insurance part time while holding on to his existing job with a company called Zeus West, Incorporated. Between July of 1984 and April of 1985, he received training classes but no specific training [***6] on limited underwriting authority (LUA) or the calculation of loss ratio. Farmers maintains a manual or guide for its agents which discusses LUA status and how it is attained. It states: "When the 4th quarter Experience

Analysis reports are published each year, all Agents are evaluated to determine their status for the subsequent year. [P] . . . . [P] [The LUA] designation will apply to those Agents who have an underwriting loss of over 10 and $ 60,000 or more during the past 36 months, ending December 31st, regardless of policy-in-force. [P] Limited Underwriting Agent may not bind risks in Farmers Auto." Magpali could not remember when he received his own copy of the agent's guide, possibly not until he became a full-time agent. However, he was required to study the guide as part of his training and had access to a copy of the guide located in the office in which he worked.

In April of 1985, Magpali signed an agent appointment agreement and became a full-time agent for Farmers, quitting his job with Zeus West. The agreement provided that "[t]he Agent shall, as an independent contractor, exercise sole right to determine the time, place and manner in which the [*478] [***7] objectives of this Agreement are carried out, provided only that the Agent conform to normal good business practice, and to all State and Federal laws governing the conduct of the Companies and their Agents." The agreement stated that it could be terminated by either party "on thirty (30) days written notice," which would suggest that it could be terminated with or without cause. However, there is no dispute that Farmers' practice was to terminate agency agreements only for cause.

Magpali first recalls hearing about the LUA program in 1986 or 1987 when an agent in his office was placed in it. In addition, it was his understanding from studying the agent's guide that one of Farmers' objectives for its agents was that they have a profitable loss ratio. He received quarterly loss ratio reports from the time he became a career agent. He was expressly informed that he was having a loss ratio problem in 1988 when he received a memorandum from Cammeraat listing the weaknesses in his agency, including "low production" and "loss ratio 172.7." The memorandum instructed him to "be prepared to discuss the contents of this memo and present your development plans" at their next meeting. Magpali [***8] believed that the problem was caused by some of his clients' lying about their driving records. He prepared a response for Cammeraat in which he listed a number of actions he intended to undertake to improve his statistics.

Magpali received notice on April 17, 1989, that due to his loss ratio he would be put in the LUA program. The most significant result of this designation was that Magpali no longer had authority to bind the company when clients sought the low cost automobile policy designed for preferred risks unless he had a motor vehicle report, photographs of the car, and a copy of an existing insurance policy. At a meeting held shortly thereafter, he was told to correct the loss ratio problem by expanding his book of business outside the Filipino and Hispanic communities. In a memorandum from the regional sales manager which followed the meeting, he was instructed to "develop your plans, including quantitative goals, which you will work in order to return your Agency to profitability, by year-end."

The loss ratio situation did not improve. Effective May 1, 1990, the LUA status was renewed. A year later, in May of 1991, he [**230] was designated a LUA agent for the third [***9] year in a row.

At a meeting which followed the May 1991 LUA designation, Magpali was told his record was the worst ever seen and urged to resign. About a month later he met with his district manager and was again urged to resign and told to avoid writing Filipinos and Hispanics because they were giving him the loss ratio problem. He was required to do a mock sales presentation [*479] which was pronounced "lousy." At that meeting, he informed Farmers he would not change any practices unless the request was put in writing. Afterwards, he contacted a lawyer who sent a letter dated July 9, 1991, to Farmers, stating: "We were informed by our client that recently he has been the subject of harassment, threats, intimidation, insults and racial discrimination as evidenced by various written memoranda as well as verbal confrontations. [P] . . . . [P] We were informed by our client that he was verbally given notice that he cannot get customers who have Filipino and Hispanic origin." After sending the letter, Magpali decided not to attend further meetings. In December, his lawyers sent a letter outlining a marketing program "to resolve the alleged deficiencies existing in our client's [***10] agency" and agreeing to a meeting in January.

In January of 1992, Magpali met with Farmers accompanied by his lawyer to discuss his proposal. On February 4, 1992, he was called to another meeting and was given notice of termination. No one spoke aggressively or improperly to him at those times. At the final meeting he was told that Farmers had only wanted him to expand his marketing efforts and that he had been free to sell to whatever nationalities he desired.

