# TABS 21 - 28

# TAB 21

1 of 1 DOCUMENT

**BRANDON J. NOEL, Plaintiff and Appellant, v. RIVER HILLS WILSONS, INC., et al., Defendants and Respondents.**

**D040367**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION ONE**

*113 Cal. App. 4th 1363*; *7 Cal. Rptr. 3d 216*; *2003 Cal. App. LEXIS 1806*; *2003 Cal. Daily Op. Service 10482*; *2003 Daily Journal DAR 13221*

**December 5, 2003, Filed**

**PRIOR HISTORY:** [***1] Superior Court of San Diego County, No. GIC766061, Patricia Yim Cowett, Judge.

**DISPOSITION:** Affirmed.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

An employee filed suit against his former employer and manager for defamation and other counts. The former employee had filled out a background questionnaire for a position with a new employer, which required full disclosure of all criminal convictions. An investigator, hired by the prospective new employer to conduct a background investigation, contacted the prospective employee's former employer, and its manager mistakenly informed the investigator that the employee left because of loss prevention issues. When deposed, the manager testified that when the investigator called she mistakenly believed that he was requesting information about a different former employee. The former employer and manager move for summary judgment. The court granted the motion on the ground of common interest privilege. (Superior Court of San Diego County, No. GIC766061, Patricia Yim Cowett, Judge.)

The Court of Appeal affirmed. The court held that no reasonable jury could have found that malice motivated the former manager's statement. The undisputed evidence showed the manager made an unintentional error or a careless blunder, by paying insufficient attention to the investigator's inquiry. She gave inaccurate employment information on the employee because she was expecting an inquiry from a prospective employer on a different former employee. The manager did not doubt the truth of the information she conveyed, or show a reckless disregard for the former employee's rights or feelings.*Civ. Code, § 47, subd. (c)*, was applicable, and the former employer and manager were entitled to summary judgment on the defamation cause of action, and on all other tort claims since they also stemmed from the manager's comments. The court also held that by amending *Civ. Code, § 47, subd. (c)*, to include the language, "based on credible evidence," the Legislature did not intend to make the common interest privilege inapplicable in the employment reference context on a showing of an employer's mere negligence. [*1364] Although negligence is relevant in determining probable cause, the manager's mere negligence in the sense of oversight or unintentional error was not alone enough to constitute malice. (Opinion by McConnell, P. J., with Benke, and Haller, JJ., concurring.)

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Libel and Slander § 2?Definitions.**--Defamation is effected either by libel or slander (*Civ. Code, § 44*), each of which is defined as a false and unprivileged publication (*Civ. Code, §§ 45, 46.*)

**(2) Libel and Slander § 24--Privileged Communications--Qualified Privilege--**

**Communication to Interested Persons--Defamatory Statements Made Without of Malice.**--*Civ. Code, § 47, subd. (c)*, extends a conditional privilege against defamatory statements made without malice on subjects of mutual interest.

**(3) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons--Application to Employment Context.**--Courts have consistently interpreted *Civ. Code, § 47, subd. (c)*, to apply in the employment context.

**(4) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons.**--*Civ. Code, § 47, subd. (c)*, expressly states the common interest privilege applies to communications made by current or former employers to prospective employers.

**(5) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons--Evidence of Malice.**--No reasonable jury could find malice was a motivating cause of a former employer's statements to a prospective employer where the undisputed evidence showed a manager of the former employer made an unintentional error or careless blunder by paying insufficient attention to an investigator's inquiry regarding a former employee. The former employer had given inaccurate employment information on employee because she was expecting an inquiry from a prospective employer on another former employee. The manager had not doubted the truth of the information she conveyed, or shown a reckless disregard for his rights or feelings.

**(6) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons--Statutory Provision Not Applicable to Mere Negligence.**--By adding the "based upon credible evidence" language to *Civ. Code, § 47, subd. (c)*, the Legislature, out of an abundance of caution, intended to bar any argument that in the employment reference context, the protection of the interest involved may make it reasonable to report mere rumors or unfounded gossip. In other words, the Legislature clarified that if a current or former employer's publication was based on mere rumor, the privilege would be lost because he or she lacked reasonable grounds for believing the truth of the publication. Although negligence is relevant in determining probable cause, mere negligence in the sense of oversight or unintentional error, is not alone enough to constitute malice. Thus, where a manager reported no rumors or gossip regarding a former employee. She was merely negligent and the statement had no improper purpose. When, by a careless blunder she incorrectly stated that the former employee had left due to loss prevention issues, the common interest privilege applied.

[5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 527, 554.]

**COUNSEL:** Law Office of David A. Miller and David A. Miller for Plaintiff and Appellant.

Littler Mendelson and Michelle S. Park for Defendants and Respondents.

**JUDGES:** MCCONNELL, P. J.; Benke, and Haller, JJ., concurred.

**OPINION BY:** MCCONNELL

**OPINION**

[**218] **MCCONNELL, P. J.**--In this defamation action, plaintiff Brandon J. Noel appeals a summary judgment in favor of defendants River Hills Wilsons, Inc. (Wilsons) and its employee Shelly Santillan. Noel contends the conditional common-interest privilege of *Civil Code* [1] section 47, subdivision (c), amended in 1994 to be expressly made applicable to defamatory statements made without malice by a current or former employer to a prospective employer, did not arise because in making the statements, Santillan acted with malice. Alternatively, Noel contends the privilege did not arise because the statements were not "based on credible evidence," as that phrase is used in the amended statute.

1 Statutory references are to the Civil Code except when otherwise specified.

[***2] We conclude the defendants proved the defamatory statements were made on a privileged occasion, and Noel presented no evidence from which a [*1366] reasonable jury could infer malice. Further, as a matter of apparent first impression, we hold that in including the "based on credible evidence" language in the 1994 amendment to *section 47, subdivision (c)*, the Legislature did not intend to make the common-interest

privilege inapplicable in the employment reference context on a showing of the defendant's mere negligence. The trial court ruled correctly, and accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2000 Noel filled out a background questionnaire for a position with GTE, for whom he had recently begun working on a contingent basis. The questionnaire required full disclosure of any criminal convictions. In response, Noel wrote that in 1994 he was convicted of a felony he described as "aiding and abeting [*sic*]/not fully involved," and he received "parole/probation to youth authority."

GTE retained ChoicePoint to conduct a background investigation of Noel. ChoicePoint contacted Noel's former employers, including Wilsons, where he worked for approximately [***3] two months in 1999. Santillan, a Wilsons manager, advised ChoicePoint that Noel left its employ because of "loss prevention issues," and his "rehire status" was "unfavorable." It is undisputed that Noel actually had no "loss prevention issues" with Wilsons, and that Santillan mistakenly gave this information to ChoicePoint.

[**219] ChoicePoint included Santillan's information in an April 13, 2000, report to GTE. ChoicePoint also provided GTE with an April 25 addendum report regarding its criminal records search on Noel. The report revealed that in February 1995 Noel was convicted of carjacking, three counts of attempted robbery, two counts of exhibiting a weapon other than a firearm, two counts of residential burglary and four counts of robbery. [2] The addendum stated Noel was sentenced to the California Youth Authority (CYA), and was released on parole in March 1999. [3] After receiving the addendum report, GTE notified Noel in writing that his employment was terminated. [4] GTE provided Noel with copies of ChoicePoint's reports.

2 In interrogatory responses, Noel admitted he was convicted of one count of carjacking, two counts of residential burglary, four counts of robbery, three counts of attempted robbery, and one count of exhibiting a deadly weapon other than a firearm.

[***4]

3 In deposition, Noel testified he was incarcerated between October 1994 and March 1999, and he was transferred from the CYA to state prison in early 1997 when he turned 19 years of age.

4 GTE's termination letter is dated April 21, 2000. However, its author, Patricia Eller, testified that date was incorrect, and the letter was not written until after she received ChoicePoint's April 25 addendum report.

[*1367] Noel sued Wilsons and Santillan for defamation and numerous other counts, based on Santillan's comments to ChoicePoint. [5] Noel alleged that Santillan's comments caused the loss of his position with GTE and emotional distress. He sought compensatory and punitive damages.

5 In addition to defamation, the complaint included causes of action for negligence, negligent supervision and training, intentional and negligent infliction of emotional distress, violation of *Labor Code section 1050* and violation of *Civil Code section 43*.

[***5] The defendants moved for summary judgment, arguing Santillan's comments to ChoicePoint were privileged under the conditional common-interest privilege of *section 47, subdivision (c)*, because she was responding to an inquiry by a potential employer and did not act with malice. In support of the motion, the defendants relied on Santillan's deposition testimony that about 30 minutes before ChoicePoint telephoned her, she received a telephone call from the manager of another Wilsons store, informing her she would be receiving an employment reference check for another former employee, an A. T., who Wilsons fired because of "loss prevention issues." Santillan explained that because she was waiting for that call, she mistakenly believed ChoicePoint was requesting employment information on A. T. instead of Noel.

The defendants also relied on Noel's deposition testimony that he did not have a bad relationship with anyone at Wilsons, and when he contacted Santillan after receiving a copy of ChoicePoint's April 21, 2000, report, she apologized for mistakenly giving out inaccurate information about him. Noel believed Santillan was sincere. He also testified she immediately offered him a job at [***6] Wilsons, which he accepted, but then later rejected. Santillan testified she offered Noel a job "[b]ecause I wanted to do anything I could to help him."

Additionally, the defendants argued that even if the common-interest privilege were inapplicable, the erroneous information Santillan gave ChoicePoint caused him no damage. The defendants relied on the deposition testimony of Patricia Eller, the GTE employee who terminated Noel's employment, that he was disqualified because he falsified his criminal history on the [**220] background questionnaire, and Santillan's comments did not influence the decision. [6]

6 In the factual statement of his appellate brief, Noel asserts his termination from GTE was not based on the falsification of his criminal history, but on Santillan's comments to ChoicePoint. However, he cites no competent evidence in support.

The court granted the defendants' motion on the ground of the common-interest privilege. Judgment was entered on April 12, 2002.

[***7] [*1368] DISCUSSION

I

*Standard of Review*

A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 850 [107 Cal. Rptr. 2d 841, 24 P.3d 493].*) A defendant satisfies this burden by showing " 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' " to that cause of action. (*Ibid.*)

"De novo review is used to determine whether, as a matter of law, summary judgment was appropriately granted. [Citation.] De novo review is [also used] to determine the soundness of a trial court's resolution of the meaning of a statute, as entailing a pure question of law." (*Camarillo v. Vaage (2003) 105 Cal.App.4th 552, 560 [130 Cal. Rptr. 2d 26].*)

II

*Conditional Common-Interest Privilege*

A

**(1)** Defamation is effected either by libel or slander (*§ 44*), each of which is defined as a false and *unprivileged* publication (*§§ 45, 46*). Slander, with which we are concerned here, is defined as an oral communication that "[t]ends directly to injure [a person] in respect to his [or her] office, [***8] profession, trade or business ... ." (*§ 46.*)

**(2)** *Section 47, subdivision (c)*, whose predecessor was enacted in 1872, extends a conditional privilege against defamatory statements made without malice on subjects of mutual interest. (*Lundquist v. Reusser (1994) 7 Cal.4th 1193, 1205 [31 Cal. Rptr. 2d 776, 875 P.2d 1279].*) [7] "[I]f malice is shown, the privilege is not merely overcome; it never arises in the first instance." (*Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 723, fn. 7 [257 Cal. Rptr. 708, 771 P.2d 406].*) "It is *the occasion* giving rise to the publication that is [*1369] conditionally privileged, i.e., under specified conditions the occasion gives rise to a privilege. If the privilege arises, it is a complete defense." (*Ibid.*)

7 *Section 47* provides in part: "A privileged publication or broadcast is one made: [¶] ... [¶] (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."

[***9] In enacting *section 47, subdivision (c)*, "the Legislature intended to codify without change the common law common-interest privilege. At common law, that privilege embodied a two-step analysis, under which the defendant bore the initial burden of demonstrating that the allegedly defamatory communication was made upon a privileged occasion, and the plaintiff then bore the burden of proving that defendant had made the statement with malice." (*Lundquist v. Reusser, supra, 7 Cal.4th at p. 1208* [**221] [discussing *§ 47, subd. 3,* the predecessor of *§ 47, subd. (c)*].)

**(3)** Courts have consistently interpreted *section 47, subdivision (c)* to apply in the employment context. (See *Cuenca v. Safeway San Francisco Employees Fed. Credit Union (1986) 180 Cal. App. 3d 985, 995 [225 Cal. Rptr. 852].*) In *Manguso v. Oceanside Unified School Dist. (1984) 153 Cal. App. 3d 574 [200 Cal. Rptr. 535]*, this court held the common-interest privilege applied to

uncomplimentary statements the plaintiff's former employer made to prospective employers. We explained that "[b]ecause the letter containing the alleged defamation was written by an educator, regarding qualifications [***10] of a particular teacher and directed to those prospective employers of that teacher, it is subject to a qualified privilege.? (*Id. at p. 580*; see also *Neal v. Gatlin (1973) 35 Cal. App. 3d 871, 877 [111 Cal. Rptr. 117]* ["It is well established that a former employer may properly respond to an inquiry from a potential employer concerning an individual's fitness for employment, and if it is not done maliciously, such response is privileged."]; accord, *Lesperance v. North American Aviation, Inc. (1963) 217 Cal. App. 2d 336, 341 [31 Cal. Rptr. 873]*.)

**(4)** In 1994 the Legislature amended *section 47, subdivision (c)* to expressly state the common-interest privilege applies to communications made by current or former employers to prospective employers. (*§ 47, subd. (c)*, as amended by Stats. 1994, ch. 364, § 1 (Assem. Bill No. 2778).) The statute currently reads in pertinent part: "This subdivision applies to and includes a communication concerning the job performance or qualifications of an applicant for employment, based upon credible evidence, made without malice, by a current or former employer of the applicant to, and upon request of, one [***11] whom the employer reasonably believes is a prospective employer of the applicant." (*§ 47, subd. (c)*.)

The sponsor of Assembly Bill No. 2778 was the Los Angeles Unified School District Personnel Commission (the Commission), which reported "that former employers are loathe to comment on the fitness of prospective school employees because of the fear of legal retribution." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2778 (1993-1994 Reg. Sess.) as [*1370] amended May 18, 1994, p. 2.) The Commission advised "that it must hire numerous persons to fill very sensitive positions involving close contact with young children," and it "is critical that former employers be able to respond candidly about former employees" applying for such positions. (*Id.* at p. 3.) According to the Commission, in the 1992-1993 school year, it dismissed 124 classified employees for cause, and "if 'references had been received, many of these persons might never have been hired.' " (*Ibid.*) The Legislature was aware that courts had interpreted the common-interest privilege to apply in the employment reference context, but it sought to "afford employers the certainty of statute, rather than the uncertainty [***12] of case law." (*Id.* at p. 4.)

B

Noel contends summary judgment was improper because he raised triable issues of fact regarding whether Santillan acted with malice when she gave ChoicePoint erroneous information on his employment. We find the contention without merit.

Insofar as the common-interest privilege is concerned, malice is not inferred from the communication itself. (*§ 48*.) " 'The malice necessary to defeat a qualified privilege is "actual malice" which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing [**222] that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights (citations).' [Citations.]" (*Sanborn v. Chronicle Pub. Co. (1976) 18 Cal.3d 406, 413 [134 Cal. Rptr. 402, 556 P.2d 764]*, citing *Roemer v. Retail Credit Co. (1975) 44 Cal. App. 3d 926, 936 [119 Cal. Rptr. 82]*; *Agarwal v. Johnson (1979) 25 Cal.3d 932, 944 [160 Cal. Rptr. 141, 603 P.2d 58]*, disapproved on another ground in *White v. Ultramar, Inc. (1999) 21 Cal.4th 563, 574, fn. 4 [88 Cal. Rptr. 2d 19, 981 P.2d 944]* ["The malice referred [***13] to by the statute is actual malice or malice in fact, that is, a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person."]; *Lundquist v. Reusser, supra, 7 Cal.4th at pp. 1204, 1213*; *Brown v. Kelly Broadcasting Co., supra, 48 Cal.3d at p. 723*; BAJI Nos. 7.05, 7.05.1 [defendant abuses conditional privilege by publishing defamatory statement without good faith belief in its truth or without reasonable grounds for believing its truth, or when he or she is motivated by hatred or ill will toward plaintiff].)

However, "[l]ack of reasonable or probable cause ... is not ... a simple negligence concept. ... [M]alice focuses upon the defendant's state of mind, not his [or her] conduct. Mere negligence in inquiry cannot constitute lack of reasonable or probable cause." (*Rollenhagen v. City of Orange (1981) 116 Cal. App. 3d 414, 423 [172 Cal. Rptr. 49]*, disapproved on another ground in [*1371] *Brown v. Kelly Broadcasting Co., supra, 48 Cal.3d at p. 738*.) "While '[t]he concept of negligence is inherent in the issue of probable cause' [citation], ... [¶] ... [***14] mere negligence ... in the sense of oversight or unintentional error, is not alone enough to constitute

malice. It is only when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a wilful disregard for or avoidance of accuracy, that malice is shown." (*Roemer v. Retail Credit Co. (1970) 3 Cal. App. 3d 368, 371-372 [83 Cal. Rptr. 540]*; see also *Bierbower v. FHP, Inc. (1999) 70 Cal.App.4th 1, 9 [82 Cal. Rptr. 2d 393]* ["[m]alice entails more than sloppiness"]; *Davis v. Hearst (1911) 160 Cal. 143, 167 [116 P. 530]* [" 'Mere inadvertence or forgetfulness, or careless blundering, is no evidence of malice.' "]; *Vackar v. Package Machinery Company (N.D. Cal. 1993) 841 F. Supp. 310, 314* [mere negligence does not constitute malice within meaning of *section 47, subd. (c)*]; *Hoesl v. United States (N.D. Cal. 1978) 451 F. Supp. 1170, 1180* ["simple negligence does not satisfy the scienter requirement of the qualified privilege in the law of defamation"].)

**(5)** We conclude no reasonable jury could find malice was a motivating cause of Santillan's statements. Rather, the undisputed evidence shows she [***15] made an unintentional error, or careless blunder, by paying insufficient attention to ChoicePoint's inquiry. Santillan gave inaccurate employment information on Noel because she was expecting an inquiry from a prospective employer on another former employee of Wilsons. In his responsive separate statement, Noel conceded that Santillan "had sincerely made [a] ... mistake in providing the incorrect employment reference to GTE." Contrary to Noel's position now, Santillan did not doubt the truth of the information she conveyed, or show a reckless disregard for his rights or feelings. "Inherent in the concept of reckless disregard for truth is the notion that it is the speaker's belief regarding the accuracy of his [or her] statements, rather than the truth of the underlying statements themselves, [**223] that is relevant to the malice determination." (*Vackar v. Package Machinery Company, supra, 841 F. Supp. at p. 314.*) Noel ignores Santillan's belief and relies exclusively on the falsity of her statements. " 'That the statement is now ... proved to be untrue is no evidence that it was made maliciously.' " (*Davis v. Hearst, supra, 160 Cal. at p. 167.*) [***16]

Noel cites the following from Witkin on Torts in support of his assertion Santillan's innocence or good faith is immaterial: "[I]nnocence or good faith of the defendant *who makes a defamatory statement* is not a defense, although it may be shown in mitigation of damages. ... Thus, where he or his employees through an honest and reasonable mistake defame the *wrong person,* he is liable." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 554, p. 651.) However, this section of Witkin does not concern the conditional common-interest privilege of *section 47, subdivision (c)*. Moreover, Witkin explained "[t]his rule is, however, subject to the *New York Times v. Sullivan* [*1372] *(1964) 376 U.S. 254 [11 L. Ed. 2d 686, 84 S. Ct. 710]* requirement of proof of actual malice where the defamatory statement is directed at public officials or public figures ... , and to the *Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323 [41 L. Ed. 2d 789, 94 S. Ct. 2997]* requirement of negligence where it is directed at a private individual." (5 Witkin, *supra,* Torts, § 554, p. 651.) [8] Accordingly, when a conditional privilege applies, as here, malice [***17] must be shown. (*Brown v. Kelly Broadcasting Co., supra, 48 Cal.3d at pp. 740-742* [malice standard, not negligence standard, governs in determining whether *section 47, subd. (c)* applies].)

8 In *New York Times v. Sullivan, supra, 376 U.S. at pages 279-280, 283*, the United States Supreme Court held that "constitutional guarantees [of the *First* and *Fourteenth Amendments to the United States Constitution*] require ... a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'--that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The court also held that negligence in failing to discover published misstatements was constitutionally insufficient to show the recklessness required for a finding of malice. (*Id. at p. 288.*)

In *Gertz v. Robert Welch, Inc., supra, 418 U.S. at page 347*, the court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

[***18] Noel's reliance on *Kerby v. Hal Roach Studios (1942) 53 Cal. App. 2d 207 [127 P.2d 577]*, is also misplaced. There, the court stated, in dictum, "that inadvertence or mistake affords no defense to a charge of libel, where the defamatory publication does, in fact,

refer to the plaintiff." (*Id. at p. 213.*) The case, however, does not concern the common-interest privilege of *section 47, subdivision (c)*. " 'It is axiomatic that cases are not authority for propositions not considered.' [Citation.]" (*In re Marriage of Cornejo (1996) 13 Cal.4th 381, 388 [53 Cal. Rptr. 2d 81, 916 P.2d 476].*)

Additionally, Noel cites *Cruey v. Gannett Co. (1998) 64 Cal.App.4th 356, 370 [76 Cal. Rptr. 2d 670]*, for the proposition that whether the defendant acted with malice is for the trier of fact, and thus summary judgment is unavailable when a conditional privilege is at issue. The court there, however, merely concluded that in response to the defendant's motion for summary judgment, the plaintiff raised a triable issue of fact as to whether the defendant made the publication maliciously. (*Id. at p. 370.*) In [**224] contrast, Noel raised no facts from which Santillan's malice could reasonably be inferred. [***19] The applicability of the common-interest privilege provision is a question of law where, as here, the facts alleged to give rise to the privilege are undisputed. (*Vackar v. Package Machinery Company, supra, 841 F. Supp. at p. 313.*)

*Section 47, subdivision (c)* is applicable, and thus the defendants were entitled to summary judgment on the defamation cause of action, and on all [*1373] other tort claims since they also stemmed from Santillan's comments. "California courts have held that plaintiffs may not avoid the strictures of defamation law by artfully pleading their defamation claims to sound in other areas of tort law." (*Vackar v. Package Machinery Company, supra, 841 F. Supp. at p. 315*; *Felton v. Schaeffer (1991) 229 Cal. App. 3d 229, 239 [279 Cal. Rptr. 713]*; *Lerette v. Dean Witter Organization, Inc. (1976) 60 Cal. App. 3d 573, 579 [131 Cal. Rptr. 592].*)

C

Alternatively, Noel contends Santillan's lack of malice is immaterial because her false statements were not based on credible evidence. Again, in 1994 the Legislature amended *section 47, subdivision (c)* to expressly apply to statements current or former employers [***20] make to prospective employers when the statements are "based on credible evidence, made without malice." (*§ 47, subd. (c).*)

The issue is one of statutory interpretation. " 'When interpreting a statute, we must ascertain legislative intent so as to effectuate the purpose of a particular law. Of course our first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citation.] When the words are clear and unambiguous, there is no need for statutory construction or resort to other indicia of legislative intent, such as legislative history. [Citation.] But language that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may turn to customary rules of statutory construction or legislative history for guidance. [Citation.] [¶] ... Statutory language [that] seems clear when considered in isolation may in fact be ambiguous or uncertain when considered in context. [Citation.]' [Citation.]" (*National Technical Systems v. Commerical Contractors, Inc. (2001) 89 Cal.App.4th 1000, 1007-1008 [108 Cal. Rptr. 2d 67].*)

Here, we consider the legislative history of the 1994 amendment [***21] to *section 47, subdivision (c)*. Standing alone, the phrase "based on credible evidence" connotes a negligence standard, and thus it is latently ambiguous given the Legislature's intent to foster communication between current or former employers and prospective employers, and the well-established rule that mere negligence does not constitute malice within the meaning of the statute. [9]

9 We asked the parties for supplemental briefing on the "based on credible evidence" language of *section 47, subdivision (c)*, and we have taken their responses into consideration.

By amending *section 47, subdivision (c)* the Legislature foreclosed any argument the common-interest privilege is inapplicable in the employment [*1374] reference context, and sought to encourage current or former employers to respond, or more fully respond, to inquiries of prospective employers regarding applicants' job qualifications. "The legislative history of the 1994 amendments clarified that their major purpose was to encourage a freer flow of reference [***22] information." (Saxton, *Employment References in California After Randi W. v.* [**225] *Muroc Joint Unified School District: A Proposal for Legislation To Promote Responsible Employment Reference Practices* (1997) *18 Berkeley J.Emp. & Lab.L. 240, 245, fn. 10*; *Randi W. v. Muroc Joint Unified School Dist. (1997) 14 Cal.4th 1066, 1080 [60 Cal.Rptr.2d 263, 929 P.2d 582] (Randi W.)* [10] ["existence of this privilege may encourage more open disclosure of relevant information regarding

former employees"].)

10 In *Randi W. supra, 14 Cal.4th at p. 1070*, the court held "defendants' letters of recommendation, containing unreserved and unconditional praise for [a] former employee ... despite defendants' alleged knowledge of complaints or charges of his sexual misconduct with students, constituted misleading statements that could form the basis for tort liability for fraud or negligent misrepresentation."

The express extension of a conditional privilege to employment references [***23] serves an important purpose. "To the extent that no comment and 'name, rank and serial number' policies protect employers, the protection comes at the expense of communication in the job market. Employers' silence policies arrest the flow of positive information as well as negative information that most typically creates the risk of being sued. The consequences of employer silence affect the employers who seek references as well as job seekers who would benefit from receiving positive references." (Cooper, *Job Reference Immunity Statutes: Prevalent But Irrelevant* (2001) *11 Cornell J.L. & Pub. Policy 1, 10*; see also comment, *"To Tell the Truth, the Whole Truth, and Nothing but the Truth:" Employment References and Tort Liability* (2002) *33 U. Tol. L.Rev. 847, 864-865* [" 'no comment' policies are detrimental to society as a whole"].)

The original version of Assembly Bill No. 2778 did not contain the "based on credible evidence" phrase. Rather, the bill was amended to add the phrase in response to opposition by the California Trial Lawyers Association's (the Association). The legislative history explains that "[b]y requiring that the communication [***24] be 'based upon credible evidence,' the bill ... will not immunize communications to a prospective employer that are *based upon mere rumor*." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2778 (1993-1994 Reg. Sess.) as amended May 18, 1994, p. 3, italics added.)

