# TABS 29 - 35

# TAB 29

LEXSEE 2 CAL. APP. 4TH 153, 158

**CEIL TARMANN, Plaintiff and Appellant, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant and Respondent.**

**No. H006997**

**COURT OF APPEAL OF CALIFORNIA, SIXTH APPELLATE DISTRICT**

***2 Cal. App. 4th 153; 2 Cal. Rptr. 2d 861; 1991 Cal. App. LEXIS 1479; 92 Daily Journal DAR 16***

**December 30, 1991, Decided**

**PRIOR HISTORY:** [***1] Superior Court of Santa Clara County, No. 632416, Peter G. Stone, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Plaintiff brought an action for fraud and negligent misrepresentation against an insurer alleging the insurer made false statements concerning its obligation to indemnify plaintiff. In her complaint plaintiff generally alleged that the declarants were "authorized agents" of the insurer, but specifically alleged that she did not know their names. The trial court sustained without leave to amend the insurer's demurrer to the fifth amended complaint and dismissed the action. (Superior Court of Santa Clara County, No. 632416, Peter G. Stone, Judge.)

The Court of Appeal affirmed. It held that plaintiff's complaint did not meet the requirement that a fraud complaint against a corporation plead the names of the individuals who made allegedly false representations. It also held that the insurer's statements concerning indemnity were either statements of opinion or intentional false promises, and thus plaintiff failed to state a cause of action for negligent misrepresentation. (Opinion by Capaccioli, Acting P. J., with Premo and Cottle, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d and 4th Series

**[1] Pleading § 29--Demurrer to Complaint--Determination.** --In reviewing the sufficiency of a complaint against a general demurrer, the court is guided by long-settled rules. It treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. It also considers matters that may be judicially noticed. Further, the court gives the complaint a reasonable interpretation, reading it as a whole and its parts in their context.

**[2] Appellate Review § 128--Scope of Review--Rulings on Demurrers.** --When a demurrer is sustained, the appellate court determines whether the complaint states facts sufficient to constitute a cause of action. When it is sustained without leave to amend, the appellate court decides whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and the appellate court reverses; if not, there has been no abuse of discretion and the appellate court affirms. The burden of proving a reasonable possibility is squarely on the plaintiff.

**[3] Fraud and Deceit § 25--Actions--Pleading--Action Against Corporation.** --Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow the defendant to understand fully the nature of the charge made. The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to

speak, to whom they spoke, what they said or wrote, and when it was said or written. Thus, in a fraud action against an insurer for making false statements concerning its obligation to indemnify plaintiff, the trial court did not err in sustaining without leave to amend the insurer's demurrer to the complaint, where plaintiff generally alleged that the declarants were "authorized agents" of the insurer, but specifically alleged that she did not know their names. The exception to the rule of specificity for situations in which the facts are in the possession of the defendant did not apply, since the insurer had no more reason to know who made the allegedly false statements than plaintiff.

[See 5 **Witkin,** Cal. Procedure (3d ed. 1985) Pleading, §§ 662, 868.]

**[4] Fraud and Deceit § 6--Actual Fraud--False Representations--Statements of Opinion.** --To be actionable, a negligent misrepresentation must ordinarily be as to past or existing material facts. Predictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 678.]

**[5a] [5b] [5c] Fraud and Deceit § 25--Actions--Pleading--Negligent Misrepresentation--Insurer's Representation of Future Payment.** --In a negligent misrepresentation action arising from an insurer's alleged representations that it would make payments to plaintiff in the future, the trial court did not err in sustaining without leave to amend the insurer's demurrer to the complaint. To the extent that the representations were statements of opinion as to the insurer's obligation to indemnify plaintiff, they were not actionable. To the extent the representations constituted promises with no intention of performance, they were intentional conduct and not actionable under a theory of negligent misrepresentation.

**[6] Fraud and Deceit § 7--Actual Fraud--False Representations--Promises.** --Certain broken promises of future conduct may be actionable. *Civ. Code, § 1710, subd. (4)*, defines one type of deceit as "A promise, made without any intention of performing it." A false promise is actionable on the theory that a promise implies an intention to perform, that intention to perform or not to perform is a state of mind, and that misrepresentation of such a state of mind is a misrepresentation of fact. The allegation of a promise, which implies a representation of intention to perform, is the equivalent of the ordinary allegation of a representation of fact. To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing. Given this requirement, an action based on a false promise is simply a type of intentional misrepresentation, i.e., actual fraud. The specific intent requirement precludes pleading a false promise claim as a negligent misrepresentation.

[See 5 **Witkin,** Cal. Procedure (3d ed. 1985) Pleading, § 670.]

**[7] Fraud and Deceit § 7--Actual Fraud--False Representations--Promises--Unreasonable Intent to Perform.** --Making a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise.

**[8] Appellate Review § 128--Scope of Review--Rulings on Demurrers--Appellant's Burden.** --It is the correctness of the trial court's action in sustaining a demurrer, not its reasons, that is reviewable. The burden is upon the appellant to demonstrate that the action of the trial court was an abuse of discretion.

**COUNSEL:** Harry Delizonna for Plaintiff and Appellant.

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Daniel R. Kirwan and Mark Bonino for Defendant and Respondent.

**JUDGES:** Opinion by Capaccioli, Acting P. J., with Premo and Cottle, JJ., concurring.

**OPINION BY:** CAPACCIOLI, Acting P. J.

**OPINION**

[*156] [**861] *Statement of the Case*

Plaintiff Ceil Tarmann appeals from a judgment entered after the trial court sustained [**862] without leave to amend defendant State Farm Mutual Automobile Insurance Company's (State Farm) demurrer to

Tarmann's fifth amended complaint. She claims her complaint sufficiently pled causes of action for fraud and negligent misrepresentation. We disagree and affirm the judgment.

*Standard of Review*

**[1]** "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole [***2] and its parts in their context. [Citation.] **[2]** When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." ( *Blank v. Kirwan (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].*)

*Facts Alleged in the Fifth Amended Complaint*

On September 22, 1985, Tarmann was involved in an auto accident with Andy Roselada, a State Farm insured. Roselada's liability was reasonably clear. Tarmann obtained an estimate of $ 3,200 to repair her vehicle, and State Farm authorized the estimate.

In particular, State Farm represented to her that she was authorized to have her vehicle repaired at Capitol Ford, Inc., of Almaden, that their obligation to indemnify her for her damages was reasonably [***3] clear, and that it "would pay Plaintiff for all such repairs ... immediately upon completion of those repairs." These representations were made by persons whose names were "unknown to Plaintiff but [who] were adjustors and/or claims supervisors/managers" employed by State Farm and acting as its agents. The [*157] representations, however, "were and are false and [State Farm] knew or should have known them to be false at the time they were made." The true facts were that State Farm "had no intention to reasonably and in good faith effectuate a prompt and reasonable processing, evaluation, investigation and settlement of Plaintiff's claim, nor pay the complete repair of Plaintiff's vehicle."

State Farm's representations were intended to induce Tarmann's reliance so that she would bring her vehicle in for repairs and delay filing an action for damages. Tarmann relied on the representations and brought her vehicle to be repaired. However, State Farm refused to pay for the repairs or indemnify her. Because Tarmann lacked the funds to complete the repairs or obtain the release of her vehicle, she was left without its use for an extended period of time.

Tarmann hired an attorney, [***4] who filed an action against Roselada. In September 1986, State Farm settled her claim for $ 3,476.47. She then initiated this action.

Discussion

*The Cause of Action for Fraud*

**[3]** "Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow defendant to understand fully the nature of the charge made." ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz (1976) 57 Cal.App.3d 104, 109 [128 Cal.Rptr. 901]*; *Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 216-217 [197 Cal.Rptr. 783, 673 P.2d 660]*; *Stansfield v. Starkey (1990) 220 Cal.App.3d 59, 73 [269 Cal.Rptr. 337]*.

The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent [**863] representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written. ( *Archuleta v. Grand Lodge etc. of Machinists (1968) 262 Cal.App.2d 202, 208-209 [68 Cal.Rptr. 694]*; [***5] *Gautier v. General Telephone Co. (1965) 234 Cal.App.2d 302, 308 [44 Cal.Rptr. 404]*; *Mason v. Drug, Inc. (1939) 31 Cal.App.2d 697, 703 [88 P.2d 929]*; *Sanders v. Ford Motor Co. (1979) 96 Cal.App.3d Supp. 43, 46 [158 Cal.Rptr. 656]*; see Grossman & Van Alstyne, California Practice (2d ed. 1976) § 984, pp. 111-114.)

Here, Tarmann generally alleged that the persons were "authorized agents of State Farm ... cloaked with such authority" and were "adjustors and/or [*158] claims supervisors/managers[.]" However, she

specifically alleged she did not know their names. [1]

1 We note that in her original complaint under the Insurance Code, Tarmann specifically alleged the names of State Farm agents who initially authorized her $ 3,200 estimate.

We acknowledge that the requirement of specificity is relaxed when the allegations indicate that "the defendant must necessarily possess full information [***6] concerning the facts of the controversy" ( *Bradley v. Hartford Acc. & Indem. Co. (1973) 30 Cal.App.3d 818, 825 [106 Cal.Rptr. 718]*, disapproved on another ground in *Silberg v. Anderson (1990) 50 Cal.3d 205, 212- 213 [266 Cal.Rptr. 638, 786 P.2d 365]*) or "when the facts lie more in the knowledge of the opposite party[.]" ( *Turner v. Milstein (1951) 103 Cal.App.2d 651, 658 [230 P.2d 25]*.) However, we consider this exception inapplicable here, for State Farm has no more reason to know who made the allegedly false representations to Tarmann than Tarmann.

Under the circumstances, the court properly sustained the demurrer to the fraud claim without leave to amend.

*The Cause of Action for Negligent Misrepresentation*

**[4]** To be actionable, a negligent misrepresentation must ordinarily be as to past or existing material facts. "[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 678, pp. 779-780; [***7] *Richard P. v. Vista Del Mar Child Care Service (1980) 106 Cal.App.3d 860, 865 [165 Cal.Rptr. 370]*.)

**[5a]** Here, the gist of both Tarmann's fraud and negligent misrepresentation claims is that State Farm said it *would* pay for her repairs *immediately upon their completion*, it failed to do so, Tarmann could not complete the repairs or redeem her vehicle, and she lost the use of it until State Farm settled the case.

The critical alleged misrepresentation as to immediate payment upon completion did not involve a past or existing material fact. Rather, it involved a promise to perform at some future time.

**[6]** Certain broken promises of future conduct may, however, be actionable. *Civil Code section 1710, subdivision (4)* defines one type of deceit as "A promise, made without any intention of performing it." As Witkin explains, "A false promise is actionable on the theory that a promise implies an intention to perform, that *intention to perform or not to perform* is a state [*159] of mind, and that misrepresentation of such a state of mind is a misrepresentation of *fact*. The allegation of a *promise* (which implies a representation [***8] of intention to perform) is the equivalent of the ordinary allegation of a representation of fact." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 670, p. 120, italics in original.)

To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing. ( *Hills Trans. Co. v. Southwest Forest Industries, Inc. (1966) 266 Cal.App.2d 702, 708 [72 Cal.Rptr. 441]*; *Regus v. Schartkoff (1957) 156 Cal.App.2d 382, 389 [319 P.2d 721]*.) **[5b]** Given this requirement, an [**864] action based on a false promise is simply a type of *intentional* misrepresentation, i.e., actual fraud. [2] The specific intent requirement also precludes pleading a false promise claim as a negligent misrepresentation, i.e., "The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." ( *Civ. Code, § 1710, subd. (2)*.) **[7]** Simply put, making a promise with an honest [***9] but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise. Moreover, we decline to establish a new type of actionable deceit: the negligent false promise.

2 If we assume Tarmann's fraud cause of action alleges a promise and an actual contemporaneous intent not to perform it, her failure to name the actual promisor would still be a fatal defect.

**[5c]** In light of our discussion, the trial court properly sustained the demurrer to Tarmann's cause of action for negligent misrepresentation.

*Conclusion and Disposition*

**[8]** "It is the correctness of the trial court's action in sustaining a demurrer, not its reasons, which is reviewable. [Citation.] The burden is upon appellant to demonstrate that the action of the trial court was an abuse of discretion. [Citation.]" ( *Stansfield v. Starkey, supra,*

*220 Cal.App.3d at p. 72.*)

Since the trial court's rejection of Tarmann's fraud and negligent [***10] misrepresentation claims was correct and Tarmann neither argues nor suggests that her complaint states a cause of action under any other legal theory, she has not met her burden of proving the trial court abused its discretion in sustaining State Farm's demurrer to her fifth amended complaint without leave to amend.

[*160] The judgment is affirmed.

Premo, J., and Cottle, J., concurred.

# TAB 30

LEXSEE 39 CAL.3D 30

**MICHAEL L. TENZER, Plaintiff and Appellant, v. SUPERSCOPE, INC., Defendant and Respondent**

**L.A. No. 31842**

**Supreme Court of California**

***39 Cal. 3d 18***; ***702 P.2d 212***; ***216 Cal. Rptr. 130***; ***1985 Cal. LEXIS 293***

**July 25, 1985**

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. C 376037, Sara Kleban Radin, Judge.

**DISPOSITION:** The judgment is reversed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A corporation director brought an action against the corporation based on its refusal to pay him a finder's fee for finding a buyer of corporation real estate. The director alleged an oral promise by the corporation president and board chairman to pay him a 10 percent finder's fee, that he acted in reliance upon the promise, and that he suffered damage as a result. The trial court granted the corporation's motion for summary judgment based on the provision in the statute of frauds requiring an agreement authorizing or employing an agent, broker, or any other person to find a purchaser or seller of real estate for compensation or a commission to be in writing and subscribed by the party to be charged or by his agent (*Civ. Code, § 1624*, *subd. 5*). (Superior Court of Los Angeles County, No. C 376037, Sara Kleban Radin, Judge.)

The Supreme Court reversed. It held that, although there is no finder's fee exception to the statute of frauds set forth in *Civ. Code, § 1624*, *subd. 5*, and that the action would therefore ordinarily be barred, the director's allegations entitled him to invoke the doctrine of estoppel to plead the statute of frauds. Further, it held that the unenforceability of the promise as a contract due to the statute of frauds did not preclude the cause of action for fraud. However, it held that proof that a promise was made and that it was not fulfilled is not sufficient to prove fraud, but rather that something more than nonperformance would be required to prove the defendant's intent not to perform the promise. The court held that, on remand, the director would be required to prove that the finder's fee agreement was fair and reasonable to the corporation in order to prove that his reliance on the promise of the finder's fee was justifiable. It held that establishing whether the agreement was fair and reasonable would involve determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to the facts. It held that these would be functions mainly for the trier of facts. Finally, it held that, on remand, if the director's reliance on the promise of a finder's fee was unjustified, equity would not require that the director be allowed to enforce the promise. Thus, in order to invoke the doctrine of estoppel to plead the statute of frauds, the director would, on remand, have to establish that his behavior was reasonably consistent with his fiduciary role. (Opinion by Grodin, J., expressing the unanimous view of the court.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Frauds, Statute of § 6--Agreements for Lease or Sale of Real Property--Finder's Fee.** --There is no finder's fee exception to the requirement that an agreement authorizing or employing an agent, broker, or any other person to find a purchaser or seller of real estate for compensation or a commission must be in writing and subscribed by the party to be charged or by

his agent (*Civ. Code, § 1624, subd. 5*).

**(2a) (2b) Frauds, Statute of § 11--Operation of Statute--Estoppel to Assert Statute--Finder's Fee.** --In an action by a corporation director alleging breach of an oral contract for payment by the corporation of a finder's fee for finding a buyer of corporation real estate, the trial court erred in granting the corporation's motion for summary judgment, based on the statute of frauds. Although the action would ordinarily be barred by the provision in the statute of frauds applying to finder's fees agreements (*Civ. Code, § 1624, subd. 5*), the director alleged that he was not a licensed real estate broker, that he supplied the corporation with the name of a buyer in reliance on the promise of payment made by the corporation president and board chairman, and that this was valuable information which he could have sold elsewhere. On these allegations, the director was entitled to invoke the doctrine of estoppel to plead the statute of frauds.

**(3) Frauds, Statute of § 11--Operation of Statute--Estoppel to Assert Statute.** --The doctrine of estoppel to plead the statute of frauds may be applied where necessary to prevent either unconscionable injury or unjust enrichment.

**(4a) (4b) Frauds, Statute of § 8--Operation of Statute--Effect on Action for Fraud.** --In an action in which a corporation director alleged that the corporation president and board chairman, acting for the corporation, deliberately misled the director by falsely orally promising to compensate him for his services in finding a buyer of corporation real estate, that the director acted in reliance upon these misrepresentations, and that he suffered damage as a result, the trial court erred in granting the corporation's motion for summary judgment on the cause of action for fraudulent misrepresentation. Although the finder's fee agreement was unenforceable under the statute of frauds (*Civ. Code, § 1624, subd. 5*), the unenforceability of an allegedly fraudulent promise as a contract due to the statute of frauds does not preclude an action for fraud. (Disapproving the rule stated in *Kroger v. Baur (1941) 46 Cal. App. 2d 801, 803 [117 P.2d 50]*, *Keely v. Price (1972) 27 Cal. App. 3d 209, 215 [103 Cal. Rptr. 531]*, *Owens v. Foundation for Ocean Research (1980) 107 Cal. App. 3d 179 [165 Cal. Rptr. 571]*, and *Beach v. Arblaster (1961) 194 Cal. App. 2d 145, 163 [14 Cal. Rptr. 854]*.)

