# TABLE OF CONTENTS OF EXHIBITS


EXHIBIT A. .......... 1 - 43
EXHIBIT A -1 .......... 44 - 54
EXHIBIT A -2 .......... 55 - 56
EXHIBIT A -3 .......... 57
EXHIBIT A -4 .......... 58 - 63
EXHIBIT A -5 .......... 64
EXHIBIT A -6 .......... 65
EXHIBIT A -7 .......... 66
EXHIBIT A -8 .......... 67 - 76
EXHIBIT A -9 .......... 77 - 78
EXHIBIT A -10 .......... 79 - 85
EXHIBIT A -11 .......... 86 - 89
EXHIBIT A -12 .......... 90 - 91
EXHIBIT A -13 .......... 92 - 95
EXHIBIT A -14 .......... 96
EXHIBIT A -15 .......... 97
EXHIBIT A -16 .......... 98
EXHIBIT A -17 .......... 99
EXHIBIT A -18 .......... 100
EXHIBIT A -19 .......... 101
EXHIBIT A -20 .......... 102
EXHIBIT A -21 .......... 103
EXHIBIT A -22 .......... 104
EXHIBIT A -23 .......... 105
EXHIBIT A -24 .......... 106
EXHIBIT A -25 .......... 107

EXHIBIT A -26 .......... 108
EXHIBIT A -27 .......... 109
EXHIBIT A -28 .......... 110
EXHIBIT A -29 .......... 111
EXHIBIT A -30 .......... 112
EXHIBIT A -31 .......... 113
EXHIBIT A -32 .......... 114
EXHIBIT A -33 .......... 115 - 116
EXHIBIT A -34 .......... 117
EXHIBIT A -35 .......... 118
EXHIBIT A -36 .......... 119
EXHIBIT A -37 .......... 120
EXHIBIT A -38 .......... 121 - 128
EXHIBIT A -39 .......... 129 - 162
EXHIBIT A -40 .......... 163 - 216
EXHIBIT A -41 .......... 217 - 228
EXHIBIT A -42 .......... 229 - 235
EXHIBIT B .......... 236 - 239

# EXHIBIT "A"

**BANNING MICKLOW & BULL LLP**
ATTORNEYS AT LAW
501 West Broadway • Suite 2090
San Diego, California 92101
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

William L. Banning
Partner

E-mail: wbanning@
nningmicklow.com

SAN DIEGO
SAN FRANCISCO
AMERICAN SAMOA
LONDON

May 23, 2008

**New Hampshire Insurance Company**
c/o AI Marine Adjusters, Inc.
Member Companies of American International Group, Inc.
175 Water Street, 14th Floor
New York, New York, 10038

**Attention:**
Ms. Susan Smith, Regional Hull Manager
Marine Claims Department

Re: M/Y MI BARUR

| | |
|---|---|
| Insureds: | Mi Barur, Inc., Arsenio Farell, Norma Farrell |
| Policy No.: | YM 868-56-66 |
| Date of Loss: | October 20, 2007 |
| Your Reference No. | LE08939 |
| Our File No.: | 8274-001 |

Dear Ms. Smith:

We write on behalf of your insureds Mi Barur, Inc., Arsenio Farell and Norma Farrell ("Insureds") with the hope of convincing New Hampshire Insurance Company ("NHIC") to change its decision to deny the Insureds' claims ("Claims") for the losses incurred during the fire and total loss of M/Y MI BARUR ("MI BARUR") at La Paz, Mexico on October 20, 2007 (the "Loss"). More particularly, this letter is in response to your letter dated March 10, 2008, wherein the Insureds' claims on the NHIC Policy No. YM868-56-66 (the "Policy") arising out of the Loss were denied ("Denial Letter"). NHIC sued the Insureds on March 10, 2008, in the action entitled *New Hampshire Insurance Company v. MiBarur, Inc.*, United States District Court for the Southern District of California, Case No. 08 CV 0443 BEN POR ("Action"). The Action seeks damages against the

EXHIBIT A
1

Insureds and a declaration that NHIC owes nothing to the Insureds under the Policy for the Loss. The letter will also respond to the substantive allegations of the Complaint in the Action ("Complaint").

As set forth herein, the Insureds believe the denial of their Claims was wrong, defamatory and in Bad Faith. The Insureds demand that NHIC promptly pay all Claims due under the Policy, as well as the attorneys' fees and costs and the experts' fees and costs they have expended to date, interest at 10% on the unpaid amount beginning 30 days after the Insureds' Claim was submitted, and, the withdrawal of any adverse or other reporting regarding the Farells, Mi Barur, Inc., and Captain Rello from any data base where it may have been submitted.

## I. Introduction:

Within a few days of the October 20, 2007, fire involving MI BARUR, NHIC sent a team of investigators to La Paz, Mexico to gather information. The Insureds from the date of the Loss, cooperated in every reasonable way possible to provide documents and information to NHIC. However, on March 3, 2008, NHIC coverage counsel, attorney Geoffrey Robb of the law firm of Gibson Robb & Lindh wrote to Mi Barur Inc., President, Michael Hallmark, ("Robb Letter") enclosing a copy of the insurer's investigation fire report prepared by Arthur Murphy, dated February 26, 2008 ("Murphy Report"). Shocking to the Insureds, the Murphy Report contends that the loss of MI BARUR was caused by arson. The Robb Letter followed more than four months of investigation of the Loss by NHIC. The Robb letter requested "further relevant information" from the Insureds if the Insureds disagreed with the finding of arson. Before the Insureds had any meaningful opportunity to respond legally and factually to the Murphy Report, the Robb Letter and the allegation of arson, on March 10, 2008, NHIC filed the Action and mailed out the Denial Letter.

In the Action and in the Denial Letter, NHIC claims, *inter alia*, that the loss of the MI BARUR was "caused by the willful or intentional wrongful acts of Mi Barur, Inc., its employees, agents, or others acting on its behalf." NHIC further claims that Mi Barur, Inc. was guilty of "intentional concealment or

misrepresentation of material fact or circumstance relating to the insurance or the application for insurance." The prayer of NHIC in the Action seeks a declaration from the court that New Hampshire "is not obligated to indemnify Mi Barur, Inc. in connection with the loss of the MI BARUR," but instead, should reimburse New Hampshire for $61,883.43 for amounts "incurred to raise and preserve the MI BARUR following the fire."

## II. Summary of Reasons Why the Denial of the Insureds Claims Was Wrong and in Bad Faith:

### A. Allegations of Arson:

In the Action NHIC asserts several technical defenses to coverage, including nondisclosure and misrepresentation. The heart of the Denial however, clearly lies in the allegation that the Insureds intentionally burned MI BARUR in an attempt to obtain insurance proceeds. Having now completed a thorough inspection of the wreck of the MI BARUR, interviewed material witnesses, reviewed all relevant documents, and received the opinions of multiple true fire experts, there is no basis whatsoever in fact or law for NHIC to deny the Insureds' Claims based upon the defense of arson or variations thereof.

First, Murphy, a former park ranger with no fire department experience, is wrong about where the fire started. The fire started in the area of the Crew Lounge, port side, amidships, not the captain's cabin (stateroom).

Second, the fire was not intentionally started by Captain Rello or anyone else. The fire started from a short in the electrical wiring of the vessel.

Third, Murphy failed to follow basic fire science rules of investigation and protocol for determining the cause of the fire. Even accepting all of his factual statements as true, the only proper conclusion in his report should have been that the fire was of "undetermined" origin, not one of arson.

Fourth, NHIC's agents, including Murphy, committed spoliation of the

evidence at the fire scene.

Fifth, the insurer has the burden of proving arson and its other affirmative defenses to coverage, including Insurance Code §533. Such affirmative defenses are construed by the courts as exclusions and are therefore strictly construed. In this circumstantial evidence case, NHIC has the burden of proving: (1) proof of incendiary origin, (2) proof of opportunity or other inculpatory evidence, and (3) proof of motive or other inculpatory evidence. NHIC will not be able to carry its burden on any of the elements of proof. There is no proof of incendiary origin, only Murphy's rank speculation. The is no proof of opportunity to set the fire, as smoke was not seen for over an hour after Captain Rello left the vessel. There is no evidence anywhere of any timing device that would have allowed Captain Rello to set a fire that was not discovered for over an hour on a dock crowded with people. Finally, neither the Insureds nor Captain Rello had any motive to commit arson.

**B. Allegation of Non-disclosure and Misrepresentation:**

No evidence supports NHIC's claim of non-disclosure or misrepresentation. Mr. Farell, who has owned and insured expensive yachts for over twenty-five years, fully disclosed all material facts to NHIC and made only affirmative representations that were in all respects true and correct. He, for example, never hid the fact that Mi Barur, Inc., was fully owned by him and his wife, Mexican citizens. At the time of the issuance (and renewal) of the NHIC policies, NHIC was expressly notified in writing that the vessel was owned by a single vessel corporation (a title holding mechanism known and approved by NHIC) and that its beneficial owner was an "Attorney" named "Arsenio Farell" residing in "Mexico City, MX."

Similarly, NHIC was fully aware that the MI BARUR would be trading primarily, if not exclusively, in Mexico, and, again, was provided this information in writing during the underwriting process and at the time of renewal. In fact, NHIC charged an additional premium for these extended trading rights. Finally, in representing the "cost, including equipment," of the MI BARUR, or her fair

market value, the figure of $2,200,000 was completely honest and accurate. Specifically, not only did the Farells provide NHIC with a copy of the referenced survey placing the value at $2,200,000, but it is undisputed that Mr. Farell paid $900,000 in cash, traded in a 75 foot yacht with a survey market value of $1.4 million and spent in excess of $300,000 on upgrades on the MI BARUR.

