

The above photo depicts the crew's berth to port on the left side of this photo and the Captains berth to the starboard or on the right side of the photo.

Two freezers were located in the crews berthing area.

- One freezer was enclosed mid-ships, and forward between the crews berth as mentioned above. The front of the freezer faced aft and was accessible from the top of the stairs landing area. Both were "on" at the time of the fire.

- The second freezer is located immediately starboard, from the top of the access stairs to the crews berthing. The front of the freezer faced mid-ships. The rear paneling for the freezer would enclose a portion of the Captains berth.

An enclosed diagram further depicts these areas.



Remaining fire debris from the previous investigation was removed and the deck area cleaned and washed. Excess fire debris was systematically removed from this area, placed in large garbage bags, and set on the remains of the main deck on the starboard side of the vessel. Remaining fire debris from the previous investigation by Mr. Murphy has been placed in the crew lounge/galley area and VIP stateroom. It was removed and the deck area cleaned and washed.

The crew's accommodations were severely fire damaged and consumed in this fire loss leaving only a portion of the crews berthing areas and storage accommodations "outboard" in place.

***<u>The fire patterns observed are consistent with witness observations in that the fire did not start in the either crew or Captains berthing compartment.</u>*** Among the observations supporting my opinions include:

- Initial witnesses on scene do not see any glow of fire from the starboard portholes located in the Captains berth and shower.
- The carpet area on the Captains side of the berth was clean and clear of any drop down materials or indications of charring from radiant heat flux as the fire consumed materials including a portion of the Captains berth.

- The freezer protected the flooring and the head of the Captains berth.
- Carpet on the crew side of the berth was also clean with exception of the floor area mid-ships at the aft bulkhead. (as observed in photograph on page #18) A small nightstand and drawers were located in the area.



- The upper berth of the crew's bunk bed had greater fire damage than the bottom berth.
- Heat damage patterns on the carpeted floor indicate the fire entered the crews berthing area and involved a small chest as depicted in the survey photos.



- Comparison of both the Captains and crews head and shower facility clearly show greater fire damage from the port side of the vessel. Specific damage comparison was noted to the toilet, shower bulkhead and the overhead.

- The Captains berth was mostly consumed with exception to the head of the bed located aft and to the rear of the freezer and carpet on the Captains deck in front of his berth.

- In Mr. Murphy's report he comments on the combustibility of a foam mattress, which is well known to fire investigators. He fails to tell the readers of his report that a burning foam mattress produces materials running and pooling on the floor below yet the carpet on the deck of the Captain's compartment is not burned at all.



- By the time it took firefighters to reach the vessel and begin suppression efforts the carpet would have been burned. The carpet was not burned because the fire did not originate in the Captains berth or the crews berth.

***Fire Debris / Evidence Storage***



Fire debris from the motor vessel MI BARUR was in the northwest side of the storage yard located northeast of the marina. None of the materials / items I observed are marked or identified as evidence by the previous fire investigator.

We were told by security that this was the area where the pervious investigator had placed his "evidence". The items in this area were exposed to the elements and only protected by perimeter fencing and a yard dog. Due to the exposure, lack of protection, and absence of any proper documentation, these materials could not be subjected to any meaningful examination by the undersigned.

***VIP Stateroom:***



Just aft and starboard of the crews area was a VIP Stateroom with a double bed, closet, with a shower and head.

Note the bottom left hand side of the photo. This is at the base of the stairs from the galley and the entrance to the VIP Stateroom. The view is forward and to starboard. The stairs and companion way is located forward of the bulkhead with the picture on the wall.

When I examined the vessel, the fire debris was two feet above the bed platform. Given the amount of debris piled in this area I would have to assume the area was not processed or examined closely by the previous examiner. This omission would preclude meaningful data collection and analytical reasoning.

Mr. Murphy again failed to abide by his inferred systematic approach in his fire scene investigation by not conducting an inspection of remaining fire patterns in the crew's galley and VIP stateroom as recommended by NFPA 921 and Forensic Fire Scene Reconstruction as authored by Dr. John DeHaan and Dr. David Icove. Such an examination could reveal critical evidence of an alternate area of fire origin.

The VIP stateroom area was also cleared of remaining fire debris and photographed. Among the fire patterns I observed supporting my opinion that the fire did not originate from this area include:



- Fire patterns are even throughout the room and consistent with the fire progressing from the top-down.
- The door to the VIP Stateroom was burned off approximately two feet off the carpeted deck.
- All fire patterns were high, no floor patterns or low burn/char indicator supporting a

fire on the bed or from the lower areas of the room. (See above comment on results from foam mattress fires)

- Fire patterns are consistent with the fire progress into the VIP stateroom.

***Based on these considerations it was my opinion that the VIP stateroom was not the area of fire origin***

***Crew's Lounge / Galley area:***



Just aft of the crew's quarters on the port side of the vessel was a small lounge / dining area. As with the VIP Stateroom fire debris had been tossed into this area to some five-feet in depth.

