# EXHIBIT "A"

Case 3:08-cv-0044[illegible]N-POR Document 16-5 File[illegible]10/200[illegible] COPY

Rebecca R. Weinreich, SB# 155684
E-Mail: weinreich@lbbslaw.com
Stephen V. Kovarik, SB# 184656
E-Mail: kovarik@lbbslaw.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
221 North Figueroa Street, Suite 1200
Los Angeles, California 90012
Telephone: (213) 250-1800
Facsimile: (213) 481-0621

FILED
08 MAR 10 PM 2:52
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

Attorneys for Plaintiff New Hampshire Insurance Company

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| New Hampshire Insurance Company,<br>Plaintiff,<br>v.<br>Mi Barur, Inc.,<br>Defendant. | CASE NO. 08 CV 0443 BEN POR<br>**COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT**<br>**DEMAND FOR JURY TRIAL** |

COMES NOW plaintiff New Hampshire Insurance Company ("New Hampshire") and files the following complaint against defendant Mi Barur, Inc. for declaratory relief and reimbursement as follows:

## I. JURISDICTION

1. This action involves a dispute on a policy of marine insurance and is brought as an admiralty and maritime claim within the meaning of Federal Rules of Civil Procedure, Rule 9(h). This Court has admiralty jurisdiction pursuant to 28 U.S.C. section 1333(1).

2. The Court also has jurisdiction over this action pursuant to 28 U.S.C. section 2201; Federal Rule of Civil Procedure, Rule 57; and 28 U.S.C. section 1332 based upon the following facts:



LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

a. Plaintiff New Hampshire is a Pennsylvania corporation, with its principal place of business in New York, New York.

b. Defendant Mi Barur, Inc. is a Delaware corporation, with its principal place of business in San Diego, California.

c. The amount in controversy exceeds $75,000.

## II. VENUE

3. Venue in this district is proper pursuant to 28 U.S.C. section 1391(b). Mi Barur, Inc. has its principal place of business in this district and is subject to personal jurisdiction in this Court. Further, the insurance policy that is the subject of this controversy was produced in this district and lists an address for Mi Barur, Inc. in the district.

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

## III. THE UNDERLYING CLAIM

### A. The Purchase of the Yacht "Mi Barur"

4. Mi Barur, Inc. is the owner of the "Mi Barur," a 92-foot Hatteras motor yacht built in 1990, with a port registry of Wilmington, Delaware.

5. All of the shares of Mi Barur, Inc. are owned by Jose Arsenio Farrell Campo ("Mr. Farell") and his wife. The Farells are citizens of the Republic of Mexico and reside in Mexico City, Mexico.

6. Mi Barur, Inc. was formed as a United States ("U.S.") company, naming the yacht's U.S. broker, Michael Hallmark, as the president, secretary, treasurer and director of the corporation. The purpose of the formation was, among other reasons, to obtain U.S. vessel documentation and insurance.

7. In September 2003, the Mi Barur was purchased through Mr. Hallmark for approximately $1,000,000 cash, plus the trade of a DeFever yacht, which was later resold for $620,000.

### B. The Attempts to Sell the Mi Barur

8. In March 2006, the Mi Barur was listed for sale through Mr. Hallmark for $2.7 million. Mr. Hallmark was unable to sell the yacht during the listing period.

9. On or about May 9, 2007, a new listing agreement was entered into with Mr. Hallmark that authorized the sale of the Mi Barur at $2.2. million. Mr. Hallmark was unable to sell the yacht during the listing period.

10. In or about July 2007, Mr. Farell decided to sell the Mi Barur in Florida and arranged to have the yacht transported to Miami on or about September 20, 2007.

11. In August 2007, the Mi Barur's owner switched brokers to Merrill-Stevens and dropped the sale price to $1.9 million.

12. On or about September 13, 2007, Mr. Farell received an offer of $1.7 for the Mi Barur and transport of the yacht to Florida was canceled. The offer was subsequently withdrawn.

## C. The Misinformation Provided to New Hampshire

13. Mi Barur, Inc. was represented to New Hampshire's underwriters as a U.S. company seeking to insure the Mi Barur, a U.S. documented vessel. The undisclosed risk presented for insurance was that Mi Barur, Inc. was a "shell" company set up by a Mexican resident to circumvent U.S. law regarding vessel documentation.

14. The Mi Barur was also represented to the underwriters as calling in U.S. ports, particularly San Diego. However, after the vessel was purchased and modified in San Diego, it never returned to U.S. waters, and there was no intent for it to call in the U.S. In reality, the undisclosed risk presented for insurance was that the Mi Barur was a yacht purchased by Mexican residents for private pleasure use only in Mexican waters.

15. The original application for insurance submitted to New Hampshire's underwriters for the Mi Barur represented the purchase cost to be $2.2 million and the yacht was insured for that value. No explanation was given for the purchase price.

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

16. At the time insurance for the Mi Baur was due for renewal in September 2007, the underwriters found the yacht listed for sale on the internet for $1.9 million. The broker was told that the underwriters would drop the insured value from $2.2 million to $1.9 million on any renewal of insurance.

17. The underwriters had also been told that the yacht was being shipped to Florida for use there by the owner. On September 20, 2007, the broker advised underwriters that the vessel will no longer be shipped to Florida and will remain a "San Diego, La Paz, Acapulco vessel."

**D. <u>The Arson Involving the Mi Barur</u>**

18. On October 20, 2007, the Mi Barur was moored at the Marina Palmira, La Paz, BCS, Mexico. The vessel was at a dock protected by a locked security gate and video surveillance.

19. The Mi Barur was typically manned by a three person crew headed by Captain Luis Manuel Rello Romero ("Captain Rello"). This allowed for one crew member to be aboard the Mi Barur at all times.

20. On the day in question, Captain Rello was the only crew member present; one crew member had been reassigned by the ship's owner and the other was out of town.

21. Captain Rello reportedly spent the night on the Mi Barur in the Main Salon on the carpeted floor. At about 7:00 a.m., Captain Rello was joined by Alfredo Amador Fausto ("Mr. Amador") for coffee.

22. Captain Rello has provided conflicting information regarding when he departed the Mi Barur. He first told investigators that he left the vessel with Mr. Amador between 8:00 a.m. and 8:15 a.m. Captain Rello then told investigators that Mr. Amador departed at approximately 8:00 a.m. and that he departed the vessel between approximately 8:15 a.m and 8:20 a.m. No other person was aboard the yacht after Captain Rello left the vessel.

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

23. At approximately 9:30 a.m., a fire was reported aboard the Mi Barur.

24. An investigation by a Certified Fire Investigator and Certified Marine Investigator with Maze Consultants & Investigations, Inc. concluded that the fire began in the Captain's Cabin, located in the forward, starboard (right) side of the Mi Barur. The point of origin for the fire was identified by the investigator as the bedding and polyurethane foam mattress of the Captain's bunk. The fire then spread through the vessel.

25. Potential ignition sources identified by the investigator in the area of origin included electrical wires, electrical service equipment, mechanical equipment, air conditioning coolers and compressor, and appliances. Each of these sources was ruled out as an accidental cause of the fire. Interview statements of Captain Rello ruled out smoking materials. Any natural cause was also ruled out as an accidental cause of the fire.

26. Captain Rello denied that he ever used or slept in the Captain's Cabin. He observed no lights on in those quarters the morning of the fire. Captain Rello could point to no unusual events before the fire, such as flickering lights or smell of smoke.

27. Based upon an investigation and details of the origin of the fire, the investigator concluded that the cause of the fire was arson.

28. The Mi Barur was a total loss as a result of the fire.

## IV. THE NEW HAMPSHIRE POLICY

29. The New Hampshire Insurance Company issued policy number YM 868-56-66 to named insured, Mi Barur, Inc., with effective dates of September 23, 2007 to September 23, 2008 (the "policy"). The policy was issued to Mi Barur, Inc. at its San Diego, California address. A copy of the New Hampshire policy is attached hereto as Exhibit "A" and is incorporated herein by reference.

30. Coverage "A" of the New Hampshire policy provides "Hull" coverage with an "agreed value" limit of $1,900,000, subject to the applicable deductible.

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

Coverage A is subject to additional terms, exclusions, conditions and limits as stated in the New Hampshire policy, which are incorporated by reference.

31. The New Hampshire policy provides, in part, as follows:

SECTION "A" - HULL INSURANCE

1. WHAT WE INSURE:

A. Physical Loss to Your Yacht: We shall pay for direct physical loss to your yacht arising out of all perils unless otherwise excluded herein.

* * *

10. CAUSES OF LOSS THAT ARE NOT COVERED:

B. We shall not cover any loss or damage arising out of:

(1) Intentional Acts: Any intentional misuse or misconduct, criminal, willful or malicious act or lack of reasonable care or due diligence, in the operation or maintenance of your yacht, tender or trailer;

* * *

(5) Any willful misconduct, criminal, or dishonest act by an insured, your employees, or any person to whom you entrust your yacht;

32. The New Hampshire policy also provides, in part, as follows:

DEFINITIONS

* * *

29. You and your means:

A. The person or organization named as the insured on the enclosed Declarations;

B. Members of the immediate family of the insured who live in the same household;

C. Anyone else operating the insured vessel with the prior express permission of the named insured, as long as the actual use is within the scope of such

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

Case 3:08-cv-0044[illegible]EN-POR Document 16-5 File[illegible]10/2008 Page 8 of 61

permission and for private pleasure use only; or

D. A captain or crew member who works on your yacht. You and your does not include, however, anyone operating or working for a marina, yacht club, boat repair yard, or similar business and who is not in your employ.

33. The New Hampshire policy also provides, in part, as follows:

1. GENERAL CONDITIONS

* * *

J. CONCEALMENT OR MISREPRESENTATION

Any relevant coverage(s) shall be voided if you intentionally conceal or misrepresent any material fact or circumstance relating to this insurance, or your insurance application, whether before or after the loss.

34. Coverage "F" of the New Hampshire policy provides "Personal Effects" coverage with limits of $10,000, subject to a $250 deductible. Coverage F is subject to additional terms, exclusions, conditions and limits as stated in the New Hampshire policy, which are incorporated by reference.

35. The New Hampshire policy provides, in part, as follows:

<u>SECTION "F" – PERSONAL EFFECTS</u>

1. WHAT WE INSURE: We shall cover physical loss to your personal effects arising out of all perils while boarding, aboard, or leaving your yacht, unless otherwise excluded herein.

* * *

8. EXCLUSIONS: We shall not cover any loss or damage which is excluded under Section A of this policy . . . .

36. The New Hampshire policy also provides, in part, as follows:

<u>DEFINITIONS</u>

* * *

29. Personal Effects means personal belongings not excluded under this policy and not used in the operation of your yacht. Personal effects may

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

include, but not be limited to, sporting equipment, fishing equipment, and the property of guests or crew members.

