# EXHIBIT "C"
# PART ONE OF SIX

BANNING MICKLOW & BULL LLP
William L. Banning, State Bar No. 75757
Edward M. Bull III, State Bar No. 141996
Jessica L. Voss, State Bar No. 247033
501 West Broadway, Suite 2090
San Diego, California 92101
Telephone: (619) 230-0030
Facsimile: (619) 230-1350

Attorneys for Counter-Claimants
Mi Barur, Inc., Arsenio Farell
and Norma Farell

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEW HAMPSHIRE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>MI BARUR, INC.,<br><br>Defendant.<br>________________________________<br>MI BARUR, INC., ARSENIO FARELL and NORMA FARELL,<br><br>Counter-Claimants,<br><br>vs.<br><br>NEW HAMPSHIRE INSURANCE COMPANY, and DOES 1-10<br><br>Counter-Defendants. | Case No. 08 CV 0443 BEN POR<br><br>**FIRST AMENDED COUNTER-CLAIM FOR BREACH OF INSURANCE CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, FRAUD, NEGLIGENT MISREPRESENTATION, NEGLIGENT SALVAGE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, LIBEL AND SLANDER**<br><br>**DEMAND FOR JURY TRIAL** |

**I.**

**INTRODUCTORY ALLEGATIONS**

1. This is a Counter-Claim for breach of insurance contract, breach of the implied covenant of good faith and fair dealing, promissory fraud, negligent misrepresentation, negligent salvage, intentional infliction of emotional distress,

negligent infliction of emotional distress, libel and slander brought by the insured owners and operators of a yacht against their insurance company arising from the insurer's wrongful denial of coverage for the yacht fire that totally destroyed the insured vessel M/Y MI BARUR ("MI BARUR") on October 20, 2007, (the "Loss"). The insurance policy at issue ("Policy") is attached as Exhibit A to the Complaint For Declaratory Relief and Reimbursement ("Complaint") of Counter-Defendant NEW HAMPSHIRE INSURANCE COMPANY' ("NHIC")[1/] which initiated this action. A timely proof of loss was made by Counter-Claimants to Counter-Defendants. On March 10, 2008, Counter-Defendants, filed the Complaint and, by and through their agents, AI Marine Adjusters, Inc. ("AIMA"), wrote a letter to the President of Mi Barur, Inc., denying Counter-Claimants' insurance claims arising out of the Loss ("Denial Letter"). A copy of the Denial Letter is attached to as exhibit B to the Complaint. In response, a Demand Letter and a Supplemental Proof of Loss , dated May 23, 2008, ("Demand Letter") was sent by Counter-Claimants to Counter-Defendants seeking reconsideration of the denial of the claims. A true and correct copy of the Demand Letter is attached hereto, and incorporated herein by reference herein, collectively as **Exhibit A.** For ease of reference, a true and correct copy of the Denial Letter is attached hereto as **Exhibit B** and incorporated by reference herein. No response has ever been received to the Demand Letter.

2. Counter-Claimant MI BARUR, INC. ("Mi Barur, Inc.") is a corporation organized and existing under the laws of the State of Delaware.

3. Counter-Claimants ARSENIO FARELL ("Mr. Farell") and NORMA FARELL ("Mrs. Farell") are individuals and are husband and wife ("Farells"). The Farells owned 100% of the stock of Mi Barur, Inc. They are citizens and residents of the Republic of Mexico.

4. Counter-Claimants are insureds under the Policy issued by NHIC that

---

1/ The Complaint and its exhibits are is incorporated herein by this reference.

cover the Loss, as more fully set forth below. Mi Barur, Inc., was at all times relevant the named insured. The Farells at all times relevant were joint insureds as well as express beneficiaries because they were beneficial owners and operators of MI BARUR. From the date of the inception of the Policy through the date of the Loss, the Farells were "operating" MI BARUR with the "prior express permission" of Mi Barur, Inc., "for private pleasure use only." The Farells paid for the fuel, provisions maintenance and repairs of the vessel and determined the vessels itinerary. At all times relevant the Farells were the employers of the crew of MI BARUR including, without limitation, Captain Rello. The Farells as sole shareholders in Mi Barur Inc., are the only individuals or entities who would receive policy proceeds and are thus the intended beneficiaries under the Policy. Counter-Defendants have always acknowledged the Farells' status as insureds and policy beneficiaries. Counter-Defendants' agents/employees consistently identified the Farells in their writing as insureds in correspondence concerning the Loss. NHIC's agents/employees use words such as "your insurance company," "your loss" and "your claim" communicating with the Farells concerning the Loss. According to the terms of the Policy and the applicable law, all of the foregoing facts make the Farells insureds under the terms of the Policy.

5. Counter-Claimants are informed and believe and thereon allege that Counter-Defendant NHIC is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in New York, New York.

6. Counter-Claimants are ignorant of the true names and capacities of the Counter-Defendants sued herein as DOES 1-10, inclusive, and therefore, Counter-Claimants sue these Counter-Defendants by such fictitious names. Counter-Claimants are informed and believe and thereon allege that each of these fictitiously named Counter-Defendants is responsible and liable in some manner for the occurrences and Counter-Claimants' damages herein alleged. Counter-Claimants will amend this Counter-Claim to allege their true names and capacities when ascertained.

7. Counter-Claimants are informed and believe and thereon allege that at all times herein mentioned each of the Counter-Defendants was and is the agent, alter ego, partner, joint venturer, co-conspirator, principal, shareholder, servant, employer, employee and the like of each of the other Counter-Defendants, and in doing the things hereinafter mentioned, was acting within the course and scope of that Counter-Defendant's authority as such agent, alter ego, partner, joint venturer, co-conspirator, principal, shareholder, servant, employer, and employee and the like of the other Counter-Defendants with the permission, ratification or consent of the other Counter-Defendants, and each of them, and thus, each Counter-Defendant is legally liable for all damages, including punitive damages, if any, resulting from the acts and/or omissions of each of the other Counter-Defendants.

8. Jurisdiction exists pursuant to 28 U.S.C. §1332.

9. Venue is proper in this district because one or more of the insurance contracts at issue in this action were issued in the Southern District of California, Defendant and Counter-Claimant Mi Barur, Inc. has its principal place of business in this district, a substantial part of the events and omissions giving rise to this claim occurred within the Southern District of California and NHIC has already filed a complaint against Defendant and Counter-Claimant Mi Barur, Inc. in this district.

10. Mr. Farell comes from a family of four children. He and each of his siblings are highly educated and graduated *summa cum laude* from prestigious schools. Mr. Farell is an attorney; his brother is a cardiologist; one of his sisters is a mathematician and another is a dentist. For many generations, Mr. Farell's family has been widely recognized as one of the most successful in Mexico, and Mr. Farell's father (who passed away in 2006) was one of the top trial attorneys in the country for over twenty years. Mr. Farell followed in his father's footsteps and chose to be a trial attorney. A year after Mr. Farell finished law school in 1971, his father went into government service. Mr. Farell joined his father's law firm and ultimately came to lead the firm (which was founded in the late nineteen forties). During his thirty years

of government service, Mr. Farell's father led various important government departments (for a long period, one level below the President) for five Mexican Presidents (with different ideologies, but requiring an administrator and politician of his skills and knowledge).

11. Mr. Farell has been, and still is, a legal counsel and trial attorney for many of the most successful and influential business people in Mexico and of many large Mexican and foreign corporations, including several major insurance companies. He has also been counsel to Presidents and heads of government departments. At the time of this loss, Mr. Farell was comfortably leading his law firm through some of its most prosperous and successful years.

12. Mr. Farell has been married to Mrs. Farell since 1977. In addition to a large and beautiful house that they have owned for over twenty-five years in Mexico City, a remarkable collection of automobiles and a stable full of pure blood horses, Mr. Farell is also the owner of a valuable beach front weekend house in Acapulco and an exceptional collection of paintings and sculptures from renowned Mexican artists. Mr. Farell has enjoyed leisure boats and yachts for many years. Mr. Farell also owns a third home as well as his office building in Mexico City (along with a law partner). All his properties and vessels are virtually debt free.

13. Mr. and Mrs. Farell's daughters have recently married (the last one last year). Their elder daughter is both a biologist and psychologist and holds dual Master's Degrees (one in mathematics) from Boston University and the University of Massachusetts. She is married to a Professor and both will begin working at Yale University in August of this year. Mr. Farell's younger daughter is also married and living with her husband at Stanford University. At this time, Mr. Farell has greater personal wealth than at any prior time in his life. Mr. Farell has virtually no debts, outstanding obligations or financial problems of any kind.

14. Mr. Farell has owned numerous high-end boats and yachts over the last twenty-five years. In the larger yacht category, Mr. Farell owned a 42-foot Grand

Banks, a 55-foot Grand Banks and a 75-foot DeFever before he purchased the 92' Hatteras MI BARUR. Mr. Farell purchased each of these vessels for cash, never carried any loans on any of his yachts, and always fully insured such vessels. In addition to owning MI BARUR on the date of loss, Mr. Farell also owned a 29-foot yacht which he docks at his beachfront home in Acapulco. Mr. Farell maintains a berth at the Acapulco Yacht Club (for which he paid $120,000). Mr. Farell has never made an insurance claim.

15. MI BARUR, a 1990, 92-foot Hatteras motor yacht, was in pristine condition at the time of her loss; impeccably maintained and the product of one of the most sought after, distinguished and respected yacht builders. At the time of her last survey, completed by marine surveyor Cecil Lange in September of 2007, MI BARUR was found to have a market value of $2,300,000 ("in its present condition") and a replacement cost of $5,500,000. At that time, the hull of the yacht, "including the decks, superstructure flying bridge and boat deck were found to be in excellent condition . . . ." The interior of MI BARUR was described as "excellent and like new condition throughout" and overall Lange commented that she was "a vessel that has been well maintained and a credit to her owner." *See* a true and correct copy of the Survey and Evaluation report for the motor vessel "MI BARUR" attached as **Exhibit A-1** hereto and incorporated herein by reference.

