# EXHIBIT "C"
# PART FIVE OF SIX

- It was some minutes after he tried to enter the galley when the smoke became dense and dark and was forcefully emanating from the starboard side of the galley passageway door.
- He stated that he looked under the smoke layer while in the galley and saw no flames from the floor of the galley or under the smoke layer.
- He heard explosions coming from the vessel, but that was when it was against the breakwater.
- He did not see the firefighters fighting the fire from on board the vessel.
- He spoke briefly with Captain Rello around 8:15-8:20 A.M.
- He said that Captain Rello told him he was going to the warehouse.

**Captain Luis Rello**
**MI BARUR Captain**

I conferred with Mr. Rello during my investigation of this fire loss. He provided me with the following information:

- He is employed by Mr. Farell as Captain on the MI BARUR,
- On the morning of the fire he woke up early, had coffee, and watched a little television.
- He also took a shower, and used the facilities in the lower crews berthing area.
- He did not use the bunk beds or the Captains berth for sleep.
- He lives on board the vessel and sleeps on the floor of the salon on the main deck.
- He did not smell or detect anything out of the ordinary while in the crews berth or lounge.
- The lights were out in the lower berthing area but the freezers were always on.
- The port holes were closed. The doors to both berths were open.
- He had a friend come by and they had coffee together in the main salon.
- His friend left after an hour or so and he left the vessel around 8:00 -8:30 am.
- He walked off the dock and conferred with various individuals along the way to a small storage facility in a nearby warehouse.
- He smokes but not on the vessel
- He was not aware of any mechanical or electrical problems with the vessel.
- He first became aware of the fire when he heard people yelling about the fire.
- Once outside of the warehouse he first saw the smoke emanating from the MI BARUR.
- He does not know how the fire occurred.

Case 3:08-cv-00443-BEN-POR Document 22-4 Filed 08/04/2008 Page 15 of 17

**Mr. Cecil M. Lange, AMS 011 52 (612)122-7066**
**Marine Surveyor**

I spoke with Mr. Lange while conducting my investigation of this fire loss. He provided me with the following information:

- He surveyed the motor vessel MI BARUR in September of 2007'.
- He stated that there are "low power" problems to the docks within the Palmira Yacht Harbor Marina.
- He stated that a crane was used to raise the vessel and that sections were torn from the vessel during this process and prior to entering the ways at Abaroa's ship yard in La Paz, Mexico.
- There were divers in the water during this process.
- This process of raising the vessel was under the direction of a Mr. Terry Carpenter who was retained by Todd and Associates, a Mr. Todd Schwede, out of San Diego, California.
- He overheard Mr. Schwede asking individuals if Captain Rello had set the fire. This was before any investigation, as to the origin and cause of the fire, had been done on the vessel.
    - Note that Mr. Murphy's report on page #5 reflects that on October 31, 2007 the vessel MI BARUR was raised and towed to Abaror's boat yard for inspection.
    - On page #12 of Mr. Murphy's report he asked Captain Rello on October 30th if he set the fire.
    - It would be "presumption of cause" on Mr. Murphy, to have formed this opinon prior to any fire investigation.
        - NFPA 921: 4.3.7 "until all data has been collected, no specific hypothesis can be reasonable formed or treated. All fires, however, should be approached by the investigator without presumption.
- He knows Mr. Schwede and in fact had attended a SAMS conference in San Diego where Mr. Schwede and Fire Investigator Murphy (Maze Investigations) were presenting together as guest speakers at the conference.
- He stated to me that since Mr. Murphy was on the west coast at the conference, it would be convienent for him to look at the fire for Mr. Schwede.

**Mr. Victor Franchini (612)12-5-87-08**
**Electrical Maintenance**

I met and conferred with Mr. Franchini during my investigation of this fire loss. He provided me with the following information:

- He is an electrical maintenance person and was on the motor vessel MI BARUR two weeks prior to this fire loss.



EXHIBIT A - 39
143

EXHIBIT C 0252

- He performed maintenance in lower maintenance space below the crews galley
- There was a history with the shore power connection at the marina.
- The shore power was protected by a 55-ampere rated circuit breaker.
- Electrical Engineer Ron Kilgore and he conferred over the vessels electrical system.

**Mr. Ron Kilgore, EE**
**Kilgore Engineering**

I met and conferred with Mr. Kilgore who conducted his investigation of the vessels electrical system and components during my investigation process on the motor yacht MI BARUR. He provided me with a summation of his scene inspection on the vessel.

