# TAB 1

LEXSEE 17 CAL.APP4TH 1783

**ACL TECHNOLOGIES, INC., Plaintiff and Appellant, v. NORTHBROOK PROPERTY AND CASUALTY INSURANCE COMPANY, Defendant and Respondent.**

**No. G012053.**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

***17 Cal. App. 4th 1773; 22 Cal. Rptr. 2d 206; 1993 Cal. App. LEXIS 868; 93 Cal. Daily Op. Service 6334; 93 Daily Journal DAR 10877***

**August 24, 1993, Decided**

**NOTICE:** [***1] Opinion certified for partial publication. *

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of footnote 1.

**SUBSEQUENT HISTORY:** As Modified September 21, 1993. Review Denied November 17, 1993, Reported at: *1993 Cal. LEXIS 6097.*

**PRIOR HISTORY:** Superior Court of Orange County, No. X-619576, C. Robert Jameson, Judge.

**DISPOSITION:** The language of the pollution exclusion is clear and unambiguous. Whatever shades of meaning inhere in the word sudden, gradual is not one of them. The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court, in an action by an insured against its insurer, involving a claim for expenses to clean up pollutants that leaked from rusted and corroded underground storage tanks on property purchased by the insured, found that any coverage otherwise provided by the policy was excluded under the pollution exclusion, and that the exception for discharges that were "sudden and accidental" was inapplicable. Judgment was entered for the insurer. (Superior Court of Orange County, No. X-619576, C. Robert Jameson, Judge.)

The Court of Appeal affirmed. The court held that the "sudden and accidental" language in the pollution exclusion did not allow for coverage for gradual pollution, even if unexpected and unintentional. The contract language was "clear and explicit" as a lay person would understand it; in context, if "sudden" meant merely "unexpected," then it would have no independent meaning, and insurance contracts are construed to avoid rendering terms surplusage. The word "sudden" must, preceding "accidental," convey a temporal meaning of immediacy, quickness, or abruptness. Accordingly, the court held, in context, "sudden and accidental" unambiguously did not include gradual pollution. It further held that even if the "sudden and accidental" language was ambiguous, coverage would not be consistent with the objectively reasonable expectations of the insured. Whatever "sudden" means, it does not mean gradual, and the ordinary person would never think that something which happens gradually also happens suddenly. (Opinion by Sills, P. J., with Moore and Wallin, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1a) (1b) (1c) (1d) (1e) Insurance Contracts and Coverage § 17--Rules in Aid of Interpretation of Contracts--Reasonable and Ordinary Meaning of Words--Pollution Exclusion--Sudden and Accidental Discharge.** --In an action by an insured against its insurer, involving a claim for expenses to clean up pollutants that leaked from rusted and corroded underground storage tanks on property purchased by the insured, the trial court properly found that any coverage otherwise provided by the policy was excluded under the pollution exclusion, and that the exception to the exclusion for

discharges that were "sudden and accidental" was inapplicable, since the "sudden and accidental" language did not allow for coverage for gradual pollution. The contract language was "clear and explicit" as a lay person would understand it; in context, if "sudden" meant merely "unexpected," then it would have no independent meaning, and insurance contracts are construed to avoid rendering terms surplusage. The word "sudden" must, preceding "accidental," convey a temporal meaning of immediacy, quickness, or abruptness. Accordingly, in context, "sudden and accidental" unambiguously did not include gradual pollution.

**(2) Courts § 40--Doctrine of Stare Decisis--Opinions of Lower Federal Courts--Unpublished Opinions.** --Unpublished federal slip opinions that have not been officially published, and can only be "accessed" by means of a computerized legal research service, are beyond the cognizance of California courts. The California rule against citation to unpublished opinions makes no differentiation between state and federal cases (*Cal. Rules of Court, rule 977(a)*).

**(3a) (3b) (3c) Insurance Contracts and Coverage § 10--Rules in Aid of Interpretation of Contracts--Fundamental Principles.** --Under the rules for interpreting insurance contracts, if contractual language is clear and explicit, it governs. If there is ambiguity in a promise, its terms must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it. When particular policy language is ambiguous, it is interpreted in the sense the insurer believed the insured understood it at the time of formation. Only if application of this last rule does not resolve the ambiguity should the courts then resolve the ambiguity against the insurer. Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract. The fact that a number of courts have disagreed over the meaning of a word does not show the word is ambiguous. Different jurisdictions apply different rules governing the issue of textual ambiguity, and so may reach different results that are not necessarily logically inconsistent.

[See 1 **Witkin**, Summary of Cal. Law (9th ed. 1987) Contracts, § 699.]

**(4) Insurance Contracts and Coverage § 13--Rules in Aid of Interpretation of Contracts--Interpretation as Affected by Intent of the Parties--Pollution Exclusion--"Sudden and Accidental."** --In an action by an insured against its insurer, involving a claim for expenses to clean up pollutants that leaked from rusted and corroded underground storage tanks on property purchased by the insured, the trial court properly found that any coverage otherwise provided by the policy was excluded under the pollution exclusion, and that the exception for discharges that were "sudden and accidental" was clearly inapplicable, since even if the "sudden and accidental" language was ambiguous, coverage would not be consistent with the objectively reasonable expectations of the insured. Whatever "sudden" means, it does not mean gradual, and the ordinary person would never think that something which happens gradually also happens suddenly. The words are antonyms. Accordingly, no objectively reasonable policyholder would expect the word "sudden" to allow for coverage for gradual pollution. "Sudden" never means both "unexpected and gradual."

**(5a) (5b) Insurance Contracts and Coverage § 11--Rules in Aid of Interpretation of Contracts--Interpretation as Question of Law--Pollution Exclusion--Drafting History.** --In an action by an insured against its insurer, involving a claim for expenses to clean up pollutants that leaked from rusted and corroded underground storage tanks on property purchased by the insured, in which the trial court properly found that any coverage otherwise provided by the policy was excluded under the pollution exclusion, and that the exception for discharges that were "sudden and accidental" was clearly inapplicable, the "sudden and accidental" language could not be construed to include coverage for unintended and unexpected pollution, even if it occurred gradually, by reliance on the "drafting history," particularly "industry interpretations," of the exclusion. A showing of ambiguity is necessary before extrinsic evidence may be admitted to shed light on the meaning of language; the phrase "sudden and accidental" unambiguously did not include "gradual." To allow extrinsic evidence to show that it did would be to allow extrinsic evidence to contradict the terms of the contract in violation of the parol evidence rule (*Code Civ. Proc., § 1856*). Also, reliance on extrinsic drafting history contradicts the basic rule that words in an insurance policy should be interpreted as lay persons would interpret them. Further, there was no evidence that all insurers and insureds, and specifically the parties involved, were aware of the drafting history. Finally, there is no legal authority for the use of drafting history.

**(6) Contracts § 28--Construction and Interpretation--Intention of Parties--Objective Theory.** --California recognizes the objective theory of contracts. It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation.

**(7) Insurance Contracts and Coverage § 128--Actions--Evidence--Burden of Proof--Pollution--Gradualness.** --In an action by an insured against its

insurer, involving a claim for expenses to clean up pollutants that leaked from rusted and corroded underground storage tanks on property purchased by the insured, the trial court properly found that any coverage otherwise provided by the policy was excluded under the pollution exclusion, and that the exception for discharges that were "sudden and accidental" was clearly inapplicable. Assuming the insurer had the burden of showing that the release was not sudden and accidental, that burden was met by substantial evidence that the release of contaminants was a result of holes in the tanks which developed over time as a result of rust. Corrosion is, by definition, a gradual process. When there is no evidence of any traumatic release during the policy period, and substantial evidence of release from gradual corrosion, it is reasonably obvious that an insurer has carried any burden it might have to show the applicability of the pollution exclusion.

**COUNSEL:** Aprahamian & Ducote, Harold A. Ducote, Jr., Richard J. Aprahamian, Mark D. Alpert, Susan M. Trager, Geoffrey K. Willis and David E. Kendig for Plaintiff and Appellant.

Latham & Watkins, David L. Mulliken, Kristine L. Wilkes and Michael D. Ramsey as Amici Curiae on behalf of Plaintiff and Appellant.

Long & Williamson, Patrick A. Long, John A. Delis, Gleason, McGuire & Shreffler, Philip J. McGuire and David E. Schroeder for Defendant and Respondent.

Hufstedler, Kaus & Ettinger, John P. Olson, Wiley, Rein & Fielding, Thomas W. Brunner, Christopher D. Cerf, James P. Anasiewicz, Buchalter, Nemer, Fields [***2] & Younger, Randolph P. Sinnott, Cheryl A. Orr, Harwood Lloyd, Victor C. Harwood III, Edward Zampino and Bernadette M. Peslak as Amici Curiae on behalf of Defendant and Respondent.

**JUDGES:** Opinion by Sills, P. J., with Moore and Wallin, JJ., concurring.

**OPINION BY:** SILLS, P. J.

**OPINION**

[*1777]

[**207] I. INTRODUCTION

Insurance claims arising out of leaking underground storage tanks raise the question of who will pay for the cleanup of millions of tons of toxic waste produced in the United States since World War II. This problem has sparked a legal war that has raged in both federal and state courts from Maine to California. (See *Northern Ins. Co. v. Aardvark Associates (3d Cir. 1991) 942 F.2d 189, 191*; see also *Avondale Industries, Inc. v. Travelers Indem. Co. (2d Cir. 1989) 887 F.2d 1200, 1201* ["the vast carelessness that created the conundrum of [**208] hazardous waste . . . will not be quickly or easily remedied"].) Much of the strife has focused on the precise issue of whether the "sudden and accidental" exception to the pollution exclusion contained in the 1973 version of the standard comprehensive general liability insurance policy (CGL) [***3] allows for coverage for pollution which escaped gradually.

This case, like many throughout the country, involves a claim for expenses to clean up pollutants which leaked from rusted and corroded underground storage tanks. The trial judge found the release of the pollutants was gradual. He therefore held, among other things, that the pollution exclusion precluded coverage. We agree and affirm the judgment in favor of the insurer. Gradual is the opposite of sudden.

II. FACTS

In August 1984 ACL Technologies purchased some property in an industrial section of Santa Ana. About the same time the company obtained a [*1778] CGL policy from Northbrook Property and Casualty Insurance Company, with the policy period from September 28, 1984, to September 28, 1985. Unknown to ACL at the time, the property contained underground storage tanks which had been used to store hazardous substances for over two decades.

ACL first learned of the tanks in late 1985 or early 1986 when the Santa Ana Fire Department ordered the company to "establish testing conditions" on the tanks or remove them. City officials later explained that a city ordinance required all underground storage tanks be monitored [***4] and used or declared out of service and removed.

In January, February, and April 1988 the tanks were removed. They were rusted and had many small holes (largest about an inch in diameter); a particularly large (12,000-gallon) tank had a split seam about an inch and one-half long at the junction of the end and side plates. Corrosion was visible in the area of the split. Photographs were taken of the newly removed tanks.

Soil samples from the area around the tanks showed contamination. The city and the California Regional Water Quality Control Board then ordered ACL to develop a cleanup plan. ACL presented Northbrook with a claim for the cost of the cleanup, which Northbrook denied. ACL then filed this lawsuit for breach of contract and declaratory relief.

**(1a)** The CGL policy issued by Northbrook contained this exclusion: "This part does not insure: [P] (f) bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does [***5] not apply if such discharge, dispersal, release or escape is sudden and accidental."

Trial was to the court, which specifically found that the pollutants escaped through leaks caused by corrosion, and that this corrosion occurred gradually over an "extended" period of time. Accordingly, the court concluded that any coverage otherwise provided by the policy was excluded under the policy's pollution exclusion. As the judge put it, "the word 'sudden' is directed at rupture or human error, an explosion, a spill, something which occurs abruptly, and the term is used to specifically exclude the situation which happens in this case, and that is the corrosion over an extended period of time of the pipes or tanks in the ground which could actually cause a leaking situation over several years, such as in this case."

[*1779] ACL now appeals from the ensuing judgment. * *

* See footnote, *ante*, page 1773.

III. DISCUSSION

A. *GRADUAL IS THE OPPOSITE OF SUDDEN*

The Supreme Courts of Massachusetts, [2] [**209] [***6] Michigan, [3] North Carolina, [4] and Ohio [5] have held that the word "sudden" or the phrase "sudden and accidental" as used in the 1973 pollution exclusion did not allow for liability coverage arising from gradual pollution, with state intermediate appellate courts and federal courts construing state law unanimously taking the same position in Indiana, [6] Kansas, [7] Kentucky, [8] New Hampshire, [9] Pennsylvania, [10] [*1780] South Carolina, [11] Tennessee, [12] and Utah. [13] With our opinion today, and the recent decision in *Shell Oil Co. v. Winterthur Swiss Ins. Co. (1993) 12 Cal.App.4th 715, 752 [15 Cal.Rptr.2d 815]* (" *'Sudden' Events Start Abruptly*"), California should be added to this list.

2 *Lumbermens Mut. Cas. v. Belleville Ind. (1990) 407 Mass. 675 [555 N.E.2d 568, 572]* ("For the word 'sudden' to have any significant purpose, and not to be surplusage when used generally in conjunction with the word 'accidental,' it must have a temporal aspect to its meaning, and not just the sense of something unexpected.").

[***7]

3 *Upjohn Co. v. New Hampshire Ins. Co. (1991) 438 Mich. 197 [476 N.W.2d 392, 397]* ("We conclude that when considered in its plain and easily understood sense, 'sudden' is defined with a 'temporal element that joins together conceptually the immediate and the unexpected.' ").

4 *Waste Management v. Peerless Ins. Co. (1986) 315 N.C. 688 [340 S.E.2d 374, 383]* (holding that waste material that had leached into groundwater had not done so suddenly and was therefore "clearly excluded by the plain terms of the pollution exclusion"). See also *Harleysville Mut. v. R.W. Harp and Sons (1991) 305 S.C. 492 [409 S.E.2d 418]* (applying North Carolina law and following *Waste Management*).

5 *Hybud Equip. v. Sphere Drake Ins. (1992) 64 Ohio St.3d 657 [597 N.E.2d 1096, 1103]* ("The inclusion of the word 'sudden' readily indicates that the exception was not intended to apply to a release that occurred over an extended time.").

6 *Barmet of Indiana v. Security Ins. Group (Ind.App. 1981) 425 N.E.2d 201, 203* ("regular and frequent" emissions from malfunctioning of pollution control system at an aluminum recycling plant held not sudden and accidental).

[***8]

7 *U. S. Fidelity & Guar. v. Morrison Grain Co. (D.Kan. 1990) 734 F.Supp. 437, 446* ("To divorce 'sudden' of its temporal component would eviscerate it of any independent meaning or force."); see also *American Motorists Ins. Co. v. General Host Corp. (D.Kan. 1987) 667 F.Supp. 1423, 1429* ("The language is clear and plain, something only a lawyer's ingenuity could make ambiguous.").

8 *U. S. Fidelity and Guar. v. Star Fire Coals, Inc. (6th Cir. 1988) 856 F.2d 31, 34* ("We believe the everyday meaning of the term 'sudden' is exactly what this clause means. We do not believe that it is possible to define 'sudden' without reference to a temporal element that joins together conceptually the immediate and the unexpected.").

9 *Great Lakes Container v. National Union Fire Ins. (1st Cir. 1984) 727 F.2d 30, 33-34* (no allegation of sudden and accidental release where groundwater was contaminated by migration of wastes discharged from barrel reconditioning operation).

10 *Lower Paxon Tp. v. U.S. Fid. and Guar. Co. (1989) 383 Pa. Super. 558 [557 A.2d 393, 402]* ("To read 'sudden and accidental' to mean only unexpected and unintended is to rewrite the policy by excluding one important . . . requirement--abruptness of the pollution discharge. The very

use of the words 'sudden *and* accidental' . . . reveal a clear intent to define the words differently."); *Techalloy Co.* v. *Reliance Ins. Co (1984) 338 Pa. Super. 1 [487 A.2d 820, 827]* ("it is immediately apparent that Peterman did not allege a sudden event. In contrast, the allegations were directly the opposite, identifying the source of the problem as contamination which occurred on a 'regular or sporadic basis from time to time during the past 25 years' "); *Northern Ins. Co. v. Aardvark Associates, supra, 942 F.2d 189, 192* (following *Lower Paxon Tp.*); *Centennial Ins. Co.* v. *Lumbermens Mut. Cas. Co. (E.D.Pa. 1987) 677 F.Supp. 342, 348* ("This Court cannot characterize continuous activity . . . as sudden."); *Fischer & Porter Co.* v. *Liberty Mut. Ins. Co. (E.D.Pa. 1986) 656 F.Supp. 132, 140* ("The plain, ordinary meaning of the word 'sudden' signifies an event that occurs abruptly, without warning."); *American Mut. Liability Ins. v. Neville Chemical (W.D.Pa. 1987) 650 F.Supp. 929, 933* (following *Techalloy*).

[***9]

11 *Greenville County v. Insurance Res. Fund (S.C.App. 1993) 427 S.E.2d 913, 917* ("the word 'sudden' was included in the policy to cover an event not yet defined by the policy, i.e. a release which was abrupt or precipitant. We find further support for this interpretation by the realization that if we were to otherwise define the word 'sudden,' the language of the occurrence provision, the pollution exclusion clause and its exception becomes unduly repetitious.").

12 *U.S. Fidelity & Guar. Co. v. Murray Ohio Mfg. Co. (M.D.Tenn. 1988) 693 F.Supp. 617, 622* ("Simply put, an event that occurs over the course of six years logically cannot be said to be 'sudden.' ").

13 *Hartford Acc. & Indem. Co. v. USF & G (10th Cir. 1992) 962 F.2d 1484, 1489* (" 'sudden' cannot mean 'gradual,' 'routine' or 'continuous' ").

On the other hand, state Supreme Courts [**210] in Colorado, [14] Georgia, [15] Illinois, [16] West Virginia, [17] and Wisconsin [18] have held the words allowed for coverage of gradual pollution [***10] as long as the pollution was unintended and [*1781] unexpected. State intermediate appellate courts and federal courts construing state law appear united on the same result in Delaware, [19] Minnesota, [20] New Jersey [21] and Washington. [22]

14 *Hecla Min. Co. v. New Hampshire Ins. Co. (Colo. 1991) 811 P.2d 1083, 1092* ("Although 'sudden' can reasonably be defined to mean abrupt or immediate, it can also reasonably be defined to mean unexpected and unintended. Since the term 'sudden' is susceptible to more than one reasonable definition, the term is ambiguous, and we therefore construe the phrase 'sudden and accidental' against the insurer to mean unexpected and unintended.").

15 *Claussen v. Aetna Cas. & Sur. Co. (1989) 259 Ga. 333 [380 S.E.2d 686, 688]* ("even in its popular usage, 'sudden' does not usually describe the duration of an event, but rather its unexpectedness"). The dissent replied, "while 'sudden' may have a number of meanings, and, over the years, may have been used in a number of contexts, in *this* context it clearly means abrupt and unexpected." (*Id. at p. 690* (dis. opn. of Hunt, J.).)

[***11]

16 *Outboard Marine v. Liberty Mut. Ins. (1992) 154 Ill. 2d 90 [180 Ill.Dec. 691, 607 N.E.2d 1204, 1218]* (because there are two reasonable interpretations of sudden in the context in which the term appears, the ambiguity is construed in favor of the policyholder so that sudden is interpreted to mean "unexpected or unintended.").

17 *Joy Technologies v. Liberty Mut. Ins. (1992) 187 W.Va. 742 [421 S.E.2d 493, 500]* ("Liberty Mutual unambiguously and officially represented to the West Virginia Insurance Commission that the exclusion in question did not alter coverage under the policies involved . . . even if it resulted over a period of time and was gradual, so long as it was not expected or intended."). In other places, the *Joy Technologies* court made reference to "the insurance industry" and "the Mutual Insurance Rating Board, acting on behalf of their members and subscribers, including Liberty Mutual," (see *421 S.E.2d at pp. 498-499*), so there can be little doubt the holding in the case would not also apply to any other insurer having issued a standard 1973 CGL.

[***12]

18 *Just v. Land Reclamation, Ltd. (1990) 155 Wis.2d 737 [456 N.W.2d 570, 578]* ("the phrase 'sudden and accidental,' contained in the pollution exclusion clause, means unexpected and unintended damages").

19 *New Castle County v. Hartford Acc. and Indem. Co. (3d Cir. 1991) 933 F.2d 1162, 1198* ("Because the term 'sudden' appears capable of two reasonable interpretations ('abrupt' and 'unexpected'), we conclude that the term is ambiguous under Delaware law.").

20 *Grinnell Mut. Reinsurance Co. v. Wasmuth (Minn.App. 1988) 432 N.W.2d 495, 500* ("The ambiguity inherent in 'sudden' bolsters the lay person's reasonable expectation of coverage.

From Carlson's viewpoint, and the victim's, the release of formaldehyde [gradually, from home insulation] was certainly unexpected, and they could reasonably consider it sudden.").

21 *Du-Wel Products v. U.S. Fire Ins. (1989) 236 N.J.Super. 349 [565 A.2d 1113, 1119]* (coverage where there was "overwhelming evidence" that policyholder "neither expected nor intended" property damage); *Summit Assoc. v. Liberty Mut. Fire Ins. (1988) 229 N.J.Super. 56 [550 A.2d 1235, 1239]* ("our courts have consistently interpreted that exclusion to constitute the equivalent of an occurrence and to eliminate coverage only where such damages appear to be expected or intended on the part of the insured."); *Broadwell Realty v. Fidelity & Cas. (1987) 218 N.J.Super. 516 [528 A.2d 76, 86]* ("By defining the word 'sudden' as meaning unexpected and unintended, we avoid the question whether the focus of the exclusion is upon the release of the contaminant or the resulting permeation . . .."); *Jackson TP., etc. v. Hartford Acc. & Indem. (1982) 186 N.J.Super. 156 [451 A.2d 990, 994]* ("If the inquiry is, as it should be, whether the pleadings charged the insured with an act resulting in unintended or unexpected damage, then the act or acts are sudden and accidental regardless of how many deposits or dispersals may have occurred, and although the permeation . . . may have been gradual . . .."); *CPC Intern. v. Northbrook Excess & Surplus Ins. (1st Cir. 1992) 962 F.2d 77, 87* (agreeing with the analysis in *Broadwell*).

On July 21, 1993, the New Jersey Supreme Court issued an opinion relying on industry interpretations to preclude enforcement of the pollution exclusion as written even though the court acknowledged the word "sudden" has a temporal element. However, the opinion has not yet been released for publication, so we must regard the New Jersey high court as not having spoken definitively on the subject. (See fns. 24 & 34, *post.*)

[***13]

22 *Queen City Farms v. Central Nat. Ins. (1992) 64 Wn.App. 838 [827 P.2d 1024, 1050]* ("we cannot ignore the history which indicates that with respect to these standardized qualified pollution exclusion clauses the insurers' intent was to provide coverage for polluters who neither expected nor intended pollution to occur--and that no coverage that was provided in the occurrence clauses was being taken away in these pollution exclusion clauses"), review granted February 4, 1993; *United Pacific Ins. v. Van's Westlake Union (1983) 34 Wn.App. 708 [664 P.2d 1262, 1266, 39 A.L.R.4th 1040]* (construing pollution exclusion as restatement of definition of "occurrence," and holding policy covered liability for gasoline leaking from hole in tank).

[*1782] [**211] Courts have divided on the subject in Florida, [23] with no definitive word yet from its state Supreme Court. [24] Also, while not directly considering the gradual-sudden dichotomy, the state high courts of New York [25] and Iowa [26] have [***14] treated the "accidental" component of the pollution exclusion in such a way as to indicate that they probably will construe "sudden" as unambiguous. Dicta from state intermediate appellate courts in Oregon [27] and Maryland [28] indicate that those jurisdictions would probably also hold the same way. On the other hand, dicta from the state Supreme Courts of Arkansas, [29] and Alaska [30] lean in the opposite direction. And there is a comparatively early decision from the state Supreme Court of Maine, which, [*1783] while it is sometimes put in the sudden-is-ambiguous column, did not address the gradual-sudden dichotomy and contains something for both sides. [31] The same may be said for a federal district court decision out of Missouri. [32]

23 Compare *Hayes v. Maryland Cas. Co. (N.D.Fla. 1988) 688 F.Supp. 1513, 1515* ("it is clear beyond cavil that the damage was not sudden--the pollution had to be carried on over a considerable period of time") with *Payne v. United States Fidelity & Guar. Co. (S.D.Fla. 1985) 625 F.Supp. 1189, 1193* (enough that underlying complaint was devoid of allegations policyholders intended or expected discharge of PCB's into the environment).

[***15]

24 On July 1, 1993, the Florida Supreme Court issued an opinion in a pollution coverage case (on a motion for rehearing) holding the common meaning of the word sudden includes a sense of immediacy or abruptness. However, as of the time of the drafting of our opinion, the case had not yet been officially "released," and so there was no official or regional reporter to which we could cite. The opinion is thus beyond the cognizance of this court (see fn. 34, *infra*), at least for the time being.

25 *Powers Chemco, Inc. v. Federal Ins. Co. (1989) 74 N.Y.2d 910 [549 N.Y.S.2d 650, 548 N.E.2d 1301, 1302]* ("the exclusion clause is 'unambiguously plain and operative' "); see also *Technicon Electronics v. American Home (1989) 74 N.Y.2d 66 [544 N.Y.S.2d 531, 542 N.E.2d 1048, 1050]* ("discharges that are either nonsudden or nonaccidental block the exception from nullifying the pollution exclusion"). In *Powers Chemco*, the court held that the *leaching* of haz-

ardous wastes which arose out of a predecessor's burying drums containing waste, dumping waste liquids into open pits, and discharging wastes through a pipe into pits could not be considered "accidental," relying on *Technicon*. In *Technicon*, the court held that the *intentional* discharge of toxic chemicals into a nearby waterway was not accidental. In light of the holding in *Powers Chemco* that leaching from buried drums was not "accidental," it seems unlikely that the New York high court would strain to hold that it was "sudden."

[***16]

26 *Weber v. IMT Ins. Co. (Iowa 1990) 462 N.W.2d 283, 287* (history of spilling and tracking hog manure onto road meant manure spills were expected and therefore not accidental).

27 See *Mays v. Transamerica Ins. Co. (1990) 103 Ore.App. 578 [799 P.2d 653, 657]* (depositing of wastes in unlined pit as regular part of business operations held within purview of pollution exclusion); *Transamerica Ins. Co.* v. *Sunnes (1985) 77 Ore.App. 136 [711 P.2d 212, 214]* (affirming trial court ruling that intentional discharge of water softener wastes regularly over a period of many years was not 'sudden and accidental').

28 See *Bentz v. Mutual Fire (1990) 83 Md.App. 524 [575 A.2d 795, 802]* (giving "sudden and accidental" their "common accepted meaning," but holding that a contractors' and manufacturers' liability policy (i.e., not a CGL) covered the negligent application of pesticides to a home).

29 *Minerva Enterprises, Inc. v. Bituminous Cas. (1993) 312 Ark. 128 [851 S.W.2d 403, 404]* (in process of holding that a backup of a septic tank in a mobilehome park was not a pollutant within the meaning of the exclusion, the court stated that the exclusion was never intended to apply to "those who are not active polluters").

[***17]

30 *Sauer v. Home Indem. Co. (Alaska 1992) 841 P.2d 176, 181*, footnote 8 (favorable treatment of cases holding "sudden" is ambiguous).

31 In *Travelers Indem. Co. v. Dingwell (Me. 1980) 414 A.2d 220, 223*, the court held there was a duty to defend a class action suit seeking damages for contamination of well water because the complaint might have encompassed unintentional spills rather than deliberate releases. But the court also said "(a) release may be unexpected and unintentional, without being sudden and accidental," suggesting it might be inclined to accord "sudden" an independent meaning.

32 *U.S. v. Conservation Chemical Co. (W.D.Mo. 1986) 653 F.Supp. 152, 203-204* (special master's recommendation to deny summary judgment where there was evidence of pollution from "incidents that it would be difficult to characterize as gradual," but also suggesting there is ambiguity in the pollution exclusion).

In light of the foregoing, it would appear that claims by one side or the other for possession [***18] of the "majority rule" are at [**212] present premature. [33] **(2)** (See fn. 34.) The best we can do is note how the jurisdictions are divided as we write in the late spring and summer of 1993. [34]

33 In *Technicon Electronics v. American Home, supra, 74 N.Y.2d 66 [544 N.Y.S.2d 531, 542 N.E.2d 1048, 1050]*, the court spoke of "an emerging nationwide judicial consensus that the 'pollution exclusion' clause is unambiguous . . .." The last five years have obviously not borne the statement out.

On the other hand, it would appear safe to say that the statement in *Sauer v. Home Indem. Co., supra, 841 P.2d 176, 181*, footnote 8, that "most courts which have interpreted the pollution exclusion consider the phrase 'sudden and accidental' to be ambiguous," is also wrong.

34 We do not consider cases which have not been officially published and can only be "accessed" by means of a computerized legal research service. There appears to be a growing body of unpublished federal court slip opinions that have found their way into the data bases of these services. Such unpublished opinions have, on very rare occasion, been mentioned in published California appellate decisions. (See *American Internat. Group, Inc. v. Superior Court (1991) 234 Cal.App.3d 749, 754, fn. 4 [285 Cal.Rptr. 765]*; *Appalachian Ins. Company v. Superior Court (1984) 162 Cal.App.3d 427, 437 [208 Cal.Rptr. 627]*.) We believe such unpublished federal slip opinions are beyond the cognizance of California courts. The California rule against citation to unpublished opinions makes no differentiation between state and federal cases. (See *rule 977(a) of the Cal. Rules of Court* ["An opinion that is not ordered published shall not be cited or relied on by a court or a party . . .."].)

[***19] Courts on both sides of the divide have generally joined issue on the problem of the multiple shades of meaning inherent in the word "sudden." (See Holmes, *The Theory of Legal Interpretation* (1899) 12 Harv. L. Rev. 417 ["A word generally has several meanings, even in the dictionary. You have to consider the

sentence in which it stands to decide which of those meanings it bears in the particular case, and very likely will see that it there has a shade of significance more refined than any given in the wordbook."], quoted in *Shell Oil, supra, 12 Cal.App.4th at p. 737.*) As ACL and amicus [*1784] curiae Montrose Chemical Company remind us, "sudden" (at least in some contexts) can mean "unexpected." [35] Courts holding in favor of coverage have tended to emphasize that some dictionary definitions of the word do not necessarily convey a sense of abruptness. (See, e.g., *New Castle, supra, 933 F.2d at 1193* ("the word has more than one reasonable definition").) [36]

35 *New Castle County v. Hartford Acc. and Indem. Co., supra, 933 F.2d 1162, 1193-1194*, is a good example of the cases emphasizing this shade of the word's meaning.

[***20]

36 ACL refers us to Ballard and Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion* (1990) *75 Cornell L. Rev. 610, 614*, which lists definitions of "sudden" from a number of dictionaries. These include words which, when taken in isolation, do not necessarily convey the idea of temporality, e.g., "happening without warning," "unforeseen," "unexpected," and "not prepared or provided for."

**(1b)** While ACL and Montrose Chemical Company have emphasized that this court is not bound by the recent decision in *Shell Oil Co. v. Winterthur Swiss Ins. Co., supra, 12 Cal.App.4th 715*, we believe that *Shell Oil* was correctly decided. It followed the basic framework for interpreting insurance contracts articulated by our Supreme Court in *Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]* and *AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253]*. [***21] Using this framework, there is no way that we could come to any other conclusion than that reached in the *Shell Oil* decision: the "sudden and accidental" language in the CGL pollution exclusion does not allow for coverage for gradual pollution. [37] Here is that framework: **(3a)** "If contractual language is clear and explicit, it governs." ( *Bank of the West, supra, 2 Cal.4th at p. 1264*, citing *Civ. Code, § 1638*; *AIU, supra, 51 Cal.3d at p. 822* [the intent of the parties "is to be inferred, if possible, solely from the written provisions of the contract . . .. Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning"]; see *Shell Oil, supra, 12 Cal.App.4th at p. 737* ["The parties' intent is found, if possible, solely in the contract's written provisions."].)

37 *Shell Oil* concerned liability coverage for contamination of soil and groundwater at the Rocky Mountain Arsenal in Colorado. Jury instructions defining "sudden" to limit coverage to abrupt events were upheld.

More recently, *Truck Ins. Exchange v. Pozzuoli, ante*, page 856 [*21 Cal.Rptr.2d 650]*, held that leakage from a gasoline storage tank which had been "going on for at least 60 days" was not "sudden" for purposes of the pollution exclusion in a CGL policy which *specifically defined* "sudden" as " 'not continuous or repeated in nature.' " (, *ante*, at p. 858.) There being no specific definition of "sudden" in the instant case, *Pozzuoli* is not necessarily controlling.

[***22] If there is ambiguity in a promise, its terms must be " 'interpreted in the [**213] sense in which the promisor believed, at the time of making it, that the promisee understood it.' " ( *Bank of the West, supra, 2 Cal.4th at pp. 1264-1265*, quoting *Civ. Code, § 1649*; *AIU, supra, 51 Cal.3d at p. 822* ["If there [*1785] is ambiguity, however, it is [to be] resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation."]; see *Shell Oil Co., supra, 12 Cal.App.4th at p. 737* ["When particular policy language is ambiguous, it is interpreted in the sense the insurer believed the insured understood it at the time of formation."].)

"Only" if application of this last rule does not resolve the ambiguity should the courts "then" resolve the ambiguity against the insurer. ( *Bank of the West, supra, 2 Cal.4th at p. 1265*; *AIU, supra, 51 Cal.3d at p. 822* [***23] ["If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist."]; accord, *Shell Oil, supra, 12 Cal.App.4th at p. 737* ["If that principle cannot remove an ambiguity, as when there is no basis for a belief that the insured understood a term in a specific sense, then the ambiguity is construed against the party who caused the uncertainty to exist."].)

**(1c)** Applying the *Bank of the West* and *AIU* framework, the first question is whether the contract language is "clear and explicit" as a layperson would understand it. **(3b)** In deciding this question, we keep in mind that " '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract*.' " ( *Bank of the West, supra, 2 Cal.4th at p. 1265*, quoting *Producers Dairy Delivery Co. v. Sentry Ins. Co. (1986) 41 Cal.3d 903, 916, fn. 7 [226 Cal.Rptr. 558, 718 P.2d 920]*, italics [***24] by the *Bank of the West* court.)

**(1d)** The most immediate "context" for the word "sudden" is its link, in the pollution exclusion, to the word "accidental." Plainly, for there to be coverage (i.e., for the exclusion not to apply), the release must be both "sudden and accidental." If, in the context of the pollution exclusion, "sudden" meant *merely* "unexpected," then it would have no independent meaning, as the idea would also be subsumed within the word "accidental." The word would be reduced to surplusage. In California, however, contracts --even insurance contracts--are construed to avoid rendering terms surplusage. (E.g., *AIU, supra, 51 Cal.3d at p. 827* [declining to apply a definition of "damages" which would render "redundant" the phrase "legally obligated to pay"]; *Shell Oil, supra, 12 Cal.App.4th at p. 753* ["The way we define words should not produce redundancy . . . ."]; *Stein v. International Ins. Co. (1990) 217 Cal.App.3d 609, 613-614 [266 Cal.Rptr. 72]* [distinguishing between "claims" and "suits" to avoid redundancy]; [***25] *Mid-Century Ins. Co. v. Bash (1989) 211 Cal.App.3d 431, 438 [259 Cal.Rptr. 382]* ["To interpret the [*1786] policy provision as respondent does would render the words 'financial responsibility' mere surplusage."]; *Southern Ins. Co. v. Domino of California, Inc. (1985) 173 Cal.App.3d 619, 624 [219 Cal.Rptr. 112]* [rejecting policyholder interpretation that would render words "of property" redundant].)

To avoid the surplusage problem, the Third Circuit turned cartwheels in *New Castle County* to extract a meaning for "sudden" that was not "completely synonymous" with "accidental." (See *933 F.2d at p. 1194* ["We believe that the word 'sudden,' even if defined to mean 'unexpected,' is not completely synonymous with the [**214] word 'accidental.' "].) [38] The flaw in such an approach is that it strains the word accidental, wrenching the word from its natural embrace of the concept of unexpectedness. It is thus necessary, to give the word "sudden" a definition severed from any idea of temporality and still not run afoul of the strictures against surplusage, to strip [***26] the concept of "accident" of one of its most common ideas, unexpectedness. This is contrary to both established canons and common sense. (See *Reserve Insurance Co. v. Pisciotta (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764]* ["Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists."]; *Aim Insurance Co. v. Culcasi (1991) 229 Cal.App.3d 209, 219 [280 Cal.Rptr. 766]* ["Courts, however, should not strain to find ambiguity where none reasonably exists."]; *Barrett v. Farmers Ins. Group (1985) 174 Cal.App.3d 747, 752 [220 Cal.Rptr. 135]* ["Courts should not indulge in forced construction so as to cast upon the insurance company liability which it has not assumed."].)

38 *New Castle County* did not cite any authority on the surplusage point.

Even if, for the sake of argument, there is some "abstract" sense [***27] in which the word "sudden" does not necessarily convey a temporal meaning, the context of its placement in the phrase "sudden and accidental" necessarily conveys a temporal meaning. In the context of that phrase, the word *must*, if it is to be anything more than a hiccup in front of the word "accidental," convey a "temporal" meaning of immediacy, quickness, or abruptness.

The best argument that can be adduced to meet the surplusage point is that insurance policies "routinely use words that, while not strictly redundant, are somewhat synonymous." ( *New Castle, supra, 933 F.2d at p. 1194.*) So what, ACL asks rhetorically, if confining "sudden" to "unexpected" results in a redundancy?

The first answer, of course, is that defining terms in contracts to render them redundant is contrary to established principles of contract interpretation as laid down by our Supreme Court. As we have already shown, the [*1787] antiredundancy principle extends to insurance contracts, including, as in *AIU* and *Shell Oil*, those involving questions of coverage for pollution.

Additionally, the argument founders within the context of the so-called redundancies in [***28] the pollution exclusion itself. It is not enough that the meanings of two words, "sudden" and "accidental," overlap. Of course they overlap. The world is full of accidents which happen suddenly. The critical point, however, is that the interpretation ACL and Montrose Chemical Company proffer renders "sudden" a mere subset of "accidental," making it totally redundant.

It is one thing for meanings of individual words to overlap. It is quite another to interpret them so that they add nothing in the context in which they are used. In the earlier portion of the pollution exclusion, for example, it is undoubtedly true that the meanings of the words "discharge, dispersal, release or escape" overlap. But they also each convey a different nuance of meaning bearing on just exactly how "pollution" may have "gotten out." Likewise the words "smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants" also obviously overlap, but again each conveys a slightly different thought. Given that the phrase "sudden and accidental" consists of only two words, there is all the more reason to conclude that "sudden" was intended [***29] to convey some independent meaning not subsumed by "accidental." Giving "sudden" a meaning independent of "accidental," therefore, requires giving it a meaning with a temporal aspect--immediacy, quickness or abruptness--that does not allow it to cover events, such as happened in this case--that occurred gradually. **(3c)** (See fn. 39.) **(1e)** We therefore conclude, in the context of this case,

that "sudden and accidental" unambiguously does not include gradual pollution. [39]

39 One argument that sometimes crops up in the cases is that *the very fact* a substantial number of courts have disagreed over the meaning of "sudden" shows the word is ambiguous. (See, e.g., *New Castle County, supra, 933 F.2d at p. 1196* ["We agree with this assertion to a certain extent."]; *Just v. Land Reclamation, Ltd., supra, 456 N.W.2d at p. 578* ["the fact that substantial conflicting authority exists . . . merely serves to strengthen the conclusion that the terms are susceptible to more than one meaning, and thus ambiguous"].)

The argument is unpersuasive. Different jurisdictions apply different rules governing the issue of textual ambiguity, and so may reach different results which are not necessarily logically inconsistent. The mere fact that judges of diverse jurisdictions disagree does not establish ambiguity under the particular principles which govern the interpretation of insurance contracts in California (see *ante*, at pp. 1784-1785).

Specifically, cases which have held, on linguistic grounds, that the words sudden and accidental are ambiguous have typically relied on the simple fact there are nontemporal dictionary definitions of the word sudden (see fn. 36, *ante*) to reach their result. (See, e.g., *New Castle County, supra, 933 F.2d 1162*; *Hecla Min. Co. v. New Hampshire Ins. Co., supra, 811 P.2d 1083.*) In essence, these courts considered it sufficient that ambiguity be established *in the abstract.* Whatever the intrinsic merits of this idea, it is contrary to the rule in California. ( *Bank of the West, supra, 2 Cal.4th at p. 1265*, quoted *supra* at p. 1785.)

Other cases have reached different results on nonlinguistic grounds. Some jurisdictions--but not California--allow extrinsic evidence even where contract terms are unambiguous (see discussion, *infra*, at p. 1792 [Oregon allows, California does not]). And some jurisdictions have relied on an "estoppel" or regulatory history rationale not necessarily related to any textual ambiguity (see, e.g., *Joy Technologies v. Liberty Mut. Ins., supra, 421 S.E.2d 493*; see also *Queen City Farms, supra, 827 P.2d 1024, 1049-1050* [partial reliance on drafting history]).

[***30] [*1788] [**215] **(4)** However, even if, for sake of argument, one concludes that "sudden and accidental" is ambiguous, the judgment must still be affirmed. Following the framework of *Bank of the West* and *AIU*, ambiguity would require us to address whether coverage is consistent with the *objectively reasonable* expectations of the insured. It clearly is not.

One of the less remarked aspects in the great war over the pollution exclusion is this: whatever "sudden" means, it does not mean gradual. The ordinary person would never think that something which happened gradually also happened suddenly. The words are antonyms. As our colleagues in *Shell Oil* put it, "We cannot *reasonably* call 'sudden' a process that occurs slowly and incrementally over a relatively long time." (*12 Cal.App.4th at p. 754*, italics added.) The word "sudden" has been recognized as conveying a meaning *opposite* to that of gradual in usage by both the California Supreme Court and the various state courts of appeal. (See *City of Long Beach v. Mansell (1970) 3 Cal.3d 462, 469, fn. 4 [91 Cal.Rptr. 23, 476 P.2d 423]* [***31] [contrasting "gradual natural *accretion*" with "sudden *avulsion*"]; *Prudential-LMI Com. Insurance v. Superior Court (1990) 51 Cal.3d 674, 698 [274 Cal.Rptr. 387, 798 P.2d 1230]* [quoting journal article contrasting "sudden damage such as fire and windstorm" with "gradual damage such as settlement"]; *Heckman v. Swett (1893) 99 Cal. 303, 305 [33 P. 1099]* [quoting trial court findings that "cutting, washing, and carrying away was not slow, gradual, and imperceptible in its progress; but, upon the contrary, the same was rapid, sudden, and perceptible"]; *T. L. Enterprises, Inc. v. County of Los Angeles (1989) 215 Cal.App.3d 876, 877 & 879 [263 Cal.Rptr. 772]* ["Appellant contends: . . . 'The damage incurred by the improvement was "sudden". . ..' " [P] . . . [P] "Appellant's first contention lacks merit. Contrary to its position, the evidence shows the damage to the property occurred gradually over an extended period of time."]; *Ulwelling v. Crown Coach Corp. (1962) 206 Cal.App.2d 96, 126 [23 Cal.Rptr. 631]* [***32] ["all witnesses heard it; it was sudden--not a slow or gradual escape of air"]; *Goldman v. Goldman (1959) 169 Cal.App.2d 103, 106 [336 P.2d 952]* ["It is not a disease of sudden onset, 'the very meaning of the term "schizo" means [*1789] gradual onset.' "]; *Bohn v. Albertson (1951) 107 Cal.App.2d 738, 748* [quoting New York case contrasting "gradual or imperceptible encroachment on the land" with a "sudden or violent action of the elements"].) While we recognize these cases do not represent the product of sustained judicial meditation on the subtleties inherent in the word "sudden," they do illustrate what the ordinary person readily knows: gradual is the opposite of sudden. [40] Accordingly, no *objectively* reasonable policyholder [**216] would expect the word "sudden" to allow for coverage for gradual pollution. [41] "Sudden" never means *both* "unexpected and gradual." [42]

40 The tendency of some courts to define "sudden" in such a way as to encompass gradual pollution brings to mind W. S. Gilbert's description of the lawyer Sir Bailey Barre, Q.C., M.P., in *Utopia, Limited*, one of Gilbert and Sullivan's lesser-known operas:

"A marvelous Philologist, who'll undertake to show

"That 'yes' is but another and a neater form of 'no.' " (Jefferson, The Complete Gilbert & Sullivan Opera Guide (1984) p. 303.)

[***33]

41 Indeed, one curious aspect of the leading cases interpreting "sudden" as merely "unexpected" or "unexpected and unintended" so as to allow for coverage for gradual pollution is that they never really confront the problem that "gradual" and "sudden" are opposites. (E.g., *Outboard Marine, supra, 607 N.E.2d at pp. 1217-1220.*)

The closest *Outboard* comes to confronting the mutual exclusivity of the ideas of sudden and gradual is this (relatively obscure) passage:

"To construe 'sudden' to mean 'abrupt' results in a contradiction if one accepts the insurers' own definition of the term 'accident.' (See *Hecla Mining Co., 811 P.2d at 1092.*) Such a construction would result in the pollution exclusion exception clause retriggering coverage for toxic releases which are 'abrupt' *and* gradual or 'continuous or repeated' releases. Clearly, under such a construction this clause would be rendered absurd." ( *Outboard Marine, supra, 607 N.E.2d at p. 1219.*)

The flaw in this passage is the unsupported assumption that "the insurers' own definition of the term 'accident' " *is synonymous* with gradual events. This is incorrect. The "definition" to which the passage refers is the definition of "occurrence" as "an accident, including continuous or repeated exposure to conditions." The definition shows that a "repeated exposure to conditions" can fall within the meaning of occurrence. But there is obviously no requirement that repeated exposure *must* fall within the meaning of "accident." The definition of "occurrence" cannot reasonably be read to mean that an accident must entail "repeated exposure to conditions."

Then again, this is only common sense. Most accidents do not involve a "repeated exposure to conditions" and most "repeated exposure to conditions" does not involve an accident. Accordingly, it is hardly "absurd" to give "sudden" its natural meaning of "not gradual." If an event is both accidental and sudden, there is no possibility that it will be both gradual and abrupt.

[***34]

42 A relatively well-known example of how "sudden" can mean "unexpected" is from the popular comic strip, "Peanuts." The character Snoopy is sometimes shown typing out a story beginning, "It was a dark and stormy night. Suddenly a pirate ship appeared on the horizon. . .." In these two sentences, "suddenly" can mean either unexpected (the pirate ship appeared without warning) or abrupt (one moment there was no ship, the next moment there was). However, in no reasonable sense can Snoopy's sentence be twisted to mean "Gradually a pirate ship appeared on the horizon."

[*1790] B. *THE RELEVANCE OF "DRAFTING HISTORY"*

**(5a)** Both ACL and Montrose Chemical Company lay heavy emphasis on what they call the "drafting history" of the 1973 CGL pollution exclusion. Their argument may be summarized this way: prior to 1970, the CGL had no pollution exclusion and the policy--at least as interpreted by the courts--allowed for coverage for gradual pollution as long as the damages were not intended by the policyholder. Between 1970 and 1973 the pollution exclusion was phased in, but, as Montrose puts it, "industry [***35] spokesmen" stated that the intent of the exclusion "was to clarify the existing scope of coverage, rather than to restrict it." Specifically, the phrase "sudden and accidental," having been construed in the context of boiler and machinery policies to mean unforeseen and unexpected, the "industry" incorporated the pollution exclusion into the CGL to emphasize the idea that coverage should be restricted to "unintended and unexpected" pollution, even if it occurred gradually, and the "insurance industry" represented as much to state insurance regulatory bodies. [43]

43 There is always a risk in paraphrasing any argument that the paraphrase will leave out key elements that the paraphraser thinks irrelevant but the original proponent thinks critical. For a more complete exposition of the "drafting history" argument, we therefore refer the reader to *New Castle County, supra, 933 F.2d at pages 1196-1198*. With the qualification that the drafting history is "far from conclusive" (*933 F.2d at p. 1198*), *New Castle County* generally adopts the drafting history argument.

We must add, of course, that in paraphrasing the argument we do not necessarily agree, or disagree, with certain of the argument's underlying

premises, e.g., that the "representations" made on behalf of the "insurance industry" unambiguously were to the effect that the introduction of the new pollution exclusion was not intended to effect a reduction of ultimate coverage, a counterintuitive proposition to say the least. (But cf. *Truck Ins. Exchange v. Pozzuoli*, *supra*, *ante*, at p. 859, fn. 2 ["the principal draftsman of the pollution exclusion clause has stated it was intended to wholly eliminate coverage for pollution except in the case of a 'classical accident'. . .."].) Amici on both sides in this case have devoted considerable effort to the underlying merits of the drafting history argument.

[***36] Montrose Chemical Company argues that "every appellate court which has examined [**217] the drafting history has concluded that the policyholder interpretation should prevail." The argument is a well-veiled tautology, even assuming the assertion that "every" court which has "examined" the drafting history has decided the same way (at least up to now) is true. Given the rule that unambiguous language should control, use of drafting history indicates that the court involved has already decided that the language is ambiguous.

In any event, the drafting history argument is unpersuasive. First and foremost, the drafting history argument is inconsistent with the rules of insurance contract interpretation articulated in *Bank of the West* and *AIU*. Both *Bank of the West* and *AIU* clearly require a showing of ambiguity before [*1791] extrinsic evidence may be admitted to shed light on that ambiguity. (See *Bank of the West, supra, 2 Cal.4th at p. 1264* ["If contractual language is clear and explicit, it governs."]; *AIU, supra, 51 Cal.3d at p. 822* [intent [***37] of parties to be derived, "if possible, *solely* from the written provisions of the contract" (italics added)]; *Shell Oil, supra, 12 Cal.App.4th at p. 737* ["only" the basic principles are needed to interpret contract language]; see also *Aim Insurance Co. v. Culcasi, supra, 229 Cal.App.3d at pp. 218-219* [following *AIU* and starting analysis by asking whether the meaning a layperson would give to the policy language was unambiguous].)

As shown above, the phrase "sudden and accidental" unambiguously does not include "gradual." Indeed, if there is a key word in California's statement of the parol evidence rule ( *Code Civ. Proc., § 1856*) it is "contradict." [44] Whatever else extrinsic evidence may be used for, it may not be used to show that words in contracts mean the exact opposite of their ordinary meaning. (Cf. *Brant v. California Dairies, Inc. (1935) 4 Cal.2d 128, 133-134 [48 P.2d 13]* [testimony of the vice president of a corporate defendant was not admissible to show an understanding contrary to the plain meaning of the series of letters forming [***38] the contract].) To allow extrinsic evidence to show that "sudden and accidental" may mean "gradual as long as unintended and unexpected" is to allow extrinsic evidence to contradict the terms of the contract by stripping from "sudden" its unambiguous meaning of "not gradual." The idea is not judicially sound. **(6)** (See fn. 45.) "Unlike the deconstructionists at the forefront of modern literary criticism, the courts still recognize the possibility of an unambiguous text." ( *Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n (5th Cir. 1986) 783 F.2d 1234, 1238.*) [45]

44 Subdivision (a) of *Code of Civil Procedure section 1856*, states: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be *contradicted* by evidence of any prior agreement or of a contemporaneous oral agreement." (Italics added.)

45 California recognizes the objective theory of contracts. (E.g., *Titan Group, Inc. v. Sonoma Valley County Sanitation Dist. (1985) 164 Cal.App.3d 1122, 1127 [211 Cal.Rptr. 62]* ["It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation."]; *Consolidated Dock & Storage Co. v. Superior Court (1971) 18 Cal.App.3d 949, 952 [96 Cal.Rptr. 254]* ["It is immaterial that one of the parties [to a contract] had an undisclosed intention or belief as to what it meant."].) A corollary to our first reason for rejecting the drafting history argument is that it contradicts the objective theory.

[***39] **(5b)** Second, reliance on extrinsic drafting history contradicts the basic rule that words in insurance policies should be interpreted as laypersons would interpret them. ( *American Star Ins. Co. v. Insurance Co. of the West (1991) 232 Cal.App.3d 1320, 1330-1331 [284 Cal.Rptr. 45]* [rejecting use of industry publication as interpretative aide because use would contravene [*1792] layperson interpretation principle].) As another panel of this court stated in *American Star*, policyholders do not have ready access to insurance industry publications (*232 Cal.App.3d at p. 1331*). Nor, we might add in reference to the current litigation, do either insurers or policyholders have ready access to what members of a trade group committee supposedly told some state regulators in the early [**218] 1970's. The drafting history argument assumes that all insurers *and* all policyholders were aware of "industry interpretations" of the 1973 pollution exclusion, a proposition for which there is obviously no support in either this record or in the briefs of amici curiae. (See *AIU, supra, 51 Cal.3d at p. 823*

[***40] [no evidence insured understood policy language in any technical sense].)

Third, and related to this last point, the drafting history argument assumes that individual insurers should be bound by statements made by "industry spokesmen" years before. Yet there is no authority cited requiring they should be so bound. In the present case, for example, there was no evidence that *this* insurance company, Northbrook, ever represented to *this* policyholder, ACL, that despite what the ordinary person might think about the relationship between gradual and sudden, in this particular policy the word "sudden" would have some *special* meaning in contradiction to that relationship.

Finally, there is no legal authority for the use of drafting history. Montrose Chemical Company cites two cases for the proposition that California courts treat contemporaneous statements by the drafters as highly probative of contractual intent: *ITT World Communications, Inc. v. City and County of San Francisco (1985) 37 Cal.3d 859 [210 Cal.Rptr. 226, 693 P.2d 811]* and *Fireguard Sprinkler Systems v. Scottsdale Ins. (9th Cir. 1988) 864 F.2d 648, 651*. [***41] However, *ITT World* was a constitutional interpretation case which merely noted in passing that the California Supreme Court may disregard the "literal language of enactments . . . to avoid absurd results." (See *37 Cal.3d at p. 867*.) [46] There is, of course, no argument here that to read "sudden" as *not* gradual is absurd (the absurdity lies in the opposite direction).

46 As no page cite was given, we assume that it was this particular passage to which Montrose's brief refers.

The other case, *Fireguard*, was a federal decision construing Oregon law. See *864 F.2d at page 651*: "Under Oregon law we may examine extrinsic evidence as an aid to determining the meaning of contract language, even if [*1793] the contract, on its face, is not ambiguous." As shown by the statements from *Bank of the West* and *AIU* above, that is not the rule in California. [47]

47 Interestingly enough, neither ACL nor Montrose has cited *Maryland Casualty Co. v. Reeder (1990) 221 Cal.App.3d 961 [270 Cal.Rptr. 719]*, which did cite *Fireguard* and which does, in dictum, contain at least some arguable support for the use of extrinsic evidence from the "insurance industry" to interpret policies. Perhaps *Reeder* was not cited because this court criticized *Reeder* in *American Star Ins. Co. v. Insurance Co. of the West, supra, 232 Cal.App.3d at pages 1330-1331* and 1331, footnotes 8 and 9. We reiterate our criticisms here: there was no need for the court in *Reeder* to rely on the Fire Casualty & Surety Bulletin--the publication merely acknowledged what was obvious from the words of the policy themselves --and so its reliance was dictum. (See *American Star, supra, 232 Cal.App.3d at p. 1331, fn. 8*.) Moreover, the interpretation of an insurance contract should not depend on access to industry publications.

[***42] Montrose also contends that even if "sudden and accidental" is not ambiguous "on its face," we should still "consider" the drafting history "as an initial matter" to show the words really are ambiguous. For this it relies solely on *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co. (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]*.

*Pacific Gas* has been criticized for casting doubt on the very possibility of finding meaning in language. [48] (See *Trident Center v. Connecticut General Life Ins. (9th Cir. 1988) 847 F.2d 564, 569* ["If we are unwilling to say that parties, dealing face to face, can come up with language that binds them, how can we send anyone to jail for violating statutes consisting of mere words lacking 'absolute and constant referents'? [**219] "].) In citing *Pacific Gas* for the idea that extrinsic evidence is *always* available to show ambiguity, no matter how plain the actual words of a contract may be, Montrose would appear to be tacitly agreeing with the critics' reading of *Pacific Gas*.

48 At various points the opinion disparages the "primitive faith" in the "inherent meaning of words" (*69 Cal.2d at p. 37*), the idea words have "absolute and constant referents" ( *id. at p. 38*), and the idea that words have " 'an objective meaning' " (, quoting Corbin, *The Interpretation of Words and the Parol Evidence Rule* (1965) 50 Cornell L.Q. 161, 187.)

[***43] With all due respect to the critics of *Pacific Gas*, the case is not an endorsement of linguistic nihilism. Despite what might be called its "deconstructionist" dictum, [49] the actual holding of the case is a fairly modest one: courts should allow parol evidence to explain *special* meanings which the individual parties to a contract may have given certain words.

49 See *Rodriguez v. Secretary of Health & Human Services (D.P.R. 1992) 794 F.Supp. 58, 60*: "Deconstructionists like Jacques Derrida contend that language is inherently equivocal . . .."

No such evidence, of course, was ever offered in the case before us. There is nothing to indicate, for example, that an agent of Northbrook told an [*1794] officer of ACL that, despite the ordinary meaning of "sudden" as "not gradual," Northbrook would agree to give the word

a special meaning in the particular policy it was about to issue so that it would mean "gradual." *That* is the sort of thing contemplated by *Pacific Gas* [***44] . [50]

50 The most famous example of "special meaning" probably comes from literature, not law. (See Carroll, Alice's Adventures in Wonderland and Through the Looking-Glass (Collier Books 1962) p. 247 [conversation between Alice and Humpty Dumpty, in which Humpty Dumpty gives the word "glory," a special meaning, i.e., "a nice knock-down argument"].)

Interestingly enough, the allusion to Humpty Dumpty is the focus of what appears to be one of the most oft-cited law review articles on the pollution exclusion, Note, *The Pollution Exclusion Clause Through the Looking Glass* (1986) *74 Geo. L.J. 1237, 1254*, which criticizes several of the early decisions because they were nothing more than attempts by judges, apropos Carroll's Humpty Dumpty, to redefine words to mean what they wanted them to mean.

C. *OTHER CONTENTIONS*

ACL asserts that the pollution exclusion should be confined to "active polluters." This is merely a restatement of the idea that "sudden" should be redefined to mean "unexpected [***45] even if gradual." Moreover, the "active-passive" distinction has nothing to do with the plain meaning of the word "sudden," and the distinction appears to have played no role in the state high court decisions holding that gradual pollution is inconsistent with a sudden and accidental release. (E.g., *Hybud Equip., supra, 597 N.E.2d 1096* [leakage from landfills]; *Upjohn Co., supra, 476 N.W.2d 392* [leakage from underground storage tank which had three holes due to corrosion]; accord, *Powers Chemco, supra, 548 N.E.2d 1301, 1302* ["We also reject plaintiff's contention that since it was not the actual polluter, but merely inherited the problem from the prior landowner, the pollution exclusion clause cannot bar its present insurance claim."].) [51]

51 Even where the claim was made by policyholders who, to use Montrose's phrase, "should have known" that contaminants generated in the ordinary course of their business were being released into the environment, the active-passive distinction appears to have played no role in the court's exegesis of the pollution exclusion. (E.g., *Lumbermens Mut. Cas., supra, 555 N.E.2d 568, 571-573* [policyholder used PCBs in manufacturing electrical capacitors, but no discussion of active-passive distinction while considering meaning of "sudden and accidental"].)

[***46] ACL also suggests (albeit somewhat obliquely) that the trial judge in this case improperly put the burden on the insured of showing that the release in this case was sudden and accidental. We do not, however, need to decide who exactly has the burden of proof on the sudden and accidental issue to affirm the judgment here. **(7)** Assuming, for sake of analysis, that the insurer has the burden of showing that a release is not sudden and accidental, that burden was met in this case.

[*1795] There was substantial evidence presented to the trier of fact that the release of contaminants was a result of holes in the tanks which developed over time as a result of rust. Corrosion is, by definition, a gradual process. On the other hand, there was no evidence of any specific trauma to the tanks during the Northbrook policy period. This absence distinguishes [**220] this case from *Brian Chuchua's Jeep, Inc. v. Farmers Ins. Group (1992) 10 Cal.App.4th 1579 [13 Cal.Rptr.2d 444]*, a recent decision of another panel of this court which employed concurrent causation analysis to rule in favor of first party insurance coverage for cleanup expenses of an underground [***47] gasoline storage tank that had been damaged in an earthquake. Even so, the court noted that the "risk of leaking pollutants" was not covered. (*10 Cal.App.4th at p. 1583.*)

ACL's very theory that the release occurred during the policy period is necessarily predicated on the idea of a series of gradual, continuous leaks which might have taken place during the period September 1984 to September 1985. Under such circumstances, where there is no evidence of any traumatic release during the policy period, and substantial evidence of release from gradual corrosion, it is reasonably obvious that an insurer has carried any burden it might have to show the applicability of the pollution exclusion.

IV. CONCLUSION

The language of the pollution exclusion is clear and unambiguous. Whatever shades of meaning inhere in the word sudden, gradual is not one of them. The judgment is affirmed.

Moore, J., and Wallin, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 17, 1993.

# TAB 2

LEXSEE 24 CAL. 4TH 627

**ALAN O. AAS et al., Petitioners, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; WILLIAM LYON COMPANY et al., Real Parties in Interest. PROVENCAL COMMUNITY ASSOCIATION, Petitioner, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; WILLIAM LYON COMPANY et al., Real Parties in Interest.**

**No. S071258.**

**SUPREME COURT OF CALIFORNIA**

*24 Cal. 4th 627*; *12 P.3d 1125*; *101 Cal. Rptr. 2d 718*; *2000 Cal. LEXIS 9048*; *2000 Cal. Daily Op. Service 9607*; *2000 Daily Journal DAR 12831*

**December 4, 2000, Decided**

**NOTICE:**

[EDITOR'S NOTE: PART 1 OF 2. THIS DOCUMENT HAS BEEN SPLIT INTO MULTIPLE PARTS ON LEXIS TO ACCOMMODATE ITS LARGE SIZE. EACH PART CONTAINS THE SAME LEXIS CITE.]

**SUBSEQUENT HISTORY:** Extending finality of Opinion is terminated January 8, 2001 and the Opinion is ordered Final.

**PRIOR HISTORY:** Superior Court of San Diego County. Super. Ct. Nos. 695611 and 694688. Robert E. May, Judge.

Appeal from the Fourth Appellate District, Division One. Nos. D030218 and D030399.

**DISPOSITION:** The judgment of the Court of Appeal is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In two construction defect actions against a developer, a contractor, and subcontractors, brought by a condominium homeowners association and owners of single-family homes in a subdivision, the trial court granted defendants' motions for orders in limine excluding evidence of alleged construction defects that had not caused property damage and related economic losses sustained by plaintiffs. (Superior Court of San Diego County, Nos. 695611 and 694688, Robert E. May, Judge.) Plaintiffs sought review of the rulings in limine by petition for a writ of mandate, and the Court of Appeal, Fourth Dist., Div. One, Nos. D030218 and D030399, denied the petitions.

The Supreme Court affirmed the judgment of the Court of Appeal. The court held that the trial court properly granted defendants' motions to exclude the evidence. The difference between the price paid and the value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than the law of negligence. Although a defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity may support recovery if the defendant was under a duty to protect those interests, the applicable multifactored balancing test did not identify such a duty in the present case. As to the degree of certainty that plaintiffs suffered injury, construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of appreciable harm--an essential element of a negligence claim. Nor could plaintiffs establish foreseeability of the harm because they did not show actual harm. Similarly, plaintiffs failed to show that any of the alleged defects actually posed a serious risk of harm to person or property. (Opinion by Werdegar, J., with Kennard, Baxter, Chin, and Brown, JJ., concurring. Concurring and dissenting opinions by George, C. J. (see p. 653), and by Mosk, J. (see p. 673).)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1) Trial § 51--Presentation of Evidence--Objections--Motion to Exclude All Evidence--Standard of Review.** --While a ruling excluding evidence is not ordinarily subject to review by writ and typically is reviewed for abuse of discretion on appeal, a motion to exclude all evidence on a particular claim is subject to independent review as the functional equivalent of a common law motion for judgment on the pleadings or, if decided in light of evidence produced during discovery, a motion for nonsuit.

**(2a) (2b) Damages § 14--Measure of Damages--Construction Defect Case--Recovery for Economic Loss Without Personal Injury or Property Damage: Building and Construction Contracts § 6--Actions.** --In two construction defect actions against a developer, a contractor, and subcontractors, brought by a condominium homeowners association and owners of single-family homes in a subdivision, the trial court properly granted defendants' motions to exclude evidence of alleged construction defects that had not caused property damage and related economic losses sustained by plaintiffs. The difference between the price paid and the value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than the law of negligence. Although a defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity may support recovery if the defendant was under a duty to protect those interests, the applicable multifactored balancing test did not identify such a duty in the present case. As to the degree of certainty that plaintiffs suffered injury, construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of appreciable harm--an essential element of a negligence claim. Nor could plaintiffs establish foreseeability of the harm, since they did not show actual harm. Similarly, plaintiffs failed to show that any of the alleged defects actually posed a serious risk of harm to person or property. (Disapproving *Huang v. Garner (1984) 157 Cal.App.3d 404 [203 Cal.Rptr. 800]* to the extent it is inconsistent.)

[See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 1297, 1298.]

**(3) Torts § 6--Damages--Breach of Duty That Restates Contractual Obligation: Damages § 15--Breach of Contract.** --A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations. Instead, courts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.

**COUNSEL:** Procopio, Cory, Hargreaves & Savitch, Steven M. Strauss, Edward I. Silverman and Victor M. Felix for Petitioners Alan O. Aas et al.

Epstein & Grinnell, Douglas W. Grinnell, Luis E. Ventura; The Law Offices of Duane E. Shinnick, Silldorf, Shinnick & Duignan and Duane E. Shinnick for Petitioner Provencal Community Association and for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Ian Herzog; Douglas Devries; Roland Wrinkle; Harvey R. Levine; Robert Steinberg; Thomas G. Stolpman; William D. Turley; Mary E. Alexander; Joseph Harbison III; Bruce Broilett; Wayne McClean; Leonard Sacks; Tony Tanke; Lea-Ann Tratten; Steven J. Kleifield; David Rosen; Moses Lebovits; Christine Spagnoli; James Sturdevant; Daniel Smith; Deborah David; Lawrence Drivon; Thor Emblem; Rick Simons; David Casey, Jr., Kasdan, Simonds, McIntyre, Epstein & Martin and Kenneth S. Kasdan for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Verboon, Whitaker & Peter, Mark A. Milstein and Michael T. Whitaker for Southern California Apartment Owners Association as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Wolf, Rifkin & Shapiro, Leslie S. Marks and Douglas A. Lusson for League of California Homeowners as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Berding & Weil and James O. Devereaux for the Executive Council of Homeowners as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Berger & Hopkins, Jane Francis Hopkins and A. Alan Berger for the Structural Engineers Association of California as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.

Orbach & Huff, David M. Huff and Eric P. Weiss for Coalition of American Structural Engineers, Park Purdue Homeowners Association, Angelina Heights Homeowners Association and Silverado Oaks Homeowners Association as Amici Curiae on behalf of Petitioners Alan O. Aas et al.

Williams, Wester, Hall & Nadler and Scott A. Williams as Amici Curiae on behalf of Petitioners Alan O. Aas et al.

Burdman & Benson and Linda Angle-Keny as Amici Curiae on behalf of Petitioners Alan O. Aas et al.

No appearance for Respondent.

Newmeyer & Dillion, Gregory L. Dillion, Timothy S. Menter, Gene M. Witkin; Lincoln, Gustafson & Cercos, Thomas J. Lincoln and Charles K. Egan for Real Parties in Interest the William Lyon Company and Lyon Communities, Inc.

Dale, Braden & Hinchcliffe and Suzanne M. Martin for Real Parties in Interest Ben F. Smith, Inc., and B & L Plastering.

Wilson, Elser, Moskowitz, Edelman & Dicker, Andrew J. Blackburn and William S. Roberts for Real Parties in Interest West Coast Sheet Metal, Inc., and Ben F. Smith, Inc.

Kring & Brown, Jeffrey A. Lake and Jon H. Van de Grift for Real Parties in Interest Ben F. Smith, Inc., and New Continental Tile & Marble Co., Inc.

Maxie Rheinheimer Stephens & Vrevich, Barry M. Vrevich, Darin L. Wessel, Kelegian & Thomas and Michael Paul Thomas for Real Party in Interest Branco Corporation.

Bullard & Olin, Robert M. Granafei and Lee H. Graham for Real Party in Interest Cal West Nurseries, Inc.

Brownwood, Rice & Zurawski and Michael F. Saydah for Real Parties in Interest C.R.E. Electric and Ghianni Corporation.

Acker, Kowalick & Whipple, Anthony H. Whipple, W. Frederck Kowalick, Linwood Warren, Jr., Catherine L. Rhodes and Tawnya L. Southern for Real Party in Interest Premier Window Products, Inc.

Farmer, Weber & Case, David Weber; The Law Office of Mark Siegel and Mark Siegel for Real Party in Interest Sun Plumbing Company, Inc.

Kolod, Wager & Gordon, Scott M. Kolod, Jerome A. Wager, Vekeno Kennedy; Law Offices of Elisa J. Nemeth and Elisa J. Nemeth for Real Party in Interest Allstate Plumbing

Cozad & Krutcik and Ronald J. Cozad for Real Party in Interest Schmid Insulation Contractors, Inc.

Berger, Kahn, Safton, Moss, Figler, Simon & Gladstone, Timothy A. Nicholson and Stephen L. Weber for Real Party in Interest Surecraft Supply, Inc.

Perkins & Miltner and Timothy E. Salter for Real Party in Interest Bowers Construction Co.

Callahan, McCune & Willis and Norma Marshal for Real Party in Interest Frank Bowers Construction

Balestreri, Pendleton & Potocki, Thomas A. Balestreri, Jr., Mary B. Pendleton, Michael M. Freeland, Maurine P. Brand; Kring and Brown and Jeffrey A. Lake for South Coast Framers, Inc., Alta Drywall, Inc., West Coast Sheet Metal and D.J. Drywall, Inc., as Amici Curiae on behalf of Real Parties in Interest.

Lewis, D'Amato, Brisbois & Bisgaard, Robert V. Closson, Terrell A. Quealy and Judith A. Lewis for United National Insurance Company as Amicus Curiae on behalf of Real Parties in Interest.

John H. Findley, Sharon L. Browne and Stephen R. McCutcheon, Jr., for Pacific Legal Foundation as Amicus Curiae on behalf of Real Parties in Interest.

Dale, Braden & Hinchcliffe, George D. Dale, Suzanne M. Martin; Perkins & Miltner, Timothy E. Salter; and Kathryn Turner-Arsenault for the Construction Defect Defense Action Coalition as Amicus Curiae on behalf of Real Parties in Interest.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Real Parties in Interest.

Cox, Castle & Nicholson, Sandra C. Stewart, Jeffrey D. Masters, Debbie L. Freedman; Gray, Cary, Ware & Freidenrich and Jonathan B. Sokol for the Building Industry Legal Defense Foundation and the California Building Industry Association as Amici Curiae on behalf of Real Parties in Interest.

White, Gentes & Garcia, Timothy S. Noon and Charles R. Bongard for the Associated General Contractors of America, San Diego Chapter, Inc., as Amicus Curiae on behalf of Real Parties in Interest.

Thelen Reid & Priest, Gary L. Fontana, Hilary N. Rowen, James A. Riddle; Craig A. Berrington and Laura L. Kersey for American Insurance Association as Amicus Curiae on behalf of Real Parties in Interest.

Parker & Stanbury, Jenna L. Price and Mary-Tyler Crenshaw for West Coast Sheet Metal and H & D Con-

struction as Amici Curiae on behalf of Real Parties in Interest.

Morris, Polich & Purdy, Randy Koenig and Gary L. Jacobsen as Amici Curiae on behalf of Real Parties in Interest.

Gibbs, Giden, Locher & Turner, Barry C. Vaughan and Michael I. Giden for CalMat Co. as Amicus Curiae.

**JUDGES:** Opinion by Werdegar, J., with Kennard, Baxter, Chin, and Brown, JJ., concurring. Concurring and dissenting opinions by George, C.J. (see p. 653), and by Mosk, J. (see p. 673).

**OPINION**

[*632] [**1128] [***721] **WERDEGAR, J.**

In this case we are asked to decide whether homeowners and a homeowners association may recover damages in negligence from the developer, contractor and subcontractors who built their dwellings for construction defects that have not caused property damage. Plaintiffs would find an affirmative answer in the tort of "negligent interference with prospective economic advantage" described in *J'Aire Corp. v. Gregory (1979) 24 Cal. 3d 799, 804-805 [157 Cal. Rptr. 407, 598 P.2d 60]*. Applying settled law limiting the recovery of economic losses in tort actions ( *Seely v. White Motor Co. (1965) 63 Cal. 2d 9, 18 [45 Cal. Rptr. 17, 403 P.2d 145]*), we answer the question in the negative and, thus, affirm the decision of the Court of Appeal.

I. BACKGROUND

This matter comes to us on review of consolidated writ proceedings affecting two cases in the superior court. Plaintiffs in *Aas v. William Lyon Co.* (Super. Ct. San Diego County, 1996, No. 695611) (*Aas*) own the [*633] single-family homes in the Belle Fleur subdivision. Plaintiff in *Provencal Community Assn. v. William Lyon Co.* (Super. Ct. San Diego County, 1996, No. 694688) (*Provencal*) is the homeowners [***722] association responsible for managing and maintaining the Provencal condominium project. Defendants (as relevant here) include the William Lyon Company and Lyon Communities, Inc. (collectively Lyon), which served as developer and general contractor of Belle Fleur and Provencal, and the many subcontractors who participated in those projects.

Plaintiffs in each case allege their dwellings suffer from a variety of construction defects affecting virtually all components and aspects of construction. Based on these defects, plaintiffs assert causes of action for negligence, strict liability, breach of implied warranty and, in the *Aas* case alone, breach of contract and express warranty. Plaintiffs in both cases seek, among other things, the cost of repairing the alleged defects. Additionally, plaintiffs in *Aas* expressly seek damages representing the diminution in value of their residences.

Trial has not yet commenced. In pretrial proceedings, defendants in both cases moved for orders in limine excluding evidence of those alleged construction defects that have not caused property damage. (There is no [**1129] claim of personal injury.) Plaintiff in *Provencal* responded with an offer of proof asserting that some of the alleged defects violate provisions of the applicable building codes intended to prevent harm to life, health and property. [1] Plaintiff acknowledged, however, that many of the defects enumerated in defendants' motions have not actually caused property damage. The same is true in *Aas*. After extensive oral argument in each case, the trial [*634] court granted defendants' motions as to plaintiffs' tort claims only. [2] With the court's encouragement, plaintiffs sought review of the rulings in limine by petition for writ of mandate. The Court of Appeal, after issuing an alternative writ, denied the petitions. We granted review of that decision.

1 The following is a representative excerpt from plaintiff's offer of proof:

"5. During the investigation at Provencal in this case, engineers . . . observed violations of the Uniform Building Code, including failures to properly construct shear walls and failures to properly connect shear walls to other building components. Such shear walls and connections are required under the Uniform Building Code to prevent or minimize property damage and personal injury in the event of seismic and wind forces. . . .

"6. During the investigation at Provencal in this case, architects . . . observed violations of the Uniform Building Code, including failures to properly construct one-hour and two-hour fire protection in party walls. Such fire protection measures are required under the Uniform Building Code to prevent or minimize property damage and personal injury in the event of a fire. . . . [P] . . . [P]

"8. During the investigation of Provencal in this case, [an] electrical engineer . . . observed numerous violations of the National Electrical Code, including failures to support electrical cables, improperly supported light fixtures, and improperly labeled electrical circuits. . . . [P] . . . [P]

"10. For many of the Uniform Building Code and National Electrical Code violations described

in paragraphs 5, 6, and 8, there has not yet been any physical property damage or personal injury. . . ."

2 Plaintiff in *Provencal* subsequently moved to amend its complaint to allege a cause of action for breach of implied warranty. Plaintiff's request for judicial notice of defendant Lyon's memorandum in opposition to the motion, filed after the Court of Appeal affirmed the trial court's ruling, is denied.

In granting defendants' motions, the trial court did not create or adopt a definitive list of construction defects to be excluded at trial. Instead, the court simply excluded "evidence of [defects] . . . that have not resulted in bodily injury or physical property damage, i.e., [defects causing only] 'economic loss' . . . ." The trial court illustrated the possible effect of its ruling with the example of "a home with no resultant damages at all, but everybody agrees that the flashing's not lapped properly under the industry standards, the [Uniform Building Code], whatever, but it hasn't resulted in any leaks; everybody agrees that the tile is overextended, that is, it doesn't have the overlap of three inches that's called for by the manufacturer; that [***723] you have a nailing pattern on the shear walls which does not comply with the applicable provision in the [Uniform Building Code], but the house is still standing and hasn't started swaying . . . ." The court and the parties seemed to recognize that further hearings (see generally *Evid. Code, § 402* [procedure for determining preliminary facts]) would be necessary to determine which alleged defects would, and would not, be submitted to the trier of fact in connection with plaintiffs' tort claims. [3]

3 The trial court explained: "I would address [at trial] any issues that are over and above my ruling that you felt were close calls and listen to what your proffer might be at the appropriate time." There is, thus, no basis for assuming that every item on the exhaustive lists of construction defects attached to defendants' motions in limine is deemed excluded, even if plaintiffs are able to prove that a particular defect has actually caused property damage.

The absence of a definitive list of excluded defects is of no consequence because the issue before us is one of law. **(1)** While a ruling excluding evidence is not ordinarily subject to review by writ ( *People v. Municipal Court (Ahnemann) (1974) 12 Cal. 3d 658, 660 [117 Cal. Rptr. 20, 527 P.2d 372]*) and typically is reviewed for abuse of discretion on appeal ( *People v. Williams (1997) 16 Cal. 4th 153, 197 [66 Cal. Rptr. 2d 123, 940 P.2d 710]*), a motion to exclude all evidence on a particular claim is subject to independent review as the functional equivalent of a common law motion for judgment on the pleadings ( *Edwards v. Centex Real Estate Corp. (1997) 53 Cal. App. 4th 15, 26-27 [61 Cal. Rptr. 2d 518]*; *Clemens v. American Warranty* [**1130] *Corp. (1987) 193 Cal. App. 3d 444, 451-452 [238 Cal. Rptr. 339]*; see generally 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, [*635] § 176, pp. 589-591) or, if decided in light of evidence produced during discovery, a motion for nonsuit (*Edwards v. Centex Real Estate Corp., at p. 27*). Understood as a motion for judgment on the pleadings, the dispositive question is whether plaintiffs may state a cause of action for construction defects that have not caused property damage. (Cf. *id. at p. 26.*) Understood as a motion for nonsuit, the question is whether, disregarding conflicting evidence, indulging in every legitimate inference that may be drawn from the evidence, and viewing the record in the light most favorable to plaintiffs, evidence of construction defects that have not caused property damage will support a judgment in plaintiffs' favor. (Cf. *id. at pp. 27-28*; see also *Casey v. Overhead Door Corp. (1999) 74 Cal. App. 4th 112, 123-124 [87 Cal. Rptr. 2d 603]* [offer of proof may defeat nonsuit based on exclusion of evidence].) Accordingly, however we view the orders on review, the sole question before us is one of law.

II. DISCUSSION

**(2a)** We turn, then, to the question at hand: May plaintiffs recover in negligence from the entities that built their homes a money judgment representing the cost to repair, or the diminished value attributable to, construction defects that have not caused property damage? Plaintiffs define construction defects as deviations from the applicable building codes or industry standards. Strict liability is not here at issue. While plaintiffs have asserted strict liability claims, they no longer argue that strict liability provides a remedy for defects that have not caused property damage. We need not address liability for construction defects that *have* caused property damage, if any have, because the trial court's ruling does not prevent plaintiffs from introducing evidence of such defects. Nor, finally, does the ruling prevent plaintiffs from introducing any evidence relevant to their claims for breach of contract or warranty, assuming those claims survive to trial, even if that evidence has been excluded for the purposes of plaintiffs' tort claims.

This procedural posture makes the question we address fairly narrow. The question, [***724] however, is not simple, because it arises from the nebulous and troublesome margin between tort and contract law. (See generally *Erlich v. Menezes (1999) 21 Cal. 4th 543, 550-551 [87 Cal. Rptr. 2d 886, 981 P.2d 978]*; *Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal. 4th 85, 105-107 [44 Cal. Rptr. 2d 420, 900 P.2d 669]* (conc. & dis. opn.

of Mosk, J.).) Speaking very generally, tort law provides a remedy for construction defects that cause property damage or personal injury. Focusing on the conduct of persons involved in the construction process, courts in this state have found [*636] such a remedy in the law of negligence. [4] Viewing the home as a product, courts have also found a tort remedy in strict products liability, [5] even when the property damage consists of harm to a sound part of the home caused by another, defective part. [6] For defective products and negligent services that have caused neither property damage nor personal injury, however, tort remedies have been uncertain. Any construction defect can diminish the value of a house. But the difference between price paid and value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence. In actions for negligence, a manufacturer's liability [**1131] is limited to damages for physical injuries; no recovery is allowed for economic loss alone. ( *Seely v. White Motor Co.*, *supra*, 63 Cal. 2d 9, 18.) This general principle, the so-called economic loss rule, is the primary obstacle to plaintiffs' claim. [7]

4 *Sabella v. Wisler (1963) 59 Cal. 2d 21, 27-30 [27 Cal. Rptr. 689, 377 P.2d 889]*; *Stewart v. Cox (1961) 55 Cal. 2d 857, 861-863 [13 Cal. Rptr. 521, 362 P.2d 345]*; *Hale v. Depaoli (1948) 33 Cal. 2d 228, 230-232 [201 P.2d 1, 13 A.L.R.2d 183]*; *Sumitomo Bank v. Taurus Developers, Inc. (1986) 185 Cal. App. 3d 211, 223-224 [229 Cal. Rptr. 719]*; *Huang v. Garner (1984) 157 Cal. App. 3d 404, 419-425 [203 Cal. Rptr. 800]*; *Cooper v. Jevne (1976) 56 Cal. App. 3d 860, 867-869 [128 Cal. Rptr. 724]*.

5 *Stearman v. Centex Homes (2000) 78 Cal. App. 4th 611, 613 [92 Cal. Rptr. 2d 761]* (citing the many decisions applying strict liability to construction defects); *Avner v. Longridge Estates (1969) 272 Cal. App. 2d 607, 609-615 [77 Cal. Rptr. 633]*; *Kriegler v. Eichler Homes, Inc. (1969) 269 Cal. App. 2d 224, 227-229 [74 Cal. Rptr. 749]*.

6 *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611, 613-614, 617-623*.

7 Courts in other jurisdictions have reached various conclusions on this subject. South Carolina broadly holds builders liable in tort for all deviations from applicable building code and industry standards that diminish the value of a house. ( *Kennedy v. Columbia Lumber & Mfg. Co. (1989) 299 S.C. 335 [384 S.E.2d 730, 736-738]*.) Maryland more narrowly permits homeowners to recover in a negligence action the reasonable cost of correcting construction defects that present "a clear danger of death or personal injury," but not conditions that present merely "a risk to general health, welfare, or comfort . . . ." ( *Council of Co-Owners v. Whiting-Turner (1986) 308 Md. 18, 35 [517 A.2d 336, 344-345* & fn. 5].) A North Carolina decision does not clearly identify the circumstances that will support recovery, but holds that the plaintiffs stated a cause of action for negligence by alleging they "were forced to undergo extensive demolition and repair work to correct the defective, dangerous and unsafe conditions caused by the defendant's negligence." ( *Oates v. Jag, Inc. (1985) 314 N.C. 276 [333 S.E.2d 222, 224-226]*.)

In contrast, the Supreme Court of Nevada, after tentatively rejecting the economic loss rule in construction defect cases ( *Calloway v. City of Reno (1997) 113 Nev. 564 [939 P.2d 1020, 1024-1026]*), reversed course on rehearing and held that no liability exists for defects that cause damage only to the house and its components. ( *Calloway v. City of Reno (Nev. 2000) 993 P.2d 1259, 1263-1270* [trial court properly dismissed negligence claims alleging that defective framing caused water intrusion, damage to flooring and ceilings, and structural and wood decay].)

Plaintiffs contend the decision in *J'Aire Corp. v. Gregory*, *supra*, 24 Cal. 3d 799 (J'Aire) overcomes this obstacle. According to plaintiffs, when the parties occupy the "special relationship" defined in *J'Aire* ( *id. at p. 804*), [*637] there is both a duty to avoid negligently [***725] injuring a person's economic interests and a right to recover for such injury, even though unaccompanied by any injury to person or property. Before addressing *J'Aire's* significance and application to this case, we review the law to which *J'Aire* is said to constitute an exception.

Formerly, after a builder had completed a structure and the purchaser had accepted it, the builder was not liable to a third party for damages suffered because of the work's condition, even though the builder was negligent. (E.g., *Fanjoy v. Seales (1865) 29 Cal. 243, 249-250*; see also *Hale v. Depaoli, supra, 33 Cal. 2d 228, 230* [reviewing the former law].) The purchaser, of course, had remedies against the builder in contract and warranty. But injured third parties had no clear remedy until we, following the trend that began with *MacPherson v. Buick Motor Co. (1916) 217 N.Y 382 [111 N.E. 1050]*, qualified the general rule exonerating manufacturers from third party claims with an exception applicable whenever " 'the nature of a [manufactured] thing is such that it is reasonably certain to place life and limb in peril when negligently made . . . .' " ( *Kalash v. Los Angeles*

*Ladder Co. (1934) 1 Cal. 2d 229, 231-232 [34 P.2d 481]*, quoting *MacPherson v. Buick Motor Co., supra, 111 N.E. 1050, 1053.*) Having already held that the manufacturers of defective ladders (*Kalash v. Los Angeles Ladder Co., at pp. 231-233*), elevators ( *Dahms v. General Elevator Co. (1932) 214 Cal. 733, 737-742 [7 P.2d 1013]*), and tires ( *Nebelung v. Norman (1939) 14 Cal. 2d 647, 654 [96 P.2d 327]*) could be liable to persons not in contractual privity with them yet foreseeably injured by their products, we easily applied the same rule to someone responsible for part of a house, i.e., a defective railing (*Hale v. Depaoli, at pp. 230-232*).

We first recognized a remedy in the law of negligence for construction defects causing property damage, as opposed to personal injury, in *Stewart v. Cox, supra, 55 Cal. 2d 857*. There, we upheld a homeowner's judgment against a subcontractor who had negligently applied concrete to the inside of a swimming pool, thereby causing the release of water that damaged the pool, lot and house. In our opinion we noted, and seemingly were influenced by, the " 'decisions . . . plac[ing] building contractors on the same footing as sellers of goods, and . . . [holding] them to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by the negligence, even after acceptance of the work.' " ( *Id. at p. 862*, quoting Prosser, [**1132] Torts (2d ed. 1955) pp. 517-519.) The deciding factor in finding liability, however, appears to have been our own then recent decision in *Biakanja v. Irving (1958) 49 Cal. 2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]* (*Biakanja*). In *Biakanja*, we had held that the intended beneficiary of a failed testamentary gift could recover damages from a [*638] notary public who, practicing law without a license, negligently prepared the will and failed to have it properly solemnized. Because *Biakanja* is the acknowledged basis for the later decision in *J'Aire*, *supra*, 24 Cal. 3d 799, 804, the case on which plaintiffs here primarily rely, it will be discussed in more detail later (at p. 643, *post*). At this point, it suffices to note that *Biakanja* held that the negligent performance of a contractual obligation, resulting in damage to the property or economic interests of a person not in privity, could support recovery if the defendant was under a duty to protect those interests. (*Biakanja, at pp. 648-650.*) "The determination whether in a specific case the defendant will be held liable to a third person not in privity," we wrote, "is a matter of policy and involves the balancing of various factors . . . ." ( *Id. at p. 650.*) [8] [***726] Applying those factors to the negligent concrete subcontractor in *Stewart v. Cox, supra, 55 Cal. 2d 857*), we determined that he should not be exempted from liability proximately caused by his negligence. His work, we explained, was specifically intended to affect the plaintiffs; damage to their property was foreseeable if the work were negligently done; and serious damage actually occurred. ( *Id. at p. 863, 13 Cal. Rptr. 521, 362 P.2d 345.*)

8 The six factors were: "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Biakanja, supra, 49 Cal. 2d 647, 650.*)

Two years later, we again applied *Biakanja, supra, 49 Cal. 2d 647*, to uphold a judgment for property damage caused by negligent residential construction. ( *Sabella v. Wisler, supra, 59 Cal. 2d 21, 29* (*Sabella*).) The defendant had built a house and offered it for sale to the general public. As it turned out, the defendant's negligent preparation of the lot, in combination with a subcontractor's careless plumbing work, later caused leaks, subsidence and damage to the house. The purchasers sued for negligence. The builder, arguing against the imposition of tort liability, sought to distinguish the recent decision in *Stewart v. Cox, supra, 55 Cal. 2d 857* (*Stewart*), on the ground "that damage to property other than the swimming pool [in *Stewart*] was foreseeable, [whereas] . . . the only harm foreseeable [in *Sabella*] . . . was damage to the house itself." (*Sabella, at p. 29.*) We rejected the asserted distinction because we had already determined "in the *Stewart* case that the liability of a contractor should be determined by the consideration and weighing of the various factors bearing upon liability [i.e., the factors set out in *Biakanja at page 650*], rather than by resort to special rules or distinctions." (*Sabella, at p. 29.*)

In the years following *Sabella, supra, 59 Cal. 2d 21*, the law governing tort remedies for construction defects diverged into two distinct theories: (1) [*639] strict products liability; and (2) the theory of negligence outlined in *Biakanja, supra, 49 Cal. 2d 647*, and further developed in *J'Aire*, *supra*, 24 Cal. 3d 799.

We first embraced the doctrine of strict products liability in *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal. 2d 57 [27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]*, just a week after deciding *Sabella, supra, 59 Cal. 2d 21*. A few years later, the court in *Kriegler v. Eichler Homes, Inc., supra, 269 Cal. App. 2d 224* (*Kriegler*), applied the new tort to mass-produced homes, reasoning that in "today's society, there are no meaningful distinctions between [the] mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same." ( *Id. at p. 227*; see also [**1133] *Avner v. Longridge Estates, supra, 272 Cal. App. 2d 607, 609-615* [examining and following

*Kriegler*].) The relevant policy considerations, the *Kriegler* court explained, were the average home buyer's reliance on the builder's skill and implied representations of fitness, and the public interest in assigning the cost of foreseeable injuries to the developer who created the danger. (*Kriegler, at p. 228*; cf. *Greenman v. Yuba Power Products, Inc., at pp. 63-64.*)

While these decisions applied the doctrine of strict liability to mass-produced homes, [9] they did not create a remedy for [***727] defects that have not caused property damage or personal injury. Whatever the product, whether homes or automobiles, strict liability affords a remedy only when the defective product causes property damage or personal injury. The tort does not support recovery of damages representing the lost benefit of a bargain, such as the cost of repairing a defective product or compensation for its diminished value. We explained this principle in *Seely v. White Motor Co.*, *supra*, 63 Cal. 2d 9 (*Seely*). "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss," we wrote, "is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." ( *Id. at p. 18.*) A manufacturer "can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety," but not "for the level of performance" of its products unless the manufacturer "agrees that the product was designed to meet the consumer's demands." (*Ibid.*) Similarly, "[a] [*640] consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." (*Ibid.*)

9 See generally *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611, 613*. Compare *Peterson v. Superior Court (1995) 10 Cal. 4th 1185, 1200 [43 Cal. Rptr. 2d 836, 899 P.2d 905]*, *Cronin v. J.B.E. Olson Corp. (1972) 8 Cal. 3d 121, 130 [104 Cal. Rptr. 433, 501 P.2d 1153]*, and *Price v. Shell Oil Co. (1970) 2 Cal. 3d 245, 251* and footnote 6 [*85 Cal. Rptr. 178, 466 P.2d 722]* (all acknowledging the doctrine's potential applicability to persons in the business of residential construction).

Applying these principles, we concluded in *Seely, supra*, 63 Cal. 2d 9, that the plaintiff could not recover in strict liability or negligence for the cost of repairing a defective truck or for business income lost because the truck could not make deliveries. "Even in actions for negligence," we wrote, "a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." (*Id. at p. 18.*) Plaintiffs argue that this statement, and *Seely's* other observations about damages for negligence, were dictum because the court actually upheld, on a breach of express warranty theory, an award of damages representing the purchase price of the truck and lost profits. (*Id. at p. 13.*) Indeed, the statement can be seen either as dictum or as part of the court's rationale for permitting the *Seely* plaintiff to recover his economic losses in warranty rather than in tort. Which label we attach to the statement is of no consequence. This is because the principle articulated in *Seely* has by critical examination and application in subsequent cases been confirmed as law. Courts routinely apply *Seely* in strict liability and negligence cases alike to distinguish recoverable damages for physical injury from unrecoverable damages representing the benefit of a contractual bargain.

In *Zamora v. Shell Oil Co. (1997) 55 Cal. App. 4th 204, 208-211 [63 Cal. Rptr. 2d 762]*, for example, homeowners were not allowed to recover in negligence or strict liability for the cost of replacing water pipes known to be defective, but which had not yet leaked. In *Fieldstone v. Briggs Plumbing Products, Inc. (1997) 54 Cal. App. 4th 357, 363-367 [62 Cal. Rptr. 2d 701]*, a strict liability case, a general contractor was not awarded the cost of [**1134] replacing installed sinks that rusted and chipped prematurely, because no other property had been damaged. In *San Francisco Unified School Dist. v. W.R. Grace & Co. (1995) 37 Cal. App. 4th 1318, 1327-1330 [44 Cal. Rptr. 2d 305]*, a public school district could not state a cause of action in negligence or strict liability based on the presence of asbestos products in its buildings, when the products had not contaminated [***728] the buildings by releasing friable asbestos. In *Sacramento Regional Transit Dist. v. Grumman Flxible (1984) 158 Cal. App. 3d 289, 293-298 [204 Cal. Rptr. 736]*, the court held a transportation district could not recover in negligence or strict liability for the cost of repairing defective bus parts that had not caused further damage. "We believe," the court explained, that "the line between physical injury to property and economic loss reflects the line of demarcation between tort theory and contract theory." ( *Id. at p. 294.*) As one final example, significant [*641] because of its similarity to the case before us, the court in *Casey v. Overhead Door Corp., supra, 74 Cal. App. 4th 112, 123-124*, a negligence case based on defective windows in mass-produced housing, relied on *Seely, supra*, 63 Cal. 2d 9, to uphold an order excluding testimony about damages representing the cost to replace defective windows that had not caused property damage and a nonsuit based on that order. "A consumer," the court explained, "may not recover economic loss damages against the manufacturer of a defective

product in a cause of action for strict liability or negligence. (*Seely*[, at p.] 18 . . . .) [P] Since plaintiffs could not recover economic losses [i.e., the cost of repairing and replacing the defective windows], testimony on that item of damages would have been irrelevant." (*Casey v. Overhead Door Corp., at p. 123.*)

Over time, the concept of recoverable physical injury or property damage expanded to include damage to one part of a product caused by another, defective part. Examples include cases in which poorly prepared lots subsided, damaging the houses built thereon ( *Stearman v.* [**1135] *Centex Homes, supra, 78 Cal. App. 4th 611, 615, 616-623)*, in which defective bottle caps ruined wine ( *International Knights of Wine, Inc. v. Ball Corp. (1980) 110 Cal. App. 3d 1001, 1003-1005 [168 Cal. Rptr. 301]* (lead opn. of Roth, P. J.); see also *id. at p. 1008* (conc. opn. of Fleming, J.)), and in which an unknown defect in an engine compartment started a fire that destroyed the entire automobile ( *Gherna v. Ford Motor Co. (1966) 246 Cal. App. 2d 639, 644, 649-651 [55 Cal. Rptr. 94]*). Indeed, the decision in *Seely*, *supra*, 63 Cal. 2d 9, suggested these results by intimating that further damage to a truck caused by a manufacturing defect might be recoverable in strict liability or negligence, even though the cost of repairing the original defect was not. (*Id. at p. 19*; see generally *Stearman v. Centex Homes, at pp. 616-623* [extensively discussing the point].)

Plaintiffs argue no requirement of property damage exists, at least in the context of residential construction. The cases discussed above do not support the argument. They go only so far as to hold that property damage compensable in tort can exist when a defective component damages other parts of the same product. Plaintiffs attempt to find a more favorable rule in the two older cases noted above, *Stewart, supra, 55 Cal. 2d 857*, and *Sabella, supra, 59 Cal. 2d 21*. (See *ante*, at p. 637 et seq.) Those cases, however, do not establish the rule plaintiffs seek. We held in *Stewart* that the plaintiff homeowners could recover from a subcontractor for damages to their house and lot caused by water escaping from a negligently built swimming pool. (*Stewart, at p. 860.*) No question was presented of a defect without resulting property damage. Likewise, *Sabella* concerned a house damaged by the subsidence of an improperly compacted lot. (*Sabella, at pp. 23-27.*) Today, [*642] after *Seely*, *supra*, 63 Cal. 2d 9, the plaintiffs in those cases would argue that defective components of the property (in *Stewart* the concrete in the swimming pool, and in *Sabella* the lot) had damaged [***729] other components, including the houses. (See, e.g., *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611, 622-623.*) Because *Stewart* and *Sabella* clearly involved property damage, we find nothing in those decisions to cast doubt on the requirement of property damage later articulated in *Seely* and the many cases following *Seely*. (See *ante*, at p. 639 et seq.) [10]

10 The concurring and dissenting justices would hold that property damage occurs when a defective component is incorporated into a house. (Conc. & dis. opn. of Mosk, J., at pp. 674-675; see also conc. & dis. opn. of George, C. J., at p. 673, fn. 11.) The decision offered as support for that view, *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co. (7th Cir. 1992) 972 F.2d 805*, however, offers its conclusion not as a rule of tort liability but as an interpretation of contractual language in an insurance policy. While we intimate no view as to *Eljer's* correctness as a matter of California law, we find the decision insufficiently relevant to the question before us to be of any assistance.

Plaintiffs also contend the court in *Seely*, *supra*, 63 Cal. 2d 9, was concerned exclusively with commercial losses or lost business profits, rather than economic losses in a broader sense. To the contrary, the court in *Seely* was unmistakably concerned not just with lost profits but also with the fundamental difference between, on the one hand, the consumer's contractual interest in having a product of the expected, bargained-for value and quality, and, on the other hand, the consumer's tort interest in not suffering property damage or personal injury due to negligence in the manufacturing process. Chief Justice Traynor could not have articulated the point more clearly: "A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." (*Id. at p. 18.*) Certainly the opinion also speaks of the manufacturer not being "held for the level of performance of his products *in the consumer's business* unless he agrees that the product was designed to meet the consumer's demands." (*Ibid.*, italics added.) After all, the immediate factual context of the case before the court included a claim for lost profits. (*Id. at p. 13.*) But to read this court's seminal decision in *Seely* as speaking only to claims for lost profits, and not more generally to the distinction between tort and contract, is to mistake the particular application for the governing principle.

An uncertain number of plaintiffs purchased their houses directly from defendant Lyon. As to these plaintiffs, it is argued, privity of contract offers [*643] an additional reason for rejecting any requirement of prop-

erty damage in an action for negligence based on construction defects. It has been said that "[a] contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner" and that "[a] negligent failure to do so may be both a breach of contract and a tort." ( *North American Chemical Co. v. Superior Court (1997) 59 Cal. App. 4th 764, 774 [69 Cal. Rptr. 2d 466].*) Therefore, plaintiffs argue, defendant Lyon's negligent breach of contractual duties owed directly to plaintiffs to deliver homes in compliance with the applicable building codes is a tort, for which plaintiffs may recover "the amount which will compensate for all the detriment proximately caused thereby . . . ." ( *Civ. Code, § 3333.*)

The argument is not persuasive. **(3) (2b)** A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations. Instead, " '[c]ourts will generally enforce the breach of a contractual promise through contract [***730] law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.' " ( *Erlich v. Menezes 21 Cal. 4th 543, 552*, quoting *Freeman & Mills, Inc. v. Belcher Oil Co., supra, 11 Cal. 4th 85, 107* (conc. & dis. opn. of Mosk, J.).) This court recently rejected the argument that the negligent performance of a construction contract, without more, justifies an award of tort damages. (*Erlich v. Menezes at pp. 550-554* [**1136] [reversing an award of damages for emotional distress for negligent construction].) In so doing, however, we reiterated that conduct amounting to a breach of contract becomes tortious when it also violates a duty independent of the contract arising from principles of tort law. (*Id. at p. 551.*) The strict liability and negligence cases discussed above, which hold the builders of homes liable for construction defects causing property damage, may be understood as recognizing such an independent duty. But that duty is limited by the rule in *Seely, supra, 63 Cal. 2d 9, 18*, which bars recovery of economic damages representing the lost benefit of a bargain.

We noted earlier that the law of construction defects after *Sabella, supra, 59 Cal. 2d 21*, diverged into two theories: strict products liability, which we have discussed, and the tort recognized in *J'Aire, supra*, 24 Cal. 3d 799. Apart from the arguments that *Seely, supra, 63 Cal. 2d 9*, does not apply to negligent construction (see *ante*, at pp. 641-642) and that plaintiffs in privity may recover tort damages for breach of contract (see *ante*, at p. 642), plaintiffs base their claim exclusively on *J'Aire* and cases following that decision.

*J'Aire, supra*, 24 Cal. 3d 799, as mentioned, relied on this court's 1958 decision in *Biakanja, supra, 49 Cal. 2d 647*. In *Biakanja*, we held that a [*644] defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity could support recovery if the defendant was under a duty to protect those interests. The court articulated a case-by-case test for identifying such a duty. "The determination whether in a specific case the defendant will be held liable to a third person not in privity," we wrote, "is a matter of policy and involves the balancing of various factors . . . ." (*Biakanja, at p. 650.*) The six factors were: "[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." (*Ibid.*) In concluding the defendant notary owed a duty to an intended beneficiary not to mishandle the will's drafting and solemnization, we attached particular importance to the fact that the " 'end and aim' " of the notary's service to the testator was "to provide for the passing of [the] estate to [the] plaintiff" (*ibid.*), and to the high impropriety of, and need to prevent, the unlicensed practice of law (*id. at p. 651*).

Twenty-one years later, the court in *J'Aire, supra*, 24 Cal. 3d 799, applied the *Biakanja* (*supra*, *49 Cal. 2d 647, 650)* factors to conclude that the tenant of a building used as a restaurant could state a cause of action for negligence against a renovation contractor hired by the building's owner for business income lost when the contractor "fail[ed] to complete the project with due diligence." ( *J'Aire*, at pp. 802, 804-805, 157 Cal. Rptr. [***731] 407, 598 P.2d 60.) Applying the *Biakanja* factors, the court held that a "special relationship" (J'Aire, at p. 804) permitting recovery of economic losses (i.e., the relationship defined by the *Biakanja* test) existed between the contractor and the tenant. The court dismissed concerns that such a theory of recovery would threaten liability, out of proportion to fault, for remote consequences and speculative damages. (J'Aire, at pp. 807-808.) In the court's view, the *Biakanja* factors, in combination with "ordinary principles of tort law such as proximate cause," were "fully adequate to limit recovery" of purely economic damages "without the drastic consequence of an absolute rule which bars recovery in all such cases." (J'Aire, at p. 808.)

The lower courts have applied the theory of liability articulated in *J'Aire*, *supra*, 24 Cal. 3d 799, in a wide variety of cases. To mention just a [**1137] few, courts have relied on *J'Aire* to assess a chemical manufacturer's claim against a transportation company for business losses caused by the contamination of its product in shipment ( *North American Chemical Co. v. Superior Court, supra, 59 Cal. App. 4th 764, 781-785)*; a dairy's claim against the manufacturer of an allegedly defective milking machine for lost profits and [*645] property

damage ( *Ott v. Alfa-Laval Agri, Inc. (1995) 31 Cal. App. 4th 1439, 1448-1457 [37 Cal. Rptr. 2d 790]*); a construction lender/mortgagee's claim against a builder for construction defects ( *Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal. App. 3d 211, 223-226)*; an abalone packer's claim for lost profits against the manufacturer of unusable cans ( *Ales-Peratis Foods Internat., Inc. v. American Can Co. (1985) 164 Cal. App. 3d 277, 284-290 [209 Cal. Rptr. 917]*); and real estate investors' claims for the cost of repairing construction defects in an apartment building ( *Huang v. Garner, supra, 157 Cal. App. 3d 404, 422-425*; see *post*, at p. 648 et seq.).

The lower courts have also expanded upon *J'Aire*, *supra*, 24 Cal. 3d 799. While the court in *J'Aire* purported only to address duties owed to persons not in contractual privity with the defendant (*id. at p. 804*), courts subsequently have applied *J'Aire* to cases in which privity did exist. These courts have concluded that "the reasoning of *J'Aire* is wholly incompatible with a limitation of the cause of action to those instances in which the plaintiff and defendant are not in privity . . . ." ( *Ott v. Alfa-Laval Agri, Inc., supra, 31 Cal. App. 4th 1439, 1448*; see also *North American Chemical Co. v. Superior Court, supra, 59 Cal. App. 4th 764, 783*; *Pisano v. American Leasing (1983) 146 Cal. App. 3d 194, 197 [194 Cal. Rptr. 77]* [both applying *J'Aire* in cases apparently involving privity].)

Plaintiffs contend that *J'Aire*, *supra*, 24 Cal. 3d 799, when it applies, displaces the general rule (*Seely, supra, 63 Cal. 2d 9, 18)* that damages are not recoverable for product defects that have not caused property damage. [11] Plaintiffs base the contention on the following statement in *J'Aire*: "Where the risk of harm is foreseeable, . . . an injury to the plaintiff's [***732] economic interests should not go uncompensated merely because it was unaccompanied by any injury to his person or property." (J'Aire, at p. 805.) The validity of the orders on review depends largely on the significance of that statement. Paraphrasing it, one might ask the dispositive question this way: Does the law of negligence protect plaintiffs' economic interests in having houses that fully comply with the building codes, measured by the cost of repairs or diminished value associated with noncompliance, even though the asserted harm to those interests is unaccompanied by any injury to person or property?

11 Plaintiffs also argue that *Seely, supra, 63 Cal. 2d 9*, does not apply to the negligent performance of *services*, as distinguished from the negligent manufacture of *products*, but the basis for that argument appears, once again, to be that *J'Aire, supra*, 24 Cal. 3d 799, takes precedence over *Seely*. (See *North American Chemical Co. v. Superior Court, supra, 59 Cal. App. 4th 764, 778-785*, and *Huang v. Garner, supra, 157 Cal. App. 3d 404, 421-424* [both concluding that liability under *J'Aire* is unaffected by *Seely*]; cf. *Cooper v. Jevne, supra, 56 Cal. App. 3d 860, 867-869* [relying on *Biakanja, supra, 49 Cal. 2d 647*, rather than *J'Aire*, to reach the same conclusion].)

[*646] To apply the multifactored balancing test set out in *J'Aire, supra*, 24 Cal. 3d 799, 804, tends to involve a court in making fairly subjective judgments. In this case, however, a relatively objective obstacle to plaintiffs' claim appears in factor (3), which looks to "the degree of certainty that the plaintiff suffered injury . . . ." (*Ibid.*) Construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of " 'appreciable harm' " --an essential element of a negligence claim. ( *Davies v. Krasna (1975) 14 Cal. 3d 502, 513 [121 Cal. Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]*; see *San Francisco Unified School Dist. v. W.R. Grace & Co., supra, 37* [**1138] *Cal. App. 4th 1318, 1327-1331* [the presence of asbestos products in buildings did not, prior to the release of friable asbestos, constitute actual and appreciable harm under *Davies v. Krasna*]; *Zamora v. Shell Oil Co., supra, 55 Cal. App. 4th 204, 208-211* [finding no cognizable damage in the cost of replacing defective pipes that had not yet leaked].) The breach of a duty causing only speculative harm or the threat of future harm does not normally suffice to create a cause of action. (*Davies v. Krasna, at p. 513.*) For the same reason--because the physical harm traditionally compensable in tort is lacking--to ask in the words of factor (2) whether the harm to plaintiffs was "foreseeab[le]" (*J'Aire*, at p. 804) simply begs the question: What harm?

Plaintiffs argue that the cost of repairs is an accepted measure of damage for construction defects and that plaintiffs could make the cost of repairs certain within the meaning of *J'Aire, supra*, 24 Cal. 3d 799, 804, by voluntarily repairing defects and obtaining a receipt for money spent. This confuses the *measurement* of alleged damages with the ability of particular facts to support a tort action. To say that one's house needs repairs costing a certain amount is not necessarily to say that one has suffered the type of harm cognizable in tort, as opposed to contract. Plaintiffs also argue that "the degree of certainty that the plaintiff suffered injury" (*ibid.*) is merely a factor to be balanced with the other factors set out in *J'Aire* for determining a person's liability for negligently injuring another's economic interests. We do not believe, however, that the *J'Aire* court intended to dispense with the rule that appreciable, nonspeculative, present injury is an essential element of a tort cause of action. ( *Davies v. Krasna, supra, 14 Cal. 3d 502, 513*; cf. *Romano v. Rockwell Internat., Inc. (1996) 14 Cal. 4th 479, 500-503*

*[59 Cal. Rptr. 2d 20, 926 P.2d 1114]* [plaintiff suffered appreciable harm sufficient to support a tort claim for wrongful discharge upon actual termination rather than upon prospective notification].) Lacking that fundamental prerequisite to a tort claim, it is difficult to imagine what other factors, singly or in combination, might justify the court in finding liability.

Turning to the other factors, we find no adequate justification. We may assume for argument's sake that the conduct of a person engaged in construction is "intended to affect" all foreseeable purchasers of the property. [*647] (*J'Aire*, *supra*, 24 Cal. 3d 799, 804 [***733] [factor (1)]; see also *Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal. App. 3d 211, 224*; *Huang v. Garner, supra, 157 Cal. App. 3d 404, 423-424*; *Cooper v. Jevne, supra, 56 Cal. App. 3d 860, 869*.) We may also assume that a sufficiently "close[] connection [exists] between . . . defendant's conduct" and the alleged defects. (*J'Aire*, at p. 804 [factor (4)].) Also, while some "moral blame" arguably "attach[es]" to many deviations from the building codes (*ibid.* [factor (5)]), the degree of blame would appear to depend upon the nature of the deviation. Thus, even if significant moral blame inheres in negligent construction creating a risk of likely structural failure leading to a notice of abatement (*Huang v. Garner, at p. 424* & fn. 13), we may still reasonably assign reduced moral blame to less serious defects not presenting that degree of risk, and to such flaws as doors that are out of plumb, discolored drain stoppers, and inoperable garbage disposals, to take a few examples from this case. Factor (6), the last factor, looks to "the policy of preventing future harm." (*J'Aire*, at p. 804.) Certainly, as plaintiff in *Provencal* noted in its offer of proof, the express purpose of the building codes is to "provide minimum standards to safeguard life or limb, health, property and public welfare . . . ." (U. Bldg. Code, § 102, Cal. Code Regs., tit. 24, former § 2-102.) Plaintiffs have not shown, however, that any of the alleged defects actually poses a serious risk of harm to person or property. To say, as plaintiffs do, that the purpose of construction standards for shear walls is to "minimize property damage and personal injury in the event of seismic and wind forces," is not to say that any given defect is sufficiently grave to pose a realistic risk of structural failure. [**1139] In conclusion, applying the *J'Aire* factors, we do not find they justify a broad rule permitting recovery of repair costs unaccompanied by property damage or personal injury.

Plaintiffs contend precedent requires a different result. "[E]very reported decision applying the *J'Aire*[, *supra*, *24 Cal. 3d 799, 804]* factors to residential construction," they argue, "has allowed the recovery of economic loss," meaning, in this context, the cost of repairing defects that have not caused property damage. The decisions plaintiffs cite, however, do not strongly support their position. The courts in *Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal. App. 3d 211*, and *Cooper v. Jevne, supra, 56 Cal. App. 3d 860* (which predated *J'Aire* and relied on *Biakanja, supra, 49 Cal. 2d 647*), simply held that the plaintiffs in those cases had stated causes of action and, thus, reversed judgments of dismissal entered after demurrers were erroneously sustained. The court in *Sumitomo Bank v. Taurus Developers, Inc.*, did not address the distinction between economic damages and physical harm; no such issue was raised. The court in *Cooper v. Jevne* held that the plaintiff homeowners had stated a cause of action in negligence against the architects of their houses, with whom the plaintiffs were not in privity. As damages for [*648] their negligence cause of action, the plaintiffs sought the cost of repairs, compensation for lost use and income, and "[p]ast and future damage to personal property," among other things. ( *Cooper v. Jevne, supra, 56 Cal. App. 3d at p. 867, fn. 2*.) That the plaintiffs had stated a cause of action was established by the architects' concession that their professional liability to the plaintiffs not in privity of contract with them extended to property damage. ( *Id. at p. 868, fn. 3*.) For this reason, and because the question was not before the court on demurrer, the court's conclusion that *Seely's* economic loss rule does not apply to professional negligence claims (*Cooper v. Jevne, at p. 869*) is dictum. The court, in any event, acknowledged *Seely's* continuing relevance to the liability of a manufacturer for product defects. (*Cooper v. Jevne, at p. 868*.) Furthermore, unlike the judgments of dismissal on appeal in *Sumitomo Bank v. Taurus Developers, Inc.*, and *Cooper v. Jevne*, the instant rulings in limine do not preclude plaintiffs from presenting to the trier of fact whatever claims for property damage may exist. [12]

12 In addition to these cases cited by plaintiffs, the Chief Justice relies on *Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal. 2d 850 [73 Cal. Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224]*, *Krusi v. S.J. Amoroso Construction Co. (2000) 81 Cal. App. 4th 995 [97 Cal. Rptr. 2d 294]*, *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611*, and *Keru Investments, Inc. v. Cube Co. (1998) 63 Cal. App. 4th 1412 [74 Cal. Rptr. 2d 744]*. None of these cases purports to hold that a plaintiff may recover for construction defects that have not caused damage to other property.

In *Connor v. Great Western Sav. & Loan Assn., supra, 69 Cal. 2d 850*, this court held that persons whose homes "suffered serious damage from cracking caused by ill-designed foundations" ( *id. at p. 856*) could sue the construction lender as the joint venturer of the developer on

the theory that it owed the plaintiffs a duty to "exercise reasonable care to protect them from damages caused by major structural defects" ( *id. at p. 866*). Thus, to the extent *Connor* might be thought relevant to the case before us, it is entirely consistent with the rule we apply today. (The Legislature has rejected *Connor's* holding that construction lenders are liable in negligence for construction defects. See *Civ. Code, § 3434*.)

The courts in *Krusi v. S.J. Amoroso Construction Co., supra, 81 Cal. App. 4th 995, 1005*, and *Keru Investments, Inc. v. Cube Co., supra, 63 Cal. App. 4th 1412, 1423-1425*, held simply that causes of action for construction defects accrued when the defects caused damage and belonged to the persons who owned the buildings at that time, rather than to the subsequent purchasers. Because the courts in both cases held the plaintiffs lacked standing to sue, neither court faced any question of liability for purely economic damages. In any event, the buildings at issue in both cases had actually suffered major structural damage as a result of construction defects. (*Krusi, at p. 998*; *Keru, at p. 1415*.) The court in *Stearman v. Centex Homes, supra, 78 Cal. App. 4th 611, 616-623*, held merely that strict liability applies when a defective component of a house damages a nondefective component. (See p. 641, *ante*.)

Plaintiffs place particular emphasis on *Huang v. Garner, supra, 157 Cal. App. 3d 404* (*Huang*). The court in that case relied on *J'Aire*, *supra*, 24 Cal. 3d 799, to reverse [**1140] a nonsuit for the defendants (a developer and a contractor) on the plaintiff real estate investors' claims for the cost of repairing defects in an apartment building. Some of the alleged defects had caused property damage, and some had not. (*Huang, at pp. 419-425*.) The *Huang* [*649] court found the "certainty" of injury required by *J'Aire* (at p. 804) in plaintiffs' duty to comply with a notice of abatement citing likely structural failure and requiring specific repairs. (*Huang, at p. 424* & fn. 13.) Yet *Huang's* analysis is not entirely satisfactory because other alleged construction defects in that case had neither caused property damage nor been cited in the notice of abatement. (Compare *id. at pp. 419-420* [summary of alleged defects] with *id. at p. 424, fn. 13* [order of abatement].) Even accepting for the sake of argument the *Huang* court's suggestion that a notice of abatement might suffice to convert repair costs into tort damages, the decision offers no adequate explanation for permitting the plaintiffs, consistently with *Seely, supra, 63 Cal. 2d 9*, to recover repair costs for the other defects that had neither appeared in the notice nor resulted in property damage. Accordingly, we disapprove *Huang* to the extent it is inconsistent with the views set out in this opinion.

Whether viewed as part of the test set out in *J'Aire*, *supra*, 24 Cal. 3d 799, 804, or as an independent argument for extending tort liability, the "policy of preventing future harm" (*ibid.* [factor (6)]) is probably plaintiffs' strongest argument. In some sense, [***735] that policy might be served by a rule of tort liability making builders, in effect, the insurers of building code compliance, even as to defects that have not caused property damage or personal injury. Moreover, as plaintiffs argue, to require builders to pay to correct defects as soon as they are detected rather than after property damage or personal injury has occurred might be less expensive. On the other hand, such a rule would likely increase the cost of housing by an unforeseeable amount as builders raised prices to cover the increased risk of liability. Such a rule should also be unnecessary to the extent buyers timely enforce their contract, warranty and inspection rights, and to the extent building authorities vigorously enforce the applicable codes for new construction.

The Chief Justice, in his concurring and dissenting opinion, proposes to resolve these conflicting policy considerations with a complex new rule of tort liability (1) barring recovery for *minor* defects and building code violations that have not caused personal injury or property damage; (2) permitting recovery for *serious* defects and code violations posing a significant risk of death, personal injury, or considerable property damage; and (3) requiring court-supervised disbursement of all damages awarded to ensure that repairs are actually made. (Conc. & dis. opn. of George, C. J., *post*, at pp. 653-654, 671, 672-673.)

The proposal entails serious difficulties. First among these is that the Chief Justice, while asserting that our holding "offends . . . established common law" (conc. & dis. opn. of George, C. J., *post*, at p. 653), nevertheless "agree[s] with the majority to the extent it declines to allow recovery in [*650] negligence for the cost of repairing construction defects that pose no significant risk of serious personal injury or property damage" (*id. at p. 671*). As we have explained, whether the economic loss rule applies depends on whether property damage has occurred rather than on the possible gravity of damages that have not yet occurred. While the Chief Justice rejects our understanding of the economic loss rule, his concurring and dissenting opinion offers no other rationale for denying recovery for minor defects. Although the Chief Justice advances policy considerations to justify providing recovery for serious defects, his narrow conception of the economic loss rule as applicable only to commercial losses (conc. & dis. opn. of George, C. J., *post*, at p. 657; but see this opn., *ante*, at p. 642) would seem to compel the court to permit recovery for minor

defects, as well. In short, the proposed rule lacks coherence.

The Legislature, whose lawmaking power is not encumbered by precedent, is free to [**1141] adopt a rule like that proposed in the Chief Justice's concurring and dissenting opinion. Yet even if the proposed rule could plausibly be defended as a logical development of the common law, and thus appropriate for judicial rather than legislative promulgation, the rule's shortcomings would counsel its rejection. The distinction between serious and minor defects has a superficial theoretical appeal that evaporates in practice. Amicus curiae Structural Engineers Association of California, which supports plaintiffs' position in this court, aptly demonstrates that almost any building code violation can, under the right set of assumptions and circumstances, be considered serious. [13] [***736] "[T]here is no mechanism at this level to separate life safety defects from cosmetic defects," amicus curiae argues; such questions, in its view, are "better left to the trier of fact after a complete presentation of expert testimony on both sides." If experts claim to be unable before trial to rule out any building code violations as trivial, then a rule looking to the *potential* seriousness of *possible* property damage, rather than the existence of *actual* damage, is very likely to frustrate the pretrial disposition of claims based on trivial defects. Such a rule, by forcing judges [*651] to attempt to predict the likelihood that any given defect will cause property damage and, if so, its likely seriousness, will make it difficult for them to screen out trivial claims as a matter of law. Because, moreover, the rule invites a speculative inquiry, any pretrial dispositions based thereon are likely to be inconsistent [14] and challenged on appeal. In short, the practical effect of a rule permitting recovery for "serious" defects only, however well intentioned, would likely be to insulate from demurrer and summary judgment virtually all complaints containing allegations of building code violations.

13 Amicus curiae explains in detail how alleged defects that might on "[i]nitial impression[]" seem "trivial, nitpickey and even ridiculous," might cause or indicate serious problems. "Closet shelving, interior doors not fitting properly, sagging roof rafters, spalling plaster, [and] GFI [ground fault interrupt] receptacles missing" are cited as examples. Expert testimony at trial, amicus curiae speculates, might show that "the location of the closet shelving in conjunction with the lighting poses a fire hazard and violates the National Electrical Code. The interior doors may not fit properly because the buildings/homes have moved due to structural problems or soil issues. The roof rafters may be sagging because they were not attached properly, and their installation violates the Uniform Building Code. The plaster could be spalling due to missing structural components, and by the way, maybe the plaster is supposed to serve as some shear. The missing GFI receptacles pose a fire hazard and a life safety threat to adults and children and the fact that they are missing violates the National Electrical Code."

14 This case illustrates the problem. The Chief Justice apparently concludes that the defects alleged in this case put plaintiffs' homes at risk of collapse or fire. (Conc. & dis. opn. of George, C. J., *post*, at p. 654.) To be sure, plaintiffs have alleged that shear and fire walls do not comply with the applicable building codes, and that the purpose of codes for these components is to protect against those sorts of harm. (See *ante*, at p. 633 & fn. 1.) Yet, as the trial court recognized (see *ante*, at pp. 633-634), this does not necessarily mean that any given defect is sufficiently grave to pose a realistic risk of serious damage. (See also *ante*, at pp. 646-647.)

The Chief Justice's suggestion that courts should supervise the disbursement of tort damages (conc. & dis. opn. of George, C. J., *post*, at pp. 663-664, 672-673) highlights a final difficulty with the rule he proposes. Ordinarily, nothing compels a successful plaintiff to spend money recovered in construction defect litigation on repairs. Indeed, plaintiffs in *Aas* expressly seek in their complaint, in addition to the cost of repairs, damages representing the "diminution in value" of their residences. [15] The possibility that tort damages [***737] [**1142] will not actually be spent on repairs, defendants contend, weakens the argument that imposing liability for construction defects without resulting damage will serve the policy goal of improving the state's housing stock. [*652] The rule the Chief Justice proposes would address this concern by requiring court-supervised disbursement of all damages awarded to ensure that repairs are actually made. (Conc. & dis. opn. of George, C. J., at pp. 672-673.) Again, while such a rule might be appropriate as *legislation*, to reconcile it with the traditional role of the judiciary is very difficult, indeed. While there have been exceptions, courts do not ordinarily tell successful plaintiffs how to spend their tort recoveries. [16] That judicial control over the proceeds might be necessary to render the proposed liability rule fair suggests the rule tries the limits of our power to expound the common law.

15 Plaintiffs may be surprised to read in the Chief Justice's concurring and dissenting opinion that he believes they have abandoned this claim. Plaintiffs did abandon a claim for so-called stigma damages, representing the residual loss of

market value after repairs have been made, after losing on this issue in the Court of Appeal. As that court explained, no reported decision in this state appears to authorize such recovery; we intimate no view on the matter.

In contrast, diminished value is simply one of the standard alternative measures of damage for injury to property. The successful plaintiff in such cases ordinarily recovers either the diminution in market value attributable to the injury or the cost of repairs, whichever is less ( *Mozzetti v. City of Brisbane (1977) 67 Cal. App. 3d 565, 576 [136 Cal. Rptr. 751]*), although the rule is not rigid and the court may award the greater amount in appropriate circumstances ( *Heninger v. Dunn (1980) 101 Cal. App. 3d 858, 863-864 [162 Cal. Rptr. 104]*; see generally 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 1461- 1462, pp. 934-935). Plaintiffs understandably emphasize the cost of repairs in their briefs and argument because damages measured by the cost of repairs typically exceed damages measured by diminution in value.

This case is being remanded for further proceedings, possibly including a trial on any alleged defects that have caused property damage. (See *ante*, at pp. 634, 635.) Because plaintiffs have not expressly abandoned the right to recover the diminished value of their homes, should that turn out to be the appropriate measure of damages, we see no basis on which to preclude the court from applying the ordinary law of remedies.

16 Arguing that courts *should* do so, the Chief Justice cites *Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal. 4th 965 [25 Cal. Rptr. 2d 550, 863 P.2d 795]*. (Conc. & dis. opn. of George, C. J., at pp. 663-664, 672-673.) The plaintiffs in *Potter* sought, among other things, medical monitoring costs following their exposure to carcinogenic toxic waste. In a footnote, we noted the suggestion of "[v]arious commentators and courts . . . that creation of court-supervised funds to pay medical monitoring claims as they accrue, rather than the award of a lump-sum verdict, may be a more appropriate mechanism for compensating plaintiffs in a toxic exposure case." ( *Id. at p. 1010, fn. 28.*) Nothing in the *Potter* decision, which we painstakingly limited to its specific factual and legal context, suggests that courts have a broad, general role in supervising the disbursement of tort recoveries.

In our view, the many considerations of social policy this case implicates, rather than justifying the imposition of liability for construction defects that have not caused harm of the sort traditionally compensable in tort (*Seely, supra, 63 Cal. 2d 9, 18)*, serve instead to emphasize that certain choices are better left to the Legislature. That body has at its disposal a wider range of options and superior access to information about the social costs and benefits of each. "Legislatures, in making such policy decisions, have the ability to gather empirical evidence, solicit the advice of experts, and hold hearings at which all interested parties may present evidence and express their views . . . ." ( *Foley v. Interactive Data Corp. (1988) 47 Cal. 3d 654, 694, fn. 31 [254 Cal. Rptr. 211, 765 P.2d 373]*; see also *Moore v. Regents of University of California (1990) 51 Cal. 3d 120, 147 [271 Cal. Rptr. 146, 793 P.2d 479, 16 A.L.R. 4th 903]*.) [17]

17 In fact, the Legislature in this term has considered and rejected proposals to make persons engaged in residential construction liable for the cost of bringing homes into compliance with the building codes, without regard to the existence of property damage (Assem. Bill. No. 1669 (1999-2000 Reg. Sess.), as introduced Mar. 15, 1999) and to create a state-sanctioned home warranty program (Assem. Bill No. 1221 (1999-2000 Reg. Sess.)). We note the Legislature is also considering a bill that would recognize a lack of "empirical data on the incidence of construction defects, the amount of construction defects litigation, and whether there is any causal relationship between shoddy construction, construction defect litigation, and the construction of new condominium and affordable housing," and commission a comprehensive study to collect such data. (Sen. Bill No. 1882 (1999-2000 Reg. Sess.).) Defendants' motion for judicial notice of these bills is granted.

Home buyers in California already enjoy protection under contract and warranty law for enforcement of builders' and sellers' obligations; under the [*653] law of negligence and strict liability for acts and omissions that cause property damage or personal injury; under the law of fraud for misrepresentations about the property's condition; and an exceptionally long 10-year statute of limitations for latent construction defects ( *Code Civ. Proc., § 337.15*). While the Legislature may add [***738] whatever additional protections it [**1143] deems appropriate, the facts of this case do not present a sufficiently compelling reason to preempt the legislative process with a judicially created rule of tort liability.

III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CONCUR BY:** GEORGE (In Part); MOSK (In Part)

**DISSENT BY:** GEORGE (In Part); MOSK (In Part)

**DISSENT**

**GEORGE, C. J.**, Concurring and Dissenting.

Other courts faced with the question we address today have asked: Why should a homeowner have to wait for a personal tragedy to occur in order to recover damages to repair known serious building code safety defects caused by negligent construction? (E.g., *Council of Co-Owners v. Whiting-Turner (1986) 308 Md. 18 [517 A.2d 336, 345]*.) Perhaps because those courts have addressed the matter from such a commonsense perspective, they have reached conclusions very different from that adopted by the majority in the present case. In determining that a negligently constructed home must first collapse or be gutted by fire before a homeowner may sue in tort to collect costs necessary to repair negligently constructed shear walls or fire walls, the majority today embraces a ruling that offends both established common law and basic common sense.

In this case, we must decide whether, under California law, when a building contractor has breached its duty of care by constructing a home that violates significant building safety code provisions that are designed to protect health and safety, and the homeowner has discovered these safety code violations before a personal injury has occurred or before the home has suffered any physical property damage, the homeowner, in a negligence action, may recover those costs of repair that a reasonably prudent homeowner would incur under the circumstances, or whether the "economic loss" rule of *Seely v. White Motor Co. (1965) 63 Cal. 2d 9 [45 Cal. Rptr. 17, 403 P.2d 145]* (*Seely*)--a rule designed to limit recovery of such business-related losses as lost profits or lost commercial opportunities--bars a homeowner from recovering such repair costs in a negligence action.

I agree with the majority that many if not most of the defects listed in the underlying complaints--items such as "discolored drain stoppers, and inoperable garbage disposals" (maj. opn., *ante*, at p. 647)--do not pose a risk of [*654] personal injury or property damage sufficient to warrant recognition of a right to recover repair costs in negligence, and hence to this extent I concur in the judgment. At the same time, however, I conclude, consistent with California authority and with the courts of other jurisdictions, that a homeowner may maintain a cause of action in negligence to recover the costs of correcting the most significant building safety code violations conceded in this litigation (e.g., shear walls that were improperly constructed or fastened and that put the structure at risk of collapse during high winds or an earthquake; improperly constructed fire walls that would allow a fire to spread rapidly from one part of the structure to another), but that have not yet manifested themselves in physical damage to the property or resulted in personal injury. To the extent the majority bars such recovery, I dissent. Recognizing a right to recover costs to repair the serious safety defects here at issue--defects that pose a risk of serious personal injury or considerable property damage--would not require us to break new ground; all of the established factors traditionally used to assess building defect cases militate strongly in favor of such relief. And allowing such limited recovery also best comports with rational economic policy, as well as common sense: It obviously is preferable to pay a relatively few dollars at an early date to correct a serious safety risk that may cost millions [***739] or billions of dollars to redress if the inhabitants of dwellings are forced to wait for disaster to strike and for death, personal injury, or physical property damage to ensue.

I.

A.

In *Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal. 2d 850 [73 Cal. Rptr. 369,* [**1144] *447 P.2d 609, 39 A.L.R.3d 224]* (*Connor*), Chief Justice Roger Traynor, upholding a negligence action by homeowners against a lending institution that had financially backed and extensively controlled a new housing development, observed that "the usual buyer of a home is ill-equipped with experience or financial means to discern . . . structural defects." ( *Id., at p. 867*.) The *Connor* opinion rejected as "conjectural claims" assertions that recognizing a duty on the part of the defendant to the homeowners would "increase housing costs, drive marginal builders out of business, and decrease total housing at a time of great need" (*ibid.*), observing that "[i]n any event, there is no enduring social utility in fostering the construction of seriously defective homes. If reliable construction is the norm, the recognition of a duty on the part of tract financiers to home buyers should not materially increase the cost of housing or drive small builders out of business." ( *Id., at pp. 867-868*, fn. omitted.) Finally, the court observed in *Connor* that "a home is not only a major investment for the usual buyer but [*655] also the only shelter he has. *Hence it becomes doubly important to protect him against structural defects that could prove beyond his capacity to remedy.*" ( *Id., at p. 867*, italics added.)

As implied in the above italicized observation, tort law offers the most effective, and often the only realistic, nonstatutory remedy for consumers in this area. Although technically available to at least some of the plaintiffs in this and similar litigation, contract or warranty claims in this setting are difficult to prove and to enforce, and our decisions have recognized that problems with

privity, disclaimers inserted into contracts by developers or contractors, and notice requirements, often frustrate the ability to recover on contract or warranty theories. (See, e.g., *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal. 2d 57, 61 [27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]* [notice requirement under implied warranty is a " 'booby-trap for the unwary' " and " 'consumer[s are] seldom "steeped in the business practice which justifies the rule" ' "]; *Anthony v. Kelsey-Hayes Co. (1972) 25 Cal. App. 3d 442, 448 [102 Cal. Rptr. 113]* [lack of privity defeats implied warranty claim]. ) As observed in *Kriegler v. Eichler Homes, Inc. (1969) 269 Cal. App. 2d 224, 228 [74 Cal. Rptr. 749]* (*Kriegler*), because the purchaser of a " 'development house' " " 'has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible. . . .' [P] 'Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale.' " Accordingly, as Chief Justice Traynor recognized in *Connor, supra, 69 Cal. 2d 850*, the inadequacy of contract and warranty law properly should inform our consideration of the role and use of tort law in this context. (Cf. *Kaiser Steel Corp. v. Westinghouse Elec. Corp. (1976) 55 Cal. App. 3d 737, 747-748 [127 Cal. Rptr. 838]*.)

B.

As the majority observes, the author of *Connor's* rousing confirmation of the right of homeowners to sue in negligence in [***740] order to remedy negligent construction also authored the majority opinion in *Seely, supra, 63 Cal. 2d 9*--a decision that concerned not an action in negligence for repair of serious construction defects in residential housing, but, instead, an action under warranty and strict products liability for lost business profits arising from an assertedly defective commercial truck. The majority asserts that dictum in *Seely*, to the effect that "[*e*]*ven in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for* [*656] *economic loss alone*" ( *id., at p. 18*, italics added), supports a conclusion that there can be no recovery in negligence for any of the repair or correction costs here at issue. I disagree with the majority's broad reading of the *Seely* dictum, and I agree with plaintiffs that *Seely's* dictum should not be extended to bar recovery in negligence for *costs to correct serious safety violations in the construction* [**1145] *of dwellings* that pose a significant risk of personal injury or property damage. Because the majority relies heavily upon a broad reading of *Seely's* dictum, and because I believe that reliance is misplaced, I review the decision in *Seely* in some detail.

In *Seely, supra, 63 Cal. 2d 9*, the plaintiff sued the manufacturer in both warranty and strict liability after his truck, which he used in his commercial hauling business, was involved in an accident and needed to be repaired. Previously, the plaintiff had become dissatisfied with the truck; he informed the manufacturer that it was "galloping" (bouncing violently) and was difficult to handle. ( *Id., at p. 12*.) He used the truck in his business for approximately 11 months, during which time the manufacturer tried unsuccessfully on many occasions to correct the galloping problem to the plaintiff's satisfaction. During this period, the plaintiff paid off approximately half of the purchase price. Then one day, rounding a corner, the brakes failed and the truck overturned. The plaintiff was convinced that the accident was caused by the defective condition of the truck, and he also was dissatisfied with the overall performance of the truck, even before the accident. He had the truck repaired, ceased making payments, and sued for "(1) damages, related to the accident, for the repair of the truck, and (2) damages, unrelated to the accident, for the money he had paid on the purchase price and for the profits lost in his business because he was unable to make normal use of the truck." ( *Id., at p. 13*.) The trial court found that the plaintiff had not proved that the galloping had caused the accident, and hence declined to award damages for repair costs. (*Ibid.*) The trial court did, however, award the other damages on the plaintiff's warranty cause of action. (*Ibid.*)

In *Seely, supra, 63 Cal. 2d 9*, this court approved the award of those damages, based upon the plaintiff's warranty theory. Then, in dictum, we also addressed the plaintiffs' strict liability claim. At this point in the analysis, we considered the damages described in item (2) above, finding them not allowable under strict liability theory. First, we noted concern about the prospect of permitting "unknown and unlimited" liability for such "commercial losses." ( *Id., at p. 17*.) In this regard, we stated that a consumer (i.e., the plaintiff) is "fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." ( *Id., at p. 18*.) The court then stated, in dictum within dictum that has been repeated in subsequent cases and is heavily relied upon by the majority: [*657] "*Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.*" (*Ibid.*, italics added.)

[***741] Clearly, this dictum in *Seely, supra, 63 Cal. 2d 9*, was directed toward the issue presented in *Seely*--the recovery of *lost profits* and related liability for *commercial expectation damages*. The majority, how-

ever, reads *Seely's* dictum much more broadly, as precluding recovery in either negligence or strict liability for the cost of repairing serious and potentially life-threatening defects reflecting building safety code violations in residential housing. I find no such suggestion in *Seely*. Although the court felt it important to explain that a manufacturer should not be liable in tort for commercial losses caused by the failure of a product to meet the specific needs of a purchaser's business ( *id., at p. 17*), it did not assert, expressly or by implication, that there could be no damages in negligence for correction of serious safety violations in residential housing that pose a danger of personal injury or serious property damage. Such a conclusion, of course, would be quite at odds with the tenor of Chief Justice Traynor's above quoted observations in *Connor, supra, 69 Cal. 2d at pages 867-868*, rendered just a few years thereafter.

Recognition of a homeowner's ability to recover repair costs necessary to remedy serious safety defects in residential housing would not substantially implicate *Seely's* concerns about "unknown and unlimited" liability for "commercial losses." ( *Seely, supra, 63 Cal. 2d at p. 17*.) As plaintiffs note in their joint opening [**1146] brief, "[r]ecovery of costs of repair in negligence is adequately limited. Code violations or other negligent construction must be proven. Causation must be proven. Costs of repair are limited in amount, even if expert opinions may vary as to exact amounts. The number of claimants is limited to the number of homes sold. These factors distinguish recovery of such costs from the 'economic loss' cases in which concern was expressed about potentially limitless claims by potentially limitless claimants."

In short, *Seely's* cautions against allowing recovery of commercial expectation damages for lost profits do not justify barring recovery of the cost of repairing serious construction defects involving dwelling code violations that pose a threat to life and property. Accordingly, I find the majority unpersuasive to the extent that it relies on a broad interpretation of the *Seely* dictum.

C.

The understanding of the limited reach of *Seely, supra, 63 Cal. 2d 9*, set forth above is confirmed by numerous decisions described below, in which [*658] California courts repeatedly have allowed recovery of construction repair costs.

Eleven years after *Seely*, the Court of Appeal in *Cooper v. Jevne (1976) 56 Cal. App. 3d 860 [128 Cal. Rptr. 724]* (*Cooper*), allowed a negligence suit by condominium owners against architects, for "economic loss" damages ( *id., at p. 868*) that included "cost of repairs" ( *id., at p. 867, fn. 2*). Eight years later, the Court of Appeal decision in *Huang v. Garner (1984) 157 Cal. App. 3d 404 [203 Cal. Rptr. 800]* (*Huang*), presented a situation essentially identical to the one that we address in this case. Apartment building owners sued the developer and contractor for costs to remedy serious safety code violations that, like the present case, fell into two categories: (i) building safety code violations that *had* manifested themselves in physical damage ( *id., at p. 419* [these consisted of "deflected and cracked beams and dry rot damages to the balcony area"]), and (ii) building safety code violations that *had not yet* manifested themselves in physical damage ( *id., at pp. 419-420* [in *Huang*, as here, these consisted of inadequate or missing "firewalls, shear walls, fire stops, and other alleged defects in the structure which had not yet caused actual physical damages at the time of [***742] trial"]). The Court of Appeal in *Huang*, distinguishing *Seely*, ruled that the apartment owners could recover repair costs to remedy the serious building safety code violations that had not yet manifested themselves in physical damage. ( *Id., at pp. 421-425*.) Addressing the crucial question whether there was sufficient certainty that the plaintiffs in that case had suffered harm, the court noted in *Huang* that the defects were "dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant." ( *Id., at p. 424*.) That court further observed: "Failure to comply with the Uniform Building Code by a developer-contractor involves potential risk of harm to later purchasers. In this case ample evidence was offered with respect to the cost of repairing the subject defects. Thus it is relatively certain that plaintiffs have suffered injury as a result of the defects. . . . [P]laintiffs have . . . suffered damages in being forced to repair the building." (*Ibid.*)

In *Sumitomo Bank v. Taurus Developers, Inc. (1986) 185 Cal. App. 3d 211 [229 Cal. Rptr. 719]*, a California appellate court followed *Huang, supra, 157 Cal. App. 3d 404*, and *Cooper, supra, 56 Cal. App. 3d 860*, allowing a purchaser of a condominium complex to pursue a negligence action against the builder for the cost to repair both then existing physical damage, e.g. , cracking concrete and leaking roofs, and, apparently, detriment that had not yet manifested itself in physical damage, e.g., improperly designed drainage and structural retaining walls. (*185 Cal. App. 3d at pp. 216, 223-226*.) Subsequently, construction litigation decisions of our Courts of Appeal that have had occasion to address the aspect of *Huang* that is relevant here have [*659] uniformly treated *Huang's* analysis as accepted and established law. (See, e.g., *Keru Investments, Inc. v. Cube Co. (1998) 63 Cal. App. 4th 1412, 1421-1422 [74 Cal. Rptr. 2d 744]* [noting that in *Huang* the plaintiffs were not seeking lost opportunity costs, but instead, " 'the cost to repair the defects in the structure in order to bring it into compliance [**1147] with the Uniform Building Code' "];

*Krusi v. S.J. Amoroso Construction Co. (2000) 81 Cal. App. 4th 995, 1000-1001 [97 Cal. Rptr. 2d 294]* [describing with apparent approval *Huang's* conclusion that "the plaintiffs were entitled to economic damages" in order to correct building code violations "in addition to recovery for physical damage" and noting testimony in *Huang* that the defects were " 'dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant' "]; cf. *Stearman v. Centex Homes (2000) 78 Cal. App. 4th 611, 618 [92 Cal. Rptr. 2d 761]* [discussing with approval "Huang's definition and application of [*Seely's*] economic loss rule"].)

D.

Finally, the above reading of *Seely, supra, 63 Cal. 2d 9*, also is confirmed by numerous cases from other jurisdictions that permit recovery of construction repair costs essentially identical to those here at issue. Although the majority adopts a broad view of the *Seely* dictum as barring recovery of costs for repair of construction defects that pose a substantial risk to persons and property, the trend of well-reasoned sister-court decisions is in the opposite direction.

Almost all of the out-of-state decisions in this area cite and discuss *Seely* and adopt in general a version of the rule set out in that case, restricting recovery for commercial expectation damages. These sister-state decisions recognize that *Seely* was concerned primarily with precluding potentially limitless damages for lost profits and/or lost commercial expectations in the context of suits for product liability, and these out-of-state cases also recognize, explicitly or implicitly, that suits for costs to repair and correct dwelling safety defects that pose a serious risk to life and limb are [***743] clearly distinguishable from *Seely* and do not similarly implicate concerns of limitless damages.

The majority, *ante*, at page 636, footnote 7, mentions three such out-of-state decisions. ( *Kennedy v. Columbia Lumber & Mfg. Co. (1989) 299 S.C. 335 [384 S.E.2d 730, 737]* [a builder does not escape liability for building code violations merely because "luck has smiled upon him and no physical harm has yet occurred. . . . [W]e once again join those states which strive to protect the modern new home buyer"]; *Oates v. Jag, Inc. (1985) 314 N.C. 276 [333 S.E.2d 222, 225-226]* [allowing recovery of repair costs to correct [*660] building code violations that had apparently not caused physical damages, and noting, "[w]e must be realistic. . . . The purchaser can ill afford to suddenly find a latent defect in his or her home . . . and have no remedy for recourse"]; *Council of Co-Owners v. Whiting-Turner, supra, 517 A.2d 336* (*Whiting-Turner*).)

The *Whiting-Turner* case is especially well reasoned and particularly apt here. In that case the Maryland high court permitted the plaintiff in a negligence action to recover the costs necessary to correct the construction of 10 vertical utility shafts in a 22-story condominium complex. The shafts presented a fire hazard because of the absence of required insulation--a serious violation of applicable building codes. ( *Whiting-Turner, supra, 517 A.2d at pp. 338-339.*) Although the defective shafts all posed a clear danger of death or personal injury, none of them yet had produced any personal injury or physical property damage.

The *Whiting-Turner* decision held: " 'We reject the contention by appellant that there can be no recovery in negligence absent proof of personal injury or property damage. We hold that there can be recovery for economic loss. Why should a buyer have to wait for a personal tragedy to occur in order to recover damages to remedy or repair defects? In the final analysis, the cost to the developer for a resulting tragedy could be far greater than the cost of remedying the condition.' [P] We conclude that the determination of whether a duty will be imposed in this type of case should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage. Where the risk is of death or personal injury the action will lie for recovery of the reasonable cost of correcting the dangerous condition." ( *Whiting-Turner, supra, 517 A.2d at p. 345*, fn. omitted.) [1]

1 In the omitted footnote, the court wrote in *Whiting-Turner*: "It is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual injury. Accordingly, conditions that present a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice. A claim that defective design or construction has produced a drafty condition that may lead to a cold or pneumonia would not be sufficient." ( *Whiting-Turner, supra, 517 A.2d at p. 345, fn. 5.*)

[**1148] In addition to these authorities, it is instructive to consider another out-of-state decision relied upon by defendants to support their assertion that all repair and correction costs in the present case should be barred under *Seely's* rule restricting recovery of commercial expectation damages. As defendants observe, the Florida Supreme Court's closely divided decision in *Casa Clara v. Charley Toppino and Sons (Fla. 1993) 620 So.2d 1244* (*Casa Clara*) does support defendants' and the majority's position. There, a condominium association sued the supplier of concrete for having provided defective [*661] concrete with a high salt content that caused it to crack, putting at risk the dwellings constructed with the concrete. The Florida high court, em-

ploying a broad interpretation of *Seely's* dictum barring recovery of commercial expectation damages (*Casa Clara, at p. 1245* et seq.), and ignoring Chief Justice Traynor's caution against relying on contract law to protect homeowners [***744] in such circumstances (see *ante,* 101 Cal. Rptr. 2d at pp. 722-723, 12 P.3d at pp. 1128-1130), concluded that home buyers should " 'bear the cost of economic losses sustained by those who failed to bargain for adequate contract remedies' " (*Casa Clara, at p. 1247*), and denied the condominium association any recovery in negligence premised upon "the mere possibility" that the defective concrete "will cause physical injury." ( *Id., at p. 1247.*) The court reasoned in *Casa Clara* that the plaintiffs' "argument goes completely against the principle that *injury must occur before a negligence action exists. Because an injury has not occurred, its extent and the identity of injured persons is completely speculative.*" (*Ibid.*, italics added.) The court in *Casa Clara* was divided four to three, and reached its conclusion over the dissenting justices' protestations that "it stretches reason to apply the [economic loss] doctrine in this context." ( *Id., at p. 1248* (conc. & dis. opn. of Barkett, C. J.).)

Defendants, however, overlook the subsequent history of *Casa Clara.* More than a year ago, the Florida Supreme Court, by a six-to-one vote, "effectively overruled" that case. ( *Moransais v. Heathman (Fla. 1999) 744 So.2d 973, 985* (dis. opn. of Overton, J.) [characterizing the majority opinion] (*Moransais* ).) [2] The Florida high court's analysis and observations in *Moransais* concerning the proper scope of *Seely's* rule barring recovery of commercial expectation damages are especially instructive and strongly repudiate the broad application of the rule proposed by defendants and the majority.

2 The opinion in *Moransais* was filed after briefing in the present case was completed. On August 28, 2000, however, codefendant William Lyon Company filed a "Supplemental Brief of Additional Authorities," citing and discussing the recent subsequent history of a Nevada case cited in earlier briefs, and citing three other recent (and distinguishable) cases from other jurisdictions. Nonetheless, the supplemental brief failed to note that, more than one year earlier, the Florida Supreme Court effectively had overruled *Casa Clara, supra, 620 So.2d 1244,* the primary out-of-state case upon which Lyon had relied in its "Answer Brief on the Merits."

*Moransais, supra, 744 So.2d 973,* was a suit by a homeowner against a professional engineer who had inspected the plaintiff's home prior to purchase. The inspection had failed to disclose various (unspecified) defects that "rendered the home uninhabitable" ( *id., at p. 975*), but which had not yet caused any property damage or personal injury. The plaintiff was not in privity with the engineer, but was with the engineer's employer. The plaintiff sued the engineer personally for his negligent inspection of the home.

[*662] Consistent with *Cooper, supra, 56 Cal. App. 3d 860,* in which our Court of Appeal permitted a similar action against architects, the Florida high court in *Moransais, supra, 744 So.2d 973,* allowed the negligence suit against the engineer. In the process, the Florida court explained that its prior decisions--including, most notably, *Casa Clara*--"[*u*]*nfortunately*" had extended the economic loss doctrine "*beyond its principled origins and have contributed to applications of the rule . . . well beyond our* [**1149] *original intent.*" ( *Moransais, supra, 744 So.2d at p. 980,* italics added).) The court held that henceforth, the doctrine would be limited in order to avoid precluding traditional and well-established actions in tort. ( *Id., at p. 983.*)

Underscoring its retreat from its prior applications of *Seely's* economic loss rule, the court explained in *Moransais*: "Today, we again emphasize that by recognizing that *the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of action*, such as those for neglect in providing professional services. *Rather, the rule was primarily intended to limit actions in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical* [***745] *to those underlying the product liability-type analysis. . . . The rule, in any case, should not be invoked to bar well-established causes of actions in tort . . . .*" ( *Moransais, supra, 744 So.2d at p. 983*, fn. omitted, italics added.) The court in *Moransais* concluded by stressing that " '[*i*]*f the doctrine were genuinely applied to bar "all tort claims for economic losses without accompanying personal injury or property damage," the rule would wreak havoc on the common law of torts.*' " (*Ibid.*, italics added.)

Instead of expanding the reach of *Seely's* rule barring recovery of commercial expectation damages beyond its proper original and intended scope, and instead of reaching to distinguish and disapprove established California Court of Appeal decisions that appropriately have limited the scope of *Seely's* dictum in the context of serious building code violations, we should, like the Florida Supreme Court, recognize the appropriate limited reach of the *Seely* doctrine so that it does not preclude application of traditional rules of negligence permitting limited and rational recovery of correction costs in the circumstances here presented.

II.

Even outside the construction defect context, past California decisions do not support the majority's conclusion that the dictum in *Seely, supra, 63 Cal. 2d 9*, properly should be interpreted to bar a plaintiff in a negligence action from recovering damages in the absence of personal injury or physical property damage. [*663]

For example, in *Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal. 4th 965 [25 Cal. Rptr. 2d 550, 863 P.2d 795]* (*Potter*), a case in which the plaintiffs were negligently exposed to carcinogens in their drinking water, we approved the plaintiffs' recovery of costs for medical monitoring, prior to any actual manifestation of personal injury. ( *Id., at p. 974.*) Our reasoning in *Potter* in permitting the plaintiffs to recover the costs of medical monitoring is instructive here.

First, *Potter, supra, 6 Cal. 4th 965*, employing established tort analysis, allowed recovery of costs to monitor an increased risk of future illness even though there was no "present physical injury or illness" ( *id., at p. 974*), upon a showing that the need for such monitoring was *a reasonably necessary response to the defendant's negligent acts*. ( *Id., at p. 1009.*) The same reasoning applies here: Costs to remedy the most serious building code safety violations should be allowed to the extent they are a reasonably prudent and necessary response to the defendants' negligent acts, incurred to avoid or minimize the damage that will result from such negligence.

Second, *Potter, supra, 6 Cal. 4th 965*, approved the recovery of these limited damages, without regard to the majority's broad reading of the *Seely* dictum. *Potter* is obviously distinguishable from *Seely*, in that *Potter* addressed medical monitoring costs designed to guard against severe personal injury, whereas the *Seely* dictum was addressed to the question of allowing recovery of potentially limitless lost profits and lost commercial expectations. In the same fashion, the present case also is distinguishable from *Seely*--here we are concerned with repair costs designed to guard against severe personal injury and property damage caused by negligent construction of residential housing. *Seely's* dictum did not stand in the way of allowing monitoring costs in *Potter,* and it does not [**1150] stand in the way of allowing repair costs here.

Third, as plaintiffs observe in their briefs, and as *Potter, supra, 6 Cal. 4th 965*, stressed ( *id., at pp. 1005-1006*), *Civil Code section 3333* provides [***746] that a plaintiff may recover in negligence damages "for all the *detriment* proximately caused thereby" (italics added)--the statute imposes no requirement of a showing of present physical injury or property damage. [3] This statute and comparable provisions of the Restatement Second of Torts (§§ 7, 910, & 917) are at odds with the majority's broad application of the *Seely* dictum and with its holding that, in the absence of present physical injury or [*664] property damage, costs to remedy the most serious building code safety violations conceded here are not recoverable in negligence.

3 That statute provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." ( *Civ. Code, § 3333.*)

Fourth, just as we acknowledged in *Potter, supra, 6 Cal. 4th 965*, with regard to the various policy reasons supporting recovery of medical monitoring costs in that case ( *id., at p. 1008*), here as well, policy factors relating to public safety, deterrence, mitigation of damages, economic efficiency, and "societal notions of fairness and elemental justice" (*ibid.*) all militate in favor of allowing the limited recovery proposed.

Finally, as was true with regard to the medical monitoring costs at issue in *Potter, supra, 6 Cal. 4th 965*, the policy factors supporting the conclusion that we should allow recovery of costs to repair the most serious safety code defects here at issue--considerations aimed at ensuring that known safety risks in our housing stock are avoided, or at least corrected--in this case militate in favor of adopting a "fund remedy" procedure that we described with approval in *Potter, supra, 6 Cal. 4th at page 1010*, footnote 28. [4]

4 Our opinion in *Potter* stated in this regard: "Various commentators and courts have suggested that creation of court-supervised funds to pay medical monitoring claims as they accrue, rather than the award of a lump-sum verdict, may be a more appropriate mechanism for compensating plaintiffs in a toxic exposure case. [Citation.] [P] In *Ayers [v. Jackson Tp. (1987) 106 N.J. 557 [525 A.2d 287, 314, 76 A.L.R.4th 571]]*, the court observed: 'Although conventional damage awards do not restrict plaintiffs in the use of money paid as compensatory damages, mass-exposure toxic tort cases involve public interests not present in conventional tort litigation. The public health interest is served by a fund mechanism that encourages regular medical monitoring for victims of toxic exposure.' [Citation.] Thus, in contrast to a lump-sum payment, a fund remedy will encourage plaintiffs to spend money to safeguard their health by not allowing them the option of spending the money for other purposes. The fund remedy will also assure that medical monitoring damages will be paid only to compensate for

medical examinations and tests actually administered, thus serving to limit the liability of defendants to the amount of expenses actually incurred. (*Ibid.*) In turn, this should tend to reduce insurance costs, both to potential defendants and the general public alike." ( *Potter, supra, 6 Cal. 4th at p. 1010, fn. 28.*)

III.

As the majority implicitly concedes, the scope of *Seely's* dictum, *supra, 63 Cal. 2d at page 18*, has been limited in a variety of contexts by decisions allowing such recovery upon a proper showing based upon the familiar six-factor test set out in *Biakanja v. Irving (1958) 49 Cal. 2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]* (*Biakanja*) and *J'Aire Corp. v. Gregory (1979) 24 Cal. 3d 799 [157 Cal. Rptr. 407, 598 P.2d 60]* (*J'Aire*). In light of that authority, the majority finds it necessary to paraphrase the question before us as follows: "Does the law of negligence protect plaintiffs' economic interests in *having houses that fully comply with the building codes*, measured by the cost of repairs *or diminished value associated with noncompliance*, even [*665] though the asserted harm to those interests is unaccompanied by any injury to person or property?" (Maj. opn., [***747] *ante*, at p. 645, 101 Cal. Rptr. 2d at p. 732, 12 P.3d at 1137, italics added.)

By reformulating the question in this manner, the majority skews the inquiry and fails adequately to consider that even if a negligence [**1151] action cannot be maintained for the costs of remedying every minor building code violation, general common law negligence principles support a cause of action for the costs of correcting serious building code safety violations that pose a significant risk of death, serious personal injury, or considerable property damage if left unremedied. [5]

5 Although plaintiffs' complaint sought, among other things, damages for the diminution in value of their homes, plaintiffs' briefing and argument before this court make it quite clear that they have abandoned any such claim and that they *now* limit their negligence claim regarding code violations that have not manifested themselves in physical injury or property damage to recovery of repair costs. Plaintiffs' joint opening brief states the issue as follows: "Can homeowners and a homeowners association . . . recover in negligence for the *cost to repair* violations of governing building codes . . . even though the violations have not yet caused physical property damage?" (Italics added.) This phrasing of the issue and this singular focus of recovery sought at this stage in the litigation is repeated throughout the briefing. Indeed, plaintiffs specifically assert, "*the measure of damages for negligent construction is limited to the cost of repair. Imaginative consequential damages are not applicable.*" (Italics added.) And plaintiffs also argue that defendants in this case should be responsible "only . . . for compliance with governing building codes" and "*will not be exposed to monetary damages beyond the cost of repair.*" Similarly, at oral argument, counsel for plaintiffs asserted that at this stage plaintiffs do not seek lost profits or any other such difficult-to-define form of damages, but instead, and only, funds necessary to address "very specific code violations for which specific repairs are designed and for which there is a known measure of damages"--namely, the specific "costs to repair code violations."

Thus, the matter in contention, at this point, is simply whether, with respect to code violations that have not manifested themselves in physical injury or property damage, we should recognize a limited negligence action for recovery of specific and definable repair costs. In my view it does not advance this inquiry for the majority to invoke repeatedly plaintiffs' now abandoned claim for damages relating to the diminished value of their homes.

In applying the traditional six-factor test, the majority determines with very little discussion that four of the six relevant factors set out in *Biakanja, supra, 49 Cal. 2d at page 650*, and *J'Aire, supra, 24 Cal. 3d at page 804*, support plaintiffs' right to sue in negligence for repair costs, but that two of the factors do not support a negligence action for costs of repair. The majority applies these factors out of their traditional order, and I shall do so here as well, addressing last the two assertedly problematic factors.

A.

*Factor (1): The extent to which the transaction was intended to affect plaintiffs.* The majority, in a single sentence, "assume[s] for argument's sake that the conduct of a person engaged in construction is 'intended to affect' [*666] all foreseeable purchasers of the property." (Maj. opn., *ante*, at p. 646.) It is unclear why the majority includes that qualification; this factor is quite clearly met, and is in fact established law, as the Court of Appeal--which ultimately agreed with the majority's conclusion that the repair costs sought by plaintiffs are *not* recoverable--readily acknowledged. The appellate court stated: "It is undisputed that the 162-unit residential condominium project at issue in the pending Provencal case was developed and built by [codefendant] Lyon. The subcontractors were also involved in the construction of Pro-

vencal. It is also undisputed that the Aas [plaintiffs'] [***748] single-family homes were developed and built by Lyon, and that Lyon subcontracted with several design and construction professionals to design and build the homes. [P] *These facts are sufficient to satisfy the first Biakanja factor under well-settled case law*." (Italics added.) I believe the majority should acknowledge, and not minimize, plaintiffs' strong showing with regard to this factor.

B.

*Factor (4): The closeness of the connection between defendants' conduct and the injury suffered.* The majority also "assume[s] that a sufficiently 'close[] connection [exists] between . . . defendant's conduct' and the alleged defects." (Maj. opn., *ante*, at p. 647.) Again, the Court of Appeal expressed no hesitation [**1152] on this point, stating: "Lyon and subcontractors do not vigorously contend their conduct is remote to [plaintiffs'] alleged harm. Their alleged conduct is sufficiently connected to the alleged construction defects alleged in the [plaintiffs'] pleadings."

# TAB 3

1 of 1 DOCUMENT

**ARMSTRONG WORLD INDUSTRIES, INC., Plaintiff, Cross-defendant and Respondent, v. AETNA CASUALTY & SURETY COMPANY et al., Defendants and Appellants; RELIANCE INSURANCE COMPANY, Defendant, Cross-complainant and Appellant. FIBREBOARD CORPORATION, Cross-complainant and Respondent, v. PACIFIC INDEMNITY COMPANY et al., Cross-defendants and Appellants. GAF CORPORATION, Plaintiff and Appellant, v. COLUMBIA CASUALTY COMPANY et al., Defendants and Appellants.**

**Nos. A049419, A049631, A049654, A049659, A049661, A049663, A049664, A049665, A049666, A049667, A049668, A049669, A049670, A049671, A049672, A049808, A049875.**

**COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVISION ONE**

***45 Cal. App. 4th 1*; *52 Cal. Rptr. 2d 690*; *1996 Cal. App. LEXIS 402*; *96 Cal. Daily Op. Service 3058*; *96 Daily Journal DAR 5048***

**April 30, 1996, Decided**

**NOTICE:** [***1] Opinion certified for partial publication. *

> * Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Issue Group I (Lost Insurance Policy), and the designated portion of part H of Issue Group III.

**PRIOR HISTORY:** Los Angeles County Superior Court. Super. Ct. Nos. C315367, C286217. San Francisco County Superior Court. Super. Ct. No. 753885, JCC Proceeding No. 1072, Hon. Ira A. Brown, Jr., Judge.

**DISPOSITION:** The judgment on phase I denying recovery or relief to GAF Corporation under Continental Casualty Company policy RD 9972548 (paragraph 3) is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Separate declaratory relief actions and related cross-actions involving three asbestos manufacturers and their various insurance carriers were coordinated and tried in six separate phases in the trial court. For purposes of appeal, the issues were divided into three major issue groups, two of which were published: Issue Group II, pertaining to the bodily injury claims against the manufacturers, including issues relating to the trigger and scope of coverage, the application of the phrase "neither expected nor intended," the liability of premerger insurers, and the effect of a settlement agreement; and Issue Group III, pertaining to the property damage claims against one of the manufacturers, including issues relating to the coverage for property damage, the trigger and scope of coverage, the duties to defend and indemnify, and the coverage of one insurer's excess policy.

Trial Court Rulings

Issue Group II. The trial court was asked to determine the trigger and scope of coverage of the comprehensive general liability (CGL) policies under which the manufacturers were insured with respect to asbestos-related bodily injuries. The trial court found, for purposes of the trigger issue, that the language contained in the various policies was functionally identical, and that the meaning of the language was plain and unambiguous in requiring indemnification and defense when any one of three distinct conditions--bodily injury, sickness, or disease--was present during the policy period. Having found that bodily injury occurs during the period of exposure to asbestos, that it continues to occur during the latency period even in the absence of further exposure, and that it continues to occur past the manifestation point, accompanied by sickness and disease, until the claimant's death from the disease or other causes, the trial court adopted a continuous trigger of coverage, under which all of a manufacturer's policies in effect from

the first exposure to asbestos or asbestos-containing products until the date of death or the date of a claim, whichever occurs first, are triggered with respect to an asbestos-related bodily injury claim. The court further concluded that once a claim is filed by a living claimant, the claimant's bodily injury is no longer an unknown event and, accordingly, under the loss-in-progress rule, policies beginning after the claim is filed are not triggered.

With respect to the scope of coverage, the trial court ruled that each manufacturer was required to be indemnified by one insurer for the full extent of the loss up to the policy's limits, but with liability ultimately being apportioned among all insurers based on the policy limits and the years of coverage. Furthermore, the court concluded that the manufacturers did not have an obligation to share pro rata in indemnification and defense costs because of any uninsured or self-insured periods of time simultaneous with the occurrence of bodily injury pertaining to a claim. The trial court, in interpreting the phrase, "neither expected nor intended," as used in the CGL policies, providing coverage for injuries that are "neither expected nor intended," by the insured, determined that it applied to exclude coverage where the insured acted either willfully, intentionally, or maliciously for the purpose of causing injury. Applying this test, the court found that, contrary to the arguments of its insurers, one of the manufacturers had not acted for the purpose of causing injury, and, hence, the injuries from exposure to asbestos had been neither expected nor intended by the manufacturer. The court also ruled that an insurer is not required to produce express testimony or documentation as to an insured's subjective, wrongful intent to cause injury, but may show that reason mandates that by the very nature of the act undertaken, coupled with the knowledge actually in possession of the insured, harm must have been intended. The trial court also determined that the liability policies of one of the manufacturers provided coverage for asbestos-related bodily injuries attributable to the products of another company with which the manufacturer had merged after the expiration of the policies. The trial court found that a settlement agreement between two of the manufacturers and several of the insurers was reasonable and concluded that the manufacturers' settlement payments were presumptive evidence of their liability with respect to the policies of nonsettling insurers, even though, under the settlement, payments by the manufacturers went toward all claims regardless of whether they were claims for which the manufacturers were liable.

Issue Group III. The trial court was asked to determine the obligations of one manufacturer's insurers to defend and indemnify it in the so-called "building cases"--the property damage lawsuits filed against the manufacturer on account of the presence of asbestos-containing building material (ACBM) in buildings. The trial court concluded that all claims, whether for release of asbestos fibers or for mere installation of ACBM, were for covered "property damage" under all of the manufacturer's policies. However, the trial court found that asbestos property damage, unlike bodily injury, is not necessarily continuous, and instead of a continuous trigger of coverage, it adopted a multiple trigger, pursuant to which coverage is triggered if it is shown that ACBM was installed in the buildings in question, that ACBM released fiber or material into the air or on surfaces of the buildings, or that settled releases of ACBM were disturbed and reentrained into the air, during any portion of the period that a liability policy was in effect. The trial court rejected the argument of one insurer that its accident policy did not cover the claims against the manufacturer, on the ground that such a policy requires a sudden, unexpected event, reasoning that there is no requirement of suddenness and that, in any event, the release and reentrainment of asbestos fibers qualify as sudden events. The trial court concluded that each of the triggered policies was responsible "in full" for the losses, subject to the "no stacking" qualification (only one policy's limits can apply to each claim) and subject to apportionment among the insurers based on "other insurance" clauses.

The trial court further ruled that the manufacturer had no obligation to share pro rata in indemnification or defense costs because of any uninsured or self-insured periods. The trial court ruled that the insurer under each triggered policy had an independent obligation to pay in full any indemnity costs on an asbestos building claim and that, if the policy contained a defense obligation, to also pay in full any defense costs on the claim. The trial court also concluded that none of the business risk exclusions in the liability policies--damage to the insured's own products, product recall, and design defect--applied to the asbestos building cases. (Superior Court of the City and County of San Francisco, No. 753885, Ira A. Brown, Jr., * Judge.)

* Retired judge of the San Francisco Superior Court sitting under assignment by the Chairperson of the Judicial Council.

Decision by Court of Appeal

Issue Group II. The Court of Appeal affirmed the judgment concerning the trigger and scope of coverage for bodily injury claims, but modified it to read that all of a manufacturer's policies subject to the judgment that were in effect from the date of the claimant's first exposure to the manufacturer's asbestos product until the date of death or claim, whichever occurred first, were triggered on an asbestos-related bodily injury claim, but the claimant was presumed to have been exposed to all de-

fendant-manufacturers' asbestos products, and the burden was on the insurer to prove that the claimant was not exposed to its manufacturer-policyholder's product before or during the policy period. The court held that, because standard CGL policies cover occurrences that result in injury during the policy period, the operative event, or "trigger of coverage," that activates the insurer's defense and indemnity obligations is the injury. The trial court did not err in using an injury-in-fact analysis to apply a continuous trigger approach, and its conclusion that injury actually occurs upon exposure to asbestos, even though the injury may not be capable of detection until much later, and continues until death, was amply supported by its factual findings. Since, for purposes of determining insurance coverage, absolute precision is not required as to when the injury occurred, the trial court did not err in finding that, for individuals who had actually developed asbestos-related injuries, the evidence permitted the inference that injury took place in the past, that is, that, in retrospect, undiscovered injury existed during the asbestos exposure period and during the latency period in the absence of exposure. Further, the court held that, since the doctrine of joint and several liability is one of tort liability, not contract law, it was not applicable to the obligations of the insurers, and the trial court correctly decided that, although the doctrine may sometimes have been imposed on the manufacturers in the underlying lawsuits by the injured persons, it had no application to the obligations of successive insurers of a single manufacturer. Nevertheless, the trial court's decision with respect to the apportionment of liability among the insurers did not erroneously impose joint and several liability on them, but, rather, it ensured that each manufacturer would be indemnified by one insurer for the full extent of the loss up to the policy's limits, and apportioned liability among all insurers whose policies were triggered by the claimant's asbestos-related bodily injury.

The court also held that, since the apportionment of the liability of multiple insurers on a single claim, pursuant to "other insurance" provisions, has no bearing on the obligations of the insurers to the insured, the trial court correctly concluded that the manufacturers were not obligated to share pro rata in indemnification and defense costs because of any uninsured or self-insured periods of time simultaneous with the occurrence of bodily injury pertaining to a claim. However, the court held that a liability insurer has no liability under a policy covering claims of asbestos-related bodily injuries if the policy expired before the claimant was exposed to the manufacturer-policyholder's products. In determining the liability insurance coverage of multiple asbestos manufacturers for a claim of an asbestos-related bodily injury, the claimant will be presumed to have been exposed to asbestos products of all of the manufacturers, but an insurer is entitled to rebut that presumption and show that its policy was not triggered because the claimant was first exposed to its manufacturer-policyholder's products after the policy period had expired. Thus, the trial court erred in ruling that all of a manufacturer's policies were triggered upon the claimant's exposure to any asbestos product, regardless of who manufactured it, since, in effect, the decision created an irrebuttable presumption that all of an asbestos manufacturer's policies are triggered by a claim of injurious exposure to any asbestos product. The court also held that, for purposes of determining whether liability may be imposed on a particular insurer who was on the risk before the claimant was exposed to the manufacturer-policyholder's product, the insurer's liability does not parallel the joint and several liability of the manufacturers.

The Court of Appeal reversed the trial court's declaration on the meaning of the "expected or intended" language, but affirmed the judgment that coverage existed for asbestos bodily injury claims under the particular policy at issue on appeal. The court held that the use of an objective standard in determining the meaning of the word "expected," as used in liability insurance policies providing coverage for injuries that are "neither expected nor intended" by the insured, would deny coverage for mere negligence and create an exclusion swallowing the entire purpose of insurance protection for unintended consequences. Thus, the trial court correctly used a subjective standard in interpreting the word "unexpectedly" as used in one insurance policy that defined the term "occurrence" as an event that unexpectedly causes personal injury. The exclusion for injuries that were not unexpected applied only to injuries that the insured manufacturer subjectively knew or believed to be practically certain to occur even though it did not act for the purpose of causing injury. However, the court held that there is a distinction between the words "expected" and "intended," such that the insured may expect injuries--that is, believe them to be substantially certain to occur--without having the express purpose of causing damage. Thus, the trial court erred in failing to differentiate "expected" from "intended" in interpreting the word "unexpectedly," and it should have considered whether the manufacturer, though not intending to cause injury, expected the injuries because it knew of the hazards of asbestos and was aware of the substantial probability of harm from its manufacture and sale. Nevertheless, the error was harmless, since the insurer failed to meet its burden of proving that the manufacturer actually expected bodily injuries from the use of its asbestos products within the meaning of the policy provision and, thus, the evidence was insufficient to support a finding that the manufacturer knew or believed that asbestos bodily injuries were practically certain to occur.

The Court of Appeal reversed the judgment that the liability policies of one of the manufacturers provided coverage for asbestos-related injuries attributable to the products of another company with which the manufacturer had merged after the expiration of the policies. The court held that, although the insuring agreements in the policies obligated the insurers to pay for all sums that the insured manufacturer became obligated by law to pay, and the manufacturer became obligated for the liabilities of the other company upon the merger, insurance policies must be read as a whole, and, thus, the insuring agreements were required to be read in conjunction with the "named insured" provisions. The other company had not had any relationship with the insured during the policy periods, and the fact that the companies became affiliated later was not enough to give the other company the status of a named insured under those provisions of the pre-merger policies. Moreover, the court held that language in the liability policies identifying the named insured as the insured and its affiliated companies as "now existing or hereafter constituted," indicated an intention to provide coverage to the manufacturer despite its assumption of new liabilities resulting from the acquisition of another company after the policies had expired. Although, in the abstract, the phrase "or hereafter constituted" could have referred to companies acquired at any time in perpetuity, as a matter of policy interpretation, the phrase had to be read in the context of the entire policy, including the policy period. Thus, the named insured definition under the policies did not include a company acquired after the policy periods ended.

The Court of Appeal affirmed the judgment on the effects of the settlement agreement. The court held that the general rule placing the burden on the policyholder to establish facts to trigger coverage of a liability insurance policy is subject to the exception that when the insurer refuses to accept a settlement that the insured proves to be reasonable, then it is presumed that the insured is liable to the claimant in the amount of the settlement. The trial court's finding that the settlement was reasonable had not been challenged on appeal. Moreover, the manufacturers had offered sufficiently substantial evidence that the settlement was reasonable and that the nonsettling insurers had declined to join the settlement despite having had the opportunity to do so.

Issue Group III. The Court of Appeal affirmed the judgment concerning the defense and indemnity obligations of the insurers on asbestos-related property damage claims against the manufacturer, concerning policy exclusions, and concerning the trigger and scope of coverage, but reversed the judgment on interpretation of the excess policy and remanded the matter for findings on the objectively reasonable expectations of the manufacturer. The court held that, in a declaratory relief action, questions of liability insurance coverage may be determined on the basis of the underlying pleadings in actions against the insured and such other evidence as is available. Thus, the trial court properly looked to the nature of the manufacturer's potential liability, taken from the allegations in the various complaints in the underlying building cases, together with the totality of the evidence, in ruling on the meaning of "property damage," as used in the liability policies. The court held that not only contamination of a building from a release of asbestos fibers into the building's air supply and onto the building surfaces, but also the mere presence of ACBM in buildings, constitutes a physical injury and, hence, property damage covered under a liability insurance policy. Thus, the trial court properly ruled that the manufacturer's liability policies covered claims for the release of asbestos fibers into buildings, regardless of the amount of fibers that were actually released and claims alleging that the mere presence of ACBM in buildings was a health hazard, even though there had been no releases of fibers. In both cases, whether and to what extent there had been damage to the buildings were factual issues for the underlying building cases, and, for purposes of determining the insurance coverage, it had to be assumed that damage had occurred for which the manufacturer would be liable. Moreover, the court held that, with respect to the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, even if the underlying complaints in the building cases alleged that the mere presence of ACBM in buildings was a health hazard because of the potential for future releases of asbestos fibers, and there were no releases of fibers, if the manufacturer was held liable for the mere presence of ACBM, the injury to the buildings was a physical one and, hence, property damage covered under a liability insurance policy. The court also held that, with respect to such coverage, the physical incorporation of ACBM into buildings is distinguished from cases involving hazardous waste leaks or spills from containers, that the rule that physical incorporation of a defective product into another does not constitute property damage unless there is physical harm to the whole was not applicable, and that the damages allegedly suffered by the building owners from the presence of ACBM could not be considered solely economic losses. Furthermore, the court held that evidence introduced by the insurers to show that the mere presence of ACBM is not necessarily injurious had no bearing on the insurance coverage issue.

With respect to the trigger of coverage issue, the court held, although the rule that liability insurance coverage is triggered when the injury actually occurred applies with respect to liability insurance for both asbestos-related bodily injuries and asbestos-related property damage, it is not illogical to apply different triggers of coverage for the two types of cases. Thus, the trial court's

adoption of a multiple trigger approach was proper, since the evidence indicated that, in contrast to the continuous, progressive physiological process involved in the inhalation of asbestos, asbestos property damage is episodic, with measurable intervals between episodes, so that the process of injuries cannot be deemed continuous. The court also held that the trial court did not err in concluding that property damage happens at any time asbestos fiber or material is released from asbestos-containing building material into the air or onto surfaces of buildings, and when settled releases are disturbed and reentrained into the air, no matter how small the quantity of the released fibers. Thus, it was not necessary that "sufficiently appreciable" fibers be released in order to trigger coverage under the manufacturer's liability policies. Moreover, the trial court did not err in deciding that if the manufacturer was to be held liable for contamination of a building from released asbestos fibers, each of the manufacturer's liability policies was triggered if any part of the contamination damage, no matter how small the quantity of the released fibers, took place when the policy was in effect. The court held that, with respect to the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, if the manufacturer is held liable for the mere presence of ACBM (and the potential for releases), without evidence of contamination of a building from released asbestos fibers, coverage under a liability policy would be triggered only at the time ACBM was installed; it would not also be triggered by subsequent, incidental releases of asbestos fibers. However, if the manufacturer were held liable for contamination of a building from the release of asbestos fibers into the air, coverage would be triggered at the time of installation of ACBM as well as at the time of release. Since the loss-in-progress rule, providing that an insurer can insure only against a contingent or unknown loss (*Ins. Code, §§ 22, 250*), does not apply if the damage was triggering the coverage of an asbestos manufacturer's liability insurance policy for claims of asbestos-related property damage to buildings upon reentrainment of asbestos fibers into the air, inasmuch as resuspension of settled fibers is a continuation of the loss that began when the fibers were released from the ACBM. Moreover, the rule that, for purposes of determining liability insurance coverage for property damage, property damage occurs in the policy year in which a defective product is installed, rather than the policy year in which it fails or is replaced in anticipation of failure or causes the market value of the building to diminish is applicable to asbestos products. Thus, the trial court did not err in selecting the installation of ACBM as an event triggering coverage of the manufacturer's liability policies.

The court held that the rule, applicable in first party liability insurance cases, that property damage occurs when the loss is first manifested, is not applicable in a third party liability case involving property damage from asbestos. The court also held that the trial court properly ruled that accident insurance policies covered damage to buildings from ACBM, since the release and reentrainment of asbestos fibers into the air qualified as sudden events so as to constitute accidents within the meaning of the policies. However, the court held that, contrary to the trial court's conclusion, an accident insurance policy covers only unexpected and unintended events that are also sudden. The court held that once one of the manufacturer's liability policies was triggered, the policy obligated the insurer to pay "all sums" that the manufacturer became legally obligated to pay as damages because of property damage during the policy period (up to the policy limits), not just for the part of the damage that occurred during the policy period. Moreover, the apportionment of the liability of multiple insurers on a single claim, pursuant to "other insurance" provisions, has no bearing on the obligations of the insurers to the insured. Thus, the trial court correctly concluded that the manufacturer was not obligated to share pro rata in indemnification or defense costs because of any uninsured or self-insured periods during which there was property damage. Furthermore, the scope of the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings does not depend on the continuous, indivisible nature of the damage or the application of a continuous trigger of coverage, and an insurer has an obligation to respond in full when several successive policies are triggered by continual, episodic property damage.

With respect to the insurers' duty to indemnify and defend, the court held that, although in a declaratory relief action tried before an insured's liability has been established, the trial court cannot determine the insurer's indemnity obligation and must limit its declaration to whether the claim is covered by the policy, the trial court did not err in declaring the insurers' duty to indemnify, since the declaration recognized the prematurity of the manufacturer's request that it be made and was conditioned on the manufacturer being held liable for the damages alleged in the underlying complaints. Moreover, the manufacturer was not required to prove that its liability would necessarily result from covered property damage; for purposes of deciding the coverage dispute, the trial court had properly looked to the allegations of the underlying complaints and had assumed the manufacturer would be held liable for the damages alleged therein. In addition, the allegations of damages from the presence of ACBM in buildings, which were made in the underlying complaints against the manufacturer, were not conclusory and were sufficient to show a potential for coverage and to give rise to a duty on the part of the liability insurers to defend the manufacturer.

With respect to the business risk exclusions in the policies, the court held that the trial court did not err in concluding that none of the business risk exclusions in the liability policies applied to the underlying asbestos building cases, since a decision on the applicability of the exclusions did not need to await a determination of the actual basis for the manufacturer's liability. Rather, for purposes of determining whether the property damage claims were covered or excluded under the policies, it had to be assumed that the manufacturer would be held liable for the damages alleged in the complaints in the underlying cases. The court held that the exclusion for damage to the insured's own products was not applicable, since the underlying asbestos building cases alleged damage to the remainder of the buildings, not damage to the ACBM. The exclusion for product recall was not applicable, since the exclusion applies only to the cost of withdrawing a product due to an apprehended danger but does not apply to actual damage caused by the product itself. And, the active malfunctioning exception to the exclusion for design defect was applicable so as to make the exclusion itself inapplicable. The exception was applicable not only with respect to the allegations in the underlying asbestos building cases that released asbestos fibers had contaminated buildings, but also with respect to the allegations of damages from the mere presence of ACBM. (Opinion by Dossee, J., with Newsom, J., ** and Stein, Acting P. J., concurring.)

** Retired Associate Justice of the Court of Appeal, First District, sitting under assignment by the Chairperson of the Judicial Council.

HEADNOTES

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1a) (1b) Insurance Contracts and Coverage § 10--Interpretation of Contracts--As Judicial Function.** --Interpretation of an insurance policy is primarily a judicial function, and when the trial court's interpretation did not depend on conflicting extrinsic evidence, the reviewing court makes its own independent determination of the policy's meaning. In interpreting an insurance contract, the court's fundamental goal is to give effect to the mutual intention of the parties, which is inferred, if possible, solely from the written provisions of the contract. If contractual language is clear and explicit, it governs. Words in an insurance policy must be interpreted as a layperson would interpret them, in their ordinary and popular sense unless the parties intended a special or technical sense, and a policy should not be read as it might be analyzed by an attorney or an insurance expert, even if the policyholder is a sophisticated insured. Ambiguous policy language must be resolved by interpreting it in accordance with the insured's objectively reasonable expectations, and only if this method fails to resolve the ambiguity will the policy provision be construed in favor of the insured.

**(2) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage.** --Because standard comprehensive general liability insurance policies cover occurrences that result in injury during the policy period, the operative event, or "trigger of coverage," that activates the insurer's defense and indemnity obligations is the injury; that is, occurrence policies (as distinguished from claims-made policies) are invoked, or "triggered," when the injury takes place.

**(3) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Continuous Trigger--Injury-in-fact Analysis--Asbestos-related Bodily Injuries.** --In an action to determine the liability insurance coverage of three asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court did not err in using an injury-in-fact analysis to apply a continuous trigger approach in determining when injury occurred from exposure to the manufacturers' asbestos within the meaning of the manufacturers' comprehensive general liability insurance policies. Since claims involving asbestos-related diseases involve unique facts, the injury-in-fact trigger may be appropriate. In the context of continuous or progressively deteriorating injuries, the injury-in-fact trigger, like the continuous injury trigger, affords coverage for continuing or progressive injuries occurring during successive policy periods subsequent to the established date of the initial injury-in-fact. Thus, the continuous trigger pertains to the duration of coverage, providing coverage throughout successive policy periods. The injury-in-fact trigger establishes the onset of injury, to determine when coverage begins.

**(4a) (4b) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Bodily Injuries.** --In an action to determine the liability insurance coverage of three asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court did not err in adopting a continuous trigger approach, in determining when injury occurred from exposure to the manufacturers' general liability (CGL) insurance policies. The trial court's conclusion that injury actually occurs upon exposure to asbestos, even though the injury may not be capable of detection until much later, and continues until death, was amply supported by its factual findings with respect to the medical evidence and those findings were binding on the appellate court. Moreover, there was nothing in the language of the poli-

cies to require as a condition of coverage that the injury be discovered at any point in time. To read the CGL occurrence policies to provide coverage only when the injury became apparent during the policy period would unfairly transform the policies into "claims made" policies.

**(5) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Bodily Injuries--Validity of Retrospective Analysis.** --In an action to determine the liability insurance coverage of three asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court's finding that, for individuals who had actually developed asbestos-related injuries, the evidence permitted the inference that injury took place in the past, that is, that, in retrospect, undiscovered injury existed during the asbestos exposure period and during the latency period in the absence of exposure, was not in error. For purposes of determining insurance coverage, absolute precision is not required as to when the injury occurred; all that is necessary is reasonably reliable evidence that the injury, sickness, or disease more likely than not occurred during a period of coverage.

**(6a) (6b) (6c) Insurance Contracts and Coverage § 106--Extent of Liability of Insurer--Liability Insurance--Multiple Insurers--Asbestos-related Bodily Injuries--Apportionment of Liability.** --In an action to determine the liability insurance coverage of three asbestos manufacturers for claims of asbestos-related bodily injuries, each of the multiple insurers was required to bear potential liability for an entire claim, subject to allocation based on the "other insurance" provisions of their policies. Thus, the trial court did not err in ruling that each manufacturer was to be indemnified by one of the various insurers for the full extent of the loss up to the policy's limits, but with liability ultimately being apportioned among all insurers based on the policy limits and the years of coverage. The trial court's decision did not erroneously impose joint and several liability on the insurers, but rather it ensured that each manufacturer would be indemnified by one insurer for the full extent of the loss up to the policy's limits, and apportioned liability among all insurers whose policies were triggered by the claimant's asbestos-related bodily injury.

**(7) Insurance Contracts and Coverage § 118--Apportionment of Risk--Other Insurance Clauses.** --When multiple insurance policies share the same risk but have inconsistent "other insurance" clauses, the general rule is to prorate according to the policy limits.

**(8a) (8b) Insurance Contracts and Coverage § 118--Apportionment of Liability--Applicability of Doctrine of Joint and Several Liability.** --In an action to determine the liability insurance coverage of three asbestos manufacturers for claims of asbestos-related bodily injuries, the contractual obligations of the insurers to a single manufacturer-policyholder were separate and distinct from the tort liability of multiple asbestos manufacturers to an asbestos claimant. Thus, since the doctrine of joint and several liability is one of tort liability, not contract law, it was not applicable to the obligations of the insurers, and the trial court correctly decided that, although the doctrine may sometimes have been imposed on the manufacturers in the underlying lawsuits by the injured persons, it had no application to the obligations of successive insurers of a single manufacturer-policyholder.

**(9a) (9b) Insurance Contracts and Coverage § 117--Liability Insurance--Apportionment of Liability--Asbestos-related Bodily Injuries--Obligation of Policyholder to Share Pro Rata in Costs for Uninsured or Self-insured Periods.** --In an action to determine the liability insurance coverage of three asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court correctly concluded that the manufacturers were not obligated to share pro rata in indemnification and defense costs because of any uninsured or self-insured periods of time simultaneous with the occurrence of bodily injury pertaining to a claim. The apportionment of the liability of multiple insurers on a single claim, pursuant to "other insurance" provisions, had no bearing on the obligations of the insurers to the insured. The insurance policies obligated the insurers to pay "all sums" that the manufacturers became legally obligated to pay as damages because of bodily injury during the policy periods, which means that once coverage was triggered, an insurer's obligation to a manufacturer was to cover its liability "in full" up to the policy limits. It was irrelevant that only part of the asbestos-related disease developed during any single policy period or during a period in which the manufacturer had no insurance.

**(10) Insurance Contracts and Coverage § 117--Liability Insurance--Apportionment of Liability--Distinction Between Apportionment Among Multiple Insurers and Apportionment Between Insurer and Insured.** --In suits between an insured and an insurer to determine coverage, interpretation of the policy language will typically take precedence. In contrast, where two or more comprehensive general liability insurance carriers turn to the courts to allocate the costs of indemnity for a paid loss, different contractual and policy considerations may come into play in the effort to apportion such costs among the insurers. The task may require allocation of contribution amongst all insurers on the risk in proportion to their respective policies' liability limits (such as

deductibles and ceilings) or the time periods covered under each such policy.

**(11a) (11b) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Bodily Injuries--Multiple Manufacturers and Insurance Policies--Claimant Not Exposed to Product Until After Expiration of Insurer's Policy.** --A liability insurer has no liability under a policy covering claims of asbestos-related bodily injuries if the policy expired before the claimant was exposed to the policyholder's products and, even though coverage of such a policy is triggered continuously, upon exposure, upon manifestation, and upon exposure-in-residence, it is not enough to trigger coverage that the claimant experienced some asbestos-related injury during a policy period; the injury must have resulted from exposure to the policyholder's products. Thus, in an action to determine the liability insurance coverage of three asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court erred in ruling that all of a manufacturer's policies were triggered upon the claimant's exposure to any asbestos product, regardless of who manufactured it. The effect of this decision was to trigger an insurer's indemnity obligations even if the claimant had not been exposed to the manufacturer's product until after the insurer's policy period had expired.

**(12a) (12b) Insurance Contracts and Coverage § 128--Liability Insurance--Actions--Presumptions and Burden of Proof--Trigger of Coverage--Asbestos-related Bodily Injuries--Multiple Manufacturers and Insurance Policies--Time of Exposure.** --In determining the liability insurance coverage of multiple asbestos manufacturers for a claim of an asbestos-related bodily injury, the claimant will be presumed to have been exposed to asbestos products of all of the manufacturers, but an insurer is entitled to rebut that presumption and show that its policy was not triggered because the claimant was first exposed to its manufacturer-policyholder's products after the policy period had expired. Thus, in an action to determine the liability insurance coverage of three asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court erred in ruling that all of a manufacturer's policies were triggered upon the claimant's exposure to any asbestos product, regardless of who manufactured it. In effect, the decision created an irrebuttable presumption that all of an asbestos manufacturer's policies are triggered by a claim of injurious exposure to any asbestos product.

**(13) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Bodily Injuries--Multiple Manufacturers and Insurance Policies--Claimant Not Exposed to Product Until After Expiration of Insurer's Policy--Joint and Several Liability.** --In a case involving the liability insurance coverage of multiple asbestos manufacturers for a claim of an asbestos-related bodily injury, for purposes of determining whether liability may be imposed on a particular insurer who was on the risk before the claimant was exposed to the manufacturer-policyholder's product, the insurer's liability does not parallel the joint and several liability of the manufacturers. The liability of the manufacturers is not necessarily joint and several and, in any event, this is an issue concerning the trigger of coverage, not apportionment of liability. Whether the liability of the manufacturers is joint and several, proportionate to market share, the contractual obligation of an insurer to indemnify the manufacturer-policyholder, that is, to pay all sums that its manufacturer-policyholder becomes legally obligated to pay, arises only if coverage is triggered. Further, coverage is triggered only if the claimant was exposed to the manufacturer's product either before or during the policy period.

**(14a) (14b) (14c) Insurance Contracts and Coverage § 80--Liability Insurance--Exclusions and Limitations--Injury Not Unexpected--Subjective Awareness as Test of "Expected" Injury.** --The use of an objective standard in determining the meaning of the word "expected," as used in liability insurance policies providing coverage for injuries that are "neither expected nor intended" by the insured such that coverage is excluded if the policyholder should have known of the dangers of its conduct, would deny coverage for mere negligence and create an exclusion swallowing the entire purpose of insurance protection for unintended consequences. Thus, in an action to determine the liability insurance coverage of asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court correctly used a subjective standard in interpreting the word "unexpectedly" as used in one insurance policy that defined the term "occurrence" as an event that unexpectedly causes personal injury. The exclusion for injuries that were not unexpected applied only to injuries that the manufacturer subjectively knew or believed to be practically certain to occur even though it did not act for the purpose of causing injury.

**(15a) (15b) (15c) (15d) Insurance Contracts and Coverage § 80--Liability Insurance--Exclusions and Limitations--Injury Not Unexpected--"Expected" and "Intended" Distinguished.** --There is a distinction between the words "expected" and "intended," as used in liability insurance policies providing coverage for injuries that are "neither expected nor intended" by the insured: the insured may expect injuries--that is, believe them to be substantially certain to occur--without having the express purpose of causing damage. Thus, in an ac-

tion to determine the liability insurance coverage of asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court erred in failing to differentiate "expected" from "intended" in interpreting the word "unexpectedly" as used in one insurance policy that defined the term "occurrence" as an event that unexpectedly causes personal injury. The trial court should have considered whether the insured manufacturer, though not intending to cause injury, expected the injuries because it knew of the hazards of asbestos and was aware of the substantial probability of harm from its manufacture and sale. Moreover, the trial court was sufficiently aware of this issue despite any failure of the insurer to alert it to the distinct language of the policy.

**(16) Insurance Contracts and Coverage § 78--Liability Insurance--Definitions--"Expect": Words, Phrases, and Maxims--Expect.** --The plain and ordinary meaning of "expect" is to anticipate, to consider probable or certain. Thus, the term "expected," as used in the language of insurance policies, means anticipation with a high degree of probability, no matter whether the degree of that probability is expressed as substantially certain, practically certain, highly likely, or highly probable.

**(17) Insurance Contracts and Coverage § 77--Liability and Indemnity Insurance--Costs of Doing Business or Calculated Risks as Insurable.** --Ordinarily insurance does not provide indemnification for the type of economic detriments that occur so regularly that they are commonly regarded as a cost, rather than as an insurable risk, of an enterprise or activity. Closely associated with this basic principle is the view that it is fundamentally inconsistent with the legitimate purpose of an insurance arrangement for one to seek to use it as protection against calculated risks. If the insured is allowed through intentional or reckless acts to consciously control the risks covered by the policy, a central concept of insurance is violated.

**(18a) (18b) Appellate Review § 184--Harmless Error--Failure to Make Finding of Fact--Evidence Insufficient to Sustain Finding.** --In an action to determine the liability insurance coverage of asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court's error in failing to differentiate "expected" from "intended" in interpreting the word "unexpectedly" as used in one insurance policy that defined the term "occurrence" as an event that unexpectedly causes personal injury, was harmless. When a trial court fails to make a finding on a material issue, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party, and the evidence was insufficient to support a finding that the insured manufacturer knew or believed that asbestos-related bodily injuries were practically certain to occur.

**(19) Insurance Contracts and Coverage § 128--Liability Insurance--Actions--Burden of Proof--Expectation by Insured of Bodily Injury From Asbestos.** --In an action to determine the liability insurance coverage of asbestos manufacturers for claims of asbestos-related bodily injuries, an insurer whose policy excluded coverage for injuries that were not unexpected failed to meet its burden of proving that its insured manufacturer actually expected bodily injuries from the use of the manufacturer's asbestos products within the meaning of that provision. Although there was evidence of the manufacturer's general knowledge of asbestos dangers that might have supported a finding that it should have expected the asbestos bodily injuries, general knowledge of the hazards of asbestos is not equivalent to knowledge that such injuries were practically certain to occur. The record indicated that the manufacturer's officials believed that the company's asbestos products were not dangerous, that they were taking every precaution to protect their workers from any dangers from breathing asbestos dust, and that the workers would not be harmed as long as the dust levels were controlled.

**(20a) (20b) (20c) Insurance Contracts and Coverage § 79--Liability Insurance--Risks Covered--Liability of Insured for Claims Against Another Company With Which Insured Merged After Policy Expired.** --In an action to determine the liability insurance coverage of asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court erred in determining that the liability policies of one of the manufacturers provided coverage for asbestos-related injuries attributable to the products of another company with which the manufacturer had merged after the expiration of the policies. Although the insuring agreements in the policies obligated the insurers to pay for all sums that the insured manufacturer became obligated by law to pay, and the manufacturer became obligated for the liabilities of the other company upon the merger, insurance policies must be read as a whole and, thus, the insuring agreements were required to be read in conjunction with the "named insured" provisions. The other company had not had any relationship with the manufacturer during the policy periods, and the fact that the companies became affiliated later was not enough to give the other company the status of a named insured under those provisions of the premerger policies.

**(21) Insurance Contracts and Coverage § 10--Interpretation of Contracts--Effect of Availability of Other Insurance.** --Generally, insurance policies should be interpreted as if no other insurance is avail-

able. Thus, in construing the liability policies of an asbestos manufacturer to determine whether they covered the liability for claims of asbestos-related bodily injuries of another company with which the manufacturer had merged after the policies had expired, the availability of coverage under the other company's own liability policies was not a valid consideration.

**(22a) (22b) Insurance Contracts and Coverage § 79--Liability Insurance--Named Insured as Including Company as "Hereafter Constituted"--Interpretation in Context of Policy Period.** --In an action to determine the liability insurance coverage of asbestos manufacturers for claims of asbestos-related bodily injuries, the trial court erred in determining that the plain meaning of "hereafter constituted," as used in two liability policies to identify the named insured manufacturer as the insured and its affiliated companies as "now existing or hereafter constituted," indicated an intention to provide coverage to the manufacturer despite its assumption of new liabilities resulting from the acquisition of another company after the policies had expired. Although, in the abstract, the phrase "or hereafter constituted" could have referred to companies acquired at any time in perpetuity, as a matter of policy interpretation, the phrase had to be read in the context of the entire policy, including the policy period. Thus, the named insured definition under the policies did not include a company acquired after the policy periods ended. This conclusion was applicable as well to another policy, which expressly limited the named insured to those companies owned or acquired by the insured during the policy term.

**(23) Insurance Contracts and Coverage § 79--Liability Insurance--Duration.** --A liability insurance policy has a finite duration. Pursuant to *Ins. Code, § 381, subd. (e)*, the period of time during which the insurance policy is effective is an essential element of a liability insurance contract. The insurer's obligation to indemnify is limited to insurable events occurring during the coverage period and, unless coverage has been triggered during the policy period, there is no coverage once the policy period has ended. Logically, then, neither is there a named insured once the policy period has ended. Thus, a corporate acquisition taking place after the policy has expired can have no retroactive effect on the identity of the named insured during the policy period.

**(24a) (24b) Insurance Contracts and Coverage § 128--Liability Insurance--Actions--Refusal of Insurer to Accept Settlement--Presumption of Insured's Liability.** --The general rule placing the burden on the policyholder to establish facts to trigger coverage of a liability insurance policy is subject to the exception that when the insurer refuses to accept a settlement that the insured proves to be reasonable, it is presumed that the insured is liable to the claimant in the amount of the settlement. Thus, in an action to determine the liability insurance coverage of three asbestos manufacturers for claims of asbestos-related bodily injuries, once the trial court found that a settlement between two of the manufacturers and some of the insurers was reasonable, it correctly found that the manufacturers' settlement payments were presumptive evidence of their liability with respect to the policies of nonsettling insurers. This was so even though, under the settlement, payments by the manufacturers went toward all claims regardless of whether they were claims for which the manufacturers were liable. The manufacturers had offered sufficiently substantial evidence that the settlement was reasonable and that the nonsettling insurers had declined to join the settlement despite having had the opportunity to do so.

**(25a) (25b) Insurance Contracts and Coverage § 110--Adjustment of Loss and Liability--Insurer's Breach of Duty to Act in Good Faith--Right of Insured to Settle and Sue Insurer for Reimbursement.** --If an insurance carrier breaches its contract with the insured and erroneously denies coverage or refuses to defend, then the insured is entitled to make a reasonable settlement with the claimant and to sue the carrier to recover the amount of the settlement. Even if the insurer has not denied coverage or refused to defend, the insurer has a duty to accept a reasonable settlement, and the insurer's refusal to settle may give rise to the insured's action for reimbursement of the settlement.

**(26a) (26b) Insurance Contracts and Coverage § 128--Reimbursement Action Following Insurer's Breach of Contract or Refusal to Settle--Presumption of Insured's Liability.** --In an action by an insured against its insurer for reimbursement of a settlement following the insurer's breach of contract by erroneously denying coverage or refusing to defend the insured, the settlement is presumptive evidence of the insured's legal liability on the third party's claim and the amount of the insured's liability. In an action for reimbursement of a settlement following the insurer's breach of its duty to accept a reasonable settlement, the insured has the burden of showing the settlement was reasonable and, if he or she meets that burden, then the act of settlement raises the presumptions that the claim was legitimate and the amount of the settlement was the amount of the insured's liability.

**(27) Insurance Contracts and Coverage § 122--Liability Insurance--Declaratory Relief Action to Determine Coverage--Assumption of Injury Based on Underlying Pleadings.** --In a declaratory relief action, questions of liability insurance coverage may be deter-

mined on the basis of the underlying pleadings in actions against the insured and such other evidence as is available. Thus, in an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the trial court properly looked to the nature of the manufacturer's potential liability, taken from the allegations in the various complaints in the underlying building cases, together with the totality of the evidence, in ruling on the meaning of "property damage," as used in the liability policies. The trial court's conclusion that the claims of injury were covered "property damage" as defined by the policies was necessarily based on the assumption that there had been legally compensable injuries to the buildings for which the manufacturer would be held liable, for if it were ultimately determined that there had been no such injuries, there would be no need for insurance coverage.

**(28) Insurance Contracts and Coverage § 127--Liability Insurance--Declaratory Relief Action to Determine Coverage--Evidence--Admissibility.** --In an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the trial court did not err in admitting the deposition testimony of experts, which the trial court had initially excluded from the manufacturer's case-in-chief, but which the trial court eventually admitted after various insurers had moved for judgment on the ground that the manufacturer had failed to prove property damage. Although the testimony supported the manufacturer's position that buildings are injured by the presence of asbestos-containing building material, that position was founded in the allegations of the complaints in the underlying building cases against the manufacturer, and the trial court properly relied primarily on those allegations and assumed, for purposes of the declaratory relief action, that the buildings suffered damage for which the manufacturer would be held liable. Thus, admission of the testimony was not prejudicial to the insurers.

**(29) Insurance Contracts and Coverage § 79--Liability Insurance--Risks Covered--Property Damage--Asbestos Contamination of Buildings as Physical Injury--Release of Asbestos Fibers.** --The contamination of a building from the release of asbestos fibers into the building's air supply and onto the building surfaces constitutes a physical injury and, hence, property damage covered under a liability insurance policy. Thus, in an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the trial court properly ruled that the manufacturer's liability policies covered claims for the release of asbestos fibers into buildings, regardless of the amount of fibers that were actually released. Whether and to what extent a release of asbestos fibers had damaged the buildings were factual issues for the underlying building cases and, for purposes of determining the insurance coverage for the property damage claims, it had to be assumed that damage had occurred for which the manufacturer would be liable. As long as it was to be held liable for the release of asbestos fibers, whatever the level of contamination, the injury was a physical injury covered by the insurance policies.

**(30a) (30b) Insurance Contracts and Coverage § 79--Liability Insurance--Risks Covered--Property Damage--Asbestos Contamination of Buildings as Physical Injury--Presence of Asbestos-containing Building Material.** --The mere presence of asbestos-containing building material (ACBM) in a building constitutes a physical injury to the building and, hence, property damage covered under a liability insurance policy. Thus, in an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the trial court properly ruled that the manufacturer's liability policies covered claims alleging that the mere presence of ACBM in buildings was a health hazard, even though there had been no releases of fibers. If the manufacturer was to be held liable for the mere presence of ACBM, the injury to the buildings was a physical one and, hence, property damage covered by the policies. Whether ACBM had actually caused harm was a question for the underlying building cases and, for purposes of determining insurance coverage, it had to be assumed that the presence of ACBM constituted an injury to the buildings for which the manufacturer would be liable.

**(31) Insurance Contracts and Coverage § 79--Liability Insurance--Risks Covered--Property Damage--Asbestos Contamination of Buildings as Physical Injury--Presence of Asbestos-containing Building Material--As Physically Incorporated Into Building.** --With respect to the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, even if the underlying complaints in the building cases allege that the mere presence of asbestos-containing building material (ACBM) in buildings is a health hazard because of the potential for future releases of asbestos fibers, and there have been no releases of fibers, if the manufacturer is held liable for the mere presence of ACBM, the injury to the buildings is a physical one and, hence, property damage covered under a liability insurance policy. Once installed, the ACBM is physically linked with or physically incorporated into the building and, therefore, physically affects tangible property. The term "physical injury"

covers a loss that results from physical contact, as when a potentially dangerous product is incorporated into another and, because it is incorporated and not merely contained, must be removed, at some cost, in order to prevent the danger from materializing.

**(32) Insurance Contracts and Coverage § 79--Liability Insurance--Risks Covered--Property Damage--Asbestos Contamination of Buildings as Physical Injury--Presence of Asbestos-containing Building Material--As Distinguished From Hazardous Waste Leaks.** --With respect to the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the physical incorporation of asbestos-containing building material into the buildings is distinguished from those cases involving hazardous waste leaks or spills from containers. In those cases, the remedial costs incurred in cleaning up contaminated waste sites are covered by comprehensive general liability policies, but "prophylactic" costs--costs incurred in advance of any release of hazardous waste, to prevent threatened future pollution--are not incurred because of property damage. In contrast, in an asbestos case, because the potentially hazardous material is physically touching and linked with the building, and not merely contained within it, the injury is physical even without a release of toxic substances into the building's air supply.

**(33) Insurance Contracts and Coverage § 79--Liability Insurance--Risks Covered--Property Damage--Asbestos Contamination of Buildings as Physical Injury--Presence of Asbestos-containing Building Material--Rule That Physical Incorporation of Defective Product Into Another Constitutes Physical Harm to Whole--Applicability.** --With respect to the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage from the physical incorporation of asbestos-containing building material (ACBM) into buildings, the rule that physical incorporation of a defective product into another does not constitute property damage unless there is physical harm to the whole is not applicable. That rule is designed to limit the liability coverage of contractors against claims of defective materials or poor workmanship, for such claims are a commercial risk that is not passed on to the liability insurer. In an asbestos case, however, the manufacturer is facing liability not as a contractor but as a manufacturer or supplier of ACBM. The claims against the manufacturer go beyond allegations of defective work or materials and allege injury to other property.

**(34) Insurance Contracts and Coverage § 79--Liability Insurance--Risks Covered--Property Damage--Asbestos Contamination of Buildings as Physical Injury--Presence of Asbestos-containing Building Material--As Resulting Only in Economic Loss** --With respect to the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage from the physical incorporation of asbestos-containing building material (ACBM) into buildings, the damages allegedly suffered by the building owners from the presence of ACBM cannot be considered solely economic losses. Diminished market value or abatement costs or costs of inspecting, assessing, and maintaining the in-place ACBM are not the "property damage." They are damages because of property damage, that is, they are the alternative measures of the physical injury to the building. The fact that the measure of damages is economic does not preclude a physical injury.

**(35a) (35b) Insurance Contracts and Coverage § 127--Liability Insurance--Declaratory Relief Action to Determine Coverage for Property Damage--Asbestos Contamination of Buildings as Physical Injury--Presence of Asbestos-containing Building Material--Evidence of Injuriousness--Relevancy.** --In an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, in which action some of the underlying claims against the manufacturer alleged that the mere presence of asbestos-containing building material (ACBM) in buildings was a health hazard, evidence introduced by the insurers to show that the mere presence of ACBM is not necessarily injurious had no bearing on the insurance coverage issue. That issue was separate and distinct from the question of the manufacturer's liability; whether ACBM had actually caused harm was a question for the underlying building cases and, for purposes of determining insurance coverage, it had to be assumed that the presence of ACBM constituted an injury to the buildings for which the manufacturer would be liable.

**(36a) (36b) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Property Damage.** --In an action to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the trial court properly adopted a multiple trigger approach in determining when damage occurred from asbestos-containing building material (ACBM) within the meaning of the manufacturer's liability insurance policies. The evidence indicated that, unlike bodily injuries caused by asbestos exposure, asbestos property damage is not necessarily continuous. Rather, releases of asbestos fibers in buildings, if they occur at all, occur sporadically, as a result of episodic disturbances such as accidental striking, vandalism, water damage, and the like. Thus, under the multiple trigger approach, the in-

surer's indemnity obligations are triggered if it is shown that ACBM was installed in the buildings in question, that ACBM released fiber or material into the air or on surfaces of the buildings, or that settled releases of ACBM were disturbed and reentrained into the air, during any portion of the period that a liability policy was in effect.

**(37a) (37b) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Distinction Between Asbestos-related Bodily Injuries and Asbestos-related Property Damage.** --Although the rule that liability insurance coverage is triggered when the injury actually occurred applies with respect to liability insurance for both asbestos-related bodily injuries and asbestos-related property damage, it is not illogical to apply different triggers of coverage for the two types of cases. The triggers are different because the injury to the human body upon inhalation of asbestos fibers is not the same as the injury to a building from the presence of asbestos-containing building material. In contrast to the continuous, progressive physiological process involved in the inhalation of asbestos, asbestos property damage is episodic, with measurable intervals between episodes, so that the process of injury cannot be deemed continuous.

**(38) Insurance Contracts and Coverage § 132--Liability Insurance--Declaratory Relief Action to Determine Coverage for Property Damage--Trial--Questions of Law and Fact--Asbestos-related Property Damage as Occurring Continuously.** --Whether asbestos-related property damage occurs continuously is a question of fact. Thus, in an action to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, in light of the trial court's factual finding that asbestos property damage is not always continuous, good reason existed for adopting a coverage trigger different from the continuous trigger adopted for asbestos-related bodily injuries.

**(39a) (39b) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Property Damage--Release and Reentrainment of Asbestos Fibers--Quantity of Fibers Released.** --In an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the trial court did not err in concluding that property damage happens at any time asbestos fiber or material is released from asbestos-containing building material into the air or onto surfaces of buildings, and when settled releases are disturbed and reentrained into the air, no matter how small the quantity of the released fibers. Thus, it was not necessary that "sufficiently appreciable" fibers be released in order to trigger coverage under the manufacturer's liability policies. For purposes of determining the insurance coverage for the property damage claims, it had to be assumed that damage had occurred for which the manufacturer would be liable. As long as it was to be held liable for contamination from the release of asbestos fibers, no matter what the level of contamination, the insurance policies provided coverage.

**(40a) (40b) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Property Damage--Release and Reentrainment of Asbestos Fibers--Release of Fibers During Policy Period.** --In an action to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the trial court did not err in deciding that if the manufacturer was to be held liable for contamination of a building from released asbestos fibers, each of the manufacturer's liability policies was triggered if any part of the contamination damage, no matter how small the quantity of the released fibers, took place when the policy was in effect. Each release or reentrainment of asbestos fibers into the air contributes to the state of contamination of a building, and the total property damage may take place across several policy periods. Moreover, there was nothing in the manufacturer's policies to preclude coverage from being triggered simply because only a part of the total damage occurred during any particular policy period. Thus, since property damage took place during several policy periods, the insurance coverage was triggered when any part of the damage--any release or reentrainment--took place.

**(41a) (41b) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Property Damage--Presence of Asbestos-containing Building Material--Installation as Only Trigger.** --With respect to the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, if the manufacturer is held liable for the mere presence of asbestos-containing building material (ACBM), and the potential for releases, without evidence of contamination of a building from released asbestos fibers, coverage under a liability policy would be triggered only at the time ACBM was installed; it would not also be triggered by subsequent, incidental releases of asbestos fibers. This is so because any incidental releases that may have occurred during subsequent policy periods would not constitute damage for which the manufacturer could be held liable. Releases or reentrainments of asbestos fibers into the air during a policy period will trigger coverage only if the basis of the manufacturer's liability is contamination from released asbestos fibers.

**(42) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Property Damage--Release and Reentrainment of Asbestos Fibers--Effect of Loss-in-progress Rule.** --Triggering the coverage of an asbestos manufacturer's liability insurance policy for claims of asbestos-related property damage to buildings upon reentrainment of asbestos fibers into the air does not violate the loss-in-progress rule, since resuspension of settled fibers is a continuation of the loss that began when the fibers were released from the asbestos-containing building material. The loss-in-progress rule provides that an insurer can insure only against a contingent or unknown loss (*Ins. Code, §§ 22, 250*), and it does not apply if the damage was unknown or contingent at the time the policy was issued, even if the damage was inevitable. As long as the reentrainments were contingent or unknown when the policy was issued, the loss-in-progress rule does not preclude coverage.

**(43) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Property Damage--Installation of Asbestos-containing Building Material--As Event Causing Actual Injury.** --The rule that, for purposes of determining liability insurance coverage for property damage, property damage occurs in the policy year in which a defective product is installed, rather than the policy year in which it fails or is replaced in anticipation of failure or causes the market value of the building to diminish, is applicable to asbestos products. Thus, in an action to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the trial court did not err in selecting the installation of asbestos-containing building material (ACBM) as an event triggering coverage of the manufacturer's liability policies. Its decision fully conformed to the requirement that coverage must be triggered by the event causing the actual injury and not an earlier event that created the potential for future injury, since damage to the buildings was done as soon as the ACBM was installed, even though the health hazards created by the asbestos did not come to light until a later date.

**(44) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Property Damage--Release and Reentrainment of Asbestos Fibers--Installation as Proper Trigger.** --With respect to the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, if the manufacturer is held liable for contamination of a building from the release of asbestos fibers into the air, coverage is triggered at the time of installation of asbestos-containing building material (ACBM) as well as at the time of release. The fact that the mere presence of ACBM, by itself, might not give rise to liability for property damage is of no consequence if the insured has, in fact, been held liable for property damage. The installation of ACBM obviously contributes to the state of contamination of the building; it is a part of the overall property damage for which the insured is liable.

**(45) Insurance Contracts and Coverage § 77--Liability Insurance--Trigger of Coverage--Asbestos-related Property Damage--Manifestation of Loss.** --The rule, applicable in first party liability insurance cases, that property damage occurs when the loss is first manifested, is not applicable in a third party liability case involving property damage from asbestos. There is nothing in the language of comprehensive general liability policies to require as a condition of coverage that the damage be discovered at any point in time. Also, to apply the manifestation rule to third party liability policies would unfairly transform them into "claims made" policies and would raise the problem of who must discover the damage, since the insured's discovery may not occur until long after the injured party's discovery. The injury to a building from asbestos first occurs when asbestos-containing building material (ACBM) is installed and, since that date is ascertainable, there is no need for a fictional date of injury. Moreover, a manifestation trigger would place the entire burden for property damage claims on those insurers who were on the risk in later years, when the dangers from ACBM were perceived.

**(46a) (46b) Insurance Contracts and Coverage § 70--Accident Insurance--Risks Covered--Asbestos-related Property Damage--Release of Asbestos Fibers as Sudden Event and as Trigger of Coverage.** --In an action to determine the insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings, the trial court properly ruled that accident insurance policies covered such damage from asbestos-containing building material. The release and reentrainment of asbestos fibers into the air qualified as sudden events so as to constitute accidents within the meaning of the policies and such releases and reentrainments, not the manifestation of loss, triggered coverage under the policies. The property damage was the contamination of the buildings from the introduction of asbestos fibers into the air supplies and onto building surfaces, and each release or reentrainment contributed to the state of contamination and formed a part of the overall property damage. Thus, insofar as the manufacturer was to be held liable for contamination of a building from released asbestos fibers, the policies were triggered

if any part of the contamination damage took place when the policies were in effect.

**(47) Insurance Contracts and Coverage § 70--Accident Insurance--Risks--What Constitutes "Accident"--Necessity for Suddenness.** --Although in ordinary language the word "accident" carries the meaning of unexpected and unintended, an insurance policy providing coverage for property damage caused by accident covers only unexpected and unintended events that are also sudden.

**(48) Insurance Contracts and Coverage § 117--Liability Insurance--Apportionment of Liability--Asbestos-related Property Damage--Obligation of Policyholder to Share Pro Rata in Costs for Uninsured or Self-insured Periods.** --In an action to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage, the trial court correctly concluded that the manufacturer was not obligated to share pro rata in indemnification or defense costs because of any uninsured or self-insured periods during which there was property damage. Once one of the manufacturer's liability policies was triggered, the policy obligated the insurer to pay "all sums" that the manufacturer became legally obligated to pay as damages because of property damage during the policy period (up to the policy limits), not just for the part of the damage that occurred during the policy period. Moreover, the apportionment of the liability of multiple insurers on a single claim, pursuant to "other insurance" provisions, has no bearing on the obligations of the insurers to the insured.

**(49) Insurance Contracts and Coverage § 106--Extent of Liability of Insurer--Liability Insurance--Asbestos-related Property Damage--Scope of Coverage as Dependent on Continuous Nature of Damage or Continuous Trigger.** --The scope of the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage to buildings does not depend on the continuous, indivisible nature of the damage or the application of a continuous trigger of coverage, and an insurer has an obligation to respond in full when several successive policies are triggered by continual, episodic property damage. Thus, in an action to determine such liability, each release or reentrainment of asbestos fibers into the air, along with the installation of the asbestos-containing building material (ACBM), formed a part of the unitary property damage for which the manufacturer was alleged to be liable, and as long as there was property damage to a building during a policy period, whether from installation of ACBM or from releases or reentrainments of asbestos fibers from existing ACBM, and as long as the manufacturer would have to pay damages as a result of that property damage, the policies provided coverage (up to the policy limits) for whatever damages it would have to pay.

**(50a) (50b) Insurance Contracts and Coverage § 106--Extent of Liability of Insurer--Duty to Indemnify--As Determinable in Advance of Insured's Underlying Liability--Conditional Declaration of Duty.** --In an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage, the trial court did not err in declaring the insurers' duty to indemnify, since the declaration recognized the prematurity of the manufacturer's request that it be made and was conditioned on the manufacturer being held liable for the damages alleged in the underlying complaints. Moreover, the manufacturer was not required to prove that its liability would necessarily result from covered property damage. For purposes of deciding the coverage dispute, the trial court had properly looked to the allegations of the underlying complaints and had assumed the manufacturer would be held liable for the damages alleged therein. The underlying complaints alleged liability arising either from the release of asbestos fibers or from the mere installation of asbestos-containing building material, and the manufacturer was not required to prove more.

**(51) Insurance Contracts and Coverage § 107--Extent of Liability of Insurer--Duty to Defend Insured--As Distinguished From Duty to Indemnify.** --The duty of a liability insurer to indemnify the insured is different from the duty to defend the insured. The duty to defend arises when there is a potential for indemnity, and it may exist even when coverage is in doubt and ultimately does not develop. The duty to indemnify, on the other hand, arises when the insured's underlying liability is established (*Civ. Code, § 2778, subd. (1)*), and the duty to indemnify on a particular claim is determined by the actual basis of liability imposed on the insured. Although an insurer may have a duty to defend, it may ultimately have no duty to indemnify--either because no damages were awarded or because the actual judgment was for damages not covered by the policy.

**(52) Insurance Contracts and Coverage § 106--Extent of Liability of Insurer--Duty to Indemnify--As Determinable in Advance of Insured's Underlying Liability--Authority of Court in Declaratory Relief Action.** --The question whether a liability insurer has a duty to indemnify the insured on a particular claim is ripe for consideration only if the insured has already incurred liability in the underlying action. Thus, in a declaratory relief action held before the insured's liability has been established, the trial court cannot determine the

insurer's indemnity obligation; it must limit its declaration to whether the claim is covered by the policy.

**(53) Insurance Contracts and Coverage § 107--Extent of Liability of Insurer--Duty to Defend Insured--As Based on Conclusory Allegations in Underlying Complaint--Asbestos-related Property Damage.** --In an action to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage, allegations of damages from the presence of asbestos-containing building material (ACBM) in buildings, which were made in the underlying complaints against the manufacturer, were sufficient to show a potential for coverage and to give rise to a duty on the part of the liability insurers to defend the manufacturer. As a general rule, conclusory allegations in an underlying complaint against an insured do not give rise to a duty on the part of its liability insurer to defend, but, since the mere presence of ACBM in a building constitutes physical injury to tangible property, even though there have not yet been any releases of asbestos fibers, the allegations against the manufacturer were not conclusory.

**(54) Insurance Contracts and Coverage § 80--Liability Insurance--Risks Covered--Exclusions--Business Risk--Time for Determining Applicability--Asbestos-related Property Damage.** --In an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage, the trial court did not err in concluding that none of the business risk exclusions in the liability policies applied to the underlying asbestos building cases. A decision on the applicability of the exclusions did not need to await a determination of the actual basis for the manufacturer's liability, since, for purposes of determining whether the property damage claims were covered or excluded under the policies, it had to be assumed that the manufacturer would be held liable for the damages alleged in the complaints in the underlying cases.

**(55) Insurance Contracts and Coverage § 80--Liability Insurance--Risks Covered--Exclusions--Business Risk--Damage to Insured's Own Products--Asbestos-related Property Damage.** --In an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage, the trial court did not err in concluding that the exclusion in the liability policies for damage to the insured's own products was not applicable. The underlying asbestos building cases alleged damage to the remainder of the buildings, not damage to the asbestos-containing building material (ACBM), and, for purposes of interpreting the language of the policies, it had to be assumed that the buildings themselves had been injured by the ACBM. Thus, insofar as the manufacturer was to be held liable for the claimed damage to the buildings, the "own products" exclusion did not bar coverage.

**(56) Insurance Contracts and Coverage § 80--Liability Insurance--Risks Covered--Exclusions--Business Risk--Product Recall--Asbestos-related Property Damage.** --In an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage, the trial court did not err in concluding that the exclusion in the liability policies for product recall was not applicable. The exclusion applies only to the cost of withdrawing a product due to an apprehended danger but does not apply to actual damage caused by the product itself. Even though the complaints in the underlying asbestos building cases alleged that the mere presence of asbestos-containing building material (ACBM) posed a potential health risk, the removal of ACBM from the buildings was not based merely on an apprehension of danger. The complaints also alleged damage to the buildings from the release of asbestos fibers. Moreover, it had to be assumed that actual damage to the buildings had resulted from the mere presence of ACBM for which the manufacturer would be held liable. Thus, insofar as the manufacturer was ultimately to be held liable for such damage, the exclusion did not bar coverage.

**(57a) (57b) Insurance Contracts and Coverage § 80--Liability Insurance--Risks Covered--Exclusions--Business Risk--Design Defect--Active Malfunctioning Exception--Asbestos-related Property Damage.** --In an action for declaratory relief to determine the liability insurance coverage of an asbestos manufacturer for claims of asbestos-related property damage, the trial court did not err in concluding that the active malfunctioning exception to the exclusion in the liability policies for design defect was applicable so as to make the exclusion itself inapplicable. The exception was applicable not only with respect to the allegations in the underlying asbestos building cases that released asbestos fibers had contaminated buildings, but also with respect to the allegations of damages from the mere presence of asbestos-containing building material (ACBM). It had to be assumed for purposes of deciding coverage that the presence of ACBM was injurious and would be the basis of the manufacturer's liability to the building owners. And, since injury from the presence of ACBM qualified as a physical injury under the policies, insofar as the manufacturer was to be held liable for injuries from the presence of ACBM, the design defect exclusion was inapplicable.

**(58) Insurance Contracts and Coverage § 80--Liability Insurance--Risks Covered--Exclusions--Business Risk--Design Defect--Active Malfunctioning Exception--Nature.** --Under the "active malfunctioning" exception to the exclusion in liability insurance policies for design defect, design errors resulting in mere passive failure to discharge an intended function are regarded as the insured's normal business risk and are excluded from coverage, while design errors themselves causing some positive or active harm deemed extraordinary in the insured's business are covered. Thus, the policy is not intended to cover liability resulting from the faulty design of an insecticide that fails to kill insects, a hair tonic that fails to prevent baldness, or a rust inhibitor that fails to inhibit rust. On the other hand, the active malfunctioning exception would apply to provide coverage for liability resulting from an insecticide that harms crops to which it is applied, a hair tonic that causes a scalp rash, or a rust inhibitor that corrodes a radiator to which it is added.

**COUNSEL:** Gibson, Dunn & Crutcher, Richard J. Doren, Fred F. Gregory, Lynberg & Watkins, R. Jeff Carlisle, Ellen R. Krakow, Bishop, Barry, Howe, Haney & Ryder, Nelson C. Barry, Rebecca Barry Aherne, Daniel U. Smith, Kirtland & Packard, Robert A. Muhlbach, Alschuler, Grossman & Pines, Marshall Grossman, Frank Kaplan, Carroll, Burdick & McDonough, Rodney Eshelman, Donald Ramsey, David M. Rice, Wachtell, Lipton, Rosen & Katz, Herbert M. Wachtell, David Gruenstein, Jeffrey R. Boffa, Morris, Polich & Purdy, Steven M. Crane, Kaufman & Logan, Jeffrey Kaufman, Peter J. Logan, [***2] Pave, McCord, Jacobs & Berkes, Robert H. Berkes, Patrick J. Jacobs, O'Melveney & Myers, Martin S. Checov, John G. Niles, Hillsinger & Costanzo, N. Brooks Weld, Dinsmore & Shohl, Gerald V. Weigle, Jr., Manta & Welge, Joseph G. Manta, Mark Manta, Sedgwick, Detert, Moran & Arnold, Frederick D. Baker, Kathleen D. Patterson, Terry L. Croghan, Crosby, Heafey, Roach & May, Raoul D. Kennedy, Peter Davis, James C. Martin, Dewey Ballantine, Paul J. Bschorr, Richard B. Sypher, Rosenfeld, Meyer & Susman, Ronald R. Robinson, Marybeth Jacobsen, Paul S. White, Hancock, Rothert & Bunshoft, Philip R. Matthews, Paul J. Killion, Harris & Green, Lon Harris and Gary L. Green for insurance company Appellants.

Troop, Meisinger, Steuber & Pasich, David W. Steuber, Kirk A. Pasich and Martin D. Katz for Plaintiff and Appellant.

Covington & Burling, Robert H. Sayler, William Skinner, Howrey & Simon, John E. Heintz, Lisa Latorre, Munger, Tolles & Olson and Cary B. Lerman for Plaintiff, Cross-defendant and Respondent.

Brobeck, Phleger & Harrison, William R. Irwin, Donald W. Brown and Thomas M. Peterson for Cross-complainant and Respondent.

**JUDGES:** Opinion by Dossee, J., with Newsom, J., * and Stein, [***3] Acting P. J., concurring.

> * Retired Associate Justice of the Court of Appeal, First District, sitting under assignment by the Chairperson of the Judicial Council.

**OPINION BY:** DOSSEE

**OPINION**

[*34] [**696] **DOSSEE, J.**

This appeal raises a number of complex questions concerning insurance coverage for claims of asbestos-related bodily injuries and property damage. In the proceedings below, separate declaratory relief actions [*35] and related cross-actions involving three asbestos manufacturers--Armstrong World Industries, Inc., Fibreboard Corporation, and GAF Corporation--and their various insurance carriers were coordinated and tried in six separate phases over a five-year period. [1]

> 1 Phase I involved the existence and terms of missing insurance policies. Phase II concerned the application of exclusions for "asbestosis." Phase III involved the trigger and scope of coverage for bodily injury claims, the meaning of the "neither expected nor intended" language contained in some of the policies, and the defense obligations of various insurers under their policies. Phase IV involved various coverage issues not resolved in phase III. Phase V concerned coverage for property damage claims, and phase VI involved issues of damages, bad faith, and contribution claims.
>
> No issues have been raised on appeal concerning phase II. The appeals pertaining to phase VI have been dismissed.

[***4] On appeal, the parties submitted briefs on three major "Issue Groups," and our opinion follows that organization. First, in the unpublished [**697] portion of the opinion, we discuss the issues of Issue Group I pertaining to a lost insurance policy. In Issue Group II we discuss the issues concerning the bodily injury claims: trigger and scope of coverage; the application of the phrase "neither expected nor intended"; the liability of premerger insurers; the effect of the Wellington Agreement. In Issue Group III, we discuss the issues surrounding the property damage claims: coverage for

property damage; trigger and scope of coverage; the duties to defend and indemnify; and, in the unpublished portion of the opinion, the "drop-down" obligation of an INA-Armstrong excess policy.

After this appeal was submitted for decision, we granted a motion of certain parties to sever issues unique to them in order to facilitate a pending settlement. Accordingly, we have deferred decision upon issues pertaining to a lost Fibreboard-Pacific Indemnity insurance policy; the number of occurrences; the effect of the Fibreboard-Continental manuscript policy; and the application of the pollution exclusion clause.

[***5] Our previous opinion, filed on November 15, 1993, was vacated by the Supreme Court, and the matter was remanded to us for reconsideration in light of *Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal. 4th 645 [42 Cal. Rptr. 2d 324, 897 P.2d 1]*.

GUIDING PRINCIPLES

At the outset, we set forth the principles guiding our review. **(1a)** Interpretation of an insurance policy is primarily a judicial function. When the trial court's interpretation did not depend upon conflicting extrinsic evidence, the reviewing court makes its own independent determination of the [*36] policy's meaning. (*Masonite Corp.* v. *Great American Surplus Lines Ins. Co. (1990) 224 Cal. App. 3d 912, 916 [274 Cal. Rptr. 206]*.)

In interpreting an insurance contract, the court's fundamental goal is to give effect to the mutual intention of the parties. Such intent is inferred, if possible, solely from the written provisions of the contract. ( *AIU Ins. Co. v. Superior Court (1990) 51 Cal. 3d 807, 821-822 [274 Cal. Rptr. 820, 799 P.2d 1253]*.) "If contractual language is clear and explicit, it governs." ( *Bank of the West v. Superior Court (1992) 2 Cal. 4th 1254, 1264 [10 Cal. Rptr.* [***6] *2d 538, 833 P.2d 545]*.) Words in an insurance policy are to be interpreted as a layperson would interpret them, in their " 'ordinary and popular sense.' " (*AIU, supra, 51 Cal. 3d at p. 822*; *Reserve Insurance Co.* v. *Pisciotta (1982) 30 Cal. 3d 800, 807 [180 Cal. Rptr. 628, 640 P.2d 764]*.) A policy should not be read as it might be analyzed by an attorney or an insurance expert. ( *Delgado v. Heritage Life Ins. Co. (1984) 157 Cal. App. 3d 262, 271 [203 Cal. Rptr. 672]*.) This is so even if the policyholder is a sophisticated insured. (*AIU, supra, 51 Cal. 3d at p. 823*.)

If particular policy language is ambiguous, it is to be resolved by interpreting the ambiguous provisions in accordance with the insured's objectively reasonable expectations. ( *Bank of the West v. Superior Court, supra, 2 Cal. 4th at pp. 1264-1265*.) Only if application of this rule does not resolve the ambiguity will the policy provision be construed in favor of the insured. ( *Id. at p. 1265*.)

ISSUE GROUP I: LOST INSURANCE POLICY *

* See footnote, *ante*, page 1.

[***7] ISSUE GROUP II: BODILY INJURY CLAIMS

A. TRIGGER AND SCOPE OF COVERAGE

Phase III of the coordinated proceedings below concerned the rights and obligations of insurers to indemnify and defend the manufacturers or distributors of asbestos or asbestos products that are, or have been, defendants in tens of thousands of lawsuits brought by persons who claim to have developed disabling and often fatal asbestos-related diseases as a result of exposure to asbestos products many years ago. It bears emphasizing that the issues do not pertain to the legal rights of those suffering from [**698] asbestos-related diseases to recover damages from asbestos manufacturers.

[*37] The principal issues before the trial court concerned the trigger and scope of coverage under the comprehensive general liability policies for asbestos-related bodily injury claims: What event triggers an insurer's indemnification and defense obligations? And to what extent must policyholders share in the indemnity and defense costs?

In order to resolve these issues, the trial court heard extensive medical testimony and took documentary evidence concerning the pathogenesis of asbestos-related conditions. The trial court [***8] artfully described the insidious nature of asbestos: "Asbestos is a naturally occurring mineral which has long been known to man. Its principal use has been as an insulator against heat because it is incombustible in air. It has been used to insulate against heat since approximately 1866 and has been commercially produced since at least 1874. [Citation.] The health problem caused by asbestos is that when it is mined or used in the manufacturing process it produces quantities of asbestos dust composed of millions of tiny fibers which may be inhaled into the body by those working in and around it. Those fibers that avoid the body's initial natural defense mechanisms are deposited in the human lung and remain there. The very quality that has made asbestos useful for so long, its indestructibility, also accounts for the problems that result in asbestos-related disease."

THE MEDICAL EVIDENCE

We adopt the trial court's summary of the medical evidence: "Several diseases may result from exposure to asbestos. The most prevalent are asbestosis, bronchogenic carcinoma, and mesothelioma. Asbestosis is a form

of lung disease characterized by the permanent deposition of asbestos fibers in [***9] the lungs and the resultant scarring of the lungs' alveoli (air sacs) and interstitium (the membrane through which gas exchange occurs between the alveoli and the blood). In the context of asbestos inhalation, bronchogenic carcinoma (lung cancer) refers to a malignant condition of cells which arises as the result of tissue scarring caused by asbestos. Mesothelioma is, similarly, a cancerous condition. It arises at the site of asbestos-caused scarring within the visceral pleura (the lining which covers the outer aspect of the lung) or the peritoneum (the lining of the abdominal cavity).

"While the disease processes are distinct, they share at least one characteristic which makes this Court's interpretation of the policy language universally applicable to these diseases, as well as to other conditions which may arise from inhaling asbestos. That common element is that the diseases and the associated pathological processes occur because of the fibrosis induced by the inhaled asbestos.

[*38] "Fibrosis refers to the formation of fibrous tissue, and is more commonly called scarring. When associated with an external cut to the skin, fibrosis may be considered a necessary and helpful [***10] form of healing which restores the body to a functional--albeit altered--state. When associated with the inhalation of asbestos, however, fibrosis results in the impairment and destruction of the alveolar/capillary gas exchange units necessary to breathe. As such, and because of the irreversible nature of the fibrotic process on the lung tissue, fibrosis caused by the inhalation of asbestos is more appropriately characterized as a form of injury than of healing or repair.

"Fibrosis within the lungs occurs as part of the body's reaction to the inhalation of foreign particulate matter. The indestructible nature of asbestos fibers which helped make asbestos such an attractive construction material makes it equally as detrimental to the body once inhaled. Once deposited in the lungs, the fibers tend to remain in the alveolar region and the lungs' normal clearance mechanisms are ineffective.

"One clearance mechanism--and a key to the fibrotic process--involves a specialized form of white blood cell known as a macrophage. These cells naturally respond to foreign matter within the body and attempt to eliminate this matter from the body by engulfing (i.e., phagocytozing) and digesting [***11] the matter with their own secretions and enzymes. This process occurs on the cellular [**699] level, but is frustrated and unsuccessful in the context of asbestos fibers because of the macrophages' inability effectively to engulf and digest the fibers.

"This, in turn, leads to a further and sustained inflammatory process. The inflammation becomes chronic as more macrophages and other white blood cells are attracted to the site of the asbestos fibers caused by the release of certain chemical substances by the macrophages which responded initially to the fibers. More macrophages are summoned, further frustrated phagocytosis occurs, and the cycle continues.

"Another result of the inflammation is that other cells, called fibroblasts, are summoned to the site of inflammation by a different chemical secretion (fibronectin) from the macrophages. Fibronectin not only attracts these fibroblasts, but also causes them to proliferate. The fibroblasts, once summoned, produce the collagen in the alveolar walls and the interstitium which constitutes fibrosis.

"This process--inhalation of asbestos fibers, the inflammatory reaction, and the resulting fibrosis--characterizes the disease asbestosis. When [***12] the fibrosis is extensive enough, i.e., when enough alveolar/capillary units have [*39] become fibrosed, clinical symptoms of asbestosis become apparent. Although there is no universal threshold for when such symptoms will become apparent, it is estimated that at least 100 million of the 300 million alveolar/capillary units in the human body must be affected for a clinical diagnosis to occur.

"Bronchogenic carcinoma and mesothelioma arise from a malignant transformation of cells. The asbestos fibers and related fibrosis do not directly cause the malignant transformation but, rather, enhance the potential of other cancerous agents to cause such a transformation. The transformation occurs at the site of the fibrosis and the cancer develops therefrom."

1. *Trigger of Coverage*

The relevant language of the standard form comprehensive general liability (CGL) policy reads as follows: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . caused by an occurrence . . . . [P] 'Bodily injury' means bodily injury, sickness, or disease sustained by any person. [P] 'Occurrence' means [***13] an accident, including injurious exposure to conditions, which results during the policy period in bodily injury . . . neither expected nor intended from the standpoint of the insured." [8]

8 The trial court found that for purposes of this trigger issue the language contained in the various policies at issue is functionally identical. The trial court also found the meaning of the policy language to be plain and unambiguous in requiring indemnification and defense when any one of

three distinct conditions--bodily injury, sickness or disease--is present during the policy period.

**(2)** A recurring problem in interpreting standard CGL policies that provide coverage for injuries "caused by an occurrence" is determining what has come to be called the "trigger of coverage"--that is, the operative event which activates the insurer's defense and indemnity obligations. As the Supreme Court recently explained, the word "trigger" is not found in the CGL policies themselves, nor does the Insurance Code define "trigger of [***14] coverage." Instead, "trigger of coverage" is a term of convenience used to describe what must happen in the policy period to give rise to insurance coverage. (*Montrose Chemical Corp.* v. *Admiral Ins. Co., supra, 10 Cal. 4th 645, 655, fn. 2.*)

Case law has long established that the operative event triggering coverage is the injury. Because occurrence policies (as distinguished from claims-made policies) cover occurrences that result in injury "during the policy period," the courts in California and elsewhere have concluded that the [*40] policies are invoked, or "triggered," when the injury takes place. ( *American Cyanamid Co. v. American Home Assurance Co. (1994) 30 Cal. App. 4th 969, 979 [35 Cal. Rptr. 2d 920]*; *Hallmark Ins. Co.* v. *Superior Court (1988) 201 Cal. App. 3d 1014, 1017 [247 Cal. Rptr. 638]*; *State Farm Mut. Auto. Ins. Co. v. Longden (1987) 197 Cal. App. 3d 226, 231 [242 Cal. Rptr. 726]*; [**700] *Schrillo Co. v. Hartford Accident & Indemnity Co. (1986) 181 Cal. App. 3d 766, 773 [226 Cal. Rptr. 717]*; *Atlantic Mutual Ins. Co. v. Travelers Ins. Co. (1983) 147 Cal. App. 3d 1054, 1056 [195 Cal. Rptr. 476]*; *Maples v. Aetna Cas. & Surety* [***15] *Co. (1978) 83 Cal. App. 3d 641, 647 [148 Cal. Rptr. 80]*; *Remmer v. Glens Falls Indem. Co. (1956) 140 Cal. App. 2d 84, 88 [295 P.2d 19]*; see also *Employers Casualty Co. v. Northwestern Nat. Ins. Group (1980) 109 Cal. App. 3d 462, 468-469 [167 Cal. Rptr. 296]* disapproved on other grounds in *In re Marriage of Arceneaux (1990) 51 Cal. 3d 1130, 1137 [275 Cal. Rptr. 797, 800 P.2d 1227]*; *Chamberlin v. Smith (1977) 72 Cal. App. 3d 835 [140 Cal. Rptr. 493]*; 7A Appleman, Insurance Law & Practice (rev. ed. 1979) § 4501.03, p. 256; 11 Couch on Insurance (2d ed. 1982) § 44:8, p. 193; 43 Am.Jur.2d (1982 rev.) Insurance, § 243, pp. 323-324; Annot. (1985) 37 A.L.R.4th 382.) [9]

9 This general rule has not been followed where the policy language was substantially distinguishable. ( *Insurance Co. of North America v. Sam Harris Constr. Co. (1978) 22 Cal. 3d 409, 412 [149 Cal. Rptr. 292, 583 P.2d 1335]* ["occurrence" not defined in policy; coverage held triggered by act of negligence committed within policy period]; *Harbor Ins. Co.* v. *Central National Ins. Co. (1985) 165 Cal. App. 3d 1029, 1035 [211 Cal. Rptr. 902]* [policy covered offenses committed during policy period; held, no coverage when offense committed before policy took effect].)

[***16] In *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th 645, 669-670*, the Supreme Court reaffirmed this rule and applied it for the first time to a case of continuous or progressively deteriorating injury. The court held that when the bodily injury or property damage continues throughout successive policy periods, all of the insured's policies in effect during those periods are triggered. ( *Id. at pp. 685-689.*) Coverage is not limited to the policy in effect at the time of the precipitating event or conditions. ( *Id. at pp. 669, 686.*) Nor is coverage cut off once the injury or damage begins or becomes manifest. (See *10 Cal. 4th at p. 677, fn. 17*; *id., at pp. 680, 686.*)

*Montrose* involved property damage and human deaths resulting from the insured's disposal of toxic or hazardous wastes. The time of the onset of the damage and injury was not in dispute; the underlying complaints specified, in one set of lawsuits, that the bodily injury and property damage commenced in 1956 and extended to the present, and in a second set of lawsuits, that the property contamination began in 1947 and continued throughout periods (1982-1986) when the policies of the [***17] insurer (Admiral) were in [*41] effect. ( *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at pp. 656-657, 659.*)

In contrast, the timing of the commencement of the injuries here is not so definite. As the trial court explained, asbestos-related diseases are "insidious diseases with delayed manifestations. The original cause of each disease is the inhalation of asbestos fibers, but a victim is generally unaware of the development of such a disease until the victim or a physician detects signs or symptoms many years after the causative exposure." Thus, the key question before the trial court in phase III with regard to the trigger of coverage was the point in time at which the injury takes place.

a. *Precedent Cases*

The courts have developed several different approaches to determine when bodily injury occurs in asbestos-related bodily injury cases. [10] (See *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th 645, 673-685*; Annot. (1993) 14 A.L.R.5th 695.)

10 Throughout the briefs in this appeal--in Issue Group II no less than in other issue groups--certain parties have cited and relied upon unpublished opinions, in violation of *rule 977 of the California Rules of Court*. We emphasize that such citations are inappropriate, and we have paid

them no heed. ( *Casella v. City of Morgan Hill (1991) 230 Cal. App. 3d 43, 58 [280 Cal. Rptr. 876]*, cert. den. *503 U.S. 983 [118 L. Ed. 2d 387, 112 S. Ct. 1665]*.)

[***18] 1. Under the *exposure theory*, bodily injury is deemed to commence upon the claimant's first exposure to asbestos, upon the claimant's initial inhalation of asbestos fibers. (E.g., *Ins. Co. North America v. Forty-Eight Insulations (6th Cir. 1980) 633 F.2d 1212,* [**701] *1218-1220*, clarified *657 F.2d 814*, cert. den. *(1981) 454 U.S. 1109 [70 L. Ed. 2d 650, 102 S. Ct. 686]*; *Commercial Union Ins. Co. v. Sepco Corp. (11th Cir. 1985) 765 F.2d 1543*; *Porter v. American Optical Corp. (5th Cir. 1981) 641 F.2d 1128*, cert. den. *sub nom. Aetna Cas. & Surety Co. v. Porter (1981) 454 U.S. 1109 [70 L. Ed. 2d 650, 102 S. Ct. 686]*; *Cole v. Celotex Corp. (La. 1992) 599 So.2d 1058, 1076-1077*.)

2. Pursuant to the *manifestation theory*, no bodily injury occurs, and thus no insurance coverage is triggered, until the "asbestos-related disease became reasonably capable of medical diagnosis." ( *Eagle-Picher Industries, Inc. v. Liberty Mut. Ins. (1st Cir. 1982) 682 F.2d 12, 25*, cert. den. *(1983) 460 U.S. 1028 [75 L. Ed. 2d 500, 103 S. Ct. 1279]*.) In adopting the manifestation theory, the *Eagle-Picher* court reasoned that the language of the policies distinguishes between the event [***19] which causes injury--the accident or exposure--and the resulting injury or disease. "[I]t is the resulting injury, *not* the [*42] exposure, which must take place 'during the policy period' in order to trigger coverage . . . ." (*682 F.2d at p. 19*.)

3. In *Keene Corp. v. Ins. Co. of North America (D.C. Cir. 1981) 667 F.2d 1034 [215 App.D.C. 156]*, certiorari denied *(1982) 455 U.S. 1007 [71 L. Ed. 2d 875, 102 S. Ct. 1644]*, the court adopted a theory of *continuous trigger* or "triple triggers" whereby the asbestos injury is deemed a continuous process and all policies are triggered on a claim if they were in effect either during the exposure period, or at the time of manifestation, or at any time in between (the latency or "exposure-in-residence" period). " (See also *ACandS, Inc. v. Aetna Cas. and Sur. Co. (3d Cir. 1985) 764 F.2d 968*.)

11 Yet another approach--a theory of "double triggers"--was taken by the Illinois Supreme Court in *Zurich Ins. Co. v. Raymark Industries (1987) 118 Ill.2d 23 [112 Ill.Dec. 684, 514 N.E.2d 150]*. There, the trial court found that "injury" occurs when asbestos fibers are inhaled and retained in the lung, i.e., when the claimant is exposed to asbestos; "disease" occurs when an asbestos-related disease has progressed to the point that it significantly impairs the lungs' function and is thereby capable of clinical detection and diagnosis, but between those two points, after exposure to asbestos ceases and before an asbestos-related disease becomes diagnosable, there is no continuous injury. The court based this conclusion on the expert testimony that asbestos-related disease may or may not progress during periods of nonexposure. (*514 N.E.2d at pp. 160-161*.) In addition, the court found that "sickness" may take place in the period before clinical manifestation of the disease; whether and when a claimant suffered sickness must be determined on a case-by-case basis. The Illinois Supreme Court upheld this approach as consistent with the plain and unambiguous language of the policies.

[***20] 4. Under the *injury-in-fact rule*, coverage is triggered when the actual injury is shown, retroactively, to have occurred. ( *Abex Corp. v. Maryland Cas. Co. (D.C. Cir. 1986) 790 F.2d 119 [252 App.D.C. 297]* [asbestos]; *American Home Products Corp. v. Liberty Mut. Ins. (2d Cir. 1984) 748 F.2d 760* [pharmaceuticals]; *Maryland Cas. Co. v. W.R. Grace & Co. (S.D.N.Y. 1991) 794 F. Supp. 1206, 1215* [asbestos]; *Aetna Cas. & Sur. Co. v. Abbott Lab., Inc. (D.Conn. 1986) 636 F. Supp. 546, 548-550* [DES].)

Like the manifestation theory, the injury-in-fact approach holds that mere exposure to asbestos during the policy period is not enough to trigger coverage: "The plain language of the definition of 'occurrence' used in the CGL policy requires exposure that 'results, *during the policy period*, in bodily injury' in order for an insurer to be obligated to indemnify the insured. The unambiguous meaning of these words is that an *injury*--and not mere exposure--must result *during the policy period*. The CGL policies expressly distinguish exposure from injury; to equate the two . . . is to ignore this distinction. Any argument that mere exposure--without injury--triggers [***21] liability is simply unsound linguistically." ( *Abex Corp. v. Maryland Cas. Co., supra, 790 F.2d at p. 127*, italics in original; see also *American Home Products Corp. v. Liberty Mut. Ins., supra, 748 F.2d at p. 764*.)

[*43] But in contrast to the manifestation trigger, the injury-in-fact approach acknowledges that injury may occur before the injury has become apparent. Under this approach, coverage is triggered by " 'a real but undiscovered injury, proved in retrospect to have existed at the relevant time . . . irrespective [**702] of the time the injury became [diagnosable].' " ( *American Home Products Corp. v. Liberty Mut. Ins., supra, 748 F.2d at p. 766*.) That is, after an injury has been diagnosed, it may be inferred, from the nature of the gestation period and from the stage of the illness, that the harm actually began sometime earlier. ( *Id. at p. 765*.)

**(3)** As mentioned above, the California Supreme Court, after reviewing the various judicially recognized triggers, has concluded that a continuous trigger should be applied to claims of continuous or progressively deteriorating damage or injury. ( *Montrose Chemical Corp. v. Admiral Ins. Co., supra,* [***22] *10 Cal. 4th 645.*) Yet, the *Montrose* court explicitly recognized that an injury-in-fact analysis is not inconsistent with a continuous trigger: "In the context of continuous or progressively deteriorating injuries, the injury-in-fact trigger, like the continuous injury trigger, affords coverage for continuing or progressive injuries occurring during successive policy periods subsequent to the established date of the initial injury-in-fact." ( *Id. at p. 676.*) That is, the continuous trigger pertains to the duration of coverage, providing coverage throughout successive policy periods. The injury-in-fact trigger establishes the onset of the injury, to determine when coverage begins. (See *Stonewall Ins. Co. v. Asbestos Claims Management (2d Cir. 1995) 73 F.3d 1178, 1194-1197.*)

b. *The Trial Court's Decision*

Based upon the extensive medical evidence, the trial court found "that bodily injury occurs during the exposure period, that it continues to occur during the latency period, even in the absence of further exposure, and that it continues to occur past the manifestation point, accompanied by sickness and disease, until the claimant's death from the disease or other causes." [***23] Accordingly, the court adopted a continuous trigger: "[A]ll of a policyholder's policies in effect from first exposure to asbestos or asbestos-containing products until date of death or date of claim, whichever occurs first, are triggered with respect to an asbestos-related bodily injury claim." [12]

12 The trial court further concluded that once a claim is filed by a living claimant the claimant's bodily injury is no longer an unknown event and, accordingly, under the loss-in-progress rule ( *Ins. Code, § 22, 250*) policies beginning after the claim is filed are not triggered. This aspect of the trial court's decision is erroneous, as the Supreme Court has now clarified that as long as the insured's *liability* remains uncertain the loss-in-progress rule will not bar coverage. ( *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at pp. 689-693.*) However, because the policyholders have not challenged the trial court's trigger decision, the error is waived.

Yet, although the trial court [***24] concluded that a continuous trigger should apply, the court reached that conclusion through an injury-in-fact analysis. [*44] Unlike the court in *Keene, supra*, which *deemed* asbestos injury to be continuous, the trial court here relied upon medical evidence to make factual findings on the physiological processes that actually occur upon inhalation of asbestos fibers and continue until death. [13]

13 The trial court found as follows: "The Court determines that regardless of which terms the medical experts use to describe the physiological processes associated with the inhalation of asbestos, the medical evidence establishes that these processes impair the gas exchange function of the lung cells and tissue. The Court finds that these processes begin almost immediately upon the inhalation and deposition of asbestos fibers into the lung, and slowly and continuously impair new portions of lung tissue throughout one's life, even after exposure to asbestos ceases. This continuing process could properly be termed 'progression,' with the understanding that this refers to progressive involvement of new cells and tissue and constitutes new injury to the cells, tissue and body.

"The issue concerning progressive involvement of new tissue during the latency period was one of the most vigorously contested at trial. Admittedly, it was not conclusively established that every person exposed to asbestos experiences such progression. However, the case before this Court concerns coverage for only those individuals who present asbestos-related claims against the manufacturers for which the manufacturers seek indemnity from their insurers. Even within this group of individuals, it is impossible to say with absolute certainty whether all or any particular percentage of these individuals continued to develop asbestos-related injury in each and every policy period following cessation of exposure and preceding manifestation.

"Such certainty and universality are not required, however, for the Court to make the foregoing determinations. More than sufficient evidence was presented to enable the Court to determine that among individuals who present claims for asbestos-related injury and/or disease, the injurious physiological processes associated with the inhalation of asbestos continue to occur from initial exposure, after cessation of exposure, and throughout those individuals' lives.

"This determination is amply and convincingly supported by the record. The non-biodegradable nature of the fibers and their continued retention in the lungs elicit a sustained response by the body's cellular defense mechanisms. Animal studies demonstrate such progression in more detail than is possible by medically ethical studies of humans and can be extrapolated

to the human experience. Clinical diagnostic tools such as serial x-rays and lung function tests, though relatively crude in their ability to measure progression, have also confirmed such progression."

[***25] [**703] In contrasting its decision with the decision in *Zurich Ins. Co. v. Raymark Industries, supra, 118 Ill.2d 23 [514 N.E.2d 150]*, the trial court noted that the *Zurich* trial court had "concluded from the medical evidence that injury does not always occur in the absence of exposure. (See *id., 514 N.E.2d at pp. 160-161.*) This conclusion differs from that reached by this Court."

In rejecting the "exposure theory," THE TRIAL COURT FOUND AS FOLLOWS: "[A]lthough this Court agrees with the exposure theorists that 'bodily injury' occurs nearly simultaneously with inhalation, and therefore throughout the [*45] exposure period, this Court finds that new and additional 'bodily injury' continues to occur even past the cessation of exposure . . . ."

Further, in comparing its decision with that of *American Home Prod. v. Liberty Mut. Ins. Co (S.D.N.Y. 1983) 565 F. Supp. 1485* affirmed as modified (2d Cir. 1984) *748 F.2d 760* (*AHP*), the trial court noted that the *AHP* court had declined to make a general declaration that every exposure to any of the drugs at issue causes injury and therefore triggers coverage. But the trial court found it could do so with respect [***26] to asbestos: "This Court, however, has received evidence which supports such a 'general declaration' as to when injury occurs, and has applied it generally to all claimants who suffer from asbestos-related 'bodily injury.' " The trial court explained that "[t]he *AHP* decision, as modified, provides that coverage is triggered by 'a real but undiscovered injury, proved in retrospect to have existed at the relevant time.' (*Supra, 748 F.2d at p. 766.*) This Court simply proceeds one step further in its analysis, and applies the 'injury in fact' concept to the asbestos medical evidence, thereby establishing in retrospect that undiscovered injury existed during the asbestos exposure period and during the latency period in the absence of exposure."

We find no error in the trial court's use of an injury-in-fact analysis to apply a continuous trigger. ( *Stonewall Ins. Co. v. Asbestos Claims Management, supra, 73 F.3d at pp. 1195-1196.*) Indeed, we note that in *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at pp. 676-677, fn. 16*, the Supreme Court acknowledged that claims involving asbestos-related diseases involve "unique facts" and the injury-in-fact [***27] trigger may be appropriate. Moreover, the court referred to our earlier (now vacated) opinion and observed that our affirmance of the trial court's decision "appears largely consistent with [the *Montrose*] analysis of the applicable principles of third party CGL coverage . . . ." (*Ibid.*)

c. *Arguments of Insurers*

The insurers raise two principal arguments against the trial court's trigger decision. First, the insurers dispute the trial court's interpretation of "bodily injury." Second, the insurers argue that the trial court's continuous trigger decision improperly holds insurers liable even though the claimant had no contact with the policyholder's products during the policy period. We disagree with the first argument but find some merit in the second, as we will explain below.

(1) *Subclinical Changes*

**(4a)** The insurers contend the trial court's interpretation of bodily injury is contrary to the plain meaning of the words in that it equates bodily injury [*46] with "imperceptible subclinical cellular changes." Although the insurers have now disavowed the manifestation [**704] theory, the lone support for the insurers' argument is *Eagle-Picher Industries, Inc. v.* [***28] *Liberty Mut. Ins., supra, 682 F.2d 12*, where the court held that "sub-clinical insults to the lungs" do not constitute an injury "until, if ever, they accumulate to become clinically evident or manifest." [14]

14 In the trial court, the insurers took various positions on the trigger of coverage: some advocated the exposure theory; others the manifestation theory, and still others took no position. On appeal, the joint briefs of the insurers which remain in the action do not clearly articulate what events should trigger coverage, but their arguments imply an advocacy for the manifestation theory. We were advised at oral argument, however, that the insurers accept the injury-in-fact approach.

In *Eagle-Picher*, the court refused to adopt the exposure theory, noting that "it is uncontested that even sub-clinical injury to the lung does not occur simultaneously with the inhalation of asbestos. Nor is the existence of sub-clinical injury an inevitable by-product of exposure, since the body's natural mechanisms [***29] may remove the fibers before they become embedded in the lungs." (*682 F.2d at p. 19*, fn. omitted.) Likewise, in the present case, the insurers emphasize the medical evidence and the trial court's finding that not every exposure to asbestos results in an asbestos-related injury.

Yet, while it may be that not every inhalation of asbestos fibers results in bodily injury, it can be said that every manifested asbestos-related injury resulted from inhalation of asbestos fibers. (See *Commercial Union Ins. Co. v. Sepco Corp., supra, 765 F.2d at pp. 1545-*

*1546.*) **(5)** In the present case, the trial court necessarily took a retrospective point of view. In resolving the insurance coverage questions, the court was concerned only with individuals who have actually developed asbestos-related diseases, and for such claimants the court found that the evidence permitted the inference that injury took place in the past: "[T]he asbestos medical evidence [establishes] *in retrospect* that undiscovered injury existed during the asbestos exposure period and during the latency period in the absence of exposure." (Italics added.)

The trial court's continuous trigger decision, then, is based upon [***30] factual findings that for asbestos claimants an injury-in-fact took place during each triggered policy period, even though the injury was not diagnosable and compensable during the policy period. The trial court found it "sufficient that such injuries eventually became compensable, and this is, of course, true with respect to all claims for which insurers are called upon to indemnify policyholders." We find no error in this retrospective approach. For purposes of determining insurance coverage, absolute precision is not required as to [*47] when the injury occurred. "[A]ll that is necessary is reasonably reliable evidence that the injury, sickness, or disease more likely than not occurred during a period of coverage . . . ." (*AHP*, *supra*, 565 F. Supp. at p. 1509; accord, *Abex Corp. v. Maryland Cas. Co., supra, 790 F.2d at p. 128.*)

**(4b)** The insurers' argument assumes that an injury does not occur until there is an impairment capable of detection. In the present case, however, the medical evidence established and the trial court found that impairment actually occurs even earlier: "[T]he physiological processes associated with the inhalation of asbestos . . . impair [***31] the gas exchange function of the lung cells and tissue. . . . almost immediately upon the inhalation and deposition of asbestos fibers into the lung, and slowly and continuously impair new portions of lung tissue throughout one's life, even after exposure to asbestos ceases, . . . [involving] new injury to the cells, tissue and body." Those factual findings, of course, are binding on this court.

It bears emphasizing that whether there is coverage for "bodily injury" is not the question here; it is undisputed that the CGL policies provide coverage for the asbestos-related injuries suffered by the claimants. The question before this court is when the injuries occurred. In contrast to the situation in *Eagle-Picher, supra*, where the court found no factual basis for the conclusion that bodily injury occurs upon exposure (*Eagle-Picher, supra, 682 F.2d at p. 19, fn. 3*), the trial court's factual findings here, made after consideration of extensive medical testimony, amply support the conclusion that injury actually occurs upon exposure and continues [**705] until death. We therefore find no error in the trial court's adoption of a continuous trigger. (See also *Stonewall Ins.* [***32] *Co. v. Asbestos Claims Management, supra, 73 F.3d 1178, 1196-1197*; *Owens-Illinois, Inc. v. United Ins. Co. (1994) 138 N.J. 437 [650 A.2d 974, 995]*; *J.H. France Refractories v. Allstate (1993) 534 Pa. 29, 626 A.2d 502, 506-507].*)

In any event, the insurers' approach would essentially render the asbestos manufacturers' insurance coverage illusory, for by the time asbestos diseases caused detectable impairments (in the 1970's), insurance companies ceased issuing policies that adequately covered asbestos-related disease. Hence, the insurers' theory would deprive the manufacturers of coverage for product liability injuries of which they were unaware during the policy periods. (E.g., *Hancock Laboratories, Inc. v. Admiral Ins. (9th Cir. 1985) 777 F.2d 520, 525*; *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at pp. 1045-1046*; *Ins. Co. North America v. Forty-Eight Insulations, supra, 633 F.2d at p. 1219.*)

Moreover, there is nothing in the language of the policies to require as a condition of coverage that the injury be discovered at any point in time. As [*48] the Supreme Court recognized in *Montrose Chemical Corp. v. Admiral Ins. Co* [***33] ., *supra, 10 Cal. 4th at pp. 688-689*, to read the CGL occurrence policies to provide coverage only when the injury becomes apparent during the policy period would unfairly transform the policies into "claims-made" policies. (See also *American Home Products Corp. v. Liberty Mut. Ins., supra, 748 F.2d at p. 764*; *Ins. Co. North America v. Forty-Eight Insulations, supra, 633 F.2d at p. 1219*; *Hartford County v. Hartford Mut. Ins. (1992) 327 Md. 418 [610 A.2d 286, 294-295].*)

In short, we find the trial court's continuous trigger decision well supported both by the unique facts of asbestos-related bodily injuries and by the existing case law. We uphold that decision.

(2) *Contact With Policyholder's Product*

The trial court's judgment states that all of a policyholder's policies are triggered from the claimant's first exposure to *any* asbestos product until the date of death or claim. We agree with the insurers that this aspect of the trigger decision is overbroad. Our analysis of this point is intertwined with the analysis of scope of coverage and will be presented in part 2.b below.

2. *Scope of Coverage*

Under the trial court's continuous trigger [***34] decision, multiple, successive policies of a policyholder are likely to be triggered on any single bodily injury claim. Two questions emerge concerning the extent or "scope" OF COVERAGE OF THESE MULTIPLE INSURERS: Should the responsibility for indemnification be apportioned among the insurers? And should the

policyholder be required to share in the indemnification and defense costs if the policyholder was uninsured or self-insured for certain periods? To facilitate analysis of these issues, we draw a distinction between (1) the obligations of successive insurance carriers toward a single manufacturer-policyholder, and (2) the obligations of successive carriers when multiple asbestos manufacturers are held liable on a single claim.

a. *Obligations of Successive Insurers of a Single Asbestos Manufacturer-Policyholder*

(1) *Apportionment Among Insurers*

The standard CGL insurance policies require the insurers to indemnify the policyholder only if bodily injury occurs during the policy period: "The company will pay on behalf of the insured all sums which the insured shall [*49] become legally obligated to pay as damages because of bodily injury . . . caused by an occurrence [***35] . . . . [P] 'Occurrence' means an accident, including injurious exposure to conditions, which results during the policy period in bodily injury . . . ."

Thus, the question raised by the insurance companies is whether liability should be apportioned among the insurers based on their periods of coverage. As will be seen in the discussion below, the trial court ruled that the policyholder must be indemnified by one insurer for the full extent of the loss up to the policy's limits, but with liability ultimately [**706] being apportioned among all insurers based upon the policy limits and the years of coverage. We affirm that decision.

Liable "in Full"

**(6a)** In phase III, the trial court concluded that each policy triggered by an asbestos-related bodily injury claim has an independent obligation to respond "in full" to a claim. In reaching that conclusion, the trial court relied primarily upon the insurers' obligations under the CGL policies to pay for "all sums which the insured shall become liable to pay as damages."

The trial court's decision follows several out-of-state asbestos cases. In *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d 1034*, the court held as follows: [***36] "The policies at issue in this case provide that the insurance company will pay on behalf of Keene 'all sums' that Keene becomes legally obligated to pay as damages because of bodily injury during the policy period. . . . As a result [of our continuous trigger decision], when Keene is held liable for an asbestos-related disease, only part of that disease will have developed during any single policy period. The rest of the development may have occurred during another policy period or during a period in which Keene had no insurance. The issue that arises is whether an insurer is liable in full, or in part, for Keene's liability once coverage is triggered. We conclude that the insurer is liable in full, subject to the 'other insurance' provisions . . . ." ( *Id. at p. 1047.*) "Once triggered, each policy covers Keene's liability. There is *nothing* in the policies for a reduction of the insurer's liability if an injury occurs only in part during a policy period. As we interpret the policies, they cover Keene's entire liability once they are triggered." ( *Id. at p. 1048*; see also *ACandS, Inc. v. Aetna Cas. and Sur. Co., supra, 764 F.2d at p. 974*; *Zurich Ins. Co. v. Raymark* [***37] *Industries, supra, 514 N.E.2d at p. 165*; *Monsanto Co. v. C.E. Heath Comp. & Liability (Del. 1994)* [*50] *652 A.2d 30, 34-35*; *J.H. France Refractories v. Allstate, supra, 626 A.2d 502, 507-508.*) [15]

15 In phase IV, the trial court qualified its "in full" ruling by concluding that only one policy's limits can apply to each claim, and the policyholder may select the policy under which it is to be indemnified. That decision, too, is supported by *Keene*: "The principle of indemnity implicit in the policies requires that successive policies cover single asbestos-related injuries. That principle, however, does not require that Keene be entitled to 'stack' applicable policies' limits of liability. . . . Therefore, we hold that only one policy's limits can apply to each injury. Keene may select the policy under which it is to be indemnified." ( *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at pp. 1049-1050*; see also *Owens-Illinois, Inc. v. Aetna Cas. and Sur. Co. (D.D.C. 1984) 597 F. Supp. 1515, 1524*; contra, *Cole v. Celotex Corp., supra, 599 So.2d 1058, 1074-1080*; *J.H. France Refractories v. Allstate, supra, 626 A.2d 502, 510.*) The policyholders have not challenged this ruling.

[***38] We believe the California Supreme Court's decision in *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th 645*, supports this reasoning. In distinguishing third party liability policies from first party liability policies, the court observed that under third party liability policies, if coverage is ultimately established, the insurer must indemnify the insured for "all sums" which the insured becomes obligated to pay. (*10 Cal. 4th at p. 665.*) Moreover, in concluding that a continuous trigger should be applied, the court on two occasions cited with approval the opinion in *Gruol Construction Co. v. Insurance Co. of No. America (1974) 11 Wn.App. 632 [524 P.2d 427]*, in which the Washington Court of Appeal applied a continuous trigger in a case involving progressive property damage. (*10 Cal. 4th at pp. 677-678, 681.*) In both references to the *Gruol* case, the *Montrose* court observed that under a continuing injury theory, an insurer may become liable for the entire loss up to the policy limits even though the continuing

injury may extend over several policy periods. ( *Id. at pp. 678, 681.*)

Furthermore, in support of its conclusion that a continuous trigger [***39] should be applied, the *Montrose* court relied upon existing case law holding that coverage for a manifested loss is not terminated by the expiration of the policy; coverage continues until the damage is complete. ( *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at pp. 680, 686,* [**707] citing *California Union Ins. Co. v. Landmark Ins. Co. (1983) 145 Cal. App. 3d 462, 475 [193 Cal. Rptr. 461]*; *Snapp v. State Farm Fire & Cas. Co. (1962) 206 Cal. App. 2d 827, 831-832 [24 Cal. Rptr. 44]*; and *Harman v. American Casualty Co. of Reading, Pa. (S.D.Cal. 1957) 155 F. Supp. 612.*) As the *Montrose* court put it, "an insurer on the risk when continuous or progressively deteriorating damage or injury first manifests itself remains obligated to indemnify the insured *for the entirety of the ensuing damage or injury.*" (*10 Cal. 4th at p. 686*, italics added.)

[*51] Apportionment

At the same time that the trial court ruled each insurer must respond "in full," the court also ruled that "the obligation to respond in full is subject to the operation of policy limits, deductibles, applicable exclusions, applicable 'other insurance' clauses, provisions which [***40] make certain policies' coverage 'excess' to that of other policies, and any rights to equitable contribution from the issuers of other policies triggered by the same claim."

That decision, too, is consistent with language in the *Montrose* case: "Allocation of the cost of indemnification once several insurers have been found liable to indemnify the insured for all or some portion of a continuing injury or progressively deteriorating property damage requires application of principles of contract law to the express terms and limitations of the various policies of insurance on the risk. [Citing *Keene* and *Forty-Eight Insulations*.]" ( *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at p. 681, fn. 19.*)

In *Keene*, the court held that liability among insurers must be allocated pursuant to the "other insurance" CLAUSES: "In any suit against Keene for an asbestos-related disease, it is likely that the coverage of more than one insurer will be triggered. Because each insurer is fully liable, and because Keene cannot collect more than it owes in damages, the issue of dividing insurance obligations arises. The only logical resolution of this issue is for [***41] Keene to be able to collect from any insurer whose coverage is triggered, the full amount of indemnity that it is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury. . . . Our holding each insurer fully liable to Keene [] does not mean that a single insurer will be saddled with full liability for any injury. When more than one policy applies to a loss, the 'other insurance' provisions of each policy provide a scheme by which the insurers' liability is to be apportioned. . . . These provisions of the policies must govern the allocation of liability among the insurers in any particular case of asbestos-related disease. However, the primary duty of the insurers whose coverage is triggered by exposure or manifestation is to ensure that Keene is indemnified in full." (*667 F.2d at p. 1050*, fn. omitted.)

The *Keene* court did not specify how the "other insurance" clauses would serve to allocate liability among the insurers. In the present case, however, in phase IV, the trial court concluded that the presence of "other insurance" clauses in the policies had the effect of requiring a pro rata apportionment [***42] among multiple insurers whose policies were triggered successively on the [*52] same claim. The court employed an apportionment method based on the respective policy limits multiplied by the years of coverage: "When more than one policy is triggered by a claim, defense and indemnity costs shall be allocated among all triggered policies according to applicable 'per occurrence' policy limits, multiplied by years of coverage. When a policy does not contain a 'per occurrence' limit, the 'per person' limit shall be used in this calculation.

"This Court finds that the most equitable method of allocation is proration on the basis of policy limits, multiplied by years of coverage. This method is consistent with the policy language in that it takes policy limits into consideration. Typically, a pro rata 'other insurance' clause provides for proration according to 'the applicable limit of liability.' This method also reflects the fact that higher premiums are generally paid for higher 'per person' or 'per occurrence' limits. Since some policies are in effect for more than one [**708] year, and injury occurs during every year from first exposure to asbestos until death (phase III Decision at p. [***43] 42), multiplying the policy limits by years of coverage results in a more equitable allocation than proration based on policy limits alone. Thus, when a particular claim triggers more than one policy, each insurer's share of liability shall be determined by the proportion that each policy's applicable 'per occurrence' limits multiplied by years the policy was in effect bears to the sum total of the applicable 'per occurrence' limits of all triggered policies multiplied by the years each policy was in effect. When a policy does not contain a 'per occurrence' limit, the 'per person' limit shall be used in this calculation."

This allocation procedure does not affect the obligation of the insurers to respond in full: "a policyholder may obtain full indemnification and defense from one insurer, leaving the targeted insurer to seek contribution from other insurers covering the same loss."

The trial court's ruling on the method of apportionment is not challenged on appeal. We note that although the method is nontraditional, it is nonetheless sound. **(7)** The general rule, when multiple policies share the same risk but have inconsistent "other insurance" clauses, is to prorate according to [***44] the policy limits. (See *Argonaut Ins. Co. v. Transport Indem. Co. (1972) 6 Cal. 3d 496, 507 [99 Cal. Rptr. 617, 492 P.2d 673]*; *Employers Reinsurance Corp. v. Phoenix Ins. Co. (1986) 186 Cal. App. 3d 545, 557 [230 Cal. Rptr. 792]*; *CNA Casualty of California v. Seaboard Surety Co. (1986) 176 Cal. App. 3d 598, 620 [222 Cal. Rptr. 276]*.) Courts in other jurisdictions have taken different approaches. Most prominent among the alternatives is an allocation based upon time on the risk--i.e., the number of years an insurer [*53] covered the continuous loss. (E.g., *Ins. Co. North America v. Forty-Eight Insulations, supra, 633 F.2d 1212*.) [16]

16 Other approaches include apportionment (1) based on the premiums paid ( *Insurance Co. of Tex. v. Employers Liability Assur. Corp. (S.D.Cal. 1958) 163 F. Supp. 143, 147, 151*); (2) in equal shares ( *Reliance Ins. Co. v. St. Paul Surplus Lines Ins. (4th Cir. 1985) 753 F.2d 1288, 1292)*; and (3) using a "maximum loss" method ( *Mission Ins. Co. v. Allendale Mut. Ins. Co. (1981) 95 Wn.2d 464 [626 P.2d 505]*; and see *Uniroyal, Inc. v. Home Ins. Co. (E.D.N.Y. 1988) 707 F. Supp. 1368, 1392-1393* [agent orange]). (See generally, Ostrager & Newman, Handbook on Insurance Coverage Disputes (4th ed. 1991) § 9.04, p. 338.)

[***45] **(6b)** The apportionment formula used by the trial court in the present case--combining the policy limit formula with the time on the risk approach--was advocated by some insurers in *CNA Casualty of California v. Seaboard Surety Co., supra, 176 Cal. App. 3d at pages 619-620*, with respect to defense costs. The court rejected the argument and used a straight policy limit approach. But in doing so the court noted that the Supreme Court had declined to formulate a definitive rule "in light of varying equitable considerations which may arise" in particular cases. ( *Signal Companies, Inc. v. Harbor Ins. Co. (1980) 27 Cal. 3d 359, 369 [165 Cal. Rptr. 799, 612 P.2d 889, 19 A.L.R.4th 75]*.) Quoting from an earlier case, the Supreme Court explained the need for "equitable" CONSIDERATIONS: " 'The reciprocal rights and duties of several insurers who have covered the same event do not arise out of contract, for their agreements are not with each other . . . . Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. . . .' " (*27 Cal. 3d at p. 369*.) The *CNA* court, therefore, acknowledged that in an appropriate [***46] case the scope of an insured's coverage could be affected by such factors as the insurer's time on the risk. (*176 Cal. App. 3d at p. 620*.) And, indeed, in the present case, the trial court found its method of allocation, based upon both the policy limits and the time on the risk, to be the "most equitable."

Given that the trial court's method of apportionment is not challenged on appeal, we find no error in the decision to hold each policy responsible in full subject to such apportionment. [17] (See also *Owens-Illinois, Inc. v.* [**709] *United Ins. Co., supra, 650 A.2d 974, 993-995*, proposing the same method of [*54] allocation.) We are not persuaded otherwise by *Ins. Co. North America v. Forty-Eight Insulations, supra, 633 F.2d 1212*, in which the trial court employed an exposure trigger and prorated liability among the multiple, successive insurers who were on the risk while the claimant was exposed to asbestos. On appeal, no question was raised concerning this proration; the dispute focused on prorating the costs of defense. The appellate court affirmed, finding the exposure theory to provide a reasonable means of proration: "An insurer contracts to pay the entire cost [***47] of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period. . . . [P] [The] exposure theory . . . establishes that a reasonable means of proration is available. . . . [I]ndemnity costs can be allocated by the number of years that a worker inhaled asbestos fibers." ( *Id. at pp. 1224-1225*.) Although other courts using an exposure theory have similarly prorated liability among the insurers ( *Commercial Union Ins. Co. v. Sepco Corp., supra, 765 F.2d at p. 1544*; *Porter v. American Optical Corp., supra, 641 F.2d at p. 1145* [the rule of proration among insurers is "logically consequent" to the exposure theory]), we agree with the Illinois Supreme Court that a pro rata approach does not apply to defense costs or indemnity if the exposure theory is not used. ( *Zurich Ins. Co. v. Raymark Industries, supra, 514 N.E.2d 150, 165*.) In finding that asbestos injuries continue to occur even after exposure to asbestos ceases, the trial court necessarily rejected the underlying temporal premise of the exposure theory, that injury occurs and the insurers' [***48] obligations are triggered only during the claimant's period of exposure to asbestos. [18]

17 Despite the phase III decision obligating the insurers to respond "in full," the effect of the trial court's apportionment formula is to make the liability of the insurers proportionate. In their briefs on phase III, the insurers make little mention of the phase IV decision and imply that the trial court did not prorate the losses or take into account the amount of time that insurance coverage was provided to the policyholder. Yet when

the phase III and phase IV decisions are read together, the insurance carriers got what they want--pro rata allocation of liability.

As a practical matter, the point is academic for most insurers. The trial court noted that "all primary policies have been or will be exhausted by asbestos-related claims. The method of allocation affects only the timing of payments." With respect to Fibreboard, however, two of its insurers (Pacific Indemnity and Continental) issued policies without aggregate limits. Thus, as to presently unpaid claims against Fibreboard, the only allocation will be between those two unexhausted policies. Contrary to the assertions of the insurers, this fact is not the result of any flaw in the trial court's decision on the scope of coverage. Whether the policies provide unlimited coverage is before us on other issues which Pacific Indemnity and Continental have asked us to defer.

[***49]

18 The insurers have relied upon the appellate court's decision in *J.H. France Refractories v. Allstate (1990) 396 Pa.Super. 185 [578 A.2d 468]*, which applied a continuous trigger and also allocated liability pro rata among insurers based upon the time each insurer was on the risk. But during the pendency of this appeal, the Pennsylvania Supreme Court reversed that decision and instead followed *Keene* to hold, as we do here, that each insurer must bear potential liability for the entire claim, subject to allocation based on the "other insurance" provisions of the policies. ( *J.H. France Refractories v. Allstate, supra, 626 A.2d 502.*)

Moreover, the rule of proration adopted by *Forty-Eight Insulations* and its progeny fails to recognize that the event which triggers coverage does not define the scope of coverage. Although each policy is triggered only by the occurrence of an injury during the policy period, once a policy is triggered, the policy obligates the insurer to pay "all sums" for which the policyholder [*55] becomes liable. There is nothing in the policies [***50] limiting the scope of coverage to that portion of a continuous injury that developed during the policy period. ( *Keene Corp. v. Ins. Co. North America, supra, 667 F.2d at p. 1049.*) "As long as there was either inhalation exposure or exposure in residence during a policy period, and as long as [the policyholder] must pay damages as a result, the insurer must indemnify [the policyholder] for whatever damages it must pay." ( *Id. at pp. 1044-1045, fn. 20*; see also *J.H. France Refractories v. Allstate, supra, 626 A.2d 502, 508.*)

In *Montrose*, the Supreme Court criticized language in *California Union Ins. Co. v. Landmark Ins. Co., supra, 145 Cal. App. 3d at page 478*, which held the successive insurers liable "jointly and severally" [**710] for the full amount of the damage. [19] ( *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at p. 681, fn. 19.*) **(8a)** In the present case, the trial court correctly explained that the doctrine of joint and several liability has no application to the obligations of successive insurers of a single policyholder. [20] **(6c)** Nevertheless, the insurance companies insist that the trial court's decision on the scope of coverage [***51] imposes joint and several liability upon the insurers. It does not. The trial court's decision ensures that the policyholder is indemnified by one insurer for the full extent of the loss up to the policy's limits, but apportions liability among all insurers whose policies were triggered by the claimant's asbestos-related bodily injury. We find nothing erroneous in that decision.

19 Despite the *California Union* court's appellation of the liability as "joint and several," the court went on to apportion the damages pro rata between the two insurers based on the policy limits. (*145 Cal. App. 3d at p. 478.*)

20 The trial court expressly disavowed joint and several liability: "The Court recognizes that 'joint and several liability' is a doctrine of tort liability, not contract law. Furthermore, the Court is aware that liability for many of the underlying injury claims which are the subject of this coverage dispute is not joint and several among the policyholders, but rather is pursuant to settlement agreements which specify distinct damage amounts attributed to each policyholder. [P] This Court emphasizes that its determination of the scope of coverage for asbestos-related bodily injury claims is not predicated on the joint and several liability which is sometimes but not always imposed on the policyholders in the underlying lawsuits."

[***52] (2) *Effect of Policyholder's Self-insurance*

**(9a)** In phase III, the trial court concluded that "the policyholders do not have an obligation to share pro rata in indemnification and defense costs because of any uninsured or self-insured periods of time simultaneous with the 'occurrence' of bodily injury pertaining to a claim . . . ." The insurers challenge that ruling. The insurers argue that they are obligated to pay only for injuries that took place during the policy periods; thus the manufacturers must pay for injuries that occurred during periods in which the manufacturers were uninsured or self-insured.

[*56] The leading support for the insurers' position is provided by those cases in which the courts apportioned coverage among insurers based upon the time each policy was on the risk. Those courts then included

the policyholder in the allocation scheme and held the policyholder responsible for a pro rata share for periods of self-insurance or no insurance. ( *Stonewall Ins. Co. v. Asbestos Claims Management, supra, 73 F.3d at pp. 1202-1204*; *Commercial Union Ins. Co. v. Sepco Corp., supra, 765 F.2d at p. 1544*; *Ins. Co. North America v. Forty-Eight Insulations* [***53] , *supra, 633 F.2d at p. 1225*; *NSP v. Fidelity & Cas. Co. of New York (Minn. 1994) 523 N.W.2d 657, 662*; see also *IMCERA Group, Inc. v. Liberty Mutual Ins. Co. (1996) 47 Cal. App. 4th 699, 736-743 [50 Cal. Rptr. 2d 583]* [defense costs] review granted May 22, 1996 (S052878); *Gulf Chemical & Metallurgical v. Associated Metals (5th Cir. 1993) 1 F.3d 365, 372.*)

We decline to follow this approach, for we conclude that a distinction must be drawn between apportionment among multiple insurers and apportionment between an insurer and its insured. **(10)** This distinction was noted in *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th 645, 665*: "In suits between an insured and an insurer to determine coverage, interpretation of the policy language . . . will typically take precedence. . . . [P] In contrast, where two or more CGL carriers turn to the courts to allocate the costs of indemnity for a paid loss, different contractual and policy considerations may come into play in the effort to apportion such costs among the insurers. The task may require allocation of contribution amongst all insurers on the risk in proportion to their respective policies' liability [***54] limits (such as deductibles and ceilings) or the time periods covered under each such policy."

As we have already explained in sub part (1) above, the trial court apportioned the liability of the successive insurers based upon both the policy limits and the time on the risk. [21] [**711] **(9b)** That apportionment among multiple insurers, however, has no bearing upon the obligations of the [*57] insurers to the insured. The insurance policies obligate the insurers to pay on behalf of a policyholder "all sums" that the policyholder becomes legally obligated to pay as damages because of bodily injury during the policy period. We interpret this language to mean that once coverage is triggered, the insurer's obligation to the policyholder is to cover the policyholder's liability "in full" up to the policy limits. It is irrelevant that only part of the asbestos-related disease developed during any single policy period or during a period in which the manufacturer had no insurance. The logical consequence of this ruling is that the policyholder is covered (up to the policy limits) for the full extent of its liability and need not pay a pro rata share. ( *ACandS, Inc. v. Aetna Cas. and Sur. Co.*, [***55] *supra, 764 F.2d at p. 974*; *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at pp. 1047-1049*; *Zurich Ins. Co. v. Raymark Industries, supra, 514 N.E.2d at p. 165*; *J.H. France Refractories v. Allstate, supra, 626 A.2d 502, 508*; but see *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at p. 1058* (conc. opn. of Wald, J.).)

21 In phase IV, where the issue was the method of allocating indemnity and defense costs among multiple insurers pursuant to "other insurance" clauses, no insurer argued that the "other insurance" clauses apply to periods when the policyholder is self-insured. Indeed, most courts hold that "other insurance" refers only to another policy, not to self-insurance. (E.g., *Metro U.S. Services v. City of Los Angeles (1979) 96 Cal. App. 3d 678, 683 [158 Cal. Rptr. 207]*; *Universal Underwrit. Ins. Co. v. Marriott Homes, Inc. (1970) 286 Ala. 231 [238 So.2d 730, 732]*; *American Nurses Ass'n v. Passaic Gen. Hosp. (1984) 98 N.J. 82 [484 A.2d 670, 674]*; contra, *Aetna Casualty & Surety Co. v. Market Insurance Co. (Fla.Dist.Ct.App. 1974) 296 So.2d 555, 558*; see generally, Annot. (1986) 46 A.L.R.4th 707.) Thus, we construe the insurers' argument as one directed to the insurers' obligations to its insured and not as a challenge to the allocation formula governing the insurers' obligations to other insurers.

In any event, the trial court employed a hybrid method of allocation, taking into account both the time on the risk and the policy limits. Because the policy limits are an essential part of the trial court's apportionment formula, it would be virtually impossible to compute the policyholder's share of the losses for periods of no insurance. The *Keene* court so reasoned: "We have no authority upon which to pretend that Keene also has a 'self-insurance' policy that is triggered for periods in which no other policy was purchased. Even if we had the authority, what would we pretend that the policy provides? What would its limits be?" (*667 F.2d at pp. 1048-1049*; accord, *J.H. France Refractories v. Allstate, supra, 626 A.2d 502, 508*; contra, *Owens-Illinois, Inc. v. United Ins. Co., supra, 650 A.2d 974, 995.*)

[***56] We therefore affirm the trial court's decision in phase III relieving the policyholders from any responsibility to share in the loss for periods of no insurance.

b. *Obligations of Insurers Covering Multiple Tortfeasors on a Claim*

When a claimant was exposed to products of more than one manufacturer such that an asbestos manufacturer-policyholder is but one of several tortfeasors held liable to an injured victim, the question arises as to how

liability should be apportioned among the defendant-manufacturers, especially if the claimant was minimally exposed to one manufacturer's product and extensively exposed to another's.

No general statement can be made about the allocation of tort liability of multiple asbestos manufacturers. In some cases, the manufacturers may be held jointly and severally liable to the injured claimant, despite the claimant's relatively short period of exposure to a particular defendant's product. ( *Borel v. Fibreboard Paper Products Corporation (5th Cir. 1973) 493 F.2d* [*58] *1076* cert. den. *(1974) 419 U.S. 869 [42 L. Ed. 2d 107, 95 S. Ct. 127]*.) [22] In other cases, upon adequate proof of the claimant's varying exposures to different products, [***57] damages may be apportioned among the defendants. ( *Moore v. Johns-Manville Sales Corp. (5th Cir. 1986) 781 F.2d 1061*; [**712] see Prosser & Keeton on Torts (5th ed. 1984) § 52, p. 352; 3 Harper et al., The Law of Torts (2d ed. 1986), § 10.1, p. 1.) In some jurisdictions, the market share doctrine may be applied, at least where the claimant was exposed to fungible asbestos products ( *Wheeler v. Raybestos-Manhattan (1992) 8 Cal. App. 4th 1152 [11 Cal. Rptr. 2d 109]*), making the manufacturers only severally liable, based upon each manufacturer's share of the national market at the time of the plaintiff's exposure to the product. ( *Brown v. Superior Court (1988) 44 Cal. 3d 1049, 1072-1075 [245 Cal. Rptr. 412, 751 P.2d 470]*; *Sindell v. Abbott Laboratories (1980) 26 Cal. 3d 588 [163 Cal. Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061]*, cert. den. *(1980) 449 U.S. 912 [66 L. Ed. 2d 140, 101 S. Ct. 285]*.)

22 In California, as in many states, statutory modifications have been made to the doctrine of joint and several liability. Liability among concurrent tortfeasors for noneconomic damages is now several--proportionate to fault, not joint. ( *Civ. Code, § 1431.2, subd. (a)*.) The purpose of this change was to eliminate the unfairness of requiring a tortfeasor who was minimally culpable to bear all of the plaintiff's damages when the more culpable tortfeasor became insolvent. ( *Evangelatos v. Superior Court (1988) 44 Cal. 3d 1188, 1198 [246 Cal. Rptr. 629, 753 P.2d 585]*.)

[***58] It bears emphasizing that questions concerning the nature and extent of the *tort* liability of the asbestos manufacturers are not involved in this litigation. Those questions must be resolved in the underlying injury suits. The question here is the extent of the *indemnity* obligations of the insurers toward their policyholders. **(8b)** The contractual obligations of insurers to a single manufacturer-policyholder are separate and distinct from the tort liability of multiple asbestos manufacturers to an asbestos claimant. ( *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at p. 1051*; *Ins. Co. North America v. Forty-Eight Insulations, supra, 633 F.2d at p. 1225*.) No matter what the tort liability of an asbestos manufacturer--whether joint and several, proportionate to fault or proportionate to market share--the indemnity obligations of its insurers are as set forth in part 2.a above: to respond in full to the policyholder's liability obligations up to the policy's limits, subject to apportionment pursuant to "other insurance" clauses. (See *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at pp. 1050-1051, 1051 fn. 39*.)

**(11a)** The insurers, however, [***59] have raised a trigger question which arises when multiple asbestos manufacturers are held liable on a single claim and each manufacturer is insured by multiple, successive policies: For purposes [*59] of deciding which of a manufacturer-policyholder's successive policies cover the manufacturer's liability on the claim, is insurance coverage triggered if the claimant was first exposed to the policyholder's product *after* the insurer's policy had expired? That is, does an insurer have any indemnity obligation if the policyholder's product was not involved in the claimant's injury during the policy period? [23]

23 For purposes of our discussion, we assume that the claimant was exposed to a policyholder's product at some point. In most jurisdictions, an asbestos manufacturer will not be held liable unless the plaintiff proves, directly or circumstantially, actual exposure to the defendant's product. (See *Lineaweaver v. Plant Insulation Co. (1995) 31 Cal. App. 4th 1409, 1415-1419 [37 Cal. Rptr. 2d 902]*; *Mullen v. Armstrong World Industries, Inc. (1988) 200 Cal. App. 3d 250, 257-258 [246 Cal. Rptr. 32]*; *In re Hawaii Federal Asbestos Cases (9th Cir. 1992) 960 F.2d 806, 816-818*; *Bauer v. Raymark Industries, Inc. (2d Cir. 1988) 849 F.2d 790, 792-793*; *Roehling v. Nat. Gypsum Co. Gold Bond Bldg. (4th Cir. 1986) 786 F.2d 1225, 1228, fn. 5*; *Blackston v. Shook & Fletcher Insulation Co. (11th Cir. 1985) 764 F.2d 1480, 1482, 1485*; *Gideon v. Johns-Manville Sales Corp. (5th Cir. 1985) 761 F.2d 1129, 1144-1145*.) In other jurisdictions, under the market share doctrine, the plaintiff need not identify the manufacturer of the asbestos product; the burden of proof is shifted to the defendant-manufacturer to prove its product did not cause the plaintiff's injury. ( *Wheeler v. Raybestos-Manhattan, supra, 8 Cal. App. 4th 1152*; *Menne v. Celotex Corp. (10th Cir. 1988) 861 F.2d 1453, 1469*; see *Sindell v. Abbott Laboratories, supra, 26 Cal. 3d 588*.) Nevertheless, if the plaintiff was not exposed to the manufacturer's product, the manufacturer will not be liable.

We note, however, that the New York Court of Appeals has modified tort law principles of causation and held that a manufacturer may be held severally liable in proportion to its market share even if it can prove that its product did not contribute to the plaintiff's injury; only those defendants who can prove that they never participated in the marketing of the product for use by the class of injured victims are exculpated. ( *Hymowitz v. Eli Lilly and Co. (1989) 73 N.Y. 487 [541 N.Y.S.2d 941, 950*, 539 N.Ed.2d 1069], cert. den. *(1989) 493 U.S. 944 [107 L. Ed. 2d 338, 110 S. Ct. 350]* [DES case].)

Of course, new forms of liability created by statute or by judicial pronouncement come within the scope of liability covered by a CGL policy. ( *AIU Ins. Co. v. Superior Court (1990) 51 Cal. 3d 807, 822, fn. 8 [274 Cal. Rptr. 820, 799 P.2d 1253]*; *Travelers Ins. Co. v. Industrial Indem. Co. (1971) 18 Cal. App. 3d 628, 632 [96 Cal. Rptr. 191]*.) The question before us, however, is not whether the manufacturers' liability is covered but when coverage begins.

[***60] [**713] The trial court's trigger decision states that all of a policyholder's policies are triggered upon the claimant's exposure to *any* asbestos product. The effect of this decision is to trigger an insurer's indemnity obligations even if the claimant was not exposed to the policyholder's product until after the insurer's policy period had expired. For example, if a claimant was first exposed to asbestos products of manufacturer A in 1957 but was not exposed to manufacturer B's asbestos products until 1967, the trial court's decision would make policies insuring manufacturer B covering the period from 1957-1966 triggered: the 1957 policy by virtue of the claimant's exposure to asbestos and the 1958-1966 policies by virtue of the latent development of asbestos disease. (Policies insuring manufacturer B from 1967 to the date of claim or death would, of course, also be triggered by the continuous development of asbestos disease.)

[*60] In this respect, the trial court's decision runs counter to the decision in *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d 1034*. After concluding that insurance coverage is continuously triggered from the point of exposure to the [***61] point of manifestation, and after concluding that each successive insurer must indemnify the policyholder in full, subject to apportionment under the "other insurance" provisions, the *Keene* court went on to hold that an insurance company has no liability if it can prove that the claimant was not exposed to the manufacturer-policyholder's product either during the policy period or before the policy period. "If a victim sues more than one asbestos-product manufacturer, it may be impossible to prove which company's products were used at which time. If so, it will be impossible to prove that exposure to Keene's products--as opposed to those of another manufacturer--occurred during a particular time period. In such a case, there should be a presumption that throughout the victim's period of exposure to asbestos he or she was exposed to Keene's and the other manufacturers' products. The insurer defending Keene in the underlying tort suits may then try to show that Keene's products could not have been involved for certain years. Similarly, if a suit arises to resolve the allocation of insurance liability, any insurance company can try to prove that there was no inhalation of Keene's asbestos [***62] during or before its policy period. If an insurance company does so, then that company will be free of liability." ( *Id. at p. 1052*.)

Although the above quoted portion of the *Keene* decision purports to pertain to the allocation of liability among insurers, it effectively serves to qualify the trigger of coverage. The *Keene* court held that there is no coverage unless the injury resulted from exposure to the policyholder's products. "If [there was no inhalation of Keene's asbestos during or before an insurer's policy period], then that company will be free of liability." (667 F.2d at at p. 1052.) Indeed, despite its rejection of the exposure theory for purposes of triggering coverage, the *Keene* court recognized that the time of the claimant's exposure to the policyholder's products is relevant to the trigger of coverage: "[The full extent of the claimant's exposure to asbestos] is essential to determining which policies cover Keene's liability." (*Id.* at at p. 1051.)

On this point, the *Keene* court cited and followed the decision in *Ins. Co. North America v. Forty-Eight Insulations, supra, 633 F.2d 1212*, even though *Forty-Eight Insulations* had [***63] applied an exposure trigger. ( *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at p. 1052, fn. 42*.) In *Forty-Eight Insulations*, the court recognized the basic contract principle that an insurance policy provides coverage only for injuries resulting from the policyholder's own products, and the court concluded that "where an insurer can [*61] show that no exposure to asbestos manufactured by its insured took place during certain years, then that insurer cannot be liable for those years. The reason is simple: no bodily injury *resulting from Forty-Eight's products*, took place during the years in question." (*633 F.2d at p. 1225*, italics in original.) At the same time, the court in *Forty-Eight Insulations* held that in asbestos cases, because of the difficulties of proof, each asbestos manufacturer's products should be presumed to be involved upon a claimant's exposure to asbestos, but an insurer is entitled to show that the claimant was not exposed to its manufacturer-policyholder's [**714] products. ( *Id. at 1225-1226, fn. 27*.)

Both *Forty-Eight Insulations* and *Keene* instruct that an insurance policy is not triggered if the claimant's exposure to the [***64] manufacturer-policyholder's products took place *after* the policy period. [24] Even though coverage is triggered continuously, upon exposure, upon manifestation, and upon exposure-in-residence, it is not enough to trigger coverage that the claimant experienced some asbestos-related injury during a policy period; the injury must have resulted from exposure to the policyholder's products. In the hypothetical example given above, then, the policies insuring manufacturer B would not be triggered until 1967, the date of the claimant's first exposure to B's products. B's policies in effect before 1967 would not be triggered on the claim, despite the claimant's earlier exposure to manufacturer A's products in 1957, as there was no injury from B's products until 1967. (Of course, B's policies in effect from 1967 onward, to the date of the claimant's death or claim, would be triggered by virtue of the progressive development of the disease, even if exposure ceased in 1967.)

24 Language in *Montrose* supports our conclusion. In describing the continuous trigger, the *Montrose* court observed that the timing of the event or conditions causing the injury or damage is largely immaterial: "it can occur *before or during* the policy period." (*10 Cal. 4th at p. 675*, italics added.) We construe this language to mean that exposure to hazardous conditions *after* the policy period will not trigger coverage.

[***65] We think this conclusion is sound. The language of the CGL policies reflects the requirement of a causal connection between the claimant's injury and the policyholder's conduct. The insurance policies obligate the insurer to pay all sums "which the insured shall become legally obligated to pay as damages because of bodily injury . . . caused by an occurrence." An "occurrence" is defined as injurious exposure to conditions "which results during the policy period in bodily injury . . . ." When a claimant was not exposed to the insured's products until after the policy had ended, the causal connection is missing. If there is bodily injury during the policy period due to exposure to another manufacturer's products, the insured does not become liable "because of" such bodily injury. The insured does not become liable *at all* unless and until there is an exposure to its own products. It is only [*62] "because of" the bodily injury caused by the later exposure to the insured's products that the insured becomes "legally obligated to pay" damages. As a matter of common sense, an ordinary lay reader would not understand the policy provisions to extend coverage to damages arising from [***66] conduct that took place after the policy had expired. [25] (Contra, *Stonewall Ins. Co. v. Asbestos Claims Management, supra, 73 F.3d 1178, 1200-1201*, finding policy ambiguous and holding policies triggered on exposure to asbestos generally.)

25 Throughout our discussion we have referred to the claimant's "contact with" or "exposure to" the policyholder's products, for in this case the policyholders' wrongful conduct, upon which their underlying liability is based, consists of exposing the asbestos victims to hazardous products. (Fn. 23, *ante.*) The parties have neither raised nor briefed the question of trigger of coverage when the underlying liability is established in a jurisdiction such as New York, where a manufacturer may be held liable in proportion to its market share despite proof that the claimant was not exposed to its products. We express no opinion on that question. We hold only that coverage is not triggered if the policyholder's liability-producing conduct took place after the policy expired.

[***67] Thus, in our hypothetical example, if a manufacturer is held liable to a claimant who was exposed to the products of other manufacturers in 1957 and who was exposed to the manufacturer-policyholder's products in 1967, the manufacturer's legal liability would be "because of" that *later* exposure to its own products, not because of the 1957 exposure. Hence, policies in effect before 1967 would not be triggered on the claim. To construe the policy language otherwise so as to trigger coverage upon exposure to any asbestos product could have the absurd result of triggering policies in effect before the manufacturer-policyholder ever manufactured asbestos products.

**(12a)** In the present case, the trial court's trigger decision fails to acknowledge this point. The decision creates in effect an irrebuttable presumption that all of an asbestos manufacturer's policies are triggered by a claim of injurious exposure to any asbestos product. We agree with *Keene* and *Forty-Eight Insulations* [**715] that an insurer is entitled to rebut that presumption and show that its policy was not triggered because the claimant was first exposed to its manufacturer-policyholder's products after the policy period [***68] had expired.

**(11b)** We therefore modify the judgment to read that a policyholder's policies are triggered from the claimant's first exposure to the policyholder's products. An insurer has no liability if its policy expired before the claimant was exposed to the policyholder's product. **(12b)**We emphasize, however, that pursuant to *Keene* and *Forty-Eight Insulations* the claimant will be presumed to have been exposed to asbestos products of all defendant-manufacturers, and the burden is on the insurer to prove that the claimant [*63] was not exposed

to its policyholder's product before or during the policy period.

We reiterate, too, our affirmance of the trial court's continuous trigger decision: all of a policyholder's policies are triggered from first exposure to the policyholder's products until the date of claim or death, whichever occurs first. Thus, coverage is triggered if either (1) the claimant was exposed to the manufacturer's products during the policy period or (2) the claimant was exposed to the manufacturer's products at an earlier time such that during the policy period the claimant was experiencing latent asbestos injury from that earlier exposure.

**(13)** In seeking to [***69] justify the imposition of liability upon an insurer which was on the risk before the claimant was exposed to the policyholder's product, the policyholders contend the insurer's liability should parallel the "joint and several" liability of the manufacturers. Although one court has said as much ( *ACandS, Inc. v. Aetna Cas. and Sur. Co., supra, 764 F.2d at p. 974*), we think this reasoning is faulty. First, as already noted at the beginning of this section, the liability of the manufacturers is not necessarily joint and several. Second, this is a trigger issue; we are not concerned with apportionment of liability. Whether the liability of the manufacturers is joint and several, proportionate to fault, or proportionate to market share, the contractual obligation of an insurer to indemnify the manufacturer-policyholder, to pay "all sums" which its policyholder becomes legally obligated to pay, arises only if coverage is triggered. And coverage is triggered only if the claimant was exposed to the policyholder's product either before or during the policy period.

In summary, we affirm the trial court's continuous trigger decision, and we affirm the trial court's allocation of indemnity [***70] and defense costs among the insurers, including the decision relieving policyholders from bearing a share of the loss for periods of no insurance. But we modify the first sentence of paragraph 8 of the judgment to read that all of a policyholder's policies that were in effect from the date of the claimant's first exposure to the policyholder's asbestos product until the date of death or claim, whichever occurs first, are triggered on an asbestos-related bodily injury claim, but the claimant is presumed to have been exposed to all defendant-manufacturers' asbestos products, and the burden is on the insurer to prove that the claimant was not exposed to its policyholder's product before or during the policy period.

B. "NEITHER EXPECTED NOR INTENDED"

**(14a) (15a)** In phase III of the proceedings, the trial court was called upon to interpret the phrase "neither expected nor intended," which appeared [*64] in the standard CGL policy definition of an occurrence: " 'Occurrence' means an accident, including injurious exposure to conditions, which results during the policy period, in bodily injury . . . neither expected nor intended from the standpoint of the insured." The trial court determined [***71] that the phrase applies to exclude coverage "where the insured acted either wilfully, intentionally, or maliciously for the purpose of causing injury."

In phase IV, two insurers of Armstrong, Commercial Union and Travelers, argued that their policies provided no coverage for the claims of asbestos-related injuries because Armstrong expected or intended bodily injury resulting from exposure to asbestos. The trial court, however, rejected the argument and, applying its earlier test, found that [**716] Armstrong did not act for the purpose of causing injury. Hence, the court found the injuries from exposure to asbestos were neither expected nor intended by Armstrong.

Commercial Union appeals and challenges the trial court's interpretation of the policy language, arguing that the trial court's interpretation focuses only on the term "intended" and fails to give effect to the term "expected." The distinction between intended and expected takes on significance because Commercial Union's policy (issued by its predecessor, Employers' Liability Assurance Corporation (ELAC)), being an excess policy to the underlying policy of Continental Casualty, followed the form of that Continental manuscript [***72] policy whose language differed from the standard form policy language and defined occurrence as follows: "The term 'Occurrence' means an event or continuous or repeated exposure to conditions, which *unexpectedly* causes Personal Injury and/or Property Damage and/or Advertising Liability during the policy period. . . ." (Italics added.) (That is, in lieu of the standard phrase "neither expected nor intended," the policy used the term "unexpectedly.")

The Commercial Union policy was in effect from January 1, 1966, to January 1, 1969. Commercial Union contends that by 1966 Armstrong officials were well aware of asbestosis and other problems associated with inhalation of asbestos. In the view of Commercial Union, because Armstrong knew of the injurious effects of asbestos, the current claims for asbestos-related injuries are not claims for "unexpected" injuries and therefore are not covered, even though Armstrong may not have intended to cause the injuries.

1. *Facts*

The corporation now known as Armstrong World Industries, Inc. (hereafter Armstrong) began operating in the 1800's as a cork company and has a [*65] long history as a manufacturer of cork products, including [***73] L.T. Cork Covering, a low temperature insulation. That product had a paper backing and in 1956, after an episode in which the paper had burned, the decision

was made to include asbestos in the paper backing. From 1956 to 1959, Armstrong manufactured this asbestos-containing product.

The asbestos in L.T. Cork Covering was not friable; it was bonded into the paper. The record reveals that Armstrong officials believed L.T. Cork Covering was not a harmful product because it was not dusty. In fact, the cases now pending against Armstrong involving L.T. Cork Covering are relatively few, and in those cases Armstrong is a peripheral defendant. In 1959 Armstrong discontinued the manufacture and sale of L.T. Cork Covering and replaced it with Armaflex, a new insulation product that did not contain asbestos. [26]

26 Because most claims filed against Armstrong for asbestos-related injuries involve insulation workers, the focus of the trial was on Armstrong's insulation products. In addition, Armstrong also manufactured floor tiles, which until 1983 contained asbestos. Again, the asbestos was not friable; it was bonded into the tiles. And until 1984, Armstrong manufactured an asbestos-containing gasket used for automotive purposes. The phase IV record does not indicate whether any bodily injury claims have arisen from these products. (Note that the floor tiles are involved in the phase V dispute over property damage.)

[***74] In the manufacturing operations, Armstrong's safety supervisor was concerned with the inhalation of dust, especially silica dust, which was known to cause silicosis. The manufacturing plants were kept well ventilated, and in the areas where sacks of asbestos (or other dusty material) were opened and dumped into a hopper for mixing into a product, a suction device was used to draw the dust away from the workers. Respirators were also made available, although they were seldom, if ever, used, as they were bulky and uncomfortable. Employees were given regular chest X-rays, and any employee with a sign of lung disease was transferred to another area of the plant. Actually, Armstrong has received relatively few claims for asbestos-related injuries arising from its manufacturing operations.

Most claims stem from Armstrong's insulation installation business. Armstrong began in the 1940's installing various asbestos-containing insulation products which were manufactured by other companies. In some cases Armstrong's name was placed on the insulation, [**717] but Armstrong did not manufacture the insulation.

For its manufacturing operations, Armstrong employed a staff of permanent employees, but [***75] for its insulation installation business, Armstrong used temporary workers, hired from the union hall, for each job. A job might last [*66] a week; it might last a year. Different insulation products were used on different jobs. It is not entirely clear from the record what precautions were taken with respect to the insulation workers. Because the insulation installations were performed on the owners' property, Armstrong had less control over working conditions. Respirators were apparently available, but not frequently used, except when using a spray-on product.

Armstrong received its first workers' compensation claim for an asbestos-related injury in 1952, from an insulation installer. The worker had worked for many different insulation installation companies, but had worked for Armstrong for only 2 weeks. The claim was dismissed as to Armstrong. During the 1960's, the number of workers' compensation claims from insulation installers for asbestos-related injuries substantially increased. Yet, about half of the workers' compensation claims filed against Armstrong were eventually dismissed.

In 1958 Armstrong was restructured so that its installation business became a subsidiary, [***76] Armstrong Contracting and Supply Company. In the late 1960's, Armstrong decided to focus its business on home furnishings rather than commercial installations, and it sold the subsidiary in 1969.

One of the asbestos-containing products used by Armstrong Contracting and Supply was a spray-on insulation called Limpet, which was manufactured in England. (A spray-on product is probably the most dangerous because the asbestos particles are sent directly into the air.) By the 1960's, Limpet was becoming expensive (due to import duties) and difficult to obtain in sufficient quantities. Moreover, the workers were not happy with the dustiness of the product. Hence, Armstrong Contracting and Supply asked its parent company, Armstrong, to come up with an alternative product, and in 1967 Armstrong began to manufacture Armaspray, a spray-on asbestos insulation. Armstrong sold it only to its subsidiary, Armstrong Contracting and Supply Company, as a test product. Ultimately, the product was deemed a failure, and it was discontinued in December 1968, although the inventory continued to be used by Armstrong Contracting and Supply into 1969 to finish jobs in progress. By that time, too, Armstrong [***77] Contracting and Supply was sold. According to the testimony, the decision to discontinue Armaspray was based not on health concerns, but on the lack of sales.

Armaspray was only 9 percent asbestos, in contrast to Limpet, which was nearly 100 percent asbestos. Armstrong's manufacturing policy called for safety testing of a product before manufacture, and Armaspray passed the [*67] health and safety examination given it by Arm-

strong's industrial hygienists. Yet, in fact, no tests had been done to determine the airborne dust levels during use of the product. Not until 1968, after a meeting with Dupont, one of Armstrong's major customers for insulation installations, did Armstrong undertake its first tests of Armaspray to determine the dust count. But by December 1968 Armstrong had stopped manufacturing Armaspray. Test results that came in after Armaspray had been discontinued showed dust levels more than 10 times the acceptable limit.

The first asbestos-related lawsuit was filed against Armstrong in 1970, *Borel v. Fibreboard, supra*, in which Armstrong was one of the many named defendants. By 1987, the time of the phase IV trial, Armstrong had been sued by over 60,000 [***78] plaintiffs. Nearly all cases involve Armstrong's contract insulation installations. Some plaintiffs were Armstrong's own workers. (Not all states make workers' compensation benefits an exclusive remedy.) Some were workers at the job sites where the insulation work was done. Others were household members exposed to the dust on a worker's clothes.

2. *The Trial Court's Decision*

In phase III, the trial court ruled in part as follows on the meaning of the "neither [**718] expected nor intended" CLAUSE: "This Court determines that the 'neither expected nor intended' clause applies where the insured acted either wilfully, intentionally, or maliciously for the purpose of causing injury. (See *U.S Fid. & Guar. Co. v. American Employers Insurance Co. (1984) 159 Cal. App. 3d 277 [205 Cal. Rptr. 460].*) The intent behind the act in question must involve an element of wrongfulness or misconduct. (*Mullen* [v. *Glens Falls Ins. Co.* (1977)] *73 Cal. App. 3d [163,] 171 [140 Cal. Rptr. 605].*)

"

"One final clarification on the standard is in order. An insurer is not required to produce express testimony or documentation as to an insured's subjective, wrongful intent to cause [***79] injury, but may show that reason mandates that by the very nature of the act undertaken, coupled with the knowledge actually in possession of the insured, harm must have been intended. [Citation.] This clarification accords with the language of the policy, which speaks in terms of what *was* 'expected or intended,' and not in terms of what *should have been* 'expected or intended.' It further accords with the general duty and right of courts to make determinations based on circumstantial evidence and inferences, as well as determinations drawn directly from the evidence." (Italics in original.)

After the trial in phase IV, the trial court concluded that "the evidence presented by Commercial Union does not satisfy [the phase III] standard. . . . that the insured acted wilfully, intentionally, or maliciously *for* [*68] *the purpose of causing injury*. Here, the Court finds that Armstrong did not act for the purpose of causing injury." (Italics in original.) [27]

27 In phase III, the trial court determined that because the effect of the "neither expected nor intended" clause was to limit coverage, the burden was on the insurer to prove the injury was expected or intended. In phase IV, the trial court explained that it would have found that Armstrong did not act for the purpose of causing injury even if the burden of proof had been upon the insured.

[***80] 3. *Discussion*

Prior to 1966, standard liability policies covered injuries "caused by accident." The words "caused by accident" served to exclude coverage for wilful acts of the insured. (1 Long, *The Law of Liability Insurance (1993) § 1.08[1].*) Beginning in 1966, however, the standard policy language was changed to provide coverage for injuries "caused by an occurrence" so long as the injuries were "neither expected nor intended from the standpoint of the insured." (See *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th 645, 671-672.*)

The meaning of the phrase "neither expected nor intended" has been a puzzle for the courts around the country, and the courts have given it varying interpretations. Some find the phrase "neither expected nor intended" to be ambiguous. Other courts do not. Some courts find the terms "expected" and "intended" to have separate meanings. Others find them to be synonymous. Some courts employ a subjective standard (the insured actually expected), while others employ an objective standard (the insured should have expected). It is difficult to find a clear trend in the law. (See Keeton & Widiss, Insurance Law (1988) § 5.4(d)(1) [***81] & (2), pp. 518-524; 1 Long, *op. cit. supra*, § 1.08[2][b]; Annot. (1984) 31 A.L.R.4th 957.) As we will explain below, we give the phrase its plain meaning and construe "expected" to mean an actual awareness that harm was practically certain even though harm was not intended.

a. *High Probability*

Several courts in other jurisdictions have construed "expected" within the phrase "neither expected nor intended" TO MEAN A HIGH DEGREE OF PROBABILITY: " 'The term "expected" when used in association with "intended" carries the connotation of a high degree of certainty or probability . . . ' "practically [to] equate with "intended" . . . .' " ( *Patrons-Oxford Mut. Ins. Co. v. Dodge (Me. 1981) 426 A.2d 888, 891*, quoting from *State Farm Fire & Casualty Company v. Muth*

*(1973) 190 Neb. 248 [190 Neb. 272, 207 N.W.2d 364, 366].*) [*69]

In *Patrons-Oxford, supra*, the court found the phrase "neither expected nor intended" [**719] ambiguous and construed it against the insurer. Accordingly, the court interpreted the word "expected" so as not to enlarge the exclusion of coverage. Other courts have adopted substantially similar interpretations by examining the ordinary (dictionary) [***82] definition of "expect." ( *Indiana Farmers Mut. Ins. Co. v. Graham (Ind.Ct.App. 1989) 537 N.E.2d 510, 512* ["the insured acted although he was consciously aware that the harm caused by his actions was practically certain to occur"]; *Brown Foundation v. St. Paul Ins. Co. (Ky. 1991) 814 S.W.2d 273, 278* [the insured "subjectively foresaw as a practically certain or expected-to-be result of the conduct"]; *Quincy Mut. Fire Ins. Co. v. Abernathy (1984) 393 Mass. 81, 469 N.E.2d 797, 800]* [the insured "knew to a substantial certainty that the bodily injury would result"]; *United Services Auto. Ass'n v. Elitzky (1986) 358 Pa.Super. 362, 517 A.2d 982, 991]* ["the insured acted even though he was substantially certain that an injury . . . would result"]; and see *Bay State Ins. Co. v. Wilson (1983) 96 Ill.2d 487 [71 Ill.Dec. 726, 451 N.E.2d 880, 883]* [the insured was "consciously aware that . . . injuries were practically certain to be caused by his conduct"]; *Farmers Union Oil v. Mutual Service Ins. (Minn.Ct.App. 1988) 422 N.W.2d 530, 533* [the insured subjectively "knew of the substantial risks involved, proceeded in light of this knowledge, and disregarded [***83] the known hazard"]; see also Keeton & Widiss, Insurance Law, op. cit. supra, § 5.4(e)(2), at p. 535.)

**(1b)** In California, the fundamental principle guiding judicial interpretation of insurance policy language is that words must be construed in their ordinary and popular sense unless the parties intended a special or technical sense. ( *Civ. Code, § 1644*; *AIU Ins. Co. v. Superior Court, supra, 51 Cal. 3d at pp. 821-822.*) **(16)** The plain and ordinary meaning of "expect," as reflected in dictionary definitions, is to anticipate, to consider probable or certain. [28] Hence, in *Shell Oil Co. v. Winterthur Swiss Ins. Co. (1993) 12 Cal. App. 4th 715 [15 Cal. Rptr. 2d 815]*, this court concluded that "expected," as used in the language of insurance policies, means anticipation with a high degree of probability, no matter whether the degree of that probability is expressed as "substantially certain, practically certain, highly likely, or highly probable." ( *Id. at p. 746.*)

28 "Expect" is given the following dictionary definitions: "TO LOOK FORWARD: look with anticipation . . . : to look forward to; *specify.*: to anticipate the occurrence of . . .: to consider probable or certain . . . ." (Webster's New International Dict. (3d ed. 1965) p. 799); "to look forward to (an event), regard (it) as about to happen; to anticipate the occurrence of (something whether good or evil)" (5 Oxford English Dict. (2d ed. 1989) p. 556); "1. To look forward to the probable occurrence or appearance of. 2. To consider likely or certain" (American Heritage Dict. (2d college ed. 1982) p. 476).

[***84] [*70] b. *Subjective Awareness*

**(14b)** In *Shell Oil*, the jury had been instructed that " 'the exclusionary word "expected" denotes that the actor knew or should have known that there was a substantial probability that certain consequences would result from his or her acts or omissions.' " (*12 Cal. App. 4th at p. 743.*) The appellate court rejected the objective (should have known) standard, holding instead that the appropriate inquiry is what the insured *actually* knew or believed. ( *Id. at pp. 746-748*; see also *Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal. 4th 1, 17 [44 Cal. Rptr. 2d 370, 900 P.2d 619]*; *Titan Corp. v. Aetna Casualty & Surety Co. (1994) 22 Cal. App. 4th 457, 468 [27 Cal. Rptr. 2d 476]*.)

This interpretation conforms to a line of product liability cases in which the California courts have held that an injury is excluded from coverage only if the insured knew of the defects. The rationale underlying these product liability cases seems to be that if the insured knew of the defects the insured also knew that injuries were practically certain to occur and, hence, the injuries were expected: "[T]o bar third party liability coverage, the defect [***85] causing the postsale damage must have been *known* to Chu or their agents before the units were sold . . . ." ( *Chu v. Canadian Indemnity Co. (1990) 224 Cal. App. 3d 86, 97 [274 Cal. Rptr. 20]*, italics in original.) "As previously discussed, the purpose of third party liability insurance is to [**720] protect the insured against injuries to third parties neither expected nor intended by the insured. To the extent Chu knew of extant defects pre-sale, any injuries flowing therefrom would not be an unexpected or unintended consequence of selling defective units. . . . [P] However, if Chu did not have pre-sale knowledge of the defect, any injuries suffered would be an unexpected or unintended consequence of selling the units." ( *Id., at pp. 98-99*; see also *Hogan v. Midland National Ins. Co. (1970) 3 Cal. 3d 553, 560 [91 Cal. Rptr. 153, 476 P.2d 825]*; *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co. (1959) 51 Cal. 2d 558, 563-564 [334 P.2d 881]*; *Economy Lumber Co. v. Insurance Co. of North America (1984) 157 Cal. App. 3d 641, 648 [204 Cal. Rptr. 135]*.)

Several out-of-state courts have similarly concluded a subjective test should be employed to determine whether [***86] the injury was intended or expected. (

*Stonewall Ins. Co. v. Asbestos Claims Management, supra, 73 F.3d 1178, 1205*; *Broderick Inv. Co. v. Hartford Acc. & Indem. Co. (10th Cir. 1992) 954 F.2d 601, 605-606*, cert. den. *506 U.S. 865 [121 L. Ed. 2d 133, 113 S. Ct. 189]*; *City of Johnstown v. Bankers Standard Ins. (2d Cir. 1989) 877 F.2d 1146, 1151, fn. 1; Hatco Corp. v. W.R. Grace & Co.--Conn. (D.N.J.* [*71] *1992) 801 F. Supp. 1334, 1375-1376*; *Indiana Farmers Mut. Ins. Co. v. Graham, supra, 537 N.E.2d at p. 512*; *Brown Foundation v. St. Paul Ins. Co., supra, 814 S.W.2d at pp. 278-279*; *Patrons-Oxford Mut. Ins. Co. v. Dodge, supra, 426 A.2d 888*; *Quincy Mut. Fire Ins. Co. v. Abernathy, supra, 469 N.E.2d at p. 800*; *Queen City Farms v. Central Nat. Ins. Co. (1994) 126 Wn.2d 50 [882 P.2d 703, 712-714]*; and see *Farmers Union Oil v. Mutual Service Ins., supra, 422 N.W.2d at p. 533*; *United Services Auto. Ass'n v. Elitzky, supra, 517 A.2d at p. 991*.)

The courts have used various approaches to reach that conclusion. In *Patrons-Oxford Mut. Ins. Co. v. Dodge, supra, 426 A.2d 888*, the court found the phrase "neither [***87] expected nor intended" to be ambiguous and therefore construed the phrase against the insurer. In *United Services Auto. Ass'n v. Elitzky, supra, 517 A.2d at page 991*, the court focused on the ordinary, dictionary definitions of "expected": "Each of these definitions connotes an element of conscious awareness by the insured. None of them defines expected as events the insured should have known about." (See also *Indiana Farmers Mut. Ins. Co. v. Graham, supra, 537 N.E.2d at p. 512* ["Nothing in the definition of 'expected' excludes harm that the insured 'should have anticipated.' "].)

Other courts have focused on the language of the exclusionary clause: "neither expected nor intended *from the standpoint of the insured*." As one court put it, "The policies here state that the insurer has a duty to indemnify or defend the insured for damage if the damage was neither expected nor intended from the standpoint of the insured. They do not say from the standpoint of a reasonable person." ( *Brown Foundation v. St. Paul Ins. Co., supra, 814 S.W.2d at p. 279*.)

Other courts have rejected an objective standard because such a standard would extend the exclusionary clause [***88] to exclude coverage even for negligence--the very risk the insured sought coverage for. "We are also fearful that an exclusion of injuries the insured 'should have anticipated' might exclude from coverage, not only intentional injuries but also those caused by negligence." ( *United Services Auto. Ass'n v. Elitzky, supra, 517 A.2d at p. 991*; see also *Queen City Farms v. Central Nat. Ins. Co., supra, 882 P.2d at pp. 712-713*; *Grange Mutual Casualty Company v. Thomas (Fla.Dist.Ct.App. 1974) 301 So.2d 158, 159* [declining to differentiate "expected" from "intended" because to do so would exclude coverage for gross negligence].)

In the *Shell Oil* decision, the court took this approach and reasoned in part that the objective standard would deny coverage for mere negligence: "By [*72] testing what Shell should have known, the instructions invited denial of coverage for conduct within the realm of negligence . . . ." (*12 Cal. App. 4th at p. 748*.)

That decision finds support in *Chu v. Canadian Indemnity Co., supra, 224 Cal. App. 3d 86*, where the insured was aware of certain construction defects in the condominium units at the time of sale, but other defects [***89] manifested themselves later. The insurer argued that coverage [**721] should be denied for the postsale defects, as they were the inevitable result of the known defects. The appellate court rejected the insurer's argument and held that "third party liability coverage was not barred merely because Chu 'should have discovered' the defect but negligently failed to do so." (*224 Cal. App. 3d at p. 97*; see also *Fire Ins. Exchange v. Abbott (1988) 204 Cal. App. 3d 1012, 1021 [251 Cal. Rptr. 620]* ["We assume that the [phrase] '. . . neither expected nor intended by the insured' excludes from insurance coverage only conduct by the insured which was subjectively intended to harm or injure."].)

The *Chu* court reasoned that if the insured was actually ignorant of the defects, denial of coverage on account of a negligent failure to investigate would defeat the very purpose of third party liability coverage: "[I]f Chu did not have pre-sale knowledge of the defect, any injuries suffered would be an unexpected or unintended consequence of selling the units. This is the case even though Chu may have had notice of facts which would incite investigation by a reasonably prudent person, but nevertheless [***90] negligently failed to investigate and obtain actual knowledge of the existence of such defects. [Citation.] Since a major purpose of third party liability insurance is to protect the insured from claims for negligence ( *Garvey v. State Farm Fire & Casualty Co.*, *supra*, 48 Cal. 3d 395, 407-408 . . .), Chu's third party coverage is not forfeited merely because they should have known of the existence of defects but negligently failed to discover such defects." (*224 Cal. App. 3d at p. 99*.) "In reviewing the pertinent authorities, we find no cases denying third party liability coverage to an insured who sold property when he 'should have known' of the defect, but who through negligence was actually ignorant of the defect." ( *Id., at pp. 99-100*.)

We are persuaded by the *Chu* court's reasoning, and we apply it here. In our view, imposing a "should have known" standard on insureds would defeat the essential purpose of insurance agreements. What is expected or intended is different from that which was reasonably foreseeable or which should have been known. An insurance policy exclusion from manufacturing activities which carry a risk of causing environmental harm, al-

though not [***91] known or intended to cause harm in the insured's business conduct, would [*73] create an exclusion swallowing the entire purpose of insurance protection for unintended consequences. Insurance is purchased and premiums are paid to indemnify the insured for damages caused by accidents, that is, for conduct not meant to cause harm but which goes awry. The insured may be negligent indeed in failing to take precautions or to foresee the possibility of harm, yet insurance coverage protects the insured from his own lack of due care. If coverage is lost for damage which a prudent person should have foreseen, there would be no point to purchasing a policy of liability insurance.

c. *"Expected" Differentiated from "Intended"*

**(15b)** In the *Shell Oil* case some insurance policies did not contain the exclusionary phrase "neither expected nor intended." The court therefore had to decide whether *Shell's* environmental pollution came within the statutory exclusion for "wilful" acts ( *Ins. Code, § 533*). [29] The court concluded that a "wilful" act extends beyond an act which causes harm that the insured intended and encompasses as well an act which causes harm that the insured expected: [***92] "A 'wilful act' under *section 533* must also include a deliberate, liability-producing act that the individual, before acting, expected to cause harm. Conduct for which the law imposes liability, and which is expected or intended to result in damage, must be considered wrongful and willful. Therefore, *section 533* precludes indemnification for liability arising from deliberate conduct that the insured expected or intended to cause damage." ( *Shell Oil Co. v. Winterthur Swiss Ins. Co., supra, 12 Cal. App. 4th 715, 743.*)

29 *Insurance Code section 533* provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but [the insurer] is not exonerated by the negligence of the insured, or of the insured's agents or others."

[**722] By implication, then, the *Shell Oil* court acknowledged that "expected" injuries are different from "intended" injuries in that the insured may expect injuries--believe them to be substantially certain to occur--without having the express purpose of causing [***93] damage. (See also *12 Cal. App. 4th at p. 745.*)

Good reasons exist for excluding injuries that are expected though they are not intended. **(17)** "[O]rdinarily insurance does not provide indemnification for the type of economic detriments that occur so regularly that they are commonly regarded as a cost, rather than as an insurable risk, of an enterprise or activity. Closely associated with this basic principle is the view that it is fundamentally inconsistent with the legitimate purpose of an insurance arrangement for one to seek to use it as protection against calculated risks . . . ." (Keeton & Widiss, Insurance Law, *op. cit. supra*, § 5.4(e), pp. 534-535.) " 'If the single insured is allowed through *intentional or* [*74] *reckless* acts to consciously control the risks covered by the policy, a central concept of insurance is violated.' " ( *Farmers Union Oil v. Mutual Service Ins., supra, 422 N.W.2d at p. 533*, quoting from *Bituminous Cas. Corp. v. Bartlett (1976) 307 Minn. 72 [240 N.W.2d 310, 313]* overruled on other grounds, *Prahm v. Rupp Const. Co. (Minn. 1979) 277 N.W.2d 389, 391*; italics added; see also *City of Carter Lake v. Aetna Cas. and Sur* [***94] . *(8th Cir. 1979) 604 F.2d 1052, 1059* [where insured took calculated risk that damage would occur and elected to proceed, the results were not accidental]; 7A Appleman, Insurance Law & Practice, *op. cit. supra*, § 4492.01, p. 21.)

**(15c)** Several out-of-state courts have determined that the two words "expected" and "intended" within the phrase "neither expected nor intended" language cannot be treated as synonymous. These courts have reasoned that the purpose of adding the phrase "neither expected nor intended from the standpoint of the insured" was to broaden the class of excluded injuries beyond intentional injuries. ( *Patrons-Oxford Mut. Ins. Co. v. Dodge, supra, 426 A.2d at pp. 890-891*; *Farm Bureau Town & Country Ins. v. Turnbo (Mo.Ct.App. 1987) 740 S.W.2d 232, 236*; *United Services Auto. Ass'n. v. Elitzky, supra, 517 A.2d at p. 990*; see Keeton & Widiss, Insurance Law, *op. cit. supra*, § 5.4(e)(4), p. 538; *id.*, § 5.4(g), pp. 544-545; 7A Appleman, *op. cit. supra*, § 4491, pp. 3-4.) Accordingly, the courts have concluded that unless the terms are given different meanings, "expected" would serve no purpose within the exclusionary clause. (*Bay State* [***95] *Ins. Co. v. Wilson, supra, 451 N.E.2d at p. 882*; *Aetna Cas. & Sur. Co. v. Freyer (1980) 89 Ill.App.3d 617 [44 Ill.Dec. 791, 411 N.E.2d 1157, 1159]*; *Indiana Farmers Mut. Ins. Co. v. Graham, supra, 537 N.E.2d at p. 512*; *Steelman v. Holford (Mo.Ct.App. 1989) 765 S.W.2d 372, 377 [765 SW2d 372]*; *Farm Bureau Town & Country Ins. v. Turnbo, supra, 740 S.W.2d at p. 236.*)

In dictum, this court, too, has observed that the inclusion of the term "expected" within the policy language renders the exclusionary clause broader than the exclusion for intentional or wilful acts. (See *United Pacific Ins. Co. v. McGuire Co. (1991) 229 Cal. App. 3d 1560, 1566, fn. 2 [281 Cal. Rptr. 375].*)

**(14c) (15d)** In light of these authorities, we conclude that in the present case the exclusion within the Commercial Union policy for "unexpected" injuries applies to injuries that the insured subjectively knew or believed to be practically certain to occur even though the insured did not act for the purpose of causing injury. The trial court correctly used a subjective standard, but the court failed to differentiate "expected" from "in-

tended" and did not consider whether Armstrong, the insured, [***96] though not intending to cause [*75] injury, expected the injuries because it knew of the hazards of asbestos and was aware of the substantial probability of harm from its manufacture and sale.

Armstrong contends that the insurers' arguments come too late because the insurers failed to alert the trial court to the distinct language of the Continental policy. This contention, however, is not persuasive. The trial court expressly acknowledged that one argument before it, advanced by some insurers, was that "the term 'expected' must be given a meaning independent of 'intended' so as to bar coverage when the resultant damage is a 'substantial probability,' or is 'likely,' or is 'highly expectable.' " Whether that argument [**723] was directed at the standard form language ("neither expected nor intended") or the Continental manuscript policy ("unexpectedly") is irrelevant. The fact remains that the trial court did not give meaning to the term "unexpected" and did not make a finding on whether the asbestos injuries were expected by Armstrong.

**(18a)** Although we find the trial court's interpretation of the policy language in error (paragraphs 20 and 21 of the judgment), we find it unnecessary [***97] to remand for further findings in accordance with a broader interpretation of the exclusionary language. When a trial court fails to make a finding on a material issue, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party. ( *Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co. (1988) 200 Cal. App. 3d 1518, 1525 [246 Cal. Rptr. 823]*; *People* ex rel. *Sorenson v. Randolph (1979) 99 Cal. App. 3d 183, 187 [160 Cal. Rptr. 69]*; *South Bay Irr. Dist. v. California-American Water Co. (1976) 61 Cal. App. 3d 944, 995 [133 Cal. Rptr. 166]*.) From our review of the trial record, we find insufficient evidence to support a finding that Armstrong officials knew or believed the asbestos bodily injuries were practically certain to occur.

**(19)** By all accounts, Armstrong executives believed that the company's own asbestos products, L.T. Cork Covering and Armaspray, were not dangerous. There was concern about the dustiness of Armaspray--but not so much for health reasons as for reasons of cleanup and potential damage to electrical equipment. The specifications for Armaspray called for good ventilation, screening off the areas [***98] from non-users, and respirators while using the product.

There is no evidence that Armstrong officials knew that its own workers were endangered by Armstrong's insulation installation operations. Mr. Bushnell, Armstrong's research and development specialist, testified that he [*76] first learned of the health dangers of asbestos at a May 1968 conference. Mr. King, the marketing manager for Armaspray, testified that he was unaware of the health risk of asbestos until the 1968 meeting with Dupont officials. Other Armstrong executives, however, were aware by the early 1960's that breathing asbestos dust could be dangerous. But general knowledge of the hazards of asbestos is not equivalent to knowledge that asbestos bodily injuries were practically certain to occur. The record indicates that the Armstrong officials believed that the workers would not be harmed as long as the dust levels were controlled. There is no evidence the Armstrong officials actually knew the dust levels at their own job sites were hazardous.

Armstrong's insurance manager, Mr. Hofferth, knew that Armstrong's insurers periodically sent "loss prevention engineers" to inspect Armstrong's manufacturing plants [***99] and job sites. He relied on them to alert Armstrong to potential problems. At no time during the 1953-1973 policy periods did any loss prevention report from any of Armstrong's carriers express a concern for the dangers of using or inhaling asbestos. (In 1977, Armstrong's carrier inserted an exclusion for asbestosis.) In fact, Mr. Hofferth knew that Armstrong got favorable premiums because of its relatively low loss experience compared to the national average.

Commercial Union primarily relies upon the evidence that Armstrong expected workers' compensation claims from its insulation installers. By 1961, Mr. Hofferth was "alarmed" and "concerned" at the rise in workers' compensation claims for asbestos injuries. At trial, Mr. Hofferth explained that what had concerned him was that Armstrong was being saddled with workers' compensation claims for injuries that occurred on other companies' jobs. He knew that the workers hired from the union hall worked for other companies who might not take the same precautionary measures. And he knew that in many states the workers' compensation laws make the last employer responsible for payment of workers' compensation benefits. Mr. Hofferth proposed [***100] that the insulation workers be given preemployment chest X-rays, so that diseased employees could be screened out, but that plan was opposed by the union and was not put into effect. Mr. Hofferth therefore expected the workers' compensation claims to increase.

[**724] But Mr. Hofferth testified that he believed that Armstrong was taking every necessary precaution to protect the workers from injury; he believed the dust levels were being controlled. Moreover, Mr. Hofferth relied on Armstrong's carriers to investigate workers' compensation claims. Despite the carriers' awareness of the increasing number of claims, no carrier expressed concern over the use of asbestos products.

[*77] Finally, there is no evidence that anyone at Armstrong knew that third parties might be injured by exposure to asbestos fibers released during Armstrong's contract installation activities. The record indicates that until the *Borel* lawsuit was filed in 1970, Armstrong officials had been unaware that its asbestos products were a danger to third parties. In fact, in 1973, Armstrong changed its primary insurance carrier to Liberty Mutual, and even though the *Borel* lawsuit had been filed, Liberty Mutual [***101] expressed no concern for Armstrong's potential liability for asbestos injuries.

In summary, although the evidence of Armstrong's general knowledge of asbestos dangers might support a finding that Armstrong should have expected the asbestos bodily injuries, the insurer's burden was to prove, directly or circumstantially, that Armstrong actually did expect them. **(18b)** In light of the whole record, we find the evidence insufficient to support a finding that during the policy period at issue here, 1966 through 1968, Armstrong was actually aware the asbestos bodily injuries were practically certain to occur. Consequently, we affirm the trial court's judgment (paragraph 32) that coverage under the Commercial Union policy for asbestos bodily injury claims is not excluded.

C. PREMERGER LIABILITY

**(20a)** From May 1, 1961, to May 1, 1967, Continental Casualty and Commercial Union provided excess insurance coverage to GAF Corporation under three separate policies. The premiums were based on GAF's gross sales and were adjusted annually to reflect changes in GAF's operations, including corporate acquisitions, during the policy period. During the 1961-1967 policy periods, GAF did not manufacture asbestos [***102] products. On May 26, 1967--after the expiration of the Continental and Commercial Union policies--GAF merged with Ruberoid Co., which had manufactured asbestos building materials since the 1880's. After the merger, Ruberoid ceased to exist. All of its assets were transferred to GAF, which took over its asbestos-manufacturing operations. Not until 1969 was the first claim brought against GAF for an asbestos-related bodily injury arising out of Ruberoid's products.

In phase IV of the coordinated proceedings below, the trial court was asked to decide whether the premerger insurers of GAF (Continental and Commercial Union) provided coverage for asbestos-related injuries attributable to the products of the Ruberoid Company. The trial court concluded that the premerger policies do provide coverage, but we have concluded that ruling was erroneous.

[*78] 1. *The Insuring Agreements*

The insuring agreements in each of the three insurance policies at issue here obligate the insurers to pay "for all sums which the insured shall be obligated to pay by reason of the liability imposed upon him by law or assumed by him under contract for damages . . . on account of . . . personal injuries [***103] . . . ." In support of the trial court's ruling, GAF emphasizes that upon the merger with Ruberoid GAF became obligated both by law ( *Ray v. Alad Corp. (1977) 19 Cal. 3d 22, 28 [136 Cal. Rptr. 574, 560 P.2d 3]*; *Moe v. Transamerica Title Ins. Co. (1971) 21 Cal. App. 3d 289, 304 [98 Cal. Rptr. 547]*) and by contract for the liabilities of Ruberoid. [30] Hence, GAF argues that the insuring agreements extend coverage to damages for which GAF is held liable on account of asbestos-related injuries caused by exposure to Ruberoid's products.

30 The laws of Delaware and New Jersey, the respective states of GAF and Ruberoid, are in accord with the general rule that upon a merger a surviving corporation is answerable for the debts and liabilities of the acquired corporation. ( *N.J. Rev. Stat. § 14A:10-6(e)*; *8 Del. Code § 259(a)*.)

The trial court accepted this argument and ruled that "Coverage is mandated by the language contained in the insuring agreement of each of the three policies. . . . Courts have [***104] imposed liability for asbestos-related [**725] bodily injury damages on GAF because of its acquisition of Ruberoid. The plain language in the insuring agreements therefore provides coverage to GAF for that liability." We cannot agree.

It is axiomatic that insurance policies must be interpreted as a whole. ( *Producers Dairy Delivery Co. v. Sentry Ins. Co. (1986) 41 Cal. 3d 903, 916, fn. 7 [226 Cal. Rptr. 558, 718 P.2d 920]*; *Milazo v. Gulf Ins. Co. (1990) 224 Cal. App. 3d 1528, 1536 [274 Cal. Rptr. 632]*.) Although, on its face, the insuring agreement may appear to extend coverage to GAF's liabilities attributable to Ruberoid, the insuring agreement must be read in conjunction with the "named insured" provision. (*Milazo, supra, at p. 1536*.) **(21)** (See fn. 31.) **(20b)** As we will discuss below, Ruberoid does not qualify as a named insured. [31]

31 The insurers rely upon *Aetna Life & Cas. v. United Pac. Rel. Ins. (Utah 1978) 580 P.2d 230*, but that case holds that insurance coverage survives a corporation's merger and passes to the surviving corporation along with the liabilities. (See also *Oklahoma Morris Plan Co. v. Security Mutual Cas. Co. (8th Cir. 1972) 455 F.2d 1209*; *Maryland Cas. Co. v. W.R. Grace & Co., supra, 794 F. Supp. at pp. 1233-1236*.) Application of that principle here means that upon GAF's suc-

cession to Ruberoid's liabilities, GAF became entitled to insurance coverage by *Ruberoid's* insurers. This principle is of no relevance to the issue before us. As a general rule, insurance policies should be interpreted as if no other insurance is available. ( *Pacific Indemnity Co. v. Imperial Casualty & Indemnity Co. (1976) 176 Cal. App. 3d 622, 627 [222 Cal. Rptr. 115]*; *Chamberlin v. Smith, supra, 72 Cal. App. 3d at p. 844*.) Therefore, in construing GAF's premerger policies we do not consider the availability of coverage under Ruberoid's policies.

[***105] [*79] 2. *Named Insured*

**(22a)** The two policies issued by Commercial Union's predecessors, Employers' Surplus Lines Insurance Company (ESLIC) and Employers' Liability Assurance Corporation (ELAC), contain language limiting products liability coverage to products manufactured "by the named insured or by others trading under his name." The Continental policy follows form to the underlying ESLIC policy. The "named insured" is identified in the ESLIC and Continental policies as "[GAF] and/or its subsidiary, associated, and affiliated companies or owned and controlled companies as now existing or hereafter constituted." The ELAC policy contains a more limited definition of named insured, insuring only those companies owned or acquired during the policy term. [32]

32 The ELAC policy provides in pertinent part: "It is agreed that the Named Insured shall read as follows: [GAF] and any other business organization while the foregoing named insured owns an interest therein of more than fifty percent (50) during the policy period."

[***106] Commercial Union and Continental contend that the definition of "named insured" within the ESLIC and Continental policies cannot extend to Ruberoid because Ruberoid was never a subsidiary of GAF nor was it an owned and controlled company: upon the merger, Ruberoid ceased to exist. GAF, on the other hand, argues that the purpose of the language was to extend coverage to corporations acquired by GAF. The trial court agreed with GAF's argument: "The plain meaning of 'hereafter constituted' indicates an intention to provide coverage to GAF despite its assumption of new liabilities resulting from the acquisition of Ruberoid."

We conclude to the contrary. We do not doubt that the phrase "or hereafter constituted" within the named insured definition would extend coverage to a company acquired after the policy period began. [33] (See *Reserve Insurance Co. v. Apps (1978) 85 Cal. App. 3d 228, 231 [149 Cal. Rptr. 223]* [dictum: named insured includes spouse acquired after policy took effect].) But the word "hereafter" cannot reasonably be read as referring to any time in the indefinite future. Obviously, in the abstract, the phrase "or hereafter constituted" could refer either to companies [***107] acquired at any time in perpetuity or to those acquired after the inception of the policy but before the end of the policy term. (See, e.g., Webster's New International Dict., *supra*, p. 1058 [*80] [defining "hereafter" as "in some future time or state"].) As a matter of policy interpretation, however, the phrase must be read within [**726] the context of the policy as a whole, and thus must be read in conjunction with the policy period.

33 Similarly, in light of the phrase "as now existing," coverage would extend to a subsidiary severed after the policy period began.

**(23)** A liability insurance policy has a finite duration. The period of time during which the insurance policy is effective is an essential element of a liability insurance contract ( *Ins. Code, § 381, subd. (e)*; *Parlier Fruit Co. v. Fireman's etc. Ins. Co. (1957) 151 Cal. App. 2d 6, 21 [311 P.2d 62]*), and the reason is obvious: the insurer's obligation to indemnify is limited to insurable events occurring during the coverage period. Unless [***108] coverage has been triggered during the policy period, there is no coverage once the policy period has ended. Logically, then, neither is there a named insured once the policy period has ended. Thus, a corporate acquisition taking place after the policy has expired can have no retroactive effect on the identity of the named insured during the policy period. [34]

34 Although we rely upon a plain reading of the language of the policy, we reach the same result as was reached in *Cooper Companies v. Transcontinental Ins. Co. (1995) 31 Cal. App. 4th 1094 [37 Cal. Rptr. 2d 508]*, in which the court found the language ambiguous and relied upon the reasonable expectations of the insured. We find the policy language, when construed in the context of the policy as a whole, capable of only one plausible construction; hence, we discern no ambiguity. (See generally *Bay Cities Paving Grading, Inc. v. Lawyers' Mutual Ins. Co. (1993) 5 Cal. 4th 854, 867 [21 Cal. Rptr. 2d 691, 855 P.2d 1263]*, defining ambiguity.)

[***109] **(22b)** We therefore conclude that the named insured definition under the ESLIC and Continental policies does not include a company acquired, as here, after the policy period ended. [35] This conclusion applies as well to the ELAC policy, which expressly limits the named insured to those companies owned or acquired by GAF during the policy term.

35 Continental and Commercial Union contend an acquired company qualifies as a named insured only if it was already acquired at the time of the occurrence--at the time insurance coverage was triggered. This contention suggests that insurance coverage would be excluded if an occurrence arising from the acquired company's conduct took place before the merger (and during the policy period), even though the tortfeasor-company was acquired during the policy period. We need not decide this point, i.e., whether the phrase "or hereafter constituted" would qualify the acquired company as a named insured during the entire policy period and extend insurance coverage to occurrences that took place before the merger as well as occurrences that took place afterward. We decide only that there is no coverage when the merger took place after the policy period had expired.

[***110] **(20c)** Indeed, in all of the California cases we have located on this issue, the party who qualified as a named insured did so during the policy period. (See, e.g., *Continental Cas. Co. v. Phoenix Constr. Co. (1956) 46 Cal. 2d 423, 438 [296 P.2d 801, 57 A.L.R.2d 914]* [negligent driver qualified as a [*81] "managing employee"]; *Utley v. Allstate Ins. Co. (1993) 19 Cal. App. 4th 815, 819, 823 [24 Cal. Rptr. 2d 1]* [adult son was additional insured as "resident relative" of insured]; *Safeco Ins. Co. v. Gibson (1989) 211 Cal. App. 3d 176, 182, 184 [259 Cal. Rptr. 206]* [minor child of divorced parents was "resident" of the insured's household]; *Reserve Insurance Co. v. Apps, supra, 85 Cal. App. 3d at p. 231* [separated spouse was "resident" of the household]; *State Farm Mut. Auto. Ins. Co. v. Elkins (1975) 52 Cal. App. 3d 534, 538 [125 Cal. Rptr. 139]* [insured's college student daughter was "resident" of the household]; cf. *National Auto. & Cas. Ins. Co. v. Underwood (1992) 9 Cal. App. 4th 31, 40 [11 Cal. Rptr. 2d 316]* [minor child of divorced parents was not "resident" of insured's household].) [36]

36 Although the decision in *Oliver Machinery Co. v. United States Fid. & Guar. Co. (1986) 187 Cal. App. 3d 1510 [232 Cal. Rptr. 691]* (product of predecessor company was not one of named insured's products) supports the decision here, we do not rely upon it, as it involved very different facts and issues. The question before the *Oliver* court was whether the named insured's distributor qualified as an additional insured. The meaning of "hereafter constituted" was not in issue.

Two other decisions reached the same conclusion reached here, that the premerger insurer of the acquiring company does not provide coverage for liabilities of the acquired company: *State of Idaho v. Bunker Hill Co. (D.Idaho 1986) 647 F. Supp. 1064, 1077*, and *Maryland Cas. Co. v. W.R. Grace & Co., supra, 794 F. Supp. 1206, 1230-1232*. However, the courts in those cases employed a somewhat different analysis, reasoning that during the premerger policy period the insured was not responsible for the liabilities of the later-acquired company. Although we focus instead on the fact that Ruberoid was not a named insured under the premerger policies, those cases support our view that the named insured must qualify as such during the policy period.

[***111] [**727] In the present case, Ruberoid had no relationship with GAF during the 1961-1967 policy periods. The merger of Ruberoid and GAF took place after the Continental and Commercial Union policies had expired. The fact that the companies became affiliated later is not enough to give Ruberoid the status of a named insured under the premerger policies. Accordingly, we reverse the trial court's judgment (paragraph 30) on this point.

D. *The Wellington Agreement*

In 1985 certain parties of the coordinated proceedings, along with other asbestos manufacturers and insurers, joined in a settlement known as the Wellington Agreement. The trial court described the settlement as follows:

"Negotiations between producers of asbestos products and insurers began in 1982 in response to the problems associated with massive, nationwide litigation of asbestos bodily injury claims. During the period the Wellington Agreement was being negotiated, producers of asbestos were faced with literally tens of thousands of bodily injury claims by workers, as well as [*82] cross-claims by co-defendants in the underlying cases. In addition, there were numerous and major coverage disputes between producers and [***112] insurers. After several years of negotiations, the Wellington Agreement was executed on June 19, 1985. There were 47 original signatories to Wellington, including both insurers and producers. Any other producer or insurer could become a signatory to the agreement.

"The purposes of the Wellington Agreement were to resolve the numerous coverage disputes between and among insurers and producers, to revolve the cross-claims among producers, and to reduce the costs of litigation. According to the agreement itself, the subscribers to Wellington desired to take reasonable and practical steps 'to ensure the expenditure of funds for the reasonable payment of meritorious claims at reasonable processing costs.'

"To this end, the subscribing members of Wellington agreed to establish a non-profit organization, the Asbestos Claims Facility, which would administer, evaluate, settle, pay or defend all asbestos-related claims against the subscribing producers and insurers. The Wellington Agreement sets forth standards for the handling of claims by the facility. The facility is governed by a board of directors which contains an equal number of producers and insurers.

"Settlement of the cross-claims [***113] among producers was essential to the consolidation of the handling of asbestos claims into a single entity. In order to achieve such a settlement, producers agreed to pay a percentage of all claims, whether or not they were named in a claim. The mechanism by which liability on each asbestos-related claim is allocated among producers is the producer allocation formula. The Court does not have before it the percentage that each producer pays, but rather the formula from which the numbers are derived. The percentage allocation is computed based on the number of open and closed claims for each producer as of September 30, 1983 and the amount paid or owing on closed claims."

1. *The Trial Court's Findings*

In phase IV of the proceedings the trial court was called upon to decide the effect of the Wellington Agreement (and other settlements) on disputes among settling and non-settling insurers: does the settlement determine the amount of "other insurance" available to the policyholder for payment of claims for purposes of contribution among insurers? The court was also called upon to decide the effect of the Wellington Agreement on disputes between settling policyholders and nonsettling [***114] insurers. Continental Casualty Company and its related companies, Columbia Casualty Company and [*83] CNA Casualty of California, (hereafter referred to collectively as the CCC Companies) challenge the trial court's decision on the latter issue.

*Reasonable Settlement*

Although the former (other insurance) issue is not before us, the trial court's decision [**728] on that issue has relevance to our analysis of the effect of the settlement upon the CCC Companies' indemnity obligations. We therefore take note that the trial court heard evidence and made a finding that the Wellington Agreement was a reasonable, good-faith settlement, despite the charge of inaccuracy in the producer allocation formula. The trial court's decision follows:

"Dr. Wecker testified that the producer allocation formula is inaccurate in that it does not replicate the tort system. A major source of inaccuracy, according to Dr. Wecker, is the requirement that producers pay on claims in which they are not named. Dr. Wecker testified that the formula assumes that the frequency with which a producer is named in a claim will not change over time. If new categories of claims arise which apply to a particular producer, [***115] the frequency with which that producer is named would increase, and there would be a corresponding decrease in the frequency with which other producers are named. Mr. Pulkrabek testified that there were new categories of claims and that some producers and insurers have expressed concern regarding their Wellington share.

"Assuming that the formula has resulted over time in differentials between what producers would pay under the tort system and what producers are paying under Wellington, it does not follow that the producer allocation formula is unreasonable. The Court must evaluate the settlement at the time it was made. It is clear to the Court that at the time the Wellington Agreement was executed, the producer allocation formula was intended to replicate what producers would have paid on claims outside of Wellington. Mr. Pulkrabek testified that Armstrong, for example, looked very hard at the formula and determined that Armstrong's liability would not increase under Wellington. This is borne out by the formula itself, which determines each producer's share on the basis of the producer's litigation experience over the years prior to September 30, 1983. Although a producer pays [***116] on all claims, whether or not that producer is named in a particular claim, it is equally true that other producers pay on claims in which they are not named and thus pay a proportionate share of the named producer's liability. In addition, the Court finds that defense costs were reduced substantially by the Wellington Agreement. Given the circumstances in which the Wellington Agreement [*84] was executed, the producer allocation formula clearly meets the standard of reasonableness.

"The Wellington Agreement represents a unique solution to an unprecedented litigation problem. Given the lengthy negotiations between insurers and producers preceding the execution of the agreement, the procedures and standards set up for handling claims, and the allocation formulas incorporated in the agreement, the Court is convinced that the Wellington Agreement represents a reasonable, good faith settlement among the subscribing insurers and producers."

*Liability of Policyholders*

The nonsettling insurers argued below that their obligations to indemnify the asbestos manufacturers should not be defined by the manufacturers' Wellington payments because the producer allocation formula requires [***117] the manufacturers to pay on claims for which they are not legally liable. The trial court rejected the

argument: "The Court concludes that the amounts paid by the policyholders pursuant to the producer allocation formula are presumptive evidence of the legal liability of the policyholders for asbestos-related claims. . . . [P] Since the insurers have failed to offer sufficient evidence to rebut this presumption, the Court concludes that the insurers are obligated to reimburse the policyholders for their liability for asbestos-related claims as defined by the producer allocation formula, subject to the contribution principles set forth in this decision."

2. *Discussion*

**(24a)** Fibreboard and Armstrong became parties to the Wellington Agreement, but the CCC Companies declined to join the settlement. In this segment of the appeal, the CCC Companies argue that the trial court's finding that the policyholders' Wellington payments are "presumptive evidence" of the [**729] policyholders' liability contravenes basic principles of insurance law.

The CCC Companies rely on the rule that it is the policyholder who has the initial burden of proving that a claim comes within the scope of coverage. ( [***118] *Merced Mutual Ins. Co. v. Mendez (1989) 213 Cal. App. 3d 41, 47 [261 Cal. Rptr. 273]*; *Royal Globe Ins. Co. v. Whitaker (1986) 181 Cal. App. 3d 532, 537 [226 Cal. Rptr. 435]*.) And the CCC Companies emphasize the policy language which triggers coverage only if the occurrence "results during the policy period in bodily injury" and which obligates the insurers to indemnify the policyholders for amounts the policyholders become "legally obligated to pay as damages." The CCC Companies argue, [*85] therefore, that the policyholders have the burden of establishing the policies were triggered by the claims paid. Since no evidence was presented on the facts of any of the claims paid through Wellington and, indeed, since the Wellington payments admittedly went toward *all* claims regardless of whether they were claims for which the policyholders were liable, the CCC Companies argue they have no obligation to reimburse the policyholders for their Wellington payments.

We cannot agree. The general rule placing the burden on the policyholder to establish facts to trigger coverage is subject to the exception explained in *Isaacson v. California Ins. Guarantee Assn. (1988) 44* [***119] *Cal. 3d 775 [244 Cal. Rptr. 655, 750 P.2d 297]*: When the insurer refuses to accept a settlement and the insured meets its burden of proving the settlement was reasonable, then the insured is entitled to a presumption in his favor--a presumption that the insured is indeed liable to the claimant and that the amount of his liability is the amount of the settlement.

**(25a)** In *Isaacson*, the Supreme Court reiterated the rule that if an insurance carrier breaches its contract with the insured and erroneously denies coverage or refuses to defend, then the insured is entitled to make a reasonable settlement with the claimant and to sue the carrier to recover the amount of the settlement. (*44 Cal. 3d at p. 791*; see also *Clark v. Bellefonte Ins. Co. (1980) 113 Cal. App. 3d 326, 335 [169 Cal. Rptr. 832]*.) **(26a)**Further, in such an action for reimbursement of the settlement, the settlement is presumptive evidence of the insured's legal liability on the third party's claim and the amount of the insured's liability. ( *Isaacson, supra, 44 Cal. 3d 775*; see also *Peter Culley & Associates v. Superior Court (1992) 10 Cal. App. 4th 1484, 1493-1494, 1497 [13 Cal. Rptr. 2d 624]*; *Kershaw v. Maryland* [***120] *Casualty Co. (1959) 172 Cal. App. 2d 248, 256-257 [342 P.2d 72]*; *Lamb v. Belt Casualty Co. (1935) 3 Cal. App. 2d 624, 631 [40 P.2d 311]*.)

**(25b)** The *Isaacson* court went on to say that even if the insurer has not denied coverage or refused to defend, the insurer has a duty to accept a reasonable settlement, and the insurer's refusal to settle may give rise to the insured's action for reimbursement of the settlement. (*44 Cal. 3d at p. 792*; see also *Crisci v. Security Ins. Co. (1967) 66 Cal. 2d 425, 430 [58 Cal. Rptr. 13, 426 P.2d 173]*; *Comunale v. Traders & General Ins. Co. (1958) 50 Cal. 2d 654, 659 [328 P.2d 198]*.) **(26b)** In such a case, the insured has the burden of showing the settlement was reasonable and if it meets that burden, then again the act of settlement raises two presumptions: that the claim was legitimate and that the amount of the settlement was the amount of the insured's liability. ( *Isaacson v. California Ins. Guarantee Assn., supra, 44 Cal. 3d at pp. 793-794*.)

[*86] **(24b)** In *Isaacson*, the court held the insureds in that case were not entitled to reimbursement for their contribution toward the settlement because the insurer had neither [***121] denied coverage nor refused to defend and the insured had failed to prove the settlement was reasonable. In the present case, the trial court distinguished *Isaacson* on these grounds: "In this case, no determination has as yet been made as to whether the non-settling insurers wrongfully refused to defend or indemnify claims. However, it is clear that the insurers were disputing defense and coverage obligations at the time that the policyholders entered into the Wellington Agreement. The policyholders in this case have 'offered evidence of sufficient substantiality' that the Wellington Agreement is reasonable, and that the non-settling insurers had the opportunity to join Wellington but declined to do so."

[**730] Further, the trial court reiterated that the Wellington Agreement is a reasonable settlement: "In *Isaacson*, the court evaluated the reasonableness of the settlement of the underlying claim in determining whether the insureds were entitled to a presumption of liability. Here, there is no evidence before the Court regarding the specifics of the settlements of the underlying

claims. However, in the unique context of this case, the Court finds that the principles of *Isaacson* [***122] are applicable to the producer allocation formula and to the ongoing process of claims handling by the Asbestos Claims Facility as set forth in the Wellington Agreement. It would place an unreasonable burden on the policyholders and on the judicial system to allow the non-settling insurers to revisit the merits of the many claims which have been settled by the facility since its inception. Moreover, the insureds have offered no evidence of bad faith or unreasonableness in the facility's handling of the underlying claims. [P] Under the circumstances of this case, the Court finds that the amounts paid by the policyholders pursuant to the producer allocation formula . . . are presumptive evidence of the policyholders' liability."

The trial court's finding that the Wellington Agreement was a reasonable settlement is not challenged on appeal, and it is determinative of the issue. [37] Once the trial court found the settlement was reasonable, despite the inaccuracy of the producer allocation formula, the *Isaacson* rule became operative and justified the trial court's treatment of the settlement as presumptive [*87] evidence of liability. (See *Stonewall Ins. Co. v. Asbestos* [***123] *Claims Management, supra, 73 F.3d 1178, 1206-1208.*) The judgment on the effect of the Wellington Agreement (paragraph 19) is affirmed.

37 Language in *Isaacson* suggests that the "reasonableness" of a settlement includes a showing that the underlying claim was covered, although the insured "need not prove his actual liability on the underlying claim, and establishing a breach [of the insurer's duty to settle for a reasonable amount] does not require a trial of the underlying action." (*44 Cal. 3d at p. 793.*) Thus, the trial court's finding that the Wellington Agreement was a reasonable settlement disposes of the objection of the CCC Companies that the Wellington payments go to claims for which the manufacturers are not legally liable. The trial court found the Wellington Agreement to be a reasonable means to resolve the claims among the producers: "Although a producer pays on all claims, whether or not the producer is named in a particular claim, it is equally true that other producers pay on claims in which they are not named and thus pay a proportionate share of the producer's liability." The CCC Companies have not challenged this finding on appeal; their appellate arguments pertain to the application of the presumption of liability.

[***124] ISSUE GROUP III: PROPERTY DAMAGE

In phase V of the coordinated proceedings, the trial court was asked to determine the obligations of Armstrong's insurers to defend and indemnify Armstrong in the so-called "building cases"--the myriad of property damage lawsuits filed against Armstrong on account of the presence of asbestos-containing building material (ACBM) in buildings. [38] Armstrong is facing liability primarily for its manufacture of asbestos-containing floor tile and insulation materials.

38 While this appeal was pending, we received notices of injunctions and stays issued in connection with receivership and liquidation proceedings involving the following subscribers to certain Armstrong policies: Kingscroft Insurance Company Ltd., El Paso Insurance Company Ltd., Lime Street Insurance Company Ltd., Mutual Reinsurance Company Ltd., and Walbrook Insurance Company Ltd. Nothing in this opinion should be construed as being inconsistent with the orders staying proceedings against those parties.

The [***125] underlying complaints in the building cases, taken as a whole, reveal that the presence of ACBM in buildings may have various consequences to the buildings' owners. The ACBM may pose a health hazard to those who use the building in that asbestos fibers may be released into the air or onto building surfaces (walls, upholstery, fixtures, etc.) or settled releases may be disturbed and "reentrained" into the air. Whether or not the ACBM has released asbestos fibers, the building owner may decide to remove or encapsulate the asbestos to eliminate the potential health risk. Or the building owner may incur costs for inspecting, assessing, maintaining and repairing in-place ACBM. [**731] And the market value of the property may fall as a result of the presence of asbestos.

Beginning in the early 1980's, after the federal government started to voice concern about the safety of ACBM, numerous lawsuits were brought against Armstrong and other asbestos producers for property damage to buildings in which ACBM had been installed. At the start of phase V there were 163 building cases, including a number of class actions, pending against Armstrong in courts across the country. Although the complaints advance [***126] various legal theories, the plaintiffs in the building cases generally seek compensation for the sums they must expend to eliminate the alleged [*88] health hazard in their buildings and for the diminished value of their buildings resulting from the presence of asbestos.

A. COVERAGE FOR "PROPERTY DAMAGE"

We begin with the question whether the injuries allegedly suffered by the building owners constitute "property damage" as defined by the insurance policies. Many of Armstrong's policies are standard CGL policies; others have substantially the same provisions. The insuring agreements of the CGL policies obligate the insurers to pay "all sums which the insured shall become legally obligated to pay as damages because of . . . property . . . damage caused by an occurrence." [39] Since 1973, the standard CGL policy has defined property damage as follows: "i) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or ii) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." [***127]

39 We discuss separately, in part C below, the early policies covering property damage "caused by accident."

Before 1973, under the 1966 revision to the standard CGL occurrence policy, "physical injury" was not a necessary element of property damage; property damage was defined as "injury to or destruction of tangible property." Before 1966, the standard CGL policy had no requirement that the property be "tangible." Because the post-1973 policies contain the most restrictive definition of property damage, we confine our analysis to those policies, for if there is coverage under the post-1973 policies, there will be coverage under the pre-1973 policies as well.

The trial court concluded that all claims, whether for release of asbestos fibers or for mere installation of ACBM, are for covered "property damage" under all of Armstrong's policies. The trial court reasoned that the release of asbestos fibers is an act of contamination that amounts to physical injury and, even without a release of fibers, the [***128] diminished value resulting from the incorporation of ACBM in a building constitutes property damage. Although we employ slightly different reasoning, we agree with the trial court's conclusion that the building claims allege "property damage" within the meaning of the insurance policies.

1. *Injury Is Assumed*

**(27)** Relying upon the rule that in a coverage dispute the burden is on the insured to prove coverage ( *Royal Globe Ins. Co. v. Whitaker (1986) 181* [*89] *Cal. App. 3d 532 [226 Cal. Rptr. 2d 435]*), the insurers argue that Armstrong failed to prove that the buildings have suffered physical injury. The insurers complain that Armstrong relied on the allegations of injury, without actual evidence of such injury. Indeed, the trial court noted that "Armstrong introduced little evidence independent of the underlying allegations to support its position."

We find no merit in the insurers' argument. This is a declaratory relief action, held before the determination of Armstrong's liability for property damage. None of the 163 building cases filed against Armstrong have yet gone to trial. In such circumstances, the trial court may properly determine questions of insurance coverage [***129] on the basis of the underlying pleadings and such other evidence as is available. (See *Underwriters Ins. Co. v. Purdie (1983) 145 Cal. App. 3d 57, 64 [193 Cal. Rptr. 248]*; *State Farm* [**732] *Fire & Cas. Co. v. Kohl* (1982) 131 Cal. App. 3d 1031, 1034 [*182 Cal. Rptr. 720]*.) Here, in ruling upon the meaning of "property damage," the trial court looked to the "nature of the insured's potential liability," taken from the allegations in the various complaints in the underlying building cases, together with the "totality of the evidence." We see no error in this approach.

We emphasize that there is nothing in the trial court's decision, nor in our own, which resolves whether the various effects of ACBM upon a building will give rise to liability of the asbestos manufacturer for property damage. In fact, we note that in some circumstances tort liability is uncertain. (See, e.g., *Anthony v. Kelsey-Hayes Co. (1972) 25 Cal. App. 3d 442, 446-447 [102 Cal. Rptr. 113]* [mere depreciation in value caused by safety concern not compensable property damage]; *San Francisco Unified School Dist. v. W.R. Grace & Co. (1995) 37 Cal. App. 4th 1318, 1324-1335 [44 Cal. Rptr. 2d 305]* [mere [***130] presence of ACBM, without contamination from released fibers, not compensable property damage]; *Adams-Arapahoe School Dist. No. 28-J v. GAF Corp. (10th Cir. 1992) 959 F.2d 868, 872* [same].)

The trial court's conclusion that the claims of injury from ACBM are covered "property damage" as defined by the insurance policies was necessarily based upon the *assumption* that there have been legally compensable injuries to the buildings for which Armstrong will be held liable, for if it is ultimately determined that there have been no such injuries, then there will be no need for insurance coverage. In this appeal, too, for purposes of deciding the coverage dispute, we *assume*, as did the trial court, the buildings have been injured as alleged in the complaints.

2. *Admissibility of Evidence*

**(28)** In a separate brief, four insurers challenge the admissibility of certain deposition testimony during the trial held on Armstrong's declaratory [*90] relief action. [40] We treat the issue rather summarily, as the evidence was not prejudicial.

40 The insurers on this brief are United States Fire Insurance Co., Central National Insurance Co. of Omaha, Puritan Insurance Co., and Interstate Fire & Casualty Company.

[***131] The challenged evidence consists of the deposition testimony of experts designated by Reliance Insurance Co., which the trial court had initially excluded from Armstrong's case-in-chief, but which the trial court eventually admitted after various insurers had moved for judgment on the ground that Armstrong had failed to prove property damage. The four challenging insurers claim that without the deposition testimony Armstrong's case was devoid of evidence and the trial court would have granted the insurers' motion for judgment.

We reject the argument. Although the deposition testimony supported Armstrong's position that buildings are injured by the presence of ACBM, that position was founded in the allegations of the underlying complaints. As we have explained in part A.1 above, the trial court relied primarily upon the allegations in the underlying building cases and *assumed*, for purposes of the declaratory relief action, that the buildings suffered damage for which Armstrong will be held liable. We can discern no prejudice to the insurers from the admission of the deposition testimony.

3. *The Injury Is Physical*

**(29)** Because we assume there has been an injury, the question [***132] we must decide is whether injury to a building from ACBM qualifies as a "physical" injury. In cases alleging releases of asbestos fibers into a building's air supply and onto building surfaces, the issue is relatively easy to resolve. As the trial court found, upon a release of asbestos fibers within a building, "[t]he area becomes hazardous and certain measures must be taken to restore the surface to its prior condition." The courts have held that contamination of buildings and their contents from released fibers constitutes a physical injury and, hence, property damage covered under the terms of the insurance policies. ( *Dayton Independent School D. v. National Gypsum (E.D.Tex. 1988) 682 F. Supp. 1403, 1407*, revd. on jurisdictional grounds *sub nom. W.R. Grace & Co. v. Continental Cas. Co. (5th* [**733] *Cir. 1990) 896 F.2d 865, 875*; *USF&G v. Wilkin Insulation Co. (1991) 144 Ill.2d 64 [161 Ill.Dec. 280, 578 N.E.2d 926, 931-932]*; see *AIU Ins. Co. v. Superior Court (1990) 51 Cal. 3d 807, 829, 842 [274 Cal. Rptr. 820, 799 P.2d 1253]* [contamination of environment from release of hazardous waste]; Abraham, Environmental Liability Insurance Law (1991), pp. 80-81, 88.) This [***133] conclusion finds support in a [*91] number of tort cases in which the courts have held, under the tort doctrine allowing recovery only upon physical injury to property, that contamination from the release of asbestos fibers constitutes a physical injury. ( *City of Greenville v. W. R. Grace & Co. (4th Cir. 1987) 827 F.2d 975, 980*; *City of Manchester v. National Gypsum Co. (D.R.I. 1986) 637 F. Supp. 646, 651-652*; *Town of Hooksett School Dist. v. W.R. Grace Co. (D.N.H. 1984) 617 F. Supp. 126, 130-131*; *80 S. 8th St. Ltd. Ptsp. v. Carey-Canada (Minn. 1992) 486 N.W.2d 393, 399* modified *492 N.W.2d 256*; *Sch. Dist. of Independence v. U.S. Gypsum (Mo.Ct.App. 1988) 750 S.W.2d 442, 456-457*; *Northridge Co. v. W.R. Grace and Co. (1991) 162 Wis.2d 918 [471 N.W.2d 179, 186]*.)

The insurers complain that "contamination" is not a legally defined term, and the trial court's ruling makes the release of even a single asbestos fiber property damage. We find the complaint unfounded, as the insurers have failed to distinguish between the question whether Armstrong is liable for asbestos property damage and the question whether the insurance policies provide coverage. As to the [***134] former, whether and to what extent a release of asbestos fibers has damaged the buildings are factual issues for the underlying building cases. It may be that the trier of fact will conclude in a particular case that a low level of contamination was not damaging, and Armstrong then will have no liability and no need for insurance coverage. As we have explained in part A.1 above, however, for purposes of determining the separate question of insurance coverage for the property damage claims, we assume, as did the trial court, that damage has occurred for which Armstrong will be held liable. We hold that as long as Armstrong is held liable for the release of asbestos fibers, whatever the level of contamination, the injury is a physical injury covered by the insurance policies.

**(30a)** Some of the underlying complaints in the building cases, however, allege that the mere presence of ACBM in buildings is a health hazard because of the potential for *future* releases of asbestos fibers. The complaints allege that common daily activities may cause asbestos fibers to be released from the ACBM and thus the ACBM poses a threat of harm. We conclude that even in such cases, when there have been no [***135] releases of asbestos fibers, if Armstrong is held liable for the mere presence of ACBM, the injury to the buildings is a physical one.

**(31)** Once installed, the ACBM, whether in the form of insulating pipe coverings, fireproof floor tile, accoustical ceiling finishes, or the like, is physically linked with or physically incorporated into the building and therefore physically affects tangible property. We agree with the formulation put forth by the Seventh Circuit Court of Appeals that the term "physical [*92] injury" covers "a loss that results from physical contact, physical linkage, as when a potentially dangerous prod-

uct is incorporated into another and, because it is incorporated and not merely contained (as a piece of furniture is contained in a house but can be removed without damage to the house), must be removed, at some cost, in order to prevent the danger from materializing." ( *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co. (7th Cir. 1992) 972 F.2d 805, 810* cert. den. *(1993) 507 U.S. 1005 [123 L. Ed. 2d 267, 113 S. Ct. 1646]* [defective plumbing systems]; see also *American Motorists Ins. Co. v. Trane Co. (7th Cir. 1983) 718 F.2d 842, 844* [defective heat exchangers, [***136] a component of a natural gas plant].)

**(32)** The physical incorporation of ACBM into the buildings distinguishes the present case from those cases involving hazardous waste leaks or spills from containers. In the latter cases, the courts have held that remedial costs incurred in cleaning up contaminated waste sites are covered by CGL policies, but "prophylactic" costs--costs incurred in advance of any release of hazardous waste, to prevent threatened future pollution--are not incurred because of property damage. ( *AIU Ins. Co. v. Superior Court, supra, 51 Cal. 3d 807, 843*; *Aerojet-Corp.* [**734] *v. Superior Court (1989) 211 Cal. App. 3d 216, 237-238 [258 Cal. Rptr. 684]*; *Maryland Cas. Co. v. Armco, Inc. (4th Cir. 1987) 822 F.2d 1348, 1353*, cert. den. *(1988) 484 U.S. 1008 [98 L. Ed. 2d 654, 108 S. Ct. 703]*.) In contrast, in the present case, because the potentially hazardous material is physically touching and linked with the building, and not merely contained within it, the injury is physical even without a release of toxic substances into the building's air supply.

**(33)** The insurers rely upon the rule that physical incorporation of a defective product into another does not constitute [***137] property damage unless there is physical harm to the whole. ( *St. Paul Fire & Marine Ins. Co. v. Coss (1978) 80 Cal. App. 3d 888, 892 [145 Cal. Rptr. 836]*; *Hamilton Die Cast, Inc. v. United States F. & G. Co. (7th Cir. 1975) 508 F.2d 417, 419-420*; see *Maryland Casualty Co. v. Reeder (1990) 221 Cal. App. 3d 961, 969-970 [270 Cal. Rptr. 719]*; *Fresno Economy Import Used Cars, Inc. v. United States Fid. & Guar. Co. (1977) 76 Cal. App. 3d 272, 284 [142 Cal. Rptr. 681]*; *General Ins. Co. v. Intern. Sales Corp. (1977) 18 Wn.App. 180, 566 P.2d 966, 968-969]*.) In our view, however, that rule is designed to limit the liability coverage of contractors against claims of defective materials or poor workmanship, for such claims are a commercial risk which is not passed on to the liability insurer. (See *Maryland Casualty Co. v. Reeder, supra, 221 Cal. App. 3d at p. 967*; *Economy Lumber Co. v. Insurance Co. of North America (1984) 157 Cal. App. 3d 641, 649-651 [204 Cal. Rptr. 135]*; *Rafeiro v. American Employers' Ins. Co. (1970) 5 Cal. App. 3d 799, 808 [85 Cal. Rptr.* [*93] *701]*.) Here, Armstrong is facing liability not as a contractor but as a manufacturer [***138] or supplier of ACBM. The claims against Armstrong go beyond allegations of defective work or materials and allege injury to other property. (See discussion in part G, *post.*)

**(34)** The insurers further argue that the mere presence of ACBM results only in economic losses--e.g., diminished property value, abatement costs, or costs of responding to the presence of asbestos--and not in a physical injury. They urge us to follow those cases which have construed the phrase "physical injury" SO AS TO DIFFERENTIATE ECONOMIC LOSSES: e.g., *Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal. 4th 1, 17-18 [44 Cal. Rptr. 2d 370, 900 P.2d 619]*; *New Hampshire Ins. Co. v. Vieira (9th Cir. 1991) 930 F.2d 696, 697-701*; *Federated Mut. Ins. Co. v. Concrete Units (Minn. 1985) 363 N.W.2d 751, 756*; *Wyoming Sawmills v. Transportation Ins. Co. (1978) 282 Or. 401 [578 P.2d 1253]*. In our view, however, the damages allegedly suffered by the building owners from the presence of ACBM cannot be considered solely economic losses. Diminished market value or abatement costs or costs of inspecting, assessing, and maintaining the in-place ACBM are not the "property damage." They are "damages because [***139] of property damage." That is, they are the alternative measures of the physical injury to the building. ( *Maryland Cas. Co. v. W.R. Grace and Co. (2d Cir. 1993) 23 F.3d 617, 627*, cert. den. (1994) . . . U.S. . . . *[130 L. Ed. 2d 559, 115 S. Ct. 655]*; see *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co. (1959) 51 Cal. 2d 558, 565 [334 P.2d 881]*, quoting from *Hauenstein v. Saint Paul-Mercury Indem. Co. (1954) 242 Minn. 354 [65 N.W.2d 122, 125]*; see also *Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co. (1965) 63 Cal. 2d 602, 609 [47 Cal. Rptr. 564, 407 P.2d 868]*; *Mozzetti v. City of Brisbane (1977) 67 Cal. App. 3d 565, 576 [136 Cal. Rptr. 751]*.) The fact that the measure of damages is economic does not preclude a physical injury. ( *Northridge Co. v. W.R. Grace and Co., supra, 471 N.W.2d 179, 184*; see *U.S. Fid. & Guar. v. Specialty Coatings (1989) 180 Ill.App.3d 378 [129 Ill.Dec. 306, 535 N.E.2d 1071, 1081]*.)

**(35a)** At trial, the insurers introduced evidence to show that the mere presence of ACBM is not necessarily injurious: that ACBM's do not spontaneously emit asbestos fibers, nor do releases occur more frequently as the ACBM's deteriorate [***140] with age; that left undisturbed, ACBM's pose no health hazard to building occupants; and that even if the ACBM's are occasionally disturbed such that asbestos fibers are released, the fibers are removed quickly by normal air circulation. That evidence, however, has no bearing on [**735] the insurance coverage issue before us. **(30b)** **(35b)** Once again, the insurers have failed to distinguish between questions of liability and questions of insurance coverage. Whether

ACBM has actually caused harm is a [*94] question for the underlying building cases, and if the trier of fact finds that the mere presence of Armstrong's products does not cause damage, then Armstrong will have no liability and no need for insurance coverage. The posture of the present case is such that for purposes of determining the separate question of insurance coverage we *assume* that the presence of ACBM is injurious and that Armstrong will be held liable for injuring the buildings. Given that assumption, we conclude that the alleged injury from installation of ACBM qualifies as "physical injury to . . . tangible property" under the terms of the policies.

B. TRIGGER OF COVERAGE

1. *Multiple Trigger*

**(36a)** Having concluded that [***141] there is property damage, we must next decide when the property damage takes place, for purposes of determining which policies are responsible for indemnifying Armstrong. As we have discussed in Issue Group II, part A, *ante*, the courts have devised several approaches for determining when asbestos-related bodily injuries occur, and we have upheld the trial court's use of a continuous trigger. In property damage cases, too, some courts have applied a continuous trigger. (E.g., *California Union Ins. Co. v. Landmark Ins. Co. (1983) 145 Cal. App. 3d 462 [193 Cal. Rptr. 461]* [leaking swimming pool]; *Hatco Corp. v. W.R. Grace & Co.--Conn., supra, 801 F. Supp. 1334, 1345* [hazardous waste]; *Hirschberg v. Lumbermens Mut. Cas. (N.D.Cal. 1992) 798 F. Supp. 600, 603* [same]; *New Castle County v. Continental Cas. Co. (CNA) (D.Del. 1989) 725 F. Supp. 800, 813*, affd. in part and revd. in part (3d Cir. 1991) *933 F.2d 1162* [same]; *Dayton Independent School D. v. National Gypsum, supra, 682 F. Supp. at pp. 1409-1410*, reversed *sub nom. W.R. Grace & Co. v. Continental Cas. Co., supra, 896 F.2d at pp. 875-876* [asbestos]; *Lac d' Amiante du Quebec v. Am.* [***142] *Home Assur. (D.N.J. 1985) 613 F. Supp. 1549* [asbestos]; *Owens-Illinois, Inc. v. United Ins. Co., supra, 650 A.2d 974, 983-984, 995* [asbestos]; *Gottlieb v. Newark Ins. Co. (1990) 238 N.J.Super. 531 [570 A.2d 443]* [toxic insecticides].)

In *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th 645*, our Supreme Court has held that a continuous trigger should be applied to claims of continuous or progressively deteriorating bodily injuries *or* property damage. The *Montrose* court observed, however, that proper resolution of a trigger of coverage issue may depend on whether the CGL policy insures against liability to third parties for bodily injury, property damage, or both. ( *Id. at pp. 665-666.*) In *Montrose*, the coverage clauses in the CGL [*95] policies did not distinguish between the nature of the underlying harm, whether bodily injury or property damage. Accordingly, the parties in *Montrose* did not dispute that "under a plain reading of that unambiguous aspect of the policy language, whatever be the circumstances (or timing of the circumstances) that will potentially trigger liability coverage under the policies, coverage [***143] will apply uniformly under such circumstances whether the claims be for bodily injury, or property damage, alleged in the underlying third party lawsuits." (*10 Cal. 4th at p. 666.*)

Yet, in *Montrose*, the property damage and the bodily injuries were all alleged to be continuous or progressive. As the *Montrose* court put it, ". . . we are dealing both with claims of continuous or progressively deteriorating bodily injury . . . and progressively deteriorating property damage . . . all arising from continuous or repeated exposure to hazardous waste contamination over time . . . ." (*10 Cal. 4th at p. 666.*)

In *Lac d' Amiante du Quebec v. Am. Home Assur., supra, 613 F. Supp. 1549, 1561* the court found that contamination of buildings from released asbestos fibers was both continuous and progressive: "release of [asbestos] fibers . . . may occur by a slow continuous degradation of the insulating surface which may be accelerated by the air movement [**736] and vibration which occurs in most buildings. . . . [T]he injury to property caused by asbestos is both continuous and progressive and certainly not complete upon the act of installation." Reasoning that it would be "illogical" [***144] to apply the continuous trigger to asbestos bodily injury claims but not to asbestos property damage, the court ruled that coverage was triggered at the time of installation, at the time of removal, and at all points in between.

In the present case, in contrast, the record indicates that releases of asbestos fibers, if they occur at all, occur sporadically, as a result of episodic disturbances such as accidental striking, vandalism, water damage, and the like. The trial court declined to apply a continuous trigger to the property damage claims, finding that asbestos property damage is not necessarily continuous: "the evidence presented to this court indicates that property damage from ACBM is not always continuous. The continuous trigger adopted by this Court in the bodily injury cases was based upon a finding that bodily injury from asbestos exposure was a continuous process beginning with first exposure. Because property damage from ACBM is not always continuous, the Court cannot adopt a comprehensive 'continuous trigger' approach as to which policies owe a duty to defend in the building cases. . . . [T]he Court declines to adopt a comprehensive rule stating that all policies [***145] from the time of installation until the time of removal of ACBM [*96] owe a duty to indemnify for property damage. The evidence presented in this phase as to the nature of property

damage does not support the 'continuous' trigger approach adopted by this Court in the bodily injury case."

Instead of a continuous trigger, the trial court adopted a *multiple* trigger: "Aside from property damage occurring at the time ACBM is installed, property damage also happens at any time asbestos fiber or material is released from ACBM into the air or on surfaces of the building, and when settled releases are disturbed and reentrained into the air. . . . The Court therefore holds that indemnity obligations are triggered if it is shown that ACBM was installed in the building or buildings in question, that ACBM released fiber or material into the air or on surfaces of the buildings in question, or that settled releases of ACBM were disturbed and reentrained into the air, during any portion of the period that the policy was in effect."

**(37a)** Unlike the court in *Lac d'Amiante*, we do not find it illogical to apply different triggers for asbestos-related bodily injuries and asbestos-related property [***146] damage. The same legal rule applies in both instances: coverage is triggered when the injury actually occurred. ( *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at pp. 669-670.*) **(36b)** **(37b)** But the triggers are different because the injury to the human body upon inhalation of asbestos fibers is not the same as the injury to a building from the presence of ACBM. (See *Maryland Casualty Co. v. W.R. Grace & Co., supra, 23 F.3d at p. 627.*) We interpret the trial court's decision to mean that in contrast to the continuous, progressive physiological process involved in the inhalation of asbestos, asbestos property damage is episodic, with measurable intervals between episodes, so that the process of injuries cannot be deemed continuous.

**(38)** As the Supreme Court recognized in *Montrose (10 Cal. 4th at p. 694)*, whether the underlying damage or injury is in fact continuous is a matter for determination by the trier of fact. ( *Carey Canada, Inc. v. California Union Ins. Co. (D.D.C. 1990) 748 F. Supp. 8*; see also *Triangle Publications v. Liberty Mut. Ins. Co. (E.D.Pa. 1989) 703 F. Supp. 367, 371.*) In light of the trial court's factual finding that asbestos property [***147] damage is not always continuous, good reason exists for adopting a trigger different from the continuous trigger adopted for asbestos-related bodily injuries. (See *Home Ins. Co. v. Landmark Ins. Co. (1988) 205 Cal. App. 3d 1388, 1394-1395 [253 Cal. Rptr. 277]* [property damage cases differ from asbestos bodily injury cases]; Arness & Eliason, *Insurance Coverage for "Property Damage" in Asbestos and Other Toxic Tort Cases* (1986) *72 Va. L.Rev. 943, 972-973.*) [*97]

[**737] 2. *Release and Reentrainment as Triggers*

In *Maryland Cas. Co. v. W.R. Grace and Co., supra, 23 F.3d 617, 627-628*, the Second Circuit Court of Appeals concluded that property damage occurs upon installation of asbestos products in a building, but the damage does not continue afterward. "Once installed, the damage that asbestos inflicts is complete. . . . If [asbestos fibers are constantly released and re-entrained into a building's atmosphere], its damaging effect concerns solely the health of those persons who breathe the contaminated air. No further property damage occurs because the need to remove or encapsulate the asbestos, which occurred upon the product's installation, remains unchanged." [***148] ( *Id. at p. 628.*) Hence, the court applied a single trigger, holding that only the insurers on the risk at the time of installation were obligated to defend and indemnify the insured. (See also *Stonewall Ins. Co. v. Asbestos Claims Management, supra, 73 F.3d 1178, 1210.*)

**(39a)** As we have already said, the trial court concluded otherwise, that "property damage . . . happens at any time asbestos fiber or material is released from ACBM into the air or on surfaces of the building, and when settled releases are disturbed and reentrained into the air." In deciding the trigger of coverage issue, the trial court ruled that the duty to indemnify is triggered "when it is shown that property damage occurred during any portion of the period that the policy was in effect. . . . The Court therefore holds that indemnity obligations are triggered if it is shown that ACBM was installed in the building or buildings in question, that ACBM released fiber or material into the air or on surfaces of the buildings in question, or that settled releases of ACBM were disturbed and reentrained into the air, during any portion of the period that the policy was in effect."

The insurers complain that the [***149] trial court's decision, taken literally, makes any release--even the release of a single asbestos fiber--enough to trigger coverage, despite the fact that the release was inconsequential and, by itself, would not constitute compensable property damage. [41] The insurers contend that coverage should not be triggered unless the fibers released during the policy period were "sufficiently appreciable."

41 As a practical matter, the insurers' argument seems academic. We find it difficult to envision a scenario in which a single released fiber would be detected, much less serve as the sole basis for triggering coverage.

We reject the argument. The trigger question--*which* policies provide coverage--must be distinguished from the question *whether* the policies provide coverage. As to the latter issue, we reiterate that the trial court [*98] assumed, as we must do for purposes of deciding insurance coverage, that compensable property damage has occurred for which Armstrong will be held liable. As we [***150] have explained in part A.3 above, as long as Armstrong is held liable for contamination from the re-

lease of asbestos fibers, no matter what the level of contamination, the insurance policies provide coverage.

**(40a)** With respect to the separate question of when the property damage occurred for purposes of determining which policies are triggered, the fact that a particular release or reentrainment of asbestos fibers, by itself, might not give rise to liability is irrelevant. The property damage for which Armstrong may be held liable and for which the policies provide coverage is the contamination of the buildings from the introduction of asbestos fibers into the building air supply and onto building surfaces. We understand the trial court's decision to mean that each release or reentrainment contributes to the state of contamination of the building: "[P]roperty damage . . . happens at any time asbestos fiber or material is released from ACBM into the air or on surfaces of the building, and when settled releases are disturbed and reentrained into the air. . . . [P] . . . The release of a harmful substance onto an area is a 'physical injury to tangible property.' [Citation.] The area [***151] becomes hazardous and certain measures must be taken to restore the surface to its prior condition. Release of asbestos material and fiber and reentrainment are all property damage events because each is an act of contamination which makes the building more hazardous." Each release or reentrainment, then, [**738] is a part of the overall property damage giving rise to Armstrong's liability.

We infer from the trial court's multiple trigger decision that the total property damage may take place across several policy periods. That is, although property damage from release and reentrainment of asbestos fibers is episodic and not continuous, the property damage is continual in that new episodes of releases or reentrainments of asbestos fibers may occur repeatedly over time. There is nothing in the policies to preclude coverage from being triggered simply because only a part of the total damage occurred during any particular policy period. We therefore conclude that when, as here, property damage takes place during several policy periods, the trial court correctly ruled that insurance coverage is triggered when any part of the damage--any release or reentrainment--takes place.

**(39b) (40b) (41a)** (See fn. 42.) In sum, we find [***152] no error in the trial court's decision that if Armstrong is held liable for contamination of a building from [*99] released asbestos fibers, each policy is triggered if any part of the contamination damage, no matter how small the quantity of the released fibers, took place when the policy was in effect. [42]

42 The trial court concluded that "the duty to indemnify is triggered when Armstrong proves an occurrence during the policy period to [*sic*] which it is held liable." We infer from this ruling that if Armstrong is held liable not for contamination of a building from released asbestos fibers but for the mere presence of ACBM (and the potential for releases), coverage would be triggered only at installation. This is so because any incidental releases that may have occurred during subsequent policy periods would not constitute damage for which Armstrong was held liable. We agree. Releases or reentrainments of asbestos fibers during a policy period will trigger coverage only if the basis of Armstrong's liability is contamination from released asbestos fibers.

[***153] **(42)** The insurers further argue that triggering coverage upon reentrainment violates the loss-in-progress rule, as resuspension of settled fibers is a continuation of the loss that began when the fibers were released from the ACBM. The argument is unsound. The loss-in-progress rule provides that an insurer can insure only against a contingent or unknown loss. ( *Ins. Code, § 22, 250*) The rule does not apply if the damage was unknown or contingent or the insured's liability was uncertain at the time the policy was issued, even if the damage was inevitable. ( *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at pp. 689-693.*) As long as Armstrong's liability for the reentrainments was uncertain when the policy was issued, the loss-in-progress rule does not preclude coverage.

3. *Installation as Trigger*

**(43)** The insurers contend that the selection of the installation of ACBM as an event triggering insurance coverage violates the rule that coverage is triggered by "the event causing the actual injury and not an earlier event which created the potential for future injury." ( *Hallmark Ins. Co. v. Superior Court (1988) 201 Cal. App. 3d 1014, 1018 [247 Cal. Rptr. 638]*; [***154] *Maples v. Aetna Cas. & Surety Co. (1978) 83 Cal. App. 3d 641, 647-648 [148 Cal. Rptr. 80]*; see also *Whittaker Corp. v. Allianz Underwriters, Inc. (1992) 11 Cal. App. 4th 1236 [14 Cal. Rptr. 2d 659]*; *Millers Mut. Fire Ins., etc. v. Ed Bailey (1982) 103 Idaho 377 [647 P.2d 1249].*) The insurers argue that installation of the ACBM did not inflict injury at the moment of installation; rather, there was a time gap between the installation and the injury, and coverage should be triggered when costs were actually incurred for removing or neutralizing and maintaining the asbestos materials or when the building's market value was actually reduced.

We conclude, however, that the trial court's decision fully conforms to the "actual injury" requirement. The underlying complaints allege that the installation of ACBM in a building created a health hazard to the building [*100] occupants--a hazard that has come to light only in recent years as a result of governmental reports

and increased knowledge. This hazard occurred no less at installation than upon realization of the dangers of asbestos. The damage was done as soon as the ACBM was installed. ( *Stonewall Ins. Co. v.* [***155] *Asbestos Claims Management,* [**739] *supra, 73 F.3d at p. 1209*; *Maryland Cas. Co. v. W.R. Grace and Co., supra, 23 F.3d at p. 627.*)

The Seventh Circuit Court of Appeals has held that in light of the purposes of insurance, property damage occurs in the policy year in which a defective product is installed, rather than the policy year in which it fails or is replaced in anticipation of failure or causes the market value of the building to diminish. "[T]he incorporation of a defective product into another product inflicts physical injury in the relevant sense on the latter at the moment of incorporation--here, the moment when the defective Qest [plumbing] systems were installed in homes." ( *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co., supra, 972 F.2d at p. 814*; see also *Colonial Gas Co. v. Aetna Cas. & Sur. Co. (D.Mass. 1993) 823 F. Supp. 975* [installation of "UFFI" insulation].) We are persuaded by that view and find it applicable to asbestos products.

Our conclusion is supported by the line of property damage cases in which the courts have held that injury occurs and coverage is triggered immediately upon first exposure to the hazardous material or latent defect. [***156] ( *California Union Ins. Co. v. Landmark Ins. Co., supra, 145 Cal. App. 3d 462* [water seepage from leaking swimming pool]; *Ray Industries, Inc. v. Liberty Mut. Ins. Co. (6th Cir. 1992) 974 F.2d 754, 764-766* [dumping of hazardous waste]; *Continental Ins. v. N.E. Pharm. & Chem. Co. (8th Cir. 1987) 811 F.2d 1180, 1189-1192*, vacated on other grounds upon rehearing en banc *842 F.2d 977*, cert. den. *488 U.S. 821 [102 L. Ed. 2d 43, 109 S. Ct. 66]* [same]; *Trizec Properties v. Biltmore Const. Co. (11th Cir. 1985) 767 F.2d 810, 813* [latent defects in roof]; *Lac d' Amiante du Quebec v. Am. Home Assur., supra, 613 F. Supp. at pp. 1560-1561* [release of asbestos]; *Gruol Construction Co. v. Insurance Co. of No. Amer. (1974) 11 Wn.App. 632 [524 P.2d 427]* [dry rot of foundation from defective backfilling].) [43]

43 The courts in the cited cases found the damage both immediate and continuous and employed a continuous trigger. As we have discussed in part B.1 above, the continuous trigger was not applied here, as the trial court found asbestos property damage is not continuous. But the fact that property damage is not continuous does not preclude the damage from being immediate upon exposure to the hazardous material.

[***157] **(41b)** We emphasize that for purposes of determining insurance coverage, we have assumed, as did the trial court, that Armstrong will be held liable for the damages alleged in the underlying complaints. Some of those [*101] complaints do not allege contamination from released asbestos fibers, but allege only that asbestos is present in the buildings, posing a threat of future releases. We hold that in the event that Armstrong is held liable for the mere presence of ACBM, without evidence of contamination from released asbestos fibers, coverage is triggered at the time ACBM was installed in the building. (As we explain in footnote 42 *ante*, where the basis of liability is the mere presence of ACBM, not contamination from released fibers, coverage would not also be triggered by subsequent, incidental releases of asbestos fibers.)

**(44)** Moreover, even in those jurisdictions in which the mere presence is not enough to give rise to liability, if Armstrong is held liable for contamination of the building from released asbestos fibers, coverage is triggered at the time of installation as well as at the time of release. Our reasoning parallels that set forth in part B.2 above. The fact that [***158] the mere presence of ACBM, by itself, might not give rise to liability for property damage is of no consequence if the insured has, in fact, been held liable for property damage. The installation of ACBM obviously contributes to the state of contamination of the building; it is a part of the overall property damage for which the insured is liable. The trial court correctly concluded that insurance coverage is triggered when any part of the damage--installation, release, or reentrainment--took place.

**(45)** The insurers urge us to reject the trial court's multiple trigger and to follow *Prudential-LMI Com. Insurance v. Superior Court (1990) 51 Cal. 3d 674, 694-699 [274 Cal. Rptr. 387, 798 P.2d 1230]*, to conclude instead that property damage occurs on a single date of loss, the date of "manifestation." The Supreme Court, however, has held that the rationale of *Prudential-LMI*, [**740] adopting a manifestation trigger of coverage for first party cases, is inapposite in the context of third party liability policies. ( *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th 645, 663-666, 683-685, 687-689.*) Indeed, here the unique facts surrounding property damage from ACBM provide [***159] good reasons to reject a manifestation trigger.

The manifestation rule deems damage to occur only when the damage has become apparent. Yet, the health hazard allegedly created by the presence of ACBM occurred no less at installation than upon the realization of the dangers of asbestos. That the building owners were unaware of the dangers until years after installation of the ACBM does not mean that the hazard was not present or that damage did not occur. Nor does the fact that the damage was not susceptible of measurement until the dangers of asbestos were known obviate the occurrence

of injury at an earlier time. ( *Maryland Casualty Co. v. W.R. Grace and Co., supra, 23 F.3d at pp. 626-627.*)

[*102] As one court has made clear, the manifestation rule creates a legal fiction: "There are situations . . . in which the existence or scope of damage remains concealed or uncertain for a period of time even though damage is occurring. The leakage of hazardous wastes . . . is a clear example. Determining exactly when damage begins can be difficult, if not impossible. In such cases we believe that the better rule is that the occurrence is deemed to take place when the injuries [***160] first manifest themselves." ( *Mraz v. Canadian Universal Ins. Co., Ltd. (4th Cir. 1986) 804 F.2d 1325, 1328.*) With respect to asbestos building cases, however, as we have explained, the alleged injury to the buildings first occurred when the ACBM was installed. That date is ascertainable; there is no need for a fictional date of injury. (See *Maryland Cas. Co. v. W.R. Grace and Co., supra, 23 F.3d at pp. 627-628.*)

Finally, a manifestation trigger would place the entire burden for property damage claims upon those insurers who were on the risk in later years, when the dangers from ACBM were perceived. Despite the fact that Armstrong paid insurance premiums to a number of companies over the years to insure it against the risk of property damage, only a small group of insurers would be liable.

Although the manifestation rule does serve to promote certainty in the insurance industry and to avoid the problems of apportionment among insurers ( *Prudential-LMI Com. Insurance v. Superior Court, supra, 51 Cal. 3d at p. 699*; *Home Ins. Co. v. Landmark Ins. Co., supra, 205 Cal. App. 3d at pp. 1395-1396*), we reject the manifestation rule as an appropriate trigger for [***161] insurance coverage of asbestos property damage. We conclude that in asbestos property damage cases coverage is triggered pursuant to the rule applicable generally in third party liability cases, i.e., when the claimant's injury actually took place.

We affirm the trial court's decision that insurance coverage is triggered if any part of the underlying property damage--installation, release, or reentrainment--took place during a policy period.

C. ACCIDENT POLICIES

**(46a)** From 1942 to 1951, Armstrong was insured by Standard Accident Insurance Company, the predecessor of Reliance Insurance Company, whose policies provided coverage for property damage "caused by accident." Reliance argued below that its policies provide no coverage for damage from ACBM because, unlike an occurrence policy, an accident policy requires a sudden, unexpected event. The trial court rejected the argument for two reasons: (1) there is no requirement of suddenness; and (2) the release and reentrainment of asbestos fibers qualify as sudden events.

[*103] **(47)** We disagree with the trial court on the first point. The trial court reasoned that "[i]n ordinary language, an unexpected and unintended event is viewed [***162] as an accident." Although we agree that the word "accident" carries the meaning of unexpected and unintended ( *Hogan v. Midland National Ins. Co. (1970) 3 Cal. 3d 553, 559-561 [91 Cal. Rptr. 153, 476 P.2d 825]*; *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.,* [**741] *supra, 51 Cal. 2d 558*), we conclude that an accident policy covers only unexpected and unintended events which are also sudden. [44] ( *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co., supra, 51 Cal. 2d at pp. 563-564*; *Shell Oil Co. v. Winterthur Swiss Ins. Co., supra, 12 Cal. App. 4th 715, 751-752*; see *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th 645, 672*; 1 Long, *The Law of Liability Insurance (1993) § 1.08[1]*, p. 1-50.)

44 There is no dispute that in order for the policy to provide coverage it is the act or event that must be accidental, not the consequences. ( *Shell Oil Co. v. Winterthur Swiss Ins. Co., supra, 12 Cal. App. 4th 715, 749-750*; *Commercial Union Ins. Co. v. Superior Court (1987) 196 Cal. App. 3d 1205, 1208 [242 Cal. Rptr. 454].*)

[***163] **(46b)** The trial court found, however, that the suddenness requirement was fulfilled by the releases and reentrainments of asbestos fibers: "Reliance's arguments assume a finding that . . . damage occurs solely upon installation. However, as discussed, property damage from ACBM occurs episodically upon release and reentrainment of material and fibers. Episodic ACBM releases fulfill the more restrictive sudden and fortuitous requirement Reliance suggests and therefore the events are 'caused by accident.' These releases trigger the policies immediately after the ACBM is installed."

Reliance does not challenge the trial court's finding that the releases qualify as sudden events. Instead, Reliance argues that past releases or reentrainments of asbestos fibers cannot trigger coverage because no actual injury occurred at the time of those events; the injury occurred later, when costs were actually incurred and property value actually diminished. Insofar as this argument advocates a manifestation trigger, we reject the argument for the reasons explained in part B.3. Moreover, as we have explained in part A.3, response costs and diminished property values are not the "property damage"; they are [***164] the measures of the property damage. The property damage is the contamination of the buildings from the introduction of asbestos fibers into the building air supply and onto building surfaces. Each release or reentrainment contributes to the state of con-

tamination and forms a part of the overall property damage. Accordingly, for the reasons we have explained in part B.2 above, insofar as Armstrong is held liable for contamination of a building from released asbestos fibers, the Reliance policies are [*104] triggered if any part of the contamination damage took place when the policies were in effect. [45]

45 Reliance also argues that installation of ACBM during a policy period cannot trigger coverage because installation poses only the potential for release of asbestos fibers. As we have explained in part B.3 above, however, we conclude that actual injury was inflicted at the moment of installation.

Neither Reliance nor any other party has argued that the installation of ACBM fails to meet the suddenness requirement. Nor has any party argued that the installation of ACBM fails to qualify as an unexpected or unintended event so as to meet the other defining element of "accident." Accordingly, we do not decide whether installation of ACBM constitutes an "accident" or an "occurrence" under policies defining "occurrence" as an "accident, including continuous or repeated exposure to conditions."

[***165] D. SCOPE OF COVERAGE

Under the trial court's multiple trigger decision, several successive policies from the date of installation to the date of manifestation may be triggered on a single claim. Thus the question arises how the coverage should be allocated among the insurers whose policies are triggered.

In the present case, the trial court concluded that "[a]lthough the factual basis of the property damage claims differs from that of the bodily injury claims, the Court finds no reason to distinguish property damage from bodily injury for the purposes of the scope and allocation issues raised in phase V." Hence, the court reached the same conclusions it reached with respect to the bodily injury claims (discussed in Issue Group II, part A, *ante*): The court held each of the triggered policies responsible "in full" for the losses, subject to the "no stacking" qualification (only one policy's limits can apply to each claim) and subject to apportionment among the insurers based upon "other insurance" clauses. And the court ruled that [**742] Armstrong has no obligation to share pro rata in indemnification or defense costs because of any uninsured or self-insured periods. The insurers [***166] object to the latter ruling, that Armstrong need not pay a pro rata share of the damages.

The basic insuring agreement of the CGL policies obligates the insurer to pay "all sums which the insured shall become legally obligated to pay as damages" because of property damage. The occurrence policies define an "occurrence" as "an accident, including injurious exposure to conditions, which results during the policy period in . . . [property damage]." In addition, the 1973 policies define property damage as "physical injury to . . . tangible property which occurs during the policy period." **(48)** The insurers argue that each individual insurance policy can be called upon to pay only for property damage that took place during the policy period; [*105] hence, Armstrong must pay for any damage that took place while it was uninsured or self-insured. [46]

46 In contrast to the insurers' position on the bodily injury claims (Issue Group II, part A, *ante*), the insurers have not raised the argument with respect to the property damage claims that liability should be allocated proportionately among the insurers based upon the time each insurer was on the risk. Their argument is confined to the assertion that Armstrong must contribute for periods during which it had no insurance.

[***167] We disagree. The insurers have confused the trigger of coverage and the scope of coverage. As we have explained in Issue Group II, part A, *ante*, the event which triggers an insurance policy's coverage does not define the extent of the coverage. Although a policy is triggered only if property damage takes place "during the policy period," once a policy is triggered, the policy obligates the insurer to pay "all sums" which the insured shall become liable to pay as damages for bodily injury or property damage. The insurer is responsible for the full extent of the insured's liability (up to the policy limits), not just for the part of the damage that occurred during the policy period. ( *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d 1034, 1047-1048*; see also *Hatco Corp. v. W.R. Grace & Co.--Conn., supra, 801 F. Supp. at pp. 1345-1347*; *New Castle County v. Continental Cas. Co. (CNA), supra, 725 F. Supp. 800, 817*; *Dayton Independent School D. v. National Gypsum, supra, 682 F. Supp. at p. 1410*; *Lac d' Amiante du Quebec v. Am. Home Assur., supra, 613 F. Supp. 1549, 1562*; *Monsanto Co. v. C.E. Heath Comp. & Liability, supra, 652 A.2d* [***168] *30, 35*; *J.H. France Refractories v. Allstate, supra, 626 A.2d 502, 508*.) It follows, then, that the insured need not pay a pro rata share for periods during which it had no insurance. ( *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d 1034*.)

We recognize that there is language in some cases to suggest that the insurers' obligations to pay for the full extent of the policyholder's liability apply only if the injury was continuous and indivisible; otherwise, appor-

tionment will be allowed. ( *Hatco Corp. v. W.R. Grace & Co.--Conn., supra, 801 F. Supp. at pp. 1345-1347*; *Lac d' Amiante du Quebec v. Am. Home Assur., supra, 613 F. Supp. at pp. 1562-1563*; *Sandoz, Inc. v. Employer's Liability Assur. Corp. (D.N.J. 1983) 554 F. Supp. 257, 266*; *Diamond Shamrock Chemicals v. Aetna (1992) 258 N.J.Super. 167 [609 A.2d 440, 467].*)

As we have explained in Issue Group II, part A, *ante*, however, apportionment among multiple insurers must be distinguished from apportionment between an insurer and its insured. When multiple policies are triggered on a single claim, the insurers' liability is apportioned pursuant to the "other insurance" clauses of the [***169] policies ( *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d 1034, 1049)* or under the equitable doctrine of contribution [*106] ( *Signal Companies, Inc. v. Harbor Ins. Co. (1980) 27 Cal. 3d 359, 369 [165 Cal. Rptr. 799, 612 P.2d 889]*; *CNA Casualty of California v. Seaboard Surety Co. (1986) 176 Cal. App. 3d 598, 619-620 [222 Cal. Rptr. 276]*). That apportionment, however, has no bearing upon the insurers' obligations to the policyholder. (See *Dayton Independent School D. v. National Gypsum, supra, 682 F. Supp. at pp. 1410-1411* and fn. 21.) A pro rata allocation among insurers "does not reduce their respective obligations to their insured." ( *Sandoz, Inc. v. Employer's Liability Assur. Corp., supra, 554 F. Supp. at p. 267.*) The insurers' contractual obligation to the policyholder [**743] is to cover the full extent of the policyholder's liability (up to the policy limits).

**(49)** Moreover, in our view, the scope of coverage does not depend upon the continuous, indivisible nature of the damage or the application of a continuous trigger. A continuous injury merely gives rise to the scope of coverage issue by triggering several successive policies on an [***170] individual claim. We believe the insurers have the same obligation to respond in full when several successive policies are triggered by continual, episodic property damage. In both situations the claimant's overall damage for which the insured is liable is unitary. It is irrelevant that the damage took place across several policy periods and only a part of the damage occurred during any particular policy period. The plain language of the policies requires that each triggered policy respond in full.

The *Keene* court said as much in dictum: "If each exposure is considered a separate 'injury,' under the terms of the policies, one might be able to argue that each insurer is responsible only for the 'injuries' that occurred during its policy periods . . . . It is clear, however, that such a result would be contrary to the terms of the insurance policies, which explicitly state that the insurer will pay 'all sums which the insured shall become legally obligated to pay as damages because of bodily injury [during the policy period].' As long as there was either inhalation exposure or exposure in residence during a policy period, and as long as Keene must pay damages as a result, the [***171] insurer must indemnify Keene for whatever damages it must pay. . . ." ( *Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at pp. 1044-1045, fn. 20.*)

In the present case, we construe the trial court's decision to mean that although asbestos property damage is composed of a series of discrete injuries, each injury constitutes an ingredient of the overall property damage for which Armstrong is liable. Each release or reentrainment of asbestos fibers, along with the installation of the ACBM, forms a part of the unitary property damage for which Armstrong is alleged to be liable. We follow the [*107] ruling in *Keene* and conclude that as long as there was property damage to a building during a policy period, whether from installation of ACBM or from releases or reentrainments of asbestos fibers from existing ACBM, and as long as Armstrong must pay damages as a result of that property damage, the policies provide coverage (up to the policy limits) for whatever damages Armstrong must pay. [47] Armstrong need not pay a pro rata share.

47 The trial court was not asked to decide the number of occurrences in the building cases, and we express no opinion on that issue.

[***172] E. DUTY TO INDEMNIFY

The uncertainty of Armstrong's underlying liability in the building cases prompted us to pose the question in a request for supplemental briefing whether declaratory relief is appropriate here, whether the determination of coverage for property damage should await resolution of Armstrong's liability in the underlying actions and a determination of the actual types of damages for which Armstrong is liable. [48] We find it unnecessary to analyze that issue in depth, as both sides have agreed there is an actual controversy on the meaning of the policies' language and no reason to defer a ruling on questions of interpretation. [49]

48 Obviously this question does not arise in connection with the asbestos-related bodily injury claims, as there is no dispute that the claimants have suffered bodily injuries; the key question is when the injuries occurred for purposes of triggering coverage. (Issue Group II, part A, *ante.*)

49 We express no opinion on whether declaratory relief would be appropriate if the insured objected to a determination of coverage questions in advance of a determination of liability.

[***173] **(50a)** The insurers argue, however, that the duty to indemnify, as distinct from the coverage of the insurance policies, cannot be determined in advance of the insured's underlying liability. **(51)** The insurers correctly point out that the duty to indemnify is different from the duty to defend. As the court explained in *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th 645, 659, fn. 9*, the duty to defend arises when there is a *potential* for [**744] indemnity. ( *Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal. 4th 1076, 1081 [17 Cal. Rptr. 2d 210, 846 P.2d 792]*; *Gray v. Zurich Insurance Co. (1966) 65 Cal. 2d 263, 276 [54 Cal. Rptr. 104, 419 P.2d 168].*) It may exist even when coverage is in doubt and ultimately does not develop. ( *Horace Mann, supra; Saylin v. California Ins. Guarantee Assn. (1986) 179 Cal. App. 3d 256, 263 [224 Cal. Rptr. 493].*) The duty to indemnify, on the other hand, arises when the insured's underlying liability is established. ( *Civ. Code, § 2778, subd. 1*; *Clark v. Bellefonte Ins. Co. (1980) 113 Cal. App. 3d 326, 336-337 [169 Cal. Rptr. 832]*; *Alberts v. American Casualty Co. (1948) 88 Cal. App. 2d 891, 899-900 [200 P.2d 37]*; [***174] see 1 Long, *The Law* [*108] *of Liability Insurance, supra, § 1.03[4]*, p. 1-11.) The duty to indemnify on a particular claim is determined by the actual basis of liability imposed on the insured. ( *City of Laguna Beach v. Mead Reinsurance Corp. (1990) 226 Cal. App. 3d 822, 829-832 [276 Cal. Rptr. 438]*; *International Surplus Lines Ins. Co. v. Devonshire Coverage Corp. (1979) 93 Cal. App. 3d 601, 610 [155 Cal. Rptr. 870].*) Although an insurer may have a duty to defend, it may ultimately have no duty to indemnify--either because no damages were awarded or because the actual judgment was for damages not covered by the policy. (See *City of Laguna Beach v. Mead Reinsurance Corp., supra, 226 Cal. App. 3d at p. 830*; 1 Cal. Liability Insurance Practice: Claims & Litigation (Cont.Ed.Bar 1992) § 4.6, p. 4-6.2.)

**(52)** Thus, the question whether an insurer has a duty to indemnify the insured on a particular claim is ripe for consideration only if the insured has already incurred liability in the underlying action. ( *Aetna Cas. & Sur. Co. v. PPG Industries, Inc. (D.Ariz. 1983) 554 F. Supp. 290, 296*; *Outboard Marine v. Liberty Mut. Ins. (1992) 154 Ill.2d 90 [180* [***175] *Ill.Dec. 691, 607 N.E.2d 1204, 1221]*; *USF&G v. Wilkin Insulation Co., supra, 578 N.E.2d at p. 930.*) In a declaratory relief action held before the insured's liability has been established, the trial court cannot determine the amount of the insured's indemnity obligation; it must limit its declaration to whether the claim is covered by the policy. ( *Atchison v. Founders Ins. Co. (1958) 166 Cal. App. 2d 432, 439 [333 P.2d 178]*; see *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at p. 659, fn. 9.*) [50]

50 In an analogous context the same rule applies: a direct action by a third party claimant against an insurer must await a final determination of the insured's underlying liability. ( *McKee v. National Union Fire Ins. Co. (1993) 15 Cal. App. 4th 282 [19 Cal. Rptr. 2d 286]*; *Nationwide Ins. Co. v. Superior Court (1982) 128 Cal. App. 3d 711 [180 Cal. Rptr. 464]*; *Laguna Pub. Co. v. Employers Reinsurance Corp.* (C.D.Cal. 1985) 617 F. Supp. 271.)

**(50b)** In the present [***176] case, the insurers argue that the trial court should have denied Armstrong's request for a declaration of the insurers' duty to indemnify either because the request was premature or because Armstrong failed to prove its actual liability. We reject the argument for several reasons.

First, the trial court's declaration of the insurers' obligations to indemnify acknowledges the prematurity of Armstrong's request; the declaration is conditional: "[I]ndemnity obligations are triggered *if it is shown* that ACBM was installed in the building or buildings in question, that ACBM released fiber or material into the air or on surfaces of the buildings in question, or that settled releases of ACBM were disturbed and reentrained into the air, during any portion of the period that the policy was in effect." (Italics [*109] added.) "The building claims trigger the indemnity obligations of any policy that has indemnity obligations *if it is shown* that covered property damage occurred during any portion of the period that the policy was in effect." (Italics added.)

From this language we infer that the trial court contemplated future proceedings between Armstrong and its insurers, after [***177] Armstrong's liability has been established, in which Armstrong would provide proof that the conditions for triggering coverage had been met in a particular case. We note that the trial court made no determination as to which policies would cover any particular claims; that issue was obviously left for future proceedings.

[**745] Second, we reject the insurers' contention that Armstrong failed to prove that its liability will necessarily result from covered property damage. As we have explained in part A.1 above, for purposes of deciding the coverage dispute, the trial court properly looked to the allegations of the underlying complaints and *assumed* Armstrong would be held liable for the damages alleged therein. The underlying complaints allege liability arising either from the release of asbestos fibers or from the mere installation of ACBM. Armstrong was not required to prove more.

The gist of the insurers' argument is not that Armstrong failed to prove its case but that the trial court erroneously found the building claims to constitute covered

property damage. Because we have upheld the trial court's decision and have concluded that installation of ACBM and releases of asbestos [***178] fibers do qualify as "physical injury to tangible property," we find no error in the trial court's declaration that Armstrong is entitled to indemnification *if* Armstrong is held liable for the damages alleged in the underlying complaints.

F. DUTY TO DEFEND

The trial court's decision in phase V on property damage addressed the indemnification obligations of the insurers but said little about the duty to defend: "Each triggered policy has an independent obligation to pay in full any indemnity costs on an asbestos building claim and, if the policy contains a defense obligation, to also pay in full any defense costs on the claim." [51]

> 51 In its phase V decision on property damage, the trial court referred back to its decision in phase III (on bodily injury claims) in which the trial court concluded that although as a legal matter the duty to defend is broader than the duty to indemnify, when applied here the duty to defend coincides with the duty to indemnify: "the trigger and scope of defense follows [*sic*] the trigger and scope of indemnity." That is, with respect to bodily injury claims, "since any policy triggered by a claim has an independent obligation to indemnify, each triggered policy which contains a defense obligation to the insured has an independent obligation to defend or reimburse defense costs, depending on the policy language."

[***179] **(53)** In a separate brief, Liberty Mutual Insurance Company raises the issue of the duty to defend and argues that mere conclusory allegations of [*110] "property damage" in the underlying complaints should not be enough to give rise to a duty to defend. Liberty Mutual asserts that the duty to defend should arise only if the underlying complaints allege actual contamination of the building and not merely a potential health hazard from the presence of ACBM.

Liberty Mutual is correct that as a general rule conclusory allegations are not enough to give rise to a duty to defend. (See *Fire Ins. Exchange v. Jiminez (1986) 184 Cal. App. 3d 437, 443, fn. 2 [229 Cal. Rptr. 83].)* [52] But we construe Liberty Mutual's argument as an alternate attack on the trial court's ruling that the mere presence of ACBM in a building constitutes "physical injury to tangible property." For the reasons explained in part A(3) above, physical injury occurs even in those cases in which there have not yet been any releases of asbestos fibers. Allegations of damages from the presence of ACBM in a building are therefore sufficient to show a potential for coverage and to give rise to a duty to defend.

> 52 The duty to defend is not dependent solely on the allegations in the underlying complaint; the duty to defend may be triggered if the insurer learns of facts from *any* source that create the potential for liability. ( *Gray v. Zurich Insurance Co., supra, 65 Cal. 2d at pp. 276-277*; *CNA Casualty of California v. Seaboard Surety Co. (1986) 176 Cal. App. 3d 598, 606 [222 Cal. Rptr. 276].*) Likewise, the insurer may produce undisputed extrinsic evidence that eliminates the possibility of coverage. (See *Montrose Chemical Corp. v. Superior Court (1993) 6 Cal. 4th 287, 304 [24 Cal. Rptr. 2d 467, 861 P.2d 1153].*)

[***180] G. EXCLUSIONS

The trial court was also asked to determine the applicability of various policy exclusions--the so-called "business risk" exclusions. One commentator has explained the rationale for the business risk exclusions as follows: "In every business venture there is an element of risk; the product fails to perform as expected; it lacks appeal to the consumer and does not sell; or it actively a [**746] malfunctions and a third party suffers a loss. Products liability coverage is designed to protect only the bodily injury or property damage of others and not the business risks that accompany every commercial venture." (7A Appelman, Insurance Law & Practice (rev. ed. 1979) § 4508.01, p. 353.)

**(54)** The trial court concluded that none of the business risk exclusions apply to the asbestos building cases. The insurers first contend that the trial court erred in issuing such a sweeping ruling. They argue that a decision on the applicability of the exclusions must await a determination of the actual basis for Armstrong's liability, for it may turn out that a particular plaintiff [*111] will recover damages which are excluded by the policy. (See *Central Mutual Ins. Co. v. Del Mar Beach* [***181] *Club Owners Assn. (1981) 123 Cal. App. 3d 916, 930-931 [176 Cal. Rptr. 895].*)

We draw the same distinction here that we drew with respect to the coverage dispute discussed in part A above and the duty to indemnify discussed in part E above. For purposes of determining whether the property damage claims are covered or excluded under the insurance policies, we *assume* that Armstrong will be held liable for the damages alleged in the complaints in the underlying building cases. (Cf. *Maryland Cas. Co. v. W.R. Grace & Co., supra, 794 F. Supp. at pp. 1227, 1228* [summary judgment inappropriate to determine application of exclusions in the absence of factual development of the underlying claims].) We express no opin-

ion on whether the damages alleged are sufficient to give rise to liability, nor do we determine whether the exclusions apply in the event Armstrong is actually held liable for damages other than those alleged in the underlying complaints. (See *Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal. 4th at p. 694.*)

1. *Insured's Own Products*

**(55)** The first exclusion put forth by the insurers bars coverage for damage to the insured's own products. [***182] The 1966 and 1973 standard form CGL policies exclude "property damage to . . . the named insured's products arising out of such products or any part of such products." The earlier version (the 1947 standard form) excluded "injury or destruction of . . . any goods or products manufactured, sold, handled, or distributed or premises alienated by the named insured, or work completed by or for the named insured, out of which the accident arises."

The earlier version was explained by the Court of Appeal to mean that " 'if the insured becomes liable to replace or repair any "goods or products" . . . after the same has caused an accident because of a defective condition, the cost of such replacement or repair is not recoverable under the policy. However, if the accident also caused damage to some *other* property or caused personal injury, the insured's liability for such damage or injury becomes a liability of the insurer under the policy, and is not excluded.' " ( *Central Mutual Ins. Co. v. Del Mar Beach Club Owners Assn., supra, 123 Cal. App. 3d at p. 929*, quoting *Liberty Bldg. Co. v. Royal Indem. Co. (1960) 177 Cal. App. 2d 583, 587 [2 Cal. Rptr. 329]*, italics in original.) [***183]

The trial court ruled the "own products" exclusion inapplicable because the underlying building cases allege damage to the remainder of the building, not damage to the ACBM. A similar conclusion was reached by the [*112] Illinois Supreme Court in *USF&G v. Wilkin Insulation Co., supra, 578 N.E.2d 926, 934*. The court reasoned that the underlying complaints seeking recovery for the costs of removal, repair and/or replacement of the ACBM "seek these damages as a result of the contamination visited upon the buildings and the contents therein *by* the product that Wilkin installed. As such, the underlying complaints seek recovery for damage to property other than the product installed by Wilkin . . . ." (Italics in original; see also *Dayton Independent School D. v. National Gypsum, supra, 682 F. Supp. at p. 1412* ["the 'own product' exclusion does not bar coverage for the damages alleged to have been sustained by the Plaintiffs' buildings or their contents"]; accord, *Stonewall Ins. Co. v. Asbestos Claims Management, supra, 73 F.3d at p. 1210*; *Maryland Cas. Co. v. W.R. Grace & Co., supra, 794 F. Supp. at p. 1227*; and see [**747] *Aetna Cas. & Sur. Co. v.* [***184] *PPG Industries, Inc., supra, 554 F. Supp. at p. 294* [damage from foam insulation was damage to the building, not to the insulation itself; hence, exclusion not applicable].)

The reasoning in those preceding asbestos property damage cases conforms to rulings by California courts in analogous settings. ( *Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co., supra, 63 Cal. 2d 602, 606-608* [defective doors caused damage to whole house]; *Economy Lumber Co. v. Insurance Co. of North America, supra, 157 Cal. App. 3d 641, 649-650* [defective siding caused damage to whole house]; cf. *Volf v. Ocean Accident & Guar. Corp. (1958) 50 Cal. 2d 373, 375-376 [325 P.2d 987]* [defective cement damaged only the wall, and the wall was the insured-contractor's own product]; *Diamond Heights Homeowners Assn. v. National American Ins. Co. (1991) 227 Cal. App. 3d 563, 572-573 [277 Cal. Rptr. 906]* [various construction defects damaged the house, but the whole house was the insured-contractor's own product].)

Relying on *Volf* and *Diamond Heights*, the insurers argue that because the underlying claimants are seeking the costs of repairing or replacing only the [***185] ACBM, and not any other part of the building, only damage to the ACBM is at issue in the building cases. Yet, as explained in part A.1 above, we have *assumed*, for purposes of interpreting the policy language, that the buildings themselves have been injured by the ACBM. We hold only that insofar as Armstrong is held liable for the claimed damage to the buildings, the "own products" exclusion does not bar coverage.

2. *Product Recall*

**(56)** The second exclusion advanced by the insurers is the product recall or "sistership" exclusion, which is expressed in the standard policy as [*113] follows: "Damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein."

The trial court found this exclusion, too, inapplicable to the building cases, and we affirm that ruling.

The term "sistership" stems from the practice in the aircraft industry of recalling planes for repairs when a plane [***186] of the same model--a sister ship--had crashed because of a design defect. ( *Arcos Corporation v. American Mutual Liability Ins. Co. (E.D.Pa. 1972) 350 F. Supp. 380, 384, fn. 2*; Annot. (1984) 32 A.L.R.4th 630.) The sistership exclusion "operates to exclude coverage for the cost of 'preventative or curative

action' when the insured withdraws a product in situations in which a danger is merely apprehended. [Citation.] It does not, however, operate to exclude coverage for actual damage caused by the very product giving rise to such an apprehension." ( *Dayton Independent School D. v. National Gypsum, supra, 682 F. Supp. at p. 1412* [asbestos building products], quoting from *Todd Shipyards Corp. v. Turbine Service, Inc. (5th Cir. 1982) 674 F.2d 401, 419* cert. den. *459 U.S. 1036 [74 L. Ed. 2d 602, 103 S. Ct. 447]* [malfunctioning turbine]; accord, *Stonewall Ins. Co. v. Asbestos Claims Management, supra, 73 F.3d at p. 1211* [asbestos building products]; *Maryland Cas. Co. v. W.R. Grace & Co., supra, 794 F. Supp. at p. 1227* [same]; see also *Gulf Mississippi Marine Corp. v. George Engine Co. (5th Cir. 1983) 697 F.2d 668* [defective engines and gears]; [***187] *Marathon Plastics v. Intern. Ins. Co. (1987) 161 Ill.App.3d 452, [112 Ill.Dec. 816, 514 N.E.2d 479, 487]* [defective pipes].)

The insurers argue that because the underlying complaints allege that the mere presence of ACBM poses only a potential health risk, the removal of ACBM from the buildings is based upon an apprehension of danger, not actual damage. The argument is flawed in two respects. First, it ignores the allegations of damage from contamination from asbestos fibers released into the air supply or onto surfaces of the buildings. Second, it ignores the fact that we have assumed, as did the trial court, that actual damage to the buildings has resulted from [**748] the mere presence of still-contained ACBM for which Armstrong will be held liable. Insofar as Armstrong is ultimately held liable for such damage, the sistership exclusion does not bar coverage.

[*114] 3. *Design Defect*

**(57a)** The third exclusion put forth by the insurers was the design defect exclusion. The 1966 standard form CGL excludes: "Property damage resulting from the failure of the named insured's products or work completed by or for the named insured to perform the function or serve the purpose intended [***188] by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to . . . property damage resulting from the active malfunctioning of such products or work."

**(58)** In *American Employers' Ins. Co. v. Maryland Casualty Co. (1st Cir. 1975) 509 F.2d 128, 130*, the court explained the "active malfunctioning" EXCEPTION TO THIS EXCLUSION: "Design errors resulting in mere 'passive' failure to discharge an intended function are regarded as the insured's normal business risk and are excluded from coverage, while design errors themselves causing some positive or 'active' harm deemed extraordinary in the insured's business are covered. Thus, to recite some of the hypotheticals appearing in commentaries dealing with the clause, the policy is not intended to cover liability resulting from the faulty design of an insecticide which fails to kill insects, a hair tonic which fails to prevent baldness, or a rust inhibitor which fails to inhibit rust. On the other hand, the active malfunctioning exception would apply to provide coverage [***189] for liability resulting from an insecticide which harms crops to which it is applied, a hair tonic which causes a scalp rash, or a rust inhibitor which corrodes a radiator to which it is added." (Fns. omitted.)

**(57b)** In the present case, the trial court found that the "active malfunctioning" exception applies to make the design defect exclusion inapplicable: "In the instant case, the alleged defect in the ACBM is not a 'passive' failure to insulate or perform any of the normal functions expected of floor tile, pipe insultation or surfacing material. Rather, as resolved earlier in this phase, the building cases allege that a positive harm results from ACBM. The alleged contamination of the buildings from ACBM is closely analogous to the hypotheticals considered within the scope of the active malfunctioning clause. As in the above examples, the type of resulting harm is a side effect of the product and has nothing to do with the product failing to perform its primary purpose. Therefore, the active malfunctioning limitation applies to the building cases and renders the 1966 CGL design defect exclusion inapplicable."

The insurers do not challenge this ruling as applied to cases in which [***190] the underlying complaints allege asbestos fibers have been released and have [*115] contaminated the building. The insurers argue, however, that in cases alleging damages from the mere presence of still-contained ACBM, there is no "active malfunctioning." Yet, this argument seems to be simply another presentation of the point that the mere presence of still-contained ACBM is not a physical injury. As we have explained in part A.1 above, we must assume for purposes of deciding coverage that the presence of ACBM is injurious and will be the basis of Armstrong's liability to the building owners. And as explained in part A.3, we have concluded that injury from the presence of ACBM qualifies as a physical injury within the meaning of the policies. We therefore hold that insofar as Armstrong is held liable for injuries from the presence of ACBM, the design defect exclusion is inapplicable.

H. EXCESS POLICIES: AGGREGATE OR CATASTROPHE *

* See footnote, *ante*, page 1.

In summary, we [***191] affirm the trial court's decision that all claims in the underlying building cases, whether for releases of asbestos fibers or for the mere presence of ACBM, qualify as claims for "physical injury to . . . tangible property" and are covered by the [**749] insurance policies. We affirm the trial court's decision that coverage is triggered if ACBM was installed during a policy period or if releases or reentrainments took place during a policy period, and we affirm the trial court's ruling that the policies provide coverage "in full," without the participation of Armstrong, (up to the policy limits, and subject to apportionment based upon "other insurance" clauses). We also affirm the judgment concerning the duty to defend and the duty to indemnify. With respect to the judgment on the INA excess policy (paragraph 54), we remand for findings on the objectively reasonable expectations of the insured.

DISPOSITION

The judgment on phase I denying recovery or relief to GAF Corporation under Continental Casualty Company policy RD 9972548 (paragraph 3) is affirmed.

The judgment on phase III concerning the trigger and scope of coverage for bodily injury claims is affirmed, except that the first [***192] sentence of paragraph 8 of the judgment is modified to read that all of a policyholder's policies subject to this judgment that were in effect from the date of the [*116] claimant's first exposure to the policyholder's asbestos product until the date of death or claim, whichever occurs first, are triggered on an asbestos-related bodily injury claim, but the claimant is presumed to have been exposed to all defendant-manufacturers' asbestos products, and the burden is on the insurer to prove that the claimant was not exposed to its policyholder's product before or during the policy period.

The declaration on the meaning of "expected or intended" language (paragraphs 20 and 21) is reversed, but the judgment that coverage exists under the policy of Commercial Union's predecessor issued to Armstrong for asbestos bodily injury claims (paragraph 32) is affirmed.

The judgment that the policies issued to GAF prior to May 26, 1967, by Continental Casualty and by predecessors of Commercial Union provide coverage for asbestos-related bodily injury claims related to the Ruberoid Co. (paragraph 30) is reversed.

The judgment on the effects of the Wellington Agreement (paragraphs 17 through [***193] 19) is affirmed.

The judgment on phase V concerning defense and indemnity obligations of the insurers on asbestos-related property damage claims against Armstrong, concerning policy exclusions, and concerning the trigger and scope of coverage is affirmed, except that the judgment on the INA excess policy (paragraph 54) is reversed and the matter is remanded for findings on the objectively reasonable expectations of the insured.

Newsom, J., * and Stein, Acting P. J., concurred.

* Retired Associate Justice of the Court of Appeal, First District, sitting under assignment by the Chairperson of the Judicial Council.

The petitions of all appellants for review by the Supreme Court were denied August 21, 1996.