# TAB 4

LEXSEE 2 CAL. 4TH 1254

**BANK OF THE WEST, Petitioner, v. THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent; INDUSTRIAL INDEMNITY COMPANY et al., Real Parties in Interest.**

**No. S019556**

**SUPREME COURT OF CALIFORNIA**

***2 Cal. 4th 1254; 833 P.2d 545; 10 Cal. Rptr. 2d 538; 1992 Cal. LEXIS 3489; 61 U.S.L.W. 2102; 92 Cal. Daily Op. Service 6640; 92 Daily Journal DAR 10597***

**July 30, 1992, Decided**

**PRIOR HISTORY:** Superior Court of Contra Costa County, Nos. C88-04328, C88-04346 and C89-00665, Richard S. Flier, Judge.

**DISPOSITION:** The judgment of the Court of Appeal is reversed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court granted summary adjudication of issues in favor of a comprehensive liability insurer, declaring that provisions in a policy issued to a bank covering "damages" the insured must pay for injury arising out of "unfair competition" in the course of "advertising activities," did not cover restitutionary relief paid by the bank under *§ 17203* of the Unfair Business Practices Act (*Bus. & Prof. Code, § 17200 et seq.*). The claims paid by the bank were based on the inadequacy of disclosures to consumers and illegality of the terms of loans to finance automobile insurance premiums. (Superior Court of Contra Costa County, Nos. C88-04328, C88-04346 and C89-00665, Richard S. Flier, Judge.) The Court of Appeal, First Dist., Div. Four, No. A050298, granted the bank's petition for a writ of mandate and vacated the trial court's order.

The Supreme Court reversed the judgment of the Court of Appeal. The court held that insurance coverage for "advertising injury" due to "unfair competition" is limited to claims under the common law and excludes statutory claims; that the policy provision covered "damages," which are available for common law unfair competition, but not relief under *Bus. & Prof. Code, § 17203,* which provides for disgorgement or restitution. So read, the provision was not ambiguous and no construction in favor of the insured was called for. The court further held that the settlement payment represented disgorgement, since if it did not it would not have been for a violation of the act, and if not for such a violation, it could not have been for "unfair competition." The court also held that the claims were not based on "unfair competition" arising under "advertising activities" so as to be insurable under the policy. Although the bank advertised the loan program in question to insurance agents for customers desiring to pay insurance premiums in installments, consumers were not aware of the advertising activities. The policy provision required a causal connection between "advertising activities" and "advertising injury." A mere remote connection between the bank's advertisements and the lending practices resulting in the consumer claims did not give rise to coverage. (Opinion by Panelli, J., with Lucas, C. J., Arabian, Baxter and George, JJ., concurring. Separate concurring opinion by Mosk, J., with Kennard, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1a) (1b) (1c) (1d) Insurance Contracts and Coverage § 79--Risks Covered by Liability Insurance--Damages for Unfair Competition--Restitution Under Unfair Business Practices Act.** --The trial court properly granted summary adjudication of issues in favor of a comprehensive liability insurer, declaring that provisions in a policy issued to a bank covering "damages" the insured must pay for injury arising out of "unfair competition" in the course of "advertising activities," did not cover restitutionary relief paid by the bank in settlement of a consumer class action alleging violations of the Un-

fair Business Practices Act (*Bus. & Prof. Code, § 17200 et seq.*). Insurance coverage for "advertising injury" due to "unfair competition" is limited to claims under the common law and excludes statutory claims; the provision covers "damages," which are available for common law unfair competition, but not by way of relief under *§ 17203* of the act, which provides for disgorgement or restitution. So read, the provision was not ambiguous and no construction in favor of the insured was called for. The settlement payment represented disgorgement, since if it did not it would not have been for a violation of the act, and if not for such a violation, it could not have been for "unfair competition." (Disapproving *United Farm Workers of America v. Superior Court (1975) 47 Cal.App.3d 334, 344 [120 Cal.Rptr. 904]*, to the extent it is inconsistent with the court's opinion.) [See 11 **Witkin,** Summary of Cal. Law (9th ed. 1990) Equity, § 95.]

**(2) Unfair Competition** *§ 3*--**Unfair Practices--Purpose.** --The primary purpose of the Unfair Business Practices Act (*Bus. & Prof. Code, § 17200 et seq.*) is to extend to the entire consuming public the protection once afforded only to business competitors, since the common law tort of unfair competition, which required a showing of competitive injury, did not provide an effective remedy for consumers. Statutory "unfair competition" extends to all unfair and deceptive business practices, and thus cannot be equated with the common law definition of unfair competition.

**(3) Insurance Contracts and Coverage § 15--Interpretation Against Insurer--Ambiguity.** --Although insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply, including *Civ. Code, § 1649*, providing that ambiguous or uncertain terms are to be interpreted in the sense in which the promisor believed the promisee understood it. As applied to a promise of coverage in an insurance policy, the rule protects not the subjective beliefs of the insurer but, rather, the objectively reasonable expectations of the insured. Only if this rule does not resolve the ambiguity is it resolved against the insurer. Thus, a court faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy, since language in a contract must be construed in the context of the instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.

[See 1 **Witkin,** Summary of Cal. Law (9th ed. 1987) Contracts, § 699.]

**(4) Insurance Contracts and Coverage § 79--Risks Covered by Liability Insurance--Return of Wrongfully Acquired Property.** --One may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Such orders do not award "damages" as that term is used in insurance policies.

**(5) Unfair Competition § 10--Actions--Damages and Injunctive Relief.** --The purpose of *Bus. & Prof. Code, § 17203*, authorizing courts to make orders to restore to any person in interest any money or property which may have been acquired by unfair competition, is to deter future violations of the Unfair Business Practices Act (*Bus. & Prof. Code, § 17200 et seq.*) and to foreclose retention by the violator of its ill-gotten gains. If insurance coverage were available for monetary awards under the act, a person found to have violated the act would simply shift the loss to his or her insurer and, in effect, retain the proceeds of the unlawful conduct, a result inconsistent with the act's deterrent purpose. Insurable "damages" do not include claims for costs incurred in disgorging money that has been wrongfully acquired; hence there is no insurance coverage for such claims under *Bus. & Prof. Code, § 17203.*

**(6) Unfair Competition § 4--Acts Constituting Unfair Competition--Advertising--What Constitutes.** --Claims settled by a bank that were based on the inadequacy of disclosures to borrowers and illegality of the terms of the loans, did not amount to "unfair competition" arising under "advertising activities" so as to be insurable under a comprehensive liability policy. Although the bank advertised the loan program in question to insurance agents for customers desiring to pay insurance premiums in installments, consumers were not aware of the advertising activities. The policy provision required a causal connection between "advertising activities" and "advertising injury." A mere remote connection between the bank's advertisements and the lending practices resulting in the consumer claims did not give rise to coverage.

**COUNSEL:** Severson & Werson, Jan T. Chilton and William L. Stern for Petitioner.

Martha Chuchill, Thomas & Porrozzo, Michael H. Porrozzo, Anderson, Kill, Olick & Oshinsky, Eugene R. Anderson, William G. Passannante, Cotchett, Illston & Pitre, Joseph W. Cotchett, Susan Illston, Marie Seth Weiner, Morgan, Ruby, Schofield, Franich & Fredkin, Allen J. Ruby, Lexie D. Schroeder, Thomas T. Anderson, Sherry N. Bass, David A. Beck, Morrison & Hecker, P. John Owen, Ann S. DuRoss, Richard J. Osterman, Jr., Joan E. Smiley, Nossaman, Guthner, Knox & Elliott, Kurt W. Melchior, Jared E. Peterson, Alison S.

Hightower, Patricia Lee Connors, Wilson, Sonsini, Goodrich & Rosati, Denise M. Amantea, Richard F. Cauley, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Denis T. Rice, Helane L. Morrison, Kathryn M. Nelson, H. Joseph Escher III and Alan T. Foster as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Lawrence O. Monin, Michael A. Mathews, Andre Hassid, Crosby, Heafey, Roach & May, Raoul D. Kennedy, Peter W. Davis, Richard de Saint Phalle, Dolores A. Dalton, Paul H. Breslin, Frank Gilbert, Jesse I. Santana, James C. Martin and James H. Kallianis, Jr., for Real Parties in Interest.

Baker, Hostetler, McCutchen & Black, Philip K. Verleger, Donna R. Black, Martin J. McTigue, Jr., Proskauer, Rose, Goetz & Mendelsohn, Phyllis E. Andelin, McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner, James H. Wilkins, Robert K. Landen, Morton, Lulofs & Allen, Michael Charles Comyns, Horvitz & Levy, Ellis J. Horvitz, Peter Abrahams, Lisa Perrochet, Alan I. Widiss, Cummins & White, James D. Otto, Kent M. Bridwell, Haight, Brown & Bonesteel, Roy G. Weatherup, Lawrence A. Tabb, Greines, Martin, Stein & Richland, Irving H. Greines and Feris M. Greenberger as Amici Curiae on behalf of Real Parties in Interest.

**JUDGES:** Opinion by Panelli, J., with Lucas, C. J., Arabian, Baxter and George, JJ., concurring. Separate concurring opinion by Mosk, J., with Kennard, J., concurring.

**OPINION BY:** PANELLI, J.

**OPINION**

[*1258] [**547]

[***540] Comprehensive general liability (CGL) insurance policies generally include coverage for "advertising injury." This coverage, as ordinarily written, applies to "damages" the insured must pay for injury arising out of "unfair competition" occurring in the course of the insured's "advertising activities." We granted review to consider questions regarding the scope of coverage afforded by this standard policy language. As we shall explain, we hold that the CGL policy does not cover claims for advertising injury that arose under the Unfair Business Practices Act. ( *Bus. & Prof. Code, § 17200 et seq.* [1])

1 All further references to statutes are to the Business and Professions Code except as noted or as the context may require.

FACTS AND PROCEDURAL HISTORY

Plaintiffs Industrial Indemnity Company and Industrial Insurance Company of Hawaii, Ltd. (collectively Industrial) have sued for a declaratory judgment determining their obligations under a CGL policy issued to Central Bank. Defendant Bank of the West is Central Bank's successor in interest. (This opinion refers to both entities collectively as the Bank.) Judgment has not been entered. However, by granting Industrial's motion for summary adjudication of issues the trial court has decided that language in the Bank's CGL policy relating to "advertising injury" does not give rise to coverage for the particular claims involved in this case. It is this order that we are reviewing. We are not called upon to decide any other coverage issues or any issues involving the duty to defend.

The coverage dispute arises out of the Bank's settlement of a consumer class action entitled Fallat v. Central Bank (Super. Ct., S.F., No. 865597). To summarize the relevant facts, the Bank developed a program to finance automobile insurance premiums [**548] [***541] for consumers who preferred to pay in installments. The Bank did not advertise the so-called "Coast Program" directly to consumers. Instead, the Bank informed insurance agents that it was willing to lend money to finance premiums and that it would pay fees to agents who referred such business to the Bank. Nor did consumers apply directly to the Bank for loans. Instead, when a consumer expressed a desire to extend payment the insurance agent would ask for a down payment of 20 to 30 percent, obtain the consumer's power of attorney, and apply for a loan [*1259] in the consumer's name. Sometime later, the consumer would receive notice of the loan's acceptance by the Bank and disclosure of its terms. Until receiving such notice, many consumers were unaware both of the Coast Program's existence and that loans had in fact been made. Many were also unaware of the terms of the loans, which included interest at rates of over 126 percent, as well as substantial fees and penalties. Some consumers, upon receiving notification, sought to cancel their loans by paying the balance due. However, the Bank did not permit cancellation.

In their complaint against the Bank, the Fallat plaintiffs alleged violations of the federal Truth-in-Lending Act (*15 U.S.C. § 1601 et seq.*), the Unruh Act ( *Civ. Code, § 1801 et seq.*), the Unfair Business Practices Act (*§ 17200 et seq.*), and a state statute that prohibits excessive liquidated damages ( *Civ. Code, § 1671*). The Fallat plaintiffs also alleged that the loans were unconscionable

and that the Bank had breached the covenant of good faith and fair dealing.

The case was removed to federal court, which remanded all but the federal claims. (*Fallat v. Central Bank* (N.D. Cal., No. C-86-6521 RFP).) On the Fallat plaintiffs' motion for partial summary judgment, the federal court held that the Bank had violated the Truth-in-Lending Act by miscalculating and misdisclosing the interest rate and by failing to give disclosures required by federal law before the loans were consummated. (See *15 U.S.C. § 1638*.) In its order, the court explained that the Bank's miscalculation of interest "resulted in an understatement of an already astronomical APR by over 20 percentage points." The court also found that the additional "error" of untimely disclosure "was built into the incentives given to insurance agents responsible for recommending the Coast Program to their clients." As the court explained, "[t]o the extent insurance agents' compensation is tied to their level of policy sales, such agents have a strong incentive to 'sell' a loan program like the Coast Program *without* making the required [Truth-in-Lending Act] disclosures that could jeopardize a potential sale."

Several months after the federal court ruled, the state court in Fallat addressed the parties' motions for summary adjudication of issues related to the state law claims. The court's order disposing of these motions eliminated the plaintiffs' claims under the Unruh Act ( *Civ. Code, § 1801 et seq.*) and the covenant of good faith and fair dealing but allowed the remaining claims to proceed.

The federal and state court rulings considerably narrowed the scope of the dispute between the Fallat plaintiffs and the Bank. Although the plaintiffs continued to seek injunctive and declaratory relief, the only remaining [*1260] claims under which plaintiffs sought to recover money were their claims under the Unfair Business Practices Act (*§ 17203*), the statute prohibiting excessive liquidated damages ( *Civ. Code, § 1671*), and the Truth-in-Lending Act (*15 U.S.C. § 1640*). In their complaint, the Fallat plaintiffs incorporated each of their claims into their request for relief under the Unfair Business Practices Act. Indeed, the Fallat plaintiffs' only demand for money, other than for punitive damages and attorneys' fees, was for "restitution ... of any and all amounts collected by defendants through their unlawful and unfair business practices ...." (Cf. *§ 17203* [authorizing such relief].)

It was in this posture that the Fallat case settled. Pursuant to a class- wide settlement agreement, the Bank paid the plaintiffs $ 500,000 and attorneys fees, and agreed to make several changes in the operation [**549] [***542] of its Coast Program. The settlement agreement did not characterize the $ 500,000 payment as attributable to any particular claim. However, in the parties' joint motion for approval of the settlement the Fallat plaintiffs' counsel expressed the opinion that $ 500,000 represented the amount that could be recovered either as the return of unlawful liquidated damages ( *Civ. Code, § 1671*) or as the maximum statutory recovery under the Truth-in-Lending Act (*15 U.S.C. § 1640(a)(2)(b)*).

At some point before the Fallat parties agreed to settle, the Bank began to assert that its CGL policy covered the claims in that action. Industrial responded by filing a complaint for declaratory judgment, asking the court to declare that the policy did not provide coverage. The Bank cross-complained for breach of the insurance contract.

The ensuing litigation focused on a single theory of coverage: The Bank sought to prove that the amounts it had paid to the Fallat plaintiffs were "damages" for "unfair competition" that occurred in the course of the Bank's "advertising activities." To support its argument, the Bank looked to the statutory definition of "unfair competition" contained in the Unfair Business Practices Act. (*§ 17200*.) [2] Industrial, in contrast, sought to prove that the policy referred to the common law tort of unfair competition rather than to conduct prohibited by the act. Industrial also sought to prove that insurance was not available for restitutionary relief under the act,[3] and that the Fallat plaintiffs' claims had not occurred "in the course of [the Bank's] advertising activities" within the meaning of the policy.

2 *Section 17200* provides:

"As used in this chapter, *unfair competition* shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." (Italics added.)

3 The only nonpunitive monetary relief available under the Unfair Business Practices Act is the form of restitution described in *section 17203*:

"Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. *The court may make such orders or judgments*, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or *as may be necessary to restore to any person in interest any money* or property, real or personal, *which may have been acquired by*

*means of such unfair competition*." (Italics added.)

[*1261] Industrial moved for summary adjudication of issues to obtain a ruling on the Bank's theory of coverage. The superior court granted the motion. In its order, the court decided the following issues in Industrial's favor, thus holding, in effect, that coverage for "advertising injury" did not include the Fallat plaintiffs' claims:

"1. The phrase 'unfair competition' in the policies insuring [the] Bank and issued by Industrial ... means the common law tort of unfair competition;

"2. The *Fallat* claim does not allege, and could not be amended to allege, the common law tort of unfair competition;

"3. The policies insuring [the] Bank issued by Industrial ... do not cover claims for equitable or restitutionary relief such as provided for in *Business and Professions Code Section 17203*; and

"4. The acts on which the *Fallat* claim was based did not occur in the course of [the] Bank's or the Coast Program's 'advertising activities' within the meaning of the policies referred to in paragraph 1."

When the Bank challenged this ruling in a petition for writ of mandate, the Court of Appeal found coverage and vacated the trial court's order. The court did not conclude that the Fallat plaintiffs had alleged common law claims for unfair competition. Instead, contrary to the weight of authority, the court held that the policy term "unfair competition" was ambiguous and could refer either to the common law or to conduct prohibited by the Unfair Business Practices Act. The court resolved the perceived ambiguity against Industrial.

[**550] [***543] In response to Industrial's further argument that insurable "damages" do not include the restoration of amounts obtained through violations of the Unfair Business Practices Act, the Court of Appeal concluded that the Fallat action could be viewed as seeking compensatory damages in addition to statutory restitution. Although the act does not authorize compensatory damages, the court believed that the law on this point was uncertain. The court also resolved this perceived uncertainty in the law against Industrial. Finally, the court held that the instances of "unfair competition" alleged in [*1262] the Fallat complaint had "occurred in the course of [the Bank's] advertising activities" within the meaning of the policy.

We granted Industrial's petition for review.

DISCUSSION

**(1a)** The ultimate question before us is whether language in the CGL policy concerning "advertising injury" provides coverage for the claims asserted in the Fallat action and, thus, for the Bank's payment to settle such claims.

The relevant policy language provides: "The company [Industrial] will pay on behalf of the insured [the Bank] all sums which the insured shall become legally obligated to pay as *damages* because of ... *advertising injury* to which this insurance applies .... 'Advertising injury' means injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, *unfair competition*, or infringement of copyright, title or slogan." (Italics added.)

This language appears in a "Liability Extended Coverage Endorsement" attached to the Bank's CGL policy. Through various renewals, the policy was in effect from April 1, 1984, to April 1, 1986. The language of the endorsement generally follows that of a form drafted in 1973 by the Insurance Services Office, Inc. (ISO), an organization that develops standard policy forms for the insurance industry and collects statistical data and estimates risks relevant to the forms. (See generally *In re Insurance Antitrust Litigation (9th Cir. 1991) 938 F.2d 919*.) In 1986 ISO developed a revised CGL policy that replaced the term "unfair competition" with "style of doing business." However, several insurance companies continue to offer coverage under the older form and many coverage disputes under the older form, including this case, remain pending.

A. *The Policy Term "Unfair Competition" Does Not Refer to Conduct Prohibited by the Unfair Business Practices Act.*

The Court of Appeal, as already mentioned, held that the CGL policy's reference to "unfair competition" was ambiguous and could refer either to statutory or to common law claims. Industrial challenges this conclusion.

The Court of Appeal's decision in this case stands virtually alone among published opinions in holding that the CGL policy's standard language [*1263] covers claims under a state statute prohibiting unfair business practices. The authority against coverage for such claims is overwhelming. ( *Seaboard Sur. Co. v. Ralph Williams' N.W. Chrys. P., Inc. (1973) 81 Wn.2d 740, [504 P.2d 1139, 1140-1143]*; *Ruder & Finn Inc. v. Seaboard Sur. Co. (1981) 52 N.Y.2d 663 [439 N.Y.S.2d. 858, 422 N.E.2d. 518, 522]*; *Pine Top Ins. v. Public Util. D. 1 of Chelan Cty. (E.D.Wash. 1987) 676 F.Supp. 212, 215-217*; *Globe Indem. Co. v. First American State Bank (W.D.Wash. 1989) 720 F.Supp. 853, 855- 857*; *Westfield*

*Ins. Co. v. TWT, Inc. (N.D.Cal. 1989) 723 F.Supp. 492, 496*; *Boggs v. Whitaker, Lipp & Helea, Inc. (1990) 56 Wn.App. 583 [784 P.2d 1273, 1275-1276]*; *Aetna Cas. & Sur. Co. v. Trans World Assur. Co. (N.D.Cal. 1990) 745 F.Supp. 1524, 1528- 1529*; *Tigera Group, Inc. v. Commerce & Industry Ins. (N.D.Cal. 1991) 753 F.Supp. 858, 859-861*; *Nationwide Mut. Ins. Co. v. Dynasty Solar, Inc. (N.D.Cal. 1990) 753 F.Supp. 853, 855-858.*)

[**551] [***544] In two published opinions, lower federal courts in the Ninth Circuit have found *a duty to defend* claims under the Unfair Business Practices Act. ( *American States Insurance Co. v. Canyon Creek (N.D.Cal. 1991) 786 F.Supp. 821, 827-828*; *Keating v. National Union Fire Ins. Co. (C.D.Cal. 1990) 754 F.Supp. 1431, 1435-1437, 1441.*) However, these holdings are against the clear weight of authority both generally and in the Ninth Circuit. (See the cases cited above.)

The majority of courts have concluded that the term "unfair competition" as used in policy language defining "advertising injury" refers to the common law tort of unfair competition rather than to conduct prohibited by unfair business practice statutes. As we shall explain, this conclusion substantially limits the scope of coverage.

The common law tort of unfair competition is generally thought to be synonymous with the act of "passing off" one's goods as those of another. The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection. (See generally 1 Callmann, Unfair Competition, Trademarks & Monopolies (4th ed. 1981) § 2.01-2.03.) According to some authorities, the tort also includes acts analogous to "passing off," such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market. (See Rest., Torts, § 711-743; see also 1 Callmann, *supra*, § 2.04.)

Expansion of legal remedies against deceptive business practices occurred not so much through the common law as through the enactment of statutes, particularly the Federal Trade Commission Act. (*15 U.S.C. § 45.*) Of particular importance was a 1938 amendment to the act, which expanded the [*1264] Federal Trade Commission's (FTC) preexisting jurisdiction over "unfair methods of competition" to include "unfair or deceptive acts or practices." (52 Stat. 111 (1938), amending *15 U.S.C. § 45.*) This amendment, which became a model for state regulatory statutes, gave the FTC jurisdiction over unfair business practices that harmed the public, whether or not such practices also implicated the interests of competitors. (See *FTC v. Sperry & Hutchinson Co. (1972) 405 U.S. 233, 239-244 [31 L.Ed.2d 170, 176-179, 92 S.Ct. 898.*) A host of so-called "little FTC Acts" followed, including California's Unfair Business Practices Act. (*§ 17200 et seq.*; see also Civ. Code, former § 3369.)

**(2)** The primary purpose of these statutes was to "extend[] to the entire consuming public the protection once afforded only to business competitors." ( *Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 109 [101 Cal.Rptr. 745, 496 P.2d 817]*, interpreting Civ. Code, former § 3369.) The common law tort of unfair competition, which required a showing of competitive injury, did not provide an effective remedy for consumers. (See *Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660]*; *Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at pp. 109-110.*) In contrast, statutory "unfair competition" extends to all unfair and deceptive business practices. For this reason, the statutory definition of "unfair competition" "cannot be equated with the common law definition ...." ( *Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at p. 109*, interpreting Civ. Code, former § 3369.)

**(1b)** The majority of published opinions, as already mentioned, hold that insurance coverage for "advertising injury" due to "unfair competition" is limited to claims under the common law and excludes statutory claims. The Bank takes issue with these holdings. **(3)** Because the CGL policy does not define "unfair competition," that term, according to the Bank, is ambiguous and must be construed against the insurer. (See *Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168].*)

The Bank has invoked this rule of construction too early in the interpretive process. While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation [**552] [***545] apply. (See *AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253]* (AIU).) The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. ( *Civ. Code, § 1636.*) If contractual language is clear and explicit, it governs. ( *Civ. Code, § 1638.*) On the other hand, "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor [*1265] believed, at the time of making it, that the promisee understood it." (*Id., § 1649*; see *AIU, supra, 51 Cal.3d at p. 822.*) This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the insured." ( *AIU, supra, at p. 822.*) Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. (See *AIU, supra, at p. 822.*)

In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. ( *Producers Dairy Delivery Co. v. Sentry Ins. Co. (1986) 41 Cal.3d 903, 916- 917* & fn. 7 [*226 Cal.Rptr. 558, 718 P.2d 920]*.) This is because "*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract*." ( *Id., at p. 916, fn. 7*, italics added; cf. *Civ. Code, § 1641*.)

**(1c)** It is obviously possible to argue that the term "unfair competition," in the abstract, might refer to statutory claims. As the Bank correctly observes, policy terms must be read in their "ordinary and popular sense" ( *Civ. Code, § 1644*; see also *AIU, supra, 51 Cal.3d at p. 822*; cf. *Reserve Ins. Co. v. Pisciotta (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764]*), and definitions of "unfair competition" in standard dictionaries generally include acts that harm the public as well as acts that harm competitors only. One dictionary, for example, defines "unfair competition" as "business competition effected by an act that is deceptive and in effect a fraud on the public or that otherwise violates the legal and equitable rights of a competitor or the public." (See Webster's Third New Internat. Dict. (unabridged ed. 1961) p. 2494; cf. Random House Dict. of the English Language (unabridged ed. 1979) p. 1549 [giving "unfair competition" as a synonym for "unfair practices"].)

While the foregoing argument is probably correct as a matter of abstract philology, it is defective as a matter of policy interpretation because it disregards the context. The policy does not purport to cover "unfair competition" in the abstract; instead, it covers "*damages*" for "advertising injury" caused by "unfair competition." Read in this context, the term "unfair competition" can only refer to a civil wrong that can support an award of damages.

Damages are available for common law unfair competition (see generally 4 Callmann, *supra*, § 22.48-22.51) and for each of the other wrongs [*1266] enumerated in the CGL policy's advertising injury coverage (i.e., libel, slander, defamation, violation of right of privacy, and infringement of copyright, title or slogan).

In contrast, damages are not available under *section 17203*. ( *Dean Witter Reynolds, Inc. v. Superior Court (1989) 211 Cal.App.3d 758, 774 [259 Cal.Rptr. 789]*; *Industrial Indemnity Co. v. Superior Court (1989) 209 Cal.App.3d 1093, 1095- 1097 [257 Cal.Rptr. 655]*; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 95, p. 776; see also *Chern v. Bank of America (1976) 15 Cal.3d 866, 875 [127 Cal.Rptr. 110, 544 P.2d 1310]* [interpreting the nearly identical language of section 17535].) The only nonpunitive monetary relief available under the Unfair Business Practices Act is the disgorgement of money that has been [**553] [***546] wrongfully obtained or, in the language of the statute, an order "restor[ing] ... money ... which may have been acquired by means of ... unfair competition." (*§ 17203*; cf. § 17206, 17207 [penalties].)

The Bank argues that the term "damages" for insurance purposes includes virtually all forms of monetary relief, including disgorgement orders under *section 17203*. However, the argument is too broad. **(4)** It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Such orders do not award "damages" as that term is used in insurance policies. (See *Jaffe v. Cranford Ins. Co. (1985) 168 Cal.App.3d 930, 934-935 [214 Cal.Rptr. 567]*; *AIU, supra, 51 Cal.3d at p. 836*; see also *O'Neill Investigations v. Ill. Emp. Ins., etc. (Alaska 1981) 636 P.2d 1170, 1173-1177*; *Central Dauphin School v. American Cas. Co. (1981) 493 Pa. 254 [426 A.2d 94, 95-97, 21 A.L.R.4th 884]*; *Haines v. St. Paul Fire & Marine Ins. Co. (D.Md. 1977) 428 F.Supp. 435, 439-442*; *Seaboard Sur. Co. v. Ralph Williams' N.W. Chrys. P., Inc., supra, 504 P.2d at pp. 1140-1143*.)

**(5)** To explain the conclusion that insurable damages do not include the costs of disgorgement under *section 17203*, it is necessary to review the scope and purpose of the Unfair Business Practices Act and its remedial provisions.

The Unfair Business Practices Act defines "unfair competition" as any "unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising ...." (*§ 17200*.) The Legislature intended this "sweeping language" to include " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ( *Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at pp. 111, 113*, citation omitted.) In drafting the act, the Legislature deliberately traded the attributes of tort [*1267] law for speed and administrative simplicity. As a result, to state a claim under the act one need not plead and prove the elements of a tort. Instead, one need only show that "members of the public are likely to be deceived." ( *Chern v. Bank of America, supra, 15 Cal.3d at p. 876*; see also *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d at p. 211*.)

*Section 17203*, which incorporates the broad, statutory definition of "unfair competition," permits "any court of competent jurisdiction" to enjoin "[a]ny person

performing or proposing to perform an act of unfair competition ...." (*§ 17203*.) The section also authorizes courts to make such orders as "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." () The purpose of such orders is "to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains." ( *Fletcher v. Security Pacific National Bank (1979) 23 Cal.3d 442, 449 [153 Cal.Rptr. 28, 591 P.2d 51]* [interpreting the nearly identical language of section 17535]; see also *People v. Superior Court (Jayhill) (1973) 9 Cal.3d 283, 288-289 &* fn. 3 [*107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191]*.) The Legislature considered this purpose so important that it authorized courts to order restitution without individualized proof of deception, reliance, and injury if necessary to prevent the use or employment of an unfair practice. ( *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d at p. 211*; see also *Fletcher v. Security Pacific National Bank, supra, 23 Cal.3d at pp. 449-453*.)

If insurance coverage were available for monetary awards under the Unfair Business Practices Act, a person found to have violated the act would simply shift the loss to his insurer and, in effect, retain the proceeds of his unlawful conduct. Such a result would be inconsistent with the act's deterrent purpose. As we have previously explained, " '[t]o permit the [retention of even] a portion of the illicit profits, would impair the full impact of the deterrent [**554] [***547] force that is essential if adequate enforcement [of the law] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom.' " ( *Fletcher v. Security Pacific National Bank, supra, 23 Cal.3d at p. 451*, quoting *Securities & Exchange Com'n v. Golconda Mining Co. (S.D.N.Y. 1971) 327 F.Supp. 257, 259-260* [brackets in *Fletcher*].)

The Court of Appeal below, which found coverage for statutory unfair competition claims under *section 17203*, sacrificed the deterrent goal of the Unfair Business Practices Act to a rule of construction, i.e., the principle that insurance policies should be interpreted to maximize coverage. The sacrifice, [*1268] however, is unnecessary if one applies the rule that insurable damages do not include costs incurred in disgorging money that has been wrongfully acquired. This rule bars coverage for claims under *section 17203*.

This was the reasoning of the court that first addressed the issue that is now before us. ( *Seaboard Sur. Co. v. Ralph Williams' N.W. Chrys. P., Inc., supra, 504 P.2d 1139* (*Seaboard*).) The insured in *Seaboard*, an automobile dealer, had been sued by the Attorney General of Washington for violations of Washington's Consumer Protection Act. The Washington statute, like California's Unfair Business Practices Act, prohibited "unfair methods of competition and unfair or deceptive acts or practices" and authorized the court to award injunctive relief and disgorgement but not damages. The dealer's liability insurer sued for declaratory relief to establish that it had no duty to defend under policy language providing coverage for "unfair competition" that caused "advertising injury." The Supreme Court of Washington held that the insurer had no duty to defend because the action did not threaten the insured with a judgment for "damages" within the meaning of the policy. (*Id., at pp. 1140-1143*.)

The principle that underlies the *Seaboard* decision is recognized in California law. The leading case is *Jaffe v. Cranford Ins. Co., supra, 168 Cal.App.3d 930* (*Jaffe*). The insured in *Jaffe*, a psychiatrist, was prosecuted by the Attorney General for the fraudulent receipt of Medi-Cal payments. The insured's malpractice insurer refused to provide a defense in the criminal action. After the insured was acquitted, he sued the insurer for reimbursement of his defense costs. Observing that his policy covered "damages," the insured argued that one consequence of a conviction might have been an order requiring him to reimburse the state for Medi-Cal overpayments. (See *Welf. & Inst. Code, § 14172*.)

The *Jaffe* court rejected the insured's argument as dependent on an overly broad interpretation of the term "damages." As the court explained, " '[d]amages' describes a payment made to compensate a party for injuries suffered. [In contrast, the return of Medi-Cal overpayments] is more properly characterized as restitutionary rather than compensatory in nature. The defendant is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct. At least absent demonstrably unusual circumstances, we have doubts whether an insurance policy which purported to insure a party against payments of a restitutionary nature would comport with public policy. Although the concept of 'restitution' may have a broader meaning in other contexts, we limit our reference to it here to situations in which the defendant is required to restore to the plaintiff that which was wrongfully acquired." ( *Jaffe, supra, 168 Cal.App.3d at p. 935*.)

[*1269] This reasoning has also found acceptance in other jurisdictions. For example, in *O'Neill Investigations v. Ill. Emp. Ins., etc., supra, 636 P.2d 1170*, the Supreme Court of Alaska held that a debt collector's professional liability insurance did not cover a claim under that state's Unfair Trade Practices and Consumer Protection Act for the restoration of money acquired from consumers through unfair collection practices. (See *id., at pp. 1173-1177*.) In *Central Dauphin School v. American*

*Cas.* [**555] [***548] *Co., supra, 426 A.2d 94, 95-97*, the Supreme Court of Pennsylvania held that a school district's liability insurance policy did not cover a claim by taxpayers for the return of unlawfully collected taxes. Similarly, in *Haines v. St. Paul Fire & Marine Ins. Co., supra, 428 F.Supp. 435, 439-442*, the federal court for the District of Maryland held that a law firm's professional liability insurance did not cover an action by the Securities Exchange Commission that threatened the insured with a judgment requiring it to disgorge attorneys' fees; the action did not seek "damages" within the meaning of the insurance policy.

The public policy rationale that underlies these holdings, explicitly or implicitly, is this: When the law requires a wrongdoer to disgorge money or property acquired through a violation of the law, to permit the wrongdoer to transfer the cost of disgorgement to an insurer would eliminate the incentive for obeying the law. Otherwise, the wrongdoer would retain the proceeds of his illegal acts, merely shifting his loss to an insurer. (Cf. *Jaffe, supra, 168 Cal.App.3d at p. 935*; *Central Dauphin School v. American Cas. Co., supra, 426 A.2d at p. 96.*) [4]

4 The Bank argues that Industrial waived the "public policy" issue by failing to raise it below. To the contrary, Industrial has advanced this position throughout the litigation. Citing *Jaffe, supra, 168 Cal.App.3d 930*, as authority, Industrial argued in its motion for summary adjudication that "[c]laims for ... restitutionary relief ... such as authorized by *Sections 17200 et seq.* do *not* entail 'damages' under liability insurance policies." Industrial prevailed on this issue in the trial court and renewed it in the Court of Appeal, which discussed the issue in its opinion.

Upon close examination, the Bank's claim of "waiver" boils down to the observation that Industrial did not attach the "public policy" label to its argument.

The Bank does not argue that monetary relief under the Unfair Business Practices Act is not intended to serve the goal of deterrence. Instead, the Bank argues that insurance for statutory restitution is permissible because the holding in *Jaffe, supra, 168 Cal.App.3d 930*, did not survive this court's decision in *AIU, supra, 51 Cal.3d 807*. To the contrary, *AIU* confirms the holding in *Jaffe*.

The insured in *AIU*, who had allowed hazardous wastes to contaminate groundwater, was ordered to reimburse the government for its cleanup and response costs under the Comprehensive Environmental Response, Compensation, and Liability Act. (*42 U.S.C. § 9601 et seq.*) One of the questions [*1270] before us was whether the government's suit for reimbursement of cleanup costs was an action for "damages" within the meaning of a CGL policy. We held that the suit did seek "damages" because the judgment awarding reimbursement was analogous to a judgment awarding damages for injury to property, measured by the cost of restoring the property to its original condition. Under the applicable statutes, the government could have proceeded against the insured either by requiring the insured to take remedial action or by taking remedial action itself and suing for reimbursement. The government chose the latter alternative. ( *AIU, supra, 51 Cal.3d at pp. 829-837.*)

The insurer in *AIU* argued that the *Jaffe* rule barred coverage for reimbursement of cleanup costs because such costs were a form of "restitution" rather than "damages." However, we rejected the analogy to *Jaffe* because "[r]eimbursement of response costs ... is not restitutive in the narrow sense identified by *Jaffe* as inappropriate for insurance coverage." ( *AIU, supra, 51 Cal.3d at p. 836.*)

Contrary to the Bank's argument, *AIU* did not overrule *Jaffe* or hold that any award capable of bearing the "restitution" label is insurable as "damages." We did hold in *AIU* that insurable "damages" include monetary awards that represent compensation for harm to third parties, even if such awards bear the label "restitution." However, we were also careful to note prior holdings to the effect that, "as a matter of public policy, an insured's payment of certain types of restitution cannot be covered by insurance." ( *AIU, supra, 51 Cal.3d at p. 836.*) [**556] [***549] We mentioned two illustrations of the rule: *Jaffe, supra, 168 Cal.App.3d 930*, which held that liability insurance would not cover the insured's restitution of Medi-Cal overpayments, and *State Farm Fire & Cas. Co. v. Superior Court (1987) 191 Cal.App.3d 74 [236 Cal.Rptr. 216]*, which held that insurance would not cover the insured's payment of statutory restitution to the victims of crime. To emphasize the distinction between what is insurable and what is not, we noted that *Jaffe* bars coverage only in " 'situations in which *the defendant is required to restore to the plaintiff that which was wrongfully acquired*.' " ( *AIU, supra, 51 Cal.3d at p. 836*, quoting *Jaffe, supra, 168 Cal.App.3d at p. 935*, italics added.)

The Bank also contends that a rule of public policy barring coverage for actions under the Unfair Business Practices Act would contradict *Insurance Code section 533.5*. In this statute, the Legislature declared that "[n]o policy of insurance" shall provide "coverage" or "any duty to defend" in "any action or proceeding" brought under the Unfair Business Practices Act "by the Attorney General, any district attorney, any city prosecutor, or any [*1271] county counsel ...." While *section 533.5* thus bars insurance in statutory unfair competition actions brought by the government, the Bank argues that the

section also authorizes, by implication, insurance in actions brought by private plaintiffs.

The argument is easily met. The history of *section 533.5* does not suggest that the Legislature gave any thought to the availability of insurance coverage in private actions under the Unfair Business Practices Act. As originally enacted, *section 533.5* did not even refer to the act. Instead, it barred coverage in all civil and criminal actions, whatever the theory of liability, brought by the Attorney General, a district attorney, or a city prosecutor. (Stats. 1988, ch. 489, § 1, p. 1896.) In 1990, the Legislature limited the statute's reach to criminal actions and actions under the Unfair Business Practices Act. (Stats. 1990, ch. 1512, § 1.)

This legislative history might support the inference that the Legislature has equated actions under the Unfair Business Practices Act with criminal actions, at least for insurance purposes. (Obviously, the comparison does not advance the Bank's argument for coverage.) However, the legislative history does not support the additional inference that the Legislature actually considered the availability of insurance coverage in actions brought by private plaintiffs. On that point the history is silent. Lacking relevant legislation, the question can only be resolved by applying the more general principles of law on which we rely.

**(1d)** It remains to be considered whether the amount that the Bank paid to settle the Fallat action represented disgorgement under the Unfair Business Practices Act. The Bank strenuously argues that its payment did not represent disgorgement because the superior court had already dismissed, prior to settlement, the plaintiffs' claims under the Unruh Act ( *Civ. Code, § 1801 et seq.*) for recovery of excessive finance charges. The claims still being asserted at the time of settlement were pursuant to a state statute prohibiting excessive liquidated damages ( *Civ. Code, § 1671*) and the Truth-in-Lending Act (*15 U.S.C. § 1638, 1640*). The Bank asserts that these claims amounted to claims of "unfair competition" under the CGL policy because the Fallat plaintiffs incorporated them into their claim for statutory unfair competition under *section 17203*, which also survived summary adjudication. [5]

5 The superior court held that the Fallat complaint "[did] not allege, and could not be amended to allege, the *common law* tort of unfair competition." (Italics added.) This ruling followed the Bank's acquiescence in Industrial's argument that competitive injury is an element of common law unfair competition ( *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d at p. 209*; *Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at pp. 109-110*) and that the Fallat plaintiffs' claims did not implicate the interests of the Bank's competitors.

Now, the Bank argues that "competitive injury has been cast aside as a requirement for common-law unfair competition claims ...." However, common law cases cited by the Bank establish only that courts may enjoin the unfair use of trade names or the sale of confusingly similar goods. (E.g., *Academy of Motion Picture, etc. v. Benson (1940) 15 Cal.2d 685 [104 P.2d 650]*; *American Philatelic Soc. v. Claibourne (1935) 3 Cal.2d 689 [46 P.2d 135]*.)

[**557] [***550] The problem with this argument is that it contradicts the Bank's theory of coverage. To argue for coverage, the Bank takes the position that the policy [*1272] term "unfair competition" includes claims under the Unfair Business Practices Act. Next, to avoid the rule that disgorgement is not a form of "damages" for insurance purposes, the Bank argues that its settlement payment did not represent disgorgement. However, disgorgement is the only nonpunitive monetary remedy available under the Unfair Business Practices Act. (See *§ 17203* [authorizing relief "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition"].) Thus, if the settlement payment did not represent disgorgement, it could not have been for a violation of the act. However, if the payment was not for a violation of the act, it could not have been for "unfair competition" and, hence, was not covered even under the Bank's broad definition of that term.

In summary, the Unfair Business Practices Act does not authorize an award of damages, and a definition of "unfair competition" that cannot support a claim for damages cannot reflect the objectively reasonable expectations of the insured. Accordingly, we hold that the policy term "unfair competition" does not refer to conduct that violates the Unfair Business Practices Act. [6] (*§ 17200 et seq.*) Because the context elucidates the meaning, there is no need to resort to the rule that ambiguities are resolved against the insurer. (See *AIU, supra, 51 Cal.3d at p. 822*.)

6 The Bank argues that coverage restricted to claims of common law unfair competition would be illusory because a plaintiff must show fraud to recover damages under that theory (e.g., *Wood v. Peffer (1942) 55 Cal.App.2d 116, 125-126 [130 P.2d 220]*) and because *Insurance Code section 533* bars insurance for losses "caused by the willful act of the insured." We see no occasion to address this argument. No common law claim is involved in this case and, regardless of the scope

of coverage for such claims, it is clear that claims under the Unfair Business Practices Act are not covered.

The Court of Appeal reached a different conclusion on this point because it believed that the case law was "in conflict as to whether damages are recoverable under *section 17203*." However, we perceive no conflict. In *Chern v. Bank of America, supra, 15 Cal.3d 866*, we expressly held that damages were not available under section 17535, another section of the Unfair Business Practices Act that authorizes courts to order the restoration of money acquired through misleading advertising. (*15 Cal.3d at p. 875*.) The language of section 17535 is nearly identical to that of *section 17203*, [*1273] which was based on the former. In addition, the history of *section 17203* demonstrates that the Legislature expressly intended both sections to be "interpreted in the same way." (Assem. Com. of Research, Report on Assem. Bill. No. 3279 (1975-1976 Reg. Sess.), p. 1.) *Chern* effectively overruled the earlier, contrary holding in *United Farm Workers of America v. Superior Court (1975) 47 Cal.App.3d 334, 344 [120 Cal.Rptr. 904]*, which the Court of Appeal in the case before us read to create a "conflict."

It is true that this court once expressly declined to decide a litigant's claim for compensatory damages under the Unfair Business Practices Act. ( *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d at p. 215*; cf. *id.*, dis opn. of Bird, C. J., at pp. 223-228 [opining that damages should be available under the Unfair Business Practices Act].) However, in view of *Chern's* express holding that damages are not available under the act, the Court of Appeal read far too much into *Committee on Children's Television, Inc., supra.* Today, the point is too well settled to warrant extensive discussion. [7]

7 See *Dean Witter Reynolds, Inc. v. Superior Court, supra, 211 Cal.App.3d at page 774*; *Industrial Indemnity Co. v. Superior Court, supra, 209 Cal.App.3d at pages 1095-1097*; see also *E.W. French & Sons, Inc. v. General Portland Inc. (9th Cir. 1989) 885 F.2d 1392, 1401-1402*; *Little Oil Co., Inc. v. Atlantic Richfield Co. (9th Cir. 1988) 852 F.2d 441, 445*; *Kates v. Crocker National Bank (9th Cir. 1985) 776 F.2d 1396, 1398*; *Burt on Behalf of McDonnell Douglas v. Danforth (E.D.Mo. 1990) 742 F.Supp. 1043, 1052-1054*; *Xerox Corp. v. Apple Computer, Inc. (N.D.Cal. 1990) 734 F.Supp. 1542, 1550*, footnote 14; *Newport Components v. NEC Home Electronics (C.D.Cal. 1987) 671 F.Supp. 1525, 1550-1552*; *Meta- Film Associates, Inc. v. MCA, Inc. (C.D.Cal. 1984) 586 F.Supp. 1346, 1363*; see also 11 Witkin, Summary of Cal. Law, *supra*, at page 776.

*United Farm Workers of America v. Superior Court, supra, 47 Cal.App.3d 334*, is disapproved to the extent it is inconsistent with our opinion.

[**558] [***551] In conclusion, we hold that the superior court properly granted Industrial's motion for summary adjudication of issues on the theory that the *Fallat* complaint did not seek "damages" for "unfair competition" within the meaning of the CGL policy. The Court of Appeal's decision to the contrary was erroneous and must be reversed.

B. *The Fallat Plaintiffs' Injuries Did Not Occur "In the Course of" the Bank's Advertising Activities.*

**(6)** The Bank's CGL policy covers "damages" for "unfair competition" only if such conduct "occur[s] in the course of the ... insured's advertising activities." Because the Bank did not advertise its Coast Program to consumers, Industrial argues that the unlawful lending practices alleged in the *Fallat* complaint did not occur in the course of the Bank's advertising activities.

While we have concluded that the Fallat complaint did not seek "damages" for "unfair competition" within the meaning of the CGL policy, other [*1274] questions about the scope of coverage for "advertising injury" continue to have substantial importance. For that reason we shall address, as an alternative, independent basis for our decision, the parties' arguments about the requisite connection between "advertising activities" and "advertising injury."

As already discussed, the state and federal court orders granting summary adjudication narrowed the Fallat plaintiffs' claims for monetary relief to a few claims based on unlawful lending practices. These included the claims under the Truth-in-Lending Act for failing to make timely and correct disclosures (*15 U.S.C. § 1638, 1640*) and under a state statute that prohibits excessive liquidated damages ( *Civ. Code, § 1671*). In their complaint, the Fallat plaintiffs incorporated both of these claims into their request for disgorgement under the Unfair Business Practices Act. (*§ 17203*.) Arguing that the remaining claims thus amounted to "unfair competition," the Bank asserted a claim for coverage under the policy.

The trial court, in its order granting Industrial's motion for summary adjudication, found that "[t]he acts on which the *Fallat* claim was based did not occur in the course of [the Bank's] 'advertising activities' within the meaning of the policies ...." While the Bank advertised its Coast Program to insurance agents through representatives and trade journals, it does not appear that consumers were aware of these advertising activities. Thus,

it is only with considerable difficulty that the Bank is able to argue that the alleged acts of "unfair competition" "occur[ed] in the course of ... [the Bank's] advertising activities."

In order to base a claim for coverage on advertising directed to insurance agents, the Bank must take the difficult position that the CGL policy does not require a causal connection between "advertising activities" and "advertising injury." Instead, according to the Bank, there is coverage if any connection, however remote, exists between the Bank's advertisements and the lending practices that harmed the Fallat plaintiffs, even if the advertisements, themselves, did not cause the harm.

This argument has not found acceptance in other jurisdictions. Those courts that have addressed the issue in published opinions have rejected coverage claims based on injuries that did not have a causal connection with the insured's advertising activities. ( *National Union Fire Ins. Co. v. Siliconix Inc. (N.D.Cal. 1989) 729 F.Supp. 77, 79-80*; *Meyers & Sons Corp. v. Zurich American Ins. (1989) 74 N.Y.2d 298 [546* [**559] [***552] *N.Y.S.2d. 818, 545 N.E.2d. 1206-1209]*; *Lazzara Oil Co. v. Columbia Casualty Co. (M.D.Fla. 1988) 683 F.Supp. 777, 780*; cf. *First Bank & Trust Co. v. N.H. Ins. Group (1983) 124 N.H. 417 [469 A.2d 1367, 1368].*)

[*1275] The reasoning that supports the requirement of a causal connection is clear and persuasive: "Taken to its extreme, [the argument that no causal relationship is necessary] would lead to the conclusion that any harmful act, if it were advertised in some way, would fall under the grant of coverage merely because it was advertised. Under this rationale, for instance, injury due to a defective product which is sold as a result of advertising activity and which later harms a consumer may fall within the coverage grant. The definition of 'advertising' is quite broad and may encompass a great deal of activity. Thus, a great many acts may fall within the ambit of advertising, extending advertising injury coverage far beyond the reasonable expectations of the insured." ( *National Union Fire Ins. Co. v. Siliconix Inc., supra, 729 F.Supp. at p. 80*, fn. omitted.)

Under this rule, it has been held that a claim of patent infringement does not "occur[] in the course of ... advertising activities" within the meaning of the policy even though the insured advertises the infringing product, if the claim of infringement is based on the sale or importation of the product rather than its advertisement. ( *National Union Fire Ins. Co. v. Siliconix Inc., supra, 729 F.Supp. at p. 80* [sale]; *Meyers & Sons Corp. v. Zurich American Ins., supra*, 545 N.E.2d at pp. 1208-1209 [importation].) Similarly, there is no coverage for a bank's failure to provide an advertised service in a proper manner. ( *First Bank & Trust Co. v. N.H. Ins. Group, supra, 469 A.2d at p. 1368.*)

The single published opinion that the Bank cites as direct authority [8] to the contrary does not actually support the Bank's position. ( *John Deere Ins. Co. v. Shamrock Industries, Inc. (D.Minn. 1988) 696 F.Supp. 434*, affd. on other grounds (8th Cir. 1991) *929 F.2d 413* (*John Deere*).) The insured in *John Deere* started a business in competition with his former employer. The employer filed suit, alleging that the employee's product infringed the employer's patents and constituted a misuse of its trade secrets. The employee tendered the claim to his CGL insurer, who refused to defend and sued for declaratory relief.

8 The Bank cites several cases that use or discuss the terms "advertising" and "in the course of" in other contexts. (E.g., *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d 197, 210* [concerning statutory prohibitions against false "advertising"]; *West American Ins. Co. v. California Mutual Ins. Co. (1987) 195 Cal.App.3d 314, 319-323 [240 Cal.Rptr. 540]* [concerning the requirement that injury must occur "in the course of" employment for workers' compensation insurance purposes].) These cases offer little help to a court interpreting a CGL policy.

One of the issues before the court was whether the alleged instances of patent infringement and misuse of trade secrets had "occurred in the course [*1276] of [the employee's] advertising activities" within the meaning of a CGL policy. ( *John Deere, supra, 696 F.Supp. at pp. 435-440.*) The insurer argued that it was the sale of the infringing product, rather than the employee's representations to potential purchasers, that constituted infringement and misuse of trade secrets. In opposition, the employee argued that the policy did not require a causal relationship between "advertising activities" and the alleged harm. The court did not resolve the issue. Instead, the court disposed of the case on the principle that claims "need only arguably fall within the coverage of the policies" to give rise to a duty to defend. ( *Id., at p. 440.*) This limited disposition is of no assistance to a court deciding a coverage dispute.

We believe that the apparent majority rule, under which "advertising injury" must have a causal connection with "advertising activities," best articulates the insured's objectively reasonable expectations about the scope of coverage. This conclusion is partly a matter of interpretation and partly a matter of common sense.

[**560] [***553] As a matter of interpretation, the context of the CGL policy strongly indicates the re-

quirement of a causal connection. The other types of "advertising injury" enumerated in the policy often do have a causal connection with advertising. "Defamation," whether libel or slander, occurs upon publication. (See *Civ. Code, § 45, 46.*) "Violation of right of privacy," in the advertising context, is virtually synonymous with unwanted publicity. (See, e.g., *Civ. Code, § 3344.*) "Infringement of copyright, title or slogan" typically occurs upon unauthorized reproduction or distribution of the protected material. (See *17 U.S.C. § 106.*) Reading the term "unfair competition" in this context, an objectively reasonable insured would not conclude that the term "unfair competition" could refer to claims that bore no casual relationship to its advertising activities.

Moreover, as a matter of common sense, an objectively reasonable insured would not expect "advertising injury" coverage to extend as far as the Bank argues it should extend. Virtually every business that sells a product or service advertises, if only in the sense of making representations to potential customers. [9] If no causal relationship were required between "advertising activities" and "advertising injuries," then "advertising injury" coverage, [*1277] alone, would encompass most claims related to the insured's business. However, insureds generally expect to obtain such broad coverage, if at all, only by purchasing several forms of insurance, including coverage for "errors and omissions liability," "directors and officers liability," "completed operations and products liability," and/or other coverages available as part of a CGL policy. (See, e.g., *3 Cal. Insurance* Law (Matthew Bender 1990) pp. 43-55 et seq., 47-36 et seq., 49-80 et seq. [examples of policy forms for various coverages].)

9 Although we need not address the issue, we note that courts have disagreed on the question of what constitutes "advertising" for these purposes. Most of the published opinions hold that "advertising" means widespread promotional activities directed to the public at large. ( *International Ins. v. Florists' Mut. Ins. (1990) 201 Ill.App.3d 428 [147 Ill.Dec. 7, 559 N.E.2d 7, 9-10]*; *Playboy Enterprises v. St. Paul Fire & Marine Ins. (7th Cir. 1985) 769 F.2d 425, 428- 429*; *Fox Chemical Co., Inc. v. Great Am. Ins. Co. (Minn. 1978) 264 N.W.2d 385, 386*; cf. *First Bank & Trust Co. v. N.H. Ins. Group, supra, 469 A.2d at p. 1368.*)

Of the published opinions, only the courts in *American States Insurance Co. v. Canyon Creek, supra, 786 F.Supp. 821, 828*, and *John Deere, supra, 696 F.Supp. 434, 440*, appear to have held that the term "advertising" can also encompass personal solicitations.

For these reasons, we hold that "advertising injury" must have a causal connection with the insured's "advertising activities" before there can be coverage. Applying this rule to the case before us, it is evident that the *Fallat* plaintiffs' claims were not so connected with the Bank's advertising activities. The only claims in the Fallat complaint that might be described as claims for "unfair competition," and which survived summary adjudication, were claims for the restoration of amounts allegedly acquired through violations of the Unfair Business Practices Act. (*§ 17203.*) These claims, which were based on the inadequacy of disclosures to consumers and the illegality of the terms of the loans, do not have a sufficient causal connection with advertisements directed solely to insurance agents.

Arguing against this conclusion, the Bank observes that its "advertising activities" included the payment of referral fees to insurance agents and that such fees, as the federal court found, gave the insurance agents an incentive to "sell" the Bank's loans without first making the disclosures required by federal law. [10] This contention, however, merely restates the argument that harm caused by a defective product or service is "advertising injury" simply because the product or service was incorrectly [**561] [***554] described. As already discussed, this argument has been rejected as an unreasonable extension of coverage. (See *National Union Fire Ins. Co. v. Siliconix Inc., supra, 729 F.Supp. at p. 80.*)

10 The Bank also argues that the loan application itself, which incorrectly disclosed the interest rate and other charges, can be viewed as a form of direct advertising to consumers. However, it was this document that, in many cases, was signed by the insurance agent rather than the customer pursuant to a power of attorney. As the federal court found, it was the Bank's practice to send the application to the consumer only after it had been accepted by the Bank and, thus, become the actual loan agreement. (See *ante*, pp. 1258-1259.)

We thus conclude, as did the superior court, that the acts underlying the Fallat plaintiffs' claims did not occur in the course of the Bank's advertising activities within the meaning of the CGL policy.

[*1278] DISPOSITION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**CONCUR BY:** MOSK, J.

**CONCUR**

I concur in the majority opinion insofar as it holds that disgorgement of sums obtained in violation of *section 17203 of the Business and Professions Code* is not "damages" for "advertising injury" caused by "unfair competition" under the policy. In my view, the opinion should conclude with the statement of this principle and its application to the facts of the case.

Discussion of the second point made by the majority, that there must be a causal connection between "advertising injury" and "advertising activities," and that such a connection was not established, is entirely unnecessary to the opinion. I express no view as to its validity.

Kennard, J., concurred.

# TAB 5

LEXSEE 5 CAL.4TH 866

**BAY CITIES PAVING & GRADING, INC., Plaintiff and Respondent, v. LAWYERS' MUTUAL INSURANCE COMPANY, Defendant and Appellant.**

**No. S023292**

**SUPREME COURT OF CALIFORNIA**

*5 Cal. 4th 854*; *855 P.2d 1263*; *21 Cal. Rptr. 2d 691*; *1993 Cal. LEXIS 3922*; *93 Cal. Daily Op. Service 6082*; *93 Daily Journal DAR 10395*

**August 12, 1993, Decided**

**PRIOR HISTORY:** Superior Court of the City and County of San Francisco, No. 875397, Thomas Kongsgaard, Judge. *

* Retired judge of the Napa Superior Court sitting under assignment by the Chairperson of the Judicial Council.

**DISPOSITION:** The judgment of the Court of Appeal is reversed with directions to remand this action to the trial court with instructions to enter judgment in favor of appellant Lawyers' Mutual.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A general contractor brought a professional malpractice action against its attorney based on the attorney's having failed to serve a stop notice on a project's construction lenders and having failed to file a complaint to foreclose a mechanic's lien. These omissions resulted in the contractor's being unable to collect the amount it was owed on the project. The attorney's professional liability insurance policy contained a provision limiting coverage to a maximum of $ 250,000 "for each claim" and further provided that two or more claims arising out of a single act or a series of related acts were to be treated as a single claim. Pursuant to a stipulation, the attorney was dismissed from the action, and his insurer was designated as the defendant. The trial court determined that the attorney had committed two acts of legal malpractice that were not related under the terms of the policy. Thus, the court awarded the contractor $ 169,000 in addition to the $ 250,000 the insurer had already paid the contractor under the stipulation. (Superior Court of the City and County of San Francisco, No. 875397, Thomas Kongsgaard, Judge. *) The Court of Appeal, First Dist., Div. Three, No. A049722, affirmed, determining that each of the errors gave rise to a separate claim under the policy, and that the two claims were not "related" within the meaning of the policy.

* Retired judge of the Napa Superior Court sitting under assignment by the Chairperson of the Judicial Council.

The Supreme Court reversed the judgment of the Court of Appeal with directions to remand the action to the trial court with instructions to enter judgment in favor of the insurer. The court held that the attorney's two omissions constituted a single claim under the policy. It held that when a single client seeks to recover from a single attorney alleged damages based on a single debt collection matter for which the attorney was retained, there is a single claim under the attorney's professional liability policy. The court further held that, even assuming that the two omissions resulted in separate claims, they were subject to the policy provision requiring that claims arising out of a single act or a series related acts be treated as a single claim. The policy's failure to define the term "related" did not by itself render the term ambiguous. That term, as it is commonly understood and used, encompasses both logical and causal connections. The court held that the attorney's two errors were "related" in that they arose out of the same transaction, arose as to the same client, were committed by the same attorney, and resulted in the same injury, loss of the debt. No objectively reasonable insured could have expected that he or she would be entitled to coverage for two claims under the policy. (Opinion by Baxter, J., with Lucas, C. J., Mosk, Panelli, Arabian and George, JJ., concurring. Separate concurring opinion by Kennard, J.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) Insurance Contracts and Coverage § 80--Risks Covered by Liability Insurance--Per-claim Limitation--Legal Malpractice--Number of Claims.** --In a malpractice action against an attorney by a general contractor arising from defendant's failure to serve a stop notice on a project's construction lenders and his failure to file a complaint to foreclose a mechanic's lien, which omissions resulted in the contractor's inability to collect the amount it was owed on the project, the trial court erred in determining that the two omissions gave rise to two separate claims, each of which was subject to the $ 250,000 per claim limit of defendant's malpractice policy. Foreclosure of the mechanic's lien and the serving of a timely stop notice on the lenders were merely different remedies for the same nonpayment. When a single client seeks to recover from a single attorney alleged damages based on a single debt collection matter for which the attorney was retained, there is a single claim under the attorney's professional liability policy. Although a per-occurrence limitation is generally determined on the basis of the number of occurrences (i.e., causes), rather than the number of injuries, in the present circumstances the respective foci of "occurrence" and "claims-made" policies were different. (Disapproving *Beaumont-Gribin-Von Dyl Management Co. v. California Union Ins. Co. (1976) 63 Cal.App.3d 617 [134 Cal.Rptr. 25]*, to the extent it can be read to suggest that under such circumstances, the type of policy--"claims-made" or "occurrence"--is not significant.)

**(2) Actions and Special Proceedings § 6--Existence of Right of Action--Primary Rights Theory: Words, Phrases, and Maxims--Cause of Action--Pleading Count.** --California applies the primary rights theory, under which the invasion of one primary right gives rise to a single cause of action. The cause of action is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief. The concept of a "cause of action" is not the same as that of pleading "counts," which are merely ways of stating the same cause of action differently, although the two terms are often used imprecisely and indiscriminately.

[See 4 **Witkin,** Cal. Procedure (3d ed. 1985) Pleading, § 23.]

**(3a) (3b) Insurance Contracts and Coverage § 80--Risks Covered by Liability Insurance--Related-claims Limitation--Legal Malpractice.** --An attorney's failure to serve a stop notice on a project's construction lenders and his failure to file a complaint to foreclose a mechanic's lien, which omissions resulted in the contractor's inability to collect the amount it was owed on the project, were subject to the provision of the attorney's malpractice policy requiring that claims arising out of a single act or a series of related acts be treated as a single claim, and thus were subject to the policy's $ 250,000 per claim limitation, even assuming that each omission were viewed as giving rise to a separate claim. The policy's failure to define the term "related" did not by itself render the term ambiguous. That term, as it is commonly understood and used, encompasses both logical and causal connections. The attorney's two errors were "related" in that they arose out of the same transaction, arose as to the same client, were committed by the same attorney, and resulted in the same injury, loss of the debt. No objectively reasonable insured could have expected that he or she would be entitled to coverage for two claims under the policy.

**(4) Insurance Contracts and Coverage § 10--Rules in Aid of Interpretation of Contracts--Ambiguities.** --An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are reasonable. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.

**(5) Contracts § 30--Construction and Interpretation--Ambiguities--In the Abstract.** --Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract. There cannot be an ambiguity per se, i.e., an ambiguity unrelated to an application.

**COUNSEL:** Richard Amerian, Phillips, Greenberg, Dolven & Strain, Aaron M. Greenberg, Esner, Marylander & Zakheim, Stuart B. Esner, Grant Marylander and Rosalyn S. Zakheim for Defendant and Appellant.

Musick, Peeler & Garrett, R. Jospeh De Briyn, Harry W. R. Chamberlain II, Adams, Duque & Hazeltine, Richard T. Davis, Jr., Andrew J. Waxler, Jill Baran Scott, Gibson, Dunn & Crutcher, John L. Endicott, Scott R. Hoyt, Deborah A. Aiwasian, Meyers, Bianchi & McConnell, Martin E. Pulverman, Jeffrey M. Cohon and Lawrence P. House as Amici Curiae on behalf of Defendant and Appellant.

Arthur R. Abelson for Plaintiff and Respondent.

**JUDGES:** Opinion by Baxter, J., with Lucas, C. J., Mosk, Panelli, Arabian and George, JJ., concurring. Separate concurring opinion by Kennard, J.

**OPINION BY:** BAXTER, J.

**OPINION**

[*857] [**1264] [***692] A general contractor was owed money for its work on a construction project. The attorney who had been representing the contractor in connection with the project recorded a mechanic's lien but thereafter failed to serve a stop notice on the project's construction lenders and failed to file a complaint to foreclose the mechanic's lien. As a result of the attorney's omissions, the contractor was unable to collect the amount it was owed.

The contractor then commenced this action against its attorney. The attorney's professional liability insurance policy contains a provision limiting coverage to a maximum of $ 250,000 "for each claim" and further provides that, "Two or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim."

The narrow issue before us is one of first impression. Does the policy's $ 250,000 per claim limit apply to the attorney's two omissions? We hold the limitation applies for two independent reasons: (1) The contractor's suit against its former attorney is a single claim within the meaning of the [*858] insurance policy's definition of "claim." (2) Even if the contractor's action could be viewed as comprising two claims within the policy definition, those claims must be treated as a single claim under the policy's provision limiting coverage for claims arising out of a series of related acts, errors, or omissions.

FACTS

The facts are few and undisputed. Respondent Bay Cities Paving & Grading, Inc. (Bay Cities), a licensed general contractor, retained Attorney Robert Curotto to represent Bay Cities in connection with construction work it was performing. Bay Cities completed its work on the project but was unable to collect a substantial portion of the amount it was owed. Curotto filed a mechanic's lien on Bay Cities' behalf. Curotto, however, did not serve a stop notice on the project's construction lenders. Nor did he timely seek to foreclose the mechanic's lien.

Bay Cities sued Curotto for legal malpractice, alleging that he had been negligent in failing to serve a stop notice and in failing to foreclose the mechanic's lien. Curotto tendered the defense of the action to his professional liability insurance carrier, appellant Lawyers' Mutual Insurance Company (Lawyers' Mutual).

Curotto, Bay Cities, and Lawyers' Mutual stipulated as follows: Coverage under the Lawyers' Mutual policy issued to Curotto was limited to $ 250,000 per claim and an annual aggregate of $ 750,000. Bay Cities contended it was asserting two separate claims within the meaning of the policy and that the limit of coverage was therefore $ 500,000. Lawyers' Mutual contended that only one claim was being asserted. Lawyers' Mutual would pay Bay Cities $ 250,000, and the parties would try before the court the issue of whether two claims were [**1265] [***693] being asserted within the meaning of the policy. If the court found there was only one claim, Bay Cities' recovery would be limited to the $ 250,000 stipulated payment. If the court found there were two claims, Bay Cities could recover additional damages up to a maximum of $ 187,000. Pursuant to the stipulation, Curotto was dismissed from the action, and Lawyers' Mutual was designated as the defendant.

The trial court ruled that Curotto had committed two acts of legal malpractice that were *not* related under the terms of the policy: (1) the failure to file a stop notice, and (2) the failure to file a timely action to foreclose the mechanic's lien. Bay Cities was awarded $ 169,000 in addition to the $ 250,000 already paid under the stipulation.

Lawyers' Mutual appealed. The Court of Appeal affirmed, holding that: (1) each of Curotto's two errors gave rise to a separate claim under the [*859] policy, and (2) the two claims are not "related" within the meaning of the policy.

DISCUSSION

I. *MEANING OF "CLAIM" UNDER THE POLICY*

The attorney's liability policy states, " 'Claim' whenever used in this policy means a *demand,* including service of suit or institution of arbitration proceedings, *for money against the insured.*" (Italics added.) By any reasonable understanding, Bay Cities' suit against Curotto is a demand for money. Bay Cities does not contend otherwise. Rather, the dispute is centered on the policy's "Limits of Liability" section. It states, "*The liability of the company* under subsection 1 of the section of this policy entitled 'The Coverage' *for each claim* First Made Against the Insured During the Policy Period *shall not exceed the amount stated in the Declarations for 'each claim . . ..'* " (Italics added.) **(1a)** Bay Cities contends it is asserting two separate claims, each of which is subject to the per-claim limit of $ 250,000, because each of Curotto's two omissions resulted in a separate injury to Bay Cities. Lawyers' Mutual contends there is a single claim. The parties have stipulated that the pertinent portion of the policy is paragraph 3 of the policy's "Limits of Liability" section. It states: "The inclusion herein of more than one Insured or the making of claims or the bringing of suits by more than one person or organization shall not operate to increase the Company's limit of li-

ability. *Two or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim.*" (Italics added.) As we shall explain, Lawyers' Mutual has the better view. Bay Cities has a single claim under the policy.

In concluding two claims are presented, the Court of Appeal rejected Lawyers' Mutual's argument there is only one claim because there is only one lawsuit. The court's premise was that, "There are two distinct causes of action and the fact that they are included within one lawsuit should not be the deciding factor." We agree with the Court of Appeal's view that including multiple claims within a single action does not render them a single claim. That conclusion, however, begs the question of whether there is more than one claim in the first instance. The Court of Appeal erred on that threshold question by starting with the underlying premise that Bay Cities was asserting two causes of action. We do not suggest that the number of claims is determined by rules of pleading. A correct understanding, however, of the nature of a "cause of action" does shed light on the question before us.

[*860] **(2) (1b)** Bay Cities was not asserting two causes of action. Bay Cities had a single injury and thus a single cause of action against its attorney. [1] "California has consistently applied the 'primary rights' theory, under which the invasion of one primary right gives rise to a single cause of action." ( *Slater v. Blackwood, supra,* 15 Cal.3d 791, 795; [**1266] [***694] *Big Boy Drilling Corp. v. Rankin (1931) 213 Cal. 646, 649 [3 P.2d 13]*; 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 23, pp. 66-67.) Bay Cities had one primary right--the right to be free of negligence by its attorney in connection with the particular debt collection for which he was retained. He allegedly breached that right in two ways, but it nevertheless remained a single right.

1 Apparently, the Court of Appeal confused the concept of a "cause of action" with that of pleading "counts," which are merely ways of stating the same cause of action differently. We have previously noted that the two terms are often used imprecisely and indiscriminately. ( *Slater v. Blackwood (1975) 15 Cal.3d 791, 796 [126 Cal.Rptr. 225, 543 P.2d 593]*.)

Similarly, "[T]he 'cause of action' is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. . . . Even where there are multiple legal theories upon which recovery might be predicated, *one injury* gives rise to only one claim for relief." ( *Slater v. Blackwood, supra, 15 Cal.3d 791, 795*, italics added.) Bay Cities suffered a single injury as a result of its attorney's omissions--the inability to collect the amount owed to Bay Cities for its work on the construction project.

In *Big Boy Drilling Corp. v. Rankin, supra, 213 Cal. 646, 649*, we considered the concept of a "cause of action" in connection with a contractor's efforts (through its assignee) to recover money owed for work done on real property. "Whether plaintiff accomplishes this purpose by the foreclosure of mechanics' liens or by way of a personal judgment, or both, is immaterial. Both demands having arisen out of the same transaction, there is but one cause of action with two forms of relief. The seeking of different kinds of relief does not establish different causes of action. . . . The 'cause of action' is to be distinguished from the 'remedy' and the 'relief' sought, for a plaintiff may frequently be entitled to several species of remedy for the enforcement of a single right." ( *Big Boy Drilling Corp. v. Rankin, supra, 213 Cal. 646, 649* [citations omitted].)

The reasoning as to proper pleading, though not controlling, is illustrative in the present case. Bay Cities contends it had two sources of payment of its construction work: (1) foreclosure of the mechanic's lien, and (2) serving a timely stop notice on the project's construction lenders. These two procedures, however, arose from the same transaction--Bay Cities' work on the project--and were merely different remedies for nonpayment of the amount [*861] owed to Bay Cities. Thus, Bay Cities had a single right--the right to payment for its construction. The loss of that right as a result of the attorney's two omissions resulted in a single injury.

We find it difficult to imagine how the loss of or damage to a single right could give rise to more than one claim under an attorney's professional liability policy. We need not speculate, however, as to whether or how such an unusual circumstance might arise because the least that can be said is that--when, as in this case, a *single* client seeks to recover from a *single* attorney alleged damages based on a *single* debt collection matter for which the attorney was retained--there is a *single* claim under the attorney's professional liability insurance policy.

Other factors, primarily the policy language and context, lead to the same conclusion. As noted above, the relevant policy language states that, "The inclusion herein of more than one Insured or the making of claims or the bringing of suits by more than one person or organization shall not operate to increase the Company's limit of liability. Two or more claims arising out of a single act, error or omission . . . shall be treated as a single claim." Under this language, if an attorney's single error harmed two clients and gave each of them a separate claim, those two claims would be treated as a single claim under the policy's limitation of liability. It would

be anomalous to limit liability in that circumstance but to disregard the limitation when, as in this case, a single client suffers a single injury as a result of multiple errors.

Under Bay Cities' view, the greater the number of an attorney's negligent acts, the greater the number of claims under the policy, even if all the acts cause only a single injury. Such a rule would have the plainly undesired result of providing the attorney who has made one error with an incentive to then make as many additional [**1267] [***695] errors and omissions as possible, so as to increase the amount of insurance coverage.

Moreover, allowing a client to assert multiple claims under the policy would create a serious potential of prejudice to the attorney and to other clients. The professional liability policy in this case, like most such policies, has two independent coverage limitations. One is the per-claim limitation. The other is an aggregate limitation that applies regardless of the number of claims submitted during the policy period. If a particular client could obtain increased coverage by creating multiple claims for a single injury, less coverage would remain for other clients with claims against the attorney. That result could prejudice those clients. Conversely, the attorney could also [*862] be prejudiced because of an increased risk that the attorney's personal, noninsurance assets would have to be used to pay those clients' claims.

The multiplication of claims could prejudice the attorney in another material respect. This and other professional liability policies contain a "deductible," that is, a requirement that the insured bear a portion of the liability "[w]ith respect *to each claim.*" (Italics added.) The amount of the deductible can be significant. If a client could assert multiple claims based on a single injury, the attorney would be responsible for multiple deductibles, corresponding to the number of claims. Indeed, in some cases, insurers have contended that multiple claims were being presented, so as to increase the amount of the insured's deductible and thereby decrease the amount owed by the insurer. ( *Combined Communications Corp. v. Seabord Sur. Co. (9th Cir. 1981) 641 F.2d 743, 744.*) Such result is obviously not favorable to the insured. It also works to the disadvantage of the insured's client because the insurer is responsible for a smaller portion of the damages, and the client must therefore attempt to obtain satisfaction from the attorney's other assets. [2] Courts have generally rejected insurers' attempts to apply multiple deductibles to single claims or related claims by third parties against insureds. ( *Beaumont-Gribin-Von Dyl Management Co. v. California Union Ins. Co. (1976) 63 Cal.App.3d 617 [134 Cal.Rptr. 25]*; *Haerens v. Commercial Cas. Ins. Co. (1955) 130 Cal.App.2d Supp. 892 [279 P.2d 211]*; see generally Annot., Liability Insurance: What Is "Claim" Under Deductibility-Per-Claim Clause (1988) 60 A.L.R.4th 983, 987.) By parity of reasoning, the artificial multiplication of claims should not result in increased coverage. To construe a policy provision narrowly so as to find only one claim and thus limit the deductible, but to construe the same language expansively so as to find multiple claims and thereby increase coverage, would be a result- oriented approach we decline to follow.

2 At first blush, it might seem odd for an insurer to contend that a particular case presents multiple claims because doing so could increase the amount of coverage. Whether an insurer would choose to do so would depend on the facts of each case, but, as prior cases illustrate, a finding of multiple claims can benefit the insurer and disadvantage the insured and the client. For example, assume that a client obtains a judgment for $ 25,000 in damages against the attorney, the per claim limitation is $ 100,000, and the per claim deductible is $ 5,000. If there is only one claim, the client is entitled to receive $ 25,000--$ 20,000 from the carrier and $ 5,000 from the attorney. If, however, the case is construed as presenting two claims, the client remains entitled to the same amount, $ 25,000, but the insurer is obligated only to pay $ 15,000, and the attorney is responsible for twice as much, $ 10,000. As explained above, this result works against both the insured and the client.

Bay Cities contends, "[I]t is almost the universal rule that in analyzing coverage issues, the courts look to the number of *causes* of damage as opposed to the number of *injuries* sustained." Such a principle *is* often stated. [*863] ( *Michigan Chemical Corp. v. American Home Assur. Co. (6th Cir. 1984) 728 F.2d 374, 379.*) Its application and effect, however, do not support Bay Cities. When there is a single cause of multiple injuries (or a number of causes that result in a greater number of injuries), courts often look to the cause rather than the injuries in determining the amount of insurance coverage. In such a case, the result is a finding of only one claim, i.e., the court looks to the single cause rather than to the multiple injuries. Under Bay [**1268] [***696] Cities' view, the converse of this rule should apply so that, when there are multiple causes of a single injury, the number of causes should determine the number of insurance claims. In other words, Bay Cities proposes we convert a principle that generally limits coverage into one that expands coverage. We decline to do so, at least in the circumstances before us.

The rule proposed by Bay Cities would have little logical or practical consistency and would be unworkable. For example, assume a policy with a $ 250,000 per-claim limitation, and that the client retains the attor-

ney, as in the present case, to collect a debt of $ 1 million from a third party. The attorney commits a single error that results in loss of the debt. The client has been damaged in the amount of $ 1 million, and under Bay Cities' view, is limited to recovery of $ 250,000 because there was a single cause of the injury. If, however, a different client (or even the same client) lost a debt in the same amount ($ 1 million) because the attorney committed *three* errors, the recovery would be $ 750,000 (three errors times $ 250,000). The point is obvious. Under Bay Cities' rule, clients with the same injuries in the same amount would receive different recoveries based solely on the fortuity of how many errors the attorney commits.

A brief review of the primary cases on which Bay Cities relies further demonstrates why Bay Cities' proposed rule does not apply in this case. In *Michigan Chemical Corp. v. American Home Assur. Co., supra, 728 F.2d 374*, a chemical manufacturer, which produced both a livestock feed supplement and a toxic flame retardant, had erroneously shipped the flame retardant rather than the feed supplement to a feed distributor. (Apparently the bags were mislabelled.) The distributor mixed the toxin with regular feed and sold the resulting product to farmers. Thousands of head of livestock became ill and had to be destroyed. The farmers filed suit. The manufacturer contended that each action against it constituted a separate "occurrence" under its liability insurance policies. The insurers contended there was only one occurrence, the accidental shipment of the wrong chemical. Applying Illinois law, the court agreed with the insurer, explaining, "[T]he number of occurrences must be determined by examining the cause of the property damage, *i.e.,* the misshipment or misshipments of PBB [the toxin]." ( *Id., at* [*864] *p. 382.*) The court remanded the action to the trial court to determine the number of misshipments.

Similarly, in *Home Indem. Co. v. City of Mobile (11th Cir. 1984) 749 F.2d 659*, more than 200 claims were filed against a city for flood damages incurred during 3 rainstorms. The claimant property owners alleged the city had been negligent in its planning, construction, and operation of its water drainage system. The city contended each claim against it constituted a single occurrence in applying its insurance policy's per- occurrence limitation. The insurer contended each storm was a separate cause of the damage and that there were only three occurrences. Applying Alabama law, the court agreed with the insurer that the number of causes, not the number of injuries, was determinative and that each discrete act or series of acts causing damage was a separate occurrence under the policy. ( *Id., at p. 663.*) [3]

3 In the third case cited by Bay Cities on this point, the dispute was between two insurers for an attorney, one which had issued an "occurrence" policy, and the other which had subsequently issued a "claims-made" policy. The question was which insurer was liable for the claim against the attorney. There was no issue as to the amount of coverage, and the court explained that the "cause v. injury" test, advocated by Bay Cities, did not apply. ( *American Home Assur. Co. v. Dykema, Gossett, et al. (7th Cir. 1987) 811 F.2d 1077, 1084.*) The case is thus inapposite and provides no support for Bay Cities.

*Michigan Chemical Corp. v. American Home Assur. Co., supra, 728 F.2d 374*, and *Home Indem. Co. v. City of Mobile, supra, 749 F.2d 659*, illustrate why Bay Cities' proposed rule does not properly apply in this case. First and foremost, those cases were decided under "occurrence" polices rather than "claims-made" policies. Bay Cities asserts without analysis that the type of policy should make no difference in [**1269] [***697] our analysis. Not so. The language of the occurrence policies at issue in those cases was significantly different from the relevant provision in this case. [4] Indeed, after noting the general rule that a per-occurrence limitation is determined on the basis of the number of occurrences, i.e., the number of causes, rather than on the number of injuries, the *Michigan Chemical* court, *supra, 728 F.2d 374*, explained: "The definitions of 'occurrence' in the present insurance policies reflect this approach. First, these provisions in essence refer to an 'accident' which results in injury during the policy period. The language makes the accident constituting the occurrence logically distinct from the injuries which later take place. *Second, the insurance policies under review afford coverage on an 'occurrence' rather than on a 'claim' basis.* The use of the former term 'indicates [*865] that the polic[ies were] not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances which resulted in the claim[s] for damages.' " ( *Id., at p. 379*, italics added and bracketed material in original, quoting *Champion International Corp. v. Continental Casualty Co. (2d Cir. 1976) 546 F.2d 502, 505-506.*) We agree that the respective foci of "occurrence" and "claims-made" policies are different in the present context. [5]

4 For example, one of the policies in *Michigan Chemical Corp. v. American Home Assur. Co., supra, 728 F.2d 374*, stated: "The term 'Occurrence' wherever used herein shall mean *an accident or a happening or event* or a continuous or repeated exposure to conditions *which unexpectedly and unintentionally results in* personal injury, *property damage* or advertising liability *during the policy period.*" ( *Id., at p. 378*, italics

in original.) The other policy contained substantially identical language. (*Ibid.*)

5 In *Beaumont-Gribin-Von Dyl Management Co. v. California Union Ins. Co., supra, 63 Cal.App.3d 617*, the court decided that claims asserted by multiple third parties against a property management company constituted a single claim for purposes of computing the amount of the deductible under the company professional liability policy. Although this result is consistent with our view in this case, Bay Cities nevertheless cites the decision for its statement that, "[T]he label, whether 'claims made' or 'occurrence,' applied to an insurance policy is of little aid in its interpretation." ( *Id., at p. 624.*) In the context of the question before that court, the observation may have been accurate. As explained in one of the cases cited by Bay Cities, however, the two types of policies are notably different in some respects, most importantly, the period for which they provide coverage. ( *Chamberlin v. Smith (1977) 72 Cal.App.3d 835, 845, fn. 5 [140 Cal.Rptr. 493].*) Otherwise, there would be no need for or use of both types of policies. Depending on the question before a court, the type of policy--"claims-made" or "occurrence"--can be significant to the outcome. To the extent that it suggests otherwise, we disapprove of the statement in *Beaumont-Gribin-Von Dyl Management Co. v. California Union Ins. Co., supra, 63 Cal.App.3d 617, 624.*

Bay Cities also relies on *Transamerica Ins. Co. v. Keown (D.N.J. 1978) 451 F.Supp. 397*, in which an attorney acting as the trustee of an estate had been found liable to its beneficiaries for having breached the trust agreement by investing in real estate. The beneficiaries contended each year the attorney held the real estate gave rise to a separate claim. His insurer contended there was a single claim. The court agreed and noted that other decisions had been based on "whether the court focuses on cause or effect." ( *Id., at p. 403.*) The *Keown* court then explained there was a single cause in that case. Based on that alone, Bay Cities cites the decision as supporting the "cause v. injury" test it espouses. Bay Cities reads too much into *Keown.* Properly understood, it supports our view. The *Keown* court, like us, looked to the injury. "The effect is also singular; one piece of real estate lost value to the detriment of a single estate." (*Ibid.*) The same logic applies here. To paraphrase *Keown,* "The effect is singular; one debt was lost to the detriment of one client."

As shown, the cases on which Bay Cities relies are largely distinguishable because they were decided under different policy language (in most cases, "occurrence" policies), different states' approaches to insurance policy construction, and different fact situations. Moreover, the "cause" approach resulted in a restriction of coverage, not the expansion Bay Cities seeks.

[*866] [**1270] [***698] For all the foregoing reasons, we hold that Bay Cities has a single claim against its attorney within the meaning of the professional liability insurance policy issued by Lawyers' Mutual.

II. *"RELATED" ACTS, ERRORS, AND OMISSIONS*

In light of its conclusion that there were two claims under the policy, the dispositive issue before the Court of Appeal then became whether they were "related" under the policy. Perhaps for that reason, most of the Court of Appeal's opinion dealt with the meaning of "related" as a policy term. Similarly, the parties' briefs in this court also emphasize that issue. We therefore address that question as well.

**(3a)** Even if we were to view each of the attorney's two omissions as giving rise to a separate claim by Bay Cities, the per-claim limitation nevertheless would apply. The policy states, "Two or more claims arising out of a single act, error or omission or *a series of related acts, errors or omissions* shall be treated as a single claim." (Italics added.) The Court of Appeal deemed the term "related" to be ambiguous, construed it to mean only errors that are causally related to one another, and concluded this provision does not apply because neither of the attorney's two errors caused the other error. As we shall explain, the Court of Appeal's analysis and conclusion are flawed in several respects.

The Court of Appeal assumed an ambiguity merely because, ". . . no definition was provided [in the policy] for the term 'related,' " and reasoned that "The lack of definition [of 'related'] allows for ambiguity with respect to the 'Limits of Liability' clause." The absence from the policy of a definition of the term "related" does not *by itself* render the term ambiguous. We recently rejected the view that the lack of a policy definition necessarily creates ambiguity. ( *Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1264- 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]*; see also *Castro v. Fireman's Fund American Life Ins. Co. (1988) 206 Cal.App.3d 1114, 1120 [253 Cal.Rptr. 833].*) Indeed, any rule that rigidly presumed ambiguity from the absence of a definition would be illogical and unworkable. To avoid the ambiguity perceived by the Court of Appeal, an insurer would have to define every word in its policy, the defining words would themselves then have to be defined, their defining words would have to be defined, and the process would continue to replicate itself until the result became so cumbersome as to create impenetrable ambiguity. The present case illustrates the problem. The insurer

contends that "related" means a logical connection, rather than only a causal connection as held by the Court of Appeal. Under the Court of [*867] Appeal's view, the insurer's position could prevail only if it had defined or somehow qualified "related," that is, by using the words "logically related," rather than the unqualified term "related." Of course, the addition of the word "logically" would not remove the ambiguity unless the word "logically" were itself defined in the policy. Every definition would require a further definition. We reject such a result. Of course, in an appropriate case, the absence of a policy definition, though perhaps not dispositive, might weigh, even strongly, in favor of finding an ambiguity, for example, when the term in question has no generally accepted meaning outside the context of the policy itself. The absence from a policy of a definition of a word or phrase does not *by itself*, however, necessarily create an ambiguity.

The proper and settled approach is more refined. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. ( *Civ. Code, § 1636*.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id., § 1639*.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id., § 1644*) controls judicial interpretation. (*Id., § 1638*.)" ( *AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253]*; *Reserve Insurance Co. v. Pisciotta (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764]*.) [**1271] [***699] This reliance on common understanding of language is bedrock.

Equally important are the requirements of reasonableness and context.

**(4)** First, "An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are *reasonable*." ( *Suarez v. Life Ins. Co. of North America (1988) 206 Cal.App.3d 1396, 1402 [254 Cal.Rptr. 377]*, italics added.) "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." ( *Reserve Insurance Co. v. Pisciotta, supra, 30 Cal.3d 800, 807*.)

**(5)** Second, "[*L*]*anguage in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract*." ( *Bank of the West v. Superior Court, supra, 2 Cal.4th 1254, 1265*, original italics, quoting *Producers Dairy Delivery Co. v. Sentry Ins. Co. (1986) 41 Cal.3d 903, 916, fn. 7 [226 Cal.Rptr. 558, 718 P.2d 920]*.) "There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application." ( *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court (1986) 177 Cal.App.3d 855, 859, fn. 1 [223 Cal.Rptr. 246]*.)

**(3b)** Applying the foregoing principles in this case, the first question is whether the term "related" is ambiguous as to the specific issue in this case, [*868] that is, the question of whether the per-claim limitation applies. "Related" is a commonly used word with a broad meaning that encompasses a myriad of relationships. For example, a leading legal dictionary defines "related" to mean "standing in relation; connected; allied; akin." (Black's Law Dict. (6th ed. 1990) p. 1288, col. 1.) Similarly, a legal thesaurus lists many synonyms for "related." (Burton, Legal Thesaurus (1980) p. 925, col. 2.) In a coverage case (not involving a claim limitation), the court observed that "related" can denote a causal connection as well as the "notion of similarity." ( *O'Doan v. Insurance Co. of North America (1966) 243 Cal.App.2d 71, 78 [52 Cal.Rptr. 184, 33 A.L.R.3d 684]*.)

Although "related" is broad enough to encompass both logical as well as causal relationships, the Court of Appeal incorrectly found an inherent ambiguity. Multiple or broad meanings do not necessarily create ambiguity. For example, assume that an insurance policy excluded coverage for any claim arising from the operation of a "motor vehicle." Obviously, a "motor vehicle" could be either an automobile or a truck, but that does not mean it must be only one or the other, rather than both. Likewise here, the fact that "related" can encompass a wide variety of relationships does not necessarily render the word ambiguous. To the contrary, a word with a broad meaning or multiple meanings may be used for that very reason--its breadth--to achieve a broad purpose. We need not, however, belabor the question of whether "related" is ambiguous in the abstract or in some hypothetical circumstance. That is not the question.

The proper question is whether the word is ambiguous in the context of *this* policy and the circumstances of *this* case. ( *Bank of the West v. Superior Court, supra, 2 Cal.4th 1254, 1265*.) The provision will shift between clarity and ambiguity with changes in the event at hand." ( *O'Doan v. Insurance Co. of North America, supra, 243 Cal.App.2d 71, 77*.) The linchpin of Bay Cities' argument is that "related" is ambiguous because it could have either a broad meaning, for example, meaning all services rendered by the attorney in connection with this particular matter, or, alternatively, a narrower meaning, that is, only those acts by the attorney that are *causally* related. The precise and narrow question is thus whether "related" in an attorney's professional liability insurance policy is ambiguous because the word is reasonably susceptible to both of these meanings.

We find no ambiguity because the construction of "related" advocated by Bay Cities is not reasonable. If an attorney's error causes one or more other errors, the result is a chain of causation that leads to *an* injury, that is, a single claim. One of the decisions on which Bay Cities relies [**1272] [***700] makes this very [*869] point. "[E]ven though there have been multiple causative acts, there will be a single 'occurrence' if the acts are causally related to each other as well as to the final result." ( *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme (1987) 153 Ariz. 129, 136 [735 P.2d 451, 458, 64 A.L.R.4th 651]*, italics omitted.) A single claim is, of course, subject to the per-claim limitation of the policy. Similarly, if the chain of causally related events somehow led to two claims (a result difficult to imagine), they would be treated as a single claim under Bay Cities' view of "related", and would be subject to the per- claim limitation. Thus, if the related-acts limitation were applied only to causally related acts, the related-acts limitation would be duplicative of the per-claim limitation.

Moreover, the "causally related" test ignores the nature of the injury. For example, assume an attorney makes two separate omissions during a trial. The attorney fails to object to the admission of an otherwise inadmissible document submitted by the opponent and also fails to produce a key witness on behalf of the client. Each error independently leads to an adverse judgment against the client. Under Bay Cities' analysis, however, there are two claims because neither error caused the other error. If, however, the two claims were causally related, there would be only one claim under the policy. We are not persuaded. Regardless of whether the two errors are independent or causally related, the injury to the client is the same--the adverse judgment. Moreover, when two or more errors lead to the same injury, they are--for that very reason--"related" under any fair and reasonable meaning of the word.

The only attorney malpractice case on which the Court of Appeal relied is largely inapposite and unpersuasive in any event. *Estate of Logan v. Northwestern Nat. Cas. (1988) 144 Wis.2d 318 [424 N.W.2d 179]* involved no issue as to the amount of coverage or a per claim limitation. The underlying malpractice suit against the attorney arose out of his failure to file inheritance and estate tax returns for a decedent's estate and negligence in connection with other matters for the estate. The court held that his professional liability insurance policy provided no coverage for failure to file the inheritance and estate tax returns because he was aware when he applied for the policy that he had breached his professional duty as to the tax returns. ( *Id., at p. 326 [424 N.W.2d at p. 181]*.) After having failed to file the tax returns, the attorney misplaced them, and he contended this error was a separate act for which he should be covered. The court squarely rejected this contention, holding that the attorney's ". . . initial failure to file and his subsequent misplacement of the tax returns are 'a series of related acts' which must be treated as a single claim." ( *Id., at p. 344 [424 N.W.2d at p. 188]*.) The court [*870] noted that, if the attorney had not failed to file the tax returns, he would not have been in a position later to misplace them. The court did not, however, suggest that one error had caused the other.

In a brief paragraph, the *Logan* court, *supra, 144 Wis.2d 318 [424 N.W.2d 179]*, also concluded that other negligent acts in connection with the estate were not related to the failure to file the tax returns. The court's reasoning is not entirely clear: "[T]he claim arising out of [the attorney's] negligence in failing to file timely the tax returns and the claims arising out of [his] alleged negligence in failing to file timely the fiduciary returns, to process the auction check, to close the estate, or to manage the cash assets of the estate are not a series of related acts which must be treated as one claim. The duties encompassed in the above claims would have arisen notwithstanding [the attorney's] failure to file the state tax returns in a timely matter." ( *Id., at p. 345 [424 N.W.2d at p. 189]*.) Based on this passage, Bay Cities contends the *Logan* court adopted the causally related test advocated by Bay Cities for applying the per-claim limitation. This reads far too much into the decision. It had nothing to do with a per-claim limitation, and the court never explicitly referred to or discussed a causally related test. At most, the decision might be read to suggest that each of the acts of alleged negligence was a breach of a separate duty. We need not [**1273] [***701] decide whether we would agree with the Wisconsin court on the facts of that case, i.e., an estate taxation matter. Moreover, each of the attorney's errors apparently caused separate, identifiable monetary damage to the estate. That fact alone distinguishes *Logan* from the present case, in which the attorney's two errors related to the same debt he was retained to collect. Finally, to the extent the decision might be read broadly (probably more broadly than the court intended) to suggest that every breach of duty in connection with a particular matter necessarily gives rise to a separate insurance claim, we simply disagree. (See discussion at pp. 859-866, *ante*.) In short, *Logan* provides scant, if any, support for Bay Cities.

The other decision on which the Court of Appeal relied is more apposite but nevertheless unpersuasive. In *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme, supra, 735 P.2d 451* (*Helme*), a state guaranty fund sought to limit its liability for claims against two physicians insured by an insolvent carrier. (For purposes of the coverage action, the fund was subject to the same rights and defenses as the insurer would have been under the policy.) Over a

period of time, the two doctors had treated a patient who deteriorated and died. His survivors sued the doctors, alleging that they had repeatedly failed to examine the patient's X-rays or react to his worsening condition. The fund contended the doctors' alleged negligence constituted a single occurrence [*871] under their professional liability policy. (The policy was an "occurrence" policy, rather than a "claims-made" policy as in the present case.) The policy defined "occurrence" as being "any incident, act or omission, or series of *related* incidents, acts or omissions resulting in injury . . .." (*Id., at p. 456*, italics added, original italics deleted.) The question was whether the various failures of the doctors constituted a series of "related incidents, acts or omissions" and thus only one occurrence. The court first acknowledged that "related" can mean either a logical or a causal connection. The court concluded, however, that "logic" is a subjective notion, that "causation" is more objective, and therefore that the policy term "related" should be limited to occurrences with a causal connection. (*Id., at pp. 456-457.*)

For the reasons we have already discussed, we respectfully disagree with the *Helme* court, *supra, 735 P.2d 451*. Nor are we persuaded a "causal connection" is necessarily more precise than a "logical connection," especially in view of the multiple and imprecise meanings of causation. ( *Mitchell v. Gonzales (1991) 54 Cal.3d 1041, 1050-1054 [1 Cal.Rptr.2d 913, 819 P.2d 872]* [noting the widespread confusion over causation].) More important, our function is not to redraft a policy term merely so that it might be more precise and easier for us to apply.

To support its contention that "related" must mean "causally" related, Bay Cities notes several cases for the proposition that the number of claims is generally determined by the number of causes rather than the number of injuries. This point seems more properly directed to the issue of whether there was one claim or two in the first instance, and we have discussed some of those decisions in connection with that point, explaining why they are either inapposite or unpersuasive. (See discussion at pp. 862-866, *ante.*) As important, however, those cases did not present any issue as to whether claims or occurrences were related. Thus, even in those cases which might be read as holding that the number of causes determines the number of claims or occurrences, those courts did not decide, or even discuss, whether the claims could be "related" under language like that in the policy before us. ( *Eureka Federal S & L v. Amer. Cas. Co. of Reading (9th Cir. 1989) 873 F.2d 229*; *Okada v. MGIC Indem. Corp. (9th Cir. 1986) 823 F.2d 276*; *Pioneer Nat. Title Ins. Co. v. Andrews (5th Cir. 1981) 652 F.2d 439*; *North River Ins. Co. v. Huff (D.Kan. 1985) 628 F.Supp. 1129*; *St. Paul Fire & Marine Ins. Co. v. Hawaiian Ins. & Guar. Co. (1981) 2 Hawaii App. 595 [637 P.2d 1146]*; *Hyer v. Inter-Insurance Exchange, etc. (1926) 77 Cal.App. 343 [246 P. 1055].*)

[**1274] [***702] Several of these decisions are also distinguishable for reasons other than the absence of any discussion of the meaning of "related." For example, [*872] three of the cases arose out of errors and omissions of the officers and directors of savings and loan associations that resulted in the associations' insolvency, and the question was whether various acts and omissions leading to the insolvency constituted multiple losses or, alternatively, whether the insolvency itself was the sole loss. The facts of those cases and the nature of the injuries were not similar to the facts of the present case. ( *Eureka Federal S & L v. Amer. Cas. Co. of Reading, supra, 873 F.2d 229*; *Okada v. MGIC Indem. Corp., supra, 823 F.2d 276*; *North River Ins. Co. v. Huff, supra, 628 F.Supp. 1129.*) Moreover, the holdings of those cases are not as broad as Bay Cities suggests. As one court explained, "We thus hold that the mere existence of an aggressive loan policy is insufficient as a matter of law to transform disparate acts and omissions by five directors in connection with issuance of loans to over 200 unrelated borrowers into a single loss. We do not foreclose the possibility, however, that loans to separate borrowers may be aggregated as a single loss in an appropriate fact situation." ( *Eureka Federal S & L v. Amer. Cas. Co. of Reading, supra, 873 F.2d 229, 235.*) Unlike *Eureka,* the present case does not have five defendants committing multiple errors in unrelated loan transactions that injured two hundred clients. We have one defendant, one client, and one injury.

Far more apposite and persuasive is the decision in *Gregory v. Home Ins. Co. (7th Cir. 1989) 876 F.2d 602* (*Gregory*), in which an attorney's liability policy contained a provision like that in the present case: "Two or more claims arising out of a single act, error, or omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim." ( *Id., at p. 604*, italics omitted.) In connection with the marketing of a videotape investment program, the attorney drafted a "production service agreement" and promissory note for his client, the broker of the videotapes. The attorney also drafted a tax and security opinion letter that his client distributed to prospective buyers of the videotapes. The letter stated that the tapes were not securities that needed to be registered with the Securities and Exchange Commission and that buyers of the tapes would obtain certain tax advantages. The tax and securities advice proved to be incorrect and resulted in actions against the attorney by the investors and by his client.

The *Gregory* court, *supra, 876 F.2d 602*, acknowledged and agreed with the observation in *Helme, supra,*

*735 P.2d 451*, that "related" can mean both causal and logical connections. "However, we don't think the rule requiring insurance policies to be construed against the party who chose the language requires such a drastic restriction of the natural scope of the definition of the word 'related' [to mean only a causal connection]. . . . At some point, of [*873] course, a logical connection may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of broad language would come into play." ( *Gregory, supra, 876 F.2d 602, 606*, fn. omitted.) Having rejected the causally related test, the *Gregory* court held that claims against the attorney by his client and by the class of investors were a single claim because they "comfortably fit within the commonly accepted definition of the concept [of 'related']." ( *Id., at p. 606*; see also *Home Ins. Co. v. Wiener (N.D.Ill. 1989) 716 F.Supp. 10, 11* (holding that independent errors committed by two attorneys in a firm gave rise to a single claim by the client).)

We agree with the court in *Gregory, supra, 876 F.2d 602*, that the term "related" as it is commonly understood and used encompasses both logical and causal connections. Restricting the word to only causal connections improperly limits the word to less than its general meaning. "Related" is a broad word, but it is not therefore a necessarily ambiguous word. We hold that, as used in this policy and in these circumstances, "related" is not ambiguous and is not limited only to causally related acts.

[**1275] [***703] We do not suggest, however, that, in determining the amount of coverage, the term "related" would encompass every conceivable logical relationship. At some point, a relationship between two claims, though perhaps "logical," might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy. In the present case, there is no attenuation or surprise to the insured. The two errors by the attorney are "related" in multiple respects. They arose out of the same specific transaction, the collection of a single debt. They arose as to the same client. They were committed by the same attorney. They resulted in the same injury, loss of the debt. No objectively reasonable insured under this policy could have expected that he would be entitled to coverage for two claims under the policy.

DISPOSITION

The judgment of the Court of Appeal is reversed with directions to remand this action to the trial court with instructions to enter judgment in favor of appellant Lawyers' Mutual.

Lucas, C. J. Mosk, J. Panelli, J., Arabian, J., and George, J., concurred.

**CONCUR BY:** KENNARD, J.

**CONCUR**

I concur in the judgment. In my view, however, much of the discussion in the majority opinion is unnecessary. As I shall explain, the majority interjects a doctrine of civil pleading into an insurance dispute that has nothing to do with pleading. Moreover, the majority reaches out to [*874] decide an issue concerning the scope of "related" acts or omissions under an insurance contract that is superfluous to a resolution of the narrow dispute in this case, and decides the issue in unnecessarily broad terms.

I

This is an insurance case. The question here is whether, when an attorney commits two separate acts of negligence in the same matter that preclude his client's right to recover a single sum against either of two other parties, on either of two legal theories, the attorney's malpractice insurer is liable for only one claim under the policy, or is liable for two claims. The majority determines that under these circumstances the insurer can be liable for only one claim. I agree with the result, but not the reasoning, of the majority opinion.

The majority analyzes the question of whether one or two claims were made under the insurance policy in this case in terms of the "primary rights" doctrine. This doctrine concerns pleadings filed in court. But a claim made under an insurance policy is not the same as a pleading filed in court. Instead, the determination of rights under an insurance policy is a question of *contract law*. ( *Mid-Century Ins. Co. v. Bash (1989) 211 Cal.App.3d 431, 436 [259 Cal.Rptr. 382]*; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 682, p. 616; *Civ. Code, § 1635* ["All contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by this code."].) The parties to a contract can define "claim" any way they want. Here, they defined it without reference to the rules of civil pleading.

The parties defined "claim" as "a demand . . . for money against the Insured." This definition can be applied to the facts of this case without reference to pleading doctrines. As the record in this case shows, the former client of the insured, Bay Cities Paving & Grading, Inc., made a demand on the insured attorney, Robert Curotto, through a letter written by new counsel it had retained. The demand letter stated it was asserting "two separate claims," premised on Curotto's two acts of negligence that precluded Bay Cities from recovering from either of two responsible parties. But the demand letter sought payment of a single amount, based on the work performed by Bay Cities on a construction project.

Therefore, Bay Cities made a *single* "demand for money against the Insured."

Accordingly, analyzing the main issue in this case without reference to doctrines of [**1276] [***704] pleading, but as a question of contract interpretation, I reach the same result as the majority.

[*875] II

Although the majority concludes that Bay Cities made a single claim, thus resolving the issue on which review was granted, it goes on to discuss at considerable length whether, assuming that Bay Cities had made two claims, the claims would be "related" within the meaning of the policy. This discussion is not only unnecessary to the disposition of the case, but also misleading, as I shall explain.

The pertinent policy language is this: " 'Two or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim.' " (Maj. opn., *ante,* at p. 866, italics omitted.) The policy does not define the term "related."

Bay Cities argues that the term "related" is ambiguous because it could have a broad meaning--all acts or omissions related in some way--or a narrow meaning of *causally* related. Because the term is not defined in the policy, Bay Cities argues it should be interpreted against the drafting party, in conformance with standard rules of insurance contract interpretation. (1 Witkin, Summary of Cal. Law, *supra,* § 699, p. 632; see *AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253]*; *Universal Underwriters Ins. Co. v. Gewirtz (1971) 5 Cal.3d 246, 250 [95 Cal.Rptr. 617, 486 P.2d 145]*; *Gray v. Zurich Ins. Co. (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]*.) The majority rejects this argument, saying Bay Cities' interpretation is "not reasonable." (Maj. opn., *ante,* at p. 868.) The majority concludes that "[r]estricting the word ['related'] to only causal connections improperly limits the word to less than its general meaning." (Maj. opn., *ante,* at p. 873.)

I am unconvinced. There are any number of ways in which two acts giving rise to claims under a malpractice insurance policy might be said to be "related" in the general sense of the term. A law firm that has a single policy may commit, through two lawyers, two acts of malpractice affecting the same client on the same day. These claims could be said to be related in at least three ways: temporally (same day), thematically in one sense (same client), and thematically in another sense (two real estate matters involving boundary disputes). Accordingly, the two claims could reasonably be said to be "related" within the "general meaning" of the term. But it is unlikely, given that the acts of malpractice occurred in two separate matters, that the claims would be considered "related" within the meaning of the policy. Thus, the necessity arises to impose some limiting construction on the policy term "related acts or omissions."

[*876] When the language of an insurance policy is ambiguous the courts look to the expectations of a reasonable insured. ( *American Star Ins. Co. v. Insurance Co. of the West (1991) 232 Cal.App.3d 1320, 1331 [284 Cal.Rptr. 45]*; see *AIU Ins. Co. v. Superior Court, supra, 51 Cal.3d at p. 822* [stating that to protect an insured's objectively reasonable expectations, coverage clauses of insurance policies are interpreted broadly].) Here, the context suggests that a reasonable attorney/insured would have thought that under the policy two claims made in the circumstances of this case would be classed as related, but *only* because the element of damages from each was identical and coextensive. Thus, the majority's conclusion that the claims are related within the meaning of the policy is correct, but its endorsement of the policy language "related acts, errors or omissions" as inherently unambiguous is not.

Thus, although the majority has reached the correct result in this case, I cannot subscribe to its reasoning.

# TAB 6

LEXSEE 38 CAL. 3D 454

**GEORGE BECKER, Plaintiff and Appellant, v. IRM CORPORATION, Defendant and Respondent**

**S.F. No. 24618**

**Supreme Court of California**

*38 Cal. 3d 454*; *698 P.2d 116*; *213 Cal. Rptr. 213*; *1985 Cal. LEXIS 270*; *48 A.L.R.4th 601*; *CCH Prod. Liab. Rep. P10,522*

**April 29, 1985**

**PRIOR HISTORY:** Superior Court of Contra Costa County, No. 196265, Martin E. Rothenberg, Judge.

**DISPOSITION:** The judgment is reversed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A tenant was seriously injured when he slipped and fell against an untempered glass shower door in his rented apartment in a 36-unit apartment complex owned, operated, and maintained by defendant. The apartment complex had been built in 1962-1963 and was acquired by defendant in 1974. It was undisputed that the risk of serious injury would have been substantially reduced if the shower door had been made of tempered, rather than untempered, glass. The trial court granted summary judgment in favor of the landlord, dismissing the tenant's causes of action for negligence and strict liability. (Superior Court of Contra Costa County, No. 196265, Martin E. Rothenberg, Judge.)

The Supreme Court reversed, holding the trial court erred in granting summary judgment in favor of defendant as to each cause of action. The court held that a landlord engaged in the business of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant, in order to insure that the landlord who markets the product bears the cost of injuries resulting from the defects rather than the injured persons who are powerless to protect themselves. It further held the absence of a continuing business relationship between the builder and the landlord is not a factor warranting denial of strict liability of the landlord. The landlord's duty to inspect for dangerous conditions in the exercise of due care could properly be found in the instant case and lack of awareness of the dangerous condition did not necessarily preclude liability for negligence. (Opinion by Broussard, J., with Kaus, Reynoso and Grodin, JJ., concurring. Separate concurring opinion by Bird, C. J. Separate concurring and dissenting opinion by Lucas, J., with Mosk, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Summary Judgment § 3--Propriety.** --The summary judgment procedure is drastic and should be used with caution so that it will not become a substitute for a full trial. A summary judgment is proper only if the affidavits of the moving party would be sufficient to support a judgment in his favor and doubts as to the merits of the motion should be resolved in favor of the party opposing the motion.

**(2) Products Liability § 38--Strict Liability in Tort--Persons Liable--Manufacturers and Sellers.** --A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.

**(3) Products Liability § 32--Strict Liability in Tort--Stream of Commerce.** --The stream of commerce approach to strict liability in tort extends liability to all those who are a part of the overall producing and marketing enterprise that should bear the cost of injuries from defective products.

**(4a) (4b) Landlord and Tenant § 74--Possession and Use of Premises--Injuries to Tenants, Employees and Occupants--Duties and Liabilities of Landlord--Strict Liability--Latent Defects.** --A landlord engaged in the business of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant. Accordingly, in an action by a tenant against the owner of a 36-unit apartment building for injuries sustained when the tenant slipped and fell against an untempered glass shower door in his apartment, the trial court erred in granting the landlord's motion for summary judgment on a strict liability cause of action on the asserted ground a landlord is not liable to a tenant for a latent defect of the rented premises absent concealment of a known danger or an express contractual or statutory duty to repair.

**(5) Landlord and Tenant § 52--Possession and Use of Premises--Covenants by Lessor.** --Absent disclosure of defects, a landlord in renting premises makes an implied representation that the premises are fit for use as a dwelling and the representation is ordinarily indispensable to the lease.

**(6) Products Liability § 37--Strict Liability in Tort--Persons Liable--Landlord--Purchase of Existing Building--Latent Defects.** --A landlord who purchases an existing building which is not new is not exempt from strict liability in tort for latent defects. Since a continuing business relationship is not essential to imposition of strict liability, and since the paramount policy of the strict products liability rule is the spreading throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects, the absence of a continuing business relationship between builder and landlord is not a factor warranting denial of strict liability of the landlord for latent defects. Landlords are an integral part of the enterprise of producing and marketing of rental housing, and the cost of protecting tenants is an appropriate cost of the enterprise.

**(7) Landlord and Tenant § 64--Possession and Use of Premises--Injuries to Tenants, Employees and Occupants--Duties and Liabilities of Landlord--Negligence.** --The fundamental principle of negligence liability (*Civ. Code, § 1714, subd. (a)*), is applicable to a landlord's liability to a tenant, and the landlord owes a tenant a duty of reasonable care in providing and maintaining the rented premises in a safe condition. Accordingly, a landlord in caring for his property must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect.

**(8) Landlord and Tenant § 74--Possession and Use of Premises--Injuries to Tenants, Employees and Occupants--Duties and Liabilities of Landlord--Negligence--Latent Defect.** --Where a tenant sustained injuries when he slipped and fell against an untempered glass shower door in his apartment in a 36-unit building which had been purchased by the landlord long after it was built, the landlord's lack of knowledge of the defective condition or of prior accidents did not relieve him of his duty to inspect for dangerous conditions in the exercise of due care, and his lack of awareness of the dangerous condition did not necessarily preclude liability although he was chargeable only with those matters a reasonable inspection would have disclosed. Maintenance of rental property in a safe and habitable condition is the primary responsibility of the landlord, and the mere fact that a particular kind of an accident has not happened before does not show that such accident is one which might not reasonably have been anticipated. *Civ. Code, § 1954*, limiting the landlord's right to enter a rented dwelling unit, did not bar the landlord's duty to inspect.

**COUNSEL:** Meyer & Mitchell and Jack P. Dougherty for Plaintiff and Appellant.

Leonard Sacks, Edwin Train Caldwell, McNamara, Houston, Dodge, McClure & Ney and Edward Kelly Shinnick as Amici Curiae on behalf of Plaintiff and Appellant.

John P. Caudle, Robert W. Brower and Kincaid, Gianunzio, Caudle & Hubert for Defendant and Respondent.

Rogers, Joseph, O'Donnell & Quinn, Joseph W. Rogers, Jr., Nance F. Becker and Jon D. Smock as Amici Curiae on behalf of Defendant and Respondent.

**JUDGES:** Opinion by Broussard, J., with Kaus, Reynoso and Grodin, JJ., concurring. Separate concurring opinion by Bird, C. J. Separate concurring and dissenting opinion by Lucas, J., with Mosk, J., concurring.

**OPINION BY:** BROUSSARD

**OPINION**

[*457] [**117] [***214] In this personal injury action plaintiff's complaint asserted causes of action of strict liability and negligence against defendant landlord. Defendant moved for summary judgment urging that a landlord is not liable to a tenant for a latent defect of the rented premises absent concealment of a known danger or an expressed contractual or statutory duty to repair.

The trial court granted the motion and denied a motion for reconsideration. Plaintiff appeals. [1]

1 We have been advised that while the case was pending in this court plaintiff settled with the builder and a door assembler and installer for $ 150,000 plus $ 50,000 in the event plaintiff is unsuccessful against the remaining defendants. Apparently, the case remains pending in the trial court against a component part supplier. Defendant landlord will be referred to as defendant herein.

We have concluded that the trial court erred as to both causes of action.

The complaint alleged that plaintiff was injured when he slipped and fell against the frosted glass shower door in the apartment he leased from defendant. The door was made of untempered glass. It broke and severely lacerated his arm. It is undisputed that the risk of serious injury would have been substantially reduced if the shower door had been made of tempered glass rather than untempered glass.

Defendant's affidavits in support of the motion for summary judgment may be summarized as follows: Plaintiff's apartment is part of a 36-unit apartment complex built in 1962 and 1963 and acquired by defendant in [*458] 1974. Prior to the acquisition, two officers of defendant walked through most of the apartments and observed that all of the shower doors were of frosted glass and appeared to be the same. The officials, one of whom managed the property from the time of its acquisition, stated that prior to plaintiff's accident in 1978 there were no accidents involving the shower doors and that they were not advised [**118] [***215] that any of the shower doors were made of untempered glass. They first learned that some of the shower doors were of untempered glass after the accident. Their inspection of shower doors after the accident provided "no visible difference between the tempered and untempered glass in terms of visible appearance."

Defendant's maintenance man stated that after the accident he examined the glass doors, and that 31 of the doors with untempered glass were replaced by him. He also stated that in looking for the untempered glass shower doors "there was no way that a layperson could tell any difference by simply looking at the shower doors. The only way that I was able to differentiate . . . was by looking for a very small mark in the corner of each piece of glass."

Plaintiff did not file affidavits in opposition to defendant's.

**(1)** The summary judgment procedure is drastic and should be used with caution so that it will not become a substitute for a full trial. A summary judgment is proper only if the affidavits of the moving party would be sufficient to support a judgment in his favor and doubts as to the merits of the motion should be resolved in favor of the party opposing the motion. ( *Rowland v. Christian (1968) 69 Cal.2d 108, 111 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]*.)

Strict Liability

**(2)** In *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]*, we established the rule: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. Recognized first in the case of unwholesome food products, such liability has now been extended to a variety of other products that create as great or greater hazards if defective. [Citations.]" The court recognized that the cases imposing strict liability had "usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff." (*59 Cal.2d at p. 63*.) The justification for departing from warranty theory and for establishing a doctrine of strict liability in tort was the recognition that the [*459] liability was imposed by law and the refusal to permit the manufacturer to define the scope of its own liability for defective products. (*Ibid.*)

Our concern was not that warranty law failed to adequately define the manufacturer's duty but that the "'intricacies of the law of sales'" applicable to commercial transactions might defeat the obvious representation of safety for intended use made by the manufacturer. ( *Id., at pp. 63-64*.) In declining to discuss the basis of the strict liability, *Greenman* pointed out that the basis of it had been fully articulated, citing to the classical concurring opinion in *Escola v. Coca Cola Bottling Co. (1944) 24 Cal.2d 453, 461 [150 P.2d 436]*. (*Id., at p. 63*.) In the concurring opinion in *Escola*, Justice Traynor pointed out: "The retailer, even though not equipped to test a product, is under an absolute liability to his customer, for the implied warranties of fitness for proposed use and merchantable quality include a warranty of safety of the product. [Citations.]" (*24 Cal.2d at p. 464*.) It was also pointed out that the retailer should not bear the burden of his warranty alone but that he could recoup any losses by means of the warranty of safety attending the wholesaler's or manufacturer's sale to him. (*Ibid.*)

*Greenman* also noted that the purpose of strict liability in tort is "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the

injured persons who are powerless to protect themselves." (*59 Cal.2d at p. 63*; see *Daly v. General Motors Corp. (1978) 20 Cal.3d 725, 732-733, 736 [144 Cal.Rptr. 380, 575 P.2d 1162]*.)

[**119] [***216] **(3)** We follow a stream of commerce approach to strict liability in tort and extend liability to all those who are part of the "overall producing and marketing enterprise that should bear the cost of injuries from defective products." ( *Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 262* et seq. [*37 Cal.Rptr. 896, 391 P.2d 168]*.) The doctrine of strict liability in tort has been applied not only to manufacturers but to the various links in the commercial marketing chain including a retailer (*id.*), a wholesale-retail distributor ( *Barth v. B.F. Goodrich Tire Co. (1968) 265 Cal.App.2d 228, 251* et seq. [*71 Cal.Rptr. 306]*), personal property lessors and bailors ( *Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 251-253 [85 Cal.Rptr. 178, 466 P.2d 722]*), and a licensor of personalty ( *Garcia v. Halsett (1970) 3 Cal.App.3d 319, 324-326 [82 Cal.Rptr. 420]*). In holding that strict liability in tort was applicable to lessors and bailors in *Price v. Shell Oil Co., supra, 2 Cal.3d at page 254*, it was pointed out that strict liability does not apply to isolated transactions such as the sale of a single lot.

Application of warranty doctrine has not been limited to those engaged in commerce in personalty but has been applied where appropriate to those [*460] engaged in the real estate business. Traditionally, the courts applied the doctrine of caveat emptor with the buyer assuming the risk on quality unless there was express warranty, fraud or misrepresentation. (E.g., *Gustafson v. Dunman, Inc. (1962) 204 Cal.App.2d 10, 13 [22 Cal.Rptr. 161]*.)

However, the courts have recognized that a contract to build is in effect one of material and labor, that implied warranties are not limited to sales transactions, and that building contracts give rise to a warranty of merchantability and suitability for ordinary use. ( *Aced v. Hobbs-Sesack Plumbing Co. (1961) 55 Cal.2d 573, 580-583 [12 Cal.Rptr. 257, 360 P.2d 897]*; *Pollard v. Saxe & Yolles Dev. Co. (1974) 12 Cal.3d 374, 378 [115 Cal.Rptr. 648, 525 P.2d 88]*; *Green v. Superior Court (1974) 10 Cal.3d 616, 626 [111 Cal.Rptr. 704, 517 P.2d 1168]*.) And in *Pollard v. Saxe & Yolles Dev. Co., supra, 12 Cal.3d 374, 377-380*, it was held that an implied warranty of quality attaches to the sale of new construction. The court pointed out that the doctrine of implied warranty in a sales contract is based on the actual and presumed knowledge of the seller, reliance on the seller's skill and judgment, and the ordinary expectations of the parties. The court reasoned that "the builder or seller of new construction -- not unlike the manufacturer or merchandiser of personalty -- makes implied representations, ordinarily indispensable to the sale, that the builder has used reasonable skill and judgment in constructing the building. On the other hand, the purchaser does not usually possess the knowledge of the builder and is unable to fully examine a completed house and its components without disturbing the finished product." (*12 Cal.3d at p. 379*.) The court concluded that "builders and sellers of new construction should be held to what is impliedly represented -- that the completed structure was designed and constructed in a reasonably workmanlike manner." ( *Id. at p. 380*.)

Similarly, application of strict liability in tort has not been limited to those engaged in commerce in personalty but has been applied where appropriate to those engaged in real estate businesses who impliedly represent the quality of their product. In *Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749]*, a builder who mass-produced homes was held strictly liable when the heating system placed in a home failed. The court relied upon *Schipper v. Levitt & Sons, Inc. (1965) 44 N.J. 70 [207 A.2d 314, 325-326]*, where the court pointed out that when in our modern society a person purchases a tract house from an advertised model, he relies upon the skill of the developer and the implied representation that the house will be erected in a reasonably workmanlike manner and reasonably fit for habitation, that the purchaser ordinarily does not have the means to protect himself either by hiring [**120] [***217] experts to supervise and inspect or by provision in the deed, and that the public interest dictates that the cost of injury from defects should be borne by the developer who created the danger [*461] and who is in a better economic position to bear the loss rather than the injured party who relied on the developer's skill and implied representation. In *Avner v. Longridge Estates (1969) 272 Cal.App.2d 607, 615 [77 Cal.Rptr. 633]*, it was held that a manufacturer of a residential lot may be held strictly liable in tort for damages suffered by the owner as the result of defect in the manufacturing process causing subsidence.

A similar development appears with respect to the landlord-tenant relationship. The earlier legal concepts regarded the lease as an equivalent to a sale of the premises for the term and under traditional common law rules the landlord owed no duty to place leased premises in a habitable condition and no obligation to repair absent an agreement. ( *Green v. Superior Court (1974) 10 Cal.3d 616, 622 [111 Cal.Rptr. 704, 517 P.2d 1168]*; *McNally v. Ward (1961) 192 Cal.App.2d 871, 878 [14 Cal.Rptr. 260]*.) "The common law placed the risk on the tenant as to whether the condition of the leased property made it unsuitable for the use contemplated by the parties. In recent years, the definite judicial trend has been in the direction of increasing the responsibility of the landlord,

in the absence of a valid contrary agreement, to provide the tenant with property in a condition suitable for the use contemplated by the parties. This judicial trend has been supported by the statutes that deal with this problem. This judicial and statutory trend reflects a view that no one should be allowed or forced to live in unsafe and unhealthy housing." (Rest. 2d Property, Landlord and Tenant, ch. 5, introductory note, p. 150.)

The Restatement draws a distinction as to defective conditions in leased dwellings existing at the time of the lease and those arising thereafter. In the former situation the tenant may recover damages in the absence of lessor fault while in the latter damages are recoverable only if the landlord is at fault. (Compare *id.*, § 5.1, subd. (2)(a), pp. 168-169 with §§ 5.2, subd. (2) (a), p. 184, and 5.4, subd. (2)(a), pp. 194-195.)

Departures from the traditional common law rule applicable to landlords evolved in California both by statute and judicial decision. *Civil Code section 1941* requires that the lessor of a building intended for use as a dwelling put it in fit condition for such use and repair all subsequent dilapidations. However, the tenant's remedies for violation of the statute are limited to the making of necessary repairs and deducting costs from one month's rent, or to abandon the premises with discharge from rental obligations. (*Civ. Code, § 1942, subd. (a)*.) And the landlord's duty does not arise if the tenant has breached certain of his obligations relating to maintenance of the premises. (*Id.*, § 1941.2.) An agreement by the lessee waiving his rights under *section 1941* is void as contrary to public policy except that the lessee [*462] may agree as part of the rental to improve, repair, or maintain stipulated portions of the dwelling. (*Id.*, see § 1942.1.)

Pointing out that the traditional common law rule that the landlord had no duty to make the dwelling habitable arose in the agrarianism of the Middle Ages and is incompatible with contemporary social conditions and modern legal values, California courts have recognized that a lease for a dwelling contains an implied warranty of habitability. ( *Hinson v. Delis (1972) 26 Cal.App.3d 62, 68-71 [102 Cal.Rptr. 661]*; *Green v. Superior Court, supra, 10 Cal.3d 616, 622* et seq.; *Knight v. Hallsthammar (1981) 29 Cal.3d 46, 51-53 [171 Cal.Rptr. 707, 623 P.2d 268]*.) In *Green*, the court reasoned that the typical city dweller leasing an apartment cannot realistically be viewed as merely acquiring an interest in land but rather contracts for a place to live, that modern apartment buildings are complex, difficult and expensive to repair and adequate inspection by tenants is a virtual impossibility, that repairs will often be outside the reach of abilities or finances of tenants, that the scarcity of adequate low-cost housing has left tenants with little [**121] [***218] bargaining power and rendered the common law remedies inadequate, and that the widespread enactment of comprehensive housing codes show that public policy compels landlords to bear "the primary responsibility for maintaining safe, clean and habitable housing in our state." (*10 Cal.3d at pp. 623-628*.)

*Green* analogized to the parallel dramatic changes in the law of commercial transactions where modern decisions have recognized that the consumer in an industrial society should be entitled to rely on the skill of the supplier to assure that goods and services are of adequate quality and, discarding the caveat emptor approach, have implied a warranty of merchantability and fitness. Pointing out that the modern urban tenant is in the same position as any normal consumer of goods, it was concluded that a tenant may reasonably expect that the product purchased is fit as a living unit and that since the lease specifies a term the tenant may reasonably expect that the premises will be fit for habitation for the term. (*10 Cal.3d at p. 627*.)

*Green* held that breach of the implied warranty of habitability may be urged as a defense in an unlawful detainer proceeding and that in such cases the court could determine that the breach warranted a partial or total reduction in rent. (*10 Cal.3d at p. 631* et seq.) Neither *Green* nor our subsequent decision in *Knight v. Hallsthammar, supra, 29 Cal.3d 46*, discussed whether or to what extent breach of the implied warranty of habitability might provide a basis for recovery of tort damages for injuries caused by the breach. [2]

2 As will appear, subsequent Court of Appeal cases have considered this issue.

[*463] Developments in the law of landlord liability for injuries due to defective condition of the demised premises have not lagged far behind. The traditional common law rule was that a landlord is not liable to the tenant for injuries due to a defective condition or faulty construction of the demised premises in the absence of fraud, concealment or covenant in the lease. (E.g., *Del Pino v. Gualtieri (1968) 265 Cal.App.2d 912, 919-920 [71 Cal.Rptr. 716]*; *Forrester v. Hoover Hotel & Inv. Co. (1948) 87 Cal.App.2d 226, 232 [196 P.2d 825]*.) The rule was not only based on traditional property concepts and caveat emptor but also on the landlord's lack of possession and control. (E.g., *Brennan v. Cockrell Investments, Inc. (1973) 35 Cal.App.3d 796, 799-801 [111 Cal.Rptr. 122]*.) A number of exceptions have developed to the rule of landlord nonliability -- where the landlord voluntarily undertakes to repair, where the landlord had knowledge of defects, where a safety law was violated, where the landlord retained a part of the premises for common use, and where the lease was for a semipublic purpose. (3 Witkin, Summary of Cal. Law (8th ed. 1973) pp. 2135-2136.)

Strict liability for the conditions of the demised premises has been applied to landlords. Prior to *Greenman*, it was held that where a landlord represented that a wall-bed was safe, secure and in fit condition at the time of the letting, the plaintiff could maintain an action based on the express warranty. ( *Shattuck v. St. Francis Hotel & Apts. (1936) 7 Cal.2d 358, 360-361 [60 P.2d 855].*) Also, prior to *Greenman*, it was held that a lessee could recover for breach of an implied warranty of fitness for use when a door to which a folding bed was attached fell and injured him. ( *Fisher v. Pennington (1931) 116 Cal.App. 248, 249-251 [2 P.2d 518].*) *Fisher* was followed in *Charleville v. Metropolitan Trust Co. (1934) 136 Cal.App. 349, 355 [29 P.2d 241]* which also involved a folding bed and *Hunter v. Freeman (1951) 105 Cal.App.2d 129, 131* et seq. [*233 P.2d 65]*, involving an explosion of a detachable heater. In all four cases, the accident occurred shortly after the tenant went into possession, and it was also held that the warranty liability was limited to "the condition of the premises at the beginning of the term and not to conditions which, unknown to the lessor, subsequently arise." ( *Forrester v. Hoover* [**122] [***219] *Hotel & Inv. Co., supra, 87 Cal.App.2d 226, 232 [196 P.2d 825].*) [3] Each of the above cases involved a furnished apartment and the accident was arguably attributable to the furnishings as well as the condition of the demised premises.

3 *Stowe v. Fritzie Hotels, Inc. (1955) 44 Cal.2d 416, 424 [282 P.2d 890]*, stated that *Forrester* and *Hunter* disapproved a statement in *Fisher* that the landlord of a furnished apartment warrants the safety of the premises and the furnishings to the same extent as an innkeeper. The citation to *Forrester* and *Hunter* reflects approval of the limited implied warranty recognized in the former case and applied in the latter of a warranty of the condition of the premises at the beginning of the term. Thus, *Stowe* should not be read as rejecting implied warranties by landlords generally but only the equation of such warranties to an innkeeper's warranties.

[*464] Subsequent to *Greenman*, strict liability in tort was applied to landlords for injuries to tenants in *Fakhoury v. Magner (1972) 25 Cal.App.3d 58, 62-63 [101 Cal.Rptr. 473]* and *Golden v. Conway (1976) 55 Cal.App.3d 948, 960-963 [128 Cal.Rptr. 69]*. In *Fakhoury*, a couch in a furnished apartment collapsed, and the court held that the landlord is strictly liable in tort for defective furniture, pointing out that the liability was not for defective premises. (*25 Cal.App.3d at p. 63.*) In *Golden*, the landlord employed a contractor to install a heater, and because of defective manufacture or installation there was a fire. Although acknowledging the distinction made in *Fakhoury* between defective fixtures and defective furniture, the court rejected it and held that the landlord engaged in the business of leasing property is strictly liable in tort when he equips the premises with an appliance which proves to have defects causing injury. (*55 Cal.App.3d at pp. 960-963.*) Defendant points out that *Fakhoury* differs from the instant case because injury resulted from defective personalty rather than the condition of the premises and that *Golden* differs because the landlord installed the heater whereas the shower door was apparently installed by the builder.

**(4a)** We are satisfied that the rationale of the foregoing cases, establishing the duties of a landlord and the doctrine of strict liability in tort, requires us to conclude that a landlord engaged in the business of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant. [4] It is clear that landlords are part of the "overall producing and marketing enterprise" that makes housing accommodations available to renters. (Cf. *Vandermark v. Ford Motor Co., supra, 61 Cal.2d at p. 262*; *Green v. Superior Court, supra, 10 Cal.3d at pp. 623, 627.*) A landlord, like defendant owning numerous units, is not engaged in isolated acts within the enterprise but plays a substantial role. The fact that the enterprise is one involving real estate may not immunize the landlord. Our courts have long recognized that contracts relating to realty may give rise to implied warranties. ( *Aced v. Hobbs-Sesack Plumbing Co., supra, 55 Cal.2d 573, 580-583.*)

4 We do not determine whether strict liability would apply to a disclosed defect. (See *Luque v. McLean (1972) 8 Cal.3d 136, 141-146 [104 Cal.Rptr. 443, 501 P.2d 1163].*)

**(5)** Absent disclosure of defects, the landlord in renting the premises makes an implied representation that the premises are fit for use as a dwelling and the representation is ordinarily indispensable to the lease. ( *Pollard v. Saxe & Yolles Dev. Co., supra, 12 Cal.3d 374, 377-380.*) The tenant purchasing housing for a limited period is in no position to inspect for latent defects in the increasingly complex modern apartment buildings or to bear the expense of repair whereas the landlord is in a much better position to inspect for and repair latent defects. ( *Green v. Superior Court, supra, 10 Cal.3d at p. 626.*) [*465] The tenant's ability to inspect is ordinarily substantially less than that of a purchaser of the property. (Cf. *Pollard* [**123] [***220] *v. Saxe & Yolles Dev. Co., supra, 12 Cal.3d at p. 379.*)

The tenant renting the dwelling is compelled to rely upon the implied assurance of safety made by the landlord. It is also apparent that the landlord by adjustment of price at the time he acquires the property, by rentals or

by insurance is in a better position to bear the costs of injuries due to defects in the premises than the tenants.

**(4b)** In these circumstances, strict liability in tort for latent defects existing at the time of renting must be applied to insure that the landlord who markets the product bears the costs of injuries resulting from the defects "rather than the injured persons who are powerless to protect themselves." ( *Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d at p. 63*.)

**(6)** Defendant argues that a landlord who purchases an existing building which is not new should be exempt from strict liability in tort for latent defects because, like dealers in used personalty, he assertedly is not part of the manufacturing and marketing enterprise. Defendant relies on a statement in *Vandemark v. Ford Motor Co., supra, 61 Cal.2d 256, 262-263*: "Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." Defendant states that it has never been in a business relationship with the builder and that purchasers of used rental properties do not have a continuing business relationship with builders permitting adjustments of the costs of protecting tenants.

In several cases, it has been held that a seller of used machinery who does not rebuild or rehabilitate the machinery is not strictly liable in tort. ( *Wilkinson v. Hicks (1981) 126 Cal.App.3d 515, 520* et seq. [*179 Cal.Rptr. 5*]; *LaRosa v. Superior Court (1981) 122 Cal.App.3d 741, 748* et seq. [*176 Cal.Rptr. 224*]; *Tauber-Arons Auctioneers Co., Inc. v. Superior Court (1980) 101 Cal.App.3d 268, 273* et seq. [*161 Cal.Rptr. 789*].) Each of these cases relied at least in part on the theory that the used machinery dealer simply by offering machinery for sale does not make any representation as to quality or durability and thus does not generate the expectation of safety involved in the sale of new goods. ( *Wilkinson, supra, 126 Cal.App.3d at pp. 520-521*; *LaRosa, supra, 122 Cal.App.3d at pp. 760-761*; *Tauber-Arons, supra, 101 Cal.App.3d at p. 278* et seq.) When the seller of the used goods makes extensive modifications or reconditions, he is treated as a manufacturer -- there is an expectation that the safety of the product has been [*466] addressed. ( *Green v. City of Los Angeles (1974) 40 Cal.App.3d 819, 838 [115 Cal.Rptr. 685]*.)

*LaRosa v. Superior Court, supra, 122 Cal.App.3d 741, 756-757* and *Tauber-Arons Auctioneers Co., Inc. v. Superior Court, supra, 101 Cal.App.3d 268, 282*, also suggested that the used machinery dealer ordinarily is not part of the manufacturing and marketing enterprise.

However, a continuing business relationship is not essential to imposition of strict liability. The unavailability of the manufacturer is not a factor militating against liability of others engaged in the enterprise. The paramount policy of the strict products liability rule remains the spreading throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects. ( *Ray v. Alad Corp. (1977) 19 Cal.3d 22, 33-34 [136 Cal.Rptr. 574, 560 P.2d 3]*; *Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722]*; *Rawlings v. D.M. Oliver, Inc. (1979) 97 Cal.App.3d 890, 899* et seq. [*159 Cal.Rptr. 119*].) If anything, the unavailability of the manufacturer is a factor militating in favor of liability of persons engaged in the enterprise who can spread the cost of compensation. (See *Ray v. Alad Corp., supra, 19 Cal.3d 22, 33-34*.) Just as the unavailability of the manufacturer does not [**124] [***221] militate against liability, the absence of a continuing business relationship between builder and landlord is not a factor warranting denial of strict liability of the landlord.

Landlords are an integral part of the enterprise of producing and marketing rental housing. While used machinery is often scrapped or discarded so that resale for use may be the exception rather than the rule, landlords are essential to the rental business. They have more than a random or accidental role in the marketing enterprise. In addition, landlords have a continuing relationship to the property following the renting in contrast to the used machinery dealer who sells. As we have seen, in renting property the landlord, unlike the used machinery dealer, makes representations of habitability and safety.

The cost of protecting tenants is an appropriate cost of the enterprise. Within our marketplace economy, the cost of purchasing rental housing is obviously based on the anticipated risks and rewards of the purchase, and thus it may be expected that along with numerous other factors the price of used rental housing will depend in part on the quality of the building and reflect the anticipated costs of protecting tenants, including repairs, replacement of defects and insurance. Further, the landlord after purchase may be able to adjust rents to reflect such costs. The landlord will also often be able to seek equitable indemnity for losses.

[*467] We conclude that the absence of a continuing business relationship between builder and landlord does not preclude application of strict liability in tort for latent defects existing at the time of the lease, because landlords are an integral part of the enterprise and they should bear the cost of injuries resulting from such defects rather than the injured persons who are powerless to protect themselves. ( *Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d 57, 63*.) [5]

5 In view of our conclusion it is unnecessary to determine whether the landlord is strictly liable for defects in the property which develop after the property is leased.

Negligence

*Civil Code section 1714, subdivision (a)* establishes the fundamental principle of negligence liability, providing: "Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary skill in the management of his property or person, . . ."

Rejecting the prior distinctions made by the common law as to invitees, licensees, and trespassers, the landmark case of *Rowland v. Christian, supra, 69 Cal.2d 108, 111* et seq. held that the fundamental rule was applicable to the liability of owners and occupiers of land. **(7)** The fundamental principle is applicable to the landlord's liability to the tenant, and the landlord owes a tenant a duty of reasonable care in providing and maintaining the rented premises in a safe condition. ( *Stoiber v. Honeychuck (1980) 101 Cal.App.3d 903, 924 [162 Cal.Rptr. 194]*; *Evans v. Thomason (1977) 72 Cal.App.3d 978, 985 [140 Cal.Rptr. 525]*; *Golden v. Conway, supra, 55 Cal.App.3d 948, 955*; *Brennan v. Cockrell Investments, Inc., supra, 35 Cal.App.3d 796, 800-801.*)

Any departure from the fundamental principle involves the "balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" ( *Rowland v. Christian, supra, 69 Cal.2d at pp. 112-113.*)

[**125] [***222] "In the typical rental situation involving a dwelling house, the foreseeability of harm to a tenant from the landlord's failure to maintain the premises [*468] in a habitable condition is obvious; the degree of certainty that the tenant suffered injury and the closeness of the connection between the landlord's conduct and the injury is readily ascertainable by proof in each case; the moral blame attached to the landlord's conduct in not complying with the habitability requirements articulated in the Civil Code and the policy of preventing future harm are present. Nor can we say that the imposition of a duty to exercise care with resulting liability for breach would unduly extend a landlord's burden insofar as the availability, cost and prevalence of insurance for the risk involved. In short, we believe that under the policy standards articulated in *Rowland*, a due regard for human safety and health compels the imposition on a landlord of a duty of due care in the maintenance of the premises." ( *Stoiber v. Honeychuck, supra, 101 Cal.App.3d 903, 924.*)

Accordingly, a landlord in caring for his property must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect. ( *Golden v. Conway, supra, 55 Cal.App.3d 948, 955*; *Brennan v. Cockrell Investments, Inc., supra, 35 Cal.App.3d 796, 800-801.*)

**(8)** Defendant urges that in the absence of knowledge of the defective condition or of prior accidents it was not under a duty to inspect for defective shower doors and that imposition of a duty to inspect would conflict with *Civil Code section 1954* limiting the landlord's right to enter a rented dwelling unit. So far as appears in the instant case, the dangerous shower doors were installed by the builder at the time of the construction and were in position at the time defendant purchased the building.

A person contemplating purchase of rental property, in the exercise of due care, will examine its condition. Maintenance of rental property in a safe and habitable condition is the primary responsibility of the landlord. ( *Green v. Superior Court, supra, 10 Cal.3d 616, 627.*) In the exercise of ordinary care, the purchaser of rental property may be expected to inspect the premises not only to determine whether they are aesthetically pleasing but also to determine whether they meet bare living standards, including whether they are safe. The prospective purchaser may be expected to make such inspection in the absence of knowledge of any existing defects or of any prior accidents. Similarly, a landlord at time of letting may be expected to inspect an apartment to determine whether it is safe.

The mere fact that a particular kind of an accident has not happened before does not show that such accident is one which might not reasonably have been anticipated. ( *Weirum v. RKO General, Inc. (1975) 15 Cal.3d 40, 47* [*469] *[123 Cal.Rptr. 468, 539 P.2d 36].*) Defective glass doors provide a substantial risk of injury which reasonably may be anticipated.

*Civil Code section 1954* limiting the right of the landlord to enter the tenant's premises provides that he may enter to exhibit the dwelling unit "to prospective or actual purchasers" and to make necessary repairs, and the section does not provide a bar to recognition of a duty to inspect in the instant case. Defendant's officials inspected the apartments.

We conclude that a duty to inspect for dangerous conditions in the exercise of due care may properly be found in the instant case and that lack of awareness of the dangerous condition does not necessarily preclude liability.

In urging that there was no duty to inspect, defendant relies upon cases where the defect developed after purchase of the building by the defendant and while the apartment was in possession of the tenant. [**126] [***223] (E.g., *Uccello v. Laudenslayer (1975) 44 Cal.App.3d 504, 510* et seq. [*118 Cal.Rptr. 741, 81 A.L.R.3d 628]*.) Those cases are distinguishable because, in the instant case, the dangerous condition existed at the time of purchase and at the time the property was leased.

The duty to inspect should charge the defendant only with those matters which would have been disclosed by a reasonable inspection. In the instant case, the undisputed affidavits are to the effect that there was "no visible difference between the tempered and untempered glass in terms of visible appearance," but that there was a "very small mark" in the corner of each piece of glass which apparently showed that the glass was untempered. The glass was not before the trial court when it granted the motion for summary judgment, and the record does not disclose the nature of the "mark." If the "mark" was "untempered" a trier of fact could properly conclude that a reasonable inspection would have, at least, included a visual inspection which disclosed the danger. In resolving doubts in favor of the party opposing the motion for summary judgment ( *Rowland v. Christian, supra, 69 Cal.2d 108, 111)*, defendant's failure to fully identify the "mark" requires us to assume that it would have disclosed the danger to a reasonable inspection.

As to each cause of action the trial court erred in granting summary judgment in favor of defendant.

The judgment is reversed.

**CONCUR BY:** BIRD; LUCAS (In Part)

**CONCUR**

[*470] **BIRD, C. J.,** Concurring. Justice Newsom wrote a fine opinion in the Court of Appeal with which I agree. It is adopted herewith as my own. *

* Brackets together, in this manner [], without enclosing material, are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote my insertions or additions.

"This is an appeal from a summary judgment dismissing appellant's causes of action for negligence and strict products liability. Declarations submitted by respondent in support of its motion for summary judgment reveal the following pertinent facts, which we summarize as necessary to a resolution of the issues raised on appeal.

Appellant was seriously injured on November 21, 1978, when he slipped and fell against the *untempered* glass shower door of his rented apartment, which is in a 36-unit apartment complex owned, operated and maintained by respondent. The apartment complex was built in 1963 and acquired by IRM Corporation in 1974 [IRM]. According to undisputed evidence, had the shower door been made of *tempered* glass, the risk of serious injury to appellant would have been reduced.

The declarations submitted in support of the summary judgment motion state that between the time respondent acquired the building and appellant's injury none of the tenants either complained that the shower doors were made of unsafe untempered glass or reported injuries similar to those suffered by appellant. Appellant's shower door was in place when IRM purchased the apartment complex. Of the 36 showers in the apartment building prior to appellant's accident, 31 had untempered and 5 had tempered glass.

It is difficult to visually distinguish tempered from untempered glass. The apartment manager for IRM declared that he walked through most of the bathrooms prior to appellant's accident, and found the two types of shower doors to be highly similar: he said both had a "frosted glass" appearance. After the accident, at respondent's request, a maintenance man for IRM and an expert from Diablo Glass & Paint Company inspected the shower doors. According to the maintenance man, "from my own examination following the . . . accident, there was no visible difference between the tempered or the nontempered glass in terms of visible appearance." But [**127] [***224] he also explained: "The only way that I was able to differentiate . . . was by looking for a very small mark in the corner of each piece of glass." After the inspection, the 31 shower doors without tempered glass were replaced with doors made of tempered glass.

The summary judgment procedure authorized by *section 437c of the Code of Civil Procedure* is a ""'drastic procedure to be used sparingly and with [*471] circumspection." . . .'" ( *Harris v. De La Chapelle (1976) 55 Cal.App.3d 644, 647 [127 Cal.Rptr. 695]*[, disapproved on another point in *Sprecher v. Adamson Companies (1981) 30 Cal.3d 358, 372, fn. 9 (178 Cal.Rptr. 783, 636 P.2d 1121*)].) A defendant moving for summary judgment has the burden of establishing that the action is without merit; a factual showing negating all causes of action on all theories is required. ( *Tre-*

*semer v. Barke (1978) 86 Cal.App.3d 656, 666 [150 Cal.Rptr. 384, 12 A.L.R.4th 27]*; *Harris, supra, at p. 647*.) "If he fails in that burden, summary judgment must be denied despite the lack of opposing declarations." ( *Tresemer, supra, at p. 666*.) But if all material issues of fact are eliminated and the declarations filed in support of the motion establish that the defendant is entitled to judgment as a matter of law, summary judgment should be granted. ( *Tauber-Arons Auctioneers Co. v. Superior Court (1980) 101 Cal.App.3d 268, 273-274 [161 Cal.Rptr. 789]*.) "'Applicable substantive law determines the facts necessary to support a particular theory of relief and hence the sufficiency of properly framed factual statements in declarations to support a summary judgment.'" ( *Tresemer, supra, at pp. 666-667*.)

Appellant claims that his negligence cause of action presents issues of fact which must be litigated at trial. He insists that respondent's declarations do not sufficiently negate the elements of his action for negligence.

Respondent submits that it had no *duty* of care to appellant, absent actual notice of the dangerous condition of the shower doors, and that its declarations disprove such notice.

The essential elements of a cause of action for negligence are: (1) defendant's legal duty of care to plaintiff, (2) defendant's breach of duty -- by negligent act or omission, (3) injury to plaintiff as the result of the breach, and (4) compensable damages. ( *Rosales v. Stewart (1980) 113 Cal.App.3d 130, 133 [169 Cal.Rptr. 660]*; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 450, p. 2103.) Liability for negligent conduct may only be imposed where it is found that defendant owed a duty of care to the plaintiff or to a class of persons of which the plaintiff is a member. ( *J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60]*; *Rogers v. Jones (1976) 56 Cal.App.3d 346, 350 [128 Cal.Rptr. 404]*.) The duty may arise by statute, contract, the general character of the activity in which the defendant engaged, the relationship of the parties, or even the interdependent nature of human society. ( *J'Aire, supra, at p. 803*.) "Whether a duty is owed is simply a shorthand way of phrasing what is '"the essential question -- whether the plaintiff's interests are entitled to legal protection against the defendant's conduct."'" (*Ibid.*)

The crucial issue before us is, therefore, whether plaintiff has established that his corporate landlord owed a duty of care to protect him against the [*472] particular risk of harm which caused his injury. ([See] *Evans v. Thomason (1977) 72 Cal.App.3d 978, 984 [140 Cal.Rptr. 525]*.) "'While the question whether one owes a duty to another must be decided on a case-by-case basis, every case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as a result of their conduct . . . .'" ( *J'Aire, supra, 24 Cal.3d at p. 806*; *Weirum v. RKO General, Inc. (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]*.) In *Rowland v. Christian (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.* [**128] *R.3d* [***225] *496]*, our high court enumerated the following factors as relevant to a determination of whether a possessor or owner of land owes a duty of care to injured victims: the foreseeability of the harm to the plaintiff; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between defendant's conduct and the injury suffered; the moral blame attached to the defendant's conduct; the policy of preventing future harm; the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and the availability, cost and prevalence of insurance for the risk involved. (See also *Thompson v. County of Alameda (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]*; *Sun N' Sand, Inc. v. United California Bank (1978) 21 Cal.3d 671, 695 [148 Cal.Rptr. 329, 382 P.2d 920]*; *Rosales v. Stewart, supra, 113 Cal.App.3d 130, 134*; *DeSuza v. Andersack (1976) 63 Cal.App.3d 694, 702 [133 Cal.Rptr. 920]*.)

But in all cases, the primary consideration in establishing the element of duty is the foreseeability of the risk. ( *Sun N' Sand, supra, 21 Cal.3d at p. 695*; *Weirum, supra, 15 Cal.3d at p. 46*; *DeSuza, supra, at p. 702*.) "'As a general principle, a "defendant owes a duty of care to all persons who are *foreseeably* endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous."'" ( *Tresemer v. Barke, supra, 86 Cal.App.3d 656, 670*.) The question of whether a legal duty exists is one of law (*Thompson* v. *County of Alameda*[, *supra*,] *27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]*), but if the issue depends upon the foreseeability of the risk it becomes a question of fact for resolution by the jury (*Weirum* [], *supra, 15 Cal.3d 40, 46*; *Harris v. De La Chapelle, supra, 55 Cal.App.3d 644, 647*). [1]

1 The reasonableness of the defendant's conduct is also a question for the trier of fact. ( *Slater v. Alpha Beta Acme Markets, Inc. (1975) 44 Cal.App.3d 274, 278 [118 Cal.Rptr. 561, 72 A.L.R.3d 1264]*.)

It is now settled that a landlord generally owes a tenant a duty of reasonable care in maintaining the rented premises in a safe condition. ( *Evans v. Thomason, supra, 72 Cal.App.3d 978, 985*; *Golden v. Conway (1976) 55 Cal.App.3d 948, 955* [*473] *[128 Cal.Rptr. 69]*; *Brennan* v. *Cockrell Investments, Inc. (1973) 35 Cal.App.3d 796, 800-801 [111 Cal.Rptr. 122]*.) In

*Stoiber v. Honeychuck (1980) 101 Cal.App.3d 903, 924 [162 Cal.Rptr. 194]*, the court explained: "In the typical rental situation involving a dwelling house, the foreseeability of harm to a tenant from the landlord's failure to maintain the premises in a habitable condition is obvious; the degree of certainty that the tenant suffered injury and the closeness of the connection between the landlord's conduct and the injury is readily ascertainable by proof in each case; the moral blame attached to the landlord's conduct in not complying with the habitability requirements articulated in the Civil Code and the policy of preventing future harm are present. Nor can we say that the imposition of a duty to exercise care with resulting liability for breach would unduly extend a landlord's burden insofar as the availability, cost and prevalence of insurance for the risk involved. In short, we believe that under the policy standards articulated in *Rowland*, a due regard for human safety and health compels the imposition on a landlord of a duty of due care in the maintenance of the premises."

And in *Golden v. Conway, supra, 55 Cal.App.3d at page 955*, this court adopted the standard expressed in *Brennan v. Cockrell Investments, Inc., supra, 35 Cal.App.3d 796*, that ". . . a landlord must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of such injury, the burden of reducing or [**129] [***226] avoiding the risk, and his degree of control over the risk-creating defect . . . ."

But like any other business proprietor or owner of property, the landlord is not an insurer of a tenant's safety. ( *Riley v. Marcus (1981) 125 Cal.App.3d 103, 109 [177 Cal.Rptr. 827]*; *Rogers v. Jones, supra, 56 Cal.App.3d 346, 351*.) And, we repeat, as in all cases, foreseeability is the key factor to be considered. ( *Coulter v. Superior Court (1978) 21 Cal.3d 144, 152 [145 Cal.Rptr. 534, 577 P.2d 669]*[, superseded by statute as stated in *Strang v. Cabrol (1984) 37 Cal.3d 720, 724 (209 Cal.Rptr. 347, 691 P.2d 1013*)]; *Riley, supra, at p. 109*.) Consequently, we must decide whether the unsafe nature of the shower doors was reasonably foreseeable by respondent.

The uncontradicted evidence offered by respondent establishes that IRM had no actual notice of the dangerous condition of the premises either from complaints or previous accidents. According to undisputed declarations, it was also difficult to distinguish the untempered glass shower doors from those made of tempered glass; only a "very small mark in the corner of each piece of glass," observed upon a careful inspection following appellant's accident, set the two types of doors apart.

[*474] But foreseeability does not require that prior identical or even similar events must have occurred. ( *Kwaitkowski v. Superior Trading Co. (1981) 123 Cal.App.3d 324, 329 [176 Cal.Rptr. 494]*.) As noted in *Weirum v. RKO General, Inc., supra, 15 Cal.3d 40, 47*: "'The mere fact that a particular kind of [an] accident has not happened before does not . . . show that such accident is one which might not reasonably have been anticipated.'" Appellant's accident cannot be characterized as unforeseeable simply because it was the first of its kind at the apartment complex.

And although the dangerous condition of the shower door may not have been readily apparent, the evidence indicates that it was discoverable upon reasonably careful inspection. In light of the landlord's control over the premises and ability to insure against the risk of injury, we think it reasonable to conclude that foreseeability of risk presented a triable issue of fact best left for resolution by the jury. That IRM had no actual notice of the risk should not, we repeat, absolve it from a duty of care as a matter of *law*. Maintenance of rental property, particularly fixtures and appliances, in a safe and habitable condition, has been recognized as an important obligation of the landlord. ( *Green v. Superior Court (1974) 10 Cal.3d 616, 626-627 [111 Cal.Rptr. 704, 517 P.2d 1168]*; *Stoiber v. Honeychuck, supra, 101 Cal.App.3d 903, 914, 924*.) [2] Since it was possible if not likely that IRM would have learned of the dangerous condition of the property had it devoted closer attention to the safety of its tenants, particularly given the direct and serious threat of harm which the hazard posed to IRM's tenants, we think that the trial court erred in granting summary judgment and dismissing appellant's negligence action.

2 In *Stoiber, supra, 101 Cal.App.3d 903*, the court noted that "public policy requires landlords to bear the primary responsibility for maintaining safe, clean and habitable housing" ( *id., at p. 914*), and added: ". . . we believe that under the policy standards articulated in *Rowland* [v. *Christian (1968) 69 Cal.2d 108 (70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496*)], a due regard for human safety and health compels the imposition on a landlord of a duty of due care in the maintenance of the premises." (*Id., at p. 924*.)

Appellant also argues that respondent's declarations do not negate his strict liability cause of action since the doctrine of strict products liability applies to respondent as a supplier of housing. Respondent submits that, on the contrary, as a matter of law a landlord does not incur liability under a theory of strict liability for the defective condition of rented premises.

In the landmark case of *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]*, our high court announced the rule that, "A manufacturer is [**130]

[***227] strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to [*475] a human being." (See also *McGee v. Cessna Aircraft Co. (1978) 82 Cal.App.3d 1005, 1012 [147 Cal.Rptr. 694]*.) "That rule is equally applicable to the manufacturer and the retailer." (*Barrett* v. *Atlas Powder Co. (1978) 86 Cal.App.3d 560, 564 [150 Cal.Rptr. 339]*.) [3]

3 In fact, as noted in *Kasel v. Remington Arms Co. [1972] 24 Cal.App.3d 711, 724 [101 Cal.Rptr. 314]*: "The following entities besides the manufacturer, obviously the principal one, have been found to be integral components of the particular enterprise responsible for placing alleged defective products on the market: a lessor ( *McClaflin v. Bayshore Equipment Rental Co., 274 Cal.App.2d 446* . . . [stepladder] and *Price v. Shell Oil Co., 2 Cal.3d 245* . . . [gasoline truck]); a developer ( *Kriegler v. Eichler Homes, Inc., 269 Cal.App.2d 224* . . . [a builder engaged in mass tract development of homes]); a licensee ( *Garcia v. Halsett, 3 Cal.App.3d 319* . . . [a launderette owner who was said to have licensed the use of a washing machine to plaintiff]); a retailer ( *Vandermark v. Ford Motor Co., supra, 61 Cal.2d 256* [retailer of a defective automobile]); and a wholesale-retail distributor ( *Barth v. B.F. Goodrich Tire Co., 265 Cal.App.2d 228* . . . [who merely distributed tires from his stock on order of the manufacturer])."

The courts have freely applied strict liability in tort law link by link in the marketing chain -- "from manufacturer to distributor, to retailer, and so forth." (*Kasel* v. *Remington Arms Co.*[, *supra*,] *24 Cal.App.3d 711, 724*[].) California follows a "stream-of-commerce" approach to strict liability, under which "'. . . no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability. It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability.'" ( *Tauber-Arons Auctioneers Co. v. Superior Court, supra, 101 Cal.App.3d 268, 275-276*, quoting from *Kasel v. Remington Arms Co., supra, 24 Cal.App.3d 711, 725*.) The strict products liability doctrine extends to all those who are "engaged in the business of distributing goods to the public" as an "integral part of the overall producing and marketing enterprise" for the product in question. ( *Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168]*; *Tauber-Arons, supra, at pp. 274-275*.) Thus, participation in the marketing enterprise by which distribution of the product to the consuming public is effected in more than a "'random and accidental role'" justifies imposition of strict liability. ( *Tauber-Arons, supra, at p. 277*; *Garcia v. Halsett (1970) 3 Cal.App.3d 319, 326 [82 Cal.Rptr. 420]*.) [4]

4 In *Garcia* a launderette owner who maintained four rows of coin-operated washing machines manufactured by Philco-Bendix in continuous operation for public use, was held liable as a marketer. The court observed: "Although respondent is not engaged in the distribution of the product, in the same manner as a manufacturer, retailer or lessor, he does provide the product to the public for use by the public, and consequently does play more than a random and accidental role in the overall marketing enterprise of the product in question." (*3 Cal.App.3d at p. 326*.)

[*476] Landlords have been included within the scope of the strict products liability doctrine. For example, in *Fakhoury v. Magner (1972) 25 Cal.App.3d 58 [101 Cal.Rptr. 473]*, the lessee of a furnished apartment -- injured when the couch supplied by her landlord collapsed under her -- sued on a theory of strict liability. The court concluded that the landlord was strictly liable as lessor of the defective furniture rather than as lessor of furnished real property. ( *Id., at p. 63*.)

[**131] [***228] Subsequently, in *Golden v. Conway, supra, 55 Cal.App.3d 948*, this court extended the doctrine of strict products liability to a landlord who supplied and installed, through an independent contractor, a defective wall heater in an unfurnished apartment. Relying upon *Fakhoury*, we found no reason to distinguish between furniture and appliances attached to realty, and concluded that a "lessor of real property who, as the landlord in this case, is engaged in the business of leasing apartments and appurtenant commercial premises, equips the premises with an appliance without knowing whether or not it is defective because of the manner in which it is manufactured or installed, and it proves to have defects which cause injury to persons or property when used in a normal manner, is strictly liable in tort." ( *Id., at pp. 961-962*.)

Here, respondent is in the business of leasing apartments, including appliances and fixtures, and is therefore an integral part of the marketing enterprise by which the shower door in question reached the user public. In *Green v. Superior Court, supra, 10 Cal.3d 616, 627*, our high court observed: "In most significant respects, the modern urban tenant is in the same position as any other

normal consumer of goods. [Citation.] Through a residential lease, a tenant seeks to purchase 'housing' from his landlord for a specified period of time. The landlord 'sells' housing, enjoying a much greater opportunity, incentive and capacity than a tenant to inspect and maintain the condition of his apartment building. A tenant may reasonably expect that the product he is purchasing is fit for the purpose for which it is obtained, that is, a living unit. Moreover, since a lease contract specifies a designated period of time during which the tenant has a right to inhabit the premises, the tenant may legitimately expect that the premises will be fit for such habitation for the duration of the term of the lease. It is just such reasonable expectations of consumers which the modern 'implied warranty' decisions endow with formal, legal protection." The landlord is a vital link in the commercial chain, and directly profits from the consumer's use of products provided as part of the rental unit. We think it a reasonable rule that a landlord should be treated as a "retailer" of rental housing, subject to liability for defects in the premises rented.

[*477] In reaching this conclusion, we have considered that the salutary policies underlying the strict products liability doctrine will be furthered by inclusion of landlords within its scope. According to our high court, "the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." ( *Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722]*; see also *Tauber-Arons Auctioneers Co. v. Superior Court, supra, 101 Cal.App.3d 268, 283.*) "Placing the economic burden of injuries on those best able to pay for those costs while permitting the transfer of that burden to those most culpable is consistent with the equitable considerations inherent in the resolution of the difficult problems which have been judicially posed." ( *Rawlings v. D. M. Oliver, Inc. (1979) 97 Cal.App.3d 890, 901 [159 Cal.Rptr. 119].*) The landlord receives the financial benefit from the tenants' use of appliances included in rental housing, and has the ability to spread the cost of compensation throughout the marketing system by obtaining insurance or otherwise accounting for the risk of loss. In addition, the landlord has control over the rental premises, which provides the means by which the possible harm from defective appliances or fixtures can be eliminated.

We find the cases relied upon by respondent unpersuasive. In both *Tauber-Arons Auctioneers Co. v. Superior Court, supra, 101 Cal.App.3d 268*, and *LaRosa v. Superior Court (1981) 122 Cal.App.3d 741, [176 Cal.Rptr. 224]* it was held that a dealer in used products acting merely as an agent for the seller or manufacturer, and who has no other connection with the product, cannot be held strictly [**132] [***229] liable in tort for its defective condition. In contrast, here respondent played no such random and accidental role in the marketing of the untempered glass shower doors; rather, it directly provided the product to tenants for their use, thus actively entering the marketing enterprise for that product.

It is vigorously argued as a reason for exclusion of respondent from liability as a matter of law, that it was not the owner of the building when the allegedly defective product was installed. Once IRM became the landlord, however, it acted in effect as distributor or supplier of housing, with authority and ability to monitor all products so furnished, including appliances and fixtures in the apartments. And by failing to remove shower doors made of untempered glass, respondent maintained the distribution of these appliances to its tenants.

Respondent argues with equal force that it reasonably ought not to incur liability for the defective shower doors because it had no notice of the defect. We disagree, since we regard notice as irrelevant to the strict liability analysis.

[*478] The doctrine of strict products liability is based upon a defect in the product, and can arise from an unsafe design as well as from faults attributable to the manufacturing process. ( *Pike v. Frank G. Hough Co. (1970) 2 Cal.3d 465, 475 [85 Cal.Rptr. 629, 467 P.2d 229].*)

While the operative term "defect" is not capable of precise definition, and is concededly an amorphous and elusive concept, it does *not* require proof that the defective design renders the product "unreasonably dangerous" to the unsuspecting customer. ( *Cronin v. J.B.E. Olson Corp. (1972) 8 Cal.3d 121, 133 [104 Cal.Rptr. 433, 501 P.2d 1153]*; *McGee v. Cessna Aircraft Co., supra, 82 Cal.App.3d 1005, 1015*; *Buccery v. General Motors Corp. (1976) 60 Cal.App.3d 533, 544 [132 Cal.Rptr. 605].*) On the other hand, of course, neither does the concept of strict liability make the manufacturer an absolute insurer of its product. (*Daly* v. *General Motors* [**133] [***230] *Corp. (1978) 20 Cal.3d 725, 733 [144 Cal.Rptr. 380, 575 P.2d 1162].*)

Our high court has suggested that issue of defectiveness can best be resolved by resort to the "cluster of precedents" forming the crucible in which the products liability doctrine has been forged and shaped. ( *Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413, 428 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]*; *Cronin v. J.B.E. Olson Corp., supra, at p. 134.*) In *Barker, supra*, the court enumerated the following as standards to be employed in determining whether a product is defectively designed: "First, a product may be found defective in design if the plaintiff establishes that the product

failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id., at p. 432.*)

In evaluating the adequacy of a product's design pursuant to these standards, a jury may consider, among other relevant factors: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer alternative design; the financial cost of an improved design; and the adverse consequences to the product and the consumer that would result from an alternative design. ( *Barker v. Lull Engineering Co., supra, 20 Cal.3d 413, 431*; *Horn v. General Motors Corp. (1976) 17 Cal.3d 359, 367 [131 Cal.Rptr. 78, 551 P.2d 398]*; *Southern Cal. Edison Co. v. Harnischfeger Corp. (1981) 120 Cal.App.3d 842, 854 [175 Cal.Rptr. 67].*) The cases have recognized the "need to 'weigh' competing considerations in an *overall* product design, in [*479] order to determine whether the design was 'defective.'" ( *Daly v. General Motors Corp., supra, 20 Cal.3d 725, 746*, italics added.)

The strict liability doctrine also "'requires a manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse . . . .'" ( *Buccery v. General Motors Corp., supra, 60 Cal.App.3d 533, 546*; *Self* v. *General Motors Corp. (1974) 42 Cal.App.3d 1, 7 [116 Cal.Rptr. 575].*) Strict liability should not be imposed upon a manufacturer when injury results from a use of its product that is not reasonably foreseeable. ( *Cronin v. J.B.E. Olson Corp., supra, 8 Cal.3d 121, 126*; *Self, supra*, at p. 7.) But as the court acknowledged in *Cronin, supra*: "The design and manufacture of products should not be carried out in an industrial vacuum but with recognition of the realities of their everyday use." ( *Id., at p. 126*; *Buccery, supra, at p. 546*; *Self, supra*, at p. 7.) The prospect of liability for injuries resulting from foreseeable abuse and misuse "keeps the manufacturer on his toes and thereby serves a socially useful purpose." ( *Self* v. *General Motors, supra*, 42 Cal.App.3d at p. 8.) []"

**DISSENT BY:** LUCAS (In Part)

**DISSENT**

**LUCAS, J.,** Concurring and Dissenting. I concur in that portion of the majority opinion which holds that a landlord may be held liable for dangerous conditions of which he knew or should have known. However, I cannot join in imposing upon landlords strict liability for latent defects in any component of their property no matter who built or installed the defective item.

Taking an unprecedented leap, the majority imposes "an unusual and unjust burden on property owners . . . [The] landlord [will] be faced with liability for every injury claim resulting from any untoward condition in every cranny of the building, whether it is reasonably foreseeable or not." ( *Dwyer v. Skyline Apartments, Inc. (1973) 123 N.J.Super. 48 [301 A.2d 463, 467]*, affd. obiter dictum, *63 N.J. 577 [311 A.2d 1].*) Any landlord, even one renting the family home for a year, will now be insurer for defects in any wire, screw, latch, cabinet door, pipe or other article on and in his premises at the time they are let despite the fact that he neither installed the item nor had any knowledge or reason to know of the defect. I believe, in conformance with the almost unanimous judgment of other jurisdictions considering this issue, that such imposition of liability is inappropriate. As one authority has remarked, "One problem in analyzing product liability law is our tendency to study rule changes in isolation and not to analyze their aggregate effect on liability costs or primary behavior." (Epstein, *Commentary* (1983) *58 N.Y.U. L.Rev. 930, 931.*) My colleagues here have taken just such an "isolated" viewpoint.

[*480] Justice Traynor, over 40 years ago in his classic concurrence, reasoned that "it should now be recognized that a manufacturer incurs an absolute liability when an article that he has placed on the market, knowing that it is to be used without inspection, proves to have a defect that causes injury to human beings." ( *Escola v. Coca Cola Bottling Co. (1944) 24 Cal.2d 453, 461 [150 P.2d 436].*) Thereafter, in *Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]*, speaking for a unanimous court, Justice Traynor explained that "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." In other words, one who *makes* the product should be held responsible for its defects.

The next year, strict liability was extended to retailers. ( *Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168].*) The rationale articulated in support of this extension was that [**134] [***231] "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products . . . . Strict liability on the manufacturer and retailer alike affords maximum protec-

tion to the injured plaintiff and *works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship*." ( *Id. at pp. 262-263*, italics added.) We later held that lessors and bailors of personal property similarly might be held strictly liable, after stressing "the necessity for a continuous course of business as a condition to application of the rule . . . ." ( *Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 253-254 [85 Cal.Rptr. 178, 466 P.2d 722]*.) As I shall discuss, this requirement of a continuing relationship which avoids "injustice" to defendants is given no meaningful consideration in the majority approach.

The potential liability of *producers* of residences was addressed in *Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749]*, a case cited with approval in *Price, supra, (2 Cal.3d at p. 251, fn. 6*), for the proposition that manufacturers placing products on the market, including mass producers of homes, should be held strictly liable for defects in their products. The *Kriegler* court concluded that "there are no meaningful distinctions between Eichler's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same." (*269 Cal.App.2d at p. 227*; see *Del Mar Beach Club Owners Assn. v. Imperial Contracting Co. (1981) 123 Cal.App.3d 898, 911-912 [176 Cal.Rptr. 886, 25 A.L.R.4th 336]*.) *Kriegler's* holding rested on the identification of Eichler as essentially a "manufacturer [*481] of homes," a situation undeniably very different from the one present here. IRM Corporation *purchased* an already "produced" and used property.

This distinction between a party actually selecting, installing, constructing and buying the defective product and a party who plays no such role and *therefore has no connection with anyone up the ladder of distribution*, was fundamentally adhered to by the Court of Appeal in two cases dealing with defects allegedly present in items found on or in leased premises. In *Fakhoury v. Magner (1972) 25 Cal.App.3d 58 [101 Cal.Rptr. 473]*, the plaintiff was injured when a couch in a rented apartment collapsed. She sued her landlord in strict liability asserting latent defects in the furniture. The court concluded that the landlord could be held strictly liable "not as lessor of real property, but as lessor of the furniture." (P. 63.) The requirement that property be placed in the stream of commerce was met because "a casual or isolated transaction will not bring the doctrine into play. [However, in] the case at hand, the landlord furnished two apartments in San Francisco and three in Sacramento at the same time with the same kind of couch purchased from the same seller." (P. 64.) In the instant case, the shower door was a fixture and the defendant is being sued as lessor of property not as lessor of furniture. Moreover, the shower doors had not been purchased by defendant.

The role of strict liability in landlord-tenant relationships was further explored in *Golden v. Conway (1976) 55 Cal.App.3d 948 [128 Cal.Rptr. 69]*. The plaintiff sued the landlord in strict liability after suffering damages in a fire caused by a wall heater installed by a contractor at the landlord's behest approximately one year before. The court permitted maintenance of the cause of action on the ground "that a lessor of real property who . . . is engaged in the business of leasing apartments and appurtenant commercial premises, equips the premises with an appliance without knowing whether or not it is defective because of the manner in which it was manufactured or installed, and it proves to have defects which cause injury to persons or property when used in a normal manner, is strictly liable in tort." (Pp. 961-962.) [**135] [***232] The installation of the heater assertedly created the dangerous condition, and the court was careful to distinguish the facts from those in *Ruiz v. Minnesota Mining & Mfg. Co. (1971) 15 Cal.App.3d 462 [93 Cal.Rptr. 270]*. In the latter case, the *Golden* court stressed, a product used on the premises was defective "and the property owner merely failed to take corrective action because he did not discover the defect" and therefore was not strictly liable. (*55 Cal.App.3d at p. 963*.) In our case, there is no allegation that the landlord was aware of the defect in the already present product. [1]

1 The *Golden* court did *not* discuss whether the transaction at issue there was an isolated one and therefore not normally the subject of an action in strict liability. The relevant continuing relationship usually is the one between the party sought to be held strictly liable and those up the chain of distribution to the manufacturer. Neither the relationship of the landlord to the marketing chain, nor between landlord and tenant was considered for this purpose, and I therefore consider *Golden* to be of limited assistance in evaluating the underlying policy problems.

[*482] The treatment of cases involving used goods and their sale better highlights relevant concerns ignored by the majority. In *Tauber-Arons Auctioneers Co. v. Superior Court (1980) 101 Cal.App.3d 268 [161 Cal.Rptr. 789]*, the Court of Appeal held that an auctioneer of used machinery who did not perform any maintenance or repair on the equipment, did not inspect it, and sold it "as is," could not be held strictly liable for any defects in the items. The court stated that when considering the requirement that a potential defendant be a participant "in the manufacturing-marketing system" before he be held subject to strict liability, one significant factor is "the requirement that defendant have a participatory

connection with the enterprise which 'created consumer demand for and reliance upon' the particular 'injury-producing product' [citation] not just products of the same classification." (*101 Cal.App.3d at p. 276*; see also *Brejcha v. Wilson Machinery, Inc. (1984) 160 Cal.App.3d 630, 639 [206 Cal.Rptr. 688]*.) The court further emphasized participation in the "initial distribution of the particular manufacturer's products . . . ." (P. 277.) Because a used machinery dealer normally "has no continuing business relationship with the manufacturer in the course of which he can adjust the cost of protection from strict liability . . . the rationale which underlies *Vandermark* simply is inapplicable to such a dealer. Moreover, the risk reduction which was sought in *Vandermark* on the assumption that 'the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end' ( Cal.2d at p. 262) . . . is simply unattainable because the 'used-goods dealer is normally entirely outside the original chain of distribution of the product . . . .' ( *Tillman v. Vance Equipment Co. [(Ore. 1979) 596 P.2d 1299, 1304]*.)" (*101 Cal.App.3d at p. 283*, fn. omitted; see also *Wilkinson v. Hicks (1981) 126 Cal.App.3d 515, 521 [179 Cal.Rptr. 5]*; *LaRosa v. Superior Court (1981) 122 Cal.App.3d 741, 753-754 [176 Cal.Rptr. 224]*.) Analogous considerations apply in the case of the "used property" lessor.

Discounting other crucial and long-recognized justifications for imposition of strict liability, my colleagues focus primarily on the "risk-spreading" function of this form of liability. Essentially they ignore the fact that landlords of used property have no special position with regard to original manufacturers and sellers and thus have no influence to wield in order to improve product safety. Moreover, contrary to the majority's implication, the landlord, while impliedly representing that the premises are habitable, [*483] is not representing to tenants that he has expertise and guarantees the perfection of every item forming the premises. Instead of considering what role landlords of used property realistically play with regard to that property, the majority concentrates narrowly on the advancement of "The paramount policy of the strict products liability rule [namely] the spreading [**136] [***233] throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects." (*Ante*, p. 466.) Next my colleagues observe that "landlords are essential to the rental business. They have more than a random or accidental role in the marketing enterprise [and] a continuing relationship to the property following the renting . . . ." In addition, "it may be expected that along with numerous other factors the price of used rental housing will depend in part on the quality of the building and reflect the anticipated costs of protecting tenants, including repairs, replacement of defects and insurance," and that rentals may be adjusted to cover such costs. (*Ante*, at p. 466.) [2]

2 One Court of Appeal recently undertook an extensive review of strict liability in the context of sellers of used machinery which "they neither inspected, repaired nor modified." ( *LaRosa v. Superior Court, supra, 122 Cal.App.3d 741, 743.*) It reviewed five "policy predicates" for strict liability described in Note, *Sales of Defective Used Products: Should Strict Liability Apply*? (1979) 52 So.Cal.L.Rev. 805, namely, (1) enterprise liability (forcing the enterprise to bear costs of injuries caused by its defective products); (2) deterrence; (3) risk distribution; (4) practicality (problems of proof made easier by application of strict liability) and (5) implied representations of safety because product is present on the market. (*122 Cal.App.3d at pp. 756-760.*) The Court of Appeal found that as to the risk-distribution rationale, so heavily relied upon here by the majority, "the very pervasiveness of the . . . rationale suggests that it is probably insufficient, by itself, to justify *strict* liability." (*122 Cal.App.3d at p. 759.*) As to diminishing problems of proof, the court observed "ease of recovery is not really a *rationale* for strict liability; more precisely it describes the *effect* strict liability was expected to have. Obviously if ease of recovery *were* a pervasive rationale for strict liability then strict liability would be the universal rule." ( *Id. at p. 760.*) These conclusions have validity in our context as well.

One major difficulty with this approach is the concentration on the wrong "stream of commerce." Unquestionably a landlord has more than an "accidental role" in the marketing of rental property. Except for those who on a one-time basis rent out a piece of property for a reasonably short term, every landlord of both multiple and single properties has a continuing role in the rental market. But those same landlords in all likelihood will have absolutely no direct or continuing relationships with the *manufacturers and marketers* of the particular defective products found on the premises. We are not discussing here those who *build* the property; we are discussing those who purchase already existing multiple residence properties. In fact, applying the majority's analysis, those who decide to rent out the family home on a regular basis are also now strictly liable for defects in any item located therein. Under the majority's formulation, where the relevant relationship is that of landlord to his property and tenants, any landlord is now strictly liable for defects of which he or she has no knowledge or reason to [*484] know and which appear in any part of the property no matter how esoteric the understanding necessary to comprehend the working of that part. [3] Nothing in

the majority's approach is necessarily confined to landlords of multiple residences.

3 This sharply contrasts with the general view that "Only a seller who can be regarded as a merchant or as one engaged in the business of supplying goods of the kind involved in the case is subject to strict liability . . . ." (Prosser & Keeton on the Law of Torts (5th ed. 1984) Products Liability, § 100 at p. 705.) We conformed to this viewpoint in *Price* where the court concluded "that for the doctrine of strict liability in tort to apply to a lessor of personalty, the lessor should be found to be in the business of leasing, in the same general sense as the seller of personalty is found to be in the business of manufacturing or retailing." (*2 Cal.3d at p. 254.*) The majority makes landlords "merchants" of anything contained in or on their property, no matter what the expertise or familiarity entailed, or the actual role of the landlord with regard to the particular product at issue.

The weakness of the majority's analysis of the relevant stream of commerce is revealed by consideration of its basis for concluding that "a continuing business relationship is not essential to imposition of strict liability." It relies upon *Ray v. Alad Corp. (1977) 19 Cal.3d 22 [136 Cal.Rptr.* [**137] [***234] *574, 560 P.2d 3]*, for the proposition that unavailability of a manufacturer militates in favor of the imposition of liability on "persons engaged in the enterprise who can spread the cost of compensation." (See *ante*, p. 466.) In *Alad*, we held that a corporation which had acquired all assets of the manufacturer of the defective product and which continued to run the business in a manner almost identical to its original form, could be held strictly liable for defects in a product manufactured by the predecessor corporation. "By taking over and continuing the established business of producing and distributing Alad ladders, Alad II became 'an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products' ( *Vandermark v. Ford Motor Co., supra, 61 Cal.2d 256, 262).*" ( *Ray v. Alad Corp., supra, 19 Cal.3d at p. 34.*) Under those narrow circumstances, we held the successor could be held liable.

Similar complete unavailability of the manufacturer or others in the original chain of distribution simply is not at issue here. As the majority states in its recitation of facts, the plaintiff here settled with the builder and a door assembler and installer for a minimum of $ 150,000 and has actions pending against defendants in addition to the landlord. No legal unavailability of the kind occurring in *Alad* presented a problem for plaintiff's recovery. Moreover, there is no reasonable suggestion that the relationship between the landlord here and any party participating in the original manufacture and distribution of the shower door can be analogized to the almost complete overlap of the corporate entities in *Alad*. It is illogical to conclude that the landlord here became part of the overall *marketing* scheme for the shower doors merely by purchasing property in which they had long since been installed.

[*485] Unlike retailers, lessors, bailors, wholesalers or others in the original chain of distribution of the product, the landlord owning used property cannot adjust the costs of protection up the chain. He may only do it, at best, *down* the chain of "distribution," namely by charging more to his tenants. Unlike the others mentioned above, such a "merchant" has no opportunity to enter into indemnification agreements with those more closely linked with the making of the product -- he will have little idea if any when he buys the property as to the origin of items such as the wiring found in the walls, and without doubt even if he has such knowledge will have no bargaining power to enter into any agreements with such suppliers. Moreover, his responsibility extends to a myriad of products, unlike the situation faced by a retailer of a particular line of goods. Landlords henceforth are in a risky business. No matter how carefully they inspect, and no matter how impossible to discern the defect, they are now the last outpost of liability for countless unrelated products in which they have no particular expertise. [4]

4 One court summed up the difference between extending strict liability to lessors of commercial products and to motel owners in a manner which has general application in our context as well: "A major consideration in holding lessors of commercial products strictly liable was that such lessors possessed expert knowledge of the characteristics of the equipment or machines they leased. [Citations.] Another consideration is that such lessors, like retailers, deal continually with their suppliers, giving them an enduring relationship which permits them to seek contribution and indemnification. These considerations do not apply when a motel operator makes a one-time purchase of furnishings and fixtures about which he has no special expertise. Therefore, we hold that a motel operator is not strictly liable for defects in the fixtures and furnishings of the rooms he held out to the public." ( *Livingston v. Begay (1982) 98 N.M. 712 [652 P.2d 734, 738-739].*)

Consideration of the inherent problems -- and unfairness -- in extending strict liability to landlords has led almost every other jurisdiction deciding this issue to de-

cide that imposition of such liability is unwarranted. In 1973, a New Jersey appellate court so held in a decision affirmed by that state's highest court. The opinion contained a cogent discussion of some of the [**138] [***235] reasons why use of this theory of recovery is inappropriate in this context:

"The underlying reasons for the enforcement of strict liability against the manufacturer, seller or lessor of products or the mass builder-vendor of homes do not apply to the ordinary landlord of a multiple family dwelling.

"Such a landlord is not engaged in mass production whereby he places his product -- the apartment -- in a stream of commerce exposing it to a large number of consumers. He has not created the product with a defect which is preventable by greater care at the time of manufacture or assembly. He does not have the expertise to know and correct the condition so as to be saddled with responsibility for a defect regardless of negligence.

[*486] "An apartment involves several rooms with many facilities constructed by many artisans with differing types of expertise, and subject to constant use and deterioration from many causes. It is a commodity wholly unlike a product which is expected to leave the manufacturer's hands in a safe condition with an implied representation upon which the consumer justifiably relies.

"The tenant may expect that at the time of the letting there are no hidden dangerous defects known to the landlord and of which the tenant has not been warned. But he does not expect that all will be perfect in his apartment for all the years of his occupancy with the result that his landlord will be strictly liable for all consequences of any deficiency regardless of fault. He expects only that in the event anything goes wrong with the accommodations or the equipment therein, the landlord will repair it when he knows or should know of its existence; and that if injury results liability will attach." ( *Dwyer v. Skyline Apartments, Inc., supra, 301 A.2d at p. 467.*)

Several other courts have reached similar conclusions in reviewing analogous cases. As the Missouri Court of Appeals observed, "No case has been cited, nor has one been found, imposing strict liability upon the nonbuilder landlord for latent defects, rendering the premises unsafe or dangerous, absent some actual or constructive notice of the defects." ( *Henderson v. W. C. Haas Rlty. Management, Inc. (Mo.App. 1977) 561 S.W.2d 382, 387.*) [5] Cases rejecting application of liability without knowledge have utilized various approaches. (See, e.g., *Meyer v. Parkin (Minn.App. 1984) 350 N.W.2d 435, 438-439* [recent legislation did not eliminate requirement of scienter on part of landlord before he has duty to warn lessee of concealed defects]; *George Washington University v. Weintraub (D.C.App. 1983) 458 A.2d 43, 49* and fn. 9 [landlord exercising reasonable care may not be held liable for losses caused from defects of which he neither knew nor should have known]; *Livingston v. Begay, supra, 652 P.2d 734* [lessor of motel room not strictly liable; theory not meant to apply to "unsafe design of a hotel room"]; *Boudreau v. General Elec. Co. (1981) 2 Hawaii App. 10 [625 P.2d 384, 389-390, 34 A.L.R.4th 86]* [strict liability requires lessor be engaged in business of supplying goods in which defect is claimed]; *Segal v. Justice Court Mut. Housing Co-op (1980) 105 Misc.2d 453 [432 N.Y.S.2d 463, 467]*, affd. *(1981) 108 Misc.2d 1074 [442 N.Y.S.2d 686]* [no strict liability of landlords under public policy or legislation; they are not insurers of property]; *Kidd v. Price (Ky.App. 1971) 461 S.W.2d 565, 567* [liability for latent defect depends on notice or knowledge thereof].)

5 The one apparent exception is in Louisiana where *pursuant to statute* a landlord may be held liable for defects in the absence of actual knowledge of the defective condition of his property. (See *Parr v. Head (La.App. 1983) 442 So.2d 1234, 1235*; *Buxton v. Allstate Ins. Co. (La.App. 1983) 434 So.2d 605, 607-608.*)

[*487] I would hold that a subsequent purchaser of property who has not installed, altered or created the item or condition which is claimed to be defective, and who has no actual or constructive knowledge of any defect therein, should not be held strictly liable. If the landlord knows or should know of the defect, then he has a duty to take appropriate action to correct or warn [**139] of the problem. However, where the landlord has no continuing relationship with the chain of marketing leading back to the [***236] manufacturer of the defective product, and thus has no way of influencing the production or design of the product or of adjusting potential costs of the *manufacturer's* enterprise or others in the business of marketing the item at issue, imposition of strict liability is inappropriate. The only rationales supporting such responsibility are ease of proof for the injured party and "distributing" the risk of damages to the landlord. The costs of such an extension of liability to those *without* expertise or continuing relationships for the multiple products and parts for which they may now bear responsibility will entail a significant shift in how our tort system has heretofore operated. It amounts, in effect, to insurance for tenants, [6] because it does nothing to aid in the goals of deterrence or product safety.

6 The majority never considers the economic effect of its holding. The only logical result is that the price of rental housing will increase because of the increased cost of insurance, assuming in-

surance can be obtained for this purpose. Even if landlords can sue participants in the original line of manufacture and marketing, the litigation costs involved will likely also have an effect on the price of rental housing. Arguably, instead of risk distribution, the majority's conclusion will result in a general increased cost attributable to the risks involved without a concurrent benefit. Someone will have to pay for the additional litigation today's decision is likely to create.

I would affirm the trial court's decision to the extent that it granted summary judgment to defendant on the cause of action sounding in strict liability, while joining in the majority's reversal as to the negligence cause of action.

# TAB 7

LEXSEE 136 CAL. APP. 4TH 1241

**MAGDA BENAVIDES, Plaintiff and Appellant, v. STATE FARM GENERAL INSURANCE COMPANY, Defendant and Appellant; LISA HALEY, Defendant and Respondent.**

**B179028**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION FIVE**

***136 Cal. App. 4th 1241*; *39 Cal. Rptr. 3d 650*; *2006 Cal. App. LEXIS 226*; *2006 Cal. Daily Op. Service 1593*; *2006 Daily Journal DAR 2190***

**February 23, 2006, Filed**

**NOTICE:** CERTIFIED [***1] FOR PARTIAL PUBLICATION*

> * Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.C. and III.D., and a portion of the concurring opinion.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. SC073073, Terry B. Friedman, Judge.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

In an action brought by a condominium unit owner against an insurer which was based on the presence of mold in condominium units, the jury found that there was no insurance coverage and no breach of the insurance contract by the insurer. However, the jury also found the insurer negligently investigated the owner's claim, causing her $ 260,000 in damages. On appeal, the owner, who had submitted an additional living expense claim, argued that she was entitled to a new trial on her claims for contract breach and violation of the implied covenant of good faith and fair dealing against the insurer. (Superior Court of Los Angeles County, No. SC073073, Terry Friedman, Judge.)

The Court of Appeal reversed the owner's judgment against the insurer for negligent investigation, but affirmed the judgment in all other respects. The court held that absent coverage, there is no tort liability for improperly investigating a first party insurance claim, whether the insurer's conduct is characterized as an implied covenant breach or negligence. The insurance policy that was issued to the owner excluded coverage for mold unless a covered peril was the predominant cause of the mold. There was no tort liability on the insurer's part for negligent investigation of the owner's first party insurance claim. None of the circumstances allowing for a contract claim to be pursued as a tort cause of action were present. The cause of action at issue was not breach of the covenant of good faith and fair dealing, but negligence. Because no benefits were due, the insurer's allegedly negligent investigation did not frustrate the owner's right to the benefits of the contract. The owner suffered no injury as a result of the manner in which the insurer conducted its investigation. Whatever the merits of the owner's [*1242] assertion of inadequate investigation, the fact that the investigation yielded a correct conclusion of no coverage precluded any claim by the owner that the inadequacy caused her any damage. (Opinion by Turner, P. J., with Kriegler, J., concurring. Concurring opinion by Mosk, J. (see p. 1253).)

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Negligence § 27--Exercise of Care by Particular Persons--Insurer--Presence of Mold in Condominium Units--Negligent Handling of Claim.**--In an action based on the presence of mold in a condominium unit, the condominium unit owner could not recover against an insurer for the negligent handling of her additional living expense claim where there was no coverage under the terms of her policy.

[2 Witkin, Summary of Cal. Law (10th ed. 2005) Insurance, § 251.]

**(2) Insurance Contracts and Coverage § 91--Property Insurance--Efficient Probable Cause--All-risk Policy.**--An all-risk policy covers risks of physical loss except those excluded under the terms of the insuring contract. Under an all-risk policy, the limits of coverage are defined by the exclusions. If an excluded risk is the efficient proximate or predominant cause of the loss, there is no coverage. Stated conversely, if the predominate cause of loss is a covered risk, the insured's claim will be covered, even if a non-insured peril contributed to the injury.

**(3) Insurance Contracts and Coverage § 91--Property Insurance--Efficient Probable Cause--Included and Excluded Risks.**--When sufficient evidence is introduced to support the possibility that an insured's damages were caused by both included and excluded risks, coverage should be determined by a jury under an efficient proximate cause analysis.

**(4) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant--Breach--Tort Liability.**--The relationship between insured and insurer is contractual. Nevertheless, it is well established that tort liability will lie against an insurer for breach of the implied covenant of good faith and fair dealing. The implied covenant arises from the contract. [*1243]

**(5) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant.**--In addition to the duties imposed on the contracting parties by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing. The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement.

**(6) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant--Breach--Tort Liability--Benefits Withheld Without Proper Cause.**--The precise nature and extent of the duty imposed by an implied promise of good faith and fair dealing will depend on the contractual purposes. In the first party insurance context, the insured's primary contractual right is to receive benefits due under the policy. Tort liability for an insurer's breach of the implied covenant of good faith and fair dealing arises when the insurer unreasonably and in bad faith withholds payment of the insured's claim. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort. For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it must give at least as much consideration to the latter's interests as it does to its own. An insurer cannot reasonably and in good faith deny payments to its insured without fully investigating the grounds for its denial. When an insurer withholds benefits for proper cause, however, there is no breach of the implied covenant. Declining to perform a contractual duty under the policy with proper cause is not a breach of the implied covenant. Thus, to establish an implied covenant tortious breach, an insured must show first, that benefits were due under the policy, and second, that the benefits were withheld without proper cause.

**(7) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant--Breach--Tort Liability--Covered Loss.**--An insured cannot maintain a claim for tortious breach of the implied covenant of good faith and fair dealing absent a covered loss. If the insurer's investigation--adequate or not--results in a correct conclusion of no coverage, no tort liability arises for breach of the implied covenant.

**(8) Insurance Contracts and Coverage § 109--Good Faith and Fair Dealing--Implied Covenant--Inadequate Investigation.**--Absent coverage, there is no tort liability for improperly investigating a first party insurance claim, whether the insurer's conduct is characterized as an implied covenant breach or negligence. The relationship between the parties is contractual. The insured's primary right is to receive compensation for covered losses. The insurer's duty is not to unreasonably [*1244] withhold the payment of benefits due. When no benefits are due, a negligent investigation does not frustrate the insured's right to the benefits of the contract. The insured who is not entitled to insurance proceeds has suffered no injury as a result of the manner in which the insurer's investigation was conducted. Whatever the merits of an assertion of inadequate investigation, the fact that the investigation yielded a correct conclusion of no coverage precludes any claim that the inadequacy caused any damage.

**(9) Contracts § 45--Actions--Tortious Breach--Independent Duty.**--Generally, outside the insurance context, a tortious breach of contract may be found when: (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion; or (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages. A breach of contract is tortious only when some independent duty arising from tort law is violated.

**COUNSEL:** Cohen & Lord, Scott Richard Lord and James F. Boyle for Plaintiff and Appellant.

Horvitz & Levy, Mitchell C. Tilner, S. Thomas Todd; Sedgwick, Detert, Moran & Arnold and Maria Louise Cousineau for Defendant and Appellant.

Law Office of Lloyd C. Ownbey, Jr., and Lloyd C. Ownbey, Jr., for Defendant and Respondent.

**JUDGES:** Turner, P. J., with Kriegler, J., concurring. Concurring opinion by Mosk, J.

**OPINION BY:** Turner

**OPINION**

[**651] **TURNER, P. J.--**

I. INTRODUCTION

Before us are appeals from the judgment entered after a jury trial in an action based on the presence of mold in condominium units in Santa Monica instituted by plaintiff, Magda Benavides. Although she prevailed on her negligent investigation claim, plaintiff appeals from the judgment against her [*1245] insurer, defendant State Farm General Insurance Company (State Farm). Plaintiff argues that [***2] she is entitled to a new trial on her claims for contract breach and violation of the implied covenant of good faith and fair dealing against State Farm. Plaintiff does not argue she is entitled to a new trial on her negligent investigation claim on which she prevailed during the jury trial. But State Farm appeals from the judgment in favor of plaintiff on her negligent investigation claim. Plaintiff also appeals from a judgment in favor of defendant, Lisa Haley. Ms. Haley's condominium was upstairs from plaintiff's unit.

**(1)** In the published portion of this opinion, we discuss whether plaintiff may recover for negligent handling of her claim despite the fact there is no coverage under the terms of her policy. As will be noted, we conclude plaintiff may not recover for the negligent handling of her claim because there is no coverage under the terms of the policy. Further, none of the circumstances which allow for a contract claim to be pursued as a tort cause of action are present. Hence, we reverse plaintiff's judgment against State Farm for negligent investigation. We affirm the judgment in all other respects.

II. BACKGROUND

Plaintiff purchased a ground floor condominium unit [***3] in Santa Monica in 1994. In 2001, mold was found in the exterior walls of the property, including walls adjacent to plaintiff's unit. Subsequent testing revealed mold inside plaintiff's condominium. Plaintiff was advised by a physician to move out of her condominium. Plaintiff submitted a claim for additional living expense to State Farm, which hired a civil engineer to investigate. State Farm later denied plaintiff's claim on grounds the mold was an excluded loss which was not caused by a covered peril. Plaintiff sued State Farm and Ms. Haley. Plaintiff alleged State Farm had failed to properly investigate her claim, resulting in an erroneous coverage decision. The jury found there was no coverage and no breach of the insurance contract. However, the jury also found State Farm negligently investigated [**652] plaintiff's claim, causing her $ 260,000 in damages.

Ms. Haley lived upstairs from plaintiff. The complaint alleged that in May 2000, during remodeling, Ms. Haley's contractor caused water to leak into plaintiff's kitchen and living room. At trial, plaintiff presented evidence of other leaks from Ms. Haley's unit. The jury found Ms. Haley was not negligent with regard to water intrusion [***4] into plaintiff's unit.

[*1246] III. DISCUSSION

A. *The Policy and the Jury Findings*

The State Farm insurance policy issued to plaintiff excluded mold unless a covered peril was the predominant cause of the mold. Plaintiff's additional living expense claim fell within "Coverage C--Loss of Use." That provision stated in part: "Additional Living Expense. When a Loss Insured causes the residence premises to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 24 months." "Losses Insured" included "Coverage A--Building Property." Coverage A provided: "We cover: [¶] 1. alterations, appliances, fixtures and improvements which are part of the building contained within your unit; [¶] 2. items of real property which pertain exclusively to your unit; or [¶] 3. property which is your insurance responsibility under the governing rules of the condominium. ..." (Italics omitted.) In "Section I--Losses Insured," the policy stated: "We insure for accidental direct physical loss to the property described in Coverage A [building property] ... , except as provided in SECTION I--LOSSES NOT INSURED." "Section I--Losses [***5] Not Insured" stated in relevant part: "1. We do not insure under any coverage for any loss consisting of the items in paragraphs 2., 3., 4. or 5. below. This exclusion does not apply if the loss is caused by a peril which is not otherwise excluded. [¶] 2. We do not insure for any loss to the property described in Coverage A [building property] ... which is caused by one or more of the items below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these: [¶] ... [¶] f. continuous or repeated seepage or leakage of water ... from a: [¶] ... [¶] (2) household appliance; or [¶] (3) plumbing

system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings or floors; [¶] which occurs over a period of time ... ; [¶] g. wear, tear, marring, scratching, deterioration, inherent vice, latent defect or mechanical breakdown; [¶] h. corrosion, electrolysis or rust; [¶] i. Mold, fungus or wet or dry rot; [¶] j. contamination; [¶] ... [¶] 4. We [***6] do not insure under any coverage for any loss which is caused by one or more of the items below, regardless of whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these: [¶] ... [¶] c. Water Damage, meaning: [¶] (1) ... surface water ... . [¶] ... [¶] 5. We do not insure for loss described in paragraphs 2., 3. and 4. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss: [¶] ... [¶] b. defect, weakness, inadequacy, fault or unsoundness in: [¶] ... [*1247] [¶] (2) design, specifications, workmanship, construction, grading, compaction; [¶] (3) materials used in construction or repair; or [¶] (4) maintenance; [**653] [¶] of any property (including land, structures, or improvements or any kind) whether on or off the residence premises; or [¶] c. weather conditions. [¶] However, we do insure for any resulting loss from items a., b. and c. unless the resulting loss is itself [***7] a Loss Not Insured by this Section."

**(2)** With respect to building property coverage, the insurance policy at issue was a first party "all-risk" policy. (*Garvey v. State Farm Fire & Casualty Co. (1989) 48 Cal.3d 395, 399 [257 Cal. Rptr. 292, 770 P.2d 704]*; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2005) ¶ 6:250.1, p. 6B-24 (rev. # 1, 2005).) (The parties do not discuss and we do not consider the policy provisions relating to personal property loss.) An all-risk policy covers risks of physical loss except those excluded under the terms of the insuring contract. Under an all-risk policy, the limits of coverage are defined by the exclusions. (*Garvey v. State Farm Fire & Casualty Co., supra, 48 Cal.3d at p. 406*; *Nissel v. Certain Underwriters at Lloyds of London (1998) 62 Cal.App.4th 1103, 1114 [73 Cal. Rptr. 2d 174]*.) If an excluded risk is the "efficient proximate" or predominant cause of the loss, there is no coverage. (*Julian v. Hartford Underwriters Ins. Co. (2005) 35 Cal.4th 747, 761 [27 Cal. Rptr. 3d 648, 110 P.3d 903]*; *Garvey v. State Farm Fire & Cas. Co., supra, 48 Cal.3d at pp. 402-403*.) Stated conversely, if the predominate cause of [***8] loss is a covered risk, the insured's claim will be covered, even if a noninsured peril contributed to the injury. (*Julian v. Hartford Underwriters Ins. Co., supra, 35 Cal.4th at p. 754*; *State Farm Fire & Casualty Co. v. Von Der Lieth (1991) 54 Cal.3d 1123, 1131 [2 Cal. Rptr. 2d 183, 820 P.2d 285]*.)

**(3)** The Supreme Court has held that when sufficient evidence is introduced to support the possibility that a plaintiff's damages were caused by both included and excluded risks, "Coverage should be determined by a jury under an efficient proximate cause analysis." (*Garvey v. State Farm Fire & Casualty Co., supra, 48 Cal.3d at p. 412*; accord, *State Farm Fire & Cas. Co. v. Von Der Lieth, supra, 54 Cal.3d at p. 1131*.) In *Garvey*, for example, there was conflicting evidence as to the causes of damage to the plaintiff's residence. Earth movement was an excluded peril. Contractor negligence was a covered risk. The Supreme Court held: "If the earth movement was the efficient proximate cause of the loss, then coverage would be denied ... . On the other hand, if negligence was the efficient proximate cause of the loss, then coverage exists ... . These issues were [***9] jury questions because sufficient evidence was introduced to support both possibilities." (*Garvey v. State Farm Fire & Casualty Co., supra, 48 Cal.3d at pp. 412-413*.)

It is undisputed plaintiff's condominium unit owners policy excluded coverage for mold. But an exception to the mold exclusion arose under the [*1248] following policy language found in "Section I--Losses Not Insured": "We do not insure under any coverage for any [losses not insured]. *This exclusion does not apply if the loss is caused by a peril which is not otherwise excluded.*" (Italics added.) A State Farm claims representative, Julie Lynn Nisbet, testified at trial the foregoing clause meant, "[I]f the cause of the mold is not otherwise excluded, then [State Farm] could provide coverage for the mold." Stated differently, she testified: "Mold is an excluded peril. However, if the predominant cause is covered, this paragraph gives that coverage back."

[**654] The jury found by an 11-to-1 margin that Sate Farm performed all of its contractual duties under the policy it issued to plaintiff. Further, the jury found by a 10-to-2 margin that the "Haley water event in May 2000" was not the predominant cause [***10] of the mold in plaintiff's unit. As noted, mold is a noncovered injury. But the evidence was subject to the interpretation that the May 2000 water leakage from Ms. Haley's unit was of the type that it *could* be a covered event; i.e. the leakage was a predominate cause of plaintiff's loss. Hence, that potentiality was presented to the jury. And the jury found a preponderance of the evidence demonstrated that the May 2000 water leakage from Ms. Haley's unit, which was immediately remediated, was not a predominate cause of plaintiff's injuries. Plaintiff does not contend that substantial evidence does not support the jurors' findings in this regard. Nor does plaintiff argue that the trial court committed evidentiary error in any

respect. Hence, these issues have been forfeited. (*Tiernan v. Trustees of Cal. State University & Colleges (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal. Rptr. 115, 655 P.2d 317]*; *Johnston v. Board of Supervisors (1947) 31 Cal.2d 66, 70 [187 P.2d 686]*, disapproved on another point in *Bailey v. County of Los Angeles (1956) 46 Cal.2d 132, 139 [293 P.2d 449]*.) Therefore, in the absence of a loss covered by the policy, we are confronted with the question of [***11] whether plaintiff may recover for negligent failure to investigate her claim.

B. *There Was No Tort Liability in This Case for Negligent Investigation of a First Party Insurance Claim Absent Coverage*

We turn to the question whether, absent coverage, State Farm can be held liable in tort for negligently investigating plaintiff's insurance claim. The jury found State Farm negligently investigated plaintiff's claim causing her $ 260,000 in damages. We conclude there was no tort liability on State Farm's part for negligent investigation of plaintiff's first party insurance claim.

**(4)** The relationship between insured and insurer is contractual. Nevertheless, it is well established that tort liability will lie against an insurer for breach of the implied covenant of good faith and fair dealing. (*Frommoethelydo v. Fire Ins. Exchange (1986) 42 Cal.3d 208, 214 [228* [*1249] *Cal.Rptr. 160, 721 P.2d 41]*; *Silberg v. California Life Ins. Co. (1974) 11 Cal.3d 452, 461 [113 Cal. Rptr. 711, 521 P.2d 1103]*; *Gruenberg v. Aetna Ins. Co. (1973) 9 Cal.3d 566, 575 [108 Cal. Rptr. 480, 510 P.2d 1032]*; see *Kransco v. American Empire Surplus Lines Ins. Co. (2000) 23 Cal.4th 390, 402 [97 Cal. Rptr. 2d 151, 2 P.3d 1]*.) [***12] The implied covenant arises from the contract. (*Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 35-36 [44 Cal. Rptr. 2d 370, 900 P.2d 619]*; *Tran v. Farmers Group, Inc. (2002) 104 Cal.App.4th 1202, 1216-1217 [128 Cal. Rptr. 2d 728]*.) **(5)** The Supreme Court has held: "In addition to the duties imposed on the contracting parties by the express terms of their [insuring] agreement, the law implies in every contract a covenant of good faith and fair dealing. (*Comunale v. Traders & General Ins. Co. (1958) 50 Cal.2d 654, 658 [328 P.2d 198]*; see also Comment, *Extending the Insurer's Duty of Good Faith and Fair Dealing to Third Parties Under Liability Insurance Policies* (1978) 25 UCLA L.Rev. 1413, 1418-1424.) The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. (*Murphy v. Allstate Ins. Co. (1976) 17 Cal.3d 937, 940 [132 Cal. Rptr. 424, 553 P.2d 584]*; *Crisci v. Security Ins. Co. (1967) 66 Cal.2d 425, 429 [58 Cal. Rptr. 13, 426 P.2d 173]*; *Comunale v. Traders &* [**655] *General Ins. Co., supra, 50 Cal.2d at p. 658*.)" (*Egan v. Mutual of Omaha Ins. Co. (1979) 24 Cal.3d 809, 818 [169 Cal. Rptr. 691, 620 P.2d 141]*; [***13] see *Love v. Fire Ins. Exchange (1990) 221 Cal. App. 3d 1136, 1153 [271 Cal. Rptr. 246]*.)

**(6)** The Supreme Court has held, "The precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes." (*Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal.3d at p. 818*; see *Jonathan Neil & Assoc., Inc. v. Jones (2004) 33 Cal.4th 917, 937 [16 Cal. Rptr. 3d 849, 94 P.3d 1055]*.) In the first party insurance context, the insured's primary contractual right is to receive benefits due under the policy. (*CalFarm Ins. Co. v. Krusiewicz (2005) 131 Cal.App.4th 273, 285-286 [31 Cal. Rptr. 3d 619]*; *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1153*.) Tort liability for an insurer's breach of the implied covenant of good faith and fair dealing arises when the insurer unreasonably and in bad faith withholds payment of the insured's claim. (*Frommoethelydo v. Fire Ins. Exchange, supra, 42 Cal.3d at pp. 214-215*; *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1151*.) The Supreme Court has held: " '[When] the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it [***14] is subject to liability in tort.' (*Gruenberg [v. Aetna Ins. Co., supra, 9 Cal.3d at p. 575*]; accord, *Silberg [v. California Life Ins. Co., supra, 11 Cal.3d at p. 461*]; *Fletcher[ v. Western National Life Ins. Co. (1970) 10 Cal. App. 3d 376, 401-402 [89 Cal. Rptr. 78]*].) For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it ... must give at least as much consideration to the latter's interests as it does to its own. (*Silberg[ v. California Life Ins. Co., supra, 11* [*1250] *Cal.3d at p. 460*]." (*Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal.3d at pp. 818-819*.) The Supreme Court has further explained, "[A]n insurer cannot reasonably and in good faith deny payments to its insured without fully investigating the grounds for its denial. (*Egan v. Mutual of Omaha Ins. Co.[, supra,] 24 Cal.3d [at pp.] 818-819 ...* .)" (*Frommoethelydo v. Fire Ins. Exchange, supra, 42 Cal.3d at p. 215*.) When an insurer withholds benefits *for proper cause*, however, there is no breach of the implied covenant. [***15] (*Love v. Fire Ins. Exchange, supra, 121 Cal. App. 3d at p. 1151*; *California Shoppers, Inc. v. Royal Globe Ins. Co. (1985) 175 Cal. App. 3d 1, 54-55 [221 Cal. Rptr. 171]*.) This is because, as the Court of Appeal held in *California Shoppers, Inc.*: "[D]eclining to perform a contractual duty under the policy *with proper cause* is not a breach of the implied covenant. (See *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752, 770 [206 Cal. Rptr. 354, 686 P.2d 1158]*[, overruled in *Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal.4th 85, 87-88 [44 Cal. Rptr. 2d 420, 900 P.2d 669]*].)" (*California Shoppers, Inc. v. Royal Globe Ins. Co., supra, 175 Cal. App. 3d at p. 54*,

original italics.) Thus, to establish an implied covenant tortious breach, an insured must show first, that benefits were due under the policy, and second, that the benefits were withheld without proper cause. (*Progressive West Ins. Co. v. Superior Court (2005) 135 Cal.App.4th 263, 278 [37 Cal. Rptr. 3d 434]*; *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1151*.)

[**656] **(7)** It follows an insured cannot maintain a claim for tortious breach of [***16] the implied covenant of good faith and fair dealing absent a covered loss. (*Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at pp. 35-36* [no potential coverage hence no duty to defend]; *McMillin Scripps North Partnership v. Royal Ins. Co. (1993) 19 Cal.App.4th 1215, 1222 [23 Cal. Rptr. 2d 243]*; *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d at p. 1153*; *Murray v. State Farm Fire & Casualty Co. (1990) 219 Cal. App. 3d 58, 66 [268 Cal. Rptr. 33]*; *Brodkin v. State Farm Fire & Casualty Co. (1989) 217 Cal. App. 3d 210, 218 [265 Cal. Rptr. 710]*; see *Kopczynski v. Prudential Ins. Co. (1985) 164 Cal. App. 3d 846, 849 [211 Cal. Rptr. 12]*.) If the insurer's investigation--adequate or not--results in a *correct* conclusion of no coverage, no tort liability arises for breach of the implied convenant. (*Murray v. State Farm Fire & Casualty Co., supra, 219 Cal. App. 3d at p. 66*; *Brodkin v. State Farm Fire & Casualty Co., supra, 217 Cal. App. 3d at p. 218*; *Kopczynski v. Prudential Ins. Co., supra, 164 Cal. App. 3d at p. 849*.)

**(8)** The cause of action at issue is [***17] not breach of the implied covenant of good faith and fair dealing, but *negligence*. The question arises, therefore, whether, in the absence of benefits due under the insuring contract, plaintiff can recover for State Farm's *negligent* investigation of her claim. We conclude in this case that absent coverage, there is no tort liability for improperly investigating a first-party insurance claim whether the insurer's conduct is characterized as an implied covenant breach or negligence. The [*1251] same logic that precludes imposition of damages for breach of the implied covenant in the absence of coverage in this case also rules out recovery for negligence. The relationship between the parties is contractual. The insured's primary right is to receive compensation for covered losses. The insurer's duty is not to unreasonably withhold the payment of benefits due. When, as here, no benefits are due, a negligent investigation does not frustrate the insured's right to the benefits of the contract. The insured who is not entitled to insurance proceeds has suffered no injury as a result of the manner in which the insurer's investigation was conducted. The Court of Appeal's conclusion in *Murray v. State Farm Fire & Casualty Co., supra, 219 Cal. App. 3d at pages 65-66,* [***18] with regard to a breach of the implied covenant claim is equally applicable to a negligence cause of action: "Whatever the merits [of the] assertion [of inadequate investigation], the fact that the investigation yielded a correct [no coverage] conclusion precludes any claim that the inadequacy caused any damage." (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc. (2000) 78 Cal.App.4th 847, 880 [93 Cal. Rptr. 2d 364]*; *Brodkin v. State Farm Fire & Casualty Co., supra, 217 Cal. App. 3d at p. 218*.)

**(9)** Also, the California Supreme Court has identified the limited circumstances where the litigants' relationship, which has its basis in a contract, can give rise to a tort claim. In *Robinson Helicopter Co., Inc. v. Dana Corp. (2004) 34 Cal.4th 979, 990 [22 Cal. Rptr. 3d 352, 102 P.3d 268]*, the Supreme Court synthesized the relevant test for allowing a contract based claim to be pursued as a tort cause of action: " 'Generally, outside the insurance context, "a tortious breach of contract ... may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or [***19] undue coercion; or (3) one party intentionally breaches the contract intending [**657] or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." [Citation.] Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated. [Citation.] If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies.' (*Erlich v. Menezes [(1999)] 21 Cal.4th [543,] 553-554 [87 Cal. Rptr. 2d 886, 981 P.2d 978]*.)"

In *Robinson Helicopter*, the Supreme Court recited its prior holding in *Erlich* thusly: "In *Erlich* ... , we held that a party's contractual obligation may create a legal duty and that a breach of that duty may support a tort action. We stated, '[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. [Citation.]' (*Ibid.*) [¶] We went on to describe several instances where tort damages [***20] were permitted in contract cases. 'Tort [*1252] damages have been permitted in contract cases where a breach of duty directly causes physical injury [citation]; for breach of the covenant of good faith and fair dealing in insurance contracts [citation]; for wrongful discharge in violation of fundamental public policy [citation]; or where the contract was fraudulently induced. [Citation.]' [Citation.] '[I]n each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm. [Citation.]' [Citations.]" (*Robinson Heli-*

*copter Co., Inc. v. Dana Corp., supra, 34 Cal.4th at pp. 989-990.*)

This synthesis was based on principled distinctions between the purposes of contract and tort law. Citing largely to *Harris v. Atlantic Richfield Co. (1993) 14 Cal.App.4th 70, 77-80 [17 Cal. Rptr. 2d 649]*, former Chief Justice Malcolm Lucas explained the differing purposes of tort and contract remedies thusly: " 'The traditional goal of contract remedies is compensation of the promisee for the loss resulting from the breach, not compulsion of the promisor to perform his promises. Therefore, [***21] "willful" breaches have not been distinguished from other breaches. [Citation.] The restrictions on contract remedies serve purposes not found in tort law. They protect the parties' freedom to bargain over special risks and they promote contract formation by limiting liability to the value of the promise. This encourages efficient breaches, resulting in increased production of goods and services at lower cost to society. [Citation.] Because of these overriding policy considerations, the California Supreme Court has proceeded with caution in carving out exceptions to the traditional contract remedy restrictions. [Citations.]' (*[Harris v. Atlantic Richfield Co., supra] 14 Cal.App.4th at p. 77.*) [¶] The *Harris* court set forth as reasons for denying tort recovery in contract breach cases (1) the different objectives underlying the remedies for tort and contract breach, (2) the importance of predictability in assuring commercial stability in contractual dealings, (3) the potential for converting every contract breach into a tort, with accompanying punitive damage recovery, and (4) the preference for legislative action in affording appropriate remedies. [***22] (*Harris [v. Atlantic Richfield Co.], supra, 14 Cal.App.4th at pp. 81-82*; see also *Foley[ v. Interactive Data Corp. (1988)] 47 Cal.3d [654], 683, 694, fn. 31, 696 [254 Cal. Rptr. 211, 765 P.2d 373].*)" (*Freeman & Mills, Inc.* [**658] *v. Belcher Oil Co. (1995) 11 Cal.4th 85, 98 [44 Cal. Rptr. 2d 420, 900 P.2d 669].*)

Plaintiff's negligence claim does not fall within the circumstances identified by the California Supreme Court which allow a contract based cause of action to be pursued as a tort claim. State Farm owed no contractual duty to plaintiff. Her negligence claim contains none of the elements identified in *Robinson Helicopter* and *Erlich*. Hence, plaintiff's negligence verdict and the ensuing judgment must be reversed.

[*1253] We recognize that in *Murray v. State Farm Fire & Casualty Co., supra, 219 Cal. App. 3d at page 66, footnote 5*, the Court of Appeal stated in obiter dictum that there may be a situation where even if there was no coverage, potential liability could still exist because of the unreasonable delay in performing an investigation. In *Murray*, the Court of Appeal noted, "[T]he insurance company might be liable if it unreasonably delayed in performing [***23] an investigation of a claim before concluding there was no coverage and the insured suffered consequential loss as a result of the delay." (*Ibid.*) Further, in *Brizuela v. CalFarm Ins. Co. (2004) 116 Cal.App.4th 578, 594 [10 Cal. Rptr. 3d 661]*, the Court of Appeal noted, again in dictum, an insurer might be liable for an implied covenant breach if, instead of investigating a noncovered claim, the insurance company embarked on a campaign to intimidate its insured into settling. (See *Progressive West Ins. Co. v. Superior Court, supra, 135 Cal.App.4th at p. 280.*) We need not discuss these holdings. None of the extreme circumstances identified is present here nor was the case litigated on these theories. There are no elements of detrimental reliance as in *Murray* nor the extreme conduct discussed in *Brizuela*. Further, we note none of these cases discusses the effect of *Robinson Helicopter* or *Erlich*. The effect of *Robinson Helicopter* or *Erlich* was not before the Courts of Appeal in *Murray* and *Brizuela* and the aforementioned analysis arose solely in the context of obiter dictum.

C., D.* [***24] [NOT CERTIFIED FOR PUBLICATION]

* See footnote, *ante*, page 1241.

IV. DISPOSITION

The judgment in favor of defendant, Lisa Haley, and against plaintiff, Magda Benavides, is affirmed. The judgment in favor of plaintiff and against defendant, State Farm General Insurance Company, is reversed. Defendants are to recover their costs on appeal from plaintiff.

Kriegler, J., concurred.

**CONCUR BY:** Mosk

**CONCUR**

**MOSK, J.,** Concurring.--I concur.

I agree that the judgment in favor of plaintiff and against defendant State Farm Insurance Company should be reversed. Plaintiff could not recover for negligence in investigating the insurance claim because "[n]egligence is not among the theories of recovery generally available against insurers. Delay or failure to pay policy benefits may be actionable as a breach of contract or bad [*1254] faith, not negligence." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2005) ¶ [***25] 11:205, p. 11-48.)

* [NOT CERTIFIED FOR PUBLICATION]

* See footnote, *ante*, page 1241.

# TAB 8

LEXSEE 70 CAL. APP. 4TH 1

**SHARON BIERBOWER, Plaintiff and Appellant, v. FHP, INC., Defendant and Respondent.**

**No. G018307.**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

*70 Cal. App. 4th 1*; *82 Cal. Rptr. 2d 393*; *1999 Cal. App. LEXIS 137*; *14 I.E.R. Cas. (BNA) 1494*; *79 Fair Empl. Prac. Cas. (BNA) 69*; *99 Cal. Daily Op. Service 1326*; *99 Daily Journal DAR 1631*

**February 19, 1999, Decided**

**SUBSEQUENT HISTORY:** [***1] Rehearing Denied March 22, 1999. Review Denied May 12, 1999, Reported at: *1999 Cal. LEXIS 3128*.

**PRIOR HISTORY:** Appeal from a judgment of the Superior Court of Orange County. Super. Ct. No. 717174. Robert J. Polis, Judge.

**DISPOSITION:** The point is, of course, that maliciousness cannot be derived from negligence. Malice entails more than sloppiness or, as in this case, an easily explained typo. To make more of it borders on pettifoggery (literally, to wrangle or quibble about petty points). (See 11 Oxford English Dict. (1989) p. 643.) The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court granted a nonsuit for an employer in a defamation action by a former employee arising out of a memo written by plaintiff's supervisor relating the substance of a complaint by another employee accusing plaintiff of sexual harassment, finding that the memo was protected by the conditional privilege for communications to interested persons (*Civ. Code, § 47, subd. (c)*). (Superior Court of Orange County, No. 717174, Robert J. Polis, Judge.)

The Court of Appeal affirmed. The court held that the conditional privilege against defamation for communications made without malice on subjects of mutual interest covers investigations of sexual harassment complaints by private employers when made without malice. The malice necessary to overcome the privilege was not shown by the fact that the memo was written on the same day the complaint was received, that it was dated Aug. 27, 1992, but the first paragraph stated that the supervisor talked with the complainant on Aug. 26, 1992, a date when plaintiff was on vacation. When faced with sexual harassment allegations, the supervisor's duty was to document and report, not to evaluate or investigate. The supervisor testified, without contradiction, that the computer supplied the correct date, but he typed the wrong date. The court held that maliciousness cannot be derived from negligence and entails more than sloppiness or an easily explained typo. (Opinion by Sills, P. J., with Wallin and Sonenshine, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1a) (1b) Libel and Slander § 24--Qualified Privilege--Communication to Interested Persons--Report of Sexual Harassment Accusation--Malice.** --The trial court properly granted a nonsuit for an employer in a defamation action by a former employee arising out of a memo written by plaintiff's supervisor relating the substance of complaint by another employee accusing plaintiff of sexual harassment, since the memo was protected by the conditional privilege for communications to interested persons (*Civ. Code, § 47, subd. (c)*). The malice necessary to overcome the privilege was not shown by the fact that the memo was written on the same day the complaint was received, that being the same day that the incident allegedly occurred, Aug. 27, 1992, but the first paragraph stated that the supervisor talked with the complainant on Aug. 26, 1992, a date when plaintiff was on

vacation. When faced with sexual harassment allegations, the supervisor's duty was to document and report, not to evaluate or investigate. The supervisor testified, without contradiction, that the computer supplied the correct date, but he typed the wrong date. Also, the allegedly defamatory memo set forth three complaints, not just the one that happened on the date the complainant spoke with the supervisor. Moreover, when the allegedly defamatory memo is read as a whole and in the context of the undisputed fact that the complainant was at least upset (if not in tears) when she came to see the supervisor, it would be totally unreasonable to conclude that he harbored any malice in writing it. Maliciousness cannot be derived from negligence and entails more than sloppiness or an easily explained typo.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 526.]

**(2) Libel and Slander § 24--Qualified Privilege--Communication to Interested Persons--Sexual Harassment Accusation.** --The conditional privilege against defamation for communications made without malice on subjects of mutual interest (*Civ. Code, § 47, subd. (c)*) covers investigations of sexual harassment complaints by private employers when made without malice. Employers and employees both have a common interest in preventing and correcting sexual harassment. Any other conclusion would fly in the face of workplace reality as it has been shaped by sexual harassment law.

**COUNSEL:** Chandler & Vatave, Linda Hart Chandler and Sunil Lewis Vatave for Plaintiff and Appellant.

Heller, Ehrman, White & McAuliffe, Deborah C. Saxe, David B. Fischer; Jones, Day, Reavis & Pogue and Miwon Yi for Defendant and Respondent.

**JUDGES:** Opinion by Sills, P. J., with Wallin and Sonenshine, JJ., concurring.

**OPINION BY:** SILLS

**OPINION**

[*3] [**393] **SILLS, P. J.**

You cannot make a mountain out of a typo. Nor can you, at least in this case, make a defamation suit. **(1a)** Today we hold that a discrepancy [**394] in an office memo concerning the date on which an alleged incident of sexual harassment took place is insufficient [***2] evidence of malice for purposes of whether a company investigation of the alleged harassment is protected by the "common interest" privilege against defamatory communications. (See *Civ. Code, § 47, subd. (c)*.)

I

**(2)** *Civil Code, section 47, subdivision (c)* extends a conditional privilege against defamation to communications made *without malice* on subjects of mutual interest. (*Civ. Code, § 47, subd. (c)* ["A privileged publication . . . is one made: [P] . . . [P] (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested . . . ."].)

A number of cases have now established that this "mutual interest" privilege covers investigations of sexual harassment complaints by private employers when made without malice. (See *Cruey v. Gannett Co. (1998) 64 Cal. App. 4th 356, 369 [76 Cal. Rptr. 2d 670]* ["The conditional privilege set out in *subdivision (c) of section 47* potentially applies in the present case because Lacy's letter of complaint to Gannett pertains to a subject of mutual interest to Gannett and its employees, an accusation of workplace harassment and discrimination."]; *Garziano v. E. I. Du Pont De Nemours & Co. (5th Cir. 1987) 818 F.2d 380, 387* [***3] [intracompany memo protected by qualified common interest privilege under Mississippi law]; *Stockley v. AT & T Information Systems, Inc. (E.D.N.Y. 1988) 687 F. Supp. 764, 768* [applying common interest privilege under New York law to investigation into sexual harassment allegations]; *Lawson* v. *Boeing Co. (1990) 58 Wn.App. 261 [792 P.2d 545, 549]* [citing *Stockley*]; see also *Vackar v. Package Mach. Co. (N.D.Cal. 1993) 841 F. Supp. 310, 313-314* [assuming privilege applied where argument was over whether malice provision applied].)

There is no reason to doubt the validity of these courts' conclusions. As indicated by the groundbreaking case on the point, *Garziano v. E. I. Du Pont De Nemours & Co., supra, 818 F.2d 380*, employers and employees both have a common interest in preventing and correcting sexual harassment. To that we would add--to put the matter in practical terms--that because any given interaction between any two people at the same workplace carries at least the *danger* of a sexual harassment lawsuit, the matter is necessarily of "mutual interest" under Civil Code CA_CIV_47 *section 47*, subdivision [***4] (c). Any other [*4] conclusion would fly in the face of workplace reality as it has been shaped by sexual harassment law.

The usual battleground in cases where an employee sues an employer claiming that he or she was falsely accused of sexual harassment is--as it is in the present appeal--whether the employer's communications were made with malice so as to deprive the employer of the conditional privilege. (E.g., *Stockley v. AT & T Information Systems, Inc., supra, 687 F. Supp. at p. 770* ["Plaintiff essentially concedes the existence of a qualified privilege, but argues that allegedly defamatory state-

ments were made outside the scope of the privilege and with actual malice."].)

The present case involves a defamation action by Sharon Bierbower, a sales representative, against her former employer, FHP, a health care provider, arising out of a complaint made against her by a receptionist, Pauline Ayala. It is undisputed that on a day in late August 1992 (the exact date *is* disputed, as will soon be shown), Ayala complained about several incidents of alleged sexual harassment, including one incident that happened that very day. [1] She went to Bruce Huyghue, [***5] a senior plan manager at FHP. It is also undisputed that on that day she was upset (she testified she was crying, Huyghue testified she was upset but couldn't remember if she was crying), and related one [**395] of the incidents, which allegedly happened in the reception area. She also stated that she just wanted to make Bierbower "go away" and would file a formal complaint if Bierbower ever "approached her again in a suggestive manner."

1 The alleged incidents included one time when Bierbower stopped her car in front of Ayala in the company parking lot, asked her where she was going and said she wanted to be "friends"; one incident where Bierbower stuck out her butt at Ayala, rubbed it and licked her own lips; and one incident where Bierbower first asked to eat a baby plum that Ayala already had in her mouth, then exposed part of her breast, including a little bit of nipple, to Ayala, fondled it in front of her, and then left after making a crude remark. The plum and breast exposure incident was the one which happened the very day of the complaint.

[***6] Huyghue was familiar with FHP's anti-sexual harassment policy. As he understood company policy, he was *required* to "document" incidents of sexual harassment and report them to the company's personnel department even if the complainant did not want any action taken.

Huyghue typed up a memo concerning what Ayala had said to him within five minutes. The memo recited that he spoke with Ayala on August 26, but was dated August 27, and related the three incidents we have mentioned [*5] above. It also related the fact that Ayala wanted to file a "formal complaint" if Bierbower ever approached her in a "suggestive manner" again. [2]

2 Here is the complete text of the memo, in as close as we can approximate to its original typographical format:

"DATE: August 27, 1992

"TO: File

"FROM: W. Bruce Huyghue

"SUBJECT: Pauline Ayala Sexual Harassment Complaint

"I spoke with Pauline on August 26, 1992 regarding her complaint about the recent actions of Sharon Bierbower.

"Pauline stated that she is offended by the sexually explicit actions and remarks Sharon has made towards her.

"According to Pauline, Sharon has expressed a desire to 'become friends' with her on several occasions. According to Pauline:

"Sharon has approached Pauline in the parking lot after work and 'tried to come on to her.' She felt that the looks and comments Sharon gave her were intended to arouse a romantic interest

"Sharon asked Pauline for a plum. Pauline answered that she was already eating the only plum she had. Sharon asked her to give her a piece of what was then in her mouth.

"Sharon entered the lobby when Pauline was at the switchboard and began talking to Pauline in a suggestive manner. Pauline asked her to get away from her. Sharon partially exposed and fondled her own breast while looking directly at Pauline. Sharon made a lewd comment and left.

"Pauline feels that the other female employees find it funny and embarrassing that Sharon displays such obvious sexual interest in Pauline who is also female.

"Pauline is aware of her right to file a complaint. She asked me to make Sharon just go away, since the Consultant group is being disbanded. She stated that she would definitely want to file a formal complaint if Sharon ever approached her again in a suggestive manner.

"I told her that I would discuss the situation with other appropriate management people and take what ever disciplinary action company policy might require."

[***7] Later that same day Huyghue spoke with Connie Walters, Bierbower's supervisor, about it. Walters told Huyghue that Bierbower was on vacation.

Now here is where the discrepancy in the dates becomes important in this appeal. Huyghue's memo was *dated* August *27*, 1992, but the first paragraph recites that "I spoke with Pauline on August 26." But it is also undisputed that on August *26* Bierbower was in Las Vegas on her vacation. According to Bierbower, because

the conversation between Huyghue and Ayala took place on a date on which Huyghue knew Bierbower was on vacation, yet concerned an incident which took place on that very date, Huyghue necessarily must have known that Ayala's accusations were false (cf. *Lawson* v. *Boeing Co., supra, 792 P.2d at p. 549* ["If their allegations were false, they were unquestionably knowingly false."]). For Bierbower, the fact Huyghue later circulated the memo to the personnel department necessarily demonstrates that he acted with malice because the memo contained what he knew was a false accusation.

[*6] For his part, Huyghue testified that he wrote the memo on *August 27*, because the date was automatically supplied [***8] by his computer, and the recitation that he spoke with Ayala on August 26 was simply a mistake. Ayala, on the other hand, testified that she could not remember "the exact date," and said it was *either* the 26th or the 27th, but in any event it was the day she went to Huyghue. She did, however, admit that at her deposition she testified that the date was the 26th.

Despite the discrepancy over the date of Ayala's talk with Huyghue, the trial court judge granted a motion for nonsuit after Bierbower had rested her case when her [**396] defamation suit against FHP came to trial in May 1995. The judge concluded that Bierbower had failed to present any substantial evidence of malice on the part of FHP. From the ensuing judgment Bierbower has brought this appeal.

II

**(1b)** Naturally, given the procedural posture of the appeal, Bierbower reminds us that the standard of review of a judgment based on a motion for nonsuit runs in her favor. She is entitled to the benefit of any conflict in the evidence and any reasonable inference that might be drawn from it. Even so, we cannot say the trial court erred. A number of reasons based on the undisputed facts require this conclusion.

First, [***9] Huyghue's marching orders when faced with sexual harassment allegations were to document and report, not to evaluate. His testimony was unequivocal that his job was to document and report, not investigate. The question of *whether* Bierbower might have been falsely accused was not for him to decide. In that regard, we can hardly say that an employer acts maliciously in requiring supervisorial employees who may have no formal training in factual investigation to document and report sexual harassment claims without first having to ascertain the validity of those complaints. FHP's policy is easily justified as a matter of reasonable employer prudence. (See *Cotran v. Rollins Hudig Hall Internat., Inc. (1998) 17 Cal. 4th 93, 106-107 [69 Cal. Rptr. 2d 900, 948 P.2d 412].*) As our Supreme Court has recently observed, sexual harassment investigations may implicate "intractable factual uncertainties." ( *Id. at p. 106.*) [3] Given the difficulty faced by the employer in the face of a sexual harassment allegation, an employer certainly acts reasonably by having a mechanism for forwarding complaints on [*7] for an investigation even where there is something [***10] suspicious about the complaint. To hold an employer liable for defamation because one employee must pass on a defamatory allegation of sexual harassment to another for investigation flies in the face of all sexual harassment law. The idea that the formal investigation should be conducted by a firm's human relations or personnel departments rather than the supervisor who first receives the complaint is an eminently reasonable one, if only because it promotes neutrality in any investigation. (See Lederman, *Investigating Sexual Harassment* (Nov. 1998) 18 Cal.Law. 73, 75 [recommending that investigation be conducted by employer's human relations department, or other neutral entity]; cf. *Casenas v. Fujisawa USA, Inc. (1997) 58 Cal. App. 4th 101 [67 Cal. Rptr. 2d 827]* [memo to regional sales manager containing sexual harassment complaint prompted timely investigation by both regional sales manager and company personnel manager; firm's response described by court as "exemplary"].) [4]

3 A point with which Justice Kennard *agreed* in her concurring and dissenting opinion. (See 17th Cal. 4th at p. 117 (conc. & dis. opn. of Kennard, J.) ["resolution of close factual questions involving difficult evaluations of witness credibility and hard choices among conflicting inferences"].)

[***11]

4 As our Supreme Court observed in *Cotran* in the context of whether a dismissal contravened an implied agreement not to discharge except for good cause, the proper inquiry is whether the employer's decision that a "dischargeable act had been committed" had been "reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual." (*Cotran v. Rollins Hudig Hall Internat., Inc., supra, 17 Cal. 4th at p. 107.*) It is thus almost impossible to see how any one could take issue with a company policy that required all sexual harassment complaints to be forwarded for "appropriate investigation," and did not risk allowing the complaint to fall through the cracks by giving the supervisorial employee discretion to pocket veto any complaint if he or she concluded it was unfounded. Such a policy further promotes neutrality in the investigation. On the other hand, as *Casenas* teaches us, an employer who does allow a supervisor who receives a complaint to participate in its investigation can hardly be faulted either. In *Casenas* we gave the employer an "A"

grade for an "exemplary" investigation. (See *Casenas v. Fujisawa USA, Inc., supra, 58 Cal. App. 4th at p. 118.*) Whether FHP here should get an "A" for its rigid requirement that all complaints be passed on to personnel (which assures neutrality), or merely a "B-" because the same policy allows possibly meritless complaints to make their way higher up the corporate hierarchy than might otherwise be the case, is a matter on which reasonable minds can disagree. Both approaches, however, obviously pass the course.

[***12] [**397] Two, the allegedly defamatory memo set forth *three* complaints from Ayala, not just the one that happened on the date Ayala spoke with Huyghue. This fact demonstrates that Huyghue's state of mind in writing the memo was to document and report Ayala's complaint, not investigate the bona fides of the one incident that allegedly happened on the day the memo was written. (Cf. generally, *Cotran v. Rollins Hudig Hall Internat., Inc., supra, 17 Cal. 4th at p. 107* [emphasizing employer's state of mind in distinction to whether employee did "in fact" commit dischargeable act as criterion for whether there was good cause to discharge].) As such, actual falsity was irrelevant from the point of view of Huyghue's duties in the overall scheme of FHP's anti-sexual harassment policy, and therefore the fact that the date might have belied Ayala's story is also irrelevant. Huyghue's role was [*8] simply to pass on information as part of an *overall* anti-sexual harassment policy, not adjudicate the bona fides of any given claim.

Three, when the allegedly defamatory memo is read as a whole and in the context of the undisputed fact that Ayala was at least "upset" [***13] (if not in tears) when she came to see Huyghue, it would be totally unreasonable to conclude that Huyghue harbored any malice in writing it. There is a complete absence in the text of the memo--with the arguable exception of the discrepancy in the dates--of anything that would even begin to give rise to an inference that Ayala's complaint was false. The memo recites that Ayala just wanted Bierbower to "go away" and only planned to file a "formal complaint" after the *next* incident of alleged harassment. That is hardly what one would expect from someone who was contriving an obviously false story against a coworker who supposedly was several hundred miles away at the time. The facts that Ayala only wanted to have Bierbower kept away from her and would only file a formal complaint if another incident took place would naturally lead someone in Huyghue's position to believe that Ayala was not fabricating her complaint.

Finally, with regard to the discrepancy in the dates, Huyghue's testimony that his computer supplied the right date and he simply got the date wrong is without any basis for contradiction. As anyone who has ever written a check in January dated the previous year knows, [***14] human beings often make mistakes with exact dates. [5] It is unreasonable to ascribe to a malevolent conspiracy that which is easily, naturally and *ordinarily* explained by a common human error. "Things happen," as one of the wisest portions of the Civil Code reminds us, "according to the ordinary course of nature and the ordinary habits of life." (Civ. Code, CA_CIV_3546 § 3546.) Given the totality of evidence in this case, no reasonable jury could have found malice on FHP's part in this case.

5 There is no reasonable inference that can be drawn in Bierbower's favor from the fact that one date was typed in and the other generated automatically by the computer. If an inference had to be drawn, it is that the date Huyghue typed in was the incorrect one, because--however maddening computers and their software programs can sometimes be--they usually have the right date and approximately the right time.

Unlike *Cruey v. Gannett Co., supra, 64 Cal. App. 4th 356*, this case does not involve [***15] the issue of whether there was any evidence that a complaining *coworker* may have acted with malice in making a false sexual harassment complaint. (Cf. *Cruey, supra, 64 Cal. App. 4th at pp. 369-370* [statement by coworker that she "knew how to protect her job" held sufficient to allow malice issue to go to jury].) This case, rather, is more like *Garziano v. E. I. Du Pont De Nemours & Co., supra, 818 F.2d at pages 390-391* and *Vackar v.* [*9] *Package Mach. Co., supra, 841 F. Supp. at pages 314-315*, where the allegedly defamed coworker unsuccessfully argued that malice could be inferred from the fact that the employer could have done a better job of investigating the sexual harassment complaint.

The point is, of course, that maliciousness cannot be derived from negligence. Malice entails more than sloppiness or, as in this case, an easily explained typo. To make more of it borders on pettifoggery (literally, to wrangle or quibble about petty points). [**398] (See 11 Oxford English Dict. (1989) p. 643.) The judgment is affirmed.

Wallin, J., and Sonenshine, J., concurred.

A petition for a rehearing was denied March 22, 1999, and [***16] appellant's petition for review by the Supreme Court was denied May 12, 1999.

# TAB 9

LEXSEE 42 CAL.3D 1042

**WILLIAM PETER BLATTY, Plaintiff and Appellant, v. NEW YORK TIMES COMPANY, Defendant and Respondent**

**L.A. No. 32173**

**Supreme Court of California**

*42 Cal. 3d 1033*; *728 P.2d 1177*; *232 Cal. Rptr. 542*; *1986 Cal. LEXIS 300*; *13 Media L. Rep. 1928*

**December 29, 1986**

**SUBSEQUENT HISTORY:** Appellant's Petition for a Rehearing was Denied February 26, 1987.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. WEC82071, Laurence J. Rittenband, Judge.

**DISPOSITION:** The judgment of the Court of Appeal is reversed insofar as it reverses the judgment of dismissal on the amended complaint's causes of action for intentional interference with prospective economic advantage, with directions to affirm the judgment in that respect, and in all other respects the judgment of the Court of Appeal is affirmed; and the order of the Court of Appeal dismissing as moot the appeal from the order denying the motion to tax costs is reversed with directions to resolve that issue on the merits.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action by the author of a novel against a newspaper based upon the newspaper's failure to include the novel on its best seller list, the trial court sustained without leave to amend defendant's demurrer to causes of action for negligent interference with prospective economic advantage, negligence, and trade libel, and sustained with leave to amend defendant's demurrer to the cause of action alleging intentional interference with prospective economic advantage. Plaintiff amended the complaint to allege intentional interference with prospective economic advantage based on publication of the list in the newspaper, intentional interference with prospective economic advantage based on marketing of the list, unfair competition in violation of *Bus. & Prof. Code, §§ 17200-17208*, false and misleading advertising in violation of *Bus. & Prof. Code, §§ 17500-17520*, and "breach of the public duty and trust to report the news fairly and honestly without bias or prejudice." The trial court sustained defendant's demurrer to the amended complaint without leave to amend. (Superior Court of Los Angeles County, No. WEC82071, Laurence J. Rittenband, Judge.) The Court of Appeal, Second Dist., Div. Seven, Nos. B008737 and B010053, affirmed in part and reversed in part.

The Supreme Court affirmed in part and reversed in part with directions the judgment of the Court of Appeal, holding that the causes of action plaintiff attempted to assert in his original and amended complaints had as their gravamen the alleged injurious falsehood of the best seller list, and hence were required to satisfy *U.S. Const., 1st Amend.*, requirements. The court further held that the trial court properly sustained without leave to amend defendant's demurrer to all the causes of action, since none of them alleged nor reasonably could allege that the list was "of and concerning" plaintiff author or his novel. (Opinion by Mosk, J., with Bird, C. J., Reynoso and Panelli, JJ., concurring. Separate concurring and dissenting opinion by Grodin, J., with Broussard and Lucas, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 128--Scope and Extent--**

**Rulings on General Demurrers.** --When the ultimate object of review is the sufficiency of a complaint against a general demurrer, the reviewing court accepts as true all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. The reviewing court also considers facts that may be judicially noticed. Moreover, when the allegations of the complaint contradict or are inconsistent with such facts, the reviewing court accepts the latter and rejects the former. When a demurrer is sustained, the reviewing court determines whether the complaint states facts sufficient to constitute a cause of action. When it is sustained without leave to amend, the reviewing court decides whether there is a reasonable possibility that the defect can be cured by amendment. If it can be, the trial court has abused its discretion and will be reversed. If not, there has been no abuse of discretion and the trial court's ruling will be affirmed. The burden of proving such reasonable possibility is on the plaintiff.

**(2) Libel and Slander § 38--Actions--Pleading--Complaint--Plaintiff's Burden of Pleading and Proving Falsehood.** --In defamation actions, in which the alleged injurious falsehood of a statement is the gravamen of the plaintiff's claim, for constitutional purposes it is not enough that the traditional affirmative defense of truth, with the burden of proof on the defendant, be available to the press; rather it is the plaintiff who is required to plead and prove falsehood.

**(3a) (3b) Libel and Slander § 4--Application to Plaintiff.** --In defamation actions *U.S. Const., 1st Amend.*, requires that the statement on which the claim is based must specifically refer to, or be "of and concerning," the plaintiff in some way. A defamation plaintiff cannot constitutionally establish liability without satisfying the requirement, even though the governing state law imposes no such prerequisite. The "of and concerning" or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe caused them some hurt. The requirement serves to immunize a kind of statement which, though it can cause hurt to an individual, is deemed too important to the vigor and openness of public discourse in a free society to be discouraged.

**(4a) (4b) Constitutional Law § 57--Freedom of the Press--Application of Constitutional Limitations to Claims Based Upon Alleged Injurious Falsehood of a Statement.** --The limitations that define the zone of protection of *U.S. Const., 1st Amend.*, for the press apply to all claims whose gravamen is the alleged injurious falsehood of a statement. Although such limitations happen to have arisen in defamation actions, they do not concern matters peculiar to such actions but broadly protect free-expression and free-press values. Moreover, if these limitations applied only to actions denominated "defamation," they would furnish little if any protection to free-speech and free-press values: plaintiffs suing press defendants might simply affix a label other than "defamation" to their injurious-falsehood claims--a task that appears easy to accomplish as a general matter. To prevent creative pleading from rendering the limitations nugatory, they must be broadly applicable wherever the gravamen of the claim is injurious falsehood.

**(5) Interference § 8--Interference With Prospective Economic Advantage--Justification, Privilege, Defenses--Newspaper's Failure to Include Novel on Best Seller List.** --In an action by the author of a novel against a newspaper for failure of the newspaper to include the novel on its best seller list, the trial court properly sustained defendant newspaper's demurrer to causes of action alleging intentional interference with prospective economic advantage. Since the gravamen of those causes of action was the alleged injurious falsehood of a statement, they were required to satisfy the requirements of *U.S. Const., 1st Amend.* The claims failed to allege that the list was of and concerning, or specifically referred to, plaintiff author or his novel. Moreover, the best seller list did not expressly refer to the author or his novel, and could not be reasonably understood to so refer by implication. The statement alleged to be injuriously false concerned a group in excess of 25 members, and accordingly plaintiff could not show that the statements were of and concerning him. Moreover, plaintiff failed to attempt to carry his burden of showing that it was reasonably possible he could cure the defect by amendment.

**(6) Constitutional Law § 57--Freedom of the Press--Application of Constitutional Limitations to Claims Based Upon Alleged Injurious Falsehood of a Statement.** --In an action by the author of a book against a newspaper for failure of the newspaper to include the book on its best seller list, the trial court properly sustained defendant newspaper's general demurrer to

causes of action alleging negligent interference with prospective economic advantage, negligence, trade libel, unfair competition in violation of *Bus. & Prof. Code, §§ 17200- 17208*, false and misleading advertising in violation of *Bus. & Prof. Code, §§ 17500- 17520*, and "breach of the public duty and trust to report the news fairly and honestly without bias or prejudice." Each of these causes of action had as its gravamen the alleged injurious falsehood of the list and hence was required to satisfy the requirements *U.S. Const., 1st Amend.*, and none of the causes of action alleged or reasonably could allege that the list was "of and concerning" the author or his novel.

**COUNSEL:** Richard M. Coleman, John P. Farrell and Coleman & Farrell for Plaintiff and Appellant.

McCutchen, Doyle, Brown & Enersen, Palmer Brown Madden and Lynne M. Yerkes as Amici Curiae on behalf of Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Richard P. Levy, Gail E. Lees, William C. Foutz and David A. Thurm for Defendant and Respondent.

Edward J. McIntyre, John Allcock, Laura Whitcomb Halgren, Gray, Cary, Ames & Frye and Harold W. Fuson, Jr., as Amici Curiae on behalf of Defendant and Respondent.

**JUDGES:** Opinion by Mosk, J., with Bird, C. J., Reynoso and Panelli, JJ., concurring. Separate concurring and dissenting opinion by Grodin, J., with Broussard and Lucas, JJ., concurring.

**OPINION BY:** MOSK

**OPINION**

[*1036] [**1178] [***543] The fundamental question in this case is whether a newspaper can be held liable for failing to include a book in its list of "best sellers." As we shall explain, we conclude that the answer is no.

I

Plaintiff William Peter Blatty brought this action for damages against defendant New York Times Company, publisher of the New York Times. Four causes of action are asserted in the original complaint: negligent interference with prospective economic advantage, intentional interference with prospective economic advantage, negligence, and trade libel.

The allegations underlying each of these causes of action may be summarized as follows: Blatty is the author of a number of works of fiction [*1037] including *The Exorcist* and a recently published hardback novel entitled *Legion*; the Times publishes a weekly list "purporting to rank best selling books . . . based on actual sales"; because many new books are published each year, authors whose hardback books appear on this list benefit by greater sales of the books themselves and an increased value of paperback and film rights; although the list purports to rank books on the basis of sales and expresses no opinion on their merits, because of the reputation of the Times and its perceived expertise in literary matters the list has a substantial positive influence on the ordering and promotion [**1179] of books by booksellers and on the purchase of books by consumers; the Times knew or should have known of this influence; *Legion*, authored by Blatty and published by Simon & Schuster, sold more than enough copies, and met all other criteria, to merit inclusion on the list; the Times, however, failed to include *Legion*; [***544] as a result, Blatty suffered injury by loss of the benefits that inclusion would have brought. With respect to the intentional-interference claim it is also alleged that Simon & Schuster provided the Times with information to the effect that *Legion* had sold more than enough copies to merit inclusion, but that the Times nevertheless refused to include the book.

Although they bear different labels, the four causes of action each have as their gravamen the alleged injurious falsehood of a statement -- viz., the Times falsely represented that the list was based on actual sales; by failing to include *Legion*, the Times falsely represented that the novel did not meet its stated criteria for inclusion; by these misrepresentations, the Times adversely affected the volume of sales of the hardback edition and consequently the value of the paperback and film rights, thereby subjecting Blatty to injury.

Before the Times responded to the complaint, Blatty filed a notice to take certain depositions and produce certain documents. Thereupon the Times generally demurred on the following ground, among others: "The Complaint as a whole fails to state facts sufficient to constitute a cause of action against the Times in that . . .

the complained of 'Best Seller' list is not of and concerning plaintiff and therefore cannot constitutionally provide a basis for liability upon a media defendant . . . ." In its memorandum of points and authorities the Times properly requested that the court take compulsory judicial notice, pursuant to *Evidence Code sections 452* and *453*, of a copy of one week's list which bore the following legend: "The listings above are based on computer-processed sales figures from about 2,000 bookstores in every region of the United States."

Blatty moved to compel discovery, asserting his right to do so despite the pendency of the demurrer. In support he submitted a declaration incorporating by reference an attached newspaper article which he alleged [*1038] showed the relevance of the proposed discovery. Led by the article to question the truth of Blatty's allegation that the Times refused to include *Legion* on the list despite its receipt of sales information from Simon & Schuster, the court declined to rule on the demurrer until it could determine whether the allegation was supported by admissible evidence. Over Blatty's objection, the court then issued an order directing the parties to depose certain employees of Simon & Schuster and the Times with regard to the alleged communication and to that matter alone, and the parties did so. Also over Blatty's objection, the court prohibited further discovery until the legal sufficiency of his complaint appeared.

Taking judicial notice of what it considered to be the "uncontradicted facts adduced at the depositions" to the effect that "at no time did [Simon & Schuster] disclose to [the Times] the actual figures of sales of the book," the court made the following ruling, as subsequently clarified, on the demurrer. As to the intentional-interference claim, the court sustained the demurrer but granted leave to amend "to allege in good faith facts to establish (1) that the New York Times violated its public duty or trust to sell or distribute its newspaper to the public containing a fair and honest report of all news without bias or prejudice; and (2) . . . that the New York Times had in its possession reports of the actual sales of the book, *Legion*, which would qualify it for inclusion on the Best Seller List, and deliberately refrained from listing plaintiff's book." As to this cause of action the court ruled that "if the new facts to be alleged also are sufficient to support other causes of action, the complaint may so allege," and that Blatty was "[limited] . . . to a cause of action for an intentional omission of *Legion* from the 'Best Seller List' by the New York Times despite its *knowledge* [**1180] that the sales of the book to the public qualified it for inclusion on the List." As to Blatty's other claims, the court sustained the demurrer "on all grounds stated therein without leave to amend."

In his amended complaint Blatty added Doe defendants and asserted five causes of [***545] action: intentional interference with prospective economic advantage based on the Times publication of the list in the newspaper; intentional interference with prospective economic advantage based on the Times marketing of the list separate and apart from its newspaper publication; unfair competition in violation of *Business and Professions Code sections 17200 to 17208*; false and misleading advertising in violation of *Business and Professions Code sections 17500 to 17508*; and "breach of [the] public duty and trust to report the news fairly and honestly without bias or prejudice."

The allegations underlying each of these causes of action are essentially those stated in the original complaint with the following relevant modifications and additions: the Times falsely "represented . . . that the List was [*1039] an objective, unbiased and accurate compilation of actual sales of books each week by 2000 bookstores in every region of the United States"; and Simon & Schuster told the Times that it had sales figures to substantiate its claim that *Legion* merited inclusion, but the Times failed and refused to review the figures.

Once again, although they bear different labels the five causes of action each have as their gravamen the alleged injurious falsehood of a statement -- viz., the Times falsely represented that the list was an accurate compilation of actual book sales; by failing to include *Legion*, the Times falsely represented that the novel did not meet its stated criteria for inclusion; and by so doing the Times caused Blatty to be harmed.

The Times again generally demurred on the ground, among others, that the complaint was "barred by the *First Amendment to the United States Constitution* and by *Article I, Section 2 of the California Constitution*, in that those provisions . . . forbid the imposition of liability where, as here, no statement has been made 'of and concerning' the plaintiff . . . ." In its memorandum of points and authorities the Times again effectively made a proper request that the court take compulsory judicial notice of a copy of one week's list and the legend it bore.

The court sustained the demurrer without leave to

amend "on grounds stated in the moving papers," ordered the action dismissed, awarded costs to the Times, and entered judgment accordingly. After judgment Blatty moved to tax costs, and the court denied the motion.

Thereupon Blatty filed timely notices of appeal from the judgment of dismissal and the order denying his motion to tax costs. On his motion the Court of Appeal ordered the appeals consolidated.

On appeal, Blatty contended that both the original and the amended complaints stated causes of action, and that in the proceedings on the demurrer to the original complaint the court erred in ordering and taking judicial notice of the depositions and in restricting discovery to those limited depositions. He also contended that the court erred in denying his motion to tax costs.

Relying on our decision in *Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660]*, in which we held that "Although ordinarily an appellate court will not consider the allegations of a superseded complaint [citation], that rule does not apply when the trial court denied plaintiffs leave to include those allegations in an amended complaint," the Court of Appeal concluded [*1040] that its review extended not only to the claims of the amended complaint but also to those of the original complaint as to which the trial court sustained the demurrer without leave to amend.

The Court of Appeal held that the facts alleged were legally sufficient to support the intentional interference causes of action [**1181] of the amended complaint and accordingly reversed the judgment of dismissal in that respect with directions to overrule the demurrer as to those causes of action. It also held that the trial court otherwise properly ruled on the demurrers, and hence that it was not obligated to, and did not, reach Blatty's contentions concerning the [***546] discovery rulings; it therefore affirmed the judgment in all other respects. It also dismissed the appeal from the order denying Blatty's motion to tax costs on the ground that because the award of costs to the Times was incident to the judgment, the partial reversal operated to vacate the award and hence this appeal was moot.

Both parties petitioned for review. In his petition Blatty contended that the trial court erred in ordering and taking judicial notice of the depositions for the purpose of ruling on the original complaint and that the Court of Appeal erred in holding that no cause of action was or could be stated for negligence, negligent interference with prospective economic advantage, or unfair competition. In its petition the Times contended that the Court of Appeal erred in holding that on the facts alleged it can be held liable under either or both of the amended complaint's two causes of action for intentional interference with prospective economic advantage.

II

**(1)** When, as in this case, the ultimate object of our review is the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. We accept as true "all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." ( *Serrano v. Priest (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]*.) We also consider facts that may be judicially noticed. (*Ibid.*) Indeed, when the allegations of the complaint contradict or are inconsistent with such facts, we accept the latter and reject the former. (See, e.g., *Curran v. Mount Diablo Council of the Boy Scouts (1983) 147 Cal.App.3d 712, 722 [195 Cal.Rptr. 325, 38 A.L.R.4th 607]*; *Saltares v. Kristovich (1970) 6 Cal.App.3d 504, 510-511 [85 Cal.Rptr. 866]*, and cases cited.) "When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has [*1041] been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." ( *Blank v. Kirwan (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]*.)

The Times contends that Blatty's intentional interference claims -- and his other claims as well -- do not, and cannot, state a claim on which relief may be granted. In support it argues, inter alia, that the *First Amendment to the United States Constitution* and *article I, section 2, of the California Constitution* establish an absolute bar to liability. For the reasons that follow, we agree.

A

**(2)** In order to advance society's interest in free and open discussion on matters of public concern and to

avoid undue self-censorship by the press, the First Amendment establishes a broad zone of protection within which the press may publish without fear of incurring liability on the basis of injurious falsehood. ( *Reader's Digest Assn. v. Superior Court (1984) 37 Cal.3d 244, 265 [208 Cal.Rptr. 137, 690 P.2d 610]*; see *Bose Corp. v. Consumers Union of U.S., Inc. (1984) 466 U.S. 485, 513 [80 L.Ed.2d 502, 525, 104 S.Ct. 1949]*; see generally *New York Times Co. v. Sullivan (1964) 376 U.S. 254, 267-283 [11 L.Ed.2d 686, 698-708, 84 S.Ct. 710]*; *Curtis Publishing Co. v. Butts (1967) 388 U.S. 130, 155 [18 L.Ed.2d 1094, 1111, 87 S.Ct. 1975]* [plur. opn.], 162-165 [18 L.Ed.2d 1115-1117] [conc. opn. of Burger, C. J.], 170 [*18 L.Ed.2d 1120]* [conc. opn. of Black, J.], 172 [*18 L.Ed.2d 1121]* [conc. opn. of Brennan, J.]; *Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 339-348* [**1182] *[41 L.Ed.2d 789, 804-810, 94 S.Ct. 2997]*.) *Article I, section 2, of the California Constitution*, our state constitutional guarantee of freedom of expression and of the press, independently establishes a zone of protection that is broader still. (See *People v. Glaze (1980) 27 Cal.3d 841, 844, fn. 2 [166 Cal.Rptr. 859, 614 P.2d 291]*; [***547] *Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908-910 [153 Cal.Rptr. 854, 592 P.2d 341]*, affd. *(1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]*; *Wilson v. Superior Court (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]*.)

The necessity for this protection is clear. "The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty -- and thus a good unto itself -- but also is essential to the common quest for truth and the vitality of society as a whole." ( *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at pp. 503-504 [80 L.Ed.2d at p. 518*].)

The First Amendment establishes its broad zone of protection by means of various rules. Two are especially implicated by the allegations of the original and amended complaints herein.

[*1042] At the threshold, in defamation actions -- in which, of course, the alleged injurious falsehood of a statement is the gravamen of the plaintiff's claim -- the amendment has abrogated the common law of strict liability. ( *Gertz v. Robert Welch, Inc., supra, 418 U.S. at p. 347 [41 L.Ed.2d at pp. 809-810*].) For constitutional purposes it is not enough that the traditional affirmative defense of truth, with the burden of proof on the defendant, be available to the press; rather it is the plaintiff who is required to plead and prove falsehood. ( *Id. at pp. 339-348 [41 L.Ed.2d at pp. 804-810*]; *New York Times Co. v. Sullivan, supra, 376 U.S. at pp. 278-280 [11 L.Ed.2d at pp. 705-707*]; see, e.g., *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at p. 511, fn. 30 [80 L.Ed.2d at p. 524, fn. 30*] [holding that when the plaintiff is a public official or public figure, in order to carry his burden he must prove "actual malice" -- i.e., he must "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement"]; *Gertz v. Robert Welch, Inc., supra, at p. 347 [41 L.Ed.2d at pp. 809-810*] [effectively holding that when the plaintiff is a private individual, he must prove that the defendant made the falsehood with at least negligence].)

**(3a)** In defamation actions the First Amendment also requires that the statement on which the claim is based must specifically refer to, or be "of and concerning," the plaintiff in some way. The *New York Times* case suggested as much, although it could possibly have been read to imply that the requirement derives from the due process clause of the Fourteenth Amendment and ultimately from the state's definition of the tort of defamation, and hence that it is merely an element which the state is presumably free to require or not as it sees fit. (*376 U.S. at pp. 288-292 [11 L.Ed.2d at pp. 711-714*].) *Rosenblatt v. Baer (1966) 383 U.S. 75 [15 L.Ed.2d 597, 86 S.Ct. 669]*, however, made it plain that the requirement derives directly and ultimately from the First Amendment. In that case, the United States Supreme Court held that a defamation plaintiff could not constitutionally establish liability without satisfying the requirement even though the governing state law imposed no such prerequisite: "under *New York Times* . . . [the plaintiff is] required to show *specific reference*." ( *Id. at p. 83 [15 L.Ed.2d at p. 604*], italics added.)

**(4a)** Although the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement: "[that] constitutional protection does not depend on the label given the stated cause of action" ( *Reader's Digest Assn. v. Superior Court, supra, 37 Cal.3d at p. 265*), and no cause of action "can claim . . . talismanic immunity from constitutional limitations" [*1043] [**1183] ( *New*

*York Times Co. v. Sullivan, supra, 376 U.S. at p. 269 [11 L.Ed.2d at p. 700]*). (See, e.g., *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at pp. 493-514 [80 L.Ed.2d at pp. 511-526*] [in a product-disparagement action a public figure plaintiff must prove actual malice]; *Time, Inc. v. Hill (1967) 385 U.S. 374, 387-388* [***548] *[17 L.Ed.2d 456, 466-467, 87 S.Ct. 534]* [under a statute granting a person a right of action when his name, picture, or portrait is the subject of a false publication, a public-figure plaintiff must prove actual malice]; *Reader's Digest Assn.* v. *Superior Court, supra*, at p. 265 [in an action for intentional infliction of emotional distress, "false light" invasion of privacy, and "intrusion" invasion of privacy, a public-figure plaintiff must prove actual malice]; *Kapellas v. Kofman (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]* [same as to "false light" invasion of privacy].)

Further, it is immaterial for First Amendment purposes whether the statement in question relates to the plaintiff himself or merely to his property broadly defined. (See *Bose Corp. v. Consumers U. of U.S., Inc. (D. Mass. 1981) 508 F.Supp. 1249, 1270-1271*, revd. on other grounds (1st Cir. 1982) *692 F.2d 189*, affd. *(1984) 466 U.S. 485 [80 L.Ed.2d 502, 104 S.Ct. 1949]* [holding that when a public-figure plaintiff sues to recover damages predicated on injury to his product, just as when he sues to recover damages predicated on injury to his reputation, he must prove actual malice]; *Simmons Ford, Inc.* v. *Consumers Union of U.S.* (S.D.N.Y. 1981) *516 F.Supp. 742, 744, fn. 4* [same].)

The fundamental reason that the various limitations rooted in the First Amendment are applicable to all injurious falsehood claims and not solely to those labeled "defamation" is plain: although such limitations happen to have arisen in defamation actions, they do not concern matters peculiar to such actions but broadly protect free-expression and free-press values. (See *Reader's Digest Assn. v. Superior Court, supra, 37 Cal.3d at p. 265*.)

For example, the fault requirement gives "freedom[] of expression . . . the 'breathing space' that [it] '[needs] . . . to survive.'" ( *New York Times Co. v. Sullivan, supra, 376 U.S. at pp. 271-272 [11 L.Ed.2d at p. 701*].) As the United States Supreme Court has stated: "Realistically, . . . some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times, Butts, Gertz*, and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material." ( *Herbert v. Lando (1979) 441 U.S. 153, 171-172 [60 L.Ed.2d 115, 131, 99 S.Ct. 1635]*; accord, *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at p. 513 [80 L.Ed.2d at p. 525*].)

[*1044] The "of and concerning" or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt. To allow a plaintiff who is not identified, either expressly or by clear implication, to institute such an action poses an unjustifiable threat to society. For example, as a federal court has cautioned, the absence of the "of and concerning" requirement "could invite any number of vexatious lawsuits and seriously interfere with public discussion of issues, or groups, which are in the public eye. Statements about a religious, ethnic, or political group could invite thousands of lawsuits from disgruntled members of these groups claiming that the portrayal was inaccurate and thus libelous. Such suits would be especially damaging to the media, and could result in the public receiving less information about topics of general concern." (*Michigan United Conservation Clubs* v. *CBS News* (W.D.Mich. 1980) *485 F.Supp. 893, 900*, affd. (6th Cir. 1981) *665 F.2d 110*.) In the special case in which the plaintiff is a public official suing in response to criticism of governmental operations, an absence of this requirement would allow recovery based on a theory that is "tantamount to . . . libel of government, [**1184] and therefore . . . constitutionally insufficient." ( *Rosenblatt v. Baer, supra, 383 U.S. at p. 83 [15 L.Ed.2d at p. 604*].)

**(3b)** The "of and concerning" requirement serves to immunize a kind of statement which, though it can cause hurt to an individual, [***549] is deemed too important to the vigor and openness of public discourse in a free society to be discouraged. Statements of opinion, "[however] pernicious," are immunized by the First Amendment in order to insure that their "correction [depends] not on the conscience of judges and juries but on the competition of other ideas." ( *Gertz v. Robert Welch, Inc., supra, 418 U.S. at p. 339-340 [41 L.Ed.2d at p. 805*].) Statements without specific reference are immunized for a similar reason: "'It is far better for the public welfare that some occasional consequential injury

to an individual arising from general censure of his profession, his party, or his sect should go without remedy than that free discussion on the great questions of politics, or morals, or faith should be checked by the dread of embittered and boundless litigation.'" ( *Michigan United Conservation Clubs* v. *CBS News, supra*, 485 F.Supp. at p. 900.) [1]

1 To be referred to specifically, we emphasize, the plaintiff need not be mentioned by name, but may be identified by clear implication. For example, if a company consists of Smith, Jones, and Doe, and a publication asserts "Smith and Jones are the only honest members of the company," certainly the publication specifically refers to Doe and accuses him of dishonesty by clear implication.

**(4b)** Not only does logic compel the conclusion that First Amendment limitations are applicable to all claims, of whatever label, whose gravamen [*1045] is the alleged injurious falsehood of a statement, but so too does a very pragmatic concern. If these limitations applied only to actions denominated "defamation," they would furnish little if any protection to free-speech and free-press values: plaintiffs suing press defendants might simply affix a label other than "defamation" to their injurious-falsehood claims -- a task that appears easy to accomplish as a general matter (see, e.g., *Reader's Digest Assn. v. Superior Court, supra, 37 Cal.3d at p. 265* [injurious-falsehood claim asserted as causes of action for defamation, intentional infliction of emotional distress, "false light" invasion of privacy, and "intrusion" invasion of privacy]) -- and thereby avoid the operation of the limitations and frustrate their underlying purpose.

Regrettably, the foregoing is not mere unsupported speculation. In recent years plaintiffs suing press defendants have more frequently affixed labels other than defamation to injurious falsehood claims and have increasingly achieved some measure of success in their actions. (Mead, *Suing Media for Emotional Distress: A Multi-Method Analysis of Tort Law Evolution* (1983) 23 Washburn L.J. 24, 24-25, 30-44 [discussing defamation, privacy, and intentional infliction of emotional distress theories].)

It follows that to prevent creative pleading from rendering the limitations nugatory, they must be broadly applicable whenever the gravamen of the claim is injurious falsehood.

B

**(5)** The causes of action for intentional interference with prospective economic advantage, as stated, are barred by the First Amendment.

It is plain that Blatty's intentional interference claims have as their gravamen the alleged injurious falsehood of a statement. Under the allegations of the amended complaint the assertion they make is as follows: the Times falsely represented that the list was an accurate compilation of actual book sales; by failing to include *Legion*, the Times falsely represented that the novel did not meet its stated criteria for inclusion; by so doing the Times caused Blatty to be harmed. Under the allegations of the original complaint the assertion can be read in substantially the same way, and in his petition for review Blatty himself urged us to do so. Because these causes of action thus have as their gravamen the alleged injurious falsehood of a statement, [**1185] they must satisfy the requirements of the First Amendment.

[***550] It is also plain that Blatty's intentional interference claims fail to satisfy First Amendment requirements.

[*1046] The claims fail to allege that the list is of and concerning, or specifically refers to, Blatty or his novel. In order to satisfy this requirement, the plaintiff must effectively plead that the statement at issue either expressly mentions him or refers to him by reasonable implication. (Cf. *Kelly v. Johnson Publishing Co. (1958) 160 Cal.App.2d 718, 721-726 [325 P.2d 659]* [action for defamation and invasion of privacy]; *Saucer v. Giroux (1921) 54 Cal.App. 732, 733-734 [202 P. 887]* [action for defamation].) Blatty, however, can do neither.

To begin with, the list does not expressly refer to Blatty or his novel. Nor does he contend otherwise. Quite the contrary: the failure of *Legion* to appear on the list is the very basis of his action.

Further, the list cannot be reasonably understood to refer to Blatty or his novel by implication. When, as in this case, the statement that is alleged to be injuriously false concerns a group -- here, books currently in print and their authors -- the plaintiff faces a "difficult and sometimes insurmountable task. If the group is small and its members easily ascertainable, [the] plaintiff[] may succeed. But where the group is large -- in general, any group numbering over twenty-five members -- the courts

in California and other states have consistently held that plaintiffs cannot show that the statements were 'of and concerning them,' *See, e.g., Noral v. Hearst Publications, Inc., 40 Cal.App.2d 348, 350, 104 P.2d 860 (1940); Mullins v. Brando, 13 Cal.App.3d 409, 422-23* & n. 13, *91 Cal.Rptr. 796 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2231, 29 L.Ed.2d 701 (1971)*, and cases cited therein; *Neiman-Marcus v. Lait, 13 F.R.D. 311 (S.D.N.Y. 1952).*" (*Barger* v. *Playboy Enterprises, Inc.* (N.D.Cal. 1983) *564 F.Supp. 1151, 1153*, affd. (9th Cir. 1984) *732 F.2d 163*, cert. den. *469 U.S. 853 [83 L.Ed.2d 110, 105 S.Ct. 175]* [discussing Cal. defamation law].)

The group in question here obviously numbers substantially more than 25 members: a visit to even the smallest bookstore establishes this fact. Moreover, Blatty himself has impliedly admitted the point. In the amended complaint he alleges that "To obtain sales figures from bookstores, [the Times] sent to the bookstores forms . . . which [it] prepared; the forms for works of fiction contain and contained a printed list of 36 'bestselling' books which has and had the effect of encouraging reports as to sales of books listed on the forms and discouraging reports as to sales of books not listed on the forms . . . ." By so stating Blatty impliedly alleges that the "forms" should have contained the titles of more than 36 books and hence that more than 36 books were potentially among the top 15 "best sellers." [2]

2 Blatty's claims also fail to effectively allege falsehood. Contrary to Blatty's allegation, the Times did *not* make the crucial false representation of which he complains -- viz., that the list was an accurate compilation of actual book sales. This is so because the Times never made such a representation, whether true or false. The legend of the list -- of which the trial court properly took compulsory judicial notice ( *Evid. Code, §§ 452, subd. (h)*, and *453*), and of which we must therefore take judicial notice as well (*id.*, § 459, subd. (a)) -- declared merely that "The listings above are *based on* computer-processed sales figures from about 2,000 bookstores in every region of the United States." To the extent that Blatty may mean to argue that the compound adjective "computer-processed" implies, in the words of the amended complaint, an "objective, unbiased and accurate compilation of actual sales," he is unpersuasive: the legend plainly implies that the list represents a general ranking of books based on sales figures from a *sample* of bookstores.

[*1047] Not only are the intentional interference claims barred by the First Amendment as stated, Blatty has failed to attempt to carry his burden of showing that it is reasonably possible he can cure the defect by amendment. Limiting our consideration to the "of and concerning" requirement, we reiterate that in sustaining the demurrer to the amended complaint without leave to amend the trial court relied generally "on grounds stated in the moving papers" -- one of which was that the complaint was barred [**1186] by the constitutional provisions forbidding [***551] the imposition of liability "where, as here, no statement has been made 'of and concerning' the plaintiff . . . ." Even though he was thus put on notice, Blatty has made no attempt to carry his burden. Hence, we are compelled to conclude that there is no reasonable possibility he can cure the defect.

To prevent this conclusion Blatty insists that the "of and concerning" requirement does not derive from the First Amendment. The point, as we have shown, is plainly without merit.

Blatty then argues in effect that to require a plaintiff to establish that the alleged injurious falsehood published by a press defendant is "of and concerning" him would add a new element to the tort of intentional interference with prospective economic advantage and thereby alter its nature, and that such a result is impermissible. In support he relies on *Falwell v. Flynt (4th Cir. 1986) 797 F.2d 1270*, in which the court held that a public-figure plaintiff suing a press defendant for intentional infliction of emotional distress was not required to establish actual malice as that term has commonly been understood: "When applied to a defamation action, the actual malice standard alters none of the elements of the tort; it merely increases the level of fault the plaintiff must prove in order to recover in an action based upon a publication. Requiring a plaintiff to prove knowledge of falsity or reckless disregard of the truth in an action for intentional infliction of emotional distress would add a new element to this tort, and alter its nature." ( *Id. at p. 1275.*) The point must be rejected.

The fundamental premise of Blatty's argument is unsound. Under the supremacy clause a state's definition of a tort cannot undermine the requirements [*1048] of the First Amendment. That is precisely the teaching of *New York Times*. In that case, the United States Supreme

Court held that the First Amendment required the plaintiff to establish falsity (*376 U.S. at pp. 279-280 [11 L.Ed.2d at pp. 706-707]*) -- even though state law did not require him to do so ( *id. at p. 262 [11 L.Ed.2d at p. 696]*). Indeed, in that case the court effectively held that the First Amendment abrogated the common law of strict liability, added the element of falsity, and thereby altered the nature of the tort. The *Falwell* court misses this crucial point and as a result cannot be followed. [3]

3 Blatty argues in effect that the First Amendment is inapplicable to the intentional-interference claim based on the Times's marketing of the list, on the ground that in that context the list constitutes "commercial speech." The argument is unpersuasive.

To begin with, even in that context the list does not constitute commercial speech. "Commercial speech" is defined as speech that does "no more than propose a commercial transaction . . . ." ( *Pittsburg Press Co. v. Human Rel. Comm'n (1973) 413 U.S. 376, 385 [37 L.Ed.2d 669, 677, 93 S.Ct. 2553]*; see *Friedman v. Rogers (1979) 440 U.S. 1, 10, fn. 9 [59 L.Ed.2d 100, 110-111, fn. 9, 99 S.Ct. 887]*; see generally *Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 510-511 [217 Cal.Rptr. 225, 703 P.2d 1119].*) The list plainly does not come within that definition. That the Times is alleged to have marketed the list for its newspaper profit does not affect the result: commercial motivation does not transform noncommercial speech into commercial speech (see *Friedman v. Rogers, supra, at p. 11, fn. 10 [59 L.Ed.2d at p. 111, fn. 10]*; see also *Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 761 [48 L.Ed.2d 346, 358, 96 S.Ct. 1817]* [stating that "Speech . . . is protected [under the First Amendment] even though it is carried in a form that is 'sold' for profit"]; *New York Times Co. v. Sullivan, supra, 376 U.S. at p. 266 [11 L.Ed.2d at p. 698]* [holding that the fact that the Times was paid for publishing the noncommercial advertisement in question in that case was "immaterial"]).

In any event, Blatty's major premise is false: commercial speech is *not* excluded from First Amendment protections. (E.g., *Bose Corp. v. Consumers Union of U.S., Inc., supra, 466 U.S. at p. 504, fn. 22 [80 L.Ed.2d at p. 519, fn. 22]*; *Schaumburg v. Citizens For Better Environ. (1980) 444 U.S. 620, 632, fn. 7 [63 L.Ed.2d 73, 85 fn. 7, 100 S.Ct. 826]*; *Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 758, 770 [48 L.Ed.2d at pp. 356, 363].*)

III

**(6)** Because each of the other causes of action that Blatty attempted to assert in his original and amended complaints has as its gravamen the alleged injurious falsehood [**1187] [***552] of the list and hence must satisfy First Amendment requirements, and because none of them does or can reasonably allege that the list is "of and concerning" Blatty or his novel, the Court of Appeal did not err in holding that the judgment of dismissal was proper as to them. Thus, we need not discuss Blatty's arguments to the contrary. Nor need we consider his contentions going to the trial court's discovery rulings and its taking of judicial notice of the depositions in passing on the Times demurrer to the original complaint. Since each of the causes of action, as we have concluded, was barred on First Amendment grounds specified in the demurrer, the sustaining of the demurrer was correct and as such must be [*1049] upheld. (*Penziner v. West American Finance Co. (1933) 133 Cal.App. 578, 582 [24 P.2d 501]*; *des Granges v. Crall (1915) 27 Cal.App. 313, 316 [149 P. 777]*; see, e.g., *Weinstock v. Eissler (1964) 224 Cal.App.2d 212, 224-226 [36 Cal.Rptr. 537].*) It follows that Blatty's point is unnecessary to our decision and need not be considered. (E.g., *Ferguson v. Keays (1971) 4 Cal.3d 649, 656, fn. 6 [94 Cal.Rptr. 398, 484 P.2d 70]*; *Young v. Three for One Oil Royalties (1934) 1 Cal.2d 639, 647 [36 P.2d 1065].*) [4]

4 Throughout this opinion we have used "First Amendment" to refer not only to that provision of the United States Constitution, but also to *article I, section 2, of the California Constitution.* It is the latter on which we primarily rely.

The judgment of the Court of Appeal is reversed insofar as it reverses the judgment of dismissal on the amended complaint's causes of action for intentional interference with prospective economic advantage, with directions to affirm the judgment in that respect, and in all other respects the judgment of the Court of Appeal is affirmed; and the order of the Court of Appeal dismissing as moot the appeal from the order denying the motion to

tax costs is reversed with directions to resolve that issue on the merits.

**CONCUR BY:** GRODIN (In Part)

**DISSENT BY:** GRODIN (In Part)

**DISSENT**

**GRODIN, J.,** Concurring and Dissenting. I cannot join in the majority's conclusion that the "of and concerning" requirement applicable to defamation actions is a constitutionally required element of a cause of action for intentional interference with prospective economic advantage, whenever the alleged intentional tort is effectuated through a media publication. A hypothetical example may be helpful in exposing the fallacy of the majority's broad holding.

Suppose that the New York Times, after conducting its normal survey of representative bookstores throughout the country, found that Blatty's novel was, indeed, the top selling book for a particular week based on its own statistics. Suppose further that, despite this information, the Times purposefully substituted one of its own publications for Blatty's book at the top of its best seller list in order to enhance its own book's sales, and entirely omitted Blatty's book from the list.

Under the majority's analysis, Blatty would have no cause of action against the New York Times for intentional interference with prospective economic advantage under these hypothetical facts, because nothing in the false best seller list would have indicated to the reading public that the falsity in the published information was "of and concerning" Blatty's book. It seems clear from this hypothetical, however, that the "of and concerning" requirement [*1050] is ill-suited to this type of intentional tort, since the plaintiff is required in any event to prove, as an element of the tort, that the defendant acted for the specific purpose of injuring the particular plaintiff. If a plaintiff can prove that a media defendant knowingly published a false statement for the purpose of inflicting financial injury on him personally, I do not believe that the free speech provisions of either the state or federal Constitution would be offended if the defendant were held liable in damages for such conduct, [***553] even if it were [**1188] not obvious on the face of the publication who the defendant was intending to injure. Thus, I do not join in the majority's broad holding.

Nonetheless, on the specific facts of this case, I concur in the judgment. Although plaintiff has attempted to state a cause of action for intentional interference with prospective economic advantage, the facts that he has alleged -- even after being granted leave to amend -- are not, in my view, sufficient to support such an action. Plaintiff's allegations do not suggest that the Times intentionally misrepresented the actual results of its bookstore survey for the purpose of injuring plaintiff financially; at most, the allegations suggest that the Times did not do as thorough a job in gathering sales statistics as it should have and that, after Blatty's publisher complained to the Times, the Times should have realized that its survey figures would harm plaintiff financially. Even assuming those allegations are true, they would not support recovery on an intentional-interference theory.

Accordingly, I agree with the majority that the trial court properly sustained defendant's demurrer to all causes of action, and I concur in the reversal of the judgment of the Court of Appeal to the extent that its judgment is inconsistent with this conclusion.

# TAB 10

LEXSEE 163 CAL.APP.3D 1068

**C & H FOODS CO. et al., Plaintiffs and Appellants, v. HARTFORD INSURANCE COMPANY, Defendant and Respondent**

**No. B004275**

**Court of Appeal of California, Second Appellate District, Division Four**

*163 Cal. App. 3d 1055*; *211 Cal. Rptr. 765*; *1984 Cal. App. LEXIS 2914*

**October 17, 1984**

**SUBSEQUENT HISTORY:** [***1] Appellants' petition for a hearing by the Supreme Court was denied January 17, 1985.

**PRIOR HISTORY:** Superior Court of Los Angeles County, Nos. 416674, B004275, Lawrence C. Waddington, Judge.

**DISPOSITION:** The order (judgment) of dismissal is affirmed.

**SUMMARY:**


**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, the trial court sustained the insurer's demurrers, without leave to amend, to the causes of action for declaratory relief, bad faith, refusal to pay benefits, and emotional distress to the two individual owners of the insured. A policy provision limited the time for bringing an action on the policy to 12 months after the occurrence of loss, and the insured filed the action after expiration of that period of time. (Superior Court of Los Angeles County, No. 416674, Lawrence C. Waddington, Judge.)

The Court of Appeal affirmed the order of dismissal. It held that the 12-month time limitation in the policy was valid. The provision was clear, plain, and easily understood, and the insured could not avoid application thereof by contending that, both because the insurer did not advise the insured of the limitation, and because it was "buried in small type in an obscure corner of the back side of the insurance policy," it was unaware of the provision. The court held that the insurer did not waive the provision; the insured gave no notice of loss to the insurer until more than one year after the loss occurred. Moreover, in the insured's own complaint, it pled the fact that the insurer based its timely denial of liability for the claims in part on the failure of the insured to commence suit within the 12-month period. The insured could not avoid the effect of the time limitation by contending that, since the beef which was delivered in a spoiled and unusable condition was immediately destroyed by government order, notice to the insurer within 12 months would have made no difference for the purposes of the insurer's investigation. The court held that there was no coverage for the loss and no bad faith in denying coverage on that ground. Further, it held that the right to punitive damages could not arise from the mere pleading of the covenant of good faith or its breach. Since neither of the two individual owners of the insured was a named or additional insured or beneficiary under the policy, they did not state a cause of action for bad faith or negligent infliction of emotional distress. (Opinion by McClosky, J., with Woods, P. J., and Byrne, J., * concurring.)


* Assigned by the Chairperson of the Judicial Council.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 23--Decisions Appealable--Orders on Demurrer.** --An order sustaining a demurrer is nonappealable.

**(2) Pleading § 22--Demurrer to Complaint--Demurrer as Admission.** --A general demurrer admits all material facts that are properly pleaded. Generally, material facts alleged in the complaint are treated as true for the purpose of ruling on the demurrer. Also taken as true are facts that may be implied or inferred from those expressly alleged. However, contentions, deductions, or conclusions of fact or law alleged in the complaint are not considered in judging its sufficiency. In short, the ruling on a demurrer determines a legal issue on the basis of assumed facts, i.e., those properly alleged in the complaint, regardless of whether they ultimately prove to be true.

**(3) Pleading § 29--Demurrer to Complaint--Hearing and Determination.** --In ruling on a demurrer, the trial court is required to construe the complaint liberally with a view to substantial justice between the parties.

**(4) Pleading § 29--Demurrer to Complaint--Hearing and Determination.** --A general demurrer will not be sustained unless the complaint liberally construed fails to state a cause of action on any theory. Doubt in the complaint may be resolved against the plaintiff and facts not alleged are presumed not to exist.

**(5) Pleading § 30--Demurrer to Complaint--Hearing and Determination--Amendment After General Demurrer Sustained.** --Sustaining a general demurrer without leave to amend is not an abuse of discretion if it appears from the complaint that under applicable substantive law there is no reasonable probability that the defect can be cured by amendment.

**(6a) (6b) Insurance Contracts and Coverage § 126--Actions--Limitations and Defenses.** --The provision in an insured's insurance policy limiting the time for bringing an action thereon to 12 months after the occurrence of the loss was valid where it was clear, plain, and easily understood. The insured could not avoid application thereof by contending that, both because the insurer did not advise it of the provision, and because the provision was "buried in small type in an obscure corner of the backside of the insurance policy," it was unaware of the provision, since the policy consisted of a single page, printed on both sides, and the provision in question was printed in the same size type as the others.

**(7) Insurance Contracts and Coverage § 124--Actions--Pleading.** --Where a conclusion is alleged along with the special facts from which the conclusion is drawn, the special facts control if they are inconsistent with and do not support the conclusion, and the sufficiency of the complaint is to be determined from the special facts pleaded. Thus, in determining a demurrer to the complaints in an action by an insured against its insurer, the language in the actual policy provision appearing in the exhibit to the complaints prevailed over the inconsistent general conclusional allegations concerning that provision.

**(8) Insurance Contracts and Coverage § 126--Actions--Limitations and Defenses.** --In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, the insurer did not waive the policy provision limiting the time for bringing an action on the policy to 12 months after the occurrence of the loss. The insured gave no notice of loss to the insurer until more than one year after the losses occurred. In the insured's own complaint it pled the fact that in a letter to the insured the insurer based its denial of liability for the claims in part on the failure of the insured to commence suit within the 12-month period.

**(9) Insurance Contracts and Coverage § 126--Actions--Limitations and Defenses.** --In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, which action the insured filed after expiration of the 12-month period specified by the insurance policy for bringing an action on the policy, the insured could not avoid the effect of the 12-month limitation by contending that, since the beef, which was delivered in a spoiled and unusable condition, was immediately destroyed by government order, notice to the insurer within 12 months would have made no difference for the purposes of the insurer's investigation. The complaint did not allege when the goods were destroyed or the pails buried or why no notice was given and no suit filed until more than one year after the last of the losses occurred. Nothing in the complaint negated the insurer's ability to have conducted a meaningful investigation had the insured complied with the policy by giving timely notice before the goods were destroyed.

**(10) Insurance Contracts and Coverage § 126--Actions--Limitations and Defenses.** --In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, which action the insured filed after expiration of the 12-month period specified by the insurance policy for bringing an action on the policy, the insured's allegation that a pail of the beef, which was

delivered in a spoiled and unusable condition and therefore destroyed by government order, was recovered and was a representative sample of the destroyed pails was not an allegation of fact to be accepted as true for the purpose of ruling on a general demurrer, but was a mere conclusion of no avail to the insured.

**(11) Insurance Contracts and Coverage § 124--Actions--Pleading--Bad Faith Refusal to Pay Benefits.** --In an action by an insured against its insurer on a policy insuring the shipment of pails of cured beef, the insured and its owners failed to state a cause of action for bad faith refusal to pay benefits. The failure of the insured to give the insurer timely notice of the loss, the admitted destruction of the goods before the notice was given, the failure of the insured to file suit within the 12-month period provided by the policy for bringing an action on the policy, and the allegation in the complaint that the damage to the goods was not the result of transit damages but was the result of a manufacturer's defect in the pails in which the beef was packed, adequately formed the basis upon which the trial court properly sustained the general demurrers to the causes of action. There was no coverage for the loss and no bad faith in denying coverage on that ground.

**(12) Insurance Contracts and Coverage § 138--Actions--Damages--Punitive Damages.** --The right to punitive damages against an insurer does not rise from the mere pleading of the covenant of good faith or its breach. While it is true that the requisite malice to establish a right to punitive damages is properly pleaded by alleging the wrongful motives, intent, or purpose, and that a general allegation of such intent is sufficient to support a claim for exemplary damages, sufficient facts must be pleaded to establish the breach of the insurer's duty to its insured.

**(13) Insurance Contracts and Coverage § 124--Actions--Pleading.** --In an action by an insured against its insurer on the insurance policy, neither of the two individual owners of the insured stated a cause of action for bad faith or negligent infliction of emotional distress. Neither was a named or additional insured or beneficiary under the policy.

**COUNSEL:** David S. Sperber for Plaintiffs and Appellants.

Overton, Lyman & Prince and Jon P. Kardassakis for Defendant and Respondent.

**JUDGES:** Opinion by McClosky, J., with Woods, P. J., and Byrne, J., * concurring.

* Assigned by the Chairperson of the Judicial Council.

**OPINION BY:** McCLOSKY

**OPINION**

[*1059] [**766] Plaintiffs C & H Foods Co. (C & H), a division of Kwik-Serv Foods, Inc. (Kwik-Serv), Frank Cottle (Cottle) and Fred W. Harris (Harris) purport to "appeal from the January 5, 1983 Superior Court's Order to the effect that a portion of the First Amended Complaint be sustained without leave to amend, and from the March 24, 1983 Superior Court's Order to the effect that the First and Second Causes of Action of the Second Amended Complaint be dismissed without leave to amend." **(1)** An order sustaining a demurrer is a nonappealable order. We treat the notice of appeal as taken from the order (judgment) of dismissal entered in favor of respondent [***2] The Hartford Fire Insurance Company (Hartford) on March 24, 1983. In connection therewith, we review the propriety of both orders of the trial court sustaining the demurrers to the portions of the first and second amended complaints.

All plaintiffs also sued defendants Hayward Mason and Rolapp Insurance Associates and certain Does for "insurance malpractice" but none of those defendants are properly parties to this appeal as the judgment was solely in favor of Hartford.

Plaintiffs contend: (1) A private statute of limitations in an insurance policy does not bar an insured when the insured is unaware of the private statute of limitations; (2) even if the private statute of limitations was a bar, it was waived by defendant Hartford; (3) the individual [**767] plaintiffs state a cause of action for bad faith refusal to pay an insurance benefit since there was a close nexus between the individuals and the corporate insured, and the corporate plaintiff states a cause of action for bad faith refusal to pay benefits; (4) the complaint affords a basis to award punitive damages.

[*1060] Facts

In their first and second amended complaints plaintiffs alleged that C & H bought eight marine insurance [***3] policies covering the shipment of 6,437

pails of cured beef. Of these, 4,154 pails of beef were delivered to Pago Pago, American Samoa between September 1980 and February 1, 1981, in a spoiled and unusable condition. The plaintiffs attached to the respective complaints a copy of a two-page marine insurance policy insuring the pails of beef "against all risks of physical loss or damage from any external cause . . . but . . . warranted free from any claims arising out of the inherent vice of goods insured . . . ." In the two complaints, all of the plaintiffs sued for declaratory relief, bad faith and refusal to pay benefits. The individual plaintiffs additionally sued for emotional distress. In the complaints it was further alleged that "[buried] within the reverse side of each of the aforesaid policies, in unreasonably small type, was the following provision: '12. No suit or action on this policy shall be sustainable in any court of law or Equity unless the Insured shall have complied in full with all the terms and conditions of this insurance, nor unless same shall be commenced within twelve (12) months next after the happening of the loss, . . .'"

Nevertheless, in the complaints [***4] it was alleged that defendants did not advise plaintiffs either orally or in writing of "the shortened statute of limitations," of which plaintiffs were unaware, but instead represented to plaintiffs "that defendants were not of the practice of relying upon technicalities of any kind in connection with the handling of claims by insureds, and in connection with the handling of a claim, defendants would look to the merits of the claim." They alleged further that "defendants owed to plaintiff a fiduciary responsibility, and pursuant to that fiduciary relationship, defendants are precluded from relying upon a shortened statute of limitations absent a complete and full disclosure of it to plaintiff."

On or about February 16, 1982, some 12 months after the last loss, plaintiffs first notified Hartford of the aforesaid loss and made demand upon it for $ 169,489.88, the amount of the loss. Defendants thereafter denied the claim saying among other things: "As I have told you, in most instances in my experience, technical provisions of a policy are not enforced by an insurance company if their basic position has not been jeopardized. In the case of the last claim [the claim on the eighth [***5] policy] where there was a potential of recovery from the steamship line, because of the passage of time, The Hartford is blocked out and therefore their position was seriously prejudiced. In the case of the other claims [policies one through seven] where there was an inadequate pail used, even though you have all-risk insurance, this type of situation does not fall under that area of coverage. It is presumed in any type of a cargo policy the container used for the [*1061] shipment must be adequate to the job and when it isn't, this is not subject to insurance."

On or about March 23, 1982, defendants wrote C & H as follows: "Our problems with the claims at this late date are:

"1. Late notice -- no opportunity to survey or inspect damages, or develop the facts as to cause.

"2. In the event of transit damages -- any claim against the responsible carrier is time barred -- T/B [time barred] date is one year from date delivered.

"3. As the major cause of damages appears to be the packing -- pails -- the shipments were apparently not sufficiently packaged to withstand the anticipated conditions of the voyage to Pago Pago. [**768] The insurance policy also contains a one year time [***6] for suit clause which had expired before receipt of notice. In view of the foregoing, we have no alternative but to decline liability for these claims under [the policies in question]."

Plaintiffs alleged on information and belief that their late notice caused no prejudice to defendants as "even timely notice would not have given [Hartford] an opportunity to survey or inspect damages, since the goods were ordered immediately destroyed by the Health Department of American Samoa. The goods were destoryed [*sic*], and the pails within which the goods were shipped were buried. A representative sample of the aforesaid pails has been recovered."

They also alleged on information and belief "that the damage was not the result of transit damages and defendants have not been prejudiced by any claim not being made to the shipper, since there is no claim as against the shipper." "That the cause of damages was the result of a manufacturer's defect in the pails, and that defendants have not been prejudiced in any way as to their rights as against the manufacturer of the pails."

Plaintiffs Cottle and Harris alleged that they were each 50 percent owners of C & H and that it was at their [***7] behest that the insurance policies were bought to

guarantee the continued operation of C & H. They further alleged that the unconditional denial of liability by Hartford to C & H was intentional, wrongful, reckless, malicious, oppressive, fraudulent in nature, and done in bad faith with conscious disregard of plaintiffs' rights and caused Cottle and Harris emotional distress for which they sought compensatory and punitive damages.

[*1062] All plaintiffs also alleged that Hartford, acting in bad faith, pursuant to a plan and scheme to act in bad faith refused to pay the benefits to them where there was no prejudice to Hartford. They alleged that it was Hartford's normal practice not to invoke the statute of limitations when there had been no prejudice to it by an insured's failure to file an "early" claim. They also alleged that Hartford failed to adopt and implement reasonable standards for the prompt investigation and processing and settlements of claims under plaintiffs' policies of insurance.

Discussion

I

**(2)** A general demurrer admits all material facts that are properly pleaded. Generally, material facts alleged in the complaint are treated as true for the purpose of ruling [***8] on the demurrer. (*Gruenberg* v. *Aetna Ins. Co. (1973) 9 Cal.3d 566, 572 [108 Cal.Rptr. 480, 510 P.2d 1032].*) Also taken as true are facts that may be implied or inferred from those expressly alleged. ( *Harvey v. City of Holtvile (1969) 271 Cal.App.2d 816 [76 Cal.Rptr. 795]*; *Miranda* v. *Great Southwest Fire Ins. Co. (1975) 50 Cal.App.3d 492 [123 Cal.Rptr. 357]*, disapproved in part on other grounds in *Wood v. Elling Corp. (1977) 20 Cal.3d 353, 362, fn. 7 [142 Cal.Rptr. 696, 572 P.2d 755].*) However, contentions, deductions or conclusions of fact or law alleged in the complaint are not considered in judging its sufficiency. ( *Gruenberg* v. *Aetna Ins. Co., supra*, 9 Cal.3d 566.) In short, the ruling on a demurrer determines a legal issue on the basis of assumed facts, i.e., those properly alleged in the complaint, regardless of whether they ultimately prove to be true. (See 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 800, p. 2413-2414.)

**(3)** In ruling on a demurrer, the trial court is required to construe the complaint liberally with a view to substantial justice between the parties. ( *Code Civ. Proc., § 452*; *Cameron v. Wernick* [***9] *(1967) 251 Cal.App.2d 890 [60 Cal.Rptr. 102].*) **(4)** A general demurrer will not be sustained unless the complaint liberally construed fails to state a cause of action on any theory. (See *Brousseau v. Jarrett (1977) 73 Cal.App.3d 864 [141 Cal.Rptr. 200].*) Doubt in the complaint may be resolved against plaintiff and facts not alleged are presumed not to exist. [**769] (*Melikian* v. *Truck Ins. Exchange (1955) 133 Cal.App.2d 113 [283 Cal.Rptr. 269].*) **(5)** Sustaining a general demurrer without leave to amend is not an abuse of discretion if it appears from the complaint that under applicable substantive law there is no reasonable probability that the defect can be cured by amendment. ( *Vater v. County of Glenn (1958) 49 Cal.2d 815, 821 [323 P.2d 85]*; *Sackett v. Wyatt (1973) 32 Cal.App.3d 592, 603 [108 Cal.Rptr. 219].*)

[*1063] Under these salutary principles, we consider plaintiffs' contentions.

II

**(6a)** Plaintiffs first contend that the private "statute of limitations does not bar plaintiffs' causes of action."

Each of the policies of insurance contained a provision to the effect that "[no] suit or action on this policy shall be sustainable in any court of [***10] law or Equity unless the Insured shall have complied in full with all the terms and conditions of this insurance, nor unless same shall be commenced within twelve (12) months next after the happening of the loss, . . ."

The trial court sustained a demurrer without leave to amend and noted that there was a "one year private statute of limitations" which "seems reasonable."

Plaintiffs urge that "this private statute of limitations was not one which was ever made known to the plaintiff." They also urge that defendant did not ever "advise plaintiff in writing or orally of the shortened statute of limitations, and indeed at all times defendant represented to plaintiffs that defendant was not of the practice of relying upon technicalities. Additionally, at all times, plaintiff was unaware of the shortened private statute of limitations, and plaintiff believed the statute of limitations as against plaintiff was the same statute of limitations as against any other entity on a written agreement."

A "representative policy" containing the language which constitutes the shortened time-for-commencement-of-suit provision is attached as

an exhibit and incorporated into the first and second amended [***11] complaints. Plaintiffs allege that that provision "is buried in small type in an obscure corner on the backside of the insurance policy." The record furnished us, however, discloses only a short policy with a single front and a single reverse side with the provision in question printed in the same size type as all of the other printed provisions of the policy except for the titles of some of its paragraphs and the witness clause. In short, the furnished provisions of the policy incorporated into the complaint as an exhibit are inconsistent with plaintiffs' conclusional allegations concerning them.

**(7)** "'[Where] a conclusion is alleged and also the special facts from which the conclusion is drawn, if the special facts are inconsistent with and do not support the conclusion, the former control, and the sufficiency of the complaint is to be determined from the special facts pleaded.'" ( *Denman v. City of Pasadena (1929) 101 Cal.App. 769, 776-777 [282 P. 820]*, quoting [*1064] *Little v. Union Oil Co. (1925) 73 Cal.App. 612, 619 [238 P. 1066]*; *Stowe v. Fritzie Hotels, Inc. (1955) 44 Cal.2d 416, 422 [282 P.2d 890]*; 3 Witkin, Cal. Procedure (2d ed. 1971) [***12] Pleading, § 338, p. 2006-2007.) Thus the language in the actual policy provision appearing in the exhibit to the complaints prevails over the inconsistent general conclusional allegations concerning that provision.

**(6b)** We next consider the validity of the clause itself. Such a provision has long been recognized as valid in California. As is stated in *Fageol T. & C. Co. v. Pacific Indemnity Co. (1941) 18 Cal.2d 748, 753 [117 P.2d 669]*, of a policy provision requesting action to be commenced within 12 months after the happening of the loss: "Such a covenant shortening the period of limitations is a valid provision of an insurance contract and cannot be ignored with impunity as long as the limitation is not so unreasonable as to show imposition or undue advantage. One year was not an unfair period of limitation. ( *Tebbets v. Fidelity and Casualty Co. [1909] 155 Cal. 137 [99 P.* [**770] *501]*; *Beeson v. Schloss [1920] 183 Cal. 618 [192 P. 292]*.)" (Accord. *Olds* v. *General Acc. Fire etc. Corp. (1945) 67 Cal.App.2d 812, 817 [155 P.2d 676]*, disapproved in part on other grounds in *Barrera* v. *State Farm Mut. Automobile Ins. Co. (1969) 71 Cal.2d 659,* [***13] *679, fn. 16 [79 Cal.Rptr. 106, 456 P.2d 674]*.) We accordingly hold that the shortened time-for-commencement-of-suit provision in the policies in question is valid and governs the time within which suit has to be commenced in this case. As the policies clearly so provided, and in view of the fact that plaintiffs do not deny that C & H was furnished the policies, we reject plaintiffs' claim that they were unaware of that provision.

Plaintiffs' reliance on *Ponder v. Blue Cross of Southern California (1983) 145 Cal.App.3d 709 [193 Cal.Rptr. 632]*, is misplaced. That case is completely distinguishable. In *Ponder*, the appellate court reversed a summary judgment against Mrs. Ponder in favor of Blue Cross. After first having paid benefits to her for treatment of her temporomandibular joint syndrome, Blue Cross later denied payments to her for further treatment of that joint problem on the basis that the policy did not cover treatment for temporomandibular joint syndrome. The *Ponder* court based its decision on its conclusion that the exclusion therein did not meet the reasonable expectations of the insured at the time the policy was taken out because it was neither [***14] conspicuous nor plain and clear. The exclusion of coverage for temporomandibular joint syndrome was hidden under a provision entitled "Dental Care" and a subheading of "Dental Care Services" in small print on a page containing other exclusions and provisions in bold faced type and in capitals. The temporomandibular joint syndrome was not so printed. The cases are not comparable. As distinguished from the *Ponder* provision, the provision in the case at bench is clear, plain and easily understood.

[*1065] III

**(8)** Plaintiffs next contend that "[the] statute of limitations has been waived by defendant." This contention is without merit.

Plaintiffs admit that they gave no notice of the loss to defendant until more than one year after the losses, and the record shows that the action was not filed until over one year after the latest of the losses. In paragraph 11 of their complaint, they contend that defendant did not raise the statute of limitations in its oral denial of liability and thus waived that provision. This contention, however, ignores the fact that plaintiffs incorporated into the complaint as exhibit 2, defendant Hartford's denial letter of March 23, 1982, which [***15] lists, among other things, the fact that "[the] insurance policy also contains a one year time for suit clause which had expired before receipt of notice." [1]

1 That letter read in pertinent part as follows:

"Gentlemen:

"We confirm our March 3, 1982 phone conversation during which you advised a number of claims on shipments of cured beef to Samoa had been received from C & H Foods. On March 12, 1982 we received your March 9, 1982 letter with the following claims:

| | | | | | |
|---|---|---|---|---|---|
| "Polynesia | 7/13/80 | 15 | 192 out of | 650 pails | $ 5,760.00 |
| Austral Moon | 8/21/80 | 16 & 17 | 1,324 out of | 2,208 pails | 39,720.00 |
| African Stars | 8/27/80 | 18 | 493 out of | 700 pails | 15,939.00 |
| Polynesia | 9/7/80 | 21 | 700 out of | 700 pails | 23,100.00 |
| African Stars | 9/18/80 | 19 | 700 out of | 700 pails | 22,400.00 |
| Austral Rainbow | 9/23/80 | 20 | 347 out of | 700 pails | 11,451.00 |
| Polynesia | 1/12/81 | 23 | 199 out of | 752 pails | 5,472.50 |
| | | | | | |
| | | | | Total | $ 123,842.50 |

"After review of the files and the general correspondence between Burns Philip South Sea Co., American Samoa Government, C & H Foods, Chamber of Commerce of American Samoa and U.S.D.A. Meat Inspector, Chief Lefao Su'e's confirmation that 3,746 pails of "Alofa Aja" brand cured salt beef was spoiled and dumped, we note Inspector Su'e states 'one of the major reasons resulting spoilage would be contributed by product packaging.'

"As Kwik Serv or C & H have filed claim on the Pail supplier and are negotiating with the Products Liability Carrier -- Chubb & Company, its [*sic*] quite clear that there is a substantial question on the propriety of the pails supplied, as indicated by the damages at Pago Pago -- pails crushed, split sides, buckled on sides, etc.

"Our problems with the claims at this late date are:

"1. Late notice -- no opportunity to survey or inspect damages, or develop facts as to cause.

"2. In the event of transit damages -- any claim against the responsible carrier is Time Barred -- T/B date is one year from date delivered.

"3. As the major cause of damages appears to be the packing -- pails -- the shipments were apparently not sufficiently packaged to withstand the anticipated conditions of the voyage to Pago Pago.

"The insurance policy also contains a one year time for suit clause which had expired before receipt of notice.

"In view of the foregoing, we have no alternative but to decline liability for these claims under *Open Policy 72 CO 037274* and original Marine Insurance policies *72 CO 037274*/ 15, 16, 17, 18, 19, 20, 21 and 23.

"If there is documentary evidence to bring the claim within the terms and conditions of policy coverage, we shall be pleased to review the matter."

[***16] [*1066] [**771] The facts specially pled by inclusion of that letter as an exhibit in the complaint demonstrate that the defendant Hartford based its timely denial of liability for the claims on, among other things, the failure of plaintiff C & H to commence suit within the one year time-for-suit provision of the policy. In the face

of their pleading of those special facts, plaintiffs' allegation that Hartford did not raise plaintiffs' violation of the policy "statute of limitations" in its "oral denial" is without consequence or merit.

**(9)** In their complaint plaintiffs also alleged in conclusional language, and on information and belief, that the late notice caused defendant no prejudice. They alleged that even had timely notice been given such timely notice "would not have given an opportunity to survey or inspect the damages [*sic*], since the goods were ordered immediately destroyed by the Health Department of American Samoa. The goods were destoryed [*sic*], and the pails within which the goods were shipped were buried. A representative sample of the aforesaid pails has been recovered."

Plaintiffs now urge on appeal that "[since] the goods were immediately destroyed, [***17] notice to defendants within 12 months would have made no difference for the purposes of defendant's investigation. In fact, if defendant wanted to conduct an investigation, they still could have, because plaintiff alleged that a pail was recovered."

The fact is that the complaint does not allege when the goods were destroyed or the pails buried or why no notice was given or no suit filed until more than one year after the last of the losses occurred. Nothing in the complaint negates Hartford's ability to have conducted a meaningful investigation had plaintiffs complied with the notice and time-for-commencement-of-suit provisions of the policies by giving timely notice before the goods were destroyed.

**(10)** Further, the allegation by plaintiffs that a pail that was recovered was a "representative sample" of the condition of the buried or destroyed pails of beef is not an allegation of fact, the truth of which we must accept for the purpose of ruling on the general demurrer, but is a mere conclusion which is of no avail to plaintiffs. Nor were any facts pled showing that the recovered pail was, at the time of the first notice to Hartford, in the same condition that the pails containing [***18] the spoiled beef were in when the loss was discovered, or that the cause of the loss was discoverable from the recovered pail at the time that notice was first given to Hartford.

IV

**(11)** Plaintiffs' next contention is that they have stated a cause of action for the bad faith refusal to pay benefits.

[*1067] In support of this contention, plaintiffs cite *Murphy v. Allstate Ins. Co. (1978) 83 Cal.App.3d 38 [147 Cal.Rptr. 565]*, for the proposition that "[even] if one has lost the principal cause of action, he may still have a claim for the bad faith subsequent con [**772] duct of the insurer." Not always. While that principle is true under certain circumstances, it is of no aid to plaintiffs here.

In the cited *Murphy* case, plaintiffs did not seek to hold Allstate on its policy, but for the damages caused by Allstate's conduct after the loss occurred in using contractors who did the repair and restoration of their fire damaged home in an unsatisfactory and unworkmanlike manner. *(83 Cal.App.3d 38, at pp. 49-50)*.

The case at bench is distinguishable as there is no question concerning the date of accrual of the causes of action with which we are here concerned, or that the underlying [***19] causes of action were not "on the policy." Moreover, the purported causes of action for bad faith and for negligent infliction of emotional harm fail to state facts sufficient to constitute a cause of action based upon the incorporated facts of certain paragraphs of the respective first causes of action and the incorporated exhibits and the denial of Hartford. These factors, coupled with the failure of plaintiffs to give timely notice, the admitted destruction of the goods before the notice was given, the failure to file suit within the one year time-for-commencement-of-suit provision, and the allegation in the complaint that the damage to the goods was not the result of transit damages but was the result of a manufacturer's defect in the pails in which the beef was packed, adequately formed the basis upon which the trial court properly sustained the general demurrers to the causes of action in question. Since the "goods" consisted of pails of beef, the defective pails constituted an inherent vice of the goods themselves, not damage from an external cause. (See Goodacre, Marine Insurance Claims (1974) pp. 89-90.) Under the "Perils Insured and Special Conditions" clauses of each [***20] policy, in capital typed letters, the insured plaintiff warranted that the insurer Hartford would be free of any claims under the policy "arising out of the inherent vice of goods insured . . . ."

Inasmuch as each of the policies specified on its face that it covered "all risks of physical loss or damage from

any external cause . . ." there was no coverage for the loss and no bad faith in denying coverage on that ground.

V

**(12)** The plaintiffs' next contention is that the complaint affords a basis to award punitive damages. They urge that "[if] one has pled the covenant [*1068] of good faith and fair dealings, punitive damages will lie, since a breach of the covenant is an intentional non-negligent act. Punitive damages can be pled generally when an intentional non-negligent act is alleged. *Unruh v. Truck Insurance Exchange [1972] 7 Cal.3d 616, 632 [102 Cal.Rptr. 815, 498 P.2d 1063]* (a general allegation of such intent is sufficient to support a claim for exemplary damages)." (AOB 15-16)

The right to punitive damages does not rise from the mere pleading of the covenant of good faith or its breach. See *Neal* v. *Farmers Ins. Exchange (1978) 21 Cal.3d 910,* [***21] *922 [148 Cal.Rptr. 389, 582 P.2d 980]*; *Silberg v. California Life Ins. Co. (1974) 11 Cal.3d 452, 462-463 [113 Cal.Rptr. 711, 521 P.2d 1103].*) While it is true that the requisite malice to establish a right to punitive damages "'. . . is properly pleaded by alleging the wrongful motive, intent or purpose'" ( *Unruh v. Truck Insurance Exchange (1972) 7 Cal.3d at p. 632*, quoting 3 Witkin [Cal. Procedure (2d ed. 1971)] Pleading, § 766, p. 2383) and that "[a] general allegation of such intent is sufficient to support a claim for exemplary damages" ( *Unruh v. Truck Insurance Exchange, supra, 7 Cal.3d at p. 632*), nothing in that statement excuses the requirement that sufficient facts be pleaded to establish the breach of the insurer's duty to its insured. Plaintiffs have failed to sufficiently allege such facts in their complaints.

VI

As to plaintiffs Frank Cottle and Fred W. Harris, the relevant complaint alleged that each was an individual who owned "50 [**773] percent of the stock in plaintiff corporation and [is] employed by plaintiff corporation, and [maintains] a close working relationship with plaintiff corporation which relationship is well known to defendants."

[***22] **(13)** The incorporated policy of insurance shows that neither Cottle nor Harris was a named or additional insured or a beneficiary under the policy. They did not state a cause of action for bad faith or negligent infliction of emotional harm (emotional distress) against Hartford. (See *Austero v. National Cas. Co. (1976) 62 Cal.App.3d 511, 516-517 [133 Cal.Rptr. 107].*)

The trial court did not abuse its discretion in dismissing the causes of action in the two complaints as to which the demurrers were sustained without leave to amend.

[*1069] The order (judgment) of dismissal is affirmed.

# TAB 11

LEXSEE 48 CAL.APP.4TH 1694

**CALIFORNIA CASUALTY INSURANCE COMPANY, Plaintiff and Appellant, v. NORTHLAND INSURANCE COMPANY et al., Defendant and Respondent. CALIFORNIA CASUALTY INSURANCE COMPANY, Plaintiff, Cross-defendant and Respondent, v. MEMORIE YESSIAN, Defendant, Cross-complainant and Appellant. MEMORIE YESSIAN, Cross-complainant and Appellant, v. ALLSTATE INSURANCE CO., Cross-defendant and Respondent.**

**Nos. E013768, E013426, E014026.**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION TWO**

*48 Cal. App. 4th 1682*; *56 Cal. Rptr. 2d 434*; *1996 Cal. App. LEXIS 829*; *1996 AMC 2643*; *96 Cal. Daily Op. Service 6594*; *96 Daily Journal DAR 10761*

**August 30, 1996, Decided**

**NOTICE:** [***1] Opinion certified for partial publication. *

* Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of parts II.A.1.b., II.A.1.c., II.A.2., II.B.1.b., II.B.1.c., II.B.2., II.B.3, II.C., II.D. and II.E.

**PRIOR HISTORY:** Appeal from the Superior Court of San Bernardino County. Super. Ct. No. SVC 258262. Hon. John P. Wade, Judge. (Assigned by the Chairperson of the Judicial Council.)

**DISPOSITION:** The judgments are affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A woman was seriously injured when an inboard-engine watercraft collided with her jet ski. She obtained a personal injury judgment against the man who had operated the watercraft and his wife, who had been riding the craft at the time of the accident. The injured woman sought to enforce the judgment, and to assert claims assigned to her by the couple against two of their insurers for failure to defend or indemnify them. In a declaratory relief action initiated by one of the insurers, the trial court granted summary judgment for the insurers, finding that neither insurer's policy covered the claims. (Superior Court of San Bernardino County, No. SCV268262, John P. Wade, Judge. +)

\+ Judge of the Municipal Court of San Bernardino County, Central Division, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

The Court of Appeal affirmed the judgments. The court held that one of the homeowners policies, which provided liability coverage for accidental bodily injury or property damage to a third party, but excluded liability for injury arising from the use of a "watercraft with inboard or inboard-outdrive motor power," did not cover the woman's injuries. The watercraft exclusion applied even though the craft was propelled by a jet pump rather than a propeller. In addition, the obvious purpose of the exclusion was to exclude liability for all watercraft, except those specifically covered, and the exclusion was not ambiguous. Further, the insurer did not have a separate duty to cover the wife of the man who had operated the watercraft at the time of the accident, based on the wife's liability for her husband's torts under the community property laws, and the exclusion applied even though the policy contained a severability clause that provided that the policy applied "separately to each insured." The court further held that the other insurance policy, which provided liability coverage for bodily injury or property damage resulting from the ownership, maintenance, or use of "covered watercraft, boat equipment or boat trailers" also did not cover the woman's injuries. The "covered watercraft" was the insureds' 18-foot water-ski boat, not the watercraft involved in the accident at issue. "Boat equipment" was defined to include dinghies and tenders "used to service" the covered watercraft. It was undisputed that the inboard-engine

craft at issue was not being used as a dinghy or tender at the time of the accident. Thus, since the insureds could not reasonably have expected their policy to cover as "boat equipment" watercraft not actually being used to service the covered watercraft at the time of the accident, there clearly was no coverage under the policy. (Opinion by Richli, J., with Ramirez, P. J., and Hollenhorst, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) (1c) (1d) Insurance Contracts and Coverage § 89--Coverage of Contracts--Homeowners Insurance--Watercraft Exclusion--Applicability to Injuries Arising Out of Accident Involving Inboard-engine Watercraft--Interpretation of Policy--Plain Meaning.** --A homeowners policy that provided liability coverage for accidental bodily injury or property damage to a third party, but excluded liability for injury arising from the use of a "watercraft with inboard or inboard-outdrive motor power," did not cover a woman's injuries arising out of a boating accident involving an inboard-engine watercraft owned by the insureds. The watercraft exclusion applied even though the craft was propelled by a jet pump rather than a propeller, since the plain meaning of the words "watercraft with inboard motor power," read in their ordinary sense, was "a watercraft powered by an inboard motor," regardless of the means of propulsion. Interpretation of the exclusion to apply to all watercraft with inboard engines did not render the words "motor power" surplusage, since those words were necessary to make the language intelligible. The fact that the words "motor power" were included did not imply they were intended to impose some requirement in addition to the requirement that the watercraft have an inboard engine. Further, the additional policy language excluding watercraft with "inboard-outdrive motor power" was not surplusage, since, in light of conflicting authority, the insurer was well-advised to refer specifically to "inboard-outdrive" craft even if the exclusion for "inboard" watercraft should have been enough by itself to include both inboard and inboard-outdrive craft. Finally, the obvious purpose of the exclusion was to exclude liability for all watercraft, except those specifically covered.

**(2) Insurance Contracts and Coverage § 11--Rules in Aid of Interpretation of Contracts--Interpretation as Question of Law--Coverage as Determined by Policy Language.** --Interpretation of an insurance policy is a question of law. The rules governing policy interpretation require the court to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. Further, words in an insurance policy must be read in their ordinary sense, and any ambiguity cannot be based on a strained interpretation of the policy language.

**(3a) (3b) Insurance Contracts and Coverage § 16--Rules in Aid of Interpretation of Contracts--Interpretation Against Insurer--Exclusions and Exemptions.** --Although insurance policy coverage exclusions are to be strictly construed, the court may not, under the guise of strict construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid. Furthermore, an exclusionary clause cannot be construed in the abstract without regard to its intended function in the policy.

**(4) Insurance Contracts and Coverage § 89--Coverage of Contracts--Homeowners Insurance--Watercraft Exclusion--Ambiguity: Contracts § 30--Construction and Interpretation--Ambiguity.** --A homeowners liability policy exclusion for injury arising from the use of a "watercraft with inboard or inboard-outdrive motor power" was not ambiguous. Therefore, the policy did not cover a woman's injuries arising out of a boating accident involving an inboard-engine, jet pump powered watercraft owned by the insureds. There was no dispute that the craft's engine was located inboard. Additionally, even if the exclusion may have been ambiguous in some factual contexts, it was not ambiguous in this case, since the craft's engine could not reasonably have been viewed as either an inboard or not an inboard motor, depending on the perspective. Language in a contract must be construed in the circumstances of that case and cannot be found to be ambiguous in the abstract. Finally, although the insurer might have promoted clarity by stating specifically that jet pump powered watercraft were excluded, the fact that language could be more explicit does not render it ambiguous. In view of the plain language of the policy, which excluded all watercraft powered by inboard motors, without qualification based on their means of propulsion, the exclusion was not ambiguous. Thus, the principle requiring that ambiguities be resolved against the insurer did not apply.

[See 1 **Witkin**, Summary of Cal. Law (9th ed. 1987) Contracts, § 699.]

**(5) Insurance Contracts and Coverage § 90--Coverage of Contracts--Homeowners Insurance--Persons Insured--Coverage of Wife for Husband's Torts--Community Property Interest--Effect of Severability Clause.** --Where a watercraft exclusion barred coverage for an insured who had injured a woman when the inboard-engine watercraft he was operating collided with her jet ski, the insurer did not have a separate duty

to cover the insured's wife, who was also insured under their homeowners liability policy, based on the wife's liability for her husband's torts under the community property laws. There was no indication in the injured woman's complaint against the insureds that she sought to hold the wife liable on a community property theory, or any other theory not based on ownership or use of the watercraft. Even if the injured woman intended to assert an independent claim against the wife based solely on her community property interest, the insurer was not obligated to cover that claim. The policy excluded injuries arising out of the ownership, maintenance, or use of an inboard watercraft "owned by any insured." The unambiguous intent was to exclude coverage for any insured, even if the liability of that insured did not arise from his or her personal ownership or use of the watercraft. Further, the exclusion applied even though the policy contained a severability clause that provided that the policy applied "separately to each insured." A clause excluding liability for specific conduct should prevail over a more general severability provision, since the purpose of severability clauses is to afford each insured a full measure of coverage up to the policy limits, not to negate bargained-for and plainly worded exclusions.

**(6a) (6b) Insurance Contracts and Coverage § 77--Coverage of Contracts--Liability Insurance--Reasonable Expectation of Coverage--Bodily Injury Caused by Inboard-engine Watercraft--Coverage Under Policy.** --An insurance policy that provided liability coverage for bodily injury or property damage resulting from the ownership, maintenance, or use of "covered watercraft, boat equipment or boat trailers" did not cover a woman's injuries arising out of a boating accident involving an inboard-engine watercraft owned by the insureds. The "covered watercraft" was the insureds' 18-foot water-ski boat, not the watercraft involved in the accident at issue. "Boat equipment" was defined to include dinghies and tenders "used to service" the covered watercraft. It was undisputed that the inboard-engine craft was not being used as a dinghy or tender at the time of the accident. Thus, since the insureds could not reasonably have expected their policy to cover as "boat equipment" watercraft not actually being used to service the covered watercraft at the time of the accident, there clearly was no coverage under the policy. The manifest intended function of the "boat equipment" provision was to provide coverage for equipment, including dinghies and tenders, acquired and used as an integral part of the operation of the covered vessel. Although the inboard-engine craft had occasionally been used with the covered watercraft, its main use was as an independent means of transportation and recreation on a different body of water. Additionally, no separate premium was assessed for boat equipment, supporting the conclusion that coverage was expected by the parties to extend to such equipment only while it was being used with the covered vessel.

**(7) Insurance Contracts and Coverage § 77--Coverage of Contracts--Liability Insurance--Reasonable Expectation of Coverage.** --If an insured could not reasonably expect coverage under a liability policy, the principle requiring construction in favor of coverage where more than one reasonable interpretation is possible does not apply. A party's reasonable expectation of coverage is a question of law, not a question of fact. In determining whether coverage is consistent with an insured's objectively reasonable expectations, the court must interpret the language in context, with regard to its intended function in the policy. The court may also employ common sense. In addition, the court may consider the manner in which premiums are assessed under the policy.

**COUNSEL:** David C. Werner and James B. Abeltin for Plaintiff and Appellant and for Plaintiff, Cross-defendant and Respondent.

Steven W. Murray for Defendant, Cross-complainant and Appellant and for Cross-complainant and Appellant.

Parker & Stanbury, Stephen H. Osborn and Gorman J. DeGrave for Defendant and Respondent.

Sonnenschein, Nath & Rosenthal, Ronald D. Kent and Charles W. Hokanson for Cross-defendant and Respondent.

**JUDGES:** Opinion by Richli, J., with Ramirez, P. J., and Hollenhorst, J., concurring.

**OPINION BY:** RICHLI

**OPINION**

[*1687] [**436] **RICHLI, J.**

Memorie Yessian (Yessian) obtained a judgment against Mr. and Mrs. Joe Harmer for personal injuries sustained in a boating accident involving [***2] the Harmers' Yamaha Waverunner. Yessian sought to enforce her judgment, and to assert claims assigned to her by the Harmers, against two of the Harmers' insurers, California Casualty Insurance Company (CCIC) and Allstate Insurance Co. (Allstate). The lower court granted summary judgment for the insurers, concluding neither CCIC's nor Allstate's policy covered Yessian's injuries. Yessian appeals.

We agree with the lower court that neither policy covered Yessian's claims. CCIC's policy expressly excluded liability arising from the use of a watercraft with

inboard motor power. It was undisputed the Waverunner was a watercraft with an inboard engine. We reject Yessian's argument that because the Waverunner was propelled by a jet pump rather than a propeller, it was not an "inboard motor power watercraft" despite the location of its engine.

Allstate's policy covered the Harmers' 18-foot Donzi water-ski boat, not the Waverunner. Although it also covered dinghies or tenders "used to service" the Donzi, the Waverunner was not being used for that purpose when the accident occurred. We reject Yessian's argument that because the Harmers had used the Waverunner in conjunction with the Donzi [***3] on other occasions, the Waverunner was covered as a dinghy or tender regardless of how it was being used when the accident occurred.

I. FACTUAL AND PROCEDURAL BACKGROUND

Yessian was seriously injured in a collision between a Kawasaki Jet Ski, which she was operating, and the Waverunner, which Mr. Harmer was [*1688] operating and on which Mrs. Harmer was riding. The collision occurred on April 12, 1990, on the Colorado River near Bullhead City, Arizona.

The Harmers were insured by CCIC, Allstate and Northland Insurance Company (Northland). CCIC's policy was a homeowners policy which provided liability coverage up to $ 100,000 but excluded liability arising from the use of a watercraft with inboard or inboard-outdrive motor power. Allstate's policy provided liability coverage for the Donzi, and for watercraft used to service the Donzi, up to $ 300,000. Northland's policy, which the Harmers purchased specifically to cover the Waverunner, provided liability coverage for the Waverunner up to $ 15,000.

CCIC began investigating the accident shortly after it occurred. On January 31, 1991, CCIC advised the Harmers it was denying coverage, based on the watercraft exclusion.

A. [***4] *The Underlying Personal Injury Action*

On April 1, 1991, Yessian sued the Harmers for personal injuries. On April 12, 1991, Yessian's husband, Jerry Yessian, filed a separate action against the Harmers for negligent infliction of emotional distress and loss of consortium. The actions were consolidated. Northland defended the Harmers in both actions.

On July 18, 1991, the Harmers tendered the defense and indemnity of the Yessians' actions to Allstate. On October 4, 1991, Allstate advised the Harmers there was no coverage for the actions, because the Waverunner was not a covered watercraft under the Allstate policy.

Effective October 18, 1991, the Harmers agreed to stipulate to a judgment in favor of Yessian for $ 792,000, and in favor of Mr. Yessian for $ 88,000. The Yessians agreed to [**437] enforce the judgment, except for $ 10,000, only against proceeds from the CCIC and Allstate policies. The Harmers assigned to the Yessians any claims they had against CCIC or Allstate for not defending or indemnifying the Harmers.

On November 15, 1991, CCIC advised the Harmers that if Northland failed to provide a defense to the Yessians' actions, CCIC would do so under a reservation of rights.

[***5] The Yessians and Harmers stipulated to a judgment as they had agreed. The Yessians filed an ex parte application for entry of judgment pursuant to the stipulation. Judge Davis of the lower court signed the judgment and it was filed December 19, 1991.

[*1689] B. *CCIC's Declaratory Relief Action*

On May 31, 1991, while Yessian's personal injury action was pending, CCIC filed a separate action for declaratory relief, naming as defendants the Harmers, Yessian, Northland and Allstate. The present appeals emanate from that action. CCIC sought a declaration that its policy did not cover Yessian's claims, and that Northland's and Allstate's policies did.

On April 16, 1992, Yessian answered CCIC's complaint and filed separate cross-complaints against CCIC and Allstate. [1] On August 4, 1992, Yessian amended the cross-complaints. As amended, each cross-complaint alleged the same seven causes of action: (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) enforcement of the stipulated judgment pursuant to *Insurance Code section 11580, subdivision (b)(2)*; (4) declaratory relief (duty to defend); (5) declaratory relief (duty to indemnify); (6) [***6] breach of contract; and (7) breach of covenant of good faith and fair dealing. Yessian asserted causes of action (1) and (2) as the Harmers' assignee, alleging the insurers breached the policies and acted in bad faith by failing to defend and indemnify the Harmers. Causes of action (4) and (5) sought declarations that the insurers were obligated to defend and indemnify the Harmers. Yessian asserted causes of action (6) and (7) as a third party beneficiary of the policies, alleging the insurers breached the medical payments provisions of the policies, and acted in bad faith, by failing to pay her medical expenses.

1 Mr. Yessian and the Harmers also were listed as cross-complainants. Because those parties did not appeal, we discuss only the claims asserted by Yessian herself.

C. *Summary Judgment for CCIC*

On April 13, 1993, CCIC moved for summary judgment on its declaratory relief complaint and on Yessian's cross-complaint, on the ground CCIC had no duty to indemnify or defend the Harmers. CCIC argued [***7] the Waverunner was a watercraft with inboard motor power and therefore fell within the policy's watercraft exclusion. Yessian argued the Waverunner was not an "inboard motor power watercraft" because it was propelled by a jet pump rather than a propeller. Judge Wade of the lower court ruled the Waverunner was subject to the exclusion, and granted the motion.

D. *Summary Judgment for Allstate*

On February 5, 1992, Allstate moved for summary judgment on CCIC's complaint. Allstate argued its policy expressly covered only the Donzi, not [*1690] the Waverunner. Yessian opposed the motion, arguing there was a triable fact issue whether the Waverunner was covered as a dinghy or tender for the Donzi. Judge Krug of the lower court agreed with Yessian, and denied Allstate's motion. Allstate petitioned for interlocutory review, which we summarily denied.

On September 7, 1993, Allstate made a second motion for summary judgment. Allstate argued that even if the Waverunner had been used as a dinghy or tender to service the Donzi on other occasions, it was not covered because it was not being used in that manner on the day of the accident. Judge Wade agreed and granted Allstate's motion.

[***8] E. *Summary Judgment for Northland*

On April 8, 1993, Northland moved for summary judgment on CCIC's declaratory relief complaint, on the ground there was no actual controversy between CCIC and [**438] Northland because Northland had acknowledged coverage and paid its policy limits. Judge Wade granted the motion.

F. *Matters on Appeal*

Yessian filed separate appeals from the summary judgments for CCIC and Allstate. CCIC separately appealed the summary judgment for Northland. We consolidated the three appeals in view of the common issues of law and fact.

II. DISCUSSION

A. *Yessian vs. CCIC*

1. *Coverage*

a. *Watercraft Exclusion*

**(1a)** CCIC's policy provided the Harmers with liability coverage for accidental bodily injury or property damage to a third party. It excluded, however, liability for injury "arising out of . . . the ownership, maintenance, use, loading or unloading of a watercraft . . . with inboard or inboard-outdrive motor power owned by any insured . . . or powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an insured." The question is whether the Waverunner was a [*1691] watercraft "with inboard [***9] or inboard-outdrive motor power" within the meaning of the exclusion.

The Waverunner was powered by an engine located inside its hull. It was propelled by a jet pump which expelled a stream of water through a nozzle. It was steered by a steering wheel which controlled the direction of the nozzle. It had no drive shaft or propeller. At the time the Harmers purchased the CCIC policy, Waverunners did not exist.

Yessian does not dispute that the Waverunner had an inboard engine. She argues, however, that the exclusion does not apply to all watercraft with inboard engines, but only to those with inboard "*motor power*." She asserts that "inboard motor power" must be interpreted to refer to something more than the location of the engine, or the words "motor power" are superfluous. Specifically, she concludes, an "inboard motor power watercraft" must have not only an inboard motor, but also "a transmission and gears, with a shaft, which is connected through the hull to a propeller, which is supported beneath the hull with a strut. . . . Such a watercraft is steered by use of a rudder . . . ."

**(2)** The Supreme Court recently stated: "Interpretation of an insurance policy is a question [***10] of law. [Citation.] The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." ( *Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal. 4th 1, 18 [44 Cal. Rptr. 2d 370, 900 P.2d 619]*.) In an earlier decision, the court observed that ". . . words in an insurance policy must be read in their ordinary sense, and any ambiguity cannot be based on a strained interpretation of the policy language." (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co. (1986) 41 Cal. 3d 903, 912 [226 Cal. Rptr. 558, 718 P.2d 920]*.)

We would have to disregard these principles to embrace Yessian's interpretation of the watercraft exclusion. **(1b)** The plain meaning of the words "watercraft . . . with inboard . . . motor power," read in their ordinary sense, is "a watercraft powered by an inboard motor." As stated, Yessian concedes the Waverunner was powered by an inboard motor. There can be no dispute the Waverunner was a watercraft. It follows, necessarily, that the Waverunner was a "watercraft . . . with inboard . . . motor power" subject to the exclusion. To imply [***11] an

additional requirement that the Waverunner have a transmission, shaft, propeller and rudder, when the plain words of the policy, read in their ordinary sense, impose no such requirement, we would have to indulge in precisely the kind of strained interpretation the Supreme Court has forbidden us to adopt. **(3a)** Although coverage exclusions are to be strictly construed, " 'we may not, under the guise [*1692] of strict construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid.' " ( *Suarez v. Life Ins. Co. of North America (1988) 206 Cal. App. 3d 1396, 1403* [**439] *[254 Cal. Rptr. 377]*, quoting *Safeco Ins. Co. v. Gilstrap (1983) 141 Cal. App. 3d 524, 532-533 [190 Cal. Rptr. 425]*.)

**(1c)** Contrary to Yessian's assertion, interpretation of the exclusion to apply to all watercraft with inboard engines does not render the words "motor power" surplusage. Those words are necessary to make the language intelligible. If they were eliminated, the policy would exclude "watercraft . . . with inboard or inboard-outdrive owned by any insured," which makes no sense. The fact the words "motor power" were included therefore does not [***12] imply they were intended to impose some requirement in addition to the requirement that the watercraft have an inboard engine.

We also are not persuaded by Yessian's argument that if the reference to watercraft with "inboard . . . motor power" includes any watercraft with an inboard engine, the additional policy language excluding watercraft with "inboard-outdrive motor power" is surplusage. As one of the authorities cited by Yessian indicates, an inboard-outdrive watercraft (also called an "inboard-outboard" craft) does have an engine mounted inboard, that is, inside the hull. However, it differs from an "inboard" watercraft in that the drive unit is outboard, and turns as a unit for steering. ( *Martenson v. Massie (1973) 113 N.H. 18 [304 A.2d 372, 373-374]*.) Thus, the court in *Martenson* held an exclusion covering boats with "inboard motor power" did not apply to a watercraft powered by an inboard-outboard motor. (*Id., at p. 374*.)

Although there is also later authority holding an exclusion for "inboard motor power" watercraft *does* apply to inboard-outdrive craft ( *Green v. Merrill (1975) 293 Ala. 628, 632 [308 So.2d 702, 704-705]*), in view of the conflicting [***13] authority, CCIC was well advised to refer specifically to "inboard-outdrive" craft even if the exclusion for "inboard" watercraft should have been enough by itself to include both inboard and inboard-outdrive craft. It cannot reasonably be inferred, therefore, that because the exclusion referred to both types of watercraft, the reference to "inboard motor power" watercraft was intended to mean something other than a watercraft powered by an inboard motor. Certainly, there is no basis for inferring an intent to exclude *only* watercraft having a transmission, drive shaft, propeller and rudder, as Yessian would have us do.

Yessian focuses on language from *Martenson v. Massie, supra*, in which the court stated: "The inboard motor is usually located about a third of the way up from the stern toward the bow and supplies power to the propeller [*1693] through a transmission and a propeller shaft which runs through the bottom of the boat and is supported by a strut. Steering is by a separate rudder." (*304 A.2d at p. 373*.) *Martenson*, however, involved a propeller-driven boat, not one powered by a jet pump. The context of the court's discussion therefore assumed all three [***14] of the types of watercraft it described--inboard, inboard-outboard and outboard--were powered by propellers. We do not infer an intent to hold that a watercraft which has an inboard engine but not a propeller does not have "inboard motor power."

Indeed, in describing the various arrangements, the *Martenson* court began by observing that "there are three types of motors for boats." (*304 A.2d at p. 373*.) It then described each type in terms of engine location and arrangement of drive shaft and propeller. Under Yessian's reading of the decision, because a Waverunner has no drive shaft or propeller, it cannot be considered a "boat" powered by a "motor" at all. We decline to adopt a construction so at odds with the ordinary meaning of the words used. (See *74 Ops.Cal.Atty.Gen. 174, 176 (1991)* [jet pump powered personal watercraft is a "boat" for purposes of Harbors and Navigation Code].)

**(3b)** Furthermore, an exclusionary clause cannot be construed "in the abstract, without regard to its intended function in the policy." (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co., supra, 41 Cal. 3d at p. 916*.) **(1d)** The exclusion here was carefully drawn to exclude inboard, in-board-outdrive, [***15] and outboard motor power craft, except those with outboard motors of 25 horsepower or less. The obvious purpose of the exclusion was to exclude liability for *all* watercraft, except those specifically covered.

[**440] **(4)** Yessian also cites *Lantier v. Aetna Cas. & Sur. Co. (La.Ct.App. 1993) 614 So.2d 1346*, in which the court held a provision which, like CCIC's, excluded watercraft "with inboard or inboard-outdrive motor power" was ambiguous. In *Lantier*, however, the watercraft was an airboat with a motor which was *within* the spatial boundaries of the hull when viewed from above but *above* the hull when viewed from the sides, front or rear. The court held the exclusion reasonably could be construed either to cover or not to cover such a watercraft, because the engine could be considered to be located either inboard or not inboard, depending on the viewer's perspective. Therefore, finding the exclusion

ambiguous, the court construed the policy to provide coverage. ( *Id., at p. 1355.*)

Here, as stated, there is no dispute the Waverunner's engine was located inboard. Thus, *Lantier* does not support Yessian's position. In fact, by focusing exclusively on the physical location [***16] of the engine, and not on the means of propulsion, *Lantier* actually undermines Yessian's argument that engine location by itself is not determinative.

[*1694] Additionally, even if we assume the exclusion may be ambiguous in some factual contexts, it does not follow it is ambiguous in all contexts. To the contrary, "language in a contract must be construed . . . in the circumstances of that case, and cannot be found to be ambiguous in the abstract." (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co., supra, 41 Cal. 3d 903, 916, fn. 7.*) Thus, in *Castro v. Fireman's Fund American Life Ins. Co. (1988) 206 Cal. App. 3d 1114 [253 Cal. Rptr. 833]*, the court stated: "Plaintiff argues that because other courts have found similar exclusions to be ambiguous, . . . therefore more than one reasonable interpretation must exist. We fail to see the logic of the argument as presented. [P] Disagreement concerning the meaning of a phrase does not automatically make the policy ambiguous." ( *Id., at p. 1120.*)

Here, unlike the situation in *Lantier*, the Waverunner's engine could not reasonably be viewed as either an inboard or not an inboard motor, depending on the [***17] perspective. Consequently, the exclusion was not ambiguous in this case, notwithstanding *Lantier's* finding of ambiguity on the facts present there.

Finally, we are not persuaded by Yessian's argument that if it wanted to exclude jet pump powered watercraft, CCIC should have updated its policy to refer to them specifically when they became available. In *State Farm Fire & Cas. Co. v. Johnson (Fla.Dist.Ct.App. 1992) 596 So.2d 1162*, the court held an exclusion of liability for injury arising from the use of a "jet ski or similar type of craft," applied to a Waverunner even though it differed somewhat from a Jet Ski. Noting that when the policy was written only Jet Skis and not Waverunners were in existence, the court rejected the assertion the insurer should have amended the policy to exclude "personal watercraft," a term broad enough to include Waverunners. ( *Id., at pp. 1162-1164.*)

Although it might have promoted clarity in CCIC's policy to state specifically that jet pump powered watercraft were excluded, ". . . the fact that language could be more explicit does not render it ambiguous." ( *Suarez v. Life Ins. Co. of North America, supra, 206 Cal. App. 3d 1396,* [***18] *1406.*) In view of the plain language of the policy, which excluded all watercraft powered by inboard motors, without qualification based on their means of propulsion, the exclusion was not ambiguous. Accordingly, the principle on which Yessian relies, requiring that ambiguities be resolved against the insurer, does not apply. ( *Bank of the West v. Superior Court (1992) 2 Cal. 4th 1254, 1265 [10 Cal. Rptr. 2d 538, 833 P.2d 545].*) [*1695]

b., c. *

* See footnote, *ante*, page 1682.

d. *Mrs. Harmer's Community Property Interest*

**(5)** Yessian asserts that even if the watercraft exclusion barred coverage for Mr. Harmer, CCIC had a separate duty to cover Mrs. Harmer, who also was insured under the policy. Yessian points out that Mrs. Harmer's interest in the Harmers' community property was liable for any judgment [**441] against Mr. Harmer under former *Civil Code sections 5120.110* and *5122* (see now, *Fam. Code, § 910, 1000*). Consequently, Yessian concludes, Mrs. Harmer faced potential liability [***19] which was not subject to the exclusion, because it was based not on her ownership or use of the Waverunner, but on her liability for Mr. Harmer's torts under the community property laws.

There is no indication in Yessian's complaint against the Harmers that she sought to hold Mrs. Harmer liable on this community property theory, or any other theory not based on ownership or use of the Waverunner. The complaint alleged that both Harmers owned the Waverunner, and that each of them was operating and directing it at the time of the accident. It also alleged that the Harmers were in joint possession and control of the Waverunner at that time. Mr. Yessian's complaint made the same allegations.

Even if we assume Yessian intended to assert an independent claim against Mrs. Harmer based solely on her community property interest, we cannot conclude CCIC was obligated to cover that claim. The only California case which, to our knowledge, has considered whether an insured's community property interest can provide an independent basis for coverage has rejected the proposition. In *Hartford Fire Ins. Co.* v. *Superior Court (1983) 142 Cal. App. 3d 406 [191 Cal. Rptr. 37]*, a homeowners [***20] general liability policy issued to a husband and wife excluded liability arising from ownership, maintenance, operation or use of any aircraft. The husband was killed when the plane he was flying crashed with four passengers aboard. The wife was not in the plane. The passengers filed actions against the wife, individually and as the representative of the husband's estate, for injuries sustained in the crash. All of the husband's and wife's community property was placed in probate, and the passengers claimed against that property.

The wife sought a determination she was entitled to a defense under the policy, arguing that " 'any judgment rendered in the tort case is enforceable against her community property, as a proximate result of her "act" of [*1696] marrying Thomas F. Tobin, not of using an aircraft.' " (*142 Cal. App. 3d at p. 411.*) The court held the insurer had no duty to defend the wife, stating: "Any potential liability on her part in this case could only have arisen out of the aircraft operations . . . . The relationship or marital status of the Tobins gave rise to no independently insurable event which would place this case beyond the aircraft exclusions in the policies." [***21] ( *Id., at p. 416.*)

*Hartford* is consistent with other California decisions finding no coverage where the act causing injury falls within an exclusion, even though the party seeking coverage did not participate in the act and is sought to be held liable only vicariously or for negligent supervision. In *Fire Ins. Exchange v. Altieri (1991) 235 Cal. App. 3d 1352 [1 Cal. Rptr. 2d 360]*, the court held a homeowners policy provided no coverage to parents whose son injured a schoolmate in a fight. The court stated, "where, as here, the policy excludes coverage for bodily injury intended or expected by 'an' or 'any' insured, the cases have uniformly denied coverage for all claims, including negligent supervision claims." ( *Id., at p. 1361.*) Consequently, the parents were not covered even though liability against *them* was not based on any intentional act of *theirs*. (*Ibid.*) The court distinguished cases involving exclusions for intentional acts of "*the* insured," where it was possible to conclude the exclusion only barred coverage for the specific insured who committed the intentional act. ( *Id., at pp. 1360-1361.*)

*Altieri* was followed in *Western Mutual* [***22] *Ins. Co.* v. *Yamamoto (1994) 29 Cal. App. 4th 1474, 1486 [35 Cal. Rptr. 2d 698]*, in which the court found no coverage under a homeowners policy for parents whose son used his father's gun to shoot a third party. Again, the policy excluded injuries intended by "an insured." ( *Id., at p. 1481.*)

The CCIC policy excluded injuries arising out of the ownership, maintenance or use of an inboard watercraft "owned by any insured." The unambiguous intent is to exclude coverage for *any* insured, even if liability of that insured does not arise from his or her personal ownership or use of the watercraft.

[**442] Yessian points out the CCIC policy contained a severability clause which provided that the policy applied "separately to each insured." She cites *Worcester Mut. Ins. Co. v. Marnell (1986) 398 Mass. 240 [496 N.E.2d 158]*, *Northwestern Nat. Ins. Co.* v. *Nemetz (1986) 135 Wis.2d 245 [400 N.W.2d 33]* and *American Nat. Fire Ins. v. Fournelle Est. (Minn. 1991) 472 N.W.2d 292*. In each of those cases, the court held the existence of a severability clause required a finding of coverage for a coinsured who did not personally commit the act giving rise to liability, despite [***23] the policy's exclusion of [*1697] liability based on such an act if committed by "any insured" (*Worcester, American Nat.*) or "an insured" (*Northwestern*). The courts reasoned that a severability clause requires each insured be treated as having a separate insurance policy, so that the term "insured" in the exclusion must be interpreted to mean only the person claiming coverage. If liability against that person is not based on an excluded act committed by that person, he or she is covered. (See, e.g., *Worcester, supra, 398 Mass. at p. 244 [496 N.E.2d at p. 161]*.)

It is not clear from *Hartford Fire Ins. Co.* v. *Superior Court, supra, 142 Cal. App. 3d 406, Fire Ins. Exchange v. Altieri, supra, 235 Cal. App. 3d 1352*, or *Western Mutual Ins. Co.* v. *Yamamoto, supra, 29 Cal. App. 4th 1474*, whether the policies in those cases contained severability clauses. There appear to be no California decisions considering whether an exclusion based on the act of "an insured" precludes coverage of a different insured where there is a severability clause. However, we conclude the exclusion should apply.

First, the cases cited by Yessian represent [***24] only one view. Later cases from other jurisdictions have reached the opposite conclusion. (See discussion of conflicting authority in *Thoele v. Aetna Cas. & Sur. (7th Cir. 1994) 39 F.3d 724, 727-728, fn. 1.*) In *Northwest G.F. Mut. Ins. Co. v. Norgard (N.D. 1994) 518 N.W.2d 179, 183-184*, for example, the court held an exclusion for liability based on sexual molestation by "an insured" barred coverage of a wife for liability based on her husband's molestation of a child, even though the wife had no involvement in the molestation and notwithstanding a severability clause. Similarly, in *Chacon v. American Family Mut. Ins. Co. (Colo. 1990) 788 P.2d 748, 752*, the court held an exclusion for intentional conduct of "any insured" barred coverage of parents for their son's vandalism, despite a severability clause.

We find these decisions more persuasive than those on which Yessian relies. The court in *Norgard* acknowledged but rejected all three of Yessian's authorities. (*518 N.W.2d at p. 182.*) It reasoned that a clause excluding liability for specific conduct should prevail over a more general severability provision. It also noted the purpose of severability clauses is to afford [***25] each insured a full measure of coverage up to the policy limits, not to negate bargained-for and plainly worded exclusions. ( *Id., at p. 183.*)

We reach the same conclusion, at least in the context of this case, in which coverage is urged on the basis of

the community property laws. Indeed, acceptance of Yessian's position would effectively nullify exclusions from coverage in any case involving married co-insureds and a policy with a [*1698] severability provision. A spouse could always demand a defense based on potential liability of his or her community property interest, regardless of whether the act giving rise to the liability was excluded. A spouse could make that demand even where, as here, he or she was expressly alleged to have participated in the tortious act. It is inconceivable that parties to a policy would include clauses specifically excluding coverage for claims based on certain types of conduct, but intend those exclusions to have no effect in any case involving claims against coinsured spouses.

2. *Duty to Defend* *

* See footnote, *ante*, page 1682.

[***26] B. *Yessian vs. Allstate*

1. *Coverage*

**(6a)** The Allstate policy provided liability coverage for bodily injury or property damage resulting from the ownership, maintenance or use of "covered watercraft, boat equipment or boat trailers." The "covered [**443] watercraft" was the Donzi. "Boat equipment" was defined to include dinghies and tenders "used to service" the covered watercraft.

The Harmers kept the Waverunner at their condominium in Bullhead City, Arizona, on the Colorado River. They regularly visited the condominium about 32 weekends a year. They took the Waverunner onto the Colorado River on most of their visits.

The Harmers kept the Donzi at a dock on Lake Mojave, five miles away from their condominium. Although they took the Waverunner to Lake Mojave on occasion, they took it there "less often" than they took it to the Colorado River. One of the purposes for which the Harmers purchased the Waverunner was to use it to travel between the Donzi and the shore. On occasion, when they took the Donzi to an island in the middle of Lake Mojave, they used the Waverunner to go between the island and the shore. They also used the Waverunner to carry water skiers to the Donzi instead [***27] of taking the Donzi to the shore to pick up the skiers.

As of June 1993, Mr. Harmer had taken the Donzi on the Colorado River only one time, in 1988, before the Harmers bought the Waverunner. He had used the Waverunner to carry water skiers to and from the Donzi only four or five times. Up until the time of the accident, he had used the Waverunner as a dinghy or tender on approximately two occasions. Mr. Harmer had [*1699] never put the Waverunner on the Donzi and could not recall whether he had ever tied it to the Donzi.

Based on the above facts, Allstate made its second motion for summary judgment. It argued that because the Waverunner was not being "used to service" the Donzi when the accident occurred, there was no coverage. The lower court agreed and granted Allstate's motion.

Yessian does not dispute that the Harmers' use of the Waverunner on April 12, 1990, "was completely independent of the Donzi." However, she argues the court erred in interpreting the policy provision requiring a dinghy or tender to be "used to service" the covered watercraft to require it to be used for that purpose *at the time of the accident.* The parties agree the proper interpretation of [***28] the policy is a question of law.

a. *Policy Interpretation*

As discussed previously, we are required to give language in an insurance policy "its plain meaning or the meaning a layperson would ordinarily attach to it." ( *Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal. 4th 1, 18.*) In the sense in which the term was used in the policy, a "dinghy" means a small boat used as a tender for a larger boat. (Webster's Third New Internat. Dict. (1964) p. 635.) A "tender" is defined as "a boat or small steamer for communication between shore and a larger vessel." (*Id.*, at p. 2355.)

Thus, a dinghy or tender, *by definition*, is a boat used to service another watercraft. Consequently, it would be redundant to speak of a dinghy or tender "used to service your watercraft" if the phrase meant only that *at some time* the smaller vessel was used to service the larger one. If the smaller craft were not used *at some time* to service the larger one, it would not qualify as a dinghy or tender at all. The requirement that the dinghy or tender be "used to service" the covered watercraft therefore must be read to impose a requirement *in addition* to the requirement that [***29] the smaller craft be used to service the larger vessel frequently enough to qualify as a "dinghy" or "tender" at all.

The most reasonable interpretation is that the policy was intended to require the smaller craft be used as a dinghy or tender routinely, as its sole or at least principal function. But we need not go that far to resolve this case. Instead, we need only conclude that the dinghy or tender must have been serving that function at the time of the event giving rise to liability. As it is undisputed the Waverunner was not being used for that purpose on April 12, 1990, there clearly was no coverage if the policy is interpreted in this manner.

[*1700] We conclude such an interpretation is required. First, even assuming the words "used to service your watercraft" reasonably [**444] can be interpreted more than one way, we must interpret them in accordance with the " 'objectively reasonable expectations of

the insured.' " ( *Bank of the West v. Superior Court, supra, 2 Cal. 4th 1254, 1265.*) **(7)** If an insured could not reasonably expect coverage, the principle requiring construction in favor of coverage where more than one reasonable interpretation is possible does not apply. [***30] (*Ibid.*; *Cooper Companies v. Transcontinental Ins. Co. (1995) 31 Cal. App. 4th 1094, 1106 [37 Cal. Rptr. 2d 508].*) "A party's reasonable expectation of coverage is a question of law not a question of fact." ( *Suarez v. Life Ins. Co. of North America, supra, 206 Cal. App. 3d 1396, 1406.*)

In determining whether coverage is consistent with an insured's objectively reasonable expectations, "the court must interpret the language in context, with regard to its intended function in the policy." ( *Bank of the West v. Superior Court, supra, 2 Cal. 4th at p. 1265.*) The court "may also employ 'common sense.' " ( *Cooper Companies v. Transcontinental Ins. Co., supra, 31 Cal. App. 4th at p. 1106*, quoting *Bank of the West, supra, at p. 1276.*) In addition, the court may consider the manner in which premiums are assessed under the policy. (*31 Cal. App. 4th at p. 1108.*)

In *Cooper Companies, supra*, the court applied these principles to interpret two policies which provided liability coverage for companies "hereafter acquired" by the insured company. The issue was whether the policies covered companies acquired *after* the policies expired. Although [***31] the court found the language was ambiguous, it concluded an insured could have an objectively reasonable expectation of coverage only for companies acquired during the policy period. (*31 Cal. App. 4th at p. 1106.*) The court reasoned the "finite policy period" set forth in the policies was necessary "both to circumscribe the time in which an insurable event may occur and to provide a time for auditing for purposes of fixing premiums." ( *Id., at p. 1107.*) Because premiums were based on gross sales of the acquired companies at the end of the policy period, there was no way to assess premiums for companies acquired after the policies expired. ( *Id., at p. 1108.*)

**(6b)** Applying a similar analysis here, we conclude the Harmers could not reasonably expect their Allstate policy to cover as "boat equipment" watercraft not actually being used to service the Donzi at the time of the event causing liability. A contrary interpretation would mean Allstate would be required to cover, for the entire term of the policy, any smaller craft which had *ever* been used to service the Donzi on any occasion. The Harmers could obtain coverage for an unlimited number of smaller craft, [*1701] simply [***32] by using each of those craft in conjunction with the Donzi *at some time.* The court in *Cooper Companies, supra*, noted construing a contract to confer a right in perpetuity is disfavored. (*31 Cal. App. 4th at p. 1103.*) Similarly, we think it would be improper to interpret a policy written to cover a specific vessel and its attendant smaller craft to confer coverage for an unlimited number of smaller craft, even while they are being used independently of the covered vessel.

The manifest "intended function in the policy" ( *Bank of the West v. Superior Court, supra, 2 Cal. 4th at p. 1265*) of the "boat equipment" provision was to provide coverage for equipment, including dinghies and tenders, acquired and used as an integral part of the operation of the covered vessel. Although the Waverunner could be, and occasionally had been, used with the Donzi, its main use was as an independent means of transportation and recreation on a different body of water. Additionally, no separate premium was assessed for boat equipment, supporting the conclusion that coverage was expected by the parties to extend to such equipment only while it was being used with the covered vessel.

[***33] Yessian argues that because the policy covered liability arising from the "ownership, maintenance, *or* use" of boat equipment (italics added), coverage existed for liability based on the Harmers' ownership of the Waverunner regardless of its use. That argument is at odds with the policy language. [**445] The policy *defines* "boat equipment" to include dinghies and tenders "used to service your watercraft." Accordingly, a dinghy or tender which is not being used for that purpose is not "boat equipment" and liability based on the ownership of it is not covered.

Yessian asserts that under *American Star Ins. Co.* v. *Insurance Co. of the West (1991) 232 Cal. App. 3d 1320 [284 Cal. Rptr. 45]*, once the Waverunner fell within the classification of "boat equipment," its actual use on the day of the accident was irrelevant. We do not read the case that way. In *American Star*, the policy excluded an "auto" but covered a vehicle "designed for use principally off public roads." The court held this definition covered a water truck, even though the truck was being used *on* a public road when it caused an accident. The court noted the truck was normally used off road, was not licensed [***34] for road use, and was geared so that it could not exceed 25 miles per hour. It concluded that "[t]he 'intended' or 'designed' use of the water truck was for 'off public roads.' " ( *Id., at p. 1328.*)

The differences between *American Star* and this case are readily apparent. Most importantly, in *American Star*, the policy language expressly focused [*1702] on whether a vehicle was "*designed*" for use principally off road. It did not address the *actual* use of the vehicle at all. Here, conversely, the policy expressly required that a dinghy be "*used*" to service the covered craft. It did not refer to the use for which the dinghy was "designed." Accordingly, although the actual use of the vehicle was

not determinative of the coverage question in *American Star*, it does not follow that it should not be determinative here.

Additionally, in *American Star* the vehicle was "normally" used off road, and, in fact, was not even licensed or suitable for road use. In contrast, there is no claim here that the Waverunner was "normally" used as a dinghy for the Donzi, or that it was not suitable for any other use. As stated earlier, the record established that in [***35] a period of three years after they purchased the Waverunner, the Harmers had used it independently of the Donzi approximately thirty-two weekends a year, but had used it as a tender for the Donzi only four or five times.

b., c. *

* See footnote, *ante*, page 1682.

2., 3. *

* See footnote, *ante*, page 1682.

C.-E. *

* See footnote, *ante*, page 1682.

III. DISPOSITION

The judgments are affirmed.

Ramirez, P. J., and Hollenhorst, J., concurred.