# TAB 21

**INSTITUTE OF ATHLETIC MOTIVATION, Plaintiff and Appellant, v. UNIVERSITY OF ILLINOIS et al., Defendants and Respondents**

**Civ. No. 45057**

**Court of Appeal of California, First Appellate District, Division One**

***114 Cal. App. 3d 1*; *170 Cal. Rptr. 411*; *1980 Cal. App. LEXIS 2612***

**December 29, 1980**

**SUBSEQUENT HISTORY:** [***1] A petition for a rehearing was denied January 26, 1981, and appellant's petition for a hearing by the Supreme Court was denied February 25, 1982.

**PRIOR HISTORY:** Superior Court of Santa Clara County, No. 330236, George H. Barnett, Judge.

**DISPOSITION:** Insofar as the trial court by its instructions left to the jury the legal question as to whether a privileged occasion existed, that was arguable error, [5] but that error could hardly operate to plaintiff's detriment. Viewing the instructions as constituting in effect, a determination by the trial court that a privileged occasion did exist, we find no error. [6] And plaintiff is in no position to complain of the instructions which the court gave to the jury concerning malice, since the only instructions given on that topic were those which plaintiff proposed. [7] The judgment is affirmed.

5 Ordinarily, the existence of the privilege is a legal question for the court. ( *Kramer v. Ferguson (1964) 230 Cal.App.2d 237, 245 [41 Cal.Rptr. 61]*; *Gantry Constr. Co. v. American Pipe & Constr. Co. (1975) 49 Cal.App.3d 186, 197 [122 Cal.Rptr. 834]*; *Field Research Corp. v. Patrick (1973) 30 Cal.App.3d 603, 609 [106 Cal.Rptr. 473]*.) While the jury may be required to determine disputed facts relating to the existence of the privilege, it is for the court to decide whether the facts found by the jury made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged. (*Rest.2d Torts, § 619, com. a.*) Here, since the court did not do that, we regard the issue on appeal as whether there existed a privilege as a matter of law.

[***2]

6 We do not mean to suggest approval of the court's privilege instructions as exemplars. Indeed, as our opinion indicates, qualifications would have been appropriate. But where the instruction states the law correctly and is "'deficient merely by reason of generality,'" a party may not complain of its lack of completeness unless he requested an additional or qualifying instruction. ( *Agarwal* v. *Johnson, supra*, 25 Cal.3d 932, 948-949.)

7 Plaintiff complains that the court misled the jury by responding to a request for clarification by rereading all relevant instructions. We find no reversible error.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A corporation founded by two clinical psychologists to develop and market a questionnaire administered to coaches and athletes purporting to identify certain personality traits predictive of athletic success brought an action for defamation against a university and one of its professors. Plaintiffs alleged they had been defamed by a four-page letter critical of them which had been sent to numerous professional athletic organizations and to several sports magazines. One of the organization recipients of the letter republished in its periodical and sent it to basketball coaches throughout the United States. Defendant claimed his sole motivation in writing the letter was to inform "interested parties" about the

unreliability of plaintiffs' institute and its potential for abuse. At the conclusion of the trial the trial court ruled that the letter was defamatory as a matter of law, and the case went to the jury on the defenses of truth and privilege. The trial court instructed the jury on the privilege for communication to interested persons under *Civ. Code, § 47, subd. 3*. The jury returned a general verdict for defendants. (Superior Court of Santa Clara County, No. 330236, George H. Barnett, Judge.)

The Court of Appeal affirmed. The court held the scope of the privilege under *Civ. Code, § 47, subd. 3*, is not capable of precise or categorical definition, and that its application in a particular case depends on an evaluation of the competing interests which defamation law and the privilege are designed to serve. Insofar as the trial court by its instructions left to the jury the legal question as to whether a privileged occasion existed, the court held that it was arguable error, but the error was not detrimental to plaintiff, and viewing the instructions as constituting a determination by the trial court that a privileged occasion did exist, there was no error. (Opinion by Grodin, J., with Elkington, Acting P. J., and Newsom, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Libel and Slander § 50--Actions--Trial, Judgment, New Trial and Appeal--Province of Court and Jury--Fact and Opinion.** --Whether an allegedly defamatory statement constitutes fact or opinion is a question of law to be determined in light of the nature and content of the communication taken as a whole.

**(2) Libel and Slander § 2--Definitions and Distinctions--Communication to Interested Persons--Fair Comment.** --While at common law the privilege for communication to interested persons and the privilege of fair comment were distinct, fair comment being limited to assertions of opinion rather than fact, the two privileges are fused under the statutory privilege accorded by *Civ. Code, § 47, subd. 3*. Insofar as the privilege of fair comment protects only statements of opinion, as distinguished from assertions of fact, it is redundant in light of constitutional principles precluding defamation liability for the expression of opinion. However, the fair comment privilege has been extended so that, where malice is disproved, the privilege applies not only to comment (opinions) but to false statements of fact as well.

**(3) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons.** --The scope of the privilege for communication to interested persons under *Civ. Code, § 47, subd. 3*, is not capable of precise or categorical definition, and its application in a particular case depends on an evaluation of the competing interests which defamation law and the privilege are designed to serve. Determination that a privilege exists does not provide carte blanche for reckless or improperly motivated attacks on people's reputations. The occasion for the privilege may be abused and the protection of the privilege lost by the publisher's lack of belief, or of reasonable grounds for belief, in the truth of the defamatory matter, by excessive publication, by a publication of defamatory matter for an improper purpose, or if the defamation goes beyond the group interest

**(4a) (4b) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons.** --In a defamation action by an institute founded by two psychologists to develop and market a questionnaire purporting to identify personality traits predictive of athletic success, against a university and a professor who wrote a four-page letter critical of the questionnaire which was sent to numerous professional athletic organizations and to several sports magazines asserting that plaintiff were unwilling or unable to provide any evidence their questionnaire was reliable or valid, the trial court properly instructed the jury on the privilege for communication to interested persons under *Civ. Code, § 47, subd. 3*, where the persons to whom the publication was directed had a potential interest in the subject matter which went beyond general or idle curiosity, where plaintiffs could reasonably be expected to have adequate opportunity for response, where the subject matter of the communication did not involve some private aspect of individual or corporate life, and where the professor, in that capacity and as a student of sport psychology, was one who stood in such a relation to the persons interested as to afford reasonable ground for supposing the motive for his communication to be innocent. However, insofar as the instructions left to the jury the legal question as to whether a privileged occasion existed, there was arguable

error, but the error was not detrimental to plaintiff.

**(5) Libel and Slander § 50--Actions--Province of Court and Jury--Privilege.** --In defamation actions, the trial court, in determining whether there exists an occasion for privilege, has to deal with the law of general averages based on human experience and must shape a general policy to deal with a general problem. On the other hand, in the question of abuse of privilege, the problem is one of particulars.

**COUNSEL:** Beauzay, Hammer, Ezgar, Bledsoe & Rucka, W. Robert Morgan and Morgan, Zazueta, Morgan, Towery, Morgan & Spector for Plaintiff and Appellant.

Ropers, Majeski, Kohn, Bentley & Wagner, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Michael J. Brady and Mark G. Bonino for Defendants and Respondents.

**JUDGES:** Opinion by Grodin, J., with Elkington, Acting P. J., and Newsom, J., concurring.

**OPINION BY:** GRODIN

**OPINION**

[*4] [**412] In this action for defamation the jury returned a general verdict for defendants and plaintiff appeals, asserting instructional error. The [***3] principal issue presented concerns the scope of privilege for communication to interested persons under *Civil Code section 47*, *subdivision 3*. Finding no error warranting reversal, we affirm.

Plaintiff Institute of Athletic Motivation is a corporation founded in the late 1960's by two clinical psychologists, Bruce Ogilvie and Thomas Tutko, to develop and market what they termed an "Athletic Motivation Inventory" (AMI). The AMI, in the form of a questionnaire, is administered to coaches and athletes and purports to identify certain personality traits predictive of athletic success. It was the first "sports-specific" psychological test to be developed, and has been widely used by high schools, colleges, and private and professional athletic organizations.

Defendant Rainer Martens is a professor of physical education at the University of Illinois with a Ph.D. in sports psychology. He has himself published extensively on the subject of sports psychology and scientific [**413] research methodology. On January 10, 1975, Professor Martens wrote a four-page letter critical of the AMI which he sent to numerous professional athletic organizations and to several sports magazines. The [***4] letter asserted, among other things, that while Ogilvie and Tutko "frequently claimed to have supportive evidence" for the AMI, "surprisingly they have been unwilling or unable to provide any evidence that AMI . . . is reliable or valid." To offer on a commercial basis a psychological test that does not have "extensive public documentation of its reliability and validity" is, the letter claimed, an "unethical practice" according to standards of the American Psychological Association; and "[to] infer a cause and effect relationship on the basis of correlational evidence" was "an error only the novice graduate student would make." Use of the AMI by coaches was asserted to be a matter of concern "because incorrect diagnoses and prognoses may be detrimental to the athlete and coach," and "because Ogilvie and Tutko have failed to adhere to scientific protocol and ethical behavior for psychologists," leading coaches and athletes to be "deceived under the auspices [*sic*] that scientific evidence provides the basis for their diagnoses and prognoses." The letter called upon "the various sport organizations who directly work with coaches and athletes [to] initiate action to expose the [***5] AMI" by "[informing] their constituents of the potential harm that can result from [*5] unproven psychological testing. If nothing else, it is un unjustified expense."

One of the organizational recipients of the letter, the National Basketball Coaches Association, republished the letter in its periodical, "Basketball Bulletin," which is sent to basketball coaches throughout the United States. So far as appears from the record, none of the other recipients republished or made public use of its contents.

Plaintiff sued both Martens and the University of Illinois (the latter on a theory of respondeat superior), claiming that the letter contained false and defamatory statements. At trial, plaintiff sought to establish that studies confirming the reliability and validity of the AMI did in fact exist, that Martens knew or should have known of their existence at the time he sent the letter, and that Martens ignored evidence of their existence which plaintiff sent him in an effort to obtain retraction. Plaintiff also sought to convince the jury that Martens acted with ulterior or selfish motives in sending the letter, and in that regard introduced evidence to show that in the

[***6] same month he sent the letter he published a book on the subject of sports psychology, and two years later published his own, competing, sports inventory test. Martens, on the other hand, claimed that he reached his conclusion as to the unreliability of the AMI only after extensive research, consultation with other experts, and unproductive requests for information from persons connected with plaintiff; and that his sole motivation in writing the letter was to inform "interested" parties about the unreliability of the AMI and its potential for abuse.

**(1)** (See fn. 1.) At the conclusion of trial, the court ruled that the letter was defamatory as a matter of law "in that it has a tendency to affect the integrity and business reputation of the plaintiff," [1] and that [*6] the University of Illinois was responsible for its publication through ratification. Accordingly, the case [**414] went to the jury on the defenses, asserted by both defendants, of truth and privilege.

1 If Martens' letter were viewed as containing only an expression of his opinion concerning the statistical accuracy or sufficiency of particular studies proffered in support of the AMI, then of course the communication would be immune from liability on the principle that "[under] the First Amendment there is no such thing as a false idea." ( *Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 339 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997]*; *Gregory v. McDonnell Douglas Corp. (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425]*.) Respondents do not contend for that proposition, however, and the letter's assertion that Ogilvie and Tutko were unwilling or unable to provide "any evidence" of reliability or validity could reasonably be understood, and was arguably intended, as meaning not simply that particular studies were inadequate but that there were no studies at all. Whether an allegedly defamatory statement constitutes fact or opinion is a question of law, to be determined in light of the nature and content of the communication taken as a whole. ( *Gregory v. McDonnell Douglas Corp., supra, at p. 601*.)

[***7] On the issue of privilege, defendants submitted various instructions based upon *Civil Code section 47, subdivision 3* and the case law under that section. [2] Initially, plaintiff proposed a supplementary instruction to the effect that "[a] common interest in the subject matter must be demonstrated between the person communicating and the person reading the communication before this privilege is established." Later, however, plaintiff withdrew all requests for instructions relating to privilege, contending that the defense of privilege "does not exist in a situation like this." The trial court nevertheless gave the instructions on privilege proposed by defendants, with certain modifications, and it is these instructions which constitute the principal focus of plaintiff's appellate attack. [3] Jury instructions regarding the existence of a qualified privilege, plaintiff argues, should have been refused as a matter of law.

2 Defendants do not contend that plaintiff is a "public figure" within the meaning of federal constitutional doctrine ( *New York Times Co. v. Sullivan (1964) 376 U.S. 254 [11 L.Ed. 686, 84 S.Ct. 710, 95 A.L.R.2D 1412]*; *Curtis Publishing Co. v. Butts (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]*; *Gertz v. Robert Welch, Inc., supra, 418 U.S. 323*), and the jury was not instructed under that doctrine. In *Vegod Corp. v. American Broadcasting Companies, Inc. (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14]*, the California Supreme Court held that a corporation does not become a public figure subject to the *New York Times* rule simply because it sells goods to the public and advertises the sale: "While availability of goods for sale and their quality are matters of public interest, this is not the test." ( *Id., at p. 769*.) The court expressed no view, however, as to whether the statements in that case were privileged under California law. ( *Id., at p. 770, fn. 1*.)

Recent case law suggests that even private individuals suing for defamation may be precluded from recovery as a matter of constitutional doctrine, and apart from any privilege, unless it can be shown that the defendant was negligent in failing to ascertain the falsity or defamatory character of the publication. *Gertz* declared that states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehoods injurious to a private individual "so long as they do not impose liability without fault" (*418 U.S. at p. 347 [41 L.Ed.2d at p. 809]*), and while *Gertz* involved media defendants some

courts have found the principle applicable to nonmedia defendants as well. (E.g., *Jacron Sales Corp., Inc. v. Sindorf (1976) 276 Md. 580 [350 A.2d 688, 697]*; *Sewell v. Brookbank (1978) 119 Ariz. 422 [581 P.2d 267].*) This is also the Restatement view. (*Rest.2d Torts, § 580B, com. e.* But cf. *Wheeler v. Green (1979) 286 Ore. 99 [593 P.2d 777]*; *Calero v. Del Chemical Corp. (1975) 68 Wis.2d 487 [228 N.W.2d 737]*; Shiffrin, *Defamatory Non-Media Speech and First Amendment Methodology* (1978) 25 UCLA L.Rev. 915.) Defendants sought no instructions based on *Gertz*, however, and no such instructions were given. Accordingly, we are not called upon to consider whether or to what extent these constitutional principles may require modification of California defamation law.

[***8]

3 The jury was instructed in the language of *section 47, subdivision 3*, and in addition was instructed as follows: "If it is determined that Dr. Rainer Martens was acting in the common interests of the field of sports psychology and that the communication in question was reasonably calculated to protect or further the interests of sport psychology in general at the time that the statements were made then a privilege attaches and a verdict for the defendants must be returned. However, the privilege available may be lost if the defendant abuses the privilege by excessive publication or the inclusion of immaterial matters which have no bearing upon the interest sought to be protected or if the statements are actuated by malice." The jury was also instructed that if it found the plaintiff's activities were of "legitimate interest to the defendants and to the recipients of the January 10, 1975 paper, then you are instructed that the defendants could legitimately comment upon and criticize the Institute's activities even though the criticism adversely affected the Institute's reputation and business." Finally, the jury was given instructions on malice which had been proposed by plaintiff.

[***9] [*7] Discussion

*Civil Code section 47*, *subdivision 3* provides that a publication or broadcast is privileged if made: "In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

[**415] The code affords no definition of the term "interested" and the case law reflects an eclectic approach to its interpretation. One of the earliest cases is *Snively v. Record Publishing Co. (1921) 185 Cal. 565 [198 P. 1]*, involving the publication in a newspaper of a cartoon which imputed dishonesty to the Los Angeles Police Chief. The court held that the citizens of Los Angeles were "interested" within the meaning of *section 47, subdivision 3*, and that the newspaper's relation to the citizens was such as to afford "a reasonable ground for supposing the motive for the communication innocent," not because the publication was made in a newspaper but because "the official conduct of public officers, especially [***10] in a government by the people, is a matter of public concern of which every citizen may speak in good faith and without malice." (*185 Cal. at p. 571*. See also *Maher v. Devlin (1928) 203 Cal. 207, 281-284 [263 P. 812]*; cf. *Stevens v. Storke (1923) 191 Cal. 329 [216 P. 371].*)

In *Emde v. San Joaquin County etc. Council (1943) 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916]*, the Supreme Court had occasion to consider *section 47, subdivision 3* in the context of an allegedly false and defamatory publication concerning an employer involved in a labor dispute with a union, and appearing in the Stockton Labor Journal, a weekly newspaper devoted to the interests of organized labor. The court [*8] concluded, without extensive discussion, that "since the comment was published in a newspaper devoted exclusively to the interests of organized labor, its publication was conditionally privileged." ( *Id., at p. 161.*)

Five years later, the court in *Brewer v. Second Baptist Church (1948) 32 Cal.2d 791 [197 P.2d 713]*, confronted a suit brought by two members of a church against the pastor and two of its lay leaders who, plaintiffs contended, were responsible [***11] for defamatory and false statements contained in charges brought against them before the church membership. The plaintiffs were expelled on the basis of the charges, and a press release reporting the action of the church was given the local press. On the question of privilege, the court stated: "Ordinarily, the common interest of the members

of a church in church matters is sufficient to give rise to a qualified privilege to communications between members on subjects relating to the church's interest. [Citations.] A privilege would exist in this case if the publication had been made without malice and the occasion had not been abused." ( *Id., at pp. 796-797.*)

In *Maidman v. Jewish Publications, Inc. (1960) 54 Cal.2d 643 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439]*, the court held that an editorial published in a newspaper principally directed to the Jewish community in Los Angeles, and containing defamatory statements about a prominent member of that community in relation to the Jewish observances, was conditionally privileged within *section 47, subdivision 3.* **(2)** (See fn. 4.) The court observed: "Although the editorial is libelous *per se*, the defendants [***12] properly contend that the complaint itself reveals the existence of the defense of 'fair comment.' 'It is not only the privilege but the duty of every citizen and every newspaper in the community to fairly and impartially criticize the faults and misconduct of public officers, . . .' [Citation.] Statements of opinion, although of a defamatory nature, are privileged in California under *section 47, subdivision 3*, of the Civil Code. [Citations.] Maidman held a position of importance in the Southern California Jewish community. It was therefore of legitimate interest to members of that community, who would be the most likely readers of the defendant newspaper, to know whether Maidman was qualified for his position. [Citation.]" ( *Id., at pp. 651-652.*) [4]

4 At common law, the privilege for communication to interested persons and the privilege of fair comment were distinct, the latter being limited to assertions of opinion rather than fact. (See 1 Harper & James, The Law of Torts (1956) § 5.28, p. 456 et seq.) In California, the two privileges have been fused under the statutory privilege accorded by *section 47, subdivision 3.* Insofar as the privilege of fair comment protects only statements of opinion, as distinguished from assertions of fact, it has proved to be redundant in light of constitutional principles which preclude defamation liability for the expression of opinion. (See fn. 3, *ante.*) In California, however, the cases have extended the fair comment privilege so that, where malice is disproved, the privilege applies not only to comment (opinions) but to false statements of fact as well. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 310, p. 2580.) *Maidman* itself involved what could appropriately be characterized as false assertions of fact, i.e., the implication that plaintiff, in his professional capacity as a lawyer, deliberately misled a court as to the nature of a religious holiday. (*54 Cal.2d at p. 651.*)

[***13] [*9] [**416] Court of Appeal decisions have held *section 47, subdivision 3* to apply to a variety of special relationships, e.g., to communications by an employer to its employees regarding alleged misconduct by a fellow employee, in order to explain the reasons for that employee's termination and thus preserve employee morale ( *Deaile v. General Telephone Co. of California (1974) 40 Cal.App.3d 841 [115 Cal.Rptr. 582]*); a complaint by a physician to a local bar association of allegedly unethical conduct by an attorney member ( *Katz v. Rosen (1975) 48 Cal. App.3d 1032 [121 Cal.Rptr. 853]*); and a complaint by parents of school pupils, addressed to the principal and asserting misconduct of a teacher. ( *Martin v. Kearney (1975) 51 Cal.App.3d 309 [124 Cal.Rptr. 281]*. See generally, 4 Witkin, *op. cit. supra* (1980 supp.) § 307 p. 128.)

More broadly, articles appearing in a newspaper of general circulation and describing a raid on a house of prostitution were held to be within the scope of *section 47, subdivision 3*, despite the claim that they were partly false, on the ground that "the articles were published during times of war in a community where [***14] extensive war activities were being conducted, both civilian and military, and where the welfare of those engaged therein was a matter of vital concern to every right-thinking person" ( *Glenn v. Gibson (1946) 75 Cal.App.2d 649, 659 [171 P.2d 118]*). The decision relied in part upon the comment to former Restatement of Torts section 598, to the effect that "An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that (a) facts exist which affect a sufficiently important public interest . . . ."

In *Williams v. Daily Review, Inc. (1965) 236 Cal.App.2d 405 [46 Cal.Rptr. 135]*, plaintiffs, engineering contractors on a job with the City of Hayward, complained of a newspaper article which insinuated they were responsible for delay in completion of a street repair project [*10] and were incompetent, both in the preparation of their bids and in the performance of the job. In upholding the trial court's

instruction to the jury that the communication was privileged under *section 47, subdivision 3*, this court reasoned as follows: "In California the 'fair comment' privilege is encompassed within the provisions of subdivision 3 [***15] of *section 47* . . . . It has been held that this qualified privilege exists *whether the publication be in the form of opinion or of false statements of fact* . . . . [para. ] *The crucial issue involved in determining the applicability of the 'fair comment' privilege is whether or not the publication was made in the public interest* . . . . [*Contrary*] *to plaintiffs' contention, the scope of the term 'public interest' in California is not limited to matters relating solely to public officials*. Both the cases of *Glenn* and *Maidman* applied the privilege to statements defaming *private individuals, where the subject matter of the article was determined to be of public interest or the defamed individual of renown among a certain interest group*." ( *Id., at pp. 416-417*, italics added. For similar broad applications of the *§ 47, subd. 3* privilege, see *Toney v. State of California (1976) 54 Cal. App.3d 779, 793 [126 Cal.Rptr. 869]*; *Lagies v. Copley (1980) 110 Cal.App.3d 958, 968 [168 Cal.Rptr. 368]*.)

The *section 47, subdivision 3* privilege is not without limits, however, as recently exemplified in *Rancho La Costa, Inc. v. Superior* [***16] *Court (1980) 106 Cal.App.3d 646 [165 Cal.Rptr. 347]*. In that case, owners and operators of a resort sued the publishers of a national magazine over an article which accused them of involvement with organized crime and sought to implicate them in the "Watergate" scandal, nationwide bank [**417] failures, securities frauds, criminal use of union monies and pension funds, as well as the swindle of many others, including churches. The court stated: "The state conditional privilege of *section 47(3)* does not apply to a publication by a magazine or newspaper merely because it relates to a matter which may have general public interest . . . . [para. ] The word 'interested' as used in the statute refers to a more direct and immediate concern. That concern is something other than mere general or idle curiosity of the general readership of newspapers and magazines." ( *Id. at pp. 664-665*.) Distinguishing cases which applied the *section 47, subdivision 3* privilege to defamatory comments related to public officials, and to publications "limited to a local or a special interest group and related to matters of special concern" ( *id., at pp. 666-667*), the court reasoned that "[whatever] [***17] privilege is accorded defendants under *Civil Code section 47(3)*, it must yield to the plaintiffs' constitutional rights of privacy." ( *Id., at p. 667*.) The court found extended discussion of the inapplicability of *section 47, subdivision 3* [*11] unnecessary "because the only basis upon which defendants seek the benefit of the statute is by saying that the public at large, and hence that part thereof which constitutes its readership, is interested generally in the fight against organized crime. There being no specific evidence of any particular or specific subject matter of communication, no recital of the inadequacy of the evidence on the application of the section is necessary." (*Ibid.*)

**(3)** The lesson we deduce from these cases is that the scope of the privilege under *section 47, subdivision 3* is not capable of precise or categorical definition, and that its application in a particular case depends upon an evaluation of the competing interests which defamation law and the privilege are designed to serve. The Restatement Second of Torts (§ 595), seeking to formulate a general rule, suggests that an occasion is conditionally privileged "if the circumstances induce a correct [***18] or reasonable belief that (a) there is information that affects a sufficiently important interest of the recipient or a third person, and (b) the recipient . . . is a person to whom its publication is otherwise within the generally accepted standards of decent conduct." In addition, the Restatement suggests a privilege exists "if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." (§ 596.)

Harper and James in The Law of Torts, *supra*: "The occasion is privileged in all these cases when the interest which the defendant's act tends to protect or advance is sufficiently important and the harm threatened thereto is sufficiently great to require or at least justify withdrawal of the legal protection ordinarily given to the plaintiff's interest according to a social policy based upon communal standards of interest value and decent conduct." (§ 5.25, pp. 435-436.) And Professor Eldredge: "The common interest [to be shared by the recipient] must be a legitimate interest, *i.e.*, an interest which the law [***19] recognizes as worthy of protection and not an interest which springs from and seeks to gratify idle curiosity alone. 'The word "interest" as used in the cases, is not used in any technical sense. It is used in the broadest popular sense, as when we say that a man is

"interested" in knowing a fact -- not interested in it as a matter of gossip or curiosity, but as a matter of substance apart from its mere quality as news.' 'So long as the interest is of so tangible a nature that for the common convenience and welfare of society, it is expedient to protect it, it will come within the rule.'" (Eldredge, The Law of Defamation (1978) § 87, at p. 481.)

[*12] Determination that a privilege exists under *section 47, subdivision 3* does not, of course, provide carte blanche for reckless or improperly motivated attacks on people's reputations. The occasion for the privilege "may be abused and the protection of the privilege lost, by the publisher's lack of belief, or of reasonable grounds for belief, in the truth of the defamatory matter, by [**418] excessive publication, by a publication of defamatory matter for an improper purpose, or if the defamation goes beyond the group interest." [***20] ( *Emde v. San Joaquin County etc. Council, supra, 23 Cal.2d 146, 154-155*; *Brewer v. Second Baptist Church, supra, 32 Cal.2d 791, 797.*) "Thus the privilege is lost if the publication is motivated by hatred or ill will toward plaintiff [citations], or by any cause other than the desire to protect the interest for the protection of which the privilege is given. [Citations.] Although there are situations where the protection of the interest involved may make it reasonable to report rumors or statements that the publisher may even know are false [citations], ordinarily the privilege is lost if defendant has no reasonable grounds for believing his statements to be true." ( *Brewer v. Second Baptist Church, supra, at p. 797.* See also *Stationers Corp. v. Dun & Bradstreet, Inc. (1965) 62 Cal.2d 412, 418 [42 Cal.Rptr. 449, 398 P.2d 785]*; *MacLeod v. Tribune Publishing Co. (1959) 52 Cal.2d 536, 552 [343 P.2d 36]*; cf. *Agarwal v. Johnson (1979) 25 Cal.3d 932, 944-945 [160 Cal.Rptr. 141, 603 P.2d 58]*; *Sanborn v. Chronicle Pub. Co. (1976) 18 Cal.3d 406, 413-414 [134 Cal.Rptr. 402, 556 P.2d 764].*)

**(4a)** In this case, unlike *Rancho La* [***21] *Costa*, the communication was not directed toward the world at large, but mainly toward those involved as professionals in the field of athletics. And those to whom it was directed had a potential interest in the subject matter which went well beyond general or idle curiosity. The coaches who comprised the various organizational recipients of Martens' letter constituted a group with a special concern for the subject matter of the communication: depending upon how they evaluated it, the communication could affect the manner in which they conducted their professional activities. If the contents of the communication were true, it was of professional importance for them to know it.

Moreover, the context of the communication was such that, unlike the situation in *Rancho La Costa*, the subjects of the alleged defamation could reasonably be expected to have adequate opportunity for response. The record is replete with references to professional conferences and publications in which the subject of sports testing was discussed. Indeed, the representative of the National Basketball [*13] Coaches Association who wrote Martens to advise him that his letter would be used in a forthcoming [***22] bulletin, made reference to the fact that Tutko "has twice talked at our National Convention, and had standing-room audiences with a great reception for his presentation." The primary focus of the communication was an academic-professional marketplace of ideas.

*Rancho La Costa* is also distinguishable for the substantiality of the privacy interests there implicated and stressed by the court. Here the subject matter of the communications did not involve some private aspect of individual or corporate life. Plaintiff entered the arena of public controversy by offering the AMI to the athletic community and by representing it as a valid indicator of behavioral response. The subject matter of the communication was directly related to that representation. (Cf. *Mashburn v. Collin (La. 1977) 355 So.2d 879*; Annot., 96 A.L.R.3d 609.)

Finally, Martens in his capacity as professor and student of sports psychology was one who stood in such a relation to the persons interested as to afford reasonable ground for supposing the motive for the communication to be innocent. That is not to say that his motive was in fact innocent, or that there was not evidence from which the jury might [***23] have concluded that his motives were selfish, just as there was evidence from which the jury might have concluded that Martens did not have reasonable basis for believing the statements to be true, or that he abused the privilege by disseminating the communication to an unreasonably broad group of recipients or by including in his communication statements not reasonably necessary to further the interests which he allegedly sought to protect. Those, however, were questions for the jury. **(5)** In determining whether there exists an occasion for privilege, "the courts . . . [**419] have to deal with the law of general

averages based on human experience and must shape a general policy to deal with a general problem. On the other hand, in the question of abuse of privilege, the problem is one of particulars." (1 Harper & James, The Law of Torts, *supra*, § 5.25, p. 438.)

**(4b)** Insofar as the trial court by its instructions left to the jury the legal question as to whether a privileged occasion existed, that was arguable error, [5] but that error could hardly operate to plaintiff's [*14] detriment. Viewing the instructions as constituting in effect, a determination by the trial court [***24] that a privileged occasion did exist, we find no error. [6] And plaintiff is in no position to complain of the instructions which the court gave to the jury concerning malice, since the only instructions given on that topic were those which plaintiff proposed. [7] The judgment is affirmed.

5 Ordinarily, the existence of the privilege is a legal question for the court. ( *Kramer v. Ferguson (1964) 230 Cal.App.2d 237, 245 [41 Cal.Rptr. 61]*; *Gantry Constr. Co.* v. American Pipe & Constr. Co. *(1975) 49 Cal.App.3d 186, 197 [122 Cal.Rptr. 834]*; *Field Research Corp. v. Patrick (1973) 30 Cal.App.3d 603, 609 [106 Cal.Rptr. 473].*) While the jury may be required to determine disputed facts relating to the existence of the privilege, it is for the court to decide whether the facts found by the jury made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged. (*Rest.2d Torts, § 619, com. a.*) Here, since the court did not do that, we regard the issue on appeal as whether there existed a privilege as a matter of law.

[***25]

6 We do not mean to suggest approval of the court's privilege instructions as exemplars. Indeed, as our opinion indicates, qualifications would have been appropriate. But where the instruction states the law correctly and is "'deficient merely by reason of generality,'" a party may not complain of its lack of completeness unless he requested an additional or qualifying instruction. ( *Agarwal v. Johnson, supra, 25 Cal.3d 932, 948-949.*)

7 Plaintiff complains that the court misled the jury by responding to a request for clarification by rereading all relevant instructions. We find no reversible error.

# TAB 22

1 of 1 DOCUMENT

**FRANK N. JONES et al., Plaintiffs and Appellants, v. AETNA CASUALTY AND SURETY COMPANY, Defendant and Respondent.**

**No. A060386.**

**COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVISION THREE**

***26 Cal. App. 4th 1717*; *33 Cal. Rptr. 2d 291*; *1994 Cal. App. LEXIS 773*; *94 Cal. Daily Op. Service 5820*; *94 Daily Journal DAR 10549***

**July 26, 1994, Decided**

**PRIOR HISTORY:** [***1] Superior Court of Contra Costa County, No. C92-01442, David A. Dolgin, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Plaintiffs leased property to operate a restaurant, and pursuant to the lease, the lessor was obligated to maintain rental income insurance, at plaintiffs' expense, providing coverage for damage to the premises. The premises subsequently suffered water damage, causing plaintiffs to vacate. Plaintiffs notified the insurer of the loss, but the insurer failed to provide coverage benefits for loss of rental income or for damage to the structure, and the lessor ultimately sued plaintiffs for nonpayment of rent and for structural damage. Plaintiffs then sued the insurer in the present action for tortious breach of insurance contract, alleging breach of the insurer's obligations to plaintiffs as implied-in-law coinsureds and as third party beneficiaries under the policy. The insurer maintained that plaintiffs had no standing to sue, and the insurer's general demurrer to plaintiffs' amended complaint was sustained without leave to amend. (Superior Court of Contra Costa County, No. C92-01442, David A. Dolgin, Judge.)

The Court of Appeal affirmed. It held that the trial court properly sustained the insurer's demurrer without leave to amend, since plaintiffs had no standing to sue the insurer. Plaintiffs did not allege they were contracting parties for the policy, nor did they allege they were claimants. Rather, they asserted standing as implied-in-law coinsureds. While plaintiffs relied on subrogation principles, the principles governing subrogation by an insurer are equitable and have no application to a tort claim for breach of the covenant of good faith and fair dealing. Liability for bad faith has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recovery for bad faith may be had. The court further held that plaintiffs had no standing to sue the insurer as third party beneficiaries under the policy. While *Civ. Code, § 1559*, provides for enforcement of a contract by a third party beneficiary, a third party may qualify as a beneficiary only where the contracting parties intended to benefit the third party and such intent appears on the terms of the contract. The statute excludes enforcement of a contract by persons incidentally or remotely benefited by it. The fact that plaintiffs would have received some benefit if the insurer indemnified the lessor for loss of rental income only made plaintiffs incidental beneficiaries. The implied covenant of good faith and fair dealing was intended to benefit the lessor; the policy and surrounding circumstances did not show the insurer and lessor intended plaintiffs to benefit. (Opinion by Merrill, J., with White, P. J., and Chin, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1) Appellate Review § 128--Scope of Review--Function of Appellate Court--Rulings on Demurrers.** --The appellate court's review of the sufficiency of a complaint against a general demurrer admits all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law.

**(2) Appellate Review § 128--Scope of Review--Function of Appellate Court--Rulings on Demurrers Sustained Without Leave to Amend.** --On appeal from the judgment following the sustaining of a general demurrer without leave to amend, a reviewing court must determine whether the facts as pleaded state a cause of action on any legal theory, and decides whether there is a reasonable possibility that the defect can be cured by amendment. If there is no such possibility, an abuse of discretion is not shown and the reviewing court affirms the trial court.

**(3) Insurance Contracts and Coverage § 123--Actions--Parties--Standing of Nonparties to Enforce Contract.** --While an action for breach of the covenant of good faith and fair dealing sounds in tort, the duty of good faith and fair dealing arises from and exists solely because of the contractual relationship between the parties. Thus, someone who is not a party to the contract has no standing to enforce it or to recover extracontractual damages for the wrongful withholding of benefits to the contracting party. However, in the context of insurance policies, a nonparty who is nevertheless entitled to policy benefits, such as an "insured" person under the terms of the policy or an express beneficiary, has standing only if he or she is the claimant whose benefits are wrongfully withheld.

**(4a) (4b) Insurance Contracts and Coverage § 123--Actions--Parties--Tortious Breach of Contract--Standing as Implied-in-law Coinsureds.** --In an action by plaintiff lessees against an insurer for tortious breach of an insurance contract, the trial court properly sustained the insurer's demurrer without leave to amend, since plaintiffs had no standing to sue the insurer. Under the lease provisions, the lessor had to maintain rental income insurance, at plaintiffs' expense, for damage to the leased premises. When plaintiffs notified the insurer of water damage that resulted in plaintiffs' vacation of the premises, the insurer failed to provide coverage. However, plaintiffs did not allege they were contracting parties for the policy, nor did they allege they were claimants. Rather, they asserted standing as implied-in-law coinsureds. While plaintiffs relied on subrogation principles, the principles governing subrogation by an insurer are equitable and have no application to a tort claim for breach of the covenant of good faith and fair dealing. In contrast to a subrogation action, a bad faith tort claim is based on contractual principles. Liability for bad faith has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recovery for bad faith may be had.

**(5) Insurance Contracts and Coverage § 121--Subrogation--Doctrine of Superior Equities.** --A subrogation as applied to an insurer is its right to be put in the position of its insured against third parties legally responsible to its insured for the loss which the insurer has both insured and paid. An insurer's right to subrogation is governed by equitable principles. Under the doctrine of superior equities, followed in California, the burden is upon the surety to establish its superior equity in seeking recovery against a third party.

**(6a) (6b) Insurance Contracts and Coverage § 123--Actions--Parties--Tortious Breach of Contract--Standing as Third Party Beneficiaries.** --Plaintiff lessees had no standing to sue an insurer for tortious breach of an insurance contract as third party beneficiaries under an insurance policy. Under the lease, the lessor had to maintain rental income insurance, at plaintiffs' expense, for damage to the leased premises. When plaintiffs notified the insurer of water damage that caused plaintiffs to vacate the premises, the insurer failed to provide coverage. While *Civ. Code, § 1559*, provides for enforcement of a contract by a third party beneficiary, a third party may qualify as a beneficiary only where the contracting parties intended to benefit the third party and such intent appears on the terms of the contract. The statute excludes enforcement of a contract by persons incidentally or remotely benefited by it. The fact that plaintiffs would have received some benefit if the insurer indemnified the lessor for loss of rental income only made plaintiffs incidental beneficiaries. The implied covenant of good faith and fair dealing was intended to benefit the lessor; the policy and surrounding circumstances did not show the insurer and lessor intended plaintiffs to benefit.

[See 1 **Witkin,** Summary of Cal. Law (9th ed. 1987) Contracts, § 653 et seq.]

**(7a) (7b) Contracts § 46--Actions--Contract for Benefit of Third Party.** --A third party should not be permitted to enforce covenants made not for his or her benefit, but rather for others. The third party is not a contracting party; the third party's right to performance is predicated on the contracting parties' intent to benefit him or her. The fact that the third party is only incidentally named in the contract or that the contract, if carried out to its terms, would inure to the third party's benefit is insufficient to entitle him or her to demand enforcement. Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered.

**(8) Insurance Contracts and Coverage § 109--Extent of Loss of Insured and of Liability of Insurer--Insurer's Duty of Good Faith and Fair Dealing--To Whom Duty Is Owed.** --An insurer's duty of good faith and fair dealing is owed solely to its insured and, perhaps, any express beneficiary of the insurance policy. Incidental or remote beneficiaries of the policy cannot state a cause of action against the insurer for a breach of the duty.

**COUNSEL:** Mukesh Advani for Plaintiffs and Appellants.

Popelka, Allard, McCowan & Bondonno and John M. Ingle for Defendant and Respondent.

**JUDGES:** Opinion by Merrill, J., with White, P. J., and Chin, J., concurring.

**OPINION BY:** MERRILL, J.

**OPINION**

[*1720] [**293] Frank N. Jones, Donna M. Jones and Snowcreek, Inc. (Jones), appeal from the judgment entered in favor of respondent Aetna Casualty and Surety Company (Aetna), following the order sustaining the [*1721] demurrer without leave to amend to Jones's first amended complaint for tortious breach of insurance contract.

FACTUAL AND PROCEDURAL BACKGROUND

**(1)** Our review of the sufficiency of a complaint against a general demurrer admits all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. (See *Blank v. Kirwan (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].*) Accordingly, the following factual statement, gleaned from Jones's first amended complaint, [***2] is accepted as true for purposes of this appeal.

Jones had leased commercial property in Danville from Danville L&M Limited (lessor) for the operation of their restaurant. Pursuant to the lease agreement, lessor was obligated to maintain rental income insurance providing coverage for damage or destruction from fire or other perils. The lease stated this coverage would be at Jones's expense and the policy would provide that the loss would be payable to lessor. The lease also stated that during any repairs to the premises after damage or destruction from a peril, Jones's rent would be equitably reduced to the extent lessor received proceeds from the rental income insurance. The insurance policy lessor obtained, through Aetna, included a "rental value endorsement" which stated Aetna would be liable for the "Actual Loss Sustained by the insured resulting directly from necessary untenantability, caused by damage to or destruction of the building(s) or structure(s) as furnished and equipped by the insured, by a peril not excluded in this policy. . . ."

In 1989 and 1990, the restaurant premises suffered damage from the intrusion of water from a variety of sources. Patronage was reduced [***3] to the extent that Jones was unable to meet its rent obligations. On August 10, 1990, Jones vacated the premises.

Aetna was notified of the loss by Jones in 1989. It failed to provide coverage benefits on the claim for loss of rental income or damage to the structure. Jones alleged that Aetna's actions constituted a breach of the covenant of good faith and fair dealing and that such breach caused lessor to sue Jones for nonpayment of rent and for structural damage to the premises. In the first cause of action, Jones claimed Aetna breached its "obligations to the plaintiffs as implied-in-law co-insureds under the policy of insurance." In the second cause of action, Jones charged Aetna breached its obligations to Jones as third party beneficiaries under the insurance policy. A third cause of action stated that Aetna's actions were intentional and entitled Jones to punitive damages.

[*1722] Aetna's general demurrer to the original complaint was sustained with leave to amend. Its general demurrer to the amended complaint was sustained

without leave to [**294] amend. Aetna maintained Jones had no standing to sue as an implied-in-law coinsured under the contract of insurance or as a third party [***4] beneficiary.

DISCUSSION

**(2)** On appeal from the judgment following the sustaining of a general demurrer without leave to amend, a reviewing court must determine whether the facts as pleaded state a cause of action on any legal theory. When the demurrer has been sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment. If there is no such possibility, an abuse of discretion is not shown and we affirm the trial court. ( *Blank v. Kirwan, supra, 39 Cal.3d at p. 318*.) We find no error in the trial court's ruling as Jones has no standing to sue Aetna, either as an implied-in-law coinsured or as a third party beneficiary of the policy.

**(3)** While an action for breach of the covenant of good faith and fair dealing sounds in tort, the duty of good faith and fair dealing arises from and exists solely because of the contractual relationship between the parties. ( *Gruenberg v. Aetna Ins. Co. (1973) 9 Cal.3d 566, 577-578 [108 Cal.Rptr. 480, 510 P.2d 1032]*.) Thus, someone who is not a party to the contract has [***5] no standing to enforce it or to recover extracontractual damages for the wrongful withholding of benefits to the contracting party. ( *Hatchwell v. Blue Shield of California (1988) 198 Cal. App. 3d 1027, 1034 [244 Cal.Rptr. 249]*.) However, in the context of insurance policies, "[a] nonparty who is nevertheless entitled to policy benefits, such as an 'insured' person under the terms of the policy or an express beneficiary, has standing only if [he or] she is the *claimant* whose benefits are wrongfully withheld." (*Ibid.*)

**(4a)** Jones does not allege he was a contracting party for the insurance policy. Neither does he allege that he was a claimant. Instead, he submits that the facts as pled demonstrate standing as an implied-in-law coinsured under the terms of the policy. Jones states that as the lease agreement required lessor to purchase rental income insurance at Jones's expense, that insurance is deemed to mutually benefit both parties and as such he is a coinsured under the policy with standing to sue. However, the authority he cites for this proposition is unpersuasive.

Jones argues that principles set forth in subrogation cases are [***6] applicable here. He submits that in the context of subrogation cases an insurance policy [*1723] may be considered to be for the benefit of both the insured lessor and the lessee, even though the lessee is not a named insured under the policy, where the lease required the lessee to purchase the insurance. He contends, in such cases, the lessee is considered an implied-in-law coinsured. (See *Rokeby-Johnson v. Aquatronics International, Inc. (1984) 159 Cal. App. 3d 1076, 1085 [206 Cal.Rptr. 232]* [defendant held to be an implied-in-law coinsured and subrogation unavailable to insurer where separate agreement required defendant to insure equipment]; *Parsons Manufacturing Corp. v. Superior Court (1984) 156 Cal. App. 3d 1151, 1159-1160 [203 Cal.Rptr. 419]* [lease provision requiring lessor to maintain fire insurance was for mutual benefit of lessor and lessee, partial summary judgment for insurer in subrogation action denied]; *Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co. (1976) 59 Cal. App. 3d 860, 864 [131 Cal.Rptr. 211]* [held no right of subrogation [***7] where commercial expectations of parties to lease and sublease were that policy proceeds would cover loss, court considered inequities of allowing right of subrogation against sublessee who paid policy premiums and was regarded as implied-in-law coinsured]; *Tate v. Trialco Scrap, Inc. (M.D.Tenn. 1989) 745 F. Supp. 458, 473-474* [held no right of subrogation where lease provision required lessor to purchase insurance, such provision for mutual benefit of lessor and lessee absent contrary intent].)

These decisions are distinguishable as the principles governing subrogation by an insurer are equitable in nature and have no application to a tort claim for breach of the covenant of good faith and fair dealing.

**(5)** " 'A subrogation as applied to an insurer is its right to be put in the position of [**295] its insured against third parties legally responsible to its insured for the loss which the insurer has both insured and paid. [Citation.]' " ( *Parsons Manufacturing Corp. v. Superior Court, supra, 156 Cal. App. 3d at p. 1158*, citing *Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co., supra, 59 Cal. App. 3d at p. 864*.) [***8] An insurer's right to subrogation is governed by equitable principles. ( *Parsons Manufacturing Corp. v. Superior Court, supra, 156 Cal. App. 3d at p. 1158*, citing *Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co., supra, 59 Cal. App. 3d at p. 865*.) Under the doctrine of superior equities, followed

in California, the burden is upon the surety to establish its superior equity in seeking recovery against a third party. ( *Rokeby-Johnson v. Aquatronics International, Inc., supra, 159 Cal. App. 3d at p. 1084.*) For example, in the *Liberty Mutual* opinion, the Court of Appeal, in holding the insurer had no right of subrogation, considered the commercial expectation of the sublessees in paying the insurance premium and the windfall to the insurer in the event subrogation was permitted. ( *Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co., supra, 59 Cal. App. 3d at p. 865.*) The *Liberty Mutual* court denied subrogation against the sublessee as the sublessee was an implied-in-law coinsured [***9] under the insurance policy. (*Ibid.*)

[*1724] **(4b)** In contrast to a subrogation action, a bad faith tort claim is based on contractual principles. The doctrine of superior equities, critical to whether a right of subrogation exists, does not come into play in an action for tortious breach of the covenant of good faith and fair dealing. " 'Whether for better or worse, the historical development of a tort is an important factor in determining its scope (see Prosser, Law of Torts (4th ed. 1971) pp. 19-21), and, thus far, liability for "bad faith" has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recovery for "bad faith" may be had. [Citation.]' [Citation.]" ( *Hatchwell v. Blue Shield of California, supra, 198 Cal. App. 3d at p. 1034*, citing *Austero v. National Cas. Co. (1976) 62 Cal. App. 3d 511, 516-517 [133 Cal.Rptr. 107].*) Jones has not pled facts to establish standing under the implied-in-law coinsured theory. There is no reasonable possibility that this defect [***10] may be cured by amendment.

**(6a)** Neither are we persuaded by Jones's alternative argument that he has standing to prosecute the action as a third party beneficiary of the insurance policy. *Civil Code section 1559* provides: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." A third party may qualify as a beneficiary under a contract where the contracting parties must have intended to benefit that third party and such intent appears on the terms of the contract. ( *Ascherman v. General Reinsurance Corp. (1986) 183 Cal. App. 3d 307, 311 [228 Cal.Rptr. 1].*) However, it is well settled that *Civil Code section 1559* excludes enforcement of a contract by persons who are only incidentally or remotely benefited by it. ( *Lucas v. Hamm (1961) 56 Cal.2d 583, 590 [15 Cal.Rptr. 821, 364 P.2d 685]*, cert. den. *(1962) 368 U.S. 987 [7 L. Ed. 2d 525, 82 S.Ct. 603]*; *Walters v. Marler (1978) 83 Cal. App. 3d 1, 31 [147 Cal.Rptr. 655].*) [***11] **(7a)** "'A third party should not be permitted to enforce covenants made not for his benefit, but rather for others. He is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him. . ..' " ( *Cancino v. Farmers Ins. Group (1978) 80 Cal. App. 3d 335, 344 [145 Cal.Rptr. 503]*, quoting *Lucas v. Hamm, supra, 56 Cal.2d at pp. 590-591*; see also *Murphy v. Allstate Ins. Co. (1976) 17 Cal.3d 937, 944 [132 Cal.Rptr. 424, 553 P.2d 584].*) **(8)** An insurer's duty of good faith and fair dealing is owed solely to its insured and, perhaps, any express beneficiary of the insurance policy. Incidental or remote beneficiaries of the policy cannot state a cause of action against the insurer for a breach of the duty. ( *Cancino v. Farmers Ins. Group, supra, 80 Cal. App. 3d at p. 342*, citing *Austero v. National Cas. Co., supra, 62 Cal. App. 3d at pp. 516-517.*)

[**296] **(7b)** The fact that the third party is only [***12] incidentally named in the contract or that the contract, if carried out to its terms, would inure to the [*1725] third party's benefit is insufficient to entitle him or her to demand enforcement. ( *Walters v. Marler, supra, 83 Cal. App. 3d at p. 33.*) Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered. (*Ibid.*)

**(6b)** It is apparent from the terms of the insurance policy in the instant case that Jones was not an intended beneficiary. The fact that, by virtue of the lease provision for rent abatement, Jones would have received some benefit in the event Aetna indemnified the lessor for loss of rental income only makes him an incidental beneficiary under the policy. The policy itself and surrounding circumstances do not demonstrate that Aetna and lessor intended Jones to benefit from their agreement.

The implied covenant of good faith and fair dealing in the insurance policy at issue was intended to benefit the insured lessor. Jones has no [***13] standing as a third party beneficiary to enforce the covenant made for the benefit of the lessor.

We conclude the trial court properly determined the

facts as pleaded did not state a cause of action. There is no reasonable possibility that the lack of standing can be cured by amendment.

The judgment is affirmed.

White, P. J., and Chin, J., concurred.

# TAB 23

LEXSEE 221 CAL.APP.3D 1151

**DENIS LOVE et al., Plaintiffs and Appellants, v. FIRE INSURANCE EXCHANGE, Defendant and Respondent**

**No. D009984**

**Court of Appeal of California, Fourth Appellate District, Division One**

*221 Cal. App. 3d 1136*; *271 Cal. Rptr. 246*; *1990 Cal. App. LEXIS 683*

**June 28, 1990**

**SUBSEQUENT HISTORY:** [***1] Appellants' petition for review by the Supreme Court was denied September 13, 1990. Mosk, J., was of the opinion that the petition should be granted.

**PRIOR HISTORY:** Superior Court of San Diego County, No. 594987, William C. Pate, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Insureds hired a geotechnical engineering firm to inspect their home after they discovered cracks in the foundation and filling of their home and related problems. The firm advised them that the damage was related to earth movement and the negligence of the home builders. The insureds made a claim for damages which the insurer denied. Nearly five years later the insureds resubmitted their claim, which the insurer, after conducting an investigation, again denied. The insureds filed an action against the insurer for breach of the covenant of good faith and fair dealing, breach of statutory duties, breach of contract, fraud, and intentional infliction of emotional distress. The insurer moved for summary judgment on the grounds that the claims were time-barred by both the policy provisions and the governing statutes of limitation. The trial court granted summary judgment for the insurer. (Superior Court of San Diego County, No. 594987, William C. Pate, Judge.)

The Court of Appeal affirmed, holding that the insureds' action was time-barred. The court held that when an insured observes abnormal damage, hires an engineering firm to investigate, and obtains a report stating that earth movement and third party negligence are causes of the damage, his causes of action against the insurer accrue on receipt of such report, because the statute of limitations commences when a party knows or should know the facts essential to his claim. The court held that an insured who was aware of the essential facts cannot toll the statute of limitations by contending that he only belatedly discovered that his policy might provide coverage. The court also held that the insurer was not estopped to assert the defense of the statute of limitations, notwithstanding the insureds' contention that it had an obligation to disclose that where third party negligence was a proximate cause of the injury, an otherwise excluded loss was a covered loss. An insurer is under no obligation, the court held, to explain to the insured all possible legal theories of recovery. Finally, the court held, summary judgment was properly granted insofar as the insureds' causes of action were based on misfeasance allegedly committed by the insurer after they submitted their claim a second time; a cause of action for bad faith cannot be maintained unless policy benefits are due, and the insureds' claim for benefits was time-barred. (Opinion by Froehlich, J., with Kremer, P. J., concurring. Separate opinion by Wiener, J., concurring in the result.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Summary Judgment § 8--Affidavits--Construction.** --The purpose of the summary procedure is to penetrate

through evasive language and adept pleading and ascertain the existence or absence of triable issues. The trial judge determines whether triable issues exist by examining the affidavits and evidence before him, including any reasonable inferences that may be drawn from the facts before him. While the affidavits of the moving party are to be strictly construed and those of the opponent liberally construed, a party opposing a motion for summary judgment that is supported by affidavits or declarations sufficient to sustain the motion, has the burden of showing that triable issues of fact exist.

**(2) Limitation of Actions § 83--Trial, Judgment, and Appeal--Summary Judgment.** --Where the operative facts are undisputed, the question of the application of the statute of limitations is a matter of law, and summary judgment is proper where the facts show the action is time-barred as a matter of law.

**(3) Estoppel and Waiver § 16--Estoppel--Questions of Law and Fact--Summary Judgment.** --Estoppel is not always a question of fact that precludes summary judgment.

**(4a) (4b) Insurance Contracts and Coverage § 126--Actions--Statute of Limitations--Effect of Knowledge of Facts Essential to Claim.** --An action by insureds against their insurer for payments due under their policy and for wrongful denial of payment was time-barred, where the insureds were notified by their geotechnical firm that their home was suffering damages from subsidence problems caused by third party negligence in constructing the home, where the insurer denied coverage, and where they did not bring suit against the insurer until nearly seven years later. When an insured observes abnormal damage, hires an engineering firm to investigate, and obtains a report stating earth movement and third party negligence are causes of the damage, his causes of action against the insurer accrue on receipt of such report, because the statute of limitations commences when a party knows or should know the facts essential to his claim. An insured who is aware of the essential facts cannot toll the statute of limitations by contending that he only belatedly discovered that his policy might provide coverage.

**(5) Insurance Contracts and Coverage § 126--Actions--Statute of Limitations--Applicable Statutes.** --In an action by insureds against their insurer, the insureds' breach of the written contract count was subject to a four-year limitation (*Code Civ. Proc., § 337, subd. 1*), as was their claim for breach of the covenant of good faith and fair dealing insofar as it rested on the implied contractual premise.

**(6) Insurance Contracts and Coverage § 122--Breach of Statutory Duties--Private Right of Action.** --There is no private cause of action per se for an insurer's breach of its statutory duties under *Ins. Code, § 790.03.*

**(7a) (7b) Insurance Contracts and Coverage § 126--Actions--Statute of Limitations--Estoppel.** --In an action by insureds against their insurer that was brought nearly seven years after the insurer denied their claim, the insurer was not estopped to assert the statute of limitations, notwithstanding the insureds' contention that because the insurer stood in a fiduciary relationship with them, it had an obligation to disclose that where third party negligence was a proximate cause of the injury, an otherwise excluded loss was a covered loss. The insurer denied the claim without disclosing this alternative legal theory of coverage. However, an insurer is not estopped to assert the statute of limitations where denial of the claim was at most an incorrect interpretation of the terms of the policy. An insurer is under no obligation to explain to the insured all possible legal theories of recovery. Further, the entire cargo of fiduciary obligations cannot be imported uncritically into the port of insurance law: the insureds were not excused from exercising an ordinary degree of diligence in investigating or pursuing their rights because of the alleged existence of a fiduciary relationship.

**(8) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith.** --An insurer (like any other party to a contract) owes a general duty of good faith and fair dealing. Further, because of the special relationship inherent in the nature of an insurance contract, the insurer's obligations attendant to its duty of good faith are heightened. Because of this unique special relationship, a breach of the obligation of good faith may give rise to tort (rather than mere contractual) remedies.

**(9) Contracts § 41--Performance--Implied Covenant of Good Faith and Fair Dealing.** --The covenant of good faith and fair dealing is implied in every contract as a method to protect the interests of the parties in having the contractual promises and purposes performed. Because contracts differ, the nature and extent of the duties owed under the implied covenant are also variable and will depend on the contractual purposes.

**(10) Insurance Contracts and Coverage § 111--Duty of Insurer to Act in Good Faith--Payment of Proceeds.** --An insurer must investigate claims thoroughly. It may not deny coverage based on either unduly restrictive policy interpretations or standards known to be improper, and it may not unreasonably delay in processing or paying claims.

**(11) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Nature of Relationship Between Insurer and Insured.** --Unique obligations are imposed upon true fiduciaries that are not found in the insurance relationship. A true fiduciary must first consider and always act in the best interests of its trust and not allow self-interest to overpower its duty to act in the trust's best interests. An insurer, however, may give its own interests consideration equal to that it gives the interests of its insured. It is not required to disregard the interests of its shareholders and other policyholders when evaluating claims, and it is not required to pay noncovered claims, even though payment would be in the best interests of its insured.

**(12) Insurance Companies § 1--Use of Premiums.** --Unlike the rule that prohibits true fiduciaries from commingling trust funds with the funds of others or from profiting from using the funds received from the beneficiary, no similar prohibition circumscribes an insurer's use of premiums. Indeed, pooling of funds from insureds to create loss reserves, and investing such pooled funds for profit in order to enhance the insurer's financial strength, appear integral parts of the business of insurance.

**(13a) (13b) Insurance Contracts and Coverage § 126--Actions--Statute of Limitations--Insurer's Conduct Following Expiration of Period.** --In an action by insureds against their insurer that was brought nearly seven years after the insurer initially denied their claim, the trial court properly granted summary judgment for the insurer insofar as the insureds' causes of action were premised on the insurer's alleged acts of misfeasance occurring after the insureds resubmitted their claim five years after the original denial. At the time of the second submission, the statute of limitations on their right to sue for benefits under the policy had already expired, and when an insured's right to collect policy benefits is already time-barred, he may not resurrect his rights simply by resubmitting a claim after the lapse of the limitations period. Tort liability for breach of the implied covenant of good faith and fair dealing is primarily measured by whether the insurer withheld payment of an insured's claim unreasonably and in bad faith. Where benefits are withheld for proper cause, there is no breach of the implied covenant. A bad faith claim cannot be maintained unless policy benefits are due.

**(14) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Elements of Breach.** --There are at least two separate requirements to establish breach of the implied covenant of good faith and fair dealing in an insurance context: benefits due under the policy must have been withheld; and the reason for withholding benefits must have been unreasonable or without probable cause.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 656.]

**(15) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--As Supplemental to Insured's Primary Rights.** --The implied covenant of good faith and fair dealing is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract. Thus when benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because they frustrate the insured's primary right to receive the benefits of his contract--i.e., prompt compensation for losses.

**COUNSEL:** William J. Brown III for Plaintiffs and Appellants.

Kenneth N. Greenfield, Horvitz & Levy, Barry R. Levy and Mitchell C. Tilner for Defendant and Respondent.

**JUDGES:** Opinion by Froehlich, J., with Kremer, P. J., concurring. Separate opinion by Wiener, J., concurring in the result.

**OPINION BY:** FROEHLICH

**OPINION**

[*1141] [**247] Appellants Denis Love and Sharon Love appeal from a judgment in favor of Fire

Insurance Exchange (FIE) following the granting of FIE's motion for summary judgment based on the statute of limitations. The Loves contend (1) FIE's conduct estops it from relying on the statute of limitations; (2) they have independent causes of action for bad faith which are not [**248] time-barred; and (3) the numerous triable issues of fact preclude entry of summary judgment.

1. *Factual Background*

The Loves have resided in their home since 1969. They had insured the home through FIE at all relevant times. In late 1980 Mr. Love discovered cracks in the foundation and [***2] filling of the home, "strange" cracks in the ground adjacent to the home, separations, sticking doors and a broken framing member in and around the home. On February 3, 1981, the Loves hired a geotechnical engineering firm to inspect the home. The geotechnical engineering firm conducted the inspection and thereafter advised the Loves the damage was related to earth movement and the negligence of the home builders. The firm further advised the Loves the cracked slab was caused by expansion and contraction of the soils beneath the home.

Also in February of 1981 Mr. Love telephoned his insurance agent, Oliver Crocker, and made a claim for the damages described above. Crocker, FIE's agent and representative, denied the claim indicating there was no coverage under the Loves' policy because the claimed damages were an "act of god." The Loves took no further steps to pursue the denied claim.

In December of 1985 Mr. Love was told by an acquaintance the damage to his home (which had worsened over time) was common to homes in the [*1142] area and that other insurance companies had compensated other owners for similar damages. On December 30, 1985, Mr. Love again contacted Crocker to [***3] resubmit his claim for the above described damages. By a letter dated January 21, 1986, FIE acknowledged receipt of the renewed claim and informed the Loves it would undertake an investigation of their claim, without waiver of any defenses then available to FIE. The Loves acknowledged receipt of the letter, understanding that FIE was not waiving any of its rights. After conducting an investigation, FIE denied the Loves' claim on May 29, 1987.

On January 21, 1988, the Loves filed an action against FIE alleging, among others, causes of action for breach of the covenant of good faith and fair dealing, breach of statutory duties, breach of contract, fraud and intentional infliction of emotional distress. [1] FIE subsequently moved for summary judgment on the grounds the claims were time-barred by both the policy provisions [2] and governing statutes of limitations. The court concluded the action was barred by the statutory limitation periods and granted FIE's motion. Following entry of judgment, this appeal was undertaken.

1 The complaint also alleged causes of action for intentional and negligent interference with prospective economic advantage. However, these claims were against defendants other than FIE.

[***4]

2 The policies of insurance contained contractual provisions mandating that any suit on the policy be filed within one year after the loss.

2. *Standard of Review*

The purposes and standards for summary judgment are well established.

**(1)** "The purpose of the summary procedure is to penetrate through evasive language and adept pleading and ascertain the existence or absence of triable issues. [Citations.]" ( *Chern v. Bank of America (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].*) The trial judge determines whether triable issues exist by examining the affidavits and evidence before him, including any reasonable inferences which may be drawn from the facts before him. ( *People v. Rath Packing Co. (1974) 44 Cal.App.3d 56, 61-64 [118 Cal.Rptr. 438].*) While ". . . the affidavits of the moving party are to be strictly construed and those of the opponent liberally construed . . . [citation], . . . a party opposing a motion for summary judgment which is supported by affidavits or declarations sufficient to sustain [***5] the motion, has the burden of showing that triable issues of fact exist." ( *Chern v. Bank of America, supra, 15 Cal.3d at p. 873.*)

**(2)** Where the operative facts are undisputed, the question of the application of the statute of limitations is a matter of law [**249] ( *Wells Fargo Bank v.* [*1143] *Superior Court (1977) 74 Cal.App.3d 890, 895 [141 Cal.Rptr. 836]*), and summary judgment is proper where the facts show the action is time-barred as a matter of law ( *Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 1112*

*[245 Cal.Rptr. 658, 751 P.2d 923])*.

**(3)** **(See fn. 3.)** We conclude the trial court correctly determined there were no triable issues of material fact and the claims were barred by the statute of limitations. [3]

3 Love asserts estoppel is always a question of fact which precludes summary judgment. We disagree. (See, e.g., *Neff v. New York Life Ins. Co. (1947) 30 Cal.2d 165 [180 P.2d 900, 171 A.L.R. 563]* [where facts undisputed, trial court may summarily grant judgment in favor of defendant on statute of limitations grounds despite estoppel claim].)

[***6] 3. *Loves' Causes of Action Are Barred by the Statute of Limitations*

**(4a)** All of the Loves' claims for payments due under the policy (and their causes of action based on wrongful denial of said claims) accrued in 1981, when they were notified by their geotechnical firm the home was suffering damages from subsidence problems caused by third party negligence in constructing the home. Where an insured observes abnormal damage, hires an engineering firm to investigate, and obtains a report stating earth movement and third party negligence are causes of the damage, his causes of action against the insurer accrue on receipt of such report ( *Lawrence v. Western Mutual Ins. Co. (1988) 204 Cal.App.3d 565, 571-573 [251 Cal.Rptr. 319]*), because the statute of limitations commences when a party knows or should know the *facts* essential to his claim ( *Gutierrez v. Mofid (1985) 39 Cal.3d 892, 897-898 [218 Cal.Rptr. 313, 705 P.2d 886]*).

An insured who is aware of the essential facts cannot toll the statute of limitations by contending he only belatedly discovered his policy might provide coverage ( *Abari v. State Farm Fire & Casualty Co. (1988) 205 Cal.App.3d 530, 535-536 [252 Cal.Rptr. 565]*), [***7] because knowledge of the *facts*, rather than knowledge of the available legal theories or remedies, starts the statute of limitations ( *Gutierrez v. Mofid, supra, 39 Cal.3d at p. 898*). Accordingly, the Loves' causes of action accrued not later than February of 1981, because Loves were aware of the factual predicate to their suit and were aware their claim had been unconditionally denied. (Cf. *State Farm Fire & Casualty Co. v. Superior Court (1989) 210 Cal.App.3d 604 [258 Cal.Rptr. 413]* [knowledge of facts and unconditional denial of claim start statute of limitations].)

The Loves' complaint was filed in January of 1988, almost seven years after their claims were alleged to be wrongfully denied.

**(5)** ,

**(6)** **(See fn. 4.)**

[*1144] **(4b)** Although the different causes of action carry different periods of limitation, [4] all periods expired well before the complaint was filed.

4 The Loves' breach of the written contract count is subject to a four-year limitation ( *Code Civ. Proc., § 337, subd. 1*), as is their claim for breach of the covenant of good faith and fair dealing insofar as it rests on the implied contractual promise. ( *Comunale v. Traders & General Ins. Co. (1958) 50 Cal.2d 654, 662-663 [328 P.2d 198, 68 A.L.R.2d 883]*.) These obligations were breached on wrongful denial of the claim in 1981, and are time-barred. To the extent the Loves seek tort remedies on their claim for breach of the covenant of good faith and fair dealing, the claim is governed under and is barred by the two-year statute of limitations under *Code of Civil Procedure section 339, subdivision 1*. ( *Richardson v. Allstate Ins. Co. (1981) 117 Cal.App.3d 8, 12-13* [tort cause of action for breach of implied covenant of good faith governed by *Code Civ. Proc., § 339, subd. 1*].) The Loves' "fraud" claim (assuming it is somehow distinct or independent from their bad faith counts) is governed under and is barred by the three-year limitation period under *Code of Civil Procedure section 338, subdivision (d)*, since the Loves knew the *facts* (albeit not the legal theory) upon which the fraud was premised. Finally, the Loves' "intentional infliction of emotional distress" claim, again assuming it is somehow distinct or independent from their bad faith count (but see *Richardson v. Allstate Ins. Co., supra, 117 Cal.App.3d at pp. 12-14*), is barred by the one-year limitations period under *Code of Civil Procedure section 340, subdivision (3)* applicable to such claims. ( *Purcell v. Colonial Ins. Co. (1971) 20 Cal.App.3d 807, 809,*

*814-815 [97 Cal.Rptr. 874].*)

Although the Loves also purported to plead a cause of action for "breach of statutory duties," alleging violations of *Insurance Code section 790.03*, it is now settled there is not per se such a private cause of action. ( *Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal.3d 287, 304-305 [250 Cal.Rptr. 116, 758 P.2d 58].*)

[***8]

[**250] 4. *FIE's Conduct Does Not Estop It From Relying on the Statute of Limitations Defenses*

**(7a)** The Loves seek to avoid the time bar by arguing FIE is estopped to assert the statute of limitations. The Loves contend because FIE stood in a fiduciary relationship with them, it had an obligation to disclose that where third party negligence was a proximate cause of the injury, an otherwise excluded loss was a covered loss. FIE denied the 1981 claim without disclosing this alternative legal theory of coverage. Instead, the Loves argue, FIE fraudulently concealed such legal theory. They urge such fraudulent concealment and failure to disclose should operate to estop FIE from relying on the statute of limitations. We reject their argument for several reasons.

First, we are unaware of any authority holding that an insurer is estopped to plead the statute of limitations merely because when it denied a claim it failed to inform its insured of pertinent laws or legal theories upon which the insured could rely in a later lawsuit challenging denial of the claim. To the contrary, on facts similar to the instant case, our Supreme Court in *Neff v. New York Life Ins. Co., supra, 30 Cal.2d 165*, [***9] concluded an insurer's denial of a claim started the statute of limitations running. In *Neff* an [*1145] insured, possessing both the operative *facts* upon which his claim was based and the policy defining his rights, submitted a claim. The insurer unequivocally rejected the claim on the grounds the claim was not covered by the policy; and the insured failed to pursue the matter. In a later lawsuit the insured argued the insurer was estopped from relying on the statute of limitations, contending the insurer's denial of the claim was a "misrepresentation" which caused insured's failure to pursue the claim. Citing the rule that an insurer must deal with his insured in good faith and take no unfair advantage, insured claimed the denial of the claim amounted to concealing a "fact" (i.e., of coverage) sufficient to estop reliance on the statute of limitations.

The *Neff* court rejected this contention. It reasoned that if an insurer was held to have concealed facts sufficient to estop reliance on the statute of limitations merely because it denied a claim without disclosing potential legal theories or grounds for coverage, an insurer would rarely be entitled to litigate [***10] claims disputes within the limitation periods, as such periods would be indefinitely suspended until the insured sought and obtained legal advice indicating the grounds to challenge the insurer's decision. ( *Id. at p. 172.*) The *Neff* court instead concluded that, because the insured possessed both the facts and his policy, the insurer could deny the claim without concomitantly waiving the statute of limitations: ". . . Defendant [insurer], concealing no *fact* from the insured, was free to take this position. The insured, knowing all the facts which were known to defendant, was then free to litigate the issue of the liability which defendant had denied. It is a matter of common knowledge that there are often differences of opinion concerning liability under insurance policies and *no mere denial of liability, even though it be alleged to have been made through fraud or mistake, should be held sufficient, without more, to deprive the insurer of its privilege of having the disputed liability litigated within the period prescribed by the statute of limitations*." (*30 Cal.2d at pp. 172-173*, italics [***11] added.)

It is undisputed that the Loves knew the operative facts (i.e., their home was damaged and the causes of damage included third party negligence), and there is no allegation they did not possess the policy provisions outlining their rights. Finally, they admit being told unequivocally in 1981 their claim was denied for lack of coverage. FIE neither "misrepresented" nor "concealed" any facts (as opposed to pertinent law or legal theories) upon which the Loves' claim was based, nor did it conceal the terms of the policy or the fact it denied the claim for lack of coverage. [5] Under [**251] *Neff*, as well as [*1146] numerous subsequent cases, ignorance of legal theories does not toll the statute of limitations. (Cf. *State Farm Fire & Casualty Co. v. Superior Court, supra, 210 Cal.App.3d at p. 608* ["ignorance of legal remedy does not toll the statute of limitations"]; *Cardosa v. Fireman's Fund Ins. Co. (1956) 144 Cal.App.2d 279 [300 P.2d 875]* [claim denied by agent for lack of coverage; insurer not estopped to rely on statute of limitations merely because insured "relied" on denial in failing to file suit].) [***12] As recognized in

*Matsumoto v. Republic Ins. Co. (9th Cir. 1986) 792 F.2d 869*, an insurer (who conceals no facts) is not estopped to assert statute of limitations because denial of claim was "at most, an incorrect interpretation of the terms of [the policy] . . . . Here, as in *Neff*, the insurer's denial of liability may have caused the insured not to pursue a cause of action, but this does not toll the statute of limitations." ( *Id. at p. 872.*)

5 Although the Loves cite numerous cases for the contention that nondisclosure, concealment or affirmative misrepresentations can estop an insurer from relying on the statute of limitations, those cases are inapposite. Several cases involved estoppel because the defendants' nondisclosures and/or misrepresentations effectively concealed the *facts* upon which the cause of action rested, *not* the *legal theories* supporting the complainants' claims. The cases of *Pashley v. Pacific Elec. Ry. Co. (1944) 25 Cal.2d 226 [153 P.2d 325]*; *Kimball v. Pacific Gas & Elec. Co. (1934) 220 Cal. 203 [30 P.2d 39]*; *Scott v. Federal Life Ins. Co. (1962) 200 Cal.App.2d 384 [19 Cal.Rptr. 258]* and *Baker v. Beech Aircraft Corp. (1974) 39 Cal.App.3d 315 [114 Cal.Rptr. 171, 91 A.L.R.3d 981]*, relied upon by the Loves, are all of this genre. The Loves also cite several other cases ( *Wyatt v. Union Mortgage Co. (1979) 24 Cal.3d 773 [157 Cal.Rptr. 392, 598 P.2d 45]*; *Davis v. Blue Cross of Northern California (1979) 25 Cal.3d 418 [158 Cal.Rptr. 828, 600 P.2d 1060]*; and *Westrick v. State Farm Insurance (1982) 137 Cal.App.3d 685 [187 Cal.Rptr. 214]*) for the proposition that misrepresentations or nondisclosures about the terms of the insurance policy, even though the documents are possessed by the insured, breach the insurer's fiduciary obligations. However, none of those cases stands for the proposition that failure to disclose a *legal theory* of coverage is tantamount to nondisclosure of a *fact* sufficient to toll the statute of limitations. *Wyatt* merely held that a borrower, even though he signed a stack of legal documents, could sue his loan broker who (in response to the borrower's direct questions) had orally misrepresented and failed to fully disclose the true *facts* of the loan transaction. ( *Wyatt v. Union Mortgage Co., supra, 24 Cal.3d at pp. 780, 782-784.*) *Davis* held that where the contract of insurance contains an arbitration clause buried in an obscure location, and it is apparent the insured is unaware of the *fact* this procedural device is available, an insurer may not fail to disclose this fact to his insured, because such nondisclosure effectively transforms a remedy originally intended to be mutually available into a remedy unilaterally open to the insurer. ( *Davis v. Blue Cross, supra, 25 Cal.3d at pp. 426-431.*) Finally, *Westrick* held that where the circumstances permit the insured justifiably to rely on his agent to obtain insurance for a vehicle, the agent may not escape liability for failing to obtain insurance merely because he made no express promise or remained silent in response to the insured's request for insurance, but must instead affirmatively disclose the *fact* that there would be no insurance. ( *Westrick v. State Farm, supra, 137 Cal.App.3d at pp. 690-693.*)

[***13] The Loves seek to avoid the dispositive impact of *Neff* by arguing that *Neff* was decided at a time when there was no fiduciary relationship between an insurer and an insured, whereas current law recognizes that such a relationship (and its attendant duties) now exists. Positing such a relationship, the Loves argue FIE's fiduciary obligation of full disclosure of all facts pertinent to the relationship was breached when it failed to disclose potential [*1147] coverage. They further argue their reliance on FIE's fiduciary obligation induced them to withhold investigation of the bona fides of coverage denial.

We cannot accept Loves' blanket characterization of FIE as a "fiduciary." 6

**(8)** Of course, an insurer (like any other party to a contract) owes a general duty of good faith and fair dealing. ( *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752, 768-769 [206 Cal.Rptr. 354, 686 P.2d 1158].*) Moreover, because of the "special relationship" inherent in the unique nature of an insurance contract, the [**252] insurer's obligations attendant to its duty of good faith are heightened. Such obligations have been characterized [***14] as *akin* to fiduciary-type responsibilities. ( *Frommoethelydo v. Fire Ins. Exchange (1986) 42 Cal.3d 208, 214-215 [228 Cal.Rptr. 160, 721 P.2d 41].*) Because of this unique "special relationship," a breach of the obligation of good faith may give rise to tort (rather than mere contractual) remedies. (See generally, *Foley v. Interactive Data Corp*

. *(1988) 47 Cal.3d 654, 683-693 [254 Cal.Rptr. 211, 765 P.2d 373]* [discussing reasons for disparity of tort versus contract remedies for breach of implied covenant of good faith].)

6 This court has previously intimated its reservations about loose characterizations of an insurer as a fiduciary. (See *State Farm Fire & Casualty Co. v. Superior Court (1989) 216 Cal.App.3d 1222, 1226-1227, 1233* & fn. 6 to conc. opn. at p. 1233 *[265 Cal.Rptr. 372]*; *Henry v. Associated Indemnity Corp. (1990) 217 Cal.App.3d 1405, 1418-1419 [266 Cal.Rptr. 578]*.)

[***15] However, the California Supreme Court has never squarely held that an insurer is a *true* fiduciary to its insured. ( *Gibson v. Government Employees Ins. Co. (1984) 162 Cal.App.3d 441, 445 [208 Cal.Rptr. 511]* [assuming a fiduciary relationship exists].) Instead, the Supreme Court has consistently described it as a "special relationship." ( *Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 687*; *Seaman's Direct Buying Service v. Standard Oil Co., supra, 36 Cal.3d at p. 768*.) Admittedly, the insurer's "special relationship" to its insured encompasses fiduciary-like duties of decency and humanity. ( *Frommoethelydo v. Fire Ins. Exchange, supra, 42 Cal.3d at p. 215*.) We perceive, however, that the "special" nature of the duties owed by an insurer are not owed because the insurer is a *true* fiduciary, but simply because such "special" duties are consonant with the special nature and purpose inherent in an insurance contract.

**(9)** The covenant of good faith and fair dealing is implied in every contract as [***16] a method to protect the interests of the parties in having the contractual promises and purposes performed. ( *Foley v. Interactive Data Corp., supra, 47 Cal.3d 654, 689-690*.) Because contracts differ, the nature and extent of the duties owed under the implied covenant are also variable and "will depend on the contractual purposes." ( *Egan v. Mutual of Omaha Ins. Co. (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141]*.)

[*1148] Insurance contracts are unique in nature and purpose. (See generally, *Foley, supra, 47 Cal.3d at pp. 682-693* [describing differences between insurance contracts and ordinary commercial contracts].) An insured does not enter an insurance contract seeking profit, but instead seeks security and peace of mind through protection against calamity. ( *Egan, supra, 24 Cal.3d at p. 819*.) The bargained-for peace of mind comes from the assurance that the insured will receive prompt payment of money in times of need. ( *Austero v. National Cas. Co. (1978) 84 Cal.App.3d 1, 29-30 [148 Cal.Rptr. 653]*.) [***17] Because peace of mind and security are the principal benefits for the insured, the courts have imposed special obligations, consonant with these special purposes, seeking to encourage insurers promptly to process and pay claims.

**(10)** Thus, an insurer must investigate claims thoroughly ( *Egan, supra, 24 Cal.3d at p. 819*); it may not deny coverage based on either unduly restrictive policy interpretations ( *Delgado v. Heritage Life Ins. Co. (1984) 157 Cal.App.3d 262, 277-278 [203 Cal.Rptr. 672]*) or standards known to be improper ( *Moore v. American United Life Ins. Co. (1984) 150 Cal.App.3d 610, 637-638 [197 Cal.Rptr. 878]*); it may not unreasonably delay in processing or paying claims ( *McCormick v. Sentinel Life Ins. Co. (1984) 153 Cal.App.3d 1030, 1048 [200 Cal.Rptr. 732]*).

These special duties, at least to the extent breaches thereof give rise to tort liability, find no counterpart in the obligations owed by parties to ordinary commercial contracts. The rationale for the difference in obligations is apparent. If an insurer were free of such [***18] special duties and could deny or delay payment of clearly owed debts with impunity, the insured would be deprived of the precise benefit the contract was designed to secure (i.e., peace of mind) and would suffer the precise harm (i.e., lack of funds in times of crisis) the contract was designed to prevent. ( *Wallis v. Superior* [**253] *Court (1984) 160 Cal.App.3d 1109, 1117-1118 [207 Cal.Rptr. 123]*.) To avoid or discourage conduct which would thus frustrate realization of the contract's principal benefit (i.e., peace of mind), special and heightened implied duties of good faith are imposed on insurers and made enforceable in tort. While these "special" duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, *not* because an insurer *is* a fiduciary.

**(11)** Unique obligations are imposed upon true fiduciaries which are not found in the insurance

relationship. For example, a true fiduciary must first consider and always act in the best interests of its trust and not allow self-interest to overpower its duty to act in the trust's best interests. [***19] (See, e.g., *Toedter v. Bradshaw (1958) 164 Cal.App.2d 200, 208 [330 P.2d 688].*) An insurer, however, may give its own interests consideration equal to that it [*1149] gives the interests of its insured ( *Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal.3d at pp. 818-819*); it is not required to disregard the interests of its shareholders and other policyholders when evaluating claims ( *Austero v. National Cas. Co., supra, 84 Cal.App.3d at p. 30*); and it is not required to pay noncovered claims, even though payment would be in the best interests of its insured ( *Native Sun Investment Group v. Ticor Title Ins. Co. (1987) 189 Cal.App.3d 1265, 1278 [235 Cal.Rptr. 34]*).

**(12)** Moreover, unlike the rule which prohibits true fiduciaries from commingling trust funds with the funds of others or from profiting by using the funds received from the beneficiary (see, e.g., *Estate of Evans (1944) 62 Cal.App.2d 249, 258 [144 P.2d 625]*), no similar prohibition circumscribes an insurer's use of premiums. Indeed, pooling [***20] of funds from insureds to create loss reserves, and investing such pooled funds for profit in order to enhance the insurer's financial strength, appear integral parts of the business of insurance.

The above examples are illustrative, not exhaustive, of the different nature of the duties owed by insurers versus true fiduciaries. [7]

**(7b)** Because of these differences, and in the absence of Supreme Court precedent declaring an insurer to be a *true* fiduciary, we decline to import uncritically the entire cargo of fiduciary obligations into the port of insurance law. We therefore reject Loves' attempt to denigrate the continued vitality of *Neff.* We also reject Loves' related argument that they were excused from exercising an ordinary degree of diligence in investigating or pursuing their rights because of the alleged existence of a fiduciary relationship. [8]

7 Some courts (see *Gibson v. Government Employees Ins. Co., supra, 162 Cal.App.3d 441, 444-446)* and some secondary sources (see 1 Cal. Insurance Law & Practice (1989 rev.) Claims Handling, § 13.02[2][a], pp. 13-8 to 13-9) have accepted without much question that the relationship between an insurer and its insured is a fiduciary one. However, in a manual co-authored by recently retired Supreme Court Justice Kaufman, some leading commentators on the subject of insurance bad faith have reached the opposite conclusion: "While making repeated references to the insurer's 'fiduciary responsibility' to the insured, the Supreme Court has never stated the insurer-insured relationship *is* a 'fiduciary relationship' . . . . [para.] It seems doubtful that insurer-insured is a 'fiduciary relationship' in the same sense as trustee-beneficiary, attorney-client, etc. It is merely a relationship characterized by unequal bargaining power, with a potential for special dependency by the insured on the insurer. Because of this special dependency, duties are imposed on the insurer which are *akin to those imposed on fiduciaries.* But that does *not* make it a fiduciary relationship!" (Kornblum et al., Cal. Practice Guide: Bad Faith (TRG 1989) §§ 3:74-3:74.1, pp. 3-34 to 3-35.) As previously discussed, our analysis accords with this latter view.

[***21]

8 The cases cited by Love involving fiduciaries do not suggest a different rule, as they all involved defendants who concealed or misrepresented the *facts* upon which the claims were predicated, not defendants who failed to disclose legal theories for the action. In *Stafford v. Schultz (1954) 42 Cal.2d 767, 775-779 [270 P.2d 1]*, the doctor's misrepresentation and nondisclosure of the facts (i.e., the extent of plaintiff's injury and the doctor's failure to perform certain diagnostic procedures before representing that the mode of treatment would be effective) tolled the statute of limitations on plaintiff's malpractice complaint. Again, in *Day v. Rosenthal (1985) 170 Cal.App.3d 1125, 1163-1167 [217 Cal.Rptr. 89]*, the court concluded the clients' malpractice action was tolled because they were unaware of a critical fact (i.e., damages from a defective tax shelter) until their appeal from an adverse tax determination was rejected on appeal, and they had no reason to suspect malpractice earlier because the attorney continually reassured them the appeal would succeed. ( *Id. at pp. 1163-1167.*)

[***22] [*1150] [**254] We are unaware of any

cases requiring an insurer to advise an insured of different legal theories or statutory provisions which an insured could use to avoid policy exclusions. The authorities suggest a contrary rule. "An insurer is under no obligation to explain to the insured all possible legal theories of recovery." ( *Lawrence v. Western Mutual Ins. Co., supra, 204 Cal.App.3d 565, 574.*) Neither the insured's ignorance of nor the insurer's failure to explain the different legal theories upon which suit might be filed extends the time within which the insured is required to file his action. The reason that "ignorance of legal remedy does not toll the statute of limitations" ( *State Farm Fire & Casualty Co. v. Superior Court, supra, 210 Cal.App.3d at p. 608*) is apparent. If such argument were accepted, ". . . the practical effect would be to nullify the [statute of limitations]. 'Any plaintiff could simply allege ignorance of his or her legal rights against a particular defendant. This is not difficult. Most people do not know the legal answers to questions arising from certain circumstances.' [***23] [ *McGee* v. *Weinberg, supra*, 97 Cal.App.3d [798] at p. 804 [159 Cal.Rptr. 86]]." ( *Lawrence v. Western Mutual Ins. Co., supra, 204 Cal.App.3d at p. 573.*) The *Neff* court, in refusing to apply estoppel to facts identical to this case, used a similar rationale: If denial of an otherwise covered claim were always treated as concealment of facts upon which to premise estoppel, ". . . that would mean that no insurer could deny liability without indefinitely suspending the running of the statute of limitations until perchance the insured . . . might obtain at some future time legal advice indicating the view that liability existed." ( *Neff v. New York Life Ins. Co., supra, 30 Cal.2d at p. 172.*)

Thus, the courts have not tolled the statute of limitations merely because the plaintiff was ignorant or not informed of his legal remedies. For these reasons we conclude FIE, which we determine not to be a true fiduciary, is not estopped from raising the statute of limitations to bar plaintiff's claims.

5. *Summary Judgment Was Properly Entered on the Loves' Causes of Action, Insofar* [***24] *as Such Claims Were Premised on the Purported Acts of Misfeasance Occurring After Loves' Claim Was Resubmitted*

**(13a)** The Loves finally contend that, even if their claims relating to the 1981 denial of coverage are time-barred, FIE committed independent acts of bad faith in delaying 17 months before rejecting the claim the Loves had [*1151] resubmitted in January of 1986. The Loves contend their bad faith claims based on these subsequent events were timely filed. We conclude the trial court correctly entered summary judgment as to this alternative theory.

At the time the Loves resubmitted their claim for damages, the statute of limitations on their right to sue for benefits under the policy had already expired. [9] Where an insured's right to collect policy benefits is already time-barred, he may not resurrect his rights merely by resubmitting a claim after the lapse of the limitations period. ( *Cardosa v. Fireman's Fund Ins. Co., supra, 144 Cal.App.2d 279, 282-283* [where insured submits claim to agent, who denies claim for lack of coverage, resubmission of claim after lapse of limitations period does not revive right to sue insurer for denial of [***25] the resubmitted claim].)

9 As previously discussed (see § 3, *ante*), the Loves' causes of action on the policy accrued in February 1981, and were subject to a four-year statute of limitations. That four-year period expired in February 1985, almost eleven months before the Loves resubmitted their claim in late December 1985 or early January 1986.

Because all of the Loves' rights under the policy had already lapsed, the [**255] Loves' resubmission of the claim does not entitle them to recover damages for breach of the covenant of good faith and fair dealing merely because FIE's investigation or its denial of the claim was tardy or inadequate. Tort liability for breach of the implied covenant of good faith and fair dealing has been variously measured. The primary test is whether the insurer withheld payment of an insured's claim unreasonably and in bad faith. ( *Frommoethelydo v. Fire Ins. Exchange, supra, 42 Cal.3d 208, 214-215.*) Where benefits are withheld for proper cause, [***26] there is no breach of the implied covenant. ( *California Shoppers Inc. v. Royal Globe Ins. Co. (1985) 175 Cal.App.3d 1, 54-55 [221 Cal.Rptr. 171].*) The duty imposed by law is not unreasonably to withhold payments due under the policy. ( *Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 920 [148 Cal.Rptr. 389, 582 P.2d 980].*)

**(14)** Thus, there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the

reason for withholding benefits must have been unreasonable or without proper cause. (See also *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court (1986) 184 Cal.App.3d 1428, 1433 [229 Cal.Rptr. 409]* [no award for bad faith can be made "without first establishing that coverage exists"]; *Kopczynski v. Prudential Ins. Co. (1985) 164 Cal.App.3d 846, 849 [211 Cal.Rptr. 12]].*) 10

**(13b)** Here, the undisputed [*1152] facts show the threshold requirement is absent. No benefits due were withheld or delayed, because the Loves' claim to benefits [***27] was already time-barred.

10 Our interpretation that a plaintiff must show, at a minimum, benefits were delayed or withheld, accords with the analysis of the commentators: "Where benefits are *fully and promptly paid*, no action lies for breach of the implied covenant -- no matter how hostile or egregious the insurer's conduct toward the insured may have been prior to such payment. *I.e., absent an actual withholding of benefits due, there is no breach of contract and likewise no breach of the insurer's implied covenant.* [Citation.]" (Kornblum et al., Cal. Practice Guide: Bad Faith, *supra*, § 4:28, p. 4-9, italics added.)

The Loves contend delay in denying a claim constitutes bad faith even if no coverage exists. The cases they rely upon, however, are inapposite. *McCormick v. Sentinel Life Ins. Co., supra, 153 Cal.App.3d 1030*, is cited as holding that lengthy delay in denying a claim can itself give rise to bad faith damages. However, the *McCormick* court operated [***28] on the assumption that benefits were in fact due, and merely addressed the issue of whether the insurer was excused from paying because of the insured's failure to provide sufficient information. ( *Id. at pp. 1041-1046.*) The *McCormick* court's statement that lengthy delay in processing a claim can constitute bad faith was based on its conclusion that such a delay can be tantamount to a denial of benefits *otherwise due*. ( *Id. at pp. 1048-1051.*) *McCormick* did not conclude that delayed denial of an uncovered claim is an independent ground for recovery of damages.

The Loves' reliance on *Travelers Ins. Co. v. Lesher (1986) 187 Cal.App.3d 169 [231 Cal.Rptr. 791]* is similarly misplaced. The *Lesher* court merely held that when an insurer provides a defense to its insured, the insurer can be held liable if the defense it provides is inadequate, causing its insured losses which an otherwise adequate defense would have prevented, even though there is an ultimate determination the insurer had no duty to indemnify or defend. ( *Id. at pp. 186-187.*) 11 [***29]

11 Loves rely on the *Lesher* court's statement that "Travelers does not advance a persuasive basis for holding that an insurer need process in a prompt and competent manner only those claims for which there is coverage. Logic compels the conclusion that under *section 790.03* the insurer must process all claims submitted to it promptly and competently, even in those instances where no coverage will ultimately be provided." ( *Id. at p. 190.*) We are unpersuaded that this language undermines the general rule that liability for bad faith depends on denial of policy benefits otherwise due, because this statement cannot be divorced from its factual context. In *Lesher*, the insured claimed injury from an inadequate defense, based in part on the appointed attorney's failure to negotiate or evaluate the advantages of settlement with the third parties ( *id. at pp. 182, 188-190)* and in part on Travelers' failure to provide replacement counsel for the insured until a few weeks before trial (which forced the insured into a disadvantageous settlement). ( *Id. at pp. 183-184.*) The duty promptly and competently to process claims was discussed within the context of determining *whether the defense as provided discharged insurer's duty to provide a prompt and competent defense.*

*Lesher* did not hold that bad faith liability could be founded on delay in denying an uncovered claim, at least where the delay caused no prejudice to the insured's other rights under the policy. To the extent the quoted language was so intended, it appears inconsistent with controlling Supreme Court language discussed above. Moreover, because the quoted language cites no authority, and (to our knowledge) has not been subsequently relied upon by other courts, the cited language appears to be an isolated and unsupported comment, which we decline to follow.

[***30] [*1153] [**256] Our conclusion that a

bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is rooted. The covenant of good faith and fair dealing is implied in law to assure that a contracting party "refrain[s] from doing anything to injure the right of the other to receive the benefits of the agreement." ( *Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal.3d at p. 818.*)

**(15)** In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract. Thus, when benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because it frustrates the insured's *primary* right to receive the benefits of his contract -- i.e., prompt compensation for losses. Absent that primary right, however, [***31] the *auxiliary* implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings.

The judgment is affirmed.

**CONCUR BY:** WIENER

**CONCUR**

**WIENER, J.**

I concur in the result reached by the majority in this case. The opinion's discussion regarding the extent to which the insurer is a "true" fiduciary is well-written and certainly interesting in the abstract. Unfortunately, I find the discussion completely unnecessary to the result we reach. I do not read the majority to dispute that insurers owe fiduciary duties to insureds under certain circumstances. The plaintiffs themselves characterize the relationship between insurer and insured as "quasi-fiduciary" in nature. The only question before us is whether the fiduciary aspects of the relationship compel the insurer, when it denies a claim on grounds of no coverage, to explain to the insured the reasons it might be wrong. I am convinced that the reasoning of *Neff v. New York Life Ins. Co. (1947) 30 Cal.2d 165 [180 P.2d 900, 171 A.L.R. 563]* remains good law and has not been undercut by more recent cases explicating [***32] the fiduciary components of the insurer-insured relationship.

[*1154] The majority's academic excursion appears to be motivated by a concern that courts in future cases will be seduced by the term "fiduciary" and impose unwarranted liability on insurers. I see little danger of such confusion. Rather, I fear that the rigid compartmentalization and convenient labeling suggested by the opinion may serve as a substitute for thoughtful analysis of whether the circumstances of a particular case justify the imposition of enhanced duties on the insurer. Accordingly, I cannot join the majority's extended and unnecessary exegesis.

# TAB 24

LEXSEE 7 CAL.4TH 1196

**VIVIENNE LUNDQUIST, Plaintiff and Respondent, v. HEINZ REUSSER et al., Defendants and Appellants.**

**No. S030738.**

**SUPREME COURT OF CALIFORNIA**

*7 Cal. 4th 1193*; *875 P.2d 1279*; *31 Cal. Rptr. 2d 776*; *1994 Cal. LEXIS 3786*; *94 Cal. Daily Op. Service 5588*; *94 Daily Journal DAR 10215*

**July 21, 1994, Decided**

**PRIOR HISTORY:** Superior Court of Santa Barbara County, No. SM59548, Rodney S. Melville, Judge.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A horse breeder brought an action arising from defendants' communication at a seminar of breeders and owners that plaintiff had had a show horse surgically altered to conceal conformational defects. At trial, the court instructed the jury that, pursuant to the privilege for statements of common interest made without malice (*Civ. Code, § 47, subd. (c)*), defendants bore the burden of proving the communication was made without malice. The jury returned verdicts for compensatory and punitive damages in favor of plaintiff. (Superior Court of Santa Barbara County, No. SM59548, Rodney S. Melville, Judge.) The Court of Appeal, Second Dist., Div. Six, No. B059617, reversed, concluding that the instruction constituted reversible error.

The Supreme Court reversed the judgment of the Court of Appeal insofar as it overturned the trial court's judgment in favor of plaintiff. The court held that the instruction was erroneous. The Legislature enacted *Civ. Code, § 47, subd. (c)*, with the intent to codify without change the common law common-interest privilege. At common law, the privilege embodied a two-step analysis under which the defendant bore the initial burden of demonstrating the communication was made on a privileged occasion, and the plaintiff then bore the burden of proving the communication was made with malice. However, the court held that the error was not prejudicial. The trial court correctly stated that the privilege was lost if the person making the statement was motivated by hatred or ill will toward the plaintiff. The jury also was instructed as to punitive damages. By awarding plaintiff punitive damages, the jury found that plaintiff proved not merely that defendants acted with the requisite reprehensible motivation, thereby defeating the privilege, but that defendants' conduct was intentionally injurious to plaintiff, thereby meeting the heightened requirements of malice to support the award. Thus, the verdicts would have been the same had the trial court properly instructed the jury on the burden of proof. (Opinion by George, J., expressing the unanimous view of the court.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) Libel and Slander § 45--Actions--Burden of Proof--Privilege and Malice--Privilege for Communication on Matter of Common Interest Made Without Malice--Burden of Proof on Issue of Malice.** --In a horse breeder's action arising from defendants' communication at a seminar of breeders and owners that plaintiff had had a show horse surgically altered to conceal conformational defects, the trial court erred in instructing the jury that, pursuant to the privilege for statements on matters of common interest made without malice (*Civ. Code, § 47, subd. (c)*), defendants bore the burden of proving the communication was made without malice. The Legislature enacted *§ 47, subd. (c)*, with the intent to codify without change the common law common-interest privilege. At common law, the privilege embodied a two-step analysis under which the defendant

bore the initial burden of demonstrating the communication was made on a privileged occasion, and the plaintiff then bore the burden of proving the communication was made with malice. The communication to persons sharing a common interest in horse breeding was within the scope of the privilege, and thus plaintiff had the burden of showing malice.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 520.]

**(2) Libel and Slander § 3--Elements of Defamation--Publication.** --For purposes of the law of defamation, publication of the defamatory communication does not require dissemination to a substantial number of individuals; it suffices that the defamatory matter is communicated to a single individual other than the one defamed.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 476.]

**(3) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons--Malice: Words, Phrases, and Maxims--Malice.** --For purposes of the statutory privilege for a communication made without malice to an interested person (*Civ. Code, § 47, subd. (c)*), "malice" is defined as a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy, or injure another person.

**(4) Libel and Slander § 24--Privileged Communications--Qualified Privilege--Communication to Interested Persons--Absence of Malice as Precluding Defamation Action.** --If *Civ. Code, § 47, subd. (c)* (communication to interested party), applies to the occasion on which a communication is made, and if that communication was made without malice, it is privileged and cannot constitute defamation under California law.

**(5) Evidence § 21--Burden of Proof--Party Upon Whom Burden Lies--Defamation Privilege--Placing Burden of Proof on Plaintiff to Show Malice.** --Placing upon the plaintiff in a defamation action the burden of proving malice concerning the privilege for a communication of common interest made without malice (*Civ. Code, § 47, subd. (c)*) is not inconsistent with *Evid. Code, § 500,* which states that, except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he or she is asserting. Under common law, this burden was on the plaintiff, and nothing in *Evid. Code, § 500*, suggests that the statute was intended to alter the operation of common law rules, relevant to the burden of proof, which were codified by the adoption of *Civ. Code, §§ 47, subd. (c)*, and *48*. Further, *Evid. Code, § 500*, does not purport to determine which facts are "essential" to the plaintiff's "claim for relief" and which facts are "essential" to a claimed defense. These are determinations to be resolved in light of the particular action or defense at issue. Therefore, placing the burden of proof on the plaintiff to establish malice does not conflict with *Evid. Code, § 500.*

**(6a) (6b) Libel and Slander § 57--Actions--Appeal--Harmless and Reversible Error--Instruction on Burden of Proof on Issue of Malice.** --In a horse breeder's action arising from defendants' communication at a seminar of breeders and owners that plaintiff had had a show horse surgically altered to conceal conformational defects, no prejudice resulted from the trial court's error in instructing the jury that, pursuant to the privilege for statements on matters of common interest made without malice (*Civ. Code, § 47, subd. (c)*), defendants bore the burden of proving the communication was made without malice. The jury rendered special verdicts awarding plaintiff compensable and punitive damages. The court correctly stated that the privilege was lost if the person making the statement was motivated by hatred or ill will toward the plaintiff. The jury also was instructed as to punitive damages. By awarding plaintiff punitive damages, the jury found that plaintiff proved not only that defendants acted with the requisite reprehensible motivation, thereby defeating the privilege, but that defendants' conduct was intentionally injurious to plaintiff. Thus, the verdicts would have been the same had the court properly instructed the jury on the burden of proof.

**(7) Appellate Review § 183--Determination and Disposition of Cause--Harmless and Reversible Error--Instructions.** --In order to persuade an appellate court to overturn a jury verdict because of instructional error, an appellant must demonstrate that the error was prejudicial and resulted in a miscarriage of justice. Instructional error ordinarily is considered prejudicial only when it appears probable that the improper instruction misled the jury and affected the verdict.

**COUNSEL:** Archbald & Spray, Barry Clifford Snyder, Katherine H. Bower and Douglas B. Large for Defendants and Appellants.

Glen M. Reiser, Cynthia H. Reiser, Nordman, Cormany, Hair & Compton and Michael C. O'Brien for Plaintiff and Respondent.

**JUDGES:** Opinion by George, J., expressing the unanimous view of the court.

**OPINION BY:** GEORGE, J.

**OPINION**

[*1196] [**1279] [***776] Under the "common-interest privilege," codified in California in *Civil Code section 47, subdivision (c)* (hereafter *section 47(c)*), [1] a defendant who makes a statement to others [***777] on a matter of common interest is immunized from liability for defamation so long as the statement is made "without malice." In this case we must determine whether, when it is established that the statement in question was made on an occasion that falls within the [**1280] parameters of the common-interest privilege, it is *the plaintiff* who bears the burden of proving that the statement was made *with malice*, or *the defendant* who bears the burden of proving that the statement was made *without malice* .

1 All further statutory references are to the Civil Code unless otherwise indicated.

Prior to reconfiguration of the statute in 1990 into lettered subdivisions, *section 47(c)* was designated *section 47, subdivision (3)*. Where in prior decisions the statute is cited under its former designation as *section 47, subdivision (3)* (or "*section 47(3)*"), we have retained that designation.

In the present case, the Court of Appeal held that the trial court erred in instructing the jury that, under *section 47(c)*, defendants bore the burden of proof upon the issue of malice; in addition, the Court of Appeal found that this instructional error was prejudicial and required reversal of the judgment rendered by the trial court in favor of plaintiff. For the reasons discussed hereafter, we agree with the Court of Appeal that the trial court erred in instructing the jury that defendants, rather than plaintiff, bore the burden of [*1197] proof upon the issue of malice under *section 47(c)*, but we disagree with the Court of Appeal's determination that this instructional error was prejudicial in the present case. As we shall explain, in view of the trial court's instructions on the issue of punitive damages, and the jury's award of punitive damages in favor of plaintiff, we believe there is no reasonable probability that the instructional error regarding the application of *section 47(c)* affected the outcome of the case. Accordingly, we conclude that the judgment of the Court of Appeal, overturning the judgment rendered by the trial court in favor of plaintiff, should be reversed.

I.

Plaintiff Vivienne Lundquist is an established breeder of Peruvian Paso horses, animals prized for their rarity, beauty, and smooth, elegant gait. She claimed defendants Heinz and Sylvia Reusser defamed her at a meeting of 30 to 40 owners and breeders of Peruvian Paso horses, held in Buellton, Santa Barbara County, on August 14, 1988. At this seminar, Heinz Reusser participated in a panel discussion with other recognized experts regarding the use of drugs and surgery to enhance the appearance and performance of show horses. Reusser told the audience that, prior to his acquisition of a "multiple-champion" mare, the animal had been altered surgically in order to conceal a neck bulge a defect that he described as a "cosmetic conformational problem." [2]

2 Heinz Reusser's tape-recorded remarks were as follows:

"I'm Heinz Reusser. The reason I like to be on the panel here is my concern about how we influence our horses with drugs and surgery and how that affects, really affects, the future quality and future potential of our breed and to me they are very much the same thing as a breeder. We know that people breed to winning horses and if these winning horses have only been winning because they had the pharmacist at their side, then we are leading people that are breeding these horses down the wrong path. Especially if they don't know. And the same is true if they are breeding or buying for breeding horses that are surgically altered, taking genetic problems out of the horse and later we breed to them. And, of course, they come back and I think that these two things have the same effect on what we achieve in breeding with many of our breeders being led

down the wrong path that may cost them tens or hundreds of thousands of dollars until they find out what happened.

"In my specific case, and I just want to mention this to you, I have a mare, a multiple champion mare, had a surgically altered neck-ewe and it's very visible and I think that it established that was done to the mare. And now I am looking at the first foal and the first foal has exactly the same cosmetic conformational problem as the mother had except you didn't know that. That is going to come up three years and fifty thousand dollars later. So, I think drugs and the methods of surgically altering a horse, if for the purpose of winning in the show ring, are some of the worst tools to serve our breed with. This is what I would like you to think about and see that we can come back from these ills. I think they are terrible things. Sylvia, do you have the pictures here? She took some pictures of that mare so you can look at it. We are not telling you some wild story, ok?"

A question was raised at trial regarding the term "neck-ewe" that appears in the above passage. Although "ewe-neck" is a recognized conformational defect found in some Peruvian Paso horses, "neck-ewe" apparently is not a recognized term of art. At trial, the parties contested whether Heinz Reusser had transposed the words, "ewe," and "neck," or had completed his sentence with the word, "neck." The dispute is insignificant in the resolution of the present case.

Heinz Reusser did not identify the mare or the breeder, but asked his wife, Sylvia Reusser, [***778] to distribute to the audience six photographs depicting the [*1198] mare and her foal. John Burges, a horse breeder who attended the seminar and had purchased several Peruvian Paso horses from Vivienne Lundquist, believed he recognized the mare. He asked Sylvia Reusser whether the photographs depicted [**1281] a Peruvian Paso mare, raised by Lundquist, named Perla de Oro. Sylvia Reusser responded that the rules of the seminar prohibited her from identifying the mare by name, prompting Burges to ask, "Do I know that mare?" Sylvia Reusser's reply suggested that Burges knew the mare. [3] Burges and others in attendance deduced the mare was Perla de Oro, and Lundquist was the breeder. Following the seminar, rumors spread among Peruvian Paso horse owners and breeders that Vivienne Lundquist surgically altered her show horses to conceal conformational defects.

3 At trial, Sylvia Reusser testified that, in reply to John Burges's inquiry, she stated, "You might know the horse." Burges testified that her reply was, "Yeah, you know the mare."

Upon ascertaining that the rumors originated from the seminar, Lundquist filed the present lawsuit, alleging that she had been defamed by the Reussers and that they had damaged her reputation and caused her to suffer emotional distress. In their answer, the Reussers raised the affirmative defense that the challenged communication was protected by the common-interest privilege set forth in *section 47(c)*, because the statement was made without malice to other interested persons.

At trial, Vivienne Lundquist testified that, since the mid-1970's, she had been involved in breeding and showing Peruvian Paso horses. In 1978, one of her horses, Perla de Oro, then eight months of age, developed a throat abscess, necessitating surgical removal of the abscess by a veterinarian. After the infected area healed, a 14-inch surgical scar remained, which nonetheless did not prevent Perla de Oro from winning multiple championships. The scar easily was visible during the summer months, becoming less visible during the winter, when the mare's coat was thicker. Lundquist denied that Perla de Oro ever had had a conformational defect or undergone cosmetic surgery, testimony that was corroborated by the veterinarian who performed the operation to remove the abscess.

Perla de Oro's success in the show ring attracted the attention of Heinz and Sylvia Reusser, who had established their own horse-breeding business in the mid-1980's and had purchased three other Peruvian Paso horses from Vivienne Lundquist. Prior to the sale of Perla de Oro to the Reussers, the [*1199] mare had given birth to four foals, none of which exhibited conformational defects. In 1985, when the mare was pregnant with a fifth foal, Lundquist sold her to the Reussers for $25,000, without mentioning the surgery performed on Perla de Oro's neck seven years earlier.

Heinz Reusser testified that he and his wife had been particularly interested in Perla de Oro because of Vivienne Lundquist's representation to them, made shortly before the sale, that Perla de Oro was in foal to La

Briego, a stallion Heinz Reusser described as "very charismatic." Lundquist testified Perla de Oro indeed had been bred to La Briego, but that the effort did not produce a foal, leading Lundquist to "re-breed" the mare to another stallion, Romanesco--a circumstance Lundquist had neglected to mention when making her initial representations to the Reussers. Upon discovering her error as to the sire's identity, and disclosing it to the Reussers prior to consummating the sale of Perla de Oro, Lundquist offered to rescind the sale, but the Reussers declined, preferring instead that Lundquist arrange a subsequent breeding of Perla de Oro to La Briego. Lundquist agreed to do so.

Following the sale of Perla de Oro to the Reussers, and the subsequent birth of her foal (Rio Allason), which displayed no conformational defects, the Reussers elected to [***779] forego the opportunity to have the mare bred to La Briego, instead breeding Perla de Oro to the mare's own half-brother, HMS Domingo (a stallion renowned for his fluid stride). This union led to the birth, in January 1988, of Tanya, the foal depicted in the photographs (distributed by the Reussers at the seminar) as having been born with an abnormal bulge beneath her chin. The Reussers believed the bulge in Tanya's neck constituted a genetic defect, although no veterinarian or other specialist in equine physiology had so advised them.

Following Tanya's birth, and the shedding of Perla de Oro's winter coat in the spring of [**1282] 1988, the Reussers discovered the scar on the mare's neck, located in the same area as the bulge beneath Tanya's chin. The Reussers consulted a veterinarian, who told them that muscle tissue had been surgically removed from Perla de Oro's neck, that he was unable to ascertain whether the surgery had been for medical or cosmetic purposes, and that he knew of no medical reason for such an operation. The Reussers compared "baby pictures" of Perla de Oro and Tanya and--*without even attempting to contact Vivienne Lundquist*--concluded that cosmetic surgery had been performed on Perla de Oro in order to conceal a genetic defect. [4]

4 Heinz Reusser testified he did not seek an explanation from Lundquist as to how Perla de Oro had obtained the scar, because he believed Lundquist initially had been dishonest with him regarding the breeding of Perla de Oro to La Briego, and because Lundquist had not disclosed the existence of the scar to him prior to the sale.

[*1200] John Burges, one of the horse breeders who attended the seminar, testified that, upon hearing Heinz Reusser's remarks attributing the scar on Perla de Oro's neck to "secret" surgery performed to conceal a genetic defect, and upon viewing the photographs distributed at the seminar by Sylvia Reusser, he believed he had made a "huge mistake" in purchasing Peruvian Paso horses from Vivienne Lundquist. Shortly after returning to his residence in Texas, he telephoned Heinz Reusser to inquire whether the mare depicted in the photographs was Perla de Oro. Reusser confirmed that it was.

Vivienne Lundquist testified other breeders and owners of Peruvian Paso horses, including individuals who had not attended the seminar, subsequently informed her that they had heard she had been accused of surgically altering her horses. Lundquist testified the accusations damaged her reputation and caused her to suffer emotional distress. At trial, she waived her claim for economic losses directly attributable to the communications made by the Reussers at the seminar, and sought only general and punitive damages arising from the injury to her reputation and from the infliction of emotional distress.

The trial court instructed the jury that, whereas plaintiff bore the burden of proving that the statements in question were made by defendants and were defamatory, defendants bore the burden of proving that the statements were made on a privileged occasion and were made without malice. [5]

5 Plaintiff's instruction No. 20, a modified version of *BAJI No. 2.60*, in pertinent part instructed the jury regarding the burden of proof, as follows:

"In plaintiff's first cause of action for defamation and slander, the plaintiff has the burden of establishing by a preponderance of the evidence the following:

"1. That the statements made by defendants on August 14, 1988, were untrue and intentionally published by the defendants;

"2. That the natural and probable effect on the average listener was to defame plaintiff;

"3. That the publication was the proximate cause of damage to plaintiff.

"In response to plaintiff's first cause of action for defamation and slander, defendant has asserted as a defense that the statements were true or that he was privileged. As to these defenses, the defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish:

"1. That the statements made by defendant on August 14, 1988 were true; or

"2. That when defendant made the statements on August 14, 1988:

"a. He made the statements without malice towards the plaintiff; and

"b. He made them to person[s] who were interested in the subject matter of the statement; and

"[c.] He was interested in the subject matter of the statements or stood in such relation to the person[s] interested as to afford a reasonable ground for supposing the motive for the communication innocent, or was requested by the person[s] interested to give the information. . .."

[*1201] By contrast, in advising the jury upon the issue [***780] of punitive damages, the trial court instructed the jury that, in order to obtain such damages, plaintiff bore the burden of proving, by clear and convincing evidence, that defendants had acted with malice and oppression toward plaintiff. [6]

6 With respect to plaintiff's prayer for punitive damages, the trial court instructed the jury, pursuant to modified versions of *BAJI Nos. 2.62* and *14.71*, that, in seeking an award of punitive damages, plaintiff bore the burden of proving, by clear and convincing evidence, all the facts necessary to establish that defendants acted with malice or oppression toward plaintiff.

[**1283] The jury returned special verdicts awarding Vivienne Lundquist $20,000 on her cause of action for slander, $20,000 for intentional infliction of emotional distress, $25,000 in punitive damages against Heinz Reusser, and $15,000 in punitive damages against Sylvia Reusser. In reaching its verdict, the jury found that the Reussers' communication to those persons in attendance at the seminar had defamed Lundquist and was not privileged, and, additionally, with regard to the jury's award of punitive damages, that Vivienne Lundquist had established that the Reussers acted with malice. The trial court denied posttrial motions filed by the Reussers alleging instructional error and insufficiency of the evidence.

The Court of Appeal reversed the judgment of the trial court, holding that the trial court erred in instructing the jury that the Reussers bore the burden of proving that the statements they made to persons in attendance at the seminar had been made without malice. Relying upon language contained in our decision in *Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711 [257 Cal.Rptr. 708, 771 P.2d 406]*, as well as upon other decisions rendered by California appellate courts ( *Manguso v. Oceanside Unified School Dist. (1984) 153 Cal. App. 3d 574, 580-581 [200 Cal.Rptr. 535]*; *Williams v. Taylor (1982) 129 Cal. App. 3d 745, 752 [181 Cal.Rptr. 423]*; *Gantry Constr. Co. v. American Pipe & Constr. Co. (1975) 49 Cal. App. 3d 186, 197-198 [122 Cal.Rptr. 834]*), the Court of Appeal held that, where the uncontested facts establish that the allegedly defamatory statement was made on an occasion within the reach of the common-interest privilege, the plaintiff bears the burden of proving that the defendant acted with actual malice, in order to prevail upon the defamation claim. [7]

7 The Court of Appeal also held that the trial court's instruction, assigning to the Reussers the burden of establishing an absence of malice, prejudicially affected the jury's verdict as to Vivienne Lundquist's cause of action for intentional infliction of emotional distress. Additionally, the Court of Appeal held that the jury's award of punitive damages did not "cure[] the instructional error," because, had the jury been instructed properly as to which party bore the burden of proof relating to malice, it might never have reached the question of punitive damages. For these reasons, the Court of Appeal reversed the entire judgment.

[*1202] We granted Vivienne Lundquist's ensuing petition for review in order to resolve a conflict in the California decisions as to proper allocation of the burden of proof under *section 47(c)*. [8]

8 Two weeks before oral argument, plaintiff's counsel informed this court that the parties had settled their dispute. Although this development suggested that the case had become moot, and, as a general rule, this court will not render an advisory opinion ( *Coleman v. Department of Personnel Administration (1991) 52 Cal.3d 1102, 1126 [278 Cal.Rptr. 346, 805 P.2d 300]*), we instead follow the well-established line of judicial authority recognizing an exception to the mootness doctrine, and permitting the court to decline to dismiss a case rendered moot by stipulation of the parties where the appeal raises issues of continuing public importance. (See, e.g., *Burch v. George (1994) 7 Cal.4th 246, 253, fn. 4 [27 Cal.Rptr.2d 165, 866 P.2d 92]*; *In re Kieshia E. (1993) 6 Cal.4th 68, 74, fn. 5 [23 Cal.Rptr.2d 775, 859 P.2d 1290]*; *Abbott Ford, Inc. v. Superior Court (1987) 43 Cal.3d 858, 868-869, fn. 8 [239 Cal.Rptr. 626, 741 P.2d 124]*; *Daly v. Superior Court (1977) 19 Cal.3d 132, 141 [137 Cal.Rptr. 14, 560 P.2d 1193]*; *Liberty Mut. Ins. Co. v. Fales (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213]*; *D.I. Chadbourne, Inc. v. Superior Court (1964) 60 Cal.2d 723, 731-732, fn. 5 [36 Cal.Rptr. 468, 388 P.2d 700]*; *County of Madera v. Gendron (1963) 59 Cal.2d 798, 804 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555]*; see also *Cal. Rules of Court, rule 19(b)* [once the record is filed in the reviewing court, dismissal following abandonment of the appeal is discretionary, not mandatory]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 505-506, pp. 491493.) Because the present case provides this court with an opportunity to reconcile disparate lines of judicial authority and thereby clarify the law with respect to the common-interest privilege (see *post*, pp. 1202-1203, 1208-1210), we refrain from dismissing the action, instead retaining jurisdiction for the purpose of resolving the legal issues presented.

II.

**(1a)** The principal issue presented in this case is whether the trial court properly instructed [***781] the jury that, in the jury's determination whether the common-interest privilege set forth in *section 47(c)* has been established, defendants bore the burden of proving not only that the allegedly defamatory statement was made upon an occasion that [**1284] falls within the common-interest privilege, but also that the statement was made without malice. Defendants contend that, in California and throughout the United States, the general rule is that, although a defendant bears the initial burden of establishing that the allegedly defamatory statement was made upon an occasion falling within the purview of the common-interest privilege, once it is established that the statement was made upon such a privileged occasion, the plaintiff may recover damages for defamation only if *the plaintiff* successfully meets the burden of proving that the statement was made with malice. (See generally, Prosser & Keeton on Torts (5th ed. 1984) Defamation, § 115, p. 835; 2 Harper et al., The Law of Torts (1986) Defamation, § 5.27, pp. 232-242; [*1203] *Rest.2d Torts, § 613, subd. (1)(h)*, p. 307.) [9] As stated above, the Court of Appeal agreed with defendants on this point. Although, as we shall explain, there are a few (primarily early) California decisions that state a contrary rule, both the legislative history of *section 47(c)* and the overwhelming majority of recent California decisions support the Court of Appeal's conclusion. Accordingly, we agree with the Court of Appeal insofar as it concluded that the trial court erred in instructing the jury that defendants bore the burden of proof upon the issue of malice, for purposes of *section 47(c)*.

9 The cited passage of the treatise authored by Prosser and Keeton states: "The burden is upon the defendant in the first instance to establish the existence of a privileged occasion for the publication, by proof of a recognized public or private interest which would justify the utterance of the words. . . .. *Once the existence of the privilege is established, the burden is upon the plaintiff to prove that it has been abused by excessive publication, by use of the occasion for an improper purpose, or by lack of belief or grounds for belief in the truth of what is said.*" (Prosser & Keeton, *supra*, Defamation, § 115, p. 835, italics added, fns. omitted.) Similarly, the treatise authored by Harper et al. states: "As to 'malice,' i.e., actual ill will or improper purpose that constitutes an abuse of the occasion and therefore defeats a qualified privilege, the jury makes the findings, subject to the general and usual control of the court, *the burden of proof being on the plaintiff.*" (2 Harper et al., *supra*, Defamation, § 5.29, p. 248, italics added, fns.

omitted.) *Section 613 of the Restatement Second of Torts* provides in relevant part that "(1) In an action for defamation *the plaintiff has the burden of proving*, when the issue is properly raised, . . . [P] . . . (h) *the abuse of a conditional privilege*" (italics added), and comment *g* accompanying *section 613* (at p. 309) explains that, "[i]f [the defendant] relies upon the defense that the publication of the communication was conditionally privileged, [the defendant] has the burden of proving it. If he sustains this burden by evidence of the requisite quantity and quality, he will prevail *unless the plaintiff takes up and sustains the burden of proving that the privilege was abused*." (Italics added.)

A.

As we recently explained in *Brown v. Kelly Broadcasting Co., supra, 48 Cal.3d 711* (hereafter *Brown*), defamation, which constitutes an abuse of the right of free speech, "has two forms--libel and slander." (§ 44; *Brown, supra, 48 Cal.3d at p. 723*.) Slander is defined as including "a false and unprivileged publication, orally uttered, . . . [P] . . . [tending] directly to injure [any person] in respect to his office, profession, trade or business . . .." (§ 46; see also *Brown, supra, 48 Cal.3d at p. 723*.) **(2)** For purposes of the law of defamation, "publication" does not require dissemination to a substantial number of individuals; it suffices that the defamatory matter " 'is communicated to a single individual other than the one defamed.' " (*Brown, supra, 48 Cal.3d at 723, fn. 6*, quoting [***782] *Rest.2d Torts, § 577, com. b*, p. 202; *Cunningham v. Simpson (1969) 1 Cal.3d 301, 306-307 [81 Cal.Rptr. 855, 461 P.2d 39]*; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 476, p. 561.)

*Section 47(c)* establishes that certain communications made between persons on a matter of common interest are privileged if the statements are [*1204] made "without malice." [10] [**1285] *Section 48*, in turn, provides that with respect to statements falling within *section 47(c)*, "malice is not inferred from the communication."11 [11] **(3)** For purposes of this statutory privilege, malice has been defined as " 'a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.' " (*Brown, supra, 48 Cal.3d at p. 723*, quoting *Agarwal v. Johnson (1979) 25 Cal.3d 932, 944 [160 Cal.Rptr. 141, 603 P.2d 58]*.) **(4)** We have held that "[i]f *section 47(3)* applies to the occasion on which a communication is made and if it was made without malice, it is privileged and cannot constitute a defamation under California law." (*Brown, supra, 48 Cal.3d at p. 723*, original italics, fn. omitted.)

10 *Section 47(c)* provides that a privileged publication is one made: "In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."

We observe that the common-interest privilege has proved to be a source of vexation and bafflement to courts and commentators alike. (See, e.g., *Institute of Athletic Motivation v. University of Illinois (1980) 114 Cal. App. 3d 1, 11 [170 Cal.Rptr. 411]* ["[T]he scope of the privilege . . . is not capable of precise or categorical definition . . .."]; see also *Brown, supra, 48 Cal.3d at pp. 723-733* & fn. 18 [resolving various points of confusion related to the privilege]; 4 Levy, et al., Cal. Torts (1993) Defamation Defenses and Privileges, § 45.12[4], pp. 45-66-45-67 [contrasting various judicial interpretations of the privilege within California]; Prosser & Keeton, *supra*, Defamation, § 115 pp. 825, 835 [noting the "complexity" of the qualified privilege structure and "the very vagueness of the rules" pertaining to the burden-of-proof issue].)

11 Initially enacted concurrently with *section 47* in 1872, *section 48* prescribes: "In the case provided for in *[section 47(c)]*, malice is not inferred from the communication."

**(1b)** The parties do not dispute that the allegedly defamatory statements at issue in the present case, made by defendants at a seminar to persons sharing a common interest in horse breeding, were made upon a "privileged occasion" for purposes of the common-interest privilege. Accordingly, the determination whether defendants could be held liable for such statements turned upon whether defendants made the statements with or without malice. As indicated above, in the present case the trial court instructed the jury that, for purposes of the application of

*section 47(c)*, defendants bore the burden of proving an absence of malice. On appeal, the parties dispute whether defendants' assertion of the common-interest privilege as an affirmative defense requires that *defendants* prove an *absence of malice* in order to establish the privilege, or requires instead that *plaintiff*, in order to establish that she was defamed, prove that the defamatory communication was made *with malice*. In analyzing this issue, we turn first to the applicable statutes.

[*1205] B.

Our primary task in construing a statute is to determine the Legislature's intent. (*Brown, supra, 48 Cal.3d at p. 724*; *Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]*.) " 'The court turns first to the words themselves for the answer.' " (*Brown, supra, 48 Cal.3d at p. 724*, quoting *People v. Knowles (1950) 35 Cal.2d 175, 182 [217 P.2d 1]*; see also *Committee of Seven Thousand v. Superior Court (1988) 45 Cal.3d 491, 501 [247 Cal. Rptr. 362, 754 P.2d 708]*.) In this instance, however, the language of the relevant statutes does not provide a ready answer. As we have seen, section 46, by its terms, defines slander as, inter alia, "a false and *unprivileged* publication"; *section 47(c)* [***783] defines a privileged publication as including one made "[i]n a communication, *without malice*, to a person interested therein" under specified circumstances, and *section 48* provides that, in cases governed by *section 47(c)*, "malice is not inferred from the communication." (Italics added.) The statutes contain no specific language directed to the burden-of-proof issue, and, in particular, to the question whether, for purposes of *section 47(c)*, the plaintiff bears the burden of proving that a statement, made upon a privileged occasion, was made with malice, or the defendant instead bears the burden of proving the absence of malice.

In the absence of an express statutory directive as to the burden-of-proof issue, we turn to the legislative history of *section 47(c)*. As we shall explain, unlike the language of the statute, the provision's legislative history sheds considerable light upon the legislative intent regarding the burden-of-proof issue.

[**1286] We recently had occasion to examine the legislative history of *section 47(c)* in *Brown, supra, 48 Cal.3d 711, 726-729*, in addressing the question whether *section 47(c)* establishes a broad "public-interest" privilege extending considerably beyond the traditional "common-interest" privilege. Because much of the discussion in *Brown* is pertinent to the question presented in the case now before us, we quote from that opinion at some length.

"*[Section 47(3)]* was enacted as part of the Civil Code in 1872. At that time, in the common law of England and the United States, defamation was subject to strict liability, that is, liability without fault as to truth or falsity. (Eldredge, [The Law of Defamation (1978)], § 5, pp. 14-25; Prosser & Keeton, The Law of Torts (5th ed. 1984) § 113, p. 804.) The standard of liability was succinctly phrased in Lord Mansfield's often quoted statement that, 'Whenever a man publishes he publishes at his peril.' ( *The King v. Woodfall* (1774) Lofft 776, 781 [98 Eng.Rep. 914, 916].) Justice Holmes [*1206] subsequently stated the rule in equally clear fashion: 'If the publication was [libelous] the defendant took the risk.' ( *Peck v. Tribune Co. (1909) 214 U.S. 185, 189 [53 L.Ed 960, 962, 29 S.Ct. 554]* . . ..)

"To ameliorate the harshness of the strict-liability standard, certain privileges and defenses developed in the common law. The one that is most relevant . . . is the common-interest privilege, which protected communications made in good faith on a subject in which the speaker and hearer shared an interest or duty. 12 This privilege applied to a narrow range of private interests. The interest protected was private or pecuniary; the relationship between the parties was close, e.g., a family, business, or organizational interest; and the request for information must have been in the course of the relationship. . ..

12 The "good faith" requirement distinguishes a conditional (or "qualified") privilege from an absolute one. (See, e.g., Lee & Lindahl, 3 Modern Tort Law (rev. ed. 1988) Defamation, § 36.20, p. 250 ["The distinction between absolute and qualified privileges is essentially that an absolute privilege confers immunity regardless of motive while a qualified privilege can be lost if the defendant acted out of malice." (Fn. omitted.)]; Eldredge, The Law of Defamation (1978) § 93, p. 510 ["Conditionally privileged occasions are created in order to permit the publisher of the defamation to protect the interest which is entitled to protection. If the publication is made primarily for the purpose of protecting or advancing that interest, the publisher has a proper purpose and,

with respect to the purpose element, does not abuse the occasion. On the other hand, where the primary purpose is another purpose, e.g., a desire to injure the defamed person, this is an abuse of the occasion and no privilege comes into being." (Fns. omitted.)]; 2 Harper et al., *supra*, Defamation, § 5.21, pp. 179-180 ["The difference between absolute and qualified privilege lies in the effect of the motive and purpose of the defamer. The malice or malevolent purpose of the defamer is of no consequence if the occasion is absolutely privileged, but if the privilege is conditional only, proof of actual malice or ill will makes the defendant liable. In other words, malice is irrelevant if the words are spoken on an occasion absolutely privileged, as the immunity is absolute and indefeasible. But the insulation of an occasion only qualifiedly privileged is overcome by proof of malice." (Fn. omitted.)].)

"The legislative history of *section 47(3)* indicates the Legislature intended to codify the narrow common law privilege of common [***784] interest, not to create any broad news-media privilege. . .. [P] . . . We also find significance in the drafters comments to *section 47(3)*. The wording of *section 47(3)* was identical to that of section 31 of the original New York Civil Code published in 1865 as a codification of the common law (N.Y. Civ. Code, § 31 (Field 1865)). In the comments following *section 47(3)*, its drafters cited two New York cases dealing with the common-interest privilege [*Lewis and Herrick v. Chapman (1857) 16 N.Y. 369* and *Thorn v. Moser (N.Y. Sup.Ct. 1845) 1 Denio 488]* . . .. [P] . . . [and] also cited a treatise on the common law, Hilliard, The Law of Torts or Private Wrongs (1859) chapter XIV, page 317." (*Brown, supra, 48 Cal.3d at pp. 726-728*, fns. omitted, citing code comrs. note foll. 1 Ann. *Civ. Code, § 47* (1st ed. 1872, Haymond & Burch, comrs.--annotators) p. 25.)

[*1207] The authorities cited by the drafters of *section 47(c)*, and noted by us in *Brown, supra, 48 Cal.3d at pages 728-729*, speak directly to the burden-of-proof issue presented in the case now before us. The treatise authored by [**1287] Hilliard, The Law of Torts or Private Wrongs (1859) (hereafter Hilliard), contains the traditional statement of the common law common-interest privilege set forth in an English case, *Harrison v. Bush* (1855) 119 Eng.Rep. 509, as follows: "A communication made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contain criminatory matter which, without this privilege, would be slanderous and actionable." (See Hilliard, *supra*, ch. XIV at pp. 317-318.) The Hilliard treatise explains that, when the facts establish the statement was made upon a privileged occasion, the burden rests upon the plaintiff to establish malice: "The rule is well settled, that, if the words were spoken or the publication made *upon a just occasion*, the communication is privileged, and *express malice must be shown in order to maintain an action*." (Hilliard, *supra*, ch. XIV, at p. 317, initial italics in original, latter italics added, fn. omitted.) In an accompanying footnote, the treatise cites two English cases addressing this issue. In *Taylor v. Hawkins* (1851) 117 Eng.Rep. 897, 902, Lord Campbell stated: "The rule is, that, if the occasion be such as repels the presumption of malice, the communication is privileged, and the plaintiff must then, if he can, give evidence of malice: if he gives no such evidence, it is the office of the Judge to say that there is no question for the jury, and to direct a nonsuit or a verdict for the defendant." Similarly, in *Wright v. Woodgate* (1835) 150 Eng.Rep. 244, 246, Baron Parke stated: "[T]he occasion on which the communication was made rebuts the inference prima facie arising from a statement prejudicial to the character of the plaintiff, and puts it upon him to prove that there was malice in fact--that the defendant was actuated by motives of personal spite or ill-will, independent of the occasion on which the communication was made." (See Hilliard, *supra*, ch. XIV at p. 317, fn. 1 (b).)

The *Lewis and Herrick* and *Thorn* cases, also cited by the drafters of *section 47(c)*, are equally explicit on this point. (See *Lewis and Herrick v. Chapman (1857) 16 N.Y. 369, 373* ["The term 'privileged,' as applied to a communication alleged to be libelous, means simply that the circumstances under which it was made were such as to repel the legal inference of malice, and to throw upon the plaintiff the burden of offering some evidence of its existence beyond the mere falsity of the charge." (Italics added.)]; *Thorn v. Moser (N.Y. Sup.Ct. 1845) 1 Denio 488, 492-493* ["In general the mere utterance of slanderous words constitutes a ground of action, and the plaintiff need only prove their speaking to authorize a recovery. But to this there are well known exceptions growing out of the occasion of speaking the [*1208] words and the attendant circumstances. These may be such as to repel the legal presumption of malice, which

usually attaches to the speaker of defamatory words, *and may require the plaintiff, before he can recover, to prove the existence of malice in fact on the part of the* [***785] *defendant*. . .. Indeed, whenever a person speaks in the performance of any duty, legal or moral, public or private, or in the assertion of his own rights, or to vindicate and protect his interest, no action will lie against him without proving express malice, however untrue what is said may be." (Italics added.)].)

In sum, as we set forth in *Brown, supra, 48 Cal.3d at pages 726-729*, it is clear that, in enacting *section 47(c)*, the Legislature intended to codify without change the common law common-interest privilege. At common law, that privilege embodied a two-step analysis, under which the defendant bore the initial burden of demonstrating that the allegedly defamatory communication was made upon a privileged occasion, and the plaintiff then bore the burden of proving that defendant had made the statement with malice. Accordingly, the legislative history of *section 47(c)* supports the Court of Appeal's determination in the present case that the trial court erred in instructing the jury that, under the common-interest privilege, defendants bore the burden of proof upon the question of malice.

C.

In challenging the Court of Appeal's conclusion as to the burden-of-proof issue, plaintiff relies heavily upon a line of decisions, [**1288] commencing with this court's opinion in *Snively v. Record Publishing Co. (1921) 185 Cal. 565 [198 P. 1]* (hereafter *Snively*), which state that a defendant who relies upon the common-interest privilege of *section 47(c)* as a defense to a defamation action has the burden of proving that the statement was made upon a privileged occasion *and* that the statement was made without malice. (See *Snively, supra, 185 Cal. at p. 578* [13]; see also *Siemon v. Finkle (1923) 190 Cal. 611, 617 [213 P. 954]* [following *Snively*]; *Stevens v. Snow (1923) 191 Cal. 58, 64-65 [214 P. 968]* [same]; *Maher v. Devlin (1928) 203 Cal. 270, 281-284 [263 P. 812]* [same]; *Longsworth v. Curson (1922) 56 Cal.App. 489, 497 [206 P. 779]*, hg. den. Apr. 17, 1922; *Miles v. Rosenthal (1928) 90 Cal.App. 390, 408 [266 P. 320]*; *Morcom v. San Francisco Shopping News* [*1209] *(1935) 4 Cal.App.2d 284, 288-289 [40 P.2d 940]*; *Fairfield v. Hagan (1967) 248 Cal.App.2d 194, 204-205 [56 Cal.Rptr. 402]* [following *Morcom*]; *Swope v. Moskovitz (1967) 253 Cal.App.2d 514, 517 [61 Cal.Rptr. 277]* [citing *Snively*].) Although plaintiff acknowledges that the *Snively* decision was disapproved in our recent decision in *Brown*, insofar as *Snively* suggested that the common-interest privilege codified in *section 47(c)* applies broadly to all news reports of matters of public interest (see *Brown, supra, 48 Cal.3d at pp. 732-733, fn. 18*), plaintiff maintains that *Snively's* analysis of the burden-of-proof issue was not disapproved in *Brown* and remains viable today. Plaintiff is correct that our decision in *Brown* did not address the burden-of-proof issue discussed in *Snively*, but, for a number of reasons, we cannot agree with plaintiff that the Court of Appeal erred in failing to adhere to the *Snively* line of decisions.

> 13 The court in *Snively* held: "[B]y averring in their answer that the publication was on a privileged occasion and was made without malice, the defendants directly put in issue the question of actual malice. As absence of actual malice was an essential part of that defense, it was necessary for the defendants to prove such absence in order to sustain this defense. The withdrawal by the plaintiff of his claim for punitive damages and the striking out of the averments of actual malice from the complaint did not establish the fact that defendants published the cartoon without actual malice, nor excuse them from the necessity of proving absence of such malice, if they desired to establish that defense." (*185 Cal. at p. 578*.)

To begin with, in stating that a defendant, under the common-interest privilege, has the burden of proving that the statement in question was made in the absence of malice, the *Snively* court cited no authority related to the common-interest privilege, and, in particular, failed to consider or analyze the common law background or legislative history of *section 47(c)* that we have discussed above. As we have explained, at the time *section 47(c)* was enacted, the common law rule was well established that, once the defendant proved that [***786] an allegedly defamatory statement was made upon a privileged occasion, the plaintiff bore the burden of proving that the statement was made with malice. *Section 47(c)* codified that rule, but the court in *Snively* apparently was unaware of that circumstance.

Second, although *Snively's* statement regarding the burden-of-proof issue was followed in several cases (cited above) in the years immediately after the decision

in *Snively*, the rationale of the conclusion reached in that case largely was undermined by this court's subsequent decision in *Locke v. Mitchell (1936) 7 Cal.2d 599, 602-604 [61 P.2d 922]*. As noted above (see fn. 13, *ante*), the court in *Snively* had reasoned that, because the "absence of actual malice was an essential part of [the] defense [provided by the common-interest privilege], it was necessary for the defendants to prove such absence in order to sustain this defense." (*Snively, supra, 185 Cal. at p. 578*.) In *Locke v. Mitchell*, however, this court, in clarifying the operation of the common-interest privilege, explained that, "*while in the case of a false and unprivileged publication, libelous* [per se], *malice is implied, and lack of it is a matter of defense*, which need not be pleaded [citing, inter alia, *Snively*], *this is not true of a qualified privilege*, for *section 48 of the Civil Code* expressly declares that malice is not inferred from the communication or publication in the cases provided for in subdivisions 3, 4 and 5 of *section 47*. *Hence, where the complaint discloses a case of qualified privilege, no malice* [*1210] *is presumed* [**1289] *and in order to state a cause of action the pleading must contain affirmative allegations of malice in fact*. [Citations.]" (*Locke, supra, 7 Cal.2d at p. 602*, italics added.)

We recognize that the *Locke* decision, by its terms, dealt only with the question of which party bore the burden of *pleading* malice, and did not address specifically the question of which party bore the *burden of proof* with regard to malice. Nonetheless, the common law decisions establishing the common-interest privilege, as we already have seen, had established that, when the evidence demonstrated a statement had been made upon a privileged occasion, the plaintiff in an action for defamation could prevail only if he or she proved that the statement was made with malice. Following the *Locke* decision, subsequent decisions of this court applying the common-interest privilege--while not addressing explicitly the burden-of-proof issue--implicitly recognized that, once it is established that an allegedly defamatory statement was made upon an occasion that gave rise to a qualified privilege under *section 47(c)*, a plaintiff may recover damages for defamation only if he or she presents evidence sufficient to establish that the statement was made with malice. (See, e.g., *Sanborn v. Chronicle Pub. Co. (1976) 18 Cal.3d 406, 413-414 [134 Cal.Rptr. 402, 556 P.2d 764]*; *Brewer v. Second Baptist Church (1948) 32 Cal.2d 791, 796-800 [197 P.2d 713]*; *Emde v. San Joaquin County etc. Council (1943) 23 Cal.2d 146, 154-155, 161 [143 P.2d 20, 150 A.L.R. 916]*.)

Although this court has not had occasion, in the 58 years that have elapsed since the *Locke* decision, to address explicitly the question of which party bears the burden of proof under *section 47(c)* as to the issue of malice, the overwhelming majority of Court of Appeal decisions that have addressed this point have held explicitly that, where the defendant establishes that the defamatory communication was made upon a privileged occasion, the plaintiff bears the burden of proving that the defendant acted with malice. (See, e.g., *Manguso v. Oceanside Unified School Dist., supra, 153 Cal. App. 3d 574, 580-581*; *Williams v. Taylor, supra, 129 Cal. App. 3d 745, 752*; *Gantry Constr. Co. v. American Pipe & Constr. Co., supra, 49 Cal. App. 3d 186, 198*; *Deaile v. General Telephone Co. of California (1974) 40 Cal. App. 3d 841, 846-849 [115 Cal.Rptr. 582]*; *Warfield v. McGraw-Hill, Inc. (1973) 32 Cal. App. 3d 1041, 1047 [108 Cal.Rptr. 652]*; *McCunn v. California Teachers Assn. (1970) 3 Cal. App. 3d 956, 962 [83 Cal.Rptr. 846]*; *Freeman v. Mills (1950) 97 Cal.App.2d 161, 166-169 [217 P.2d* [***787] *687]*; *Shoemaker v. Friedberg (1947) 80 Cal.App.2d 911, 919 [183 P.2d 318]*; contra, *Swope v. Moskovitz, supra, 253 Cal.App.2d 514, 517* [relying upon *Snively*]; *Fairfield v. Hagan, supra, 248 Cal.App.2d 194, 204-205* [relying upon *Morcom v. San Francisco Shopping News, supra, 4 Cal.App.2d 284*, one of the decisions that chose to follow *Snively*].) [*1211]

Thus, although plaintiff faults the Court of Appeal in the present case for failing to follow *Snively*, the passage in *Snively* upon which plaintiff relies has not been followed by the overwhelming majority of California decisions that have addressed this issue in the course of the last several decades. (See also 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 520, p. 610 ["Ordinarily, privilege must be specially pleaded by the defendant, and the burden of proving it is on him. [Citations.] But where the complaint shows that the communication or publication is one within the classes qualifiedly privileged, it is necessary for the plaintiff to go further and plead *and prove* that the privilege is not available as a defense in the particular case, e.g., because of malice. [Citations.]" (Italics added.)].)

Furthermore, the Court of Appeal's conclusion as to the burden-of-proof issue not only is supported by the common law background and legislative history of *section 47(c)*, and by most of the recent California

decisions discussing this issue, but also conforms to the application of the common-interest privilege in the great majority of jurisdictions throughout the United States. (See generally, Prosser & Keeton, *supra*, Defamation, § 115, pp. 835-836 [citing cases]; Harper et al., *supra* , Defamation, § 5.29, pp. 248-249, fn. 25 [citing cases].)

[**1290] **(5)** In addition to relying upon *Snively* and its progeny, plaintiff contends that the Court of Appeal's decision in the present case--and, by implication, all of the other Court of Appeal decisions, cited above, which held the burden of proof as to malice is upon the plaintiff--are inconsistent with the provisions of *Evidence Code section 500*, which sets forth a general rule with regard to allocation of the burden of proof. That statute, enacted in 1965 as part of California's initial codification of the rules of evidence, provides in full: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (*Ibid.*)

Plaintiff's contention is unavailing for several reasons. First, the introductory clause of *Evidence Code section 500*--"[e]xcept as otherwise provided by law"--makes it clear that the section was not intended to supersede rules (allocating the burden of proof) embodied in other statutory provisions or court decisions. (*Evid. Code, § 160.*) Plaintiff has not pointed to anything in the legislative history of *Evidence Code section 500* suggesting that the statute was intended to alter the operation of the common law rules, relevant to the burden of proof as to the common-interest privilege, which were codified by the adoption of *sections 47(c)* and *48*. Second, even without regard to its introductory clause, *Evidence Code section 500* does not purport to determine which facts are "essential" to the plaintiff's "claim for [*1212] relief" and which facts are "essential" to a claimed defense, but rather leaves those substantive determinations to be resolved in light of the particular cause of action or defense at issue. As we have seen, from its origins at early common law the common-interest privilege has been understood to require that the plaintiff prove the existence of "malice" as an essential requirement of a cause of action for defamation when the evidence establishes that the statement was made upon a privileged occasion. Accordingly, the rule placing upon the plaintiff the burden of proving malice, for purposes of *section 47(c)*, does not conflict with *Evidence Code section 500.*

Finally, plaintiff contends that our recent decision in *Brown, supra, 48 Cal.3d 711*, contains several statements "from which it could be inferred" that a defendant bears the burden of proving an absence of malice. As we shall explain, plaintiff is mistaken.

[***788] In *Brown, supra, 48 Cal.3d 711*, the sole issue presented was whether former *section 47, subdivision 3*, afforded a broad "*public*-interest privilege" to the news media to make false statements regarding a private individual. (*48 Cal.3d 711, 719*, italics added.) Defendants, members of the news media, argued that when news organizations publish and broadcast matters of public interest, they share a "common interest with their audiences," warranting protection under the statute. (*Ibid.*) In rejecting the defendants argument, we addressed two issues pertinent to our present discussion.

First, we held: *Section 47(3)* provides a privilege to specified communications made 'without malice.' . . .. If *section 47(3)* applies to the occasion on which a communication is made *and* if it was made without malice, it is privileged and cannot constitute a defamation under California law." (*Brown, supra, 48 Cal.3d at p. 723*, original italics.) Plaintiff contends that, properly interpreted, the quoted statement requires that, in order to prevail upon the defense of the common-interest privilege, a defendant must prove the occasion was privileged *and* the statement was made without malice. Yet *Brown* does not so hold. Indeed, *Brown* does not even address the burden-of-proof issue in the context of the common-interest privilege, and therefore the expansive interpretation of that decision urged by plaintiff is erroneous.

Second, in the context of examining the public-interest privilege in *Brown*, we held: "Interpreting *section 47(3)* to require a private person to prove malice might have another curious result. The distinction between public and private persons reflects a special solicitude for private reputation. Under a *section 47(3)* privilege, however, a private person might have to show a greater [**1291] degree of culpability by the defendant than would a public person under the common law fair-comment defense and its constitutional-malice [*1213] standard. . . . If so, a private person subject to *section 47(3)* would have a greater burden in obtaining redress for a damaged reputation than the high court has seen fit to impose on public persons." (*Brown, supra, 48 Cal.3d at p. 745*, fn. omitted.) Significantly, this

discussion in *Brown* was directed toward explaining why *section 47(3)* did not embrace the *public*-interest privilege urged by the defendants in that case. The discussion was unrelated to the distinct question presented here, which involves a nonmedia defendant who properly has asserted the statutorily endorsed *common*-interest privilege as an affirmative defense. Accordingly, we reject plaintiff's contention that *Brown* is supportive of her position.

III.

**(6a)** Although, as we have explained, the trial court's instructions to the jury in the present case erroneously allocated to defendants the burden of proving an absence of malice for purposes of the common-interest privilege, for the reasons set forth below we conclude that this error does not warrant reversal of the trial court's judgment in favor of plaintiff.

**(7)** In order to persuade an appellate court to overturn a jury verdict because of instructional error, an appellant must demonstrate that "the error was prejudicial (*Code Civ. Proc., § 475*) and resulted in a 'miscarriage of justice.' " ( *Pool v. City of Oakland (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163]*, quoting *Cal. Const., art. VI, § 13*; *People v. Watson (1956) 46 Cal.2d 818, 834 [299 P.2d 243]*.) Instructional error ordinarily is considered prejudicial only when it appears probable that the improper instruction misled the jury and affected the verdict. ( *Krouse v. Graham (1977) 19 Cal.3d 59, 72 [137 Cal.Rptr. 863, 562 P.2d 1022]*.) **(6b)** In the present case, as to the issue of malice, the trial court instructed the jury (pursuant to a modified version of *BAJI No. 7.05*) that the qualified privilege "is lost . . . if the person making the statement was: [P] 1. Motivated by hatred or ill-will toward the plaintiff which induced the publication; or [P] [***789] 2. Was without a good-faith belief in the truth of the statement." This instruction correctly stated the law. (See *Frommoethelydo v. Fire Ins. Exchange (1986) 42 Cal.3d 208, 217 [228 Cal.Rptr. 160, 721 P.2d 41]*; *Sanborn v. Chronicle Pub. Co., supra, 18 Cal.3d at p. 413*, quoting *Roemer v. Retail Credit Co. (1975) 44 Cal. App. 3d 926, 936 [119 Cal. Rptr. 82]* [" 'The malice necessary to defeat a qualified privilege is "actual malice" which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights (citations).' " (Italics by the court in *Roemer*.)].) As to the burden-of-proof issue, the trial [*1214] court erroneously instructed the jury that defendants bore the burden of proving that their statements to seminar attendees were made without malice. The trial court's error in instructing the jury as to the burden of proof clearly was harmless, however, because the jury also was instructed as to punitive damages (pursuant to a modified version of *BAJI No. 14.71*). In this regard, the jury was informed that, if it found "*by clear and convincing evidence*" that defendants' conduct was intended "*to cause injury to the plaintiff or* [*constituted*] *despicable conduct* . . . carried on by the defendant[s] with a willful and conscious disregard for the rights of others," malice (or "oppression," a term defined in the instruction as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights") thereby was established. (Italics added.) The jury's affirmative finding as to malice (or oppression) demonstrates that the jury found plaintiff had proved not only that defendants acted with the requisite reprehensible motivation constituting an abuse of the privileged occasion, thereby defeating the qualified privilege, but that defendants' conduct also was intentionally injurious to, or in conscious disregard of, plaintiff's rights, thereby meeting the *heightened* requirements of malice (or oppression) necessary to support an award of punitive damages. (See § 3294, subd. (c)(1), (2).) Thus, it is clear the jury's verdict would have [**1292] been the same had it been instructed correctly that, in order to establish that defendants abused the privileged occasion, plaintiff bore the burden of proving that defendants defamatory remarks were made with malice. Under these circumstances, reversal of the judgment rendered by the trial court is not warranted. (See *People v. Watson, supra, 46 Cal.2d at p. 836*.)

IV.

We reverse the judgment of the Court of Appeal insofar as it overturns the trial court's judgment in favor of plaintiff.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., Baxter, J., and Werdegar, J., concurred.

# TAB 25

LEXSEE 48 CAL. APP. 4TH 471

**DESIDERIO MAGPALI, Plaintiff and Appellant, v. FARMERS GROUP, INC., et al., Defendants and Respondents.**

**No. B084128.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION FOUR**

*48 Cal. App. 4th 471*; *55 Cal. Rptr. 2d 225*; *1996 Cal. App. LEXIS 714*; *96 Cal. Daily Op. Service 5530*; *96 Daily Journal DAR 9002*

**July 25, 1996, Decided**

**SUBSEQUENT HISTORY:** [***1] As Modified on Denial of Rehearing August 20, 1996.

**PRIOR HISTORY:** Appeal from orders of the Superior Court of Los Angeles County. Super. Ct. No. KC010428. Hon. Clifton L. Allen, Judge. (Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.)

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A terminated insurance agent brought an action against the insurer for breach of contract, fraud, and intentional infliction of emotional distress arising out of his tenure as an insurance agent. Plaintiff alleged defendant made false representations concerning how plaintiff could operate the agency, which caused him to change employment. He further alleged defendant had an unspoken policy of discouraging writing insurance policies for minorities, including the minority to which plaintiff belonged. The breach of contract action was dismissed, and the trial court granted defendant a nonsuit on the other claims; plaintiff was also denied leave to amend to allege an Unruh Civil Rights Act (*Civ. Code, § 51 et seq.*) claim. (Superior Court of Los Angeles County, No. KC010428, Clifton L. Allen, Judge. *)

* Retired judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

The Court of Appeal affirmed. The court held that the allegation that defendant induced plaintiff to become one of its insurance agents by fraudulent representations stated a cause of action, but that the evidence did not support any of the claims. The evidence was uncontroverted that for years after plaintiff became a full-time insurance agent, defendant did not interfere with his operations in any way and that plaintiff ran his office as he thought best. It was only after multiple years of disappointing sales and a higher than average loss ratio that he was instructed to try different marketing techniques. The court also held that the claims were time-barred. It further held that the allegation that defendant had an unspoken policy prohibiting agents from marketing to any one specific ethnic group, and that plaintiff was instructed to write more insurance policies for non-minorities and to avoid writing policies for members of plaintiff's own ethnic group because they were poor risks, could constitute the extreme and outrageous conduct needed to support the tort of intentional infliction of emotional distress, but that the action was also time-barred. The court further held that the trial court properly denied plaintiff leave to amend on the day of trial. (Opinion by Baron, J., with Epstein, Acting P. J., and Hastings, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Fraud and Deceit § 7--False Representations--Promissory Fraud--To Change Employment--Insurance Agent.** --A complaint that an insurer induced plaintiff to become one of its insurance agents by fraudulent representations stated a cause of action. Where an employer uses misrepresentations to induce a party to

change employment when the objective could not have been achieved truthfully, and the party is left in worse circumstances than those in which he or she would have found him- or herself had he or she not been lied to, the party has a claim for promissory fraud or fraud in the inducement. Although plaintiff was an independent contractor, not an employee, the same principle applied.

**(2) Fraud and Deceit § 7--False Representations--Promissory Fraud--To Change Employment.** --The trial court properly determined that an insurance agent could not recover on a claim that an insurer induced plaintiff to become one of its insurance agents by falsely promising to allow him to run his office as he saw fit and not be terminated or threatened with termination, where there was no evidence to support the claim the alleged promise was false when made. A promise of future conduct is actionable as fraud only if made without a present intent to perform. Something more than nonperformance is required to prove the defendant's intent not to perform the promise. The evidence was uncontroverted that for years after plaintiff became a full-time insurance agent defendant did not interfere with his operations in any way and that plaintiff ran his office as he thought best. It was only after multiple years of disappointing sales and a higher than average loss ratio that he was instructed to try different marketing techniques. Defendant could not have foreseen that plaintiff would be unable to profitably operate the agency at the time the contract was made and therefore could not have known that the alleged promise of noninterference was false when made.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 685.]

**(3) Limitation of Actions § 38--Commencement of Period--Fraud--Discovery--False Promise.** --The trial court properly determined that a claim that an insurer induced plaintiff to become one of its insurance agents by falsely promising to allow him to run his office as he saw fit and not be terminated or threatened with termination, was time-barred (*Code Civ. Proc., § 338, subd. (d)*). Plaintiff knew more than three years before filing the action that he had been designated a limited underwriting authority agent, restricted as to the types of insurance he could bind, forced to defend his operating and marketing practices, and ordered to develop a plan to return his agency to profitability by year's end, and thus he had notice that he would be operating under less than the absolute freedom he asserted was his due.

**(4a) (4b) Fraud and Deceit § 8--False Representations--Concealment--To Change Employment.** --A claim that an insurer induced plaintiff to become one of its insurance agents by falsely promising to allow him to run his office as he saw fit, but failed to disclose its limited underwriting authority (LUA) program, under which an underperforming agent could be restricted as to the types of insurance he or she could bind, was not supported by the evidence. Ordinarily, failure to disclose material facts is not actionable fraud unless there is some fiduciary relationship giving rise to a duty to disclose and an insurer does not owe a fiduciary duty to its agents. Also, the agent's guide which explained the LUA program was completely accessible to plaintiff before he left his prior occupation to become a full-time agent; indeed he was expected to study it as part of his training. Moreover, to be actionable, a misrepresentation or concealment must induce justifiable reliance and resulting damage. Under any view of the facts, plaintiff knew his future as an agent was uncertain and depended on his ability to engender profit for defendant. Plaintiff could not have reasonably expected that he would be permitted to run an unprofitable agency forever in light of the fact the parties' agreement included a requirement of conformance to normal good business practices and a right of termination for cause.

**(5) Fraud and Deceit § 8--False Representations--Concealment--Fiduciary Relationship.** --Ordinarily, failure to disclose material facts is not actionable fraud unless there is some fiduciary relationship giving rise to a duty to disclose The duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts that are not accessible to the plaintiff.

**(6) Limitation of Actions § 38--Commencement of Period--Fraud--Discovery--Concealment.** --A complaint alleging that an insurer induced plaintiff to become one of its insurance agents by falsely promising to allow him to run his office as he saw fit, but failed to disclose its limited underwriting authority (LUA) program, under which an underperforming agent could be restricted as to the types of insurance he or she could bind, was time-barred. The evidence was uncontroverted that plaintiff knew about the program by no later than April of 1989 when he received notice that he was going to be designated a LUA agent due to his excessive loss ratio. That plaintiff may have believed the status was only temporary made no difference to the running of the statute of limitations, which accrues when the plaintiff has all the information essential to the claim. Since he did not file the complaint until July of 1992, more than three years later, the claim was barred.

**(7) Limitation of Actions § 38--Commencement of Period--Fraud--Discovery--False Representations.** --A complaint alleging that an insurer induced plaintiff to become one of its insurance agents by falsely representing that plaintiff would be free to deal with applicants

regardless of racial background or nationality and never told plaintiff about its unspoken policy prohibiting agents from marketing to any one specific ethnic group, was time-barred. The damages did not arise from the loss of the position with defendant, but from the loss of the previously held position which plaintiff was induced to leave. The crucial event for accrual purposes was when plaintiff first learned of the alleged discriminatory policy, not the date on which he was terminated, and the statute did not begin running anew every time the alleged discriminatory policy was mentioned or emphasized. It was indisputable that plaintiff had sufficient reason to suspect the existence of a policy of discrimination over three years before he filed the action.

**(8) Torts § 5--Intentional Infliction of Emotional Distress--Insurance Selling Restrictions.** --A complaint by an insurance agent alleging that defendant insurer had an unspoken policy prohibiting agents from marketing in any one specific ethnic group, and that plaintiff was instructed to write more insurance policies for non-minorities and to avoid writing policies for members of plaintiff's own ethnic group because they were poor risks, could constitute the extreme and outrageous conduct needed to support the tort of intentional infliction of emotional distress.

**(9) Pleading § 77--Amendment--New Cause of Action--At Trial--Denial.** --In a fraud action by a terminated insurance agent against the insurance company, the trial court did not abuse its discretion in denying plaintiff's motion on the day of trial to amend and add a cause of action alleging a violation of the Unruh Civil Rights Act (*Civ. Code, § 51 et seq.*). Adding the new cause of action would have changed the tenor and complexity of the complaint from its original focus on representations and demands made to plaintiff by his superiors to an exploration of defendant's activities and practices in an entire geographical area. The new claim would have necessitated, at the very least, a continuance to allow defendant to depose new witnesses. Where the trial date is set, the jury is about to be impaneled, counsel, the parties, the trial court, and the witnesses have blocked the time, and the only way to avoid prejudice to the opposing party is to continue the trial date to allow further discovery, refusal of leave to amend cannot be an abuse of discretion. With every relevant factor aligned on the opposing side, denial of the motion for leave to amend was the only appropriate outcome.

**COUNSEL:** Perona, Langer & Beck, Major Alan Langer, Ellen R. Serbin and E. Todd Trumper for Plaintiff and Appellant.

Tharpe & Howell, Christopher S. Maile and David B. Wasson for Defendants and Respondents.

**JUDGES:** Opinion by Baron, J., with Epstein, Acting P. J., and Hastings, J., concurring.

**OPINION BY:** BARON

**OPINION**

[*475] [**227] **BARON, J.**

Appellant Desiderio Magpali brought suit against Farmers Group, Inc., Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, Farmers New World Life Insurance Company, Shel Chaffer, Norman Gerwien, and Joe Lowther (collectively referred to herein as Farmers) for breach of contract, fraud, and intentional infliction of emotional distress arising out of his tenure as an insurance agent for Farmers. The breach of contract claim was dismissed prior to trial and the court granted [***2] Farmers' motion for nonsuit as to the other two claims. On the eve of trial, Magpali sought and was denied leave to amend to add a claim for violation of the Unruh Civil Rights Act ( *Civ. Code, § 51* [**228] *et seq.*, hereinafter referred to as the Act). We affirm.

PROCEDURAL AND FACTUAL BACKGROUND

*The Pleadings*

In his complaint, filed July 15, 1992, Magpali alleged causes of action based on breach of contract, fraud and intentional infliction of emotional [*476] distress. The complaint alleged that he had been an agent for Farmers since 1984 and that Farmers breached the parties' agreement on or about April 17, 1989, by "placing Magpali on Limited Underwriting Authority ('LUA') status, effective May 1, 1989," which "result[ed] in severe restrictions being placed upon the agent's ability to bind Farmers policies." The complaint further stated that Farmers breached the agreement "by telling Magpali how to run his business and requiring him to submit a plan of operation for Farmer[s's] approval" and "by terminating the [agreement] without good cause . . . ."

Concerning the fraud claim, the complaint alleged that in July of 1984 and April of 1985 Farmers made [***3] the following misrepresentations: "(a) As a Farmers' agent Magpali would be an independent contractor and as such, he would be able to determine the time in which he would carry out his business; [P] (b) That Magpali would be free to determine [the] manner in which he conducted his business; [P] (c) That Magpali would be free to make all decisions regarding the operation of his business as long as he performed his duties

under the Appointment Agreement; [P] (d) That Magpali would be allowed to market policies to any and all interested applicants; and [P] (e) That Magpali would be free to deal with applicants regardless of racial background or nationality." According to the complaint, the truth was that Farmers "intended to, and did: [P] (a) Require that Magpali spend certain parts of each day and night soliciting new business; [P] (b) Impose requirements on Magpali regarding the manner in which he operated his business; [P] (c) Require that Magpali submit a plan of operation to Farmers which was subject to Farmers approval; [P] (d) Place Magpali on LUA status and preclude him from binding most types of Farmers policies, and, in some cases, from even submitting an [***4] inquiry to Farmers regarding an application; and [P] (e) Order Magpali to sell policies to applicants who were not Filipino or Hispanic."

In support of the claim for intentional infliction of emotional distress, Magpali alleged that between July 1991 and February 1992, Farmers' representatives: (a) "yelled that Magpali's record was the worst . . . ever[] seen and that Magpali should resign"; (b) "told Magpali that he was writing to[o] many policies for minorities and that he should write more policies for 'white people' or resign"; (c) "insulted, belittled, and shouted at Magpali and threatened to terminate him in an effort to get him to resign"; (d) "shouted at Magpali that he had no future with Farmers, that he should avoid writing Filipinos and Hispanics and that he should resign"; and (e) "force[d] Magpali, without any preparation, to do a mock sales presentation" and "told Magpali he was doing a lousy presentation and . . . was otherwise degrading and insulting to Magpali."

[*477] A demurrer to the complaint was overruled in all relevant parts. In its answer, Farmers contended that Magpali's claims for fraud and intentional infliction of emotional distress were [***5] barred by the relevant statutes of limitations. A motion brought by Farmers for summary judgment was denied.

Trial was set for March 2, 1994, and trailed until March 11, 1994. Magpali informed Farmers by letter dated March 8, 1994, that he intended to amend his complaint to bring a claim under the Act. He filed a motion for leave to amend on March 10. The court denied the motion on the first day of trial. Magpali dismissed the action for breach of contract during the argument on motions *in limine*.

*Evidence at Trial*

Accepting as true the evidence introduced by Magpali, he was recruited to become a Farmers insurance agent by John Cammeraat. [**229] Cammeraat told him at their first meeting that being a Farmers agent was an opportunity to be independent and to have his own business and earn unlimited income. Magpali believes he indicated to Cammeraat that his natural market was the Filipino community.

Magpali became a reserve agent in July of 1984, which means he began selling insurance part time while holding on to his existing job with a company called Zeus West, Incorporated. Between July of 1984 and April of 1985, he received training classes but no specific training [***6] on limited underwriting authority (LUA) or the calculation of loss ratio. Farmers maintains a manual or guide for its agents which discusses LUA status and how it is attained. It states: "When the 4th quarter Experience Analysis reports are published each year, all Agents are evaluated to determine their status for the subsequent year. [P] . . . . [P] [The LUA] designation will apply to those Agents who have an underwriting loss of over 10 and $ 60,000 or more during the past 36 months, ending December 31st, regardless of policy-in-force. [P] Limited Underwriting Agent may not bind risks in Farmers Auto." Magpali could not remember when he received his own copy of the agent's guide, possibly not until he became a full-time agent. However, he was required to study the guide as part of his training and had access to a copy of the guide located in the office in which he worked.

In April of 1985, Magpali signed an agent appointment agreement and became a full-time agent for Farmers, quitting his job with Zeus West. The agreement provided that "[t]he Agent shall, as an independent contractor, exercise sole right to determine the time, place and manner in which the [*478] [***7] objectives of this Agreement are carried out, provided only that the Agent conform to normal good business practice, and to all State and Federal laws governing the conduct of the Companies and their Agents." The agreement stated that it could be terminated by either party "on thirty (30) days written notice," which would suggest that it could be terminated with or without cause. However, there is no dispute that Farmers' practice was to terminate agency agreements only for cause.

Magpali first recalls hearing about the LUA program in 1986 or 1987 when an agent in his office was placed in it. In addition, it was his understanding from studying the agent's guide that one of Farmers' objectives for its agents was that they have a profitable loss ratio. He received quarterly loss ratio reports from the time he became a career agent. He was expressly informed that he was having a loss ratio problem in 1988 when he received a memorandum from Cammeraat listing the weaknesses in his agency, including "low production" and "loss ratio 172.7." The memorandum instructed him to "be prepared to discuss the contents of this memo and present your development plans" at their next meeting. Magpali [***8] believed that the problem was caused by

some of his clients' lying about their driving records. He prepared a response for Cammeraat in which he listed a number of actions he intended to undertake to improve his statistics.

Magpali received notice on April 17, 1989, that due to his loss ratio he would be put in the LUA program. The most significant result of this designation was that Magpali no longer had authority to bind the company when clients sought the low cost automobile policy designed for preferred risks unless he had a motor vehicle report, photographs of the car, and a copy of an existing insurance policy. At a meeting held shortly thereafter, he was told to correct the loss ratio problem by expanding his book of business outside the Filipino and Hispanic communities. In a memorandum from the regional sales manager which followed the meeting, he was instructed to "develop your plans, including quantitative goals, which you will work in order to return your Agency to profitability, by year-end."

The loss ratio situation did not improve. Effective May 1, 1990, the LUA status was renewed. A year later, in May of 1991, he [**230] was designated a LUA agent for the third [***9] year in a row.

At a meeting which followed the May 1991 LUA designation, Magpali was told his record was the worst ever seen and urged to resign. About a month later he met with his district manager and was again urged to resign and told to avoid writing Filipinos and Hispanics because they were giving him the loss ratio problem. He was required to do a mock sales presentation [*479] which was pronounced "lousy." At that meeting, he informed Farmers he would not change any practices unless the request was put in writing. Afterwards, he contacted a lawyer who sent a letter dated July 9, 1991, to Farmers, stating: "We were informed by our client that recently he has been the subject of harassment, threats, intimidation, insults and racial discrimination as evidenced by various written memoranda as well as verbal confrontations. [P] . . . . [P] We were informed by our client that he was verbally given notice that he cannot get customers who have Filipino and Hispanic origin." After sending the letter, Magpali decided not to attend further meetings. In December, his lawyers sent a letter outlining a marketing program "to resolve the alleged deficiencies existing in our client's [***10] agency" and agreeing to a meeting in January.

In January of 1992, Magpali met with Farmers accompanied by his lawyer to discuss his proposal. On February 4, 1992, he was called to another meeting and was given notice of termination. No one spoke aggressively or improperly to him at those times. At the final meeting he was told that Farmers had only wanted him to expand his marketing efforts and that he had been free to sell to whatever nationalities he desired.

During his seven-year career with Farmers, Magpali's principal source of new business was through friends, acquaintances, and referrals from existing clients. He was earning about $ 15,000 to $ 20,000 in commissions by his fourth year. Throughout the years of criticism of his performance, he never changed his marketing practices. He continually refused to attend meetings and classes scheduled by Farmers for its agents.

Farmers's "official nondiscrimination policy" as set forth in the agent's guide stated: " '[A]ll Farmers Insurance Group of Companies policies and coverages are offered to the public on a nondiscriminatory basis and are underwritten without regard to sex, race, religion, religious creed, color, national [***11] origin, ancestory [*sic*] or geographic area. [P] Any solicitation or maintenance of business should be based on nondiscriminatory consideration in accordance with our established policy.' " A 1984 memorandum to Cammeraat referencing Magpali stated: "We have approved the Agent prospect appointment. However, the reserve appointment and attainment of qualifying production count for career conversion will not result in automatic conversion. [P] All writings under the reserve contract will be reviewed before conversions for: [P] desirable source and method of acquisition, broad based solicitation not confined to ethnic community, religious or other groups, adequate communication skills to enable proper servicing of the account, use of proper qualification techniques to enable the accurate administration of risk placement, classification and discount programs, forms completion, ability to pay and renew."

[*480] Magpali testified that if he had known about his potential problems with loss ratio, the LUA program, or the need to avoid writing insurance solely to Filipino and Hispanic clients, he would not have given up his job with Zeus West to become a Farmers agent.

After [***12] hearing plaintiff's side, the trial court granted a defense motion for nonsuit. In its order, the court made the following rulings based on the evidence presented: that Farmers did not perpetrate a fraud on Magpali; that the fraud claim was barred by the statute of limitations; that Farmers' conduct was not outrageous; and that the claim for intentional infliction of emotional distress was barred by the statute of limitations. Magpali appealed from the judgment following the grant of nonsuit.

[**231] DISCUSSION

I.

*Fraud*

We first address the issue of whether Magpali's claim of having been fraudulently induced to become a Farmers insurance agent was supported by substantial evidence and should have been permitted to go to the jury. **(1)** There is no doubt that the allegations of the complaint that Farmers induced Magpali to become one of its insurance agents by fraudulent representations stated a cause of action. The Supreme Court has held that where an employer uses misrepresentations to induce a party to change employment when the objective could not have been achieved truthfully, and the party is left in worse circumstances than those in which he would have found himself [***13] had he not been lied to, he has a claim for promissory fraud or fraud in the inducement. ( *Lazar v. Superior Court (1996) 12 Cal. 4th 631, 638-643 [49 Cal. Rptr. 2d 377, 909 P.2d 981].*) Although Magpali was an independent contractor, not an employee, we see no reason why the same principle would not apply.

Magpali's fraud claims can be broken down into three broad categories: (1) Farmers falsely represented that Magpali would be permitted to run his office as he saw fit; (2) Farmers concealed the existence of the LUA program under which agents were limited in their ability to bind insurance; and (3) Farmers falsely represented that Magpali could sell insurance to members of any racial or ethnic group without revealing the existence of an "unwritten policy" precluding an agent from dealing exclusively with particular racial or ethnic groups. We address each category separately.

[*481] A

According to the undisputed evidence, Magpali always ran his office in accordance with his own practices, and never submitted to Farmers' directives, whether they came under the guise of advice, instructions, or orders. **(2)** We presume, therefore, that when Magpali says Farmers falsely promised [***14] to allow him to run his office as he saw fit, he means that Farmers falsely represented he could run his office as he saw fit and not be terminated or threatened with termination. We agree with the trial court that there was no merit to the claim.

A promise of future conduct is actionable as fraud only if made without a present intent to perform. ( *Civ. Code, § 1710, subd. 4*; *Tarmann v. State Farm Mut. Auto. Ins. Co. (1991) 2 Cal. App. 4th 153, 158-159 [2 Cal. Rptr. 2d 861].*) " 'A declaration of intention, although in the nature of a promise, made in good faith, without intention to deceive, and in the honest expectation that it will be fulfilled, even though it is not carried out, does not constitute a fraud. [Citation.]' " ( *Edmunds v. Valley Circle Estates (1993) 16 Cal. App. 4th 1290, 1301 [20 Cal. Rptr. 2d 701]*, quoting *Church of Merciful Saviour v. Volunteers of America (1960) 184 Cal. App. 2d 851, 859 [8 Cal. Rptr. 48].*) Moreover, " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' [Citations.] . . . [I]f plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance [***15] of an oral promise, he will never reach a jury." ( *Tenzer v. Superscope, Inc. (1985) 39 Cal. 3d 18, 30-31 [216 Cal. Rptr. 130, 702 P.2d 212].*)

The evidence was uncontroverted that for years after Magpali became a full-time insurance agent, Farmers did not interfere with his operations in any way and that Magpali ran his office as he thought best. This led to very low income for him and little or no profit for Farmers. It was only after multiple years of disappointing sales and a higher than average loss ratio, that he was instructed to try different marketing techniques.

On these facts, there was simply no evidence to support the claim the alleged promise was false when made. Farmers could not have foreseen that Magpali would be unable to profitably operate the agency at the time the contract was made and therefore could not have known that the alleged promise of noninterference was false when made. Farmers may have been overly optimistic in believing that an inexperienced agent could generate sufficient sales to justify the continued operation of the agency, but an erroneous belief, no matter how misguided, does not justify a finding of fraud. (See *Tarmann v. State Farm* [***16] *Mut. Auto. Ins. Co., supra, 2 Cal. App. 4th* [*482] *at p. 159* ["Making a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise. We decline to establish a new type of actionable deceit: the negligent false promise."].)

**(3)** We further agree with the trial court that this claim is barred by the applicable statute of limitations contained in *Code of Civil Procedure section 338, subdivision (d)*. Certainly by no later than May of 1989, by which time Magpali had been designated an LUA agent, restricted as to the types of insurance he could bind, forced to defend his operating and marketing practices, and ordered to develop a plan to return his agency to profitability by year's end, he had notice that he would be operating under less than the absolute freedom he asserts was his due. His complaint was not filed for more than three years.

B

**(4a)** Magpali's primary contention concerning the LUA program is that Farmers wrongfully concealed its existence from him and thereby induced him to become a Farmers agent. **(5)** Ordinarily, failure to disclose material [***17] facts is not actionable fraud unless there is some fiduciary relationship giving rise to a duty to disclose ( *Goodman v. Kennedy (1976) 18 Cal. 3d 335, 346-*

*347 [134 Cal. Rptr. 375, 556 P.2d 737]*), and an insurer does not owe a fiduciary duty to its agents. "The duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts which are not accessible to the plaintiff. [Citations.]" (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 700, p. 801; accord, *Goodman v. Kennedy, supra, at p. 347*.) **(4b)** Here, the agent's guide which explained the LUA program was completely accessible to Magpali before he left his prior occupation to become a full-time agent; indeed he was expected to study it as part of his training.

Moreover, to be actionable, a misrepresentation or concealment must induce justifiable reliance and resulting damage. ( *Walters v. Marler (1978) 83 Cal. App. 3d 1, 17 [147 Cal. Rptr. 655]*, disapproved on another ground in *Gray v. Don Miller & Associates, Inc. (1984) 35 Cal. 3d 498 [198 Cal. Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763]*.) Magpali contends concealment of the LUA program induced him [***18] to become a Farmers agent and the resulting damage was the loss of the existing, more secure position with Zeus West. But under any view of the facts, Magpali knew his future as a salesman for Farmers was uncertain and depended on his ability to engender profit for the company. Magpali could not have reasonably expected that he would be permitted to run an unprofitable agency forever in light of the fact the [*483] parties' agreement included a requirement of conformance to normal good business practices and a right of termination for cause. Put another way, the evidence was uncontroverted that he willingly gave up a secure job and became a Farmers agent with the understanding that Farmers could terminate him for failure to make sufficient sales. Since that is the case, we fail to see how the alleged concealment of the fact that Farmers had a program for low-producing agents far less drastic than outright termination could have had any effect on his decision to become a Farmers agent.

**(6)** This aspect of the fraud claim also suffers from an insurmountable statute of limitations problem. Assuming that Farmers had a duty to disclose the LUA program and that concealment of the program [***19] induced Magpali to become a Farmers agent, the evidence was uncontroverted that Magpali knew about the program by no later than April of 1989, when he received notice that he was going to be designated an LUA agent due to his excessive loss ratio. Magpali suggests that this event did not trigger the statute because he believed the status was [**233] only temporary. This belief made no difference to the running of the statute of limitations, which accrues when the plaintiff has all the information essential to the claim. ( *Spellis v. Lawn (1988) 200 Cal. App. 3d 1075, 1080 [246 Cal. Rptr. 385]*.) Magpali's claim was that he was wrongly induced to become a Farmers agent by concealment of the LUA program. By April of 1989 at the very latest, he was informed of the existence of the allegedly concealed program and its effect on his ability to sell Farmers insurance. He had already left his position with Zeus West, suffering the alleged damage. Since he did not file the complaint until July of 1992, more than three years later, the claim was barred.

C

**(7)** We next turn to Magpali's contention that Farmers engaged in fraudulent concealment because it represented that "Magpali would [***20] be free to deal with applicants regardless of racial background or nationality" and "never told Magpali about its unspoken policy prohibiting agents from marketing in any one specific ethnic group." [1] While it is somewhat out of the ordinary to assert a claim of fraud where the defendant's transgression [*484] involves discriminatory conduct, there is no principle which impedes a claimant from asserting such a claim as long as all the elements are present. The elements of fraud are "(a) misrepresentation . . . ; (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage. [Citations.]" (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 676, p. 778.) Magpali alleged that Farmers had a policy of prohibiting agents from selling to certain ethnic groups, including their own, but told Magpali that he would be free to market to all applicants regardless of ethnicity in order to induce Magpali to become a Farmers agent. That would appear to meet all of the necessary elements of a claim for fraudulent misrepresentation. Unlike a claim for discrimination, however, the damages do not arise from the loss [***21] of the position with Farmers, as Magpali suggests in his brief, but from the loss of the previously held position which the agent was induced to leave. (See *Lazar v. Superior Court, supra, 12 Cal. 4th at pp. 642-643*.)

1 Magpali in his brief on appeal states that Farmers never told him that "agents who wrote heavily in one ethnic group were likely to end their career with Farmers because the 'ethnic group' would mean high loss-ratios for the agent." Certainly, Magpali cannot be suggesting that Farmers should warn members of various ethnic groups not to become Farmers agents because members of their group have excessive losses. It would violate public policy--and laws prohibiting discrimination--for Farmers to make any such statement to prospective agents. Likewise, Magpali suggests that he should have been warned that "it was extremely difficult and/or virtually impossible for a minority agent selling to a minority community to get off LUA." Since it

would be wholly improper and a violation of public policy for an insurance company such as Farmers to instruct a minority agent outright to stop selling insurance to any ethnic group, it would be equally improper to indirectly discourage such sales under the guise of "explaining" that that would be the only way to come off LUA status.

[***22] The choice to transmute a discrimination claim into one for fraud does lead to a potential limitations problem. The fraud claim is a backward looking one in that the tort of fraud in the inducement is complete the moment the plaintiff suffers reliance damage by leaving his previous employment. The only reason the statute of limitations does not accrue immediately is that plaintiff is presumably ignorant of the fraud at that point. (See *Code Civ. Proc., § 338, subd. (d)* [". . . The cause of action [for relief on account of fraud or mistake] is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."].) Once the plaintiff obtains the requisite knowledge, the statute begins to run. Put in terms of the present complaint, the crucial event for accrual purposes is the occasion on which the plaintiff first learns of the allegedly discriminatory policy, not the date on which he is [**234] terminated. Nor does it begin running anew every time the discriminatory policy is mentioned or emphasized.

According to Magpali's testimony, he was placed on LUA status and told he must expand his book of business outside the [***23] Filipino and Hispanic communities in May of 1989. This was the crucial date for statute of limitations purposes on his claim for fraud in the inducement based on any misrepresentations made by Farmers concerning the alleged policy of discrimination. On that date, every element of the cause of action was in place, including damages, and he had actual knowledge that the sales policy was otherwise than he had been informed. "Once a plaintiff suspects wrongdoing [*485] and therefore has an incentive to sue, he or she must decide whether to file suit or sit on his or her rights. When a suspicion exists, the plaintiff must go find the facts; he or she cannot wait for the facts to find him or her. [Citations.]" ( *San Francisco Unified School Dist. v. W.R.Grace & Co. (1995) 37 Cal. App. 4th 1318, 1327 [44 Cal. Rptr. 2d 305]*.) The parties place undue emphasis on the question of whether Magpali was told to "expand" his efforts outside the Filipino and Hispanic communities or "avoid" writing policies in these communities in May of 1989. Either way, the message that Magpali had too many clients of certain ethnic groups was obvious. Reading the evidence most favorably toward Magpali, [***24] it is undisputable that he had sufficient reason to suspect the existence of a policy of discrimination in May of 1989, yet sat on his rights for over three years. As a result, the claim of fraud based on misrepresentations concerning the nondiscrimination policy was barred by the applicable three-year statute of limitations, as the trial court found.

II.

*Intentional Infliction of Emotional Distress*

The trial court concluded that none of the conduct attributed to Farmers constituted extreme and outrageous conduct and that in any event the claim was barred by the one-year statute of limitations. We question one aspect of this finding. **(8)** The reported instructions to write more insurance policies to non-minorities and to avoid writing policies for members of Magpali's own ethnic group because they were poor risks could constitute the extreme and outrageous conduct needed to support the tort under current law. (See *Agarwal v. Johnson (1979) 25 Cal. 3d 932, 947 [160 Cal. Rptr. 141, 603 P.2d 58]* [use of racial epithet with intention to inflict emotional distress followed by termination of employment outrageous]; *Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal. 3d 493,* [***25] *498 [86 Cal. Rptr. 88, 468 P.2d 216]* [insulting plaintiff's race for the purpose of causing plaintiff to suffer emotional distress in conjunction with wrongful termination of employment sufficient to state claim for intentional infliction of emotional distress].)

But even if the statements reported by Magpali supported the claim, the cause of action was time-barred. A claim for intentional infliction of emotional distress is governed by the one-year statute of limitations for intentional torts. ( *Code Civ. Proc., § 340, subd. (3)*; *Murphy v. Allstate Insurance Co. (1978) 83 Cal. App. 3d 38, 50 [147 Cal. Rptr. 565]*.) The last purported comment of a racially denigrating nature was made in the month before Magpali's attorney's letter of July 9, 1991. The complaint was not filed until July 15, 1992.

[*486] III.

*Unruh Civil Rights Act Violation*

**(9)** Magpali was denied permission to amend his complaint to bring a claim under the Unruh Civil Rights Act. ( *Civ. Code, § 51 et seq.*) Magpali did not include an Act claim in his original complaint, but sought leave to amend on the eve of trial to add such a claim based on the allegation that "he was specifically told to avoid [***26] writing Hispanics and Filipinos . . . and that his refusal to follow Farmer[s's] orders was a substantial factor in causing his termination." The trial court denied leave. The question raised is whether the court abused its discretion. We take particular care in reviewing this ruling because of two comments made during the course of the [**235] trial. During argument over admission of a

videotape, Magpali's counsel stated: "[Magpali] happens to be a minority agent who deals in a minority market, and that is precisely . . . what this case is about." TO THIS THE COURT REPLIED: "I'm [of] German descent. I suppose I'm a minority too, huh?" Later, in a discussion of whether defense counsel had opened the door to letting the same videotape into evidence because of remarks made during his opening statement, the court commented: "According to the opening statement of the defense, they say that we can show that his partner who obviously is a minority, too,--I don't know who isn't a minority anymore, but I would guess he would fall in the class of a minority--he got off [LUA], if that's what's going to be shown." These remarks created an appearance of insensitivity to the real burdens [***27] posed by discriminatory treatment toward certain ethnic groups in this society, and cannot be ignored. "The day is long past when appellate courts can disregard judicial action rooted in racial or sexual bias as harmless error [citation]. [P] ' "[T]he trial of a case should not only be fair in fact, but it should also appear to be fair." ' [Citations.]" ( *In re Marriage of Iverson (1992) 11 Cal. App. 4th 1495, 1499-1500 [15 Cal. Rptr. 2d 70]*, quoting *Webber v. Webber (1948) 33 Cal. 2d 153, 155 [199 P.2d 934]* and *Pratt v. Pratt (1903) 141 Cal. 247, 252 [74 P. 742]*.)

Nevertheless, our independent review of the record reveals no abuse of discretion in the denial of the request for leave to amend. Magpali's amendment was proposed on the eve of trial, nearly two years after the complaint was originally filed. He did not give an explanation for leaving the Act claim out of the original complaint or bringing the request to amend so late. "A party who waits 18 months before attempting to amend, and then does so only after trial has commenced, and who offers no excuse for the failure, can hardly complain when the request to amend is denied." ( *City of Stanton v.* [***28] *Cox (1989) 207 Cal. App. 3d 1557, 1564 [255 Cal. Rptr. 682]*.) In addition, prejudice to Farmers was clearly shown because in preparing for trial on [*487] claims of breach of contract, misrepresentation, and intentional infliction of emotional distress, it had not discovered or deposed many of the witnesses who would support the new allegations, and had not marshaled evidence to oppose the contention that a system-wide discriminatory policy existed. Although courts are bound to apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial (see, e.g., *Mesler v. Bragg Management Co. (1985) 39 Cal. 3d 290, 296-297 [216 Cal. Rptr. 443, 702 P.2d 601]*; *Higgins v. Del Faro (1981) 123 Cal. App. 3d 558, 564 [176 Cal. Rptr. 704]*; *Hirsa v. Superior Court (1981) 118 Cal. App. 3d 486, 488-489 [173 Cal. Rptr. 418]*), this policy should be applied only "where no prejudice is shown to the adverse party . . . ." ( *Higgins v. Del Faro, supra, at p. 564*.) A different result is indicated "where inexcusable delay and probable prejudice to the opposing party" is shown. (*Estate* [***29] *of Murphy (1978) 82 Cal. App. 3d 304, 311 [147 Cal. Rptr. 258]*.) In *Murphy*, ". . . the proposed amendment opened up an entirely new field of inquiry without any satisfactory explanation as to why this major change in point of attack had not been made long before trial." (*Ibid.*) Under those circumstances, denial of leave to amend was appropriate.

Magpali admitted at oral argument that his Act claim depended on witnesses who had not been identified or deposed prior to the time of trial. He expected to call Farmers agents Tony Carungay and Ruby Ilao who he represented would testify that they were told not to write Hispanics or Filipinos and Paul Krieger, an ex-Farmers agent, who Magpali represented was instructed not to write Blacks or Hispanics and not to write any business south of the 605 Freeway. He proposed to show the jury a videotape on which Farmers employee Debbie Settles purportedly discussed the difficulty [**236] of getting off LUA status as a minority selling in minority communities. He also wanted to introduce maps showing the location of Farmers agents, and Bruce Broadwater, who prepared the maps, would be called reportedly to testify concerning the paucity [***30] of agents in certain minority occupied areas. Krieger, Settles, and Broadwater had not been identified in discovery or deposed. None of these witnesses or documents had been identified in response to an interrogatory seeking to discover the support for the allegation that Farmers ordered Magpali to sell policies to applicants who were not Filipino or Hispanic, although Carungay and Ilao had been mentioned in Magpali's deposition.

It is apparent that adding the new cause of action would have changed the tenor and complexity of the complaint from its original focus on representations and demands made to Magpali by his superiors to an exploration of Farmers's activities and practices in the entire Southern California area. Magpali conceded at oral argument that addition of the new claim would [*488] have necessitated, at the very least, a continuance to allow Farmers to depose new witnesses. Where the trial date is set, the jury is about to be impaneled, counsel, the parties, the trial court, and the witnesses have blocked the time, and the only way to avoid prejudice to the opposing party is to continue the trial date to allow further discovery, refusal of leave to amend cannot [***31] be an abuse of discretion. Our concern over the unfortunate remarks appearing in the record does not persuade us otherwise. With every relevant factor aligned on the opposing side, denial of the motion for leave to amend was the only appropriate outcome.

DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied August 20, 1996.

# TAB 26

LEXSEE 67 CAL. APP. 4TH 602

**JAMES W. QUAN et al., Plaintiffs and Appellants, v. TRUCK INSURANCE EXCHANGE, Defendant and Respondent.**

**No. B110711.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION TWO**

***67 Cal. App. 4th 583*; *79 Cal. Rptr. 2d 134*; *1998 Cal. App. LEXIS 901*; *98 Cal. Daily Op. Service 8098*; *98 Daily Journal DAR 11227***

**October 29, 1998, Decided**

**NOTICE:** [***1] Opinion certified for partial publication. *

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III, sections H. through K.

**SUBSEQUENT HISTORY:** Review Denied February 17, 1999, Reported at: *1999 Cal. LEXIS 978.*

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of the County of Los Angeles County. Super. Ct. No. BC150370. Ronald E. Cappai, Judge.

**DISPOSITION:** The judgment is affirmed. Each party to bear its own costs.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Insured property owners brought an action against their insurer for declaratory relief, breach of insurance contract, and breach of the implied covenant of good faith and fair dealing, after the insurer refused to defend the owners in a civil action alleging sexual misconduct by one of the owners. The trial court dismissed the action after sustaining, without leave to amend, the insurer's demurrer. (Superior Court of Los Angeles County, No. BC150370, Ronald E. Cappai, Judge.)

The Court of Appeal affirmed. The court held that the underlying action did not raise any potential for coverage under the policy's "bodily injury" coverage. The coverage applied only to "damages," defined as the cost of compensating those who suffer "bodily injury" from an "occurrence." "Occurrence" was defined to require an "accident." An intentional act is not an accident even if it causes unintended harm. In this case, there was no theory available on the facts expressed in the complaint or made known to the insurer from other sources under which the insured could be liable for physical injuries caused by "accidentally" touching, kissing, embracing or having sex with the claimant, nor was there any additional "happening" to combine with these deliberate acts so as to produce an "accident" giving rise to bodily injury. The court further held that neither the arbitrator's vacated findings nor the internal opinions of the insurer gave rise to a duty to defend under the policy's "bodily injury" coverage. The arbitrator's findings were a legal nullity (*Cal. Rules of Court, rule 1616(c)*). Similarly, the insurance company employees' opinions or memos did not give rise to a duty to defend. (Opinion by Zebrowski, J., with Boren, P. J., and Nott, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1) Appellate Review § 128--Scope of Review--Function of Appellate Court--Rulings on Demurrers.** --A demurrer is treated on review as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. The complaint must be given a reasonable interpretation, reading it as a whole and its parts in their context. When a demurrer is sustained, the reviewing court determines whether the complaint states facts sufficient to constitute a cause of action. When it is sustained without leave to amend, the reviewing court decides whether there is a reasonable possibility that the defect can be cured by amendment. If

it can be, the trial court has abused its discretion and the reviewing court will reverse; if not, there has been no abuse of discretion. The burden of proving the "reasonable possibility" of cure by amendment is on the plaintiff, but the showing need not be made in the trial court so long as it is made to the reviewing court.

**(2) Insurance Contracts and Coverage § 11--Interpretation of Contracts--Interpretation as a Question of Law.** --The interpretation of an insurance policy as applied to undisputed facts is a question of law for the court, which is not bound by the trial court's construction.

**(3) Insurance Contracts and Coverage § 107--Liability of Insurer--Liability and Indemnity Insurance--Obligation to Defend Insured.** --A liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. The carrier must defend a suit that potentially seeks damages within the coverage of the policy. Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal the possibility that the claim may be covered by the policy. To prevail on the issue of the duty to defend, the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential. Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales. The duty to defend is limited by the nature and kind of risk covered by the policy. The duty to defend derives from the insurer's coverage obligations assumed under the insurance contract. Thus, where there is no potential for coverage, there is no duty to defend.

[See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1135 et seq.]

**(4) Insurance Contracts and Coverage § 124--Actions--Pleading--Duty to Defend--Construction of Complaint in Favor of Potential Coverage.** --With respect to an insurer's duty to defend its insured, the insured's complaint is to be liberally construed in favor of potential coverage. Since pleadings are easily amended, the proper focus is on the facts alleged, rather than the theories for recovery. However, the insured may not speculate about unpleaded third party claims to manufacture coverage.

**(5) Insurance Contracts and Coverage § 107--Liability of Insurer--Liability and Indemnity Insurance--Obligation to Defend Insured--Bodily Injury Coverage--"Occurrence" Requiring "Accident."** --In an action by insured property owners against their insurer after the insurer refused to defend the owners in a civil action alleging sexual misconduct by one of the owners, the trial court properly sustained, without leave to amend, the insurer's demurrer, since the underlying action did not raise any potential for coverage under the policy's "bodily injury" coverage. The coverage applied only to "damages," defined as the cost of compensating those who suffer "bodily injury" from an "occurrence." "Occurrence" was defined to require an "accident." Under California law, "accident" refers to the nature of the insured's conduct, not his or her state of mind. Thus, negligent or not, the conduct at issue was necessarily nonaccidental, not because any "harm" was intended, but simply because the conduct could not be engaged in by "accident." An intentional act is not an accident even if it causes unintended harm. An accident can flow from an intentional act only if some additional, unexpected, independent, and unforeseen happening occurs that produces the damage. In this case, there was no theory available on the facts expressed in the complaint or made known to the insurer from other sources under which the insured could be liable for physical injuries caused by "accidentally" touching, kissing, embracing or having sex with the claimant, nor was there any additional "happening" to combine with these deliberate acts so as to produce an "accident" giving rise to bodily injury.

**(6) Insurance Contracts and Coverage § 107.1--Liability of Insurer--Liability and Indemnity Insurance--Obligation to Defend Insured--As Affected by Arbitrator's Vacated Findings or Internal Opinions of Insurer.** --In an action by insured property owners against their insurer after the insurer refused to defend the owners in an underlying civil action alleging sexual misconduct by one of the owners, in which the trial court sustained, without leave to amend, the insurer's demurrer, neither the arbitrator's vacated findings nor the internal opinions of the insurer gave rise to a duty to defend under the policy's "bodily injury" coverage. The arbitrator's findings were a legal nullity (*Cal. Rules of Court, rule 1616(c)*). A timely request for a trial de novo operates to vacate an arbitration award in its entirety, putting the case at large as though no arbitration proceedings had occurred. The legal labels the arbitrator chose to place on the insured's conduct in trying to divide it between "negligent" and "intentional" acts were the arbitrator's legal opinions, and would not be binding on a court even had

the award not been rendered a nullity. Similarly, the insurance company employees' opinions or memos did not give rise to a duty to defend. Interpretation of an insurance policy is a question of law, as is whether there is a duty to defend in this context. Even experts may not opine on pure questions of law.

**COUNSEL:** Jacob N. Segura for Plaintiffs and Appellants.

Cooper, Kardaras & Scharf, Edward C. Wilde, Greines, Martin, Stein & Richland, Irving H. Greines and Marc J. Poster for Defendant and Respondent.

**JUDGES:** Opinion by Zebrowski, J., with Boren, P. J., and Nott, J., concurring.

**OPINION BY:** ZEBROWSKI

**OPINION**

[*586] [**135] **ZEBROWSKI, J.**

The trial court in this case sustained, without leave to amend, a demurrer by defendant and respondent Truck Insurance Exchange (insurer) to a second amended complaint (SAC) for declaratory relief, breach of insurance contract, and breach of the implied covenant of good faith and [*587] fair dealing [1] brought by plaintiffs and appellants James W. Quan and [***2] Lucita L. Quan (insureds.) [2]

1 The SAC also contained causes of action against the insurer for fraud, negligent misrepresentation and "negligence." The insureds have not briefed any arguments asserting the viability of these latter three claims, despite the insurer's assertion in its respondent's brief that the failure to address the claims constituted a waiver of those issues on appeal. The insureds have waived any challenge to the trial court's dismissal of those three causes of action.

2 Use of the term "insureds" refers to both plaintiffs, James and Lucita Quan. Unless the context indicates otherwise, use of the singular "insured" refers to plaintiff James W. Quan.

Because the SAC reveals no potential that the insurer could be liable to indemnify its insureds for any of the claims presented in the underlying action, we affirm. In the published portion of this opinion, we explain that the underlying action did not raise any potential for coverage under the insurance policy's "bodily injury" [***3] coverage. In the unpublished portion, we explain that we need not consider the potential for coverage under the insurance policy's "personal injury" coverage in view of the procedural posture of this case, that (in view of the lack of any potential for either "bodily injury" or "personal injury" coverage) we need not determine the application of the "wilful act" exclusion created by *Insurance Code section 533*, and that unpled claims against [**136] Lucita Quan do not create a potential for coverage.

I. PROCEDURAL BACKGROUND

A. *The Underlying Action*

In 1989, Darlene Bradford (claimant) filed a civil action (the underlying action or underlying complaint) against insured James Quan. [3] The underlying complaint by the claimant asserts four brief causes of action, for "assault and battery," "intentional infliction of emotional distress," "negligence," and "negligent infliction of emotion [*sic*] distress."

3 Although she is a named plaintiff and is named as an "insured" in the policy at issue, the record does not reveal that Lucita Quan, the spouse of James Quan, has ever been named as a defendant in the underlying action.

[***4] The underlying complaint was not served on the insured until March of 1992, when the insured promptly tendered his defense to the insurer. That same month, the insurer assigned the defense of the insured to defense counsel chosen by the insurer, under a "reservation of rights" pending results of the insurer's coverage investigation. [4]

4 The insurer's letter sent in response to the defense tender was attached to the insureds' complaint. The letter states: "By undertaking such an investigation, the Truck Insurance Exchange does not waive any of its rights to limit or deny defense or indemnity. We have not made any final determination about whether the issues contained in the lawsuit fall within the scope of your insurance policy with Truck Insurance Exchange."

[*588] The insurer defended the action through its selected defense counsel for a period of nine months while it assertedly conducted a coverage investigation. On December 18, 1992, the insurer withdrew from the defense and denied any indemnity [***5] obligation. [5]

5 The denial letter, dated December 7, 1992, was attached as an exhibit to the insureds' first amended complaint. It states, in part: "It is the position of Truck Insurance Exchange that assault and battery as well as intentional infliction of emotional distress do not come within the meaning of 'occurrence' in your policy. [P] The complaint alleges that 'on or about April 7, 1988 . . .

defendant with force and against the consent of plaintiff, assaulted plaintiff and raped, ravaged, and carnally knew her'. [P] The plaintiff prays for punitive and/or exemplary damages. These damages are not insurable pursuant to *Insurance Code Section 533*."

Although the record does not indicate the manner in which the underlying action was sent to judicial arbitration, the SAC in this action includes as an exhibit a July 1993 letter from the insureds' subsequently retained defense counsel enclosing a document entitled "Amended Findings and Award of Arbitrator." Whatever their origin, the findings and [***6] award were apparently rendered a nullity by a request for trial de novo, inasmuch as the matter proceeded to two mistrials before the underlying action was finally tried to a judgment in favor of the claimant in May 1995. The insured appealed the underlying judgment, which was reversed by this court on December 3, 1997. [6] The record does not further disclose the immediate status of the underlying case.

6 The insureds attach the unpublished opinion of this division to their reply brief, which recites the mistrial history.

B. *The Coverage Action*

The allegations of the insureds' second amended complaint span more than 100 pages, with nearly 200 pages of exhibits. Of necessity, the factual allegations may only be summarized. They fall into two broad categories.

First, the insureds allege that the insurer's refusal to agree to defend and indemnify was not only erroneous, but unreasonable so as to constitute a breach of the implied covenant, in light of: (1) the allegations of the underlying complaint; [***7] (2) information the insurer had gathered or learned from other sources by the time it withdrew from the defense after nine months; and (3) information it learned after withdrawing from the defense.

Second, the insureds allege that the insurer not only conducted itself improperly in withdrawing from the defense, but also in the manner in which it investigated the coverage issues, and in the way it defended the insured for [*589] the nine-month period in which it was conducting a coverage investigation. The insureds allege that from the very nature of the allegations of the underlying complaint, [**137] the insurer knew there was a coverage issue of the type that should give rise to a right to independent counsel under *Civil Code section 2860*, but deprived the insured of that right for nine months while trying to build the case for a coverage denial, and then cast the insured adrift. In the interim, the insured's defense was allegedly compromised, and settlement opportunities within policy limits were either not communicated to the insured, or improperly allowed to lapse. [7]

7 On appeal, insureds do not contend this conduct independently supports their breach of contract or "bad faith" claims. We deem any such arguments waived ( *Mansell v. Board of Administration (1994) 30 Cal. App. 4th 539, 545-546 [35 Cal. Rptr. 2d 574]*), expressing no view on their merits. (Cf. *Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal. 4th 1, 36 [44 Cal. Rptr. 2d 370, 900 P.2d 619]* ["It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer. [Citation.] . . . Absent that contractual right, however, the implied covenant has nothing upon which to act as a supplement, and 'should not be endowed with an existence independent of its contractual underpinnings.' [Citation.].")

[***8] The insurer demurred to each cause of action on the ground that it failed to state a cause of action. The trial court sustained the demurrers and ordered the action dismissed under *Code of Civil Procedure section 581, subdivision (f)(1)*. The insureds appeal from the order of dismissal. (*Code Civ. Proc., § 581d*.)

On appeal, the insureds contend only that their complaint "was and is legally sufficient to state causes of action against [insurer] for breach of contract and breach of the implied covenant of good faith and fair dealing arising from [insurer's] unjustified failure and refusal to defend [insureds] against [claimant's] action." Thus, only three of the insureds' causes of action are potentially pertinent: the first cause of action, for "declaratory relief," the second cause of action (erroneously titled as an "implied covenant" claim) which alleges that the insurer's refusal to defend and indemnify is a breach of the insurance contract, and the portion of the third cause of action which alleges that the insurer's refusal to defend and indemnify further constituted a breach of the covenant of good faith and fair dealing.

## II. STANDARD OF REVIEW

The complaint must [***9] be liberally construed with a view to substantial justice between the parties. (*Code Civ. Proc., § 452*.) **(1)** A demurrer is treated as admitting all material facts properly pleaded, but not " 'contentions, deductions or conclusions of fact or law.' " ( *Blank v. Kirwan (1985) 39* [*590] *Cal. 3d 311, 318 [216 Cal. Rptr. 718, 703 P.2d 58]*). Under *Blank*, the complaint must be given a reasonable interpretation,

reading it as a whole and its parts in their context. When a demurrer is sustained, the court determines whether the complaint states facts sufficient to constitute a cause of action. And when it is sustained without leave to amend, the court decides whether there is a reasonable possibility that the defect can be cured by amendment. If it can be, the trial court has abused its discretion and the reviewing court will reverse; if not, there has been no abuse of discretion. (*Ibid.*) The burden of proving the "reasonable possibility" of cure by amendment is on the plaintiff, but the showing need not be made in the trial court so long as it is made to the reviewing court. ( *Careau & Co. v. Security Pacific Business Credit, Inc. (1990) 222 Cal. App. 3d 1371, 1381 [272* [***10] *Cal. Rptr. 387].*)

Here, the insureds make no showing of how the SAC could be amended if it is determined not to state a cause of action. The record reflects three ever-lengthening complaints and sets of exhibits comprising hundreds of pages. There is no indication that every fact allegedly known to the insurer at any time with regard to the underlying action is not either expressly alleged and/or substantiated with exhibits to the SAC. Accordingly, there is no reason to consider whether the trial court abused its discretion in light of the possibility of further amendment. [8] (See *Michaelian v. State Comp. Ins.* [**138] *Fund (1996) 50 Cal. App. 4th 1093, 1105, fn. 4 [58 Cal. Rptr. 2d 133].*)

8 For similar reasons we decline the insureds' request that we take judicial notice of hundreds of additional pages from James Quan's criminal proceedings, the entire civil file in the nine-year-old underlying action, and the remaining matters as to which judicial notice was requested by the insureds.

**(2)** The interpretation [***11] of an insurance policy as applied to undisputed facts (here, the facts alleged by the insureds) is a question of law for the court, which is not bound by the trial court's construction. ( *Collin v. American Empire Ins. Co. (1994) 21 Cal. App. 4th 787, 802 [26 Cal. Rptr. 2d 391].*)

III. DISCUSSION

A. *Nature of the Duty to Defend*

**(3)** The parties agree the dispositive issue is whether the insurer had a duty to defend. The principles governing determination of the existence of that duty are oft-stated: "[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. ( *Gray v. Zurich Insurance Co. (1966) 65 Cal. 2d 263 [54 Cal. Rptr. 104, 419 P.2d 168]* [*591] (*Gray*).) As we said in *Gray*, 'the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy.' ( *Id. at p. 275*, italics in original.) Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]" ( *Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal. 4th* [***12] *1076, 1081 [17 Cal. Rptr. 2d 210, 846 P.2d 792].*) "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal the possibility that the claim may be covered by the policy. (*Gray, supra, 65 Cal. 2d at p. 276.*)" (*Ibid.*)

Thus the Supreme Court in *Montrose Chemical Corp. v. Superior Court (1993) 6 Cal. 4th 287, 300 [24 Cal. Rptr. 2d 467, 861 P.2d 1153]*, stated: "To prevail [on the issue of the duty to defend], the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales. Any seeming disparity [***13] in the respective burdens merely reflects the substantive law." The *Montrose* court reiterated the statement in *Gray* that " 'the insurer need not defend if the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage*.' " ( *Id. at p. 300*, quoting *Gray v. Zurich Insurance Co. (1996) 65 Cal. 2d 263, 276, fn. 15 [54 Cal. Rptr. 104, 419 P.2d 168]*, italics added by the *Montrose* court.) [9]

9 The insureds cite a host of recent cases reiterating the difficult burden an insurer must overcome in establishing the absence of a defense duty. (See, e.g., *Borg v. Transamerica Ins. Co. (1996) 47 Cal. App. 4th 448 [54 Cal. Rptr. 2d 811]*; *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group (1996) 50 Cal. App. 4th 548 [59 Cal. Rptr. 2d 36]*; *Vann v. Travelers Companies (1995) 39 Cal. App. 4th 1610 [46 Cal. Rptr. 2d 617]*; *Reese v. Travelers Ins. Co. (9th Cir. 1997) 129 F.3d 1056.*) These cases simply reiterate the above principles (and the corollary that any doubt as to the existence of the duty to defend must be resolved in favor of the insured) in coverage contexts dissimilar to that in the present case.

[***14] Nevertheless, the obligation to defend is not without limits. "Rather, such a duty is limited by 'the nature and kind *of risk covered by the policy*.' " ( *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co. (1994) 9 Cal. 4th 27, 39 [36 Cal. Rptr. 2d 100, 884 P.2d 1048]*, quoting from *Gray v. Zurich Insurance Co., supra, 65 Cal. 2d at p. 275*, italics in original.) " '[T]he duty to defend derives from the insurer's coverage obligations assumed under the [*592] insurance contract.' [Citation.] Thus, 'where there is *no potential* for coverage, there is no duty to defend.' " ( *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra, 9 Cal. 4th 27, 40*, [**139] italics in original.)

**(4)** In *Michaelian v. State Comp. Ins. Fund, supra, 50 Cal. App. 4th 1093*, the court further explained the proper focus in reviewing the sustaining of a demurrer to a similar action for declaratory relief, breach of insurance contract, and "bad faith" post-*Montrose*: "A complaint is to be 'liberally construed' in favor of potential coverage. [Citation.] Since pleadings are easily amended, the proper focus is on the facts alleged, rather than the theories [***15] for recovery. [Citation.] However, the insured ' "may not speculate about unpled third party claims to manufacture coverage." ' [Citation.]" (*Michaelian, supra, 50 Cal. App. 4th at p.1106.*)

B. *Pertinent Terms of the Policy at Issue*

The insureds' complaint attaches the policy as an exhibit. The liability coverage of the policy, as pertinent here, states: "We shall pay all sums for which you may become legally obligated to pay as **damages** [10] caused by: 1. **Bodily Injury, Personal Injury[;] 2. Advertising Injury** . . . [;] 3. **Property damage** [P] We shall defend any suit against you claiming these **damages**, even if the allegations of the suit are groundless or false."

10 Bold terms are as they appear in the original and signify that the terms are defined elsewhere in the policy.

"**Damages**" is defined as "the cost of compensating those who suffer **bodily injury, personal injury, advertising injury or property damage** [11] from an **occurrence**."

11 There is no claim to "advertising injury" or "property damage" coverage in this case. The claim to coverage for "personal injury" is discussed in the unpublished portion of this decision.

[***16] "**Bodily Injury**" is defined as "physical injury to, sickness or disease sustained by the body of any person, . . ." For purposes of "bodily injury," "**occurrence**" is defined as "an accident, including continuous or repeated exposure to conditions which result in **bodily injury** or **property damage** you neither expected nor intended. . . ."

C. *The Factual Allegations of the Underlying Complaint*

The underlying complaint [12] contains four causes of action, for "assault and battery," "intentional infliction of emotional distress," "negligence," and [*593] "negligent infliction of emotional distress." Notwithstanding the assertion of both intentional and negligence-based theories of liability, the facts alleged to give rise to that liability are virtually the same for all four causes of action.

12 Although much of the insureds' argument focuses on the potential that the underlying complaint can be amended, for context it should be noted there is no indication in the record that the allegations of the underlying complaint have ever changed in the over nine years the action has been pending, despite an arbitration, two mistrials, trial, judgment and an appeal.

[***17] As the factual basis for her claim of assault and battery, the claimant alleges that "On or about April 7, 1988, . . . Defendant with force and against the consent of Plaintiff, assaulted Plaintiff and raped, ravished, and carnally knew her." As the factual basis for her claim of intentional infliction of emotional distress, claimant alleges that "On or about April 7, 1988, Defendant James Quan forcibly and without Plaintiff's consent kissed and had sexual intercourse with Plaintiff. [P] Defendant, James Quan's conduct was intentional and malicious, and done with the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional and physical distress."

The claimant's cause of action for negligence expressly incorporates her prior allegation that the insured "with force and against the consent of Plaintiff, assaulted Plaintiff and raped, ravished, and carnally knew her," and her prior description of those acts as "wrongful and malicious." The claimant then adds that "On or about April 7, 1988, Plaintiff was seventeen years old and was in the presence of the Defendant upon his request of having her help him with his tax return and vacuuming of a house he owns [***18] . . . . [P] At said time and place, Defendant negligently embarrassed [*sic*], [13] kissed and had sexual intercourse with Plaintiff without [**140] her consent so as to cause her to lose her virginity, suffer physical pain and emotional distress . . . ." The claimant's cause of action for "negligent infliction of emotional distress" specifically incorporates the same factual allegations, adding that "Said defendant knew, or should have known, that his failure to exercise due care in his actions with Plaintiff would cause Plaintiff severe emo-

tional distress.[P] Said defendant, by kissing her and forcibly having sexual intercourse with her without her consent breached his duty of care owed to Plaintiff."

13 The parties expressly agree this term should read as "embraced."

D. *Facts the Insurer Knew in Addition to the Allegations of the Underlying Complaint*

The insureds allege, and for purposes of demurrer the court assumes, that the insurer knew the following additional facts at the time it withdrew from [***19] the defense. The insurer knew that Quan is "innocent," and that he pled not guilty to the original criminal charges, which were later dismissed. Although [*594] that dismissal was reversed in yet another appeal, the insurer knew that the insured then accepted a plea bargain solely to buy his peace of mind. Pursuant to the terms of the plea bargain, the insured pled no contest to a "wobbler" offense of "sexual battery" under *Penal Code section 243.4*, which may be sentenced as either a misdemeanor or a felony. The offense was reduced to a misdemeanor, and after he fulfilled the terms of his probation, the insured's conviction was set aside, a plea of not guilty was entered, and the complaint was dismissed. The insurer also "knew" that the "no contest" plea could not be used to establish liability in the civil action.

Four days after receiving notice of the claim, the insurer conducted a recorded interview of James Quan, a transcript of which is attached to the complaint. The insured told the interviewer that he and his wife owned the apartment building where the incident allegedly took place, but the insured denied paying, hiring, touching or assaulting the claimant. At most, [***20] the insured thought the claimant may have "bumped" into him with her chest when they were walking. The insured's defense counsel in the underlying civil action gave the insurer deposition summaries that tended to indicate the innocence of the insured.

The insurer also received correspondence from the insured's defense counsel that raised an issue as to potential liability based on a distinction between rape and "unpermitted touching." The claimant's counsel had sent a letter to the insured's defense counsel articulating various "negligence" theories, among which was that the insured may have "misunderstood" communication from the claimant and mistook it for consent. The claimant's counsel sent another letter purportedly asserting "negligence" theories against both James and Lucita Quan. The insureds now assert that claimant's theory against Lucita Quan was that she was potentially negligent for allowing her husband James to handle maintenance of their co-owned properties. The insurer allegedly knew that the claimant was "looking to" the community property interest of Lucita Quan and seeking to impose liability on her "for respondeat superior," and for the negligent hiring and management [***21] of her husband.

Various memoranda in the insurer's claim file, some of which are attached to the complaint, reflect lower-echelon insurer employee opinions that there may be or was an obligation to defend due to the allegations of "negligence." An internal insurance company memo near the time of the insurer's withdrawal from the defense noted the claimant's "interesting theory of negligence," and shows that the claim was "reserved" (i.e. that loss reserves were established) for $ 250,000.

[*595] E. *Facts Known to the Insurer After Withdrawal From Defense*

After the insurer's withdrawal from the defense, the insured retained new counsel who continued to communicate with the insurer and demanded defense and indemnity. The insurer then learned that the claimant's counsel was of the opinion that Mrs. Quan might "lose her property interest." The claimant's counsel further surmised that Mr. Quan might be found to be an employee or agent of Mrs. Quan or of their enterprise.

[**141] The SAC is vague on the details, but a judicial arbitration was apparently subsequently held. The insured's counsel communicated the results of the arbitration to the insurer, arguing it was "a judicial [***22] determination of liability based on a covered activity." The arbitrator's "Amended Findings and Award" stated that the insured's acts "up and until the time of the occurrence of the sexual acts are found to have been negligent. Specifically, those acts include the furnishing of alcoholic beverages to a minor, and any unintended but negligent touching of the plaintiff, including kissing, fondling, and undressing of the plaintiff, are found to have been negligent, as it appears that such conduct was consented to. . . . [P] It is further found that any unconsented sexual acts, specifically sexual intercourse, which occurred after plaintiff demonstrated to defendant her unwillingness to proceed were oppressive and malicious. . . ." Despite the insurer's employee's memo recommending that the insurer resume the defense in light of these "findings," the insurer continued to hold to its denial of any defense obligation, although it still "reserved" the claim at $ 250,000.

F. *Neither the Underlying Complaint Nor Facts Known to the Insurer Reveal the Insureds Face Any Potentially Covered Liability for "Bodily Injury" Caused by an "Occurrence"*

**(5)** It is common to hear the argument that [***23] if the underlying complaint alleges negligence, there must be a duty to defend. This is not necessarily true. The duty to defend depends upon the coverage provided

by the policy--the "nature and kind of risk covered"--which in turn depends upon the wording of the coverage clauses. The "bodily injury" coverage of the policy involved here applies only to "damages," defined as the cost of compensating those who suffer "bodily injury" from an "occurrence." "Occurrence," in turn, is defined to require an "accident." Thus, the insureds' emphasis on *Gray v. Zurich Insurance Co., supra, 65 Cal. 2d 263*, is misplaced--here, unlike in *Gray*, the threshold question is not whether an unclear exclusionary provision applies, "BUT RATHER THE SCOPE OF COVERAGE ITSELF: whether the conduct in question constitutes an accident within the meaning of the policy provision." ( *Merced Mutual Ins. Co. v. Mendez (1989)* [*596] *213 Cal. App. 3d 41, 47 [261 Cal. Rptr. 273]*.) The distinction was discussed in *Royal Globe Ins. Co. v. Whitaker (1986) 181 Cal. App. 3d 532 [226 Cal. Rptr. 435]*: "[H]ere [unlike in Gray], the insurer only promises to indemnify or defend actions involving bodily [***24] injury caused by *an accident* resulting in bodily injury neither expected nor intended by the insured. . . . An intentional act is not an 'accident' within the plain meaning of the word. [Citations.] The same roadblock at the definition of 'accident' halts any argument claiming the [insured] intended his act but not the resulting harm." ( *Whitaker, supra, 181 Cal. App. 3d at p. 537*, fn. omitted.)

To avoid the consequences of the conclusion that no "accident" has been alleged, the insured argues he might be found merely "negligent," or may be found to have mistakenly believed the claimant had "consented." Attempting to draw a distinction between the intentional tort causes of action and the "negligence-based" causes of action, the insured argues that there will be covered liability if he is found to have been "negligent" in serving alcohol to, touching, kissing, embracing, fondling or having sex with the claimant. Such arguments misconstrue the "accident" requirement in standard general liability policies. "Under California law, the term refers to *the nature of the insured's conduct, not his state of mind*." ( *Collin v. American Empire Ins. Co., supra, 21 Cal. App.* [***25] *4th 787, 804*, italics added.) "Negligent" or not, in this case the insured's conduct alleged to have given rise to claimant's injuries is necessarily nonaccidental, not because any "harm" was intended, but simply because the conduct could not be engaged in by "accident."

In *American Internat. Bank v. Fidelity & Deposit Co. (1996) 49 Cal. App. 4th 1558, 1572-1573 [57 Cal. Rptr. 2d 567]*, the court noted the "misapprehension that all claims for negligence must at least potentially come within the policy and therefore give rise to a duty to defend. That is not so. . . . 'Negligent' and 'accidental' are not synonymous . . . ." Although the facts of *American* [**142] *International* are distinguishable (inasmuch as the underlying action involved a claim of negligent misrepresentation, which by definition requires establishing an intent to induce reliance) the principle that "negligence" does not necessarily equate with an "accident" is equally applicable here.

Arguments similar to those put forth by the insureds in this case were rejected in another action stemming from allegedly nonconsensual sex, *Merced Mutual Ins. Co. v. Mendez, supra, 213 Cal. App. 3d 41*. In *Mendez*, the [***26] court found an insurer had no duty to defend or indemnify its insured for damages caused by engaging in acts of oral copulation and attempted oral copulation, allegedly against the claimant's will. The insured admitted the acts of oral copulation, but contended the encounters were consensual. The [*597] policy at issue defined "occurrence" as " 'an accident, including exposure to conditions, which results . . . in [P] . . . bodily injury . . . .' " ( *Id. at p. 44*.) The *Mendez* court framed the issue: "The parties appear to agree that in order for coverage and a duty to defend to exist, the acts of oral copulation and attempted oral copulation must be deemed an 'accident' within the meaning of the policy. They also agree Mendez intentionally engaged in the acts in question. The dispute centers on the meaning of the term 'accident.' Respondent contends the acts do not constitute an accident because they were intentionally performed by Mendez. Conversely, appellants contend an accident occurs even if the acts causing the alleged damage were intentional as long as the resulting damage was not intended. The argument urged by appellants has been repeatedly rejected by the appellate [***27] courts." ( *Id. at p. 48*.)

The *Mendez* court continued: "In *St. Paul Fire & Marine Ins. Co. v. Superior Court (1984) 161 Cal. App. 3d 1199* . . ., the underlying suit against the insured involved an action for wrongful discharge. The court was called on to construe policy language similar to that in the present case: there the policy covered the insured against claims for ' ". . . bodily injury or damage to tangible property resulting from an accidental event." ' ( *Id. at p. 1201*.) The court noted: 'In its plain and ordinary sense, "accidental" means "arising from extrinsic causes [;1] occurring unexpectedly or by chance [; or] happening without intent or through carelessness." (Webster's Ninth New Collegiate Dict. (1983) p. 49.) . . . The court concluded the employee's termination did not constitute an 'unintentional, unexpected, chance occurrence' (*ibid.*) and thus there was no potential liability under the policy. Accordingly, the court held the insurer had no duty to defend. ( *Id. at pp. 1202-1203*.)

"In *Commercial Union Ins. Co. v. Superior Court (1987) 196 Cal. App. 3d 1205* . . ., the policy provided coverage and a defense for damages as a result of [***28] bodily injury or property damaged [*sic*] '

"caused by an *occurrence*." ' ( *Id. at p. 1206*, . . .) 'Occurrence' was then defined by the policy as ' "an accident, including, continuous or repeated exposure to conditions, which results in *bodily injury* or *property damage*. This injury or damage must be neither expected nor intended by *you*. . . ." ' ( *Id. at p. 1207*, . . .) As in *St. Paul*, the underlying action against the insured involved a claim of wrongful discharge. Relying on *St. Paul*, the court concluded the trial court erred in applying the 'term "accident" to the consequences of the act rather than to the happening of the act itself.' ( *Id. at p. 1208*.) The court held: 'An intentional termination is not an "occurrence" under the policy because it is not an accident. The definition of "accident" halts any argument that real party intended his act but not the resulting harm.' ( *Id. at p. 1209*.)" (*Merced Mutual Ins. Co.* v. *Mendez, supra, 213 Cal. App. 3d at pp. 48-49*, fn. omitted.)

[*598] After summarizing the authorities, the *Mendez* court stated: "We reject appellants' argument that in construing the term 'accident,' chance [***29] or foreseeability should be applied to the resulting injury rather than to the acts causing the injury. In terms of fortuity and/or foreseeability, both 'the *means* as well as the result must be unforeseen, involuntary, unexpected and unusual.' [Citation.] We agree coverage is not always [**143] precluded merely because the insured acted intentionally and the victim was injured. *An accident, however, is never present when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage.* [Citation.]" (*Merced Mutual Ins. Co.* v. *Mendez, supra, 213 Cal. App. 3d at p. 50*, second italics added.)

Applying these principles to the case before it, the *Mendez* court noted: "In the present case, Mendez admits intentionally engaging in sexual activity with Ms. Peery. This sexual activity, which Ms. Peery alleges occurred against her will, forms the basis of her action against Mendez. All of the acts, the manner in which they were done, and the objective accomplished occurred exactly as appellant intended. No additional, unexpected, independent or unforeseen act occurred." (*Merced Mutual Ins. Co* [***30] . v. *Mendez, supra, 213 Cal. App. 3d at p. 50*.)

Rejecting the insured's argument that an insured could reasonably expect that "negligent bodily injury" would be covered, the *Mendez* court noted: "Appellants' argument also fails because the construction offered results in a strained interpretation of the word 'accident.' . . . The argument, in effect, is that Mendez's purported honest but unreasonable belief in consent would constitute negligence. According to appellants, this mistaken belief 'alter[s] the very character of the act itself' and renders it accidental. . . . [P] We decline to construe the term 'accident' to include conduct constituting the crime of forcible oral copulation and/or assault with intent to commit forcible oral copulation. We further are unable to posit any factual construction where such conduct might be interpreted as accidentally occurring." (*Merced Mutual Ins. Co.* v. *Mendez, supra, 213 Cal. App. 3d at pp. 51-52*.)

In the instant case, the insureds claim that the causes of action for negligence and negligent infliction of emotional distress in the underlying complaint "obviously" GIVE RISE TO A DUTY TO DEFEND, ARGUING: "the most [***31] obvious theory giving rise to the potential for an award of indemnifiable damages in favor of [claimant] flows from her third cause of action for negligence which alleges that [insured] 'negligently embraced and kissed' [claimant,] causing her bodily harm." This contention fails the test stated in *Mendez*. The insured may have "negligently" embraced and kissed claimant in the sense that he violated some duty of care in doing so, but there is no allegation that his allegedly negligent but nevertheless intentional conduct [*599] led to some "additional, unexpected, independent, and unforeseen happening" constituting an accident. (Cf. *Merced Mutual Ins. Co.* v. *Mendez, supra, 213 Cal. App. 3d at p. 50*.)

Thus, the insureds' "negligence" versus "intentional tort" distinction misses the point. [14] In this context (as opposed, perhaps, to the "wilful acts" exclusion of *Insurance Code section 533*, discussed in the unpublished portion of this opinion), whether the insured intended the harm that resulted from his conduct is not determinative. The question is whether an accident gave rise to claimant's injuries. No accident is alleged, nor do the extrinsic facts suggest [***32] one. The acts asserted to give rise to the underlying claimant's injuries were deliberate, regardless of whether any harm was intended or expected to come of them. No "additional, unexpected, independent and unforeseen happening" produced the alleged injuries.

14 In their brief, the insureds posit a number of asserted factual scenarios the jury might determine took place. The insureds argue that each of these "possibilities," with the exception of a finding of forcible rape, would give rise to covered liability. None of the purported possibilities, however, involve a finding that the claimant suffered physical injury caused by an "accident."

The insured points out that in the interview with the insurer, he stated that the claimant might have "bump[ed] into me with her chest." In their reply the insureds explain that this bumping may be a fact indicating that the claimant was flirting, or that the insured could reasonably have thought so, giving rise to a "defense" of consent. Yet even if a jury was to [***33] find that the insured was mistaken in his belief as to whether the claim-

ant "consented" to the touching, embracing, kissing or sexual intercourse, there was still no additional happening constituting [**144] an "accident" which caused the injuries. The other party's consent, or the lack thereof, cannot change the nature of the insured's deliberate acts. Assuming, as the insureds insist, that liability could be imposed without a finding of any intent to "harm," the lack of such intent would not convert volitional physical acts into "accidents" within the meaning of that term in the policy under California law. In other words, injurious physical contact may have been a "mistake," but it was no "accident."

The insured claims the fact that he has denied committing any offense at all, and might be vindicated, necessarily gives rise to a defense obligation. This does not follow, and *Mendez* cannot be distinguished on that basis. Such a claim misconstrues the "groundless or false" clause common to liability policies. The point of the clause is that an insurer may not rid itself of the burden of defending an action that seeks damages potentially falling within the scope of the policy's coverage [***34] merely by arguing that the suit has no merit. The "groundless or false" clause does not change the fundamental principle that there is no defense obligation absent potential liability *under* [*600] *the policy*. "The 'groundless, false, or fraudulent' clause . . . does not extend the obligation to defend without limits; it includes only defense to those actions of the nature and kind covered by the policy." ( *Gray v. Zurich Insurance Co., supra, 65 Cal. 2d at p. 274.*)

Contrary to the insureds' arguments, in this case the availability of exculpatory information indicating that the insured's conduct may not have risen to the level of a crime does not suffice to distinguish *Mendez* or to demonstrate a potential for covered liability. [15] The insureds misapply *Horace Mann Ins. Co.* v. *Barbara B., supra, 4 Cal. 4th 1076*, to argue that so long as there remain any "disputed factual issues," determinative of the insured's liability *to the plaintiff* in the underlying action, a liability insurer must continue to defend. Yet in *Horace Mann* the insured faced liability to the claimant that, depending on the ultimate facts developed in the underlying action, [***35] could have been covered by the policy. Here, by contrast, no matter what develops as to liability or whether liability is imposed at all, the insured will not be obligated to pay damages for, and the insurer thus will not be obligated to indemnify the insured for, physical injury to the claimant caused by an "accident."

15 The insureds insist that the court must consider the "other facts" known to the insurer at the time it withdrew from the defense. These include that the insured "had received a misdemeanor sentence and that his no contest plea and conviction were inadmissible against him in the [underlying] action"; that eventually he was deemed to have entered a "not guilty" plea and the case was dismissed; that the emergency room physician had testified to the lack of physical evidence of rape (or indeed sex) or force; that appointed defense counsel had pointed out a possible legal difference between an "unpermitted touching" and rape; that the sheriff's office criminologist had not found evidence of semen or blood; and that the claimant's story "is shot through with contradictions."

[***36] An intentional act is not an accident ( *Dyer v. Northbrook Property & Casualty Ins. Co. (1989) 210 Cal. App. 3d 1540, 1547 [259 Cal. Rptr. 298]*) even if it causes unintended harm ( *Loyola Marymount University v. Hartford Accident & Indemnity Co. (1990) 219 Cal. App. 3d 1217, 1225 [271 Cal. Rptr. 528]*). An accident can flow from an intentional act only if "some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." (*Merced Mutual Ins. Co.* v. *Mendez, supra, 213 Cal. App. 3d at p. 50.*) [16] In this case, there is no theory available on the facts expressed in the complaint or made known to the insurer from other sources under which the insured can be liable for physical injuries caused by "accidentally" [**145] touching, [*601] kissing, embracing or having sex with the claimant, nor is there any additional "happening" to combine with these necessarily deliberate acts so as to produce an "accident" giving rise to bodily injury. There is thus no potential liability for "bodily injury" caused by an "occurrence" and no duty to defend.

16 For example, a worker mops the floor at a fast-food restaurant, wetting it and reducing the coefficient of friction between that floor and a potential shoe sole. The act of mopping the floor is intentional; it is not an accident. A customer then enters, slips and falls. This second event *may* be an "additional, unexpected, independent and unforeseen happening" producing an injury, and hence may be an "accident" giving rise to a duty to defend. However, the intentional act of mopping the floor alone, just as the intentional act of sexual intercourse alone, is not an accident and does not trigger the defense duty.

[***37] G. *Neither the Arbitrator's Vacated Findings Nor the Internal Opinions of Insurer Personnel Gave Rise to Any Duty to Defend*

**(6)** The insureds argue that the vacated "Amended Findings and Award of Arbitrator" "converted" potentially covered liability "into reality." Whatever the unexplained origins of this document prepared on the insured's counsel's letterhead, it is a legal nullity. (*Cal.*

*Rules of Court, rule 1616(c).*) "A timely request for a trial de novo operates to vacate an arbitration award in its entirety, putting the case at large as though no arbitration proceedings had occurred. [Citations.]" ( *Calderon v. Kane (1995) 36 Cal. App. 4th 1663, 1666 [43 Cal. Rptr. 2d 480].*) [17]

17 Indeed, the *insureds*' counsel argued below, when the insurer attempted to use the findings in connection with an earlier demurrer: "I think it's a breach of the ethical responsibilities of defendant's counsel to put forward to this court that the arbitration award in this case in the underlying action, which was de novoed, which has no legal effect, has any implication for the facts of this case."

[***38] The arbitrator "found" that "furnishing of alcoholic beverages to a minor, and any unintended but negligent touching of the plaintiff, including kissing, fondling, and undressing of the plaintiff" were "negligent" acts, which resulted in damages of $ 900,000, while "any unconsented sexual acts, specifically sexual intercourse, . . . were oppressive and malicious" but resulted in damages only of $ 250,000. Such "findings" do not affect the determination that the complaint presented no potential for covered liability for "bodily injury" caused by an "accident."

The legal labels the arbitrator chose to place on the insured's conduct in trying to divide it between "negligent" and "intentional" acts were the arbitrator's legal opinions, and would not be binding on this court even had the award not been rendered a nullity. Moreover, the arbitrator's findings, if anything, tend to confirm the complete absence of any "accident" as that term is used in the policy at issue and interpreted under California law. The arbitrator's legal opinions, conveyed to the insurer, did not constitute "facts" sufficient to give rise to a potential for covered liability and a duty to defend. Again, even if [***39] there could be "negligent" kissing, fondling and undressing of the claimant, the acts upon which such "liability" was based were not "accidents."

For similar reasons, the insureds' argument that insurance company employee opinions or memos gave rise to a duty to defend in this case must fail. [*602] Interpretation of an insurance policy is a question of law, as is whether there is a duty to defend in this context. Even experts may not opine on pure questions of law. ( *Devin v. United Services Auto. Assn. (1992) 6 Cal. App. 4th 1149, 1157, fn. 5 [8 Cal. Rptr. 2d 263].*) Without more, writings or memos by insurance company personnel venturing their opinions as to whether a defense should be afforded do not constitute "admissions" of a defense duty. The argument was rebuffed in *Chatton v. National Union Fire Ins. Co. (1992) 10 Cal. App. 4th 846 [13 Cal. Rptr. 2d 318]*, where the court stated: "Respondents' final argument that there was coverage for advertising injury under the terms of the CGL policy because National Union's employees themselves admitted the existence of such liability requires but a brief reply. It is well settled that the interpretation of an insurance [***40] policy is a *legal* rather than a *factual* determination. [Citations.] Consistent therewith, it has been held that opinion evidence is completely irrelevant to interpret an insurance contract. [Citations.]" (*Chatton, supra, 10 Cal. App. 4th at p. 865.*)

The insureds in this case improperly seek to substitute insurance company employee musings concerning the defense duty decision for actual facts that might demonstrate the potential for covered liability. The fact that insurance company employees may have [**146] questioned, in writing, whether denial of a defense obligation was proper based on the facts cannot demonstrate that those facts gave rise to potentially covered liability. As a matter of law they did not. [18]

18 Insureds do not squarely argue that insurer has "waived" or is "estopped" from asserting coverage defenses. Moreover, "the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms . . . ." ( *Aetna Casualty & Surety Co. v. Richmond (1977) 76 Cal. App. 3d 645, 653 [143 Cal. Rptr. 75].*) "[C]overage under an insurance policy cannot be established by estoppel or waiver." ( *Manneck v. Lawyers Title Ins. Corp. (1994) 28 Cal. App. 4th 1294, 1303 [33 Cal. Rptr. 2d 771].*)

[***41] H.-K. *

* See footnote, *ante*, page 583.

IV. DISPOSITION

The judgment is affirmed. Each party to bear its own costs.

Boren, P. J., and Nott, J., concurred.

A petition for a rehearing was denied November 20, 1998, and appellants' petition for review by the Supreme Court was denied February 17, 1999.

# TAB 27

LEXSEE 222 CAL.APP.3D 707

**RELIANCE INSURANCE COMPANY, Plaintiff and Respondent, v. COLIN ALAN et al., Defendants and Appellants**

**No. G008017**

**Court of Appeal of California, Fourth Appellate District, Division Three**

*222 Cal. App. 3d 702*; *272 Cal. Rptr. 65*; *1990 Cal. App. LEXIS 924*

**July 27, 1990**

**SUBSEQUENT HISTORY:** [***1] Respondent's petition for review by the Supreme Court was denied October 11, 1990.

**PRIOR HISTORY:** Superior Court of Orange County, No. 545208, William F. McDonald, Judge.

**DISPOSITION:** The portion of the judgment holding that Reliance is entitled to recover costs and attorney's fees is reversed. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action by an insurer against its insured, the trial court granted summary judgment for the insurer on the grounds that it had no duty to defend or indemnify its insured in an underlying civil action against the insured arising out of the shooting death of a woman living on the insured's yacht. The insurer's "all-risk yacht policy" contained protection and indemnity coverage arising out of the insured's ownership, operation, or maintenance of the yacht. The trial court also granted summary judgment requiring the insured to reimburse the insurer for costs expended in its defense of the action undertaken under a reservation of rights. (Superior Court of Orange County, No. 545208, William F. McDonald, Judge.)

The Court of Appeal affirmed the judgment as to coverage, but reversed as to the reimbursement issue. The court held a protection and indemnity policy only covers liabilities incurred as owners of the insured vessel and not coverage for liability arising out of the insured's "use" of it. Since there was no causal operational relationship between the insured vessel and the shooting death, which occurred while the yacht was docked, the policy did not provide coverage. However, the court held the trial court erred in ordering the insured to reimburse the insurer for costs of defense, since the insurer's claim for reimbursement was based solely on the theory of equitable restitution, which theory has been uniformly rejected under similar circumstances. (Opinion by Moore, J., with Wallin, Acting P. J., and Crosby, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Insurance Contracts and Coverage § 11--Rules in Aid of Interpretation of Contracts--Interpretation as Question of Law.** --On appeal from a judgment interpreting an insurance policy in which the facts before the lower court were not in dispute, the appellate court was not bound by the lower court's construction of the insurance policy. The proper interpretation of the policy was subject to de novo review.

**(2) Insurance Contracts and Coverage § 15--Rules in Aid of Interpretation of Contracts--Interpretation Against Insurer--Ambiguity.** --Any ambiguity or uncertainty in an insurance policy must be resolved against the insurer, and the insured's reasonable expectations of coverage must be protected. Thus, coverage clauses are interpreted broadly so as to afford the greatest possible coverage, while exclusionary clauses are interpreted narrowly against the insurer. It is the insurer's burden to phrase exceptions and exclusions in clear and unmistakable language. However, as with all contracts, when the terms are plain and unambiguous, the court is bound to enforce the language of the policy as written.

[See 1 **Witkin,** Summary of Cal. Law (9th ed. 1987) Contracts, § 699.]

**(3) Insurance Contracts and Coverage § 76--Marine Insurance--Risks and Causes of Loss--Yacht Policy--Protection and Indemnity.** --Under an "all-risk yacht policy" of insurance on a vessel containing "protection and indemnity" coverage for payment on behalf of the insured all sums which the insured was legally obligated to pay "as a result of the ownership, operation, or maintenance" of the yacht, the insurer had no duty to defend or indemnify the insured in a wrongful death action against him by the mother of a woman who was shot and killed while living with the insured on the vessel. The vessel was docked when the incident occurred and merely served as the locale for the incident, and there was no causal operational relationship between the insured vessel and the shooting death of the victim. A "protection and indemnity" coverage policy is of limited nature, only covers liabilities incurred as owners of the insured vessel, and there must be at least some causal operational relation between the vessel and the resulting injury.

**(4) Insurance Contracts and Coverage § 107.4--Liability and Indemnity Insurance--Defense Under Reservation of Rights--Reimbursement to Insurer of Attorney Fees and Costs on Finding of Noncoverage.** --In an action by an insurer against an insured in which it was determined the insurer's all-risk yacht policy did not require the insurer to indemnify or defend the insured in an action against him, the trial court erred in thereafter ordering the insured to reimburse the insurer for the insurer's cost of defense undertaken in the action under a reservation of rights. The insurer's claim for reimbursement was based solely on a theory of equitable restitution, but that theory did not entitle the insurer to recover. A person who, incidental to the performance of his own duty or to the protection of his own things, has conferred a benefit on another, is not thereby entitled to contribution. The insurer who is uncertain whether coverage is provided under a policy and undertakes the defense of its insured under a reservation of rights does so in large part to protect itself from a subsequent claim that it breached its agreement with the insured. Although the assumption of the defense by the insurer without doubt also benefits the insured, it is not primarily undertaken for the insured's benefit.

**COUNSEL:** O'Connor & Schmeltzer, Lee P. O'Connor, Cummins & White and Richard J. Wynne for Defendants and Appellants.

Mower, Koeller & Nebeker and Lynn M. Bouslog for Plaintiff and Respondent.

**JUDGES:** Opinion by Moore, J., with Wallin, Acting P. J., and Crosby, J., concurring.

**OPINION BY:** MOORE

**OPINION**

[*704] [**66] Colin Alan and Patricia Knobloch appeal the granting of summary judgment in a declaratory relief action decreeing Reliance Insurance Company (Reliance) had no duty to defend or indemnify Alan in an underlying civil action, and awarding Reliance reimbursement of all amounts it expended in Alan's defense. Alan and Knobloch contend the lower court erred in ruling Reliance had no duty to defend or indemnify Alan. In addition, Alan argues Reliance was not entitled to reimbursement for its costs of defense.

Facts

The facts are not in dispute. In September [***2] 1986, Janet Knobloch, the daughter of appellant Knobloch, was living with Alan on his vessel, inaptly named "Tranquility." Reliance had issued an "All-Risk Yacht Policy" of insurance on the vessel, which contained "Protection and Indemnity" [*705] coverage. It provided the company would pay on behalf of its insured all sums which the insured was legally obligated to pay "as a result of the ownership, operation, or maintenance of your insured property."

On September 24, 1986, when the "Tranquility" was berthed in Newport Harbor, Janet Knobloch was shot and killed aboard the vessel. Thereafter, Knobloch filed a complaint against Alan alleging causes of action for the wrongful death of her daughter, as well as intentional and negligent infliction of emotional distress. [1]

1 Knobloch's complaint alleged the shooting occurred either negligently or intentionally. In its complaint for declaratory relief, Reliance alleged Alan acted in "an intentional and/or willful manner." However, in the motion for summary judgment and the briefs on appeal, the parties focus solely on the question of whether there is a duty to defend because the shooting arose out of the ownership of the vessel. Accordingly, it is unnecessary for us to speculate as to how the shooting occurred or whether Alan intentionally or negligently fired the weapon.

[***3] Following service of the complaint, Reliance tendered a defense to Alan under a full reservation of rights. Thereafter, Reliance [**67] moved for summary judgment, contending it had no obligation to defend or indemnify Alan in the Knobloch action, because the liability did not result from the "ownership, operation

or maintenance" of the insured vessel. It also contended it was entitled to reimbursement of all sums expended on Alan's defense. Alan and Knobloch opposed the motion, contending the shooting arose, in part, from Alan's ownership of the vessel. The lower court granted Reliance's motion and entered judgment on behalf of Reliance, and this appeal followed.

Discussion

Standard of Review

**(1)** As noted, the facts before the lower court are not in dispute. Rather, the parties dispute the legal conclusions to be drawn from those facts, under the terms and conditions of the insurance policy issued by Reliance to Alan. Accordingly, this court is not bound by the lower court's construction of the insurance policy. ( *Merrick v. Writers Guild of America, West, Inc. (1982) 130 Cal.App.3d 212, 217 [181 Cal.Rptr. 530]*.) The proper interpretation of the policy [***4] is subject to de novo review. ( *Los Angeles Police Protective League v. City of Los Angeles (1985) 163 Cal.App.3d 1141, 1148 [209 Cal.Rptr. 890]*, disapproved on other grounds in *Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 427, fn. 28 [253 Cal.Rptr. 426, 764 P.2d 278]*; *Titan Group, Inc. v. Sonoma Valley Sanitation Dist. (1985) 164 Cal.App.3d 1122, 1127 [211 Cal.Rptr. 62]*.)

[*706] We are bound by established rules governing the construction of insurance policies. **(2)** Any ambiguity or uncertainty in the policy must be resolved against the insurer, and the insured's reasonable expectations of coverage must be protected. ( *Reserve Insurance Co. v. Pisciotta (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764]*.) For this reason, coverage clauses are interpreted broadly so as to afford the greatest possible coverage, while exclusionary clauses are interpreted narrowly against the insurer. ( *Garvey v. State Farm Fire & Casualty Co. (1989) 48 Cal.3d 395, 406 [257 Cal.Rptr. 292, 770 P.2d 704]*; [***5] *State Farm Mut. Auto. Ins. Co. v. Partridge (1973) 10 Cal.3d 94, 101-102 [109 Cal.Rptr. 811, 514 P.2d 123]*.) It is the insurer's burden to phrase exceptions and exclusions in clear and unmistakable language. However, as with all contracts, when the terms are plain and unambiguous, the court is bound to enforce the language of the policy as written. ( *Atlas Assurance Co. v. McCombs Corp. (1983) 146 Cal.App.3d 135, 143 [194 Cal.Rptr. 66]*.) "'When the language is clear, a court should not give it a strained construction to impose on the insurer a liability it has not assumed.'" ( *St. Paul Fire & Marine Ins. Co. v. Superior Court (1984) 161 Cal.App.3d 1199, 1202 [208 Cal.Rptr. 5]*.)

Applying these rules of construction, we proceed to the merits.

Applicability of the Yacht Policy

**(3)** The issue is whether the "Protection and Indemnity" provision of the all-risk yacht policy provides coverage for the damages, including wrongful death, alleged in Knobloch's complaint. The controlling provision states: "Perils Insured Against: We will pay sums which you or a covered person under [***6] this Policy becomes legally obligated to pay as a result of the ownership, operation, or maintenance of your insured property because of: [para.] A. Property Damage . . . [para.] B. Personal Injury . . . ." Accordingly, to fall within the scope of coverage under the policy, the insured's liability must have arisen out of the "ownership, operation or maintenance" of the insured vessel.

The subject policy is not a comprehensive general liability policy. It is well recognized that a "Protection and Indemnity" coverage policy is of a limited nature: "An important feature of the P&I policy is that it only covers liabilities incurred 'as owners of the [insured] vessel.' It is not a general liability coverage, and when the insured vessel owner's conduct in some non-vessel-related operation is the cause of [**68] an injury, even one occurring on the owner's vessel, the loss is not covered since the owner's liability was not incurred as a vessel owner." (3 Cal. Insurance Law & Practice, Marine *Insurance, § 44.04[4]*, p. 44-14.)

[*707] No California case that we have been able to find has dealt with this or a similar set of facts. However, the limited nature of a "Protection and Indemnity" policy [***7] was explained by the Fifth Circuit Court of Appeals in *St. Paul Fire & Marine Ins. Co. v. Vest Trans. (5th Cir. 1982) 666 F.2d 932, 941*, as follows: "It must be stressed initially that protection and indemnity policies do not purport to cover all types of an insured's liability but extend only to the liabilities specifically enumerated in the insuring agreement." (See also *Bohemia, Inc. v. Home Ins. Co. (9th Cir. 1984) 725 F.2d 506, 509*.)

Similarly, in *Lanasse v. Travelers Insurance Company (5th Cir. 1971) 450 F.2d 580, 584*, the Fifth Circuit noted the vessel must afford something more than a mere condition or locale for the accident: "There must be at least some causal operational relation between the vessel and the resulting injury . . . . [W]here injury is done through nonvessel operations, the vessel must be more than the inert locale of the injury." [2] (See also *Wedlock v. Gulf Mississippi Marine Corp. (5th Cir. 1977) 554 F.2d 240, 243-244*.) In the instant case, there is no question the vessel was docked in Newport Beach when the incident occurred and merely served as the locale for [***8] the incident.

2 Appellant Knobloch argues *Lanasse* and *Vest* are inapposite because the contractual provisions were not similar to those present here. We disagree. In *Lanasse*, the policy provided coverage for liability incurred "as owner of" the insured vessel. (*450 F.2d at p. 584.*) In *Vest*, the coverage was for liability incurred "*as owners of the vessel named herein* . . . ." (*666 F.2d at p. 937.*) The ownership coverage was thus substantially similar to that provided here.

When the insured vessel owner's conduct is the cause of an injury in a nonvessel-related act, even when occurring on the owner's vessel, the loss is not covered. ( *Lanasse v. Travelers Insurance Co., supra, 450 F.2d at p. 584*; *Wedlock v. Gulf Mississippi Marine Corp., supra, 554 F.2d at p. 242*; *St. Paul Fire Ins. v. Vest Transportation, supra, 666 F.2d at p. 941.*)

Appellant cites *Farmers Home Mut. Ins. Co. v. Insurance Etc. (1978) 20 Wash.App. 815 [583 P.2d 644]* [***9] in support of coverage. But there, the Washington Court of Appeals allowed recovery because injuries were suffered while the insured was helping the injured party disembark, and "all parties were involved in activities necessary to properly leave the yacht at the end of a cruise." (*Id. at p. 647.*)

Inasmuch as the language of the policy is clear and unambiguous, the cases cited by appellants regarding coverage arising out of "use" or "operation" are inapposite. For example, in *Transport Indemnity Co. v. Schnack (1982) 131 Cal.App.3d 149 [182 Cal.Rptr. 256]*, an aircraft policy provided coverage for damages caused by an occurrence arising out of the ownership, maintenance or *use* of the aircraft. Under that insuring agreement, the court [*708] concluded coverage existed for the insured's liability arising out of an explosion which occurred during the fueling of the aircraft. ( *Id. at pp. 152-153.*) In the instant case, the yacht policy did not include coverage for liability arising out of the insured's "use" of the vessel. Further, it is clear there was no "causal operational relationship" between the insured [***10] vessel and the shooting death of Janet Knobloch.

Similarly, in *State Farm Mut. Auto. Ins. Co. v. Partridge, supra, 10 Cal.3d 94*, the court construed a homeowner's policy which excluded coverage for bodily injuries "'arising out of the . . . use . . . of the owned motor vehicle.'" ( *Id. at p. 98.*) Here, the policy affords limited coverage for liability arising out of the "ownership, operation or maintenance" of the insured vessel, but does not encompass liability arising out of "use."

Finally, in *State Farm Mut. Auto. Ins. Co. v. Partridge, supra, 10 Cal.3d 94*, the court recognized a "causal connection" between a [**69] vehicle and a shooting incident, because a firearm accidentally discharged as the vehicle was being driven off-road in rough terrain on a hunting trip. ( *Id. at p. 100.*) By contrast, in the instant case, the insured vessel was moored at its berth at the time of the fatal shooting. Thus, the insured vessel served merely as the locale of the shooting and there was no "causal relationship" between [***11] the boat and the shooting which would trigger coverage under the "Protection and Indemnity" policy.

For these reasons, we hold Reliance did not have a duty to defend or indemnify Alan in the underlying action and affirm that portion of the lower court's judgment for Reliance. Having so concluded, we must determine whether the lower court properly decided Reliance was entitled to reimbursement of defense costs expended on Alan's behalf.

Reimbursement of Attorney's Fees and Costs

**(4)** The lower court ordered Alan to reimburse Reliance for $ 5,818.05 in costs of defense in the Knobloch action. We reverse that portion of the judgment.

Reliance contends it was entitled to reimbursement as a matter of law, since it had no duty to defend or indemnify Alan. It argues that, because he received the benefit of a defense Reliance was not obligated to provide, Alan must reimburse Reliance for the costs of defense. We disagree.

Reliance complied with Alan's demand for a defense and tendered it under a reservation of rights, reserving the right to seek reimbursement of monies expended in Alan's defense: "Additionally, we are reserving our [*709] right to seek reimbursement of the amount plus interest [***12] of attorneys' fees and costs should it later be determined that [Reliance] has no duty to defend or indemnify the named insureds." The record indicates this was the only "undisputed fact" relied upon by Reliance in its motion for summary judgment for the proposition it was entitled to reimbursement of defense costs as a matter of law.

Reliance's claim for reimbursement was based solely on a theory of equitable restitution. The second cause of action in the complaint alleges the sums for Alan's defense were paid "under legal compulsion" and that plaintiff "is entitled to *restitution* of all such sums in order to avoid the *unjust enrichment* of defendant Colin Alan." (Italics added.) The theory of equitable restitution has been uniformly rejected under similar circumstances in California. (See, e.g., *Insurance Co. of the West v. Haralambos Beverage Co. (1987) 195 Cal.App.3d 1308, 1323 [241 Cal.Rptr. 427]*; *Travelers Ins. Co. v. Lesher (1986) 187 Cal.App.3d 169, 203-204 [231 Cal.Rptr. 791]*; *American Oil Service v. Hope Oil Co. (1961) 194 Cal.App.2d 581, 586 [15 Cal.Rptr. 209].*) [***13] The

reason is as follows: "Among settled principles of restitution is that a person who, incidental to the performance of his own duty or to the protection of his own things, has conferred a benefit upon another, is not thereby entitled to contribution. [Citation.] The insurer who is uncertain whether coverage is provided under a policy undertakes the defense of its insured under a reservation of rights in large part to protect *itself* from a subsequent claim that it breached its agreement with the insured. [Citation.] Although the assumption of the defense by the insurer without doubt also benefits the insured, it is not primarily undertaken for the insured's benefit." ( *Travelers Ins. Co. v. Lesher, supra, 187 Cal.App.3d at pp. 203-204.*)

Reliance cites the cases of *Johansen v. California State Auto Assn. Inter-Ins. Bureau (1975) 15 Cal.3d 9 [123 Cal.Rptr. 288, 538 P.2d 744]* and *Aetna Cas. & Surety Co. v. Certain Underwriters (1976) 56 Cal.App.3d 791 [129 Cal.Rptr. 47]* for the proposition that an insurer is entitled to recover its attorney's fees and costs of [***14] defending an insured when it is later determined the insurer had no duty to defend or indemnify. Both cases, however, appear to be based on contractual, not restitutional, theories.

In *Johansen*, the court states that if an insurer has reserved its right to assert a defense of noncoverage and subsequently settles the case, it would be free to seek [**70] reimbursement of the *settlement payment* from its insured when noncoverage under its policy is established. This appears to be dictum in the case. [3] Furthermore, there is no discussion whatsoever regarding the [*710] recovery of attorney's fees and costs in defending the insured. In *Aetna Cas. & Surety Co.*, the action was by a primary insurer against excess insurers for equitable subrogation. Thus, the issue was whether the primary insurer was entitled by subrogation or otherwise to recover costs of litigation expended for the insured from the excess insurance carriers. As a subrogee, the primary insurer was entitled to reimbursement as a matter of contract, because it had been placed in the shoes of the insured. (*56 Cal.App.3d at pp. 801-804.*)

3 Moreover, California law is clear that to seek reimbursement of settlement monies from the insured, the insurer must prove the existence of an agreement -- express or implied in fact -- that the insurer may commit the insured's own funds toward any reasonable settlement. (See *Val's Painting & Drywall, Inc. v. Allstate Ins. Co. (1975) 53 Cal.App.3d 576, 588 [126 Cal.Rptr. 267].*)

[***15] Thus, the only theory for recovery of defense costs would be an agreement or understanding between Alan and Reliance that Alan would reimburse Reliance. Whether an agreement existed or not would be a question of fact. There was no such agreement contained in the policy of insurance here. And as noted, in its complaint and its motion for summary judgment, Reliance relied solely on the theory of equitable restitution. [4]

4 We note that Reliance has argued this case as if there was a contract between the parties for reimbursement of costs of defense. Even assuming Reliance had alleged such a contract in the lower court, it did not produce supporting documents or evidence to establish there is no triable issue of fact. ( *Code Civ. Proc., § 437c, subd. (c)*; *Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].*) Moreover, it would be essential that the agreement comply with all the elements necessary for the formation of a valid contract. So, it would be essential that the agreement be supported by sufficient consideration, separate and apart from that which supported the initial insurance contract. To the extent the quotation in footnote 5 in *Insurance Co. of the West v. Haralambos Beverage Co., supra, 195 Cal.App.3d at pages 1319-1320* states otherwise, we disagree with it and that opinion's implicit endorsement.

[***16] The portion of the judgment holding that Reliance is entitled to recover costs and attorney's fees is reversed. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

# TAB 28

LEXSEE 225 CAL. APP. 3D 270

**ROBOMATIC, INC., et al., Plaintiffs and Appellants, v. VETCO OFFSHORE et al., Defendants and Respondents**

**No. B037717**

**Court of Appeal of California, Second Appellate District, Division Six**

*225 Cal. App. 3d 270*; *275 Cal. Rptr. 70*; *1990 Cal. App. LEXIS 1196*; *55 Cal. Comp. Cas 451*; *5 I.E.R. Cas. (BNA) 1644*; *90 Cal. Daily Op. Service 8379*

**November 16, 1990**

**PRIOR HISTORY:** [***1] Superior Court of Ventura County, No. 74403, John Holmes, Judge. *

* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

**DISPOSITION:** Accordingly, the judgment is affirmed. Rehka is to bear costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

An employee, who claimed to have done some outside work for his employer as an independent contractor, sued his former employer for damages ensuing from dismissal of his employment, alleging causes of action for slander and negligent infliction of emotional distress. The trial court awarded judgment on the pleadings in the slander action due to the employee's failure to plead malice to defeat the employer's conditional privilege of communication. A trial followed concerning whether the employee suffered emotional distress, and if so, whether he was an employee or an independent contractor. The trial court held that the employee was not an independent contractor, and thus a proceeding under workers' compensation was the employee's sole remedy for negligently inflicted emotional distress. (Superior Court of Ventura County, No. 74403, John Holmes, Judge. *)

* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

The Court of Appeal affirmed. It held that the trial court properly found the tort action was barred by the workers' compensation exclusivity rule (*Lab. Code, § 3600*), and that it correctly awarded judgment on the pleadings on the slander cause of action due to the employee's failure to specifically plead malice to defeat the employer's conditional privilege of communication. (Opinion by Gilbert, J., with Stone (S. J.), P. J., and Abbe, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Workers' Compensation § 7.2--Exclusivity of Remedy--Scope and Extent; Dual Capacity Doctrine--Tort Action Against Employer Barred--Negligent Infliction of Emotional Distress Resulting From Dismissal.** --In an action by an employee against his former employer for damages for negligent infliction of emotional distress resulting from his dismissal from employment, the trial court properly held that the tort action was barred by the workers' compensation exclusivity rule (*Lab. Code, § 3600*). The test for deciding whether an employee may pursue a tort action or is confined to a workers' compensation action is whether the act complained of is normally within an employer-employee relationship. Although an employer may be liable in tort if it commits an act not reasonably anticipated in an employer-employee relationship, dismissal from employment is a normal risk inherent in an employment relationship. Furthermore, the principle of dual capacity, which applies when an employee's injury results from a risk of harm faced similar to that faced by the general public, did not apply so as to allow the employee to sue in tort. The trial court's conclusion that the employee did not have an independent contractor relationship with the

employer was supported by the evidence, and thus he could not base the tort action on such status.

[See 2 **Witkin,** Summary of Cal. Law (9th ed. 1987) Workers' Compensation, § 53.]

**(2) Libel and Slander § 39--Actions--Pleading--Malice and Privilege--Qualified Privilege Employer.** --In an action by a former employee, who claimed to have done outside work for the employer as an independent contractor, seeking damages for slander based on accusations made by a plant manager and overheard by co-employees that the employee improperly used the employer's property and committed other wrongful conduct, the trial court correctly awarded judgment on the pleadings, due to the employee's failure to specifically plead malice to defeat the employer's conditional privilege of communication or to plead detailed facts showing defendant's ill will toward him. The trial court's finding that the employee was not an independent contractor was supported by substantial evidence, and thus any injuries occurring from the alleged slander occurred within his employment. As an employer, defendant had a qualified privilege of communication to a listener with a common interest under *Civ. Code, § 47, subd. 3*, which provides that a privileged publication or broadcast is one made in a communication, without malice, to a person interested by one who is also interested.

**COUNSEL:** Sherwin C. Edelberg for Plaintiffs and Appellants.

Mitchell, Silberberg & Knupp, Edward M. Medvene, Mark A. Wasserman, Ronald A. DiNicola and Jeffrey K. Winikow for Defendants and Respondents.

**JUDGES:** Opinion by Gilbert, J., with Stone (S. J.), P. J., and Abbe, J., concurring.

**OPINION BY:** GILBERT

**OPINION**

[*272] [**71] Plaintiffs Robomatic, Inc., and Sidney Rehka appeal a judgment in favor of defendants. We affirm and hold that a workers' compensation proceeding is Rehka's exclusive remedy for negligent infliction of emotional distress ensuing from dismissal of employment. ( *Pichon v. Pacific Gas & Electric Co. (1989) 212 Cal.App.3d 488, 496 [260 Cal.Rptr. 677]*; *Potter v. Arizona So. Coach Lines, Inc. (1988) 202 Cal.App.3d 126, 133-135 [248 Cal.Rptr. 284]*.)

Facts

Plaintiff Sidney Rehka brought an action against his employer Vetco Offshore, Inc. (Vetco), for damages ensuing from dismissal of his [***2] employment. Rehka alleged causes of action for slander and negligent infliction of emotional distress. The trial judge awarded judgment on the pleadings regarding the slander action because Rehka failed to plead malice to defeat Vetco's conditional privilege of communication. ( *Civ. Code, § 47, subd. 3*.) A trial followed concerning whether Rehka suffered emotional distress, and if so, whether he was an employee or an independent contractor. Evidence at trial established: [1]

Vetco supplies underwater oil drilling equipment, including a pipe with a particular "pack-off" seal consisting of two concentric metal rings connected with rubber. [**72] This seal prevents petroleum and sediments from leaking into the ocean during drilling.

1 We grant Vetco's motion to strike certain portions of the statement of facts in plaintiffs' opening brief as not supported by the evidence or outside the record on appeal.

Vetco employed Rehka as a tool design engineer. As part of his duties, he drafted plans and blueprints for an improved [***3] "pack-off" seal. Vetco then manufactured a mold from his plans.

Rehka testified he spoke with plant manager George Bulgin concerning testing the mold through his independent business, Robomatic, Inc. Rehka stated that Bulgin replied: "I'll support you 100 percent. I will do everything to make the [testing] legal in the company." According to Rehka's [*273] testimony, Bulgin then directed the manufacturing supervisor, Cline Skeeters, to prepare a purchase order for Robomatic to test the mold.

Rehka testified that he performed tests and created two additional molds in the workshop of his Camarillo ranch. Thereafter he sent Vetco an invoice for $ 96,550 for testing, research and development, and engineering. Vetco did not pay the invoice and dismissed Rehka 18 months later for violating company conflict of interest policies. Rehka did not retain the molds he created nor any of the documents concerning this work. He stated that his dog "ran out" of the workshop with certain papers.

In contrast plant manager Bulgin testified and denied authorizing Rehka or Robomatic to test or perform engineering upon the "pack-off" seal mold. He stated that the mold could have been tested [***4] for $ 300 or less by certain rubber companies. He added that he informed Rehka it would violate company policies for him to perform outside work upon the mold.

Manufacturing supervisor Skeeters testified that he issued a $ 1,000 purchase order to Robomatic because plaintiff Rehka called and requested it. Skeeters did not

know that Rehka owned Robomatic. The $ 1,000 financial limit for testing was a precaution added by Skeeters because he was not familiar with Robomatic.

Rehka admitted he knew Vetco policies prohibited certain outside activities by employees. He acknowledged that Vetco required employees to notify supervisors in writing of potential conflicts of interests. Rehka also executed an agreement agreeing that any ideas, developments or improvements created during or after business hours belonged to Vetco.

The trial judge decided there was "very little evidence, if any" Rehka was an independent contractor. He then concluded that a proceeding under workers' compensation was Rehka's sole remedy for negligently inflicted emotional distress. On appeal Rehka contends he can pursue tort actions for slander and negligent infliction of emotional distress resulting from his dismissal.

[***5] Discussion

I.

**(1)** Rehka contends he is not confined to a workers' compensation proceeding for his claim of negligent infliction of emotional distress but may pursue recovery in a tort action. He relies upon *Robards v. Gaylord Bros., Inc. (9th Cir. 1988) 854 F.2d 1152, 1157*. He points out that he has not [*274] alleged any physical injury or disability accompanying or resulting from his emotional distress. He adds that Vetco may be liable in tort under the principle of dual capacity. ( *Bell v. Industrial Vangas, Inc. (1981) 30 Cal.3d 268, 282 [179 Cal.Rptr. 30, 637 P.2d 266]*.) We reject these contentions and affirm that an action for negligent infliction of emotional distress resulting from employment dismissal is barred by the workers' compensation exclusivity rule. ( *Lab. Code, § 3600*; *Potter v. Arizona So. Coach Lines, Inc., supra, 202 Cal.App.3d 126, 133-135*.)

Subject to certain narrow exceptions, recovery under workers' compensation is the exclusive remedy for injuries occurring within the course of employment. ( *Lab. Code, §§ 3600, 3602*; *Pichon v. Pacific Gas & Electric Co., supra, 212 Cal.App.3d 488, 494*.) [***6] The test for deciding whether a claimant may pursue a tort action or is confined to a workers' compensation proceeding is whether the acts complained of are normally [**73] within an employer-employee relationship. ( *Potter v. Arizona So. Coach Lines, Inc., supra, 202 Cal.App.3d 126, 133*; *Hart v. National Mortgage & Land Co. (1987) 189 Cal.App.3d 1420, 1429 [235 Cal.Rptr. 68]* rejecting the "physical harm" versus "emotional harm" test.)

Our Supreme Court announced in *Cole v. Fair Oaks Fire Protection Dist. (1987) 43 Cal.3d 148, 160 [233 Cal.Rptr. 308, 729 P.2d 743]* that "when the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harrassment, [*sic*] or intended to cause emotional disturbance resulting in disability." [***7] An employer may be liable in tort, however, if it commits an act not reasonably anticipated in an employer-employee relationship. ( *Hart v. National Mortgage & Land Co., supra, 189 Cal.App.3d 1420, 1431*.)

Dismissal from employment is a normal risk inherent in an employment relationship. ( *Zilmer v. Carnation Co. (1989) 215 Cal.App.3d 29, 40 [263 Cal.Rptr. 422]*; *Pichon v. Pacific Gas & Electric Co., supra, 212 Cal.App.3d 488, 496*.) It necessarily arises from employment because it is an event ending the employer-employee relationship. ( *Zilmer v. Carnation Co., supra, 215 Cal.App.3d 29, 40*.)

Recent decisions have confined actions for infliction of emotional distress to recovery under workers' compensation. (Authorities discussed in *Pichon v. Pacific Gas & Electric Co., supra, 212 Cal.App.3d 488, 496*.) Here Rehka admitted at trial that his emotional distress resulted from his dismissal. [*275] Since dismissal from employment inheres in the employment relationship, Rehka is limited to recovery under [***8] workers' compensation.

Rehka relies upon *Robards v. Gaylord Bros., Inc., supra, 854 F.2d 1152*. *Robards* decided that an employee may pursue a tort action for negligently inflicted emotional distress if he does not suffer accompanying physical injury or disability. ( *Id., p. 1157*.) We disagree with *Robards's* analysis. As Vetco points out, *Robards* misinterprets the cases on which it relies. These cases compel us to affirm the rule that an employee is confined to workers' compensation recovery for emotional injuries negligently inflicted as part of the normal employment relationship. ( *Russell v. Mass. Mut. Life Ins. Co. (9th Cir. 1983) 722 F.2d 482, 493* revd. on other grounds, *Massachusetts Mut. Life Ins. Co. v. Russell (1985) 473 U.S. 134 [87 L.Ed.2d 96, 105 S.Ct. 3085]*; *Renteria v. County of Orange (1978) 82 Cal.App.3d 833, 839, fn. 3 [147 Cal.Rptr. 447]*.)

Rehka also misapprehends the principle of dual capacity. That rule pertains where an employee's injury results from a risk of harm faced similar to that faced by the [***9] general public. ( *Bell v. Industrial Vangas,*

*Inc., supra, 30 Cal.3d 268, 282.*) Typically, dual capacity applies where an employee is injured by a defective product. (*Ibid.*) This situation is not present here. Moreover, the trial judge concluded, with sufficient support in the evidence, that Rehka did not have a relationship as an independent contractor with Vetco. Hence, Rehka's tort action may not be based upon his status of independent contractor.

II.

Rehka argues he is not confined to a workers' compensation proceeding for the intentional tort of slander committed by Vetco employee Bulgin. Rehka's second amended complaint alleged that plant manager Bulgin accused Rehka of improperly using Vetco property and "other wrongful conduct." Jeff Jackson and Gary Smith heard these accusations. (During the hearing upon Vetco's motion for judgment on the pleadings, Rehka's attorney conceded that Jackson and Smith were co-employees.) Rehka argues his slander action derived [**74] from his status as an independent contractor and not as an employee.

Rehka's argument fails for two reasons. First, the trial judge decided, with the support [***10] of substantial evidence, that Rehka was not an independent contractor. Thus, any injuries or damages suffered by Rehka due to the alleged slander occurred during his employment.

**(2)** Second, an employer has a qualified privilege of communication to a listener with a common interest. *Civil Code section 47*, *subdivision 3* [*276] provides that "A privileged publication or broadcast is one made -- 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested . . . ." ( *Williams v. Taylor (1982) 129 Cal.App.3d 745, 752 [181 Cal.Rptr. 423]* [employer described former employee as "a thief" to persons who referred business to employer].)

To defeat this conditional privilege, a plaintiff must specifically allege malice. ( *Williams v. Taylor, supra, 129 Cal.App.3d 745, 752.*) A general allegation of malice will not suffice; plaintiff must allege detailed facts showing defendant's ill will towards him. ( *Martin v. Kearney (1975) 51 Cal.App.3d 309, 312 [124 Cal.Rptr. 281].*) Since Rehka did not specifically allege malice, although given the opportunity [***11] to amend, judgment on the pleadings was properly granted.

Accordingly, the judgment is affirmed. Rehka is to bear costs on appeal.

# TAB 29

LEXSEE 18 CAL 3D 406

**LYMAN H. SANBORN, Plaintiff and Appellant, v. CHRONICLE PUBLISHING COMPANY, Defendant and Respondent; CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants**

**S.F. No. 23471**

**Supreme Court of California**

***18 Cal. 3d 406*; *556 P.2d 764*; *134 Cal. Rptr. 402*; *1976 Cal. LEXIS 362***

**December 3, 1976**

**PRIOR HISTORY:** Superior Court of Sacramento County, No. 190423, George E. Paras and William A. White, Judges.

**DISPOSITION:** The judgments are affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action for defamation against a newspaper, a city and county, and the clerk for the city and county, the trial court, on its own motion under *Code Civ. Proc., § 583, subd. (a)*, providing that a court in its discretion may dismiss an action for failure to prosecute, dismissed as to the newspaper. Trial was held, as to the city and county and its clerk, with a verdict and judgment for plaintiff. Plaintiff had received a release from the clerk of a client's money under attachment, which a deputy city attorney had told the clerk not to release without a court order. The clerk testified that he had made a mistake in releasing the money and that there had been no trickery or fraud involved. However, he had told a reporter for the newspaper that "it was a real con job," claiming plaintiff had ranted and raved and convinced him that the money was being held illegally. Plaintiff's original complaint had been filed nearly five years prior to the dismissal against the newspaper, and plaintiff had changed attorneys twice and had filed an amended complaint. Many pretrial papers had been filed. (Superior Court of Sacramento County, No. 190423, George E. Paras and William A. White, Judges.)

The Supreme Court affirmed, holding that the statement of the clerk was made within the scope of his authority and that the city and county was liable under the doctrine of respondeat superior. The court also held that the absolute privilege of *Civ. Code, § 47, subd. 1*, conferred on all publications made in proper discharge of an official duty, applies only to high-ranking, policy-making state and federal officials, and that the clerk was not exercising policy-making functions when he defamed plaintiff. The court further held that there was substantial evidence of malice in the clerk's statement, and therefore, the conditional or qualified privilege of *Civ. Code, § 47, subd. 3*, immunizing communications made without malice to a person interested therein by one who is requested by the person interested to give the information, was not available to the clerk. The court also held that the clerk's interview with the press was not a discretionary act within the meaning of *Gov. Code, § 820.2*, providing that a public employee is not liable for an injury resulting from an act or omission which is the result of the exercise of discretion invested in him, and the clerk did not enjoy the immunity given by *§ 820.2*. Finally the court held that the trial court had good cause to dismiss as to the newspaper since plaintiff had failed to meet his burden of showing excusable delay. (Opinion by Richardson, J., expressing the unanimous view of the court.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Municipalities § 102--Actions--Liability for Acts of Public Employee Within Scope of Employment.** --If an employee or agent while acting in the scope of his authority and in furtherance of the employer's business defames another, his employer or principal may be held liable, and this principle is unaffected by the fact that the employment is public. This is so even though the agent may have exceeded his authority, and it is true regardless of the agent's motive.

**(2) Municipalities § 102--Actions--Liability for Acts of Public Employee Within Scope of Employment.** --A city and county clerk who had made a mistake by improperly releasing funds under attachment to an insurance company manager and who had claimed in a press interview that the manager had done a real con job on him and that he had ranted and raved and convinced him that the money was being held illegally, was acting within the scope of his employment when he made the press statement, and therefore, the clerk's employer, the city and county, was properly found liable under the doctrine of respondeat superior in a subsequent defamation action by the manager.

**(3) Libel and Slander § 20--Privileged Communications--Absolute Privilege--Officers and Official Acts.** --A city and county clerk who had made a mistake by improperly releasing funds under attachment to an insurance company manager and who had made a statement to the press claiming that the manager had done a real con job and had ranted and raved and convinced him that the money was being held illegally, was not entitled, in a subsequent defamation action by the manager, to the claim of absolute privilege, under *Civ. Code, § 47, subd. 1*, providing for an absolute privilege for publications made in the proper discharge of an official duty. The privilege of *§ 47, subd. 1*, extends only to high-ranking, policy-making federal and state officials, and the clerk was not exercising policy-making functions at the time.

**(4) Libel and Slander § 23--Privileged Communications--Qualified Privilege--Effect of Malice.** --In a defamation action against a city and county clerk, there was substantial evidence to support a finding either that the clerk bore plaintiff ill will, or that he lacked a good faith belief in the truth of his statements, and, therefore, the clerk was not entitled to the conditional or qualified privilege of *Civ. Code, § 47, subd. 3*, granting immunity to communications made without malice to a person interested therein by one who is requested by the person interested to give the information, where the clerk had claimed in a press interview that plaintiff had conned him into improperly releasing funds to him, and where he had testified at trial that he realized he had made a mistake and that no fraud or trickery was involved but that he had simply been persuaded by plaintiff to release the funds to him.

**(5) Public Officers and Employees § 16--Liabilities--Statutory Immunity for Discretionary Acts.** --A city and county clerk's statement to the press that an insurance company manager had conned him into improperly releasing to him funds under attachment was not a discretionary act within the meaning of *Gov. Code, § 820.2*, providing that a public employee is not liable for an injury resulting from an act or omission which stems from the exercise of discretion vested in him. The statement was not in the nature of a basic policy decision made at the planning stage of the city's operations, but, rather, was in the nature of a ministerial duty incident to the normal operations of that office, and, therefore, the clerk could not assert *§ 820.2* immunity for his press statement in a later defamation action by the manager. The fact that an employee normally engages in discretionary activity is irrelevant if, in a given case, the employee did not render a considered decision.

**(6) Dismissal and Nonsuit § 27--Delay in Bringing Action to Trial--Two-Year Limitation--Exercise of Court's Discretion.** --The trial court properly dismissed a defamation action against a newspaper under *Code Civ. Proc., § 583, subd. (a)*, providing that a court in its discretion may dismiss an action for want of prosecution if it is not brought to trial within two years after it was filed, where prior to dismissal nearly five years had passed since the original complaint had been filed, where plaintiff had changed attorneys twice and had twice amended his complaint, and where numerous pretrial papers had been filed; *§ 583, subd. (a)*, places no restrictions on the exercise of a court's discretion and it will be disturbed only in cases of manifest abuse.

**COUNSEL:** Milton L. McGhee for Plaintiff and Appellant.

Thomas M. O'Connor, City Attorney, and John Sullivan Kenny, Deputy City Attorney, for Defendants and Appellants.

Cooper, White & Cooper, Robert R. Callan and Mark Logan Tuft for Defendant and Respondent.

**JUDGES:** Opinion by Richardson, J., expressing the unanimous view of the court. Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Sullivan, J., and Clark, J., concurred.

**OPINION BY:** RICHARDSON

**OPINION**

**[*409] [**765] [***403]** In this case we are presented with questions involving the liability of defendants City and County of San Francisco (City) and its clerk, Martin Mongan (Mongan), for defamation arising from Mongan's statements to the news media explaining his release to plaintiff of funds which had been deposited with Mongan. Concluding as we do that at the time of his statements Mongan was acting within the **[*410]** scope of his employment and that neither immunity nor

privilege enfolded City or Mongan, plaintiff's judgment against both defendants following jury verdict is affirmed.

We affirm the judgment entered in favor of defendant Chronicle Publishing Company, and adopt that portion of the vacated Court of Appeal opinion which considered this aspect of these appeals.

The record reflects that in 1968 plaintiff Sanborn visited Mongan at the latter's office and sought the release of approximately $ 25,400 in attached funds which had been **[**766]** **[***404]** deposited with Mongan in his capacity as county clerk. Although Mongan had been instructed by a deputy city attorney not to release the funds without a court order, Mongan decided that plaintiff's claim on the funds was valid and paid the money to him.

A few days later the chief deputy county clerk learned of the payment and advised Mongan that he had erred in releasing the funds without a court order. (Mongan testified at trial that he realized he had made a mistake, that no fraud or trickery was involved, but that he had simply been persuaded by plaintiff to release the funds to him.) Soon thereafter, a reporter from the San Francisco Chronicle learned of the incident, called Mongan on the telephone and interviewed him regarding the matter. In an article in the Chronicle which followed, Mongan was quoted as having said that "It was a real con job," that plaintiff "outtalked me and convinced me that we were holding his money illegally," that plaintiff "ranted and raved and said I was putting his client to a lot of unnecessary expense and trouble." The story was thereafter published in the Sacramento Bee which has a large circulation in the area where plaintiff resided. As a result of the publication, plaintiff lost his job, suffered embarrassment and ridicule, and resigned from several clubs and organizations.

Plaintiff filed a defamation action against City, Mongan, and the Chronicle Publishing Company. The suit against the Chronicle was dismissed for failure to prosecute; plaintiff appealed this dismissal. The action against City and Mongan proceeded to trial and the jury returned a verdict for plaintiff against both defendants in the amount of $ 31,650. Plaintiff appeals from the judgment of dismissal as to the Chronicle. In a separate appeal, City and Mongan seek reversal of the judgment entered in plaintiff's favor. We consider each appeal separately.

**[*411]** 1. *The Appeal of City and Mongan*

Defendants concede, for purposes of this appeal, that Mongan defamed plaintiff. They assert, however, that Mongan possessed either an absolute or qualified privilege (see *Civ. Code, § 47, subds. 1, 3*), or alternatively that both Mongan and City are immune from liability under the circumstances of this case (see *Gov. Code, §§ 815.2, subd. (b), 820.2*).

We first dispose of a preliminary issue, namely, the liability, if any, of City for the acts of Mongan, its employee.

**(1)** a.) *Respondeat superior.* As a general proposition it may be said that, if an employee or agent while acting in the scope of his authority and in furtherance of the employer's business defames another, his employer or principal may be held liable therefor. ( *Correia v. Santos (1961) 191 Cal.App.2d 844, 855 [13 Cal.Rptr. 132].*) This is so even though the agent may have exceeded his express authority ( *Draper v. Hellman Com. T. & S. Bank (1928) 203 Cal. 26, 38-39 [263 P. 240]*), and it is true regardless of the agent's motive ( *Rosenberg v. J. C. Penney Co. (1939) 30 Cal.App.2d 609, 623 [86 P.2d 696]*). It has been said that the rule is supported by "The great weight of authority." (See Annot. 150 A.L.R. 1338, 1344.)

The foregoing well-rooted principle is unaffected by the fact that the employment is public. Considerations bearing on the ambit and nature of that public employment were well expressed in *Neal v. Gatlin (1973) 35 Cal.App.3d 871, 875 [111 Cal.Rptr. 117]*, ". . . a public employee is acting in the course and scope of the employment 'when he is engaged in work he was employed to perform or when the act is an incident to his duty and was performed for the benefit of his employer and not to serve his own purposes or conveniences.' [Citations.] The phrase 'scope of employment' has been equated with the express or implied power of the public employee to act in a particular instance, and in evaluating his conduct to determine whether it is within the ambit of his authority we are to look not to the nature of the act itself, but to the purpose or result intended. [Citations, fn. omitted.] If the object or end to be accomplished **[**767]** **[***405]** is within the employee's express or implied authority his act is deemed to be within the scope of his employment irrespective of its wrongful nature." (See also *Burgdorf v. Funder (1966) 246 Cal.App.2d 443 [54 Cal.Rptr. 805].*)

**[*412]** **(2)** The record before us supports the jury's implied finding that Mongan was acting within the scope of his authority when he defamed the plaintiff. Mongan held the office of Clerk of the City and County of San Francisco and, as such, had at least implied authority to issue statements to the press and to submit to interviews regarding the operation of the clerk's office, including explanations as to why impounded funds were released without prior court order. The subject of the press interview involved public and official business. Any statements made by Mongan concerning transactions of the clerk's office, while conceivably exculpating Mongan

personally to a degree, would also serve the further purpose of informing the press and the public as to whether the clerk's office was performing its public duties in a rational and orderly fashion. While City insists that the sole purpose of the statement in question was for the personal advantage and gain of Mongan, we cannot presume as a matter of law that the statements were of no conceivable benefit to the City, or that their object was *solely* to save Mongan from personal embarrassment. The jury reasonably could have concluded that responses to press inquiry constituted, as to time, place, and circumstance, responses of a public official regarding his administration of a public office and thus was within the scope of his public employment. An important public purpose is served both by the press inquiry and by the official's response. We conclude, accordingly, that the statement was made within the ambit of Mongan's public employment, and that his principal, City, is liable therefor in the absence of other defenses.

**(3)** b.) *Absolute privilege.* Mongan and City both contend that Mongan's statements were protected by an absolute statutory privilege conferred on all publications made "[in] the proper discharge of an official duty." ( *Civ. Code, § 47, subd. 1.*) Plaintiff, however, correctly observes that the courts of this state have thus far extended the protections of this statute only to high-ranking state and federal officials, such as the President of the United States, the governor of any state or territory, cabinet officers of the United States and the corresponding officers of any state or territory. (See *Saroyan v. Burkett (1962) 57 Cal.2d 706, 710 [21 Cal.Rptr. 557, 371 P.2d 293]*; *Frisk v. Merrihew (1974) 42 Cal.App.3d 319, 323 [116 Cal.Rptr. 781]*; *White v. State of California (1971) 17 Cal.App.3d 621, 627-628 [95 Cal.Rptr. 175]*; see also Rest., Torts, § 591; Rest.2d Torts (Tent. Draft No. 20), § 591, com. (c); Prosser, The Law of Torts (4th ed. 1971) § 114, pp. 782-784; 1 Harper & James, The Law of Torts (1956) § 5.23, pp. 429-430; but see *Barr v. Matteo* **[*413]** *(1959) 360 U.S. 564, 572-576 [3 L.Ed.2d 1434, 1441-1444, 79 S.Ct. 1335]* [absolute privilege for all *federal* executive officers].)

It has been noted by recognized authorities that the purpose of the so-called absolute "official duty" privilege is to insure efficiency in government by encouraging *policy-making* officials to exercise their best judgment in the performance of their duties free from fear of general tort liability. (Harper & James, *supra*, at p. 429.) As we discuss below in greater detail we have concluded that defendant Mongan was not exercising policy-making functions when he defamed plaintiff, and thus he is not protected by the absolute privilege contained in *Civil Code section 47, subdivision 1.*

c.) *Conditional or qualified privilege.* Defendants next assert that they are entitled to the protection of that privilege, if not absolute at least conditional or qualified, which is contained in subdivision 3 of *section 47 of the Civil Code.* This statute immunizes communications made ". . . *without malice*, to a person interested therein, [by one] . . . (3) who is requested by the person interested to give the information." (Italics added.) By definition, this conditional privilege is defeated by a showing of "malice."

**[**768]** **[***406]** Section 48a, subdivision 4(d), of the Civil Code defines "actual malice" as "that state of mind arising from hatred or ill will toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice." A California appellate court has recently held that "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights (citations)." ( *Roemer v. Retail Credit Co. (1975) 44 Cal.App.3d 926, 936 [119 Cal.Rptr. 82]*, italics in original; see also *White v. State of California, supra, 17 Cal.App.3d 621, 628-629.*) Defendants have not asserted the existence of any First Amendment issues which might have invoked a different standard for proving malice. (See *Roemer, supra, at pp. 931-936.*)

**[*414]** **(4)** The record contains substantial evidence to support a finding either that Mongan bore plaintiff ill will, or that Mongan lacked a good faith belief in the truth of his statements. The jury could have found that Mongan blamed plaintiff for the loss of the deposited funds, and that Mongan wished to transfer the blame to plaintiff by characterizing plaintiff's efforts as a "con job," thereby exculpating himself in the eyes of the press and general public. Although the evidence was also susceptible of other inferences, we conclude that there was substantial evidence of malice. (See, e.g., *Cunningham v. Simpson (1969) 1 Cal.3d 301, 308 [81 Cal.Rptr. 855, 461 P.2d 39]*, illustrating the type of evidence sufficient to establish malice.)

d.) *Statutory immunity.* Defendants Mongan and City next assert that Mongan's activities constituted "discretionary acts" for which immunity is granted under *Government Code section 820.2.* If Mongan is immune from liability to plaintiff under this section, it necessarily follows that City would likewise be immune. ( *Gov. Code, § 815.2, subd. (b).*)

*Section 820.2* provides: "Except as otherwise provided by statute, a public employee is not liable for an

injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Several Court of Appeal cases have held, in varying factual contexts, that public employees who, while acting within the scope of their employment, defame third persons are engaged in discretionary activity thereby invoking immunity under *section 820.2*. (See *Miller v. Hoagland (1966) 247 Cal.App.2d 57, 62 [55 Cal.Rptr. 311]*; *Burgdorf v. Funder, supra, 246 Cal.App.2d 443, 448-449*; *Glickman v. Glasner (1964) 230 Cal.App.2d 120, 125-126 [40 Cal.Rptr. 719]*.) In *Miller* and *Burgdorf*, for example, a city attorney and a tax officer, respectively, wrote allegedly libelous letters in the course of discharging their official functions. The courts in those cases held that *section 820.2* immunity was available since these officers were "exercising their discretion" in the matters at issue. Defendants urge that Mongan was likewise engaged in discretionary activity when he discussed the plaintiff's matter with the press.

The foregoing cases, however, preceded our decision in *Johnson v. State of California (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352]*. The broad rule of discretionary immunity suggested by the courts in such cases as *Miller* and *Burgdorf* must be reexamined in the light of the principles therein enunciated by us. **(5)** In *Johnson*, we construed **[*415]** *section 820.2* as conferring immunity with respect to "basic policy decisions," or activity which may be characterized as the "planning" rather than the "operational" level of decision making. (*69 Cal.2d at pp. 793-794*; see *Ramos v. County of Madera (1971) 4 Cal.3d 685, 693 [94 Cal.Rptr. 421, 484 P.2d 93]*; *County of Sacramento v. Superior* **[**769]** **[***407]** *Court (1972) 8 Cal.3d 479, 489-491 [105 Cal.Rptr. 374, 503 P.2d 1382]* [dis. opn. by Tobriner, J.].) We pointed out in *Johnson* that "Immunity for 'discretionary' activities serves no purpose except to assure that courts refuse to pass judgment of policy decisions in the province of coordinate branches of government. Accordingly, to be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision. [Citations]" (*69 Cal.2d at pp. 794-795, fn. 8*.)

A leading commentator in the field, has interpreted *Johnson* as rejecting a mere "semantic inquiry" into the literal meaning of the word "discretionary" in *section 820.2*, and impliedly disapproving two of the libel cases relied upon by defendants herein, *Burgdorf v. Funder, supra, 246 Cal.App.2d 443*, and *Glickman v. Glasner, supra, 230 Cal.App.2d 120*. (Van Alstyne, Cal. Government Tort Liability (Cont.Ed.Bar Supp. 1969) § 5.51 at pp. 12-13.)

Was defendant Mongan's telephonic interview with the press a type of "discretionary" act contemplated by *section 820.2*? We conclude that it was not. Although defendants' contention is arguable that Mongan may have had discretion to discuss the Sanborn matter with the press, we cannot conclude that the decision to do so was in the nature of a "basic policy decision" made at the "planning" stage of City's operations. A governmental officer's discussions with the public or press regarding the functioning of his office would seem, instead, to fall within the category of those routine, ministerial duties incident to the normal operations of that office.

Moreover, Mongan testified at trial that Mr. Cooper, the county controller, had advised Mongan to discuss the Sanborn affair with the press. If, for purposes of argument, the decision to permit a press interview was a "basic policy decision" under *Johnson*, the jury reasonably could have found that such a decision was made by Cooper, not Mongan, and accordingly the decision having been made by another, **[*416]** Mongan's subsequent defamatory statements were not protected by the discretionary act immunity of *section 820.2*.

We conclude that the judgment against defendants City and Mongan should be affirmed.

2. *Appeal of Plaintiff*

As indicated above, a hearing was granted by us in this case after a decision by the Court of Appeal, Third Appellate District, for the purpose of giving further study to the problems herein presented. After such study, we have concluded that the portion of Justice Regan's well-reasoned opinion for the Court of Appeal disposing of plaintiff's appeal from the judgment dismissing his action against defendant Chronicle correctly treats the issues and we adopt it as part of the opinion of this court. That opinion, with appropriate deletions and additions, * is as follows:

> * Brackets together, in this manner[], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. ( *Estate of McDill (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874]*.)

Plaintiff contends that the trial court abused its discretion in dismissing the action against [defendant] Chronicle for failure to prosecute under *Code of Civil Procedure section 583, subdivision (a)*, relying on *Weeks*

*v. Roberts (1968) 68 Cal.2d 802 [69 Cal.Rptr. 305, 442 P.2d 361]*.

*Section 583 of the Code of Civil Procedure* provides, in pertinent part: "(a) The court, in its discretion, may dismiss an action for want of prosecution pursuant to this subdivision if it is not brought to trial within two years after it was filed. The procedure for obtaining such dismissal shall be in accordance with rules adopted by the Judicial Council.

**[**770]** " **[***408]** (b) Any action heretofore or hereafter commenced shall be dismissed . . . on motion of the defendant, after due notice to plaintiff or by the court upon its own motion, unless such action is brought to trial within five years after the plaintiff has filed his action, except where the parties have filed a stipulation in writing that the time may be extended."

**(6)** Subdivision (a) places no restrictions on the exercise of the trial court's discretion and it will be disturbed only in cases of manifest abuse. **[*417]** ( *Denham v. Superior Court (1970) 2 Cal.3d 557, 563-564 [86 Cal.Rptr. 65, 468 P.2d 193]*.)

The record in this case reveals no abuse of discretion. The complaint was filed on February 19, 1969. Over the next several months the Chronicle was given several extensions of time to plead by plaintiff's attorney, the last one being an open extension of time to plead subject to written notice. During this time plaintiff's attorney advised that he wanted a "nuisance" settlement from the Chronicle and made demand of $ 500. Plaintiff subsequently substituted attorneys and an amended complaint was filed February 6, 1970. Chronicle was not served with the amended complaint until early June 1970. On July 6, 1970, the Chronicle filed a demurrer to the complaint. The demurrer was overruled on August 7, 1970. On October 18, 1971, plaintiff served Chronicle with an at-issue memorandum. On October 22, 1971, Chronicle filed a memorandum that the case was not at issue as to it on the ground that to date plaintiff had not given notice of the court's ruling on Chronicle's demurrer as provided by *Code of Civil Procedure, section 472b* and California *Rules of Court, rule 204*.

A pretrial conference was set for November 22, 1972. Chronicle filed a pretrial statement submitting that the case was not at issue as to it since to date it had not been given notice of the court's ruling on the demurrer and had therefore not been required to answer the complaint. On November 22, prior to the conference, Chronicle filed its notice of motion for judgment on the pleadings. At the pretrial conference, at which plaintiff was present, a settlement agreement was reached between Chronicle and plaintiff's then attorney. Thereafter the pretrial conference was continued to December 19, 1972, and Chronicle took its motion for judgment on the pleadings off calendar in reliance on the proposed settlement. Chronicle did not attend the conference on December 19, at which time the court determined that the matter was at issue as to the remaining parties and the case was set for trial for March 12, 1973.

On January 24, 1973, plaintiff again substituted counsel, and under new counsel noticed a motion on February 5, 1973, to vacate or modify the existing pretrial conference order "to clear up the status of The Chronicle Publishing Company as an active defendant in the litigation" and served Chronicle with interrogatories. On February 23, 1973, plaintiff finally notified Chronicle of the overruling of their **[*418]** demurrer on August 7, 1970. Chronicle answered the complaint on March 13, 1973.

Plaintiff filed an at-issue memorandum on March 14, 1973. On April 25, 1973, he filed his first notice of motion to advance the cause for trial within the five-year bar of *Code of Civil Procedure section 583*. [On] May 7, 1973, Chronicle filed a notice of motion for summary judgment on the ground that the action had been settled, and a motion for judgment on the pleadings. The motion for summary judgment was denied on June 27, 1973, and the motion for judgment on the pleadings was granted on August 13, 1973, unless plaintiff amended the complaint to state a cause of action. Plaintiff filed a second amended complaint on August 22, 1973. Chronicle's demurrer to the second amended complaint was overruled on October 17, 1973.

Plaintiff filed his memorandum that civil case was once again at issue on October 29, 1973, and noticed a motion to advance cause for trial on October 30, 1973. Chronicle answered the second amended complaint on November 7, 1973. Thereafter on November 15, 1973, the trial court denied plaintiff's motion to advance because the at-issue **[**771]** **[***409]** memorandum had not been properly filed, and ordered the at-issue memorandum stricken on November 16, 1973.

Plaintiff filed a third at-issue memorandum on December 3, 1973, and noticed a motion to advance cause for trial on December 11, 1973. On December 31, 1973, the trial court denied the motion to advance as to Chronicle and on its own motion dismissed the action against Chronicle pursuant to *Code of Civil Procedure section 583, subdivision (a)*.

Plaintiff's only arguments in the appellate briefs, as well as in argument to the trial court, in support of his motion to advance are that he was ready to proceed to trial and under *Weeks, supra*, the court should have given him a trial date. He makes no showing of excuse for the delay, but merely supports an assertion of due diligence by listing a chronology of the various papers in the court's file. The record in the lower court does not re-

flect what showing of excuse was made orally at the hearing on the motion to advance. The record reflects that the trial court had good cause to dismiss on its own motion. The plaintiff has failed to meet his burden of showing excusable delay.

**[*419]** Plaintiff's reliance on *Weeks, supra*, is misplaced; that case is detrimental rather than helpful to his argument. *Weeks* held that: "[A] trial court should not confuse and discredit the law by refusing to set a cause within the five-year period because it believes that a discretionary dismissal is warranted. . . . If a court feels impelled to dismiss an action less than five years after its filing for want of prosecution, it should do so and accept review on that basis. It should not exercise its discretion to dismiss on the basis of inconvenience to the court and in the guise of a refusal to specially set. . . . Fault and delay may be ground for dismissal; but court congestion is no reason to preempt one's day in court when there is a reasonable time to provide it." (*68 Cal.2d at pp. 806-807.*)

It is clear in this case that the trial court followed the dictates of *Weeks* and accepted review on the basis of a discretionary dismissal for want of prosecution under *Code of Civil Procedure section 583, subdivision (a)*, rather than simply refusing to set the cause for trial. The court's order read: "As to defendant Chronicle Publishing Company, again in conformity with the suggestion at the top of Page 808 of the *Weeks* Opinion, I dismiss the Complaint on my own motion, exercising my discretion under C.C.P. § 583a. Consideration has been given to all the factors mentioned in Court Rule 203.5, with the result that I find the delay in bringing this case to trial as against this defendant to be inexcusable. Justice can be truly served between plaintiff and said defendant only by such dismissal, and I am prepared to accept review on the basis thereof." []

The judgments are affirmed.

# TAB 30

LEXSEE 72 CAL. APP. 4TH 249

**LUIS SANCHEZ, Plaintiff and Appellant, v. LINDSEY MORDEN CLAIMS SERVICES, INC., Defendant and Respondent.**

**No. B123946.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION SEVEN**

*72 Cal. App. 4th 249*; *84 Cal. Rptr. 2d 799*; *1999 Cal. App. LEXIS 492*; *99 Cal. Daily Op. Service 3755*; *99 Daily Journal DAR 4761*

**May 19, 1999, Decided**

**SUBSEQUENT HISTORY:** [***1] Review Denied July 28, 1999, Reported at: *1999 Cal. LEXIS 5244*.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC179212. John P. Shook, Judge.

**DISPOSITION:** The judgment of the trial court is affirmed. Respondent shall recover its costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action by an insured under a cargo policy brought against the claims adjuster retained by the insurer to investigate and adjust plaintiff's loss, in which plaintiff alleged negligent handling of the claim, the trial court sustained defendant's demurrer without leave to amend and dismissed. (Superior Court of Los Angeles County, No. BC179212, John P. Shook, Judge.)

The Court of Appeal affirmed. The court held that an independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract, and is not liable in tort to the insured for alleged negligent claim handling that causes only economic loss. Policy reasons militate against imposing a duty of care to an insured on an insurer-retained adjuster, as does the law of agency. An agent's failure to perform a duty owed to the principal may render him or her liable to third persons who rely on his or her undertaking where there is physical damage to person or property, but where the effect is merely to cause economic loss, the law does not recognize liability to a third person, except where a duty is created by statute. (Opinion by Neal, J., with Lillie, P. J., and Woods, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Negligence § 9--Elements--Duty of Care--Statement of Rules.** --Whether a duty of care is owed is a legal question decided by the court, and it is a question of policy. While courts do not generally make broad policy in the manner of legislatures, they do make policy decisions in the gaps, filling in the open spaces or interstices of the law. Courts deciding questions of duty are engaged in this limited legislative aspect of the judicial function. The policy concerns that govern whether a duty of care should be imposed include the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him or her, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm.

**(2) Adjusters and Private Investigators § 1--Insurer-retained Adjusters--Liability to Insured--Duty.** --In an action by an insured under a cargo policy brought against the claims adjuster retained by the insurer to investigate and adjust plaintiff's loss, in which plaintiff alleged negligent handling of the claim, the trial court properly sustained defendant's demurrer without leave to amend. An independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract, and is not liable in tort to the insured for alleged negligent claim handling that causes only economic loss. Policy reasons militate against imposing a duty of care to an insured on an insurer-retained

adjuster, as does the law of agency. An agent's failure to perform a duty owed to the principal may render him or her liable to third persons who rely on his or her undertaking where there is physical damage to person or property, but where the effect is merely to cause economic loss, the law does not recognize liability to a third person, except where a duty is created by statute.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149.]

**COUNSEL:** Herbert Dodell and Gerald J. Miller for Plaintiff and Appellant.

Arter & Hadden, Wayne S. Grajewski and Michelle McAloon for Defendant and Respondent.

**JUDGES:** Opinion by Neal, J., with Lillie, P. J., and Woods, J., concurring.

**OPINION BY:** NEAL

**OPINION**

[*250] [**800] **NEAL, J.**

SUMMARY

An independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract. The adjuster is not [*251] liable in tort to the insured for alleged negligent claims handling which causes only economic loss.

FACTS AND PROCEEDINGS IN TRIAL COURT

The relevant facts, which appear from appellant Luis Sanchez's first amended complaint, and from a status conference memorandum judicially noticed in the trial court, are as follows: Sanchez was engaged in business, transporting commercial machinery, under the fictitious business name LA Machinery [***2] Moving. Sanchez purchased cargo insurance issued by an underwriter at Lloyd's of London. A commercial dryer was damaged while Sanchez was moving it to Los Angeles. Sanchez made a claim on the cargo policy for repair of the dryer. The damage was capable of repair in one week's time, at a cost of $ 12,000. Sanchez advised that immediate repairs were needed because the dryer's purchaser, Five Star Dye House, was suffering business loss. Lloyd's engaged respondent Lindsey Morden Claims Services, a claims adjuster, to investigate and adjust the loss. Three months passed before the claim was paid and the repairs completed. As a result, the dryer's purchaser sued and in July 1996 obtained a judgment against Sanchez for $ 1,325,000.

Sanchez then sued Lloyds for breach of the cargo policy. Sanchez also sought recovery against Morden, on a negligence theory.

Morden demurred, arguing that it had no contract with Sanchez and owed him no duty of care.

The trial court sustained Morden's demurrer without leave to amend. Sanchez appealed.

DISCUSSION

**(1)** Whether a duty of care is owed is a legal question, decided by the court. (*Bily v. Arthur Young & Co. (1992) 3 Cal. 4th 370, 397 [11 Cal. Rptr. 2d 51, 834 P.2d 745, 48 A.L.R.5th 835]* [***3] [auditor is liable only to his client for negligent preparation of financial statements, and not to third persons who are strangers to the contract].) Further, it is a question of *policy*. (*Bily, supra, 3 Cal. 4th at p. 397; Biakanja v. Irving (1958) 49 Cal. 2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]* [lawyer who renders will void by negligently failing [**801] to have it witnessed owes duty of care to intended sole beneficiary].) While courts do not generally make broad policy in the manner of legislatures, they do make policy decisions in the "gaps," filling in the "open spaces" or "interstices" of the law. (Cardozo, Nature of the Judicial Process (Yale U. [*252] Press 1921) pp. 113-114.) Courts deciding questions of duty are engaged in this limited "legislative" aspect of the judicial function.

An early enumeration of the policy concerns governing whether a duty of care should be imposed appears in *Biakanja v. Irving, supra, 49 Cal. 2d at page 647*, which looked to: "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff [***4] suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm." (*Biakanja, supra, 49 Cal. 2d at p. 650.*)

In the much more recent *Bily* the Supreme Court conducted an expanded policy analysis. *Bily* involved a claim against auditors by investors who allegedly purchased stock relying on negligently prepared financial reports. The court held that the auditors owed no duty of care to the investors.

Consistent with *Biakanja*, the *Bily* court first examined the relationship between the defendant auditors' conduct and the injury, and the blameworthiness of the auditors' conduct. The court noted that auditors' clients exert extensive control over both preparation and dissemination of financial reports, and that audit reports entail discretionary exercises of judgment. Despite these limits on auditor responsibility for the content of financial reports, auditor liability for negligence could be seri-

ous: "Although the auditor's role in the financial reporting process is secondary and the subject of complex professional judgment, [***5] the liability it faces in a negligence suit by a third party is primary and personal and can be massive." (*Bily v. Arthur Young & Co., supra, 3 Cal. 4th at p. 400.*)

This disproportion between fault and injury, in the court's view, militated against imposing a duty of care owed from auditors to investors.

*Bily* also weighed the benefits and costs of a duty on auditors, concluding that a duty was unlikely to enhance deterrence of auditor mistakes, and probably would cause auditors to withdraw their services from some market segments and to increase their charges for services in other segments. The court concluded that the costs of imposing a duty outweighed the benefits. (*Bily v. Arthur Young & Co., supra, 3 Cal. 4th at pp. 404-405.*)

The court also stressed the unreliability of foreseeability, in isolation, as a grounds for imposing a duty, especially where the injury is "intangible" rather than physical. (*Bily v. Arthur Young & Co., supra, 3 Cal. 4th at pp. 398-399.*)

Finally, the court cautioned about the limits of judicial policymaking competency, stating: "In view of the nature of the problem, we refrain from [*253] [***6] endorsing a broad and amorphous rule of potentially unlimited liability that has been endorsed by only a small minority of decided cases. As we recently stated: 'In the absence of clear legislative direction . . . we are unwilling to engage in complex economic regulation under the guise of judicial decisionmaking.' [Citation.]." (*3 Cal. 4th at p. 406.*)

**(2)** The considerations paramount in *Bily* likewise argue against imposing a duty of care owed by insurer-retained adjusters [1] to claimants.

1 We do not in this opinion address the duties of so-called "public adjusters," who are retained by insureds or claimants.

Like the auditors, the insurer-retained adjuster is subject to the control of its clients, and must make discretionary judgment calls. The insurer, not the adjuster, has the ultimate power to grant or deny coverage, and [**802] to pay the claim, delay paying it, or deny it. Further, while the insurer's potential liability is circumscribed by the policy limits, and the other conditions, [***7] limits and exclusions of the policy, the adjuster has no contract with the insured and would face liability without the chance to limit its exposure by contract. Thus the adjuster's role in the claims process is "secondary," yet imposing a duty of care could expose him to liability greater than faced by his principal the insurer.

Imposing a duty also would subject the adjuster to conflicting loyalties. Insurers and insureds often disagree as to coverage or the amount of loss. An adjuster cannot argue both sides of such disputes, any more than a lawyer can represent opposite sides in a lawsuit. An adjuster owes a duty to the insurer who engaged him. A new duty to the insured would conflict with that duty, and interfere with its faithful performance. This is poor policy. (*Gay v. Broder (1980) 109 Cal. App. 3d 66, 75 [167 Cal. Rptr. 123]* [where home loan borrower sued appraiser hired by lender, court held appraiser owed no duty of care to borrower--sound policy precluded subjecting appraiser to a duty conflicting with that owed to the lender who hired the appraiser]; *Felton v. Schaeffer (1991) 229 Cal. App. 3d 229, 234 [279 Cal. Rptr. 713]* [physician [***8] hired by employer to perform preemployment physical owes no duty of care to applicant]; *Keene v. Wiggins (1977) 69 Cal. App. 3d 308, 316 [138 Cal. Rptr. 3]* [doctor hired by workers' compensation insurer to evaluate disability reported employee needed no surgery or treatment; held, physician owed no duty to the employee].)

Further, as in *Bily*, the costs of imposing a duty of care would outweigh the potential benefits.

The deterrent effect of imposing a duty on adjusters is questionable. Adjusters already are deterred from neglect by exposure to liability to the [*254] *insurer* who engaged them, for breach of contract or indemnity. Only some modest additional deterrence, at most, could be expected from imposing a new duty owed directly to insureds.

Imposing a duty also might benefit insureds by providing another source of recovery for injuries caused by negligent claims handling or investigation. However, in most cases this would be redundant, since the insurer also would be liable for unreasonable investigation or claims handling. Thus making the adjuster directly liable to the insured would, again, confer only a marginal additional benefit.

[***9] Weighing against these modest potential benefits of imposing a duty would be several substantial costs.

Insurance is a highly uncertain and risky endeavor, because it requires accurate predictions about the occurrence and cost of future events. Insurers are able to define and limit the risks, and to set premium levels commensurate with the risks, using complex and nuanced contracts (policies). By contrast, adjusters hired by insurers have no contract with insureds, and thus no ability to define or circumscribe their potential risks or liabilities to insureds. If adjusters faced negligence liability to insureds, market forces would tend to drive adjusting activities in-house, where they could be shielded with contractual exclusions, disclaimers, and limitations. Thus,

imposing a duty would reduce, perhaps severely, the offering of independent adjuster services. Yet widespread market acceptance has shown these services to be useful and desirable.

Those adjusters continuing to operate independently despite imposition of a new duty of care would attempt to buy insurance against this liability, or create their own cash reserves, adding these costs to their charges, and passing them [***10] on to the insurers who used the adjusters' services. These insurers, in turn, would add the cost to the premiums charged to insureds. The insureds thus would end up paying more for insurance without obtaining more value because, as noted above, adjuster liability would provide only a redundant source of the recovery usually available from the insurer.

Imposing a duty would significantly depart from existing law. Until now no California case has held insurers' adjusters liable to insureds for negligence. Indeed, negligence is not among the theories of recovery generally available against *insurers* (See Croskey et al., Cal. Practice Guide: Insurance Litigation 2 (The Rutter [**803] Group 1998) PP 12:818, 11:205, pp. 12C-6, 11-48 to 11-49, rev. # 1, 1996), and further, California courts have refused to extend [*255] liability for *bad faith*, the predominant insurer tort, to agents and employees of the insurer. (*Egan v. Mutual of Omaha Ins. Co. (1979) 24 Cal. 3d 809, 824 [169 Cal. Rptr. 691, 620 P.2d 141]* [employees of insurer's independent claims agency "are not parties to the insurance contract and not subject to the implied covenant" of good [***11] faith and fair dealing]; *Gruenberg v. Aetna Ins. Co. (1973) 9 Cal. 3d 566, 576 [108 Cal. Rptr. 480, 510 P.2d 1032]* [insurance adjusting firm and its employees were "total strangers to the contract of insurance" and not subject to the implied covenant of good faith].)

Adjusters doubtless have relied on the existing state of the law, taking no prudent steps to protect against negligence liability. A new rule would defeat their reasonable expectations. While consistency and predictability are not the sole objects of the law, they are important legal values which enable persons and businesses to confidently and productively plan their affairs.

Further, large litigation or transactional costs, and considerable uncertainty, probably would flow from imposition of a new duty. The nature and extent of insurer duties to insureds has been a prolific source of litigation, despite the best efforts of insurers to eliminate litigation-generating issues by drafting complex, flexible, precise policies. Adjuster liability would be an empty slate, upon which the courts would have to write a whole new body of "adjuster liability" law. They would have to do so without the aid [***12] of contracts devised by knowledgeable and imaginative private parties to give structure to the risks. Years surely would pass before the new law of "adjuster liability" was to any extent fleshed out and a degree of certainty restored.

In summary, the policy analysis mandated under *Biakanja* and *Bily* militates against imposing in California a new duty of care owed by insurer-retained adjusters to insureds.

Our conclusion is also consistent with the general law of agency. An adjuster is an agent hired by a principal, the insurer, to investigate a claim. Agents are not liable to third parties for economic loss: "An agent's mere failure to perform a duty owed to his principal may render him liable to third persons who rely on his undertaking where there is physical damage to person or property. (See Rest.2d, Agency, § 354, and Appendix, Rep. Note, p. 587.) But *where the effect is merely to cause economic loss, the law does not yet recognize liability to a third person*, except where a duty is created by statute. [Citation.]" ( 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149, pp. 144-145, italics added.)

[*256] Our decision is consistent [***13] with the majority of cases in other states, which hold that an independent adjuster hired by the insurer owes no duty of care to the insured. (*Velastequi v. Exchange Ins. Co. (1986) 132 Misc.2d 896 [505 N.Y.S. 2d 779, 782]* [New York]; *Dear v. Scottsdale Ins. Co. (Tex. 1997) 947 S.W.2d 908, 917* [Texas]; *Hill v. Giuffrida (S.D. Miss. 1985) 608 F. Supp. 648, 649* [Mississippi].)

Sanchez relies on cases from Alabama (*Baldwin Mut. Ins. Co. v. Brantley (Ala. 1987) 518 So. 2d 32*) and Alaska (*Continental Ins. Co. v. Bayless & Roberts Inc. (Alaska 1980) 608 P.2d 281*). As best we can tell, none of the defendants in the *Baldwin* case was an adjuster hired by the insurer. FCIC (Federal Crop Insurance Corporation), the claims adjuster involved, was not a defendant in the case. Thus the case does not speak to our issue. *Continental* does squarely impose negligence liability on a claims adjuster, but without offering any analysis as to whether or why a duty should be imposed. *Continental* simply relies on an earlier Alaska case where an insurer's agent was held liable to a third party for *property* [***14] *damage*, not economic damage (See *Continental, supra, 608 P.2d at p. 288.*) As shown above, however, agents are not liable to third parties for purely economic loss.

Thus there is no cogent persuasive authority from other jurisdictions to support imposing a duty.

In addition to the Alaska and Alabama cases, Sanchez relies on several California cases which held that an adjuster could be liable under *Insurance Code section 790.03, subdivision (h)* for economic injury caused by

delay in claim [**804] processing. However, as appellant concedes, the Supreme Court later held that *no private right of action* lies under that section, thus abrogating the decisions Sanchez relies on. (*Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal. 3d 287, 304 [250 Cal. Rptr. 116, 758 P.2d 58]* ["Neither *section 790.03* nor section 790.09 was intended to create a private civil cause of action against an insurer that commits one of the various acts listed in *section 790.03, subdivision (h).*"].) The Legislature, of course, could reach a different policy conclusion than we have and pass a statute imposing a duty of care on insurer-retained [***15] adjusters. However, a statutory duty authoritatively construed as providing *no* private right of action supplies no basis for imposing a *common law* private right of action indistinguishable from the barred statutory claim.

[*257] DISPOSITION

The judgment of the trial court is affirmed. Respondent shall recover its costs on appeal.

Lillie, P. J., and Woods, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 28, 1999.

# TAB 31

LEXSEE 44 CAL.APP4TH 30

**MARTHA SCOTT, Plaintiff and Appellant, v. CONTINENTAL INSURANCE COMPANY, Defendant and Respondent.**

**No. G014759.**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

***44 Cal. App. 4th 24*; *51 Cal. Rptr. 2d 566*; *1996 Cal. App. LEXIS 288*; *96 Cal. Daily Op. Service 2240*; *96 Daily Journal DAR 3694***

**March 29, 1996, Decided**

**PRIOR HISTORY:** [***1] Superior Court of Orange County, No. 695281, William F. McDonald, Judge.

**DISPOSITION:** The trial court determined that on the record before it the latent defect exclusion applied to Scott's loss as a matter of law. The judgment to that effect is reversed. Scott is to recover her costs.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court granted summary judgment for an insurer in an action by an apartment owner seeking coverage for a damaged retaining wall, ruling that coverage was precluded by an exclusion in the policy for latent defects. (Superior Court of Orange County, No. 695281, William F. McDonald, Judge.)

The Court of Appeal reversed. The court held that the term "latent defect," as used in a homeowners insurance policy exclusion and according to its ordinary dictionary definition, refers to a defect that is both not readily observable and not discoverable by any but the most searching examination; it is not restricted to defects that could not be discovered by any known or customary test. However, defects discoverable only by expert examination are not automatically latent. Moreover, latent defects include defects in design and construction. Accordingly, the court held that the trial court erred in granting summary judgment for defendant, since, although the moving papers established what was done to thoroughly study the defects after their discovery, they did not show what action was needed to merely detect them. The record did not reveal the intensity of inspection (expert or nonexpert) that was necessary at the time the policy was issued to reveal the cause of any loss to the retaining wall. It could not be inferred that, merely because the insured did not actually discover the cause until the expert's report, she could not have discovered it earlier, or that the cause of her loss might not have been ascertainable upon a less-than-searching examination. (Opinion by Sills, P. J., with Wallin and Rylaarsdam, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1a) (1b) Insurance Contracts and Coverage § 91--Coverage of Contracts--Homeowners Insurance--Exclusions--Latent Defect--What Constitutes.** --The term "latent defect," as used in a homeowners insurance policy exclusion and according to its ordinary dictionary definition, refers to a defect that is both not readily observable and not discoverable by any but the most searching examination; it is not restricted to defects that could not be discovered by any known or customary test. However, defects discoverable only by expert examination are not automatically latent. Moreover, latent defects include defects in design and construction. Accordingly, the trial court erred in granting summary judgment for an insurer in a latent defect action involving a retaining wall, where, although the moving papers established what was done to thoroughly study the defects after their discovery, they did not show what action was needed to merely detect them. The record did not reveal the intensity of inspection (expert or nonexpert) that was necessary at the time the policy was issued to reveal the cause of any loss to the retaining wall. It could not be inferred that, merely because the insured did not actually discover the cause until the expert's report, she could not have discovered it earlier, or that the cause of her loss might

not have been ascertainable upon a less-than-searching examination. (Disapproving *Carty v. American States Ins. Co. (1992) 7 Cal.App.4th 399 [9 Cal.Rptr.2d. 1]*, to the extent it is contrary.)

[See 1 **Witkin,** Summary of Cal. Law (9th ed. 1987) Contracts, § 700A.]

**(2) Insurance Contracts and Coverage § 17--Interpretation of Contracts--Reasonable and Ordinary Meaning of Words--Dictionary Definitions.** -- Words in an insurance policy, unless given special meanings by the policy itself, must be understood in their ordinary sense. In seeking to ascertain the ordinary sense of words, courts in insurance cases regularly turn to general dictionaries. It is thus safe to say that the "ordinary" sense of a word is to be found in its dictionary definition.

**COUNSEL:** Rutan & Tucker, Garvin F. Shallenberger, Duke F. Wahlquist and Ina Raileanu for Plaintiff and Appellant.

Cummins & White, Larry M. Arnold, Robert W. Bollar and Annabelle M. Harris for Defendant and Respondent.

**JUDGES:** Opinion by Sills, P. J., with Wallin and Rylaarsdam, JJ., concurring.

**OPINION BY:** SILLS, P. J.

**OPINION**

[*26] [**567] **SILLS, P. J.**

*INTRODUCTION AND FACTS*

In *Carty v. American States Ins. Co. (1992) 7 Cal. App. 4th 399, 402-403 [9 Cal. Rptr. 2d 1]*, this court rejected the idea that the words "latent defect," as used in a homeowners insurance policy, only applied to some undetected defect in construction materials, and did not apply to faulty design or shoddy workmanship. In *Carty* we also held that because certain defects in the construction of the foundation of a home were "neither readily observable nor apparent on reasonable inspection," those [***2] defects were latent, and therefore the loss they caused was not covered under an insurance policy which specifically excluded loss due to latent defect. ( *Id. at p. 404.*) In the process, we specifically declined to follow an Illinois appellate court opinion, *Mattis v. State Farm Fire & Cas. Co. (1983) 118 Ill.App. 3d 612 [73 Ill.Dec. 907, 454 N.E.2d 1156, 41 A.L.R.4th 1082]*, which involved the defective design or construction of a basement retaining wall. *Mattis* observed that "the great majority of the cases" limited the meaning of "latent defect" to inherent defects in *just* the construction materials, and only then when the defect "could not be discovered by any known or customary test." Latent defects would thus not include "defective construction" such as faulty design or shoddy workmanship. (*Id. at p. 1162.*)

The present case, like *Mattis*, also involves loss to a retaining wall. Here, the parking area retaining wall at an apartment complex in Monterey Park is leaning and cracking. Martha Scott, owner of the complex, requested her insurer to pay for repairs; the insurer, The Continental Insurance Company, has denied the claim because of the latent defect [***3] exclusion in the policy. Scott sued Continental, [**568] and Continental obtained a summary judgment based on stipulated facts.

[*27] The most significant facts are these. After Scott made her claim, the insurance company hired a geotechnical consulting firm to ascertain the cause of the distress to the wall. The consulting firm reviewed the permits, grading records and geotechnical documents, observed and mapped the distress to the wall, made borings in the parking area adjacent to the wall, hand-dug test pits along the toe of the retaining wall, prepared a geotechnical map, and tested soil and bedrock samples in the laboratory for moisture content. After all this work, plus more than 10 pages of abstruse mathematical calculations, the consulting firm (whose findings were accepted by the parties as true for purposes of a summary judgment motion) concluded that the wall was not designed for the actual pressures being exerted by the existing backfill. The wall was most likely designed to withstand 30 pounds per cubic foot equivalent fluid pressure; the actual pressure now being exerted is 44 pounds per square foot, and, with a lack of adequate drainage, can go as high as [***4] 62.4 pounds per square foot. The excessive pressure is enough to cause the wall to crack at its foundation and begin to lean downslope. Eventually, as the reinforcing steel in the wall rusts, the wall will fail. [1] Scott did not realize the cause of the cracking until the expert's report. Her insurance policy listed as an exclusion "Loss caused by ... inherent or latent defect."

1 Here is the summation of the consultants' findings in their own words: "Our findings indicate that the wall most probably was not designed for the actual loads that have developed from the existing backfill. This has probably caused the wall to crack at its stem and then lean downslope. The wall loads can be reduced or the wall can be replaced. The wall can be expected to continue to fail."

If we were only to look at *Carty*, we would affirm the judgment in an unpublished opinion. After all, if it took 10 pages of calculations made by an expert to figure out that the wall was defective, it would seem that the defect was most [***5] certainly "latent."

A year or so after *Carty*, however, *Chadwick v. Fire Ins. Exchange (1993) 17 Cal. App. 4th 1112 [21 Cal. Rptr. 2d 871]*, rejected the idea that defects discoverable only by expert examination were per se latent. The *Chadwick* court noted that *Carty* (and two federal cases preceding it [2] ) relied on a test--whether the defects were "readily observable" or "apparent on reasonable inspection"--derived from *Acme Galvanizing Co. v. Fireman's Fund Ins. Co. (1990) 221 Cal. App. 3d 170 [270 Cal. Rptr. 405]*. *Acme* had derived [*28] the test from the statute of limitations dealing with construction defect suits against builders. [3]

2 *Tzung v. State Farm Fire and Cas. Co. (9th Cir. 1989) 873 F.2d 1338* and *Winans v. State Farm Fire and Cas. Co. (9th Cir. 1992) 968 F.2d 884.*

3 *Code of Civil Procedure section 337.15.*

According to *Chadwick*, the flaw in the *Acme Galvanizing* standard (and, by extension, its use in *Carty*) was that statutes [***6] of limitations are construed in exactly the opposite direction as insurance policy exclusions. To protect consumers, "latent" is given a broad definition in the statute of limitations context, while, as a term in an insurance policy exclusion, it must necessarily be given a narrow one. In the wake of *Chadwick*, Scott now challenges *Carty* as mistaken. In essence, she asks us to rethink the latent defect issue. We accept the invitation.

**(1a)** In sum, we agree with *Chadwick* that the "neither readily observable nor apparent on reasonable inspection" standard articulated in *Acme Galvanizing* and later used by *Carty is* flawed. It does not comport with the ordinary sense of the word "latent."

We also agree with *Chadwick* that there can be no rule to the effect that a defect discoverable "only" by an expert is automatically latent. The ordinary sense of the word latent contemplates a hypothetical inspection of "searching" intensity, and not every expert inspection necessarily rises to that level.

We disagree, however, with the line of out-of-state cases discussed in *Chadwick* which holds that latent defects can never be construction or design defects. Such a conclusion [***7] is both contrary to the ordinary sense of [**569] the word "defect" and contrary to well-established California law.

And in the process, we also disagree with the suggestion in those cases that a "latent" defect can only be one which is not discoverable by *any* test. Again, such a rule does not comport with the ordinary sense of the word "defect."

Putting our conclusions together, the bottom line is that the summary judgment must be reversed. The papers did not establish the necessity for an inspection of "searching" intensity.

*A LATENT DEFECT IS ONE WHICH IS BOTH NOT READILY OBSERVABLE AND NOT DISCOVERABLE TO ANY BUT THE MOST SEARCHING INSPECTION*

**(2)** Words in an insurance policy, unless given special meanings by the policy itself, must be understood in their ordinary sense. (E.g., *Waller v.* [*29] *Truck Ins. Exchange, Inc. (1995) 11 Cal. 4th 1, 18 [44 Cal. Rptr. 2d 370, 900 P.2d 619]*; *Reserve Insurance Co. v. Pisciotta (1982) 30 Cal. 3d 800, 807 [180 Cal. Rptr. 628, 640 P.2d 764]*.) In seeking to ascertain the ordinary sense of words, courts in insurance cases regularly turn to general dictionaries. ( *A.B.S. Clothing Collection, Inc. v. Home Ins.* [***8] *Co. (1995) 34 Cal. App. 4th 1470, 1480 [41 Cal. Rptr. 2d 166]* [using dictionary to determine ordinary meaning of "cumulate"]; *Shell Oil Co. v. Winterthur Swiss Ins. Co. (1993) 12 Cal. App. 4th 715, 745 [15 Cal. Rptr. 2d 815]* [using dictionary as source for ordinary meaning of "intend"]; *St. Paul Fire & Marine Ins. Co. v. Superior Court (1984) 161 Cal. App. 3d 1199, 1202 [208 Cal. Rptr. 5]* [using dictionary to determine meaning of "accidental" in its "plain and ordinary" sense].)

Likewise, courts in noninsurance contexts turn to general dictionaries when they seek to ascertain the "ordinary" meaning of words used in a statute. (E.g., *River Lines, Inc. v. Public Util. Com. (1965) 62 Cal. 2d 244, 247 [42 Cal. Rptr. 104, 398 P.2d 144]* [using dictionary, among other sources, to show "ordinary concept of a carrier" under public utilities statute]; *Brown v. Municipal Court (1978) 86 Cal. App. 3d 357, 364-365 [150 Cal. Rptr. 216]* [using dictionary to ascertain "failure" and "inability" as used in drunk driving statute]; *Standard Oil Co. v. State Bd. of Equalization (1974) 39 Cal. App. 3d 765, 768 [114 Cal. Rptr. 571]* [using dictionary to ascertain [***9] ordinary meaning of "mains," "lines," and "pipes" under tax statute]; see also *E.W. Bliss Co. v. Superior Court (1989) 210 Cal. App. 3d 1254, 1258, fn. 2 [258 Cal. Rptr. 783]* ["A dictionary is a proper source to determine the usual and ordinary meaning of a word or phrase in a statute"]; but compare *People v. Buese (1963) 220 Cal. App.2d 802, 806 [34 Cal. Rptr. 102]* [asserting that dictionary definition of "drug" marked "the outer limits of reasonability" for purposes of a penal statute] with *People v. Garcia (1934) 1 Cal. App. 2d Supp. 761, 765 [32 P.2d 445]* [using dictionary definition of "drug" to find its "usual, natural and ordinary sense"].)

Indeed, courts in both insurance and noninsurance contexts regularly use the phrase "ordinary dictionary definition [or meaning]" as if "ordinary" were synony-

mous with "dictionary." (E.g., *People v. Anderson (1968) 70 Cal. 2d 15, 26 [73 Cal. Rptr. 550, 447 P.2d 942]* ["we find no indication that the Legislature intended to give the words 'deliberate' and 'premeditated' other than their ordinary dictionary meanings"]; *Ponder v. Blue Cross of Southern California (1983) 145 Cal. App. 3d 709, 722 [193* [***10] *Cal. Rptr. 632]* ["... the rest of that definition is consistent with the ordinary dictionary definition of the term 'dental' "]; *People v. Orabuena (1976) 56 Cal. App. 3d 540, 545 [128 Cal. Rptr. 474]* ["The words 'deliberate' and 'premeditated' are not words of art, but are to be construed in their ordinary dictionary [*30] meaning"].) It is thus safe to say that the "ordinary" sense of a word is to be found in its dictionary definition. [4]

4 Of course, the use of a mere dictionary to solve a legal problem can be the subject of easy ridicule. (See *Unzueta v. Ocean View School Dist.* (1992) 6 Cal. Cal. App. 4th 1689, 1705 [*8 Cal. Rptr. 2d 614]* (dis. opn. of Gilbert J.) [chiding majority for adhering to "dictionary school of jurisprudence"].) The truth behind this potential for ridicule is that dictionary definitions cannot be applied simplistically. For example, the multiple meanings of a word as found in a dictionary cannot be inserted into the text of an insurance policy without regard to the document construed as a whole, the exact context of the language, other basic rules of contract interpretation, and the reasonable expectations of the insured. (See *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal. Cal. App. 4th 1773, 1785-1789 [*22 Cal. Rptr. 2d 206]*.)

[***11] [**570] Sometimes the "ordinary dictionary" meaning of a word coincides with its statutory definition. (E.g., *AIU Ins. Co. v. Superior Court (1990) 51 Cal. 3d 807, 828 [274 Cal. Rptr. 820, 799 P.2d 1253]* ["... we take the statutory and dictionary definitions described above to be the 'ordinary and popular' definition of 'damages' for interpretation purposes"].)

Then again, sometimes it does not. The statutory definition of "latent deficiency" found in *section 337.15 of the Code of Civil Procedure*, for example, ("a deficiency which is not apparent by reasonable inspection") begins with the introductory clause, "[a]s used in this section," indicating that its authors were articulating a specialized definition for specific purposes. Yet the court in *Acme Galvanizing* plucked the definition of latent deficiency from the statute merely because the definition "provid[ed] a useful standard." (*Acme Galvanizing Co. v. Fireman's Fund Ins. Co., supra, 221 Cal. App. 3d at p. 178*.) The court did not say why it was "useful."

"Reasonable inspection" is a fairly easy definition for courts to apply, and if we were drafting an insurance contract on behalf of an insurer, [***12] we would see the merit of specially defining latent defect the way the Code of Civil Procedure does. But we cannot escape the rule that words in an insurance policy are to be construed in their ordinary sense, even if that sense provides a definition a little less tidy than some litigants, and perhaps the courts, might desire. [5] When ordinary people do not understand the meaning of a word, they do not turn to the Code of Civil Procedure. They turn to a dictionary. We thus agree with *Chadwick*'s criticism of *Acme Galvanizing*'s "reasonable inspection" formula as rooted in the wrong source. (See *Chadwick v. Fire Ins. Exchange, supra*, 17 Cal. Cal. App. 4th at pp. 1123-1124.)

5 "Reasonable inspection" has a wonderfully seductive appeal for judges, who generally have no problem figuring out what is "reasonable." "Most searching," on the other hand, is a harder standard to apply, requiring more attention to the fiddling details of each individual case.

[*31] Still, as happened in *AIU Ins.* [***13] *Co. v. Superior Court, supra, 51 Cal. 3d 807*, a statutory meaning and a dictionary meaning may be coterminous. Just because *Acme Galvanizing* looked to the wrong source for the meaning of latent defect does not mean it still might not have come up with the right answer, if only by coincidence. So we now examine the dictionary definition of the critical words.

The word "latent" derives from the Latin word which means "to lie hidden," and is akin to an ancient German word for den or lair, an ancient Norse word for deceit, a Greek word for escaping notice, and an old Slavic word for lying in wait. While Webster's Third New International Dictionary gives a myriad of usage examples, it provides but two basic definitions, with several variations of the first basic definition. The first definition is "existing in hidden, dormant, or repressed form," as, for example, in the phrase that someone's "sinister qualities, formerly latent, quickened into life." A variation on that is "present or capable of living or developing in a host without producing visible symptoms of disease," as in "a latent virus." A final variation pertains simply to fingerprints: "*of a fingerprint*: obtained [***14] at the scene of a crime and usu[ally] scarcely visible but capable of being developed for study," as in the "search for latent prints."

The second basic definition is merely, "concealed, disguised." But then the dictionary elaborates. "Latent applies to that which is submerged and not clearly apparent or certainly present *to any but a most searching examination* but may emerge and develop with effect and significance." (Webster's Third New Internat. Dict. (1979) p. 1275, italics added.) An example is Dickens's

line about " 'the *latent* uneasiness in Darnay's mind [being] roused to vigorous life by this letter.' " (*Ibid.*)

Two central ideas emerge from the definitions. First, if something is latent one cannot see it. One might be able to discover it, but it is not--to use a phrase that fairly leaps from the dictionary definition--"readily observable."

[**571] Second, the difficulty of discovering whether a defect is "latent" must be substantial. A latent quality cannot be detected with merely a cursory inspection. Something which is latent is not apparent "to any but a most searching examination." It takes hard work to develop fingerprints or detect a hidden virus.

[***15] **(1b)** We may now draw our first conclusion. The sense of "latent" as discoverable if sufficient efforts are exerted compels us to reject *Mattis* and [*32] other cases to the degree they restrict the latent defect exclusion to defects that "could not be discovered by any known or customary test." ( *Mattis v. State Farm Fire & Cas. Co., supra, 454 N.E.2d at p. 1162*, citing *Plaza Equities Corp. v. Aetna Casualty. & Surety Co. (S.D.N.Y. 1974) 372 F. Supp. 1325*; *Essex House v. St. Paul Fire & Marine Insurance Co. (S.D. Ohio 1975) 404 F. Supp. 978*; *General American Transp. Corp. v. Sun Insurance Office, Ltd. (E.D.Tenn. 1965) 239 F. Supp. 844.*) Not discoverable by *any* test simply does not comport with the idea that a "most searching examination" *can* reveal it (as, e.g., with fingerprints).

A tougher question, however, is whether this sense of something that is apparent only by the "most searching" efforts corresponds with the "reasonable inspection" formula enunciated in *Acme Galvanizing* and followed in *Carty*. Do "most searching" efforts extend beyond "reasonable" efforts? Instinctually, there is at least something to be said for the idea that "most [***16] searching" efforts and "reasonable efforts" are, as the British say, pretty much of a muchness. After all, practically nothing in Anglo-American law countenances unreasonable anything, much less *requires* it as part of a definition. In rethinking the issue of latent defect, can it not be said that the test used in *Acme Galvanizing* and *Carty* is the substantial equivalent of the dictionary's standard?

No. That would be a little like a nation which wages a foreign war, and, after having lost every battle, decides to declare victory and go home. The action does not meet the substance of the problem. Reasonable is *not* a synonym for "most searching." "A most searching examination" conveys a special sense of intensity not always inherent in the word "reasonable." Simply put, "reasonable inspections" may not *always* be "intense" or "most searching."

The *Acme Galvanizing* test is thus incomplete, because it lacks the sense of intensity an ordinary person would expect. We therefore agree with *Chadwick* in its rejection of the test to the extent it would make "latent" a defect which is not apparent on merely a "reasonable" inspection. To put the matter in terms of, [***17] say, a jury instruction: A latent defect is one which is both *not readily observable* and *not discoverable to any but the most searching examination.*

*DEFECTS DISCOVERABLE ONLY BY EXPERT EXAMINATION ARENOT AUTOMATICALLY "LATENT"*

Intuitively, it would seem that if a construction defect is only discoverable by an "expert" examination it is most certainly "latent." Surely, one might [*33] ask, if it takes some geotechnician or soils expert (the sort of person who understands the difference, for example, between sandy clay and clayey sand) to figure out that a contractor goofed, the defect is "latent" as an ordinary person would understand the term.

The problem with this intuitive line of reasoning is that the ordinary dictionary definition of the word focuses on the intensity of the hypothetical inspection, not who conducts it. In the light of that definition, the expert versus nonexpert distinction is what the logicians call a false dichotomy. Perhaps it is true that *most* inspections conducted by experts will be sufficiently "searching" to be reasonably described as "most searching." In the case before us, for example, there can be absolutely no doubt that the [***18] defect in the retaining wall did indeed become apparent after a "most searching examination." Reviewing permits, grading records and geotechnical documents, mapping out wall distress, boring through parking areas, digging test pits, testing dirt and working out 10 pages of mathematical equations represents a great deal of effort indeed to unearth the cause of a loss.

But it is a logical flaw to assume that just because experts *conducted* a most searching [**572] inspection for defects that the defects were *only* discoverable by a most searching inspection. We cannot say, as a matter of law, that every expert inspection automatically is "a most searching one" nor that, even if a "most searching" inspection was employed, an inspection of such scope was necessarily required to discover the defect. It is possible to imagine instances where a defect is not readily observable, but is still apparent to an expert's *cursory* examination and therefore not latent. [6] Accordingly, we agree with *Chadwick* that "defects discoverable only by expert examination" are not [*34] "per se latent." (See *Chadwick v. Fire Ins. Exchange, supra*, 17 Cal. Cal. App. 4th at pp. 1122-1125 [***19] and particularly p. 1125.)

6 In *Essex House v. St. Paul Fire & Marine Insurance. Co., supra, 404 F. Supp. at page 992*, the court observed that "[n]othing more than a simple visual inspection of the Essex House and the construction plans would have been sufficient to detect the shoddy building techniques employed therein." We may leave for another day the question of whether the effort required to obtain building plans, and the expertise required to decipher them, would amount to a sufficiently "searching" examination under California law. However, there is a fictional example which is on "all fours" as to whether a defect may be discovered by a mere cursory examination by an expert. It is from a humorous story entitled *The Builders* by John Cleese and Connie Booth:

The owners of a hotel, a married couple, desire to renovate the lobby by putting a new door through to their kitchen and block off an existing door to a drawing room. To save money, the husband hires a contractor named O'Reilly, who is totally incompetent. After an initial misunderstanding about the nature of the job (O'Reilly manages to block off all access to the kitchen), he hurries to put things to right before the wife arrives back from a golf excursion. Miraculously he completes the job. It looks fine.

An *expert* building contractor named Stubbs arrives. The wife, apropos her low opinion of O'Reilly, comments that the work will probably "all fall down by lunch time," and the husband, rather too smug that the bargain-basement contractor O'Reilly has performed so well, retorts (with a pride-goes-before-the-fall confidence), "Well, let's ask a real *expert*! Do *you* think it'll all fall down by lunch, Mr Stubbs?"

Initially judging by just what was readily observable, the expert Stubbs declares "It's a very good job."

The husband then shows Stubbs where the new door was knocked through and the old one was blocked off. Stubbs casually asks what was used for the lintel (the horizontal beam which usually carries the load of everything above a door)--an iron girder or something made of concrete? The husband is forced to answer that a wooden one was used.

The jig is up. The expert realizes the implications of the defect. "But that's a supporting wall! .... It could give way any moment."

The husband is last seen striding out of the hotel, carrying a garden gnome, cap pointing outward, looking for O'Reilly. (Cleese & Booth, *The Builders*, in The Complete Fawlty Towers (1988) at pp. 27-48, and particularly pp. 45 & 47, original italics.)

In *The Builders*, the expert's "examination" is cursory indeed. One look at the wall and one casual question by an expert and the defect is revealed.

[***20] *LATENT DEFECTS INCLUDE DEFECTS IN DESIGN AND CONSTRUCTION*

After canvassing a series of out-of-state cases predating *Acme Galvanizing* [7] the *Chadwick* court observed that those cases restricted the scope of latent defect and inherent vice exclusions to flaws or deficiencies in the materials used, such that "faulty design or construction is deemed not to come within the exclusions." ( *Chadwick v. Fire Ins. Exchange, supra*, 17 Cal. Cal. App. 4th at p. 1121.) There is, however, a question as to whether the *Chadwick* court really endorsed the idea. In specific terms the case *held* that cracks in the interior sheetrock of a home largely due to the substitution of floor trusses for joists, together with "numerous deficiencies in the design and construction of the house's floor plan and frame" created a triable issue of fact as to whether "a reasonable expert inspection" at the time the insurance policy was issued "would have revealed the defects causing [the] homeowners' loss and, hence, as to whether the defects came within the exclusion for latent defect or inherent vice." ( *Id. at pp. 1115* & 1126.) Thus even though the record before the court precluded summary [***21] judgment in favor of the insurer, the court seemed to leave open the possibility that "deficiencies in design and construction" *might* yet come within [**573] the exclusion if they fell outside the purview of a "reasonable expert inspection." [8]

7 In addition to *Plaza Equities*, *Essex House*, and *General American Transp.* already mentioned, the *Chadwick* court discussed *Mellon v. Federal Ins. Co. (S.D.N.Y. 1926) 14 F.2d 997* and *Employer's Casualty Company v. Holm (Tex.Civ.App. 1965) 393 S.W.2d 363.*

8 See *Chadwick v. Fire Ins. Exchange, supra*, 17 Cal. Cal. App. 4th at page 1126. By framing the question in terms of "reasonable expert examination," the *Chadwick* court appears to have itself fallen into the "reasonableness" trap. (See fn. 5, *ante*, p. 30.) Perhaps most examinations which are conducted by experts are indeed of the "most searching" variety. Even so, as related above, the idea of a most searching inspection does not automatically entail an "expert" examination at all. It is the nature of construction de-

fects that each case must be judged by careful attention to its own peculiar facts.

[***22] [*35] In any event, the materials-versus-design-and-construction dichotomy discussed in *Chadwick* is just as false as the layperson-expert dichotomy we have discussed above. There is nothing in the word "defect" (as in "latent defect") to restrict it to just structural deficiencies in materials.

"Defect," when used as a noun, is a general term. It is "an *irregularity* in a surface or a structure that spoils the appearance or causes weakness or failure: fault, flaw ... want or absence of *something* necessary for completeness, perfection, or adequacy in form or function: deficiency, weakness --as opposed to excess." (Webster's Third New Internat. Dict., *supra*, at p. 590, italics added.) Examples of usage given by the dictionary are phrases like "a moral defect in his nature," "several defects can be found in this argument," and "a defect in his hearing." (*Ibid.*) Nothing suggests a limitation to just materials or structure. Faults, flaws and irregularities can be the result of design or faulty construction just as much as mere weakness of material.

Moreover, to restrict the word to just materials not only unnaturally constricts its meaning to something less [***23] than its ordinary sense, [9] but runs contrary to the well-established view that contractor negligence can, indeed, be a *cause* of first party loss. (See *Garvey v. State Farm Fire & Casualty Co. (1989) 48 Cal. 3d 395, 408 [257 Cal. Rptr. 292, 770 P.2d 704]* [rejecting contention that third party negligence of a contractor is not a covered peril].) Contractor negligence often extends to poor workmanship or design, as distinct from the selection of poor quality materials in which there is some inherent propensity for structural failure.

9 While ambiguities are classically construed against insurers, courts must not strain to create ambiguity by artificially reducing the ordinary scope of words. To use "defect" to mean *only* weakness of physical materials is to use the word more as a term of art rather than in its ordinary sense.

Finally, from the viewpoint of reasonable expectations the distinction makes no sense. A retaining wall might buckle because it was made of low-quality materials, or it [***24] might buckle because someone forgot reinforcing steel, or did not design it to withstand the backfill. An insured looking at the ordinary meaning of "defect" would have no reason to distinguish among the possible causes. Thus to the degree that *Chadwick* may (arguably) stand for a per se rule that design and construction flaws cannot fall into the latent defect exclusion, we must respectfully part company.

[*36] *SUMMARY JUDGMENT WAS NOT APPROPRIATE ON THIS RECORD BECAUSE THERE WAS INSUFFICIENT EVIDENCE AS TO THE INTENSITY OF INSPECTION NECESSARY TO DETERMINE THE CAUSE OF THE LOSS*

As mentioned above, we have no doubt that the examination which was actually performed by the geotechnical consultants was of the "most searching" variety. There are, however, some missing gaps in the evidence which preclude affirmance.

In a word, while we know what *was* done to thoroughly study the defects after their discovery here, we do not know what was *needed* to be done to merely detect them. The record does not reveal the intensity of inspection (expert or no expert) that was necessary at the time the policy was issued to reveal the cause of any loss to the retaining wall. [10] [***25] All the record reveals is that Scott *herself* was not aware of the cause of [**574] her loss until the geotechnical consultants' report, and the consultants went to considerable efforts to identify the defect. We do not know whether a more cursory examination at the time the policy was issued might have revealed the cause, *either* by Scott or an expert.

10 *Chadwick* never discussed in detail the question of when a defect is "latent" for purposes of the exclusion, but a moment's reflection demonstrates that the time of the hypothetical inspection must be, as the *Chadwick* court stated, when the policy was issued. (See *Chadwick v. Ins. Exchange, supra, at p. 1126.*) After all, that is when the insurer assumed the risk of loss to the property.

We decline to draw the inference that because Scott did not actually discover the cause until the expert's report that she could not have discovered it earlier, or that the cause of her loss might not have been ascertainable upon a less-than-searching [***26] examination. There are other explanations not precluded by the record. Perhaps she is an absentee landlord who never inspects her own property. Perhaps she never actually looked at the wall.

At the most, the summary judgment motion here was premature; at the least, additional evidence might show that the defect was obvious upon a less than "searching" inspection, and therefore not latent at all. Either way, we cannot affirm. [11]

11 The *Chadwick* court noted there is a direct relationship between the general doctrine in insurance law that a loss must be fortuitous to be insurable (see *Ins. Code, § 22*) and the latent defect exclusion. (See *Chadwick v. Fire Ins. Ex-*

*change, supra*, 17 Cal. Cal. App. 4th at p. 1119, citing Hecker & Goode, *Wear and Tear, Inherent Vice, Deterioration, etc.: the Multi-Faceted All-Risk Exclusions* (1986) *21 Tort & Ins. L. J. 634, 634-635, 638-640.*) It appears that the latent defect and inherent vice exclusions are attempts to embody, in the text of the policy, the need for fortuity. (See *Compagnie Des Bauxites v. Ins. Co. of No. America (W.D.Pa. 1983) 554 F. Supp. 1080, 1084* ["The law is quite clear that an insurer is not liable for losses resulting from inherent vice, defect or infirmity in the subject matter insured, for this type of loss is not caused by chance or an extraneous event."].) The idea is that damage from an "inherent cause" is, like wear and tear, a "certainty," and therefore "uninsurable." (See *Chadwick v. Fire Ins. Exchange, supra*, 17 Cal. Cal. App. 4th at p. 1119.) However, because the parties have not briefed the effect of the fortuity doctrine on this loss, we express no opinion on the question of whether the fortuity doctrine, to the degree that it may be separable from its embodiment in the latent defect exclusion, precludes coverage in this case.

[***27] [*37] *CONCLUSION*

The trial court determined that on the record before it the latent defect exclusion applied to Scott's loss as a matter of law. The judgment to that effect is reversed. Scott is to recover her costs.

Wallin, J., and Rylaarsdam, J., concurred.