# TAB 32

LEXSEE 37 CAL. APP. 3D 289

**PERRY SCOTT, Plaintiff and Appellant, v. McDONNELL DOUGLAS CORPORATION et al., Defendants and Respondents**

**Civ. No. 41790**

**Court of Appeal of California, Second Appellate District, Division Five**

*37 Cal. App. 3d 277*; *112 Cal. Rptr. 609*; *1974 Cal. App. LEXIS 1132*

**February 14, 1974**

**SUBSEQUENT HISTORY:** [***1] A Petition for a Rehearing was Denied March 6, 1974, and the Opinion was Modified to Read as Printed Above. Appellant's Petition for a Hearing by the Supreme Court was Denied April 10, 1974.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. WEC 22094, Laurence J. Rittenband, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A former city manager brought an action against a corporation and members of the city council, seeking damages for defamation, for interference with a contractual relationship, and for the intentional infliction of emotional distress. The trial court sustained defendants' demurrers, with leave to amend only as to the cause for interference. Plaintiff failed to amend, and judgment of dismissal was entered. The action was based on letters to plaintiff, signed by defendant councilmen, one of whom was an employee of defendant corporation and allegedly acted as its agent. The letters, criticizing plaintiff's performance of his work, were read at a council meeting and copies were given to persons in the audience. Prior publication of two of the letters to other persons, outside the council chambers, was also alleged. The cause of action for intentional infliction of emotional distress further alleged that the corporation had falsely and maliciously charged plaintiff with rigging polygraph examinations, electronic surveillance of city employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees. (Superior Court of Los Angeles County, No. WEC 22094, Laurence J. Rittenband, Judge.)

The Court of Appeal affirmed, holding that the matters occurring in connection with the council meeting fell within the privilege provided by *Civ. Code, § 47, subd. 2*, to publications and broadcasts made in legislative proceedings. The court further viewed the allegedly defamatory statements as criticism of a public officer relating to his fitness, and it cited the principle that mere expression of opinion or severe criticism is not libelous though it adversely reflects on the fitness of an individual for public office. As to the additional defamatory matters alleged in support of the claim of intentional infliction of emotional distress, the court noted the lack of any allegation of publication. In conclusion, the court found that the complaint on its face showed justification for inducing breach of contract, in that plaintiff was a public official, and the efforts directed to obtaining the termination of his services were by way of the expression of defendants' views of plaintiff's fitness and qualifications for office. (Opinion by Stephens, Acting P. J., with Ashby and Hastings, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to McKinney's Digest

**(1) Libel and Slander § 29(0.5)--Privileged Communications--Absolute Privilege--Legislative Proceedings.** --Absolute immunity attaches to statements made before a legislative body, and the existence of malice on the part of the declarant will not

defeat the privilege when it is shown that the statement which is alleged to be defamatory bears some connection to the work of the legislative body.

**(2) Libel and Slander § 29(0.5)--Privileged Communications--Absolute Privilege--Legislative Proceedings.** --Allegedly defamatory statements in letters written by city council members to the city manager were privileged under *Civ. Code, § 47, subd. 2*, relating to publications or broadcasts in legislative proceedings, and the reading of such letters at a council meeting and the distribution of copies to members of the audience attending the meeting were also privileged, where the letters adequately related to the retention of the city manager, an employee whose appointment and removal, as well as continuing review of his performance and qualifications, were the responsibility of the city council.

**(3) Libel and Slander § 29(0.5)--Privileged Communications--Absolute Privilege -- Legislative Proceedings.** -- The immunity historically afforded to legislators as to otherwise defamatory statements does not impose a restriction that the statements made by a member of a legislative body are protected only if they are directed toward achieving the object of legislation. Rather, such general immunity extends to all that is spoken or done in the course of legislative proceedings, and it attaches also to interested members of the public who wish to address themselves to matters pending before a legislative body.

**(4a) (4b) Libel and Slander § 30(4)--Privileged Communications--Qualified Privilege--Criticism of Candidates, Officers and Official Acts.** --In a libel action by a former city manager against city councilmen and others based on alleged defamatory statements in letters written by the councilmen to the manager and read at a city council meeting, plaintiff could not rely on prior publication of the statements to persons outside the city council chambers, where, at the time of the utterances and publications complained of, plaintiff was a public official appointed by the council, and where no reading of the statements would justify plaintiff's claim that he was exposed to hatred, contempt or ridicule. An individual who seeks or accepts public office invites, and is properly subject to, public criticism so far as it may relate to his fitness and qualifications for his office, and severe criticism is not libelous though it adversely reflects on the fitness of an individual for public office.

**(5) Libel and Slander § 82 -- Actions -- Trial -- Province of Court and Jury.** --In a libel action, the court must determine as a matter of law whether the publication is libelous per se. If it is determined that the publication is susceptible of a defamatory meaning and also of an innocent and nondefamatory meaning it is for the jury to determine which meaning would be given to it by the average reader, but when the material published is unambiguous and in the court's opinion could not reasonably be understood as nondefamatory the issue of libel should not be submitted to the jury.

**(6) Libel and Slander § 23 -- Actionable Words -- Construction of Language Used.** --In determining the issue of defamation, the publication in question must be considered in its entirety; it may not be divided into segments and each portion treated as a separate unit. It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader, and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it.

**(7) Torts § 4.2--Intentional Infliction of Emotional Distress.** --A former city manager could not successfully base a cause of action against a corporation for intentional infliction of emotional distress on allegations that a city councilman, as agent of the corporation, had falsely and maliciously charged him with rigging polygraph examinations, electronic surveillance of city employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees, where the complaint failed to allege that such statements were ever published or made known to any third persons, and where, under the facts of the case, the conduct charged was not sufficiently outrageous as a matter of law to distress a reasonable man of ordinary sensibilities.

**(8a) (8b) Interference § 1(2)--With Contract Relations--Actions.** --The trial court properly sustained a demurrer to a cause of action by a former city manager alleging that defendant corporation had conspired with certain members of the city council to induce the council to terminate plaintiff's employment contract with the city or make the performance of his duties more difficult, where the complaint showed on its face that plaintiff was a public official, and the efforts directed to obtaining the

termination of his services were by way of the expression of defendant's views of plaintiff's fitness and qualifications for office. To some degree, a public official assumes his office subject to the vicissitudes of public opinion, and, to the extent that the changing mood of public opinion operates to interfere with his right to employment, he may not recover in tort under a theory of inducing breach of contract.

**(9) Interference § 1(1)-- With Contract Relations.** -- The elements of a cause of action for inducing breach of contract are the existence of a valid contract, the defendant's intent to induce a breach of the contract, and a breach resulting from the defendant's unjustifiable or wrongful conduct.

**(10) Interference § 1(1)-- With Contract Relations -- Justification.** -- Whether intentional interference with a contractual relationship by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances, including the nature of the actor's conduct and the relationship between the parties.

**COUNSEL:** Perry Scott, in pro. per., for Plaintiff and Appellant.

Brill, Hunt, DeBuys & Burby, John R. Johnson, Louis Lieber, Jr., Eberhard Schmoller and James J. McCarthy for Defendants and Respondents.

**JUDGES:** Opinion by Stephens, Acting P. J., with Ashby and Hastings, JJ., concurring.

**OPINION BY:** STEPHENS

**OPINION**

[*281] [**611] Plaintiff Perry Scott appeals from an order of dismissal of his third amended complaint. The complaint sought damages for "defamation; interfering with a contractual relationship; and suffering and emotional distress" while plaintiff was City Manager of the City of Santa Monica. Prior to the dismissal, the court had sustained defendants' demurrer on grounds of uncertainty and for failure to state a cause of action without leave to amend plaintiff's first and third causes of action (defamation, emotional distress and mental suffering, [**612] [***2] respectively), and with leave to amend his second cause of action (interference with a contractual relationship). Plaintiff failed to amend.

*The Complaint*

In essence, the third amended complaint alleges the following: Prior to publication of the matter complained of, plaintiff enjoyed a good reputation in the community with respect to the high standards of his occupation and the excellence and quality of his work and services rendered to the City of Santa Monica. For sometime prior to December 10, 1970, and subsequent thereto, defendant McDonnell Douglas Corporation by and through its officers, agents, servants and employees (Hochmuth, Latting, and McCloskey) [1] and defendant-Councilmen Hoover, Kingsley and Patton (and a number of Does) unlawfully, intentionally, maliciously and willfully conspired, combined and agreed to enter into a scheme to defame the plaintiff's name and reputation and to cause plaintiff's removal or resignation as city manager. The reason for the conspiracy against plaintiff was [*282] because plaintiff was and is an impediment to a zoning ordinance change which would permit a commercial development of McDonnell Douglas' property and property of [***3] the City of Santa Monica as to which McDonnell Douglas has an option to purchase. The zoning ordinance would increase the value of McDonnell Douglas' property from $ 8,000,000 to more than $ 20,000,000. Councilmen Hoover, Kingsley and Patton, and McDonnell Douglas' agent, McCloskey, did the acts complained of "in excess of their authority and outside the scope of their duties as members of the City Council."

1 John W. McCloskey, referred to throughout by defendant as McDonnell Douglas' "agent," is a member of the Santa Monica City Council and he is also in the employ of McDonnell Douglas.

The first cause of action (for defamation) names as defendants McDonnell Douglas, Councilmen Hoover, Kingsley, and Patton (and a number of Does), and alleges that in pursuance of the conspiracy, defendants "without immunity and without privilege published three defamatory letters [2] about and concerning [plaintiff]." The second cause of action (interference with a contractual relationship) names only McDonnell Douglas and [***4] the Doe defendants, and alleges that in addition to the publication of the defamatory letters, defendants "in furtherance of their conspiracy and without due process or the consent of [plaintiff] caused the termination of appellant's contract with the [City] and

the reduction of his salary in the amount of $ 6,000 per year, making performance by [plaintiff] more expensive and burdensome in a coercive attempt to force [plaintiff's] resignation." The third cause of action for "mental suffering and emotional distress" names as defendants McDonnell Douglas (and Does) and alleges that "in addition to the acts of unjustifiable interference with plaintiff's contractual relationship, [McDonnell Douglas'] agent, on the 17th day of December, 1970, in pursuance of the conspiracy directed the republication of the letters alleged to be defamatory, and on the 9th day of February, 1971, in continuance of the conspiracy, falsely and maliciously charged [plaintiff] with rigging polygraph examinations, electronic surveillance of city employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees."

2 The specific portions upon which plaintiff bases his three causes of action are discussed *infra*.

[***5] In brief, on or about December 17, 1970, at a meeting of the Santa Monica City Council, defendant Councilman Patton handed to Gene Hall, [3] [*283] Richard Aronoff, service director for the city, and Earl Reinbold, the city chief of police (who were in the audience) copies of a letter dated December 10, 1970, which he had addressed to plaintiff, and then Patton distributed copies to members of the council, the city clerk, and to plaintiff. According [**613] to plaintiff, this letter, among other things, charges him with a lack of moral and ethical character: "I know it can well become the attitude of a dictatorial 'boss' that, having title, you will stoop to any form of action in your power to continue your stay in office."; that plaintiff seeks to impose totalitarian power maintained only through the use of force: "Your past experience in other cities should have proven to you that you cannot be a dictator in a democratic city, even if you are the City Manager and have the power of appointment of the Chief of Police." "For the record I want you, the City Manager, and each of your employees to understand that as long as I serve this city as a City Councilman I will not be [***6] horse-whipped or hog-tied by you or any of your employees for doing my duty." "So you choose to write me a letter, releasing a copy to the press, in which you assume the position of not only City Manager but City Attorney, as well as City Dictator."; and charges plaintiff with unethical conduct: "I find it impossible to believe that a City Councilman of this city is required to sit idly by and succumb to malicious character assassination by an employee of that Council, of which he is a member, because he chooses to know what is going on in the various departments of the city."

3 According to plaintiff, Hall is a reporter for the Santa Monica City Outlook.

Plaintiff alleges that the second defamatory letter, dated December 17, 1970, addressed to him, was prepared by McDonnell Douglas through its "agents" Hochmuth, Latting, and McCloskey in the executive offices of McDonnell Douglas; that this letter was initially published to Peggy Ann Prentice and Alice Hynd; [4] and that this publication was not during a meeting [***7] of the city council (though plaintiff did not set forth where the publication did in fact occur). Subsequent to the initial publication of this letter, McCloskey delivered it to Hoover, with directions to her to read the contents at the city council meeting, and Hoover read the contents [*284] into the record of the meeting, This letter, signed by Councilmen Hoover, Kingsley, McCloskey, and Patton, was a letter of "censure and reprimand," which stated, among other things: "The City Council views with grave concern your complete lack of empathy and understanding of the processes of government in this city. You have failed to recognize that the City Manager has the responsibility to execute the policies laid down by the City Council.

4 Defendants raise the point that Prentice and Hynd are secretaries, thus accounting for the fact of the initial limited publication to these two individuals. However, the status of these two parties is not set forth in plaintiff's complaint. Whether the publication to Prentice and Hynd was privileged is an issue which can only be raised by way of an affirmative defense. ( *Pavlovsky v. Board of Trade, 171 Cal.App.2d 110 [340 P.2d 63].*) However, if the communication itself is privileged, the method of publication will also be privileged if it is reasonable and appropriate under the circumstances. (Prosser, The Law of Torts (4th ed.) § 115, p. 793.)

[***8] "Your statement showed no understanding of the problems faced by the Council in reaching its decision. However, of a more serious nature is that it indicated the mutinous character to which your administration of the City's affairs has descended."

Plaintiff alleges that the third allegedly defamatory letter (dated December 17, 1970, addressed to plaintiff, and signed by the same four councilmen) was also prepared by McDonnell Douglas' "agents" Hochmuth, Latting, and McCloskey in the executive offices of McDonnell Douglas; it was also initially published to Prentice and Hynd. Subsequent to that publication, McCloskey delivered the letter to Kingsley, with directions for Kingsley to read its contents at the city council meeting of [**614] December 17. Plaintiff contends that portions of the third letter defamed him in that the letter portrayed him as dishonest: "A city is most fortunate if it has a City Manager who is dedicated to efficiently and honestly administer the affairs of the City for the people and through the people's elected representatives -- the City Council. The people of Santa Monica are not so fortunate."; and that plaintiff has committed prior misconduct: [***9] "It appears you are reluctant to learn from your past mistakes. Therefore this Council feels it is necessary to take written action rather than repeated verbal communication when you continue to use the power of your administrative office to influence the legislative functions of government (the City Council)."

Plaintiff's second cause of action is premised upon the tort of interference with a contractual relationship, and alleges that McDonnell Douglas, through its agents McCloskey, Latting and Hochmuth, conspired with members of the Santa Monica City Council to terminate plaintiff's contractual relationship with the city and reduce his salary $ 6,000 per year in an attempt to coerce plaintiff to resign from his position; that he was so terminated and his salary was so reduced.

Plaintiff's third cause of action sounds also in tort. Liability is predicated upon the theory of intentional infliction of emotional distress, based in large part upon the publication of the statements alleged to be defamatory in the first cause of action. Plaintiff further alleges that certain other statements [*285] were made which caused him emotional distress, i.e., "that . . . John W. McCloskey [***10] as the agent, servant and employee of McDonnell Douglas Corporation falsely and maliciously charged Plaintiff with rigging polygraph examinations, electronic surveillance of City employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees."

We treat the demurrer as admitting all material facts properly pleaded, but not the contentions, deductions, or conclusions of fact or law. We also consider matters which may be judicially noticed. ( *Serrano v. Priest, 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].*)

The judgment in favor of defendants must be affirmed since *Civil Code section 47, subdivision 2* [5] provides an immunity under the instant circumstances, and in any case, the allegedly defamatory letters were as a matter of law not libelous per se.

5 *Civil Code section 47, subdivision 2*, in pertinent part provides: "A privileged publication or broadcast is one made -- . . . 2. In any (1) legislative . . . proceeding . . ."

[***11] The essential rights and privileges of a legislative body and/or its individual members to be free from the threat of civil suits arising out of discussions in legislative proceedings derives in the main from the English Bill of Rights granted by William and Mary in 1688. [6] In California, this freedom from liability for statements made before a legislative body is codified in *section 47 of the Civil Code*. The privilege provided by *section 47* (subd. 2) has been held to be absolute. ( *Albertson v. Raboff, 46 Cal.2d 375, 379 [295 P.2d 405]*; *Goodley v. Sullivant, 32 Cal.App.3d 619, 623 [108 Cal.Rptr. 451]*.) **(1)** Absolute immunity attaches to statements made before a legislative body, and the existence of malice on the part of the declarant will not defeat the privilege (Rest., Torts, § 586, com. a) when it is shown that the statement which is alleged to be defamatory bears some connection to the work of the legislative body. As stated in *Thornton v. Rhoden, 245 Cal.App.2d 80, 90 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152]*: "A rule which requires the demonstration of some connection with the proceedings, yet dispenses with the requirement [**615] of relevancy, [***12] materiality or pertinency, in their technical sense appears to us not only to be a fair compromise between the competing considerations involved, but to be the one adopted by the Restatement of Torts and by at least two decisions in this state. [Citations.]" **(2)** In the instant case, the allegedly [*286] defamatory statements have a clear connection with the work of the legislative body (the Santa Monica City Council) [7] in that they relate to the retention of an employee whose appointment and removal, as well as continuing review of his performance and qualifications, were the responsibility of the city council. The reading of

the letters at the city council meeting was privileged, as was the distribution of copies of the letters to members of the audience (including the press) attending the council meeting. ( *Hancock v. Burns, 158 Cal.App.2d 785, 793 [323 P.2d 456]*; cf. *Harmer v. Superior Court, 275 Cal.App.2d 345 [79 Cal.Rptr. 855].*) Once it is determined that a matter is privileged, the method of publication is privileged as long as it is reasonable and appropriate under the circumstances. (Prosser, The Law of Torts (4th ed.) § 115, p. 793; see also [***13] *Dombrowski v. Eastland, 387 U.S. 82 [18 L.Ed.2d 577, 87 S.Ct. 1425]*; *Kilbourn v. Thompson, 103 U.S. 168 [26 L.Ed. 377]*; Yankwich, *The Immunity of Congressional Speech, Its Origin, Meaning and Scope*, 99 U.Pa.L.Rev. 960.) [8]

6 1 Wm. & Mary, sess. 2, ch. 2, in pertinent part: "[Freedom] of speech, and debates or proceedings in Parliament, ought not to be impeached or questioned in any court or place out of Parliament."

7 The privilege provided in *section 47, subdivision 2*, is broad and comprehensive, including proceedings of all legislative bodies, whether state or municipal. ( *Pettitt v. Levy, 28 Cal.App.3d 484, 488 [104 Cal.Rptr. 650]*; *Kelly v. Daro, 47 Cal.App.2d 418, 421 [118 P.2d 37].*)

8 The Brown Act ( *Gov. Code, § 54950 et seq.*) requires legislative bodies of local agencies to meet in open and public sessions. It is the law's intent that deliberation as well as action occurs openly and publicly. ( *Sacramento Newspaper Guild v. Sacramento County Bd. of Suprs., 263 Cal.App.2d 41, 47 [69 Cal.Rptr. 480].*) It would be inconsistent with the spirit of the Brown Act to on the one hand require that legislators operate in a public forum, yet on the other hand, make them vulnerable to a potential civil sanction which would restrict their freedom of expression.

[***14] Plaintiff's reliance upon *Bradley v. Hartford Acc. & Indem. Co., 30 Cal.App.3d 818 [106 Cal.Rptr 718]* is misplaced. That case involved a defamation action arising out of libelous statements relative to a personal injury action contained in an extrajudicial document filed in both the Nevada Supreme Court and in the district court where the personal injury suit was to be tried. In *Bradley*, the court held (at p. 826): "It is conceded that, due to filing the documents with the courts, 'some relationship' can be established between the publication of the contents of these documents and the action itself. However, as indicated before, the fulfillment of this requirement, standing alone, does not sustain an absolute privilege. This is particularly true in the instant case where there is nothing contained in the pleadings to suggest that the publication was made to achieve the objects of the litigation. On the contrary, it affirmatively appears in the Complaints that the documents in question were filed as a part of a conspiracy for the sole purpose of having the defamations contained therein [*287] republished by the news media, that is, to bring the defamatory matter [***15] within the protective shield of the absolute privilege and then to spread it with impunity. It is easily discernible what result would ensue should we condone such an apparent ruse by providing absolute immunity to the resourceful slanderer. The privileged defamation, now a barely tolerated exception, would gain full-fledged legitimization. All that the slanderer would have to do to avoid the consequences of his evil act would be to file the defamatory matter with the court first, then republish it as an absolutely privileged matter to the news media or to the public at large, thereby converting the litigation in the court into litigation in the press or in the street.

"The above consideration all the more compels the conclusion that in determining [**616] whether or not the defamatory publication should be accorded an absolute privilege, *special emphasis must be laid on the requirement that it be made in furtherance of the litigation and to promote the interest of justice*. Only if this requirement has been satisfied, is it appropriate for the courts to define liberally the scope of the term 'judicial proceeding' and the persons who should be regarded as litigants or other [***16] participants." (Italics is original.)

It is clear that in *Bradley*, resort to the court was merely sought as a subterfuge by which the defamatory statements were introduced to the public through the news media, and by which those defendants hoped to immunize themselves against the prospect of liability for the publication of the defamatory material. Plaintiff attempts to analogize that situation with the instant controversy, asserting the principle that the existence of an ulterior motive [9] is sufficient to defeat the privilege even where some connection with a legislative proceeding is shown. We disagree. We note that while the court in *Bradley* conceded that "some relationship" existed between the defamatory statements and the court

proceeding, it was at most superficial. Accepting the fact that in *Bradley* the court saw some remote connection, we do not construe that court's analysis as contrary to the result we reach here. In *Bradley*, the court based its decision on the determination that "the defamatory statements here were not uttered on a privileged occasion, nor did they aim at securing the litigants as other participants the utmost freedom of access to [***17] the court. But most of all, [*288] they were not made *to achieve the objects of the litigation* and to promote the unfettered administration of justice." (*30 Cal.App.3d 818, 828*; italics added.) In the instant case, we find that the contents of the letter adequately related to the matter before the council. **(3)** Moreover, we recognize that the immunity historically afforded to legislators does not impose a restriction that the statements made by a member of a legislative body are protected only if they are directed toward achieving the object of legislation. Rather, the rule appears well settled that the general immunity afforded legislators extends to all that is spoken or done in the course of legislative proceedings. ( *Powell v. McCormack, 395 U.S. 486, 502 [23 L.Ed.2d 491, 505-506, 89 S.Ct. 1944]*.) The rationale for this extended coverage is that such immunity is essential in that freedom of speech "is inherent in the idea" of a deliberative assembly. (Veeder, *Absolute Immunity in Defamation*, 10 Colum.L.Rev. 131.) While this rule has been subject to some palpable abuses, [10] the benefits far outweigh a narrow interpretation of *Civil Code section 47*, even though [***18] it countenances vehement, caustic, and at times vigorous attacks on government officials. (Cf. *New York Times Co. v. Sullivan, 376 U.S. 254, 270 [11 L.Ed.2d 686, 700, 89 S.Ct. 710, 95 A.L.R.2d 1412]*.) This immunity attaches also to interested members of the public who wish to address themselves to matters pending before a legislative body. ( *Pettitt v. Levy, supra, 28 Cal.App.3d 484, 488*; *Whelan v. Wolford, 164 Cal.App.2d 689 [331 P.2d 86]*.) Since we hold that the statements made and copies of the letters distributed at the city council meeting were privileged, plaintiff's predication of liability upon their utterance and/or distribution *at that* time must fail.

9 Attempts to impose liability upon legislators because of their motives for enacting legislation or proposing business for the Legislature have been continually rejected by the courts. As stated by Justice Frankfurter in *Tenney v. Brandhove, 341 U.S. 367, 377 [95 L.Ed. 1019, 1027, 71 S.Ct. 783]*: "Legislators are immune . . . not for their private indulgence but for the public good . . . . [That] it was not consonant with our scheme of government . . . to inquire into the motives of legislators, has remained unquestioned."

[***19]

10 See, e.g., Yankwich, *The Immunity of Congressional Speech, Its Origin, Meaning and Scope, supra*, 99 U.Pa.L.Rev. 960, 970-973.)

**(4a)** Plaintiff contends that in any event the publication of the allegedly defamatory [**617] statements to Prentice and Hynd outside of the council chambers was not subject to the immunity provided in *section 47*, and thus the trial court erred in sustaining the demurrers to the complaint at least insofar as these two publications are concerned. We disagree. **(5)** Before an action in defamation may be maintained, the tests set forth in *Patton v. Royal Industries, Inc., 263 Cal.App.2d 760, 765 [70 Cal.Rptr. 44]* must be satisfied: "Upon the cause of action for libel a primary question was whether the publication is libelous on its face. ( *MacLeod v. Tribune Publishing Co., 52 Cal.2d 536* . . .; *Cameron v. Wernick, 251 Cal.App.2d 890, 893* . . . .)

[*289] "The question is one of law. The test is whether in the mind of the average reader the publication, considered as a whole, could reasonably be considered as defamatory. [Citations.]

[***20] "The court must determine as a matter of law whether the publication is libelous per se. If it is determined that the publication is susceptible of a defamatory meaning and also of an innocent and nondefamatory meaning it is for the jury to determine which meaning would be given to it by the average reader. [Citations.]

"When the material published is unambiguous and in the court's opinion could not reasonably be understood as nondefamatory the issue of libel should not be submitted to the jury. [Citations.]"

**(4b)** At the time of the utterances and publications complained of, plaintiff was a public official appointed by the Santa Monica City Council. An individual who seeks or accepts public office invites and is properly subject to public criticism so far as it may relate to his fitness and qualifications for his office. As stated in *Eva v. Smith, 89 Cal.App. 324, 329 [264 P. 803]*: "The right of criticism rests upon public policy and those who seek office should not be supersensitive or too thin-skinned

concerning criticism of their qualifications (Newell on Libel and Slander, 4th ed., p. 536). In commenting upon a published article of the character here involved [***21] the supreme court of Nebraska * used the following apt language: 'It relates to the fitness of those who adhere to the ruling clique and their conduct in office. It imputes no crime to them. It employs no degrading or insulting epithets toward them, but in extravagant language denounces them as derelict in the duties of their office, unfit, unfaithful, etc. This we understand a political stump orator may do, and outside of ethics there is no rule against using the pulpit for a like purpose. It would be absurd to hold as libelous to say of a candidate for public office that he was utterly unworthy of public confidence. To maintain that proposition, all political arguments are advanced against a candidate. They are sometimes rambling but the law does not undertake to punish the man who sums them up in a single sentence.' ( *Arnold v. Ingram, 151 Wis. 438* [Ann. Cas. 1914C, 976, *138 N. W. 111].*) And, again, it has been said that it is one of the infelicities of public life that a public officer is thus exposed to critical and often unjust comment; but these, unless they pass the bounds of what the law will tolerate, must be borne for the sake of maintaining free speech. ( [***22] *Sillers v. Collier, 151 Mass. 50 [6 L. R. A. 680, 23 N. E. 723].*) The purpose of the [*290] rule permitting fair and honest criticism is that it promotes the public good and hence is based upon public policy. (*Trigg* v. *Sun Printing Assn., supra.*) In thus permitting criticism the law gives a wide liberty, there being an honest regard for the truth. Within this limit public journals, speakers, and private individuals may express opinions and indulge in criticism upon the character or habits, or mental or moral qualifications [**618] of official candidates (1 Cooley on Torts, p. 443)."

* *Sic*; actually, the Supreme Court of Wisconsin.

Thus, "it is settled law that mere expression of opinion or severe criticism is not libelous, even though it adversely reflects on the fitness of an individual for public office." ( *Yorty v. Chandler, 13 Cal.App.3d 467, 472-473 [91 Cal.Rptr. 709].*) In *Taylor v. Lewis, 132 Cal.App. 381, 385 [22 P.2d 569]*, such statements were not deemed to be libelous per se: ". . . . [Defendant's] opinion was that '[plaintiffs] did not consistently serve the best interest of the city'; that as members of the majority [***23] group 'they usurped the functions of the city manager, dictated appointments in violation of the charter, and forced out of office useful employees of the city'; that they 'had as little respect for sound business usage in their conduct of city affairs as they showed for the charter and the merit system in municipal service'; that they did not always 'take the highest and best bids when selling, and the lowest and best when buying'; that they 'lacked that conscientious regard for the city's interest which makes of public office a public trust'; that by reason of the presence of plaintiff and his associate on the council 'this city has suffered from a lack of confidence in' it, and that business concerns 'have not felt that they could bid on municipal contracts and be sure of receiving impartial consideration,' and that 'they [business concerns] have felt that business with the city has not been on a strictly business basis'; that the 'condition,' in defendant's opinion, 'has hurt the good name of Long Beach and retarded its progress at a time when projects of major importance were to be carried forward.'"

Similarly, in *Eva v. Smith, supra* (at pp. 326-327), the following [***24] statements were held not to be defamatory per se: "'[My defendant's] desire to see the City of San Mateo advance systematically and along fair and honest businesslike lines compels me to state that these two incumbents [plaintiffs] should not be returned to the City Council.

"'They have neither the zeal nor the temperament to administer the business of San Mateo under the present charter, as it should be administered.

"'The best interests of San Mateo require the election . . . of . . . men who are in sympathy with progressive and wholesome measures for the advancement of the City of San Mateo.

[*291] "'. . . I am strongly in favor of keeping the City Council free from any suspicion or taint of unfairness in the City's contracts. No contractor should be influenced to buy from any one particular firm.'"

We do not perceive any substantial material difference between the statements found not to be defamatory in *Taylor* and *Eva*, and the allegedly defamatory statements in the instant case. Any reading of the statements would not justify plaintiff's claim that he was exposed to hatred, contempt or ridicule. **(6)** (See fn. 11.) (See *Greenbelt Pub. Assn. v. Bresler* [***25] , *398 U.S. 6, 13-14 [26 L.Ed.2d 6, 14-15, 90 S.Ct. 1537]*; *Corman v. Blanchard, 211 Cal.App.2d 126, 131-132 [27 Cal.Rptr. 327].*) [11] The fact that plaintiff takes umbrage at the tone and level of criticism directed against him is

not sufficient to sustain an action for defamation. The statements in the instant controversy should be considered in the light of the [**619] usual political hyperbole customarily encountered when political figures clash on controversial public matters. An individual in this country has the right to severely criticize the performance of public officials. ( *Yorty v. Chandler, supra, 13 Cal.App.3d 467, 473.*)

11 "In determining the issue of defamation the publication in question must be considered in its entirety; '[it] may not be divided into segments and each portion treated as a separate unit.' [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it. [Citation.] If the publication so construed is not reasonably susceptible of a defamatory meaning and cannot be reasonably understood in the defamatory sense pleaded, the demurrer was properly sustained. [Citations.]"

[***26] **(7)** Our disposition of the first cause of action (defamation) also resolves the issues relative to the third cause of action (intentional infliction of emotional distress. ( *Pettitt v. Levy, 28 Cal.App.3d 484, 489 [104 Cal.Rptr. 650].*) Both causes of action were essentially premised upon the publication of the same statements, except those statements alleged to have caused plaintiff emotional distress which were made on or about February 9, 1971, and charged plaintiff with rigging polygraph examinations, electronic surveillance of city employees and council meetings, spying on council members, and the use of undue influence on city employees. However, as to these latter utterances the complaint fails to allege that these statements were ever published or made known to any third person. Thus an action in defamation would not lie, there being no publication. ( *Harris v. Zanone, 93 Cal. 59, 69 [28 P. 845].*) Nor, under the facts in this case, is the conduct charged sufficiently outrageous as a matter of law, such as would distress a reasonable man of ordinary sensibilities. (Prosser, The Law of Torts, *supra*, § 12, p. 59.) Thus, an action [*292] for intentional [***27] infliction of emotional distress would not lie for the mere utterance of these statements.

**(8a)** Plaintiff's second cause of action sounds in intentional interference with a contractual relationship, i.e., inducing breach of contract. 12 Plaintiff alleges that McDonnell Douglas, through its agents Hochmuth, Latting, and McCloskey, conspired with certain members of the city council 13 to induce the council to terminate plaintiff's employment contract with the city and/or make the performance of his duties as city manager more difficult.

12 We read plaintiff's complaint liberally. Were we to restrict our review of the trial court's sustaining of the demurrer to the second cause of action to the statements read to the council and prepared by defendants, we would be compelled to affirm on the basis of *Pettitt v. Levy, supra, 28 Cal.App.3d 484, 489.* However, we treat the demurrer as establishing the existence of a concerted plan to oust plaintiff from his position as city manager. This presents the question of imposition of liability under a theory of inducing breach of contract between a public official and his employer, the governmental entity.

[***28]

13 The city-councilmen defendants in the first cause of action were not named as defendants in this (or the third) cause of action.

**(9)** The elements of a cause of action for inducing breach of contract are the existence of a valid contract, defendants' intent to induce a breach of the contract, and a breach resulting from defendants' unjustifiable or wrongful conduct. ( *Freed v. Manchester Service, Inc., 165 Cal.App.2d 186, 189-190 [331 P.2d 689].* The last element is the critical one here, for the issue on appeal is whether the complaint on its face showed justification for inducing breach of contract. **(10)** The general definition of what constitutes justification or privilege is set forth in *Herron v. State Farm Mutual Ins. Co., 56 Cal.2d 202, 206 [14 Cal.Rptr. 294, 363 P.2d 310]*, where the court stated: "Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature [***29] of the actor's conduct and the relationship between the parties." (See also *Bledsoe v. Watson, 30 Cal.App.3d 105, 108 [106 Cal.Rptr. 197].*) **(8b)** In the instant case, it fully appears from the face of the complaint that plaintiff is a public official, and the

efforts directed to obtaining the termination of his services were by way of the expression of defendants' views of plaintiff's fitness and qualifications for office. We have already held that such criticism directed to public officials is not actionable. [**620] We do not view this policy so narrowly that it does not encompass reasonable efforts by interested members of the public to *remove* public officials who, in the public's eyes, do not perform their [*293] duties in a satisfactory manner. In such cases, the privilege provided in *section 47* operates to promote the public interest that public officials remain accountable for their activities while in office. To some degree, a public official assumes his office subject to the vicissitudes of public opinion. And to the extent that the changing mood of public opinion operates to interfere with his right to employment, he may not recover in tort under a theory [***30] of inducing breach of contract. *Bledsoe v. Watson, supra, 30 Cal.App.3d 105, 110* is ample authority upon which to sustain the judgment of the trial court.

The judgment is affirmed.

# TAB 33

1 of 1 DOCUMENT

**PHILLIP SERETTI et al., Cross-complainants and Appellants, v. SUPERIOR NATIONAL INSURANCE COMPANY, Cross-defendant and Respondent.**

**No. B106505.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION FOUR**

*71 Cal. App. 4th 920*; *84 Cal. Rptr. 2d 315*; *1999 Cal. App. LEXIS 367*; *99 Cal. Daily Op. Service 3087*; *99 Daily Journal DAR 3965*

**April 28, 1999, Decided**

**SUBSEQUENT HISTORY:** [***1] Review Denied July 21, 1999, Reported at: *1999 Cal. LEXIS 4883*.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC127835. Madeleine I. Flier, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Certain individuals brought an action against the two shareholders of a close corporation arising out of injuries to employees of the corporation that occurred while they were working at the residence of the shareholders. The corporation's workers' compensation carrier settled the action, and the shareholders cross-complained against the carrier alleging bad faith in failing to defend the action against them and for entering a settlement adverse to them. The trial court sustained the carrier's demurrer to the cross-complaint and entered judgment thereon. (Superior Court of Los Angeles County, No. BC127835, Madeleine Flier, Judge.)

