# TAB 39

LEXSEE 71 CAL. APP. 4TH 1066

**STEPHEN F. WILKINS et al., Plaintiffs and Appellants, v. NATIONAL BROADCASTING COMPANY, INC., et al., Defendants and Respondents.**

**No. B109530.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION THREE**

***71 Cal. App. 4th 1066*; *84 Cal. Rptr. 2d 329*; *1999 Cal. App. LEXIS 420*; *27 Media L. Rep. 1865*; *99 Cal. Daily Op. Service 3194*; *99 Daily Journal DAR 4103***

**April 30, 1999, Decided**

**SUBSEQUENT HISTORY:** [***1] Review Denied July 21, 1999, Reported at: *1999 Cal. LEXIS 4884*.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC132677. David P. Yaffe, Judge.

**DISPOSITION:** Judgment is affirmed. NBC is awarded costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In preparation for a television news report that investigated the practice of charging for services on so-called "toll-free" 800 lines, two television producers responded to a national advertisement by a company engaged in that business for investors and arranged to meet with a company salesperson. The producers did not reveal their television association and met with two representatives of the company at a restaurant and videotaped the meeting with hidden cameras. After portions of the videotape appeared in a television broadcast, the two company representatives filed claims for intrusion, unlawful recording of confidential communications, fraud, and various other causes of action against the television network and its producers. The trial court granted summary judgment in favor of defendants and denied plaintiffs' motion for a new trial. (Superior Court of Los Angeles County, No. BC132677, David P. Yaffe, Judge.)

The Court of Appeal affirmed. The court held that the complaint did not state a cause of action under any of plaintiffs' theories. The sales pitch was conducted in the middle of a crowded patio within close proximity to other tables, the location was not secluded, plaintiffs did not conduct themselves as though they were dispensing private information, and plaintiffs admitted that they freely provided the same information about their products to hundreds of other potential investors. Under these circumstances, there was no intrusion into a private place, conversation, or matter; defendants actions were not highly offensive to a reasonable person, and plaintiffs had no reasonable expectation of seclusion or solitude in the restaurant. The court also held that there was no relationship between plaintiffs and defendants that imposed on defendants a duty of disclosure. (Opinion by Kitching, J., with Croskey, Acting P. J., and Aldrich, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports

**(1) Summary Judgment § 26--Appellate Review--Scope of Review.** --Review of summary judgment involves pure matters of law, which an appellate court reviews independently, considering only the facts properly before the trial court at the time it ruled on the motion. As a summary judgment motion raises only issues of law regarding the construction and effect of supporting and opposing papers, the reviewing court independently applies the same three-step analysis required of the trial court. It identifies issues framed by the pleadings; it determines whether the moving party's showing established facts that negate the opponent's claim and justify a judgment in the moving party's favor; and if it does, the court finally determines whether the opposition demonstrates the existence of a triable, material factual issue.

**(2) Summary Judgment § 11--Affidavits--Sufficiency--Defendant.** --A moving defendant for summary judgment need not support the motion with affirmative evidence negating an essential element of the responding party's case. Instead, the moving defendant may point to the absence of evidence to support the plaintiff's case. The then burden shifts to the plaintiff to present evidence showing there is a triable issue of material fact. If the plaintiff is unable to meet the burden of proof regarding an essential element of his or her case, all other facts are rendered immaterial.

**(3) Summary Judgment § 4--Propriety--First Amendment Cases.** --Because unnecessarily protracted litigation would have a chilling effect upon the exercise of *U.S. Const., 1st Amend.*, rights, speedy resolution of cases involving free speech is desirable. Therefore, summary judgment is a favored remedy in such cases. Nonetheless, the basic question raised on a defense motion for summary judgment in such cases is whether the motion record demonstrates the existence of triable issues of fact, or whether the defense is entitled to judgment as a matter of law.

**(4) Privacy § 7--Actions--Intrusion.** --The tort of intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person. To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surroundings, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation, or data source. Furthermore, while what is highly offensive to a reasonable person suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of offensiveness that must be made by the court in discerning the existence of a cause of action for intrusion. A court determining the existence of offensiveness considers the degree of intrusion, the context, conduct, and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he or she intrudes, and the expectations of those whose privacy is invaded.

**(5) Privacy § 7--Actions--Intrusion--Secret Videotaping of Conversation for Investigative Television Report.** --In an action arising out of a television news investigation of the practice of charging for services on so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services, two sales representatives of a firm engaged in that business did not state a cause of action for intrusion by alleging that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television personnel posing as potential investors. The sales pitch was conducted in the middle of a crowded patio within close proximity to other tables, the location was not secluded, plaintiffs did not conduct themselves as though they were dispensing private information, and admitted that they freely provided the same information about their products to hundreds of other potential investors. Under these circumstances, there was no intrusion into a private place, conversation, or matter; defendants' actions were not highly offensive to a reasonable person, and plaintiffs had no reasonable expectation of seclusion or solitude in the restaurant.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 580.]

**(6) Privacy § 7--Actions--Intrusion--Electronic Eavesdropping--Secret Videotaping of Conversation for Investigative Television Report.** --Allegations by two sales representatives of a firm being investigated by a television network, that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television personnel posing as potential investors, did not state a cause of action for violation of the anti-eavesdropping statute (*Pen. Code, § 632*). The sales pitch was conducted in the middle of a crowded patio within close proximity to other tables. The location was not secluded, plaintiffs did not conduct themselves as though they were dispensing private information, and plaintiffs admitted that they freely provided the same information about their products to hundreds of other potential investors. *Pen. Code, § 632*, prohibits the recording only of confidential conversations, and no trier of fact could find, judged by an objective standard, that plaintiffs reasonably expected that their conversation would not be divulged to anyone else.

[See 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 1118.]

**(7) Fraud and Deceit § 29--Actions--Evidence--Reliance--Secret Videotaping of Conversation for Investigative Television Report.** --Allegations by two sales representatives of a firm being investigated by a television network, that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television reporters posing as potential investors, did not state a cause of action for fraud. A cause of action for fraud requires the plaintiff to prove a knowingly false misrepresentation by the defendant, made with the intent to deceive or to induce reliance by the plaintiff, justifiable reliance by the plaintiff, and resulting damages. There was no evidence that plaintiffs detrimentally relied on any alleged misrepresentations by the reporters. Even if plaintiffs believed the

reporters were potential investors, they were not induced to provide any information about their firm because of any supposed representations by the reporters. One plaintiff admitted in his deposition that he would have answered the reporters' questions even if he had known they were reporters.

**(8) Summary Judgment § 17--Counteraffidavits--Sufficiency--Contradicting Deposition.** --Courts do not permit a party to defeat a summary judgment motion by contradicting, in a declaration, that party's previous deposition testimony. On a motion for summary judgment, the credibility of the deposition admissions are valued so highly that the controverting affidavits may be disregarded as irrelevant, inadmissible, or evasive.

**(9a) (9b) Fraud and Deceit § 8--False Representations--Concealment--Secret Videotaping of Conversation for Investigative Television Report.** --Allegations by two sales representatives of a firm being investigated by a television network, that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television reporters posing as potential investors, did not state a cause of action for fraudulent concealment. Plaintiffs presented no evidence that they and the reporters shared the requisite relationship that would impose a duty to disclose the use of hidden cameras. In addition, the videotape and the admissions of plaintiffs showed that they willingly presented their business pitch to anyone who was interested. Thus, the facts that the reporters were reporters and not potential investors, that they had hidden cameras, that the identity of the two individuals that accompanied them was not disclosed, and that the meeting would be broadcast, were not facts material to the transaction.

**(10) Fraud and Deceit § 8--False Representations--Concealment--When Actionable.** --There are four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts. Putting aside a fiduciary relationship, each of the other three circumstances in which nondisclosure may be actionable presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise. Such a relationship can only come into being as a result of some sort of transaction between the parties. Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances.

**(11) Privacy § 7--Actions--Public Disclosure of Private Facts--Secret Videotaping of Conversation for Investigative Television Report.** --Allegations by two sales representatives of a firm being investigated by a television network, that they were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant with television reporters posing as potential investors, and that portions of the videotape were later broadcast, did not state a cause of action for public disclosure of private facts. The use of plaintiffs' names, likenesses, voices, and occupations were of legitimate public concern and did not constitute a morbid and sensational prying into private lives for its own sake. Defendants' investigation of plaintiffs' business, the practice of charging for services on so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services, was of legitimate public concern. The use of plaintiffs' names, likenesses, voices, and occupations added authenticity to the broadcast. It showed who was making the presentation, what they were saying, and how they were saying it. The broadcast showed the verbal and nonverbal communication of the salesmen as they were making their presentation. It turned an abstract story into something the public could more readily understand by making it more concrete.

**(12) Torts § 4 --Intentional Infliction of Emotional Distress.** --The elements of a prima facie case for the tort of intentional infliction of emotional distress are extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard for the probability of causing, emotional distress; the plaintiff's suffering severe or extreme emotional distress; and actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

**(13) Appellate Review § 109--Briefs--Argument and Authority.** --In a challenge to a judgment, it is incumbent upon an appellant to present argument and authority on each point made. Arguments not presented will generally not receive consideration.

**COUNSEL:** Neville L. Johnson & Associates, Neville L. Johnson; and David A. Elder for Plaintiffs and Appellants.

Anne H. Egerton; Irell & Manella and Henry Shields, Jr., for Defendants and Respondents.

**JUDGES:** Opinion by Kitching, J., with Croskey, Acting P. J., and Aldrich, J., concurring.

**OPINION BY:** KITCHING

**OPINION**

[*1071] [**332] **KITCHING, J.**

This case arises from a 1994 *Dateline NBC* news report that investigated the then growing practice of charging for services on so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services. Many of the 800 lines provided the caller with access to 900-number type adult entertainment lines. SimTel Communications (SimTel) leased and programmed 800 and 900 lines, and then sold them to investors.

[*1072] In connection with *Dateline NBC*'s investigation, two National Broadcasting Company, Inc., producers responded to SimTel's national [***2] advertisement in USA Today for investors, and arranged to meet with a SimTel salesperson. The producers did not reveal their association with *Dateline NBC.* They met with SimTel representatives Stephen F. Wilkins (Wilkins) and Thomas R. Scott (Scott) at a restaurant in Malibu and videotaped the lunch meeting with hidden cameras. Portions of the videotape appeared in a subsequent television broadcast.

Wilkins and Scott asserted claims for intrusion, unlawful recording of confidential communications, fraud, and various other causes of action against the National Broadcasting Company, Inc., and its producers (collectively referred to as NBC). The trial court granted summary judgment in favor of NBC. The trial court also denied Wilkins and Scott's motion for a new trial and assessed discovery sanctions against them and their counsel. Wilkins and Scott appeal.

We find as a matter of law that plaintiffs have not raised triable issues of fact regarding their causes of action for intrusion, violation of *Penal Code section 632*, fraud, public disclosure of private facts, intentional infliction of emotional distress or negligent infliction of emotional distress. [***3] Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On October 4, 1994, NBC broadcast a report on its program *Dateline NBC* entitled "Hardcore Hustle." The "Hardcore Hustle" report had the first in a three-part *Dateline NBC* series about the "pay-per-call" industry.

In connection with the preparation of the "Hardcore Hustle" report, *Dateline NBC* producer Jack Cloherty (Cloherty) called SimTel, a pay-per-call provider, in response to one of its national newspaper advertisements. He spoke with SimTel salesperson Scott. Scott subsequently spoke on the telephone with a woman whom he later learned to be *Dateline NBC* associate producer Sandra Surles (Surles). Neither Cloherty nor Surles told Scott that they worked for *Dateline NBC.* Surles told Scott that she and Cloherty were coming to California. They arranged to meet to discuss SimTel's business.

A lunch meeting took place at an outside patio table at a restaurant in Malibu. Cloherty and Surles brought two additional people with them to lunch. Scott brought his supervisor, Sales Manager Wilkins. Wilkins had not previously spoken with Cloherty or Surles. Neither Scott nor Wilkins asked about the two additional [***4] people that Cloherty and Surles brought with them, nor did they inquire if these two persons were interested in purchasing SimTel's products.

[*1073] At the lunch meeting, Wilkins explained how SimTel conducted business and how its 800and 900-number products worked. The parties discussed SimTel's products. NBC videotaped the lunch meeting with hidden cameras. NBC later broadcast brief excerpts of the videotape footage in its "Hardcore Hustle" report.

On August 1, 1995, SimTel, Wilkins, and Scott filed a complaint against NBC, KNBC-TV, Jane Pauley, Lea Thompson, Cloherty, Cindy Kuhn and Geoffrey's Malibu. [1] They alleged causes of action for (1) physical intrusion on solitude or into private affairs (intrusion); (2) fraud and conspiracy to commit fraud; (3) conspiracy to commit and intentional infliction of emotional distress; (4) [**333] negligent infliction of emotional distress; (5) unlawful eavesdropping on or recording of confidential communications ( *Pen. Code, § 632, subd. (a), 634, 637.2*); (6) public disclosure of private facts; (7) violation of right of privacy (*Cal. Const., art. I, § 1*); (8) trade libel and conspiracy to commit the same; [***5] (9) conspiracy to interfere with and interference with prospective economic advantage and contractual relations; (10) unfair business practices; [2] and (11) conspiracy to commit and defamation; (12) false light and intention to commit false light. [3] The gravamen of the complaint was that NBC's secret videotape of Wilkins and Scott constituted an unwarranted invasion of their privacy.