During his seven-year career with Farmers, Magpali's principal source of new business was through friends, acquaintances, and referrals from existing clients. He was earning about $ 15,000 to $ 20,000 in commissions by his fourth year. Throughout the years of criticism of his performance, he never changed his marketing practices. He continually refused to attend meetings and classes scheduled by Farmers for its agents.

Farmers's "official nondiscrimination policy" as set forth in the agent's guide stated: " '[A]ll Farmers Insurance Group of Companies policies and coverages are offered to the public on a nondiscriminatory basis and are underwritten without regard to sex, race, religion, religious creed, color, national [***11] origin, ancestory [*sic*] or geographic area. [P] Any solicitation or maintenance of business should be based on nondiscriminatory consideration in accordance with our established policy.' " A 1984 memorandum to Cammeraat referencing Magpali stated: "We have approved the Agent prospect appointment. However, the reserve appointment and attainment of qualifying production count for career conversion will not result in automatic conversion. [P] All writings under the reserve contract will be reviewed before conversions for: [P] desirable source and method of acquisition, broad based solicitation not confined to ethnic community, religious or other groups, adequate communication skills to enable proper servicing of the account, use of proper qualification techniques to enable the accurate administration of risk placement, classification and discount programs, forms completion, ability to pay and renew."

[*480] Magpali testified that if he had known about his potential problems with loss ratio, the LUA program, or the need to avoid writing insurance solely to Filipino and Hispanic clients, he would not have given up his job with Zeus West to become a Farmers agent.

After [***12] hearing plaintiff's side, the trial court granted a defense motion for nonsuit. In its order, the court made the following rulings based on the evidence presented: that Farmers did not perpetrate a fraud on Magpali; that the fraud claim was barred by the statute of limitations; that Farmers' conduct was not outrageous; and that the claim for intentional infliction of emotional distress was barred by the statute of limitations. Magpali appealed from the judgment following the grant of nonsuit.

[**231] DISCUSSION

I.

*Fraud*

We first address the issue of whether Magpali's claim of having been fraudulently induced to become a Farmers insurance agent was supported by substantial evidence and should have been permitted to go to the jury. **(1)** There is no doubt that the allegations of the complaint that Farmers induced Magpali to become one of its insurance agents by fraudulent representations stated a cause of action. The Supreme Court has held that where an employer uses misrepresentations to induce a party to change employment when the objective could not have been achieved truthfully, and the party is left in worse circumstances than those in which he would have found himself [***13] had he not been lied to, he has a claim for promissory fraud or fraud in the inducement. ( *Lazar v. Superior Court (1996) 12 Cal. 4th 631, 638-643 [49 Cal. Rptr. 2d 377, 909 P.2d 981].*) Although Magpali was an independent contractor, not an employee, we see no reason why the same principle would not apply.

Magpali's fraud claims can be broken down into three broad categories: (1) Farmers falsely represented that Magpali would be permitted to run his office as he saw fit; (2) Farmers concealed the existence of the LUA program under which agents were limited in their ability to bind insurance; and (3) Farmers falsely represented that Magpali could sell insurance to members of any racial or ethnic group without revealing the existence of an "unwritten policy" precluding an agent from dealing exclusively with particular racial or ethnic groups. We address each category separately.

[*481] A

According to the undisputed evidence, Magpali always ran his office in accordance with his own practices, and never submitted to Farmers' directives, whether they came under the guise of advice, instructions, or orders. **(2)** We presume, therefore, that when Magpali says Farmers falsely promised [***14] to allow him to run his office as he saw fit, he means that Farmers falsely represented he could run his office as he saw fit and not be terminated or threatened with termination. We agree with the trial court that there was no merit to the claim.