Presumably, the Association was troubled by cases such as *Brewer v. Second Baptist Church (1948) 32 Cal.2d 791, 797 [197 P.2d 713]*, in which the court explained that "[a]lthough *there are situations where protection of the interest involved may make it reasonable to report rumors* or statements [*1375] that the publisher may even know are false [citations], ordinarily the [common-interest] privilege is lost if defendant has no reasonable grounds for believing his statements to be true." (Italics added; see also *Institute of Athletic Motivation v. University of Illinois (1980) 114 Cal. App. 3d 1, 12 [170 Cal. Rptr. 411]*.) Further, Witkin states the publication of rumors is ordinarily not privileged, but "where an inquiry is made as to an employee, or an employee reports to his employer about another employee, the relationship may warrant the communication of a rumor." (5 Witkin, *supra*, Torts, § 527, [***25] p. 617, citing *Rest.2d, Torts § 602*.)

If the "based on credible evidence" phrase of *section 47, subdivision (c)* is interpreted to impose a mere negligence standard in the employment reference context, the statute would afford current or former employers less protection than they had under case law predating the 1994 amendment, and the flow of information [**226] would be impeded. Indeed, because false statements are, by definition, commonly based on a lack of credible evidence, the interpretation Noel urges could essentially abrogate the common-interest privilege insofar as employment references are concerned. Since the Legislature sought to foster the exchange of employment information, we impute no such intent to it.

**(6)** Rather, we conclude that by adding the "based upon credible evidence" language to *section 47, subdivision (c)*, the Legislature, out of an abundance of caution, intended to bar any argument that in the employment reference context, the protection of the interest involved may make it reasonable to report mere rumors or unfounded gossip. In other words, the Legislature clarified that if a current or former employer's publication was [***26] based on mere rumor, the privilege is lost because he or she lacked reasonable grounds for believing the truth of the publication. Although negligence is relevant in determining probable cause, "mere negligence ... in the sense of oversight or unintentional error, is not alone enough to constitute malice." (*Roemer v. Retail Credit Co., supra, 3 Cal. App. 3d at p. 372*.) Santillan reported no rumors or gossip regarding Noel's employment; she had no improper purpose and her statements were caused by a careless blunder. Accordingly, summary judgment for the defendants on all causes of action was proper.

[*1376] DISPOSITION

The judgment is affirmed. The defendants are awarded costs on appeal.

Benke, J., and Haller, J., concurred.

# TAB 22

LEXSEE 225 CAL.APP.3D 276

**ROBOMATIC, INC., et al., Plaintiffs and Appellants, v. VETCO OFFSHORE et al., Defendants and Respondents**

**No. B037717**

**Court of Appeal of California, Second Appellate District, Division Six**

*225 Cal. App. 3d 270*; *275 Cal. Rptr. 70*; *1990 Cal. App. LEXIS 1196*; *55 Cal. Comp. Cas 451*; *5 I.E.R. Cas. (BNA) 1644*; *90 Cal. Daily Op. Service 8379*

**November 16, 1990**

**PRIOR HISTORY:** [***1] Superior Court of Ventura County, No. 74403, John Holmes, Judge. *

* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

**DISPOSITION:** Accordingly, the judgment is affirmed. Rehka is to bear costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

An employee, who claimed to have done some outside work for his employer as an independent contractor, sued his former employer for damages ensuing from dismissal of his employment, alleging causes of action for slander and negligent infliction of emotional distress. The trial court awarded judgment on the pleadings in the slander action due to the employee's failure to plead malice to defeat the employer's conditional privilege of communication. A trial followed concerning whether the employee suffered emotional distress, and if so, whether he was an employee or an independent contractor. The trial court held that the employee was not an independent contractor, and thus a proceeding under workers' compensation was the employee's sole remedy for negligently inflicted emotional distress. (Superior Court of Ventura County, No. 74403, John Holmes, Judge. *)

* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

The Court of Appeal affirmed. It held that the trial court properly found the tort action was barred by the workers' compensation exclusivity rule (*Lab. Code, § 3600*), and that it correctly awarded judgment on the pleadings on the slander cause of action due to the employee's failure to specifically plead malice to defeat the employer's conditional privilege of communication. (Opinion by Gilbert, J., with Stone (S. J.), P. J., and Abbe, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Workers' Compensation § 7.2--Exclusivity of Remedy--Scope and Extent; Dual Capacity Doctrine--Tort Action Against Employer Barred--Negligent Infliction of Emotional Distress Resulting From Dismissal.** --In an action by an employee against his former employer for damages for negligent infliction of emotional distress resulting from his dismissal from employment, the trial court properly held that the tort action was barred by the workers' compensation exclusivity rule (*Lab. Code, § 3600*). The test for deciding whether an employee may pursue a tort action or is confined to a workers' compensation action is whether the act complained of is normally within an employer-employee relationship. Although an employer may be liable in tort if it commits an act not reasonably anticipated in an employer-employee relationship, dismissal from employment is a normal risk inherent in

an employment relationship. Furthermore, the principle of dual capacity, which applies when an employee's injury results from a risk of harm faced similar to that faced by the general public, did not apply so as to allow the employee to sue in tort. The trial court's conclusion that the employee did not have an independent contractor relationship with the employer was supported by the evidence, and thus he could not base the tort action on such status.

[See 2 **Witkin,** Summary of Cal. Law (9th ed. 1987) Workers' Compensation, § 53.]

**(2) Libel and Slander § 39--Actions--Pleading--Malice and Privilege--Qualified Privilege Employer.** --In an action by a former employee, who claimed to have done outside work for the employer as an independent contractor, seeking damages for slander based on accusations made by a plant manager and overheard by co-employees that the employee improperly used the employer's property and committed other wrongful conduct, the trial court correctly awarded judgment on the pleadings, due to the employee's failure to specifically plead malice to defeat the employer's conditional privilege of communication or to plead detailed facts showing defendant's ill will toward him. The trial court's finding that the employee was not an independent contractor was supported by substantial evidence, and thus any injuries occurring from the alleged slander occurred within his employment. As an employer, defendant had a qualified privilege of communication to a listener with a common interest under *Civ. Code, § 47, subd. 3*, which provides that a privileged publication or broadcast is one made in a communication, without malice, to a person interested by one who is also interested.

**COUNSEL:** Sherwin C. Edelberg for Plaintiffs and Appellants.

Mitchell, Silberberg & Knupp, Edward M. Medvene, Mark A. Wasserman, Ronald A. DiNicola and Jeffrey K. Winikow for Defendants and Respondents.

**JUDGES:** Opinion by Gilbert, J., with Stone (S. J.), P. J., and Abbe, J., concurring.

**OPINION BY:** GILBERT

**OPINION**

[*272] [**71] Plaintiffs Robomatic, Inc., and Sidney Rehka appeal a judgment in favor of defendants. We affirm and hold that a workers' compensation proceeding is Rehka's exclusive remedy for negligent infliction of emotional distress ensuing from dismissal of employment. ( *Pichon v. Pacific Gas & Electric Co. (1989) 212 Cal.App.3d 488, 496 [260 Cal.Rptr. 677]; Potter v. Arizona So. Coach Lines, Inc. (1988) 202 Cal.App.3d 126, 133-135 [248 Cal.Rptr. 284].*)

Facts

Plaintiff Sidney Rehka brought an action against his employer Vetco Offshore, Inc. (Vetco), for damages ensuing from dismissal of his [***2] employment. Rehka alleged causes of action for slander and negligent infliction of emotional distress. The trial judge awarded judgment on the pleadings regarding the slander action because Rehka failed to plead malice to defeat Vetco's conditional privilege of communication. ( *Civ. Code, § 47, subd. 3.*) A trial followed concerning whether Rehka suffered emotional distress, and if so, whether he was an employee or an independent contractor. Evidence at trial established: [1]

Vetco supplies underwater oil drilling equipment, including a pipe with a particular "pack-off" seal consisting of two concentric metal rings connected with rubber. [**72] This seal prevents petroleum and sediments from leaking into the ocean during drilling.

1 We grant Vetco's motion to strike certain portions of the statement of facts in plaintiffs' opening brief as not supported by the evidence or outside the record on appeal.

Vetco employed Rehka as a tool design engineer. As part of his duties, he drafted plans and blueprints for an improved [***3] "pack-off" seal. Vetco then manufactured a mold from his plans.

Rehka testified he spoke with plant manager George Bulgin concerning testing the mold through his independent business, Robomatic, Inc. Rehka stated that Bulgin replied: "I'll support you 100 percent. I will do everything to make the [testing] legal in the company." According to Rehka's [*273] testimony, Bulgin then directed the manufacturing supervisor, Cline Skeeters, to prepare a purchase order for Robomatic to test the mold.

Rehka testified that he performed tests and created

two additional molds in the workshop of his Camarillo ranch. Thereafter he sent Vetco an invoice for $ 96,550 for testing, research and development, and engineering. Vetco did not pay the invoice and dismissed Rehka 18 months later for violating company conflict of interest policies. Rehka did not retain the molds he created nor any of the documents concerning this work. He stated that his dog "ran out" of the workshop with certain papers.

In contrast plant manager Bulgin testified and denied authorizing Rehka or Robomatic to test or perform engineering upon the "pack-off" seal mold. He stated that the mold could have been tested [***4] for $ 300 or less by certain rubber companies. He added that he informed Rehka it would violate company policies for him to perform outside work upon the mold.

Manufacturing supervisor Skeeters testified that he issued a $ 1,000 purchase order to Robomatic because plaintiff Rehka called and requested it. Skeeters did not know that Rehka owned Robomatic. The $ 1,000 financial limit for testing was a precaution added by Skeeters because he was not familiar with Robomatic.

Rehka admitted he knew Vetco policies prohibited certain outside activities by employees. He acknowledged that Vetco required employees to notify supervisors in writing of potential conflicts of interests. Rehka also executed an agreement agreeing that any ideas, developments or improvements created during or after business hours belonged to Vetco.

The trial judge decided there was "very little evidence, if any" Rehka was an independent contractor. He then concluded that a proceeding under workers' compensation was Rehka's sole remedy for negligently inflicted emotional distress. On appeal Rehka contends he can pursue tort actions for slander and negligent infliction of emotional distress resulting from his dismissal.

[***5] Discussion

I.

**(1)** Rehka contends he is not confined to a workers' compensation proceeding for his claim of negligent infliction of emotional distress but may pursue recovery in a tort action. He relies upon *Robards v. Gaylord Bros., Inc. (9th Cir. 1988) 854 F.2d 1152, 1157.* He points out that he has not [*274] alleged any physical injury or disability accompanying or resulting from his emotional distress. He adds that Vetco may be liable in tort under the principle of dual capacity. ( *Bell v. Industrial Vangas, Inc. (1981) 30 Cal.3d 268, 282 [179 Cal.Rptr. 30, 637 P.2d 266].*) We reject these contentions and affirm that an action for negligent infliction of emotional distress resulting from employment dismissal is barred by the workers' compensation exclusivity rule. ( *Lab. Code, § 3600*; *Potter v. Arizona So. Coach Lines, Inc., supra, 202 Cal.App.3d 126, 133-135.*)

Subject to certain narrow exceptions, recovery under workers' compensation is the exclusive remedy for injuries occurring within the course of employment. ( *Lab. Code, §§ 3600, 3602*; *Pichon v. Pacific Gas & Electric Co., supra, 212 Cal.App.3d 488, 494.*) [***6] The test for deciding whether a claimant may pursue a tort action or is confined to a workers' compensation proceeding is whether the acts complained of are normally [**73] within an employer-employee relationship. ( *Potter v. Arizona So. Coach Lines, Inc., supra, 202 Cal.App.3d 126, 133*; *Hart v. National Mortgage & Land Co. (1987) 189 Cal.App.3d 1420, 1429 [235 Cal.Rptr. 68]* rejecting the "physical harm" versus "emotional harm" test.)

Our Supreme Court announced in *Cole v. Fair Oaks Fire Protection Dist. (1987) 43 Cal.3d 148, 160 [233 Cal.Rptr. 308, 729 P.2d 743]* that "when the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harrassment, [*sic*] or intended to cause emotional disturbance resulting in disability." [***7] An employer may be liable in tort, however, if it commits an act not reasonably anticipated in an employer-employee relationship. ( *Hart v. National Mortgage & Land Co., supra, 189 Cal.App.3d 1420, 1431.*)

Dismissal from employment is a normal risk inherent in an employment relationship. ( *Zilmer v. Carnation Co. (1989) 215 Cal.App.3d 29, 40 [263 Cal.Rptr. 422]*; *Pichon v. Pacific Gas & Electric Co., supra, 212 Cal.App.3d 488, 496.*) It necessarily arises from

employment because it is an event ending the employer-employee relationship. ( *Zilmer v. Carnation Co., supra, 215 Cal.App.3d 29, 40.*)

Recent decisions have confined actions for infliction of emotional distress to recovery under workers' compensation. (Authorities discussed in *Pichon v. Pacific Gas & Electric Co., supra, 212 Cal.App.3d 488, 496.*) Here Rehka admitted at trial that his emotional distress resulted from his dismissal. [*275] Since dismissal from employment inheres in the employment relationship, Rehka is limited to recovery under [***8] workers' compensation.

Rehka relies upon *Robards v. Gaylord Bros., Inc., supra, 854 F.2d 1152. Robards* decided that an employee may pursue a tort action for negligently inflicted emotional distress if he does not suffer accompanying physical injury or disability. ( *Id., p. 1157.*) We disagree with *Robards's* analysis. As Vetco points out, *Robards* misinterprets the cases on which it relies. These cases compel us to affirm the rule that an employee is confined to workers' compensation recovery for emotional injuries negligently inflicted as part of the normal employment relationship. ( *Russell v. Mass. Mut. Life Ins. Co. (9th Cir. 1983) 722 F.2d 482, 493* revd. on other grounds, *Massachusetts Mut. Life Ins. Co. v. Russell (1985) 473 U.S. 134 [87 L.Ed.2d 96, 105 S.Ct. 3085]*; *Renteria v. County of Orange (1978) 82 Cal.App.3d 833, 839, fn. 3 [147 Cal.Rptr. 447].*)

Rehka also misapprehends the principle of dual capacity. That rule pertains where an employee's injury results from a risk of harm faced similar to that faced by the [***9] general public. ( *Bell v. Industrial Vangas, Inc., supra, 30 Cal.3d 268, 282.*) Typically, dual capacity applies where an employee is injured by a defective product. (*Ibid.*) This situation is not present here. Moreover, the trial judge concluded, with sufficient support in the evidence, that Rehka did not have a relationship as an independent contractor with Vetco. Hence, Rehka's tort action may not be based upon his status of independent contractor.

II.

Rehka argues he is not confined to a workers' compensation proceeding for the intentional tort of slander committed by Vetco employee Bulgin. Rehka's second amended complaint alleged that plant manager Bulgin accused Rehka of improperly using Vetco property and "other wrongful conduct." Jeff Jackson and Gary Smith heard these accusations. (During the hearing upon Vetco's motion for judgment on the pleadings, Rehka's attorney conceded that Jackson and Smith were co-employees.) Rehka argues his slander action derived [**74] from his status as an independent contractor and not as an employee.

Rehka's argument fails for two reasons. First, the trial judge decided, with the support [***10] of substantial evidence, that Rehka was not an independent contractor. Thus, any injuries or damages suffered by Rehka due to the alleged slander occurred during his employment.

**(2)** Second, an employer has a qualified privilege of communication to a listener with a common interest. *Civil Code section 47*, *subdivision 3* [*276] provides that "A privileged publication or broadcast is one made -- 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested . . . ." ( *Williams v. Taylor (1982) 129 Cal.App.3d 745, 752 [181 Cal.Rptr. 423]* [employer described former employee as "a thief" to persons who referred business to employer].)

To defeat this conditional privilege, a plaintiff must specifically allege malice. ( *Williams v. Taylor, supra, 129 Cal.App.3d 745, 752.*) A general allegation of malice will not suffice; plaintiff must allege detailed facts showing defendant's ill will towards him. ( *Martin v. Kearney (1975) 51 Cal.App.3d 309, 312 [124 Cal.Rptr. 281].*) Since Rehka did not specifically allege malice, although given the opportunity [***11] to amend, judgment on the pleadings was properly granted.

Accordingly, the judgment is affirmed. Rehka is to bear costs on appeal.

# TAB 23

LEXSEE 44 CAL. APP. 3D 926, 936

**PAUL F. ROEMER, JR., Plaintiff and Respondent, v. RETAIL CREDIT COMPANY, Defendant and Appellant**

**Civ. No. 30888**

**Court of Appeal of California, First Appellate District, Division Two**

***44 Cal. App. 3d 926*; *119 Cal. Rptr. 82*; *1975 Cal. App. LEXIS 985***

**January 29, 1975**

**SUBSEQUENT HISTORY:** [***1] A petition for a rehearing was denied February 28, 1975, and appellant's petition for a hearing by the Supreme Court was denied March 26, 1975.

**PRIOR HISTORY:** Superior Court of Alameda County, No. 350251, William H. Brailsford, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

On retrial of a libel action following reversal of a judgment for plaintiff insurance broker, the jury again found defendant mercantile agency guilty of libel and awarded plaintiff both compensatory and punitive damages. Defendant had prepared and submitted admittedly false investigative reports about plaintiff to four insurance companies, and the sole defense at both trials was that of the qualified privilege provided by *Civ. Code, § 47, subd. 3*, to communications, without malice, between persons interested therein. The primary source of the defamatory statements in the reports was a man admittedly biased against plaintiff, and defendant knew at the time the reports were prepared that plaintiff had enjoyed for many years an excellent business and social reputation. The trial court instructed the jury that the standard of proof of malice was the preponderance of the evidence. (Superior Court of Alameda County, No. 350251, William H. Brailsford, Judge.)

The Court of Appeal affirmed, holding that a libelous communication presented in a credit report falls outside the protection of the First Amendment, and that malice, a prerequisite to sustain punitive damages, may therefore be proved under the conventional standard of preponderance of the evidence. The court further held that the evidence clearly and convincingly supported the inference that defendant lacked reasonable grounds for believing in the truth of the publications, and that it acted in reckless disregard of plaintiff's rights. In view of the evidence of defendant's net worth and its after-tax income, the court rejected its contention that an award of $ 250,000 punitive damages was grossly excessive as a matter of law. The trial court's denial of leave to amend the answer at the close of defendant's case and its refusal to instruct the jury on alleged mitigating circumstances were held proper. Also rejected was defendant's claim, raised for the first time on appeal, of misconduct by plaintiff's attorney in his closing argument to the jury. (Opinion by Kane, J., with Taylor, P. J., and Rouse, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to McKinney's Digest

**(1) Libel and Slander § 86--Instructions--Privilege and Malice--Quantum of Proof.** --In a libel action by an insurance broker against a mercantile agency, based on admittedly false investigative reports about plaintiff submitted to four insurance companies, the trial court properly instructed the jury on the element of malice in terms of preponderance of the evidence rather than instructing that malice must be proven by clear and convincing evidence. A libelous communication presented in a credit report falls outside the protection of the First Amendment, and malice, a prerequisite to

sustain punitive damages, may therefore be proved under the conventional standard of preponderance of the evidence.

**(2a) (2b) Libel and Slander § 79--Evidence--Weight and Sufficiency--Malice.** --In a libel action by an insurance broker against a mercantile agency, based on admittedly false investigative reports about plaintiff submitted to four insurance companies, the evidence supported the jury's finding of malice, where the primary source of the information contained in the defamatory reports was a man who was admittedly biased against plaintiff, where defendant admitted knowing at the time the defamatory reports were prepared that plaintiff had enjoyed for many years an excellent business and social reputation, where defendant had failed to follow its own rule that derogatory information contained in its reports be confirmed by independent sources if available, and, if not, that a detailed explanation be included in the report to indicate the information was obtained from but a single source, and where it was admitted that, in some portions, the reports stated that the derogatory information was obtained from "sources" when in fact there was but one source.

**(3) Libel and Slander § 30(1)--Qualified Privilege--Effect of Malice--Necessary Showing.** --In defamation actions, the malice necessary to defeat a qualified privilege is "actual malice," which is established by a showing that the publication was motivated by hatred or ill will toward the plaintiff or by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights.

**(4a) (4b) Libel and Slander § 36--Inadequate and Excessive Damages.** --In a libel action by an insurance broker against a mercantile agency, based on admittedly false investigative reports about plaintiff submitted to four insurance companies, an award of $ 250,000 punitive damages could not be said to be so grossly excessive as to indicate passion or prejudice on the part of the jury, where defendant was shown to have a net worth of about $ 40 million and the award represented about 10 days of its after-tax income, and where defendant's conduct evidenced a grossly reckless disregard of plaintiff's rights, and the jury found him to have suffered $ 40,000 actual damages as a result of such conduct.

**(5) Damages § 147--Exemplary Damages--Review on Appeal.** --After an exemplary damage award has been approved by the trial court with the denial of a motion for new trial, the reviewing court will declare the amount excessive only if, on a review of the entire record, the award must be said to be so grossly excessive as to indicate passion or prejudice on the part of the jury.

**(6) Damages § 136--Exemplary Damages--Object.** --The object of exemplary damages is to make the example, as well as the punishment, fit the offense, and, in determining the amount necessary to impose the appropriate punitive effect, a jury is entitled to consider the wealth of the defendant.

**(7a) (7b) (7c) Libel and Slander § 58--Actions--Pleadings of Defendant--Amendments.** --In a libel action by an insurance broker against a mercantile agency, based on admittedly false investigative reports about plaintiff submitted to four insurance companies, the trial court did not err in denying defendant's request, made at the close of its case and prior to the giving of instructions to the jury, for leave to amend its answer to plead partial truth of the defamatory statements in mitigation of damages, where, at the beginning of a prior trial of the action, defendant had specifically stipulated that the publications were false and claimed only that they were made without malice, and, over three years later, at the second trial, again stipulated to the falsity of the reports without qualifications as to particular statements therein, and where the evidence at the first trial, as well as that at the second, indicated the truth of some of the statements in the reports.

**(8) Pleading § 200--Amendment--To Conform to Proof--Discretion of Court.** --Failure to permit an amendment to conform to proof where justice requires it is an abuse of discretion, but objectionable subject matter of the amendment, conduct of the moving party, or belated presentation of the amendment are appropriate matters for a reviewing court to consider in evaluating the trial court's exercise of discretion, and, as a matter of policy, the discretion of the trial court should be upheld unless clearly abused.

**(9) Pleading § 171--Amendment on Leave of Court.** --An amendment which contradicts an admission in an original pleading will ordinarily not be allowed unless a showing is made of mistake or other excuse for changing the allegations of fact.

**(10) Pleading § 183--Time to Amend.** --Even though a

good amendment to a pleading is proposed in proper form, unwarranted delay in presenting it may, of itself, be a valid reason for denial.

**(11) Libel and Slander § 85--Instructions.** --In a libel action by an insurance broker against a mercantile agency, based on admittedly false investigative reports about plaintiff submitted to four insurance companies, the trial court did not err in refusing to give defendant's proposed instruction charging that "even though the defendant may not have alleged truth as a defense, the jury may still consider what has been offered to prove truth as grounds for mitigating damages." The fact, relied on as a mitigating circumstance, that plaintiff had been engaged in a prolonged business dispute with a man who was the sole source of the defamatory information did not, as asserted by defendant, tend to show that it acted in good faith in publishing the defamatory statements, but rather indicated that it was unreasonable to rely on anything the source reported about plaintiff without obtaining independent confirmation, and the existence of wall defacement in plaintiff's former office, also relied on in mitigation, did not, in and of itself, establish that plaintiff did the defacing.

**(12) Trial § 50(2)--Counsel--Closing Arguments--Scope.** --On appeal from a judgment for plaintiff insurance broker in a libel action against a mercantile agency, based on admittedly false investigative reports about plaintiff submitted to four insurance companies, defendant could not successfully assert alleged misconduct of plaintiff's counsel in closing argument, where the general thrust of the argument was that defendant is a large, snooping monopoly which makes huge profits by specializing in destroying people's reputations, and several references to congressional investigations of companies like defendant helped add credibility to such characterizations, where defense counsel objected only twice to the remarks of plaintiff's counsel, and in neither objection did he specifically assign misconduct or request an admonition to the jury, and where a review of the entire record showed that the argument was entirely within the bounds of legitimate advocacy.

**COUNSEL:** Cooper, White & Cooper, Charles W. Kenady, Robert R. Callan and Richard A. Seitz for Defendant and Appellant.

Burnhill, Morehouse & Burford, Clifford Burnhill and Cyril Viadro for Plaintiff and Respondent.

**JUDGES:** Opinion by Kane, J., with Taylor, P. J., and Rouse, J., concurring.

**OPINION BY:** KANE

**OPINION**

[*930] [**84] Defendant Retail Credit Company appeals for the second time from a jury verdict finding it guilty of libel and awarding plaintiff Paul Roemer, Jr., both compensatory and punitive damages. Judgment for plaintiff at the first trial of this action was reversed because of an erroneous instruction pertaining to the subject of malice ( *Roemer v. Retail Credit Co. (1970) 3 Cal.App.3d 368 [83 Cal.Rptr. 540]*.)

Mr. Roemer is a licensed insurance broker. Defendant is a mercantile agency engaged in the business of providing commercial investigative reports to subscribers -- many of whom are insurance underwriters [***2] who request such reports in determining whether to license applicant brokers with their companies.

[*931] Plaintiff commenced this action in 1965 after discovering that defendant had prepared and submitted investigative reports about him to four insurance companies. Falsity of the reports was admitted by defendant ( *Roemer, supra, p. 370*). At both trials of the case, the sole defense was that of the qualified privilege provided by *Civil Code, section 47, subdivision 3.* [1]

1 *Civil Code, section 47*, in pertinent part reads as follows: "A privileged publication or broadcast is one made -- . . .

"3. In a communication, *without malice*, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information." (Italics added.)

[**85] On this appeal defendant contends that: 1) [***3] the award of punitive damages must be set aside because (a) the jury was erroneously instructed as to the standard of proof required to establish actual malice and

(b) the evidence (regardless of the standard of proof) does not support the jury's finding of malice. As an alternative contention on this subject, defendant claims that the jury's award of $ 250,000 punitive damages was grossly excessive as a matter of law; 2) the trial court erred in denying defendant's request for leave to amend its answer to plead partial truth in mitigation of damages and in rejecting defendant's proposed instruction on the same subject; and 3) plaintiff's counsel was guilty of prejudicial misconduct. For reasons which shall appear, none of these contentions can be sustained. Accordingly, we affirm the judgment.

*Punitive Damages -- Malice -- Quantum of Proof*

Since defendant is a mercantile agency to which the qualified privilege extends ( *Roemer, supra, p. 370*; *Stationers Corp. v. Dun & Bradstreet, Inc. (1965) 62 Cal.2d 412, 418 [42 Cal.Rptr. 449, 398 P.2d 785]*), the judgment against it can be sustained only if the jury's finding of malice is supported by the appropriate quantum [***4] of evidence.

Before evaluating the evidence, therefore, we must first determine what standard of proof of malice is required in state private defamation actions.

**(1)** Defendant, predicating its argument on the First Amendment principles enunciated in *New York Times Co. v. Sullivan (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]*, and more recently articulated in *Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997]*, urges us to hold that the element of malice must be [*932] proven by clear and convincing evidence. Since the jury was instructed in the court below in terms of preponderance of evidence, defendant argues that we must reverse. We disagree with defendant's basic premise as to the standard of proof in a case such as this. Accordingly, we conclude that the jury was properly instructed. [2]

2 The jury was thoroughly instructed on the elements of malice. Indeed, defendant's only attack on the instructions concerns the standard of proof required.