**(5) Fraud and Deceit § 28--Actions--Evidence--Promises Made Without Intent to Perform--Necessity of Evidence of Intent to Mislead.** --To survive a motion for nonsuit (*Code Civ. Proc., § 581c*) in an action on a fraudulent promise, the plaintiff must produce evidence of the promisor's intent to mislead him. Proof that a promise was made and that it was not fulfilled is not sufficient to prove fraud. Rather, something more than nonperformance is required to prove the defendant's intent not to perform his promise. (Disapproving *Santoro v. Carbone (1972) 22 Cal. App. 3d 721, 728 [99 Cal. Rptr. 488]* and *Jarkieh v. Badagliacco (1946) 75 Cal. App. 2d 505, 509 [170 P.2d 994]* to the extent that they suggest otherwise.)

**(6) Summary Judgment § 21--Hearing and Determination--Issues Precluding Judgment--Illustrations.** --In an action by a corporation director against the corporation based on its refusal to pay the director a finder's fee for finding a buyer of corporation real estate, the trial court erred in granting the corporation's motion for summary judgment based on its contention that the director acted as a real estate broker and could not recover because he was not licensed (*Bus. & Prof. Code, § 10136*). Whether the director acted as a broker was a question of fact, requiring an examination of his conduct after the introduction of the buyer and seller, to determine whether he participated in their negotiations.

**(7) Compromise, Settlement, and Release § 8--Compromise and Release--Requisites and Validity--Extinction of Obligation Without Consideration--Showing of Creditor's Intent.** --A written release under *Civ. Code, § 1541*, extinguishing an obligation without consideration, must expressly show the creditor's intent to extinguish the obligation.

**(8) Corporations § 34--Officers and Agents--Directors--Contracts With Corporation.** --A director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent. Directors' dealings with the corporation are subjected to rigorous scrutiny, and where any of their contracts or engagements with the corporation is challenged the burden is on the director not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.

**(9) Corporations § 34--Officers and Agents--Directors--Contracts With Corporation--Corporation's Option to Avoid.** --A corporate director is charged with the knowledge that any contract he entered into with his own corporation, even if valid and enforceable in all other respects, could be avoided at the corporation's option if it were determined to be unfair or unreasonable to the corporation.

**(10) Estoppel and Waiver § 6--Equitable Estoppel.** --Estoppel is an equitable remedy and, as such, will only be applied to avoid injustice.

**COUNSEL:** Merle H. Horwitz, Herbert A. Bernhard and Greenberg, Bernhard, Weiss & Rosin for Plaintiff and Appellant.

Nossaman, Guthner, Knox & Elliott and Alvin S. Kaufer for Defendant and Respondent.

**JUDGES:** Opinion by Grodin, J., expressing the unanimous view of the court. Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.

**OPINION BY:** GRODIN

**OPINION**

[*21] [**213] [***131] Plaintiff Michael L. Tenzer (Tenzer) appeals from a judgment in favor of defendant Superscope, Inc. (Superscope) after the trial court granted Superscope's motion for summary judgment.

[*22] Facts

The facts, as revealed by Tenzer's complaint [1] and the papers filed in support of and in opposition to the motion for summary judgment, are these:

Superscope is a corporation listed on the New York Stock Exchange and authorized to do business in California. Joseph Tushinsky is the president of the corporation, as well as the chairman of its board of directors.

1 In its motion for summary judgment, Superscope argued that, even if all the facts alleged in Tenzer's complaint and supporting papers were true, he was entitled to no relief as a matter of law. For this reason, Superscope submitted no factual declarations to counter the truth of Tenzer's allegations.

Tenzer has been involved in a management capacity in the real estate and housing industries in the western part of the United States for 20 years. Although he has extensive personal and business contacts among investors in the real estate field, Tenzer is not a licensed real estate broker.

Tenzer and Tushinsky served together on the board of directors of a charitable organization in Los Angeles. Sometime prior to May of 1979, they began to discuss the possibility that Tenzer should become a member of the Superscope board of directors (Board).

On May 10, 1979, at Tushinsky's invitation, Tenzer attended a Board meeting. At this meeting Tenzer learned, for the first time, that Superscope was attempting to sell its corporate headquarters to meet pressing cashflow problems. The next day, Tenzer was elected to the Board at the corporation's annual meeting. At a Board meeting the same day, the need to sell the corporation's headquarters was again discussed.

The next meeting of the Board occurred on June 22, 1979. At this meeting, the outside directors, [2] including Tenzer, first learned the details of Superscope's financial predicament. The Board was informed that the corporation was technically in default on over $ 45 million in loans and that the corporation's banks were threatening to accelerate payment on these loans. The Board was also told that a cash sale of the corporate headquarters was imperative to avoid reorganization pursuant to the federal Bankruptcy Act. The headquarters building, together with other property and facilities including a warehouse, parking lot, and adjacent undeveloped acreage, had been on the real estate market for nearly a year, but Superscope's real estate broker had not yet been able to effect a sale. The asking price for the property was approximately $ 16 million. At this meeting, Tushinsky expressed [*23] his view that the situation was desperate and that a miracle was needed to save the corporation.

2 An outside director is a director who has no interest or other duties in the corporation other than as a director.

Subsequently, Tushinsky, in a phone conversation, implored Tenzer personally to [**214] seek a suitable

buyer for the property. Shortly afterwards, Tenzer became aware that Paul Amir, a Beverly Hills-based entrepreneur, was interested in negotiating a quick-closing real estate purchase for tax reasons. The Superscope headquarters appeared to be precisely the sort of property which would suit Amir's needs. Tenzer discussed the Superscope property with Amir without revealing its identity and verified that Amir might be interested in buying it.

With this information in hand, Tenzer telephoned Tushinsky. He explained that he was calling not in his capacity as a Board member, but as a finder, that he had located a potential buyer for the corporate headquarters and that, should the sale be consummated, he would expect a finder's fee of 10 percent. Tushinsky responded enthusiastically, authorizing Tenzer to discuss the matter further with his contact. Tushinsky also indicated that payment of a [***132] finder's fee was entirely proper, that the requested fee was satisfactory, and that if a $ 16 million sale were to close when expected, Tenzer's fee would be earned and payable upon the closing.

Neither Tenzer nor Tushinsky discussed the need to reduce the finder's fee agreement to writing. Tenzer felt that their personal relationship and Tushinsky's integrity were sufficient assurance that he would be paid. In reliance upon Tushinsky's promise, Tenzer then revealed each party's identity to the other.

The Board accepted Amir's offer in July 1979. A contract for the sale of Superscope's headquarters to Amir was consummated in August, and the sale was ultimately closed.

Tenzer was aware of other real estate opportunities for Amir, but he refrained from exploring such opportunities on Amir's behalf in reliance upon Tushinsky's promise that he would receive a finder's fee from the Superscope sale. Prior to the Board's approval of the Amir transaction, Tenzer informed it that he was entitled to a finder's fee in the event of a sale to Amir. He did not, however, reveal the amount of the finder's fee to which Tushinsky had agreed. [3] Tenzer took no part in the deliberations concerning or in the vote approving acceptance of Amir's offer.

3 Tenzer felt that it was Tushinsky's duty to disclose to the Board the amount of the finder's fee. He asserts that a fee of 10 percent was reasonable given the precarious financial condition of Superscope and the fact that the sale saved Superscope from bankruptcy.

[*24] At the July 27, 1979, Board meeting at which the sale to Amir was approved, a discussion regarding the payment of finders' fees to directors was held, but a final decision on the issue was deferred to the next Board meeting on August 24, 1979. At the August meeting, a motion was made to authorize the payment of finders' fees to corporate directors. Tenzer maintains that the discussion involved only whether such fees would be approved for future transactions, and did not touch upon approval of the finder's fee arrangement he had already made with Tushinsky. He believed that the Board had ratified that arrangement when it accepted Amir's offer in July. In any case, Tenzer participated in the August discussion and voted on the motion. Part of the discussion centered upon whether such fees were permitted under the corporate bylaws. [4] All outside directors [**215] voted in favor of the resolution authorizing payment of finders' fees. All the "inside" directors (including corporate employees and members of the Tushinsky family) voted against. The resolution was defeated. Tenzer has never received a finder's fee for his services in connection with the Amir transaction.

4 Superscope's bylaws provide in pertinent part as follows:

"Article III

"Directors

"Section 1: Powers. . . . [para. ] Without prejudice to such general powers, but subject to the same limitations, it is hereby expressly declared that the directors shall have the power and authority to: [para. ] (a) Select and remove all officers, agents, and employees of the corporation, . . . and . . . fix their compensation . . . .

"Section 14: Fees and Compensation of Directors. Directors . . . may receive such compensation, if any, for their services, . . . as may be fixed or determined by resolution of the board of directors. Nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation for such services."

Tenzer filed suit against both Superscope and Tushinsky. He alleged three "causes of action" which he entitled "Breach of Contract and Unjust Enrichment," "Estoppel," and "Fraud." The complaint further alleged that, in making the promise to pay him a 10 percent finder's fee, Tushinsky had acted as the agent of the corporation, and that he made the promise fraudulently, with no intent to perform. Rather, Tenzer alleged, Tushinsky intended to cheat him by inducing him to reveal Amir's name [***133] while secretly harboring an intent to prevent payment of the agreed fee.

After a hearing on the merits, Superscope's motion for summary judgment pursuant to *Code of Civil Procedure section 437c* was granted. [5] Tenzer filed a timely appeal from the judgment in favor of Superscope. For the reasons stated below, we reverse.

5 Tushinsky is not a party to the judgment entered below or to this appeal.

[*25] Discussion

Tenzer's contentions on appeal may be summarized as follows:

1. There is a finder's fee exception to the statute of frauds contained in *Civil Code section 1624, subdivision 5*. Therefore, an oral contract to pay a finder's fee in a real estate transaction is enforceable.

2. Even if the statute of frauds would normally preclude enforcement of an oral finder's fee contract, in this case Tenzer performed in reliance upon the agreement and Superscope retained the benefits. This should operate as an estoppel to assert the statute of frauds as a defense.

3. Because of Tushinsky's misrepresentations, Tenzer may maintain an action for fraud even if the underlying oral agreement is unenforceable.

4. Summary judgment was inappropriate because of the presence of triable issues of fact.

As explained further below, we find that, liberally construed, the papers Tenzer submitted in opposition to the motion for summary judgment are sufficient to raise triable issues of fact as to the second and third of these contentions. Thus summary judgment was inappropriate. (See, e.g., *Corwin v. Los Angeles Newspaper Service Bureau, Inc. (1971) 4 Cal.3d 842, 851-852 [94 Cal. Rptr. 785, 484 P.2d 953]*.) However, we find no merit in Tenzer's first argument.

I.

*Civil Code section 1624*, provides in pertinent part as follows: "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: . . . 5. An agreement authorizing or employing an agent, broker, or any other person to . . . find a purchaser or seller of real estate . . . for compensation or a commission; . . ."

**(1)** In his first cause of action, Tenzer attempts to claim damages based upon breach of an alleged oral contract employing him to find a purchaser of real estate for a commission. He does not allege that the contract was ever put in writing. Under the plain language of the statute this contract, if it was entered into, was invalid.

Tenzer argues that precedent establishes the statute is irrelevant to his claim. He cites several cases, including *Tyrone v. Kelley (1973) 9 Cal.3d 1* [*26] *[106 Cal. Rptr. 761,* [**216] *507 P.2d 65]*; *Rees v. Dept. of Real Estate (1977) 76 Cal. App. 3d 286, 295 [142 Cal. Rptr. 789]*; and *Spielberg v. Granz (1960) 185 Cal. App. 2d 283 [8 Cal. Rptr. 190]*, for the proposition that there is a "finder's exception," both to licensing laws and the statute of frauds. He is in error. Those cases merely stand for the principle that a finder in a real estate transaction need not be licensed as a real estate broker to collect a finder's fee. They state nothing about a finder's exception to the statute of frauds. As noted in *Grant v. Marinell (1980) 112 Cal. App. 3d 617 [169 Cal. Rptr. 414]*, the Legislature has gone to considerable lengths to clarify that finders' agreements such as this must be memorialized in writing to be enforceable:

"Before 1963, the so-called oral 'finder's agreement,' that is an agreement merely to introduce a seller of real estate to a prospective purchaser or a purchaser to a prospective [***134] buyer, was held not to be within the statute of frauds, whether such contract was made by a real estate broker or agent or by an unlicensed person. (See *Heyn v. Philips (1869) 37 Cal. 529, 531*; *Palmer v. Wahler (1955) 133 Cal. App. 2d 705, 710 [285 P.2d 8]*.)

"In 1963, however, the Legislature amended subdivision 5 to add, inter alia, the italicized language: 'An agreement authorizing or employing an agent or

broker to purchase or sell real estate, . . . *or to procure, introduce, or find a purchaser or seller of real estate* or a lessee or lessor of real estate where such lease is for a longer period than one year, for compensation or a commission.' (Stats. 1963, ch. 814, § 1 p. 1843.)

"If by this amendment the Legislature intended all finder's fee agreements to come within the ambit of the statute of frauds, it failed, as was predicted in the State Bar Journal's review of 1963 legislation (38 State Bar J. 604, 649). [Fn. omitted.] The section, as amended, was interpreted to bar only oral finder's agreements between licensed brokers or agents and sellers or purchasers of property. Subdivision 5, as revised, was still held to be inapplicable to such oral agreements by unlicensed individuals. (See *Hasekian v. Krotz (1968) 268 Cal. App. 2d 311, 317 [74 Cal. Rptr. 410]*; *Porter v. Cirod, Inc. (1966) 242 Cal. App. 2d 761, 766 [51 Cal. Rptr. 784].*) This anomaly resulted in the 1967 amendment (Stats. 1967, ch. 52, § 1 p. 953), which added the following italicized language: 'An agreement authorizing or employing an agent, *or any other person* to purchase or sell real estate . . . or to procure, introduce or find a purchaser or seller . . . .'" (*d.*, at pp. 620-621, original italics.)

Tenzer also refers us to *Zalk v. General Exploration Co. (1980) 105 Cal. App. 3d 786* [Cal. Rptr. 647], and a passage from *Tyrone v. Kelley, supra, 9 Cal.3d 1, 12-13*, but these decisions merely involve oral agreements [*27] for finder's fees in nonrealty transactions, and therefore are inapposite to this case.

We conclude that Tenzer's action based on contract would ordinarily be barred by the statute of frauds. **(2a)** Tenzer asserts, however, that even if the finder's fee agreement was oral, and in violation of the statute of frauds, he has alleged facts sufficient to invoke the estoppel doctrine and thus to foreclose Superscope from relying upon the statute of frauds as a defense. In brief, Tenzer alleges that Tushinsky -- as Superscope's representative -- promised to pay him for valuable information which could have been sold elsewhere. In reliance on this promise, Tenzer surrendered Amir's name. Superscope, having profited from Tenzer's performance, now refuses to keep its end of the bargain.

**(3)** The doctrine of estoppel to plead the statute of frauds may be applied where necessary to prevent either unconscionable injury or unjust enrichment. ( *Monarco v.* [**217] *Lo Greco (1950) 35 Cal.2d 621, 623-624 [220 P.2d 737].*) On the basis of the factual contentions advanced in Tenzer's papers, Superscope has received the benefit of Tenzer's performance but relies upon the statute of frauds to avoid paying the agreed-upon price. Provided that Tenzer was not otherwise obligated to reveal this information to Superscope -- a point which we consider further, *infra* -- these allegations suggest a case of unjust enrichment as that term was defined in *Monarco v. Lo-Greco, supra, at page 624.* In such cases, the doctrine of estoppel to assert the statute of frauds may be applied in the interests of fairness.