## C. Bad Faith Failure to Pay the Claims of the Insureds

The evidence indicates that NHIC and its agent were determined to deny the Insureds' Claims even before doing any investigation. Among other things, the fire investigation was superficial and contrary to standard NFPA practice; NHIC destroyed evidence; NHIC jumped to unsupported conclusions; the Insureds were excluded from the fire investigation; and NHIC lied to the Insureds about their interest in giving the Insureds a chance to respond to the arson allegations. The statement by NHIC's surveyor Todd Schwede sums up the manner in which NHIC handled this claim:

> "New Policy, less than 30 days old, total loss, Mexican, [arson] he did it." (Insert added).

Unfortunately, NHIC Bad Faith claims handling practices did not stop with the Denial Letter. The Complaint in the Action makes patently false statements of fact and law in support of its denial of coverage. Among other things, NHIC alleges in paragraph 57, lines 22-23, of the Complaint in the Action "that Mi Barur, Inc., was set up to circumvent U.S. law regarding U.S. documentation." This allegation is not only false, but defamatory. Either the allegation was made knowing it was false, or as a result of a reckless failure to properly investigate the Claims. It is clearly not illegal under U.S. law for a U.S. flagged recreational vessel to be owned by a U. S. corporation that is 100% owned by Mexican nationals. To allege otherwise is Bad Faith.

Amazingly, NIHC also attached a policy to the Complaint that is not the policy form which was purchased by the Insureds and relies on an exclusion not even included in the operative Yacht Policy. Again, blatant acts of Bad Faith.

Each of these points, and others, are fully explained below and are fully documented by the Supplemental Proof of Loss submitted herewith. NHIC is guilty of a Bad Faith denial of the Claims of the Insureds and has defamed Mr. and Mrs. Farell and Captain Rello. NHIC now has a chance to act in Good Faith by paying the Insureds' full policy benefits and their attorneys' fees and costs and experts' fees and costs.

## III. Summary of Supplemental Proof of Loss and Other Relevant Facts:

### A. Mr. and Mrs. Farell:

Arsenio Farell comes from a family of four children. He and each of his siblings are highly educated and graduated *summa cum laude* from prestigious schools. Mr. Farell is, of course, an attorney, his brother is a cardiologist, one of his sisters is a mathematician and another a dentist. For many generations Mr. Farell's family has been widely recognized as one of the wealthiest in Mexico, and Mr. Farell's father (who passed away in 2006) was one of the top trial attorneys in the country for over twenty years.

Mr. Farell followed in his father's footsteps and chose to be a trial attorney. A year after Mr. Farell finished law school in 1971, his father went into government service. Mr. Farell joined his father's law firm and ultimately came to lead the firm (which was founded in the late nineteen forties). During his thirty years of government service, Mr. Farell's father led various important government departments (for a long period, one level below the President) for five Mexican Presidents (with different ideologies, but requiring an administrator and politician of his skills and knowledge).

Mr. Farell has been, and he is still, a legal counsel and trial attorney for many of the most important and influential entrepreneurs in Mexico and of many huge Mexican and foreign corporations, including major insurance companies. He has also been counsel to Presidents and heads of government departments. At the time of this loss, Mr. Farell was comfortably leading his law firm through some of its most prosperous and successful years.

Mr. Farell has been joyfully married to Mrs. Farell since 1977. In addition to a large and beautiful house that they have owned for over twenty-five years in Mexico City, a remarkable collection of automobiles and a stable full of pure blood horses, Mr. Farell is also the owner of a stunning beach front weekend house in Acapulco and an exceptional collection of paintings and sculptures from renowned Mexican artists. Mr. Farell has enjoyed leisure boats and yachts for many years, the size and amenities aboard which he regularly improved. Mr. Farell also owns a third home as well as his office building in Mexico City (along with his sole law partner). All his properties and vessels are virtually debt free.

Mr. and Mrs Farell's daughters have recently married (the last one last year). Their elder daughter is both a biologist and psychologist and holds dual Master's Degrees (one in mathematics) from Boston University and the University of Massachusetts. She is married to a Professor and both of them are to begin working at Yale University in August of this year. Mr. Farell's youngest daughter is also married and living with her husband at Stanford University. As a consequence of their children living abroad, Mr. and Mrs. Farell have been simplifying, rather than expanding, their boats over the past few years. At this time, Mr. Farell has greater personal wealth than at any prior time in his life. Mr. Farell has virtually no debts, outstanding obligations or financial problems of any kind.

**B. <u>Yacht Ownership and Insurance History</u>:**

Mr. Farell has owned numerous high-end boats and yachts over the last twenty-five years. In the larger yacht category, Mr. Farell owned a 42-foot Grand Banks, a 55-foot Grand Banks and a 75-foot DeFever before he purchased the 92' Hatteras MI BARUR. Mr. Farell purchased each of these vessels for cash, never carried any loans on any of his yachts, and always fully insured such vessels. In addition to owning the MI BARUR on the date of loss, Mr. Farell also owned a 29-foot yacht which he docks at his beachfront home in Acapulco. Mr. Farell maintains a berth at the Acapulco Yacht Club (for which he paid $120,000). Mr. Farell has never made an insurance claim. See the Examination Under Oath of Mr. Farell, dated January 3, 2008, pages 14-20.

C. **M/Y MI BARUR**:

MI BARUR, a 1990, 92-foot Hatteras motor yacht, was in pristine condition at the time of her loss; impeccably maintained and the product of one of the most sought after, distinguished and respected yacht builders. At the time of her last survey, completed by marine surveyor Cecil Lange in September of 2007, the vessel was found to have a market value of $2,300,000 ("in its present condition") and a replacement cost of $5,500,000. At that time, the hull of the yacht, "including the decks, superstructure flying bridge and boat deck were found to be in excellent condition . . . ." The interior of the vessel was described as "excellent and like new condition throughout" and overall Lange commented that she was "a vessel that has been well maintained and a credit to her owner." See a true and correct copy of the Survey and Evaluation report for the motor vessel "MI BARUR" attached as **Exhibit 1** to the Supplemental Proof of Loss delivered herewith.

When initially offered for sale by her prior owner, George Calcote, the asking price was $2,400,000. See the Hallmark Central Listing Agreement dated 6/16/03 and the cover sheet of the resultant listing, **Exhibits 2 and 3** to the Supplement Proof of Loss. In a prior listing, under the name ARRIVEDERCI III, the asking price for the vessel was $3,250,000. See the Merle Wood and Associates listing, **Exhibit 4** to the Supplemental Proof of Loss. In 1997 Marion Knight purchased the MI BARUR for $2,850,000. He insured the vessel for $2,825,000. See **Exhibit 5** to the Supplemental Proof of Loss. Finally, when the boat was surveyed immediately prior to her purchase by Mr. Farell, she was surveyed by marine surveyor Marvin Henderson and found to have an estimated market value of $2,200,000. See the cover sheet to the Marvin Henderson survey dated September 7, 2003, **Exhibit 6** to the Supplemental Proof of Loss.

D. **Mr. Farell's Financial Investment In MI BARUR**:

In the fall of 2003, seeking to purchase a larger boat to replace his 75-foot DeFever, Mr. Farell decided to purchase the 92-foot Hatteras, later to be named

MI BARUR. As Mr. Farell testified in his Examination Under Oath, his yacht broker of many years, Michael Hallmark, had advised him that the current owner of the Hatteras was experiencing financial troubles and that an opportunity existed to get an exceptional deal on this high-end motor yacht. After a period of negotiations, Mr. Farell indeed purchased the Hatteras for a payment of $900,000 cash and the trade-in of his existing yacht, the DeFever. It is undisputed, and NHIC has in its possession, evidence of this cash payment.

Although many factors go into what a vessel will ultimately sell for (at any given time or place), prior to the transfer in question, the prospective owner, George Calcote, arranged for a survey of the DeFever by Marvin Henderson, who placed the fair market value of the vessel at that time at $1,400,000. See the cover sheet of the Marvin Henderson survey of September 17th 2003, **Exhibit 7** to the Supplemental Proof of Loss. Calcote, who was apparently under financial duress, later reduced the price to $1.1 million, and then to $950,000 (see the Hallmark listings for said vessel, **Exhibit 8** to the Supplemental Proof of Loss), and ultimately sold the boat for $620,000. However, there is nothing to suggest that the fair market value of this vessel was less than $1,000,000 (had Calcote had the financial wherewithal to sell the vessel in the normal course). After the trade in, Zurich Insurance Company insured the DeFever's hull and machinery for $1.4 million. When the subsequent owner, Mr. Augustin Rodriguez, later listed the DeFever for sale (in February of 2006), he also valued the boat at in excess of one million dollars ($1.1 million). See Cover Note 5170 and the Hallmark Central Listing Agreement dated February 8, 2006, collectively **Exhibit 9** to the Supplemental Proof of Loss submitted herewith.