It was clear that this area was not processed prior to my arrival. I have received no information to date suggesting or supporting that this area was properly processed as required by NFPA 921 and Forensic Fire Scene Reconstruction.
The Pre-Fire photos as observed within this report depict the crew lounge / dining areas. Both views were taken from the entrance passageway door located at the base of the companion way stairs from the starboard side of the galley above. These photos are part of

the survey photos taken in September of 2007'. According to information I received from Captain Rello the coffee maker was in the salon at the time of the fire and not in this location.

The area was cleared of all fire debris and the floor washed, the area photographed and fire patterns documented. All fire debris removed from this area was bagged and placed topside, starboard deck.



After debris was removed I observed and documented the area to include: A small, three- by-two-foot table surface with foam filled cloth covered bench seats on each side of the table. I also observed and documented contents in this area consistent with the photographs taken prior to this fire. The area contained a small refrigerator, TV, microwave, and built-in lighting.

Among the fire patterns that I relied upon to form my opinion that the fire originated from the area of the crew's lounge dining area include:



Figure shows Galley Deck from above.



Figure shows view from below with greater damage over crew's lounge/galley.

- Within the fire debris / evidence in the storage yard was the remains of the galley floor. Examination of the flooring clearly indicates greater fire damage from underneath over the area of the crew's lounge / galley area than the VIP stateroom.

- Extensive fire damage to the forward bulkhead, port side, which contained the refrigeration unit, microwave oven and lighting. Less damage was noted to opposite forward side of the bulkhead.





- Low fire damage extended down to the height of the crew's seating area with severe



fire damage to the port side of the aft table bench seat

- Fire damage was limited to heat and smoke at floor level, but greater damage than the crews berthing area.

- Fire patterns are consistent with normal fire progress from the crew's lounge / dining area out into the companion way and up to the galley and out the starboard side of the vessel.

- Fire patterns within the crew's lounge / dining area were generally high, above the table level with exception of the low damage at the rear table bench seat on the port side.

***Fire Behavior:***

Fire patterns are generally consistent with a fire originating high within the forward crew's lounge. The fire most likely originated in the "forward crew's galley / lounge" area from an accidental ignition source, likely from an electrical failure or improper use of smoking materials. The fire grew from the ignition phase to an incipient fire with the products of

combustion and heat filling the upper levels of the compartment venting out of any openings at that level. (This coincides with the witness description of the fire discovery and entry into the vessel.) The light grey smoke observed by witnesses indicated that the incipient fire involved predominately cellulosic materials.

As the fire grew to involve plastics, vinyl, and other synthetics and became "ventilation controlled" it created heavier darker and smoke (as described by witnesses). The fire breached the walls of the vessel and became "fuel controlled" consuming whatever combustible fuels were available to the ensuing fire. This ensuing fire destroyed evidence of the early fire such as burn patterns "sequential patterns" but left patterns that of the fire development. These patterns require "reconstruction" of the scene to develop.

The fire rekindled after the fire department's first attempt at extinguishment, further destroying the evidence of the fire's first existence, and burned to the vessel's waterline. This was a "fuel controlled fire" in that all that could burn did burn and in such the only evidence that remains is that of "non-combustible materials", and evidence that remains is "sequential patterns" of the final stages of the fire destroying original evidence of its original existence.

First witnesses to the fire were able to walk into the main galley and progress down the forward companion way before being driven out by smoke. They only reported "light" heat present, which would negate a fire originating from the captains berthing area. A fire in the Captain's berth, as implied in Mr. Murphy's report, would generate sufficient dark smoke and heat energy that Captain Rello would not only report intense smoke but unbearable heat.

Once the fire reached the upper galley and salon the fire was not only fuel driven but had unlimited ventilation, thus the fire's progression was more intense above deck level involving the main salon, galley, and fly bridge.

***Security:***

I spoke with Attorney Bismark Moyron and the computer technician who represents the Marina Palmira Yacht Harbor in La Paz, Mexico. I was able to view the control room and view the 14-monitors of the harbor. They record 24/7. The cameras are "smart view" in that they only record with there is movement. They do not have the ability to move their cameras during operation. The average digital recording lasts 10-15 days before the hard drive recycles itself.

The photo to the right depicts the camera on Dock #2, which does not pan or show that portion of the finger where MI BARUR was secured.






Presently the newer cameras have the ability to go 30 days without recycle. There are no cameras facing the end of dock #2 only the security gate at the east end of the dock.

***Fire Cause Analysis:***

As a result of my investigation and analysis of the fire scene and witness observations, I have concluded that this fire originated below decks within the forward crew's lounge / dining area. In an effort to determine the heat source and event that initiated the fire in this area, my analysis has led me to the following possible ignition scenarios that are consistent with the evidence in this case.