## V. THE DECLINATION OF COVERAGE

37. In correspondence dated March 10, 2008, New Hampshire denied coverage for the loss of the Mi Barur based upon, among other reasons, Exclusions 10(B)(1) and 10(B)(5). A true and correct copy of the March 10, 2008 letter is attached hereto as Exhibit "B," and is incorporated by reference.

## FIRST CAUSE OF ACTION

(Declaratory Relief – No Duty to Indemnify – Applicable Exclusions)

38. New Hampshire incorporates by reference the allegations contained in paragraphs 1 through 37, inclusive, as though fully set forth herein.

39. An actual controversy exists between New Hampshire, on the one hand, and Mi Barur, Inc., on the other hand, in that New Hampshire contends that it is not obligated to indemnify Mi Barur, Inc. in connection with the loss of the Mi Barur based upon Exclusion 10(B)(1) (intentional acts) and Exclusion 10(B)(5) (willful misconduct, criminal or dishonest acts) of the policy. New Hampshire is informed and believes that Mi Barur, Inc. contends to the contrary.

40. A prompt adjudication of this controversy is necessary so that the parties may resolve this dispute at the earliest possible time to avoid prejudice to New Hampshire's rights.

41. No adequate remedy at law is available to New Hampshire.

42. Therefore, New Hampshire desires a judicial determination and declaration of New Hampshire's rights and duties on this issue.

## SECOND CAUSE OF ACTION

(Declaratory Relief - No Duty to Indemnify - Insurance Code section 533)

43. New Hampshire incorporates by reference the allegations contained in paragraphs 1 through 37, inclusive, as though fully set forth herein.

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

44. California Insurance Code section 533, which is incorporated into all insurance policies issued in the state, provides:

> An insurer is not liable for a loss caused by the willful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others.

45. An actual controversy exists between New Hampshire, on the one hand, and Mi Barur, Inc., on the other hand, on the grounds that New Hampshire believes that it is not obligated to indemnify Mi Barur in connection with the loss of the Mi Barur because that loss was caused by the willful or intentional wrongful acts by Mi Barur, Inc., its employees, agents, or others acting on its behalf, coverage for which is precluded by Insurance Code section 533. New Hampshire is informed and believes that Mi Barur, Inc. contends to the contrary.

46. A prompt adjudication of this controversy is necessary so that the parties may resolve this dispute at the earliest possible time.

47. No adequate remedy at law is available to New Hampshire.

48. Therefore, New Hampshire desires a judicial determination and declaration of New Hampshire's rights and duties.

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

**THIRD CAUSE OF ACTION**

(Declaratory Relief - No Duty to Indemnify - *Uberrimae Fidei*)

49. New Hampshire incorporates by reference the allegations contained in paragraphs 1 through 37, inclusive, as though fully set forth herein.

50. The doctrine of *uberrimae fidei* imposes upon an insured seeking maritime insurance the duty of utmost good faith and requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk.

51. Mi Barur, Inc. its employees, agents, or others acting on its behalf, did not disclose to New Hampshire, among other things, facts regarding the loss of the Mi Barur; that Mi Barur, Inc. was set up to circumvent U.S. law regarding U.S. documentation, which would not otherwise be available to a citizen of Mexico; that

Case 3:08-cv-0044[?]N-POR Document 16-5 Filed [?]10/2008 Page 11 of 61

the Mi Barur was in reality purchased by a Mexican citizen for exclusive use in Mexican waters; that the Mi Barur was purchased for consideration significantly less than the purchase cost stated in the application; and that Mi Barur, Inc. intended to sell the Mi Barur, whose sales price had to be reduced.

52. An actual controversy exists between New Hampshire, on the one hand, and Mi Barur, Inc., on the other hand, in that New Hampshire contends that it is not obligated to indemnify Mi Barur, Inc. in connection with the loss of the Mi Barur because the policy is void or voidable based upon the doctrine of *uberrimae fidei*. New Hampshire is informed and believes that Mi Barur, Inc. contends to the contrary.

53. A prompt adjudication of this controversy is necessary so that the parties may resolve this dispute at the earliest possible time.

54. No adequate remedy at law is available to New Hampshire.

55. Therefore, New Hampshire desires a judicial determination and declaration of New Hampshire's rights and duties.

**FOURTH CAUSE OF ACTION**

(Misrepresentation or Concealment)

56. New Hampshire incorporates by reference the allegations contained in paragraphs 1 through 37, inclusive, as though fully set forth herein.

57. Mi Barur, Inc. its employees, agents, or others acting on its behalf, did not disclose to New Hampshire, among other things, facts regarding the loss of the Mi Barur; that Mi Barur, Inc. was set up to circumvent U.S. law regarding U.S. documentation, which would not otherwise be available to a citizen of Mexico; that the Mi Barur was in reality purchased by a Mexican citizen for exclusive use in Mexican waters; that the Mi Barur was purchased for consideration significantly less than the purchase cost stated in the application; and that Mi Barur, Inc. intended to sell the Mi Barur, whose sales price had to be reduced.

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

Case 3:08-cv-0044 N-POR Document 16-5 Filed 10/2008 Page 12 of 61

58. An actual controversy exists between New Hampshire, on the one hand, and Mi Barur, Inc., on the other hand, in that New Hampshire contends that it is not obligated to indemnify Mi Barur, Inc. in connection with the loss of the Mi Barur because the policy is void or voidable pursuant to Condition "J" based upon intentional concealment or misrepresentation of material fact or circumstance relating to the insurance or the application for insurance before or after the loss. New Hampshire is informed and believes that Mi Barur, Inc. contends to the contrary.

59. A prompt adjudication of this controversy is necessary so that the parties may resolve this dispute at the earliest possible time.

60. No adequate remedy at law is available to New Hampshire.

61. Therefore, New Hampshire desires a judicial determination and declaration of New Hampshire's rights and duties.

**FIFTH CAUSE OF ACTION**

(Declaratory Relief - No Duty to Indemnify - Personal Effects)

62. New Hampshire incorporates by reference the allegations contained in paragraphs 1 through 61, inclusive, as though fully set forth herein.

63. An actual controversy exists between New Hampshire, on the one hand, and Mi Barur, Inc., on the other hand, in that New Hampshire contends that it is not obligated to indemnify Mi Barur, Inc. for any loss of personal effects arising out of the loss of the Mi Barur based upon Exclusion 8 of Section F, which bars coverage for, among other reasons, any loss excluded under Section A of the policy. New Hampshire is informed and believes that Mi Barur, Inc. contends to the contrary.

64. A prompt adjudication of this controversy is necessary so that the parties may resolve this dispute at the earliest possible time to avoid prejudice to New Hampshire's rights.

65. No adequate remedy at law is available to New Hampshire.

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

Case 3:08-cv-0044 -POR Document 16-5 Filed 0/2008 Page 13 of 61

66. Therefore, New Hampshire desires a judicial determination and declaration of New Hampshire's rights and duties on this issue.

**SIXTH CAUSE OF ACTION**

(Reimbursement)

67. New Hampshire incorporates by reference the allegations contained in paragraphs 1 through 37, inclusive, as though fully set forth herein.

68. In or about February 2008, New Hampshire reimbursed Mi Barur, Inc. $61,883.43 for amounts incurred to raise and preserve the Mi Barur following the fire. New Hampshire has also been paying for the storage of the Mi Barur. New Hampshire paid these amounts pursuant to a reservation of rights to seek reimbursement of those payments upon conclusion of its investigation and determination regarding whether there was coverage under the policy.

69. New Hampshire requests a judgment declaring that it is entitled to reimbursement of the $61,883.43 paid to Mi Barur, Inc., plus additional storage costs because the loss is not covered under the New Hampshire policy.

**PRAYER FOR RELIEF**

WHEREFORE, New Hampshire Insurance Company prays for judgment against Mi Barur, Inc. as follows:

1. For a declaration that New Hampshire is not obligated to indemnify Mi Barur, Inc. in connection with the loss of the Mi Barur, pursuant to the provisions of the New Hampshire policy;

2. For a declaration that New Hampshire is not obligated to indemnify Mi Barur, Inc. in connection with the loss of the Mi Barur, pursuant to Insurance Code section 533;

3. For recovery of amounts paid to raise, preserve and store the Mi Barur;

4. For costs of suit incurred; and

/ / /

/ / /

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

5. For such other and further relief as the Court deems just and proper.

DATED: March 10, 2008 LEWIS BRISBOIS BISGAARD & SMITH LLP

By

Rebecca R. Weinreich
Stephen V. Kovarik
Attorneys for Plaintiff
New Hampshire Insurance Company

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

**DEMAND FOR JURY TRIAL**

The New Hampshire Insurance Company requests a jury trial in this matter.

DATED: March 10, 2008

LEWIS BRISBOIS BISGAARD & SMITH LLP

By ______________________
Rebecca R. Weinreich
Stephen V. Kovarik
Attorneys for Plaintiff
New Hampshire Insurance Company

# EXHIBIT A

# NEW HAMPSHIRE INSURANCE COMPANY®

Boston, Massachusetts

This is a declaration page with Policy Provisions - Section A and Endorsements, if any, to issue and form part thereof, completes the below numbered policy of the NEW HAMPSHIRE INSURANCE COMPANY, A CAPITAL STOCK COMPANY.

**Policy No.YM 868-56-66** **New**

Effective Date From: 09/23/2007 to09/23/2008 at 12:01 a.m. Standard Time at place of issuance.

**Producer:** 400060
Mariner's General Insurance
2390 Shelter Island Dr
Suite #216
San Diego, CA 92106

**Named Insured:**
Mi Barur, Inc.
2525 Shelter Island Drive #B
San Diego, CA 92106

Coverage applies to items below only when amount and limits are specified.

| Section | Coverage Description | Limits | Deductible | Premium |
|---|---|---|---|---|
| A | **HULL (Agreed Value)** | $1,900,000 | $38,000 | $14,060 |
| | **Tender** | $25,000 | $500 | Inc. |
| B | **PROTECTION & INDEMNITY**<br>Longshoremen's & Harbor Workers compensation insurance as provided in public act 803 of the 69th congress, as amended.<br>Includes coverage for 2 crew. | $300,000 | N/A | $749 |
| C | **Medical Payments** | $10,000 | N/A | Inc. |
| E | **Towing** | $2,500 | N/A | Inc. |
| F | **Personal Effects** | $10,000 | $250 | Inc. |
| G | **Uninsured Boater** | $300,000 | N/A | Inc. |
| H | **Fuel Spill Liability** | $300,000 | N/A | Inc. |
| **Endorsements:** | MAN-5, MAN-6, W-1, Nav-1<br>MAN-2, GC-1, MAN-3, MAN-1, B-8 | | | $1,050 |
| | | **TOTAL PREMIUM** | | **$15,859** |

**Description of Vessel:** **Year Built** 1990 **Manufacturer:** Hatteras
**Length:** 92 ft **Model:** M/Y
**Name:** "Mi Barur" **Hull Serial #** HATDT3011990

**Description of Motors** **Year Built** 1992 **Manufacturer:** Detroit **Serial#** P:
S:

Navigation Limits Warranty: Warranted confined to the use and navigation of coastal waters and tributaries of the Pacific Ocean, not North of Pt. Conception, CA and not south of Rio Santo Tomas, Baja, MX. Nav.# 955

Countersigned: 09/21/2007
M O Taxloc NY

[signature]
MARITIME GENERAL AGENCY

The declarations page and endorsements attached hereto, are made part of, and attach to, policy form:BJP 2191-A (8/06)

**EXHIBIT A**
**1**

# NEW HAMPSHIRE INSURANCE COMPANY©

# EXECUTIVE YACHT POLICY

ADMINISTRATIVE OFFICES: 70 PINE STREET, NEW YORK, N.Y. 10270

Insurance from The New Hampshire Insurance Company and other Member companies of The New Hampshire Insurance Group Member Companies of American International Group, Inc.