16. When initially offered for sale by her prior owner, the asking price was $2,400,000. *See* the Hallmark Central Listing Agreement dated 6/16/03 and the cover sheet of the resultant listing, **Exhibits A-2 and A-3** attached hereto and incorporated herein by reference. In a prior listing, under the name ARRIVEDERCI III, the asking price for MI BARUR was $3,250,000. *See* the Merle Wood and Associates listing, **Exhibit A-4** attached hereto and incorporated herein by reference. In 1997, one Marion Knight purchased the MI BARUR for $2,850,000. He insured MI BARUR for $2,825,000. *See* **Exhibit A-5** attached hereto and incorporated herein by reference. Finally, when the boat was surveyed immediately prior to her purchase by

Mr. Farell, she was surveyed by marine surveyor Marvin Henderson and found to have an estimated market value of $2,200,000. *See* the cover sheet to the Marvin Henderson survey dated September 7, 2003, **Exhibit A-6** attached hereto and incorporated herein by reference.

17. In the fall of 2003, seeking to purchase a larger boat to replace his 75-foot DeFever, Mr. Farell decided to purchase the 92-foot Hatteras, later to be named MI BARUR. Mr. Farell's yacht broker of many years, Michael Hallmark, had advised him that the current owner of the Hatteras was experiencing financial troubles and that an opportunity existed to get an exceptional deal on this high-end motor yacht. After a period of negotiations, Mr. Farell indeed purchased the Hatteras for a payment of $900,000 cash and the trade-in of his existing yacht, the DeFever.

18. Prior to the transfer in question, the prospective owner arranged for a survey of the DeFever by Marvin Henderson, who placed the fair market value of MI BARUR at that time at $1,400,000. *See* the cover sheet of the Marvin Henderson survey of September 17, 2003, **Exhibit A-7** attached hereto and incorporated herein by reference. Counter-Claimants are informed and believe that at the time, Calcote was under financial duress, and as a result thereof, he later reduced the price to $1.1 million and then to $950,000 (*see* the Hallmark listings for said vessel, **Exhibit A-8** attached hereto and incorporated herein by reference. ). He ultimately sold the boat for $620,000. However, there is nothing to suggest that the fair market value of this vessel was less than $1,000,000 (had Calcote had the financial wherewithal to sell MI BARUR in the normal course). After the trade in, Zurich Insurance Company insured the DeFever's hull and machinery for $1.4 million. When the subsequent owner, Mr. Augustin Rodriguez, later listed the DeFever for sale (in February of 2006), he also valued the boat at in excess of one million dollars ($1.1 million). *See* Cover Note 5170 and the Hallmark Central Listing Agreement dated February 8, 2006, collectively **Exhibit A-9** attached hereto and incorporated herein by reference.

19. In addition to the above-referenced cash payment and yacht trade,

following the purchase of the MI BARUR, Mr. Farell invested well in excess of $300,000 in additional upgrades and equipment for his new yacht. Prior to the denial of this claim, NHIC's agent and attorney obtained a full copy of Hallmark's file on this vessel. In said file were detailed documents evidencing the nature and extent of such work. Also in the file was a complete ledger report prepared by Hallmark showing that Mr. Farell spent in excess of $300,000 on vessel up-grades in the fall of 2003 alone. *See* Mr. Hallmark's Register Reports, **Exhibit A-10** attached hereto and incorporated herein by reference. Using these figures, the amount spent by Mr. Farell for the cost of the 92-foot Hatteras MI BARUR, including equipment, can be conservatively estimated at over $2.3 million (even valuing the DeFever at only $1.1 million and the upgrades at only $300,000).

20. When purchased by Mr. Farell, the Hatteras was a Coast Guard documented U.S. flagged vessel. It is common and perfectly legal for Mexican owners to fly a U.S. flag on such a vessel. As Mr. Farell explained in his Examination Under Oath, there were numerous legal benefits for him to continue to fly the U.S. flag on his yacht. Not only would maintaining the U.S. flag make it easier to resell MI BARUR (in the U.S. market or to another non U.S. citizen), but Mr. Farell had experienced firsthand that flying the American flag improved the treatment he received when calling in various ports in Mexico and elsewhere.

21. NHIC knew at the inception of the Policy that the Farells chose to hold title to MI BARUR in a single vessel holding corporation, a legal and very common practice for pleasure yacht owners. *See* the Declaration of Michael Hallmark, paragraph 9, and Paul Trusso, paragraph 4, **Exhibits A-11 and A-12** attached hereto and incorporated herein by reference. Furthermore, as NHIC knew at the inception of the Policy, the holding by Mexican nationals of 100% of the stock in such a U.S. single vessel corporation is completely legal and is specifically approved by 46 C.F.R. §67.39. *See* the Declaration of Paul Trusso, paragraph 5. NHIC commonly insures such single vessel corporations, including companies where the stock is entirely held

by Mexican citizens. *See* the Declaration of Henry Medina, paragraph 8, **Exhibit A-13** attached hereto and incorporated herein by reference. Indeed, when NHIC and similar marine insurance hull underwriters insure such recreational vessels, none of their standard application forms or questionnaires even inquire as to the nationality of the ownership of such single vessel corporations. *See* the Medina declaration, paragraph 8 and **Exhibit A-14** attached hereto and incorporated herein by reference.

22. Upon purchasing MI BARUR, Mr. Farell arranged for hull and P & I insurance for MI BARUR through Henry Medina of Mariners General Marine of San Diego ("Mariners General"). Although Mariners General received various quotes on MI BARUR (*see, e.g.*, the Chubb quote of 9/18/03 with hull limits of $2,200,000, a $44,000 deductible, and an annual premium of $12,645, **Exhibit A-15** attached hereto and incorporated herein by reference), at the advice of Medina, the yacht was ultimately insured by Zurich. A copy of the Mariners General Cover Note #5171 indicates coverage effective September 23, 2003, with hull and machinery coverage in the amount of $2,200,000 (per the Henderson survey), a $44,000 deductible, and an annual premium of $20,990. *See* **Exhibit A-16** attached hereto and incorporated herein by reference. Zurich also offered to renew their policy the following year for the same policy limits and at a similar premium rate. *See* the Zurich quote dated August 16, 2004, **Exhibit A-17** attached hereto and incorporated herein by reference.

23. As the 2004 renewal deadline for the policy approached, Medina contacted other insurers, including the NHIC's general agent, Maritime General Agency ("MGA"). Medina advised MGA that he was currently insuring MI BARUR with Zurich, but was "looking for better coverage and premium." *See* the fax cover sheet from Medina to Chris Clark of August 17, 2004, **Exhibit A-18** attached hereto and incorporated herein by reference. This inquiry led to the issuance of the first NHIC policy on MI BARUR, that was to be renewed the following three years. The original NHIC policy in effect at the time of the Loss was on its third renewal.

24. The application process was conducted entirely by Medina based upon

NHIC's underwriting guidelines (as he understood them and based upon his conversations and experience with MGA). The application information was placed on a standard form utilized by Mariners General on prior placements with NHIC. A true and correct copy of the Yacht Insurance Application is attached as **Exhibit A-19** attached hereto and incorporated herein by reference. As alleged below, the initial submission to MGA included not only the cover sheet and the Mariners General standard application form, but also an updated yacht quote questionnaire prepared by Medina (**Exhibit A-20** attached hereto and incorporated herein by reference), a copy of the September 7, 2003 survey prepared by Henderson, and the resume for MI BARUR's Captain, Luis Manuel Rello (as well as other certificates and other documents attached thereto).

25. The following day, MGA's Clark e-mailed Medina attaching a quotation and requesting certain additional information including a signed compliance letter regarding the outstanding recommendation items on the Henderson survey and a severe weather plan ("Weather Plan"). *See* a copy of Clark's August 18, 2004 email, **Exhibit A-21** attached hereto and incorporated herein by reference. Furthermore, when Medina responded and asked whether the original 2003 application would work to bind coverage, Clark responded that indeed it would. *See* the further e-mail exchange of August 18, 2004, **Exhibit A-22** attached hereto and incorporated herein by reference. Medina also promised to forward the compliance letter under separate cover.

26. Thereafter on September 14, 2004, Medina faxed the signed compliance letter to MGA as requested. *See* Medina's e-mail of September 14, 2004, the requested Weather Plan and the sign off compliance, **Exhibits A-23, A-24 and A-25** attached hereto and incorporated herein by reference. Thereafter, on September 23, 2004, NHIC did in fact issue policy EY 341-92-25 with an agreed hull value of $2,200,000, a hull deductible of $44,000, and a hull premium of $16,060. *See* the 2004-2005 Declarations Page, **Exhibit A-26** attached hereto and incorporated herein

by reference. That policy was renewed twice by NHIC (with the same limits, deductible and hull premium), once on September 23, 2005, and again on September 23, 2006, each time with only a single page questionnaire and no further inquiry. *See* the NHIC Insurance Company declaration pages for policy periods 9/23/2005 to 9/23/2006, and 9/23/2006 to 9/23/2007, **Exhibits A-27 and A-28** attached hereto and incorporated herein by reference.

27. During the application process, and in related correspondence and conversations, Medina worked as an intermediary between NHIC and the Insureds and was thus particularly familiar with their underwriting guidelines. Medina gave all information which he considered to be material to NHIC, based on his many years of experience in the marine insurance business in general, and with NHIC in particular, in addition to any and all materials requested by the representatives of NHIC. Medina had absolutely no incentive to misrepresent or conceal any facts, had experienced no trouble whatsoever insuring this yacht in the past, and had received quotes with lower premiums from other insurers. Medina had insured many vessels held by single vessel owning corporations and/or Mexican citizens, and had never had any problem or any indication from any underwriter, including Clark or any others at NHIC, that either of these considerations were considered negative risk factors by the underwriters. Clark and other representatives of NHIC were never shy about requesting information they felt was important to them. Mr. Farell was always completely forthcoming in his dealings with Medina and fully advised him of all facts regarding his yacht. *See* the declaration of Henry Medina, paragraphs 5, 6, and 7, **Exhibit A-13** attached hereto and incorporated herein by reference.