- He is a licensed Professional Engineer specializing in Electrical Engineering.
- Mr. Kilgore inspected both the remains of the hull of the vessel, along with the items retained in a fenced enclosure nearby.
- He also reviewed the electrical plans for the subject vessel, MI BARUR.
- The items inspected revealed no cause of the fire; however, the items removed from the area of fire origin were not available for inspection.
    - These items have many potential electrical failure modes that could have resulted in the subject fire.
    - The inability to inspect these items prevented the determination of the fire cause or elimination of their possible contribution.
- I referred Mr. Kilgore to the void head space above the crews dining area and below the main-floor galley as the area of origin.
    - The potential fire-causing equipment within that area are many wiring harnesses and light fixtures.
    - Both 120 Volt ac and low-voltage dc circuits were routed in that area.
    - None of the wiring harnesses were retained or preserved in a fashion that made them available for forensic analysis.
    - Additionally the light fixtures in that area were intermixed either by collapse during the fire events, salvage efforts or during post-fire investigation.
        - Because of this, any light fixtures within the area of origin were not identified and were also not available for forensic analysis.

        - For these reasons the remnants of the electrical system cannot be examined to determine any potential role in the ignition of the fire.
- The wiring harnesses within vessels have been known to cause fires due to the constant movement and frequent vibration leading to mechanical damage of the wire insulation.
- Electric failures, followed by short-circuit heating and electric arcing, can ignite combustibles. Also lighting fixtures can overheat or produce inadvertent contact of the light fixture with insulating and combustible materials.
- The inability to identify and analyze these components made determining the cause of this fire impossible.

Case 3:08-cv-00443-BEN-POR Document 22-4 Filed 08/04/2008 Page 17 of 17

**Fire Investigator Mario Saldana Nolasco**
**Federal District Attorney's General Office**

I conferred with Fire Investigator Mario Saldana Nolasco during my investigation of this fire loss. He assisted me in the debris removal and conducted his own fire scene investigation. He provided me with the following information via a translator.

- He is a fire and bomb investigator out of Mexico City, Mexico. He was accompanied by his supervisor Mr. Carlos Lopez.
- Mr. Mario Saldana Nolasco stated that he is of the opinion the fire originated in the overhead of the crew's lounge and galley area.
- He believes the fire is electrical in origin.

***Origin Determination:***

The forward section of the motor vessel MI BARUR was accessed by a companion way and stairs located just inside of the doorway off the main deck on the starboard side of the galley. I observed and documented the remains of companion way and stairs that led down to the forward VIP stateroom and crew accommodations.

***Crew's Berthing Area:***

The crew's accommodations were accessed from a small stairway off the base of the stairs from the starboard side of the galley. The stairs were located approximately mid-ships and raised to a small landing, which accessed two passageway doors; one to the Captains berth and head and the other to crews berthing and head. The Captain and crew accommodations were separated by a division wall and freezer with the captain's berth and head located on the starboard side and the crew bunk bed arrangement and head to port.



The above photo depicts the crew's berth to port on the left side of this photo and the Captains berth to the starboard or on the right side of the photo.

Two freezers were located in the crews berthing area.

- One freezer was enclosed mid-ships, and forward between the crews berth as mentioned above. The front of the freezer faced aft and was accessible from the top of the stairs landing area. Both were "on" at the time of the fire.

- The second freezer is located immediately starboard, from the top of the access stairs to the crews berthing. The front of the freezer faced mid-ships. The rear paneling for the freezer would enclose a portion of the Captains berth.

An enclosed diagram further depicts these areas.



Remaining fire debris from the previous investigation was removed and the deck area cleaned and washed. Excess fire debris was systematically removed from this area, placed in large garbage bags, and set on the remains of the main deck on the starboard side of the vessel. Remaining fire debris from the previous investigation by Mr. Murphy has been placed in the crew lounge/galley area and VIP stateroom. It was removed and the deck area cleaned and washed.

The crew's accommodations were severely fire damaged and consumed in this fire loss leaving only a portion of the crews berthing areas and storage accommodations "outboard" in place.

***<u>The fire patterns observed are consistent with witness observations in that the fire did not start in the either crew or Captains berthing compartment.</u>*** Among the observations supporting my opinions include:

- Initial witnesses on scene do not see any glow of fire from the starboard portholes located in the Captains berth and shower.
- The carpet area on the Captains side of the berth was clean and clear of any drop down materials or indications of charring from radiant heat flux as the fire consumed materials including a portion of the Captains berth.