The Court of Appeal affirmed. The court held that the shareholders lacked standing to pursue the bad faith action, since they were not parties to the insurance contract, and privity of contract is essential to an implied covenant action against the insurer. The insured under the policy was the corporation, and the policy covered all officers and directors as employees, but expressly excluded the two shareholders. The shareholders could not achieve privity by piercing the veil of their own corporation to substitute themselves for the corporation as insureds. The court held that if the shareholders asserted an indemnification claim against the corporation, then that claim could be tendered to the insurer, but until such time, the insurer had no duty to defend and could not be charged with bad faith. (Opinion by Curry, J., with Epstein, Acting P. J., and Hastings, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Insurance Contracts and Coverage § 109--Liability of Insurer--Duty to Act in Good Faith--Defense of Insured--Duty to Shareholders of Insured Close Corporation.** --In an action against the two shareholders of a close corporation arising out of injuries to two employees of the corporation that occurred while they were working at the shareholders' residence, in which the corporation's workers' compensation carrier settled the case and the shareholders cross-complained against the carrier for bad faith in failing to defend the action and for entering a settlement adverse to the shareholders, the trial court properly sustained the carrier's demurrer to the shareholders' cross-complaint. The insured under the policy was the corporation, and the policy covered all officers and directors as employees, but expressly excluded the two shareholders. The shareholders thus lacked standing to pursue the bad faith action, since they were not parties to the insurance contract, and privity of contract is essential to an implied covenant action against

the insurer. The shareholders could not achieve privity by piercing the veil of their own corporation to substitute themselves for the corporation as insureds. If the shareholders asserted an indemnification claim against the corporation, then that claim could be tendered to the insurer, but until such time, the insurer had no duty to defend and could not be charged with bad faith.

[See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1140.]

**COUNSEL:** Law Offices of Herbert Dodell, Herbert Dodell; Law Offices of Burton Mark Senkfor and Burton Mark Senkfor for Cross-complainants and Appellants.

Haight, Brown & Bonesteel, Roy G. Weatherup, Robert L. Kaufman, Margaret Johnson Wiley, William G. Baumgaertner and Debra Gemgnani for Cross-defendant and Respondent.

**JUDGES:** Opinion by Curry, J., with Epstein, Acting P. J., and Hastings, J., concurring.

**OPINION BY:** CURRY

**OPINION**

[*921] [**316] **CURRY, J.**

Appellants Phillip Seretti and Janja Vujovich contend on appeal that respondent Superior National Insurance Company, the workers' compensation carrier for their wholly owned corporation, was liable to them [*922] individually for failing to defend actions brought as the result of injury to two of the corporation's employees and for entering into a settlement with the employees which was adverse to the interests of the insured. We agree with the trial court that appellants lack standing [***2] to assert a claim against respondent for bad faith insurance practices, and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*The Civil Complaints*

In June of 1994, Shawn, Debbie, Donna, and Dorian Lobina and Darlene Smith (hereafter the Lobinas) brought suit against appellant Seretti for negligence and wrongful death in connection with a fatal injury to their father, Louis Lobina. Seretti and his wife, appellant Vujovich, owned real property on Floye Street in Hollywood on which the decedent was working at the time of the accident. The complaint alleged that Seretti and the Doe defendants negligently "controlled their premises" and "the construction being performed thereon"; negligently "failed to hire a contractor, failed to properly supervise the construction project, failed to make sure that proper safety precautions and proper construction procedures were being followed"; allowed "dangerous conditions" to exist; and performed work creating "a peculiar risk of harm." Vujovich was added as Doe No. 1 in January 1995, and appellants' wholly owned corporation, Post Sound Corporation, was added as Doe No. 2 in May 1995. [1]

1 The Lobinas also ultimately sued the manufacturer of the scaffolding from which the decedent fell.

[***3] In May of 1995, Omar Garcia, a coworker of Louis Lobina's injured in the same accident, brought an independent action against appellants Seretti and Vujovich, and Post Sound. The two cases were consolidated.

In November of 1995, the Lobinas sought leave to amend their complaint to add a paragraph stating: "Plaintiffs' decedent's death and resulting damages to plaintiffs herein arose out of and occurred in the course of decedent's employment by defendant Post Sound. Defendant Post Sound failed to secure the payment of compensation for the damages arising out of decedent's death, as a result of which plaintiffs bring the within action [*923] against defendant Post Sound under the authority of and pursuant to *California Labor Code § 3706 et seq.*" [2]

2 *Labor Code section 3706* provides: "If an employer fails to secure the payment of compensation, any injured employee or his dependents may bring an action at law against such employer for damages, as if this division did not apply."

[***4] [**317] *Workers' Compensation Compromise and Release*

At the same time the lawsuits were pending, the Lobinas and Garcia pursued workers' compensation claims against Post Sound. [3] In March of 1996, Garcia entered into a compromise and release. Another compromise and release listing Sharon and Dorian

Lobina as the applicants, and signed by Sharon only, was also executed in March of 1996.

3 There was some dispute about whether all the Lobinas or only Sharon Lobina (described as "decedent Louis Lobina's live-in companion") were parties to the workers' compensation action. Sharon was not a party to the civil action.

Both compromise and release documents contained the following language: "Defendant is denying that the applicant was the employee of Post Sound Corporation at the time of his injuries, and defendant is denying that it provided workers' compensation insurance coverage to Post Sound Corporation covering the injuries of [Omar Garcia/Louis Lobina]. [P] The defendant would produce evidence [***5] that the [applicant/decedent] was injured while performing laboring duties on a construction site at a residence owned by Mr. & Mrs. Seretti, principal officers of the Post Sound Corporation. The residence which was being remodeled was neither being used as, nor designated as an insured location and place of business of Post Sound Corporation. No payroll information submitted by Post Sound Corporation listed laborers or carpenters as employees of Post Sound Corporation. [P] Defendant contends that the work activities engaged in by the [applicant/decedent] herein, were done so at the request of and for the benefit of Mr. & Mrs. Seretti, the owners of the residence. The defendant contends that the fact that [Garcia/Lobina] on occasion performed work activities at Post Sound Corporation, and that Mr. & Mrs. Seretti are the principal stockholders of Post Sound Corporation does not create an employment relationship between the [applicant/decedent], with the duties that he performed on the Seretti residence, nor does it create workers' compensation coverage at a location not listed in the policy declarations." The documents also stated that the applicants reserved the right to [***6] proceed against the Serettis individually.

In connection with the settlement of the workers' compensation claims, respondent submitted an affidavit which stated: "A serious dispute exists [*924] between the parties as to coverage, employment and injury AOE/COE. [4] As such, defendants contend that payment to lien claimants on a workers' compensation basis is neither appropriate nor reasonable."

4 In workers' compensation parlance, "AOE/COE" means "arising out of and in the course of employment."

*The Cross-complaint*

On March 22, 1996, just before trial was to proceed in the Lobina/Garcia consolidated matter, the trial court heard testimony that "the insurance company"--referring to respondent--"will not be bound by any decision of this court unless they have been included in the action as a party." By minute order of that date, the court granted "[d]efendant's" motion for leave to file a cross-complaint. Post Sound and appellants thereafter filed a cross-complaint against respondent for, among [***7] other things, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, and declaratory relief. The cross-complaint alleged that appellants were covered under the policy issued by respondent "by virtue of their ownership of Post Sound . . . ." It maintained that Lobina and Garcia were employees of Post Sound and were injured "while acting in the course and scope of their employment . . . ." The claim was based in part on settlement of the Workers' Compensation Appeals Board action on conditions "favorable to [respondent,] but adverse to its insureds."

The insurance policy on which the cross-complaint was based identified the insured as "Post Sound Corporation," operating under the classification of "radio, television or commercial broadcasting stations . . . ." The policy applied to all officers and directors of the corporation as employees, except for those expressly excluded. "Phillip Seretti" and [**318] "Janja Vujovich" were expressly excluded from coverage. [5]

5 Pursuant to *Labor Code section 3351, subdivision (c)*, where the officers and directors of a private corporation are the sole shareholders, the corporation is not required to have workers' compensation coverage for the officers and directors as employees.

[***8] Respondent demurred to the cross-complaint contending, among other things, that appellants lacked standing. The Lobinas simultaneously moved to strike the cross-complaint, on the ground that "it exceeds the scope of leave granted by the court's ruling of March 22, 1996." ACCORDING TO THOSE MOVING PARTIES: "The leave granted by this court strictly limited the scope of the cross complaint which defendants Seretti, Vujovich and Post Sound, etc., would be allowed to bring against Superior National to a declaratory relief type action. The

purpose stated by the court for allowing the cross complaint was to determine the limited issue of whether or not defendant Post Sound had viable workers compensation coverage for the subject accident and [*925] resulting death. [P] The court allowed such a limited declaratory relief type action in an abundance of caution to insure that Superior National would be bound by whatever ruling the court made in a bifurcated trial on the issue of workers compensation insurance coverage pursuant to *Labor Code § 3706* and *3708*."

The court sustained respondent's demurrer as to appellants on the grounds [***9] that (1) "Seretti and Vujovich have no standing in this action" because "[t]hey are not insureds under the subject policy" and (2) "the court did not grant leave to allow Seretti and Vujovich to file a cross-complaint." [6] The court distinguished *Truestone, Inc. v. Travelers Ins. Co. (1976) 55 Cal. App. 3d 165 [127 Cal. Rptr. 386]* in which shareholders were permitted to maintain a separate claim because "[t]he individual shareholders in Truestone were named insureds in the policy, which is not the case in the present case. Furthermore, in the present case, the policy expressly excludes Seretti and Vujovich from the status of insureds."

6 The court further stated that it "did not grant Post Sound leave to file a cross-complaint alleging anything other than the 7th C/A for Declaratory Relief re: determination of coverage. The insurance bad faith and fraud theories do not belong in this case and will unnecessarily complicate and delay resolution of this case."

The notice of ruling prepared [***10] by respondent stated that its "demurrer was sustained as to the entire cross-complaint without leave to amend, as to Phillip Seretti and Janja Vujovich's cross-claims on the basis that they have no standing to sue in this action because they are not insureds under the subject policy of insurance." The judgment, also prepared by respondent, contains similar language: "[T]he court . . . sustained the demurrer of cross-defendant Superior National Insurance Company, without leave to amend, as to the cross-complaint in its entirety regarding the claims of defendants and cross-complainants Phillip Seretti and Janja Vujovich, finding they have no standing to sue in this action as they are not insureds under cross-defendant Superior National Insurance Company's insurance policy at issue in this lawsuit." Appellants noticed a timely appeal from the judgment. [7]

7 While this appeal was pending, appellants settled with the Lobinas and Garcia.

DISCUSSION

I

**(1)** Appellants contend that the shareholders of a small, [***11] closely held corporation have standing to pursue an insurance bad faith action against the corporation's insurer. In support of their position, appellants rely primarily on *Truestone, Inc. v. Travelers Ins. Co., supra, 55 Cal. App. 3d 165*. There, [*926] Travelers Insurance Company and a related insurer issued a policy of liability insurance covering a small corporation, Truestone, Inc., and its sole shareholders. (*55 Cal. App. 3d at p. 168*.) A claim covered by the policy was asserted against the corporation and, according to the insureds, Travelers "unreasonably and in bad faith refused to accept" a settlement within policy limits. (*Ibid.*) The individual shareholders alleged in a separate cause of action against Travelers, that its failure and refusal to settle within policy [**319] limits caused them emotional distress. (*Ibid.*) Demurrer was sustained by the trial court to this cause of action. On appeal, the shareholders asserted that "because they, as well as Truestone, are named insureds in the Travelers policy, Travelers was obligated to them as well as to the corporation to act in good faith with respect to claims of third [***12] persons against the corporation." ( *Id. at p. 169*.)

In considering the issue of whether the shareholders could pursue their own individual breach of covenant claim, the appellate court discussed the rationale behind the formation of the tort: "The covenant of good faith and fair dealing implied in every liability insurance policy obligates the insurer to treat offers to settle claims against its insured within limits of the insurance coverage without regard to its own special interest existing because of policy limits. The covenant thus imposes a duty upon the insurer to accept reasonable settlement offers within the scope of its policy. [Citations.] Breach of the duty creates causes of action in both contract and tort. [Citation.] [P] While the law recognizes a cause of action in tort, the duty breached by the tortious conduct of an insurer refusing to settle in good faith flows from the contractual relationship. [Citation.] The insured does not, by the contract of insurance, seek 'to obtain a commercial

advantage but to protect [himself] against the risks of accidental losses, including the mental distress which might follow from the losses.' " (*Truestone,* [***13] *Inc. v. Travelers Ins. Co., supra, 55 Cal. App. 3d at pp. 169-170.*)

Because the tort derived from a contractual relationship, the court placed special emphasis on the fact that in the case before it "the [shareholders], equally with their closely held corporation, were parties to the insurance policy with Travelers." (*Truestone, Inc. v. Travelers Ins. Co., supra, 55 Cal. App. 3d at p. 170.*) As a result, "[t]he duty created by the implied covenant of good faith and fair dealing ran equally to them. . . . The rationale of the tort of refusal of an insurer to settle in good faith . . . dictates that the [shareholders], as named insureds with their corporation, be afforded the protection of the tort cause of action." (*Ibid.*) The court summarized its holding as follows: "[W]here, as here, shareholders of a closely held corporation are joint insureds with it, the insurers' implied covenant of good faith and fair dealing runs to the shareholders as well as to the [*927] corporation and . . . the shareholders may pursue a cause of action for its breach." ( *Id. at p. 171.*)

*Truestone* was followed [***14] in *Tan Jay Internat., Ltd. v. Canadian Indemnity Co. (1988) 198 Cal. App. 3d 695 [243 Cal. Rptr. 907]* under similar circumstances. In that case, a liability insurance provider denied coverage and refused to provide a defense to a corporation sued by one of its employees. The employee was injured while transporting a sailboat owned by the corporation's principal shareholder and lent to the corporation for a promotional campaign. The policy included the shareholder as a named insured. (*198 Cal. App. 3d at p. 707.*) The shareholder's separate claim for breach of the covenant of good faith and fair dealing was resolved at the trial level by the trial court's grant of the insurer's motion for judgment notwithstanding the verdict. In overturning that decision, the appellate court quoted a portion of the above language from *Truestone*, emphasizing the insurer's obligation to those named as insureds in the policy: "As was explained in [*Truestone*], " '[t]he covenant of good faith and fair dealing implied in every liability insurance policy obligates the insurer to treat offers to settle claims against its *insured* within limits of the insurance coverage [***15] without regard to its own special interest existing because of policy limits. . . . The *insured* does not, by the contract of insurance, seek "to obtain a commercial advantage but to protect [himself] against the risks of accidental losses, including the mental distress which might follow from the losses." ' " (*198 Cal. App. 3d at p. 707*, original italics.) Thus, as in *Truestone*, it was the shareholder's status as an additional insured under the policy which prompted the court in *Tan Jay* to revive his claim.

Appellants rely on language in *Cancino v. Farmers Ins. Group (1978) 80 Cal. App. 3d 335 [145 Cal. Rptr. 503]* to persuade us that [**320] shareholders need not be insureds under the policy to state a breach of covenant claim. That case involved an insurance company's alleged failure to deal "fairly and in good faith" with a party purporting to be both an insured and a claimant under an uninsured motorist provision of a liability policy issued to another party. (*80 Cal. App. 3d at p. 337.*) The complaint had alleged that the claimant/plaintiff " 'was an express "insured" under the terms and conditions of said insurance [***16] policy,' by virtue of the fact that he 'was loading' the 'insured' 'motor vehicle' at the time he was struck by an automobile driven by an uninsured motorist." (*Ibid.*) The main issue in *Cancino* was whether the insurer's duty of good faith and fair dealing applied equally to the insurer's handling of a claim for compensation directly from the insurer as it did to the insurer's handling of a liability claim. The court concluded: "There is no difference between the duty of an insurer to settle an insured's liability claim and thus protect him from liability in excess of policy limits [*928] and its duty to settle the insured's claims to compensation directly from the insurer. These are both simply aspects of the same duty which is said to be based upon the implied covenant of good faith and fair dealing." ( *Id. at p. 340.*)

In reaching this conclusion, the court discussed a number of cases which seemed to suggest that the insurer's duty ran to the insured and not the claimant. Discussing *Truestone*, the court stated: "The holding in *Truestone* was that two individuals who were sole shareholders of a corporation could sue the insurer. The corporation [***17] and both shareholders were named insureds in the policy. Suit was brought against the corporation on a claim within the coverage of the policy. The claimant offered to settle within policy limits and the insurer refused. When the claim went to trial, the resulting judgment exceeded the policy limits by $ 35,000. The shareholders were held entitled to seek both compensatory and punitive damages. In so holding, the court noted (*55 Cal. App. 3d at p. 170*): 'Here the

[shareholders], equally with their closely held corporation, were parties to the insurance policy with Travelers. The duty created by the implied covenant of good faith and fair dealing ran equally to them.' *Nothing said by the court, however, suggests that insureds who are not parties to the insurance contract are not owed the same duty*." ( *Cancino v. Farmers Ins. Group, supra, 80 Cal. App. 3d at p. 341*, italics added.)

The court went on to explain why the plaintiff was, in fact, an insured under the policy: " '[T]he term "insured" means the named insured and the spouse of the named insured and relatives of either while residents of the same household while occupants of a motor vehicle [***18] or otherwise, heirs and any other person while in or upon or entering into or alighting from an insured motor vehicle . . . .' [Citation.] Persons such as plaintiff are required to be covered by virtue of the same provision which benefits the named insured. The intent to benefit all insureds has the same sources: (1) the general policy of the Insurance Code 'to . . . provide compensation for those injured through no fault of their own. . . .' [Citation.]; and (2) the specific policy expressed in *Insurance Code section 790.03, subdivision (h)(5)* which prohibits as unfair practice in the business of insurance '[n]ot attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.' " ( *Cancino v. Farmers Ins. Group, supra, 80 Cal. App. 3d at p. 345*.)

Appellants are correct that the court in *Cancino* recognized a distinction between the "parties" to the insurance contract--who will generally also be named insureds--and "insureds" who are neither parties to the insurance contract nor specifically named therein. A person can be deemed an "insured" by virtue of fitting [***19] into an expressly defined category of those for [*929] whose benefit the policy was created. This distinction does not assist appellants here. They were not parties to the insurance contract; they were not specifically named insured; and to the extent they fit into the general category of those for whom the policy was created to benefit--employees, officers, and directors of Post Sound--they were specifically excluded.

[**321] In short, none of the cases relied upon by appellants support their position. In each, the plaintiff was deemed to be an insured under the relevant policy, either by virtue of being a party to the insurance contract or named in the policy or by virtue of the policy definition of "insured" to include a class of which the plaintiff was a member. [8] These cases evince the fundamental rule that "[p]rivity of contract with the insurer is essential to an implied covenant action against the insurer." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1998) P 12:55, p. 12A-14.) "Whether for better or worse . . . liability for 'bad faith' has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising [***20] out of an underlying contractual relationship. Where no such relationship exists, no recovery for 'bad faith' may be had. [Citation.] [P] . . . [P] [Thus], an insurer's duty of good faith and fair dealing is owed solely to its insured and, perhaps, any express beneficiary of the insurance policy." ( *Austero v. National Cas. Co. (1976) 62 Cal. App. 3d 511, 516-517 [133 Cal. Rptr. 107]*.)

8 We note that the *Cancino* court also relied on *Insurance Code section 790.03, subdivision (h)*, and the plaintiff's status as a claimant under the policy. This reasoning is no longer appropriate in view of the Supreme Court's holding in *Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal. 3d 287, 313 [250 Cal. Rptr. 116, 758 P.2d 58]*, that no private right of action under *section 790.03, subdivision (h)* exists.

*Austero* is one of several cases in which a party closely connected or related to the insured was precluded from recovering for [***21] its own damages arising from the insurer's breach of covenant of good faith and fair dealing owed to the insured. In *Austero*, the insurer denied Mr. Austero's claim for disability benefits, causing emotional distress to his wife. Mrs. Austero contended that her emotional distress was reasonably foreseeable, and pointed out that the disability policy premiums were paid with community funds and that their proceeds constituted community property. Concerning the foreseeability of harm to the wife of the policyholder, the court noted that it "is an important factor in fixing liability for negligently caused injury and may be an important factor in establishing tort liability generally, but it is only one of a number of policy factors to be considered. [Citations.]" (*62 Cal. App. 3d at p. 516*.) Concerning her interest in the policies and their proceeds, the court said: "[T]he fact remains that she is not a party to the contracts. As to disability benefits, plaintiff is at most an incidental or remote beneficiary, and, as such, can state no cause of action against [the [*930] disability insurer] for breach of a duty, express or

implied, arising from the contractual [***22] relationship. [Citations.]" ( *Id. at p. 517.*)

A wife's claim for bad faith was rejected under similar circumstances in *Hatchwell v. Blue Shield of California (1988) 198 Cal. App. 3d 1027 [244 Cal. Rptr. 249]*. There, the husband was insured by a medical policy obtained through his employment. He had enrolled his wife as a "Dependent Subscriber," but the bad faith claim was based on failure to pay benefits arising from his hospitalization and medical care. The court pointed out that the wife "was not a contracting party," and that "[s]omeone who is not a party to the contract has no standing to enforce the contract or to recover extra-contract damages for wrongful withholding of benefits to the contracting party." (*198 Cal. App. 3d at p. 1034.*) Moreover, "[a]lthough she was eligible for health care benefits as a Dependent Subscriber, and as such may be termed a 'co-insured' or 'dependent beneficiary,' . . . this is not sufficient to establish standing to sue for breach of contract and bad faith based upon the denial of benefits to [the husband]. A nonparty who is nevertheless entitled to policy benefits, such as an 'insured' person [***23] under the terms of the policy or an express beneficiary, has standing only if she is the *claimant* whose benefits are wrongfully withheld. [Citations.]" (*Ibid.*, citing *Cancino v. Farmers Ins. Group, supra, 80 Cal. App. 3d at pp. 344-345*, original italics.) "[The wife's] argument ignores the fact that the basis of her action is the denial of benefits for [the husband]. Her coverage as a dependent . . . does not give her standing to enforce [the husband's] contract rights. Although [the wife] is an insured person and [**322] an express beneficiary in regard to her own health care benefits, she is merely an incidental beneficiary in regard to [the husband's] benefits." ( *Hatchwell v. Blue Shield of California, supra, 198 Cal. App. 3d at p. 1035*, fn. omitted.)

*Hatchwell* was followed in *Gantman v. United Pacific Ins. Co. (1991) 232 Cal. App. 3d 1560 [284 Cal. Rptr. 188]*, where the court held that the individual members of a homeowners association did not have standing to prosecute a bad faith action against the association's insurer. The court explained: "Here, although plaintiffs stand to gain when Association [***24] gains, the benefits plaintiffs seek belong to Association by the insurance contracts sued upon. . . . Plaintiffs are simply not claimants whose benefits were wrongfully withheld." ( *Id. at p. 1568.*)

Finally, although not discussed in any of the briefs, the issue of whether shareholders to a closely held corporation can maintain their own bad faith action against the corporation's insurer was considered by this court in *C & H Foods Co.* v. *Hartford Ins. Co. (1984) 163 Cal. App. 3d 1055 [211 Cal. Rptr. 765]*. The corporation, C & H, had purchased marine insurance policies [*931] covering the shipment of 6,437 pails of cured beef. Over 4,000 pails were delivered spoiled and in an unusable condition. Two shareholders brought a claim against the insurer based on the allegations that they were each 50 percent owners of C & H, and that the insurance policies were bought at their behest to guarantee the continued operation of C & H, and that they suffered emotional distress as a result of the failure to pay the corporation's claim. (*163 Cal. App. 3d at p. 1061.*) This court concluded that because the shareholders were neither the named [***25] nor additional insureds nor beneficiaries under the policy, "[t]hey did not state a cause of action for bad faith or negligent infliction of emotional harm (emotional distress) against [the insurer]. [Citation.]" ( *Id. at p. 1068.*)

In accordance with the overwhelming weight of authority, we affirm the trial court's ruling on appellants' lack of standing as shareholders to assert a claim against the corporation's insurer.

II

Appellants suggest that privity could be achieved by allowing them to pierce the veil of their own corporation and substitute themselves in the place of Post Sound as the named insured under the policy. Ignoring a corporation's separate existence is a rare occurrence, particularly where it is the shareholders who seek to pierce its veil, and the courts will do so only "to prevent a grave injustice. [Citations.]" ( *Cooperman v. Unemployment Ins. Appeals Bd. (1975) 49 Cal. App. 3d 1, 7 [122 Cal. Rptr. 127].*) The possibility that a contractor will not get paid for any of his work because he entered a contract in his own name but held his license under a corporate name, represents a grave injustice. (See *Citizens State Bank v. Gentry (1937) 20 Cal. App. 2d 415, 420 [67 P.2d 364].*) [***26] Appellants' inability to maintain individual actions against their corporation's workers' compensation carrier does not. That individual shareholders will not be able to pursue bad faith insurance claims against the corporation's insurer does not allow the insurer to escape liability for improper

conduct. The corporation itself, as named insured, can pursue its own rights, and the shareholders will profit indirectly.

Individuals are free to operate their business in their own names and accept all its debts and liabilities as their own. Having elected to avail themselves of the benefits of the corporate structure, as appellants did here, they cannot be heard to complain of their inability to take personal advantage of a right belonging to the corporation alone.

III

Appellants state that there is an ambiguity in the policy and therefore a potential for coverage. This argument, as we understand it, goes like this: (1) [*932] the policy states that "We [respondent] have the right and duty to defend, at our expense, any claim, proceeding or suit against you [Post Sound] for damages payable by this insurance"; (2) the Lobina and Garcia actions were suits against Post Sound [***27] for damages; (3) "damages" under the [**323] policy are defined to include damages " 'for which [Post Sound is] liable to a third party . . . by reason of a claim or suit against [Post Sound] by that third party to recover the damages claimed against such third party as a result of injury to [Post Sound's] employees [e.g., Lobina and Garcia]' "; (4) if appellants were held individually liable for injury to Lobina and Garcia, they would sue Post Sound for indemnity under the Labor Code [9] or some other theory; therefore, (5) respondent is obligated to defend the Lobina and Garcia lawsuits entirely, including claims which are not asserted against Post Sound; and (6) appellants and anyone else who might possibly sue Post Sound for indemnity for injury to one of Post Sound's employees are potential "insureds" under the policy.

9 *Labor Code section 2802* provides: "An employer shall indemnify his employee for all that the employee necessarily expends or loses in direct consequence of the discharge of his duties as such, or of his obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying such directions, believed them to be unlawful."

[***28] We see numerous flaws in appellants' analysis. First, assuming that a duty to defend the entire Lobina and Garcia actions could be derived from the policy language, such duty would run to the insured. As we have explained at length, appellants are not insureds under the policy and have no standing to assert a claim for a failure to perform a duty owed under it. It would be up to Post Sound to bring a claim for failure to defend, if one exists.

Second, the duty to defend and damage provisions quoted by appellants come into play only when a "claim, proceeding, or suit" is actually brought against Post Sound "for damages payable by this insurance" or "a claim or suit" is brought by a third party "to recover the damages claimed against such third party as a result of injury to [Post Sound's] employees . . . ." Nothing in the record presented here or to the trial court suggests that appellants asserted a claim against Post Sound for indemnity or that Post Sound tendered any such claim to respondent. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, P 7:604, p. 7B-25 ["The duty to defend arises when the insured tenders defense of the third party lawsuit to [***29] the insurer."].)

Finally, this issue of whether a third party's potential claim for indemnity from the insured means that a duty of good faith is owed to the third party was resolved in *Republic Indemnity Co. v. Schofield (1996) 47 Cal. App. 4th 220, 226-227 [54 Cal. Rptr. 2d 637]* and *Alex Robertson Co.* v. *Imperial* [*933] *Casualty & Indemnity Co. (1992) 8 Cal. App. 4th 338 [10 Cal. Rptr. 2d 165]*. In *Republic Indemnity*, the cross-complainants, as employees, officers and directors of a professional corporation, brought a claim for breach of contract and breach of the covenant of good faith and fair dealing against the corporation's workers' compensation and employer's liability insurer. [10] The insurer moved for, and obtained, summary judgment on the ground that none of the claimants was an insured under the policy. On appeal, the cross-complainants argued that the indemnification provision contained in *section 2802 of the Labor Code* created an implication that all employees of a corporation were insureds under the policy. The court disagreed: "It is true the insurer may have to indemnify the corporation [***30] to the extent it is legally liable for losses its employees suffer. However, this does not mean the employees are 'insureds' under the policy for the purpose of maintaining a breach of contract or bad faith action against the insurer. [P] . . . [P] . . . 'It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual

relationship between the insured and the insurer.' [Citation.]" (*47 Cal. App. 4th at p. 227*, quoting *Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal. 4th 1, 36 [44 Cal. Rptr. 2d 370, 900 P.2d 619]*, original italics)

10 Contrary to what is stated in respondent's brief, the claimants did not base their claims against the insurer on their status as shareholders.

Similarly, in *Alex Robertson Co.* v. *Imperial Casualty & Indemnity Co., supra, 8 Cal. App.* [***31] *4th 338*, a contractor entered into a contract with an architectural firm to provide architectural plans and specifications. The contract required the architectural firm to indemnify the contractor for its negligent acts, errors, and omissions. The architectural firm did not carry professional liability insurance. The contractor demanded that it obtain such insurance, and agreed to pay the premiums. The policy obtained specifically referenced the contract between the contractor and the architectural firm and made clear that it covered the architectural firm's liability under the contract. Subsequently, the contractor was sued for breach of contract and negligence in connection with the construction project. He tendered the defense to the architectural firm's insurer, and pursued an action against it after it refused to step in.

On appeal from the insurer's motion for summary judgment, the contractor contended that "it [was] an insured under the policy, or at least a triable question of fact exists as to that issue, by reason of the contractual liability coverage endorsement, the intent of [the parties and the insurance agent] that [the contractor] be covered, and evidence [the [***32] contractor] was billed for and [*934] paid the premiums on the policy." (*Alex Robertson Co.* v. *Imperial Casualty & Indemnity Co., supra, 8 Cal. App. 4th at p. 343.*) The appellate court rejected that contention. As the court explained: "In essence, [the contractor] has sued the wrong party. Its indemnity agreement is with [the architectural firm], not with [the insurer]. [The contractor] may be able to proceed against [the architectural firm] under contractual or equitable indemnity theories. [Citations.] In either case, however, it must establish liability on the part of [the architectural firm]. . . . [P] . . . [P] Under the policy, [the insurer] agreed to pay 'on behalf of [the architectural firm] all sums which [the architectural firm] shall become legally obligated to pay . . . by reason of liability arising out of any negligent act . . . in rendering or failing to render professional services . . . .' [The architectural firm] has not yet become legally obligated to pay anything. Until such event, any claim by [the contractor] against [the insurer] under the policy is premature." (*8 Cal. App. 4th at p. 347*, fn. omitted. [***33] )

The same is true here. If appellants assert an indemnification claim against the insured, Post Sound, then that claim could be tendered to respondent. Until such time as a claim against its insured had been presented, respondent has no duty to defend and cannot be charged with bad faith.

DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 21, 1999.

# TAB 34

LEXSEE 198 CAL. APP. 3D 706

**TAN JAY INTERNATIONAL, LTD., et al., Plaintiffs, Cross-defendants and Appellants, v. CANADIAN INDEMNITY COMPANY, Defendant, Cross-complainant and Appellant**

**No. B016586**

**Court of Appeal of California, Second Appellate District, Division One**

*198 Cal. App. 3d 695*; *243 Cal. Rptr. 907*; *1988 Cal. App. LEXIS 116*

**February 17, 1988**

**SUBSEQUENT HISTORY:** [***1] A Petition for a Rehearing was Denied March 7, 1988, and the Petition of Defendant and Appellant for Review by the Supreme Court was Denied May 4, 1988.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. C485516, James Greely Kolts, Judge.

**DISPOSITION:** The judgments appealed from are affirmed in part, and reversed in part, with directions. The trial court properly denied defendant Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Tan Jay; we affirm the denial. It erred in granting defendant Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Peter Nygard; we reverse the grant of the motion. The trial court properly granted a new trial on the issue of damages only, as to plaintiff Tan Jay. New trial should also have been granted on the issue of damages *only*, as to plaintiff Nygard. The cause is remanded for new trial limited to the issue of damages owed by defendant Canadian to both plaintiffs. Plaintiff Nygard is to recover costs in this court.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A women's clothing corporation and its majority stockholder (owner) brought an action against their insurer for bad faith refusal to defend and indemnify them in a third-party action. The insurer cross-complained for declaratory relief. The jury awarded plaintiffs $ 35 million in punitive damages in addition to some $ 5.3 million in compensatory damages, and the trial court found against the insurer on its cross-complaint. The court conditionally granted the insurer's motion for a new trial with respect to damages, reducing the awards of compensatory and punitive damages, but the corporate plaintiff refused remittitur. The court denied the insurer's motion for judgment notwithstanding the verdict as to the corporation but granted it as to the owner. (Superior Court of Los Angeles County, No. C485516, James Greely Kolts, Judge.)

The Court of Appeal affirmed in part and reversed in part. It held that the trial court properly granted the insurer's motion for a new trial on the damages issue, and affirmance of this ruling rendered immaterial the insurer's claim that plaintiffs' proof of damages was inadequate. The trial court did not err in granting a new trial only as to the issue of damages, rather than granting an entire new trial, since the record clearly established the insurer's liability to the corporation; it could be presumed, in view of the excessiveness of the jury's punitive damages award, that the jury was impermissibly swayed by passion or prejudice; and there was no prejudice to either side by a new trial on the damages issue. However, the court held, the trial court erred in granting defendant's motion for judgment notwithstanding the verdict as against the owner on the ground that he lacked standing to sue for the insurer's breach; the majority stockholder of this closely held corporation was a named insured, and damages for mental suffering are included within those recoverable for an insurer's breach of duty to settle in good faith. Further, the court held, the award of damages for the owner's emotional distress was supported by the

evidence. (Opinion by Hanson, Acting P. J., with Lucas and Devich, JJ., concurring.)

HEADNOTES

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports, 3d Series

(1) Judgments § 12--Notwithstanding Verdict--Discretion of Trial Judge. --The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. The judge cannot weigh the evidence or judge the credibility of witnesses. If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. Such a motion may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.

**(2a) (2b) Insurance Contracts and Coverage § 139--Actions--New Trial on Damages--Proof of Damages.** --In an action by a women's clothing corporation and its majority stockholder (owner) against their insurer for bad faith refusal to defend and indemnify them in a third-party action, the trial court properly granted the insurer's motion for a new trial on the damages issue after the jury awarded plaintiffs punitive damages of $ 35 million in addition to $ 5.3 million in compensatory damages. Incurrence of attorney fees and costs in the third-party action, a large judgment in that action when a lesser settlement might have been possible, and damage to the corporation's business reputation constituted ample proof of damages suffered by the corporation. Affirmance of the trial court's ruling on the new trial motion rendered immaterial the insurer's claim that plaintiffs' proof on damages was inadequate.

**(3) Insurance Contracts and Coverage § 137--Actions--Damages--Breach of Duty of Good Faith and Fair Dealing.** --An insurer's breach of its duty of good faith and fair dealing renders it liable for any damages that are the proximate cause of that breach. In the so-called "third party" situation, the breach of duty may have as its proximate result the entry of a judgment in excess of policy limits against the insured. Only damages proximately resulting from the breach--such as consequent economic loss or emotional distress--are recoverable as compensation therefor.