1 SimTel dismissed all of its claims with prejudice on or about July 16, 1996. Wilkins and Scott dismissed Geoffrey's from the complaint on May 23, 1996.

2 This cause of action was never litigated by Scott and Wilkins.

3 The causes of action for violation of right of privacy (7th cause of action), conspiracy to commit and defamation (11th cause of action),

and false light and intention to commit false light (12th cause of action) were dismissed on September 19, 1996. The causes of action for trade libel and conspiracy to commit same (8th cause of action) and conspiracy to interfere with and interference with prospective economic advantage (9th cause of action) were solely SimTel's causes of action.

[***6] On October 4, 1996, Wilkins and Scott moved for summary adjudication on the second cause of action for fraud. On October 4, 1996, NBC moved for summary judgment on Wilkins and Scott's complaint. The trial court denied Wilkins and Scott's motion and granted NBC's motion. [4]

4 In a minute order the trial court stated, in relevant part: "Assuming that plaintiffs are correct in their contention that the fact that a meeting is at a restaurant does not, as a matter of law, preclude a reasonable expectation of privacy, the videotapes show that plaintiffs could not entertain any such reasonable expectation in this case. They made no effort to obtain the affiliation or reason for attendance of two of the persons present and continued to speak freely while employees of the restaurant were at the table and could hear what was said. This defect is fatal to all of the claims asserted by plaintiffs in their complaint."

Judgment was entered on November 14, 1996. On December 27, 1996, the trial court denied Wilkins and [***7] Scott's motion for a new trial.

Wilkins and Scott timely filed a notice of appeal.

[*1074] DISCUSSION

1. *Summary Judgment Was Properly Granted in Favor of NBC*

a. *Standard of Review*

**(1)** Summary judgment is granted when a moving party establishes the right to entry of judgment as a matter of law. ( *Code Civ. Proc., § 437c, subd. (c)*; *Hunter v. Pacific Mechanical Corp. (1995) 37 Cal. App. 4th 1282, 1285 [44 Cal. Rptr. 2d 335]*.) "Review of summary judgment . . . 'involves pure matters of law,' which we review independently. [Citations.]" ( *Radovich v. Locke-Paddon (1995) 35 Cal. App. 4th 946, 953 [41 Cal. Rptr. 2d 573]*.) In conducting this de novo review, "we will consider only the facts properly before the trial court at the time it ruled on the motion. [Citation.]" ( *Brantley v. Pisaro (1996) 42 Cal. App. 4th 1591, 1601 [50 Cal. Rptr. 2d 431]*.)

"As a summary judgment motion raises only issues of law regarding the construction and effect of supporting and opposing papers, this court independently applies the same three-step analysis required of the trial court. We identify issues [***8] framed by the pleadings; determine whether the moving party's showing established facts that negate the opponent's claim and justify a judgment in the moving party's favor; and if it does, we finally determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citations.]" ( *Tsemetzin v. Coast Federal Savings & Loan Assn. (1997) 57 Cal. App. 4th 1334, 1342 [67 Cal. Rptr. 2d 726]*.)

**(2)** "Under the current version of the summary judgment statute, a moving defendant need not support his [or her] motion with affirmative evidence negating an essential element of the responding party's case. Instead, the moving defendant may (through factually vague discovery responses or otherwise) point to *the absence of evidence to support the plaintiff's case*. When that is done, the burden shifts to the plaintiff to present evidence showing there is a triable [**334] issue of material fact. If the plaintiff is unable to meet [his or] her burden of proof regarding an essential element of [his or] her case, all other facts are rendered immaterial. [Citations.]" ( *Leslie G. v. Perry & Associates (1996) 43 Cal. App. 4th 472, 482 [50 Cal. Rptr. 2d 785]*, [***9] italics in original.)

**(3)** " '[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy [in such cases] . . . .' [Citations.] Nonetheless, the basic question raised on a defense motion for summary judgment, and on review of such judgment, is the same in a privacy action against media defendants as in other cases: Does the motion record demonstrate the [*1075] existence of triable issues of fact, or was the defense entitled to judgment as a matter of law?" ( *Shulman v. Group W Productions, Inc. (1998) 18 Cal. 4th 200, 228 [74 Cal. Rptr. 2d 843, 955 P.2d 469]*.)

b. *Tort of Intrusion*

Wilkins and Scott contend that NBC invaded their privacy by intrusion into their solitude, seclusion or private affairs by videotaping them at the lunch meeting. We disagree.

Our Supreme Court in *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at pages 230-232*, has recently discussed the tort of intrusion as follows: "Of the four privacy torts identified by [***10] Prosser, the tort of intrusion into private places, conversations or matter is perhaps the one that best captures the common understanding of an 'invasion of privacy.' It encompasses unconsented-to physical intrusion into the home, hospital

room or other place the privacy of which is legally recognized, as well as unwarranted sensory intrusions such as eavesdropping, wiretapping, and visual or photographic spying. [Citation.] It is in the intrusion cases that invasion of privacy is most clearly seen as an affront to individual dignity. . . .

"

**(4)** "[T]he action for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person. . . . [P] . . . To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surroundings, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source. [Citations.]"

The *Restatement Second of Torts section 652B* states that "[o]ne who intentionally intrudes, [***11] physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

Furthermore, "[w]hile what is 'highly offensive to a reasonable person' suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of 'offensiveness' which must be made by the court in discerning the existence of a cause of action for intrusion. [P] . . . [P] . . . A court determining the existence of 'offensiveness' would consider [*1076] the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." ( *Miller v. National Broadcasting Co. (1986) 187 Cal. App. 3d 1463, 1483-1484 [232 Cal. Rptr. 668, 69 A.L.R.4th 1027].*)

Three cases have applied the California rules to specific facts. They have determined that there is an expectation of privacy in one's home, or in other places when circumstances create an [***12] expectation of privacy.

In *Dietemann v. Time, Inc. (9th Cir. 1971) 449 F.2d 245*, two Life magazine reporters surreptitiously gained entrance to Mr. Dietemann's home under the guise of seeking medical treatment. ( *Id. at p. 246.*) They were preparing an article entitled Crackdown on Quackery. ( *Id. at p. 245.*) The reporters, in Mr. Dietemann's den, used hidden camera and audio equipment to record the treatments that were accomplished with the use of " 'equipment which could at best be described as gadgets.' " ( *Id. at p. 246.*) The [**335] pictures appeared in Life's magazine article. ( *Id. at pp. 245-247.*) Dietemann was arrested for practicing medicine without a license. ( *Id. at p. 246.*) Dietemann sued for, inter alia, invasion of privacy. ( *Id. at p. 247.*)

The *Dietemann* court concluded "that clandestine photography of the plaintiff in his den and the recordation and transmission of his conversation without his consent resulting in his emotional distress warrants recovery for invasion of privacy in California." ( *Dietemann v. Time, Inc., supra, 449 F.2d at p. 248.*) [***13] The court noted that "[c]oncurrently with the development of privacy law, California had decided a series of cases according plaintiffs relief from unreasonable penetrations of their mental tranquility based upon the tort of intentional infl[i]ction of emotional distress . . . . [P] We are convinced that California will 'approve the extension of the tort of invasion of privacy to instances of intrusion, whether by physical trespass or not, into spheres from which an ordinary man in plaintiff's position could reasonably expect that the particular defendant should be excluded.' [Citation.]" ( *Id. at pp. 248-249.*)

Dietemann performed his alleged quack healing in his home. He did not advertise his services or charge for them. ( *Dietemann v. Time, Inc., supra, 449 F.2d at p. 246.*) The *Dietemann* court determined that "[p]laintiff's den was a sphere from which he could reasonably expect to exclude eavesdropping newsmen. He invited two of defendant's employees to the den. One who invites another to his home or office takes a risk that the visitor may not be what he seems, and that the visitor may repeat all he hears and observes [*1077] [***14] when he leaves. But he does not and should not be required to take the risk that what is heard and seen will be transmitted by photograph or recording, or in our modern world, in full living color and hi-fi to the public at large or to any segment of it that the visitor may select." ( *Id. at p. 249.*)

In *Miller v. National Broadcasting Co., supra, 187 Cal. App. 3d 1463*, ". . . an NBC television camera crew entered the apartment of Dave and Brownie Miller in Los Angeles, without their consent, to film the activities of Los Angeles Fire Department paramedics called to the Miller home to administer life-saving techniques to Dave Miller, who had suffered a heart attack in his bedroom. The NBC television camera crew not only filmed the paramedics' attempts to assist Miller, but NBC used the film on its nightly news without obtaining anyone's consent." ( *Id. at p. 1469.*) Additionally, ". . . NBC later used portions of the film in a commercial advertising an NBC 'mini-documentary' about the paramedics' work." (*Ibid.*) Brownie Miller sued, inter alia, for invasion of privacy. ( *Id. at p. 1470.*)

The *Miller* court determined [***15] that "reasonable people could regard the NBC camera crew's intrusion into Dave Miller's bedroom at a time of vulnerability and confusion occasioned by his seizure as 'highly offensive' conduct, thus meeting the limitation on a privacy cause of action Restatement of Torts, section 652B imposes." ( *Miller v. National Broadcasting Co., supra, 187 Cal. App. 3d at p. 1484.*) The court concluded that ". . . the NBC camera crew, the uninvited media guests, not only invaded the Millers' bedroom without Dave Miller's consent, they also invaded the home and [the] privacy of [the] plaintiff['s] wife . . . ." ( *Id. at p. 1486.*) Furthermore, *Miller* concluded NBC had no right to be in any part of Brownie Miller's home without her consent. (*Ibid.*)

[**336] In *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th 200,* a flight nurse employed by a helicopter rescue company wore a microphone during her evaluation and treatment of the Shulmans, two car accident victims. ( *Id. at p. 210.*) The nurse also permitted a television photographer to accompany her to the scene of the accident and to photograph the Shulmans, [***16] both at the scene of the accident and in the rescue helicopter as it transported them to the hospital. ( *Id. at pp. 210-211.*) The microphone recorded the nurse's conversations with Mrs. Shulman, and the television production company later included those recordings in its broadcast. (*Ibid.*)

The *Shulman* court held that the cameraman's "mere presence at the accident scene and filming of the events occurring there [could not] be deemed either a physical or sensory intrusion on plaintiff's seclusion[, [*1078] because the Shulmans] had no right of ownership or possession of the property where the rescue took place [an interstate highway], nor any actual control of the premises." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 232.*) The court further concluded, however, that the plaintiffs might be entitled to recover for intrusion based on (1) the videotaping by the television camera operator "in the interior of the rescue helicopter, which served as ambulance," and (2) the audiotaping of the conversations between Mrs. Shulman and the flight nurse "and other medical rescuers at the accident scene." ( *Id. at pp. 232-233.*) [***17] The court noted that "[a] patient's conversation with a provider of medical care in the course of treatment, including emergency treatment, carries a traditional and legally well-established expectation of privacy." ( *Id. at p. 234.*)

(1) *There Was No Intrusion Into a Private Place, Conversation or Matter*

**(5)** Wilkins and Scott were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant. They met with Cloherty and Surles, and two other individuals, to discuss SimTel's products. Wilkins spoke freely about the programs, even with the addition of these two "strangers," and while waiters stood at the table. The sales pitch was conducted in the middle of a crowded patio within close proximity to other tables. The location was not secluded and neither Wilkins nor Scott conducted himselves as though they were dispensing private information. Wilkins and Scott admitted in their depositions that they freely provided the same information about SimTel's products to hundreds of other potential investors, that they never asked about the two additional people at the table, and that Cloherty and Surles could have brought as many [***18] people to lunch as they wished. There was no physical or sensory intrusion into their privacy. Wilkins and Scott were not seated in a private dining room of a restaurant. Rather, they discussed business matters on the open patio of a public restaurant with four strangers. There was no entry by NBC into their homes, or even their offices (where Scott frequently entertained prospective clients). Nor did NBC intrude into the personal lives, intimate relationships, or any other private affairs of Wilkins or Scott. Instead, NBC photographed the two men in a public place and taped their conversations which were about business, not personal matters. There was no intrusion into a private place, conversation or matter. ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 231.*)

[*1079] (2) *NBC's Actions Were Not Highly Offensive to a Reasonable Person*

For the reasons which we have already discussed, we find as a matter of law that NBC's actions were not highly offensive to a reasonable person. ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 231.*)

(3) *Wilkins and Scott Had No Objectively Reasonable Expectation* [***19] *of Seclusion or Solitude in the Public Restaurant.*

Whether Wilkins or Scott had a reasonable expectation of privacy in their business discussion with Cloherty, Surles, and the two strangers, must be judged by an objective standard. ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 232.*) Pursuant to our review of the videotape and consideration of the admissions of Wilkins and Scott, we conclude that Wilkins and Scott had no objective expectation of privacy in their business lunch meeting.

Wilkins and Scott cannot maintain an action for invasion of privacy, to wit, the tort of intrusion.

c. *Penal Code Section 632*

**(6)** Wilkins and Scott contend that by videotaping the lunch meeting at the restaurant, [**337] the *Dateline NBC* producers violated the California Penal Code's

prohibition against eavesdropping on or recording confidential communications. We disagree.

*Penal Code section 632* bars the intentional recording of a "confidential communication" without the consent of all parties to the communication. [5] *Penal Code section 637.2, subdivision (a)* permits a civil [***20] action against a person who violates the statute. It is an essential element of a *Penal Code section 632, subdivision (a)* claim that Scott and Wilkins prove that the conversation that was taped was "confidential." *Penal Code section 632, subdivision (c)* defines the term "confidential communication" as a "communication carried on in circumstances as may reasonably indicate that any [*1080] party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering . . . or in any other circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

5 *Penal Code section 632, subdivision (a)* provides that: "Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among [such] parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding . . . ($ 2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment."