A promise of future conduct is actionable as fraud only if made without a present intent to perform. ( *Civ. Code, § 1710, subd. 4*; *Tarmann v. State Farm Mut. Auto. Ins. Co. (1991) 2 Cal. App. 4th 153, 158-159 [2 Cal. Rptr. 2d 861]*.) " 'A declaration of intention, although in the nature of a promise, made in good faith, without intention to deceive, and in the honest expectation that it will be fulfilled, even though it is not carried out, does not constitute a fraud. [Citation.]' " ( *Edmunds v. Valley Circle Estates (1993) 16 Cal. App. 4th 1290, 1301 [20 Cal. Rptr. 2d 701]*, quoting *Church of Merciful Saviour v. Volunteers of America (1960) 184 Cal. App. 2d 851, 859 [8 Cal. Rptr. 48]*.) Moreover, " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' [Citations.] . . . [I]f plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance [***15] of an oral promise, he will never reach a jury." ( *Tenzer v. Superscope, Inc. (1985) 39 Cal. 3d 18, 30-31 [216 Cal. Rptr. 130, 702 P.2d 212]*.)

The evidence was uncontroverted that for years after Magpali became a full-time insurance agent, Farmers did not interfere with his operations in any way and that Magpali ran his office as he thought best. This led to very low income for him and little or no profit for Farmers. It was only after multiple years of disappointing sales and a higher than average loss ratio, that he was instructed to try different marketing techniques.

On these facts, there was simply no evidence to support the claim the alleged promise was false when made. Farmers could not have foreseen that Magpali would be unable to profitably operate the agency at the time the contract was made and therefore could not have known that the alleged promise of noninterference was false when made. Farmers may have been overly optimistic in believing that an inexperienced agent could generate sufficient sales to justify the continued operation of the agency, but an erroneous belief, no matter how misguided, does not justify a finding of fraud. (See *Tarmann v. State Farm* [***16] *Mut. Auto. Ins. Co., supra, 2 Cal. App. 4th* [*482] *at p. 159* ["Making a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise. We decline to establish a new type of actionable deceit: the negligent false promise."].)

**(3)** We further agree with the trial court that this claim is barred by the applicable statute of limitations contained in *Code of Civil Procedure section 338, subdivision (d)*. Certainly by no later than May of 1989, by which time Magpali had been designated an LUA agent, restricted as to the types of insurance he could bind, forced to defend his operating and marketing practices, and ordered to develop a plan to return his agency to profitability by year's end, he had notice that he would be operating under less than the absolute freedom he asserts was his due. His complaint was not filed for more than three years.

B

**(4a)** Magpali's primary contention concerning the LUA program is that Farmers wrongfully concealed its existence from him and thereby induced him to become a Farmers agent. **(5)** Ordinarily, failure to disclose material [***17] facts is not actionable fraud unless there is some fiduciary relationship giving rise to a duty to disclose ( *Goodman v. Kennedy (1976) 18 Cal. 3d 335, 346-347 [134 Cal. Rptr. 375, 556 P.2d 737]*), and an insurer does not owe a fiduciary duty to its agents. "The duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts which are not accessible to the plaintiff. [Citations.]" (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 700, p. 801; accord, *Goodman v. Kennedy, supra, at p. 347*.) **(4b)** Here, the agent's guide which explained the LUA program was completely accessible to Magpali before he left his prior occupation to become a full-time agent; indeed he was expected to study it as part of his training.

Moreover, to be actionable, a misrepresentation or concealment must induce justifiable reliance and resulting damage. ( *Walters v. Marler (1978) 83 Cal. App. 3d 1, 17 [147 Cal. Rptr. 655]*, disapproved on another ground in *Gray v. Don Miller & Associates, Inc. (1984) 35 Cal. 3d 498 [198 Cal. Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763]*.) Magpali contends concealment of the LUA program induced him [***18] to become a Farmers agent and the resulting damage was the loss of the existing, more secure position with Zeus West. But under any view of the facts, Magpali knew his future as a salesman for Farmers was uncertain and depended on his ability to engender profit for the company. Magpali could not have reasonably expected that he would be permitted to run an unprofitable agency forever in light of the fact the [*483] parties' agreement included a requirement of

conformance to normal good business practices and a right of termination for cause. Put another way, the evidence was uncontroverted that he willingly gave up a secure job and became a Farmers agent with the understanding that Farmers could terminate him for failure to make sufficient sales. Since that is the case, we fail to see how the alleged concealment of the fact that Farmers had a program for low-producing agents far less drastic than outright termination could have had any effect on his decision to become a Farmers agent.