Although we find it unnecessary to consider plaintiff's contention of invited error, we point out that defendant did submit instructions to the trial court which asserted that the preponderance of evidence was the appropriate quantum of proof.

[***5] While *Gertz* does hold that a private defamation plaintiff may recover punitive damages only if he sustains the standard of proof required by *New York Times* (p. 350 [41 L.Ed.2d p. 811, *94 S.Ct. p. 3012]*), the case as a whole makes it unmistakable that this rule obtains only where the protection of First Amendment freedoms is at stake. The court in *Gertz* emphatically points out that the individual's right to the protection of his own good name is a basic concept of human dignity which is at the root of any system of ordered liberty. As a consequence, the protection of private personality, like the protection of life itself, is a legitimate state interest. [3] The decision in *Gertz* that, despite this crucial state interest, the press should be held liable for libelous statements only under a more stringent standard of proof than that prescribed by state law (i.e., plaintiff must show actual loss to recover compensatory damages and must prove actual malice by clear and convincing evidence to be awarded punitive damages) is the result of balancing competing values and is predicated on a solicitous [**86] protection of the freedom of the press secured by the First [***6] Amendment. The *Gertz* court makes it clear indeed that the result reached therein is a compromise which is based on "the principle that debate on public issues should be uninhibited, robust, and wide-open" ( *New York Times Co. v. Sullivan, supra at pp. 270-271 [11 L.Ed.2d at pp. 700-701*]), and on the premise that this standard of proof "administers an extremely powerful antidote to the inducement to media self-censorship" ( *Gertz v. Robert Welch, Inc., supra, 418 U.S. at p. 342 [41 L.Ed.2d at p. 807, 94 S.Ct. at p. 3008*]).

3 The court in *Gertz* repeatedly refers to the *New York Times* standard as being applicable to a "public person," "public officials," and "public figures," and that "a different rule should obtain with respect to [private individuals]." (*94 S.Ct., at p. 3009.*) The court concluded its recognition of the distinction between private individuals and public figures or officials in defamation actions by noting that: "*Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery.*" (*418 U.S. at p. 345 [41 L.Ed.2d at p. 808, 94 S.Ct. at p. 3010*]; italics added.)

[***7] [*933] The decisive issue awaiting determination, therefore, is whether the credit report in

dispute, as opposed to news media publications, is protected by the First Amendment calling for the higher standard in proving actual malice. For the reasons which follow, we hold that the libelous communication presented in a credit report falls outside the protective umbrella of the First Amendment; and, as a consequence, malice, a prerequisite to sustain punitive damages, may be proved under the conventional standard of preponderance of evidence.

*In limine*, we wish to point out that the precise question here raised has not, as yet, been definitively decided by the United States Supreme Court. On the contrary, *Rosenbloom v. Metromedia (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811]* explicitly leaves this issue open. While in *Rosenbloom* the court reaffirms its commitment to bolster robust debate on public issues embodied in the First Amendment and extends constitutional protection to all discussion and communication involving matters of public or general concern, it intimates "*no view on the extent of constitutional protection, if any, for purely commercial* [***8] *communications made in the course of business*" (pp. 43-44, fn. 12 [29 L.Ed.2d p. 312]; italics added).

In resolving the issue, therefore, we take recourse to federal cases dealing with situations comparable with those presented in the case at bar. One of the cases in point is *Kansas Electric Supply Co. v. Dun & Bradstreet, Inc. (10th Cir. 1971) 448 F.2d 647* (cert. den., *405 U.S. 1026 [31 L.Ed.2d 486, 92 S.Ct. 1289]*). In *Kansas Electric* plaintiff, a wholesale electric supply company, brought an action against defendant, a credit reporting agency, for libelous statements contained in a credit report. The jury returned a verdict in favor of plaintiff, awarding it substantial sums of compensatory and punitive damages. In its appeal, defendant argued that under *New York Times Co. v. Sullivan, supra*, and its companion cases, the trial court should have directed a verdict in its favor because there was a total lack of "'actual malice'" as defined by *New York Times*. In affirming both the compensatory and punitive damages, the Court of Appeals held that the doctrine of *New York Times* did not extend to private credit reports because the business and credit [***9] standing of the company was not a matter of public interest, and that the credit report under consideration provided specialized information to a selective, finite audience, and concluded that the case was properly tried and decided under Kansas state law (see to same effect: *Grove v. Dun & Bradstreet, Inc. (3d Cir. 1971) 438 F.2d 433*, cert. den., *404 U.S. 898 [30 L.Ed.2d 175, 92 S.Ct. 204]*).

[*934] In *Hood v. Dun & Bradstreet, Inc. (5th Cir. 1973) 486 F.2d 25* (cert. den., *415 U.S. 985 [39 L.Ed.2d 882, 94 S.Ct. 1580]*), another case in point, plaintiff, a building contractor, instituted an action against defendant credit agency for libelous communications embraced in a credit report. In relying on *New York Times* and *Rosenbloom, supra*, defendant contended on appeal that the false credit report was constitutionally protected by the First Amendment guarantee of freedom of the press. In rejecting defendant's argument, the court held that the libelous and defamatory publications engrossed in credit reports are of a commercial nature and are unprotected by the constitutional safeguards of free speech and free press. The court recalled that the concept [***10] of purely commercial speech as an area where the First Amendment protection [**87] does not apply was originally articulated in *Valentine v. Chrestensen (1942) 316 U.S. 52 [86 L.Ed. 1262, 62 S.Ct. 920]*. In *Valentine*, a city ordinance banning the distribution of handbills which solicited a submarine tour was challenged as violative of First Amendment rights. The Supreme Court upheld the ordinance, declaring that commercial speech did not fall within the protective care of the First Amendment. The commercial speech doctrine was revitalized recently in *Pittsburgh Press Co. v. Human Rel. Comm'n (1973) 413 U.S. 376 [37 L.Ed.2d 669, 93 S.Ct. 2553]*, where the court upheld an ordinance which prohibited newspapers from referring to sex in employment headings in want ads. The court distinguished *New York Times*, emphasizing that the court there was concerned with a publication which communicated information or expressed opinion, whose existence and objectives were matters of public interest and concern. The court found that the commercial advertisements did not express such social policies and as a consequence the case was governed by *Valentine* rather than [***11] by *New York Times*.

The foregoing discussion makes it quite evident that credit reports constitute a different kind of communication than news media publications. Credit reports do not contain public policies or other matters of public or general concern. The communication contained therein is purely commercial in nature. Such reports are provided upon the request of the party concerned, reach but a relatively limited readership, and in most cases are kept in strict confidence. Under these circumstances the

rationale that the courts must protect such defamatory matter in order to safeguard free speech and free press obviously does not obtain.

The foregoing reasoning is dispositive of the limited issue before us, namely, the burden of proof required to sustain punitive damages for actual malice. In *New York Times* the Supreme Court made it [*935] abundantly clear that the requirement of proving actual malice with convincing clarity is a constitutional demand flowing from the mandate of the First Amendment (pp. 285-286 [11 L.Ed.2d pp. 709-710]; see also *Rosenbloom v. Metromedia, supra at pp. 50-52 [29 L.Ed.2d at pp. 315-317]*). Since we have concluded that [***12] the credit report in dispute is not protected by the First Amendment, the higher standard of proof deriving from the same amendment is ipso facto eliminated and the quantum of proof required by state law remains unaffected. 4

4 This is entirely consistent with the guidance expressed in *Gertz*, "that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood *injurious to the reputation of a private individual.*" ( *Gertz v. Robert Welch, Inc., supra, 418 U.S. at pp. 345-346 [41 L.Ed.2d at p. 809, 94 S.Ct. at p. 3010*]; italics added.)

We are satisfied that the cases holding that "actual malice" must be proved with clear and convincing evidence ( *New York Times Co. v. Sullivan, supra; Curtis Publishing Co. v. Butts (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]*; *Beckley Newspapers v. Hanks (1967) 389 U.S. 81 [19 L.Ed.2d 248, 88 S.Ct. 197]*; *Rosenbloom v. Metromedia, supra; Gertz v. Robert Welch, Inc., supra;* [***13] *Field Research Corp. v. Patrick (1973) 30 Cal.App.3d 603 [106 Cal.Rptr. 473]*) are distinguishable from the case at bench. Each of the cited cases deals with libelous matters published by a segment of the news media and, therefore, qualifies for the protection of the First Amendment.

We are aware that in *Field Research Corp. v. Patrick, supra at page 608*, the court intimated without qualification that in libel actions juries must be instructed that proof of "'actual malice'" must be by "'*clear and convincing evidence.*'" It is apparent, however, that *Field Research* covered an entirely different factual situation. Defendant Patrick was a candidate for Governor of California, a public figure, and the libelous statements were communicated by several news media throughout California. Thus, under the United States Supreme Court cases cited above, the libelous matters enjoyed the constitutional protection [**88] afforded by the First Amendment. We believe that, despite the overbroad language applied in *Field Research*, the degree of proof requirement laid down therein must be read within the factual context of that case.

Finally, we note that although our [***14] decision rests upon the holding that the credit report in question is not protected by the First Amendment, and in consequence the punitive damages may be proved by the conventional preponderance of evidence, we are persuaded by our [*936] independent review of the record -- hereafter summarized -- that the judgment is supported by evidence of "actual malice" and that the concomitant punitive damages were proven under the higher standard of "clear and convincing evidence," as well.

*The Evidence*

**(2a)** The evidence was generally undisputed. As noted earlier, defendant stipulated to the falsity of the publications, but denied that the inferences to be drawn from the evidence supported a finding of malice. **(3)** The malice necessary to defeat a qualified privilege is "actual malice" which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights ( *MacLeod v. Tribune Publishing Co. (1959) 52 Cal.2d 536, 552 [343 P.2d 36]*; *Field Research Corp. v. Patrick,* [***15] *supra, 30 Cal.App.3d 603, 606).*

**(2b)** We agree with defendant that the record is devoid of evidence that Retail Credit Company bore deliberate ill will towards plaintiff. However, the evidence clearly and convincingly supports the inference that defendant lacked reasonable grounds for believing in the truth of the publications and that defendant acted in reckless disregard of plaintiff's rights. Thus, defendant does not contest the fact that Mr. Kett, admittedly biased against Mr. Roemer, was the primary source of the information contained in the defamatory reports. Defendant also admits knowing at the time the defamatory reports were prepared that plaintiff had enjoyed for many years an excellent business and social

reputation. Defendant concedes that it knew at the time of publication that its own rules required derogatory information contained in its reports to be confirmed by independent sources and, if no confirmation was available, that a detailed explanation be included in the report to indicate that the information was obtained from but a single source.

Defendant claims, however, that it was impossible to confirm such information, a conclusion that the jury could reasonably [***16] disregard since the information from Mr. Kett strongly implied that plaintiff was dishonest, while defendant had in its own files prior reports indicating that Mr. Roemer had an excellent reputation. Defendant admitted adding no explanation that the information was obtained from one source, claiming that the reports made that fact implicitly clear. However, defendant also admitted that in some portions the reports [*937] stated that the derogatory information was obtained from "sources" when in fact Mr. Kett was the sole source.

In short, it cannot be said that the jury was unreasonable in drawing the inference that defendant had no reasonable cause to believe the truth of its publications about Roemer and therefore acted in reckless disregard of plaintiff's rights. The trial court's finding of malice is supported by clear and convincing evidence.

*Punitive Damages*

**(4a)** Defendant contends that the award of $ 250,000 punitive damages was grossly excessive as a matter of law. **(5)** It is a well-settled rule that after an exemplary damage award has been approved by the trial court with the denial of a motion for new trial, as in this case, the reviewing court will declare the amount [***17] excessive only if, upon a review of the entire record, the award must be said to be so grossly excessive [**89] as to indicate passion or prejudice on the part of the jury ( *Di Giorgio Fruit Corp. v. AFL-CIO (1963) 215 Cal.App.2d 560, 581 [30 Cal.Rptr. 350]*; *Cunningham v. Simpson (1969) 1 Cal.3d 301, 308-309 [81 Cal.Rptr. 855, 461 P.2d 39]*; *Wetherbee v. United Ins. Co. of America (1971) 18 Cal.App.3d 266, 272 [95 Cal.Rptr. 678]*; *Finney v. Lockhart (1950) 35 Cal.2d 161, 164 [217 P.2d 19]*; *Ferraro* v. *Pacific Fin. Corp. (1970) 8 Cal.App.3d 339, 351 [87 Cal.Rptr. 226]*; *Washer v. Bank of America (1948) 87 Cal.App.2d 501, 510 [197 P.2d 202]*; *Rosenberg v. J.C. Penney Co. (1939) 30 Cal.App.2d 609, 628 [86 P.2d 696]*).

**(6)** As this court stated in *Wetherbee v. United Ins. Co. of America, supra, at pages 270-271*: "The object of exemplary damages is to make the example as well as the punishment fit the offense ( *Thomson v. Catalina, 205 Cal. 402, 405-406 [271 P. 198, 62 A.L.R. 235]*), and in determining the amount necessary to impose the appropriate punitive effect, the jury was entitled to consider the wealth [***18] of the defendant ( *MacDonald v. Joslyn, 275 Cal.App.2d 282, 293 [79 Cal.Rptr. 707]*)." **(4b)** According to the evidence, Retail Credit Company has a net worth of about $ 40 million and an after-tax income of nearly $ 9 million a year. Using the "standard" enunciated in *Wetherbee, supra*, the $ 250,000 award represents about 10 days' after-tax income of the defendant. [5]

5 As recently observed by our Supreme Court: "It follows that the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective. [Citations.]" ( *Bertero v. National General Corp. (1974) 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608]*.)

[*938] Defendant attempts to distinguish *Wetherbee* on the grounds that it was a case of much more deplorable conduct on the part of the defendant and that there was "no such combination of judicial error and attorney misconduct as is found in the case at issue." As we explain in this opinion, however, there was neither [***19] judicial error nor attorney misconduct in the case at bench during trial.

Defendant claims that its conduct was merely negligent and, hence, completely distinguishable from the "calculated fraud" of the insurance company in the *Wetherbee* case. However, two juries, in awarding plaintiff large money damages against defendant, and the trial judge, in denying defendant's motion for a new trial, found defendant's conduct to be malicious.

Defendant's conduct evidenced a grossly reckless disregard of plaintiff's rights. The jury found plaintiff to have suffered $ 40,000 actual damages as a result of defendant's actions. In light of all the evidence in this case, including the net worth of defendant, it cannot be said that the award of $ 250,000 punitive damages is so grossly excessive as to indicate passion or prejudice on the part of the jury.

*Denial of Leave to Amend*

**(7a)** At the close of defendant's case and prior to the giving of instructions to the jury, defendant requested leave to amend its answer to plead partial truth of the defamatory statements in mitigation of damages. This request was denied as was defendant's proposed instruction on the subject of circumstances in [***20] mitigation of damages. Defendant asserts that the coupled effect of these two refusals constituted prejudicial error. We disagree.

*Section 461 of the Code of Civil Procedure* provides that the defendant in a libel action "may, in his answer, allege both the truth of the matter charged as defamatory, and any mitigating circumstances, to reduce the amount of damages. Whether he proves the justification or not, he may give in evidence the mitigating circumstances." Defendant contends that a reading of this statute in light of the liberal California rule allowing amendment of pleadings to conform to proof ( *Code Civ. Proc., § 473*; *20th Cent. Cigarette Vendors v. Shaheen (1966) 241 Cal.App.2d 391, 396 [50 Cal.* [**90] *Rptr. 773]*; *Reynolds v. Mead (1944) 62 Cal.App.2d 179, 180-181 [144 P.2d 424]*) requires the conclusion that the trial judge should have allowed leave to amend.

[*939] **(8)** Although failure to permit such amendment where justice requires it is an abuse of discretion ( *Vick v. Grasser (1959) 169 Cal.App.2d 692, 701 [338 P.2d 223]*; *Fairfield v. Hamilton (1962) 206 Cal.App.2d 594, 602 [24 Cal.Rptr. 73]*; *Farmers' Nat. Gold Bank* [***21] *v. Stover (1882) 60 Cal. 387, 390)*, the objectionable subject matter of the amendment, the conduct of the moving party, or the belated presentation of the amendment are appropriate matters for the reviewing court to consider in evaluating the trial court's exercise of discretion (3 Witkin, Cal. Procedure (2d ed.) § 1042, p. 2621; *Dos Pueblos Ranch & Imp. Co. v. Ellis (1937) 8 Cal.2d 617, 622 [67 P.2d 340]*; *Ross v. McDougal (1939) 31 Cal.App.2d 114, 121 [87 P.2d 709]*). And, as a matter of policy "The discretion of the trial court should be upheld unless clearly abused" (3 Witkin, Cal. Procedure (2d ed.) § 1040, p. 2619).

**(7b)** At the beginning of the first trial Retail Credit specifically stipulated that the publications were false and claimed only that they were made without malice. Over three years later, at the second trial, defendant again stipulated to the falsity of the reports without any qualifications as to particular statements in the reports. Assuming arguendo that defendant did not know at the start of the first trial what the evidence would show, the conclusion is inescapable that it knew at the start of the second trial what the evidence would be [***22] and, more specifically, which of the statements in the reports were true and which were not.

**(9)** It is a general rule that an amendment which contradicts an admission in the original pleading will ordinarily not be allowed unless a showing is made of mistake or other excuse for changing the allegations of fact (3 Witkin, Cal. Procedure (2d ed.) § 1045, pp. 2622-2623; *Security First Nat. Bank v. Rospaw (1951) 107 Cal.App.2d 220, 224 [237 P.2d 76]*; *Tognazzi v. Wilhelm (1936) 6 Cal.2d 123, 127 [56 P.2d 1227]*; *Findley v. Garrett (1952) 109 Cal.App.2d 166, 179 [240 P.2d 421]*; *Bank of Woodland v. Heron (1898) 122 Cal. 107, 109 [54 P. 537]*).

Although these cases are not squarely on point since defendant Retail Credit did not specifically admit the falsity of the publications in the answer itself, they offer analogous reasons for denying a request to amend an answer to contradict a stipulation on which the case has been tried.

**(10)** The law is also clear that even if a good amendment is proposed in proper form, unwarranted delay in presenting it may -- of itself -- be a [*940] valid reason for denial. The cases indicate that the denial may rest upon [***23] the element of lack of diligence in offering the amendment after knowledge of the facts, or the effect of the delay on the adverse party (3 Witkin, Cal. Procedure (2d ed.) § 1048, p. 2623; *Bank of America etc. Assn. v. Goldstein (1938) 25 Cal.App.2d 37, 47 [76 P.2d 545]*; *Dos Pueblos Ranch & Imp. Co. v. Ellis, supra; Moss Estate Co. v. Adler (1953) 41 Cal.2d 581, 585 [261 P.2d 732]*; *Nelson v. Specialty Records, Inc. (1970) 11 Cal.App.3d 126, 139 [89 Cal.Rptr. 540]*).

**(7c)** Defendant claims that the evidence introduced at the second trial made it clear that some of the statements in the reports were true, so that an amendment to plead partial truth should have been allowed. But the evidence introduced *at the first trial* also indicated the truth of some of the statements in the reports -- e.g., that Messrs. Roemer and Kett had been engaged in a business dispute, that certain legal actions had been filed between them, and that obscenities had been painted on the wall of plaintiff's former office. Such a long delay in offering the amendment after knowledge of the facts could very

reasonably be construed by the court to [**91] constitute a lack of due [***24] diligence, a finding which is implicit in the trial judge's observation that it would be improper to permit the proposed amendment after the entire case had been tried on the basis of the stipulation of falsity.

**(11)** Defendant also contends that it was error to refuse his proposed instruction number 20 on the subject of circumstances in mitigation of damages. The proposed instruction charged that "even though the defendant may not have alleged truth as a defense, the jury may still consider what has been offered to prove truth as grounds for mitigating damages."

"The 'mitigating circumstances' which *section 461 of the Code of Civil Procedure* allows the defendant to prove in a situation such as this are those which tend to show that the defendant in speaking the slanderous words acted in good faith, with honesty of purpose, and not maliciously" ( *Clay v. Lagiss (1956) 143 Cal.App.2d 441, 448 [299 P.2d 1025]*). The propriety of denying defendant's instruction depends, then, on whether the fact that plaintiff had been engaged in a business dispute and the fact that the wall of plaintiff's former office had been defaced are "other mitigating circumstances" tending to show that defendant [***25] acted in good faith in publishing the defamatory statements.

[*941] Defendant claims that these facts show that its employees acted honestly and without malice in publishing the reports, and, therefore, the jury should have been instructed to consider those circumstances in mitigation of damages. On the contrary, the fact that Roemer had been engaged in a prolonged business dispute with Kett, the sole source of the defamatory information, indicates that it was unreasonable for defendant to rely on anything Kett reported about Roemer without obtaining independent confirmation. The existence of wall defacement in plaintiff's office does not, in and of itself, establish that plaintiff did the defacing.

Furthermore, we agree with plaintiff that defendant's attempt at the end of the second trial to inject the issue of partial truth via an amendment to its answer and a jury instruction was merely an attempt "to submit its case to the jury on one theory after having tried it on another. . . ." We conclude that the trial judge did not err in denying defendant's request for leave to amend nor in refusing its proposed jury instruction.

*Misconduct of Counsel*

**(12)** Defendant for the [***26] first time on appeal accuses plaintiff's counsel of misconduct in his closing argument. Defendant also seems to assert that the trial court had a *sua sponte* duty to admonish counsel and to instruct the jury accordingly. We find no merit in these contentions.

A long established principle of appellate review calls for raising the claimed error in the trial court. This is particularly true with respect to assignments of attorney misconduct. The usual procedure requires the "assignment" of counsel's statement as misconduct and a request that the jury be instructed to disregard it. If this is not done, the error is waived unless the misconduct was of so aggravated a character that it could not be cured by any instruction (4 Witkin, Cal. Procedure (2d ed.) § 163, p. 2983; *Horn v. Atchison T. & S. F. Ry. Co. (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561]*; *Sabella v. Southern Pac. Co. (1969) 70 Cal.2d 311, 318 [74 Cal.Rptr. 534, 449 P.2d 750]*; *Tingley v. Times Mirror (1907) 151 Cal. 1, 23 [89 P. 1097]*).

In the case at bench, the general thrust of plaintiff's closing argument was that defendant is a large, snooping monopoly which makes huge [***27] profits by specializing in destroying people's reputations. Several references [*942] to congressional investigations [**92] of companies like Retail Credit helped add credibility to such characterizations.

Defense counsel objected only twice to the remarks of plaintiff's counsel, and in neither objection did he specifically assign misconduct or request an admonition to the jury. We consider the Supreme Court's statement in *Horn v. Atchison T. & S. F. Ry. Co., supra at page 611*, as appropriate in dismissing defendant's contention: "In the instant case we do not deem [plaintiff's counsel's] misconduct to be of such a character that it could not have been obviated by timely objections and instructions. Defense counsel, by his passive silence, undoubtedly encouraged the repetition of arguments which he now characterizes as so prejudicial that we should overlook his failure to object. He concedes that individual improprieties do not constitute grounds for reversal, but that the cumulative effect thereof requires this result. In such circumstances an attack on the instances of misconduct at the onset, together with proper instructions from the court to both the [***28] jury and counsel, would not only have removed the effect of the initial

improprieties but would also have forestalled the commission of subsequent acts of misconduct. As this is the very reason for the rule requiring timely objections as a prerequisite to the assignment of misconduct on appeal, defendant cannot prevail in its assignment of the instant misconduct."

Having reviewed the entire record, we are of the opinion that the argument of plaintiff's counsel was entirely within the bounds of legitimate advocacy. This is a much more plausible explanation for the absence of any assignment of misconduct than the contention urged for the first time on appeal that such an assignment would have been futile.

The judgment is affirmed.

# TAB 24

1 of 1 DOCUMENT

**LYMAN H. SANBORN, Plaintiff and Appellant, v. CHRONICLE PUBLISHING COMPANY, Defendant and Respondent; CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants**

**S.F. No. 23471**

**Supreme Court of California**

*18 Cal. 3d 406*; *556 P.2d 764*; *134 Cal. Rptr. 402*; *1976 Cal. LEXIS 362*

**December 3, 1976**

**PRIOR HISTORY:** Superior Court of Sacramento County, No. 190423, George E. Paras and William A. White, Judges.

**DISPOSITION:** The judgments are affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action for defamation against a newspaper, a city and county, and the clerk for the city and county, the trial court, on its own motion under *Code Civ. Proc., § 583, subd. (a)*, providing that a court in its discretion may dismiss an action for failure to prosecute, dismissed as to the newspaper. Trial was held, as to the city and county and its clerk, with a verdict and judgment for plaintiff. Plaintiff had received a release from the clerk of a client's money under attachment, which a deputy city attorney had told the clerk not to release without a court order. The clerk testified that he had made a mistake in releasing the money and that there had been no trickery or fraud involved. However, he had told a reporter for the newspaper that "it was a real con job," claiming plaintiff had ranted and raved and convinced him that the money was being held illegally. Plaintiff's original complaint had been filed nearly five years prior to the dismissal against the newspaper, and plaintiff had changed attorneys twice and had filed an amended complaint. Many pretrial papers had been filed. (Superior Court of Sacramento County, No. 190423, George E. Paras and William A. White, Judges.)

The Supreme Court affirmed, holding that the statement of the clerk was made within the scope of his authority and that the city and county was liable under the doctrine of respondeat superior. The court also held that the absolute privilege of *Civ. Code, § 47, subd. 1*, conferred on all publications made in proper discharge of an official duty, applies only to high-ranking, policy-making state and federal officials, and that the clerk was not exercising policy-making functions when he defamed plaintiff. The court further held that there was substantial evidence of malice in the clerk's statement, and therefore, the conditional or qualified privilege of *Civ. Code, § 47, subd. 3*, immunizing communications made without malice to a person interested therein by one who is requested by the person interested to give the information, was not available to the clerk. The court also held that the clerk's interview with the press was not a discretionary act within the meaning of *Gov. Code, § 820.2*, providing that a public employee is not liable for an injury resulting from an act or omission which is the result of the exercise of discretion invested in him, and the clerk did not enjoy the immunity given by *§ 820.2.* Finally the court held that the trial court had good cause to dismiss as to the newspaper since plaintiff had failed to meet his burden of showing excusable delay. (Opinion by Richardson, J., expressing the unanimous view of the court.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Municipalities § 102--Actions--Liability for Acts of Public Employee Within Scope of Employment.** --If

an employee or agent while acting in the scope of his authority and in furtherance of the employer's business defames another, his employer or principal may be held liable, and this principle is unaffected by the fact that the employment is public. This is so even though the agent may have exceeded his authority, and it is true regardless of the agent's motive.

**(2) Municipalities § 102--Actions--Liability for Acts of Public Employee Within Scope of Employment.** --A city and county clerk who had made a mistake by improperly releasing funds under attachment to an insurance company manager and who had claimed in a press interview that the manager had done a real con job on him and that he had ranted and raved and convinced him that the money was being held illegally, was acting within the scope of his employment when he made the press statement, and therefore, the clerk's employer, the city and county, was properly found liable under the doctrine of respondeat superior in a subsequent defamation action by the manager.