**(2b)** Superscope argues that, as a real estate finder, Tenzer may not invoke the equitable doctrine of estoppel. It relies upon a series of cases which have established that "'an estoppel to plead the statute of frauds cannot be predicated upon the . . . refusal to comply with an oral promise to pay a [real estate] commission.'" ( *Keely v. Price (1972) 27 Cal. App. 3d 209, 212* [***135] *[103 Cal. Rptr. 531]*, quoting *Herzog v. Blatt (1947) 80 Cal. App. 2d 340, 343 [180 P.2d 30]*; see also *Hicks v. Post (1908) 154 Cal.22 [96 P. 878]*; *King v. Tilden Park Estates (1958) 156 Cal. App. 2d 824 [320 P.2d 109]*; *Augustine v. Trucco (1954) 124 Cal. App. 2d 229 [268 P.2d 780]*; *White v. Hirschman (1942) 54 Cal. App. 2d 573 574 [129 P.2d 430]*; *Sweeley v. Gordon (1941) 47 Cal. App. 2d 381 [118 P.2d 14].*)

Superscope's reliance is misplaced. The cases it cites all involved licensed real estate brokers. The rationale for rigorous application of the statute of frauds to bar claims by licensed real estate brokers is related to the statutory licensing requirements. "Real estate brokers are licensed as such only after they have demonstrated a knowledge of the laws relating to real estate transactions (*Bus. & Prof. Code, §§ 10150, 10153*), and it would seem that they [*28] would thus require less protection against pitfalls encountered in transactions regulated by those laws. In *Pacific Southwest Dev. Corp. v. Western Pac. R. R. Co. [1956] 47 Cal.2d 62 [301 P.2d 825]*, the court stated at page 70: 'Plaintiff is a licensed real estate broker and, as such, is presumed to know that contracted for real estate commissions are invalid and unenforceable unless put in writing and subscribed by the person to be charged. [Citations.] Nevertheless, plaintiff failed to secure proper written authorization to protect itself in the transaction. Rather it assumed the risk of relying upon claimed oral promises of defendant, and it has no cause for complaint if its efforts go unrewarded.'" ( *Franklin v. Hansen (1963) 59 Cal.2d 570, 575 [30 Cal. Rptr. 530, 381 P.2d*

*386]*; see also *Jaffe v. Albertson Co. (1966) 243 Cal. App. 2d 592, 603-604 [53 Cal. Rptr. 25]*; *King v. Tilden Park Estates, supra, 156 Cal. App. 2d 824, 830.*) 6

6 We note that the rules withholding traditional equitable remedies, such as recovery in quantum meruit and the doctrine of estoppel, from real estate brokers have been vigorously criticized. (See, e.g., Comment, *Equitable Estoppel and the Statute of Frauds in California* (1965) 53 Cal. L. Rev. 590, 602, 609; Note, *Oral Employment Contracts and Equitable Estoppel: The Real Estate Broker as Victim* (1975) 26 Hastings L.J. 1503; 1 Miller & Starr, Current Law of Cal. Real Estate (1975) § 1:54, pp. 69-74, fn. 8.) Miller and Starr suggest that this issue may be due for reexamination in light of changed conditions in the real estate field. (*Ibid.*) In today's market, they assert, brokers often deal with sophisticated principals in superior bargaining positions. In such circumstances, the broker is powerless to compel the principal's cooperation in executing a written commission agreement and denial of the broker's claim for a commission based on failure to comply with the requirements of the statute of frauds is unjust. Whether or not there is merit in these arguments, we reserve for another day the question whether licensed brokers may invoke equitable remedies to avoid the sometimes harsh results of the statute of frauds. As noted above, the question is not presented in this case.

This rationale is inapplicable to "finders," who need not be licensed brokers, or [**218] even involved in the real estate business professionally. We, therefore, decline to extend the scope of the *Keely* v. *Price* rule to unlicensed finders such as Tenzer. Tenzer is entitled to invoke the doctrine of estoppel to plead the statute of frauds. On the facts alleged, Superscope's motion for summary judgment was improperly granted.

II.

**(4a)** Tenzer's complaint also sets forth an alternative basis for relief, seeking damages for fraud. Tenzer alleges that Tushinsky, acting for Superscope, deliberately misled him by falsely promising to compensate him for his services as a finder. Tenzer acted in reliance upon these misrepresentations and has suffered damage. Therefore, Tenzer asserts that, regardless of whether the oral contract is enforceable, he may maintain an action in tort for fraudulent misrepresentation.

[*29] A series of cases have held that an action for fraud cannot be maintained where the allegedly fraudulent promise is unenforceable as a contract due to the statute of frauds. The rule was stated in [***136] *Kroger v. Baur (1941) 46 Cal. App. 2d 801, 803 [117 P.2d 50]*, as follows: "Appellant contends that his action is not upon the invalid agreement, but is an action for damages for fraud, upon the theory that the oral promise to pay him a commission was made without any intention of performing it and for the purpose of inducing him to waive a written memorandum. If the law can be thus nullified by the transparent device of predicating a tort action upon the invalid oral promise on the ground that the promisor did not intend to perform it, then the section might just as well be stricken from the statute. To license such a circuitous procedure to evade the provisions of such legislation would be to nullify and destroy its wholesome effect and the protection it affords against fraud." (See also *Keely v. Price, supra, 27 Cal. App. 3d 209, 215*; *Owens v. Foundation for Ocean Research (1980) 107 Cal. App. 3d 179 [165 Cal. Rptr. 571]*; *Beach v. Arblaster (1961) 194 Cal. App. 2d 145, 163 [14 Cal. Rptr. 854].*)

But the *Kroger* rule has been criticized and, in 1978, Justice Kaus -- then sitting on the Second District Court of Appeal -- invited this court to disapprove it. Today we accept his invitation.

As Justice Kaus observed: "Several considerations point to a demise of the *Kroger* rule . . . . In brief: 1. The 'better' rule is contra. *Comment (c) to section 530 of the Restatement Second of the Law of Torts* states that a misrepresentation of one's intention is actionable even 'when the agreement is oral and made unenforceable by the statute of frauds, or when it is unprovable and so unenforceable under the parol evidence rule.' 2. The broad statement of the *Kroger* rule is difficult to reconcile with the principle that a party may be estopped to assert the statute of frauds where such estoppel is necessary 'to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances.' ( *Monarco v. Lo Greco (1950) 35 Cal.2d 621, 623.*) 3. It is simply untrue that a plaintiff who undertakes to plead and prove actionable fraud is attempting to get around the statute of frauds by a 'transparent device.' *Kroger* seems to assume the inability of a jury to distinguish between an unkept

but honest promise and one which the promisor never intended to perform. The law is otherwise. ( *People v. Ashley (1954) 42 Cal.2d 246, 263-264 [267 P.2d 271].*) 4. The provision of the statute of frauds which spawned *Kroger* was *Civil Code section 1624, subdivision 5*, relating to agreements for real estate brokers' commissions. The law has traditionally had little sympathy with the broker who has failed to sign up his client. (E.g., *Augustine v. Trucco (1954) 124 Cal. App. 2d 229, 237-238 [268 P.2d 780].*)" ( *Southern Cal. etc. Assemblies of God v. Shepherd* [*30] *of Hills etc. Church (1978) 77 Cal. App. 3d 951, 958, fn. 3 [144 Cal. Rptr. 46].*)

[**219] In addition, the *Kroger* approach is inconsistent with the general rule "'that the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme.'" ( *Seymour v. Oelrichs (1909) 156 Cal. 782, 794 [106 P. 88]*, quoting 2 Pomeroy's Equity Jurisprudence, § 921; see also *Moore v. Day (1954) 123 Cal. App. 2d 134, 138 [266 P.2d 51]*; 3 Williston on Contracts (3d ed. 1960) § 533A, p. 802.)

**(5)** Nor do we agree with the view that the *Kroger* rule is necessary to prevent the nullification of the statute of frauds. This view is perhaps based upon the notion that, when the statute of frauds clearly bars an action in contract, a disappointed promisee should not be allowed to present his claim for compensation to a jury simply by recasting his complaint to include an allegation of misrepresentation. If it were, in fact, that easy to reach a jury on a claim of fraud, we might agree. Fortunately, this is not the case. To survive a motion for a nonsuit (*Code Civ. Proc., § 581c*), plaintiff in an action on a fraudulent promise must [***137] produce evidence of the promisor's intent to mislead him.

Some California cases have stated broadly that "[the] subsequent failure to perform as promised warrants the inference that defendant did not intend to perform when she made the promise. [Citations.]" ( *Santoro v. Carbone (1972) 22 Cal. App. 3d 721, 728 [99 Cal. Rptr. 488]*; see also *Jarkieh v. Badagliacco (1946) 75 Cal. App. 2d 505, 509 [170 P.2d 994].*) This may suggest that proof that a promise was made and that it was not fulfilled is sufficient to prove fraud. This is not, and has never been, a correct statement of the law, and we disapprove the cases cited to the extent they suggest otherwise.

Rather, "something more than nonperformance is required to prove the defendant's intent not to perform his promise." ( *People v. Ashley (1954) 42 Cal.2d 246, 263 [267 P.2d 271]*; see also *Jacobson v. Mead (1936) 12 Cal. App. 2d 75, 82 [55 P.2d 285]*; *Justheim Petroleum Company v. Hammond (10th Cir. 1955) 227 F.2d 629, 637*; *Rest.2d Torts, § 530, com. d.*; Prosser, Torts (5th ed. 1984) § 109, p. 764.) To be sure, fraudulent intent must often be established by circumstantial evidence. Prosser, for example, cites cases in which fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform. (Prosser, *supra*, at pp. 764-765.) However, [*31] if plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury. The policies of the statute of frauds will not be subverted by affording plaintiffs who can prove actual fraud the opportunity to do so.

**(4b)** For these reasons, we disapprove of *Kroger* v. *Baur* and its progeny. We conclude that Tenzer's papers were sufficient to raise triable issues of fact on a cause of action for fraudulent misrepresentation.

III.

**(6)** In its motion for summary judgment, Superscope contended that, even if Tenzer had had a commission agreement, he acted as a real estate broker and cannot recover because he was not licensed. (*Bus. & Prof. Code, § 10136.*) Whether Tenzer acted as a broker is a question of fact, requiring an examination of his conduct after the introduction of the buyer and seller, to determine whether he participated in their negotiations. ( *Lyons v. Stevenson (1977) 65 Cal. App. 3d 595, 605-606 [135 Cal. Rptr. 457].*) **(7)** (See fn. 7.)The record does not permit adjudication of this factual question on a motion for summary judgment. [7]

7 Superscope also advanced a somewhat confused theory of "waiver"; alleging that, by giving misleading answers on questionnaires Superscope distributed in 1980 and 1981, Tenzer had waived his claim against the corporation.

The use of the term "waiver" in a contractual context is ambiguous and uninformative. (See

generally 5 Williston on Contracts (3d ed. 1961) § 678, p. 238 et seq.) As Professor Williston notes, an agreement to discharge from liability previously incurred is more normally denominated a release. *Civil Code section 1541* permits the extinction of an obligation, unsupported by consideration, provided that the release is in writing. The writing must, however, expressly show the creditor's intent to extinguish the obligation. ( *Golden West Credit etc. Co. v. Wilson (1932) 119 Cal. App. 627, 636 [7 P.2d 345].*) In our view, Tenzer's answers on the 1980 and 1981 questionnaires express no such intent.

[**220] IV.

Finally, we address Superscope's contention that in light of Tenzer's fiduciary obligations as corporate director any reliance by him upon Tushinsky's promise was unreasonable as a matter of law.

At the time of the alleged agreement, Tenzer was a member of Superscope's Board. As such, he bore a fiduciary relationship to Superscope and to all its stockholders. ( *Remillard Brick Co. v. Remillard-Dandini (1952) 109 Cal. App. 2d 405, 419 [241 P.2d 66].*) **(8)** Well-established principles [***138] of corporations law hold that a "director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent." ( *Id., at p. 418.*) "[Directors'] dealings with the corporation are [*32] subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director . . . not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [Citation.] The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. [Fn. omitted.] If it does not, equity will set it aside." ( *Pepper v. Litton (1939) 308 U.S. 295, 306-307 [84 L. Ed. 281, 289, 60 S. Ct. 238].*) "[Transactions] that are unfair and unreasonable to the corporation may be avoided." ( *Remillard Brick Co., supra, at p. 418*; see also 1 *Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1984) § 103.01*, pp. 6-20.1-6-21.)

**(9)** As a corporate director, Tenzer is charged with the knowledge that any contract he entered into with his own corporation, even if valid and enforceable in all other respects, could be avoided at the corporation's option if it were determined to be unfair or unreasonable to the corporation. Thus, in order to prove that his reliance upon Tushinsky's promise was justifiable, Tenzer will be required to prove that the arrangement was fair and reasonable to the corporation.

Establishing whether Tenzer's agreement with Superscope was fair and reasonable involves determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to these facts. These are functions mainly for the trier of facts. (See *Mueller v. MacBan (1976) 62 Cal. App. 3d 258, 276 [132 Cal. Rptr. 222]*; see also *MacEwen v. Star-Kist Foods, Inc. (E.D.N.Y. 1966) 251 F. Supp. 33.*)

For the guidance of the trial court in overseeing this factfinding process, we offer the following observations. In ever-increasing numbers, we derive our livelihoods from transactions in information rather than property or labor. In addition to real estate professionals, lawyers, bankers, and accountants, as well as consultants in any number of fields often sell what they *know* as much as what they *do*. Many of these same professionals serve as directors on the boards of corporations for which they also work. The ethics and wisdom of serving on the board of a corporation to which one regularly renders professional services has been questioned. (See Knepper, *Liability of Lawyer-Directors* (1970) 40 Ohio St. L.J. 341; see also Ruder, *The Case Against the Lawyer-Director* [**221] (1975) 30 Bus. Law. 41.) Yet the practice is widespread and has its defenders, who point out that corporations should not be deprived of the special skills such "interested directors" can provide, and that the potential for conflicts of interest can be avoided by full disclosure and establishment of procedures to assure conscientious adherence to ethical standards of fairness. (See, e.g., Note, *Should Lawyers* [*33] *Serve as Directors of Corporations for Which They Act as Counsel?* 1978 Utah L. Rev. 711.)

Certainly it would be unfair to require such directors to surrender gratuitously to their corporations information or advice for which they would otherwise be paid in the normal course of their business. At the same time, we discern nothing oppressive in the view that corporate directors should be required, as a facet of their role as fiduciaries, to pass on information vital to the survival of their corporations which either is incidental to the directors' usual mode of earning a living or was casually

acquired.

The determination whether Tenzer's agreement with Tushinsky was fair and reasonable to Superscope involves evaluation of the specific facts surrounding the transaction. Was Tenzer dependent upon transactions of this sort for his livelihood? [***139] If so, was this fact known to Tushinsky? Was it known that, by revealing Amir's name to Superscope, Tenzer would be forgoing the opportunity to sell the same information in other quarters?

How did Tenzer become aware of Amir's interest in a deal of this sort? Directors may be more obligated freely to disclose information which "falls into their laps" than information obtained by employing the skills and resources normally used in their professions.

How did the price Tenzer asked for his information compare to the usual commission for such information in this real estate market? Did Superscope's bylaws specifically allow or prohibit compensation of directors for professional services? This list of questions is by no means exhaustive.

The answers to these questions are also pertinent to Tenzer's claim of estoppel to plead the statute of frauds. **(10)** Estoppel is an equitable remedy and, as such, will only be applied to avoid injustice. If reliance upon Tushinsky's promise was unjustified in light of Tenzer's position as a director, equity does not require that Tenzer be allowed to enforce the promise. (See generally *Rest.2d Contracts, § 139*.) At the same time, this factual inquiry may establish that, because of his fiduciary relationship to the corporation, Tenzer was obligated to reveal his information without seeking compensation. If so, the corporation cannot be said to be unjustly enriched by retaining the benefits of Tenzer's information but refusing to pay for it. Thus, Tenzer will have to establish that his behavior was reasonably consistent with his fiduciary role in order to invoke the doctrine of estoppel.

Resolution of this issue requires information which, at this point, does not appear in the record. For this reason, we conclude that summary adjudication was inappropriate.

[*34] The judgment is reversed.

# TAB 31

LEXSEE 71 CAL.APP.4TH 1081

**STEPHEN F. WILKINS et al., Plaintiffs and Appellants, v. NATIONAL BROADCASTING COMPANY, INC., et al., Defendants and Respondents.**

**No. B109530.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION THREE**

***71 Cal. App. 4th 1066; 84 Cal. Rptr. 2d 329; 1999 Cal. App. LEXIS 420; 27 Media L. Rep. 1865; 99 Cal. Daily Op. Service 3194; 99 Daily Journal DAR 4103***

**April 30, 1999, Decided**

**SUBSEQUENT HISTORY:** [***1] Review Denied July 21, 1999, Reported at: *1999 Cal. LEXIS 4884.*

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC132677. David P. Yaffe, Judge.

**DISPOSITION:** Judgment is affirmed. NBC is awarded costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In preparation for a television news report that investigated the practice of charging for services on so-called "toll-free" 800 lines, two television producers responded to a national advertisement by a company engaged in that business for investors and arranged to meet with a company salesperson. The producers did not reveal their television association and met with two representatives of the company at a restaurant and videotaped the meeting with hidden cameras. After portions of the videotape appeared in a television broadcast, the two company representatives filed claims for intrusion, unlawful recording of confidential communications, fraud, and various other causes of action against the television network and its producers. The trial court granted summary judgment in favor of defendants and denied plaintiffs' motion for a new trial. (Superior Court of Los Angeles County, No. BC132677, David P. Yaffe, Judge.)

The Court of Appeal affirmed. The court held that the complaint did not state a cause of action under any of plaintiffs' theories. The sales pitch was conducted in the middle of a crowded patio within close proximity to other tables, the location was not secluded, plaintiffs did not conduct themselves as though they were dispensing private information, and plaintiffs admitted that they freely provided the same information about their products to hundreds of other potential investors. Under these circumstances, there was no intrusion into a private place, conversation, or matter; defendants actions were not highly offensive to a reasonable person, and plaintiffs had no reasonable expectation of seclusion or solitude in the restaurant. The court also held that there was no relationship between plaintiffs and defendants that imposed on defendants a duty of disclosure. (Opinion by Kitching, J., with Croskey, Acting P. J., and Aldrich, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Summary Judgment § 26--Appellate Review--Scope of Review.** --Review of summary judgment involves pure matters of law, which an appellate court reviews independently, considering only the facts properly before the trial court at the time it ruled on the motion. As a summary judgment motion raises only issues of law regarding the construction and effect of supporting and opposing papers, the reviewing court independently applies the same three-step analysis required of the trial court. It identifies issues framed by

the pleadings; it determines whether the moving party's showing established facts that negate the opponent's claim and justify a judgment in the moving party's favor; and if it does, the court finally determines whether the opposition demonstrates the existence of a triable, material factual issue.