In addition to the above-referenced cash payment and yacht trade, following the purchase of the MI BARUR Mr. Farell invested well in excess of $300,000 in additional upgrades and equipment for his new yacht.[1] See Mr. Hallmark's

[1] NHIC's attorney, Mr. Robb, obtained a full copy of Hallmark's file on this vessel. Contained in the file are detailed documents evidencing the nature and extent of such work. Also in the file is a complete ledger report prepared by Hallmark showing that Mr. Farell spent in excess of $300,000 on vessel up-grades

Register Reports, **Exhibit 10** to the Supplemental Proof of Loss. Using these figures, the amount spent by Mr. Farell for the cost of the 92-foot Hatteras MI BARUR, including equipment, can be conservatively estimate at over $2.3 million (even assuming the value of the DeFever at only $1.1 million and the upgrades at only $300,000).

**E. <u>Mi Barur, Inc</u>:**

When purchased by Mr. Farell, the Hatteras was a Coast Guard documented U.S. flagged vessel. It is common and perfectly legal for Mexican owners to fly a U.S. flag on such a vessel. As Mr. Farell explained in his Examination Under Oath, there were numerous legal benefits to continue flying the U.S. flag on his yacht. Not only would maintaining the U.S. flag make it easier to resell the vessel (in the U.S. market or to another non U.S. citizen), but Mr. Farell had experienced firsthand that flying the American flag improved the treatment he received when calling in various ports in Mexico and elsewhere.

Mr. Farell also chose to hold title to the vessel in a single vessel holding corporation, a practice, as NHIC is well aware, that is very common for both recreational and commercial vessels. Both Mr. Farell's yacht broker, Michael Hallmark, and his San Diego based attorney, Paul Trusso, will testify that this is a common and perfectly legal practice. See the Declaration of Michael Hallmark, paragraph 9, and Paul Trusso, paragraph 4, **Exhibits 11 and 12** to the Supplemental Proof of Loss. Furthermore, notwithstanding the false statements in the Denial Letter, in the Action, and in questions posed by Robb, the holding by Mexican nationals of 100% of the stock in such a U.S. single vessel corporation is completely legal and is specifically approved by 46 C.F.R. 67.39. See the Declaration of Paul Trusso, paragraph 5. NHIC's own underwriting files will reveal that it commonly insures such single vessel corporations, including companies where the stock is entirely held by Mexican citizens. See the Declaration of Henry Medina, paragraph 8, **Exhibit 13** to the Supplemental Proof

---

in the fall of 2003 alone.

of Loss. Indeed, when NHIC and similar marine insurance hull underwriters insure such recreational vessels, none of their standard application forms or questionnaires even inquire as to the nationality of the ownership of such single vessel corporations. See the Medina declaration, paragraph 8 and **Exhibit 14** to the Supplemental Proof of Loss.

**F. Initial Coverage with Zurich Insurance Company ("Zurich"):**

Upon purchasing MI BARUR, Mr. Farell arranged for hull and P & I insurance for the vessel through Henry Medina of Mariners General Marine of San Diego ("Mariners General"). Although Mariners General received various quotes on the vessel (see, e.g., the Chubb quote of 9/18/03 with hull limits of $2,200,000, a $44,000 deductible, and an annual premium of $12,645, **Exhibit 15** to the Supplemental Proof of Loss), at the advice of Medina, the yacht was ultimately insured by Zurich. A copy of the Mariners General Cover Note #5171 indicates coverage effective September 23, 2003, with hull and machinery coverage in the amount of $2,200,000 (per the Henderson survey), a $44,000 deductible, and an annual premium of $20,990. See **Exhibit 16** to the Supplemental Proof of Loss. Zurich also offered to renew their policy the following year for the same policy limits and at a similar premium rate. See the Zurich quote dated August 16, 2004, **Exhibit 17** to the Supplemental Proof of Loss.

**G. The NHIC Application and Initial Policies:**

As the 2004 renewal deadline for the policy approached, Medina contacted other insurers, including the NHIC's general agent, Maritime General Agency ("MGA"). Medina advised MGA that he was currently insuring the vessel with Zurich, but was "looking for better coverage and premium." See the fax cover sheet from Medina to Chris Clark of August 17, 2004, **Exhibit 17** to the Examination Under Oath of Mr. Farell, and **Exhibit 18** to the Supplemental Proof of Loss. This inquiry lead to the issuance of the first NHIC policy on MI BARUR, that was to be renewed the following three years, and upon which coverage would ultimately be denied by NHIC.

1. **The Application Process:**

The application process was conducted entirely by Medina based upon NHIC's underwriting guidelines (as he understood them based upon his conversations and experience with MGA). The application information was placed on a standard form utilized by Mariners General on prior placements with NHIC. A true and correct copy of the Yacht Insurance Application is attached as **Exhibit 19** to the Supplemental Proof of Loss and is also part of **Exhibit 17** to Mr. Farell's Examination Under Oath. As discussed more fully below, the initial submission to MGA included not only the cover sheet and the Mariners General standard application form, but also an updated yacht quote questionnaire prepared by Medina (**Exhibit 20** to the Supplemental Proof of Loss), a copy of the September 7, 2003 survey prepared by Henderson, and the resume for the vessel's Captain, Luis Manuel Rello (as well as other certificates and other documents attached thereto). For complete copies of these latter documents, see **Exhibit 17** to the Examination Under Oath of Arsenio Mr. Farell.

The following day, MGA's Clark emailed Medina attaching a quotation and requesting certain additional information including a signed compliance letter regarding the outstanding recommendation items on the Henderson survey and a severe weather plan ("Weather Plan"). See a copy of Clark's August 18th 2004 email, **Exhibit 21** to the Supplemental Proof of Loss. Furthermore, when Medina responded and asked whether the original 2003 application would work to bind coverage, Clark responded that indeed it would. See the further email exchange of August 18, 2004, **Exhibit 22** to the Supplemental Proof of Loss. Medina also promised to forward the compliance letter under separate cover.

Thereafter on September 14, 2004, Medina faxed the signed compliance letter to MGA and as requested. See Medina's email of September 14th, the requested and the sign off compliance, **Exhibits 23, 24 and 25** to the Supplemental Proof of Loss. Thereafter on September 23, 2004, NHIC did in fact issue policy EY 341-92-25 with an agreed hull value of $2,200,000, a hull deductible of $44,000, and a hull premium of $16,060. See the 2004-2005

Declarations Page, **Exhibit 26** to the Supplemental Proof of Loss. That policy was renewed twice by NHIC on September 23, 2005, and again on September 23, 2006, each time with only a single page questionnaire and no further inquiry (with the same limits, deductible and hull premium). See the NHIC Insurance Company declaration pages for policy periods 9/23/2005 to 9/23/2006, and 9/23/2006 to 9/23/2007, **Exhibits 27 and 28** to the Supplemental Proof of Loss.

**2. <u>All Aspects of the Application and Placement Were Handled by Marine Insurance Specialist Henry Medina</u>:**

During the above referenced application process, and in related correspondence and conversations, Medina worked as an intermediary between NHIC and the Insureds and was thus particularly familiar with their underwriting guidelines. Medina will testify that he gave all information which he considered to be material to NHIC, based on his many years of experience in the marine insurance business in general, and with NHIC in particular, in addition to any and all material requested by the representatives of NHIC. Medina had absolutely no incentive to misrepresent or conceal any facts, had experienced no trouble whatsoever insuring this yacht in the past, and had received quotes with lower premiums from other insurers. As mentioned above, Medina had insured many vessels held by single vessel owning corporations and/or Mexican citizens, never with any problem or any indication from any underwriter, including Clark and others at NHIC, that either of these considerations were considered negative risk factors by the underwriters. Medina will testify Clark and other representatives of NHIC were never shy about requesting information they felt was important to them. Medina will also testify that Mr. Farell was always completely forthcoming in his dealings with Medina and fully advised him of all facts regarding his yacht. See the declaration of Henry Medina, paragraphs 5, 6, and 7, **Exhibit 13** to the Supplemental Proof of Loss.

**3. <u>Mr. Farell, an Attorney With a Mexico City Address, Was Clearly Identified To NHIC As The Beneficial Owner</u>:**

In addition to the fact that Mr. Farell disclosed all material information to Medina, Medina also disclosed all material information regarding the identity of the insured to NHIC as part of the initial application process. First, on both the standard yacht insurance application form and the yacht quote questionnaire (**Exhibits 19 and 20**), the owner of the vessel was properly identified as Mi Barur, Inc. Given that the name of the vessel was also disclosed, it would be abundantly clear to anyone with any experience with the maritime industry, that Mi Barur, Inc. was a single vessel holding corporation (as set forth above, a very common and legal arrangement).

Second, the fact that Mr. Farell was the beneficial owner of the vessel and a Mexican citizen were also clearly disclosed. Specifically, on both the yacht quote questionnaire and the yacht insurance application, the occupation of the owner is identified as "Attorney." Not only does the insurance application indicate that Mr. Farell employs a "Licensed Mexican Captain," but the cover page of the Marvin Henderson marine insurance survey dated September 7, 2003 (**Exhibit 6**) indicates that the survey was done at the request of Mr. Farell, with an address of **"Gutenberg 147 Col. Anzures, Mexico City, MX D.F. 11590"**. Furthermore, Medina will testify that when he was asked why the Captain's resume was in Spanish, he told Clark that the owners, crew etc., of the MI BARUR were "Mexicans." See the declaration of Henry Medina, paragraph 11, **Exhibit 13** to the Supplemental Proof of Loss.