***Hypothesis #1:*** The cause of the fire can be directly related to an undetermined electrical failure from one of the above noted electrical sources in the immediate area/point of fire origin. The heat source is electrical energy. The fuel source is combustible material located within this area including interior finish materials. The event is from a yet undetermined electrical anomaly. There were reported problems with the shore power to vessels in the marina, which could cause failure of some electrical equipment or appliances.

In addition we should note that throughout this intense and long duration fire, potential items and materials that may have provided data to identify a cause were destroyed. During the prior scene investigation, where fire debris was not documented, or clearly identified and thrown about recklessly further compromised any evidence of causation.

A fire originating from an electrical anomaly cannot be eliminated.

**Hypothesis #2**: This fire originated from discarded smoking materials within the crew's lounge by Captain Rello or his companion. Among the information supporting this opinion would include:

- Captain Rello reported he smoked a pack of cigarettes a day.
- Captain Rello denies smoking in this area of the vessel although he was the only person in that area on the day of the fire.
- Mr. Rello states that he did not smell or hear anything unusual on the morning of the incident fire.
- The time frame of when Mr. Rello was in the area of fire origin and with the reporting of this fire, is consistent with a fire originating from discarded smoking materials.
- The bench seat is covered with a cloth / material over foam. Cotton upholstery or clothing can be ignited by a discarded cigarette and produce extensive smoke as the fire develops. As part of my training, education, and experience, these materials have been shown to smolder followed by flaming.

A fire resulting from discarded smoking materials cannot be eliminated.

My investigation follows the scientific method as presented in NFPA 921, the Guide for Fire and Explosion Investigations. In determining a cause for a fire the investigator must go through the following steps to provide a conclusive or more likely event cased a fire.

**NFPA 921 (2004 edition):**

4.3.3 Collect Data. Facts about the fire incident are now collected by observation, experiment, or other direct data-gathering means. The data collected is called **empirical data** because it is based on observation or experience and is **capable of being verified**.

4.3.4* Analyze the Data (Inductive Reasoning). All of the collected and observed information is analyzed by inductive reasoning: the process in which the total body of **empirical data** collected is carefully examined in the light of the investigator's knowledge, training, experience, and expertise. **Subjective or speculative information cannot be included in the analysis, only facts that can be proven clearly by observation or experiment.**

4.3.5 Develop a Hypothesis. Based on the data analysis, the investigator should now produce a hypothesis or group of hypotheses to explain the origin and cause of the fire or explosion incident. **This hypothesis should be based solely on the empirical data that the investigator has collected**.

4.3.6* Test the Hypothesis (Deductive Reasoning). The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. (See 3.3.35, Deductive Reasoning.)

This testing of the hypothesis may be either cognitive or experimental. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis should be tested. This test may include the collection of new data or the reanalysis of existing data.

This process needs to be continued until all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."

***Conclusion Re: Area of Origin:***

Based on the witness's descriptions and on accepted principals of fire and smoke spread, and burn pattern analysis, **it was concluded that the most likely area of fire origin was in the crew's lounge / galley area, lower deck, and forward on the port side of the vessel.** The VIP Stateroom, Captains quarters, and crew berthing area were eliminated as an area of fire origin.

Mr. Murphy states the fire originated in the captains berth with an open flame. A foam mattress in a small, ventilated room, would rapidly develop into flashover "full involvement" fire in that compartment. Such a fire would destroy the exposed carpet. This was not observed in the captain's berthing area.

To offer a "determined" cause you must have a "clearly defined origin"(NFPA 921-18.2.5), "when it is known conclusively to the exclusion of all other potential ignition sources". A conclusion that a fire was started with an open flam is "not to be used indiscriminately". When the origin is not clearly defined, this process is inappropriate". Some of the conditions and circumstances that prevent the origin from being clearly defined include the degree or extent of damage (such as those from a fully developed compartment fire), or adverse effects of fire suppression activities" (this vessel was under water and severely damaged by fire). This also requires the "testing and rejection or alternate hypotheses" which could not occur because all the data was not uncovered or developed.

Due to the damage sustained to this vessel in this fire loss, and no inspection and documentation prior to raising the vessel, the immediate point of fire origin could not be determined. Remaining fire patterns and examination of materials could not be relied upon to form a conclusive or a more likely than not scenario as to the cause of this fire loss for reasons discussed above.

***Due to these circumstances there is insufficient evidence to determine the exact cause for this fire loss with scientific certainty, therefore our opinion, based on the information and data available in this fire loss, is that the cause of this fire is undetermined.***

My assessment of this case is based on the analysis of physical evidence, the assessment of reported information and evaluation of all possible causes. My file will remain open pending your direction to close this file. Please feel free to contact me on any points needing further clarification.

Submitted by,

| | |
|---|---|
| Donald J. Perkins, CFI | Dr. John D. DeHaan, PhD, CFI |
| Fire Investigator | Technical Peer Review |
| Fire Cause Analysis | Fire Ex-Forensics |

DP/JdH/sa
08-10613-01-RDP