95613 (9/07)



EXHIBIT A
2

EXHIBIT A 0017

Case 3:08-cv-0044[illegible]N-POR Document 16-5 File[illegible]10/2008 Page 19 of 61

This **policy** provides different coverages. Unless otherwise stated, the terms, definitions, and exclusions of this **policy** shall apply to all coverages. Any term, definition, or exclusion under a specific coverage shall pertain only to that coverage unless otherwise stated. Please read the entire **policy** to determine **your** rights, duties, and what is and what is not covered.

Words and phrases that appear in boldface are defined in the DEFINITIONS section and shall apply to all coverages unless otherwise stated.

In consideration of the premium paid and in reliance upon **your** statements to **us**, **we** agree to provide to **you** the insurance described in this **policy**.

**DEFINITIONS**

1. **Actual Cash Value** means the price a willing seller would accept and a willing buyer would pay for **personal effects** with due allowance for depreciation at the time and place of physical loss or damage.

2. **Agreed Hull Value** means the value agreed to by **you** and by **us** on **your** insured **yacht** as shown on the **declarations**.

3. **Boating Equipment** means masts, spars, sails, and outboard motors. Boating equipment shall not mean **personal effects**.

4. **Bodily Injury** means bodily harm, sickness, or disease, including death resulting there from.

5. **Captain** means any person employed by **you** or on **your** behalf as a **crew member** to be in charge of the shipboard management and navigation of the **yacht** for which **we** have agreed to provide coverage and who is employed by **you** at the time of a covered **occurrence**.

6. **Crew Member** means any person employed by **you** or on **your** behalf to work aboard **your yacht**, up to the maximum number of employees as agreed to by **us**, and who is acting in the capacity of an employee in service of **your yacht** at the time of a covered **occurrence**, either as a paid **captain** or paid **crew member**.

7. **Claim(s)** means a demand for money.

8. **Damages** means those sums that are paid or are payable to satisfy a **claim** or **suit**.

9. **Declarations** means the most recent **declarations** we issued to **you** under the **policy**, including any subsequent amendments and/or endorsements.

10. **Electronics** means any permanently installed electronics and related equipment used for the navigation and guidance of **your yacht**. Electronics does not include electronic engine management systems.

11. **Fine Arts** means paintings, etchings, statuary, antiques, collectibles and other bona fide works or art, historical value or artistic merit while on board **your yacht** and loading and unloading aboard **your yacht** while **your yacht** is at dock or mooring. Jewelry, watches and furs are not included in the definition of **fine arts**.

12. **Fuel Spill** means, and is limited to, the unintentional discharge, leakage, or spillage of fuel, oil, or lubricant products customarily used in the operation of **your yacht**.

13. **Lay-up** means taking **your yacht** out of active service during the period shown in the **declarations**. **Your yacht** cannot be used for any boating activities or as living quarters during this **lay-up** period. **Lay-up** can include either storage on land or afloat.

14. **Marine Environmental Damage** means the physical damage or injury to, the alteration of, or destruction of, a marine habitat caused by the use, operation, or maintenance of **your yacht**.

15. **Navigational Limits** means the geographical territory described on the **Declarations** in which **your yacht** must be located at the time of any occurrence in order for this insurance to apply.

16. **Occurrence** means a loss or accident to which this insurance applies and which takes place within the **policy period**. Continuous or repeated exposure to substantially the same general conditions, unless specifically excluded, is considered to be one **occurrence**.

17. **Personal Effects** means personal belongings not excluded under this **policy** and not used in the operation of **your yacht**. **Personal effects** may include, but not be limited to, sporting equipment, fishing equipment, and the property of guests or **crew members**.

18. **Personal Injury** means injury other than **bodily injury** arising out of one or more of the following offenses:

A. False arrest, detention, or imprisonment;

B. Malicious prosecution;

C. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor;

D. Oral or written publication of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products, or services; or



EXHIBIT A
3

E. Oral or written publication of material that violates a person's right of privacy.

19. **Policy** means this policy, including the **Declarations**, any schedules, endorsements, warranties, and attachments.

20. **Policy Period** means the period commencing on the effective date shown on the **declarations**. This period ends on the earlier of the expiration date or the effective date of cancellation of this **policy**. All physical loss, **occurrences**, liability, **property damage**, **bodily damage**, or towing and assistance charges must occur during the **policy period**. If **you** became an insured under this **policy** after the effective date, the **policy period** begins on the date **you** became an insured and ends on the earlier of the expiration date or the effective date of cancellation of this **policy**.

21. **Pollutants** means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum products and derivatives, and waste. Waste includes, but is not limited to, material to be recycled, reconditioned, or reclaimed.

22. **Property Damage** means:

A. Physical injury to, or destruction of, tangible property including the loss of use of it; or

B. Loss of use of tangible property, which has not been physically injured or destroyed.

23. **Suit** means a civil proceeding in which damages because of **bodily injury** or **property damage** are alleged, including an arbitration proceeding or any other alternative dispute resolution proceeding.

24. **Temporary Substitute Yacht** means a vessel of equal or similar value, configuration, length and beam of **your yacht**.

25. **Tender** means a vessel, other than **your yacht**, that is carried on board **your yacht** and used in conjunction with **your yacht**.

26. **Trailer** means the insured vehicle shown on the **Declarations** which is used for the transportation of **your yacht** or tender.

27. **We**, **us**, or **our** means the Company issuing this policy.

28. **Yacht** means the insured vessel shown on the **Declarations** including, but not limited to, the following:

A. The vessel's sails or engine(s), machinery, furniture, and auxiliary fixtures;

B. Other vessel equipment and **electronics** on the vessel as is required aboard for its safety, maintenance, and operation; and

C. A personal watercraft you own or a dinghy you own and use solely in connection with **your yacht**, or any **tender** shown on the **Declarations**.

29. **You** and **your** means:

A. The person or organization named as the insured on the enclosed **Declarations**;

B. Members of the immediate family of the insured who live in the same household;

C. Anyone else operating the insured vessel with the prior express permission of the named insured, as long as the actual use is within the scope of such permission and for private pleasure use only; or

D. A captain or crew member who works on **your yacht**. **You** and **your** does not include, however, anyone operating or working for a marina, yacht club, boat repair yard, or similar business and who is not in **your** employ.

## GENERAL CONDITIONS AND EXCLUSIONS

### 1. GENERAL CONDITIONS

A. INSURING AGREEMENT

This **policy** is a legal contract between **you** and **us**. **We** agree to provide the insurance coverage described in this **policy** in return for **your** payment of the premium when due and compliance by **you** with all the terms and conditions of this **policy**.

B. TRANSFER OF INTEREST: This **policy** shall be void if **your yacht** is sold, assigned, transferred, or pledged without our prior written permission.

C. HELD COVERED: If the **navigational limits** or the **lay-up** warranty of this **policy**, as stated on the **Declarations**, are breached due to circumstances beyond **your** control, this **policy** shall remain in effect provided written notice is given to **us** as soon as the facts regarding the breach are known to **you** and any additional applicable premium is promptly paid.

D. WHAT YOU MUST DO IN THE EVENT OF A LOSS: If **you** have a loss or **claim** that **you** think might be covered under this **policy**, **you** must do the following:

(1) Notify the proper authorities in the event of a suspected criminal or illegal activity.

(2) Notify **your** agent or **us** in writing immediately. **You** must also provide **us** with all available information about the **occurrence** and arrange with **us** to survey and inspect the damage to **your yacht** prior to the start of repairs. **We** will give **you** instructions on where to have repairs performed.

(3) If a **claim** is made or **suit** is brought against **you**, **you** must immediately notify **us** and forward to us every demand, notice, summons, or other process received by **you** or **your** representative.

(4) If **your yacht** or other property covered by this **policy** is damaged, **you** must take all lawful and

reasonable steps to protect your yacht or other property from further damage. We will reimburse you for the reasonable expenses of protecting the property, not including your personal labor. These payments for protecting the damaged property shall be made in addition to any other payments we make for losses covered by this policy.

(5) After a loss, you may not abandon or assign your yacht to us or to any other party without our prior written permission.

E. WHEN WE SHALL PAY FOR LOSSES: We shall pay for losses covered under this policy within thirty (30) days after we receive proof of loss or other requested documentation that is satisfactory to us.

F. COOPERATION WITH US: In the event of a loss covered by this policy, you must cooperate with us fully. You shall not assume any obligations, admit any responsibility, or make any settlements or payments without first securing our written permission. You shall provide a sworn statement if we so request. If you are sued and you receive our written approval to defend the lawsuit, we shall pay defense costs. Payments for the cost of your legal defense shall be in addition to payments we make under this policy for watercraft liability insurance. If we pay for your defense, we shall have the right to select the attorney who will defend you. We have the right to control the defense, as well as the right to settle a claim or suit at our discretion.

G. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US: If you have rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. You shall do nothing to impair them. At our request, you shall bring suit or transfer those rights to us and help us enforce them.

H. OTHER INSURANCE: We shall be excess over any other insurance including, but not limited to, any self-insurance. If there is other insurance that applies to the physical loss, occurrence, liability, property damage, bodily injury, and towing and assistance charge, then this policy shall be excess over any other collectible insurance. This policy applies to the amount of loss that is more than:

(1) The Limit of Liability of the other insurance; and

(2) The total of all deductibles and self-insured amounts under all such other insurance.

In any event, we shall not pay more than our Limit of Liability.

I. LEGAL ACTION AGAINST US: If you are found liable as a result of an occurrence covered by this policy, we shall pay up to the Limit of Liability of this policy as shown on the declarations. We shall pay if you are bankrupt or insolvent. No one may begin legal action against us unless all the terms of the policy have been met, nor until thirty (30) days after the required proofs of claim have been filed with us.

J. CONCEALMENT OR MISREPRESENTATION

Any relevant coverage(s) shall be voided if you intentionally conceal or misrepresent any material fact or circumstance relating to this insurance, or your insurance application, whether before or after a loss.

K. CANCELING THE POLICY: You may cancel this policy by returning it to our authorized agent or by advising us or our authorized agent in writing of the future date you want this policy to be canceled. We can cancel this policy by providing written notice to you at the address shown in this policy or the insured's last known address. If this is done, the cancellation shall not be effective until ten (10) days after the date of mailing or such time as may be required by applicable state law. The mailing of this notice shall be sufficient proof of the notice to cancel.