28. In addition to the fact that Mr. Farell disclosed all material information to Medina, Medina also disclosed all material information regarding the identity of the insured to NHIC as part of the initial application process. First, on both the standard yacht insurance application form and the yacht quote questionnaire (**Exhibits A-19 and A-20** attached hereto and incorporated herein by reference), the owner of MI

BARUR was properly identified as Mi Barur, Inc. Given that the name of MI BARUR was also disclosed, it was abundantly clear to anyone with any experience in the maritime industry, that Mi Barur, Inc. was a single vessel holding corporation (a very common and legal arrangement). Second, the fact that Mr. Farell was the beneficial owner of MI BARUR and a Mexican citizen were also clearly disclosed. On both the yacht quote questionnaire and the yacht insurance application, the occupation of the owner is identified as "Attorney." Not only did the insurance application indicate that Mr. Farell employs a "Licensed Mexican Captain," but the cover page of the Marvin Henderson marine insurance survey dated September 7, 2003 (**Exhibit A-6** attached hereto and incorporated herein by reference) indicated that the survey was done at the request of Mr. Farell, with an address of **"Gutenberg 147 Col. Anzures, Mexico City, MX D.F. 11590"**. Furthermore, when Medina was asked why the Captain's resume was in Spanish, he told Clark that the owners, crew etc., of the MI BARUR were "Mexicans." *See* the declaration of Henry Medina, paragraph 11, **Exhibit A-13** attached hereto and incorporated herein by reference.

29. In support of the application for coverage submitted to NHIC, Medina also disclosed to NHIC the market value of the MI BARUR as $2,200,000 based on the September 7, 2003 survey by Marvin Henderson. *See* the yacht quote questionnaire, **Exhibit A-20** attached hereto and incorporated herein by reference. Additionally, on the standard application form under the heading "costs, including equipment" the figure of $2,200,000 was again entered. This, again, is a conservative figure given that Mr. Farell paid $900,000 in cash for MI BARUR, traded in a vessel with a survey value of $1.4 million (the DeFever) and invested in excess of $300,000 in upgrades immediately after purchasing MI BARUR. Notwithstanding the fact that Medina later suggested that Mr. Farell obtain an updated survey (in the fall of 2007), no representative of NHIC ever requested any further information regarding the value of MI BARUR, a further survey, or further details regarding the cost of MI BARUR. *See* the Medina Declaration, paragraph 12, **Exhibit A-13** attached hereto and

incorporated herein by reference.

30. Medina also accurately disclosed the anticipated trading patterns of MI BARUR. Indeed, he not only disclosed these patterns, but additional premiums were charged and the deductible was increased to allow MI BARUR to travel as far south as Acapulco, Mexico. First, both the application and the yacht questionnaire described the location of where MI BARUR was moored as "San Diego/Acapulco." Second, the Weather Plan showed MI BARUR would travel in the La Paz area as well. During the years NHIC insured MI BARUR, she actually traveled within the areas identified in the application and the Weather Plan. *See* **Exhibit A-24** attached hereto and incorporated herein by reference. At the time that MI BARUR was purchased, and her extensive outfitting was completed (*i.e.* when the application was prepared), MI BARUR was in San Diego. It would, in fact, have been an omission, if not a misrepresentation, not to list San Diego on the document. Third, because Mr. Farell had always used a San Diego based yacht broker to buy and sell his yachts and had always had major repairs performed on his vessels by top boat yards in San Diego, this was a necessary disclosure given the probable future use and mooring of MI BARUR in these waters.

31. Medina was well aware, at the time of making these submissions, that it was very common for yachts to remain in Mexico for the entire year and that this was not an issue that was of any concern to any insurer he worked with, including NHIC. *See* the Medina Declaration, Paragraph 9, **Exhibit A-13** to Supplemental Proof of Loss. Indeed, for the initial policy year, and each year thereafter, MI BARUR trading warranty was adopted pursuant to the navigation endorsement (Endorsement No. 1) specifically to allow the MI BARUR to travel to as far south as Acapulco, in exchange for an additional premium and an increase deductible. *See* **Exhibit A-29** attached hereto and incorporated herein by reference. If NHIC believed that its risk would be materially increased if the yacht operated out of the United States for an extended period of time, the Policy obviously could have included a limit on the time the MI

BARUR could remain in Mexico. **Nowhere in the Policy is MI BARUR required to return to U.S. waters for any period of time.** Indeed, it is not uncommon for insurers that do want a vessel to return to a specific location to so mandate in the trading warranty or elsewhere in the Policy. *See* the Medina Declaration, Paragraph 10, **Exhibit A-13** to Supplemental Proof of Loss.

32. Approximately a year before the loss in question, Mr. Farell decided that he was going to sell the MI BARUR and purchase a smaller yacht. The MI BARUR had always been used as a center of family life and relaxation, and given that both of Mr. and Mrs. Farell's daughters were leaving Mexico to study in the United States, the Farells felt that the 92-foot Hatteras was simply too large for the couple at this stage in their lives.

33. Mr. Farell was willing to take the time needed to get a reasonable price and was never an anxious seller. However, he was flexible in price when the market suggested a reduced asking price and he had the financial ability to reduce his price with ease. For example, while the boat was originally offered for $2.7 million, the price was later lowered to $2.2 million at the suggestion of Mr. Farell. *See* the Hallmark Declaration, paragraph 1, **Exhibit A-11** attached hereto and incorporated herein by reference. Mr. Farell was not in anyway desperate for money. Mr. Farell rejected multiple offers on the MI BARUR; two that Mr. Hallmark was aware of, one for $1.6 million cash and one for $1.85 million (including a home trade), and a third made directly to Mr. Farell for $1,000,000 and a 75' Italian yacht. *See* the Hallmark Declaration, Paragraph 11, **Exhibit A-11** attached hereto and incorporated herein by reference.

34. In July 2007, Mr. Farell strongly considered moving MI BARUR to Florida to experience a different cruising ground and a better yacht market. According to one of Hallmark's competitors (Merrill-Stevens Yachts), Florida was a better market for a yacht the size of MI BARUR. All of this information was conveyed to NHIC and the 2007-2008 renewal was set to have revised trading

restrictions accordingly. Merrill-Sevens also produced a $200,000 deposit and an offer for the yacht at $1,750,000. Ultimately before the renewal date, it was decided not to take the boat to Florida and to keep the boat in waters from San Diego to Acapulco. Consequently, the Policy renewed with the original trading warranty. Also, during the time prior to the 2007 renewal, Mr. Farell was considering bringing the boat back to San Diego and Hallmark had even made inquiries on arranging for a slip for the boat on Shelter Island in San Diego. *See* the Hallmark Declaration, Paragraph 12.

35. The Agreed Value for the 2007-2008 policy of $1.9 million was not based on any request or representation by the Insureds, but was based on independent research by MGA's underwriter, Michael Terrier. *See* the Declaration of Henry Medina, Paragraph 13 and the e-mail from Terrier to Medina of August 28, 2007, **Exhibit A-30** attached hereto and incorporated herein by reference.

36. Ultimately, with the boat remaining in LaPaz (and possibly being brought back to San Diego for sale), Medina requested the Policy be renewed with the same trading warranty; "a San Diego, La Paz, Acapulco vessel." *See* Medina's e-mail to Michael Terrier of September 20, 2007, **Exhibit A-31** attached hereto and incorporated herein by reference. All of the previously disclosed facts remained true and accurate and no additional information was requested by NHIC. The only material change in the coverage was as a result of Mr. Terrier's unilateral new valuation and the need to write the boat under the Yacht, rather than the Executive Yacht form. *See* the September 23, 2007 Declaration Page referencing new policy form BJP 2191-A (8/06), **Exhibit A-32** attached hereto and incorporated herein by reference. According to NHIC, these changes in policy language, as distinct from the changes in policy limits, were reversed and the Executive Yacht Policy form used again pursuant to Endorsement 9 of the September 2007 renewal. At the time of the issuance of the Policy, Mr. Farell had been an insured with NHIC for three loss free years and had paid premiums of over $70,000.

37. As of the date of the loss (October 20, 2007), Captain Rello had worked for the Farells for over ten years as the full-time Captain of MI BARUR and prior yachts owned by the Farells. Captain Rello is a graduate of the Mexican Naval Academy, has excellent credentials and has no criminal record. Captain Rello was, at all times, well compensated and well liked by the Farells, and happily employed with no complaints about his employer. Captain Rello was an admitted smoker, but did not smoke in the lower enclosed cabins on the MI BARUR. No evidence exists that would demonstrate any reason why Captain Rello would intentionally set fire to MI BARUR. Moreover, he has passed a polygraph test demonstrating he was telling the truth when he told Murphy he did not commit arson.

38. On October 20, 2007, the vessel lay at her normal dock at the Marina Palmira in LaPaz, Baja Sur, Mexico. The marina is located in a major metropolitan area and is well served by police and fire services. The fire was first reported at approximately 9:30 a.m. The MI BARUR was moored on the starboard side, facing north at slips 201 and 203 located at the east end of dock No. 2. No one was on board the motor yacht at the time the fire was reported. Captain Rello had left MI BARUR approximately one hour before the fire was reported.

39. Multiple calls were received by witnesses within the marina, who observed white or light grey smoke emanating from the forward, starboard side, of MI BARUR. Two of the witnesses, Francisco Robles and Alfredo Amador, were working on adjacent vessels towards the middle of dock No. 2 and observed the early stages of the fire. Both men ran to the yacht, disconnected the shore-power, and boarded MI BARUR. They entered through the galley passageway door located amid-ships, main deck level, at the starboard (right) side of MI BARUR, and observed a smoke layer banking down from the overhead to about three-to-four feet off the galley deck. All smoke was observed light grey in color and emanating from the companion way stairs leading down to the forward crew's quarters and VIP stateroom. Robles was able to get some three steps down the stairs before he was driven back by the smoke. There

was very little heat and he felt that he could have gone down further if it was not for the smoke.