- The freezer protected the flooring and the head of the Captains berth.
- Carpet on the crew side of the berth was also clean with exception of the floor area mid-ships at the aft bulkhead. (as observed in photograph on page #18). A small nightstand and drawers were located in the area.



- The upper berth of the crew's bunk bed had greater fire damage than the bottom berth.
- Heat damage patterns on the carpeted floor indicate the fire entered the crews berthing area and involved a small chest as depicted in the survey photos.



- Comparison of both the Captains and crews head and shower facility clearly show greater fire damage from the port side of the vessel. Specific damage comparison was noted to the toilet, shower bulkhead and the overhead.

- The Captains berth was mostly consumed with exception to the head of the bed located aft and to the rear of the freezer and carpet on the Captains deck in front of his berth.

- In Mr. Murphy's report he comments on the combustibility of a foam mattress, which is well known to fire investigators. He fails to tell the readers of his report that a burning foam mattress produces materials running and pooling on the floor below yet the carpet on the deck of the Captain's compartment is not burned at all.



- By the time it took firefighters to reach the vessel and begin suppression efforts the carpet would have been burned. The carpet was not burned because the fire did not originate in the Captains berth or the crews berth.

***Fire Debris / Evidence Storage***



08-10

Fire debris from the motor vessel MI BARUR was in the northwest side of the storage yard located northeast of the marina. None of the materials / items I observed are marked or identified as evidence by the previous fire investigator.

We were told by security that this was the area where the pervious investigator had placed his "evidence". The items in this area were exposed to the elements and only protected by perimeter fencing and a yard dog. Due to the exposure, lack of protection, and absence of any proper documentation, these materials could not be subjected to any meaningful examination by the undersigned.

***VIP Stateroom:***



Just aft and starboard of the crews area was a VIP Stateroom with a double bed, closet, with a shower and head.

Note the bottom left hand side of the photo. This is at the base of the stairs from the galley and the entrance to the VIP Stateroom. The view is forward and to starboard. The stairs and companion way is located forward of the bulkhead with the picture on the wall.

When I examined the vessel, the fire debris was two feet above the bed platform. Given the amount of debris piled in this area I would have to assume the area was not processed or examined closely by the previous examiner. This omission would preclude meaningful data collection and analytical reasoning.

Mr. Murphy again failed to abide by his inferred systematic approach in his fire scene investigation by not conducting an inspection of remaining fire patterns in the crew's galley and VIP stateroom as recommended by NFPA 921 and Forensic Fire Scene Reconstruction as authored by Dr. John DeHaan and Dr. David Icove. Such an examination could reveal critical evidence of an alternate area of fire origin.

The VIP stateroom area was also cleared of remaining fire debris and photographed. Among the fire patterns I observed supporting my opinion that the fire did not originate from this area include:



- Fire patterns are even throughout the room and consistent with the fire progressing from the top-down.
- The door to the VIP Stateroom was burned off approximately two feet off the carpeted deck.
- All fire patterns were high, no floor patterns or low burn/char indicator supporting a

fire on the bed or from the lower areas of the room. (See above comment on results from foam mattress fires)

* Fire patterns are consistent with the fire progress into the VIP stateroom.

***Based on these considerations it was my opinion that the VIP stateroom was not the area of fire origin***

***Crew's Lounge / Galley area:***



Just aft of the crew's quarters on the port side of the vessel was a small lounge / dining area. As with the VIP Stateroom fire debris had been tossed into this area to some five-feet in depth.

It was clear that this area was not processed prior to my arrival. I have received no information to date suggesting or supporting that this area was properly processed as required by NFPA 921 and Forensic Fire Scene Reconstruction.
The Pre-Fire photos as observed within this report depict the crew lounge / dining areas. Both views were taken from the entrance passageway door located at the base of the companion way stairs from the starboard side of the galley above. These photos are part of

the survey photos taken in September of 2007'. According to information I received from Captain Rello the coffee maker was in the salon at the time of the fire and not in this location.

The area was cleared of all fire debris and the floor washed, the area photographed and fire patterns documented. All fire debris removed from this area was bagged and placed topside, starboard deck.



After debris was removed I observed and documented the area to include: A small, three- by-two-foot table surface with foam filled cloth covered bench seats on each side of the table. I also observed and documented contents in this area consistent with the photographs taken prior to this fire. The area contained a small refrigerator, TV, microwave, and built-in lighting.

Among the fire patterns that I relied upon to form my opinion that the fire originated from the area of the crew's lounge dining area include:



Figure shows Galley Deck from above.



Figure shows view from below with greater damage over crew's lounge/galley.