**(4) Insurance Contracts and Coverage § 122--Actions--When Insured May Initiate Suit for Breach of Duty to Defend and Indemnify.** --An insured does not have to wait until a final judgment has been entered against him by a third party to claim that he has been damaged by the failure of his insurer to honor the duty to defend and indemnify.

**(5a) (5b) (5c) Insurance Contracts and Coverage § 139--Actions--New Trial on Damages.** --In an action by a women's clothing corporation and its majority stockholder (owner) against their insurer for bad faith refusal to defend and indemnify them in a third-party action, the trial court did not err in granting a new trial to the insurer only on the issue of damages instead of an entire new trial, where the record clearly established the insurer's liability to the corporation, where, in view of the excessiveness of the jury's punitive damages award ($ 35 million), it could be presumed that the jury was impermissibly swayed by passion or prejudice, and where there was no prejudice to either side by new trial on the damages issue.

**(6) New Trial § 8--Motion or Award as to Part of Issues.** --The trial court may grant a new trial as to some issues while refusing it as to others. An abuse of discretion must be shown before a reviewing court will reverse the trial judge's decision. Three factors of importance in assessing the choice of limited new trial as opposed to entire new trial are: whether liability was clearly established at the first trial, whether the evidence concerning damages was insufficient or entirely nonexistent, and whether prejudice to a party would result as the result of the choice of one disposition over the other.

**(7) Damages § 22--Punitive Damages--Constitutionality.** --Punitive damages are not unconstitutional.

**(8) Corporations § 28--Stockholders--Suits on Behalf of Corporation--Emotional Distress.** --A shareholder may not, as a matter of law, personally recover emotional distress damages for injury to the corporation in which he holds shares. One individual does not become entitled to a damage award for injuries sustained by another, and a corporation is a distinct legal entity apart from its shareholders.

**(9) Insurance Contracts and Coverage § 136--Actions--Judgment--Judgment Non Obstante Veredicto--Breach of Covenant of Good Faith and Fair Dealing--Recovery of Emotional Distress Damages by Insured Stockholder of Closely Held Corporation.** --In an action by a women's clothing corporation and its majority stockholder (owner) against their insurer for bad faith refusal to defend and indemnify them in a third-party action, the trial court improperly granted defendant's motion for judgment notwithstanding the verdict as against the owner on the ground that he lacked standing to sue for the insurer's breach in that he was not named as a defendant in the third-party action and could not recover for the damages sustained by the corporation. The owner, a named insured, was suing for injuries to himself. The covenant of good faith and fair dealing implied in every liability insurance policy obligates the insurer to treat offers to settle claims against its insured within limits of the insurance coverage without regard to its own special interest existing because of policy limits. Damages for mental suffering are included within those recoverable for the insurer's breach of this duty.

**(10a) (10b) (10c) Insurance Contracts and Coverage § 137--Actions--Damages--For Breach of Duty of Good Faith and Fair Dealing--Emotional Distress.** --In an action by a women's clothing corporation and its majority stockholder (owner) against their insurer for bad faith refusal to defend and indemnify them in a third-party action, there was evidence in the record to support the jury's award of damages for emotional distress to the owner, which evidence the trial court could not reweigh in performing the function of ruling on the insurer's motion for judgment notwithstanding the verdict. The insurer abandoned the owner without justification in the face of a multi-million dollar third-party claim, leaving him to face losing his reputation, his business, and his peace of mind gradually over a long period of time. Upholding such an award does not require proof of bankruptcy, physical illness or injury, nor courtroom demonstrations of the destruction of personal peace of mind or well-being.

**(11) Damages § 13--Measure of Damages--Personal Injuries--Emotional Distress.** --The law does not compensate emotional injuries that are trivial or transitory, as contrasted to substantial or enduring.

**(12) Damages § 13--Measure of Damages--Personal Injuries--Emotional Distress--Role of Finder of Fact.** --Determinations concerning emotional distress--its existence and the appropriate compensation for it--are left to the finder of fact, often a jury, based on an entire evidentiary record, including the reasonable inferences which can be drawn from it, although a jury may properly rely on the testimony of one person to reach its conclusion.

**(13) Damages § 24--Punitive Damages--Relation to and Requirement of Actual Damages.** --Punitive damages are not precluded when the plaintiff has not received an award of actual damages but only when he or she has sustained no actual damage.

**COUNSEL:** Greines, Martin, Stein & Richland and Alan G. Martin for Plaintiffs, Cross-defendants and Appellants.

Lascher & Lascher and Edward L. Lascher for Defendant, Cross-complainant and Appellant.

**JUDGES:** Opinion by [***2] Hanson, Acting P. J., with Lucas and Devich, JJ., concurring.

**OPINION BY:** HANSON

**OPINION**

[*699] [**908] Introduction

Plaintiffs Tan Jay International, Ltd. (Tan Jay) and Peter Nygard (the insureds) filed a complaint for damages, breach of contract, emotional distress and declaratory relief against the insurer, defendant Canadian Indemnity Company (Canadian), alleging bad faith refusal to defend and indemnify plaintiffs in a third-party action. Both compensatory and punitive damages were sought.

Defendant Canadian cross-complained against Tan Jay, Nygard, the third-party plaintiff Douglas Michaelson, Viking Holding Company and Does. The first two causes of action sought declaratory relief and the second [*700] two causes of action sought indemnity from defendant Canadian's insured, Peter Nygard.

Plaintiffs demurred to the cross-complaint. Cross-complainant attempted to amend the cross-complaint, and finally dismissed the third and fourth causes of action against Nygard. Plaintiffs moved

for an early trial date; their motion was granted. Defendant Canadian filed a motion for summary judgment as to both the complaint and cross-complaint; plaintiffs sought summary adjudication of issues without substantial [***3] controversy. The motions were consolidated for hearing; the motions of both plaintiffs and defendant were denied.

Trial was by jury. The jury responded to the request for special findings and rendered a verdict for plaintiffs of $ 5,298,178.71 in compensatory damages and $ 35 million in punitive damages.

Defendant Canadian substituted new counsel and moved for new trial or judgment notwithstanding the verdict. The trial court granted judgment notwithstanding the verdict as to plaintiff Peter Nygard, but denied it as to plaintiff Tan Jay. The trial court further granted defendant's motion for new trial, ruling that the award of damages was excessive and not supported by the evidence.

Defendant Canadian has appealed from the denial of defendant's motion for judgment notwithstanding the verdict as to plaintiff Tan Jay and from the trial court's order granting new trial as to issues of damages only. Plaintiff Peter Nygard has appealed from the judgment notwithstanding the verdict entered against him.

Factual and Procedural History

Plaintiff Tan Jay is a Winnipeg, Manitoba-based manufacturer of women's sportswear. Its principal owner and chairman of the board is plaintiff Peter Nygard. [***4] Nygard is a sailor of some distinction, and has been a member of the Canadian Olympic Sailing Team. Tan Jay has cultivated an image which emphasized sailing.

In 1977, Tan Jay entered the Los Angeles clothing market. Nygard owned an Olympic-class sailboat; he and Murray Batte, the president of [*701] Tan Jay and a minority shareholder in Tan Jay, decided to use the sailboat as part of a promotional campaign for Tan Jay in California.

Tan Jay temporarily stored the sailboat at the California Yacht Club in Marina del Rey. When Nygard decided not to join the club, the club requested that the boat be taken elsewhere. Nygard instructed his secretary, Cynthia Jewett, to have the boat moved to Tan Jay's warehouse. Instead of calling professional boat movers, Ms. Jewett enlisted the aid of David Swift, another Tan Jay employee to move the boat. [**909] Among those helping with the move was Douglas Michaelson. As the boat was being moved down Fiji Way in Marina del Rey on a trailer, with the mast still in place, the mast came in contact with an overhead high voltage line and Michaelson was electrocuted; he survived, but sustained very severe injuries, including the loss of one leg, several [***5] fingers, and other permanent injuries. The accident occurred on April 8, 1978, and shortly thereafter Michaelson brought suit against Tan Jay.

Plaintiff Nygard was advised of the accident shortly after it occurred. Tan Jay had a $ 1 million general comprehensive liability policy issued by defendant Canadian, bearing a special endorsement covering its employees for all accidents occurring in connection with the business. Nygard phoned Tan Jay's insurance broker, John A. Flanders Company, Ltd. and spoke to Martin Eva, the head of Flanders. Eva then spoke to the local branch claims manager of Canadian, telling him of the accident, and a letter was sent to Tan Jay's counsel advising counsel that Canadian had been notified.

Canadian denied coverage and refused to provide a defense for the Michaelson action. Eva conveyed this news to Nygard. Nygard consulted California counsel, who recommended an experienced personal injury trial lawyer, W. Marshall Morgan. Morgan, apprised of Canadian's refusal to defend, undertook that duty on behalf of Tan Jay.

Early in 1983, as the Michaelson action neared trial and substantial discovery had been completed, Morgan's law firm again requested coverage [***6] and defense from Canadian. Canadian responded by retaining Canadian and California counsel. Tan Jay provided the insurer with its discovery material and agreed that Canadian could investigate, defend and settle the case without any prejudice to its position.

At this point, it was clear that Tan Jay's exposure on Michaelson was substantial. Morgan kept Canadian advised of all developments and asked [*702] the insurer to participate in settlement discussions. He not only explained the basis for coverage, he advised Canadian that the case could be settled within policy limits. At one point Michaelson was prepared to settle for $ 1.2 million; Canadian was asked to pay $ 700,000; the boat and trailer insurer had agreed to pay its policy

limits of $ 300,000, and Nygard had agreed to pay $ 200,000 of his own funds. Canadian refused, and the settlement did not go forward because Nygard could not obtain $ 900,000.

Douglas Michaelson obtained $ 4.4 million, after a jury trial. This was reduced on motion for new trial to about $ 2.1 million. Tan Jay appealed and Michaelson cross-appealed. The California Yacht Club, named as a codefendant of Tan Jay in the Michaelson action, received [***7] a new trial; it settled and sought indemnity from Tan Jay.

Michaelson commenced collection efforts against Tan Jay in Canada. Execution on the judgment would have put Tan Jay out of business entirely. As it was, the efforts to collect damaged its business standing and public reputation.

In February 1984, Tan Jay and Nygard filed the action before us for bad faith, emotional distress and declaratory relief against defendant Canadian. Canadian cross-complained for declaratory relief. Granted an early trial date after showing that the Michaelson efforts to collect on the personal injury judgment had placed Tan Jay in jeopardy, plaintiffs proceeded against Canadian at trial in May 1985. Plaintiffs presented four expert witnesses, who agreed that Canadian had a clear duty pursuant to the terms of plaintiffs' policy to defend the Michaelson action, and its refusal to investigate, defend and indemnify was totally without justification. Evidence presented on damages included, in addition to the Michaelson judgment, then on appeal, the expenditure of approximately $ 150,000 in attorney fees, the fact of plaintiff Nygard's personal emotional distress and the damage to Tan Jay's business [***8] reputation.

At trial, Canadian's trial counsel described his client as a vastly wealthy insurance company. The jury awarded $ 35 million [**910] in punitive damages, in addition to the compensatory damages award.

After the jury verdict, the cross-complaint for declaratory relief was tried. The trial court found coverage and issued a statement of decision as requested by Canadian's new counsel (present counsel on appeal). The trial court conditionally granted Canadian's motion for new trial with respect to [*703] damages, reducing compensatory damages to $ 4,273,257 and punitive damages to $ 500,000. Tan Jay refused the remittitur. As indicated, the trial court denied Canadian's motion for judgment notwithstanding the verdict as to Tan Jay but granted it as to Peter Nygard. Canadian has appealed, as has Nygard. The record before us reveals that Canadian finally paid the Michaelson judgment and the Michaelson appeal has been dismissed.

Defendant Canadian's Appeal

On appeal, defendant Canadian contends (1) that the trial court erred in denying Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Tan Jay and (2) that the trial court erred by its limitation of [***9] new trial granted Canadian to issues of damages only.

I

The standard of review applicable to a grant of judgment notwithstanding the verdict is well established.

**(1)** In *Hauter v. Zogarts (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282]*, the California Supreme Court stated: "The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. [Citations.] The trial judge cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]"

On this appeal, [***10] defendant Canadian does not spend much time attempting to persuade this court that there was no substantial evidence of Canadian's breach of the covenant of good faith and fair dealing. Nor does Canadian attack the trial court's disposition of defendant's cross-complaint for declaratory relief concerning coverage. Defendant Canadian's main arguments as to why its comprehensive business policy did not cover the Michaelson accident were twofold: (1) that the use of the sailboat was not business related and (2) that the sailboat came within a vehicular exclusion in the [*704] policy. The trial court rejected these excuses

for noncoverage and we need not consider the issue further.

**(2a)** The main thrust of Canadian's lengthy brief is directed at the issue of damages. It is elementary that a plaintiff must show injury and entitlement to damages to recover them from a defendant; to that extent, defendant Canadian's challenge to the sufficiency of plaintiffs' evidence on the damages which flowed from Canadian's breach is understandable.

**(3)** It was said in *Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 925* (italics omitted) [*148 Cal.Rptr. 389, 582 P.2d 980]*, [***11] that "[An] insurer's breach of its duty of good faith and fair dealing renders it liable for any damages which are the proximate cause of that breach. In the so-called 'third party' situation, of which *Communale* [v. *Traders & General Ins. Co. (1958) 50 Cal.2d 654 (328 P.2d 198, 68 A.L.R.2d 883)*] and *Crisci* [v. *Security Ins. Co. (1967) 66 Cal.2d 425 (58 Cal.Rptr. 13, 426 P.2d 173)*] are representative, the breach of duty may have as its proximate result the entry of a judgment in excess of policy limits against the insured. . . . Only damages proximately resulting from the breach -- such as consequent economic loss or emotional distress, for example -- are recoverable as compensation therefor."

**(2b)** There was not only sufficient but overwhelming evidence in this record that plaintiff Tan Jay suffered damage as the result of defendant Canadian's breach. [**911] There was testimony (1) as to the incurrence of attorney fees and costs of defending in the absence of defense by Canadian; (2) about Canadian's refusal to contribute to a Michaelson settlement when one was possible for a reasonable amount; [***12] (3) about the damage to Tan Jay's business reputation; and (4) there was testimony about the Michaelson judgment entered against Tan Jay, and subsequent efforts to execute on that judgment. We enumerate these facts for the sole purpose of negating defendant Canadian's suggestion that the *liability* of defendant Canadian to plaintiff Tan Jay was questionable because of the failure of proof of damage.

We hold that there was ample proof to support the finding of liability. We further hold that the trial court properly granted new trial to defendant Canadian on the damages issue, which renders any discussion of the specific perceived inadequacies of plaintiffs' proof on damages at the first trial immaterial. Our record reflects that defendant Canadian has finally settled with Michaelson, so the issue of whether the Michaelson judgment was one which the jury could have properly considered in the 1985 trial is also immaterial.

**(4)** We note, however, that in California an insured does not have to wait until a final judgment has been entered against him by a third party to claim that he has been damaged by the failure of his insurer to [*705] honor the duty to defend and indemnify. [***13] (See *Larraburu Bros., Inc. v. Royal Indemn. Co. (9th Cir. 1979) 604 F.2d 1208*, for a lengthy discussion on this point.)

II

**(5a)** We next turn to defendant Canadian's contentions that the trial court should have granted new trial to defendant in its entirety, instead of limiting the retrial to the issue of damages.

**(6)** In *Liodas v. Sahadi (1977) 19 Cal.3d 278, 285 [137 Cal.Rptr. 635, 562 P.2d 316]*, the California Supreme Court stated that "[the] power of a trial court to grant a new trial as to some issues, while refusing it as to others, is also well established. [Citations.] '. . . An abuse of discretion must be shown before a reviewing court will reverse the trial judge's decision [citations].'" (See also *Marshall v. Brown (1983) 141 Cal.App.3d 408, 414 [190 Cal.Rptr. 392]*.)

Three factors of importance in assessing the choice of limited new trial as opposed to entire new trial are: (1) whether liability was clearly established at the first trial, (2) whether the evidence concerning damages was insufficient or entirely nonexistent; and (3) whether prejudice to a party would result [***14] as the result of the choice of one disposition over the other. (See *Liodas v. Sahadi, supra, 19 Cal.3d 278, 285*; *Leipert v. Honold (1952) 39 Cal.2d 462, 466-467 [247 P.2d 324, 29 A.L.R.2d 1185]*; *Pelletier v. Eisenberg (1986) 177 Cal.App.3d 558, 556 [223 Cal.Rptr. 84]*.)

**(5b)** We conclude that the record clearly established liability on the part of defendant Canadian to plaintiff Tan Jay. The trial court's decision to permit new trial on the issue of damages was sound, in view of the excessiveness of the jury's punitive damages award ($ 35 million), from which it can be presumed that the jury was impermissibly swayed by passion and prejudice. There is

no prejudice to either side by new trial on the damages issue. Plaintiff Tan Jay rejected the reduction in damages proposed by the trial court and stood ready for new trial.

**(7)** (See fn. 1.) Unfortunately this appeal has slowed the progress toward resolution of this matter, although no argument has been made here by either plaintiff that Canadian undertook the appeal "for delay." (*Code. Civ. Proc., § 907.*) [1]

1 We need not consider Canadian's argument that (1) punitive damages are unconstitutional as awarded in California or (2) that the United States Supreme Court may soon say so. We are bound by current decisional law. It has long been established that punitive damages are not unconstitutional in California ( *Hasson v. Ford Motor Co. (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171].*) If the United States Supreme Court says that such damages are unconstitutional, that issue may be the subject of further analysis at some future time.

[*706] [***15] We find no abuse of discretion in the trial court's grant of limited new trial on the issue of damages to defendant Canadian.

[**912] Plaintiff Nygard's Cross-Appeal

Plaintiff Nygard has appealed from the trial court's grant of judgment notwithstanding the verdict to defendant Canadian. Defendant Canadian argued below, as it does here, that plaintiff Nygard had no standing to sue for Canadian's breach of the covenant of good faith [***16] and fair dealing because plaintiff Nygard had not been named as a defendant in the Michaelson action and could not recover for the damages sustained by another entity, Tan Jay. In addition, it was contended below that there was, in any event, insufficient evidence of plaintiff Nygard's asserted emotional distress resulting from Canadian's conduct.

The trial court's grant of judgment notwithstanding the verdict did not specify the ground upon which it was based. Defendant Canadian defends the trial court's ruling with respect to plaintiff Nygard in this court by contending: (1) that a shareholder such as Nygard may not, as a matter of law, personally recover emotional distress damages for injury to the corporation in which he holds the shares; (2) that the evidentiary record did not support any award of emotional distress damages to plaintiff Nygard; and (3) that in the absence of an award of actual damages, a plaintiff cannot recover punitive damages. We address these issues seriatim.

I

Our discussion begins with the reiteration that the standard of review of a grant of judgment notwithstanding the verdict, as described in *Hauter v. Zogarts, supra, 14 Cal.3d 104, 110*, [***17] applies here as well.

**(8)** Defendant Canadian is correct in stating that a shareholder may not, as a matter of law, personally recover emotional distress damages for injury *to the corporation* in which he holds shares. One individual does not, under our law, become entitled to a damage award for injuries sustained by another, and a corporation is a distinct legal entity apart from its shareholders. ( *Jones v. H.F. Ahmanson & Co. (1969) 1 Cal.3d 93, 106-107 [81 Cal.Rptr. 592, 460 P.2d 464].*)

[*707]

**(9)** However, these principles have no relevance in the case at bench, because plaintiff Nygard sued for injuries to *himself*. Canadian's comprehensive business policy issued to and paid for by Tan Jay also included plaintiff Nygard as named insured. As was explained in *Truestone, Inc. v. Travelers Ins. Co. (1976) 55 Cal.App.3d 165, 169-170 [127 Cal.Rptr. 386]*, "[the] covenant of good faith and fair dealing implied in every liability insurance policy obligates the insurer to treat offers to settle claims against its *insured* within limits of the insurance coverage without regard to its own special interest [***18] existing because of policy limits. The covenant thus imposes a duty upon the insurer to accept reasonable settlement offers within the scope of its policy. [Citations.] Breach of the duty creates causes of action in both contract and tort. [Citation.] . . . [para. ] While the law recognizes a cause of action in tort, the duty breached by the tortious conduct of an insurer refusing to settle in good faith flows from the contractual relationship. [Citation.] The *insured* does not, by the contract of insurance, seek 'to obtain a commercial advantage but to protect [himself] against the risks of accidental losses, including the mental distress which might follow from the losses. Among the considerations in purchasing liability insurance, as insurers are well

aware, is the peace of mind and security it will provide . . . .' [Citation.] For that reason, damages for mental suffering are included within those recoverable for the insurer's breach of duty to settle in good faith. [Citation.] (Italics added.)

After reviewing the basics of bad faith law, the *Truestone* court observed that its plaintiffs, the Campbells, were shareholders and owners of a closely held corporation [***19] and insured pursuant to the policy with Travelers. Thus the duty created by the implied covenant of good faith and fair dealing was owed to them personally, a duty not to tortiously destroy the peace of mind for which they bargained. *Truestone* [**913] held that where "shareholders of a closely held corporation are joint insureds with it, the insurers' implied covenant of good faith and fair dealing runs to the shareholders as well as to the corporation and the shareholders may pursue a cause of action for its breach." ( *Id. at p. 171.*)

Defendant Canadian points out that *Truestone* was a pleading case. Such a case is a singularly appropriate vehicle for deciding a purely legal question. The question was incorrectly decided in the case before us by the trial court in granting judgment notwithstanding the verdict. Other California cases are in accord with the principles stated in *Truestone*; see *Commercial Cotton Co. v. United California Bank (1985) 163 Cal.App.3d 511 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017]*; *Cancino v. Farmers Ins. Group (1978)* [*708] *80 Cal.App.3d 335 [145 Cal.Rptr. 503]*; [***20] see, further, *Larraburu Bros., Inc. v. Royal Indemn. Co., supra, 604 F.2d 1208.*

II

**(10a)** Defendant Canadian argues that the evidentiary record made in this case did not support the award of any emotional distress damages to plaintiff Nygard. It is specious to suggest that plaintiff did not prove emotional distress.

**(11)** What the law does not compensate are emotional injuries which are trivial or transitory, as contrasted to substantial or enduring. ( *Commercial Cotton Co. v. United California Bank, supra, 163 Cal.App.3d 511, 517.*)

**(10b)** The record on appeal details conduct on the part of Canadian from 1978 to the present that is classic in its demonstration of bad faith as defined by decisional law. The fact is that Nygard's insurer (Canadian) abandoned him without justification in the face of a multimillion dollar third party claim, leaving him to face losing his reputation, his business, and his peace of mind gradually over a long period of time.

**(12)** Determinations concerning emotional distress -- its existence and the appropriate compensation for it -- are left to the finder of fact, often a jury, based on an entire evidentiary [***21] record, including the reasonable inferences which can be drawn from it, although a jury may properly rely on the testimony of one person to reach its conclusion.

**(10c)** In the instant case, both plaintiff and his attorney testified that Nygard suffered emotional distress, and the entire record supports that claim. Upholding such an award does not require proof of bankruptcy, physical illness or injury, nor courtroom demonstrations of the destruction of personal peace of mind or well-being.

We conclude that there was evidence in the record to support an award of emotional distress damages -- evidence that the trial court could not reweigh in performing its function of ruling on the motion for judgment notwithstanding the verdict.

[*709] III

Defendant Canadian finally contends that punitive damages cannot be assessed in favor of a plaintiff who has not received an award of actual damages. We address the issue for purposes of retrial on the issue of damages owed to both plaintiffs. Punitive damages are *only* precluded when a plaintiff has *sustained* no actual damage. (See *Commercial Cotton Co. v. United California Bank, supra, 163 Cal.App.3d 511, 517, fn. 2.*)

[***22] The judgments appealed from are affirmed in part, and reversed in part, with directions.

The trial court properly denied defendant Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Tan Jay; we affirm the denial. It erred in granting defendant Canadian's motion for a judgment notwithstanding the verdict as to plaintiff Peter Nygard; we reverse the grant of the motion.

The trial court properly granted a new trial on the

issue of damages only, as to plaintiff Tan Jay. New trial should also have been granted on the issue of damages *only*, as to plaintiff Nygard.

The cause is remanded for new trial limited to the issue of damages owed by defendant [**914] Canadian to both plaintiffs. Plaintiff Nygard is to recover costs in this court.

# TAB 35

LEXSEE 2 CAL. APP. 4TH 153, 158

**CEIL TARMANN, Plaintiff and Appellant, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant and Respondent.**

**No. H006997**

**COURT OF APPEAL OF CALIFORNIA, SIXTH APPELLATE DISTRICT**

*2 Cal. App. 4th 153*; *2 Cal. Rptr. 2d 861*; *1991 Cal. App. LEXIS 1479*; *92 Daily Journal DAR 16*

**December 30, 1991, Decided**

**PRIOR HISTORY:** [***1] Superior Court of Santa Clara County, No. 632416, Peter G. Stone, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Plaintiff brought an action for fraud and negligent misrepresentation against an insurer alleging the insurer made false statements concerning its obligation to indemnify plaintiff. In her complaint plaintiff generally alleged that the declarants were "authorized agents" of the insurer, but specifically alleged that she did not know their names. The trial court sustained without leave to amend the insurer's demurrer to the fifth amended complaint and dismissed the action. (Superior Court of Santa Clara County, No. 632416, Peter G. Stone, Judge.)

The Court of Appeal affirmed. It held that plaintiff's complaint did not meet the requirement that a fraud complaint against a corporation plead the names of the individuals who made allegedly false representations. It also held that the insurer's statements concerning indemnity were either statements of opinion or intentional false promises, and thus plaintiff failed to state a cause of action for negligent misrepresentation. (Opinion by Capaccioli, Acting P. J., with Premo and Cottle, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d and 4th Series

**[1] Pleading § 29--Demurrer to Complaint--Determination.** --In reviewing the sufficiency of a complaint against a general demurrer, the court is guided by long-settled rules. It treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. It also considers matters that may be judicially noticed. Further, the court gives the complaint a reasonable interpretation, reading it as a whole and its parts in their context.

**[2] Appellate Review § 128--Scope of Review--Rulings on Demurrers.** --When a demurrer is sustained, the appellate court determines whether the complaint states facts sufficient to constitute a cause of action. When it is sustained without leave to amend, the appellate court decides whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and the appellate court reverses; if not, there has been no abuse of discretion and the appellate court affirms. The burden of proving a reasonable possibility is squarely on the plaintiff.

**[3] Fraud and Deceit § 25--Actions--Pleading--Action Against Corporation.** --Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow the defendant to understand fully the nature of the charge made. The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to

speak, to whom they spoke, what they said or wrote, and when it was said or written. Thus, in a fraud action against an insurer for making false statements concerning its obligation to indemnify plaintiff, the trial court did not err in sustaining without leave to amend the insurer's demurrer to the complaint, where plaintiff generally alleged that the declarants were "authorized agents" of the insurer, but specifically alleged that she did not know their names. The exception to the rule of specificity for situations in which the facts are in the possession of the defendant did not apply, since the insurer had no more reason to know who made the allegedly false statements than plaintiff.

[See 5 **Witkin,** Cal. Procedure (3d ed. 1985) Pleading, §§ 662, 868.]

**[4] Fraud and Deceit § 6--Actual Fraud--False Representations--Statements of Opinion.** --To be actionable, a negligent misrepresentation must ordinarily be as to past or existing material facts. Predictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 678.]

**[5a] [5b] [5c] Fraud and Deceit § 25--Actions--Pleading--Negligent Misrepresentation--Insurer's Representation of Future Payment.** --In a negligent misrepresentation action arising from an insurer's alleged representations that it would make payments to plaintiff in the future, the trial court did not err in sustaining without leave to amend the insurer's demurrer to the complaint. To the extent that the representations were statements of opinion as to the insurer's obligation to indemnify plaintiff, they were not actionable. To the extent the representations constituted promises with no intention of performance, they were intentional conduct and not actionable under a theory of negligent misrepresentation.

**[6] Fraud and Deceit § 7--Actual Fraud--False Representations--Promises.** --Certain broken promises of future conduct may be actionable. *Civ. Code, § 1710, subd. (4)*, defines one type of deceit as "A promise, made without any intention of performing it." A false promise is actionable on the theory that a promise implies an intention to perform, that intention to perform or not to perform is a state of mind, and that misrepresentation of such a state of mind is a misrepresentation of fact. The allegation of a promise, which implies a representation of intention to perform, is the equivalent of the ordinary allegation of a representation of fact. To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing. Given this requirement, an action based on a false promise is simply a type of intentional misrepresentation, i.e., actual fraud. The specific intent requirement precludes pleading a false promise claim as a negligent misrepresentation.

[See 5 **Witkin,** Cal. Procedure (3d ed. 1985) Pleading, § 670.]

**[7] Fraud and Deceit § 7--Actual Fraud--False Representations--Promises--Unreasonable Intent to Perform.** --Making a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise.

**[8] Appellate Review § 128--Scope of Review--Rulings on Demurrers--Appellant's Burden.** --It is the correctness of the trial court's action in sustaining a demurrer, not its reasons, that is reviewable. The burden is upon the appellant to demonstrate that the action of the trial court was an abuse of discretion.

**COUNSEL:** Harry Delizonna for Plaintiff and Appellant.

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Daniel R. Kirwan and Mark Bonino for Defendant and Respondent.

**JUDGES:** Opinion by Capaccioli, Acting P. J., with Premo and Cottle, JJ., concurring.

**OPINION BY:** CAPACCIOLI, Acting P. J.

**OPINION**

[*156] [**861] *Statement of the Case*

Plaintiff Ceil Tarmann appeals from a judgment entered after the trial court sustained [**862] without leave to amend defendant State Farm Mutual Automobile Insurance Company's (State Farm) demurrer to

Tarmann's fifth amended complaint. She claims her complaint sufficiently pled causes of action for fraud and negligent misrepresentation. We disagree and affirm the judgment.

*Standard of Review*

**[1]** "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole [***2] and its parts in their context. [Citation.] **[2]** When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." ( *Blank v. Kirwan (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].*)

*Facts Alleged in the Fifth Amended Complaint*

On September 22, 1985, Tarmann was involved in an auto accident with Andy Roselada, a State Farm insured. Roselada's liability was reasonably clear. Tarmann obtained an estimate of $ 3,200 to repair her vehicle, and State Farm authorized the estimate.

In particular, State Farm represented to her that she was authorized to have her vehicle repaired at Capitol Ford, Inc., of Almaden, that their obligation to indemnify her for her damages was reasonably [***3] clear, and that it "would pay Plaintiff for all such repairs ... immediately upon completion of those repairs." These representations were made by persons whose names were "unknown to Plaintiff but [who] were adjustors and/or claims supervisors/managers" employed by State Farm and acting as its agents. The [*157] representations, however, "were and are false and [State Farm] knew or should have known them to be false at the time they were made." The true facts were that State Farm "had no intention to reasonably and in good faith effectuate a prompt and reasonable processing, evaluation, investigation and settlement of Plaintiff's claim, nor pay the complete repair of Plaintiff's vehicle."

State Farm's representations were intended to induce Tarmann's reliance so that she would bring her vehicle in for repairs and delay filing an action for damages. Tarmann relied on the representations and brought her vehicle to be repaired. However, State Farm refused to pay for the repairs or indemnify her. Because Tarmann lacked the funds to complete the repairs or obtain the release of her vehicle, she was left without its use for an extended period of time.

Tarmann hired an attorney, [***4] who filed an action against Roselada. In September 1986, State Farm settled her claim for $ 3,476.47. She then initiated this action.

Discussion

*The Cause of Action for Fraud*

**[3]** "Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow defendant to understand fully the nature of the charge made." ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz (1976) 57 Cal.App.3d 104, 109 [128 Cal.Rptr. 901]*; *Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 216-217 [197 Cal.Rptr. 783, 673 P.2d 660]*; *Stansfield v. Starkey (1990) 220 Cal.App.3d 59, 73 [269 Cal.Rptr. 337].*

The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent [**863] representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written. ( *Archuleta v. Grand Lodge etc. of Machinists (1968) 262 Cal.App.2d 202, 208-209 [68 Cal.Rptr. 694]*; [***5] *Gautier v. General Telephone Co. (1965) 234 Cal.App.2d 302, 308 [44 Cal.Rptr. 404]*; *Mason v. Drug, Inc. (1939) 31 Cal.App.2d 697, 703 [88 P.2d 929]*; *Sanders v. Ford Motor Co. (1979) 96 Cal.App.3d Supp. 43, 46 [158 Cal.Rptr. 656]*; see Grossman & Van Alstyne, California Practice (2d ed. 1976) § 984, pp. 111-114.)

Here, Tarmann generally alleged that the persons were "authorized agents of State Farm ... cloaked with such authority" and were "adjustors and/or [*158] claims supervisors/managers[.]" However, she

specifically alleged she did not know their names. [1]

1 We note that in her original complaint under the Insurance Code, Tarmann specifically alleged the names of State Farm agents who initially authorized her $ 3,200 estimate.

We acknowledge that the requirement of specificity is relaxed when the allegations indicate that "the defendant must necessarily possess full information [***6] concerning the facts of the controversy" ( *Bradley v. Hartford Acc. & Indem. Co. (1973) 30 Cal.App.3d 818, 825 [106 Cal.Rptr. 718]*, disapproved on another ground in *Silberg v. Anderson (1990) 50 Cal.3d 205, 212- 213 [266 Cal.Rptr. 638, 786 P.2d 365]*) or "when the facts lie more in the knowledge of the opposite party[.]" ( *Turner v. Milstein (1951) 103 Cal.App.2d 651, 658 [230 P.2d 25]*.) However, we consider this exception inapplicable here, for State Farm has no more reason to know who made the allegedly false representations to Tarmann than Tarmann.

Under the circumstances, the court properly sustained the demurrer to the fraud claim without leave to amend.

*The Cause of Action for Negligent Misrepresentation*

**[4]** To be actionable, a negligent misrepresentation must ordinarily be as to past or existing material facts. "[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 678, pp. 779-780; [***7] *Richard P. v. Vista Del Mar Child Care Service (1980) 106 Cal.App.3d 860, 865 [165 Cal.Rptr. 370]*.)

**[5a]** Here, the gist of both Tarmann's fraud and negligent misrepresentation claims is that State Farm said it *would* pay for her repairs *immediately upon their completion*, it failed to do so, Tarmann could not complete the repairs or redeem her vehicle, and she lost the use of it until State Farm settled the case.

The critical alleged misrepresentation as to immediate payment upon completion did not involve a past or existing material fact. Rather, it involved a promise to perform at some future time.

**[6]** Certain broken promises of future conduct may, however, be actionable. *Civil Code section 1710, subdivision (4)* defines one type of deceit as "A promise, made without any intention of performing it." As Witkin explains, "A false promise is actionable on the theory that a promise implies an intention to perform, that *intention to perform or not to perform* is a state [*159] of mind, and that misrepresentation of such a state of mind is a misrepresentation of *fact*. The allegation of a *promise* (which implies a representation [***8] of intention to perform) is the equivalent of the ordinary allegation of a representation of fact." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 670, p. 120, italics in original.)

To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing. ( *Hills Trans. Co. v. Southwest Forest Industries, Inc. (1966) 266 Cal.App.2d 702, 708 [72 Cal.Rptr. 441]*; *Regus v. Schartkoff (1957) 156 Cal.App.2d 382, 389 [319 P.2d 721]*.) **[5b]** Given this requirement, an [**864] action based on a false promise is simply a type of *intentional* misrepresentation, i.e., actual fraud. [2] The specific intent requirement also precludes pleading a false promise claim as a negligent misrepresentation, i.e., "The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." ( *Civ. Code, § 1710, subd. (2)*.) **[7]** Simply put, making a promise with an honest [***9] but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise. Moreover, we decline to establish a new type of actionable deceit: the negligent false promise.