[***21] "Application of the statutory definition of 'confidential communication' turns on the reasonable expectations of the parties judged by an objective standard and not by the subjective assumptions of the parties." ( *O'Laskey v. Sortino (1990) 224 Cal. App. 3d 241, 248 [273 Cal. Rptr. 674]*.) "The test of confidentiality is objective." ( *Coulter v. Bank of America (1994) 28 Cal. App. 4th 923, 929 [33 Cal. Rptr. 2d 766]*.)

Wilkins and Scott argue that the conversation at the lunch meeting was confidential because they assumed the communications would not be discussed with any other parties. However, Wilkins testified in his deposition that he did not say anything he thought was a secret, that he did not say anything he had not said to another potential investor, and that he had not told anyone that the information he provided about SimTel was private and should not be passed on to others. Wilkins did not tell potential investors that they could not pass on this information.

On the facts of this case, Wilkins and Scott cannot make the showing required under *O'Laskey* and *Coulter*. Cloherty and Surles were virtual strangers to Wilkins and Scott, [***22] and the two people who accompanied them were total strangers, about whom Wilkins and Scott never inquired. Moreover, the topic of the lunch was SimTel's business and Wilkins gave a sales pitch he had given to many others. Waiters frequently came to the table, but Wilkins did not acknowledge them, pause in his sales pitch, or even lower his voice. Indeed, Wilkins admitted at his deposition that the sales discussion contained no secrets. Scott admitted at his deposition that Cloherty and Surles could have brought with them to lunch as many people as they liked. No trier of fact could find, judged by an objective standard, that Wilkins and Scott reasonably expected that their conversation would not be divulged to anyone else. *Penal Code section 632* prohibits the recording only of "confidential" conversations. This conversation was not confidential under the terms of the statute and *O'Laskey* and *Coulter*. Accordingly, videotaping the lunch meeting did not violate *Penal Code section 632*.

d. *Fraud*

Scott and Wilkins contend that the *NBC Dateline* producers committed fraud under three alternative theories. First, they argue [***23] that Cloherty and Surles made affirmative misrepresentations to them on which they relied as [*1081] follows: Cloherty's last name was Fullerty, Cloherty and Surles were married to each other, Cloherty and Surles were potential investors, and the two people they brought to lunch were their friends. Second, they contend Cloherty and Surles made material omissions and were legally obligated to disclose that they were journalists, that SimTel [**338] was the subject of an investigation, and that NBC was videotaping them at the lunch meeting. Third, they argue NBC committed deceptive acts in connection with a contract and is liable to Scott and Wilkins under *Civil Code section 1572*.

(1) *Alleged Affirmative Misrepresentations--No Justifiable Reliance*

**(7)** Under California law, a cause of action for fraud requires the plaintiff to prove (a) a knowingly false misrepresentation by the defendant, (b) made with the intent to deceive or to induce reliance by the plaintiff, (c) justifiable reliance by the plaintiff, and (d) resulting damages. ( *Service by Medallion, Inc. v. Clorox Co. (1996) 44 Cal. App. 4th 1807, 1816 [52 Cal. Rptr. 2d 650]*.) [***24]

Even if Wilkins and Scott had evidence of misrepresentations made by the producers of *NBC Dateline*, they are unable to prove they relied to their detriment on such misrepresentations. Even assuming Wilkins and Scott believed Cloherty and Surles were potential investors, they were not induced to provide any information about

SimTel because of any supposed representations by NBC. Wilkins admitted in his deposition that he would have answered Cloherty and Surles's questions even if he had known they were reporters, and that "the gist of what [he] was saying would have been exactly the same," but that he "might have worded" some of his remarks a little differently. Scott admitted he would not have done anything differently if he had known Cloherty's true name and that he and Surles were not married. Scott admitted at his deposition that it was his job to dispense information packets about SimTel freely upon request. Wilkins testified that SimTel entered into contracts with only about 3 percent of people who made actual inquiries. Ninety-seven percent of those who called SimTel and received information about its business never leased an 800 line. Scott admitted that Cloherty and [***25] Surles could have brought as many people to the meeting as they wished. Wilkins and Scott did not ask Cloherty and Surles to identify their "friends" and they did not care whether they were interested in SimTel's business.

After the depositions, Wilkins and Scott submitted declarations in opposition to the motion for summary judgment in which they stated that [*1082] Cloherty and Surles had "indicated they were on vacation in California and a married couple" and that they "never would have had a conversation with the defendants if [they] had known they were spies for NBC . . . ." **(8)** California courts, however, do not permit a party to defeat summary judgment by contradicting in a declaration that party's previous deposition testimony. On a motion for summary judgment, "the credibility of the [deposition] admissions are valued so highly that the controverting affidavits may be disregarded as irrelevant, inadmissible or evasive." ( *Leasman v. Beech Aircraft Corp. (1975) 48 Cal. App. 3d 376, 382 [121 Cal. Rptr. 768]*; see also *D'Amico v. Board of Medical Examiners (1974) 11 Cal. 3d 1, 21-22 [112 Cal. Rptr. 786, 520 P.2d 10]*.)

(2) *Alleged* [***26] *Material Omissions--Duty to Disclose*

**(9a)** Wilkins and Scott contend that NBC was required to advise them they were the subject of an investigation, that the people they were meeting were really journalists, that the "investors" they were meeting had hidden cameras, that the two "friends" were associated with the investigation, and that the meeting would be broadcast as part of a television newsmagazine. We disagree.

**(10)** "There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts. [Citation.]' " Putting aside a fiduciary relationship, "[e]ach of the other three circumstances in which nondisclosure may be actionable presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose [**339] can arise. . . . [P] . . . [S]uch a relationship can only come [***27] into being as a result of some sort of transaction between the parties. [Citations.] Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.] All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances." ( *LiMandri v. Judkins (1997) 52 Cal. App. 4th 326, 336-337 [60 Cal. Rptr. 2d 539]*, italics & fn. omitted.)

In *Deteresa v. American Broadcasting Companies, Inc. (9th Cir. 1997) 121 F.3d 460*, a case analogous to the case at bar, the Ninth Circuit relied on the [*1083] *LiMandri* case to affirm a judgment for the American Broadcasting Company. In *Deteresa*, plaintiff filed a lawsuit against the American Broadcasting Company and producer Anthony Radziwill for, inter alia, fraud and conspiracy to commit fraud. ( *Id. at p. 462*.) Radziwill attempted to convince plaintiff, a flight attendant on the flight O.J. Simpson took from Los Angeles to Chicago, to appear on a [***28] television show to discuss the flight. (*Ibid.*) Plaintiff and Radziwill talked, but she said no. The next day, Radziwill again attempted to arrange for plaintiff to appear on television. (*Ibid.*) When plaintiff again said no, Radziwill revealed that he had audiotaped and videotaped their conversation from the previous day.

The plaintiff's claim alleged "that ABC and Radziwill committed fraud and conspiracy to commit fraud by failing to disclose that Radziwill was audiotaping and videotaping her." ( *Deteresa v. American Broadcasting Companies, Inc., supra, 121 F.3d at p. 467*.)

The Ninth Circuit stated: "The district court concluded that ABC was entitled to summary judgment on Deteresa's fraud claim because she presented no evidence that she and Radziwill shared the requisite relationship for Radziwill to have a duty to disclose that he was taping her. We agree. Deteresa has presented no evidence that she and Radziwill shared any such relationship." ( *Deteresa v. American Broadcasting Companies, Inc., supra, 121 F.3d at p. 467*.)

**(9b)** Similarly, Wilkins and Scott have presented no evidence that they and Cloherty and Surles shared the requisite relationship [***29] which would impose upon

the *NBC Dateline* producers a duty to disclose the use of hidden cameras. ( *Deteresa v. American Broadcasting Companies, Inc., supra, 121 F.3d at p. 467*; *LiMandri v. Judkins, supra, 52 Cal. App. 4th at pp. 336-337.*) In addition, the videotape and the admissions of Wilkins and Scott show that they willingly presented their business pitch to anyone who was interested. Thus, the fact that Cloherty and Surles were reporters, that they had hidden cameras, that the identity of the two "friends" was not disclosed, and that the meeting would be broadcast were not "facts material to the transaction." (See *id. at p. 337.*)

(3) *Civil Code Section 1572*

Wilkins and Scott also rely on *Civil Code section 1572*. However, that code section applies only to fraud "committed by a party to the *contract* . . . with intent to deceive another party thereto, or to induce him to enter into the [*1084] contract." (Italics added.) Since there was no contract between Wilkins and Scott and NBC, they have no cause of action under *Civil Code section 1572* [***30] .

e. *Public Disclosure of Private Facts*

**(11)** Scott and Wilkins contend that their "occupations . . . as salesmen for SimTel," their names, likenesses and voices were private facts that were not matters of public concern. We disagree.

Our Supreme Court in *Shulman* has set forth the requirements for the tort of public disclosure. They are: " '(1) public disclosure[,] (2) of a private fact[,] (3) which would be offensive and objectionable to the reasonable person[,] and (4) which is not of legitimate public concern.' [Citations.]" ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 214.*)

"The element critical to [a public disclosure of private facts] case is the presence [**340] or absence of legitimate public interest, i.e., newsworthiness, in the facts disclosed. After reviewing the decisional law regarding newsworthiness, we conclude, inter alia, that lack of newsworthiness is an element of the 'private facts' tort, making newsworthiness a complete bar to common law liability. We further conclude that the analysis of newsworthiness inevitably involves accommodating conflicting interests in personal privacy and in press freedom [***31] as guaranteed by the *First Amendment to the United States Constitution*, and that in the circumstances of this case--where the facts disclosed about a private person involuntarily caught up in events of public interest bear a logical relationship to the newsworthy subject of the broadcast and are not intrusive in great disproportion to their relevance--the broadcast was of legitimate public concern, barring liability under the private facts tort. [P] . . . [P] [T]he dissemination of truthful, newsworthy material is not actionable as a publication of private facts." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at pp. 214-215.*)

In the *Shulman* case, the court stated ". . . the subject matter of the broadcast as a whole was of legitimate public concern. Automobile accidents are by their nature of interest to that great portion of the public that travels frequently by automobile. The rescue and medical treatment of accident victims is also of legitimate concern to much of the public, involving as it does a critical service that any member of the public may someday need. The story of [the accident victim's] difficult extrication from the crushed [***32] car, the medical attention given her at the scene, and her evacuation by helicopter was of particular interest because it highlighted some of the challenges [*1085] facing emergency workers dealing with serious accidents." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 228.*)

The court stated the more difficult question was "whether [the victim's] appearance and words as she was extricated from the overturned car, placed in the helicopter and transported to the hospital were of legitimate public concern" and concluded that "the disputed material was newsworthy as a matter of law." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 228.*) The court determined that the flight nurse's work was shown as demanding and important, and the emergency care required "not only medical knowledge, concentration and courage, but an ability to talk and listen to severely traumatized patients. One of the challenges [the flight nurse] face[d] in assisting [the accident victim was] the confusion, pain and fear that [the accident victim] understandably [felt] in the aftermath of the accident. For that reason the broadcast [***33] video depicting [the accident victim's] injured physical state . . . and audio showing her disorientation and despair were substantially relevant to the segment's newsworthy subject matter." ( *Id. at p. 229.*)

In the *Shulman* case, the plaintiffs argued that showing the victim's " 'intimate private, medical facts and her suffering was not necessary to enable the public to understand the significance of the accident or the rescue as a public event.' " ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 229*, italics omitted.) The court stated that "[t]he standard . . . is not necessity. That the broadcast could have been edited to exclude some of [the victim's] words and images and still excite a minimum degree of viewer interest is not determinative. Nor is the possibility that the members of [the Supreme Court] or another court, or a jury, might find a differently edited broadcast more to their taste or even more interesting. The courts do not, and constitutionally could not, sit as superior editors of the press." (*Ibid.*)

In addition, the challenged material "did not constitute a 'morbid and sensational prying into [***34] private lives *for its own sake*.' " ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 229*, original italics.)

As explained in *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at page 230*: "It is difficult to see how the subject broadcast could have been edited to avoid completely any possible identification without severely undercutting its legitimate descriptive and narrative impact. As broadcast, the segment included neither [the victim's] full name nor direct display of [*1086] her face. She was nonetheless arguably identifiable by her first name (used in recorded [**341] dialogue), her voice, her general appearance and the recounted circumstances of the accident (which, as noted, had previously been published, with [the victim's] full name and city of residence, in a newspaper). In a video documentary of this type, however, the use of that degree of truthful detail would seem not only relevant, but essential to the narrative." (Fn. omitted.)

In our case we consider whether the alleged private facts Wilkins and Scott complained of--the use of their names, likenesses, and voices, and the fact they [***35] worked at SimTel--was of a legitimate public interest. The broadcast investigated the growing practice of charging for so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services. Many of the 800 lines provided the caller with access to 900-number type adult entertainment lines without the caller's knowledge. SimTel leased and programmed 800 and 900 lines, and then sold them to investors. The first part of the *Dateline NBC* broadcast provided a description of the firms and the persons who provided these phone lines and explained how the operation worked. The broadcast demonstrated that legislators, regulators, and law enforcement persons expressed grave concerns about the 800-number loophole in the statute regulating 900 numbers, and the ability of pay-per-call providers like SimTel to profit from calls made by unsuspecting people believing that they were free.