**(6)** This aspect of the fraud claim also suffers from an insurmountable statute of limitations problem. Assuming that Farmers had a duty to disclose the LUA program and that concealment of the program [***19] induced Magpali to become a Farmers agent, the evidence was uncontroverted that Magpali knew about the program by no later than April of 1989, when he received notice that he was going to be designated an LUA agent due to his excessive loss ratio. Magpali suggests that this event did not trigger the statute because he believed the status was [**233] only temporary. This belief made no difference to the running of the statute of limitations, which accrues when the plaintiff has all the information essential to the claim. ( *Spellis v. Lawn (1988) 200 Cal. App. 3d 1075, 1080 [246 Cal. Rptr. 385].*) Magpali's claim was that he was wrongly induced to become a Farmers agent by concealment of the LUA program. By April of 1989 at the very latest, he was informed of the existence of the allegedly concealed program and its effect on his ability to sell Farmers insurance. He had already left his position with Zeus West, suffering the alleged damage. Since he did not file the complaint until July of 1992, more than three years later, the claim was barred.

C

**(7)** We next turn to Magpali's contention that Farmers engaged in fraudulent concealment because it represented that "Magpali would [***20] be free to deal with applicants regardless of racial background or nationality" and "never told Magpali about its unspoken policy prohibiting agents from marketing in any one specific ethnic group." [1] While it is somewhat out of the ordinary to assert a claim of fraud where the defendant's transgression [*484] involves discriminatory conduct, there is no principle which impedes a claimant from asserting such a claim as long as all the elements are present. The elements of fraud are "(a) misrepresentation . . . ; (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage. [Citations.]" (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 676, p. 778.) Magpali alleged that Farmers had a policy of prohibiting agents from selling to certain ethnic groups, including their own, but told Magpali that he would be free to market to all applicants regardless of ethnicity in order to induce Magpali to become a Farmers agent. That would appear to meet all of the necessary elements of a claim for fraudulent misrepresentation. Unlike a claim for discrimination, however, the damages do not arise from the loss [***21] of the position with Farmers, as Magpali suggests in his brief, but from the loss of the previously held position which the agent was induced to leave. (See *Lazar v. Superior Court, supra, 12 Cal. 4th at pp. 642-643.*)

1 Magpali in his brief on appeal states that Farmers never told him that "agents who wrote heavily in one ethnic group were likely to end their career with Farmers because the 'ethnic group' would mean high loss-ratios for the agent." Certainly, Magpali cannot be suggesting that Farmers should warn members of various ethnic groups not to become Farmers agents because members of their group have excessive losses. It would violate public policy--and laws prohibiting discrimination--for Farmers to make any such statement to prospective agents. Likewise, Magpali suggests that he should have been warned that "it was extremely difficult and/or virtually impossible for a minority agent selling to a minority community to get off LUA." Since it would be wholly improper and a violation of public policy for an insurance company such as Farmers to instruct a minority agent outright to stop selling insurance to any ethnic group, it would be equally improper to indirectly discourage such sales under the guise of "explaining" that that would be the only way to come off LUA status.

[***22] The choice to transmute a discrimination claim into one for fraud does lead to a potential limitations problem. The fraud claim is a backward looking one in that the tort of fraud in the inducement is complete the moment the plaintiff suffers reliance damage by leaving his previous employment. The only reason the statute of limitations does not accrue

immediately is that plaintiff is presumably ignorant of the fraud at that point. (See *Code Civ. Proc., § 338, subd. (d)* [". . . The cause of action [for relief on account of fraud or mistake] is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."].) Once the plaintiff obtains the requisite knowledge, the statute begins to run. Put in terms of the present complaint, the crucial event for accrual purposes is the occasion on which the plaintiff first learns of the allegedly discriminatory policy, not the date on which he is [**234] terminated. Nor does it begin running anew every time the discriminatory policy is mentioned or emphasized.