**(3) Libel and Slander § 20--Privileged Communications--Absolute Privilege--Officers and Official Acts.** --A city and county clerk who had made a mistake by improperly releasing funds under attachment to an insurance company manager and who had made a statement to the press claiming that the manager had done a real con job and had ranted and raved and convinced him that the money was being held illegally, was not entitled, in a subsequent defamation action by the manager, to the claim of absolute privilege, under *Civ. Code, § 47, subd. 1*, providing for an absolute privilege for publications made in the proper discharge of an official duty. The privilege of *§ 47, subd. 1*, extends only to high-ranking, policy-making federal and state officials, and the clerk was not exercising policy-making functions at the time.

**(4) Libel and Slander § 23--Privileged Communications--Qualified Privilege--Effect of Malice.** --In a defamation action against a city and county clerk, there was substantial evidence to support a finding either that the clerk bore plaintiff ill will, or that he lacked a good faith belief in the truth of his statements, and, therefore, the clerk was not entitled to the conditional or qualified privilege of *Civ. Code, § 47, subd. 3*, granting immunity to communications made without malice to a person interested therein by one who is requested by the person interested to give the information, where the clerk had claimed in a press interview that plaintiff had conned him into improperly releasing funds to him, and where he had testified at trial that he realized he had made a mistake and that no fraud or trickery was involved but that he had simply been persuaded by plaintiff to release the funds to him.

**(5) Public Officers and Employees § 16--Liabilities--Statutory Immunity for Discretionary Acts.** --A city and county clerk's statement to the press that an insurance company manager had conned him into improperly releasing to him funds under attachment was not a discretionary act within the meaning of *Gov. Code, § 820.2*, providing that a public employee is not liable for an injury resulting from an act or omission which stems from the exercise of discretion vested in him. The statement was not in the nature of a basic policy decision made at the planning stage of the city's operations, but, rather, was in the nature of a ministerial duty incident to the normal operations of that office, and, therefore, the clerk could not assert *§ 820.2* immunity for his press statement in a later defamation action by the manager. The fact that an employee normally engages in discretionary activity is irrelevant if, in a given case, the employee did not render a considered decision.

**(6) Dismissal and Nonsuit § 27--Delay in Bringing Action to Trial--Two-Year Limitation--Exercise of Court's Discretion.** --The trial court properly dismissed a defamation action against a newspaper under *Code Civ. Proc., § 583, subd. (a)*, providing that a court in its discretion may dismiss an action for want of prosecution if it is not brought to trial within two years after it was filed, where prior to dismissal nearly five years had passed since the original complaint had been filed, where plaintiff had changed attorneys twice and had twice amended his complaint, and where numerous pretrial papers had been filed; *§ 583, subd. (a)*, places no restrictions on the exercise of a court's discretion and it will be disturbed only in cases of manifest abuse.

**COUNSEL:** Milton L. McGhee for Plaintiff and Appellant.

Thomas M. O'Connor, City Attorney, and John Sullivan Kenny, Deputy City Attorney, for Defendants and Appellants.

Cooper, White & Cooper, Robert R. Callan and Mark Logan Tuft for Defendant and Respondent.

**JUDGES:** Opinion by Richardson, J., expressing the unanimous view of the court. Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Sullivan, J., and Clark, J., concurred.

**OPINION BY:** RICHARDSON

**OPINION**

[*409] [**765] [***403] In this case we are presented with questions involving the liability of defendants City and County of San Francisco (City) and its clerk, Martin Mongan (Mongan), for defamation arising from Mongan's statements to the news media explaining his release to plaintiff of funds which had been deposited with Mongan. Concluding as we do that at the time of his statements Mongan was acting within the [*410] scope of his employment and that neither immunity nor privilege enfolded City or Mongan, plaintiff's judgment against both defendants following jury verdict is affirmed.

We affirm the judgment entered in favor of defendant Chronicle Publishing Company, and adopt that portion of the vacated Court of Appeal opinion which considered this aspect of these appeals.

The record reflects that in 1968 plaintiff Sanborn visited Mongan at the latter's office and sought the release of approximately $ 25,400 in attached funds which had been [**766] [***404] deposited with Mongan in his capacity as county clerk. Although Mongan had been instructed by a deputy city attorney not to release the funds without a court order, Mongan decided that plaintiff's claim on the funds was valid and paid the money to him.

A few days later the chief deputy county clerk learned of the payment and advised Mongan that he had erred in releasing the funds without a court order. (Mongan testified at trial that he realized he had made a mistake, that no fraud or trickery was involved, but that he had simply been persuaded by plaintiff to release the funds to him.) Soon thereafter, a reporter from the San Francisco Chronicle learned of the incident, called Mongan on the telephone and interviewed him regarding the matter. In an article in the Chronicle which followed, Mongan was quoted as having said that "It was a real con job," that plaintiff "outtalked me and convinced me that we were holding his money illegally," that plaintiff "ranted and raved and said I was putting his client to a lot of unnecessary expense and trouble." The story was thereafter published in the Sacramento Bee which has a large circulation in the area where plaintiff resided. As a result of the publication, plaintiff lost his job, suffered embarrassment and ridicule, and resigned from several clubs and organizations.

Plaintiff filed a defamation action against City, Mongan, and the Chronicle Publishing Company. The suit against the Chronicle was dismissed for failure to prosecute; plaintiff appealed this dismissal. The action against City and Mongan proceeded to trial and the jury returned a verdict for plaintiff against both defendants in the amount of $ 31,650. Plaintiff appeals from the judgment of dismissal as to the Chronicle. In a separate appeal, City and Mongan seek reversal of the judgment entered in plaintiff's favor. We consider each appeal separately.

[*411] 1. *The Appeal of City and Mongan*

Defendants concede, for purposes of this appeal, that Mongan defamed plaintiff. They assert, however, that Mongan possessed either an absolute or qualified privilege (see *Civ. Code, § 47, subds. 1, 3*), or alternatively that both Mongan and City are immune from liability under the circumstances of this case (see *Gov. Code, §§ 815.2, subd. (b), 820.2*).

We first dispose of a preliminary issue, namely, the liability, if any, of City for the acts of Mongan, its employee.

**(1)** a.) *Respondeat superior.* As a general proposition it may be said that, if an employee or agent while acting in the scope of his authority and in furtherance of the employer's business defames another, his employer or principal may be held liable therefor. ( *Correia v. Santos (1961) 191 Cal.App.2d 844, 855 [13 Cal.Rptr. 132].*) This is so even though the agent may have exceeded his express authority ( *Draper v. Hellman Com. T. & S. Bank (1928) 203 Cal. 26, 38-39 [263 P. 240]*), and it is true regardless of the agent's motive ( *Rosenberg v. J. C. Penney Co. (1939) 30 Cal.App.2d 609, 623 [86 P.2d 696]*). It has been said that the rule is supported by "The great weight of authority." (See Annot. 150 A.L.R. 1338, 1344.)

The foregoing well-rooted principle is unaffected by the fact that the employment is public. Considerations bearing on the ambit and nature of that public

employment were well expressed in *Neal v. Gatlin (1973) 35 Cal.App.3d 871, 875 [111 Cal.Rptr. 117]*, ". . . a public employee is acting in the course and scope of the employment 'when he is engaged in work he was employed to perform or when the act is an incident to his duty and was performed for the benefit of his employer and not to serve his own purposes or conveniences.' [Citations.] The phrase 'scope of employment' has been equated with the express or implied power of the public employee to act in a particular instance, and in evaluating his conduct to determine whether it is within the ambit of his authority we are to look not to the nature of the act itself, but to the purpose or result intended. [Citations, fn. omitted.] If the object or end to be accomplished [**767] [***405] is within the employee's express or implied authority his act is deemed to be within the scope of his employment irrespective of its wrongful nature." (See also *Burgdorf v. Funder (1966) 246 Cal.App.2d 443 [54 Cal.Rptr. 805]*.)

[*412] **(2)** The record before us supports the jury's implied finding that Mongan was acting within the scope of his authority when he defamed the plaintiff. Mongan held the office of Clerk of the City and County of San Francisco and, as such, had at least implied authority to issue statements to the press and to submit to interviews regarding the operation of the clerk's office, including explanations as to why impounded funds were released without prior court order. The subject of the press interview involved public and official business. Any statements made by Mongan concerning transactions of the clerk's office, while conceivably exculpating Mongan personally to a degree, would also serve the further purpose of informing the press and the public as to whether the clerk's office was performing its public duties in a rational and orderly fashion. While City insists that the sole purpose of the statement in question was for the personal advantage and gain of Mongan, we cannot presume as a matter of law that the statements were of no conceivable benefit to the City, or that their object was *solely* to save Mongan from personal embarrassment. The jury reasonably could have concluded that responses to press inquiry constituted, as to time, place, and circumstance, responses of a public official regarding his administration of a public office and thus was within the scope of his public employment. An important public purpose is served both by the press inquiry and by the official's response. We conclude, accordingly, that the statement was made within the ambit of Mongan's public employment, and that his principal, City, is liable therefor in the absence of other defenses.

**(3)** b.) *Absolute privilege*. Mongan and City both contend that Mongan's statements were protected by an absolute statutory privilege conferred on all publications made "[in] the proper discharge of an official duty." ( *Civ. Code, § 47, subd. 1*.) Plaintiff, however, correctly observes that the courts of this state have thus far extended the protections of this statute only to high-ranking state and federal officials, such as the President of the United States, the governor of any state or territory, cabinet officers of the United States and the corresponding officers of any state or territory. (See *Saroyan v. Burkett (1962) 57 Cal.2d 706, 710 [21 Cal.Rptr. 557, 371 P.2d 293]*; *Frisk v. Merrihew (1974) 42 Cal.App.3d 319, 323 [116 Cal.Rptr. 781]*; *White v. State of California (1971) 17 Cal.App.3d 621, 627-628 [95 Cal.Rptr. 175]*; see also Rest., Torts, § 591; Rest.2d Torts (Tent. Draft No. 20), § 591, com. (c); Prosser, The Law of Torts (4th ed. 1971) § 114, pp. 782-784; 1 Harper & James, The Law of Torts (1956) § 5.23, pp. 429-430; but see *Barr v. Matteo* [*413] *(1959) 360 U.S. 564, 572-576 [3 L.Ed.2d 1434, 1441-1444, 79 S.Ct. 1335]* [absolute privilege for all *federal* executive officers].)

It has been noted by recognized authorities that the purpose of the so-called absolute "official duty" privilege is to insure efficiency in government by encouraging *policy-making* officials to exercise their best judgment in the performance of their duties free from fear of general tort liability. (Harper & James, *supra*, at p. 429.) As we discuss below in greater detail we have concluded that defendant Mongan was not exercising policy-making functions when he defamed plaintiff, and thus he is not protected by the absolute privilege contained in *Civil Code section 47, subdivision 1*.

c.) *Conditional or qualified privilege*. Defendants next assert that they are entitled to the protection of that privilege, if not absolute at least conditional or qualified, which is contained in subdivision 3 of *section 47 of the Civil Code*. This statute immunizes communications made ". . . *without malice*, to a person interested therein, [by one] . . . (3) who is requested by the person interested to give the information." (Italics added.) By definition, this conditional privilege is defeated by a showing of "malice."

[**768] [***406] Section 48a, subdivision 4(d), of the Civil Code defines "actual malice" as "that state of

mind arising from hatred or ill will toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice." A California appellate court has recently held that "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights (citations)." ( *Roemer v. Retail Credit Co. (1975) 44 Cal.App.3d 926, 936 [119 Cal.Rptr. 82]*, italics in original; see also *White v. State of California, supra, 17 Cal.App.3d 621, 628-629.*) Defendants have not asserted the existence of any First Amendment issues which might have invoked a different standard for proving malice. (See *Roemer, supra, at pp. 931-936.*)

[*414] **(4)** The record contains substantial evidence to support a finding either that Mongan bore plaintiff ill will, or that Mongan lacked a good faith belief in the truth of his statements. The jury could have found that Mongan blamed plaintiff for the loss of the deposited funds, and that Mongan wished to transfer the blame to plaintiff by characterizing plaintiff's efforts as a "con job," thereby exculpating himself in the eyes of the press and general public. Although the evidence was also susceptible of other inferences, we conclude that there was substantial evidence of malice. (See, e.g., *Cunningham v. Simpson (1969) 1 Cal.3d 301, 308 [81 Cal.Rptr. 855, 461 P.2d 39]*, illustrating the type of evidence sufficient to establish malice.)

d.) *Statutory immunity.* Defendants Mongan and City next assert that Mongan's activities constituted "discretionary acts" for which immunity is granted under *Government Code section 820.2.* If Mongan is immune from liability to plaintiff under this section, it necessarily follows that City would likewise be immune. ( *Gov. Code, § 815.2, subd. (b).*)

*Section 820.2* provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Several Court of Appeal cases have held, in varying factual contexts, that public employees who, while acting within the scope of their employment, defame third persons are engaged in discretionary activity thereby invoking immunity under *section 820.2.* (See *Miller v. Hoagland (1966) 247 Cal.App.2d 57, 62 [55 Cal.Rptr. 311]*; *Burgdorf v. Funder, supra, 246 Cal.App.2d 443, 448-449*; *Glickman v. Glasner (1964) 230 Cal.App.2d 120, 125-126 [40 Cal.Rptr. 719].*) In *Miller* and *Burgdorf* , for example, a city attorney and a tax officer, respectively, wrote allegedly libelous letters in the course of discharging their official functions. The courts in those cases held that *section 820.2* immunity was available since these officers were "exercising their discretion" in the matters at issue. Defendants urge that Mongan was likewise engaged in discretionary activity when he discussed the plaintiff's matter with the press.

The foregoing cases, however, preceded our decision in *Johnson v. State of California (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352].* The broad rule of discretionary immunity suggested by the courts in such cases as *Miller* and *Burgdorf* must be reexamined in the light of the principles therein enunciated by us. **(5)** In *Johnson*, we construed [*415] *section 820.2* as conferring immunity with respect to "basic policy decisions," or activity which may be characterized as the "planning" rather than the "operational" level of decision making. (*69 Cal.2d at pp. 793-794*; see *Ramos v. County of Madera (1971) 4 Cal.3d 685, 693 [94 Cal.Rptr. 421, 484 P.2d 93]*; *County of Sacramento v. Superior* [**769] [***407] *Court (1972) 8 Cal.3d 479, 489-491 [105 Cal.Rptr. 374, 503 P.2d 1382]* [dis. opn. by Tobriner, J.].) We pointed out in *Johnson* that "Immunity for 'discretionary' activities serves no purpose except to assure that courts refuse to pass judgment of policy decisions in the province of coordinate branches of government. Accordingly, to be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision. [Citations]" (*69 Cal.2d at pp. 794-795, fn. 8.*)

A leading commentator in the field, has interpreted *Johnson* as rejecting a mere "semantic inquiry" into the literal meaning of the word "discretionary" in *section 820.2*, and impliedly disapproving two of the libel cases relied upon by defendants herein, *Burgdorf v. Funder, supra, 246 Cal.App.2d 443*, and *Glickman v. Glasner, supra, 230 Cal.App.2d 120.* (Van Alstyne, Cal.

Government Tort Liability (Cont.Ed.Bar Supp. 1969) § 5.51 at pp. 12-13.)

Was defendant Mongan's telephonic interview with the press a type of "discretionary" act contemplated by *section 820.2*? We conclude that it was not. Although defendants' contention is arguable that Mongan may have had discretion to discuss the Sanborn matter with the press, we cannot conclude that the decision to do so was in the nature of a "basic policy decision" made at the "planning" stage of City's operations. A governmental officer's discussions with the public or press regarding the functioning of his office would seem, instead, to fall within the category of those routine, ministerial duties incident to the normal operations of that office.

Moreover, Mongan testified at trial that Mr. Cooper, the county controller, had advised Mongan to discuss the Sanborn affair with the press. If, for purposes of argument, the decision to permit a press interview was a "basic policy decision" under *Johnson*, the jury reasonably could have found that such a decision was made by Cooper, not Mongan, and accordingly the decision having been made by another, [*416] Mongan's subsequent defamatory statements were not protected by the discretionary act immunity of *section 820.2*.

We conclude that the judgment against defendants City and Mongan should be affirmed.

2. *Appeal of Plaintiff*

As indicated above, a hearing was granted by us in this case after a decision by the Court of Appeal, Third Appellate District, for the purpose of giving further study to the problems herein presented. After such study, we have concluded that the portion of Justice Regan's well-reasoned opinion for the Court of Appeal disposing of plaintiff's appeal from the judgment dismissing his action against defendant Chronicle correctly treats the issues and we adopt it as part of the opinion of this court. That opinion, with appropriate deletions and additions, * is as follows:

* Brackets together, in this manner[], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. ( *Estate of McDill (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874].*)

Plaintiff contends that the trial court abused its discretion in dismissing the action against [defendant] Chronicle for failure to prosecute under *Code of Civil Procedure section 583, subdivision (a)*, relying on *Weeks v. Roberts (1968) 68 Cal.2d 802 [69 Cal.Rptr. 305, 442 P.2d 361].*

*Section 583 of the Code of Civil Procedure* provides, in pertinent part: "(a) The court, in its discretion, may dismiss an action for want of prosecution pursuant to this subdivision if it is not brought to trial within two years after it was filed. The procedure for obtaining such dismissal shall be in accordance with rules adopted by the Judicial Council.

[**770] " [***408] (b) Any action heretofore or hereafter commenced shall be dismissed . . . on motion of the defendant, after due notice to plaintiff or by the court upon its own motion, unless such action is brought to trial within five years after the plaintiff has filed his action, except where the parties have filed a stipulation in writing that the time may be extended."

**(6)** Subdivision (a) places no restrictions on the exercise of the trial court's discretion and it will be disturbed only in cases of manifest abuse. [*417] ( *Denham v. Superior Court (1970) 2 Cal.3d 557, 563-564 [86 Cal.Rptr. 65, 468 P.2d 193].*)

The record in this case reveals no abuse of discretion. The complaint was filed on February 19, 1969. Over the next several months the Chronicle was given several extensions of time to plead by plaintiff's attorney, the last one being an open extension of time to plead subject to written notice. During this time plaintiff's attorney advised that he wanted a "nuisance" settlement from the Chronicle and made demand of $ 500. Plaintiff subsequently substituted attorneys and an amended complaint was filed February 6, 1970. Chronicle was not served with the amended complaint until early June 1970. On July 6, 1970, the Chronicle filed a demurrer to the complaint. The demurrer was overruled on August 7, 1970. On October 18, 1971, plaintiff served Chronicle with an at-issue memorandum. On October 22, 1971, Chronicle filed a memorandum that the case was not at issue as to it on the ground that to date plaintiff had not given notice of the court's ruling on Chronicle's demurrer as provided by *Code of Civil Procedure, section 472b* and California *Rules of Court, rule 204*.

A pretrial conference was set for November 22, 1972. Chronicle filed a pretrial statement submitting that the case was not at issue as to it since to date it had not been given notice of the court's ruling on the demurrer and had therefore not been required to answer the complaint. On November 22, prior to the conference, Chronicle filed its notice of motion for judgment on the pleadings. At the pretrial conference, at which plaintiff was present, a settlement agreement was reached between Chronicle and plaintiff's then attorney. Thereafter the pretrial conference was continued to December 19, 1972, and Chronicle took its motion for judgment on the pleadings off calendar in reliance on the proposed settlement. Chronicle did not attend the conference on December 19, at which time the court determined that the matter was at issue as to the remaining parties and the case was set for trial for March 12, 1973.

On January 24, 1973, plaintiff again substituted counsel, and under new counsel noticed a motion on February 5, 1973, to vacate or modify the existing pretrial conference order "to clear up the status of The Chronicle Publishing Company as an active defendant in the litigation" and served Chronicle with interrogatories. On February 23, 1973, plaintiff finally notified Chronicle of the overruling of their [*418] demurrer on August 7, 1970. Chronicle answered the complaint on March 13, 1973.

Plaintiff filed an at-issue memorandum on March 14, 1973. On April 25, 1973, he filed his first notice of motion to advance the cause for trial within the five-year bar of *Code of Civil Procedure section 583*. [On] May 7, 1973, Chronicle filed a notice of motion for summary judgment on the ground that the action had been settled, and a motion for judgment on the pleadings. The motion for summary judgment was denied on June 27, 1973, and the motion for judgment on the pleadings was granted on August 13, 1973, unless plaintiff amended the complaint to state a cause of action. Plaintiff filed a second amended complaint on August 22, 1973. Chronicle's demurrer to the second amended complaint was overruled on October 17, 1973.

Plaintiff filed his memorandum that civil case was once again at issue on October 29, 1973, and noticed a motion to advance cause for trial on October 30, 1973. Chronicle answered the second amended complaint on November 7, 1973. Thereafter on November 15, 1973, the trial court denied plaintiff's motion to advance because the at-issue [**771] [***409] memorandum had not been properly filed, and ordered the at-issue memorandum stricken on November 16, 1973.

Plaintiff filed a third at-issue memorandum on December 3, 1973, and noticed a motion to advance cause for trial on December 11, 1973. On December 31, 1973, the trial court denied the motion to advance as to Chronicle and on its own motion dismissed the action against Chronicle pursuant to *Code of Civil Procedure section 583, subdivision (a)*.

Plaintiff's only arguments in the appellate briefs, as well as in argument to the trial court, in support of his motion to advance are that he was ready to proceed to trial and under *Weeks, supra*, the court should have given him a trial date. He makes no showing of excuse for the delay, but merely supports an assertion of due diligence by listing a chronology of the various papers in the court's file. The record in the lower court does not reflect what showing of excuse was made orally at the hearing on the motion to advance. The record reflects that the trial court had good cause to dismiss on its own motion. The plaintiff has failed to meet his burden of showing excusable delay.

[*419] Plaintiff's reliance on *Weeks, supra*, is misplaced; that case is detrimental rather than helpful to his argument. *Weeks* held that: "[A] trial court should not confuse and discredit the law by refusing to set a cause within the five-year period because it believes that a discretionary dismissal is warranted. . . . If a court feels impelled to dismiss an action less than five years after its filing for want of prosecution, it should do so and accept review on that basis. It should not exercise its discretion to dismiss on the basis of inconvenience to the court and in the guise of a refusal to specially set. . . . Fault and delay may be ground for dismissal; but court congestion is no reason to preempt one's day in court when there is a reasonable time to provide it." (*68 Cal.2d at pp. 806-807*.)

It is clear in this case that the trial court followed the dictates of *Weeks* and accepted review on the basis of a discretionary dismissal for want of prosecution under *Code of Civil Procedure section 583, subdivision (a)*, rather than simply refusing to set the cause for trial. The court's order read: "As to defendant Chronicle Publishing Company, again in conformity with the suggestion at the top of Page 808 of the *Weeks* Opinion, I dismiss the Complaint on my own motion, exercising my discretion

under C.C.P. § 583a. Consideration has been given to all the factors mentioned in Court Rule 203.5, with the result that I find the delay in bringing this case to trial as against this defendant to be inexcusable. Justice can be truly served between plaintiff and said defendant only by such dismissal, and I am prepared to accept review on the basis thereof." []

The judgments are affirmed.

# TAB 25

1 of 1 DOCUMENT

**LUIS SANCHEZ, Plaintiff and Appellant, v. LINDSEY MORDEN CLAIMS SERVICES, INC., Defendant and Respondent.**

**No. B123946.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION SEVEN**

***72 Cal. App. 4th 249; 84 Cal. Rptr. 2d 799; 1999 Cal. App. LEXIS 492; 99 Cal. Daily Op. Service 3755; 99 Daily Journal DAR 4761***

**May 19, 1999, Decided**

**SUBSEQUENT HISTORY:** [***1] Review Denied July 28, 1999, Reported at: *1999 Cal. LEXIS 5244.*

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC179212. John P. Shook, Judge.

**DISPOSITION:** The judgment of the trial court is affirmed. Respondent shall recover its costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action by an insured under a cargo policy brought against the claims adjuster retained by the insurer to investigate and adjust plaintiff's loss, in which plaintiff alleged negligent handling of the claim, the trial court sustained defendant's demurrer without leave to amend and dismissed. (Superior Court of Los Angeles County, No. BC179212, John P. Shook, Judge.)

The Court of Appeal affirmed. The court held that an independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract, and is not liable in tort to the insured for alleged negligent claim handling that causes only economic loss. Policy reasons militate against imposing a duty of care to an insured on an insurer-retained adjuster, as does the law of agency. An agent's failure to perform a duty owed to the principal may render him or her liable to third persons who rely on his or her undertaking where there is physical damage to person or property, but where the effect is merely to cause economic loss, the law does not recognize liability to a third person, except where a duty is created by statute. (Opinion by Neal, J., with Lillie, P. J., and Woods, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Negligence § 9--Elements--Duty of Care--Statement of Rules.** --Whether a duty of care is owed is a legal question decided by the court, and it is a question of policy. While courts do not generally make broad policy in the manner of legislatures, they do make policy decisions in the gaps, filling in the open spaces or interstices of the law. Courts deciding questions of duty are engaged in this limited legislative aspect of the judicial function. The policy concerns that govern whether a duty of care should be imposed include the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him or her, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm.

**(2) Adjusters and Private Investigators § 1--Insurer-retained Adjusters--Liability to Insured--Duty.** --In an action by an insured under a cargo policy brought against the claims adjuster retained by the insurer to investigate and adjust plaintiff's loss, in which plaintiff alleged negligent handling of the claim,

the trial court properly sustained defendant's demurrer without leave to amend. An independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract, and is not liable in tort to the insured for alleged negligent claim handling that causes only economic loss. Policy reasons militate against imposing a duty of care to an insured on an insurer-retained adjuster, as does the law of agency. An agent's failure to perform a duty owed to the principal may render him or her liable to third persons who rely on his or her undertaking where there is physical damage to person or property, but where the effect is merely to cause economic loss, the law does not recognize liability to a third person, except where a duty is created by statute.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149.]

**COUNSEL:** Herbert Dodell and Gerald J. Miller for Plaintiff and Appellant.

Arter & Hadden, Wayne S. Grajewski and Michelle McAloon for Defendant and Respondent.

**JUDGES:** Opinion by Neal, J., with Lillie, P. J., and Woods, J., concurring.

**OPINION BY:** NEAL

**OPINION**

[*250] [**800] **NEAL, J.**

SUMMARY

An independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract. The adjuster is not [*251] liable in tort to the insured for alleged negligent claims handling which causes only economic loss.

FACTS AND PROCEEDINGS IN TRIAL COURT

The relevant facts, which appear from appellant Luis Sanchez's first amended complaint, and from a status conference memorandum judicially noticed in the trial court, are as follows: Sanchez was engaged in business, transporting commercial machinery, under the fictitious business name LA Machinery [***2] Moving. Sanchez purchased cargo insurance issued by an underwriter at Lloyd's of London. A commercial dryer was damaged while Sanchez was moving it to Los Angeles. Sanchez made a claim on the cargo policy for repair of the dryer. The damage was capable of repair in one week's time, at a cost of $ 12,000. Sanchez advised that immediate repairs were needed because the dryer's purchaser, Five Star Dye House, was suffering business loss. Lloyd's engaged respondent Lindsey Morden Claims Services, a claims adjuster, to investigate and adjust the loss. Three months passed before the claim was paid and the repairs completed. As a result, the dryer's purchaser sued and in July 1996 obtained a judgment against Sanchez for $ 1,325,000.