**(2) Summary Judgment § 11--Affidavits--Sufficiency--Defendant.** --A moving defendant for summary judgment need not support the motion with affirmative evidence negating an essential element of the responding party's case. Instead, the moving defendant may point to the absence of evidence to support the plaintiff's case. The then burden shifts to the plaintiff to present evidence showing there is a triable issue of material fact. If the plaintiff is unable to meet the burden of proof regarding an essential element of his or her case, all other facts are rendered immaterial.

**(3) Summary Judgment § 4--Propriety--First Amendment Cases.** --Because unnecessarily protracted litigation would have a chilling effect upon the exercise of *U.S. Const., 1st Amend.*, rights, speedy resolution of cases involving free speech is desirable. Therefore, summary judgment is a favored remedy in such cases. Nonetheless, the basic question raised on a defense motion for summary judgment in such cases is whether the motion record demonstrates the existence of triable issues of fact, or whether the defense is entitled to judgment as a matter of law.

**(4) Privacy § 7--Actions--Intrusion.** --The tort of intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person. To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surroundings, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation, or data source. Furthermore, while what is highly offensive to a reasonable person suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of offensiveness that must be made by the court in discerning the existence of a cause of action for intrusion. A court determining the existence of offensiveness considers the degree of intrusion, the context, conduct, and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he or she intrudes, and the expectations of those whose privacy is invaded.

**(5) Privacy § 7--Actions--Intrusion--Secret Videotaping of Conversation for Investigative Television Report.** --In an action arising out of a television news investigation of the practice of charging for services on so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services, two sales representatives of a firm engaged in that business did not state a cause of action for intrusion by alleging that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television personnel posing as potential investors. The sales pitch was conducted in the middle of a crowded patio within close proximity to other tables, the location was not secluded, plaintiffs did not conduct themselves as though they were dispensing private information, and admitted that they freely provided the same information about their products to hundreds of other potential investors. Under these circumstances, there was no intrusion into a private place, conversation, or matter; defendants' actions were not highly offensive to a reasonable person, and plaintiffs had no reasonable expectation of seclusion or solitude in the restaurant.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 580.]

**(6) Privacy § 7--Actions--Intrusion--Electronic Eavesdropping--Secret Videotaping of Conversation for Investigative Television Report.** --Allegations by two sales representatives of a firm being investigated by a television network, that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television personnel posing as potential investors, did not state a cause of action for violation of the anti-eavesdropping statute (*Pen. Code, § 632*). The sales pitch was conducted in the middle of a crowded patio within close proximity to other tables. The location was not secluded, plaintiffs did not conduct themselves as though they were dispensing private information, and plaintiffs admitted that they freely provided the same information about their products to hundreds of other potential investors. *Pen. Code, § 632*, prohibits the recording only of confidential conversations, and no trier of fact could find, judged by an objective standard, that plaintiffs reasonably expected that their conversation would not be divulged to anyone

else.

[See 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 1118.]

**(7) Fraud and Deceit § 29--Actions--Evidence--Reliance--Secret Videotaping of Conversation for Investigative Television Report.** --Allegations by two sales representatives of a firm being investigated by a television network, that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television reporters posing as potential investors, did not state a cause of action for fraud. A cause of action for fraud requires the plaintiff to prove a knowingly false misrepresentation by the defendant, made with the intent to deceive or to induce reliance by the plaintiff, justifiable reliance by the plaintiff, and resulting damages. There was no evidence that plaintiffs detrimentally relied on any alleged misrepresentations by the reporters. Even if plaintiffs believed the reporters were potential investors, they were not induced to provide any information about their firm because of any supposed representations by the reporters. One plaintiff admitted in his deposition that he would have answered the reporters' questions even if he had known they were reporters.

**(8) Summary Judgment § 17--Counteraffidavits--Sufficiency--Contradicting Deposition.** --Courts do not permit a party to defeat a summary judgment motion by contradicting, in a declaration, that party's previous deposition testimony. On a motion for summary judgment, the credibility of the deposition admissions are valued so highly that the controverting affidavits may be disregarded as irrelevant, inadmissible, or evasive.

**(9a) (9b) Fraud and Deceit § 8--False Representations--Concealment--Secret Videotaping of Conversation for Investigative Television Report.** --Allegations by two sales representatives of a firm being investigated by a television network, that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television reporters posing as potential investors, did not state a cause of action for fraudulent concealment. Plaintiffs presented no evidence that they and the reporters shared the requisite relationship that would impose a duty to disclose the use of hidden cameras. In addition, the videotape and the admissions of plaintiffs showed that they willingly presented their business pitch to anyone who was interested. Thus, the facts that the reporters were reporters and not potential investors, that they had hidden cameras, that the identity of the two individuals that accompanied them was not disclosed, and that the meeting would be broadcast, were not facts material to the transaction.

**(10) Fraud and Deceit § 8--False Representations--Concealment--When Actionable.** --There are four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts. Putting aside a fiduciary relationship, each of the other three circumstances in which nondisclosure may be actionable presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise. Such a relationship can only come into being as a result of some sort of transaction between the parties. Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances.

**(11) Privacy § 7--Actions--Public Disclosure of Private Facts--Secret Videotaping of Conversation for Investigative Television Report.** --Allegations by two sales representatives of a firm being investigated by a television network, that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television reporters posing as potential investors, and that portions of the videotape were later broadcast, did not state a cause of action for public disclosure of private facts. The use of plaintiffs' names, likenesses, voices, and occupations were of legitimate public concern and did not constitute a morbid and sensational prying into private lives for its own sake. Defendants' investigation of plaintiffs' business, the practice of charging for services on so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services, was of legitimate public concern. The use of plaintiffs' names, likenesses, voices, and occupations added authenticity to

the broadcast. It showed who was making the presentation, what they were saying, and how they were saying it. The broadcast showed the verbal and nonverbal communication of the salesmen as they were making their presentation. It turned an abstract story into something the public could more readily understand by making it more concrete.

**(12) Torts § 4 --Intentional Infliction of Emotional Distress.** --The elements of a prima facie case for the tort of intentional infliction of emotional distress are extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard for the probability of causing, emotional distress; the plaintiff's suffering severe or extreme emotional distress; and actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

**(13) Appellate Review § 109--Briefs--Argument and Authority.** --In a challenge to a judgment, it is incumbent upon an appellant to present argument and authority on each point made. Arguments not presented will generally not receive consideration.

**COUNSEL:** Neville L. Johnson & Associates, Neville L. Johnson; and David A. Elder for Plaintiffs and Appellants.

Anne H. Egerton; Irell & Manella and Henry Shields, Jr., for Defendants and Respondents.

**JUDGES:** Opinion by Kitching, J., with Croskey, Acting P. J., and Aldrich, J., concurring.

**OPINION BY:** KITCHING

**OPINION**

[*1071] [**332] **KITCHING, J.**

This case arises from a 1994 *Dateline NBC* news report that investigated the then growing practice of charging for services on so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services. Many of the 800 lines provided the caller with access to 900-number type adult entertainment lines. SimTel Communications (SimTel) leased and programmed 800 and 900 lines, and then sold them to investors.

[*1072] In connection with *Dateline NBC*'s investigation, two National Broadcasting Company, Inc., producers responded to SimTel's national [***2] advertisement in USA Today for investors, and arranged to meet with a SimTel salesperson. The producers did not reveal their association with *Dateline NBC*. They met with SimTel representatives Stephen F. Wilkins (Wilkins) and Thomas R. Scott (Scott) at a restaurant in Malibu and videotaped the lunch meeting with hidden cameras. Portions of the videotape appeared in a subsequent television broadcast.

Wilkins and Scott asserted claims for intrusion, unlawful recording of confidential communications, fraud, and various other causes of action against the National Broadcasting Company, Inc., and its producers (collectively referred to as NBC). The trial court granted summary judgment in favor of NBC. The trial court also denied Wilkins and Scott's motion for a new trial and assessed discovery sanctions against them and their counsel. Wilkins and Scott appeal.

We find as a matter of law that plaintiffs have not raised triable issues of fact regarding their causes of action for intrusion, violation of *Penal Code section 632*, fraud, public disclosure of private facts, intentional infliction of emotional distress or negligent infliction of emotional distress. [***3] Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On October 4, 1994, NBC broadcast a report on its program *Dateline NBC* entitled "Hardcore Hustle." The "Hardcore Hustle" report had the first in a three-part *Dateline NBC* series about the "pay-per-call" industry.

In connection with the preparation of the "Hardcore Hustle" report, *Dateline NBC* producer Jack Cloherty (Cloherty) called SimTel, a pay-per-call provider, in response to one of its national newspaper advertisements. He spoke with SimTel salesperson Scott. Scott subsequently spoke on the telephone with a woman whom he later learned to be *Dateline NBC* associate producer Sandra Surles (Surles). Neither Cloherty nor Surles told Scott that they worked for *Dateline NBC*. Surles told Scott that she and Cloherty were coming to California. They arranged to meet to discuss SimTel's business.

A lunch meeting took place at an outside patio table at a restaurant in Malibu. Cloherty and Surles brought two additional people with them to lunch. Scott brought

his supervisor, Sales Manager Wilkins. Wilkins had not previously spoken with Cloherty or Surles. Neither Scott nor Wilkins asked about the two additional [***4] people that Cloherty and Surles brought with them, nor did they inquire if these two persons were interested in purchasing SimTel's products.

[*1073] At the lunch meeting, Wilkins explained how SimTel conducted business and how its 800and 900-number products worked. The parties discussed SimTel's products. NBC videotaped the lunch meeting with hidden cameras. NBC later broadcast brief excerpts of the videotape footage in its "Hardcore Hustle" report.

On August 1, 1995, SimTel, Wilkins, and Scott filed a complaint against NBC, KNBC-TV, Jane Pauley, Lea Thompson, Cloherty, Cindy Kuhn and Geoffrey's Malibu. 1 They alleged causes of action for (1) physical intrusion on solitude or into private affairs (intrusion); (2) fraud and conspiracy to commit fraud; (3) conspiracy to commit and intentional infliction of emotional distress; (4) [**333] negligent infliction of emotional distress; (5) unlawful eavesdropping on or recording of confidential communications ( *Pen. Code, § 632, subd. (a), 634, 637.2*); (6) public disclosure of private facts; (7) violation of right of privacy (*Cal. Const., art. I, § 1*); (8) trade libel and conspiracy to commit the same; [***5] (9) conspiracy to interfere with and interference with prospective economic advantage and contractual relations; (10) unfair business practices; 2 and (11) conspiracy to commit and defamation; (12) false light and intention to commit false light. 3 The gravamen of the complaint was that NBC's secret videotape of Wilkins and Scott constituted an unwarranted invasion of their privacy.

1 SimTel dismissed all of its claims with prejudice on or about July 16, 1996. Wilkins and Scott dismissed Geoffrey's from the complaint on May 23, 1996.

2 This cause of action was never litigated by Scott and Wilkins.

3 The causes of action for violation of right of privacy (7th cause of action), conspiracy to commit and defamation (11th cause of action), and false light and intention to commit false light (12th cause of action) were dismissed on September 19, 1996. The causes of action for trade libel and conspiracy to commit same (8th cause of action) and conspiracy to interfere with and interference with prospective economic advantage (9th cause of action) were solely SimTel's causes of action.

[***6] On October 4, 1996, Wilkins and Scott moved for summary adjudication on the second cause of action for fraud. On October 4, 1996, NBC moved for summary judgment on Wilkins and Scott's complaint. The trial court denied Wilkins and Scott's motion and granted NBC's motion. 4

4 In a minute order the trial court stated, in relevant part: "Assuming that plaintiffs are correct in their contention that the fact that a meeting is at a restaurant does not, as a matter of law, preclude a reasonable expectation of privacy, the videotapes show that plaintiffs could not entertain any such reasonable expectation in this case. They made no effort to obtain the affiliation or reason for attendance of two of the persons present and continued to speak freely while employees of the restaurant were at the table and could hear what was said. This defect is fatal to all of the claims asserted by plaintiffs in their complaint."

Judgment was entered on November 14, 1996. On December 27, 1996, the trial court denied Wilkins and [***7] Scott's motion for a new trial.

Wilkins and Scott timely filed a notice of appeal.

[*1074] DISCUSSION

1. *Summary Judgment Was Properly Granted in Favor of NBC*

a. *Standard of Review*

**(1)** Summary judgment is granted when a moving party establishes the right to entry of judgment as a matter of law. ( *Code Civ. Proc., § 437c, subd. (c)*; *Hunter v. Pacific Mechanical Corp. (1995) 37 Cal. App. 4th 1282, 1285 [44 Cal. Rptr. 2d 335]*.) "Review of summary judgment . . . 'involves pure matters of law,' which we review independently. [Citations.]" ( *Radovich v. Locke-Paddon (1995) 35 Cal. App. 4th 946, 953 [41 Cal. Rptr. 2d 573]*.) In conducting this de novo review, "we will consider only the facts properly before the trial court at the time it ruled on the motion. [Citation.]" ( *Brantley v. Pisaro (1996) 42 Cal. App. 4th 1591, 1601 [50 Cal. Rptr. 2d 431]*.)

"As a summary judgment motion raises only issues of law regarding the construction and effect of supporting and opposing papers, this court independently applies the same three-step analysis required of the trial court. We identify issues [***8] framed by the pleadings; determine whether the moving party's showing established facts that negate the opponent's claim and justify a judgment in the moving party's favor; and if it does, we finally determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citations.]" ( *Tsemetzin v. Coast Federal Savings & Loan Assn. (1997) 57 Cal. App. 4th 1334, 1342 [67 Cal. Rptr. 2d 726].*)

**(2)** "Under the current version of the summary judgment statute, a moving defendant need not support his [or her] motion with affirmative evidence negating an essential element of the responding party's case. Instead, the moving defendant may (through factually vague discovery responses or otherwise) point to *the absence of evidence to support the plaintiff's case.* When that is done, the burden shifts to the plaintiff to present evidence showing there is a triable [**334] issue of material fact. If the plaintiff is unable to meet [his or] her burden of proof regarding an essential element of [his or] her case, all other facts are rendered immaterial. [Citations.]" ( *Leslie G. v. Perry & Associates (1996) 43 Cal. App. 4th 472, 482 [50 Cal. Rptr. 2d 785],* [***9] italics in original.)

**(3)** " '[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy [in such cases] . . . .' [Citations.] Nonetheless, the basic question raised on a defense motion for summary judgment, and on review of such judgment, is the same in a privacy action against media defendants as in other cases: Does the motion record demonstrate the [*1075] existence of triable issues of fact, or was the defense entitled to judgment as a matter of law?" ( *Shulman v. Group W Productions, Inc. (1998) 18 Cal. 4th 200, 228 [74 Cal. Rptr. 2d 843, 955 P.2d 469].*)

b. *Tort of Intrusion*

Wilkins and Scott contend that NBC invaded their privacy by intrusion into their solitude, seclusion or private affairs by videotaping them at the lunch meeting. We disagree.

Our Supreme Court in *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at pages 230-232,* has recently discussed the tort of intrusion as follows: "Of the four privacy torts identified by [***10] Prosser, the tort of intrusion into private places, conversations or matter is perhaps the one that best captures the common understanding of an 'invasion of privacy.' It encompasses unconsented-to physical intrusion into the home, hospital room or other place the privacy of which is legally recognized, as well as unwarranted sensory intrusions such as eavesdropping, wiretapping, and visual or photographic spying. [Citation.] It is in the intrusion cases that invasion of privacy is most clearly seen as an affront to individual dignity. . . .

"

**(4)** "[T]he action for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person. . . . [P] . . . To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surroundings, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source. [Citations.]"

The *Restatement Second of Torts section 652B* states that "[o]ne who intentionally intrudes, [***11] physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

Furthermore, "[w]hile what is 'highly offensive to a reasonable person' suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of 'offensiveness' which must be made by the court in discerning the existence of a cause of action for intrusion. [P] . . . [P] . . . A court determining the existence of 'offensiveness' would consider [*1076] the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." ( *Miller v. National Broadcasting Co. (1986) 187 Cal. App. 3d 1463, 1483-1484 [232 Cal. Rptr. 668, 69 A.L.R.4th 1027].*)

Three cases have applied the California rules to specific facts. They have determined that there is an expectation of privacy in one's home, or in other places when circumstances create an [***12] expectation of privacy.