**4. <u>The Total Cost of the MI BARUR, Including Equipment, And Her Fair Market Value, Was $2.2 Million</u>:**

In support of the application for coverage submitted to NHIC, Medina also disclosed to NHIC the market value of the MI BARUR as $2,200,000, based on the September 7, 2003 survey by Marvin Henderson. See the yacht quote questionnaire, page 2 to exhibit 17 to Mr. Farell's Declaration under Oath. Additionally, on the standard application form under the heading "costs, including equipment" the figure of $2,200,000 was again entered. This, again, is a conservative figure given that Mr. Farell paid $900,000 in cash for the vessel,

traded in a vessel with a survey value of $1.4 million (the DeFever) and invested in excess of $300,000 in upgrades immediately after purchasing the vessel. Medina will testify that, notwithstanding the fact that he later suggested that Mr. Farell obtain an updated survey (in the fall of 2007), no representative of NHIC ever requested any further information regarding the value of the vessel, a further survey, or further details regarding the cost of the vessel. See the Medina Declaration, paragraph 12.

### 5. <u>The Trading Area of the MI BARUR Was Fully and Accurately Disclosed</u>:

Medina also accurately disclosed the anticipated trading patterns of the vessel. Indeed, he not only disclosed these patterns, but additional premiums were charged and the deductible was increased to allow the vessel to trade as far south as Acapulco, Mexico. First, both the application and the yacht questionnaire describe the location of where the vessel was moored as "San Diego/Acapulco." Second, the Weather Plan showed the vessel would trade in the La Paz area as well. During the years NHIC insured the vessel she actually traded as set forth in the application and the Weather Plan. See **Exhibit 24** to the Supplemental Proof of Loss. At the time that the vessel was purchased, and her extensive outfitting was completed (i.e. when the application was prepared), the vessel was indeed in San Diego. It would, in fact, have been an omission, if not a misrepresentation, not to list San Diego on the document. Second, because Mr. Farell had always used a San Diego based yacht broker to buy and sell his yachts and had always had major repairs done in top boat yards in San Diego, this was a necessary disclosure given the probable future use and mooring of the vessel in these waters.

Medina was well aware, at the time of making these submissions, that it was very common for yachts to remain in Mexico for the entire year and that this was not an issue that was of any concern to any insurer he worked with, including NHIC. See the Medina Declaration, Paragraph 9. Indeed, as mentioned, for the initial policy year, and each year there after, the vessel trading warranty was adopted pursuant to the navigation endorsement (Endorsement No. 1) specifically

to allow the MI BARUR to travel to as far south as Acapulco, in exchange for an additional premium and an increase deductible. See **Exhibit 29** to the Supplemental Proof of Loss. If NHIC believed that its risk would be materially increased if the yacht operated out of the United States for an extended period of time, the Policy obviously could have included a limit on the time the MI BARUR could remain in Mexico. **Nowhere in the policy is the vessel required to return to U.S. waters for any period of time.** Indeed, as Medina will testify, it is not uncommon for insurers that do want a vessel to return to a specific location to so mandate in the trading warranty or elsewhere in the policy. See the Medina Declaration, Paragraph 10.

**H. <u>The Decision and Efforts To Sell MI BARUR</u>:**

As Mr. Farell explained in his Examination Under Oath, approximately a year before the loss in question he decided that he was going to sell the MI BARUR and purchase a smaller yacht. As he further explained to attorney Robb, the yacht had always been used as a center of family life and relaxation, and given that both of Mr. Farell's daughters were leaving Mexico to study in the United States, the Farells felt that the 92-foot Hatteras was simply too large for the couple at this stage in their lives.

As Hallmark will testify, Mr. Farell was willing to take the time needed to get a reasonable price and was never an anxious seller. However, he was flexible in price when the market suggested a reduced asking price and he had the financial ability to reduce his price with ease. For example, while the boat was originally offered for \$2.7 million, the price was later lowered to \$2.2 million at the suggestion of Mr. Farell. See the Hallmark Declaration, paragraph 11. See also the Hallmark Central Listing Agreements, Exhibits 22 and 23 to Mr. Farell's Examination Under Oath.[2]

---

[2] Mr. Farell was not in anyway desperate for money. Mr. Farell rejected multiple offers on the MI BARUR; two that Mr. Hallmark was aware of, one for \$1.6 million cash and one for \$1.85 million (including a home trade), and a third made directly to Mr. Farell for \$1,000,000 and a 75' Italian yacht. See the

In July 2007, Mr. Farell strongly considered moving MI BARUR to Florida to experience a different cruising ground and a better yacht market. According to one of Hallmark's competitors (Merrill-Stevens Yachts), Florida was a better market for a yacht the size of MI BARUR. All of this information was conveyed to NHIC and the 2007-2008 renewal was set to have revised trading restrictions accordingly. [3] Ultimately before the renewal date, it was decided not to take the boat to Florida and to keep the boat in waters from San Diego to Acapulco. Consequently, the Policy renewed with the original trading warranty. Also, during the time prior to the 2007 renewal, Mr. Farell was considering bringing the boat back to San Diego and Hallmark had even made inquiries on arranging for a slip for the boat on Shelter Island in San Diego. See the Hallmark Declaration, Paragraph 12.

## I. <u>The 2007 Renewal</u>:

The Agreed Value for the 2007-2008 policy of $1.9 million was not based on any request or representation by the Insureds, but was based on independent research by MGA's underwriter, Michael Terrier. See the Declaration of Henry Medina, Paragraph 13 and the email from Terrier to Medina of August 28, 2007, **Exhibit 30** to the Supplemental Proof of Loss.

Ultimately, with the boat remaining in LaPaz (and possibly being brought back to San Diego for sale), Medina requested the policy be renewed with the same trading warranty; "a San Diego, La Paz, Acapulco vessel." See Medina's email to Michael Terrier of September 20, 2007, **Exhibit 31** to the Supplemental Proof of Loss. All of the previously disclosed facts remained true and accurate and no additional information was requested by NHIC. The only material change in the coverage was as a result of Mr. Terrier's unilateral new valuation and the

---

Hallmark Declaration, Paragraph 11.

[3] Merrill-Sevens also produced a $200,000 deposit and an offer for the yacht at $1,750,000.

need to write the boat under the Yacht, rather than the Executive Yacht form. See the September 23, 2007 Declaration Page referencing new policy form BJP 2191-A (8/06), **Exhibit 32** to the Supplemental Proof of Loss. At the time of the issuance of the Policy, Mr. Farell had been an insured with NHIC for three loss free years and had paid premiums of over $70,000.

**J. <u>Captain Rello</u>:**

On the date of the loss, Captain Rello had worked for the Farells for over ten years as the full-time Captain of MI BARUR and prior yachts owned by the Farells. Captain Rello is a graduate of the Mexican Naval Academy, has excellent credentials and has no criminal record. Captain Rello was, at all times, well compensated and well liked by the Farells, and happily employed with no complaints about his employer. Captain Rello was an admitted smoker, but did not smoke in the lower enclosed cabins on the MI BARUR. No evidence exists that would demonstrate any reason why Captain Rello would intentionally set fire to MI BARUR. Moreover, he has passed a polygraph test demonstrating he was telling the truth when he told Murphy he did not commit arson.

**K. <u>The Loss</u>:**

The general facts relating to the loss of the MI BARUR are covered in the Murphy report. On the date of the fire the vessel lay at her normal berth at the Marina Palmira in LaPaz, Baja Sur, Mexico. The marina is located in a major metropolitan area and is well served by police and fire services. The fire was first reported at approximately 9:30 a.m. The MI BARUR was moored on the starboard side, facing north at slips 201 and 203 located at the east end of dock No. 2. No one was on board the motor yacht at the time the fire was reported. Captain Rello had left the vessel approximately one hour before the fire was reported.

Multiple calls were received by witnesses within the marina, who observed white or light grey smoke emanating from the forward, starboard side, of the

vessel. Two of the witnesses, Francisco Robles and Alfredo Amador, were working on adjacent vessels towards the middle of dock No. 2 and observed the early stages of the fire. Both men ran to the yacht, disconnected the shore-power, and boarded the vessel. They entered through the galley passageway door located amid-ships, main deck level, at the starboard (right) side of the vessel, and observed a smoke layer banking down from the overhead to about three-to-four feet off the galley deck. All smoke was observed light grey in color and emanating from the companion way stairs leading down to the forward crew's quarters and VIP stateroom. Robles was able to get some three steps down the stairs before he was driven back by the smoke. There was very little heat and he felt that he could have gone down further if it was not for the smoke.

With assistance from individuals around the marina, captain Rello moved the vessel from its original moored position at the west end dock No. 2 to north side of dock No. 7, on the interior east side of the marina breakwater. The vessel was moved so that other vessels would not be harmed by the fire and to provide better access for fire suppression equipment. Local firefighters arrived on the scene and observed heavy flames emanating from the galley door and salon. Firefighters began suppression operations, but were driven off the vessel by the intensity of the fire that had developed by that time. Firefighters then re-directed their efforts to the exterior of the vessel. Suppression effort and pumping of large quantities of water aboard the yacht continued until approximately 2:00 p.m., when the fire was thought to be completely extinguished. The MI BARUR and all contents sustained a total fire loss. The following morning a "re-kindle" occurred on the vessel and the vessel was taken outside the breakwater, where she burned to the water line and sank in shallow water. The vessel was submerged for days prior to being raised and taken to a local marine facility at Abaroa's shipyard, where she was placed in the ways for inspection.