L. RETURN PREMIUM: If this policy is canceled, you may be entitled to a premium refund. If you request cancellation, the return premium shall be computed on a short rate basis. If we cancel, the return premium shall be computed on a pro-rata basis. If we pay for a constructive total loss or total loss of your yacht, the full premium for the policy shall be considered fully earned and you shall receive no return premium.

M. CAPTAIN: You must employ a full time, paid captain for your yacht. It is warranted that during all navigation and operation of your yacht the full time, paid captain must be aboard and in charge of your yacht. You must provide us with your captain's written resume. If there is no captain or you change captains at any time during the policy period, you are required to give reasonable notice to us. If you fail to give such notice to us, you will have no coverage under this policy during the period of time when your yacht was navigated without a captain.

This condition shall not apply if we have provided you permission to navigate without a captain as indicated on the Declarations or by endorsement.

N. MATERIAL CHANGES TO YOUR YACHT: If you alter your yacht in any manner that affects the length, speed, or stability of your yacht, then you must provide us with written notice of such alteration within thirty (30) days after the completion of such alteration. If you refit or perform yard repairs to your yacht, you must provide us with written notice within thirty (30) days after the commencement of such refit or repair.

Failure to provide timely notice in accordance with the above provisions will result in a gap in coverage from the deadline for such notice until the actual receipt of such notice by us. We reserve the right to charge an additional premium for any change in the risk.

**2. GENERAL EXCLUSIONS**

A. RESTRICTIONS ON THE USE OF YOUR YACHT: We shall not cover losses that occur directly or indirectly,

in whole or in part, while your Yacht is being used in any way that is prohibited by this policy, including, but not limited to the following:

(1) While your yacht is being used for other than private pleasure purposes. Your yacht cannot be chartered unless approved by us in advance in writing, and such charter use is limited to private pleasure purposes only. Your yacht cannot be chartered, leased, or used for any commercial purposes at any time. Entertaining business clients on your yacht or tournament fishing on your yacht is not considered charter or commercial use.

(2) Your yacht cannot be taken beyond the navigation limits described on the declarations without prior written permission by us.

(3) Your yacht cannot be used for any illegal purpose including, but not limited to, the transportation of any illegal substance; and

(4) Use of your yacht during the lay-up period shown on the declarations.

(5) Use of your yacht for any race or speed contest. This exclusion shall not apply to predicted log type events or a race or speed contest with your sailboat.

B. SEIZURE OR REQUISITION: We shall not cover any loss, claim, or defense arising out of any lawful or unlawful capture, seizure, requisition, search, or detainment of your yacht by a civil or governmental authority, or any attempt by any of the aforementioned. You are covered, however, for direct physical loss during a Coast Guard or U.S. Customs boarding, provided there is no evidence of any wrongdoing by you or in an attempt to mitigate or prevent an actual or potential pollution hazard arising out of physical damage or loss to your yacht.

C. WAR: We shall not cover any loss, claim, or defense arising out of any war, war-like hostilities, or war-like operations. This includes declared and undeclared wars, civil wars, revolutions, or any civil unrest.

D. NUCLEAR: We shall not cover any loss, claim, or defense arising out of any nuclear reaction radiation, or radioactive contamination, however caused. If, however, nuclear reaction or radiation, or radioactive contamination causes a fire, we shall cover the physical loss or damage to your yacht caused directly by the fire.

E. POLLUTION: We shall not cover any loss, claim, or defense arising out of:

(1) The actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants; or

(2) Any direction or request to test for, monitor, clean-up, remove, contain, treat, detoxify, or neutralize pollutants or in any way respond to or assess the effects of pollutants.

This exclusion, however, shall not apply to any fuel, oil, or lubricant products customarily used in the operation of your yacht for which coverage is provided under SECTION "H" - FUEL SPILL LIABILITY.

F. EMPLOYEE BENEFITS LIABILITY: We shall not cover any loss, claim or defense arising out of any act, error or omission as respects the provision of employee benefits of any kind by you.

## SECTION "A" - HULL INSURANCE

1. WHAT WE INSURE:

A. Physical Loss to Your Yacht: We shall pay for direct physical loss to your yacht arising out of all perils unless otherwise excluded herein.

B. Hidden Defect: We shall pay for indirect physical loss or property damage caused by any hidden defect in the machinery, the hull, or any other area of your yacht. In the event a mast failure is deemed to be caused by a hidden defect in the mast, the mast shall be considered one indivisible unit. We shall not, however, pay for the cost of replacing or repairing the defective part.

C. Equipment on Shore: We shall pay for direct physical loss to your boating equipment, tenders, personal watercraft and personal effects, if such property is:

(1) separated from your yacht, while your yacht is laid up on shore, or

(2) while your boating equipment, tenders, personal watercraft, or personal effects, is in temporary storage, or

(3) while in transit to and from your yacht to such temporary storage.

Coverage for theft will only apply if the items are stored within a locked premises, or locked vehicle, and there is visible evidence of forced entry.

The agreed hull value shall be decreased by any amount we pay for physical loss to your boating equipment.

D. Collision Liability: If an amount is not indicated on the declarations for Section "B" Protection and Indemnity, we shall pay those amounts for which you become legally liable for property damage to other watercraft if your yacht, while waterborne, collides with another watercraft. Payments under this coverage shall be in addition to the agreed hull value, but the total shall not exceed the agreed hull value.

We shall not, however, pay for the following under this coverage:



EXHIBIT A
6

(1) Bodily Injury;

(2) Personal Injury; or

(3) The cost of removing wrecks or obstructions.

E. Additional Living Expenses: We will pay up to $10,000 for any reasonable additional living expenses ashore you may incur in minimizing a covered loss and preventing further loss or damage to your yacht.

This coverage is in addition to the hull limit shown on the Declarations.

F. Precautionary Measures: We will pay up to $5,000 for reasonable expenses incurred by you to move your yacht to a place of safety from harms way prior to potential covered loss and while the yacht is under threat of windstorm, tidal surge, tsunami or seismic sea wave, or fire at your yacht's berth, slip, mooring, or place of storage.

This coverage is included in and does not increase the hull limit shown on the Declarations.

G. Charter and Loss of Charter Hire:

If we have agreed in writing and endorsed the policy, we will cover physical loss to your yacht while your yacht is being chartered, as long as your yacht is in the care, custody and control of the captain at all times.

We will pay up to $25,000 per occurrence if you could not fulfill your obligations under any written charter due to, or as a result of, a covered loss. We cover the loss of charter hire in the amount provided in the written charter agreements and calculated on a daily basis for a maximum of sixty (60) days for each occurrence.

This coverage is included in and does not increase the hull limit shown on the Declarations.

H. Inspections: We will pay the reasonable expenses of inspecting your yacht after an accidental grounding.

This coverage is included in and does not increase the hull limit shown on the Declarations.

I. Newly Acquired Yachts: We will cover any yacht used solely for private pleasure purposes, with a maximum design speed of fifty (50) mph that you acquire by purchase during the policy period. The most we will pay for your newly acquired yacht is the actual purchase price, but in no event will the hull and equipment limit exceed $1,000,000. You must report the Newly Acquired Yacht to us within thirty (30) days from the date of purchase.

Coverage under this clause will cease when one of the following occurs:

(1) the expiration of thirty (30) days from the date of purchase,

(2) the expiration of this policy, or

(3) you report the value of the newly acquired yacht to us.

J. Temporary Substitute Yacht: If your yacht is out of commission due covered loss or damage and cannot be repaired and made available for your private pleasure use for at least ten (10) days from the date of the occurrence, we will pay up to $1,500 per day for a Temporary Substitute Yacht to charter for your private pleasure use for up to a maximum of seven (7) consecutive days. However, we will not provide this coverage when your Temporary Substitute Yacht is used for any purpose other than your private pleasure use.

This coverage is in addition to the hull limit shown on the Declarations.

K. Overland Transportation: We will cover physical loss or damage to your yacht incurred during overland transport on your trailer within the continental United States. We will also cover incidental overland movement of your yacht in connection with hauling, launching, dry docking maintenance or repair at a marina or shipyard within a radius of ten (10) miles from the point of origin. No coverage will be afforded for any physical loss or damage to your yacht incurred during overland transport due to scratching, marring, and/or denting.

L. Search and Rescue: If a person is lost overboard from your yacht, we will pay up to $25,000, or the limit shown on the Declarations, or by endorsement hereto, for any search and rescue expense you may incur or be assessed by a governmental authority for such rescue or recovery effort.

This coverage is in addition to the hull limit shown on the Declarations.

2. LIMIT OF INSURANCE: All coverages under this policy shall cease upon payment for losses which total the agreed hull value unless your policy is reinstated in writing by us.

If we pay the agreed hull value of your yacht, the full annual premium for this policy shall be considered fully earned and you shall receive no return premium.

3. VALUATION:

A. The value of your yacht is shown on the Declarations as the agreed hull value. In the event of damage to your yacht, we shall pay for the cost of repairs with material of like kind and quality without a deduction for depreciation.

B. Covered losses to sails, protective covers, carpeting, upholstery, cushions, fabrics, outboard motors, and outdrives over three (3) years old shall be paid on the basis of their actual cash value adjusted for depreciation.



EXHIBIT A
7

EXHIBIT A 0022

4. CONSTRUCTIVE TOTAL LOSS OR TOTAL LOSS: We shall pay the agreed hull value without a deductible if:
   A. Your yacht is a total loss;
   B. Your yacht is destroyed; or
   C. The reasonable expense of recovering and repairing your yacht exceeds the agreed hull value.

5. TOTAL LOSS TO TENDER:
   A. In the event of a total loss to your tender, we shall pay in addition to the agreed hull value the fair market value of the tender at the time of the loss.
   B. You must, however, provide satisfactory proof of loss and satisfactory proof of ownership of the tender.

6. DEDUCTIBLE:
   A. Hull Deductible: We shall subtract the deductible amount stated on the declarations from any payment we make for a loss covered under this section other than for a total loss or constructive total loss to your yacht.
   B. Electronics Deductible: A loss to electronics aboard your yacht is subject to a $500 deductible per occurrence. No loss shall exceed the Limits of Liability stated on the declarations. If a single accident or occurrence gives rise to a claim where both the insured hull and electronics are damaged, the $500 electronics deductible shall be applied solely to the electronics claim if the cost of repairs to the hull do not exceed the hull deductible. If the damage to the hull is greater than the amount of the hull deductible, then the hull deductible shall apply to the total amount of loss or damage to your yacht and electronics.

   As respects this deductible clause, electronics does not include electronic engine management systems.

7. REPAIRS: If the hull of your yacht or tender as shown on the Declarations is made in whole or in part of plywood, plastic, fiberglass, metal, or other molded materials, we shall, at our option, pay for the reasonable cost of applying suitable patches, refinishing work, or bottom paint to the damaged area in accordance with standard repair practices.