40. When he returned to the marina, Captain Rello got some help and moved MI BARUR from its original moored position at the west end dock No. 2 to north side of dock No. 7, on the interior east side of the marina breakwater. MI BARUR was moved so that other vessels would not be harmed by the fire and to provide better access for fire suppression equipment. Local firefighters arrived on the scene and observed heavy flames emanating from the galley door and salon. Firefighters began suppression operations, but were driven off MI BARUR by the intensity of the fire that had developed by that time. Firefighters then re-directed their efforts to the exterior of MI BARUR. Suppression effort and pumping of large quantities of water aboard the yacht continued until approximately 2:00 p.m., when the fire was thought to be completely extinguished. The MI BARUR and all contents sustained a total fire loss. The following morning a "re-kindle" occurred on MI BARUR and MI BARUR was taken outside the breakwater, where she burned to the water line and sank in shallow water. MI BARUR was submerged for days prior to being raised and taken to a local marine facility at Abaroa's shipyard, where she was placed in the ways for inspection.

41. Counter-Claimants fully cooperated with the NHIC investigation following the Loss. At the express direction of NHIC and their marine surveyor Todd Schwede, the Farells turned over to NHIC the task of raising and salvaging MI BARUR from the marina floor. The Farells spent in excess of $60,000 of their own money for sue and labor expenses for materials, equipment and labor used by NHIC in its salvage and on-scene survey of the loss but NHIC controlled the operation. *See* the Letter of November 5, 2007 from Schwede to Mr. Farell, **Exhibit A-33** attached hereto and incorporated herein by reference. Furthermore, Mr. Farell not only submitted a detailed Statement of Loss and provided releases for all of the files maintained by his insurance broker and both of his yacht brokers, he, his Captain, and

Hallmark all submitted to lengthy videotaped examinations under oath by counsel for NHIC.. The Policy required that the Insureds provide NHIC with only a sworn statement not a videotaped examination under oath by counsel for NHIC.

42. Although the fire should have been investigated, at least initially, while MI BARUR remained undisturbed and in the water, NHIC decided to take upon itself the task of salvaging the wreck and removing it to dry land to conduct their investigation. NHIC had a duty to carry out the raising of the vessel and salvage in a reasonably prudent fashion, NHIC's agents carelessly and negligently carried out said rasing of the vessel and salvage. As a result, much evidence of how the fire was started was lost or destroyed before the fire investigator for NHIC even began his investigation. For example, NHIC's agents' haphazard use of grappling hooks and other devices to pull wreckage from the hull of the MI BARUR, destroyed critical cause and origin evidence. Mr. Farell indeed wrote to Mr. Schwede about this very issue following the loss. *See* Mr. Farell's letter of October 24, 2007, **Exhibit A-34** attached hereto and incorporated herein by reference. In addition to this negligent salvage operation, NHIC's fire investigators failed to follow proper fire investigation procedure. Competent and skilled fire investigators are supposed to comply with the requirements of the National Fire Protection Association ("NFPA") publication entitled NFPA 921: Guide for Fire and Explosion Investigations. NHIC repeatedly failed to follow proper fire investigation procedure throughout their investigation. A true and correct copy of Mr. Lyson's peer review report is attached as **Exhibit A-42** attached hereto and incorporated herein by reference. Further, after NHIC's raised the hull, it was left un-supervised and exposed to theft and tampering for over a week before NHIC's fire investigator Murphy returned to complete his cause and origin inspection and investigation. *See* letter to Todd Schwede from Mr. Farell dated November 5, 2007, **Exhibit A-35** attached hereto and incorporated herein by reference. Finally, when Murphy did begin his inspection, his de-layering of the fire debris and removal of equipment was sloppy and haphazard; Items being removed, for

Case 3:08-cv-00443-BEN-POR Document 21 Filed 08/04/2008 Page 19 of 49

example, from the Captain's Cabin area and piled on other important areas, such as the Crew Lounge. Other debris was piled ashore, again unprotected.

43. In addition to this negligent salvage and the negligent fire investigation, both Schwede and Murphy had preconceived agenda to prove that the fire had been intentionally set, rather than conducting an objective investigation (Schwede actually asked various people, before any investigation had been carried out, if Captain Rello had set fire to the MI BARUR). An oral statement made by Schwede to broker Medina sums up best the approach taken by the NHIC team, **"NEW POLICY, LESS THAN 30 DAYS OLD, TOTAL LOSS, MEXICAN, HE DID IT."** *See* the March 7, 2008, pre-denial e-mail from Mr. Medina to Mr. Robb, **Exhibit A-36** attached hereto and incorporated herein by reference and the Medina Declaration, Paragraph 14.

44. Murphy's conclusion that the fire started in the Captain's Cabin was patently wrong. His conclusion that the fire was started by an arsonist was also patently wrong. Counter-Claimants do not currently know the full relationship between Murphy and NHIC/AIG. Counter-Claimants understand he has been hired on several occasions by NHIC to investigate fires and has received significant fees from NHIC. Counter-Claimants understand that Murphy's wife is an insurance claims adjuster. Counter-Claimants also understand he was attending a marine surveyor's conference in San Diego at the time of the fire and was asked by Todd Schwede and NHIC to participate in the investigation of this fire. While on the scene Murphy let slip to Captain Rello that the evidence demonstrated that the fire was started by an electrical short in a refrigeration motor. However, in his report he concluded that the fire began in the "Captain's Cabin" (a cabin that Captain Rello did not use), and that "the Form of Ignition was (caused) by incendiary (intentional arson) human action."

45. Murphy's report has overtones of racial prejudice throughout. For example, Murphy states that Captain Rello was the last person aboard MI BARUR. He also states that the boat was unlocked (i.e. accessible to anyone within the marina

Case 3:08-cv-00443-BEN-POR Document 21 Filed 08/04/2008 Page 20 of 49

complex, which houses hundreds of boats and is accessible not only by their owners, but their crews, guests, repair personnel, marine workers etc). He then implies that the Counter-Claimants and the marina management were involved in a conspiracy to hide the identity of the arsonist stating that the "identification of the arsonist could be proven by the introduction and/or release of the marina surveillance video recordings." The truth is that the video camera on that dock does not come close to visualizing the area where MI BARUR was docked at the time of the fire. All it visualizes is a small area around the gate. Ironically, Murphy made an appointment to see the video room at the marina and meet with the security personnel, including the technician in charge of the video surveillance system, but he never showed up. Further, if Murphy had requested the video earlier, he would have been given a copy of whatever film there was prior to the fire. Unfortunately, Murphy waited until the video had automatically recycled.

46. Despite coming to the conclusion that the fire was caused by arson, Murphy found: (1) no specific evidence of incendiary origin; (2) no evidence of any timing device that would explain how Captain Rello could set the fire over an hour before any smoke was noted by persons on the crowded dock; and (3) no evidence of motive or any of the arson indicators that would implicate Captain Rello or Mr. Farell. *See* also the email from attorney Robb to Mr. Medina dated March 7, 2008, wherein even he notes in relation to the Murphy report that "I . . . did not see where he has concluded that Captain Rello started the fire." **Exhibit A-37** attached hereto and incorporated herein by reference.

47. Donald Perkins of Fire Cause Analysis, Berkeley, California, has conducted an investigation of the Loss at the request of the Counter-Claimants. Perkins is a retired Captain from the San Jose, California Fire Department. He has extensive fire and arson investigation experience and was the Arson Unit Supervisor/Investigator for that Department for four years. *See* a copy of Perkins resume, **Exhibit A-38** attached hereto and incorporated herein by reference.

Accompanying Perkins to La Paz was Ron Kilgore of Kilgore Engineering, Inc., and Bill Engstrom, a marine surveyor. Following his investigation, Perkins prepared a Fire Investigation Report in conformance with NFPA 921, **Exhibit A-39** attached hereto and incorporated herein by reference. To insure that the Perkins Report met the highest standards of NFPA 921, the Insureds had the Perkins Report peer reviewed by Dr. John Dehaan. Dr. Dehaan is one of the foremost authorities on fire science in the nation.

48. Although Perkins is continuing his investigation at the time this Counter-Claim is filed, he has reached the following conclusions:

A. Based on an objective analysis of the fire patterns, the fire originated in the Crews Lounge located on the lower level on the port side amidship. The fire then spread down the companion way and up the stairs and out the starboard side galley door. Murphy never even inspected this area, but rather buried it under the debris he had removed from the Captain's Cabin.

B. The fire was probably caused by an undetermined electrical ignition source high within the forward bulkhead/overhead in the Crews Lounge compartment. Given the manner in which NHIC's agents destroyed the evidence at the fire scene; the severe burning of the electrical conductors and components and their degradation from salt water submergence, it is now impossible to identify the specific ignition source.

C. The fire did not reach the Captain's Cabin on the starboard side of MI BARUR until MI BARUR was well engulfed in fire, many minutes after ignition. Proof of this point can be found in the fact that the carpet and lower areas of the doors, bunk etc., suffered no fire damage at all due to the fact that they were submerged in water from on-going fire suppression efforts *before* the fire reached this

compartment. Had the fire originated in this area, or even reached this area before the fire suppression water, the carpet would necessarily been burned (just as it was in the crew's lounge and cabin on the starboard side of the boat).

D. The cause of the fire was not arson. Pursuant to NFPA investigative criteria, and specifically NFPA 921, the cause of this fire must be ruled "undetermined." As discussed below in relation to his critique of Murphy's report, Perkins found no information or data that would support a conclusion of arson. See a complete copy of Perkins May 9, 2008 report, **Exhibit A-39** attached hereto and incorporated herein by reference.

E. Mr. Perkins has determined that there is a "vehicle history" of electrical fires on similar Hatteras yachts, including an electrical fire in the crew's quarters on a Hatteras 105 built just several years after the MI BARUR.