- Within the fire debris / evidence in the storage yard was the remains of the galley floor. Examination of the flooring clearly indicates greater fire damage from underneath over the area of the crew's lounge / galley area than the VIP stateroom.

- Extensive fire damage to the forward bulkhead, port side, which contained the refrigeration unit, microwave oven and lighting. Less damage was noted to opposite forward side of the bulkhead.





- Low fire damage extended down to the height of the crew's seating area with severe



fire damage to the port side of the aft table bench seat

- Fire damage was limited to heat and smoke at floor level, but greater damage than the crews berthing area.
- Fire patterns are consistent with normal fire progress from the crew's lounge / dining area out into the companion way and up to the galley and out the starboard side of the vessel.
- Fire patterns within the crew's lounge / dining area were generally high, above the table level with exception of the low damage at the rear table bench seat on the port side.

***Fire Behavior:***

Fire patterns are generally consistent with a fire originating high within the forward crew's lounge. The fire most likely originated in the "forward crew's galley / lounge" area from an accidental ignition source, likely from an electrical failure or improper use of smoking materials. The fire grew from the ignition phase to an incipient fire with the products of

combustion and heat filling the upper levels of the compartment venting out of any openings at that level. (This coincides with the witness description of the fire discovery and entry into the vessel.) The light grey smoke observed by witnesses indicated that the incipient fire involved predominately cellulosic materials.

As the fire grew to involve plastics, vinyl, and other synthetics and became "ventilation controlled" it created heavier darker and smoke (as described by witnesses). The fire breached the walls of the vessel and became "fuel controlled" consuming whatever combustible fuels were available to the ensuing fire. This ensuing fire destroyed evidence of the early fire such as burn patterns "sequential patterns" but left patterns that of the fire development. These patterns require "reconstruction" of the scene to develop.

The fire rekindled after the fire department's first attempt at extinguishment, further destroying the evidence of the fire's first existence, and burned to the vessel's waterline. This was a "fuel controlled fire" in that all that could burn did burn and in such the only evidence that remains is that of "non-combustible materials", and evidence that remains is "sequential patterns" of the final stages of the fire destroying original evidence of its original existence.

First witnesses to the fire were able to walk into the main galley and progress down the forward companion way before being driven out by smoke. They only reported "light" heat present, which would negate a fire originating from the captains berthing area. A fire in the Captain's berth, as implied in Mr. Murphy's report, would generate sufficient dark smoke and heat energy that Captain Rello would not only report intense smoke but unbearable heat.

Once the fire reached the upper galley and salon the fire was not only fuel driven but had unlimited ventilation, thus the fire's progression was more intense above deck level involving the main salon, galley, and fly bridge.

***Security:***

I spoke with Attorney Bismark Moyron and the computer technician who represents the Marina Palmira Yacht Harbor in La Paz, Mexico. I was able to view the control room and view the 14-monitors of the harbor. They record 24/7. The cameras are "smart view" in that they only record with there is movement. They do not have the ability to move their cameras during operation. The average digital recording lasts 10-15 days before the hard drive recycles itself.

The photo to the right depicts the camera on Dock #2, which does not pan or show that portion of the finger where MI BARUR was secured.





Presently the newer cameras have the ability to go 30 days without recycle. There are no cameras facing the end of dock #2 only the security gate at the east end of the dock.

***Fire Cause Analysis:***

As a result of my investigation and analysis of the fire scene and witness observations, I have concluded that this fire originated below decks within the forward crew's lounge / dining area. In an effort to determine the heat source and event that initiated the fire in this area, my analysis has led me to the following possible ignition scenarios that are consistent with the evidence in this case.

***Hypothesis #1:*** The cause of the fire can be directly related to an undetermined electrical failure from one of the above noted electrical sources in the immediate area/point of fire origin. The heat source is electrical energy. The fuel source is combustible material located within this area including interior finish materials. The event is from a yet undetermined electrical anomaly. There were reported problems with the shore power to vessels in the marina, which could cause failure of some electrical equipment or appliances.

In addition we should note that throughout this intense and long duration fire, potential items and materials that may have provided data to identify a cause were destroyed. During the prior scene investigation, where fire debris was not documented, or clearly identified and thrown about recklessly further compromised any evidence of causation.

A fire originating from an electrical anomaly cannot be eliminated.