2 If we assume Tarmann's fraud cause of action alleges a promise and an actual contemporaneous intent not to perform it, her failure to name the actual promisor would still be a fatal defect.

**[5c]** In light of our discussion, the trial court properly sustained the demurrer to Tarmann's cause of action for negligent misrepresentation.

*Conclusion and Disposition*

**[8]** "It is the correctness of the trial court's action in sustaining a demurrer, not its reasons, which is reviewable. [Citation.] The burden is upon appellant to demonstrate that the action of the trial court was an abuse of discretion. [Citation.]" ( *Stansfield v. Starkey, supra,*

*220 Cal.App.3d at p. 72.*)

Since the trial court's rejection of Tarmann's fraud and negligent [***10] misrepresentation claims was correct and Tarmann neither argues nor suggests that her complaint states a cause of action under any other legal theory, she has not met her burden of proving the trial court abused its discretion in sustaining State Farm's demurrer to her fifth amended complaint without leave to amend.

[*160] The judgment is affirmed.

Premo, J., and Cottle, J., concurred.

# TAB 36

LEXSEE 39 CAL. 3D 18

**MICHAEL L. TENZER, Plaintiff and Appellant, v. SUPERSCOPE, INC., Defendant and Respondent**

**L.A. No. 31842**

**Supreme Court of California**

*39 Cal. 3d 18*; *702 P.2d 212*; *216 Cal. Rptr. 130*; *1985 Cal. LEXIS 293*

**July 25, 1985**

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. C 376037, Sara Kleban Radin, Judge.

**DISPOSITION:** The judgment is reversed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A corporation director brought an action against the corporation based on its refusal to pay him a finder's fee for finding a buyer of corporation real estate. The director alleged an oral promise by the corporation president and board chairman to pay him a 10 percent finder's fee, that he acted in reliance upon the promise, and that he suffered damage as a result. The trial court granted the corporation's motion for summary judgment based on the provision in the statute of frauds requiring an agreement authorizing or employing an agent, broker, or any other person to find a purchaser or seller of real estate for compensation or a commission to be in writing and subscribed by the party to be charged or by his agent (*Civ. Code, § 1624, subd. 5*). (Superior Court of Los Angeles County, No. C 376037, Sara Kleban Radin, Judge.)

The Supreme Court reversed. It held that, although there is no finder's fee exception to the statute of frauds set forth in *Civ. Code, § 1624, subd. 5*, and that the action would therefore ordinarily be barred, the director's allegations entitled him to invoke the doctrine of estoppel to plead the statute of frauds. Further, it held that the unenforceability of the promise as a contract due to the statute of frauds did not preclude the cause of action for fraud. However, it held that proof that a promise was made and that it was not fulfilled is not sufficient to prove fraud, but rather that something more than nonperformance would be required to prove the defendant's intent not to perform the promise. The court held that, on remand, the director would be required to prove that the finder's fee agreement was fair and reasonable to the corporation in order to prove that his reliance on the promise of the finder's fee was justifiable. It held that establishing whether the agreement was fair and reasonable would involve determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to the facts. It held that these would be functions mainly for the trier of facts. Finally, it held that, on remand, if the director's reliance on the promise of a finder's fee was unjustified, equity would not require that the director be allowed to enforce the promise. Thus, in order to invoke the doctrine of estoppel to plead the statute of frauds, the director would, on remand, have to establish that his behavior was reasonably consistent with his fiduciary role. (Opinion by Grodin, J., expressing the unanimous view of the court.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Frauds, Statute of § 6--Agreements for Lease or Sale of Real Property--Finder's Fee.** --There is no finder's fee exception to the requirement that an agreement authorizing or employing an agent, broker, or any other person to find a purchaser or seller of real estate for compensation or a commission must be in writing and subscribed by the party to be charged or by his agent (*Civ. Code, § 1624, subd. 5*).

**(2a) (2b) Frauds, Statute of § 11--Operation of Statute--Estoppel to Assert Statute--Finder's Fee.** --In an action by a corporation director alleging breach of an oral contract for payment by the corporation of a finder's fee for finding a buyer of corporation real estate, the trial

court erred in granting the corporation's motion for summary judgment, based on the statute of frauds. Although the action would ordinarily be barred by the provision in the statute of frauds applying to finder's fees agreements (*Civ. Code, § 1624, subd. 5*), the director alleged that he was not a licensed real estate broker, that he supplied the corporation with the name of a buyer in reliance on the promise of payment made by the corporation president and board chairman, and that this was valuable information which he could have sold elsewhere. On these allegations, the director was entitled to invoke the doctrine of estoppel to plead the statute of frauds.

**(3) Frauds, Statute of § 11--Operation of Statute--Estoppel to Assert Statute.** --The doctrine of estoppel to plead the statute of frauds may be applied where necessary to prevent either unconscionable injury or unjust enrichment.

**(4a) (4b) Frauds, Statute of § 8--Operation of Statute--Effect on Action for Fraud.** --In an action in which a corporation director alleged that the corporation president and board chairman, acting for the corporation, deliberately misled the director by falsely orally promising to compensate him for his services in finding a buyer of corporation real estate, that the director acted in reliance upon these misrepresentations, and that he suffered damage as a result, the trial court erred in granting the corporation's motion for summary judgment on the cause of action for fraudulent misrepresentation. Although the finder's fee agreement was unenforceable under the statute of frauds (*Civ. Code, § 1624, subd. 5*), the unenforceability of an allegedly fraudulent promise as a contract due to the statute of frauds does not preclude an action for fraud. (Disapproving the rule stated in *Kroger v. Baur (1941) 46 Cal. App. 2d 801, 803 [117 P.2d 50]*, *Keely v. Price (1972) 27 Cal. App. 3d 209, 215 [103 Cal. Rptr. 531]*, *Owens v. Foundation for Ocean Research (1980) 107 Cal. App. 3d 179 [165 Cal. Rptr. 571]*, and *Beach v. Arblaster (1961) 194 Cal. App. 2d 145, 163 [14 Cal. Rptr. 854]*.)

**(5) Fraud and Deceit § 28--Actions--Evidence--Promises Made Without Intent to Perform--Necessity of Evidence of Intent to Mislead.** --To survive a motion for nonsuit (*Code Civ. Proc., § 581c*) in an action on a fraudulent promise, the plaintiff must produce evidence of the promisor's intent to mislead him. Proof that a promise was made and that it was not fulfilled is not sufficient to prove fraud. Rather, something more than nonperformance is required to prove the defendant's intent not to perform his promise. (Disapproving *Santoro v. Carbone (1972) 22 Cal. App. 3d 721, 728 [99 Cal. Rptr. 488]* and *Jarkieh v. Badagliacco (1946) 75 Cal. App. 2d 505, 509 [170 P.2d 994]* to the extent that they suggest otherwise.)

**(6) Summary Judgment § 21--Hearing and Determination--Issues Precluding Judgment--Illustrations.** --In an action by a corporation director against the corporation based on its refusal to pay the director a finder's fee for finding a buyer of corporation real estate, the trial court erred in granting the corporation's motion for summary judgment based on its contention that the director acted as a real estate broker and could not recover because he was not licensed (*Bus. & Prof. Code, § 10136*). Whether the director acted as a broker was a question of fact, requiring an examination of his conduct after the introduction of the buyer and seller, to determine whether he participated in their negotiations.

**(7) Compromise, Settlement, and Release § 8--Compromise and Release--Requisites and Validity--Extinction of Obligation Without Consideration--Showing of Creditor's Intent.** --A written release under *Civ. Code, § 1541*, extinguishing an obligation without consideration, must expressly show the creditor's intent to extinguish the obligation.

**(8) Corporations § 34--Officers and Agents--Directors--Contracts With Corporation.** --A director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent. Directors' dealings with the corporation are subjected to rigorous scrutiny, and where any of their contracts or engagements with the corporation is challenged the burden is on the director not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.

**(9) Corporations § 34--Officers and Agents--Directors--Contracts With Corporation--Corporation's Option to Avoid.** --A corporate director is charged with the knowledge that any contract he entered into with his own corporation, even if valid and enforceable in all other respects, could be avoided at the corporation's option if it were determined to be unfair or unreasonable to the corporation.

**(10) Estoppel and Waiver § 6--Equitable Estoppel.** --Estoppel is an equitable remedy and, as such, will only be applied to avoid injustice.

**COUNSEL:** Merle H. Horwitz, Herbert A. Bernhard and Greenberg, Bernhard, Weiss & Rosin for Plaintiff and Appellant.

Nossaman, Guthner, Knox & Elliott and Alvin S. Kaufer for Defendant and Respondent.

**JUDGES:** Opinion by Grodin, J., expressing the unanimous view of the court. Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.

**OPINION BY:** GRODIN

**OPINION**

**[*21]** **[**213]** **[***131]** Plaintiff Michael L. Tenzer (Tenzer) appeals from a judgment in favor of defendant Superscope, Inc. (Superscope) after the trial court granted Superscope's motion for summary judgment.

**[*22]** Facts

The facts, as revealed by Tenzer's complaint [1] and the papers filed in support of and in opposition to the motion for summary judgment, are these:

Superscope is a corporation listed on the New York Stock Exchange and authorized to do business in California. Joseph Tushinsky is the president of the corporation, as well as the chairman of its board of directors.

1 In its motion for summary judgment, Superscope argued that, even if all the facts alleged in Tenzer's complaint and supporting papers were true, he was entitled to no relief as a matter of law. For this reason, Superscope submitted no factual declarations to counter the truth of Tenzer's allegations.

Tenzer has been involved in a management capacity in the real estate and housing industries in the western part of the United States for 20 years. Although he has extensive personal and business contacts among investors in the real estate field, Tenzer is not a licensed real estate broker.

Tenzer and Tushinsky served together on the board of directors of a charitable organization in Los Angeles. Sometime prior to May of 1979, they began to discuss the possibility that Tenzer should become a member of the Superscope board of directors (Board).

On May 10, 1979, at Tushinsky's invitation, Tenzer attended a Board meeting. At this meeting Tenzer learned, for the first time, that Superscope was attempting to sell its corporate headquarters to meet pressing cashflow problems. The next day, Tenzer was elected to the Board at the corporation's annual meeting. At a Board meeting the same day, the need to sell the corporation's headquarters was again discussed.

The next meeting of the Board occurred on June 22, 1979. At this meeting, the outside directors, [2] including Tenzer, first learned the details of Superscope's financial predicament. The Board was informed that the corporation was technically in default on over $ 45 million in loans and that the corporation's banks were threatening to accelerate payment on these loans. The Board was also told that a cash sale of the corporate headquarters was imperative to avoid reorganization pursuant to the federal Bankruptcy Act. The headquarters building, together with other property and facilities including a warehouse, parking lot, and adjacent undeveloped acreage, had been on the real estate market for nearly a year, but Superscope's real estate broker had not yet been able to effect a sale. The asking price for the property was approximately $ 16 million. At this meeting, Tushinsky expressed **[*23]** his view that the situation was desperate and that a miracle was needed to save the corporation.

2 An outside director is a director who has no interest or other duties in the corporation other than as a director.

Subsequently, Tushinsky, in a phone conversation, implored Tenzer personally to **[**214]** seek a suitable buyer for the property. Shortly afterwards, Tenzer became aware that Paul Amir, a Beverly Hills-based entrepreneur, was interested in negotiating a quick-closing real estate purchase for tax reasons. The Superscope headquarters appeared to be precisely the sort of property which would suit Amir's needs. Tenzer discussed the Superscope property with Amir without revealing its identity and verified that Amir might be interested in buying it.

With this information in hand, Tenzer telephoned Tushinsky. He explained that he was calling not in his capacity as a Board member, but as a finder, that he had located a potential buyer for the corporate headquarters and that, should the sale be consummated, he would expect a finder's fee of 10 percent. Tushinsky responded enthusiastically, authorizing Tenzer to discuss the matter further with his contact. Tushinsky also indicated that payment of a **[***132]** finder's fee was entirely proper, that the requested fee was satisfactory, and that if a $ 16 million sale were to close when expected, Tenzer's fee would be earned and payable upon the closing.

Neither Tenzer nor Tushinsky discussed the need to reduce the finder's fee agreement to writing. Tenzer felt that their personal relationship and Tushinsky's integrity were sufficient assurance that he would be paid. In reliance upon Tushinsky's promise, Tenzer then revealed each party's identity to the other.

The Board accepted Amir's offer in July 1979. A contract for the sale of Superscope's headquarters to Amir was consummated in August, and the sale was ultimately closed.

Tenzer was aware of other real estate opportunities for Amir, but he refrained from exploring such opportunities on Amir's behalf in reliance upon Tushinsky's promise that he would receive a finder's fee from the Superscope sale. Prior to the Board's approval of the Amir transaction, Tenzer informed it that he was entitled to a finder's fee in the event of a sale to Amir. He did not, however, reveal the amount of the finder's fee to which Tushinsky had agreed. [3] Tenzer took no part in the deliberations concerning or in the vote approving acceptance of Amir's offer.

3 Tenzer felt that it was Tushinsky's duty to disclose to the Board the amount of the finder's fee. He asserts that a fee of 10 percent was reasonable given the precarious financial condition of Superscope and the fact that the sale saved Superscope from bankruptcy.

**[*24]** At the July 27, 1979, Board meeting at which the sale to Amir was approved, a discussion regarding the payment of finders' fees to directors was held, but a final decision on the issue was deferred to the next Board meeting on August 24, 1979. At the August meeting, a motion was made to authorize the payment of finders' fees to corporate directors. Tenzer maintains that the discussion involved only whether such fees would be approved for future transactions, and did not touch upon approval of the finder's fee arrangement he had already made with Tushinsky. He believed that the Board had ratified that arrangement when it accepted Amir's offer in July. In any case, Tenzer participated in the August discussion and voted on the motion. Part of the discussion centered upon whether such fees were permitted under the corporate bylaws. [4] All outside directors **[**215]** voted in favor of the resolution authorizing payment of finders' fees. All the "inside" directors (including corporate employees and members of the Tushinsky family) voted against. The resolution was defeated. Tenzer has never received a finder's fee for his services in connection with the Amir transaction.

4 Superscope's bylaws provide in pertinent part as follows:

"Article III

"Directors

"Section 1: Powers. . . . [para. ] Without prejudice to such general powers, but subject to the same limitations, it is hereby expressly declared that the directors shall have the power and authority to: [para. ] (a) Select and remove all officers, agents, and employees of the corporation, . . . and . . . fix their compensation . . . .

"Section 14: Fees and Compensation of Directors. Directors . . . may receive such compensation, if any, for their services, . . . as may be fixed or determined by resolution of the board of directors. Nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation for such services."

Tenzer filed suit against both Superscope and Tushinsky. He alleged three "causes of action" which he entitled "Breach of Contract and Unjust Enrichment," "Estoppel," and "Fraud." The complaint further alleged that, in making the promise to pay him a 10 percent finder's fee, Tushinsky had acted as the agent of the corporation, and that he made the promise fraudulently, with no intent to perform. Rather, Tenzer alleged, Tushinsky intended to cheat him by inducing him to reveal Amir's name **[***133]** while secretly harboring an intent to prevent payment of the agreed fee.

After a hearing on the merits, Superscope's motion for summary judgment pursuant to *Code of Civil Procedure section 437c* was granted. [5] Tenzer filed a timely appeal from the judgment in favor of Superscope. For the reasons stated below, we reverse.

5 Tushinsky is not a party to the judgment entered below or to this appeal.

**[*25]** Discussion

Tenzer's contentions on appeal may be summarized as follows:

1. There is a finder's fee exception to the statute of frauds contained in *Civil Code section 1624, subdivision 5*. Therefore, an oral contract to pay a finder's fee in a real estate transaction is enforceable.

2. Even if the statute of frauds would normally preclude enforcement of an oral finder's fee contract, in this case Tenzer performed in reliance upon the agreement and Superscope retained the benefits. This should operate as an estoppel to assert the statute of frauds as a defense.

3. Because of Tushinsky's misrepresentations, Tenzer may maintain an action for fraud even if the underlying oral agreement is unenforceable.

4. Summary judgment was inappropriate because of the presence of triable issues of fact.

As explained further below, we find that, liberally construed, the papers Tenzer submitted in opposition to the motion for summary judgment are sufficient to raise triable issues of fact as to the second and third of these contentions. Thus summary judgment was inappropriate. (See, e.g., *Corwin v. Los Angeles Newspaper Service Bureau, Inc. (1971) 4 Cal.3d 842, 851-852 [94 Cal. Rptr. 785, 484 P.2d 953].*) However, we find no merit in Tenzer's first argument.

I.

*Civil Code section 1624*, provides in pertinent part as follows: "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: . . . 5. An agreement authorizing or employing an agent, broker, or any other person to . . . find a purchaser or seller of real estate . . . for compensation or a commission; . . ."

**(1)** In his first cause of action, Tenzer attempts to claim damages based upon breach of an alleged oral contract employing him to find a purchaser of real estate for a commission. He does not allege that the contract was ever put in writing. Under the plain language of the statute this contract, if it was entered into, was invalid.

Tenzer argues that precedent establishes the statute is irrelevant to his claim. He cites several cases, including *Tyrone v. Kelley (1973) 9 Cal.3d 1* **[*26]** *[106 Cal. Rptr. 761,* **[**216]** *507 P.2d 65]*; *Rees v. Dept. of Real Estate (1977) 76 Cal. App. 3d 286, 295 [142 Cal. Rptr. 789]*; and *Spielberg v. Granz (1960) 185 Cal. App. 2d 283 [8 Cal. Rptr. 190]*, for the proposition that there is a "finder's exception," both to licensing laws and the statute of frauds. He is in error. Those cases merely stand for the principle that a finder in a real estate transaction need not be licensed as a real estate broker to collect a finder's fee. They state nothing about a finder's exception to the statute of frauds. As noted in *Grant v. Marinell (1980) 112 Cal. App. 3d 617 [169 Cal. Rptr. 414]*, the Legislature has gone to considerable lengths to clarify that finders' agreements such as this must be memorialized in writing to be enforceable:

"Before 1963, the so-called oral 'finder's agreement,' that is an agreement merely to introduce a seller of real estate to a prospective purchaser or a purchaser to a prospective **[***134]** buyer, was held not to be within the statute of frauds, whether such contract was made by a real estate broker or agent or by an unlicensed person. (See *Heyn v. Philips (1869) 37 Cal. 529, 531*; *Palmer v. Wahler (1955) 133 Cal. App. 2d 705, 710 [285 P.2d 8]*.)

"In 1963, however, the Legislature amended subdivision 5 to add, inter alia, the italicized language: 'An agreement authorizing or employing an agent or broker to purchase or sell real estate, . . . *or to procure, introduce, or find a purchaser or seller of real estate* or a lessee or lessor of real estate where such lease is for a longer period than one year, for compensation or a commission.' (Stats. 1963, ch. 814, § 1 p. 1843.)

"If by this amendment the Legislature intended all finder's fee agreements to come within the ambit of the statute of frauds, it failed, as was predicted in the State Bar Journal's review of 1963 legislation (38 State Bar J. 604, 649). [Fn. omitted.] The section, as amended, was interpreted to bar only oral finder's agreements between licensed brokers or agents and sellers or purchasers of property. Subdivision 5, as revised, was still held to be inapplicable to such oral agreements by unlicensed individuals. (See *Hasekian v. Krotz (1968) 268 Cal. App. 2d 311, 317 [74 Cal. Rptr. 410]*; *Porter v. Cirod, Inc. (1966) 242 Cal. App. 2d 761, 766 [51 Cal. Rptr. 784]*.) This anomaly resulted in the 1967 amendment (Stats. 1967, ch. 52, § 1 p. 953), which added the following italicized language: 'An agreement authorizing or employing an agent, *or any other person* to purchase or sell real estate . . . or to procure, introduce or find a purchaser or seller . . . .'" (*Id.*, at pp. 620-621, original italics.)

Tenzer also refers us to *Zalk v. General Exploration Co. (1980) 105 Cal. App. 3d 786* [Cal. Rptr. 647], and a passage from *Tyrone v. Kelley, supra, 9 Cal.3d 1, 12-13*, but these decisions merely involve oral agreements **[*27]** for finder's fees in nonrealty transactions, and therefore are inapposite to this case.

We conclude that Tenzer's action based on contract would ordinarily be barred by the statute of frauds. **(2a)** Tenzer asserts, however, that even if the finder's fee agreement was oral, and in violation of the statute of frauds, he has alleged facts sufficient to invoke the estoppel doctrine and thus to foreclose Superscope from relying upon the statute of frauds as a defense. In brief, Tenzer alleges that Tushinsky -- as Superscope's representative -- promised to pay him for valuable information which could have been sold elsewhere. In reliance on this promise, Tenzer surrendered Amir's name. Superscope, having profited from Tenzer's performance, now refuses to keep its end of the bargain.

**(3)** The doctrine of estoppel to plead the statute of frauds may be applied where necessary to prevent either unconscionable injury or unjust enrichment. ( *Monarco v.* **[**217]** *Lo Greco (1950) 35 Cal.2d 621, 623-624 [220 P.2d 737]*.) On the basis of the factual contentions advanced in Tenzer's papers, Superscope has received the benefit of Tenzer's performance but relies upon the statute of frauds to avoid paying the agreed-upon price. Provided that Tenzer was not otherwise obligated to reveal this information to Superscope -- a point which we consider further, *infra* -- these allegations suggest a case

of unjust enrichment as that term was defined in *Monarco v. Lo-Greco, supra, at page 624*. In such cases, the doctrine of estoppel to assert the statute of frauds may be applied in the interests of fairness.

**(2b)** Superscope argues that, as a real estate finder, Tenzer may not invoke the equitable doctrine of estoppel. It relies upon a series of cases which have established that "'an estoppel to plead the statute of frauds cannot be predicated upon the . . . refusal to comply with an oral promise to pay a [real estate] commission.'" ( *Keely v. Price (1972) 27 Cal. App. 3d 209, 212* **[***135]** *[103 Cal. Rptr. 531]*, quoting *Herzog v. Blatt (1947) 80 Cal. App. 2d 340, 343 [180 P.2d 30]*; see also *Hicks v. Post (1908) 154 Cal.22 [96 P. 878]*; *King v. Tilden Park Estates (1958) 156 Cal. App. 2d 824 [320 P.2d 109]*; *Augustine v. Trucco (1954) 124 Cal. App. 2d 229 [268 P.2d 780]*; *White v. Hirschman (1942) 54 Cal. App. 2d 573 574 [129 P.2d 430]*; *Sweeley v. Gordon (1941) 47 Cal. App. 2d 381 [118 P.2d 14]*.)

Superscope's reliance is misplaced. The cases it cites all involved licensed real estate brokers. The rationale for rigorous application of the statute of frauds to bar claims by licensed real estate brokers is related to the statutory licensing requirements. "Real estate brokers are licensed as such only after they have demonstrated a knowledge of the laws relating to real estate transactions (*Bus. & Prof. Code, §§ 10150, 10153*), and it would seem that they **[*28]** would thus require less protection against pitfalls encountered in transactions regulated by those laws. In *Pacific Southwest Dev. Corp. v. Western Pac. R. R. Co. [1956] 47 Cal.2d 62 [301 P.2d 825]*, the court stated at page 70: 'Plaintiff is a licensed real estate broker and, as such, is presumed to know that contracted for real estate commissions are invalid and unenforceable unless put in writing and subscribed by the person to be charged. [Citations.] Nevertheless, plaintiff failed to secure proper written authorization to protect itself in the transaction. Rather it assumed the risk of relying upon claimed oral promises of defendant, and it has no cause for complaint if its efforts go unrewarded.'" ( *Franklin v. Hansen (1963) 59 Cal.2d 570, 575 [30 Cal. Rptr. 530, 381 P.2d 386]*; see also *Jaffe v. Albertson Co. (1966) 243 Cal. App. 2d 592, 603-604 [53 Cal. Rptr. 25]*; *King v. Tilden Park Estates, supra, 156 Cal. App. 2d 824, 830*.) [6]

6 We note that the rules withholding traditional equitable remedies, such as recovery in quantum meruit and the doctrine of estoppel, from real estate brokers have been vigorously criticized. (See, e.g., Comment, *Equitable Estoppel and the Statute of Frauds in California* (1965) 53 Cal. L. Rev. 590, 602, 609; Note, *Oral Employment Contracts and Equitable Estoppel: The Real Estate Broker as Victim* (1975) 26 Hastings L.J. 1503; 1 Miller & Starr, Current Law of Cal. Real Estate (1975) § 1:54, pp. 69-74, fn. 8.) Miller and Starr suggest that this issue may be due for reexamination in light of changed conditions in the real estate field. (*Ibid.*) In today's market, they assert, brokers often deal with sophisticated principals in superior bargaining positions. In such circumstances, the broker is powerless to compel the principal's cooperation in executing a written commission agreement and denial of the broker's claim for a commission based on failure to comply with the requirements of the statute of frauds is unjust. Whether or not there is merit in these arguments, we reserve for another day the question whether licensed brokers may invoke equitable remedies to avoid the sometimes harsh results of the statute of frauds. As noted above, the question is not presented in this case.

This rationale is inapplicable to "finders," who need not be licensed brokers, or **[**218]** even involved in the real estate business professionally. We, therefore, decline to extend the scope of the *Keely* v. *Price* rule to unlicensed finders such as Tenzer. Tenzer is entitled to invoke the doctrine of estoppel to plead the statute of frauds. On the facts alleged, Superscope's motion for summary judgment was improperly granted.

II.

**(4a)** Tenzer's complaint also sets forth an alternative basis for relief, seeking damages for fraud. Tenzer alleges that Tushinsky, acting for Superscope, deliberately misled him by falsely promising to compensate him for his services as a finder. Tenzer acted in reliance upon these misrepresentations and has suffered damage. Therefore, Tenzer asserts that, regardless of whether the oral contract is enforceable, he may maintain an action in tort for fraudulent misrepresentation.

**[*29]** A series of cases have held that an action for fraud cannot be maintained where the allegedly fraudulent promise is unenforceable as a contract due to the statute of frauds. The rule was stated in **[***136]** *Kroger v. Baur (1941) 46 Cal. App. 2d 801, 803 [117 P.2d 50]*, as follows: "Appellant contends that his action is not upon the invalid agreement, but is an action for damages for fraud, upon the theory that the oral promise to pay him a commission was made without any intention of performing it and for the purpose of inducing him to waive a written memorandum. If the law can be thus nullified by the transparent device of predicating a tort action upon the invalid oral promise on the ground that the promisor did not intend to perform it, then the section might just as well be stricken from the statute. To license such a circuitous procedure to evade the provisions of such legislation would be to nullify and destroy its

wholesome effect and the protection it affords against fraud." (See also *Keely v. Price, supra, 27 Cal. App. 3d 209, 215*; *Owens v. Foundation for Ocean Research (1980) 107 Cal. App. 3d 179 [165 Cal. Rptr. 571]*; *Beach v. Arblaster (1961) 194 Cal. App. 2d 145, 163 [14 Cal. Rptr. 854]*.)

But the *Kroger* rule has been criticized and, in 1978, Justice Kaus -- then sitting on the Second District Court of Appeal -- invited this court to disapprove it. Today we accept his invitation.

As Justice Kaus observed: "Several considerations point to a demise of the *Kroger* rule . . . . In brief: 1. The 'better' rule is contra. *Comment (c) to section 530 of the Restatement Second of the Law of Torts* states that a misrepresentation of one's intention is actionable even 'when the agreement is oral and made unenforceable by the statute of frauds, or when it is unprovable and so unenforceable under the parol evidence rule.' 2. The broad statement of the *Kroger* rule is difficult to reconcile with the principle that a party may be estopped to assert the statute of frauds where such estoppel is necessary 'to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances.' ( *Monarco v. Lo Greco (1950) 35 Cal.2d 621, 623*.) 3. It is simply untrue that a plaintiff who undertakes to plead and prove actionable fraud is attempting to get around the statute of frauds by a 'transparent device.' *Kroger* seems to assume the inability of a jury to distinguish between an unkept but honest promise and one which the promisor never intended to perform. The law is otherwise. ( *People v. Ashley (1954) 42 Cal.2d 246, 263-264 [267 P.2d 271]*.) 4. The provision of the statute of frauds which spawned *Kroger* was *Civil Code section 1624, subdivision 5*, relating to agreements for real estate brokers' commissions. The law has traditionally had little sympathy with the broker who has failed to sign up his client. (E.g., *Augustine v. Trucco (1954) 124 Cal. App. 2d 229, 237-238 [268 P.2d 780]*.)" ( *Southern Cal. etc. Assemblies of God v. Shepherd* **[*30]** *of Hills etc. Church (1978) 77 Cal. App. 3d 951, 958, fn. 3 [144 Cal. Rptr. 46]*.)

**[**219]** In addition, the *Kroger* approach is inconsistent with the general rule "'that the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme.'" ( *Seymour v. Oelrichs (1909) 156 Cal. 782, 794 [106 P. 88]*, quoting 2 Pomeroy's Equity Jurisprudence, § 921; see also *Moore v. Day (1954) 123 Cal. App. 2d 134, 138 [266 P.2d 51]*; 3 Williston on Contracts (3d ed. 1960) § 533A, p. 802.)

**(5)** Nor do we agree with the view that the *Kroger* rule is necessary to prevent the nullification of the statute of frauds. This view is perhaps based upon the notion that, when the statute of frauds clearly bars an action in contract, a disappointed promisee should not be allowed to present his claim for compensation to a jury simply by recasting his complaint to include an allegation of misrepresentation. If it were, in fact, that easy to reach a jury on a claim of fraud, we might agree. Fortunately, this is not the case. To survive a motion for a nonsuit (*Code Civ. Proc., § 581c*), plaintiff in an action on a fraudulent promise must **[***137]** produce evidence of the promisor's intent to mislead him.

Some California cases have stated broadly that "[the] subsequent failure to perform as promised warrants the inference that defendant did not intend to perform when she made the promise. [Citations.]" ( *Santoro v. Carbone (1972) 22 Cal. App. 3d 721, 728 [99 Cal. Rptr. 488]*; see also *Jarkieh v. Badagliacco (1946) 75 Cal. App. 2d 505, 509 [170 P.2d 994]*.) This may suggest that proof that a promise was made and that it was not fulfilled is sufficient to prove fraud. This is not, and has never been, a correct statement of the law, and we disapprove the cases cited to the extent they suggest otherwise.

Rather, "something more than nonperformance is required to prove the defendant's intent not to perform his promise." ( *People v. Ashley (1954) 42 Cal.2d 246, 263 [267 P.2d 271]*; see also *Jacobson v. Mead (1936) 12 Cal. App. 2d 75, 82 [55 P.2d 285]*; *Justheim Petroleum Company v. Hammond (10th Cir. 1955) 227 F.2d 629, 637*; *Rest.2d Torts, § 530, com. d.*; Prosser, Torts (5th ed. 1984) § 109, p. 764.) To be sure, fraudulent intent must often be established by circumstantial evidence. Prosser, for example, cites cases in which fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform. (Prosser, *supra*, at pp. 764-765.) However, **[*31]** if plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury. The policies of the statute of frauds will not be subverted by affording plaintiffs who can prove actual fraud the opportunity to do so.

**(4b)** For these reasons, we disapprove of *Kroger* v. *Baur* and its progeny. We conclude that Tenzer's papers were sufficient to raise triable issues of fact on a cause of action for fraudulent misrepresentation.

III.

**(6)** In its motion for summary judgment, Superscope contended that, even if Tenzer had had a commission agreement, he acted as a real estate broker and cannot recover because he was not licensed. (*Bus. & Prof.*

*Code, § 10136.*) Whether Tenzer acted as a broker is a question of fact, requiring an examination of his conduct after the introduction of the buyer and seller, to determine whether he participated in their negotiations. ( *Lyons v. Stevenson (1977) 65 Cal. App. 3d 595, 605-606 [135 Cal. Rptr. 457].*) **(7)** (See fn. 7.)The record does not permit adjudication of this factual question on a motion for summary judgment. [7]

7 Superscope also advanced a somewhat confused theory of "waiver"; alleging that, by giving misleading answers on questionnaires Superscope distributed in 1980 and 1981, Tenzer had waived his claim against the corporation.

The use of the term "waiver" in a contractual context is ambiguous and uninformative. (See generally 5 Williston on Contracts (3d ed. 1961) § 678, p. 238 et seq.) As Professor Williston notes, an agreement to discharge from liability previously incurred is more normally denominated a release. *Civil Code section 1541* permits the extinction of an obligation, unsupported by consideration, provided that the release is in writing. The writing must, however, expressly show the creditor's intent to extinguish the obligation. ( *Golden West Credit etc. Co. v. Wilson (1932) 119 Cal. App. 627, 636 [7 P.2d 345].*) In our view, Tenzer's answers on the 1980 and 1981 questionnaires express no such intent.

**[**220]** IV.

Finally, we address Superscope's contention that in light of Tenzer's fiduciary obligations as corporate director any reliance by him upon Tushinsky's promise was unreasonable as a matter of law.

At the time of the alleged agreement, Tenzer was a member of Superscope's Board. As such, he bore a fiduciary relationship to Superscope and to all its stockholders. ( *Remillard Brick Co. v. Remillard-Dandini (1952) 109 Cal. App. 2d 405, 419 [241 P.2d 66].*) **(8)** Well-established principles **[***138]** of corporations law hold that a "director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent." ( *Id., at p. 418.*) "[Directors'] dealings with the corporation are **[*32]** subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director . . . not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [Citation.] The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. [Fn. omitted.] If it does not, equity will set it aside." ( *Pepper v. Litton (1939) 308 U.S. 295, 306-307 [84 L. Ed. 281, 289, 60 S. Ct. 238].*) "[Transactions] that are unfair and unreasonable to the corporation may be avoided." ( *Remillard Brick Co., supra, at p. 418*, see also 1 *Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1984) § 103.01*, pp. 6-20.1-6-21.)

**(9)** As a corporate director, Tenzer is charged with the knowledge that any contract he entered into with his own corporation, even if valid and enforceable in all other respects, could be avoided at the corporation's option if it were determined to be unfair or unreasonable to the corporation. Thus, in order to prove that his reliance upon Tushinsky's promise was justifiable, Tenzer will be required to prove that the arrangement was fair and reasonable to the corporation.

Establishing whether Tenzer's agreement with Superscope was fair and reasonable involves determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to these facts. These are functions mainly for the trier of facts. (See *Mueller v. MacBan (1976) 62 Cal. App. 3d 258, 276 [132 Cal. Rptr. 222]*; see also *MacEwen v. Star-Kist Foods, Inc. (E.D.N.Y. 1966) 251 F. Supp. 33.*)

For the guidance of the trial court in overseeing this factfinding process, we offer the following observations. In ever-increasing numbers, we derive our livelihoods from transactions in information rather than property or labor. In addition to real estate professionals, lawyers, bankers, and accountants, as well as consultants in any number of fields often sell what they *know* as much as what they *do*. Many of these same professionals serve as directors on the boards of corporations for which they also work. The ethics and wisdom of serving on the board of a corporation to which one regularly renders professional services has been questioned. (See Knepper, *Liability of Lawyer-Directors* (1970) 40 Ohio St. L.J. 341; see also Ruder, *The Case Against the Lawyer-Director* **[**221]** (1975) 30 Bus. Law. 41.) Yet the practice is widespread and has its defenders, who point out that corporations should not be deprived of the special skills such "interested directors" can provide, and that the potential for conflicts of interest can be avoided by full disclosure and establishment of procedures to assure conscientious adherence to ethical standards of fairness. (See, e.g., Note, *Should Lawyers* **[*33]** *Serve as Directors of Corporations for Which They Act as Counsel?* 1978 Utah L. Rev. 711.)