We find the use of Wilkins and Scott's names, likenesses, voices, and occupations were of legitimate public concern and did not constitute a " 'morbid and sensational prying into private lives for its own sake.' " ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 229,* [***36] italics omitted.)

Information about an enterprise which potentially affected unsuspecting callers was of legitimate public interest. The use of Wilkins and Scott's names, likenesses, voices and occupations added authenticity to the broadcast. It showed who was making the presentation, what they were saying, and how they were saying it. The broadcast showed the verbal and nonverbal communication of the salesmen as they were making their presentation. It turned an abstract story into something the public could more readily understand by making it more concrete.

Here, the broadcast material was not so "lurid and sensational in emotional tone, or so intensely personal in content, as to make its intrusiveness [*1087] disproportionate to its relevance." ( *Shulman v. Group W Productions, Inc., supra, 18 Cal. 4th at p. 229.*) It served a "legitimate descriptive and narrative" purpose. We find the disputed material newsworthy as a matter of law. Thus, Wilkins and Scott cannot recover for the tort of public disclosure of private facts.

f. *Intentional Infliction of Emotional Distress*

**(12)** " 'The elements of a prima facie case for the tort of intentional infliction [***37] of emotional distress [are] . . . as follows: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard [for] the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' [Citation.]" ( *Miller v. National Broadcasting Co., supra, 187 Cal. App. 3d at p. 1487.*)

We have already determined that the act of filming a business lunch in a public place constituted neither an intrusion on Wilkins and Scott's privacy, a violation of *Penal Code section 632*, fraud, or public disclosure of private facts. Based on that determination and the facts of this case, as a matter of law, we find this conduct is not so extreme and outrageous "as to exceed all bounds of that usually tolerated in a civilized society." ( *Trerice v. Blue Cross of California (1989) 209 Cal. App. 3d 878, 883 [257 Cal. Rptr. 338].*) This tort claim must also fail.

g. *Negligent Infliction of Emotional Distress*

Wilkins and Scott's negligence claim is based [***38] on the premise that NBC had a duty [**342] to tell them they were being filmed. We have already determined that Wilkins and Scott have not shown that any legal duty to disclose ever arose. As a matter of law, and in the absence of any duty, this claim must fail.

2. *New Trial Motion and Discovery Sanctions*

Without any legal authority or argument, Wilkins and Scott contend the trial court should have granted their new trial motion based on newly discovered evidence and should not have granted discovery sanctions for refusal to answer questions or appear at depositions.

[*1088] These arguments have been waived. **(13)** " 'In a challenge to a judgment, it is incumbent upon an appellant to present argument and authority on each

point made. Arguments not presented will generally not receive consideration.' [Citation.]" ( *In re Marriage of Ananeh-Firempong (1990) 219 Cal. App. 3d 272, 278 [268 Cal. Rptr. 83]*.)

DISPOSITION

Judgment is affirmed. NBC is awarded costs on appeal.

Croskey, Acting P. J., and Aldrich, J., concurred.

Appellants' petition for review [***39] by the Supreme Court was denied July 21, 1999.

# TAB 40

1 of 1 DOCUMENT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH *** 2007-2008 THIRD EXTRA. SESSION CH. 7 AND CH. 265 OF THE 2008 REGULAR SESSION APPROVED 8/4/08, AND PROPOSITION 99 APPROVED BY VOTERS 6/3/08

CIVIL CODE
Division 1. Persons
Part 2. Personal Rights

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Civ Code § 44* (2008)

**§ 44. Defamation**

Defamation is effected by either of the following:

**(a)** Libel.

**(b)** Slander.

**HISTORY:**

Enacted 1872. Amended Stats 1980 ch 676 § 39.

**NOTES:**

**Amendments:**

**1980 Amendment:**

Routine code maintenance.

**Historical Derivation:**

Field's Draft NY*CC § 28*.

**Cross References:**

Libel defined: *CC § 45*.

Matters constituting libel on its face: *CC § 45a*.

Publications constituting slander: *CC § 46*.

# TAB 41

1 of 1 DOCUMENT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH ***
2007-2008 THIRD EXTRA. SESSION CH. 7 AND CH. 265 OF THE 2008 REGULAR
SESSION APPROVED 8/4/08, AND PROPOSITION 99 APPROVED BY VOTERS 6/3/08

CIVIL CODE
Division 1. Persons
Part 2. Personal Rights

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Civ Code § 45* (2008)

## § 45. Libel defined

Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.

**HISTORY:**

Enacted 1872.

**NOTES:**

**Historical Derivation:**

Field's Draft NY*CC § 29.*

**Cross References:**

Libel on its face: *CC § 45a.*

Privileged publication or broadcast: *CC § 47.*

When malice not inferred from communication: *CC § 48.*

Demand for and publication or broadcast of correction: *CC § 48a.*

Uniform Single Publication Act: *CC §§ 3425.1-3425.5.*

Statute of limitations applicable to libel: *CCP § 340.*

Action by married person: *CCP § 370.*

Complaint and proof in libel action: *CCP § 460.*

Answer and evidence in libel actions: *CCP § 461.*

Attorney fees in actions against peace officers: *CCP § 1021.7.*

# TAB 42

1 of 1 DOCUMENT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH *** 2007-2008 THIRD EXTRA. SESSION CH. 7 AND CH. 265 OF THE 2008 REGULAR SESSION APPROVED 8/4/08, AND PROPOSITION 99 APPROVED BY VOTERS 6/3/08

CIVIL CODE
Division 1. Persons
Part 2. Personal Rights

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Civ Code § 46* (2008)

**§ 46. Slander defined**

Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which:

**1.** Charges any person with crime, or with having been indicted, convicted, or punished for crime;

**2.** Imputes in him the present existence of an infectious, contagious, or loathsome disease;

**3.** Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;

**4.** Imputes to him impotence or a want of chastity; or

**5.** Which, by natural consequence, causes actual damage.

**HISTORY:**

Enacted 1872. Amended Stats 1945 ch 1489 § 2.

**NOTES:**

**Amendments:**

**1945 Amendment:**

Substituted "orally uttered, and also communications by radio or any mechanical or other means" for "other than libel" in the introductory paragraph.

**Historical Derivation:**

Field's Draft NY *CC § 30.*

# TAB 43

1 of 1 DOCUMENT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH *** 2007-2008 THIRD EXTRA. SESSION CH. 7 AND CH. 265 OF THE 2008 REGULAR SESSION APPROVED 8/4/08, AND PROPOSITION 99 APPROVED BY VOTERS 6/3/08

CIVIL CODE
Division 1. Persons
Part 2. Personal Rights

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Civ Code § 47* (2008)

## § 47. Privileged publication or broadcast

A privileged publication or broadcast is one made:

**(a)** In the proper discharge of an official duty.

**(b)** In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with *Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure*, except as follows:

**(1)** An allegation or averment contained in any pleading or affidavit filed in an action for marital dissolution or legal separation made of or concerning a person by or against whom no affirmative relief is prayed in the action shall not be a privileged publication or broadcast as to the person making the allegation or averment within the meaning of this section unless the pleading is verified or affidavit sworn to, and is made without malice, by one having reasonable and probable cause for believing the truth of the allegation or averment and unless the allegation or averment is material and relevant to the issues in the action.

**(2)** This subdivision does not make privileged any communication made in furtherance of an act of intentional destruction or alteration of physical evidence undertaken for the purpose of depriving a party to litigation of the use of that evidence, whether or not the content of the communication is the subject of a subsequent publication or broadcast which is privileged pursuant to this section. As used in this paragraph, "physical evidence" means evidence specified in *Section 250 of the Evidence Code* or evidence that is property of any type specified in Chapter 14 (commencing with *Section 2031.010) of Title 4 of Part 4 of the Code of Civil Procedure.*

**(3)** This subdivision does not make privileged any communication made in a judicial proceeding knowingly concealing the existence of an insurance policy or policies.

**(4)** A recorded lis pendens is not a privileged publication unless it identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property, as authorized or required by law.

**(c)** In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information. This subdivision applies to and includes a communication concerning the job performance or qualifications of an applicant for employment, based upon credible evidence, made without malice, by a current or former employer of the applicant to, and upon request of, one whom the employer reasonably believes is a prospective employer of the applicant. This sub-

division authorizes a current or former employer, or the employer's agent, to answer whether or not the employer would rehire a current or former employee. This subdivision shall not apply to a communication concerning the speech or activities of an applicant for employment if the speech or activities are constitutionally protected, or otherwise protected by *Section 527.3 of the Code of Civil Procedure* or any other provision of law.

**(d)**

**(1)** By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued.

**(2)** Nothing in paragraph (1) shall make privileged any communication to a public journal that does any of the following:

**(A)** Violates *Rule 5-120 of the State Bar Rules of Professional Conduct.*

**(B)** Breaches a court order.

**(C)** Violates any requirement of confidentiality imposed by law.

**(e)** By a fair and true report of (1) the proceedings of a public meeting, if the meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit.

**HISTORY:**

Enacted 1872. Amended Code Amdts 1873-74 ch 612 § 11; Stats 1895 ch 163 § 1; Stats 1927 ch 866 § 1; Stats 1945 ch 1489 § 3; Stats 1979 ch 184 § 1; Stats 1990 ch 1491 § 1 (AB 3765); Stats 1991 ch 432 § 1 (AB 529); Stats 1992 ch 615 § 1 (SB 1804); Stats 1994 ch 364 § 1 (AB 2778), ch 700 § 2.5 (SB 1457); Stats 1996 ch 1055 § 2 (SB 1540); Stats 2002 ch 1029 § 1 (AB 2868), effective September 28, 2002; Stats 2004 ch 182 § 4 (AB 3081), operative July 1, 2005.

**NOTES:**

**Amendments:**

**1873-74 Amendment:**

Prior to 1873-74 the section read: "A privileged publication is one made:

"1. In the proper discharge of an official duty;

"2. In testifying as a witness in any proceeding authorized by law to a matter pertinent and material, or in reply to a question allowed by the tribunal.

"3. In a communication, without malice, to a person interested therein, by one who was also interested, or who stood in such a relation to the former as to afford a reasonable ground for supposing his motive innocent, or who was requested by him to give the information;

"4. By a fair and true report in a newspaper, without malice, of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof."

1873-74 Amendment amended the section to read: "A privileged publication is one made:

"One--In the proper discharge of an official duty.

"Two--In any legislative or judicial proceeding, or in any other official proceeding authorized by law.

"Three--In a communication, without malice, to a person interest therein, by one who is also interested, or by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information.

# TAB 44

1 of 1 DOCUMENT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH *** 2007-2008 THIRD EXTRA. SESSION CH. 7 AND CH. 265 OF THE 2008 REGULAR SESSION APPROVED 8/4/08, AND PROPOSITION 99 APPROVED BY VOTERS 6/3/08

CIVIL CODE
Division 1. Persons
Part 2. Personal Rights

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Civ Code § 48* (2007)

**§ 48. Malice not inferred in specified privileged communication**

In the case provided for in subdivision (c) of Section 47, malice is not inferred from the communication.

**HISTORY:**

Enacted 1872. Amended Stats 1895 ch 163 § 2; Stats 1945 ch 1489 § 4; Stats 2003 ch 62 § 11 (SB 600).

**NOTES:**

**Amendments:**

**1895 Amendment:**

Substituted "Subdivisions three, four, and five" for "Subdivisions 3 and 4."

**1945 Amendment:**

Substituted "subdivision 3" for "Subdivisions three, four, and five."

**2003 Amendment:**

Substituted "subdivision (c) of Section 47," for "subdivision 3 of the preceding section".

**Editor's Notes**

See 1945 note to § 45a.

# TAB 45

2 Witkin, California Summary 10th Insurance § 55, In General.

### § 1640. Writing disregarded; unexpressed intention

WRITING, WHEN DISREGARDED. When, through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded. *(Enacted 1872.)*

**Research References**

Rutter, Cal. Practice Guide: Landlord-Tenant Ch. 2B-7, Enforcing Rental Agreement.

### § 1641. Whole contract, effect to be given

EFFECT TO BE GIVEN TO EVERY PART OF CONTRACT. The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. *(Enacted 1872.)*

**Research References**

Rutter, Cal. Practice Guide: Family Law Ch. 9-B, B. General Drafting and Analytical Considerations.
Rutter, Cal. Practice Guide: Insurance Litigation Ch. 4-E, E. Ambiguity Problems.
Rutter, Cal. Practice Guide: Landlord-Tenant Ch. 2B-7, Enforcing Rental Agreement.

### § 1642. Several contracts as parts of one transaction

SEVERAL CONTRACTS, WHEN TAKEN TOGETHER. Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together. *(Enacted 1872.)*

**Research References**

Rutter, Cal. Practice Guide: Family Law Ch. 9-B, B. General Drafting and Analytical Considerations.
Rutter, Cal. Practice Guide: Real Prop. Transactions Ch. 4-F, F. Use of an Escrow.
Rutter, Cal. Practice Guide: Real Prop. Transactions Ch. 11-A, A. Factors Affecting Choice of Remedies.

### § 1643. Interpretation in favor of contract

INTERPRETATION IN FAVOR OF CONTRACT. A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties. *(Enacted 1872.)*

**Research References**

Rutter, Cal. Practice Guide: Family Law Ch. 9-B, B. General Drafting and Analytical Considerations.
Rutter, Cal. Practice Guide: Landlord-Tenant Ch. 2B-5, Special "Problem" Provisions.
Rutter, Cal. Practice Guide: Real Prop. Transactions Ch. 7-C, C. Representing the Purchasing Tenant.