According to Magpali's testimony, he was placed on LUA status and told he must expand his book of business outside the [***23] Filipino and Hispanic communities in May of 1989. This was the crucial date for statute of limitations purposes on his claim for fraud in the inducement based on any misrepresentations made by Farmers concerning the alleged policy of discrimination. On that date, every element of the cause of action was in place, including damages, and he had actual knowledge that the sales policy was otherwise than he had been informed. "Once a plaintiff suspects wrongdoing [*485] and therefore has an incentive to sue, he or she must decide whether to file suit or sit on his or her rights. When a suspicion exists, the plaintiff must go find the facts; he or she cannot wait for the facts to find him or her. [Citations.]" ( *San Francisco Unified School Dist. v. W.R.Grace & Co. (1995) 37 Cal. App. 4th 1318, 1327 [44 Cal. Rptr. 2d 305].*) The parties place undue emphasis on the question of whether Magpali was told to "expand" his efforts outside the Filipino and Hispanic communities or "avoid" writing policies in these communities in May of 1989. Either way, the message that Magpali had too many clients of certain ethnic groups was obvious. Reading the evidence most favorably toward Magpali, [***24] it is undisputable that he had sufficient reason to suspect the existence of a policy of discrimination in May of 1989, yet sat on his rights for over three years. As a result, the claim of fraud based on misrepresentations concerning the nondiscrimination policy was barred by the applicable three-year statute of limitations, as the trial court found.

II.

*Intentional Infliction of Emotional Distress*

The trial court concluded that none of the conduct attributed to Farmers constituted extreme and outrageous conduct and that in any event the claim was barred by the one-year statute of limitations. We question one aspect of this finding. **(8)** The reported instructions to write more insurance policies to non-minorities and to avoid writing policies for members of Magpali's own ethnic group because they were poor risks could constitute the extreme and outrageous conduct needed to support the tort under current law. (See *Agarwal v. Johnson (1979) 25 Cal. 3d 932, 947 [160 Cal. Rptr. 141, 603 P.2d 58]* [use of racial epithet with intention to inflict emotional distress followed by termination of employment outrageous]; *Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal. 3d 493,* [***25] *498 [86 Cal. Rptr. 88, 468 P.2d 216]* [insulting plaintiff's race for the purpose of causing plaintiff to suffer emotional distress in conjunction with wrongful termination of employment sufficient to state claim for intentional infliction of emotional distress].)

But even if the statements reported by Magpali supported the claim, the cause of action was time-barred. A claim for intentional infliction of emotional distress is governed by the one-year statute of limitations for intentional torts. ( *Code Civ. Proc., § 340, subd. (3)*; *Murphy v. Allstate Insurance Co. (1978) 83 Cal. App. 3d 38, 50 [147 Cal. Rptr. 565].*) The last purported comment of a racially denigrating nature was made in the month before Magpali's attorney's letter of July 9, 1991. The complaint was not filed until July 15, 1992.

[*486] III.

*Unruh Civil Rights Act Violation*

**(9)** Magpali was denied permission to amend his complaint to bring a claim under the Unruh Civil Rights Act. ( *Civ. Code, § 51 et seq.*) Magpali did not include an Act claim in his original complaint, but sought leave to amend on the eve of trial to add such a claim based on the allegation that "he was specifically told to avoid [***26] writing Hispanics and Filipinos . . . and that his refusal to follow Farmer[s's] orders was a substantial factor in causing his termination." The trial court denied leave. The question raised is whether the court abused its discretion. We take particular care in reviewing this ruling because of two comments made during the course of the [**235] trial. During argument over admission of a videotape, Magpali's counsel stated: "[Magpali] happens to be a minority agent who deals in a minority market, and that is precisely . . . what this case is about." TO THIS THE COURT REPLIED: "I'm [of] German

descent. I suppose I'm a minority too, huh?" Later, in a discussion of whether defense counsel had opened the door to letting the same videotape into evidence because of remarks made during his opening statement, the court commented: "According to the opening statement of the defense, they say that we can show that his partner who obviously is a minority, too,--I don't know who isn't a minority anymore, but I would guess he would fall in the class of a minority--he got off [LUA], if that's what's going to be shown." These remarks created an appearance of insensitivity to the real burdens [***27] posed by discriminatory treatment toward certain ethnic groups in this society, and cannot be ignored. "The day is long past when appellate courts can disregard judicial action rooted in racial or sexual bias as harmless error [citation]. [P] ' "[T]he trial of a case should not only be fair in fact, but it should also appear to be fair." ' [Citations.]" ( *In re Marriage of Iverson (1992) 11 Cal. App. 4th 1495, 1499-1500 [15 Cal. Rptr. 2d 70]*, quoting *Webber v. Webber (1948) 33 Cal. 2d 153, 155 [199 P.2d 934]* and *Pratt v. Pratt (1903) 141 Cal. 247, 252 [74 P. 742].*)