Sanchez then sued Lloyds for breach of the cargo policy. Sanchez also sought recovery against Morden, on a negligence theory.

Morden demurred, arguing that it had no contract with Sanchez and owed him no duty of care.

The trial court sustained Morden's demurrer without leave to amend. Sanchez appealed.

DISCUSSION

**(1)** Whether a duty of care is owed is a legal question, decided by the court. (*Bily v. Arthur Young & Co. (1992) 3 Cal. 4th 370, 397 [11 Cal. Rptr. 2d 51, 834 P.2d 745, 48 A.L.R.5th 835]* [***3] [auditor is liable only to his client for negligent preparation of financial statements, and not to third persons who are strangers to the contract].) Further, it is a question of *policy*. (*Bily, supra, 3 Cal. 4th at p. 397; Biakanja v. Irving (1958) 49 Cal. 2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]* [lawyer who renders will void by negligently failing [**801] to have it witnessed owes duty of care to intended sole beneficiary].) While courts do not generally make broad policy in the manner of legislatures, they do make policy decisions in the "gaps," filling in the "open spaces" or "interstices" of the law. (Cardozo, Nature of the Judicial Process (Yale U. [*252] Press 1921) pp. 113-114.) Courts deciding questions of duty are engaged in this limited "legislative" aspect of the judicial function.

An early enumeration of the policy concerns governing whether a duty of care should be imposed appears in *Biakanja v. Irving, supra, 49 Cal. 2d at page 647*, which looked to: "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff

[***4] suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm." (*Biakanja, supra, 49 Cal. 2d at p. 650.*)

In the much more recent *Bily* the Supreme Court conducted an expanded policy analysis. *Bily* involved a claim against auditors by investors who allegedly purchased stock relying on negligently prepared financial reports. The court held that the auditors owed no duty of care to the investors.

Consistent with *Biakanja*, the *Bily* court first examined the relationship between the defendant auditors' conduct and the injury, and the blameworthiness of the auditors' conduct. The court noted that auditors' clients exert extensive control over both preparation and dissemination of financial reports, and that audit reports entail discretionary exercises of judgment. Despite these limits on auditor responsibility for the content of financial reports, auditor liability for negligence could be serious: "Although the auditor's role in the financial reporting process is secondary and the subject of complex professional judgment, [***5] the liability it faces in a negligence suit by a third party is primary and personal and can be massive." (*Bily v. Arthur Young & Co., supra, 3 Cal. 4th at p. 400.*)

This disproportion between fault and injury, in the court's view, militated against imposing a duty of care owed from auditors to investors.

*Bily* also weighed the benefits and costs of a duty on auditors, concluding that a duty was unlikely to enhance deterrence of auditor mistakes, and probably would cause auditors to withdraw their services from some market segments and to increase their charges for services in other segments. The court concluded that the costs of imposing a duty outweighed the benefits. (*Bily v. Arthur Young & Co., supra, 3 Cal. 4th at pp. 404-405.*)

The court also stressed the unreliability of foreseeability, in isolation, as a grounds for imposing a duty, especially where the injury is "intangible" rather than physical. (*Bily v. Arthur Young & Co., supra, 3 Cal. 4th at pp. 398-399.*)

Finally, the court cautioned about the limits of judicial policymaking competency, stating: "In view of the nature of the problem, we refrain from [*253] [***6] endorsing a broad and amorphous rule of potentially unlimited liability that has been endorsed by only a small minority of decided cases. As we recently stated: 'In the absence of clear legislative direction . . . we are unwilling to engage in complex economic regulation under the guise of judicial decisionmaking.' [Citation.]." (*3 Cal. 4th at p. 406.*)

**(2)** The considerations paramount in *Bily* likewise argue against imposing a duty of care owed by insurer-retained adjusters [1] to claimants.

1 We do not in this opinion address the duties of so-called "public adjusters," who are retained by insureds or claimants.

Like the auditors, the insurer-retained adjuster is subject to the control of its clients, and must make discretionary judgment calls. The insurer, not the adjuster, has the ultimate power to grant or deny coverage, and [**802] to pay the claim, delay paying it, or deny it. Further, while the insurer's potential liability is circumscribed by the policy limits, and the other conditions, [***7] limits and exclusions of the policy, the adjuster has no contract with the insured and would face liability without the chance to limit its exposure by contract. Thus the adjuster's role in the claims process is "secondary," yet imposing a duty of care could expose him to liability greater than faced by his principal the insurer.

Imposing a duty also would subject the adjuster to conflicting loyalties. Insurers and insureds often disagree as to coverage or the amount of loss. An adjuster cannot argue both sides of such disputes, any more than a lawyer can represent opposite sides in a lawsuit. An adjuster owes a duty to the insurer who engaged him. A new duty to the insured would conflict with that duty, and interfere with its faithful performance. This is poor policy. (*Gay v. Broder (1980) 109 Cal. App. 3d 66, 75 [167 Cal. Rptr. 123]* [where home loan borrower sued appraiser hired by lender, court held appraiser owed no duty of care to borrower--sound policy precluded subjecting appraiser to a duty conflicting with that owed to the lender who hired the appraiser]; *Felton v. Schaeffer (1991) 229 Cal. App. 3d 229, 234 [279 Cal. Rptr. 713]* [physician [***8] hired by employer to perform preemployment physical owes no duty of care to applicant]; *Keene v. Wiggins (1977) 69 Cal. App. 3d 308, 316 [138 Cal. Rptr. 3]* [doctor hired by workers' compensation insurer to evaluate disability reported employee needed no surgery or treatment; held,

physician owed no duty to the employee].)

Further, as in *Bily*, the costs of imposing a duty of care would outweigh the potential benefits.

The deterrent effect of imposing a duty on adjusters is questionable. Adjusters already are deterred from neglect by exposure to liability to the [*254] *insurer* who engaged them, for breach of contract or indemnity. Only some modest additional deterrence, at most, could be expected from imposing a new duty owed directly to insureds.

Imposing a duty also might benefit insureds by providing another source of recovery for injuries caused by negligent claims handling or investigation. However, in most cases this would be redundant, since the insurer also would be liable for unreasonable investigation or claims handling. Thus making the adjuster directly liable to the insured would, again, confer only a marginal additional benefit.

[***9] Weighing against these modest potential benefits of imposing a duty would be several substantial costs.

Insurance is a highly uncertain and risky endeavor, because it requires accurate predictions about the occurrence and cost of future events. Insurers are able to define and limit the risks, and to set premium levels commensurate with the risks, using complex and nuanced contracts (policies). By contrast, adjusters hired by insurers have no contract with insureds, and thus no ability to define or circumscribe their potential risks or liabilities to insureds. If adjusters faced negligence liability to insureds, market forces would tend to drive adjusting activities in-house, where they could be shielded with contractual exclusions, disclaimers, and limitations. Thus, imposing a duty would reduce, perhaps severely, the offering of independent adjuster services. Yet widespread market acceptance has shown these services to be useful and desirable.

Those adjusters continuing to operate independently despite imposition of a new duty of care would attempt to buy insurance against this liability, or create their own cash reserves, adding these costs to their charges, and passing them [***10] on to the insurers who used the adjusters' services. These insurers, in turn, would add the cost to the premiums charged to insureds. The insureds thus would end up paying more for insurance without obtaining more value because, as noted above, adjuster liability would provide only a redundant source of the recovery usually available from the insurer.

Imposing a duty would significantly depart from existing law. Until now no California case has held insurers' adjusters liable to insureds for negligence. Indeed, negligence is not among the theories of recovery generally available against *insurers* (See Croskey et al., Cal. Practice Guide: Insurance Litigation 2 (The Rutter [**803] Group 1998) PP 12:818, 11:205, pp. 12C-6, 11-48 to 11-49, rev. # 1, 1996), and further, California courts have refused to extend [*255] liability for *bad faith*, the predominant insurer tort, to agents and employees of the insurer. (*Egan v. Mutual of Omaha Ins. Co. (1979) 24 Cal. 3d 809, 824 [169 Cal. Rptr. 691, 620 P.2d 141]* [employees of insurer's independent claims agency "are not parties to the insurance contract and not subject to the implied covenant" of good [***11] faith and fair dealing]; *Gruenberg v. Aetna Ins. Co. (1973) 9 Cal. 3d 566, 576 [108 Cal. Rptr. 480, 510 P.2d 1032]* [insurance adjusting firm and its employees were "total strangers to the contract of insurance" and not subject to the implied covenant of good faith].)

Adjusters doubtless have relied on the existing state of the law, taking no prudent steps to protect against negligence liability. A new rule would defeat their reasonable expectations. While consistency and predictability are not the sole objects of the law, they are important legal values which enable persons and businesses to confidently and productively plan their affairs.

Further, large litigation or transactional costs, and considerable uncertainty, probably would flow from imposition of a new duty. The nature and extent of insurer duties to insureds has been a prolific source of litigation, despite the best efforts of insurers to eliminate litigation-generating issues by drafting complex, flexible, precise policies. Adjuster liability would be an empty slate, upon which the courts would have to write a whole new body of "adjuster liability" law. They would have to do so without the aid [***12] of contracts devised by knowledgeable and imaginative private parties to give structure to the risks. Years surely would pass before the new law of "adjuster liability" was to any extent fleshed out and a degree of certainty restored.

In summary, the policy analysis mandated under *Biakanja* and *Bily* militates against imposing in

California a new duty of care owed by insurer-retained adjusters to insureds.

Our conclusion is also consistent with the general law of agency. An adjuster is an agent hired by a principal, the insurer, to investigate a claim. Agents are not liable to third parties for economic loss: "An agent's mere failure to perform a duty owed to his principal may render him liable to third persons who rely on his undertaking where there is physical damage to person or property. (See Rest.2d, Agency, § 354, and Appendix, Rep. Note, p. 587.) But *where the effect is merely to cause economic loss, the law does not yet recognize liability to a third person*, except where a duty is created by statute. [Citation.]" ( 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149, pp. 144-145, italics added.)

[*256] Our decision is consistent [***13] with the majority of cases in other states, which hold that an independent adjuster hired by the insurer owes no duty of care to the insured. (*Velastequi v. Exchange Ins. Co. (1986) 132 Misc.2d 896 [505 N.Y.S. 2d 779, 782]* [New York]; *Dear v. Scottsdale Ins. Co. (Tex. 1997) 947 S.W.2d 908, 917* [Texas]; *Hill v. Giuffrida (S.D. Miss. 1985) 608 F. Supp. 648, 649* [Mississippi].)

Sanchez relies on cases from Alabama (*Baldwin Mut. Ins. Co. v. Brantley (Ala. 1987) 518 So. 2d 32*) and Alaska (*Continental Ins. Co. v. Bayless & Roberts Inc. (Alaska 1980) 608 P.2d 281*). As best we can tell, none of the defendants in the *Baldwin* case was an adjuster hired by the insurer. FCIC (Federal Crop Insurance Corporation), the claims adjuster involved, was not a defendant in the case. Thus the case does not speak to our issue. *Continental* does squarely impose negligence liability on a claims adjuster, but without offering any analysis as to whether or why a duty should be imposed. *Continental* simply relies on an earlier Alaska case where an insurer's agent was held liable to a third party for *property* [***14] *damage*, not economic damage (See *Continental, supra, 608 P.2d at p. 288.*) As shown above, however, agents are not liable to third parties for purely economic loss.

Thus there is no cogent persuasive authority from other jurisdictions to support imposing a duty.

In addition to the Alaska and Alabama cases, Sanchez relies on several California cases which held that an adjuster could be liable under *Insurance Code section 790.03, subdivision (h)* for economic injury caused by delay in claim [**804] processing. However, as appellant concedes, the Supreme Court later held that *no private right of action* lies under that section, thus abrogating the decisions Sanchez relies on. (*Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal. 3d 287, 304 [250 Cal. Rptr. 116, 758 P.2d 58]* ["Neither *section 790.03* nor section 790.09 was intended to create a private civil cause of action against an insurer that commits one of the various acts listed in *section 790.03, subdivision (h)*."].) The Legislature, of course, could reach a different policy conclusion than we have and pass a statute imposing a duty of care on insurer-retained [***15] adjusters. However, a statutory duty authoritatively construed as providing *no* private right of action supplies no basis for imposing a *common law* private right of action indistinguishable from the barred statutory claim.

[*257] DISPOSITION

The judgment of the trial court is affirmed. Respondent shall recover its costs on appeal.

Lillie, P. J., and Woods, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 28, 1999.

# TAB 26

LEXSEE 37 CAL. APP. 3D 289

**PERRY SCOTT, Plaintiff and Appellant, v. McDONNELL DOUGLAS CORPORATION et al., Defendants and Respondents**

**Civ. No. 41790**

**Court of Appeal of California, Second Appellate District, Division Five**

*37 Cal. App. 3d 277*; *112 Cal. Rptr. 609*; *1974 Cal. App. LEXIS 1132*

**February 14, 1974**

**SUBSEQUENT HISTORY:** [***1] A Petition for a Rehearing was Denied March 6, 1974, and the Opinion was Modified to Read as Printed Above. Appellant's Petition for a Hearing by the Supreme Court was Denied April 10, 1974.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. WEC 22094, Laurence J. Rittenband, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A former city manager brought an action against a corporation and members of the city council, seeking damages for defamation, for interference with a contractual relationship, and for the intentional infliction of emotional distress. The trial court sustained defendants' demurrers, with leave to amend only as to the cause for interference. Plaintiff failed to amend, and judgment of dismissal was entered. The action was based on letters to plaintiff, signed by defendant councilmen, one of whom was an employee of defendant corporation and allegedly acted as its agent. The letters, criticizing plaintiff's performance of his work, were read at a council meeting and copies were given to persons in the audience. Prior publication of two of the letters to other persons, outside the council chambers, was also alleged. The cause of action for intentional infliction of emotional distress further alleged that the corporation had falsely and maliciously charged plaintiff with rigging polygraph examinations, electronic surveillance of city employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees. (Superior Court of Los Angeles County, No. WEC 22094, Laurence J. Rittenband, Judge.)

The Court of Appeal affirmed, holding that the matters occurring in connection with the council meeting fell within the privilege provided by *Civ. Code, § 47, subd. 2*, to publications and broadcasts made in legislative proceedings. The court further viewed the allegedly defamatory statements as criticism of a public officer relating to his fitness, and it cited the principle that mere expression of opinion or severe criticism is not libelous though it adversely reflects on the fitness of an individual for public office. As to the additional defamatory matters alleged in support of the claim of intentional infliction of emotional distress, the court noted the lack of any allegation of publication. In conclusion, the court found that the complaint on its face showed justification for inducing breach of contract, in that plaintiff was a public official, and the efforts directed to obtaining the termination of his services were by way of the expression of defendants' views of plaintiff's fitness and qualifications for office. (Opinion by Stephens, Acting P. J., with Ashby and Hastings, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to McKinney's Digest

**(1) Libel and Slander § 29(0.5)--Privileged Communications--Absolute Privilege--Legislative Proceedings.** --Absolute immunity attaches to statements made before a legislative body, and the existence of malice on the part of the declarant will not

defeat the privilege when it is shown that the statement which is alleged to be defamatory bears some connection to the work of the legislative body.

**(2) Libel and Slander § 29(0.5)--Privileged Communications--Absolute Privilege--Legislative Proceedings.** --Allegedly defamatory statements in letters written by city council members to the city manager were privileged under *Civ. Code, § 47, subd. 2*, relating to publications or broadcasts in legislative proceedings, and the reading of such letters at a council meeting and the distribution of copies to members of the audience attending the meeting were also privileged, where the letters adequately related to the retention of the city manager, an employee whose appointment and removal, as well as continuing review of his performance and qualifications, were the responsibility of the city council.

**(3) Libel and Slander § 29(0.5)--Privileged Communications--Absolute Privilege -- Legislative Proceedings.** -- The immunity historically afforded to legislators as to otherwise defamatory statements does not impose a restriction that the statements made by a member of a legislative body are protected only if they are directed toward achieving the object of legislation. Rather, such general immunity extends to all that is spoken or done in the course of legislative proceedings, and it attaches also to interested members of the public who wish to address themselves to matters pending before a legislative body.

**(4a) (4b) Libel and Slander § 30(4)--Privileged Communications--Qualified Privilege--Criticism of Candidates, Officers and Official Acts.** --In a libel action by a former city manager against city councilmen and others based on alleged defamatory statements in letters written by the councilmen to the manager and read at a city council meeting, plaintiff could not rely on prior publication of the statements to persons outside the city council chambers, where, at the time of the utterances and publications complained of, plaintiff was a public official appointed by the council, and where no reading of the statements would justify plaintiff's claim that he was exposed to hatred, contempt or ridicule. An individual who seeks or accepts public office invites, and is properly subject to, public criticism so far as it may relate to his fitness and qualifications for his office, and severe criticism is not libelous though it adversely reflects on the fitness of an individual for public office.

**(5) Libel and Slander § 82 -- Actions -- Trial -- Province of Court and Jury.** --In a libel action, the court must determine as a matter of law whether the publication is libelous per se. If it is determined that the publication is susceptible of a defamatory meaning and also of an innocent and nondefamatory meaning it is for the jury to determine which meaning would be given to it by the average reader, but when the material published is unambiguous and in the court's opinion could not reasonably be understood as nondefamatory the issue of libel should not be submitted to the jury.

**(6) Libel and Slander § 23 -- Actionable Words -- Construction of Language Used.** --In determining the issue of defamation, the publication in question must be considered in its entirety; it may not be divided into segments and each portion treated as a separate unit. It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader, and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it.

**(7) Torts § 4.2--Intentional Infliction of Emotional Distress.** --A former city manager could not successfully base a cause of action against a corporation for intentional infliction of emotional distress on allegations that a city councilman, as agent of the corporation, had falsely and maliciously charged him with rigging polygraph examinations, electronic surveillance of city employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees, where the complaint failed to allege that such statements were ever published or made known to any third persons, and where, under the facts of the case, the conduct charged was not sufficiently outrageous as a matter of law to distress a reasonable man of ordinary sensibilities.

**(8a) (8b) Interference § 1(2)--With Contract Relations--Actions.** --The trial court properly sustained a demurrer to a cause of action by a former city manager alleging that defendant corporation had conspired with certain members of the city council to induce the council to terminate plaintiff's employment contract with the city or make the performance of his duties more difficult, where the complaint showed on its face that plaintiff was a public official, and the efforts directed to obtaining the

termination of his services were by way of the expression of defendant's views of plaintiff's fitness and qualifications for office. To some degree, a public official assumes his office subject to the vicissitudes of public opinion, and, to the extent that the changing mood of public opinion operates to interfere with his right to employment, he may not recover in tort under a theory of inducing breach of contract.

**(9) Interference § 1(1)-- With Contract Relations.** -- The elements of a cause of action for inducing breach of contract are the existence of a valid contract, the defendant's intent to induce a breach of the contract, and a breach resulting from the defendant's unjustifiable or wrongful conduct.

**(10) Interference § 1(1)-- With Contract Relations -- Justification.** -- Whether intentional interference with a contractual relationship by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances, including the nature of the actor's conduct and the relationship between the parties.

**COUNSEL:** Perry Scott, in pro. per., for Plaintiff and Appellant.

Brill, Hunt, DeBuys & Burby, John R. Johnson, Louis Lieber, Jr., Eberhard Schmoller and James J. McCarthy for Defendants and Respondents.

**JUDGES:** Opinion by Stephens, Acting P. J., with Ashby and Hastings, JJ., concurring.

**OPINION BY:** STEPHENS

**OPINION**

[*281] [**611] Plaintiff Perry Scott appeals from an order of dismissal of his third amended complaint. The complaint sought damages for "defamation; interfering with a contractual relationship; and suffering and emotional distress" while plaintiff was City Manager of the City of Santa Monica. Prior to the dismissal, the court had sustained defendants' demurrer on grounds of uncertainty and for failure to state a cause of action without leave to amend plaintiff's first and third causes of action (defamation, emotional distress and mental suffering, [**612] [***2] respectively), and with leave to amend his second cause of action (interference with a contractual relationship). Plaintiff failed to amend.

*The Complaint*

In essence, the third amended complaint alleges the following: Prior to publication of the matter complained of, plaintiff enjoyed a good reputation in the community with respect to the high standards of his occupation and the excellence and quality of his work and services rendered to the City of Santa Monica. For sometime prior to December 10, 1970, and subsequent thereto, defendant McDonnell Douglas Corporation by and through its officers, agents, servants and employees (Hochmuth, Latting, and McCloskey) [1] and defendant-Councilmen Hoover, Kingsley and Patton (and a number of Does) unlawfully, intentionally, maliciously and willfully conspired, combined and agreed to enter into a scheme to defame the plaintiff's name and reputation and to cause plaintiff's removal or resignation as city manager. The reason for the conspiracy against plaintiff was [*282] because plaintiff was and is an impediment to a zoning ordinance change which would permit a commercial development of McDonnell Douglas' property and property of [***3] the City of Santa Monica as to which McDonnell Douglas has an option to purchase. The zoning ordinance would increase the value of McDonnell Douglas' property from $ 8,000,000 to more than $ 20,000,000. Councilmen Hoover, Kingsley and Patton, and McDonnell Douglas' agent, McCloskey, did the acts complained of "in excess of their authority and outside the scope of their duties as members of the City Council."

1 John W. McCloskey, referred to throughout by defendant as McDonnell Douglas' "agent," is a member of the Santa Monica City Council and he is also in the employ of McDonnell Douglas.

The first cause of action (for defamation) names as defendants McDonnell Douglas, Councilmen Hoover, Kingsley, and Patton (and a number of Does), and alleges that in pursuance of the conspiracy, defendants "without immunity and without privilege published three defamatory letters [2] about and concerning [plaintiff]." The second cause of action (interference with a contractual relationship) names only McDonnell Douglas and [***4] the Doe defendants, and alleges that in addition to the publication of the defamatory letters, defendants "in furtherance of their conspiracy and without due process or the consent of [plaintiff] caused the termination of appellant's contract with the [City] and

the reduction of his salary in the amount of $ 6,000 per year, making performance by [plaintiff] more expensive and burdensome in a coercive attempt to force [plaintiff's] resignation." The third cause of action for "mental suffering and emotional distress" names as defendants McDonnell Douglas (and Does) and alleges that "in addition to the acts of unjustifiable interference with plaintiff's contractual relationship, [McDonnell Douglas'] agent, on the 17th day of December, 1970, in pursuance of the conspiracy directed the republication of the letters alleged to be defamatory, and on the 9th day of February, 1971, in continuance of the conspiracy, falsely and maliciously charged [plaintiff] with rigging polygraph examinations, electronic surveillance of city employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees."

2 The specific portions upon which plaintiff bases his three causes of action are discussed *infra.*

[***5] In brief, on or about December 17, 1970, at a meeting of the Santa Monica City Council, defendant Councilman Patton handed to Gene Hall, 3 [*283] Richard Aronoff, service director for the city, and Earl Reinbold, the city chief of police (who were in the audience) copies of a letter dated December 10, 1970, which he had addressed to plaintiff, and then Patton distributed copies to members of the council, the city clerk, and to plaintiff. According [**613] to plaintiff, this letter, among other things, charges him with a lack of moral and ethical character: "I know it can well become the attitude of a dictatorial 'boss' that, having title, you will stoop to any form of action in your power to continue your stay in office."; that plaintiff seeks to impose totalitarian power maintained only through the use of force: "Your past experience in other cities should have proven to you that you cannot be a dictator in a democratic city, even if you are the City Manager and have the power of appointment of the Chief of Police." "For the record I want you, the City Manager, and each of your employees to understand that as long as I serve this city as a City Councilman I will not be [***6] horse-whipped or hog-tied by you or any of your employees for doing my duty." "So you choose to write me a letter, releasing a copy to the press, in which you assume the position of not only City Manager but City Attorney, as well as City Dictator."; and charges plaintiff with unethical conduct: "I find it impossible to believe that a City Councilman of this city is required to sit idly by and succumb to malicious character assassination by an employee of that Council, of which he is a member, because he chooses to know what is going on in the various departments of the city."

3 According to plaintiff, Hall is a reporter for the Santa Monica City Outlook.

Plaintiff alleges that the second defamatory letter, dated December 17, 1970, addressed to him, was prepared by McDonnell Douglas through its "agents" Hochmuth, Latting, and McCloskey in the executive offices of McDonnell Douglas; that this letter was initially published to Peggy Ann Prentice and Alice Hynd; 4 and that this publication was not during a meeting [***7] of the city council (though plaintiff did not set forth where the publication did in fact occur). Subsequent to the initial publication of this letter, McCloskey delivered it to Hoover, with directions to her to read the contents at the city council meeting, and Hoover read the contents [*284] into the record of the meeting, This letter, signed by Councilmen Hoover, Kingsley, McCloskey, and Patton, was a letter of "censure and reprimand," which stated, among other things: "The City Council views with grave concern your complete lack of empathy and understanding of the processes of government in this city. You have failed to recognize that the City Manager has the responsibility to execute the policies laid down by the City Council.

4 Defendants raise the point that Prentice and Hynd are secretaries, thus accounting for the fact of the initial limited publication to these two individuals. However, the status of these two parties is not set forth in plaintiff's complaint. Whether the publication to Prentice and Hynd was privileged is an issue which can only be raised by way of an affirmative defense. ( *Pavlovsky v. Board of Trade, 171 Cal.App.2d 110 [340 P.2d 63].*) However, if the communication itself is privileged, the method of publication will also be privileged if it is reasonable and appropriate under the circumstances. (Prosser, The Law of Torts (4th ed.) § 115, p. 793.)

[***8] "Your statement showed no understanding of the problems faced by the Council in reaching its decision. However, of a more serious nature is that it indicated the mutinous character to which your administration of the City's affairs has descended."

Plaintiff alleges that the third allegedly defamatory letter (dated December 17, 1970, addressed to plaintiff, and signed by the same four councilmen) was also prepared by McDonnell Douglas' "agents" Hochmuth, Latting, and McCloskey in the executive offices of McDonnell Douglas; it was also initially published to Prentice and Hynd. Subsequent to that publication, McCloskey delivered the letter to Kingsley, with directions for Kingsley to read its contents at the city council meeting of. [**614] December 17. Plaintiff contends that portions of the third letter defamed him in that the letter portrayed him as dishonest: "A city is most fortunate if it has a City Manager who is dedicated to efficiently and honestly administer the affairs of the City for the people and through the people's elected representatives -- the City Council. The people of Santa Monica are not so fortunate."; and that plaintiff has committed prior misconduct: [***9] "It appears you are reluctant to learn from your past mistakes. Therefore this Council feels it is necessary to take written action rather than repeated verbal communication when you continue to use the power of your administrative office to influence the legislative functions of government (the City Council)."