In *Dietemann v. Time, Inc. (9th Cir. 1971) 449 F.2d 245*, two Life magazine reporters surreptitiously gained entrance to Mr. Dietemann's home under the guise of seeking medical treatment. ( *Id. at p. 246.*) They were preparing an article entitled Crackdown on Quackery. ( *Id. at p. 245.*) The reporters, in Mr. Dietemann's den, used hidden camera and audio equipment to record the treatments that were accomplished with the use of " 'equipment which could at best be described as gadgets.' " ( *Id. at p. 246.*) The [**335] pictures appeared in Life's magazine article. ( *Id. at pp. 245-247.*) Dietemann was arrested for practicing medicine without a license. ( *Id. at p. 246.*) Dietemann sued for, inter alia, invasion of privacy. ( *Id. at p. 247.*)

The *Dietemann* court concluded "that clandestine photography of the plaintiff in his den and the recordation and transmission of his conversation without his consent resulting in his emotional distress warrants recovery for invasion of privacy in California." ( *Dietemann v. Time, Inc., supra, 449 F.2d at p. 248.*) [***13] The court noted that "[c]oncurrently with the development of privacy law, California had decided a series of cases according plaintiffs relief from unreasonable penetrations of their mental tranquility based upon the tort of intentional infl[i]ction of emotional distress . . . . [P] We are convinced that California will 'approve the extension of the tort of invasion of privacy to instances of intrusion, whether by physical trespass or not, into spheres from which an ordinary man in plaintiff's position could reasonably expect that the particular defendant should be excluded.' [Citation.]" ( *Id. at pp. 248-249.*)

Dietemann performed his alleged quack healing in his home. He did not advertise his services or charge for them. ( *Dietemann v. Time, Inc., supra, 449 F.2d at p. 246.*) The *Dietemann* court determined that "[p]laintiff's den was a sphere from which he could reasonably expect to exclude eavesdropping newsmen. He invited two of defendant's employees to the den. One who invites another to his home or office takes a risk that the visitor may not be what he seems, and that the visitor may repeat all he hears and observes [*1077] [***14] when he leaves. But he does not and should not be required to take the risk that what is heard and seen will be transmitted by photograph or recording, or in our modern world, in full living color and hi-fi to the public at large or to any segment of it that the visitor may select." ( *Id. at p. 249.*)

In *Miller v. National Broadcasting Co., supra, 187 Cal. App. 3d 1463*, ". . . an NBC television camera crew entered the apartment of Dave and Brownie Miller in Los Angeles, without their consent, to film the activities of Los Angeles Fire Department paramedics called to the Miller home to administer life-saving techniques to Dave Miller, who had suffered a heart attack in his bedroom. The NBC television camera crew not only filmed the paramedics' attempts to assist Miller, but NBC used the film on its nightly news without obtaining anyone's consent." ( *Id. at p. 1469.*) Additionally, ". . . NBC later used portions of the film in a commercial advertising an NBC 'mini-documentary' about the paramedics' work." (*Ibid.*) Brownie Miller sued, inter alia, for invasion of privacy. ( *Id. at p. 1470.*)

The *Miller* court determined [***15] that "reasonable people could regard the NBC camera crew's intrusion into Dave Miller's bedroom at a time of vulnerability and confusion occasioned by his seizure as 'highly offensive' conduct, thus meeting the limitation on a privacy cause of action Restatement of Torts, section 652B imposes." ( *Miller v. National Broadcasting Co., supra, 187 Cal. App. 3d at p. 1484.*) The court concluded that ". . . the NBC camera crew, the uninvited media guests, not only invaded the Millers' bedroom without Dave Miller's consent, they also invaded the home and [the] privacy of [the] plaintiff['s] wife . . . ." ( *Id. at p. 1486.*) Furthermore, *Miller* concluded NBC had no right to be in any part of Brownie Miller's home without her consent. (*Ibid.*)

[**336] In *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th 200*, a flight nurse employed by a helicopter rescue company wore a microphone during her evaluation and treatment of the Shulmans, two car accident victims. ( *Id. at p. 210.*) The nurse also permitted a television photographer to accompany her to the scene of the accident and to photograph the Shulmans, [***16] both at the scene of the accident and in the rescue helicopter as it transported them to the hospital. ( *Id. at pp. 210-211.*) The microphone recorded the nurse's conversations with Mrs. Shulman, and the television production company later included those recordings in its broadcast. (*Ibid.*)

The *Shulman* court held that the cameraman's "mere presence at the accident scene and filming of the events occurring there [could not] be deemed either a physical or sensory intrusion on plaintiff's seclusion[, [*1078] because the Shulmans] had no right of ownership or possession of the property where the rescue took place [an interstate highway], nor any actual control of the premises." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 232.*) The court further concluded, however, that the plaintiffs might be entitled to recover for intrusion based on (1) the videotaping by the television camera operator "in the interior of the rescue helicopter, which served as ambulance," and (2) the audiotaping of the conversations between Mrs. Shulman and the flight nurse "and other medical rescuers at the accident scene." ( *Id. at pp. 232-233.*) [***17] The court noted that "[a] patient's conversation with a provider of medical care in the course of treatment, including emergency treatment, carries a traditional and legally well-established expectation of privacy." ( *Id. at p. 234.*)

(1) *There Was No Intrusion Into a Private Place, Conversation or Matter*

**(5)** Wilkins and Scott were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant. They met with Cloherty and Surles, and two other individuals, to discuss SimTel's products. Wilkins spoke freely about the programs, even with the addition of these two "strangers," and while waiters stood at the table. The sales pitch was conducted in the middle of a crowded patio within close proximity to other tables. The location was not secluded and neither Wilkins nor Scott conducted himselves as though they were dispensing private information. Wilkins and Scott admitted in their depositions that they freely provided the same information about SimTel's products to hundreds of other potential investors, that they never asked about the two additional people at the table, and that Cloherty and Surles could have brought as many [***18] people to lunch as they wished. There was no physical or sensory intrusion into their privacy. Wilkins and Scott were not seated in a private dining room of a restaurant. Rather, they discussed business matters on the open patio of a public restaurant with four strangers. There was no entry by NBC into their homes, or even their offices (where Scott frequently entertained prospective clients). Nor did NBC intrude into the personal lives, intimate relationships, or any other private affairs of Wilkins or Scott. Instead, NBC photographed the two men in a public place and taped their conversations which were about business, not personal matters. There was no intrusion into a private place, conversation or matter. ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 231.*)

[*1079] (2) *NBC's Actions Were Not Highly Offensive to a Reasonable Person*

For the reasons which we have already discussed, we find as a matter of law that NBC's actions were not highly offensive to a reasonable person. ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 231.*)

(3) *Wilkins and Scott Had No Objectively Reasonable Expectation* [***19] *of Seclusion or Solitude in the Public Restaurant.*

Whether Wilkins or Scott had a reasonable expectation of privacy in their business discussion with Cloherty, Surles, and the two strangers, must be judged by an objective standard. ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 232.*) Pursuant to our review of the videotape and consideration of the admissions of Wilkins and Scott, we conclude that Wilkins and Scott had no objective expectation of privacy in their business lunch meeting.

Wilkins and Scott cannot maintain an action for invasion of privacy, to wit, the tort of intrusion.

c. *Penal Code Section 632*

**(6)** Wilkins and Scott contend that by videotaping the lunch meeting at the restaurant, [**337] the *Dateline NBC* producers violated the California Penal Code's prohibition against eavesdropping on or recording confidential communications. We disagree.

*Penal Code section 632* bars the intentional recording of a "confidential communication" without the consent of all parties to the communication. [5] *Penal Code section 637.2, subdivision (a)* permits a civil [***20] action against a person who violates the statute. It is an essential element of a *Penal Code section 632, subdivision (a)* claim that Scott and Wilkins prove that the conversation that was taped was "confidential." *Penal Code section 632, subdivision (c)* defines the term "confidential communication" as a "communication carried on in circumstances as may reasonably indicate

that any [*1080] party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering . . . or in any other circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

5 *Penal Code section 632, subdivision (a)* provides that: "Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among [such] parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding . . . ($ 2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment."

[***21] "Application of the statutory definition of 'confidential communication' turns on the reasonable expectations of the parties judged by an objective standard and not by the subjective assumptions of the parties." ( *O'Laskey v. Sortino (1990) 224 Cal. App. 3d 241, 248 [273 Cal. Rptr. 674].*) "The test of confidentiality is objective." ( *Coulter v. Bank of America (1994) 28 Cal. App. 4th 923, 929 [33 Cal. Rptr. 2d 766].*)

Wilkins and Scott argue that the conversation at the lunch meeting was confidential because they assumed the communications would not be discussed with any other parties. However, Wilkins testified in his deposition that he did not say anything he thought was a secret, that he did not say anything he had not said to another potential investor, and that he had not told anyone that the information he provided about SimTel was private and should not be passed on to others. Wilkins did not tell potential investors that they could not pass on this information.

On the facts of this case, Wilkins and Scott cannot make the showing required under *O'Laskey* and *Coulter*. Cloherty and Surles were virtual strangers to Wilkins and Scott, [***22] and the two people who accompanied them were total strangers, about whom Wilkins and Scott never inquired. Moreover, the topic of the lunch was SimTel's business and Wilkins gave a sales pitch he had given to many others. Waiters frequently came to the table, but Wilkins did not acknowledge them, pause in his sales pitch, or even lower his voice. Indeed, Wilkins admitted at his deposition that the sales discussion contained no secrets. Scott admitted at his deposition that Cloherty and Surles could have brought with them to lunch as many people as they liked. No trier of fact could find, judged by an objective standard, that Wilkins and Scott reasonably expected that their conversation would not be divulged to anyone else. *Penal Code section 632* prohibits the recording only of "confidential" conversations. This conversation was not confidential under the terms of the statute and *O'Laskey* and *Coulter*. Accordingly, videotaping the lunch meeting did not violate *Penal Code section 632*.

d. *Fraud*

Scott and Wilkins contend that the *NBC Dateline* producers committed fraud under three alternative theories. First, they argue [***23] that Cloherty and Surles made affirmative misrepresentations to them on which they relied as [*1081] follows: Cloherty's last name was Fullerty, Cloherty and Surles were married to each other, Cloherty and Surles were potential investors, and the two people they brought to lunch were their friends. Second, they contend Cloherty and Surles made material omissions and were legally obligated to disclose that they were journalists, that SimTel [**338] was the subject of an investigation, and that NBC was videotaping them at the lunch meeting. Third, they argue NBC committed deceptive acts in connection with a contract and is liable to Scott and Wilkins under *Civil Code section 1572*.

(1) *Alleged Affirmative Misrepresentations--No Justifiable Reliance*

**(7)** Under California law, a cause of action for fraud requires the plaintiff to prove (a) a knowingly false misrepresentation by the defendant, (b) made with the intent to deceive or to induce reliance by the plaintiff, (c) justifiable reliance by the plaintiff, and (d) resulting damages. ( *Service by Medallion, Inc. v. Clorox Co. (1996) 44 Cal. App. 4th 1807, 1816 [52 Cal. Rptr. 2d 650].*) [***24]

Even if Wilkins and Scott had evidence of misrepresentations made by the producers of *NBC Dateline*, they are unable to prove they relied to their detriment on such misrepresentations. Even assuming Wilkins and Scott believed Cloherty and Surles were

potential investors, they were not induced to provide any information about SimTel because of any supposed representations by NBC. Wilkins admitted in his deposition that he would have answered Cloherty and Surles's questions even if he had known they were reporters, and that "the gist of what [he] was saying would have been exactly the same," but that he "might have worded" some of his remarks a little differently. Scott admitted he would not have done anything differently if he had known Cloherty's true name and that he and Surles were not married. Scott admitted at his deposition that it was his job to dispense information packets about SimTel freely upon request. Wilkins testified that SimTel entered into contracts with only about 3 percent of people who made actual inquiries. Ninety-seven percent of those who called SimTel and received information about its business never leased an 800 line. Scott admitted that Cloherty and [***25] Surles could have brought as many people to the meeting as they wished. Wilkins and Scott did not ask Cloherty and Surles to identify their "friends" and they did not care whether they were interested in SimTel's business.

After the depositions, Wilkins and Scott submitted declarations in opposition to the motion for summary judgment in which they stated that [*1082] Cloherty and Surles had "indicated they were on vacation in California and a married couple" and that they "never would have had a conversation with the defendants if [they] had known they were spies for NBC . . . ." **(8)** California courts, however, do not permit a party to defeat summary judgment by contradicting in a declaration that party's previous deposition testimony. On a motion for summary judgment, "the credibility of the [deposition] admissions are valued so highly that the controverting affidavits may be disregarded as irrelevant, inadmissible or evasive." ( *Leasman v. Beech Aircraft Corp. (1975) 48 Cal. App. 3d 376, 382 [121 Cal. Rptr. 768]*; see also *D'Amico v. Board of Medical Examiners (1974) 11 Cal. 3d 1, 21-22 [112 Cal. Rptr. 786, 520 P.2d 10].*)

(2) *Alleged* [***26] *Material Omissions--Duty to Disclose*

**(9a)** Wilkins and Scott contend that NBC was required to advise them they were the subject of an investigation, that the people they were meeting were really journalists, that the "investors" they were meeting had hidden cameras, that the two "friends" were associated with the investigation, and that the meeting would be broadcast as part of a television newsmagazine. We disagree.

**(10)** "There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts. [Citation.]' " Putting aside a fiduciary relationship, "[e]ach of the other three circumstances in which nondisclosure may be actionable presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose [**339] can arise. . . . [P] . . . [S]uch a relationship can only come [***27] into being as a result of some sort of transaction between the parties. [Citations.] Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.] All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances." ( *LiMandri v. Judkins (1997) 52 Cal. App. 4th 326, 336-337 [60 Cal. Rptr. 2d 539]*, italics & fn. omitted.)

In *Deteresa v. American Broadcasting Companies, Inc. (9th Cir. 1997) 121 F.3d 460*, a case analogous to the case at bar, the Ninth Circuit relied on the [*1083] *LiMandri* case to affirm a judgment for the American Broadcasting Company. In *Deteresa*, plaintiff filed a lawsuit against the American Broadcasting Company and producer Anthony Radziwill for, inter alia, fraud and conspiracy to commit fraud. ( *Id. at p. 462.*) Radziwill attempted to convince plaintiff, a flight attendant on the flight O.J. Simpson took from Los Angeles to Chicago, to appear on a [***28] television show to discuss the flight. (*Ibid.*) Plaintiff and Radziwill talked, but she said no. The next day, Radziwill again attempted to arrange for plaintiff to appear on television. (*Ibid.*) When plaintiff again said no, Radziwill revealed that he had audiotaped and videotaped their conversation from the previous day.

The plaintiff's claim alleged "that ABC and Radziwill committed fraud and conspiracy to commit fraud by failing to disclose that Radziwill was

audiotaping and videotaping her." ( *Deteresa v. American Broadcasting Companies, Inc., supra, 121 F.3d at p. 467.*)

The Ninth Circuit stated: "The district court concluded that ABC was entitled to summary judgment on Deteresa's fraud claim because she presented no evidence that she and Radziwill shared the requisite relationship for Radziwill to have a duty to disclose that he was taping her. We agree. Deteresa has presented no evidence that she and Radziwill shared any such relationship." ( *Deteresa v. American Broadcasting Companies, Inc., supra, 121 F.3d at p. 467.*)

**(9b)** Similarly, Wilkins and Scott have presented no evidence that they and Cloherty and Surles shared the requisite relationship [***29] which would impose upon the *NBC Dateline* producers a duty to disclose the use of hidden cameras. ( *Deteresa v. American Broadcasting Companies, Inc., supra, 121 F.3d at p. 467*; *LiMandri v. Judkins, supra, 52 Cal. App. 4th at pp. 336-337.*) In addition, the videotape and the admissions of Wilkins and Scott show that they willingly presented their business pitch to anyone who was interested. Thus, the fact that Cloherty and Surles were reporters, that they had hidden cameras, that the identity of the two "friends" was not disclosed, and that the meeting would be broadcast were not "facts material to the transaction." (See *id. at p. 337.*)

(3) *Civil Code Section 1572*

Wilkins and Scott also rely on *Civil Code section 1572*. However, that code section applies only to fraud "committed by a party to the *contract* . . . with intent to deceive another party thereto, or to induce him to enter into the [*1084] contract." (Italics added.) Since there was no contract between Wilkins and Scott and NBC, they have no cause of action under *Civil Code section 1572* [***30] .

e. *Public Disclosure of Private Facts*

**(11)** Scott and Wilkins contend that their "occupations . . . as salesmen for SimTel," their names, likenesses and voices were private facts that were not matters of public concern. We disagree.

Our Supreme Court in *Shulman* has set forth the requirements for the tort of public disclosure. They are: " '(1) public disclosure[,] (2) of a private fact[,] (3) which would be offensive and objectionable to the reasonable person[,] and (4) which is not of legitimate public concern.' [Citations.]" ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 214.*)

"The element critical to [a public disclosure of private facts] case is the presence [**340] or absence of legitimate public interest, i.e., newsworthiness, in the facts disclosed. After reviewing the decisional law regarding newsworthiness, we conclude, inter alia, that lack of newsworthiness is an element of the 'private facts' tort, making newsworthiness a complete bar to common law liability. We further conclude that the analysis of newsworthiness inevitably involves accommodating conflicting interests in personal privacy and in press freedom [***31] as guaranteed by the *First Amendment to the United States Constitution*, and that in the circumstances of this case--where the facts disclosed about a private person involuntarily caught up in events of public interest bear a logical relationship to the newsworthy subject of the broadcast and are not intrusive in great disproportion to their relevance--the broadcast was of legitimate public concern, barring liability under the private facts tort. [P] . . . [P] [T]he dissemination of truthful, newsworthy material is not actionable as a publication of private facts." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at pp. 214-215.*)

In the *Shulman* case, the court stated ". . . the subject matter of the broadcast as a whole was of legitimate public concern. Automobile accidents are by their nature of interest to that great portion of the public that travels frequently by automobile. The rescue and medical treatment of accident victims is also of legitimate concern to much of the public, involving as it does a critical service that any member of the public may someday need. The story of [the accident victim's] difficult extrication from the crushed [***32] car, the medical attention given her at the scene, and her evacuation by helicopter was of particular interest because it highlighted some of the challenges [*1085] facing emergency workers dealing with serious accidents." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 228.*)

The court stated the more difficult question was "whether [the victim's] appearance and words as she was extricated from the overturned car, placed in the helicopter and transported to the hospital were of legitimate public concern" and concluded that "the disputed material was newsworthy as a matter of law." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal.*

*4th at p. 228.*) The court determined that the flight nurse's work was shown as demanding and important, and the emergency care required "not only medical knowledge, concentration and courage, but an ability to talk and listen to severely traumatized patients. One of the challenges [the flight nurse] face[d] in assisting [the accident victim was] the confusion, pain and fear that [the accident victim] understandably [felt] in the aftermath of the accident. For that reason the broadcast [***33] video depicting [the accident victim's] injured physical state . . . and audio showing her disorientation and despair were substantially relevant to the segment's newsworthy subject matter." ( *Id. at p. 229.*)

In the *Shulman* case, the plaintiffs argued that showing the victim's " 'intimate private, medical facts and her suffering was not necessary to enable the public to understand the significance of the accident or the rescue as a public event.' " ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 229*, italics omitted.) The court stated that "[t]he standard . . . is not necessity. That the broadcast could have been edited to exclude some of [the victim's] words and images and still excite a minimum degree of viewer interest is not determinative. Nor is the possibility that the members of [the Supreme Court] or another court, or a jury, might find a differently edited broadcast more to their taste or even more interesting. The courts do not, and constitutionally could not, sit as superior editors of the press." (*Ibid.*)

In addition, the challenged material "did not constitute a 'morbid and sensational prying into [***34] private lives *for its own sake.*' " ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 229*, original italics.)