**L. <u>The Insureds' Full Cooperation</u>:**

The Insureds fully cooperated with the NIHC investigation following the Loss. At the express direction of NHIC and their marine surveyor Todd Schwede, Mr. Farell paid for significant sue and labor efforts to raise the yacht and have her

hauled to facilitate the investigations of Schwede and Murphy. Mr. Farell spent in excess of $60,000 of his own money on preserving the yacht and helping NHIC in its on-scene investigation. See the Letter of November 5, 2007 from Schwede to Mr. Farell, **Exhibit 33** to the Supplemental Proof of Loss. Furthermore, Mr. Farell not only submitted a detailed Statement of Loss and provided releases for all of the files maintained by his insurance broker and both of his yacht brokers, he, his Captain, and Hallmark all submitted to lengthy examinations under oath by counsel for NHIC. The Policy required that the Insureds provide NHIC with only a sworn statement not a videotaped examination under oath by counsel for NHIC.

**M. <u>The NHIC On-Sight Investigation</u>:**

NHIC's fire investigators failed to follow proper fire investigation procedure. As a result, much evidence was lost or destroyed. Mr. Farell indeed wrote to Mr. Schwede about this very issue following the loss. See Mr. Farell's letter of October 24, 2007, **Exhibit 34** to the Supplemental Proof of Loss. Fire investigators are supposed to comply with the requirements of NFPA 921. As is noted by Mr. Perkins in his fire investigation report (see below) (as well as the peer review of Murphy's report prepared by Hal Lyson, CFI), NHIC repeatedly failed to follow proper fire investigation procedure throughout their investigation. A true and correct copy of Mr. Lyson's peer review report is attached as **Exhibit 42** to the Supplemental Proof of Loss. Common sense dictates that NIHC's agents' haphazard use of grappling hooks and other devices to pull wreckage from the hull of the MI BARUR, destroyed critical cause and origin evidence. Further, after NHIC's raised the hull, it was left un-supervised and exposed to theft and tampering for over a week before Murphy returned to complete his cause and origin inspection and investigation. See the letter to Todd Schwede from Mr. Farell dated November 5, 2007, **Exhibit 35** to the Supplemental Proof of Loss. Finally, when Murphy did begin his inspection, his de-layering or the fire debris and removal of equipment was sloppy and haphazard, items being removed, for example, from the Captain's Cabin area and piled on other important areas, such as the Crew Lounge. Other debris was piled ashore, again unprotected.

In addition to this sloppy technical approach, it was clear to those on the scene that both Schwede and Murphy had a preconceived agenda to prove that the fire had been intentionally set, rather than conducting an objective investigation (Schwede actually asked various people, before any investigation had been carried out, if Captain Rello had set fire to the MI BARUR). In addition, a comment that Medina will testify was made by Schwede sums up best the approach taken by the NHIC team, **"New policy, less than 30 days old, total loss, Mexican, he did it."** See the March 7, 2008, pre-denial email from Mr. Medina to Mr. Robb, **Exhibit 36** to the Supplemental Proof of Loss and the Medina Declaration, Paragraph 14.

**N. <u>Murphy's Conclusions</u>:**

Murphy's conclusion that the fire started in the Captain's Cabin is patently wrong. His conclusion that the fire was started by an arsonist is also patently wrong. We do not currently know the full relationship between Murphy and NHIC/AIG. We understand he has been hired on several occasions by NHIC to investigate fires and has received significant fees from NHIC. We understand that Murphy's wife is an insurance claims adjuster. We also understand he was attending a marine surveyor's conference in San Diego at the time of the fire and was asked by Todd Schwede and NHIC to participate in the investigation of this fire. While on scene Murphy let slip to Captain Rello that the evidence demonstrated that the fire was started by an electrical short in a refrigeration motor. However, in his report he concluded that the fire began in the "Captain's Cabin" (a cabin that Captain Rello did not use), and that "the Form of Ignition was (caused) by incendiary (intentional arson) human action."

Murphy's report has overtones of racial prejudice throughout. For example, Murphy states that Captain Rello was the last person aboard the vessel. He also states that the boat was unlocked (<u>i.e.</u> accessible to anyone within the marina complex, which houses hundreds of boats and is accessible not only by their owners, but their crews, guests, repair personnel, marine workers etc). He then implies that the Insureds and the marina management were involved in a conspiracy to hide the identity of the arsonist stating that the "identification of the

arsonist could be proven by the introduction and/or release of the marina surveillance video recordings." The truth is that the video camera on that dock does not come close to visualizing the area where MI BARUR was docked at the time of the fire. All it visualizes is a small area around the gate. Ironically, Murphy made an appointment to see the video room at the marina and meet with the security personnel, including the technician in charge of the video surveillance system, but he never showed up. Further, if Murphy had requested the video earlier, he would have been given a copy of whatever film there was prior to the fire. Unfortunately, Murphy waited until the video had automatically recycled.

Despite coming to the conclusion that the fire was caused by arson, Murphy found: (1) no specific evidence of incendiary origin; (2) no evidence of any timing device that would explain how Captain Rello could set the fire over an hour before any smoke was noted by persons on the crowded dock; and (3) no evidence of motive or any of the arson indicators that would implicate Captain Rello or Mr. Farell. See also the email from attorney Robb to Mr. Medina dated March 7, 2008, wherein even he notes in relation to the Murphy report that "I . . . did not see where he has concluded that Captain Rello started the fire." **Exhibit 37** to the Supplemental Proof of Loss.

## O. <u>The Perkins Investigation and Results</u>:

Donald Perkins of Fire Cause Analysis, Berkeley, California, has conducted an investigation of the Loss at the request of the Insureds. Perkins is a retired Captain from the San Jose, California Fire Department. He has extensive fire and arson investigation experience and was the Arson Unit Supervisor/Investigator for that Department for four years. See a copy of Perkins resume, **Exhibit 38** to the Supplemental Proof of Loss. Accompanying Perkins to La Paz was Ron Kilgore of Kilgore Engineering, Inc., and Bill Engstrom, a marine surveyor.

Following his investigation, Perkins prepared a Fire Investigation Report in conformance with NFPA 921. **Exhibit 39** to the Supplemental Proof of Loss. To insure that the Perkins Report met the highest standards of NFPA 921, the

Insureds had the Perkins Report peer reviewed by Dr. John Dehaan. Dr. Dehaan is one of the foremost authorities on fire science in the nation.

Perkins continues his investigation at this time, but has reached the following conclusions (some of which were not noted at the time he finalized his report at our request):

1). Based on an objective analysis of the fire patterns, the fire originated in the Crews Lounge located on the lower level on the port side amidship. The fire then spread down the companion way and up the stairs and out the starboard side galley door.[4]

2). The fire was probably caused by an undetermined electrical ignition source high within the forward bulkhead/overhead in the Crews Lounge compartment. Given the manner in which NHIC's agents destroyed the evidence at the fire seen; the severe burning of the electrical conductors and components and their degradation from salt water submergence, it is now impossible to identify the specific ignition source.

3). The fire did not reach the Captain's Cabin on the starboard side of the vessel until the vessel was well engulfed in fire, many minutes after ignition. Proof of this point can be found in the fact that the carpet and lower areas of the doors, bunk etc, suffered no fire damage at all due to the fact that they were submerged in water from on-going fire suppression efforts *before* the fire reached this compartment. Had the fire originated in this area, or even reached this area before the fire suppression water, the carpet would necessarily been burned (just as it was in the crew's lounge and cabin on the starboard side of the boat).

---

[4] Murphy never even inspected this area, but rather buried it under the debris he had removed from the Captain's Cabin.

4). The cause of the fire was not arson. Pursuant to NFPA investigative criteria, and specifically NFPA 921, the cause of this fire must be ruled "undetermined." As discussed below in relation to his critique of Murphy's report, Perkins found no information or data that would support a conclusion of arson. See a complete copy of Perkins May 9, 2008 report, **Exhibit 39** to the Supplemental Proof of Loss.

5). Mr. Perkins has determined that there is a "vehicle history" of electrical fires on similar Hatteras yachts, including an electrical fire in the crew's quarters on a Hatteras 105 built just several years after the MI BARUR.

**P. <u>The Mexican Fire Investigation and Results</u>:**

In addition to the Perkins team, the Insureds contacted and retained a highly renowned Mexican fire investigator, Mario Saldana Nolasco. Mr. Nolasco examined the remains of MI BARUR in the presence of Perkins. Mr. Nolasco reached the following conclusions:

1). The point of origin was not the Captain's Cabin.

2). The point of origin was not the Crew's Cabin.

3). The point of origin was the crew's "dinning area" (ie. Crew's Lounge).

4). The fire was not intentionally set.

5). While the probable cause was electrical in nature, the fire must be deemed of an "unknown" cause. See the report of Mr. Nolasco, **Exhibit 40** to the Supplemental Proof of Loss.

## Q. <u>The MAZE Report is Fatally Flawed</u>:

In addition to retaining Mr. Perkins to complete his independent fire cause and origin investigation, we asked Mr. Hal Lyson, another Nationally renowned fire investigator, to complete, in his words, an "evaluation of the Maze fire investigation report." In response to this request, we received, and submit herewith as **Exhibit 42** to the Supplemental Proof of Loss, Mr. Lyson's report of May 20, 2008. As indicated by way of introduction, Mr. Lyson is highly critical of the methodology of the Maze investigation and its conclusions.