8. UNREPAIRED DAMAGE: If the damage to your yacht is not repaired or replaced:
   A. We shall pay the actual cash value of the damaged parts, not exceeding the cost to repair or replace with material of like kind and quality; and
   B. We shall not pay for un-repaired damage in addition to a payment for a subsequent total loss or constructive total loss of your yacht.

   We shall not be liable for previously un-repaired damage.

9. SALVAGE:
   A. When we pay the agreed hull value for a loss, the rights to all salvage shall be ours.
   B. All salvage charges shall be limited to an amount not to exceed the agreed hull value.

10. CAUSES OF LOSS THAT ARE NOT COVERED:
   A. We shall not cover any loss of, or damage to:
      (1) Wages of the captain and crew members;
      (2) Food, fuel, or other consumables.
   B. We shall not cover any loss or damage arising out of:
      (1) Intentional Acts; Any intentional misuse or misconduct, criminal, willful or malicious act or lack of reasonable care or due diligence, in the operation or maintenance of your yacht, tender or trailer;
      (2) Any wear and tear, gradual deterioration, weathering, inherent vice, insects, animals, vermin, fungus or mold, marine life, electrolytic or galvanic action, oxidation, warping or shrinkage, corrosion, dampness of atmosphere, gel coat or fiberglass blistering, wet or dry rot, or extremes of temperature;
      (3) Any theft or the unexplained disappearance of covered property from your yacht, unless:
         a. There is physical evidence of forcible entry or removal of the covered property;
         b. Corroboratory evidence, satisfactory to us, exists; or
         c. Your yacht is stolen;
      (4) The weight of your yacht, if the weight exceeds the rated capacity of your trailer or other land conveyance vehicle;
      (5) Any willful misconduct, criminal, or dishonest act by an insured, your employees, or any person to whom you entrust your yacht;
      (6) Failure to properly winterize your yacht;
      (7) The loading, unloading, or transportation of your yacht aboard a cargo vessel.

**SECTION "B" - PROTECTION & INDEMNITY**

1. WHAT WE INSURE: We shall pay those amounts you legally must pay as damages for an occurrence which results from the ownership, maintenance, use, or operation of your yacht resulting in any of the following:

A. Bodily injury;

B. Property damage;

C. Your liability to paid captain and crew members as defined in Admiralty Law;

D. The actual or attempted raising, removal, or destruction of the wreck of your yacht;

E. The failure to raise, remove, or destroy the wreck of your yacht; or

F. The rescue of you, your passengers, or your crew members.

2. MARINE ENVIRONMENTAL DAMAGE: We will pay up to $250,000 for damages you are legally obligated to pay for marine environmental damage. We will also pay up to $50,000 for Government Fines or Penalties assessed against you by any Government or regulatory authority incurred as the result of any one occurrence of environmental damage you are legally obligated to pay.

This coverage is included in and does not increase the limit for Protection and Indemnity as shown on the Declarations.

3. COVERAGE FOR VESSELS YOU DO NOT OWN: We shall pay bodily injury and property damage arising out of your permissive use of a private pleasure vessel which you do not own or rent.

4. FEDERAL LONGSHOREMEN'S AND HARBOR WORKERS' COMPENSATION: We shall pay the amount for which you are liable if a claim is made against you for bodily injury resulting from the ownership, maintenance, or use of your yacht, and for which you are liable under the provisions of the Longshoremen's and Harbor Workers' Compensation Act. We shall, as required by the Act, conform to all the provisions of this Act, being Public Act No. 803 of the 69th Congress, approved March 4, 1927; all laws which amend or supplement this Act, and all lawful rules, regulations, orders, and decisions of the United States Department of Labor, Bureau of Employees' Compensation, and the Deputy Commissioner having jurisdiction, which affect this Act while this policy is in force. We shall carry out the provisions of Section 35 of this Act, and we shall not be relieved of our obligations due to your insolvency or bankruptcy.

5. LIMIT OF LIABILITY: The Protection and Indemnity Limit shown on the declarations is the most we shall pay under this coverage part. This is the most we will pay, regardless of the number of injured persons, claims made, or watercraft involved in any one occurrence or series of occurrences arising out of the same events.

6. LEGAL REPRESENTATION: We shall pay the costs related to the following, which are in addition to the Limit of Liability:

A. We have the right and duty to defend at our expense any suit brought against you under this coverage part even if the suit is groundless or fraudulent. We shall not be obligated to make any payment nor undertake or continue the defense of any suit or proceeding after our applicable Limit of Liability has been exhausted by payment of judgments, settlements, and/or awards.

B. We have the right to investigate any claim or suit and settle any claim or suit that we believe is proper. Our duty to defend any suit against you ends if you refuse to consent to a settlement we recommend and the claimant accepts. You shall then defend the suit at your own expense and negotiate any settlement. Our obligation to pay any settlement or judgment shall not be more than the amount for which we could have settled had you consented.

7. THIS SECTION DOES NOT COVER:

A. Any liability assumed by you under any contract or agreement without our prior written permission, except for any contract entered for the exclusive purpose of hauling, mooring, storing, or launching your yacht;

B. Bodily injury or property damage to others while your yacht or tender as shown on the declarations is being transported on land;

C. Bodily injury or property damage arising out of the use of the insured yacht while engaged in towing a person in or on a device designed for flight, such as parasailing or kite-skiing.

D. Bodily injury or property damage to:

(1) You;

(2) A relative in your household; or

(3) Any person for which you or a relative in your household are the legal guardian;

E. Any willful misconduct, criminal, or dishonest act by an insured, your employees, or person to whom you entrust your yacht;

F. Punitive, exemplary, multiplied damages, or bail;

G. Any loss involving an uninsured vessel which is owned, operated, or maintained by a local, state, or federal governmental agency or foreign military; or

H. Any vessel involved in an accident with your yacht, which is owned by you or furnished for your regular use.

**SECTION "C" - MEDICAL PAYMENTS**

1. WHAT WE INSURE: We shall pay reasonable and necessary medical, surgical, ambulance, hospital, professional nursing, and funeral expenses for any person for bodily injury arising out of an occurrence while boarding, aboard or leaving your yacht. All expenses must incur within one year of the date of the occurrence.

2. LIMIT OF LIABILITY: The Limit of Liability shown for medical payments on the declarations is our maximum limit of liability under this section.

3. MEDICAL AND OTHER REPORTS; EXAMINATION: If requested by us, any person presenting a claim under this section must:

A. Furnish reasonably obtainable information pertaining to the occurrence and bodily injury and execute authorization to enable us to obtain medical reports and copies of records;

B. Submit to physical examination by physicians selected by us as often as we may reasonably require;

C. Provide a written, sworn proof of loss; and

D. Provide copies of any other insurance policies or other evidence of health coverage that may cover the claim.

4. THIS SECTION DOES NOT COVER: We shall not cover any medical payments arising out of:

A. Bodily injury to any person while your yacht is being used:

(1) To carry paying passengers without first obtaining our prior written permission or the proper regulatory licensing; or

(2) Any other reason other than private pleasure purposes without our prior written permission;

B. Bodily injury of:

(1) Anyone who is eligible for injury or death benefits under any Workers' Compensation or Longshoremen's and Harbor Workers' Compensation Laws; or

(2) Any employee of yours, other than a household employee, or anyone who is working on or aboard your yacht;

C. Bodily injury of any trespasser who is boarding, aboard, or leaving your yacht;

D. Bodily injury to others while your yacht or tender shown on the declarations is being transported on land;

E. Bodily injury or Property Damage arising out of the use of the insured yacht while engaged in towing a person on or on a devise designed for flight, such as parasailing or kite-skiing.

F. Any liability assumed by you under any contract or agreement without our prior written permission.

**SECTION "D" - TRAILER COVERAGE**

1. WHAT WE INSURE: We will pay for loss to your trailer arising out of all perils unless otherwise excluded herein.

2. VALUATION: We shall pay for repair or replacement for any covered loss on an actual cash value basis adjusted for any applicable depreciation. Our liability for any one loss shall not exceed $10,000 or the limit shown for your trailer on the declarations, whichever is greater.

3. DEDUCTIBLE: Each loss payment under this section shall be reduced by $500 or the deductible amount shown on the declarations if otherwise scheduled.

4. TERRITORAL LIMITS: Coverage for your trailer applies only to physical loss that occurs within the United States, District of Columbia, Puerto Rico, and the Provinces of Canada.

5. CAUSES OF LOSS THAT ARE NOT COVERED: Losses which are excluded under Section "A" – Hull Insurance of this policy are also excluded under this Section.

**SECTION "E" - TOWING AND ASSISTANCE CHARGES**

1. WHAT WE INSURE: We shall pay reasonable costs you incur should your yacht become disabled while waterborne away from a safe harbor, and you are forced to seek commercial assistance because civil and/or voluntary help is not available.

We shall pay for:

A. Towing to the nearest place where necessary repairs can be made;

B. The cost of delivering gas, oil, parts, or loaned battery (but not the cost of the gas, oil, parts, or battery);

C. Labor for emergency repairs while away from safe harbor or docking/mooring berth; or

D. Yacht trailer roadside service.

2. LIMIT OF LIABILITY: The most we shall pay for towing and assistance charges is shown on the declarations, regardless of the number of occurrences requiring such towing assistance in any one policy period. No deductible shall apply to this coverage. Satisfactory proof of payment, however, shall be sent to us or our representative for reimbursement. We also reserve our right to request any other reasonable evidence regarding your disabled yacht.

If your yacht is towed as result of a covered loss under Section "A" – Hull Insurance, no amount shall be deducted under this Section.

**SECTION "F" - PERSONAL EFFECTS**

1. WHAT WE INSURE: We shall cover physical loss to your personal effects arising out of all perils while boarding, aboard, or leaving your yacht, unless otherwise excluded herein.

2. FINE ARTS: We shall pay for a covered loss of your fine arts while on board, or while loading or unloading, your yacht. The amount we will pay for a covered loss is $25,000, and will be further limited by whether the item is itemized in a schedule, or unscheduled.

3. FIREARMS: We shall pay up to $2,500 per occurrence for the theft of firearms owned by you while on board, or while loading or unloading, your yacht.

A deductible of $250 will apply for this coverage.

4. CHINA AND SILVER: We shall pay up to $2,500 per occurrence for the theft of China or Silver while on board, or while loading or unloading, your yacht or tender.

A deductible of $500 will apply for this coverage.

5. COMPUTER HARDWARE: We shall pay up to $10,000 per occurrence for physical loss to computer hardware, fax machines or printers while on board your yacht or tender.

A deductible of $250 will apply for this coverage.

6. MOPEDS AND MOTORBIKES: We shall pay up to $10,000 per occurrence, per item for your mopeds or motorbikes, but only while on board your yacht and locked, or while being loaded or unloaded from your yacht.

This coverage increases the limit for personal effects shown on the Declarations. There is no deductible for this coverage.