49. In addition to the Perkins team, Counter-Claimants contacted and retained a highly renowned Mexican fire investigator, Mario Saldana Nolasco. Mr. Nolasco examined the remains of MI BARUR in the presence of Perkins. Mr. Nolasco reached the following conclusions:

A. The point of origin was not the Captain's Cabin.

B. The point of origin was not the Crew's Cabin.

C. The point of origin was the crew's "dinning area" (i.e. Crew's Lounge).

D. The fire was not intentionally set.

E. While the probable cause was electrical in nature, the fire must be deemed of an "unknown" cause. *See* the report of Mr. Nolasco, **Exhibit A-40** attached hereto and incorporated herein by reference.

50. In addition to retaining Mr. Perkins to complete his independent fire

cause and origin investigation, Counter-Claimants asked Mr. Hal Lyson, another nationally renowned fire investigator, to complete, in his words, an "evaluation of the Maze fire investigation report." In response to this request, Counter-Claimants received, and submit herewith as **Exhibit A-42** attached hereto and incorporated herein by reference, Mr. Lyson's report of May 20, 2008. As indicated by way of introduction, Mr. Lyson is highly critical of the methodology of the Maze investigation and its conclusions. The report concludes that:

A. Mr. Murphy violated NFPA 921, section 28.3.5.11, when he "failed to examine MI BARUR while it was partially submerged" and failed to use "qualified people" to complete the "recovery and documentation," and as a consequence, "allowed for the likely destruction of evidence."

B. Mr. Murphy ignored industry standards and NFPA 921 and did not thoroughly identify and interview witnesses. As such, he missed valuable information, such as the fact that the smoke and heat of the early stages of this fire simply do not match his conclusions.

C. Mr. Murphy relied on "empirical data" that the electrical system was in proper working order, and ignored NFPA 921 sections 24.2.1-2 when he concluded that there had been no previous problems with the electrical system. Mr. Lyson notes that "NFPA 921 states that a vehicle and appliance history needs to be obtained" and notes that Mr. Murphy failed to do so. Ironically, Mr. Lyson was not even aware of the history of Hatteras electrical fires when he reached these conclusions.

D. Mr. Murphy has identified the cause as "incendiary" with open flame, but ignores the fact that while it took over an hour for this fire to be noticed, a fire of the type identified in his report would "flash over" to "full room involvement" very rapidly, "within

minutes."

E. Mr. Murphy concluded that the fire started in a mattress that would "flow like an ignitable liquid and burn on the floor," and yet failed to notice that the carpet in the captain's cabin was not burned.

F. Mr. Murphy violated NFPA 921, section 22.3, when he improperly considered evidence "not directly related to the fire or explosion cause," such as the removal of personal items from the boat.

G. Mr. Murphy ignored the recommendations of NFPA chapters 11 and 16 when he failed to label and identify the evidence and MI BARUR contents as he removed material from MI BARUR.

H. Mr. Murphy violated NFPA 921 chapter 17 when he failed to complete "arc mapping" and wiring and circuit tracing (and probably could not even do so with the destruction of this critical evidence).

I. Mr. Murphy incorrectly and indiscriminately relied on NFPA 921 section 18.2, "Process of Elimination," in a fire where NFPA specifically states that it could not be used.

J. Mr. Murphy violated NFPA 921 section 4.3.7 when he formed the arson hypothesis at least eight days before he even conducted his examination of MI BARUR.

K. Mr. Murphy ignored the clear requirements of NFPA 921, Chapter 4, when he failed to identify the cause of this fire as "undetermined."

NHIC has been advised of these findings. Given the major faults in the Maze investigation and conclusions, it is a violation of the implied of covenant of good faith and fair dealing for it to have relied on Mr. Murphy's report as a basis of the denial of this claim.

51. NHIC's entire claim of arson is implicitly based upon the assumption that

Captain Rello intentionally set MI BARUR on fire (an assumption that does not even appear to be shared by NHIC's counsel, Mr. Geoffrey Robb; "I . . . did not see where he [Mr. Murphy] has concluded that Captain Rello started the fire." **Exhibit A-37** attached hereto and incorporated herein by reference). None of the Insureds were present in La Paz on the day of the fire and the only crewmember in La Paz was Captain Rello. Murphy implicitly claims in his report that Captain Rello was lying when he said he did not set fire to the yacht. According to Perkins, while he served as Chief of Arson Investigation for the City of San Jose, it was customary to give polygraph tests to arson suspects if the suspect was willing to take the test. Further, Perkins routinely would rely upon the results of the polygraph tests in forming his opinions concerning the cause of a fire. Consequently, the Insureds arranged to have Captain Rello undergo a polygraph exam on the issues of arson and smoking in the lower level of the yacht (Captain's Cabin and Lounge). During the exam Captain Rello was found to be telling the truth when he said he did not commit arson and did not smoke in the lower level of the yacht on the day of the fire. A true and correct copy of an English translation of the report of the May 7, 2008 polygraph exam is attached as **Exhibit A-41** attached hereto and incorporated herein by reference.

52. NHIC Policy No. YM 868-56-66, effective date from 09/23/2007 to 09/23/2008, lists as the named insured Mi Barur, Inc. The Policy provides hull (Agreed Value) coverage of $ 1,900,000 subject to a 2% deductible of $38,000 and a premium of $14,060. The insured vessel, "Mi Barur," is described as a 92 foot Hatteras, built in 1990. Although the Declaration Page of the Policy references NHIC Yacht Policy standard form [Form BJB 2191-A (8/06)], Endorsement # 9, entitled "POLICY JACKET REFERENCE" states that the reference to Form BJB 2191-A (8/06) "is deleted in its entirety and replaced by form 95613 (9/07)", the Executive Yacht Policy form. That form in conjunction with the declaration Page and other endorsements (the "Policy") provides hull, protection and indemnity, medical and other incidental coverage per standard conditions.

53. The insuring language for the hull coverage provides standard "all risk" coverage and states in relevant part:

**GENERAL CONDITIONS AND EXCLUSIONS**

**1. GENERAL CONDITIONS**

. . .

**SECTION "A" - HULL INSURANCE**

**1. WHAT WE INSURE:**

A. Physical Loss to **Your Yacht**: **We** shall pay for direct physical loss to **your yacht** arising out of all perils unless otherwise excluded herein.

Those items "otherwise excluded," as set forth on page seven of the Policy, include the following (the only exclusions even allegedly applicable to this loss):

**10. CAUSES OF LOSS THAT ARE NOT COVERED:**

. . .

B. We shall not cover any loss or damage arising out of:

(1) Intentional Acts: Any intentional misuse or misconduct, criminal, willful or malicious act or lack of reasonable care or due diligence, in the operation or maintenance of **your yacht, tender or trailer;**

. . .

(5) Any willful misconduct, criminal, or dishonest act by an insured, **your** employees, or any person to whom **you** entrust **your yacht**;

54. **Part J of the GENERAL CONDITIONS**, entitled **CONCEALMENT OR MISREPRESENTATION**, also provides:

Any relevant coverage(s) shall be voided if **you** intentionally conceal or

Case 3:08-cv-00443-BEN-POR Document 21 Filed 08/04/2008 Page 27 of 49

misrepresent any material fact or circumstance relating to this insurance, or **your** insurance application, whether before or after a loss.

55. The **GENERAL CONDITIONS, Part D,** Entitled **WHAT YOU MUST DO IN THE EVENT OF A LOSS,** also imposes certain affirmative duties on the insured to give notice of any loss and provides, in relevant part, that:

> If **you** have a loss or **claim** that **you** think might be covered under this **policy**, **you** must do the following:
>
> . . .
>
> (4) If **your yacht** or other property covered by this policy is damaged, **you** must take all lawful and reasonable steps to protect **your yacht** or other property from further damage. **We** will reimburse **you** for the reasonable expenses of protecting the property, not including **your** personal labor. These payments for protecting the damaged property shall be made in addition to any other payments we make for losses covered by this **policy**.

56. Nowhere does the Policy impose a similar duty on NHIC to take such steps to protect the yacht.

57. Thereafter, in **GENERAL CONDITION Part E,** entitled **WHEN WE SHALL PAY FOR LOSSES,** the policy provides that:

> **We** shall pay for losses covered under this **policy** within thirty (30) days after **we** receive proof of loss or other requested documentation that is satisfactory to **us.**

58. As set forth above, the policy is an "Agreed Value" policy and pursuant to the policy definitions:

> "(2) **Agreed Hull Value** means the value agreed to by **you** and by **us** on your insured **yacht** as shown on the declarations."

59. Finally:

> (29) **You** and **your** means:
>
> (A) The person or organization named as the insured on the

enclosed **Declarations;**

. . .

(C) Anyone else operating the insured vessel with the prior express permission of the named insured, as long as the actual use is within the scope of such permission and for private pleasure use only; or

(D) A **captain** or **crew member** who works on **your yacht** ....

60. In addition to these standard policy terms, The Policy was also subject to certain endorsements that are relevant to this loss.

**Endorsement No. 1**, entitled NAVIGATION ENDORSEMENT, for example, provides as follows:

In consideration for premiums charged $1050. The navigation warranty of this policy is amended to include Navigation of Coastal Waters and waters tributary thereto, of the Pacific Ocean and Acapulco as far south as 16 Degrees 30 Minutes North Latitude.

It is agreed and understood a 2% deductible shall apply while the named vessel is outside US waters.

**Endorsement No. 2**, entitled GENERAL ENDORSEMENT, provides in relevant part that:

The following changes shall apply to this policy.

It is agreed and understood that MI BARUR named in this policy shall be subject to a 3% Named Windstorm deductible. This deductible shall apply any time MI BARUR is south of Rio Santo Tomas, MX, during the period of 6/30-11/1.

61. Putting aside the NHIC's allegations of non-disclosure, misrepresentation and out-right fraud (or arson), this fire loss would otherwise be covered by the Policy. The Policy under Section A ("HULL INSURANCE"), sub-section 1, provides that NHIC will pay for the "direct physical loss" of MI BARUR "arising out of all perils unless otherwise excluded . . . ." The Policy also covers Mr. Farell's personal effects

Case 3:08-cv-00443-BEN-POR Document 21 Filed 08/04/2008 Page 29 of 49

lost as a result of these same "perils" and his Sue & Labor expenses.