**Hypothesis #2:** This fire originated from discarded smoking materials within the crew's lounge by Captain Rello or his companion. Among the information supporting this opinion would include:

- Captain Rello reported he smoked a pack of cigarettes a day.
- Captain Rello denies smoking in this area of the vessel although he was the only person in that area on the day of the fire.
- Mr. Rello states that he did not smell or hear anything unusual on the morning of the incident fire.
- The time frame of when Mr. Rello was in the area of fire origin and with the reporting of this fire, is consistent with a fire originating from discarded smoking materials.
- The bench seat is covered with a cloth / material over foam. Cotton upholstery or clothing can be ignited by a discarded cigarette and produce extensive smoke as the fire develops. As part of my training, education, and experience, these materials have been shown to smolder followed by flaming.

A fire resulting from discarded smoking materials cannot be eliminated.

My investigation follows the scientific method as presented in NFPA 921, the Guide for Fire and Explosion Investigations. In determining a cause for a fire the investigator must go through the following steps to provide a conclusive or more likely event cased a fire.

**NFPA 921 (2004 edition):**

4.3.3 Collect Data. Facts about the fire incident are now collected by observation, experiment, or other direct data-gathering means. The data collected is called **empirical data** because it is based on observation or experience and is **capable of being verified.**

4.3.4* Analyze the Data (Inductive Reasoning). All of the collected and observed information is analyzed by inductive reasoning: the process in which the total body of **empirical data** collected is carefully examined in the light of the investigator's knowledge, training, experience, and expertise. **Subjective or speculative information cannot be included in the analysis, only facts that can be proven clearly by observation or experiment.**

4.3.5 Develop a Hypothesis. Based on the data analysis, the investigator should now produce a hypothesis or group of hypotheses to explain the origin and cause of the fire or explosion incident. **This hypothesis should be based solely on the empirical data that the investigator has collected.**

4.3.6* Test the Hypothesis (Deductive Reasoning). The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. (See 3.3.35, Deductive Reasoning.)

This testing of the hypothesis may be either cognitive or experimental. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis should be tested. This test may include the collection of new data or the reanalysis of existing data.

This process needs to be continued until all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."

***Conclusion Re: Area of Origin:***

Based on the witness's descriptions and on accepted principals of fire and smoke spread, and burn pattern analysis, **it was concluded that the most likely area of fire origin was in the crew's lounge / galley area, lower deck, and forward on the port side of the vessel.** The VIP Stateroom, Captains quarters, and crew berthing area were eliminated as an area of fire origin.

Mr. Murphy states the fire originated in the captains berth with an open flame. A foam mattress in a small, ventilated room, would rapidly develop into flashover "full involvement" fire in that compartment. Such a fire would destroy the exposed carpet. This was not observed in the captain's berthing area.

To offer a "determined" cause you must have a "clearly defined origin"(NFPA 921-18.2.5). "when it is known conclusively to the exclusion of all other potential ignition sources". A conclusion that a fire was started with an open flam is "not to be used indiscriminately". When the origin is not clearly defined, this process is inappropriate". Some of the conditions and circumstances that prevent the origin from being clearly defined include the degree or extent of damage (such as those from a fully developed compartment fire), or adverse effects of fire suppression activities" (this vessel was under water and severely damaged by fire). This also requires the "testing and rejection or alternate hypotheses" which could not occur because all the data was not uncovered or developed.

Due to the damage sustained to this vessel in this fire loss, and no inspection and documentation prior to raising the vessel, the immediate point of fire origin could not be determined. Remaining fire patterns and examination of materials could not be relied upon to form a conclusive or a more likely than not scenario as to the cause of this fire loss for reasons discussed above.

***Due to these circumstances there is insufficient evidence to determine the exact cause for this fire loss with scientific certainty, therefore our opinion, based on the information and data available in this fire loss, is that the cause of this fire is undetermined.***

My assessment of this case is based on the analysis of physical evidence, the assessment of reported information and evaluation of all possible causes. My file will remain open pending your direction to close this file. Please feel free to contact me on any points needing further clarification.

Submitted by,

Donald J. Perkins, CFI
Fire Investigator
Fire Cause Analysis

Dr. John D. DeHaan, PhD, CFI
Technical Peer Review
Fire Ex-Forensics

DP/JdH/sa
08-10613-01-RDP



EXHIBIT A - 39
162

Case 3:08-cv-00443-BEN-POR Document 22-6 Filed 08/04/2008 Page 1 of 18

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

La Paz, Baja California Sur, April 21, 2008.

**Sr. Arsenio Farell Campa.**
**Owner of the vessel "MI BARUR"**

The undersigned expert in fire and explosions renders the following:

**REPORT**

**I.- Exposition of the problem.**

To determine the causes and origin of the fire occurred in the vessel named "MI BARUR" at approximately the 09:30 hours, in October 20, 2007.