Certainly it would be unfair to require such directors to surrender gratuitously to their corporations information or advice for which they would otherwise be paid in the normal course of their business. At the same time, we discern nothing oppressive in the view that corporate

directors should be required, as a facet of their role as fiduciaries, to pass on information vital to the survival of their corporations which either is incidental to the directors' usual mode of earning a living or was casually acquired.

The determination whether Tenzer's agreement with Tushinsky was fair and reasonable to Superscope involves evaluation of the specific facts surrounding the transaction. Was Tenzer dependent upon transactions of this sort for his livelihood? **[***139]** If so, was this fact known to Tushinsky? Was it known that, by revealing Amir's name to Superscope, Tenzer would be forgoing the opportunity to sell the same information in other quarters?

How did Tenzer become aware of Amir's interest in a deal of this sort? Directors may be more obligated freely to disclose information which "falls into their laps" than information obtained by employing the skills and resources normally used in their professions.

How did the price Tenzer asked for his information compare to the usual commission for such information in this real estate market? Did Superscope's bylaws specifically allow or prohibit compensation of directors for professional services? This list of questions is by no means exhaustive.

The answers to these questions are also pertinent to Tenzer's claim of estoppel to plead the statute of frauds. **(10)** Estoppel is an equitable remedy and, as such, will only be applied to avoid injustice. If reliance upon Tushinsky's promise was unjustified in light of Tenzer's position as a director, equity does not require that Tenzer be allowed to enforce the promise. (See generally *Rest.2d Contracts, § 139.*) At the same time, this factual inquiry may establish that, because of his fiduciary relationship to the corporation, Tenzer was obligated to reveal his information without seeking compensation. If so, the corporation cannot be said to be unjustly enriched by retaining the benefits of Tenzer's information but refusing to pay for it. Thus, Tenzer will have to establish that his behavior was reasonably consistent with his fiduciary role in order to invoke the doctrine of estoppel.

Resolution of this issue requires information which, at this point, does not appear in the record. For this reason, we conclude that summary adjudication was inappropriate.

**[*34]** The judgment is reversed.

# TAB 37

1 of 1 DOCUMENT

**JAMES R. WALLER, JR., et al., Plaintiffs and Respondents, v. TRUCK INSURANCE EXCHANGE, INC., et al., Defendants and Appellants.**

**No. S042287.**

**SUPREME COURT OF CALIFORNIA**

***11 Cal. 4th 1; 900 P.2d 619; 44 Cal. Rptr. 2d 370; 1995 Cal. LEXIS 4788; 95 Cal. Daily Op. Service 6832; 95 Daily Journal DAR 11663***

**August 28, 1995, Decided**

**SUBSEQUENT HISTORY:** As Modified on Denial of Rehearing October 26, 1995, Reported at: *1995 Cal. LEXIS 6619.*

**PRIOR HISTORY:** Superior Court of Orange County, Nos. 52-35-77, 52-51-50 and 52-19-22, Byron K. McMillan, Judge. *

* Retired judge of the Orange Superior Court sitting under assignment by the Chairperson of the Judicial Council.

**DISPOSITION:** The Court of Appeal's judgment should be affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

An insured corporation, its former president, and four officers requested that the insurer defend them against a third party lawsuit, pursuant to the commercial general liability (CGL) policy issued by the insurer. The insurer, through its adjuster, refused to defend the lawsuit on the ground that the CGL policy did not provide coverage under the allegations of the third party complaint. After successfully defending the third party action, the insureds filed actions against the insurer and its adjuster, and the trial court ruled, inter alia, that the insurer had a duty to defend. The trial court granted the insureds' motions for partial directed verdict that the insurer breached the implied covenant of good faith and fair dealing. After concluding that both the insurer and adjuster violated *Ins. Code, § 790.03* (unfair business practices), the jury returned verdicts in favor of the insureds. (Superior Court of Orange County, Nos. 52-35-77, 52-51-50 and 52-19-22, Byron K. McMillan, Judge. *) The Court of Appeal, Fourth Dist., Div. One, No. D015864, reversed the entire judgment after concluding that the insurer's CGL policy did not provide coverage. It ruled that since the alleged emotional and physical distress flowed from noncovered economic loss, there was no potential for coverage and hence no duty to defend.

* Retired judge of the Orange Superior Court sitting under assignment by the Chairperson of the Judicial Council.

The Supreme Court affirmed the judgment of the Court of Appeal and held that the insurer had no duty to defend. The damages sought for emotional and physical distress were derivative of and inseparable from the third party's allegations of intentional and business torts, allegations that could not give rise to coverage. The CGL policy language was standard, providing coverage for bodily injury and tangible property damage. CGL policies do not provide coverage for economic losses that cause emotional distress. The court also held that the insurer, upon issuing the letter denying the insureds' request to defend them in the third party lawsuit, did not impliedly waive its right to rely on the defense that the policy did not cover economic losses, notwithstanding that the denial letter failed to specifically mention that defense. Waiver requires the insurer to intentionally relinquish its right to deny coverage, and a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial. Nor was the insurer estopped from denying a duty to defend based on its failure in the denial letter to assert that economic loss was not covered. The insureds' alleged detrimental reliance on the insurer's initial denial letter could not give rise to a claim for estoppel, since the insureds never reasonably believed, nor could they have reasonably believed, that the policy provided a potential for coverage. The court further held that the insureds could not state causes of action against the insurer for either breach of the implied covenant of good

faith and fair dealing or violation of *Ins. Code, § 790.03*. Since there was no contractual liability on the part of the insurer or its adjuster, inasmuch as the insurer owed no duty to defend the third party action, the insureds could not assert a valid bad faith claim. With respect to *Ins. Code, § 790.03*, there was no indication that either the insurer or its adjuster unnecessarily delayed in performing its investigative duties under the policy or misled plaintiffs into believing it would provide either a defense or coverage to the third party complaint. (Opinion by Lucas, C. J., with Mosk, Arabian, Baxter, George and Werdegar, JJ., concurring. Separate concurring and dissenting opinion by Kennard, J.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1) Insurance Contracts and Coverage § 79--Coverage of Contracts--Commercial General Liability Policy--Risks and Exclusions.** --A commercial general liability policy, often referred to as a business general liability policy, provides liability insurance for businesses. The policy is written in two essential parts: the insuring agreement, which states the risk or risks covered by the policy, and the exclusion clauses, which remove coverage for risks that would otherwise fall within the insuring clause. Before even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within the policy terms. This is significant for two reasons. First, when an occurrence is clearly not included within the coverage afforded by the insuring clause, it need not also be specifically excluded. Second, although exclusions are construed narrowly and must be proven by the insurer, the burden is on the insured to bring the claim within the basic scope of coverage, and (unlike exclusions) courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage. Accordingly, the insured has the burden of showing that there has been an "occurrence" within the terms of the policy.

**(2) Insurance Contracts and Coverage § 79--Coverage of Contracts--Commercial General Liability Policy--"Occurrence"--Coverage of Unexpected or Accidental Events.** --The commercial general liability policy restricts coverage to damages "caused by an occurrence," which, in standard pre-1986 policies, was defined as an "accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Although more recent policies have replaced the term "accident" with "event" (to include gradual events within the concept of accident), the phrase "neither expected nor intended" focuses coverage on unexpected or accidental injuries that are fortuitous and not planned or intended. This concept of fortuity is basic to insurance law. Insurance typically is designed to protect against contingent or unknown risks of harm (*Ins. Code, §§ 22, 250*), not to protect against harm that is certain or expected. In other words, such insurance generally protects against risks of loss rather than certainties of loss.

**(3) Insurance Contracts and Coverage § 79--Coverage of Contracts--Commercial General Liability Policy--Coverage for Bodily Injury or Tangible Property Loss--Economic Losses as Outside Scope of Coverage.** --Standard commercial general liability (CGL) policies define bodily injury to mean: "bodily injury, sickness or disease including death at any time resulting therefrom sustained by any person." The property loss section of the standard policy provides coverage for "physical injury or destruction of tangible property which occurs during the policy term." The focus of coverage for property damage is therefore the property itself, and does not include intangible economic losses, violation of antitrust laws, or nonperformance of contractual obligations. Strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment do not constitute damage or injury to tangible property covered by a CGL policy. A complaint seeking to recover damages of this nature from an insured falls within the scope of the insurance coverage only where the intangible economic losses provide a measure of damages to physical property that is within the policy's coverage. By statute, and as a matter of public policy, the liability insurer may not provide coverage for willful injuries by the insured against a third party (*Ins. Code, § 533*; *Civ. Code, § 1668*).

**(4) Insurance Contracts and Coverage § 11--Rules in Aid of Interpretation of Contracts--Interpretation as Question of Law--Coverage as Determined by Policy Language--Commercial General Liability Policy.** --When determining whether a particular insurance policy provides a potential for coverage and a duty to defend, courts are guided by the principle that interpretation of an insurance policy is a question of law. The rules governing policy interpretation require courts to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it (*Civ. Code, § 1638*). Thus, in determining whether allegations in a particular complaint give rise to coverage under a commercial general liability policy, courts must consider both the occurrence language in the policy, and the endorsements broadening coverage, if any, included in the policy terms. An insurance policy

provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. Courts will not strain to create an ambiguity where none exists.

**(5) Insurance Contracts and Coverage § 107--Extent of Liability of Insurer--Liability and Indemnity Insurance--Duty to Defend Insured--When Duty Arises.** --An insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. This duty, which applies even to claims that are groundless, false, or fraudulent, is separate from and broader than the insurer's duty to indemnify. However, where there is no possibility of coverage, there is no duty to defend. The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability. This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy.

[See 6 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 1136 et seq.]

**(6) Insurance Contracts and Coverage § 107--Extent of Liability of Insurer--Liability and Indemnity Insurance--Commercial General Liability Policy--Duty to Defend Insured--Economic Losses Causing Emotional and Physical Distress Damages.** --A commercial general liability (CGL) insurer of a corporation had no duty to defend a third party action that sought emotional and physical distress damages caused by the insured's alleged economic or business torts. The damages sought for emotional and physical distress were derivative of and inseparable from the third party's allegations of intentional and business torts, allegations that could not, by themselves, give rise to coverage. The CGL policy language was standard, providing coverage for bodily injury and tangible property damage. CGL policies do not provide coverage for economic losses that cause emotional distress; they were never intended to cover emotional distress damages that flow from an uncovered "occurrence," and the parties could not reasonably have expected that coverage would be expanded merely because a claim of emotional or physical distress was alleged as a result of the economic loss. Accordingly, the insurer owed no duty to defend the lawsuit. All allegations in the complaint were related to the third party's asserted economic loss as a shareholder of the corporation, and shareholder disputes were not covered. The allegations of the complaint, liberally construed, did not assert a risk potentially covered under the CGL policy.

**(7) Insurance Contracts and Coverage § 139--Actions--Appeal--Duty to Defend Insured--Commercial General Liability Policy--Reliance on Appellate Decisions Published After Trial.** --A commercial general liability (CGL) insurer of a corporation was able on appeal to rely on two appellate cases to support its position that it had no duty to defend a third party action that sought damages based on economic loss, notwithstanding that the two cases were not decided until after the trial in the present case, and that the insurer's defense was not raised in the trial court or in the regular briefing in the Court of Appeal. Courts of Appeal routinely consider newly published case law that was unavailable until after judgment in the trial court. Also, after the two cases were decided, the insurer got permission to file supplemental briefs. Supplemental briefing is proper when a court wishes to consider a point of law following the regular briefing of a case on appeal. Further, the duty to defend issue involved a question of law based on undisputed facts. Thus, the Court of Appeal had discretion to address the issue even though it had not been raised at trial. Moreover, judicial decisions are to be applied retroactively. Although the insureds asserted that they relied on law prior to one of the appellate decisions in deciding what facts needed to be explored, that the decision was unforeseeable, and that retroactive application of its holding was contrary to public policy, similar arguments were rejected by the United States Supreme Court. Also, that appellate decision was not new law; it was a clarification of existing law.

**(8) Insurance Contracts and Coverage § 107--Extent of Liability of Insurer--Liability and Indemnity Insurance--Commercial General Liability Policy--Duty to Defend Insured in Absence of Published Judicial Precedent.** --A commercial general liability (CGL) insurer of a corporation had no duty to defend a third party action that sought damages based on economic loss, despite the insureds' assertion that the lack of legal authority on the duty to defend issue and the uncertainty of the policy interpretation compelled a duty to defend. While the insurer must look to the facts of the complaint and extrinsic evidence to determine if there is a potential for coverage and a corresponding duty to defend, the insurer need not always defend a third party suit absent a published judicial opinion definitively construing the specific policy provision on which the insurer relies. The determination is usually made by comparing the allegations of the complaint with the policy terms. If the policy

terms provide no potential for coverage, the insurer acts properly in denying a defense even if that duty is later evaluated under case law that did not exist at the time of the tender of defense. In this case, the policy "occurrence" was based on economic loss that resulted in mental and physical damages to the third party. CGL policies do not provide coverage for intangible property losses, including economic losses. Thus, there was no potential for coverage or corresponding duty to defend.

**(9) Insurance Contracts and Coverage § 107--Extent of Liability of Insurer--Liability and Indemnity Insurance--Commercial General Liability Policy--Duty to Defend Insured--Noncovered Economic Loss.** --A commercial general liability (CGL) insurer of a corporation had no duty to defend a third party suit seeking emotional distress damages based on noncovered economic loss, despite the insureds' assertion that the policy's definition of "occurrence" was different from the standard definition in the CGL policies governing a line of judicial decisions supporting the position that there was no duty to defend. The insureds relied on a Court of Appeal case to argue that since the word "accident" was absent from the definition of "occurrence," and there was no modifying language for "event" in the occurrence clause, there was a duty to defend in cases involving intentional economic torts leading to emotional distress. However, that Court of Appeal case did not question whether "bodily injury" included incidental emotional distress damages flowing from a noncovered economic loss, as occurred in the present case. Nor did the present case focus on whether the insureds' conduct was intentional; thus, the difference in the policy language was irrelevant. Also, rather than merely predominate the complaint, the noncovered acts in the present case comprised the entire complaint. Finally, any lost reputation and humiliation the third party suffered was directly related to the uncovered economic loss, and was not a separate occurrence under the bodily injury clause.

**(10a) (10b) (10c) Insurance Contracts and Coverage § 126--Actions--Defenses--Waiver--Insurer's Denial of Claim--Effect of Insurer's Failure to Mention Every Ground for Denial.** --A commercial general liability (CGL) insurer of a corporation, upon issuing a letter denying its insureds' request to defend them in a third party lawsuit seeking damages derived from economic losses, did not impliedly waive its right to rely on the defense that the policy did not cover economic losses, notwithstanding that the letter denying the claim failed to specifically mention that defense. Waiver requires the insurer to intentionally relinquish its right to deny coverage, and a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial. (Disapproving to the extent it relies on an automatic waiver rule: *Alta Cal. Regional Center v. Fremont Indemnity Co. (1994) 25 Cal.App.4th 455 [30 Cal.Rptr.2d 841].*) A holding that an insurer waives defenses not asserted in connection with its initial denial of a duty to defend would be inconsistent with established waiver principles in that it would erroneously imply an intent to relinquish contract rights where no such intent existed. The facts in the present case did not show that the denial letter indicated an intention on the part of the insurer to relinquish additional reasons for its denial of a duty to defend. Nor did the insureds show that the insurer's actions following its defense denial were inconsistent with its intent to enforce the terms of the policy. Thus, the insureds failed to show that the insurer's denial of a defense induced a reasonable belief in the insureds that the insurer intended to waive additional policy defenses.

**(11) Estoppel and Waiver § 18--Waiver--Definition--Burden of Proof--Waiver as Express or Implied.** --Waiver is the intentional relinquishment of a known right after knowledge of the facts. The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver. The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right.

**(12) Insurance Contracts and Coverage § 126--Actions--Defenses--Waiver as Affirmative Defense--Waiver Versus Estoppel.** --In the insurance context, the terms "waiver" and "estoppel" are sometimes used interchangeably, even though estoppel requires proof of the insured's detrimental reliance. Nonetheless, waiver is an affirmative defense, for which the insured bears the burden of proof, and California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.

**(13) Insurance Contracts and Coverage § 126--Actions--Defenses--Estoppel--Insurer's Denial of Claim--Effect of Insurer's Failure to Mention Every Ground for Denial.** --A commercial general liability (CGL) insurer, upon issuing a letter denying its insureds' request to defend them in a third party lawsuit seeking damages for economic loss, was not estopped from later denying a defense on the ground that economic loss was not covered--a ground not asserted in the original denial letter. The insureds asserted that the insurer anticipated subsequent case law supporting the position that economic loss was not covered under CGL policies, yet failed to state that defense in its denial letter, thus pre-

cluding the insureds from developing facts to show the third party's injury arose from causes other than economic loss. However, the insurer's denial letter was issued on the ground that the third party lawsuit was essentially a "business dispute" based on "intentional acts," which would never have given rise to any potential for CGL coverage. The denial letter thus adequately explained the basis for the insurer's rejection of a defense. Because the "occurrence" was the ongoing business dispute between the third party and the insureds, the allegations in the third party complaint fell outside the scope of coverage. Accordingly, the insureds' alleged detrimental reliance on the insurer's initial denial letter could not give rise to a claim for estoppel, since the insureds never reasonably believed, nor could they have reasonably believed, that the policy provided a potential for coverage.

**(14a) (14b) Insurance Contracts and Coverage § 110--Extent of Liability of Insurer--Duty of Insurer to Act in Good Faith--Unfair Claims Settlement Practices--Requirement That Insured Demonstrate Contractual Liability.** --Plaintiff insureds could not state causes of action against the commercial general liability (CGL) insurer of a corporation for either breach of the implied covenant of good faith and fair dealing or violation of *Ins. Code, § 790.03* (unfair business practices), as a result of the insurer's refusal to defend the insureds against a third party suit seeking emotional distress damages based on noncovered economic loss. Since there was no contractual liability on the part of the insurer or its adjuster, inasmuch as the insurer owed no duty to defend the third party action, the insureds could not assert a valid bad faith claim. If there is no potential for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer. As for the alleged violation of *Ins. Code, § 790.03*, there was no indication that either the insurer or its adjuster unnecessarily delayed in performing its investigative duties under the policy or misled plaintiffs into believing it would provide either a defense or coverage to the third party complaint.

**(15) Insurance Contracts and Coverage § 110--Extent of Liability of Insurer--Duty of Insurer to Act in Good Faith--Unfair Claims Settlement Practices.** --When evaluating an insurer's alleged violation of *Ins. Code, § 790.03* (unfair business practices), courts are guided by the principles of first party coverage, and the fact that the insurer owes its insured an independent duty to process all claims submitted to it in a reasonable manner, and not to delay the ultimate decision to defend or indemnify, to the insured's prejudice. For example, where an insurer undertakes a defense under a reservation of rights, and then fails to pursue the defense in a reasonable manner, the insurer may be subject to penalties under *Ins. Code, § 790.03*. The insurance commissioner may also impose administrative sanctions against an insurance company responsible for committing unfair practices that are independent of the insurance contract and proscribed by *§ 790.03*.

**COUNSEL:** Waldman & Chuang, Carter & Chuang, Craig H. Bell, Horvitz & Levy, Ellis J. Horvitz, David M. Axelrad and Mitchell C. Tilner for Defendants and Appellants.

Charles W. Savage, Jody Carr, Michael A. Mathews, Buchalter, Nemer, Fields & Younger, Roxani M. Gillespie, Richard de Saint Phalle, J. Karren Baker, Barbara G. Mikalson, Haight, Brown & Bonesteel, Roy G. Weatherup, Maureen Haight Gee, Sonnenschein, Nath & Rosenthal, Paul E. B. Glad, Thomas Holden, Robie & Matthai, James R. Robie, Michael J. O'Neill, Pamela E. Dunn, Chapman, Popik & White, Susan M. Popik, Kathleen M. Wardlaw, McCormick, Bartsow, Sheppard, Wayte & Carruth, James P. Wagoner, James H. Wilkins, Wendy S. Lloyd, Gregory A. Floyd, Ropers, Majeski, Kohn & Bentley, Mark G. Bonino, Lawrence O. Monin and Allison G. Dobbrow as Amici Curiae on behalf of Defendants and Appellants.

Ford & Pedersen, The Ford Law Firm, William H. Ford III, Claudia J. Serviss, Neil Pedersen, George G. Kim, Michael D. Collins, Paul C. Cook, Osborn & Patton, Osborn, Anderson & Wood, Richard G. Osborn, George F. Robertie, Carol F. Anderson and Susan E. Abitanta for Plaintiffs and Respondents.

James T. Linford, Irell & Manella, Thomas W. Johnson, Jr., Steven L. Sloca, Marc S. Maister, Mary-Christine Sungaila, Hill, Wynne, Troop & Meisinger, Kirk A. Pasich, Lori Yankelevits, Thomas & Elliott, Steve Thomas, Jay Elliott, Brobeck, Phleger & Harrison, David M. Halbreich, Latham & Watkins, G. Andrew Lundberg, Paul, Hastings, Janofsky & Walker, Ronald M. Oster, Eve M. Coddon, Heller, Ehrman, White & McAuliffe, David B. Goodwin, Wayne S. Bravemen, Munger, Tolles & Olson and Charles D. Siegal as Amici Curiae on behalf of Plaintiffs and Respondents.

**JUDGES:** Opinion by Lucas, C. J., with Mosk, Arabian, Baxter, George and Werdegar, JJ., concurring. Separate concurring and dissenting opinion by Kennard, J.

**OPINION BY:** LUCAS, C. J.

**OPINION**

[*10] [**621] [***372] **LUCAS, C. J.**

We granted review to decide the recurring issue whether a commercial general liability insurer is required to defend a third party action that seeks incidental emotional distress damages caused by the insured's noncovered economic or business torts. The [**622] [***373] Court of Appeal below concluded that allegations of incidental emotional distress damages flowing from noncovered causes of action fall outside the scope of a commercial (formerly called comprehensive) general liability (CGL) policy and present no potential for coverage under the policy. Accordingly, the Court of Appeal reasoned, because there is no potential for coverage, there is no duty to defend on the part of the insurer. ( *Gray v. Zurich Insurance Co. (1966) 65 Cal. 2d 263 [54 Cal. Rptr. 104, 419 P.2d 168]* [hereafter *Gray*].) The Court of Appeal also concluded that if the insurer is under no obligation to defend or indemnify the third party action, it cannot be found liable for either statutory bad faith ( *Ins. Code, § 790.03*) or breach of the implied covenant of good faith and fair dealing, for its denial of a defense. (See, e.g., *Love v. Fire Ins. Exchange (1990) 221 Cal. App. 3d 1136, 1152 [271 Cal. Rptr. 246]* [bad faith claim cannot be maintained unless policy benefits are due].) As we explain, we affirm the Court of Appeal judgment.

FACTS

In 1985, defendant Truck Insurance Exchange, Inc. (hereafter T.I.E.) issued a CGL policy to plaintiff Marmac, Inc., a California corporation that [*11] provides engineering and design services to aerospace, pharmaceutical, and energy industries. The declarations page of the T.I.E. policy identified Marmac as the named insured, and contained an endorsement naming Lester Amey, among others, as a named insured. The policy was renewed in 1986, and was substantially identical (with typographical corrections) to the 1985 policy.

In pertinent part, the T.I.E. policy provided liability coverage for: "all damages which the insured becomes legally obligated to pay because of ... bodily injury to any person, and ... damage to property ... to which this insurance applies, caused by an occurrence." The policy did not provide personal injury coverage to Marmac directors and officers and specifically excluded coverage for any insured for bodily injury to a named insured. The policy defined an "occurrence" "as an event, or series of events, including injurious exposure to conditions, proximately caused by an act or omission of the insured regardless of the number of persons, vehicles or objects affected by the act or omission which results, during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." Defendant Farmers Insurance Exchange (Farmers), as T.I.E.'s adjuster, was responsible for handling claims filed by T.I.E. insureds.

Prior to August 29, 1986, plaintiff Waller, Marmac's president, owned 60 percent of Marmac stock. Amey, Marmac's executive vice-president, owned 40 percent. On August 29, 1986, Waller sold his stock in equal proportions to employees Hendrix, Akers, Petersen, and Hepple. Thereafter, Waller resigned from Marmac's board, and Hendrix and Hepple were elected to the board, with Amey remaining as the third member. Akers subsequently became president of the company, and Hendrix, Hepple and Petersen became vice-presidents. Amey was thereafter demoted.

Amey sued Marmac, Waller, and the four Marmac officers under 11 causes of action: involuntary dissolution ( *Corp. Code, § 1800, subd. (b)(4)* & *(5)*); breach of fiduciary duty; breach of statutory duty of good faith (*id.*, § 309); interference with prospective economic advantage; breach of contract; breach of the implied covenant of good faith and fair dealing; breach of duty of good faith and fair dealing; inducing breach of contract; conspiracy; intentional infliction of emotional distress; and injunctive relief. The first amended complaint included allegations that Marmac's board of directors was "guilty of or have knowingly countenanced acts of persistent and pervasive fraud, mismanagement or abuse of authority and persistent unfairness toward Amey," and that they excluded "Amey from any voice in the management [of Marmac]" to deprive him of a controlling block of stock in [*12] the corporation and in order to "gain a controlling interest in and to freeze Amey, a minority shareholder, out of the corporation." Amey also accused the management of Marmac of "self-dealing in voting themselves substantial increases in salary, and causing [Marmac] to enter into [**623] [***374] an unreasonable or sham contract of employment with [Waller]."

Amey also accused Waller of disregarding and breaching his fiduciary duties to Amey, failing "to exercise good faith and due care so as to avoid unfairness to [Amey] by entering into a transaction to dispose of his dominant or control block of stock in [Marmac] without the slightest regard to the wishes and interests, and without prior knowledge of [Amey], and for the purpose of gaining an unfair advantage in the sale or transfer of said controlling block of shares."

Amey's 10th cause of action alleged intentional infliction of emotional distress against Waller and the Marmac officers, and claimed that because of their conduct, Amey "suffered humiliation, mental anguish, and emotional and physical distress." Amey alleged that as fiduciaries, Waller and the Marmac officers' conduct leading up to the involuntary dissolution and wrongful termination as alleged in the complaint "was outrageous, went beyond all reasonable bounds of decency, was intentional and malicious and was done for the purpose of causing [Amey] to suffer humiliation, mental anguish,

and emotional and physical distress." In making these allegations, Amey did not include Marmac as a named defendant, but nonetheless incorporated all allegations of corporate misconduct and financial detriment into the cause of action.

One week after the Amey suit was filed, Robert Kull, Marmac's corporate attorney, wrote T.I.E. at its home office requesting the insurer defend the Amey lawsuit on behalf of all defendants. About three weeks latter, the letter was forwarded to Farmers' regional liability claims manager in Santa Ana. The claims manager sought an in-house coverage opinion, but did not act on the defense question. That issue was forwarded to Farmers' Anaheim branch claims office. Richard Neisser, manager of the Anaheim office, tentatively concluded that the complaint alleged a noncovered business dispute. He discussed the matter with William Vaughter, a claims representative, and instructed Vaughter to investigate the loss and to verify whether the Amey complaint had been served. Vaughter told Hendrix around December 10 or 11, 1986, that he was going to process the claim for payment. According to Hendrix, Vaughter then asked whether he was pleased with his counsel because Farmers could provide counsel if he was not.

On December 29, 1986, the insureds forwarded to Vaughter the total billing (in the amount of $ 54,000) for attorney fees incurred in defending [*13] the Amey lawsuit. Neisser directed Vaughter to (1) "transmit to [in house counsel] after you have called and discussed, among other things, whether the insurer owes a defense and whether there is an obligation under [*San Diego Federal Credit Union v. Cumis Ins. Society, Inc. (1984) 162 Cal. App. 3d 358, 364 (208 Cal. Rptr. 494)*], (2) send a reservation of rights letter and (3) make up an office file." Neisser concluded, based on the allegations of the complaint, that the policy did not provide coverage for Amey's claims. Neisser then instructed Vaughter to contact in-house counsel, who advised Vaughter to deny the claim. Neisser prepared an evaluation recommending "no coverage."

The regional claims manager (Eastman) concurred in Neisser's decision that the CGL policy did not provide coverage under the allegations of the Amey complaint. Eastman based his decision on the following factors: (1) Amey's complaint did not state an occurrence within the policy insuring clause because Amey was not claiming bodily injury or property damage, and any economic injuries he suffered were expected or intended from the standpoint of the insureds; (2) the policy endorsement listed Amey as a named insured and the policy expressly excluded coverage for liability to named insureds; and (3) Amey was a Marmac employee, and the policy excluded coverage for bodily injury suffered by Marmac employees arising out of and in the course of employment. Eastman testified that the amount of attorney fees already incurred did not influence his decision to recommend a denial of coverage under the policy.

In January 1987, Eastman directed Neisser: "Please deny the insureds' request with an appropriate response outlining specifically that since no coverage is available under the policy contract, nothing can be considered as [**624] [***375] far as any payment is concerned." Neisser sent the insureds the following denial letter:

"We have received your claim for attorney fees in the Lester H. Amey v. Marmac [case]. Accordingly, we have reviewed your policy in its entirety, spoken to your agent, obtained the opinion of our house counsel and submitted the entire packet of information to our Regional Office for a decision regarding whether this loss is covered under your policy.

"The claim against Marmac is essentially a shareholder dispute regarding intentional acts committed by Marmac and their principles [*sic*]. Intentional Acts are not covered under your Sentinel business policy or any endorsements taken out by Marmac. Accordingly we are unable to make payment for legal expenses incurred by Marmac in this matter."

Marmac's counsel asked for reconsideration of the denial, asserting that Amey's amended complaint created a potential for coverage under the CGL [*14] policy. The request was forwarded to the regional office, and the office confirmed the "no coverage" decision. Thereafter, Waller, Marmac, and the Marmac officers successfully defended the Amey action.

Between May and August of 1987, Waller, Marmac, and the four individual defendants filed separate lawsuits against T.I.E. and Farmers, alleging causes of action for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, deceit, and negligent misrepresentation. All plaintiffs sought both compensatory and punitive damages. Waller amended his pleading to substitute Farmers, Farmers Group, Inc., and Truck Underwriters Association for several Does. (Waller later dismissed the latter two entities from his complaint.) Marmac and the other plaintiffs amended their pleadings to substitute Farmers as a party. Two years later the three actions were consolidated and the parties filed second amended complaints, the subject of this proceeding. Only Waller's second amended complaint alleged a cause of action for statutory bad faith pursuant to *Insurance Code section 790.03*. Marmac, Hendrix, Akers, Petersen, and Hepple amended their complaints to include a *section 790.03* cause of action following the close of evidence at trial.

After the trial court denied a joint motion for judgment on the pleadings filed by T.I.E. and Farmers, the

parties tried the legal issues to the court. ( *Code Civ. Proc., § 592.*) The court ruled that (1) Amey's first amended complaint "alleges facts potentially within bodily injury coverage" of the T.I.E. policy; (2) as a matter of law, "the occurrence clause in [the policy] gives rise to a duty to defend in this case"; (3) T.I.E.'s letter to Marmac denying coverage "waived policy based defenses not specified therein"; and (4) *Insurance Code section 533*, disallowing coverage for the insured's "willful" acts, did not excuse T.I.E. from its duty to defend under the policy. The trial court concluded: "[T]he logical conclusions of all the findings made so far, [is that] as a matter of law you had a duty to defend."

Following plaintiffs' opening statements in the jury trial, the trial court granted motions for nonsuit filed by T.I.E. and Farmers on the following causes of action: breach of fiduciary duty, fraud, deceit and negligent misrepresentation, as well as claims by Marmac and Hendrix, Petersen, Akers, and Hepple regarding allegations that T.I.E.'s failure to defend the Amey lawsuit prejudiced their defense.

The trial court granted plaintiffs' motions for partial directed verdict that T.I.E. breached the implied covenant of good faith and fair dealing, and that Farmers was jointly and severally liable with T.I.E. for the breach.

After concluding that both T.I.E. and Farmers violated *Insurance Code section 790.03*, the jury returned verdicts in favor of plaintiffs in the [*15] following approximate amounts: to Hendrix, Akers, Petersen, and Hepple, the jury awarded $ 89,000 for the cost of defending the Amey lawsuit. Marmac received contract damages in the amount of $ 349,000 and attorney fees in the amount of $ 390,000. (See *Brandt v. Superior Court (1985) 37 Cal. 3d 813 [210 Cal. Rptr. 211, 693 P.2d 796]* [allowing attorney fees for tortious breach of insurance contract].) The jury awarded Waller contract damages of [**625] [***376] $ 144,000, attorney fees of $ 334,000, lost consulting fees of $ 227,500 and emotional distress damages of $ 250,000.

After originally being deadlocked on the punitive damages issue, the jury returned a nine-to-three verdict in favor of such damages. It awarded Waller $ 27 million in punitive damages against Farmers, and $ 3 million in punitive damages against T.I.E. Marmac received punitive damages totaling $ 26 million, and Hendrix, Akers, Petersen, and Hepple received a total of $ 4 million in punitive damages.

On motions for new trial filed by T.I.E. and Farmers, the court ordered the judgment corrected to eliminate Farmers' liability for policy benefits. The court also ruled that the punitive damages awarded to Hendrix, Akers, Petersen, and Hepple were excessive.

Both T.I.E. and Farmers appealed and the Court of Appeal reversed the entire judgment after concluding that T.I.E.'s CGL policy did not provide coverage under the allegations of the Amey complaint. The Court of Appeal concluded that because Amey's alleged emotional and physical distress flowed from noncovered economic loss, there was no potential for coverage and hence no duty to defend the plaintiffs against the Amey lawsuit. The Court of Appeal summarized its holding as follows: "Clearly, the Amey lawsuit sets forth nothing more than a business dispute; the torts alleged in the suit are all business and contract transgressions. Simply put, the gravamen of the Amey lawsuit is economic loss. In our view, the damages claim for emotional and physical distress is clearly derivative of and caused by the economic loss suffered by Amey."

We conclude the Court of Appeal correctly analyzed the duty to defend and coverage issues under authority from our state and federal courts. Moreover, the finding of no duty to defend in this context is consistent with the reasonable expectations of the parties when they enter into a contract for commercial general liability insurance, for it is widely understood by both insureds and insurers that such policies are not intended to cover economic losses. As we explain, the damages alleged in Amey's complaint flowed from intangible property losses that could not be considered covered occurrences under the CGL policy. Likewise, the derivative emotional distress [*16] damages sought by Amey for the plaintiffs' alleged business torts were not covered because they flowed from the same noncovered acts. Any damages flowing from noncovered losses that may lead to emotional distress cannot be used to expand coverage where none was intended or bargained for by the parties. ( *Keating v. National Union Fire Ins. (9th Cir. 1993) 995 F.2d 154, 156-157* [hereafter *Keating*]; *McLaughlin v. National Union Fire Ins. Co. (1994) 23 Cal. App. 4th 1132, 1150-1151 [29 Cal. Rptr. 2d 559]* [hereafter *McLaughlin*].) We begin our analysis with an explanation of a third party CGL policy and its intended coverage.