### § 1644. Sense of words

WORDS TO BE UNDERSTOOD IN USUAL SENSE. The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed. *(Enacted 1872.)*

**Research References**

California Practice Guide: Employment Litigation Ch. 3-B, B. Liability Insurance-General Considerations.
Rutter, Cal. Practice Guide: Family Law Ch. 9-B, B. General Drafting and Analytical Considerations.
Rutter, Cal. Practice Guide: Insurance Litigation Ch. 3-C, C. Anatomy of Insurance Policy.
Rutter, Cal. Practice Guide: Insurance Litigation Ch. 4-B, The "Plain Meaning" Rule.
Rutter, Cal. Practice Guide: Landlord-Tenant Ch. 2B-7, Enforcing Rental Agreement.
2 Witkin, California Summary 10th Insurance § 56, Lay Interpretation Governs.
2 Witkin, California Summary 10th Insurance § 93, "Damages.".

### § 1645. Sense of words; technical words

TECHNICAL WORDS. Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense. *(Enacted 1872.)*

**Research References**

Rutter, Cal. Practice Guide: Family Law Ch. 9-B, B. General Drafting and Analytical Considerations.
Rutter, Cal. Practice Guide: Insurance Litigation Ch. 3-C, C. Anatomy of Insurance Policy.
Rutter, Cal. Practice Guide: Insurance Litigation Ch. 4-B, The "Plain Meaning" Rule.
Rutter, Cal. Practice Guide: Landlord-Tenant Ch. 2B-7, Enforcing Rental Agreement.
2 Witkin, California Summary 10th Insurance § 53, Reference to Drafting History, Interpretive Materials, and Advertising.

### § 1646. Law and usage of place

LAW OF PLACE. A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made. *(Enacted 1872.)*

**Research References**

California Practice Guide: Employment Litigation Ch. 19-A, A. Plaintiff's Forum Selection.
Rutter, Cal. Practice Guide: Family Law Ch. 9-B, B. General Drafting and Analytical Considerations.
Rutter, Cal. Practice Guide: Insurance Litigation Ch. 15-D, D. Filing Considerations.
Rutter, Cal. Practice Guide: Real Prop. Transactions Ch. 4-E, E. Drafting the Purchase and Sale Agreement-Terms and Conditions.

### § 1646.5. Law governing rights and duties of parties; agreement; exceptions; application

Notwithstanding Section 1646, the parties to any contract, agreement, or undertaking, contingent or otherwise, relating to a transaction involving in the aggregate not less than two hundred fifty thousand dollars ($250,000), including a transaction otherwise covered by subdivision (a) of Section 1301 of the Commercial Code, may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not the contract, agreement, or undertaking or transaction bears a reasonable relation to this state. This section does not apply to any contract, agreement, or undertaking (a) for labor or personal services, (b) relating to any transaction primarily for personal, family, or household purposes, or (c) to the extent provided to the contrary in subdivision (c) of Section 1301 of the Commercial Code.

This section applies to contracts, agreements, and undertakings entered into before, on, or after its effective date; it shall be fully retroactive. Contracts, agreements, and undertakings selecting California law entered into before the effective date of this section shall be valid, enforceable, and effective as if this section had been in effect on the date they were entered into; and actions and proceedings commencing in a court of this state before the effective date of this section may be maintained as if this section were in effect on the date they were commenced. *(Added by Stats.1992, c. 615 (S.B.1804), § 2. Amended by Stats.2006, c. 254 (S.B.1481), § 1.5.)*

# TAB 46

(d) A person who commits any act described in subdivision (a), (b), or (c) is liable for up to three times the amount of any general and special damages that are proximately caused by the violation of this section. This person may also be liable for punitive damages, subject to proof according to Section 3294. If the plaintiff proves that the invasion of privacy was committed for a commercial purpose, the defendant shall also be subject to disgorgement to the plaintiff of any proceeds or other consideration obtained as a result of the violation of this section.

(e) A person who directs, solicits, actually induces, or actually causes another person, regardless of whether there is an employer-employee relationship, to violate any provision of subdivision (a), (b), or (c) is liable for any general, special, and consequential damages resulting from each said violation. In addition, the person that directs, solicits, instigates, induces, or otherwise causes another person, regardless of whether there is an employer-employee relationship, to violate this section shall be liable for punitive damages to the extent that an employer would be subject to punitive damages pursuant to subdivision (b) of Section 3294.

(f) Sale, transmission, publication, broadcast, or use of any image or recording of the type, or under the circumstances, described in this section shall not itself constitute a violation of this section, nor shall this section be construed to limit all other rights or remedies of plaintiff in law or equity, including, but not limited to, the publication of private facts.

(g) This section shall not be construed to impair or limit any otherwise lawful activities of law enforcement personnel or employees of governmental agencies or other entities, either public or private who, in the course and scope of their employment, and supported by an articulable suspicion, attempt to capture any type of visual image, sound recording, or other physical impression of a person during an investigation, surveillance, or monitoring of any conduct to obtain evidence of suspected illegal activity, the suspected violation of any administrative rule or regulation, a suspected fraudulent insurance claim, or any other suspected fraudulent conduct or activity involving a violation of law or pattern of business practices adversely affecting the public health or safety.

(h) In any action pursuant to this section, the court may grant equitable relief, including, but not limited to, an injunction and restraining order against further violations of subdivision (a) or (b).

(i) The rights and remedies provided in this section are cumulative and in addition to any other rights and remedies provided by law.

(j) It is not a defense to a violation of this section that no image, recording, or physical impression was captured or sold.

(k) For the purposes of this section, "for a commercial purpose" means any act done with the expectation of a sale, financial gain, or other consideration. A visual image, sound recording, or other physical impression shall not be found to have been, or intended to have been captured for a commercial purpose unless it is intended to be, or was in fact, sold, published, or transmitted.

(*l*) For the purposes of this section, "personal and familial activity" includes, but is not limited to, intimate details of the plaintiff's personal life, interactions with the plaintiff's family or significant others, or other aspects of plaintiff's private affairs or concerns. Personal and familial activity does not include illegal or otherwise criminal activity as delineated in subdivision (f). However, "personal and familial activity" shall include the activities of victims of crime in circumstances where either subdivision (a) or (b), or both, would apply.

(m) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application. *(Added by Stats.1998, c. 1000 (S.B.262), § 1. Amended by Stats.2005, c. 424 (A.B.381), § 1.)*

**Research References**

California Jury Instructions-Civil, 8th Edition 7.20, Right of Privacy-Intrusion Into Private Affairs-Essential Elements.
Rutter, Cal. Practice Guide: Civ. Pro. Before Trial Ch. 9(II)-A, A. Injunctions.
5 Witkin, California Summary 10th Torts § 663, (S 663) Capturing Impression of Personal or Familial Activity.

## § 1709. Deceit; damages

Fraudulent deceit. One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers. *(Enacted 1872.)*

**Research References**

California Jury Instructions - Criminal, 6th Ed. 15.03, Forgery-Actual Loss Not Necessary.
California Jury Instructions - Criminal, 6th Ed. 15.26, Intent to Defraud-Defined.
California Jury Instructions-Civil, 8th Edition 7.43, Financial Abuse-Defined.
California Jury Instructions-Civil, 8th Edition 12.57, Fraud and Deceit-Damages-Benefit of the Bargain Rule.
California Practice Guide: Employment Litigation Ch. 5-A, A. Wrongful Discharge in Violation of Public Policy (Tameny Claims).
Rutter, Cal. Practice Guide: Insurance Litigation Ch. 11-C, C. Fraud.
Rutter, Cal. Practice Guide: Personal Injury Ch. 2-E, E. Developing Theories of Recovery.
Rutter, Cal. Practice Guide: Real Prop. Transactions Ch. 11-E, E. Damages for Fraud.
5 Witkin, California Summary 10th Torts § 767, (S 767) Governing Statutes.
5 Witkin, California Summary 10th Torts § 772, (S 772) in General.
5 Witkin, California Summary 10th Torts § 790, (S 790) Representation of Sterility.
5 Witkin, California Summary 10th Torts § 802, In General.
5 Witkin, California Summary 10th Torts § 811, (S 811) Securities Cases.
5 Witkin, California Summary 10th Torts § 816, Pecuniary or Property Loss.
6 Witkin, California Summary 10th Torts § 1714, Elements of Damage.
6 Witkin, California Summary 10th Torts § 1717, (S 1717) Breach of Fiduciary Duty.

## § 1710. Deceit defined

Deceit, what. A deceit, within the meaning of the last section, is either:

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,

4. A promise, made without any intention of performing it. *(Enacted 1872.)*

**Research References**

California Jury Instructions - Criminal, 6th Ed. 15.03, Forgery-Actual Loss Not Necessary.
California Jury Instructions - Criminal, 6th Ed. 15.26, Intent to Defraud-Defined.
California Jury Instructions-Civil, 8th Edition 7.43, Financial Abuse-Defined.
California Jury Instructions-Civil, 8th Edition 12.35, Fraud and Deceit-Concealment.
California Practice Guide: Employment Litigation Ch. 5-F, F. Fraud.

# TAB 47

LEXSTAT CALIFORNIA HARBOR AND NAVIGATION CODE SECTION 651

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH ***
2007-2008 THIRD EXTRA. SESSION CH. 7 AND CH. 265 OF THE 2008 REGULAR
SESSION APPROVED 8/4/08, AND PROPOSITION 99 APPROVED BY VOTERS 6/3/08

HARBORS AND NAVIGATION CODE
Division 3. Vessels
Chapter 5. Operation and Equipment of Vessels
Article 1. Operation and Equipment

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Harb & Nav Code § 651* (2007)

**§ 651. Definitions**

As used in this chapter, unless the context clearly requires a different meaning:

**(a)** "Alcohol" means any form or derivative of ethyl alcohol (ethanol).

**(b)** "Alcohol concentration" means either grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath.

**(c)** "Associated equipment" means any of the following, excluding radio equipment:

**(1)** Any system, part, or component of a boat as originally manufactured or any similar part or component manufactured or sold for replacement, repair, or improvement of the system, part, or component.

**(2)** Any accessory or equipment for, or appurtenance to, a boat.

**(3)** Any marine safety article, accessory, or equipment intended for use by a person on board a boat.

**(d)** "Boat" means any vessel that is any of the following:

**(1)** Manufactured or used primarily for noncommercial use.

**(2)** Leased, rented, or chartered to another for the latter's noncommercial use.

**(3)** Engaged in the carrying of six or fewer passengers, including those for-hire vessels carrying more than three passengers while using inland waters of the state that are not declared navigable by the United States Coast Guard.

**(4)** Commercial vessels required to be numbered pursuant to *Section 9850 of the Vehicle Code.*

**(e)** "Chemical test" means a test that analyzes an individual's breath, blood, or urine, for evidence of drug or alcohol use.

**(f)** "Controlled substance" means controlled substance as defined in *Section 11007 of the Health and Safety Code.*

**(g)** "Department" means the Department of Boating and Waterways.

**(h)** "Director" means the Director of Boating and Waterways.

**(i)** "Drug" means any substance or combination of substances other than alcohol that could so affect the nervous system, brain, or muscles of a person as to impair to an appreciable degree his or her ability to operate a vessel in the

manner that an ordinarily prudent person, in full possession of his or her faculties, using reasonable care, would operate a similar vessel under like conditions.

**(j)** "Intoxicant" means any form of alcohol, drug, or combination thereof.

**(k)** "Legal owner" is a person holding the legal title to a vessel under a conditional sale contract, the mortgagee of a vessel, or the renter or lessor of a vessel to the state, or to any county, city, district, or political subdivision of the state, under a lease, lease-sale, or rental-purchase agreement that grants possession of the vessel to the lessee for a period of 30 consecutive days or more.

**(l)** "Manufacturer" means any person engaged in any of the following:

**(1)** The manufacture, construction, or assembly of boats or associated equipment.

**(2)** The manufacture or construction of components for boats and associated equipment to be sold for subsequent assembly.

**(3)** The importation into this state for sale of boats, associated equipment, or components thereof.

**(m)** "Marine employer" means the owner, managing operator, charterer, agent, master, or person in charge of a vessel other than a recreational vessel.

**(n)** "Motorboat" means any vessel propelled by machinery, whether or not the machinery is the principal source of propulsion, but shall not include a vessel that has a valid marine document issued by the United States Coast Guard or any federal agency successor thereto.

**(o)** "Operator" means the person on board who is steering the vessel while underway.

**(p)** "Owner" is a person having all the incidents of ownership, including the legal title, of a vessel whether or not that person lends, rents, or pledges the vessel; the person entitled to the possession of a vessel as the purchaser under a conditional sale contract; or the mortgagor of a vessel. "Owner" does not include a person holding legal title to a vessel under a conditional sale contract, the mortgagee of a vessel, or the renter or lessor of a vessel to the state or to any county, city, district, or political subdivision of the state under a lease, lease-sale, or rental-purchase agreement that grants possession of the vessel to the lessee for a period of 30 consecutive days or more.

**(q)** "Passenger" means every person carried on board a vessel other than any of the following:

**(1)** The owner or his or her representative.

**(2)** The operator.

**(3)** Bona fide members of the crew engaged in the business of the vessel who have contributed no consideration for their carriage and who are paid for their services.