Nevertheless, our independent review of the record reveals no abuse of discretion in the denial of the request for leave to amend. Magpali's amendment was proposed on the eve of trial, nearly two years after the complaint was originally filed. He did not give an explanation for leaving the Act claim out of the original complaint or bringing the request to amend so late. "A party who waits 18 months before attempting to amend, and then does so only after trial has commenced, and who offers no excuse for the failure, can hardly complain when the request to amend is denied." ( *City of Stanton v.* [***28] *Cox (1989) 207 Cal. App. 3d 1557, 1564 [255 Cal. Rptr. 682].*) In addition, prejudice to Farmers was clearly shown because in preparing for trial on [*487] claims of breach of contract, misrepresentation, and intentional infliction of emotional distress, it had not discovered or deposed many of the witnesses who would support the new allegations, and had not marshaled evidence to oppose the contention that a system-wide discriminatory policy existed. Although courts are bound to apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial (see, e.g., *Mesler v. Bragg Management Co. (1985) 39 Cal. 3d 290, 296-297 [216 Cal. Rptr. 443, 702 P.2d 601]*; *Higgins v. Del Faro (1981) 123 Cal. App. 3d 558, 564 [176 Cal. Rptr. 704]*; *Hirsa v. Superior Court (1981) 118 Cal. App. 3d 486, 488-489 [173 Cal. Rptr. 418]*), this policy should be applied only "where no prejudice is shown to the adverse party . . . ." ( *Higgins v. Del Faro, supra, at p. 564.*) A different result is indicated "where inexcusable delay and probable prejudice to the opposing party" is shown. (*Estate* [***29] *of Murphy (1978) 82 Cal. App. 3d 304, 311 [147 Cal. Rptr. 258].*) In *Murphy*, ". . . the proposed amendment opened up an entirely new field of inquiry without any satisfactory explanation as to why this major change in point of attack had not been made long before trial." (*Ibid.*) Under those circumstances, denial of leave to amend was appropriate.

Magpali admitted at oral argument that his Act claim depended on witnesses who had not been identified or deposed prior to the time of trial. He expected to call Farmers agents Tony Carungay and Ruby Ilao who he represented would testify that they were told not to write Hispanics or Filipinos and Paul Krieger, an ex-Farmers agent, who Magpali represented was instructed not to write Blacks or Hispanics and not to write any business south of the 605 Freeway. He proposed to show the jury a videotape on which Farmers employee Debbie Settles purportedly discussed the difficulty [**236] of getting off LUA status as a minority selling in minority communities. He also wanted to introduce maps showing the location of Farmers agents, and Bruce Broadwater, who prepared the maps, would be called reportedly to testify concerning the paucity [***30] of agents in certain minority occupied areas. Krieger, Settles, and Broadwater had not been identified in discovery or deposed. None of these witnesses or documents had been identified in response to an interrogatory seeking to discover the support for the allegation that Farmers ordered Magpali to sell policies to applicants who were not Filipino or Hispanic, although Carungay and Ilao had been mentioned in Magpali's deposition.

It is apparent that adding the new cause of action would have changed the tenor and complexity of the complaint from its original focus on representations and demands made to Magpali by his superiors to an exploration of Farmers's activities and practices in the entire Southern California area. Magpali conceded at oral argument that addition of the new claim would [*488] have necessitated, at the very least, a continuance to allow Farmers to depose new witnesses. Where the trial date is set, the jury is about to be impaneled, counsel, the parties, the trial court, and the witnesses have blocked the time, and the only way to avoid prejudice to the opposing party is to continue the trial date to allow further discovery, refusal of leave to amend cannot [***31] be

an abuse of discretion. Our concern over the unfortunate remarks appearing in the record does not persuade us otherwise. With every relevant factor aligned on the opposing side, denial of the motion for leave to amend was the only appropriate outcome.

DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied August 20, 1996.