Plaintiff's second cause of action is premised upon the tort of interference with a contractual relationship, and alleges that McDonnell Douglas, through its agents McCloskey, Latting and Hochmuth, conspired with members of the Santa Monica City Council to terminate plaintiff's contractual relationship with the city and reduce his salary $ 6,000 per year in an attempt to coerce plaintiff to resign from his position; that he was so terminated and his salary was so reduced.

Plaintiff's third cause of action sounds also in tort. Liability is predicated upon the theory of intentional infliction of emotional distress, based in large part upon the publication of the statements alleged to be defamatory in the first cause of action. Plaintiff further alleges that certain other statements [*285] were made which caused him emotional distress, i.e., "that . . . John W. McCloskey [***10] as the agent, servant and employee of McDonnell Douglas Corporation falsely and maliciously charged Plaintiff with rigging polygraph examinations, electronic surveillance of City employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees."

We treat the demurrer as admitting all material facts properly pleaded, but not the contentions, deductions, or conclusions of fact or law. We also consider matters which may be judicially noticed. ( *Serrano v. Priest, 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].*)

The judgment in favor of defendants must be affirmed since *Civil Code section 47, subdivision 2* [5] provides an immunity under the instant circumstances, and in any case, the allegedly defamatory letters were as a matter of law not libelous per se.

5 *Civil Code section 47, subdivision 2*, in pertinent part provides: "A privileged publication or broadcast is one made -- . . . 2. In any (1) legislative . . . proceeding . . ."

[***11] The essential rights and privileges of a legislative body and/or its individual members to be free from the threat of civil suits arising out of discussions in legislative proceedings derives in the main from the English Bill of Rights granted by William and Mary in 1688. [6] In California, this freedom from liability for statements made before a legislative body is codified in *section 47 of the Civil Code*. The privilege provided by *section 47* (subd. 2) has been held to be absolute. ( *Albertson v. Raboff, 46 Cal.2d 375, 379 [295 P.2d 405]*; *Goodley v. Sullivant, 32 Cal.App.3d 619, 623 [108 Cal.Rptr. 451].*) **(1)** Absolute immunity attaches to statements made before a legislative body, and the existence of malice on the part of the declarant will not defeat the privilege (Rest., Torts, § 586, com. a) when it is shown that the statement which is alleged to be defamatory bears some connection to the work of the legislative body. As stated in *Thornton v. Rhoden, 245 Cal.App.2d 80, 90 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152]*: "A rule which requires the demonstration of some connection with the proceedings, yet dispenses with the requirement [**615] of relevancy, [***12] materiality or pertinency, in their technical sense appears to us not only to be a fair compromise between the competing considerations involved, but to be the one adopted by the Restatement of Torts and by at least two decisions in this state. [Citations.]" **(2)** In the instant case, the allegedly [*286] defamatory statements have a clear connection with the work of the legislative body (the Santa Monica City Council) [7] in that they relate to the retention of an employee whose appointment and removal, as well as continuing review of his performance and qualifications, were the responsibility of the city council. The reading of

the letters at the city council meeting was privileged, as was the distribution of copies of the letters to members of the audience (including the press) attending the council meeting. ( *Hancock v. Burns, 158 Cal.App.2d 785, 793 [323 P.2d 456]*; cf. *Harmer v. Superior Court, 275 Cal.App.2d 345 [79 Cal.Rptr. 855]*.) Once it is determined that a matter is privileged, the method of publication is privileged as long as it is reasonable and appropriate under the circumstances. (Prosser, The Law of Torts (4th ed.) § 115, p. 793; see also [***13] *Dombrowski v. Eastland, 387 U.S. 82 [18 L.Ed.2d 577, 87 S.Ct. 1425]*; *Kilbourn v. Thompson, 103 U.S. 168 [26 L.Ed. 377]*; Yankwich, *The Immunity of Congressional Speech, Its Origin, Meaning and Scope*, 99 U.Pa.L.Rev. 960.) [8]

6 1 Wm. & Mary, sess. 2, ch. 2, in pertinent part: "[Freedom] of speech, and debates or proceedings in Parliament, ought not to be impeached or questioned in any court or place out of Parliament."

7 The privilege provided in *section 47, subdivision 2*, is broad and comprehensive, including proceedings of all legislative bodies, whether state or municipal. ( *Pettitt v. Levy, 28 Cal.App.3d 484, 488 [104 Cal.Rptr. 650]*; *Kelly v. Daro, 47 Cal.App.2d 418, 421 [118 P.2d 37]*.)

8 The Brown Act ( *Gov. Code, § 54950 et seq.*) requires legislative bodies of local agencies to meet in open and public sessions. It is the law's intent that deliberation as well as action occurs openly and publicly. ( *Sacramento Newspaper Guild v. Sacramento County Bd. of Suprs., 263 Cal.App.2d 41, 47 [69 Cal.Rptr. 480]*.) It would be inconsistent with the spirit of the Brown Act to on the one hand require that legislators operate in a public forum, yet on the other hand, make them vulnerable to a potential civil sanction which would restrict their freedom of expression.

[***14] Plaintiff's reliance upon *Bradley v. Hartford Acc. & Indem. Co., 30 Cal.App.3d 818 [106 Cal.Rptr 718]* is misplaced. That case involved a defamation action arising out of libelous statements relative to a personal injury action contained in an extrajudicial document filed in both the Nevada Supreme Court and in the district court where the personal injury suit was to be tried. In *Bradley*, the court held (at p. 826): "It is conceded that, due to filing the documents with the courts, 'some relationship' can be established between the publication of the contents of these documents and the action itself. However, as indicated before, the fulfillment of this requirement, standing alone, does not sustain an absolute privilege. This is particularly true in the instant case where there is nothing contained in the pleadings to suggest that the publication was made to achieve the objects of the litigation. On the contrary, it affirmatively appears in the Complaints that the documents in question were filed as a part of a conspiracy for the sole purpose of having the defamations contained therein [*287] republished by the news media, that is, to bring the defamatory matter [***15] within the protective shield of the absolute privilege and then to spread it with impunity. It is easily discernible what result would ensue should we condone such an apparent ruse by providing absolute immunity to the resourceful slanderer. The privileged defamation, now a barely tolerated exception, would gain full-fledged legitimization. All that the slanderer would have to do to avoid the consequences of his evil act would be to file the defamatory matter with the court first, then republish it as an absolutely privileged matter to the news media or to the public at large, thereby converting the litigation in the court into litigation in the press or in the street.

"The above consideration all the more compels the conclusion that in determining [**616] whether or not the defamatory publication should be accorded an absolute privilege, *special emphasis must be laid on the requirement that it be made in furtherance of the litigation and to promote the interest of justice*. Only if this requirement has been satisfied, is it appropriate for the courts to define liberally the scope of the term 'judicial proceeding' and the persons who should be regarded as litigants or other [***16] participants." (Italics is original.)

It is clear that in *Bradley*, resort to the court was merely sought as a subterfuge by which the defamatory statements were introduced to the public through the news media, and by which those defendants hoped to immunize themselves against the prospect of liability for the publication of the defamatory material. Plaintiff attempts to analogize that situation with the instant controversy, asserting the principle that the existence of an ulterior motive [9] is sufficient to defeat the privilege even where some connection with a legislative proceeding is shown. We disagree. We note that while the court in *Bradley* conceded that "some relationship" existed between the defamatory statements and the court

proceeding, it was at most superficial. Accepting the fact that in *Bradley* the court saw some remote connection, we do not construe that court's analysis as contrary to the result we reach here. In *Bradley*, the court based its decision on the determination that "the defamatory statements here were not uttered on a privileged occasion, nor did they aim at securing the litigants as other participants the utmost freedom of access to [***17] the court. But most of all, [*288] they were not made *to achieve the objects of the litigation* and to promote the unfettered administration of justice." (*30 Cal.App.3d 818, 828*; italics added.) In the instant case, we find that the contents of the letter adequately related to the matter before the council. **(3)** Moreover, we recognize that the immunity historically afforded to legislators does not impose a restriction that the statements made by a member of a legislative body are protected only if they are directed toward achieving the object of legislation. Rather, the rule appears well settled that the general immunity afforded legislators extends to all that is spoken or done in the course of legislative proceedings. ( *Powell v. McCormack, 395 U.S. 486, 502 [23 L.Ed.2d 491, 505-506, 89 S.Ct. 1944].*) The rationale for this extended coverage is that such immunity is essential in that freedom of speech "is inherent in the idea" of a deliberative assembly. (Veeder, *Absolute Immunity in Defamation*, 10 Colum.L.Rev. 131.) While this rule has been subject to some palpable abuses, [10] the benefits far outweigh a narrow interpretation of *Civil Code section 47*, even though [***18] it countenances vehement, caustic, and at times vigorous attacks on government officials. (Cf. *New York Times Co. v. Sullivan, 376 U.S. 254, 270 [11 L.Ed.2d 686, 700, 89 S.Ct. 710, 95 A.L.R.2d 1412].*) This immunity attaches also to interested members of the public who wish to address themselves to matters pending before a legislative body. ( *Pettitt v. Levy, supra, 28 Cal.App.3d 484, 488*; *Whelan v. Wolford, 164 Cal.App.2d 689 [331 P.2d 86].*) Since we hold that the statements made and copies of the letters distributed at the city council meeting were privileged, plaintiff's predication of liability upon their utterance and/or distribution *at that* time must fail.

9 Attempts to impose liability upon legislators because of their motives for enacting legislation or proposing business for the Legislature have been continually rejected by the courts. As stated by Justice Frankfurter in *Tenney v. Brandhove, 341 U.S. 367, 377 [95 L.Ed. 1019, 1027, 71 S.Ct. 783]*: "Legislators are immune . . . not for their private indulgence but for the public good . . . . [That] it was not consonant with our scheme of government . . . to inquire into the motives of legislators, has remained unquestioned."

[***19]

10 See, e.g., Yankwich, *The Immunity of Congressional Speech, Its Origin, Meaning and Scope, supra*, 99 U.Pa.L.Rev. 960, 970-973.)

**(4a)** Plaintiff contends that in any event the publication of the allegedly defamatory [**617] statements to Prentice and Hynd outside of the council chambers was not subject to the immunity provided in *section 47*, and thus the trial court erred in sustaining the demurrers to the complaint at least insofar as these two publications are concerned. We disagree. **(5)** Before an action in defamation may be maintained, the tests set forth in *Patton v. Royal Industries, Inc., 263 Cal.App.2d 760, 765 [70 Cal.Rptr. 44]* must be satisfied: "Upon the cause of action for libel a primary question was whether the publication is libelous on its face. ( *MacLeod v. Tribune Publishing Co., 52 Cal.2d 536* . . .; *Cameron v. Wernick, 251 Cal.App.2d 890, 893* . . . .)

[*289] "The question is one of law. The test is whether in the mind of the average reader the publication, considered as a whole, could reasonably be considered as defamatory. [Citations.]

[***20] "The court must determine as a matter of law whether the publication is libelous per se. If it is determined that the publication is susceptible of a defamatory meaning and also of an innocent and nondefamatory meaning it is for the jury to determine which meaning would be given to it by the average reader. [Citations.]

"When the material published is unambiguous and in the court's opinion could not reasonably be understood as nondefamatory the issue of libel should not be submitted to the jury. [Citations.]"

**(4b)** At the time of the utterances and publications complained of, plaintiff was a public official appointed by the Santa Monica City Council. An individual who seeks or accepts public office invites and is properly subject to public criticism so far as it may relate to his fitness and qualifications for his office. As stated in *Eva v. Smith, 89 Cal.App. 324, 329 [264 P. 803]*: "The right of criticism rests upon public policy and those who seek office should not be supersensitive or too thin-skinned

concerning criticism of their qualifications (Newell on Libel and Slander, 4th ed., p. 536). In commenting upon a published article of the character here involved [***21] the supreme court of Nebraska * used the following apt language: 'It relates to the fitness of those who adhere to the ruling clique and their conduct in office. It imputes no crime to them. It employs no degrading or insulting epithets toward them, but in extravagant language denounces them as derelict in the duties of their office, unfit, unfaithful, etc. This we understand a political stump orator may do, and outside of ethics there is no rule against using the pulpit for a like purpose. It would be absurd to hold as libelous to say of a candidate for public office that he was utterly unworthy of public confidence. To maintain that proposition, all political arguments are advanced against a candidate. They are sometimes rambling but the law does not undertake to punish the man who sums them up in a single sentence.' ( *Arnold v. Ingram, 151 Wis. 438* [Ann. Cas. 1914C, 976, *138 N. W. 111].*) And, again, it has been said that it is one of the infelicities of public life that a public officer is thus exposed to critical and often unjust comment; but these, unless they pass the bounds of what the law will tolerate, must be borne for the sake of maintaining free speech. ( [***22] *Sillers v. Collier, 151 Mass. 50 [6 L. R. A. 680, 23 N. E. 723].*) The purpose of the [*290] rule permitting fair and honest criticism is that it promotes the public good and hence is based upon public policy. (*Trigg* v. *Sun Printing Assn., supra.*) In thus permitting criticism the law gives a wide liberty, there being an honest regard for the truth. Within this limit public journals, speakers, and private individuals may express opinions and indulge in criticism upon the character or habits, or mental or moral qualifications [**618] of official candidates (1 Cooley on Torts, p. 443)."

* *Sic*; actually, the Supreme Court of Wisconsin.

Thus, "it is settled law that mere expression of opinion or severe criticism is not libelous, even though it adversely reflects on the fitness of an individual for public office." ( *Yorty v. Chandler, 13 Cal.App.3d 467, 472-473 [91 Cal.Rptr. 709].*) In *Taylor v. Lewis, 132 Cal.App. 381, 385 [22 P.2d 569]*, such statements were not deemed to be libelous per se: ". . . . [Defendant's] opinion was that '[plaintiffs] did not consistently serve the best interest of the city'; that as members of the majority [***23] group 'they usurped the functions of the city manager, dictated appointments in violation of the charter, and forced out of office useful employees of the city'; that they 'had as little respect for sound business usage in their conduct of city affairs as they showed for the charter and the merit system in municipal service'; that they did not always 'take the highest and best bids when selling, and the lowest and best when buying'; that they 'lacked that conscientious regard for the city's interest which makes of public office a public trust'; that by reason of the presence of plaintiff and his associate on the council 'this city has suffered from a lack of confidence in' it, and that business concerns 'have not felt that they could bid on municipal contracts and be sure of receiving impartial consideration,' and that 'they [business concerns] have felt that business with the city has not been on a strictly business basis'; that the 'condition,' in defendant's opinion, 'has hurt the good name of Long Beach and retarded its progress at a time when projects of major importance were to be carried forward.'"

Similarly, in *Eva v. Smith, supra* (at pp. 326-327), the following [***24] statements were held not to be defamatory per se: "'[My defendant's] desire to see the City of San Mateo advance systematically and along fair and honest businesslike lines compels me to state that these two incumbents [plaintiffs] should not be returned to the City Council.

"'They have neither the zeal nor the temperament to administer the business of San Mateo under the present charter, as it should be administered.

"'The best interests of San Mateo require the election . . . of . . . men who are in sympathy with progressive and wholesome measures for the advancement of the City of San Mateo.

[*291] "'. . . I am strongly in favor of keeping the City Council free from any suspicion or taint of unfairness in the City's contracts. No contractor should be influenced to buy from any one particular firm.'"

We do not perceive any substantial material difference between the statements found not to be defamatory in *Taylor* and *Eva*, and the allegedly defamatory statements in the instant case. Any reading of the statements would not justify plaintiff's claim that he was exposed to hatred, contempt or ridicule. **(6)** (See fn. 11.) (See *Greenbelt Pub. Assn. v. Bresler* [***25] *, 398 U.S. 6, 13-14 [26 L.Ed.2d 6, 14-15, 90 S.Ct. 1537]; Corman v. Blanchard, 211 Cal.App.2d 126, 131-132 [27 Cal.Rptr. 327].*) [11] The fact that plaintiff takes umbrage at the tone and level of criticism directed against him is

not sufficient to sustain an action for defamation. The statements in the instant controversy should be considered in the light of the [**619] usual political hyperbole customarily encountered when political figures clash on controversial public matters. An individual in this country has the right to severely criticize the performance of public officials. ( *Yorty v. Chandler, supra, 13 Cal.App.3d 467, 473.*)

11 "In determining the issue of defamation the publication in question must be considered in its entirety; '[it] may not be divided into segments and each portion treated as a separate unit.' [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it. [Citation.] If the publication so construed is not reasonably susceptible of a defamatory meaning and cannot be reasonably understood in the defamatory sense pleaded, the demurrer was properly sustained. [Citations.]"

[***26] **(7)** Our disposition of the first cause of action (defamation) also resolves the issues relative to the third cause of action (intentional infliction of emotional distress. ( *Pettitt v. Levy, 28 Cal.App.3d 484, 489 [104 Cal.Rptr. 650].*) Both causes of action were essentially premised upon the publication of the same statements, except those statements alleged to have caused plaintiff emotional distress which were made on or about February 9, 1971, and charged plaintiff with rigging polygraph examinations, electronic surveillance of city employees and council meetings, spying on council members, and the use of undue influence on city employees. However, as to these latter utterances the complaint fails to allege that these statements were ever published or made known to any third person. Thus an action in defamation would not lie, there being no publication. ( *Harris v. Zanone, 93 Cal. 59, 69 [28 P. 845].*) Nor, under the facts in this case, is the conduct charged sufficiently outrageous as a matter of law, such as would distress a reasonable man of ordinary sensibilities. (Prosser, The Law of Torts, *supra,* § 12, p. 59.) Thus, an action [*292] for intentional [***27] infliction of emotional distress would not lie for the mere utterance of these statements.

**(8a)** Plaintiff's second cause of action sounds in intentional interference with a contractual relationship, i.e., inducing breach of contract. [12] Plaintiff alleges that McDonnell Douglas, through its agents Hochmuth, Latting, and McCloskey, conspired with certain members of the city council [13] to induce the council to terminate plaintiff's employment contract with the city and/or make the performance of his duties as city manager more difficult.

12 We read plaintiff's complaint liberally. Were we to restrict our review of the trial court's sustaining of the demurrer to the second cause of action to the statements read to the council and prepared by defendants, we would be compelled to affirm on the basis of *Pettitt v. Levy, supra, 28 Cal.App.3d 484, 489.* However, we treat the demurrer as establishing the existence of a concerted plan to oust plaintiff from his position as city manager. This presents the question of imposition of liability under a theory of inducing breach of contract between a public official and his employer, the governmental entity.

[***28]

13 The city-councilmen defendants in the first cause of action were not named as defendants in this (or the third) cause of action.

**(9)** The elements of a cause of action for inducing breach of contract are the existence of a valid contract, defendants' intent to induce a breach of the contract, and a breach resulting from defendants' unjustifiable or wrongful conduct. ( *Freed v. Manchester Service, Inc., 165 Cal.App.2d 186, 189-190 [331 P.2d 689].* The last element is the critical one here, for the issue on appeal is whether the complaint on its face showed justification for inducing breach of contract. **(10)** The general definition of what constitutes justification or privilege is set forth in *Herron v. State Farm Mutual Ins. Co., 56 Cal.2d 202, 206 [14 Cal.Rptr. 294, 363 P.2d 310]*, where the court stated: "Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature [***29] of the actor's conduct and the relationship between the parties." (See also *Bledsoe v. Watson, 30 Cal.App.3d 105, 108 [106 Cal.Rptr. 197].*) **(8b)** In the instant case, it fully appears from the face of the complaint that plaintiff is a public official, and the

efforts directed to obtaining the termination of his services were by way of the expression of defendants' views of plaintiff's fitness and qualifications for office. We have already held that such criticism directed to public officials is not actionable. [**620] We do not view this policy so narrowly that it does not encompass reasonable efforts by interested members of the public to *remove* public officials who, in the public's eyes, do not perform their [*293] duties in a satisfactory manner. In such cases, the privilege provided in *section 47* operates to promote the public interest that public officials remain accountable for their activities while in office. To some degree, a public official assumes his office subject to the vicissitudes of public opinion. And to the extent that the changing mood of public opinion operates to interfere with his right to employment, he may not recover in tort under a theory [***30] of inducing breach of contract. *Bledsoe v. Watson, supra, 30 Cal.App.3d 105, 110* is ample authority upon which to sustain the judgment of the trial court.

The judgment is affirmed.

# TAB 27

1 of 1 DOCUMENT

**PHILLIP SERETTI et al., Cross-complainants and Appellants, v. SUPERIOR NATIONAL INSURANCE COMPANY, Cross-defendant and Respondent.**

**No. B106505.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION FOUR**

*71 Cal. App. 4th 920*; *84 Cal. Rptr. 2d 315*; *1999 Cal. App. LEXIS 367*; *99 Cal. Daily Op. Service 3087*; *99 Daily Journal DAR 3965*

**April 28, 1999, Decided**

**SUBSEQUENT HISTORY:** [***1] Review Denied July 21, 1999, Reported at: *1999 Cal. LEXIS 4883.*

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC127835. Madeleine I. Flier, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Certain individuals brought an action against the two shareholders of a close corporation arising out of injuries to employees of the corporation that occurred while they were working at the residence of the shareholders. The corporation's workers' compensation carrier settled the action, and the shareholders cross-complained against the carrier alleging bad faith in failing to defend the action against them and for entering a settlement adverse to them. The trial court sustained the carrier's demurrer to the cross-complaint and entered judgment thereon. (Superior Court of Los Angeles County, No. BC127835, Madeleine Flier, Judge.)

The Court of Appeal affirmed. The court held that the shareholders lacked standing to pursue the bad faith action, since they were not parties to the insurance contract, and privity of contract is essential to an implied covenant action against the insurer. The insured under the policy was the corporation, and the policy covered all officers and directors as employees, but expressly excluded the two shareholders. The shareholders could not achieve privity by piercing the veil of their own corporation to substitute themselves for the corporation as insureds. The court held that if the shareholders asserted an indemnification claim against the corporation, then that claim could be tendered to the insurer, but until such time, the insurer had no duty to defend and could not be charged with bad faith. (Opinion by Curry, J., with Epstein, Acting P. J., and Hastings, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Insurance Contracts and Coverage § 109--Liability of Insurer--Duty to Act in Good Faith--Defense of Insured--Duty to Shareholders of Insured Close Corporation.** --In an action against the two shareholders of a close corporation arising out of injuries to two employees of the corporation that occurred while they were working at the shareholders' residence, in which the corporation's workers' compensation carrier settled the case and the shareholders cross-complained against the carrier for bad faith in failing to defend the action and for entering a settlement adverse to the shareholders, the trial court properly sustained the carrier's demurrer to the shareholders' cross-complaint. The insured under the policy was the corporation, and the policy covered all officers and directors as employees, but expressly excluded the two shareholders. The shareholders thus lacked standing to pursue the bad faith action, since they were not parties to the insurance contract, and privity of contract is essential to an implied covenant action against

the insurer. The shareholders could not achieve privity by piercing the veil of their own corporation to substitute themselves for the corporation as insureds. If the shareholders asserted an indemnification claim against the corporation, then that claim could be tendered to the insurer, but until such time, the insurer had no duty to defend and could not be charged with bad faith.

[See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1140.]

**COUNSEL:** Law Offices of Herbert Dodell, Herbert Dodell; Law Offices of Burton Mark Senkfor and Burton Mark Senkfor for Cross-complainants and Appellants.

Haight, Brown & Bonesteel, Roy G. Weatherup, Robert L. Kaufman, Margaret Johnson Wiley, William G. Baumgaertner and Debra Gemgnani for Cross-defendant and Respondent.

**JUDGES:** Opinion by Curry, J., with Epstein, Acting P. J., and Hastings, J., concurring.

**OPINION BY:** CURRY

**OPINION**

[*921] [**316] **CURRY, J.**

Appellants Phillip Seretti and Janja Vujovich contend on appeal that respondent Superior National Insurance Company, the workers' compensation carrier for their wholly owned corporation, was liable to them [*922] individually for failing to defend actions brought as the result of injury to two of the corporation's employees and for entering into a settlement with the employees which was adverse to the interests of the insured. We agree with the trial court that appellants lack standing [***2] to assert a claim against respondent for bad faith insurance practices, and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*The Civil Complaints*

In June of 1994, Shawn, Debbie, Donna, and Dorian Lobina and Darlene Smith (hereafter the Lobinas) brought suit against appellant Seretti for negligence and wrongful death in connection with a fatal injury to their father, Louis Lobina. Seretti and his wife, appellant Vujovich, owned real property on Floye Street in Hollywood on which the decedent was working at the time of the accident. The complaint alleged that Seretti and the Doe defendants negligently "controlled their premises" and "the construction being performed thereon"; negligently "failed to hire a contractor, failed to properly supervise the construction project, failed to make sure that proper safety precautions and proper construction procedures were being followed"; allowed "dangerous conditions" to exist; and performed work creating "a peculiar risk of harm." Vujovich was added as Doe No. 1 in January 1995, and appellants' wholly owned corporation, Post Sound Corporation, was added as Doe No. 2 in May 1995. [1]

1 The Lobinas also ultimately sued the manufacturer of the scaffolding from which the decedent fell.

[***3] In May of 1995, Omar Garcia, a coworker of Louis Lobina's injured in the same accident, brought an independent action against appellants Seretti and Vujovich, and Post Sound. The two cases were consolidated.

In November of 1995, the Lobinas sought leave to amend their complaint to add a paragraph stating: "Plaintiffs' decedent's death and resulting damages to plaintiffs herein arose out of and occurred in the course of decedent's employment by defendant Post Sound. Defendant Post Sound failed to secure the payment of compensation for the damages arising out of decedent's death, as a result of which plaintiffs bring the within action [*923] against defendant Post Sound under the authority of and pursuant to *California Labor Code § 3706 et seq.*" [2]

2 *Labor Code section 3706* provides: "If an employer fails to secure the payment of compensation, any injured employee or his dependents may bring an action at law against such employer for damages, as if this division did not apply."

[***4] [**317] *Workers' Compensation Compromise and Release*

At the same time the lawsuits were pending, the Lobinas and Garcia pursued workers' compensation claims against Post Sound. [3] In March of 1996, Garcia entered into a compromise and release. Another compromise and release listing Sharon and Dorian

Lobina as the applicants, and signed by Sharon only, was also executed in March of 1996.

3 There was some dispute about whether all the Lobinas or only Sharon Lobina (described as "decedent Louis Lobina's live-in companion") were parties to the workers' compensation action. Sharon was not a party to the civil action.

Both compromise and release documents contained the following language: "Defendant is denying that the applicant was the employee of Post Sound Corporation at the time of his injuries, and defendant is denying that it provided workers' compensation insurance coverage to Post Sound Corporation covering the injuries of [Omar Garcia/Louis Lobina]. [P] The defendant would produce evidence [***5] that the [applicant/decedent] was injured while performing laboring duties on a construction site at a residence owned by Mr. & Mrs. Seretti, principal officers of the Post Sound Corporation. The residence which was being remodeled was neither being used as, nor designated as an insured location and place of business of Post Sound Corporation. No payroll information submitted by Post Sound Corporation listed laborers or carpenters as employees of Post Sound Corporation. [P] Defendant contends that the work activities engaged in by the [applicant/decedent] herein, were done so at the request of and for the benefit of Mr. & Mrs. Seretti, the owners of the residence. The defendant contends that the fact that [Garcia/Lobina] on occasion performed work activities at Post Sound Corporation, and that Mr. & Mrs. Seretti are the principal stockholders of Post Sound Corporation does not create an employment relationship between the [applicant/decedent], with the duties that he performed on the Seretti residence, nor does it create workers' compensation coverage at a location not listed in the policy declarations." The documents also stated that the applicants reserved the right to [***6] proceed against the Serettis individually.