As explained in *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at page 230*: "It is difficult to see how the subject broadcast could have been edited to avoid completely any possible identification without severely undercutting its legitimate descriptive and narrative impact. As broadcast, the segment included neither [the victim's] full name nor direct display of [*1086] her face. She was nonetheless arguably identifiable by her first name (used in recorded [**341] dialogue), her voice, her general appearance and the recounted circumstances of the accident (which, as noted, had previously been published, with [the victim's] full name and city of residence, in a newspaper). In a video documentary of this type, however, the use of that degree of truthful detail would seem not only relevant, but essential to the narrative." (Fn. omitted.)

In our case we consider whether the alleged private facts Wilkins and Scott complained of--the use of their names, likenesses, and voices, and the fact they [***35] worked at SimTel--was of a legitimate public interest. The broadcast investigated the growing practice of charging for so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services. Many of the 800 lines provided the caller with access to 900-number type adult entertainment lines without the caller's knowledge. SimTel leased and programmed 800 and 900 lines, and then sold them to investors. The first part of the *Dateline NBC* broadcast provided a description of the firms and the persons who provided these phone lines and explained how the operation worked. The broadcast demonstrated that legislators, regulators, and law enforcement persons expressed grave concerns about the 800-number loophole in the statute regulating 900 numbers, and the ability of pay-per-call providers like SimTel to profit from calls made by unsuspecting people believing that they were free.

We find the use of Wilkins and Scott's names, likenesses, voices, and occupations were of legitimate public concern and did not constitute a " 'morbid and sensational prying into private lives for its own sake.' " ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 229,* [***36] italics omitted.)

Information about an enterprise which potentially affected unsuspecting callers was of legitimate public interest. The use of Wilkins and Scott's names, likenesses, voices and occupations added authenticity to the broadcast. It showed who was making the presentation, what they were saying, and how they were saying it. The broadcast showed the verbal and nonverbal communication of the salesmen as they were making their presentation. It turned an abstract story into something the public could more readily understand by making it more concrete.

Here, the broadcast material was not so "lurid and sensational in emotional tone, or so intensely personal in content, as to make its intrusiveness [*1087] disproportionate to its relevance." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 229.*) It served a "legitimate descriptive and narrative" purpose. We find the disputed material newsworthy as a matter of law. Thus, Wilkins and Scott cannot recover for the tort of

public disclosure of private facts.

f. *Intentional Infliction of Emotional Distress*

**(12)** " 'The elements of a prima facie case for the tort of intentional infliction [***37] of emotional distress [are] . . . as follows: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard [for] the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' [Citation.]" ( *Miller v. National Broadcasting Co., supra, 187 Cal. App. 3d at p. 1487.*)

We have already determined that the act of filming a business lunch in a public place constituted neither an intrusion on Wilkins and Scott's privacy, a violation of *Penal Code section 632*, fraud, or public disclosure of private facts. Based on that determination and the facts of this case, as a matter of law, we find this conduct is not so extreme and outrageous "as to exceed all bounds of that usually tolerated in a civilized society." ( *Trerice v. Blue Cross of California (1989) 209 Cal. App. 3d 878, 883 [257 Cal. Rptr. 338].*) This tort claim must also fail.

g. *Negligent Infliction of Emotional Distress*

Wilkins and Scott's negligence claim is based [***38] on the premise that NBC had a duty [**342] to tell them they were being filmed. We have already determined that Wilkins and Scott have not shown that any legal duty to disclose ever arose. As a matter of law, and in the absence of any duty, this claim must fail.

2. *New Trial Motion and Discovery Sanctions*

Without any legal authority or argument, Wilkins and Scott contend the trial court should have granted their new trial motion based on newly discovered evidence and should not have granted discovery sanctions for refusal to answer questions or appear at depositions.

[*1088] These arguments have been waived. **(13)** " 'In a challenge to a judgment, it is incumbent upon an appellant to present argument and authority on each point made. Arguments not presented will generally not receive consideration.' [Citation.]" ( *In re Marriage of Ananeh-Firempong (1990) 219 Cal. App. 3d 272, 278 [268 Cal. Rptr. 83].*)

DISPOSITION

Judgment is affirmed. NBC is awarded costs on appeal.

Croskey, Acting P. J., and Aldrich, J., concurred.

Appellants' petition for review [***39] by the Supreme Court was denied July 21, 1999.

# TAB 32

defects. The fact that an inspection by a qualified person has taken place may not be introduced as evidence in a construction defect action, including any reports or other items generated by the qualified person. This subdivision shall not apply in any action initiated by the applicant who retained the qualified person.

(c) Nothing in this section, as it relates to construction inspectors or plans examiners, shall be construed to alter the requirements for licensure, or the jurisdiction, authority, or scope of practice, of architects pursuant to Chapter 3 (commencing with Section 5500) of Division 3 of the Business and Professions Code, professional engineers pursuant to Chapter 7 (commencing with Section 6700) of Division 3 of the Business and Professions Code, or general contractors pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code.

(d) Nothing in this section shall be construed to alter the immunity of employees of the Department of Housing and Community Development under the Tort Claims Act (Division 3.6 (commencing with Section 810) of Title 1 of the Government Code) when acting pursuant to Section 17965 of the Health and Safety Code.

(e) The qualifying person shall engage in no other construction, design, planning, supervision, or activities of any kind on the work of improvement, nor provide quality review services for any other party on the work of improvement.

(f) The qualifying person, or other legal entity, shall maintain professional errors and omissions insurance coverage in an amount not less than two million dollars ($2,000,000).

(g) The immunity provided by subdivision (a) does not inure to the benefit of the qualified person for damages caused to the applicant solely by the negligence or willful misconduct of the qualified person resulting from the provision of services under the contract with the applicant. **Leg.H.** 2002 ch. 722 (SB 800).

**Ref.:** W. Cal. Sum., 5 "Torts" §160, 6 "Torts" §1163.

## §44. Defamation.

Defamation is effected by either of the following:

(a) Libel.

(b) Slander. **Leg.H.** 1872, 1980 ch. 676.

**Ref.:** CACI No. 1700 (Matthew Bender); W. Cal. Sum., 5 "Torts" §529.

## §45. Libel.

Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation. **Leg.H.** 1872.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 340, "Libel and Slander"; MB Prac. Guide: Cal. Trial & Post-Trial Civ. Proc., §25A.10[2]; MB Prac. Guide: Cal. Unfair Comp. & Bus. Torts, §9.07; CACI Nos. 1700, 1702, 1704, 1706 (Matthew Bender); W. Cal. Pro., "Pleading" §694; W. Cal. Sum., 5 "Torts" §§529, 530, 539, 551, 675.

## §45a. Libel Not Actionable—When—Special Damages to Be Proven.

A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code. **Leg.H.** 1945 ch. 1489.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 340, "Libel and Slander"; MB Prac. Guide: Fed. Pretrial Proc. in Cal., §6.11[9][c]; MB Prac. Guide: Cal. Unfair Comp. & Bus. Torts, §9.07; CACI Nos. 1701, 1703, 1705, 1802 (Matthew Bender); W. Cal. Pro., "Pleading" §691; W. Cal. Sum., 5 "Torts" §§541, 675.

## §46. Slander.

Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which:

1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;

2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;

3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;

4. Imputes to him impotence or a want of chastity; or

5. Which, by natural consequence, causes actual damage. **Leg.H.** 1872, 1945 ch. 1489.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 340, "Libel and Slander"; MB Prac. Guide: Cal. Trial & Post-Trial Civ. Proc., §25A.10[2]; MB Prac. Guide: Cal. Unfair Comp. & Bus. Torts, §9.07; CACI Nos. 1700, 1702, 1704, 1706 (Matthew Bender); W. Cal. Pro., "Pleading" §606; W. Cal. Sum., 5 "Torts" §§529, 530, 551–553.

## §47. Privileged Publications or Broadcasts—Exceptions.

A privileged publication or broadcast is one made:

(a) In the proper discharge of an official duty.

(b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure, except as follows:

(1) An allegation or averment contained in any pleading or affidavit filed in an action for marital dissolution or legal separation made of or concerning a person by or against whom no affirmative relief is prayed in the action shall not be a privileged publication or broadcast as to the person making the allegation or averment within the meaning of this section unless the pleading is verified or affidavit sworn to, and is made without malice, by one having reasonable and probable cause for believing the truth of the allegation or averment and unless the allegation or averment is material and relevant to the issues in the action.

(2) This subdivision does not make privileged any

communication made in furtherance of an act of intentional destruction or alteration of physical evidence undertaken for the purpose of depriving a party to litigation of the use of that evidence, whether or not the content of the communication is the subject of a subsequent publication or broadcast which is privileged pursuant to this section. As used in this paragraph, "physical evidence" means evidence specified in Section 250 of the Evidence Code or evidence that is property of any type specified in Chapter 14 (commencing with Section 2031.010) of Title 4 of Part 4 of the Code of Civil Procedure.

(3) This subdivision does not make privileged any communication made in a judicial proceeding knowingly concealing the existence of an insurance policy or policies.

(4) A recorded lis pendens is not a privileged publication unless it identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property, as authorized or required by law.

(c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information. This subdivision applies to and includes a communication concerning the job performance or qualifications of an applicant for employment, based upon credible evidence, made without malice, by a current or former employer of the applicant to, and upon request of, one whom the employer reasonably believes is a prospective employer of the applicant. This subdivision authorizes a current or former employer, or the employer's agent, to answer whether or not the employer would rehire a current or former employee. This subdivision shall not apply to a communication concerning the speech or activities of an applicant for employment if the speech or activities are constitutionally protected, or otherwise protected by Section 527.3 of the Code of Civil Procedure or any other provision of law.

(d)(1) By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued.

(2) Nothing in paragraph (1) shall make privileged any communication to a public journal that does any of the following:

(A) Violates Rule 5-120 of the State Bar Rules of Professional Conduct.

(B) Breaches a court order.

(C) Violates any requirement of confidentiality imposed by law.

(e) By a fair and true report of (1) the proceedings of a public meeting, if the meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit. **Leg.H.** 1872, 1874 p. 184, 1905 p. 168, 1927 ch. 866, 1945 ch. 1489, 1979 ch. 184, 1990 ch. 1491, 1991 ch. 432, 1992 ch. 615, 1994 chs. 364, 700 §2.5, 1996 ch. 1055 §2, 2002 ch. 1029 (AB 2868), effective September 28, 2002, 2004 ch. 182 (AB 3081), operative July 1, 2005.

**1996 Note:** In amending Section 47 of the Civil Code by this act, it is the intent of the Legislature to abrogate the decision in *Shahvar v. Superior Court* (1994), 25 Cal. App. 4th 653, to preserve the scarce resources of California's courts, to avoid using the courts for satellite litigation, and to increase public participation in the political, legislative, and judicial processes. It is not the intent of the Legislature to limit in any manner the application of subdivision (b) or (d) of Section 47 of the Civil Code. Specifically, it is not the intent of the Legislature to affect case law holding that certain prelitigation statements are privileged as described in, for example, *Lerette v. Dean Witter Organization, Inc.*, 60 Cal. App. 3d 573; *Martin v. Kearney*, 51 Cal. App. 3d 309; *Ascherman v. Natanson*, 23 Cal. App. 3d 861; and the Second Restatement of Torts, Section 586. Stats. 1996 ch. 1055 §1.

**1994 Note:** It is the intent of the Legislature in amending Section 47 of the Civil Code to overturn the decision in *California Dredging Company v. Insurance Company of North America*, 18 Cal. App. 4th 572. Stats. 1994 ch. 700 §1.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 340, "Libel and Slander," Ch. 348, "Lis Pendens," Ch. 357, "Malicious Prosecution and Abuse of Process," Ch. 362, "Mental Suffering and Emotional Distress," Ch. 429, "Privacy"; Cal. Courtroom Ev., §2.29[3][b] (Matthew Bender); MB Prac. Guide: Cal. Debt Collection & Enforcement of Judgments, §1.70; MB Prac. Guide: Cal. Trial & Post-Trial Civ. Proc., §29.40[8][a]; MB Prac. Guide: Cal. Unfair Comp. & Bus. Torts, §§2.43[1], 4.2, 6.38[1], 9.19; CACI Nos. 1501, 1520, 1605, 1723, 2711 (Matthew Bender); W. Cal. Ev., "Circumstantial Evidence" §147, "Witnesses" §§222, 519; W. Cal. Pro., "Pleading" §1027; W. Cal. Sum., 2 "Insurance" §246, 3 "Agency and Employment" §285, 5 "Torts" §§21, 148A, 155, 186, 455, 458, 470, 473, 488, 495, 501, 508, 528, 548, 562–565, 567, 569, 571–573, 576–582, 584–589, 591–594, 596, 597, 599, 617, 648, 661, 686, 757, 766, 792, 822, 6 "Torts" §1569, 11 "Community Property" §248, 13 "Equity" §120.

## §47.5. Defamation Action by Peace Officer.

Notwithstanding Section 47, a peace officer may bring an action for defamation against an individual who has filed a complaint with that officer's employing agency alleging misconduct, criminal conduct, or incompetence, if that complaint is false, the complaint was made with knowledge that it was false and that it was made with spite, hatred, or ill will. Knowledge that the complaint was false may be proved by a showing that the complainant had no reasonable grounds to believe the statement was true and that the complainant exhibited a reckless disregard for ascertaining the truth. **Leg.H.** 1982 ch. 1588.

**Ref.:** W. Cal. Sum., 5 "Torts" §582.

## §48. Inference of Malice—Exception.

In the case provided for in subdivision (c) of Section 47, malice is not inferred from the communication. **Leg.H.** 1872, 1895 p. 167, 1945 p. 1489, 2003 ch. 62 (SB 600).

**Ref.:** Cal. Fms Pl. & Pr., Ch. 340, "Libel and Slander"; CACI No. 1723 (Matthew Bender); W. Cal. Sum., 5 "Torts" §593.

## §48a. Libel—Demand for Correction as Condition Precedent to Action Against Newspaper.

1. In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve

# TAB 33

European currency: §1663.

## §1635. Law Governing.

All contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by this code. **Leg.H.** 1872.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 140, "Contracts"; MB Prac. Guide: Cal. Contract Lit., §§13.46; 13.47[4]; 21.01; 21.18; 21.12; 21.31; 21.67; 21.73; W. Cal. Sum., 1 "Contracts" §§741, 742, 2 "Insurance" §48.

## §1636. Giving Effect to Intent at Time of Making.

A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. **Leg.H.** 1872.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 140, "Contracts"; MB Prac. Guide: Cal. Contract Lit., §§21.01; 21.02; 21.12; 21.14[1]; 21.18; 21.35; 21.37; 21.67; 21.73; CACI No. 314 (Matthew Bender); W. Cal. Sum., 1 "Contracts" §744, 2 "Insurance" §48.

## §1637. Ascertaining Intent.

For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this chapter are to be applied. **Leg.H.** 1872.

**Ref.:** MB Prac. Guide: Cal. Contract Lit., §§21.01; 21.18; 21.37; 21.67; 21.73; W. Cal. Sum., 1 "Contracts" §741.

## §1638. Language of Contract.

The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity. **Leg.H.** 1872.

**Ref.:** MB Prac. Guide: Cal. Contract Lit., §§21.01; 21.13; 21.17; 21.18; 21.22; 21.37; 21.67; 21.73; W. Cal. Sum., 1 "Contracts" §741, 2 "Insurance" §55, 4 "Sales" §205.

## §1639. Writing Sole Guide.

When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this title. **Leg.H.** 1872.

**Ref.:** MB Prac. Guide: Cal. Contract Lit., §§21.01; 21.12; 21.13; 21.17; 21.18; 21.37; 21.67; 21.73; W. Cal. Sum., 1 "Contracts" §741, 2 "Insurance" §55.