Simplifying it to its key points, the report concludes that:

1). Mr. Murphy violated NFPA 921, section 28.3.5.11, when he "failed to examine the vessel while it was partially submerged" and failed to use "qualified people" to complete the "recovery and documentation," and as a consequence, "allowed for the likely destruction of evidence."

2). Mr. Murphy ignored industry standards and NFPA 921 and did not thoroughly identify and interview witnesses. As such, he missed valuable information, such as the fact that the smoke and heat of the early stages of this fire simply do not match his conclusions.

3). Mr. Murphy relied on "empirical data" that the electrical system was in proper working order, and ignored NFPA 921 sections 24.2.1-2 when he concluded that there had been no previous problems with the electrical system. Mr. Lyson notes that "NFPA 921 states that a vehicle and appliance history needs to be obtained" and notes that Mr. Murphy failed to do so. Ironically, Mr. Lyson was not even aware of the history of Hatteras electrical fires when he reached these conclusions.

4). Mr. Murphy has identified the cause as "incendiary" with open flame, but ignores the fact that while it took over an hour for this fire to be noticed, a fire of the type identified in his report would "flash over" to "full room involvement" very rapidly, "within minutes."

5). Mr. Murphy concluded that the fire started in a mattress that would "flow like an ignitable liquid and burn on the floor," and yet failed to notice that the carpet in the captain's cabin was not burned.

6). Mr. Murphy violated NFPA 921, section 22.3, when he improperly considered evidence "not directly related to the fire or explosion cause," such as the removal of personal items from the boat.

7). Mr. Murphy ignored the recommendations of NFPA chapters 11 and 16 when he failed to label and identify the evidence and the vessel contents as he removed material from the vessel.

8). Mr. Murphy violated NFPA 921 chapter 17 when he failed to complete "arc mapping" and wiring and circuit tracing (and probably could not even do so with the destruction of this critical evidence).

9). Mr. Murphy incorrectly and indiscriminately relied on NFPA 921 section 18.2, "Process of Elimination," in a fire where NFPA specifically states that it could not be used.

10). Mr. Murphy violated NFPA 921 section 4.3.7 when he formed the arson hypothesis at least eight days before he even conducted his examination of the vessel.

11). Mr. Murphy ignored the clear requirements of NFPA 921, Chapter 4, when he failed to identify the cause of this fire as "undetermined."

Given these major faults in the Maze investigation and conclusions, it would be clear Bad Faith to continue to rely on Mr. Murphy's report as a basis of the denial of this claim.

**R. <u>Captain Rello has Passed a Polygraph Exam Wherein He Denies Smoking and Arson:</u>**

NHIC's entire claim of arson is implicitly based upon the assumption that Captain Rello intentionally set MI BARUR on fire (an assumption that does not even appear to be shared by NHIC's counsel, Mr. Geoffrey Robb; "I . . . did not see where he [Mr. Murphy] has concluded that Captain Rello started the fire." **Exhibit 37** to the Supplemental Proof of Loss). None of the Insureds were present in La Paz on the day of the fire and the only crewmember in La Paz was Captain Rello. Murphy implicitly claims in his report that Captain Rello was lying when he said he did not set fire to the yacht. According to Perkins, while he served as Chief of Arson Investigation for the City of San Jose, it was customary to give polygraph tests to arson suspects if the suspect was willing to take the test. Further, Perkins routinely would rely upon the results of the polygraph tests in forming his opinions concerning the cause of a fire. Consequently, the Insureds arranged to have Captain Rello undergo a polygraph exam on the issues of arson and smoking in the lower level of the yacht (Captain's Cabin and Lounge). During the exam Captain Rello was found to be telling the truth when he said he did not commit arson and did not smoke in the lower level of the yacht on the day of the fire. A true and correct copy of an English translation of the report of the May 7, 2008 polygraph exam is attached as **Exhibit 41** to the Supplemental Proof of Loss.

**IV. <u>The Relevant Policy Terms</u>:**

NHIC Policy No. YM 868-56-66, effective date from 09/23/2007 to 09/23/2008, lists as the named insured Mi Barur, Inc. The Policy provides hull (Agreed Value) coverage of $ 1,900,000 subject to a 2% deductible of $38,000

and a premium of $14,060. The insured vessel, "Mi Barur," is described as a 92 foot Hatteras, built in 1990.

The NHIC Yacht Policy standard form provides hull, protection and indemnity, medical and other incidental coverage per standard conditions [Form BJB 2191-A (8/06)]. The insuring language for the hull coverage provides standard "all risk" coverage and states in relevant part:

> **GENERAL CONDITIONS AND EXCLUSIONS**
>
> **1. GENERAL CONDITIONS**
>
> . . .
>
> **SECTION "A" - HULL INSURANCE**
>
> **1. WHAT WE INSURE:**
>
> Physical Loss to **Your Yacht**: **We** shall pay for direct physical loss to **your yacht** arising out of all perils unless otherwise excluded herein.
> Those items "otherwise excluded," as set forth on page six of the policy, include the following:
>
> **10. CAUSES OF LOSS THAT ARE NOT COVERED:**
>
> We shall not cover any loss or damage arising out of:
>
> (1) Any intentional misuse or misconduct, or lack of reasonable care or due diligence, in the operation or maintenance of **your yacht** or trailer;
>
> . . .
>
> (5) Any willful misconduct, criminal, or dishonest act by an insured, **your** employees, or any person to whom **you** entrust **your yacht**;

**Part 11 of the General Conditions**, entitled **CONCEALMENT OR MISREPRESENTATION**, also provides that even in the event that a loss in not "otherwise excluded:"

> Any relevant coverage(s) shall be voided if **you** intentionally conceal or misrepresent any material fact or circumstance relating to this insurance or **your** insurance application, whether before or after a loss.

The **General Conditions, Part 5**, Entitled **WHAT YOU MUST DO IN THE EVENT OF A LOSS**, also imposes certain affirmative duties on the insured to give notice of any loss and provides, in relevant part, that:

> If **you** have a loss or **claim** that **you** think might be covered under this **policy**, **you** must do the following:
>
> . . .
>
> If **your yacht** or other property covered by this policy is damaged, **you** must take all lawful and reasonable steps to protect **your yacht** or other property from further damage. **We** will reimburse **you** for the reasonable expenses of protecting the property, not including **your** personal labor. These payments for protecting the damaged property shall be made in addition to any other payments we make for losses covered by this **policy**.
>
> Part 1 of the GENERAL CONDITIONS similarly provides that:
>
> D. (4) If **your yacht** or other property covered by this **policy** is damaged **you** must take all lawful and reasonable steps to protect **your yacht** or other property from further damage. **We** will reimburse **you** for the reasonable expenses of protecting the property, not including **your** personal labor. These payments for protecting the damages property shall be made in addition to any other payments **we** make for losses covered by this **policy**.

Thereafter, in **General Condition Part 6**, entitled **WHEN WE SHALL PAY FOR LOSSES**, the policy provides that:

> **We** shall pay for losses covered under this **policy** within thirty (30) days after **we** receive proof of loss or other requested documentation that is satisfactory to us.

As set forth above, the policy is an "Agreed Value" policy and pursuant to the policy definitions:

> "**Agreed Hull Value** means the value agreed to by **you** and by **us** on your insured **yacht** as shown on the declarations."

Finally:

> **You** and **your** means: (a) The person or organization named as the insured on the enclosed **declarations**; . . . c) Anyone else operating the insured vessel with the prior express permission of the named insured, as long as the actual use is within the scope of such permission and for private pleasure use only; or (d) A **captain** or **crew member** who works on **your yacht**.

In addition to these standard policy terms, The Policy was also subject to certain endorsements that are relevant to this loss.

**Endorsement No. 1**, entitled **Navigation Endorsement**, for example, provides as follows:

> In consideration for premiums charged $1050. The navigation warranty of this policy is amended to include Navigation of Coastal Waters and waters tributary thereto, of the Pacific Ocean and Acapulco as far south as 16 Degrees 30 Minutes North Latitude.

> It is agreed and understood a 2% deductible shall apply while the named vessel is outside US waters.

**Endorsement No. 2**, entitled **General Endorsement**, provides in relevant part that:

> The following changes shall apply to this policy.
>
> It is agreed and understood that the vessel named in this policy shall be subject to a 3% Named Windstorm deductible. This deductible shall apply any time the vessel is south of Rio Santo Tomas, MX, during the period of 6/30-11/1.

## V. <u>The Applicable Law</u>:

Both federal maritime law and California law recognize that the parties to a marine insurance policy are held to the highest degree of good faith, i.e., *uberrimae fidei.* The insured and insurer both owe each other a duty of utmost good faith. Under this obligation, the party seeking to obtain insurance is required to disclose the facts known to him that materially affect the risk. <u>Certain Underwriters at Lloyds v. Inlet Fisheries Inc.</u>, 518 F.3d 645 (9th Cir. 2008); <u>N.H. Ins. Co. v. C'Est Moi, Inc.</u>, 519 F.3d 937 (9th Cir. 2008); <u>Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.</u>, 159 F.3d 412, 420 (9th Cir. 1998); <u>C.N.R. Atkin v. Smith</u>, 137 F.3d 1169 (9th Cir. 1998); <u>Certain Underwriters at Lloyd's v. Montford</u>, 52 F.3d 219 (9th Cir. 1995); California Insurance Code Section 1900.