7. VALUATION: We shall pay the actual cash value of the personal effects at the time of the covered loss. The most we shall pay in any one occurrence is the Limit of Liability shown on the Declarations for personal effects or the sub-limits as shown in Section F, regardless of the number of persons involved, property lost, or claims made.

As respects fine arts we shall pay:

(1) Scheduled Items:

(a) Total Loss – For a covered loss to an item listed in your Schedule of Fine Arts, we shall pay the total amount of coverage for that item if it is lost or damaged beyond repair.

(b) Partial Loss – If only part of the scheduled item is lost or damaged, we shall pay either the cost to restore the item to its condition immediately before the loss or the difference between its market value before and after the loss. If after restoration, the market value of the item is less than its market value at the time of the loss, we shall also pay the difference. In no event shall the total of all payments exceed the amount of coverage shown on the Schedule of Fine Arts for that item.

(2) Unscheduled Items: We will pay the lesser of $5,000 or the amount required to restore the unscheduled item, or the market value of the unscheduled item, at the time of the loss. If the market value after restoration is less than the market value at the time of the loss, we shall pay the difference up to $5,000, but in no event shall the total amount we pay for restoration and loss of market value exceed $5,000 for any one unscheduled item.

(3) For a covered loss to a pair or set, you may elect to:

(a) Repair or replace any part to restore the pair or set to its market value prior to the loss;

(b) Be paid the difference between market value of the pair or set before and after the loss; or

(c) Be paid the scheduled amount of coverage shown on the Schedule of Fine Arts for the pair or set, or the market value of the entire pair or set immediately before the covered loss if unscheduled, when you surrender the pair or set to us.

(d) The most we shall pay for a pair or set is:

(i) the limit shown on the Schedule of Fine Arts for that pair or set, or;

(ii) $5,000 for any one unscheduled pair or set.

In no event shall the total we pay in any one occurrence exceed $25,000 for all fine arts.

8. EXCLUSIONS: We shall not cover any loss or damage which is excluded under Section A of this policy, nor shall we cover the following property:

A. Currency or legal tender;

B. Valuable papers, documents, or collectibles;

C. Computer software;

D. Jewelry;

E. Furs;

F. Photographic equipment;

G. Liquor;

H. Cellular phones; or

I. Portable marine electronics.

Case 3:08-cv-0044[illegible]N-POR Document 16-5 Filed [illegible]10/2008 Page 28 of 61

9. DEDUCTIBLE: Unless otherwise stated each loss payment under this section shall be reduced by the deductible amount shown on the declarations.

SECTION "G" - UNINSURED BOATER LIABILITY

1. WHAT WE INSURE: We shall pay those amounts you are legally entitled to recover for damages from an uninsured owner or operator of a vessel due to your bodily injury arising out of an occurrence and results from the ownership, maintenance, use or operation of your Yacht.

2. CONDITION: To be entitled to coverage under this section, the following conditions shall apply:

A. The owner or operator of the other vessel must be a person or vessel owner other than the named insured shown on the declarations;

B. The owner or operator of the other vessel must be legally liable for causing or contributing to the occurrence; and

C. The owner or operator of the other vessel:

(1) Must not have an applicable valid and collectible insurance; or

(2) Cannot be identified.

3. LIMIT OF LIABILITY: The amount shown for this section on the declarations is the most we shall pay for any Uninsured Boater Liability regardless of the number of insured or uninsured persons, claims made or vessels involved in any one or series of occurrences arising out of the same event. Payment under this section shall be reduced by any amounts paid to you by or on behalf of those uninsured persons legally responsible, any state or federal compensation law or provision as well as any amounts paid under any other section of this policy. In addition, any payment to you under this section shall reduce the amount of coverage available under any other section of this policy.

4. EXCLUSIONS: We shall not cover any claim arising out of:

A. Bodily injury or property damage to others while your yacht or tender, as shown on the declarations, is being transported on land;

B. Any personal injury;

C. Any property damage;

D. Any loss involving an uninsured vessel which is owned, operated or maintained by a local, state or federal governmental agency or foreign military;

E. Any vessel involved in an accident with your yacht, which is owned by you or furnished for your regular use; or

F. Any loss or damage excluded under any portion of this policy.

SECTION "H" - FUEL SPILL LIABILITY

1. WHAT WE INSURE: We shall pay those amounts you are legally responsible to pay for the containment, clean-up, property damage, and assessments arising out of a fuel spill occurrence which results from the ownership, maintenance, use, or operation of your yacht.

2. LIMIT OF LIABILITY: The Fuel Spill Liability Limit shown on the declarations is the most we shall pay under this coverage part, regardless of the number of insureds, claims made, or watercraft involved in any one occurrence or series of occurrences arising out of the same events.

3. LEGAL REPRESENTATION: We shall pay the costs related to the following, which are in addition to the Limit of Liability:

A. We have the right and duty to defend at our expense any suit brought against you under this coverage part even if the suit is groundless or fraudulent. We shall not be obligated to make any payment nor undertake or continue the defense of any suit or proceeding after our applicable limit of liability has been exhausted by payment of judgments, settlements, and awards.

B. We have the right to investigate any claim or suit and settle any claim or suit that we believe is proper. Our duty to defend any suit against you ends if you refuse to consent to a settlement we recommend and the claimant accepts. You shall then defend the suit at your own expense and negotiate any settlement. Our obligation to pay any settlement or judgment shall not be more than the amount for which we could have settled had you consented.

4. CONDITION: To be entitled to coverage under this section you must:

A. Report the incident to the appropriate authorities; and

B. Cooperate with and assist the authorities in any and all containment and clean-up activities.

5. EXCLUSIONS: We shall not cover any claim or defense arising out of:

A. Property damage to others while your yacht or tender as shown on the declarations is being transported on land;

B. Property damage to:

(1) You;

(2) A relative in your household; or

(3) Any person for which you or a relative in your household are the legal guardian;

C. Any personal injury;

D. Any bodily injury;

E. Wages of the captain or crew members; or

F. Punitive, exemplary, multiplied damages, or bail.

This Endorsement #: 1 Effective: 9/23/2007

Attached To And Forming Part Of Policy #: YM 8685666

Of The: New Hampshire Insurance Co.

Issued To: Mi Barur. Inc.

**NAVIGATION ENDORSEMENT**

In consideration for premiums charged $1050. The navigation warranty of this policy is amended to include Navigation of Coastal Waters and waters tributary thereto, of the Pacific Ocean and Acapulco as far south as 16 Degrees 30 Minutes North Latitude.

It is agreed and understood a 2% deductible shall apply while the named vessel is outside US Waters.

All other terms and conditions remain unchanged.

Dated: 9/21/2007

Maritime General Agency

Endorsement Form: Nav - 1

**EXHIBIT A**
**14**

This Endorsement #: 2 Effective: 9/23/2007

Attached To And Forming Part Of Policy #: YM 8685666

Of The: New Hampshire Insurance Co.

Issued To: Mi Barur, Inc.

**GENERAL ENDORSEMENT**

In consideration for premiums charged, $0

The following changes shall apply to this policy.
It is agreed and understood that the vessel named in this policy shall be subject to a 3% Named Windstorm deductible. This deductible shall apply any time the vessel is south of Rio Santo Tomas, MX, during the period of 6/30 - 11/1.

This deductible shall apply to any loss resulting from, or related to; A named windstorm, tropical disturbance, wind driven water, or tidal surge.

All other terms and conditions remain unchanged.

Dated: 9/21/2007

Maritime General Agency

Endorsement Form: GC-1

This Endorsement #: 3 Effective: 9/23/2007

Attached To And Forming Part Of Policy #: YM 8685666

Of The: New Hampshire Insurance Co.

Issued To: Mi Barur, Inc.

**CREW COVERAGE**

In consideration of an additional premium of $**INCLUDED**, it is hereby understood and agreed the liability coverage of the present policy, covers the assured's liability to paid crew as defined in the Jones Act or under the general maritime law, for loss of life, injury or illness.

It is warranted that there shall not be more than **TWO (2)** crew member(s) employed aboard the insured vessel at any one time. Furthermore, it is understood and agreed that in the event additional crew are to be employed during the term of this policy, the assured shall give prior notice to the company and pay such additional premium as is required. If the assured shall fail to give such prior notice and the time of an accident in respects to crew there is a greater number employed than that which is stated above or on endorsements attached hereto, the insurance shall respond only in proportion that the stated number of crew bears to the number on board at the time of accident.

Notwithstanding the aforementioned, the company's maximum limit of liability under the policy shall not exceed the amount of insurance shown for liability coverage on the declaration page or endorsements attached thereto.

All other conditions remaining unchanged.

Dated: 9/21/2007

Maritime General Agency

Endorsement Form: B-8

**EXHIBIT A**
**16**

This Endorsement #: 4 Effective: 9/23/2007

Attached To And Forming Part Of Policy #: YM 8685666

Of The: New Hampshire Insurance Co.

Issued To: Mi Barur, Inc.

**INSTITUTE EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE November 1, 2002**

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

1. In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to by or arising from:

   1.1 ionizing radiation's from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

   1.2 the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

   1.3 any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

   1.4 the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

**INSTITUTE EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE - U.S.A. ENDORSEMENT (Amended)**

This insurance is subject to the Institute Extended Radioactive Contamination Exclusion Clause November 1, 2002 provided that

if fire is an insured peril

and

where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions

and

a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2 and 1.4 of the Institute Extended Radioactive Contamination Exclusion Clause November 1, 2002.

any loss or damage arising directly from that fire shall, subject to the provisions of this Reinsurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction nuclear radiation or radioactive contamination arising directly or indirectly from that fire.

All other terms, conditions, limitations and exclusions remain unchanged.

Dated: 9/21/2007

Maritime General Agency

Endorsement Form: MAN-1

Case 3:08-cv-0044[illegible]-POR Document 16-5 Filed [illegible]0/2008 Page 35 of 61

This Endorsement #: 5 Effective: 9/23/2007

Attached To And Forming Part Of Policy #: YM 8685666

Of The: New Hampshire Insurance Co.

Issued To: Mi Barur, Inc.

## CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, ELECTROMAGNETIC EXCLUSION CLAUSE (March 1, 2003)

**This clause shall be paramount and shall override anything contained in this insurance inconsistent herewith.**

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

Dated: 9/21/2007

Maritime General Agency

Endorsement Form: MAN-2

EXHIBIT A
19

Case 3:08-cv-0044[illegible]N-POR Document 16-5 Filed [illegible]0/2008 Page 36 of 61

**This Endorsement #:** 6 **Effective:** 9/23/2007

**Attached To And Forming Part Of Policy #:** YM 8685666

**Of The:** New Hampshire Insurance Co.

**Issued To:** Mi Barur, Inc.

## TERRORISM EXCLUSION ENDORSEMENT

This policy excludes any loss, damage, liability or expense arising from:

a) terrorism; and/or

b) steps taken to prevent, suppress, control or reduce the consequences of any actual, attempted, anticipated, threatened, suspected or perceived terrorism.