62. Unless Mr. Farell failed to disclose or misrepresented material facts, or the loss is "otherwise excluded," NHIC should have paid Mr. Farell the Agreed Value of the MI BARUR, $1.9 million, within thirty (30) days of his submission of his proof of loss, and should have paid his timely claims for lost personal effects and other covered losses.

63. Paragraphs 13 though 17 of NHIC's Complaint set forth the alleged failures to disclose and/or misrepresentations underlying its basis for the denial of this otherwise covered claim. The first such allegation, set forth in **paragraph 13**, states in relevant part, that: (1) the Mi Barur was **represented to be "a U.S. Company seeking to insure ... a U.S. documented vessel."** Paragraph 13 continues with the allegation that: "the undisclosed risk ... was that Mi Barur, Inc, was a 'shell' company set up by a Mexican resident to circumvent U.S. law regarding vessel documentation."

64. Both of these allegations fail in the face of the above outlined evidence. First, the truth was and is that Mi Barur, Inc. *was* "a U.S. Company" (actually a Delaware Corporation) "seeking to insure ... a U.S. documented vessel." Second, the fact that Mi Barur, Inc. was a "shell" company, presumably a reference to a single vessel holding company, was openly disclosed and fully known to NHIC when it chose to insure this risk. As set forth in the Declarations of Henry Medina and Paul Trusso (and will be easily shown at trial), the use of single vessel corporations (typically, as here, sharing the name of MI BARUR) is extremely common in the maritime industry and something that NHIC deals with all the time. What else could NHIC's experienced underwriters Chris Clark and Michael Terrier think a company **named after the yacht** that was warranted for private pleasure use only could have been formed for? Third, federal statutes expressly allow U.S. flag pleasure yachts (as compared to commercial vessels) to be owned entirely by non-U.S. citizens, including, yes, Mexicans. The allegation that the Insureds meant to "circumvent U.S. law regarding vessel documentation" is specious, defamatory and in Bad Faith. As Paul

Trusso, the lawyer who formed this company states, such companies and stock ownership are totally legal, are very commonly used, and provide many totally legitimate benefits. Indeed, NHIC commonly insures such vessels, both single vessel holding companies and foreign owned boats, and we suspect that discovery would reveal that is does so at a healthy profit. Fourth, the reference, echoing Schwede, that the owners were "Mexican," not only smacks of racism, but again ignores the facts disclosed directly to NHIC in the application process. Set out in black and white in the application form, the questionnaire, and the attached survey sent by Medina in support of the original 2004-2005 placement, are the facts that the beneficial owner was a 58 year old "Attorney" in "Mexico City, MX." Also given to NHIC at this time were copies of Captain Rello's resume in Spanish and his Mexican mariner's documents. Indeed, when Mr. Clark asked the question "Why are they all in Spanish?" he answered that the Insureds, the Captain, etc., were "Mexicans." *See* the Declaration of Henry Medina, Paragraph 11, **Exhibit A-12** attached hereto and incorporated herein by reference.

65. **Paragraph 14** of the NHIC Complaint contains the next allegation of purported misrepresentation, that the MI BARUR was: **"calling in U.S. ports, particularly San Diego,"** and the next alleged non-disclosure, that after being purchased and modified in San Diego, she: "never returned to U.S. waters, and there was no intent to call in the U.S." Again, the **"undisclosed risk"** is alleged to be that: "the MI Barur was a yacht purchased by Mexican residents for private pleasure use only in Mexican waters."

66. As with **paragraph 13**, the allegations of **paragraph 14** of the NHIC Complaint fail in the first instance because they misstate the true facts. Nowhere in the application does it state that MI BARUR was "calling in U.S. ports, particularly San Diego." It is also untrue that there was no intent to call in the U.S.. Mr. Farell had purchased all of his boats through Hallmark in San Diego, frequently used the high-end boat yards in San Diego, and fully anticipated that he might return the MI

BARUR to San Diego at any time and during any policy period (and wanted to have the freedom to do so). Indeed, during the summer of 2007, shortly before the renewal and the decision to take the boat to Florida, Mr. Farell was seriously considering returning the yacht to San Diego for sale. Second, the claim that the **"undisclosed risk"** was **"that the MI BARUR was a yacht purchased by Mexican residents for private pleasure use only in Mexican waters"** is a violation of the covenant of good faith and fair dealing. Not only was Mr. Farell clearly identified as the beneficial owner and as a 58 year old Attorney residing in Mexico City, but the yacht was again required by NHIC to be "used only for private pleasure purpose" within the set trading warranty area, the vast majority of which lay in Mexico. This area covered only approximately 250 miles of coastline in southern California, but about 2500 miles of coastline in Mexico. Indeed, the Weather Plan submitted with the original application stated expressly that the boat would spend the **entire year in Mexico**; six months a year in Acapulco and May 15, through November 30 (the six month hurricane season) in La Paz or the Sea of Cortez, never referencing any time in California. NHIC wrote the Policy on the MI BARUR on this operational plan, never seeking a single word of clarification or voicing a single world of complaint, but simply charging, year after year, an increased premium and deductible for this trading *right.*

67. NHIC's Complaint not only alleges no misrepresentation or failure to disclose facts, it actually misstates the true facts. Specifically, the NHIC Complaint alleges that **"the original application ... represented the purchase cost to be $2.2 million."** In truth, nowhere in the application does it state that the "purchase cost" was $2.2 million. In fact the original application materials lists $2.2 million under the heading **"cost, including equipment,"** and the "cost, including equipment" was probably far in excess of $2.2. Mr. Farell's statement as to cost and equipment is equally true and accurate. Given the $1.4 million survey value of the DeFever, the $900,000 cash down payment and the $300,000 plus in improvements, it would not have been a misstatement to state the cost at $2.6 million.

68. As to **paragraph 16** of the NHIC Complaint, where it is alleged that the underwriter advised Medina, "the broker," not the other way around, that: "underwriters found the yacht listed for sale on the internet for $1.9 million" and thus "would drop the insured value … to $1.9 million…," this simply shows that the entire issue of the original reported value and limits is irrelevant. At the time of this fire loss, the Agreed Value on this hull risk was not based on any representation made by the Insureds, but on the underwriter's own research and knowledge of MI BARUR.

69. **Paragraph 17** of the NHIC Complaint alleges that underwriters were told: (1) that the boat was going to be moved to Florida, (2) that theses plans were later changed and (3) that the boat would remain a "San Diego, La Paz, Acapulco vessel." However, again, each of these alleged representations are completely true. Indeed, as set forth above, while at the time of the loss Mr. Farell was planning to send the boat to Florida in January of 2008, just before the time of this renewal he had been making plans to return MI BARUR to San Diego for sale (Hallmark had even been looking for a slip). To omit the very real possibility of the boat returning to San Diego in this renewal, would actually have been an omission (perhaps not material, but an omission nonetheless).

70. Given these undisputed facts, there is no reasonable argument that the Insureds misrepresented or failed to disclosed any facts or did anything other than to act in the highest degree of good faith, disclosing all facts known to them that materially affect the risk assumed by NHIC. Rather, the allegations of misrepresentation and non-disclosure, given this record, are themselves egregious violations of the covenant of good faith and fair dealing implied in every insurance contract.

71. The gravamen of NHIC's denial of the insurance claim and of the NHIC Complaint is that NHIC has no duty to indemnify the Insureds because the Loss was caused by arson. The **First Cause of Action** asserts that because of the arson there is no duty to indemnify the Insureds for the Loss based on "Exclusion 10(B)(1)

(intentional acts) and Exclusion 10(B)(5) (wilful misconduct, criminal or dishonest acts) of the policy." These are actually terms, again, of the prior Executive Yacht Policy, rather than the Yacht Policy in question. The **Second Cause of Action** asserts that because of the arson there is no duty to indemnify the Insureds for the Loss based upon California Insurance Code § 533. The NHIC Complaint is silent on who committed the arson, but the Denial Letter states that "Underwriters find no evidence to suggest that anyone other than the Captain set the fire." Given the totality of the allegations in the Denial Letter relating to the Farells status as Mexicans, the Farell's use of the yacht in Mexican waters, and their attempts to sell the yacht, and the lack of any allegations suggesting that Captain Rello had any independent motive to commit arson, the clear implication of the allegation is that they are "of and concerning" the Farells and that the Farells are guilty of the crime of arson. The provisions of Insurance Code §533 have been held to be the equivalent of an exclusionary clause in an insurance policy. Thus, the insurer has the burden of proof with respect to Insurance Code §533 as well as any exclusion or exculpatory clause in the policy. Moreover, like the exclusions in the Policy, the Insurance Code §533 defense is narrowly construed.

72. Nowhere in Murphy's report does he identify any affirmative evidence that the fire was intentionally set by Captain Rello or the Farells. In fact, he does not even say that Captain Rello started the fire. There was no evidence of any accelerant. There was no evidence of a timing device. There was no evidence that Captain Rello had any experience in arson techniques or any history of being involved with a vessel that caught fire. Perhaps most importantly, Murphy did not even correctly determine where the fire actually started. The overwhelming evidence is that the fire did not start in the Captain's Cabin as claimed by Murphy, but rather in the Crew Lounge as a result of an electrical short.

73. Despite extensive interviews by Murphy and a videotaped examination under oath of Mr. Farell and Captain Rello, there is no evidence identified by Murphy

Case 3:08-cv-00443-BEN-POR Document 21 Filed 08/04/2008 Page 34 of 49

that suggests that the Insureds or Captain Rello had any motive to intentionally set fire to MI BARUR. Not only did the Farells have absolutely no financial problems that would motivate such an extreme act, they had no mortgage on the yacht and the boat was in pristine condition. Thus, if Mr. Farell needed money, he could simply have taken one of the many offers that would have put funds in hand within a relatively few dollars of the insured value of the boat.