**II.- VESSEL INFORMATION.**
Name of the vessel: "**MI BARUR**".
Manufacturer: **HATTERAS.**
Length: **92 PIES.**
Model: **MOTOR DEL YATE 92.**
Year: **1990.**
Documentation HIN: **HATDT3011990 NUMERO OFICIAL DE EUA 975461.**
Material of the hull: **FIBRA DE VIDRIO REFORZADO.**
Type of fuel: **DIESEL.**
Color: **BLANCO CON FRANJA AZUL.**

**III.- TECHNICAL INSPECTION OF THE VESSEL "MI BARUR".**

**Site of the investigation.**
Standing in the city of La Paz Baja California Sur, México, in the dockyard Abaroa, in Abril 07, 2008, I had in sight the debris of the vessel named "MI BARUR", of which, at first sight, I observed damages caused by fire; the vessel was extracted from the sea on this date in order to realize this technical examination.

**EXHIBIT A - 40**
**163**

EXHIBIT C 0272

Ing. Mario Ricardo Saldaña Nolasco.
Perito en Incendios y Explosivos.

**External inspection.**

In the first previous walking around the vessel, I observed that the upper part of the vessel disappeared, **when observing the vessel from the starboard** (right side) it was observed that the central part shows the greatest damages caused by fire and that the prow-side portholes show signs of smoke, while walking around it, **when seeing the vessel from the por side** (left side) they were observed signs of smoke in the portholes of the prow, as well in its central part, as the walking continued, **when arriving to the stern** (rear part) I observed damages caused by fire in the upper part (see photographs 1,2 and 3).



Photograph number 1.- Starboard (right side of the vessel).

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 2.- Port (left side of the vessel).

Ing. Mario Ricardo Saldaña Nolasco.
Perito en Incendios y Explosivos.



Photograph number 3.- Stern (Rear part of the vessel)

**Inside inspection.**

When I had access to the inside of the vessel through a stairway, I had a general view from the highest point, confirming the vanishing of the upper part of the vessel, as well as observing the total damages caused by the fire and observing that the in the internal part of the vessel may remnants and debris spread all over exists, observing the greater concentration of these debris in the middle part of the vessel to the port (left side) where it was located ***the crew's lounge*** (see Photographs 4,5, 6 and the location in the vessel's scheme).

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 4.- General view from the Prow (front side).

Ing. Mario Ricardo Saldaña Nolasco.
Perito en Incendios y Explosivos.



Photograph number 5.- General view from the Stern (rear side).



*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

Photograph number 6.- Concentration of debris in the crew's lounge (see the location in the vessel's scheme).

In the beginning of the technical inspection from the **Prow** it was observed that the front part of the prow is semi-complete, displaying a burnt pattern from stem to prow (from rear to front) and which shows greater damages caused by fire in the port side (left side of the vessel) (see photograph 7).



Photograph number 7.- They are observed greater damages in the port side (left side) with a fire direction from stern to prow (from rear to front).

Standing in the area where the **captain's cabin** were, which were located in the prow side (front part) at starboard (right side), I observed the existence of debris from the deck's upper-right-side (see photograph 8).

Case 3:08-cv-00443-BEN-POR Document 22-6 Filed 08/04/2008 Page 8 of 18

Ing. Mario Ricardo Saldaña Nolasco.
Perito en Incendios y Explosivos.



Photograph number 8.- They are observed debris from deck's starboard side (right side).

The starboard's portholes (right side) in their frames show carbonization, that the **central post** which serves as support to divide the area of the showers of the captain's cabin with the crew's cabin, shows a burnt pattern from top to bottom with a fire direction from port to starboard (from left to right) finding in its right side debris of a **door and a wall** that divide the showers and bathroom areas, these door and wall show the greater damages caused by fire in their upper part obeying the burnt pattern from top to bottom with a fire direction from port to starboard (from left to right), observing that the base of the door is complete and the absence of the bathroom furniture.

Continuing my intervention, it was observed the absence of the **door which divides the bathroom area and the cabin**, as well as the wall which divides the **crew's cabin and the captain's cabin**, where wardrobes

Case 3:08-cv-00443-BEN-POR Document 22-6 Filed 08/04/2008 Page 9 of 18

Ing. Mario Ricardo Saldaña Nolasco.
Perito en Incendios y Explosivos.

existed, observing in the bottom part of this area, rest of the bases of these walls, as well as rests of the base of the bedroom.