DISCUSSION

A. *The Commercial General Liability Policy*

**(1)** In pertinent part, a CGL policy, often referred to as a business general liability policy, provides liability insurance for businesses. The policy is written in two essential parts: the insuring agreement, which states the risk or risks covered by the policy, and the exclusion clauses, which remove coverage for risks that would otherwise fall within the insuring clause. ( *Collin v. American Empire Ins. Co. (1994) 21 Cal. App. 4th 787, 802 [26 Cal. Rptr. 2d 391]*.) Before "even considering exclusions, a court must examine the coverage provi-

sions to determine whether a claim falls within [the policy terms]." ( *Hallmark Ins. Co. v. Superior Court (1988) 201 Cal. App. 3d 1014, 1017 [247 Cal. Rptr. 638].*) "This is significant for two reasons. First, '... when an occurrence is clearly not included within the coverage afforded by the insuring clause, it need not also be specifically excluded.' ( *Glavinich v. Commonwealth Land Title Ins. Co. (1984) 163 Cal. App. 3d 263, 270 [209 Cal. Rptr. 266].*)

"Second, although exclusions are construed narrowly and must be proven by the insurer, the burden is on the insured to bring the claim within the basic scope of coverage, and (unlike exclusions) courts will not indulge in a forced construction of the policy's insuring [**626] [***377] clause to bring a claim with in the policy's coverage." ( *Collin v. American Empire Ins. Co., supra, 21 Cal. App. 4th at p. 803.*) Accordingly, the insured has the burden of showing that there has been an "occurrence" within the terms of the policy. (*Ibid.*)

**(2)** The CGL policy restricts coverage to damages "caused by an occurrence," which, in standard pre-1986 policies, was defined as an "accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Although more recent policies (including T.I.E.'s policy) have replaced the term "accident" with "event" (to include gradual events within the concept of accident), the phrase "neither expected nor intended" focuses coverage on *unexpected* or *accidental injuries* that are [*17] fortuitous and not planned or intended. This concept of fortuity is basic to insurance law. ( *Chu v. Canadian Indemnity Co. (1990) 224 Cal. App. 3d 86, 94-95 [274 Cal. Rptr. 20]* (*Chu*).) Insurance typically is designed to protect against contingent or unknown risks of harm ( *Ins. Code, § 22, 250*), not to protect against harm that is certain or expected. (*Chu, supra, 224 Cal. App. 3d at pp. 94-95.*) In other words, such insurance generally protects against risks of loss rather than certainties of loss. (*Ibid.*; see e.g., *Shell Oil Co.* v. *Winterthur Swiss Ins. Co. (1993) 12 Cal. App. 4th 715, 747 [15 Cal. Rptr. 2d 815]* [the phrase "expected or intended" precludes coverage for damage that the insured subjectively intended to be a result of its conduct, as well as damage that it in fact subjectively foresaw as practically certain to be a result of its conduct].)

**(3)** Standard CGL policies define bodily injury to mean: "bodily injury, sickness or disease [including death at any time resulting therefrom] sustained by any person." (3 Keller & Golub, *Cal. Insurance Law & Practice (1995) ch. 49, General Liability Policies, § 49.14[1]*, pp. 49-27 to 49-28.)

The property loss section of the standard policy provides coverage for "physical injury or destruction of tangible property which occurs during the policy term." The focus of coverage for property damage is therefore the property itself, and does not include intangible economic losses, violation of antitrust laws or nonperformance of contractual obligations. (See, e.g., *Gulf Ins. Co. v. L.A. Effects Group, Inc. (9th Cir. 1987) 827 F.2d 574, 578* [no coverage under business general liability policy for insured's alleged nonperformance of contractual obligations to create special visual effects for motion picture]; *Lassen Canyon Nursery v. Royal Ins. Co. of America (9th Cir. 1983) 720 F.2d 1016, 1018* [business liability policy for property damage does not cover claims for strictly economic losses caused by insured's alleged antitrust violations]; *Montrose Chemical Corp. v. Superior Court (1993) 6 Cal. 4th 287, 303 [24 Cal. Rptr. 2d 467, 861 P.2d 1153]* [recognizing that "a suit seeking recovery for injuries to intangible economic interests is not a suit 'of the nature and kind' covered by a CGL policy"]; *Chatton v. National Union Fire Ins. Co. (1992) 10 Cal. App. 4th 846 [13 Cal. Rptr. 2d 318]* [hereafter *Chatton*] [ruling there was no coverage for emotional distress damages resulting from investment losses caused by negligent misrepresentation]; *Giddings v. Industrial Indemnity Co. (1980) 112 Cal. App. 3d 213, 217 [169 Cal. Rptr. 278]* [hereafter *Giddings*] [no coverage for intangible economic interests, including breach of securities laws and fraud].) As *Giddings* observed, "strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy. [Citations.] A complaint seeking to recover damages of this nature from an insured falls within [*18] the scope of the insurance coverage only where these intangible economic losses provide 'a measure of damages to physical property which is within the policy's coverage.' [Citations]." ( *Id. at p. 219.*)

Finally, by statute, and as a matter of public policy, the insurer may not provide coverage for willful injuries by the insured against a third party. ( *Ins. Code, § 533.*)

[**627] [***378] *The Interpretation of Insurance Contracts*

**(4)** When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law. ( *AIU Ins. Co v. Superior Court (1990) 51 Cal. 3d 807, 818 [274 Cal. Rptr. 820, 799 P.2d 1253]* [hereafter *AIU*].) The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. ( *Civ. Code, § 1638*; *Reserve Insurance Co.*

*v. Pisciotta (1982) 30 Cal. 3d 800, 807 [180 Cal. Rptr. 628, 640 P.2d 764]* [hereafter *Reserve Insurance* ].) Thus, in determining whether allegations in a particular complaint give rise to coverage under a CGL policy, courts must consider both the occurrence language in the policy, and the endorsements broadening coverage, if any, included in the policy terms. ( *Collin v. American Empire Ins. Co., supra, 21 Cal. App. 4th at p. 803.*)

The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. ( *Civ. Code, § 1636.*) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id., § 1639.*) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id., § 1644*), controls judicial interpretation. (*Id., § 1638.*)" (*AIU, supra, 51 Cal. 3d at pp. 821-822*; *Bank of the West v. Superior Court (1992) 2 Cal. 4th 1254, 1264-1265 [10 Cal. Rptr. 2d 538, 833 P.2d 545]* [hereafter *Bank of the West*].) A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. ( *Bay Cities Paving Grading, Inc. v. Lawyers' Mutual Insurance Co. (1993) 5 Cal. 4th 854, 867 [21 Cal. Rptr. 2d 691, 855 P.2d 1263].*) But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. (*Bank of the West, supra, 2 Cal. 4th at p. 1265.*) Courts will not [*19] strain to create an ambiguity where none exists. (*Reserve Insurance, supra, 30 Cal. 3d at p. 807.*)

These well-established precepts of insurance coverage guide us in our determination of whether a particular policy requires a liability insurer to defend a lawsuit filed by a third party against the insured. **(5)** It has long been a fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. (*Gray, supra, 65 Cal. 2d at p. 276*; see also *Montrose Chemical Corp. v. Superior Court, supra, 6 Cal. 4th at p. 295.*) This duty, which applies even to claims that are "groundless, false, or fraudulent," is separate from and broader than the insurer's duty to indemnify. (*Gray, supra, 65 Cal. 2d at pp. 273-275.*) However, " 'where there is no possibility of coverage, there is no duty to defend ....' " ( *Fire Ins. Exchange v. Abbott (1988) 204 Cal. App. 3d 1012, 1029 [251 Cal. Rptr. 620].*) *Gray* and its progeny have made it clear that the determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. (*Gray, supra, 65 Cal. 2d at p. 276*; *La Jolla Beach & Tennis Club Inc. v. Industrial Indemnity Co. (1994) 9 Cal. 4th 27, 44 [36 Cal. Rptr. 2d 100, 884 P.2d 1048]* [test is whether underlying action for which defense [**628] [***379] is sought potentially seeks relief within policy terms].)

Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability. ( *Saylin v. California Ins. Guarantee Assn. (1986) 179 Cal. App. 3d 256, 263 [224 Cal. Rptr. 493]*; *State Farm Mut. Auto. Ins. Co. v. Flynt (1971) 17 Cal. App. 3d 538, 548-549 [95 Cal. Rptr. 296].*) This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy. (*Gray, supra, 65 Cal. 2d at p. 274*; *Giddings, supra, 112 Cal. App. 3d at p. 218.*) With these principles in mind, we proceed with our discussion of T.I.E.'s duties to plaintiffs under its CGL policy.

B. *T.I.E.'s Duty to Defend*

**(6)** The T.I.E. CGL policy insuring language was standard. The company agreed to "pay all damages which the insured becomes legally obligated to pay because of ... bodily injury to any person, and ... damage to property ... to which this insurance applies, caused by an occurrence." Bodily injury was defined as "sickness or disease" and property damage [*20] meant "physical injury or destruction of tangible property." The T.I.E. policy also contained the standard exclusions for "bodily injury to any employee of the insured arising out of and in the course of his employment by the insured," and for "the liability of any insured for bodily injury to ... the named insured."

The policy defined "occurrence" to mean "an event, or series of events, including injurious exposure to conditions, proximately caused by an act or omission of the insured regardless of the number of persons, vehicles or objects affected by the act or omission which results, during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." Thus, to demonstrate a potential for coverage under T.I.E.'s policy, an insured must show the claim he must defend is an alleged act or omission that caused bodily injury or tangible property damage (as defined by the policy) to the third party, and that the alleged injury was neither expected nor intended by the insured.

The first issue we address is whether, under the insuring language and definitions of the liability policy, T.I.E. owed a duty to defend plaintiffs against Amey's

lawsuit based on the fact that T.I.E.'s CGL policy provided coverage for "property damage" and "bodily injury" caused by an "occurrence."

In reversing the trial court judgment, the Court of Appeal focused on the fact that Amey's complaint alleged emotional and physical distress flowing from an uncovered economic loss. The appellate court found no duty to defend the underlying lawsuit because the "gravamen" of the complaint was economic loss. It found the damages for emotional and physical distress were derivative of and inseparable from Amey's allegations of intentional and business torts, allegations that could not, by themselves, give rise to coverage under a CGL policy. [1]

1 Because the Court of Appeal believed that CGL policies were never intended to cover conduct that causes economic losses, it did not address (except for brief reference in a footnote) either the "named insured" or "employee liability" exclusions that may have provided additional grounds for denying a duty to defend the Amey action. We find it unnecessary to address alternative grounds for denying a duty to defend in this case.

The Court of Appeal relied principally on three cases (including two cases decided after the trial in the present matter) to conclude that T.I.E. had no duty to defend the Amey action because plaintiffs' alleged misconduct (as asserted in the Amey complaint) was not potentially covered by the T.I.E. policy. (*Keating, supra, 995 F.2d at pp. 156-157*; *McLaughlin, supra, 23 Cal. App. 4th at pp. 1150-1151*; *Chatton, supra, 10 Cal. App. 4th 846*.)

In *Keating, supra*, the United States Court of Appeals for the Ninth Circuit addressed the issue whether, under California law, an insurer had a duty to [*21] defend its insureds against an investor action alleging that the insureds' conduct in committing securities fraud and other related claims had [**629] [***380] caused the plaintiff investors to suffer economic damages that, in turn, resulted in their suffering from " 'emotional and physical distress, and impairment of health.' " (*995 F.2d at p. 156*.) The court held the insurer owed no duty to defend the underlying investor lawsuits because the alleged emotional and physical distress flowed from economic losses, which were not covered by the CGL policy and therefore did not give rise to a duty to defend. (*Ibid.*)

The *Keating* court relied on *Allstate Ins. Co. v. Interbank Financial Services (1989) 215 Cal. App. 3d 825 [264 Cal. Rptr. 25]* (hereafter *Allstate*), which denied coverage under a CGL policy for bodily injury in a lawsuit alleging that an investment firm had conspired to convince third party plaintiffs to make unsound investments. In reaching its conclusion, the *Allstate* court held that "[t]he [liability] policy covers losses resulting from accidental events which cause bodily injury or property damage, not the giving of professional or investment advice.... Here, although the insureds attempt to characterize the claims differently, the clear bases of the complaints are that the insureds gave poor professional advice and the plaintiffs lost money in a tax shelter investment. [P] Had these insureds desired to obtain a professional liability policy to protect them from charges resulting from the performance of professional services, such insurance could have been obtained [at a higher premium].... [J]ust as an insurer would not reasonably expect that a [CGL] policy would cover claims for securities fraud, these insureds could not reasonably expect that such claims would be covered under this policy." ( *Id. at pp. 830-831*.)

As in *Allstate, supra, 215 Cal. App. 3d at pages 830-831*, the *Keating* court recognized that economic or business loss "of the sort alleged by the investors" is not a covered loss within the meaning of a standard CGL policy. Nor, in the *Keating* court's view, is emotional and physical distress induced by (or derivative of) the economic loss a covered event. As the court observed, "It would expand coverage of these policies far beyond any reasonable expectation of the parties to sweep within their potential coverage any alleged emotional or physical distress that might result from economic loss that is itself clearly outside the scope of the policy." (*Keating, supra, 995 F.2d at p.156*.) For this latter statement, the *Keating* court relied on *Chatton, supra, 10 Cal. App. 4th 846*, a coverage case that is nonetheless applicable to our duty to defend discussion because the court concluded that a CGL policy does not provide a potential for coverage for allegations based on economic losses and emotional distress flowing from those losses. ( *Id. at p. 857*.)

In *Chatton*, several investors sued the directors and officers of Technical Equities, an investment services company, for fraud, negligent misrepresentation, [*22] breach of fiduciary duty and negligence. The investors prevailed on their negligence and fraud causes of action and were awarded damages for both their economic losses and resulting emotional distress, as well as punitive damages. Following their success at trial, the investors filed a declaratory relief action against the company's liability insurer to adjudicate coverage. The trial court held, among other things, that there was coverage under the bodily injury clause because the investors' emotional distress constituted "bodily injury" under the CGL policy, and that the wrongful activities of Technical Equities (i.e., security manipulations, note fraud, etc.) were "occurrences" within the meaning of the same policy.

The Court of Appeal reversed, holding that any emotional distress suffered by the investors due to their economic losses was not covered by the liability policy even though those losses were caused by the negligent misrepresentations of Technical Equities officers and directors. (See *Warner v. Fire Ins. Exchange (1991) 230 Cal. App. 3d 1029 [281 Cal. Rptr. 635]*; *Allstate, supra, 215 Cal. App. 3d 825*; *Giddings, supra, 112 Cal. App. 3d 213*; *Fresno Economy Import Used Cars, Inc. v. United States Fid. & Guar. Co. (1977) 76 Cal. App. 3d 272, 279 [142 Cal. Rptr. 681].*) This is so, the court held, because the "bodily injury" clause under a CGL policy "provides coverage for bodily injury to the person and [**630] [***381] for physical injury to, or destruction or loss of use of, *tangible property*." (*Chatton, supra, 10 Cal. App. 4th at p. 857*, some italics omitted.) Recognizing that the investors' emotional distress claims were "predicated upon the 'bodily injury' clause of the CGL policy," the court concluded that the emotional trauma suffered by the investors was caused by investment or *intangible* economic losses which, in turn, were caused by the negligent misrepresentations of the Technical Equities officers. (*Id. at p. 860.*) The emotional trauma, the court concluded, fell outside the coverage clauses of the CGL policy. (*Id. at p. 858.*)

The present Court of Appeal also relied on *McLaughlin, supra, 23 Cal. App. 4th 1132, 1150*, another case involving Technical Equities officers and directors, decided after the *Keating* and *Chatton* cases. One issue in *McLaughlin* was whether the insurer had a duty to defend against an action alleging that the insureds' conduct had caused the investor plaintiffs to suffer economic damages and resultant mental, physical and emotional distress. (*Ibid.*) The *McLaughlin* court followed the reasoning of *Keating, supra, 995 F.2d 154*, and *Chatton, supra, 10 Cal. App. 4th 846*, to reverse a multimillion-dollar, bad faith judgment against Technical Equities's insurer, National Union Fire Insurance Company of Pittsburgh, Pa., and to conclude the insurer owed no duty to defend under the bodily injury and property damage clauses because none of the damages sought was allowed under the CGL policy.

[*23] The *McLaughlin* court observed, "[p]laintiffs' physical and emotional distress derived from their investment loss which in turn was negligently inflicted upon them by the insureds. First, the property damage coverage under the CGL extends only to physical injury to, or destruction or loss of use of, 'tangible property.' Damage for lost profits, loss of investment or other harm to one's economic interest constitute injuries to *intangible* property which by definition fall outside the scope of the [CGL] policy. (*Chatton, supra, 10 Cal. App. 4th at pp. 857-858.*) [P] Second, since [p]laintiffs' physical distress was induced by an uncovered economic loss it defies reason that bodily injury coverage would nevertheless independently obtain." (*McLaughlin, supra, 23 Cal. App. 4th at p. 1150*, italics in original.)

We agree with the Court of Appeal below that *Keating*, *Chatton*, and *McLaughlin* properly determined that CGL policies do not provide coverage for economic losses that cause emotional distress. As we have observed, the CGL policy provides coverage for "occurrences" that cause bodily injury or tangible property losses. (*Giddings, supra, 112 Cal. App. 3d at p. 217.*) These policies were never intended to cover emotional distress damages that flow from an uncovered "occurrence," and the parties could not reasonably have expected that coverage would be expanded merely because a claim of emotional or physical distress is alleged as a result of the economic loss. (*Keating, supra, 995 F.2d at p. 157, fn.1.*) Accordingly, when we apply this rule to the present case and look to the allegations of the Amey complaint compared with the terms of T.I.E.'s CGL policy, we conclude that T.I.E. owed no duty to defend the Amey lawsuit. (*Gray, supra, 65 Cal. 2d at p. 276.*) All allegations in the Amey complaint were related to Amey's asserted *economic loss* as a Marmac shareholder, and, as T.I.E. noted in its denial letter, shareholder disputes are not covered by its policy. In sum, the allegations of the Amey complaint, liberally construed, did not assert a risk potentially covered under T.I.E.'s CGL policy. Nonetheless, plaintiffs make several procedural arguments urging this court to recognize a duty to defend based on the allegations of the complaint.

**(7)** First, plaintiffs contend that T.I.E. and Farmers should not be allowed to rely on either *Keating* or *McLaughlin*, or their theory of no coverage for economic losses, because those cases were not decided until after the trial in the present matter was complete. Moreover, plaintiffs contend the "economic loss" issue cannot be considered because it was not raised in the trial court or in the regular briefing in the Court of Appeal.

[**631] [***382] Both arguments fail. As T.I.E. and Farmers observe, Courts of Appeal routinely consider newly published case law that was not available until after entry of judgment in the trial court. (See, e.g., *Hattersley v. American* [*24] *Nucleonics Corp. (1992) 3 Cal. App. 4th 397, 402 [4 Cal. Rptr. 2d 331]* [rejecting claim that appellant should be foreclosed from relying on theory of law espoused in newly decided Court of Appeal opinion]; see also *Cal. Rules of Court, rule 29.3(a)* ["When a party desires to present new authorities ... not available in time to have been included in the party's brief on the merits, the party may serve and file a supplemental brief ...."].)

Moreover, after the *Keating* and *McLaughlin* cases were decided, T.I.E. (and Farmers) sought, and obtained

permission, to file supplemental briefs. As the Court of Appeal observed, supplemental briefing is proper when a court wishes to consider a point of law following the regular briefing of a case on appeal. (See *Meier v. Ross General Hospital (1968) 69 Cal. 2d 420, 423-424, fn. 1 [71 Cal. Rptr. 903, 445 P.2d 519]*; *Kievlan v. Dahlberg Electronics, Inc. (1978) 78 Cal. App. 3d 951, 957, fn. 5 [144 Cal. Rptr. 585]*.)

Second, as T.I.E., Farmers, and the Court of Appeal observe, the duty to defend issue involves a question of law based on undisputed facts. Under settled law, the Court of Appeal had discretion to address the issue even though it had not been raised in the trial court. ( *Canaan v. Abdelnour (1985) 40 Cal. 3d 703, 733, fn. 17 [221 Cal. Rptr. 468, 710 P.2d 268, 69 A.L.R.4th 915]*; see *Ward v. Taggart (1959) 51 Cal. 2d 736, 742 [336 P.2d 534]* [new theory pertaining to question of law on facts appearing in the record may be raised for the first time on appeal].)

In a related context, plaintiffs assert the Court of Appeal should not have applied *Keating* or *McLaughlin* "retroactively" because both cases represent new law that should not be used to justify T.I.E.'s denial of a defense to the Amey action. Plaintiffs also claim that any uncertainty on legal questions of policy interpretation compels a defense of a third party lawsuit until the issue is resolved by controlling authority.

These claims ignore the general rule that judicial decisions are to be applied retroactively. ( *Newman v. Emerson Radio Corp. (1989) 48 Cal. 3d 973, 978-982 [258 Cal. Rptr. 592, 772 P.2d 1059]* ["general rule that judicial decisions are given retroactive effect is basic to our legal tradition"]; *Evangelatos v. Superior Court (1988) 44 Cal. 3d 1188, 1207 [246 Cal. Rptr. 629, 753 P.2d 585]* [relying on general rule of retroactive application of judicial decisions]; see also *Harper v. Virginia Dept. of Taxation (1993) 509 U.S. 86, 96 [125 L. Ed. 2d 74, 86, 113 S. Ct. 2510, 2517]* (hereafter *Harper*) [stating that in general, civil decisions "must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule"].)

Notwithstanding the general rule on retroactive application of case law, plaintiffs assert that neither *Keating* nor *McLaughlin* should apply to their [*25] bad faith action because they relied on pre-*Keating* law "in deciding what facts needed to be explored in the Amey suit." Plaintiffs also assert that *Keating* was an unforeseeable decision, and retroactive application of its holding would be contrary to the public policy behind the duty to defend.

Similar arguments were rejected by the high court in *Harper, supra, 509 U.S. at p. 96 [125 L. Ed. 2d at p. 86, 113 S. Ct. at p. 2517*]. The *Harper* court found unmeritorious the argument that a court should consider the equities of each individual case in deciding the question of retroactivity. (Cf. *Newman v. Emerson Radio Corp., supra, 48 Cal. 3d at pp. 986-987*.) Moreover, the Ninth Circuit's decision in *Keating* was not new law; rather it was a clarification of the law as it existed when plaintiffs tendered their defense to T.I.E. Thus, T.I.E. may rely on *Keating* to defend the position it took at the time of tender, and its position here, that there was no possibility of coverage under the facts alleged or otherwise known to T.I.E. Indeed, the *Keating* decision was but a logical extension of the principle, well established at [**632] the time T.I.E. denied a defense in the Amey action (see e.g., *Lassen Canyon Nursery, supra, 720 F.2d 1016, 1018*; *Giddings, supra,* [***383] *112 Cal. App. 3d 213, 219*; *Fresno Economy Import Used Cars, Inc., supra, 76 Cal. App. 3d 272, 279*), that a CGL policy does not cover intangible economic loss. (*Keating, supra, 995 F.2d at p. 156*.)

**(8)** Plaintiffs' related claim, that the lack of authority on the duty to defend issue required a defense by T.I.E. of the Amey lawsuit because "uncertainty of policy interpretation compels a duty to defend in this case," is equally unmeritorious. Plaintiffs misinterpret *CNA Casualty of California v. Seaboard Surety Co. (1986) 176 Cal. App. 3d 598, 605 [222 Cal. Rptr. 276]* (hereafter *CNA Casualty*) (criticized on other grounds in *Montrose v. Superior Court, supra, 6 Cal. 4th at pp. 297, 298*). *CNA Casualty* held that: "An insurer's duty to defend must be analyzed and determined on the basis of any *potential* liability arising from facts available to the insurer from the complaint or other sources available to it at the time of the tender of defense." (*176 Cal. App. 3d at p. 605*, italics in original.) As the Court of Appeal below observed, *CNA Casualty* simply recites the settled rule that the insurer must look to the facts of the complaint and extrinsic evidence, if available, to determine whether there is a potential for coverage under the policy and a corresponding duty to defend. *CNA Casualty* does not hold, as plaintiffs suggest, that the insurer must always defend a third party lawsuit absent a published judicial opinion definitively construing the specific policy provision on which the insurer relies, or, as plaintiffs assert, "until the extent of 'the policy coverage' is legally certain," to deny the defense. This has never been the law. (See, e.g., *McLaughlin, supra, 23 Cal. App. 4th at p. 1152* [duty to defend depends on facts in complaint; where only potential for liability [*26] turns on resolution of legal question, there is no duty to defend]; citing *State Farm Mut. Auto. Ins. Co.* v. *Longden (1987) 197 Cal. App. 3d 226, 233 [242 Cal. Rptr. 726]*.)

As plaintiffs themselves observe, the determination whether the insurer owes a duty to defend usually is

made in the first instance by comparing the allegations of the complaint with the terms of the policy. (*Gray, supra, 65 Cal. 2d at p. 276.*) If the terms of the policy provide no potential for coverage, as in this case, the insurer acts properly in denying a defense even if that duty is later evaluated under case law that did not exist at the time of the defense tender. (*Ibid.*; see *Giddings, supra, 112 Cal. App. 3d 213*; see also *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co. (1993) 14 Cal. App. 4th 1595, 1608-1609 [18 Cal. Rptr. 2d 692]* [affirming summary judgment for insurer based on numerous cases decided after insurer refused to defend]; *Standard Fire Ins. Co. v. Peoples Church of Fresno (9th Cir. 1993) 985 F.2d 446, 448-451* [applying *Bank of the West, supra, 2 Cal. 4th 1254*, to relieve insurers of obligation to defend action pending when *Bank of the West* was decided].)

Here, the terms of the policy provided coverage for an "occurrence," meaning an event proximately caused by the insured's act or omission that causes either bodily injury or tangible property damage neither expected nor intended from the standpoint of the insured. The event in this case that led to Amey's complaint was the purposeful conduct of Waller and Marmac in allegedly mismanaging Marmac property, manipulating the value of Marmac stock, disregarding Amey's rights as a minority shareholder, violating the corporate bylaws, interfering with Amey's prospective economic advantage and inducing Waller to breach his stock-sale contract with Amey. This conduct, according to plaintiffs eventually resulted in financial detriment to Amey and was the reason he suffered "humiliation, mental anguish, and emotional and physical distress." Thus, the alleged policy "occurrence" under which T.I.E. evaluated coverage was based entirely on economic acts or events that resulted in economic injury and mental and physical damages to Amey. At no point did Amey allege an "occurrence" that could have triggered liability and thus a duty to defend, i.e., an event based on a noneconomic act causing either emotional distress or bodily injury.

Plaintiffs claim that the "plain meaning of the words [in the insuring clause] [**633] would lead the insured to reasonably expect the insurer to defend him against suits seeking damages for bodily injuries caused by an [***384] occurrence as defined." This argument is misleading, for it ignores the fact that the occurrence or act leading to coverage must be an injury to tangible property, not to one's economic interest. It is well established that CGL [*27] policies do not provide coverage for intangible property losses, including economic losses. (*Chatton, supra, 10 Cal. App. 4th 846, 850*; *Giddings, supra, 112 Cal. App. 3d 213.*) Both *Keating* and *McLaughlin* apply the *Chatton* and *Giddings* rule, notwithstanding the fact that the insureds in those cases alleged both mental and physical distress caused by the economic occurrence. Because the alleged "occurrence" here was the creation of economic loss to Amey, harmful enough to result in his removal from the company, there is no potential for coverage and no corresponding duty to defend under the policy, regardless of the damages allegedly suffered by Amey as a result of that loss.

Plaintiffs next criticize *Chatton* (and, indirectly, *Keating* and *McLaughlin*) for creating an "economic loss" exclusion by allegedly confusing the definitions of "bodily injury" and "property damage" as they appeared in the CGL policy. This "economic loss exclusion," plaintiffs claim, "is an unwarranted expansion and attenuation of the holding in *Giddings v. Industrial Indemnity Co., supra, 112 Cal. App. 3d 213*," which simply held that purely economic losses do not constitute tangible property losses under a CGL policy. (*Giddings, supra, 112 Cal. App. 3d at pp. 218-219.*)

Plaintiffs claim that *Chatton* created an "economic loss" exclusion by erroneously eliminating the separate and independent nature of "bodily injury" coverage and "property damage" coverage in a CGL policy. They argue that *Chatton* would require covered property damage as a prerequisite to bodily injury and thereby eviscerate the separate and independent coverage for bodily injury resulting from an occurrence, and criticize *Chatton's* reliance on cases defining "tangible property loss." (See, e.g., *Allstate, supra, 215 Cal. App. 3d 825, 830* [economic or contractual losses not tangible property losses in CGL policy]; *Kruse v. Bank of America (1988) 202 Cal. App. 3d 38, 67 [248 Cal. Rptr. 217]* [emotional distress damages not recoverable as element of fraud].)

We agree with the Court of Appeal that plaintiffs' criticism of the *Chatton* analysis is unwarranted. As the Court of Appeal observed, when the third party complaint alleges emotional and/or physical distress flowing from economic losses--as was the case in *Chatton, Keating*, and *McLaughlin* as well as in the present lawsuit--the occurrence or event that causes damages is an economic loss. There is no separate "bodily injury" occurrence within the terms of the policy. Thus, the injured party's claim that he suffered incidental emotional distress flows directly from the economic occurrence and, hence, is not covered by the CGL policy.

As the Court of Appeal also noted, the result reached by the courts in *Chatton, Keating*, and *McLaughlin* is consistent with the reasonable expectations of the parties when they enter into an insurance contract for CGL [*28] coverage. It is simply not within the intent of parties to a CGL contract that the "bodily injury" provision would require the insurer to defend a third party lawsuit in which uncovered economic loss is the gravamen of the complaint.

**(9)** Plaintiffs also attempt to distinguish this case from *Chatton, Keating*, and *McLaughlin* on the ground that the definition of "occurrence" in the T.I.E. policy is different from the standard definition found in the policies governing the above cases. In the T.I.E. policy, the word "accident" is absent from the definition of "occurrence," and there is no modifying language for "event or series of events" in the occurrence clause. Plaintiffs claim this indicates that the volitional nature of the occurrence or event leading to coverage is irrelevant, and the T.I.E. policy therefore potentially covers intentional or purposeful acts. Plaintiffs rely on *United Pacific Ins. Co. v. McGuire Co. (1991) 229 Cal. App. 3d 1560, 1564 [281 Cal. Rptr. 375]* (hereafter *United Pacific*) to support their contention.

The issue in *United Pacific, supra, 229 Cal. App. 3d at page 1563*, [**634] [***385] was whether a plaintiff's claim of wrongful termination that allegedly resulted in mental distress was an "event" within the meaning of a policy endorsement that defined "occurrence" to mean " 'an accident, an event or a continuous or repeated exposure to conditions which results, during the policy period, in bodily injury or property damage neither expected nor intended by the insured.' " (Italics omitted.) The *United Pacific* court held that the expanded policy "definition of occurrence provides coverage for intentional actions (subject to the statutory limitations of *Ins. Code, § 533*) that result in bodily injury but excludes coverage for those elements of *damages* that were expected or intended by the insured." (*United Pacific, supra, 229 Cal. App. 3d at p. 1566*, italics added.) Thus, the defendants were covered for the intentional act of terminating the plaintiff, as long as the result of the termination --i.e., emotional distress--was not intended by the defendants. (*Ibid.*)

Plaintiffs assert that *United Pacific* supports their argument for a duty to defend in cases involving intentional economic torts that lead to emotional distress. The argument is misplaced. First, in contrast to the present case, the *United Pacific* court did not question whether coverage for "bodily injury" includes incidental emotional distress damages that may flow from a noncovered loss. In addition, as the Court of Appeal below observed, the issue we address does not focus on whether plaintiffs' actions toward Amey were intentional; thus, this difference in the policy language is irrelevant.

Finally, plaintiffs assert that the Court of Appeal disregarded the rule set forth by this court in *Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal. 4th 1076* [*29] *[17 Cal. Rptr. 2d 210,* [***386] *846 P.2d 792]* (hereafter *Horace Mann*). There, a student sued her teacher primarily for sexual misconduct, but included allegations of negligence in her complaint. The defendant's general liability policy provided for coverage " 'as a result of any claim arising out of an occurrence in the course of the insured's educational employment activities, and caused by any acts or omissions of the insured ....' " ( *Id. at pp. 1079-1080.*) A majority of this court held that the insurer must provide a defense under the complaint of any claim potentially covered, even though the noncovered claims predominated the action: "Horace Mann contends that [defendant's] alleged misconduct apart from the molestation could not possibly give rise to liability because the admitted molestation is the 'dominant factor' in this case. The argument misconceives the role of the court in determining the duty to defend. We look not to whether noncovered acts predominate in the third party's action, but rather to whether there is *any* potential for liability under the policy. [Citation.] Since an insurer has a duty to defend the entire third party action if any claim encompassed within it potentially may be covered ... the mere fact that Horace Mann could not indemnify [defendant] for the molestation did not eliminate its duty to defend other, possibly covered claims." ( *Id. at p. 1084*, italics in original.)

Plaintiffs are correct that the complaint for sexual misconduct in *Horace Mann*, *supra*, 4 Cal. 4th at pages 1079-1080, alleged potentially covered negligent acts. By contrast, the Amey complaint alleged no potentially covered acts because all allegations were based on the occurrence of business torts, corporate mismanagement and other equally noncovered acts. Moreover, rather than predominate, the noncovered acts in this case comprised the entire complaint. Thus, the facts on which Amey based his theory of intentional infliction of emotional distress were identical business and contract transgressions on which he based the remainder of his complaint. Unlike the complaint in *Horace Mann*, *supra*, 4 Cal. 4th 1076, therefore, the Amey complaint gave rise to no potential for coverage under T.I.E.'s CGL policy, and hence no duty to defend. (*Gray, supra, 65 Cal. 2d at p. 276.*)

Plaintiffs also argue that in addition to the alleged emotional and physical distress, the Amey complaint asserted loss in reputation and humiliation that did not arise from the occurrence of economic loss and should give rise to a duty to defend under *Horace Mann*, *supra*, 4 Cal. 4th 1076. [**635] This claim is equally unavailing. Plaintiffs assert that Amey's complaint arguably alleged conduct resulting in uncovered "bodily injury" as well as potentially covered conduct. For example, plaintiffs claim that although Amey's allegations of physical distress were generally alleged to have been caused by all of the acts set forth in the complaint, his bodily injury allegations were not specific as to "root causes." Plaintiffs note that Amey's allegations were broad and [*30] varied and alleged that plaintiffs' conduct in changing Amey's job description humiliated him in front of others. In addition, Amey alleged he was upset and distressed by

being excluded from the board and shareholder meetings and the decisionmaking process. Amey was also upset that despite his implicit trust in Waller for over 16 years, Marmac's officers entered into a secret stock transaction causing Amey fear, anger, and a sense of betrayal. Indeed, plaintiffs observe, Amey was distressed because he felt he was being forced out of Marmac, a company he felt he owned and which he helped build. Plaintiffs contend that for T.I.E., Farmers, "and the Court of Appeal to claim that, as a matter of law on undisputed facts, all such allegations necessarily or entirely flowed from economic loss, is, respectfully, incomprehensible."

As T.I.E., Farmers, and the Court of Appeal observe, however, any lost reputation and humiliation Amey may have suffered was, like the emotional and physical distress alleged in the Amey complaint, directly related to the uncovered business torts and economic loss. That plaintiffs' alleged business torts may have caused Amey to feel betrayed, angry or distressed, does not transform those feelings into a separate occurrence under the bodily injury clause of the CGL policy.

C. *Waiver and Estoppel*

**(10a)** The trial court ruled that, as a matter of law, T.I.E.'s denial letter of January 16, 1987, "waived policy based defenses not specified therein." On appeal, T.I.E. challenged the trial court's ruling, but the Court of Appeal declined to reach the issue after concluding there was no potential of coverage under the policy. Plaintiffs now assert that even if *Chatton, Keating*, and *McLaughlin* correctly preclude coverage for emotional distress damages arising from an economic occurrence, T.I.E. nonetheless should have been required to provide a defense to the Amey action on the ground that a liability insurer that refuses to defend a suit on a specified ground impliedly waives all other nonspecified grounds it knew or would have discovered by a reasonable investigation.