**(4)** Any guest on board a vessel that is being used exclusively for pleasure purposes who has not contributed any consideration, directly or indirectly, for his or her carriage.

**(r)** "Person" means an individual, partnership, firm, corporation, limited liability company, association, or other entity, but does not include the United States, the state, or a municipality or subdivision thereof.

**(s)** "Personal watercraft" means a vessel 13 feet in length or less, propelled by machinery, that is designed to be operated by a person sitting, standing, or kneeling on the vessel, rather than in the conventional manner of sitting or standing inside the vessel.

**(t)** "Recreational vessel" means a vessel that is being used only for pleasure.

**(u)** "Registered owner" is the person registered by the Department of Motor Vehicles as the owner of the vessel.

**(v)** "Special-use area" means all or a portion of a waterway that is set aside for specified uses or activities to the exclusion of other incompatible uses or activities.

**(w)** "State" means a state of the United States, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the District of Columbia.

**(x)** "State of principal use" means the state on which waters a vessel is used or intended to be used most during a calendar year.

**(y)** "Undocumented vessel" means any vessel that is not required to have, and does not have, a valid marine document issued by the United States Coast Guard or any federal agency successor thereto.

**(z)** "Use" means operate, navigate, or employ.

**(aa)** "Vessel" includes every description of watercraft used or capable of being used as a means of transportation on water, except either of the following:

**(1)** A seaplane on the water.

**(2)** A watercraft specifically designed to operate on a permanently fixed course, the movement of which is restricted to a fixed track or arm to which the watercraft is attached or by which the watercraft is controlled.

**(bb)** "Water skis, an aquaplane, or a similar device" includes all forms of water skiing, barefoot skiing, skiing on skim boards, knee boards, or other contrivances, parasailing, ski kiting, or any activity where a person is towed behind or alongside a boat.

**(cc)** "Waters of this state" means any waters within the territorial limits of this state.

**HISTORY:**

Added Stats 1989 ch 1114 § 3, operative January 1, 1992. Amended Stats 1994 ch 1010 § 149 (SB 2053); Stats 1997 ch 746 § 1 (SB 347); Stats 2000 ch 398 § 1 (AB 2538).

**NOTES:**

**Former Sections:**

Former § 651 similar to the present section, was added Stats 1959 ch 1454 § 1, effective July 6, 1959, amended Stats 1961 ch 980 § 1, ch 1606 § 1, Stats 1963 ch 1619 § 1, Stats 1st Ex Sess 1966 ch 61 § 5, Stats 1970 ch 1428 § 34, ch 1544 § 10, Stats 1976 ch 744 § 4, Stats 1978 ch 365 § 14, Stats 1981 ch 897 § 1, Stats 1987 ch 745 § 7, Stats 1988 ch 216 § 2, effective June 29, 1988, Stats 1989 ch 1106 § 1, operative until January 1, 1992, and repealed Stats 1989 ch 1114 § 43, operative January 1, 1992.

**Editor's Notes**

Stats 1998 ch 485 § 104 provides for the repeal of "*Section 651 of the Harbors and Navigation Code*, as amended by Chapter 1106 of the Statutes of 1989." However, by the terms of Stats 1989 ch 1114 § 43, the amendment of this section by Stats 1989 ch 1106 was operative only until January 1, 1992.

**Amendments:**

**1994 Amendment:**

**(1)** Added "limited liability company," in subd (p); and **(2)** substituted "manufacture" for "manufacturer" in subd (x)(1).

**1997 Amendment:**

**(1)** Restructured the former section to place the definitions in alphabetical order; **(2)** substituted "that" for "which" in the introductory clause of subd (d), and after "means a test" in subd (e); **(3)** added subd (s); **(4)** substituted "that is not

required to have, and does not have" for "which is not required to have and does not have" in subd (y); and **(5)** deleted the former last sentence which read: "This section shall become operative on January 1, 1992."

**2000 Amendment:**

**(1)** Generally substituted "that" for "which"; and **(2)** substituted "13 feet in length or less" for "less than 12 feet in length" in subd (s).

**Note**

Stats 1989 ch 1114 provides:

SEC. 43. Section 3 of this bill incorporates amendments to *Section 651 of the Harbors and Navigation Code* proposed by this bill and AB 1973. It shall only become operative if (1) both bills are enacted and become effective on or before January 1, 1990, (2) each bill amends or amends, repeals, and adds *Section 651 of the Harbors and Navigation Code*, and (3) this bill is enacted after AB 1973, in which case *Section 651 of the Harbors and Navigation Code*, as amended by AB 1973, shall remain operative only until the operative date of Section 3 of this bill, at which time Section 3 of this bill shall become operative, and Sections 1 and 2 of this bill shall not become operative.

**Cross References:**

"Documented vessel": *Rev & Tax C § 130(b).*

**Collateral References:**

*Cal Forms Pl & Practice (Matthew Bender) ch 100 "Boats and Boating", § 100.63.*

Witkin & Epstein, Criminal Law (3d ed), Crimes Against Public Peace and Welfare §§ 341, 429, 430.

6 Witkin Summary (10th ed) Torts §§ 889, 1273.

**Law Review Articles:**

Documented vessels, as legal aspect of small boat financing. 34 St BJ 289.

**Hierarchy Notes:**

Harb & Nav Code Note

Div. 3, Ch. 5 Note

Div. 3, Ch. 5, Art. 1 Note

# TAB 48

LEXSTAT CAL INS CODE § 11580.06

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH *** 2007-2008 THIRD EXTRA. SESSION CH. 7 AND CH. 265 OF THE 2008 REGULAR SESSION APPROVED 8/4/08, AND PROPOSITION 99 APPROVED BY VOTERS 6/3/08

INSURANCE CODE
Division 2. Classes of Insurance
Part 3. Liability, Workers' Compensation, and Common Carrier Liability Insurance
Chapter 1. General Regulations
Article 2. Actions on Policies Containing Liability Provisions

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Ins Code § 11580.06* (2007)

## § 11580.06. Definitions

Except as may be otherwise provided in this article:

**(a)** The term "motor vehicle" means any vehicle designed for use principally upon streets and highways and subject to motor vehicle registration under the laws of this state.

**(b)** The term "insured" shall include the person or persons to whom any policy subject to this article is issued as named insured and any other person to whom coverage is afforded under the terms of any such policy.

**(c)** The term "bodily injury" shall include sickness or disease, including death resulting therefrom.

**(d)** The term "automobile" means any self-propelled motor vehicle, with neither more than nor less than four wheels, designed for use principally upon streets and highways and subject to motor vehicle registration under the laws of this state.

**(e)** The term "arrest" shall have the same meaning as set forth in *Section 834 of the Penal Code*.

**(f)** The term "operated by" or "when operating" shall be conclusively presumed to describe the conduct of the person sitting immediately behind the steering controls of the motor vehicle. The person shall be conclusively presumed to be the sole operator of the motor vehicle.

**(g)** The term "use" when applied to a motor vehicle shall only mean operating, maintaining, loading, or unloading a motor vehicle.

**(h)** The word "terms" when used with reference to a policy or endorsement includes the provision of coverage, exclusions, restrictions, conditions, deductions, and limits.

**(i)** Unless otherwise provided in this code, the term "leased motor vehicle" means a motor vehicle leased or rented by a lessor licensed to lease motor vehicles under a written contract for a period of six months or longer.

### HISTORY:

Added Stats 1970 ch 300 § 2. Amended Stats 1981 ch 647 § 2; Stats 1982 ch 1136 § 4; Stats 1983 ch 1244 § 1; Stats 1984 ch 341 § 3; Stats 1985 ch 792 § 2; Stats 1994 ch 359 § 1 (AB 2602).

### NOTES:

**NOTES:**

**Amendments:**

**1981 Amendment:**

Added subds (d) and (e).

**1982 Amendment:**

Added subd (f).

**1983 Amendment:**

Added "neither more than nor less than" in subd (d).

**1984 Amendment:**

Added **(1)** the last sentence of subd (f); and **(2)** subd (g).

**1985 Amendment:**

Added subd (h).

**1994 Amendment:**

Added subd (i).

**Cross References:**

Automobile insurance defined: *Ins C § 116.*

**Collateral References:**

2 Witkin Summary (10th ed) Insurance §§ 92, 162, 165, 166, 171, 172.

Pertinent administrative regulations. *10 Cal Code Reg §§ 2107* et seq.

**Annotations:**

Risks within "loading and unloading" clause of motor vehicle liability insurance policy. 6 ALR4th 686.

# TAB 49

[redacted]

# California Practice Guide

# INSURANCE LITIGATION

CHAPTERS 11-15
Tables & Index

**HON. H. WALTER CROSKEY**
Justice, California Court of Appeal
Second District

**HON. REX HEESEMAN**
Judge, Los Angeles Superior Court

**SUSAN M. POPIK**
Chapman, Popik & White, LLP
San Francisco

ADDITIONAL ORIGINAL AUTHORS

**HON. MARCUS M. KAUFMAN**
Associate Justice (Ret.)
California Supreme Court

**THOMAS W. JOHNSON, JR.**
Irell & Manella LLP

**DAVID B. CASSELMAN**
Wasserman, Comden, Casselman & Pearson LLP

**PATRICK M. KELLY**
Wilson, Elser, Moskowitz, Edelman & Dicker LLP

**2007**

CONTINUING LEGAL EDUCATION TRG™ PROGRAMS AND PUBLICATIONS

THE RUTTER GROUP™
A DIVISION OF THOMSON WEST

5. [11:205] **Negligence:** Negligence is not among the theories of recovery generally available against insurers. Delay or failure to pay policy benefits may be actionable as a breach of contract or bad faith, not negligence. [See *Sanchez v. Lindsey Morden Claims Services, Inc.* (1999) 72 CA4th 249, 254, 84 CR2d 799, 802 (citing text); *Benavides v. State Farm Gen. Ins. Co.* (2006) 136 CA4th 1241, 1253-1254, 39 CR3d 650, 658 (J. Mosk concur.opn.) (citing text)]

*(Text cont'd on p. 11-49)*

# TAB 50

Federal Practice & Procedure
Current through the 2008 Update

Federal Rules Of Civil Procedure
The Late Charles Alan Wright[FNa6], Arthur R. Miller[FNa7]

Chapter 4. Pleadings and Motions
Rule 8. General Rules Of Pleading
C. Pleading A Claim For Relief

Link to Monthly Supplemental Service

**§ 1245 Statement of Particular Matters—Libel and Slander**

**Primary Authority**

Fed. R. Civ. P. 8

**Forms**

West's Federal Forms §§ 1551 to 2200

Although special pleading requirements have not been set out in the federal rules for libel and slander actions, the standard for successfully pleading defamation tends to be **more stringent** than that **applicable to most** other **substantive claims** because of the historically unfavored nature of this type of action,[FN1] the First Amendment implications of many of these cases, and the desire to discourage what some believe to be all too frequently vexatious litigation. Thus, many of the somewhat inhibiting traditional attitudes toward pleading in the context of defamation have survived the adoption of the federal rules.

Of course, all the plaintiff technically is required to do is state a claim for which relief may be granted, and many federal courts have demanded no more than that.[FN2] This theoretically means providing a short and plain statement indicating that the elements of a libel or slander claim are present. Contrary to the common law and the generally accepted code approach, some courts have held that it is not necessary to include in the complaint the exact statements upon which the action is based,[FN3] which seems consistent with Rule 8, although some federal courts have held to the contrary[FN4] and others have indicated that the substance of the actionable words should be pleaded.[FN5] It also has been held by at least one court that an allegation of falsity is required.[FN6] A general allegation of publication[FN7] and the place where the libel circulated will suffice in most instances. However, if the defendant does seek by a motion for a more definite statement under Rule 12(e) to have the plaintiff fix the situs of the alleged tort, the motion may well be granted,[FN8] although this seems to represent a technically improper use of that motion.

If the defamatory character of the statement rests on extrinsic facts, those facts should be pleaded.[FN9] And if the libelous character of the statement depends upon an interpretation of the words other than a meaning

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that usually is given to the statement, the special meaning should be specifically pleaded by way of innuendo, explanation, or colloquium.[FN10] It also is necessary to allege that the defamation pertained to the plaintiff.[FN11]

A complaint indicating that the uttered statements are not actionable per se has been held not sufficient to state a claim for relief in the absence of an allegation of special damages,[FN12] as is discussed under Rule 9(g);[FN13] conversely, if a writing contains material that is libelous per se, allegations in the complaint of special damages under Rule 9(g) are not necessary.[FN14]

Although some courts tend to be unwilling to construe the statement of the claim for relief liberally in a libel or slander action and require that all elements of the substantive cause of action be specially pleaded, nothing in Rule 8 imposes a special burden on the pleader in these classes of cases. A number of federal courts have not insisted that each element of the underlying cause be specifically pleaded. In Garcia v. Hilton Hotels International, Inc.,[FN15] for example, the plaintiff failed to allege in so many words that there had been a publication and the defendant challenged the complaint under Rules 12(b)(6), 12(e), and 12(f). Although the court in Garcia inferred the existence of publication and denied the motion to dismiss, as is discussed in another section,[FN16] it did grant the defendant's motion for a more definite statement, inter alia, because of the vagueness resulting from the plaintiff's failure to set out the substance of the utterance alleged to have been made slanderously or the facts relied upon to establish that it had been published to anyone else. Thus, despite the fact that the Garcia case represents a liberal attitude toward the pleading requirements of the federal rules, it also indicates that traces of disfavor for defamation actions still exist. There is little doubt that because of the unfavored status of libel and slander actions, it is advisable for the pleader to set forth the claim for relief as clearly as possible, and that all the elements of the claim at least should be inferable from the allegations in the complaint.