In connection with the settlement of the workers' compensation claims, respondent submitted an affidavit which stated: "A serious dispute exists [*924] between the parties as to coverage, employment and injury AOE/COE. [4] As such, defendants contend that payment to lien claimants on a workers' compensation basis is neither appropriate nor reasonable."

4 In workers' compensation parlance, "AOE/COE" means "arising out of and in the course of employment."

*The Cross-complaint*

On March 22, 1996, just before trial was to proceed in the Lobina/Garcia consolidated matter, the trial court heard testimony that "the insurance company"--referring to respondent--"will not be bound by any decision of this court unless they have been included in the action as a party." By minute order of that date, the court granted "[d]efendant's" motion for leave to file a cross-complaint. Post Sound and appellants thereafter filed a cross-complaint against respondent for, among [***7] other things, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, and declaratory relief. The cross-complaint alleged that appellants were covered under the policy issued by respondent "by virtue of their ownership of Post Sound . . . ." It maintained that Lobina and Garcia were employees of Post Sound and were injured "while acting in the course and scope of their employment . . . ." The claim was based in part on settlement of the Workers' Compensation Appeals Board action on conditions "favorable to [respondent,] but adverse to its insureds."

The insurance policy on which the cross-complaint was based identified the insured as "Post Sound Corporation," operating under the classification of "radio, television or commercial broadcasting stations . . . ." The policy applied to all officers and directors of the corporation as employees, except for those expressly excluded. "Phillip Seretti" and [**318] "Janja Vujovich" were expressly excluded from coverage. [5]

5 Pursuant to *Labor Code section 3351, subdivision (c)*, where the officers and directors of a private corporation are the sole shareholders, the corporation is not required to have workers' compensation coverage for the officers and directors as employees.

[***8] Respondent demurred to the cross-complaint contending, among other things, that appellants lacked standing. The Lobinas simultaneously moved to strike the cross-complaint, on the ground that "it exceeds the scope of leave granted by the court's ruling of March 22, 1996." ACCORDING TO THOSE MOVING PARTIES: "The leave granted by this court strictly limited the scope of the cross complaint which defendants Seretti, Vujovich and Post Sound, etc., would be allowed to bring against Superior National to a declaratory relief type action. The

purpose stated by the court for allowing the cross complaint was to determine the limited issue of whether or not defendant Post Sound had viable workers compensation coverage for the subject accident and [*925] resulting death. [P] The court allowed such a limited declaratory relief type action in an abundance of caution to insure that Superior National would be bound by whatever ruling the court made in a bifurcated trial on the issue of workers compensation insurance coverage pursuant to *Labor Code § 3706* and *3708*."

The court sustained respondent's demurrer as to appellants on the grounds [***9] that (1) "Seretti and Vujovich have no standing in this action" because "[t]hey are not insureds under the subject policy" and (2) "the court did not grant leave to allow Seretti and Vujovich to file a cross-complaint." [6] The court distinguished *Truestone, Inc. v. Travelers Ins. Co. (1976) 55 Cal. App. 3d 165 [127 Cal. Rptr. 386]* in which shareholders were permitted to maintain a separate claim because "[t]he individual shareholders in Truestone were named insureds in the policy, which is not the case in the present case. Furthermore, in the present case, the policy expressly excludes Seretti and Vujovich from the status of insureds."

6 The court further stated that it "did not grant Post Sound leave to file a cross-complaint alleging anything other than the 7th C/A for Declaratory Relief re: determination of coverage. The insurance bad faith and fraud theories do not belong in this case and will unnecessarily complicate and delay resolution of this case."

The notice of ruling prepared [***10] by respondent stated that its "demurrer was sustained as to the entire cross-complaint without leave to amend, as to Phillip Seretti and Janja Vujovich's cross-claims on the basis that they have no standing to sue in this action because they are not insureds under the subject policy of insurance." The judgment, also prepared by respondent, contains similar language: "[T]he court . . . sustained the demurrer of cross-defendant Superior National Insurance Company, without leave to amend, as to the cross-complaint in its entirety regarding the claims of defendants and cross-complainants Phillip Seretti and Janja Vujovich, finding they have no standing to sue in this action as they are not insureds under cross-defendant Superior National Insurance Company's insurance policy at issue in this lawsuit." Appellants noticed a timely appeal from the judgment. [7]

7 While this appeal was pending, appellants settled with the Lobinas and Garcia.

DISCUSSION

I

**(1)** Appellants contend that the shareholders of a small, [***11] closely held corporation have standing to pursue an insurance bad faith action against the corporation's insurer. In support of their position, appellants rely primarily on *Truestone, Inc. v. Travelers Ins. Co., supra, 55 Cal. App. 3d 165*. There, [*926] Travelers Insurance Company and a related insurer issued a policy of liability insurance covering a small corporation, Truestone, Inc., and its sole shareholders. (*55 Cal. App. 3d at p. 168*.) A claim covered by the policy was asserted against the corporation and, according to the insureds, Travelers "unreasonably and in bad faith refused to accept" a settlement within policy limits. (*Ibid.*) The individual shareholders alleged in a separate cause of action against Travelers, that its failure and refusal to settle within policy [**319] limits caused them emotional distress. (*Ibid.*) Demurrer was sustained by the trial court to this cause of action. On appeal, the shareholders asserted that "because they, as well as Truestone, are named insureds in the Travelers policy, Travelers was obligated to them as well as to the corporation to act in good faith with respect to claims of third [***12] persons against the corporation." ( *Id. at p. 169*.)

In considering the issue of whether the shareholders could pursue their own individual breach of covenant claim, the appellate court discussed the rationale behind the formation of the tort: "The covenant of good faith and fair dealing implied in every liability insurance policy obligates the insurer to treat offers to settle claims against its insured within limits of the insurance coverage without regard to its own special interest existing because of policy limits. The covenant thus imposes a duty upon the insurer to accept reasonable settlement offers within the scope of its policy. [Citations.] Breach of the duty creates causes of action in both contract and tort. [Citation.] [P] While the law recognizes a cause of action in tort, the duty breached by the tortious conduct of an insurer refusing to settle in good faith flows from the contractual relationship. [Citation.] The insured does not, by the contract of insurance, seek 'to obtain a commercial

advantage but to protect [himself] against the risks of accidental losses, including the mental distress which might follow from the losses.' " (*Truestone,* [***13] *Inc. v. Travelers Ins. Co., supra, 55 Cal. App. 3d at pp. 169-170.*)

Because the tort derived from a contractual relationship, the court placed special emphasis on the fact that in the case before it "the [shareholders], equally with their closely held corporation, were parties to the insurance policy with Travelers." (*Truestone, Inc. v. Travelers Ins. Co., supra, 55 Cal. App. 3d at p. 170.*) As a result, "[t]he duty created by the implied covenant of good faith and fair dealing ran equally to them. . . . The rationale of the tort of refusal of an insurer to settle in good faith . . . dictates that the [shareholders], as named insureds with their corporation, be afforded the protection of the tort cause of action." (*Ibid.*) The court summarized its holding as follows: "[W]here, as here, shareholders of a closely held corporation are joint insureds with it, the insurers' implied covenant of good faith and fair dealing runs to the shareholders as well as to the [*927] corporation and . . . the shareholders may pursue a cause of action for its breach." ( *Id. at p. 171.*)

*Truestone* was followed [***14] in *Tan Jay Internat., Ltd. v. Canadian Indemnity Co. (1988) 198 Cal. App. 3d 695 [243 Cal. Rptr. 907]* under similar circumstances. In that case, a liability insurance provider denied coverage and refused to provide a defense to a corporation sued by one of its employees. The employee was injured while transporting a sailboat owned by the corporation's principal shareholder and lent to the corporation for a promotional campaign. The policy included the shareholder as a named insured. (*198 Cal. App. 3d at p. 707.*) The shareholder's separate claim for breach of the covenant of good faith and fair dealing was resolved at the trial level by the trial court's grant of the insurer's motion for judgment notwithstanding the verdict. In overturning that decision, the appellate court quoted a portion of the above language from *Truestone*, emphasizing the insurer's obligation to those named as insureds in the policy: "As was explained in [*Truestone*], " '[t]he covenant of good faith and fair dealing implied in every liability insurance policy obligates the insurer to treat offers to settle claims against its *insured* within limits of the insurance coverage [***15] without regard to its own special interest existing because of policy limits. . . . The *insured* does not, by the contract of insurance, seek "to obtain a commercial advantage but to protect [himself] against the risks of accidental losses, including the mental distress which might follow from the losses." ' " (*198 Cal. App. 3d at p. 707*, original italics.) Thus, as in *Truestone*, it was the shareholder's status as an additional insured under the policy which prompted the court in *Tan Jay* to revive his claim.

Appellants rely on language in *Cancino v. Farmers Ins. Group (1978) 80 Cal. App. 3d 335 [145 Cal. Rptr. 503]* to persuade us that [**320] shareholders need not be insureds under the policy to state a breach of covenant claim. That case involved an insurance company's alleged failure to deal "fairly and in good faith" with a party purporting to be both an insured and a claimant under an uninsured motorist provision of a liability policy issued to another party. (*80 Cal. App. 3d at p. 337.*) The complaint had alleged that the claimant/plaintiff " 'was an express "insured" under the terms and conditions of said insurance [***16] policy,' by virtue of the fact that he 'was loading' the 'insured' 'motor vehicle' at the time he was struck by an automobile driven by an uninsured motorist." (*Ibid.*) The main issue in *Cancino* was whether the insurer's duty of good faith and fair dealing applied equally to the insurer's handling of a claim for compensation directly from the insurer as it did to the insurer's handling of a liability claim. The court concluded: "There is no difference between the duty of an insurer to settle an insured's liability claim and thus protect him from liability in excess of policy limits [*928] and its duty to settle the insured's claims to compensation directly from the insurer. These are both simply aspects of the same duty which is said to be based upon the implied covenant of good faith and fair dealing." ( *Id. at p. 340.*)

In reaching this conclusion, the court discussed a number of cases which seemed to suggest that the insurer's duty ran to the insured and not the claimant. Discussing *Truestone*, the court stated: "The holding in *Truestone* was that two individuals who were sole shareholders of a corporation could sue the insurer. The corporation [***17] and both shareholders were named insureds in the policy. Suit was brought against the corporation on a claim within the coverage of the policy. The claimant offered to settle within policy limits and the insurer refused. When the claim went to trial, the resulting judgment exceeded the policy limits by $ 35,000. The shareholders were held entitled to seek both compensatory and punitive damages. In so holding, the court noted (*55 Cal. App. 3d at p. 170*): 'Here the

[shareholders], equally with their closely held corporation, were parties to the insurance policy with Travelers. The duty created by the implied covenant of good faith and fair dealing ran equally to them.' *Nothing said by the court, however, suggests that insureds who are not parties to the insurance contract are not owed the same duty*." ( *Cancino v. Farmers Ins. Group, supra, 80 Cal. App. 3d at p. 341*, italics added.)

The court went on to explain why the plaintiff was, in fact, an insured under the policy: " '[T]he term "insured" means the named insured and the spouse of the named insured and relatives of either while residents of the same household while occupants of a motor vehicle [***18] or otherwise, heirs and any other person while in or upon or entering into or alighting from an insured motor vehicle . . . .' [Citation.] Persons such as plaintiff are required to be covered by virtue of the same provision which benefits the named insured. The intent to benefit all insureds has the same sources: (1) the general policy of the Insurance Code 'to . . . provide compensation for those injured through no fault of their own. . . .' [Citation.]; and (2) the specific policy expressed in *Insurance Code section 790.03, subdivision (h)(5)* which prohibits as unfair practice in the business of insurance '[n]ot attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.' " ( *Cancino v. Farmers Ins. Group, supra, 80 Cal. App. 3d at p. 345*.)

Appellants are correct that the court in *Cancino* recognized a distinction between the "parties" to the insurance contract--who will generally also be named insureds--and "insureds" who are neither parties to the insurance contract nor specifically named therein. A person can be deemed an "insured" by virtue of fitting [***19] into an expressly defined category of those for [*929] whose benefit the policy was created. This distinction does not assist appellants here. They were not parties to the insurance contract; they were not specifically named insured; and to the extent they fit into the general category of those for whom the policy was created to benefit--employees, officers, and directors of Post Sound--they were specifically excluded.

[**321] In short, none of the cases relied upon by appellants support their position. In each, the plaintiff was deemed to be an insured under the relevant policy, either by virtue of being a party to the insurance contract or named in the policy or by virtue of the policy definition of "insured" to include a class of which the plaintiff was a member. [8] These cases evince the fundamental rule that "[p]rivity of contract with the insurer is essential to an implied covenant action against the insurer." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1998) P 12:55, p. 12A-14.) "Whether for better or worse . . . liability for 'bad faith' has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising [***20] out of an underlying contractual relationship. Where no such relationship exists, no recovery for 'bad faith' may be had. [Citation.] [P] . . . [P] [Thus], an insurer's duty of good faith and fair dealing is owed solely to its insured and, perhaps, any express beneficiary of the insurance policy." ( *Austero v. National Cas. Co. (1976) 62 Cal. App. 3d 511, 516-517 [133 Cal. Rptr. 107]*.)

8 We note that the *Cancino* court also relied on *Insurance Code section 790.03, subdivision (h)*, and the plaintiff's status as a claimant under the policy. This reasoning is no longer appropriate in view of the Supreme Court's holding in *Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal. 3d 287, 313 [250 Cal. Rptr. 116, 758 P.2d 58]*, that no private right of action under *section 790.03, subdivision (h)* exists.

*Austero* is one of several cases in which a party closely connected or related to the insured was precluded from recovering for [***21] its own damages arising from the insurer's breach of covenant of good faith and fair dealing owed to the insured. In *Austero*, the insurer denied Mr. Austero's claim for disability benefits, causing emotional distress to his wife. Mrs. Austero contended that her emotional distress was reasonably foreseeable, and pointed out that the disability policy premiums were paid with community funds and that their proceeds constituted community property. Concerning the foreseeability of harm to the wife of the policyholder, the court noted that it "is an important factor in fixing liability for negligently caused injury and may be an important factor in establishing tort liability generally, but it is only one of a number of policy factors to be considered. [Citations.]" (*62 Cal. App. 3d at p. 516*.) Concerning her interest in the policies and their proceeds, the court said: "[T]he fact remains that she is not a party to the contracts. As to disability benefits, plaintiff is at most an incidental or remote beneficiary, and, as such, can state no cause of action against [the [*930] disability insurer] for breach of a duty, express or

implied, arising from the contractual [***22] relationship. [Citations.]" ( *Id. at p. 517.*)

A wife's claim for bad faith was rejected under similar circumstances in *Hatchwell v. Blue Shield of California (1988) 198 Cal. App. 3d 1027 [244 Cal. Rptr. 249]*. There, the husband was insured by a medical policy obtained through his employment. He had enrolled his wife as a "Dependent Subscriber," but the bad faith claim was based on failure to pay benefits arising from his hospitalization and medical care. The court pointed out that the wife "was not a contracting party," and that "[s]omeone who is not a party to the contract has no standing to enforce the contract or to recover extra-contract damages for wrongful withholding of benefits to the contracting party." (*198 Cal. App. 3d at p. 1034.*) Moreover, "[a]lthough she was eligible for health care benefits as a Dependent Subscriber, and as such may be termed a 'co-insured' or 'dependent beneficiary,' . . . this is not sufficient to establish standing to sue for breach of contract and bad faith based upon the denial of benefits to [the husband]. A nonparty who is nevertheless entitled to policy benefits, such as an 'insured' person [***23] under the terms of the policy or an express beneficiary, has standing only if she is the *claimant* whose benefits are wrongfully withheld. [Citations.]" (*Ibid.*, citing *Cancino v. Farmers Ins. Group, supra, 80 Cal. App. 3d at pp. 344-345*, original italics.) "[The wife's] argument ignores the fact that the basis of her action is the denial of benefits for [the husband]. Her coverage as a dependent . . . does not give her standing to enforce [the husband's] contract rights. Although [the wife] is an insured person and [**322] an express beneficiary in regard to her own health care benefits, she is merely an incidental beneficiary in regard to [the husband's] benefits." ( *Hatchwell v. Blue Shield of California, supra, 198 Cal. App. 3d at p. 1035*, fn. omitted.)

*Hatchwell* was followed in *Gantman v. United Pacific Ins. Co. (1991) 232 Cal. App. 3d 1560 [284 Cal. Rptr. 188]*, where the court held that the individual members of a homeowners association did not have standing to prosecute a bad faith action against the association's insurer. The court explained: "Here, although plaintiffs stand to gain when Association [***24] gains, the benefits plaintiffs seek belong to Association by the insurance contracts sued upon. . . . Plaintiffs are simply not claimants whose benefits were wrongfully withheld." ( *Id. at p. 1568.*)

Finally, although not discussed in any of the briefs, the issue of whether shareholders to a closely held corporation can maintain their own bad faith action against the corporation's insurer was considered by this court in *C & H Foods Co.* v. *Hartford Ins. Co. (1984) 163 Cal. App. 3d 1055 [211 Cal. Rptr. 765]*. The corporation, C & H, had purchased marine insurance policies [*931] covering the shipment of 6,437 pails of cured beef. Over 4,000 pails were delivered spoiled and in an unusable condition. Two shareholders brought a claim against the insurer based on the allegations that they were each 50 percent owners of C & H, and that the insurance policies were bought at their behest to guarantee the continued operation of C & H, and that they suffered emotional distress as a result of the failure to pay the corporation's claim. (*163 Cal. App. 3d at p. 1061.*) This court concluded that because the shareholders were neither the named [***25] nor additional insureds nor beneficiaries under the policy, "[t]hey did not state a cause of action for bad faith or negligent infliction of emotional harm (emotional distress) against [the insurer]. [Citation.]" ( *Id. at p. 1068.*)

In accordance with the overwhelming weight of authority, we affirm the trial court's ruling on appellants' lack of standing as shareholders to assert a claim against the corporation's insurer.

II

Appellants suggest that privity could be achieved by allowing them to pierce the veil of their own corporation and substitute themselves in the place of Post Sound as the named insured under the policy. Ignoring a corporation's separate existence is a rare occurrence, particularly where it is the shareholders who seek to pierce its veil, and the courts will do so only "to prevent a grave injustice. [Citations.]" ( *Cooperman v. Unemployment Ins. Appeals Bd. (1975) 49 Cal. App. 3d 1, 7 [122 Cal. Rptr. 127].*) The possibility that a contractor will not get paid for any of his work because he entered a contract in his own name but held his license under a corporate name, represents a grave injustice. (See *Citizens State Bank v. Gentry (1937) 20 Cal. App. 2d 415, 420 [67 P.2d 364].*) [***26] Appellants' inability to maintain individual actions against their corporation's workers' compensation carrier does not. That individual shareholders will not be able to pursue bad faith insurance claims against the corporation's insurer does not allow the insurer to escape liability for improper

conduct. The corporation itself, as named insured, can pursue its own rights, and the shareholders will profit indirectly.

Individuals are free to operate their business in their own names and accept all its debts and liabilities as their own. Having elected to avail themselves of the benefits of the corporate structure, as appellants did here, they cannot be heard to complain of their inability to take personal advantage of a right belonging to the corporation alone.

III

Appellants state that there is an ambiguity in the policy and therefore a potential for coverage. This argument, as we understand it, goes like this: (1) [*932] the policy states that "We [respondent] have the right and duty to defend, at our expense, any claim, proceeding or suit against you [Post Sound] for damages payable by this insurance"; (2) the Lobina and Garcia actions were suits against Post Sound [***27] for damages; (3) "damages" under the [**323] policy are defined to include damages " 'for which [Post Sound is] liable to a third party . . . by reason of a claim or suit against [Post Sound] by that third party to recover the damages claimed against such third party as a result of injury to [Post Sound's] employees [e.g., Lobina and Garcia]' "; (4) if appellants were held individually liable for injury to Lobina and Garcia, they would sue Post Sound for indemnity under the Labor Code [9] or some other theory; therefore, (5) respondent is obligated to defend the Lobina and Garcia lawsuits entirely, including claims which are not asserted against Post Sound; and (6) appellants and anyone else who might possibly sue Post Sound for indemnity for injury to one of Post Sound's employees are potential "insureds" under the policy.

9 *Labor Code section 2802* provides: "An employer shall indemnify his employee for all that the employee necessarily expends or loses in direct consequence of the discharge of his duties as such, or of his obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying such directions, believed them to be unlawful."

[***28] We see numerous flaws in appellants' analysis. First, assuming that a duty to defend the entire Lobina and Garcia actions could be derived from the policy language, such duty would run to the insured. As we have explained at length, appellants are not insureds under the policy and have no standing to assert a claim for a failure to perform a duty owed under it. It would be up to Post Sound to bring a claim for failure to defend, if one exists.

Second, the duty to defend and damage provisions quoted by appellants come into play only when a "claim, proceeding, or suit" is actually brought against Post Sound "for damages payable by this insurance" or "a claim or suit" is brought by a third party "to recover the damages claimed against such third party as a result of injury to [Post Sound's] employees . . . ." Nothing in the record presented here or to the trial court suggests that appellants asserted a claim against Post Sound for indemnity or that Post Sound tendered any such claim to respondent. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, P 7:604, p. 7B-25 ["The duty to defend arises when the insured tenders defense of the third party lawsuit to [***29] the insurer."].)

Finally, this issue of whether a third party's potential claim for indemnity from the insured means that a duty of good faith is owed to the third party was resolved in *Republic Indemnity Co. v. Schofield (1996) 47 Cal. App. 4th 220, 226-227 [54 Cal. Rptr. 2d 637]* and *Alex Robertson Co.* v. *Imperial* [*933] *Casualty & Indemnity Co. (1992) 8 Cal. App. 4th 338 [10 Cal. Rptr. 2d 165]*. In *Republic Indemnity*, the cross-complainants, as employees, officers and directors of a professional corporation, brought a claim for breach of contract and breach of the covenant of good faith and fair dealing against the corporation's workers' compensation and employer's liability insurer. [10] The insurer moved for, and obtained, summary judgment on the ground that none of the claimants was an insured under the policy. On appeal, the cross-complainants argued that the indemnification provision contained in *section 2802 of the Labor Code* created an implication that all employees of a corporation were insureds under the policy. The court disagreed: "It is true the insurer may have to indemnify the corporation [***30] to the extent it is legally liable for losses its employees suffer. However, this does not mean the employees are 'insureds' under the policy for the purpose of maintaining a breach of contract or bad faith action against the insurer. [P] . . . [P] . . . 'It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual

relationship between the insured and the insurer.' [Citation.]" (*47 Cal. App. 4th at p. 227*, quoting *Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal. 4th 1, 36 [44 Cal. Rptr. 2d 370, 900 P.2d 619]*, original italics)

10 Contrary to what is stated in respondent's brief, the claimants did not base their claims against the insurer on their status as shareholders.

Similarly, in *Alex Robertson Co.* v. *Imperial Casualty & Indemnity Co., supra, 8 Cal. App.* [***31] *4th 338*, a contractor entered into a contract with an architectural firm to provide architectural plans and specifications. The contract required the architectural firm to indemnify the contractor for its negligent acts, errors, and omissions. The architectural firm did not carry professional liability insurance. The contractor demanded that it obtain such insurance, and agreed to pay the premiums. The policy obtained specifically referenced the contract between the contractor and the architectural firm and made clear that it covered the architectural firm's liability under the contract. Subsequently, the contractor was sued for breach of contract and negligence in connection with the construction project. He tendered the defense to the architectural firm's insurer, and pursued an action against it after it refused to step in.

On appeal from the insurer's motion for summary judgment, the contractor contended that "it [was] an insured under the policy, or at least a triable question of fact exists as to that issue, by reason of the contractual liability coverage endorsement, the intent of [the parties and the insurance agent] that [the contractor] be covered, and evidence [the [***32] contractor] was billed for and [*934] paid the premiums on the policy." (*Alex Robertson Co.* v. *Imperial Casualty & Indemnity Co., supra, 8 Cal. App. 4th at p. 343.*) The appellate court rejected that contention. As the court explained: "In essence, [the contractor] has sued the wrong party. Its indemnity agreement is with [the architectural firm], not with [the insurer]. [The contractor] may be able to proceed against [the architectural firm] under contractual or equitable indemnity theories. [Citations.] In either case, however, it must establish liability on the part of [the architectural firm]. . . . [P] . . . [P] Under the policy, [the insurer] agreed to pay 'on behalf of [the architectural firm] all sums which [the architectural firm] shall become legally obligated to pay . . . by reason of liability arising out of any negligent act . . . in rendering or failing to render professional services . . . .' [The architectural firm] has not yet become legally obligated to pay anything. Until such event, any claim by [the contractor] against [the insurer] under the policy is premature." (*8 Cal. App. 4th at p. 347*, fn. omitted. [***33] )

The same is true here. If appellants assert an indemnification claim against the insured, Post Sound, then that claim could be tendered to respondent. Until such time as a claim against its insured had been presented, respondent has no duty to defend and cannot be charged with bad faith.

DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 21, 1999.

# TAB 28

LEXSEE 198 CAL. APP. 3D 706

**TAN JAY INTERNATIONAL, LTD., et al., Plaintiffs, Cross-defendants and Appellants, v. CANADIAN INDEMNITY COMPANY, Defendant, Cross-complainant and Appellant**

**No. B016586**

**Court of Appeal of California, Second Appellate District, Division One**

*198 Cal. App. 3d 695*; *243 Cal. Rptr. 907*; *1988 Cal. App. LEXIS 116*

**February 17, 1988**

**SUBSEQUENT HISTORY:** [***1] A Petition for a Rehearing was Denied March 7, 1988, and the Petition of Defendant and Appellant for Review by the Supreme Court was Denied May 4, 1988.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. C485516, James Greely Kolts, Judge.

**DISPOSITION:** The judgments appealed from are affirmed in part, and reversed in part, with directions. The trial court properly denied defendant Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Tan Jay; we affirm the denial. It erred in granting defendant Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Peter Nygard; we reverse the grant of the motion. The trial court properly granted a new trial on the issue of damages only, as to plaintiff Tan Jay. New trial should also have been granted on the issue of damages *only*, as to plaintiff Nygard. The cause is remanded for new trial limited to the issue of damages owed by defendant Canadian to both plaintiffs. Plaintiff Nygard is to recover costs in this court.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A women's clothing corporation and its majority stockholder (owner) brought an action against their insurer for bad faith refusal to defend and indemnify them in a third-party action. The insurer cross-complained for declaratory relief. The jury awarded plaintiffs $ 35 million in punitive damages in addition to some $ 5.3 million in compensatory damages, and the trial court found against the insurer on its cross-complaint. The court conditionally granted the insurer's motion for a new trial with respect to damages, reducing the awards of compensatory and punitive damages, but the corporate plaintiff refused remittitur. The court denied the insurer's motion for judgment notwithstanding the verdict as to the corporation but granted it as to the owner. (Superior Court of Los Angeles County, No. C485516, James Greely Kolts, Judge.)