## §1640. Fraud, Mistake, or Accident Obscuring Intent.

When, through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded. **Leg.H.** 1872.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 140, "Contracts," Ch. 215, "Duress, Menace, Fraud, Undue Influence, and Mistake," Ch. 488, "Reformation of Instruments"; MB Prac. Guide: Cal. Contract Lit., §§16.01; 16.09[2]; 16.12[7]; 16.21; 16.23; 21.01; 21.18; 21.37; 21.51; 21.55; 21.67; 21.73

## §1641. Giving Effect to Entire Contract.

The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. **Leg.H.** 1872.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 140, "Contracts"; MB Prac. Guide: Cal. Contract Lit., §§21.01; 21.12; 21.18; 21.19[1]; 21.25[2]; 21.37; 21.67; 21.73; CACI No. 317 (Matthew Bender); W. Cal. Sum., 1 "Contracts" §746.

## §1642. Several Instruments Covering One Transaction.

Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together. **Leg.H.** 1872.

**Ref.:** MB Prac. Guide: Cal. Contract Lit., §§12.08; 21.01; 21.12; 21.18; 21.19[2]; 21.37; 21.39; 21.57; 21.67; 21.73; W. Cal. Sum., 1 "Contracts" §747.

## §1643. Favoring Legality, Certainty, and Effectiveness.

A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties. **Leg.H.** 1872.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 140, "Contracts"; MB Prac. Guide: Cal. Contract Lit., §§21.01; 21.18; 21.12; 21.27; 21.37; 21.67; 21.73; W. Cal. Sum., 1 "Contracts" §750.

## §1644. Ordinary Meaning of Words.

The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed. **Leg.H.** 1872.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 140, "Contracts"; MB Prac. Guide: Cal. Contract Lit., §§21.01; 21.18; 21.20; 21.37; 21.38; 21.39; 21.67; 21.73; CACI No. 315 (Matthew Bender); W. Cal. Sum., 1 "Contracts" §745, 2 "Insurance" §§56, 93.

## §1645. Technical Words Given Technical Sense.

Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense. **Leg.H.** 1872.

**Ref.:** Cal. Fms Pl. & Pr., Ch. 140, "Contracts"; MB Prac. Guide: Cal. Contract Lit., §§21.01; 21.18; 21.22; 21.37; 21.67; 21.73; CACI No. 316 (Matthew Bender); W. Cal. Sum., 1 "Contracts" §745, 2 "Insurance" §53.

## §1646. Law Governing.

A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made. **Leg.H.** 1872.

**Ref.:** MB Prac. Guide: Cal. Contract Lit., §§1.03; 1.07[2][a]; 21.01; 21.12; 21.18; 21.21; 21.37; 21.67; 21.73; W. Cal. Sum., 1 "Contracts" §§70, 90.

## §1646.5. Agreement of Parties to Be Governed by California Law.

Notwithstanding Section 1646, the parties to any contract, agreement, or undertaking, contingent or otherwise, relating to a transaction involving in the aggregate not less

# TAB 34

[redacted]

# California Practice Guide

# INSURANCE LITIGATION

CHAPTERS 11-15
Tables & Index

**HON. H. WALTER CROSKEY**
Justice, California Court of Appeal
Second District

**HON. REX HEESEMAN**
Judge, Los Angeles Superior Court

**SUSAN M. POPIK**
Chapman, Popik & White, LLP
San Francisco

ADDITIONAL ORIGINAL AUTHORS

**HON. MARCUS M. KAUFMAN**
Associate Justice (Ret.)
California Supreme Court

**THOMAS W. JOHNSON, JR.**
Irell & Manella LLP

**DAVID B. CASSELMAN**
Wasserman, Comden, Casselman
& Pearson LLP

**PATRICK M. KELLY**
Wilson, Elser, Moskowitz,
Edelman & Dicker LLP

**2007**

CONTINUING LEGAL EDUCATION TRG™ PROGRAMS AND PUBLICATIONS

THE RUTTER GROUP™

A DIVISION OF THOMSON WEST

5. [11:205] **Negligence:** Negligence is not among the theories of recovery generally available against insurers. Delay or failure to pay policy benefits may be actionable as a breach of contract or bad faith, not negligence. [See *Sanchez v. Lindsey Morden Claims Services, Inc.* (1999) 72 CA4th 249, 254, 84 CR2d 799, 802 (citing text); *Benavides v. State Farm Gen. Ins. Co.* (2006) 136 CA4th 1241, 1253-1254, 39 CR3d 650, 658 (J. Mosk concur.opn.) (citing text)]

*(Text cont'd on p. 11-49)*

# TAB 35

Federal Practice & Procedure
Current through the 2008 Update

Federal Rules Of Civil Procedure
The Late Charles Alan Wright[FNa6], Arthur R. Miller[FNa7]

Chapter 4. Pleadings and Motions
Rule 8. General Rules Of Pleading
C. Pleading A Claim For Relief

Link to Monthly Supplemental Service

**§ 1245 Statement of Particular Matters—Libel and Slander**

**Primary Authority**

Fed. R. Civ. P. 8

**Forms**

West's Federal Forms §§ 1551 to 2200

Although special pleading requirements have not been set out in the federal rules for libel and slander actions, the standard for successfully pleading defamation tends to be **more stringent** than that **applicable** to **most** other **substantive claims** because of the historically unfavored nature of this type of action,[FN1] the First Amendment implications of many of these cases, and the desire to discourage what some believe to be all too frequently vexatious litigation. Thus, many of the somewhat inhibiting traditional attitudes toward pleading in the context of defamation have survived the adoption of the federal rules.

Of course, all the plaintiff technically is required to do is state a claim for which relief may be granted, and many federal courts have demanded no more than that.[FN2] This theoretically means providing a short and plain statement indicating that the elements of a libel or slander claim are present. Contrary to the common law and the generally accepted code approach, some courts have held that it is not necessary to include in the complaint the exact statements upon which the action is based,[FN3] which seems consistent with Rule 8, although some federal courts have held to the contrary[FN4] and others have indicated that the substance of the actionable words should be pleaded.[FN5] It also has been held by at least one court that an allegation of falsity is required.[FN6] A general allegation of publication[FN7] and the place where the libel circulated will suffice in most instances. However, if the defendant does seek by a motion for a more definite statement under Rule 12(e) to have the plaintiff fix the situs of the alleged tort, the motion may well be granted,[FN8] although this seems to represent a technically improper use of that motion.

If the defamatory character of the statement rests on extrinsic facts, those facts should be pleaded.[FN9] And if the libelous character of the statement depends upon an interpretation of the words other than a meaning

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that usually is given to the statement, the special meaning should be specifically pleaded by way of innuendo, explanation, or colloquium.[FN10] It also is necessary to allege that the defamation pertained to the plaintiff.[FN11]

A complaint indicating that the uttered statements are not actionable per se has been held not sufficient to state a claim for relief in the absence of an allegation of special damages,[FN12] as is discussed under Rule 9(g);[FN13] conversely, if a writing contains material that is libelous per se, allegations in the complaint of special damages under Rule 9(g) are not necessary.[FN14]

Although some courts tend to be unwilling to construe the statement of the claim for relief liberally in a libel or slander action and require that all elements of the substantive cause of action be specially pleaded, nothing in Rule 8 imposes a special burden on the pleader in these classes of cases. A number of federal courts have not insisted that each element of the underlying cause be specifically pleaded. In Garcia v. Hilton Hotels International, Inc.,[FN15] for example, the plaintiff failed to allege in so many words that there had been a publication and the defendant challenged the complaint under Rules 12(b)(6), 12(e), and 12(f). Although the court in Garcia inferred the existence of publication and denied the motion to dismiss, as is discussed in another section,[FN16] it did grant the defendant's motion for a more definite statement, inter alia, because of the vagueness resulting from the plaintiff's failure to set out the substance of the utterance alleged to have been made slanderously or the facts relied upon to establish that it had been published to anyone else. Thus, despite the fact that the Garcia case represents a liberal attitude toward the pleading requirements of the federal rules, it also indicates that traces of disfavor for defamation actions still exist. There is little doubt that because of the unfavored status of libel and slander actions, it is advisable for the pleader to set forth the claim for relief as clearly as possible, and that all the elements of the claim at least should be inferable from the allegations in the complaint.

Some of the federal courts that have required strict pleading of defamation claims have done so on the ground that the state pleading requirements for libel and slander are controlling in a defamation action when subject matter jurisdiction is based on diversity of citizenship. For example, in Simpson v. Oil Transfer Corporation,[FN17] the complaint alleged slander but failed to set out the defamatory words as required by the law of New York. The district court, citing the Supreme Court's decision in Guaranty Trust Company v. York,[FN18] held that state law controlled and dismissed the complaint. State law also has been followed for pleading other elements of a defamation claim, such as the innuendo of the challenged words.[FN19]

Whatever the merits of these decisions may have been when they were decided, in light of the subsequent Supreme Court decisions in Byrd v. Blue Ridge Rural Electrical Co-operative, Inc.[FN20] and Hanna v. Plumer[FN21] it appears that adherence to a state's strict pleading requirements no longer is necessary. Hanna makes it clear that Rule 8(a) should be followed.[FN22] Perhaps insistence upon a greater degree of detail in these cases can be tolerated because of the disfavor with which some courts view defamation actions, but the basic philosophy of the Rule 8(a) requirement of a plain and concise statement of the claim for relief should not be sacrificed in order to follow state notions of pleading particularity or an antipathy toward certain claims for relief. This conclusion seems appropriate since, as the Supreme Court made clear in Hanna, divergent pleading practices between state and federal courts within the same jurisdiction do not lead to the type of outcome determination or inequitable administration of the law difficulties that constituted much of the basis for Erie Railroad Company v. Tompkins[FN23] and the Guaranty Trust decision. These conclusions seem to have been reinforced by the Supreme Court's 2002 pleading decision in Swierkiewicz v. Sorema N.A., although that was not a diversity of citizenship case.[FN24]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FNa6] Charles Alan Wright Chair in Federal Courts, The University of Texas.

[FNa7] Bruce Bromley Professor of Law, Harvard University.

[FN1]

**Unfavored action**

Defamation is not a favored cause of action, and always must be specifically alleged. Cimijotti v. Paulsen, D.C.Iowa 1963, 219 F.Supp. 621, appeal dismissed C.A.8th, 1963, 323 F.2d 716.

See also vol. 5B, § 1357.

Kirk v. NCI Leasing, Inc., D.C.Kan.2005, 2005 WL 3115859 (when complaint attempts to state traditionally disfavored cause of action, such as defamation, courts have construed complaint by stricter standard).

[FN2]

**Claim for relief stated**

Wright v. Sodexho Marriott Servs., C.A.6th, 2002, 30 Fed.Appx. 566 (unpublished).

A complaint in defamation must provide sufficient notice of the communications complained of to allow the defendant to mount a defense. McGeorge v. Continental Airlines, Inc., C.A.10th, 1989, 871 F.2d 952.

It is sufficient for dismissal purposes in defamation proceedings that the plaintiff has advanced colorable claims of having been identified and described by the defamatory comment, and the federal rules do not require special pleading, but rather, the mode of pleading is governed by the rule requiring only that the charge be set forth in a short and concise statement, detailed only to the extent necessary to enable the defendant to respond and to raise the defense of res judicata if appropriate, and the pleading of additional evidence is in contravention of proper pleading procedure. Geisler v. Petrocelli, C.A.2d, 1980, 616 F.2d 636, 640, **citing Wright & Miller.**

Williams v. Gorton, C.A.9th, 1976, 529 F.2d 668, 672, **citing Wright & Miller**, affirmed without opinion C.A.9th, 1977, 566 F.2d 1186.

Phillips v. Murchison, C.A.2d, 1967, 383 F.2d 370, certiorari denied 88 S.Ct. 1050, 390 U.S. 958, 19 L.Ed.2d 1154.

Palladino v. VNA of Southern New Jersey, Inc., D.C.N.J.1999, 68 F.Supp.2d 455, **citing Wright & Miller.**

Tuman v. Genesis Associates, D.C.Pa.1996, 935 F.Supp. 1375.

An FBI agent's complaint against the author, publisher, and contributor to a book satisfied the pleading rule for defamation that charges be set forth in a short and concise statement giving enough detail to en-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

able the defendants to respond and to raise the defense of res judicata. Price v. Viking Press, Inc., D.C.Minn.1985, 625 F.Supp. 641.

It is sufficient to plead a defamation claim that the plaintiff has advanced colorable claims of having been identified and described by the defamatory comment and the pleadings need be detailed only to the extent necessary to enable the defendant to respond and to raise the defense of res judicata if appropriate and the pleading of additional evidence is in contravention of proper pleading procedure. Linker v. Custom-Bilt Machinery Inc., D.C.Pa.1984, 594 F.Supp. 894.

Frito-Lay, Inc. v. Wapco Constructors, Inc., D.C.La.1981, 520 F.Supp. 186.

Baxter Travenol Labs., Inc. v. LeMay, D.C.Ohio 1981, 93 F.R.D. 379, 381, **citing Wright & Miller.**

A complaint alleging that the airline slandered the plaintiff and her now deceased husband by stating that the husband was incompetent, an alcoholic, constantly drunk, and was not suffering from any physical or mental illness and lacked a respected credit rating stated a claim on which relief could be granted under Pennsylvania law against the contention that the plaintiff neither specified the defamatory communications in haec verba nor set out the circumstances of publication or the facts relied on to establish publication. Beascoechea v. Sverdrup & Parcel & Associates, Inc., D.C.Pa.1980, 486 F.Supp. 169.

A defamation complaint drawn by a layman, which averred generally that both defendants, a bank and a bank-holding company, defamed the plaintiff, would withstand a motion to dismiss as against the holding company, even though the holding company had no apparent links of authorship to the specific defamatory statements pled in the complaint. The denial of the holding company's motion to dismiss did not prevent it from moving for summary judgment. Stinnett v. Third Nat. Bank of Hampden County, D.C.Minn.1978, 443 F.Supp. 1014.

The failure of the plaintiff to plead allegedly slanderous statements in haec verba did not render his complaint insufficient when the complaint was sufficient to give the defendant notice of the nature of the communications complained of. Pirre v. Printing Dev., Inc., D.C.N.Y.1977, 432 F.Supp. 840.

Stearn v. MacLean-Hunter, Ltd., D.C.N.Y.1969, 46 F.R.D. 76.

Riverhouse Publishing Co. v. Porter, D.C.R.I.1968, 287 F.Supp. 1.

A complaint alleging that a retail credit company, pursuant to a request by a railroad, sent an agent to the plaintiff's house for the purpose of investigating the plaintiff's activities and that the agent later was convicted of impersonating a federal employee stated a cause of action in defamation. Fullerton v. Monongahela Connecting R. Co., D.C.Pa.1965, 242 F.Supp. 622.

A complaint, alleging that letters sent by the defendant to clients in Holland and Cuba were intended to and did injure the plaintiff in the practice of his profession and discredited him in his position as a consulting engineer, was sufficient to state a cause of action for libel. Mueller v. Rayon Consultants, Inc., D.C.N.Y.1959, 170 F.Supp. 555.

Bleau v. Greater Lynn Mental Health & Retardation Ass'n, D.C.Mass.2005, 371 F.Supp.2d 1, 2005 WL 1330440 (no special pleading is required).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**See also**

Edelman v. Locker, D.C.Pa.1946, 6 F.R.D. 272.

Consolidated Terminal Corp. v. Drivers, Chauffeurs & Helpers Local Union 639, D.C.D.C.1940, 33 F.Supp. 645.

**No claim stated**

In a libel action on a letter by the plaintiff's former employer to his prospective employers with respect to the plaintiff's competency and qualifications, when the amended complaint did not allege that the communication was false, and it was not libelous on its face and the allegation of extrinsic facts did not make it so, no cause of action for libel was stated. Pond v. General Elec. Co., C.A.9th, 1958, 256 F.2d 824, certiorari denied 79 S.Ct. 30, 358 U.S. 818, 3 L.Ed.2d 60.

To state a claim for defamation, the plaintiff needed to state, at a minimum, the alleged defamatory statements, the maker of the statements, the date the statements were made or published, and the third parties to whom the statements were made or otherwise published. Scott v. Houma-Terrebonne Housing Authority, D.C.La.2002, 2002 WL 31007412.

The plaintiff's allegation that an article critical of a government agency that he had been involved with made an accusation that the plaintiff may have known or should have known of torture and perhaps condoned it failed to establish an explicit accusation of the plaintiff's active participation in torture sufficient to state a cause of action for defamation. Saenz v. Playboy Enterprises, Inc., D.C.Ill.1987, 653 F.Supp. 552.

A counterclaim stating that alleged attempts to monopolize were continuing and would continue thereafter unless enjoined by the court, and that these attempts threatened the counterclaimant with injuries and damage to his business did not state a claim for relief in defamation. National Bowl-O-Mat Corp. v. Brunswick Corp., D.C.N.J.1967, 264 F.Supp. 221.

Although the court recognized the pleader "was not required to plead the defamatory words verbatim" it still viewed a mere allegation of defamation as insufficient to state a claim, or provide notice. Latino Food Marketers, LLC v. Ole Mexican Foods, Inc., D.C.Wis.2004, 2004 WL 632869.

"Although plaintiff is not required to plead a defamation action "in these words" or with specificity, a lack of reference to any allegedly defamatory statements fails to comport with even the liberal pleading requirements of Federal Rule of Civil Procedure 8." Daniels v. Alvarado, D.C.N.Y.2004, 2004 WL 502561 (Weinstein, J.).