There is, however, "a reciprocal duty on the part of the insurer to deal fairly, to give the assured fair notice of his obligations, and to furnish openhandedly the benefits of a policy . . . Insurance obligations must not be construed so as to render the coverage mere gossamer." <u>Contractors Realty Co., Inc. v. Insurance Co. of North America</u>, 469 F. Supp. 1287, 1294 (S.D.N.Y. 1979).

Based on this duty, a marine insurer may rescind the contract if it can show intentional misrepresentation of a fact (regardless of materiality) or concealment of a fact material to the risk (regardless of intent). Cigna Prop. & Cas. Ins., 159 F.3d at 420; Markel Am. Ins. Co. v. Fitt, 528 F. Supp. 2d 1010 (S.D. Cal. 2007). The key, however, is that the insured has to have made a misrepresentation or concealed a material fact. The obligation is also undeniably bilateral, mandating the utmost good faith from both the insured and the insurer. Furthermore, "Materiality depends 'solely on the probable and *reasonable* influence of the facts upon the party to whom the communication is due.' . . . and the likely practices of the insurance company had the concealed facts been truthfully disclosed." Markel American Ins. Co. v. Fitt, 528 F. Supp. 2d at 1017. [emphasis added].

In order to prove arson, the burden on the insurer is high.[5] Because direct proof of arson is often unavailable, courts have determined that arson can be established, in proper cases, by circumstantial evidence. However, to sustain a jury's finding of arson based upon circumstantial evidence, the insurer must establish by a preponderance of the evidence: 1) fire of an incendiary origin, 2) motive on the part of the insured and, 3) opportunity of the insured to cause the fire. American Home Assurance Co. v. Essy, 179 Cal. App. 2d 19 (1960). Don Burton, Inc. v. Aetna Life & Casualty Co., 575 F.2d 702, 707 (9th Cir. 1978); Boone v. Royal Indemnity Co., 460 F.2d 26, 29 (10th Cir. 1972); St. Paul Fire & Marine Ins. Co. v. Salvador Beauty College, Inc., 930 F.2d 1329, 1331 (8th Cir. 1991); S & W Properties Inc. v. American Motorist Ins. Co., 668 So. 2d 529 (Ala. 1995); Allstate Ins. Co. v. McGory, 697 So. 2d 1171 (Miss. 1971). None of these factors can be demonstrated here.

---

[5] The trend of the law is to require the insurer to prove arson by "clear and convincing evidence." B. Bennett Mfg. Co. Inc v. South Carolina Inc. Co. , 692 So. 2d 1258 (La. Ct. App. 5th Cir. 1997); American Family Mut. Ins. Co. v. Schley, 978 F. Supp 870 (E.D. Wis 1997); Chenago Mutual Ins. Co. v. Charles, 235 A.D. 2d 667, 652 NY S.2d 134 (3d Dept. 1997).

## VI. Coverage Analysis:

### A. The Loss of the MI BARUR Is Clearly Covered By the Policy:

Putting aside the NHIC's allegations of non-disclosure, misrepresentation and out-right fraud (or arson), there can be no doubt that this fire loss would otherwise be covered by the Policy. The Policy under Section A, 1. provides that NHIC will pay for the "direct physical loss" of MI BARUR "arising out of all perils unless otherwise excluded . . . ." The policy also covers Mr. Farell's personal effects lost as a result of these same "perils." The Policy also covers his Sue & Labor expenses in section 1. **General Conditions**, D.(4).

Thus, unless Mr. Farell failed to disclose or misrepresented material facts, or the loss is "otherwise excluded," NHIC should have paid Mr. Farell the Agreed Value of the MI BARUR, $1.9 million, within thirty (30) days of his submission of his proof of loss, and should have paid his timely claims for lost personal effects and other covered losses.

### B. The Insureds' Disclosures to NHIC Were Truthful and Contained All the Material Facts:

Paragraphs 13 though 17 of NHIC's Complaint on file in the Action set forth the alleged failures to disclose and/or misrepresentations underlying its basis for the denial of this otherwise covered claim.

The first such allegation, set forth in **paragraph 13**, states in relevant part, that:

> (1) the Mi Barur was **represented to be "a U.S. Company seeking to insure ... a U.S. documented vessel."**

Paragraph 13 continues with the allegation that:

**"the undisclosed risk ... was that Mi Barur, Inc, was a 'shell' company set up by a Mexican resident to circumvent U.S. law regarding vessel documentation."**

Both of these allegations utterly fail in the face of the above outlined evidence.

First, the truth was and is that MI BARUR *was* "a U.S. Company" (actually a Delaware Corporation) "seeking to insure ... a U.S. documented vessel."

Second, the fact that MI BARUR was a "shell" company, presumably a reference to a single vessel holding company, was openly disclosed and fully known to NHIC when it chose to insure this risk. As set forth in the Declarations of Henry Medina and Paul Trusso (and will be easily shown at trial), the use of single vessel corporations (typically, as here, sharing the name of the vessel) is extremely common in the maritime industry and something that NHIC deals with all the time. What else could NHIC's experienced underwriters Chris Clark and Michael Terrier think a company **named after the yacht** that was warranted for private pleasure use only could have been formed for?

Third, federal statutes expressly allow U.S. flag pleasure yachts (as compared to commercial vessels) to be owned entirely by non-U.S. citizens, including, yes, Mexicans. The allegation that the Insureds meant to "circumvent U.S. law regarding vessel documentation" is specious, defamatory and in Bad Faith. As Paul Trusso, the lawyer who formed this company states, such companies and stock ownership are totally legal, are very commonly used, and provide many totally legitimate benefits. Indeed, Medina will testify that NHIC commonly insures such vessels, both single vessel holding companies and foreign owned boats, and we suspect that discovery would reveal that is does so at a healthy profit.

Fourth, the reference, echoing Schwede, that the owners were "Mexican," not only smacks of racism, but again ignores the facts disclosed directly to NHIC in the application process. As mentioned above, set out in black and white in the application form, the questionnaire, and the attached survey sent by Medina in support of the original 2004-2005 placement, are the facts that the beneficial owner was a 58 year old "Attorney" in "Mexico City, MX." Also given to NHIC at this time were copies of Captain Rello's resume in Spanish and his Mexican mariner's documents. Indeed, Mr. Medina will testify that when Mr. Clark asked the question "Why are they all in Spanish?" he answered that the Insureds, the Captain, etc., were "Mexicans." See the Declaration of Henry Medina, Paragraph 11, **Exhibit 12** to the Supplemental Proof of Loss.

**Paragraph 14** of the complaint contains the next allegation of purported misrepresentation, that the MI BARUR was:

> **"calling in U.S. ports, particularly San Diego,"**

and the next alleged non-disclosure, that after being purchased and modified in San Diego, she:

> **"never returned to U.S. waters, and there was no intent to call in the U.S."**

Again, the **"undisclosed risk"** is alleged to be that:

> **"the MI Barur was a yacht purchased by Mexican residents for private pleasure use only in Mexican waters."**

As with **paragraph 13**, the allegations of **paragraph 14** fail in the first instance because they misstate the true facts. Nowhere in the application does it state that MI BARUR was "calling in U.S. ports, particularly San Diego." It is also untrue that there was no intent to call in the U.S. Mr. Farell had purchased all of his boats through Hallmark in San Diego, frequently used the high-end boat

yards in San Diego, and fully anticipated that he might return the MI BARUR to San Diego at any time and during any policy period (and wanted to have the freedom to do so). Indeed, during the summer of 2007, shortly before the renewal and the decision to take the boat to Florida, Mr. Farell was seriously considering returning the yacht to San Diego for sale.

Second, the claim that the **"undisclosed risk"** was **"that the MI BARUR was a yacht purchased by Mexican residents for private pleasure use only in Mexican waters"** is in Bad Faith. Not only was Mr. Farell clearly identified as the beneficial owner and as a 58 year old Attorney residing in Mexico City, but the yacht was again required by NHIC to be "used only for private pleasure purpose" within the set trading warranty area, the vast majority of which lay in Mexico. This area covered only approximately 250 miles of coastline in southern California, but about 2500 miles of coastline in Mexico. Indeed, the Weather Plan submitted with the original application stated expressly that the boat would spend the **entire year in Mexico**; six months a year in Acapulco and May 15, through November 30 (the six month hurricane season) in La Paz or the Sea of Cortez, never referencing any time in California. NHIC wrote the policy on the MI BARUR on this operational plan, never seeking a single word of clarification or voicing a single world of complaint, but simply charging, year after year, an increased premium and deductible for this trading *right*.

**Paragraph 15** not only alleges no misrepresentation or failure to disclose facts, it actually misstates the true facts. Specifically, the Complaint alleges that **"the original application ... represented the purchase cost to be $2.2 million."** In truth, nowhere in the application does it state that the "purchase cost" was $2.2 million. In fact the original application materials lists $2.2 million under the heading **"cost, including equipment,"** and the "cost, including equipment" was probably far in excess of $2.2. Mr. Farell's statement as to cost and equipment is equally true and accurate. Frankly, given the $1.4 survey value of the DeFever, the $900 cash down payment and the $300,000 plus in improvements, it would not have been a misstatement to state the cost at $2.6 million.