For the purpose of this clause, "terrorism" means any act(s) of any person(s) or organization(s) involving:

(i) the causing, occasioning or threatening of harm of whatever nature and by whatever means;

(ii) putting the public or any section of the public in fear,

(iii) in circumstances in which it is reasonable to conclude that the purpose(s) of the person(s) or organization(s) concerned are of a political, religious and/or ideological nature.

All other terms, conditions, limitations and exclusions remain unchanged.

Dated: 9/21/2007

Maritime General Agency

Endorsement Form: MAN-3

**EXHIBIT A**
**20**

Case 3:08-cv-004 N-POR Document 16-5 File /10/2008 Page 37 of 61

# PRIVACY POLICY

## Our Commitment to Privacy

The AIG Companies (AIG) believe one of our most important assets is the trust consumers place in us to respect and properly handle nonpublic personal information received by us in connection with providing our products and services. To continue earning your trust and enhance the products and services offered to you, the companies listed below have adopted the following privacy policy to govern how we treat your nonpublic personal information including such information about our former customers.

It's important for you to know that this privacy policy applies only to the product or service you have just obtained or the insurance policy under which you are seeking or receiving benefits. As a large worldwide leader in the delivery of financial products and services, we offer numerous products and services to many types of consumers and clients in many different states and countries around the world. Therefore, each of our companies may issue different privacy policies to fit the specific products and services they offer.

## Protecting and Safeguarding Your Information

To help prevent unwarranted disclosure of your nonpublic information and secure it from theft, we utilize secure computer networks and restrict access to nonpublic personal information about you to those employees who need to know that information to provide products or services to you. In addition, we maintain physical, electronic, and procedural safeguards that comply with applicable laws and regulations to guard our customers' nonpublic personal information.

## Maintaining Accurate Information

We also maintain procedures to ensure that the information we collect is accurate, up-to-date, and as complete as possible. If you believe the information we have about you in our records or files is incomplete or inaccurate, you may request that we make additions or corrections, or if it is feasible, that we delete this information from our files. You may make this request by writing (include your name, address and policy number):

Chief Privacy Officer
AIG - Domestic Brokerage Group
175 Water Street, 3rd Floor
New York, NY 10038

FAX: 212-785-9495

e-mail: DBG.Privacy@AIG.com

**Information We Collect:**

We collect information about you that is necessary to tailor our products and services to meet your individual needs, provide effective customer service, and comply with legal requirements.

We collect nonpublic personal information about you, from the following sources:

- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates or others;
- Information we receive from a consumer-reporting agency; and
- Information received in handling claims.

**Sharing Information Within Our Family of Companies**

We may share some or all of the nonpublic personal information we collect with our affiliates—the members of the AIG family of companies. In many cases, the information that is shared may be at your request or is necessary to administer, process or otherwise handle your transactions with us or settle a claim on your behalf. In addition, we may provide this information to our affiliates in order to offer you products and services in which you may be interested.

Our family of companies includes many insurance companies (e.g., auto, home, and life insurance), insurance claims handling companies, other financial institutions (e.g. savings bank), and non-financial institutions.

**Sharing Information Outside the AIG Family:**

Sometimes, we use companies or businesses outside the AIG family to administer, process, or otherwise handle your transactions with us, such as for claims handling or customer service. Other times, we may enter into contracts with nonaffiliated companies to perform services on our behalf, such as marketing our products and services, or we may enter into joint marketing agreements with other financial institutions. In these and other circumstances permitted by law, we may share some or all of the information we collect above with these nonaffiliated third parties. However, whenever we utilize a nonaffiliated third party to provide these services, they are required to follow federal privacy laws governing this notice. We also may share information to combat fraud, in response to a court order, or at the request of government regulators.

**Nonpublic Personal Health Information**

We will not disclose nonpublic personal health information about you without obtaining prior written authorization from you, except as permitted by applicable law or regulation.

**Important Information Concerning the Applicability and Future Changes to this Privacy Policy:**

This privacy policy applies, with respect to nonpublic personal financial information, to products or services provided primarily for personal, family, or household purposes in the United States by the AIG Companies listed below, and it applies to all nonpublic personal health information

these Companies may have. Although we may change this policy at any time, please rest assured that you will be notified of any changes as required by law.

AIG Companies Covered by this Policy:

AIU Insurance Company
American Home Assurance Company
American International Pacific Insurance Company
American International South Insurance Company
Birmingham Fire Insurance Company of Pennsylvania
Commerce and Industry Insurance Company
Granite State Insurance Company
Illinois National Insurance Co
National Union Fire Insurance Company of Louisiana
National Union Fire Insurance Company of Pittsburgh, Pa
New Hampshire Insurance Company
The Insurance Company of the State of Pennsylvania
American International Specialty Lines Insurance Company
Landmark Insurance Company
Lexington Insurance Company
A.I. Risk Specialists Insurance, Inc.
A.I. Risk Specialists of Missouri, Inc.
American International Entertainment, Inc.
Eastern Risk Specialists, Inc.
Florida Risk Specialists, Inc.
Louisiana Risk Specialists, Inc.
Medical Excess Insurance Services, Inc.
Michigan Risk Specialists, Inc.
Midwestern Risk Specialists, Inc.
Nevada Risk Specialists, Inc.
New England Risk Specialists, Inc.
Northwestern Risk Specialists, Inc.
Risk Specialists Companies, Inc.
Risk Specialists Company (Bermuda), Ltd.
Risk Specialists Company of Colorado, Inc.
Risk Specialists Company of Kentucky, Inc.
Risk Specialists Company of Minnesota, Inc.
Risk Specialists Company of New Jersey, Inc.
Risk Specialists Company of New York, Inc.
Risk Specialists Company of Ohio, Inc.
Southeastern Risk Specialists, Inc.
Southern Risk Specialists, Inc.
Western Risk Specialists, Inc.
American International Surplus Lines Agency, Inc.
AIG Warranty Services and Insurance Agency, Inc.

and other member companies of the AIG family who sent you this privacy policy statement.

This Endorsement #: 8 Effective: 9/23/2007

Attached To And Forming Part Of Policy#: YM 8685666

Of The: New Hampshire Insurance Co.

Issued To: Mi Barur, Inc.

## MACHINERY ENDORSEMENT

It is hereby understood and agreed that all Propulsion machinery, engines and auxiliary equipment aboard the vessel shall be covered on the basis of it's actual cash value at the time of loss.

At no time shall payment for loss exceed more than the actual cash value of the machinery.

All other terms and conditions remain unchanged.

Dated: 9/21/2007

Maritime General Agency

Endorsement Form: W-1

**EXHIBIT A**
**24**

This Endorsement #: 9 Effective: 9/23/2007

Attached To And Forming Part Of Policy #: YM 8685666

Of The: New Hampshire Insurance Co.

Issued To: Mi Barur, Inc.

**POLICY JACKET REFERENCE**

The policy form referenced on your declarations page, BJP 2191-A (8/06), is deleted in its entirety and replaced by policy form 95613 (9/07).

All other terms and conditions remain unchanged.

Dated: 9/21/2007

Maritime General Agency

Endorsement Form: MAN-6

**EXHIBIT A**
**25**

Case 3:08-cv-0044[illegible]-POR Document 16-5 Filed [illegible]10/2008 Page 42 of 61

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aigproducercompensation.com or by calling AIG at 1-800-706-3102.

# PRIVACY POLICY

**Our Commitment to Privacy:**

The AIG Companies (AIG) believe one of our most important assets is the trust consumers place in us to respect and properly handle nonpublic personal information received by us in connection with providing our products and services. To continue earning your trust and enhance the products and services offered to you, the companies listed below have adopted the following privacy policy to govern how we treat your nonpublic personal information including such information about our former customers.

It's important for you to know that this privacy policy applies only to the product or service you have just obtained or the insurance policy under which you are seeking or receiving benefits. As a worldwide leader in the delivery of financial products and services, we offer numerous products and services to many types of consumers and clients in different states and countries around the world. Therefore, the same company may have more than one privacy policy, each tailored to fit specific products and services.

**Information We Collect:**

We collect information about you that is necessary to tailor our products and services to meet your individual needs, provide effective customer service, and comply with legal requirements.

We may collect nonpublic personal information about you, from one or more of the following sources:

- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates or others;
- Information we receive from a consumer-reporting agency; and
- Information received in handling claims.

**Sharing Information Within Our Family of Companies:**

We may share some or all of the nonpublic personal information we collect with our affiliates—the members of the AIG family of companies (this includes any of the AIG Companies, not just the ones listed at the end of this document), unless such sharing of information is prohibited by law. In many cases, the information that is shared may be at your request or is necessary to administer, process or otherwise handle your transactions with us or settle a claim on your behalf. In addition, we may provide this information to our affiliates in order to offer you products and services in which you may be interested.

Our family of companies includes many insurance companies (e.g., auto, home, and life insurance), insurance claims handling companies, other financial institutions (e.g., savings bank), and non-financial institutions.

**Sharing Information Outside the AIG Family:**

Sometimes, we use companies or businesses outside the AIG family to administer, process, or otherwise handle your transactions with us, such as for claims handling or customer service. Other times, we may enter into contracts with nonaffiliated companies to perform services on our

behalf, such as marketing our products and services, or we may enter into joint marketing agreements with other financial institutions. In these and other circumstances permitted by law, we may share some or all of the information we collect above with these nonaffiliated third parties. However, whenever we utilize a nonaffiliated third party to provide these services, they are required to follow federal privacy laws governing this notice. We also may share information to combat fraud, in response to a court order, or at the request of government regulators.

**Nonpublic Personal Health Information:**

We will not disclose nonpublic personal health information about you without obtaining prior written authorization from you, except as permitted by applicable law or regulation.

**Protecting and Safeguarding Your Information:**

To help prevent unwarranted disclosure of your nonpublic information and secure it from theft, we utilize secure computer networks and restrict access to nonpublic personal information about you to those employees who need to know that information to provide products or services to you. In addition, we maintain physical, electronic, and procedural safeguards that comply with applicable laws and regulations to guard our customers' nonpublic personal information.