74. There is also no evidence that any of the Insureds had the opportunity to burn the MI BARUR. The Farells were in Mexico City and Hallmark was in San Diego at the time of the Loss. Captain Rello had left the boat more than an hour before the fire and was never seen to return by any witness on the docks that morning. Indeed, Murphy does not even provide an explanation of how Captain Rello was supposed to have ignited the foam mattress in the Captain's cabin (a highly flammable fuel source), over an hour before the first signs of smoke were seen by the numerous people on the crowded dock. As, set forth above, none of the tell-tale signs of arson are presented by the facts of this Loss.

75. NHIC has accused Captain Rello, and by clear implication, the Farells, of the criminal act of arson without the proof required by law and the proof required under NFPA 921. The accusations of criminal arson are insulting and defamatory on their face. Moreover, as set forth in detail herein, NHIC has committed the following acts which are breaches of the insurance contract and of the implied covenant of good faith and fair dealing and are evidence of the fact that NHIC never intended to perform as promised under the policy: (1) failure to investigate the claim thoroughly and objectively before denial; (2) demanding examination under oath in bad faith; (3) making groundless accusations against the insured; (4) denying the claim before the claimants were given a chance to provide information to support coverage only days after inviting the insureds, in writing, to submit any evidence to respond to Murphy's allegations of arson; (5) failing to evaluate the claim objectively; (6) relying on biased, prejudiced and unreasonable experts; (7) denying claim based on arbitrary and

unreasonable standards; (8) filing of a declaratory relief action after the claim has been denied but before considering the Insureds' Supplemental Proof of Loss; (9) refusing to reconsider its denial and continuing to allege arson and misrepresentation against Counter-Claimants even after receiving and reviewing the Supplemental Proof of Loss, all of its exhibits and all of the facts set forth herein; and (10) filing and persisting in the maintenance of a declaratory relief action where the Counter-Defendants' position is inherently unreasonable.

**II.**

**FIRST CAUSE OF ACTION**

**(Breach Of Insurance Contract Against All Counter-Defendants)**

76. Counter-Claimants refer to and by that reference incorporate as though fully set forth herein each and every allegation contained in paragraphs 1 through 75, above.

77. The policy of insurance identified herein constituted a valid contract of insurance as between Counter-Claimants and Counter-Defendants and each of them.

78. Counter-Claimants complied with all terms and conditions of such insurance contract and timely paid all insurance premiums due. Any policy terms or conditions which were not fully performed by Counter-Claimants, if any, were excused and/or waived.

79. The fire loss was covered under the terms and conditions of the insurance contract identified herein and any renewals thereof. As a result and under the circumstances of this case, NHIC and the other Counter-Defendants had a contractual duty to pay the claim.

80. NHIC and the other Counter-Defendants breached this duty by refusing and failing to pay the claim and thus avoid exposing Counter-Claimants herein to economic and non-economic damages.

81. As a proximate result of the breach of insurance contract by NHIC and the other Counter-Defendants, Counter-Claimants have suffered economic and non-

economic damages in amounts to be established at the time of trial.

**III.**

**SECOND CAUSE OF ACTION**

**(Breach Of The Implied Covenant of Good Faith And Fair Dealing Against All Counter-Defendants)**

82. Counter-Claimants refer to and by that reference incorporate as though fully set forth herein each and every allegation contained in paragraphs 1 through 81, above.

83. Implied by law in the above described policy of insurance issued to Counter-Claimants were covenants by which Counter-Defendants owed a duty to Counter-Claimants to act in good faith and to deal fairly with each of them in all insurance matters related to the policy of insurance and any renewals thereof.

84. NHIC and the other Counter-Defendants breached these implied covenants of good faith and fair dealing in various respects, including, but not limited to, the following:

(A) Unreasonably and without proper cause denying Counter-Claimant's insurance claim;

(B) Unreasonably and without proper cause forcing the litigation of this claim thus needlessly forcing Counter-Claimants to incur additional fees and costs to obtain benefits under their policy of insurance;

(C) Unreasonably and without proper cause placing their own financial interests ahead of the financial interests of Counter-Claimants herein;

(D) Unreasonably and without proper cause failing to undertake and perform a proper investigation of the claim by Counter-Claimants;

(E) Unreasonably and without proper cause refusing to timely and properly communicate with the insureds;

Case 3:08-cv-00443-BEN-POR Document 21 Filed 08/04/2008 Page 37 of 49

(F) Unreasonably and without proper cause withholding policy benefits;

(G) Relying on biased, prejudiced and unreasonable experts;

(H) Denying the claim based on arbitrary and unreasonable standards;

(I) Filing of a declaratory relief action after the claim has been denied but before considering the Insureds' Supplemental Proof of Loss;

(J) Refusing to reconsider its denial and continuing to allege arson and misrepresentation against Counter-Claimants even after receiving and reviewing the Supplemental Proof of Loss and all of its exhibits; and

(K) Filing and persisting in the maintenance of a declaratory relief action where the Counter-Defendants' position is inherently unreasonable.

85. As a proximate result of the multiple, successive and continuing breaches of the implied covenant of good faith and fair dealing by NHIC and the other Counter-Defendants, Counter-Claimants have suffered economic and non-economic damages in amounts to be established at the time of trial.

86. The acts and omissions of NHIC and the other Counter-Defendants in connection with the investigation and denial of Counter-Claimants' claims were done by NHIC and the other Counter-Defendants with fraud, malice and oppression entitling Counter-Claimant to an award of punitive damages in an amount sufficient to punish and make an example of NHIC and the other Counter-Defendants. NHIC and the other Counter-Defendants committed the acts complained of herein wilfully and with the design and intent to financially benefit themselves at the expense of injuring Counter-Claimants.

## IV.

## THIRD CAUSE OF ACTION

**(Promissory Fraud - No Intention to Perform - Against All Counter-Defendants)**

87. Counter-Claimant refers to and by that reference incorporates as though fully set forth herein each and every allegation contained in paragraphs 1 through 86, above.

88. Counter-Defendants promised and warranted in the Policies identified herein that any renewals thereof that they would act in good faith and pay claims for losses to or of MI BARUR pursuant to the terms of the Policy and the law, and that they would properly investigate all claims, act reasonably in evaluating claims, and not subjugate the insureds' interests to their own. NHIC also promised and represented that would pay the claims of single vessel corporations, claims on vessels spending most or all of the policy year trading in Mexican waters, and claims on vessels owned by citizens of Mexico.

89. However, at the time that these promises and representations were made, they were in fact false. Rather, at the time that these promises and representations were made, NHIC had in place a business plan and policy to ignore policy terms and conditions and the controlling law and to deny and delay valid claims to avoid payment on such claims or to use the litigation process to force insureds to accept less than policy limits or what they were otherwise entitled to as far as policy benefits. NHIC misrepresented material facts and failed to disclose the fact that it would not pay the claims of single vessel corporations (but in fact considered them to be "shell" companies set up to "circumvent U.S. law regarding vessel documentation."), claims on vessels spending most or all of the policy year trading in Mexican waters, or claims on vessels owned by citizens of Mexico (namely, on yachts "purchased by Mexican residents for private pleasure use only in Mexican waters"). In addition to making the representations and promises set forth above, NHIC also failed to disclose the above information.

90. Counter-Defendants made these promises and representations and failed to disclose its true business practices and position regarding Mexican owned single vessel corporations with the design and intent that Counter-Claimants reasonably rely

on them and purchase the policies of insurance from Counter-Defendants.

91. The fact that Counter-Defendant never intended to perform as promised is evidenced by its actions after the claim was presented herein, including but not limited to the following direct and circumstantial evidence:

a. NIHC's denial of the claims on the basis that Mi Barur, Inc. failed to disclose that its shares were 100% owned by Mexican nationals when in fact NHIC knew before the inception of the Policy that the Farells, Mexican nationals, owned all the shares of Mi Barur, Inc. *See,* Denial Letter, pages 2 and 3, Exhibit B hereto.

b. NIHC denial of the claims on the basis that Mi Barur, Inc., was engaged in illegal activity by documenting MI BARUR as a U.S. flag vessel because its shareholders were non-U.S. citizens when in fact NHIC knew before the inception of the Policy that it was legal under U.S. law for non-U.S. citizens to own 100% of the shares of U.S. documented recreational vessels. *See,* Denial Letter, pages 2 and 3, Exhibit B hereto.

c. NIHC's denial of the claims on the basis that the Farells illegally conspired with Michael Hallmark to violate U.S. law by forming a single purpose corporation to own the vessel when in fact NHIC knew before the inception of the Policy that it was perfectly legal to form single purpose corporations to own a vessel. In fact NHIC had written numerous polices to single purpose corporate owners. *See,* Denial Letter, pages 2 and 3, Exhibit B hereto.

d. NIHC's denial of the claims on the basis that the insureds misrepresented that the vessel would return to San Diego during the Policy term when in fact NHIC knew she normally sailed in Mexican waters and the Policy did not require the vessel to return to San Diego at any time during the Policy term.

e. NIHC's knowingly denying the claims based upon a fire report prepared

by a biased fire investigator who knowingly failed to follow standard fire investigation techniques as set for in NFPA 921;

f. NIHC's knowingly denying the claims based upon a fire report prepared by an incompetent fire investigator who knowingly failed to follow standard fire investigation techniques as set for in NFPA 921;

g. NIHC's falsely telling the insureds in the Denial Letter, page 3, that "The conclusions of the investigation are serious, and underwriters would like to make sure they have considered all relevant facts and information that reasonably support alternative conclusions." and then on the same day as the Denial Letter filing a declaratory relief action denying coverage.

h. NIHC's denial of the claims based on an alleged arson without any showing of any motive of any kind or any of the elements of proof required to prove arson under NFPA 921;

i. NIHC's surveyor and fire investigator pursuing an agenda of denying the claim from the beginning and prior to the development of any empirical data to support the conclusion of arson as required by NFPA 921;

j. NIHC's continuing to deny the claim without explanation after receiving Counter-Claimants' detailed supplemental proof of loss by way of the Demand Letter showing the numerous fatal errors in the Denial Letter;

k. NHIC's failure to reconsider the claim after receiving the Demand Letter and failing to even respond to said Demand Letter; and,

i. Repeated racist and anti-Mexican national references by NHIC's agents during the investigation of the claim and a statement by NHIC's surveyor indicating that the cause of the fire must be arson if the boat was owned by a Mexican.