**While inspecting the carpet** it was found that the carpet does not show damages caused by fire, being free of any damage caused by fire, later it was observed over the floor of the corner formed by the stairway a mark or sign of a square form of a refrigerator type furniture (see photographs 9 and 10)



Photograph number 9.- Door located between the area of showers and the bathroom of the captain's cabin, its base is complete, in the bathroom area it can be observed the absence of furniture.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 10.- The carpet of the captain's cabin does not show damages caused by fire (right side).

Standing in the aisle located **between the cabins of the crew and the captain,** it was observed that the carpet shows damages caused by fire with a direction from stern to prow (from rear to front) and from port to starboard (from left to right), later it was found over the floor the mark or sign of a square form of a freezer type furniture (see photograph 11).

**EXHIBIT A - 40**
**172**

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 11.- Over the aisle which divides the cabins of the crew and the captain shows damages caused by fire with a port to starboard direction (from left to right).

Standing in the area where the **crew's cabin** were located it was observed that such area does not show deck's debris, what indicates that the port side (left side of the vessel) was more exposed to the fire, that in the frames of its portholes show signs of carbonization, that it was observed the absence of the wall and the door that divide the showers and the bathroom areas, where in the base of the door can be seen greater carbonization than in the base of the door of the shower of the captain's cabin (see photograph 12).

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 12.- It can be seen greater damages caused by fire in the base of the door of the shower of the crew's cabin than in the base of the door of the shower of the captain's cabin.

Seeing in this place the absence of bathroom furniture, continuing my intervention it was observed the absence of the door that divides the bathroom and the cabin areas, as well as the wall that divides the captain's cabin and the crew's cabin where a wardrobe existed, observing that the carpet shows damages caused by fire with a burnt pattern from stern to prow (from rear to front) with a fire direction from port to starboard (from left to right) (see photographs 13, 14 and 15).

*Ing. Mario Ricardo Saldaña Nolasco*
*Perito en Incendios y Explosivos*



Photograph number 13.- Bathroom area it is observed the absence of furniture, as well as it can be seen a burnt pattern from top to bottom.



Photograph number 14.- Rests of the wall that divides the captain's cabin and the crew's cabin where a wardrobe existed.

Case 3:08-cv-00443-BEN-POR Document 22-6 Filed 08/04/2008 Page 14 of 18

Ing. Mario Ricardo Saldaña Nolasco.
Perito en Incendios y Explosivos.



Photograph number 15.- Carpet of the crew's cabin with a burnt pattern from stern to prow (from rear to front) and port to starboard (from left to right).

Standing in the **cabin named VIP**, which is located in the left side down the stairway that come from the kitchen, when removing the debris it was found the base of a matrimonial bed which do not show damages caused by fire (see photograph 16), that the wall which is located in this cabin and the stairway show damages caused by fire with a burnt pattern from top to bottom, that the furniture which were located in the right side of the bed show damages caused by fire with a pattern from top to bottom, likewise observing that the wall which is located over the bed-head shows a mark of fire in a swing form with a burnt pattern in radial form and with a direction from top to bottom (see photographs 17, 18 and 19).

Ing. Mario Ricardo Saldaña Nolasco.
Perito en Incendios y Explosivos.



Photograph number 16.- Removing the debris of the cabin named VIP and sight of the wall located between the cabin and the stairway, where it can be seen a burnt pattern from top to bottom, base of the matrimonial bed at sight which do not show damages of fire.



Photograph number 17.- Wall located at the bed-head which shows a mark of a "swing", with a burnt pattern from top to bottom.

*Ing. Mario Ricardo Saldaña Nolasco,*
*Perito en Incendios y Explosivas.*



Photograph number 18.- Sight of the mark left by the fire in a "swing" form.



Photograph number 19.- Sight of the mark left by the fire in a "swing" form.

Case 3:08-cv-00443-BEN-POR Document 22-6 Filed 08/04/2008 Page 17 of 18

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

Standing in the area used as dinning room (crew's lounge) which is located to the left of the cabin named VIP, once removed the debris, it was found a table, two seats, and a furniture which is located to left of the table, all of which show damages caused by fire with a burnt pattern from top to bottom and with a direction from stern to prow (from rear to front) (see photographs 20, 21 and 22). Likewise, it is important to mention that in this point of the boat the burnt pattern changes direction, as from this point it parts to two directions, one towards the stern (rear) and the other towards the bow (front).