In their opening briefs, plaintiffs assert that in addition to waiver of defenses based on T.I.E.'s denial letter, T.I.E.'s "conduct over the past seven years, particularly the failure to raise the '*Keating*' issue in its denial letter and subsequent failure to raise the issue during litigation, evidences an objective intent to waive its right to rely on the issue." We address the waiver issue notwithstanding the Court of Appeal's refusal to do so, and despite the fact that it was not actually pleaded by plaintiffs at the trial court level, because it was a basis for the trial court's findings and is an important [*31] recurring issue that requires our attention. We conclude that an insurer does not impliedly waive coverage defenses it fails to mention when it denies the claim.

1. *Waiver*

As noted above, T.I.E. denied a defense to the Amey action because it believed the CGL policy provided no potential for coverage for what its claims managers believed was essentially a "shareholder dispute" giving rise to uncovered "intentional acts." Plaintiffs assert that because T.I.E.'s denial letter failed to state specifically that the policy did not cover "economic losses," T.I.E. waived its right to rely on *Keating* and its progeny in denying a duty to defend. In essence, we are asked to consider whether the doctrine of waiver may be invoked to create coverage for losses that the CGL policy by its terms did not cover. We address this issue, notwithstanding the antiwaiver clause in T.I.E.'s policy. That clause states the insurer does not waive rights or terms under the policy in the absence of an endorsement and focuses on the terms and conditions of the policy itself, rather than on the insurer's claims [**636] [***387] practices. In sum, the clause does not affect the insured's right to assert waiver of defenses in a denial letter.

**(11)** Case law is clear that " '[w]aiver is the intentional relinquishment of a known right after knowledge of the facts.' [Citations.] The burden ... is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver' [citation]." ( *City of Ukiah v. Fones (1962) 64 Cal. 2d 104, 107-108 [48 Cal. Rptr. 865, 410 P.2d 369]*; *DRG/Beverly Hills, Ltd.* v. *Chopstix Dim Sum Cafe & Takeout III, Ltd. (1994) 30 Cal. App. 4th 54, 60 [35 Cal. Rptr. 2d 515]* [" ' "Waiver always rests upon intent." ' "]; *Brookview Condominium Owners' Assn. v. Heltzer Enterprises-Brookview (1990) 218 Cal. App. 3d 502, 512 [267 Cal. Rptr. 76]*; *National Union Fire Ins. Co. v. Siliconix Inc. (N.D.Cal. 1989) 726 F. Supp. 264, 270* [applying California law, and finding no waiver in absence of evidence insurer had intentionally relinquished right to contest coverage].) The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right. (*Brookview Condominium Owners' Assn., supra, 218 Cal. App. 3d at p. 513*.)

**(10b)** As T.I.E. observes, California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage and that a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial. ( *State Farm Fire & Casualty Co. v. Jioras (1994) 24* [*32] *Cal. App. 4th 1619, 1628, fn. 7 [29 Cal. Rptr. 2d 840]* ["Waiver depends solely on the intent of the waiving party, and is not established merely by evidence the insurer failed to specify the exclusion in a letter reserving rights."]; cf. *Titan Corp. v. Aetna Casualty & Surety Co. (1994) 22 Cal. App. 4th 457, 467 [27 Cal. Rptr. 2d 476]*;

*Velasquez v. Truck Ins. Exchange (1991) 1 Cal. App. 4th 712, 722 [5 Cal. Rptr. 2d 1]* ["Whether a waiver has occurred depends solely on the intention of the waiving party. [Citation.] An intention to waive a limitations provision is not evinced by the failure to raise that point in a letter denying a claim."]; *California Union Ins. Co. v. Poppy Ridge Partners (1990) 224 Cal. App. 3d 897, 902 [274 Cal. Rptr. 191]* [insurer's reliance on particular policy provision to deny coverage does not preclude insurer from later claiming rights under other provisions]; contra, *Alta Cal. Regional Center v. Fremont Indemnity Co. (1994) 25 Cal. App. 4th 455, 466 [30 Cal. Rptr. 2d 841]* [dictum stating that where insurance contract does not provide coverage but insurer fails to assert correct ground for denying coverage, automatic waiver doctrine permits insured to receive coverage where none exists].)

Of the 33 sister states to consider the issue, 32 agree with the California rule. (See, e.g., *Schiff Assoc. v. Flack (1980) 51 N.Y.2d 692, 699 [435 N.Y.S.2d 972, 417 N.E.2d 84]* [no waiver of coverage defenses by failure to assert them in disclaimer notice]; *Tobi Engineering v. Nationwide Mut. Ins. (1991) 214 Ill. App. 3d 692 [158 Ill. Dec. 366, 574 N.E.2d 160, 162]* [insurer not required to assert all defenses to liability in denial letter to insured]; *Terre Haute First Nat. v. Pacific Employers (Ind.App. 1993) 634 N.E.2d 1336, 1337* [no waiver of defenses to coverage in absence of prejudice to insured]; and cases cited in Berg & O'Connell, *Waiver and Estoppel Without Waste*: *Titan Corp. v. Aetna Casualty & Surety Co.* (1995) 17 Ins. Litig. Rptr. 13, 19, fn. 59.) Still other states have held that the doctrine of waiver cannot be applied to expand coverage. (See, e.g., *Pearce v. American Defender Life Ins. Co. (1986) 316 N.C. 461 [343 S.E.2d 174, 177]*.) Only one state has held that an insurer waives coverage defenses not stated in its initial denial letter. ( *Armstrong v. Hanover Insurance Company (1971) 130 Vt. 182 [289 A.2d 669, 672]*.)

Notwithstanding the foregoing weight of authority, plaintiffs rely on the automatic waiver rule announced in dictum in *McLaughlin v. Connecticut General Life Ins. Co. (N.D.Cal. 1983) 565 F. Supp. 434*. In attempting to predict what this court would do when faced with the waiver issue, the *McLaughlin v. Connecticut General Life* court held that "an insurance company which [**637] [***388] relies on specified grounds for denying a claim thereby waives the right to rely in a subsequent litigation on any other grounds which a reasonable investigation would have uncovered." ( *Id. at p. 451*.) The federal [*33] district court relied on this court's decisions recognizing the insurer's duty to conduct a reasonable investigation in order to comply with the covenant of good faith and fair dealing. (*Ibid.*; see also *Egan v. Mutual of Omaha Ins. Co. (1979) 24 Cal. 3d 809 [169 Cal. Rptr. 691, 620 P.2d 141]*.)

T.I.E. and Farmers assert *McLaughlin v. Connecticut General Life Ins. Co., supra, 565 F. Supp. 434*, has been superseded by the Ninth Circuit decision in *Intel Corp. v. Hartford Acc. & Indem. Co. (9th Cir. 1991) 952 F.2d 1551, 1559* (hereafter *Intel*), which concluded that "in *McLaughlin* it was necessary to find waiver to protect insureds who had been misled by the insurer's statements as to the denial of coverage." (*Intel, supra, 952 F.2d at p. 1560*.) Nonetheless, the *Intel* court rejected application of an automatic waiver rule and determined that under California law, an insurer waives defenses to coverage not asserted in its denial only if the insured can show misconduct by the insurer or detrimental reliance by the insured. (*Ibid.*; see *Aceves v. Allstate Ins. Co. (S.D.Cal. 1993) 827 F. Supp. 1473, 1476-1477* [under *Intel* insurer may raise all available defenses to coverage at any time unless the insured proves detrimental reliance].) Plaintiffs urge us to reject the reasoning of *Intel* on the grounds that it (1) blurs the waiver-estoppel doctrines and erroneously applies the estoppel doctrine of detrimental reliance to issues involving waiver, (2) would preclude prompt, summary adjudication of legal issues pertinent to the meaning of the words of denial, and (3) would lead to a proliferation of bad faith lawsuits. Plaintiffs assert that the *McLaughlin* automatic waiver rule "provides an incentive for carriers to promptly disclose bases for denial [and] reduces or eliminates litigation by means of a rule easy to understand and apply."

We agree with *Intel, supra, 952 F.2d at page 1559*, and decline to follow the *McLaughlin* rule of automatic waiver. A holding that an insurer waives defenses not asserted in its initial denial of a duty to defend would be inconsistent with established waiver principles by erroneously implying an intent to relinquish contract rights where no such intent existed. Such a conclusion would contradict the holdings of the majority of California and sister-state cases addressing the waiver issue. (See, e.g., *Velasquez v. Truck Ins. Exchange, supra, 1 Cal. App. 4th 712, 722*.)

**(12) (10c)** As the *Intel* court recognized, in the insurance context the terms "waiver" and "estoppel" are sometimes used interchangeably, even though estoppel requires proof of the insured's detrimental reliance. (*Intel, supra, 952 F.2d at p.1560*.) Nonetheless, as the *Intel* court observed, "[w]aiver is an affirmative defense, for which the insured bears the burden of proof," and "California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an [*34] intent to enforce the right as to induce a reasonable belief that such right has been relinquished." (*Id. at p. 1559*.) The present facts do not show that T.I.E.'s denial letter indicated an intention on the part of the insurer to relinquish additional reasons for denial of a duty to defend. Nor have plaintiffs shown that

T.I.E.'s actions following its defense denial were inconsistent with its intent to enforce the terms of the policy. Accordingly, plaintiffs have not shown that T.I.E.'s denial of a defense induced a reasonable belief in plaintiffs that T.I.E. intended to waive additional policy defenses. To the extent *Alta Cal. Regional Center v. Fremont Indemnity Co., supra, 25 Cal. App. 4th at page 466*, relies on *McLaughlin v. Connecticut General Life, Ins. Co., supra, 565 F. Supp. 434*, and its rule of automatic waiver, it is disapproved.

2. *Estoppel*

**(13)** Plaintiffs also assert that notwithstanding our resolution of the *McLaughlin* waiver issue, T.I.E. should be estopped from denying a duty to defend on the basis of *Keating* and its progeny because the insurer anticipated the *Keating* decision at the time it denied a defense to the Amey action, but failed to state "economic loss" as a reason for denying a defense in its denial letter. This [**638] [***389] allegedly "wrongful conduct" by the insurer, plaintiffs claim, precluded plaintiffs from developing "facts [showing that] Amey's alleged bodily injury arose from causes other than economic loss."

As T.I.E. observes, however, proof of estoppel requires a showing of detrimental reliance by the injured party. (See *State Farm Fire Casualty co. v. Jioras, supra, 24 Cal. App. 4th at pp. 1627-1628*; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 177, p. 859.) Plaintiffs do not show how they relied to their detriment on T.I.E.'s grounds for denial. In the absence of any such proof, plaintiffs cannot show detrimental reliance on the grounds for denial of a defense.

In the present case, T.I.E.'s letter denying a defense and coverage on the ground that the Amey complaint represented nothing more than a "shareholder dispute" based on "intentional acts" unequivocally informed plaintiffs that the insurer was denying coverage under the terms of the policy. A "shareholder dispute" is essentially a "business dispute" and, in the context of the Amey allegations as set forth in the second amended complaint, would never give rise to the potential for coverage under T.I.E.'s CGL policy. T.I.E.'s denial letter thus adequately explained the factual basis for the insurer's rejection of a defense. (See *Cal. Code Regs., tit. 10, § 2695.2, subd. (z)* [insurer's denial of claim shall be in writing and shall provide factual basis of denial that is within the insurer's knowledge at the time claim is [*35] denied].) Moreover, the fact that coverage was defined in terms of an "event" as opposed to an "accident" could in no way lead to potential coverage for business torts, whether these torts are characterized by the insured as "intentional" or "negligent" acts. As noted above, T.I.E.'s CGL policy provided coverage for tangible or physical property losses and bodily injury caused by an "occurrence." Because the "occurrence" here was the ongoing business dispute between Amey and plaintiffs, the allegations in the Amey complaint fell outside the scope of T.I.E.'s CGL coverage. (*Giddings, supra, 112 Cal. App. 3d 213, 169 Cal. Rptr. 278.*) Accordingly, plaintiffs' alleged detrimental reliance on T.I.E.'s initial denial letter could not give rise to a claim for estoppel because plaintiffs never reasonably believed, nor could they reasonably believe, that the T.I.E. policy provided a potential for coverage for Amey's lawsuit.

D. *Bad Faith*

**(14a)** We next consider whether plaintiffs may state causes of action for either breach of the implied covenant of good faith and fair dealing or violation of *Insurance Code section 790.03* for unfair business practices, when the policy does not provide such coverage by its terms. We do so after recognizing that the present case was not final when we held that *section 790.03* confers no private right of action for damages. ( *Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal. 3d 287, 305 [250 Cal. Rptr. 116, 758 P.2d 58]* [decision will be applied prospectively]; see also *Zephyr Park v. Superior Court (1989) 213 Cal. App. 3d 833, 837-838 [262 Cal. Rptr. 106]* [*Moradi-Shalal* applies to first party actions].)

In its original decision, the Court of Appeal noted at the beginning of its discussion that because a contractual obligation is the underpinning of a bad faith claim, such a claim cannot be maintained unless policy benefits are due under the contract. (See, e.g., *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d 1136, 1153.*) After finding that T.I.E. owed no duty to defend the Amey action, the Court of Appeal concluded that because there was no contractual liability on the part of T.I.E., plaintiffs could not assert a valid bad faith claim. ( *Id. at p. 1151.*) Accordingly, the Court of Appeal concluded, Farmers also could not be found liable for bad faith conduct. Although the court ignored the issue of T.I.E.'s (and Farmers's) liability under *Insurance Code section 790.03*, on petition for rehearing the opinion was modified to add a citation to *Brodkin v. State Farm Fire & Casualty Co. (1989) 217 Cal. App. 3d 210, 218 [265 Cal. Rptr. 710]*, which held that "there can be no cause of action for breach of the covenant of good faith *or of any statutory duty*" because the insurer defendant had properly denied the claim under the policy. (Italics added.) We agree with the Court of Appeal. [*36]

[**639] [***390] It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer. ( *Love v. Fire Ins. Exchange, supra, 221 Cal. App. 3d 1136, 1151-*

*1153.*) As the *Love* court observed, its "conclusion that a bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is [firmly] rooted." ( *Id. at p. 1153.*) The legal principle is based on general contract law and the long-standing rule " 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " ( *Gruenberg v. Aetna Ins. Co. (1973) 9 Cal. 3d 566, 573 [108 Cal. Rptr. 480, 510 P.2d 1032]*, citing *Comunale v. General Ins. Co. (1958) 50 Cal. 2d 654, 658 [328 P.2d 198]*; see also *Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal. 3d at p. 818.*) In sum, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement. (*Love, supra, 221 Cal. App. 3d at p. 1153.*) Thus, as the *Love* court noted, when benefits are due an insured, "delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because" they frustrate the insured's right to receive the benefits of the contract in "prompt compensation for losses." (*Ibid.*) Absent that contractual right, however, the implied covenant has nothing upon which to act as a supplement, and "should not be endowed with an existence independent of its contractual underpinnings." (*Ibid.*)

**(15)** When evaluating an insurer's alleged violation of *Insurance Code section 790.03*, we are guided by the principles of first party coverage, and the fact that the insurer owes its insured an independent duty to process all claims submitted to it in a reasonable manner, and not to delay, to the insured's prejudice, the ultimate decision to defend or indemnify. For example, where an insurer undertakes a defense under a reservation of rights, and then fails to pursue the defense in a reasonable manner, the insurer may be subject to penalties under *section 790.03*. (See, e.g., *Travelers Ins. Co. v. Lesher (1986) 187 Cal. App. 3d 169, 190 [231 Cal. Rptr. 791]* [insurer must process all claims submitted to it competently even when no coverage will be provided].) Thus, our holding does not foreclose the insurance commissioner from imposing administrative sanctions against an insurance company responsible for committing unfair practices that are independent of the insurance contract and proscribed by *section 790.03*. ( *Moradi-Shalal v. Fireman's Fund Ins. Companies, supra, 46 Cal. 3d at p. 304.*)

**(14b)** In the present case, however, we cannot say that the Court of Appeal erred in concluding neither T.I.E. nor Farmers violated *Insurance* [*37] *Code section 790.03*. There is no indication that either defendant unnecessarily delayed performing its investigative duties under the policy or misled plaintiffs into believing it would provide either a defense or coverage to the Amey complaint, and any finding to the contrary would misconstrue the record.

CONCLUSION

If an insurance policy provides no potential basis for coverage, the insurer is under no duty to defend an action against the insured. (*Gray, supra, 65 Cal. 2d at p. 276.*) We conclude T.I.E.'s CGL policy provided no potential for coverage in a suit based on business and economic torts. Because T.I.E. was under no obligation to defend or indemnify the Amey action, it did not breach the implied covenant of good faith and fair dealing. In addition, T.I.E.'s denial of a defense did not independently violate *Insurance Code section 790.03*. The same holding applies to Farmers, as T.I.E.'s adjuster. We therefore conclude the Court of Appeal's judgment should be affirmed.

Mosk, J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**DISSENT BY:** KENNARD, J.

**DISSENT**

[***391] **KENNARD, J.,**

[**640] Concurring and Dissenting.--Insurance policies are, first and last, contracts. This court has repeatedly emphasized that by and large an insurance policy is interpreted no differently than any other contract, and that when the parties express their intent in unambiguous language in the policy, that intent governs. Although courts have evolved special rules for interpreting ambiguities in insurance policies, what these rules have in common is that they protect the insured. No special rules have developed that deny an insured coverage that an insurer has promised in unambiguous policy language.

In this case, the majority makes a sharp departure from the mainstream of insurance coverage law. Rather than hewing to the language of the insurance policy at issue in this case, the majority concludes that coverage within the ordinary and unambiguous meaning of the policy language does not exist.

Specifically, the majority holds that the liability insurance policy issued by defendant insurers excludes coverage for bodily injuries related to economic (i.e., intangible property) losses. The majority errs in doing so, for its conclusion finds no support in the language of the policy or in any other evidence of the mutual intent of defendant insurers and plaintiff insureds. The plain language of the policy covers liability for all bodily injuries caused by an "occurrence." The policy defines "occurrence" as any "event, or series of events ... proximately caused by an act or omission of the [*38] insured ...

which results ... in bodily injury ... neither expected nor intended from the standpoint of the insured." Nothing in the ordinary meaning of this language, and nothing in the rest of the policy, excludes coverage for bodily injuries resulting from events that either themselves are economic losses or cause economic losses in addition to bodily injury.

Because the majority's approach has no support in our law or in the language of the contract at issue here, I disagree with the majority's reasoning. As I shall explain, however, I would nonetheless affirm the judgment of the Court of Appeal because there is an independent reason why defendant insurers properly denied coverage here: Plaintiff insureds sought coverage under the bodily injury coverage of the insurance policy for a lawsuit alleging they had intentionally caused someone to suffer emotional and physical distress; the insurance policy excludes coverage for bodily injuries expected or intended by the insureds, such as the intentional injuries alleged against the insureds; thus, there was no coverage under the policy for the lawsuit against plaintiff insureds.

I

Waller owned 60 percent of Marmac, Inc. (Marmac) and was its president; Amey owned 40 percent and was its vice-president. Waller sold his stock to Marmac employees Akers, Hendrix, Hepple, and Petersen (referred to hereafter collectively with Waller and Marmac as the insureds), who thereafter demoted and ultimately terminated Amey.

Amey sued the insureds. Amey alleged 11 causes of action in his amended complaint, including, as relevant here, one for the intentional infliction of emotional distress.

In his cause of action for emotional distress, Amey alleged that he suffered "humiliation, mental anguish, and emotional and physical distress" from the "conduct" of the individual insureds alleged in the other causes of action (for example, Waller's sale of his stock to Akers, Hendrix, Hepple, and Petersen without notice to Amey and allegedly in breach of a contract to sell the stock to Amey; the alleged interference by Akers, Hendrix, Hepple, and Petersen with Amey's contract with Waller for the sale of Waller's stock; Amey's demotion and subsequent termination in breach of his employment contract with Marmac; Akers, Hendrix, Hepple, and Petersen's bad faith abuse of their positions as controlling shareholders and directors to engage in self-dealing and to deny Amey a voice in corporate affairs). Amey alleged that the individual insureds' conduct had been "intentional and malicious and ... done for the purpose of causing Amey ... emotional [*39] and physical distress." At his deposition, Amey testified he had suffered [**641] [***392] headaches, back pains, and rashes as a result of the individual insureds' conduct.

The insureds were insured under a policy issued by Truck Insurance Exchange through Farmers Insurance Exchange (collectively Truck). The insureds tendered their defense to Truck, which rejected it on the ground that Amey's causes of action were not covered under the policy. The insureds sued Truck for bad faith denial of its duty to defend, contending that Amey's cause of action for emotional distress was covered under the Truck policy. The insureds also alleged that Truck had breached its duties under *Insurance Code section 790.03, subdivision (h)*, which prohibits various acts and practices by insurers in processing and settling the claims of their insureds. In a bifurcated proceeding, the trial court held that Amey's cause of action for emotional distress was covered under the policy and, accordingly, Truck had a duty to defend; a jury then determined that Truck had also breached its duties under *Insurance Code section 790.03, subdivision (h)*.

The Court of Appeal reversed, holding that the Truck policy did not cover bodily injury related to economic loss, and holding that there could be no cause of action under *Insurance Code section 790.03, subdivision (h)* because there was no coverage under the Truck policy.

II

Whether Truck had a duty to defend turns on whether the relevant facts or pleadings give rise to any potential for coverage under the policy. ( *Gray v. Zurich Insurance Co. (1966) 65 Cal. 2d 263, 277 [54 Cal. Rptr. 104, 419 P.2d 168]*.) The insureds contend that there was the potential for coverage under the policy of Amey's cause of action for intentional infliction of emotional distress. I conclude that there was no potential for coverage because Amey's cause of action fell within the policy's exclusion of injuries expected or intended by the insured.

In *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co. (1994) 9 Cal. 4th 27, 37 [36 Cal. Rptr. 2d 100, 884 P.2d 1048]*, this court recently summarized the principles governing the interpretation of insurance contracts: " 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' ( *Bank of the West v. Superior Court (1992) 2 Cal. 4th 1254, 1264 [10 Cal. Rptr. 2d 538, 833 P.2d 545]*; see *AIU Ins. Co. v. Superior Court (1990) 51 Cal. 3d 807, 821-822 [274 Cal. Rptr. 820, 799 P.2d 1253]*.) 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of [*40] the parties. ( *Civ. Code, § 1636*.)' ( *Bank of the West v. Superior Court, supra, 2 Cal. 4th at p. 1264*.) 'Such intent is to be inferred, if possible, solely from the

written provisions of the contract.' ( *AIU Ins. Co. v. Superior Court, supra, 51 Cal. 3d at p. 822.*) 'If contractual language is clear and explicit, it governs. ( *Civ. Code, § 1638.*)' ( *Bank of the West v. Superior Court, supra, 2 Cal. 4th at p. 1264.*)"

Application of these principles yields a straightforward resolution of this case. No party has put forward extrinsic evidence bearing on the interpretation of the policy. Therefore, it is solely the language of the policy that determines whether coverage exists.

The coverage clause of the policy obligates the insurer to "pay all damages which the insured becomes legally obligated to pay because of [P] (C) *bodily injury* to any person ... [P] ... [P] ... [P] ... *caused by an occurrence*." (Italics added.) The question of coverage therefore turns on whether there was "bodily injury" caused by an "occurrence."

Did Amey allege a "bodily injury" within the meaning of the policy? The policy defines "bodily injury" as "bodily injury, sickness, or disease." Amey alleged in his complaint that he had suffered both emotional and physical distress as a result of the insureds' conduct. At his deposition, Amey testified that the insureds' conduct had [***393] caused him to suffer headaches, back pains, [**642] and rashes. [1]

1 The insureds renewed their tender of defense on the basis of Amey's deposition testimony; Truck never responded.

Most of the courts that have addressed the issue have held that any physical manifestations accompanying emotional distress are "bodily injuries" as that term is used in insurance policies. ( *Aim Ins. Co. v. Culcasi (1991) 229 Cal. App. 3d 209, 220, 226 [280 Cal. Rptr. 766]*; *Employers Cas. Ins. Co. v. Foust (1972) 29 Cal. App. 3d 382, 387 [105 Cal. Rptr. 505]*; *Garvis v. Employers Mut. Cas. Co. (Minn. 1993) 497 N.W.2d 254, 257* ["emotional distress with appreciable physical manifestations can qualify as a 'bodily injury' within the meaning of the insurance policy"; as here, policy defined "bodily injury" as "bodily injury, sickness, or disease"]; *Voorhees v. Preferred Mut. Ins. Co. (1992) 128 N.J. 165, 179 [607 A.2d 1255, 1262, 8 A.L.R.5th 937]*; Ostrager & Newman, Handbook on Insurance Coverage Disputes (7th ed. 1994) § 7.03[a][3][B], pp. 237-238 [collecting cases]; see also *Burgess v. Superior Court (1992) 2 Cal. 4th 1064, 1078-1079 [9 Cal. Rptr. 2d 615, 831 P.2d 1197]* [physical symptoms of emotional distress are "physical injury"]; *Molien v. Kaiser Foundation Hospitals (1980) 27 Cal. 3d 916, 929 [167 Cal. Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]* [*41] [same].) On its face, the policy's definitional language, "bodily injury, sickness, or disease," broadly covers any somatic condition, and does not exclude those that are caused or accompanied by mental distress. Although I therefore assume for purposes of this case that at least the physical symptoms Amey alleged he suffered were "bodily injuries" within the meaning of the policy, it is not necessary to decide the issue because I conclude, for the reasons discussed below, that there was no "occurrence" within the policy's definition of that term.

Were Amey's "bodily injuries" caused by an "occurrence"? The policy defines "occurrence" to mean "an *event*, or series of events, including injurious exposure to conditions, *proximately caused by* an act or omission of *the insured* regardless of the number of persons, vehicles or objects affected by such act or omission *which results*, during the policy period, in *bodily injury* or property damage, *neither expected nor intended* from the standpoint of the insured." (Italics added.) Stated otherwise, the elements of an "occurrence" can be broken down into (1) an event or series of events (2) proximately caused by the insured (3) resulting in bodily injury or property damage, (4) with the injury or damage being neither expected nor intended.

The majority and I agree on the elements of the "occurrence" definition. (See maj. opn., *ante*, at p. 20 ["to demonstrate a potential for coverage under [Truck's] policy, an insured must show the claim he must defend is an alleged act or omission that caused bodily injury or tangible property damage (as defined by the policy) to the third party, and that the alleged injury was neither expected nor intended by the insured"].) The majority, however, never applies these elements to the facts of this case to determine whether there was a potential for coverage of Amey's claims against the insureds. Accordingly, I do so here.

The first element of the definition of "occurrence" requires an "event, or series of events." [2] The conduct of plaintiffs that [**643] [***394] Amey alleged caused his injury (e.g., his demotion, the sale of stock from Waller to the other four plaintiffs) certainly was a series of events in the ordinary meaning of the term.

2 The requirement of an "event" that causes injury is a departure in Truck's policy from the language of the current standard commercial general liability (CGL) policy drafted by the Insurance Services Office (an insurance industry trade group). The standard CGL policy requires that an "accident," not an "event," cause the injury. (Insurance Services Office, Commercial General Liability Coverage Form (eff. Jan. 1, 1986), reprinted in 3 Cal. Insurance Law and Practice (1995) Business General Liability Policies, appen. C.) The Truck policy represents a broadening of coverage in that the cause of injury no

longer need be sudden and fortuitous, as it must be under an "accident" occurrence clause. (Compare *United Pacific Ins. Co. v. McGuire Co. (1991) 229 Cal. App. 3d 1560, 1565 [281 Cal. Rptr. 375]* ["the word 'event' is not limited to fortuitous happenings"] with *Shell Oil Co. v. Winterthur Swiss Ins. Co. (1993) 12 Cal. App. 4th 715, 751 [15 Cal. Rptr. 2d 815]* [discussing "accident" occurrence clause's requirements of suddenness and fortuity].)

In this respect, the majority is mistaken in describing the Truck policy as a "standard" CGL policy. (See maj. opn., *ante*, at p. 19.)

[*42] The second element of "occurrence" requires that the insured proximately cause the event or events. There is no dispute that the events alleged by Amey to have caused his injury were ones that he alleged the individual insureds had proximately caused.

The third element of "occurrence" requires, as relevant here, that the events result in bodily injury. As I have already explained, to the extent Amey suffered physical manifestations of his emotional distress, I assume the events resulted in bodily injury.

The fourth element of the definition of "occurrence" requires that the bodily injury be "neither expected nor intended from the standpoint of the insured." It is on this point that the insureds' claim for coverage fails. The intentional infliction of emotional distress that Amey alleged is not an occurrence within the policy's definition because the tort requires that the insured either intend or expect that the emotional distress (and any accompanying physical manifestations) occur. "The tort calls for intentional, or at least reckless conduct--conduct intended to inflict injury or engaged in with the realization that injury will result." ( *Davidson v. City of Westminster (1982) 32 Cal. 3d 197, 210 [185 Cal. Rptr. 252, 649 P.2d 894]*.) To state a cause of action for intentional infliction of emotional distress, a plaintiff must allege "that the conduct of ... the defendants was directed primarily at them, was calculated to cause them severe emotional distress, or was done with knowledge of their presence and of a substantial certainty that they would suffer severe emotional injury." ( *Christensen v. Superior Court (1991) 54 Cal. 3d 868, 906 [2 Cal. Rptr. 2d 79, 820 P.2d 181]*.)

Any injury caused by the insured that is calculated (i.e., intended), or which the insured knew was substantially certain to result from the insured's conduct, however, is an injury that the insured "expected or intended." ( *Shell Oil Co. v. Winterthur Swiss Ins. Co., supra, 12 Cal. App. 4th at pp. 745-748* [insured "expected or intended" a result if the insured intended the result or believed the result was substantially certain or highly likely to occur].) Because the intentional infliction of emotional distress is an injury that is either "calculated" by the insured or that the insured knew was "substantial[ly] certain[]" to result ( *Christensen v. Superior Court, supra, 54 Cal. 3d at p. 906*), policy language that, as here, excludes from coverage acts that the insured "expected or intended" thereby excludes coverage of any cause of action for the intentional infliction of emotional distress. [*43]

In this case, Amey specifically alleged that the insureds' acts were intended to cause him both emotional and physical injury. Both Amey's original complaint and his amended complaint alleged that the conduct of the insureds "was intentional and malicious and was done for the purpose of causing Amey to suffer humiliation, mental anguish, and emotional and physical distress." The definition of "occurrence" in the Truck policy excludes events resulting in injuries that the insured expects or intends. (See *Shell Oil Co. v. Winterthur Swiss Ins. Co., supra, 12 Cal. App. 4th at pp. 745-748*.) Therefore, Amey's cause of action for intentional infliction of emotional distress cannot be a covered occurrence because it alleged that the insureds intended the emotional and physical injuries that they caused him. [3] (Accord, *Smith v. State Farm Fire and Cas. Co. (1985) 127 Wis. 2d 298, 302-304 [380 N.W.2d 372, 374-375]*.) Because there was no potential for coverage under the policy's definition of "occurrence" for the emotional and physical distress the insureds allegedly intentionally [***395] caused to Amey, Truck [**644] properly denied the insureds' tender of their defense. [4]

3 The insureds do not contend that, although Amey's complaint was limited to the intentional infliction of emotional distress, he might have ultimately recovered damages for emotional and physical distress on a theory that those injuries were negligently inflicted and that therefore there was a potential for coverage. (See *Gray v. Zurich Insurance Co., supra, 65 Cal. 2d at p. 276*.)

4 Truck denied coverage to the insureds on the ground that "Intentional Acts are not covered ...." Although inartfully phrased (because it focuses on intentional acts rather than intentional damage or injury), it seems clear that the purpose of Truck's letter was to invoke the "neither expected nor intended" language of the "occurrence" definition. Because I conclude that there was no potential for coverage for the same reason, I find it unnecessary to address the waiver and estoppel arguments addressed in section C of the majority opinion. Likewise, I do not have occasion to address the retroactivity and legal uncertainty issues considered by the majority. (Maj. opn., *ante*, at pp. 24-26.) Nor is it necessary for me to address

the other alternative grounds for denying coverage put forward by Truck. (See maj. opn., *ante*, at p. 20, fn. 1.)

I concur in the majority's decision that in the absence of any potential for coverage the insureds do not have a cause of action against Truck for its alleged violation of its duties under *Insurance Code section 790.03, subdivision (h)* with respect to its processing and resolution of the insureds' claim for coverage.

III

The majority, however, ignores the controlling language of the policy that I have just discussed. Instead, the majority manufactures an exclusion of bodily injuries "related to" economic losses that has no basis in the policy language or in any other indicia of the parties' intent, and on that ground concludes there was no potential for coverage of Amey's lawsuit against the insureds. The majority asserts that because the events underlying Amey's lawsuit caused uncovered "economic" (i.e., intangible property) losses to Amey, there can be no coverage for any bodily injuries to Amey that were [*44] caused by, or even related to, the same events. Under the majority's view, there is no coverage for bodily injuries that are in any way related to economic losses.

On what basis does the majority reach this conclusion? Instead of closely analyzing the policy language to determine whether coverage exists, the majority engages in a lengthy recitation of three cases on which the Court of Appeal relied, and then in a conclusory paragraph asserts that "CGL policies do not provide coverage for economic losses that cause emotional distress.... These policies were never intended to cover emotional distress damages that flow from an uncovered 'occurrence,' ..." (Maj. opn., *ante*, at p. 23.) Accordingly, the majority concludes that there was no potential for coverage because "[a]ll allegations in the Amey complaint were related to Amey's asserted *economic loss* as a Marmac shareholder." (*Ibid.*)

The majority's conclusion is wrong. The majority's exclusion of all bodily injuries "related to" an economic loss is an unsupportable judicial rewriting of the insurance contract at issue here. The majority does not and cannot justify its sweeping statements by anything found in the language of the policy. Contrary to the majority's conclusion, nothing in the language of the insureds' policy with Truck excludes coverage for bodily injuries that are "related to" (maj. opn., *ante*, at p. 23) economic losses. The Truck policy's definition of "bodily injury" does not exclude injuries that are caused by or related to economic losses. It covers all "bodily injury, sickness or disease," regardless of the cause.

Likewise, the Truck policy's definition of "occurrence" broadly encompasses any "event, or series of events," that "results in ... bodily injury," whether or not one of the events in the chain of causation also causes a concurrent economic loss or is itself an economic loss. [5] The policy's definition of "occurrence" nowhere excludes from that term events that either are economic losses or are "related to" economic losses. The ordinary meaning of "event" is "something that happens." (Webster's New Collegiate Dict. (9th ed. 1988) p. 430.) An economic loss is "something that happens."

5 In this part, I put aside for the moment the "neither expected nor intended" portion of the Truck policy's definition of "occurrence" that I discussed previously in part II, as the majority does not base its exclusion of bodily injuries related to economic losses on that language.

Thus, there is nothing in the policy language that limits "occurrence," as the majority does, to "an event based on a noneconomic [**645] [***396] act" (maj. opn., *ante*, at p. 26). Rather, as I set forth earlier, the policy defines an "occurrence" to include events that result in bodily injury. An occurrence does not become a nonoccurrence simply because the event causes both bodily injury and economic loss.