Some of the federal courts that have required strict pleading of defamation claims have done so on the ground that the state pleading requirements for libel and slander are controlling in a defamation action when subject matter jurisdiction is based on diversity of citizenship. For example, in Simpson v. Oil Transfer Corporation,[FN17] the complaint alleged slander but failed to set out the defamatory words as required by the law of New York. The district court, citing the Supreme Court's decision in Guaranty Trust Company v. York,[FN18] held that state law controlled and dismissed the complaint. State law also has been followed for pleading other elements of a defamation claim, such as the innuendo of the challenged words.[FN19]

Whatever the merits of these decisions may have been when they were decided, in light of the subsequent Supreme Court decisions in Byrd v. Blue Ridge Rural Electrical Co-operative, Inc.[FN20] and Hanna v. Plumer[FN21] it appears that adherence to a state's strict pleading requirements no longer is necessary. Hanna makes it clear that Rule 8(a) should be followed.[FN22] Perhaps insistence upon a greater degree of detail in these cases can be tolerated because of the disfavor with which some courts view defamation actions, but the basic philosophy of the Rule 8(a) requirement of a plain and concise statement of the claim for relief should not be sacrificed in order to follow state notions of pleading particularity or an antipathy toward certain claims for relief. This conclusion seems appropriate since, as the Supreme Court made clear in Hanna, divergent pleading practices between state and federal courts within the same jurisdiction do not lead to the type of outcome determination or inequitable administration of the law difficulties that constituted much of the basis for Erie Railroad Company v. Tompkins[FN23] and the Guaranty Trust decision. These conclusions seem to have been reinforced by the Supreme Court's 2002 pleading decision in Swierkiewicz v. Sorema N.A., although that was not a diversity of citizenship case.[FN24]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FNa6] Charles Alan Wright Chair in Federal Courts, The University of Texas.

[FNa7] Bruce Bromley Professor of Law, Harvard University.

[FN1]

**Unfavored action**

Defamation is not a favored cause of action, and always must be specifically alleged. Cimijotti v. Paulsen, D.C.Iowa 1963, 219 F.Supp. 621, appeal dismissed C.A.8th, 1963, 323 F.2d 716.

See also vol. 5B, § 1357.

Kirk v. NCI Leasing, Inc., D.C.Kan.2005, 2005 WL 3115859 (when complaint attempts to state traditionally disfavored cause of action, such as defamation, courts have construed complaint by stricter standard).

[FN2]

**Claim for relief stated**

Wright v. Sodexho Marriott Servs., C.A.6th, 2002, 30 Fed.Appx. 566 (unpublished).

A complaint in defamation must provide sufficient notice of the communications complained of to allow the defendant to mount a defense. McGeorge v. Continental Airlines, Inc., C.A.10th, 1989, 871 F.2d 952.

It is sufficient for dismissal purposes in defamation proceedings that the plaintiff has advanced colorable claims of having been identified and described by the defamatory comment, and the federal rules do not require special pleading, but rather, the mode of pleading is governed by the rule requiring only that the charge be set forth in a short and concise statement, detailed only to the extent necessary to enable the defendant to respond and to raise the defense of res judicata if appropriate, and the pleading of additional evidence is in contravention of proper pleading procedure. Geisler v. Petrocelli, C.A.2d, 1980, 616 F.2d 636, 640, **citing Wright & Miller.**

Williams v. Gorton, C.A.9th, 1976, 529 F.2d 668, 672, **citing Wright & Miller**, affirmed without opinion C.A.9th, 1977, 566 F.2d 1186.

Phillips v. Murchison, C.A.2d, 1967, 383 F.2d 370, certiorari denied 88 S.Ct. 1050, 390 U.S. 958, 19 L.Ed.2d 1154.

Palladino v. VNA of Southern New Jersey, Inc., D.C.N.J.1999, 68 F.Supp.2d 455, **citing Wright & Miller.**

Tuman v. Genesis Associates, D.C.Pa.1996, 935 F.Supp. 1375.

An FBI agent's complaint against the author, publisher, and contributor to a book satisfied the pleading rule for defamation that charges be set forth in a short and concise statement giving enough detail to en-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

able the defendants to respond and to raise the defense of res judicata. Price v. Viking Press, Inc., D.C.Minn.1985, 625 F.Supp. 641.

It is sufficient to plead a defamation claim that the plaintiff has advanced colorable claims of having been identified and described by the defamatory comment and the pleadings need be detailed only to the extent necessary to enable the defendant to respond and to raise the defense of res judicata if appropriate and the pleading of additional evidence is in contravention of proper pleading procedure. Linker v. Custom-Bilt Machinery Inc., D.C.Pa.1984, 594 F.Supp. 894.

Frito-Lay, Inc. v. Wapco Constructors, Inc., D.C.La.1981, 520 F.Supp. 186.

Baxter Travenol Labs., Inc. v. LeMay, D.C.Ohio 1981, 93 F.R.D. 379, 381, **citing Wright & Miller.**

A complaint alleging that the airline slandered the plaintiff and her now deceased husband by stating that the husband was incompetent, an alcoholic, constantly drunk, and was not suffering from any physical or mental illness and lacked a respected credit rating stated a claim on which relief could be granted under Pennsylvania law against the contention that the plaintiff neither specified the defamatory communications in haec verba nor set out the circumstances of publication or the facts relied on to establish publication. Beascoechea v. Sverdrup & Parcel & Associates, Inc., D.C.Pa.1980, 486 F.Supp. 169.

A defamation complaint drawn by a layman, which averred generally that both defendants, a bank and a bank-holding company, defamed the plaintiff, would withstand a motion to dismiss as against the holding company, even though the holding company had no apparent links of authorship to the specific defamatory statements pled in the complaint. The denial of the holding company's motion to dismiss did not prevent it from moving for summary judgment. Stinnett v. Third Nat. Bank of Hampden County, D.C.Minn.1978, 443 F.Supp. 1014.

The failure of the plaintiff to plead allegedly slanderous statements in haec verba did not render his complaint insufficient when the complaint was sufficient to give the defendant notice of the nature of the communications complained of. Pirre v. Printing Dev., Inc., D.C.N.Y.1977, 432 F.Supp. 840.

Stearn v. MacLean-Hunter, Ltd., D.C.N.Y.1969, 46 F.R.D. 76.

Riverhouse Publishing Co. v. Porter, D.C.R.I.1968, 287 F.Supp. 1.

A complaint alleging that a retail credit company, pursuant to a request by a railroad, sent an agent to the plaintiff's house for the purpose of investigating the plaintiff's activities and that the agent later was convicted of impersonating a federal employee stated a cause of action in defamation. Fullerton v. Monongahela Connecting R. Co., D.C.Pa.1965, 242 F.Supp. 622.

A complaint, alleging that letters sent by the defendant to clients in Holland and Cuba were intended to and did injure the plaintiff in the practice of his profession and discredited him in his position as a consulting engineer, was sufficient to state a cause of action for libel. Mueller v. Rayon Consultants, Inc., D.C.N.Y.1959, 170 F.Supp. 555.

Bleau v. Greater Lynn Mental Health & Retardation Ass'n, D.C.Mass.2005, 371 F.Supp.2d 1, 2005 WL 1330440 (no special pleading is required).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**See also**

Edelman v. Locker, D.C.Pa.1946, 6 F.R.D. 272.

Consolidated Terminal Corp. v. Drivers, Chauffeurs & Helpers Local Union 639, D.C.D.C.1940, 33 F.Supp. 645.

**No claim stated**

In a libel action on a letter by the plaintiff's former employer to his prospective employers with respect to the plaintiff's competency and qualifications, when the amended complaint did not allege that the communication was false, and it was not libelous on its face and the allegation of extrinsic facts did not make it so, no cause of action for libel was stated. Pond v. General Elec. Co., C.A.9th, 1958, 256 F.2d 824, certiorari denied 79 S.Ct. 30, 358 U.S. 818, 3 L.Ed.2d 60.

To state a claim for defamation, the plaintiff needed to state, at a minimum, the alleged defamatory statements, the maker of the statements, the date the statements were made or published, and the third parties to whom the statements were made or otherwise published. Scott v. Houma-Terrebonne Housing Authority, D.C.La.2002, 2002 WL 31007412.

The plaintiff's allegation that an article critical of a government agency that he had been involved with made an accusation that the plaintiff may have known or should have known of torture and perhaps condoned it failed to establish an explicit accusation of the plaintiff's active participation in torture sufficient to state a cause of action for defamation. Saenz v. Playboy Enterprises, Inc., D.C.Ill.1987, 653 F.Supp. 552.

A counterclaim stating that alleged attempts to monopolize were continuing and would continue thereafter unless enjoined by the court, and that these attempts threatened the counterclaimant with injuries and damage to his business did not state a claim for relief in defamation. National Bowl-O-Mat Corp. v. Brunswick Corp., D.C.N.J.1967, 264 F.Supp. 221.

Although the court recognized the pleader "was not required to plead the defamatory words verbatim" it still viewed a mere allegation of defamation as insufficient to state a claim, or provide notice. Latino Food Marketers, LLC v. Ole Mexican Foods, Inc., D.C.Wis.2004, 2004 WL 632869.

"Although plaintiff is not required to plead a defamation action "in these words" or with specificity, a lack of reference to any allegedly defamatory statements fails to comport with even the liberal pleading requirements of Federal Rule of Civil Procedure 8." Daniels v. Alvarado, D.C.N.Y.2004, 2004 WL 502561 (Weinstein, J.).

**See also**

Johnson v. Stone, C.A.7th, 1959, 268 F.2d 803.

James v. FDIC, D.C.La.1964, 231 F.Supp. 475.

[FN3]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exact statement not required**

**Libelous statements**

Kalika v. Stern, D.C.N.Y.1995, 911 F.Supp. 594.

Odom v. Columbia Univ., D.C.N.Y.1995, 906 F.Supp. 188.

When the plaintiff in a libel action against an out-of-state newspaper alleged that the article was defamatory in its entirety, the complaint satisfied the notice requirements, and plaintiff was not required to plead, in haec verba, the defamatory language in the article alleged to be actionable. Stabler v. New York Times Co., D.C.Tex.1983, 569 F.Supp. 1131.

A complaint in a libel action alleging that the defendant produced and exhibited an inferior motion picture imputing its authorship to the plaintiff, a well-known and competent movie producer, was not defective for failing to set forth in full the alleged libelous matter inasmuch as simple and concise pleadings are mandatory under the rules, and libel is not one of the matters required by Rule 9 to be stated with particularity. Carroll v. Paramount Pictures, Inc., D.C.N.Y.1942, 3 F.R.D. 95.

**Slanderous statements**

A complaint alleging that the plaintiff was discharged from a federal office as a result of the defendant's malicious giving of false information concerning the plaintiff to the Federal Bureau of Investigation, was not defective for failing to plead the false and defamatory matter in haec verba. Foltz v. Moore McCormack Lines, Inc., C.A.2d, 1951, 189 F.2d 537, certiorari denied 72 S.Ct. 106, 342 U.S. 871, 96 L.Ed. 655.

Under federal pleading requirements, the plaintiff need not assert specific time, place, substance, and to whom the defamatory remarks were made. DeSalle v. Key Bank of Southern Maine, D.C.Me.1988, 685 F.Supp. 282.

Adler v. American Standard Corp., D.C.Md.1982, 538 F.Supp. 572, 576, **citing Wright & Miller.**

A complaint alleging that the airline slandered the plaintiff and her now deceased husband by stating that the husband was incompetent, an alcoholic, constantly drunk, and was not suffering from any physical or mental illness and lacked a respected credit rating stated a claim on which relief could be granted under Pennsylvania law against the contention that the plaintiff neither specified the defamatory communications in haec verba nor set out the circumstances of publication or the facts relied on to establish publication. Beascoechea v. Sverdrup & Parcel & Associates, Inc., D.C.Pa.1980, 486 F.Supp. 169.

The alleged slanderous statements were not required to be set forth in specific words in a counterclaim seeking damages for alleged slanderous remarks uttered by the plaintiff that impaired the defendant's credit in the trade, when the tenor of the statements satisfactorily indicated that a prima facie cause of action had been alleged. Edelman v. Locker, D.C.Pa.1946, 6 F.R.D. 272.

[FN4]

**Words must be alleged**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"In an action for slander or libel the words alleged to be defamatory must be pleaded and proved. It is also essential that it be alleged that the accusation was untrue." Holliday v. Great Atl. & Pac. Tea Co., C.A.8th, 1958, 256 F.2d 297, 302 (Gardner, C.J.).

"In the instant case, the complaint fails to identify any specific defamatory statements made by the defendants or when, where, or to whom any defamatory statements were made. Since plaintiffs have failed to identify any defamatory statement, the defamation claim is subject to dismissal for failure to state a claim upon which relief can be granted." Celli v. Shoell, D.C.Utah 1998, 995 F.Supp. 1337, 1346.

Thomas v. St. Louis Bd. of Educ., D.C.Mo.1996, 933 F.Supp. 817.

Jones v. Capital Cities/ABC Inc., D.C.N.Y.1995, 874 F.Supp. 626 (complaint dismissed because it failed to allege defamatory words with specificity as required by Rule 9; judge mistakenly applied Rule 9 when Rule 8 was correct rule).