The Court of Appeal affirmed in part and reversed in part. It held that the trial court properly granted the insurer's motion for a new trial on the damages issue, and affirmance of this ruling rendered immaterial the insurer's claim that plaintiffs' proof of damages was inadequate. The trial court did not err in granting a new trial only as to the issue of damages, rather than granting an entire new trial, since the record clearly established the insurer's liability to the corporation; it could be presumed, in view of the excessiveness of the jury's punitive damages award, that the jury was impermissibly swayed by passion or prejudice; and there was no prejudice to either side by a new trial on the damages issue. However, the court held, the trial court erred in granting defendant's motion for judgment notwithstanding the verdict as against the owner on the ground that he lacked standing to sue for the insurer's breach; the majority stockholder of this closely held corporation was a named insured, and damages for mental suffering are included within those recoverable for an insurer's breach of duty to settle in good faith. Further, the court held, the award of damages for the owner's emotional distress was supported by the

evidence. (Opinion by Hanson, Acting P. J., with Lucas and Devich, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1)** Judgments § 12--Notwithstanding Verdict--Discretion of Trial Judge. --The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. The judge cannot weigh the evidence or judge the credibility of witnesses. If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. Such a motion may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.

**(2a) (2b) Insurance Contracts and Coverage § 139--Actions--New Trial on Damages--Proof of Damages.** --In an action by a women's clothing corporation and its majority stockholder (owner) against their insurer for bad faith refusal to defend and indemnify them in a third-party action, the trial court properly granted the insurer's motion for a new trial on the damages issue after the jury awarded plaintiffs punitive damages of $ 35 million in addition to $ 5.3 million in compensatory damages. Incurrence of attorney fees and costs in the third-party action, a large judgment in that action when a lesser settlement might have been possible, and damage to the corporation's business reputation constituted ample proof of damages suffered by the corporation. Affirmance of the trial court's ruling on the new trial motion rendered immaterial the insurer's claim that plaintiffs' proof on damages was inadequate.

**(3) Insurance Contracts and Coverage § 137--Actions--Damages--Breach of Duty of Good Faith and Fair Dealing.** --An insurer's breach of its duty of good faith and fair dealing renders it liable for any damages that are the proximate cause of that breach. In the so-called "third party" situation, the breach of duty may have as its proximate result the entry of a judgment in excess of policy limits against the insured. Only damages proximately resulting from the breach--such as consequent economic loss or emotional distress--are recoverable as compensation therefor.

**(4) Insurance Contracts and Coverage § 122--Actions--When Insured May Initiate Suit for Breach of Duty to Defend and Indemnify.** --An insured does not have to wait until a final judgment has been entered against him by a third party to claim that he has been damaged by the failure of his insurer to honor the duty to defend and indemnify.

**(5a) (5b) (5c) Insurance Contracts and Coverage § 139--Actions--New Trial on Damages.** --In an action by a women's clothing corporation and its majority stockholder (owner) against their insurer for bad faith refusal to defend and indemnify them in a third-party action, the trial court did not err in granting a new trial to the insurer only on the issue of damages instead of an entire new trial, where the record clearly established the insurer's liability to the corporation, where, in view of the excessiveness of the jury's punitive damages award ($ 35 million), it could be presumed that the jury was impermissibly swayed by passion or prejudice, and where there was no prejudice to either side by new trial on the damages issue.

**(6) New Trial § 8--Motion or Award as to Part of Issues.** --The trial court may grant a new trial as to some issues while refusing it as to others. An abuse of discretion must be shown before a reviewing court will reverse the trial judge's decision. Three factors of importance in assessing the choice of limited new trial as opposed to entire new trial are: whether liability was clearly established at the first trial, whether the evidence concerning damages was insufficient or entirely nonexistent, and whether prejudice to a party would result as the result of the choice of one disposition over the other.

**(7) Damages § 22--Punitive Damages--Constitutionality.** --Punitive damages are not unconstitutional.

**(8) Corporations § 28--Stockholders--Suits on Behalf of Corporation--Emotional Distress.** --A shareholder may not, as a matter of law, personally recover emotional distress damages for injury to the corporation in which he holds shares. One individual does not become entitled to a damage award for injuries sustained by another, and a corporation is a distinct legal entity apart from its shareholders.

**(9) Insurance Contracts and Coverage § 136--Actions--Judgment--Judgment Non Obstante Veredicto--Breach of Covenant of Good Faith and Fair Dealing--Recovery of Emotional Distress Damages by Insured Stockholder of Closely Held Corporation.** --In an action by a women's clothing corporation and its majority stockholder (owner) against their insurer for bad faith refusal to defend and indemnify them in a third-party action, the trial court improperly granted defendant's motion for judgment notwithstanding the verdict as against the owner on the ground that he lacked standing to sue for the insurer's breach in that he was not named as a defendant in the third-party action and could not recover for the damages sustained by the corporation. The owner, a named insured, was suing for injuries to himself. The covenant of good faith and fair dealing implied in every liability insurance policy obligates the insurer to treat offers to settle claims against its insured within limits of the insurance coverage without regard to its own special interest existing because of policy limits. Damages for mental suffering are included within those recoverable for the insurer's breach of this duty.

**(10a) (10b) (10c) Insurance Contracts and Coverage § 137--Actions--Damages--For Breach of Duty of Good Faith and Fair Dealing--Emotional Distress.** --In an action by a women's clothing corporation and its majority stockholder (owner) against their insurer for bad faith refusal to defend and indemnify them in a third-party action, there was evidence in the record to support the jury's award of damages for emotional distress to the owner, which evidence the trial court could not reweigh in performing the function of ruling on the insurer's motion for judgment notwithstanding the verdict. The insurer abandoned the owner without justification in the face of a multi-million dollar third-party claim, leaving him to face losing his reputation, his business, and his peace of mind gradually over a long period of time. Upholding such an award does not require proof of bankruptcy, physical illness or injury, nor courtroom demonstrations of the destruction of personal peace of mind or well-being.

**(11) Damages § 13--Measure of Damages--Personal Injuries--Emotional Distress.** --The law does not compensate emotional injuries that are trivial or transitory, as contrasted to substantial or enduring.

**(12) Damages § 13--Measure of Damages--Personal Injuries--Emotional Distress--Role of Finder of Fact.** --Determinations concerning emotional distress--its existence and the appropriate compensation for it--are left to the finder of fact, often a jury, based on an entire evidentiary record, including the reasonable inferences which can be drawn from it, although a jury may properly rely on the testimony of one person to reach its conclusion.

**(13) Damages § 24--Punitive Damages--Relation to and Requirement of Actual Damages.** --Punitive damages are not precluded when the plaintiff has not received an award of actual damages but only when he or she has sustained no actual damage.

**COUNSEL:** Greines, Martin, Stein & Richland and Alan G. Martin for Plaintiffs, Cross-defendants and Appellants.

Lascher & Lascher and Edward L. Lascher for Defendant, Cross-complainant and Appellant.

**JUDGES:** Opinion by [***2] Hanson, Acting P. J., with Lucas and Devich, JJ., concurring.

**OPINION BY:** HANSON

**OPINION**

[*699] [**908] Introduction

Plaintiffs Tan Jay International, Ltd. (Tan Jay) and Peter Nygard (the insureds) filed a complaint for damages, breach of contract, emotional distress and declaratory relief against the insurer, defendant Canadian Indemnity Company (Canadian), alleging bad faith refusal to defend and indemnify plaintiffs in a third-party action. Both compensatory and punitive damages were sought.

Defendant Canadian cross-complained against Tan Jay, Nygard, the third-party plaintiff Douglas Michaelson, Viking Holding Company and Does. The first two causes of action sought declaratory relief and the second [*700] two causes of action sought indemnity from defendant Canadian's insured, Peter Nygard.

Plaintiffs demurred to the cross-complaint. Cross-complainant attempted to amend the cross-complaint, and finally dismissed the third and fourth causes of action against Nygard. Plaintiffs moved

for an early trial date; their motion was granted. Defendant Canadian filed a motion for summary judgment as to both the complaint and cross-complaint; plaintiffs sought summary adjudication of issues without substantial [***3] controversy. The motions were consolidated for hearing; the motions of both plaintiffs and defendant were denied.

Trial was by jury. The jury responded to the request for special findings and rendered a verdict for plaintiffs of $ 5,298,178.71 in compensatory damages and $ 35 million in punitive damages.

Defendant Canadian substituted new counsel and moved for new trial or judgment notwithstanding the verdict. The trial court granted judgment notwithstanding the verdict as to plaintiff Peter Nygard, but denied it as to plaintiff Tan Jay. The trial court further granted defendant's motion for new trial, ruling that the award of damages was excessive and not supported by the evidence.

Defendant Canadian has appealed from the denial of defendant's motion for judgment notwithstanding the verdict as to plaintiff Tan Jay and from the trial court's order granting new trial as to issues of damages only. Plaintiff Peter Nygard has appealed from the judgment notwithstanding the verdict entered against him.

Factual and Procedural History

Plaintiff Tan Jay is a Winnipeg, Manitoba-based manufacturer of women's sportswear. Its principal owner and chairman of the board is plaintiff Peter Nygard. [***4] Nygard is a sailor of some distinction, and has been a member of the Canadian Olympic Sailing Team. Tan Jay has cultivated an image which emphasized sailing.

In 1977, Tan Jay entered the Los Angeles clothing market. Nygard owned an Olympic-class sailboat; he and Murray Batte, the president of [*701] Tan Jay and a minority shareholder in Tan Jay, decided to use the sailboat as part of a promotional campaign for Tan Jay in California.

Tan Jay temporarily stored the sailboat at the California Yacht Club in Marina del Rey. When Nygard decided not to join the club, the club requested that the boat be taken elsewhere. Nygard instructed his secretary, Cynthia Jewett, to have the boat moved to Tan Jay's warehouse. Instead of calling professional boat movers, Ms. Jewett enlisted the aid of David Swift, another Tan Jay employee to move the boat. [**909] Among those helping with the move was Douglas Michaelson. As the boat was being moved down Fiji Way in Marina del Rey on a trailer, with the mast still in place, the mast came in contact with an overhead high voltage line and Michaelson was electrocuted; he survived, but sustained very severe injuries, including the loss of one leg, several [***5] fingers, and other permanent injuries. The accident occurred on April 8, 1978, and shortly thereafter Michaelson brought suit against Tan Jay.

Plaintiff Nygard was advised of the accident shortly after it occurred. Tan Jay had a $ 1 million general comprehensive liability policy issued by defendant Canadian, bearing a special endorsement covering its employees for all accidents occurring in connection with the business. Nygard phoned Tan Jay's insurance broker, John A. Flanders Company, Ltd. and spoke to Martin Eva, the head of Flanders. Eva then spoke to the local branch claims manager of Canadian, telling him of the accident, and a letter was sent to Tan Jay's counsel advising counsel that Canadian had been notified.

Canadian denied coverage and refused to provide a defense for the Michaelson action. Eva conveyed this news to Nygard. Nygard consulted California counsel, who recommended an experienced personal injury trial lawyer, W. Marshall Morgan. Morgan, apprised of Canadian's refusal to defend, undertook that duty on behalf of Tan Jay.

Early in 1983, as the Michaelson action neared trial and substantial discovery had been completed, Morgan's law firm again requested coverage [***6] and defense from Canadian. Canadian responded by retaining Canadian and California counsel. Tan Jay provided the insurer with its discovery material and agreed that Canadian could investigate, defend and settle the case without any prejudice to its position.

At this point, it was clear that Tan Jay's exposure on Michaelson was substantial. Morgan kept Canadian advised of all developments and asked [*702] the insurer to participate in settlement discussions. He not only explained the basis for coverage, he advised Canadian that the case could be settled within policy limits. At one point Michaelson was prepared to settle for $ 1.2 million; Canadian was asked to pay $ 700,000; the boat and trailer insurer had agreed to pay its policy

limits of $ 300,000, and Nygard had agreed to pay $ 200,000 of his own funds. Canadian refused, and the settlement did not go forward because Nygard could not obtain $ 900,000.

Douglas Michaelson obtained $ 4.4 million, after a jury trial. This was reduced on motion for new trial to about $ 2.1 million. Tan Jay appealed and Michaelson cross-appealed. The California Yacht Club, named as a codefendant of Tan Jay in the Michaelson action, received [***7] a new trial; it settled and sought indemnity from Tan Jay.

Michaelson commenced collection efforts against Tan Jay in Canada. Execution on the judgment would have put Tan Jay out of business entirely. As it was, the efforts to collect damaged its business standing and public reputation.

In February 1984, Tan Jay and Nygard filed the action before us for bad faith, emotional distress and declaratory relief against defendant Canadian. Canadian cross-complained for declaratory relief. Granted an early trial date after showing that the Michaelson efforts to collect on the personal injury judgment had placed Tan Jay in jeopardy, plaintiffs proceeded against Canadian at trial in May 1985. Plaintiffs presented four expert witnesses, who agreed that Canadian had a clear duty pursuant to the terms of plaintiffs' policy to defend the Michaelson action, and its refusal to investigate, defend and indemnify was totally without justification. Evidence presented on damages included, in addition to the Michaelson judgment, then on appeal, the expenditure of approximately $ 150,000 in attorney fees, the fact of plaintiff Nygard's personal emotional distress and the damage to Tan Jay's business [***8] reputation.

At trial, Canadian's trial counsel described his client as a vastly wealthy insurance company. The jury awarded $ 35 million [**910] in punitive damages, in addition to the compensatory damages award.

After the jury verdict, the cross-complaint for declaratory relief was tried. The trial court found coverage and issued a statement of decision as requested by Canadian's new counsel (present counsel on appeal). The trial court conditionally granted Canadian's motion for new trial with respect to [*703] damages, reducing compensatory damages to $ 4,273,257 and punitive damages to $ 500,000. Tan Jay refused the remittitur. As indicated, the trial court denied Canadian's motion for judgment notwithstanding the verdict as to Tan Jay but granted it as to Peter Nygard. Canadian has appealed, as has Nygard. The record before us reveals that Canadian finally paid the Michaelson judgment and the Michaelson appeal has been dismissed.

Defendant Canadian's Appeal

On appeal, defendant Canadian contends (1) that the trial court erred in denying Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Tan Jay and (2) that the trial court erred by its limitation of [***9] new trial granted Canadian to issues of damages only.

I

The standard of review applicable to a grant of judgment notwithstanding the verdict is well established.

**(1)** In *Hauter v. Zogarts (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282]*, the California Supreme Court stated: "The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. [Citations.] The trial judge cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]"

On this appeal, [***10] defendant Canadian does not spend much time attempting to persuade this court that there was no substantial evidence of Canadian's breach of the covenant of good faith and fair dealing. Nor does Canadian attack the trial court's disposition of defendant's cross-complaint for declaratory relief concerning coverage. Defendant Canadian's main arguments as to why its comprehensive business policy did not cover the Michaelson accident were twofold: (1) that the use of the sailboat was not business related and (2) that the sailboat came within a vehicular exclusion in the [*704] policy. The trial court rejected these excuses

for noncoverage and we need not consider the issue further.

**(2a)** The main thrust of Canadian's lengthy brief is directed at the issue of damages. It is elementary that a plaintiff must show injury and entitlement to damages to recover them from a defendant; to that extent, defendant Canadian's challenge to the sufficiency of plaintiffs' evidence on the damages which flowed from Canadian's breach is understandable.

**(3)** It was said in *Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 925* (italics omitted) [*148 Cal.Rptr. 389, 582 P.2d 980]*, [***11] that "[An] insurer's breach of its duty of good faith and fair dealing renders it liable for any damages which are the proximate cause of that breach. In the so-called 'third party' situation, of which *Communale* [v. *Traders & General Ins. Co. (1958) 50 Cal.2d 654 (328 P.2d 198, 68 A.L.R.2d 883)*] and *Crisci* [v. *Security Ins. Co. (1967) 66 Cal.2d 425 (58 Cal.Rptr. 13, 426 P.2d 173)*] are representative, the breach of duty may have as its proximate result the entry of a judgment in excess of policy limits against the insured. . . . Only damages proximately resulting from the breach -- such as consequent economic loss or emotional distress, for example -- are recoverable as compensation therefor."

**(2b)** There was not only sufficient but overwhelming evidence in this record that plaintiff Tan Jay suffered damage as the result of defendant Canadian's breach. [**911] There was testimony (1) as to the incurrence of attorney fees and costs of defending in the absence of defense by Canadian; (2) about Canadian's refusal to contribute to a Michaelson settlement when one was possible for a reasonable amount; [***12] (3) about the damage to Tan Jay's business reputation; and (4) there was testimony about the Michaelson judgment entered against Tan Jay, and subsequent efforts to execute on that judgment. We enumerate these facts for the sole purpose of negating defendant Canadian's suggestion that the *liability* of defendant Canadian to plaintiff Tan Jay was questionable because of the failure of proof of damage.

We hold that there was ample proof to support the finding of liability. We further hold that the trial court properly granted new trial to defendant Canadian on the damages issue, which renders any discussion of the specific perceived inadequacies of plaintiffs' proof on damages at the first trial immaterial. Our record reflects that defendant Canadian has finally settled with Michaelson, so the issue of whether the Michaelson judgment was one which the jury could have properly considered in the 1985 trial is also immaterial.

**(4)** We note, however, that in California an insured does not have to wait until a final judgment has been entered against him by a third party to claim that he has been damaged by the failure of his insurer to [*705] honor the duty to defend and indemnify. [***13] (See *Larraburu Bros., Inc. v. Royal Indemn. Co. (9th Cir. 1979) 604 F.2d 1208*, for a lengthy discussion on this point.)

II

**(5a)** We next turn to defendant Canadian's contentions that the trial court should have granted new trial to defendant in its entirety, instead of limiting the retrial to the issue of damages.

**(6)** In *Liodas v. Sahadi (1977) 19 Cal.3d 278, 285 [137 Cal.Rptr. 635, 562 P.2d 316]*, the California Supreme Court stated that "[the] power of a trial court to grant a new trial as to some issues, while refusing it as to others, is also well established. [Citations.] '. . . An abuse of discretion must be shown before a reviewing court will reverse the trial judge's decision [citations].'" (See also *Marshall v. Brown (1983) 141 Cal.App.3d 408, 414 [190 Cal.Rptr. 392]*.)

Three factors of importance in assessing the choice of limited new trial as opposed to entire new trial are: (1) whether liability was clearly established at the first trial, (2) whether the evidence concerning damages was insufficient or entirely nonexistent; and (3) whether prejudice to a party would result [***14] as the result of the choice of one disposition over the other. (See *Liodas v. Sahadi, supra, 19 Cal.3d 278, 285*; *Leipert v. Honold (1952) 39 Cal.2d 462, 466-467 [247 P.2d 324, 29 A.L.R.2d 1185]*; *Pelletier v. Eisenberg (1986) 177 Cal.App.3d 558, 556 [223 Cal.Rptr. 84]*.)

**(5b)** We conclude that the record clearly established liability on the part of defendant Canadian to plaintiff Tan Jay. The trial court's decision to permit new trial on the issue of damages was sound, in view of the excessiveness of the jury's punitive damages award ($ 35 million), from which it can be presumed that the jury was impermissibly swayed by passion and prejudice. There is

no prejudice to either side by new trial on the damages issue. Plaintiff Tan Jay rejected the reduction in damages proposed by the trial court and stood ready for new trial.

**(7)** (See fn. 1.) Unfortunately this appeal has slowed the progress toward resolution of this matter, although no argument has been made here by either plaintiff that Canadian undertook the appeal "for delay." (*Code. Civ. Proc., § 907.*) [1]

1 We need not consider Canadian's argument that (1) punitive damages are unconstitutional as awarded in California or (2) that the United States Supreme Court may soon say so. We are bound by current decisional law. It has long been established that punitive damages are not unconstitutional in California ( *Hasson v. Ford Motor Co. (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171].*) If the United States Supreme Court says that such damages are unconstitutional, that issue may be the subject of further analysis at some future time.

[*706] [***15] We find no abuse of discretion in the trial court's grant of limited new trial on the issue of damages to defendant Canadian.

[**912] Plaintiff Nygard's Cross-Appeal

Plaintiff Nygard has appealed from the trial court's grant of judgment notwithstanding the verdict to defendant Canadian. Defendant Canadian argued below, as it does here, that plaintiff Nygard had no standing to sue for Canadian's breach of the covenant of good faith [***16] and fair dealing because plaintiff Nygard had not been named as a defendant in the Michaelson action and could not recover for the damages sustained by another entity, Tan Jay. In addition, it was contended below that there was, in any event, insufficient evidence of plaintiff Nygard's asserted emotional distress resulting from Canadian's conduct.

The trial court's grant of judgment notwithstanding the verdict did not specify the ground upon which it was based. Defendant Canadian defends the trial court's ruling with respect to plaintiff Nygard in this court by contending: (1) that a shareholder such as Nygard may not, as a matter of law, personally recover emotional distress damages for injury to the corporation in which he holds the shares; (2) that the evidentiary record did not support any award of emotional distress damages to plaintiff Nygard; and (3) that in the absence of an award of actual damages, a plaintiff cannot recover punitive damages. We address these issues seriatim.

I

Our discussion begins with the reiteration that the standard of review of a grant of judgment notwithstanding the verdict, as described in *Hauter v. Zogarts, supra, 14 Cal.3d 104, 110,* [***17] applies here as well.

**(8)** Defendant Canadian is correct in stating that a shareholder may not, as a matter of law, personally recover emotional distress damages for injury *to the corporation* in which he holds shares. One individual does not, under our law, become entitled to a damage award for injuries sustained by another, and a corporation is a distinct legal entity apart from its shareholders. ( *Jones v. H.F. Ahmanson & Co. (1969) 1 Cal.3d 93, 106-107 [81 Cal.Rptr. 592, 460 P.2d 464].*)

[*707]

**(9)** However, these principles have no relevance in the case at bench, because plaintiff Nygard sued for injuries to *himself.* Canadian's comprehensive business policy issued to and paid for by Tan Jay also included plaintiff Nygard as named insured. As was explained in *Truestone, Inc. v. Travelers Ins. Co. (1976) 55 Cal.App.3d 165, 169-170 [127 Cal.Rptr. 386]*, "[the] covenant of good faith and fair dealing implied in every liability insurance policy obligates the insurer to treat offers to settle claims against its *insured* within limits of the insurance coverage without regard to its own special interest [***18] existing because of policy limits. The covenant thus imposes a duty upon the insurer to accept reasonable settlement offers within the scope of its policy. [Citations.] Breach of the duty creates causes of action in both contract and tort. [Citation.] . . . [para. ] While the law recognizes a cause of action in tort, the duty breached by the tortious conduct of an insurer refusing to settle in good faith flows from the contractual relationship. [Citation.] The *insured* does not, by the contract of insurance, seek 'to obtain a commercial advantage but to protect [himself] against the risks of accidental losses, including the mental distress which might follow from the losses. Among the considerations in purchasing liability insurance, as insurers are well

aware, is the peace of mind and security it will provide . . . .' [Citation.] For that reason, damages for mental suffering are included within those recoverable for the insurer's breach of duty to settle in good faith. [Citation.] (Italics added.)

After reviewing the basics of bad faith law, the *Truestone* court observed that its plaintiffs, the Campbells, were shareholders and owners of a closely held corporation [***19] and insured pursuant to the policy with Travelers. Thus the duty created by the implied covenant of good faith and fair dealing was owed to them personally, a duty not to tortiously destroy the peace of mind for which they bargained. *Truestone* [**913] held that where "shareholders of a closely held corporation are joint insureds with it, the insurers' implied covenant of good faith and fair dealing runs to the shareholders as well as to the corporation and the shareholders may pursue a cause of action for its breach." ( *Id. at p. 171.*)

Defendant Canadian points out that *Truestone* was a pleading case. Such a case is a singularly appropriate vehicle for deciding a purely legal question. The question was incorrectly decided in the case before us by the trial court in granting judgment notwithstanding the verdict. Other California cases are in accord with the principles stated in *Truestone*; see *Commercial Cotton Co. v. United California Bank (1985) 163 Cal.App.3d 511 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017]*; *Cancino v. Farmers Ins. Group (1978)* [*708] *80 Cal.App.3d 335 [145 Cal.Rptr. 503]*; [***20] see, further, *Larraburu Bros., Inc. v. Royal Indemn. Co., supra, 604 F.2d 1208.*

II

**(10a)** Defendant Canadian argues that the evidentiary record made in this case did not support the award of any emotional distress damages to plaintiff Nygard. It is specious to suggest that plaintiff did not prove emotional distress.

**(11)** What the law does not compensate are emotional injuries which are trivial or transitory, as contrasted to substantial or enduring. ( *Commercial Cotton Co. v. United California Bank, supra, 163 Cal.App.3d 511, 517.*)

**(10b)** The record on appeal details conduct on the part of Canadian from 1978 to the present that is classic in its demonstration of bad faith as defined by decisional law. The fact is that Nygard's insurer (Canadian) abandoned him without justification in the face of a multimillion dollar third party claim, leaving him to face losing his reputation, his business, and his peace of mind gradually over a long period of time.

**(12)** Determinations concerning emotional distress -- its existence and the appropriate compensation for it -- are left to the finder of fact, often a jury, based on an entire evidentiary [***21] record, including the reasonable inferences which can be drawn from it, although a jury may properly rely on the testimony of one person to reach its conclusion.

**(10c)** In the instant case, both plaintiff and his attorney testified that Nygard suffered emotional distress, and the entire record supports that claim. Upholding such an award does not require proof of bankruptcy, physical illness or injury, nor courtroom demonstrations of the destruction of personal peace of mind or well-being.

We conclude that there was evidence in the record to support an award of emotional distress damages -- evidence that the trial court could not reweigh in performing its function of ruling on the motion for judgment notwithstanding the verdict.

[*709] III

Defendant Canadian finally contends that punitive damages cannot be assessed in favor of a plaintiff who has not received an award of actual damages. We address the issue for purposes of retrial on the issue of damages owed to both plaintiffs. Punitive damages are *only* precluded when a plaintiff has *sustained* no actual damage. (See *Commercial Cotton Co. v. United California Bank, supra, 163 Cal.App.3d 511, 517, fn. 2.*)

[***22] The judgments appealed from are affirmed in part, and reversed in part, with directions.

The trial court properly denied defendant Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Tan Jay; we affirm the denial. It erred in granting defendant Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Peter Nygard; we reverse the grant of the motion.

The trial court properly granted a new trial on the

issue of damages only, as to plaintiff Tan Jay. New trial should also have been granted on the issue of damages *only*, as to plaintiff Nygard.

The cause is remanded for new trial limited to the issue of damages owed by defendant [**914] Canadian to both plaintiffs. Plaintiff Nygard is to recover costs in this court.