**See also**

Johnson v. Stone, C.A.7th, 1959, 268 F.2d 803.

James v. FDIC, D.C.La.1964, 231 F.Supp. 475.

[FN3]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exact statement not required**

**Libelous statements**

Kalika v. Stern, D.C.N.Y.1995, 911 F.Supp. 594.

Odom v. Columbia Univ., D.C.N.Y.1995, 906 F.Supp. 188.

When the plaintiff in a libel action against an out-of-state newspaper alleged that the article was defamatory in its entirety, the complaint satisfied the notice requirements, and plaintiff was not required to plead, in haec verba, the defamatory language in the article alleged to be actionable. Stabler v. New York Times Co., D.C.Tex.1983, 569 F.Supp. 1131.

A complaint in a libel action alleging that the defendant produced and exhibited an inferior motion picture imputing its authorship to the plaintiff, a well-known and competent movie producer, was not defective for failing to set forth in full the alleged libelous matter inasmuch as simple and concise pleadings are mandatory under the rules, and libel is not one of the matters required by Rule 9 to be stated with particularity. Carroll v. Paramount Pictures, Inc., D.C.N.Y.1942, 3 F.R.D. 95.

**Slanderous statements**

A complaint alleging that the plaintiff was discharged from a federal office as a result of the defendant's malicious giving of false information concerning the plaintiff to the Federal Bureau of Investigation, was not defective for failing to plead the false and defamatory matter in haec verba. Foltz v. Moore McCormack Lines, Inc., C.A.2d, 1951, 189 F.2d 537, certiorari denied 72 S.Ct. 106, 342 U.S. 871, 96 L.Ed. 655.

Under federal pleading requirements, the plaintiff need not assert specific time, place, substance, and to whom the defamatory remarks were made. DeSalle v. Key Bank of Southern Maine, D.C.Me.1988, 685 F.Supp. 282.

Adler v. American Standard Corp., D.C.Md.1982, 538 F.Supp. 572, 576, **citing Wright & Miller.**

A complaint alleging that the airline slandered the plaintiff and her now deceased husband by stating that the husband was incompetent, an alcoholic, constantly drunk, and was not suffering from any physical or mental illness and lacked a respected credit rating stated a claim on which relief could be granted under Pennsylvania law against the contention that the plaintiff neither specified the defamatory communications in haec verba nor set out the circumstances of publication or the facts relied on to establish publication. Beascoechea v. Sverdrup & Parcel & Associates, Inc., D.C.Pa.1980, 486 F.Supp. 169.

The alleged slanderous statements were not required to be set forth in specific words in a counterclaim seeking damages for alleged slanderous remarks uttered by the plaintiff that impaired the defendant's credit in the trade, when the tenor of the statements satisfactorily indicated that a prima facie cause of action had been alleged. Edelman v. Locker, D.C.Pa.1946, 6 F.R.D. 272.

[FN4]

**Words must be alleged**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"In an action for slander or libel the words alleged to be defamatory must be pleaded and proved. It is also essential that it be alleged that the accusation was untrue." Holliday v. Great Atl. & Pac. Tea Co., C.A.8th, 1958, 256 F.2d 297, 302 (Gardner, C.J.).

"In the instant case, the complaint fails to identify any specific defamatory statements made by the defendants or when, where, or to whom any defamatory statements were made. Since plaintiffs have failed to identify any defamatory statement, the defamation claim is subject to dismissal for failure to state a claim upon which relief can be granted." Celli v. Shoell, D.C.Utah 1998, 995 F.Supp. 1337, 1346.

Thomas v. St. Louis Bd. of Educ., D.C.Mo.1996, 933 F.Supp. 817.

Jones v. Capital Cities/ABC Inc., D.C.N.Y.1995, 874 F.Supp. 626 (complaint dismissed because it failed to allege defamatory words with specificity as required by Rule 9; judge mistakenly applied Rule 9 when Rule 8 was correct rule).

"A complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made by whom and to whom." Ersek v. Township of Springfield, Delaware County, D.C.Pa.1993, 822 F.Supp. 218, 223 (Ditter, J.), affirmed C.A.3d, 1996, 102 F.3d 79.

An allegation that on several occasions the defendants presented to various county officials a letter that contained statements about the plaintiffs that were untrue, with a photograph of the plaintiffs' headquarters, failed to state a claim when the plaintiffs had not substantially set forth the words alleged to be defamatory and untrue nor any facts that would establish publication. Walters v. Linhof, D.C.Colo.1983, 559 F.Supp. 1231.

Thompson v. Kiekhaefer, D.C.Wis.1976, 71 F.R.D. 115.

Drummond v. Spero, D.C.Vt.1972, 350 F.Supp. 844, 845, **citing Wright & Miller.**

Allegations of libel and slander were insufficient to withstand a motion to strike in that they failed to set forth in haec verba the defamatory language employed. Bound Brook Water Co. v. Jaffe, D.C.N.J.1968, 284 F.Supp. 702.

The court granted the plaintiff leave to amend his complaint to allege the specific statements constituting defamation, as well as the elements of publication and fault. Blanck v. Hager, D.C.Nev.2005, 360 F.Supp.2d 1137.

**See also**

The paragraph of a complaint that contained the full text of the alleged libelous document complied with the requirement that defamatory statements be set forth in haec verba. Isenman v. Bandler, D.C.N.Y.1954, 15 F.R.D. 400.

Defamatory words must be set forth in the complaint if a slander action is based thereon. Simpson v. Oil Transfer Corp., D.C.N.Y.1948, 75 F.Supp. 819.

[FN5]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Substance of words pleaded**

A complaint alleging that the defendant had stated that the plaintiff was a parasite and could not be dealt with and that trying to deal with an organization like the plaintiff was like the United Nations trying to deal with communists in truce talks stated a cause of action for slander. Olan Mills, Inc. v. Enterprise Pub. Co., C.A.5th, 1954, 210 F.2d 895.

Silicon Knights, Inc. v. Crystal Dynamics, Inc., D.C.Cal.1997, 983 F.Supp. 1303.

Jones v. Capital Cities/ABC Inc., D.C.N.Y.1995, 874 F.Supp. 626, quoting Liguori v. Alexander, D.C.N.Y.1980, 495 F.Supp. 641.

Ford v. Clement, D.C.N.Y.1993, 834 F.Supp. 72.

Pelech v. Klaff-Joss, LP, D.C.Ill.1993, 828 F.Supp. 525 (when precise wording of alleged defamatory statement is unlikely to affect its interpretation and plaintiff has alleged sufficient information to enable defendant to respond, claim will survive Rule 12(b)(6) motion).

A wife alleging that she was libeled by an article describing a domestic dispute between her and her estranged husband complied with the notice requirements of Rule 8 when she attached a copy of the offending article to her complaint and stated that "the entire article as a whole is false." Ritzmann v. Weekly World News, Inc., D.C.Tex.1985, 614 F.Supp. 1336.

Allegations of a federal court complaint alleging defamation must afford the defendant sufficient notice of the communications complained of to enable him to defend himself. Liguori v. Alexander, D.C.N.Y.1980, 495 F.Supp. 641.

The allegation that publication of a magazine article depicting taxi cab drivers in Washington, D.C., as ill-mannered, brazen, contemptuous of patrons, and dishonest, stated a claim for relief in favor of a cab driver whose photograph appeared as an illustration forming a part of the article. Peay v. Curtis Pub. Co., D.C.D.C.1948, 78 F.Supp. 305.

**Substance of words insufficiently pleaded**

A counterclaim alleging that a false statement was made to bowling center operators that the operation by counterclaimant of bowling centers was an unlawful attempt to monopolize the bowling center business was not sufficiently particular to enable a determination whether the statement was in fact defamatory. National Bowl-O-Mat Corp. v. Brunswick Corp., D.C.N.J.1967, 264 F.Supp. 221.

A claim for relief for slander, set forth in an action in admiralty, was subject to dismissal unless the alleged slanderous statements were set forth substantially in the language uttered. Foster v. U.S., D.C.N.Y.1957, 156 F.Supp. 421.

Kirk v. NCI Leasing, Inc., D.C.Kan.2005, 2005 WL 3115859 (plaintiff failed to allege content of statement, who made statement, and to whom statements were made).

[FN6]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Allegation of falsity required**

Holliday v. Great Atl. & Pac. Tea Co., C.A.8th, 1958, 256 F.2d 297. This case was decided in accordance with Missouri law, which contains such a requirement. It seems to be the only federal decision speaking to this question, and the holding may be inconsistent with the usual rule that truth is an affirmative defense, although truth is not so listed in Rule 8(c). See § 1272. Nevertheless, it may be argued that words are not defamatory unless untrue, and thus a formal allegation of falsity is required in the complaint, even though the defendant will carry the burden of pleading and proving truth.

[FN7]

**Statement of publication sufficient**

A complaint sufficiently charged that the defendant published a libelous article by causing its distribution to news dealers in Spokane. Albi v. Street & Smith Publications, Inc., C.A.9th, 1944, 140 F.2d 310.

Davidson v. Cao, D.C.Mass.2002, 211 F.Supp.2d 264 (magistrate judge).

The allegation that a defamatory telegram concerning the plaintiff was read by the addressee and by him referred to another third party was a sufficient allegation of publication. Lesesne v. Willingham, D.C.S.C.1949, 83 F.Supp. 918.

[FN8]

**Allegation of situs**

When the complaint for libel disclosed that the accused publication went into every state and to members of the armed forces overseas and to all civilized nations and the defendant did not avail itself of means to compel the plaintiff to draw out allegations to the end that the situs of the torts alleged might be restricted to the states of publication or any other particular states, the court treated the allegations as referring to torts committed throughout the United States and the civilized countries. Hartmann v. Time, Inc., C.A.3d, 1947, 166 F.2d 127, 1 A.L.R.2d 370, certiorari denied 68 S.Ct. 1495, 334 U.S. 838, 92 L.Ed. 1763.

[FN9]

**Pleading extrinsic facts**

If a person is not referred to by name in the libelous publication, or in such manner as to be readily identified from the descriptive matter in the publication, extrinsic facts must be alleged showing that a third person understood the publication to refer to the plaintiff. Golden No. Airways, Inc. v. Tanana Publishing Co., C.A.9th, 1954, 218 F.2d 612, 15 Alaska 303.

If the defamatory character of a newspaper article rests on extrinsic facts, those facts should be alleged. Gonzalez v. Hearst Consol. Publications, Inc., D.C.N.Y.1953, 115 F.Supp. 721.

[FN10]

**Pleading special meanings**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Words of allegedly libelous publication must be viewed in terms of their usually accepted meaning and special meanings of a derogatory nature must be specially pleaded in the complaint by way of innuendo, explanation, or colloquium. Dorney v. Dairymen's League Co-op. Ass'n, Inc., D.C.N.J.1957, 149 F.Supp. 615.

Oral statements by a corporate officer or agent concerning the plaintiff were not actionable per se, thus it was necessary for the plaintiff to allege inducement, colloquium, or innuendo. Chambers v. National Battery Co., D.C.Mo.1940, 34 F.Supp. 834.

[FN11]

**Defamation pertained to plaintiff**

Church of Scientology Int'l v. Time Warner, Inc., D.C.N.Y.1992, 806 F.Supp. 1157 (references in article to "church" and "Church of Scientology" could be understood as "of and concerning" the Church of Scientology International).

Allegations by individual members of a large class about whom allegedly libelous statements were written that the matter was written "of and concerning each of them" was insufficient to satisfy the requirement that there be an allegation that the plaintiff was the person defamed by the publication. Neiman-Marcus v. Lait, D.C.N.Y.1952, 13 F.R.D. 311.

In an action by a corporation for alleged libel, the corporation was required to show that the libel contained a false statement or charge concerning itself and not concerning one of its officers, promoters, or principal stockholders. Cal-Therm Indus., Inc. v. Dun & Bradstreet, Inc., D.C.N.Y.1948, 75 F.Supp. 541.

[FN12]

**Necessity of pleading special damages**

A complaint charging a newspaper publisher with libel did not state a cause of action for publishing words that were actionable per quod, in the absence of an allegation showing special damages and actual malice. Schy v. Hearst Pub. Co., C.A.7th, 1953, 205 F.2d 750.

A complaint that the defendants published and circulated false accusations about the plaintiff and that the plaintiff's reputation, character, social standing, and professional career had been ruined and that he suffered embarrassment, humiliation, nervousness, mental anguish, and shock did not plead the special damages suffered with the required particularity. Barton v. Barnett, D.C.Miss.1964, 226 F.Supp. 375.

The court dismissed the slander claim against the defendant because the plaintiff failed to "meet the standard for slander per se" and, in the alternative, did not plead special damages. Daniels v. Alvarado, D.C.N.Y.2004, 2004 WL 502561.

**Special damages sufficiently pleaded**

Although the complaint made general claims of loss of reputation, it also averred that as a result of the allegedly libelous letter the plaintiff "has been and is still being refused normal credit terms by its sup-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pliers" and has expended time, money, and effort to re-establish its credit, and this was a sufficient pleading of special damages. Fleck Bros. Co. v. Sullivan, C.A.7th, 1967, 385 F.2d 223, appeal after remand C.A.7th, 1970, 423 F.2d 155.

**See also**

Rose v. Indianapolis Newspapers, Inc., C.A.7th, 1954, 213 F.2d 227.

Brewer v. Hearst Pub. Co., C.A.7th, 1950, 185 F.2d 846.

Fowler v. Curtis Publishing Co., C.A.1950, 182 F.2d 377, 86 U.S.App.D.C. 349.

[FN13]

**Rule 9(g)**

See vol. 5A, §§ 1310 to 1312.

[FN14]

**Allegation not required**

When a newspaper publication was libelous per se, an allegation of special damages was not essential to make out a cause of action for libel. Stevenson v. Hearst Consol. Publications, Inc., C.A.2d, 1954, 214 F.2d 902, certiorari denied 75 S.Ct. 110, 348 U.S. 874, 99 L.Ed. 688.

**See also**

Estill v. Hearst Publishing Co., C.A.7th, 1951, 186 F.2d 1017.

Sargent v. National Broadcasting Co., D.C.Cal.1955, 136 F.Supp. 560.

[FN15]

**Garcia case**

D.C.Puerto Rico 1951, 97 F.Supp. 5.

[FN16]

**Discussion elsewhere**

See § 1216.

[FN17]

**Simpson case**

D.C.N.Y.1948, 75 F.Supp. 819.

[FN18]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Guaranty Trust case**

1945, 65 S.Ct. 1464, 326 U.S. 99, 89 L.Ed. 2079, 160 A.L.R. 1231.

This case is discussed in vol. 19, § 4504.

[FN19]

**Innuendo**

Under New York law, if the plaintiff would read into a newspaper article something derogatory to his reputation, he should have pleaded an appropriate innuendo. Gonzalez v. Hearst Consol. Publications, Inc., D.C.N.Y.1953, 115 F.Supp. 721.

**Special damages**

Under California law, the special facts that are said to give rise to special damages for libel must be pleaded. Anderson v. Hearst Pub. Co., D.C.Cal.1954, 120 F.Supp. 850.

[FN20]

**Byrd case**

1958, 78 S.Ct. 893, 356 U.S. 525, 2 L.Ed.2d 953.

This case is discussed in vol. 19, § 4504.

[FN21]

**Hanna case**

1965, 85 S.Ct. 1136, 380 U.S. 460, 14 L.Ed.2d 8.

This case is discussed in vol. 19, § 4504.

[FN22]

**Federal law controls**

Andresen v. Diorio, C.A.1st, 2003, 349 F.3d 8, **citing Wright & Miller.**

Caster v. Hennessey, C.A.11th, 1986, 781 F.2d 1569, 1570, **citing Wright & Miller.**

Palladino v. VNA of Southern New Jersey, Inc., D.C.N.J.1999, 68 F.Supp.2d 455.

Mruz v. Caring, Inc., D.C.N.J.1998, 991 F.Supp. 701, **citing Wright & Miller.**

Ford v. Clement, D.C.N.Y.1993, 834 F.Supp. 72, **citing Wright & Miller.**

Liguori v. Alexander, D.C.N.Y.1980, 495 F.Supp. 641, 647, **citing Wright & Miller.**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bleau v. Greater Lynn Mental Health & Retardation Ass'n, D.C.Mass.2005, 371 F.Supp.2d 1, 2005 WL 1330440 (no heightened pleading requirement for defamation claims brought in federal court).

Nickerson v. Communication Workers of America Local 1171, D.C.N.Y.2005, 2005 WL 1331122.

**See also**

Koch v. Saint Francis Medical Center, D.C.Mo.2003, 2003 WL 1960439.

[FN23]

**Erie case**

1938, 58 S.Ct. 817, 304 U.S. 64, 82 L.Ed. 1188, 114 A.L.R. 1487.

The Erie doctrine is discussed in vol. 19, §§ 4501 to 4515.

[FN24]

**Swierkiewicz case**

2002, 122 S.Ct. 992, 534 U.S. 506, 152 L.Ed.2d 1.

This case is discussed in §§ 1216 and 1221.

**See also**

Koch v. Saint Francis Medical Center, D.C.Mo.2003, 2003 WL 1960439 (although dismissing complaint, court recognized that defamation claims are only held to liberal notice pleading standards).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Work.

5 FPP § 1245

END OF DOCUMENT