As to **paragraph 16**, where it is alleged that the underwriter advised Medina, "the broker," not the other way around, that:

> **"underwriters found the yacht listed for sale on the internet for $1.9 million"** and thus **"would drop the insured value ... to $1.9 million...,"**

This simply shows that the entire issue of the original reported value and limits is irrelevant. Simply put, at the time of this fire loss, the Agreed Value on this hull risk was not based on any representation made by the Insureds, but on the underwriter's own research and knowledge of the vessel.

Finally, **paragraph 17,** alleges that underwriters were told: (1) that the boat was going to be moved to Florida, (2) that theses plans were later changed and (3) that the boat would remain a "San Diego, La Paz, Acapulco vessel." However, again, each of these alleged representations are completely true. Indeed, as set forth above, while at the time of the loss Mr. Farell was planning to send the boat to Florida in January of 2008, just before the time of this renewal he had been making plans to return the vessel to San Diego for sale (Hallmark had even been looking for a slip). To omit the very real possibility of the boat returning San Diego in this renewal, would actually have been an omission (perhaps not material, but an omission nonetheless).

Given these undisputed facts, there is simply no reasonable argument that the Insureds misrepresented or failed to disclosed any facts or did anything other than to act in the highest degree of good faith, disclosing all facts known to them that materially affect the risk assumed by NHIC. Rather, the allegations of misrepresentation and non-disclosure, given this record, are themselves clear acts of Bad Faith.

C. **<u>The Claims Should be Paid As There Is No Evidence of Intentional Destruction or Arson</u>:**

The gravamen of the Denial Letter and the Action is that NHIC has no duty to indemnify the Insureds because the Loss was caused by arson. The **First Cause of Action** asserts that because of the arson there is no duty to indemnify the Insureds for the Loss based on "Exclusion 10(B)(1) (intentional acts) and Exclusion 10(B)(5) (wilful misconduct, criminal or dishonest acts) of the policy."[6] The **Second Cause of Action** asserts that because of the arson there is no duty to indemnify the Insureds for the Loss based upon California Insurance Code § 533. The Complaint is silent on who committed the arson, but the Denial Letter states that "Underwriters find no evidence to suggest that anyone other than the Captain set the fire."[7]

NHIC seeks to deny coverage even though there is no proof of any of the required elements of arson.

1). **<u>Murphy Found No Evidence That the Fire Was of an Incendiary Origin</u>:**

Nowhere in Murphy's report does he identify any affirmative evidence that the fire was intentionally set by Captain Rello. In fact, he does not even say that Captain Rello started the fire. There was no evidence of any accelerant. There

---

[6] Which are actually terms, again, of the prior Executive Yacht Policy, rather than the Yacht Policy in question.

[7] The provisions of Insurance Code §533 have been held to be the equivalent of an exclusionary clause in an insurance policy. Thus, the insurer has the burden of proof with respect to Insurance Code §533 as well as any exclusion or exculpatory clause in the policy. <u>Clemmer v. Hartford Ins. Co.</u>, 22 Cal. 3d 865, 880 (1978). Moreover, like exclusions in the policy, the Insurance Code §533 defense is narrowly construed.

was no evidence of a timing device. There was no evidence that Captain Rello had any experience in arson techniques or any history of being involved with a vessel that caught fire. Perhaps most importantly, Murphy did not even correctly determine where the fire actually started. The overwhelming evidence is that the fire did not start in the Captain's Cabin as claimed by Murphy, but rather in the Crew Lounge as a result of an electrical short.

2). **Murphy and Attorney Robb Found No Evidence of Motive by the Insureds or Captain Rello to Commit Arson:**

Despite extensive interviews by Murphy and a videotaped examination under oath of Mr. Farell and Captain Rello, there is not one shred of evidence identified by Murphy that proves that the Insureds or Captain Rello had any motive to intentionally set fire to MI BARUR. Not only did the Farells have absolutely no financial problems that would motivate such an extreme act, they had no mortgage on the yacht and the boat was in pristine condition. Thus, if Mr. Farell needed money, he could simply have taken one of the many offers that would have put funds in hand within a relatively few dollars of the insured value of the boat. Hallmark will testify, for example, that if Mr. Farell were desperate (which he never appeared to be), he could have sold the yacht "overnight" if he had dropped the price even to $1.6 million. In other words, one would have to believe that Mr. Farell or Captain Rello would commit this most serious crime, risking not only their careers, but criminal prosecution, for $200,00 to $300,000 (an amount less than the value of Mr. Farell's automobiles alone).

3). **Murphy Found No Evidence That the Insureds or Their Agents Had the Opportunity to Set the Fire:**

There is also no evidence that any of the Insureds had the opportunity to burn the MI BARUR. The Farells were in Mexico City and Hallmark was in San Diego at the time of the Loss. Captain Rello had left the boat more than an hour before the fire and was never seen to return by any witness on the docks that morning. Indeed, Murphy does not even provide an explanation of how Captain

Rello was supposed to have ignited the foam mattress in the Captain's cabin (a highly flammable fuel source), over an hour before the first signs of smoke were seen by the numerous people on the crowded dock. Indeed, as set forth above, none of the tell-tale signs of arson are presented by the facts of this Loss.

## VII. Failure to Pay the Claims Immediately Will Be Bad Faith:

NHIC has accused the Farells and Captain Rello of the criminal act of arson without the proof required by law and the proof required NFPA 921. The accusations of criminal arson are defamatory on their face. Moreover, NHIC has committed the following acts which constitute Bad Faith:

- **Failure to Investigate the Claim Thoroughly Before Denial:**
  Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d 809, 819 (1979).

- **Demanding Examination Under Oath in Bad Faith:**
  Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1281 (1994).

- **Groundless accusations against the Insured:**
  Gruenberg v. Aetna Ins. Co., 9 Cal. 3d 566, 575 (1973) [arson].

- **Denial of the Claim Before the Claimants were given a chance to provide information to support coverage:**
  Blake v. Aetna Life Ins. Co., 99 Cal. App. 3d 901, 924 (1979).

- **Failure to Evaluate Claim Objectively:**
  Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1281 (1994).

- **Relying on Unreasonable Experts:**
  Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (applying California law); See also Fraley v. Allstate Ins. Co., 81 Cal App. 4th 1282, 1292 (2000).

- **Denying Claim Based on Arbitrary or Unreasonable Standards:**
  Moore v. American United Life Ins. Co., 150 Cal. App. 3d 610, 621 (1984); Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1162-1163 (9th Cir. 2001); Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th at 1281-1282.

- **Filing of a Declaratory Relief Action After the Claim has Been Denied:**
  Atlas Assur. C. Ltd. V. McCombs Corp., 146 Cal. App. 3d 135, 150 (1983).

- **Filing of a Declaratory Relief Action Where the Insurer's Position is Inherently Unreasonable:**
  Dalrymple v. United Services Auto Ass'n, 40 Cal. App. 4th 497, 515 (1995).

We, on behalf of the Insureds, reserve all rights, to assert other grounds for Bad Faith and other torts. We will dispense, for now, with a full discussion of potential Bad Faith and other tort claims that can be brought against NHIC. Instead, we hope that the evidence itself, rather than the risk of punitive damages, will lead you to pay the Claims at this time.

**VIII. Conclusion:**

We hereby request that NHIC consider all of the evidence and points made herein and submitted herewith, and reverse its earlier decision to deny the Claims. We believe that if indeed the evidence is considered in good faith, and the flaws and gaps in Murphy's investigation and conclusions are considered objectively, NHIC will have no choice but to alter its initial conclusion and promptly pay all Claims due under the Policy, as well as the attorneys' fees and costs and the experts' fees and costs the Insureds have expended to date, interest at 10% on the unpaid amount beginning 30 days after the Insureds' Claim was submitted, and, the withdrawal of any adverse or other reporting regarding the Farells, Mi Barur, Inc., and Captain Rello from any data base where it may have been submitted.

We trust that we have provided all the information that you require to complete your re-evaluation of this claim and to reverse your earlier denial. However, if you require any further information, documentation or other assistance from us, please do not hesitate to have your counsel contact us.

Respectfully,

BANNING MICKLOW & BULL

William L. Banning
Edward M. Bull III

William L. Banning
Partner
E-mail: wbanning@banningmicklow.com

**BANNING MICKLOW & BULL LLP**
ATTORNEYS AT LAW
501 West Broadway • Suite 2090
San Diego, California 92101
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

SAN DIEGO • SAN FRANCISCO • AMERICAN SAMOA • LONDON

May 23, 2008

**New Hampshire Insurance Company**
c/o AI Marine Adjusters, Inc.
Member Companies of American International Group, Inc.
175 Water Street, 14th Floor
New York, New York, 10038

**Attention:**
Ms. Susan Smith, Regional Hull Manager
Marine Claims Department

Re: <u>M/Y MI BARUR: SUPPLEMENTAL PROOF OF LOSS:</u>

| | |
|---|---|
| Insureds: | Mi Barur, Inc., Arsenio Farell, Norma Farrell |
| Policy No.: | YM 868-56-66 |
| Date of Loss: | October 20, 2007 |
| Your Reference No. | LE08939 |
| Our File No.: | 8274-001 |

Dear Ms. Smith:

We hereby submit, on behalf of your insureds Mi Barur, Inc., Arsenio Farell and Norma Farrell, the following Supplemental Proof of Loss in conjunction with our letter of this date. Please do not hesitate to request any further information you may require to evaluate this claim.

Respectfully,

BANNING MICKLOW & BULL

William L. Banning
Edward M. Bull III

**EXHIBIT A**
**43**