**Maintaining Accurate Information:**

We also maintain procedures to ensure that the information we collect is accurate, up-to-date, and as complete as possible. If you believe the information we have about you in our records or files is incomplete or inaccurate, you may request that we make additions or corrections, or if it is feasible, that we delete this information from our files. You may make this request in writing to (include your name, address and policy number):

Chief Privacy Officer
AIG - Domestic Brokerage Group
175 Water Street, 3rd Floor
New York, NY 10038

FAX: 212-785-9495

e-mail: DBG.Privacy@AIG.com

***Special notice for customers who reside in any of the following states: Arizona, California, Connecticut, Georgia, Illinois, Kansas, Maine, Massachusetts, Minnesota, Montana, Nevada, New Jersey, North Carolina, Ohio, Oregon, Virginia or Wisconsin:*** *You can obtain access to any nonpublic personal information we have about you if you properly identify yourself and submit a written request to us at the address above describing the information you want to review (include your name, address and policy number). Once we have received your request, and if the information is reasonably locatable and retrievable, we will, within 30 business days, take the following actions:*

- *Inform you of the nature and substance of the recorded information;*
- *Allow you to see and copy, in person, such recorded personal information; or*

- *Send you a copy of the recorded personal information by mail (we may charge you a reasonable fee to cover the cost of this service).*

*We will also tell you at this time the identity, if recorded, of persons to whom we have disclosed the nonpublic personal information within the preceding two years.*

*If you ask us to correct, amend or delete any information about you, we will, within 30 business days, either correct, amend or delete the nonpublic personal information in dispute or notify you of our refusal to take such action along with the reasons for our decision. If we make the correction, amendment or deletion you've requested, we will also notify you along with any person you designate who has received the information about you within the preceding two years, together with any insurance support organization(s) which provided us with the disputed information.*

*If we refuse to make the requested correction, amendment or deletion, you are permitted to file a concise statement setting forth what you think is the correct, relevant or fair information along with a statement of the reasons why you disagree with our refusal to correct, amend or delete the information subject to dispute. We will file your statement with the disputed personal information and make any person who reviews your file aware of your statement. We will also furnish your statement to any person who has received personal information from us within the two preceding years and any insurance support organization whose primary source of personal information is an insurer.*

**Important Information Concerning the Applicability and Future Changes to this Privacy Policy:**

This privacy policy applies, with respect to nonpublic personal financial information, to the particular products or services you have just obtained, which are primarily for personal, family, or household purposes in the United States by the AIG Companies listed below, and it applies to all nonpublic personal health information these Companies may have. Although we may change this policy at any time, as it relates to the particular product or service, please rest assured that you will be notified of any changes as required by law.

**This Policy Is Used by the Following AIG Companies:**

AIG Hawaii Insurance Company, Inc.
AIG Casualty Company
AIU Insurance Company
American Home Assurance Company
American International Pacific Insurance Company
American International South Insurance Company
Audubon Indemnity Company
Audubon Insurance Company
Commerce and Industry Insurance Company
Granite State Insurance Company
Illinois National Insurance Co.
National Union Fire Insurance Company of Louisiana
National Union Fire Insurance Company of Pittsburgh, Pa.

New Hampshire Insurance Company
The Insurance Company of the State of Pennsylvania
American International Specialty Lines Insurance Company
American Pacific Insurance Company, Inc.
Landmark Insurance Company
Lexington Insurance Company
Starr Excess Liability Insurance Company Ltd
Agency Management Corporation
A.I. Risk Specialists Insurance, Inc.
A.I. Risk Specialists of Missouri, Inc.
American International Entertainment, Inc.
Eastern Risk Specialists, Inc.
Florida Risk Specialists, Inc.
The Gulf Agency, Inc.
Louisiana Risk Specialists, Inc.
Medical Excess Insurance Services, Inc.
Michigan Risk Specialists, Inc.
Midwestern Risk Specialists, Inc.
Nevada Risk Specialists, Inc.
New England Risk Specialists, Inc.
Northwestern Risk Specialists, Inc.
Risk Specialists Companies, Inc.
Risk Specialists Company (Bermuda), Ltd.
Risk Specialists Company of Colorado, Inc.
Risk Specialists Company of Kentucky, Inc.
Risk Specialists Company of Minnesota, Inc.
Risk Specialists Company of New Jersey, Inc.
Risk Specialists Company of New York, Inc.
Risk Specialists Company of Ohio, Inc.
Risk Specialists Company of the Carolinas, Inc.
Southeastern Risk Specialists, Inc.
Southern Risk Specialists, Inc.
Western Risk Specialists, Inc.
American International Surplus Lines Agency, Inc.
AIG Warranty Services and Insurance Agency, Inc.

and other member companies of the AIG family who sent you this privacy policy statement.

# EXHIBIT B

AI Marine Adjusters, Inc.

175 Water Street, 14th Floor
New York, New York 10038
Tel. #: 212-458-6513
Fax #: 212-458-6520
E-Mail: Susan.Smith3@AIG.com

March 10, 2008

**VIA CERTIFIED AND REGULAR MAIL**
Certified Mail No.: 70072560000172840513
Michael Hallmark
President Mi Barur, Inc.
2525 Shelter Island Drive, Suite B
San Diego, CA 92106

**Re: M/Y MI BARUR**

| | |
|---|---|
| **Insured:** | **Mi Barur, Inc.** |
| **Policy No.:** | **YM 868-56-66** |
| **Date of Loss:** | **October 20, 2007** |
| **Our Reference No.:** | **LE08939** |

Dear Mr. Hallmark:

Underwriters have reached a decision on the claim of Mi Barur, Inc. for total loss by fire occurring on October 20, 2007. The evidence discovered in the investigation supports the conclusion that the fire was started with the significant involvement of Captain Rello. For this reason, and other reasons stated more fully below, underwriters must decline your claim.

Underwriters authorized release of the fire investigation report, which was provided to you. The report concludes that the fire was intentionally set on the Captain's bunk. The fire investigator reviewed other possible causes, such as an accidental cause (including smoking) or electrical cause, but ruled them out. Captain Rello denied that he ever used or slept in the Captain's quarters; he observed that no lights on in those quarters the morning of the fire. He could point to no unusual events before the fire, such as flickering lights or smell of smoke. We understand that the fire investigator has ruled out any electrical source in that area as a cause.

Underwriters could find no evidence to suggest that anyone other than the Captain set the fire. Captain Rello was the only person staying on the boat; the other permanent crew had left La Paz for different reasons. The MI BARUR was located at the end of a dock behind a locked security gate with video surveillance. We understand that those who claim to have seen the video say that there was nothing unusual. While we must question why the Marina would not turn over the tapes, the report that there was nothing out of the ordinary suggests that no other person was involved in setting the fire.

Captain Rello was the last person leaving the boat before the fire started.

Case 3:08-cv-0044 N-POR Document 16-5 File 10/2008 Page 49 of 61

Underwriters have not determined if others were involved in planning the fire. It is not necessary to the current coverage decision, but underwriters reserve the right to further investigate others possibly involved and assert any related defenses.

New Hampshire Insurance Company issued the Executive Yacht Policy of insurance YM- 868-56-66 effective 9/23/07 - 08 to Mi Barur Inc, located in San Diego, California. California law and maritime law will therefore govern the contract.

While the policy would generally cover damage to the hull caused by accidental fires, it does not cover fires started by or with the involvement of a captain or others acting on behalf of the insured. Your policy states:

> 10. CAUSES OF LOSS THAT ARE NOT COVERED
>
> B. We shall not cover any loss or damage arising out of:
>
> (1) Intentional Acts: Any intentional misuse or misconduct, criminal, willful or malicious act or lack of reasonable care or due diligence, in the operation or maintenance of your yacht, tender or trailer;
>
> * * *
>
> (5) Any willful misconduct, criminal, or dishonest act by an insured, your employees, or any person to whom you entrust your yacht;

The policy also includes the Captain with in the definition of "YOU," and may thereby make his conduct the conduct of the named insured. Any involvement of an insured in the fire would subject the claim to an arson defense to a fire loss. It may also implicate certain provisions under California law such as Insurance Code Section 533 relating to willful action of the insured and/or Civil Code section 1668, relating to willful injury or violation of law.

There are other facts that have come to underwriters' attention that constitute additional bases for underwriters declining coverage as follows:

First, Mi Barur Inc. was formed as a US company, naming you, the yacht broker, as the sole president and director of the company. The purpose of the formation was to obtain US vessel documentation. As a Mexican citizen, Mr. Farell could not legally obtain US documentation for his boat. So, he created and wholly owns Mi Barur, Inc. (with his wife). Even though he is the decision maker for Mi Barur Inc and manager of the MI BARUR, the statement of any official involvement of Mr. Farell with Mi Barur Inc. is avoided; he is not mentioned in the submission for US documentation. Mi Barur Inc. appears to be a shell company, set up to use your US citizenship as the designated president and director, so that the company could try to meet US vessel document requirements.

Case 3:08-cv-0044[illegible]N-POR Document 16-5 File[illegible]10/2008 Page 50 of 61

Mi Barur Inc. was presented as a US company seeking to insure the MI BARUR, which was also represented to be calling in US ports, particularly San Diego. However, after the vessel was purchased and modified in San Diego, it never returned to US waters, and there was no intent for it to call in the US. The reality of the risk presented for insurance was that it was a boat purchased by Mexican resident for private pleasure use only in Mexican waters. That was not the risk disclosed to underwriters.

Both maritime law and California law require the utmost good faith in disclosing of matters material to the risk. The foregoing was not disclosed. Nor was the basis for the purchase cost disclosed. The application represented the purchase cost to be $2.2 million. We acknowledge a survey supporting the valuation, but the boat was actually purchased for about $1 million plus a trade in, which brought only $620,000 in resale. Before the fire, the boat was listed at $1.9 million, and the only offer received was for $1.7 million.

Pending any further development of facts, Underwriters must reserve rights to assert the condition of the policy which states:

> J. CONCEALMENT OR MISREPRESENTATION
>
> Any relevant coverage(s) shall be voided if you intentionally conceal or misrepresent any material fact or circumstance relating to this insurance, or your insurance application, whether before or after the loss.

New Hampshire is declining this claim based upon the information developed in its investigation. If you feel that underwriters' assessment is wrong or that underwriters have not considered relevant information, please provide the bases for your own assessment and the facts and information that support your position. The conclusions of the investigation are serious, and underwriters would like to make sure they have considered all relevant facts and information that reasonably support alternative conclusions.

If you believe that a further inspection of the hull is necessary, please provide ample advance notice so that we may arrange attendance for any further inspection. Otherwise, we see no reason to continue to incur the significant expenses being charged by Mr. Abarroa to retain the hull. There is significant salvage value to the engines, which underwriters do not claim in view of their coverage decision. Underwriters will agree to pay for continued storage of the hull until the end of March, which should allow sufficient time for you to decide on how you will approach any further salvage and destruction of the hull. Underwriters are also paying for storage of contents of the boat at Atalanta Marina, which underwriters hereby tender to your possession. Underwriters will likewise pay for storage until the end of March and then authorize removal or destruction if you have not claimed them.

Underwriters continue to reserve all rights, defenses and remedies available under the policy and at law, including but not limited the right to reimbursement of expenses

incurred and the right to rescind or decline on other facts that may be discovered, and underwriters do not waive any such rights, defenses and remedies by this declination or further actions taken in response to this claim.

If you feel this claim has been wrongfully denied, you may have the matter reviewed by the California Department of Insurance at: Claims Services Bureau, 11th Floor, 300 South Spring Street, Los Angeles, CA 90013 Tel: (800) 927-4357.

Please advise the undersigned if you have any questions or comments.

Very truly yours,

Susan Smith

/Susan Smith
Regional Hull Manager
Marine Claims Department

A Member Company of
American International Group, Inc.



EXHIBIT B
34

EXHIBIT A 0050