92. Counter-Claimants did in fact reasonably rely on the promises and warranties made by NHIC and each of them and in reliance thereon purchased the insurance coverages set forth in the Policy and any renewals thereof.

93. Counter-Defendants at the time they made these promises and warranties had no intention of performing such promises or honoring such warranties, but planned all along to continue their business practice of denying valid claims in an attempt to coerce insureds and increase profits and to deny claims of single vessel owning corporations, vessels trading in Mexico, and vessels owned by Mexican citizens.

94. As a legal result of such fraud, Counter-Claimants have suffered economic and non-economic damages in amounts to be established at the time of trial.

95. The above fraud by Counter-Defendants was committed with fraud, malice and oppression entitling Counter-Claimants to an award of punitive damages in an amount sufficient to punish and make an example of Counter-Defendants. Counter-Defendants committed the acts complained of herein wilfully and with the design and intent to financially benefit themselves at the expense of injuring Counter-Claimants.

**V.**

**FOURTH CAUSE OF ACTION**

**(Negligent Misrepresentation against all Counter-Defendants)**

96. Counter-Claimant refers to and by that reference incorporates as though fully set forth herein each and every allegation contained in paragraphs 1 through 95, above.

97. The promises, representations and failures to disclose information or suppression of information were made by Counter-Defendants as previously alleged. When Counter-Defendants made the representations herein alleged they had no reasonable grounds for believing them to be true.

98. Counter-Defendants made these promises and representations and failed to disclose its true business practices and position regarding Mexican owned single vessel corporations with the design and intent that Counter-Claimants reasonably rely on them and purchase the policies of insurance from Counter-Defendants.

99. Counter-Defendant made these representations or suppressed or failed to disclose information with the intention of inducing Counter-Claimants to act in reliance on those representations or suppression or failure to disclose information in the manner hereafter alleged, or with the expectation that Counter-Claimants would so act.

100. Counter-Claimants, at the time these representations or suppressions or failures to disclose information were made by Counter-Defendants, and at the time Counter-Claimants took the actions herein alleged, was ignorant of the falsity of Counter-Defendants' representations and believed them to be true, and was ignorant of the existence of facts which Counter-Defendants suppressed or failed to disclose. In reliance on Counter-Defendants' representations or suppressions of facts or failures to disclose facts, Counter-Claimants did in fact reasonably rely on these promises and warranties made by NHIC and each of them and in reliance thereon purchased the insurance coverages set forth in the Policy and any renewals thereof. Had Counter-Claimants known the actual facts, they would not have done so. Counter-Claimants' reliance on Counter-Defendants' representations was justified because Counter-Claimants could reasonably expect that Counter-Defendants would act in good faith and pay claims for losses to or of MI BARUR pursuant to the terms of the Policy and the law, that they would properly investigate all claims, act reasonably in evaluating claims, not subjugate the insureds' interests to their own, pay the claims of single vessel corporations, pay claims on vessels spending most or all of the policy year trading in Mexican waters, and pay claims on vessels owned by citizens of Mexico.

101. As a legal result of such negligent misrepresentations and failures to disclose, Counter-Claimants have suffered economic and non-economic damages in amounts to be established at the time of trial.

**VI.**

**FIFTH CAUSE OF ACTION**

**(Negligent Salvage Against All Counter-Defendants)**

102. Counter-Claimants refer to and by that reference incorporates as though fully set forth herein each and every allegation contained in paragraphs 1 through 101, above.

103. Counter-Defendants undertook to salvage the yacht and to protect it until such time as they finished their survey and investigation of the fire, and in so doing undertook, assumed and owed a duty to Counter-Claimants to hire competent salvage and fire investigators and to exercise the degree of care one would expect from reasonably prudent salvage and fire investigation professionals under the circumstances. Counter-Defendants were obligated to act in conformity with this standard of care with respect to all activities undertaken by them relating to the salvage, fire investigation and protection of the yacht MI BARUR, including without limitation, compliance with NFPA 921.

104. Counter-Defendants breached these duties by, among other things, negligent hiring and carelessly and negligently carrying out said salvage and fire investigation. As a result, much evidence was lost or destroyed before the fire investigator for NHIC even began his investigation. For example, NHIC's agents haphazardly used grappling hooks and other devices to pull wreckage from the hull of the MI BARUR, destroyed critical cause and origin evidence.

105. The above conduct on the part of Counter-Defendants and each of them caused Counter-Claimants to suffer economic and non-economic damages in amounts to be established at the time of trial, including being unable to prove the cause of the loss of MI BARUR and obtain immediate payment from Counter-Defendants.

**VII.**

**SIXTH CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress By Counter-Claimants Arsenio Farell and Norma Farell Against All Counter-Defendants)**

106. Counter-Claimants refer to and by that reference incorporate as though fully set forth herein each and every allegation contained in paragraphs 1 through 105,

above.

107. Counter-Defendants' conduct alleged herein was outrageous, intentional and malicious and done for the purpose of causing Counter-Claimants to suffer mental anguish and emotional and physical distress, and/or was undertaken with reckless disregard of the probability of causing Counter-Claimants to suffer emotional distress.

108. Counter-Claimants have suffered severe emotional distress as the result of Counter-Defendants' outrageous conduct herein alleged, and have been injured in mind and body as follows: Counter-Claimants have suffered extreme stress and humiliation in front of friends, family and business associates, were repeatedly lied to and deceived, all to their further humiliation and distress, and have suffered and continue to suffer extreme mental distress, nervousness, grief, worry, depression and anxiety as a result thereof, all to Counter-Claimants' damage in a sum in excess of the jurisdictional minimum of this Court, said amount to be determined at trial, with interest on that sum at the legal rate.

109. The aforementioned conduct of Counter-Defendants was done intentionally and was malicious, oppressive and fraudulent in nature, and was done with the intention on the part of Counter-Defendants of thereby depriving Counter-Claimants of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Counter-Claimants to cruel and unjust hardship in conscious disregard of Counter-Claimants' rights. Counter-Defendants' wrongful conduct as herein alleged was done intentionally and was malicious, oppressive and fraudulent in nature, and was ratified or authorized by an officer, director of managing agent of NHIC and each of the other Counter-Defendants.

**VIII.**

**SEVENTH CAUSE OF ACTION**

**(Negligent Infliction of Emotional Distress By Counter-Claimants Arsenio Farell and Norma Farell Against All Counter-Defendants)**

110. Counter-Claimants incorporates by reference the allegations of

paragraphs 1 through 109 of this Complaint.

111. Counter-Defendants owed a duty of care to Counter-Claimants. Specifically, Counter-Defendants owed Counter-Claimants a duty to exercise proper care and skill in the performance of their duties under the Policy for Counter-Claimants, and/or to be honest and truthful towards them.

112. Counter-Defendants knew, or should have known, that their failure to exercise due care would cause Counter-Claimants severe emotional distress.

113. Counter-Claimants have suffered severe emotional distress as the result of Counter-Defendants' breach of their duty to Counter-Claimants, and have been injured in mind and body as follows: Counter-Claimants have suffered extreme stress and humiliation in front of friends, family and business associates, were repeatedly lied to and deceived, all to their further humiliation and distress, and have suffered and continue to suffer extreme mental distress, nervousness, grief, worry, depression and anxiety as a result thereof, all to Counter-Claimants' damage in a sum in excess of the jurisdictional minimum of this Court, said amount to be determined at trial, with interest on that sum at the legal rate.

**IX.**

**EIGHTH CAUSE OF ACTION**

**(Libel By Counter-Claimants Arsenio Farell and Norma Farell Against All Counter-Defendants)**

114. Counter-Claimants refer to and by that reference incorporate as though fully set forth herein each and every allegation contained in paragraphs 1 through 113, above.

115. On or about March 10, 2008, Counter-Defendants, by and through their agents, wrote the Denial Letter to the President of Mi Barur, Inc., containing false and defamatory statements of fact of and concerning Counter-Claimants Mr. and Mrs. Farell.

116. The statements contained in **Exhibit B** are not privileged.

Case 3:08-cv-00443-BEN-POR Document 21 Filed 08/04/2008 Page 46 of 49

117. The statements contained in **Exhibit B** are defamatory because they falsely accuse Mr. and Mrs. Farell, expressly of committing a felony by conspiring to violate U.S. law by illegally owning a beneficial interest in a U.S. flag vessel. Further, by clear implication, the Farells are accused of intentionally setting fire or conspiring with others to set fire to their yacht MI BARUR in an illegal scheme to collect insurance proceeds. Although the letter makes reference to Captain Rello, in the context of the Farells' beneficial ownership of MI BARUR and the investigation which focused on their ownership, operation and efforts to sell MI BARUR, and the lack of any evidence of any motive that might implicate Captain Rello acting on his own, the clear implication of the letter is that the Farells were guilty of arson.

118. Counter-Defendants intended to defame Counter-Claimants Mr. and Mrs. Farell when they made the libelous statements or they made such statements after negligently failing to ascertain the falsity of such statements.

119. These false and libelous statements have exposed Counter-Claimants Mr. and Mrs. Farell to hatred, contempt, ridicule, disgrace and have caused them to be shunned or avoided in their occupations. As a result of said libelous statements, Counter-Claimants have suffered consequential damages and special damages including but not limited to attorney's fees, fire investigator's fees, and investigation expenses, in amounts to be proven at trial.

120. These statements were made with actual malice and ill will, were the result of racist stereo-typing of the Counter-Claimants, and Counter-Defendants, in making these statements, lacked reasonable grounds for belief in the truth of these publications and therefore acted in reckless disregard in so making them, and in acting maliciously, fraudulently and oppressively, entitle Counter-Claimants to an award of punitive damages.

///

///

///