Photograph number 20.- Sight of the dinning room or crew's lounge once the debris were removed, where it can be seen in the back of the seat the same burnt pattern in swing form, as well as the table and the furniture at its side shows damages caused by fire with a direction form stern to prow (from rear to front)

EXHIBIT A - 40
179

Case 3:08-cv-00443-BEN-POR Document 22-6 Filed 08/04/2008 Page 18 of 18

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 21.- Detail of the table and the furniture where it can be seen the fire direction from stern to prow (from rear to front of the vessel)



Photograph number 22.- Detail of the mark of the fire direction in the dinning room's table or dinning table, from stern to prow (from rear to front).

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

It should mention that **the rooms used as dinning room** (*crew's lounge*) **and the cabin named VIP** are located in a lower level than the cabins designated to the crew and the captain in approximately 1.00 meter, in such rooms it can be seen the collapse of their soffit (at the same time floor of the kitchen) and that a part of that roof was found inside the debris, where it can be seen they show damages caused by fire in its internal layer (see photographs 23, 24 and its location in the vessel's scheme).



Photographs number 23.- Where it can be seen the unevenness.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 24.- Part of the kitchen's floor, which at the same time was the soffit of the dinning room or dining table rooms and VIP cabin.

Standing at the debris that are left in the **kitchen's floor level** to the starboard side it was observe remnants of the kitchen's door, where it can be seen that it shows damages caused by fire with a burnt pattern from bottom to top, and with a direction from port to starboard (from left to right), where it can be seen damages beneath the kitchen's floor level (see photograph 25 and 26.)

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 25.- Kitchen's door where it can be seen that the damages caused by fire show a burnt pattern from bottom to top and in a level beneath the kitchen's floor.



Photograph number 26.- Deck's aisle at the height of the kitchen's door, where it can be seen the burnt pattern from bottom to top.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos*

When passing the **machinery area** it was observed that this vessel has two engines in its central part, one for port and other for starboard, as well as two generators located in its ends, one for port and the other one for starboard, which show damages caused by fire, radiant heat, smoke, with a burnt pattern from top to bottom and with a fire direction from prow to stern (from front to rear).



Photograph number 27.- Starboard's Engine and Generator observing the damages caused by fire with a burnt pattern from top to bottom and with a fire direction from the middle part towards the stern (backward).

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 28.- Port's Engine and Generator observing the damages caused by the fire with a burnt pattern from top to bottom, and with a fire direction from the middle part of the vessel towards the stern (backward).

Standing in front of the **distribution panel** (loading centre) which is located on the wall towards the prow, it was observed that it shows damages of fire, radiant heat and smoke, observing that the majority of the panel's electric conductives, as other parts, show cuts made by a sharp instrument (see photograph 29, 30, 31, 32, 33 and 34).

**In accordance with the specialized literature, when a cut is made in a conductive cable, is in order to obtain an indicia related to the fact that is investigated, which has to be packed, label, protect and follow the chain custody for its study; <u>it is important to state that said samples or indicia was not showed to the me</u>.**

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 29.- Remnants of the distribution panel or loading centre where it can be observe the burnt pattern from top to bottom.



Photograph number 30.- Conductive cables that show cuts made by a sharp instrument.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 31.- Conductive cables that show cuts made by a sharp instrument.



Photograph number 32.- Conductive cables that show cuts made by a sharp instrument.

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*



Photograph number 33.- Conductive cables that show cuts made by a sharp instrument.



Photograph number 34.- Conductive cables that show cuts made by a sharp instrument.

Case 3:08-cv-00443-BEN-POR Document 22-7 Filed 08/04/2008 Page 9 of 18

*Ing. Mario Ricardo Saldaña Nolasco.*
*Perito en Incendios y Explosivos.*

Continuing with my intervention it was observed beneath each generator **four batteries** that show damages caused by the radiant heat, smoke and oxidation.

Continuing towards the stern they were found debris of two **cabins in the rear part**, the first one located in the corner formed by the stern and the starboard (the rear part of the vessel and the right side) where it can be seen a base for a matrimonial bed, the second one located in the corner formed by the stern and the port (the rear part of the vessel and the left side) in this cabin they were found to bases for individual beds; these cabins show damages caused by fire in their furniture with a burnt pattern from top to bottom with a direction from the middle part of the vessel (crew's lounge) towards the stern (towards the rear part) (see photographs 35 and 36)



Photograph number 35.- Cabin located in the corner formed by the stern and the starboard (the rear part of the vessel and the right side) where it can be seen damages caused by fire with a burnt pattern from top to bottom with a fire direction from the middle part of the vessel towards the stern (towards the rear part).

EXHIBIT A - 40
189