[*45] The majority's erroneous conclusion arises from its mistaken view that the bodily injury and property damage coverages of the Truck policy are somehow interdependent, and that therefore "the occurrence or act leading to coverage must be an injury to tangible property, not to one's economic interest." (Maj. opn., *ante*, at p. 26.) The majority's conclusion is contrary to the express policy language at issue in this case. [6]

6 The majority's conclusion is also contrary to its acknowledgment elsewhere that "the CGL policy provides coverage for 'occurrences' that cause bodily injury *or* tangible property losses." (Maj. opn., *ante*, at p. 23, italics added.)

The coverage clause of the policy obligates the insurer to "pay all damages which the insured becomes legally obligated to pay because of [P] (C) *bodily injury* to any person, and [P] ... [P] (E) damage to property ... [P] to which this insurance applies, *caused by an occurrence.*" (Italics added.) The bodily injury coverage (which the policy refers to as "Coverage C") is independent of the property damage coverage (which the policy refers to as "Coverage E"). Coverage E and coverage C, for example, are subject to different exclusions, can be separately purchased, and can be subject to different liability limits. The coverage clause does not require that for a bodily injury to be covered under coverage C it must be caused by property damage covered under cov-

erage E. Likewise, under the policy's definition of occurrence, it is irrelevant whether the event resulting in bodily injury under coverage C takes the form of property loss that is not covered under coverage E; all that is necessary is that the event, whatever its nature, "result[] in ... bodily injury."

The majority is therefore wrong in its assertion that coverage for bodily injury under coverage C is limited to events that also cause property damage that is covered under coverage E. ("[T]he occurrence or act leading to coverage [for bodily injury under coverage C] must be an injury to tangible property [i.e., property damage covered under coverage E], not to one's economic interest." Maj. opn., *ante*, at p. 26.) The Truck policy independently covers either property damage *or* bodily injury resulting from an event or series of events proximately caused by an insured, regardless of the nature of the intermediate events in the chain of causation.

The majority maintains nonetheless that it was the "intent of the parties" to exclude from coverage bodily injuries related to economic losses. (Maj. opn., *ante*, at p. 28.) But the majority offers no evidence that the parties here mutually held this supposed intent. What the majority calls the "intent" of the parties is actually its own opinion of how insurance policies should be drafted. It is not this court's function, however, to draft or redraft insurance policies. The true intent of the parties in this case is the meaning to be found in the language of the policy--nothing more, nothing less. As the analysis [*46] above reveals, the policy language reflects no intent to exclude all bodily injuries related to economic losses.

Nor are the three cases relied on by the majority and by the Court of Appeal persuasive. Like the majority, those decisions failed to ground their conclusions in the contractual language before them. In the first of those cases, *Chatton v. National Union Fire Ins. Co. (1992) 10 Cal. App. 4th 846, 857 [13 Cal. Rptr. 2d 318]*, defrauded investors sought to recover from the insurer of a corporation's directors and officers for the emotional distress (without any physical symptoms) caused by "the loss of their investment." The Court of Appeal in *Chatton* concluded that emotional distress without accompanying physical manifestations is not "bodily injury" for purposes of a policy containing the same "bodily injury" definition that is at issue here. ( *Id. at pp. 853-857.*) Although this holding was dispositive of the case, since the shareholders had not claimed any physical symptoms, the [**646] [***397] court went on to conclude that the wrongful acts also were not accidental and therefore were not "occurrences" under a policy definition that, unlike the policy in this case, required that occurrences be accidents, not merely events. ( *Id. at pp. 860-862.*) Finally, *Chatton* held that when a policy provides coverage for bodily injury *or* tangible property damage, there is no coverage for bodily injuries caused by intangible property loss. ( *Id. at pp. 857-860.*)

The Court of Appeal in *Chatton* based its conclusion that the policy before it excluded coverage for bodily injuries caused by intangible property loss on its assertion that "the 'bodily injury' clause of the CGL policy ... incorporated coverage for loss or destruction of tangible property as well." ( *Chatton v. National Union Fire Ins. Co., supra, 10 Cal. App. 4th at p. 860.*) The court, however, did not explain how the bodily injury coverage "incorporated" the property damage coverage, nor could it have done so, for in *Chatton*, as here, the two forms of coverage were independent. Like the majority, the *Chatton* court erroneously collapsed the two forms of coverage together. *Chatton* failed to recognize that any bodily injuries, whatever their cause, were independently covered under the bodily injury coverage, and it viewed bodily injury caused by economic loss only as a form of consequential damages accompanying an uncovered intangible property loss. The two cases that follow *Chatton*, and on which the majority also relies, *Keating v. National Union Fire Ins. (9th Cir. 1993) 995 F.2d 154, 156-157*, and *McLaughlin v. National Union Fire Ins. Co. (1994) 23 Cal. App. 4th 1132, 1150-1151 [29 Cal. Rptr. 2d 559]*, adopt *Chatton's* faulty analysis without adding anything to it. [7]

7 Nor does *Allstate Ins. Co. v. Interbank Financial Services (1989) 215 Cal. App. 3d 825 [264 Cal. Rptr. 25]* support the majority's holding. *Allstate* involved a policy with language quite different from either the Truck policy at issue in this case or the standard CGL policy. In *Allstate* the insureds were sued for economic losses (but not emotional or physical injuries) allegedly caused by erroneous and fraudulent investment advice they had provided. ( *Id. at pp. 827-828.*) The policy in *Allstate* excluded coverage for damages " 'arising out of the rendering of or the failure to render ... professional services, or consulting business ... services.' " ( *Id. at p. 829.*) The court held that under this exclusion there was no coverage under the policy for the lawsuit against the insureds; "the clear bases of the complaints are that the insureds gave poor professional advice ...." ( *Id. at p. 831.*) That the quite different policy language in *Allstate* did not cover economic losses caused by the investment advice given by the insureds in that case says nothing about whether the Truck policy covers the insureds for the bodily injury they allegedly caused to Amey.

In addition to being contrary to the language of the Truck policy, the majority's adoption of *Chatton's* ap-

proach is at odds with this court's [*47] decision in *Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal. 4th 1076, 1084 [17 Cal. Rptr. 2d 210, 846 P.2d 792]*. *Horace Mann* rejected the notion that the existence of a duty to defend turns on whether there is coverage for the "dominant factor" of the lawsuit. Rather, in determining the duty to defend, "[w]e look not to whether noncovered acts predominate in the third party's action, but rather to whether there is *any* potential for liability under the policy." (*Ibid*., original italics.) *Horace Mann* thus precludes the majority's approach of excluding covered losses simply because they are "related to" (maj. opn., *ante*, at p. 30) uncovered losses that are the dominant factor in the lawsuit against the insured.

Even if the decisions in *Chatton v. National Union Fire Ins. Co., supra, 10 Cal. App. 4th 846*, *Keating v. National Union Fire Ins., supra, 995 F.2d 154*, and *McLaughlin v. National Union Fire Ins. Co., supra, 23 Cal. App. 4th 1132*, were correct, they would be inapplicable on the facts of this case. The injured parties in the three cases just cited were defrauded investors who were emotionally distressed because they had lost money, not because of the content of the fraudulent statements or the other conduct by the insureds that caused them to lose money. Unlike the injured investors in those cases, however, Amey did not allege that his emotional and physical distress arose from the financial loss caused by the insureds. Rather, he alleged that his emotional and physical distress arose from his demotion and termination, [**647] [***398] his loss of influence and control over Marmac, and other "conduct" by the insureds--conduct that *in addition* caused him financial loss. Intangible economic loss was not the cause, only an accompaniment, of Amey's emotional and physical distress. Amey's distress and his economic loss were concurrent effects of the insureds' conduct, not successive effects as was the case in *Chatton*. Thus, here Amey's emotional and physical distress was independent of his economic loss in a way that was not true in *Chatton*. [8]

8 Moreover, Amey claimed the insureds caused him emotional and physical distress by conduct that did not cause any accompanying economic loss. Amey testified at his deposition in his lawsuit against the insureds that the insureds had humiliated him by cutting his office telephone lines, packing his belongings and putting them out on the sidewalk, and humiliating him in front of a client. None of these acts caused economic loss to Amey. As I have noted previously, the insureds renewed their tender of defense on the basis of Amey's deposition testimony.

This case presents other distinctions as well from *Chatton v. National Union Fire Ins. Co., supra, 10 Cal. App. 4th 846*. Unlike *Chatton*, here there was physical injury accompanying the emotional distress. Also unlike *Chatton*, here the Truck policy defines "occurrence" in terms of events, not accidents.

Nor can the majority's holding be justified by its assertion that the exclusion of bodily injury related to economic loss conforms to the "reasonable expectations" of the insureds. The reasonable expectations doctrine [*48] comes into play only when the language of an insurance policy relevant to a particular question of coverage is ambiguous. ( *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra, 9 Cal. 4th at p. 37*; *Bank of the West v. Superior Court (1992) 2 Cal. 4th 1254, 1264-1265 [10 Cal. Rptr. 2d 538, 833 P.2d 545]*; *Reserve Insurance Co. v. Pisciotta (1982) 30 Cal. 3d 800, 807-808 [180 Cal. Rptr. 628, 640 P.2d 764]*.) As there is no ambiguous policy language to construe here, there is no basis for applying the reasonable expectations doctrine in this case. Even if there were some basis for applying it here, the doctrine requires a court to resolve the ambiguity in favor of the insured by extending coverage to the insured. ( *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra, 9 Cal. 4th at p. 37*; *AIU Ins. Co. v. Superior Court (1990) 51 Cal. 3d 807, 822 [274 Cal. Rptr. 820, 799 P.2d 1253]*.) This court has never deployed the reasonable expectations doctrine as the majority does here to *deny* an insured coverage that is within the ordinary and unambiguous meaning of the policy language, and it is a misuse of the doctrine to do so.

The majority creates a blanket rule that no coverage exists under the bodily injury liability provisions of an insurance policy if the bodily injury is related to property damage not covered by the policy. That rule will restrict the bodily injury coverage provided by any policy that, like the Truck policy here, on its face covers bodily injury independent of whether or not any related property damage is covered by the policy. For example, assume a policy that provides coverage for bodily injuries, but not property damage, caused by the insured. The majority's reasoning would deny an insured coverage for any bodily injury caused by property damage (e.g., if the insured's car strikes and damages a tree that falls and injures someone) solely because there is no coverage for the property damage that is the immediate cause of the bodily injury.

CONCLUSION

The ordinary meaning of the pertinent Truck policy language covers bodily injuries without regard for the nature of the event causing the bodily injury. The policy therefore covers bodily injuries that are caused by economic losses or, as here, are caused by an event that also

causes an economic loss. Had Truck wanted to exclude coverage for bodily injuries related to economic loss, it could, as the drafter of the policy at issue in this case, have so provided. It is not the proper role of this court to manufacture coverage [*49] exclusions that are contrary to the express language of the policy, as the majority does here.

As I have previously explained, however, Amey's complaint did not allege an "occurrence" within the meaning of the Truck policy [**648] [***399] for a far different reason. The policy defines an "occurrence" as an event resulting in bodily injury *neither expected nor intended* by the insured. Amey alleged that the emotional and physical distress that he suffered was intended by the insureds. Because he alleged that the insureds intended to cause him those injuries, those injuries were not caused by an "occurrence" within the policy's definition of that term. It is on that ground that I would affirm the judgment of the Court of Appeal.

Respondents' petition for a rehearing was denied October 26, 1995, and the opinion was modified to read as printed above. Kennard, J., was of the opinion that the petition should be granted.

# TAB 38

LEXSEE 186 CAL.APP. 3D 1332

**FRANK C. WILHELM, as Conservator, etc., Plaintiff and Appellant, v. PRAY, PRICE, WILLIAMS & RUSSELL et al., Defendants and Respondents**

**No. B010724**

**Court of Appeal of California, Second Appellate District, Division Three**

*186 Cal. App. 3d 1324*; *231 Cal. Rptr. 355*; *1986 Cal. App. LEXIS 2171*

**November 7, 1986**

**PRIOR HISTORY:** [***1] Superior Court of Los Angeles County, No. SOC 71090, Norman W. Gordon, Judge.

**DISPOSITION:** The judgment as to the sustaining of the demurrer without leave to amend, the motion to strike the punitive damages, and the award of sanctions is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court sustained, without leave to amend, the demurrer of defendant attorney to plaintiff conservator's third amended complaint alleging fraud or deceit, based on defendant's alleged misrepresentations to plaintiff's conservatee which allegedly led the 87-year-old woman to dismiss a pending action on a $ 104,000 promissory note against a client of defendant's. The trial court also granted defendant's motion to strike the prayer for punitive damages and a paragraph alleging that defendant had arranged a meeting in her office with plaintiff's conservatee without notifying the conservatee's attorneys in violation of Rules Prof. Conduct of State Bar, *rule 7-103*, providing that a member of the bar must not communicate directly or indirectly with a party whom he knows to be represented by counsel on a subject of controversy without the express consent of such counsel. The trial court also granted defendant sanctions pursuant to *Code Civ. Proc., § 128.5*, providing that a trial court may order sanctions as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay, based on plaintiff's bad faith in his failure to make any significant changes in his complaint following the sustaining of three previous demurrers. (Superior Court of Los Angeles County, No. SOC 71090, Norman W. Gordon, Judge.)

The Court of Appeal affirmed. The court held that the third amended complaint did not state a cause of action for fraud or deceit, since it failed to plead with specificity a factual basis for how defendant knew her representations (viz., dismiss the suit with prejudice and the loan will be repaid) were false, and it failed to specifically plead justifiable reliance on the part of plaintiff's conservatee. Further, plaintiff failed to plead a cause of action for negligent misrepresentation, and, even if plaintiff had been allowed to amend, plaintiff could not have shown proximate cause, since after plaintiff's conservatee heard defendant's representations, she dismissed her action only after meeting with her own attorneys, an independent intervening act. Further, the prayer for punitive damages was properly stricken since the demurrer was properly sustained, and the allegations of professional misconduct were properly stricken since a violation of professional conduct rules did not subject defendant to civil liability in damages. Finally, the court held the award of sanctions was proper since the third amended complaint revealed only superficial amendments and the grounds for demurrer to the third amended complaint were the same as for all previous demurrers. (Opinion by Klein, P. J., with Lui, J., and Herrington, J., * concurring.)

* Assigned by the Chairperson of the Judicial Council.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1a) (1b) Pleading § 23--Demurrer to Complaint--Demurrer as Admission--Application of Rule on Appeal.** --The function of a demurrer is to test the suffi-

ciency of a plaintiff's pleading by raising questions of law; for purposes of appeal, factual allegations of the complaint, properly pled, are deemed admitted by defendant's demurrer. All intendments weigh in favor of the regularity of the trial court proceedings and the correctness of the judgment, and, unless clear error of abuse of discretion is demonstrated, the trial court's judgment of dismissal following the sustaining of defendants' demurrer will be affirmed on appeal.

**(2) Pleading § 67--Denial of Leave to Amend.** --Leave to amend a complaint is properly denied when the facts are not in dispute and the nature of the claim is clear, but there is no liability under substantive law.

**(3a) (3b) (3c) (3d) Fraud and Deceit § 25--Actions--Pleading--Failure to Adequately State Cause of Action.** --The essential allegations for an action in fraud or deceit are false representation as to a material fact, knowledge of its falsity, intent to defraud, justifiable reliance and resulting damage. The absence of any one of these required elements will preclude recovery. Thus, in an action brought by a conservator against an attorney, based on the attorney's alleged misrepresentations to plaintiff's conservatee, leading the conservatee to dismiss an action pending against a client of defendant's, the trial court properly sustained defendant's demurrer to plaintiff's third amended complaint for failure to state a cause of action. The complaint failed to plead with specificity a factual basis for how defendant "knew" the representations she communicated to plaintiff's conservatee on behalf of her client were false. Further, the complaint made no showing of "actual" or "justifiable" reliance, since plaintiff's conservatee was represented by counsel at the time of the alleged misrepresentations, and it was not reasonable for plaintiff's conservatee to accept defendant's alleged misrepresentations as an adversary without an independent inquiry.

**(4) Fraud and Deceit § 25--Actions--Pleading--Specificity.** --Although on demurrer, plaintiff's pleading must be taken as true, the allegations in a fraud action need not be liberally construed; fraud must be specifically pleaded. General pleading of a legal conclusion of fraud is insufficient, and every element of the cause of action must be alleged in full, factually and specifically. The policy of liberal construction of pleading will not usually be invoked to sustain a pleading that is defective in any material respect.

**(5) Fraud and Deceit § 12--Actual Fraud--Reliance--Actual and Justifiable Reliance.** --In an action for fraud or deceit, "actual" reliance, i.e., that a representation is an "immediate cause" which alters the parties' legal relations, must be shown. Further, beside actual reliance, "justifiable" reliance, i.e., that circumstances are such to make it reasonable for a plaintiff to accept a defendant's statements without an independent inquiry or investigation, must also be shown.

**(6) Negligence § 61--Actions--Pleading--Negligent Misrepresentation.** --In an action for fraud and deceit brought by a conservator against an attorney, based on the attorney's alleged misrepresentations to plaintiff's conservatee, leading the conservatee to dismiss an action pending against defendant's client, the complaint alleged no cause of action for negligent misrepresentation. The complaint alleged only that defendant knew that representations were false, but nowhere was it alleged that defendant made false representations honestly believing they were true but having no reasonable ground for such belief.

**(7a) (7b) Negligence § 19--When Intervening Cause Becomes Superseding Cause--Consultation With Counsel.** --In an action for fraud and deceit brought by a conservator based on an attorney's alleged misrepresentations to plaintiff's conservatee, leading to the dismissal of an action by the conservatee that was pending against one of defendant's clients, the complaint could not have been amended to allege a cause of action for negligent misrepresentation. Even if the duty necessary for negligent misrepresentation existed, plaintiff could not allege proximate cause, since, after plaintiff's conservatee heard the attorney's alleged misrepresentations, she then consulted with her own attorneys, and it was only after the meeting that the action against defendant's client was dismissed. Thus, the conservatee's discussion with her own attorneys amounted to an independent intervening act relieving defendant of any negligence.

**(8) Fraud and Deceit § 21--Actions--Election of Remedies--Intentional and Negligent Misrepresentation.** --In an action for fraud and deceit, a plaintiff can allege causes of action for both intentional and negligent misrepresentation since a plaintiff is able to plead inconsistent facts on information and belief.

**(9) Pleading § 94--Motion to Strike Part of Pleading--Prayer for Punitive Damages.** --In an action for fraud and deceit, the trial court properly struck plaintiff's prayer for punitive damages since defendant's demurrer to plaintiff's complaint was properly sustained without leave to amend.

**(10) Attorneys at Law § 26--Attorney-client Relationship--Liability of Attorneys--Violation of Rules of Conduct.** --Although the actions of an attorney in meeting with plaintiff's conservatee, who had an action pending against a client of the attorney, may have constituted

a violation of *Rules Prof. Conduct, rule 7-103*, providing that a member of the State Bar may not communicate directly or indirectly with a party whom he knows to be represented by counsel on a subject of controversy, without the express consent of such counsel, and thus may have subjected the attorney to State Bar disciplinary proceedings, it did not subject the attorney to civil liability in damages.

**(11) Pleading § 32--Judgment on Demurrer--Sanctions.** --In an action for fraud and deceit, after sustaining defendant's demurrer to plaintiff's third amended complaint for failure to state a cause of action, the trial court properly awarded defendant sanctions pursuant to *Code Civ. Proc., § 128.5*, providing that a trial court may order payment of any reasonable expenses incurred by another party as a result of badfaith actions or tactics that are frivolous or solely intended to cause unnecessary delay. The trial court had previously sustained three demurrers, and the third amended complaint revealed only superficial amendments and the grounds for demurrer to the third complaint were precisely the same as for the previous demurrers.

**COUNSEL:** George T. Kelly for Plaintiff and Appellant.

Bottum, Rady & Feltion, Nancy L. Rady and Christopher Granville-Mathews for Defendants and Respondents.

**JUDGES:** Opinion by Klein, P. J., with Lui, J., and Herrington, J., * concurring.

* Assigned by the Chairperson of the Judicial Council.

**OPINION BY:** KLEIN

**OPINION**

[*1328] [**356] Plaintiff and appellant Frank C. Wilhelm (Wilhelm), conservator for the estate and person of Vona J. Goodman (Goodman), appeals from a judgment sustaining the demurrer without leave to amend to the third amended complaint interposed by defendant and respondent Nellie Cohen (Cohen), granting a motion to strike, and awarding sanctions.

Because the complaint does not, and cannot, state a cause of action, the judgment is affirmed.

Procedural and Factual Background [1]

1 The instant facts are garnered from the pleadings.

[***2] In March 1981, Goodman, who was 87 years old at the time, retained William C. Price III (Price) and the firm of Pray, Price, Williams & Russell (Firm) to recover $ 104,000 she loaned Albert S. Leedy (Leedy) and for which she received a note. On or about April 1, 1981, the Firm filed an action against Leedy (Goodman v. Leedy, et al. (Super. Ct. L.A. County, No. 61303)). The Firm also petitioned the court for a voluntary conservatorship for Goodman.

After the initiation of the lawsuit, Goodman, accompanied by Leedy, met with Leedy's attorney, Cohen, in Cohen's office sometime in April 1981. Following Goodman's meeting with Cohen and Leedy, her lawsuit against Leedy was dismissed with prejudice by her counsel on May 19, 1981.

[*1329] On November 17, 1982, Wilhelm was appointed conservator of the person and estate of Goodman. On November 2, 1983, Wilhelm filed the instant action against Price, the Firm, Leedy and Cohen.

In the original complaint, the first cause of action alleged malpractice against Priced and the Firm based on the dismissal of the action against Leedy, especially in light of the petition to establish a conservatorship for Goodman filed at the same time as [***3] the lawsuit on her behalf. The second cause of action sought damages from Cohen for deceit under *Civil Code section 1710*. The third and fourth causes of action were for constructive fraud against Cohen and Leedy under *Civil Code section 1573*.

Cohen interposed successful demurrers to the original, the first and the second amended complaints.

The third amended complaint alleged malpractice against the Firm in the first cause of action. The second cause of action for fraud and deceit against Cohen alleged that when Goodman visited Cohen's office with Leedy, Cohen made certain false representations in order to convince Goodman to dismiss the lawsuit against Leedy. The prayer requested general and punitive damages against both the Firm and Cohen.

Cohen demurred to the second cause of action, and at the same time, filed a motion to strike both the punitive damages and a paragraph that alleged Cohen arranged the meeting in her office with Goodman without notifying Goodman's attorneys in violation of Rules of Professional Conduct of the State Bar, *rule 7-103* (*rule 7-103*). Lastly, Cohen filed a motion for sanctions pursuant to *Code of Civil Procedure section 128.5* (*section 128.5*), alleging [***4] Wilhelm's failure to make any significant changes in the complaints following the sustaining of three previous demurrers was in bad faith and caused her unnecessary delay and expense.

[**357] After a hearing on December 20, 1984, the trial court sustained Cohen's demurrer without leave to amend to the third amended complaint and granted her

motion to strike. It then dismissed Cohen from the instant lawsuit and awarded $ 500 in sanctions pursuant to *section 128.5* against Wilhelm in his representative capacity. [2]

2 We take judicial notice that the lawsuit between Wilhelm and Price and the Firm is still pending.

Contentions

Wilhelm contends the trial court erred: (1) in sustaining Cohen's demurrer to the third amended complaint; (2) in striking the punitive damages allegation; and (3) granting the motion for sanctions.

[*1330] Discussion

1. *Scope of appellate review.*

**(1a)** The function of a demurrer is to test the sufficiency of a plaintiff's pleading by raising questions of law. ( *Whitcombe* [***5] *v. County of Yolo (1977) 73 Cal.App.3d 698, 702 [141 Cal.Rptr. 189].*) For purposes of appeal, factual allegations of the complaint, properly pleaded, are deemed admitted by defendant's demurrer. ( *Thompson v. County of Alameda (1980) 27 Cal.3d 741, 746 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]*; *Lopez v. Southern Cal. Rapid Transit Dist. (1985) 40 Cal.3d 780, 784 [221 Cal.Rptr. 840, 710 P.2d 907].*)

**(2)** Leave to amend is properly denied when the facts are not in dispute and the nature of the claim is clear, but there is no liability under substantive law. ( *Johnson v. County of Los Angeles (1983) 143 Cal.App.3d 298, 306 [191 Cal.Rptr. 704].*) **(1b)** "[All] intendments weigh in favor of the regularity of the trial court proceedings and the correctness of the judgment. Unless clear error of abuse of discretion is demonstrated, the trial court's judgment of dismissal following the sustaining of defendants' demurrer will be affirmed on appeal [citation]." ( *Owens v. Foundation for Ocean Research (1980) 107 Cal.App.3d 179, 182 [165 Cal.Rptr. 571].*)

It is this standard we apply to the instant appeal.

2. *The complaint does not state a cause* [***6] *of action for either fraud or deceit.*

**(3a)** Wilhelm contends he adequately stated a cause of action for some form of either fraud or deceit. [3]

3 *Civil Code section 1572* (*section 1572*) states: "Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: [para. ] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [para. ] 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; [para. ] 3. The suppression of that which is true, by one having knowledge or belief of the fact; [para. ] 4. A promise made without any intention of performing it; or, [para. ] 5. Any other act fitted to deceive."

*Civil Code section 1709* (*section 1709*) defines: "*Fraudulent deceit.* One willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

*Civil Code section 1710* (*section 1710*) provides: "A deceit, within the meaning of the last section, is either: [para. ] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [para. ] 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; [para. ] 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, [para. ] 4. A promise, made without any intention of performing it."

[***7] [*1331] a. *No "actual" or "justifiable" reliance on Cohen's representations.*

The essential allegations for an action in fraud or deceit are false representation as to a material fact, knowledge of its falsity, intent to defraud, *justifiable* reliance and resulting damage. ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz (1976) 57 Cal.App.3d 104, 109 [128 Cal.Rptr.* [**358] *901]*; *Gonsalves v. Hodgson (1951) 38 Cal.2d 91, 100-101 [237 P.2d 656].*)

The absence of any one of these required elements will preclude recovery. ( *Gonsalves v. Hodgson, supra, 38 Cal.2d at p. 101.*)

Wilhelm alleges in the third amended complaint that at their meeting, Cohen made the following representations to Goodman: (1) if Goodman would dismiss her action against Leedy, he would pay back the $ 104,000; (2) it would be in the best interests of Goodman to dismiss the suit because otherwise it would damage her longstanding and future relationship with Leedy; and (3) Goodman would save substantial monies in attorney's fees.

Wilhelm further alleged Cohen knew these representations were false and that they were made with intent to defraud Goodman, and that Goodman relied [***8] on these representations and caused the lawsuit to be dis-

missed with prejudice against Leedy and was thereby damaged because she no longer had a legal remedy.

**(4)** While Wilhelm is correct that plaintiff's pleading must be taken as true ( *Douglas v. E. & J. Gallo Winery (1977) 69 Cal.App.3d 103, 114 [137 Cal.Rptr. 797]*), the allegations in a fraud action need not be liberally construed.

Instead, fraud must be specifically pleaded. This means: (1) general pleading of the legal conclusion of fraud is insufficient; and (2) every element of the cause of action for fraud must be alleged in full, factually and specifically, and the policy of liberal construction of pleading will not usually be invoked to sustain a pleading that is defective in any material respect. ( *Hall v. Department of Adoptions (1975) 47 Cal.App.3d 898, 904 [121 Cal.Rptr. 223]*.) "It is bad for courts to allow and lawyers to use vague but artful pleading of fraud simply to get a foot in the courtroom door." (*Ibid.*)

**(3b)** Here, the complaint fails to plead with specificity a factual basis for how Cohen "knew" the representations she communicated to Goodman on behalf of Leedy were false.

**(5)** Moreover, reliance, [***9] one of the elements necessary to state a cause of action in fraud or deceit is not adequately pled. Plaintiffs must show [*1332] "actual" reliance, i.e., that the representation was an "'immediate cause'" that altered their legal relations. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 472, p. 2732.) Besides actual reliance, plaintiff must also show "justifiable" reliance, i.e., circumstances were such to make it *reasonable* for plaintiff to accept defendant's statements without an independent inquiry or investigation. (4 Witkin, *supra*, § 475, p. 2734.)

**(3c)** Here, Wilhelm's allegations, as a matter of law, preclude a showing of "actual" or "justifiable" reliance. Wilhelm clearly admits Goodman was represented by counsel at the time of the alleged misrepresentations. In the first cause of action for malpractice against the Firm, Wilhelm alleges *the Firm* dismissed the lawsuit against Leedy without properly investigating the facts. But in the second cause of action against Cohen, Wilhelm alleges Goodman, relying on Cohen's representations, caused the action against Leedy to be dismissed.

Because her counsel prepared and filed the dismissal, she must have [***10] consulted with Price and the Firm before hand. Also, it would not be "reasonable" for Goodman to accept Cohen's representations as an *adversary* without an independent inquiry.

Based on the above, the complaint does not, and cannot, show reliance by Goodman on Cohen's representations. Therefore, because an element of fraud is missing, recovery is precluded. ( *Gonsalves v. Hodgson, supra, 38 Cal.2d at p. 101*.)

[**359] b. *The complaint does not state a cause of action for negligent misrepresentation, nor can it be amended to do so.*

Wilhelm contends at length that Cohen had a *duty* to Goodman as a third party, even though she was not in privity with Goodman.

The question of duty is relevant in cases where a cause of action for negligent misrepresentation is alleged. (See *§ 1710, subd. 2*.) Both cases cited by the parties discuss the issue of an attorney's duty to a *third party* in that context. ( *Goodman v. Kennedy (1976) 18 Cal.3d 335, 342 [134 Cal.Rptr. 375, 556 P.2d 737]*; *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra, 57 Cal.App.3d at p. 110*.)

**(6)** However, a scrutiny of the third amended complaint indicates no allegation of a cause [***11] of action for negligent misrepresentation. Instead, the complaint alleges only that Cohen "*knew* that said representations were false and untrue when they were made" and "[said] representations were made by . . . Cohen, . . ., with the *knowledge* that they were false and [*1333] untrue and with the intent to deceive and defraud Vona J. Goodman . . . ." (Italics added.) Nowhere in the complaint is it alleged that Cohen made these false representations honestly believing they were true but having no reasonable ground for such belief. (See *§ 1710, subd. 2*; 4 Witkin, Summary of Cal. Law, *supra*, § 480, p. 2739.)

Thus, as negligence was not alleged, we need not concern ourselves with the question of duty. **(7a) (8) (See fn. 4)** However, even if we were to permit amendment of the complaint to allege a cause of action for negligent misrepresentation, such cause of action would still not survive a demurrer. [4]

4 Apparently, a plaintiff can allege causes of action for both intentional and negligent misrepresentation as "there is some authority holding that a plaintiff should be able, on information and belief, to plead inconsistent *facts* . . . ." ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra, 57 Cal.App.3d at p. 110*, italics added.)

[***12] **(7b)** This is so because even if duty necessary for a negligent misrepresentation cause of action existed, there remains the problem of proximate cause. As discussed *ante* in part 2.a. on reliance, after Goodman heard Cohen's representations, she then consulted with her own attorneys, and it was only *after* this meeting that the action against Leedy was dismissed. Thus, Goodman's discussion with her own counsel amounts to an

independent intervening act, relieving Cohen of any negligence.

**(3d) (9) (10) (See fn. 5)** Because the complaint fails to state any cause of action, Cohen's demurrer was properly sustained, and the prayer for punitive damages was likewise properly stricken. [5]

5 Cohen's actions may constitute a violation of *rule 7-103.*

*Rule 7-103* states in pertinent part: "A member of the State Bar shall not communicate directly or indirectly with a party whom he [sic] knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel."

While a violation of *rule 7-103* does not subject an attorney to civil liability in damages, it may subject him or her to State Bar disciplinary proceedings. ( *Noble v. Sears, Roebuck & Co. (1973) 33 Cal.App.3d 654, 658-659 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164]*.) (See, e.g., *Carpenter v. The State Bar (1930) 210 Cal. 520, 521-523 [292 P. 450]* (three-month suspension); *Turner v. State Bar (1950) 36 Cal.2d 155 [222 P.2d 857]* (three-month suspension); *Mitton v. State Bar (1969) 71 Cal.2d 525 [78 Cal.Rptr. 649, 455 P.2d 753]* (three-month suspension); *Crane* v. *State Bar* (1981) Cal.3d 117, 122-124 *[177 Cal.Rptr. 670, 635 P.2d 163]* (one-year suspension); *Shalant v. State Bar (1983) 33 Cal.3d 485, 489-490 [189 Cal.Rptr. 374, 658 P.2d 737]* (public reproval).)

[***13] 3. *The award of sanctions was proper on its merits.*

**(11)** Wilhelm contends the trial court erred in awarding sanctions pursuant to *section 128.5* as all pleadings were in good faith. [6]

6 *Section 128.5* states in pertinent part: "(a) Every trial court may order a party, the party's attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay. . . . [para. ] (b) For purposes of this section: [para. ] (1) 'Actions or tactics' include, but are not limited to, the making or opposing of motions or the filing and service of a complaint or cross-complaint. The mere filing of a complaint without service thereof on an opposing party does not constitute 'actions or tactics' for purposes of this section. [para. ] (2) 'Frivolous' means (A) totally and completely without merit or (B) for the sole purpose of harassing an opposing party. [para. ] (c) Expenses pursuant to this section shall not be imposed except on notice contained in a party's moving or responding papers; or the court's own motion, after notice and opportunity to be heard. An order imposing expenses shall be in writing and shall recite in detail the conduct or circumstances justifying the order."

[***14] [*1334] *Section 128.5* allows expenses incurred by a party as a result of another party's "bad-faith actions or tactics that [**360] are frivolous or solely intended to cause unnecessary delay. . . ." The section defines frivolous as "totally and completely without merit or . . . for the sole purpose of harassing an opposing party."

Both *City of Long Beach v. Bozek (1982) 31 Cal.3d 527 [183 Cal.Rptr. 86, 645 P.2d 137]*, certiorari granted, vacated and remanded *459 U.S. 1095 [74 L.Ed.2d 943, 103 S.Ct. 712]*, reaffirmed and reissued *(1983) 33 Cal.3d 727 [190 Cal.Rptr. 918, 661 P.2d 1072]*, and *Atchison, Topeka & Santa Fe Ry. Co. v. Stockton Port Dist. (1983) 140 Cal.App.3d 111 [189 Cal.Rptr. 208]*, have held that *section 128.5* sanctions are appropriate for frivolous actions. In *Atchinson, Topeka* the court reflected "where an action is initiated for an improper motive, or a party knows or should know the facts or law or both preclude the action or any recovery, yet prosecutes the action in any event, the question of a frivolous action is raised." ( *Atchinson, Topeka & Santa Fe Ry. Co. v. Stockton Port Dist., supra, at p. 116.*

In the instant [***15] case, the trial court awarded sanctions of $ 500 only after sustaining three previous demurrers. At hearing on the first amended complaint, the trial court stated: "I'm suspect as to whether you are ever going to be able to state a cause of action."

Subsequently, the third amended complaint revealed only superficial amendments. The grounds for the demurrer to this complaint were precisely the same as for the previous demurrers -- namely, the facts as alleged and the law precluded a cause of action, and there was a lack of good faith by Wilhelm's counsel.

On this record, the trial court did not err in awarding sanctions after the complaint did not state a cause of action on the fourth try. [7]

7 No procedural infirmities in the granting of the award were raised. (See *Lesser v. Huntington Harbor Corp. (1985) 173 Cal.App.3d 922 [219 Cal.Rptr. 562]*.)

[*1335] The judgment as to the sustaining of the demurrer without leave to amend, the motion to strike

the punitive damages, and the award of sanctions [***16] is affirmed.