"A complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made by whom and to whom." Ersek v. Township of Springfield, Delaware County, D.C.Pa.1993, 822 F.Supp. 218, 223 (Ditter, J.), affirmed C.A.3d, 1996, 102 F.3d 79.

An allegation that on several occasions the defendants presented to various county officials a letter that contained statements about the plaintiffs that were untrue, with a photograph of the plaintiffs' headquarters, failed to state a claim when the plaintiffs had not substantially set forth the words alleged to be defamatory and untrue nor any facts that would establish publication. Walters v. Linhof, D.C.Colo.1983, 559 F.Supp. 1231.

Thompson v. Kiekhaefer, D.C.Wis.1976, 71 F.R.D. 115.

Drummond v. Spero, D.C.Vt.1972, 350 F.Supp. 844, 845, **citing Wright & Miller.**

Allegations of libel and slander were insufficient to withstand a motion to strike in that they failed to set forth in haec verba the defamatory language employed. Bound Brook Water Co. v. Jaffe, D.C.N.J.1968, 284 F.Supp. 702.

The court granted the plaintiff leave to amend his complaint to allege the specific statements constituting defamation, as well as the elements of publication and fault. Blanck v. Hager, D.C.Nev.2005, 360 F.Supp.2d 1137.

**See also**

The paragraph of a complaint that contained the full text of the alleged libelous document complied with the requirement that defamatory statements be set forth in haec verba. Isenman v. Bandler, D.C.N.Y.1954, 15 F.R.D. 400.

Defamatory words must be set forth in the complaint if a slander action is based thereon. Simpson v. Oil Transfer Corp., D.C.N.Y.1948, 75 F.Supp. 819.

[FN5]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Substance of words pleaded**

A complaint alleging that the defendant had stated that the plaintiff was a parasite and could not be dealt with and that trying to deal with an organization like the plaintiff was like the United Nations trying to deal with communists in truce talks stated a cause of action for slander. Olan Mills, Inc. v. Enterprise Pub. Co., C.A.5th, 1954, 210 F.2d 895.

Silicon Knights, Inc. v. Crystal Dynamics, Inc., D.C.Cal.1997, 983 F.Supp. 1303.

Jones v. Capital Cities/ABC Inc., D.C.N.Y.1995, 874 F.Supp. 626, quoting Liguori v. Alexander, D.C.N.Y.1980, 495 F.Supp. 641.

Ford v. Clement, D.C.N.Y.1993, 834 F.Supp. 72.

Pelech v. Klaff-Joss, LP, D.C.Ill.1993, 828 F.Supp. 525 (when precise wording of alleged defamatory statement is unlikely to affect its interpretation and plaintiff has alleged sufficient information to enable defendant to respond, claim will survive Rule 12(b)(6) motion).

A wife alleging that she was libeled by an article describing a domestic dispute between her and her estranged husband complied with the notice requirements of Rule 8 when she attached a copy of the offending article to her complaint and stated that "the entire article as a whole is false." Ritzmann v. Weekly World News, Inc., D.C.Tex.1985, 614 F.Supp. 1336.

Allegations of a federal court complaint alleging defamation must afford the defendant sufficient notice of the communications complained of to enable him to defend himself. Liguori v. Alexander, D.C.N.Y.1980, 495 F.Supp. 641.

The allegation that publication of a magazine article depicting taxi cab drivers in Washington, D.C., as ill-mannered, brazen, contemptuous of patrons, and dishonest, stated a claim for relief in favor of a cab driver whose photograph appeared as an illustration forming a part of the article. Peay v. Curtis Pub. Co., D.C.D.C.1948, 78 F.Supp. 305.

**Substance of words insufficiently pleaded**

A counterclaim alleging that a false statement was made to bowling center operators that the operation by counterclaimant of bowling centers was an unlawful attempt to monopolize the bowling center business was not sufficiently particular to enable a determination whether the statement was in fact defamatory. National Bowl-O-Mat Corp. v. Brunswick Corp., D.C.N.J.1967, 264 F.Supp. 221.

A claim for relief for slander, set forth in an action in admiralty, was subject to dismissal unless the alleged slanderous statements were set forth substantially in the language uttered. Foster v. U.S., D.C.N.Y.1957, 156 F.Supp. 421.

Kirk v. NCI Leasing, Inc., D.C.Kan.2005, 2005 WL 3115859 (plaintiff failed to allege content of statement, who made statement, and to whom statements were made).

[FN6]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Allegation of falsity required**

Holliday v. Great Atl. & Pac. Tea Co., C.A.8th, 1958, 256 F.2d 297. This case was decided in accordance with Missouri law, which contains such a requirement. It seems to be the only federal decision speaking to this question, and the holding may be inconsistent with the usual rule that truth is an affirmative defense, although truth is not so listed in Rule 8(c). See § 1272. Nevertheless, it may be argued that words are not defamatory unless untrue, and thus a formal allegation of falsity is required in the complaint, even though the defendant will carry the burden of pleading and proving truth.

[FN7]

**Statement of publication sufficient**

A complaint sufficiently charged that the defendant published a libelous article by causing its distribution to news dealers in Spokane. Albi v. Street & Smith Publications, Inc., C.A.9th, 1944, 140 F.2d 310.

Davidson v. Cao, D.C.Mass.2002, 211 F.Supp.2d 264 (magistrate judge).

The allegation that a defamatory telegram concerning the plaintiff was read by the addressee and by him referred to another third party was a sufficient allegation of publication. Lesesne v. Willingham, D.C.S.C.1949, 83 F.Supp. 918.

[FN8]

**Allegation of situs**

When the complaint for libel disclosed that the accused publication went into every state and to members of the armed forces overseas and to all civilized nations and the defendant did not avail itself of means to compel the plaintiff to draw out allegations to the end that the situs of the torts alleged might be restricted to the states of publication or any other particular states, the court treated the allegations as referring to torts committed throughout the United States and the civilized countries. Hartmann v. Time, Inc., C.A.3d, 1947, 166 F.2d 127, 1 A.L.R.2d 370, certiorari denied 68 S.Ct. 1495, 334 U.S. 838, 92 L.Ed. 1763.

[FN9]

**Pleading extrinsic facts**

If a person is not referred to by name in the libelous publication, or in such manner as to be readily identified from the descriptive matter in the publication, extrinsic facts must be alleged showing that a third person understood the publication to refer to the plaintiff. Golden No. Airways, Inc. v. Tanana Publishing Co., C.A.9th, 1954, 218 F.2d 612, 15 Alaska 303.

If the defamatory character of a newspaper article rests on extrinsic facts, those facts should be alleged. Gonzalez v. Hearst Consol. Publications, Inc., D.C.N.Y.1953, 115 F.Supp. 721.

[FN10]

**Pleading special meanings**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Words of allegedly libelous publication must be viewed in terms of their usually accepted meaning and special meanings of a derogatory nature must be specially pleaded in the complaint by way of innuendo, explanation, or colloquium. Dorney v. Dairymen's League Co-op. Ass'n, Inc., D.C.N.J.1957, 149 F.Supp. 615.

Oral statements by a corporate officer or agent concerning the plaintiff were not actionable per se, thus it was necessary for the plaintiff to allege inducement, colloquium, or innuendo. Chambers v. National Battery Co., D.C.Mo.1940, 34 F.Supp. 834.

[FN11]

**Defamation pertained to plaintiff**

Church of Scientology Int'l v. Time Warner, Inc., D.C.N.Y.1992, 806 F.Supp. 1157 (references in article to "church" and "Church of Scientology" could be understood as "of and concerning" the Church of Scientology International).

Allegations by individual members of a large class about whom allegedly libelous statements were written that the matter was written "of and concerning each of them" was insufficient to satisfy the requirement that there be an allegation that the plaintiff was the person defamed by the publication. Neiman-Marcus v. Lait, D.C.N.Y.1952, 13 F.R.D. 311.

In an action by a corporation for alleged libel, the corporation was required to show that the libel contained a false statement or charge concerning itself and not concerning one of its officers, promoters, or principal stockholders. Cal-Therm Indus., Inc. v. Dun & Bradstreet, Inc., D.C.N.Y.1948, 75 F.Supp. 541.

[FN12]

**Necessity of pleading special damages**

A complaint charging a newspaper publisher with libel did not state a cause of action for publishing words that were actionable per quod, in the absence of an allegation showing special damages and actual malice. Schy v. Hearst Pub. Co., C.A.7th, 1953, 205 F.2d 750.

A complaint that the defendants published and circulated false accusations about the plaintiff and that the plaintiff's reputation, character, social standing, and professional career had been ruined and that he suffered embarrassment, humiliation, nervousness, mental anguish, and shock did not plead the special damages suffered with the required particularity. Barton v. Barnett, D.C.Miss.1964, 226 F.Supp. 375.

The court dismissed the slander claim against the defendant because the plaintiff failed to "meet the standard for slander per se" and, in the alternative, did not plead special damages. Daniels v. Alvarado, D.C.N.Y.2004, 2004 WL 502561.

**Special damages sufficiently pleaded**

Although the complaint made general claims of loss of reputation, it also averred that as a result of the allegedly libelous letter the plaintiff "has been and is still being refused normal credit terms by its sup-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pliers" and has expended time, money, and effort to re-establish its credit, and this was a sufficient pleading of special damages. Fleck Bros. Co. v. Sullivan, C.A.7th, 1967, 385 F.2d 223, appeal after remand C.A.7th, 1970, 423 F.2d 155.

**See also**

Rose v. Indianapolis Newspapers, Inc., C.A.7th, 1954, 213 F.2d 227.

Brewer v. Hearst Pub. Co., C.A.7th, 1950, 185 F.2d 846.

Fowler v. Curtis Publishing Co., C.A.1950, 182 F.2d 377, 86 U.S.App.D.C. 349.

[FN13]

**Rule 9(g)**

See vol. 5A, §§ 1310 to 1312.

[FN14]

**Allegation not required**

When a newspaper publication was libelous per se, an allegation of special damages was not essential to make out a cause of action for libel. Stevenson v. Hearst Consol. Publications, Inc., C.A.2d, 1954, 214 F.2d 902, certiorari denied 75 S.Ct. 110, 348 U.S. 874, 99 L.Ed. 688.

**See also**

Estill v. Hearst Publishing Co., C.A.7th, 1951, 186 F.2d 1017.

Sargent v. National Broadcasting Co., D.C.Cal.1955, 136 F.Supp. 560.

[FN15]

**Garcia case**

D.C.Puerto Rico 1951, 97 F.Supp. 5.

[FN16]

**Discussion elsewhere**

See § 1216.

[FN17]

**Simpson case**

D.C.N.Y.1948, 75 F.Supp. 819.

[FN18]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Guaranty Trust case**

1945, 65 S.Ct. 1464, 326 U.S. 99, 89 L.Ed. 2079, 160 A.L.R. 1231.

This case is discussed in vol. 19, § 4504.

[FN19]

**Innuendo**

Under New York law, if the plaintiff would read into a newspaper article something derogatory to his reputation, he should have pleaded an appropriate innuendo. Gonzalez v. Hearst Consol. Publications, Inc., D.C.N.Y.1953, 115 F.Supp. 721.

**Special damages**

Under California law, the special facts that are said to give rise to special damages for libel must be pleaded. Anderson v. Hearst Pub. Co., D.C.Cal.1954, 120 F.Supp. 850.

[FN20]

**Byrd case**

1958, 78 S.Ct. 893, 356 U.S. 525, 2 L.Ed.2d 953.

This case is discussed in vol. 19, § 4504.

[FN21]

**Hanna case**

1965, 85 S.Ct. 1136, 380 U.S. 460, 14 L.Ed.2d 8.

This case is discussed in vol. 19, § 4504.

[FN22]

**Federal law controls**

Andresen v. Diorio, C.A.1st, 2003, 349 F.3d 8, **citing Wright & Miller.**

Caster v. Hennessey, C.A.11th, 1986, 781 F.2d 1569, 1570, **citing Wright & Miller.**

Palladino v. VNA of Southern New Jersey, Inc., D.C.N.J.1999, 68 F.Supp.2d 455.

Mruz v. Caring, Inc., D.C.N.J.1998, 991 F.Supp. 701, **citing Wright & Miller.**

Ford v. Clement, D.C.N.Y.1993, 834 F.Supp. 72, **citing Wright & Miller.**

Liguori v. Alexander, D.C.N.Y.1980, 495 F.Supp. 641, 647, **citing Wright & Miller.**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bleau v. Greater Lynn Mental Health & Retardation Ass'n, D.C.Mass.2005, 371 F.Supp.2d 1, 2005 WL 1330440 (no heightened pleading requirement for defamation claims brought in federal court).

Nickerson v. Communication Workers of America Local 1171, D.C.N.Y.2005, 2005 WL 1331122.

**See also**

Koch v. Saint Francis Medical Center, D.C.Mo.2003, 2003 WL 1960439.

[FN23]

**Erie case**

1938, 58 S.Ct. 817, 304 U.S. 64, 82 L.Ed. 1188, 114 A.L.R. 1487.

The Erie doctrine is discussed in vol. 19, §§ 4501 to 4515.

[FN24]

**Swierkiewicz case**

2002, 122 S.Ct. 992, 534 U.S. 506, 152 L.Ed.2d 1.

This case is discussed in §§ 1216 and 1221.

**See also**

Koch v. Saint Francis Medical Center, D.C.Mo.2003, 2003 WL 1960439 (although dismissing complaint, court recognized that defamation claims are only held to liberal notice pleading standards).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Work.

5 FPP § 1245

END OF DOCUMENT